# EXHIBIT 28 PART 4

of shares in Blades owing to the circumstances in which Prince Abdullah made use of Dr Rakan to find potential investors in Saudi Arabia.

481. There is, in short, no evidence of any financial or other prejudice arising from the fact that Prince Abdullah by agreement with Kevin McCabe used Dr Rakan to find a potential investor in Blades who advanced £3 million as a loan. SUL cannot create a possibility of prejudice by simply asserting (as it did) that the Club could lose support from its bankers, sponsors and fans, or face regulatory difficulties with the Football League, if it was known that Prince Abdullah had wrongly abused his relationship with a Saudi businessman to obtain advantage for SUFC without making full disclosure to the Saudi government. This was, in substance, what SUL's new case on bribery amounts to. The case based on dubious dealings is, necessarily, something less than that and is based on the circumstances leading to the making of the Charwell loan.

482. The only demonstrated potential prejudice to the Club that has arisen from this trial is as a result of the press coverage of the revelation that Blades had borrowed money from the bin Laden family. It was as a result of that that Santander, SUFC's bankers, asked questions about the Charwell loan, including whether due diligence had been done on the ownership of Charwell and whether the loan had been repaid. Santander did not ask whether Prince Abdullah had abused his position of authority to source an investor or whether he had disclosed his relationship with Dr Rakan and the benefit of the introductions to the Saudi authorities. I am confident that SUL's "no stone left unturned" approach to these issues would have placed any such evidence of actual prejudice before me, if there was any.

483. Further, the attempts by Prince Abdullah to find a new investor were made in good faith – with the backing of SUL – in order to benefit the Club. It must be remembered that in autumn 2016, when Project Delta started, the Club was likely to make losses of up to £8 million in the 2016/17 football season and neither shareholder was willing or able to fund such a deficit on a continuing basis. When Prince Abdullah was no longer able to contribute further money after November 2016, the Club was on several occasions on the verge of insolvency and only rescued by the ability of the Scarborough Group to provide small sums at the very last minute. Had the loan of £3 million not been provided, SUFC would either have become insolvent in February 2017 or SUL would have been forced (because Prince Abdullah was unable) to find that extra money and subscribe for more shares, contrary to its intention of passing on the baton to a responsible new owner. The attempts to find a new investor were therefore not only made in good faith but as much if not more for SUL's benefit than for UTB's benefit.

484. Even if there were some prejudice to the interests of SUL as a shareholder for which Prince Abdullah bears responsibility, I would have no hesitation on the facts of this case in concluding that any such prejudice is not unfair to SUL. The reason for that is that Prince Abdullah was acting in good faith, in the best interests of Blades and SUFC, with the encouragement of Kevin McCabe on behalf of SUL, to seek an investor who could buy SUL's shares and the property assets. SUL through the McCabes was fully aware of the circumstances in which Dr Rakan was involved and was able to put Blades in contact with potential investors. As was clear from the evidence, both oral and documentary, SUL expected and wished for Prince Abdullah to use his authority and contacts in Saudi Arabia to assist Blades in that way. As one

example only, on 11 January 2017, after the meetings in Dubai, Kevin McCabe emailed Mr Howard:

> "I better understand the influence HRH has to 'force' a possible transaction involving Sela Sports and their prospective investors … all very friendly and the association with HRH excellent – to 'make it happen' rests with him using his influence and his position of authority"

Prince Abdullah did so in accordance with Kevin McCabe's wishes for the benefit of SUL and UTB.

485. Mr Downes's answer to that conclusion was that SUL had no idea that Prince Abdullah had not regularised the dealings with Dr Rakan by making full disclosure to the Saudi government. But the truth is that the McCabes had no concern with any such matter. They did not ask themselves at any stage whether what was being done was scrupulously proper and did not assume that it was. This is demonstrated by Kevin McCabe's dismissal of Mr Tutton's concern about the Club being at risk of association with dirty money. They were desperate to find a new benefactor for the Club, who could get them off the financial hook for the future, and were only interested in a rich and willing investor coming forward somehow. I find that they would have acted no differently had Prince Abdullah told them in Dubai that he had not disclosed his dealings with Dr Rakan to the Saudi government. In any event, the argument about disclosure only raises again, in a different guise, the same unresolved question of what (if any) disclosure was required under Saudi law.

486. I therefore conclude that the allegedly dubious dealings between Prince Abdullah and Dr Rakan were not unfairly prejudicial to SUL. SUL knowingly supported them, no prejudice was caused by them and, on the contrary, SUL benefited from them. Had they resulted in a full investment by Charwell or others, SUL would have benefited much more substantially, but the investment unfortunately for them did not happen.

487. There is, accordingly, no conduct by Prince Abdullah, UTB or Mr Giansiracusa that can be said to be unfairly prejudicial to Blades such that the Court should grant relief to SUL.

K.   Specific Performance

488. In view of the conclusions that I reached, there is no substance in SUL's argument that service of SUL's Call Option Notice was caused, wholly or in part, by unfairly prejudicial conduct of UTB, Prince Abdullah or Mr Giansiracusa. Service of the Call Option Notice was the result of Kevin McCabe's and his sons' and Mr Tutton's careful assessment of the way in which SUL and other Scarborough Group companies could benefit most from bringing the ISA to an end, in order to sell a majority stake in Blades to ALK.

489. Although SUL could have waited until it had received the benefit of a loan or advance from ALK, Kevin McCabe evidently considered that the time was right immediately after Christmas 2017 to exercise the option. Kevin McCabe had, in my judgment, learnt enough from his conversation with Mr Giansiracusa on 20 December 2017 to persuade him that Prince Abdullah was unlikely to be able to pay for the shares and

property assets within the year that clause 9.1.12 of the ISA required. He therefore judged that an offer for UTB's shares much lower than the £10 million mentioned to Mr Giansiracusa would have a good chance of success, given that UTB had to pay the price for the shares, fund the continuing deficit and then find in the region of £40 million within a year if it were to serve a counternotice. I find that Kevin McCabe had calculated that UTB would feel unable to make any such commitment and so would be unable to serve a counternotice, leaving SUL able to acquire UTB's shares cheaply for £5 million.

490. Kevin McCabe accordingly took the risk that UTB would serve a counternotice, but he undoubtedly believed that if it did so SUL would be paid £5 million for its shares and the Scarborough Group would be entitled to receive another £40 million or so within a year for the property assets. UTB considered that it could serve a counternotice and avoid having to pay for the property assets until it was willing to do so. UTB was wrong in its assessment, for the reasons that I have given. As things have turned out, if specific performance of the contract of sale and purchase is granted, SUL will receive £5 million for its shares and the Scarborough Group now has the benefit of contracts with SUFC under the property call options to sell the property assets. SUL will therefore be - after a delay of a little over a year and a half - in the position in which it should have been in February 2018.

491. In two respects SUL is in a better position. First, in February 2018, SUL and other Scarborough Group companies would have had the benefit of a contract with SUFC that was then a loss-making Championship football club, unable without the support of a new investor to afford to complete the contract. Now, SUFC is a profitable Premier League football club and very likely to be able to afford to buy the property assets. Second, the price payable for the property assets depends on their values as at the date of exercise of the property options. According to SUL's property valuation expert, the values of the main property assets increased between December 2017 and February 2019. It is inherently likely that the property assets have further increased in value as a result of being associated with a Premier League football club, as from April 2019. A higher price will therefore be payable to SUL and other Scarborough Group companies as a result of exercise of the property call options in July 2019 rather than in February 2018.

492. Nevertheless, SUL contends that the Court should exercise its discretion to refuse specific performance of the contract of sale and purchase of SUL's shares in Blades. It also submits that the Court should not award UTB damages in lieu of specific performance because UTB has not claimed damages in lieu of specific performance. I have no hesitation in rejecting the last submission. The Court has jurisdiction to award damages in lieu of specific performance where damages are not expressly claimed, just as it can award damages in lieu of injunctive relief. If the court cannot do so then it is hard to imagine circumstances in which it would be equitable to exercise a discretion to refuse specific performance and leave the claimant with no remedy. The consequence of that, in this case, would be to create a remedy for SUL's mistake about UTB's motives that is otherwise unavailable to SUL as a matter of law.

493. If damages were an adequate remedy for the loss of SUL's shares in Blades the Court might leave UTB to a remedy in damages. However, I consider that damages would not be an adequate remedy for the loss of complete control of Blades and SUFC, particularly as it would leave UTB and SUL deadlocked as 50/50 shareholders of

Blades and provide no effective resolution of their dispute. In any event, damages in lieu would be almost as burdensome to SUL as the loss of the shares, since the starting point for quantifying the value of the contract of sale and purchase would be the difference between the value of the shares to a purchaser in the position of UTB and the £5 million to be paid for them. Since the Club is now a Premier League football club worth in the region of £100 million, that could leave SUL paying up to £45 million in damages. UTB's submissions do not grapple with the implication and quantum of damages in lieu of specific performance except by arguing that damages in lieu should not be awarded.

494. The grounds on which SUL contends that the Court should refuse specific performance are: that damages are an adequate remedy; that UTB unfairly took advantage of a mistake made by SUL and so does not come to court with clean hands; and that specific performance would cause great hardship to SUL because of the change in circumstances since January 2018, namely that the Club (and so the shares in Blades) are now worth very substantially more than they were worth in December 2017 when SUL served the Call Option Notice and took the risk of being bought out for £5 million.

495. In my judgment damages are not an adequate remedy for UTB for the reasons to which I have alluded. Moreover, in clause 20.1 of the ISA, the parties expressly agreed that damages are not an adequate remedy for breach of obligations under the ISA. While not determinative, that agreement reflects the importance of performance according to the terms of the ISA, which includes the call option provisions of clause 11. Shares in a limited company are a form of property and many limited companies are unique in the same way that a parcel of real property is unique. The shares in Blades carry with them control of SUFC, a company that runs a famous football club, ownership of which confers all kinds of non-financial benefits that people such as Kevin McCabe and Prince Abdullah find attractive and rewarding irrespective of financial gain or loss. An award of damages would not be adequate compensation to UTB for loss of these benefits, especially as it would leave UTB deadlocked with SUL in a non-functioning relationship as joint owners, without any form of shareholder agreement for the future.

496. SUL made a mistake about the motives of UTB and UTB tried to take advantage of that mistake but in the event it has failed to do so. Had I concluded that UTB succeeded in avoiding clause 9.1.12 of the ISA in breach of contract, so that it was entitled to buy the shares in Blades of SUL but not obliged to trigger the property call options, I would have refused specific performance except on terms that the property call options were exercised. I would have done so on the basis that the court would otherwise confer on UTB a benefit obtained by a breach of the ISA that it was never intended that it would have, to the great disadvantage of SUL. However, apart from the fact that SUFC has exercised the property call options, my decision that UTB was unsuccessful in avoiding clause 9.1.12 means that, on completion of the contract of sale and purchase, UTB would have been bound to cause SUFC to exercise the property call options. In fact, the property call options were exercised in July 2019 and SUL is therefore in the same position (apart from about 18 months' delay – which as pointed out above is not wholly disadvantageous to it) as it would have been in if UTB had not attempted to avoid clause 9.1.12. SUL will therefore not be disadvantaged in consequence of any mistake that it made or UTB's attempt to take

advantage of any such mistake. There is therefore no reason in this case to refuse specific performance on grounds of prejudice caused by SUL's mistake.

497. As for hardship and change of circumstances, SUL is wrong to contend that there has been a fundamental change in the subject matter of the contract of sale and purchase during the period of delay in its completion. It is also wrong to contend that UTB will obtain a windfall or something more than the performance due to it. There has been no change in subject matter and there is no undeserved windfall. SUL served the Call Option Notice putting a value of £5 million on 50% of the shares of Blades. It did so in the knowledge that Blades had a short-term objective of achieving Premier League status for the Club and a reasonably good chance of achieving that objective. The fact that the Club then did so, at the end of the following season, is no material change in circumstances. What changed is the value of the shares as a result of promotion being acheived, but SUL knew that the price for the shares was fixed by the terms of the Call Option Notice that it served and knew that the Club might be promoted.

498. SUL is not able to – and does not – contend that the change in the value of Blades shares was attributable to anything that it rather than UTB did during the period of delay in completion. Both SUL and UTB injected a further £1 million each into Blades in April 2018, to enable it to repay the Charwell loan, and this was done on the basis that the eventual "loser" in the litigation would have its contribution treated as a loan to Blades. There was no evidence of any further investment by either owner subsequently to April 2018. SUL does not contend that it rather than UTB was responsible for the success of the Club in achieving promotion. Rather, it appears that the success was down to the considerable skill of the Club's independent management and executives.

499. In those circumstances, the change in the value of Blades' shares since February 2018 is not the result of any work or investment of SUL, which would make it unjust to enforce the contract of sale and purchase without taking that work or investment into account. SUL was always prepared to take the risk of having to sell half the shares in a football club that could (and in the view of Kevin McCabe should and deserved to) be promoted to the Premier League. It was a calculated risk. The consolation, if the risk eventuated, was that SUFC would have to buy the property assets. That is what will now happen. In that sense, SUL has obtained that which it was prepared to accept when it served the Call Option Notice. It cannot in my judgment be heard to say that circumstances have changed because the subject matter of the contract is now more valuable. The position would have been the same in reverse if UTB had not served a counternotice but had disputed the validity of the Call Option Notice on different grounds, resulting in litigation and a delay in completion. UTB could not in such circumstances expect to resist specific performance of the contract to sell its shares for £5 million on the ground of an increase in the value of the shares in the meantime.

500. Patel v Ali [1984] Ch 283, on which SUL relies, was a wholly different case in which a vendor's personal health and circumstances had so declined during a four-year delay that enforcing the contract of sale and purchase of her house would have created great personal hardship for her. Had Mrs Ali sought to resist specific performance on the ground that her house had significantly increased in value during the four years, I have no doubt that the argument would have been swiftly rejected.

501. SUL seek to contend that UTB will obtain a windfall and that specific performance will therefore operate harshly and oppressively to SUL, but this is merely another way of formulating the same argument. UTB would only obtain a windfall if the increase in the value of the shares was the result of something that SUL rather than UTB had done during the period of delay, or possibly something caused by the delay itself. Unless UTB would promptly have sold its shares in Blades to a third party for a low price, reflecting Championship status, UTB will obtain the same benefit today as if the contract had been completed in February 2018 and the Club's management and executives had achieved promotion in 2019. SUL has not argued or sought to prove that UTB would have sold the shares in 2018 to anyone that it did not control (UTB 2018 will hold its shares on resulting trust for UTB and is otherwise controlled by Prince Abdullah and UTB has the option to take back from Prince Musa'ad and Mr Giansiracusa the shares that were to be transferred by SUL to them). SUL does assert that UTB will obtain a windfall because it will now seek to sell the Club to a third party at a large profit, but in my judgment even if that is true it is an irrelevance: whether UTB intends to keep its shares or sell them is a matter for it and, regardless of its choice, it will have an asset of the same value.

502. Accordingly, for the above reasons, I reject the argument that any change in circumstances makes it oppressive to SUL to enforce the contract for sale and purchase of its shares in Blades for £5 million. The true position here is that SUL will get, as a result of the delay, more than it was prepared to accept when it served the Call Option Notice: a better prospect of the property call options being completed by SUFC on time for a higher price. There is nothing inequitable about enforcing the contract simply because SUL misjudged the risk of UTB serving a counternotice and the shares increasing in value. There is no relevant change of circumstances that makes enforcement oppressive or unduly harsh.

503. As for the doctrine of clean hands, it is true that UTB comes to court seeking equitable relief in circumstances in which it has acted in repudiatory breach of the ISA by stating that it would not execute the property option notices on completion of the contract of sale and purchase. Further, it has admitted that it was aware that SUL must have specified a price of £5 million believing that the property call options would be triggered and that it attempted to take advantage of that mistake. These circumstances call for a careful consideration of whether a court of equity should decline to grant UTB the equitable remedy that it seeks.

504. UTB's attempt to evade clause 9.1.12 was unsuccessful. SUL has not in fact been prejudiced by what UTB did. SUL has to sell its shares in Blades for £5 million because of the terms of clause 11 of the ISA and the price that it chose to specify in the Call Option Notice. This was a low price and SUL hoped that UTB would feel compelled to accept the low price. As it was put in submissions, SUL was "playing hard ball" and UTB was entitled to seek to make the terms of the ISA work in its favour, without regard for SUL's interests, so far as it lawfully could. It was fully entitled to serve a counternotice and take advantage of the low offer. It was mistaken in thinking that it could acquire SUL's shares and not trigger clause 9.1.12.

505. I have accepted Mr Giansiracusa's and Prince Abdullah's evidence that UTB only decided on 10 January 2018 to serve a counternotice. That was at a time when the only "avoidance" device that it had in mind was nominating transferees of SUL's shares other than UTB. For reasons already given that would not have meant that

UTB did not "acquire" SUL's shares; nevertheless UTB was entitled to sub-sell the shares and expressly permitted by the ISA to direct SUL to transfer the shares to others. It is not therefore the case that UTB only served a counternotice because it had devised the Scheme and would otherwise not have served a counternotice. SUL did not plead or seek to establish that UTB would not have served a counternotice if it had believed that it must comply with clause 9.1.12.

506. A claimant for specific performance of a contract is not disqualified from equitable relief merely because it has done wrong to the defendant. It must be something wrong that relates to the contract that the claimant seeks to enforce, such that it would be against conscience for the court to grant the particular relief sought. Although UTB sought to avoid an obligation owed under the ISA, nothing that it did wrong affected the formation or terms of the contract of sale and purchase of Blades shares. SUL freely chose to serve the Call Option Notice and UTB was entitled to serve a counternotice for any reason, giving it the right to purchase SUL's shares in Blades. The Scheme did not affect the service of the Counternotice, save perhaps the exact timing of it, but that was irrelevant to the formation of the contract of sale and purchase. Although UTB then wrongly refused to execute the property call option notices until it chose to do so, that was a breach of contract whose effect on SUL was, as it turns out, only temporary.

507. By ordering specific performance of the contract of sale and purchase, the Court will not be conferring any advantage on UTB that it has wrongfully acquired, except as regards the timing of the purchase of the property assets. It is true that delay in having to pay for the property assets has benefited UTB in the sense that UTB will probably not now have to sell an interest to another investor or borrow large sums of money in order to cause SUFC to comply with its obligations. On the other hand, the price that SUFC will have to pay has probably increased as a result of the delay. In that way, the delay in sale and purchase of the property assets has benefited both UTB and SUL for different reasons.

508. The right that UTB seeks to enforce arises directly from service of the Counternotice. UTB resolved on 10 January 2018 to serve a counternotice. That was not dependent on the Scheme because Mr Giansiracusa did not think of that until 22 January 2018. It is not the case therefore that the decision was taken and the Counternotice was served only because UTB intended to act in breach of the ISA. As at 10 January 2018, UTB intended to act pursuant to the express terms of the ISA by requiring transfer of some of SUL's shares to persons other than UTB. The only breaches of contract occurred on 31 January 2018. It is therefore not the case that the rights that UTB seeks to enforce depend on a breach of contract, an intention to breach a contract or on any other wrong. The only breaches of contract followed the accrual of UTB's rights under the contract of sale and purchase.

509. By granting specific performance, the Court will be placing both parties in the position that SUL had bound itself to accept when it served the Call Option Notice and knowingly took the risk that UTB might serve a counternotice. The only difference is the delay. In my judgment, the "unclean hands" of UTB arising from its breach of the ISA on 31 January 2018 therefore do not infect its equitable claim to enforce the contract of sale and purchase. The grant of specific performance does more complete justice to the substantive rights of the parties than refusing it would do. Refusing specific performance would leave both parties in a very difficult

position with Blades and SUFC deadlocked without the benefit of the ISA; with an obligation on SUFC to buy the property assets by July 2020, and with a liability of SUL to compensate UTB for the value of the 50% of Blades shares that UTB will not receive. This would, in my judgment, be highly likely to lead to further disputes and litigation, to the inevitable harm of others interested in the Club. It is therefore not unconscionable to grant the relief that UTB seeks.

510. For these reasons, I will not refuse UTB specific performance of the contract of sale and purchase on account of its anticipatory breach of the ISA and its attempt to obtain an advantage of buying SUL's shares without triggering the property call options.

511. In closing, Mr Downes QC submitted that of the possible and available outcomes in this case only two are fair outcomes: allowing SUL to buy the shares in Blades owned by UTB or UTB 2018 at full value, and ordering a re-run of the clause 11 option notice procedure but with UTB forced to serve the option notice. He recognised that although leaving each party with a 50% holding might be said to be fair it was nevertheless an unsatisfactory outcome. Both the outcomes preferred by Mr Downes depend on SUL establishing unfairly prejudicial conduct of UTB, Prince Abdullah and/or Mr Giansiracusa, which merit the grant of relief of that nature, but for the reasons that I have given no such conduct meriting relief of any kind has been established.

512. SUL's characterising as unfair the outcome of one side acquiring the other's shareholding for £5 million is in substance the same argument of change in circumstances or windfall that I have already addressed. SUL sought the advantage of acquiring (and took the risk of having to sell) a 50% holding in Blades for what might turn out to be much less than its true value at a later date, but this was inherent in the clause 11 procedure that allowed both parties to seek to balance that advantage and risk as they saw fit. There is nothing inherently unfair in enforcing the contract of sale and purchase that arose from the terms of the Call Option Notice and Counternotice, once it is established that neither was served as a result of unlawful conduct.

513. Mr Downes also sought to persuade me that it would be damaging to the interests of the Club to allow UTB to obtain full control at the expense of SUL, on the basis that Kevin McCabe is much valued by the staff, executives and manager of the Club as well as by the supporters, whereas Prince Abdullah and the UTB-appointed directors are relatively unknown and might be disliked as having been the instruments of Kevin McCabe's removal. The basis for this argument was one character witness, Peter Beeby, and the evidence of Mr Bettis. Mr Beeby is a supporter who has known Kevin McCabe for upwards of 20 years. He spoke in glowing terms of the benefits that Kevin McCabe has brought to the Club and the regard in which he is held. Mr Bettis said, in one-word answers to many leading questions, what a force for good Kevin McCabe had been and how his removal might be unsettling. However, Mr Beeby had nothing adverse to say about Prince Abdullah's involvement in the Club or about UTB, and it was clear that Mr Bettis has an equal regard for the management qualities that UTB brings to Blades and SUFC and that he is on equally good terms with Prince Abdullah and Mr Giansiracusa. I have already concluded that, despite the conduct of both of the disputing owners, the Club has been successful recently because of the strength of the independent management and executives of the Club.

514. In any event, mere speculation about what impact certain outcomes or this judgment as a whole may have on those associated with the Club cannot be a proper basis for granting or withholding relief that is otherwise appropriate. This judgment and my decision are based on the merits of the underlying dispute between the two owners of the Club.

L. Postscript: Valuation Evidence

515. The parties prepared and served evidence from expert valuers on the value of the property assets that were subject to the property call options and on the value of the shares of Blades at three different times: about the time that the Call Option Notice was served, in March 2019, shortly before the start of the trial in April 2019, and in June 2019. In the event, after SUFC agreed to exercise the property call options after the start of the trial, it was agreed that it was unnecessary to call the property valuers on the basis that resolution of any disagreement in their evidence had become irrelevant to the issues to be decided at trial. The reports prepared by the property valuers were admitted as written evidence but in the event neither side needed to rely on that evidence in their closing submissions.

516. I heard oral evidence from the two share valuation experts, Mr Nicholas Good FCA, a partner in KPMG LLP, who was called on behalf of SUL, and Mr Douglas Harmer ACA, a former KPMG employee and now a director of Oakwell Capital Ltd, who was called on behalf of the UTB parties. The evidence of these expert witnesses would have been material had I awarded SUL the relief that it claimed in its Petition, namely an order that SUL buy the shares of UTB in Blades at their current value, or similar relief. However, I have held that the contract of sale and purchase of SUL's shares in Blades should be enforced and that no relief should be granted on account of unfairly prejudicial conduct alleged by SUL. In those circumstances, the valuation evidence was only of peripheral relevance to my conclusions.

517. In case it later becomes material, I express briefly below my conclusions on the valuation evidence, in so far as it remained a matter of dispute.

518. Mr Harmer in his reports had valued Blades and 50% of the shares in Blades at late December 2017, March 2019 and – in a supplementary report – June 2019. The significance of the latter date is of course that by then (but not in March 2019) SUFC had secured promotion to the Premier League. Mr Good similarly addressed the values in late December 2017 and March 2019 in his original report and valued at June 2019 in a supplementary report.

519. Mr Harmer valued Blades at between £21 million and £25 million in 2017 and Mr Good at between £35 million and £40 million. Mr Harmer valued in March 2019 at £24 million to £29 million and Mr Good at £30 million to £35 million. The current value of Blades with the Club promoted to the Premier League was put in the range of £100 million to £120 million by Mr Harmer and between £88 million and £104 million by Mr Good. Each of the valuers considered that a 50% holding of Blades shares would attract a significant discount from pro rata value, on a sale to a third party, on account of the absence of control over the company.

520. Mr Harmer and Mr Good were quite different as valuers. Mr Good was an orthodox professional valuer, who had only limited experience of working with football clubs

135

and no particular expertise in the football world, but who relied on colleagues for specialist knowledge. His valuations were rigorous and careful and he impressed me as a highly competent and professional man, appropriately cautious and reasoned in his approach, and aware of the limtits to his own knowledge and of the difficulties of valuing a football club. Mr Harmer, on the other hand, was deeply immersed and actively involved in the world of transactions in football clubs and their shares, but was not otherwise an expert in forensic accountancy. His report was thin on reasoning and he was unimpressive as a professional valuer, failing to address and answer properly most of the questions that were put to him. In the final analysis he relied on his gut feel for the right value, based on his experience of the sector and the market.

521. I was more impressed with the valuations of Mr Good, in particular with his approach to valuing the risk that a newly-promoted club could be relegated within one or two seasons, but I considered that one aspect of his approach was unpersuasive in that regard. This was his partial reliance on betting odds in forming a judgment on the appropriate discount to the value of a well-established Premier League club of the size of SUFC. I consider that a discount of 50%, based on the historic evidence of the fortunes of newly-promoted Premier League clubs, is much more reliable than the bookmakers odds of SUFC specifically being relegated within 2 seasons. Accordingly, I would incline towards the top of Mr Good's range of £88 million to £104 million, rather than the bottom of it (which resulted from the bookmakers' odds being converted into a discount).

522. Mr Harmer's reasoning, apparently based on a table of multiples of revenue that he considered appropriate to a loss-making business, ultimately did not influence his opinion that the current value of Blades was in the range of £100 million to £120 million. Rather, the multiple that he considered appropriate was derived form his gut feeling that applying the median multiple from his table produced too high a value for the Club, rather than the value being derived from the appropriately selected multiple. I do however have some regard for Mr Harmer's considerable experience of what is an unusual market. In my judgment his gut feel is of some persuasive value, given his experience, though the range of values that he gives is a broad one.

523. Mr Harmer expressed the opinion, which I accept, that in the real world a transaction for Blades shares would not have happened in March 2019, because the difference in value between a Championship club and a Premier League club is very great and any seller and buyer would want to know whether or not the Club achieved the promotion in April 2019 that in March it was on course but not certain to achieve. I also accept his opinion that in reality a one-off payment would not be made for a newly-promoted club but that the consideration would be structured so that further tranches became payable if the club survived one, two or more years in the Premier League. Nevertheless, the issues that the valuers were asked to address were the market value of Blades and holdings in Blades on particular dates, which requires one to assess the cash consideration that would be paid in full on the completion date of the transaction.

524. Having heard both valuers, my conclusion is that the most likely market value of Blades in June 2019 was £104 million, a figure at the top of Mr Good's range of values but still within Mr Harmer's range.

525. Mr Downes QC on behalf of SUL, having successfully undermined in cross-examination the methodology contained in Mr Harmer's reports, then sought to persuade him that the best evidence of the value of Blades in June 2019 was not his overall gut feel for value but an amount based on the figures for which two other Premier League clubs (with which Mr Harmer is currently involved) are being offered on the market and on the non-binding terms agreed on 1 April 2019 between SUL and ALK for the sale of a majority stake in Blades. Mr Downes also sought to abandon reliance on SUL's own expert, Mr Good, on the basis that he did not have sufficient knowledge of actual deals being discussed in the market, of which Mr Harmer was aware.

526. I found these attempts to try to justify the highest possible figure on any available basis unpersuasive. Mr Harmer's knowledge of the dealings involving the two other Premier League clubs would have been taken into account in the range of values that he expressed in his supplementary report, since the relevant facts were known to him at the time. Further, these were values at which no deal had taken place and, in the case of one of them, no interest had been expressed. ALK's terms were not binding, involved a number of "kickers" (staged payments) depending on how long the Club remained in the Premier League, and included very substantial sums paid upfront for the property assets, including assets not owned by SUFC or Blades.

527. If it became material to consider the value of Blades in December 2017 or March 2019, I would accept the opinion of Mr Good as to the appropriate range of values, namely £35 million to £40 million in December 2017 and £30 million to £35 million in March 2019 and would determine a value in the middle of each range. Although it appears odd that the value of Blades - at a time when the Club was close to securing promotion - is lower than the value at a time when promotion was merely speculative, the reason, as Mr Good explained, is that SUFC owned one very valuable player at the earlier time, who was sold at the end of the 2017/18 season for in the region of £12 million in total. With a loss-making Championship club, the value of the club is essentially based on the value of its players and any property assets that it owns. In my judgment, Mr Harmer significantly undervalued Blades in March 2019 at a time when promotion was almost within its grasp because he entirely disregarded that prospect in his valuation approach.

528. The valuers appear to agree that 50% of the shares in Blades would be worth on the open market only about one-third of the net asset value of Blades. The discount arises because a 50% holding does not carry with it any control over the company's affairs. The special value attributable to a possible purchase by the other existing shareholder would be disregarded on a valuation on a market value basis, though in reality in many circumstances an existing shareholder would be likely to pay more than the market value.

M. Summary of Conclusions

529. Blades is not a quasi-partnership and the terms of the ISA are not subject to an implied term that each of the shareholders is to deal with the other in good faith. In any event, no such implied term applies once one of the shareholders is about to serve or has served a Call Option Notice under clause 11 or a Roulette Notice under clause 10 of the ISA.

530. There is a term to be implied in the ISA that UTB must not wilfully obstruct or hinder the operation of clause 9.1.12 of the ISA in connection with the exercise of rights under clause 10 or clause 11 to purchase the shares of SUL.

531. The contract of sale and purchase of SUL's shares in Blades that arose on 26 January 2018 cannot be set aside on the ground of any mistake made by SUL in serving the Call Option Notice on 29 December 2017.

532. UTB was not in breach of the ISA prior to service of its counternotice dated 26 January 2018 and did not conspire with Prince Abdullah and/or Mr Giansiracusa to use unlawful means to cause harm to SUL.

533. UTB's attempt to avoid the operation of clause 9.1.12 was unsuccessful. It will "acquire" the shares of SUL in Blades within the meaning of clause 9.1.12 on completion of the contract of sale and purchase of SUL's shareholding and would have been obliged to cause SUFC to execute property call option notices had the contract of sale and purchase completed on time.

534. UTB was in repudiatory breach of the ISA by refusing on 31 January 2018 to execute property call option notices and the ISA was terminated by SUL on 6 February 2018.

535. No loss that is the subject of any claim by SUL has been caused by UTB's repudiatory breach of the ISA because UTB agreed in April 2019 to cause SUFC to exercise the property call options in April 2019 and SUFC did so in July 2019.

536. Save for a minor respect in which no harm was caused and no relief is appropriate, none of Prince Abdullah, Mr Giansiracusa and UTB have conducted the affairs of Blades in a manner unfairly prejudicial to the interests of SUL as a shareholder in Blades.

537. The contract of sale and purchase of SUL's shares in Blades was unaffected by termination of the ISA and should be specifically enforced, since damages are not an adequate remedy for UTB, with the consequence that SUL must complete the sale of its shares in Blades to UTB for £5 million. As a consequence of the exercise of the property call options, SUFC must acquire the property assets pursuant to the property call options by July 2020.

538. The additional claim for damages for breach of contract and for conspiracy to cause harm to SUL is dismissed.