# EXHIBIT 29

HOUSE OF LORDS

SESSION 2007–08
**[2008] UKHL 55**

*on appeal from: [2006]EWCA Civ 1139*

# OPINIONS

# OF THE LORDS OF APPEAL

# FOR JUDGMENT IN THE CAUSE

## Yeoman's Row Management Limited (Appellants) and another *v* Cobbe (Respondent)

**Appellate Committee**

**Lord Hoffmann
Lord Scott of Foscote
Lord Walker of Gestingthorpe
Lord Brown of Eaton-under-Heywood
Lord Mance**

**Counsel**

*Appellants*:
Nicholas Dowding QC
Timothy Morshead

*Respondent*:
Thomas Ivory QC
Myriam Stacey

(Instructed by DLA Piper UK LLP)

(Instructed by Bird & Bird)

*Hearing dates:*
4 and 5 JUNE 2008

ON
WEDNESDAY 30 JULY 2008

## HOUSE OF LORDS

## OPINIONS OF THE LORDS OF APPEAL FOR JUDGMENT
## IN THE CAUSE

### Yeoman's Row Management Limited (Appellants) and another *v* Cobbe (Respondent)

### [2008] UKHL 55

### LORD HOFFMANN

My Lords,

1.     I have had the advantage of reading in draft the speech of my noble and learned friend Lord Scott of Foscote.  For the reasons he gives, with which I agree, I too would allow this appeal.

### LORD SCOTT OF FOSCOTE

My Lords,

*Introduction*

2.     The essence of the problem to be resolved in this case can be quite shortly stated.  A is the owner of land with potential for residential development and enters into negotiations with B for the sale of the land to B.  They reach an oral "agreement in principle" on the core terms of the sale but no written contract, or even a draft contract for discussion, is produced.  There remain some terms still to be agreed.  The structure of the agreement in principle that A and B have reached is that B, at his own expense, will make and prosecute an application for the desired residential development and that, if the desired planning permission is

obtained, A will sell the land to B, or more probably to a company nominated by B, for an agreed up-front price, £x. B will then, again at his own expense, develop the land in accordance with the planning permission, sell off the residential units, and, when the gross proceeds of sale received by B equals £2x, any further gross proceeds of sale will be divided equally between A and B. Pursuant to this agreement in principle B makes and prosecutes an application for planning permission for the residential development that A and he have agreed upon. B is encouraged by A to do so. In doing so B spends a considerable sum of money as well, of course, as a considerable amount of time. The application is successful and the desired planning permission is obtained. A then seeks to re-negotiate the core financial terms of the sale, asking, in particular, for a substantial increase in the sum of money that would represent £x. B is unwilling to commit himself to the proposed new financial terms and A is unwilling to proceed on the basis of the originally agreed financial terms. So B commences legal proceedings. The question for your Lordships is what relief, in the circumstances described, B should be granted, for, I believe, none of your Lordships considers that he would not be entitled to any.

3. A number of possible bases for the grant of relief to B need to be considered.

(i) First, there is proprietary estoppel. B has, with the encouragement of A, spent time and money in obtaining the planning permission and has done so, to the knowledge of A, in reliance on the oral agreement in principle and in the expectation that, following the grant of the planning permission, a formal written agreement for the sale of the property, incorporating the core financial terms that had already been agreed and any other terms necessary for or incidental to the implementation of the core terms, would be entered into. In these circumstances, it could be, and has been, argued, A should be held to be estopped from denying that B had acquired a proprietary interest in the property and a court of equity should grant B the relief necessary to reflect B's expectations.

(ii) Second, there is constructive trust. In circumstances such as those described, equity can, it is suggested, give effect to the joint venture agreed upon by A and B by treating A as holding the property upon a constructive trust for himself and B, with A and B taking beneficial interests calculated to enable effect to be given to B's expectations engendered by the agreement in principle.

(iii) Third, there is unjust enrichment. The grant of planning permission, obtained by B at his expense and through the deployment of his time and planning expertise, has increased the value of the property. So A has been enriched at the expense of B and, since it was A's

2

repudiation of the oral agreement in principle that frustrated the basis upon which B had been relying, perhaps unjustly enriched.

(iv) Fourthly, there is the question of a *quantum meruit.* B has supplied valuable services to A in obtaining planning permission for the benefit of A's property. There is no question of the services having been provided gratuitously but no fee for the services was agreed between A and B. B's reward was supposed to have been the conclusion of an enforceable contract. In these circumstances a *quantum meruit*, taking into account the amount of B's expenditure of time and money and the value of the services, can, it could be argued, be fixed by the court.

(v) Fifthly, the arrangement between A and B for the sale of the property to B can be regarded as involving two stages. The first stage is the making and prosecution by B at his own expense of the application for the grant of planning permission. This stage constitutes, in effect, the consideration given by B to A in return for A's promise, if planning permission is granted, to enter into a formal written contract of sale embodying, *inter alia*, the core financial terms that had already been agreed. A's promise, being no more than an oral promise to enter into a written contract and, moreover, part of an incompletely negotiated agreement, is not contractually enforceable but A's repudiation of that promise, after B had supplied his first stage consideration and the planning permission had been granted, would, it could be argued, constitute a complete failure of the consideration that A was to have given, and entitle B to a restitutionary remedy.

(vi) Finally, in circumstances such as those described the possibility of a remedy in damages for the tort of deceit must be kept in mind. If A represented to B that he was willing to enter into a written agreement, or regarded himself as bound by an oral agreement embodying the core financial terms that had already been agreed, and so represented at a time when he, A, had already decided to repudiate those terms and demand better ones, B, if and to the extent that he had acted on those false representations and thereby suffered loss, would have an action in deceit for damages.

4.    Two features of these possible remedies are worth noticing. First, both the proprietary estoppel claim and the constructive trust claim are claims to a proprietary interest in the property. The other remedies do not require proprietary claims but follow upon *in personam* claims for compensation or restitution. Second, a proprietary estoppel claim and a constructive trust claim would constitute, if successful, a means whereby B could obtain a remedy providing him with a benefit more or less equivalent to the benefit he expected to obtain from the oral and

inchoate agreement; in effect a benefit based on the value of his non-contractual expectation. By way of contrast, an unjust enrichment remedy, a *quantum meruit* remedy and a consideration that has wholly failed remedy are essentially restitutionary in character, concentrating not at all on the value of the expected benefit of which B has been deprived but, as the case may be, on the extent of A's enrichment at B's expense, on the value of B's services or on the amount or value of the consideration provided by B to A. And a tortious remedy for deceit would concentrate on the loss caused to B in acting on A's false representation and would seek to restore him to the position in which he would have been if the false representation had never been made. One of the main issues for your Lordships to decide on this appeal is, in my opinion, whether B should be held entitled to a proprietary remedy based on the extent of his disappointed expectations or to an *in personam* remedy of, using the adjective fairly loosely, a restitutionary character. The question of a remedy in deceit does not arise, for no allegation of fraudulent misrepresentation has been made, but the conceptual possibilities of such a claim are useful to keep in mind. It is very well established that the remedy for a fraudulent misrepresentation inducing a contract is, besides rescission of the contract if the victim so elects, a tortious action in deceit for damages for any loss thereby caused; and that, unless the representation has become a term of the contract, the victim is not entitled to claim damages measured by the loss of the benefit he would have obtained if the representation had been true, i.e. he is not entitled to contractual damages.

*The Facts*

5.     A, in the present case, is the appellant company, Yeoman's Row Management Ltd. B is the respondent, Mr Cobbe. He is an experienced property developer. The property in question consists of a block of, originally, thirteen flats, one of which has, since 1983, been the home of Mrs Lisle-Mainwaring and, until his fairly recent death, her husband. In about 1986 Mr and Mrs Lisle-Mainwaring, no doubt recognising the development potential of the property, decided to purchase it. They used the appellant company, of which they were the directors and shareholders, as the vehicle by means of which to do so. First, however, Mrs Lisle-Mainwaring acquired a long leasehold interest in her flat (and, later, two other flats with which her flat was then physically combined into one unit). Then, in April 1998, the property was transferred to the appellant company subject to Mrs Lisle-Mainwaring's long lease and to the tenancies of the other flats, five of which were held on Rent Act protected tenancies.     Negotiations with Mr Cobbe about the development of the property began in February 2001. It was Mrs Lisle-

4

Mainwaring who, on behalf of the appellant, played the leading role in the negotiations that led, towards the end of 2002, to an oral agreement in principle being reached between her and Mr Cobbe. This agreement replaced an earlier agreement in principle that she and Mr Cobbe had reached and is, for that reason, referred to in the judgments of the trial judge, Etherton J, and Mummery LJ in the Court of Appeal as "the second agreement". I shall, for convenience, also do so.

6.      The substance of the second agreement was (i) that Mr Cobbe, at his own expense, would apply for planning permission to demolish the existing block of flats and to erect, in its place, a terrace of six houses, (ii) that, upon the grant of planning permission and the obtaining of vacant possession, the property would be sold to Mr Cobbe, or to a company nominated by him, for an up-front payment to the appellant of £12 million, (iii) and that Mr Cobbe, or the nominee company, would develop the property in accordance with the planning permission and (iv) would sell the six houses and pay to the appellant 50 per cent of the amount, if any, by which the gross proceeds of sale exceeded £24 million. So, in effect, Mr Cobbe was to take the risk, first, that planning permission might be refused, in which case his expenditure and time spent in seeking to obtain the planning permission would be wasted, and, secondly, that the gross proceeds of sale, after deduction of the cost of obtaining planning permission, the £12 million and the building and other costs of development, might leave him with an inadequate profit or even none at all. The amount that he, or his nominee company, would have to pay as the up-front price would clearly have constituted an important element in his calculations.

7.      The oral agreement in principle that had been reached, i.e. the core terms, did not cover everything that would have been expected in due course to be dealt with in a formal written contract. It must have been expected, for example, that Mrs Lisle-Mainwaring would have wanted some provision to be included in the formal contract regarding the reasonably expeditious commencement and progress of the development and, also, some security and timetable for the payment of the appellant's share of the excess over £24 million of the gross proceeds of sale. The nature of the transaction would plainly have excluded reliance on a vendor's lien. Mr Cobbe, for his part, would probably have wanted some contractual assurance as to the timing of the availability of vacant possession of the block of flats. These would not have been expected to have been difficult matters on which to reach agreement but were all matters for future discussion, and the outcome of future negotiations has always an inherent uncertainty.

8. Planning permission for the demolition of the existing block of flats and the erection of a terrace of six houses on the site was formally granted on 5 April 2004 but the Council resolution approving the grant had been passed on 17 March 2004 and Mrs Lisle-Mainwaring on 18 March announced her dissatisfaction with the financial terms of the second agreement and demanded an up-front price of £20 million in place of the originally agreed £12 million. She suggested that the appellant's share of the proceeds of sale of the development should become 40 per cent of the amount by which the gross proceeds exceeded £40 million. Mr Cobbe at first agreed to these changes but subsequently, after further reflection on the commercial implications, withdrew his agreement, and insisted on adherence to the financial terms of the second agreement. Mrs Lisle-Mainwaring refused to proceed on those terms and the *impasse* led to Mr Cobbe commencing the proceedings which are now before the House.

*The proceedings in the courts below*

9. Mr Cobbe's claim, as originally pleaded, sought specific performance and damages for breach of contract, i.e. contractual relief. However, at the outset of the trial on liability, on 18 January 2005, these contractual claims were abandoned. Section 2 of the Law of Property (Miscellaneous Provisions) Act 1989 made them untenable -

"2(1) A contract for the sale or other disposition of an interest in land can only be made in writing…"

But section 2(5) of the 1989 Act says that

"… nothing in this section affects the creation or operation of resulting, implied or constructive trusts."

and Mr Cobbe, with the permission of Etherton J, amended his pleadings in order to substitute for the claims he had abandoned claims for declarations that the appellant held the property on constructive trust for itself and him and was estopped from denying that he had an interest in the property, with, in each case, consequential relief. He added, also, a claim for an inquiry into the time he had spent and expenditure he had incurred in obtaining planning permission and, following that inquiry, "… such restitution as the court considers just". These amended claims left it, in my opinion, open to the court, if the proprietary estoppel and

6

constructive trust bases of claim should fail, to award relief on the basis of unjust enrichment, or a *quantum meruit*, or a consideration that had wholly failed.

10.   Etherton J held, on 25 February 2005, that the conditions for proprietary estoppel were satisfied and that the minimum equity to do justice to Mr Cobbe required that he be awarded one-half of the increase in value of the property brought about by the grant of planning permission and that he be granted a lien over the property to secure that interest. The judge held, also, that Mr Cobbe would have been entitled to relief on his constructive trust claim but that relief on the basis of proprietary estoppel was the more satisfactory way of satisfying the equity to which the facts of the case entitled him. The judge did not, therefore, find it necessary to deal with Mr Cobbe's alternative claim in restitution. By a later supplemental judgment, given on 12 August 2005, the judge directed that, for the purpose of assessing the increase in value of the property attributable to the planning permission, the valuation of the property was to be on a vacant possession basis. In addition, the judge extended the scope of the lien so as to include Mrs Lisle-Mainwaring's leasehold interest in her enlarged flat.   But she successfully appealed against this extension of the lien. The appellant's appeal was, however, dismissed. The lien over the property to secure payment to Mr Cobbe of the one-half of the increase in value of the property brought about by the grant of planning permission was granted by Etherton J on the condition that the appellant be given permission to use the architects' plans in respect of which the planning permission had been granted (see para 2 of the judge's order dated 25 February 2005). Mr Cobbe, following Mrs Lisle-Mainwaring's repudiation of the second agreement, had instructed the architects not to permit any such use.

11.   Following the dismissal of the appellant's appeal, the inquiry directed by the judge into the increase in value of the property attributable to the planning permission commenced and led eventually to an agreement between the parties that the amount payable to Mr Cobbe pursuant to the order made by Etherton J was £2million. In March 2007 the appellant paid Mr Cobbe that amount. However nothing, for present purposes, turns on that.

12.   Etherton J's findings of fact are conveniently set out in summary form by Mummery LJ in the twelve sub-paragraphs of paragraph 35 of his judgment :

7

"(1)   Mrs. L-M acted as agent for YRML [i.e. the appellant] in her dealings with Mr Cobbe in connection with the sale and development of the property.

(2)   Neither Mr Cobbe nor Mrs L-M thought that the second agreement was a legally enforceable contract, which would only come into existence after planning permission was granted and a formal agreement was drawn up by lawyers containing terms to be negotiated and agreed additional to those of the second agreement. They would include some provision for security for the payment of overage, obtaining vacant possession and the obligation of the purchaser to commence, carry through and conclude the development in accordance with the planning permission.

(3)   Mr Cobbe believed that the second agreement comprised all the critical commercial terms, that the other terms were secondary and would inevitably be agreed one way or the other, and that YRML was bound in honour to enter into a formal written contract embodying the terms of the second agreement if Mr Cobbe obtained planning permission.

(4)   Mr Cobbe believed that the second agreement was binding on him in honour.

(5)   Mr Cobbe envisaged that, if Mrs L-M decided not to proceed before the grant of planning permission, he would be re-imbursed his reasonable expenditure and that, if planning permission were refused, he would not be re-imbursed.

(6)   In those beliefs Mr Cobbe spent considerable time and effort and incurred considerable expense pursuing the planning application between the end of 2002 and 17 March 2004.

(7)   His beliefs and his expenditure in reliance on them were encouraged by Mrs L-M, who was fully aware of the expenditure. She gave him the impression, and intended so to do, that she intended to carry through the second agreement into a formal binding contract if planning permission were obtained.

8

(8)  Christmas 2003 was an 'aspirational date' set for obtaining planning permission, but it was not a final and irrevocable cut-off date.  Mrs L-M was aware that it was highly unlikely that planning permission would be obtained by then.  From Christmas 2003 on she became increasingly involved in promoting a successful outcome of the planning application.

(9)  Sometime before Christmas 2003, however, Mrs L-M had formed the settled intention not to abide by the terms of the second agreement, as it left deferred and uncertain a much greater proportion of the consideration in terms of overage than she originally envisaged.  If planning permission were obtained, she intended to renegotiate for a higher fixed sum.  However, she deliberately refrained from giving Mr Cobbe any indication that she did not intend to carry the second agreement into effect and intended to renegotiate, so as to ensure that he continued unabated his efforts to obtain planning permission.  She was aware of the risks to the success of the application if she alerted Mr Cobbe to her true intentions regarding renegotiation of the second agreement.

(10)  The grant of the planning permission immediately resulted in a significant increase in the value of the property.

(11)  The day after the resolution to grant planning permission (18 March 2004) Mrs L-M told Mr Cobbe that the second agreement was no longer relevant, as planning permission had not been obtained by Christmas 2003. She would only enter an agreement on terms for payment by him of £20m together with overage.

(12)  Mr Cobbe believed he had been badly treated by Mrs L-M and that he had been 'ambushed'.  He reached an agreement with Mrs L-M 'in principle' at the end of March 2004 in an attempt to salvage a commercial deal, but he decided in May 2004 not to proceed with the March 2004 terms, because they did not provide him with a sufficiently secure and worthwhile return on the money he would have to invest in the purchase and development of the property."

13.    Etherton J said, in paragraph 123 of his judgment -

> "I have found as proven facts that Mrs Lisle-Mainwaring, on behalf of [the appellant], encouraged Mr Cobbe to believe that, if Mr Cobbe succeeded in obtaining planning permission in accordance with the Second Agreement, that Agreement would be honoured, even though it was not legally binding, and that, in reliance on that belief, Mr Cobbe, to her knowledge and with her encouragement, acted to his detriment.  I have also concluded that, in all the circumstances, she took an unconscionable advantage of him"

and, in paragraph 140, that -

> "The Second Agreement, broadly speaking, reflected an intention that [the appellant], through Mrs Lisle-Mainwaring, and Mr Cobbe should share equally the increased value or commercial potentiality arising from the grant of the Planning Permission.    In all the circumstances, including the conduct of the parties and their mutual beliefs and intentions, the minimum equity to do justice to Mr Cobbe is to order the payment to him by [the appellant] of one-half of the increased value of the Property due to the grant of the Planning Permission."

It is apparent, therefore, that the judge granted relief on the footing that Mr Cobbe was entitled to compensation calculated by reference to the value of his expectations under the unenforceable and incomplete agreement that the second agreement constituted.

*Proprietary estoppel*

14.    Both the learned judge and the Court of Appeal regarded the relief granted as justified on the basis of proprietary estoppel.    I respectfully disagree.  The remedy to which, on the facts as found by the judge, Mr Cobbe is entitled can, in my opinion, be described neither as based on an estoppel nor as proprietary in character.  There are several important authorities to which I want to refer but I want first to consider as a matter of principle the nature of a proprietary estoppel.    An "estoppel" bars the object of it from asserting some fact or facts, or,

10

sometimes, something that is a mixture of fact and law, that stands in the way of some right claimed by the person entitled to the benefit of the estoppel. The estoppel becomes a "proprietary" estoppel – a sub-species of a "promissory" estoppel – if the right claimed is a proprietary right, usually a right to or over land but, in principle, equally available in relation to chattels or choses in action. So, what is the fact or facts, or the matter of mixed fact and law, that, in the present case, the appellant is said to be barred from asserting? And what is the proprietary right claimed by Mr Cobbe that the facts and matters the appellant is barred from asserting might otherwise defeat?

15.    The pleadings do not answer these questions. The terms of the oral "agreement in principle", the second agreement, relied on by Mr Cobbe are pleaded but it is accepted that there remained still for negotiation other terms. The second agreement was, contractually, an incomplete agreement. The terms that had already been agreed were regarded by the parties as being "binding in honour", but it follows that the parties knew they were not legally binding. So what is it that the appellant is estopped from asserting or from denying? The appellant cannot be said to be estopped from asserting that the second agreement was unenforceable for want of writing, for Mr Cobbe does not claim that it was enforceable; nor from denying that the second agreement covered all the terms that needed to be agreed between the parties, for Mr Cobbe does not claim that it did; nor from denying that, pre 18 March 2004, Mr Cobbe had acquired any proprietary interest in the property, for he has never alleged that he had. And what proprietary claim was Mr Cobbe making that an estoppel was necessary to protect?  His originally pleaded claim to specific performance of the second agreement was abandoned at a very early stage in the trial (see para.8 above) and the proprietary claims that remained were claims that the appellant held the property on trust for itself and Mr Cobbe. These remaining proprietary claims were presumably based on the proposition that a constructive trust of the property, with appropriate beneficial interests for the appellant and Mr Cobbe, should, by reason of the unconscionable conduct of Mrs Lisle-Mainwaring, be imposed on the property. I must examine that proposition when dealing with constructive trust as a possible means of providing Mr Cobbe with a remedy, but the proposition is not one that requires or depends upon any estoppel.

16.    It is relevant to notice that the amendments to Mr Cobbe's pleaded prayer for relief, made when the specific performance and damages for breach of contract claims were abandoned, include the following :

"(4) Alternatively, a declaration that [the appellant and Mrs Lisle-Mainwaring] are estopped from denying that [Mr Cobbe] has such interest in the Property and/or the proceeds of sale thereof as the Court thinks fit."

This is the only pleaded formulation of the estoppel relied on by Mr Cobbe and, with respect to the pleader, is both meaningless and pointless. Etherton J concluded, in para.85 of his judgment, that the facts of the case "gave rise to a proprietary estoppel in favour of Mr Cobbe", but nowhere identified the content of the estoppel. Mummery LJ agreed (paras.60 and 61 of his judgment, concurred in by Dyson LJ (para.120) and Sir Martin Nourse (para.141)), but he, too, did not address the content of the estoppel. Both Etherton J and Mummery LJ regarded the proprietary estoppel conclusion as justified by the unconscionability of Mrs Lisle-Mainwaring's conduct. My Lords, unconscionability of conduct may well lead to a remedy but, in my opinion, proprietary estoppel cannot be the route to it unless the ingredients for a proprietary estoppel are present. These ingredients should include, in principle, a proprietary claim made by a claimant and an answer to that claim based on some fact, or some point of mixed fact and law, that the person against whom the claim is made can be estopped from asserting. To treat a "proprietary estoppel equity" as requiring neither a proprietary claim by the claimant nor an estoppel against the defendant but simply unconscionable behaviour is, in my respectful opinion, a recipe for confusion.

17.    Deane J, in *Muschinski v Dodds* (1985) 160 CLR 583, in a judgment concurred in by Mason J, drew attention to the nature and function of constructive trusts in the common law. His remarks, at 612 to 616 repay careful reading but I would respectfully draw particular attention to a passage at 615 relevant not only to constructive trusts but equally, in my opinion, to proprietary estoppel. He said this:

"The fact that the constructive trust remains predominantly remedial does not, however, mean that it represents a medium for the indulgence of idiosyncratic notions of fairness and justice.     As an equitable remedy, it is available only when warranted by established equitable principles or by the legitimate processes of legal reasoning, by analogy, induction and deduction, starting from the conceptual foundations of such principles … Under the law of this country – as, I venture to think under the present law of England … proprietary rights fall to be governed by principles of law and not by some mix of

12

> judicial discretion, subjective views about which party
> 'ought to win' … and the 'formless void' of individual
> moral opinion …"

A finding of proprietary estoppel, based on the unconscionability of the
behaviour of the person against whom the finding was made but without
any coherent formulation of the content of the estoppel or of the
proprietary interest that the estoppel was designed to protect invites, in
my opinion, criticism of the sort directed by Deane J in the passage
cited. However, Mr Ivory QC, counsel for Mr Cobbe both in the Court
of Appeal and before your Lordships, has relied on authority and to that
I must now turn.

18.    Oliver J (as he then was) stated the requirements of proprietary
estoppel in a "common expectation" class of case in a well-known and
often cited passage in *Taylors Fashions Ltd v Liverpool Victoria
Trustees Co. Ltd* [1982] QB 133 at 144 :

> "if A under an expectation created or encouraged by B that
> A shall have a certain interest in land, thereafter, on the
> faith of such expectation and with the knowledge of B and
> without objection by him, acts to his detriment in
> connection with such land, a Court of Equity will compel
> B to give effect to such expectation."

Note the reference to "a certain interest in land". *Taylors Fashions* was
a case where the "certain interest" was an option to renew a lease.
There was no lack of certainty; the terms of the new lease were spelled
out in the option and the lessees' expectation was that on the exercise of
the option the new lease would be granted.  The problem was that the
option had not been registered under the Land Charges Act 1925 and the
question was whether the freeholders, successors in title to the original
lessors who had granted the option, could be estopped from denying the
right of the lessees to exercise the option.  But what is the comparable
expectation and the comparable "certain interest" in the present case?
Mr Cobbe's expectation, encouraged by Mrs Lisle-Mainwaring, was that
upon the grant of planning permission there would be a successful
negotiation of the outstanding terms of a contract for the sale of the
property to him, or to some company of his, and that a formal contract,
which would include the already agreed core terms of the second
agreement as well as the additional new terms agreed upon, would be
prepared and entered into.    An expectation dependent upon the
conclusion of a successful negotiation is not an expectation of an
interest having any comparable certainty to the certainty of the terms of

13

the lessees' interest under the *Taylors Fashions* option. In the *Taylors Fashions* case both the content of the estoppel, i.e. an estoppel barring the new freeholders from asserting that the option was unenforceable for want of registration, and the interest the estoppel was intended to protect, i.e. the option to have a renewal of the lease, were clear and certain. Not so here. The present case is one in which an unformulated estoppel is being asserted in order to protect Mr Cobbe's interest under an oral agreement for the purchase of land that lacked both the requisite statutory formalities (s.2 of the 1989 Act) and was, in a contractual sense, incomplete.

19.    A reference to the expectation of "a certain interest in land" had appeared in the speech of Lord Kingsdown in *Ramsden v Dyson* (1866) LR 1 HL 129 at 170

> "If a man, under a verbal agreement with a landlord for a certain interest in land, or, what amounts to the same thing, under an expectation, created or encouraged by the landlord, that he shall have a certain interest, takes possession of such land, with the consent of the landlord, and upon the faith of such promise or expectation, with the knowledge of the landlord, and without objection by him, lays out money upon the land, a Court of equity will compel the landlord to give effect to such promise or expectation."

Lord Kingsdown went on to say, at 171, that even if there were uncertainty as to the terms of the contract a court of equity could nevertheless interfere in order to prevent fraud but that it was unclear what, in that case, the remedy should be. The choices, he said, were between the grant of a specific interest in the land and the grant of a restitutionary remedy such as monetary compensation. This is an issue to which I must return but it suffices for the moment to notice that Lord Kingsdown's remarks at 171 show that, when referring at 170 to "a verbal agreement … for a certain interest in land", he was referring to an agreement that was complete, with no uncertainty as to its terms.

20.    Lord Kingsdown's requirement that there be an expectation of "a certain interest in land", repeated in the same words by Oliver J in the *Taylors Fashions* case, presents a problem for Mr Cobbe's proprietary estoppel claim.    The problem is that when he made the planning application his expectation was, for proprietary estoppel purposes, the wrong sort of expectation.    It was not an expectation that he would, if

14

the planning application succeeded, become entitled to "a certain interest in land". His expectation was that he and Mrs Lisle-Mainwaring, or their respective legal advisers, would sit down and agree the outstanding contractual terms to be incorporated into the formal written agreement, which he justifiably believed would include the already agreed core financial terms, and that his purchase, and subsequently his development of the property, in accordance with that written agreement would follow. This is not, in my opinion, the sort of expectation of "a certain interest in land" that Oliver J in the *Taylors Fashions* case or Lord Kingsdown in *Ramsden v Dyson* had in mind.

21.    Mr Ivory cited, also, a number of other authorities in support of his proprietary estoppel case. In *Plimmer v Mayor of Wellington* (1884) 9 App. Cas. 699, a Privy Council case, the question was whether the appellant, Mr Plimmer, had a sufficient "estate or interest" in land to qualify for statutory compensation when the land became vested in the Wellington Corporation.    Plimmer had occupied the land under a revocable licence from the Corporation's predecessor-in-title and at the request of that predecessor-in-title had made extensive improvements to the land. The Judicial Committee held that these circumstances "were sufficient to create in his [Plimmer's] mind a reasonable expectation that his occupation would not be disturbed…" In effect, the owner of the land became estopped from asserting that the licence remained revocable. That was sufficient to constitute the licence an "estate or interest" for compensation purposes. The *Plimmer* case does not, in my opinion, assist Mr Cobbe, whose expectation was that of further negotiations leading, as he hoped and expected, to a formal contract. To the extent that he had an expectation of a "certain interest in land", it was always a contingent one, contingent not simply on the grant of planning permission but contingent also on the course of the further contractual negotiations and the conclusion of a formal written contract.

22.    *Inwards v Baker* [1965] 2 QB 29 was the case in which an indulgent father had encouraged his son to build a bungalow on his, the father's, land. The son had done so in the expectation, encouraged by the father, that he, the son, would be permitted to remain in occupation. The Court of Appeal held that the son had an equity entitling him to live in the bungalow as long as he wished. In effect the father, and after his death the trustees of his will, were estopped from denying that the son's licence to occupy the land was an irrevocable one. The case was on all fours with *Plimmer*'s case, which was relied on both by Lord Denning M.R. (36/37) and by Danckwerts LJ (38) in their respective judgments. The principle that, if A, an owner of land, encourages B to build on his, A's, land on the footing that B will be entitled thereafter to occupy the

new buildings for as long as he wishes and B, taking A at his word, then acts accordingly, A will be estopped from denying the right of B to continue to occupy the new buildings, is undoubted good law but is a principle of no assistance to Mr Cobbe in the present case. *Crabb v Arun D.C.* [1976] Ch. 179 is likewise of no assistance to Mr Cobbe. The case was one in which the DC had led Mr Crabb to believe that he could have access to his land via a road belonging to the DC. In reliance on that promise Mr Crabb allowed his land to become otherwise landlocked. He was held entitled by way of proprietary estoppel to a right of way as promised. The DC was estopped from denying that he had the right of way.

23.   Closer to home, so far as support for Mr Cobbe's promissory estoppel claim is concerned, is the line of cases in which a claimant has expended money on land on the basis of an informal or incomplete agreement and in the expectation that, in due course, a binding agreement would be forthcoming. The present case, if the proprietary estoppel claim is to succeed, must be brought within this line of cases. *Laird v Birkenhead Railway Co.* (1859) Johns.500 is an early example. The plaintiff applied to the defendant railway company for permission to construct and use a private branch line connecting with the railway company's main line. Agreement was reached for the plaintiff to do so "on reasonable terms, which were to be afterwards settled" (per Page Wood V-C at 513). The plaintiff, acting on this agreement, constructed and used the branch line and for some two and a half years paid tolls at an agreed rate to the railway company. Agreement in principle was reached on the details of the plaintiff's user of the branch line but a formal agreement was never signed. The railway company gave notice to the plaintiff to cease his user of the branch line. The Vice-Chancellor said that the railway company had allowed the plaintiff "to expend his money on the faith that he would be permitted to join their line on reasonable terms" (513) and that the tolls agreed upon and paid by the plaintiff for his past user must be assumed to represent reasonable terms. "It must", said the Vice-Chancellor, "be inferred, from the nature of the transaction, that the privilege of using the line was not to be determinable …" (511). The Vice-Chancellor's ability, by inference from the nature of the transaction and from the basis on which the plaintiff for the past two and a half years had been using the branch line, to fill in the gaps in the parties' contractual agreement is not an ability that has its counterpart in the present case. The court could not have made complete the inchoate second agreement. On none of the three outstanding matters referred to in paragraph 6 above would the court have been able to infer the contractual terms that further negotiations would or might have produced and Etherton J, quite rightly, did not attempt to do so.

24. *Holiday Inns Inc. v Broadhead* (1974) 232 EG 951, 1087 has been treated as, but correctly analysed is in my opinion not, a case of proprietary estoppel. The plaintiffs, *Holiday Inns*, and the defendant, Mr Broadhead, agreed, in effect, on a joint venture, the essential ingredients of which were that a site in the vicinity of Heathrow Airport would be identified as suitable for an hotel. Mr Broadhead, or a company nominated by him, would acquire the site, Holiday Inns would apply for the requisite planning permission and, if planning permission were granted, the site would be leased to Holiday Inns under a lease the terms of which the parties had agreed. A suitable site was identified and was then purchased by a company owned or controlled by Mr Broadhead. Holiday Inns, at their own expense, applied for and obtained planning permission for the building of the hotel. But Mr Broadhead then entered into negotiations for a lease with another hotel group and granted a lease to a company in that group before Holiday Inns could intervene. Whatever equity Holiday Inns had against Mr Broadhead could not have been asserted against the lessee, which had taken the lease without notice of any such equity. Holiday Inns sued Mr Broadhead. The judge, Goff J, accepted that the Holiday Inns executives who had dealt with Mr Broadhead thought that they and he had reached "a gentleman's agreement which would be honoured" and that Mr Broadhead's "failure to inform them of his true state of mind was deceitful and unconscionable" (1089). He held that Holiday Inns were "clearly entitled to relief" (1094) and declared that Mr Broadhead's company, which had purchased the site and granted the lease to the rival hotel group, held the land subject to the lease upon trust to sell it and to divide the net proceeds of sale, after discharging various expenses incurred by the respective parties, between itself and Holiday Inns in equal shares. The relief was granted, therefore, by imposing, or recognising, a constructive trust over the property. Whether, if Mr Broadhead had not pre-empted the choice of relief by granting the lease before any restraining injunction could be obtained, Holiday Inns' expectation of a lease would have been recognised by an order that they were entitled to a lease on the terms already agreed is an open question. It does not appear from the report of the case that anything remained to be negotiated between Mr Broadhead and Holiday Inns. The terms of the intended lease had been agreed. In the event, however, the relief granted by Goff J was on the same footing as that granted in the joint venture cases to which, starting with *Pallant v Morgan*, I will later refer, namely, that where a joint venture involves the acquisition by one of the joint venturers of the property intended for the purposes of the joint venture and the pursuit of the joint venture then becomes impracticable or impossible, the acquirer is not entitled to retain the property for his own benefit but must be taken to hold the property upon trust for himself and the other joint venturers jointly. Before leaving the *Holiday Inns* case, it is to be noted that the judge,

Goff J, was Sir Reginald Goff, and not Sir Robert Goff, later Lord Goff of Chieveley, as was erroneously stated at 122F in the judgment of the Board (of which, oddly, Lord Goff was a member) delivered by Lord Templeman in *Attorney-General of Hong Kong v Humphreys Estate (Queen's Gardens) Ltd* [1987] AC 114.

25.    The *Humphreys Estate* case was one in which a written agreement, expressed to be "subject to contract", for the purchase of development property had been signed.  The agreement said that the terms could be varied or withdrawn and that any agreement was subject to the documents necessary to give legal effect to the transaction being executed and registered.  In short the parties had made it clear that neither of them was for the time being legally bound.  The Hong Kong government, the intended purchaser, was permitted to take possession of the property and to spend money on it.  The owners of the property then decided to withdraw from the transaction and gave notice terminating the government's licence to occupy the property.  In the litigation that ensued, the government contended that the owners were barred by proprietary estoppel from exercising their legal right to withdraw from the transaction (see the submissions of counsel referred to by Lord Templeman at 121).  The proprietary estoppel relied on was that which had been enunciated by Lord Kingsdown in *Ramsden v Dyson*.  The government lost in the courts in Hong Kong and appealed to the Privy Council but lost there too.  Lord Templeman explained why at 127H

> "It is possible but unlikely that in circumstances at present unforeseeable a party to negotiations expressed to be 'subject to contract' would be able to satisfy the court that the parties had subsequently agreed to convert the document into a contract or that some form of estoppel had arisen to prevent both parties from refusing to proceed with the transaction envisaged by the document.  But in the present case the government chose to begin and elected to continue on terms that either party might suffer a change of mind and withdraw."

The reason why, in a 'subject to contract' case, a proprietary estoppel cannot ordinarily arise is that the would-be purchaser's expectation of acquiring an interest in the property in question is subject to a contingency that is entirely under the control of the other party to the negotiations (see also *British Steel Corporation v Cleveland Bridge and Engineering Co. Ltd* [1984]  1 AER 504 per Robert Goff J at 511; *Walton Stores (Interstate) Ltd v Maher* [1988]  164 CLR 387; *London & Regional Investments Ltd v TBI Plc.* [2002]  EWCA 355 per

18

Mummery LJ at para.42 and *Pridean v Forest Taverns* (1996) 75 P&CR 447). The expectation is therefore speculative.

26.     Both Etherton J and Mummery LJ in the Court of Appeal recognised that, in cases where negotiations had been made expressly subject to contract and a contract had not in the end been forthcoming, it would be very difficult for a disappointed purchaser to establish an arguable case for a proprietary estoppel.  Etherton J, having referred to the relevant authorities, accepted the improbability that in a subject-to-contract case a proprietary estoppel might arise (paras. 119 and 120), but distinguished the present case on the footing that Mrs Lisle-Mainwaring had encouraged Mr Cobbe to believe that if he succeeded in obtaining planning permission the second agreement would be honoured even though not legally binding (para.123) and, also, I think, that nothing equivalent to a subject-to-contract reservation had ever been expressed (para.119) and that no issue likely to cause any difficulty had been raised in the negotiations that culminated in the second agreement (para.122).  In the Court of Appeal Mummery LJ dealt with the subject-to-contract point in paragraphs 53 to 57.  The second agreement, he said, "was never expressly stated to be 'subject to contract' either by use of that well known expression or by other language to the same effect" (para.57).  He agreed with Etherton J that

> "proprietary estoppel could be established even where the parties anticipated that a legal binding contract would not come into existence until after planning permission had been obtained, further terms discussed and agreed and formal written contracts exchanged."

27.     My Lords, I can easily accept that a subject-to-contract reservation made in the course of negotiations for a contract relating to the acquisition of an interest in land could be withdrawn, whether expressly or by inference from conduct.  But debate about subject-to-contract reservations has only a peripheral relevance in the present case, for such a reservation is pointless in the context of oral negotiations relating to the acquisition of an interest in land.  It would be an unusually unsophisticated negotiator who was not well aware that oral agreements relating to such an acquisition are by statute unenforceable and that no express reservation to make them so is needed.  Mr Cobbe was an experienced property developer and Mrs Lisle-Mainwaring gives every impression of knowing her way around the negotiating table.  Mr Cobbe did not spend his money and time on the planning application in the mistaken belief that the agreement was legally enforceable.  He

spent his money and time well aware that it was not. Mrs Lisle-Mainwaring did not encourage in him a belief that the second agreement was enforceable. She encouraged in him a belief that she would abide by it although it was not. Mr Cobbe's belief, or expectation, was always speculative. He knew she was not legally bound. He regarded her as bound "in honour" but that is an acknowledgement that she was not legally bound.

28.    The reality of this case, in my opinion, is that Etherton J and the Court of Appeal regarded their finding that Mrs Lisle-Mainwaring's behaviour in repudiating, and seeking an improvement on, the core financial terms of the second agreement was unconscionable, an evaluation from which I do not in the least dissent, as sufficient to justify the creation of a "proprietary estoppel equity". As Mummery LJ said (para.123), she took unconscionable advantage of Mr Cobbe. The advantage taken was the benefit of his services, his time and his money, in obtaining planning permission for the property. The advantage was unconscionable because immediately following the grant of planning permission, she repudiated the financial terms on which Mr Cobbe had been expecting to be able to purchase the property. But to leap from there to a conclusion that a proprietary estoppel case was made out was not, in my opinion, justified. Let it be supposed that Mrs Lisle-Mainwaring were to be held estopped from denying that the core financial terms of the second agreement were the financial terms on which Mr Cobbe was entitled to purchase the property. How would that help Mr Cobbe?  He still would not have a complete agreement. Suppose Mrs Lisle-Mainwaring had simply said she had changed her mind and did not want the property to be sold after all. What would she be estopped from denying?  Proprietary estoppel requires, in my opinion, clarity as to what it is that the object of the estoppel is to be estopped from denying, or asserting, and clarity as to the interest in the property in question that that denial, or assertion, would otherwise defeat. If these requirements are not recognised, proprietary estoppel will lose contact with its roots and risk becoming unprincipled and therefore unpredictable, if it has not already become so. This is not, in my opinion, a case in which a remedy can be granted to Mr Cobbe on the basis of proprietary estoppel.

29.    There is one further point regarding proprietary estoppel to which I should refer. Section 2 of the 1989 Act declares to be void any agreement for the acquisition of an interest in land that does not comply with the requisite formalities prescribed by the section. Subsection (5) expressly makes an exception for resulting, implied or constructive trusts. These may validly come into existence without compliance with

20

the prescribed formalities. Proprietary estoppel does not have the benefit of this exception. The question arises, therefore, whether a complete agreement for the acquisition of an interest in land that does not comply with the section 2 prescribed formalities, but would be specifically enforceable if it did, can become enforceable via the route of proprietary estoppel. It is not necessary in the present case to answer this question, for the second agreement was not a complete agreement and, for that reason, would not have been specifically enforceable so long as it remained incomplete. My present view, however, is that proprietary estoppel cannot be prayed in aid in order to render enforceable an agreement that statute has declared to be void. The proposition that an owner of land can be estopped from asserting that an agreement is void for want of compliance with the requirements of section 2 is, in my opinion, unacceptable. The assertion is no more than the statute provides. Equity can surely not contradict the statute. As I have said, however, statute provides an express exception for constructive trusts. So to Mr Cobbe's constructive trust claim I must now turn.

### Constructive Trust

30. It is impossible to prescribe exhaustively the circumstances sufficient to create a constructive trust but it is possible to recognise particular factual circumstances that will do so and also to recognise other factual circumstances that will not. A particular factual situation where a constructive trust has been held to have been created arises out of joint ventures relating to property, typically land. If two or more persons agree to embark on a joint venture which involves the acquisition of an identified piece of land and a subsequent exploitation of, or dealing with, the land for the purposes of the joint venture, and one of the joint venturers, with the agreement of the others who believe him to be acting for their joint purposes, makes the acquisition in his own name but subsequently seeks to retain the land for his own benefit, the court will regard him as holding the land on trust for the joint venturers. This would be either an implied trust or a constructive trust arising from the circumstances and if, as would be likely from the facts as described, the joint venturers have not agreed and cannot agree about what is to be done with the land, the land would have to be re-sold and, after discharging the expenses of its purchase and any other necessary expenses of the abortive joint venture, the net proceeds of sale divided equally between the joint venturers. A number of cases exemplify the operation of a constructive trust in such a situation. *Pallant v Morgan* [1952] Ch.43 was one such case. In essence, A and B agreed, prior to an auction of land in which both were interested, that A would bid for

the land, that B would refrain from bidding and that if A became the purchaser the land would be divided between them. A did become the purchaser but he and B failed to agree on the scheme and terms of the division. A then claimed to be entitled to retain the whole of the land. Harman J at 50 said this:

> "The plaintiff and the defendant have failed to agree on a division, and the court cannot compel them to agree. The best it can do is to decree that the property is held by the defendant for himself and the plaintiff jointly, and if they still fail to agree on a division the property must be resold, either party being at liberty to bid, and the proceeds of sale divided equally after repaying to the defendant the £1,000 which he paid …"

31.    The *Holiday Inns* case, properly understood, was, in my opinion, a case falling into this class. Holiday Inns and Mr Broadhead embarked, in effect, on a joint venture pursuant to which Mr Broadhead acquired the site intended for the building of the hotel. Mr Broadhead reneged on this joint venture and Goff J, citing *Pallant v Morgan*, declared (1097) the property to be held on trusts equivalent, in effect, to those that had been declared in *Pallant v Morgan*. This was, if I may respectfully say so, a straightforward recognition of a constructive trust arising out of a failed joint venture and was nothing to do with proprietary estoppel.

32.    Another case in which a constructive trust provided a remedy following a frustrated joint venture was *Banner Homes Group Plc v Luff Developments Ltd* [2000] Ch.372. As Chadwick LJ, who gave the leading judgment in the Court of Appeal, observed at 397 –

> "It is the pre-acquisition arrangement which colours the subsequent acquisition [of the land] by the defendant and leads to his being treated as a trustee if he seeks to act inconsistently with it."

Chadwick LJ referred in his judgment to an unreported case, *Time Products Ltd v Combined English Stores* (in which Oliver J gave judgment on 2 December 1974) in which the plaintiff and the defendant had been interested in acquiring a particular property and had agreed that one of them would make an offer, the other refraining from doing so, and that if the offer were to be accepted the purchaser would deal

22

with the property in a manner to the advantage of both.     The
arrangement was not sufficiently detailed as to constitute an enforceable
contract and the offeror, having become the purchaser with the other
refraining from competing, sought to keep the property for itself,
excluding the other from any benefit.  The result was that the property
was declared to be held on trust for the two parties in equal shares.

33.     The constructive trust in these failed joint venture cases cannot,
in my opinion, be recognised or imposed in the present case.     The
Yeoman's Row property was owned by the appellant some years before
Mrs Lisle-Mainwaring began her joint venture discussions (for such in
effect they were) with Mr Cobbe.  In the *Banner Homes* case Chadwick
LJ commented (at 397) on how the situation might appear in such a case

> "Where the arrangement or understanding is reached in
> relation to property already owned by one of the parties,
> he may (if the arrangement is of sufficient certainty to be
> enforced specifically) thereby constitute himself trustee on
> the basis that 'equity looks on that as done which ought to
> be done'; or an equity may arise under the principles
> developed in the proprietary estoppel cases."

For the reasons already explained I think the "principles developed in
the proprietary estoppel cases" are inapplicable in cases such as the
present; and "if the arrangement is of sufficient certainty to be enforced
specifically" there would be a straightforward contractual remedy, with
no need to resort to trusts.  But the point underlying the Lord Justice's
comment is a valid one.  If the property that is to be the subject of the
joint venture is owned by one of the parties before the joint venture has
been embarked upon (as opposed to being acquired as part of the joint
venture itself), on what basis, short of a contractually complete
agreement for the joint venture, can it be right to regard the owner as
having subjected the property to a trust and granted a beneficial interest
to the other joint venturers?  As Chadwick LJ observed at p.400 of his
judgment in *Banner Homes*

> "The [*Pallant v Morgan*] equity is invoked where the
> defendant has acquired property in circumstances where it
> would be inequitable to allow him to treat it as his own".

34.    *Banner Homes* was considered by the Court of Appeal in *London & Regional Investments Ltd v TBI Plc* [2002] EWCA Civ.355. This case, like the present case, was one which concerned a joint venture arrangement that had never become contractually enforceable (it had been expressed to be "subject-to-contract"), but in premature reliance on which one of the parties, London & Regional, had taken certain steps said to constitute detriment (see para.34 of Mummery LJ's judgment). The joint venture related to a property which had been owned by TBI before the joint venture had been embarked upon.    When TBI announced its decision to withdraw from the joint venture London & Regional claimed a *Pallant v Morgan* equity in the property.    TBI sought summary judgment dismissing London & Regional's claim. They succeeded both at first instance and in the Court of Appeal. Mummery LJ, whose judgment was concurred in by the other members of the court, distinguished *Banner Homes*, not only on the 'subject-to-contract' point (para.47):

> "The recorded intentions as to the joint venture implicitly proceeded on the basis that no concluded agreement had been reached and contemplated that such an agreement might never be reached"

but also on the footing that

> "… the person sought to be made liable as a constructive trustee has an existing entitlement to the land in question and the claimed agreement to dispose of it, in this case to a joint venture, is too uncertain and vague to be enforced".

All of that could be said of the present case.

35.    The final case on this point to which I should refer is *Kilcarne Holdings Ltd v Targetfollow (Birmingham) Ltd* [2005] 2 P & CR 105 where a *Pallant v Morgan* type of equity was claimed consequent upon an abortive alleged joint venture.  Lewison J examined in some depth Chadwick LJ's judgment in *Banner Homes* and Mummery LJ's judgment in the *London & Regional* case and, on the "pre-acquisition or post-acquisition arrangement" point, noted (in para.242) that the case was

24

"… not a case of a pre-acquisition agreement which colours [the first defendant's] acquisition of [the property in respect of which the equity was claimed]".

Kilcarne appealed but its appeal was dismissed ([2005] EWCA Civ.45).

36.    The circumstances of the present case are that the property in question was owned by the appellant before any negotiations for a joint venture agreement had commenced. The interest in the property that Mr Cobbe was expecting to acquire was an interest pursuant to a formal written agreement some of the terms of which remained still to be agreed and that never came into existence. Mr Cobbe expended his time and money in making the planning application in the knowledge that the appellant was not legally bound. Despite the unconscionability of the appellant's behaviour in withdrawing from the inchoate agreement immediately planning permission had been obtained, this seems to me a wholly inadequate basis for imposing a constructive trust over the property in order to provide Mr Cobbe with a remedy for his disappointed expectations.    This property was never joint venture property and I can see no justification for treating it as though it was.

37.    The unconscionable behaviour of Mrs Lisle-Mainwaring is, in my opinion, not enough in the circumstances of this case to justify Mr Cobbe's claim to have acquired, or to be awarded by the court, a beneficial interest in the property. The salient features of the case that preclude that claim are, to my mind, that the appellant owned the property before Mr Cobbe came upon the scene, that the second agreement produced by the discussions between him and Mrs Lisle-Mainwaring was known to both to be legally unenforceable, that an unenforceable promise to perform a legally unenforceable agreement – which is what an agreement "binding in honour" comes to – can give no greater advantage than the unenforceable agreement, that Mr Cobbe's expectation of an enforceable contract, on the basis of which he applied for and obtained the grant of planning permission, was inherently speculative and contingent on Mrs Lisle-Mainwaring's decisions regarding the incomplete agreement and that Mr Cobbe never expected to acquire an interest in the property otherwise than under a legally enforceable contract.    In these circumstances the imposition of the constructive trust on the property and the *pro tanto* divesting of the appellant's ownership of it seems to me more in the nature of an indignant reaction to Mrs Lisle-Mainwaring's unconscionable behaviour than a principled answer to Mr Cobbe's claim for relief.

*The Proprietary Claims: Conclusion*

38. I would for the reasons I have given reject both of the proprietary claims made on Mr Cobbe's behalf. Mr Cobbe's alternative *in personam* claims are relatively uncontroversial but before turning to them I want to reflect for a moment on the implications of the claim he has not made, namely, a claim in deceit. The findings of fact made by Etherton J suggest that well before 18 March 2004 Mrs Lisle-Mainwaring had decided to repudiate the core financial terms of the second agreement but nonetheless had continued to represent to Mr Cobbe, by conduct if not expressly, that she intended to abide by the core financial terms and regarded herself as honour bound to do so. It may be that the detriment incurred by Mr Cobbe had already been incurred and that no further detriment in reliance on any such knowingly false representations was incurred, but that may not have been so. If Mr Cobbe's proprietary claims, of proprietary estoppel and to an interest under a constructive trust, were well founded, similar claims could presumably be brought in many cases where a contract had been induced by a fraudulent misrepresentation. The dishonest representation would often have led to unrealised expectations of benefit. But, unless the representation had become a term of the contract, no one, I think, would suggest that the victim could claim to be compensated for the loss of the expected benefit. The tortious damages recoverable for the deceit would be limited to consequential loss. How could the victim be entitled to a better result than that if there were no contract at all but simply a dishonest representation on which he had acted to his disadvantage, or, *a fortiori*, to a better result if not only had there been no contract at all but, in addition, the representation had not been dishonest? In my opinion, the representations of intention on which Mr Cobbe acted in the present case cannot, in principle, entitle him to a remedy intended to give him the value of his expectations engendered by the representations. A genuine proprietary claim enabled to succeed by the operation of a genuine proprietary estoppel would be in accordance with principle. But a claim for the imposition of a constructive trust in order to provide a remedy for a disappointed expectation engendered by a representation made in the context of incomplete contractual negotiations is, in my opinion, misconceived and cannot be sustained by reliance on unconscionable behaviour on the part of the representor.

26

*The in personam remedies*

39.     Each of these is a well recognised common law remedy and, I think, each produces much the same result.

*Unjust enrichment*

40.     There is no doubt but that the value of the property will have been increased by the grant of planning permission and that the appellant has, accordingly, been enriched by the grant of the permission for which it has had to pay nothing. Since the planning permission was obtained at the expense of Mr Cobbe it is very easy to conclude that the appellant has been enriched at his expense and, in the circumstances that I need not again rehearse, unjustly enriched. So, in principle, he is entitled to a common law remedy for unjust enrichment.

41.     But what is the extent of the unjust enrichment? It is not, in my opinion, the difference in market value between the property without the planning permission and the property with it. The planning permission did not create the development potential of the property; it unlocked it. The appellant was unjustly enriched because it obtained the value of Mr Cobbe's services without having to pay for them. An analogy might be drawn with the case of a locked cabinet which is believed to contain valuable treasures but to which there is no key. The cabinet has a high intrinsic value and its owner is unwilling to destroy it in order to ascertain its contents. Instead a locksmith agrees to try to fashion a key. He does so successfully and the cabinet is unlocked. As had been hoped, it is found to contain valuable treasures. The locksmith had hoped to be awarded a share of their value but no agreement to that effect had been concluded and the owner proposes to reward him with no more than sincere gratitude. The owner has been enriched by his work and, many would think, unjustly enriched. For why should a craftsman work for nothing? But surely the extent of the enrichment is no more than the value of the locksmith's services in fashioning the key. Everything else the owner of the cabinet already owned. So here.

*Quantum Meruit*

42.     It seems to me plain that Mr Cobbe is entitled to a *quantum meruit* payment for his services in obtaining the planning permission.

27

He did not intend to provide his services gratuitously, nor did Mrs Lisle-Mainwaring understand the contrary. She knew he was providing his services in the expectation of becoming the purchaser of the property under an enforceable contract. So no fee was agreed. In the event the expected contract did not materialise but a *quantum meruit* for his services is a common law remedy to which Mr Cobbe is entitled. The *quantum meruit* should include his outgoings in applying for and obtaining the planning permission, which should be taken to be reasonably incurred unless Mrs Lisle-Mainwaring can show otherwise, and a fee for his services assessed at the rate appropriate for an experienced developer. To the extent, of course, that Mr Cobbe's outgoings included the fees of planning consultants whom he employed, there must not be double counting. The amount of the *quantum meruit* for Mr Cobbe's services would, in my opinion, represent the extent of the unjust enrichment for which the appellant should be held accountable to Mr Cobbe.

*Consideration which has wholly failed*

43.    Where an agreement is reached under which an individual provides money and services in return for a legal but unenforceable promise which the promissor, after the money has been paid and the services provided, refuses to carry out, the individual would be entitled, in my opinion, to a restitutionary remedy. The consideration in return for which the money was paid and the services were provided would have wholly failed. In such a case the money paid, with interest thereon, could be recovered, together, in my opinion, with a fee for the services. The remedy would be, in my opinion, co-extensive with the *quantum meruit* discussed in the previous paragraph.

44.    I would, therefore, hold Mr Cobbe to be entitled to a *quantum meruit*. The appellant, in the course of the trial, made an open offer to Mr Cobbe of £150,000 intended to exceed the maximum sum recoverable and in full and final settlement. The offer was not accepted by Mr Cobbe but is some indication of the amount a *quantum meruit* might provide. The *quantum meruit* should be assessed on the footing that the appellant is entitled to use the architects' plans in respect of which the planning permission was granted and, accordingly, should be subject to the same condition as was imposed by Etherton J as a condition of the grant of the lien over the property (see para 10 above).

*Conclusion*

45.    In the result, for the reasons I have given, I would allow this appeal, discharge the orders made by Etherton J and the Court of Appeal and substitute orders

(1) if Mr Cobbe instructs Paul Davies & Partners, architects, to permit the use of the plans in respect of which the planning permission for the appellant's property was granted, for the payment by the appellant to Mr Cobbe of a *quantum meruit* for his services in obtaining the planning permission, such *quantum meruit* to include the repayment to him of the expenses reasonably incurred by him in making and prosecuting the planning application, with simple interest thereon at the judgment rate from 18 March 2004 until payment;

(2) for the amount of the *quantum meruit* if not agreed to be assessed in chambers in the Chancery Division with liberty to either party to apply for directions regarding the assessment;

(3) subject to (4) below, for the repayment by Mr Cobbe to the appellant of the £2million referred to in paragraph 11 above, with interest thereon at the rate referred to in (1) above from the date of payment of that sum to Mr Cobbe until repayment;

(4) for the amount due to Mr Cobbe under the *quantum meruit* to be set-off against the £2million repayable by Mr Cobbe under (3) above, and so that, pending the assessment of the amount of the *quantum meruit* or agreement by the parties as to the amount, Mr Cobbe is to be at liberty to retain out of the £2million a sum of £150,000.

The parties may make submissions in writing within 14 days as to how the costs in the courts below, including the costs of the abortive inquiry into the value of the property before and after the grant of planning permission, and the costs of the appeal to this House, should be borne. Any costs of the assessment of the *quantum meruit* should be costs in the assessment.

## LORD WALKER OF GESTINGTHORPE

My Lords,

46.    Equitable estoppel is a flexible doctrine which the Court can use, in appropriate circumstances, to prevent injustice caused by the vagaries and inconstancy of human nature. But it is not a sort of joker or wild card to be used whenever the Court disapproves of the conduct of a litigant who seems to have the law on his side. Flexible though it is, the doctrine must be formulated and applied in a disciplined and principled way. Certainty is important in property transactions. As Deane J said in the High Court of Australia in *Muschinski v Dodds* (1985) 160 CLR 583, 615-616,

> "Under the law of [Australia]—as, I venture to think, under the present law of England—proprietary rights fall to be governed by principles of law and not by some mix of judicial discretion, subjective views about which party 'ought to win' and 'the formless void of individual moral opinion'" [references omitted].

47.    The principle has been applied in quite a wide variety of factual situations, sometimes of a domestic nature, sometimes commercial. Any formulation of the principle must, if it is to be comprehensive, be expressed in such general terms as to give little idea of what it is really about—what Lord Hoffmann (comparing estoppel with legitimate expectation in *R (Reprotech (Pebsham) Ltd) v East Sussex County Council* [2003] 1 WLR 348, para 35) referred to as "the moral values which underlie the private law concept of estoppel." Wide tripartite formulations, which need to be fleshed out by reference to the facts of decided cases, can be found in Megarry and Wade, The Law of Real Property, 6th Edit. para 13.001 (cited by Etherton J at para 51) and Gray and Gray, Land Law 4th Edit. para 10.174. The main difference between these formulations is that Professor Harpum, the editor of Megarry and Wade, links detriment to the second element whereas the authors of Gray and Gray link it to the third. This difference may not ultimately be of great significance. It is fully discussed in Gray and Gray at paras 10.256-10.267.

48.    The authors of Gray and Gray (para 10.189) propose a classification which Mr Ivory QC (for the respondent, Mr Cobbe) adopted in his printed case:

> "The concatenation of ideas underlying proprietary estoppel emerges from three broad, and not entirely

distinct, categories of circumstance. These categories comprise (1) the 'imperfect gift' cases, (2) the 'common expectation' cases, and (3) the 'unilateral mistake' cases. These cases alike present the essential characteristics of proprietary estoppel, but each class of case in its turn gives a heightened emphasis to one or other of the constituent elements of representation, reliance and unconscionable disadvantage. The tendency in the modern case law is to synthesise the jurisprudence of proprietary estoppel in a more unified doctrine of 'detrimental reliance'".

I may have made a small personal contribution to that tendency. But the difficulty and importance of this appeal, and the very full examination of the authorities which counsel have undertaken, remind me that synthesis and unification, however desirable as objectives, have their dangers. Without embarking on anything like an exhaustive review of the case law, I propose to look at some of the key authorities with Gray and Gray's suggested taxonomy in mind.

49.     *Dillwyn v Llewelyn* (1862) 4 De G F & J 517, one of the earliest leading cases, is a very clear example of an imperfect gift. In 1853 a father wished to give his younger son an estate in Wales, and thought he had done so by signing a memorandum presenting it to him "for the purpose of furnishing himself with a dwelling-house".     The memorandum was unfortunately not a deed. The son incurred great expense in building himself a house on the land. Two years later the father died and the elder son disputed his brother's title. The Master of the Rolls decreed that the younger son was entitled to a life interest. Lord Westbury LC allowed the younger son's appeal. He said (at p.521):

> "About the rules of the Court there can be no controversy. A voluntary agreement will not be completed or assisted by a Court of Equity, in cases of mere gift. If anything be wanting to complete the title of the donee, a Court of Equity will not assist him in obtaining it; for a mere donee can have no right to claim more than he has received. But the subsequent acts of the donor may give the donee that right or ground of claim which he did not acquire from the original gift . . . so if A puts B in possession of a piece of land, and tells him, 'I give it to you that you may build a house on it,' and B on the strength of that promise, with the knowledge of A, expends a large sum of money in building a house accordingly, I cannot doubt that the

31

donee acquires a right from the subsequent transaction to call on the donor to perform that contract and complete the imperfect donation which was made. The case is somewhat analogous to that of verbal agreement not binding originally for the want of the memorandum in writing signed by the party to be charged, but which becomes binding by virtue of the subsequent part performance."

The Lord Chancellor awarded the younger son the fee simple since "no one builds a house for his own life only."

50.    Although *Dillwyn v Llewelyn* is aptly described as a case of imperfect gift, it also had a slight flavour of "common expectation", because the father wanted to have his son living near him (the Lord Chancellor referred almost in the same breath to an agreement and a donation). It also had an element of mistake, but not of unilateral mistake. Both father and son must be taken to have made the common mistake of supposing the signed memorandum to be an effective way of making a gift of land. Had the mistake been discovered during the father's lifetime, it would no doubt have been put right without the need for legal proceedings.

51.    Cases of unilateral mistake occurred quite frequently in the 19th century, when the construction of canals and railways, coupled with the complexity of unregistered conveyancing in those days, made it not uncommon for building works to be carried out on land whose owner (or part-owner) had not agreed to the works. An example is *Rochdale Canal Company v King* (1853) 16 Beav 630, 633-637, in which Sir John Romilly MR said

"The principle on which the Defendants rely is one often recognised by this Court, namely, that if one man stand by and encourage another, though but passively, to lay out money, under an erroneous opinion of title, or under the obvious expectation that no obstacle will afterwards be interposed in the way of his enjoyment, the Court will not permit any subsequent interference with it, by him who formally promoted and encouraged those acts of which he now either complains or seeks to take advantage. This is the rule laid down in *Dann v Spurrier* (7 Ves 231), *Powell v Thomas* (6 Hare 300), and many other cases, to which it is unnecessary to refer, because the principle is clear."

*Dann v Spurrier* (1802) 7 Ves Jun 231 was a decision of Lord Eldon in a case concerned with improvements to a leasehold property carried out by the tenant's assignee in circumstances where it was uncertain whether the length of the term (7, 14 or 21 years) was at the option of the lessee alone (and ultimately the case was decided on that point of construction). Lord Eldon made clear (at pp.235-236) that the fact of the defendant's knowledge (of the plaintiff's mistake) must be proved by strong and cogent evidence. He gave some weight to the fact that the plaintiff was a professional man who had acted incautiously.

52.    The great case of *Ramsden v Dyson* (1866) LR 1 HL 129 has, rightly, been closely examined in the course of the appeal. The Vice-Chancellor had held that two tenants of Sir John Ramsden, the owner of a large estate near Huddersfield, were entitled to long leases of plots on the estate. They ostensibly held the plots as tenants at will only, but they had spent their own money in building on the strength of assurances, said to have been given to them by the landowner's agent, that they would never be disturbed. This House reversed that decision by a majority (Lord Cranworth LC, Lord Wensleydale and Lord Westbury, Lord Kingsdown dissenting). The difference of opinion was over an issue of fact, that is the substance of what was said on the occasion when some tenants agreed to be tenants at lower rents than were being paid by other tenants of Sir John Ramsden.    Lord Kingsdown's statement of the law (at p.170, emphasising the element of encouragement) has often been preferred to Lord Cranworth's (at pp.140-141, emphasising the importance of mistake on one side and knowledge of the mistake on the other side). Lord Kingsdown was seeing the case as one of common expectation (of the tenant's right to be granted a long lease on demand), whereas Lord Cranworth was seeing it as one of unilateral mistake. *Ramsden v Dyson* is a good example of a case which does not fit neatly into one category to the exclusion of another.

53.    The passages in *Ramsden v Dyson* that I have just mentioned are too well-known to need repetition. But Mr Dowding QC (for the appellant) drew attention to another, less frequently quoted, passage in Lord Cranworth's speech. After mentioning one competing version of the substance of what had been said (that is, that the tenants could "safely allow the matter to rest in the honour of the Ramsden family") Lord Cranworth said (at p.145-146),

"If any one makes an assurance to another, with or without consideration, that he will do or will abstain from doing a particular act, but he refuses to bind himself, and says that for the performance of what he has promised the person to whom the promise has been made must rely on the honour of the person who has made it, this excludes the jurisdiction of Courts of equity no less than of Courts of law."

Lord Wensleydale made similar comments at the end of his speech (p.170). These may be the first references to the notion that an arrangement which is expressly and deliberately acknowledged to be a "gentleman's agreement" may not be capable of giving rise to an estoppel. It is of some relevance to this appeal, the facts of which are stated in the opinion of my noble and learned friend Lord Scott of Foscote, whose account I gratefully adopt.

54.    *Plimmer v Mayor, Councillors and Citizens of the City of Wellington* (1884) 9 App Cas 699 was a common expectation case. Mr Plimmer seems to have been a businessman of some substance, and he was dealing with the provincial government, but their arrangements seem to have been attended by a high degree of informality. In that respect it is in striking contrast to *Attorney General of Hong Kong v Humphreys Estate (Queen's Gardens)* [1987] AC 114, discussed below. In *Plimmer* the nub of the Privy Council's decision appears at p.712:

"In the present case, the equity is not claimed because the landowner has stood by in silence while his tenant has spent money on his land. This is a case in which the landowner has, for his own purposes, requested the tenant to make the improvements. The Government were engaged in the important work of introducing immigrants into the colony. For some reason, not now apparent, they were not prepared to make landing-places of their own, and in fact they did not do so until the year 1863. So they applied to John Plimmer to make his landing-place more commodious by substantial extension of his jetty and the erection of a warehouse for baggage. Is it to be said that, when had had incurred the expense of doing the work asked for, the Government could turn round and revoke his licence at their will? Could they in July, 1856, have deprived him summarily of the use of the jetty? It would be in a high degree unjust that they should do so, and that

> the parties should have intended such a result is, in the
> absence of evidence, incredible."

55.    In *Plimmer* the opinion of the Privy Council, delivered by Sir
Arthur Hobhouse, is of interest because it discusses (at pp.710-712) the
case of *Ramsden v Dyson* at some length, and rejects the argument
(based on Lord Cranworth's speech) that some sort of unilateral mistake
is necessary in every case.  *Plimmer* is also important for the discussion
(at pp.713-714) of the Court's discretion as to the remedy to be granted
in any case where an equitable estoppel is established.

56.    Four years before *Plimmer* Fry J decided *Willmott v Barber*
(1880) 15 Ch D 96.  It calls for mention because Fry J's five *probanda*
have over the years proved something of a stumbling-block in the
development of equitable estoppel, until the position was clarified by
Oliver J in *Taylors Fashions Ltd v Liverpool Victoria Trustees Co Ltd*
(1979) [1982] QB 133.  Gray and Gray comment (para 10.204, footnote
1) that courts often tried to force factual situations into the *probanda*
even when they were "ludicrously irrelevant or inapplicable" to the case.

57.    The facts of *Willmott v Barber* were that Barber was in 1869
granted a 99-year lease of three acres of land in east London, subject to
a covenant against assignment or sub-letting without consent.  In 1874,
in breach of covenant, he sub-let one acre on an annual tenancy to
Willmott (who owned a sawmill on adjoining land) and gave him an
option to acquire the whole of the three acres.  Willmott spent money in
levelling the land and laying it out as a timber-yard.  In 1877 Barber
purported to surrender his term to his landlord, Bowyer, and take an
immediate re-grant (it is not clear whether Barber was dishonest or
simply disorganised).   Then Willmott exercised his option and sued
Barber for specific performance, joining Bowyer as a party and seeking
a declaration that he had unreasonably refused consent.  The real issue
was whether Bowyer had disabled himself, by acquiescence, from
objecting to the breach of covenant.  That was the context in which Fry J
formulated his five detailed *probanda.*  He was not trying to state
principles applicable to equitable estoppel as a whole.  Indeed he began
his judgment (at p.104),

> "I think it is very questionable whether, after what Bowyer
> has done, he could interfere with the Plaintiff's possession
> of the one acre.  But that point is not raised in this action,
> and my decision will in no way affect it."

58.    In *Taylor's Fashions* Oliver J analysed the authorities in a
masterly way (with the assistance of two chancery silks who were later
to become Law Lords) and put this part of the law back on the right
track. He pointed out that the five *probanda* (including the defendant's
knowledge of his own title, and of the claimant's mistake as to title) are
relevant only to cases of unilateral mistake, where the defendant's only
encouragement to the claimant has been passive non-intervention: see at
p. 147.   Oliver J discussed *Ramsden v Dyson* at some length and
followed the preference shown by the Privy Council in *Plimmer* for
Lord Kingsdown's analysis rather than Lord Cranworth's: see at pp.
148-151.

59.    Towards the end of his judgment Oliver J made some important
general observations (at pp.151-152):

> "Furthermore the more recent cases indicate, in my
> judgment, that the application of the *Ramsden v Dyson* LR
> 1 HL 129 principle—whether you call it proprietary
> estoppel, estoppel by acquiescence or estoppel by
> encouragement is really immaterial—requires a very much
> broader approach which is directed rather at ascertaining
> whether, in particular individual circumstances, it would
> be unconscionable for a party to be permitted to deny that
> which, knowingly, or unknowingly, he has allowed or
> encouraged another to assume to his detriment than to
> enquiring whether the circumstances can be fitted within
> the confines of some preconceived formula serving as a
> universal yardstick for every form of unconscionable
> behaviour."

This passage certainly favours a broad or unified approach to equitable
estoppel. But it is emphatically not a licence for abandoning careful
analysis for unprincipled and subjective judicial opinion. It is worth
noting that on this part of the case Oliver J analysed over twenty
authorities spanning more than two centuries.

60.    The last authority that calls for close examination is *Attorney
General of Hong Kong v Humphreys Estate (Queen's Gardens) Ltd*
[1987] AC 114. It was concerned with protracted (and ultimately
abortive) negotiations for an exchange of valuable property between the
Government of Hong Kong (which was to acquire a block of flats to
house senior civil servants) and a large property developer (which was
to take a Crown lease of Queen's Gardens in order to develop it,

36

together with other land already owned by the developer). An agreement in principle had been reached in discussions recorded in lengthy written correspondence, which unsurprisingly referred to the agreement in principle as being "subject to contract". Experienced lawyers were acting on both sides, and they and their clients were well aware that an enforceable contract would come into existence only on exchange of contracts as finally agreed between the lawyers.

61.     Despite that both sides incurred expenditure in the expectation that a contract would eventually be entered into. The Government took possession of the flats and spent money on them; the developer entered Queen's Gardens and carried out work at its expense. But each side was acting at its own risk, because each knew perfectly well that it had no enforceable rights against the other. The Government's main witness, Mr Ward, was a surveyor who accepted that he was not a party to the negotiations under which the Government moved into the flats and that he had no authority to take decisions. The parties' knowledge that neither had any enforceable rights was fatal to the Government's claim to rely on equitable estoppel. Lord Templeman, delivering the opinion of the Board, summarised the position at p.124:

> "Their Lordships accept that the Government acted to their detriment and to the knowledge of HKL in the hope that HKL would not withdraw from the agreement in principle. But in order to found an estoppel the Government must go further.   First the Government must show that HKL created or encouraged a belief or expectation on the part of the Government that HKL would not withdraw from the agreement in principle.   Secondly the Government must show that the Government relied on that belief or expectation.   Their Lordships agree with the courts of Hong Kong that the Government fail on both counts."

62.     In reaching that conclusion the Privy Council naturally referred to, and placed some reliance on, the use of the phrase "subject to contract" in the correspondence between the parties. But in my opinion that was simply a routine acknowledgement of what both parties knew very well in any event: that they were involved in a complex process of negotiation which might come to nothing (as occurred when the Hong Kong property market fell sharply in 1984). The Government of Hong Kong was at pains, as appears from the documents quoted by the Privy Council (and still more from the fuller quotations from the documents in the judgments in the Hong Kong Court of Appeal, [1986] HKLR 669),

to emphasise on every occasion that it was not committing itself in any way. By the same token, it could not expect the developer to be committing itself, either in law or in equity. It could not be unconscionable for the developer to follow a course which the Government repeatedly insisted was open to itself.

63.    The present appeal is not a case of imperfect gift, like *Dillwyn v Llewelyn.* Nor is it a case of unilateral mistake to which the *Willmott v Barber probanda* would be appropriate—that is, a case of the defendant taking advantage of a mistake as to title of which he is well aware. This case is, in the terminology used by Gray and Gray, a case of "common expectation" if it is anything. The critical issue, to my mind, is whether there was, on the judge's findings, a common expectation of the type capable of raising an equitable estoppel. Although they are not based on common mistake (as in the "imperfect gift" cases) or unilateral mistake (as in the "standing by" cases) "common expectation" cases often have at least a flavour of mistake, or at any rate what restitution lawyers call misprediction (Mr Cobbe predicted, wrongly, that Mrs Lisle-Mainwaring would not withdraw from the non-binding arrangement). Was it also necessary for Mr Cobbe to believe, wrongly, that Mrs Lisle-Mainwaring had no legal right to withdraw from it?

64.    On this point the language of Lord Kingsdown's much-quoted statement in *Ramsden v Dyson* at p.170 is not without ambiguity:

". . . under a verbal agreement with a landlord for a certain interest in land, or, what amounts to the same thing, under an expectation, created or encouraged by the landlord, that he shall have a certain interest . . ."

But an expectation of an interest is the same thing as a contracted interest only if it can be relied on. The rest of the speech indicates (at p.172) that Lord Kingsdown's reading of the facts was that the tenants believed (wrongly) that they had a legal right to a long lease, and that that was of critical importance. So he seems not to have differed, as to the law on this point, from Lord Cranworth (at pp. 145-146, a passage I have already quoted) and the rest of the majority. Reliance on the Ramsden family's honour was not enough.

65.    In *Plimmer* the Privy Council (at p.712, the passage I have already quoted) regarded it as an irresistible inference that Mr Plimmer thought that his compliance with the Government's request gave him a

38

right to security of tenure, even if the duration of that security was uncertain. It is not enough to hope, or even to have a confident expectation, that the person who has given assurances will eventually do the proper thing.

66.     The point that hopes by themselves are not enough is made most clearly in cases with a commercial context, of which *Attorney General of Hong Kong* is the most striking example. It does not appear so often in cases with more of a domestic or family flavour, from *Inwards v Baker* [1965] 2 QB 29 and *Pascoe v Turner* [1979] 1 WLR 431 to *Windeler v Whitehall* [1990] 2 FLR 505, *Gillett v Holt* [2001] Ch 210, *Grundy v Ottey* [2003] WTLR 1253, *Jennings v Rice* [2003] 1 P & CR 8 and *Lissimore v Downing* [2003] 2 FLR 308. The son who built the bungalow in *Inwards v Baker*, the young farm manager in *Gillett v Holt*, the elderly country neighbour in *Jennings v Rice* and the female companions in the other three cases almost certainly did not take any legal advice until after the events relied on as creating the estoppel. They may not have had a clear idea of the quantum of what they expected to get (in *Grundy v Ottey*, unusually, the expected quantum was precisely defined). But in those cases in which an estoppel was established, the claimant believed that the assurance on which he or she relied was binding and irrevocable.

67.     It may possibly be that some of the domestic cases might have been decided differently if the nature of the claimant's belief had been an issue vigorously investigated in cross-examination. In *Gillett v Holt* there was such cross-examination ([2001] Ch 210, 229),

> "Mr Gillett was cross-examined at length about some increasingly improbable eventualities: that Mr Holt would marry his housekeeper, that he would have children, that his elderly sister would suddenly lose all her investments and turn to him for help. Mr Gillett naturally enough conceded that in those circumstances Mr Holt could or would have made some provision for these moral obligations. But, in giving evidence, he stuck resolutely to the promises made to him. . . Mr Gillett was not in the witness box to take part in a seminar on the elements of proprietary estoppel (although parts of his cross-examination suggest otherwise). He was there to give evidence, which was largely unchallenged and which the judge accepted, about the assurances made to him and his detrimental reliance on them."

39

In most of these cases the controversial issues tend to be whether any sufficient assurance was made, and whether it was causally relevant (often cross-examination is directed towards establishing that the claimant would have done the same in any case, out of friendship or family feeling).

68.    It is unprofitable to trawl through the authorities on domestic arrangements in order to compare the forms of words used by judges to describe the claimants' expectations in cases where this issue (hope or something more?) was not squarely raised. But the fact that the issue is seldom raised is not, I think, coincidental. In the commercial context, the claimant is typically a business person with access to legal advice and what he or she is expecting to get is a *contract*. In the domestic or family context, the typical claimant is not a business person and is not receiving legal advice. What he or she wants and expects to get is an *interest* in immovable property, often for long-term occupation as a home. The focus is not on intangible legal rights but on the tangible property which he or she expects to get.  The typical domestic claimant does not stop to reflect (until disappointed expectations lead to litigation) whether some further legal transaction (such as a grant by deed, or the making of a will or codicil) is necessary to complete the promised title.

69.    The judge's findings of fact, which are not challenged in any significant respect, need to be examined with these points in mind. His findings are clearly identified and set out in paras 62 to 84 of his judgment. To say that they are dispassionate is not to suggest that they are in any way unfocused; quite the reverse.

70.    The crucial findings, to my mind, are in paras 68 to 70:

"68. On the other hand, I find that, from the end of 2002 until the grant of the Planning Permission on 17 March 2004, Mr Cobbe believed the following: that the Second Agreement comprised all the critical commercial terms, that any outstanding terms were of secondary importance and in the nature of legal mechanics, which would inevitably be agreed one way or another, and that Mrs Lisle-Mainwaring was, and regarded herself as, bound in honour to enter into a formal written contract embodying the terms of the Second Agreement if Mr Cobbe obtained

planning permission for the development of the Property by its demolition and its replacement by six houses.

69. I also accept Mr Cobbe's evidence that he himself felt the Second Agreement was binding on him in honour. I reject the submission of Mr Seitler to the contrary based on the oral evidence of Mr McMahon, as to what Mr McMahon had been told by, and the general impression that was given to him by, Mr Cobbe, and on a note made by Mr Cobbe in 2004 concerning the First Agreement and its termination.

70. Mr Cobbe envisaged that, if Mrs Lisle-Mainwaring decided not to proceed with the development of the Property, prior to planning permission being granted, he would be reimbursed his reasonable expenditure. If she did not withdraw, and such planning permission was refused, he would not be reimbursed."

71.    So the judge found that Mr Cobbe believed that Mrs Lisle-Mainwaring was, and regarded herself as, bound in honour to enter into a formal written contract if planning permission was granted; and that Mr Cobbe regarded himself as similarly bound. It is implicit—in my view necessarily and deliberately implicit—in the judge's carefully chosen language that neither Mrs Lisle-Mainwaring nor Mr Cobbe regarded herself or himself as legally bound. They were both very experienced in property matters and they knew perfectly well that that was not the position.

72.    Another unusual feature of this case is the judge's finding that Mr Cobbe believed that he would be reimbursed his reasonable expenditure if Mrs Lisle-Mainwaring decided to withdraw from the arrangement before planning permission was granted. This emphasis on the actual grant of planning permission as the crucial condition produces a strange result: would it be conscionable for Mrs Lisle-Mainwaring to withdraw (subject only to reimbursement) at a stage when 99% of the work necessary to obtain planning permission had been done, and success was virtually certain, but unconscionable to do so once success had actually been achieved? This feature of the arrangement emphasises the risk which Mr Cobbe was undertaking, in deciding to rely on Mrs Lisle Mainwaring's sense of honour.

73.    The judge then proceeded to analyse the position (paras 85-129 of his judgment), stating at the outset his conclusion that the facts did give rise to a proprietary estoppel in favour of Mr Cobbe. The judge's analysis is lengthy and closely-reasoned but there are, as I see it, three main themes.

74.    The first is the importance (para 86) of Mr Cobbe's

"belief that, even though the Second Agreement was not a legally binding and enforceable contract, Mrs Lisle Mainwaring regarded it as binding."

The judge did not add "in honour only" but that was necessarily implicit. Mr Cobbe knew enough about the law of property, and about Mrs Lisle-Mainwaring's astuteness, to know that there was no legally binding contract between them, and that Mrs Lisle-Mainwaring would not regard an obligation arising in honour only as legally binding. This point then re-emerged in para 123, near the end of the judge's analysis, with a reference to Mr Cobbe's belief that the arrangement "would be honoured, even though it was not legally binding." "Honour" is used, as a verb, to describe compliance with both contractual and non-contractual promises, and so its use rather elides the difference between them.

75.    The second theme of the judge's analysis is the weight which he placed, in discussing the authorities, on the use of the expression "subject to contract" in *Attorney-General of Hong Kong* and *London and Regional Investments v TBI plc* [2000] EWCA Civ 355 (in which the words "SUBJECT TO CONTRACT" appeared prominently at the head of the written "Principles for Joint Venture"). In each of those cases there were written terms which, in the absence of any "subject to contract" formula, might arguably have amounted to binding contracts, and the formula emphasised that matters were still at the stage of negotiation. But I can see no good reason for according a higher degree of revocability or negotiability to written terms "subject to contract" than to terms which have never been written down at all (so that the use of the "subject to contract" formula has not been called for), especially where the negotiations have been carried on between experienced parties well versed in property law. As Ralph Gibson LJ said in *J T Developments Ltd v Quinn* (1990) 62 P & CR 33, 47, referring to *Attorney General of Hong Kong,*

> "In that case, there was express use of the phrase 'subject to contract' and its effect was fully understood by both sides. In this case there were no such words. The right, however, not to proceed with negotiations for the contract exists independently of the use of that phrase, which is required, normally, in circumstances where an express agreement in writing is apparently reached which would constitute an enforceable agreement but for the use of that phrase."

76.     The third theme of the judge's analysis was its discussion of earlier cases in which estoppel had been claimed in a commercial context. Apart from those mentioned in the last paragraph, the most important, in chronological order, are *Holiday Inns Inc v Broadhead* (1974) 232 EG 951; *Crabb v Arun District Council* [1976] Ch 179 and *Pridean v Forest Taverns Ltd* (1998) 75 P & CR 447.

77.     In *Holiday Inns* the defendant behaved very badly indeed. The judge described his conduct as deceitful as well as unconscionable. He repeatedly assured his American partners in the joint venture "that we had his word; that he was an English gentleman; and that we could count on him." The two principal witnesses for Holiday Inns (Mr Wilson and Mr Tigrett, who were businessmen, not lawyers) believed implicitly that they had a deal with Mr Broadhead: see their evidence as summarised by Goff J at pp 1089-1091, and his findings on it. It is also very important to note that *Holiday Inns* was not a case in which Mr Broadhead was bringing land of his own into a joint venture. He obtained an option over the site at the request of Mr Wilson, but then failed to keep Mr Wilson informed about it: see at pp 953-954. It was the commercial strength and reputation of Holiday Inns that secured planning permission for the hotel development. Mr Broadhead could not have got it on his own. Mr Wilson regarded Mr Broadhead as totally committed to granting Holiday Inns a lease on agreed terms (see at p 1089):

> "I want to repeat that Mr Broadhead would never have got this piece of property. If he had not told me he was going out and try and get the property, then I would have sent somebody else out to get the property. Mr Broadhead understood our 3 and 1 lease and was happy for my friend Mr Broadhead to buy this ground and us to lease it from him on that kind of terms.   This was our complete understanding and agreement."

78.    *Holiday Inns* can therefore be seen as a case where one joint venturer permitted another to acquire legal rights (in that case, an option to purchase the site) in the belief that the property would be used for the joint venture. It was therefore akin to *Pallant v Morgan* [1953] Ch 43, which Goff J referred to in his discussion of the law (at p1087). Chadwick LJ recognised that as a possible analysis in *Banner Homes Group Plc v Luff Developments Ltd* [2000] Ch 372, 397-399, although in his discussion Chadwick LJ ultimately favoured proprietary estoppel (see also the discussion by Lewison J in *Kilcarne Holdings Ltd v Targetfollow (Birmingham) Ltd* [2005] 2 P & CR 105, 159-162). In the present case, of course, Mrs Lisle-Mainwaring and YRML owned the property (subject only to some outstanding tenancies) long before Mr Cobbe came on the scene.

79.    *Crabb v Arun District Council,* the facts of which are well known, is a difficult case, not least because of different views taken by different members of the Court (Lord Denning MR, and Lawton and Scarman LJJ). The situation was that of a commercial negotiation in which both sides expected formal legal documents to be agreed and executed. The case is best explained, I think, by recognising that the Council's erection of the two sets of gates was an act so unequivocal that it led to Mr Crabb irretrievably altering his position, putting the matter beyond the stage at which it was open to negotiation: see at pp 186 (Lord Denning MR), 191 (Lawton LJ) and 197 (Scarman LJ).

80.    In *Pridean* the Court of Appeal upheld the County Court judge's rejection of the estoppel claim on the grounds that the negotiations still left one crucial point still to be decided. In the present case, by contrast, the judge found (in para 68 of his judgment, quoted above) that all the critical commercial terms had been agreed in principle. Mr Dowding did not directly challenge that conclusion, but he pointed out that the successful redevelopment involved many uncertainties which were not simply a matter for Mr Cobbe and Mrs Lisle-Mainwaring to agree between themselves; I will come back to that aspect of the matter.

81.    In my opinion none of these cases casts any doubt on the general principle laid down by this House in *Ramsden v Dyson*, that conscious reliance on honour alone will not give rise to an estoppel. Nor do they cast doubt on the general principle that the court should be very slow to introduce uncertainty into commercial transactions by over-ready use of equitable concepts such as fiduciary obligations and equitable estoppel. That applies to commercial negotiations whether or not they are expressly stated to be subject to contract.

44

82.    The judge went on to consider how he should exercise his discretion so as to give effect to the estoppel which he had found to be established. The difficulties that he encountered are a further indication, I think, of the incongruity of trying to apply the doctrine of equitable estoppel to a complicated commercial negotiation in which one crucial element—how Mr Cobbe was going to fund the project, and provide security both for the funding and for Mrs Lisle-Mainwaring's overage interest—had hardly been addressed.

83.    The Court of Appeal (Mummery and Dyson LJJ and Sir Martin Nourse) unanimously dismissed Mrs Lisle-Mainwaring's appeal from the judge's main judgment (her appeal against being made personally liable, a matter covered in the judge's second judgment, was allowed, and nothing now turns on that). Mummery LJ gave the leading judgment in the Court of Appeal. He summarised the five main grounds of appeal:

    (1)    the mutual promises point: that Mr Cobbe had not performed all (or substantially all) of his side of a complex bargain;

    (2)    the uncertainty point: that Mr Cobbe's expectation was of "a contract", which was meaningless unless the terms of the contract were clear;

    (3)    the "subject to contract" point: this has been sufficiently explained already;

    (4)    the unconscionability point: that it was not, in all the circumstances, unconscionable for Yeoman's Row Management Ltd ("YRML") to continue to allow Mr Cobbe to spend money, after Christmas 2003, in seeking planning permission; and

    (5)    a point on section 2 of the Law of Property (Miscellanous Provisions) Act 1989.

84.    Mummery LJ disposed of the first four of these points relatively briefly (paras 45-61) and then went on to the fifth point, to the relief granted and to the problems raised by the judge's second judgment. Dyson LJ agreed with Mummery LJ and added some further reasoning on the issue of relief. Sir Martin Nourse agreed with both judgments.

85.    My Lords, I yield to no one in my respect for Etherton J and for
the three very experienced judges in the Court of Appeal who upheld his
main judgment.  But I have after anxious consideration reached the clear
conclusion that they stretched the boundaries of the doctrine of equitable
estoppel too far in granting relief going well beyond the restitutionary
relief to which I would hold Mr Cobbe to be entitled.  In my opinion the
Court of Appeal's decision, if it were to stand, would tend to introduce
considerable uncertainty into commercial negotiations, and not only in
the field of property development (compare *Baird Textile Holdings Ltd v
Marks & Spencer plc* [2001]  EWCA Civ 274, [2002] 1 All ER (Comm)
737 which the editors of Meagher, Gummow & Lehane, 4th ed. Para 17-
050, contrast with recent developments in Australia).  Equity has some
important functions in regulating commercial life, but those functions
must be kept within proper bounds:  see generally Sir Peter Millett,
"Equity's Place in the Law of Commerce", (1998) 114 LQR 214.

86.    My reasons for differing from the courts below are three-fold
(although, as always seems to happen in this area of law, the points are
not completely distinct; they rub shoulders together).  They broadly
correspond to the first four grounds of appeal in the Court of Appeal, but
taking the first and second grounds together.

87.    The informal bargain made in this case was unusually complex,
as both courts below acknowledged.  When a claim based on equitable
estoppel is made in a domestic setting the informal bargain or
understanding is typically on the following lines:  if you live here as my
carer/companion/lover you will have a home for life.  The expectation is
of acquiring and keeping an interest in an identified property.  In this
case, by contrast, Mr Cobbe was expecting to get a contract.  Under that
contract he (or much more probably a company controlled by him)
would have been entitled to acquire the property for a down-payment of
£12m, but only as part of a deal under which the block of flats on the
site was to be demolished, the site cleared, and six very expensive
townhouses were to be erected instead, and sold for the best prices that
they would fetch.  The interests of Mrs Lisle-Mainwaring and YRML
were not restricted to the £12m down-payment.  She was to receive a
further sum amounting (together with the £12m) to one-half of the gross
proceeds of sale of the six townhouses.  She would expect this future
sum to be secured on the property.  The bank or other institution
providing the development finance would also expect its lending to be
fully secured.  At some point a very large sum of money was going to be
secured on an empty site.  None of these matters seems to have been
under negotiation before the deal collapsed in March 2004.  Mr Ivory
made a virtue of that point, arguing that the absence of any active

46

negotiations between September 2002 and March 2004 shows that the parties did not expect to encounter any difficulty in agreeing these matters. It is more likely, to my mind, that they both accepted that there was no point in tackling them until planning permission had been obtained.

88.    I have already mentioned the judge's finding that Mr Cobbe believed (para 68),

> "that the Second Agreement comprised all the critical commercial terms, that any outstanding terms were of secondary importance and in the nature of legal mechanics, which would inevitably be agreed one way or another."

Mr Dowding did not directly attack this conclusion, but he did submit (to my mind convincingly) that the matters which were not agreed (or even under negotiation) were far from trivial. The fact that one or both parties may have expected that all outstanding points would be resolved does not mean that that outcome was certain or near-certain (as is confirmed by recent events in the mortgage lending and property sectors).

89.    The judge may also have taken rather too broad a view of the commercial reality of the proposed deal. In discussing the issue of relief he observed (para 140),

> "The Second Agreement, broadly speaking, reflected an intention that [YRML], through Mrs Lisle-Mainwaring, and Mr Cobbe should share equally the increased value or commercial potentiality arising from the grant of the planning permission."

That was no doubt true, in a very broad sense. But Mr Cobbe's prospective rewards were much more highly geared, and vulnerable to changing economic and financial circumstances. Not that there was anything unfair in that: after all, Mrs Lisle-Mainwaring and her company were bringing the property into the venture, and Mr Cobbe's main contribution was his entrepreneurial skill and experience. But it is important, I think, to grasp the degree of risk which Mr Cobbe was

undertaking, on any view of the relationship of trust between himself and Mrs Lisle-Mainwaring.

90.    These considerations (which are loosely connected with the first and second grounds of appeal in the Court of Appeal, and more closely with points made at various places between paragraphs 52 to 78 in the appellant's printed case) are not in themselves decisive. It may be possible to imagine a situation in which an equitable estoppel might arise even though the expected outcome was not really within the gift of the party estopped. But the considerations which I have mentioned do at the least indicate that the estoppel claimed in this case is a very unusual one, which calls for rigorous and even sceptical examination.

91.    When examined in that way, Mr Cobbe's case seems to me to fail on the simple but fundamental point that, as persons experienced in the property world, both parties knew that there was no legally binding contract, and that either was therefore free to discontinue the negotiations without legal liability—that is liability in equity as well as at law, to echo the words of Lord Cranworth quoted in para 53 above. Mr Cobbe was therefore running a risk, but he stood to make a handsome profit if the deal went ahead, and the market stayed favourable. He may have thought that any attempt to get Mrs Lisle-Mainwaring to enter into a written contract before the grant of planning permission would be counter-productive. Whatever his reasons for doing so, the fact is that he ran a commercial risk, with his eyes open, and the outcome has proved unfortunate for him. It is true that he did not expressly state, at the time, that he was relying solely on Mrs Lisle-Mainwaring's sense of honour, but to draw that sort of distinction in a commercial context would be as unrealistic, in my opinion, as to draw a firm distinction depending on whether the formula "subject to contract" had or had not actually been used.

92.    Mr Dowding devoted a separate section of his printed case to arguing that even if the elements for an estoppel were in other respects present, it would not in any event be unconscionable for Mrs Lisle-Mainwaring to insist on her legal rights. That argument raises the question whether "unconscionability" is a separate element in making out a case of estoppel, or whether to regard it as a separate element would be what Professor Peter Birks once called "a fifth wheel on the coach" (Birks & Pretto (eds) Breach of Trust (2002) p.226). But Birks was there criticising the use of "unconscionable" to describe a *state of mind* (*Bank of Credit & Commerce International (Overseas) Ltd v Akindele* [2001] Ch 437, 455). Here it is being used (as in my opinion it

48

should always be used) as an objective value judgment on *behaviour* (regardless of the state of mind of the individual in question). As such it does in my opinion play a very important part in the doctrine of equitable estoppel, in unifying and confirming, as it were, the other elements. If the other elements appear to be present but the result does not shock the conscience of the court, the analysis needs to be looked at again. In this case Mrs Lisle-Mainwaring's conduct was unattractive. She chose to stand on her rights rather than respecting her non-binding assurances, while Mr Cobbe continued to spend time and effort, between Christmas 2003 and March 2004, in obtaining planning permission. But Mr Cobbe knew that she was bound in honour only, and so in the eyes of equity her conduct, although unattractive, was not unconscionable.

93.     Mr Cobbe cannot in my opinion obtain any further assistance from the doctrine of the constructive trust. I do not think it is necessary or appropriate to consider the issue on section 2 of the Law of Property (Miscellanous Provisions) Act 1989.  I would (in common, as I understand it, with all of your Lordships) allow this appeal and direct an inquiry with a view to reimbursing Mr Cobbe on a generous scale not only for his out of pocket expenditure in seeking and obtaining planning permission, but also for his time and trouble in doing so.

## **LORD BROWN OF EATON-UNDER-HEYWOOD**

My Lords,

94.     I have had the advantage of reading in draft the opinions of my noble and learned friends, Lord Scott of Foscote and Lord Walker of Gestingthorpe. I agree with both of them and for the reasons they give I too would allow this appeal and make the order proposed.

## **LORD MANCE**

My Lords,

95. I have had the benefit of reading in draft the speech of my noble and learned friend Lord Scott of Foscote.

96. I express no view as to whether the appellant's offer of £150,000 represents any indication of the amount of a *quantum meruit* (see paragraph 44), but in all other respects I am in full agreement with Lord Scott, and there is nothing I would wish to add. I would therefore allow this appeal and make the orders he proposes.