# EXHIBIT 31

Case No: HC-2014-000497

Neutral Citation Number: [2015] EWHC 386 (Ch)
**IN THE HIGH COURT OF JUSTICE**
**CHANCERY DIVISION**

Rolls Building
Royal Courts of Justice
Fetter Lane, London, EC4A 1NL

Date: 20/02/2015

Before :

**MR JUSTICE HENDERSON**
- - - - - - - - - - - - - - - - - - - -
**Between :**

**PEAK HOTELS AND RESORTS LIMITED**          **Claimant**
- and -
**(1) TAREK INVESTMENTS LIMITED**          **Defendants**
**(2) PEAK HOTELS AND RESORTS GROUP LIMITED**
**(3) SHERWAY GROUP LIMITED**
**(4) CARL JOHAN ELIASCH**
-and-
**(1) PHRL HOLDINGS LIMITED**
**First Named Third Party**
**(2) MR OMAR SHARIF AMANAT**
**Second Named Third Party**
**(3) MR LALIT MODI**
**Fourth Party**

- - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - -

**Mr John Brisby QC, Mr Richard Hill QC and Mr Alexander Cook** (instructed by **Candey Limited**) for the **Claimant**
**Mr David Caplan** (instructed by **Herbert Smith Freehills LLP**) for the **1st Defendant**
**Mr Michael Brindle QC and Mr Adam Zellick** (instructed by **Berwin Leighton Paisner LLP**) for **the 3rd and 4th Defendants**

Hearing dates: 16 and 17 December 2014
- - - - - - - - - - - - - - - - - - - -
**Judgment**

**Mr Justice Henderson:**

<u>**Introduction**</u>

1.     On 16 and 17 December 2014, I heard applications for security for costs by the first defendant, Tarek Investments Ltd ("Tarek"), and the third and fourth defendants, Sherway Group Ltd ("Sherway") and Mr Carl Eliasch (together "the Sherway defendants"), against the claimant, Peak Hotels and Resorts Ltd ("PHRL"). I also heard a cross-application for security for costs by PHRL against Tarek.

2.     The applications arise in the context of a hotly contested dispute concerning the ownership and control of the Aman Group, which was founded in the 1980s by Mr Adriaan Zecha and now operates a chain of small luxury hotels and resorts in Asia, Europe and the Americas under the brand name Aman Resorts.

3.     There are three main parties to the dispute: PHRL, Tarek and Sherway. Each of those companies is a corporate vehicle controlled, directly or indirectly, by a prominent businessman: Mr Omar Amanat (who is the second named third party), in the case of PHRL; Mr Vladislav Doronin, in the case of Tarek; and Mr Eliasch, in the case of Sherway.

4.     In January 2014, Mr Amanat and Mr Doronin combined to purchase Aman Resorts from the then owners of the business for US$ 358 million. The purchase was effected through a joint venture company, the second defendant Peak Hotels and Resorts Group Ltd ("the JVC"). Approximately 65% of the shares in the JVC were held by Tarek, and the remaining approximately 35% of the shares were held by PHRL. The relationship between the shareholders was governed by a shareholders' agreement dated 31 January 2014 ("the SHA"). Despite the inequality of the two shareholdings, the SHA was structured in such a way as to give Tarek and PHRL equal management and control of the JVC at board level, and each of Tarek and PHRL had the right to nominate two directors to the board.

5.     In April 2014, it was agreed by Mr Amanat and Mr Eliasch, following an introduction and discussions, that Sherway would lend US$ 50 million to PHRL. A series of linked agreements was then signed, which included provision for about 53% of the loan to be converted into shares in a new intermediate holding company inserted between PHRL and the JVC, PHRL Holdings Ltd ("PHRL Holdings", which is the first named third party). In this way, it was envisaged that Mr Eliasch (through Sherway) would acquire an indirect stake of about 14% in the JVC.

6.     It is common ground that the loan of US$ 50 million was drawn down in full on 2 April 2014. A few days later, Mr Eliasch replaced Mr Amanat as one of the two directors of the JVC nominated by PHRL. No steps were taken, however, to implement the new shareholding structure through PHRL Holdings. That remains one of the myriad points in dispute between the parties.

7.     Relations between Mr Amanat and Mr Doronin began to deteriorate at a very early stage, and according to Mr Amanat this formed an important part of the backdrop to the deal which he struck with Mr Eliasch. In particular, Mr Amanat alleges (in broad outline) that Mr Eliasch falsely represented to him that he was not a close friend or business associate of Mr Doronin, and that he (Mr Eliasch) would support and

promote the interests of PHRL in the conduct of the JVC's business, whereas the truth of the matter was that Mr Eliasch and Mr Doronin were good friends, and their intention from the outset had been to pursue a strategy designed to force PHRL and parties connected with PHRL (including Mr Amanat and Mr Zecha) out of the JVC, and to assume ultimate control of Aman Resorts.

8.  These allegations are denied by Mr Doronin, Mr Eliasch, and their respective companies. They say that they have throughout done their best to run the business of the JVC in the best interests of all the shareholders, but have been faced by a "greenmailing" strategy by Mr Amanat (orchestrated through PHRL and its nominated directors of the JVC) designed to put pressure on Mr Doronin and/or Tarek to buy PHRL out of the of joint venture at a premium, or to sell Tarek's stake in it to Mr Amanat or a third party at a discount, by disrupting and frustrating the proper running and financing of the business.

9.  What I have said so far is no more than the barest summary of a very complicated dispute. The consolidated statements of case (the particulars of claim of PHRL, the defence and counterclaim of Tarek, and the defence and counterclaim of the Sherway defendants) run in total to several hundred paragraphs and some 225 pages. There are numerous issues of fact and law. Nobody at the hearing in December suggested that I either could, or should, attempt to form a view at this stage about the ultimate merits of the dispute. They will have to be determined at the trial of the action, which is due to begin in November 2015 with a time estimate of five weeks.

**The proceedings to date**

10.  The proceedings were begun when PHRL issued a claim form on 25 June 2014 against Tarek, the JVC and Sherway, seeking declaratory and injunctive relief and damages for breach of contract. On 17 July 2014, PHRL issued a further claim against the Sherway defendants, claiming rescission of the SHA and various other agreements for fraudulent (or alternatively negligent) misrepresentation, damages for misrepresentation, and (in the further alternative) damages on the footing that the agreements had been terminated by PHRL's acceptance of repudiatory breaches of contract by the defendants.

11.  Various applications for interim relief were made, and judgments dealing with issues which could not be resolved by agreement were delivered by Catherine Newman QC (sitting as a deputy judge of the High Court) on 14 July 2014; by Robert Englehart QC (sitting as a deputy judge of the High Court) on 18 July 2014; by Rose J on 31 July 2014; and by His Honour Judge Pelling QC (also sitting as a judge of the High Court) on 19 September 2014. The last of those judgments contains a helpful account of the background to the case and of the procedural history which I have summarised: see [2014] EWHC 3066 (Ch).

12.  Judge Pelling also made an order on 19 September 2014 consolidating the two actions which I have mentioned above, staying two other actions, directing the service of consolidated statements of case, and giving other case management directions down to trial. One of those directions was that any application by any party for security for costs should be issued by no later than 3 October 2014.

13.  PHRL's consolidated particulars of claim were served on 2 October 2014, and the consolidated defences and counterclaims of Tarek and the Sherway defendants were served on 25 November 2014.   Tarek and the Sherway defendants issued their applications for security for costs against PHRL on 3 October, but PHRL did not make its application for security in respect of Tarek's counterclaim until 6 December 2014. No point was taken about the late issue of PHRL's application, because it could not sensibly have been issued before receipt of Tarek's counterclaim.

**The relevant provisions of the CPR**

14.  The relevant provisions of the CPR dealing with security for costs are contained in rules 25.12 and 25.13.  So far as material, they provide as follows:

> "**Security for Costs**
>
> 25.12(1) A defendant to any claim may apply under this Section of this Part for security for his costs of the proceedings …
>
> (2) An application for security for costs must be supported by written evidence.
>
> (3) Where the court makes an order for security for costs, it will-
>
>> (a) determine the amount of security; and
>>
>> (b) direct –
>>
>>> (i) the manner in which; and
>>>
>>> (ii) the time within which
>>
>> the security must be given.
>
> **Conditions to be satisfied**
>
> 25.13(1) The court may make an order for security for costs under rule 25.12 if –
>
>> (a) it is satisfied, having regard to all the circumstances of the case, that it is just to make such an order; and
>>
>> (b) (i) one or more of the conditions in paragraph (2) applies, or
>>
>> (ii) …
>
> (2) The conditions are –
>
>> (a) the claimant is –

(i) resident out of the jurisdiction; but

(ii) not resident in a Brussels Contracting State, a State bound by the Lugano Convention or a Regulation State, as defined in section 1(3) of the Civil Jurisdiction and Judgments Act 1982;

…

(c) the claimant is a company or other body (whether incorporated inside or outside Great Britain) and there is reason to believe that it will be unable to pay the defendant's costs if ordered to do so;

…

(g) the claimant has taken steps in relation to his assets that would make it difficult to enforce an order for costs against him."

15. It can be seen, therefore, that an applicant for security for costs must overcome two hurdles. First, he must show that one or more of the conditions in rule 25.13(2) applies.   Secondly, the court must also be satisfied, having regard to all the circumstances of the case, that it is just to make an order. If both conditions are satisfied, the court still has a residual discretion whether or not to order security, although in practice it is hard to see how this adds anything to the judgment which the court is required to form under paragraph (1)(a). Finally, as with all rules of the CPR, rules 25.12 and 25.13 must of course be construed, and the discretion under them exercised, in accordance with the overriding objective of enabling the court to deal with cases justly and at proportionate cost: see rules 1.1 and 1.2.

**Condition (a)**

16. Each of PHRL and Tarek is a company incorporated and registered in the British Virgin Islands ("BVI").  They are therefore resident out of the jurisdiction.  Further, the BVI do not fall within the relevant definitions of a "Brussels Contracting State", a "State bound by the Lugano Convention" or a "Regulation State". Condition (a) is therefore satisfied in respect of each of the three applications for security for costs.

17. It was, however, common ground before me that an order for security made on this ground alone may cover only costs relating to the additional burden of enforcement, if any, in the relevant jurisdiction: see the decision of the Court of Appeal in Nasser v United Bank of Kuwait [2001] EWCA Civ 556, [2002] 1 WLR 1868, particularly at [61] to [68] per Mance LJ (with whom the other member of the court, Simon Brown LJ, agreed). PHRL provided an estimate for its additional costs of enforcement in the BVI in the sum of £116,000, which was not disputed by the other parties.  This sum unfortunately pales into insignificance, however, when compared with (i) the combined costs already incurred in this case by all parties of some £3 million, and (ii) the amounts of security sought by Tarek, the Sherway defendants and PHRL, which after applying a discount of about 35% to their estimates of the relevant costs amount to around £3.77 million, £3 million and £1.3 million respectively. The real question,

therefore, around which most of the debate on this part of the case revolved, is whether condition (c) in rule 25.13(2) is satisfied. In addition, the Sherway defendants also rely on condition (g).

**Condition (c)**

*Introduction*

18.   The critical question under condition (c) is whether "there is reason to believe that [*the claimant company*] will be unable to pay the defendant's costs if ordered to do so". In Jirehouse Capital v Beller [2008] EWCA Civ 908, [2009] 1 WLR 751, the Court of Appeal emphasised that the test of "reason to believe" is not one of balance of probabilities. As Arden LJ, delivering the leading judgment, said at [26]:

> "In my judgment, there is a critical difference between a conclusion that there is "reason to believe" that the company will not be able to pay costs ordered against it and a conclusion that it has been proved that the company will not be able to pay costs ordered against it. In the former case, there is no need to reach a final conclusion as to what will probably happen. In the latter case, a conclusion has to be reached on the balance of probabilities."

Arden LJ went on to say at [29]:

> "That which has to be established is something that will occur only after the order for security is made. It can therefore only be a matter of evaluation. A person can have a reason to believe that a future event will occur."

19.   To similar effect, Moore-Bick LJ said at [38]:

> "It is most unwise in my view for judges to paraphrase the wording of the rules in cases such as the present. One could debate at length the nuances of an expression such as "reason to believe that the company will be unable to pay the costs", but to do so only gives rise to a danger of creating competing tests in slightly differing terms, as this case demonstrates. In my view, judges should simply ask themselves whether the requirement set out in the rules is satisfied and express their conclusions in those terms, giving their reasons for doing so."

20.   Mummery LJ (at [39]) agreed with both judgments.

***Is there reason to believe that PHRL will be unable to pay the defendants' costs if ordered to do so?***

21.   With the above principles in mind, I now turn to consider the financial position of PHRL. I remind myself that the time when the question would arise is when judgment is handed down after the trial of the action, and on the assumption that PHRL will have failed to make good its claims. Given the complexity of the case,

and the five week time estimate for the trial, the earliest date at which a judgment could realistically be expected is probably around March 2016.

22.  I will begin with some preliminary points. First, by way of background, it is clear that PHRL was set up as a special purpose vehicle for the acquisition of an interest in the JVC and through it in Aman Resorts. It has not been suggested that PHRL carries on any other business of its own.

23.  Secondly, PHRL has chosen not to place before the court any accounts, audited or otherwise, or any other detailed evidence from a person able to speak with first-hand knowledge to its current and probable future financial position. This omission is all the more striking because repeated requests for such information have been made by the other parties, and at the hearing on 31 July 2014 Rose J gave a strong indication that such disclosure was needed in support of the cross-undertakings in damages given by PHRL in respect of the injunctive relief which she granted. This led Mr Amanat himself to produce a witness statement (his fourth) dated 4 August 2014, where he said that he was in the process of making arrangements to provide security in the form of unencumbered property in the sum of US$ 10 million. In the light of that assurance, which led (as I shall explain) to a payment into court of US$ 10 million in September 2014, Mr Amanat said that PHRL's asset position did not need to be considered, but "for completeness" he would provide some details about it.

24.  Mr Amanat then said that, in the limited time available for preparation of his statement, he had been unable to instruct an accountant to prepare a balance sheet for PHRL, but he proceeded to set out the current assets and liabilities of PHRL, to the best of his knowledge, as follows:

> "16.  PHRL is a special purpose vehicle. It was established in order to acquire the shareholding in the JVC. Accordingly PHRL's main asset is its 35.21% shareholding in the JVC. [*Sherway's solicitors, Berwin Leighton Paisner LLP*] seek to maintain that this is only worth US$ 62,673,800. I do not accept this … in order to properly assess the shareholding, a proper valuation would need to be carried out.
>
> …
>
> 19.  In addition to its shareholding, PHRL has available to it US$ 53 million (rounded for ease) currently held on deposit. A redacted copy of a recent bank statement showing this sum is [*exhibited*]. Since the date of that statement some of the monies have been transferred to other accounts however I confirm that this sum remains available and is held on deposit. This sum is comprised of the Sherway loan monies (as described in the correspondence exhibited), together with other monies belonging to PHRL. The monies which are in the process of being transferred to Candey [*PHRL's solicitors, Candey Ltd*] are PHRL monies.

> 20. I also believe that PHRL is also owed approximately US$ 6 million by the JVC in respect of expenses which should have been paid to it pursuant to the SHA.
>
> 21. I believe that PHRL therefore has assets (or assets available to it, or to which it is entitled) worth approximately US$ 116 million.  Even if:
>
>> (a) PHRL is liable to repay to Sherway US$ 50 million upon rescission (less damages to which PHRL is entitled for misrepresentation/repudiatory breach); and
>>
>> (b) PHRL has a potential contingent liability to BTG/Jinpeng of US$ 35 million (which is denied …),
>
> this is a total maximum of US$ 85 million …
>
> 22. PHRL's position is that it is not liable to BTG/Jinpeng for US$ 35 million, whether as set out as paragraph 21 above or at all.  PHRL's position is that the liability has been extinguished following the transfer of shares to BTG/Jinpeng in May 2014 …
>
> 23. PHRL does not have any other material liabilities.
>
> 24. PHRL's maximum total liabilities, including for present purposes any alleged liability to BTG/Jinpeng, are therefore US$ 85 million.  PHRL therefore has surplus assets to the value of approximately US$ 37 million."

25.   Later in 2014, PHRL was briefly put into provisional liquidation in the BVI, and KPMG, as the provisional liquidators, produced a report on PHRL's financial position for the BVI court.  Counsel for PHRL submitted that this report was confidential, and could not simply be disclosed to third parties in the context of the present applications.  That may be true, but it would have been open to PHRL to apply to the BVI court for permission to disclose the KPMG report for the purposes of the present proceedings.  PHRL has neither taken this step nor provided any explanation why it would be inappropriate to do so.  In any event, there is no reason why PHRL could not have instructed other accountants to produce a report for the present hearing, following service of the applications for security for costs in early October 2014.

26.   As it is, the evidence filed by PHRL about its current asset position in response to the present applications could hardly be more exiguous.  It is contained in the fourth witness statement of Andrew Dunn, the partner of Candey with day to day conduct of the case for PHRL, where he says this:

> "33. PHRL's available assets currently include the following:
>
>> 33.1  12,333 shares in the JVC, with an estimated value of between US$ 67 million and US$ 100 million;

> 33.2 US$ 35 million in bonds in an account in PHRL's name held at Power Capital ("the Company Account"); and
>
> 33.3 US$ 10 million held in a Candey's client account and which is in the process of being paid into Court pursuant to the undertaking given to HHJ Pelling …
>
> 34. The Company Account is of course held subject to undertakings [*given to the BVI court*] and on the basis of Power Capital's letter … Furthermore, both Ms Turnbull [*who is now PHRL's sole director*] and I are signatories to the Company Account.  The undertaking given by PHRL in the Order [*made by Bannister J in the BVI on 17 October 2014*] permits payments out of the Company Account in the ordinary course of business and for full value.  In my view, a costs order pursuant to this litigation (in which PHRL as an asset holding company is fighting to preserve and protect its major asset, namely, its shareholding in the JVC) would plainly be in the ordinary course of its business.
>
> 35. I also understand, in so far as this is relevant, that PHRL also has various other assets, including its claim in these proceedings and US$ 1 million which has been invested with Cornucopia which has been in turn invested in a contract to purchase real estate comprising of some 30 acres of land in the Turks and Caicos Islands next to the Aman Resorts hotel there."

27.   It should be noted that Mr Dunn produces no evidence at all to substantiate his estimate of the value of PHRL's shareholding in the JVC. Nor does he state the source of his understanding in relation to the Cornucopia investment, or provide any documentary evidence to support it. Still less does he provide any explanation of how US$ 35 million of PHRL's money apparently came to be held, in the form of bonds, in an account with Power Capital, or of the relationship (if any) between this sum and the bank deposit of US$ 53 million to which Mr Amanat had referred in his statement of 4 August 2014.  It should be noted in this connection that the redacted bank statement exhibited by Mr Amanat consisted of a single page summary for an account held with JP Morgan Chase Bank, N.A. in Newark, Delaware, for the month of April 2014.  The name of the account holder was not disclosed.  The statement showed an opening balance of just under US$ 404,000, deposits and credits of some US$ 54.6 million, payments and transfers of some US$ 1.9 million, and a closing balance of approximately US$ 52.9 million.  The figures are contained in a "checking account summary", and do not disclose the dates of the transactions, or the parties to them.

28.   A further preliminary point concerns Mr Amanat's character.  It was submitted by Tarek and the Sherway defendants that Mr Amanat is a serial fraudster with a proven track record of dishonesty in his commercial dealings.  Reliance was placed on findings made against Mr Amanat in the courts of New York State.  In September 2004, Judge Richard B Lowe III (sitting in the Supreme Court of the State of New York) held that Mr Amanat and other defendants associated with him had "engaged in a pattern of blatant disregard of this Court's orders which rises to a level of wilful,

contumacious, bad faith conduct". In a decision handed down in January 2005, Judge Allan L Gropper found that Mr Amanat had induced his chauffeur to file an involuntary bankruptcy petition against him, in order to try to take advantage of an automatic stay.  In further judgments handed down in October 2007, March 2009 and March 2010 respectively, Judge Gropper found that Mr Amanat was a "blatant" fraudster who had arranged intentional fraudulent conveyances, that he had fraudulently backdated documents, and that there was "overwhelming evidence" that he had acted in bad faith with actual or constructive knowledge of a fraudulent scheme.   Furthermore, in September 2008 the US Financial Industry Regulatory Authority ("FINRA") issued a decision barring Mr Amanat from associating with any FINRA firm in any capacity, having found him guilty of violating various rules of conduct, including wilful failure on seven separate occasions to disclose material information to FINRA, and failure to respond to two requests for information issued by FINRA.

29.     In the light of this lamentable history, it was submitted that the evidence of Mr Amanat and PHRL about PHRL's financial position should be treated with considerable caution, and that Mr Amanat's established propensity to fraud was also highly relevant to the question whether any assets which PHRL may now have would still be available on a future date when PHRL has to meet costs orders which have been made against it.  Counsel for PHRL sought to counter the obvious force of these points by arguing that Mr Amanat is no longer a director of PHRL, having been replaced by Ms Turnbull.  On the evidence before me, however, and without making any findings of fact on the point, it is far from clear to me that Ms Turnbull can be regarded as independent from Mr Amanat, or (subject to the undertakings given to the BVI court) that she may not be replaced as director if and when it suits his purposes to do so. Mr Amanat is clearly the driving force behind PHRL, through its parent company Peak Investments Ltd ("PIL").  The shares in PIL may, indeed, be held (as I was told) for family trusts connected with Mr Amanat, but there can in my view be no serious doubt about his ultimate control of PHRL.  Symptomatic of this, to my mind, is the fact that Candey also act for Mr Amanat personally, when it suits his interests for them to do so, and letters or witness statements from him are duly produced whenever he deems it advantageous for this to happen.

30.     I now turn to a closer examination of PHRL's assets and liabilities, while stressing the complete absence of any company accounts, or of any independently verified financial information.

### (a) **PHRL's shares in the JVC**

31.     PHRL's holding of approximately 35% of the shares in the JVC would obviously be an asset of substantial value, if and to the extent that the shares were at the free disposal of PHRL, and could be readily marketed or used as security for raising a loan.  Mr Dunn's estimate of their value is vague and unsubstantiated, but I do not think it is seriously disputed that the present value of the shares, assuming them to be unencumbered, would be well in excess of the amount of any costs orders likely to be made against PHRL at the conclusion of the trial.  A critical question, however, is whether it could be right to treat the shares as an asset potentially available to PHRL to meet such costs orders, when the shares themselves are a central part of the subject matter of the litigation, and PHRL will only become liable to pay substantial costs to the defendants if it loses the action.

32. At the hearing before Rose J on 31 July 2014, the judge's instinctive reaction, to which counsel then appearing for PHRL did not demur, was that the shares could not be used to provide security for PHRL's cross-undertaking in damages. She said (page 211 of the transcript):

> "It seems to me that it's not right that the security that is put up for the cross-undertaking is the very shares in the joint venture company which is the subject of the dispute."

My instinctive reaction is exactly the same as Rose J's, and it is reinforced by a number of specific points which were drawn to my attention. First, under the agreements entered into between Sherway and PHRL, there is a requirement for the shares to be transferred to PHRL Holdings. Secondly, Sherway has a further claim in respect of PHRL Holdings under a call option which it exercised on 8 October 2014, the effect of which is apparently to entitle Sherway to purchase all of the "Option Shares" in PHRL Holdings for US$ 1. Thirdly, approximately 75% of PHRL's shares in the JVC have in any event been pledged to Sherway as part of the security package negotiated between Sherway and PHRL in April 2014. Fourthly, the SHA contains restrictions on the ability of PHRL to transfer any interest in the shares to a third party. Fifthly, the shares are subject to a "stop notice" issued by the BVI court, in support of the security which Sherway has over them. And finally, even if there were any remaining value in the shares in the hands of PHRL after it ended up on the losing side of the litigation, such value would in principle be available to meet all of PHRL's liabilities. It cannot be assumed that it would be used to meet the costs liabilities in full, and even if PHRL were then solvent, it may well be suspected that Mr Amanat would do his best to ensure that the costs liabilities went unsatisfied.

**(b) The US Treasury Bonds**

33. According to Mr Dunn's evidence, PHRL owned US$ 35 million of bonds in an account held in PHRL's name at Power Capital. This appeared to be substantiated by a letter dated 28 October 2014 from Power Capital Financial Trading (UK) Ltd ("Power Capital"), an English company authorised and registered by the Financial Conduct Authority, to which Mr Dunn referred in paragraph 34 of his statement. The letter was addressed to PHRL, Jinpeng Group Ltd ("Jinpeng"), and the interim joint provisional liquidators of PHRL. It was signed by Peter Brooks and Graham Farrow, respectively described as "Director and CFO" and "CEO" of Power Capital. The letter confirmed that an account had been opened at Power Capital in the name of PHRL, and gave the account number. Details were given of the US$ 35 million US Treasury 0.125% 2014 bonds, held in the account in the sole name, and to the order, of PHRL. The bonds were further said to be held and controlled by Power Capital, for PHRL, in an account held by Power Capital with Linear Investments Ltd ("Linear"), which itself acted as Power Capital's FCA-regulated custodian and prime broker. Linear in turn held the bonds with Nomura Securities and Bank of New York Mellon. The letter stated that the bonds had previously been held by Power Capital in the name and to the order of Cornucopia Equity I LP; that the sole signatory on the account was Ms Turnbull, as director of PHRL; and that upon discharge of the joint provisional liquidators from office, Power Capital would only accept instructions in relation to the account from Ms Turnbull.

34.  In the light of this evidence, it is not surprising that the hearing before me in December proceeded on the footing that US$ 35 million US Treasury bonds were indeed held by Power Capital in the specified account in the sole name, and to the order, of PHRL. There were obvious questions about the source of the bonds, and the previous role of Cornucopia (a vehicle controlled by Mr Amanat) as their holder, but at least there appeared to be no doubt about the present existence and location of this substantial asset. Further reassurance was provided by the fact that Mr Dunn himself had been added as a signatory to the account, pursuant to undertakings given to the BVI court on 17 October 2014. The effect of those undertakings, in summary, was that Mr Dunn would remain a co-signatory on the account, and no payments from it would be made unless the instructions for such payment included his signature.

35.  Within a few days of the end of the hearing, however, it transpired that the true position was very different. On 6 January 2015 Candey wrote to me to draw attention to some recent events which might have a bearing on my pending judgment. The letter was copied to the defendants' solicitors, and also to another firm (Blake Morgan LLP) acting for Mr Amanat. I was informed that at approximately 6pm on 22 December 2014 it had come to Candey's attention, at a meeting at the offices of Power Capital requested by Power Capital, that the US Treasury bonds had been "subjected to encumbrances" without the knowledge of either Mr Dunn or Ms Turnbull. On the following day, PHRL sought and obtained urgent injunctive relief from Newey J, who made freezing orders against Power Capital, Linear and Nomura International Plc. The respondents were directed to provide relevant information within 24 hours of service of the order, to be verified subsequently by affidavit. A return date was fixed for 6 January 2015.

36.  Candey's letter to me went on to say:

> "It now appears that, pursuant to evidence filed by Linear, in fact the US Treasuries had been purchased by an arrangement involving a deposit of c. US$ 3 million, and which was at all times subject to the possibility of a call requiring the remainder (i.e. US$ 32 million) to be paid up. Accordingly, it now appears that, whilst the US Treasuries existed, they were not fully paid up securities with Linear … Furthermore, it now appears that … the Power Capital account with Linear had no US Treasuries in it – the US Treasuries were instead in an account with Linear held by Peak Venture Partners LLC ("PVP") (a company controlled by Mr Omar Amanat), over which Power Capital had a power of attorney."

37.  The letter went on to explain that further hearings had taken place before Newey J on Sunday 28 December, and David Richards J on 30 December 2014, as a consequence of which the freezing injunctions against Nomura and Linear had been discharged, the bonds had been sold, and the net sale proceeds of approximately US$ 3 million had been paid into court. I was told that PVP had agreed that the net sale proceeds could be paid to Power Capital. A copy of a letter from PVP, signed by Mr Amanat as chairman, purportedly confirming this was enclosed. Candey also said they had been informed that PVP was taking steps to provide PHRL with assets to the value of US$ 32 million, with a view to restoring the position to what it had previously been understood to be.

38.    Over the next month I received various written communications from the parties, including a note from counsel for Tarek dated 9 January 2015, a note from counsel for PHRL dated 12 January 2015, a letter from Sherway's solicitors dated 20 January 2015, and further updates from Candey.  It is unnecessary for me to review this material in any detail.  It is enough to cite the following extracts from Candey's recent letter to me dated 6 February 2015:

> "In summary, while PVP's position has remained that PHRL's claims are contested and the injunctive relief unnecessary, and that PVP is taking steps to restore assets to the appropriate value to PHRL's control or make suitable equivalent arrangements, as yet no assets have in fact been placed under PHRL's control as a result.  Accordingly, … the position remains that PHRL does not have under its control the liquid assets that it believed that it had under its control between the time of the October Order until shortly before Christmas … given the time that may be required to achieve any similar outcome through litigation, PHRL accepts that it cannot say with any confidence that the position will be restored within any certain (or short) timeframe, or indeed that PHRL will within any certain or short term timeframe have the liquid funds to meet an award for security for costs (if, contrary to PHRL's other submissions, any award is made)."

39.    The extraordinary position has thus been reached that, far from PHRL being the undisputed owner of US Treasury bonds to the value of US$ 35 million, not a cent has ever been held in the account opened by PHRL with Power Capital, and for the foreseeable future there is no realistic prospect of this state of affairs being rectified.  The only sum that PHRL has so far been able to salvage from the wreckage is an amount of approximately US$ 2.4 million, which on 11 January 2015 the court ordered should be paid out of court and into PHRL's client account with Candey.  Nothing could more graphically illustrate the potential unreliability of any evidence about the financial position of entities connected with Mr Amanat, and the fact that even assurances given in good faith by solicitors acting for him or his companies cannot necessarily be accepted at face value.  Furthermore, the passage which I have quoted from Candey's letter to me of 6 February seems to come very close to admitting that condition (c) in CPR rule 25.13(2) is indeed satisfied.  If it cannot be said with any confidence that "PHRL will within any certain or short term timeframe have the liquid funds to meet an award for security for costs", there must surely be reason to believe that PHRL will be unable to pay the defendants' costs if ordered to do so.

### (c) The US$ 10 million paid into court

40.    The third asset expressly identified in paragraph 33 of Mr Dunn's fourth statement is the sum of US$ 10 million which was then held in his firm's client account and was in the process of being paid into court pursuant to the undertaking given to Judge Pelling on 19 September 2014.  The undertaking was given in the context of applications by the Sherway defendants for PHRL to fortify its cross-undertakings in damages.  It was contained in recital (20) to the court's order of 19 September 2014 granting injunctive relief, as follows:

> "AND UPON (20) CANDEY LLP undertaking to pay the sums referred to in its written undertaking dated 18 August 2014 into Court as soon as reasonably practicable, to stand as security for payment of any damages which the Court thinks PHRL ought to pay pursuant to its cross-undertakings in damages …"

There is no dispute that the US$ 10 million was duly paid into court pursuant to this undertaking.

41.    While the money remains in court, standing as security for PHRL's cross-undertakings in damages, it cannot in my view be treated as an asset currently available to PHRL for any other purpose.  I agree on this point with the analysis of Oliver LJ, who gave the leading judgment in <u>W A Sherratt Ltd v John Bromley Ltd</u> [1985]  QB 1038, where the issue was whether a defendant which had made a voluntary payment into court in satisfaction of the claim against it could withdraw the money when it subsequently went into liquidation.  The judge at first instance held that the money should be paid out so that the claimant was not placed in the position of a secured creditor in the defendant's liquidation, but the Court of Appeal disagreed, holding that the claimant remained a secured creditor to the extent of the payment in. For present purposes, the relevant part of Oliver LJ's judgment begins at 1056G, where he expressly doubted the proposition (upon which the Court of Appeal had proceeded in an earlier case) "that the money in court remains, as it were, an asset of the defendant which, on his bankruptcy, forms part of his property available for distribution".

42.    Oliver LJ continued:

> "Speaking entirely for myself, I question this approach. That the money in court may become such an asset is unquestionable if an order is made for payment out.  But in my judgment a defendant paying into court … parts outright with his money.  I doubt whether it can be said that the Accountant-General is a trustee in whose hands his money can be traced.  Nor is there a "debt" or chose in action in the accepted sense of the word. The money becomes subject entirely to whatever order the court may see fit to make and to treat it as the defendant's property available for distribution in his bankruptcy is to assume, for the purposes of exercising the court's discretion, the very situation which will only arise if the court exercises its discretion in a particular way."

The other two members of the court (Sir John Donaldson MR and Robert Goff LJ) agreed with the reasoning of Oliver LJ.

43.    Accordingly, I am satisfied that the money standing in court cannot be regarded as an asset available to PHRL unless and until an application is made by PHRL for some or all of the money to be released to it, and the court accedes to the application. Mr Brisby QC submitted on behalf of PHRL that US$ 10 million is now far in excess of any possible exposure of PHRL pursuant to the cross-undertakings, but the fact remains that no such application has yet been made.

44.    With regard to other possible assets of PHRL, the evidence is in my judgment too unsatisfactory for me to be able to draw any firm conclusions. I cannot attach any significant weight to the unsupported assertions made by Mr Dunn in paragraph 35 of his fourth statement. Furthermore, there is a host of unanswered questions about what has happened to the US$ 50 million lent to PHRL by Sherway. This sum may have been reflected in the sum apparently held on deposit with J P Morgan Chase Bank in April 2014, but what has subsequently happened to it? There is no clear explanation, and PHRL has done nothing to dispel the cloud of uncertainty and suspicion which surrounds it. At one stage it appeared likely that US$ 35 million of this sum had somehow ended up in the form of the US Treasury bonds apparently held in the Power Capital account. But that has now been shown not to be the case, and Mr Amanat's promises to restore an equivalent sum to PHRL have so far proved worthless. It may be surmised that the US$ 10 million paid into court was funded in some way by the Sherway loan, but even then that would leave US$ 40 million unaccounted for.

45.    In truth, the evidence relating to PHRL's assets is so thin and contradictory, and the doubts concerning Mr Amanat's personal integrity are so insistent, that even without considering PHRL's liabilities I would have little hesitation in concluding that condition (c) was satisfied. That conclusion could only be reinforced by an examination of the liabilities side of PHRL's balance sheet, so I will deal with it briefly.

46.    First, and most obviously, PHRL owes US$ 50 million to Sherway. On PHRL's own case, the agreement to make this loan has now been rescinded for misrepresentation, so PHRL is prima facie liable to make counter-restitution of the full amount of the loan (albeit, on PHRL's case, reduced by setting off against it the damages for misrepresentation claimed by PHRL). Sherway's case, however, is that the loan agreement remains in force, but Sherway has exercised its right to convert about 53% of the loan into shares. On that footing, the remaining debt owed to Sherway amounts to approximately US$ 23.4 million, which together with interest down to (say) February 2016 would amount to a sum in the region of US$ 28 million. I am content to assume for present purposes that this is the appropriate figure to take for the debt owed by PHRL to Sherway, bearing in mind that Sherway will only recover its costs of the proceedings from PHRL if its case is substantially accepted by the court at trial.

47.    Secondly, PHRL may well owe US$ 35 million, plus interest at 6% per annum from a date in January 2014, to Jinpeng. In order to help fund its participation in the acquisition of the JVC, PHRL borrowed US$ 35 million from Jinpeng, which is a BVI company, on the terms of a Memorandum of Understanding dated 24 January 2014. The parties to the Memorandum of Understanding were PHRL, Mr Zecha, Jinpeng and Beijing Tourism Group Co., Ltd ("BTG"), which is a state-owned enterprise of the People's Republic of China. The agreement provided for BTG to lend US$ 35 million to Jinpeng, which would then lend the same amount on to PHRL. The duration of the loan was to be one year, and PHRL was obliged to apply the money (through its subsidiaries) towards the purchase of the JVC. Interest on the loan was payable at the rate of 6% per annum. Unless otherwise agreed between the parties, the loan was to be repaid in full on the expiry of the one year term, subject to a proviso which enabled the loan to be converted into equity in PHRL on terms to be agreed between the parties. Upon such agreement, PHRL would issue the relevant

shares to an associated company established by BTG and Jinpeng, and the outstanding amount of the loan and interest would be offset against the purchase price of the shares. The agreement was expressed to be governed by Hong Kong law, and it provided that any dispute arising under it should be referred to arbitration in Hong Kong.

48.   There is a dispute between the parties whether the loan has been converted into shares in PHRL. Jinpeng's position is that it has not agreed to the conversion of the loan, and it further alleges that various material documents have been forged. PHRL maintains that the loan has been validly converted, and relies on an issue of shares which it made to Jinpeng.

49.   On 18 September 2014, Jinpeng applied in the BVI for provisional liquidators to be appointed of PHRL. At a hearing "ex parte on notice" which took place on 26 September 2014, an order appointing provisional liquidators was made by Bannister J. An application was then made by PHRL to strike out the application, primarily on the ground that the debt allegedly owed by PHRL to Jinpeng was disputed on substantial grounds and Jinpeng therefore lacked standing to make the application. PHRL also took steps to invoke the arbitration clause in the agreement.

50.   On 17 October 2014, Bannister J made an order dismissing the application for appointment of provisional liquidators with effect from 29 October 2014, provided that certain conditions had been satisfied by that date. The first condition was that the intended arbitration had been duly commenced. The second condition was that an account had been opened at Power Capital in the name of PHRL, and Power Capital had confirmed in writing to the parties and the joint provisional liquidators that the US$ 35 million US Treasury bonds were held in this account to PHRL's order. It was this condition which led to the letter of 28 October 2014 from Power Capital, apparently providing the necessary confirmation, which I have described above. The third condition was that the parties should have filed a jointly signed written confirmation that the first two conditions had been satisfied. Such confirmation was provided on 29 October 2014, so the provisional liquidation then came to an end a little over a month after it had started.

51.   The separate question of interim relief pending determination of the dispute by arbitration was dealt with by agreement, and is reflected in the undertakings set out in the BVI court's order of 17 October 2014. The undertakings included:

a)   an undertaking by PHRL, until seven days after receipt of any final award in the arbitration, not to deal with, dispose of or diminish the value of its assets anywhere in the world, save in the ordinary course of business and for full value, or with leave of the court (with express exceptions authorising expenditure on the prosecution of the present proceedings and the intended arbitration);

b)   an undertaking by PHRL, over the same period, that steps would be taken to make Mr Dunn a co-signatory on the Power Capital account; and

c)   an undertaking by PIL, again over the same period, that it would not terminate Ms Turnbull's appointment as a director of PHRL without the leave of the court.

52.  The present position, therefore, is that the arbitration in Hong Kong is proceeding, and until an award has been made it will be impossible to say with any confidence whether PHRL's debt to Jinpeng of US$ 35 million plus interest has been extinguished by being converted into equity. It clearly remains possible that the debt has not been extinguished, and that a final award to this effect will be released before judgment is given after the trial of the present action.  In that scenario, the debt would be immediately due and payable; but unless PHRL had in the meantime been able to sort out the problem of the missing US Treasury bonds, it would have no (or virtually no) liquid assets with which to pay the debt.  The probable outcome would therefore be the insolvent liquidation of PHRL, unless Mr Amanat were able, and chose, to procure the repayment of the debt from other resources available to him.

53.  Quite apart from the Sherway and Jinpeng loans, a further question arose at the hearing whether PHRL is also indebted to a Mr George Robinson in respect of a sum of US$ 20 million which he lent to the operating company of the Aman Group, Silverlink Resorts Ltd. It appears that the obligation to repay this debt was subsequently transferred by novation to PHRL, and that Mr Robinson may also have assigned his right to the debt to PIL.  The evidence on this topic was sparse and confusing, not least because Mr Dunn says in paragraph 40.3 of his fourth statement that the loan is a liability "of" (not "owed to") PIL, and that it is not a liability of PHRL.  Without a much fuller explanation of the relevant transactions, I cannot rule out the possibility that the debt became, and remains, a liability of PHRL. Nor am I much reassured by the fact that, during the hearing, a letter was procured from Mr Amanat in which he purported to confirm, on behalf of PIL, that PHRL had been released and was free from any liability to PIL in respect of the loan.  The letter did not explain why, when, or by what means the release had supposedly been effected, and no supporting documentation was provided.

54.  It will already be apparent that the actual or potential liabilities of PHRL in relation to the Sherway, Jinpeng and Robinson loans could amount to at least US$ 83 million.  In addition to this, PHRL has already expended, and will continue to expend, very substantial sums on its legal costs in England, Hong Kong and the BVI.  The evidence is that PHRL has already incurred legal fees of well over £1 million in relation to the present proceedings, and it has indicated in correspondence that its probable future costs of defending the counterclaims brought by Tarek and the Sherway defendants are likely to amount to a further £4 million, quite apart from PHRL's costs of continuing to prosecute its own claim.  Taking these figures at face value, I would not be surprised if PHRL's total costs in the three jurisdictions which I have mentioned, down to and including the trial of the present action, were in excess of £10 million.

55.  Finally, in the absence of any accounts or detailed evidence about PHRL's financial position, I cannot be satisfied that it does not have other liabilities of which I am wholly ignorant.

56.  Taking all these factors into account, it appears to me overwhelmingly clear that there is indeed reason to believe that PHRL will be unable to pay the relevant defendants' costs if ordered to do so, either now or at any time down to the conclusion of the forthcoming trial.  I therefore conclude that condition (c) is made out against PHRL.

*Is there reason to believe that Tarek will be unable to pay PHRL's costs of Tarek's counterclaim?*

57.     PHRL also relies on condition (c) in seeking security for costs from Tarek in respect of Tarek's counterclaim.  Counsel for PHRL submitted that there were three main reasons for considering this condition to be satisfied.  First, Tarek is a special purpose vehicle set up by Mr Doronin for the purpose of acquiring an interest in the JVC. There is no suggestion that it carries on any other business of its own.  Secondly, other corporate vehicles used by Mr Doronin have a history of resisting payment pursuant to court orders.  In his fifth statement, Mr Dunn refers to a dispute in 2008/2009 in which claims were brought by a Mr Van Egeraat in Russia against Mr Doronin's main corporate vehicle, Capital Group. Despite the claimant obtaining two court orders in Russia against Capital Group, and successfully resisting appeals from those orders, Capital Group refused to make payment until bankruptcy proceedings had been issued against it.  Thirdly, despite requests to do so, Tarek through its solicitors, Herbert Smith Freehills LLP, has declined to provide any information about its assets.  In those circumstances, it is submitted, and I agree, that I must proceed on the basis that Tarek's only known asset is its shareholding in the JVC.

58.     On the assumption that PHRL succeeds in the litigation, and Tarek's counterclaim is dismissed, PHRL is likely to be granted declaratory relief recognising its right to purchase Tarek's shares in the JVC at a discount of 20% from their market value. Counsel for Tarek accordingly submits that, in those circumstances, PHRL would have adequate security for its costs of the counterclaim, because PHRL would be able to set off the costs owed to it by Tarek against the purchase price of the shares.

59.     PHRL's answer to this submission is contained in paragraph 15 of Mr Dunn's fifth statement, where he says:

> "[*Tarek*] appears to be proceeding on the mistaken basis that if PHRL is successful in its claim then there will necessarily be a buy out by PHRL of [*Tarek's*] shareholding. PHRL seeks a declaration in this litigation that an "*Obligatory Transfer Event*" has occurred and it is entitled to and has served a "*Default Notice*". Any buy out pursuant to an "*Obligatory Transfer Event*" would take place in accordance with the terms of clause 17 and 19.4 of the SHA. While PHRL would under these contractual provisions have the option to purchase [*Tarek's*] shares, there may be a number of factors at that time which would determine whether PHRL exercised its option or not.  It cannot be assumed that there will be automatic buy out of shares."

60.     The problem with this contention, however, is that PHRL has already circulated promotional literature in which it says it will seek to market Tarek's shares in the JVC.  A presentation document entitled "Aman Resorts: Exclusive Investment Opportunity" appears to have been circulated in September 2014 (or possibly earlier) by PHRL. The Executive Summary refers to an "opportunity to replace" Tarek's 65% stake in the business "at or below the previous acquisition price of US$ 120 million". A later section in the document wrongly states that the hearing on 15 September 2014

(which was presumably intended to refer to the return date for the various injunctions before His Honour Judge Pelling QC):

> "will confirm majority shareholder can be replaced … PHRL now has the opportunity to both refinance the Group's debt and to replace the majority equity shareholder at a potentially attractive price versus fair market value."

61.    In the light of this document, it is in my view impossible for PHRL to contend with any credibility that, if it succeeds in its claim, it may choose not to exercise its option to acquire Tarek's shares. PHRL has already informed the world at large that this is precisely what it intends to do. In those circumstances, I consider that PHRL does not need security for its costs of Tarek's counterclaim because it will be able to recover its legal costs from Tarek, if necessary, by setting them off against the purchase price of the shares. There is accordingly no reason to believe that Tarek will be unable to pay PHRL's costs if ordered to do so.  It will in practice have no choice but to pay them, by way of set-off against the purchase price of the shares.  I therefore conclude that condition (c) is not made out against Tarek.

**Condition (g)**

62.    The Sherway defendants (but not Tarek) also rely upon condition (g) in seeking security for costs against PHRL, namely that "the claimant has taken steps in relation to his assets that would make it difficult to enforce an order for costs against him". Since I have already held that condition (c) is clearly satisfied, it is unnecessary for me to consider this alternative condition in any detail.  I am, however, satisfied that it too is made out. The disappearance of 90% of the US$ 35 million borrowed from Jinpeng, and PHRL's apparent inability to account for the bulk of the US$ 50 million Sherway loan, taken in conjunction with Mr Amanat's established history of dishonesty, are in my judgment sufficient to ground the inference that PHRL has taken steps designed to strip the company of most of its liquid assets, and that those steps would make it difficult to enforce an order for costs against PHRL.

**Should the court make an order for security?**

63.    I now turn to the second test which has to be satisfied before the court can exercise its power to make an order for security for costs, namely the question whether the court is satisfied, having regard to all the circumstances of the case, that it is just to make such an order.

64.    Most of the circumstances which I have so far considered appear to me to tell very strongly in favour of ordering PHRL to provide security for the costs of Tarek and the Sherway defendants.  These defendants have been sued by a BVI company, which is unable to show that it has any unencumbered assets of any substance, and which appears to have taken steps designed to denude itself of most of its liquid resources. The efforts of PHRL's current management to regain control of the missing US Treasury bonds have, to date, proved unsuccessful, apart from the recovery of US$ 2.4 million which has been paid out of court into Candey's client account.  There are no firm grounds for believing that any substantial further recoveries will be made in the foreseeable future.

65. On the available evidence, the known and potential liabilities of PHRL greatly exceed the assets likely to be available to PHRL at the conclusion of a trial which (ex hypothesi) it will have lost. The evidence about its financial position which PHRL has chosen to place before the court is both scanty and unsatisfactory, giving rise to many questions which demand (but have not received) an answer.

66. Furthermore, PHRL is under the indirect control of Mr Amanat, who has an established record of dishonesty in the USA. The court (and the defendants) are in my judgment unable to derive much comfort from the fact that Mr Amanat is not at present a director of PHRL, or from the undertakings given to the BVI court by PHRL and PIL in October 2014, because it is unclear how far Ms Turnbull is truly independent of Mr Amanat, and the undertakings will in any event lapse seven days after the release of a final award in the Hong Kong arbitration.

67. No doubt recognising the cumulative force of these points, Mr Brisby QC for PHRL placed at the forefront of his oral submissions an argument based on what is sometimes called the "Crabtree" principle. The reference is to the decision of the Court of Appeal in B J Crabtree (Insulation) Ltd v G P T Communications Systems Ltd (1990) 59 BLR 43. In that case, a building contractor (which was a small private company) brought proceedings to recover money said to be due to it for additional work. The defendant employer denied that it had authorised this work, and also counterclaimed for damages for defective and uncompleted work. The Court of Appeal held that the contractor should not be ordered to give security in respect of its claim.

68. The leading judgment was delivered by Bingham LJ, who stressed at the outset that the question whether security should be ordered was a discretionary one:

> "to be exercised in the interests of justice having regard to the peculiar features of the case before the court. It cannot be too firmly emphasised that there can be no rule of thumb as to the grant or refusal of an order for security …"

69. On the facts of the case, Bingham LJ considered the most important factor to be that the claim and the counterclaim raised "essentially the same issues" and were "going to be fully litigated anyway so far as one can tell". He was also influenced by the risk of unfairness to the claimant if it were ordered to provide security but failed to do so. In relation to this, Bingham LJ said:

> "It would have the effect, as the defendants acknowledge, of preventing the plaintiffs pursuing their claim. It would, however, leave the defendants free to pursue their counterclaim. The plaintiffs could then defend themselves against the counterclaim although their own claim was stayed. It seems quite clear – and, indeed, was not I think in controversy – that in the course of defending the counterclaim all the same matters would be canvassed as would be canvassed if the plaintiffs were to pursue their claim, but on that basis they would defend the claim and advance their own in a somewhat hobbled manner, and would be conducting the litigation (to change the metaphor) with one hand tied behind

their back.  I have to say that that does not appeal to me on the facts of this case as a just or attractive way to oblige a party to conduct its litigation.

Mr Phillips for the defendants submits there would really be no problem because, if the defendants failed in their counterclaim and the plaintiffs' case contrary to the counterclaim effectively succeeded, then the stay could be lifted and the plaintiffs could be given judgment.  But on that assumption one is bound to ask what would be the point of making the order at all except to give the defendants a tactical advantage in the litigation.

One comes back, I think, at the end of the day to the reflection that this is a rule intended to give a measure of protection to a defendant who is put to the cost of defending himself against a claim made by an impecunious corporate plaintiff.  It may in some cases be fair and just to make such an order even though the defendant is himself counterclaiming, but I am persuaded that it would be wrong to do so here because the costs that these defendants are incurring to defend themselves may equally, and perhaps preferably, be regarded as costs necessary to prosecute their counterclaim … The fact that the plaintiffs are plaintiffs and the defendants are counterclaiming defendants instead of the other way round appears on the facts here to be very largely a matter of chance."

70.     The other member of the court, Parker LJ, said in his judgment that:

"if the money is not paid into court and the plaintiff's claim is therefore stayed, the defendant will still raise issues on the counterclaim which are precisely the same as the issues which he would raise on the claim."

He agreed with Bingham LJ that, in such circumstances, the effect of granting security would be "nothing less than the use of the rule to obtain some tactical advantage rather than to obtain protection".

71.     I was referred by Mr Brisby to a number of other cases in which the court has discussed Crabtree and the approach which the court should adopt where security is sought by, or against, a counterclaiming defendant. I do not propose to review these cases in any detail, however, because the most important rule, as Bingham LJ was at pains to emphasise in Crabtree, is that there is no general rule: every case turns on its own facts, and on the court's assessment of what the justice of the case requires.

72.     This basic point has again been stressed by the Court of Appeal in Autoweld Systems Ltd v Kito Enterprises LLC [2010] EWCA Civ 1469, where Black LJ (with whose judgment Sedley and Rimer LJJ agreed) said at [58]:

"Indeed, it is clear from the authorities that, in view of the court's overriding discretion, no one factor automatically determines the outcome of a particular case. The fact that the

> claim and counterclaim give rise to the same issues is important but not determinative – Parker J's first instance decision in *The Silver Fir* was overturned by the Court of Appeal because he proceeded on the basis that it was, and the Court of Appeal intervened in *Hutchison Telephone* for the same reason."

73.   Thus, for example, the authorities illustrate that in cases involving cross-claims the right course is sometimes to order security in respect of both the claim and the cross-claim, as the Court of Appeal did in <u>The Silver Fir</u> [1980] 1 Lloyd's Rep 371 (but note that special considerations may have applied, because it was a case involving European arbitrations: see <u>Autoweld</u> at [43] and [46]). In other cross-claim cases, however, the court may conclude that the right approach is to make no order for security on either side: see <u>Apex Global Management Ltd v F I Call Ltd and Others</u> [2014] EWHC 779 (Ch) at [43] per Newey J.

74.   Particularly where security is sought in respect of a counterclaim, the court will often ask itself whether, as a matter of substance, the defendant is simply defending himself, or is also launching a cross-claim "with an independent vitality of its own": see <u>Hutchison Telephone (UK) Ltd v Ultimate Response Ltd</u> [1993] BCLC 307 (CA) at 317, per Bingham LJ.  If the cross-claim is of  the latter type, it may then be appropriate to limit any security to the additional costs referable to the issues which go beyond mere self-defence.

75.   In appropriate cases, any risk that a claimant who fails to provide security may be compelled to defend a counterclaim "with one hand tied behind his back" may be neutralised by an undertaking from the defendant not to prosecute his counterclaim if security for the costs of the claim is not provided, and the claim is either stayed or struck out in consequence.  Such an undertaking was, in effect, offered by Mr Caplan on behalf of Tarek in his opening oral submissions, when he said (transcript, day 1, pages 66-67):

> "My Lord, to put the matter beyond doubt, I can confirm that if the claim does not proceed, my client will not be pursuing the counterclaims."

Later on (day 1, pp 145-6), Mr Caplan intervened during Mr Brisby's submissions to confirm his client's willingness to give an undertaking in the terms of his earlier statement.

76.   Initially, no similar undertaking was offered by the Sherway defendants, but in his submissions in reply Mr Brindle QC said he had instructions to give the same undertaking as Tarek in relation to some parts of Sherway's counterclaim. The parts of the counterclaim to which the undertaking would extend were those covering the same ground as the claim against Sherway, in particular Sherway's own claims for misrepresentation and those relating to the alleged greenmail strategy pursued by Mr Amanat and PHRL. The undertaking would not, however, extend to what Mr Brindle called Sherway's "enforcement claims", that is to the claims to recover money owed or for security rights to be enforced, including in particular Sherway's claims arising from service of the "Sherway Notice" on 2 June 2014 and Sherway's claim for repayment of the non-convertible tranche of the Sherway loan.

77.   I would add that the risk of PHRL failing to provide security, if ordered to do so, is in my view a remote one. Mr Amanat is, according to his own evidence, a man of very great wealth.  In his statement of 4 August 2014, he gave a non-exhaustive list of assets which he owned personally or through his associated companies worth well in excess of US$ 160 million.  Accordingly, if PHRL failed to provide security when ordered to do so, it could only be because Mr Amanat had chosen not to provide the necessary funds.  For the same reason, PHRL has not attempted to argue that there would be any risk of its claim being stifled if security were to be ordered.

78.   Taken together, the undertakings offered by the defendants, and the evidence of Mr Amanat's personal wealth, persuade me that there would be no real risk of procedural unfairness to PHRL if I were to order it to provide security for the defendants' costs. However, I still need to consider Mr Brisby's arguments that, to a large extent, the counterclaims cover the same ground as PHRL's claim, that the counterclaims have little (if any) independent vitality, and that it is a matter of chance that the litigation was begun by PHRL rather than one of the defendants.

79.   Taking the last point first, I see a lot of force in the argument that, once the relationship of the protagonists behind the joint venture had broken down, it was a virtual certainty that litigation between them would ensue.  In this regard, the complexity of the dispute, and the vigour and acrimony with which it has been pursued by all concerned, are in my judgment revealing.  The idea that the parties might have been able to sort out their differences without recourse to the court, if PHRL had never initiated the present action, is in my opinion far-fetched.

80.   Thus, to give just two examples, it seems to me largely a matter of chance that the alleged "greenmailing" strategy relied on by the defendants was first advanced by them in their defences to the present claim, rather than being alleged against PHRL in proceedings which they themselves had initiated. Again, following service of the Sherway Notice, I think it unrealistic to suppose that Sherway would never have needed to go to court if PHRL had not started the present action.  Apart from anything else, Mr Brindle frankly conceded that Sherway would have had to start proceedings in order to recover the non-convertible balance of the Sherway loan.

81.   Taking a broad view, I also consider that the cross-claims in the present case do in substance cover very much the same ground.  In the case of PHRL's claim against Tarek, and Tarek's counterclaim, this was not really disputed, save in relation to certain additional issues raised by the counterclaim which form the basis of PHRL's application for security against Tarek.  In the case of Sherway, Mr Brindle submitted that its enforcement claims were of a radically different nature from the remainder of Sherway's defence and counterclaim, which (as he accepted) covered essentially the same ground as PHRL's claim. However, the enforcement claims arose out of the same investment by the Sherway defendants in the joint venture, and (as Mr Brisby pointed out) PHRL's main defences to them (misrepresentation and rescission) take one straight back to the core of PHRL's own case against Sherway.

82.   The question therefore becomes one of how much weight I should attach, in the overall exercise of my discretion, to the substantial degree of factual and legal overlap between the cross-claims, and to the fact that (as I see it) the dispute was in practice almost bound to lead to bitter litigation, whichever party happened to start it.

83.  In cases of that general nature, it will often, indeed usually, be unjust to make an order for security in favour of the counterclaiming defendant.  As Moore-Bick LJ said in <u>Anglo Irish Asset Finance Plc v Brendan Flood and Another</u> [2011] EWCA Civ 799 at [20]:

> "If the claim and counterclaim raise the same issues it may well be a matter of chance which party is the claimant and which a counterclaiming defendant and in such a case it will not usually be just to make an order for security for costs in favour of the defendant, although the court must always have regard to the particular circumstances of the case."

84.  In my judgment, however, the present case has several unusual features which mean that the normal approach cannot be uncritically applied.  The factors which would otherwise tell in favour of ordering security against PHRL are in my view unusually strong, and their strength is to a considerable extent caused by the deficiencies in PHRL's own evidence, the impossibility of forming an accurate estimate of PHRL's assets and liabilities, the disappearance of the US Treasury bonds and Mr Amanat's personal history.  In these circumstances I consider that the justice of the case does still require PHRL to give a substantial amount of security for the defendants' costs, and the right way to take account of the degree of overlap between the cross-claims is in fixing the amount of the security to be given, rather than in declining to order security at all.

85.  I have so far considered the question of discretion in relation to the defendants' applications for security against PHRL.  The question also arises in relation to PHRL's application for security against Tarek, but is of much less practical significance since I have held that only condition (a) is satisfied in respect of PHRL's costs of Tarek's counterclaim.  PHRL's estimate of its additional costs of enforcement in the BVI is £116,000.  There is no explanation of how this figure has been calculated, however, or of whether it takes into account the fact that PHRL is itself a BVI company, so it would be seeking to enforce any costs order which it may obtain against Tarek in its home jurisdiction.

86.  On the assumption that condition (c) were also satisfied, PHRL submits that certain additional issues arise in Tarek's counterclaim which go beyond "self-defence", and will considerably increase the costs of the litigation.  According to Mr Dunn's evidence, Tarek alleges that damage and disruption has been caused to the business of Aman Resorts, and expert evidence will be needed to quantify Tarek's loss.  There will be a requirement, he says, for considerably greater disclosure relating to the day-to-day operation of the business, witness evidence dealing with the allegations, and expert evidence (for which Judge Pelling's order of 19 September 2014 does not make provision).  PHRL's estimate of the additional expenditure which it will have to incur in dealing with this part of the counterclaim, down to conclusion of the trial, amounts to £1,859,700, apart from the additional costs of enforcement in the BVI which I have already mentioned.

87.  I am not persuaded that it would be right to regard the aspects of Tarek's counterclaim identified by Mr Dunn as going significantly beyond the scope of PHRL's claim against Tarek or as having independent vitality of their own.  Viewed in the context of the litigation as a whole, they seem to me to represent no more than a small part of the

overall dispute between the parties about the ownership and operation of the Aman Resorts business. Furthermore, in relation to quantum Tarek (in common with PHRL) has merely reserved the right to rely on expert evidence, should it become necessary to do so. Although no application has been made for a split trial, it seems to me more than likely that any issues of quantum requiring expert evidence will be held over for determination after the main trial, either by agreement between the parties or as a result of further pre-trial directions. In any event, whether or not that turns out to be the case, I would regard Tarek's counterclaim as essentially a cross-claim relating to the same subject matter as the claim against it, and as a matter of discretion, even if condition (c) were satisfied, I would see no reason to depart from the usual principle that in such circumstances an order for security should not be made.

88.     PHRL's application for security against Tarek will therefore be dismissed.

**Quantum**

89.     I come next to the question of how much security PHRL should be ordered to provide for the costs of Tarek and the Sherway defendants. Two initial points may be noted. First, in view of the sums potentially at stake in the action, which clearly exceed £10 million, it is agreed that this is not a case to which the costs management regime in the CPR applies: see CPR 3.12, and recital (8) to Judge Pelling's case management order dated 19 September 2014 which records the agreement of all parties to this effect. Secondly, given the compressed trial timetable, it is also common ground that this is not a case where it would be appropriate to make a staged order for the provision of security.

**(a) Tarek's costs**

90.     Tarek estimates its costs of defending the claim (including costs incurred to date) as likely to be in the region of £5.82 to £6 million, excluding VAT. The estimate is set out in a schedule in the form of Precedent H (the use of which would be compulsory if the case were subject to costs management by the court). According to Tarek's solicitors (Herbert Smith Freehills), the estimate is a conservative one, and assumes that the case will proceed towards trial "on a relatively straightforward basis" and in accordance with the timetable set by Judge Pelling. In particular, it is assumed that:

a)      the only interim application brought by or against Tarek will be the present application for security;

b)      there will not be a case management conference;

c)      disclosure provided by all parties will be fairly well organised and complete;

d)      there will be no specific disclosure requests;

e)      there will be no expert evidence; and

f)      there will be a one day mediation, but no other significant settlement negotiations.

91.     I was informed that, as at 3 October 2014, approximately £1.3 million of Tarek's costs had already been incurred. Tarek also submitted that its estimated costs were

comparable to those of the Sherway defendants, who have incurred approximately £1.2 million to date and estimate expenditure of a further sum in the region of £3.4 million. PHRL has given no indication of its overall projected costs of the litigation, but has estimated its costs of defending Tarek's counterclaim to be £2 million, and its costs of defending the Sherway defendants' counterclaim to be a further £2 million.

92. It is common ground that, when costs are assessed on the standard basis, the receiving party can normally expect to recover around 65% of its actual expenditure. Accordingly, Tarek asks the court to make an order for security against PHRL in the sum of £3.77 million (i.e. approximately 65% of £5.82 million).

93. Mr Brisby took a number of detailed points about Tarek's costs estimate, arguing that it was on any view excessive. For example, he pointed out that Herbert Smith Freehills were claiming profit costs for disclosure of £764,000; that the brief fee for leading counsel at the trial was estimated at £1 million; and that if the relevant guideline charge-out rates were applied to the total time costs estimated for Herbert Smith Freehills, the result would be a reduction of approximately £810,000. To a large extent, it seems to me that criticisms of this nature are already taken into account in the admitted reduction of 35% to allow for the effects of detailed assessment on the standard basis. On the other hand, I am satisfied that the costs claimed have been estimated on a generous basis, and for the purposes of ordering security I would be inclined to reduce them by a figure more in the region of 40%. As I have explained, I also need to consider what further reduction to make to reflect the considerable degree of overlap between the subject matter of the claim and Tarek's counterclaim, and the fact that litigation between these parties was all but inevitable, whichever of them happened to initiate it. In my judgment a further reduction of 50% would be appropriate on this account, so the sum which I would order by way of security is one half of 60% (i.e. 30%) of £5.82 million, which comes to £1.746 million.

**(b) The Sherway defendants' costs**

94. I would apply the same general approach to the Sherway defendants' costs, which seem to me to have been estimated on a similarly generous basis. As set out in the Precedent H form prepared by Berwin Leighton Paisner, the estimated costs (including costs to date of £1.2 million) of the Sherway defendants total approximately £4.64 million. The amount requested by way of security is £3 million, which is slightly less than 65% of £4.64 million. Mr Brisby again argued that the estimate was excessive, partly by way of comparison with the costs claimed by Herbert Smith Freehills, although it is fair to point out that the brief fees allowed for counsel are significantly lower. On the other hand, the solicitors' time costs for trial preparation and the trial itself amount to well over £1 million, even though Berwin Leighton Paisner would not be responsible for preparation of the trial bundles. All in all, I am satisfied that it is reasonable to take 60% of the total costs claimed as my starting point, and then to reduce that figure by a further 50% in order to reflect the overlap of issues between the cross-claims and the fact that Sherway would anyway have had to start proceedings to recover the non-convertible part of the Sherway loan. I will therefore order security in the sum of 30% of £4.64 million, which comes to £1.392 million.

**The relevance of the $10 million already paid into court**

95.   Mr Brisby's final argument was that Tarek and the Sherway defendants already have more than adequate security for their costs in the form of the $10 million paid into court pursuant to the undertaking given to Judge Pelling in September 2014.   Mr Brisby submitted that $10 million was far more than could ever be needed to compensate the defendants for any loss occasioned to them by the injunctions granted in favour of PHRL, particularly because the Tokyo project, which might arguably have been prejudiced by delay caused by the injunctions in raising further working capital by means of a rights issue, has now been brought to a satisfactory conclusion. Mr Brisby further argued that PHRL's intention to rely on the money in court, if applications were made against it for security for costs, had been clearly indicated to the court at the conclusion of the hearing before Judge Pelling.

96.   In particular, Mr Brisby relied on the following exchange which took place on 19 September 2014, just before Judge Pelling rose at 1.40 pm (page 82 of the transcript):

> "MR BRISBY: Can I just say this – I will endeavour to find the authority and send it to Mr Howard, but I just want him to be clear on one thing: if there is going to be further application for security we will be arguing that with the passage of the August resolutions [*for the second tranche of the rights issue*], in fact the [*defendants*] are now over secured and some of this should come back to me and/or that some of it can stand if they are going to make an application for security for costs.
>
> HIS HONOUR JUDGE PELLING: I understand that and that's no doubt all noted by Mr Howard and will be dealt with in due course."

97.   Despite this exchange, however, no proviso was added to Judge Pelling's order to the effect that the $10 million should stand as security for anything other than payment of any damages which the court might think PHRL ought to pay pursuant to its cross-undertakings.   This can hardly have been an oversight, because the draft order was the subject of lengthy discussions between the parties and was not finally sealed until 28 October 2014, five and a half weeks after the end of the hearing.   In those circumstances, I consider that the whole of the $10 million is held in court to secure PHRL's cross-undertakings in damages, and unless and until a proper application is made, supported by evidence, for that security to be reduced, no part of it can be used for any other purpose.   Mr Brisby expressly disclaimed any intention of making such an application at the hearing before me, and the other parties made it clear that, if such an application were to be made, it would be opposed on the ground, among other things, that there has been no change of circumstances sufficient to justify it since the date when the relevant undertaking was given.

98.   I therefore consider that it is not open to me to treat the $10 million as available for any purpose other than securing PHRL's cross-undertakings, and if PHRL wishes to obtain the release of any part of the $10 million from that security, it must make a separate application for the purpose.   Meanwhile, no part of the $10 million can be treated as an asset available to PHRL for the purposes of providing security for costs,

and there is no basis upon which I could properly vary the order made by Judge Pelling last year.

**<u>Conclusion</u>**

99.     For the reasons which I have given, I will order PHRL to provide security for the costs of Tarek and the Sherway defendants in the sums of £1.746 million and £1.392 million respectively.   PHRL's application for security against Tarek, in respect of Tarek's counterclaim, will be dismissed.