# EXHIBIT 2

Burnford v Automobile Association Developments Ltd, 2022 WL 16906117 (2022)

# Lucy Burnford, Oliver Astley, Giles Fitzpatrick, Michael Symons, Kevin Gaskell v Automobile Association Developments Limited

 **No Substantial Judicial Treatment**

**Court**
Court of Appeal (Civil Division)

**Judgment Date**
14 November 2022

Case No: CA-2022-000626

Court of Appeal (Civil Division)

**[2022] EWCA Civ 1943, 2022 WL 16906117**

Before: Lord Justice Lewison , Lord Justice Newey and Lady Justice Asplin

Date: 14/11/2022

On Appeal from the High Court of Justice Business and Property Courts of England and Wales Business List (ChD)

His Honour Judge Paul Matthews (Sitting as a Judge of the High Court)

*[2022] EWHC 368 (Ch)*

Hearing dates: 1 & 2 November 2022

**Representation**

 Stephen Auld KC and KV Krishnaprasad (Instructed by Stewarts Law LLP ) for the Appellants.
 Andrew Thompson KC and Ben Griffiths (Instructed by Reynolds Porter Chamberlain LLP ) for the Respondent.

**Approved Judgment**

Lord Justice Newey:

© 2023 Thomson Reuters.

1.  The main question raised by this appeal is whether Judge Paul Matthews ("the Judge") was right to strike out the claim on the basis that it was barred by the "reflective loss" principle considered by the Supreme Court in *Marex Financial Ltd v Sevilleja [2020] UKSC 31, [2021] AC 39 ("Marex")* . There is also an issue as to the implications of a settlement agreement ("the Settlement Agreement") concluded on 22 December 2020 between the second claimant, Mr Oliver Astley, and, among others, the defendant, Automobile Association Developments Limited ("AAD").

2.  The claimants are all former shareholders in Motoriety (UK) Limited ("Motoriety"). Mr Astley and the first claimant, Ms Lucy Burnford, were also directors of Motoriety. The other claimants (Mr Giles Fitzpatrick, Mr Michael Symons and Mr Kevin Gaskell) were not founder shareholders, but they had subscribed for shares by 21 January 2015 for sums totalling £250,000. AAD is a company in the Automobile Association group ("the AA Group").

3.  Motoriety's business involved products called "Automyze" and "Garage Guide". The former kept an electronic record of a vehicle's service history and sent prompts to motorists when vehicles were due for servicing or MOT tests. The latter consisted of an online garage directory and booking platform.

4.  In 2015, there were negotiations which ultimately led to AAD investing in Motoriety. According to the particulars of claim, "the Claimants (and Motoriety's other shareholders) wished to develop and expand Motoriety's business by finding a suitable investment partner enabling the expansion of the company's subscriber base" and potential investors included not only the AA Group but Solera Holdings Inc ("Solera"), a subsidiary of which provided a vehicle history checking service. The particulars of claim explain that "[s]ubstantive discussions between the Claimants/ Motoriety and [AAD] commenced in February 2015" and that "Motoriety and its shareholders and managers, including the Claimants, were principally represented in these discussions by Ms. Burnford and Mr. Astley".

5.  In May 2015, heads of terms were agreed between AAD and Motoriety setting out terms and conditions on which AAD was willing to proceed with negotiations with regard to investment in Motoriety. On 28 August 2015, an investment agreement ("the Investment Agreement") was concluded between the claimants, Motoriety's other shareholders, Motoriety itself and AAD under which AAD agreed to subscribe

© 2023 Thomson Reuters.

Case 1:21-cv-11059-GHW   Document 182-2   Filed 08/15/23   Page 4 of 27

for 50% of the shares in Motoriety for £400,000 and also, subject to the delivery by Motoriety of an information technology development plan in an agreed form, to lend Motoriety £400,000 by way of "Marketing Facility". By clause 12.1, Motoriety's shareholders, including the claimants, granted AAD an option to become Motoriety's sole shareholder by purchasing from them the balance of the issued shares. The option could not be exercised unless Motoriety's "EBITDA" (i.e. the company's earnings before interest, taxes, depreciation and amortisation for a year) was at least £1.3 million, but, if it was exercised, AAD was to pay the shareholders sums termed the "Initial Option Payment" and the "Earn-out Consideration". The "Initial Option Payment" was defined to refer to the aggregate of six times 50% of Motoriety's "EBITDA" for the 12 month period ending immediately before the option's exercise and an amount in respect of cash held by or on behalf of the company. The "Earn-out Consideration" was calculated by multiplying by six 50% of the mean EBITDA in the year before the option was exercised and (a) the next year, (b) the next two years and (c) the next three years and, in each case, deducting the "Initial Option Payment".

6.   Also on 28 August 2015, AAD and Motoriety entered into a brand licence and services agreement ("the Licence Agreement") pursuant to which, among other things, AAD licensed Motoriety to use certain trade marks.

7.   It is the claimants' case that they and Motoriety concluded the Investment Agreement and the Licence Agreement in "intended and specific reliance on the Immediate Access Representation, the Honesty Representation, the Business Plan Representations and the Services Representation": see paragraphs 7.6 and 8.4 of the particulars of claim. References to the alleged representations being relied on by both the claimants and Motoriety are also to be found in paragraphs 3.4, 4.7, 6.1.2 and 6.3 of the particulars of claim. The "Immediate Access Representation" is described as follows in paragraph 3.1 of the particulars of claim:

> "[AAD] expressly represented to the Claimants and Motoriety *inter alia* that upon the conclusion of [AAD's] proposed investment agreement, [AAD] would be in a position to, and would, provide Motoriety with immediate access to the AA's customer base of 4 million members and 9 million B2B customers".

© 2023 Thomson Reuters.

With regard to the "Honesty Representation", this is said in paragraph 3.2 of the particulars of claim:

> "Further, in making the Immediate Access Representation, [AAD] also impliedly represented that [AAD] … honestly and reasonably believed the Immediate Access Representation to be true ('the Honesty Representation')".

In paragraph 4.5 of the particulars of claim, it is alleged that AAD:

> "represented:
>
> (1)  That the Claimants and Motoriety could realistically expect that over a 12-month period (or Year 1 in the Business Plan) approximately 5,000,000 of the AA's customers would receive an email reminder that the MOT on their vehicle was due.
>
> (2)  That it was reasonable and realistic to expect that, of those 5,000,000 customers, 600,000 customers a year (i.e. 50,000 customers a month) would sign-up to Motoriety's Automyze product in response to the MOT reminder email referred to in paragraph 4.5(1) above
>
> (together 'the Business Plan Representations')".

As for the "Services Representation", paragraph 7.5.1 of the particulars of claim states:

> "The Claimants concluded the Investment Agreement in reliance upon an express or implied representation by [AAD] that it would provide to Motoriety the agreed services referred to in the Licence Agreement … ('the Services Representation')".

8.  The claimants allege that the Immediate Access Representation, the Honesty Representation, the Business Plan Representations and the Services Representation were all false and made fraudulently in that they were made intentionally or with reckless disregard as to their truth or falsity: see paragraphs 10.1, 11.1, 15.1 and 15.2 of the particulars of claim. It is further alleged that the Immediate Access Representation, the Honesty Representation and the Business Plan Representations were made negligently: see paragraph 12 of the particulars of claim.

9.  There are also allegations of breach of contract. This is said in paragraph 9 of the particulars of claim:

> "9.1  In the premises set out above, the Investment Agreement including the Business Plan and the Licence Agreement were part of a relational transaction which was akin to a joint venture. There was a mutual intention to have a long-term relationship, for the parties to perform with integrity and fidelity to their bargain and reposing trust and confidence in each other in circumstances where performance of the transaction required collaboration, a significant investment by the parties, exclusivity and communication, co-operation and mutual trust/confidence.
>
> 9.2  In the premises, there were implied terms of the Investment Agreement (and/or as necessary the Licence Agreement between Motoriety and the AA), inter alia:
>
> 9.2.1  That [AAD] had exercised and would exercise good faith in relation to the provision of information including the contents of the Business Plan.
>
> 9.2.2  That the parties would act in good faith in relation to performance of the Investment Agreement including the Business Plan going forward.
>
> 9.2.3  That [AAD] would not of its own motion act in a way which frustrated, defeated or undermined the purpose of the venture or change the circumstances or basis upon which the venture was based."

10.  Breaches of these terms are alleged in paragraph 14.1 of the particulars of claim. It is said that:

> "(1)  The Business Plan was not prepared in good faith but was intentionally or recklessly false.
>
> (2)  The Business Plan was not accurate but was materially inaccurate to an extent which seriously undermined the viability of the venture.
>
> (3)  [AAD's] conduct following the conclusion of the Investment Agreement (and related agreements) was designed to (and did) frustrate, defeat or undermine the purpose of the venture and/or changed the circumstances or basis upon which the venture was based."

11.  For whatever reasons, Motoriety did not thrive. It went into administration on 24 April 2017 and was dissolved on 5 June 2019. The administrators sold its business and assets for £20,004 to Automobile Association Travel Services Limited, another company in the AA Group, on 25 April 2017.

12.  The claimants contend that they have suffered loss as a result of the misrepresentations and breaches of contract which they allege. So far as misrepresentation/deceit is concerned, paragraph 16.1.1 of the particulars of claim asserts:

> "But for the misrepresentations referred to above, the Claimants would not have entered into the Investment Agreement (and Motoriety would not have entered into the Heads of Terms or the Licence Agreement) but would have concluded the envisaged venture with Solera on the terms of Solera's proposal on 11 May 2015 or substantially similar terms. As a result of entering into the Investment Agreement, the Claimants have suffered loss and damage."

13.  This is then said on the subject in the draft amended particulars of claim:

> "16.1.5  The value of the Claimants' shareholdings in Motoriety will be the subject of expert evidence as necessary and pursuant to the Court's Directions. Without prejudice to this, the adjusted EBITDA for Motoriety for the relevant period is likely to have been in the region of at least £5.45 million and the appropriate multiple range is at least 7.5 to 9.7 producing an approximate enterprise value for Motoriety at the relevant time of between £40.7 and £53 million and an approximate equity value of between £46.9 and £59.2 million.
>
> 16.1.6    In the premises, the value of each Claimant's shareholding, reflecting the multiple range referred to above, is as more particularly set out in Table 1 of Schedule 1A hereto.
>
> 16.1.6A  Further or alternatively, Mr Fitzpatrick, Mr Symons and Mr Gaskell were unable to recover their investments in Motoriety. Had it not been for [AAD's] misrepresentations, they would have been able to do so. The quantum of such loss is particularised in Table 2 of Schedule 1A hereto."

14.  Schedule 1A to the draft amended particulars of claim is headed "Schedule of loss and damage – Misrepresentation/deceit" and divided into two parts. The first, Table 1, has the heading "Loss of Claimant Share Value" and specifies a "Share Value – Range" for each claimant. The second, Table 2, reads as follows:

**"Loss of Initial Investments**

| | |
|---|---|
| Giles Fitzpatrick | £100,000 |

| | |
|---|---|
| Michael Symons | £50,000 |
| Kevin Gaskell | £100,000 |
| | **£250,000** " |

15. Turning to breach of contract, the draft amended particulars of claim say this:

"16.2.1    In relation to the claim for breach of contract, the Claimants are entitled to damages on the basis that the venture would have proceeded in accordance with the intended and agreed terms of the Investment Agreement and Licence Agreement and more particularly the Business Plan, which would have resulted in Motoriety: (1) obtaining immediate access to the AA customer base in the volume and on the basis agreed in the Business Plan, (2) meeting or exceeding forecasts as set out in the agreed Business Plan, (3) becoming cash flow positive by Year 2 at the latest and (4) surpassing the EBITDA threshold of £1.3m at the latest by Year 3 (enabling exercise of the call option).

…

16.2.5  The value of the Claimants' shareholdings in Motoriety will be the subject of expert evidence as necessary and pursuant to the Court's Directions. Without prejudice to this, the adjusted EBITDA for Motoriety for the relevant period is likely to have been at least in the region of 5 million for the year ended 31 August 2018 and 14 million for the year ended 31 August 2021, the future maintainable earnings are likely to have been around £9 million and the appropriate multiple range is 7.0x and 10.6x producing an approximate enterprise value for Motoriety between £67 million and £100 million and an approximate equity value between £98 million and £132 million.

16.2.6     In the premises, the value [of] each Claimant's shareholding, reflecting the multiple range referred to above, is as more particularly set out in Table 1 of Schedule 1B hereto.

16.2.6A   Alternatively, had it not been for [AAD's] breach of contract, it would have exercised the call option under clause 12 of the Investment Agreement and paid the Claimants the Initial Option Payment and the Earn-out Consideration as defined therein. Due to AA Developments' breach of contract, the Claimants suffered loss consisting of the Initial Option Payment and the Earn-Out Consideration (alternatively, they lost the chance to earn these amounts). Pending expert evidence, the quantum of such loss is particularised in Table 2 of Schedule 1B hereto."

16.  Schedule 1B to the draft amended particulars of claim is headed "Schedule of loss and damage – Breach of Contract" and, like schedule 1A, is split into a "Table 1" and a "Table 2". Table 1 gives somewhat larger figures than schedule 1A's Table 1, but otherwise corresponds to it. Table 2 reads as follows:

**"Loss of Initial Option Payment & Earn-out Consideration**

| | |
|---|---:|
| Lucy Burnford | £18,990,267 |
| Oliver Astley | £7,825,760 |
| Giles Fitzpatrick | £775,303 |
| Michael Symons | £449,338 |
| Kevin Gaskell | £3,460,944 |
| | **£31,501,612** " |

17.  The present proceedings were issued on 7 May 2021 and served on AAD on 3 June 2021. In its defence, served on 27 August 2021, AAD not only denied the substance of the claimants' allegations against it, but asserted, first, that the loss which the claimants allege that they have suffered is reflective of loss that would also have been suffered by Motoriety and so is not recoverable by the claimants as a matter of law and, secondly, that some of Mr Astley's claims are barred by the Settlement Agreement.

18.  On 8 October 2021, AAD applied for the claim to be struck out, or for summary judgment in its favour. The matter came before the Judge, sitting as a Judge of the High Court, who, in a judgment dated 28 February 2022, concluded that all the claims against AAD are barred by the "reflective loss" principle and, further, that the Settlement Agreement prevents Mr Astley from making the breach of contract claims and the claim based on the Services Representation. He therefore struck out the claim in its entirety.

19.  It was common ground before both the Judge and us that AAD's strike out/ summary judgment application should be determined by reference to the draft amended particulars of claim which the claimants have provided and on the basis that the facts alleged in that document are assumed to be true. In the remainder of this judgment, references to the "particulars of claim" are to the draft amended particulars of claim.

**The grounds of appeal**

20.  There are three grounds of appeal. Two of them relate to the applicability of the "reflective loss" principle. The claimants say, first, that the issue is not suitable for summary determination because it raises fact-sensitive questions and the relevant law is uncertain and developing and, secondly, that their claims are not in any event barred by the "reflective loss" principle. The third ground of appeal concerns the Settlement Agreement. It is said that, correctly construed, the Settlement Agreement does not prevent Mr Astley from pursuing any of his claims.

## Grounds 1 and 2: the applicability of the "reflective loss" principle

*The "reflective loss" principle*

21.  The earliest of the cases concerned with "reflective loss" to which we were taken was *Prudential Assurance Co Ltd v Newman Industries Ltd (No 2) [1982] Ch 204 ("Prudential")* . In that case, the claimant alleged that two directors (Mr Bartlett and Mr Laughton) of a company referred to as "Newman" had conspired together to cause Newman to buy assets at an overvalue and, to that end, Newman's shareholders had been sent a misleading circular. The Court of Appeal (Cumming-Bruce, Templeman and Brightman LJJ) held this "personal claim" to be misconceived. At 222-223, the Court said:

> "It is of course correct, as the judge found and Mr. Bartlett did not dispute, that he and Mr. Laughton, in advising the shareholders to support the resolution approving the agreement, owed the shareholders a duty to give such advice in good faith and not fraudulently. It is also correct that if directors convene a meeting on the basis of a fraudulent circular, a shareholder will have a right of action to recover any loss which he has been personally caused in consequence of the fraudulent circular; this might include the expense of attending the meeting. But what he cannot do is to recover damages merely because the company in which he is interested has suffered damage. He cannot recover a sum equal to the diminution in the market value of his shares, or equal to the likely diminution in dividend, because such a 'loss' is merely a reflection of the loss suffered by the company. The shareholder does not suffer any personal loss. His only 'loss' is through the company, in the diminution in the value of the net assets of the company, in which he has (say) a 3 per cent. shareholding. The plaintiff's shares are merely a right of participation in the company on the terms of the articles of association. The shares themselves, his right of participation, are not directly affected by the wrongdoing. The plaintiff still holds all the shares as his own absolutely unencumbered property. The deceit practised upon the plaintiff does not affect the shares; it merely enables the defendant to rob the company."

"If", the Court said at 225, "Mr. Bartlett and Mr. Laughton defrauded Newman then the proper plaintiff was Newman". At 224, the Court said:

© 2023 Thomson Reuters.

"A personal action would subvert the rule in *Foss v. Harbottle* and that rule is not merely a tiresome procedural obstacle placed in the path of a shareholder by a legalistic judiciary. The rule is the consequence of the fact that a corporation is a separate legal entity. Other consequences are limited liability and limited rights. The company is liable for its contracts and torts; the shareholder has no such liability. The company acquires causes of action for breaches of contract and for torts which damage the company. No cause of action vests in the shareholder. When the shareholder acquires a share he accepts the fact that the value of his investment follows the fortunes of the company and that he can only exercise his influence over the fortunes of the company by the exercise of his voting rights in general meeting. The law confers on him the right to ensure that the company observes the limitations of its memorandum of association and the right to ensure that other shareholders observe the rule, imposed upon them by the articles of association."

22.   The "reflective loss" principle was the subject of consideration by the House of Lords in *Johnson v Gore Wood & Co [2002] 2 AC 1 ("Johnson")* . Lord Bingham said at 35-36 that he considered the authorities to support the following propositions:

"(1)   Where a company suffers loss caused by a breach of duty owed to it, only the company may sue in respect of that loss. No action lies at the suit of a shareholder suing in that capacity and no other to make good a diminution in the value of the shareholder's shareholding where that merely reflects the loss suffered by the company. A claim will not lie by a shareholder to make good a loss which would be made good if the company's assets were replenished through action against the party responsible for the loss, even if the company, acting through its constitutional organs, has declined or failed to make good that loss ….

(2)   Where a company suffers loss but has no cause of action to sue to recover that loss, the shareholder in the company may sue in respect of it (if the shareholder has a cause of action to

© 2023 Thomson Reuters.

do so), even though the loss is a diminution in the value of the shareholding ….

(3)  Where a company suffers loss caused by a breach of duty to it, and a shareholder suffers a loss separate and distinct from that suffered by the company caused by breach of a duty independently owed to the shareholder, each may sue to recover the loss caused to it by breach of the duty owed to it but neither may recover loss caused to the other by breach of the duty owed to that other …."

23.  The leading case on the "reflective loss" principle is now *Marex* , where, by a majority, the Supreme Court endorsed it. Lord Reed, with whom Lady Black and Lord Lloyd-Jones agreed, reaffirmed the approach adopted in *Prudential* and by Lord Bingham in *Johnson* : see paragraph 89. *Prudential* , Lord Reed said at paragraph 9, decided that:

"a shareholder cannot bring a claim in respect of a diminution in the value of his shareholding, or a reduction in the distributions which he receives by virtue of his shareholding, which is merely the result of a loss suffered by the company in consequence of a wrong done to it by the defendant, even if the defendant's conduct also involved the commission of a wrong against the shareholder, and even if no proceedings have been brought by the company".

The rationale, Lord Reed explained at paragraph 10, is that, where the rule applies, "the shareholder does not suffer a loss which is recognised in law as having an existence distinct from the company's loss". "On that basis, a claim by the shareholder is barred by the principle of company law known as the rule in *Foss v Harbottle (1843) 2 Hare 461* : a rule which (put shortly) states that the only person who can seek relief for an injury done to a company, where the company has a cause of action, is the company itself": see paragraph 10.

24.  As for *Johnson* , Lord Reed said at paragraph 67 that that case:

"gives authoritative support to the decision in *Prudential* that a shareholder is normally unable to sue for the recovery of a

© 2023 Thomson Reuters.

> diminution in the value of his shareholding or in the distributions
> he receives as a shareholder, which flows from loss suffered by
> the company, for the recovery of which it has a cause of action,
> even if it has declined or failed to make good that loss".

Discussing Lord Bingham's proposition (1) from *Johnson at 35* , Lord Reed
commented at paragraph 42 that its third sentence "should not be understood as
limiting the rule in *Prudential* to cases where there is an exact correlation between
the company's loss and the fall in share value" and that "it is possible to envisage cases
where there is not a precise correlation, and where recovery by the company might
not therefore fully replenish the value of its shares, but where the rule in *Prudential*
would nevertheless apply". In the same vein, Lord Reed said at paragraph 49 that
"[t]he rule in *Prudential* is not premised on any necessary relationship between a
company's assets and the value of its shares (or its distributions)". In paragraph 32 of
his judgment, Lord Reed had observed:

> "Where a company suffers a loss, that loss may affect its
> current distributions or the amount retained and invested in
> order to pay for future distributions (or, if the company is
> wound up, the surplus, if any, available for distribution among
> the shareholders). Since the value of a company's shares
> is commonly calculated on the basis of anticipated future
> distributions, it is possible that a loss may result in a fall in
> the value of the shares. That is, however, far from being an
> inevitable consequence: companies vary greatly, and the value of
> their shares can fluctuate upwards or downwards in response to
> a wide variety of factors. In the case of a small private company,
> there is likely to be a close correlation between losses suffered
> by the company and the value of its shares. In the case of a
> large public company whose shares are traded on a stock market,
> on the other hand, a loss may have little or no impact on its
> share value. If there is an impact on share value, it will reflect
> what Lord Millett described in *Johnson [2002] 2 AC 1, 62* as
> 'market sentiment', and will not necessarily be equivalent to the
> company's loss. If the company's loss does not affect the value
> of its shares, then there is no claim (or at least no sustainable
> claim) available to a shareholder, and in principle the problem
> addressed in *Prudential* does not arise. A problem only arises
> where, as in *Prudential* , a shareholder claims that the company's
> loss has had a knock-on effect on the value of his shares."

© 2023 Thomson Reuters.

25.   Summarising his conclusions, Lord Reed said this:

> "79.   Summarising the discussion to this point, it is necessary
> to distinguish between (1) cases where claims are brought by
> a shareholder in respect of loss which he has suffered in that
> capacity, in the form of a diminution in share value or in
> distributions, which is the consequence of loss sustained by the
> company, in respect of which the company has a cause of action
> against the same wrongdoer, and (2) cases where claims are
> brought, whether by a shareholder or by anyone else, in respect
> of loss which does not fall within that description, but where the
> company has a right of action in respect of substantially the same
> loss.
>
> 80.   In cases of the first kind, the shareholder cannot bring
> proceedings in respect of the company's loss, since he has no
> legal or equitable interest in the company's assets: *Macaura*
> and *Short v Treasury Comrs* . It is only the company which
> has a cause of action in respect of its loss: *Foss v Harbottle.*
> However, depending on the circumstances, it is possible that
> the company's loss may result (or, at least, may be claimed to
> result) in a fall in the value of its shares. Its shareholders may
> therefore claim to have suffered a loss as a consequence of the
> company's loss. Depending on the circumstances, the company's
> recovery of its loss may have the effect of restoring the value of
> the shares. In such circumstances, the only remedy which the law
> requires to provide, in order to achieve its remedial objectives
> of compensating both the company and its shareholders, is an
> award of damages to the company.
>
> 81.   There may, however, be circumstances where the company's
> right of action is not sufficient to ensure that the value of the
> shares is fully replenished. One example is where the market's
> valuation of the shares is not a simple reflection of the company's
> net assets, as discussed at para 32 above. Another is where the
> company fails to pursue a right of action which, in the opinion
> of a shareholder, ought to have been pursued, or compromises
> its claim for an amount which, in the opinion of a shareholder,
> is less than its full value. But the effect of the rule in *Foss v*

*Harbottle* is that the shareholder has entrusted the management of the company's right of action to its decision-making organs, including, ultimately, the majority of members voting in general meeting. If such a decision is taken otherwise than in the proper exercise of the relevant powers, then the law provides the shareholder with a number of remedies, including a derivative action, and equitable relief from unfairly prejudicial conduct.

…

83.  The critical point is that the shareholder has not suffered a loss which is regarded by the law as being separate and distinct from the company's loss, and therefore has no claim to recover it. As a shareholder (and unlike a creditor or an employee), he does, however, have a variety of other rights which may be relevant in a context of this kind, including the right to bring a derivative claim to enforce the company's rights if the relevant conditions are met, and the right to seek relief in respect of unfairly prejudicial conduct of the company's affairs.

84.  The position is different in cases of the second kind. One can take as an example cases where claims are brought in respect of loss suffered in the capacity of a creditor of the company. The arguments which arise in the case of a shareholder have no application. There is no analogous relationship between a creditor and the company. There is no correlation between the value of the company's assets or profits and the 'value' of the creditor's debt, analogous to the relationship on which a shareholder bases his claim for a fall in share value. The inverted commas around the word 'value', when applied to a debt, reflect the fact that it is a different kind of entity from a share."

26.  Lord Reed concluded in paragraph 89:

"The rule in *Prudential* is limited to claims by shareholders that, as a result of actionable loss suffered by their company, the value of their shares, or of the distributions they receive as shareholders, has been diminished. Other claims, whether by shareholders or anyone else, should be dealt with in the ordinary way."

© 2023 Thomson Reuters.

Burnford v Automobile Association Developments Ltd, 2022 WL 16906117 (2022)

27. Lord Hodge, agreeing with Lord Reed, endorsed the proposition that "where a company suffers a loss as a result of wrongdoing and that loss is reflected to some extent in a fall in the value of its shares or in its distributions, the fall in the share value or in the distributions is not a loss which the law recognises as being separate and distinct from the loss sustained by the company": see paragraph 99. Lord Hodge considered that "the law's refusal to recognise the diminution in value of a shareholding or the reduction or loss of a distribution, which is the consequence of the company suffering loss as a result of wrongdoing against it, as being separate and distinct from the company's loss is a principled development of company law": see paragraph 108.

28. *In Primeo Fund v Bank of Bermuda (Cayman) Ltd [2021] UKPC 22, [2022] 1 All ER 1219 ("Primeo")* , Lords Kitchin and Sales, with whom Lords Reed, Hodge and Lloyd-Jones agreed, stressed at paragraph 55 that the "reflective loss" principle is "a rule of substantive law associated with the rule in *Foss v Harbottle* and concerned with the recognition in law of particular types of loss", "not a procedural rule concerned only with the avoidance of double recovery". At paragraph 59, Lords Kitchin and Sales expressed the view that:

> "since the rule is substantive rather than procedural in character, the relevant time to assess whether it applies or not is when the loss which is said by the claimant to be recoverable in law is suffered by it. The timing of the bringing of a claim and the circumstances which may pertain at that point in time are adventitious happenstance and have nothing to do with the operation of the rule."

29. In *Allianz Global Investors GmbH v Barclays Bank plc [2022] EWCA Civ 353 ("Allianz")* , the Court of Appeal proceeded on the basis that, as the Privy Council had held in *Primeo* , the applicability of the "reflective loss" principle is to be tested by reference to the position when the claimant's loss is said to have been suffered rather than that when the claim was brought: see paragraphs 19, 45 and 47-49. *UCP plc v Nectrus Ltd [2022] EWCA Civ 949 ("Nectrus")* also indicates that that is the correct view: see paragraph 15.

30. For present purposes, I would draw the following points from the authorities:

i)  The "reflective loss" principle applies where a shareholder brings a claim "in respect of loss which he has suffered in that capacity, in the form of a diminution in share value or in distributions, which is the consequence of loss sustained by the company, in respect of which the company has a cause of action against the same wrongdoer" ( *Marex* at paragraph 79);

ii)  A shareholder cannot escape the "reflective loss" principle merely by showing that he has an independent cause of action against the defendant. He must also have suffered "separate and distinct" loss, and the law does not regard a reduction in the value of shares or distributions which is a knock-on effect of loss suffered by the company as "separate and distinct";

iii)  There need be no exact correlation between the shareholder's loss and the company's for the "reflective loss" principle to be applicable. The "reflective loss" principle can apply "where recovery by the company might not … fully replenish the value of its shares" (see *Marex* at paragraph 42). Equally, the company's loss can exceed the fall in the value of its shares;

iv)  The "reflective loss" principle will not be in point if, although the shareholder's loss is a consequence of loss sustained by the company, the company has no cause of action against the defendant in respect of its loss;

v)  Nor will the "reflective loss" principle apply to a claim which is not brought as a shareholder but rather as, say, a creditor or an employee;

vi)  The Court has no discretion in the application of the "reflective loss" principle, which is a rule of substantive law;

vii)  The applicability of the "reflective loss" principle is to be determined by reference to the circumstances when the shareholder suffered the alleged loss, not those when the claim was issued.

*Suitability for summary determination*

31.  In *X (Minors) v Bedfordshire County Council [1995] 2 AC 633* , Lord Browne-Wilkinson noted at 740-741 that "[w]here the law is not settled but is in a state of development … it is normally inappropriate to decide novel questions on hypothetical facts". Likewise, in *Lungowe v Vedanta Resources plc [2019] UKSC 20, [2020] AC 1045* , Lord Briggs, having referred in paragraph 48 to "an assertion that the claim against Vedanta raised a novel and controversial issue in the common law of negligence", said that "difficult issues of law of that kind are best resolved once all the facts have been ascertained at a trial, rather than upon the necessarily abbreviated and hypothetical basis of pleadings or assumed facts".

32.  Citing these cases, Mr Stephen Auld KC, who appeared for the claimants with Mr KV Krishnaprasad, argued that the law relating to the "reflective loss" principle is uncertain and developing and, hence, that the applicability of the principle in the

© 2023 Thomson Reuters.

present case should be determined at a trial rather than on the basis of assumed facts. Following *Marex* , Mr Auld submitted, the law is in a state of transition.

33.  However, the "reflective loss" principle has recently been considered in depth by the Supreme Court, which, in *Marex* , confirmed its existence and explained its scope. As Mr Auld stressed, the principle has since been the subject of debate in *Primeo* , *Allianz* , *Broadcasting Investment Group Ltd v Smith [2022] EWCA Civ 912, [2022] 1 WLR 1* and *Nectrus* . However, the points aired in those cases do not give rise to any legal uncertainty relevant to the present case, and the mere fact that it might be possible to identify other issues on which the implications of the "reflective loss" principle might be the subject of argument cannot have required the Judge to decline to determine the strike out/summary judgment application. It is not the case that the Court should not entertain a strike out/summary judgment wherever an undecided question can be discerned in the relevant area of law. In fact, as was pointed out by Mr Andrew Thompson KC, who appeared for AAD with Mr Ben Griffiths, such questions might be said to exist in any legal field. In all the circumstances, I have not been persuaded that the strike out/summary judgment was unsuitable for summary determination on the basis that the relevant law is uncertain and developing.

34.  The claimants also suggest that the strike out/summary judgment application raised issues of fact which could not be determined. Plainly, the Judge would have been wrong to strike out the proceedings if the application of the "reflective loss" principle depended on the resolution of such issues. If, on other hand, it can be seen at this stage, assuming the facts pleaded in the particulars of claim to be correct, that the claimants' claims are barred by the "reflective loss" principle, then the existence of hot dispute between the parties on factual matters is immaterial. I shall turn, therefore, to whether that is the case, taking the misrepresentation claim first.

*The misrepresentation claim*

35.  The claimants allege that they have suffered very substantial loss by way of "Loss of Claimant Share Value" as a result of misrepresentations by AAD. In essence, what is suggested is that the claimants' shares were rendered valueless in consequence of the decision to proceed with AAD rather than Solera and that that decision was made in reliance on false representations by AAD.

36.  However, it is evident from the particulars of claim that, supposing the allegations of misrepresentation to be well-founded, Motoriety would itself have (or have had) a cause of action against AAD in respect of them. Ms Burnford and Mr Astley are said to have represented Motoriety as well as shareholders in negotiations with AAD; the "Immediate Access Representation" is explicitly stated to have been made to "the Claimants *and Motoriety* " and the "Honesty Representation" is said to have been implied in the making of the "Immediate Access Representation"; there are multiple references to Motoriety having relied on all the alleged representations, implying that

they had been made to it as well as to the claimants; and the particulars of claim proceed on the basis that contracting with AAD rather than Solera was disastrous for Motoriety.

37. It is evident, too, that the "Loss of Claimant Share Value" which is alleged is reflective of loss which, on the claimants' case, Motoriety sustained. The claimants' shares became worthless *because of the company's failure* .

38. The Judge said this on the subject in paragraph 88 of his judgment:

> "In the present case, the misrepresentation claim is that, without the misrepresentations, the company would have been much more valuable (and would not have failed) and therefore the claimants' shareholdings would have been much more valuable. But the claimants' alleged losses are entirely derived from the claimed losses of the company, as indeed paragraphs 16.1.5 and 16.2.5 of the draft amended particulars of claim make clear. The claimants may have a direct *claim* , but they have only an indirect *loss* " (emphasis in the original).

39. I agree. The loss of share value would be a knock-on effect of loss suffered by Motoriety for which it would itself have (or have had) a cause of action and, hence, not be recognised by the law as "separate and distinct". The claim is in this respect one relating to loss which the claimants would have suffered as shareholders "in the form of a diminution in share value …, which is the consequence of loss sustained by the company, in respect of which the company has a cause of action against the same wrongdoer". It is thus barred by the "reflective loss" principle.

40. In the alternative, Mr Fitzpatrick, Mr Symons and Mr Gaskell maintain that the alleged misrepresentations resulted in their being unable to recover the £250,000 which they had invested in Motoriety. Mr Auld confirmed during the hearing before us that the sums in question were those that Mr Fitzpatrick, Mr Symons and Mr Gaskell had paid for their shares in Motoriety. By the time the misrepresentations are alleged to have been made, therefore, Mr Fitzpatrick, Mr Symons and Mr Gaskell no longer had the £250,000, having exchanged it for shares. If Motoriety had prospered, Mr Fitzpatrick, Mr Symons and Mr Gaskell might have been able to recoup their investments from their shares, but the failure of the company has made that impossible. In substance, therefore, the complaint is once again about loss of share value. The inability of Mr Fitzpatrick, Mr Symons and Mr Gaskell to recover the £250,000 they invested is a consequence of the fact that their shares have lost any value, and that is itself a consequence of the failure of Motoriety for which, on the

© 2023 Thomson Reuters.

claimants' case, the company has (or had) a cause of action against AAD. To adapt Lord Bingham's proposition (1) (quoted in paragraph 22 above), Mr Fitzpatrick, Mr Symons and Mr Gaskell are seeking "to make good a loss which would be made good if [Motoriety's] assets were replenished through action against [AAD]". Accordingly, the "reflective loss" principle must again be applicable.

41.   The Judge said this about this head of loss in paragraph 117 of his judgment:

> "even though the claims are limited to the amounts paid for the shares, the loss suffered by the claimants is still the loss of their value. And the loss of their value is still reflective of the loss to the company. This is not some kind of reliance loss, where the shares were acquired *because* of something which the defendant did. Instead, the shares were acquired long before the defendant came on the scene" (emphasis in the original).

42.   In my view, the Judge was correct. The misrepresentation claim is, in the circumstances, wholly barred by the "reflective loss" principle and the Judge was right to strike it out. The applicability of the principle does not depend on the resolution of any factual disputes.

*The breach of contract claim*

43.   The breach of contract claim proceeds on the footing that the Investment Agreement contained implied terms as to good faith which AAD breached and that, as a result, the claimants have been deprived of the value which their shares would otherwise have had or, alternatively, have lost the "Initial Option Payment" and "Earn-Out Consideration" which they would have received pursuant to clause 12 of the Investment Agreement.

44.   The first question which arises in this context is whether, supposing the claimants' contractual claim to be well-founded, Motoriety would also have (or have had) a cause of action against AAD. Mr Thompson queried whether it is even open to the claimants to suggest the contrary when, he said, they had not done so before the Judge. That the claimants did not at that stage dispute that the alleged obligations of good faith were owed to Motoriety as well as the claimants is, perhaps, borne out by passages in the claimants' skeleton argument for that hearing in which it was said, in paragraph 6.3.5, that "[t]he Claimants (not just Motoriety) were parties to the Investment Agreement" and "[c]omplaints about the Defendant's breaches following the conclusion of the Investment Agreement were made by the Claimants as well as Motoriety". Leaving aside that point, however, it seems to me that, on the basis

of what is alleged in paragraph 9 of the particulars of claim, any implied good faith obligations will have been owed to Motoriety as well as the claimants. Paragraph 9.1, from which the implied terms specified in paragraph 9.2 are said to be derived, asserts that "the Investment Agreement including the Business Plan and the Licence Agreement were part of a relational transaction which was akin to a joint venture" and that there was a mutual intention "for the parties to perform with integrity and fidelity to their bargain". The "parties" in question must include Motoriety since the claimants were not parties to the Licence Agreement while Motoriety was a party to both that and the Investment Agreement. Further, it is pleaded in paragraph 9.2 that there were implied terms of the Investment Agreement "and/or as necessary the Licence Agreement between Motoriety and the AA", confirming that implied terms in favour of Motoriety (as the only party than AAD to the Licence Agreement) were being alleged. In any case, I cannot see that the terms which the claimants allege would have been implied solely in favour of the claimants. If the terms were implied in the Investment Agreement at all, they will surely have been implied in favour of all AAD's counterparties, including Motoriety, the more so since they related to the conduct of the business which Motoriety was conducting. Why, for example, would there be an implied obligation only to the claimants, and not to Motoriety, to exercise good faith in relation to the contents of the Business Plan?

45.  It thus appears to me that, if the claimants have a contractual cause of action in respect of the matters they allege, so will Motoriety have (or have had) one. That being so, the claimants' claim will be barred by the "reflective loss" principle unless they are alleging "separate and distinct" loss.

46.  It is plain, I think, that the "Loss of Claimant Share Value" which the claimants allege does not constitute "separate and distinct" loss. The position as regards this head of loss is similar to that in relation to the corresponding head of claim for misrepresentation. As the Judge said in paragraph 88 of his judgment, "[i]f the defendant had performed its contract, the company would have been much more valuable, and so would the claimants' shareholdings". The loss in share value would be reflective of loss sustained by Motoriety in respect of which it would itself have (or have had) a cause of action against AAD.

47.  That leaves the alternative claim for loss of the "Initial Option Payment" and "Earn-Out Consideration" which, the claimants say, they would have received pursuant to clause 12 of the Investment Agreement but for AAD's breaches of contract. The Judge said this about it in paragraph 115 of his judgment:

> "In my judgment this claim too is barred by the no reflective loss rule …. The shareholders have suffered loss, in the capacity of shareholders. Their loss is that the value of their shares has diminished, as a consequence of loss sustained by the company.

The company has *a* cause of action against the same wrongdoer in respect of its loss. Here the value of their shares has gone down to zero. This was caused by the wrong done to the company. The fact that the *measure* of the claimants' loss is by reference to a contractual formula, and different to the measure of the loss of the company, is beside the point. And there is no requirement that the company's cause of action be the same as the claimants'" (emphases in the original).

48.  Taking issue with the Judge's view, Mr Auld argued that this head of claim relates to loss of contractual rights, not diminution in the value of shares. He further pointed out that it was the claimants, not Motoriety, which granted the option for which clause 12 of the Investment Agreement provided and, hence, that Motoriety could never have become entitled to the "Initial Option Payment" or "Earn-Out Consideration". The claimants are thus, Mr Auld said, seeking compensation for loss in respect of which Motoriety could never have had a claim. Mr Auld accepted that AAD would not have been *obliged* to exercise the option, but submitted that that does not matter in circumstances where the claimants allege that AAD would *in fact* have exercised it if its breaches of contract had not led to Motoriety's downfall.

49.  For his part, Mr Thompson supported the Judge's conclusion. The claimants are still, Mr Thompson said, claiming in respect of loss which they claim to have suffered in the form of a diminution in share value: they are merely using a different valuation mechanism to measure that diminution. The value that it is alleged that the claimants' shares would have had but for AAD's breaches of contract is being identified by reference to a specific exit route as opposed to general market value. That, however, is an immaterial difference, Mr Thompson submitted.

50.  To my mind, the Judge was right that the "reflective loss" principle applies to this head of loss as well as the others put forward by the claimants. The value of a share can in principle be assessed by reference to the company's anticipated future earnings, to the prospects of distributions to shareholders and to what the share could be sold for (which will normally in practice itself be affected by likely future earnings/distributions). The claim for "Loss of Claimant Share Value" relates to the general market value of the claimants' shares, that for loss of "Initial Option Payment" and "Earn-Out Consideration" to what the shares would have fetched if sold to AAD following its exercise of the clause 12 option. Either way, the allegation is that AAD's alleged breaches of contract meant that the claimants would not be paid anything for their shares, and that reflected the fact that, on the claimants' case, the breaches had brought about Motoriety's failure such that there was no longer any prospect of either earnings or distributions. The figures given in schedule 1B to the particulars of claim suggest that the claimants would have stood to obtain

substantially more for their shares in the general market than under clause 12 of the Investment Agreement (between £46.7 million and £62.8 million as opposed to £31.5 million), but the essential point is that loss of "Initial Option Payment" and "Earn-Out Consideration" represents one way of measuring loss of share value. If the claimants' pleaded case is correct, breaches of contract by AAD have caused Motoriety to fail and, in consequence, rendered the claimants' shares worthless, both in the sense that they lost any value in the general market and in the sense that there was no longer any prospect of selling them to AAD pursuant to clause 12 of the Investment Agreement. The claimants are therefore claiming in respect of loss "in the form of a diminution in share value …, which is the consequence of loss sustained by [Motoriety], in respect of which he company has [(or had)] a cause of action against [AAD]". There may or not be a precise correlation between the claimants' loss and Motoriety's, but no such correlation is required for the "reflective loss" principle to apply.

*Conclusion*

51.   In my view, the Judge was right that the claim is barred in its entirety by the "reflective loss" principle and, accordingly, to strike it out. The principle can be seen to be applicable now, without the matter going to trial.

**Ground 3: the Settlement Agreement**

52.   In 2019, Mr Astley brought proceedings in the Employment Tribunal, but they were disposed by the Settlement Agreement under which he was paid £60,000 and withdrew his claims. For present purposes, it is clause 4 of the Settlement Agreement that is important. That was in these terms:

> "The Claimant accepts the Settlement Monies in full and final settlement of the Claims and of all and any other claims, whether statutory, contractual and at common law which the Claimant has or may have against the Respondents and/or any associated or subsidiary company, business, partnership or undertaking; their directors, officers or employees, whether arising out of the Claimant's employment with the Respondents, its termination or otherwise excluding claims of personal injury of which he is unaware … at the date of this settlement, accrued pension rights and claims to enforce the terms of the agreement and any High Court claim in relation to the claims specifically referenced in the letter from Stewarts LLP to AA PLC on 27 August 2020 ('the Excluded Claims')."

© 2023 Thomson Reuters.

Mr Astley thus compromised all claims he might have against AAD other than "any High Court claim in relation to the claims specifically referenced in the letter from Stewarts LLP to AA PLC on 27 August 2020".

53.  The letter from Stewarts LLP to AA plc dated 27 August 2020 explained that it was written in accordance with pre-action obligations and addressed "[t]he relevant factual background which applies to the Claimants' legal claims" and "[a] detailed summary of the Claimants' legal claims". It contained a detailed account of the history, including references to what were termed the "Member Marketing Representation", the "Immediate Access Representation" and the Investment Agreement before stating in paragraph 48:

> "In light of the facts and circumstances set out above, the Claimants have actionable claims for fraudulent and/or negligent misrepresentation and/or pursuant to section 2 of the Misrepresentation Act 1967 . The Claimants reserve the right to plead any additional cause of action in due course."

The letter proceeded to allege that the "Member Marketing Representation" and the "Immediate Access Representation" had been false and that the claimants had suffered loss as a result of relying on them.

54.  The letter did not mention either the "Services Representation" or the possibility of Mr Astley having a contractual claim. In the circumstances, AAD contends, and the Judge accepted, that Mr Astley cannot maintain against AAD any claim based on the "Services Representation" or for breach of contract. The Judge concluded that these claims had not been "specifically referenced" in the letter and so had been compromised.

55.  Challenging the Judge's view, Mr Auld argued that High Court proceedings could be "in relation to" a claim "specifically referenced" in the Stewarts letter without the particular cause of action or allegation having been expressly identified in the Stewarts letter. In that connection, he pointed out that, in the letter, the claimants "reserve[d] the right to plead any additional cause of action in due course" and that

© 2023 Thomson Reuters.

facts relevant to the "Services Representation" and breach of contract claims were to be found in the letter.

56.   I agree with the Judge, however. The Stewarts letter excludes from the compromise for which it provides High Court proceedings "in relation to the claims specifically referenced in the letter". There being no mention of them at all in the letter, the simple fact is that the claims based on the "Services Representation" and breach of the Investment Agreement were not "specifically mentioned" in the letter. The fact that the claimants may have reserved their right to plead further causes of action does not mean that such causes of action were "specifically referenced". Nor can it be enough that some of the facts relevant to the "Services Representation" and breach of contract claims were included in the letter. Those claims were not "specifically referenced" and, to that extent, the present proceedings are not "in relation to" claims so referenced.

## Overall conclusion

57.  I would dismiss the appeal.

Lady Justice Asplin:

58.  I agree.

Lord Justice Lewison:

59.  I also agree.

Crown copyright

© 2023 Thomson Reuters.