# EXHIBIT 4

282                                                      [1998] BCC

# Secretary of State for Trade and Industry v Tjolle & Ors.

Chancery Division (Bristol District Registry).
Jacob J.
Judgment delivered 2 May 1997.

> *Disqualifying unfit directors of insolvent companies – Voluntary liquidation –
> Substantial deficiency for unsecured creditors – Fraud by controller of company –
> Employee a manager – Referred to as 'director' –Whether employee a de facto
> director – Legal test for being a director – Company Directors Disqualification
> Act 1986, s. 6, 22(4).*

This was an application by the Secretary of State for Trade and Industry seeking a
disqualification order under s. 6 of the Company Directors Disqualification Act 1986 against
an employee ('K') who was alleged by the applicant to be a de facto director, as defined in
s. 22(4) of the Act, of a company in voluntary liquidation.

The company was a holiday company which went into voluntary liquidation in July 1992
with an estimated deficiency for unsecured creditors of £12.4m. Over half of the sum was
made up of lost deposits from over 40,000 members of the public, paid for future holidays
which were lost. The controller of the company, 'T', was charged with fraudulent trading,
imprisoned and disqualified by consent for the maximum 15 years. The trial of
disqualification proceedings against the second respondent was adjourned until she was fit
enough to attend trial.

K, the third respondent, had begun employment with the company in a part-time capacity
in 1982 and worked her way up, principally in the sales, marketing and customer care side
of the business. She became a manager and at some period was referred to as a director
(and for a few months given the courtesy title 'deputy managing director'), without ever
being formally appointed as a director. T had run the company in an autocratic way and K
had never been involved in the financial side of the business.

The 'charges' against K were that she allowed the company to continue to trade when she
ought to have known that it was hopelessly insolvent, that she permitted the company to
accept deposits from customers when she knew or ought to have known that there was no
reasonable prospect that the company could supply the holidays, that she failed in varying
degrees to comply with Companies Act 1985 requirements to ensure that audited accounts
were filed with the registrar of companies and that she was responsible for making
misrepresentations and misleading information to creditors on a holiday programme on
national television.

There had been a great delay in the proceedings and these charges were heard nearly five
years after the events took place. K had not acted as director since the company's collapse.
The Secretary of State did not contend that K's conduct merited more than a 2–5 year
period of disqualification as set out in Re Sevenoaks Stationers (Retail) Ltd [1990]
BCC 765.

*Held*, dismissing the application:

1. Someone who had no, or only peripheral, knowledge of matters of vital company
concern (e.g. its financial state) and had no right, legal or de facto, to access such matters
was not to be regarded as a director.

2. The use of the title of 'director' did not necessarily mean that the person was holding
herself out to be a director. In this case, the title may have been merely a motivational tool
for staff to do better, while the actual running of the company was left to T.

3. The actual work that K did in the company was not that which could only be performed
by a director. Other evidence showed that she had not been regarded as being in charge and

© 1998 CCH Editions Limited
bcp98 bcp   203 Mp   282   —bcp20375

A     also that she did not know about the true financial position of the company and could not
      have influenced the direction the company was heading.

      4. Even if K were to be regarded as a director of the company, on the evidence concerning
      the charges against her the court was wholly unsatisfied that she had conducted herself in a
      manner which made her unfit to be concerned in the management of a company.

      5. (Obiter.) The incidental effects of a disqualification order (heavy costs, stigma of the
B     order and deterrent effect on others) was not the purpose of the disqualification legislation.
      If the period of disqualification was likely to be low and the case had been significantly
      delayed through no fault of the respondent the public interest was outweighed by the de
      facto disqualification resulting from the pending proceedings and legal costs. If the
      respondent was legally aided, the state bore those costs, thereby diminishing the public
      interest. The longer time taken for proceedings was also contrary to the statutory intention
      of concluding disqualifications quickly.
C
      The following cases were referred to in the judgment:

      *Canadian Land Reclaiming and Colonizing Co (Coventry and Dixon's Case), Re* (1880)
      14 ChD 660.
      *Carecraft Construction Co Ltd, Re* [1993] BCC 336; [1994] 1 WLR 172.
      *C S Holidays Ltd, Re. Secretary of State for Trade and Industry v Taylor* [1997] BCC
D     172; [1997] 1 WLR 407.
      *Grayan Building Services Ltd, Re* [1995] BCC 554; [1995] Ch 241.
      *Hydrodan (Corby) Ltd, Re* [1994] BCC 161.
      *Richborough Furniture Ltd, Re* [1996] BCC 155.
      *Secretary of State for Trade and Industry v Elms* (unreported, 16 January 1997).
      *Sevenoaks Stationers (Retail) Ltd, Re* [1990] BCC 765; [1991] Ch 164.
      *Williams (Rex) Leisure plc, Re* [1994] BCC 551; [1994] Ch 350.

E     Stephen Davies (instructed by Osborne Clarke, Bristol) for the Secretary of State for
      Trade and Industry.

      The third respondent appeared in person.

                                    JUDGMENT

      **Jacob J: Introduction**
F
      Land Travel Ltd, a holiday company, went into voluntary liquidation on 24 July 1992.
      The statement of affairs disclosed an estimated deficiency as regards unsecured creditors
      of £12.4m. This included no less than £6.6m of lost deposits of members of the public,
      deposits paid for future holidays which also were lost. How many individual members of
      the public were affected is difficult to estimate. There were about 40,000 deposits lost, but
      a significant proportion of these were for group bookings (e.g. for clubs) so a larger
G     number than 40,000 were affected. Plainly matters were severely amiss. It is not surprising
      that at about the same time the Fraud Squad seized the company's records. Nor is it
      surprising that a collapse on this scale involved fraud. The fraudster involved was
      Mr Tjolle. He was the sole formally appointed ('de jure') director of the company and
      was, in substance, its owner. Formally, 999 of the 1,000 issued shares were owned by a
      company called Beau Nash Enterprises Ltd, 'BNE', the remaining share being held by
      Mrs McDermott as nominee for BNE. The shares in BNE were owned by Mr Tjolle.
H
      Fast following the appointment of liquidators (Messrs Buller and Gerrard of Grant
      Thornton) came the bankruptcy of Mr Tjolle. And later in 1992 he (along with
      Mrs McDermott) was charged with fraudulent trading under s. 458 of the *Companies
      Act* 1985. Over two years later (on 10 February 1995) Mr Tjolle pleaded guilty. He
      was sentenced to nine months' imprisonment and disqualified for ten years pursuant to
      s. 10 of the *Company Directors' Disqualification Act* 1986 ('the Act').

Mr Tjolle's guilty plea (and consequent disqualification) was solely in respect of his     A
conduct from 1 April 1992 until the demise of the company in July. The Secretary of
State for Trade and Industry was of the opinion that Mr Tjolle's conduct overall and
prior to that date merited the maximum permissible period of disqualification under s. 6
of the Act, namely 15 years.

I do not know whether the criminal court was aware of the 'sentencing guidelines' laid
down by the Court of Appeal in *Re Sevenoaks Stationers (Retail) Ltd* [1990] BCC 765;     B
[1991] Ch 164. It is highly desirable that criminal courts should be aware of this guidance,
for it is self-evident that civil and criminal courts should be applying the same standards:
the purpose of disqualification – to protect the public from the activities of persons unfit
to be concerned in the management of a company – is the same in both kinds of court.
The period of disqualification is perhaps not always seen as of major concern in a criminal
trial where the defendant is also to be punished for some kind of dishonest activity and is
likely to be imprisoned. Nonetheless it is important in the public interest. It may also be     C
important in the interests of the defendant to see that he is in fact disqualified for an
appropriate period. If he is under-disqualified then he may find himself on the receiving
end of a civil application by the Secretary of State for which, if he loses, he will have to
pay the costs. The present case is a good example of what may happen. The prosecution
accepted Mr Tjolle's plea of guilty to fraudulent trading for a period of just three months
or so. He in fact admitted before me to 'significant failings' in his 'duty as a director and     D
steward of Land Travel Ltd during the period of July 1990 to 1992' (his words). That is
a very substantial period – and particularly so having regard to the size of the business
being conducted. I was told that if a 15-year period of disqualification had been imposed
at the criminal trial that would have been an end of the matter as far disqualification is
concerned. As it was the Secretary of State, rightly in my view, felt that in the public
interest he should seek a longer period. In the end Mr Tjolle consented to an order of
15 years' disqualification and paid an agreed figure for costs.     E

Whilst the criminal proceedings were still pending, the Secretary of State launched the
current proceedings by summons dated 20 July 1994. They are not only against Mr Tjolle
and Mrs McDermott, but also Mrs Kenning. The proceedings were stayed (without
Mrs Kenning's knowledge or consent) until the criminal trial which took place on
9 January 1994, when, as I have said, Mr Tjolle pleaded guilty. No evidence was offered
against Mrs McDermott who was accordingly acquitted. Mr Tjolle was sentenced on     F
10 February 1995. After two months of delay the Secretary of State applied for the stay
of these proceedings to be removed. So they moved on their way towards trial.

Originally the trial was to involve all three respondents, Mr Tjolle, Mrs McDermott
and Mrs Kenning. After a pre-trial review by Chadwick J and certain other preliminaries
the trial date was set for 7 April 1997 But in early February it became apparent that, for
strong medical reasons, Mrs McDermott could not attend a trial then. She is unlikely to     G
be able to attend a trial until early 1998 at the earliest. An application was made to
Chadwick J for an adjournment. The Secretary of State wanted an adjournment of the
trial against all three respondents. He was of the view that it would be inappropriate for
it to proceed against only one or two of the respondents. It did not weigh sufficiently with
him that, so far as Mrs Kenning was concerned, the considerable strain which she has
had to endure whilst these proceedings have been pending would continue.

It is, I think, worth remembering that, as Hoffmann LJ said in *Re Rex Williams Leisure*     H
*plc* [1994] BCC 551; [1994] Ch 350, this kind of litigation can be oppressive and requires
careful handling, inter alia, by the Department of Trade and Industry. I was, for instance,
saddened by the following incident. Mrs Kenning indicated she wanted to refer to a
number (a reasonable number) of authorities. I asked whether she had copies for me and
she did not. I turned to Mr Davies for assistance. He told me that the department had a

© **1998 CCH Editions Limited**
bcp98 bcp  203 Mp  284  —bcp20375

A   policy of refusing assistance of this sort. That was not to accord the courtesy and assistance one normally expects of a funded party towards a bona fide litigant in person. I expressed my distaste for the position indicated and am glad to record that the next day I was told that the policy had been altered.

On 26 February 1997 Chadwick J decided to split the trial, postponing that of Mrs McDermott until a later date. When the matter came before me, for the reasons I

B   gave at the commencement of this trial, I acceded to an application by Mr Tjolle for his case to be heard with that of Mrs McDermott. Thus the main trial before me was concerned only with Mrs Kenning. However, for convenience, I did hear one day of the case concerning Mr Tjolle and Mrs McDermott. This is because the Secretary of State's deponent, Mr Buller, has now retired and it was in the interests of all that he finished with the matter. He was the liquidator, and to a large extent his evidence consisted of putting together the Secretary of State's case from the company's documents rather than

C   matters of his own direct knowledge. That is often the case in disqualification proceedings, so there is seldom any point in substantial cross-examination of the Secretary of State's witness.

On the penultimate day of the trial, Mr Tjolle decided to accept a 15-year disqualification period. I allowed Mr Halden, of Thrings and Long, a solicitor, to appear in open court for the purpose of a consent order. I would like to pay a tribute to him for

D   providing Mr Tjolle with legal advice, even though Mr Tjolle had been refused legal aid and was unlikely to be able to pay for Mr Halden's assistance. What Mr Halden did was in the finest tradition of the legal profession. I do not know why Mr Tjolle did not have legal aid. However I hope it was not a case where it was refused even though he was within the financial limits. Even in cases where a director has no real defence to disqualification, it is highly desirable that he has access to legal advice. Good advice includes advice not to defend the indefensible and extends to assisting the court in relation

E   to any penalty.

Thus, for present purposes, I am left with the case against Mrs Kenning. The evidence in this case is not evidence against the remaining respondent and vice-versa. Counsel for the Secretary of State, Mr Stephen Davies, made it plain that the Secretary of State regarded the procedural position as fundamentally unsatisfactory. He said it was unlikely that the court would ever get at the truth with a split trial, a major consequence of which

F   was that the evidence of one respondent could not be used for, or against, another respondent. I do not agree. It is up to the Secretary of State to make his case against any particular respondent, as indeed Chadwick J pointed out when ordering separate trials. When there are a number of respondents it is essentially for convenience that their cases are normally tried together. And it is entirely possible that one or more of the respondents may decide not to contest the case, for instance by dealing with the matter pursuant to the procedure approved in *Re Carecraft Construction Co Ltd* [1993] BCC 336; [1994] 1

G   WLR 172, or as Mr Tjolle did here. An alternative procedure, were it available, would be for a respondent to avoid the necessity for a trial by giving suitable undertakings. Such undertakings would probably have to include an undertaking not to be involved in the management of a company and to be personally responsible for all the relevant debts of any relevant company whilst the main undertaking was in force so as to get the same effect as that provided for under s. 15. Such undertakings are not, as the law is presently

H   understood, possible, though I heard no argument on the point. To my mind they would provide a perfectly adequate method of dealing with the specific object of the Act – protection of the public, not punishment. It would probably be necessary to keep a list of those who have given undertakings along with the register under s. 18, but that would be a mere administrative matter. I understand that the question of the use of undertakings is pending before the Court of Appeal. If a different view of the law is taken there, undertakings would seem to be a very efficient way of dealing with the case against

Mrs McDermott who has, in the past, indicated a willingness so to undertake in her    A
affidavit. I hope the Court of Appeal will be appraised of my views on this point.

I must briefly outline the history of the company. It was formed in 1980 to take over
the business and assets of Land Travel (Bath) Ltd which had been formed in 1974. The
latter company changed its name to BNE and, as I have said, was the company's holding
company. Mr Tjolle was the founder of the business. That business was the provision of
cheap holidays – particularly for groups. The company was never a member of the    B
Association of British Travel Agents (ABTA) and deposits from members of the public
were never secured in any way, for instance by being placed in a separate trust account
or by some form of insurance. When paid they immediately formed part of the company's
cash.

In September 1989 the company was sold by Mr Tjolle to the Granada Group of
companies. In July 1990 Mr Tjolle bought it back. So far as the case against Mrs Kenning    C
is concerned the details of this do not matter because it is not contended that she had any
knowledge of any of the detail of the transaction between Mr Tjolle and Granada. All
she knew was that Mr Tjolle was back in control as the owner. She was told that he had
had to pay only £1 but she was also told, both by Mr Tjolle and the company's then
accountant, Mr Shaw, that they had done a very good deal. She knew nothing of a £2.2m
loan from the company to Mr Tjolle or any other matters arising from the Granada
arrangement (e.g. Mr Tjolle's very substantial drawings by way of repayment of the loan)    D
which might have alerted her to the true position of the company's finances. That
continued to be the position until the company went under. I have mentioned Mr Shaw.
He was a chartered accountant and I think may well have had a lot to do with the
company's demise, for reasons I will come to later.

Mrs Kenning joined the company in 1982 as a part-time administrative assistant.
Shortly thereafter she became a permanent employee and worked her way up in the    E
company. She was always principally concerned with sales, marketing and customer care.
She had never really known work in any other company. At all times Mr Tjolle was the
dominant force – he has been described as 'autocratic' not only by Mrs Kenning, but by
other employees. Mrs Kenning at all times looked upon Mr Tjolle as her boss. When the
takeover by Granada came Mrs Kenning was formally made a director of BNE, along
with four other employees of the company. She received no further payment for this and
was made a director because Mr Tjolle told her to be one. Granada also appointed its    F
own directors. At the time she was being paid £15,000 p.a. and thereafter she says she
was paid by BNE and not the company. The company paid BNE for its management
services. The Secretary of State does not entirely accept that she was paid only by BNE.
She has produced documents showing this to be the case for the later period (late 1991
and 1992 until collapse). There is a document produced by Mr Shaw suggesting she was
paid by the company at a rather earlier point, but I prefer to accept Mrs Kenning's
evidence than any document of Mr Shaw for reasons I will indicate later. I do not think    G
it matters who in fact paid Mrs Kenning.

### Procedure and the 'charges' against Mrs Kenning

Before proceeding further I must identify the 'charges' against Mrs Kenning. Originally
these were set out in para. 85 of Mr Buller's first affidavit. Earlier in the affidavit he
indicated that Mrs Kenning was a so-called de facto director. When he came to the    H
charges two very serious matters were alleged. The first of these was that she caused or
permitted herself (and the other respondents) to be remunerated excessively when she
knew that this such drawings were to the detriment of the company and its creditors. The
second was that she caused or permitted payments to Mr Tjolle of £540,000 by way of a
misapplication of company funds.

**© 1998 CCH Editions Limited**
bcp98 bcp   203 Mp   286   —bcp20375

A       Throughout that affidavit at most points no distinction is drawn between the position of any of the three respondents, who are generally referred to compendiously as 'the respondents'. I am well aware of the difficulties of the Secretary of State in formulating a case under the Act when there are several individuals involved. But in common fairness each individual is entitled to a full consideration of each charge brought against him or her. I am not convinced that that was the case in respect of Mrs Kenning. In particular the two serious charges to which I refer do not seem to me ever to have been properly
B       considered in relation to her.

        Further it is important to note that Mrs Kenning was never interviewed or even given warning about the possibility of these proceedings. This is in contrast to the position of the other two respondents who were interviewed by Mr Buller's assistants from Grant Thornton in September 1994. Mrs Kenning only learned of these proceedings in September 1994, over two years from the collapse of the company. The ten-day letter and
C       the initial summons were served at her former address by post. She did not get actual notice until 6 September 1994. By this time she had discarded any personal documents she had about the company and some of the fellow-employees who might have assisted her defence had scattered. As it was she called four such employees who, not surprisingly, at times said that they could not remember details of what had happened. None of these employees (or any others so far as I know) were interviewed before the proceedings were
D       commenced or indeed thereafter.

        The procedural difficulties of this case were further compounded by the fact that Mr Buller did not have all the documents. After his first affidavit Mrs Kenning replied to it in a lengthy affidavit (prepared not only under the stress of this application but stress due to an unsuccessful eye operation and the need for a further operation). Necessarily Mr Buller's affidavit was prepared using the company papers then available to him,
E       though he knew that the police had also seized papers. It was thought that those taken by the police had been destroyed but it emerged that this was not so: there were six filing cabinets-full of company papers at Bridewell Police Station. It became necessary for all parties to go through these and for further evidence to be prepared by all sides based upon them. I make no attempt to suggest blame on the part of anyone – but there is a lesson for the future. If the police and a liquidator both have documents and the Insolvency Unit consider it may be necessary to take action it would be as well to take
F       active steps at an early stage to co-operate with the police to ensure that proper records are kept of where documents are stored and to prevent their inadvertent destruction or loss. In the present case even the further material is incomplete, though it is not suggested that the missing documents have been deliberately abstracted by anyone.

        Following all this the Secretary of State substantially reduced the charges against Mrs Kenning. This he did by a solicitors' letter of 30 July 1996 (there had been one earlier
G       reduction). The remaining charges, those with which I have to deal, are as follows.

        (a)     That she permitted the company to continue to trade from at least 10 December 1990, when she ought to have known by virtue of the unequivocal warnings given by Mr Tony Davies, the financial director, that the company was hopelessly insolvent and that continued trading would be at the risk of, and to the detriment of creditors.

H       (b)     That she, along with the other respondents, caused or permitted the company to accept deposits from customers when she knew or ought to have known that, due to the company's financial position, there was no reasonable prospect of the company being able to supply the holidays that the deposits were paid over in respect of. Her actions caused some 40,000 creditors amounting to £6m to be unsecured creditors in the liquidation with no prospects of any return to them.

(c)    That she, along with the other respondents, failed 'in varying degrees', to comply
       with their statutory duties to ensure that audited accounts be filed with the registrar
       of companies as required by the *Companies Act* 1985.

(d)    That she was responsible for making misrepresentations to creditors and potential
       creditors whilst appearing on national television in giving misleading information
       to the public at large.

In the result I have to consider these charges in 1997, nearly five years after the demise
of the company. I am concerned with events back as far as 1990 and before. The delay
cannot in any way be laid at Mrs Kenning's door. Mrs Kenning has not acted as a
director since the company's collapse. Moreover the Secretary of State does not contend
that her conduct merits more than the something within the two- to five-year period of
disqualification contemplated by *Sevenoaks*. So it is difficult to see what real public
interest has been served by the case proceeding. However it has, and I must deal with it.
For if she is properly to be regarded as a director and her conduct as a director was such
that it made her unfit to be concerned in the management of a company, I must make a
disqualification order of at least two years, however pointless that may now be in the
public interest: see *Re Grayan Building Services Ltd* [1995] BCC 554; [1995] Ch 241. As
Hoffman LJ said in that case (at p. 574B; p. 253E), what the court must do is to decide:

> 'whether that conduct [i.e. the conduct as a director], viewed cumulatively and
> taking into account any extenuating circumstances, has fallen below the standards
> of probity and competence appropriate for persons fit to be directors of
> companies.'

Given that that is the position in law, I do think that in some cases the Secretary of State
would do well to consider whether the public interest is really served by pressing on with
cases which, for one reason or another, really no longer have a point. It should be
remembered that the essential purpose of an order of disqualification is to protect the
public. Its incidental effects, particularly what is often likely to be a heavy costs order
(probably much higher in amount than any fine in a criminal court), the stigma of an
order, and its deterrent effect on others, are not the purposes of the legislation. If a period
of disqualification is likely to be low and the case has been significantly delayed through
no fault of the respondent, any public interest involved in a disqualification may be
outweighed by the de facto disqualification which is often the result of pending
proceeding and the legal costs involved in going through with the procedure. In cases
where the respondent is legally aided the state bears the costs of both sides. In other cases
the respondents may be paying for their own representation or, as is not uncommon,
may represent themselves. In almost all cases simply defending proceedings (particularly
those concerned with events of some antiquity) puts an enormous strain on a respondent.
The cost and effort involved may be very significant because one frequently has to go
over the whole history of the management of a company. There is this further
consideration. In s. 6 proceedings the case must be commenced within two years of the
insolvency of the company, except with the leave of the court. There is a clear statutory
intention that these cases are taken to a conclusion quickly. It hardly is in accordance
with that intention that, after they have been commenced they should be stayed against
an individual who has not consented to that stay. I mention all these matters because I
hope they may assist the Secretary of State in his consideration of disqualification
proceedings generally.

### De facto directors: the law

It is one of the preconditions for s. 6 of the Act to apply that the court 'is satisfied' that
the respondent 'is or has been a director of a company which has at any time become
insolvent.' If a person was a de jure director, i.e. was formally appointed a director by

© 1998 CCH Editions Limited
bcp98 bcp   203 Mp   288   —bcp20375

A   the appropriate machinery, this condition is obviously satisfied. But formal appointment is not the only way someone can became a director. The law recognises what is called in the jargon a de facto director. This is achieved by s. 22(4) of the Act which reads:

> ' "Director" includes any person occupying the position of a director, by whatever name called, and . . . includes a shadow director.'

B   I am not concerned with a case based on alleged shadow directorship. The Secretary of State contends that Mrs Kenning was a de facto director from at least July 1990. So what is the legal test for being a director, even though not appointed as such? There are several judicial opinions on the point.

In *Re Hydrodan (Corby) Ltd* [1994] BCC 161 at p. 163C Millett J said:

> 'A de facto director is a person who assumes to act as a director. He is held out as a director by the company, and claims and purports to be a director, although
C   never actually or validly appointed as such. To establish that a person was a de facto director of a company it is necessary to plead and prove that he undertook functions in relation to the company which could properly be discharged only by a director. It is not sufficient to show that he was concerned in the management of the company's affairs or undertook tasks in relation to its business which can properly be performed by a manager below board level.'

D   And, a little earlier (p. 162G), he pointed to the purpose of any test by saying:

> 'Liability for wrongful trading is imposed by the Act on those persons who are responsible for it, that is to say, who were in a position to prevent damage to creditors by taking proper steps to protect their interest. Liability cannot sensibly depend upon the validity of the defendant's appointment. Those who assume to act as directors and who thereby exercise the powers and discharge the functions
E   of a director, whether validly appointed or not, must accept the responsibilities which are attached to the office.'

I think this is an all important passage, to which I will return.

In *Re Richborough Furniture Ltd* [1996] BCC 155 Mr Lloyd QC (as he then was) said Millet J's test was 'not exhaustive'. He assumed that by the expression 'assumes to act as a director' Millett J meant someone who was held out as a director or who claimed or
F   purported to be a director. I do not so read Millett J. I think by that phrase he was focusing on what the individual did. At any rate, on the basis that the test was not exhaustive, Mr Lloyd formulated his own test at p. 170B:

> 'It seems to me that for someone to be made liable to disqualification under s. 6 as a de facto director, the court would have to have clear evidence that he had been either the sole person directing the affairs of the company (or acting with others all
G   equally lacking in a valid appointment, as in *Morris v Kanssen*) or, if there were others who were true directors, that he was acting on an equal footing with the others in directing the affairs of the company. It also seems to me that, if it is unclear whether the acts of the person in question are referable to an assumed directorship, or to some other capacity such as shareholder or, as here, consultant, the person in question must be entitled to the benefit of the doubt.'

H   The 'equal footing' test, Mr Davies contended, was wrong – in most boardrooms all directors are not equal. Mr Davies referred me to an article by Stephen Griffin (*The Insolvency Lawyer*, October 1966, p. 6) which criticised the test. However if one reads what Mr Lloyd said as Judge Cooke did in *Secretary of State for Trade and Industry v Elms* (16 January 1997, unreported) much of the criticism falls away. Judge Cooke said:

> 'At the forefront of the test I think I have to go on to consider by way of further analysis both what Millett J meant by "functions properly discharged only by a

**290**     **Secretary of State for Trade and Industry v Tjolle**     **[1998] BCC**
                              *(Jacob J)*

director", and Mr Lloyd QC meant by "on an equal footing". As to one, it seems     A
to me clear that this cannot be limited simply to statutory functions and to my
mind it would mean and include any one or more of the following: directing others,
putting it very compendiously, committing the company to major obligations, and
thirdly, (really I think what we are concerned with here) taking part in an equally
based collective decision process at board level, i.e. at the level of a director in
effect with a foot in the board room. As to Mr Lloyd's test, I think it is very much     B
on the lines of that third test to which I have just referred. It is not I think in any
way a question of equality of power but equality of ability to participate in the
notional board room. Is he somebody who is simply advising and, as it were,
withdrawing having advised, or somebody who joins the other directors, de facto
or de jure, in decisions which affect the future of the company?'

It will be seen that Judge Cooke reads Mr Lloyd as referring to equality of ability to
participate in the notional board room.     C

For myself I think it may be difficult to postulate any one decisive test. I think what is
involved is very much a question of degree. The court takes into account all the relevant
factors. Those factors include at least whether or not there was a holding out by the
company of the individual as a director, whether the individual used the title, whether
the individual had proper information (e.g. management accounts) on which to base
decisions, and whether the individual has to make major decisions and so on. Taking all     D
these factors into account, one asks 'was this individual part of the corporate governing
structure?', answering it as a kind of jury question. In deciding this, one bears very much
in mind why one is asking the question. That is why I think the passage I quoted from
Millett J is important. There would be no justification for the law making a person liable
to misfeasance or disqualification proceedings unless they were truly in a position to
exercise the powers and discharge the functions of a director. Otherwise they would be
made liable for events over which they had no real control, either in fact or law.     E

In this regard I think it very important to remember that an alleged de facto director
can only be such by reason of the factual position. De jure directors have both common
law and statutory powers and duties. In particular they are entitled to be at the heart of
the company, and to have proper details of its financial position. They cannot be heard
to say: 'I had no way of knowing what the position was'. But an alleged de facto director
is in a different position. De facto they may have had no knowledge and no right or     F
means to have that knowledge. This is important in this case, because the Secretary of
State's case in part relies on what he alleges Mrs Kenning *ought* to have known.
Mr Davies contends that one is either a director or not. He says there are no different
rules for de facto directors as opposed to de jure directors. I think that must be right, but
I think it follows that someone who has no, or only peripheral knowledge of matters of
vital company concern (e.g. financial state) and has no right, legal or de facto, to access
to such matters is not to be regarded by the law as in substance a director.     G

Mr Davies relied on part of a further passage from Judge Cooke's judgment:

'Mr Algazy, who made a number of helpful and very able submissions on behalf
of Mr Suckling broke it down I think in a way which very much assists me in this
way. He said the tests are these:

(1) (a) Has the company held X out to be a director, i.e. allowed X to be cloaked     H
    with the indicia of directorship, and (b) has X claimed and purported to be
    a director?

(2) Did X undertake functions which could properly be discharged only by a
    director and not just a manager?

(3) Is there clear evidence (a) that X was the sole person directing the affairs of

A          the company or (b) if acting with others validly appointed or not, acting on an equal footing with the others and directing the affairs of the company? He says, and it is undoubtedly right, any doubt as to the capacity in which X acted is to be resolved in X's favour.

It seems to me that having read both these authorities [i.e. *Hydrodan* and *Richborough*], that the three main tests are disjunctive rather than conjunctive.'

B    Mr Davies proceeded on that basis that Judge Cooke accepted the three alternative tests suggested. I am not sure that is so – and in particular he was not concerned with a type (1) case. He was concerned with a man whom he found to be in 'decision-making charge of the company's financial affairs'. Mr Davies needed to fasten on to type (1), because it would be very difficult to say that Mrs Kenning was a de facto director if she had not used the title of 'director' as I indicate more fully below. What Mr Davies submitted was that if an individual holds himself out as a director and the company
C   allows him so to do, that is enough to make him a de facto director, irrespective of whether he really formed part of the corporate governance of the company. He relied upon a passage from the judgment of Sir George Jessel MR in *Re Canadian Land Reclaiming and Colonizing Co (Coventry and Dixon's Case)* (1880) 14 ChD 660 at p. 664:

'The point I have to consider is whether the person who acts as *de facto* director is a director within the meaning of this section, or whether he can afterwards be
D      allowed to deny that he was a director within the meaning of this section. I think he cannot. We are familiar in the law with a great number of cases in which a man who assumes a position cannot be allowed to deny in a Court of Justice that he really was entitled to occupy that position.'

However I think the passage should not be read out of context. The court there was concerned with two individuals who in every way acted as directors but did not have the
E   requisite shareholding required by the articles. That is a very different case from one where someone has just used the title 'director.' After all it is common experience that many business executives these days use (and are told to use) the title 'director' when there are no such thing. In my experience (if that is anything to go by) it is particularly so on the marketing side of a company. Titles such as 'marketing director', 'sales director' and so on are far from uncommon. It would potentially lead to injustice if all such individuals were to be treated in law as if they really were directors.
F

Thus I do not accept type (1) as being a sufficient test to make a person a de facto director. No doubt if a person uses the title and is permitted or required by the company to use the title that is a factor to be taken into account. Persons who have used the title may well have to rebut the inference that they were in fact directing the company. But if they were not so doing then they were not de facto directors.

G   **The facts concerning Mrs Kenning**

(a) *Use of the title 'director'*

I have already recounted Mrs Kenning's rise in the company. By 1990 she was in charge of customer care and marketing – subject however to the overall autocratic control of Mr Tjolle. The evidence discloses that she had some limited power to commit the company to expenditure within this area, but all major and many minor decisions were
H   made by Mr Tjolle. However, she was using the title 'director' with added words of description. There are many documents which show this and her evidence went as follows:

'Mr Davies: I would like to ask you questions about when you started to call yourself director of Land Travel. We know it happened and went throughout and we have been through that. Can we just put some dates on when it started, and I

am going to try and help you by showing you some documents. If we could just     A
exchange that file you have there for file 7?

Jacob J:  She knows what the date is. What date –

A.  It was during the course of whenever Granada bought the company. During
the course of that, myself and four other managers were made directors. In fact I
had three different directors' names during the course of that time. I was called
Super Breaks director, I was called Customer Care director, I was called Sales and     B
Marketing director at different stages.

Q.  Just put some dates on those, if you will?

A.  The Super Breaks would have probably been in the '88–'89 period. Customer
Care was towards the end, '89, and the Sales and Marketing was from about
January or February of 1990.

Mr Davies:  In respect of those you accept that you, for instance, signed bank     C
mandates showing yourself as a director – bank mandates in the name of Land
Travel?

A.  I signed bank mandates as Sales and Marketing director, and that I think was
in 1990.

Q.  In relation to foreign banks as well?

A.  Yes, there were foreign banks set up where I was to be a signatory, as were a     D
lot of other people.

Jacob J:  I do not think there is a dispute about that.

Mr Davies:  I would like to establish the date if I can. The documents show that
those mandates were signed in September 1989; would you have any quarrel with
that?

A.  No.                                                                              E

Mr Davies:  I am obliged to your Lordship.

Jacob J:  I think it is right that thereafter at I think every point, both with the staff
and with the public, you were described as a director?

A.  I was described as a director. I was told to use the term "director" in whatever
division I was put into by Mr Tjolle, for authority with customers and staff.'     F

For about six months she was called 'Deputy Managing Director', though the use
lessened during that period. I accept her explanation of how the title came about. She
was in fact being slightly demoted because she was being moved out of sales by Mr Tjolle.
She was to be in charge of 'customer care' – dealing with special requests, checking on
complaints and so on. She felt she needed a title which gave her clout both with customers
and so that staff did not see her as being demoted. She asked for the title by a
memorandum which reads:                                                             G

  ' "Customer Care" as a title is too "wimpy" for this company. The position must
  not be perceived as a demotion – otherwise aims will be defused. I propose title
  that is heavy-weight: Deputy MD.'

In January 1992 she stopped using the word 'director'. The reason she stopped using
the word 'director' is, I think, significant. Up until that point she had in fact been a de
jure director of BNE and had been told by Mr Tjolle that BNE was providing its services     H
to Land Travel. She was formally being paid by BNE at that time and, as I have said, I
think that had been the case since at least Mr Tjolle's buy-back. Her evidence was as
follows:

  'The trigger for my having a concern was that I got a communication through for
  the very first time from Companies House in January 1992 saying that the accounts

© 1998 CCH Editions Limited
bcp98 bcp  203 Mp  292  —bcp20375

A  were behind. I came into work and I spoke to Mr Tjolle and I said "What is this about?" and he said "Oh, don't worry, I have got it in hand. Don't worry, there is no problem" and it further reinforced to me that there was no way in which I could have any impact on whether it would be in hand or not. I discussed with my husband about the issue and he spoke to Mr Cowley who had been a colleague at some time in the past, and he recommended that if there was any possibility of me being seen as a shadow director of Land Travel or of Beau Nash Enterprises that I

B  should just move myself out of the situation.

I had no major concerns about the company as such, I just realised that I was in no position to dictate what would happen with accounts. I knew through discussions that I had with Mr Tjolle in 1991 that it was his company to do with as he wished. The restructuring of the company at the beginning of the year further reinforced that I was in sales and Friendly Holidays, so I resigned.'

C  Her evidence as to consulting Mr Cowley (an accountant friend of her husband) is corroborated by an affidavit from Mr Cowley which is accepted by the Secretary of State. I think this is the first time Mrs Kenning actually knew about the duties of a director. She knew she had no access to the accounts, she knew Mr Tjolle was in total charge, and she knew that the company's finances were being overseen by an apparently respectable chartered accountant, Mr Shaw. She knew she was not directing the company.

D  After formally resigning as a director of BNE she started using the title 'Chief Executive Friendly Holidays/Land Travel'. By this point Mr Tjolle had put her in charge of a 'division' concerned with direct sales to the public rather than sales to groups. She accepted that the title was 'preposterous'. Another employee, Elke Jantzen (who gave evidence and whose evidence I accept) was told to call herself 'Chief Executive of Land Travel' and did so. 'Land Travel' here meant the group holiday business. Miss Jantzen had joined the company much later than Mrs Kenning but had risen quickly. She told

E  me that by January 1992 she was on an equal footing in the company with Mrs Kenning, each reporting to Mr Tjolle.

The Secretary of State contends that by the use of the title 'Chief Executive' Mrs Kenning was also holding herself out as a director. I just do not see why. She was certainly holding herself out as having considerable authority (as was Miss Jantzen). But it is perfectly possible to be a chief executive and not to be director. I do not think there

F  was any holding out of any kind after her resignation. I should perhaps add that there were two classes of document dated after January which apparently use the title 'Deputy Managing Director'. One was a document which had been prepared earlier and was sent out later, as the Secretary of State now accepts is so. The other suggests something more serious, though not on Mrs Kenning's part. These were faxes to the bank authorising payment on a single signature. In fact what seems to have happened is that a form had

G  been signed in blank by Mrs McDermott and Mrs Kenning, using the respective titles 'Managing Director' and 'Deputy Managing Director' respectively. What was done was to use a photocopy of this form with various amounts and payees filled in. The bank would not know that this was so – all it would get would be a faxed copy of this document. Mrs Kenning had no part in this. Mr Davies took the point that Mrs Kenning never mentioned this explanation before giving evidence. What she said was she could not for a long time understand how these documents dated after she had resigned as a

H  director existed. She pointed out that one can see that in each case the signatures are exactly the same and in exactly the same place on the page – which to my mind can only really have happened in the way she suggested.

Given that Mrs Kenning was using the title 'director' – principally in the form 'Sales and Marketing Director' and for a time in the form 'Deputy Managing Director' what am I to make of her evidence in her first affidavit? Mr Buller had pointed to a circular

letter which she had signed as a 'director of Friendly Holidays.' She said that was a        A
division of the company and that signing as a director of Friendly Holidays was
recognised good sales practice, She added: 'To the best of my knowledge, I never signed
letters as a director of Land Travel.' Further, she said:

> 'At no time, in fact, did I refer to myself as Deputy Managing Director, and no
> documentation exists where I acknowledge such a title. Indeed in [a bank mandate]
> I sign as sales and marketing director.'          B

Now the latter passage is in fact an acknowledgement that she at least signed that
mandate as a director of the company. But it is an unequivocal assertion that she did not
sign any documents as 'Deputy Managing Director.' That was not true. She did – and
did so regularly for at least several months. This became apparent when the second batch
of documents (from Bridewell Police Station) emerged. It is contended on behalf of the
Secretary of State that she was deliberately lying in her first affidavit (when she thought        C
no more documents would emerge), in order to distance herself from the centre of the
company. I have to say that I think there is much force in this. It is true that by the time
she made the first affidavit the events were over three years old. But I cannot accept that
she had no recollection of using the title at all. After all she herself had suggested it. I
think I am obliged to say that these parts of her affidavit were not true. She was an alert
and intelligent woman. I did not find her explanation of misremembering convincing.
                                                                                    D

However it does not follow that the rest of the affidavit is not true – though it does
make it more difficult to discern the truth. The evidence shows that titles in this company
were conferred, and required to be used, by Mr Tjolle on a far from usual scale or
manner. Consider, for instance, his requirement that Miss Jantzen call herself a 'Chief
Executive Officer', when all she was head of was sales of the division concerned with
groups travel. He was the boss and an autocratic one at that. I think he used titles as a        E
way of motivating his employees. At all times he (perhaps with Mrs McDermott) was
really the one pulling the strings.

### (b) Mrs Kenning's position as a signatory on the bank account

The evidence shows that the people who had most to do with the company's financial
state were Mr Tjolle, Mr Shaw and Mrs McDermott. Mrs Kenning did not have access
to the company's financial records, save in some instances peripherally and without any        F
responsibility. However she was a signatory on the bank mandate. So also were Mr Tjolle
and Mrs McDermott and several others besides. Cheques required two signatures
(though there came a point when on occasions the bank was instructed to act on
just Mr Tjolle's signature – a matter of which Mrs Kenning had no knowledge). Generally
Mr Tjolle and Mrs McDermott signed, but Mrs Kenning was used from time to time.
She would be given a pile of cheques, with an authorisation form duly complete and she        G
just signed, without any real knowledge of the underlying transaction. Some of the
cheques were post-dated, a point to which I will return. I accept the evidence of Mrs
Kenning, corroborated by Mrs Hamilton who worked in the Finance Department that
in practice Mrs Kenning was used as a 'second signature of last resort', i.e. when for
some reason Mr Tjolle and Mrs McDermott were not both available to sign. The same
was true for another employee, Mary Hassell. I also accept Mrs Hamilton's evidence that
Mrs Kenning's signature was mainly used for small cheques.          H

Mrs Hamilton, who worked for the company for seven years, also gave other
important evidence. She made it clear that all the financial records were kept under lock
and key by Mrs McDermott and that Mrs Kenning did not have access to them. I note
also that Mrs Kenning made negligible expenses claims – unlike Mr Tjolle who regularly
took by way of 'expenses' large sums in cash.

A  Further, Mrs Hamilton made it clear that Mrs Kenning was regarded as a director by her. How she learned of this is somewhat lost in the mists of time (one of the troubles of a case coming to a hearing so many years after the event). However even though this was so Mrs Hamilton said this in her affidavit:

   'I believed that Mr Tjolle and Mrs McDermott were the people in charge of Land Travel and that Diana Kenning worked for them, solely in sales and customer
B   care. Because Diana Kenning had no interaction with the Financial Department, and was not given financial information, I believed Diana Kenning had nothing to do with Land Travel's financial management.'

  That belief must have been reinforced by where Mrs Kenning worked. Mrs Hamilton was being asked when she first thought Mrs Kenning was a director. Some memos showing command structures which described Mrs Kenning as a director were put. Her
C evidence went like this:

   'Q. We have five memos that say they went to all staff and I think in all five she is shown as a director?

   A. Yes.

   Q. Do I take it from that you either didn't get it or didn't read it?

   A. Probably, but I was there for a long, long time. I just thought Diana was sales
D   manager. She didn't have an office like Val and Theresa. She was in with everybody else.'

  Further, Mrs Hamilton's evidence effectively disposed of the Secretary of State's suggestion that Mrs Kenning had real authority within her sphere of management concerning the pay of employees. What happened was that Mrs Kenning suggested what the pay should be, but it was Mr Tjolle and Mrs McDermott who decided. There was no
E joint discussion involving Mrs Kenning.

 *(c) Mrs Kenning's remuneration*

  Mrs Kenning was paid a salary and had a company car (second hand) of no great value. Her salary was £15,000 p.a. in 1989 (during Granada ownership), £25,000 p.a. in 1990, £35,000 p.a. in 1992 and at a rate of £40,000 p.a. in 1992 (though in the result not a lot of this was actually paid). It was Mr Tjolle who simply told her what she would be
F paid. Her rate of pay was not that much more than that of others who are accepted to be only senior managers. Her pay was a lot less than that of Mrs McDermott. She says, and I accept, that her sort of pay is consistent with being a senior manager with considerable responsibility and a very heavy work-load. Mrs Kenning was not a shareholder and essentially received no other benefits from the company apart from the car and her salary. She was in a very different position from Mr Tjolle (who was abstracting considerable
G sums) and, perhaps also, Mrs McDermott (as to whom I make no finding).

 *(d) Mrs Kenning's actual work within the company*

  It seems clear that Mrs Kenning's actual work consisted of being in charge, subject to the overall control of Mr Tjolle, of sales, marketing and customer care. She had a number of people working for her, and what she did varied from time to time pursuant to instructions of Mr Tjolle. The 'demotion' (which led to her asking for the title 'Deputy
H Managing Director') and her transfer to Friendly Holidays all happened on his orders.

  Nonetheless it is clear that she was the third most senior person in the company, after Mr Tjolle and Mrs McDermott. As such she took part in a number of meetings, regular meetings, with the other two. There are minutes of some 13 meetings between 18 January 1990 and 9 December 1991 which are described as 'board meetings'. It is not entirely clear whether they are BNE or Land Travel board meetings. They were certainly

concerned with Land Travel, however. And during 1990 at least she got some           A
management accounts. The Secretary of State contends that she got them all in 1990,
including those for August. I am not certain this is so. It was suggested that her evidence
was unsatisfactory in relation to receipt of these accounts. I reject that suggestion. What
she said was she could remember some of the accounts for earlier in the year, but not the
later ones. She is shown on the circulation list and so at one point accepted she must have
had them. But she could not say she did because she did not remember. I think this is a
fair summary of the position – though under very considerable pressure from Mr Davies,           B
she at times appeared to vary in her answers. I bear in mind that she was being asked
about events seven years ago, and that the particular subject of the discussion, company
accounts, was no part of her actual job or responsibility.

At some of these 'directors' meetings' financial matters were discussed. At some it
seems clear that the company's financial problems were raised. What Mrs Kenning
probably gleaned was that the company had been losing money. But she never had an           C
overall picture of what was going on. It is quite clear to my mind that the 'board meetings'
were primarily operational in character. They are not like board meetings of other
companies. There is no meeting (at which Mrs Kenning was present), for instance, dealing
with the appointment of bankers, legal and financial advisors, or dealing with statutory
accounts or auditing.

The true position is that the 'board meetings' at which Mrs Kenning was present were           D
not meetings at the heart of the company. I think a much truer picture of her position
was given not only by herself but by the independent witnesses she called. Thus
Miss Cafferty who worked in the financial department from June 1990 gave clear
evidence of Mrs Kenning's lack of involvement in anything financial. She summarised
her view of Mrs Kenning's position thus:

> 'In summary I understood Diana Kenning was a senior manager of the Friendly           E
> Holidays division reporting to Mr Tjolle who was in overall charge. I did not at
> any time during my employment with Land Travel, consider her to be involved in
> the financial management, budgetary or strategic controls of the company.'

During her cross-examination Mr Davies put to Miss Cafferty a number of documents
recording meetings between 'senior managers'. On these Mrs Kenning is described as a
'director' and copies of the document are recorded as going to her. The point being made
was that Mrs Kenning was seen as a director, getting the results of the meetings. I asked           F
Miss Cafferty about this and about how she saw Mrs Kenning's position.

'Q. You have said that you regarded Mrs Kenning as a director?

A. Mrs Kenning had the title director and, yes, was a senior member of staff.

Q. And she didn't attend these meetings except at the end of them, these senior
managers' meetings?           G

A. I actually think Diana started attending them – my memory says Diana started
attending them per se anyway almost for their entirety rather than just the half an
hour slot, which is how it started, but Theresa or Val never did that.

Q. To what extent did you regard Diana as a person in control of the company?

A. In control of the company?

Q. Yes.           H

A. I would have said very little.

Q. Why is that?

A. Any sort of serious issues, certainly serious financial issues, my first port of call
would have been Theresa because Theresa is who I worked for, and my second

© 1998 CCH Editions Limited
bcp98 bcp   203 Mp  296  —bcp20375

A    port of call would have been Val. And I certainly wouldn't have ever referred to
     Diana on financial matters at all.

     Jacob J:  Do you want to ask any questions out of that?

     Mr Davies:  My Lord, no.'

     *(e) Mrs Kenning's attendance and 'vote' at the meeting of 10 December 1990*

B        The first 'charge' against Mrs Kenning refers to warnings from Mr Tony Davies on
     10 December 1990. The evidence concerning this meeting relates both to de facto director
     and unfitness. For the fact that she attended might be evidence of her taking part in
     corporate governance. So I deal with it now.

         At one point the chartered accountant, Mr Shaw, had been advising the company. His
     firm had been the auditors at least since 1985 until Granada bought it in 1989, when Price
C    Waterhouse replaced them. Mr Shaw remained as a financial advisor and was described
     as 'Chief Financial Officer' in a document of 19 January 1990. It was Mr Tjolle and
     Mr Shaw who dealt with the company's bankers, the TSB. On 31 May 1990 Mr Shaw
     resigned and Mr Tony Davies took over as 'Chief Financial Officer'. Mr Tony Davies
     was also a chartered accountant. There were some 'directors' meetings' attended by
     Mrs Kenning at which significant losses were reported and she must have had some,
     though far from perfect, knowledge of this. On 11 September 1990 Mr Tony Davies sent
D    a memo addressed to Mr Tjolle, Mrs McDermott and Mrs Kenning. It read:

             'I met Steve (illegible) (PW) . . . to discuss the problems re signing off the 30.9.89
             and 31.3.90 accounts.

             – PW still want to qualify both sets of accounts because they are not satisfied on
             the going concern principle: they are not convinced that the company will be able
             to continue trading over the next six to nine months
E
             – PW have also pointed out that directors should be aware of their responsibilities
             and the consequences of continuing to trade in an insolvent situation

             The purpose of this note is to make you aware of the situation as directors.'

         Mrs Kenning readily accepted she got this memo. She said that at the time she
     understood that there was no real problem and that it was all being sorted out by
F    Mr Tony Davies and Price Waterhouse. She says she was quite friendly with him and
     there were never any discussions with him about anything being significant. Now one of
     the unfortunate facets of this case is that I have no evidence from Mr Tony Davies. I was
     told that the Secretary of State has looked for him without success. I do not know when
     he was looked for. It may well only have been in 1995 when the stay was lifted. That
     would have been four and a half years after he had gone. Mr Tony Davies might have
     been able to shed a lot of light on Mrs Kenning's position at the time.

G        There was also a letter from Price Waterhouse of 22 August 1990 addressed to the
     'Directors of Land Travel'. This warned of the possibility that the group may be deemed
     unable to pay its debts and reminded the directors of their potential exposure, inter alia,
     to disqualification proceedings. Mrs Kenning never got that letter. I suppose Mr Tjolle
     got it and perhaps Mrs McDermott. Whoever did did not give it to Mrs Kenning –
     suggesting to my mind strongly that she was not part of the inner sanctum of this
H    company.

         I now come to the meeting of 10 December 1990. Mrs Kenning had no notice of it. I
     asked her to describe what happened when she was giving her evidence in chief:

             'Q.  I think it would be helpful if you just took me over what happened about the
             calling of that meeting and your attendance at the meeting and what happened at
             the meeting without looking at any documents.

Case 1:21-cv-11059-GHW   Document 182-4   Filed 08/15/23   Page 18 of 24

A   A.  Right. Well, the irony of all ironies was that I was actually really busy that morning organising reservations staff because we were getting so many bookings in on a new promotion — I can't remember, it was some kind of shopping trip, that promotion, that had really taken off. In travel what happens is things go in fads and there was a particular fad that year that was just taking off in the run-up to Christmas and I was having to reorganise people because of telephone

B   links and all the rest of it. Mr Tjolle came up to me and said ''I want you to come down to a meeting''. I was actually quite impatient because I had not scheduled any meeting in, but I went down to this meeting. I went into the room and Mrs McDermott and Mr Davies were sitting there. There was no conversation going on. I sat down and there was a very fast interaction where Mr Davies said —

C   Q. Was Mr Tjolle there?
A. Mr Tjolle sat down behind his desk. Mr Davies sat opposite him. To be honest, really, as far as I am concerned Mrs McDermott and myself were almost like outsiders in a meeting between Mr Tjolle and Mr Davies. Mr Davies referred to the fact that the overdraft facility from the bank had been withdrawn.

D   Q. Did you know that before?
A. No. His main point was that he did not know it had been withdrawn, so he was obviously ''personally affronted'', as he uses in subsequent notes, and he said in effect basically, ''I think the company should be closed down''. Mr Tjolle looked at Mrs McDermott and said ''Do we close the company down?'' and it was just such a ludicrous suggestion at the time that there was no formal discussion about it. Mr Davies did not even address any points. There was no communication between myself or Mrs McDermott and Mr Davies. Mr Davies then very quickly pulled an envelope out which he gave to Mr Tjolle and left the room. Oh, Mr Davies had said, ''Is there anything I should know about funding of the

E   company?'' and Mr Tjolle was just completely blank with him. There was obviously a lot of hostility, and —

F   Q. Did you have any pieces of paper yourself?
A. No, I had no pieces of paper handed to me. I did not know the meeting was going to take place. There was no documentation handed to me. It was just something that happened completely out of the blue, further confused to me by the fact that I had actually stayed in Wales a few weekends before, had travelled on with Mr Davies and there had been no discussion of such matters. So Mr Davies left the room and I said to Mr Tjolle, ''Well, why didn't you answer his question?'' and he said ''I'm not going to discuss my business with him'' and that was the end

G   of the interaction. Then the next day it was announced that Mr Shaw was coming in to take over. There was also a context in this where Mr Davies had been building up a kind of reputation in the company. Some members of staff, some long-standing, had refused to work with him any more. He had changed the computer system. There was discontent on a number of levels with the way he was operating, which I was in no position to make a judgment about but I certainly knew that there was talk of him mishandling some meetings with major suppliers. So actually

H   my understanding was, to be honest, he ''wasn't hacking it'' — he was not operating well in this environment, and that Mr Tjolle and indeed Mrs McDermott really did not want him around, but not for any sinister reasons; for his incompetence, was my understanding.'

That account of events was explored in cross-examination. In particular Mrs Kenning was pressed as to what Mr Tony Davies had actually read out. The upshot is that he probably read out a short prepared speech which is in the following terms:

© 1998 CCH Editions Limited
bcp88 bcp  203 Mp  298  —bcp298375

A      'This urgent directors' meeting has been called today at my request because I am
seriously concerned about the current financial situation and whether the company
is able to meet its obligations.

My six-month trial period as Financial Director designate has now expired and so
I have had to make a decision as to whether or not to continue. When Val offered
the share option and full directorship a couple of months ago I deferred my

B      decision and did not sign a form 288 for registration with the Companies Registrar
in order to see how business would develop.

After the move out of Granada the financial position was little better than even
even if we treat the Granada 10-year loan stock and Val's directors loan as capital.
Bookings have unfortunately not continued anywhere near the level forecast and
we have not been granted credit terms with major creditors.

C      The TSB bank have now withdrawn their facility with effect from 30 November
and I was personally professionally affronted at not having been told by Val until
last Friday that this was the case.

The general situation is therefore one where I believe we are not in a solvent
situation and cannot continue trading legally. This is also borne out by the view
taken by Price Waterhouse since they insist on qualifying the accounts on the
"going concern" concept.

D      We all have a legal responsibility to creditors, customers, employees and
shareholders.

Unless there are circumstances which I do not know about which support very
strong reasons to the contrary, I believe the company should cease trading.

If there are no circumstances of which I am not aware, and you will not accept my
advice as to the action I believe the company should take, then I shall have no

E      alternative but to resign. This will be more in sadness than in anger. I feel we have
all put in a great deal of effort to try and achieve success.'

A copy of this was sent to Mrs Kenning with the minutes of the meeting. The minutes
were prepared by Mr Tony Davies. They record a 'vote' in favour of carrying on but on
the account of the meeting I have (and accept) that word imports a formality and real
power of decision which did not exist. It would seem that at the meeting Mr Tony Davies

F      handed to Mr Tjolle a short letter of resignation, but Mrs Kenning did not see its terms
then or thereafter.

The next day Mrs Kenning was told that Mr Shaw was back in place as the company's
financial advisor. It now appears that from then on his firm were drawing £10,000 per
month out of the company. Mrs Kenning knew nothing of this. What Mr Shaw did
remains a subject of considerable murkiness. Prima facie, he has much to answer for: as

G      an accountant he either found out what the company's financial position was or he did
not. Either way he fell considerably short of what can reasonably be expected from a
chartered accountant. I say 'prima facie' because I of course have not heard his side of
the story. I do not know whether his professional body have investigated his conduct. In
my view they should.

So far as Mrs Kenning was concerned, a responsible chartered accountant had come
on the scene. She knew he had knowledge of the company and was the trusted advisor of

H      her boss, Mr Tjolle. I do not see why she should have inquired further. She knew
bookings were up (whereas Mr Tony Davies had said they were down) and she could
reasonably expect this accountant to consider the viability of the company. In any event
she had no power or machinery to look into matters for herself.

Now does her attendance at the meeting of 10 December make her a de facto director?
On its own I do not think it does. She was being asked for her opinion – and in such a

way and in such circumstances that she did not have nearly enough information to          A
decide. She suspected Mr Tjolle wanted to get rid of her Mr Tony Davies and did not at the
time react as she now wishes she had. She was put under considerable pressure in cross-
examination and the relevant part reads, after Mr Tony Davies' warning had been read:

> 'This is a very, very strong warning, this document. There is no doubt about it, it
> was a very, very strong warning, and I did not act on that because in the context
> of the time, Mr Shaw moved in and I, stupidly or whatever, trusted the other          B
> people who had more experience in financial matters.'

I omit the remainder of her answer, which shows the strain she was under.

### De facto director – conclusion

Mr Davies reminded me of what Henry LJ said in *Re Grayan Building Services Ltd*
[1995] BCC 554 at p. 577E; [1995] Ch 241 at p. 257:          C

> 'Those who fail to reach [the proper] standards and whose failure contributes to
> others losing money will often both be plausible and capable of inspiring initial
> trust, often later regretted. Those attributes make them attractive witnesses.'

I bear this in mind, but am satisfied that the essence of Mrs Kenning's account of her
place in the company is true. I am particularly helped by her co-employees who have
given evidence, part of which I quote above. I should in addition refer to the evidence of          D
one other employee, Miss Jantzen, who joined the company in April 1991. Miss Jantzen
was, I thought, particularly careful in her evidence, notwithstanding a suggestion to the
contrary by Mr Davies.

> 'Q.  When people talked of the directors, they meant those three people, in 1991?
>
> A.  (Pause) It's very difficult to say that. I find it very difficult to say that, because
> Val and Theresa were the ones making the decisions.          E
>
> Q.  How do you know that? You do not know anything about –
>
> A.  I do know who made the decisions, because I needed a lot of decisions made.
>
> Q.  I am not talking about 1992.
>
> A.  No, I'm talking about 1991. When I wanted a decision on anything I went to
> Val. That was from very early on. In fact, I can remember specifically when it was,
> it was the summer of 1991, it was early in the summer, when the Euro-Disney sales          F
> started happening and he came in and sat on my desk, and that was it: I reported
> directly to him.
>
> Q.  But you regarded – let us be clear about it –?
>
> A.  I am.
>
> Q – the directors – the people who called themselves the directors – as the three
> did you not; at the time, regardless of what you know now?          G
>
> A.  No, I am talking about at the time. The people I regarded – it depends –
> whether or not they called themselves directors, or whether or not I regarded them
> as people that could take decisions about the company. I disagree with you, no. I
> regarded Val and Teresa as the people who would make decisions and were
> running the company in 1992.'

I understood that last reference to '1992' as to also applying to the whole time          H
Miss Jantzen was there – as indeed the context makes clear because she was being asked
about 1991.

What Henry LJ had to say was, I think, true of Mr Tjolle in relation to his staff,
including Mrs Kenning. It was he who deceived, amongst others, Mrs Kenning.
Mrs Kenning was obviously a very capable manager, but she did not form part of the

© **1998 CCH Editions Limited**
bcp98 bcp  203 Mp  300  —bcp20375

A   real corporate governance of the company. Although the employees called to corroborate her account all acknowledged that she was a 'director', they all also made it clear that she was not in fact directing the company. Taking Millett J's test, there is no function she performed that could only properly be discharged by a director. Nor do I think she accepted the responsibilities of office – no-one could properly do so who did not have access to the company's financial position in reasonable detail.

B       Still less does Mrs Kenning satisfy Mr Lloyd QC's test, even if understood as in the way suggested by Judge Cooke. If one considers the matter as one of degree, as I suggest, then I do not consider she was a director. She was called one and held out as such, but she did not in fact direct this company. It was the creature of Mr Tjolle and, perhaps, Mrs McDermott or Mr Shaw or both.

**Unfitness**

C       Section 6 of the Act requires that the court must disqualify a director if his conduct as a director makes him unfit to be concerned in the management of a company. In the case of an insolvent company, by s. 9(1) the court shall have regard in particular to the matters mentioned in Pt. I and II of Sch. 1. That Schedule sets out ten matters. Seven of these begin with the words 'The extent of the director's responsibility for'. The remaining three (misfeasance or breach of fiduciary duty, misapplication or taking of funds, and failure

D   to comply with certain specified statutory duties) have no application in this case.

    The words I have identified mean that the court must consider the individual position of each director, and in particular his 'responsibility for'. Chadwick J so held in *Re C S Holidays Ltd. Secretary of State for Trade and Industry v Taylor* [1997] BCC 172 at p. 177H–178E; [1997] 1 WLR 407 at p. 412, a decision which seems to me to be obviously right. It would be unjust to make a director liable for matters for which he did not have sufficient responsibility. One of the faults of the Secretary of State's case here is that it

E   did not seek to identify with any precision what he alleged Mrs Kenning's 'responsibilities' were. This is particularly important in the case of an alleged de facto director who may only have de facto responsibilities and powers.

    Before considering the individual charges against Mrs Kenning, I must record the fact that I am quite sure that, until the company went down, she in fact did not know that it was hopelessly insolvent. By June 1992 her salary was £40,000 p.a. She and her husband

F   had been living in a one-bedroomed flat. In June 1992 they sold that and bought a more substantial flat. The mortgage was increased from £32,000 to £96,000. Mr Tjolle told the building society that Mrs Kenning's employment was secure. She thought it was. If she had thought otherwise, if she had even an inkling that the company was insolvent, she would have been insane to go through this transaction at that time: her mortgage repayments depended on her job. When the company went down, she and her husband

G   could not afford the repayments and had to sell at a loss of £20,000. Since then they have been living in rented accommodation. The fact is that Mrs Kenning, and her husband, suffered more from the collapse of Land Travel than any member of the public who lost their payment for a cheap holiday.

    Mr Davies suggested that I was in danger of falling into the trap of believing that Mrs Kenning had put herself 'on the line' for the company. I rather think he misunderstood me. Of course she did not do so by way of giving guarantees or anything

H   of the sort. And of course there are cases where a director has done something like that and yet been disqualified. Generally such persons do that in relation to companies which are theirs. All I do is to hold that Mrs Kenning cannot have thought the company was seriously insolvent when she altered her personal financial position in June 1992.

    Mr Davies only put his case on *ought* to have known. He said that Mrs Kenning ought to have known that the company was in serious trouble from a variety of sources.

(a) *The meeting of 10th December 1990 and the matters going before*　　A

I have covered this ground already. The fact is that she knew there had been substantial losses. But she also knew that that an apparently safe pair of financial hands in the shape of Mr Shaw had come on board and that the company was booming in terms of numbers of holidays both being booked and run.

(b) *Meetings in 1991*　　B

The high point of the Secretary of State's case is contained in a note of 30 September 1991. The cross-examination about this ran as follows:

'Q. Could I ask you to read out your handwriting at point 7 for the purposes of the note, please?

A. "Wednesday and Friday, strategy meetings, 2nd of the 10th and 4th of the 10th. Initiated by marketing discussions. T McD's aim is to achieve '92 budget by end of October 1991. T McD aims to achieve covering half a million pounds of the loss. Val will not be there Wednesday am. DK, T McD and KR will start."　　C

Q. "McDermott aims to achieve covering half a million of the loss." What loss?

A. That is obviously referring to losses that were being referred to.

Q. What did you think it was at the time? You wrote this down, your handwriting. What losses are we talking about?　　D

A. Obviously company losses.

Q. Yes. It is a board meeting?

A. It is headed as a board meeting.

Q. What did you think the company losses were at that time?

A. I did not know what the company losses were.　　E

Q. What did you think they were?

A. I do not remember, and I did not know.

Q. We know they are at least half a million because you are saying "trying to cover half a million of the loss". Do you think they were more than that?

A. I remember we talked about achieving any sales figures to achieve break-even and part of that was the Land Travel sales campaign to achieve that.　　F

Q. The reality is that nobody hid losses from you, did they, Mrs Kenning? Nobody. (Pause) It requires an answer.

A. (Pause) I knew that the company was carrying losses from previous years in Granada and I knew we had an issue in getting sales and profits in 1991.

Q. I will ask the question again –　　G

A. And I did not have specific details on the company's finances.

Q. Nobody was hiding any losses from you, were they? They were not suggesting that the company was not making a loss?

A. I was never involved in detailed paperwork or discussions.

Q. Can I ask the question for a third time; I do require an answer. Nobody was suggesting to you that the company was not making a loss?　　H

A. Nobody was directly saying to me, "This company is booming".

Q. No. We can see, this time in your own handwriting so you cannot very well disassociate yourself from this document, that you are talking about achieving a budget and covering half a million of the loss. Yes? You have given evidence on

A
    oath that you cannot recall what the full extent of the loss was so far as you are concerned; is that right?

    A. That is correct.

    Q. But I can take it from this that it was at least in your mind half a million?

    A. Obviously that was what was said by Theresa McDermott at the meeting, yes.

B
    Q. And presumably the fact that the company was making a loss did not come as news to you, did it?

    A. No, I knew we were carrying forward the problems from the Granada days. I knew that.

    Jacob J: This does not actually state that this is a current loss-making. It simply says half a million of "the loss".

C
    Mr Davies: I am well aware of that, my Lord, if I may say so, but your Lordship will see where my questions are coming from. There comes a time when this witness's evidence beggars belief, frankly.'

I saw and heard Mrs Kenning. I do not think she knew the company was making a loss in 1991. Nor does the memorandum say it was. I do not think her evidence as to what knowledge she had in 1991 'beggars belief'. The memorandum does not say the company is losing money. Indeed 'covering half a million of the loss' suggests, as a matter

D
of language, the opposite – that past losses are expected to be covered. Moreover I have the independent evidence of a number of employees as to Mrs Kenning's function and her lack of access to financial information which, I think, largely corroborates what she says.

Of course the reference to the loss means that Mrs Kenning had some sketchy knowledge of the past position, but that is far from establishing that she had the kind of

E
knowledge required by the 'charge' – that the company was hopelessly insolvent. She knew bookings had picked up and that an apparently reliable chartered accountant was overseeing things.

    (c) *Post-dated cheques*

The company issued a large number of post-dated cheques. Mrs Kenning was a signatory on some of these, though how many is not established. Because she was one of

F
the signatories of 'last resort' it is unlikely to have been a large proportion of them. The evidence of Mrs Cafferty from the accounts department is the best evidence I have of the position. In many cases post-dated cheques were not given to an existing creditor – the cheque was given in advance of the service to be provided. In other cases there were creditors who were given such cheques because the company was short of cash. However the signatories (and particularly the second signatory) would not have known the reason

G
for a post-dated cheque. All they would have known is that Mrs McDermott or Mr Tjolle had authorised the cheque.

I do not think it possible to draw any inference from this evidence to the effect that Mrs Kenning ought to have known that the company was hopelessly insolvent and was losing money.

H
    (d) *County court judgments*

There were a number of county court judgments against the company. The total amounts were very small – and largely if not wholly for the period before the date of the charge. It is not clear that the judgments were unsatisfied. Nor is it clear that all of the judgments were in respect of plain unpaid bills. Some were to do with disputed claims. The amounts involved, according to Miss Cafferty, were small. I do not think there is anything in the county court judgment point.

**The first two 'charges'**                                                                     A

It follows from what I have said that I do not think the first two 'charges' are
established. Furthermore in relation to the first 'charge' I do not think she was in a
position to 'permit' the company to trade. That was all down to Mr Tjolle, and perhaps
Mrs McDermott and Mr Shaw. And in relation to the second charge I do not think it
was Mrs Kenning's actions which caused the loss to creditors. Again it was Mr Tjolle
and perhaps the other two or one or other of them.                                              B

**The third charge**

I turn to the third charge – 'failure to comply with statutory duties to ensure that
audited accounts be filed'. Mr Davies pressed this only lightly, acknowledging that if the
other charges had not been brought, this would not have been. But it remains in play and
I must deal with. I begin by noting that this is an alleged de facto director case. From
where, one asks, does the 'statutory duty' come? I can understand a case where a person         C
was in substance in overall control of a company. Such a person would de facto have the
power to deal with accounts and the statute would apply to him. But what about the case
here, where Mrs Kenning clearly did not de facto have anything to do with the accounts
and had no way of doing anything about them? Plainly she was not at fault in relation to
any supposed duty to file accounts. To hold otherwise would be most unjust. But there is
more. Where and how does the alleged 'duty' arise? I cannot see that it does. I think that
this itself suggests that she cannot fairly be regarded as a de facto director. A person so        D
removed from a matter of central importance to a company they neither in practice or in
law have responsibility for its accounts can hardly be said to be directing it.

**The fourth charge**

Finally I come to the fourth charge – going on television and making
misrepresentations a few weeks before the company collapsed. By this time Mrs Kenning       E
was running the division called Friendly Holidays dealing with sales of individual
holidays direct to the holidaymakers concerned. Elke Jantzen was in a corresponding
position for the main business of the company, sales to groups. Each was calling
themselves a 'Chief Executive' of the division concerned. (I think another employee was
also calling herself 'Chief Executive'.) Mr Tjolle knew that the BBC Travel Show wanted
to come and do an interview. He first asked Miss Jantzen to go on television, but she
could not do the date involved. So he asked Mrs Kenning. She went on television and       F
was asked questions by the reporter, Penny Junor. She answered using the word 'we'.
She was not representing herself to be a director, she was a spokesperson and no more.
She was asked about three cases where customers of Land Travel had not received
refunds. She blamed the computer system. That was in fact misleading. By then Mr Tjolle
and Mrs McDermott were, according to Mrs Hamilton, ordering the finance department
not to send out refund cheques requested by the Friendly Holidays department.
Mrs Hamilton said she was sure that Mrs Kenning would not have known of these.          G
However it was the fact that there had been trouble with the computer system, Mrs
Kenning was being asked about customers of another department and I do not think she
intended to mislead at all. If she had really known what the position was – as the charge
requires, she would not have herself taken out a mortgage with no more prospect of being
able to make the repayments than the company had of rending customers' money.

In the result, even if Mrs Kenning is to be regarded as a director of the company, I am     H
wholly unsatisfied that she conducted herself in a manner which makes her unfit to be
concerned in the management of a company. I think it is a pity that this stale case was
pressed to a conclusion.

*(Application dismissed)*

© 1998 CCH Editions Limited
bcp98 bcp   203 Mp   304   —bcp20375