# EXHIBIT 5

# Harris v Microfusion 2003-2 LLP

 **Positive/Neutral Judicial Consideration**

**Court**
Court of Appeal (Civil Division)

**Judgment Date**
6 December 2016

**Report Citation**
[2016] EWCA Civ 1212
[2017] C.P. Rep. 15

Court of Appeal (Civil Division)

Jackson , McCombe , Christopher Clarke LJJ

6 December 2016

Breach of fiduciary duty; Derivative claims; Film industry; Fraud; Limited liability partnerships; Permission to issue;

H1 *Limited Liability Partnerships—Breach of Fiduciary Duty—Derivative Claims—Fraud*

H2.  **Appeal** by the Appellant (H) against the decision of HH Judge Pelling QC, sitting as a judge of the High Court, [2015] EWHC 1116 (Ch) that H could pursue only two of three issued derivative claims issued on behalf of the First Respondent limited liability partnership. The Second and Third Respondents (F) cross appealed.

H3.  The court was required to determine whether the three claims brought by H against F fell within the exception to the rule in *Foss v Harbottle (1843) 2 Hare 461* that only a company against whom a wrong has been committed can bring proceedings in respect of that wrong.

H4.  H was a member of a limited liability partnership (LLP) established to invest in a film financing scheme in order to obtain certain tax advantages. F were the Designated Members who under the partnership deed had a veto over any proposed litigation by the partnership. H alleged that F had acted in breach of fiduciary duties owed to the partnership and sought to bring a derivative action on behalf of the partnership

© 2023 Thomson Reuters.

by way of three claims for damages. It was common ground between the parties that the Companies Act 2006 did not apply to limited liability partnerships and that the common law derivative action remained. HH Judge Pelling QC decided that two of H's three claims fell within the fourth exception to the rule in Foss v Harbottle that a member of an LLP may pursue legal action on behalf of the LLP where a fraud has been perpetrated and there is no other remedy. The Judge held that in the absence of deliberate and dishonest act of wrongdoing, the fourth exception could only be invoked if the wrongdoing had caused loss to the LLP and personal benefit to the wrongdoers. H appealed in relation to the third claim; F appealed against the permission granted in respect of the first and second claim.

H4.  **Held** , dismissing H's appeal and allowing F's cross appeal,

(a)  There are four exceptions to the rule in Foss v Harbottle, as set out in the judgment of Templeman J in Daniels v Daniels [1978] 1 W.L.R. 406 . The fourth of these exceptions allows a derivative action where a fraud has been committed and there is no other remedy (at [14]).

(b)  The law in relation to the fourth exception had been accurately stated in the judgment of David Richards J in *Abouraya v Sigmund [2014] EWHC 277 (Ch)* (at [31]).

(c)  As a result, where a claimant sought to bring a derivative action and did not rely upon deliberate and dishonest conduct to show that there had been a fraud, they must show that the alleged wrongdoing has caused harm to the LLP or company in question and that the alleged wrongdoer has benefited from the alleged wrongdoing. It was not sufficient to simply allege that there had been a breach of fiduciary duty or an abuse/misuse of power in order to rely on the fourth exception (at [21] and [31]).

(d)  H conceded that no personal benefit to F could be alleged in respect of the two claims in respect of which the Judge had granted permission for a derivative action to be brought. Therefore, permission should not have been granted for a derivative action in respect of the two claims (at [34]).

(e)  In relation to the third claim, there was not a sufficient evidence of a benefit to F to allow a derivative action and the Judge had reached the correct decision that a derivative action could not be brought by H in respect of it (at [37]).

**H5 Cases referred to:**

*Daniels v Daniels [1978] Ch. 406; [1978] 2 W.L.R. 73; (1977) 121 S.J. 605*
*Estmanco (Kilner House) Ltd v GLC [1982] 1 W.L.R. 2; 80 L.G.R. 464; (1981) 125 S.J. 790*

© 2023 Thomson Reuters.

*Fort Gilkicker Ltd, Re [2013] EWHC 348 (Ch); [2013] Ch. 551; [2013] 3 W.L.R. 164*
*Foss v Harbottle 67 E.R. 189; (1843) 2 Hare 461*

**H6 Legislation Referred to:**

Companies Act 2006

**H7 Representation**

Mark Harper QC (instructed by Gateley Plc ) for the Appellant/Respondent (H).
Lesley Anderson QC (instructed by DLA Piper UK LLP ) for the Second and Third Respondents/Appellants (F).

**Approved Judgment**

Lord Justice McCombe:

1.  Mr Brian Harris ("Mr Harris") is a member of the limited liability partnership Microfusion 2003-2 LLP ("the LLP"). He wishes to bring a derivative claim which he says would be for the benefit of the LLP against Future Films (Management Services) Limited and Future Films (Partnership Services) Limited (collectively "Future Films") in respect of what Mr Harris says were breaches of duty committed by those companies as "Designated Members" of the LLP to the detriment of the LLP. He alleges that the LLP is entitled to damages or equitable compensation from Future Films amounting to more than £5 million.

2.  The intended claims arise under three heads. He applied to the High Court, pursuant to standard procedure, for permission to continue the claims against Future Films on the LLP's behalf. The application came before HH Judge Pelling QC, sitting as a judge of the High Court, on 24 March 2015 and by his judgment and order made on the following day, 25 March 2015, the judge granted permission to proceed with two of the intended claims but refused permission to proceed with a third. (The neutral citation for the judge's judgment is [2015] EWHC 1116 (Ch)).

3.  Mr Harris appeals against the order refusing permission to continue the third claim and Future Films appeals against the grant of permission in respect of the other

© 2023 Thomson Reuters.

two grounds. The judge refused permission to appeal but permission was granted in respect of both appeals by Lewison LJ by orders of 21 May 2015.

4.    Behind the issues arising in this litigation lies voluminous commercial documentation about which it is not necessary to give more than a very brief outline. The context is a film financing scheme into which wealthy individuals were invited to invest, primarily in order to obtain certain taxation advantages from investment in the British film industry. In this case, in common with similar schemes, investment was invited to enable production of a particular film, ultimately called "Chasing Liberty". There are 32 individual investor members of the LLP and the two Future Films companies, Future Films, who are parties to these appeals, are appointed as the "Designated Members" of the LLP.

5.   Under the partnership deed (to the version of 28 November 2013 of which we were directed), cl.3.1 provides as follows:

> "All matters relating to the management and conduct of the affairs of the Partnership and any agreement or approvals required by this Deed to be made or given by the Members shall be decided by a Member Majority save that, notwithstanding the foregoing, the Designated Members shall have sole authority to determine those matters which are stated in this Deed as requiring only their approval, consent or determination (as the case may be). In addition to the foregoing, the Designated Members shall have full power and authority to carry out the duties referred to in clause 9.5 and (on their own behalf and so as to bind the Partnership thereby) execute any deed or document or do any other act or thing which the Members may direct the Partnership to execute or do under the provisions of this clause 3 or any other provision of this Deed."

(Clause 9.5 concerns duties of registration with the Registrar of Companies and does not concern us.) Clause (A)(1) of the introductory provisions contains definitions. It defines "Member Majority" as,

> "the prior written consent of the Designated Members and those Investors who hold more than 75% of Total Investments."

Any decision to bring or conduct litigation on behalf of the LLP, therefore, is subject to the veto of Future Films as the Designated Members. Mr Harris says in evidence that he has the support of 25 individual members for the claims that he now wishes to make. Naturally enough, he does not have the support of Future Films. Hence the application for permission to bring a derivative action.

6.   The draft Particulars of Claim presented to the judge alleges that Future Films had and have control over the day to day management of the LLP and that they owed and owe fiduciary duties which were particularised in para.4 of the draft as follows (in the draft the LLP is called " the C" and Future Films "the Ds"):

> "The Ds and each of them owed the following fiduciary/ statutory duties to the claimant namely to:
>
> (i)  act within the powers delegated to them;
>
> (ii)  promote the success and/or to act in the best interests of the C;
>
> (iii)  exercise reasonable care, skill and diligence;
>
> (iv)  avoid a situation in which it has or could have a direct/ indirect interest that conflicts with or possibly may conflict with the interests of the C;
>
> (v)  declare an interest in any proposed transaction involving the C;

© 2023 Thomson Reuters.

(vi)  disclose to the claimant any wrongdoing on its part or the part of others in the course of its (their) performance of its (their) role on behalf of the claimant."

7.  The allegation is that Future Films committed breaches of these obligations in respect of three matters. These have been called in the proceedings "the LMI fee issue", "the Alcon fee issue" and "the rebate of minimum guaranteed amount issue". The judge granted permission to proceed with the second and third of these claims, but not the first.

8.  Taking the LMI fee issue first, here it is alleged that LM Investments Limited (i.e. "LMI"), a company owned by the same person(s) who controlled the promotion of the film, had the apparent role of carrying through various parts of the film financing scheme. It is alleged that, at the instigation of Future Films, it received a fee from the LLP of £3.39 million for its general administrative services. The promotional literature had said that,

> "LMI, in its capacity as Film Consultant, will charge the Partnership fees of approximately 8% of the Capital Contributions to the Partnership…The precise sums charged will depend on the specifics of each Film and will be advised to prospective members by LMI… ".

In contrast, it is alleged that the fees actually paid represented 15% of the contributions rather than 8%. This gives rise to the following allegation in the draft pleading:

> "3
>
> (a)  The Ds have not either at the time or subsequently provided any explanation as to why it was in the interests of

the C to agree to, and/or pay the LMI fee, and/or a fee in excess of that referred to in para.7(2) above.

(b)  The Ds did not disclose to the C that they were in a position or actual or perceived conflict in view of the 'connection' between the Ds and LMI …

(c)  The Ds proceeded to agree and/or pay the LMI fee despite having failed to make the disclosure referred to in (b) above.

(d)  The Ds did not seek or obtain the consent, informed or otherwise, of the members of the C paying the LMI fee and/or a fee in excess of that referred to in para.7.2 above.

(e)  The Ds subsequently failed to disclose their conduct in relation to the agreement and/or payment of the LMI fee."

Consequently, the following is alleged in paragraph 8 of the draft:

"In these circumstances the Ds, and each of them, have breached the duties pleaded in para.4 above and/or clause 3.1 of the deed of partnership.

As a result of the matters aforesaid the claimant has suffered loss and damage in the sum of £1.582.073.72, being the difference between the LMI fee and the fee referred to para.7.2 above …"

9.  The second issue, the Alcon fee issue, arises out of Future Films being said to have procured the payment by the LLP of a fee of £2.5 million to Alcon Entertainment LLC for marketing services. It is alleged that there was no good commercial reason for the LLP to pay for such services, as it contracted for the provision of the same services by a company called Daughter Productions LLC ("DPL") on the same day. It is alleged that the purposes of the arrangements with Alcon was explained in various different ways by the individual controlling Future Films. In an email of 4 August 2003 the fee was (it is said) broken down into three parts, "an EP fee", "a financing fee" and "commission". It is said that HM Revenue and Customs rejected

Case 1:21-cv-11059-GHW   Document 182-5   Filed 08/15/23   Page 9 of 23

this explanation, saying that Alcon was the real maker of the film and the fee was not for better performance but part of the costs of the production arrangements. In the circumstances, it is alleged in the draft pleading that the payment was a breach of fiduciary duty as follows:

> "15.  Further, in view of the facts and matters pleaded at [12] above, the C cannot see on what basis the Ds (or either of them) can have honestly believed that Alcon was entitled to the Alcon Fee pursuant to the Marketing Services Letter."

10.    The third matter of which complaint is made is the "rebate of minimum guaranteed amount issue". In this case it is said that the LLP entered into two agreements on 30 September 2003, with separate companies Trademark (First Daughter) Limited and Etic Films SRO (a Czech company) to make the film proposed to be produced by the LLP. Each was paid a sum of money. It was a term of each agreement that the difference between the sums paid over and the actual costs of production would be held by each company on trust for the LLP. The draft pleading alleges that on 7 June 2004 the LLP, acting by Future Films, agreed that a surplus of more than £1 million would be paid over to DPL as a rebate of money ("the Minimum Guaranteed Amounts") otherwise due to the LLP.

11.    Again, it is alleged that there was no real commercial reason for the surplus to be paid away in this way and that the stated consideration was merely illusory. It is alleged that the arrangement constituted a breach of duty by Future Films and, as with the Alcon fee, it is alleged as follows:

> "21.  Further, in view of the facts and matters pleaded in paragraph 17 above, the C cannot see on what basis the Ds (or either of them) can have honestly believed that there was any benefit (commensurate or otherwise) to the C arising out of the payment of the Total Surplus to DPL."

12.  As already mentioned Mr Harris wishes to pursue these three claims on behalf of the LLP in a derivative action. His right to do so in respect of each is challenged by Future Films and each have appeals before us in respect of those claims in which their respective contentions were rejected by the judge. Thus, Mr Harris has to persuade us that the three claims are the proper subject of such an action and Future Films have to persuade us otherwise. The rival cases were presented with skill and cogency by Mr Harper QC for Mr Harris and by Miss Anderson QC for Future Films.

13.  It has been common ground throughout that Ch.1 of Pt 11 of the Companies Act 2006 providing for a statutory derivative remedy, does not apply to limited liability partnerships. It is also not challenged that the common law derivative remedy has survived the enactment of the statutory remedy: see the decision of Briggs J (as he then was) in *Universal Project Management Services Ltd v Fort Gilkicker Ltd & ors [2013] Ch. 551* .

14.  The question for us is whether the proposed claims or any of them can properly be brought by Mr Harris as a member of the LLP because they fall within an exception to the rule in *Foss v Harbottle (1843) 2 Hare 461* . That is the rule of law by which only the company against whom a wrong is said to have been committed can bring proceedings in respect of that wrong; an individual member of the company cannot normally do so. There are four exceptions succinctly stated by Templeman J (as he then was) in *Daniels v Daniels [1978] 1 W.L.R. 406 at 408G-H* as follows:

> "The exceptions are four in number, and only one of which is of possible application in the present case. The first exception is that a shareholder can sue in respect of some attack on his individual rights as a shareholder; secondly, he can sue if the company, for example, is purporting to do by ordinary resolution that which its own constitution requires to be done by special resolution; thirdly, if the company has done or proposes to do something which is ultra vires; and fourthly, if there is fraud and there is no other remedy. There must be a minority who are prevented from remedying the fraud or taking any proceedings because of the protection given

to the fraudulent shareholders or directors by virtue of their majority."

15.   The legal debate before us has been as to the ambit of the fourth exception. I have to say a little more about the authorities on this subject. However, the judge summarised what he took to be the law from the recent analysis of David Richards J (as he then was) in Abouraya v Sigmund [2014] EWHC 277 (Ch) . In that case, David Richards J said this (at [18] of the judgment):

"18.   The scope of "fraud" for the purposes of this exception has been considered in many cases. In *Daniels v Daniels [1978] Ch 406* , Templeman J reviewed the authorities to date on this subject. The nineteenth century authorities proceeded largely on the basis that the exception applied only to cases of what might be called actual fraud, that is to say deliberate and dishonest breaches of duty. The same is true of the celebrated passage in the advice of the Privy Council given by Lord Davey in *Burland v Earle [1902] AC 83* at 93. However, derivative actions were permitted in *Alexander v Automatic Telephone Co [1900] 2 Ch 56* and *Cook v Deeks [1916] 1 AC 554* , where allegations of fraud were rejected but the directors exercised their powers in a manner which conferred personal benefits on themselves at the expense of the company and the other shareholders. "

He concluded on that aspect of the case before him (at [24]) as follows:

"24.   It is therefore the case that all the authorities on direct derivative actions have taken as a requirement that the alleged wrongdoing should result in a loss to the company and, hence, an indirect or reflective loss to the shareholders and also that

© 2023 Thomson Reuters.

the alleged wrongdoers should have personally gained from their breaches of duty. "

I should also quote the subsequent passage at [25] to this effect:

> "25.   It follows, on the authorities as they stand, that financial or other loss to the shareholders, albeit normally of a reflective character, is essential to give a claimant shareholder sufficient interest in the proceedings to make the shareholder an appropriate claimant on behalf of the company, whether he is a member of that company or of its holding company. Equally, the authorities require that, in the absence of actual fraud or an ultra vires act, the wrongdoers should themselves have benefitted from the wrongdoing. The significance of this requirement is that their breach of duty cannot be ratified by a majority vote which depends on the votes of the wrongdoers. It is essential to the exception to the rule in *Foss v Harbottle* that the alleged wrongdoing is incapable of lawful ratification: see *Smith v Croft (No 2) [1988] Ch 114* ."

16.   Judge Pelling in the present case said,

> "23.   It follows from David Richards J's analysis of the exception that for it to apply the following conditions must be satisfied: (a) the alleged wrongdoing should result in a loss to the company; (b) that the alleged wrongdoers must have personally gained from the breaches of duty, unless what is alleged is fraud, as he defined it to be – that is *"deliberate and dishonest breaches of duty"* ."

© 2023 Thomson Reuters.

17.  Having reached that conclusion on the law, the judge's decision on the LMI fee issue was this:

> "26.  I agree with Miss Anderson that there is no allegation of fraud made in relation to the LMI fee issue, nor is there either an allegation of a deliberate and dishonest breach of duty, or an allegation that the respondents exercised their powers, whether fraudulently or otherwise, for the purpose of benefiting themselves. Whilst I accept that it might have been alleged that the power was exercised for the purpose of benefiting either the group of which the respondents formed part, or its ultimate beneficial owner, Mr. Levy, that is not pleaded either. If such an allegation is to be made then it must be clearly and distinctly pleaded. In those circumstances, I am not satisfied that the LMI fee allegation is one that comes within the fraud on minority exception to the rule in *Foss v Harbottle* . In those circumstances, permission must be refused in relation to that element of the claim."

18.  With regard to the Alcon fee issue, the judge recited the allegation at [15] of the draft pleading, which I have quoted above, alleging that the claimant could not see on what basis Future Films could honestly believe that Alcon was entitled to the fee paid. He then said (at [30]):

> "30.  Whilst I accept that para.15 of the particulars of claim is expressed tentatively, I am satisfied for the purposes of an application such as that which I am now considering, that it has not been expressed too tentatively. I am satisfied that when para.15 is read together with paras.10.1 and 12.3 of the particulars of claim, what is alleged is a deliberate and dishonest breach of duty by the respondents by which they entered into the agreement with Alcon on behalf of the LLP,

© 2023 Thomson Reuters.

and thus caused or permitted payments to be made pursuant to it without any belief in Alcon's entitlement to the fees paid."

19.   The judge reached a like conclusion with regard to the rebate of minimum guaranteed amount issue, in the light of the similar statement at [21] of the pleading that the claimant could not see the basis of any honest belief in any benefit to the LLP in what was done. He said this (at [33]):

> "33.   Although I accept that the language used in para.21 of the particulars of claim is tentative as I have said already in relation to para.15, I am satisfied that para.21 in combination with para.17.5, para.18.1 to 18.3 and para.18.6 amounts to allegations that the respondents deliberately and dishonestly breached their duties to the LLP by entering into the rebate agreement and thereafter sanctioning payments pursuant to it."

20.   Before us Mr Harper said that he had not intended to convey to the judge (and he did not, therefore, submit to us) that the plea in respect of the Alcon fee issue or that in respect of the rebate of minimum guaranteed amount issue were allegations of "deliberate and dishonest breach of duty". He did not, therefore, seek to uphold the judge's decision with regard to those two proposed claims on the basis decided by the judge.

21.   Mr Harper's submission, in outline, was that the summary of the ambit of the fourth exception to the rule in *Foss v Harbottle* was too narrowly stated by both David Richards J in the Abouraya case (supra) and by the judge in the present case. He argued that the requirement of "fraud" for the purpose of the exception was satisfied "where the proposed claim involves an allegation of breach of fiduciary duty and/or an abuse/misuse of power" (skeleton argument paragraph 40). He maintained that David Richards J had been wrong to find that a breach of duty (whether fiduciary or otherwise) would only amount to "fraud" if it was alleged that the person in breach of the duty had benefitted by it. This he said was contrary to the decisions of Briggs J

© 2023 Thomson Reuters.

in the *Fort Gilkicker* case and that of Megarry V-C in *Estmanco (Kilner House) Ltd v GLC [1982] 1 W.L.R. 2* . Thus, it was submitted that all three proposed claims fell within the fourth exception.

22.  Miss Anderson QC for Future Films argued that the judge's conclusion on the law was correct but that he had erred in the application of it with regard to the Alcon fee issue and the rebate of guaranteed minimum amounts claims. As indicated above, Mr Harper did not seek to uphold those two claims on the basis found by the judge. He sought to defend them on the basis of his wider submission as to the ambit of the fourth exception.

23.  Mr Harper's submission rested primarily upon the *Estmanco* case, which he sought to support with certain dicta in *Fort Gilkicker* . I think it is useful, however, first, to consider the conclusion to which Templeman J came in *Daniels v Daniels* , after conducting a thorough review of earlier authority.

24.  It will be recalled that in that case two directors were accused of selling land owned by the company at a gross undervalue to one director who was the wife of the other. The defendants sought to strike out the claim on the basis that there was no pleaded allegation of fraud. The application to strike out failed. After, as I say, a full review of the cases, in which Templeman J described this exception as "a restricted exception to the rule in *Foss v Harbottle* " (at p.413G) he said this:

> "The authorities which deal with simple fraud on the one hand and gross negligence on the other do not cover the situation which arises where, without fraud, the directors and majority shareholders are guilty of a breach of duty which they owe to the company, and that breach of duty not only harms the company but benefits the directors. In that case it seems to me that different considerations apply. If minority shareholders can sue if there is fraud, I see no reason why they cannot sue where the action of the majority and the directors, though without fraud, confers some benefit on those directors and majority shareholders themselves. It would seem to me quite monstrous – particularly as fraud is so hard to plead and difficult to prove – if the confines of the exception to

*Foss v. Harbottle* , 2 Hare 461, were drawn so narrowly that directors could make a profit out of their negligence. Lord Hatherley L.C. in Turquand v. Marshall, L.R. 4 Ch.App. 376, 386 , opined that shareholders must put up with foolish or unwise directors. Danckwerts J. in *Pavlides v. Jensen [1956] 1 Ch. 565* accepted that the forbearance of shareholders extends to directors who are "an amiable set of lunatics." Examples, ancient and modern, abound. To put up with foolish directors is one thing; to put up with directors who are so foolish that they make a profit of £115,000 odd at the expense of the company is something entirely different. The principle which may be gleaned from *Alexander v. Automatic Telephone Co. [1900] 2 Ch. 56* (directors benefiting themselves), from *Cook v. Deeks [1916] 1 A.C. 554* (directors diverting business in their own favour) and from dicta in Pavlides v. Jensen [1956] 2 Ch. 565 (directors appropriating assets of the company) is that a minority shareholder who has no other remedy may sue where directors use their powers, intentionally or unintentionally, fraudulently or negligently, in a manner which benefits themselves at the expense of the company. This principle is not contrary to Turquand v. Marshall, L.R. 4 Ch.App. 376 , because in that case the powers of the directors were effectively wielded not by the director who benefited but by the majority of independent directors who were acting bona fide and did not benefit. I need not consider the wider proposition for which Mr. Blackburne against some formidable opposition from the authorities contends that any breach of duty may be made the subject of a minority shareholder's action."

25. *Estmanco* was a very unusual case. The Greater London Council owned a block of flats in which, in mid-1980, it began to sell off the flats on long leases. Later in the same year it set up a management company to manage the block. There was a share capital of £3000 divided into 60 shares of £50 each. Initially, all the shares were held by the Council but as flats were sold off on the long leases one share was transferred to each purchaser. It was envisaged that in due course the shares so transferred would be voting shares, but in the interim all voting rights were held by the Council. The three directors were council employees. In 1981 the company entered into an agreement with the Council by which it was provided (inter alia) that the council would use its best endeavours to dispose of the remaining flats on long leases.

Later in the year control of the Council passed to a political party that was opposed to the sale of Council properties. Twelve flats had been sold and in the case of 35 others agreements (subject to contract) had been entered with prospective purchasers who had paid deposits. The three directors brought proceedings to enforce the contract with the Council, but the Council took steps to convene a meeting of the company at which it used its voting powers to instruct the directors to discontinue the action. The applicant, a purchaser of one of the flats, sought to be substituted as plaintiff.

26.    Counsel for the applicant relied for his client's standing to continue the proceedings upon the same "fraud on the minority" exception to the rule in *Foss v Harbottle* as is relied upon by Mr Harris in this case. Megarry V-C said this (at p. 12C-G):

> "It was on the firmly established exception of "fraud on a minority" that Mr. Steinfeld mainly relied. It does not seem to have yet become very clear exactly what the word "fraud" means in this context; but I think it is plainly wider than fraud at common law, in the sense of *Derry v. Peek (1889) 14 App.Cas. 337* . In a valuable survey of the authorities, Templeman J. recently came to the conclusion that this head permitted the minority to sue even though there had not been even an allegation of fraud: *Daniels v. Daniels [1978] Ch. 406* . That was a case in which a husband and wife were the two directors of a company and also the majority shareholders. They caused the company to sell to the wife land owned by the company; and four years later she sold the land for over 28 times what she had paid for it. The judge refused to strike out the statement of claim of minority shareholders in *Foss v. Harbottle* proceedings against the two directors and the company. The principle which he derived from the cases was that
>
>> "… a minority shareholder who has no other remedy may sue where directors use their powers, intentionally or unintentionally, fraudulently or negligently, in a manner which benefits themselves at the expense of the company: " see p.414.

© 2023 Thomson Reuters.

> Apart from the benefit to themselves at the company's expense, the essence of the matter seems to be an abuse or misuse of power. "Fraud" in the phrase "fraud on a minority" seems to be being used as comprising not only fraud at common law but also fraud in the wider equitable sense of that term, as in the equitable concept of a fraud on a power."

His conclusion in favour of the application by the individual purchaser/shareholder to be substituted as plaintiff was as follows (at p.15G-16A/B):

> "As I have indicated, I do not consider that this is a suitable occasion on which to probe the intricacies of the rule in *Foss v. Harbottle* and its exceptions, or to attempt to discover and expound the principles to be found in the exceptions. All that I need say is that in my judgment the exception usually known as "fraud on a minority" is wide enough to cover the present case, and that if it is not, it should now be made wide enough. There can be no doubt about the 12 voteless purchasers being a minority; there can be no doubt about the advantage to the council of having the action discontinued; there can be no doubt about the injury to the applicant and the rest of the minority, both as shareholders and as purchasers, of that discontinuance; and I feel little doubt that the council has used its voting power not in order to promote the best interests of the company but in order to bring advantage to itself and disadvantage to the minority. Furthermore, that disadvantage is no trivial matter, but represents a radical alteration in the basis on which the council sold the flats to the minority. It seems to me that the sum total represents a fraud on the minority in the sense in which "fraud" is used in that phrase, or alternatively represents such an abuse of power as to have the same effect."

27.  In an earlier passage, the Vice-Chancellor made clear that "I do not think that it can simply be said that there is an exception from the rule whenever the justice of the case requires it" (p.10H). He continued,

> "Although the concept of injustice is not the test, I think that it is nevertheless a reason, and an important reason, for making exceptions to the rule; yet the reasons for an exception must not be confused with the exception itself. If the test were simply justice or injustice, this would mean different things to different men; and the courts have in fact proceeded by way of formulating, not always with great clarity, a number of individual exceptions."

28.  I quote this last passage because it seemed to me that at times Mr Harper sought to justify the width of the exception for which he contended by a simple touchstone of "justice" in the particular case. In my judgment, the passage just quoted from the judgment of Megarry V-C precludes such an approach.

29.  I think that it is clear that *Estmanco* was a case where the majority was seeking to use the alleged breach of duty to further its own ends and in that sense to gain a personal benefit, albeit political rather than financial, and therefore was (allegedly) using its majority voting power to commit a "fraud on the minority". To that extent it is on all fours with *Daniels v Daniels* .

30.  Mr Harper's submission was also advanced on the basis of certain passages in the judgment of Briggs J in the *Fort Gilkicker* case. The first passages were in the section of the judgment in which the judge was considering whether the procedural device of the multiple derivative action had survived the enactment of the statutory remedy under the Companies Act 2006 . He was examining, it seems to me, the justification for the exceptions to the rule in *Foss v Harbottle* rather than their boundaries. In this context, he said this (at paragraph 19):

> "19. The rationale for the derivative action, namely to enable justice to be done where the wrongdoer is in control of the entity in which the cause of action is vested, is to be found stated in numerous authorities on the derivative action. In Russell v Wakefield Waterworks Co (1875) LR 20 Eq 474, 480 , Jessel MR said, of all the exceptions to the rule in *Foss v Harbottle* that: "The exceptions depend very much on the necessity of the case; that is, the necessity for the court doing justice." In *Wallersteiner v Moir (No 2) [1975] QB 373* Lord Denning MR, describing the derivative action generally, said, at p 390: "In one way or another some means must be found for the company to sue. Otherwise the law would fail in its purpose. Injustice would be done without redress."

The statement was made in considering whether Parliament could have been thought to have done away with the wider procedural device by legislating specifically for one area of derivative proceedings. He found that the common law procedures, dealing with instances beyond the specifics of the statute, had not been abolished. I do not consider that he was seeking to do more than describe the rationale behind the derivative action not the extent of its availability to members of a company.

31. I do not think that either of these cases ( *Estmanco or Gilkicker* ) supports Mr Harper's wider proposition that the exception to the rule in *Foss v Harbottle* is "opened up" in cases, short of deliberate and dishonest breach of duty, in the absence of personal benefit to the party allegedly in breach of duty. For my part, having reviewed the authorities, with the helpful assistance of counsel, I consider that the extent of the relevant exception to the rule is indeed as stated by David Richards J in Abouraya .

32. While the authorities to which I refer are all authorities at first instance, they are decisions of judges with the deepest of knowledge of our company law and I would not be inclined to depart from them except for very good reason. I can find no good reason to do so.

© 2023 Thomson Reuters.

33.   On the contrary, it seems to me that Miss Anderson was correct to say that principle supported her submission as to the extent of the exception. Essentially, people are free to join as members of corporate entities upon whatever terms they choose, formulated in articles of association, partnership deeds for LLPs or shareholders' agreements. They are bound by such arrangements and if majority rule is provided for, the minority is bound by the wishes of the majority. The majority can choose to excuse breaches of duty by directors, provided that the majority have not used their voting powers to confer benefits upon themselves in breach of duty and are not using the self-same powers to prevent the company from recovering the loss caused to it, in effect expropriating the minority in the process. The constraints imposed by equity make an exception to the rule in *Foss v Harbottle* in cases where the controlling members are precluded from ratifying the relevant breach by exercise of their majority votes. Thus, the "fraud on the minority" exception prevents directors from improperly benefitting themselves at the expense of the company.

34.   Mr Harper accepted that in the cases in which the judge granted permission to proceed there was no allegation of deliberate and dishonest breach of duty and no personal benefit to Future Films could be alleged. Accordingly, as it seems to me, on the formulation of the law as stated in Abouraya , the judge should not have given permission to proceed.

35.   So far as the LMI fee claim is concerned, equally there is no allegation of deliberate and dishonest breach of duty. The only question is whether there is sufficient allegation of "benefit" to Future Films themselves to fall within the exception to the rule in *Foss v Harbottle* as I perceive its extent to be.

36.   The relevant allegations in the draft pleading are as follows. As appears from paragraph 2(4) to (7), it is alleged that the LLP was promoted to potential investors by Future Films Limited (defined as "FFL"). FFL and Future Films are (and were at all material times) members of the Group of Companies headed by Future Capital Global Holdings Limited ("Global" and "the Group") respectively. A Mr Levy in addition to being a member of the LLP is said to be a director of Future Films (as defined in this judgment), and Global. Mr Levy is said to be the ultimate beneficial owner of the Group. It is then said that, at material dates, Mr Levy was a director of LMI. Then, in paragraph 7(3) b of the draft it is alleged that Future Films did not disclose to the LLP that they were in a position of actual or perceived conflict in view of the

"connection" (inverted commas as in the draft pleading itself) between Future Films and LMI "see para.2(4) to (7) above" (again inverted commas as in the draft).

37.  For my part, I do not find that that is a sufficient averment of "benefit" to Future Films themselves to satisfy the requirements of the exception to the *Foss v Harbottle* rule, as stated in Abouraya . As Miss Anderson submitted, it is a long way from the type of benefits alleged to have been obtained by the allegedly defaulting directors in any of the authorities to which we were taken. I agree with the judge's decision on this issue in paragraph 26 of his judgment which I have already quoted above.

38.  As final points, I should mention, first, that it was contended on behalf of Future Films that the proposed claims against them by the LLP would, in any event be statute barred by the Limitation Act 1980 . Thus, as a matter of the court's discretion, permission to proceed should be refused. Further, Future Films also relied upon an exculpation and indemnity provision in cl.13.1 of the partnership deed, which it was said would relieve them from the material breaches of duty. Mr Harper for Mr Harris argued that the claims in this case would be taken outside the time bar under the 1980 Act by either s.21 or s.32(1)(b) or both, covering cases of fraud or fraudulent breach of trust and cases of concealment from a claimant of relevant facts. So far as the exoneration clause was concerned, Mr Harper argued that the breaches of duty alleged would fall within the description of "fraud, wilful misconduct, bad faith or reckless disregard for…obligations and duties" which fall expressly outside the cover of the clause.

39.  In the light of the view that I have taken, that the proposed claims do not properly fall within the relevant exception to the rule in *Foss v Harbottle* , it is not necessary to say more about those issues.

40.  For these reasons, I would dismiss Mr Harris's appeal and would allow the appeal of Future Films.

Lord Justice Christopher Clarke:

41.  I agree.

**Lord Justice Jackson:**

42.  I also agree.

Samuel Ritchie, Barrister, Fountain Court Chambers