# EXHIBIT 6

# *503 Abouraya v Sigmund

 Positive/Neutral Judicial Consideration

**Court**
Chancery Division

**Judgment Date**
13 February 2014

**Report Citation**
[2014] EWHC 277 (Ch)
[2015] B.C.C. 503

Chancery Division

David Richards J :

13 February 2014

H1 *Derivative claims—Double derivative claims—Permission to continue claim—Application for permission—Conditions for permission for double derivative claim at common law—Whether petitioner established a prima facie case—Level of prima facie case—Whether company entitled to relief claimed—Whether exception to rule in Foss v Harbottle applied—Whether loss to claimant—Discretion of court—Whether court should grant permission in its discretion—Factors to be taken into consideration—Court's case management powers—Companies Act 2006 Pt 11.*

H2.  This was an application for permission to continue a claim against the first defendant as a double derivative claim at common law on behalf of and for the benefit of the second and third defendant companies by a claimant with disputed ownership of a share in the second defendant company for alleged loss to the third defendant company which was a wholly-owned subsidiary of the second defendant company.

H3.  The claimant, "A", and the first defendant, "S", were the only members of the second defendant company, "Triangle HK", which was incorporated by A in October 2001 in Hong Kong and since 2003 A and S were each registered as the holder of one ordinary share and were its only directors. The third defendant company, "Triangle UK", was incorporated in England in 2002 with S as its only director as a wholly-owned subsidiary of Triangle HK which it remained at all times. Triangle HK was always a holding company and Triangle UK carried on the business of trading in metals and other commodities. Working capital for the business was provided by A or companies under his control but he was not actively involved in the day-to-day

management of the business, which was the responsibility of S. A was never a director of Triangle UK and at all times since 2003 S was its managing director. Following discussions between A and S in 2010 "Triangle Switzerland" was incorporated in Switzerland with S as its sole director as a wholly-owned subsidiary of Triangle HK. There was a dispute between A and S as to whether A held his share in Triangle HK for S absolutely after A agreed in writing to transfer his share to S for $1 but he unilaterally halted the process of registration of the transfer of his share to her, alleging that the contract for the sale of his share was conditional on the repayment by Triangle UK of sums which he alleged were due to him or to a company of his. If A was wrong in his contention, the beneficial interest in the share in Triangle HK had passed to S and A's interest was limited to a mere unpaid vendor's lien. A then applied for permission to bring a double derivative claim at common law against S for the benefit of Triangle HK and Triangle UK. (He could not bring a statutory derivative claim under Pt 11 of the Companies Act 2006 as he was not a member of Triangle UK and Triangle HK, registered in Hong Kong, was not a company for the purposes of Pt 11 .) The claim related to alleged misappropriations of funds and diversion of a business opportunity of Triangle UK by S although neither the funds nor the *504 business opportunity went to S personally, rather the funds were paid to Triangle Switzerland, with no loss to Triangle HK or to A as a shareholder thereof, and the business opportunity that A was negotiating apparently on behalf of Triangle UK, was in fact made with Triangle HK and then assigned to Triangle Switzerland. The reason why A sought to bring the derivative proceedings to recover the payments and benefit of the contract for Triangle UK was that he claimed to be a creditor of Triangle UK and he and a company controlled by him issued proceedings in the Queen's Bench Division for recovery of the sums alleged to be due from Triangle UK which it would not be able to meet if the funds and contract were not restored. If permission to continue the derivative proceedings was granted, A sought directions to enable the trial of those proceedings to take place at the same time as the trial of the Queen's Bench action before the same judge.

H4.  **Held,** refusing the application:

H5.  1. It was common ground that the English court had jurisdiction to entertain a derivative claim in the circumstances of the present case in what was generally called a double (or multiple) derivative claim as the cause of action was vested not in the company of which the claimant was a member but in a subsidiary of that company to obtain relief for the benefit of the subsidiary. The provisions of Pt 11 of the Companies Act 2006 did not apply to double derivative claims and the common law rules for such claims continued to apply. ( *Universal Project Management Services Ltd v Fort Gilkicker Ltd [2013] EWHC 348 (Ch); [2013] Ch 551; [2013] B.C.C. 365 applied*

© 2023 Thomson Reuters.

.) The fact that A was a member of a foreign company was no bar to the jurisdiction of the court at common law in relation to a derivative claim. ( *Konamaneni v Rolls-Royce Industrial Power (India) Ltd [2002] 1 W.L.R. 1269; [2003] B.C.C. 790 applied* .) In so far as a double derivative claim involved a member bringing a claim on behalf of a holding company of which he was a member, as well as the subsidiary, it followed that the court had jurisdiction to entertain the claim notwithstanding that the holding company was a foreign company.

H6.  2. The common law principles governing the circumstances in which the court would consider its discretion whether to give permission for the commencement or continuation of a derivative claim applied to the instant proceedings: the claimant must establish a prima facie case that the company was entitled to the relief claimed and that the action fell within the proper boundaries of the exceptions to the rule in *Foss v Harbottle (1843) 2 Hare 461* . ( *Prudential Assurance Co Ltd v Newman Industries Ltd (No.2) [1982] Ch. 204 applied* .) Financial or other loss to the shareholders, albeit normally of a reflective character, was essential to give a claimant shareholder sufficient interest in the proceedings to make the shareholder an appropriate claimant on behalf of the company, whether as a member of that company or of its holding company. Equally, in the absence of actual fraud or an ultra vires act, the wrongdoers should themselves have benefitted from the wrongdoing so that their breach of duty could not be ratified by a majority vote which depended on the votes of the wrongdoers.

3. A prima facie case was a higher test than a seriously arguable case and meant a case that, with regard to the totality of the evidence placed before the court and in the absence of an answer by the defendant, would entitle the claimant to judgment. On balance, from the viewpoint of Triangle UK, A had demonstrated a prima facie case that Triangle UK had a claim for relief in respect of the alleged diverted contract. Matters were less certain in relation to the alleged misappropriation of funds, but the court was prepared to accept that, viewed solely from the point of view of Triangle UK, there was a prima facie case for the relief claimed against S.

H8.  4. A had also to establish a prima facie case that the proposed derivative action fell within the exceptions to the rule in *Foss v Harbottle* (above) but on the basis of all the existing authorities he had failed to do so. He was required to show that the company in which he as the claimant was a shareholder, and therefore the claimant himself, had suffered a loss as a result of the alleged *\*505* wrongdoing, but A was unable to demonstrate that he had suffered any loss as a shareholder in Triangle HK

© 2023 Thomson Reuters.

and he made no attempt to do so. It was insufficient that a shareholder might wish to seek relief on behalf of a subsidiary in order, for example, to prevent the subsidiary from becoming insolvent.

H9.  5. Even if A could satisfy the requirements of a prima facie case, it was clear that the real purpose of the claim was to advance A's interests in his capacity as an alleged creditor of Triangle UK if there were not assets to satisfy it in any judgment in his favour in the Queen's Bench action. By bringing these proceedings to trial at the same time as that action, he hoped to secure a judgment against S for the benefit of Triangle UK at the same time as he obtained a judgment in his personal capacity against Triangle UK. It would not be appropriate, in the exercise of the court's discretion, to permit a derivative action to continue in these circumstances and for this purpose to advance A's interests as a creditor of Triangle UK and provide him with a means of enforcement not available to any other creditors. It would not be a proper use of the derivative procedure to assist creditors who happened also to be shareholders but who, in that capacity, had no real interest in the outcome of the derivative claim.

H10.   6. In any event, there were strong case management grounds on which permission to continue the double derivative claim should clearly be refused. To give permission now, so that both cases could be heard together, would significantly increase the burden on the parties and significantly increase the amount of court time required. There was no real overlap in the issues in the two cases as the claims made in the Queen's Bench claim were concerned with payments alleged to have been made by the claimant and his company to or for the benefit of Triangle UK with no connection with the issues raised in the instant proceedings. If A failed in his Queen's Bench claim, a trial of the instant proceedings would be a waste of time and resources. Also the beneficial ownership of the share held by A had to be determined. Ordinarily, if the derivative claim should otherwise be permitted to continue, the present application would be adjourned and the trial of a preliminary issue directed as to the beneficial ownership of the share. It did not seem a sensible or practical way forward in the particular circumstances for the decision whether to grant permission for the proceedings to continue to be made following determination of that preliminary issue.

H11.  7. For case management and other practical reasons, the right course was to refuse permission to continue the instant proceedings as a derivative claim.

© 2023 Thomson Reuters.

**H12 Cases referred to:**

*Alexander v Automatic Telephone Co [1900] 2 Ch. 56*
*Barrett v Duckett [1995] B.C.C. 362*
*Burland v Earle [1902] A.C. 83*
*Cook v Deeks [1916] 1 A.C. 554*
*Daniels v Daniels [1978] Ch. 406*
*Edwards v Halliwell [1950] 2 All E.R. 1064*
*Estmanco (Kilner House) Ltd v Greater London Council [1982] 1 W.L.R. 2*
*Foss v Harbottle (1843) 2 Hare 461*
*Konamaneni v Rolls-Royce Industrial Power (India) Ltd [2002] 1 W.L.R. 1269;
[2003] B.C.C. 790*
*Nurcombe v Nurcombe [1985] 1 W.L.R. 370; (1984) 1 B.C.C. 99269*
*Pavlides v Jensen [1956] Ch. 565*
*Prudential Assurance Co Ltd v Newman Industries Ltd (No.2) [1982] Ch. 204*
*Smith v Croft (No.2) [1988] Ch. 114; (1987) 3 B.C.C. 207*
*Universal Project Management Services Ltd v Fort Gilkicker Ltd [2013] EWHC 348
(Ch); [2013] Ch 551; [2013] B.C.C. 365* **\*506**
Waddington Ltd v Thomas [2009] 2 B.C.L.C. 82

**H13 Representation**

Daniel Lightman and Thomas Elias (instructed by Asserson Law Offices ) for the claimant.
David di Mambro and Henry Day (instructed by Kidd Rapinet LLP ) for the first defendant.

**JUDGMENT**

DAVID RICHARDS J:

**Introduction**

1.  This is an application for permission to continue this action against the first defendant as a derivative claim on behalf of and for the benefit of the second and third defendants. Permission is also sought pursuant to CPR r.6.36 to serve the claim form out of the jurisdiction on the second defendant at its registered office in Hong Kong.

2.  The claimant, Waleed Abouraya, and the first defendant, Anja Sigmund, are the only members of the second defendant, Triangle Metals & Minerals Trading Ltd

© 2023 Thomson Reuters.

("Triangle HK"), a company incorporated in Hong Kong. Each of them is registered as the holder of one ordinary share. The third defendant, Triangle Metals & Minerals Ltd ("Triangle UK"), is a company incorporated in England and is a wholly owned subsidiary of Triangle HK. The claimant and the first defendant, who I will call the defendant, are the only directors of Triangle HK and the defendant is the only director of Triangle UK.

3.   Triangle HK was incorporated in October 2001 by the claimant and two other investors. In or about January 2003, the other two investors ceased any involvement in Triangle HK and since then the only registered shareholders have been the claimant and the defendant. Until quite recently, the claimant maintained that the defendant held her share as his nominee, but he now accepts that she has at all times since 2003 beneficially owned the share registered in her name.

4.   Triangle UK was incorporated in January 2002 and has at all times been wholly owned by Triangle HK. Triangle HK has always been a holding company, and Triangle UK has carried on the business of trading in metals and other commodities. Working capital for the business was provided by the claimant or companies under his control but he was not actively involved in the day-to-day management of the business, which was the responsibility of the defendant. He was never a director of Triangle UK while she has at all times since 2003 been its managing director. Between January 2004 and January 2012, there was a second, non-executive director of Triangle UK.

5.   Following discussions between the claimant and the defendant in the course of 2010, Triangle Metals & Minerals GmbH ("Triangle Switzerland") was incorporated in Switzerland as, and has remained, a wholly-owned subsidiary of Triangle HK. The claimant's own evidence as to the reasons for the establishment of Triangle Switzerland is: "We decided to establish a Swiss company because Anja wanted to move to Switzerland and because of the tax benefits this corporate structure would bring. … Anja is and has been at all relevant times the sole director of Triangle Switzerland".

6.   The claims advanced in these proceedings all relate to alleged misappropriations of funds belonging to Triangle UK and the alleged diversion of a business opportunity available to Triangle UK. It is alleged that the defendant procured these various misappropriations and the diversion of the business opportunity. Except for some

© 2023 Thomson Reuters.

minor sums, it is not, however, alleged that the funds were misappropriated, or that the business opportunity was diverted, to the defendant personally or to entities owned by her. The claimant accepts that the payments were made to Triangle Switzerland. Any loss to Triangle UK resulting from these payments involved a corresponding gain to Triangle *507 Switzerland, and therefore involved no loss to Triangle HK or to the claimant in his capacity as a shareholder of Triangle HK. Likewise, the contract which the defendant was negotiating, it appears on behalf of Triangle UK, was in fact made with Triangle HK and then assigned to Triangle Switzerland. The only personal gains to the defendant alleged in the particulars of claim are limited benefits conferred on the defendant by Triangle Switzerland, to which I shall later return.

7.  The reason why the claimant is nonetheless seeking to bring these proceedings to recover the payments and the benefit of the contract for Triangle UK is that he claims to be a creditor of Triangle UK. He and a company controlled by him have issued proceedings in the Queen's Bench Division of the High Court for recovery of the sums alleged to be due ("the QB action"). As well as being the obvious inference from the facts, the claimant's purpose is made clear by him in his evidence. He states at para.60 of his witness statement in support of the present application:

> "If permission is not given for me to continue these derivative proceedings, Triangle UK will be left without any means of recovering money which properly belongs to it. As I have explained in paragraph 7 above, I am already engaged (with my company, MEBPC) in litigation against Triangle UK in order to recover sums of money loaned to it which it now refuses to acknowledge or repay. Unless Anja is forced to restore sums which she has misappropriated to Triangle UK, Triangle UK is likely to be unable to meet any judgment against it in favour of me or MEBPC in the [QB action]."

Again, at para.68, he states:

> "I wish to compel her to reimburse Triangle UK the monies which ought now to be in Triangle UK's coffers as quickly as possible. This would enable Triangle UK to pay its debtors – including (in the event that judgment is entered against it in the [QB action]) MEBPC and me."

© 2023 Thomson Reuters.

I should here say that there is no evidence of any other claims against Triangle UK, still less any evidence of any debts going unpaid.

8.  The trial of the QB action is listed in a five-day window commencing on 12 May 2014, with an estimate of four to five days. If permission to continue the present proceedings is granted, the claimant seeks directions to enable the trial of these proceedings to take place at the same time as the trial of the QB action and before the same judge. Directions are proposed for statements of case, disclosure and service of witness statements over the next two months to enable this matter to be ready for trial in May.

9.  A further unusual and important feature of the present proceedings is that there is a dispute between the claimant and the defendant as to whether the claimant holds his share for the defendant absolutely. I will set out the relevant facts in a little more detail below but, in summary, it is not in dispute that the claimant agreed in writing to transfer his share to the defendant for consideration and that he unilaterally halted the process designed to register the transfer of his share to her. The dispute is whether, as the claimant alleges, the contract for the sale of his share was conditional on the repayment by Triangle UK of sums which he alleged were due to him or to his company. If the claimant is wrong in his contention, it follows that, as the contract is specifically enforceable, the beneficial interest in the share has passed to the defendant and the interest of the claimant is limited to an unpaid vendor's lien. The lien is of no significance since the agreed price was $1. Although the contract may be governed by the law of Hong Kong, there is no material distinction between its law and English law on this issue.

10.   This is an important factor in considering whether to give permission for the claimant to continue with his derivative claim. I would regard it as close to inconceivable that the court would give *508 permission for a nominee shareholder to proceed with a derivative action against the wishes of the beneficial owner of the share. In such circumstances, the nominee shareholder has no legitimate interest in the proceedings. Mr Lightman, counsel for the claimant, was unable to suggest any ground on which the court would give permission in such circumstances.

11.   Before turning to the relevant facts in the present case, I shall deal in general terms with the applicable legal principles.


## Relevant legal principles

12.   It is common ground that the claims made in these proceedings are not "derivative claims" for the purposes of the statutory framework for derivative claims contained in Pt 11 of the Companies Act 2006 . For the purposes of proceedings in England and Wales, a derivative claim is defined by s.260(1) as a claim "by a member of a company (a) in respect of a cause of action vested in the company, and (b) seeking relief on behalf of the company". The present proceedings do not fall within this definition for two reasons. First, the claimant is not a member of Triangle UK, the company in which the relevant causes of action are vested and on behalf of which relief is sought. The only member of Triangle UK is Triangle HK. Secondly, Triangle HK is not "a company" for the purposes of these provisions, which are restricted to companies incorporated in the United Kingdom under the present or former Companies Act or the equivalent legislation in Northern Ireland: s.1 of the Companies Act 2006 . It follows that none of the detailed provisions contained in s.263 for determining whether permission should be given for the commencement or continuation of a derivative claim applies to these proceedings.


13.   It is also common ground that the English court nonetheless has jurisdiction to entertain a derivative claim in the circumstances of the present case. As the cause of action is vested not in the company of which the claimant is a member but in a subsidiary of that company, any claim to obtain relief for the benefit of the subsidiary is what is generally called a double (or multiple) derivative claim. In *Universal Project Management Services Ltd v Fort Gilkicker Ltd [2013] EWHC 348 (Ch); [2013] Ch 551; [2013] B.C.C. 365* , Briggs J held that double derivative claims were maintainable under English law, applying the reasoning of Lord Millett NPJ in the decision of the Court of Final Appeal of Hong Kong in *Waddington Ltd v Thomas [2009] 2 B.C.L.C. 82* . Briggs J further held that the provisions of Pt 11 of the Companies Act 2006 did not apply to double derivative actions and had not implicitly or otherwise abolished the common law jurisdiction of the courts to entertain such actions. In the absence of any statutory provisions, Briggs J held that the common law rules for derivative actions continued to apply to double derivative actions.


14.   As this is a matter which goes to the jurisdiction of the court, I am not bound by the common approach of the parties but must be satisfied that the court does

indeed possess the necessary jurisdiction. In view of the doubts expressed by some commentators on whether the decision in *Universal Project Management Services Ltd v Fort Gilkicker Ltd* (above) is correct (see, for example, Gore-Browne on Companies (45th edn, Jordan Publishing) paras 18.2 and 18.39), I should say that I have considered the judgment of Briggs J and fully endorse both his conclusions and his reasoning.

15.  It is also common ground that the fact that the claimant is a member of a foreign company is no bar to the jurisdiction of the court in relation to a derivative claim. In *Konamaneni v Rolls-Royce Industrial Power (India) Ltd [2002] 1 W.L.R. 1269; [2003] B.C.C. 790* , Lawrence Collins J held that the English court had jurisdiction to entertain a derivative claim brought by shareholders on behalf of a foreign company. In so far as a double derivative claim involves a member bringing a claim on behalf of a holding company, of which he is a member, as well as the subsidiary, it follows that the *\*509* court has jurisdiction to entertain the claim notwithstanding that the holding company is a foreign company.

16.  It follows that the common law principles governing the circumstances in which the court will give permission for the commencement or continuation of a derivative claim apply to the present proceedings. The modern statement of these principles is contained in the judgment of the Court of Appeal in *Prudential Assurance Co Ltd v Newman Industries Ltd (No.2) [1982] Ch. 204* , which repeated and built on the statement of principle contained in the earlier decision of the Court of Appeal in *Edwards v Halliwell [1950] 2 All E.R. 1064* , a case concerning a derivative claim by a member of a trade union. At p.222, the Court of Appeal in *Prudential Assurance* (above) stated:

> "… the plaintiff ought at least to be required before proceeding with his action to establish a prima facie case (i) that the company is entitled to the relief claimed, and (ii) that the action falls within the proper boundaries of the exception to the rule in *Foss v Harbottle* ."

As summarised by the Court of Appeal at p.211, the exception arises:

© 2023 Thomson Reuters.

"where what has been done amounts to fraud and the wrongdoers are themselves in control of the company. In this case the rule is relaxed in favour of the aggrieved minority, who are allowed to bring a minority shareholder's action on behalf of themselves and all others. The reason for this is that, if they were denied that right, their grievance could never reach the court because the wrongdoers themselves, being in control, would not allow the company to sue."

17.  It is common ground that for the purpose of the exception to the rule in *Foss v Harbottle (1843) 2 Hare 461* , the requirement for wrongdoer control is satisfied where control of the company entitled to the remedy is split 50:50 between the claimant and the alleged wrongdoer. It is not in issue that this requirement is satisfied in the present case. The defendant is the sole director of Triangle UK, in which any relevant cause of action is vested, and the only directors and shareholders of Triangle HK are the claimant and the defendant, with the result that the defendant can block any steps which might be taken to enable proceedings to be brought in the name of Triangle UK.

18.  The scope of "fraud" for the purposes of this exception has been considered in many cases. In *Daniels v Daniels [1978] Ch. 406* , Templeman J reviewed the authorities to date on this subject. The nineteenth century authorities proceeded largely on the basis that the exception applied only to cases of what might be called actual fraud, that is to say deliberate and dishonest breaches of duty. The same is true of the celebrated passage in the advice of the Privy Council given by Lord Davey in *Burland v Earle [1902] A.C. 83* at 93. However, derivative actions were permitted in *Alexander v Automatic Telephone Co [1900] 2 Ch. 56* and *Cook v Deeks [1916] 1 A.C. 554* , where allegations of fraud were rejected but the directors exercised their powers in a manner which conferred personal benefits on themselves at the expense of the company and the other shareholders.

19.  In *Daniels v Daniels* (above), Templeman J held that a derivative action could be maintained against a director alleged to have negligently caused his company to sell to himself a valuable asset at a gross undervalue. He distinguished *Pavlides v Jensen*

© 2023 Thomson Reuters.

*[1956] Ch. 565* where a derivative claim alleging that directors had been guilty of negligence in selling a valuable asset at a gross undervalue to third parties was struck out as not coming within the exception to the rule in *Foss v Harbottle* . The distinction lay in the fact that the alleged negligence in *Daniels v Daniels* , if proved, resulted not only in harm to the company but personal benefit for the directors. The principle which Templeman J derived from the authorities was that:  ***510***

> "… a minority shareholder who has no other remedy may sue where directors use their powers, intentionally or unintentionally, fraudulently or negligently, in a manner which benefits themselves at the expense of the company." (p.414D)

20.  In reviewing the authorities in its Consultation Paper on *Shareholder Remedies* (CP No.142, 1996), the Law Commission stated in para.4.9 that in this context fraud means fraud in "the wider equitable sense of that term" (citing *Estmanco (Kilner House) Ltd v Greater London Council [1982] 1 W.L.R. 2* at 12) and, citing from Lord Davey's judgment in *Burland v Earle* (above), continued:

> "Essentially, the term encompasses situations such as … where the majority are endeavouring directly or indirectly to appropriate to themselves money, property or advantages which belong to the company or in which other shareholders are entitled to participate …"

At para.4.11, the Law Commission stated:

> "'Fraud' does not, however, cover the situation where the wrongdoers do not themselves benefit. Thus it does not include mere negligence on the part of the directors, so that a derivative action cannot be brought against directors who mismanage a company and cause it loss, even if they have control."

© 2023 Thomson Reuters.

21.  An authority which may be said to extend the boundaries of the "fraud" exception is the decision of Sir Robert Megarry V-C in *Estmanco* , referred to above. In that case, the GLC had formed the plaintiff company to regulate the management of a block of 60 flats being sold off to owner-occupiers, each of whom acquired one of the 60 shares in the company when the sale of a flat was completed. The GLC covenanted with the company to use its best endeavours to sell all the flats. Control of the GLC changed after the sale of 12 flats and, as a result of a change in housing policy, the sale of the further flats, many of which had been agreed subject to contract, was halted and the flats were used to house disadvantaged families. The GLC had complete voting control of the company because, under the terms of its articles of association, the shares held by flat owners acquired voting rights only once all the flats had been sold. The three directors of the company who were all employees of the GLC took the view that the company ought to seek to enforce the contractual obligations of the GLC and acting on that view caused the company to issue proceedings. At a subsequent general meeting of the company, the GLC as the only member entitled to vote passed a resolution instructing the directors to withdraw the action. A flat-owner and member of the company applied for an order that she be substituted as plaintiff and that the action be permitted to continue in her name as a derivative action.

22.  An unusual feature of the case was that the company was a non-profit making, non-trading company. Issues of financial benefit or loss to the shareholders could not arise, and as Sir Robert Megarry observed at 13, the test of what was for the benefit of the company could not be a simple test of financial benefit for the company. Nonetheless, the evidence before the court satisfied the judge that the new policy of the GLC, and its decision to prevent the enforcement of the covenants given in favour of the company, involved the GLC and, it may be said, the company "in depriving the purchasers of flats of their rights as shareholders, and in destroying the scheme under which they were induced to buy their flats" (at 15). Sir Robert Megarry concluded that the circumstances of the case brought it within the exception to the rule in *Foss v Harbottle* :

> "There can be no doubt about the 12 voteless purchasers being a minority; there can be no doubt about the advantage to the council of having the action discontinued; there can be no doubt about the injury to the applicant and the rest of the minority, both as shareholders and as purchasers, *511* of that discontinuance; and I feel little doubt that the council has used its voting power not in order to promote the best interests of the company but in order to bring advantage to itself and disadvantage to the

> minority. Furthermore, that disadvantage is no trivial matter, but
> represents a radical alteration in the basis on which the council
> sold the flats to the minority."

The judge appreciated the difference between the minority's rights as shareholders and their rights as purchasers of flats but he considered, first, that the injury to the rights as shareholders sufficed in itself and, secondly, that their rights as shareholders formed such an integral part of the scheme as a whole as to make it unreal to consider those rights independently of their rights as purchasers: see 16B.

23.  *Estmanco* is not a case of financial gain to the majority and financial loss to the company and the minority members. It is, however, a case, and in his judgment Sir Robert Megarry V-C analysed it as being a case, in which the majority exercised their control of the company to advance their own interests as the local authority and, as a necessary result, to injure the interests of the company and its other members.

24.  It is therefore the case that all the authorities on direct derivative actions have taken as a requirement that the alleged wrongdoing should result in a loss to the company and, hence, an indirect or reflective loss to the shareholders and also that the alleged wrongdoers should have personally gained from their breaches of duty. The same approach has been taken in double derivative actions. In all the cases of which I am aware, the alleged breach of duty by directors of the subsidiary has resulted in loss not only to the subsidiary but also to the holding company and therefore, indirectly, to the shareholders in the holding company. See, for example, the facts in *Universal Project Management Services Ltd v Fort Gilkicker Ltd* (above), especially at [12]–[13]. This aspect was specifically addressed by Lord Millett in *Waddington Ltd v Thomas* (above) at [74]–[75]:

> "[74]  As I have said, the question is simply a question of the plaintiff's standing to sue. This would have been obvious when the procedure was for the proposed plaintiff to apply to the court for leave to use the company's name. On a question of standing, the court must ask itself whether the plaintiff has a legitimate interest in the relief claimed sufficient to justify him in bringing proceedings to obtain it. The answer in the case of person wishing to bring a multiple derivative action is plainly

© 2023 Thomson Reuters.

'Yes'. Any depletion of a subsidiary's assets causes indirect loss to its parent company and its shareholders. In either case the loss is merely reflective loss mirroring the loss directly sustained by the subsidiary and as such it is not recoverable by the parent company or its shareholders for the reasons stated in *Johnson v Gore Wood & Co [2001] 1 BCLC 313, [2002] 2 AC 1* . But this is a matter of legal policy. It is not because the law does not recognise the loss as a real loss; it is because if creditors are not to be prejudiced the loss must be recouped by the subsidiary and not recovered by its shareholders. It is impossible to understand how a person who has sustained a real, albeit reflective, loss which is legally recoverable only by a subsidiary can be said to have no legitimate or sufficient interest to bring proceedings on behalf of the subsidiary.

[75]  This is not to allow economic interests to prevail over legal rights. The reflective loss which a shareholder suffers if the assets of his company are depleted is recognised by the law even if it is not directly recoverable by him. In the same way the reflective loss which a shareholder suffers if the assets of his company's subsidiary are depleted is recognised loss even if it is not directly recoverable by him. The very same reasons which justify the single derivative action *512 also justify the multiple derivative action. To put the same point another way, if wrongdoers must not be allowed to defraud a parent company with impunity, they must not be allowed to defraud its subsidiary with impunity."

25.   It follows, on the authorities as they stand, that financial or other loss to the shareholders, albeit normally of a reflective character, is essential to give a claimant shareholder sufficient interest in the proceedings to make the shareholder an appropriate claimant on behalf of the company, whether he is a member of that company or of its holding company. Equally, the authorities require that, in the absence of actual fraud or an ultra vires act, the wrongdoers should themselves have benefitted from the wrongdoing. The significance of this requirement is that their breach of duty cannot be ratified by a majority vote which depends on the votes of the wrongdoers. It is essential to the exception to the rule in *Foss v Harbottle* that the alleged wrongdoing is incapable of lawful ratification: see *Smith v Croft (No.2) [1988] Ch. 114; (1987) 3 B.C.C. 207* .

© 2023 Thomson Reuters.

26.   Satisfaction of the requirement for the claimant to establish a prima facie case both that the company is entitled to the relief claimed and that the action falls within the proper boundaries of the exception to the rule in *Foss v Harbottle* does not automatically entitle the claimant to permission to commence or continue the action. The court exercises a discretion whether to grant permission and will have regard to all relevant factors. This is illustrated by the authorities which establish that a claimant who has been involved in the alleged wrongdoing or who seeks to bring the proceedings for an ulterior purpose will not be regarded as an appropriate claimant and will not be given permission: see *Nurcombe v Nurcombe [1985] 1 W.L.R. 370 at 376; (1984) 1 B.C.C. 99269* at 99273–99274 per Lawton LJ, *Barrett v Duckett [1995] B.C.C. 362* at 367 per Peter Gibson LJ. Above all, it is illustrated by the requirement that a reasonable board of directors would consider it to be in the best interests of the company to pursue the proceedings.

## Facts

27.   In December 2010, the claimant decided to sever his connections with the Triangle companies. This occurred because his wife discovered that he and the defendant had for some time been in a personal relationship.

28.   In an email dated 12 December 2010 to the defendant, the claimant dealt with a number of issues which arose as a result of this decision, including the following:

> "Accordingly, please start the required procedures to transfer all the shares in the company to yourself, and you would become the sole owner of the company, which should be done before the start of the new fiscal year according to the UK fiscal year system. …
>
> We just need to finalise all related payments and loans already provided for the company, to be paid back to me, within the time frame of transferring the shares to you.
>
> Please organise with Nanis the required documents that need to be signed from my side, and also any required procedures.
>
> Would appreciate much starting working on this issue with immediate effect."

© 2023 Thomson Reuters.

The defendant responded on 13 December 2010, saying "I will proceed as per below message".

29.  On 14 December 2010, the defendant sent to the claimant two documents for signature by him. Both were addressed to Sovereign Secretaries (HK) Ltd, the company secretary of Triangle HK. The first stated: *513*

> "I, Mohamed Waleed Abouraya, born 17.07.1962 herewith undertake to transfer my ownership of one share (certificate #4 Mohamed Walid Abouraya) for $1 to Anja Hannelore Sigmund."

The second letter stated:

> "Further to our correspondence regarding transfer of share, please find attached my original share certificate #4 which I undertake to transfer for $1 to Anja Hannelore Sigmund."

The claimant signed these letters and sent them, together with the relevant share certificate, to Sovereign Secretaries.

30.  In January 2011, the claimant twice signed a further document dealing with the transfer of the share, first a letter incorrectly dated 16 January 2010 and secondly a letter dated 18 January 2011. In both letters his signature was witnessed by two witnesses and the second was notarised by a bank. The text in both is the same and reads as follows:

> "I, Mohamed Waleed Abouraya, born 17.07.1962

© 2023 Thomson Reuters.

Herewith declare the transfer of my ownership of one share (certificate #4) for $1 in Triangle Metals & Minerals Trading Ltd, registered address [which is stated] to Anja Hannelore Sigmund, born 18.11.1966 (PP#C8WNCK405).

This transfer is legally binding and comes into effect as of today 14.12.2010."

31.   Sovereign Secretaries advised that in order to assess the amount of stamp duty payable on the transfer, the Hong Kong tax authorities required up-to-date accounts for Triangle HK, for a period ending within the last six months, to be audited and submitted. Accounts for the year ended 28 February 2011 were prepared and sent by the defendant to the claimant on 27 April 2011. She stated that they needed to be filed in order to arrange for the share transfer and requested him to sign and return them. The claimant signed the accounts and returned them as an email scanned document, but it later transpired that it was necessary to produce the original signed by the claimant and the defendant. The claimant duly provided the original at the end of May 2011.

32.   In May 2011 there was a breakdown in the relationship between the claimant and the defendant. This occurred when the claimant learnt that the defendant had been dealing with Ulrich Glaser, the brother of Rainer Glaser who was one of the original investors in Triangle HK. The claimant had formed a very low opinion of Rainer Glaser and was furious that the defendant should have been dealing with any member of the Glaser family. Having discovered the contact with Ulrich Glaser, the claimant emailed the defendant on 15 May 2011. After referring to the dealings with Mr Glaser and other matters, the claimant wrote:

"I am not sure what else is hidden, or what other stories I am not aware of, but I am sure that you would agree that I have to take all precautions, just in case I find other unpleasant surprises, or find the Glaser family are fabricating a court case and find the court putting their hands on the money in HSBC London.

Having said that, we have to move the money out of HSBC London account immediately, so I need you to transfer all the

© 2023 Thomson Reuters.

> money in the account to my personal account in Geneva with
> BNP for a start.
>
> I will also need to have the details of the outstanding loans that
> were given Trgl from my side, so it would be shown in the
> official documents that part of this money transfer to my personal
> account is to settle these loans." *514*

33.   Not surprisingly, the defendant refused to comply with the claimant's request
or instruction for the funds of Triangle UK to be transferred to his personal account.
Instead, she caused his loan of $463,324 to be repaid and requested details of his euro
account so that repayment of an outstanding loan of €27,000 could be made to him.
Her email dated 17 May 2011 continued:

> "Then for the balance amount in HSBC, we would need to do
> a final settlement, i.e. deducting all costs, settling outstanding
> money due to me and also adding the cash amounts you have
> been providing to be refunded to you. I would proceed with the
> detailed account once I have time but for the moment there is
> no way I could provide this given the fact that I am entirely
> overworked and trying to keep the company going despite what
> is going on …"

34.   On 22 May 2011, the claimant unilaterally arranged for the transfers of $10,000
and €9,000 from Triangle UK's Cairo accounts to his personal account. He accepts
in his evidence that he acted in an improper fashion in causing these payments to be
made.

35.   On 30 May 2011, the defendant emailed an associate of the claimant with her
proposals for the way forward with the claimant. She stated that "As per agreement
with Waleed, all matters had been put forward to Sovereign to arrange for share
transfer". She then set out a number of further steps, including:

> "Waleed would list all his costs and expenses which he deems are refundable to him, and so would I; this to be done by end of June; whenever he was providing cash, I advised him that all amounts are recorded, which has always been done."

36.  On 15 June 2011, the claimant emailed Sovereign Secretaries with instructions to stop the process for the transfer of his share to the defendant. He said that his relationship with the defendant had reached "a dead end, and we will have to most likely settle our issues in court".

37.  In his witness statement in these proceedings, the claimant explains that by this date "it had become clear to me that Anja had no intention of fulfilling Triangle UK's obligations to me as part of an overall financial settlement, which was a condition of my transferring my share in Triangle HK to her". He accordingly gave the above instructions to Sovereign Secretaries. I have to say that the evidence before the court on this application does not bear out that explanation. Not only was there the correspondence between the claimant and the defendant to which I have referred, including the defendant's suggestion that there should be in effect an account taken of the sums, if any, due from Triangle UK to each of them, but in a letter dated 6 July 2011 from the claimant's solicitors to the defendant, they stated that:

> "In relation to the sum owed by Triangle to Mr Abouraya, our client is currently working with an accountant to prepare a list of amounts owed. These calculations will be provided as soon as possible."

38.  In a further letter dated 12 August 2011, the claimant's solicitors referred to the sums which had already been paid or repaid to the claimant by Triangle UK, as mentioned above, and continued:

"However, various further sums of money are owed either to Mr Abouraya or to MEBPC by Triangle UK. The details of these sums are set out at Schedule 1 to this letter. The total amount known to date is $517,185. However accountants for MEBPC and Mr Abouraya are still in the process of finalising this calculation, so this figure may yet be increased. It may also grow further on proper disclosure of relevant information by you. In this regard, my client reserves his position entirely." *515*

The letter went on to demand repayment of the sums which they said were due. Further sums allegedly due were detailed in a letter from the claimant's solicitors dated 17 October 2011. The amounts now claimed in the QB action are less than the total claimed in those letters, and whether or not Triangle UK is indebted to the claimant or his company is of course the matter to be decided in the QB action.

39.  Having instructed Sovereign Secretaries to take no further steps in relation to the transfer of his share, the claimant's next step was to write on 20 June 2011 to HSBC, giving notice that the bank should freeze any transactions on Triangle UK's accounts with it and not permit any transfer of funds out of the account until further notice. This step was taken by the claimant unilaterally, without notice to or the consent of the defendant, and notwithstanding that he was not a director of Triangle UK. HSBC acted on this instruction. HSBC provided him with copies of statements for the accounts of Triangle UK, from which the claimant learnt of the payments which are the subject of the present proceedings.

40.  The claimant's solicitors wrote a number of letters to the defendant concerning the payments about which the claimant was concerned. Further correspondence followed in April 2012 and on 15 August 2012 the claimant's solicitors wrote a formal letter before action in respect of the proposed derivative claim. The present proceedings were not, however, issued until September 2013. The only explanation for this delay, and it is not an explanation which by any means accounts for the whole of the delay, was that the decision in *Universal Project Management Services Ltd v Fort Gilkicker Ltd* , ruling that a double derivative action was available under English law, was not handed down until 26 February 2013.

© 2023 Thomson Reuters.

41. The QB action was commenced against Triangle UK in November 2011. The claimant and his company make claims totalling £473,363. The claims as pleaded in the particulars of claim amended in December 2012, are for sums alleged to be due in respect of a portion of the salaries of employees of the claimant's company and services provided by it (about £37,583), telephone and courier expenses (about £27,500), travel reimbursement and hotel expenses (about £77,600), petty cash (about £61,440), commissions and shares of profits on business opportunities said to have been introduced to Triangle UK totalling £193,740, loans said to total about £9,250, and interest of £63,669 on loans said to have been made for working capital purposes. Triangle UK has filed a substantive defence and denies the claims made against it.

**Allegations in the present proceedings**

42. The present proceedings were issued in September 2013. The claimant has proposed some substantial draft amendments to the particulars of claim, which are not opposed by the defendant, mainly deleting a number of claims originally made. All the claims are framed as claims against the defendant for breach of her fiduciary or other duties as a director of Triangle UK. I set out brief details of the claims in the following paragraphs.

43. First, it is alleged that Triangle UK paid $60,352.81 to Apar Industries Ltd for the purchase of wire rods, but the corresponding payment received for the onwards sale of the wire rods, totalling $62,323.60, was paid in September 2011 not to Triangle UK but to Triangle Switzerland. The defendant's evidence provided in response to the present application is that the payment was made to Triangle Switzerland instead of Triangle UK because the bank account of Triangle UK had been frozen on the claimant's instructions. The defendant states that the payment has been recorded as a loan from Triangle UK to Triangle Switzerland, carrying interest at 3.5 per cent p.a.

44. Secondly, three sums totalling €13,543 and one sum of $2,395 are claimed as unauthorised payments by Triangle UK to the defendant. The defendant's evidence is that a payment of €12,000  *516  was made to her in April 2011 as a loan in respect of her relocation cost to Switzerland. It was treated as a payment on account of director's fees and was recorded as such, being a loan pending the authorisation of fees. The other payments were all in sums equivalent to SFr 1,900 being the monthly rent on her apartment in Switzerland. Again in each case she says that these payments were treated as payments on account of director's fees and recorded as a loan pending authorisation. In the case of all these payments, she produces what she says are

© 2023 Thomson Reuters.

contemporaneous loan agreements recording in each case the amount of the loan and the interest rate payable by her. Given their relatively small amount, Mr Lightman on behalf of the claimant accepted that these were not, as he described them, core claims. It may also be observed that, as detailed above, the claimant himself accepts in his evidence that in May 2011 he arranged for $10,000 and €9,000 to be transferred from Triangle UK's accounts in Cairo to his personal account.

45.   Thirdly, claims are made in respect of five payments, totalling $50,000 and €360,000 made from Triangle UK to Triangle Switzerland between 23 May 2011 and 21 June 2011. The claimant pleads that each of the payments in euros was described in the bank statements as a loan. The defendant accepts in her evidence that each of these payments was made and states that each was expressly treated as a loan by Triangle UK to Triangle Switzerland, recorded in the books as such and carrying interest at 3.5 per cent p.a.

46.   The defendant has stated in an answer to a request for further information that the loan of $50,000 together with interest was fully repaid in 2012 and that the amount outstanding on the loan of €360,000 has been reduced to approximately €80,000 through the use of the funds in defending the QB action.

47.   Finally, the claimant alleges that the defendant diverted a valuable business opportunity from Triangle UK to Triangle Switzerland. The opportunity was for a contract with UMCOR AG, the international sales arm of a large Russian metals group. The defendant negotiated with UMCOR for this business during 2010 with, as she states, the knowledge and approval of the claimant. In her witness statement she quotes from an email sent to her by the claimant on 10 October 2010 where, referring to her discussions with UMCOR, he stated:

> "Feed back from the Russians, as if the business with the Russians would be done or not, which I guess will be clear within the coming few days, right? So we need to wait and see if this is going to be part of Trgl, or you will decide to do it in a different way, as I am not sure what your intentions will be, and you may choose to work with them directly, or to do it on your own, but frankly speaking, I am not sure at all of what you will eventually decide to do with them."

© 2023 Thomson Reuters.

48.  The defendant did not undertake the business with UMCOR on her own or in a company owned solely by her but initially treated this as a business opportunity for Triangle UK.

49.  For its claim that the arrangements with UMCOR represented a diversion of a business opportunity from Triangle UK to Triangle Switzerland, the claimant relies on the evolution of the draft contract with UMCOR. On 15 December 2010, the defendant sent to the claimant a draft of the agreement with UMCOR which she had prepared. It showed Triangle UK as the party contracting with UMCOR. On the same day, the claimant returned the draft contract showing his suggested changes. There was no change suggested to the identity of the Triangle party. On 16 December 2010, a further draft of the agreement was sent to UMCOR which incorporated the amendments proposed by the claimant. It differed from the draft seen and commented on by the claimant in that the Triangle party was no longer Triangle UK but was Triangle HK. Further a provision had been included as cl.7(c) permitting the assignment of the agreement to Triangle HK's "European subsidiary or branch". It seems clear that this was in anticipation of the incorporation of the Swiss subsidiary on which the  *517  claimant and the defendant had agreed, and indeed the defendant had referred to this step in an email on 14 December 2010 to Sovereign Secretaries.

50.  The defendant has disclosed that in the period 2011–2013 Triangle Switzerland has been paid $829,000, including VAT at 8 per cent, by UMCOR under the terms of the contract.

51.  The only allegations of any personal benefit to the defendant resulting from the alleged breaches of duty are contained in para.22 of the amended particulars of claim. It is alleged that, between October 2011 and November 2013, Triangle Switzerland paid at least $181,000 to one unidentified recipient and that, in the course of 2011 and 2012, Triangle Switzerland incurred staff expenses in sums amounting in sterling to approximately £210,000. It is pleaded that "it is to be inferred from the above that Ms Sigmund has benefitted personally from the monies paid and/or the opportunities diverted from Triangle UK to Triangle Switzerland". The defendant's solicitors have stated in recent correspondence that the payments comprising $181,000 were

not payments to an unidentified recipient but were internal account transfers from Triangle Switzerland's US dollar account to its Swiss franc account, details of which have been provided.

52.  The only benefits received by the defendant from Triangle Switzerland for which there is any evidence comprises the payment of remuneration. It is, I think, accepted that Triangle Switzerland has been carrying on business and that its business has been managed by the defendant. There can therefore be no objection in principle to the payment of remuneration to her. Although there are no grounds for considering that she has been paid excessive remuneration, any claim for the reimbursement of excessive remuneration would be a claim to be made by Triangle Switzerland. There is no basis for suggesting that Triangle Switzerland was used as a conduit to pass funds taken from Triangle UK to the defendant.

### Application of the relevant legal principles to the present case

53.  The first requirement is that the claimant must demonstrate a prima facie case that the company, in this case Triangle UK, is entitled to the relief claimed. A prima facie case is a higher test than a seriously arguable case and I take it to mean a case that, in the absence of an answer by the defendant, would entitle the claimant to judgment. In considering whether the claimant has shown a prima facie case, the court will have regard to the totality of the evidence placed before it on the application.

54.  Looked at exclusively from the point of view of Triangle UK, the diversion of the opportunity of the contract with UMCOR from Triangle UK to Triangle Switzerland requires an answer. The apparent lack of concern demonstrated by the claimant in his email in October 2010 as to whether the defendant was to take the contract for herself personally or for the company, and the agreement of the claimant and the defendant to establish Triangle Switzerland as a trading entity, clearly provide substantial potential grounds of defence for the defendant. I would however on balance conclude, on the basis of the evidence presently before the court, that the claimant has demonstrated a prima facie case that Triangle UK has a claim for relief in respect of the UMCOR contract.

55.  I am less certain that this is the case in relation to the payments made by Triangle UK to Triangle Switzerland and the payment received for the sale of the wire rods. The relevant funds were not dissipated but were lent, at interest, to Triangle

Switzerland. It is not at all clear what, if any, loss Triangle UK suffered as a result of these payments or why it is said that they were not properly made. Nonetheless, there is before the court insufficient evidence as to the financial position of Triangle Switzerland and as to the parties' agreed intentions for the future trading of Triangle UK and Triangle Switzerland, as discussed in the latter part of 2010, to be satisfied that the defendant has an answer    *518 to this part of the claim. I am therefore prepared to accept that, viewed solely from the point of view of Triangle UK, there is a prima facie case for the relief claimed against the defendant.

56.  Secondly, the claimant must establish a prima facie case that the proposed derivative action falls within the exception to the rule in *Foss v Harbottle* . On the basis of all the existing authorities, he fails to do so. As discussed above, all the authorities indicate that the claimant must show that the company in which the claimant is a shareholder, and therefore the claimant himself, has suffered a loss as a result of the alleged wrongdoing. The claimant in the present case is unable to demonstrate that he has suffered any loss as a shareholder in Triangle HK and he makes no attempt to do so. Mr Lightman submitted that reflective loss was not a necessary requirement and that, for example, a shareholder might wish to seek relief on behalf of a subsidiary in order, for example, to prevent the subsidiary from becoming insolvent, so resulting in reputational damage to the shareholder. None of the authorities suggests that this could be a sufficient basis for bringing derivative claims but, even if it were, it is a situation which is far from the facts of the present case, as I will discuss below.

57.  Further, the claimant is unable to show a prima facie case that the defendant has benefited personally from the alleged breaches of duty. Mr Lightman submitted that this was not a necessary pre-condition in circumstances where the company was insolvent or was rendered insolvent by the alleged wrongdoing. It is certainly the case that in such circumstances the shareholders are unable to ratify breaches of duty by directors. However, the claimant is unable to satisfy the court that Triangle UK is insolvent. Apart from any other consideration, such as the means which may be available to Triangle UK to meet any judgment entered against it, it presupposes the very question which arises in the QB action, namely whether Triangle UK is indebted to the claimant or his company.

58.  Assuming that, contrary to the above, the claimant could satisfy the requirements of a prima facie case, there are some significant and unusual features about the present

proceedings which are highly relevant to the applicant for permission to continue as a derivative action.

59.  It is clear that the real purpose of the present claim is to advance the interests of the claimant in his capacity as an alleged creditor of Triangle UK. His concern is that, if he obtains judgment against Triangle UK, there will not be assets available to satisfy it. By bringing these proceedings to trial at the same time as the QB action, he hopes to secure a judgment against the defendant for the benefit of Triangle UK at the same time as he obtains a judgment in his personal capacity against Triangle UK.

60.  I do not consider that it would be appropriate, in the exercise by the court of its discretion, to permit a derivative action to continue in these circumstances and for this purpose. It would enable the claimant to use the happenstance of his shareholding in Triangle HK to advance his interests as a creditor of Triangle UK. It would provide him with a means of enforcement not available to any other creditors, if there were any. The law provides a wide range of remedies to judgment creditors to enforce their judgments and to claimants in advance of obtaining judgment. It would not, in my view, be a proper use of the derivative procedure to assist creditors or claimants who happened also to be shareholders but who, in that capacity, have no real interest in the outcome of the derivative claim.

61.  In any event, there are, as I see it, strong case management grounds on which permission should clearly be refused.

62.  The purpose of the present application is to enable these proceedings to come on for trial at the same time and before the same judge as the QB action. If it were necessary or appropriate that both sets of proceedings should be tried, then there is clearly merit in them being tried simultaneously by the same judge. Not only is there a shared common background but the principal witnesses in both cases will be the claimant and the defendant. Hearing both cases simultaneously would be likely to *519 take less time than hearing them separately and it would eliminate the risk of inconsistent assessments of the credibility of the two principal witnesses.

63.  At the same time, there can be no doubt that giving permission now, so that both cases can be heard together, will significantly increase the burden on the parties and significantly increase the amount of court time required.

64.  There is, so far as I can tell from the pleadings in the two cases, no real overlap in the issues in the two cases. The claims made in the QB action are concerned with payments alleged to have been made by the claimant and his company to or for the benefit of Triangle UK. The payments for the most part occurred before the end of 2010. They have no connection with the issues raised in the present proceedings which, as detailed above, relate to payments made by Triangle UK on the instructions of the defendant in the course of 2011 and also the circumstances in which the contract with UMCOR was made. Counsel for either side in the QB action might seek to cross-examine in relation to some of these latter matters but could do so only if they went to credit and so they would not be the subject of extensive exploration in a trial limited to the issues raised in the QB action.

65.  If the trial were to extend to the present proceedings, it would be necessary to have new disclosure and new witness statements and full cross-examination going to the issues in these proceedings. The parties' estimates as to the additional time required range from two to five days. In my view, the former is optimistic and it would be likely to add the best part of four or five days to the trial.

66.  The question then is whether it is either necessary or appropriate to add a trial of the present proceedings to the trial of the QB action. Since the hearing, I have been informed by counsel for the claimant that enquiries made of the clerk of the lists in the Queen's Bench Division have shown that a 10-day trial could be accommodated in May this year, so that there would not need to be any further delay in the trial. This is not however, in my judgment, the principal concern. The principal concern is the additional burden on the resources of the parties and the court.

67.  If the claimant fails in his QB action, a trial of the present proceedings would be a waste of time and resources.

68.   Failure by the claimant in the QB action has two consequences. First, it means that there are no debts of Triangle UK which require to be made good out of sums recovered either from Triangle Switzerland or the defendant. Secondly, it means that, even if the claimant is right that the contract to sell his share in Triangle HK to the defendant was conditional on payment of sums due to him and his company by Triangle UK, no such sums are in fact payable and therefore the contract is unconditional and he is obliged to transfer the share on payment of $1 to the defendant. In those circumstances, for the reasons already given, he is not the beneficial owner of the share registered in his name and, on any basis, has no legitimate interest in pursuing the present proceedings.

69.   If, on the other hand, the claimant were to succeed in whole or in part in the QB action, it is far from clear that the judgment debt would not be paid. If it really was necessary to take proceedings against the defendant in order to make good any shortfall, the claimant as a judgment creditor can apply for a winding-up order or the appointment of the receiver of the claim against the defendant.

70.   A further consideration is that an issue which must be determined is the beneficial ownership of the share held by the claimant. In ordinary circumstances, if I were satisfied that the derivative claim should otherwise be permitted to continue, I would adjourn the present application and direct the trial of a preliminary issue as to the beneficial ownership of the share. The decision whether to grant permission for the proceedings to continue would be made following determination of that preliminary issue. That does not seem to me a sensible or practical way forward in the particular circumstances of this case. The trial of the QB action is too close to accommodate sensibly the trial  *520  of that preliminary issue and enable the parties to prepare for a trial of the present proceedings in May 2014. Equally, it cannot be right to allow a trial of the present proceedings to take place as a derivative claim when there is a substantial issue as to the beneficial ownership of the share registered in the claimant's name.

71.   In my judgment, for case management and other practical reasons, even leaving aside the other matters dealt with in this judgment, the right course is to refuse permission to continue the present proceedings as a derivative action.

© 2023 Thomson Reuters.

*(Application refused)*  *521*