# EXHIBIT 7

Neutral Citation Number: [2022] EWCA Civ 440

Case No: A1/2021/0803

**IN THE COURT OF APPEAL (CIVIL DIVISION)**
**ON APPEAL FROM BUSINESS AND PROPERTY COURT**
**TECHNOLOGY AND CONSTRUCTION COURT (QBD)**
**MRS JUSTICE O'FARRELL**
**[2021] EWHC 347 (TCC)**

Royal Courts of Justice
Strand, London, WC2A 2LL

Date: 04/04/2022

Before :

**LORD JUSTICE COULSON**
**LORD JUSTICE PHILLIPS**
and
**MR JUSTICE ZACAROLI**
- - - - - - - - - - - - - - - - - - - -
**Between :**

| | |
|---|---|
| **Soteria Insurance Limited (formerly CIS General Insurance Limited)** | **Appellant** |
| **- and -** | |
| **IBM United Kingdom Limited** | **Respondent** |

- - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - -

**Bankim Thanki QC, Michael Lazarus & Laurentia de Bruyn** (instructed by **Addleshaw Goddard LLP**) for the **Appellant**
**Nigel Tozzi QC, Adam Kramer QC, Matthew Lavy & Iain Munro** (instructed by **CMS Cameron McKenna Nabarro Olswang LLP**) for the **Respondent**

Hearing Dates : 23 & 24 February 2022
- - - - - - - - - - - - - - - - - - - -

# Judgment Approved

**This judgment was handed down remotely by circulation to the parties' representatives by email and released to BAILII and the National Archives. The date and time for hand-down is deemed to be 10.30am on 4 April 2022**

## LORD JUSTICE COULSON :

## 1 INTRODUCTION

1.    The primary issue in this case concerns the proper construction of an exclusion clause. Whilst that may sound a little unexciting, the parties are agreed that at least £80 million turns on the construction of that one clause of the contract.

2.    The underlying litigation concerned an IT system to be provided by the respondent ("IBM") to the appellant ("CISGIL") which was very late and, ultimately, not delivered at all. The judge found that IBM was responsible for those critical delays [657]. Towards the end of the contract, a dispute arose in respect of an IBM invoice, in the sum of £2.9m, relating to milestone Application Gate 5 ("the AG5 invoice"). The invoice was not paid and, in the events that followed, the contract was terminated. Each side blamed the other for that termination.

3.    CISGIL commenced proceedings against IBM alleging that IBM had wrongfully repudiated the contract. Their principal claim was for damages in the sum of £132 million in respect of their wasted expenditure arising out of the alleged wrongful repudiation. CISGIL also had separate multi-million pound claims for breaches of warranties and in respect of the delays. IBM defended the claims on the basis that they had been entitled to terminate the contract because of the non-payment of the AG5 invoice. They also counterclaimed the £2.9m due by reference to the AG5 invoice.

4.    Including reading time, the trial before O'Farrell J ("the judge") lasted 35 days. In a clear and painstaking judgment ([2021] EWHC 347 (TCC)), running to a total of 754 paragraphs, the judge held (amongst other things) that:

   a)    IBM had wrongfully repudiated the contract;

   b)    CISGIL had established a claim for wasted expenditure in consequence of that repudiation. Subject to separate arguments about the exclusion clause and the contractual cap, the judge valued that claim at £122 million;

   c)    However, that claim for wasted expenditure was excluded in its entirety by operation of clause 23.3 of the contract;

   d)    CISGIL were entitled to recover damages of £15,887,990 in respect of additional costs and losses as a result of IBM's other breaches of contract;

   e)    IBM were entitled to set-off against that figure the sum of £2.9m referred to above;

   f)    CISGIL were therefore entitled to recover damages in the net sum of £12,998,390 together with interest.

5.    CISGIL sought permission to appeal on the issue of the proper construction of clause 23.3. I granted permission to appeal on that construction issue on 23 June 2021. If the

judge was wrong as to the proper construction of clause 23.3 there was a separate issue as to the precise sum due to CISGIL. That was because of the operation of contractual cap clauses which the judge did not need to address (because of her construction of clause 23.3). There were originally three possible options as to the sum due, but that dispute has since narrowed. CISGIL say that the caps allow them to increase their recovery to £96m odd; IBM say that the correct increase would be to £80m odd. There is no appeal in respect of the sums awarded or refused by way of damages in relation to CISGIL's other claims for breach of contract.

6.      Following the grant of permission to appeal, IBM issued a Respondent's Notice. I accept that this was a valid Notice because it sought to uphold the judge's order for other reasons. However, the main 'other reason' relied on by IBM went back into the heart of the 35 day trial, because IBM challenged the judge's conclusion that CISGIL had repudiated the contract when they purported to rely on the non-payment of the AG5 invoice to terminate the contract. The judge said that, because the AG5 invoice had been challenged, in accordance with the contract, within the stipulated 7 Business Days, the purported termination for non-payment of that invoice was unlawful and amounted to repudiation. Of course, if IBM's challenge was right, and they had been entitled to terminate, then the issue about the true construction of clause 23.3 would not matter, because CISGIL would not be entitled to any damages for repudiation at all. In addition, IBM sought to raise an entirely separate causation issue, to the effect that the expenditure was wasted, not as a result of the termination of the contract, but because of what it called "a change of strategic direction" by CISGIL's parent company after the repudiation.

7.      Just to emphasise the way in which this appeal has rather drifted away from the simple dispute about the construction of one clause, in response to IBM's challenge to the judge's conclusion on repudiation, CISGIL countered by asserting that their alternative basis for alleging repudiation by IBM at the trial – which the judge rejected – should have been upheld. That concerned CISGIL's alleged right to set-off their claims (for delay and for IBM's other breaches of contract) against the AG5 invoice. If that counterargument is right, then that would give CISGIL another route back to the wasted expenditure claim. In this way, in one way or another, the parties sought to reactivate many of the major issues between them that were debated and resolved by the judge at trial.

8.      In hearing this appeal, therefore, this court must be astute to avoid the submissions becoming a vehicle for the re-argument of disputes of fact. The trial was the proper place for those matters to be resolved: it was, in Lewison LJ's memorable phrase "the first and last night of the show": see *Fage UK Ltd v Chobani Ltd and another* [2014] EWCA Civ 5. The court must also avoid what he called "island hopping", particularly where the potential issues of fact arose primarily, not out of the appeal (where permission would have been necessary), but out of the Respondent's Notice (where it was not).

9.      The number of issues before this court also raised the question of sequence. The logical order in which to address the issues may have been to deal with the repudiation and causation issues first, and then turn to the construction issue, because it would only be if the repudiation and causation issues were resolved against IBM that the construction and cap issues would be relevant. However, neither party made their submissions in that order, and I have concluded that it would be inappropriate to allow the

Respondent's Notice to dictate proceedings to that extent. This was, after all, an appeal about the construction of a particular clause in the context of the contract as a whole.

10.     Accordingly, having set out the factual background and the issues, I deal with the construction issue first (*Section 4* below). I then deal with the other matter raised by CISGIL in the Appellant's Notice, namely the issue as to the applicable cap on damages (*Section 5*). That will lead to a conclusion on the appeal, subject to the matters raised by and in response to the Respondent's Notice. Thereafter, I deal with those matters: the repudiation issue (*Section 6*), the set-off issue raised in response (*Section 7*), and the causation issue (*Section 8*). There is a short summary of my conclusions in *Section 9*. I am very grateful to leading counsel, and their respective teams, for their assistance and for largely avoiding the potential pitfalls illustrated by Lewison LJ in *Fage*.

## 2  THE FACTUAL BACKGROUND

11.     In about 2014 CISGIL, whose business was the underwriting and distribution of general insurance products, decided to purchase and implement a new IT solution for its business. This was known as Project Cobalt. On 16 June 2015, CISGIL entered into a contract with IBM for the supply of the new IT system for CISGIL's insurance business and for management of the system for a term of 10 years.

12.     The contract comprised a Master Services Agreement ("the MSA"), and two other documents dealing with the detail of the services to be provided by IBM: the Implementation Statement of Work ("Implementation SOW") which covered the provision of the new IT system; and the Managed Services Statement of Work ("Management SOW"), which covered the subsequent management services which IBM would provide, over a 10-year period, once the new IT system had been installed. The Implementation SOW set out the cost of supply and implementation of the new IT system in the total sum of £50.2m, with a schedule showing how that sum was broken down and when the various stage payments would be made. The Management SOW identified the total figure for the management services over the 10-year period at £125.6m.

13.     The MSA provided for IBM to deliver the new operating platform substantially before the long stop date of 31 December 2017. There were various staged completion dates: 30 April 2016 (later extended to 30 May 2016) for the home insurance platform ("Release 1 Go Live Date"); 15 August 2016 for the motor insurance platform ("Release 2 Go Live Date"); and October 2017 for the longstop date by which the historic customer data would be transferred from the old system to the new system.

14.     Serious delays occurred to Project Cobalt for which IBM were responsible. The contractual dates for "Release 1 Go Live" and "Release 2 Go Live" were not met. Prior to the repudiation of the contract, the most up-to-date projections provided by IBM were that the Release 1 Go Live Date would be November 2017 (18 months beyond the contractual completion date) and that the Release 2 Go Live Date was March 2019 (31 months beyond the contractual completion date): see [181] of the judgment.

15.     On 24 March 2017, IBM submitted an invoice in the sum of £2.9m in respect of milestone Application Gate 5 ("the AG5 invoice"). That invoice reflected payments due in respect of software licences and, under the Implementation SOW, became due in January 2017. CISGIL considered that the sum was not payable because of the

significant delays to the contract. Those delays led Mr Summerfield, CISGIL's relevant manager, to refuse to issue a Purchase Order Number for the AG5 invoice. In an email dated 27 March 2017, CISGIL refused to accept the invoice because of the absence of the Purchase Order Number. I return to these particular events in greater detail in *Section 6* below.

16. Following the exchange of various emails and other documents, on 27 July 2017, IBM purported to exercise a contractual right of termination based on CISGIL's failure to pay the AG5 invoice. CISGIL disputed IBM's right to terminate (because they said they had followed the contractual procedure and, by their email of 27 March 2017, challenged the invoice in time), and treated the purported termination as a repudiatory breach of contract. For the reasons explained by the judge, and also examined in greater detail in *Section 6* below, the judge accepted CISGIL's case as to IBM's wrongful repudiation of the contract.

17. However, having won on the facts in respect of repudiation, and having established to the judge's satisfaction that they had incurred wasted costs of £122.6 million as a result of that repudiation (including the £34.1 million paid to IBM for no discernible benefit), CISGIL's primary claim for wasted expenditure failed, because the judge found that clause 23.3 operated to exclude that claim. The judge found that CISGIL's other claims for damages, which arose prior to the repudiation and were primarily related to IBM's delays, were not affected by clause 23.3, and she awarded CISGIL a total of £15,887,990 by way of damages in respect of such claims. That was subject to IBM's set off of £2.9 million by reference to the AG5 invoice, leaving a net amount due to CISGIL of £12,998,390.

## 3  THE ISSUES ON APPEAL

18. The first issue raised by the appeal is the proper construction of clause 23.3 of the MSA. IBM contended at trial that this clause excluded CISGIL's right to make any claim for wasted expenditure. That submission was upheld by the judge and, as I have said, it is the primary point in the appeal ("Issue 1").

19. If the judge's construction of clause 23.3 was wrong, and the clause did not exclude the claims for wasted expenditure, the issue then becomes: what sum is due by way of damages? Notwithstanding her construction of the clause, the judge helpfully went on to identify the gross sum of £122 million that would have been recoverable but for that clause. The complication is created by a series of contractual caps and the extent at which they might overlap. IBM accept that, if they are wrong about clause 23.3, and if they are wrong about the other issues too, the net figure due to CISGIL would increase from £12,998,390 to **£80,574,168**, because this would be the agreed cap under clause 23.5(a). CISGIL say that it also necessary to aggregate the cap under clause 23.5(e) as well, which would increase the net damages still further to **£96,274,168** ("Issue 2").

20. There are two further issues raised by the respondent's notice, and an additional issue raised by CISGIL in response to one of them. The first concerns the question of repudiation. IBM contend that CISGIL did not in good faith dispute the invoice in relation to the AG5 milestone. Accordingly, they say, in accordance with the terms of the contract, CISGIL were obliged to pay that invoice and that, because of its non-payment, IBM were entitled to terminate the MSA. CISGIL contend that, on the judge's findings, they did dispute the invoice and they did act in good faith ("Issue 3").

21.     As I have indicated, CISGIL also say that, if IBM are right about Issue 3 it avails them nothing, because CISGIL were entitled to set-off their claim for unliquidated damages for delay against the AG5 invoice and that, in those circumstances, IBM were not entitled to exercise any right to terminate as a result of non-payment. IBM respond by saying that the judge was right to conclude that CISGIL had to raise that set-off expressly within 7 Business Days in order to dispute the invoice in accordance with the contractual mechanism, and that the judge was right to conclude that their failure to do so meant that they could not rely on their set-off to allege repudiation on the part of IBM ("Issue 4").

22.     The final issue raised directly by the Respondent's Notice is a causation issue. IBM say that the wasted expenditure was not caused by the termination of the MSA, and that instead CISGIL would have suffered these losses in any event because of what it describes as "a change of strategic direction of the claimant's then parent company". CISGIL contest this submission root and branch: amongst other things, they say that this alternative case on causation was never pleaded, never the subject of proper evidence, and was raised for the first time in IBM's closing submissions, to which they immediately took objection ("Issue 5").

23.     Before turning to deal with those matters, there is one important health warning that I should provide. Leaving aside the construction issue, there is an air of artificiality about the position taken by both sides in respect of the underlying events, and in particular the repudiation/termination issues, which turn solely on the AG5 invoice. This was summarised by the judge at [396] as follows:

> "396.   Having read the contemporaneous documents and having listened carefully to the factual witnesses, it is clear that by July 2017 both parties were resigned to abandonment of the project. Both parties retained legal teams and tried to manoeuvre themselves into a position where they could extricate themselves from the MSA with minimum damage. A high-risk strategy was adopted on both sides; the AG5 milestone payment, a modest sum in relation to the high value of the overall project, was the vehicle used to bring the project to an end."

From all that I have seen and read, I can only respectfully agree with that observation. It explains why at trial there was so much focus on such a small handful of events in the early part of 2017, when so much else was going on (and going wrong).

## 4  ISSUE 1: THE CONSTRUCTION ISSUE

### 4.1  Clause 23.3 of the MSA

24.     Clause 23.3 of the MSA provided as follows:

> "Subject to clause 23.2 and 23.4, neither party shall be liable to the other or any third party for any Losses arising under and/or in connection with this Agreement (whether in contract, tort (including negligence), breach of statutory or otherwise) which are indirect or consequential Losses, or for loss of profit, revenue, savings (including anticipated savings), data (save as set out in clause 24.4(d)), goodwill , reputation (in all cases

whether direct or indirect) even if such Losses were foreseeable and notwithstanding that a party had been advised of the possibility that such Losses were in the contemplation of the other party or any third party".

25.   Schedule 1 to the MSA defined "Losses" as:

"All losses, liabilities, damages, costs and expenses including reasonable legal fees on a solicitors/client basis and disbursements and reasonable costs of investigation, litigation settlement, judgment, interest."

26.   Clause 23.4 provided as follows:

"23.4 Notwithstanding clause 23.3, the Customer shall if proven and without prejudice to its other rights and remedies, be entitled to recover as direct loss:
(a) incremental cost of implementing and performing workarounds;
(b) the reasonable cost of
   (i) running a procurement exercise;
   (ii) the reasonable, incremental costs of procuring substantially similar replacement or alternatives services or systems in substitution for the Services for the remainder of the committed Term of the Agreement;
in both cases on termination by Customer of the Agreement under clauses 26.2(a) and 26.2(b);
(c) the cost of replacing tangible goods tangible or materials lost, stolen or damaged (or the value of those goods or materials where they are not replaceable) caused by a failure of the Supplier and/or its Contractors to provide the Services in accordance with Agreement; or
(d) the costs of restoring Customer Data and/or any Software lost, damaged or corrupted by the Supplier, and in both cases by reloading from the last back up required to be taken by the Supplier."

27.   What were the items of wasted expenditure which, on the judge's ruling, clause 23.3 excluded? They were dealt with by the judge at [704]-[727] of the judgment. They broadly consist of items of expenditure (including £34.1 million paid to IBM and other large sums paid to third party suppliers) incurred by CISGIL in the expectation that IBM would perform their contractual obligations and provide them with a much-improved IT system. There is also a significant claim for financing costs. The judge said at [681] that it was anticipated that the new IT solution "would produce substantial savings, increased revenues and increased profits" ([681]). Instead, because IBM wrongfully repudiated the contract, the new IT system was never delivered and the costs which CISGIL incurred in anticipation of it were wasted.

## 4.2  The Judgment

28.   The judge addressed the construction of clause 23.3 between [666] and [688]. She set out various legal principles between [670]-[679], which concerned losses claimed on the expectation and the reliance basis; how each provided compensation for the same loss of the contractual bargain; and the legal nature of a "wasted expenditure" claim. Her analysis in these paragraphs did not address any of the principles of contract construction, or the particular rules relating to the construction of exclusion clauses.

She also sought at [687] to distinguish her own decision in *The Royal Devon & Exeter NHS Foundation Trust v ATOS IT Services UK Limited* [2017] EWHC 2196 (TCC).

29.     The judge's discussion and conclusions on the construction of clause 23.3 were typically crisp:

> "680.   Applying the above principles to this case, the starting point is to identify the contractual benefit lost as a result of IBM's repudiatory breach of contract.
>
> 681.   CISGIL's business was the underwriting and distribution of general insurance products. The new IT solution which IBM promised to supply was anticipated to improve CISGIL's competitiveness as a market-leading digital and data-based business, which would produce substantial savings, increased revenues and increased profits.
>
> 682.   The loss of the bargain suffered by CISGIL as a result of IBM's repudiatory breach comprised the savings, revenues and profits that would have been achieved had the IT solution been successfully implemented.
>
> 683.   A conventional claim for damages in this type of commercial case would usually be quantified based on those lost savings, revenues and profits. CISGIL is entitled to frame its claim as one for wasted expenditure but that simply represents a different method of quantifying the loss of the bargain; it does not change the characteristics of the losses for which compensation is sought.
>
> 684.   Clause 23.3 of the MSA excludes any claim by either party for "loss of profit, revenue, savings (including anticipated savings) ... (in all cases whether direct or indirect) ..."
>
> 685.   In accordance with the above analysis, such a claim is excluded, whether it is quantified as the value of the lost profit, revenue and savings, or as wasted expenditure.
>
> 686.   It follows that CISGIL's claim for wasted expenditure is excluded by clause 23.3."

## 4.3  The Law

### 4.3.1  General Principles of Construction

30.     The principles of contract construction have been set out in no less than three recent Supreme Court cases: *Rainy Sky SA v Kookmin Bank* [2011] UKSC 50 at [14]-[30]; *Arnold v Britton* [2015] UKSC 36 at [14]-[22]; and *Wood v Capita Insurance Services Limited* [2017] UKSC 24 at [8]-[15]. They are well-known and it is unnecessary to dwell on them for too long here.

31.     One of the many themes developed in those cases was the emphasis on the language that the parties used. So, in *Rainy Sky*, Lord Clarke said:

> "...The ultimate aim of interpreting a provision in a contract, especially a commercial contract, is to determine what the parties meant by the language

Case 1:21-cv-11059-GHW   Document 182-7   Filed 08/15/23   Page 10 of 46

Judgment Approved by the court for handing down.                                    CISGIL v IBM

used, which involves ascertaining what a reasonable person would have understood the parties to have meant."

A little later in his judgment he said that:

"…The exercise of construction is essentially one unitary exercise in which the court must consider the language used and ascertain what a reasonable person, that is a person who has all the background knowledge which would reasonably be available to the parties in the situation in which they were at the time of the contract, would have understood the parties to have meant. In doing so, the court must have regard to all the relevant surrounding circumstances. If there are two possible constructions, the court is entitled to prefer the construction which is consistent with business common sense and to reject the other…where the parties have used unambiguous language, the court must apply it."

32.     In *Arnold v Britton* Lord Neuberger stressed the importance of the words of the contract. His summary of the relevant considerations begins with them. He said:

"15. When interpreting a written contract, the court is concerned to identify the intention of the parties by reference to "what a reasonable person having all the background knowledge which would have been available to the parties would have understood them to be using the language in the contract to mean", to quote Lord Hoffmann in *Chartbrook Ltd v Persimmon Homes Ltd* [2009] UKHL 38, [2009] 1 AC 1101, para 14. And it does so by focussing on the meaning of the relevant words, in this case clause 3(2) of each of the 25 leases, in their documentary, factual and commercial context. That meaning has to be assessed in the light of (i) the natural and ordinary meaning of the clause, (ii) any other relevant provisions of the lease, (iii) the overall purpose of the clause and the lease, (iv) the facts and circumstances known or assumed by the parties at the time that the document was executed, and (v) commercial common sense, but (vi) disregarding subjective evidence of any party's intentions. In this connection, see *Prenn* at pp 1384-1386 *and Reardon Smith Line Ltd v Yngvar Hansen-Tangen (trading as HE Hansen-Tangen)* [1976] 1 WLR 989, 995-997 per Lord Wilberforce, *Bank of Credit and Commerce International SA (in liquidation) v Ali* [2002] 1 AC 251, para 8, per Lord Bingham, and the survey of more recent authorities in *Rainy Sky*, per Lord Clarke at paras 21-30."

33.     In *Wood v Capita*, Lord Hodge said:

"…In striking a balance between the indications given by the language and the implications of the competing constructions the court must consider the quality of drafting of the clause…"

34.     There are also general rules applicable to the construction of exclusion clauses and other clauses which might reduce the remedies ordinarily available to the victim of a breach of contract. In *Gilbert-Ash (Northern) Limited v Modern Engineering (Bristol) Limited* [1974] AC 689, Lord Diplock said at 717H:

"one starts with the presumption that neither party intends to abandon any remedies for its breach arising by operation of law,

Case 1:21-cv-11059-GHW   Document 182-7   Filed 08/15/23   Page 11 of 46

Judgment Approved by the court for handing down.                                      CISGIL v IBM

and clear express words must be used in order to rebut the presumption."

35.    That point was taken up by Moore-Bick LJ in *Stocznia Gdynia SA v Gearbulk Holdings Limited* [2010] QB 27, where he said:

> "The court is unlikely to be satisfied that a party to a contract has abandoned valuable rights arising by operation of law unless the terms of the contract make it sufficiently clear that that was intended. The more valuable the right the clearer the language will need to be."

36.    In *Kudos Catering (UK) v Manchester Central Convention Complex Limited* [2013] EWCA Civ 38, the exclusion clause in question excluded liability for, amongst other things, "revenue or profits, anticipated savings or wasted expenditure…" It was therefore doing expressly what the judge found clause 23.3 in this case was doing impliedly. The draconian consequences of such a clause in circumstances of wrongful repudiation led this court in *Kudos* to conclude that the clause did not exclude liability for loss of profits for refusal or disabling inability to perform, restricting the clause only to defective performance. Tomlinson LJ said at [29]:

> "29. The parties could had they so wished have provided that there should be an exclusion of all liability for financial loss in favour of the Company, but not the Contractor, in the event of a refusal to perform. That would be a bargain which Mr Phillips has, I suggest, come close to acknowledging is unlikely, not just for the reason given in the last paragraph but also because of his insistence that whilst the Company accepted no liability for loss of profits, the Contractor could enforce the contract against it and thereby earn those profits. ***Had the parties intended such an exclusion of all liability for financial loss in the event of refusal or inability of the Company to perform, I would have expected them to spell that out clearly, probably in a free-standing clause rather than in a sub-clause designed in part to qualify an express and limited indemnity, and in one which moreover forms part of a series of sub-clauses dealing with the provision of indemnities and the insurance to support them.*** It is plain that the parties intended that this wide category of loss – goodwill, business, revenue, profits, wasted expenditure – should not be recoverable in respect of breaches of the sort itemised by the Respondent in paragraph 47 of its skeleton argument – the inadvertent provision of wrong information concerning events or likely attendance size, the inadvertent exclusion of the Appellant from the catering area or areas ancillary thereto by blocking off, the failure to set out the necessary furniture as required by Clause 19.11 and so on and so forth. In my judgment however by their language and the context in which they used it they demonstrated that the exclusion related to defective performance of the Agreement, not to a refusal or to a disabling inability to perform it." (***My emphasis***)

37.    It is unnecessary to set out any more of the principles relating to the rules of construction of exclusion clauses. The enthusiast can find a comprehensive discussion in Chapter 12 of *The Interpretation of Contracts,* 7th Edition, by Sir Kim Lewison. At paragraph

12.126, the author endorses the conclusions of Evans LJ on this topic in *BHP Petroleum Limited v British Steel PLC* [2000] 2 Lloyd's Rep 277:

> "… a general rule that the more extreme the consequences are, in terms of excluding or modifying the liability that would otherwise arise, then the more stringent the court's approach should be in requiring that the exclusion or limit  should be clearly and unambiguously expressed."

### 4.3.2 *'Wasted Expenditure'*

38.     The starting point is the compensatory principle: in *Robinson v Harman* (1848) 1 Ex Rep 850, [1843-60] ALL ER Rep 383, Baron Parke said at 385 that a party who suffers loss as a result of breach of contract was entitled "to be placed in the same situation, with respect to damages, as if the contract had been performed."

39.     This can sometimes give rise to difficulties where, on analysis, a claimant's claim for damages ignores the underlying reality or subsequent events. Thus, where it can be shown that the victim's claim for wasted expenditure in anticipation of performance of a contract would never have been recouped (because the contract was always a bad bargain), or where the losses would have been more than recouped (because the repudiation gave the victim a more valuable asset than he would have had if the contract had been performed), the claim will fail: in the former situation because the damages claimed would put the victim in a better position than it would have been in if the contract had been performed; and in the latter because of the duty to mitigate.

40.     When a claimant claims damages in consequence of the other side's repudiation, there is a choice. The claimant can either claim its loss of profits or, alternatively, its wasted expenditure. If the claim is for wasted expenditure, it is not limited to the expenditure incurred after the contract was made but can also include the expenditure before the contract, provided it was reasonably in the contemplation of the parties as likely to be wasted if the contract were broken: see *Anglia Television Limited v Reed* [1972] 1 QB 60. In that case, Lord Denning MR said:

> "It seems to me that a plaintiff in such a case as this has an election: he can either claim for loss of profits; or for his wasted expenditure. But he must elect between them. He cannot claim both. If he has not suffered any loss of profits- or if he cannot prove what his profits would have been- he can claim in the alternative the expenditure which has been thrown away, that is, wasted, by reason of the breach."

41.     There was a time when a potential distinction was drawn between expectation losses (that is to say, the losses which were suffered as a result of the contract not being performed and therefore not producing the expected results) and reliance losses (which were said to be expenditure incurred in reliance upon the fact that the contract would ultimately be performed). It is not unfair to say that this distinction was rather more important to academics than those in practice, and only mattered at all when it was (wrongly) suggested that reliance losses were, in some way, a separate head of loss and not recoverable pursuant to the compensatory principle.

42.    This alleged distinction has long since been explained and resolved, first by Steyn LJ (as he then was) in *Surrey CC v Bredero Homes Ltd* [1993] 1 WLR 1361 and subsequently by Teare J in his celebrated judgment in *Omak Maritime Limited v Mamola Challenger Shipping Co.* [2010] EWHC 2026 (Comm), [2011] 2 All ER (Comm) 155.

43.    In the *Surrey* case, Steyn LJ said at 1369B-D:

> "An award of compensation for breach of contract serves to protect three separate interests. The starting principle is that the aggrieved party ought to be compensated for loss of his positive or expectation interests. In other words, the object is to put the aggrieved party in the same financial position as if the contract had been fully performed. But the law also protects the negative interest of the aggrieved party. If the aggrieved party is unable to establish the value of a loss of bargain he may seek compensation in respect of his reliance losses. The object of such an award is to compensate the aggrieved party for expenses incurred and losses suffered in reliance on the contract. These two complementary principles share one feature. Both are pure compensatory principles. If the aggrieved party has suffered no loss he is not entitled to be compensated by invoking these principles. The application of these principles to the present case would result in an award of nominal damages only."

44.    *Omak* was a case in which, for the purposes of their damages claim, the Owners wanted to ignore the fact that the Charterers' breach had actually put them in a better position than if the contract had been performed. Teare J dealt in detail with the asserted difference between reliance and expectation losses and concluded that wasted expenditure was a form of expectation loss and was not recoverable if in fact the claimant had not suffered any net loss as a result of the termination of the contract. He concluded:

> "55. I am not therefore persuaded that the right to choose or elect between claiming damages on an expectancy basis or on a reliance basis indicates that there are two different principles at work. Both bases of damages are founded on, and are illustrations of, the fundamental principle in *Robinson v Harman,* for the reasons explained by Chief Judge Learned Hand in *L. Albert & Son v Armstrong Rubber Co.,* by Berger J. in *Bowlay Logging v Donmar Limited,* by all members of the High Court of Australia in *The Commonwealth of Australia v Amman* and by the English Courts in *C&P Haulage v Middleton* and *CCC Films v Impact Quadrant Films Limited.* Thus, notwithstanding my unfeigned respect for any opinion of Professor Treitel, I am unable to accept that there are two principles, rather than one, governing the law of damages for breach of contract...
>
> 59.  This appears to be true and is the reason why both parties accepted that there was no binding authority as to the question which the Court has to decide. However, in circumstances where, for the reasons I have given, the weight of authority firmly suggests that an award of reliance damages is governed by the

Case 1:21-cv-11059-GHW   Document 182-7   Filed 08/15/23   Page 14 of 46

Judgment Approved by the court for handing down.                                    CISGIL v IBM

principle in *Robinson v Harman* I consider that to award substantial damages, measured by wasted expenditure, where the Owners have, as a result of the Charterers' breach, been able to trade the vessel at the higher market rates and have "more than recuperated" their loss, would be wrong in principle. Such an award would place the Owners in a better position than they would have been in had the contract been performed. Moreover, damages for breach of contract are intended to compensate for loss suffered and the Owners have, as a result of their own efforts to mitigate their loss, suffered no loss. To ignore the benefits received by the Owners as a result of their action to mitigate their loss would be contrary to the principles established by *British Westinghouse*."

45.     These points of principle were confirmed by Leggatt J (as he then was) in *Yam Seng PTE Limited v International Trade Corporation Limited* [2013] EWHC 111 (QB); [2013] 1ALL ER (Comm) 1321. In that case ITC was in repudiatory breach of contract which justified Yam Seng in terminating that contract. There was a rebuttable presumption that Yam Seng would have recouped the expenditure incurred in reliance on ITC's performance of the contract. Leggatt J said:

> **"Claim for Wasted Expenditure**
>
> 186. ITC's alternative claim is for its net expenditure incurred as a result of entering into the Agreement. The basis on which wasted expenditure can be recovered as damages for breach of contract was considered by Teare J in *Omak Maritime Ltd v Mamola Challenger Shipping Co* [2011] 1 Lloyd's Rep 47. In his masterly judgment Teare J has shown that awarding compensation for wasted expenditure is not an exception to the fundamental principle stated by Baron Parke in *Robinson v Harman* (1848) 1 Ex 850 at 855 that the aim of an award of damages for breach of contract is to put the injured party, so far as money can do it, in the same position as if the contract had been performed, but is a method of giving effect to that fundamental principle. That conclusion must logically follow once it is recognised, as it was by the Court of Appeal in *C & P Haulage v Middleton* [1983] 1 WLR 1461, that the court will not on a claim for reimbursement of losses incurred in reliance on the contract knowingly put the claimant in a better position than if the contract had been performed.
>
> 187. The advantage of claiming damages on the 'reliance' basis is not that the claimant can recover expenditure which would have been wasted even if the contract had been performed but that, where such a claim is made, the burden of proof lies on the defendant to show that the expenditure would not have been recouped and would have been wasted in any event: see *CCC Films (London) Ltd v Impact Quadrant Films* [1985] QB 16. In this regard the English courts have adopted the approach stated by Learned Hand CJ in *L Albert & Son v Armstrong Rubber Co* 178 F 2d 182 (1949):
>
> "We cannot agree that the promisor's default in performance should under this guise make him the insurer of the promisee's venture; yet it does not follow that the breach should not throw upon him the duty of showing that the value of the performance would in fact have been less than the promisee's outlay. It is often very hard to learn what the value of the performance would have been; and it is a common expedient, and a just one, in such situations to put the peril of the

Case 1:21-cv-11059-GHW   Document 182-7   Filed 08/15/23   Page 15 of 46

Judgment Approved by the court for handing down.                                    CISGIL v IBM

answer upon that party who by his wrong has made the issue relevant to the rights of the other."

188. The "common expedient" referred to by Learned Hand LJ reflects a general theme which runs through the law of damages. On the one hand, the general rule that the burden lies on the claimant to prove its case applies to proof of loss just as it does to the other elements of the claimant's cause of action. But on the other hand, the attempt to estimate what benefit the claimant has lost as a result of the defendant's breach of contract or other wrong can sometimes involve considerable uncertainty; and courts will do the best they can not to allow difficulty of estimation to deprive the claimant of a remedy, particularly where that difficulty is itself the result of the defendant's wrongdoing. As Vaughan Williams LJ said in *Chaplin v Hicks* [1911] 2 KB 786 at 792: "the fact that damages cannot be assessed with certainty does not relieve the wrong-doer of the necessity of paying damages for his breach of contract." Accordingly the court will attempt so far as it reasonably can to assess the claimant's loss even where precise calculation is impossible. The court is aided in this task by what may be called the principle of reasonable assumptions – namely, that it is fair to resolve uncertainties about what would have happened but for the defendant's wrongdoing by making reasonable assumptions which err if anything on the side of generosity to the claimant where it is the defendant's wrongdoing which has created those uncertainties…

190. It seems to me that the (rebuttable) presumption that the claimant would have recouped expenditure incurred in reliance on the defendant's performance of the contract is an illustration of this approach. Parties in normal circumstances contract and incur expenditure in pursuance of their contract in the expectation of making a profit. Where money has been spent in that expectation but the defendant's breach of contract has prevented that expectation from being put to the test, it is fair to assume that the claimant would at least have recouped its expenditure had the contract been performed unless and to the extent that the defendant can prove otherwise.

191. Applying this approach to the present case, ITC has not attempted to discharge the burden of showing what financial return Yam Seng would have made if ITC had not been in breach of contract. It is reasonable to suppose that if ITC had made all the Manchester United products available in accordance with the timetable promised and had shipped all orders promptly, Yam Seng would have made more sales than it in fact did. What the proceeds of such sales would have been and whether they would have been sufficient to defray Yam Seng's expenditure including its expenditure on marketing and promoting the fragrance is impossible for me to determine. ITC has not put forward any estimate of what loss, if any, Yam Seng would have suffered in those circumstances and I am unable to make such an assessment."

46.    Mr Kramer QC, on behalf of IBM, also took the court to a decision of the deputy judge in *Galtrade Ltd v BP Oil International Limited* [2021] EWHC 1796 where one of the issues was whether the defendant had established that the claimant would have lost money even if the cargo had been in accordance with the specification. I did not derive any real assistance from this decision because the relevant part of the judgment ([123]-

[137]) was expressly *obiter*; it set out no new points of principle and instead followed the guidance articulated in *Yam Seng;* and was a case decided entirely on its own facts (namely that, although the evidence was vague and the hypotheticals difficult to pin down, on the balance of probabilities the defendant had not discharged the necessary burden of showing that the loss was inevitable). The issue was, as a matter of fact, whether the expenses would have been recouped or whether the market had turned against the claimant such that the contract was or would have been loss-making. That was a perfectly understandable issue on the facts of that case, but it is far removed from Issue 1 on this appeal.

47.  Perhaps of more significance are paragraphs [138]-[139] of the judgment in *Galtrade.* The defendant argued that the claim for wasted expenditure was a claim for "loss of anticipated profits" and was therefore excluded by the exclusion clause in that contract. The deputy judge considered that that argument was misconceived. Instead he said that "although the claim for wasted expenditure is an expression of the claim for expectation losses, it is no necessary part of that claim that the claimant has forgone any actual net profits." He distinguished the judgment below in the present case on the basis that the exclusion clause also included "revenue [or] savings".

48.  Neither *Omak* nor *Yam Seng* were concerned with the operation of an exclusion clause, much less one that did not expressly address all the potential losses that might be claimed for the loss of the bargain. However, O'Farrell J was herself concerned with such a clause in *Royal Devon v ATOS,* already cited above. That clause excluded liability for "loss of profits or of business or of revenue or of goodwill or of anticipated savings…". In that case, the judge found that, although the usual claim was measured by reference to the additional amount of money that the claimant would require to achieve the expected contractual benefit (i.e. lost profits and the cost of reinstatement of diminution in value), a claimant was entitled to claim damages on an alternative basis by reference to expenditure incurred in reliance on the defendant's promise. She said that the former was the expectation basis and the latter was the reliance basis, but both provided compensation for the same loss of the contractual bargain.

49.  O'Farrell J defined a claim for wasted costs at [58] in the following terms:

"58.  A claim for wasted costs can be explained as compensation for the loss of the bargain based on a rebuttable presumption that the value of the contractual benefit must be at least equal to the amount that the claimant is prepared to expend in order to obtain such benefit. That presumption applies equally to cases of non-pecuniary benefit where the claimant does not expect or aim to make a profit: *Omak* (above) at para. [56]."

50.  In *Royal Devon*, O'Farrell J found that the claimant Trust was not entitled to recover any lost profits or any lost revenue or savings, because such claims were expressly excluded. However she went on to say at [61]-[64]:

"61.  However, that does not preclude the Trust from recovering damages to compensate for the loss of a functioning EMR system. That was a contractual benefit to which the Trust was entitled and of which it has been deprived by ATOS's alleged breach. The rebuttable presumption that the value of that loss is at least equal to the Trust's expenditure does not transform the claim for loss

Case 1:21-cv-11059-GHW   Document 182-7   Filed 08/15/23   Page 17 of 46

Judgment Approved by the court for handing down.                                    CISGIL v IBM

of the EMR system into a claim for loss of any additional benefits that would flow from use of the EMR system.

62.  ATOS's submissions wrongly assume that any "contractual benefit" which is presumed to at least equal the value of the expenditure must represent profits, revenues or savings. In most commercial cases, there would be such a defined financial benefit that would be expected to defray the costs incurred and render the bargain financially viable. However, that is not the case where the contractual benefit is non-pecuniary. In those cases, the anticipated benefit is not a financial gain that could defray the costs incurred but rather a non-pecuniary benefit for which the claimant is prepared to incur such costs. In cases where a party does not expect to make a financial gain, it is the non-pecuniary "benefit" that is assigned a notional value equivalent to at least the amount of expenditure.

63.  In this case, regardless whether the EMR system was anticipated to produce any profits, revenue or savings, the Trust would have the use of the EMR system as a contractual benefit. The claim for wasted expenditure is based on a rebuttable presumption, not that the EMR system would produce revenues to defray such expenditure, but rather that the use of the EMR system was worth at least the expenditure incurred.

64.  ATOS has identified the internal costs of staff at the Trust as a particular head of damage that falls within the exclusion in clause 8.1.3(a) because it is pleaded that those resources would otherwise have been employed in beneficial work for the Trust. Reliance is placed on the *Aerospace, Azzurri* and *Admiral* cases as support for the proposition that on a proper analysis such internal costs are claims for lost revenue. However, those cases were concerned with the costs of diverted staff resources incurred after and as a consequence of the relevant breach or other wrong, in order to remedy the damage suffered. As such, they were properly characterised as lost revenues caused by the breach. They can be distinguished from the internal staff costs in this case, which form part of the costs incurred in performing the Contract. As such, they fall to be dealt with in the same way as the other wasted costs."

51.      In other words, in *Royal Devon* the claims for wasted costs could proceed to trial because the exclusion clause (which was very similar to clause 23.3 in the present appeal) did not preclude the Trust from recovering such damages to compensate it for the loss of a functioning EMR system, the latter being described as a contractual benefit to which the Trust was entitled and of which it had been deprived by ATOS's alleged breach.

52.      Finally, in a review of the authorities on this topic, I should refer to an article by Professor Peel, entitled '*Excluding Liability for "Wasted Expenditure"*', at [2021] Lloyd's Maritime and Commercial Law Quarterly at 425. That makes a number of criticisms of the judge's judgment in this case and suggests that her construction of clause 23.3 may have been incorrect. Mr Thanki QC, on behalf of CISGIL, properly accepted that such articles carry little weight when the court is considering an appeal in the same case.

53.     However, I consider that Professor Peel's article – on which Mr Kramer on behalf of IBM spent some time during his oral submissions – is of some importance because of what he says about the decision in *Royal Devon* and its relationship with the present judgment. Having analysed O'Farrell J's judgments in both cases, Professor Peel said:

> "By way of an initial comment, it is a little difficult to see how O'Farrell J's decisions in the CIS case and in the *Royal Devon* case can both be correct. Put in simple terms, the claimant in the *Royal Devon* case was entitled to recover its wasted expenditure because that amounted to a claim that it did not get the very "thing" for which it contracted i.e. a functioning "EMR system", and that was a benefit not covered by the references in the exclusion clause to "loss of profits" or "savings" etc. But equally, on the hypothesis that it was left with no part of the IT system, the claimant in the *CIS* case did not get the very "thing" it contracted for i.e. a functioning IT system, and that too was a benefit not covered by the references in clause 23.3 to "loss of profits" or "savings" etc. No doubt the NHS Trust's ultimate aim in the *Royal Devon* case was not to make "profits" as such, but one would like to think even an NHS Trust might be interested in being financially efficient so that the "benefit" of the EMR system might be said to lie in the "savings" to be obtained through its use…"

54.     Mr Kramer was right to say that one of the many points made by Professor Peel was that the reference to loss of profit and savings was (or should be taken to be) a reference to net profit and net savings (see also *C.C.C. Films (London) Ltd v Impact Quadrant Films Ltd* [1985] QB 16 at 32 and 40). But that was far from being the main thrust of the article, which is primarily a critique of the judgment below, and its "stark" outcome. Professor Peel's conclusion was not only that the judge "may have been incorrect to decide that clause 23.3 excluded liability for 'wasted expenditure'" but also that her own decision in *Royal Devon* "is to be preferred, without confining that case to so-called cases of 'non-pecuniary benefit."

## 4.4 Discussion

55.     For five separate reasons, set out below, I have concluded that the judge was wrong to construe clause 23.3 as precluding CISGIL from recovering its claims for wasted expenditure following IBM's repudiation of the contract.

### 4.4.1 Natural and Ordinary Meaning of the Words

56.     Losses were widely defined: see the definition in Schedule 1, set out at paragraph 25 above. Clause 23.3 then carved out of that wide definition some specific types of loss which are excluded. So, the starting point in any consideration of Issue 1 must be the natural and ordinary meaning of the words of clause 23.3: what claims or losses were excluded? However, ascertaining the natural and ordinary meaning of the words was not an exercise in which the judge expressly engaged. Nor, as Mr Thanki pointed out in his submissions in reply, was it an exercise which either Mr Tozzi QC or Mr Kramer undertook on behalf of IBM at the appeal hearing itself.

57.     The short point is whether, as a matter of language, the description of the types of losses being excluded, namely "loss of profit, revenue, savings" is apt to cover or include "wasted expenditure". In my view, the fundamental difficulty, which IBM never

Case 1:21-cv-11059-GHW   Document 182-7   Filed 08/15/23   Page 19 of 46

Judgment Approved by the court for handing down.                                    CISGIL v IBM

addressed, let alone surmounted, is that claims for "wasted expenditure" were not excluded by the terms of clause 23.3 because those words are simply not there.

58.    I consider that the objective meaning of clause 23.3, as understood by a reasonable person in the position of these parties, was that the clause did not exclude a claim for expenditure incurred, but wasted because of the other party's repudiatory breach. Claims for wasted expenditure – costs actually incurred but wasted – were not referred to in clause 23.3 and, on the natural and ordinary meaning of the words, were not included in "loss of profit, revenue [or] savings". The principles of construction, identified in paragraphs 30 - 33 above, lead inexorably to that conclusion.

59.    Furthermore, clause 23.3 contains a good deal of particularity as to what types of loss were being excluded from the otherwise wide definition in Schedule 1. They included not only loss of profit, revenue or savings, but also loss of data, goodwill and reputation. In the light of that specificity, the parties' decision not to exclude claims for wasted expenditure is telling. That leads on to the second reason why I consider that the judge's conclusion was wrong.

*4.4.2 The Proper Approach to Exclusion Clauses*

60.    My view as to the ordinary and natural meaning of the words is confirmed by the principles relating to the construction of exclusion clauses (paragraphs 34-37 above). The more valuable the right, the clearer the language of any exclusion clause will need to be; the more extreme the consequences, the more stringent the court must be before construing the clause in a way which allows the contract-breaker to avoid liability for what may be his catastrophic non-performance. In my view, there was nothing in clause 23.3 to suggest that the costs, which CISGIL inevitably incurred in the expectation that Project Cobalt would be completed satisfactorily, would somehow be irrecoverable if IBM repudiated that contract.

61.    Take, simply as an example of this point, the £34.1 million paid by CISGIL to IBM. On the judge's findings, this money was wasted because there never was a new IT system or anything like it. It was money spent in expectation of the contractual benefits that IBM had promised but which, as a result of IBM's repudiatory breach, never materialised. On ordinary principles, that loss would be recoverable as damages. Indeed, in circumstances where such a large amount of money had been wasted, exhaustion and instinctive wariness about the promised benefits of new IT systems in general might well have meant that this was the most likely claim to be made by CISGIL should IBM repudiate. For the recoverability of such a likely claim to be excluded, the exclusion must be clear and obvious. Yet here, there were no relevant exclusionary words, let alone clear and obvious ones. The convoluted argument on which IBM rely to avoid this difficulty (addressed in section 4.4.5 below) only confirms the absence of the necessary clarity.

62.    In my view, in respect of claims for wasted expenditure following repudiation, this exclusion clause does not meet the *Gilbert-Ash/Stocznia* test, or come anywhere close. The parties cannot be taken to have excluded this obvious and common type of damages in circumstances where they have not made any reference in the relevant clause to wasted expenditure at all. Putting the same point another way, IBM's arguments do not get over the hurdle of *Kudos* and *BHP*: clause 23.3 does not begin to suggest that the

parties intended that the costs actually incurred and then wasted because of IBM's repudiation of the contract were to be excluded.

63.     In my judgment, the confluence of these two general principles of construction (namely the natural meaning of the words used, and the need for clear language to exclude such an obvious remedy) explains why, in *Motortrak Limited v FCA Australia Pty* [2018] EWHC 990 (Comm), Moulder J referred to an exclusion clause like this (namely one that excluded loss of profit but did not refer to wasted costs or wasted expenditure) and said that the clause did not preclude a claim for wasted costs arising out of the repudiation of the contract (see [96], [108] and [129]-[131]). Although it is acknowledged that these were *obiter* observations, and that no detailed argument was addressed to her on this specific point, the issue was not irrelevant to her decision, because one of the points taken was that, if the clause meant what the defendant said it meant, the claimant was left without a remedy. Moulder J was making clear that that was not so, because the claimant could have recovered its wasted costs (which claim was not excluded by the clause). The observations were, in my judgment, informed by an experienced Commercial Court judge's intuitive understanding of the basic principles of contract construction to which I have referred in section 4.3.1 above.

64.     On one analysis, that is the end of the construction point. Claims for wasted expenditure were not excluded because those words do not appear in the relevant exclusion clause. That conclusion is, however, also supported by an analysis of the types of loss which were excluded and the types of loss which were not.

*4.4.3 Different Types of Loss*

65.     There are a number of good reasons for distinguishing between loss of profits, revenue or savings, on the one hand, and wasted expenditure, on the other.

66.     The types of loss expressly identified by the particular words of clause 23.3 at the heart of this case (loss of profit, revenue, savings) are all of a similar kind. They are often considered to be types of consequential loss. They are claims which involve a consideration of a variety of counterfactuals: what benefits would the contract have brought if it had been performed? What savings would have been made? What additional revenue would have been earned by the new IT system? What additional profits would have been made as a result of the improvements? Because they depend on hypotheticals, they inevitably involve at least an element of speculation. Here, of course, because the new IT system was never installed, nobody could have been certain about the answers.

67.     For completeness, I should add that, in my view, the other types of loss which were excluded by clause 23.3 (data, goodwill and reputation) are also species of loss of profit claims: see *McGregor on Damages* (21st Edition) at 25-107 in respect of goodwill, and by analogy, reputation. It is difficult to see how a loss of data claim can sound in anything other than loss of profits or a decrease in revenue.

68.     All loss of profit/revenue/savings claims are difficult for the potential contract-breaker to estimate in advance. They can be notoriously open-ended. Claims for loss of profit, revenue and savings are therefore types of potential loss which, because of those problems of speculation and ascertainment, are routinely excluded by clauses like clause 23.3.

69.     Claims for wasted expenditure are an entirely different animal. To be able to claim such wasted expenditure is a valuable right: see *Anglia v Reed* and *Yam Seng*. Moreover, if the victim of a breach of contract has spent money in anticipation that the contract would be performed, then his or her loss is easy to ascertain: there will be invoices, contracts, receipts and the like. This type of loss is the opposite of speculative: it is precisely ascertainable. It is a pure accounting exercise. Perhaps for that reason, such claims are not usually regarded as claims for consequential loss.

70.     Accordingly, it is unsurprising from a commercial perspective that, whilst speculative and uncertain types of loss were excluded by clause 23.3, at least one kind of easily-ascertainable type of loss – wasted expenditure - was not. In this way the clause, construed in the way that I have construed it, makes commercial sense. The claims that would have compensated CISGIL for being better off as a result of the new IT system were excluded; the claims to compensate them for being worse off as a result of the non-provision of the IT system were not. I therefore accept the submission at paragraph 33 of Mr Thanki's skeleton argument that the exclusion of loss of profits/revenue/savings, but not wasted expenditure, struck a fair commercial balance between the parties.

71.     This distinction is also in accordance with the law. That these are different types of loss as a matter of law is underlined by the decision in *Anglia Television* (paragraph 40 above). When a contract is repudiated, the victim can claim loss of profits or the expenditure which has been thrown away as a result of the repudiation. He or she cannot claim both and, to address a point touched on in Treitel's *The Law of Contract*, 15th Edition at 20-036, also edited by Professor Peel, there are "formidable objections to running the two claims in the alternative": see *Filoblake Ltd v Rondo Ltd* [2005] EWCA Civ 563 at [64]. On its face, therefore, clause 23.3 expressly excluded the former type of loss, but did not exclude the latter.

72.     In cases like this, it can be trite to say that, if IBM wanted to exclude wasted expenditure as well as loss of profit/savings/revenue, they could easily have done so. I accept that such observations are usually unhelpful as an aid to construction. However, it is not irrelevant to note that the reported cases demonstrate that "wasted expenditure" is a type of loss which can be – and sometimes is – expressly excluded by clauses of this kind. Thus "wasted expenditure" was expressly identified in the applicable exclusion clause in *Kudos*. Furthermore, it was the subject of the relevant exclusion clauses in *Heathmill Multimedia ASP v British Telecoms PLC* [2003] EWHC 690 (QB) at [39] and, more recently, *Natixis SA v Marex Financial and Access World Logistics (Singapore) PTE Limited* [2019] 2 Lloyds Rep 431 at [480]. Professor Peel suggests in his article that, if that had been the intention of the parties, a prudent drafter would have sought expressly to exclude wasted expenditure, and should not have been content to rely on a clause referring only to loss of profit/revenue/savings. In other words, it is not only possible, but it is not uncommon for claims for wasted expenditure to be the subject of an exclusion clause of this type. But such claims were not excluded here.

73.     During the course of his oral submissions, Mr Kramer on behalf of IBM was obliged to submit that there was no such thing as wasted expenditure or even reliance loss. With great respect, I consider the authorities referred to in section 4.3.2 above make plain the contrary: that wasted expenditure is a recognised and recoverable type of loss, well within the compensatory principle.

*4.4.4 Loss of the Bargain*

74.     In my view, what clause 23.3 was seeking to do was to exclude some of the types of loss which flow from an underlying loss of the bargain, but not to exclude other types of loss which arise from that same lost bargain. For that analysis, it is necessary first to consider what the bargain was.

75.     By reference to [682] of the judgment, IBM suggest that the loss of the bargain was comprised *solely* in the savings, revenues and profit that would have been achieved by CISGIL had the IT solution been successfully implemented. Of course, if that submission was correct, then that would mean that clause 23.3 – which identified each of those three potential losses - excluded the entirety of any claims for the loss of the bargain that resulted from IBM's repudiation. In my judgment, for a number of separate reasons, that analysis cannot be right.

76.     First, that proposition ignores the straightforward point that the loss of the bargain was principally represented by the loss of the IT system itself. In *Royal Devon*, the judge expressly found that that which had been lost was the provision of the EMR system. So here, the primary thing which had been lost was the provision of the new, improved IT system. It is therefore fundamentally incorrect to say that the loss of the bargain was solely represented by lost profits, revenue and savings.

77.     Secondly, the paradigm financial loss resulting from the loss of the bargain would, in an ordinary case, be the cost of re-procurement: getting in another contractor to do what IBM had failed to do. Mr Tozzi spent some time submitting that, by reference to clause 23.4, the re-procurement costs were expressly allowed for, and that therefore IBM were *not* saying that this important element of the potential damages recoverable for the loss of the bargain was excluded by clause 23.3.

78.     The principal difficulty with that submission is that it failed to acknowledge that, pursuant to clause 23.4, the costs of re-procurement were only said to be recoverable in particular instances (effectively, termination for cause). That was not what happened here: on the judge's findings, IBM wrongly repudiated the contract, which repudiation CISGIL accepted. There was no termination for cause by CISGIL on the facts here, so clause 23.4 is irrelevant.

79.     So, what then would the position have been if CISGIL had sought to recover the costs of a re-procurement exercise, in circumstances where, as here, clause 23.4 did not apply? One argument might be to say that the costs of a new IT system was an item of wasted expenditure, in that it would be a financial liability which CISGIL would not have incurred but for IBM's wrongful repudiation of the contract. On IBM's construction of clause 23.3 – which is that it excluded all "wasted expenditure" – that would mean that the clause excluded the claim for re-procurement costs. That would be an extraordinary result.

80.     The better view must be that such a claim was not excluded by clause 23.3 at all. But that would mean that clause 23.3 does *not* exclude all claims for loss of the bargain, and that the judge was wrong to suggest otherwise at [682]. If – as I think it must be – it is accepted that clause 23.3 does not exclude all the types of loss that may result from the loss of the bargain, then it becomes simply a question of identifying those which

Case 1:21-cv-11059-GHW   Document 182-7   Filed 08/15/23   Page 23 of 46

Judgment Approved by the court for handing down.                                    CISGIL v IBM

were excluded (loss of profit, revenue or savings), and those which were not (most obviously, claims for re-procurement and wasted expenditure).

81.    Thirdly, if it is suggested that clause 23.3 excluded the entirety of the loss of the bargain, even in circumstances of wrongful repudiation, then this case becomes indistinguishable from *Kudos*. The reason why this court refused to permit the exclusion clause to bite in the way asserted by the defendant in *Kudos* (even though it included the words "wasted expenditure"), was because the clause did not support such a draconian result in the event of wrongful repudiation. That outcome was not apparent from the words used in the clause. That same conclusion must apply, a *fortiori,* to the exclusion clause in the present case, where "wasted expenditure" was not even referred to in the clause at all.

82.    On that basis, I accept paragraph 37 of Mr Thanki's skeleton argument. Some types of loss of bargain damages, like loss of profit, revenue or savings, were excluded by clause 23.3. Other types, such as re-procurement costs and wasted expenditure, were not. By reference to Steyn LJ in *Surrey CC v Bredero*, (paragraph 43 above) the contract excluded what he called the aggrieved party's positive interests; it did not exclude his negative interest, namely "expenses incurred and losses suffered in reliance on the contract".

*4.4.5 Recoupment and the Result in Royal Devon*

83.    The argument which found favour with the judge was to this effect:

       a)     A conventional claim for damages for repudiatory breach of contract would usually be for the savings/revenue/profits that would have been achieved had the contract been performed, but which had been lost in consequence of the repudiation;

       b)     Wasted expenditure is, in the judge's words, "a different method of quantifying the loss of the bargain", but she concluded that that did not change the characteristics of the losses for which compensation was sought;

       c)     There is a presumption that any wasted expenditure would have been recouped from the profit, revenue or savings if the contract had been performed (although this presumption can be rebutted by a defendant on appropriate evidence);

       d)     Therefore, because clause 23.3 of the contract excluded "loss of profit, revenue, [or] savings," the contract also excluded any claim for wasted expenditure.

       In this way, as a matter of contract construction, "wasted expenditure" was to be taken as being impliedly included within "lost profits, revenue [or] savings".

84.    In my view, the principal flaw in this reasoning is the characterisation of "wasted expenditure" as a method of calculating "lost profits, revenues or savings". That is an unjustified leap of reasoning. Whilst lost profits (or revenue or savings) is one method of calculating damages for the loss of the bargain, a claim for wasted expenditure is simply a different method of calculating such damages. That does not make wasted expenditure a method of assessing or claiming lost profits (or revenue or savings).

85.    On the contrary, they are different types of claims, for the reasons that I have identified above. And although there is a rebuttable presumption that the wasted expenditure

would have been recouped out of profits/savings/revenue if the contract had been performed, that does not make an ascertainable claim for monies paid to, say, a third party supplier in the expectation that the contract will be completed the same as, or impliedly included within, a claim for lost profits, revenue or savings. The highest that any linkage can be put is that the juridical basis for recovering wasted expenditure involves the rebuttable presumption that recoupment would have been made out of profits or revenue or savings. But that connection does not mean that they are the same claims, or the same types of loss, for the purposes of construing clause 23.3.

86.     I consider that this conclusion is consistent with the observations at [138]-[139] of *Galtrade* because, although I recognise that the clause in that case was limited to net profits, the fact that it made no reference to wasted expenditure meant that it did not exclude such claims. More importantly, that conclusion is also consistent with the judge's own decision in *Royal Devon*. There the judge had no difficulty at all in concluding that the Trust's claim for wasted expenditure, a type of loss which was not expressly referred to in the exclusion clause, had not been excluded. Although, in the present case, the judge herself sought to distinguish her decision in *Royal Devon* at [687], I find the distinction unpersuasive. She said that in *Royal Devon* the claim for wasted costs in that case was not excluded because the contractual benefit to the Trust was non-pecuniary. She said that in cases where a party does not expect to make a financial gain, it was the non-pecuniary 'benefit' that was assigned a notional value equivalent to at least the amount of expenditure.

87.     But that simply cannot work as a matter of contract construction. The issue is whether wasted expenditure was somehow excluded by the words 'loss of profits/revenue/savings'. The answer to that question of construction cannot possibly turn on whether the anticipated benefit of any given contact was primarily pecuniary or primarily non-pecuniary. That would make for an extremely uncertain result, as Professor Peel indicates in his article (paragraph 53 above). It would mean that the interpretation of the same words in the same contract would mean something completely different, depending on the identity of the employer and whether it was a profit-making company or not. It would be the opposite of providing the clarity required to construe an exclusion clause.

88.     Furthermore, it seems to me to be impossible to find a sensible way of distinguishing between contracts for pecuniary benefits (where on this analysis, claims for wasted expenditure would be excluded without express reference) and contracts for non-pecuniary benefits (where such claims would not be excluded). It is not a distinction made by Teare J in *Omak*: on the contrary, it might be said that his conclusions are inconsistent with the need to distinguish between pecuniary and non-pecuniary benefit. Moreover, what if there is a mixture of benefits (which in many cases, there will be)? When large organisations sign contracts with computer companies for new IT systems, the anticipated benefits may be a mixture of pecuniary and non-pecuniary benefits: greater profits and revenue, but also greater general efficiency and a happier workforce. There can be no rational reason for distinguishing between the two, so as to say a computer company that repudiates its contract with a charity is liable for wasted expenditure, but the same company that repudiates the same contract with a commercial organisation is not, as a result of an exclusion clause which refers only to "loss of profit, revenue, savings".

89.     For these reasons, I consider that the specific argument which found favour with the judge was unsound, and contrary to what I consider to be her correct conclusion in *Royal Devon.*

## 4.5 Conclusion on Issue 1

90.     For these reasons, I have concluded that the judge's construction of clause 23.3 did not follow the applicable principles and therefore led her to an erroneous conclusion. In my view, recovery for damages for wasted expenditure was not excluded by clause 23.3. I would therefore allow the appeal on Issue 1.

## 5  ISSUE 2: THE APPLICABLE CONTRACTUAL CAP

## 5.1     The Clauses

91.     Clause 23.5 of the MSA provided as follows:

> "Subject to clauses 23.2, 23.3 and 23.6 the Supplier's aggregate liability to the Customer Group:
>
> a)     for the Implementation Services, shall be limited to 150% (one hundred and fifty percent) of the Charges paid and/or would have been payable by the Customer if the Implementation Services had been performed in full and there had been no claims or deductions;
>
> b)     for the indemnity at clause 24.1 (Data Protection), shall be limited to £5,000,000 (five million pounds);
>
> c)     for the indemnity at clause 24.2 (Regulatory Fines), shall be limited to £3,000,000 (three million pounds);
>
> d)     for each SOW for Programme Related Services and/or Additional Services:
>
>> i)     with a duration of up to and including 12 months, shall be limited to 150% (one hundred and fifty percent) of the Charges paid or payable in relation to the relevant SOW; and
>>
>> ii)     With a duration of over 12 months, shall be limited to the greater of:
>>
>>> A) 125% (one hundred and twenty five percent) of the projected charges for the 12 months charges at the date it is signed; or
>>>
>>> B) 125% (one hundred and twenty five percent) of the total Charges paid and/or would have been payable in the 12 (twelve) month period immediately preceding the first clause of action arising.
>
> e)     Arising otherwise under and/or in connection with this Agreement shall be limited to the greater of:

i)      £15.7 million (fifteen million seven hundred thousand pounds); or

ii)     125% (one hundred and twenty-five percent) of the total Charges paid and/or would have been payable for the Managed Services in the 12 (twelve) month period immediately preceding the first cause of action arising.

f)      for Wilful Default, the limit of Supplier's total liability in clauses 23.5(a), 23.5(d) and 23.5(e) (as applicable) shall be extended by an additional 50% (fifty percent)

The provisions of this clause 23.5 shall operate as separate and additional liability limitations to all other limitations of liability in this clause 23.5 and clause 23 and any liability for any matters listed in this clause 23.5 shall not form part of any calculation of whether the limits of liability under any other provision of this clause 23 have been reached."

92.     The disputes between the parties have narrowed. The present position is as follows:

a)      The judge found that CISGIL had demonstrated wasted expenditure in the total sum of £122m.

b)      If, as IBM contend, the claim for that wasted expenditure only arose under clause 23.5(a), then it is agreed that that would cap the net claim (ie allowing for the other claims and cross-claims, including IBM's set-off), at £80,574,168.

c)      If, as CISGIL contend, the claim arises under both clause 23.5(a) and clause 23.5(e), then it is agreed that that would cap the net claim at £96,274,168.

**5.2 The Arguments**

93.     IBM advanced two arguments as to why clause 23.5(e) was irrelevant. The first was a matter of construction: IBM's case was that there was a single cause of action arising out of their wrongful repudiation of the MSA and that, in consequence, clause 23.5(a) was the single applicable cap. Mr Tozzi argued that the use of the word "otherwise" in clause 23.5(e) meant that the clauses were mutually exclusive.

94.     The second issue concerned the nature and scope of the claims being made, and whether they triggered both clauses 23.5(a) and 23.5(e). Do CISGIL need to show that they incurred losses in expectation of the Management Services, as well as or separately from incurred losses in expectation of the Implementation Services, is there, on the facts here an automatic aggregation of the two clauses?

**5.3 The Construction Issue**

95.     The Agreement in this case was defined as including the MSA and both the Implementation SOW and the Management SOW. The cap under clause 25.5(a) related to the Implementation SOW: it is calculated at 150% of the cost of the Implementation Services. Clause 23.5(e) was concerned with a cap on IBM's liability under the Management SOW. We know that because 'Managed Services' are expressly referred

to at 23.5(e)(ii), and because the £15.7m cap figure identified in 23.5(e)(i) is calculated by taking the average annual managed services charge and multiplying it by 125%.

96.     In essence, this argument came down to the meaning of the word "otherwise" in clause 23.5(e). Mr Tozzi submitted that, because the primary cap clause for this claim was 23.5(a), there was no scope for any other claim, and there could be no aggregation by reference to clause 23.5(e). He said that IBM's liability could not arise under clause 23.5(a) and also arise "otherwise" under clause 23.5(e). He said that the two were mutually exclusive.

97.     I do not accept that submission as a matter of construction. A reasonable person with the background knowledge of the parties would think that they were cumulative, not mutually exclusive. Clauses 23.5(a) and (e) related to the two key elements of the services to be provided by IBM. Indeed, during the course of the argument, Mr Tozzi accepted that "otherwise" in clause 25.5(e) meant "otherwise than arising under clauses 25.5 (a), (b), (c) or (d)". So if on the facts a claim arose under 23.5(a), and a separate claim arose under 23.5(e), the caps would be aggregated. The claim under 23.5(e) would arise "otherwise" to the claim under 23.5(a).

98.     That also seems to me to be the only sensible construction to be given to the words "the Supplier's aggregate liability" in the introductory words to the clause, and the express proviso at the end of the clause that each of these provisions "shall operate as separate and additional liability limitations to all other limitations of liability…" These words made plain that the caps were cumulative and aggregate; they were not mutually exclusive. Thus, as a matter of construction, two separate claims for separate failures in respect of each of the Implementation SOW and the Management SOW would trigger both clause 23.5(a) and clause 23.5(e). So, the question becomes: is that a fair description of the claims made by CISGIL?

### 5.4 The Nature and Scope Issue

99.     That is rather more problematic. CISGIL's claims have not been divided up by reference to the separate clauses or the separate SOWs. CISGIL simply say that, because the contract included both SOWs, it is unnecessary for them to separate out their claims under the two different SOWs in the way suggested. In answer to a question from me during the hearing, Mr Thanki accepted that, in essence, he was submitting that, in the circumstances which occurred, CISGIL had an automatic right to aggregation under both clauses 23.5(a) and 23.5(e), because the repudiation meant that neither the Implementation nor the Management Services were provided.

100.    Mr Tozzi maintained that this ignored the reality of the claims actually being made. He demonstrated, certainly to my satisfaction, that the biggest items of wasted expenditure related solely to the Implementation Services. They were: i) the monies that had already been paid to IBM, which only concerned the Implementation Services (because no payment for any Managed Services was ever made by CISGIL); ii) the money paid to third party suppliers, which again only concerned the Implementation Services (for the same reason); and iii) the cost of financing the bond which, at [695], the judge expressly found related to the implementation element of the IT project.

101.    There is also an air of artificiality in CISGIL seeking to pray in aid the Management Services SOW for the purposes of the cap: the delays to the Implementation SOW, and

then the wrongful repudiation of the contract, meant that the stage was never reached when Managed Services would or could be provided. That goes someway to making good Mr Tozzi's point that, since the Management Services were, in the events which occurred, a long way down the line, all CISGIL's losses related to the failure to provide the Implementation Services.

102.    I am not persuaded by Mr Thanki's submission that, in the circumstances that arose here, there was an automatic aggregation, regardless of the nature and scope of the individual claims actually being made. The different parts of clause 23.5 related to different elements of the overall contract, namely the Implementation Services, data protection, regulatory compliance (and fines for non-compliance), and the Managed Services). The primary loss was, on any view, in respect of the Implementation Services. In my view, the way in which the MSA was drafted does not permit a further claim in respect of Managed Services unless specific costs had been wasted in respect of that element of the MSA.

103.    That can be illustrated in this way. If CISGIL had been able to demonstrate that they took on a new employee to be responsible for IBM's Managed Services once the implementation of the IT system was complete, then the costs of first hiring and then (following the repudiation) the costs of making that same employee redundant would have been wasted, and would have given rise to a separate claim under clause 23.5(e). That claim could not be attributed to the claim in respect of the Implementation Services under clause 23.5(a); it would only arise for these purposes under clause 23.5(e). But no such claims have either been pleaded or assessed by the judge. In the absence of such identified claims I consider that, on the material before this court, the additional cap referable to clause 23.5(e) has not been triggered.

104.    In summary, therefore, I conclude that clause 23.5 contained a series of separate caps for separate parts of the overall service being provided by IBM under the MSA. In order to bring a claim within any one of those separate caps, CISGIL had to show that they had suffered a loss in respect of that element of the service. CISGIL have shown such losses in respect of the Implementation Services. They have not shown any such losses in respect of the Management Services. I reject CISGIL's attempt to get around that difficulty by claiming an entitlement to automatic aggregation under both 23.5(a) and 23.5(e), regardless of the nature and scope of the claims actually made.

## 5.5  Conclusion on Issue 2

105.    For these reasons, I consider that CISGIL have no entitlement to invoke clause 23.5(e)(i) as well as 23.5(a). I therefore conclude in respect of Issue 2 that the appropriate cap gives rise to a net claim in favour of CISGIL of £80,574,168.

## 6  ISSUE 3: REPUDIATION

## 6.1 The Clauses

106.    Clause 14 of the MSA provided:

> "In consideration of the performance of the Services, the Customer shall pay the Supplier the Charges as set out in and/or as calculated in accordance with schedule

5 (Charges), which shall be invoiced at the times and in the manner specified in schedule 5 (Charges)."

107. Schedule 5 to the MSA was concerned with invoicing and payment. Schedule 5 contained the following provisions:

"1.2    This schedule sets out the Charges and/or the methodology for calculating the Charges applicable to this Agreement together with certain financial related rules and processes that apply to the calculation, invoicing and payment of the Charges…

11.1     All invoices under this Agreement must be addressed to the following address (unless agreed otherwise in writing by the Customer):

(a) by email to purchase2pay@cfs.coop, simultaneously copied by email to gifinancialreportingteam@co-operative.coop; or

(b) via post to The Co-operative, GI Invoice processing, 6th Floor Angel Sq, Manchester M60 OAG and simultaneously copied by post to GI Financial Reporting 10th Floor Angel Sq, Manchester M60 OAG…

11.3     The Supplier shall submit hard copy invoices to the Customer together with the invoice back-up in soft copy form, unless otherwise agreed by the parties. Invoices shall be submitted to such authorised representative as may be appointed or as may be agreed between the Supplier and the Customer from time-to-time.

11.4 Unless otherwise agreed by the parties, each Supplier invoice shall:

(a) reflect and support the pricing and financial provisions set out in this schedule 5 (Charges);

(b) quote the relevant Statement of Work identifier and the unique Customer purchase order number;

(c) clearly show the basis of the Charges including the calculations used to establish the Charges for time and material Statements of Work and the relevant payment milestone for fixed price Statements of Work; and

(d) provide a summary of the Charges incurred each month separately for each Statement of Work;

11.5     Unless otherwise set out in a Statement of Work, the Supplier shall invoice the Customer in respect of the Charges to which it is entitled under the Agreement within 180 days of the date on which the Supplier completes the relevant Milestone identified in the relevant Statement of Work. Any Charges which are not invoiced within this timeframe shall not be recoverable by the Supplier. The parties agree that this paragraph 11.5 shall not apply in cases where there is a dispute between the parties relating to Charges including the applicability of taxes and the parties agree that the timeline for invoicing shall be subject to extension in such cases…

> 11.7    ***Unless the Customer disputes an invoice in good faith in accordance with paragraphs 11.11 and 11.12 of this schedule 5 (Charges)***, the Customer shall pay correctly prepared invoices properly submitted in relation to payments to be made under this Agreement within seven (7) Business Days of receipt…(***My emphasis***)

> 11.10    An invoice from the Supplier in relation to any part of the Charges is deemed not to have been correctly prepared if the Supplier has failed, in relation to that invoice and the supporting relevant documentation to be provided in relation to that invoice, to meet the relevant requirements for an invoice as set out in this schedule 5 (Charges).

> 11.11    If, at any time, the Customer acting in good faith disputes an invoice or an amount shown in an invoice delivered by the Supplier, the Customer shall pay the undisputed amount (if any) of the invoice within the period required under paragraph 11.7 above. The Customer shall within seven (7) Business Days of receipt of an invoice notify the Supplier in writing if it disputes any element of the invoice with details of the amounts (Disputed Amount) and reasons for disputing the relevant part of the invoice.

> 11.12    Provided the Customer has given the notice in paragraph 11.11, the Customer may withhold payment of, and meet with the Supplier to discuss, the Disputed Amount, and will request at such meeting any additional details that it may need to verify the accuracy of the Disputed Amount within ten (10) Business Days of notifying the Supplier of the Disputed Amount. The Supplier shall comply with each such request from the Customer for additional information. If within (10) Business Days after the date on which the Customer has received the additional details requested from the Supplier, the Disputed Amount has not been agreed, then the Customer and the Supplier shall resolve the matter in accordance with the dispute resolution process set out in schedule 19 (Dispute Resolution) of this Agreement."

108.    During the course of argument, we were also referred to the termination provisions in clause 26 of the MSA and in particular clause 26.7, which provided:

> "26.7    The supplier shall have the right to serve on the Customer a written notice (Final Notice) if the Customer has failed to pay undisputed invoiced amounts which in aggregate exceed £1 million (one million pounds sterling) and which have been due and payable for a period in excess of forty five (45) days. Any such Final Notice shall itemise the undisputed invoiced amounts to which it relates and be addressed for the attention of the Chief Financial Officer of the Customer stating the Supplier's intentions to terminate this Agreement and specifically referring to this clause 26.7. If the Customer fails to pay such undisputed invoiced amounts fifteen (15) Business Days of receipt of the Final Notice the Supplier may terminate this Agreement immediately. "

## 6.2 The Judgment

109.    I have already referred above to the judge's observation about the artificiality of the arguments concerned with repudiation. That is perhaps best illustrated by Issues 3 and

Case 1:21-cv-11059-GHW   Document 182-7   Filed 08/15/23   Page 31 of 46

Judgment Approved by the court for handing down.                                    CISGIL v IBM

4. The reason why the parties invested so much time and effort in their respective arguments about the AG5 invoice is that, in July 2017, it was the non-payment of that invoice which IBM sought to rely on to terminate the MSA. If they were wrong about that, and the AG5 invoice had been validly disputed, then they accept that they were not entitled to terminate and their conduct amounted to wrongful repudiation. The judge explained that at [359]-[364].

110.    The judge set out the facts surrounding the submission of the AG5 invoice and its rejection between [284] - [299]. The critical point was that the AG5 invoice did not have a Purchase Order Number because CISGIL, through Mr Summerfield, had refused to provide one, due to his belief – subsequently upheld by the judge – that IBM were responsible for the significant delays to the Implementation Services.

111.    It is necessary to set out some of the background surrounding the provision of the AG5 invoice. The judge dealt with this in considerable detail and I have already referred above to the dangers of "island hopping". However, I consider that the following is an accurate working summary of the background to the submission of the AG5 invoice and CISGIL's response to it:

> a) By late 2016/early 2017, there were extensive delays to Project Cobalt, dealt with by the judge at [101]-[162]. The judge ultimately found that these were the responsibility of IBM.

> b) At a meeting on 14 December 2016, IBM referred to the AG5 payment of £2.9m which would become due in January 2017: [254].

> c) Mr Summerfield, the Chief Executive Officer of CISGIL, concluded at the time that "given the chronic delay in delivery of the solution and IBM's failure to deliver key milestones, payment for AG5 was not yet due": [256].

> d) In consequence of his genuine belief that IBM were not entitled to be paid AG5, Mr Summerfield took the deliberate decision to withhold a Purchase Order Number: [256], [328].

> e) In consequence, CISGIL resolved not to make the AG5 payment: the judge identified the various internal documents in which this decision was recorded at [257]-[262].

> f) It appears that IBM did not issue the AG5 invoice for some time after January because they understood that the invoice would be controversial, and that issuing it was simply "a leverage tool": [264].

> g) Eventually, the AG5 invoice, without a Purchase Order Number, was issued on 24 March 2017.

112.    On receipt of the AG 5 invoice on 27 March 2017, Ms Clough of CISGIL replied in an email in these terms:

> "Please can this invoice be resubmitted with the correct Purchase Order Number quoted on it. We cannot accept this invoice for payment without a Purchase Order Number quoted on the invoice."

The subsequent emails and minutes, including IBM's own internal email traffic, reveal that IBM were not surprised at this turn of events: [287]-[292]. In consequence, at a meeting on 9 May 2017, it was agreed that the AG5 invoice "would be added to the table of disputed invoices".

113.    At the trial, CISGIL raised a number of issues as to the validity of the AG5 invoice. The judge dealt with them at [300]-[315]. She rejected the complaints that the AG5 invoice was defective and not properly submitted.

114.    That left what the judge called at [316] "the real dispute as to the validity of the invoice", namely whether IBM were entitled to submit any invoice for AG5 in the light of its failure to achieve earlier milestones and the absence of any authorisation (in the form of a Purchase Order Number) from CISGIL. The competing considerations were these. On the one hand, Mr Summerfield genuinely believed that CISGIL's claims arising out of the delay meant that he was entitled to withhold the Purchase Order Number and that CISGIL did not have to pay the AG5 invoice. It should be noted in this regard that the judge subsequently agreed and valued CISGIL's delay claims against IBM at £15.9 million at the date of repudiation (just 3 months later), far in excess of the £2.9 million due under the AG5 invoice. On the other hand, the judge found that the AG5 payment was date-based and not linked to progress, so that CISGIL's failure to provide the Purchase Order Number was a breach of contract: see [302].

115.    There were primarily two matters for the judge by reference to clause 11.7 of Schedule 5 of the MSA (paragraph 107 above). Was the AG5 invoice disputed? And if so, was it disputed in good faith?

116.    The judge concluded that the invoice was disputed and was disputed in good faith. Her reasoning was as follows:

> "324.    Firstly, IBM is correct that Ms Clough did not challenge CISGIL's underlying liability in respect of the AG5 milestone payment; nor did she challenge IBM's entitlement to submit an invoice for the milestone; nor did she challenge the amount invoiced; nor did she assert any of the technical defects subsequently relied on by CISGIL that the Court has dismissed as unmeritorious. Ms Clough rejected the whole of the AG5 invoice on one ground alone, that was the absence of a purchase order number. I accept CISGIL's submission that under paragraph 11.11 of Schedule 5, that was sufficient notification for the purposes of placing the AG5 invoice in dispute.
>
> 325.    IBM's submission that Ms Clough did not dispute the invoice is simply wrong. Ms Clough asked for the invoice to be re-submitted with the correct purchase order number quoted but she also stated that: *"We can not accept this invoice for payment without a Purchase Order Number quoted on the invoices"*. On any sensible interpretation of those words, CISGIL disputed the invoice submitted and indicated that it would not pay it.
>
> 326.    Secondly, when this issue arose initially, IBM accepted that the invoice had been rejected and was in dispute. The invoice was credited in its internal accounting system and identified as disputed. At the CMG meeting on 3 May 2017, Steve Allen of IBM raised concern at CISGIL's failure to issue a purchase order for the

application gate 5 milestone. Ms Noakes stated that CISGIL's position was that the milestone would become due at the contracted point in the programme delivery. At the CMG meeting on 9 May 2017 it was recorded that application gate 5 would be added to the table of disputed invoices.

327. Thirdly, the invoice was disputed in good faith. IBM submits that CISGIL is not entitled to rely on the stated ground of dispute, namely, the absence of a purchase order number, because such rejection would not satisfy the requirement of paragraph 11.11 that the invoice must be disputed *"in good faith"*:

i) IBM had sought payment of AG5 and requested a purchase order for it in December 2016 but CISGIL intentionally failed to provide a purchase order number to IBM for the invoice;

ii) CISGIL chose, deliberately, not to tell IBM that it had decided not to provide it with a purchase order or to pay the invoice, or that it was disputed;

iii) CISGIL chose not to invoke the dispute resolution procedure by serving a notice on IBM with sufficient information to enable IBM to appreciate the nature of the dispute; and

iv) CISGIL acted wrongfully in that it was not entitled to withhold the purchase order.

328. Mr Summerfield of CISGIL admitted that he took a deliberate decision to withhold the purchase order number for application gate 5 because he did not consider that IBM was entitled to payment, having failed to achieve the Release 1 and Release 2 Go Live milestones. As set out above, that was wrong. IBM was entitled to the purchase order for the AG5 milestone because payment was not conditional on progress of the project. However, CISGIL's case on construction of the Roadmap, the relevant provisions of the MSA and the Implementation SOW against the relevant factual matrix, was worthy of scrutiny and could not be considered unarguable. On that basis, it was a position that was not so unreasonable that it amounted to bad faith.

329. Fourthly, there was no contractual obligation on CISGIL to forewarn IBM of its decision to withhold the purchase order for the application gate 5 milestone, to justify its decision to withhold the purchase order, or to activate the dispute resolution procedure. IBM was well aware that CISGIL did not intend to pay the AG5 milestone, as evidenced by Jonathan Smith's internal email. The purchase order had been requested and had not been issued. Both parties knew that the AG5 milestone payment was controversial; both parties had the opportunity, but failed, to use the dispute resolution procedure in respect of the matter.

330. For the above reasons, I find that CISGIL validly disputed the AG5 invoice for the purpose of paragraph 11.11 of Schedule 5, entitling it to withhold payment of the same."

**6.3 The Law**

117. There are three legal principles potentially at issue here: whether a dispute arose as to the AG5 invoice (which involves the proper construction of the email of 27 March); whether, if it did, CISGIL disputed the invoice in good faith; and whether the so-called prevention principle operated against CISGIL, so as to mean that, in some way, they should not be allowed to take advantage of their own breach of contract (in failing to provide a Purchase Order Number) when disputing the AG5 invoice.

### 6.3.1 A Dispute

118. There is a good deal of authority as to when, as a matter of law, a dispute can be said to arise between two parties. Many of the more recent cases have arisen in the field of construction adjudication, where a defendant often asserts that a notice of adjudication was given by the claiming party before a dispute had in fact arisen. The best simple summary was provided by Akenhead J in *Whitley Town Council v Beam Construction (Cheltenham) Ltd* [2001] EWHC 2332 (TCC); [2001] BLR 707, where he said that "a dispute arises generally when and in circumstances in which a claim or assertion is made by one party and expressly or implicitly challenged or not accepted."

119. Construction adjudication is also relevant to the judge's description of the overall scheme set out in paragraph 11 of Schedule 5 as being one in which, "unless CISGIL disputed the invoice in good faith in accordance with paragraphs 11.11 and 11.12, it was obligated to pay the invoice within 7 Business Days of receipt." In consequence, at [356], she referred to those provisions as "clear and unambiguous and introduced a 'pay now, argue later' principle". That is, of course, the basic principle underlying construction adjudication.

120. Since, in this case, the question as to whether or not the AG5 invoice was disputed turns, in large part, on Ms Clough's email of 27 March, reference should be made to the decision of the House of Lords in *Mannai Investment Co. Limited v Eagle Star life Assurance Co. Limited* [1997] AC 749. That case remains the leading authority on the proper approach to the construction of contractual notices. Their Lordships concluded that the construction of such notices had to be approached objectively. The question was how a reasonable recipient would have understood the notice, bearing in mind the context, and that the reasonable recipient would be aware of the terms of the contract when considering the notice. As Lord Steyn put it at 768B-C: "Thirdly, the inquiry is objective: the question is what reasonable persons, circumstance as the actual parties were, would have had in mind. It follows that one cannot ignore that a reasonable recipient of the notices would have had in the forefront of his mind the terms of the leases."

### 6.3.2 Good Faith

121. In my view, the authorities are tolerably clear that, unless the contracting party has acted in bad faith, it is difficult to see how he can be in breach of an obligation of good faith: see Lord Scott at paragraph 111 of his judgment in *Manifest Shipping Co v Uni-Polaris Shipping Co* [2003] 1 AC 469. In *CPC Group Ltd v Qatari Diar Real Investment Co* [2010] EWHC 1535 (Ch),Vos J, (as he then was) referred to conduct in breach of a good faith obligation as being "deliberate conduct by one party to a contract which frustrated the agreed common purpose of that contract", and went on to observe that "it might be hard to understand how... without bad faith there can be a breach of a duty of

good faith". These two authorities show perhaps the height of the good faith/bad faith hurdle.

122.    In *Astor Management AG v Atalaya Mining PLC* [2017] EWHC 425 (Comm), Leggatt J (as he then was) referred to the duty to act in good faith as reflecting "the expectation that the contracting party will act honestly towards the other party and will not conduct itself in a way which is calculated to frustrate the purpose of the contract, or which could be regarded as commercially unacceptable by reasonable and honest people". A similar test of fidelity to the parties' bargain was utilised by Teare J in *New Balance Athletics Inc v Liverpool Football Club and Athletic Grounds Ltd* [2019] EWHC 2837 (Comm).

123.    The most recent decision grappling with this issue, decided after the judgment in the present case, is *Times Travel (UK) Limited and another v Pakistan International Airline Corporation* [2021] UKSC 40; [2021] 3 WLR 727, which was concerned with bad faith in the context of lawful act economic duress. The Supreme Court said a 'bad faith demand' would not be one simply motivated by commercial self-interest; it would be motivated by reprehensible or unconscionable conduct, such as where the party making the demand does so in the knowledge that it did not have the legal entitlement to which it claims.

### 6.3.3 The Prevention Principle

124.    In *Alghussein Establishment v Eton College* [1988] 1 WLR 587 it was held that there was a rule of construction based on the presumption that a party to a contract could not be permitted to take advantage of his own wrong as against the other party. The case itself turned on the construction of a proviso in a lease which, if construed literally, would have led to a "bizarre result" but which was avoided by the application of the rule of construction.

## 6.4  Discussion

125.    The judge found that, in accordance with clause 11.7 of Schedule 5, CISGIL disputed the AG 5 invoice in good faith, and that, in consequence, IBM could not rely on the non-payment of that invoice to justify termination. For the reasons set out below, I respectfully agree with that conclusion.

126.    The first issue is whether or not the AG5 invoice was disputed by CISGIL. In my view, it was. Ms Clough's email (paragraph 112 above) said expressly that CISGIL "cannot accept this invoice for payment". To use Akenhead J's test in *Whitney Town Council*, a claim had been made by IBM in the form of the invoice, and that claim was expressly not accepted by CISGIL because of the absence of the Purchase Order Number. There was therefore, in the plainest terms, a dispute as to the AG 5 invoice.

127.    IBM's suggest that CISGIL did not dispute the invoice, because they did not use the word "dispute" or similar in Ms Clough's email, and/or did not trigger the dispute machinery under clause 11. I consider those submissions to be untenable. Neither was necessary for there to be a dispute in law. Similarly unrealistic is IBM's attempt to characterise Ms Clough's email as "simply (making) an administrative request for the invoice to be resubmitted with a Purchase Order". That is not what the email said.

128.   These arguments not only ignore the common sense approach to the meaning of
       "dispute" outlined by Akenhead J, but are also contrary to what Lord Steyn said in
       *Mannai*, where he deprecated the overly-technical approach to the construction of
       notices. One of his reasons was the proposition that a reasonable recipient of the notice
       would have the terms of the contract well in mind. Paragraph 11.4 (b) of Schedule 5
       required, as IBM would have known, a unique Purchase Order Number for every
       invoice. IBM would therefore also have known that Ms Clough was referring to and
       relying on an express contractual requirement with which IBM had not complied.

129.   This also answers IBM's attempt to differentiate between Ms Clough, an accounts
       clerk, on the one hand, and those making the decisions for CISGIL higher up the
       management chain, such as Mr Summerfield, on the other. The argument is, I think,
       that because Ms Clough did not know the reason why the Purchase Order Number had
       been withheld, she was not in a position to dispute the invoice on its merits. So, it is
       said that if the email raised a dispute, that was entirely accidental.

130.   In my view, that submission is untenable. The invoice went to Ms Clough because she
       was responsible for the email address (in the CISGIL accounts department), to which
       the contract required all invoices to be sent. Ms Clough was simply doing her job,
       notifying IBM that the invoice could not be accepted for what might be called an
       accounting reason: because it did not contain the contractually required information.
       There is no relevance in the fact that Mr Summerfield had not shared with her the reason
       why there was no Purchase Order Number, particularly given that Mr Summerfield did
       not know that the AG5 invoice had been sent at all because, contrary to their usual
       practice, IBM did not send a copy of the invoice to CISGIL's management.

131.   Finally on the question of whether or not there was a dispute, there is a complaint that
       the judge wrongly had regard to the wider evidence that showed that IBM were
       unsurprised at the time that the invoice was disputed, and agreed to include the AG5
       invoice on the list of disputed invoices. Again, I reject that criticism. The judge
       construed the email of 27 March objectively, in accordance with the relevant principles.
       But any judge doing such an exercise should test their construction, to see if it reflected
       the way in which it was actually understood by the parties. Here the judge's
       interpretation passed the reality check: IBM expected, and were therefore unsurprised
       by, the non-payment of the AG5 invoice. It is absurd for IBM to seek to construe the
       email as meaning that the invoice was not disputed, when they knew that it would be,
       and that it was.

132.   For these reasons, I conclude that the judge was right to find that the invoice was
       disputed.

133.   The second issue is whether CISGIL acted in good faith. I consider that the judge found
       on the facts that they did so act, and there is no permission to open up her findings of
       fact. As a result of that, and in the light of the proper concessions made by Mr Tozzi on
       behalf of IBM, it does not seem to me to be possible for this court to reach any other
       view.

134.   The starting point is IBM's concession at paragraph 43 of their skeleton argument that
       no individual acted dishonestly or in bad faith. It has never been suggested that Ms
       Clough acted in bad faith when she sent her email which, for the reasons already given,
       disputed the AG5 invoice in accordance with the contractual machinery. If no-one acted

in bad faith, I do not consider that, in these circumstances,  there can have been a breach of the obligation to dispute invoices in good faith: see paragraph 121 above. I specifically reject the suggestion that, in some way, Ms Clough could somehow be in breach of the good faith obligation even though it is accepted that she did not act in bad faith.

135.   As for Mr Summerfield, who had refused to authorise a Purchase Order Number, the judge expressly found that he was acting in good faith: see [328]. Although he was ultimately wrong to believe that the AG5 invoice could be disputed because of CISGIL's significant delay claims against IBM, CISGIL's case to the contrary "was worthy of scrutiny and could not be considered unarguable".

136.   There was also a suggestion that Ms Clough in her email should have articulated Mr Summerfield's reasons for withholding the Purchase Order Number, and that her failure to do so was a sign that, as Mr Tozzi put it, CISGIL were "playing games" and not acting in good faith. Leaving aside my view that such an argument is contrary to the judge's findings of fact, I have already rejected the attempt to differentiate between the conduct and knowledge of Ms Clough, on the one hand, and Mr Summerfield, on the other. In any event, this is far too artificial an argument to found an allegation of bad faith. Ms Clough did not need to know why the Purchase Order Number had not been given: she simply knew that it had not been, and that therefore the invoice could not be accepted. There was no question of "playing games"; she was simply doing her job in the accounts department.

137.   It is clear that the judge found that CISGIL acted fairly and honestly towards IBM and did not conduct itself in a way which was calculated to frustrate the purpose of the contract or act in a way that was commercially unacceptable: see the test in *Astor Management* and *New Balance Athletics*. There was no intentional or objectively reprehensible conduct. In the circumstances, I conclude that there is no room for a good faith challenge.

138.   The highest that IBM can put it is that, whilst Mr Summerfield genuinely believed that he was entitled to refuse to authorise a Purchase Order Number because he did not consider that any payment was due as a result of IBM's significant and ongoing delays, the judge found that, on a proper construction of the contract, although his interpretation was "worthy of scrutiny and could not be considered unarguable", it was wrong. The sum was due anyway, subject to CISGIL's right to assert their own complaints about IBM's delay. But that argument would elevate a breach of contract into an automatic failure to act in good faith. That is emphatically not the law.

139.   In applying *Pakistan International*, the real question may be said to be whether Mr Summerfield did not genuinely believe that CISGIL was entitled to refuse to pay the AG5 invoice. On the approach of the Supreme Court, that could have amounted to bad faith. But that has never been asserted by IBM, let alone found by the judge. Indeed, the judge expressly found the opposite: that Mr Summerfield genuinely believed that he was entitled to do what he did and that his stance could not be considered unarguable. Furthermore, the underlying merits were with CISGIL; the delays which were the cause of all the problems were, on the judge's findings, IBM's responsibility.

140.   For all these reasons, therefore, I reject the attempt by IBM to reopen the argument as to good faith.

141.   That leaves the so-called prevention principle. It is difficult to see how this rule of construction can arise here, which may explain why it was not argued before the judge. Given that the invoice was disputed and that CISGIL acted in good faith, it follows that CISGIL complied with clause 11.7. That leaves no room for the prevention principle, which simply provides that a contract should not be construed in a way that allows the contract-breaker to take advantage of his own breach. In any event, that does not arise here, since clause 11.7 is straightforward and, on the judge's findings, CISGIL complied with it.

142.   In reality, what IBM are seeking to do is to say that there was some sort of implied term that, even if CISGIL disputed the invoice, and even if they acted in good faith, they should be treated as if they had not so acted, because they were wrong about their legal entitlement to challenge the invoice. It is, in reality, an attempt to circumvent the good faith requirement altogether by arguing that, if Mr Summerfield's reasons for withholding the Purchase Order Number were legally incorrect, then the invoice should have been treated as unchallenged.

143.   No basis for such an implied term has ever been advanced. It would give rise to all sorts of fundamental objections: it is not necessary to give the contract business efficacy; it would alter the balance of risk and entitlement under the contract; and it would unjustifiably rewrite the existing clause. Such a situation seems to me to be a country mile away from the prevention principle as articulated in *Alghussein Establishment*.

144.   Accordingly, I reject IBM's submission about the prevention principle. It has no application in the present case, given CISGIL's compliance with the contract.

## 6.5  Conclusion on Issue 3

145.   For these reasons, I would uphold the judge's decision in respect of the disputed AG5 invoice. I therefore find for CISGIL on Issue 3. That makes Issue 4 academic. However, in deference to the arguments we heard, I address it in brief terms in the next section of this judgment.

## 7  ISSUE 4: SET-OFF

## 7.1  The Clauses

146.   The relevant clauses are those set out in paragraph 107 above, dealing with challenges to invoices. It is common ground that there was no provision anywhere within the MSA which explicitly addressed set-off either by way of confirming or enhancing existing common law of equitable rights of set-off, or by way of purported exclusion of such rights.

## 7.2  The Judgment

147.   As I have said, the judge concluded that CISGIL had disputed the AG5 invoice within 7 Business Days and acted in good faith, which therefore meant that IBM were not entitled to rely on the non-payment of the invoice in terminating the contract. CISGIL's alternative argument, that it was entitled to rely on its equitable set-off to justify withholding payment of the AG5 invoice (thereby providing it with another way to allege repudiation on the part of IBM) was therefore academic. But it was rejected by

the judge in any event. She accepted at [328] that CISGIL's claims against IBM for culpable delay in failing to achieve key milestones gave rise to an equitable set-off. She recorded CISGIL's argument at [343] that, in the absence of any terms excluding a right to set-off, it asserted a valid right to set-off as a ground for disputing payment of the AG5 invoice. She also recorded IBM's response at [344] that the mechanism for challenging that invoice was clear and unequivocal and no set-off was asserted within the 7 Business Day period.

148.   The judge's conclusion was plain. She said:

> "345.   IBM's construction is clearly correct to the extent that paragraph 11 of Schedule 5 provided a complete and mandatory code for disputing the validity or content of an invoice. If, contrary to the Court's finding above, CISGIL had failed to dispute the AG5 invoice within seven days of receipt, it would have been precluded from challenging IBM's contractual entitlement to payment. However, the Court must also address the question as to whether CISGIL could nonetheless assert an equitable right of set-off against any such contractual entitlement to payment; that is, whether the right of set-off was excluded on a proper construction of the MSA"

149.   The judge acknowledged the presumption that the parties had retained all remedies for breach of contract, including any equitable rights of set-off, because they were not excluded: see [351]. However, she then referred to clauses 11.7, 11.11 and 11.12 of Schedule 5 and concluded:

> "356. The effect of those paragraphs, read together, was clear and unambiguous and introduced a 'pay now, argue later' principle. They did not exclude any right of set-off; CISGIL would retain its right of set-off against future payments due and would retain its right to counterclaim for damages; but the paragraph 11 provisions restricted the exercise of such set-off rights against invoices to those in respect of which a valid notice of dispute had been given within seven days.
>
> 357. CISGIL has a further argument that it could rely on equitable set-off, not to reduce or extinguish the AG5 Invoice, but to bar IBM's right to rely on it by serving a Final Notice under clause 26.7 and thereafter terminating the MSA. However, that ignores the wording of clause 26.7, which permitted IBM to issue a Final Notice in circumstances where CISGIL failed to pay undisputed invoiced amounts. If CISGIL was unable to rely on set-off so as to render the AG5 invoice a Disputed Amount, IBM was entitled to issue a Final Notice. IBM's entitlement to terminate was triggered by the failure of CISGIL to pay those undisputed amounts within fifteen days of receipt of the Final Notice.
>
> 358.   For the above reasons, if, contrary to the Court's finding above, CISGIL had failed to dispute invoice AG5 within seven days as required by paragraph 11.11 of Schedule 5, it would have lost its right to rely on any equitable set-off to justify withholding payment in respect of that invoice and to prevent IBM relying on clause 26.7 to exercise its right to terminate. "

## 7.3  The Law

150.    There were two strands of authority, primarily relied on by CISGIL, in support of their contention that the judge was wrong to conclude that they were not entitled to rely on equitable set-off. The first line of authorities are those set out in paragraphs 34-37 above, to the effect that, if an otherwise existing contractual right was to be excluded (in this instance, the right to set-off), the relevant clause needed to spell that out. That was recently confirmed specifically in relation to set-off by Lord Leggatt in *Triple Point Technology Inc v PTT Public Company* [2021] UKSC 29 at [106]-[113].

151.    The second line of authority was concerned with the nature of equitable set-off. In *Fearns (t/a Autopaint International) v Anglo-Dutch Paint and Chemical Co. Limited & Others* [2010] EWHC 2355 (Ch), [2011] 1 WLR 366, George Leggatt QC (as he then was) explained the nature of equitable set-off. He said at [25] he did not think it was right to regard either the existence or the exercise of a right to equitable set-off as having the effect of extinguishing or reducing the liability of either party to the other. He went on to say:

> "30.    This line of cases shows that in order for an equitable set-off to arise it is not necessary that the claim which is relied on as a set-off should be valid (on a true analysis of the law and the facts) but only that the claim should be asserted reasonably and in good faith. This being so, it cannot be the case that the exercise of a right of equitable set-off has the effect of extinguishing or reducing the other party's claim; otherwise a liability could be extinguished by a cross-claim which, although asserted reasonably and in good faith, turned out to be invalid…
>
> 33.    From these different lines of authority I therefore conclude that, where A has a claim against B which A is entitled in equity to set off against a claim made by B against A, neither the existence nor the exercise by A of this right of equitable set-off has the effect of extinguishing or reducing either claim.
>
> 34.    This conclusion also seems to me to be in accordance with both policy and principle. If the mere existence of a right of set-off, even if not exercised, had the effect of extinguishing or reducing the cross-liabilities, this would produce great uncertainty and injustice. For example, it would allow a party who failed to make payments under a contract and offered no excuse for the default, whereupon the other party terminated the contract, to argue subsequently that the termination was wrongful because of a set-off of which no mention had been made (and of which both parties might even have been unaware) at the time. It would be equally damaging to commercial certainty if it were the law that the assertion of a set-off has the effect of retrospectively reducing or extinguishing the cross-claims.
>
> 35.    A rule that the assertion of an equitable set-off has the effect of extinguishing the cross-claims, whether retrospectively or prospectively, would be contrary to principle. In principle, a tender of payment is only effective to extinguish a liability if the recipient agrees to accept it in discharge of the liability. There must, in the old language of pleading, be accord and satisfaction. Thus, if a debtor tenders payment of the debt but the tender is rejected, the debt is not discharged (though if the creditor subsequently sues, the debtor may have a defence of tender before claim). This applies whatever

the form of payment tendered, including therefore where what is offered as satisfaction is discharge of a cross-claim. I accordingly do not see how asserting a cross-claim, however closely connected, in set-off of a liability can have the effect of discharging the liability in the absence of agreement."

## 7.4 Discussion

152.    In my view, for the reasons noted below, the judge was right to reject this aspect of CISGIL's case.

153.    Mr Thanki's basic propositions were that i) there was a difference in law between disputing the invoice and raising a set-off; ii) any assertion of a set-off by CISGIL did not amount to disputing the claim on the invoice; and iii) in law the assertion of a set-off was the equivalent of tendering payment for the invoiced sum. For these reasons, he said, the failure to assert the set off within 7 Business Days was not a failure under clause 11 of Schedule 5. As a matter of construction of the contract, however, I do not think that these propositions address the real issue.

154.    In my view, the judge was right to find that the payment provisions of the MSA, and in particular Schedule 5, created a clear mechanism by which CISGIL had to notify IBM whether or not they were going to pay the invoice concerned. They had a very short period of time – 7 Business Days – in which to set out that objection. The detailed requirements as to notification of disputes, and the truncated timetable in which such notices were required, borrow heavily from the Housing Grants (Construction and Regeneration) Act 1996 ("the 1996 Act") and the subsequent *Scheme for Construction Contracts* (SI 1998/649). The whole purpose of such provisions is to allow the claiming party to know within a short period whether its claim is agreed or not. Hence the requirement here for the paying party to notify the claiming party within 7 days if it was going to pay or withhold payment and, if the latter, to explain why.

155.    Under the 1996 Act and the Scheme, after an initial reluctance to move too far from conventional principles as to set-off as outlined by Mr Thanki in this case (see by way of example *Parsons Plastics (Research and Development) Ltd v Purac Ltd* [2002] BLR 334, CA), it was generally established that any proposed defence/set-off which the paying party wished to assert to justify non-payment of the sum claimed had to be asserted at the time, or the sum claimed would be due (see *Rupert Morgan Building Services (LLC) Ltd v Jervis* [2004] 1 WLR 1867, CA). In general terms, therefore, nice distinctions between abatement and set-off no longer mattered. The whole purpose of the payment provisions was to ensure that both parties knew where they stood: to avoid the situation where a claiming party's invoice was not paid; that party started proceedings and sought summary judgment; and then and only then was met by the paying party's set-off and counterclaim.

156.    As a matter of construction, anyone reading Schedule 5, with a knowledge of the other terms of the contract and a knowledge of the applicable law, would immediately appreciate that this was "cards on the table" territory. You either paid up and argued later, or you used the short period of time available to explain why you were not paying any money to the other side, despite the existence of the invoice. To suggest that the informed reader would know that this clause only dealt with a dispute about the invoice on its own terms, and that it did not require the paying party to give any details within the 7 Business  Days of any purported set-off (even if the set-off was the reason why

Case 1:21-cv-11059-GHW   Document 182-7   Filed 08/15/23   Page 42 of 46

Judgment Approved by the court for handing down.                                    CISGIL v IBM

the invoice was not paid) is, I think, artificial and, in the twenty-first century, commercially unrealistic. As the judge found, such a distinction would be contrary to the clear provisions of Schedule 5.

157.    There is also the reference in clause 26.7 (paragraph 108 above). That refers to IBM's right to serve a Final Notice in circumstances where CISGIL "has failed to pay undisputed invoiced amounts which in aggregate exceed £1m and which have been due and payable for a period in excess of 45 days". Mr Thanki argued that his case on set-off was not inconsistent with that provision because the equitable set-off meant that CISGIL had not "failed to pay" the invoice. In my view, that is a wholly unrealistic construction of the words, which link a dispute about invoices to a failure to pay them. If X gives Y an invoice, and Y does not assert a set-off in the prescribed time and does not pay it, he has failed to pay an undisputed invoiced amount.

158.    Mr Tozzi also made the fair point that, in *Fearns v Anglo-Dutch Paint and Chemical Co. Limited & Others* at [21] the judge said that his discussion about equitable set-off was based on the assumption that the set-off has been "properly asserted". In the present case, that must mean an assertion in order to ensure that a particular invoice which would otherwise have been payable was legitimately not paid. Although Mr Thanki said that CISGIL had asserted their set-off prior to termination (and that therefore IBM were aware of the existence of the asserted set-off before they attempted to terminate), this does not get around the construction difficulty. If Mr Thanki's construction is right, IBM could, in other circumstances, have purported to terminate for non-payment of an invoice, only to discover that CISGIL had a set-off which, although they had not asserted it, they now endeavoured to rely on because their right so to do had not been excluded. I do not accept that that is a sensible or commercial outcome.

159.    I have some residual sympathy with Mr Thanki's underlying submission that, if it had been intended to exclude a right to set-off, that should have been made clearer. But that suggestion ignores the developments in commercial law (not just construction law) engendered by the 1996 Act. It is also an argument which, in the final analysis, tilts at windmills. The right to set-off was not excluded. On this construction, it was simply folded into the right and obligation to challenge an invoice within 7 Business Days and to spell out the reasons for the non-payment. CISGIL's primary liability was to pay the invoice: as Mr Tozzi rightly pointed out, the words in Schedule 5 are "shall pay". If CISGIL were not going to comply with the obligation to pay, they needed to say why not. If that was because of a claimed set-off, they needed to set that out. They did not do so within the required 7 days after 24 March; the right to set-off was only asserted on 12 May 2017. That absence of challenge meant that the purported set-off could not justify the non-payment of the AG5 invoice.

## 7.5  Conclusion on Issue 4

160.    For the reasons set out above, although it is academic, I would have decided Issue 4 against CISGIL. The judge was right to find that they could not rely on set-off as a reason for withholding payment.

## 8  ISSUE 5: CAUSATION

161.    I can take Issue 5 more shortly, not because of judgment fatigue, but because I am in no doubt that IBM's belated causation argument is untenable.

162. IBM seek to say that CISGIL's parent company, the Co-Op Group, changed its strategic direction after the repudiation of the contract, and went on to sell CISGIL to a third party, Markerstudy. Thus, they contend, the claim for wasted expenditure must fail, because the cause of the wasted expenditure was not their repudiation of the contract, but the unrelated strategic change of direction. Putting the same point in a different way, they say they have rebutted the presumption that CISGIL would have recouped its costs if the contract had gone ahead, and shown instead that the costs would always have been wasted.

163. The first insurmountable difficulty with this new case on causation was that it was never pleaded. There is no breath of it anywhere in any of IBM's pleaded documents. Although Mr Tozzi made a game attempt to suggest that paragraph 54 of IBM's Reply to Defence Counterclaim covered the point, it plainly did not do so.

164. The sequence was this. At paragraph 53(a) of their Defence, IBM took the point dealt with under Issue 1, that CISGIL's claims were not for wasted costs but were "disguised claims for loss of profit or revenue and are thereby excluded by clause 23.3 of the MSA." In response to that, at paragraph 55.2 of CISGIL's Reply, CISGIL alleged that they were entitled to claim wasted expenditure "as a proxy for the damages to which the claimant is entitled in order to put it in the position it would have been in had the contract been performed". In reply to that, at paragraph 54 of the Reply to Defence to counterclaim, IBM said:

> "As to paragraph 55.2: had the project been successful, it would not have resulted in any increase in the claimant's profitability or revenues; consequently the principle of law to which the claimant refers has no application."

165. Accordingly, IBM did not plead that CISGIL would have wasted this expenditure anyway, let alone that this was the result of events which occurred after IBM's repudiation of the contract.

166. The causation argument was therefore never an issue at trial. That explains why it was not part of IBM's opening submissions, nor a part of either party's list of issues provided at the outset of the trial, nor a part of the judge's own list of issues at [191] of the judgment.

167. Cases like this are complicated and difficult to try. Judges are entitled to proper assistance from the extensive legal teams mustered for trial to identify what issues they are being asked to decide. The conventional place for those issues to be identified is the pleadings. The pleadings shape the subsequent evidence and provide the agenda for the trial. The failure on the part of IBM to plead this potentially crucial point meant that it was much too late for the point to be raised for the first time in IBM's closing submissions at the end of the case. CISGIL immediately objected to it for this reason (along with others, explored below).

168. At paragraphs 541-550 of IBM's closing submissions, the point was taken for the first time that, by reference to some short passages of Mr Summerfield's evidence, CISGIL could not establish that the costs were wasted by reason of the termination. This relied on the subsequent sale to Markerstudy, coupled with the suggestion that this sale occurred because of a different strategy being pursued by CISGIL's parent company, which wanted to get out of capital-intensive business.

169.   In their response closing submissions, at paragraphs 162-172, CISGIL objected to this new causation point for a variety of reasons. They pointed out that it was neither pleaded nor opened, and was "a belated attempt to discharge the burden of proof that lies on a defendant faced with a wasted costs claim to prove that that the MSA would not have been a profitable one for CISGIL even if IBM had fully performed it". CISGIL said that "it is far too late for IBM to attempt to run this case". They described the new argument as "hopelessly speculative", making the point at paragraph 164 that the point assumed "that the same transaction would have taken place on the same terms if the project had been successful". They submitted that there was no basis for such an assumption. They also made the point that there was no real evidence about what Markerstudy intended to do with CISGIL and their business (and IT system).

170.   There the matter rested. IBM did not seek to amend their defence or raise the matter with the judge during the period between the completion of the written closing submissions and the provision of her judgment. In her judgment, the judge decided the issues which had been referred to her at the outset of the trial, and not this late and disputed add-on. That also gives rise to the further difficulty that none of the judge's findings are challenged on appeal. That means that this unpleaded causation point was the subject of oral submissions for the first time in this court. That is unsatisfactory for all sorts of reasons.

171.   To my surprise, at paragraph 61 of IBM's skeleton argument, the suggestion is made that the judge did not deal with this issue because of her conclusion about the applicability of clause 23.3. That is wrong. Notwithstanding her conclusion on clause 23.3, the judge went on to deal in detail with the quantum of the wasted expenditure, in case she was wrong about her construction of clause 23.3. It is misleading now to say that the judge did not deal with the last-gasp causation point because of her conclusions on the construction of clause 23.3: she did not deal with it because it had not been pleaded, not properly addressed in the evidence, and was never an identified issue in the case.

172.   During the course of his submissions, Mr Tozzi complained that it was unfair to criticise IBM for the late raising of the point. He said that CISGIL had refused to give disclosure of the post-repudiation documents, because they said they were not relevant, and that it was only when Mr Summerfield gave oral evidence that IBM had the opportunity to cross-examine him about the events which led to the sale of CISGIL to Markerstudy.

173.   I am afraid that I do not accept any of that. On the face of it, CISGIL were right to say that the post-repudiation documents were irrelevant. IBM had pleaded no issue which made them relevant. As CISGIL pointed out at paragraph 160 of the response submissions (previously referred to at paragraph 169 above), the solicitors' letter seeking those documents, and a raft of other documents too, was an obvious 'fishing' exercise which, having been rejected in correspondence, was not pursued further. If IBM had genuinely believed that the documents relating to the proposed sale were or might be relevant, it was open to them to make an application for specific disclosure, explaining how and why these documents mattered. That was particularly so, given that the announcement of the proposed sale to Markerstudy was made publicly a year or more *before* the trial started. It was not open to IBM to wait until cross-examination, without any of the relevant documents, and hope that something might turn up.

174.    The evidence on which IBM now seeks to rely was very vague. There was no detail as to what Markerstudy intended to do with CISGIL after acquiring it, beyond an earlier indication that they would migrate CISGIL's business to its own platform. Mr Summerfield was not involved in the detail; indeed, at the time of the trial, the sale had not yet happened. But Markerstudy's detailed intentions were directly relevant to whether or not the earlier expenditure could be said to have been wasted.

175.    Further, there was a more fundamental difficulty with the new causation argument, also raised expressly at paragraphs 164 onwards of CISGIL's response submissions. We were shown the short passages of evidence on which Mr Tozzi now relies. The questions that were put to Mr Summerfield concerned what actually happened after IBM's repudiation of this contract, which had gone so wrong. In one sense, the most helpful answer to IBM given by Mr Summerfield was not in cross-examination, but in answer to a question in re-examination, and even that answer was subsequently qualified.

176.    What was not explored with Mr Summerfield (or any other witness) was what the position would have been if IBM had not repudiated the contract and had instead performed as everyone expected. I agree with Mr Thanki that that was the relevant counterfactual (a point made at paragraph 165 of CISGIL's response submissions). As noted above, CISGIL's claim for damages is predicated on the assumption that the contract had been performed. Thus what matters is what, if anything, CISGIL would have done following the successful completion of the IT contract by IBM. Then the relevant questions would have been: would the company have been sold at all? If so, to whom? On what basis? And at what price? Most critically of all: would the successful purchaser have scrapped the new, improved, profit-generating IT system in favour of its own?

177.    None of those matters were explored at the trial. Nor could they have been, because there was no evidence (either factual or expert) dealing with that counterfactual. Such evidence as there was indicated that, if the contract had been performed, CISGIL's profit would have increased by around £4 million a year, so CISGIL might therefore have been retained, or sold for a much greater sum: see Mr Summerfield's evidence on day 6, page 184 of the transcript, lines 7-15. Beyond that, there was nothing. It would be grossly unfair now to conclude that CISGIL's claims should fail in total, not only by reference to a point that was never pleaded, but by reference to evidence that was never assembled, let alone tested.

178.    Accordingly, I reject IBM's belated case on causation. Had it been pleaded, and had there been relevant evidence about it, and had the judge reached detailed conclusions on that evidence, the position might be different. In the absence of all those things, this argument is not open to IBM.

179.    For these reasons, therefore, I reject IBM's case on Issue 5.

## 9.  SUMMARY

180.    If my Lords agree, I would allow the appeal and find, following my conclusions on Issues 1 and 2, that the sum of **£80,574,168** is due to CISGIL. I would dismiss IBM's cross-appeal (Issues 3 and 5), and the alternative argument as to set-off raised by CISGIL in response (Issue 4).

181.    Although I have disagreed with the judge on the important issue concerning the proper construction of the exclusion clause, I note that the remainder of her findings of fact and conclusions of law have either not been challenged on appeal, or have been upheld by this court. I should like to pay tribute to the organisation and clarity of her lengthy judgment.

**LORD JUSTICE PHILLIPS:**

182.    I agree.

**MR JUSTICE ZACAROLI:**

183.    I also agree.