# EXHIBIT 8



<u>Neutral Citation Number: [2022] EWCA Civ 1371</u>

Case No: CA-2021-000720

**IN THE COURT OF APPEAL (CIVIL DIVISION)**
**ON APPEAL FROM THE HIGH COURT OF JUSTICE**
**BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES**
**COMPANIES COURT (ChD)**
**Mr. Justice Adam Johnson**
**[2021] EWHC 787 (Ch)**

Royal Courts of Justice
Strand, London, WC2A 2LL
Date: 21 October 2022

Before :
**LORD JUSTICE NEWEY**
**LADY JUSTICE CARR**
and
**LORD JUSTICE SNOWDEN**

- - - - - - - - - - - - - - - - - - - - -

**IN THE MATTER OF COMPOUND PHOTONICS GROUP LIMITED**
**AND IN THE MATTER OF COMPOUND PHOTONICS UK LIMITED**
**AND IN THE MATTER OF THE COMPANIES ACT 2006**

Between :
**(1) MARK FAULKNER**      **Petitioners/**
**(2) JONATHAN SACHS**      **Respondents**
**(3)-(70) THE MINORITIES**
**(As listed in Schedule 1 to the Petition)**
- and -
**(1) VOLLIN HOLDINGS LIMITED**      **Respondents/**
**(2) MINDEN WORLDWIDE LIMITED**      **Appellants**
**(5) ALDON INVESTMENTS LIMITED**

- - - - - - - - - - - - - - - - - - - - -

**Andreas Gledhill KC and Donald Lilly** (instructed by **Allen & Overy LLP**) for the
**Appellants Vollin and Aldon**
**Mark Rainsford KC** (instructed by Direct Access) for the **Appellant Minden**
**Robin Hollington KC and Adrian Pay** (instructed by **Mishcon de Reya LLP**) for the
**Petitioners/Respondents to the Appeal**

Hearing dates : 4-6 May 2022
- - - - - - - - - - - - - - - - - - - - -

# Approved Judgment

*Remote hand-down:* This judgment was handed down remotely at 10.00am on 21 October 2022 by circulation to the parties or their representatives by e-mail and by release to the National Archives.

**Lord Justice Snowden :**

Index to judgment                                                                       Paragraph number

A.    Introduction                                                                      1

B.    Factual Background                                                               9

C.    The terms of the 2013 SHA and 2013 Articles                                      75

D.    The arguments of the parties at trial                                            93

E.    The Judge's analysis of the law and the parties' bargain                         97

F.    The Judge's application of the law to the facts                                  122

G.    The central issues on the appeal                                                 142

H.    The meaning of clause 4.2 of the 2013 SHA                                        147

I.    The parties' bargain                                                             243

J.    Was the 2013 SHA part of the Company's constitution?                             277

K.    Were the Minorities unfairly prejudiced?                                         287

L.    The Respondents' Notice                                                          336

M.    Disposition                                                                      341

A.    Introduction

1.    This is an appeal against the decision of Mr. Justice Adam Johnson ("the Judge") given in a detailed judgment after a four week trial of an unfair prejudice petition under section 994 of the Companies Act 2006 ("section 994" and "the 2006 Act"). The Judge ordered the Appellants ("Vollin", "Minden" and "Aldon", together "the Investors") to buy the shares of the Petitioners ("Dr. Sachs", "Mr. Faulkner" and 68 other shareholders, together "the Minorities") in Compound Photonics Group Limited ("CPGL" or "the Company") at a value to be determined.

2.    The core of the case for the Minorities, which the Judge accepted, was that they had been unfairly prejudiced by the Investors when Dr. Sachs and Mr. Faulkner were respectively forced to resign and removed from office as directors and thereby excluded from any continuing role in the management of the Company.

3.    It was, however, common ground that the Company was not a "quasi-partnership" company to which any equitable considerations of the type identified by Lord Hoffmann in O'Neill v Phillips [1999] 1 WLR 1092 might apply. Instead, the Judge accepted that, in excluding Dr. Sachs and Mr. Faulkner, the Investors had acted in breach of the terms of a shareholders' agreement relating to the Company. The Judge

also found that the directors nominated by the Investors had acted in breach of their duties to the Company under sections 171(a) and 172 of the 2006 Act.

4.    At the heart of the Judge's decision was the finding that the shareholders' agreement and the Company's articles comprised a "constitutional settlement" reached between the shareholders under which (i) Dr. Sachs and Mr. Faulkner were entrenched in office as directors; and (ii) even though the Investors had provided very substantial capital for the Company's business and as a result held 93% of the shares, if they voted in favour of removing Dr. Sachs or Mr. Faulkner from office or sought to obtain control of the board, that would be a breach of contract.

5.    There were, however, no express terms of the shareholders' agreement to that effect. The central component of the Judge's reasoning in this regard was the meaning that he gave to a clause in the shareholders' agreement under which the shareholders undertook to each other and to the Company that they would at all times act "in good faith" to each other in relation to the matters contained in the agreement.  In interpreting that clause, the Judge adopted the formulation of HHJ Klein in Unwin v Bond [2020] EWHC 1768 (Comm) of what were described as "minimum standards" of conduct required by a contractual good faith clause.

6.    The Judge held, in particular, that the good faith clause required the Investors to act "with fidelity to the bargain", and that the bargain that the Investors had made was "expressly designed to avoid the will of the majority prevailing in matters concerned with the commercial future of the Company".  The Judge also held that the contractual duty of good faith included an obligation upon the Investors to deal "fairly and openly" with Dr. Sachs and Mr. Faulkner, and to take account of the interests of the Minorities as well as their own interests.

7.    The Investors appeal, essentially on the basis that the Judge interpreted the "good faith" clause in the shareholders' agreement far too widely.  The Investors contend that the clause did not mean that they had given up the right to vote to remove Dr. Sachs and Mr. Faulkner or take control of the management of the Company in which they were very substantial investors and majority shareholders; and neither did it impose upon them any duties of procedural fairness or require them to take into account the interests of the Minorities when deciding how to exercise their right to vote as majority shareholders.

8.    On the facts, the Investors rely on the finding by the Judge that they had genuinely and reasonably formed the view that it was necessary for Dr. Sachs to cease to be involved in the management of the business for the good of the Company.  On that basis they contend that they did not act in breach of their obligation of good faith when they required the resignation of Dr. Sachs as a condition of providing the substantial further financial investment that the Company needed.   The Investors also deny any wrongdoing by themselves or their nominee directors when they subsequently assumed control of the management of the Company's business and removed Mr. Faulkner as a director.

B.    Factual Background

9.    The factual background is set out in considerable and lucid detail at paragraphs 1 to 333 of the Judgment.  Although the Investors challenge a number of the characterisations

and legal conclusions that the Judge drew, there was no direct challenge to any of his findings of fact. What follows is therefore a simplified (and necessarily incomplete) overview of some of the key events for the purposes of understanding the legal issues arising on this appeal.

10.    The Company and its subsidiary, Compound Photonics UK Limited ("CPUK") were the vehicles for the intended development and commercialisation of academic research by Dr. Sachs into gallium arsenide and liquid crystal technology. The Company was formed in 2009 to become the holding company of CPUK, which had been formed in 2006. The focus of the plan was to develop, manufacture and sell a very small ("Pico") projector.

11.    Dr. Sachs was Chief Executive Officer ("CEO") of the Company and an employee of CPUK, and had day-to-day control of the business of the two companies. The Judge described Dr. Sachs as the man whose vision for the exploitation of the technology the Minorities had bought into when investing in the Company: or, more colourfully, as Mr. Faulkner had said in evidence, Dr. Sachs was "*the jockey they were backing*".

12.    Mr. Faulkner was an independent financial adviser, who was the non-executive Chairman of the Company. In his role as financial adviser, Mr. Faulkner had originally introduced the other Minorities to CPUK as shareholders.

13.    Vollin and Aldon are part of an investment structure of which the beneficial owners are Dr. Alexander Abramov and Dr. Alexander Frolov, two Russian businessmen who made substantial sums on the public listing of EVRAZ plc, a mining and metals business. Together, Dr Abramov and Dr Frolov hold approximately 29% of the issued shares in EVRAZ plc. Minden is part of an investment structure of which the Israeli-Russian businessman Mr. Roman Abramovich is the beneficial owner. Mr. Abramovich is also the owner of a 29% stake in EVRAZ plc. During the relevant events, Vollin and Aldon were given investment advice by an entity called Kew Capital LLP ("Kew") which was based in London, and Minden was given investment advice by an entity named MHC (Services) Limited ("MHC"), also based in London.

14.    Vollin was introduced to the Company and CPUK in about 2010, and made an initial investment of about $20 million, becoming a minority shareholder in the Company on the terms of a detailed shareholders' agreement and new articles of association (the "2010 SHA" and the "2010 Articles"). Those documents entitled Vollin to nominate two directors to the board of the Company. At that time, the board comprised Dr. Sachs, Mr. Faulkner, a Dr. Robert Lind (an associate of Dr. Sachs), and a Mr. Fletcher and a Mr. Bolger from Kew (nominees of Vollin). The Company's business was, however, managed in an informal way. There is no record of any formal board meetings taking place at any time.

15.    In August 2011, further capital was needed and was raised by a rights issue which resulted in Vollin's shareholding in the Company increasing to about 51%. At this time good progress was being made with the Pico projector project and there was confidence in the business.

16.    By April 2013, the project had not kept to the timetable originally envisaged and substantial further investment was required. There was minimal further investment by the Minorities in the rights issue, and as a consequence Vollin provided the bulk of the

new funding required. This saw its shareholding in the Company increase to around 80%. At the same time, a revised shareholders' agreement (the "2013 SHA") and articles (the "2013 Articles") were agreed.

17.   The 2013 SHA incorporated a new target "exit" date for Vollin, which was for the Pico projector to enter production in the second half of 2014, with mass production to follow thereafter. With a view to such production of the Pico projector, in June 2013, CPUK acquired the largest gallium arsenide fabrication plant in Europe, located at Newton Aycliffe in County Durham ("Newton Aycliffe"). Newton Aycliffe employed a large number of staff and came with substantial running costs. These were mitigated somewhat by a long-term supply contract with a company called Selex (which in turn had a contract with the Ministry of Defence), but even with this contract, the Newton Aycliffe facility was loss-making.

18.   By November 2013, the Company's business plan contemplated the Pico projector being launched in late 2014 and entering full-scale production in early 2015. But to achieve this, about US$76 million of further funding was required. This was more than Vollin was willing to provide on its own, and so, in January 2014, Mr. Abramovich was approached and given a presentation based upon the Company's business plan. He was impressed, and agreed that Minden would invest alongside Vollin. To that end, in March 2014 Minden executed a Subscription Agreement and Deed of Adherence to the 2013 SHA.

19.   After the investment by Vollin and Minden in 2014, their combined shareholdings amounted to about 93% of the equity share capital of the Company.

20.   Under the Subscription Agreement and Deed of Adherence to the 2013 SHA, Minden was entitled to appoint a single nominee to the board of the Company. As a consequence, from 2014, the board comprised six members: Mr. Faulkner (Chairman), Dr. Sachs (CEO) and Dr. Lind; Mr. Fletcher and Mr. Bolger (the Vollin nominees); and a Mr. De Cort from MHC (the Minden nominee).

21.   Unfortunately, the Pico projector project did not result in a saleable product conforming to the originally intended specification even within the extended timescales envisaged in the Company's revised business plans. In particular, there was a setback at the World Mobile Congress in Barcelona in February 2014 when Dr. Sach's efforts to engage other investors in the project failed.

22.   By mid-June 2014 it was clear that the projections that had been shared with Mr. Abramovich in early 2014 were no longer achievable. Plans for the Pico projector were then shelved and attention focused on development of a less ambitious and larger projector. However, these plans also slipped. The launch date was put back to early 2016, and by June 2015 the expectation was that the first customer shipment would not be until November 2016.

23.   By this time in June 2015, Mr. Fletcher (who had originally recommended the investment to Vollin) had begun to lose confidence in Dr. Sachs. However, a consultant appointed by the Investors provided a positive report, despite the delays. On that basis there was no overt expression of concern when, at a meeting on 1 July 2015, Dr. Sachs presented a revised request to the Investors for an "additional investment to launch" of US$118 million and an "additional investment to breakeven" of US$180 million.

24.   Subsequently, on 7 August 2015, Vollin and Minden executed a further Subscription Agreement for an additional US$31 million in monthly tranches starting on 1 August 2015. By September 2015, the Investors had invested a total of US$135 million in the Company. Their expectation at that stage was still that a product would go to market by November 2016. There was also a further quarterly presentation to the Investors in October 2015 which represented that the business was largely on track and spending was within or under budget.

25.   In November 2015, Mr. Bolger made a trip to Phoenix, USA to assess how work was progressing with the projector. Mr. Bolger was very concerned by what he saw. The prototype was larger than anticipated and there was a significant internal disagreement about likely production costs. What he saw caused Mr. Bolger to have serious reservations as to whether Dr. Sachs' vision was in fact realisable.

26.   On 16 December 2015, Mr. Bolger resigned as a director of the Company. This left the board of directors as follows: Dr. Sachs (CEO), Mr. Faulkner (Chairman) and Dr. Lind; Mr. Fletcher (Vollin's nominee) and Mr. De Cort (Minden's nominee). On 8 February 2016, a Mr. Burkey (of Kew) was appointed as Vollin's second nominee.

27.   On 7 January 2016 Dr. Sachs attended a meeting at Kew in advance of a planned presentation of a prototype to the Investors in Phoenix in February. The Judge found that preparations for the presentation in Phoenix did not go smoothly. There were continuing issues with the technology and it was difficult to get Dr. Sachs to focus on the detail. The presentation was re-scheduled and took place on 17 February 2016. Although it seemed to go successfully, issues remained about the size of the prototype, the level of further investment needed, and (at least as far as Mr. Fletcher was concerned) the continuing role of Dr. Sachs as CEO.

28.   On 4 March 2016, draft documentation for the next funding round was circulated. This included a draft Subscription Agreement for a further US$8 million investment from Vollin and Minden. This was well short of the amount needed to launch a marketable product, and would only have been sufficient to keep the Company and CPUK running for another few weeks.

29.   On 9 March 2016, Mr. Bolger made a presentation to the Investors and their representatives and Dr. Sachs at Kew's offices. Mr. Bolger suggested that the additional capital requirements to break even ranged between US$200 million and US$270 million. Dr. Sachs openly disagreed with the figures presented and thought that the Investors were not being given a fair account of his (different) point of view.

30.   Although Dr. Sachs had the perception that Mr. Fletcher and Kew were somehow doctoring the flow of information to the Investors, the Judge rejected that suggestion and found that at this stage no decision had been taken by the Investors to remove Dr. Sachs. Rather, the primary concern of the Investors was to obtain a reliable and objective assessment of the business. To that end it was suggested that a firm of management consultants should be engaged.

31.   That idea was further discussed at a meeting at Kew's offices on Friday 11 March 2016 attended by the advisers to the Investors and Dr. Sachs. Mr. Fletcher suggested appointing a firm of management consultants at which a close associate of his was senior partner. This caused a further disagreement with Dr. Sachs, but that

disagreement became of secondary importance because Dr. Sachs refused to engage with the question of the level of access to be allowed to the consultants, whoever was given the job. The meeting was adjourned over the weekend for Dr. Sachs to consider the position further.

32.     The next day, Saturday 12 March 2016, there was a meeting of the representatives of Vollin and their advisers at Kew's offices.  One of the purposes of this meeting was to decide whether the Investors should support the latest funding round (i.e. to execute the draft Subscription Agreement for a further US$8 million).  The Judge found that it was this group who also initially formed the view that Dr. Sachs should be asked to resign as a director and CEO, that the plan to engage management consultants should be abandoned, and that the Company should focus on a short-term strategy of seeking to retain what existing value the business had.

33.     The Judge found that Mr. Fletcher and Mr. Bolger regarded it as important to have Mr. Faulkner's support for what was proposed.  Accordingly, on Sunday 13 March 2016, Mr. Burkey wrote on behalf of the Investors to Mr. Faulkner, copying Mr. Fletcher, advising that the Investors had lost confidence in Dr. Sachs as CEO and as a result would not provide further funding to the Company under the existing management arrangements. Mr. Fletcher and Mr. Burkey then telephoned Mr. Faulkner to reiterate this.  When approached, Mr. Faulkner was inclined to provide his support. When cross-examined on the point at trial, he said he would "follow the money".

34.     On Monday 14 March 2016, a meeting took place between (among others) Dr. Sachs, Dr. Abramov, Mr. Fletcher and Mr. Burkey.  Mr. Fletcher told Dr. Sachs that the Investors were not going to fund the Company unless he was no longer CEO and presented him with a term sheet for his removal.  It was made clear to Dr. Sachs that he had to resign as a director by close of business on Thursday 17 March 2016 and that if he did not go voluntarily, he would be removed by the Investors using the procedure under the 2006 Act.  The Judge concluded that Dr. Sachs felt he had been given no opportunity for discussion, had in effect been presented with a *fait accompli*, and that he had little option but to go.

35.     There were then discussions over a period of a week regarding settlement terms for Dr. Sachs.  The Company paid for him to be advised and represented by a separate team at its solicitors, Fieldfisher LLP, and the Company was represented by Allen & Overy LLP.  On Monday 21 March 2016, Dr. Sachs executed a settlement agreement which provided, among other things, for his removal as CEO of the Company. The settlement provided for him to be treated as a "*Good Leaver*" under the terms of the 2013 SHA. It also provided for the full and final settlement of all claims arising out of services rendered to the Company.   The settlement agreement was approved by written resolution of the board of the Company, and signed by all the then directors including Dr. Sachs and Mr. Faulkner.

36.     The subscription agreement for the further round of investment by Investors was then concluded on Tuesday 22 March 2016, resulting in a further injection of US$8 million into the business.

37.     After Dr. Sachs' resignation, Mr. Bolger assumed the role of interim CEO of the Company, announcing the creation of a new "executive committee" of the Company to the employees on Wednesday 23 March 2016.

38.     At a subsequent Investor update meeting on 13 April 2016, Mr. Bolger presented a proposal to the Investors which envisaged abandoning Dr. Sachs' vision for the Company because of its heavy capital requirements, and instead adopting a lower risk business model which involved minimising costs and entering into joint development agreements with third parties. An important element of minimising costs was for CPUK to serve a Last Time Buy Notice terminating the supply contract with Selex, and to close Newton Aycliffe after fulfilling the final orders. At the time, the plant was costing US$19 million per annum to run but was generating only US$7 million per annum from the Selex contract.

39.     After the Investor meeting on 13 April 2016, Mr. Bolger had discussions with a senior employee at Newton Aycliffe (Mr. Richard Jackson) and Selex which flagged up the possibility that a Last Time Buy Notice might be served.  In addition, Mr. Bolger and Mr. Jackson began to consider the possibility of saving the facility at Newton Aycliffe by a management buy-out with a view to continuing to service Selex business.

40.     Mr. Faulkner had been told by Mr. Fletcher that he could not attend the meeting on 13 April 2016 because it was a meeting of Investors. Mr. Faulkner was, however, sent a copy of the slide deck setting out the new plans for the Company on 18 April 2016 prior to a meeting which he had with Mr. Bolger, with the result that he was made aware of the proposals in relation to Newton Aycliffe and the service of a Last Time Buy Notice.

41.     Mr. Faulkner became concerned about this and on 4 May 2016 he emailed Mr. Fletcher, acknowledging that the meeting on 13 April 2016 had been an Investor meeting, but reminding Mr. Fletcher of the need for "proper corporate governance".  Mr. Faulkner asked for a board meeting of the Company to be convened for 23 or 24 May 2016.  Mr. Fletcher's email response later that day was as follows,

> "We can certainly convene a board meeting if you wish and either of the two dates you suggest are currently available in my diary, but we would need to check with others.
>
> However, given that you are already extremely well briefed about the company and have full access to [Mr. Bolger] as the interim CEO, as well as the rest of the management team, I wonder if a board meeting isn't excessively formal. Wouldn't it make much more sense for you just to come in and meet with [Mr. Burkey] and I. It's obvious, following the departure of [Dr. Sachs], and the discovery of the serious condition that the company now finds itself in, that changes to both governance and the board structure and composition are required and inevitable if the company is going to continue to attract funding from its funding majority shareholders. This funding is essential for [the Company's] survival. Previous corporate governance has manifestly failed and I don't currently see much, if any, scope for negotiation on the changes required.
>
> So why don't you just come in?  We can talk it all through: to the extent that changes need to be properly papered by board resolutions, we can then convene a board meeting…

> Next week is probably difficult, but the week following should
> work or we can default to your suggested dates.  Feel free to call
> me."

42.    Mr. Faulkner responded quickly by email, agreeing to come in to discuss matters with
       Mr. Fletcher on 23 May 2016.  He also gave Mr. Fletcher a "heads up" that the
       Company's accounts were due to be finalised very soon, and that there would have to
       be some thought given to the forward looking statement as to the ability of the Company
       to continue as a going concern given the funding position.

43.    On 10 May 2016 Mr. Bolger and Mr. Jackson had a further meeting with Selex,
       following which a Last Time Buy Notice was served by Mr. Jackson on behalf of CPUK
       on 16 May 2016, terminating the supply contract with Selex and giving Selex two
       months to place any final orders.  Mr. Faulkner was not aware that a Last Time Buy
       Notice had actually been served until about 3 June 2016 when he learnt of this in a
       discussion with Mr. Jackson.

44.    When Mr. Faulkner met Mr. Fletcher on 23 May 2016, Mr. Fletcher said that Mr.
       Faulkner should resign, and he was left to think more generally about changes to the
       corporate governance and board structure and to revert to Mr. Fletcher.  He did not,
       however, do so.  Rather, he and Dr. Sachs consulted external lawyers (Bryan Cave LLP)
       in relation to a possible claim.

45.    Mr. Faulkner did, however, respond to a round-robin email from Mr. Bolger on 16 June
       2016 which gave a general up-date, including mentioning the service of the Last Time
       Buy Notice.  Mr. Faulkner arranged a lunch meeting with Mr. Bolger for 28 June 2016.
       The lunch was cordial.  Among other things Mr. Faulkner told Mr. Bolger that he was
       under "a lot of pressure" from the Minorities and that "there was going to be some
       unusual behaviour coming up".

46.    As well as having lunch with Mr. Bolger, on 28 June 2016 Mr. Faulkner also spoke to
       Mr. Jackson and learned of a planned meeting with Selex on 4 July 2016.  Mr. Faulkner
       insisted he should attend, and so Mr. Jackson sent Mr. Faulkner a copy of the slide pack
       outlining the earlier discussions that had taken place with Selex and explained that the
       purpose of the meeting was to discuss the economics of a management buy-out and
       Newton Aycliffe continuing to supply Selex after the contract with CPUK came to an
       end.  Mr. Faulkner duly attended the meeting on 4 July 2016, at which the possibility
       of a management buy-out was discussed in a limited way.  This led to Mr. Faulkner
       being keen to obtain more information about it if he could.

47.    At around this time in June 2016, Dr. Lind agreed to resign as a director of the
       Company.  His departure was entirely consensual, albeit that his decision was in part
       taken because of concern that he was not being included in the business of the Company
       in a way that allowed him to discharge his duties as a director satisfactorily, and he was
       concerned about the risk of litigation.

48.    Efforts were also being made at this time to recruit a new CEO for the business.  One
       party involved in such efforts was Target Global ("Target") an international venture
       capital firm founded by Mr. Alexander Frolov Junior (the son of Dr. Frolov).  As a by-
       product of being involved in that search, Target also took a broader interest in solving
       the problem that the investment in the Company had come to represent for Vollin.

Target's Managing General Partner's motivation for doing so was to curry favour with Dr. Frolov and possibly prise away from Kew parts of the Frolov/Abramov investment portfolio.

49.   To this end, in mid-June 2016 Target identified a company called Kaiam Corp ("Kaiam") as a potential merger partner for the Company.  On 24 June 2016 Mr. Fletcher asked Mr. Bolger and another to review a slide deck giving background information on Kaiam, and indicating that it was interested in the facility at Newton Aycliffe.  Further discussions involving Mr. Bolger took place in San Francisco in July 2016, and although Mr. Fletcher was both resistant to the level of involvement of Target and sceptical about the merger proposals, he eventually cleared the air with Mr. Alexander Frolov Junior and agreed a due diligence process.

50.   By this time in late July 2016, nothing had been heard from Mr. Faulkner concerning corporate governance and the structure of the board since the meeting with Mr. Fletcher on 23 May 2016.  Mr. Fletcher had sent Mr. Faulkner a chaser email on 5 July 2016, reminding him of their earlier meeting and saying,

> "We have since heard nothing and we need to get this matter resolved.  As I made clear at our meeting, we simply will not continue to fund you as Chairman or in any non-exec capacity. Additionally, the governance of [the Company] needs to be brought in line with the ownership structure.
>
> Please get back to me as soon as possible."

Mr. Fletcher followed this up with a further chaser on 17 July 2016, but again Mr. Faulkner did not respond.

51.   Mr. Faulkner's input was also required in order to finalise the statutory accounts for the Company and CPUK for 2015.  Mr. Faulkner had previously been supplied with draft accounts for comment on 7 April and 18 May 2016, and on 27 July 2016 Mr. Jackson emailed him (and others) stating that the accounts had been approved by the auditors, attaching a final copy and asking for comments and questions.

52.   On 2 August 2016 (as the Judge put it) Mr. Faulkner broke his period of silence by sending an email to Mr. Jackson.  It was entitled "Information required" and with no explanation simply said "Please send" and listed 16 categories of information or documents.  These included financial information on the Company, CPUK and the Company's US subsidiary for the first half of 2016, lists of their employees and copies of the Selex contract and purchase orders.  The email concluded,

> "I need this by COB tomorrow. I will see you in Newton Aycliffe on Thursday 11 [August] and expect you will be able to answer any questions I will have."

53.   Against the silence that had preceded it, the Judge described this email from Mr. Faulkner as peremptory and odd.  The Judge found that it was very likely not simply part of an exercise of Mr. Faulkner flexing his muscles to see what he could get, but was part of a process which was going on behind the scenes in which Mr. Faulkner and Dr. Sachs were assessing litigation options and other strategies, with Newton Aycliffe

and Selex being a particular focus of attention and the subject of a possible rival acquisition as part of a joint venture between them.

54.    The indication by Mr. Faulkner that he intended to visit Newton Aycliffe on 11 August 2016 presented Mr. Jackson with a problem, because that was the same day fixed for a visit from Kaiam as part of the merger discussions.  The Judge found that Mr. Jackson successfully deflected Mr. Faulkner from attending by lying to him, saying that the management team were meeting in London that week.  Mr. Faulkner's email and intention to visit Newton Aycliffe were discussed by Mr. Jackson with Mr. Bolger, with the net result that Mr. Bolger resolved to treat Mr. Faulkner with caution until it was clear what was happening.

55.    After their visit on 11 August 2016, Kaiam were impressed with Newton Aycliffe and were keen on the idea of some sort of venture with the Company. During this visit, Mr. Jackson took the decision to remove the page for 11 August 2016 from the visitors' book. The Judge accepted Mr. Jackson's explanation that this was not done with a view to deceiving Mr. Faulkner, but instead was taken as a routine precaution to limit the risk of the news of the Kaiam visit leaking inadvertently.

56.    On 5 August 2016, the Company's solicitors, Fieldfisher LLP, circulated a draft board resolution proposing the addition of Mr. Fletcher as a further director of CPUK.  At the time Mr. Faulkner was CPUK's sole director.  Mr. Faulkner protested that this was another example of the lack of governance and was the first he had heard of this proposal.  Mr. Fletcher responded that Mr. Faulkner had been Chairman for years and had had ample opportunity to say something if he was unhappy about governance, but had not.  The Judge commented that this exchange exemplified "the stand-off between the two sides which had developed".

57.    This caused Mr. Faulkner to contact Mr. De Cort (as Mr. Faulkner told the Judge) "in an attempt to engage Minden's interest as a possible peace-broker".  Mr. Faulkner's email stated,

> "The purpose of the meeting is to discuss [the Company] and affiliated companies – some of which are insolvent. Furthermore I have not been consulted or briefed regarding any further funding proposals and the companies are out of cash in the coming weeks.  There are governance issues which I have been flagging with [Mr. Fletcher] and I asked to meet with him today or tomorrow – to which he had declined.
>
> So, lots to talk about (including 86 minority shareholders) – and I am hoping to have a meaningful direct conversation with you."

58.    A call was arranged for 9 August 2016, but in the event, Mr. De Cort was unable to attend.  Instead Mr. Faulkner spoke to Mr. Fletcher and Mr. Burkey.  Mr. Faulkner was accompanied by a lawyer from Gordon Dadds.  The next day, 10 August 2016, Mr. Fletcher sent an email to Mr. Faulkner summarising what had been agreed on the call,

> "On that call, we agreed 3 action points:

> 1.      You would circulate to your fellow board members your comments, questions and open issues on the accounts of CPGL, CPUK and CPUS as well as the questions to which you have requested answers from Richard Jackson, none of which any of us have seen.
>
> 2.      You would sign the appropriate form which you have received from Fieldfisher approving/consenting to my appointment as a Director of CPUK.
>
> 3.      For so long as you remain chairman, you would seek to call regular board meetings in order to ensure that you are properly informed about CP, its direction and future strategy and in the interests of good governance.
>
> We note your concerns about the solvency of CPUK and CPUS. We do not share those concerns which we believe arise out of a basic misunderstanding about how [the Company] and its affiliates are funded. But as fellow directors, it is important that we hear the properly articulated rationale behind your concerns. Please let us have this."

59.     In the event, Mr. Faulkner did not respond to the invitation in the email to set out his concerns and he did not call a board meeting for the Company or CPUK at any time.

60.     There was a further investor update meeting on 15 August 2016 to discuss the future plans for the business and to review the events that had taken place since April 2016. The meeting was also to consider the financial forecast and projected cash requirements of the group for the remainder of 2016.  The slide deck for the meeting contained a page entitled "What we have achieved since April" and a section headed "Kaiam Discussions".  It also identified an immediate requirement of US$4.5 million in August 2016 and a further US$11 million for the remainder of the year.  It was envisaged that the investment of US$4.5 million would be achieved by Vollin and Minden entering into a further subscription agreement for more shares in the Company.

61.     Mr. Faulkner was not invited to this meeting but he knew it was to take place, because on 12 August 2016 he sent an email to Mr. Bolger asking him to provide a copy of the slide deck presentation.  Mr. Faulkner was also involved in discussions on 16 August 2016 - the day after the meeting had taken place - about the mechanics for approval by the Company of the subscription agreement for the proposed investment of the US$ 4.5 million.

62.     Those discussions highlighted a difference of opinion as to the meaning and effect of clause 20.1 of the 2013 SHA between Gordon Dadds (who were advising Mr. Faulkner), and Fieldfisher (who were advising the Company).  The essential question was whether approval of the subscription agreement was a matter for the board or a matter for the shareholders, and if the latter, whether Vollin and Minden were conflicted and unable to vote by reason of being counterparties to the proposed agreement. Fieldfisher took the view that this was a matter for the board, but that Mr. Faulkner would be the sole director who was disinterested and who could vote; whereas Gordon

Dadds took the view that it was a matter for the shareholders, and Minden and Vollin were conflicted and could not vote.

63. Fieldfisher's advice to the Company was set out in an email to Mr. Bolger which was copied to Mr. Faulkner. The email recorded that the partner at Fieldfisher had discussed the matter with Mr. Faulkner. It concluded,

> "Mark [Faulkner] has indicated that he is willing to approve the resolution on this basis. However, before releasing his signature, he wishes to receive the outstanding data requested in his email to Richard Jackson of 2 August at 16.26, forwarded to you on 12 August at 11.08, together with the investor presentation referred to in that latter email.
>
> He does so in recognition of the fact that the interests of the Company are most likely to be served by an immediate injection of cash to enable the payroll to be met, but with continuing serious misgivings about the governance of the group, and its solvency. It is clearly unsatisfactory for a director to be asked to approve a share allotment - particularly where he is the sole director empowered to give that approval - without any involvement in decisions as to the future direction of the company, or any information as to the likely future funding of the group, and thus its solvency. These are matters on which he continues to take independent advice, and which I know are very much on the agenda."

64. Without consulting anyone, Mr. Bolger sent an amended version of the investor presentation to Mr. Faulkner, omitting the page entitled "What we have achieved since April" and the section headed "Kaiam Discussions". The Judge accepted Mr. Bolger's behaviour "was consistent with what was expected generally in dealing with Mr. Faulkner … i.e. it was one example of the practice which had developed of keeping Mr. Faulkner at arm's-length and telling him only what Mr. Bolger and others thought he needed to know."

65. Although Mr. Faulkner had said he would approve the board resolution for the proposed share subscription by Vollin if he was given a copy of the investor presentation, that did not happen. Instead, on 17 August 2016, Mr. Faulkner took it upon himself to circulate to the Minorities a form of written resolution to have them approve the proposed Subscription Agreement. The covering letter appeared to come from the board of the Company as it mentioned the existing four directors, but the reality was that the letter did not come from the board and was against Fieldfisher's advice to the Company.

66. Over the next few days there were a number of what the Judge described as "fraught" exchanges. Mr. Faulkner took the position that he was acting appropriately and in conformity with the legal advice had received from his lawyers, and he pressed ahead with collecting signatures from all the individual Minorities before giving his approval as director to the Vollin subscription. This exercise concluded on Wednesday 24 August 2016 shortly before the payroll deadline on Friday 26 August 2016.

67.     These events were a step too far for Vollin and Kew, and the decision was taken to remove Mr. Faulkner from office.   On 7 September 2016, Vollin requisitioned a meeting to pass a resolution under section 168 of the 2006 Act removing Mr Faulkner as a director of the Company. The notice given of the meeting was defective; therefore a further notice was sent on 30 September 2016 and a meeting convened for 18 October 2016.

68.     On 9 September 2016, Mr. Fletcher offered the CEO role to a Mr. Woo. Mr. Faulkner was not involved in any relevant decision to do so, although he was still director and Chairman of the Company.

69.     On 18 October 2016, Mr. Faulkner produced a letter in accordance with his entitlement under section 169 of the 2006 Act to be heard on any resolution to remove him, setting out the representations he wished to make to the shareholders. Dr. Sachs did not attend the general meeting on 18 October 2016, with the result that it was inquorate.  However, the meeting continued and Mr. Bolger presented essentially the same presentation as at the Investor meeting on 15 August 2016.

70.     The general meeting was then reconvened on 25 October 2016, and on that occasion was quorate.  Vollin and Minden voted their shares in favour of Mr Faulkner's removal: Minorities holding just over one million shares voted against.   The resolution was therefore passed by an overwhelming majority of 97.5% for and 2.5% against.

71.     On 26 October 2016, Mr. Faulkner was also removed as a director of CPUK and Mr. Fletcher was appointed instead. In a letter dated 9 December 2016, Mr. Faulkner, like Dr. Sachs before him, was classified as a *"Good Leaver"* for the purposes of the 2013 SHA.

*Events after Mr. Faulkner's removal*

72.     After Mr. Faulkner's removal, Mr. Fletcher and Mr. Bolger considered the proposed merger with Kaiam, a sale of Newton Aycliffe to Kaiam, and the possibility of the sale of Newton Aycliffe to a third party other than Kaiam.   After exploring other options, the sale of Newton Aycliffe to Kaiam became the favoured option. On 3 May 2017. Newton Aycliffe was acquired by Kaiam Laser Limited, a newly formed subsidiary of Kaiam.  The price was US$10 million, to be satisfied by shares in Kaiam.

73.     As matters turned out, following an announcement by Apple Inc. that it was looking to incorporate augmented reality hardware tools into some of its products, Kaiam Laser Limited resold Newton Aycliffe within about three months after a competition between a number of third party bidders.  The price was US$80 million.

74.     Although Kaiam made a substantial profit on the acquisition and resale of Newton Aycliffe, it continued to experience liquidity problems and the companies in the group entered formal insolvency proceedings in the UK and US in December 2018 and January 2019.

C.      The terms of the 2013 SHA and 2013 Articles

75.     At this stage it is convenient to set out the relevant provisions of the 2013 SHA and 2013 Articles.

*The 2013 SHA*

76.     The definitions section contained the following provisions:

> "Business" means the production and supply of projection products and
> technologies and all activities reasonably ancillary and necessary in
> relation to the production and supply of projection products and
> technologies.
>
> "CEO" means Jonathan Sachs who shall be a Director and the Chief
> Executive Officer of the Company.
>
> "Exit" means any of the following events:
>
> (a) a Listing;
>
> (b) a Share Sale;
>
> (c) a Subsidiary IPO; or
>
> (d) an Asset Sale;
>
> "Founder Director" means Mark Faulkner.
>
> "Management" means Jonathan Sachs, Mark Faulkner and Robert
> Lind."

77.     Clause 3 recorded an agreement to create a new category of B Shares. These had no
voting rights attached to them, but instead carried certain rights to participate on an
"Exit" (as defined).  The B Shares were allocated to Dr. Sachs and Mr. Faulkner.

78.     Clause 4 of the 2013 SHA was headed "Warranties".  After a conventional set of
warranties in clause 4.1 as to matters such as the power of the parties to enter into the
agreement, it contained the following clause 4.2:

> "4.2      Each Shareholder undertakes to the other Shareholders
> and the Company that it will at all times act in good faith in all
> dealings with the other Shareholders and with the Company in
> relation to the matters contained in this Agreement."

79.     Clause 5 was headed "Business of the Company". Clause 5 included the following
provisions:

> "5.1      The Shareholders shall procure that the only business of
> the Company and each CPG Group company shall, unless
> otherwise agreed in writing by the Shareholders, be the Business.
> The Shareholders shall each co-operate with the Board in the
> running and operation of the company and each CPG Group
> Company.
>
> 5.2      The Shareholders shall exercise their respective rights and
> powers to ensure, so far as they are lawfully able to do so, that the

Company complies with its obligations under this Agreement and any other agreements to which the Company is a party, and that the Business is conducted in accordance with good business practice and on sound commercial and profit making principles.

5.3     Without prejudice to the foregoing provisions of this clause 5, the Shareholders agree that the Company and each CPG Group Company will be run in accordance with the following general principles, as varied from time to time with the written agreement of the shareholders:

(a)     the Company and each CPG group company shall carry on and conduct its business and affairs in a proper and efficient manner and for their own benefit;

(b)     the Company and each CPG Group Company shall transact all of their business on arm's-length terms;

(c)     the Business shall be carried on in accordance with policies laid down from time to time by the Board and in accordance with the Annual Budget;

[…]

(f)     the company and each CPG group company shall keep the shareholders (except the B shareholders) fully informed as to all their material financial and business affairs."

80.     Clause 7 was headed "The Board", and contained the following provisions:

"7.1.     Subject to clause 7.3, the maximum number of Directors holding office at any one time shall be six.

7.2     The Investor shall have the right (but not the obligation) to appoint and maintain in office two of those directors (the 'Investor Directors').

7.3     If the Board resolves to increase the maximum number of Directors beyond six Directors, the Investor shall have the right (but not the obligation) to appoint and maintain in office one additional Director for every two additional non-Investor Directors appointed.

7.4     As at the date of this Agreement, the Directors are Jonathan Sachs, Mark Faulkner, Brian Bolger, Jeremy Fletcher and Robert Lind.

[…]

7.8     Subject to clause 7.9, the quorum for the transaction of business at any board meeting shall be three directors and shall include (insofar as they each remain a director) the Founder

Director, the CEO and, if one or more has been appointed, an Investor Director.

[…]

7.10    Unless otherwise agreed, the Board shall meet in the United Kingdom once every four months and otherwise as circumstances require.

[…]

7.13    Subject to clause 7.16, resolutions arising at any meeting of the Directors shall be decided by a majority of votes provided that both of the Founder Director and the CEO must at all times form part of that majority. If the number of votes for and against a proposal are equal, the Chairman of the Board or other Director chairing the meeting shall not have a casting vote in addition to his own vote.

7.14    The Chairman of the Board shall be appointed by the majority of Directors. The first Chairman of the Board shall be Mark Faulkner.

7.15    If a resolution submitted to a duly convened Board Meeting is not carried by a resolution of the Board at that meeting then, without prejudice to the Board's ability to consider any other business put to it at that meeting, a new meeting may (on the written request of any Director or his alternate present at the meeting) be convened for the same day or the next week at the same time and place to consider and if thought fit, pass that resolution.

7.16    If a Director is of the opinion (acting reasonably) that there is a conflict between his fiduciary duties to the Company and his role as an appointed Director of a Shareholder in voting on any particular matter to be considered by the Board, he shall disclose that interest to the Board and shall abstain from voting on that matter and they will not be required to form part of the majority required under clause 7.13.

7.17    If a Shareholder, who has voting rights attaching to the Shares that he holds, is an Interested Shareholder (as defined in clause 20.1), the quorum shall be not less than two Directors appointed by the non-Interested Shareholders and a resolution may be passed at a Board Meeting if it is voted in favour of by the Directors present (excluding for these purposes any Director appointed by the Interested Shareholder)."

81.    Clause 8 related to Shareholders' Meetings and included the following,

"8.1    The Shareholders shall use all reasonable endeavours to procure that their respective representatives attend each meeting of the members of the Company and that a quorum is present throughout each meeting. A quorum shall consist of Jonathan

Case 1:21-cv-11059-GHW   Document 182-8   Filed 08/15/23   Page 19 of 80

Judgment Approved by the court for handing down.                                    Faulkner v Vollin

Sachs, Mark Faulkner and the Investor (or a duly authorised representative of those members.

8.2     If within half an hour from the time appointed for a meeting of the members of the Company a quorum is not present the meeting shall be adjourned to the same day of the next week at the same time and place. If the business to have been conducted at that meeting;

(a)     includes a Reserved Matter, then the provisions of clauses 9.2 and 9.3 shall apply;

(b)     does not include a Reserved Matter, then at that adjourned meeting those members present in person or by proxy shall constitute a quorum."

82.   Reserved Matters were set out in Schedule 3.  They included a number of major business decisions such as the approval of annual budgets and IP Strategy for the Company and any material change in the nature or scope of the Business.  Clause 9.1 provided that,

"The Shareholders and the Board shall exercise their powers in the Company to procure that the Company shall not transact any business which is a Reserved Matter without the approval of the Investor."

83.   Clauses 9.2 and 9.3 made provision for a situation in which the Investor abstained or voted against a resolution in relation to a Reserved Matter, and provided for the meeting to be reconvened to reconsider the Reserved Matter (but not to override the Investor's veto).

84.   Clause 14.8(a) set the target Exit date,

"The Company and the Shareholders agree that they will work together and use their reasonable endeavours to achieve an Exit as soon as reasonably practicable after 2 years from the date of this Agreement."

Two years from the date of the 2013 SHA was April 2015.

85.   Clause 16 was headed "Compulsory transfer and disenfranchisement" and contained specific provisions applicable to the newly created category of B Shares.  Broadly speaking, the effect was that if any holder of B Shares came to be characterised as a "*Bad Leaver*", that shareholder would be required to sell all of his B Shares either to the Company or to a nominated party. On the other hand, a person designated a "*Good Leaver*" would be required only to relinquish half of his B Shares.

86.   "*Good Leaver*" and "*Bad Leaver*" were defined in clause 16.1. The definition of "*Good Leaver*" was as follows:

"Good Leaver" means a B Shareholder who ceases to be a director, employee or consultant of the CPG group and that cessation occurs as a result of:

(a)      death; or

(b)      serious illness or physical or mental incapacity which is determined by two medical reports from independent medical specialists […]

(c)      wrongful dismissal; or

(d)      termination by the relevant CPG group Company of his service agreement, employment agreement or consultancy agreement (as applicable) without Cause […]".

The definition of "*Cause*" mirrored that in Dr. Sachs' employment contract with CPUS. "*Bad Leaver*" was then defined to mean anyone who is not a *Good Leaver*.

87.     Clause 21 of the 2013 SHA provided,

"21.1     The Company undertakes with the Shareholders to be bound by and comply with the terms and conditions of this Agreement insofar as they relate to the Company and to act in all respects as contemplated by this Agreement.

21.2     The Shareholders undertake with one another to:

(a)      exercise their powers in relation to the Company in a manner consistent with ensuring that the Company fully and promptly observes, performs and complies with its obligations under this Agreement;

(b)      exercise their rights as Shareholders in a manner consistent with this Agreement;

(c)      exercise all voting and other rights and powers vested in or available to them in a manner consistent with procuring the convening of all meetings, the passing of all resolutions and the taking of all steps necessary or desirable to give effect to the terms of this Agreement and the rights and obligations of the parties set out in this Agreement; and

(d)      procure that any director of any CPG Group Company appointed by them from time to time shall (subject to their fiduciary duties to the Company or any relevant CPG Group Company) exercise his/her voting rights and other rights and powers vested in or available to him/her in a

> manner consistent with giving effect to the terms
> of this Agreement and the rights and obligations
> of the parties set out in this Agreement."

88.   Clause 23 importantly provided,

> "23.   Nothing in this agreement shall create a partnership or
> establish a relationship of principal and agent or any other
> fiduciary relationship between or among any of the parties."

89.   Clause 25 was an entire agreement clause, which provided that the 2013 SHA and the
other documents to be executed in accordance with it were to "supersede any prior
written discussions, understanding or agreements between the parties."

*The 2013 Articles*

90.   The 2013 Articles reflected the provisions of the 2013 SHA in some respects.   For
example, Article 17.7 reflected clause 7.8 of the 2013 SHA (quorum at board meetings)
and Article 17.9 reflected clause 7.13 of the 2013 SHA (voting at board meetings).   The
Articles did, however, contain certain additional provisions.

91.   So, for example, Article 14 was as follows,

> "14.1   The directors shall not be required to retire by rotation
> and regulations 73 to 80 (inclusive) of Table A shall not apply to
> the Company.
>
> 14.2   Subject to the approval of both the Founder Director
> and the CEO, the directors may appoint a person who is willing
> to act to be a director, either to fill a vacancy or as an additional
> director."

92.   Article 15 also provided,

> "15.1   Subject to Article 15.2, the office of a director shall be
> vacated if
>
> (a)   he ceases to be a director by virtue of any provision of
> the 2006 Act or these Articles or he becomes prohibited by law
> from being a director, or
>
> (b)   he becomes bankrupt or makes any arrangement or
> composition with his creditors generally, or
>
> (c)   he is, or may be, suffering from mental disorder and
> either
>
>> (i) he is admitted to hospital in pursuance of an
>> application for admission for treatment under the
>> Mental Health Act 1983 …

(ii) an order is made by a court having jurisdiction … in matters concerning mental disorder for his detention or for the appointment of a receiver, curator bonis or other person to exercise powers with respect to his property or affairs, or

(d)     he resigns his office by notice to the Company, or

(e)     the Board passes a resolution to remove the director, or

(f)     he shall for more than six consecutive months have been absent without permission of the directors from meetings of directors held during that period and the directors resolve that his office be vacated.

15.2    The Board shall not be able to pass a resolution to remove the CEO as a director or the Founder Director as a director and nor shall those individuals vacate the office of a director if they make any arrangement or composition with their creditors generally."

D.     The arguments of the parties at trial

93.    The Judge summarised the arguments of the parties at trial in paragraphs 334-337 of his Judgment.  He identified that the Minorities alleged unfair prejudice arising in two ways:

i)      breaches by the Investors of the terms of the 2013 SHA, and in particular the "good faith" clause 4.2; and

ii)     breaches by the directors nominated by the Investors of two of the 2013 Articles relating to conflicts of interest, and certain of their duties under sections 171-175 of the 2006 Act.

94.    The meaning of clause 4.2 of the 2013 SHA was central to both limbs of the Minorities' case.  It was relevant to the first limb because the obligation of good faith was said to require adherence to a "bargain" which was said to be inherent in the 2013 SHA and the 2013 Articles, namely that Dr. Sachs and Mr. Faulkner would be "entrenched" as directors and would hold the balance of power on the board of the Company. The Judge summarised the Minorities' contentions in this respect at paragraph 336 of his Judgment,

"336.    Mr. Hollington's contention on this general point of characterisation was that the 2013 constitution gave rise to what he called a contractual quasi-partnership.   Mr. Hollington clarified that in making that submission, he was not seeking to rely on any oral assurances given to Dr. Sachs and Mr. Faulkner as to their continued involvement in the management of CPGL. Instead, his case was based on a reading of the constitutional documents, looked at in the round, and of course against the background of the factual matrix as it stood at the time of

contracting. Mr. Hollington said that reading the constitutional documents in this way disclosed two particular agreed common purposes, namely (1) entrenchment of the positions in management of Dr. Sachs and Mr. Faulkner, and, as its corollary, (2) the prevention of Vollin and Minden from obtaining control of the CPGL board. Mr. Hollington argued that both those purposes had been overridden or frustrated by the actions taken by the Investors from March 2016 onwards, in breach of their obligation of good faith under [clause 4.2 of the 2013 SHA], and that consequently the Petitioners had been treated in a manner which was both unfair and prejudicial."

95.     The meaning of clause 4.2 was also central to the second limb of the Minorities' case, because they contended that the 2013 SHA formed part of the constitution of the Company for the purposes of the directors' duties under section 171(a) of the 2006 Act. The Minorities alleged that this meant that the directors nominated by the Investors breached their duties to act in accordance with the Company's constitution when they participated in the process for removal of Dr. Sachs and Mr. Faulkner from the board, and thereafter when the directors managed the Company without their involvement.

96.     The Judge summarised the Investors' arguments against these propositions in paragraph 337 of his Judgment as follows,

> "337. Mr. Gledhill for the Investors disagreed fundamentally. He said there was no analogy to be drawn with the quasi-partnership type case. Such cases involved the Court recognising the existence of an equitable constraint, which inhibited in some way the otherwise unrestricted right of a shareholder to exercise its legal rights however it sees fit. In the present case, no such equitable constraint was alleged. Instead, the case in the Petition is that the Investors breached the Petitioners' legal rights under the 2013 Articles or the 2013 SHA. But there is nothing in those agreements which gave Dr. Sachs or Mr. Faulkner an entrenched right to remain as directors and managers of CPGL, and nothing which inhibited the statutory entitlement of the majority shareholders under CA section 168 to remove the directors if they saw fit to do so, for whatever reason. At most the Investors were subject only to the obligation under SHA clause 4.2 to act in good faith, but here the Investors had acted in good faith, because they had acted honestly and in a manner which was commercially justified: commercially, it was entirely right to have required Dr. Sachs to step down as a director of CPGL in March 2016, given the state of the business at the time which (as CEO) Dr. Sachs must have contributed to."

**E.      The Judge's analysis of the law and the parties' bargain**

97.     In his Judgment, after having set out his findings of fact and summarised the arguments of the parties, the Judge then set out his view of the relevant legal principles.

98.     The Judge first set out section 168 of the 2006 Act which provides,

> "A company may by ordinary resolution at a meeting remove a
> director before the expiration of his period of office,
> notwithstanding anything in any agreement between it and him."

99.     At paragraph 341 of his Judgment, the Judge characterised this as an "inalienable right"
        of majority shareholders to remove a director from office.  At paragraph 342 of the
        Judgment, the Judge said that although the effectiveness of the decision to remove could
        not be impugned, the act of doing so might infringe some other right and give rise to
        other remedies.  I shall return to consider that analysis of section 168 later in this
        judgment.

100.    The Judge then referred to Ebrahimi v Westbourne Galleries [1973] AC 360 as the
        paradigm case in which the exclusion of a director might give rise to a just and equitable
        winding up in a case of a quasi-partnership company.  The Judge commented that in
        Ebrahimi the right relied upon was based on an agreement or understanding binding in
        equity, but that the same approach could also apply under section 994, and could be
        based upon an agreement between shareholders that they would exercise their voting
        rights (or not exercise them) in a particular way.

101.    The Judge then stated,

> "346.    In the present case, it seems to me that Mr. Hollington's
> argument is really based on this same logic.  No equitable
> constraint is relied on (c.f. Ebrahimi).  Mr. Hollington instead
> says that there was a contractual commitment binding on the
> majority shareholders – Vollin and Minden – that they would not
> use their majority voting power to exclude either Dr. Sachs or
> Mr. Faulkner from their offices as directors of CPGL.  He says
> that, consequently, although Vollin and Minden must be taken to
> have had the power as a matter of company law to exclude Dr.
> Sachs and Mr. Faulkner from office, at the same time, as a matter
> of private contract between the shareholders, they had agreed not
> to exercise or otherwise rely on that power.
>
> 347.    Mr. Hollington's argument is focused on the good faith
> provision in clause 4.2 of the 2013 SHA, when read together
> with the other provisions of the SHA and indeed the Articles of
> CPGL. The central question, therefore, is whether the good faith
> provision can be read in that way, and whether it can bear the
> weight which Mr. Hollington places on it."

102.    The Judge then turned to consider a number of authorities on the meaning of a
        contractual obligation of good faith.  I shall return to consider those authorities in
        greater detail below.  Ultimately, the Judge agreed with and adopted the statements of
        principle set out by HHJ Klein in Unwin v Bond [2020] EWHC 1768 (Comm) at
        paragraphs 229 to 232.  Those paragraphs are as follows,

> "229.    First, the context in which the good faith obligation was
> entered into is everything, or at least a great deal. That is hardly
> surprising, because the extent of the obligation, that is, what
> prospective acts of a defendant may be subject to a duty of good

faith, is a matter of the construction of the contract which contains the obligation.

230.    Secondly, once it is established that a prospective act of a defendant is subject to a duty of good faith, the defendant is bound to observe the following minimum standards:

i)      they must act honestly;

ii)     they must be faithful to the parties' agreed common purpose as derived from their agreement;

iii)    they must not use their powers for an ulterior purpose;

iv)     when acting they must deal fairly and openly with the claimant;

v)      they can consider and take into account their own interests but they must also have regard to the claimant's interest.

These minimum standards are not entirely distinct from one another. Rather, they tend to overlap.

231.    Fair and open dealing is a broad concept and what it means in practice in any case will again depend on context. It is likely that, in many cases, the claimant is entitled to have fair warning of what the defendant proposes. In those cases where the defendant is contemplating taking a decision which will affect the claimant, fair and open dealing is likely to require that the claimant is given an opportunity to put their case before the defendant makes the decision and the defendant is likely to be required to consider the claimant's case with an open mind.

232.    Thirdly, and very much linked to the second point, the fact that a defendant could have achieved the same result in a procedurally compliant way does not amount to a defence where the approach they adopt does not meet the minimum standards I have set out."

103.    In his summary of the law, the Judge then turned to the second way in which the Minorities put their case in relation to the duties of the directors nominated by the Investors.

104.    The Judge set out the relevant provisions of sections 171-175 of the 2006 Act, including in particular section 171(a) which provides,

"171.    A director of a company must –

(a)     act in accordance with the company's constitution."

and section 172(1) which provides,

"172.    (1) A director of a company must act in the way he considers, in good faith, would be most likely to promote the success of the company for the benefit of its members as a whole, and in doing so have regard (amongst other matters) to,

(a)    the likely consequences of any decision in the long term,

(b)    the interests of the company's employees,

(c) …

(d) …

(e)    the desirability of the company maintaining a reputation for high standards of business conduct, and

(f)    the need to act fairly as between members of the company."

105.    In relation to section 171(a), the Judge accepted, without comment, a submission by Mr. Hollington that by virtue of section 17 of the 2006 Act, the Company's constitution for the purposes of section 171(a) included the 2013 SHA as well as the 2013 Articles. I shall return to consider that finding later in this judgment.

106.    Having decided that a contractual obligation of good faith such as clause 4.2 of the 2013 SHA necessarily includes, as a "minimum standard", a requirement that the parties be faithful to their agreed common purpose as derived from their agreement (which the Judge paraphrased as "the parties' bargain"), and that by reason of sections 17 and 171(a) of the 2006 Act, the 2013 SHA (including clause 4.2) formed part of the Company's constitution so that the directors nominated by the Investors were bound to act in accordance with it, the Judge then sought to identify what the parties' bargain entailed in the instant case.

107.    The Judge first sought to identify the relevant factual matrix.  He suggested that in 2010 the parties envisaged a potentially long term arrangement which, in light of the uncertainties inherent in commercialising a new technology, was likely to become subject to pressures over time.  The Judge then commented that in 2010, the Minorities (who were then the majority shareholders) were "not investors in a technology business; they were investors in a start-up business headed by Dr. Sachs, whose purpose was to realise the vision he had set out": or in Mr. Faulkner's words, Dr. Sachs was "the jockey they were backing", and that Dr. Sachs and Mr. Faulkner were key individuals to realising the business vision the Minorities had invested in.

108.    In passing, and in light of the importance attached to it in argument by the Minorities, I would observe that the colourful image of Dr. Sachs being "the jockey" whom the Minorities were backing when they invested in 2010, should not be allowed to lead a life of its own.  In law, the Minorities had invested in and were shareholders in the Company, and their rights capable of giving rise to relief under section 994 were their rights *qua* members of the Company.  Those were rights in relation to the horse, rather than the jockey, and in the absence of any suggestion of a quasi-partnership, those rights were governed by the articles and shareholders' agreement in force from time to time.

109.    As regards Vollin, the Judge acknowledged that, even in 2010, Vollin was taking a material financial risk in investing in an unproven business.  He accepted that it wished to have latitude to take decisions in its own commercial interests given that there was "plenty of opportunity for things to go wrong, not only with the technology but with the management of the business more generally".

110.    At this stage in his analysis, the Judge concluded (at paragraph 385 of his Judgment) that the structure arrived at in 2010 and 2013 was a compromise designed to hold a balance between these potentially differing sets of interests.  At paragraph 386, he observed that,

> "A cornerstone of this constitutional settlement, designed as it was to maintain an acceptable balance of power between the existing and new shareholders, was the allocation of management responsibility for the business to the Company's board of directors.  More specifically, the allocation of responsibility was to a board having the particular characteristics described in the SHA and Articles."

111.    The Judge then turned to the central part of his analysis of the parties' bargain.  He placed particular emphasis upon the provisions of clauses 7.1 to 7.3, 7.8 and 7.13 of the 2013 SHA, which he saw as providing that Vollin's representatives would be in the minority on the board; that both Dr. Sachs and Mr. Faulkner had to be present for a board meeting to be quorate; and that both Dr. Sachs and Mr. Faulkner had to vote in favour for a decision to be passed at board level.

112.    At paragraphs 386(iv)-(vi), the Judge also relied upon what he described as,

> "… other protections that were built into the overall arrangement to ensure that Dr. Sachs and Mr. Faulkner could *not* be removed from office as directors."

> (the Judge's emphasis)

113.    In this regard, the Judge referred to the provisions that Dr. Sachs and Mr. Faulkner were not to retire by rotation and (unlike other directors) by virtue of Article 15.2 could not be removed from office by resolution of the board and were to vacate office only in more limited circumstances set out in Article 15.

114.    The Judge then considered the balance of power between the shareholders and the board, referring to clause 5 of the SHA and in particular to the second sentence of clause 5.1 which provided,

> "The Shareholders shall each co-operate with the Board in the running and operation of the company and each CPG Group Company."

115.    The Judge then reached his central conclusion at paragraph 390,

> "390.    Thus, the overall structure is clear: the business of CPGL and its subsidiaries was to be managed by the board; Vollin and Minden between them were to nominate three of the

six board members; but Dr Sachs and Mr Faulkner were to be central figures on the board and were to hold the balance of power in the company at that level; and the board was to be able to operate free from shareholder interference, because the shareholders were bound to co-operate with it."

116.    The Judge then continued,

"391.    Viewed in that light I have concluded that I am persuaded by Mr. Hollington's submissions on the scope and content of the good faith duty in this case.

392.    First of all as to scope, the good faith provision in clause 4.2 is in a section of the SHA headed "*Warranties*." Given both its position within the SHA as a whole, set as it is among other, general undertakings, and given also its language which could not be broader ("*act in good faith in all dealings with the other Shareholders and with the Company in relation to the matters contained in this Agreement*"), clause 4.2 seems to me in principle wide enough in scope to capture the exercise of voting rights by the majority shareholder(s) in a manner which has an impact on the overall balance of interests achieved by the 2010 and 2013 Constitutions.

393.    As to content, it seems to me that Mr. Hollington must be right that the good faith obligation was intended to impose a contractual restriction, binding as between the shareholders, on the otherwise untrammelled rights of Vollin and Minden to exercise their majority power under Companies Act section 168(1) as they saw fit. They were bound to act with fidelity to the bargain (see [357]-[358] above), and that meant respecting the balance of power achieved by means of the overall constitutional settlement. Critical parts of that were the special positions occupied by Dr. Sachs and by Mr. Faulkner. It makes no real sense to say that the Investors retained an entirely unrestricted right to drive a coach and horses through that constitutional settlement by virtue of their majority voting power.

394.    True, [the Investors] had such an unrestricted right as a matter of company law, which could not be excluded; but as a matter of private contract it could, and it makes perfect sense to conclude that it was, because otherwise the protections built into the overall scheme by virtue of Dr. Sachs' and Mr. Faulkner's special positions could be swept away at will. That cannot have been what the parties intended. The upshot is that the Investors could of course exercise their majority power to remove Dr. Sachs and Mr. Faulkner, and such removals would be effective and not susceptible to revocation; but at the same time, they would constitute a breach of contract as between the shareholders, entitling the disadvantaged shareholders in an

> appropriate case to claim a remedy – as they do in this case, in the form of relief for unfair prejudice under Section 994."

117. The Judge's cross-reference in paragraph 393 to paragraphs 357 and 358 of his Judgment, was to two first instance cases, namely Berkeley Community Villages v Pullen [2007] EWHC 1330 (Ch) ("Berkeley") and CPC Group Ltd v Qatari Diar Real Estate Investment Co. [2010] EWHC 1535 (Ch) ("CPC Group"). I will return to consider those cases below.

118. The Judge then dismissed two contrary arguments made on behalf of the Investors which drew attention to the words "insofar as they each remain a Director" in clause 7.8 of the 2013 SHA, and the provisions in clause 16 of the 2013 SHA for mandatory sale of some or all of Dr. Sachs' and Mr. Faulkner's B Shares in the event of them being a "Good Leaver" or "Bad Leaver" as defined.

119. The Judge accepted that these clauses were consistent with Dr. Sachs and Mr. Faulkner being vulnerable to removal as directors, but he sought to explain this on the basis that this did not mean that their removal might not also give rise to other legal consequences, such as breach of contract or a claim for unfair prejudice. So, for example, in paragraph 399 he said, as regards the provisions for sale of the B Shares,

> "At its highest, all that is said is that there would have been no purpose providing for what should happen to Dr Sachs and Mr Faulkner's B shares upon their being removed as directors, if the correct position is that they could never be removed. The short answer, again, is that they always could be removed by majority shareholder vote – there was nothing to be done to prevent that – but that is not the same as saying that if they were, there could be no claim for unfair prejudice."

120. The Judge then concluded, at paragraph 400,

> "That deals with what seems to me to be a critical component of the good faith obligation in this case, which is probably best expressed as the requirement of fidelity to the bargain. Before moving on to look at the facts, I should again make it clear that I regard the duty as wider than that, and I gratefully adopt in full HHJ Klein's articulation of the overall content of the duty [in Unwin v Bond] … I emphasise in particular the obligation to deal fairly and openly, the need to take into account the interests of the other party as well as one's own interests, and the fact that the duty may be breached where an otherwise justifiable result is achieved in procedurally non-compliant way."

121. In summary, the Judge's reasoning was that the obligation in clause 4.2 of the 2013 SHA to act in good faith necessarily imported all of the "minimum standards" of good faith identified in Unwin v Bond, including the requirement of "fidelity to the bargain". The Judge also considered that because of the terms of that bargain, which he derived from the 2013 SHA and the 2013 Articles, the Investors would be acting in breach of contract if they removed Dr. Sachs or Mr. Faulkner from the board, or interfered in any way with the management of the Company by a board on which Dr. Sachs and Mr. Faulkner held the balance of power.

F.       The Judge's application of the law to the facts

122.    The Judge then turned to apply the principles of law that he had set out to the facts.  I
         can summarise his relevant findings (omitting some of the complaints that he did not
         find proven) under a number of headings.

*The resignation of Dr. Sachs*

123.    The Judge first held that on the basis of his interpretation of clause 4.2, the enforced
         resignation of Dr. Sachs necessarily involved a breach of contract by the Investors and
         a breach by their nominated directors of their duties under sections 171(a) and 172(1)(f)
         of the 2006 Act.  His reasoning as regards the Investors can be seen from the following
         paragraphs,

                  "402.   It follows from the views I have already expressed that in my
                  judgment, the actions taken by the Investors to exclude Dr. Sachs in
                  March 2016 were unfairly prejudicial to the Petitioners. They were unfair
                  in the sense that, in breach of the obligation of good faith, they involved
                  the Investors exerting their power to exclude Dr. Sachs in a manner
                  expressly designed to override the carefully calibrated constitutional
                  balance; it was prejudicial because the effect was to deprive the
                  Petitioners not only of the benefit of Dr. Sachs' technical expertise, but
                  also of the protections which his presence on the CPGL board were
                  designed to achieve.

                  …

                  405.   I would also go further and say that the process by which Dr.
                  Sachs' removal was achieved involved a breach of the good faith duty. In
                  my judgment there was a failure to deal fairly and openly with Dr. Sachs,
                  and a failure by the Investors to take into account the interests of the
                  Minorities as well as their own interests. The effect was a result which,
                  even if it had otherwise been justifiable, was achieved in a procedurally
                  non-compliant way."

124.    The basis for the Judge's finding of procedural unfairness was that the Investors had
         deliberately taken Dr. Sachs by surprise when they presented him with an ultimatum to
         resign at the meeting on 14 March 2016.  The Judge also found that the representatives
         of the Investors gave Dr. Sachs the impression that Vollin would withdraw funding
         immediately if he did not resign, thereby putting him under time pressure.  The Judge
         did not find that the Investors deliberately misled Dr. Sachs in that respect, but he
         concluded that the obligation upon them to deal fairly and openly with Dr. Sachs
         required that they should have told him that Vollin had in fact agreed to provide funding
         until the end of May 2016.

125.    The basis for the Judge's finding that the Investors failed to take into account the
         Minorities' interests was essentially based on the fact that the Minorities had invested
         in a company led by Dr. Sachs and that he had a "special status" for them in the
         management and direction of the business.

126.    In the course of this part of the Judgment, the Judge made a number of important findings as to the Investors' beliefs and reasons for acting as they did. In particular, he held that the Investors genuinely, *bona fide* and rationally held the view that the success of the Company's business was only possible if Dr. Sachs was removed as a director. However, the Judge concluded that this did not matter, because of the view that he had formed that the 2013 constitution was designed to entrench Dr. Sachs and Mr. Faulkner in office and "to avoid the will of the majority shareholders prevailing in relation to the commercial future of the Company". The Judge stated,

> "413. … By 14 March 2016, the Investors had reached the view that success (or perhaps, as they saw it, salvaging something from failure) was possible only with Dr. Sachs out of the picture. Viewed purely commercially, I have no doubt that that was a rational view to have come to: the overall project had come to be vastly more expensive than originally anticipated; there had been many setbacks including missed milestones; the P1 prototype tested in Phoenix in February was some way removed from the original vision; Dr. Sachs had demonstrated a stubborn personality and limited leadership skills; and there had been the ugly disagreement with Mr. Bolger at the meeting on 11 March, and then the stand-off over the appointment of management consultants, both of which – entirely reasonably in my view – had so unsettled Mr. Tenenbaum.
>
> …
>
> 415. The case advanced [for the Investors] was essentially that they had finally come to the view that Dr. Sachs and his vision were a busted flush. I have no doubt that that was their legitimately held view, but I also think that in taking the action they did they failed to have regard to the facts that (1) there was at least scope for a different view … ; and (2) excluding Dr. Sachs would materially disadvantage the Minorities in terms of the balance of power at board level. What one is left with is essentially the majority Investors imposing on CPGL their own vision of what should happen to CPGL commercially. In my view, it does not matter that that vision may have been a sound one. The point is that, good or bad, it was an expression of the will of the majority only. The 2013 constitution was expressly designed to avoid the will of the majority prevailing in matters concerned with the commercial future of CPGL.
>
> …
>
> 419.    The majority investors justify the exclusion of Dr Sachs on the basis that they *bona fide* held the view that it was right for the business for him to go. I am sure they did hold that view, but even so, they were not entitled to impose it on the other shareholders…."

127.    As regards the directors, the Judge held that it followed from his interpretation of clause 4.2 of the 2013 SHA and his acceptance that it formed part of the constitution of the Company that the directors had breached their duties under section 171(a) of the 2006 Act. He held, at paragraph 427,

> "427.   … it must follow that in participating in the events which led to the removal of Dr. Sachs, Mr. Fletcher and Mr. Burkey were in breach of the duty under section 171(a) of the Companies Act. That is because, in participating in those events, they were necessarily taking steps which undermined CPGL's constitution, for all the reasons I have identified above. A company's constitution is wider than its memorandum and articles for these purposes and includes a shareholders agreement such as the 2013 SHA."

128.   The Judge also concluded, at paragraph 429, that the directors nominated by the Investors had breached their duties under section 172(1)(f) of the 2006 Act when participating in the events leading to the removal of Dr. Sachs,

> "429.   … I think it must also follow that Mr. Fletcher and Mr. Burkey were in breach of their duty under the Companies Act section 172. I say that because discharge of the section 172 duty required them specifically to have regard to "*the need to act fairly as between the members of the company*" (section 172(1)(f)). In supporting the initiative to remove Dr. Sachs, Mr. Fletcher and Mr. Burkey must obviously have disregarded the separate and specific interest of the Minorities in having him remain in post, for all the reasons already described above, including in particular their interest in maintaining the overall constitutional balance enshrined in the 2013 SHA."

129.   The Judge did, however, absolve the directors from any other breaches of their duties to the Company as regards the process leading to the resignation of Dr. Sachs.

*The management of the Company after the departure of Dr. Sachs*

130.   At paragraphs 434 and 435, the Judge summarised the Minorities' complaints in respect of the period after Dr. Sachs' resignation.   In essence the complaint was that the management of the Company was not conducted by the board, but was conducted by the Investors at meetings from which Mr. Faulkner was excluded.   The Minorities also complained that information was withheld from Mr. Faulkner.

131.   The Judge rejected the Minorities' generalised complaints about a lack of information, but found, at paragraph 448, that the "real point" was that after Dr. Sachs' resignation, "Mr. Faulkner was given no active role in the management of the business, although that is what the 2013 constitution required".   He found that instead, *de facto* control of the management of the business was taken over by the Investors via the medium of the regular presentations to them by Kew.   At paragraph 451, the Judge held that it was clear that the only directors present at these Investor meetings with Kew were those nominated by the Investors, whereas "the agreed on constitutional balance required others to be involved in those same discussions (Mr. Faulkner and Dr. Lind, and possibly a replacement for Dr. Sachs) but that did not happen" because they were not invited and did not attend.   The Judge concluded at paragraph 453, that by this means, although Mr. Faulkner remained a director of the Company and CPUK, he was kept at arm's length from the key strategic decisions made in relation to both companies.

132.   The Judge held, at paragraph 456, that the particular instances of a failure to provide information   and   a   failure   to   consult   relied   upon   by   the   Minorities   were   best

characterised as examples of the Company's constitutional machinery having broken down. He explained, at paragraphs 457 to 459,

> "457.   Thus, although Mr. Faulkner was given information about the closure of Newton Aycliffe, about the possible MBO, and about the Group's funding needs, nonetheless the manner in which those matters were dealt with reveals breaches by the Investors of the material terms of the [2013] SHA, and in particular clause 4.2 (good faith), clause 5.2 (good business practice), and clause 5.3(a) (proper and efficient manner). That is because in dealing with them, the constitutional structure set out in the [2013] SHA and the 2013 Articles was effectively ignored by the Investors. In my view, because they were so fundamental, those breaches were both unfair and prejudicial.
>
> 458.   The same goes for the Company's fund-raising efforts in August 2016. Mr. Faulkner was aware of what was needed, but had no active involvement in the relevant decision-making process. His resultant concerns informed his decision to circularise the Minorities on 17 August 2016, seeking their consent to the further US$4.5m subscription by Vollin. Given that their consent was sought and provided, it is impossible for them to say they did not know what was going on or were not consulted, but what they can say is that by this stage the proper constitutional machinery for approving new subscriptions had entirely broken down. Even assuming Fieldfisher's view of clause 20.1 of the SHA was the correct one, still, what clause 20.1 contemplated was a board constituted and operating in accordance with the 2013 constitution. Self-evidently, by August 2016 that was no longer happening. Thus, whatever they may have known, the crux of the matter is that the Minorities were deprived of the benefits of the constitutional settlement they had agreed with the Investors. The same logic can be applied to the later loan by Minden in November 2016, although that was not the subject of any detailed submissions by the parties at trial.
>
> 459.   The deception of Mr. Faulkner as regards the approach by Kaiam is a more serious matter, of course, but ultimately in my view symptomatic of the same basic problem. Thus, there was some debate at trial as to what Mr. Faulkner should have been told about the Kaiam merger approach. It seems to me the answer to that question is clear if one imagines what would have happened in the normal course had there been a properly functioning board. In such circumstances, it is obvious that Mr. Faulkner would and should have been informed about the approach by Kaiam, even at the stage when the favoured option was a merger. That is because a critical part of Kaiam's motivation was acquisition of the Newton Aycliffe Fab, and the Fab was a major asset of the Group and indeed of CPUK, of which Mr. Faulkner was the sole director … The failure to inform Mr. Faulkner was symptomatic of the generally dysfunctional governance regime which followed in the wake of Dr. Sachs' departure, and therefore a product of the ongoing breaches by the Investors which I have already referred to."

133.    As regards the conduct of the directors nominated by the Investors during this period, the Judge found (at paragraph 477) that it necessarily followed from his earlier conclusions that they acted in breach of their section 171(a) duties because,

> "... the balance of powers enshrined in the 2013 constitution had been entirely overridden: the machinery of the 2013 SHA and [2013] Articles had entirely broken down."

134.    However, the Judge found that the directors had not otherwise breached their duties during the period after Dr. Sachs had left. In particular, he held (at paragraphs 479 to 485) that they had acted in good faith in taking the steps they thought necessary to salvage something from the position that the Company found itself in.  The Judge also took the view that the interests of the Minorities and the Investors in the survival of the business during this period were aligned,

> "485.    ...I can well see that the Investors and the Minorities had divergent interests when it came to the make-up of the board and constitutional structure of the business, but not when it came to the commercial direction of the business, and to making the tough decisions which had to be made in the Spring of 2016 in the wake of Dr. Sachs' departure. Very likely, given the state the business was in, and its dependence on the majority Investors for its ongoing funding, the range of options available to the nominee directors was very narrow, and they had no real choice but to do what they did. It thus seems to me that at that point and in that sense, the interests of the Investors and the Minorities were aligned; ..."

*The removal of Mr. Faulkner*

135.    The Judge upheld the Minorities' complaints about the removal of Mr. Faulkner at the general meeting held on 25 October 2016 for essentially the same reasons as he had applied to the process leading to the resignation of Dr. Sachs.  As regards the Investors, he said, at paragraph 504:

> "504.    ... The actions taken by the Investors to remove him from his position as a director were on the face of it unfairly prejudicial for just the same reasons as in the case of Dr. Sachs. They were unfair because they involved the Investors exercising their voting power to exclude Mr. Faulkner in a manner which obviously had the effect of overriding the agreed upon constitutional balance, and they were prejudicial because they deprived the Minorities not only of Mr. Faulkner's presence on the board as someone who could look out for their interests, but also of the protections which his presence on the board were designed to achieve."

And as regards the directors, the Judge held, at paragraph 511,

> "511.    The same analysis applies as above, in relation to the removal of Dr. Sachs. The removal of Mr. Faulkner was brought about by the Investors, not the directors. To the extent they were involved in encouraging or facilitating that removal, that can only have involved

breaches of duty under [the] Companies Act s171(a) and s172, but not breach of any other duty…"

*The appointment of further directors*

136. A further group of complaints by the Minorities alleged that the changes to the composition of the board of the Company in the periods after October 2016 infringed Article 14.2 (i.e. the provisions stipulating that the board could only appoint replacement or additional directors with the approval of Dr. Sachs and Mr. Faulkner). At various times after the departure of Dr. Sachs and Mr. Faulkner, new directors were appointed. These included, in particular the appointment of Mr. Woo as CEO (14 November 2016) and Mr. Bolger (7 December 2016).

137. The Judge identified that the underlying question was "how the constitution of CPGL was intended to work, in the absence of Dr. Sachs and/or Mr. Faulkner", and observed, at paragraph 521:

> "The fact is that the 2013 constitution does not contain answers to these questions. That fact in itself, it seems to me, supports the view I have taken of the parties' bargain: the constitution contains no obvious machinery for dealing with the situation in which Dr. Sachs and Mr. Faulkner are removed from office because it was not seriously expected to happen: or perhaps, it was not seriously expected to happen and for the Minorities to remain as shareholders in a business controlled by the majority Investors."

138. The Judge then went on to hold, at paragraphs 522 to 524, that the appointments of new directors without the consent of Dr. Sachs and Mr. Faulkner amounted to a breach by the Investors of the 2013 SHA and breaches of their duties under sections 171(a) and 172 by the other directors,

> "522. That being so, it seems to me the real value of the Petitioners' argument under this head is that it is another example of the machinery of the 2013 constitution having entirely collapsed, and simply not being workable in any recognisable way, in the periods after the departure of Dr. Sachs and Mr. Faulkner. As Mr. Hollington put it in his Written Closing: *"The breach of Article 14.2 is part-and-parcel of the majority investors driving a coach and horses through the 2013 Constitution by assuming full board control for themselves."*

> 523. I agree with the broad thrust of that proposition. I therefore agree that the appointments of the further directors mentioned, in a manner which ignored entirely the possibility that the Minorities might be entitled to a say in how the business was run, necessarily involved further breaches by the Investors of the material provisions of the SHA, and in particular clause 4.2 (good faith), clause 5.2 (good business practice), and clause 5.3(a) (proper and efficient manner).

> 524. To the extent the appointments were approved by and/or supported by the existing directors, they must also have involved

breaches by those directors of their duties under [the] Companies Act 2006, sections 171(a) and 172 …"

*The sale of Newton Aycliffe*

139.    The Judge found, having heard expert evidence, that Newton Aycliffe had <u>not</u> been sold to Kaiam at an undervalue. He also found that the directors had <u>not</u> breached their duties under section 172 of the 2006 Act in relation to the sale for similar reasons.

140.    However, on the same basis as in relation to the management of the Company more generally over the period after the departure of Dr. Sachs, the Judge found, at paragraph 569, that the *process* leading to the sale did involve breaches by the Investors of the 2013 SHA,

> "569.  It follows [from the fact that Newton Aycliffe was not sold at an undervalue] that the particular potency of the [Minorities'] complaint against the Investors under this heading is rather lost. Nonetheless, I am bound to conclude, for all the reasons already explained above, that the circumstances leading down to the sale to Kaiam involved continuing breaches of the [2013] SHA by the Investors and continuing unfair prejudice. As before, I would identify in particular breaches of the [2013] SHA clauses 4.2, 5.2 and 5.3(a). That is because the relevant decisions were taken not by the board of CPGL, constituted in the manner required by the 2013 SHA and operating in the manner contemplated by the 2013 SHA. Instead, the relevant decisions, including in particular the eventual decision to sell in May 2017, were taken by a board constituted by Vollin and Minden and comprising their nominees and Mr. Woo (the CEO) whom they had selected."

141.    At paragraph 578, the Judge also found, for the same reasons, that the directors nominated by the Investors had breached their duty to act in accordance with the Company's constitution under section 171(a) of the 2006 Act.

G.    The central issues on the appeal

142.    In principle, the Judge was correct to approach matters on the basis that, in the absence of any suggestion that the Company was a quasi-partnership or that there were any other grounds for the imposition of equitable constraints upon the actions of the members, the question of whether the acts of the Investors amounted to unfairly prejudicial conduct within the meaning of section 994 turned upon whether such conduct breached the terms upon which the members had agreed that the affairs of the Company should be conducted, i.e. the 2013 Articles and the 2013 SHA: see per Lord Hoffmann in O'Neill v Phillips [1999] 1 WLR 1092 at 1098G-1099A.

143.    In that respect, as is apparent from my lengthy summary of the Judge's reasoning, the majority of his findings of unfair prejudice depended upon his interpretation of the content of the obligation of good faith in clause 4.2 of the 2013 SHA. The Judge took the view that the use of the expression "good faith" in clause 4.2 necessarily imported all of the "minimum standards" of good faith identified in Unwin v Bond. These minimum standards included, in addition to a requirement that the Investors should act

honestly, a requirement of "fidelity to the bargain", a requirement of "fair and open dealing", and a requirement "to have regard to the interests" of the Minorities.

144.   Also critical to the Judge's decision on the meaning of clause 4.2 of the 2013 SHA was his identification of the "bargain" embodied in the 2013 constitution of the Company. He took the view that the bargain was that, come what may, the management of the Company was to be conducted by a board on which Dr. Sachs and Mr. Faulkner were entrenched and held the balance of power, and with whose decisions the Investors could not interfere.

145.   In addition to the question of whether the actions of the Investors were themselves unfairly prejudicial to the Minorities within the meaning of section 994, the Judge also found that the actions of the directors nominated by the Investors were unfairly prejudicial, because they involved breaches of duty by the directors. Again, however, the vast majority of the Judge's findings of breach of duty against the directors also depended upon his interpretation of clause 4.2 of the 2013 SHA. Moreover, so far as the directors' duties under section 171(a) of the 2006 Act were concerned, the Judge's findings also depended upon his conclusion that by reason of section 17 of the 2006 Act, the Company's constitution was not limited to the 2013 Articles, but also included the 2013 SHA.

146.   I shall consider the Judge's legal analysis of these issues in the same sequence.

H.    The meaning of clause 4.2 of the 2013 SHA

*The general approach*

147.   In approaching the interpretation of clause 4.2, the first, and most important, point to emphasise is that like any question of interpretation of a contract, an express clause in a contract requiring a party to act in "good faith" must take its meaning from the context in which it is used. That point has been made very clearly in many cases, including by Jackson and Beatson LJJ in Compass Group UK and Ireland Ltd (t/a Medirest) v Mid-Essex Hospital Services NHS Trust [2013] EWCA Civ 200 ("Compass Group") at [109] and [150]- [151].

148.   The second, and related, point is that when considering the interpretation and meaning of an express good faith clause in context, cases from other areas of law or commerce, which turn upon their own particular facts, may be of limited value and must be treated with considerable caution. That point was made very clearly by Auld LJ in Street v Derbyshire Unemployed Workers' Centre [2004] EWCA Civ 964 ("Street") at paragraph [41], which was cited with approval by Jackson LJ in Compass Group at [110],

> "Shorn of context, the words "in good faith" have a core meaning of honesty. Introduce context, and it calls for further elaboration. Thus in the context of a claim or representation, the sole issue as to honesty may just turn on its truth. But even where the content of the statement is true or reasonably believed by its maker to be true, an issue of honesty may still creep in according to whether it made with sincerity of intention for which the Act provides protection or for an ulterior and, say, malicious, purpose. The term is to be found in many statutory and common-law contexts, and because they

> are necessarily conditioned by their context, it is dangerous to apply judicial
> attempts at definition in one context to that of another."

(my emphasis)

149.    Given that very clear warning, as Newey LJ observed at the hearing, apart from the
        very obvious point made by Auld LJ in <u>Street</u> that the core meaning of an obligation of
        good faith is an obligation to act honestly, it is very far from obvious why it is logical
        or appropriate to attempt to analyse other cases, decided on other facts, in order to
        deduce a number of further "minimum standards" of conduct that a defendant must be
        taken to have agreed to comply with in every case in which a good faith clause has been
        used in a contract.

150.    That was, however, what HHJ Klein did in paragraphs 230 to 232 of his judgment in
        <u>Unwin v Bond</u>, which formula the Judge endorsed and applied "in full" as the
        cornerstone of his reasoning in paragraphs 366, 367 and 400 of his Judgment in the
        instant case.

151.    I respectfully agree with the point made by Auld LJ in <u>Street</u> and the doubts expressed
        by Newey LJ. Whilst the concepts and ideas advanced in other cases might well be
        useful analytical tools in the process of interpretation of a particular contract, in my
        view it is not appropriate simply to apply them in a formulaic way in every case,
        irrespective of the context and the other terms of the agreement in issue.

*Procedural fairness*

152.    That point can be illustrated in relation to the Judge's conclusion that the duty of good
        faith in clause 4.2 included a procedural requirement that the Investors should deal
        "fairly and openly" with Dr. Sachs and Mr. Faulkner, including when seeking their
        respective resignation or removal from office as directors. It is evident from the
        Judgment that this duty was not derived by the Judge from any other provisions of the
        2013 SHA or the 2013 Articles. The only basis for his conclusion that clause 4.2 was
        intended to impose such a duty upon the Investors in this case, was that such a duty had
        been found to exist in a number of earlier authorities.

153.    The first authority relied upon by the Judge in that regard, at paragraph 363 of his
        Judgment, was the decision of Neuberger J in <u>Mullins v Laughton</u> [2002] EWHC 2761
        (Ch), [2003] Ch 250. The Judge regarded this as a "good example" of a duty of good
        faith being breached by procedural deficiencies in the process by which a meeting with
        the claimant had been held. However, I consider the facts of that case and the legal
        basis for Neuberger J's comments were clearly distinguishable from the instant case.

154.    <u>Mullins v Laughton</u> was a partnership case which did not concern a contractual duty of
        good faith at all. Instead, the partnership agreement contained a clause which required
        the partners to be "just and faithful to the other partners". As Neuberger J made clear
        at paragraph 95 of his judgment, this simply enshrined in the agreement, "the most
        fundamental obligation which the law imposes on a partner", namely "the duty to
        display complete good faith towards his co-partners".

155.    In my judgment there is, however, no equivalence between the duty of good faith
        imposed by law on partners, between whom there is a fiduciary relationship, and the

agreement made between the shareholders of the Company in the instant case. The shareholders had expressly agreed by clause 23 of the 2013 SHA (see paragraph 88 above) that their relationship was not to be one of partnership, and that they owed each other no fiduciary obligations.

156. Likewise, the Judge placed reliance, at paragraph [364] of his Judgment, on Re Audas Group [2019] EWHC 2304 (Ch). That was a case in which HHJ Halliwell (sitting as a Deputy High Court Judge) had held that an express contractual duty of good faith had been breached when the minority shareholder had been dismissed as an employee of the company without a "fair and proper process". However the facts and legal context of Re Audas Group were very different from the instant case.

157. Re Audas Group was a case in which HHJ Halliwell expressly found that the company had been formed as a quasi-partnership based upon a personal relationship involving mutual confidence, and that the subsequent shareholders' agreement containing a "good faith" clause was not intended to supersede those understandings: see paragraphs 135 and 136 of his judgment.

158. It is therefore wholly unsurprising that in Re Audas Group, HHJ Halliwell took the view that the contractual good faith clause had a procedural content that reflected what he expressly referred to as "the analogous context of partnership law". In particular, HHJ Halliwell referred to the requirement of partnership law set out in Blisset v Daniel (1853) 10 Hare 493 that partners should not exercise a power of expulsion without first notifying the partner concerned and providing the partner with a proper opportunity to explain his case: see paragraphs 108 and 109 of his judgment. That express analogy with partnership law set the scene for HHJ Halliwell's finding that the defendants had breached their duties of good faith when "peremptorily" dismissing the claimant as an employee: see paragraph 120 of his judgment.

159. It is also apparent that none of Mullins v Laughton, Re Audas Group or Unwin v Bond considered what a duty to deal "fairly and openly" might require in the context of the statutory process for removal of a director of a company by its shareholders pursuant to section 168 of the 2006 Act. As I have indicated, Mullins v Laughton was a partnership case, and the act complained of in both Re Audas Group and Unwin v Bond was the dismissal of the petitioner as an employee of the relevant company.

160. In that regard, I note that section 168(2) of the 2006 Act contains an express requirement for special notice to be given of a resolution to remove a director under section 168, and section 169 of the 2006 Act contains an express statutory code under which a director faced with an intended resolution for his removal has a right to make written representations to the members of the company and to be heard on the resolution at the meeting of shareholders. However, because the Judge relied on the authorities to which I have referred, and adopted the entirety of HHJ Klein's formulation of minimum standards of good faith from Unwin v Bond, he did not consider how (if at all) the parties to the 2013 SHA might be taken to have envisaged that a duty of fair and open dealing was intended to fit alongside or to add to those statutory procedures.

*Fidelity to the bargain and consideration of interests*

161. Similar points can also be made in relation to the other cases which were relied upon by the Judge in deciding that the obligation of good faith in clause 4.2 necessarily

obliged the Investors to act "with fidelity to the bargain", and to have regard to the interests of the Minorities as well as their own interests.

162.     First, although the Judge did refer, in paragraphs 382 to 399 of his Judgment, to some aspects of the factual background and other provisions of the 2013 SHA and 2013 Articles in arriving at his view of what the concept of fidelity to the bargain required, there was no such analysis in relation to the concept of the need to take into account the interests of the other party.  In that regard, the Judge repeated that he adopted in full HHJ Klein's "articulation of the overall duty" of good faith in Unwin v Bond.

163.     Secondly, an examination of the cases upon which the Judge (and HHJ Klein) relied shows that these twin concepts originated in other legal systems – in particular the United States and New South Wales – where they have been applied in other areas of law and commerce not involving changes to the constitutional structure of a company.

Berkeley

164.     In Berkeley, the claimant was a commercial property developer which had been engaged to promote farmland owned by the defendants in Kent for property development purposes.  The agreement provided for the developer to receive a fee if planning permission was obtained.  Morgan J held that the defendant's intended sale of the land would breach an express term of the agreement to co-operate with the claimant to obtain planning permission: see paragraphs 65 to 70 and 85 of the judgment. However, Morgan J went on to consider *obiter* whether the proposed sale would also breach an express contractual term requiring the parties to act "with utmost good faith towards one another".

165.     It is apparent from Morgan J's judgment that the meaning of the good faith clause was advanced by the claimant primarily by reference to dicta of French J in Bropho v Human Rights & Equal Opportunity Commission [2004] FCAFC 16 ("Bropho").  That was an Australian case which considered the concept of good faith in the very different context of a statutory defence under the Australian Racial Discrimination Act which had been held to apply to a cartoon published in a newspaper.  The cartoon had depicted a group of Aboriginal people and had been the subject of a complaint that it was reasonably likely to offend, insult, humiliate or intimidate a group of people on the basis of race or ethnic origin.   As Morgan J observed, Bropho was not a decision in a commercial case, nor was it one in which a contractual duty of good faith was in issue. Instead, the judgment contained a general discussion of the concept of good faith by reference to a large number of examples drawn from very different contexts and different jurisdictions.

166.     Having sounded that note of warning, two of the examples given in Bropho nonetheless resonated with Morgan J.  The first was part of a citation from *Black's Law Dictionary*, an American publication, which contained a definition of good faith as,

> "A state of mind consisting in (1) honesty in belief or purpose,
> (2) faithfulness to one's duty or obligation, (3) observance of
> reasonable commercial standards of fair dealing in a given trade
> or business, or (4) absence of intent to defraud or to seek
> unconscionable advantage. – Also termed bona fides."

From that definition, counsel for the claimant in Berkeley had isolated and emphasised the third point.

167.    The second example highlighted by Morgan J was said to be paragraph 205 of the United States Second Restatement of Contracts ("the US Restatement"), which French J in Bropho had reported to be in these terms:

> "The phrase "good faith" is used in a variety of contexts and its meaning varies somewhat with the context. Good faith performance or enforcement of a contract emphasises faithfulness to an agreed common purpose and consistency with the justified expectations of the other party; it excludes a variety of types of conduct characterised as involving "bad faith" because they violate community standards of decency, fairness or reasonableness."

168.    French J's reference to paragraph 205 of the US restatement was incorrect. Paragraph 205 of the US Restatement in fact states,

> "Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement."

The text quoted by French J actually appears in the Commentary by the American Law Institute (ALI) upon paragraph 205. In context, the ALI Commentary is describing part of a composite expression ("good faith and fair dealing") which appears to be a summation of general duties imposed by law on contracting parties in the United States.

169.    In Berkeley, Morgan J construed the good faith clause as imposing an obligation which was an amalgam of these US law materials to which he had been referred. He also made clear that he did so in the absence of any contrary argument. At paragraph 97 of his judgment, Morgan J stated,

> "97.    [Counsel for the defendant] did not suggest that these statements by French J. (and the material referred to by the learned judge) were not a useful attempt to describe the concept of "good faith". Nor did [he] refer me to any English authority, or any other authority, which adopted a different approach. In these circumstances, based on the material that has been put before me, I feel I am able to construe [the utmost good faith clause] as imposing on the defendants a contractual obligation to observe reasonable commercial standards of fair dealing in accordance with their actions which related to the Agreement and also requiring faithfulness to the agreed common purpose and consistency with the justified expectations of the first claimant."

CPC Group

170.    Morgan J's decision in Berkeley was referred to by Vos J in CPC Group. That case concerned the terms of a sale and purchase agreement by which the claimant had sold its interest in a property-owning company to the defendant on the basis that if planning

permission was subsequently obtained for the property, additional deferred consideration would be paid. The claimant contended that steps taken by the defendant to withdraw an application for planning permission that had attracted adverse comment and to resubmit it with a new design, breached an express contractual term requiring the parties to act "in the utmost good faith" in relation to the matters set out in the agreement.

171.   The observations of Vos J as to the meaning of the relevant clause were expressly *obiter*, as he decided that a particular factual premise for the alleged breach of the good faith term had not been made out: see paragraph 237 of his judgment.

172.   In his judgment, Vos J referred first to Lord Scott's dictum in <u>Manifest Shipping v Uni-Polaris Shipping Co</u> [2003] 1 AC 469 ("<u>Manifest Shipping</u>") at paragraph 111 that,

> "Unless the assured has acted in bad faith, he cannot, in my opinion, be in breach of a duty of good faith, utmost or otherwise."

173.   Vos J then referred to the New South Wales case of <u>Overlook v Foxtel</u> [2002] NSWSC 17 ("<u>Overlook</u>"). As a preliminary matter, Vos J commented at paragraph 238 that the particular relevance of the <u>Overlook</u> case was that it dealt with the inter-action between an obligation of good faith and the parties' pursuit of their own commercial or other interests. As Vos J subsequently pointed out in paragraph 243 of his judgment, this raised a particular type of issue as to the extent to which a good faith clause might inhibit the defendant's ordinary freedom to act in its own interests if to do so might render the contract worthless or significantly less valuable for the claimant.

174.   That was also the particular factual context of the decision in <u>Overlook</u>, which concerned a contract for the supply of two foreign television channels to a company that provided pay television services in Australia. The contract provided for the claimant supplier to be remunerated by the defendant pay television provider on the basis of a percentage of revenue from supply of the channels by the defendant to its subscribers. The defendant had decided to offer the channels to its subscribers at half the previous price with a view to increasing its overall market penetration of non-English language channels, thereby causing a short-term reduction in the amounts payable to the claimant, which contended that this was a breach of contract.

175.   Vos J quoted the following extract from the judgment of Barrett J in <u>Overlook</u>, adding the emphasis shown in bold that focussed on the particular issue with which he was concerned,

> "65.   If adherence to such standards of conduct is the predominant component of a separate obligation of good faith in performance of a contract, it becomes necessary to enquire about the extent to which selflessness is required. **It must be accepted that the party subject to the obligation is not required to subordinate the party's own interests, so long as pursuit of those interests does not entail unreasonable interference with the enjoyment of a benefit conferred by the express contractual terms so that the enjoyment becomes (or could become), in words used by McHugh and Gummow JJ**

> in Byrne v Australian Airlines Ltd [1995] HCA 24; (1995) 185 CLR 410, "**nugatory, worthless or, perhaps, seriously undermined**". This seems to me to be the principle emerging from paras 172 to 177 of the joint judgment in [Burger King v. Hungry Jack's Pty [2001] NSWCA 187] where the various authorities are collected and discussed.
>
> 66.     Dr. Elisabeth Peden of the University of Sydney has characterised the effect of the good faith requirement in contractual performance as follows ("Incorporation of Terms of Good Faith in Contract Law in Australia", (2001) 23 Syd L.Rev 222):
>
> > "Most basically, by using the obligation to perform in good faith as a principle of construction the courts are merely required to ensure that the parties have genuinely adhered to the bargain which they entered into. This will require an examination of the whole contract and the underlying intentions. Strict rights may not be adhered to, if in the context of the contract as a whole, this would subvert the character of the contract. Most cases that discuss the concept do so in terms of negatives, that is, what is not in breach of good faith. This makes sense, since it is the context of the contract read as a whole that will indicate what is appropriate and what is not."
>
> 67.     Viewed in this way, **the implied obligation of good faith underwrites the spirit of the contract and supports the integrity of its character. A party is precluded from cynical resort to the black letter. But no party is fixed with the duty to subordinate self-interest entirely which is the lot of the fiduciary**: Burger King at para 187. **The duty is not a duty to prefer the interests of the other contracting party. It is, rather, a duty to recognise and to have due regard to the legitimate interests of both the parties in the enjoyment of the fruits of the contract as delineated by its terms.**
>
> 68.     In many ways, the implied obligation of good faith is best regarded as an obligation to eschew bad faith. This is borne out by the … succinct statement by Lord Scott of Foscote in Manifest Shipping Co Ltd v Uni-Polaris Shipping Co Ltd …"

176.    Vos J then cited passages from Morgan J's decision in Berkeley. There is no indication from the judgment that the origins of Morgan J's formulation were the subject of any detailed criticism or contrary argument before Vos J.

177.    Vos J then drew specific attention to the other clauses in the contract which had some bearing upon the extent to which the defendant, when taking steps in relation to the planning application, was obliged to have regard to the interests of the claimant in receiving payment of deferred consideration,

> "243.    In my judgment, all these authorities and analogies are helpful. The obligation in the SPA must, however, take its colour from the commercial context of the contract. Clause 7.1 is found specifically in the section concerned with the *"Protection of Deferred Consideration"*. It is, therefore, directed at things that might be done or not done in connection with the pursuit of the Planning Application, the success of which would trigger that consideration.
>
> 244.    In addition, clause 7.3 contained an express obligation on [the defendant] not to do anything so as to avoid or reduce payment of the Deferred Consideration. Delaying the payment would obviously reduce the payment's value, and must be included within that provision.
>
> 245.    There are other signs in the SPA, however, that the parties' commercial interests were not intended to be entirely subjugated to the pursuit of the Planning Application to the exclusion of all else. In paragraph 5(a), the central obligation was to use all reasonable but commercially prudent endeavours to procure a Planning Permission free of Legal Challenge. In paragraph 5(c), [The parties] were required to review a proposed variation *"to see if it is in their respective interests to make"* it. Moreover, clause 7.1 itself repeated the express obligation on [the defendant] to use *"all reasonable but commercially prudent endeavours"*, this time to enable the achievement of the various threshold events and Payment Dates."

178.    Vos J then concluded,

> "246.    Thus, it seems to me that the content of the obligation of utmost good faith in the SPA was to adhere to the spirit of the contract, which was to seek to obtain planning consent for the maximum Developable Area in the shortest possible time, and to observe reasonable commercial standards of fair dealing, and to be faithful to the agreed common purpose, and to act consistently with the justified expectations of the parties. I do not need, it seems to me, to decide whether this obligation could <u>only</u> be broken if [the parties] acted in bad faith, but it might be hard to understand, as Lord Scott said in <u>Manifest Shipping</u> how, without bad faith, there can be a breach of a duty of good faith, utmost or otherwise"."

179.    Although prefaced by a consideration of other terms of the SPA, Vos J's formulation of the content of the good faith duty in the first part of paragraph 246 plainly adopted the same wording as Morgan J's decision in <u>Berkeley</u>.

<u>The New South Wales cases</u>

180.    Given Vos J's extensive citation of Barrett J's judgment in <u>Overlook</u>, it is worth putting that decision and the other Australian cases upon which it was based into context.

181.  Although there was a factual similarity between the type of issue that was being considered in Berkeley and CPC Group and that considered in Overlook, it should be appreciated that there was an important juridical difference between the task being undertaken by the courts in those cases.  In CPC Group, as in Berkeley, the English court was engaged in the conventional exercise of interpretation of the express term of a contract governed by English law.  In contrast, Overlook did not concern the interpretation of an express contractual term of good faith.  Nor did Barrett J find that a duty of good faith was to be implied on the basis of construction of the contract.  A claim on that basis was considered by reference to the conventional tests for the implication of terms, and rejected on the basis that such a clause was not necessary to give business efficacy to the contract: see paragraphs 54 to 60 of the judgment, referring to BP Refinery (Westernport) v Shire of Hastings (1977) 180 CLR 266 at 283 and Codelfa Construction v State Railway Authority of NSW [1982] 149 CLR 337.

182.  Instead, the term requiring good faith in the performance of the contract in Overlook was held to be implied, as a matter of the law of New South Wales, in circumstances in which a discretionary decision taken by one party affected the benefit to be enjoyed by the other under the contract.  In that respect, and as is apparent from the extract cited by Vos J in CPC Group, Barrett J simply followed the earlier New South Wales decision in Burger King v Hungry Jack's Pty [2001] NSWCA 187 ("Burger King").

183.  Burger King concerned a contract governed by New South Wales law for development of a restaurant franchise business.  The court was not engaged in the interpretation of a good faith clause in the contract, but held as a matter of New South Wales law that the franchisor, Burger King, was required to exercise its discretion to approve or reject new franchises "in good faith and reasonably", and could not do so for an extraneous purpose so as to "thwart" the franchisee's ability to develop its business, and ultimately to procure a situation in which Burger King could terminate the contract: see paragraphs 185 to 187 of the judgment.

184.  The justification for the imposition of this term as to good faith was explained at paragraphs 146 to 150, making clear that it was heavily based upon the general concepts of good faith and fair dealing implied into all contracts under US law,

> "146.     Until Renard Construction (ME) Pty v Minister of Public Works (1992) 26 NSWLR 234 [("Renard")], there had only been tentative acceptance in Australian jurisprudence of an implied term of good faith. However, in Renard Priestley JA said at 268:
>
> > "... that people generally, including judges and other lawyers, from all strands of the community, have grown used to the courts applying standards of fairness to contract which are wholly consistent with the existence in all contracts of a duty upon the parties of good faith and fair dealing in its performance. In my view this is in these days the expected standard, and anything less is contrary to prevailing community expectations."
>
> 147.     Priestley JA reviewed the influence that the *Uniform Commercial Code* (1951),   and   its   later   formulation   in

the *Restatement (Second) of Contract* (1981), had had on American case law.

148.    We respectfully refer to his Honour's detailed treatment of this development and do not repeat it, except to refer to of the *Restatement (Second)* s 205 (1981) which provides:

> "Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement."

149.    Priestley JA considered, at 268, that there were strong arguments "for recognition in Australia of [such a] duty".

150.    His Honour also observed that the American experience indicated that judges used the notion of good faith flexibly as an "excluder". In other words, the concept "serve[d] to exclude many heterogeneous forms of bad faith" so as "to do justice according to law". See generally R S Summers in *"Good Faith" in General Contract Law and the Sales Provisions of the Uniform Commercial Code* (1968) 54 Virginia Law Review 1995, discussed by Priestley JA at 266-7."

185.    The court in <u>Burger King</u> then went on to accept that although the franchise development agreement in question did not fall into a type of contract which had hitherto been subjected to a good faith duty implied by New South Wales law, it was nonetheless appropriate to extend the concept to such agreement.

<u>Macquarie</u>

186.    <u>Burger King</u> and <u>Overlook</u> were subsequently relied upon by the New South Wales Court of Appeal in <u>Macquarie International Health Clinic v Sydney South West Area Health Service</u> [2010] NSWCA 268 ("<u>Macquarie</u>"). That case was referred to by HHJ Klein in <u>Unwin v Bond</u> and by the Judge in the instant case.

187.    In <u>Macquarie</u>, the parties had entered into a number of inter-related agreements concerning the development by the claimants of a new private hospital on land owned by the defendant health authority, which hospital was then to be leased to the claimants for 103 years. The key "Heads of Agreement" (HOA) contained an express term requiring the parties to act with the utmost good faith in performing their duties, exercising their powers, and in their dealings with each other. A dispute arose over the non-disclosure by the defendant health authority of certain aspects of a planning application which it had made in relation to a nearby public hospital which it operated, and the effect that such a design might have on the development of the private hospital to be undertaken by the claimants and their commercial ability to exploit their future leasehold interest in it.

188.    In giving the first judgment, Allsop P stated, at paragraphs 5 to 14,

> "5.    The place of good faith in the law of contract in Australia has been debated in recent years. One significant aspect of that debate has

been the place of good faith in the implication of terms in contracts (whether as a matter of fact or law and whether in contracts generally or in those of a commercial character) and in the construction and interpretation of written agreements.

...

8.      The content of the clauses is to be understood and ascertained by construing the language of the parties in the context in which the clauses appear. They are contractual terms to be construed, like any other. Here, the commercial and contractual relationship was envisaged to be (in the transaction documents) for a century. This was also envisaged in the Heads of Agreement, although that contract was preliminary to the formation of others. The performance of the agreements required planning by both parties, consultation among the parties and the expenditure of very large amounts of money upon planning and building work and the operation of a significant hospital in proximity to, and in connection with, a large hospital of the other party. The parties can be seen, by the clauses providing for the utmost good faith, to have required honesty and fair dealing of a high standard to govern their contractual behaviour.

...

11.     The notion of good faith in the performance of contracts is one established by a number of cases in this Court and is well-known to the law in both common law and civilian systems. It was part of the law merchant. It finds its place in international conventions.  I repeat what I said in United Group Rail Services Limited v Rail Corporation New South Wales [2009] NSWCA 177 at [58],

> "[G]ood faith is not a concept foreign to the common law, the law merchant or businessmen and women. It has been an underlying concept in the law merchant for centuries... It is recognised as part of the law of performance of contracts in numerous sophisticated commercial jurisdictions: for example *Uniform Commercial Code* s.1-201 and s.1-203 ... It has been recognised by this Court to be part of the law of performance of contracts: Renard Constructions (ME) Pty Ltd v Minister for Public Works (1992) 26 NSWLR 234 at 263-270; Hughes Bros Pty Ltd v Trustees of the Roman Catholic Church for the Archdiocese of Sydney (1993) 31 NSWLR 91; Burger King Corporation v Hungry Jack's Pty Ltd at 565-574 [141]-[187]; and Alcatel Australia Ltd v Scarcella at 363-369. ..."

12.     The usual content of the obligation of good faith that can be extracted from Renard Constructions (ME) Pty Ltd v

Minister for Public Works (1992) 26 NSWLR 234, Hughes Bros Pty Ltd v Trustees of the Roman Catholic Church for the Archdiocese of Sydney (1993) 31 NSWLR 91, Burger King Corporation v Hungry Jack's Pty Ltd [2001] NSWCA 187; 69 NSWLR 558; Alcatel Australia Ltd v Scarcella (1998) 44 NSWLR 349 and United Group Rail Services Limited v Rail Corporation New South Wales [2009] NSWCA 177 is as follows:

(a)     obligations to act honestly and with a fidelity to the bargain;

(b)     obligations not to act dishonestly and not to act to undermine the bargain entered or the substance of the contractual benefit bargained for;

(c)     an obligation to act reasonably and with fair dealing having regard to the interests of the parties (which will, inevitably, at times conflict) and to the provisions, aims and purposes of the contract, objectively ascertained.

13.     None of these obligations requires the interests of a party to be subordinated to those of the other. It is good faith or fair dealing between arm's length commercial parties by reference to the bargain and its terms that is called for.

14.     It is important to recognise that these obligations must be assessed and interpreted in the light of the bargain itself and its contractual terms. Those terms, however, must be assessed and interpreted in the light of the presence of the obligation of good faith, here pursuant to an express clause."

189.   The second judgment, with which both other judges agreed, was given by Hodgson JA. At paragraphs 145 to 148, he stated,

"145.   What then did the obligation of utmost good faith in the [Heads of Agreement] require of [the defendant]?

146.   Writing extra-curially, Sir Anthony Mason has argued that a contractual obligation of good faith embraces no less than three related notions:

(1)     An obligation on the parties to co-operate in achieving the contractual objects;

(2)     Compliance with honest standards of conduct; and

(3)     Compliance with standards of conduct that are reasonable having regard to the interests of the parties.

See A F Mason "*Contract, Good Faith and Equitable Standards in Fair Dealing*" (2000) 116 LQR 66 at 69. That the obligation has these three elements is consistent with Australian authority: <u>Alcatel Australia Limited v Scarcella</u> (1998) 44 NSWLR 349 at 369 (Sheller JA, with Powell and Beazley JJA agreeing), <u>Burger King Corporation v Hungry Jack's Pty Limited</u> [2001] NSWCA 187; (2001) 69 NSWLR 558 at [171] (Sheller, Beazley and Stein JJA).

147.    However, a contractual obligation of good faith does not require a party to act in the interests of the other party or to subordinate its own legitimate interest to the interests of the other party; although it does require it to have due regard to the legitimate interests of both parties: c.f. <u>Overlook v Foxtel</u> [2002] NSWSC 17 at [65] - [67] (Barrett J).

148.    Applying that approach to the HOA, in my opinion the obligation of utmost good faith did not go so far as to require [the defendant] to defer to the interests of [the claimants] in developing its own plans for [the hospital], or to include [the claimants] in its own planning processes. But in my opinion, when [the defendant's] planning processes would make a substantial difference to what [the claimants] could reasonably expect concerning the flow of persons between the hospitals or the creation of a campus concept, the obligation of utmost good faith would require that [the claimants] be informed of this, at least to enable them to take account of it in the design and construction of the works contemplated by the HOA."

190.    Although <u>Macquarie</u> involved the interpretation of an express contractual duty of good faith, the context was a long-term contract governed by New South Wales law between two parties based in New South Wales and relating to a development in Sydney.  It is, therefore, hardly surprising that Allsop P and Hodgson JA approached matters on the basis that the parties had chosen expressly to adopt the same content of an obligation of good faith that had been established in earlier decisions in New South Wales in (among others) <u>Renard</u>, <u>Burger King</u> and <u>Overlook</u>.  As I read those authorities, it is likely that such a formulation would have been implied as a matter of New South Wales law in any event.

191.    Hodgson JA also expressly relied upon a formulation of good faith derived from a 2000 Law Quarterly Review article by Sir Anthony Mason, which, like an earlier lecture on the same topic given by him in 1993, had featured in some of the earlier New South Wales cases such as <u>Burger King</u> and <u>Overlook</u>.  In that article, Sir Anthony Mason advocated the imposition as a matter of law of good faith and fair dealing duties in the negotiation and performance of contracts, and traced the development of that concept in Australia.

192.    Sir Anthony Mason's formulation of the content of good faith appeared under the heading, "The concept of good faith" and simply comprised citation of the provisions of the United States UCC and paragraph 205 of the US Restatement to which I have already referred.  Sir Anthony then continued,

"It is by no means clear what "good faith" in the context of these provisions means. But it is probable that the concept embraces no less than three related notions:

(1)    an obligation on the parties to co-operate in achieving the contractual objects (loyalty to the promise itself);

(2)    compliance with honest standards of conduct; and

(3)    compliance with standards of conduct which are reasonable having regard to the interests of the parties.

Criticism that "good faith" is an obscure and uncertain concept is sometimes countered by the claim that, in substance, "good faith" is no more than an excluder of "bad faith" behaviour."

It is readily apparent that Sir Anthony Mason's focus was on the imposition of such duties as a matter of general contract law.  It did not extend to contracts between shareholders in companies.

F&C Alternative Investments v Barthelemy

193.    Hodgson JA's judgment in Macquarie, together with the dicta of Morgan J in Berkeley were referred to by Sales J in F&C Alternative Investments v Barthelemy (No.2) [2012] Ch 613 ("F&C").  The case concerned a commercial joint venture between two individual members and a corporate member (Holdings) of a limited liability partnership (LLP) which was to conduct a hedge fund business.  Sales J pointed out, at paragraph 208 of his judgment, that the Limited Liability Partnership Act 2000 included only a minimal legal framework for the operation of an LLP, leaving it to the parties to provide for the detail of the relationship between the members as a matter of contract in the agreement constituting the LLP.  The agreement in question included a clause 13.6 under which each of the three members of the LLP was required at all times to show "the utmost good faith" to the LLP.

194.    In interpreting clause 13.6, Sales J indicated, at paragraph 255, that the content of the duty was informed by the contractual context, and that the decision in Macquarie "provides helpful guidance to the approach to be adopted".  He then cited the judgment of Hodgson JA and also briefly noted the decision of Morgan J in Berkeley, before concluding, at paragraph 257,

"257.    The balance of interests established by a contractual duty of utmost good faith in the context of a commercial joint venture, which permits Holdings to have regard to [its] own commercial interests while also imposing an obligation upon it to have due regard to the legitimate interests of the other parties to the agreement, represented the parties' considered reconciliation of the interests of [Holdings] and the LLP and the defendants under the agreement. This was the essence of the bargain which they made, and it is appropriate that it should inform the content of the fiduciary obligations assumed by [Holdings'] representatives on the LLP board, mancom and compensation committee as set out above. The adoption of such a standard of conduct made sense in the context of an arrangement which sought to marry

> together the disparate strengths of the defendants and [Holdings] through the
> vehicle of the LLP in a relationship intended to last a long time (and which
> therefore required considerable flexibility of application to cope with the wide
> range of unforeseeable business challenges which might arise), where they
> were each required to have regard to the legitimate interests of the other
> parties to the agreement while at the same time being entitled to take into
> account their own self-interest."

195.   From this survey of the cases relied upon by the Judge, a number of points emerge
       relating to the concepts of fidelity to the bargain and a requirement to have regard to
       the interests of the other contracting party.

196.   The first, and general, point is that those specific concepts originated in a commentary
       on US contract law and were then adopted and developed in New South Wales in the
       context of the imposition of terms requiring good faith in the performance of contracts
       as a matter of general law.  They were not developed in the context of the interpretation
       of individually negotiated contracts.  It is entirely understandable that if a term is
       implied as a matter of law, it should have a single, clearly understood meaning.
       However, I see no sound juridical basis for saying that all of the same concepts should
       automatically be regarded as incorporated in a formulaic way whenever any contract
       governed by English law contains an express term requiring the parties to act in good
       faith.  Put into the context of this case, I do not see why the parties to an English law
       governed contract concerning an English company should automatically be presumed
       to have intended to incorporate such obligations, irrespective of the context given by
       the other terms of their contract.

197.   Secondly, the particular concept of a requirement to have regard to the interests of the
       other contracting party has largely been developed and applied in cases concerning
       business decisions by one party which are capable of adversely affecting, or even
       depriving the other party of, the commercial benefit expected to be enjoyed by that
       other party under their contract (e.g. Burger King, Overlook, Berkeley and CPC Group).
       It is far from obvious how or why the same approach is automatically to be applied in
       the context of voting by shareholders at general meetings of a limited company.

198.   The structure of a limited company and the relationship and interests of its members
       form a very different backdrop to that of an ordinary commercial contract.  The
       agreement between the members and the company is to be found in the articles of
       association, to which section 33 of the 2006 Act gives the force of a contract.  Under
       that contract, the rights and interests of the shareholders are defined by the holding of
       shares, and so far as shareholders are concerned, decisions are taken democratically by
       specified majority votes from time to time.

199.   In that respect, the holding of general meetings gives the shareholders the opportunity
       to consult with each other, but there is no requirement that they should do so.  Nor is
       there any general requirement that shareholders should take into account the interests
       of other shareholders when deciding how to vote.  Rather, the long-standing rule is that
       the votes attaching to shares are proprietary rights that the holder may exercise as they
       see fit in their own interests: see North-West Transportation Co. Ltd v Beatty (1887)
       12 App Cas 589 PC and Burland v Earle [1902] AC 83 PC.

200.    It is also the case that the votes of shareholders do not ordinarily have the result of depriving other shareholders of the benefit of the statutory contract – i.e. their shares. That is certainly the case where the vote is simply to remove a director from office. But even if a resolution is proposed which might be thought to operate to the disadvantage of the minority, e.g. to alter the articles to give the board the power to remove a permanent director, the test applied by the court to determine the validity of the resolution is simply whether those voting in favour honestly believed that it was for the benefit of the company: see Shuttleworth v Cox Bros & Co. (Maidenhead) Ltd [1927] 2 KB 9, cited with approval by the Privy Council in Citco Banking Corporation v Pusser's Ltd [2007] UKPC 13 at paragraphs 15 to 17. There is no requirement in such a case for the shareholders voting in favour to have regard to the particular interests of the minority, as opposed to the benefit of the company as a whole.

201.    That basic position under the articles of association and general company law could, of course, be affected by an agreement between individual shareholders regulating how they should each vote on specific matters. However, if such well-known principles of company law are intended to be changed, one would ordinarily expect that to be expressed clearly and directly, and any further consequences (e.g. as to consultation between the parties) to be spelled out – especially in a professionally drafted agreement.

202.    Thirdly, the judges in a number of the cases referred to above have pointed out that the interpretation of a good faith clause as requiring fidelity to the bargain may reflect the fact that an ordinary contract cannot expressly provide for every event that may happen in the future, especially if the contract is a long-term contract. In such cases, the parties might more readily be taken to have intended a good faith clause to require adherence to their common aims and purposes (as expressed or implied in the terms of their agreement) in unforeseen future situations (see e.g. Macquarie and F&C).

203.    In argument, Mr. Hollington suggested that the relationship between the parties as shareholders of the Company was a potentially long-term one, which tended to support the conclusion that a duty of fidelity to the bargain existed in the instant case. However, quite apart from the fact that the 2013 SHA expressly envisaged the Exit of the Investors within a relatively short time, it seems to me that considerable caution must be exercised before applying that concept to the particular matters which are in issue in this case, namely changes to the constitution of a company incorporated under the 2006 Act and the composition of its board of directors.

204.    That is because, unlike an ordinary contract, the terms of the articles and the identity of a company's directors are not cast in stone when the company is incorporated, but can be amended and changed from time to time by specified majority votes of the shareholders. There is thus the inherent flexibility to amend the statutory contract by a democratic shareholder process to respond to changing and unforeseen circumstances. Given such inherent flexibility, it cannot readily be presumed that a good faith clause has been designed to prescribe how the parties should behave in unforeseen future circumstances – still less that such a clause should have the result of eliminating flexibility and entrenching the original structure so that changes cannot be made at all.

205.    Fourthly, although judges have, on occasions, used the expression "the spirit of the contract" in the context of a good faith clause, I do not read that as an open invitation to the court to interpret a good faith clause as imposing additional substantive obligations (or restrictions on action) outside the other terms of the contract. That must

especially be so where (as in the instant case) the contract in question is professionally and comprehensively drafted, and contains an entire agreement clause.

206.    That proposition is consistent with the approach of the Court of Appeal to the interpretation of a clause in a shareholders' agreement which included both an express "good faith" sub-clause and an express "spirit and intention of the agreement" sub-clause in Re Coroin [2013] EWCA Civ 781, [2014] BCC 14 ("Coroin").

207.    In Coroin, the appellant petitioner alleged that pre-emption provisions in a shareholders' agreement had been triggered by the respondents, who were therefore obliged to offer their shares for purchase by him. He contended that they had refused to do so, thereby causing unfair prejudice to him. Arden LJ rejected that argument as a matter of construction of the pre-emption provisions themselves. She then dealt with an argument that the same result should be reached by application of a different clause in the shareholders' agreement that provided,

> "8.5    Each of the Shareholders agrees that:
> …
> 8.5.2 each of them shall at all times act in good faith towards the others and shall use all reasonable endeavours to ensure the observance of the terms of this Agreement;
> …
> and
> 8.5.4    each of them will do all things [necessary] or desirable to give effect to the spirit and intention of this Agreement."

208.    Arden LJ rejected the petitioner's arguments based on both clause 8.5.2 and 8.5.4. She stated, at paragraphs 48 to 53,

> "48.    … [Counsel for the appellant] argues for a meaning for this expression that was really the same as the meaning of clause 8.5.4, namely, that it required the court to enforce the spirit of the agreement and not just "its black letter" (relying on CPC Group at [238]–[246] per Vos J.). That argument in my judgment properly belongs under clause 8.5.4 and I will address it at that point. The respondents proceed on the basis that "good faith" in the context of clause 8.5.2 imposes a duty simply to act honestly. (They did not need to refine the meaning of honesty further than to say that it was a subjective test.)
>
> 49.    I consider that the respondents are right to submit that the requirement to act in good faith in cl.8.5 involves an obligation to act honestly in a subjective sense as this is its natural meaning and the context does not suggest some other meaning….
>
> …
>
> 51.    I do not consider that the obligation to act in good faith can impose a binding general obligation to act in a manner outside the terms of the shareholders' agreement because there is no indication of the circumstances in which the obligation to act in good faith obliges the parties to go beyond the obligations in the shareholders' agreement.

There is, therefore, no benchmark against which the court could enforce the obligation.

52.     The second group of provisions in the good faith clause is composed solely of clause 8.5.4. The parties agreed to do all things necessary or desirable to give effect to the spirit and intention of the shareholders' agreement. Again, this clause prescribes no basis for determining the "spirit and intention"….

53.     In my judgment, the only way in which the court can give effect to the obligation in clause 8.5.4 is to treat the reference to the "spirit and intention" of the shareholders' agreement as a reference to the shared aims of the parties in entering into the agreement. Those aims would have to be ascertained in the way in which the court ascertains the background to an agreement as part of the process of interpretation. On this basis, clause 8.5.4 has content, but it is merely a mirror image of the process of interpreting an agreement or implying terms into it…"

209.   In the instant case, at paragraph 352 of his Judgment, the Judge treated Arden LJ's decision as simply going to the scope, rather than the content, of the good faith clause. I do not agree.  Arden LJ plainly determined that, in the context of the agreement before her, the requirement to act in good faith in clause 8.5.2 imposed no more than the core duty to act honestly.  That was a decision on the content of the clause.

210.   For present purposes, however, what is significant is that Arden LJ reinforced her interpretation of clause 8.5.2 by making the point, in paragraph 51 of her judgment, that if the other terms of the agreement did not require the respondents to serve a transfer notice, then the good faith clause could not require them to do so, because there would be no relevant frame of reference (benchmark) outside the terms of the agreement against which to give such clause any particular meaning.

211.   Arden LJ returned to the same theme when interpreting the express "spirit and intention of the agreement" sub-clause 8.5.4 in paragraph 53 of her judgment.  She held that the way to give meaning to that sub-clause was to ascertain the shared aims of the parties in entering into the agreement as a matter of conventional interpretation of the agreement or implication of terms.

212.   Understood in this way, even where thought to be inherent in an obligation of good faith, the concept of fidelity to the bargain or adherence to the spirit of the agreement could only operate to support the common purpose and aims of the parties as objectively ascertained from the express or implied terms of the contract.  Depending on context, the essence of the concept might be captured by Barrett J's reference in Overlook to the prohibition of "cynical resort to the black letter" or by Allsop P's reference in Macquarie to the prohibition of conduct that "undermines the bargain entered or the substance of the contractual benefit bargained for".  On any footing, however, the shared aims of the parties must be identified by interpretation of the other terms of the agreement, or by implication of terms according to the usual test outlined in Marks & Spencer plc v BNP Paribas Securities [2016] AC 742.

*Is dishonesty or bad faith required for any breach of a good faith clause?*

213.   As indicated above, the Judge adopted the formulation of minimum standards of good faith derived from paragraphs 230 to 232 of HHJ Klein's judgment in Unwin v Bond. It is also clear that the Judge thought that the duty of good faith could be breached if any one of those minimum standards were breached, even if others were not.  That appears from his observation in paragraph 370 of the Judgment that on the facts of Unwin v Bond, HHJ Klein found the defendant to have acted in breach of the duty of good faith by not dealing fairly with the claimant and in failing to have regard to his interests, even though there had been no dishonesty or use of powers for an ulterior purpose.

214.   Approaching matters in that way, the Judge did not consider the point identified by Vos J in CPC Group by reference to the dictum of Lord Scott in Manifest Shipping.  In Manifest Shipping, Lord Scott had stated that,

> "Unless [the defendant] has acted in bad faith he cannot be in breach of a duty of good faith, utmost or otherwise".

215.   It will also be recalled that Vos J cited paragraph 68 of Barrett J's judgment in Overlook, in which Barrett J expressed the view,

> "68.    In many ways, the implied obligation of good faith is best regarded as an obligation to eschew bad faith. This is borne out by the … succinct statement by Lord Scott of Foscote in Manifest Shipping Co Ltd v Uni-Polaris Shipping Co Ltd …"

216.   Although on the facts of CPC Group, Vos J did not consider it necessary to decide whether a term requiring the defendants to act in good faith could <u>only</u> have been breached if the defendants had acted in bad faith, it is clear from his dicta in paragraph 246 of his judgment that he inclined to that view.

217.   This line of argument appeared to be raised by paragraph 3.3 of the Investors' Notice of Appeal (as repeated, *mutatis mutandis* in paragraphs 6 to 8), in which it was said that the Judge erred by making findings of a breach of the good faith obligation in clause 4.2 of the 2013 SHA in circumstances in which he made no finding that the Investors or the directors appointed by them had acted in bad faith.  This manifested itself in a submission in Mr. Gledhill's skeleton argument that the Judge should not have found clause 4.2 to have been breached without a finding of "dishonesty or something akin to it".

218.   In support of his thesis, Mr. Gledhill referred to Compass and Coroin.  He contended that those cases were binding authority that a duty of good faith could not be breached unless the defendant had acted dishonestly.

219.   Mr. Gledhill also accepted that Arden LJ's reference in Coroin to an obligation to act honestly "in a subjective sense" had to be understood in the sense that it must be assessed in light of what the defendant actually knew, albeit that the standard of behaviour required in such circumstances is an objective one.  Those principles were explained by Lord Nicholls in Royal Brunei Airlines v Tan [1995] 2 AC 378 ("Royal

Brunei") and more recently endorsed by the Supreme Court in <u>Ivey v Genting Casinos</u> <u>(UK)</u> [2018] AC 391 ("<u>Ivey</u>").

220.    In <u>Royal Brunei</u>, Lord Nicholls stated, at page 389,

> "… in the context of the accessory liability principle acting
> dishonestly, or with a lack of probity, which is synonymous,
> means simply not acting as an honest person would in the
> circumstances. This is an objective standard. At first sight this
> may seem surprising. Honesty has a connotation of subjectivity,
> as distinct from the objectivity of negligence. Honesty, indeed,
> does have a strong subjective element in that it is a description
> of a type of conduct assessed in the light of what a person
> actually knew at the time, as distinct from what a reasonable
> person would have known or appreciated. Further, honesty and
> its counterpart dishonesty are mostly concerned with advertent
> conduct, not inadvertent conduct. Carelessness is not dishonesty.
> Thus for the most part dishonesty is to be equated with conscious
> impropriety. However, these subjective characteristics of
> honesty do not mean that individuals are free to set their own
> standards of honesty in particular circumstances. The standard
> of what constitutes honest conduct is not subjective. Honesty is
> not an optional scale, with higher or lower values according to
> the moral standards of each individual. If a person knowingly
> appropriates another's property, he will not escape a finding of
> dishonesty simply because he sees nothing wrong in such
> behaviour."

221.    In <u>Ivey</u>, at paragraph 74, Lord Hughes endorsed Lord Nicholls' judgment in <u>Royal</u> <u>Brunei</u>, and gave the following further guidance,

> "When dishonesty is in question the fact-finding tribunal must first ascertain
> (subjectively) the actual state of the individual's knowledge or belief as to
> the facts. The reasonableness or otherwise of his belief is a matter of
> evidence (often in practice determinative) going to whether he held the
> belief, but it is not an additional requirement that his belief must be
> reasonable; the question is whether it is genuinely held. When once his
> actual state of mind as to knowledge or belief as to facts is established, the
> question whether his conduct was honest or dishonest is to be determined by
> the fact-finder by applying the (objective) standards of ordinary decent
> people. There is no requirement that the defendant must appreciate that what
> he has done is, by those standards, dishonest."

222.    For the Minorities, Mr. Hollington protested that this point was not open to the Investors
because it had not been taken at trial.  He submitted that in their opening at trial the
Investors had accepted that the content of the good faith clause was to be found in the
decision in <u>Berkeley</u>, in which Morgan J had found a breach of the good faith term
without making any finding of dishonesty.  Mr. Hollington also objected that an
argument that a breach of the obligation of good faith always required proof of
"conscious dishonesty" was "only faintly trailed" in the Investors' closing submissions
by reference to the decision on the meaning of the good faith sub-clause 8.5.2 in <u>Coroin</u>.

223.   I do not accept Mr. Gledhill's argument that the decisions in Compass and Coroin are binding authority that in any situation in which it might be used, the meaning of a contractual good faith clause is limited to a requirement to act honestly. Both cases were decisions on the interpretation of the particular agreement in issue in the case and did not purport to set out any general principles.

224.   That is readily apparent from the judgments of Jackson and Beatson LJJ in Compass at paragraphs 109, and 152 to 154. There is also no indication in the judgment of Arden LJ in Coroin that she was intending to set out any generally applicable rule as to the meaning of a good faith clause. Her view of the meaning of the good faith sub-clause 8.5.2 of the shareholders' agreement in that case (see above) was expressly reached in the absence of any indication from the context that it should be interpreted more widely. In that regard, it should also be noted that Arden LJ's rejection of the suggestion that the good faith provision in sub-clause 8.5.2 required the court to have regard to the spirit of the agreement was based upon the fact that such an obligation appeared expressly under a separate clause 8.5.4 of the contract in question, so that there was no reason to interpret the good faith sub-clause more broadly to cover the same ground.

225.   In support of his thesis, Mr. Gledhill also referred to a number of other English cases dealing with the meaning of "good faith".

226.   Mr. Gledhill first relied upon a dictum of Scott V-C in the context of a claim against a receiver for mismanaging mortgaged property in Medforth v Blake [2000] Ch 86 at 103,

> "In my judgment, the breach of a duty of good faith should, in
> this area as in all others, require some dishonesty or improper
> motive, some element of bad faith, to be established."

227.   I do not consider that this dictum supports Mr. Gledhill's thesis. Quite apart from the fact that it was a very short statement in a case which primarily dealt with other issues, Scott V-C plainly did not equate the concept of good faith to dishonesty, because he also referred in the alternative to some "improper motive".

228.   Mr. Gledhill also referred to observations about the content of a duty of good faith in a contractual setting by Leggatt J (as he then was) in Yam Seng Pte Ltd v International Trade Corp Ltd [2013] 1 All ER (Comm) 1321 ("Yam Seng"), and the decision of Leggatt LJ (as he had become, but still sitting in the High Court) in Al Nehayan v Kent [2018] EWHC 333 (Comm) ("Al Nehayan").

229.   Yam Seng was a case which concerned a distribution agreement relating to "Manchester United" branded fragrances that envisaged that the defendant would provide products to be sold by the claimant in specified territories in the Middle East, Asia, Africa and Australasia (including Singapore), mainly by way of duty-free sales. The distribution agreement was skeletal in form, containing only eight clauses, and had been drafted by the parties themselves without legal assistance. It did not contain an express good faith clause. The claimant contended that the defendant had acted in repudiatory breach of the agreement entitling the claimant to terminate it and claim damages, *inter alia* by shipping orders late, failing to provide ordered products, undercutting the duty free prices charged by the claimant by offering the same products for sale in the Singapore domestic market at lower prices, and providing false

Case 1:21-cv-11059-GHW   Document 182-8   Filed 08/15/23   Page 58 of 80

Judgment Approved by the court for handing down.                    Faulkner v Vollin

information about that Singapore domestic market price. The context of the case was, therefore, very different from the instant case.

230.    Leggatt J held, at paragraphs 119 et seq., after a review of domestic and overseas case-law, that as a matter of necessary interpretation so as to give effect to their presumed intention, the parties were subject to an implied duty of good faith in the performance of their contract.

231.    Leggatt J then explained that such duty had two aspects. The first aspect included both a duty to act honestly (see paragraph 135) and a requirement to observe other generally accepted standards of commercial dealing (see paragraph 138). In that latter regard, Leggatt J continued,

> "Put the other way round, not all bad faith conduct would necessarily be described as dishonest. Other epithets which might be used to describe such conduct include "improper", "commercially unacceptable" or "unconscionable"."

232.    On its face, it seems to me that in this dictum, Leggatt J clearly took the view (i) that a duty of good faith could be breached by "bad faith conduct", and (ii) that this could include conduct that would "not necessarily be described as dishonest".

233.    At paragraph 139 Leggatt J then described "Another aspect of good faith which overlaps with the first" – namely "fidelity to the parties' bargain". The reference to the two concepts overlapping is ambiguous, but I do not read Leggatt J to be suggesting that the two aspects were co-terminous, so that a party could only be in breach of a requirement of fidelity to the bargain if they had also acted dishonestly or in bad faith. That reading of Leggatt J's judgment is supported by the fact that he went on, at paragraph 140, to suggest that the two aspects of good faith that he had identified were consistent with the decisions in Berkeley and CPC Group – at least the first of which did not require a finding of dishonesty or bad faith.

234.    In short, I do not consider that the dicta in Yam Seng support Mr. Gledhill's contention.

235.    Leggatt LJ expanded upon his views of the requirements of good faith in a contractual setting in Al Nehayan. The case concerned a dispute between the claimant businessman, a resident of the UAE, and the defendant, a Greek businessman. They fell out and decided to separate their business interests pursuant to a "Framework Agreement". There were various claims and cross-claims alleging breaches of a fiduciary relationship between the parties and/or for breach of this agreement.

236.    Leggatt LJ held that neither party owed any fiduciary duties to the other, but that the Framework Agreement was a so-called "relational contract" under which, as a matter of implication by law given the nature of the agreement, each party owed the other a duty of good faith: see paragraph [174].

237.    Leggatt LJ then continued, at paragraph [175] (which I have sub-divided for ease of reference),

> "175.    It is unnecessary and perhaps impossible to attempt to spell out an exhaustive description of what this obligation [of

good faith] involved. There is a considerable body of Australian authority on the subject which has informed the interpretation by English courts of express contractual duties of good faith: see [Berkeley], paras 91-97; [CPC Group], paras 240-246; Gold Group Properties v BDW Trading [2010] EWHC 1632 (TCC), paras 89-91.

In Paciocco v Australia and New Zealand Banking Group Limited [2015] FCAFC 50 ["Paciocco"], para 288, in the Federal Court of Australia, Allsop CJ summarised the usual content of the obligation of good faith as an obligation to act honestly and with fidelity to the bargain; an obligation not to act dishonestly and not to act to undermine the bargain entered or the substance of the contractual benefit bargained for; and an obligation to act reasonably and with fair dealing having regard to the interests of the parties (which will, inevitably, at times conflict) and to the provisions, aims and purposes of the contract, objectively ascertained.

In my view, this summary is also consistent with the English case law as it has so far developed, with the *caveat* that the obligation of fair dealing is not a demanding one and does no more than require a party to refrain from conduct which in the relevant context would be regarded as commercially unacceptable by reasonable and honest people: see Bristol Groundschool Ltd v Intelligent Data Capture Ltd [2014] EWHC 2145 (Ch), para 295 [sic] … ; and Astor Management AG v Atalaya Mining plc [2017] EWHC 425 (Comm), para 98…."

238.   Leggatt LJ's reference to "the obligation of fair dealing" in the last sub-paragraph of paragraph 175 of Al Nehayan was plainly intended to be a reference to the obligation of good faith. That appears most clearly from Leggatt LJ's cross-reference to his earlier decision in Astor Management AG v Atalaya Mining plc [2017] EWHC 425 (Comm) ("Astor") at paragraph 98. That paragraph was in the following terms,

"98. I have discussed elsewhere the question of whether or when there is in English law an implied duty to perform a contract in good faith: see Yam Seng. I do not think that this case is the occasion to explore that question further. A duty to act in good faith, where it exists, is a modest requirement. It does no more than reflect the expectation that a contracting party will act honestly towards the other party and will not conduct itself in a way which is calculated to frustrate the purpose of the contract or which would be regarded as commercially unacceptable by reasonable and honest people. This is a lesser duty than the positive obligation to use all reasonable endeavours to achieve a specified result which the contract in this case imposed."

(my emphasis)

239.   Mr. Gledhill suggested that these dicta were authority for the proposition that a duty of good faith involved no more than a requirement to act honestly. In that respect it could

also be noted that Leggatt LJ's reference to "commercially unacceptable" conduct tracked Lord Nicholls' observation in Royal Brunei at page 370. When giving an illustration of what honest behaviour required in the context of taking risks, Lord Nicholls stated,

> "The individual is expected to attain the standard which would be observed by an honest person placed in those circumstances. It is impossible to be more specific. Knox J. captured the flavour of this, in a case with a commercial setting, when he referred to a person who is "guilty of commercially unacceptable conduct in the particular context involved:" see Cowan de Groot Properties v Eagle Trust plc [1992] 4 All ER 700, 761."

240.   Whilst I accept that Leggatt LJ's statements in Al Nehayan and Astor were clearly intended to signify that a duty of good faith is not intended to impose an obligation that could be described as "demanding" or more than "modest", I do not consider that Leggatt LJ was intending to alter the views that he had expressed in Yam Seng or to suggest that a duty to act in good faith was entirely synonymous with a requirement of honesty. If he had intended to do so, it would have been very easy for him to say so in terms.

241.   In my judgment, therefore, the authorities do not support the proposition that a contractual duty of good faith can only be breached by conduct that is dishonest according to the explanation of that concept in Royal Brunei and Ivey. Depending on the contractual context, a duty of good faith may be breached by conduct taken in bad faith. This could include conduct which would be regarded as commercially unacceptable to reasonable and honest people, albeit that they would not necessarily regard it as dishonest. I therefore reject the Investors' argument that a finding of dishonesty was a pre-requisite for a finding of breach of clause 4.2 of the 2013 SHA.

242.   For completeness, I would observe that in opening the appeal, Mr. Gledhill reformulated his case by submitting that what he called "the autonomous aspect" of a duty of good faith was the duty to behave honestly "in a commercially moral way". He then submitted that any other "performance obligations" – such as a duty of fidelity to the bargain - would only exist if they could be arrived at by a conventional process of interpretation of the agreement or implication of terms. Mr. Gledhill further accepted that if they existed, such obligations or duties could be breached without any finding of dishonesty (or something akin to it), but he then described such performance duties as "derivative" of the autonomous duty of honesty.

243.   As I have explained, I accept the argument that apart from the "core" duty of honesty and (depending on the context) a duty not to engage in conduct that could be characterised as bad faith, any further requirements of an express duty of good faith must be capable of being derived as a matter of interpretation or implication from the other terms of the contract in issue in the particular case. However, I do not think that it helps to describe those other requirements as "derivative" of the core duty of honesty.

I.     The parties' bargain

244.   Having commented upon the Judge's approach to the content of a good faith clause, I
       next turn to consider what he identified as "the parties' bargain" in the context of the
       duty of "fidelity to the bargain" which he thought was inherent in clause 4.2.

245.   As I have indicated, a central plank of the bargain which the Judge found to have been
       struck between the parties was that the Investors had promised not to use their power
       as majority shareholders to remove Dr. Sachs or Mr. Faulkner from office as directors.
       In that regard, whilst the Judge rightly acknowledged that it is possible for shareholders
       to agree contractual restrictions on their individual right to cast the votes attaching to
       their shares as they see fit, I consider that his explanation of how such restrictions would
       operate in the context of a resolution to remove a director under section 168 of the 2006
       Act was flawed in an important respect.

246.   As indicated above, in paragraphs 341 and 342 of his Judgment, the Judge took the
       view that section 168 of the 2006 Act,

              "… gives the majority shareholders in a company an inalienable
              right to remove a director from office, notwithstanding any
              agreement to the contrary with the director."

       The Judge then stated that this meant that although the effectiveness of the decision to
       remove the director could not be impugned, the act of doing so might nonetheless
       infringe some other right of the director/shareholder in question.

247.   That analysis was repeated in the Judge's central finding in paragraphs 393 and 394 of
       his Judgment that the Investors were bound to act with fidelity to the bargain, a critical
       part of which was the "special position" occupied by Dr. Sachs and Mr. Faulkner. The
       Judge held that although the Investors had "an unrestricted right as a matter of company
       law" to remove them as directors, that right was excluded "as a matter of private
       contract" by clause 4.2.  He concluded,

              "… The upshot is that the Investors could of course exercise their
              majority power to remove Dr. Sachs and Mr. Faulkner, and such
              removals would be effective and not susceptible to revocation;
              but at the same time, they would constitute a breach of contract
              as between the shareholders, entitling the disadvantaged
              shareholders in an appropriate case to claim a remedy … "

248.   The Judge also relied upon this analysis at paragraph 396 to reject the arguments of the
       Investors that the wording of clause 7.8 of the 2013 SHA envisaged that Dr. Sachs and
       Mr. Faulkner could be removed as directors.  The Judge took the view that they were
       vulnerable to being removed, but that this was not the same as saying that their removal
       might not be a breach of contract.

249.   Likewise, at paragraph 399 of his Judgment, the Judge sought to explain the
       inconsistency between the Minorities' contention that Dr. Sachs and Mr. Faulkner were
       entrenched in office by virtue of clause 4.2 of the 2013 SHA, with the provisions of
       clause 16 of the 2013 SHA requiring Dr. Sachs or Mr. Faulkner to sell some or all of
       their B Shares if they were removed as directors, by saying that,

> "… they always could be removed by majority shareholder vote-
> there was nothing to be done to prevent that – but that is not the
> same as saying that if they were, there could be no claim for
> unfair prejudice."

250.    Mr. Gledhill criticised the Judge's analysis in these respects as illogical and containing
        a fundamental conceptual error by envisaging a contractual obligation which did not
        prevent the removal of the director, but which at the same time gave rise to a breach of
        contract if the director was removed.  For the following reasons I agree with that
        submission.

251.    Section 168 of the 2006 Act provides,

> "A company may by ordinary resolution at a meeting remove a
> director before the expiration of his period of office,
> notwithstanding anything in any agreement between it and him".

252.    Contrary to the Judge's view, it is clear from the wording of section 168 that the
        statutory right to remove a director is not given to the majority shareholders, and neither
        does it prevent them from alienating any such right.  The right under section 168 is
        given to *the company* in general meeting, and it is *the company* that cannot by contract
        alienate such right by contract between *it* and the director.

253.    This is not mere semantics.  The right of any shareholder is to cast his vote at a general
        meeting of the company, and there is nothing in section 168 which prohibits a majority
        shareholder from alienating or fettering how he should exercise that personal right.  So,
        for example, a majority shareholder can validly enter into an agreement with a director
        or minority shareholder that the majority shareholder will not vote in favour of a
        resolution for the director's removal at a general meeting.

254.    Moreover, if a majority shareholder has entered into such an agreement, then the
        director or minority shareholder would be able to apply to the court before the meeting
        of the company for an injunction to restrain the majority shareholder from voting in
        breach of the agreement.  Subject to any discretionary bars to relief being granted - such
        as a situation in which the director or minority shareholder was guilty of dishonesty or
        similar misconduct so as to make it inequitable to grant him an injunction to enforce
        the agreement - the director or minority shareholder could ordinarily expect to obtain
        an order to prevent the majority shareholder from voting in favour of such a resolution.
        Once the majority shareholder has been restrained from voting, the minority
        shareholder would then have the expectation of being able to use his own votes and
        those of his allies to defeat the resolution at the meeting.

255.    I consider that the Judge ought to have tested his interpretation of clause 4.2 against the
        other clauses of the 2013 SHA and the 2013 Articles on this basis.  Had he done so, he
        would have asked the obvious question of why, if the bargain was that Dr. Sachs and
        Mr. Faulkner were to be entrenched in office as the Minorities contended, the 2013
        SHA did not simply contain an express agreement by the Investors not to vote at any
        general meeting of the Company in favour of a resolution to remove Dr. Sachs and Mr.
        Faulkner as directors.  The absence of such an express provision to deal with the most
        obvious way in which the Investors might seek to use their votes to remove a director

under section 168 is especially striking given that the 2013 SHA is a comprehensive and professionally drafted document.

256.    Had he approached matters on this basis, the Judge would also not have been able to dismiss, as he did, the arguments of the Investors based upon the provisions of clause 7.8 of the 2013 SHA and the provisions requiring Dr. Sachs and Mr. Faulkner to sell some or all of their B Shares on being removed from office.

257.    In relation to clause 7.8 of the 2013 SHA, the Judge placed reliance upon the provision that both Dr. Sachs and Mr. Faulkner had to be present in order for any meeting of the board to be quorate, but he attached no significance to the words in clause 7.8 "insofar as they each remain a director" as supporting the Investors' contention that the bargain envisaged that they could be removed from office.  The Judge accepted that Dr. Sachs and Mr. Faulkner <u>were</u> "vulnerable to removal" by the Investors, but stated "that is not the same as saying that such removal might not also give rise to other legal consequences".  What the Judge failed to appreciate was that if the Minorities were right as to the meaning of the bargain, they could have obtained an injunction to prevent the Investors from voting on a resolution to remove Dr. Sachs and Mr. Faulkner.

258.    Likewise, at paragraph 399, the Judge dismissed the Investors' point that there would have been no purpose in the 2013 SHA providing for what was to happen to Dr. Sachs' and Mr. Faulkner's B Shares upon their being removed as directors if they could never be removed.  The Judge held that "they always could be removed by majority shareholder vote – there was nothing to be done to prevent that".  As indicated above, that failed to take into account that if the Minorities were right that clause 4.2 obliged the Investors to be faithful to a bargain under which Dr. Sachs and Mr. Faulkner were entitled to remain as directors, the Minorities could seek an injunction to prevent the Investors from voting to remove them at a meeting of the Company.

259.    As I have indicated in paragraph 137 above, a further point relied upon by the Judge in paragraph 521 of his Judgment in support of his conclusion as to the parties' bargain was that a number of Articles relating to the proceedings of the board appeared to envisage the continued holding of office by Dr. Sachs and Mr. Faulkner.  These included Article 14.2 which required the approval of both Dr. Sachs and Mr. Faulkner for the appointment of additional directors by the board, and Article 17.7 under which the quorum of three at a board meeting had to include Dr. Sachs and Mr. Faulkner.

260.    I consider that these provisions are neutral and do not carry the weight that the Judge ascribed to them.  It is true that Article 14.2 did not expressly indicate whether Dr. Sachs or Mr. Faulkner would still be required to give their approval to new directors in the event that they had been removed from office under section 168 of the 2006 Act (which the Judge noted was a possibility contemplated by Article 15.1(a)).  However, neither did Article 14.2 do so in relation to any of the other circumstances in which Dr. Sachs or Mr. Faulkner might have ceased to hold office, e.g. by reason of becoming bankrupt or suffering mental disorder under Articles 15.1(b) and (c), or by resignation under Article 15.1(d) (which is of course what occurred in relation to Dr. Sachs). Further, as regards Article 17.7, as the Investors pointed out, the equivalent wording in clause 7.8 of the 2013 SHA expressly included the wording "insofar as they each remain a Director", and the 2013 SHA was expressed to prevail in the event of any conflict between its terms and those of the 2013 Articles.

261.  Accordingly, for the reasons that I have explained, I do not consider that the Judge was right in paragraph 386 of his Judgment to find that the parties' bargain as set out in the 2013 SHA and 2013 Articles envisaged that the board of the Company would always have Dr. Sachs and Mr. Faulkner on it, and that it would be a breach of the bargain if the Investors voted to remove them from office in any circumstance.

262.  That deals with the first aspect of what the Judge regarded as the "cornerstone" of the "constitutional settlement" between the parties – namely the supposed entrenching of Dr. Sachs and Mr. Faulkner in office as directors.  The second aspect upon which the Judge relied was his conclusion, at paragraphs 387 to 390 of his Judgment, that the 2013 SHA allocated responsibility for management of the Company's business to the board which,

> "was to be able to operate free from shareholder interference, because the shareholders were bound to co-operate with it".

The Judge later put this in more striking terms, at paragraph 416,

> "The 2013 constitution was expressly designed to avoid the will of the majority prevailing in matters concerned with the commercial future of [the Company]."

263.  The Judge's reasoning in this respect was based upon clause 5 of the 2013 SHA (set out in paragraph 79 above) which was headed "Business of the Company".  The Judge addressed this clause in paragraph 389 of the Judgment as follows,

> "389.    First, there is the second sentence of clause 5.1: "The Shareholders shall each co-operate with the Board in the running and operation of the Company and each CPG Group Company." Second, there is the reference in clause 5.2 to "the Business" being conducted "in accordance with good business practice." Third, there is the commitment in clause 5.3(a) that CPGL and the CPGL group companies should conduct their affairs "in a proper and efficient manner and for their own benefit" – "proper" to my mind being a reference to proper corporate governance. Fourth, there is the provision in clause 5.3(c): " … the Business shall be carried on in accordance with the policies laid down from time to time by the Board and in accordance with the Annual Budget." And fifth, there is clause 5.4, which makes it clear that the duty to cooperate with the board continues even if the relevant shareholder has become subject to an obligation to transfer his shares, for example under a Transfer Notice or Compulsory Transfer Notice (as defined): even in such cases, the shareholders affected were required to "do all things in their power to continue to co-operate with the board in its running and operation of the Company …"."

264.  For the reasons that follow, I do not consider that these provisions in clause 5 of the 2013 SHA can be interpreted – whether in conjunction with the good faith clause 4.2 of the 2013 SHA or otherwise - as an agreement by the Investors that they would forgo any right to play a role in decisions regarding the management and commercial future

of the Company, and that they would instead entirely cede such power to the board of the Company for all time and in all circumstances.

265.   I do not think that the provisions of clause 5 of the 2013 SHA were intended to be a constitutional allocation of authority and responsibility for the management of the Company as between the shareholders and the board.   That allocation of power is invariably not contained in a shareholders' agreement, which may not exist in relation to every company and is not a document which is required to be publicly registered so as to give third parties notice of such allocation of power.   Rather, the allocation of power to manage the company is invariably contained in the main constitutional document which every company has, namely its articles of association: see e.g. Quin & Axtens v Salmon [1909] 1 Ch 311 (CA), [1909] AC 442 (HL).

266.   So it was that the 2013 Articles incorporated, by reference, the Companies Act 1985 Table A Regulations (as amended) ("Table A").   These included Regulation 70 ("Regulation 70") which provides,

> ""Subject to the provisions of the Act, the memorandum and the articles and to any directions given by special resolution, the business of the company shall be managed by the directors who may exercise all the powers of the company.  No alteration of the memorandum or articles and no such direction shall invalidate any prior act of the directors which would have been valid if that alteration had not been made or that direction had not been given. The powers given by this regulation shall not be limited by any special power given to the directors by the articles and a meeting of directors at which a quorum is present may exercise all powers exercisable by the directors."

> (my emphasis)

267.   This fundamental, and standard, provision of company articles, made it clear that the management of the Company's business was to be conducted by the board of directors, but "subject … to any directions given by special resolution" of the shareholders in general meeting.  The Judge did not refer to Regulation 70 or explain how it fitted his conclusion that the Investors had agreed that they would not use their majority voting power to prevail in relation to any matters concerning the management or commercial future of the Company.

268.   In my judgment, if it had really been intended that the shareholders of the Company would not have the power to give any directions under Regulation 70, it is inevitable that this power would have been expressly excluded.  That is especially so since the 2013 Articles were professionally drafted and adopted at the same time as the 2013 SHA was executed, and contained other specific exclusions of Regulations in Table A – see e.g. Article 14.1 which excluded Regulations 73 to 80 (inclusive) in relation to the retirement of directors by rotation.  In that respect it is also significant that there was no restriction in the 2013 SHA on the amendment of the 2013 Articles, other than that this would be a "Reserved Matter" that would require the approval of the Investors.

269.   In my view, the function of clause 5 of the 2013 SHA to which the Judge referred was to set out parameters and operational mechanisms for the way in which the board would,

in the ordinary course, manage the "Business" (as defined) and the wider affairs of the Company in the exercise of the authority given to the board under Regulation 70. The second sentence of clause 5.1 of the 2013 SHA required each shareholder to co-operate with decisions which had actually been taken by the board in the exercise of that authority. However, that is a long way from an exclusion of the express power of the shareholders of the Company in general meeting under Regulation 70 to pass a special resolution giving a direction to the board in relation to a specific matter.

270.    In short, I do not believe that the second sentence of clause 5.1 of the 2013 SHA can carry the weight that the Judge placed upon it. In my view, that sentence did not exclude the power of the shareholders to give a direction under Regulation 70, and the ability to procure the passing of such a special resolution was available to the Investors, who at all relevant times at and after the 2013 SHA and 2013 Articles came into force, held in excess of 80% of the voting rights at a general meeting of the Company.

271.    I therefore consider that the Judge was wrong to hold that the "bargain" embodied in the 2013 SHA and the 2013 Articles was that the Investors would be powerless to have any say in the management of the Company, or (as he put it) that the 2013 SHA and the 2013 Articles were "expressly designed to avoid the will of the majority prevailing in matters concerned with the commercial future of [the Company]".

272.    Standing back, I also consider that the Judge's view of the bargain that had been struck in 2013 – namely that Dr. Sachs and Mr. Faulkner could not be removed, and that a board of directors on which they held the balance of power was to be able to control the management and commercial future of the Company free from any interference by the Investors - was, in the context of the commercial and financial position that had been reached in 2013, an implausible conclusion to reach.

273.    By 2013 the Investors had invested a very large amount of money in the Company (in excess of $135 million), they held 80% of its equity shares, and it could be foreseen that even more substantial finance would be required from them to bring the project to completion. Against that background, for it to be concluded that the Investors had effectively surrendered to the Minorities any right, in any circumstances, to exercise any control over the management and commercial future of the Company is commercially counter-intuitive. I consider that such a surprising result would have required very clear wording, and in my view, none can be found in the 2013 SHA or 2013 Articles.

274.    For completeness, I would repeat the points that I have already made that the Judge did not identify any specific provisions of the 2013 SHA or the 2013 Articles to support his conclusions that clause 4.2 required the Investors to deal fairly and openly with Dr. Sachs or Mr. Faulkner or that the Investors were required to have regard to the interests of the Minorities when exercising their voting rights as shareholders. Those conclusions were based purely upon legal authorities concerning the meaning of good faith in other contexts, and for the reasons that I have explained, I consider that the Judge's conclusion that such duties were automatically imposed without there being anything in the other provisions of the 2013 SHA or 2013 Articles to support them, was incorrect.

275.    Pulling the threads together, the net result, in my view, is that the duty of good faith in clause 4.2 of the 2013 SHA imposed a core requirement that the parties should act

honestly towards each other and the Company. It might be objected that this would simply be stating the obvious, but I consider that making such a requirement served a purpose in a contract between parties who had not worked together before, and who came from very different business backgrounds.

276.   I would also accept that clause 4.2 required the parties not to act in bad faith towards each other. As Leggatt J explained in Yam Seng, this would prohibit conduct that reasonable and honest people would regard as commercially unacceptable, but not necessarily dishonest. However, in the same way as Lord Nicholls suggested in Royal Brunei that it is impossible to be entirely specific about the meaning of "dishonesty", I do not consider that it is appropriate to try to be prescriptive in describing what conduct might fall into this category, given that to do so would necessarily involve recourse to synonyms or epithets (such as "improper" or "sharp practice").

277.   For the reasons I have explained, I have considerable reservations about finding a duty of fidelity to the bargain to be inherent in a good faith clause used in the context of a shareholders' agreement in the absence of any other indication to that effect in the agreement (c.f. the express wording in Coroin). However, whether or not that is so, in the instant case I do not in any event accept that clause 4.2 required the parties to adhere to the concept of a bargain having the characteristics identified by the Judge of a constitutionally omnipotent board on which Dr. Sachs and Mr. Faulkner held an unalterable balance of power. Nor, in the absence of any supporting wording in the 2013 SHA, do I accept that clause 4.2 imposed on the Investors some procedural duty of fair and open dealing with Dr. Sachs or Mr. Faulkner going beyond the terms of sections 168 and 169 of the 2006 Act. And neither do I consider that clause 4.2 required the Investors to have regard to the interests of the Minorities in some undefined way over and above any requirements that would be imposed upon shareholders to have regard to the interests of the Company when voting on particular types of resolutions as a matter of general company law.

J.     Was the 2013 SHA part of the Company's constitution?

278.   I next turn to the Judge's finding – critical to his conclusions as regards the conduct of the directors nominated by the Investors – that the Company's constitution for the purposes of the duties of the directors included the 2013 SHA.

279.   As indicated above, in that regard the Judge accepted the submission of Mr. Hollington that this was the consequence of section 17 of the 2006 Act. That section provides,

> "17.     Unless the context otherwise requires, references in the Companies Acts to a company's constitution include—
>
> (a)     the company's articles, and
>
> (b)     any resolutions and agreements to which Chapter 3 applies (see section 29)."

280.   Chapter 3 and section 29 are both entitled "Resolutions and agreement affecting a company's constitution". Section 29 of the 2006 Act relevantly provides,

> "(1)     This Chapter applies to -

> (a)     any special resolution;
>
> (b)     any resolution or agreement agreed to by all the members of a company that, if not so agreed to, would not have been effective for its purpose unless passed as a special resolution;
>
> (c)     any resolution or agreement agreed to by all the members of a class of shareholders that, if not so agreed to, would not have been effective for its purpose unless passed by some particular majority or otherwise in some particular manner;
>
> (d)     any resolution or agreement that effectively binds all members of a class of shareholders though not agreed to by all those members;
>
> (e)     any other resolution or agreement to which this Chapter applies by virtue of any enactment."

Section 30 then provides that a copy of every resolution or agreement to which Chapter 3 applies must be filed with the Registrar of Companies.

281.    I consider that the Judge was wrong to accept the argument that section 17 meant that for the purposes of section 171, the constitution of the Company included the 2013 SHA.

282.    In my view, section 29 does not apply to the 2013 SHA because it is not an agreement that, if not agreed to by all the shareholders or a class of shareholders, would not have been effective for its purpose unless passed by a special resolution.  The essence of subsections (b) and (c) are to include within the concept of the company's constitution a written agreement between all members or members of a class that has been used in place of a special resolution required by the 2006 Act so as, for example, to amend the articles.  But the 2013 SHA does not, by its terms, purport to amend the 2013 Articles or do anything else that would require a special resolution of the Company.  Nor does the 2013 SHA fall within the terms of subsections (c) – (e) of section 29.  Although not determinative, it is also of note that the 2013 SHA was not filed with the Registrar of Companies.

283.    On appeal, and I think recognising the force of these points, Mr. Hollington abandoned his reliance on section 17.  Instead he relied on section 257 of the 2006 Act.  That section appears in the same Part 1 of the 2006 Act as section 171 and provides,

> "257.    References in this Part to a company's constitution include -
>
> (a)     any resolution or other decision come to in accordance with the constitution, and
>
> (b)     any decision by the members of the company, or a class of members, that is treated by virtue of any enactment

or rule of law as equivalent to a decision by the company."

284. Mr. Hollington contended that the 2013 SHA was a "decision by the members" that is treated in law as a "decision of the Company". I do not accept that submission. It is not a natural use of words to describe a shareholders' agreement such as the 2013 SHA as a "resolution" or "decision" by the shareholders; the agreement was not come to in accordance with any provision in the Company's articles of association (so as to engage section 257(a)); and it is not treated in law as equivalent to a decision of the Company (so as to engage section 257(b)), even though the Company was a party to the agreement.

285. I do not consider that the intention of the legislature was that by the indirect operation of section 257, section 171 should place directors under a general obligation to exercise their powers in accordance with a shareholders' agreement. That would have been an entirely new statutory obligation to place on directors, which is not mentioned in any of the materials attending the passing of the 2006 Act, and is a proposition for which we were shown no supporting academic or other commentary.

286. In my view, the more obvious explanation of section 257 of the 2006 Act is that it is designed to deal with cases in which, for example, (a) the shareholders in general meeting of the company decide, pursuant to a provision such as Regulation 70, to pass a special resolution to give a direction or instruction to the board to act in a certain way; or (b) the shareholders take a unanimous informal decision affecting the constitution of the company which is binding on the company under the Duomatic rule (so-called after the decision in Re Duomatic Limited [1969] 2 Ch 365, discussed by the Privy Council in Ciban Management Corporation v Citco (BVI) Limited [2020] UKPC 21). A director who disobeyed such an instruction or decision would be acting in contravention of his section 171 duty.

K.     Were the Minorities unfairly prejudiced?

287. Having set out my reasons for concluding that the Judge erred in various aspects of his approach to the interpretation of clause 4.2 of the 2013 SHA, and that he also erred in his conclusion that the Company's constitution for the purposes of the directors' duties under section 171(a) included the 2013 SHA, I turn to consider the particular respects in which the Judge found that the Minorities had been unfairly prejudiced. I shall do so under the same headings as I used when summarising the Judge's application of the law to the facts.

*The resignation of Dr. Sachs*

288. In paragraph 126 above, I have set out the Judge's findings, at paragraphs 413, 415 and 419 of his Judgment that, as regards the enforced resignation of Dr. Sachs, the Investors had reached the view that the success (or perhaps, as they saw it, salvaging something from failure) of the Company was possible only with Dr. Sachs out of the picture. The Judge also found that that was a commercially rational and legitimate conclusion for the Investors to have come to and that they were *bona fide* of the view that it was right for the business that he should go.

289.    The Judge held that none of this mattered because of the view that he had taken that clause 4.2 of the 2013 SHA meant that the Investors had to act with fidelity to a bargain that required them to maintain the "constitutional balance" of the Company and thus to refrain from removing Dr. Sachs – or at least that if they did so, it would be a breach of contract.  The Judge also took the view that the Investors breached clause 4.2 because they failed to have regard to the interests of the Minorities in deciding to remove Dr. Sachs.  But that finding seems to have been based upon the same premise – namely that the interests of the Minorities were to have Dr. Sachs on the board come what may, because that is what had been agreed as part of their bargain.

290.    For the reasons that I have explained, I consider that the Judge was wrong in that interpretation of clause 4.2, both as to the nature of the bargain that was embodied in the 2013 SHA and the 2013 Articles, and also because there was no basis in the terms of those agreements for the imposition of a contractual duty to have regard to the interests of the Minorities.

291.    It follows that, in my judgment, in light of the Judge's findings that the Investors rationally and genuinely held the view that what they were doing was necessary in the interests of the Company and its business, their decision to require Dr. Sachs to resign and to threaten to remove him pursuant to section 168 if he did not go voluntarily was not a breach of their duty of good faith.

292.    The Judge also found that in this regard the Investors had acted in breach of what he characterised as a procedural duty to deal fairly and openly with Dr. Sachs.  He held that the Investors had deliberately ambushed him at the meeting on 14 March 2016, and although the Judge did not find that the Investors had deliberately misled him about Vollin's willingness to fund the Company, he thought that the duty to be fair and open required them to tell Dr. Sachs that Vollin had agreed to fund the Company to the end of May 2016.

293.    For the reasons that I have set out, I do not consider that such an affirmative procedural duty can be read into the obligation to act in good faith in clause 4.2 in the absence of anything in the other terms of the 2013 SHA and 2013 Articles to support it.  That being so, the absence of any finding that Dr. Sachs was deliberately misled means that the issue is simply whether the Investors' conduct in taking Dr. Sachs by surprise at the meeting on 14 March 2016 could be described as being dishonest, or in bad faith in the sense in which that latter concept has been used in the authorities to connote some commercially unacceptable conduct which would not necessarily be regarded as dishonest.

294.    In my view such conduct was not dishonest, and neither do I consider that it amounted to bad faith.  Although Dr. Sachs was deliberately taken by surprise by being presented with an ultimatum, he was not required to make an immediate decision, and it would in any event have taken some time before the Investors could utilise the statutory mechanism under section 168 of the 2006 Act to require a meeting of shareholders to be convened to consider a resolution for his removal.  It is also the case that Dr. Sachs had the benefit of independent legal advice from solicitors paid for by the Company for a week before entering into a settlement agreement.

295.    It must necessarily follow from that conclusion, together with the conclusion that the constitution of the Company did not include the 2013 SHA, that the directors nominated

by the Investors did not act in breach of their duties under section 171(a) of the 2006 Act.  The finding of the Judge in paragraph 428 of his Judgment that they did breach their duties in that respect therefore cannot stand.

296.    The Judge also found, in paragraph 429 of his Judgment, that in supporting the initiative of the Investors to remove Dr. Sachs, Mr. Fletcher and Mr. Burkey acted in breach of their duty under section 172(1)(f) of the 2006 Act "to have regard to the need to act fairly as between the members of the company".  However, the Judge described this conclusion as following from his earlier findings, and the only express basis upon which he reached his conclusion was that,

> "In supporting the initiative to remove Dr. Sachs, Mr. Fletcher and Mr. Burkey must obviously have disregarded the separate and specific interests of the Minorities in having Dr. Sachs remain in post, for all the reasons already described above, including in particular their interest in maintaining the overall constitutional balance enshrined in the 2013 SHA."

297.    In my view, this finding must fall with the conclusion that the Minorities did not have a right under the 2013 SHA to have Dr. Sachs remain in office come what may.  The section 172(1)(f) duty placed upon directors to have regard to the need to act "fairly" as between members of the Company must be given some legal frame of reference and cannot simply require directors to have regard to their own free-standing view of what might be "fair" between members.  In the context of a proposal to remove a director from office using the procedure under section 168 of the 2006 Act, in the absence of any contractual restraint upon the exercise of voting power by the Investors under the 2013 SHA, I cannot see how the section 172(1)(f) duty could have been infringed by the directors supporting the initiative of the Investors who held the vast majority of the shares in the Company, who could inevitably be assured of passing a resolution to remove Dr. Sachs from office, and who (as the Judge found) were acting in the genuine and reasonable belief that the best interests of the Company and its business required Dr. Sachs to go.

298.    I should add, although it is not essential for the decision, that I find it difficult to see how the Minorities (and Mr. Faulkner in particular) can complain about the conduct of the directors nominated by the Investors in circumstances in which Mr. Faulkner himself indicated that he was inclined to support the removal of Dr. Sachs and certainly did not manifest any belief at the time that his duties to the Company required him to object.

*The management of the Company after the departure of Dr. Sachs*

299.    As is apparent from the extracts from the Judgment set out in paragraphs 131 to 133 above, the essential basis of the Judge's finding that the Minorities were unfairly prejudiced by the conduct of the Investors and of their nominated directors in the period after the removal of Dr. Sachs, was that decisions concerning the management and future of the Company were taken by the Investors at their update meetings with Kew, rather than by the board.  This had the result that Mr. Faulkner, who was still a director, was not given an active role in the management of the business, but was kept at arm's length and marginalised by the Investors.

300.    The matters to which the Judge referred included, in particular, the discussions over the future of Newton Aycliffe, the August 2016 fund-raising and the approach by Kaiam. In paragraph 457 of the Judgment, the Judge found that "the manner in which these matters were dealt with" amounted to a breach by the Investors of clauses 4.2 (good faith), 5.2 and 5.3(a) of the 2013 SHA, essentially because "the constitutional structure set out in the 2013 SHA and 2013 Articles was effectively ignored by the Investors". The Judge also concluded that "because they were so fundamental, those breaches were both unfair and prejudicial".

301.    To the extent that the Judge's reasoning depends upon his finding that the good faith provision in clause 4.2 of the 2013 SHA required the Investors to adhere to a bargain that the management of the Company should always be conducted by a board upon which Dr. Sachs and Mr. Faulkner held the balance of power, free from any interference by the Investors, these findings were flawed and cannot be supported for the reasons that I have explained.

302.    I also do not think that the Judge was right to characterise what occurred in this respect as a breach by the Investors of clause 5.2 of the 2013 SHA.  As indicated above, that clause provided,

> "5.2     The Shareholders shall exercise their respective rights and powers to ensure, so far as they are lawfully able to do so, that the Company complies with its obligations under this Agreement and any other agreements to which the Company is a party, and that the Business is conducted in accordance with good business practice and on sound commercial and profit making principles."

303.    It is apparent that the last part of this clause, upon which the Judge relied, related to the conduct of the "Business".  That term was defined as,

> "… the production and supply of projection products and technologies and all activities reasonably ancillary and necessary in relation to the production and supply of projection products and technologies"

304.    These provisions related to the conduct of the underlying business of production and supply of projection products.  They were not, in my judgment, in any way infringed by the failure to hold board meetings involving Mr. Faulkner.

305.    I do not, however, think that the Judge's finding that the Investors breached clause 5.3(a) of the 2013 SHA can be dismissed in the same way.  By that clause, the Investors agreed that,

> "the Company and each CPG group company shall carry on and conduct its business and affairs in a proper and efficient manner and for their own benefit;"

306.    This clause is not limited to the conduct of the "Business" as defined, and in paragraph 389 of his Judgment, the Judge expressed the view that the reference to "proper" meant "proper corporate governance".  I agree.  I would also observe that in any event the

2013 Articles, and in particular Regulation 70 which they incorporated by reference, placed the power to manage the business of the Company into the hands of the board (however it might be constituted from time to time). As I have explained, if the Investors wished to control the management of the Company, they were entitled to give directions to the board of the Company by voting to pass a special resolution in accordance with Regulation 70. But the 2013 Articles did not entitle the Investors to manage the business of the Company themselves.

307.    The answer given by the Investors to this point at trial and in Ground 5 of their Notice of Appeal is that Mr. Faulkner could, if he had wished to do so, convened board meetings, but he chose not to do so. The Judge dealt with this point in paragraphs 454 to 455 of his Judgment,

> "454.    The Investors say that Mr. Faulkner was a director and indeed Chairman of CPGL, and so had the ability to convene board meetings himself. That is true, but in the circumstances it seems to me that the reasons are plain. Mr. Fletcher's view of Mr. Faulkner has always been poor … There is nothing to suggest that Mr. Fletcher's view had improved over time, and indeed it seems logical to think that he viewed with increasing alarm the idea of Mr. Faulkner playing an active role in the management of the business, still less one which involved him having a right of veto over resolutions at board meetings. From his point of view, the existing constitutional structure was a dead letter.
>
> 455.    Mr. Faulkner realised that, and indeed by 23 May he knew that the Investors wanted him to resign. In a sense he was powerless to help the unfolding chain of events because the business was dependent on continuing financial support from Vollin and Minden. Thus, the die was already cast, and no doubt to him, the idea that he should seek to invoke a governance structure which his major investors considered to have "manifestly failed" and had already in practice overridden seemed quite unrealistic."

308.    These paragraphs are based upon the correspondence between Mr. Fletcher and Mr. Faulkner in May 2016 set out in paragraphs 41 to 53 and 58 to 59 above. I do not consider that the Judge's interpretation of such correspondence was accurate or enabled him to dismiss the point made by the Investors as he did.

309.    As I have set out in paragraph 41 above, in his email of 4 May 2016, Mr. Faulkner had acknowledged that the meeting on 13 April 2016 had been an Investor meeting, and he did not pursue a complaint that he had not been invited to it. Mr. Faulkner did, however, raise the need for "proper corporate governance" and asked for a board meeting to be convened.

310.    The email response of Mr. Fletcher on the same day was not to refuse to hold a board meeting but to suggest that Mr. Faulkner should "just come in" to talk informally to him and Mr. Burkey about the state of the business and the changes which Mr. Fletcher thought would be required to the Company's governance and board structure in light of the need to obtain further funding from the Investors. Mr. Faulkner readily accepted

that invitation and such a meeting was held on 23 May 2016. At that meeting Mr. Faulkner agreed to consider the issue of corporate governance and to revert to Mr. Fletcher. However, he did not do so for over two months, in spite of having consulted external lawyers and receiving chasers from Mr. Fletcher. Mr. Faulkner also did not follow up the invitation made by Mr. Fletcher on the call on 9 August 2016 and in his email the following day that he (Mr. Faulkner) should call regular board meetings.

311.    In these circumstances I do not think that the Judge was right to say that the Investors breached the 2013 SHA by ignoring the constitutional structure set out in it and in the 2013 Articles. For the reasons that I have given, the constitutional structure to which the Judge was referring was one in which Dr. Sachs and Mr. Faulkner were entitled to be entrenched on the board and hold the balance of power: but that was not the true position. Moreover, far from ignoring the constitution that was in place, through Mr. Fletcher, the Investors raised the question with Mr. Faulkner of how it could operate after the departure of Dr. Sachs and sought Mr. Faulkner's input on how to resolve the issues that had arisen.

312.    This being so, I do not accept that a failure to hold board meetings thereafter could be unfair to the Minorities when the very person who (on their case) was entitled to be actively involved in such meetings was silent for over two months and neither renewed his request for board meetings nor objected to the lack of them.

313.    Further, I do not agree with the Judge's conclusion that because the breaches of the constitution that he thought had occurred were so fundamental, they were necessarily prejudicial to the Minorities within the meaning of section 994.

314.    In paragraph 381 of his Judgment, the Judge referred to the judgment of David Richards J (as he then was) in Re Coroin [2012] EWHC 2343 (Ch) as authority for the proposition that prejudice for the purposes of section 994 was not confined to financial prejudice. David Richards J had said, at paragraph 630,

> "630.    Prejudice will certainly encompass damage to the financial position of a member. The prejudice may be damage to the value of his shares but may also extend to other financial damage which in the circumstances of the case is bound up with his position as a member. So, for example, removal from participation in the management of a company and the resulting loss of income or profits from the company in the form of remuneration will constitute prejudice in those cases where the members have rights recognised in equity if not at law, to participate in that way. Similarly, damage to the financial position of a member in relation to a debt due to him from the company can in the appropriate circumstances amount to prejudice. The prejudice must be to the petitioner in his capacity as a member but this is not to be strictly confined to damage to the value of his shareholding. Moreover, prejudice need not be financial in character. A disregard of the rights of a member as such, without any financial consequences, may amount to prejudice falling within the section."

315.   I agree with that summary, and in particular agree that a disregard of the rights of a member in his capacity as such, without any financial consequences, may amount to prejudice within the meaning of section 994. However, "may" does not mean "must", and in that regard it is important to note what David Richards J went on to say, at paragraph 631,

> "631.   Where the acts complained of have no adverse financial consequence, it may be more difficult to establish relevant prejudice. This may particularly be the case where the acts or omissions are breaches of duty owed to the company rather than to shareholders individually. If it is said that the directors or some of them had been in breach of duty to the company but no loss to the company has resulted, the company would not have a claim against those directors. It may therefore be difficult for a shareholder to show that nonetheless as a member he has suffered prejudice.   In <u>Rock (Nominees) Limited v RCO Holdings plc</u> [2004] BCC 466 the respondent directors of the company procured the sale of an asset to a company of which they were also directors. It was alleged to be a sale at an undervalue and procured in breach of the respondent directors' fiduciary duties to the company. The evidence established that the price paid was not an undervalue but was the best price reasonably obtainable, and the Court of Appeal upheld the decision at first instance that no prejudice had been caused to the petitioner…"

316.   Those observations are relevant in the instant case, because the Judge did not find that the Minorities had suffered any adverse financial consequences arising from the way that the Company was managed by the Investors after the resignation of Dr. Sachs. Instead, when dealing with the issue of whether the directors nominated by the Investors had breached their general duty under section 172 to promote the success of the Company during this period, the Judge concluded, at paragraph 480 of his Judgment, that the directors,

> "… honestly thought (and had good reason to think) that what they were doing was in the interests of the Company as a whole."

317.   The Judge explained,

> "482.   … given the condition the business was in as at March 2016 – a long way behind in its plans for development of marketable products, but with significant cash requirements each month and therefore a high degree of dependence on the Investors in keeping it afloat – I find it difficult to be critical of the decisions made to cut costs and to try and reposition CPGL in its efforts to make some money (or at least, break-even), and in the meantime keep the Investors on side.
>
> 483.   Newton Aycliffe was loss-making even with the Selex contract, and although a part of Dr. Sachs' vision, there were sound commercial reasons at the time for thinking that vision

> could not be realised, given the state of development of the P1 prototype and the disagreement over production costs (i.e., the BoM). Service of the Last Time Buy Notice was defensible commercially in that sense, even though it set the clock ticking on a possible closure, and of course in the meantime brought the Fab to a breakeven position. The same goes for the early phases of the discussions with Kaiam, to the extent the nominee directors were involved in them. Leaving aside the question of the constitutional framework within which the discussions took place, there was commercial sense at least in exploring what the Kaiam approach might involve and whether it might offer a solution."

318.    The Judge also held, at paragraph 484, that during this period the interests of the Investors and the Minorities were aligned,

> "484.    I think Mr. Gledhill was right to submit that in the broad sense I have described, and in the circumstances as they stood through the Spring and Summer of 2016, the interests of the Investors and of the Minorities *were* effectively the same: the interest of both was in salvaging something from the position CPGL found itself in. It seems to me the nominee directors acted in good faith in taking the steps they thought necessary to bring that about."

319.    Even if, therefore, it might be said that the Investors had acted unfairly in the sense that they did not follow the 2013 Articles in ensuring that the management of the Company was carried out by the directors at board meetings, in the absence of any adverse financial consequences and light of the Judge's finding that the relevant decisions during that period were taken honestly and reasonably in an attempt to serve the interests of all members, I do not consider that any prejudice within the meaning of section 994 was thereby caused to the Minorities.

320.    As indicated above, the Judge also thought that it followed from his findings that the Investors had overridden the agreed constitutional structure after Dr. Sachs resigned, and that the 2013 SHA formed part of the Company's constitution for the purposes of section 171(a) of the 2006 Act, that the directors nominated by the Investors must also have breached their duties under section 171(a) to act in accordance with the Company's constitution during the period after Dr. Sachs' departure.  For the reasons that I have given, I do not consider that either finding was correct, and hence the finding of unfair prejudice by the actions of the directors during that period also cannot stand.

*The removal of Mr. Faulkner*

321.    The Judge's reasons for finding unfair prejudice in the removal of Mr. Faulkner from office essentially tracked his reasoning in relation to Dr. Sachs.  He found that it was unfair of the Investors to "override the agreed upon constitutional balance" and that it was prejudicial because Mr. Faulkner's removal deprived the Minorities of the protection which his presence on the board was designed to achieve.

322.    In my view, and for the reasons that I have explained, I do not consider that there was any such agreement for Mr. Faulkner to be entrenched in office.  Nor was there any basis for a finding that the Investors had, or had breached, any duty to deal fairly and openly with Mr. Faulkner or to have regard to the interests of the Minorities when voting to remove him from office in accordance with section 168 of the 2006 Act. Accordingly, the Judge's finding that the Minorities were unfairly prejudiced by the Investors' removal of Mr. Faulkner must be set aside.

323.    The Judge's further finding that, to the extent that the directors nominated by the Investors encouraged or facilitated that removal, they breached their duty under sections 171(a) and 172(1)(f) of the 2006 Act, must also be set aside for similar reasons to those in relation to the resignation of Dr. Sachs.

*The appointment of further directors*

324.    I have set out in paragraphs 137 to 138 above the Judge's reasons for finding that the appointment of new directors after the resignation and removal of Dr. Sachs and Mr. Faulkner involved breaches by the Investors of clauses 4.2, 5.2 and 5.3(a) of the 2013 SHA and of Article 14.2 of the 2013 Articles.  Although the Judgment does not say so expressly, the assumption is that such appointments were made by the board and not by the shareholders in general meeting.

325.    The Judge's reasoning as regards clause 4.2 of the 2013 SHA essentially followed his finding as to the content of the parties' bargain, and cannot stand in light of the analysis that I have set out above.  Nor do I consider that the Judge was right to regard the appointment of directors as having anything to do with clause 5.2 of the 2013 SHA, which, as I have indicated above, concerned the conduct of the Business (as defined) and not constitutional questions such as appointments to the board.

326.    The question of whether the appointment of new directors breached clause 5.3(a) of the 2013 SHA (conduct of the business and affairs in a proper manner) must turn on whether such appointments were made in breach of Article 14.2.  However, because the Judge took the view that the parties' bargain required Dr. Sachs and Mr. Faulkner to remain in office, the Judge did not determine the question of whether Article 14.2 might still require their approval for the appointment of new directors if they had lawfully ceased to hold office (i.e. by resignation under Article 15.1(d) and removal under Article 15.1(a) respectively).

327.    I incline to the view that Article 14.2 did not require the approval of Dr. Sachs or Mr. Faulkner to the appointment of further directors by the board if they were no longer in office as a director and thus would have no part to play in the management of the Company by the board.  That would be the necessary interpretation of Article 14.2 in the event, for example, that they were to cease to be a director by reason of death or because they were suffering from a mental disorder, and it would, I think, also be the obvious interpretation in the event that they were to vacate office by reason of becoming bankrupt.  I also note that neither the 2013 SHA nor the 2013 Articles contained any provision requiring the approval of Dr. Sachs and Mr. Faulkner to the appointment of additional directors by the shareholders of the Company in general meeting.

328.    However, even if, contrary to that view, the approval of Dr. Sachs and Mr. Faulkner was still required under Article 14.2 notwithstanding that they had ceased to be

directors, then although the appointment of new directors by the board would not have complied with Article 14.2 and hence could be characterised as unfair within the meaning of section 994, I cannot see that such appointments were prejudicial to the Minorities.

329.    That is essentially for the same reasons as outlined above in relation to the Judge's findings as to the conduct of business in the period between the removal of Dr. Sachs and Mr. Faulkner. The Judge found that the interests of the Investors and the Minorities as members of the Company were aligned during that period and there was no basis for criticising the decisions taken by the directors, so that the Minorities did not suffer any adverse financial consequences. There is no indication that the position changed in any material respect as a result of the appointments of further directors in the period after the removal of Mr. Faulkner.

330.    I would therefore set aside the Judge's findings of unfair prejudice as a result of appointment of new directors.

*The sale of Newton Aycliffe*

331.    Although the Judge found that Newton Aycliffe had not been sold at an undervalue, he did hold that the process leading to the sale had involved breaches of clauses 4.2. 5.2 and 5.3(a) of the 2013 SHA by the Investors, and corresponding breaches by the directors of their duties under section 171(a) of the 2006 Act because the relevant decisions were not taken by a board including Dr. Sachs and Mr. Faulkner.

332.    The same reasoning that I have set out above in relation to the management of the Company during the period between Dr. Sachs' resignation and Mr. Faulkner's removal must also apply to these findings.

333.    The only basis for the Judge's finding of a breach of the good faith provision of clause 4.2 during this period was his view of what the parties' bargain required as regards the composition of the board. That finding must fall with my conclusion that the Judge's view of the parties' bargain was wrong. I also do not consider that clause 5.2 in relation to conduct of the Business was engaged in relation to the process of decision-making in relation to the sale of the Newton Aycliffe facility.

334.    To the extent that clause 5.3(a) of the 2013 SHA was engaged and breached by the Investors as a result of the relevant decisions concerning the future of Newton Aycliffe not being taken at board level, it seems to me that the Judge's express finding that the sale was not at an undervalue must lead to the conclusion that no prejudice within the meaning of section 994 was caused to the Minorities. In essence, the position is the same as in the case of Rock (Nominees) Limited v RCO Holdings plc [2004] BCC 466 to which David Richards J referred in Re Coroin (above). In that case, although the respondent directors of the company breached their duties in procuring a sale of an asset to a company with which they were associated, the evidence established that the price paid was not an undervalue, with the result that the Court of Appeal upheld the decision at first instance that no prejudice had been caused to the petitioner.

*Conclusion*

335.   For the reasons I have explained, I consider that the Judge was wrong in his findings that the Investors or the directors whom they had nominated had conducted the affairs of the Company in a manner that was unfairly prejudicial to the Minorities.

L.      The Respondents' Notice

336.   For completeness I would briefly refer to the Respondents' Notice. By that notice, the Minorities contended that the Judge was wrong not to draw adverse inferences from the fact that none of the ultimate beneficial owners of Vollin, Aldon and Mindon, namely Dr. Abramov, Dr. Frolov or Mr. Abramovich, were prepared to give evidence at the trial. As clarified in a document served pursuant to an order which I made on 24 February 2022, the adverse inference for which the Minorities contend, is that,

> "…in their usurpation of the functions of the boards … [the Investors] … acted with conscious and deliberate disregard of the rights of the Minorities under the 2013 Constitution of CPGL (and CPUK) being managed and directed by their respective boards."

337.   Although the question of whether adverse inferences should be drawn from the absence of Dr. Abramov, Dr. Frolov and Mr. Abramovich was apparently raised at trial, the Judge was not expressly invited by the Minorities to make findings on it, even when it was apparent from the draft Judgment that he did not propose to do so. That being so, I do not consider that it is appropriate to invite this court, which has not heard the evidence and could not sensibly put itself into the position in which to address the issue *de novo*, to do so.

338.   It would also seem (at least as expressed) that the adverse inference which it is contended should be drawn either (i) is premised upon the assumption that the Judge was correct in his view that the rights of the Minorities under the 2013 SHA were to have the business of the Company and CPUK conducted exclusively by a board upon which Dr. Sachs and Mr. Faulkner held the balance of power, or (ii) does not relate to the decision to require the resignation of Dr. Sachs or the decision to vote to remove Mr. Faulkner from office, but is to be limited to the management of the Company by the Investors rather than through board meetings in the period after Dr. Sachs' resignation.

339.   For the reasons that I have explained, I consider that the Judge was wrong in his view of the rights of the Minorities under the 2013 SHA, so that the first basis suggested for drawing an adverse inference falls away.

340.   As to the alternative basis, as I have also explained, the Judge did not find that there were any adverse financial consequences for the Minorities caused by the decisions taken by the Investors or their nominated directors after Dr. Sachs resigned. Instead the Judge found that the interests of the Investors and the Minorities were aligned and the directors concerned acted honestly and reasonably in seeking to salvage the Company's business. As such, whatever the state of mind of the beneficial owners of the Investors during this period as to where the decisions concerning the management of the Company's business should be taken, I fail to see how any prejudice could be said to have been caused to the Minorities within the meaning of section 994.

M.     Disposition

341.    I would allow the appeal and dismiss the Respondents' Notice.

**Lady Justice Carr:**

342.    I agree.

**Lord Justice Newey:**

343.    I also agree.