# EXHIBIT 9



Neutral Citation Number: [2013] EWCA Civ 781

Case No: A3/2012/2515

**IN THE COURT OF APPEAL (CIVIL DIVISION)**
**ON APPEAL FROM THE HIGH COURT OF JUSTICE**
**(CHANCERY DIVISION) (COMPANIES COURT)**
**MR JUSTICE DAVID RICHARDS**
**[2012] EWHC 2343 (Ch)**

Royal Courts of Justice
Strand, London, WC2A 2LL

Date: 03/07/2013

Before :

**LADY JUSTICE ARDEN**
**LORD JUSTICE MOORE-BICK**
and
**LORD JUSTICE RIMER**
- - - - - - - - - - - - - - - - - - - -
**IN THE MATTER OF COROIN LIMITED**
**AND IN THE MATTER OF THE COMPANIES ACT 2006**

Between :

|  |  |
|---|---|
| **PATRICK GERARD McKILLEN** | **Appellant** |
| **- and -** | |
| **(1) MISLAND (CYPRUS) INVESTMENTS LIMITED** | **Respondents** |
| **(2) DEREK QUINLAN** | |
| **(3) ELLERMAN CORPORATION LIMITED** | |
| **(4) B OVERSEAS LIMITED** | |
| **(5) RICHARD FABER** | |
| **(6) MICHAEL SEAL** | |
| **(7) RIGEL MOWATT** | |
| **(8) COROIN LIMITED** | |

- - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - -

**Lord Goldsmith QC, Mr Philip Marshall QC, Mr Richard Hill QC & Mr Gregory Denton-Cox** (instructed by **Herbert Smith Freehills LLP**) for the **Appellant**
**Mr Kenneth MacLean QC, Mr Edmund Nourse, Mr Sa'ad Hossain & Miss Emma Jones** (instructed by **Weil, Gotshal & Manges**) for the **1st, 3rd & 4th Respondents**
**Mr Stephen Auld QC, Mr Michael Fealy & Mr Michael d'Arcy (instructed by Quinn Emanuel Urquhart & Sullivan LLP) for the 2nd Respondent**
**The 5th, 6th & 7th Respondents - interested parties - not represented**

Hearing dates : 5-7 February 2013

- - - - - - - - - - - - - - - - - - - -
## Approved Judgment

**Lady Justice Arden :**

*OUTLINE OF THIS APPEAL*

1.      Mr Patrick McKillen holds 36.2% of the issued share capital of Coroin Limited ("Coroin").  He seeks through this litigation to acquire more shares in Coroin so that he becomes the majority shareholder.  He contends that he should have been offered more shares for purchase, and that the failure to make that offer was a wrong to him as a minority shareholder.  He was unsuccessful in these contentions at trial but he now seeks to establish his rights in this court.

2.      Accordingly, Mr McKillen appeals from the order of David Richards J dated 11 September 2012 dismissing his petition under section 994 of the Companies Act 2006 ("CA 2006") for relief against unfairly prejudicial conduct.  The appeal is opposed by the first four respondents, who are present or former shareholders in Coroin, namely Mr Derek Quinlan and three companies controlled by the trustees of the Sir David and Sir Frederick Barclay family settlements (together "the Barclay interests").

3.      Under a shareholders' agreement dated 14 May 2004 ("the shareholders' agreement") and Coroin's articles, Mr McKillen had "pre-emption" rights, that is, rights or opportunities to purchase shares of other shareholders in particular circumstances. The essence of Mr McKillen's complaints in these proceedings is that the appropriate offer was not made when it should have been made and instead Mr Quinlan's 35.4% shareholding has found its way into the control of the Barclay interests without going through the "pre-emption" provisions.  The relief he seeks is an order of the court entitling him to purchase the Quinlan shareholding or exercise his pre-emption rights.

4.      The fundamental legal issue on this appeal is whether Mr McKillen has satisfied the requirement for relief in section 994(1) of the CA 2006 that there should have been unfairly prejudicial conduct by Coroin.

5.      In my judgment, for the reasons given below, the circumstances that occurred in this case were not circumstances in which pre-emption rights might become exercisable save in one respect.  Even in that one respect there was no unfairly prejudicial conduct by Coroin as required by section 994(1) of the CA 2006.

6.      I have divided the remainder of this judgment into the following sections:

**How the Barclay interests acquired control of Coroin** (paras 7 to 10)

**What Mr McKillen has to demonstrate in order to succeed on this appeal** (paras 11 to 22)

**(1) Practical effect argument**                                    (paras 23 to 35)

**(2) Proprietary interest argument**                              (paras 36 to 40)
**(3) Good faith argument**                                          (paras 41 to 56)
**(4) Security becoming enforceable argument**          (paras 57 to 58)
          **Threshold issue: (a) the 2004 charge and (b) the 2005 charge** (para 59)
                    **(a) the 2004 charge**          (paras 60 to 69)
                    **(b) the 2005 charge**          (paras 70 to 78)
          **Substantive issue (2005 charge only): no unfair prejudice to Mr McKillen**

Case 1:21-cv-11059-GHW   Document 182-9   Filed 08/15/23   Page 5 of 51

Judgment Approved by the court for handing down.                    McKillen v Misland (Cyprus) Investments Ltd & Ors

(para 79)

**(a) No implied term requiring notification of event within clause 6.6** (paras 80 to 92)
**(b) Pre-emption rights not triggered by breach of clause 6.17** (paras 93 to 99)
**(c) No implied term extending the one month period in clause 6.6** (paras 100 to 102)
**(d) Standstill arrangements and power of Mr McKillen to convene a board meeting** (paras 103 to 112)
**(e) Conclusion on security becoming enforceable argument** (para 113)

**No remaining issues need to be decided**     (paras 114 to 116)
**Handling complex appeals**     (paras 117 to 127)
**Conclusions**     (paras 128 to 131)
**Appendix 1  Extracts from shareholders' agreement: pre-emption provisions (clause 6) and good faith provision (clause 8.5)**

**Appendix 2  Relevant provisions of the 2004 and 2005 charges and BOSI's general conditions**

## *HOW THE BARCLAY INTERESTS ACQUIRED CONTROL OF COROIN*

7.     In a meticulous and clear judgment, the judge set out the facts.   I will refer simply to the facts which are essential for the purposes of this judgment.  The judge's factual findings are not challenged.

8.     Coroin is a substantial company.  It indirectly owns three major London hotels, The Connaught, The Berkeley and Claridge's.

9.     The essential facts relating to the acquisition by the Barclay interests of control over the Quinlan shareholding are as follows:

(1)     Mr Quinlan was from at least 2009 in severe financial difficulties.  His shares were charged to secure borrowings.  He wished to sell his shares.  He had discussions for this purpose with the Barclay brothers.  Mr Quinlan originally thought that he could simply elect not to offer his shares under clause 6 of the shareholders' agreement.

(2)     At the end of October 2010, the Barclay brothers lent Mr Quinlan the sum of €500,000.   In November 2010, Mr Quinlan informally agreed to inform the Barclay brothers of any proposal to dispose of his shares.

(3)     In January 2011, the fourth respondent, B Overseas Limited ("B Overseas"), acquired the share capital of the first respondent, Misland (Cyprus) Investments Ltd ("Misland"), a company controlled by another group of investors, namely the Green family. Misland held a 25% stake in Coroin.  Mr McKillen subsequently unsuccessfully challenged this transaction as a breach of his pre-emption rights:  see *McKillen v Misland Investments Ltd and ors*

[2012] EWCA Civ 179, now reported as *Re Coroin Ltd* [2012] 2 BCLC 611 ("*Re Coroin (No 1)*").

(4)     On 14 January 2011, Mr Quinlan and the Barclay brothers reached a non-binding agreement in principle that the Barclay brothers would buy Mr Quinlan's shares on the basis of a valuation of the entire share capital at £900m.

(5)     On 15 January 2011, Mr Quinlan entered into a written "exclusivity" agreement with the fourth respondent, B Overseas, a vehicle of the Barclay brothers, under which he agreed not to speak to any other party about selling his Coroin shares for four weeks. The judge found that there was also a non-binding agreement between Mr Quinlan and the Barclay brothers to co-operate.

(6)     On about 15 January 2011, the Barclay brothers made a commitment to provide financial support to Mr Quinlan. However, the judge found that this commitment was not binding. In particular he did not find that the Barclay interests agreed to provide financial support in return for Mr Quinlan's co-operation in relation to Coroin. On the contrary, Mr McKillen accepts that the Barclay interests provided substantial support to Mr and Mrs Quinlan by way of gift.

(7)     On 29 January 2011, Ellerman Corporation Limited ("Ellerman"), the third respondent, acquired for €71 million borrowings of Mr Quinlan secured on part of his shareholding. Ellerman was registered as holder of the shares pursuant to clause 6.18 of the shareholders' agreement. Mr Quinlan and Ellerman gave a written confirmation to Coroin that there was no agreement between Mr Quinlan and the Barclay interests for the acquisition of any interest in Mr Quinlan's shares.

(8)     On 17 February 2011, Mr Quinlan entered into a binding written agreement ("the February agreement") with Ellerman Hotels Group Limited ("EHGL") for the sale of his Coroin shares. This is a key document. This agreement provided that the sale was subject to (1) compliance with the terms of the shareholders' agreement and Coroin's articles, and (2) consent from any chargee holding security over Mr Quinlan's shares.

(9)     EHGL has not called for Mr Quinlan to complete the sale as that would on any view require Mr Quinlan first to offer his shares around at the agreed price of £80 million pursuant to clause 6.

(10)    On 16 May 2011 Mr Quinlan resigned as a director of Coroin at the request of the Barclay interests. Mr Quinlan said that he did so voluntarily to concentrate on his other business interests. His shares carried the right to the appointment of a director and at their request he appointed a nominee of the Barclay interests as a director.

(11)    Also on 16 May 2011, Mr Quinlan executed a power of attorney for one year in favour of a nominee of the Barclay interests. This gave the attorney wide power to perform acts in relation to the company on behalf of Mr Quinlan.

(12)    Mr McKillen only learnt about the power of attorney after commencing these proceedings.

(13)    By September 2011 the Barclay interests had acquired all the other security over Mr Quinlan's shares, or secured its release.

(14)    The judge held that, in consequence of what had happened, the Barclay interests had achieved practical control over Mr Quinlan's shareholding (judgment, paragraph 349).

(15)    However, the judge held that there was no breach of clause 6.  After handing down his judgment, the judge, in refusing permission to appeal, observed (with respect to the agreements and arrangements summarised above) that:

> "The agreements and arrangements quite deliberately fell short of the transfer of an interest in the shares, because the parties wanted to avoid triggering the pre-emption provisions."

10.    I will refer to the agreements and arrangements between Mr Quinlan and the Barclay interests summarised above as "the Arrangements".

## WHAT MR MCKILLEN HAS TO DEMONSTRATE IN ORDER TO SUCCEED ON THIS APPEAL

11.    Mr McKillen has chosen to invoke the remedy provided by section 994(1) of the CA 2006.  The advantage of that remedy is that the court's power to grant relief is wide and flexible, and extends beyond the relief which could be granted, say, in an action for breach of contract.  However, it is a purely statutory jurisdiction.  That means, in particular, that it cannot be exercised unless the requirements of section 994(1) are fulfilled.

12.    Section 994(1) provides:

> "(1)    A member of a company may apply to the court by petition for an order under this Part on the ground—
>
> (a)    that the company's affairs are being or have been conducted in a manner that is unfairly prejudicial to the interests of members generally or of some part of its members (including at least himself), or
>
> (b)    that an actual or proposed act or omission of the company (including an act or omission on its behalf) is or would be so prejudicial."

13.    The requirements relevant to this appeal are that (1) there is an act or omission on the part of the company and (2) that act or omission is unfairly prejudicial to Mr McKillen.

14.    These requirements are cumulative. If the court concludes that the first requirement is not satisfied, the second requirement does not arise.  Moreover there is nothing to stop

the court considering the requirements on the basis most favourable to Mr McKillen and, if it concludes that the case could not succeed on that basis, restricting its consideration of other issues raised. Cases under section 994(1) can be very resource-intensive. This case is an example of a heavy section 994(1) petition since the trial below occupied 30 days of court time. Courts must, where possible, find ways and means of reducing the hearing times for these cases. In this case it may have been possible for significant amounts of court time to have been saved by focusing on the statutory requirements for an act or omission of Coroin which is unfairly prejudicial.

15. The expression "unfairly prejudicial" has been subject to extensive judicial interpretation. There needs to be both prejudice and unfairness.

16. Prejudice does not mean that there has to be financial loss. It may be enough to show that the rights of the petitioning member have been infringed without showing that that led to any financial loss.

17. In order to show unfairness, Mr McKillen had to demonstrate unfairness stemming from a breach of a legal right conferred by the articles or the shareholders' agreement: see generally *O'Neill v Phillips* [1999] 2 BCLC 1. In one category of case, that is where the company is formed on the basis of a personal relationship between the shareholders, the court is able to subject legal rights to equitable considerations. However, the judge held that Coroin did not fall into that category of case and there is no appeal on that point.

18. To meet the requirement to show unfairness Mr McKillen argues that his contractual rights under the pre-emption provisions have been breached. His principal arguments (and here I leave aside other arguments which I shall refer to below) are that the pre-emption articles were triggered in the following four ways. These arguments may be summarised as follows:

    (1) *the Practical Effect Argument*: Mr McKillen argues that even though Mr Quinlan has not transferred the legal and beneficial interest in his Coroin shares to the Barclay interests, the practical effect of the Arrangements is to do so and accordingly his rights under the pre-emption provisions have become exercisable.

    (2) *the Proprietary Interest Argument*: Mr McKillen argues that under the Arrangements there was a transfer of a proprietary interest in Mr Quinlan's shares to the Barclay interests. This argument is alternative to (1) above. The transfer of a proprietary interest in shares is prohibited unless it complies with the pre-emption provisions.

    (3) *the Good Faith Argument*: Mr McKillen argues that there was a breach of an express obligation of good faith in clause 8.5 of the shareholders' agreement.

    (4) *the Security Becoming Enforceable Argument*: Mr McKillen argues that the provisions of two charges over Mr Quinlan' shares (defined below as the 2004 charge and the 2005 charge) became enforceable and so triggered another provision of the pre-emption articles (clause 6.6) which enabled the directors to implement the pre-emption articles in Mr McKillen's favour.

19.  The respondents' basic response is that the only disposal of an interest in shares was the transfer of shares by Mr Quinlan to the Barclay interests by way of transfer of a charge. It is common ground that this was a permitted transfer under the pre-emption provisions. There was no breach of the pre-emption provisions or of the good faith clause in clause 8.5 of the shareholders' agreement.

20.  The pre-emption provisions appear, so far as material, in the same form in Coroin's articles and in clause 6 of the shareholders' agreement. It is therefore sufficient to take the relevant provisions of the shareholders' agreement. The most material provisions of clause 6 are clauses 6.1, 6.3, 6.6, 6.17 and 6.18. These are set out in Appendix 1 to this judgment but, for ease of reading, I have changed the order of clause 6 in Appendix 1 and put clauses 6.17 and 6.18 first. (For the same reason, I refer also to the sub-clauses, for example clause 6.17, as clauses). The shareholders' agreement also contains what has been called a "good faith" clause: clause 8.5. This is also set out in Appendix 1 to this judgment. The shareholders' agreement is subject to Irish law, but nothing turns on that point.

21.  I shall discuss the interpretation of the relevant provisions of clause 6 in more detail below. At this stage it is sufficient to give an overview of them. In many respects, the provisions followed the usual pattern. The provisions included:

  ▪  a basic provision forbidding the transfer of shares, or any interest in them, other than in accordance with the pre-emption provisions (clause 6.17).

  ▪  exceptions for permitted transfers of specified kinds, such as a transfer between a shareholder and the holders of security over his shares (clause 6.14 to 6.16, not replicated in Appendix 1 and clause 6.18).

  ▪  provision for a shareholder who wished to transfer his shares to offer them to the other shareholders at a price fixed by him, in which case he became bound on completion to sell them if his offer was accepted in full (clause 6.1 to 6.3). (Separate provision was made for the case where the offer was not accepted (clause 6.4, which is not reproduced in Appendix 1).)

  ▪  power for the directors to deem a transfer notice to have been given in certain circumstances, including where security over shares had become enforceable or an attempt had been made to transfer the shares in breach of the pre-emption provisions. In that case, they would be offered round to the other shareholders for purchase at their fair value (clause 6.6).

22.  The expression "trigger" in relation to pre-emption provisions is convenient shorthand for describing the circumstances in which pre-emption provisions come into effect.


### (1) PRACTICAL EFFECT ARGUMENT

23.  Lord Goldsmith QC, for Mr McKillen, submits that the practical effect of the Arrangements is that the Barclay interests have obtained what they want. The only interest left in the Quinlan shares is Mr Quinlan's equity of redemption: Lord Goldsmith compares the situation to that of the smile on the Cheshire cat. He submits

that Mr McKillen has seen Mr Quinlan's ownership over his shareholding disappear like the Cheshire cat until only the smile is left. Lord Goldsmith contends that the judge looked at the question whether the pre-emption articles had been breached in a blinkered and unrealistic way. He should have approached the question whether the pre-emption provisions were breached by construing the pre-emption provisions purposively and the facts realistically: see the well-known dictum of Ribeiro PJ in *Commissioner of Stamp Duties v Arrowtown Assets Ltd* (2003) 6 ITLR 454 (Court of Final Appeal of Hong Kong) at [35] in the context of interpreting tax statutes:

> "Accordingly, the driving principle in the *Ramsay* line of cases continues to involve a general rule of statutory construction and an unblinkered approach to the analysis of the facts. The ultimate question is whether the relevant statutory provisions, construed purposively, were intended to apply to the transaction, viewed realistically. "

24.     Lord Goldsmith submits that there was a "desire" to transfer shares for the purposes of clause 6.1, and for this purpose relies on the observations of Lord Reid in *Lyle & Scott Ltd v Scott's Trustees* [1959] AC 763. In that case, article 9 of the company's articles provided:

> "...no registered shareholder of more than one per centum of the issued ordinary share capital of the company shall, without the consent of the directors, be entitled to transfer any ordinary share for a nominal consideration or by way of security and no transfer of ordinary shares by such a shareholder shall take place for an onerous consideration so long as any other ordinary shareholder is willing to purchase the same at a price which shall be ascertained by agreement between the intending transferor and the directors and, failing agreement, at a price to be fixed by the auditor of the company. ... Any such ordinary shareholder who is desirous of transferring his ordinary shares shall inform the secretary in writing of the number of ordinary shares which he desires to transfer. ..."

25.     At pages 777 to 778, Lord Reid adopted a purposive approach to the interpretation of the pre-emption article in that case. He held:

> "The respondents are each holders of more than 1 per cent. of the ordinary shares, and it is clear from their defences that they have received the price of £3 per share and that they have not attempted to resile from their contracts with Mr. Fraser. The appellants maintain that this necessarily means that they are desirous of transferring their shares within the meaning of this article, and that they are therefore bound so to inform the secretary of the company so as to set in motion the provisions of the article under which the other shareholders are entitled to have an opportunity to purchase any share which any shareholder is desirous of transferring. ...

I have come to the conclusion without difficulty that on their own admissions the respondents are in breach of article 9. The purpose of the article is plain: to prevent sales of shares to strangers so long as other members of the company are willing to buy them at a price prescribed by the article. And this is a perfectly legitimate restriction in a private company. But the respondents argue that, whatever may have been the intention, the terms of the article are such that it has only very limited application. They say that transfer "and transferring" only apply to a complete transfer of the ownership of shares by acceptance and registration of deeds of transfer, and that a shareholder who agrees to sell his shares is quite entitled to do so and to receive the price and vote as the purchaser wishes so long as he is not desirous of having a transfer registered.

I see no reason for reading the article in that limited way. Transferring a share involves a series of steps, first an agreement to sell, then the execution of a deed of transfer and finally the registration of the transfer. The word transfer can mean the whole of those steps. Moreover, the ordinary meaning of "transfer" is simply to hand over or part with something, and a shareholder who agrees to sell is parting with something. The context must determine in what sense the word is used. …"

26.  Lord Goldsmith concentrates on the practical effect of the arrangements between Mr Quinlan and the Barclay interests. He submits that the transfer of control over Mr Quinlan's shares to the Barclay interests would not be reversible unless the Barclay interests permitted Mr Quinlan to withdraw.  The Barclay interests made substantial loans to Mr Quinlan. Mr Quinlan's shares were charged up to the hilt.

27.  Moreover, submits Lord Goldsmith, there is no prospect of Mr Quinlan redeeming the charges on the Quinlan shares.  The irresistible inference is that the other shareholders do not want to trigger the pre-emption rights.  He relies on a submission by Mr Stephen Auld QC, for Mr Quinlan, that the charges would never be enforced as showing that the chargees have already got all that they need and that the respondents are circumventing the pre-emption provisions in clause 6.1, which is unacceptable. Lord Goldsmith submits that the Barclay interests have circumvented the pre-emption provisions so as to deprive Mr McKillen of his bargain.  The pre-emption articles were triggered at the latest in September 2011 when the Barclay interests acquired the charges over Mr Quinlan's shares.

28.  Mr Kenneth MacLean QC, for the Barclay interests, submits that the pre-emption provisions are geared to preventing transfers of proprietary interests and not mere changes in control: Mr MacLean submits that this court in *Re Coroin (No 1)* at [50] decided that the interest transferred has to be a proprietary interest and not a commercial interest.  It is not enough that the transaction has the same practical effect. The parties had similarly intended that control of the Misland shares should be transferred without triggering the pre-emption article.  There was no transfer of a proprietary interest in Mr Quinlan's shares at any stage and the non-binding agreements which Mr Quinlan made with the Barclay interests cannot make what was not a transfer of a proprietary interest into the transfer of such an interest.

29.    In my judgment, Mr MacLean is correct for the following reasons.

30.    First, the arrangements between Mr Quinlan and the Barclay interests neither resulted in Mr Quinlan having a desire to transfer shares for the purposes of clause 6.1 nor breached clause 6.17 because the sale and transfer contemplated by the February agreement was subject to compliance with the shareholders' agreement and Coroin's articles.  The position is on all fours with that in *Re Ringtower Holdings plc* (1989) 5 BCC 82, 99 and *Re Sedgefield Steeplechase Co (1927) Ltd* [2001] 1 BCLC 211, where the court held that there was no relevant desire or intention to transfer shares for the purpose of pre-emption provisions where what was proposed was to transfer the shares subject to a similar condition.  It cannot, therefore, be said that the Quinlan shares had been "transferred, sold or otherwise disposed of save as provided in this clause 6" for the purposes of clause 6.6.  It follows that the February agreement is also not an attempt to transfer shares within clause 6.6.

31.    Second, Mr McKillen cannot go behind the judge's findings of fact and assert some different and wider agreement than the judge actually found.  The judge held that none of the Arrangements between Mr Quinlan and the Barclay interests, either singly or in combination, involved a transfer of an interest in shares such as to trigger clause 6 (judgment, paragraph 289).  He rejected the argument that there was a binding oral agreement made on 15 January 2011, and found that the February agreement was the only binding agreement which Mr Quinlan made with the Barclay interests.  At paragraph 180 of his judgment the judge rejected the idea of a pre-conceived plan to acquire control of Coroin when the control of the Misland shares was acquired.

32.    Third, the court can only enforce an agreement (expressed, in this case, in the shareholders' agreement and Coroin's articles) that the parties have actually made.  In this particular case, the parties were quite specific about the circumstances in which the pre-emption rights were to arise.  In addition, the parties were quite specific in clause 6.17 as to the transactions which were prohibited and those transactions do not include a mere transfer of control: see *Coroin (No. 1)*.

33.    Fourth, the situation was not the same in law as if there had been a transfer of the whole of the interest in the Quinlan shares to the Barclay interests because Mr Quinlan always retained the equity of redemption.  While it seems unlikely, it was theoretically open to him at any time to pay off the charges vested in the Barclay interests, and recover the shares himself.  The arrangements were, therefore, not irreversible as they would have been if there had been a full transfer.  I therefore do not accept that the arrangements achieved the same result as if the pre-emption provisions had in fact been triggered.  All that was achieved was control.  It is clear that the power of attorney was much more limited than Mr McKillen suggests.  In particular, the attorney had to act in Mr Quinlan's interests.  The fact that Mr Quinlan kept his arrangements with the Barclay interests secret from Mr McKillen cannot turn the arrangements into something which they were not in law already.

34.    Lastly, as Mr MacLean points out, the machinery for giving effect to pre-emption rights is set out in detail in clause 6.  This makes no provision for circumstances which have the same practical effect.  This is another strong indication that clause 6 only operates in the circumstances specified in it.

35.     It follows that the Arrangements cannot by virtue of their practical effect give rise to any complaint of unfair prejudice on Mr McKillen's part.

## (2) PROPRIETARY INTEREST ARGUMENT

36.     In *Re Coroin (No. 1)*, this court held that an interest in a share for the purpose of the prohibition in clause 6.17 on the transfer of interests in shares had to be a proprietary interest in shares, and therefore did not include a mere change in the control over a share.  That decision is of course binding on us on this appeal.

37.     Basing himself on this holding, Lord Goldsmith submits that, by the February agreement, Mr Quinlan had transferred to the Barclay interests a contingent proprietary interest in his shares.  He points out that an interest in property includes a contingent interest:  such interests are treated as interests in land by section 4 of the Law of Property Act 1925.  There is no reason to limit the interests within clause 6.17 to the full beneficial interest in a share.    The courts have held that where there is the grant of a mere right of pre-emption, or the entry into an agreement to sell shares which is conditional on complying with pre-emption articles, there is no desire or intention to sell the shares (see, for example *Re Ringtower Holdings* above).  However, on Lord Goldsmith's submission the February agreement was not truly conditional, since Mr Quinlan was bound to accept any offer.

38.     In my judgment, the short answer to this point is that, by virtue of clause 6.17, no interest in shares could be conveyed other than in a manner for which clause 6 provided.  I shall have more to say about clause 6.17 below.

39.     There is a further reason for rejecting Lord Goldsmith's submission. The fundamental characteristic of the February agreement is that it was conditional on compliance with Coroin's pre-emption articles.  In my judgment, an interest in shares would not pass under a contract for the sale of shares which is subject to a true condition precedent until the condition precedent is fulfilled: *Wood Preservation Ltd v Prior* [1968] 2 All ER 849 at 845I to 856H, affirmed on other grounds [1969] 1 WLR 1077.  Fulfilment of the condition precedent was under the control of the Barclay interests, but that did not, in my judgment, prevent it from being a true condition precedent so far as Mr Quinlan as transferor was concerned (c.f *Michaels v Harley House (Marylebone) Ltd* [2000] Ch 104).  (Contrary to Lord Goldsmith's submission, Mr Quinlan could not waive the condition as to the chargee's consent).

40.     Furthermore, while cases such as *Ringtower* and *Lyle & Scott* turn on the question whether a party to such an agreement can be said to desire or intend to transfer his share, here the question is different but simpler:  a disposal of an interest in a share is not within clause 6.17 if it is a preparatory step in a transaction which will comply with clause 6.17.  Moreover, looking at the proposed transaction as a whole, it can properly be said to involve a transfer which is "provided in" clause 6 within the meaning of clause 6.17.  Mr Quinlan therefore did not trigger Mr McKillen's pre-emption rights by agreeing to the restrictions imposed on him by the February agreement.    Therefore the making of that agreement cannot give rise to any complaint of unfair prejudice.

## (3) GOOD FAITH ARGUMENT

41.     Lord Goldsmith further submits that, if the practical result of what has happened is to do the very thing the shareholders' agreement was intended to prevent, the "good faith" clause, that is, clause 8.5 of the shareholders' agreement (see Appendix 1 to this judgment) comes into play. The intention of the shareholders' agreement was that the shares would be offered by way of pre-emption. A party is precluded from cynical resort to the black letter of the agreement. The good faith clause must have some meaning. In practice the whole of the interest in Mr Quinlan's shares is being controlled in perpetuity by the Barclay interests.

42.     Mr MacLean submits that clause 6.6 cannot be given some wider meaning by reading it with clause 8.5, and that the reasons for rejecting Lord Goldsmith's practical effect argument apply equally here. He further submits that it was not put to Mr Quinlan in cross-examination that he had tried to achieve the same effect as a transfer without triggering the pre-emption provisions. There was, therefore, no basis on which the judge could make factual findings about any breach of clause 8.5. Mr MacLean also submits that there is no support in the authorities for Lord Goldsmith's submission on clause 8.5.

43.     Mr MacLean also relies on the decision of this court in *Re Coroin (No. 1)*. In that case, Mr McKillen also sought to argue that if the acquisition by the Barclay interests of control over the Misland shares was outside clause 6, it was nonetheless a breach of the shareholders' agreement because of the "good faith" clause. Mr Marshall's submission, as recorded in the judgment of Rimer LJ, was that the good faith clause "obviously catered for the possibility that the precise wording of the agreement had not catered for all eventualities." However, Rimer LJ, with whom Lloyd and Tomlinson LJJ agreed, rejected this argument:

> "45. …. I do not accept that [the good faith clause] is or purports to be capable of doing the work attributed to it. If the focus is on the suggested 'spirit and intention' of the agreement, this case is about what that was as regards the ambit of the pre-emption provisions. Clause 8.5 sheds no relevant light on that. Little reliance was placed upon cl.8.5 before the judge, although much reliance was placed on it before us. For my part, I fail to see what assistance it is supposed to provide in relation to the resolution of the question of interpretation with which we are presented."

44.     Mr Auld supports Mr MacLean's submissions.

45.     In my judgment, the good faith clause does not assist Mr McKillen.

46.     The good faith clause seems to me to contain two relevant groups of provisions. The first group (clause 8.5.1 to 8.5.3) imposes some limited restrictions on a party by requiring him to exercise his contractual rights whilst taking account of the interests of other parties. This is an agreed departure from the normal principle that a party is free to exercise his contractual rights as he thinks fit.

47.  The first group also contain some limited express references to filling gaps.  For instance, clause 8.5.1 requires parties to enter into transactions with the Coroin group on an arm's length basis if there is no agreement as to the basis upon which they engage.  However, that provision is not directly relevant because it applies only to transactions between the respondents and the Coroin group, with which we are not concerned.  Neither are we concerned with clause 8.5.3, which is very general and on which no counsel has relied.

48.  That leaves clause 8.5.2 in the first group.  Any suggestion that clause 8.5.2 applies to fill gaps in the parties' agreement would have to rest on the words "in good faith".  Neither party has suggested that those words lack legal content in this agreement.  Lord Goldsmith argues for a meaning for this expression that was really the same as the meaning of clause 8.5.4, namely, that it required the court to enforce the spirit of the agreement and not just "its black letter" (relying on *CPC Group Ltd v Qatari Diar Real Estate Investment Company* [2010] EWHC 1535 (Ch) at [238] to [246] per Vos J).  That argument in my judgment properly belongs under clause 8.5.4 and I will address it at that point.  The respondents proceed on the basis that "good faith" in the context of clause 8.5.2 imposes a duty simply to act honestly.  (They did not need to refine the meaning of honesty further than to say that it was a subjective test).

49.  I consider that the respondents are right to submit that the requirement to act in good faith in clause 8.5 involves an obligation to act honestly in a subjective sense as this is its natural meaning and the context does not suggest some other meaning.  As it was not put to Mr Quinlan in cross-examination that he had not acted honestly in this sense, then, for that reason alone, Mr McKillen cannot now assert that he did not do so.

50.  Moreover, as Mr MacLean pointed out, the terms of the February agreement were inconsistent with the notion that Mr Quinlan intended to act in bad faith as it was conditional on the due observance of Mr McKillen's pre-emption rights on any transfer of his shares to the Barclay interests.  I accept that argument.

51.  I do not consider that the obligation to act in good faith can impose a binding general obligation to act in a manner outside the terms of the shareholders' agreement because there is no indication of the circumstances in which the obligation to act in good faith obliges the parties to go beyond the obligations in the shareholders' agreement.  There is, therefore, no benchmark against which the court could enforce the obligation.

52.  The second group of provisions in the good faith clause is composed solely of clause 8.5.4.  The parties agreed to do all things necessary or desirable to give effect to the spirit and intention of the shareholders' agreement.   Again, this clause prescribes no basis for determining the "spirit and intention".  The "spirit" is by implication an animating principle, which, like the smile on the Cheshire cat (see paragraph 23 above), may exist in a state that is detached from the express terms of the shareholders' agreement.

53.  In my judgment, the only way in which the court can give effect to the obligation in clause 8.5.4 is to treat the reference to the "spirit and intention" of the shareholders' agreement as a reference to the shared aims of the parties in entering into the agreement.  Those aims would have to be ascertained in the way in which the court ascertains the background to an agreement as part of the process of interpretation.  On

this basis, clause 8.5.4 has content, but it is merely a mirror image of the process of interpreting an agreement or implying terms into it. I shall refer in more detail to the implication of terms below.

54.   In short, the good faith clause, while it may be an additional weapon in Mr McKillen's armoury, gives no additional support to his case. This unsurprisingly accords with the conclusion of this court on different facts in *Re Coroin (No. 1)*. I have not gone quite as far as Rimer LJ in *Re Coroin (No. 1)* in denying any utility to the good faith clause as that was not the way this case was argued and in any event there may, for instance, be circumstances in which a gap can be filled by purposive interpretation.

55.   Therefore I conclude that the arrangements whereby control of Mr Quinlan's shares ended up in the hands of the Barclay interests did not involve any breach of the good faith clause in the shareholders' agreement or of Coroin's articles. Accordingly there can be no question here of any act or omission of Coroin relevant for the purposes of section 994(1) of the CA 2006, still less any such act or omission which is unfairly prejudicial to Mr McKillen.

56.   Finally, Lord Goldsmith drew our attention to clause 6.23, which provides that each of the shareholders agreed to use "all reasonable endeavours to comply with its obligations pursuant to this clause and to respond to all notices and requests in a prompt and timely manner and to co-operate fully with each other in the administration and operation of these terms." However, he did not submit that this provision imposed any new obligation on the Shareholders to give a transfer notice.

### *(4) SECURITY BECOMING ENFORCEABLE ARGUMENT*

57.   This point relates to two charges which Mr Quinlan executed over his Coroin shares dated 14 May 2004 ("the 2004 charge") and 20 October 2005 ("the 2005 charge") respectively in favour of Bank of Scotland (Ireland) Limited ("BOSI"). There is a threshold issue: did either charge become enforceable for the purposes of clause 6.6.2 of the shareholders' agreement? If either charge did become enforceable, there is a substantive issue: did the directors' failure to determine pursuant to clause 6.6 that Mr Quinlan should be deemed to have given a transfer notice in respect of his Coroin shares constitute conduct of Coroin which was unfairly prejudicial to Mr McKillen?

58.   Appendix 2 to this judgment comprises relevant provisions of the 2004 charge and the 2005 charge, and (so far as relevant) of BOSI's general conditions of business ("the BOSI Conditions") incorporated into the charges. The 2005 charge was secured on some only of the Quinlan shares, but nothing turns on that point.

### *Threshold issue: (a) the 2004 charge and (b) the 2005 charge*

59.   The judge held that neither the 2004 charge nor the 2005 charge became enforceable for this purpose. I agree with him on the 2004 charge, but not on the 2005 charge.

### *(a) the 2004 charge*

60.   The core issue here is whether paragraph (iv) of the tailpiece to condition 9 of the BOSI Conditions (set out at the end of Appendix 2) ("tailpiece (iv)") meant that the

2004 charge did not "become [..] enforceable" for the purposes of clause 6.6 when there was a default in the payment of principal or interest secured by the 2004 charge but BOSI made no declaration of immediate enforceability under that tailpiece.

61.    For the reasons given below, I conclude that:

    (1)    the tailpiece formed part of the terms of the 2004 charge;

    (2)    if doubtful, the rights of BOSI to enforce the 2004 charge are to be strictly construed against BOSI;

    (3)    if doubtful, clause 6.6 is to be construed against any restriction on the power of members of Coroin to transfer their shares;

    (4)    a restrictive interpretation of "becomes enforceable" does not prejudice the effectiveness of clause 6.

62.    I turn first to the compatibility of the tailpiece with the 2004 charge. On the face of it, clause 10(1) of the 2004 Charge (set out in Appendix 2 below) conflicts with condition 9 in that the former provides for the power of sale to be exercisable "on the happening of an Event of Default" whereas the tailpiece to condition 9 provides for BOSI to make a declaration. However, clause 2(1)(a) of the 2004 charge, like the tailpiece to condition 9, requires a further step, that is, a demand, to be made before the secured indebtedness becomes repayable. The requirement for a demand prevails over clause 10. In the event of any doubt, as the House of Lords held in *Hunter v Hunter* [1936] AC 222 at 247 (per Lord Hailsham Lord Chancellor, with whom Lord Blanesburgh and Lord Maugham agreed) with respect to the failure of the bank in that case to make clear that it was making a demand for repayment:

> "...the right of sale is a very drastic remedy, and it is essential for the due protection of borrowers that the conditions of its exercise should be strictly complied with."

63.    The requirements for a demand under clause 2(1)(a) and a declaration of immediate enforceability dovetail with each other. Moreover, the parties agreed numerous amendments to the numbered sub-paragraphs of condition 9 in the facility letter dated 6 April 2004 (referred to in the definitions to the 2004 charge: see Appendix 2 below). That makes it unlikely that they intended that the tailpiece should not apply: they would surely have said so while they were making detailed amendments to condition 9 if that were the case. In the result, the 2004 charge must be read subject to the tailpiece. This is supported in a minor way by the fact that the whole of condition 9, and not just the numbered sub-paragraphs preceding the tailpiece, is headed "Events of Default".

64.    The next question is whether the expression "becomes enforceable" in clause 6.6.2 of the shareholders' agreement means "immediately enforceable" or extends to the case where a security is enforceable subject only to the taking of a step which is within the lender's own control. As to this, as I see it, tailpiece (iv) confers a real and substantial power on the lender. It has an important commercial purpose. Its inclusion reflects the deliberate choice of the parties. The lender may, for instance, wish to waive any Event of Default, or grant a grace period for remedying the breach, without being

placed in a position where the security has already become enforceable. There may be adverse consequences to the lender of the security becoming enforceable as it may trigger cross-default clauses under other borrowings and cause the borrower to enter an insolvency procedure against the wishes of the lender.   A comparison may be made with *BNY Corporate Trustee Services Ltd v Neuberger Berman Europe Ltd* [2013] UKSC 28 at [16], where the lender had to make a different form of declaration to render the security enforceable, and the security was not treated as enforceable until this was done.

65.    In addition, clause 6 of the shareholders' agreement and the pre-emption provisions in the articles set out circumstances in which members may lose the right to their shares. They are, therefore, expropriatory in nature.  Given the ambiguity in the meaning of the phrase "becomes enforceable", the court should in my judgment prefer the narrower meaning. This approach is consistent with the earlier decisions of this court on construing articles of association of a company restricting the transfer of shares laid down in: *Re Smith and Fawcett Ltd* [1942] 1 Ch 304 at 306 and *Greenhalgh v Mallard* (1943) 2 All ER 234 at 237:  see, for example, per Lord Greene MR in the first of the cases cited:

> "[When using their power under the articles to reject a share transfer, the directors] must have regard to those considerations, and those considerations only, which the articles on their true construction permit them to take into consideration, and in construing the relevant provisions in the articles it is to be borne in mind that one of the normal rights of a shareholder is the right to deal freely with his property and to transfer it to whomsoever he pleases. When it is said, as it has been said more than once, that regard must be had to this last consideration, it means, I apprehend, nothing more than that the shareholder has such a *prima facie* right, and that right is not to be cut down by uncertain language or doubtful implications. The right, if it is to be cut down, must be cut down with satisfactory clarity. It certainly does not mean that articles, if appropriately framed, cannot be allowed to cut down the right of transfer to any extent which the articles on their true construction permit."

66.    In his judgment in *Re Coroin (No. 1)* at first instance [2011] EWHC 3466 (Ch) at [73] to [74], the judge held that he would not take this principle too far, and that the court would be bound to enforce any clause which it was satisfied cut down a shareholder's rights. However, I do not read these observations as departing from what this court has previously held.

67.    In my judgment, the authorities reflect the basic principle that rights of property should not be taken away by a side wind and without warrant.  There is nothing to indicate that the wider view of "becomes enforceable" should be taken.  Indeed, the high level of specificity in clause 6.6 can be said to support a meaning which covers the situation in which security is *actually* enforceable.

68.    Furthermore, the conclusion that the 2004 charge did not "become…enforceable" for the purposes of clause 6.6.2 of the shareholders' agreement on the occurrence of an

Event of Default until BOSI proceeded to make a declaration of immediate enforceability under tailpiece (iv) does not reduce the effectiveness of clause 6.6. There is no potential prejudice to the other shareholders unless BOSI exercises its right to make a declaration under tailpiece (iv). Likewise, the other shareholders are not at risk of a forced sale by a receiver or mortgagee of the shares (or of an entry into possession by the charge) until the declaration is made.

69.    Accordingly, in my judgment, the 2004 charge did not "become enforceable" for the purpose of clause 6.6.2 of the shareholders' agreement when an Event of Default occurred but BOSI did not proceed to declare that the security was enforceable under tailpiece (iv) to condition 9 of the BOSI conditions incorporated into the 2004 charge.

### (b) the 2005 charge

70.    The position regarding the 2005 charge is, however, different. In my judgment, that charge did become enforceable for the reasons given in paragraphs 73 to 80 below.

71.    Shortly after 12 May 2011 Ellerman discovered that Mr Quinlan was in arrears with the payment of interest due under a loan agreement dated 28 August 2005 relating to the Bank of Ireland's headquarters at Baggott Street, Dublin in favour of a consortium of lenders before Ellerman purchased his debts. This loan agreement was secured by the 2005 charge over the Quinlan shareholding in Coroin. By a letter dated 10 September 2009, BOSI (as agent for the lenders) required either the payment of outstanding interest payments or the remedying of the event of default within 60 days "in the manner specified in the Proviso to Clause 19.1 of the Loan Agreement", and stated that the lenders would be entitled to exercise their rights under clause 19.2 of the loan agreement, including the right to demand repayment of the loan:

> "We write to advise that various interest payments… remain outstanding. As at today's date, the aggregate outstanding interest payments [from Mr Quinlan] under the Loan Agreement total £564,664.99… We wish to advise that as a result of the failure to make such payments [Mr Quinlan] is in default … under the Loan Agreement. This constitutes an Event of Default under clause 19.1 of the Loan Agreement unless remedied within 60 days to the satisfaction of the Majority Lenders in the manner set out in the proviso (the "Proviso") to clause 19.1 of the Loan Agreement.
>
> We hereby make a formal demand for payment forthwith of all outstanding interest payments. In the event that the outstanding interest payments are not immediately paid or the above Event of Default is not remedied to the satisfaction of the Majority Lenders within 60 days of the date of this letter in the manner specified in the Proviso, the Lenders will be entitled to exercise the rights conferred upon them by Clause 19.2 of the Loan Agreement including the right to demand immediate repayment of the Loan together or interest and other sums (including any broken funding costs). In the event that such sums are not paid, we reserve the right to exercise the power to put the receiver

over the Secured Assets, and the power of sale and all other powers conferred on us by the Security Documents."

72.     Accordingly, it is necessary to examine the proviso to clause 19.1, and clause 19.2, of the loan agreement.

73.     Clause 19.1 of the loan agreement sets out a number of Events of Default, including the non-payment of interest, and concludes with the following proviso:

> "Provided that any of the events or circumstances specified in clause 19.1 shall not be an Event of Default if such events or circumstances arise in relation to one or more (but not all) of the Borrowers and within sixty days of the occurrence of such event or circumstance either:
>
> (a) another person acceptable to the Majority Lenders (acting reasonably) takes over the interest of the defaulting Borrower(s) to the Property and becomes a Borrower in place of such Borrowers and assumes the obligations of such Borrower under the Finance documents and the Transaction Documents, or
>
> (b) any one or more of the other Borrowers takes over the interests of such Borrowers in the Property and assumes the obligations of such Borrowers under the Finance Documents and the Transaction Documents,
>
> in each case in a manner satisfactory to the Majority Lenders (acting reasonably); or…"

74.     Clause 19.2 of the Loan Agreement provides so far as material as follows:

> "Rights on a default
>
> The Agent may and, if so instructed by the Majority Lenders, shall (without prejudice to any other rights of any Finance Party upon and at any time after the happening of an Event of Default…:
>
> 19.2.2 by notice to the Borrowers declare that the Drawings have become immediately due and payable, whereupon the Borrowers shall forthwith repay the same together with all interest accrued and all other sums payable under this Agreement…"

75.     Mr Quinlan paid the outstanding interest on about 4 November 2009. He did not comply with the proviso to clause 19.1 and provide a suitable substitute borrower.

76.     The judge held that the 2005 charge had not become enforceable because BOSI had to wait 60 days to see if either of the alternatives in paragraph 73 above was satisfied.

77.    I do not agree.  The payment of interest some two months after the date of BOSI's demand did not constitute immediate payment.   BOSI's alternative was not met because the proviso to clause 19.1 required the substitution of another satisfactory covenant which did not occur.  The fact that BOSI probably had to wait until at least 4 November 2009 before it knew that the alternative course would not be taken did not prevent the late payment from being an Event of Default.   Any other interpretation deprives the demand for immediate payment of its full effect.

78.    On that basis, the security created by the 2005 charge was enforceable within clause 6.6.2 at the latest by 9 November 2009.  This is so even though BOSI had to take further steps before it could sell the property or appoint a receiver and never did so. There was no need for an enforcement declaration in this case.

### Substantive issue (2005 charge only): no unfair prejudice to Mr McKillen:

79.    The Coroin board did not know that the 2005 charge had become enforceable before the expiry of the one month time limit set out in clause 6.6.  Accordingly the next issue is whether clause 6.6 can be interpreted as extending that time limit.

### (a) No implied term requiring notification of event within clause 6.6

80.    The judge held that there had to be implied into clause 6.6 a term that a shareholder would inform Coroin of the circumstances in which the directors' discretion arose as otherwise the effect of clause 6.6 would be uncertain and haphazard.   The judge observed that a similar term had been implied in *Tett v Phoenix Property and Investment Co Ltd* [1986] BCLC 149.

81.    Mr MacLean submits that the judge was wrong to imply this term. He submits that it is clear from the fact that the period of one month ran from the occurrence of the relevant event that the parties prized certainty of time over the effectiveness of the clause.  The shareholders were protected by the fact that the directors had a fiduciary discretion and by the fact that if the security were enforced by a sale, there would have to be a transfer notice by virtue of clause 6.17 and clause 6.1.

82.    Lord Goldsmith seeks to uphold the judge's holding for the reasons that the judge gave.

83.    I prefer the submissions of Mr MacLean.  The approach of the law to the implication of terms has recently undergone development as a result of the speech of Lord Hoffmann in the Privy Council in *Attorney-General of Belize v Belize Telecom* [2009] 1 WLR 1988. Hitherto the relevant test had been variously described but the most common formulation was that the implication of the term should be necessary for the business efficacy of the contract.  In *Belize,* Lord Hoffmann made it clear that the real task is one of interpretation of the contract.  He held:

> "[21] It follows that in every case in which it is said that some provision ought to be implied in an instrument, the question for the court is whether such a provision would spell out in express words what the instrument, read against the relevant background, would reasonably be understood to mean. It will be noticed from Lord Pearson's speech that this question can be

reformulated in various ways which a court may find helpful in providing an answer – the implied term must *'go without saying'*, it must be *'necessary to give business efficacy to the contract'* and so on – but these are not in the Board's opinion to be treated as different or additional tests. There is only one question: is that what the instrument, read as a whole against the relevant background, would reasonably be understood to mean?"

84.     I drew attention to the importance of this passage in my judgment in *Stena Line v Merchant Navy Ratings Fund* [2011] EWCA Civ 543, with which Toulson and Rimer LJJ agreed.  On Lord Hoffmann's approach, the underlying basis for the implication of a term is the interpretation of the document. Thus, the exercise becomes one of ascertaining the reasonable understandings and expectations of the parties. In other words, the meaning and effect of the process of testing necessity for the purposes of an implied term is not an exercise to be carried out in a manner detached from the reasonable expectations of the parties to the particular agreement being interpreted. In that way, the common law continues to insist in this field on party autonomy as a key principle of contract law.

85.     As respects clause 6.6, there are many events which could occur and could bring it into play.  There is no legal reason for Coroin to be informed of those events. On the face of it, that means that the one month period allowed for the board to make a decision under clause 6.6 could elapse before the directors knew that the relevant event had occurred. However, that is not necessarily so, since the parties intended to work closely with one another in the hotel business and would therefore be in close contact.

86.     The decision of this court in *Tett v Phoenix Property and Investment Co Ltd*, above, on which the judge relied, is distinguishable from this case. There this court implied a term for notification of the desire to transfer shares by shareholders into a pre-emption article.  The article prohibited transfers of shares by members and non-members when members, or their families, were willing to purchase those shares but contained no machinery for implementing offers to members and their families. That case was a much stronger case than the present case for the implication of a term as to notification since the obligation to offer shares to existing members and their families was unworkable without some machinery for giving effect to it.

87.     By contrast, in this case clause 6.6 is not rendered ineffectual without the implied term. This is because clause 6.17 guards against the possibility that one of the events in clause 6.6 leads to a sale to a non-member by providing that neither a share nor an interest in a share can be transferred except in accordance with clause 6.

88.     In relation to an interest in a share, this provision takes effect, in most cases, exactly as it provides and invalidates any disposition of such an interest unless it is one for which clause 6 provides.  It is an incident of any interest in a share in Coroin that it cannot be transferred except by a method authorised by clause 6 (see, generally, *Linden Gardens Trust Ltd v Lenesta Sludge Disposal Ltd* [1994] 1 AC 85).  There may be some qualification to be made where the person making the disposition is not a member and does not know of the restrictions, but that is not this case or the usual

case.  Dispositions of interests in shares for which clause 6 provides, whether expressly or by implication, are also excluded from the operation of clause 6.1.7.

89.    Registration of the transfer of a share in Coroin's register of members in breach of clause 6 is of course unlikely to occur unless the directors have been misled or overlooked some material factor.  Their duty is not to register any transfer in breach of clause 6.17 (see *Tett v Phoenix Property & Investment Co Ltd*, above, at 162 and 168).  However, it may occur.  The respondents submit that, if it does occur, the registration would be of no effect.  I do not accept this.  At the moment of registration, the transferee acquires the status of a member under section 112 of the CA 2006.  Therefore legal title would pass.  Coroin would be entitled and bound to act on the basis of its register of members unless and until rectified. The register of members could only properly be rectified by an order of the court under its statutory jurisdiction to rectify the register of members contained in section 125 of the CA 2006.

90.    Nonetheless, the other members are not prejudiced by the registration of a transfer in breach of clause 6.  Either Coroin or one of its members could apply for rectification of the register.  It is difficult to see how an order for rectification could be resisted in the absence of some matter such as acquiescence or waiver.  Bennett J made an order restoring the names of previous holders to the register in these circumstances in *Hunter v Hunter* (Emily's action), 15 January 1934, affirmed by this Court (Hanworth MR, Romer and Maugham LJJ, 19 April 1934, unreported).

91.    The decision of the House of Lords in *Hunter v Hunter,* above, was not in Emily's action but in an action brought by one of the previous holders of the shares, the subject of Emily's action. He sought to set aside the sale made by the persons who had been wrongly registered as the holders of his shares.  They were nominees of a bank which had lent him money and taken security over his shares.  The previous holder was unsuccessful in this court as the bank was held to have been entitled to sell the equitable interest in his shares.   He appealed from that order but the order for rectification of the register of members in Emily's action was not appealed.  Thus the appeal to the House of Lords proceeded on the basis of the order made in Emily's action.  In the event the appeal was decided in the previous holder's favour on the basis that the bank could not sell only the equitable interest in the shares.  The House of Lords did not, therefore, have to decide the effect of a transfer in breach of a pre-emption article.  While some members at least of the House thought that such a sale was ineffective, their observations were only *obiter* and they did not give detailed consideration to this question.

92.    Moreover, as a matter of construction, clause 6.16 expressly requires the trustees of family trusts holding shares to notify the directors if the shares cease to be held on family trusts and empowers the directors to require the shares to be transferred back to the shareholder who settled the shares on trust.   The presence of this express obligation to notify suggests that none was intended in clause 6.6.

### *(b) Pre-emption rights not triggered by breach of clause 6.17*

93.    Lord Goldsmith submits that the matter does not stop there. He submits that the pre-emption process in clause 6.1 would be triggered if clause 6.17 was breached.  He

relies on the holding of Vinelott J in *Tett v Phoenix Property & Investment Co Ltd* [1984] BCLC 599 (reversed by this court on other grounds). As I have explained, in that case, the material provision in the pre-emption articles prohibited the transfer of shares if any other member or family member was willing to purchase them. At page 619, Vinelott J held that, if the shares have been transferred into the name of a purchaser in breach of pre-emption rights, the purchaser took subject to the rights of the other members if he had (as he usually would have) notice at the time of the transfer that the transfer was in breach of the other members' pre-emption rights. Vinelott J reasoned that the option rights of the other members conferred by the pre-emption articles would have been triggered by the registration of the transfer.

94.     Lord Goldsmith's submission is supported by the fact that an order requiring shares to be offered to other members was made in *Lyle & Scott*, above, and also in *Hurst v Crampton Brothers Ltd* (2003) BCC 190 (which neither party cited). In the former case, there had been no registration of a transfer in breach of the pre-emption articles. In the latter case, the name of the transferee had been wrongly entered in the register of members. Importantly, the court made an order to secure compliance with the other members' pre-emption rights. I shall have to more to say about these two cases in paragraph 99 below.

95.     Finally, Lord Goldsmith also submits that in clause 6.1, the word "may" means "must" so that any shareholder who desires to transfer a share is bound to give a transfer notice under clause 6.1.

96.     It seems to me that we do not need to decide the issue whether, if a transfer were made in breach of clause 6.17, the pre-emption rights of the other members would be triggered. Whether the appropriate order is one which rectifies the register by restoring the name of the previous holder, or is one for enforcing the pre-emption process, clause 6 is effective to preserve the rights of members where an event to which clause 6.6 applies slips through the net and a share transfer is registered because the directors do not become aware of it within the one month period. Nonetheless the point is important to the parties and therefore I propose to deal with it.

97.     The respondents submit that the conclusion of Vinelott J does not apply because clause 6.17 prevents the transfer of an interest in a share. This submission is not dispositive of Mr McKillen's case on this point because clause 6.17 only prevents the disposition of an interest in a share which is not in accordance with clause 6. If an interest in a share had passed under the procedure in clause 6.1, the disposition of that interest would be permitted.

98.     I do not, however, accept the argument that the expression "may" in clause 6.1 means "must". Clause 6 contains no provision which states that a shareholder cannot change his mind. Clause 6.3 provides that he is bound to transfer his shares on completion of the pre-emption process. This by implication means that he is not bound to sell his shares before that time. I can only assume that the drafter used the word "may" deliberately. Accordingly, even if a shareholder contracts to sell his share in breach of clause 6, he may choose not to serve a transfer notice. Moreover, as the respondents submit, the purchaser could not obtain an order for specific performance because the contract involves a breach of clause 6. (I am not concerned with any other remedy which the purchaser may have.) The other members may be able to

implement clause 6.6.3, dealing with attempts to transfer shares, in which case the directors might decide to deem a transfer notice to be given.  On that basis, an attempt to transfer shares in breach of clause 6.1 does not transfer the members' pre-emption rights into options to purchase the shares in question.

99.   This conclusion is not inconsistent with *Lyle & Scott* (paragraphs 24 and 25 above) or *Hurst v Crampton Brothers Ltd*.  In *Lyle & Scott*, the shareholders did not resile from the transaction into which they had entered in breach of the pre-emption article in that case.  They were held to have a continuing desire to transfer the shares, and the relevant article imposed an obligation to serve a transfer notice to give effect to the pre-emption rights of the other members in those circumstances.  Likewise, in *Hurst v Crampton Brothers Ltd*, the pre-emption articles had been triggered.  Under the pre-emption articles in question, the effect of so doing was to appoint the company the member's agent for the purpose of selling the shares.  That agency was expressed to be irrevocable without the directors' sanction (which was not forthcoming).  That case is, therefore, also distinguishable from the present case.  Under clause 6, a member is not prevented from withdrawing from a transaction in breach of clause 6.17 unless he serves a transfer notice and the time for completion of the sale of all his shares under the pre-emption procedure arrives, or he is deemed to serve a transfer notice under clause 6.6.

### (c) No implied term extending the one month period in clause 6.6

100.  For the reasons given above, in my judgment, clause 6.17 provides protection against a transfer of a share or an interest in a share consequent on one of the events specified in clause 6.6.  It is in effect self-policing and self-correcting: if a member decides to dispose of an interest in a share in breach of clause 6, the disposition is annulled by clause 6.17, and if a transfer of a share is registered in breach of clause 6, the court will be able to rectify the register of members to restore the previous holder.  On this basis, clause 6.6 could not reasonably be understood to contain any implied term extending the one month period to enhance its effectiveness.  Indeed, the judge does not draw this conclusion.

101.  It follows that no term is to be implied extending the one month period in clause 6.6.  If the one month period elapsed without the directors discovering that the 2005 charge had become enforceable, they had no further power.  Mr McKillen cannot, therefore, contend that he has been unfairly prejudiced by the failure to exercise such power.

102.  That is not the end of the matter.  Even if the period in clause 6.6 had not expired before the directors became aware of that the 2005 charge had become enforceable, there would in my judgment, for the reasons given in paragraphs 103 to 113,  have been no unfair prejudice to Mr McKillen for the following reasons:

(1)   there was, in my judgment, no threat by the directors to act in breach of duty at any such meeting; and

(2)   Mr McKillen could himself have convened a board meeting.

*(d) Standstill arrangements and power of Mr McKillen to convene a board meeting*

103.    By letter dated 13 October 2011, Weil, Gotshal and Manges, solicitors for the Barclay interests, informed Herbert Smith, Mr McKillen's solicitors, that various events rendering the Shareholder Security over Mr Quinlan's shares enforceable had occurred but had done so more than one month previously.  On 27 October 2011 Herbert Smith, Mr McKillen's solicitors, wrote to the solicitors for the Coroin notifying them that these matters constituted events making the Shareholder Security enforceable. At the end of their letter Herbert Smith, on behalf of Mr McKillen, requested that a board meeting should take place as a matter of urgency and within the next five days so that the directors could determine that Coroin should notify Mr Quinlan and also Ellerman and B Overseas, in whose name his shares were then registered, that a transfer notice had been deemed to have been given in respect of Mr Quinlan's shares in accordance with the pre-emption provisions.

104.    This meeting has not been held. In his petition, Mr McKillen alleges that Coroin has wrongfully refused to convene a board meeting, and that this is demonstrated by a letter dated 1 November 2011 from DLA Piper refusing to convene a board meeting. In their defence, both Mr Quinlan and the Barclays' interests deny that this refusal was wrongful.

105.    However the parties sensibly got together and agreed a standstill on 10 November 2011. The core provision in the standstill agreement is that, insofar as the one month period in the pre-emption provisions was currently running in relation to the matters contained in Herbert Smith's letter of 27 October 2011, "that period be extended to exclude the time period from today's date until the earlier of (1) seven days following the final determination by a court or (2) upon seven days' notice of any party that time shall again commence."  If there was any refusal to hold a board meeting between 27 October 2011 and the ending of the standstill, the slate is wiped clean by the terms of the standstill agreement.

106.    The next question then is whether the presence of the standstill agreement would effectively remove the possibility of Mr McKillen showing any unfair prejudice as a result of the failure to hold a board meeting. I agree with the judge that it would be a breach of duty for the directors to fail to give proper consideration to circumstances of which they knew which would entitle them to exercise their powers under clause 6.6. However, as I read the correspondence, the directors, who are separately advised by solicitors and counsel, would hold a meeting if the court concluded that they were bound to do so.  DLA Piper's reply of 1 November 2011 disputed that clause 6.6 had been triggered, but concluded:

> "It is sufficient to record that the Company does not consider that it yet has any evidence upon which the directors could properly conclude that [the charges have] become enforceable within the past month and that the directors could (if so minded) properly deem a Transfer Notice to have been given."

107.    In my judgment, that reply means that the directors will be prepared to review their decision not to hold a meeting to consider whether to make a determination under clause 6.6 of the shareholders' agreement.

108.   Moreover, Mr McKillen has his own right as a director to require a directors' meeting
to be convened.  As Mr Nigel Dougherty, for Coroin, in a written submission points
out, each individual director has the right under article 88 of Table A (which forms
part of Coroin's articles) to cause a board meeting to be convened. In my judgment,
the articles confer this right on an individual director to meet the situation in which
the board improperly does not convene to consider some matter, and Mr McKillen can
hardly complain of unfair prejudice if he does not exercise the power he has to
prevent him from suffering unfair prejudice as a shareholder.  Mr McKillen could
have exercised this right (if it served any purpose) at any time, including the time
when he first discovered facts which made the 2005 charge enforceable in October
2011.

109.   In any event, as Mr MacLean points out, there is no allegation in the petition of any
threat not to hold a meeting or to act in breach of duty at the meeting.

110.   If the directors were to give improper consideration to the question whether to
exercise their clause 6.6 power or to prevent a board meeting from being held even on
the requisition of a single director under article 88, that might form the substance of a
new complaint.  However, those circumstances do not exist at the present time.

111.   The duties of the directors under clause 6.6 are potentially complex, and were not
fully argued.   Directors are fiduciaries.   They may not use their powers for an
improper purpose: see CA 2006, section 171(1)(b).  It is in general improper:

> 'for the directors to use their fiduciary powers over the shares in the company
> purely for the purpose of destroying an existing majority, or creating a new
> majority which did not previously exist.'

> (see *Howard Smith Ltd v Ampol Petroleum Ltd* [1974] AC 831, 837) .

112.   The respondents submit that, where Shareholder Security becomes enforceable, the
directors can properly take into account (if it be the case) that the circumstances
leading to Shareholder Security becoming enforceable were trivial or technical (that
is, not leading to any enforcement action). They further submit that the directors could
wait and see whether the security was in fact enforced, since clause 6.17 would
prevent any transfer that overrode the members' pre-emption rights.  In my judgment,
the court should not express a view on how the directors should make their decision
before they have met to do so or decide not to meet to do so.  The decision is for them
to take in the first instance.  If required to do so, the court can then review their
decision.

### (e) Conclusion on security becoming enforceable argument

113.   For the reasons given above, as of now, Mr McKillen has failed to establish any act of
Coroin which could constitute unfair prejudice by reason of the 2005 charge
becoming enforceable.

## NO REMAINING ISSUES NEED TO BE DECIDED

114.   The principal outstanding issue argued on this appeal is whether the judge was wrong
to conclude that, if the pre-emption provisions had been triggered, Mr McKillen could

not have funded the acquisition of his rateable share of Mr Quinlan's shareholding. Mr Philip Marshall QC, for Mr McKillen, who addressed the court on this issue, submits, first, that the judge did not address the relevant question: all that Mr McKillen needed to show was that he was deprived of an opportunity which the court should now direct should be given to him, alternatively that it is sufficient for him to show that there is now, or was at the time of the alleged breach of the pre-emption provisions, a real prospect that he could have acquired his rateable proportion of Mr Quinlan's shares. Second, Mr Marshall submits that in any event the judge's factual conclusion was wrong and should be set aside.

115.   In the light of my conclusions on the earlier issues, these questions do not arise and I do not propose to express a view on the remaining issues.

116.   Before I summarise my conclusions, I will make some points about handling complex appeals, further to remarks which I made at the start of the hearing.

## HANDLING COMPLEX APPEALS

117.   When I gave Mr McKillen permission to appeal in this case, I made an order that the appellant should reduce the length of his skeleton argument (then 68 pages) to 25 pages. My direction reflected the importance of written argument being focused on the limited issues sought to be raised on appeal. This order in fact did little more than is now required by paragraph 31 of CPR Practice Direction 52C, as amended with effect from October 2012:

> "31 (1) Any skeleton argument must comply with the provisions of Section 5 of Practice Direction 52A and must-
> (a) not normally exceed 25 pages (excluding front sheets and back sheets);
> (b) be printed on A4 paper in not less than 12 point font and 1.5 line spacing.
> (2) Where an appellant has filed a skeleton argument in support of an application for permission to appeal, the same skeleton argument may be relied upon in the appeal or the appellant may file an appeal skeleton argument (Timetable Section 5, Part 1).
> (3) At the hearing the court may refuse to hear argument on a point not included in a skeleton argument filed within the prescribed time. "

118.   There is a sanction provided for non-compliance with this paragraph:

> "(4) The court may disallow the cost of preparing an appeal skeleton argument which does not comply with these requirements or was not filed within the prescribed time."

119.   I directed that the respondents should aim to do likewise, but that aim was not achieved. The skeleton argument of the Barclay interests was 60 pages (including a short appendix) and that of Mr Quinlan 36 pages (plus an annexe of 18 pages). I say no more as the court has yet to receive submissions on costs.

120.    When I dealt with the permission application I saw that the trial had lasted nearly 30 days and that the careful judgment of the judge ran to 657 paragraphs, covering some 158 pages of A4 paper (single-spaced), and that the judge had received many hundreds of pages of closing submissions.

121.    In their respondent's skeleton, Mr Quinlan's advisers suggested that the court spend 12 hours pre-reading the judge's judgment. That is an indication of the complexity of the detailed material in this case. Pre-reading time of that order is certainly not accommodated within the usual schedule of this court.

122.    However, in general, at the appeal stage submissions can often be more focused than at first instance since there is often no challenge to the judge's primary findings of fact. It has turned out that the issues on this appeal fall within a comparatively narrow compass.

123.    CPR Practice Direction 52C is there for a good reason. The parties are expected to co-operate in reducing the length of documentation put before the court generally: skeleton arguments, closing submissions and witness statements. Reducing or as appropriate redacting these documents will enable an appeal to be better focused.

124.    I made similar points in open court at the start of this appeal, and I repeat them now, in order to get the message across to the professions and the public. As I said then, it is quality, not quantity, that counts. Small is beautiful. I also then made the point, by reference to my recent article (*Judgment writing: are shorter judgments achievable?* (2012) 128 LQR 515-520), and repeat, that it is in the interests of access to justice, reducing legal costs in the instant and other cases and the standing of English law in international fora that judgments should be as short and focused as the circumstances permit. This is not necessarily easy to achieve because, as Blaise Pascal famously observed (and I have quoted this in another judgment) it can take longer to write more shortly than to write at length.

125.    Accordingly, I take this opportunity to emphasise that parties to appeals in this court must make every endeavour to ensure that the length of skeleton arguments on an appeal falls with the normal range described in Practice Direction 52. Happily, the parties in this case substantially complied with a page limit imposed when further submissions were directed after the hearing.

126.    There is another very important point related to the length of documents. The court is required to deal with an appeal justly, and under CPR that includes, among other considerations, for any individual case:

> "(e) allotting to it an appropriate share of the court's resources, while taking into account the need to allot resources to other cases. "

127.    No appeal should take more of the court's resources than it needs to do as this may result in unfairness to other litigants waiting to have their appeals heard. The length of appeal hearings cannot be governed by the desire of a party to file a longer skeleton argument than is required in order to achieve a just result in that case.

*CONCLUSIONS*

128.    In my judgment, for the reasons given above, there is no act or omission of Coroin of which Mr McKillen can complain under section 994 of the CA 2006:

- o   The practical effect of the arrangements between Mr Quinlan and the Barclay interests did not breach the pre-emption provisions in clause 6 of the shareholders' agreement.

- o   The Arrangements did not involve the transfer of a proprietary interest in Mr Quinlan's shares contrary to clause 6.17 of the shareholders' agreement.

- o   The Arrangements did not result in a breach of the good faith clause in clause 8.5 of the shareholders' agreement.

- o   The 2004 charge did not "become [..] enforceable" for the purposes of clause 6.6 of the shareholders' agreement because BOSI did not make the declaration of the immediate enforceability required by the conditions forming part of the 2004 charge.

- o   The 2005 charge became enforceable at the latest on 9 November 2009. However, the one month period within which the directors had power under clause 6.6 to deem a transfer notice to have been given in respect of Mr Quinlan's shares has expired without their exercising that power. They did not know that the 2005 charge had become enforceable and Mr McKillen cannot therefore complain about the failure to exercise the power.

- o   There is no implied term which has the effect of extending the one month period in clause 6.6. Clause 6.17 in any event prevents any disposal of an interest in shares contrary to clause 6. A member of Coroin may apply to the court for an order rectifying the register of members to restore the name of the previous holder if a share transfer in breach of clause 6 is registered in that register.

- o   In any event, the directors have not evinced an out and out refusal of Mr McKillen's request to consider whether that power should be exercised. Even if they had so refused, Mr McKillen has power under the articles of Coroin to convene a board meeting himself.

129.    For these reasons I would dismiss this appeal.

130.    In the course of this judgment, I have also observed that courts need to consider whether the issues involved in unfair prejudice cases under section 994(1) of the CA 2006 can be reduced, as they tend to be heavy cases (paragraph 14, above).

131.    I have also made the observations that, in the interests of (among other matters) access to justice and reducing legal costs:

- o   Skeleton arguments should normally comply with the length limit in CPR PD 52C 31;

- o   Other documentation presented to the court should likewise be no longer than required (paragraphs 117 to 127, above).

# APPENDIX 1

## Extracts from the shareholders' agreement:

## pre-emption provisions (clause 6) and good faith provision (clause 8.5)

*No Transfers except as Permitted*

6.17 No Share nor any interest therein shall be transferred, sold or otherwise disposed of save as provided in this clause 6.[1]

6.18 Nothing in this clause 6 shall prohibit or restrict the grant by a Shareholder of any Shareholder Security[2] or the transfer of any Share to the holder for the time being of such Shareholder Security and the Directors shall approve such transfer; provided that for the avoidance of doubt the holder of such Shareholder Security shall be subject to the terms of clause 6 (including clauses 6.1 to 6.5 hereof) in the event of any such Shareholder Security becoming enforceable.

*Transfer of Shares*

6.1 Except in respect of a transfer made pursuant to clauses 6.14, 6.15 and/or 6.16, a Shareholder (the Proposing Transferor) desiring to transfer one or more Shares (or any interest therein) (the Transfer Shares) may at any time give notice in writing to the Company (Transfer Notice) of his desire to transfer the Transfer Shares and the sale price thereof and other sale terms, as fixed by him. For the purposes of this clause 6, "Share" shall be deemed to include Loan Stock and any other debt or other instruments convertible into share capital of the Company.

…

6.3 If any Transfer Shares so offered are accepted the Proposing Transferor will upon completion of the foregoing procedures (but subject to clause 6.4) be bound to sell and transfer …the relevant Transfer Shares…

6.6 If any Shareholder

6.6.1 (being a corporate Shareholder) enters into liquidation or receivership or suffers the appointment

---

[1]  As stated in paragraph 19 above, clauses 6.17 and 6.18 have been set out first for ease of reading.

[2]  This was defined in the shareholders' agreement as any security "as may from time to time be granted by any Shareholder over this Shares and/or Loan Stock".

of an examiner or any Shareholder Security becomes enforceable or suffers any analogous proceeding (not being a voluntary liquidation for the purpose of and followed by a reconstruction or amalgamation while solvent upon such terms as may be approved by all of the Shareholders); or

6.6.2 (being an individual Shareholder) becomes or is adjudged bankrupt in any part of the world or enters into any composition or arrangement with his creditors generally or any Shareholder Security becomes enforceable; or

6.6.3 attempts to deal with or otherwise dispose of any Shares or interest in Shares in the Company otherwise than in accordance with the provisions of this Agreement;

such Shareholder or as the case may be, his personal representatives, if so notified by the Company following a determination by the Directors at any time within a period of one month after the occurrence of any such event, shall be deemed to have given a Transfer Notice in respect of all Shares held by it or him on the date of such notice and the provisions of clause 6.7 shall apply.

…

8.5 Each of the Shareholders agrees that:

8.5.1 during the continuance of this Agreement all transactions entered into between any of them or any company controlled by them on the one hand and the Group on the other shall be conducted in good faith and on the basis set out or referred to in this Agreement or, if not provided for in this Agreement as may be agreed by the parties and in the absence of such agreement on an arm's length basis;

8.5.2 each of them shall at all times act in good faith towards the others and shall use all reasonable endeavours to ensure the observance of the terms of this Agreement;

8.5.3 no party will seek to increase its profit or reduce its loss at the expense of another; and

8.5.4 each of them will do all things [necessary] or desirable to give effect to the spirit and intention of this Agreement."

## APPENDIX 2

## RELEVANT PROVISIONS OF THE 2004 AND 2005 CHARGES

## AND BOSI'S GENERAL CONDITIONS

*The 2004 charge*

…

"1. INTERPRETATION

1.1 In this Charge the following expressions shall, unless the context otherwise requires, have the following meanings:

…

"Events of Default" means the events of default set out in the Facility Letter and any one an "Event of Default";

…

"Facility Letter" means the facility letter dated 6 April 2004 addressed by the Bank to the Chargor as amended by supplemental letter dated 21 April 2004.

…

2. THE SECURED OBLIGATIONS

2.1 For good and valuable consideration (receipt of which is hereby acknowledged):

(a)     the Chargor hereby unconditionally covenants to pay or discharge on demand (which demand may be made only after the occurrence of an Event of Default which is continuing unremedied or unwaived) to the Bank the Indebtedness;

(b)     the Chargor hereby unconditionally and irrevocably covenants to pay or discharge on demand to the Bank all costs, charges, expenses and other sums (banking, legal or otherwise) on a full indemnity basis howsoever incurred or to be incurred by the Bank or by or through any receiver, attorney, delegate, sub-delegate, substitute or agent of the Bank (including, without limitation, the remuneration of any of them) for any of the purposes referred to in this Charge or in relation to the enforcement of this security together with interest to the date of payment (as well after as before any demand made or judgment obtained hereunder) at the Default Rate.

2.2 A certificate signed by a duly authorised officer of the Bank setting forth the amount of any sum due hereunder shall, in the absence of manifest error, be conclusive evidence against the Chargor without the necessity of proof of the signature of such person or that he holds the office described in such certificate.

2.3 The Secured Obligations shall upon written notice by the Bank, become due and payable and the Chargor shall pay or repay all actual liabilities and provide cash cover to the Bank for all actual, and the maximum amount of all contingent, liabilities of the Chargor to the Bank on the occurrence of any Event of Default.

2.4 The Chargor hereby covenants immediately to notify the Bank in writing of the occurrence of any Event of Default or of the occurrence of any event which with the lapse of time or giving of notice or both would or may constitute an Event of Default."

…

10. 1 Upon the happening of an Event of Default the Bank shall have and be entitled to exercise the power to sell … as the Bank shall think fit, the whole or any part of the Charged Property …

10.2 The restriction contained in Section 103 of [the Law of Property Act 1925] on the exercise of the statutory power of sale shall not apply to any exercise by the Bank of its power of sale or other disposal which shall arise, as shall the statutory power under Section 101 of the Act of appointing a receiver of the Charged Property or the income thereof, immediately upon the security created by this Charge becoming enforceable. In favour of a purchaser a certificate in writing by an officer or agent of the Bank that either or both of such powers has arisen and is exercisable shall be conclusive evidence of that fact.

### The 2005 charge

"1. INTERPRETATION

1.1 …

…

"Event of Default" means any failure by the Chargor to pay, on written demand by the Bank any sums which are due and payable to the Bank by the Chargor whether as principal, surety or in any other manner whatsoever;

…

…

### General conditions

"GENERAL CONDITIONS APPLICABLE TO LOAN FACILITIES PROVIDED BY BANK OF SCOTLAND (IRELAND) LIMITED

## 1. DEFINITIONS AND INTERPRETATION

…

"Events of Default" means the events specified in Condition 9 and any further events of default specified in the Facility Letter and any one an "Event of Default";

…

"Potential Event of Default" means any event which may, with the passage of time, the giving of notice, the making of any determination or any combination thereof constitute an Event of Default;

…

## 9. EVENTS OF DEFAULT

(i) If the Borrower fails to pay on the due date any monies payable or due by it from time to time to the Bank in the currency and manner specified in the Loan Agreement or fails to discharge or perform any obligation or liability to the Bank or if the Borrower or any Guarantor fails to comply with any term or condition under any of the Finance Documents (including without limitation, the Loan Agreement) or if any representation, warranty or undertaking from time to time made (or deemed to be made) to the Bank by the Borrower or any Guarantor is or becomes incorrect or misleading;

…

(xx) If the Registrar of Companies issues a notice to the Borrower or any Guarantor pursuant to either Section 11 or Section 12 of the Companies (Amendment) Act 1982;

then, and in such case and at any time thereafter, the Bank may, in its absolute discretion:-

(i) by written notice to the Borrower declare all Drawings to be immediately due and payable and call for the repayment thereof whereupon the same shall become immediately payable together with accrued interest thereon and any other sums due and payable by the Borrower under the Finance Documents; and/or

(ii) by written notice to the Borrower declare the Loan to be due and payable on demand in which case the Borrower shall make payment thereof on demand made by the Bank at any time thereafter; and/or

(iii) cancel all or any of its obligations under the Loan Agreement whereupon same shall be cancelled forthwith and the commitments of the Bank shall be reduced to zero; and/or

(iv) declare that the Security Documents have become enforceable immediately in accordance with their terms, whereupon the same shall be immediately enforceable.

**Lord Justice Moore-Bick:**

132.    I agree that the appeal should be dismissed broadly for the reasons given by Arden L.J., but in relation to some aspects of the appeal I have reached conclusions which differ from hers and in relation to others I have reached the same conclusion by a slightly different route. I therefore propose to set out the reasons for my decision as briefly as I can. In doing so I gratefully adopt the description of the circumstances giving rise to the appeal given by Arden L.J. as well as her recital of the material parts of the shareholders' agreement and the relevant parts of the Bank of Scotland (Ireland) Ltd's ("BOSI's") General Conditions, none of which I need repeat. For convenience I shall deal with the issues in the order in which they are addressed in the judgment of Arden L.J.

*The practical effect of the arrangements*

133.    The primary submission of Lord Goldsmith Q.C. on behalf of Mr. McKillen was based on the proposition that the arrangements between Mr. Quinlan and the Barclay interests transferred for all practical purposes the whole of his interest in his shares to them. The argument proceeds on the footing that the court should construe the shareholders' agreement in a realistic and commercially sensible way so as to treat such arrangements as amounting to a transfer of the shares or an interest in them for the purposes of clause 6.

134.    I agree that this submission must be rejected. In the present case the Barclay interests obtained practical control of Mr. Quinlan's shares because Mr. Quinlan was prepared for personal reasons to act entirely in accordance with their wishes in relation to the affairs of the company. However, it is to be assumed for these purposes that they acquired no legal or beneficial interest in them. The question, therefore, is whether the word "interest" in clause 6 is capable of connoting something less than a recognised proprietary interest. In *McKillen v Misland Investments Ltd* [2012] EWCA Civ 179, [2012] 2 BCLC 611, an earlier decision in these very proceedings, this court held that "interest" in clause 6.17 meant a direct proprietary interest and did not include a commercial interest of the kind which resulted from the ownership of the company which itself owned the shares. The question under consideration on that occasion differed from that which arises on this only to the extent that it concerned a commercial or practical interest of a different kind amounting to practical control. The court's decision that "interest" means a direct proprietary interest is in my view binding on the parties. The parties could have agreed that a transfer of control, even one effected by such informal means, should be sufficient to trigger the rights of pre-emption, but they did not do so. Even if the previous decision of this court were not binding, however, I do not think that it would be possible to construe clause 6.17 as extending to the situation which now exists.

*Creation of a proprietary interest*

135.    Next there is the question whether the agreement of 17th February 2011 operated to transfer to the Barclay interests in the form of Ellerman Hotels Group Ltd a proprietary interest in Mr. Quinlan's shares. Lord Goldsmith submitted that it was effective to transfer an immediate contingent equitable interest in the shares of a kind that would be recognised as such under section 4 of the Law of Property Act 1925 if

the subject matter had been land. If so, it can only be because the court would grant specific performance of the contract.

136.   The agreement of 17th February 2011 was an agreement for the sale of Mr. Quinlan's shares subject to compliance with the pre-emption provisions. The agreement to transfer ownership of the shares was therefore conditional in nature. In order to perform the agreement it was necessary as a first step for Mr. Quinlan to give a transfer notice pursuant to clause 6.1. The agreement does not contain any express requirement for him to do that, but it does oblige him to provide assistance to the buyer to the extent reasonably necessary to give effect to the terms of the agreement and in my view it is not difficult to find within the agreement an obligation on him to give such a notice forthwith or whenever asked to do so. Given the nature of the subject matter, the court would in my view compel compliance with that term, but that is not the same as saying that as from the time the agreement was entered into the contract to transfer the ownership of the shares was specifically enforceable.

137.   In *Wood Preservation Ltd v Prior* [1969] 1 W.L.R. 1077 the question arose whether the beneficial interest in certain shares had passed to the purchaser under a conditional contract for sale. At page 1091 Goff J. said that the real test was whether the property in the shares had passed in equity to the purchaser. He held that although the agreement as a whole was not subject to a condition precedent, the obligation to buy and sell the shares was and that therefore the property in the shares would not pass to the purchaser until the condition had been performed or performance had been waived. Having reviewed a number of earlier authorities, he concluded at page 1094 that ordinarily where the mutual obligations of sale and purchase are subject to a condition precedent, property does not pass so long as the condition remains unperformed. In my view that is the position in the present case. Until the pre-emption provisions have been triggered by the giving of a transfer notice and the existing shareholders' rights under them have been exhausted the purchaser does not have the right to call for the title to any remaining shares to be transferred to him. This tends to support the conclusion that no proprietary interest of any kind could pass to the Barclay interests under the agreement of 17th February 2011 until the whole of the pre-emption process had been completed.

138.   Even if that is wrong, however, and the Barclay interests would otherwise have acquired a contingent equitable interest in Mr. Quinlan's shares under the agreement, clause 6.17 is, in my view, effective to prevent the creation of any such interest, as Mr. MacLean Q.C. and Mr. Auld Q.C. both submitted. In the course of argument Lord Goldsmith did not expressly accept that proposition, but he did not expressly dispute it either. His submission as to the effect of clause 6.17 was rather different, namely, that any purported transfer in contravention of that clause obliged the transferor to give a transfer notice under clause 6.1. In my view, however, that is not correct. Clause 6.1 is essentially permissive in nature and prescribes the conditions which must be complied with if a valid transfer is to be made. A shareholder who purports to deal with or dispose of his shares may find himself the subject of a notice given under clause 6.6, but if no such notice is given, one is simply left with a transfer that contravenes clause 6.17.

139.   As I have explained, the precise nature of clause 6.17 and the manner in which it operates were not developed during the hearing, but on reflection it seemed to us that a proper understanding of its nature and effect might play an important part in

understanding the rest of clause 6, particularly clause 6.6. We therefore invited the parties to make further submissions in writing directed to that limited question.

140.    Counsel for Mr. McKillen submitted that clause 6.17 does not render a transfer contrary to the pre-emption provisions wholly ineffective or void. They argued that such a transfer confers an interest on the transferee, subject to the rights of the other shareholders under clause 6, which crystallise into an option to purchase the shares and constitute a prior equity. At that point the transferor is obliged to serve a transfer notice under clause 6.1. In support of that argument they relied on the decision of Vinelott J. at first instance in *Tett v Phoenix Property and Investment Co Ltd* [1984] BCLC 599 and the decision in *Cottrell v King* [2004] BCC 307.

141.    Counsel for the respondents submitted, as they had in argument, that clause 6.17 renders any transfer which does not comply with clause 6 wholly ineffective. Their argument was based on two propositions: (a) that in the case of a chose in action the instrument by which it is created (in this case the company's articles) determines its essential nature and the extent to which it can be transferred; and (b) that the creation of an equitable interest under a contract to transfer property depends on the willingness of the court to grant an order for specific performance. In this case, they said, clause 6.17 and the corresponding provision in the company's articles make it clear that neither the shares themselves nor any interest in them can be transferred or disposed of otherwise than in accordance with clause 6 and the court would not order specific performance of an agreement to dispose of shares or an interest in them contrary to the terms of the articles.

142.    In my view the respondents' submissions are to be preferred. One difficulty with the argument put forward on behalf of Mr. McKillen is that the articles and the shareholders' agreement provide a procedure for giving effect to the pre-emption rights which is intended to be self-contained, but it can be initiated only by the member who wishes to make a transfer, or in certain circumstances by the company itself. They do not enable the other members to initiate the process, even where one member seeks to make a transfer in breach of the requirements of clause 6.1. (In such a case the company alone may act under clause 6.6). It is difficult to see, therefore, how the other members would enforce their equitable interests in the right of pre-emption, otherwise than by resorting to proceedings. In my view that is not what the pre-emption provisions contemplate. *Cottrell v King* differs from the present case in that the transferee became the legal owner of the shares by virtue of being registered as the holder, although she took them subject to the equity in the form of the option to purchase which had been created under the articles in favour of the other member as a result of her giving notice to the company of her wish to be registered as holder.

143.    There is authority in the shape of the decision of this court in *Tett v Phoenix Property and Investment Co Ltd* (1986) 2 BCC 141 for the proposition that the directors have no power to register a transfer of shares made otherwise than in accordance with the pre-emption provisions and there is also authority for the proposition that the transferability of a chose in action generally may be limited by the instrument creating it: see *Linden Gardens Trust Ltd v Lenesta Sludge Disposal Ltd* [1994] 1 A.C. 85. The view that this principle applies to the chose in action represented by a share in a company is supported by the decision in *Re Claygreen Ltd* [2005] EWHC 2032, [2006] 1 BCLC 715. It is true that there are indications to the contrary in the judgment at first instance in *Tett v Phoenix*, but in my view the question in the present case

turns on the construction of the company's articles, which contain pre-emption provisions corresponding to those in the shareholders' agreement. A similar pre-emption clause (though one not worded so as to prohibit the disposal of equitable interests) was considered in *Emily Hunter v T. H. V. Hunter* (Court of Appeal, 19th April 1934). The court (upholding the judgment below) held that the purpose of the restriction was to ensure that the company remained in the hands of the family and that a transfer of shares contrary to the terms of the articles was null and void. (Emily's case was not the subject of a further appeal, but in the parallel case brought by another member of the family, Samuel, which was considered by the House of Lords, various members of the House expressed similar views, albeit obiter: see *Hunter v Hunter* [1936] A.C. 222.) The purpose of the pre-emption provisions in this case is substantially the same and for all these reasons I think that clause 6.17, particularly when read in the light of clause 6.6.3, is effective to invalidate transfers or the creation of interests otherwise than in accordance with the pre-emption provisions. Having said that, I accept that if, for some reason the transferee were formally registered as the holder of the shares, he would enjoy all the rights of a member unless and until the register was rectified and his name was removed.

144. Accordingly, the best that can be said of the agreement of 17th February 2011 from Mr. McKillen's perspective is that it constituted an attempt to transfer the shares. However, since the agreement specifically provides for the transfer of the shares to be subject to the pre-emption provisions, it cannot constitute an attempt to transfer them "otherwise than in accordance with the provisions of this Agreement" for the purposes of clause 6.6.3. I am therefore unable to accept that the pre-emption provisions were automatically triggered by the agreement of 17th February 2011.

### Breach of good faith

145. Mr. McKillen's alternative argument is that the informal transfer of control by Mr. Quinlan to the Barclay interests constituted a breach of clause 8.5 of the shareholders' agreement, in particular clauses 8.5.2 and 8.5.4. In the light of the modern approach to construction exemplified in *Attorney General of Belize v Belize Telecom Ltd* [2009] UKPC 10, [2009] 1 W.L.R. 1988, I doubt whether in this case either of these clauses has any practical significance beyond providing part, albeit perhaps an important part, of the context in which the substantive terms of the agreement are to be construed. The intention of the parties has to be derived from the agreement as a whole, including clause 8.5, and if, as I think, the pre-emption provisions were intended to apply only to the transfer or creation of proprietary interests in the shares, arrangements falling short of that do not involve any breach of the shareholders' agreement or the company's articles. In any event, I do not think that the argument is capable of advancing Mr. McKillen's case. If there had been any want of good faith on the part of Mr. Quinlan and other shareholders that was capable of amounting to a breach of clause 8.5, that might give rise to a personal claim against them, but it would not constitute an act or omission of the company within the meaning of section 994(1)(b).

### Security became enforceable

146. The final question is whether the security over the shares charged to BOSI in support of the 2004 or 2005 loan to Mr. McKillen became enforceable within the meaning of clause 6.6.2 of the shareholders' agreement. As far as the 2005 loan is concerned, I

agree with Arden L.J. that the charge became enforceable, but that for the reasons she gives there was no act or omission on the part of the company that unfairly prejudiced Mr. McKillen. It is therefore unnecessary for me to say anything further about that loan. I regret, however, that I am unable to agree with her about the position in relation to the security held by BOSI in support of the 2004 loan.

147. Although it was not in dispute before the judge that a number of events of default had occurred under the 2004 loan agreement in 2010 and 2011, he held that on the true construction of clause 9 of BOSI's General Conditions it was necessary for the bank to declare the security enforceable before it could become so and that in the absence of such a declaration the requirements of clause 6.6.2 were not satisfied. The General Conditions are, of course, important because they define the circumstances under which, and the manner in which, the security can be enforced, but for present purposes the court is primarily concerned with the meaning of clause 6.6.2 of the shareholders' agreement, which forms part of the pre-emption provisions.

148. The nature and terms of the pre-emption provisions indicate that their purpose is to ensure as far as possible that the company remains in the hands of the original members or those whom they are willing to admit to their circle. Clause 6.6 seeks to achieve that by obviating the risk of shares passing into the hands of a third party as a result of insolvency or an attempt to dispose of shares or an interest in them otherwise than in accordance with the pre-emption provisions. "Enforceable" simply means "capable of being enforced" and in the context of the shareholders' agreement I think that the expression "becomes enforceable" must have been intended to cover any situation in which the holder of security over shares in the company has an immediate power to enforce it. Whatever its purpose or function as part of the General Conditions, paragraph (iv) of the tailpiece to condition 9 does not impose any restriction on the bank's power to enforce the security. At most it provides a mechanism that must be complied with in the form of a notice of some kind to the borrower, but it places no restriction whatever on the bank's ability to enforce the security. If, therefore, following an event of default one were to ask whether the security over the shares had become capable of enforcement (and therefore "enforceable"), the answer would surely be that it had, even if the bank had to declare the security enforceable before taking practical steps to realise it. For these reasons I am of the view that as soon as an event of default occurred in relation to the 2004 loan the requirements of clause 6.6 of the shareholders' agreement were satisfied in respect of the shares charged as security for it.

149. However, I do not think that assists Mr. McKillen. Lord Goldsmith submitted that if the security became enforceable Mr. Quinlan was to be deemed to have given a transfer notice, but that is not what clause 6.6 says. All it does is to give the company the power, if the directors so decide, to notify the relevant shareholder that he is to be treated as having given a transfer notice, thus initiating the pre-emption process. The directors have a discretion whether to take that step, which must be exercised within a month of the occurrence of the relevant event.

150. As Arden L.J. has pointed out in her paragraphs [13] – [17], in order to succeed in his claim for relief under section 994(1) of the Companies Act 2006 it is necessary for Mr. McKillen to establish that an act or omission on the part of the company is or would be unfairly prejudicial to him and in order to establish unfairness he must show that there has been a breach of a right conferred by the articles or the shareholders'

agreement. Mr. McKillen may have had a right to require the directors to consider whether the company should exercise its power under clause 6.6, but he did not seek to do so until 27th October 2011. There is no reason to think that the directors were aware of any earlier events of default and if they were not aware of them I do not think that their failure to consider whether to treat Mr. Quinlan as having given a transfer notice can amount to a breach of Mr. McKillen's rights.

151.    In the course of argument it was submitted that, in order to prevent the power under clause 6.6 from lapsing before the company had become aware of its existence, it was necessary to imply into the shareholders' agreement and the articles a term that any shareholder would inform the company immediately of the occurrence of any event falling within the terms of the clause of which he became aware. The judge held that such a term should be implied in order to make the clause workable, but, for reasons which I will explain in a moment, I do not ascribe the same importance to clause 6.6 and for that reason I am unable to agree with his conclusion. However, even if one were to imply a term of that kind, I do not think that it would assist Mr. McKillen. It is clear that, if Mr. Quinlan was under an obligation to inform the company that an event of default had occurred under the 2004 loan agreement, he failed to do so. That might give rise to a personal claim against Mr. Quinlan, but it could not extend the time in which the company could exercise its power under the clause. It is not possible, in my view, to imply a term extending the period provided in clause 6.6, because to do so would contradict the parties' intention as expressed in the contract itself.

152.    That clause 6.6 may be of limited value in some cases is less surprising if, as I think, the effect of clause 6.17 is to invalidate any transfer of shares, or the creation or disposition of any interest in them, which does not comply with the pre-emption provisions. In those circumstances clause 6.6 does not provide the principal means of protection for the interests of the other shareholders, but can be seen to fulfil the subsidiary, but nonetheless potentially important, purpose of allowing the company to force the hand of a member whose shares are at risk of transfer to a third party by treating him as having given a transfer notice pursuant to clause 6.1. There is, therefore, no need to read into it a term of the kind suggested. However, even if the alternative view were to be preferred and a transfer were to have the effect for which Mr. McKillen contends, the rights of the other members would be preserved in the form of an equitable interest which they could enforce against the transferee.

153.    The upshot of all this is that, although the security for the 2004 loan to Mr. Quinlan became enforceable, the company was unaware of the fact at the time and was therefore unable to consider whether to exercise its right under clause 6.6 to treat him as having given a transfer notice while it still had the power to do so. However, its failure did not involve any breach of Mr. McKillen's rights and cannot be regarded as causing him unfair prejudice.

154.    For these reasons I agree that the appeal should be dismissed.

                    *Postscript*

155.    At the end of her judgment Arden L.J. has drawn attention to paragraph 31 of Practice Direction 52C, emphasising the importance of ensuring that skeleton arguments are as succinct as possible and that the materials prepared for the appeal are limited to those

that are really necessary for that purpose. I respectfully endorse those remarks and have said much the same myself on other occasions. The reading time available to the court is limited and skeleton arguments are intended to provide a clear statement of the points that are to form the backbone of the parties' submissions. It is not their function to include all the points of detail which the parties intend to deploy in support of those submissions. They can be developed more effectively in oral argument.

**Lord Justice Rimer:**

156.    I have read in draft the judgments of Arden and Moore-Bick LJJ. I too agree that Mr McKillen's appeal should be dismissed, but not in all respects for the reasons that Arden LJ has given. I add the following observations.

*A. The pre-emption provisions*

157.    The pre-emption provisions in the shareholders' agreement follow in all material respects those in Coroin's articles of association, and I shall refer only to the former provisions. Their scheme is that, apart from permitted transfers (which include a transfer to a mortgagee), all transfers or other dispositions must be made in a manner compliant with the requirements of clause 6: see clause 6.17. There are, however, questions as to the operation of, and interrelation between, clauses 6.1, 6.6 and 6.17.

158.    As for clause 6.1, does the provision that 'a Shareholder … desiring to transfer … Shares (or any interest therein) … may at any time give [a transfer notice] to the Company …' mean that such a shareholder *must* give such a notice? I consider that the answer is yes, although it needs a little explanation. Clause 6.1 does not compel the giving of a transfer notice as soon as a proposing transferor forms a desire to transfer any shares. A desire formed on Monday may have evaporated by Friday; and if, in the meantime, no transfer notice has been given, it would be odd if such an ephemeral desire could result in a shareholder being compelled to give a transfer notice when he no longer wishes to transfer his shares at all. On the other hand, I regard it as clear that, once the formation of the desire has moved into the valley of decision intended to be followed by action, the sense of clause 6.1 is that it is a condition of a valid transfer that the shareholder must first give a transfer notice for the purpose of activating the pre-emption provisions. If he does not, any attempt by him to transfer his shares will run into (i) the provisions of clause 6.6, under which the directors are empowered to deem him to have given a transfer notice; and (ii) in default of an exercise by the board of that power, the provisions of clause 6.17. The answer to the 'may' or 'must' question is, therefore, simply that it is a condition of a valid transfer of shares – and of any interest in shares – that the proposing transferor first gives a transfer notice.

159.    Clause 6.6 also raises interpretational questions. It provides that, following the occurrence of any such events as are referred to in clauses 6.6.1 to 6.6.3, the directors may 'deem' the relevant shareholder to have given a transfer notice in respect of all his shares. Such events include the case in which the shareholder 'attempts' to deal with, or otherwise dispose of, his shares or an interest therein otherwise than in accordance with the provisions of the shareholders' agreement.

160. Clause 6.6 provides, however, that the directors can only so deem 'within a period of one month after the occurrence of any such event'. The problem here is that it is likely that in many cases the directors will only learn of such occurrence after the expiration of the one-month period: the relevant event might, for example, be a non-compliant share transfer which, with a view to circumventing the clause 6.6 time limit, the parties had deliberately kept secret and of which they had deferred applying for registration. This raises a question as to whether, in the final paragraph of clause 6.6, the quoted words mean what they say, namely that the board's discretionary power is exercisable only within the specified one-month period; or whether there is any basis for a more flexible reading to the effect that the one-month period runs from when the directors first have relevant knowledge.

161. In my view, the words mean what they say. First, as a matter of language, there is no scope for reading them as meaning anything else; and no basis for an inference that something has gone wrong with the drafting. It may perhaps not be a very clever piece of drafting, but it is not the court's function, by a process of purported interpretation, to improve the scheme that Coroin has chosen to adopt. Second, that interpretation is anyway unlikely to be injurious to the members' pre-emption rights. An attempted transfer, sale or disposition of shares, or of any interest in shares, that is made without prior compliance with clause 6.1 and slips the net of clause 6.6 does not get away scot-free, because the effect of clause 6.17 is to strike down any transfer, sale or disposition 'save as provided by this clause 6'. That means, in my judgment, that no such transaction will be effective between the parties unless it has been preceded by compliance with the pre-emption provisions.

162. As to the practical consequences of an attempted, but non-compliant, share transfer, the board would have no power to register it as it would have been made in breach of the articles. That is shown by the Court of Appeal's decision in *Tett v. Phoenix Property and Investment Co Ltd and others* [1986] BCLC 149. In *Emily Hunter v. T.H.V. Hunter and Others*, 15 January 1934, unreported ('the *Emily Hunter* case', not apparently cited in *Tett's* case), Bennett J came to a like conclusion in relation to share transfers made in breach of article 17 of a company's articles, which provided that 'no member shall be entitled to transfer any share otherwise than in accordance with the following [pre-emption] provisions'. Save that article 17 did not also include a restriction on dispositions of an *interest* in shares, there is no relevant distinction between the restriction in article 17 and that in clause 6.17 of the shareholders' agreement (and its equivalent in the articles) in the present case. Bennett J made an order for the rectification of the registration of the transferees so as to restore to the register the name of the purporting transferor.

163. Bennett J's decision was upheld by the Court of Appeal (Lord Hanworth MR, Romer and Maugham LJJ), 19 April 1934, unreported. Lord Hanworth expressed his agreement with Bennett J that 'the meaning of the opening words of Article 17 is that there is to be a prohibition against a transfer of any shares at all except and only in the manner in which is [sic] permitted [by the pre-emption provisions]'. Romer and Maugham LJJ gave concurring judgments. There was no appeal against that decision to the House of Lords, although another decision in the *Hunter* litigation (the *Samuel Hunter* case) was so appealed: *Hunter v. Hunter and Others* [1936] AC 222. The *Emily Hunter* case shows that a purported transfer of shares made in defiance of the pre-emption provisions of clause 6 will be ineffective.

164.   As for an attempted, but non-compliant, disposition of an *interest* in shares (for example, by a declaration of trust), no question as to that arose in the *Hunter* litigation. But just as it was open to Coroin to impose restrictions in its articles as to the manner in which a shareholder could transfer his shares, so was it open to Coroin to impose restrictions as to the manner in which a shareholder could transfer an *interest* in his shares. Mr Peter Prescott QC, sitting as a Deputy High Court Judge of the Chancery Division in *Re Claygreen Ltd, Romer-Ormiston v. Claygreen Ltd and others* [2005] EWHC 2032 (Ch); [2006] 1 BCLC 715, took that view in relation to an article that, like clause 6.17, provided that 'no share or any interest therein shall be transferred, assigned, charged or otherwise disposed of' unless (inter alia) pre-emption rights had been exhausted. As he put it, at paragraph 53:

> 'A share in a company should not be thought of as a tangible object, but as a bundle of rights. Those rights have existence in virtue of the company's articles. If Epsom has acquired any rights in the claimant's shares, they must be rights recognised in equity alone, for no legal transfer of the shares has been or could be effected without registration. Now, how can equity recognise or give effect to a transaction in relation to a bundle of rights which, by their very nature, do not admit of that transaction, the parties having had notice thereof?'

I agree.

165.   The result is that I consider that, in a case where there has been no prior compliance with the pre-emption provisions, clause 6.17 renders ineffective both a purported transfer of shares and a purported transfer of any proprietary interest in shares. Of course, if, as it should not be, a transfer of shares were in fact to be registered, Coroin might well have to regard the registered owner as a member so long as he remains registered. But the other members would in principle be entitled to ask for the register to be rectified so as to restore the prior position.

### B. The 'practical effect' argument

166.   I deal below with whether the agreement of 17 February 2011 was one under which Mr Quinlan either did, or purported to, transfer an interest in his shares to the Barclay interests. Subject to that, I agree with Arden and Moore-Bick LJJ that the arrangements under which control in the Quinlan shares passed to the Barclay interests did not amount to the transfer either of the shares or of any interest in them, interest here meaning a *proprietary* interest. Such arrangements did not therefore engage the clause 6 pre-emption provisions.

### C. The agreement dated 17 February 2011

167.   The essence of this agreement is that, subject to compliance with the shareholders' agreement, Mr Quinlan agreed to sell to Ellerman Hotels Group Limited ('EHGL') all his Coroin shares for £80m, or such of his shares as he was able to sell at a *pro rata* price. Lord Goldsmith QC submitted that it followed that the effect of the agreement was to give EHGL a defeasible contingent interest, and thus a proprietary interest, in all Mr Quinlan's shares. His primary submission was that this engaged clauses 6.1 and 6.17; alternatively, that it engaged clause 6.6.

168.   I do not understand how the claimed engagement of clauses 6.1 and/or 6.17 can assist Mr McKillen. If the agreement amounted to a purported transfer of an 'interest' in shares, and thus the type of disposition to which clause 6.1 applies, then no doubt Mr Quinlan should have given a transfer notice before entering into the agreement. He did not do so, but his omission in that respect cannot have been an unfairly prejudicial act or omission in the conduct of the affairs of Coroin. In any event, for reasons given, I consider that the effect of clause 6.17 is that any such purported transfer would have been ineffective.

169.   I anyway respectfully regard Lord Goldsmith's interpretation of the agreement as incorrect. The nature of the agreement was that Mr Quinlan was agreeing to sell EHGL all his shares, but only if he was able to do so after prior compliance with the pre-emption provisions; and if following such compliance he was only able to sell part of his holding, the agreement was for the sale of such part at a *pro rata* price. The sale agreement was in substance one for the sale of such (if any) shares as were available to be sold after compliance with the pre-emption provisions; and it was a condition of the agreement that those provisions should first be complied with.

170.   Prior to compliance with such condition, EHGL could not, by a claim for specific performance, compel the transfer to it of any part of Mr Quinlan's shareholding, let alone the entire shareholding; and, if it could not do that, the agreement cannot have given it any proprietary interest in the shares. As the identification of the sale shares and their price was conditional upon the outcome of prior compliance with the pre-emption provisions, it follows that if any relevant 'interest' in shares was destined to pass under the agreement it could only so pass at the earliest once the sale shares had been identified, which could not happen until after such compliance. It follows, therefore, that even assuming that the board became aware of the agreement within one month of its signing, the agreement was not one that triggered the board's powers under clause 6.6 and so there can be no complaint by Mr McKillen (and I am not clear that there is) that Coroin's affairs in relation to the agreement of 17 February 2011 have been conducted in any unfairly prejudicial way.

*D. The charge dated 14 May 2004*

171.   Clause 1.1 of the 2004 charge defined 'Events of Default' as meaning 'the events of default set out in the Facility Letter and any one an "Event of Default".' It defined the 'Facility Letter' as one of 6 April 2004, as amended by a supplemental letter of 21 April 2004. It defined the 'General Conditions' as 'the general conditions applicable to loan facilities provided by [BOSI]', although we were not shown any reference to such conditions in the operative parts of the charge.

172.   Clause 2, headed 'The Secured Obligations', provided so far as material:

'2.1   For good and valuable consideration (receipt of which is hereby acknowledged):

(a)   The Chargor hereby unconditionally covenants to pay or discharge on demand (which demand may be made only after the occurrence of an Event of Default which is continuing unremedied or unwaived) to the Bank the Indebtedness; …

2.3    The Secured Obligations shall upon written notice by the Bank, become due and payable and the Chargor shall pay or repay all actual liabilities and provide cash cover to the Bank for all actual, and the maximum amount of all contingent, liabilities of the Chargor to the Bank on the occurrence of any Event of Default.

2.4    The Chargor hereby covenants immediately to notify the Bank in writing of the occurrence of any Event of Default or of the occurrence of any event which with the lapse of time or giving of notice or both would or may constitute an Event of Default.'

173.    Clause 10.1 provided that, upon 'the happening of an Event of Default', the Bank was to be entitled to exercise its power of sale or otherwise to dispose of the charged property. Clause 10.2 provided that:

'The restriction contained in Section 103 of [the Law of Property Act 1925] on the exercise of the statutory power of sale shall not apply to any exercise by the Bank of its power of sale or other disposal which shall arise, as shall the statutory power under the [sic] Section 101 of the Act of appointing a receiver of the Charged Property or the income thereof, immediately upon the security created by this Charge becoming enforceable. In favour of a purchaser a certificate in writing by an officer or agent of the Bank that either or both of such powers has arisen and is exercisable shall be conclusive evidence of that fact.'

Clause 11 permitted the Bank to appoint a receiver 'at any time after the power of sale may become exercisable …'. By clause 13, Mr Quinlan irrevocably appointed the Bank to be his attorney for the purpose, inter alia, of doing all things necessary to enable the Bank to exercise its power of sale.

174.    The facility letter did not itself set out the 'Events of Default' (cf clause 1.1 of the charge) but, by paragraph 9, it incorporated the Bank's general conditions ('the conditions'). Paragraph 9 provided:

'In addition to the terms contained in this facility letter, the Loan is subject to [the conditions] attached. Unless expressly excluded or varied by the terms of this facility letter, [the conditions] shall apply to this loan.'

The charge post-dated the facility letter.

175.    Condition 1.1 of the conditions defines 'Events of Default' as meaning 'the events specified in Condition 9 and any further events of default specified in the Facility Letter and any one an "Event of Default". Condition 9 is headed 'Events of Default'. Its twenty sub-paragraphs list a series of events. Arden LJ has quoted two of them in her Appendix 2 and has so given the flavour of the list. Each event is described in conditional terms, namely 'if such and such happens', although the sub-paragraphs do not explain the consequence of the event. The suspense is, however, ended by the tailpiece to condition 9, which reads 'then, and in such case and at any time thereafter, the Bank may, in its absolute discretion' exercise any or more of four options, which Arden LJ has also quoted. Option (iv) entitled the Bank to 'declare that the Security Documents have become enforceable immediately in accordance with their terms, whereupon the same shall be immediately enforceable'.

176.    The judge found that several things that happened in 2010 and 2011 were 'Events of Default' falling within one or more of the twenty sub-paragraphs of condition 9. He also recorded that there had been no consequential declaration under paragraph (iv) of its tailpiece.

177.    In those circumstances, the question arises whether, upon the happening of the first (or any) of such events, the 2004 charge (a shareholder security) '[became] enforceable' within the meaning of the applicable paragraph of clause 6.6 of the shareholders' agreement (whether it is clause 6.6.1 or 6.6.2 may be debatable, but it does not matter). The judge favoured the view that it did not, on the ground that it would only have '[become] enforceable' upon the making by the chargee of an option (iv) declaration, which did not happen. Arden LJ agrees with the judge. Moore-Bick LJ favours the different view that the security did '[become] enforceable', on the ground that the key words to be interpreted are the words 'becomes enforceable' in clause 6.6. In his view, they were intended to cover any situation in which the security holder had an immediate power to enforce it and paragraph (iv) did not impose any restriction on the exercise of such power. I agree with Moore-Bick LJ's conclusion.

178.    Such problem (if any) as there may be lies in what is arguably an internal inconsistency in the charge documentation, but I regard the following as clear. First, the occasion of any event of the nature listed in the first twenty sub-paragraphs is an 'Event of Default' within the meaning of the charge. Second, as follows, and contrary to Mr Auld QC's submission, the happening of such an event of default is not dependent upon the prior exercise by the Bank of one or more of its options under the tailpiece to condition 9: those options can do no more than they purport to do, namely to give the Bank alternative or cumulative choices of action once an event of default has happened. Third, clause 2 of the charge shows that the borrower's personal covenant to repay the indebtedness is an 'on demand' obligation and that a demand can only be made after the occurrence of an event of default. Fourth, options (i) and (ii) of the condition 9 tailpiece are therefore consistent with, and add nothing to, clause 2 of the charge, the substance of both options being that, upon an event of default, the Bank can by written notice call in the indebtedness. Fifth, clauses 10 and 11 of the charge show that it becomes immediately enforceable by way of the exercise of a power of sale or by the appointment of a receiver upon the occasion of an event of default, and that no prior declaration of enforceability by the Bank is required before the Bank may proceed to exercise its powers as chargee. Sixth, and arguably inconsistently with this, option (iv) in the condition 9 tailpiece entitles the Bank, upon the occasion of an event of default, to 'declare that the Security Documents have become enforceable immediately in accordance with their terms, whereupon the same shall be immediately enforceable'.

179.    Option (iv) is a curious piece of drafting. One meaning of the permitted declaration, underpinned by the words 'have become enforceable immediately in accordance with their terms', is that the declaration is directed at doing no more than confirming that which, upon the occurrence of the event of default, the charge anyway provides – namely, that the security has become immediately enforceable. If so, the declaration is not a condition of the Bank's right of enforcement, since it does no more than declare the existence of a right of enforcement that has already arisen and become exercisable. A possible alternative meaning, however, is that the declaration is regarded as triggering a right of enforcement that has not yet become exercisable, and

that 'the terms' referred to are the means by which the charge provides for the security to be enforced (by way of sale, the appointment of a receiver etc).

180.   As between the alternatives, I prefer the former. That is because it harmonises with the terms of the charge and is consistent with it. It is also to be noted that, unlike options (i) and (ii), the exercise of option (iv) does not apparently even require a notice of its exercise to be given to the borrower. Of course, if this is the right interpretation, the making of the declaration is pointless, since it adds nothing to what the charge provides. Nor, though, does option (i) add anything to what the charge provides; and option (ii) merely entitles the chargee to warn the borrower that he is at risk at any time of receiving a demand for payment that could have been made straight away under option (i). The problem, however, with the alternative interpretation of option (iv) is that it is inconsistent with the provisions of the charge. If, however, there is in fact any inconsistency, I consider that the provisions of the charge ought to prevail. It would be surprising if the unambiguous provisions of clauses 10 and 11 of the charge should be required to yield to an ambiguous provision in the conditions to which the charge makes no reference in its material operative parts.

181.   If, however, I am wrong about this, I consider that it anyway makes no difference to the position. The question is whether the 2004 charge '[became] enforceable' within the meaning of clause 6.6. of the shareholders' agreement. Even if the exercise of option (iv) is correctly to be regarded as a critical condition to the enforcement of the charge, it is a purely formal condition whose satisfaction is, upon the occurrence of an event of default, within the exclusive control of the chargee. The substantive position is therefore that upon the occurrence of an event of default, the charge becomes enforceable: that is because the chargee is entitled to enforce it at will.

182.   It follows in my view that, as Lord Goldsmith QC correctly submitted, the 2004 charge did '[become] enforceable' within the meaning of clause 6.6 of the shareholders' agreement. I respectfully disagree with the views to the contrary effect favoured by the judge and Arden LJ.

183.   That conclusion means that in theory it would have been open to the board (although only within the one month period after the occurrence of any event of default) to determine in its discretion under its clause 6.6 power that a transfer notice should be deemed to have been given. It was submitted by Mr MacLean QC that no case was pleaded, made or sought to be made at the trial that the board had wrongly or improperly failed or refused to exercise its powers under clause 6.6 in consequence of any event of default under the 2004 charge; and, that being so, that Mr McKillen had established no act or omission in the affairs of Coroin that was unfairly prejudicial to him as a member. On the other hand, Lord Goldsmith submitted that Mr McKillen had made a clear request in October 2011 for the board to consider exercising its clause 6.6 powers in consequence of the defaults under the 2004 charge and that the board had wrongfully refused to do so, a refusal said to amount to unfairly prejudicial conduct towards Mr McKillen.

184.   Mr Marshall QC, in his closing submissions for Mr McKillen at the trial, had sought to make a like submission to the judge. The judge declined to allow it to be made, on the basis that such a case had not been in issue at the trial and that Mr McKillen's rights (if any) to have the board consider the exercise of its clause 6.6 powers were

covered by the standstill agreement, to which Arden LJ has referred. In the exchange with Mr Marshall, the judge made clear his understanding that the point of the standstill agreement was so that the questions of principle as to whether the clause 6.6 powers had been triggered at all could first be determined by the court in its decision on the petition. In the meantime, the parties' rights in this respect were preserved. The judge, having declined to hear Mr Marshall further on the point, did not rule upon the point in his judgment. In his view, it was simply not in issue before him.

185.    Lord Goldsmith submitted that in that respect the judge was wrong and should have ruled that the board's refusal to call a meeting was unfairly prejudicial. I understood him to wish also to rely on an alleged, and unpleaded, refusal made in January 2012. He asked this court to make a finding as to unfairly prejudicial conduct that he says the judge should have made but refused to make.

186.    In my view it cannot be appropriate for this court to turn itself into a court of first instance for this purpose and make findings of primary fact of the nature that Lord Goldsmith's submission invited: whilst the board's refusal to call a meeting was admitted, it was denied that such refusal was wrongful and there was no investigation at the trial as to the 'wrongfulness' issue. I regard it as clear that the purpose of the standstill agreement was to stop time running under clause 6.6 pending the determination by the court in the petition of the necessary questions of principle as to the application (if any) of clause 6.6. The standstill agreement has duly preserved Mr McKillen's rights existing at the time he made his October 2011 request for the holding of a board meeting. In the light of our judgments, it will now be open to him to make such representations to the board as he thinks fit.

187.    I add that in paragraph 42A of his petition Mr McKillen asserts six events of default in relation to the 2004 charge. The fourth is said to have happened on 15 June 2011, some five months before the standstill agreement. I have set out my views as to the strictness of the time limits for the workings of clause 6.6, and no case was made to us that, on the findings by the judge, there had in respect of those events been any wrongful act or omission by Coroin that could be regarded as unfairly prejudicial conduct towards Mr McKillen. The two further events alleged are said to have happened on 21 October 2011 and 19 December 2011. Insofar as Mr McKillen may wish to make representations to the board in relation to those matters, I presume that his right to do so is covered by the standstill agreement.

*E. The charge dated 20 October 2005*

188.    I respectfully agree with what Arden LJ has said about Mr McKillen's case in relation to the 2005 charge. I have expressed my view that the 'one month' period in clause 6.6 of the shareholders' agreement means what it says; and I agree with Arden LJ that there is no scope for implying the term that the judge favoured. Nor do I follow how the implication of such a term can help Mr McKillen. If there was such a term, Mr Quinlan may have breached his obligation under it, but that would be irrelevant to Mr McKillen's case based on section 994. In the circumstances explained by Arden LJ, Mr McKillen has proved no act or omission of Coroin in consequence of the enforceability of the 2005 charge that amounted to the conduct of its affairs in a way unfairly prejudicial to his interests as a member.

189.    I too would dismiss Mr McKillen's appeal.

McKillen v Misland (Cyprus) Investments Ltd & Ors