# EXHIBIT 10




**[2021] UKSC 40**
*On appeal from: [2019] EWCA Civ 828*

# JUDGMENT

# Pakistan International Airline Corporation (Respondent) *v* Times Travel (UK) Ltd (Appellant)

**before**

**Lord Reed, President**
**Lord Hodge, Deputy President**
**Lord Lloyd-Jones**
**Lord Kitchin**
**Lord Burrows**

## JUDGMENT GIVEN ON

## 18 August 2021

**Heard on 2 and 3 November 2020**

*Appellant*
Philip Shepherd QC
Heather Murphy

(Instructed by Charles Morgan Lawyers)

*Respondent*
Nigel Jones QC
Thomas Bell
Professor Paul Davies
(Instructed by City Solicitors Ltd t/a Farani Taylor Solicitors)

*1st Intervener*
Bankim Thanki QC
Ben Jaffey QC
Simon Atrill
(Instructed by Quinn Emanuel Urquhart & Sullivan UK LLP)

*2nd Intervener*
Oliver Jones
(Instructed by Norton Rose Fulbright LLP)

*3rd Intervener*
Thomas Roe QC
Richard Samuel
Simon Reevell
Daniel Black
Hannah Fry
(Instructed by Hausfeld & Co LLP (London))

**Interveners:**
(1) Ukraine
(2) The Law Debenture Trust Corporation Plc
(3) All Party Parliamentary Group on Fair Business Banking

**LORD HODGE: (with whom Lord Reed, Lord Lloyd-Jones and Lord Kitchin agree)**

1. I am very grateful to Lord Burrows for setting out the facts of the case and the legal proceedings to date. There is a great deal in the exposition of the law in his clear judgment with which I agree. In particular, I agree with what he says about (i) the essential elements of duress (paras 78-80), (ii) the existence in English law of the concept of lawful act duress (paras 82-92), (iii) the importance of clarity and certainty in our commercial law, which means that the concept of lawful act duress must not be stated too widely (para 93), (iv) the rejection of a range of factors approach (para 94), (v) the similar rejection of the use of a wide principle of good faith dealing (para 95), (vi) the appropriateness of focusing on the nature and justification of the demand rather than the legality of the threat (paras 88 and 96), and (vii) the law's general acceptance of the pursuit of commercial self-interest as justified in commercial bargaining and the rarity of cases where lawful act duress will be found to exist in such bargaining (paras 97-99). I therefore also agree with the first four points of his summary (para 136(i)-(iv)). I also agree that the appeal should be dismissed. In relation to point (vi) above, I would add that the court in focusing on the nature and justification of the demand, as the case law which I discuss below shows, has regard to, among other things, the behaviour of the threatening party including the nature of the pressure which it applies, and the circumstances of the threatened party.

2. Where I respectfully disagree with him is in my analysis of what the law has recognised as an illegitimate threat or pressure. As I will seek to show, the courts have developed the common law doctrine of duress to include lawful act economic duress by drawing on the rules of equity in relation to undue influence and treating as "illegitimate" conduct which, when the law of duress was less developed, had been identified by equity as giving rise to an agreement which it was unconscionable for the party who had conducted himself or herself in that way to seek to enforce. In other words, morally reprehensible behaviour which in equity was judged to render the enforcement of a contract unconscionable in the context of undue influence has been treated by English common law as illegitimate pressure in the context of duress.

3. The boundaries of the doctrine of lawful act duress are not fixed and the courts should approach any extension with caution, particularly in the context of contractual negotiations between commercial entities. In any development of the doctrine of lawful act duress it will also be important to bear in mind not only that analogous remedies already exist in equity, such as the doctrines of undue influence and unconscionable bargains, but also the absence in English law of any overriding

doctrine of good faith in contracting or any doctrine of imbalance of bargaining power. As I will seek to explain, the absence of those doctrines in English law leads me to conclude that Times Travel's claim for lawful act economic duress would not have succeeded in this case even if it had shown that Pakistan International Airline Corporation ("PIAC") had made what Lord Burrows has defined as a bad faith demand.

4. If one focuses on the few cases in which a remedy has been provided for what would now be analysed as lawful act duress, there are to date two circumstances in which the English courts have recognised and provided a remedy for such duress. The first circumstance is where a defendant uses his knowledge of criminal activity by the claimant or a member of the claimant's close family to obtain a personal benefit from the claimant by the express or implicit threat to report the crime or initiate a prosecution. The second circumstance is where the defendant, having exposed himself to a civil claim by the claimant, for example, for damages for breach of contract, deliberately manoeuvres the claimant into a position of vulnerability by means which the law regards as illegitimate and thereby forces the claimant to waive his claim. In both categories of case the defendant has behaved in a highly reprehensible way which the courts have treated as amounting to illegitimate pressure.

*(1) The first circumstance: exploitation of knowledge of criminal activity*

5. The examples of the first circumstance are the three cases to which Lord Burrows refers in para 89 of his judgment. In *Williams v Bayley* (1866) LR 1 HL 200 a son forged his father's signature indorsing promissory notes for substantial amounts of money. Representatives of the bank, on discovering the forgery, put pressure on the father to undertake to repay the sums. The representatives stated that they could not compound a felony (ie stifle a prosecution) and that conviction for the offence would involve transportation for life. The father, faced with this implicit threat to prosecute his son unless he took on the debt, undertook to pay the debt and granted an equitable mortgage of his property to secure it. The House of Lords held that the contract was illegal as it was an agreement to stifle a prosecution and, separately, the contract was invalid on the equitable ground that it had been procured by undue influence.

6. In *Kaufman v Gerson* [1904] 1 KB 591, the Court of Appeal refused to enforce a contract entered into by two people domiciled in France, by which the wife of A, who had misappropriated money belonging to B, undertook to pay to B the misappropriated amount in consideration of his not prosecuting her husband. Expert evidence established that such an agreement was valid in French law with the result that the defence of illegality failed. But the Court of Appeal upheld the defence of coercion; Collins MR stated (p 597) that it was "impossible to say that it was not

coercion to threaten a wife with the dishonour of her husband and children". Romer LJ (p 599) stated that the plaintiff had "extorted" the contract from the wife by threats of criminal proceedings against her husband if she did not comply. Mathew LJ (p 600) described the means by which the contract had been obtained as "unjust and immoral".

7. The third case, *Mutual Finance Ltd v John Wetton and Sons Ltd* [1937] 2 KB 389, involved the financial institution making an implied threat to prosecute a family member for forgery to obtain a guarantee from a family company. Joseph Wetton obtained a lorry on hire purchase by forging signatures on a guarantee which purported to be executed on behalf of the company. Neither his father nor his brother, Percy Wetton, was aware of the document at the time. The representative of the financial institution, when negotiating the signing of the replacement guarantee from the company, was aware that Percy Wetton was concerned that the prosecution of his brother would kill their father, who was seriously ill. By stressing the seriousness of the matter for Joseph Wetton, the representative sought to apply pressure to obtain the company guarantee. Porter J held that duress at common law could not be pleaded because he understood that duress was limited to duress of the person, by the use of unlawful force or threats of unlawful force. He invoked the equitable doctrine of undue influence and cited both *Williams v Bayley* and *Kaufman v Gerson* as examples of the principle that undue influence might exist where a promise was extracted by a threat to prosecute certain third persons unless that promise were given. He continued by asking himself whether the principle was wide enough to cover the case where the persons involved were the brother and father of the alleged criminal and answered that question in the affirmative, stating (p 396) that he was inclined to say that:

> "it extended to any case where the persons entering into the undertaking were in substance influenced by the desire to prevent the prosecution or possibility of prosecution of the person implicated, and were known and intended to have been so influenced by the person in whose favour the undertaking was given."

8. Those three cases pre-dated the development of the common law doctrine of lawful act duress and can be seen to rely on the equitable doctrine of undue influence which in the past would have been within the exclusive jurisdiction of the Chancery Courts. The coercion from the threat of prosecution of the third-party family member and the implied term of the contract which it extracted that no prosecution would take place, even where such a contractual term was legal under a governing foreign law, caused the courts to classify the behaviour of the person using the threat to obtain personal benefit as contrary to public policy, involving undue pressure or as unenforceable in equity.

9. Those three cases are now seen as examples of lawful act duress. In leading cases which have discussed the doctrine of lawful act duress, Steyn LJ in *CTN Cash and Carry Ltd v Gallaher Ltd* [1994] 4 All ER 714, 718 and Cooke J in *Progress Bulk Carriers Ltd v Tube City IMS LLC (The Cenk Kaptanoglu)* [2012] EWHC 273 (Comm); [2012] 2 All ER (Comm) 855, 864 ("*The Cenk K*") cited *Mutual Finance Ltd* as an example of an illegitimate threat in the context of the law of duress.

*(2) The second circumstance: using illegitimate means to manoeuvre the claimant into a position of weakness to force him to waive his claim*

10. The second circumstance in which the courts have upheld a plea of lawful act duress is illustrated by two cases.

11. In the first case, *Borrelli v Ting* [2010] UKPC 21; [2010] Bus LR 1718, the liquidators of Akai Holdings Ltd ("Akai"), which had collapsed into an insolvent winding up, wished to enter into a scheme of arrangement to obtain money to fund the liquidation. The scheme of arrangement needed shareholder approval and Mr Ting, Akai's former chairman and chief executive officer, held a crucial minority shareholding in Akai through Blossom Assets Ltd ("Blossom") and Costner Holdings Ltd ("Costner"), by which he could block the scheme of arrangement. Mr Ting failed to perform his duty as a former officer of Akai to assist the liquidators by providing information relevant to the winding up in the absence of adequate books and records of the company's affairs. He sought to use the votes of Blossom and Costner to block the scheme of arrangement and he forged a document and procured the provision of false evidence to the liquidators in his opposition to the scheme. The liquidators objected to the votes which were purportedly cast by Blossom and Costner at the scheme meetings and applied to the court to disallow their votes. Mr Ting and those companies opposed that application. When time was running out for the liquidators to meet a court deadline for approval of the scheme of arrangement, they entered into a settlement agreement with Mr Ting, Blossom, Costner and another company. In that agreement the liquidators undertook not to pursue any claims against Mr Ting or those companies and to cease all investigations relating to the legal proceedings or to claims against Mr Ting. Thereupon, Mr Ting and his companies dropped their opposition to the scheme, which was approved by the court. The scheme of arrangement was then completed, and the liquidators received the payment needed to conduct the liquidation. Having later received reports from the Hong Kong police concerning criminal activity by Mr Ting, the liquidators stated that they regarded the settlement agreement as unenforceable or voidable and commenced legal proceedings against him in Hong Kong for misappropriation of funds from Akai. Mr Ting and his companies raised legal proceedings in Bermuda seeking a declaration that the settlement agreement was valid and an injunction to restrain the liquidators from prosecuting the proceedings in Hong Kong.

12. The Judicial Committee of the Privy Council ("the Board") held that the settlement agreement was invalid because it had been entered into as a result of illegitimate economic pressure and that Mr Ting's behaviour had been unconscionable. Lord Saville of Newdigate, who delivered the judgment of the Board, founded on two findings of fact by the trial judge. The first was Mr Ting's deliberate failure to cooperate with the liquidators, including his failure to explain the absence of books and papers relating to the three years before Akai's collapse. The second finding was that Mr Ting had procured the opposition by Blossom and Costner to the scheme solely with the intention of depriving the liquidators of funds and so preventing them from investigating further his conduct of Akai's affairs. Mr Ting's opposition, Lord Saville said, was not in good faith but was for an improper motive. He stated (para 32):

> "In the view of the Board James Henry Ting's failure to provide any assistance to the liquidators; his opposition to the scheme; and his resort to forgery and false evidence in order to further that opposition amount to unconscionable conduct on his part. … [B]y agreeing to withdraw the opposition to the scheme James Henry Ting did no more than he should have done from the outset, had he acted in good faith rather than in an attempt to avoid responsibility for his conduct of the affairs of Akai Holdings Ltd."

Lord Saville repeated these points at para 35 of the Board's judgment and stated that by adopting those "illegitimate means", Mr Ting had left the liquidators "with no reasonable or practical alternative but to enter into the settlement agreement."

13. It is clear in my view that in *Borrelli* the Board treated as important the conclusion that it was the unconscionable or illegitimate conduct of Mr Ting which placed the liquidators in the position that they had no reasonable or practicable alternative but to enter into the settlement agreement. By so acting, Lord Saville stated, at para 31, Mr Ting "had the liquidators over a barrel". In other words, it was Mr Ting's illegitimate or unconscionable acts which placed the liquidators in the position of vulnerability with the result that they had no reasonable alternative but to agree to his demands.

14. In the second case in which the courts have upheld a claim of lawful act duress, *The Cenk K*, we again see a party, A, against whom the other party, B, has a legal claim, using illegitimate means to manoeuvre B into a position in which B has no reasonable alternative but to enter into a contract with A, by which B waives his claims against A. In this case the claimant charterers entered into a charterparty with the owners of the Cenk K for the carriage of shredded scrap metal to China. The charterers had entered into a contract to sell the scrap metal to purchasers in China

who had stipulated for a fixed shipment date. The owners, in repudiatory breach of the charterparty, chartered the Cenk K to another party but gave assurances to the claimant charterers that they would provide a substitute vessel to load the cargo at a later date and that they would compensate them for all damages resulting from their failure to provide the contracted vessel. In reliance on that assurance the charterers did not seek to find an alternative vessel. Several days later, the owners offered a substitute vessel which would have a delayed shipment date. The charterers negotiated with the Chinese purchasers to obtain their agreement to a later shipment date. The Chinese purchasers intimated that they would extend the shipment date but would only pay a reduced price per metric ton for the scrap. The owners offered to provide the substitute vessel at a discount on the freight which fell far short of the sum needed to compensate the charterers for the price reduction which the purchasers had demanded. The owners refused to offer a discount for the cargo which matched the reduced price which the purchasers were prepared to pay for the delayed shipment. The charterers informed the owners that they accepted the discount offered by the owners but reserved their rights to claim damages arising out of the breach of the charterparty. The charterers then accepted the purchasers' revisions to the sale contract and the reduced price per metric ton that that entailed. Later that day, the owners gave the charterers a "take it or leave it" offer, requiring that the charterers accept the substitute vessel at the discounted price for freight which they had offered and that they waive all claims for loss and damage arising out of the nomination of the substitute vessel outside the contracted laycan and its resulting late arrival. The charterers accepted the offer under protest, explaining that the circumstances were urgent and they needed to mitigate their losses and accommodate their Chinese purchasers.

15. The dispute went to arbitration and the arbitrators held that the waiver agreement was voidable for economic duress. They found that the owners had been in repudiatory breach of contract, had lulled the charterers into a false sense of security by their assurances, and had manoeuvred them into a position where, because of the passage of time, they had no choice but to accept the owners' "take it or leave it" offer. Cooke J, citing among other authorities *CTN Cash and Carry Ltd* and *Borrelli*, rejected the owners' appeal against the arbitrators' award. He held (para 36) that it was clear from the authorities that "illegitimate pressure" can be constituted by conduct which is not in itself unlawful "although it will be an unusual case where that is so." He continued: "It is also clear that a past unlawful act, as well as the threat of a future unlawful act can, in appropriate circumstances, amount to 'illegitimate pressure'." In para 40 he summarised the arbitrators' findings describing the owners' repudiation of the contract as "the dominant factor in the situation". He continued:

> "Whilst the arbitrators did not expressly find that the owners were in bad faith in what they did thereafter, it is clear that the arbitrators took the view that the owners had manoeuvred the

> charterers into the position they were in, following the breach, in order to drive a hard bargain. The charterers had no realistic practical alternative but to submit to the pressure …"

16. Cooke J summarised his conclusions on "illegitimate pressure" at para 44:

> "As I have already said, the pressure created by the owners in their demand for a waiver of rights by the charterers has to be seen both in the light of their repudiatory breach and in the light of their subsequent conduct, including their deliberate refusal to comply with the assurances they had previously given about providing a substitute vessel and paying full compensation in respect of that breach. Their refusal to supply the substitute vessel to meet the charterers' needs, *in circumstances which they had created by their breach and their subsequent misleading activity*, unless the charterers waived their rights, could readily be found by the arbitrators to amount to 'illegitimate pressure'. In my judgment, not only was that a finding which the arbitrators could properly reach when applying the correct test in law, … it was the right decision on the facts of this case." (Emphasis added)

*(3) Summarising the cases where the court has found lawful act duress*

17. The three earlier cases, *Williams v Bayley*, *Kaufman v Gerson* and *Mutual Finance Ltd*, were all cases in which the court treated the attempt by the party to uphold or enforce the contract as being unconscionable because of that party's behaviour. In *Borrelli*, the Board described Mr Ting's conduct as unconscionable and treated "illegitimate" as a synonym for unconscionable. In that case and *The Cenk K* it was the combination of (i) the existence of legal claims by B against A and (ii) the manoeuvring by A of B by reprehensible means into a vulnerable position where it had no alternative but to waive its pre-existing rights that amounted to illegitimate pressure.

18. It is noteworthy that in *Borrelli*, at paras 32 and 35, Lord Saville placed emphasis on Mr Ting's breach of his duty as an officer of the insolvent company and his dishonest behaviour in concluding that the pressure which he applied to the directors was illegitimate. Similarly, in *The Cenk K*, Cooke J focused not only on the ship owners' prior breach of contract but also on their subsequent "misleading activity": the context of the demand was that the owners had induced the charterers to rely on the owners' assurances to their detriment.

*(4) The influence of equity on lawful act duress*

19. The role of equity in the development of the common law of duress is apparent from wider case law in which there was no finding of lawful act economic duress. In *Barton v Armstrong* [1976] AC 104, 121, a case which concerned unlawful threats of violence, Lord Wilberforce and Lord Simon of Glaisdale in a dissenting judgment which has been quoted in later judgments, discussed the nature of illegitimate pressure. They stated:

> "out of the various means by which consent may be obtained - advice, persuasion, influence, inducement, representation, commercial pressure - the law has come to select some which it will not accept as a reason for voluntary action: fraud, abuse of relation of confidence, undue influence, duress or coercion. In this the law, *under the influence of equity*, has developed from the old common law conception of duress - threat to life and limb - and it has arrived at the modern generalisation expressed by Holmes J - 'subjected to an improper motive for action' - *Fairbanks v Snow*, 13 NE Reporter 596, 598." (Emphasis added)

20. The ideas of an improper motive for action or illegitimate pressure are closely aligned with the equitable concept of unconscionability. In *Universe Tankships Inc of Monrovia v International Transport Workers Federation (The Universe Sentinel)* [1983] 1 AC 366 Lord Diplock discussed the development of the common law of economic duress. He stated (p 384) that the rationale for this development of the common law was that a person's apparent consent to a contract had been induced by pressure exercised upon him by the other party "which the law does not regard as legitimate" with the result that the consent was treated as revocable. He continued:

> "It is a rationale similar to that which underlies the avoidability of contracts entered into and the recovery of *money exacted under colour of office, or under undue influence* or in consequence of threats of physical duress." (Emphasis added)

21. In *Huyton S A v Peter Cremer GmbH & Co* [1999] 1 Lloyd's Law Rep 620 Mance J at p 637 quoted the judgment of McHugh JA in the Supreme Court of New South Wales in *Crescendo Management Pty Ltd v Westpac Banking Corpn* (1988) 19 NSWLR 40, 46, to which Lord Goff referred in *Dimskal Shipping Co SA v International Transport Workers Federation (The Evia Luck)* [1992] 2 AC 152: "Pressure will be illegitimate if it consists of unlawful threats *or amounts to unconscionable conduct*." (Emphasis added) Mance J made a similar equation

between illegitimate pressure and unconscionable conduct at the end of his judgment (p 642) in which he stated that the pressure which Huyton applied was not a sufficiently significant cause of the agreement for it to be unconscionable for Huyton to insist on the agreement.

22. In *Borrelli*, Lord Saville referred to Mr Ting's conduct as "unconscionable". In *The Cenk K*, Cooke J (paras 34 and 35) referred to *Borrelli* and its reference to unconscionable conduct and to the textbooks which supported the view that the courts were willing to apply "a standard of impropriety". Lord Saville and Cooke J used the term "unconscionable" to describe the pressure applied by the person seeking to enforce the contract. The standard of impropriety is the high standard of unconscionability.

23. The place of lawful act economic duress in English law needs to be seen against the backdrop of the remedies which equity already provides. Unconscionability is not an overarching criterion to be applied across the board without regard to context. Were it so, judges would become arbiters of what is morally and socially acceptable. Equity takes account of the factual and legal context of a case and has identified specific contexts which call for judicial intervention to protect the weaker party. For example, the equitable doctrine of undue influence may result in a contract being set aside when two persons have a relationship in which A has acquired influence or ascendancy over B and A takes unfair advantage of its influence or ascendancy: *Royal Bank of Scotland Plc v Etridge (No 2)* [2002] 2 AC 773, paras 6-8 per Lord Nicholls of Birkenhead. It applies typically where there is a relationship of trust and confidence between A and B which A exploits to the detriment of B: "Chitty on Contracts" (ed Hugh Beale 33rd ed (2018)), paras 8-058 to 8-059.

24. Similarly, the equitable doctrine of unconscionable bargains has been applied where B is at a serious disadvantage relative to A through "poverty, or ignorance, or lack of advice or otherwise" so that circumstances existed of which unfair advantage could be taken; A exploited B's weakness in a morally culpable manner; and the resulting transaction was not merely hard or improvident but overreaching and oppressive: *Alec Lobb (Garages) Ltd v Total Oil (Great Britain) Ltd* [1983] 1 WLR 87, 94-95, per Peter Millett QC, sitting as a deputy High Court judge. See also "Snell's Equity" (John McGhee and Steven Elliott eds, 34th ed (2019), para 8-042). Examples of unconscionable transactions include circumstances in which A knowingly negotiates an agreement with B while B is elderly, unwell and intoxicated (*Blomley v Ryan* (1954) 99 CLR 362) and where a poor, illiterate and unwell person is induced to enter into a disadvantageous transaction without advice and in great haste (*Clark v Malpas* (1862) 4 De GF & J 401; 45 ER 1238). In *Fry v Lane* (1888) 40 Ch D 312, Kay J summarised the then existing case law in these terms (p 322): "where a purchase is made from a poor and ignorant man at a considerable undervalue, the vendor having no independent advice, a Court of Equity will set

aside the transaction." He held that the circumstances of poverty, ignorance and lack of independent advice impose on the purchaser the burden of showing that the purchase was fair, just and reasonable. Unequal bargaining power does not suffice; it is necessary for the claimant to show that unconscientious advantage has been taken of his or her disabling condition or circumstances: *Boustany v Pigott* (1993) 69 P & CR 298 (JCPC) at p 303 per Lord Templeman. Extortionate bargains can be struck down or varied in other circumstances; see, for example, *The Port Caledonia and the Anna* [1903] P 184 in which the court drastically reduced a claim for salvage where a ship's captain in an emergency had been forced to accept an extortionate offer from a tug captain for the provision of salvage services. But the rules relating to salvage may depend on specialties of maritime law: "Chitty on Contracts" (above), para 8-048.

25. While there is an overlap between duress as it has developed in English law and the equitable doctrines of undue influence and unconscionable bargains, it is of note that under neither equitable doctrine is inequality of bargaining power sufficient of itself to entitle B to relief.

*(5) The absence in English law of a doctrine of inequality of bargaining power and of a principle of good faith in contracting*

26. It is not in dispute that there is in English common law no doctrine of inequality of bargaining power in contract, although such inequality may be a relevant feature in some cases of undue influence: *National Westminster Bank Plc v Morgan* [1985] AC 686, 708 per Lord Scarman. As Lord Scarman observed in *The Universe Sentinel* (p 401), when he referred to the judgment of Lord Wilberforce and Lord Simon in *Barton v Armstrong*, in commercial life many acts are done under pressure and sometimes overwhelming pressure. In negotiating a commercial contract each party to the negotiations seeks to obtain contractual entitlements which he or she does not possess unless and until the parties agree the terms of the contract. Inequality of bargaining power means that one party in the negotiation of a commercial contract may be able to impose terms on a weaker party which a party of equal bargaining power would refuse to countenance. Equally, a party in a strong bargaining position, such as a monopoly supplier, may refuse outright to enter into a contract which the weaker party desires or may impose terms which the weaker party considers to be harsh. The courts have taken the position that it is for Parliament and not the judiciary to regulate inequality of bargaining power where a person is trading in a manner which is not otherwise contrary to law. See for example *Hilton v Eckersley* (1855) 6 E & B 47, 74-75; 119 ER 781, 792 per Baron Alderson; *Mogul Steamship Co Ltd v McGregor, Gow & Co* [1892] AC 25, 36 per Lord Halsbury LC; *OBG Ltd v Allan* [2007] UKHL 21; [2008] AC 1, para 56 per Lord Hoffmann; *CTN* (above), at p 717 per Steyn LJ, and in this case, at paras 103 and 107 per David Richards LJ.

27. The English law of contract seeks to protect the reasonable expectations of honest people when they enter into contracts. It is an important principle which is applied to the interpretation of contracts: Lord Steyn, "Contract law: Fulfilling the reasonable expectations of honest men" (1997) 113 LQR, 433-442, 433; and *Mannai Investment Co Ltd v Eagle Star Life Assurance Co Ltd* [1997] AC 749 at 771A per Lord Steyn. But, in contrast to many civil law jurisdictions and some common law jurisdictions, English law has never recognised a general principle of good faith in contracting. Instead, English law has relied on piecemeal solutions in response to demonstrated problems of unfairness: *Interfoto Picture Library Ltd v Stiletto Visual Programmes Ltd* [1989] QB 433, 439 per Bingham LJ; *MSC Mediterranean Shipping Co SA v Cottonex Anstalt* [2016] EWCA Civ 789; [2017] 1 All ER (Comm) 483, para 45 per Moore-Bick LJ.

28. The absence of these doctrines restricts the scope for lawful act economic duress in commercial life. In chapter 5 of his book, "The Use and Abuse of Unjust Enrichment" (Oxford 1991) Professor Jack Beatson (later to become Beatson LJ) discussed the development of the modern doctrine of economic duress and the severe limitations on its application in commercial negotiation. At pp 129-130 he explained the basic approach of the common law in these terms:

> "All that is not prohibited is permitted and there is no general doctrine of abuse of rights. If therefore a person is permitted to do something, he will generally be allowed to do it for any reason or for none. In the context of contractual negotiations this position enables people to know where they stand and provides certainty as to what is acceptable conduct in the bargaining process but it does leave many forms of socially objectionable conduct unchecked. Again, this is soundly based for judges should not, as a general rule, be the arbiters of what is socially unacceptable and attach legal consequences to such conduct."

He suggested (p 134) that the scope for lawful act duress in contractual negotiations was "extremely limited". I agree.

29. "Anson's Law of Contract", 31st ed (2020) (J Beatson, A Burrows and J Cartwright eds) similarly recognises this restrictive approach to the law of duress in contractual negotiations (p 379, ch 10.2(d)):

> "It is not ordinarily duress to threaten to do that which one has a right to do, for instance to refuse to enter into a contract or to terminate a contract lawfully. In the cut-and-thrust of business

> relationships various types of pressure may be brought to bear in differing situations. … [A] contracting party will not be permitted to escape from its contractual obligations merely because it was coerced into making a contract by fear of the financial consequences of refusing to do so. Although this approach leaves many forms of socially objectionable conduct unchecked, as a general rule the determination of when socially objectionable conduct which is not in itself unlawful should be penalized is for the legislature rather than the judiciary."

30. Against this commercial background the pressure applied by a negotiating party will very rarely come up to the standard of illegitimate pressure or unconscionable conduct. It will therefore be a rare circumstance that a court will find lawful act duress in the context of commercial negotiation.

*(6) The approach of other common law jurisdictions to economic duress*

31. A similar picture of circumspection in the application of lawful act duress in commercial negotiations emerges from a review of judgments in several leading common law jurisdictions.

32. As David Richards LJ demonstrated in his judgment in this case (paras 79-82), no clear picture of the existence and boundaries of lawful act duress has emerged throughout Australia. The Supreme Court of New South Wales recognised lawful act duress in *Crescendo Management* (above). McHugh JA's views in that case have been cited with approval by the Queensland Court of Appeal (*Mitchell v Pacific Dawn Pty Ltd* [2011] QCA 98, paras 50-52), the Court of Appeal of Western Australia (*Electricity Generation Corpn (trading as Verve Energy) v Woodside Energy Ltd* [2013] WASCA 36, paras 24-25, 174-176; see also *Morgan Stanley Wealth Management Australia Pty v Detata (No 3)* [2018] WASC 32, paras 236-237), and the Court of Appeal of Victoria (*Doggett v Commonwealth Bank of Australia* (2015) 47 VR 302, para 73; see also *Braam v BBC Hardware* [2020] VSCA 164, para 82). But the Court of Appeal of New South Wales in *Australia and New Zealand Banking Group Ltd v Karam* (2005) 64 NSWLR 149, para 66, and in *May v Brahmbhatt* [2013] NSWCA 309, paras 39-40, rejected the concept of lawful act duress, confining duress to threatened or actual unlawful conduct, thereby leaving the weaker party to invoke the equitable doctrines of undue influence and unconscionable transactions if it can.

33. The Australian textbook, Edelman and Bant, "Unjust Enrichment", 2nd ed (2016), p 217, approves of a restrictive approach to the undermining of commercial contracts which were entered into as a result of lawful commercial threats:

> "The general reluctance of courts to recognise lawful economic or commercial threats as disproportionate to commercial goals (and thus illegitimate) is to be applauded. Any other approach would cut across the statutory competition law rules which draw complex distinctions between lawful and unlawful commercial behaviour. … Only in the most exceptional circumstances, if at all, should it be illegitimate to threaten to engage in conduct which a plaintiff has a right to engage in and which is not proscribed by competition law. However, where the threatened conduct is non-commercial in nature, such as threats to publish information or threats to foster rumours about a company, a finding that the threat is disproportionate and therefore illegitimate may be more readily made."

The authors' reference to disproportionality has not been mirrored in English law but the emphasis on the need to avoid conflict with statutory competition law echoes concerns expressed in English case law that the regulation of inequality of bargaining power should as a general rule fall to Parliament. Further, the authors' recognition that there might be scope for non-commercial threats to fall within the doctrine of lawful act duress is salutary as the control of such threats by the common law would not cut against the grain of statutory regulation of unfair contract terms or consumer contracts.

34. The courts in New Zealand have recognised lawful act duress, adopting the approach of the House of Lords in *The Universe Sentinel*, but have taken a restrictive approach to it. Like the English courts, the courts in New Zealand have held that pressure is commonplace in commercial negotiation and only illegitimate pressure can support a case of duress: *McIntyre v Nemesis DBK Ltd* [2010] 1 NZLR 463 (CA). Illegitimate pressure has been equated with unconscionable conduct: *Magsons Hardware Ltd v Concept 124 Ltd* [2011] NZCA 559. More recently, the New Zealand Court of Appeal in *Dold v Murphy* [2020] NZLR 313 held that the doctrine of lawful act duress does not provide a remedy against hard-nosed commercial self-interest without more. The Court of Appeal rejected a claim of lawful act duress in circumstances where a minority shareholder, who had 6.2% of a company's shares, successfully demanded to be paid considerably more than the proportionate value of his shareholding when the other two shareholders, who between them held 93.8% of the shares, wished to accept a particularly valuable offer for all of the shares in the company. The court held that a threat not to enter into a contract, other things being equal, was most unlikely to be an unlawful or illegitimate act. In that case, Mr Murphy's opportunistic behaviour was not unlawful and the question of the genuineness of his belief in his entitlement did not arise: "he was entitled to act in his own self-interest, even if his actions were both unexpected and ungenerous."

35. This court was also referred to a judgment of the Court of Appeal of Singapore: *BOM v BOK* (2018) SGCA 83; (2018) 21 ITELR 607. This case was not concerned with commercial contracts or directly with the law of duress. It concerned a deed of trust which a husband had been induced to sign by his wife by means of misrepresentation and undue influence. The deed was set aside for mistake and undue influence, and as an unconscionable transaction in that the husband was suffering from an infirmity and the wife had to show that the transaction had been fair, just and reasonable. The case is indirectly relevant to this appeal in so far as it discussed and rejected a submission that Singapore law should adopt a new umbrella doctrine of unconscionability which subsumed duress and undue influence. Andrew Phang Boon Leong JA, delivering the judgment of the court, recognised, in paras 169-179, the linkages between the doctrines of undue influence and unconscionable bargain and the similarities in substance between duress and undue influence. Duress in Singapore law involves the exertion by a party of illegitimate pressure on the other party in the form of a threat which coerces the will of the other. Undue influence in Singapore law involves the plaintiff showing that he was suffering from an infirmity that the other party exploited in procuring the transaction. If that requirement is satisfied, the defendant has the burden of demonstrating that the transaction was fair, just and reasonable (para 142). The judge rejected an umbrella doctrine of unconscionability principally because there were no practically workable legal criteria which the court could use to determine what amounts to unconscionable behaviour that vitiates a contract. An umbrella doctrine, he said, would lead to excessive subjectivity, which would engender excessive uncertainty and unpredictability and would undermine the sanctity of contract.

36. While making clear the danger of judicial subjectivity if one were to adopt a general criterion of morally reprehensible conduct, the Singapore Court of Appeal did not discuss the meaning of "illegitimate pressure" in duress.

37. The Supreme Court of Canada has recognised the existence of economic duress as a potential defence to contractual enforcement in *Martel Building Ltd v Canada* [2000] 2 SCR 860, para 70 but the substantive case law is at the level of the provincial courts of appeal. Canadian jurisprudence, such as the judgments of the Court of Appeal for Ontario in *Stott v Merit Investment Corpn* (1988) 63 OR (2d) 545 and in *Techform Products Ltd v Wolda* (2001) 206 DLR (4th) 171, has considered English jurisprudence and jurisprudence of the Board, such as in *The Universe Sentinel* and *Pao On v Lau Yiu Long* [1980] AC 614, and has required illegitimate pressure as a component in the doctrine. In *Techform Products*, which concerned the ownership of inventions, the Court of Appeal (paras 34-38) referred to *CTN*, attached weight to the bona fide belief by the company that it owned the inventions in dispute, and saw as an important consideration the fact that the consultant had been allowed to take away the draft agreement, giving him ample opportunity to obtain legal advice. In *Stott* an employee in an investment firm was unexpectedly confronted by his manager without notice and given no opportunity to

consider his position or consult a lawyer before being required to sign a contract to pay off a debt owed to the company by a client in a context where he was justifiably fearful for his job. The court would have treated the case as one of economic duress and given a remedy but for the claimant's subsequent conduct which approbated the contract. In *Greater Fredericton Airport Authority Inc v NAV Canada* (2008) 290 DLR (4th) 405 the Court of Appeal of New Brunswick was critical of the importation from English law of the concept of illegitimate pressure as a condition precedent to a finding of economic duress, principally because of the lack of clarity as to when pressure moved from being legitimate to being illegitimate (paras 35-50 per Robertson JA). The Newfoundland and Labrador Court of Appeal followed Robertson JA's approach in *Fredericton* in *Burin Peninsula Community Business Development Corpn v Grandy* (2010) 327 DLR (4th) 752. The approach of the Court of Appeal for Ontario appears to be the dominant line of authority, but the decision of the Canadian Supreme Court in *Bhasin v Hrynew* [2014] 3 SCR 494 to recognise a general organising principle of good faith in contractual performance may have a significant influence on the direction of Canadian jurisprudence on the doctrine of economic duress. See Brandon Kain and Justin Nasseri, "Economic duress after *Bhasin v Hrynew*: does the organizing principle of good faith offer a new framework?" Archibald and Scott, Annual Review of Civil Litigation 2016. S M Waddams, "The Law of Contracts", 7th ed (2017) concludes that the courts can give relief from provisions in agreements which are "highly unreasonable or very unfair" and that the test for duress is one of unfairness or unconscionability: "whether the promisee has taken unfair advantage of inequality of bargaining power" (p 354, para 514 and p 358, para 520).

38. In the United States the Restatement (Second) of Contracts (1981, June 2020 update), which the American Law Institute produced, discusses when a threat is improper. It states in section 176, so far as relevant:

> "(1) A threat is improper if
>
> (a) what is threatened is a crime or a tort, or the threat itself would be a crime or a tort if it resulted in obtaining property,
>
> (b) what is threatened is a criminal prosecution,
>
> (c) what is threatened is the use of civil process and the threat is made in bad faith, or

> (d) the threat is a *breach of the duty of good faith and fair dealing under a contract* with the recipient." (Emphasis added)

The first heading addresses unlawful act duress. The second heading is the equivalent of the three lawful act duress cases to which I referred in paras 5-9 above. The fourth heading is influenced by the general duty of good faith and fair dealing in contract (viz Uniform Commercial Code para 1-304; Restatement (Second) of Contracts section 205), which does not have its counterpart in English law. Little guidance can therefore be gained from the fourth heading in the Restatement on the question of lawful act duress in English law.

39. In summary, several jurisdictions, such as Australia, New Zealand and Singapore, have adopted a circumspect approach to economic duress and lawful act duress. Jurisdictions with a general requirement of good faith in contract, such as Canada and the United States, may be expected to be more open to a claim of economic duress in the context of what Lord Burrows has described as a "bad faith demand".

*(7) CTN Cash and Carry Ltd and the "bad faith demand"*

40. Before turning to the judgment of the Court of Appeal in this appeal, I examine the earlier judgment of the Court of Appeal in *CTN Cash and Carry Ltd* [1994] 4 All ER 714 which featured prominently in the reasoning of David Richards LJ in his admirable judgment. In *CTN*, in contrast with the five judgments which I have discussed in paras 5-17 above, the Court of Appeal found that the impugned contract had not been obtained by duress.

41. CTN Cash and Carry Ltd ("CTN") traded at arm's length with Gallaher Ltd ("Gallaher") from whom it purchased consignments of cigarettes. Gallaher was the sole distributor in England of certain popular brands of cigarettes. Gallaher was not contractually bound to sell cigarettes to CTN and each sale was a separate contract on Gallaher's standard terms of business. Gallaher gave credit facilities to CTN which it could withdraw at its discretion at any time. The manager of one of CTN's warehouses ordered a consignment of cigarettes which Gallaher in error delivered to another of CTN's warehouses. When the mistake was discovered, Gallaher agreed to collect and deliver the consignment to the correct warehouse. But before that could be done, the entire consignment of cigarettes was stolen. Gallaher, believing, erroneously, that the goods were at CTN's risk at the time of the theft, demanded that CTN pay the purchase price of the consignment. CTN initially refused to pay but paid the contractual sum for the purchase when Gallaher threatened to withdraw its credit facilities in future dealings. CTN raised legal proceedings to recover the

£17,000 which it had paid, alleging that it had paid the sum under economic duress. The judge at first instance held that CTN had failed to make out a case for economic duress and the Court of Appeal dismissed CTN's appeal.

42. Steyn LJ delivered the first judgment. He identified three distinctive features of the case. First, he observed (p 717h-j) that the dispute arose out of arm's length commercial dealings between two trading companies. While Gallaher was in a sense in a monopoly position as the sole supplier of the brands, the control of monopolies was a matter for Parliament and the common law did not recognise the doctrine of inequality of bargaining power in commercial dealings. He stated: "The fact that the defendants were in a monopoly position cannot therefore by itself convert what is not otherwise duress into duress." Secondly, he observed that Gallaher could lawfully refuse to enter into any future contracts with CTN for any reason or for no reason at all and could similarly lawfully refuse to grant credit. The third characteristic of the case, which he regarded as "critically important", was that Gallaher thought in good faith that the goods were at CTN's risk when they were stolen: "[Gallaher's] motive in threatening withdrawal of credit facilities was commercial self-interest in obtaining a sum that they considered due to them" (p 718c). The combination of those three features meant that CTN's claim failed. Steyn LJ warned of the risk of introducing uncertainty into the commercial bargaining process: "The aim of our commercial law ought to be to encourage fair dealing between parties. But it is a mistake for the law to set its sights too highly when the critical enquiry is not whether the conduct is lawful but whether it is morally or socially unacceptable" (p 719b-c). He concluded:

> "Outside the field of protected relationships, and in a purely commercial context, it might be a relatively rare case in which 'lawful act duress' can be established. And it might be particularly difficult to establish duress if the defendant bona fide considered that his demand was valid. In this complex and changing branch of the law I deliberately refrain from saying 'never'. But as the law stands, I am satisfied that the defendant's conduct in this case did not amount to duress."

Farquharson LJ and Sir Donald Nicholls V-C agreed. The latter expressed concern at the outcome, which was that Gallaher retained the money notwithstanding that the basis on which it had sought and insisted on payment had since been shown to be false, and wondered if a claim might lie in unjust enrichment.

43. This judgment, although an important steppingstone in the development of the doctrine of lawful act duress and cited in later cases, is authority for what is <u>not</u> such duress and not for what is. It is unquestionably correct in its conclusion that CTN's payment was not recoverable on the ground of duress. Lord Burrows in his

judgment sees an implication in the Court of Appeal's reasoning that if Gallaher had sought the payment in bad faith and had exploited their monopoly position in the knowledge that the money was not due, the money would have been recoverable on the basis of economic duress. Steyn LJ's statement (p 718b-c) that Gallaher's bona fide belief that the goods were at the risk of CTN when they were stolen was "a third, and critically important, characteristic" of the case readily supports that view. Lord Burrows also derives support for that conclusion from (i) the judgment of David Richards LJ in this case and (ii) Mitchell, Mitchell and Watterson, "Goff and Jones on the Law of Unjust Enrichment", 9th ed (2016) who say at para 10-70:

> "If the claimants could have shown that when the defendants made their threat they knew that the goods were at the defendants' risk, then the claimants would surely have succeeded, for the money would then have been extorted from them, and commercial self-interest is not unbridled."

44. Although it is not necessary in order to determine this appeal to decide whether that is correct, I do not think that the Court of Appeal would have been right so to decide. The present case can be determined by applying the analysis of lawful act duress set out in paras 2-30 above, which is anchored in established legal principles. The analysis in the preceding paragraph is, with respect, not so anchored. As I have said (paras 26-30 above), there is no doctrine of inequality of bargaining power and no general principle of good faith in contracting in English law. A commercial party in negotiation with another commercial party is entitled to use its bargaining power to obtain by negotiation contractual rights which it does not have until the contract is agreed. A powerful commercial party, such as a monopoly supplier or monopoly purchaser, can impose onerous terms, for example demanding a premium, as a condition for entering into a transaction with another party. Steyn LJ does not suggest otherwise. The implication of his judgment may be that the dishonest assertion of a pre-existing entitlement to payment accompanied by a threat to carry out a lawful act, such as to withdraw credit arrangements on future contracts or to refuse to enter into further contracts, could amount to lawful act duress as a form of an abuse of right.

45. Lord Burrows would not confine lawful act duress to a claim based on a dishonest assertion by A of a pre-existing legal entitlement to payment which was implicitly the subject matter of the Court of Appeal's discussion in *CTN Cash and Carry Ltd*. Instead, he argues that A's demand for a waiver by B of a claim against A would amount to lawful act economic duress where (i) A did not genuinely believe that it had a defence to the claim - ie his "bad faith demand", and (ii) A has deliberately created or increased B's vulnerability to that demand.

46. In my view this would extend the doctrine of lawful act duress well beyond the position reached in the five cases which I have discussed in which such a claim succeeded.

47. Dealing, first, with *CTN Cash and Carry Ltd*, the circumstance which Steyn LJ appears to have envisaged, and which persuaded David Richards LJ in this case to recognise the existence of lawful act duress if the demand were made in bad faith, was simply the extreme inequality of bargaining power between A and B without any manoeuvring by A to create B's vulnerability in order to extract a concession.

48. A "bad faith demand" based on an asserted pre-existing entitlement may not be a rare occurrence in commercial life. Discreditable behaviour can be a feature of commercial activity. For example, it appears from the judgment of Sir Donald Nicholls V-C in *CTN* that, at the time of the hearing in the Court of Appeal, Gallaher had declined to repay the price of the stolen cigarettes although it knew by then both that its prior good faith demand was wrong in law and that it had no right to the money in dispute. There may therefore be a mischief which the law could address. But the extension of lawful act duress which may be implicit in Steyn LJ's judgment in *CTN Cash and Carry Ltd* would nonetheless give rise to at least three difficulties.

49. First, it would be difficult to anchor the extension in any recognised legal principle. Where B is induced by A's fraudulent representation to meet its demand, B may have a claim against A under the tort of deceit. But that is not the circumstance envisaged in *CTN* or by the Court of Appeal in this case. Where B is induced to meet A's demand because of the stark inequality of bargaining power which gives B no effective choice but to meet the demand which B knows is not justified, it is not obvious to me that, without more, B could have a claim for economic duress in the absence of a general principle of good faith in contracting or a doctrine of imbalance of bargaining power, neither of which currently exists. It is difficult in principle to distinguish such a circumstance from a circumstance in which A makes an exorbitant demand in the course of negotiations as a condition for entering into contractual relations with B.

50. Secondly, in the absence of an underlying principle, the extension of lawful act duress in this way would create unwanted uncertainty. There is, in my view, force in the concern that the extension of the concept of lawful act duress would risk creating unacceptable uncertainty in the sphere of commercial transactions: see Professor Graham Virgo, "The Principles of the Law of Restitution", 3rd ed (2015), pp 215-221. Lord Burrows seeks to avoid such uncertainty through the construct of the bad faith demand, but I do not accept that, without more, lawful act economic duress would exist even if there were such a bad faith demand. In my view the doctrine is more limited in the context of commercial relations.

51. Thirdly, the extension of lawful act duress in this way might be of limited utility. This is because, first, commercial organisations may enter into a dispute or commence litigation without an informed idea of their legal rights or any intention of seeking judicial resolution but with the aim of reaching a settlement of the dispute on better terms than are currently on offer. The vast majority of commercial disputes do not go to trial and are not expected to do so. Each organisation may have to reach its own view as to its entitlements and resolve the dispute accordingly. Secondly, it would be very difficult for B to establish its case because B would have to demonstrate A's subjective bad faith. The application of legal rules to a particular factual circumstance, such as when risk passes on a contract of sale, commonly involves questions of legal judgment on which legal advisers may reasonably differ. A party may be advised that it has an arguable case but that the application of the law to the facts of that case is uncertain. A party may proceed to make a claim on the basis of legal advice of a percentage chance of success. What is envisaged in the "bad faith demand" requirement in this context is that there is little, if any, uncertainty as to A's lack of entitlement, and that A makes its demand in the knowledge that it does not have the legal entitlement which it claims. B would succeed in its claim for lawful act duress only if it established that A did not genuinely believe that it had that entitlement.

52. I therefore do not accept that the lawful act doctrine could be extended to a circumstance in which, without more, a commercial organisation exploits its strong bargaining power or monopoly position to extract a payment from another commercial organisation by an assertion in bad faith of a pre-existing legal entitlement which the other organisation believes or knows to be incorrect.

53. Lord Burrows would extend the doctrine further. In his view *Borrelli* and *The Cenk K* support the conclusion that a demand by A that B waive a claim against it would be a "bad faith demand" if A did not genuinely believe that it had a defence to the claim. If A then used its bargaining power and nothing more to make B vulnerable to its demand or to increase B's vulnerability, the combination of the bad faith demand and the manoeuvring would, he argues, be sufficient to establish lawful act duress. I respectfully disagree for four reasons.

54. First, the demand for a waiver, to which A must know that it has no prior entitlement, is in principle no different from the demand for a sum of money as a pre-condition for entering into contractual relations in the context of a commercial negotiation, which I mentioned in para 44 above. Lord Burrows in para 125 of his judgment accepts that economic duress could not be made out in the latter circumstance. If the demand for money, which is supported by the assertion of A's bargaining power, does not give rise to a claim for duress, why should a demand for a waiver of a valid claim which is backed up in the same way?

55. Secondly, the absence of an identifiable principle to distinguish those two circumstances would increase the undesirable uncertainty in commercial transactions which I mentioned in para 50 above.

56. Thirdly, and in any event, bad faith plays a wider role in lawful act duress than merely the absence of belief in an entitlement to a pre-existing right or in the invalidity of a claim for which A seeks a waiver. In both *Borrelli* and *The Cenk K* the conduct of A by which A applied pressure to B involved bad faith or behaviour which was similarly reprehensible: para 18 above. In both cases it was the combination of the probable or at least possible validity of B's claim against A combined with A's behaviour of that nature which gave rise to the court's conclusion that the waiver had been obtained through the application of illegitimate pressure. In other words, bad faith is potentially relevant both to the content of the demand and to the context in which A makes its demand. To my mind, the two cases do not support Lord Burrows' model.

57. Fourthly, there is no support in either *Borrelli* or *The Cenk K* for the proposition that the mere assertion of bargaining power, such as a lawful threat to terminate an existing contract or to reduce the supply of goods under the contract in a way which the contract allowed, could without more amount to illegitimate pressure. Lord Burrows considers that PIAC's deliberate act of cutting its ticket allocation, thereby increasing Times Travel's vulnerability to its demand for a waiver of a claim that it was in breach of contract, was an act which was beyond the mere exercise of monopoly power and would have amounted to illegitimate pressure if PIAC had known that it had indeed broken its contract. I respectfully disagree and take a narrower view of the scope of lawful act economic duress in this context. The reduction of the ticket allocation was a hard-nosed exercise of monopoly power, which, in the absence of a doctrine of unequal bargaining power, could not by itself amount to illegitimate pressure. Something more was needed, such as the reprehensible characteristics of the behaviour in *Borrelli* and *The Cenk K* to which I have referred in para 18 above. As I have said (para 28 above) the scope for lawful act economic duress is extremely limited in the sphere of commercial transactions.

*(8) The Court of Appeal's judgment in this case*

58. In my view the Court of Appeal was correct to conclude that the claimants had not made out a case of economic duress. The court was correct to conclude that it would be rare that in a commercial context the use by A of lawful pressure to induce B to concede to a demand would amount to economic duress. Significantly, there are no findings that PIAC had used any reprehensible means such as were evident in *Borrelli* and *The Cenk K*, to manoeuvre Times Travel into a position of increased vulnerability in order to exploit that vulnerability. PIAC gave notice on 14 September 2012 that Times Travel's contract would be terminated at the end of

October 2012. On 17 September PIAC cut Times Travel's fortnightly allocation of tickets from 300 to 60, as under its existing contract it was entitled to do. At the meeting on 24 September 2012 PIAC gave Times Travel a "take it or leave it" option: to sign the new agreement with the waiver and thus regain its prior allocation of tickets, or its agency would come to an end on the expiry of the existing contract. While this entailed hard-nosed commercial negotiation that exploited PIAC's position as a monopoly supplier, it did not involve the reprehensible means of applying pressure which gave rise to the findings of lawful act economic duress in *Borrelli* and *The Cenk K*. There are also no findings that PIAC acted in bad faith in making the demands which it did.

59. Where I respectfully disagree with David Richards LJ is in para 62 of his judgment in which he states:

> "In my view, *CTN Cash and Carry Ltd v Gallaher* … can be taken to establish that where A uses lawful pressure to induce B to concede a demand to which A does not bona fide believe itself to be entitled, B's agreement is voidable on grounds of economic duress."

Taken literally this might refer to a demand in a negotiation for a contractual term which did not yet exist rather than only the assertion of an alleged pre-existing right; but it is clear in context that David Richards LJ had the latter assertion in mind. Thus, at para 96 he states:

> "If Gallaher had made its demand in bad faith, not believing it to be *well founded*, the court would have held the payment to have been made under duress." (Emphasis added)

It may indeed be correct that the Court of Appeal in *CTN* would have so held. But, for the reasons set out above, I do not think that the court would have been correct to reach that conclusion, absent circumstances which involved the manoeuvring by Gallaher of CTN into a position of vulnerability by means which involved bad faith or were similarly reprehensible and went beyond the use of its position as a monopoly supplier, or which brought the transaction within the ambit of the equitable doctrine of unconscionable transactions.

60. In this case, on the facts found by Warren J, PIAC believed in good faith that it was not liable for breach of contract as a result of its failure to pay past commission and, in any event, the pressure which it applied to obtain the waiver was the assertion of its power as a monopoly supplier.

*9. Conclusion*

61. I would dismiss the appeal.

**LORD BURROWS:**

**1. Introduction and overview**

62. Duress in the law of contract focuses on an illegitimate threat (or illegitimate pressure) which induces a party to enter into a contract. If duress is established, the remedy for the threatened party is rescission of the contract (sometimes referred to as the avoidance, or setting aside, of the contract). In this case, we are concerned with that form of duress that has been labelled "economic duress". Economic duress was first recognised in English law in first instance cases in the 1970s (*Occidental Worldwide Investment Corpn v Skibbs A/S Avanti* [1976] 1 Lloyd's Rep 293 and *North Ocean Shipping Co Ltd v Hyundai Construction Co Ltd* [1979] QB 705) and was authoritatively accepted by the House of Lords in *Universe Tankships Inc of Monrovia v International Transport Workers Federation (The Universe Sentinel)* [1983] 1 AC 366. Prior to those cases, the conventional view was that the common law recognised only duress of the person and, as regards the restitution of non-contractual payments (but not the avoiding of a contract: *Skeate v Beale* (1841) 11 Ad & El 983), duress of goods. Although economic duress may take various forms, the main example of it in the case law is where one contracting party threatens to break a contract unless the other contracting party agrees to do something (for example, to pay extra money for completion of the promised performance). However, in this case, we are not concerned with where what is threatened (or the relevant pressure) is unlawful, such as a threatened breach of contract or tort. Rather we are crossing a line to where what is threatened is lawful. In other words, we are concerned with what has been termed "lawful act duress". We have heard submissions on, and need to answer, fundamental questions such as, does lawful act duress exist and, if so, what is its scope? To decide this appeal, we then need to apply those answers to the facts of this case.

63. The claimant, Times Travel (UK) Ltd ("TT"), is a travel agent in Birmingham. At the relevant time, its business almost entirely comprised selling tickets for flights to Pakistan on planes owned by the defendant, Pakistan International Airlines Corporation ("PIAC"). PIAC is the national flag carrier airline of Pakistan and, at the relevant time, it was the only airline operating direct flights between the UK and Pakistan. Disputes arose between various travel agents and PIAC as to non-payment of commission that the travel agents claimed was owed to them on the sale of PIAC tickets. PIAC threatened to end any contractual

relationship with TT, as it was legally entitled to do, unless TT entered into a new contract under which, inter alia, TT released PIAC from all claims that TT might have against PIAC in relation to commission under the previous contract. TT subsequently sought to rescind the new contract for duress thereby freeing it to recover the commission, which it claimed it was owed, under the previous contract.

64. At first instance, [2017] EWHC 1367 (Ch), Warren J held that TT was entitled to rescind the contract for economic duress. But that decision was overturned by the Court of Appeal, [2019] EWCA Civ 828; [2020] Ch 98, with the leading judgment being given by David Richards LJ, with whom Moylan and Asplin LJJ agreed. The Court of Appeal held that, as the relevant threat was lawful, duress could only be established if PIAC's demand, that TT give up its claims for commission, had been made in bad faith in the sense that PIAC must not have genuinely believed that it had a defence to TT's claims for commission. It followed that, as Warren J had found that PIAC did genuinely believe that it had a defence to the main claims for past commission - and that, even in relation to a relatively minor claim, where there was clearly no defence, Warren J had still not found that PIAC had been acting in bad faith - lawful act duress was not made out. According to the Court of Appeal, it is insufficient for lawful act duress that PIAC's belief, that it had a valid defence, was unreasonable: in the context of lawful act duress, there is a critical distinction between bad faith demands and unreasonable demands. TT appeals to the Supreme Court against that decision of the Court of Appeal.

## 2. The facts

65. It took Warren J over 200 paragraphs to cover the factual ground. He faced significant difficulties. Agreements were reached orally as well as in writing and the events extended over several years. His task was further complicated because he was having to make factual findings in respect of two claimants (TT and Nottingham Travel (UK) Ltd) in respect of whom the facts were similar but not the same. In the circumstances, it is perhaps not surprising that one needs to jump about in Warren J's judgment in order to piece together his essential findings of fact in relation to the claims brought by TT which is the sole claimant with whom we are concerned in this appeal.

66. TT entered into a relationship with PIAC in 2006, initially using the International Air Transport Association ("IATA") agency licence of its partner, Gazelle Travel. TT was paid a basic commission of 9% on ticket sales and, until the end of June 2008, was also paid an overriding commission ("ORC"). Towards the end of 2008 (the precise date is nowhere made clear), TT obtained its own IATA licence and began trading as an IATA-approved passenger sales agent of PIAC in its own right. The contract between PIAC and TT included the standard form IATA Passenger Sales Agency Agreement (in the form of IATA Resolution 824). This

required PIAC to remunerate TT for the sale of tickets in a manner and amount stated from time to time to TT by PIAC; and the contract could be terminated at the end of a month by giving at least a month's notice in writing.

67. It is not in dispute between the parties that this was a one-sided contract. Nigel Jones QC, counsel for PIAC, did not shy away from this. On the contrary, in his opening oral submissions, he recognised that TT was the weaker party and had taken the risk of building up its business by an almost exclusive reliance on PIAC without legal safeguards. PIAC could choose to terminate TT's contract, and effectively end its business, simply by giving the required short period of notice.

68. The parties used IATA's accounting system known as the "BSP", which was shorthand for IATA's "Billing and Settlement Plan". All IATA agents were required to use this system. As Warren J explained, [2017] EWHC 1367 (Ch), at para 10:

> "[U]nder the accounting system … an agent was obliged to pay all the fare applicable into the BSP which collates all sales and ticketing done through the booking system and produces a report on a weekly basis. The BSP is designed to facilitate and simplify the selling, reporting and remitting procedures of IATA Accredited Passenger Sales Agents and to ensure that there is a definitive accounting between the agent and the carrier. IATA collected ticket revenue by direct debit through the BSP system. I note that the claimants' claims … are all based on figures derived from the BSP …"

69. It is not clear when issues first arose about the non-payment of commission allegedly owed by PIAC to its UK travel agents. But on 25 February 2011 and, particularly importantly for this case, on 25 October 2012, actions were commenced by a number of UK travel agents against PIAC. Under pressure from PIAC, especially exerted in September 2012, TT did not join in with those legal actions. In September 2012, PIAC gave notice that the contract with TT would be terminated at the end of October 2012 and TT's normal ticket allocation was suddenly cut from 300 to 60. It is not in dispute that PIAC was acting within its legal rights in doing so: ie it was not acting in breach of contract in giving the notice of termination or in cutting the number of tickets. But under the threat of PIAC not continuing with their contractual relationship, and therefore not supplying them with tickets to sell, TT reluctantly agreed to accept an onerous waiver term (clause 6(2)) in a new agreement with PIAC (which included an agent productivity scheme) with effect from 1 November 2012.

70. To understand the significance of the sudden cutting of the ticket allocation and the general manoeuvring by PIAC of TT into a particularly vulnerable position, under which TT had no reasonable alternative but to bow to PIAC's demands, it is worth setting out two paragraphs from David Richards LJ's judgment in the Court of Appeal.

> "13. On 14 September 2012, PIAC sent a notice of termination to Times Travel, as it did also to all other agents in the UK, terminating its appointment with effect from 31 October 2012. The notice also stated that PIAC offered terms of re-appointment as set out in an attached document. On 17 September 2012, PIAC reduced Times Travel's fortnightly allocation of tickets from 300 to 60. As the judge found, this reduction in ticket allocation had a major impact on Times Travel's business and, if continued for much longer, would have put it out of business. It is not suggested that PIAC was acting in breach of contract, or otherwise unlawfully, in reducing the ticket allocation.
>
> 14. At a meeting on 24 September 2012, Times Travel signed a new agreement with PIAC … The New Agreement, already signed on behalf of PIAC, was provided to the representatives of Times Travel. Earlier in September 2012, Asrar Ahmad [one of the two directors of TT, the other being his son] had been shown a draft of the agreement but his request to take a copy with him, in order to read it carefully, discuss it with his son and obtain legal advice, had been refused."

71. Under clause 6(2), TT released any claims it might have against PIAC for unpaid commission under the previous contract(s). Clause 6 read as follows:

> "In consideration for [the Agent Productivity Scheme] 1 July to 31 December 2012 as set out in Appendix I it is agreed that:
>
> (1) The aforesaid scheme supersedes, nullifies, voids and replaces any and all previous incentive arrangements made or binding as between PIAC, its directors, officers and employees and the Agent and/or anybody representing the Agent of any nature whatsoever and howsoever arising.

> (2) The Agent hereby agrees to release and discharge PIAC, its directors, officers and employees from any and all claims, costs, liabilities or actions of any nature whatsoever and howsoever arising which have, may now or in the future arise from, or otherwise be connected in any way whatsoever with any commission or remuneration, or the calculation of the amount of any commission or remuneration, due to the Agent from PIAC on any basis other than as set out in the New Agreement."

72. TT subsequently commenced a claim against PIAC on 31 December 2014 alleging, inter alia, that it was entitled to rescind the new agreement because TT had entered into it under economic duress; and, consequent to the rescission of that new agreement, TT claimed that it was entitled to unpaid commission (for the period prior to 1 November 2012) under three main heads.

73. The three main heads of commission claimed by TT (for the period prior to 1 November 2012) were as follows:

*(1) The claim for 9% basic commission*

TT claimed that it was entitled to 9% basic commission after 31 October 2010 and until 31 October 2012. PIAC disputed that, arguing that, after 16 October 2010, the 9% basic commission had been replaced by what was termed "net sale remuneration"; and that TT had been given notice of this on or around 23 September 2010. This was the largest claim of the three. According to the judgment of David Richards LJ, [2019] EWCA Civ 828; [2020] Ch 98, at para 26, it amounted to £1.215m exclusive of interest (at the time of Warren J's judgment).

*(2) The ORC claim*

TT claimed that it was entitled to be paid overriding commission after 30 June 2008 until 31 October 2012. PIAC disputed that claim, arguing that it had been entitled to, and did, stop paying ORC after 30 June 2008. According to the judgment of David Richards LJ, at para 26, "on a very rough basis [this claim] must have been of the order of £250,000-£300,000" (at the time of Warren J's judgment).

*(3) The YQ commission claim (prior to October 2010)*

TT claimed that the basic commission should have been worked out by including the fuel surcharge on the ticket price. This was referred to as the "YQ commission". PIAC disputed that, arguing that, prior to the end of October 2010, it was entitled to, and therefore did, stop paying the YQ commission. Compared to the other two heads of claim, the sum claimed here was relatively trivial. According to the judgment of David Richards LJ, at para 26, it amounted to £56,639 (at the time of Warren J's judgment).

74. It is important to clarify what Warren J decided about those three heads of claim (assuming that there had been no valid waiver of them by TT). He held that TT was entitled to succeed on the 9% basic commission claim and on the YQ claim but not on the ORC claim. More specifically:

*(1) The claim for 9% basic commission*

Warren J held that TT was entitled to succeed on the 9% basic commission claim (see [2017] EWHC 1367 (Ch) at paras 203, 224, 260(v)). However, and this is a very important finding of fact, he found at para 260(i) that PIAC considered, and Warren J had no reason to doubt that PIAC genuinely believed, that the 9% basic commission had ceased to be payable, and had been replaced by net sales remuneration, in October 2010. Para 260(i) reads:

> "PIAC considered (wrongly, as I have held, but I have no reason to doubt that PIAC genuinely believed it to be true) that the 9% Basic Commission had ceased to be payable, having been replaced by Net Sales Remuneration in October 2010."

*(2) The ORC claim*

Warren J held that TT was not entitled to succeed on the ORC claim (ie after 30 June 2008, TT was not entitled to ORC) (see [2017] EWHC 1367 (Ch) at paras 223-224). Nevertheless, the claim was, on the part of TT, "genuine and arguable" (para 260(v)).

*(3) The YQ commission claim (prior to October 2010)*

Warren J thought that the (relatively trivial) YQ claim for the period prior to October 2010 was very strong and that TT would have been entitled to summary judgment on it (see [2017] EWHC 1367 (Ch) at paras 224, 260(v), 262(i)). As regards YQ commission for the period after October 2010, TT

would also have had to succeed on its claim to 9% basic commission (which, as we have seen, it would have done). But even in respect of the YQ claim for the period prior to October 2010, Warren J did not find that PIAC had acted in bad faith. In para 262, Warren J said the following:

> "(i) The case concerning YQ at least prior to October 2010 was very strong. I feel confident that summary judgment would have been given. PIAC ought to have paid 9% commission on the YQ element in respect of the periods prior to October 2010 before the New Agreement was signed. …
>
> (ii) Whether PIAC has acted in good faith or bad faith is moot. The Claimants have not established that there was bad faith but nor has PIAC established good faith. It is clear to me that the whole basis on which the Notice was served and the terms of the New Agreement were formulated was to ensure that agents would lose their claims to accrued rights in a situation where some of those rights (in particular, 9% commission on YQ) were clear. Indeed, Mr Schama accepted that this was the motivation for the Notice. Whether this demonstrates bad faith is a matter on which different minds might take different views."

75. I should stress that, in respect of the quantum of the sums claimed under each of the three heads, I am relying on the judgment of David Richards LJ. In turn he was relying on a schedule put before Warren J by TT in March 2018 in what I assume was one of the "account" hearings dealing with working out the sums to be paid under his judgment. But as David Richards LJ commented, at para 26, the position on the amounts under the three heads of claim "is not entirely clear". Moreover, it is nowhere made clear what sums of commission TT had been paid although I note that, in para 26, David Richards LJ said that, against the principal sum of £1.27m claimed for the 9% basic commission, "[TT] had to give credit for income of some £435,000 received in respect of ticket sales between October 2010 and October 2012".

## 3. Claims other than for rescission for duress

76. Apart from the claim for rescission based on economic duress, there were claims by TT against PIAC for rescission on the ground of misrepresentation and for breach of a collateral contract. The claim for misrepresentation failed before Warren J. The claim for breach of a collateral contract succeeded but Warren J held that TT could not both rescind the new agreement for economic duress and rely on

the collateral contract. It had to choose one or the other. In the event, TT chose rescission of the new agreement and so the claim for breach of a collateral contract fell away. There was no appeal by TT (or PIAC) in relation to either of those claims. There was similarly no appeal by TT against Warren J's decision that clause 6(2) (the waiver term) did not fall foul of the Unfair Contract Terms Act 1977.

77. It is also important at the outset to be clear that, putting to one side misrepresentation (which is no longer in issue), TT has sought rescission of the new agreement solely on the basis of economic duress. It has not sought to invoke the law on "unconscionable bargains". That area of the law deals not with illegitimate threats or pressure but with the exploitation by A of a weakness of B by entering into a contract that is clearly disadvantageous to B who has not obtained independent advice. In almost all past English cases on unconscionable bargains, B has been an individual with a mental weakness such as inexperience, confusion because of old age or emotional strain: see, eg, *Earl of Aylesford v Morris* (1873) 8 Ch App 484; *Fry v Lane* (1888) 40 Ch D 312; *Cresswell v Potter (Note)* [1978] 1 WLR 255; *Backhouse v Backhouse* [1978] 1 WLR 243; *Boustany v Pigott* (1993) 69 P & CR 298; *Chitty on Contracts*, 33rd ed (2018), paras 8-132 to 8-142. But it is not inconceivable that the relevant weakness could be the very weak bargaining position of a company; and this possibility was recognised 35 years ago by the Court of Appeal in *Alec Lobb Garages Ltd v Total Oil (Great Britain) Ltd* [1985] 1 WLR 173. Although some of the submissions of Philip Shepherd QC, counsel for TT, might be thought to have been steering in the direction of the law on unconscionable bargains, that was not the basis on which TT's claim was put. The *Alec Lobb* case was not relied on and, for example, there was no evidence as to whether independent advice was taken by TT (although we do know that PIAC did not allow TT to take away draft copies of the new agreement prior to signing). This appeal is therefore solely concerned with the claim for rescission based on economic duress.

## 4. The essential elements of duress

78. Where it is alleged that one contracting party (the defendant) has induced the other contracting party (the claimant) to enter into the contract between them by duress, the case law has laid down that there are two essential elements that a claimant needs to establish in order to succeed in a claim for rescission of the contract. The first is a threat (or pressure exerted) by the defendant that is illegitimate. The second is that that illegitimate threat (or pressure) caused the claimant to enter into the contract. As Lord Goff said, in the context of economic duress, in *Dimskal Shipping Co SA v International Transport Workers' Federation (The Evia Luck) (No 2)* [1992] 2 AC 152, 165:

> "[I]t is now accepted that economic pressure may be sufficient to amount to duress [which would entitle a party to avoid a

> contract] provided at least that the economic pressure may be characterised as illegitimate and has constituted a significant cause inducing the plaintiff to enter into the relevant contract …"

79. It is also important that, in the context of economic duress (but the position appears to be different in respect of other forms of duress: see *Astley v Reynolds* (1731) 2 Stra 915), there is a third element. This is that the claimant must have had no reasonable alternative to giving in to the threat (or pressure): see, for example, Dyson J in *DSND Subsea Ltd (formerly DSND Oceantech Ltd) v Petroleum Geo-Services ASA* [2000] BLR 530, para 131; *Borrelli v Ting* [2010] UKPC 21; [2010] Bus LR 1718, para 35.

80. As both parties accepted, the dispute in this case is solely concerned with the first element: the illegitimacy of the threat or pressure. It is not in dispute that the claimant can establish causation and that it had no reasonable alternative to giving in to the threat.

81. It should be noted that it was not argued by TT that the breach of contract by PIAC, in failing to pay commission owed, meant that this was a case of unlawful, rather than lawful, act duress. In my view, this acknowledgement by TT that we are here concerned with lawful act duress was correct. A breach of contract in failing to pay past commission was not the relevant threat or pressure inducing TT to enter into the new agreement. As set out in para 69 above, it was the threat of PIAC not continuing the contractual relationship with TT, and therefore not supplying TT with tickets to sell - which PIAC was legally entitled not to do - that induced TT, reluctantly, to enter into the new agreement.

## 5. Does lawful act duress exist?

82. Lawful act duress is controversial. This is essentially because many contracts are entered into under some form of pressure exerted by the other party and, plainly, one would not wish to undermine all such contracts. An insistence that the threat must be one to do something unlawful draws a clear line with a standard that is easily understood and can easily be applied. But once one crosses that line to include threats of lawful acts, it is not easy to distinguish between threats that will count as duress and threats that will not. Peter Birks, in *An Introduction to the Law of Restitution*, revised ed (1989), at p 177, expressed this difficulty as follows:

> "Can lawful pressures also count? This is a difficult question, because, if the answer is that they can, the only viable basis for

> discriminating between acceptable and unacceptable pressures is not positive law but social morality. In other words, the judges must say what pressures … are improper as contrary to prevailing standards. That makes the judges, not the law or the legislature, the arbiters of social evaluation."

See also the helpful discussion by Jack Beatson in *The Use and Abuse of Unjust Enrichment* (1991), pp 129-134, especially p 130.

83. The fear of wide-ranging disruption and uncertainty, particularly for commercial parties, has led some distinguished commentators to argue that lawful act duress should not exist. For example, Graham Virgo, *The Principles of the Law of Restitution*, 3rd ed (2015), p 218 writes:

> "[D]espite the recent explicit recognition that a lawful threat can still be an illegitimate threat for economic duress, the better view is that only unlawful threats should suffice. A lawful threat may still result in restitution, but only … if the more stringent test of unconscionability is satisfied. This ensures that the law does not intervene unacceptably in commercial markets. Where a defendant has obtained a benefit as a result of an unlawful threat which caused the benefit to be transferred, it is appropriate for restitution to be awarded. Where the benefit was obtained as the result of a lawful threat, it is only appropriate to award restitution where the defendant's conduct is characterised as unconscionable …"

84. Similarly, in their excellent case-note on the Court of Appeal's decision in this case, Paul Davies and William Day, "*'Lawful Act' Duress (Again)*", (2020) 136 LQR 7, 12, write:

> "[W]e suggest that the Supreme Court should jettison the concept of lawful act duress. The lack of reported cases applying the doctrine demonstrates that there would be no gap in the law if lawful act duress were abolished, and the welcome effect would be to place the law of contract on a more certain and stable footing, avoiding protracted and expensive litigation about the existence and scope of lawful act duress. Whereas the Court of Appeal in [*CTN Cash and Carry Ltd v Gallaher Ltd* [1994] 4 All ER 714] took a 'never say never' approach to the possibility of lawful act duress, it is to be hoped that the

> Supreme Court in *Times Travel* will be more definitive and explicitly reject such an open-ended doctrine."

85. I am also conscious that lawful act duress has been rejected by the Court of Appeal of New South Wales in *Australia and New Zealand Banking Group Ltd v Karam* [2005] NSWCA 344; (2005) 64 NSWLR 149 (albeit that one needs to be careful in making comparisons given that particular statutory interventions in that jurisdiction may be thought relevant). Here the defendants were directors of a company in serious financial difficulties. The claimant bank gave them financial assistance in return for the defendants securing the company's debts by giving personal guarantees and mortgages over their own property. It was held that the personal guarantees and mortgages should not be set aside for duress or unconscionable conduct. In a joint judgment of the Court, Beazley JA, Ipp JA and Basten JA said the following, at para 66:

> "[First, the] vagueness inherent in the terms 'economic duress' and 'illegitimate pressure' can be avoided by treating the concept of 'duress' as limited to threatened or actual unlawful conduct … Secondly, if the conduct or threat is not unlawful, the resulting agreement may nevertheless be set aside where the weaker party establishes undue influence (actual or presumptive) or unconscionable conduct based on an unconscientious taking advantage of his or her special disability or special disadvantage … Thirdly, where the power to grant relief is engaged because of a contravention of a statutory provision such as section 51AA, section 51AB or section 51AC of the *Trade Practices Act*, the Court may be entitled to take into account a broader range of circumstances than those considered relevant under the general law."

86. Despite that support for the non-recognition or abolition of lawful act duress, it is my view (as it was the view of Birks in the continuation of the passage cited in para 82 above) that lawful act duress does, and should, exist as a ground for rescinding a contract (or for the restitution of non-contractual payments) in English law. There are three reasons for this.

87. The first reason is that, although the facts of the leading cases of *The Universe Sentinel* and *The Evia Luck (No 2)* concerned alleged unlawful act duress - by threats to commit a tort in the context of the "blacking" of ships sailing under flags of convenience - the House of Lords chose to use the language of the pressure needing to be "illegitimate" not "unlawful". In the former case, Lord Diplock (with whom Lords Cross and Russell agreed), after recognising the development of the common law to include economic duress, continued at p 384:

> "It is, however, in my view crucial … to identify the rationale of this development of the common law. It is not that the party seeking to avoid the contract which he has entered into with another party, or to recover money that he has paid to another party in response to a demand, did not know the nature or the precise terms of the contract at the time when he entered into it or did not understand the purpose for which the payment was demanded. The rationale is that his apparent consent was induced by pressure exercised upon him by that other party which the law does not regard as legitimate, with the consequence that the consent is treated in law as revocable unless approbated either expressly or by implication after the illegitimate pressure has ceased to operate on his mind."

And, in *The Evia Luck*, as we have seen in the passage set out above in para 78, Lord Goff, giving the leading speech in the House of Lords, referred to the economic pressure needing to be "illegitimate".

88. The second reason is that the crime of blackmail, which is contained in section 21 of the Theft Act 1968, clearly includes threats of lawful action. Under section 21(1):

> "A person is guilty of blackmail if, with a view to gain for himself or another or with intent to cause loss to another, he makes any unwarranted demand with menaces; and for this purpose a demand with menaces is unwarranted unless the person making it does so in the belief -
>
> (a) that he has reasonable grounds for making the demand; and
>
> (b) that the use of the menaces is a proper means of reinforcing the demand."

Classic examples of (the actus reus of) blackmail involving lawful threats would be a threat by A, unless money is paid by B, to reveal true information about B to a newspaper or to B's family or to the police. Although the link between the crime of blackmail and lawful act duress has to be very carefully handled to avoid circularity - this is best done by excluding the possibility of the crime of blackmail having been committed when considering what counts as lawful act duress - it would be very odd for the civil law of duress not to include threats of lawful acts when the criminal law

of blackmail does so. Lord Scarman expressly drew an analogy with blackmail in *The Universe Sentinel* at p 401:

> "The origin of the doctrine of duress in threats to life or limb, or to property, suggests strongly that the law regards the threat of unlawful action as illegitimate, whatever the demand. Duress can, of course, exist even if the threat is one of lawful action: whether it does so depends upon the nature of the demand. Blackmail is often a demand supported by a threat to do what is lawful, eg to report criminal conduct to the police. In many cases, therefore, 'What [one] has to justify is not the threat, but the demand ...': see per Lord Atkin in *Thorne v Motor Trade Association* [1937] AC 797, 806."

89. The third reason is that there have been several cases - and not just recent cases - in which it has been accepted that threats of lawful action should entitle the threatened party (the claimant) to rescind a contract (or to have the restitution of non-contractual payments). A long-established area, although traditionally thought of as within the equitable doctrine of undue influence rather than the common law doctrine of duress, has comprised illegitimate threats to prosecute the claimant or a member of the claimant's family. These were not economic duress cases. Rather the threats in question were threats to reputation or emotional threats. But the important point is that (avoiding the circularity of blackmail: see the previous paragraph), the threats in question were threats to do lawful acts. So, for example, in *Williams v Bayley* (1866) LR 1 HL 200 a father agreed to pay promissory notes in favour of a bank (secured by a charge over his property) in order to avert the bank's implied threat to prosecute his son for forging his signature on the notes. As a separate ground from the contract being "illegal" (as stifling a criminal prosecution) it was held that the contract was invalid as it had been procured by undue influence. And in *Mutual Finance Ltd v John Wetton and Sons Ltd* [1937] 2 KB 389 a guarantee of payment to the claimant company was signed by Percy Wetton on behalf of the defendant company in order to avert the claimant company's implied threat to prosecute Joseph Wetton (Percy's brother) for forgery in acquiring a lorry on hire purchase. Percy Wetton signed the agreement for fear that prosecution of his brother would kill their father who was very ill. Porter J distinguished duress at common law, which he regarded as being confined to duress of the person, but held that the contract here was voidable for undue influence. See also, for example, *Kaufman v Gerson* [1904] 1 KB 591.

90. Although these cases may have used the language of undue influence, it is clear that they were not concerned with the standard case of undue influence where the relationship between the parties is such that one party's judgment is not being exercised freely and independently of the other party. That standard area of "relational" undue influence was not in issue in those cases. Rather one was looking

at actual undue influence where the influence was being exerted by a lawful threat. At the time of those cases, and prior to the development of economic duress in the 1970s, common law duress was thought to be confined to duress of the person or, in the context of the restitution of non-contractual payments, duress of goods. The threats in question in those cases were not ones of physical violence or detainment or to seize or retain goods. They therefore fell outside those two categories of common law duress. But now that economic duress has been recognised at common law, there is no reason to hive off those earlier cases from duress by labelling them as cases on undue influence. On the contrary, the underlying element is identical - it is an illegitimate, albeit lawful, threat - and it is therefore rational today to treat them as examples of duress (albeit not economic duress). As Lord Nicholls said in the leading modern case on undue influence, *Royal Bank of Scotland Plc v Etridge (No 2)* [2001] UKHL 44; [2002] 2 AC 773, para 8:

> "Equity identified broadly two forms of unacceptable conduct. The first comprises overt acts of improper pressure or coercion such as unlawful threats. *Today there is much overlap with the principle of duress as this principle has subsequently developed.* The second form arises out of a relationship between two persons where one has acquired over another a measure of influence, or ascendancy, of which the ascendant person then takes unfair advantage." (Emphasis added)

91. Furthermore, since the recognition of economic duress, there have been several cases in which lawful act economic duress can be said to have been accepted as a ground for the avoidance of a contract or restitution (whether made out on the facts or not). These include *CTN Cash and Carry Ltd v Gallaher Ltd* [1994] 4 All ER 714; *Alf Vaughan & Co Ltd v Royscot Trust Plc* [1999] 1 All ER (Comm) 856; *Borrelli v Ting* [2010] UKPC 21; [2010] Bus LR 1718; *Progress Bulk Carriers Ltd v Tube City IMS LLC (The Cenk Kaptanoglu)* [2012] EWHC 273 (Comm), [2012] 1 Lloyd's Rep 501; *Marsden v Barclays Bank Plc* [2016] EWHC 1601 (QB); [2016] 2 Lloyd's Rep 420; *The Flying Music Co Ltd v Theater Entertainment SA* [2017] EWHC 3192 (QB); and *Al Nehayan v Kent* [2018] EWHC 333 (Comm); [2018] 1 CLC 216. One should also bear in mind the Privy Council decision in *Attorney General for England and Wales v R* [2003] UKPC 22; [2003] EMLR 24, in which lawful act duress was carefully considered, albeit not made out on the facts, in a non-commercial context (so that "economic" duress was not in issue). In two of those cases, *Borrelli v Ting* and *Progress Bulk Carriers Ltd v Tube City IMS LLC*, the decision was that economic duress was made out thereby rendering the contract voidable (although, as is explained in paras 104-112 below, some of the reasoning in both those cases focused on the unlawful conduct prior to the relevant lawful threat). In the other cases, duress was either held not to be made out on the facts or, as in the *Al Nehayan* case, the view that lawful act duress was made out on the facts was obiter dicta. However, in none of the cases was any doubt cast on lawful act

duress being a valid concept. In this respect, it is also significant that in the present case both Warren J and the Court of Appeal accepted that lawful act duress exists.

92. For these three reasons, the better view is that, although controversial, lawful act duress does, and should, exist as a matter of English law.

**6. How does one determine the illegitimacy of the threat for lawful act economic duress?**

*(1) Certainty and clarity*

93. Within the realm of commercial contracts, with which we are here concerned, English law has a long-standing reputation for certainty and clarity and there is a significant danger that that reputation will be lost if the law on lawful act economic duress is stated too widely or with insufficient precision.

94. Mr Shepherd, counsel for TT, submitted that the best way forward would be to adopt a "range of factors" approach. He referred us to the adoption of that approach by this court in *Patel v Mirza* [2016] UKSC 42; [2017] AC 467, in the context of illegality as a defence and argued that an analogous approach was appropriate here. I do not agree. The long-standing problem with the law on illegality as a defence was that, over many decades, rules had been formulated that were inappropriate and clashed with the outcomes that, as a matter of the policies involved, one would wish to reach. In that context, the best solution to the problem was for the Supreme Court to draw on the covert reasoning of the courts, to cast aside the unsatisfactory rules, and to put forward a range of factors approach reflecting the underlying policies. The expectation is that this will lead to desirable outcomes based on transparent and rational reasoning and, in time, the approach seems likely to lead to the formulation of appropriate rules. But in the realm of lawful act economic duress, there is no equivalent problem of a series of rules being applied that are unsatisfactory. On the contrary, the law is in its infancy and the best approach is for the common law to be clarified or developed in a traditional incremental way.

95. For similar reasons, I do not think that this is an appropriate case in which to rely on a general principle of good faith dealing in so far as that would require a court to try to apply a standard of what is commercially unacceptable or unreasonable behaviour. That would be a radical move forward for the English law of contract and the uncertainty caused by it seems unlikely to be a price worth paying. In my view, the better strategy, at this stage in the law's development, is to

try to set out a limited but clear and workable boundary for the concept of lawful act economic duress in the context of the facts with which this case is concerned.

*(2) A focus on the demand*

96. With regard to lawful act duress, the courts have stressed that, because the threat is of a lawful act, the question of whether it is illegitimate should focus on the nature of the demand rather than the nature of the threat. We have seen, in para 88 above, that Lord Scarman stressed this in *The Universe Sentinel* and referred to Lord Atkin's judgment on this point in *Thorne v Motor Trade Association* [1937] AC 797. Although said in the context of the crime of blackmail, it is worth spelling out in full what Lord Atkin said, at p 806:

> "The ordinary blackmailer normally threatens to do what he has a perfect right to do - namely, communicate some compromising conduct to a person whose knowledge is likely to affect the person threatened. Often indeed he has not only the right but also the duty to make the disclosure, as of a felony, to the competent authorities. What he has to justify is not the threat, but the demand of money."

*(3) Commercial self-interest*

97. In thinking about the justification of the demand, in the context of lawful act economic duress, it is clear that, in general, a demand motivated by commercial self-interest is justified. If that were not the case, normal commercial bargaining would be seriously disrupted. For example, in the course of negotiations for a contract, lawful act threats may sometimes be used by one party (A) as a means of extracting from the other party (B) what A is demanding from B. As Dyson J observed in *DSND Subsea Ltd (formerly DSND Oceantech Ltd) v Petroleum Geo-Services ASA* [2000] BLR 530, para 131 (although the focus in that case was on alleged unlawful act economic duress):

> "Illegitimate pressure must be distinguished from the rough and tumble of normal commercial bargaining."

98. A useful illustration of the general position - that a lawful act threat, coupled with a demand motivated by commercial self-interest, is legitimate - is provided by the recent case in New Zealand of *Dold v Murphy* [2020] NZCA 313. Mr Dold, Mr Jacobs and Mr Murphy owned a tourism company. Mr Murphy owned 6.2%. Mr Jacobs and Mr Dold each owned 46.9%. They received an offer for AUD 112m to

buy their company. This offer was far higher than they were expecting. They were all keen to sell, but Mr Dold and Mr Jacobs especially so. Mr Murphy refused to sell unless he was paid another AUD 2m each from Mr Dold and Mr Jacobs for his shares. Reluctantly, as they needed his approval to be able to sell the company, Mr Dold and Mr Jacobs agreed. Mr Dold subsequently sought to recover the AUD 2m he paid Mr Murphy on the basis of economic duress. That claim failed. The New Zealand Court of Appeal took the view that, as there was no unlawfulness involved in what Mr Murphy had threatened, it would be a rare case, and this was not one, where economic duress could be made out. At para 79 Kos P said that the behaviour of Mr Murphy had been "opportunistic" but that, nevertheless, "he was entitled to act in his own self-interest, even if his actions were both unexpected and ungenerous." It should be added that, in any event, it would appear that Mr Dold did have a reasonable alternative to giving in to Mr Murphy's threat: he could simply not have sold the shares.

99. It follows from the general proposition, that a demand made in commercial self-interest is justified, that the doctrine of lawful act economic duress is essentially concerned with identifying rare exceptional cases where a demand motivated by commercial self-interest is nevertheless unjustified.

*(4) CTN Cash and Carry Ltd v Gallaher Ltd: a "bad faith demand" requirement*

100. In thinking about the justification of the demand in relation to the facts of this case, the most important appellate decision in English law, which therefore merits careful examination, is the Court of Appeal's decision in *CTN Cash and Carry Ltd v Gallaher Ltd* [1994] 4 All ER 714. The defendants mistakenly delivered cigarettes to the claimants' Burnley warehouse rather than their Preston warehouse from where the cigarettes were stolen. Mistakenly believing that the risk had passed to the claimants, the defendants demanded the £17,000 contract price and made clear that they would withdraw the claimants' credit facilities on future contracts if they failed to pay. The claimants paid the £17,000 but later sought repayment on the ground that they had paid under duress. The Court of Appeal held that the claim failed. It was stressed that it was lawful for the defendants to insist that they would no longer grant credit. Although it was accepted that duress can be constituted by lawful acts, it was thought that this would rarely be so between commercial parties. That was so even though the defendants were the sole distributors of popular brands of cigarettes and were therefore, in a sense, in a monopoly position. What was regarded as being of particular importance was that the defendants were acting in good faith in making the demand: albeit mistakenly, they thought that the goods were at the risk of the claimants and that they (the defendants) were therefore contractually owed the payment demanded.

101. The leading judgment was given by Steyn LJ with whom Farquharson LJ and Sir Donald Nicholls V-C agreed. Steyn LJ said the following, at pp 717-719:

> "The present dispute does not concern a protected relationship. It also does not arise in the context of dealings between a supplier and a consumer. The dispute arises out of arm's length commercial dealings between two trading companies. It is true that the defendants were the sole distributors of the popular brands of cigarettes. In a sense the defendants were in a monopoly position. The control of monopolies is, however, a matter for Parliament. Moreover, the common law does not recognise the doctrine of inequality of bargaining power in commercial dealings. See *National Westminster Bank Plc v Morgan* [1985] AC 686. The fact that the defendants were in a monopoly position cannot therefore by itself convert what is not otherwise duress into duress.
>
> A second characteristic of the case is that the defendants were in law entitled to refuse to enter into any future contracts with the plaintiffs for any reason whatever or for no reason at all. Such a decision not to deal with the plaintiffs would have been financially damaging to the defendants, but it would have been lawful. A fortiori it was lawful for the defendants, for any reason or for no reason, to insist that they would no longer grant credit to the plaintiffs. The defendants' demand for payment of the invoice, coupled with the threat to withdraw credit, was neither a breach of contract nor a tort.
>
> A third, and critically important, characteristic of the case is the fact that the defendants bona fide thought that the goods were at the risk of the plaintiffs and that the plaintiffs owed the defendants the sum in question. The defendants exerted commercial pressure on the plaintiffs in order to obtain payment of a sum which they bona fide considered due to them. The defendants' motive in threatening withdrawal of credit facilities was commercial self-interest in obtaining a sum that they considered due to them.
>
> …
>
> We are being asked to extend the categories of duress of which the law will take cognizance. That is not necessarily

> objectionable, but it seems to me that an extension capable of covering the present case, involving 'lawful-act duress' in a commercial context in pursuit of a bona fide claim, would be a radical one with far-reaching implications. It would introduce a substantial and undesirable element of uncertainty in the commercial bargaining process. Moreover, it will often enable bona fide settled accounts to be re-opened when parties to commercial dealings fall out. The aim of our commercial law ought to be to encourage fair dealing between parties. But it is a mistake for the law to set its sights too highly when the critical enquiry is not whether the conduct is lawful but whether it is morally or socially unacceptable. That is the enquiry in which we are engaged. In my view there are policy considerations which militate against ruling that the defendants obtained payment of the disputed invoice by duress.
>
> Outside the field of protected relationships, and in a purely commercial context, it might be a relatively rare case in which 'lawful-act duress' can be established. And it might be particularly difficult to establish duress if the defendant bona fide considered that his demand was valid. In this complex and changing branch of the law I deliberately refrain from saying 'never'. But as the law stands, I am satisfied that the defendants' conduct in this case did not amount to duress."

102. The decision in this case was that there was no economic duress. The explanation for why lawful act economic duress was not made out was that the demand of the defendants was made in good faith. That was the "critically important" characteristic. Given that "good faith" can be used in different senses, it is important to clarify that what was here meant was that, albeit mistakenly, the defendants genuinely believed that they were contractually owed the payment demanded. The case may therefore be said to establish what I shall refer to hereinafter as the "bad faith demand" requirement. This requirement can be expressed as follows. In the context we are focusing on - of a demand for what is claimed to be owing, or analogously, as on the facts of this case, a demand for the waiver of a claim - it is a necessary requirement for establishing lawful act economic duress that the demand is made in bad faith in the particular sense that the threatening party does not genuinely believe that it is owed what it is claiming to be owed or does not genuinely believe that it has a defence to the claim being waived by the threatened party. This is on the assumption that, as a matter of law, what the threatening party claims to be owing is not legally owing or there is no defence to the claim being waived by the threatened party. On the facts of *CTN Cash and Carry* lawful act economic duress was not made out because this "bad faith demand"

requirement was not satisfied: the defendants genuinely believed that the payment they were claiming was contractually owing.

103. It is possible to go one step further in one's interpretation of the reasoning in *CTN Cash and Carry* by treating the Court of Appeal as having implicitly laid down that lawful act economic duress would have been made out had the facts been the same except for the crucial difference that the "bad faith demand" requirement had been satisfied. I shall explore that wider interpretation further below (see paras 121-125). However, as will become clear, I do not need to accept that wider interpretation in order to decide this case. All I need to take from *CTN Cash and Carry*, in order to decide this case, is the narrower proposition that, in the context of a demand for what is claimed to be owing or, analogously, a demand for the waiver of a claim, there is a "bad faith demand" requirement for lawful act economic duress.

*(5) Borrelli v Ting; Progress Bulk Carriers Ltd v Tube City IMS LLC*

104. It is next important to clarify that the two cases from the list in para 91 above, in which lawful act economic duress may be said to have succeeded - *Borrelli v Ting* [2010] UKPC 21; [2010] Bus LR 1718 and *Progress Bulk Carriers Ltd v Tube City IMS LLC* [2012] EWHC 273 (Comm); [2012] 1 Lloyd's Rep 501 - may both be said to be consistent with the "bad faith demand" requirement of *CTN Cash and Carry*, although in those cases the bad faith in question related to a demand for a waiver of a claim against the threatening party rather than a demand for a payment owed to the threatening party. It is also a very important feature of these two cases that the threatening party can be said to have deliberately created, or increased, the threatened party's vulnerability which it was then able to exploit by making the demand.

105. In *Borrelli v Ting*, James Ting was the former chair and CEO of Akai Holdings Ltd ("Akai") which had collapsed with a large deficit. Akai and its liquidators wished to enter into a scheme of arrangement (to raise money to fund the liquidation) but that needed shareholder approval. Ting, through two companies he controlled, Blossom Assets Ltd ("B Ltd") and Costner Holdings Ltd ("C Ltd"), held a crucial minority shareholding in Akai. Initially using forgery and false evidence, Ting blocked the scheme of arrangement. With time running out for the liquidators to meet a court deadline for approval of the scheme of arrangement, and with Ting threatening further to delay the scheme, as he was lawfully free to do through his minority shareholding, the liquidators entered into a settlement agreement with Ting, B Ltd and C Ltd. Under that settlement agreement, the liquidators promised not to pursue any claims they might have against Ting or B Ltd or C Ltd. Ting thereupon dropped his opposition to the scheme of arrangement which was approved. Subsequently the liquidators challenged the validity of the settlement

agreement on the basis that it had been entered into under economic duress and it was held by the Privy Council that that was indeed so.

106. Lord Saville, giving the judgment of the Privy Council, said, at para 35:

> "The Board is of the view that in the present case the liquidators entered into the settlement agreement as the result of the illegitimate means employed by James Henry Ting, namely by opposing the scheme for no good reason and in using forgery and false evidence in support of that opposition, all in order to prevent the liquidators from investigating his conduct of the affairs of Akai Holdings Ltd or making claims against him arising out of that conduct. As the Board has already observed, by adopting these means James Henry Ting left the liquidators with no reasonable or practical alternative but to enter into the settlement agreement."

Earlier at para 28, it was said:

> "[A] finding of particular importance is that James Henry Ting procured the opposition to the scheme by Blossom Holdings Ltd and Costner Assets Ltd 'solely so as to defeat [the scheme] with the desire and intention of thereby depriving the liquidators of funds with a view to preventing any further investigation of his conduct of the affairs of the company' … In other words, James Henry Ting's opposition was not made in good faith, but for an improper motive."

And at para 32:

> "In the view of the Board James Henry Ting's failure to provide any assistance to the liquidators; his opposition to the scheme; and his resort to forgery and false evidence in order to further that opposition amount to unconscionable conduct on his part … [B]y agreeing to withdraw the opposition to the scheme James Henry Ting did no more than he should have done from the outset, had he acted in good faith rather than in an attempt to avoid responsibility for his conduct of the affairs of Akai Holdings Ltd."

107. The relevant threats by Ting, which induced the settlement agreement, were lawful. But they had been preceded by unlawful acts in failing to cooperate with the liquidators and in initially using forgery and false evidence to block the scheme of arrangement. For that reason, one might argue that this was not a case of lawful act duress. However, the fact remains that the pressure that finally led to the settlement was lawful. And importantly, viewing this as a case of lawful act duress, the decision is consistent with the "bad faith demand" requirement. It was clear that Ting was making the demand in bad faith in the sense that he did not genuinely believe that he had a defence to claims against him and was seeking to prevent further investigation and a waiver of them. It is also clear that Ting deliberately brought about, or increased, the liquidator's vulnerability which he was then able to exploit by making the demand.

108. Moving on to the *Progress Bulk Carriers* case, the claimant charterers entered into a charterparty with the defendant owners of a ship (*Cenk K*) for the carriage of a cargo of shredded scrap metal to China. The cargo was being sold by the charterers to Chinese buyers. The owners, in repudiatory breach, chartered the *Cenk K* to another party but assured the charterers that they would find a substitute ship and would compensate the claimants for any losses caused. The owners found a substitute ship, which was available with a later loading period, which they offered to the charterers at a reduced rate of freight. The charterers wished to accept this, while reserving their rights to claim damages for breach of contract. However, at a late stage, the owners said that they would only go ahead with the substitute ship if the charterers agreed to waive all their rights to damages for the breach. Under protest, the charterers agreed to this waiver so as to fulfil their sale contract with the Chinese buyers. The question was whether the waiver (settlement) agreement was voidable for economic duress. The arbitrators decided that it was and, on appeal by the owners, Cooke J upheld that decision.

109. It is clear that the owners had deliberately created, or increased, the charterers' vulnerability, by misleading them as to the substitute ship, which it was then able to exploit by making the demand. But how far is this decision consistent with the "bad faith demand" requirement? Cooke J twice referred, at paras 28 and 40, to the fact that the arbitrators had made no express finding that the owners were in bad faith. But nor was there any finding that they were in good faith. Moreover, on any fair reading of the facts, and without any finding to the contrary, one can readily assume that, had the question specifically arisen, the arbitrators would have been very likely to find that the owners did not genuinely believe, prior to entering into the waiver agreement, that they had a defence to a claim against them for damages for breach of contract. In my view, the decision can be regarded as correctly decided provided that, as appears to be the case, the owners made the demand in bad faith not genuinely believing that they had a defence to a claim for damages against them. In other words, the decision can be regarded as correct assuming that it was consistent with the "bad faith demand" requirement.

110. However, as with *Borrelli v Ting*, one can ask, was this a case of lawful act duress at all? Cooke J thought it important that the owners had been in repudiatory breach by not providing the first vessel. He said at paras 37-39:

> "37. The only basis of the appeal put forward was that the Arbitrators had not made findings of fact which could amount to 'illegitimate pressure', essentially because they had not found that the pressure put upon the Charterers to enter into the settlement agreement involved an unlawful act. The Owners were not threatening to break a contract at the time nor committing any tort in refusing to enter into a variation of the charter with the substitution of the Agia and a new laycan, save on terms which bore down heavily upon the Charterers because of their existing sale contract. It was said that this was just the operation of market forces of which the Owners were entitled to take advantage.
>
> 38. The Owners contended that the Arbitrators had not found any threatened breach of contract by them, in refusing to ship the cargo on the Agia without a waiver of rights by the Charterers. It is true that the Arbitrators made no finding that there had been a binding agreement made on the 27th April to ship the cargo on the Agia, so that there could be no threatened breach in refusing to do so, without the waiver of rights. Thus far the Owners are correct.
>
> 39. What however the Owners' submissions overlook is the fact that their repudiatory breach was the root cause of the problem and that their continuing conduct thereafter was, as described by the Arbitrators, designed to put the Charterers in a position where they had no option but to accept the settlement agreement in order to ship the cargo to China and avoid further huge losses on the sale contract to the Chinese receivers. As the Charterers submitted, it would be very odd if pressure could be brought about by a threatened breach of contract, which did amount to an unlawful act but not by a past breach, coupled with conduct since that breach, which drove the victim of the breach into a position where it had no realistic alternative but to waive its rights in respect of that breach, in order to avoid further catastrophic loss."

111. Cooke J may be interpreted as categorising the duress as unlawful, rather than lawful act, duress. Certainly, the owners' repudiatory breach initially created the

difficulty that the charterers needed a substitute ship. However, the relevant pressure or threat that led to the waiver agreement was the threat not to be provided with the substitute ship that the owners had said would be provided but without committing themselves to providing. The past breach of contract created the opportunity to apply the threat or pressure. However, it was the lawful threat (or pressure) that was the effective cause of the charterers' entering into the waiver agreement. And in para 38, which I have set out in the previous paragraph, Cooke J examined the argument, only to reject it, that the original contract was continuing so that the owners were contractually bound to provide the substitute ship and were therefore threatening a breach of contract in failing to do so. If one focuses on the threat (or pressure) that directly induced the contract (or non-contractual payment), we are in the realm of lawful act duress. In my view, therefore, *Progress Bulk Carriers* can be correctly viewed as a decision on lawful act duress.

112. Taken together, what *Borrelli v Ting* and *Progress Bulk Carriers* can be taken to have established is that, in relation to a demand for a waiver by the threatened party of a claim against the threatening party, the demand is unjustified, so that the lawful act economic threat is illegitimate where: first, the threatening party has deliberately created, or increased, the threatened party's vulnerability to the demand; and, secondly, the "bad faith demand" requirement is satisfied (ie the threatening party does not genuinely believe that it has a defence, and there is no defence, to the claim being waived).

*(6) The Court of Appeal in the present case correctly accepted, and applied, the "bad faith demand" requirement*

113. I now turn to the central reasoning of the Court of Appeal in the present case. As in *Borrelli v Ting* and *Progress Bulk Carriers*, the facts of this case concern a demand for a waiver by the threatened party (TT) of claims against the threatening party (PIAC). PIAC was in effect in a monopoly position as regards the supply of airline tickets for direct flights between the UK and Pakistan. There is obviously nothing objectionable about that in itself. But there are at least two features of the facts that take this case outside the realm of the mere use of monopoly power. First, Warren J found (see paras 73-75 above) that PIAC was in breach of contract by failing to pay a very large sum of past commission owing to TT (the principal sum claimed was over £1.2m, exclusive of interest). Secondly, PIAC then went further by, for example, suddenly cutting TT's normal ticket allocation from 300 to 60 which increased TT's particular vulnerability which PIAC was then able to exploit by making the demand for the waiver (see paras 69-70 above). It follows that, in line with the analysis of *CTN Cash and Carry*, *Borrelli v Ting* and *Progress Bulk Carriers* that I have set out above, the crucial issue is whether the "bad faith demand" requirement was satisfied.

114. David Richards LJ was therefore correct to insist on, and apply, that "bad faith demand" requirement (with its subjective test). He distinguished a demand made without reasonable grounds (an objective test). In the course of a wide-ranging judgment, which surveyed English and Commonwealth authorities, as well as academic writings, David Richards LJ said this at para 105:

> "My conclusion on the central legal issue is that the doctrine of lawful act duress does not extend to the use of lawful pressure to achieve a result to which the person exercising pressure believes in good faith it is entitled, and that is so whether or not, objectively speaking, it has reasonable grounds for that belief. The common law and equity set tight limits to setting aside otherwise valid contracts. In this way undesirable uncertainty in a commercial context is reduced."

He went on at paras 106-107:

> "106. The relevant considerations go beyond uncertainty. In judging the use of lawful acts or threats of lawful acts as commercial pressure, there is a sharp distinction between such use to pursue demands made in good faith and those made in bad faith. As I earlier mentioned, a lack of good faith on the part of a contracting party is a feature in a number of the grounds on which contracts may be avoided. Rescission on grounds of fraudulent misrepresentation or unconscionable transaction are examples. It is a clear criterion involving conduct which all can agree is unacceptable and which is a fact capable of proof, often as it happens by reference to the lack of any reasonable grounds for the belief. By contrast, not only is reasonableness in this context a standard of very uncertain content but it is also very unclear why or on what basis the common law should hold that a party with a private law right, whose exercise is not subject to any overriding duty, cannot use it to achieve a purpose which is both lawful and advanced in good faith.
>
> 107. Moreover, it is relevant to note that the economic pressure that PIAC was able to apply in this case resulted from its position at that time as a monopoly supplier of tickets for direct flights between the UK and Pakistan. As I have earlier mentioned, the common law has always rejected the use, or abuse, of a monopoly position as a ground for setting aside a contract, leaving it to be regulated by statute."

Then finally at para 113, he said:

> "In my judgment, a lack of reasonable grounds is insufficient to engage the doctrine of duress where the pressure involves the commission or threat of lawful acts."

115. In relation to a demand for a waiver of claims, even in a situation where it can be said that PIAC deliberately increased TT's vulnerability to the demand, the "bad faith demand" requirement is crucial for determining the illegitimacy of the lawful act threat. Had TT proved that PIAC was in bad faith in making the demand for the waiver, its claim for rescission would have succeeded in this case. But as we have seen, the findings of fact of Warren J were to the effect that there was no such bad faith. As Mr Shepherd accepted, we cannot go behind those findings of fact (which were also unchallenged in the Court of Appeal).

116. It may be objected that the "bad faith demand" requirement means that the relevant standard depends on the threatening party's own subjective perception of what the law is and that a more objective approach is to be preferred. However, taking a subjective approach in the context of disputed claims is consistent with the law on compromises where it has traditionally been regarded as important whether or not a party bona fide believes it has a claim: see, for example, *Chitty on Contracts*, 33rd ed (2018), para 4-051.

117. Mr Shepherd submitted that the "bad faith demand" requirement would render it too easy for the threatening party to insist on a contract being upheld because that party would simply have to assert that it genuinely believed that the money was owing or that there was a defence to the claim being waived (ie on these facts, PIAC would simply need to assert that it genuinely believed that it had a defence to the claims for breach of contract that were being waived). It is true that the legal burden of proof in relation to the "bad faith demand" requirement is on the threatened party who is seeking redress for duress. That is, the threatened party has to prove that the threatening party was acting in bad faith in the sense that it did not genuinely believe that the money was owing or that there was a defence to the claim being waived. This was recognised by David Richards LJ who said, at para 111:

> "The judge accepted that Times Travel had not established bad faith. That should have been the end of the discussion of good or bad faith. It was not for PIAC to establish its good faith."

118. However, this does not mean that a court will accept that the threatened party (the claimant) cannot satisfy the burden of proof whenever the threatening party (the

defendant) asserts that it genuinely believed that the money was owing or that it had a defence to the claim being waived. On the contrary, the more unreasonable that belief, the more will be required, from an examination of all relevant material, before a court will accept that the defendant did genuinely have that belief. What can be envisaged is that where the defendant's belief is manifestly unreasonable, the evidential onus switches to the defendant. But ultimately such problems of proof are not unique to this area of the law and are ones that the courts are well-used to confronting and dealing with.

119. In this case, therefore, David Richards LJ correctly applied the "bad faith demand" requirement to the facts as found by Warren J. As there was no such bad faith, the Court of Appeal was correct to deny TT's claim for rescission of the contract for economic duress. That is enough to decide this case.

120. However, for the purposes of completeness, and because of the possible future incremental development of the law on lawful act economic duress, building from this decision, I now go on to discuss three further matters. First, the wider interpretation of *CTN Cash and Carry*; secondly, why I have rejected several prominent alternative approaches to the scope of lawful act economic duress (ie approaches that do not turn on the "bad faith demand" requirement); and thirdly, my reasons for rejecting an alternative strategy put forward by Mr Jones (counsel for PIAC).

*(7) The wider interpretation of CTN Cash and Carry*

121. I have explained in para 103 above that *CTN Cash and Carry* can be said to establish the "bad faith demand" requirement for lawful act economic duress; but that it is possible to go one step further in one's interpretation of the reasoning in *CTN Cash and Carry* by treating it as implicitly laying down that lawful act economic duress would have been made out had the facts been the same except for the crucial difference that the "bad faith demand" requirement had been satisfied. In other words, one may say that the implication of Steyn LJ's reasoning is that, had the defendants made the demand in bad faith, not genuinely believing that the payment was contractually owing, the money would have been recoverable on the facts of that case.

122. That one can draw that implication derives support from Mitchell, Mitchell and Watterson, *Goff and Jones on the Law of Unjust Enrichment*, 9th ed (2016). They write, at para 10-70:

> "If the claimants could have shown that when the defendants made their threat they knew that the goods were at the defendants' risk, then the claimants would surely have succeeded, for the money would then have been extorted from them, and commercial self-interest is not unbridled."

I agree. Although one cannot say that the defendants had deliberately created, or increased, the claimants' vulnerability (as one could in *Borrelli v Ting* and *Progress Bulk Carriers* and on the facts of this case), the defendants must have known that the claimants were in an exceptionally vulnerable position because of the defendants' monopoly position. If one then adds to that the postulated satisfaction of the "bad faith demand" requirement - so that, on the facts, the defendants would have been dishonestly claiming that the money was owing under the contract when they knew it was not - there is a compelling analogy to the facts of *Borrelli v Ting* and *Progress Bulk Carriers*. Although it is not necessary to decide this point in this case, I am of the view that, had the facts otherwise been the same but the "bad faith demand" requirement had been satisfied in *CTN Cash and Carry*, the demand would have been unjustified thereby rendering the threat illegitimate.

123. The Court of Appeal in the instant case also made clear that one could take the wider interpretation of the reasoning in the *CTN Cash and Carry* case. Hence, David Richards LJ said at para 62:

> "*CTN Cash and Carry v Gallagher* can be taken to establish that where A uses lawful pressure to induce B to concede a demand to which A does not bona fide believe itself to be entitled, B's agreement is voidable on grounds of economic duress."

124. However, that bald proposition goes too far and caution must here be exercised. Having clarified that, in that "test", David Richards LJ must have been meaning "legal" rather than "moral" entitlement (because otherwise the test would be far too vague), Davies and Day (2020) 136 LQR 7, 9, express one of the difficulties as follows:

> "However, if entitlement is used in a legal sense, then the language of this test does not quite work in the contractual context. The demand will be to receive a contractual promise. Unless issues of public policy are engaged, a party is always legally entitled to receive a contractual promise, even if that is a waiver of a prior claim. This is illustrated by *Times Travel* itself: the point was not whether the defendant bona fide

> believed itself to be entitled to the thing demanded (the obligations under the new agency agreement) but rather whether the defendant actually believed there was a prior claim against it for past unlawfulness (for not paying commissions due under the old agency agreement). Since the airline had genuinely believed itself not to be liable to pay the commissions under the old agreement, the waiver of that claim in the new agreement could not be rescinded for duress."

125. It is clear, therefore, that the above statement of David Richards LJ must be read in the context of the facts in *CTN Cash and Carry* because, on its face, it is far too wide. The context was one where the money was being demanded on the mistaken basis that it was owing under the contract for the goods that had been delivered but stolen. The law on lawful act economic duress would be far too wide if, generally, the illegitimacy of the threat turned on whether the threatening party did, or did not, bona fide believe that it was entitled to what was demanded. For example, a party (A) negotiating a contract with another party (B) may threaten (lawfully) not to supply goods unless B pays A money. Plainly economic duress could not be made out (there would otherwise be a risk of undermining ordinary contractual negotiations) even if it could be shown that A did not genuinely believe itself entitled to the money demanded from B. Indeed, it is obvious that, until the contract has been concluded, A has no contractual entitlement to what is demanded. Put another way, the "bad faith demand" requirement is dependent on there being an existing legal right and duty between the parties (whether contractual or otherwise) which provides a clear and certain standard against which alleged bad faith of the threatening party can be assessed. Without that tie to an existing legal right and duty, the "bad faith demand" requirement loses its force as being underpinned by a workable standard of dishonesty: the bad faith demand is concerned with either a dishonest assertion of an existing right or the dishonest removal (by waiver) of an existing right. It also loses its force as providing a clear and certain means of controlling the scope of lawful act economic duress and of distinguishing a demand that is unjustified from one that is made in ordinary commercial bargaining.

*(8) Some alternative approaches to the scope of lawful act economic duress*

126. I have looked at several alternative approaches to the scope of lawful act economic duress (ie approaches that do not turn on the "bad faith demand" requirement). Although these approaches have been put forward generally, and are not focusing on the context of a demand for what is claimed to be owing or for a waiver of a claim, with which we are directly concerned in this case, they may be taken to include that narrower context. But, with respect, these alternative approaches tend to flounder on the shifting sands as to what constitutes a reasonably held belief or, more generally, unreasonable or abnormal behaviour. For example,

there is the suggestion of Hugh Beale in *Chitty on Contracts*, 33rd ed (2018), para 8-046 that the relevant test might be whether the lawful act threat is

> "coupled with a demand which goes substantially beyond what is normal or legitimate in commercial arrangements."

127. Again, there is a focus on assessing the reasonableness of the demand, and indeed the threat, in the fascinating obiter dicta of Leggatt LJ (as he then was) sitting at first instance in *Al Nehayan v Kent* [2018] EWHC 333 (Comm); [2018] 1 CLC 216, para 188. He there suggested that:

> "the test suggested in *Chitty on Contracts* could be made more precise by transposing into objective requirements the elements of the offence of blackmail. On this basis a demand coupled with a threat to commit a lawful act will be regarded as illegitimate if (a) the defendant has no reasonable grounds for making the demand and (b) the threat would not be considered by reasonable and honest people to be a proper means of reinforcing the demand."

128. It is my view, with respect, that those tests risk rendering the law on lawful act duress too uncertain and would potentially jeopardise the stability of the English law of contract. Of course, a scholar of the distinction of Hugh Beale is well alive to those risks and trusts that the courts can draw a stable line as to what, for example, constitutes a demand that goes substantially beyond what is normal. But that the risk is significant is shown by his further comment at the end of para 8-046 that:

> "care must be taken in treating threats lawful in themselves as amounting to duress, for otherwise threats commonly used in business (eg of lawful strikes) would fall into the category of economic duress."

129. Another interesting suggestion is that made by James Edelman and Elise Bant, *Unjust Enrichment*, 2nd ed (2016), at p 212. They argue that what should, and does, underlie the law on lawful act duress is:

> "disproportionality between (i) the lawful threat and (ii) the defendant's legitimate interest in the demand it supports."

However, although notions of "disproportionality" have begun to play a role in contract law - one thinks particularly of the restated law on penalty clauses in *Cavendish Square Holdings BV v Makdessi* [2015] UKSC 67; [2016] AC 1172 - it is far from clear how disproportionality would work in the context of a case like the present; and, more generally, one can anticipate that there would be great uncertainty in the working out of a disproportionality idea in the general context of lawful act economic duress. Indeed, it is significant that, in the commercial context, Edelman and Bant go on to say the following, at p 217:

> "The general reluctance of courts to recognise lawful economic or commercial threats as disproportionate to commercial goals (and thus illegitimate) is to be applauded. Any other approach would cut across the statutory competition law rules which draw complex distinctions between lawful and unlawful commercial behaviour ... Only in the most exceptional circumstances, if at all, should it be illegitimate to threaten to engage in conduct which a plaintiff has a right to engage in and which is not proscribed by competition law."

130. The difficulties with these alternative approaches confirm my belief that, in the context of a demand for what is claimed to be owing or for a waiver of a claim, the "bad faith demand" requirement provides the appropriate certainty that is essential for the recognition of lawful act economic duress.

*(9) An alternative strategy put forward by Mr Jones*

131. Mr Jones put forward, as an alternative to his primary submission (that the reasoning of the Court of Appeal was correct), a line of argument which would deny the claim in this case for different reasons than those relied on by the Court of Appeal (ie for reasons different from the non-establishment of the "bad faith demand" requirement). His alternative submission was that, unless the criminal law offence of blackmail has been committed, lawful act duress should not exist. In particular, he submitted that *Borrelli v Ting* and *Progress Bulk Carriers* are better regarded as cases of unlawful act duress not lawful act duress. This alternative line of argument has some attractions. But, ultimately, I have rejected that alternative submission for the following main reasons:

(i) As I have explained at paras 107 and 110-111, *Borrelli v Ting* and *Progress Bulk Carriers* can be correctly viewed as cases on lawful act duress.

(ii) It is not clear how exactly a direct reliance on the crime of blackmail (at least without further elaboration) would work in the civil law context. Mr Jones argued that blackmail should be recognised as an example of "unlawful means". But that involves the circularity referred to in para 88 above.

(iii) Mr Jones's submission would involve largely ignoring the Court of Appeal's reasoning in *CTN Cash and Carry* which accepted that there can be lawful act economic duress without reference to the crime of blackmail.

(iv) Mr Jones's submission would also run contrary to my view, explained at para 122 above, that, had there been a bad faith demand in *CTN Cash and Carry*, economic duress would have been made out. Similarly, Mr Jones's submission would also run contrary to my view that, on the facts of this case, had PIAC's demand been made in bad faith, the threat would clearly have been illegitimate.

(v) Looking across the range of past cases in English law (including some that have been classified as cases of actual undue influence) they support the view that lawful act duress does exist. See paras 89-91 above.

## 7. The judgment of Lord Hodge

132. Since writing this judgment I have had the benefit of reading the judgment of Lord Hodge. There is a large measure of agreement between us. Where we fundamentally differ is that, in deciding that there was no lawful act economic duress on the facts of this case, I regard it as essential that, on Warren J's findings, PIAC was not acting in bad faith in the specific sense relating to PIAC's genuine belief as to its not being contractually liable for the unpaid commission that was being waived. That is what the Court of Appeal's decision turned on. It is my view that, had there been a contrary finding of bad faith, in that specific sense, TT's claim for lawful act economic duress would here have succeeded. While already in a strong position by reason of having a monopoly over the supply of tickets for direct flights between the UK and Pakistan, PIAC withheld a very large sum of commission owing to TT (the principal sum claimed was over £1.2m) and then went further by, for example, suddenly cutting TT's normal ticket allocation from 300 to 60 thereby increasing TT's vulnerability which it was then able to exploit by making the demand for the waiver (see above paras 69-70). All this went beyond the mere use of monopoly power. On the face of it, PIAC's conduct seems to fall within Lord Hodge's lawful act duress category comprising "using illegitimate means to manoeuvre the claimant into a position of weakness to force him to waive his claim". The fact that the claimant was already in a weak position (because of the monopoly) cannot make the claim for lawful act economic duress less deserving than if the

claimant had been in a stronger bargaining position. It follows that, in my view, contrary, as I understand it, to that of Lord Hodge, it is the "bad faith demand" requirement, as I have explained it, that is critical to the decision that there was no lawful act economic duress in this case.

133. With great respect, I am also very concerned that, without any focus on the "bad faith demand" requirement, defined in the specific sense that I have set out, and with instead the essential guide being that the defendant's conduct must be "reprehensible" or "unconscionable" or using "illegitimate means" (which is, by definition, distinct from unlawful means), one will be permitting lawful act economic duress to create considerable uncertainty in the realm of commercial contracts. While not supporting a "bad faith demand" requirement, Lord Hodge also refers at some points to "bad faith" as being relevant (see, for example, paras 56 and 59) but it is not clear to me what Lord Hodge means by that and how that approach is consistent with his rejection of a "good faith dealing" principle. I have tried to make clear (see para 95) that I am precisely not advocating a general principle of good faith dealing; and the "bad faith demand" requirement that I have been relying on, and which David Richards LJ was also using in the Court of Appeal, is narrow and sharply defined.

134. Although unnecessary for this decision, we also differ in relation to what the outcome would have been in *CTN Cash and Carry* had the defendants known that they were not contractually owed the money they were demanding for the goods. In my view, if that had been the position, the claimants would have succeeded in their claim for restitution of the money paid based on lawful act economic duress. But Lord Hodge takes the contrary view.

135. Finally, Lord Hodge suggests, at para 54 of his judgment, that there is no principled difference between a demand for payment, based on a bad faith demand, and a demand for payment as a pre-condition to entering into a contract. With respect, the principled difference is that one involves bad faith, as I have defined it, but the other does not. I have sought to make clear in para 125 that the "bad faith demand" requirement is dependent on there being an existing legal right and duty between the parties. To try to apply it outside that context would risk unduly interfering with ordinary commercial bargaining; and it would deprive the requirement of its force as being underpinned by a workable standard of dishonesty and as providing a clear and certain means of controlling the scope of lawful act economic duress. It is also worth stressing that the root principle, to which one is seeking to provide a clear guide, is that the demand is unjustified so that the lawful act economic threat is illegitimate. At this stage in the law's development, my strategy (see para 95 above) has been to set out a limited but clear and workable boundary for what constitutes an unjustified demand - so that a lawful act economic threat is illegitimate - in the context of the facts with which this case is concerned. Any incremental development of what the common law treats as an unjustified

demand in relation to lawful act economic duress can in the future proceed cautiously, in the light of known facts, from that secure base.

## 8. Conclusion

136. One can summarise the analysis of the law set out in this judgment as follows:

(i) Lawful act duress, including lawful act economic duress, exists in English law.

(ii) Three elements need to be established for lawful act economic duress: an illegitimate threat; sufficient causation; and that the threatened party had no reasonable alternative to giving in to the threat.

(iii) As the threat is lawful, the illegitimacy of the threat is determined by focusing on the justification of the demand.

(iv) A demand motivated by commercial self-interest is, in general, justified. Lawful act economic duress is essentially concerned with identifying rare exceptional cases where a demand, motivated by commercial self-interest, is nevertheless unjustified.

(v) In relation to a demand for a waiver by the threatened party of a claim against the threatening party, a demand is unjustified, so that the lawful act economic threat is illegitimate, where, first, the threatening party has deliberately created, or increased, the threatened party's vulnerability to the demand and, secondly, the "bad faith demand" requirement is satisfied. The demand is made in bad faith where the threatening party does not genuinely believe that it has any defence (and there is no defence) to the claim being waived.

137. In addition, I have explained that, although not necessary for the decision in this case, it is my view that, had the "bad faith demand" requirement been satisfied in *CTN Cash and Carry*, the demand would have been unjustified thereby rendering the lawful act economic threat illegitimate. That is, had the defendants not genuinely believed that the payment that they demanded from the claimants was contractually owed, it would have been recoverable by the claimants for economic duress.

138. Applying the analysis of the law summarised in para 136 to this case, my conclusion is that the decision of the Court of Appeal was correct largely for the reasons it gave (although it was unnecessary for it to have taken, what I have termed, the wider interpretation of *CTN Cash and Carry*). Lawful act economic duress was not made out on the facts of this case because the threatened lawful act was not coupled with a bad faith demand. On the facts found by Warren J, TT failed to establish bad faith by PIAC in the specific sense relating to PIAC's genuine belief as to its not being contractually liable for the unpaid commission. The Court of Appeal correctly applied the "bad faith demand" requirement in this case. I would therefore dismiss the appeal.




**[2021] UKSC 40**
*On appeal from: [2019] EWCA Civ 828*

# JUDGMENT

# Pakistan International Airline Corporation (Respondent) *v* Times Travel (UK) Ltd (Appellant)

**before**

**Lord Reed, President**
**Lord Hodge, Deputy President**
**Lord Lloyd-Jones**
**Lord Kitchin**
**Lord Burrows**

## JUDGMENT GIVEN ON

## 18 August 2021

**Heard on 2 and 3 November 2020**

*Appellant*
Philip Shepherd QC
Heather Murphy

(Instructed by Charles Morgan Lawyers)

*Respondent*
Nigel Jones QC
Thomas Bell
Professor Paul Davies
(Instructed by City Solicitors Ltd t/a Farani Taylor Solicitors)

*1st Intervener*
Bankim Thanki QC
Ben Jaffey QC
Simon Atrill
(Instructed by Quinn Emanuel Urquhart & Sullivan UK LLP)

*2nd Intervener*
Oliver Jones
(Instructed by Norton Rose Fulbright LLP)

*3rd Intervener*
Thomas Roe QC
Richard Samuel
Simon Reevell
Daniel Black
Hannah Fry
(Instructed by Hausfeld & Co LLP (London))

**Interveners:**
(1) Ukraine
(2) The Law Debenture Trust Corporation Plc
(3) All Party Parliamentary Group on Fair Business Banking

**LORD HODGE: (with whom Lord Reed, Lord Lloyd-Jones and Lord Kitchin agree)**

1. I am very grateful to Lord Burrows for setting out the facts of the case and the legal proceedings to date. There is a great deal in the exposition of the law in his clear judgment with which I agree. In particular, I agree with what he says about (i) the essential elements of duress (paras 78-80), (ii) the existence in English law of the concept of lawful act duress (paras 82-92), (iii) the importance of clarity and certainty in our commercial law, which means that the concept of lawful act duress must not be stated too widely (para 93), (iv) the rejection of a range of factors approach (para 94), (v) the similar rejection of the use of a wide principle of good faith dealing (para 95), (vi) the appropriateness of focusing on the nature and justification of the demand rather than the legality of the threat (paras 88 and 96), and (vii) the law's general acceptance of the pursuit of commercial self-interest as justified in commercial bargaining and the rarity of cases where lawful act duress will be found to exist in such bargaining (paras 97-99). I therefore also agree with the first four points of his summary (para 136(i)-(iv)). I also agree that the appeal should be dismissed. In relation to point (vi) above, I would add that the court in focusing on the nature and justification of the demand, as the case law which I discuss below shows, has regard to, among other things, the behaviour of the threatening party including the nature of the pressure which it applies, and the circumstances of the threatened party.

2. Where I respectfully disagree with him is in my analysis of what the law has recognised as an illegitimate threat or pressure. As I will seek to show, the courts have developed the common law doctrine of duress to include lawful act economic duress by drawing on the rules of equity in relation to undue influence and treating as "illegitimate" conduct which, when the law of duress was less developed, had been identified by equity as giving rise to an agreement which it was unconscionable for the party who had conducted himself or herself in that way to seek to enforce. In other words, morally reprehensible behaviour which in equity was judged to render the enforcement of a contract unconscionable in the context of undue influence has been treated by English common law as illegitimate pressure in the context of duress.

3. The boundaries of the doctrine of lawful act duress are not fixed and the courts should approach any extension with caution, particularly in the context of contractual negotiations between commercial entities. In any development of the doctrine of lawful act duress it will also be important to bear in mind not only that analogous remedies already exist in equity, such as the doctrines of undue influence and unconscionable bargains, but also the absence in English law of any overriding

doctrine of good faith in contracting or any doctrine of imbalance of bargaining power. As I will seek to explain, the absence of those doctrines in English law leads me to conclude that Times Travel's claim for lawful act economic duress would not have succeeded in this case even if it had shown that Pakistan International Airline Corporation ("PIAC") had made what Lord Burrows has defined as a bad faith demand.

4. If one focuses on the few cases in which a remedy has been provided for what would now be analysed as lawful act duress, there are to date two circumstances in which the English courts have recognised and provided a remedy for such duress. The first circumstance is where a defendant uses his knowledge of criminal activity by the claimant or a member of the claimant's close family to obtain a personal benefit from the claimant by the express or implicit threat to report the crime or initiate a prosecution. The second circumstance is where the defendant, having exposed himself to a civil claim by the claimant, for example, for damages for breach of contract, deliberately manoeuvres the claimant into a position of vulnerability by means which the law regards as illegitimate and thereby forces the claimant to waive his claim. In both categories of case the defendant has behaved in a highly reprehensible way which the courts have treated as amounting to illegitimate pressure.

*(1) The first circumstance: exploitation of knowledge of criminal activity*

5. The examples of the first circumstance are the three cases to which Lord Burrows refers in para 89 of his judgment. In *Williams v Bayley* (1866) LR 1 HL 200 a son forged his father's signature indorsing promissory notes for substantial amounts of money. Representatives of the bank, on discovering the forgery, put pressure on the father to undertake to repay the sums. The representatives stated that they could not compound a felony (ie stifle a prosecution) and that conviction for the offence would involve transportation for life. The father, faced with this implicit threat to prosecute his son unless he took on the debt, undertook to pay the debt and granted an equitable mortgage of his property to secure it. The House of Lords held that the contract was illegal as it was an agreement to stifle a prosecution and, separately, the contract was invalid on the equitable ground that it had been procured by undue influence.

6. In *Kaufman v Gerson* [1904] 1 KB 591, the Court of Appeal refused to enforce a contract entered into by two people domiciled in France, by which the wife of A, who had misappropriated money belonging to B, undertook to pay to B the misappropriated amount in consideration of his not prosecuting her husband. Expert evidence established that such an agreement was valid in French law with the result that the defence of illegality failed. But the Court of Appeal upheld the defence of coercion; Collins MR stated (p 597) that it was "impossible to say that it was not

coercion to threaten a wife with the dishonour of her husband and children". Romer LJ (p 599) stated that the plaintiff had "extorted" the contract from the wife by threats of criminal proceedings against her husband if she did not comply. Mathew LJ (p 600) described the means by which the contract had been obtained as "unjust and immoral".

7. The third case, *Mutual Finance Ltd v John Wetton and Sons Ltd* [1937] 2 KB 389, involved the financial institution making an implied threat to prosecute a family member for forgery to obtain a guarantee from a family company. Joseph Wetton obtained a lorry on hire purchase by forging signatures on a guarantee which purported to be executed on behalf of the company. Neither his father nor his brother, Percy Wetton, was aware of the document at the time. The representative of the financial institution, when negotiating the signing of the replacement guarantee from the company, was aware that Percy Wetton was concerned that the prosecution of his brother would kill their father, who was seriously ill. By stressing the seriousness of the matter for Joseph Wetton, the representative sought to apply pressure to obtain the company guarantee. Porter J held that duress at common law could not be pleaded because he understood that duress was limited to duress of the person, by the use of unlawful force or threats of unlawful force. He invoked the equitable doctrine of undue influence and cited both *Williams v Bayley* and *Kaufman v Gerson* as examples of the principle that undue influence might exist where a promise was extracted by a threat to prosecute certain third persons unless that promise were given. He continued by asking himself whether the principle was wide enough to cover the case where the persons involved were the brother and father of the alleged criminal and answered that question in the affirmative, stating (p 396) that he was inclined to say that:

> "it extended to any case where the persons entering into the undertaking were in substance influenced by the desire to prevent the prosecution or possibility of prosecution of the person implicated, and were known and intended to have been so influenced by the person in whose favour the undertaking was given."

8. Those three cases pre-dated the development of the common law doctrine of lawful act duress and can be seen to rely on the equitable doctrine of undue influence which in the past would have been within the exclusive jurisdiction of the Chancery Courts. The coercion from the threat of prosecution of the third-party family member and the implied term of the contract which it extracted that no prosecution would take place, even where such a contractual term was legal under a governing foreign law, caused the courts to classify the behaviour of the person using the threat to obtain personal benefit as contrary to public policy, involving undue pressure or as unenforceable in equity.

9. Those three cases are now seen as examples of lawful act duress. In leading cases which have discussed the doctrine of lawful act duress, Steyn LJ in *CTN Cash and Carry Ltd v Gallaher Ltd* [1994] 4 All ER 714, 718 and Cooke J in *Progress Bulk Carriers Ltd v Tube City IMS LLC (The Cenk Kaptanoglu)* [2012] EWHC 273 (Comm); [2012] 2 All ER (Comm) 855, 864 ("*The Cenk K*") cited *Mutual Finance Ltd* as an example of an illegitimate threat in the context of the law of duress.

*(2) The second circumstance: using illegitimate means to manoeuvre the claimant into a position of weakness to force him to waive his claim*

10. The second circumstance in which the courts have upheld a plea of lawful act duress is illustrated by two cases.

11. In the first case, *Borrelli v Ting* [2010] UKPC 21; [2010] Bus LR 1718, the liquidators of Akai Holdings Ltd ("Akai"), which had collapsed into an insolvent winding up, wished to enter into a scheme of arrangement to obtain money to fund the liquidation. The scheme of arrangement needed shareholder approval and Mr Ting, Akai's former chairman and chief executive officer, held a crucial minority shareholding in Akai through Blossom Assets Ltd ("Blossom") and Costner Holdings Ltd ("Costner"), by which he could block the scheme of arrangement. Mr Ting failed to perform his duty as a former officer of Akai to assist the liquidators by providing information relevant to the winding up in the absence of adequate books and records of the company's affairs. He sought to use the votes of Blossom and Costner to block the scheme of arrangement and he forged a document and procured the provision of false evidence to the liquidators in his opposition to the scheme. The liquidators objected to the votes which were purportedly cast by Blossom and Costner at the scheme meetings and applied to the court to disallow their votes. Mr Ting and those companies opposed that application. When time was running out for the liquidators to meet a court deadline for approval of the scheme of arrangement, they entered into a settlement agreement with Mr Ting, Blossom, Costner and another company. In that agreement the liquidators undertook not to pursue any claims against Mr Ting or those companies and to cease all investigations relating to the legal proceedings or to claims against Mr Ting. Thereupon, Mr Ting and his companies dropped their opposition to the scheme, which was approved by the court. The scheme of arrangement was then completed, and the liquidators received the payment needed to conduct the liquidation. Having later received reports from the Hong Kong police concerning criminal activity by Mr Ting, the liquidators stated that they regarded the settlement agreement as unenforceable or voidable and commenced legal proceedings against him in Hong Kong for misappropriation of funds from Akai. Mr Ting and his companies raised legal proceedings in Bermuda seeking a declaration that the settlement agreement was valid and an injunction to restrain the liquidators from prosecuting the proceedings in Hong Kong.

12. The Judicial Committee of the Privy Council ("the Board") held that the settlement agreement was invalid because it had been entered into as a result of illegitimate economic pressure and that Mr Ting's behaviour had been unconscionable. Lord Saville of Newdigate, who delivered the judgment of the Board, founded on two findings of fact by the trial judge. The first was Mr Ting's deliberate failure to cooperate with the liquidators, including his failure to explain the absence of books and papers relating to the three years before Akai's collapse. The second finding was that Mr Ting had procured the opposition by Blossom and Costner to the scheme solely with the intention of depriving the liquidators of funds and so preventing them from investigating further his conduct of Akai's affairs. Mr Ting's opposition, Lord Saville said, was not in good faith but was for an improper motive. He stated (para 32):

> "In the view of the Board James Henry Ting's failure to provide any assistance to the liquidators; his opposition to the scheme; and his resort to forgery and false evidence in order to further that opposition amount to unconscionable conduct on his part. … [B]y agreeing to withdraw the opposition to the scheme James Henry Ting did no more than he should have done from the outset, had he acted in good faith rather than in an attempt to avoid responsibility for his conduct of the affairs of Akai Holdings Ltd."

Lord Saville repeated these points at para 35 of the Board's judgment and stated that by adopting those "illegitimate means", Mr Ting had left the liquidators "with no reasonable or practical alternative but to enter into the settlement agreement."

13. It is clear in my view that in *Borrelli* the Board treated as important the conclusion that it was the unconscionable or illegitimate conduct of Mr Ting which placed the liquidators in the position that they had no reasonable or practicable alternative but to enter into the settlement agreement. By so acting, Lord Saville stated, at para 31, Mr Ting "had the liquidators over a barrel". In other words, it was Mr Ting's illegitimate or unconscionable acts which placed the liquidators in the position of vulnerability with the result that they had no reasonable alternative but to agree to his demands.

14. In the second case in which the courts have upheld a claim of lawful act duress, *The Cenk K*, we again see a party, A, against whom the other party, B, has a legal claim, using illegitimate means to manoeuvre B into a position in which B has no reasonable alternative but to enter into a contract with A, by which B waives his claims against A. In this case the claimant charterers entered into a charterparty with the owners of the Cenk K for the carriage of shredded scrap metal to China. The charterers had entered into a contract to sell the scrap metal to purchasers in China

who had stipulated for a fixed shipment date. The owners, in repudiatory breach of the charterparty, chartered the Cenk K to another party but gave assurances to the claimant charterers that they would provide a substitute vessel to load the cargo at a later date and that they would compensate them for all damages resulting from their failure to provide the contracted vessel. In reliance on that assurance the charterers did not seek to find an alternative vessel. Several days later, the owners offered a substitute vessel which would have a delayed shipment date. The charterers negotiated with the Chinese purchasers to obtain their agreement to a later shipment date. The Chinese purchasers intimated that they would extend the shipment date but would only pay a reduced price per metric ton for the scrap. The owners offered to provide the substitute vessel at a discount on the freight which fell far short of the sum needed to compensate the charterers for the price reduction which the purchasers had demanded. The owners refused to offer a discount for the cargo which matched the reduced price which the purchasers were prepared to pay for the delayed shipment. The charterers informed the owners that they accepted the discount offered by the owners but reserved their rights to claim damages arising out of the breach of the charterparty. The charterers then accepted the purchasers' revisions to the sale contract and the reduced price per metric ton that that entailed. Later that day, the owners gave the charterers a "take it or leave it" offer, requiring that the charterers accept the substitute vessel at the discounted price for freight which they had offered and that they waive all claims for loss and damage arising out of the nomination of the substitute vessel outside the contracted laycan and its resulting late arrival. The charterers accepted the offer under protest, explaining that the circumstances were urgent and they needed to mitigate their losses and accommodate their Chinese purchasers.

15. The dispute went to arbitration and the arbitrators held that the waiver agreement was voidable for economic duress. They found that the owners had been in repudiatory breach of contract, had lulled the charterers into a false sense of security by their assurances, and had manoeuvred them into a position where, because of the passage of time, they had no choice but to accept the owners' "take it or leave it" offer. Cooke J, citing among other authorities *CTN Cash and Carry Ltd* and *Borrelli*, rejected the owners' appeal against the arbitrators' award. He held (para 36) that it was clear from the authorities that "illegitimate pressure" can be constituted by conduct which is not in itself unlawful "although it will be an unusual case where that is so." He continued: "It is also clear that a past unlawful act, as well as the threat of a future unlawful act can, in appropriate circumstances, amount to 'illegitimate pressure'." In para 40 he summarised the arbitrators' findings describing the owners' repudiation of the contract as "the dominant factor in the situation". He continued:

> "Whilst the arbitrators did not expressly find that the owners were in bad faith in what they did thereafter, it is clear that the arbitrators took the view that the owners had manoeuvred the

> charterers into the position they were in, following the breach, in order to drive a hard bargain. The charterers had no realistic practical alternative but to submit to the pressure …"

16. Cooke J summarised his conclusions on "illegitimate pressure" at para 44:

> "As I have already said, the pressure created by the owners in their demand for a waiver of rights by the charterers has to be seen both in the light of their repudiatory breach and in the light of their subsequent conduct, including their deliberate refusal to comply with the assurances they had previously given about providing a substitute vessel and paying full compensation in respect of that breach. Their refusal to supply the substitute vessel to meet the charterers' needs, *in circumstances which they had created by their breach and their subsequent misleading activity*, unless the charterers waived their rights, could readily be found by the arbitrators to amount to 'illegitimate pressure'. In my judgment, not only was that a finding which the arbitrators could properly reach when applying the correct test in law, … it was the right decision on the facts of this case." (Emphasis added)

*(3) Summarising the cases where the court has found lawful act duress*

17. The three earlier cases, *Williams v Bayley*, *Kaufman v Gerson* and *Mutual Finance Ltd*, were all cases in which the court treated the attempt by the party to uphold or enforce the contract as being unconscionable because of that party's behaviour. In *Borrelli*, the Board described Mr Ting's conduct as unconscionable and treated "illegitimate" as a synonym for unconscionable. In that case and *The Cenk K* it was the combination of (i) the existence of legal claims by B against A and (ii) the manoeuvring by A of B by reprehensible means into a vulnerable position where it had no alternative but to waive its pre-existing rights that amounted to illegitimate pressure.

18. It is noteworthy that in *Borrelli*, at paras 32 and 35, Lord Saville placed emphasis on Mr Ting's breach of his duty as an officer of the insolvent company and his dishonest behaviour in concluding that the pressure which he applied to the directors was illegitimate. Similarly, in *The Cenk K*, Cooke J focused not only on the ship owners' prior breach of contract but also on their subsequent "misleading activity": the context of the demand was that the owners had induced the charterers to rely on the owners' assurances to their detriment.

*(4) The influence of equity on lawful act duress*

19. The role of equity in the development of the common law of duress is apparent from wider case law in which there was no finding of lawful act economic duress. In *Barton v Armstrong* [1976] AC 104, 121, a case which concerned unlawful threats of violence, Lord Wilberforce and Lord Simon of Glaisdale in a dissenting judgment which has been quoted in later judgments, discussed the nature of illegitimate pressure. They stated:

> "out of the various means by which consent may be obtained - advice, persuasion, influence, inducement, representation, commercial pressure - the law has come to select some which it will not accept as a reason for voluntary action: fraud, abuse of relation of confidence, undue influence, duress or coercion. In this the law, *under the influence of equity*, has developed from the old common law conception of duress - threat to life and limb - and it has arrived at the modern generalisation expressed by Holmes J - 'subjected to an improper motive for action' - *Fairbanks v Snow*, 13 NE Reporter 596, 598." (Emphasis added)

20. The ideas of an improper motive for action or illegitimate pressure are closely aligned with the equitable concept of unconscionability. In *Universe Tankships Inc of Monrovia v International Transport Workers Federation (The Universe Sentinel)* [1983] 1 AC 366 Lord Diplock discussed the development of the common law of economic duress. He stated (p 384) that the rationale for this development of the common law was that a person's apparent consent to a contract had been induced by pressure exercised upon him by the other party "which the law does not regard as legitimate" with the result that the consent was treated as revocable. He continued:

> "It is a rationale similar to that which underlies the avoidability of contracts entered into and the recovery of *money exacted under colour of office, or under undue influence* or in consequence of threats of physical duress." (Emphasis added)

21. In *Huyton S A v Peter Cremer GmbH & Co* [1999] 1 Lloyd's Law Rep 620 Mance J at p 637 quoted the judgment of McHugh JA in the Supreme Court of New South Wales in *Crescendo Management Pty Ltd v Westpac Banking Corpn* (1988) 19 NSWLR 40, 46, to which Lord Goff referred in *Dimskal Shipping Co SA v International Transport Workers Federation (The Evia Luck)* [1992] 2 AC 152: "Pressure will be illegitimate if it consists of unlawful threats *or amounts to unconscionable conduct*." (Emphasis added) Mance J made a similar equation

between illegitimate pressure and unconscionable conduct at the end of his judgment (p 642) in which he stated that the pressure which Huyton applied was not a sufficiently significant cause of the agreement for it to be unconscionable for Huyton to insist on the agreement.

22. In *Borrelli*, Lord Saville referred to Mr Ting's conduct as "unconscionable". In *The Cenk K*, Cooke J (paras 34 and 35) referred to *Borrelli* and its reference to unconscionable conduct and to the textbooks which supported the view that the courts were willing to apply "a standard of impropriety". Lord Saville and Cooke J used the term "unconscionable" to describe the pressure applied by the person seeking to enforce the contract. The standard of impropriety is the high standard of unconscionability.

23. The place of lawful act economic duress in English law needs to be seen against the backdrop of the remedies which equity already provides. Unconscionability is not an overarching criterion to be applied across the board without regard to context. Were it so, judges would become arbiters of what is morally and socially acceptable. Equity takes account of the factual and legal context of a case and has identified specific contexts which call for judicial intervention to protect the weaker party. For example, the equitable doctrine of undue influence may result in a contract being set aside when two persons have a relationship in which A has acquired influence or ascendancy over B and A takes unfair advantage of its influence or ascendancy: *Royal Bank of Scotland Plc v Etridge (No 2)* [2002] 2 AC 773, paras 6-8 per Lord Nicholls of Birkenhead. It applies typically where there is a relationship of trust and confidence between A and B which A exploits to the detriment of B: "Chitty on Contracts" (ed Hugh Beale 33rd ed (2018)), paras 8-058 to 8-059.

24. Similarly, the equitable doctrine of unconscionable bargains has been applied where B is at a serious disadvantage relative to A through "poverty, or ignorance, or lack of advice or otherwise" so that circumstances existed of which unfair advantage could be taken; A exploited B's weakness in a morally culpable manner; and the resulting transaction was not merely hard or improvident but overreaching and oppressive: *Alec Lobb (Garages) Ltd v Total Oil (Great Britain) Ltd* [1983] 1 WLR 87, 94-95, per Peter Millett QC, sitting as a deputy High Court judge. See also "Snell's Equity" (John McGhee and Steven Elliott eds, 34th ed (2019), para 8-042). Examples of unconscionable transactions include circumstances in which A knowingly negotiates an agreement with B while B is elderly, unwell and intoxicated (*Blomley v Ryan* (1954) 99 CLR 362) and where a poor, illiterate and unwell person is induced to enter into a disadvantageous transaction without advice and in great haste (*Clark v Malpas* (1862) 4 De GF & J 401; 45 ER 1238). In *Fry v Lane* (1888) 40 Ch D 312, Kay J summarised the then existing case law in these terms (p 322): "where a purchase is made from a poor and ignorant man at a considerable undervalue, the vendor having no independent advice, a Court of Equity will set

aside the transaction." He held that the circumstances of poverty, ignorance and lack of independent advice impose on the purchaser the burden of showing that the purchase was fair, just and reasonable. Unequal bargaining power does not suffice; it is necessary for the claimant to show that unconscientious advantage has been taken of his or her disabling condition or circumstances: *Boustany v Pigott* (1993) 69 P & CR 298 (JCPC) at p 303 per Lord Templeman. Extortionate bargains can be struck down or varied in other circumstances; see, for example, *The Port Caledonia and the Anna* [1903] P 184 in which the court drastically reduced a claim for salvage where a ship's captain in an emergency had been forced to accept an extortionate offer from a tug captain for the provision of salvage services. But the rules relating to salvage may depend on specialties of maritime law: "Chitty on Contracts" (above), para 8-048.

25. While there is an overlap between duress as it has developed in English law and the equitable doctrines of undue influence and unconscionable bargains, it is of note that under neither equitable doctrine is inequality of bargaining power sufficient of itself to entitle B to relief.

*(5) The absence in English law of a doctrine of inequality of bargaining power and of a principle of good faith in contracting*

26. It is not in dispute that there is in English common law no doctrine of inequality of bargaining power in contract, although such inequality may be a relevant feature in some cases of undue influence: *National Westminster Bank Plc v Morgan* [1985] AC 686, 708 per Lord Scarman. As Lord Scarman observed in *The Universe Sentinel* (p 401), when he referred to the judgment of Lord Wilberforce and Lord Simon in *Barton v Armstrong*, in commercial life many acts are done under pressure and sometimes overwhelming pressure. In negotiating a commercial contract each party to the negotiations seeks to obtain contractual entitlements which he or she does not possess unless and until the parties agree the terms of the contract. Inequality of bargaining power means that one party in the negotiation of a commercial contract may be able to impose terms on a weaker party which a party of equal bargaining power would refuse to countenance. Equally, a party in a strong bargaining position, such as a monopoly supplier, may refuse outright to enter into a contract which the weaker party desires or may impose terms which the weaker party considers to be harsh. The courts have taken the position that it is for Parliament and not the judiciary to regulate inequality of bargaining power where a person is trading in a manner which is not otherwise contrary to law. See for example *Hilton v Eckersley* (1855) 6 E & B 47, 74-75; 119 ER 781, 792 per Baron Alderson; *Mogul Steamship Co Ltd v McGregor, Gow & Co* [1892] AC 25, 36 per Lord Halsbury LC; *OBG Ltd v Allan* [2007] UKHL 21; [2008] AC 1, para 56 per Lord Hoffmann; *CTN* (above), at p 717 per Steyn LJ, and in this case, at paras 103 and 107 per David Richards LJ.

27. The English law of contract seeks to protect the reasonable expectations of honest people when they enter into contracts. It is an important principle which is applied to the interpretation of contracts: Lord Steyn, "Contract law: Fulfilling the reasonable expectations of honest men" (1997) 113 LQR, 433-442, 433; and *Mannai Investment Co Ltd v Eagle Star Life Assurance Co Ltd* [1997] AC 749 at 771A per Lord Steyn. But, in contrast to many civil law jurisdictions and some common law jurisdictions, English law has never recognised a general principle of good faith in contracting. Instead, English law has relied on piecemeal solutions in response to demonstrated problems of unfairness: *Interfoto Picture Library Ltd v Stiletto Visual Programmes Ltd* [1989] QB 433, 439 per Bingham LJ; *MSC Mediterranean Shipping Co SA v Cottonex Anstalt* [2016] EWCA Civ 789; [2017] 1 All ER (Comm) 483, para 45 per Moore-Bick LJ.

28. The absence of these doctrines restricts the scope for lawful act economic duress in commercial life. In chapter 5 of his book, "The Use and Abuse of Unjust Enrichment" (Oxford 1991) Professor Jack Beatson (later to become Beatson LJ) discussed the development of the modern doctrine of economic duress and the severe limitations on its application in commercial negotiation. At pp 129-130 he explained the basic approach of the common law in these terms:

> "All that is not prohibited is permitted and there is no general doctrine of abuse of rights. If therefore a person is permitted to do something, he will generally be allowed to do it for any reason or for none. In the context of contractual negotiations this position enables people to know where they stand and provides certainty as to what is acceptable conduct in the bargaining process but it does leave many forms of socially objectionable conduct unchecked. Again, this is soundly based for judges should not, as a general rule, be the arbiters of what is socially unacceptable and attach legal consequences to such conduct."

He suggested (p 134) that the scope for lawful act duress in contractual negotiations was "extremely limited". I agree.

29. "Anson's Law of Contract", 31st ed (2020) (J Beatson, A Burrows and J Cartwright eds) similarly recognises this restrictive approach to the law of duress in contractual negotiations (p 379, ch 10.2(d)):

> "It is not ordinarily duress to threaten to do that which one has a right to do, for instance to refuse to enter into a contract or to terminate a contract lawfully. In the cut-and-thrust of business

> relationships various types of pressure may be brought to bear in differing situations. … [A] contracting party will not be permitted to escape from its contractual obligations merely because it was coerced into making a contract by fear of the financial consequences of refusing to do so. Although this approach leaves many forms of socially objectionable conduct unchecked, as a general rule the determination of when socially objectionable conduct which is not in itself unlawful should be penalized is for the legislature rather than the judiciary."

30. Against this commercial background the pressure applied by a negotiating party will very rarely come up to the standard of illegitimate pressure or unconscionable conduct. It will therefore be a rare circumstance that a court will find lawful act duress in the context of commercial negotiation.

*(6) The approach of other common law jurisdictions to economic duress*

31. A similar picture of circumspection in the application of lawful act duress in commercial negotiations emerges from a review of judgments in several leading common law jurisdictions.

32. As David Richards LJ demonstrated in his judgment in this case (paras 79-82), no clear picture of the existence and boundaries of lawful act duress has emerged throughout Australia. The Supreme Court of New South Wales recognised lawful act duress in *Crescendo Management* (above). McHugh JA's views in that case have been cited with approval by the Queensland Court of Appeal (*Mitchell v Pacific Dawn Pty Ltd* [2011] QCA 98, paras 50-52), the Court of Appeal of Western Australia (*Electricity Generation Corpn (trading as Verve Energy) v Woodside Energy Ltd* [2013] WASCA 36, paras 24-25, 174-176; see also *Morgan Stanley Wealth Management Australia Pty v Detata (No 3)* [2018] WASC 32, paras 236-237), and the Court of Appeal of Victoria (*Doggett v Commonwealth Bank of Australia* (2015) 47 VR 302, para 73; see also *Braam v BBC Hardware* [2020] VSCA 164, para 82). But the Court of Appeal of New South Wales in *Australia and New Zealand Banking Group Ltd v Karam* (2005) 64 NSWLR 149, para 66, and in *May v Brahmbhatt* [2013] NSWCA 309, paras 39-40, rejected the concept of lawful act duress, confining duress to threatened or actual unlawful conduct, thereby leaving the weaker party to invoke the equitable doctrines of undue influence and unconscionable transactions if it can.

33. The Australian textbook, Edelman and Bant, "Unjust Enrichment", 2nd ed (2016), p 217, approves of a restrictive approach to the undermining of commercial contracts which were entered into as a result of lawful commercial threats:

> "The general reluctance of courts to recognise lawful economic or commercial threats as disproportionate to commercial goals (and thus illegitimate) is to be applauded. Any other approach would cut across the statutory competition law rules which draw complex distinctions between lawful and unlawful commercial behaviour. … Only in the most exceptional circumstances, if at all, should it be illegitimate to threaten to engage in conduct which a plaintiff has a right to engage in and which is not proscribed by competition law. However, where the threatened conduct is non-commercial in nature, such as threats to publish information or threats to foster rumours about a company, a finding that the threat is disproportionate and therefore illegitimate may be more readily made."

The authors' reference to disproportionality has not been mirrored in English law but the emphasis on the need to avoid conflict with statutory competition law echoes concerns expressed in English case law that the regulation of inequality of bargaining power should as a general rule fall to Parliament. Further, the authors' recognition that there might be scope for non-commercial threats to fall within the doctrine of lawful act duress is salutary as the control of such threats by the common law would not cut against the grain of statutory regulation of unfair contract terms or consumer contracts.

34. The courts in New Zealand have recognised lawful act duress, adopting the approach of the House of Lords in *The Universe Sentinel*, but have taken a restrictive approach to it. Like the English courts, the courts in New Zealand have held that pressure is commonplace in commercial negotiation and only illegitimate pressure can support a case of duress: *McIntyre v Nemesis DBK Ltd* [2010] 1 NZLR 463 (CA). Illegitimate pressure has been equated with unconscionable conduct: *Magsons Hardware Ltd v Concept 124 Ltd* [2011] NZCA 559. More recently, the New Zealand Court of Appeal in *Dold v Murphy* [2020] NZLR 313 held that the doctrine of lawful act duress does not provide a remedy against hard-nosed commercial self-interest without more. The Court of Appeal rejected a claim of lawful act duress in circumstances where a minority shareholder, who had 6.2% of a company's shares, successfully demanded to be paid considerably more than the proportionate value of his shareholding when the other two shareholders, who between them held 93.8% of the shares, wished to accept a particularly valuable offer for all of the shares in the company. The court held that a threat not to enter into a contract, other things being equal, was most unlikely to be an unlawful or illegitimate act. In that case, Mr Murphy's opportunistic behaviour was not unlawful and the question of the genuineness of his belief in his entitlement did not arise: "he was entitled to act in his own self-interest, even if his actions were both unexpected and ungenerous."

35. This court was also referred to a judgment of the Court of Appeal of Singapore: *BOM v BOK* (2018) SGCA 83; (2018) 21 ITELR 607. This case was not concerned with commercial contracts or directly with the law of duress. It concerned a deed of trust which a husband had been induced to sign by his wife by means of misrepresentation and undue influence. The deed was set aside for mistake and undue influence, and as an unconscionable transaction in that the husband was suffering from an infirmity and the wife had to show that the transaction had been fair, just and reasonable. The case is indirectly relevant to this appeal in so far as it discussed and rejected a submission that Singapore law should adopt a new umbrella doctrine of unconscionability which subsumed duress and undue influence. Andrew Phang Boon Leong JA, delivering the judgment of the court, recognised, in paras 169-179, the linkages between the doctrines of undue influence and unconscionable bargain and the similarities in substance between duress and undue influence. Duress in Singapore law involves the exertion by a party of illegitimate pressure on the other party in the form of a threat which coerces the will of the other. Undue influence in Singapore law involves the plaintiff showing that he was suffering from an infirmity that the other party exploited in procuring the transaction. If that requirement is satisfied, the defendant has the burden of demonstrating that the transaction was fair, just and reasonable (para 142). The judge rejected an umbrella doctrine of unconscionability principally because there were no practically workable legal criteria which the court could use to determine what amounts to unconscionable behaviour that vitiates a contract. An umbrella doctrine, he said, would lead to excessive subjectivity, which would engender excessive uncertainty and unpredictability and would undermine the sanctity of contract.

36. While making clear the danger of judicial subjectivity if one were to adopt a general criterion of morally reprehensible conduct, the Singapore Court of Appeal did not discuss the meaning of "illegitimate pressure" in duress.

37. The Supreme Court of Canada has recognised the existence of economic duress as a potential defence to contractual enforcement in *Martel Building Ltd v Canada* [2000] 2 SCR 860, para 70 but the substantive case law is at the level of the provincial courts of appeal. Canadian jurisprudence, such as the judgments of the Court of Appeal for Ontario in *Stott v Merit Investment Corpn* (1988) 63 OR (2d) 545 and in *Techform Products Ltd v Wolda* (2001) 206 DLR (4th) 171, has considered English jurisprudence and jurisprudence of the Board, such as in *The Universe Sentinel* and *Pao On v Lau Yiu Long* [1980] AC 614, and has required illegitimate pressure as a component in the doctrine. In *Techform Products*, which concerned the ownership of inventions, the Court of Appeal (paras 34-38) referred to *CTN*, attached weight to the bona fide belief by the company that it owned the inventions in dispute, and saw as an important consideration the fact that the consultant had been allowed to take away the draft agreement, giving him ample opportunity to obtain legal advice. In *Stott* an employee in an investment firm was unexpectedly confronted by his manager without notice and given no opportunity to

consider his position or consult a lawyer before being required to sign a contract to pay off a debt owed to the company by a client in a context where he was justifiably fearful for his job. The court would have treated the case as one of economic duress and given a remedy but for the claimant's subsequent conduct which approbated the contract. In *Greater Fredericton Airport Authority Inc v NAV Canada* (2008) 290 DLR (4th) 405 the Court of Appeal of New Brunswick was critical of the importation from English law of the concept of illegitimate pressure as a condition precedent to a finding of economic duress, principally because of the lack of clarity as to when pressure moved from being legitimate to being illegitimate (paras 35-50 per Robertson JA). The Newfoundland and Labrador Court of Appeal followed Robertson JA's approach in *Fredericton* in *Burin Peninsula Community Business Development Corpn v Grandy* (2010) 327 DLR (4th) 752. The approach of the Court of Appeal for Ontario appears to be the dominant line of authority, but the decision of the Canadian Supreme Court in *Bhasin v Hrynew* [2014] 3 SCR 494 to recognise a general organising principle of good faith in contractual performance may have a significant influence on the direction of Canadian jurisprudence on the doctrine of economic duress. See Brandon Kain and Justin Nasseri, "Economic duress after *Bhasin v Hrynew*: does the organizing principle of good faith offer a new framework?" Archibald and Scott, Annual Review of Civil Litigation 2016. S M Waddams, "The Law of Contracts", 7th ed (2017) concludes that the courts can give relief from provisions in agreements which are "highly unreasonable or very unfair" and that the test for duress is one of unfairness or unconscionability: "whether the promisee has taken unfair advantage of inequality of bargaining power" (p 354, para 514 and p 358, para 520).

38. In the United States the Restatement (Second) of Contracts (1981, June 2020 update), which the American Law Institute produced, discusses when a threat is improper. It states in section 176, so far as relevant:

> "(1) A threat is improper if
>
> (a) what is threatened is a crime or a tort, or the threat itself would be a crime or a tort if it resulted in obtaining property,
>
> (b) what is threatened is a criminal prosecution,
>
> (c) what is threatened is the use of civil process and the threat is made in bad faith, or

> (d) the threat is a *breach of the duty of good faith and fair dealing under a contract* with the recipient." (Emphasis added)

The first heading addresses unlawful act duress. The second heading is the equivalent of the three lawful act duress cases to which I referred in paras 5-9 above. The fourth heading is influenced by the general duty of good faith and fair dealing in contract (viz Uniform Commercial Code para 1-304; Restatement (Second) of Contracts section 205), which does not have its counterpart in English law. Little guidance can therefore be gained from the fourth heading in the Restatement on the question of lawful act duress in English law.

39. In summary, several jurisdictions, such as Australia, New Zealand and Singapore, have adopted a circumspect approach to economic duress and lawful act duress. Jurisdictions with a general requirement of good faith in contract, such as Canada and the United States, may be expected to be more open to a claim of economic duress in the context of what Lord Burrows has described as a "bad faith demand".

*(7) CTN Cash and Carry Ltd and the "bad faith demand"*

40. Before turning to the judgment of the Court of Appeal in this appeal, I examine the earlier judgment of the Court of Appeal in *CTN Cash and Carry Ltd* [1994] 4 All ER 714 which featured prominently in the reasoning of David Richards LJ in his admirable judgment. In *CTN*, in contrast with the five judgments which I have discussed in paras 5-17 above, the Court of Appeal found that the impugned contract had not been obtained by duress.

41. CTN Cash and Carry Ltd ("CTN") traded at arm's length with Gallaher Ltd ("Gallaher") from whom it purchased consignments of cigarettes. Gallaher was the sole distributor in England of certain popular brands of cigarettes. Gallaher was not contractually bound to sell cigarettes to CTN and each sale was a separate contract on Gallaher's standard terms of business. Gallaher gave credit facilities to CTN which it could withdraw at its discretion at any time. The manager of one of CTN's warehouses ordered a consignment of cigarettes which Gallaher in error delivered to another of CTN's warehouses. When the mistake was discovered, Gallaher agreed to collect and deliver the consignment to the correct warehouse. But before that could be done, the entire consignment of cigarettes was stolen. Gallaher, believing, erroneously, that the goods were at CTN's risk at the time of the theft, demanded that CTN pay the purchase price of the consignment. CTN initially refused to pay but paid the contractual sum for the purchase when Gallaher threatened to withdraw its credit facilities in future dealings. CTN raised legal proceedings to recover the

£17,000 which it had paid, alleging that it had paid the sum under economic duress. The judge at first instance held that CTN had failed to make out a case for economic duress and the Court of Appeal dismissed CTN's appeal.

42. Steyn LJ delivered the first judgment. He identified three distinctive features of the case. First, he observed (p 717h-j) that the dispute arose out of arm's length commercial dealings between two trading companies. While Gallaher was in a sense in a monopoly position as the sole supplier of the brands, the control of monopolies was a matter for Parliament and the common law did not recognise the doctrine of inequality of bargaining power in commercial dealings. He stated: "The fact that the defendants were in a monopoly position cannot therefore by itself convert what is not otherwise duress into duress." Secondly, he observed that Gallaher could lawfully refuse to enter into any future contracts with CTN for any reason or for no reason at all and could similarly lawfully refuse to grant credit. The third characteristic of the case, which he regarded as "critically important", was that Gallaher thought in good faith that the goods were at CTN's risk when they were stolen: "[Gallaher's] motive in threatening withdrawal of credit facilities was commercial self-interest in obtaining a sum that they considered due to them" (p 718c). The combination of those three features meant that CTN's claim failed. Steyn LJ warned of the risk of introducing uncertainty into the commercial bargaining process: "The aim of our commercial law ought to be to encourage fair dealing between parties. But it is a mistake for the law to set its sights too highly when the critical enquiry is not whether the conduct is lawful but whether it is morally or socially unacceptable" (p 719b-c). He concluded:

> "Outside the field of protected relationships, and in a purely commercial context, it might be a relatively rare case in which 'lawful act duress' can be established. And it might be particularly difficult to establish duress if the defendant bona fide considered that his demand was valid. In this complex and changing branch of the law I deliberately refrain from saying 'never'. But as the law stands, I am satisfied that the defendant's conduct in this case did not amount to duress."

Farquharson LJ and Sir Donald Nicholls V-C agreed. The latter expressed concern at the outcome, which was that Gallaher retained the money notwithstanding that the basis on which it had sought and insisted on payment had since been shown to be false, and wondered if a claim might lie in unjust enrichment.

43. This judgment, although an important steppingstone in the development of the doctrine of lawful act duress and cited in later cases, is authority for what is <u>not</u> such duress and not for what is. It is unquestionably correct in its conclusion that CTN's payment was not recoverable on the ground of duress. Lord Burrows in his

judgment sees an implication in the Court of Appeal's reasoning that if Gallaher had sought the payment in bad faith and had exploited their monopoly position in the knowledge that the money was not due, the money would have been recoverable on the basis of economic duress. Steyn LJ's statement (p 718b-c) that Gallaher's bona fide belief that the goods were at the risk of CTN when they were stolen was "a third, and critically important, characteristic" of the case readily supports that view. Lord Burrows also derives support for that conclusion from (i) the judgment of David Richards LJ in this case and (ii) Mitchell, Mitchell and Watterson, "Goff and Jones on the Law of Unjust Enrichment", 9th ed (2016) who say at para 10-70:

> "If the claimants could have shown that when the defendants made their threat they knew that the goods were at the defendants' risk, then the claimants would surely have succeeded, for the money would then have been extorted from them, and commercial self-interest is not unbridled."

44. Although it is not necessary in order to determine this appeal to decide whether that is correct, I do not think that the Court of Appeal would have been right so to decide. The present case can be determined by applying the analysis of lawful act duress set out in paras 2-30 above, which is anchored in established legal principles. The analysis in the preceding paragraph is, with respect, not so anchored. As I have said (paras 26-30 above), there is no doctrine of inequality of bargaining power and no general principle of good faith in contracting in English law. A commercial party in negotiation with another commercial party is entitled to use its bargaining power to obtain by negotiation contractual rights which it does not have until the contract is agreed. A powerful commercial party, such as a monopoly supplier or monopoly purchaser, can impose onerous terms, for example demanding a premium, as a condition for entering into a transaction with another party. Steyn LJ does not suggest otherwise. The implication of his judgment may be that the dishonest assertion of a pre-existing entitlement to payment accompanied by a threat to carry out a lawful act, such as to withdraw credit arrangements on future contracts or to refuse to enter into further contracts, could amount to lawful act duress as a form of an abuse of right.

45. Lord Burrows would not confine lawful act duress to a claim based on a dishonest assertion by A of a pre-existing legal entitlement to payment which was implicitly the subject matter of the Court of Appeal's discussion in *CTN Cash and Carry Ltd*. Instead, he argues that A's demand for a waiver by B of a claim against A would amount to lawful act economic duress where (i) A did not genuinely believe that it had a defence to the claim - ie his "bad faith demand", and (ii) A has deliberately created or increased B's vulnerability to that demand.

46. In my view this would extend the doctrine of lawful act duress well beyond the position reached in the five cases which I have discussed in which such a claim succeeded.

47. Dealing, first, with *CTN Cash and Carry Ltd*, the circumstance which Steyn LJ appears to have envisaged, and which persuaded David Richards LJ in this case to recognise the existence of lawful act duress if the demand were made in bad faith, was simply the extreme inequality of bargaining power between A and B without any manoeuvring by A to create B's vulnerability in order to extract a concession.

48. A "bad faith demand" based on an asserted pre-existing entitlement may not be a rare occurrence in commercial life. Discreditable behaviour can be a feature of commercial activity. For example, it appears from the judgment of Sir Donald Nicholls V-C in *CTN* that, at the time of the hearing in the Court of Appeal, Gallaher had declined to repay the price of the stolen cigarettes although it knew by then both that its prior good faith demand was wrong in law and that it had no right to the money in dispute. There may therefore be a mischief which the law could address. But the extension of lawful act duress which may be implicit in Steyn LJ's judgment in *CTN Cash and Carry Ltd* would nonetheless give rise to at least three difficulties.

49. First, it would be difficult to anchor the extension in any recognised legal principle. Where B is induced by A's fraudulent representation to meet its demand, B may have a claim against A under the tort of deceit. But that is not the circumstance envisaged in *CTN* or by the Court of Appeal in this case. Where B is induced to meet A's demand because of the stark inequality of bargaining power which gives B no effective choice but to meet the demand which B knows is not justified, it is not obvious to me that, without more, B could have a claim for economic duress in the absence of a general principle of good faith in contracting or a doctrine of imbalance of bargaining power, neither of which currently exists. It is difficult in principle to distinguish such a circumstance from a circumstance in which A makes an exorbitant demand in the course of negotiations as a condition for entering into contractual relations with B.

50. Secondly, in the absence of an underlying principle, the extension of lawful act duress in this way would create unwanted uncertainty. There is, in my view, force in the concern that the extension of the concept of lawful act duress would risk creating unacceptable uncertainty in the sphere of commercial transactions: see Professor Graham Virgo, "The Principles of the Law of Restitution", 3rd ed (2015), pp 215-221. Lord Burrows seeks to avoid such uncertainty through the construct of the bad faith demand, but I do not accept that, without more, lawful act economic duress would exist even if there were such a bad faith demand. In my view the doctrine is more limited in the context of commercial relations.

51. Thirdly, the extension of lawful act duress in this way might be of limited utility. This is because, first, commercial organisations may enter into a dispute or commence litigation without an informed idea of their legal rights or any intention of seeking judicial resolution but with the aim of reaching a settlement of the dispute on better terms than are currently on offer. The vast majority of commercial disputes do not go to trial and are not expected to do so. Each organisation may have to reach its own view as to its entitlements and resolve the dispute accordingly. Secondly, it would be very difficult for B to establish its case because B would have to demonstrate A's subjective bad faith. The application of legal rules to a particular factual circumstance, such as when risk passes on a contract of sale, commonly involves questions of legal judgment on which legal advisers may reasonably differ. A party may be advised that it has an arguable case but that the application of the law to the facts of that case is uncertain. A party may proceed to make a claim on the basis of legal advice of a percentage chance of success. What is envisaged in the "bad faith demand" requirement in this context is that there is little, if any, uncertainty as to A's lack of entitlement, and that A makes its demand in the knowledge that it does not have the legal entitlement which it claims. B would succeed in its claim for lawful act duress only if it established that A did not genuinely believe that it had that entitlement.

52. I therefore do not accept that the lawful act doctrine could be extended to a circumstance in which, without more, a commercial organisation exploits its strong bargaining power or monopoly position to extract a payment from another commercial organisation by an assertion in bad faith of a pre-existing legal entitlement which the other organisation believes or knows to be incorrect.

53. Lord Burrows would extend the doctrine further. In his view *Borrelli* and *The Cenk K* support the conclusion that a demand by A that B waive a claim against it would be a "bad faith demand" if A did not genuinely believe that it had a defence to the claim. If A then used its bargaining power and nothing more to make B vulnerable to its demand or to increase B's vulnerability, the combination of the bad faith demand and the manoeuvring would, he argues, be sufficient to establish lawful act duress. I respectfully disagree for four reasons.

54. First, the demand for a waiver, to which A must know that it has no prior entitlement, is in principle no different from the demand for a sum of money as a pre-condition for entering into contractual relations in the context of a commercial negotiation, which I mentioned in para 44 above. Lord Burrows in para 125 of his judgment accepts that economic duress could not be made out in the latter circumstance. If the demand for money, which is supported by the assertion of A's bargaining power, does not give rise to a claim for duress, why should a demand for a waiver of a valid claim which is backed up in the same way?

55. Secondly, the absence of an identifiable principle to distinguish those two circumstances would increase the undesirable uncertainty in commercial transactions which I mentioned in para 50 above.

56. Thirdly, and in any event, bad faith plays a wider role in lawful act duress than merely the absence of belief in an entitlement to a pre-existing right or in the invalidity of a claim for which A seeks a waiver. In both *Borrelli* and *The Cenk K* the conduct of A by which A applied pressure to B involved bad faith or behaviour which was similarly reprehensible: para 18 above. In both cases it was the combination of the probable or at least possible validity of B's claim against A combined with A's behaviour of that nature which gave rise to the court's conclusion that the waiver had been obtained through the application of illegitimate pressure. In other words, bad faith is potentially relevant both to the content of the demand and to the context in which A makes its demand. To my mind, the two cases do not support Lord Burrows' model.

57. Fourthly, there is no support in either *Borrelli* or *The Cenk K* for the proposition that the mere assertion of bargaining power, such as a lawful threat to terminate an existing contract or to reduce the supply of goods under the contract in a way which the contract allowed, could without more amount to illegitimate pressure. Lord Burrows considers that PIAC's deliberate act of cutting its ticket allocation, thereby increasing Times Travel's vulnerability to its demand for a waiver of a claim that it was in breach of contract, was an act which was beyond the mere exercise of monopoly power and would have amounted to illegitimate pressure if PIAC had known that it had indeed broken its contract. I respectfully disagree and take a narrower view of the scope of lawful act economic duress in this context. The reduction of the ticket allocation was a hard-nosed exercise of monopoly power, which, in the absence of a doctrine of unequal bargaining power, could not by itself amount to illegitimate pressure. Something more was needed, such as the reprehensible characteristics of the behaviour in *Borrelli* and *The Cenk K* to which I have referred in para 18 above. As I have said (para 28 above) the scope for lawful act economic duress is extremely limited in the sphere of commercial transactions.

*(8) The Court of Appeal's judgment in this case*

58. In my view the Court of Appeal was correct to conclude that the claimants had not made out a case of economic duress. The court was correct to conclude that it would be rare that in a commercial context the use by A of lawful pressure to induce B to concede to a demand would amount to economic duress. Significantly, there are no findings that PIAC had used any reprehensible means such as were evident in *Borrelli* and *The Cenk K*, to manoeuvre Times Travel into a position of increased vulnerability in order to exploit that vulnerability. PIAC gave notice on 14 September 2012 that Times Travel's contract would be terminated at the end of

October 2012. On 17 September PIAC cut Times Travel's fortnightly allocation of tickets from 300 to 60, as under its existing contract it was entitled to do. At the meeting on 24 September 2012 PIAC gave Times Travel a "take it or leave it" option: to sign the new agreement with the waiver and thus regain its prior allocation of tickets, or its agency would come to an end on the expiry of the existing contract. While this entailed hard-nosed commercial negotiation that exploited PIAC's position as a monopoly supplier, it did not involve the reprehensible means of applying pressure which gave rise to the findings of lawful act economic duress in *Borrelli* and *The Cenk K*. There are also no findings that PIAC acted in bad faith in making the demands which it did.

59. Where I respectfully disagree with David Richards LJ is in para 62 of his judgment in which he states:

> "In my view, *CTN Cash and Carry Ltd v Gallaher* … can be taken to establish that where A uses lawful pressure to induce B to concede a demand to which A does not bona fide believe itself to be entitled, B's agreement is voidable on grounds of economic duress."

Taken literally this might refer to a demand in a negotiation for a contractual term which did not yet exist rather than only the assertion of an alleged pre-existing right; but it is clear in context that David Richards LJ had the latter assertion in mind. Thus, at para 96 he states:

> "If Gallaher had made its demand in bad faith, not believing it to be *well founded*, the court would have held the payment to have been made under duress." (Emphasis added)

It may indeed be correct that the Court of Appeal in *CTN* would have so held. But, for the reasons set out above, I do not think that the court would have been correct to reach that conclusion, absent circumstances which involved the manoeuvring by Gallaher of CTN into a position of vulnerability by means which involved bad faith or were similarly reprehensible and went beyond the use of its position as a monopoly supplier, or which brought the transaction within the ambit of the equitable doctrine of unconscionable transactions.

60. In this case, on the facts found by Warren J, PIAC believed in good faith that it was not liable for breach of contract as a result of its failure to pay past commission and, in any event, the pressure which it applied to obtain the waiver was the assertion of its power as a monopoly supplier.

9. *Conclusion*

61. I would dismiss the appeal.

**LORD BURROWS:**

**1. Introduction and overview**

62. Duress in the law of contract focuses on an illegitimate threat (or illegitimate pressure) which induces a party to enter into a contract. If duress is established, the remedy for the threatened party is rescission of the contract (sometimes referred to as the avoidance, or setting aside, of the contract). In this case, we are concerned with that form of duress that has been labelled "economic duress". Economic duress was first recognised in English law in first instance cases in the 1970s (*Occidental Worldwide Investment Corpn v Skibbs A/S Avanti* [1976] 1 Lloyd's Rep 293 and *North Ocean Shipping Co Ltd v Hyundai Construction Co Ltd* [1979] QB 705) and was authoritatively accepted by the House of Lords in *Universe Tankships Inc of Monrovia v International Transport Workers Federation (The Universe Sentinel)* [1983] 1 AC 366. Prior to those cases, the conventional view was that the common law recognised only duress of the person and, as regards the restitution of non-contractual payments (but not the avoiding of a contract: *Skeate v Beale* (1841) 11 Ad & El 983), duress of goods. Although economic duress may take various forms, the main example of it in the case law is where one contracting party threatens to break a contract unless the other contracting party agrees to do something (for example, to pay extra money for completion of the promised performance). However, in this case, we are not concerned with where what is threatened (or the relevant pressure) is unlawful, such as a threatened breach of contract or tort. Rather we are crossing a line to where what is threatened is lawful. In other words, we are concerned with what has been termed "lawful act duress". We have heard submissions on, and need to answer, fundamental questions such as, does lawful act duress exist and, if so, what is its scope? To decide this appeal, we then need to apply those answers to the facts of this case.

63. The claimant, Times Travel (UK) Ltd ("TT"), is a travel agent in Birmingham. At the relevant time, its business almost entirely comprised selling tickets for flights to Pakistan on planes owned by the defendant, Pakistan International Airlines Corporation ("PIAC"). PIAC is the national flag carrier airline of Pakistan and, at the relevant time, it was the only airline operating direct flights between the UK and Pakistan. Disputes arose between various travel agents and PIAC as to non-payment of commission that the travel agents claimed was owed to them on the sale of PIAC tickets. PIAC threatened to end any contractual

relationship with TT, as it was legally entitled to do, unless TT entered into a new contract under which, inter alia, TT released PIAC from all claims that TT might have against PIAC in relation to commission under the previous contract. TT subsequently sought to rescind the new contract for duress thereby freeing it to recover the commission, which it claimed it was owed, under the previous contract.

64. At first instance, [2017] EWHC 1367 (Ch), Warren J held that TT was entitled to rescind the contract for economic duress. But that decision was overturned by the Court of Appeal, [2019] EWCA Civ 828; [2020] Ch 98, with the leading judgment being given by David Richards LJ, with whom Moylan and Asplin LJJ agreed. The Court of Appeal held that, as the relevant threat was lawful, duress could only be established if PIAC's demand, that TT give up its claims for commission, had been made in bad faith in the sense that PIAC must not have genuinely believed that it had a defence to TT's claims for commission. It followed that, as Warren J had found that PIAC did genuinely believe that it had a defence to the main claims for past commission - and that, even in relation to a relatively minor claim, where there was clearly no defence, Warren J had still not found that PIAC had been acting in bad faith - lawful act duress was not made out. According to the Court of Appeal, it is insufficient for lawful act duress that PIAC's belief, that it had a valid defence, was unreasonable: in the context of lawful act duress, there is a critical distinction between bad faith demands and unreasonable demands. TT appeals to the Supreme Court against that decision of the Court of Appeal.

## 2. The facts

65. It took Warren J over 200 paragraphs to cover the factual ground. He faced significant difficulties. Agreements were reached orally as well as in writing and the events extended over several years. His task was further complicated because he was having to make factual findings in respect of two claimants (TT and Nottingham Travel (UK) Ltd) in respect of whom the facts were similar but not the same. In the circumstances, it is perhaps not surprising that one needs to jump about in Warren J's judgment in order to piece together his essential findings of fact in relation to the claims brought by TT which is the sole claimant with whom we are concerned in this appeal.

66. TT entered into a relationship with PIAC in 2006, initially using the International Air Transport Association ("IATA") agency licence of its partner, Gazelle Travel. TT was paid a basic commission of 9% on ticket sales and, until the end of June 2008, was also paid an overriding commission ("ORC"). Towards the end of 2008 (the precise date is nowhere made clear), TT obtained its own IATA licence and began trading as an IATA-approved passenger sales agent of PIAC in its own right. The contract between PIAC and TT included the standard form IATA Passenger Sales Agency Agreement (in the form of IATA Resolution 824). This

required PIAC to remunerate TT for the sale of tickets in a manner and amount stated from time to time to TT by PIAC; and the contract could be terminated at the end of a month by giving at least a month's notice in writing.

67. It is not in dispute between the parties that this was a one-sided contract. Nigel Jones QC, counsel for PIAC, did not shy away from this. On the contrary, in his opening oral submissions, he recognised that TT was the weaker party and had taken the risk of building up its business by an almost exclusive reliance on PIAC without legal safeguards. PIAC could choose to terminate TT's contract, and effectively end its business, simply by giving the required short period of notice.

68. The parties used IATA's accounting system known as the "BSP", which was shorthand for IATA's "Billing and Settlement Plan". All IATA agents were required to use this system. As Warren J explained, [2017] EWHC 1367 (Ch), at para 10:

> "[U]nder the accounting system … an agent was obliged to pay all the fare applicable into the BSP which collates all sales and ticketing done through the booking system and produces a report on a weekly basis. The BSP is designed to facilitate and simplify the selling, reporting and remitting procedures of IATA Accredited Passenger Sales Agents and to ensure that there is a definitive accounting between the agent and the carrier. IATA collected ticket revenue by direct debit through the BSP system. I note that the claimants' claims … are all based on figures derived from the BSP …"

69. It is not clear when issues first arose about the non-payment of commission allegedly owed by PIAC to its UK travel agents. But on 25 February 2011 and, particularly importantly for this case, on 25 October 2012, actions were commenced by a number of UK travel agents against PIAC. Under pressure from PIAC, especially exerted in September 2012, TT did not join in with those legal actions. In September 2012, PIAC gave notice that the contract with TT would be terminated at the end of October 2012 and TT's normal ticket allocation was suddenly cut from 300 to 60. It is not in dispute that PIAC was acting within its legal rights in doing so: ie it was not acting in breach of contract in giving the notice of termination or in cutting the number of tickets. But under the threat of PIAC not continuing with their contractual relationship, and therefore not supplying them with tickets to sell, TT reluctantly agreed to accept an onerous waiver term (clause 6(2)) in a new agreement with PIAC (which included an agent productivity scheme) with effect from 1 November 2012.

70. To understand the significance of the sudden cutting of the ticket allocation and the general manoeuvring by PIAC of TT into a particularly vulnerable position, under which TT had no reasonable alternative but to bow to PIAC's demands, it is worth setting out two paragraphs from David Richards LJ's judgment in the Court of Appeal.

> "13. On 14 September 2012, PIAC sent a notice of termination to Times Travel, as it did also to all other agents in the UK, terminating its appointment with effect from 31 October 2012. The notice also stated that PIAC offered terms of re-appointment as set out in an attached document. On 17 September 2012, PIAC reduced Times Travel's fortnightly allocation of tickets from 300 to 60. As the judge found, this reduction in ticket allocation had a major impact on Times Travel's business and, if continued for much longer, would have put it out of business. It is not suggested that PIAC was acting in breach of contract, or otherwise unlawfully, in reducing the ticket allocation.
>
> 14. At a meeting on 24 September 2012, Times Travel signed a new agreement with PIAC … The New Agreement, already signed on behalf of PIAC, was provided to the representatives of Times Travel. Earlier in September 2012, Asrar Ahmad [one of the two directors of TT, the other being his son] had been shown a draft of the agreement but his request to take a copy with him, in order to read it carefully, discuss it with his son and obtain legal advice, had been refused."

71. Under clause 6(2), TT released any claims it might have against PIAC for unpaid commission under the previous contract(s). Clause 6 read as follows:

> "In consideration for [the Agent Productivity Scheme] 1 July to 31 December 2012 as set out in Appendix I it is agreed that:
>
> (1) The aforesaid scheme supersedes, nullifies, voids and replaces any and all previous incentive arrangements made or binding as between PIAC, its directors, officers and employees and the Agent and/or anybody representing the Agent of any nature whatsoever and howsoever arising.

> (2) The Agent hereby agrees to release and discharge PIAC, its directors, officers and employees from any and all claims, costs, liabilities or actions of any nature whatsoever and howsoever arising which have, may now or in the future arise from, or otherwise be connected in any way whatsoever with any commission or remuneration, or the calculation of the amount of any commission or remuneration, due to the Agent from PIAC on any basis other than as set out in the New Agreement."

72. TT subsequently commenced a claim against PIAC on 31 December 2014 alleging, inter alia, that it was entitled to rescind the new agreement because TT had entered into it under economic duress; and, consequent to the rescission of that new agreement, TT claimed that it was entitled to unpaid commission (for the period prior to 1 November 2012) under three main heads.

73. The three main heads of commission claimed by TT (for the period prior to 1 November 2012) were as follows:

*(1) The claim for 9% basic commission*

TT claimed that it was entitled to 9% basic commission after 31 October 2010 and until 31 October 2012. PIAC disputed that, arguing that, after 16 October 2010, the 9% basic commission had been replaced by what was termed "net sale remuneration"; and that TT had been given notice of this on or around 23 September 2010. This was the largest claim of the three. According to the judgment of David Richards LJ, [2019] EWCA Civ 828; [2020] Ch 98, at para 26, it amounted to £1.215m exclusive of interest (at the time of Warren J's judgment).

*(2) The ORC claim*

TT claimed that it was entitled to be paid overriding commission after 30 June 2008 until 31 October 2012. PIAC disputed that claim, arguing that it had been entitled to, and did, stop paying ORC after 30 June 2008. According to the judgment of David Richards LJ, at para 26, "on a very rough basis [this claim] must have been of the order of £250,000-£300,000" (at the time of Warren J's judgment).

*(3) The YQ commission claim (prior to October 2010)*

TT claimed that the basic commission should have been worked out by including the fuel surcharge on the ticket price. This was referred to as the "YQ commission". PIAC disputed that, arguing that, prior to the end of October 2010, it was entitled to, and therefore did, stop paying the YQ commission. Compared to the other two heads of claim, the sum claimed here was relatively trivial. According to the judgment of David Richards LJ, at para 26, it amounted to £56,639 (at the time of Warren J's judgment).

74. It is important to clarify what Warren J decided about those three heads of claim (assuming that there had been no valid waiver of them by TT). He held that TT was entitled to succeed on the 9% basic commission claim and on the YQ claim but not on the ORC claim. More specifically:

*(1) The claim for 9% basic commission*

Warren J held that TT was entitled to succeed on the 9% basic commission claim (see [2017] EWHC 1367 (Ch) at paras 203, 224, 260(v)). However, and this is a very important finding of fact, he found at para 260(i) that PIAC considered, and Warren J had no reason to doubt that PIAC genuinely believed, that the 9% basic commission had ceased to be payable, and had been replaced by net sales remuneration, in October 2010. Para 260(i) reads:

> "PIAC considered (wrongly, as I have held, but I have no reason to doubt that PIAC genuinely believed it to be true) that the 9% Basic Commission had ceased to be payable, having been replaced by Net Sales Remuneration in October 2010."

*(2) The ORC claim*

Warren J held that TT was not entitled to succeed on the ORC claim (ie after 30 June 2008, TT was not entitled to ORC) (see [2017] EWHC 1367 (Ch) at paras 223-224). Nevertheless, the claim was, on the part of TT, "genuine and arguable" (para 260(v)).

*(3) The YQ commission claim (prior to October 2010)*

Warren J thought that the (relatively trivial) YQ claim for the period prior to October 2010 was very strong and that TT would have been entitled to summary judgment on it (see [2017] EWHC 1367 (Ch) at paras 224, 260(v), 262(i)). As regards YQ commission for the period after October 2010, TT

would also have had to succeed on its claim to 9% basic commission (which, as we have seen, it would have done). But even in respect of the YQ claim for the period prior to October 2010, Warren J did not find that PIAC had acted in bad faith. In para 262, Warren J said the following:

> "(i) The case concerning YQ at least prior to October 2010 was very strong. I feel confident that summary judgment would have been given. PIAC ought to have paid 9% commission on the YQ element in respect of the periods prior to October 2010 before the New Agreement was signed. …
>
> (ii) Whether PIAC has acted in good faith or bad faith is moot. The Claimants have not established that there was bad faith but nor has PIAC established good faith. It is clear to me that the whole basis on which the Notice was served and the terms of the New Agreement were formulated was to ensure that agents would lose their claims to accrued rights in a situation where some of those rights (in particular, 9% commission on YQ) were clear. Indeed, Mr Schama accepted that this was the motivation for the Notice. Whether this demonstrates bad faith is a matter on which different minds might take different views."

75. I should stress that, in respect of the quantum of the sums claimed under each of the three heads, I am relying on the judgment of David Richards LJ. In turn he was relying on a schedule put before Warren J by TT in March 2018 in what I assume was one of the "account" hearings dealing with working out the sums to be paid under his judgment. But as David Richards LJ commented, at para 26, the position on the amounts under the three heads of claim "is not entirely clear". Moreover, it is nowhere made clear what sums of commission TT had been paid although I note that, in para 26, David Richards LJ said that, against the principal sum of £1.27m claimed for the 9% basic commission, "[TT] had to give credit for income of some £435,000 received in respect of ticket sales between October 2010 and October 2012".

**3. Claims other than for rescission for duress**

76. Apart from the claim for rescission based on economic duress, there were claims by TT against PIAC for rescission on the ground of misrepresentation and for breach of a collateral contract. The claim for misrepresentation failed before Warren J. The claim for breach of a collateral contract succeeded but Warren J held that TT could not both rescind the new agreement for economic duress and rely on

the collateral contract. It had to choose one or the other. In the event, TT chose rescission of the new agreement and so the claim for breach of a collateral contract fell away. There was no appeal by TT (or PIAC) in relation to either of those claims. There was similarly no appeal by TT against Warren J's decision that clause 6(2) (the waiver term) did not fall foul of the Unfair Contract Terms Act 1977.

77. It is also important at the outset to be clear that, putting to one side misrepresentation (which is no longer in issue), TT has sought rescission of the new agreement solely on the basis of economic duress. It has not sought to invoke the law on "unconscionable bargains". That area of the law deals not with illegitimate threats or pressure but with the exploitation by A of a weakness of B by entering into a contract that is clearly disadvantageous to B who has not obtained independent advice. In almost all past English cases on unconscionable bargains, B has been an individual with a mental weakness such as inexperience, confusion because of old age or emotional strain: see, eg, *Earl of Aylesford v Morris* (1873) 8 Ch App 484; *Fry v Lane* (1888) 40 Ch D 312; *Cresswell v Potter (Note)* [1978] 1 WLR 255; *Backhouse v Backhouse* [1978] 1 WLR 243; *Boustany v Pigott* (1993) 69 P & CR 298; *Chitty on Contracts*, 33rd ed (2018), paras 8-132 to 8-142. But it is not inconceivable that the relevant weakness could be the very weak bargaining position of a company; and this possibility was recognised 35 years ago by the Court of Appeal in *Alec Lobb Garages Ltd v Total Oil (Great Britain) Ltd* [1985] 1 WLR 173. Although some of the submissions of Philip Shepherd QC, counsel for TT, might be thought to have been steering in the direction of the law on unconscionable bargains, that was not the basis on which TT's claim was put. The *Alec Lobb* case was not relied on and, for example, there was no evidence as to whether independent advice was taken by TT (although we do know that PIAC did not allow TT to take away draft copies of the new agreement prior to signing). This appeal is therefore solely concerned with the claim for rescission based on economic duress.

## 4. The essential elements of duress

78. Where it is alleged that one contracting party (the defendant) has induced the other contracting party (the claimant) to enter into the contract between them by duress, the case law has laid down that there are two essential elements that a claimant needs to establish in order to succeed in a claim for rescission of the contract. The first is a threat (or pressure exerted) by the defendant that is illegitimate. The second is that that illegitimate threat (or pressure) caused the claimant to enter into the contract. As Lord Goff said, in the context of economic duress, in *Dimskal Shipping Co SA v International Transport Workers' Federation (The Evia Luck) (No 2)* [1992] 2 AC 152, 165:

> "[I]t is now accepted that economic pressure may be sufficient to amount to duress [which would entitle a party to avoid a

> contract] provided at least that the economic pressure may be characterised as illegitimate and has constituted a significant cause inducing the plaintiff to enter into the relevant contract …"

79. It is also important that, in the context of economic duress (but the position appears to be different in respect of other forms of duress: see *Astley v Reynolds* (1731) 2 Stra 915), there is a third element. This is that the claimant must have had no reasonable alternative to giving in to the threat (or pressure): see, for example, Dyson J in *DSND Subsea Ltd (formerly DSND Oceantech Ltd) v Petroleum Geo-Services ASA* [2000] BLR 530, para 131; *Borrelli v Ting* [2010] UKPC 21; [2010] Bus LR 1718, para 35.

80. As both parties accepted, the dispute in this case is solely concerned with the first element: the illegitimacy of the threat or pressure. It is not in dispute that the claimant can establish causation and that it had no reasonable alternative to giving in to the threat.

81. It should be noted that it was not argued by TT that the breach of contract by PIAC, in failing to pay commission owed, meant that this was a case of unlawful, rather than lawful, act duress. In my view, this acknowledgement by TT that we are here concerned with lawful act duress was correct. A breach of contract in failing to pay past commission was not the relevant threat or pressure inducing TT to enter into the new agreement. As set out in para 69 above, it was the threat of PIAC not continuing the contractual relationship with TT, and therefore not supplying TT with tickets to sell - which PIAC was legally entitled not to do - that induced TT, reluctantly, to enter into the new agreement.

## 5. Does lawful act duress exist?

82. Lawful act duress is controversial. This is essentially because many contracts are entered into under some form of pressure exerted by the other party and, plainly, one would not wish to undermine all such contracts. An insistence that the threat must be one to do something unlawful draws a clear line with a standard that is easily understood and can easily be applied. But once one crosses that line to include threats of lawful acts, it is not easy to distinguish between threats that will count as duress and threats that will not. Peter Birks, in *An Introduction to the Law of Restitution*, revised ed (1989), at p 177, expressed this difficulty as follows:

> "Can lawful pressures also count? This is a difficult question, because, if the answer is that they can, the only viable basis for

> discriminating between acceptable and unacceptable pressures is not positive law but social morality. In other words, the judges must say what pressures … are improper as contrary to prevailing standards. That makes the judges, not the law or the legislature, the arbiters of social evaluation."

See also the helpful discussion by Jack Beatson in *The Use and Abuse of Unjust Enrichment* (1991), pp 129-134, especially p 130.

83. The fear of wide-ranging disruption and uncertainty, particularly for commercial parties, has led some distinguished commentators to argue that lawful act duress should not exist. For example, Graham Virgo, *The Principles of the Law of Restitution*, 3rd ed (2015), p 218 writes:

> "[D]espite the recent explicit recognition that a lawful threat can still be an illegitimate threat for economic duress, the better view is that only unlawful threats should suffice. A lawful threat may still result in restitution, but only … if the more stringent test of unconscionability is satisfied. This ensures that the law does not intervene unacceptably in commercial markets. Where a defendant has obtained a benefit as a result of an unlawful threat which caused the benefit to be transferred, it is appropriate for restitution to be awarded. Where the benefit was obtained as the result of a lawful threat, it is only appropriate to award restitution where the defendant's conduct is characterised as unconscionable …"

84. Similarly, in their excellent case-note on the Court of Appeal's decision in this case, Paul Davies and William Day, "*'Lawful Act' Duress (Again)*", (2020) 136 LQR 7, 12, write:

> "[W]e suggest that the Supreme Court should jettison the concept of lawful act duress. The lack of reported cases applying the doctrine demonstrates that there would be no gap in the law if lawful act duress were abolished, and the welcome effect would be to place the law of contract on a more certain and stable footing, avoiding protracted and expensive litigation about the existence and scope of lawful act duress. Whereas the Court of Appeal in [*CTN Cash and Carry Ltd v Gallaher Ltd* [1994] 4 All ER 714] took a 'never say never' approach to the possibility of lawful act duress, it is to be hoped that the

> Supreme Court in *Times Travel* will be more definitive and explicitly reject such an open-ended doctrine."

85. I am also conscious that lawful act duress has been rejected by the Court of Appeal of New South Wales in *Australia and New Zealand Banking Group Ltd v Karam* [2005] NSWCA 344; (2005) 64 NSWLR 149 (albeit that one needs to be careful in making comparisons given that particular statutory interventions in that jurisdiction may be thought relevant). Here the defendants were directors of a company in serious financial difficulties. The claimant bank gave them financial assistance in return for the defendants securing the company's debts by giving personal guarantees and mortgages over their own property. It was held that the personal guarantees and mortgages should not be set aside for duress or unconscionable conduct. In a joint judgment of the Court, Beazley JA, Ipp JA and Basten JA said the following, at para 66:

> "[First, the] vagueness inherent in the terms 'economic duress' and 'illegitimate pressure' can be avoided by treating the concept of 'duress' as limited to threatened or actual unlawful conduct … Secondly, if the conduct or threat is not unlawful, the resulting agreement may nevertheless be set aside where the weaker party establishes undue influence (actual or presumptive) or unconscionable conduct based on an unconscientious taking advantage of his or her special disability or special disadvantage … Thirdly, where the power to grant relief is engaged because of a contravention of a statutory provision such as section 51AA, section 51AB or section 51AC of the *Trade Practices Act*, the Court may be entitled to take into account a broader range of circumstances than those considered relevant under the general law."

86. Despite that support for the non-recognition or abolition of lawful act duress, it is my view (as it was the view of Birks in the continuation of the passage cited in para 82 above) that lawful act duress does, and should, exist as a ground for rescinding a contract (or for the restitution of non-contractual payments) in English law. There are three reasons for this.

87. The first reason is that, although the facts of the leading cases of *The Universe Sentinel* and *The Evia Luck (No 2)* concerned alleged unlawful act duress - by threats to commit a tort in the context of the "blacking" of ships sailing under flags of convenience - the House of Lords chose to use the language of the pressure needing to be "illegitimate" not "unlawful". In the former case, Lord Diplock (with whom Lords Cross and Russell agreed), after recognising the development of the common law to include economic duress, continued at p 384:

> "It is, however, in my view crucial … to identify the rationale of this development of the common law. It is not that the party seeking to avoid the contract which he has entered into with another party, or to recover money that he has paid to another party in response to a demand, did not know the nature or the precise terms of the contract at the time when he entered into it or did not understand the purpose for which the payment was demanded. The rationale is that his apparent consent was induced by pressure exercised upon him by that other party which the law does not regard as legitimate, with the consequence that the consent is treated in law as revocable unless approbated either expressly or by implication after the illegitimate pressure has ceased to operate on his mind."

And, in *The Evia Luck*, as we have seen in the passage set out above in para 78, Lord Goff, giving the leading speech in the House of Lords, referred to the economic pressure needing to be "illegitimate".

88. The second reason is that the crime of blackmail, which is contained in section 21 of the Theft Act 1968, clearly includes threats of lawful action. Under section 21(1):

> "A person is guilty of blackmail if, with a view to gain for himself or another or with intent to cause loss to another, he makes any unwarranted demand with menaces; and for this purpose a demand with menaces is unwarranted unless the person making it does so in the belief -
>
> (a) that he has reasonable grounds for making the demand; and
>
> (b) that the use of the menaces is a proper means of reinforcing the demand."

Classic examples of (the actus reus of) blackmail involving lawful threats would be a threat by A, unless money is paid by B, to reveal true information about B to a newspaper or to B's family or to the police. Although the link between the crime of blackmail and lawful act duress has to be very carefully handled to avoid circularity - this is best done by excluding the possibility of the crime of blackmail having been committed when considering what counts as lawful act duress - it would be very odd for the civil law of duress not to include threats of lawful acts when the criminal law

of blackmail does so. Lord Scarman expressly drew an analogy with blackmail in *The Universe Sentinel* at p 401:

> "The origin of the doctrine of duress in threats to life or limb, or to property, suggests strongly that the law regards the threat of unlawful action as illegitimate, whatever the demand. Duress can, of course, exist even if the threat is one of lawful action: whether it does so depends upon the nature of the demand. Blackmail is often a demand supported by a threat to do what is lawful, eg to report criminal conduct to the police. In many cases, therefore, 'What [one] has to justify is not the threat, but the demand ...': see per Lord Atkin in *Thorne v Motor Trade Association* [1937] AC 797, 806."

89. The third reason is that there have been several cases - and not just recent cases - in which it has been accepted that threats of lawful action should entitle the threatened party (the claimant) to rescind a contract (or to have the restitution of non-contractual payments). A long-established area, although traditionally thought of as within the equitable doctrine of undue influence rather than the common law doctrine of duress, has comprised illegitimate threats to prosecute the claimant or a member of the claimant's family. These were not economic duress cases. Rather the threats in question were threats to reputation or emotional threats. But the important point is that (avoiding the circularity of blackmail: see the previous paragraph), the threats in question were threats to do lawful acts. So, for example, in *Williams v Bayley* (1866) LR 1 HL 200 a father agreed to pay promissory notes in favour of a bank (secured by a charge over his property) in order to avert the bank's implied threat to prosecute his son for forging his signature on the notes. As a separate ground from the contract being "illegal" (as stifling a criminal prosecution) it was held that the contract was invalid as it had been procured by undue influence. And in *Mutual Finance Ltd v John Wetton and Sons Ltd* [1937] 2 KB 389 a guarantee of payment to the claimant company was signed by Percy Wetton on behalf of the defendant company in order to avert the claimant company's implied threat to prosecute Joseph Wetton (Percy's brother) for forgery in acquiring a lorry on hire purchase. Percy Wetton signed the agreement for fear that prosecution of his brother would kill their father who was very ill. Porter J distinguished duress at common law, which he regarded as being confined to duress of the person, but held that the contract here was voidable for undue influence. See also, for example, *Kaufman v Gerson* [1904] 1 KB 591.

90. Although these cases may have used the language of undue influence, it is clear that they were not concerned with the standard case of undue influence where the relationship between the parties is such that one party's judgment is not being exercised freely and independently of the other party. That standard area of "relational" undue influence was not in issue in those cases. Rather one was looking

at actual undue influence where the influence was being exerted by a lawful threat. At the time of those cases, and prior to the development of economic duress in the 1970s, common law duress was thought to be confined to duress of the person or, in the context of the restitution of non-contractual payments, duress of goods. The threats in question in those cases were not ones of physical violence or detainment or to seize or retain goods. They therefore fell outside those two categories of common law duress. But now that economic duress has been recognised at common law, there is no reason to hive off those earlier cases from duress by labelling them as cases on undue influence. On the contrary, the underlying element is identical - it is an illegitimate, albeit lawful, threat - and it is therefore rational today to treat them as examples of duress (albeit not economic duress). As Lord Nicholls said in the leading modern case on undue influence, *Royal Bank of Scotland Plc v Etridge (No 2)* [2001] UKHL 44; [2002] 2 AC 773, para 8:

> "Equity identified broadly two forms of unacceptable conduct. The first comprises overt acts of improper pressure or coercion such as unlawful threats. *Today there is much overlap with the principle of duress as this principle has subsequently developed.* The second form arises out of a relationship between two persons where one has acquired over another a measure of influence, or ascendancy, of which the ascendant person then takes unfair advantage." (Emphasis added)

91. Furthermore, since the recognition of economic duress, there have been several cases in which lawful act economic duress can be said to have been accepted as a ground for the avoidance of a contract or restitution (whether made out on the facts or not). These include *CTN Cash and Carry Ltd v Gallaher Ltd* [1994] 4 All ER 714; *Alf Vaughan & Co Ltd v Royscot Trust Plc* [1999] 1 All ER (Comm) 856; *Borrelli v Ting* [2010] UKPC 21; [2010] Bus LR 1718; *Progress Bulk Carriers Ltd v Tube City IMS LLC (The Cenk Kaptanoglu)* [2012] EWHC 273 (Comm), [2012] 1 Lloyd's Rep 501; *Marsden v Barclays Bank Plc* [2016] EWHC 1601 (QB); [2016] 2 Lloyd's Rep 420; *The Flying Music Co Ltd v Theater Entertainment SA* [2017] EWHC 3192 (QB); and *Al Nehayan v Kent* [2018] EWHC 333 (Comm); [2018] 1 CLC 216. One should also bear in mind the Privy Council decision in *Attorney General for England and Wales v R* [2003] UKPC 22; [2003] EMLR 24, in which lawful act duress was carefully considered, albeit not made out on the facts, in a non-commercial context (so that "economic" duress was not in issue). In two of those cases, *Borrelli v Ting* and *Progress Bulk Carriers Ltd v Tube City IMS LLC*, the decision was that economic duress was made out thereby rendering the contract voidable (although, as is explained in paras 104-112 below, some of the reasoning in both those cases focused on the unlawful conduct prior to the relevant lawful threat). In the other cases, duress was either held not to be made out on the facts or, as in the *Al Nehayan* case, the view that lawful act duress was made out on the facts was obiter dicta. However, in none of the cases was any doubt cast on lawful act

duress being a valid concept. In this respect, it is also significant that in the present case both Warren J and the Court of Appeal accepted that lawful act duress exists.

92. For these three reasons, the better view is that, although controversial, lawful act duress does, and should, exist as a matter of English law.

## 6. How does one determine the illegitimacy of the threat for lawful act economic duress?

### *(1) Certainty and clarity*

93. Within the realm of commercial contracts, with which we are here concerned, English law has a long-standing reputation for certainty and clarity and there is a significant danger that that reputation will be lost if the law on lawful act economic duress is stated too widely or with insufficient precision.

94. Mr Shepherd, counsel for TT, submitted that the best way forward would be to adopt a "range of factors" approach. He referred us to the adoption of that approach by this court in *Patel v Mirza* [2016] UKSC 42; [2017] AC 467, in the context of illegality as a defence and argued that an analogous approach was appropriate here. I do not agree. The long-standing problem with the law on illegality as a defence was that, over many decades, rules had been formulated that were inappropriate and clashed with the outcomes that, as a matter of the policies involved, one would wish to reach. In that context, the best solution to the problem was for the Supreme Court to draw on the covert reasoning of the courts, to cast aside the unsatisfactory rules, and to put forward a range of factors approach reflecting the underlying policies. The expectation is that this will lead to desirable outcomes based on transparent and rational reasoning and, in time, the approach seems likely to lead to the formulation of appropriate rules. But in the realm of lawful act economic duress, there is no equivalent problem of a series of rules being applied that are unsatisfactory. On the contrary, the law is in its infancy and the best approach is for the common law to be clarified or developed in a traditional incremental way.

95. For similar reasons, I do not think that this is an appropriate case in which to rely on a general principle of good faith dealing in so far as that would require a court to try to apply a standard of what is commercially unacceptable or unreasonable behaviour. That would be a radical move forward for the English law of contract and the uncertainty caused by it seems unlikely to be a price worth paying. In my view, the better strategy, at this stage in the law's development, is to

try to set out a limited but clear and workable boundary for the concept of lawful act economic duress in the context of the facts with which this case is concerned.

*(2) A focus on the demand*

96. With regard to lawful act duress, the courts have stressed that, because the threat is of a lawful act, the question of whether it is illegitimate should focus on the nature of the demand rather than the nature of the threat. We have seen, in para 88 above, that Lord Scarman stressed this in *The Universe Sentinel* and referred to Lord Atkin's judgment on this point in *Thorne v Motor Trade Association* [1937] AC 797. Although said in the context of the crime of blackmail, it is worth spelling out in full what Lord Atkin said, at p 806:

> "The ordinary blackmailer normally threatens to do what he has a perfect right to do - namely, communicate some compromising conduct to a person whose knowledge is likely to affect the person threatened. Often indeed he has not only the right but also the duty to make the disclosure, as of a felony, to the competent authorities. What he has to justify is not the threat, but the demand of money."

*(3) Commercial self-interest*

97. In thinking about the justification of the demand, in the context of lawful act economic duress, it is clear that, in general, a demand motivated by commercial self-interest is justified. If that were not the case, normal commercial bargaining would be seriously disrupted. For example, in the course of negotiations for a contract, lawful act threats may sometimes be used by one party (A) as a means of extracting from the other party (B) what A is demanding from B. As Dyson J observed in *DSND Subsea Ltd (formerly DSND Oceantech Ltd) v Petroleum Geo-Services ASA* [2000] BLR 530, para 131 (although the focus in that case was on alleged unlawful act economic duress):

> "Illegitimate pressure must be distinguished from the rough and tumble of normal commercial bargaining."

98. A useful illustration of the general position - that a lawful act threat, coupled with a demand motivated by commercial self-interest, is legitimate - is provided by the recent case in New Zealand of *Dold v Murphy* [2020] NZCA 313. Mr Dold, Mr Jacobs and Mr Murphy owned a tourism company. Mr Murphy owned 6.2%. Mr Jacobs and Mr Dold each owned 46.9%. They received an offer for AUD 112m to

buy their company. This offer was far higher than they were expecting. They were all keen to sell, but Mr Dold and Mr Jacobs especially so. Mr Murphy refused to sell unless he was paid another AUD 2m each from Mr Dold and Mr Jacobs for his shares. Reluctantly, as they needed his approval to be able to sell the company, Mr Dold and Mr Jacobs agreed. Mr Dold subsequently sought to recover the AUD 2m he paid Mr Murphy on the basis of economic duress. That claim failed. The New Zealand Court of Appeal took the view that, as there was no unlawfulness involved in what Mr Murphy had threatened, it would be a rare case, and this was not one, where economic duress could be made out. At para 79 Kos P said that the behaviour of Mr Murphy had been "opportunistic" but that, nevertheless, "he was entitled to act in his own self-interest, even if his actions were both unexpected and ungenerous." It should be added that, in any event, it would appear that Mr Dold did have a reasonable alternative to giving in to Mr Murphy's threat: he could simply not have sold the shares.

99. It follows from the general proposition, that a demand made in commercial self-interest is justified, that the doctrine of lawful act economic duress is essentially concerned with identifying rare exceptional cases where a demand motivated by commercial self-interest is nevertheless unjustified.

*(4) CTN Cash and Carry Ltd v Gallaher Ltd: a "bad faith demand" requirement*

100. In thinking about the justification of the demand in relation to the facts of this case, the most important appellate decision in English law, which therefore merits careful examination, is the Court of Appeal's decision in *CTN Cash and Carry Ltd v Gallaher Ltd* [1994] 4 All ER 714. The defendants mistakenly delivered cigarettes to the claimants' Burnley warehouse rather than their Preston warehouse from where the cigarettes were stolen. Mistakenly believing that the risk had passed to the claimants, the defendants demanded the £17,000 contract price and made clear that they would withdraw the claimants' credit facilities on future contracts if they failed to pay. The claimants paid the £17,000 but later sought repayment on the ground that they had paid under duress. The Court of Appeal held that the claim failed. It was stressed that it was lawful for the defendants to insist that they would no longer grant credit. Although it was accepted that duress can be constituted by lawful acts, it was thought that this would rarely be so between commercial parties. That was so even though the defendants were the sole distributors of popular brands of cigarettes and were therefore, in a sense, in a monopoly position. What was regarded as being of particular importance was that the defendants were acting in good faith in making the demand: albeit mistakenly, they thought that the goods were at the risk of the claimants and that they (the defendants) were therefore contractually owed the payment demanded.

101. The leading judgment was given by Steyn LJ with whom Farquharson LJ and Sir Donald Nicholls V-C agreed. Steyn LJ said the following, at pp 717-719:

> "The present dispute does not concern a protected relationship. It also does not arise in the context of dealings between a supplier and a consumer. The dispute arises out of arm's length commercial dealings between two trading companies. It is true that the defendants were the sole distributors of the popular brands of cigarettes. In a sense the defendants were in a monopoly position. The control of monopolies is, however, a matter for Parliament. Moreover, the common law does not recognise the doctrine of inequality of bargaining power in commercial dealings. See *National Westminster Bank Plc v Morgan* [1985] AC 686. The fact that the defendants were in a monopoly position cannot therefore by itself convert what is not otherwise duress into duress.
>
> A second characteristic of the case is that the defendants were in law entitled to refuse to enter into any future contracts with the plaintiffs for any reason whatever or for no reason at all. Such a decision not to deal with the plaintiffs would have been financially damaging to the defendants, but it would have been lawful. A fortiori it was lawful for the defendants, for any reason or for no reason, to insist that they would no longer grant credit to the plaintiffs. The defendants' demand for payment of the invoice, coupled with the threat to withdraw credit, was neither a breach of contract nor a tort.
>
> A third, and critically important, characteristic of the case is the fact that the defendants bona fide thought that the goods were at the risk of the plaintiffs and that the plaintiffs owed the defendants the sum in question. The defendants exerted commercial pressure on the plaintiffs in order to obtain payment of a sum which they bona fide considered due to them. The defendants' motive in threatening withdrawal of credit facilities was commercial self-interest in obtaining a sum that they considered due to them.
>
> …
>
> We are being asked to extend the categories of duress of which the law will take cognizance. That is not necessarily

> objectionable, but it seems to me that an extension capable of covering the present case, involving 'lawful-act duress' in a commercial context in pursuit of a bona fide claim, would be a radical one with far-reaching implications. It would introduce a substantial and undesirable element of uncertainty in the commercial bargaining process. Moreover, it will often enable bona fide settled accounts to be re-opened when parties to commercial dealings fall out. The aim of our commercial law ought to be to encourage fair dealing between parties. But it is a mistake for the law to set its sights too highly when the critical enquiry is not whether the conduct is lawful but whether it is morally or socially unacceptable. That is the enquiry in which we are engaged. In my view there are policy considerations which militate against ruling that the defendants obtained payment of the disputed invoice by duress.
>
> Outside the field of protected relationships, and in a purely commercial context, it might be a relatively rare case in which 'lawful-act duress' can be established. And it might be particularly difficult to establish duress if the defendant bona fide considered that his demand was valid. In this complex and changing branch of the law I deliberately refrain from saying 'never'. But as the law stands, I am satisfied that the defendants' conduct in this case did not amount to duress."

102. The decision in this case was that there was no economic duress. The explanation for why lawful act economic duress was not made out was that the demand of the defendants was made in good faith. That was the "critically important" characteristic. Given that "good faith" can be used in different senses, it is important to clarify that what was here meant was that, albeit mistakenly, the defendants genuinely believed that they were contractually owed the payment demanded. The case may therefore be said to establish what I shall refer to hereinafter as the "bad faith demand" requirement. This requirement can be expressed as follows. In the context we are focusing on - of a demand for what is claimed to be owing, or analogously, as on the facts of this case, a demand for the waiver of a claim - it is a necessary requirement for establishing lawful act economic duress that the demand is made in bad faith in the particular sense that the threatening party does not genuinely believe that it is owed what it is claiming to be owed or does not genuinely believe that it has a defence to the claim being waived by the threatened party. This is on the assumption that, as a matter of law, what the threatening party claims to be owing is not legally owing or there is no defence to the claim being waived by the threatened party. On the facts of *CTN Cash and Carry* lawful act economic duress was not made out because this "bad faith demand"

requirement was not satisfied: the defendants genuinely believed that the payment they were claiming was contractually owing.

103. It is possible to go one step further in one's interpretation of the reasoning in *CTN Cash and Carry* by treating the Court of Appeal as having implicitly laid down that lawful act economic duress would have been made out had the facts been the same except for the crucial difference that the "bad faith demand" requirement had been satisfied. I shall explore that wider interpretation further below (see paras 121-125). However, as will become clear, I do not need to accept that wider interpretation in order to decide this case. All I need to take from *CTN Cash and Carry*, in order to decide this case, is the narrower proposition that, in the context of a demand for what is claimed to be owing or, analogously, a demand for the waiver of a claim, there is a "bad faith demand" requirement for lawful act economic duress.

*(5) Borrelli v Ting; Progress Bulk Carriers Ltd v Tube City IMS LLC*

104. It is next important to clarify that the two cases from the list in para 91 above, in which lawful act economic duress may be said to have succeeded - *Borrelli v Ting* [2010] UKPC 21; [2010] Bus LR 1718 and *Progress Bulk Carriers Ltd v Tube City IMS LLC* [2012] EWHC 273 (Comm); [2012] 1 Lloyd's Rep 501 - may both be said to be consistent with the "bad faith demand" requirement of *CTN Cash and Carry*, although in those cases the bad faith in question related to a demand for a waiver of a claim against the threatening party rather than a demand for a payment owed to the threatening party. It is also a very important feature of these two cases that the threatening party can be said to have deliberately created, or increased, the threatened party's vulnerability which it was then able to exploit by making the demand.

105. In *Borrelli v Ting*, James Ting was the former chair and CEO of Akai Holdings Ltd ("Akai") which had collapsed with a large deficit. Akai and its liquidators wished to enter into a scheme of arrangement (to raise money to fund the liquidation) but that needed shareholder approval. Ting, through two companies he controlled, Blossom Assets Ltd ("B Ltd") and Costner Holdings Ltd ("C Ltd"), held a crucial minority shareholding in Akai. Initially using forgery and false evidence, Ting blocked the scheme of arrangement. With time running out for the liquidators to meet a court deadline for approval of the scheme of arrangement, and with Ting threatening further to delay the scheme, as he was lawfully free to do through his minority shareholding, the liquidators entered into a settlement agreement with Ting, B Ltd and C Ltd. Under that settlement agreement, the liquidators promised not to pursue any claims they might have against Ting or B Ltd or C Ltd. Ting thereupon dropped his opposition to the scheme of arrangement which was approved. Subsequently the liquidators challenged the validity of the settlement

agreement on the basis that it had been entered into under economic duress and it was held by the Privy Council that that was indeed so.

106. Lord Saville, giving the judgment of the Privy Council, said, at para 35:

> "The Board is of the view that in the present case the liquidators entered into the settlement agreement as the result of the illegitimate means employed by James Henry Ting, namely by opposing the scheme for no good reason and in using forgery and false evidence in support of that opposition, all in order to prevent the liquidators from investigating his conduct of the affairs of Akai Holdings Ltd or making claims against him arising out of that conduct. As the Board has already observed, by adopting these means James Henry Ting left the liquidators with no reasonable or practical alternative but to enter into the settlement agreement."

Earlier at para 28, it was said:

> "[A] finding of particular importance is that James Henry Ting procured the opposition to the scheme by Blossom Holdings Ltd and Costner Assets Ltd 'solely so as to defeat [the scheme] with the desire and intention of thereby depriving the liquidators of funds with a view to preventing any further investigation of his conduct of the affairs of the company' … In other words, James Henry Ting's opposition was not made in good faith, but for an improper motive."

And at para 32:

> "In the view of the Board James Henry Ting's failure to provide any assistance to the liquidators; his opposition to the scheme; and his resort to forgery and false evidence in order to further that opposition amount to unconscionable conduct on his part … [B]y agreeing to withdraw the opposition to the scheme James Henry Ting did no more than he should have done from the outset, had he acted in good faith rather than in an attempt to avoid responsibility for his conduct of the affairs of Akai Holdings Ltd."

107. The relevant threats by Ting, which induced the settlement agreement, were lawful. But they had been preceded by unlawful acts in failing to cooperate with the liquidators and in initially using forgery and false evidence to block the scheme of arrangement. For that reason, one might argue that this was not a case of lawful act duress. However, the fact remains that the pressure that finally led to the settlement was lawful. And importantly, viewing this as a case of lawful act duress, the decision is consistent with the "bad faith demand" requirement. It was clear that Ting was making the demand in bad faith in the sense that he did not genuinely believe that he had a defence to claims against him and was seeking to prevent further investigation and a waiver of them. It is also clear that Ting deliberately brought about, or increased, the liquidator's vulnerability which he was then able to exploit by making the demand.

108. Moving on to the *Progress Bulk Carriers* case, the claimant charterers entered into a charterparty with the defendant owners of a ship (*Cenk K*) for the carriage of a cargo of shredded scrap metal to China. The cargo was being sold by the charterers to Chinese buyers. The owners, in repudiatory breach, chartered the *Cenk K* to another party but assured the charterers that they would find a substitute ship and would compensate the claimants for any losses caused. The owners found a substitute ship, which was available with a later loading period, which they offered to the charterers at a reduced rate of freight. The charterers wished to accept this, while reserving their rights to claim damages for breach of contract. However, at a late stage, the owners said that they would only go ahead with the substitute ship if the charterers agreed to waive all their rights to damages for the breach. Under protest, the charterers agreed to this waiver so as to fulfil their sale contract with the Chinese buyers. The question was whether the waiver (settlement) agreement was voidable for economic duress. The arbitrators decided that it was and, on appeal by the owners, Cooke J upheld that decision.

109. It is clear that the owners had deliberately created, or increased, the charterers' vulnerability, by misleading them as to the substitute ship, which it was then able to exploit by making the demand. But how far is this decision consistent with the "bad faith demand" requirement? Cooke J twice referred, at paras 28 and 40, to the fact that the arbitrators had made no express finding that the owners were in bad faith. But nor was there any finding that they were in good faith. Moreover, on any fair reading of the facts, and without any finding to the contrary, one can readily assume that, had the question specifically arisen, the arbitrators would have been very likely to find that the owners did not genuinely believe, prior to entering into the waiver agreement, that they had a defence to a claim against them for damages for breach of contract. In my view, the decision can be regarded as correctly decided provided that, as appears to be the case, the owners made the demand in bad faith not genuinely believing that they had a defence to a claim for damages against them. In other words, the decision can be regarded as correct assuming that it was consistent with the "bad faith demand" requirement.

110. However, as with *Borrelli v Ting*, one can ask, was this a case of lawful act duress at all? Cooke J thought it important that the owners had been in repudiatory breach by not providing the first vessel. He said at paras 37-39:

> "37. The only basis of the appeal put forward was that the Arbitrators had not made findings of fact which could amount to 'illegitimate pressure', essentially because they had not found that the pressure put upon the Charterers to enter into the settlement agreement involved an unlawful act. The Owners were not threatening to break a contract at the time nor committing any tort in refusing to enter into a variation of the charter with the substitution of the Agia and a new laycan, save on terms which bore down heavily upon the Charterers because of their existing sale contract. It was said that this was just the operation of market forces of which the Owners were entitled to take advantage.
>
> 38. The Owners contended that the Arbitrators had not found any threatened breach of contract by them, in refusing to ship the cargo on the Agia without a waiver of rights by the Charterers. It is true that the Arbitrators made no finding that there had been a binding agreement made on the 27th April to ship the cargo on the Agia, so that there could be no threatened breach in refusing to do so, without the waiver of rights. Thus far the Owners are correct.
>
> 39. What however the Owners' submissions overlook is the fact that their repudiatory breach was the root cause of the problem and that their continuing conduct thereafter was, as described by the Arbitrators, designed to put the Charterers in a position where they had no option but to accept the settlement agreement in order to ship the cargo to China and avoid further huge losses on the sale contract to the Chinese receivers. As the Charterers submitted, it would be very odd if pressure could be brought about by a threatened breach of contract, which did amount to an unlawful act but not by a past breach, coupled with conduct since that breach, which drove the victim of the breach into a position where it had no realistic alternative but to waive its rights in respect of that breach, in order to avoid further catastrophic loss."

111. Cooke J may be interpreted as categorising the duress as unlawful, rather than lawful act, duress. Certainly, the owners' repudiatory breach initially created the

difficulty that the charterers needed a substitute ship. However, the relevant pressure or threat that led to the waiver agreement was the threat not to be provided with the substitute ship that the owners had said would be provided but without committing themselves to providing. The past breach of contract created the opportunity to apply the threat or pressure. However, it was the lawful threat (or pressure) that was the effective cause of the charterers' entering into the waiver agreement. And in para 38, which I have set out in the previous paragraph, Cooke J examined the argument, only to reject it, that the original contract was continuing so that the owners were contractually bound to provide the substitute ship and were therefore threatening a breach of contract in failing to do so. If one focuses on the threat (or pressure) that directly induced the contract (or non-contractual payment), we are in the realm of lawful act duress. In my view, therefore, *Progress Bulk Carriers* can be correctly viewed as a decision on lawful act duress.

112. Taken together, what *Borrelli v Ting* and *Progress Bulk Carriers* can be taken to have established is that, in relation to a demand for a waiver by the threatened party of a claim against the threatening party, the demand is unjustified, so that the lawful act economic threat is illegitimate where: first, the threatening party has deliberately created, or increased, the threatened party's vulnerability to the demand; and, secondly, the "bad faith demand" requirement is satisfied (ie the threatening party does not genuinely believe that it has a defence, and there is no defence, to the claim being waived).

*(6) The Court of Appeal in the present case correctly accepted, and applied, the "bad faith demand" requirement*

113. I now turn to the central reasoning of the Court of Appeal in the present case. As in *Borrelli v Ting* and *Progress Bulk Carriers*, the facts of this case concern a demand for a waiver by the threatened party (TT) of claims against the threatening party (PIAC). PIAC was in effect in a monopoly position as regards the supply of airline tickets for direct flights between the UK and Pakistan. There is obviously nothing objectionable about that in itself. But there are at least two features of the facts that take this case outside the realm of the mere use of monopoly power. First, Warren J found (see paras 73-75 above) that PIAC was in breach of contract by failing to pay a very large sum of past commission owing to TT (the principal sum claimed was over £1.2m, exclusive of interest). Secondly, PIAC then went further by, for example, suddenly cutting TT's normal ticket allocation from 300 to 60 which increased TT's particular vulnerability which PIAC was then able to exploit by making the demand for the waiver (see paras 69-70 above). It follows that, in line with the analysis of *CTN Cash and Carry*, *Borrelli v Ting* and *Progress Bulk Carriers* that I have set out above, the crucial issue is whether the "bad faith demand" requirement was satisfied.

114. David Richards LJ was therefore correct to insist on, and apply, that "bad faith demand" requirement (with its subjective test). He distinguished a demand made without reasonable grounds (an objective test). In the course of a wide-ranging judgment, which surveyed English and Commonwealth authorities, as well as academic writings, David Richards LJ said this at para 105:

> "My conclusion on the central legal issue is that the doctrine of lawful act duress does not extend to the use of lawful pressure to achieve a result to which the person exercising pressure believes in good faith it is entitled, and that is so whether or not, objectively speaking, it has reasonable grounds for that belief. The common law and equity set tight limits to setting aside otherwise valid contracts. In this way undesirable uncertainty in a commercial context is reduced."

He went on at paras 106-107:

> "106. The relevant considerations go beyond uncertainty. In judging the use of lawful acts or threats of lawful acts as commercial pressure, there is a sharp distinction between such use to pursue demands made in good faith and those made in bad faith. As I earlier mentioned, a lack of good faith on the part of a contracting party is a feature in a number of the grounds on which contracts may be avoided. Rescission on grounds of fraudulent misrepresentation or unconscionable transaction are examples. It is a clear criterion involving conduct which all can agree is unacceptable and which is a fact capable of proof, often as it happens by reference to the lack of any reasonable grounds for the belief. By contrast, not only is reasonableness in this context a standard of very uncertain content but it is also very unclear why or on what basis the common law should hold that a party with a private law right, whose exercise is not subject to any overriding duty, cannot use it to achieve a purpose which is both lawful and advanced in good faith.
>
> 107. Moreover, it is relevant to note that the economic pressure that PIAC was able to apply in this case resulted from its position at that time as a monopoly supplier of tickets for direct flights between the UK and Pakistan. As I have earlier mentioned, the common law has always rejected the use, or abuse, of a monopoly position as a ground for setting aside a contract, leaving it to be regulated by statute."

Then finally at para 113, he said:

> "In my judgment, a lack of reasonable grounds is insufficient to engage the doctrine of duress where the pressure involves the commission or threat of lawful acts."

115. In relation to a demand for a waiver of claims, even in a situation where it can be said that PIAC deliberately increased TT's vulnerability to the demand, the "bad faith demand" requirement is crucial for determining the illegitimacy of the lawful act threat. Had TT proved that PIAC was in bad faith in making the demand for the waiver, its claim for rescission would have succeeded in this case. But as we have seen, the findings of fact of Warren J were to the effect that there was no such bad faith. As Mr Shepherd accepted, we cannot go behind those findings of fact (which were also unchallenged in the Court of Appeal).

116. It may be objected that the "bad faith demand" requirement means that the relevant standard depends on the threatening party's own subjective perception of what the law is and that a more objective approach is to be preferred. However, taking a subjective approach in the context of disputed claims is consistent with the law on compromises where it has traditionally been regarded as important whether or not a party bona fide believes it has a claim: see, for example, *Chitty on Contracts*, 33rd ed (2018), para 4-051.

117. Mr Shepherd submitted that the "bad faith demand" requirement would render it too easy for the threatening party to insist on a contract being upheld because that party would simply have to assert that it genuinely believed that the money was owing or that there was a defence to the claim being waived (ie on these facts, PIAC would simply need to assert that it genuinely believed that it had a defence to the claims for breach of contract that were being waived). It is true that the legal burden of proof in relation to the "bad faith demand" requirement is on the threatened party who is seeking redress for duress. That is, the threatened party has to prove that the threatening party was acting in bad faith in the sense that it did not genuinely believe that the money was owing or that there was a defence to the claim being waived. This was recognised by David Richards LJ who said, at para 111:

> "The judge accepted that Times Travel had not established bad faith. That should have been the end of the discussion of good or bad faith. It was not for PIAC to establish its good faith."

118. However, this does not mean that a court will accept that the threatened party (the claimant) cannot satisfy the burden of proof whenever the threatening party (the

defendant) asserts that it genuinely believed that the money was owing or that it had a defence to the claim being waived. On the contrary, the more unreasonable that belief, the more will be required, from an examination of all relevant material, before a court will accept that the defendant did genuinely have that belief. What can be envisaged is that where the defendant's belief is manifestly unreasonable, the evidential onus switches to the defendant. But ultimately such problems of proof are not unique to this area of the law and are ones that the courts are well-used to confronting and dealing with.

119. In this case, therefore, David Richards LJ correctly applied the "bad faith demand" requirement to the facts as found by Warren J. As there was no such bad faith, the Court of Appeal was correct to deny TT's claim for rescission of the contract for economic duress. That is enough to decide this case.

120. However, for the purposes of completeness, and because of the possible future incremental development of the law on lawful act economic duress, building from this decision, I now go on to discuss three further matters. First, the wider interpretation of *CTN Cash and Carry*; secondly, why I have rejected several prominent alternative approaches to the scope of lawful act economic duress (ie approaches that do not turn on the "bad faith demand" requirement); and thirdly, my reasons for rejecting an alternative strategy put forward by Mr Jones (counsel for PIAC).

*(7) The wider interpretation of CTN Cash and Carry*

121. I have explained in para 103 above that *CTN Cash and Carry* can be said to establish the "bad faith demand" requirement for lawful act economic duress; but that it is possible to go one step further in one's interpretation of the reasoning in *CTN Cash and Carry* by treating it as implicitly laying down that lawful act economic duress would have been made out had the facts been the same except for the crucial difference that the "bad faith demand" requirement had been satisfied. In other words, one may say that the implication of Steyn LJ's reasoning is that, had the defendants made the demand in bad faith, not genuinely believing that the payment was contractually owing, the money would have been recoverable on the facts of that case.

122. That one can draw that implication derives support from Mitchell, Mitchell and Watterson, *Goff and Jones on the Law of Unjust Enrichment*, 9th ed (2016). They write, at para 10-70:

> "If the claimants could have shown that when the defendants made their threat they knew that the goods were at the defendants' risk, then the claimants would surely have succeeded, for the money would then have been extorted from them, and commercial self-interest is not unbridled."

I agree. Although one cannot say that the defendants had deliberately created, or increased, the claimants' vulnerability (as one could in *Borrelli v Ting* and *Progress Bulk Carriers* and on the facts of this case), the defendants must have known that the claimants were in an exceptionally vulnerable position because of the defendants' monopoly position. If one then adds to that the postulated satisfaction of the "bad faith demand" requirement - so that, on the facts, the defendants would have been dishonestly claiming that the money was owing under the contract when they knew it was not - there is a compelling analogy to the facts of *Borrelli v Ting* and *Progress Bulk Carriers*. Although it is not necessary to decide this point in this case, I am of the view that, had the facts otherwise been the same but the "bad faith demand" requirement had been satisfied in *CTN Cash and Carry*, the demand would have been unjustified thereby rendering the threat illegitimate.

123. The Court of Appeal in the instant case also made clear that one could take the wider interpretation of the reasoning in the *CTN Cash and Carry* case. Hence, David Richards LJ said at para 62:

> "*CTN Cash and Carry v Gallagher* can be taken to establish that where A uses lawful pressure to induce B to concede a demand to which A does not bona fide believe itself to be entitled, B's agreement is voidable on grounds of economic duress."

124. However, that bald proposition goes too far and caution must here be exercised. Having clarified that, in that "test", David Richards LJ must have been meaning "legal" rather than "moral" entitlement (because otherwise the test would be far too vague), Davies and Day (2020) 136 LQR 7, 9, express one of the difficulties as follows:

> "However, if entitlement is used in a legal sense, then the language of this test does not quite work in the contractual context. The demand will be to receive a contractual promise. Unless issues of public policy are engaged, a party is always legally entitled to receive a contractual promise, even if that is a waiver of a prior claim. This is illustrated by *Times Travel* itself: the point was not whether the defendant bona fide

> believed itself to be entitled to the thing demanded (the obligations under the new agency agreement) but rather whether the defendant actually believed there was a prior claim against it for past unlawfulness (for not paying commissions due under the old agency agreement). Since the airline had genuinely believed itself not to be liable to pay the commissions under the old agreement, the waiver of that claim in the new agreement could not be rescinded for duress."

125. It is clear, therefore, that the above statement of David Richards LJ must be read in the context of the facts in *CTN Cash and Carry* because, on its face, it is far too wide. The context was one where the money was being demanded on the mistaken basis that it was owing under the contract for the goods that had been delivered but stolen. The law on lawful act economic duress would be far too wide if, generally, the illegitimacy of the threat turned on whether the threatening party did, or did not, bona fide believe that it was entitled to what was demanded. For example, a party (A) negotiating a contract with another party (B) may threaten (lawfully) not to supply goods unless B pays A money. Plainly economic duress could not be made out (there would otherwise be a risk of undermining ordinary contractual negotiations) even if it could be shown that A did not genuinely believe itself entitled to the money demanded from B. Indeed, it is obvious that, until the contract has been concluded, A has no contractual entitlement to what is demanded. Put another way, the "bad faith demand" requirement is dependent on there being an existing legal right and duty between the parties (whether contractual or otherwise) which provides a clear and certain standard against which alleged bad faith of the threatening party can be assessed. Without that tie to an existing legal right and duty, the "bad faith demand" requirement loses its force as being underpinned by a workable standard of dishonesty: the bad faith demand is concerned with either a dishonest assertion of an existing right or the dishonest removal (by waiver) of an existing right. It also loses its force as providing a clear and certain means of controlling the scope of lawful act economic duress and of distinguishing a demand that is unjustified from one that is made in ordinary commercial bargaining.

*(8) Some alternative approaches to the scope of lawful act economic duress*

126. I have looked at several alternative approaches to the scope of lawful act economic duress (ie approaches that do not turn on the "bad faith demand" requirement). Although these approaches have been put forward generally, and are not focusing on the context of a demand for what is claimed to be owing or for a waiver of a claim, with which we are directly concerned in this case, they may be taken to include that narrower context. But, with respect, these alternative approaches tend to flounder on the shifting sands as to what constitutes a reasonably held belief or, more generally, unreasonable or abnormal behaviour. For example,

there is the suggestion of Hugh Beale in *Chitty on Contracts*, 33rd ed (2018), para 8-046 that the relevant test might be whether the lawful act threat is

> "coupled with a demand which goes substantially beyond what is normal or legitimate in commercial arrangements."

127. Again, there is a focus on assessing the reasonableness of the demand, and indeed the threat, in the fascinating obiter dicta of Leggatt LJ (as he then was) sitting at first instance in *Al Nehayan v Kent* [2018] EWHC 333 (Comm); [2018] 1 CLC 216, para 188. He there suggested that:

> "the test suggested in *Chitty on Contracts* could be made more precise by transposing into objective requirements the elements of the offence of blackmail. On this basis a demand coupled with a threat to commit a lawful act will be regarded as illegitimate if (a) the defendant has no reasonable grounds for making the demand and (b) the threat would not be considered by reasonable and honest people to be a proper means of reinforcing the demand."

128. It is my view, with respect, that those tests risk rendering the law on lawful act duress too uncertain and would potentially jeopardise the stability of the English law of contract. Of course, a scholar of the distinction of Hugh Beale is well alive to those risks and trusts that the courts can draw a stable line as to what, for example, constitutes a demand that goes substantially beyond what is normal. But that the risk is significant is shown by his further comment at the end of para 8-046 that:

> "care must be taken in treating threats lawful in themselves as amounting to duress, for otherwise threats commonly used in business (eg of lawful strikes) would fall into the category of economic duress."

129. Another interesting suggestion is that made by James Edelman and Elise Bant, *Unjust Enrichment*, 2nd ed (2016), at p 212. They argue that what should, and does, underlie the law on lawful act duress is:

> "disproportionality between (i) the lawful threat and (ii) the defendant's legitimate interest in the demand it supports."

However, although notions of "disproportionality" have begun to play a role in contract law - one thinks particularly of the restated law on penalty clauses in *Cavendish Square Holdings BV v Makdessi* [2015] UKSC 67; [2016] AC 1172 - it is far from clear how disproportionality would work in the context of a case like the present; and, more generally, one can anticipate that there would be great uncertainty in the working out of a disproportionality idea in the general context of lawful act economic duress. Indeed, it is significant that, in the commercial context, Edelman and Bant go on to say the following, at p 217:

> "The general reluctance of courts to recognise lawful economic or commercial threats as disproportionate to commercial goals (and thus illegitimate) is to be applauded. Any other approach would cut across the statutory competition law rules which draw complex distinctions between lawful and unlawful commercial behaviour ... Only in the most exceptional circumstances, if at all, should it be illegitimate to threaten to engage in conduct which a plaintiff has a right to engage in and which is not proscribed by competition law."

130. The difficulties with these alternative approaches confirm my belief that, in the context of a demand for what is claimed to be owing or for a waiver of a claim, the "bad faith demand" requirement provides the appropriate certainty that is essential for the recognition of lawful act economic duress.

*(9) An alternative strategy put forward by Mr Jones*

131. Mr Jones put forward, as an alternative to his primary submission (that the reasoning of the Court of Appeal was correct), a line of argument which would deny the claim in this case for different reasons than those relied on by the Court of Appeal (ie for reasons different from the non-establishment of the "bad faith demand" requirement). His alternative submission was that, unless the criminal law offence of blackmail has been committed, lawful act duress should not exist. In particular, he submitted that *Borrelli v Ting* and *Progress Bulk Carriers* are better regarded as cases of unlawful act duress not lawful act duress. This alternative line of argument has some attractions. But, ultimately, I have rejected that alternative submission for the following main reasons:

(i) As I have explained at paras 107 and 110-111, *Borrelli v Ting* and *Progress Bulk Carriers* can be correctly viewed as cases on lawful act duress.

(ii) It is not clear how exactly a direct reliance on the crime of blackmail (at least without further elaboration) would work in the civil law context. Mr Jones argued that blackmail should be recognised as an example of "unlawful means". But that involves the circularity referred to in para 88 above.

(iii) Mr Jones's submission would involve largely ignoring the Court of Appeal's reasoning in *CTN Cash and Carry* which accepted that there can be lawful act economic duress without reference to the crime of blackmail.

(iv) Mr Jones's submission would also run contrary to my view, explained at para 122 above, that, had there been a bad faith demand in *CTN Cash and Carry*, economic duress would have been made out. Similarly, Mr Jones's submission would also run contrary to my view that, on the facts of this case, had PIAC's demand been made in bad faith, the threat would clearly have been illegitimate.

(v) Looking across the range of past cases in English law (including some that have been classified as cases of actual undue influence) they support the view that lawful act duress does exist. See paras 89-91 above.

## 7. The judgment of Lord Hodge

132. Since writing this judgment I have had the benefit of reading the judgment of Lord Hodge. There is a large measure of agreement between us. Where we fundamentally differ is that, in deciding that there was no lawful act economic duress on the facts of this case, I regard it as essential that, on Warren J's findings, PIAC was not acting in bad faith in the specific sense relating to PIAC's genuine belief as to its not being contractually liable for the unpaid commission that was being waived. That is what the Court of Appeal's decision turned on. It is my view that, had there been a contrary finding of bad faith, in that specific sense, TT's claim for lawful act economic duress would here have succeeded. While already in a strong position by reason of having a monopoly over the supply of tickets for direct flights between the UK and Pakistan, PIAC withheld a very large sum of commission owing to TT (the principal sum claimed was over £1.2m) and then went further by, for example, suddenly cutting TT's normal ticket allocation from 300 to 60 thereby increasing TT's vulnerability which it was then able to exploit by making the demand for the waiver (see above paras 69-70). All this went beyond the mere use of monopoly power. On the face of it, PIAC's conduct seems to fall within Lord Hodge's lawful act duress category comprising "using illegitimate means to manoeuvre the claimant into a position of weakness to force him to waive his claim". The fact that the claimant was already in a weak position (because of the monopoly) cannot make the claim for lawful act economic duress less deserving than if the

claimant had been in a stronger bargaining position. It follows that, in my view, contrary, as I understand it, to that of Lord Hodge, it is the "bad faith demand" requirement, as I have explained it, that is critical to the decision that there was no lawful act economic duress in this case.

133. With great respect, I am also very concerned that, without any focus on the "bad faith demand" requirement, defined in the specific sense that I have set out, and with instead the essential guide being that the defendant's conduct must be "reprehensible" or "unconscionable" or using "illegitimate means" (which is, by definition, distinct from unlawful means), one will be permitting lawful act economic duress to create considerable uncertainty in the realm of commercial contracts. While not supporting a "bad faith demand" requirement, Lord Hodge also refers at some points to "bad faith" as being relevant (see, for example, paras 56 and 59) but it is not clear to me what Lord Hodge means by that and how that approach is consistent with his rejection of a "good faith dealing" principle. I have tried to make clear (see para 95) that I am precisely not advocating a general principle of good faith dealing; and the "bad faith demand" requirement that I have been relying on, and which David Richards LJ was also using in the Court of Appeal, is narrow and sharply defined.

134. Although unnecessary for this decision, we also differ in relation to what the outcome would have been in *CTN Cash and Carry* had the defendants known that they were not contractually owed the money they were demanding for the goods. In my view, if that had been the position, the claimants would have succeeded in their claim for restitution of the money paid based on lawful act economic duress. But Lord Hodge takes the contrary view.

135. Finally, Lord Hodge suggests, at para 54 of his judgment, that there is no principled difference between a demand for payment, based on a bad faith demand, and a demand for payment as a pre-condition to entering into a contract. With respect, the principled difference is that one involves bad faith, as I have defined it, but the other does not. I have sought to make clear in para 125 that the "bad faith demand" requirement is dependent on there being an existing legal right and duty between the parties. To try to apply it outside that context would risk unduly interfering with ordinary commercial bargaining; and it would deprive the requirement of its force as being underpinned by a workable standard of dishonesty and as providing a clear and certain means of controlling the scope of lawful act economic duress. It is also worth stressing that the root principle, to which one is seeking to provide a clear guide, is that the demand is unjustified so that the lawful act economic threat is illegitimate. At this stage in the law's development, my strategy (see para 95 above) has been to set out a limited but clear and workable boundary for what constitutes an unjustified demand - so that a lawful act economic threat is illegitimate - in the context of the facts with which this case is concerned. Any incremental development of what the common law treats as an unjustified

demand in relation to lawful act economic duress can in the future proceed cautiously, in the light of known facts, from that secure base.

## 8. Conclusion

136. One can summarise the analysis of the law set out in this judgment as follows:

(i) Lawful act duress, including lawful act economic duress, exists in English law.

(ii) Three elements need to be established for lawful act economic duress: an illegitimate threat; sufficient causation; and that the threatened party had no reasonable alternative to giving in to the threat.

(iii) As the threat is lawful, the illegitimacy of the threat is determined by focusing on the justification of the demand.

(iv) A demand motivated by commercial self-interest is, in general, justified. Lawful act economic duress is essentially concerned with identifying rare exceptional cases where a demand, motivated by commercial self-interest, is nevertheless unjustified.

(v) In relation to a demand for a waiver by the threatened party of a claim against the threatening party, a demand is unjustified, so that the lawful act economic threat is illegitimate, where, first, the threatening party has deliberately created, or increased, the threatened party's vulnerability to the demand and, secondly, the "bad faith demand" requirement is satisfied. The demand is made in bad faith where the threatening party does not genuinely believe that it has any defence (and there is no defence) to the claim being waived.

137. In addition, I have explained that, although not necessary for the decision in this case, it is my view that, had the "bad faith demand" requirement been satisfied in *CTN Cash and Carry*, the demand would have been unjustified thereby rendering the lawful act economic threat illegitimate. That is, had the defendants not genuinely believed that the payment that they demanded from the claimants was contractually owed, it would have been recoverable by the claimants for economic duress.

138. Applying the analysis of the law summarised in para 136 to this case, my conclusion is that the decision of the Court of Appeal was correct largely for the reasons it gave (although it was unnecessary for it to have taken, what I have termed, the wider interpretation of *CTN Cash and Carry*). Lawful act economic duress was not made out on the facts of this case because the threatened lawful act was not coupled with a bad faith demand. On the facts found by Warren J, TT failed to establish bad faith by PIAC in the specific sense relating to PIAC's genuine belief as to its not being contractually liable for the unpaid commission. The Court of Appeal correctly applied the "bad faith demand" requirement in this case. I would therefore dismiss the appeal.