# EXHIBIT 11

Case No: 2010 FOLIO 1468

Neutral Citation Number: [2013] EWHC 3147 (Comm)
**IN THE HIGH COURT OF JUSTICE**
**QUEEN'S BENCH DIVISION**
**COMMERCIAL COURT**

Royal Courts of Justice
Rolls Building, Fetter Lane
London, EC4A 1NL

Date: 18/10/2013

Before:

**THE HON. MR JUSTICE POPPLEWELL**
- - - - - - - - - - - - - - - - - - - -
Between:

|  |  |
|---|---|
| **MADOFF SECURITIES INTERNATIONAL LIMITED (In Liquidation)** | **Claimant** |
| - and - | |
| **(1) Stephen Raven** | **Defendants** |
| **(2) Leon Flax** | |
| **(3) Christopher James Dale** | |
| **(4) Philip John Toop** | |
| **(5) Malcolm Stevenson** | |
| **(6) Peter Barnet Madoff** | |
| **(7) Mark David Madoff** | |
| **(8) Andrew Howard Madoff** | |
| **(9) Sonja Kohn** | |
| **(10)    Erko Incorporated** | |
| **(11)    Tecno Development & Research Limited** | |

- - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - -

**Pushpinder Saini QC, Robert Weekes, Tom Richards and Shane Sibbel** (instructed by **Taylor Wessing LLP**) for the **Claimant**
**Nicholas Yell** (instructed by **EMW Law LLP**) for the **1st Defendant**
**Ian Clarke and Lara Kühl** (instructed by **Radcliffes Le Brasseur**) for the **2nd Defendant**
**Philip Toop** (Litigant in Person) the **4th Defendant**
**Zoe O'Sullivan** (instructed by **Pitmans LLP**) for the **7th & 8th Defendants**
**Jonathan Crow QC and James Knott** (instructed by **Asserson Law Offices**) for the **9th & 11th Defendants**

Hearing dates: 10-13, 17-20, 24-27 June; 1-4, 8-11, 15-18 July 2013
- - - - - - - - - - - - - - - - - - - -

# Judgment

Index

| | |
|---|---|
| 1 Introduction | 1 |
| 2 The claims and defences in outline | 8 |
| 3 The parties | 30 |
| 4 The corporate history of MSIL | 61 |
| 5 Mrs Kohn's agreement with Bernard Madoff | 108 |
| 6 The research | 135 |
| 7 Financial and accounting treatment of the MSIL | 146 |
| Kohn Payments: | |
| a. Invoices | 146 |
| b Funding | 160 |
| c. Auditing | 164 |
| d. Accounting, including the "fees receivable" issue | 168 |
| 8 Directors' duties: the law | 187 |
| 9 MSIL Kohn payments: breaches of directors' duties | 210 |
| 10 MSIL Kohn payments: the directors' *Duomatic* defence | 266 |
| 11 MSIL Kohn payments: remedy/causation | 289 |
| 12 MSIL Kohn payments: the directors' no loss defence | 296 |

| | |
|---|---|
| 13 MSIL Kohn payments: the directors' ex turpi causa defence | 307 |
| 14 MSIL Kohn payments: the directors' limitation defence | 321 |
| 15 MSIL Kohn payments: the directors' claim for relief from sanction | 334 |
| 16 MSIL Kohn payments: the claim against Mrs Kohn, Erko and Tecno Gibraltar | 337 |
| 17 MSIL Kohn payments: Mrs Kohn's limitation and laches defence | 384 |
| 18 The Interest Payments: the facts | 391 |
| 19 The Interest Payments: breaches of directors' duties | 416 |
| 20 The Interest Payments: defences | 442 |
| 21 The Lifestyle Payments: claim and defences | 458 |
| 22 Conclusion and postscript | 469 |

**The Hon. Mr Justice Popplewell:**

## (1) Introduction

1.  On 29 June 2009, Bernard Madoff was sentenced by a Court of the Southern District of New York to 150 years in prison and ordered to forfeit US$170 billion. The present claim is brought in the long shadow cast by his notorious Ponzi scheme, perpetrated through his New York business for two decades or more. But this case is not primarily about the Ponzi scheme. None of the remaining Defendants knew of, or suspected, the fraud. It is not suggested that they did, nor that they should have done. Many lost their own savings as a result of the scheme. All have had their lives turned upside down. They are all victims of Bernard Madoff's fraud.

1.  During the three decades with which this case is concerned, Bernard Madoff enjoyed a reputation as a titan of Wall Street. Prior to the revelation of the fraud in December 2008, he was to the world a self made billionaire, regarded within the financial industry, by participants and regulators alike, as a successful businessman of high standing and integrity. His New York business filed audited statements of financial condition attesting to his enormous wealth and success. His stature was enhanced by the senior positions he held within institutions at the heart of the US financial

establishment. He served on several committees to advise the Securities & Exchange Commission; he was chairman of NASDAQ; he was vice chairman of the National Association of Securities Dealers; he was a director of the US Securities Industry Association. His reputation was not built on his investment advisory business, which turned out to be a Ponzi scheme, but on his proprietary trading and market making business, which was conducted conventionally and legitimately with envied success for over forty years.

2.      From around 1960 to the end of 2000 Bernard Madoff's New York business was conducted under the trading style Bernard L. Madoff Investment Securities, of which he was sole proprietor. Thereafter it was conducted through Bernard L. Madoff Investment Securities LLC which was incorporated as a New York company on 1 January 2001. He was the sole director and owned all the shares. In this judgment I use "BLMIS" to refer to both the incorporated and unincorporated entities.

3.      BLMIS had three divisions: investment advisory, market making and proprietary trading. The investment advisory business was housed on the 17th floor of the firm's New York offices, separately from the market making and proprietary trading divisions which were on the 19th floor. It was run by Frank DiPascali, under Bernard Madoff's personal supervision. Personnel in the investment advisory business did not share information with the personnel in the market making and proprietary trading businesses: compliance policies and procedures expressly forbade any interaction between the businesses.

4.      The market making and proprietary trading divisions carried out legitimate and profitable business activities. By contrast, BLMIS' investment advisory business engaged in no material investment activity. The "investments" made for clients did not take place. The investors' money was mixed with money from the legitimate trading activities in a variety of bank accounts, including in particular one held at JP Morgan ("the 703 account"). BLMIS issued to each of its clients monthly or quarterly statements which purported to show the securities which were owned and traded in the client's accounts with BLMIS, and the growth and profit in such accounts. In reality there was no such trading, growth or profit. When from time to time customers of BLMIS sought repayment of their investment, BLMIS would make payments which were consistent with the false account statements which the customers had been receiving. In reality the customers' funds had been co-mingled and depleted by BLMIS's payments out of the scheme to other customers. Towards the end of 2008, when requests for redemptions exceeded the amount of funds deposited by new customers, the scheme became unsustainable. In early December 2008 BLMIS had generated about 5,000 client account statements, which together purported to show the clients' investments totalling approximately US$ 65 billion. In fact at that time the investment advisory business had only about US$ 200 million in cash and no investments.

5.      This case is concerned with Bernard Madoff's London business, Madoff Securities International Ltd ("MSIL"). MSIL was not part of the Ponzi scheme. It was conducting its own legitimate business in London. At all material times Bernard Madoff was MSIL's executive CEO or chairman, and owned virtually all of the voting shares. MSIL had a number of other directors apart from Bernard Madoff, the composition of the board varying over time. The present claim is brought by the liquidators of MSIL against some of its former directors; and against Mrs Sonja Kohn,

an Austrian businesswoman who was very well connected with a range of influential individuals and institutions in the European financial and political world.  Her introductions led to billions of dollars worth of investments in BLMIS in what turned out to be the Ponzi scheme.

6.      It is necessary to keep firmly in mind that the conduct and state of mind of the Defendants in this case falls to be judged against the widespread contemporary perception of Bernard Madoff as a man of integrity, whose honesty in all his business dealings was taken for granted; and as a man whose success and high standing in the financial world caused his views on financial matters to command widespread deference and respect.  Mrs Kohn and the directors had no reason to suspect Bernard Madoff's fraud, and none for a moment did so.  In common with the rest of the financial world, they believed Bernard Madoff to be a man of unquestioned probity whose high reputation and status was justified by his apparently formidable history of financial trading and investment.

**(2) The claims and defences in outline**

7.      There are five directors against whom the claim is now pursued ("the director Defendants").  They are Mr Raven, Mr Flax, Mr Toop, Mr Mark Madoff and Mr Andrew Madoff. Mr Raven, Mr Flax and Mr Toop were directors of MSIL, based in MSIL's London office.  So too were Mr Dale and Mr Stevenson, the third and fifth defendants with whom MSIL settled.  There were other directors of MSIL in London from time to time during the relevant period whom MSIL has not sued.  Three members of the Madoff family in addition to Bernard Madoff himself were also directors of MSIL, but worked principally from BLMIS's New York offices.  They were Peter Madoff, Bernard Madoff's brother; and Mark and Andrew Madoff, Bernard Madoff's sons.  MSIL discontinued the action against Peter Madoff, the sixth Defendant, on 4 April 2013.  Mark Madoff is deceased; Andrew Madoff represents his late brother's estate in these proceedings.

8.      The claim relates to three sets of payments made by MSIL, to which I will refer as (i) "the MSIL Kohn Payments", (ii) "the Interest Payments" and (iii) the "Lifestyle Payments".  The first of these was described by MSIL as its principal claim.

*(i) The MSIL Kohn Payments*

9.      The MSIL Kohn Payments were made by MSIL regularly throughout the period between 1992 and 2007 to entities connected with Mrs Kohn.  They total US$27,059,054.  Until 2001, the payments were made to the Tenth Defendant, Erko Incorporated, ("Erko"), a New York company dissolved in 1998.  From 2002 to 2007 they were made to Tecno Development and Research Srl, an Italian company also now dissolved, ("Tecno Italy").  In 2007 they were made to the Eleventh Defendant, Tecno Development & Research Limited, a Gibraltar company ("Tecno Gibraltar").  The payments ceased in 2007 in circumstances to which I shall return.  The payments were generally made quarterly and the annual totals were as follows:

| Year | MSIL Kohn Payments | | |
|------|-------------|-------------|-----------------|
|      | Erko | Tecno Italy | Tecno Gibraltar |
| 1992 | $61,579.00 | | |
| 1993 | $165,900.00 | | |

| 1994 | $268,875.00 | | |
|-------|----------------|-----------------|-----------------|
| 1995 | $277,200.00 | | |
| 1996 | $651,700.00 | | |
| 1997 | $1,625,300.00 | | |
| 1998 | $1,636,500.00 | | |
| 1999 | $1,500,000.00 | | |
| 2000 | $2,000,000.00 | | |
| 2001 | $2,871,000.00 | | |
| 2002 | | $2,325,000.00 | |
| 2003 | | $3,100,000.00 | |
| 2004 | | $2,876,000.00 | |
| 2005 | | $2,800,000.00 | |
| 2006 | | $2,800,000.00 | |
| 2007 | | $700,000.00 | $1,400,000.00 |
| 2008 | | | |
| **Total** | **$11,058,054.00** | **$14,601,000.00** | **$1,400,000.00** |

10.     The payments to Erko were made by cheque, collected by Mrs Kohn or her husband when in London.  The Erko cheques were, at least from 1996, paid into an account or accounts at Bank Gutmann AG (a private bank in Austria) in the name of Mrs Kohn's daughter.  The payments to Tecno Italy and Tecno Gibraltar were made by electronic bank transfer.  BLMIS funded MSIL to make all these payments in the way I describe in more detail below.

11.     Mrs Kohn had agreed with Bernard Madoff that such payments would be made by MSIL in return for services provided by her.  Mrs Kohn's evidence was that the payments were for a range of services which were essentially (a) introductions to important individuals and institutions (b) advice, information and ideas about global financial and economic matters, communicated at face to face meetings with Bernard Madoff and (c) written research.  Written research was delivered in very substantial quantities to both MSIL in London and BLMIS in New York.  MSIL's case is that the payments were simply for introducing investors' money into BLMIS's investment advisory business.  In addition to the MSIL Kohn Payments, between 1998 and 2008 over US$32 million was paid by BLMIS for her services, making a total of some US$59 million.

12.     It is worth emphasising that, large though these payments were, the total amount of the payments made by MSIL and BLMIS to the entities connected with Mrs Kohn was no more than a reasonable amount for the services which were in fact provided.  This was common ground.  Mrs Kohn was very well connected and very successful in making effective introductions, although she did not know at the time whether or how such introductions would flower into profitable business.  MSIL's case was that her introductions led to at least US$9 billion of funds being invested in BLMIS's investment advisory business.  Mrs Kohn did not know, and had no reason to suspect, that the investment advisory business was a fraudulent scheme.  Had it been what it appeared to be, it is accepted by MSIL that the introductions effected by her would justify the amount of the payments.  Indeed the unchallenged expert evidence before me established that the going rate for introductions leading to funds under management of that size was considerably greater.

13.    Each payment was covered by an invoice from, successively, Erko, Tecno Italy, and Tecno Gibraltar, although not all the invoices from the early years have survived. Some referred to "services" generally, some simply to "research" and some to a range of named services including "market researches", "analysis", "specific reports", "ideas and strategies for new business developments" and "business opportunities".

14.    In respect of these payments MSIL pursues claims against Mr Raven, Mr Flax, Mr Toop, Mr Andrew Madoff and Mr Mark Madoff by reason of their having been directors of MSIL for some or all of the time during which the MSIL Kohn Payments were made.  It alleges that so far as these directors were concerned, the payments were simply being made in return for the written research being delivered to MSIL's London offices, which was not passed on to New York; and that as the directors knew, the written research provided to MSIL was useless and of no value to MSIL, both because of its own poor and plagiarised quality and because it was irrelevant to the trading activities in which MSIL was engaged.  The claim against these directors is advanced on the basis that each was in breach of his duty as a director in making or permitting the payments because:

    (1) the payments constituted an unlawful distribution of capital to MSIL's shareholder, Bernard Madoff; and/or

    (2) the director was in breach of the duty to exercise powers for the purposes for which such powers are conferred; and/or

    (3) the director was in breach of the duty to act in the way he considers in good faith to be in the best interests of the company; and/or

    (4) the director was in breach of the duty to exercise reasonable care skill and diligence.

15.    The director Defendants deny that they were in breach of duty in any of the respects alleged.  In addition they advance the following alternative defences:

    (1) The payments were approved by the voting shareholders which affords a defence under the **Duomatic** principle.  Bernard Madoff held all bar one of the voting shares in MSIL, which was held by his brother Peter Madoff.

    (2) Any breach of duty was not causative of any loss: Bernard Madoff would have procured the payments to be made had the director not been in breach of duty as alleged.

    (3) MSIL has suffered no loss in respect of the payments because they were funded by BLMIS and so were cash neutral for MSIL.

    (4) The claim fails under the *ex turpi causa* doctrine, because it is MSIL's case that, albeit unbeknown to the directors at the time, the payments were funded from the fraudulent Ponzi scheme, and were part of it in the sense that the entities connected with Mrs Kohn were being paid for introductions to the scheme.

(5) Claims in respect of payments made before 8 December 2004 are time barred having occurred more than six years prior to the issue of the Claim Form.

(6) The directors should be afforded relief from sanction under section 1157 of the Companies Act 2006 and its statutory predecessors, on the grounds that they acted honestly and reasonably and ought fairly to be excused from liability.

16.   MSIL disputes the applicability or validity of the causation, no loss, and ex *turpi causa* arguments, and contends that relief from sanction is not available because the directors did not act honestly or reasonably.   MSIL contends that the ***Duomatic*** defence has no application for one or more of the following reasons:

(1) There was no unanimous informed approval by the voting shareholders because Peter Madoff held one voting share and he was unaware of the MSIL Kohn payments.

(2) The company was at the time of all the payments insolvent (albeit unknown to any of the Defendants) because it was funded from the proceeds of the Ponzi scheme, and all such funding was immediately repayable to BLMIS at the time of receipt; or alternatively was at least in a precarious financial state at the time of all the payments because it was dependant on funding from BLMIS.

(3) The transactions were not honest or bona fide transactions from the point of view of the directors or the relevant shareholder, Bernard Madoff.

17.   MSIL contends that no time bar applies because:

(1) each of the director defendants was guilty of fraud within the meaning of s. 21(1)(a) of the Limitation Act 1980; and/or

(2) each of the directors was guilty of deliberate concealment under s. 32(1)(b) and 32(2) of the Limitation Act 1980.

18.   Against Mrs Kohn, MSIL's claim is advanced on four bases, namely dishonest assistance constructive trust; knowing receipt constructive trust; a common law restitutionary claim; and a proprietary receipt based claim. It is common ground that the first two, at least, require a finding that at least one director was in breach of a fiduciary duty.

19.   MSIL's case against Mrs Kohn can be summarised as follows. The true reason for the MSIL Kohn Payments was for introductions to Bernard Madoff's investment advisory business. The written research provided to MSIL was, as she knew, valueless per se and worthless to MSIL in its trading business. It was provided merely as a pretext for the payments. The pretext was maintained by false invoicing purporting to justify the payments as being for such research. This dressing up of the payments by the provision of worthless research and false invoicing reflected Mrs Kohn's knowledge that the payments were not for MSIL's benefit or in MSIL's interests.

20.   Mrs Kohn disputes this analysis. Her case is that the payments were for a range of services which she provided, and for which she was paid a proportionate amount pursuant to an agreement reached with the chief executive and owner of MSIL; it was

a matter of indifference to her whether the payments were made by BLMIS or MSIL, which she regarded simply as parts of Bernard Madoff's single global business; she did not regard the MSIL Kohn payments as being solely or even primarily for the written research; her services included the introduction of people, not money, which might result in benefit to the proprietary trading business as much as the investment advisory business; so far as she was concerned, the introduction of European connections might naturally benefit Bernard Madoff's London based business; in any event the research was not worthless to MSIL, or at least was not regarded by her as worthless to MSIL; the research was provided openly to the London office over many years in a way which would have been apparent to the directors in London and to the auditors; the payments and invoices were equally open and transparent; there was no secrecy and no one ever told her that the research should not be provided or that they thought it was a pretext for the payments; there was nothing false about the wording of the invoices, to which she paid little attention, and there was no intention to mislead anyone.

21.     Mrs Kohn contends that the claim in respect of payments made before 8 December 2004 is time barred by the Limitation Act 1980 or the doctrine of laches. MSIL relies in this context on sections 21 and 32 of the Limitation Act 1980.

*(ii) The Interest Payments*

22.     The second set of payments in respect of which MSIL claims arise out of two subordinated loan agreements by which Bernard Madoff lent MSIL a total of US$62.5 million. The first loan agreement was dated 28 November 2000 and was for US$37.5 million. The second was dated 28 December 2001 and was for US$25 million. The loans were at a commercial rate of 0.5% over LIBOR and on commercial terms. The loan agreements were countersigned by the Financial Services Authority ("FSA"). Between 2002 and 2007 interest payments totalling about US$14 million were made in accordance with the terms of the agreements. The loans were capitalised in 2007.

23.     MSIL's case is that these loans were unnecessary: MSIL had no need or use for such monies and was left with expensive and unused capital upon which it was obliged to pay interest. MSIL has not alleged or sought to prove that the use to which MSIL put the capital generated less than the cost of the interest payments so that MSIL suffered a loss as a result of taking out the loans or making the contractual interest payments; nor has it sought to quantify the extent of any such loss. The claim was advanced simply on the basis that MSIL did not need so much capital. MSIL contends that the directors are under a liability to restore the amounts of the Interest Payments irrespective of any amounts earned by MSIL on the capital sums loaned under the subordinated loan agreements.

24.     There was a substantial dispute before and at the commencement of the trial as to how to deal with the issue as to what, if any, credit needed to be taken into account for money earned on the use of the capital borrowed under the loan agreements. In particular the Defendants complained that they had not had proper disclosure in order to enable the question of loss fairly to be investigated, and the Claimant complained that the point had not been pleaded by the Defendants, save possibly Mr Toop, as it contended it needed to have been. The question of the use to which the loans were put, and how much was earned by the use of the capital, is potentially relevant not only to arguments on loss, but also to the liability of the directors, whose perception

of whether the loans would cause or were causing a net loss to the company is relevant to whether they were in breach of duty. Following argument, it was agreed to treat the evidence available at the trial as sufficient on which the parties could address the liability questions, but that the question whether or to what extent MSIL had in fact suffered a loss, if the use of the capital fell to be taken into account, could not fairly be investigated on the basis of disclosure to date. Accordingly it was agreed that I would decide the liability issues on the basis of the evidence adduced at trial, and, if liability were established, I would also determine the issue of principle whether earnings from the proceeds of the subordinated loans are relevant to the measure of loss recoverable from the directors; but that if I should conclude that they did fall to be taken into account, I would not seek to decide the amount at this hearing: in that eventuality, if it arose, the question of how the issue would be dealt with would be revisited, including whether there should be a further hearing or whether the issue should be decided for or against either party as a pleading point or by reference to the burden of proof.

25.     The legal bases for the claims against the directors, and the directors' defences, mirror those in respect of the MSIL Kohn Payments. MSIL alleges breach of the same duties, save for the allegation of unlawful distribution of capital; the response of the directors is to deny breach and rely on the same additional defences.

*(iii) The Lifestyle Payments*

26.     The third element of the claim concerns payments by MSIL for goods or services which were made for the benefit of Bernard Madoff or members of his family. They included the purchase of a yacht and a car, and credit cards drawn on an account with an Isle of Man bank. The total of such payments in their currency of payment is €5,316,629, US$566,535 and £180,009. In every case the amount of these "lifestyle" payments was deducted from Bernard Madoff's director's loan account which was always in credit. The loan account comprised a loan from Bernard Madoff to MSIL repayable by MSIL to Bernard Madoff on demand. These payments therefore caused MSIL no economic loss because they reduced its loan obligation to Bernard Madoff.

27.     MSIL contends that a director's loan account is usually for the purposes of providing working capital to the company, and that in any event the loan by Bernard Madoff, albeit repayable on demand, provided money which became the company's money and the directors were under a duty not to apply such money for purposes other than those of the company itself.

28.     Again, the legal bases for the claims against the directors and their defences mirror those in respect of the MSIL Kohn Payments. MSIL alleges breach of the same duties, save for the allegation of unlawful distribution of capital; the response of the directors is to deny breach and rely on the same additional defences.

## (3) The parties

*MSIL*

29.     MSIL was incorporated on 11 March 1983 as Madoff Holdings Ltd and changed its name to MSIL on 14 October 1988. MSIL operated from offices in London. It was never very large, having a staff which reached a maximum of 26 employees in its last

years. It was regulated by the FSA and its predecessors, the Securities and Futures Authority and the Securities Association. Its auditors and tax advisers were Thomson McLintock which became part of Peat Marwick McLintock and then KPMG (collectively "KPMG").

30.     From 15 March 1983 and throughout the relevant period Bernard Madoff was a director of MSIL and its chief executive officer or executive chairman. He would participate in almost all board meetings, which took place mostly in London, but sometimes in New York. Bernard Madoff would usually participate in the London board meetings by phone or video conference, but sometimes attended in person. He would have regular telephone conversations with the directors, and sometimes the traders, in London. He would visit MSIL's offices a few times per year. The impression I formed from the evidence which emerged during the trial was that despite some idiosyncrasies he was open to reasonable discussion. He was not a tyrannical bully; he commanded loyalty, respect, and on the whole affection, from those who worked for him or with him. Nevertheless he left all with the clear sense that MSIL was his company, in which he had the ultimate say; and, ironically, that he was anxious that his prestige and reputation should be protected and enhanced in all the company did. As he was fond of saying, "It's my bat and ball", and "it's my name on the door."

31.     His brother Peter Madoff was also a director of MSIL throughout the relevant period, from 16 March 1983 shortly after its incorporation, until December 2008. He participated in board meetings by phone or video conferencing, or occasionally in person, but played no executive role in MSIL's business until the last few years when he was concerned with compliance. On 29 June 2012 he pleaded guilty to various offences involving the falsification of books and records of BLMIS and making false filings with the SEC. He was ordered to forfeit property up to the value of \$143.1 billion and sentenced to 10 years in prison. Neither the Claimant nor the Defendants have alleged in these proceedings that he was party to, or aware of, his brother's Ponzi scheme fraud.

32.     The shareholdings in the company varied over time but can be summarised as follows:

        (1) Voting shares. At all times Bernard Madoff held all the voting shares bar one, which was held by his brother Peter Madoff. After 1987 the number of voting shares varied from time to time, between 252,297 and almost 58 million.

        (2) Non voting shares. Prior to December 1998, Bernard Madoff held non voting shares, in addition to his voting shareholding, of between about 9% and 15% of the total shareholding. His associates Mr Konigsberg and Mr Cohn had a similar sort of percentage between them. In this period, therefore, Bernard Madoff owned about 85% or more of the company's equity. After December 1998 when US\$ denominated shares were issued, it is harder to calculate the relevant percentage holdings of non voting shares, but Bernard Madoff continued to hold a substantial proportion of the non voting shares in addition to virtually all the voting shares, and to be the largest beneficial owner of the company's shares. Non voting shares were also held by Bernard Madoff's wife Ruth Madoff, his brother Peter, and his sons Mark and Andrew Madoff, as well as Mr Konigsberg and Mr Cohn. So far as Mark and Andrew Madoff

were concerned they derived no benefit from these shares because they were obliged to pay any dividends declared on them to their father as interest repayments on loans Bernard Madoff made to them for subscription for the shares.

33.  MSIL's corporate history can be broken down into five phases:

(1) Between 1983 and 1986 the company does not appear to have conducted any substantial business.

(2) In 1987 and 1988, MSIL had a single trader, Miss Sutton, who was sent from BLMIS in New York to deal in US equities and American depository receipts of a number of UK companies. MSIL traded such securities as principal, but entered into back to back trades with BLMIS. Thus MSIL reported no dealing profits or losses in 1987 or 1988.

(3) From about 1988 to about 2001, MSIL traded in US stocks in Europe, primarily as agent for BLMIS; for most of this period it had three principal traders.

(4) From about 2001, MSIL traded in European and US securities on its own account as a proprietary trading firm. The number of traders grew, and the areas of trading and strategies diversified.

(5) Following the revelation of Bernard Madoff's fraud on 10 December 2008, MSIL ceased trading and joint provisional liquidators of MSIL were appointed on 19 December 2008. A winding up order was made on 15 December 2009.

34.  This case is concerned with events during phases 3 and 4. It is necessary to describe the development and management of the company in greater detail in order to place the conduct and attitude of the directors in the context of the business and their management roles from time to time. Before doing so I will introduce the Defendants.

*Mr Raven*

35.  Mr Raven was born in 1938 and spent the first 20 years of his career with a jobbing firm, becoming a senior partner in a firm employing about 120 staff which was merged into Ackroyd & Smithers PLC. Between 1977 and 1987 he was a main board director of Ackroyd & Smithers, where he established its financial futures division and was actively involved in its merger with SG Warburg. For the last two years of his time at the Warburg Securities Group, following its acquisition of Ackroyd & Smithers, Mr Raven fulfilled a compliance role, somewhat reluctantly because he wanted to remain involved in international trading. For this reason he left Warburgs and having spent a brief period with County Nat West Securities, where he was deputy CEO, he resigned to join International City Holdings PLC and was the main board director in charge of a 400 strong international broking division. He left International City Holdings PLC in 1991 and for the next three years, until 1994, was Chairman of Tradepoint Financial Network PLC a newly formed company operating a screen based dealing market.

36.     Apart from a two week period in 1983 when the company was being set up, Mr Raven
        first became a director of MSIL on 1 January 1992, initially on a part time non
        executive basis.  From 1998 he started working for MSIL on a more full time basis
        and became full time chief executive officer in 2003.  He was a director from 1
        January 1992 until 15 December 2009.  He started on a modest salary of about £5,000
        per annum, reflecting his part time role, increasing to about £50,000 p.a. in 1994 and
        more than £300,000 p.a. (inclusive of bonuses) in 2008; in 2006 his remuneration
        totalled almost £1 million but this was as a result of special factors and is not
        representative of his general level of remuneration.

37.     When he became a director of MSIL in his mid 50s, Mr Raven was already a person
        of some standing in the City.  In 1975, at an impressively young age, he had been
        elected to the Council of the London Stock Exchange ("LSE"), on which he remained
        until 1991.  During that time he chaired the committee responsible for the creation of
        SEAQ International and the committee responsible for the formation of the London
        Traded Options Market; he served as deputy chairman of the Commissions and
        Dealing Committee; and he facilitated the merger of the LSE and the International
        Securities Regulatory Organisation so as to form the International Stock Exchange; he
        was chairman of a new committee of the LSE called the International Markets
        Committee formed in 1985 for the purposes of shepherding the introduction of a new
        category of membership of international broker dealers, in the context of the
        deregulation of the LSE's restrictive practices in 1986, colloquially referred to at the
        time as "Big Bang".  He was a founding director of the London International
        Financial Futures Exchange ("LIFFE") and was appointed chairman of the Floor
        Trading Committee.

*Mr Flax*

38.     Mr Flax was born in South Africa in 1943 and became resident in the United
        Kingdom in April 1977.  He was admitted to the South African Bar in 1964, although
        he never subsequently practised law.  He obtained an MBA from Columbia
        University in New York in 1967.  From 1967 to 1983 he worked for what can loosely
        be termed his family's business in South Africa, being a director from 1976.  He
        remained a non executive director after 1983 until the business was sold in 1988.

39.     Mr Flax met Bernard Madoff in October 1986 and was offered a position with MSIL
        in London on a starting salary of £33,000 a year from 3 November 1986.  Although
        his one page service contract dated 22 April 1987 refers to him as Director of
        Operations, the company had no employees when he joined.  Linda Sutton, a young
        trader from the New York office of BLMIS was sent over.  On 7 November 1986
        Miss Sutton was appointed managing director and Mr Flax was appointed a director.
        He remained a director until 12 May 2009.  His salary increased over time to reach
        about £100,000 pa (inclusive of bonuses) by 2008.

*Mr Toop*

40.     Mr Toop joined BLMIS as an assistant equity trader on the market making desk in
        August 1987 shortly after completing an MBA at New York University.  Between
        1987 and 1999 he worked as an equity trader for BLMIS, first on the market making
        desk until 1995, then moving to the proprietary trading desk.  In 1999 he agreed at

Bernard Madoff's request to move to London on a three year assignment. As it turned out he never returned.

41.   Having moved to London Mr Toop was employed by MSIL as a trader on the trading desk between October 1999 and June 2002. Between June 2002 and December 2008 he managed the London trading desk. He became a director on 1 January 2003 and remained one until 23 December 2008.

42.   Mr Toop's remuneration was dependent in part on trading profits. He was paid about £67,000 p.a. in 2000 increasing to nearly £370,000 p.a. (inclusive of bonuses) by 2007.

*Mr Mark Madoff and Mr Andrew Madoff*

43.   Mark Madoff and Andrew Madoff each joined BLMIS upon graduating from university, in 1986 and 1988 respectively, and learned the business on the market making desk. By the mid 1990s they were jointly managing the market making desk at BLMIS. Mark Madoff continued to manage the market making desk after Andrew Madoff began to focus on the proprietary trading desk, although they were each involved in both aspects of the business. They reported directly to their uncle Peter Madoff, who oversaw the legitimate proprietary trading and market making business of BLMIS in New York.

44.   Neither brother was ever a director or shareholder of BLMIS and neither saw accounting records or bank statements for the firm as a whole. They were never privy to BLMIS' investment advisory business and never saw any records of transactions for the investment advisory business.

45.   Both brothers were appointed directors of MSIL by Bernard Madoff on 31 December 1998 when they became non voting shareholders. The brothers remained directors of MSIL until 10 December 2008. On that day their father confessed to them the fraud he had been committing. They immediately reported his crimes to the US authorities and he was arrested the following day. Exactly two years later, on 11 December 2010, Mark Madoff took his own life.

46.   Andrew Madoff has suffered a recurrence of the form of cancer which was originally diagnosed in 2003. He has recently undergone a stem cell transplant in Seattle and remains seriously unwell. He was not well enough to give evidence even by video link, although he had provided a witness statement before undergoing treatment.

*Mrs Kohn*

47.   Mrs Kohn has led a remarkable life. I regard its unusual course as important context for the assessment of her evidence and conduct in relation to the issues I have to decide. She was born shortly after the war as the only child of two holocaust survivors, and brought up in Vienna where her father traded in textiles, coffee and other commodities and then opened a chain of dry cleaning shops. She married her husband a month before she left school at the age of 18. She never attended university. Her first business, which she started before she was 20, involved selling custom jewellery, and she remained in the business of wholesaling and manufacturing

accessories and watches until the mid 1980s. During this time she brought up her five children.

48.     It was not until approaching early middle age that she first ventured into the world of finance. In 1984 she decided to study for the qualification required to obtain a broker licence for practice in the United States, and for those purposes prevailed upon the Zurich offices of Merrill Lynch to allow her to spend a few days there. Shortly after passing the exam, she moved with her family to New York for reasons connected with her children's education. In preparing for her move to the USA, she spoke to a number of Swiss contacts, and identified the lack of a Swiss Chamber of Commerce in New York as a gap she could fill. In founding this not for profit entity in New York after her arrival, she was able to make important contacts in New York and the Swiss financial sector.

49.     In about May 1985 she started working for Merrill Lynch in New York and spent two years in the international office. Encouraged by two of her clients at Merrill Lynch, in 1987 she established her own brokerage firm called Windsor, operating from office space within Oppenheimer and Co., to whose in house research she had access.

50.     In about 1990 she set up Eurovaleur. Its initial business model was to establish a European fund in which US citizens could invest, to be managed by local managers in different European countries. For these purposes she needed to develop a pool of trusted investment managers. The concept of Eurovaleur was of interest to Prudential Insurance Company and she travelled with a representative from Prudential through Europe meeting a large number of candidates for local fund managers in a number of European countries. The candidates included, amongst others, Commerzbank, SG Warburg, Kempen, Banca Intesa, Bank Austria and Raiffeisen. This laid the foundation of a strong European network of contacts with a variety of major European institutions, senior European bankers, finance ministers and others in the financial world.

51.     In the 1990s she also provided consultancy services to Bank Austria, developing ideas for them which were based on her experience obtained in the USA. Eurovaleur assisted Bank Austria to create a capital guarantee note product and in setting up a US denominated fund, amongst other services. Her cooperation with Bank Austria was formalised in 1994 with the establishment of a finance house, Medici Finanz, in which she held 90% of the shares, with Bank Austria holding 10% of the shares as her institutional partner. In 2003 Medici Finanz became Bank Medici and obtained a full banking licence which allowed it to carry out investment banking services. At that time Bank Austria increased its shareholding to 25%. Mrs Kohn was on Bank Medici's supervisory board and contributed ideas and introduced contacts to the bank; she was not however part of the executive managing board of Bank Medici.

52.     She became an advisor to the Austrian Minister of Economic Affairs in the 1990s and was also at one time an adviser to Austria's foreign minister.

53.     In 1996 she set up Infovaleur as a company for the provision of consultancy services, and introductions of European financial institutions to money managers, brokerage firms and investment banks; and to carry out research and analysis in relation to international markets. In the 1990s she also developed contacts with business leaders in the Arab world, leading to the establishment of a joint investment fund between

Emirates Bank and Bank Austria in November 1998. In the late 1990s, she established and developed FundsWorld. This was an online distribution platform for mutual funds. FundsWorld launched in September 1999, with Banca Intesa (now Intesa San Paolo IMS), one of the largest Italian financial institutions, as its institutional shareholder.

54. Milan became a centre of her business operations in Europe, with an office there for FundsWorld, and Bank Medici, to service which she formed Tecno Italy. In 2005 Bank Austria's parent, HVB, was bought by the Italian banking group Unicredit. She pursued a number of business ventures in Italy, which did not ultimately mature to the point of making significant profits but again contributed to the breadth of her contacts.

55. In 2007 she set up a Lichtenstein insurance company called PrivatLife in conjunction with Wiener Städtische, Austria's largest insurance company, to provide insurance policies as financial instruments which could be sold to Bank Medici distribution partners, private banks and investment advisors. This business never took off, as a result of the Madoff scandal and the consequent adverse publicity attached to Mrs Kohn.

56. Prior to the 1990s, there were few senior European financiers on Wall Street and international communications were more difficult than they are today. Wall Street was less familiar with Europe, and Europeans had limited access to Wall Street. There were few international financial institutions which had significant branches both in the USA and Europe. Mrs Kohn's position and contacts meant that she was a bridge from the USA to a world which was not well known even to some of the most senior US financiers on Wall Street. The fact that she spoke English and a number of European languages, particularly German, Italian and French, also made her an efficient link between Europe and Wall Street. As a result Mrs Kohn developed a reputation in Europe both for knowing who did what on Wall Street, and for an ability to get meetings with those people. She was regularly approached by those in the European financial markets for assistance in getting introductions when they were coming to New York, not just with Bernard Madoff but with other influential individuals and institutions.

57. Mrs Kohn and her family had invested approximately US$11.5 million of their own money in funds invested in BLMIS's investment advisory business. One striking feature of the Madoff debacle is that none of the entities she introduced to Bernard Madoff's investment advisory business have brought claims against her. For all their losses, none of them has suggested any fault or inappropriate behaviour on her part.

*Erko*

58. Erko was incorporated as a company under the laws of New York on 15 April 1987. Mrs Kohn was the sole shareholder. Erko in turn held the shares in Windsor. Invoices for the MSIL Kohn payments were made in its name until 2002, and payments were made by cheque made out to it, which were, at least from 1996, paid by endorsement of the cheques directly into Mrs Kohn's daughter's bank account in Austria. This practice was not hindered by the fact that Erko was dissolved in June 1998.

*Tecno Gibraltar*

59.    Tecno Gibraltar was incorporated as a limited company under the laws of Gibraltar on 3 January 2007.  It invoiced and was paid for the last two MSIL Kohn payments of US$700,000 each in June and July 2007.

## (4) The corporate history of MSIL

*Phase 1: 1983-1986*

60.    MSIL was incorporated on 11 March 1983 as Madoff Holdings Ltd and changed its name to MSIL on 14 October 1988.  It came into existence as a result of a social meeting between Bernard Madoff and Mr Raven in about 1983.  Mr Raven had been introduced to Bernard Madoff in the early 1970s by Maurice Cohn who was a close friend of Bernard Madoff and whom Mr Raven knew professionally.  Mr Raven was chairman of the Floor Trading Committee of "LIFFE" which was responsible for inviting suitable organisations to buy seats on the Exchange.  Mr Raven suggested that Bernard Madoff consider buying a seat on LIFFE for capital appreciation, not necessarily with a view to trading on the exchange himself, but in order to lease the seat out to a local operator.  Bernard Madoff decided to do so and asked Mr Raven to assist with the application procedure.  MSIL was incorporated for that purpose.  Mr Raven became a director of MSIL in March 1983 solely for the purposes of forming the company and resigned as a director two weeks later having fulfilled that purpose.  His wife became a director in his place.  She played no part in the governance of the company at any stage and ceased to be a director on 30 December 1988.

61.    MSIL acquired a seat on LIFFE on 13 April 1984.  So far as the evidence shows, MSIL did not conduct any substantial business for about four years.

*Phase 2: 1987-1988*

62.    In the latter part of 1986 Bernard Madoff decided that MSIL would sell its LIFFE seat because the price of seats had not greatly appreciated in value.  He asked Mr Raven what trading activity the company in London might be used for now that it had been set up, and Mr Raven suggested becoming a member of the LSE and trading on SEAQ International as a market maker in US securities.  Bernard Madoff asked Mr Raven to help steer him through the LSE membership process.

63.    Mr Flax was recruited as an office administrator to set up and run a London office, where he started on 3 November 1986.  Linda Sutton, a young trader from the New York office of BLMIS was sent over.  On 7 November 1986 Ms Sutton was appointed managing director and Mr Flax was appointed a director.  Mr Flax's role was initially just that of an administrator, consistent with his background in business administration.  He was not a trader and had very little stock exchange knowledge or experience.  He was not a qualified accountant.  The administrative role included tasks such as acquiring computers and other equipment necessary to set up a working office.  In the early months he was not responsible for any book keeping, payroll or other accounting records.  The office was in London Wall in the City.  In these early years Mr Flax spoke infrequently with Bernard Madoff.  If Bernard Madoff had cause to speak to someone in the firm he would usually ring Ms Sutton as his first point of contact.

64.     Rodney Yates joined MSIL in January 1987. He was the retired finance director of Ackroyd & Smithers PLC, whom Mr Raven asked to join in order to secure LSE membership, which occurred on 1 February 1987. On 1 March 1987, Ms Sutton was replaced as managing director by Mr Yates. He was a qualified accountant and so undertook the book keeping, payroll and accounting function for the company.

65.     Miss Sutton traded in US equities and American depository receipts of a number of UK companies. MSIL entered into such trades as principal, but entered into back to back trades with BLMIS. It was therefore in effect trading as an agent for BLMIS and not generating any of its own profits or losses.

*Phase 3: 1988-2001*

66.     In September 1988 Anthony Marshall and John Purcell joined MSIL as traders for the purposes of trading US securities on SEAQ International, and became directors of MSIL on 6 September 1988 and 21 November 1988 respectively. They were former colleagues of Mr Raven at the jobbing firm he had headed. They were joined a year later by another trader, Colin Bond, who started in September 1989 and became a director on 16 October 1992.

67.     On 7 November 1988 there was a written agreement signed by Bernard Madoff and Mr Yates by which BLMIS appointed MSIL to act as its agent in entering into market making transactions.

68.     Mr Yates resigned as managing director on 30 December 1988 and left MSIL shortly thereafter. Bernard Madoff asked Mr Flax to undertake the managing director role previously being performed by Mr Yates. Mr Flax agreed to do so on the understanding that because he was not a qualified accountant or a practicing lawyer, he could perform the administrative aspects of the job but would need legal and accounting advice as and when necessary. His salary was increased to £50,000 per year. Although he nominally took over Mr Yates' duties as managing director, in practice between 1988 and 2001 the traders were running the operational side of the business with Bernard Madoff's input; Mr Flax was responsible for the day to day administration of the company, including bookkeeping, payroll, payment and company administration functions. These included liaising with the auditors, regulators and tax authorities and with lawyers and tax advisers for this purpose. He maintained the company's books and accounting records. The statutory accounts were prepared by KPMG.

69.     At this stage, MSIL had five employees and its only business was the trading which Messrs Bond, Marshall and Purcell were carrying out. The majority of the business was a niche market making service in US equities for financial institutions in Europe to enable them to trade before the New York Stock Exchange opened. MSIL would offer a market in particular US equities, and would typically close out its book at the opening of the New York Stock Exchange. This accounted for about 90% of its business. In addition MSIL carried out a small amount of trading on behalf of European clients on an agency basis, using BLMIS to execute the trades and earning commission from the clients. As a very small part of its business, MSIL also undertook some speculative trades taking a position on its own account. Record keeping for all trading was undertaken in New York. The profits made by MSIL on

its trading were recorded in accounts in New York designated "Q account", "QQ account" and "XX Account" (hereafter referred to as "the Q accounts").

70.    Mr Raven joined MSIL as a director on 1 January 1992. He did so because he was asked as a friend of Bernard Madoff to keep an eye on the traders. Until he started working more full time at MSIL in 1994 he spent little time at its office.

71.    Mr Marshall ceased to be a director on 31 March 1992, but remained engaged to carry out his trading function as a consultant.

72.    This was the nature of the business when the first MSIL Kohn payments were made at the end of 1992. The directors at the time were Bernard Madoff and Messrs Raven, Flax, Purcell and Bond.

73.    In 1994 Mr Raven resigned from Tradepoint and agreed with Bernard Madoff to spend more time at MSIL, giving advice on building the business and using his City contacts to encourage them to trade orders with MSIL during London trading hours before the US market opened. They agreed a salary of £50,000 per annum. Mr Raven continued to regard himself as a non executive director and expected his involvement to last two or three years. His efforts with his City contacts and a wider marketing campaign produced disappointing results.

74.    From the spring of 1996 to the spring of 1997 Mr Raven took time off from MSIL for medical reasons. When he returned in 1997, Bernard Madoff asked him to oversee MSIL's move to new premises in Mayfair which took place in the last quarter of 1997. Bernard Madoff was obsessive about the furnishing of the new office in Berkeley Street which he wanted to seem prestigiously expensive, and Mr Raven spent a considerable amount of time on the project. He continued in an essentially non executive role so far as concerned the operation of MSIL's business.

75.    Following the move to Mayfair, between 1998 and 2000 Mr Raven attended MSIL's offices on a more regular basis and assisted Mr Flax when needed. He shared an office with Mr Flax and was there three or four days a week. At about this time Bernard Madoff became interested in acquiring a broking capability and Mr Raven spent several months negotiating clearing arrangements, which had to be unwound when the broking team MSIL hoped to acquire went elsewhere.

76.    In the late 1990s, the structure within MSIL was that the traders reported either to Bernard Madoff or Andrew Madoff. Mr Flax managed all the office functions, reporting directly to Bernard Madoff. Mr Raven assisted Mr Flax whenever he was asked to do so.

77.    Andrew and Mark Madoff were both appointed directors of MSIL by Bernard Madoff on 31 December 1998 when they became non voting shareholders. They did not receive any remuneration as directors of MSIL, and although they received dividends on the MSIL shares, the dividends were offset by interest payments they were required to make on loans provided by their father for the purposes of the purchase of the shares. Accordingly they never received any financial consideration in relation to their role at MSIL. They did, however, regularly attend board meetings, usually by video link from BLMIS' office in New York. They did not carry out any specific executive role, but during Phase 3 were aware of MSIL's levels of profitability and

trading because the trading was reflected in the Q accounts in BLMIS: Andrew Madoff would check the trading performance on a daily basis as with other trading accounts.

78.     In 1999, Bernard Madoff decided to send a senior trader from BLMIS to work at MSIL, and Mr Toop was approached to assume this role.  He agreed to move to London on a three year assignment.  Mr Toop was employed by MSIL as a trader on the trading desk from October 1999.  Daniel Flax, Mr Flax's nephew, who was a trader with BLMIS moved at the same time.

79.     When Mr Toop began working at MSIL in 1999, the traders were on the second floor. The trading room was at the back, and Mr Raven and Mr Flax occupied the offices in the front.  There was some antipathy between Mr Purcell and Mr Marshall, on the one hand, and Mr Raven on the other and it seems that for the most part Mr Raven and the other traders avoided each other.

*Phase 4: 2001-2008*

80.     In the summer of 2000 the first floor of the Mayfair building became available and Bernard Madoff decided to take on this floor because he had plans to enlarge MSIL's London business to establish a market making business in the newly formed NASDAQ Europe and a proprietary trading operation trading in European and US securities.

81.     In October 2000 MSIL approached the FSA to extend MSIL's business profile to enable it to trade on a new investment exchange called Jiway.  MSIL joined Jiway by an agreement dated 20 November 2000.  By the end of December 2000 MSIL deposited US Treasury Bills ("T-Bills") with a face value of US$10 million with Jiway.

82.     It was in this period that the first subordinated loan agreement was entered into on 28 November 2000 for US$37.5 million.  At that time the directors were Bernard Madoff, Peter Madoff, Andrew Madoff, Mark Madoff, Mr Raven, Mr Flax, Purcell and Mr Bond.

83.     Andrew Madoff had particular expertise in technology and was asked by his father to assume responsibility for the implementation of the trading systems required for the new direction of the business.  To carry out that role, he visited MSIL's offices four or five times in a year.  The refurbishment of the first floor was completed in July 2001, again to what Bernard Madoff wished to be prestigiously expensive standards.  The first floor held the trading room, and from that time on the geographical division between the traders on the first floor, including Mr Toop, and the management staff on the second floor, including Mr Raven, Mr Flax and Mr Dale, reflected the separation of those aspects of the business.

84.     Andrew Madoff was involved in the decision that MSIL should establish a proprietary trading operation and in recruiting a team from Merrill Lynch to replace Mr Purcell and Mr Marshall who had been talking about retiring for several years.  This new team of about five additional traders was led by Stephen Burnham and joined MSIL in about July 2001.  Mr Stevenson also joined MSIL on 1 July 2001 as part of this team, as head of settlements in charge of the back office function.  He had spent many years

in broking, merchant banking and trading before joining MSIL in his early 60s. He was subsequently appointed a director on 1 July 2005 and remained a director until 16 February 2009.

85.   In the aftermath of 9/11 there was a falling out between Bernard Madoff and Mr Purcell, following which he and Mr Bond ceased to be directors in September 2001. Mr Marshall and Mr Purcell left MSIL at that time. Mr Bond stayed as a consultant until April 2003. This left Mr Flax and Mr Raven as the only London directors, and accordingly Mr Raven took on a larger managerial role assisting Mr Flax when needed. Of the two, Mr Raven could properly be described as the managing director.

86.   The new trading also included a statistical arbitrage book, colloquially referred to as the black box, in which a large volume of trades in equities were undertaken according to predetermined algorithms which were based on a successful model used by BLMIS. The model proved to be less successful for MSIL.

87.   Mr Dale began his employment with MSIL on 5 November 2001. He was a qualified chartered accountant who also came from Merrill Lynch. He initially worked in a financial control function in relation to MSIL's trading activity reporting to Mr Flax, but soon eclipsed him.

88.   The second subordinated loan was entered into on 28 December 2001 and was for US$25 million. This was shortly after the first interest repayment under the first subordinated loan agreement, which was on 18 October 2001.

89.   Barclays Capital became MSIL's clearing and settlement agent for its trading in European equities, which commenced in about January 2002. Andrew and Mark Madoff took on the role of supervising the traders' daily trading performance. The new trading system made it possible for them to review the London traders' positions from New York in real time. Andrew Madoff also spoke regularly on the telephone with Mr Toop and worked closely with Mr Stevenson and Mr Dale when they first joined MSIL. He would also participate in interviewing prospective recruits to the trading team.

90.   In about July 2002 Mr Toop took over management of the London trading desk as Head of Trading in place of Mr Burnham who left after a dispute about the reduction of his salary. The market making business as part of NASDAQ Europe was not a success, and NASDAQ Europe closed down shortly after Mr Burnham left. Trading on Jiway was also not a success and had stopped by January 2003. Thereafter MSIL was carrying out proprietary trading.

91.   Mr Toop became a director on 4 February 2003, although it made no difference to his day to day activities. Mr Dale also became a director of MSIL on 4 February 2003 and was from that time MSIL's Finance Director. He ceased to be a director on 21 May 2009.

92.   Mr Raven did not at this stage have any specific management responsibility, and was asked by Bernard Madoff to organise a compliance function whose importance was enhanced by the expansion in MSIL's activities. Until then there were only minimum compliance procedures in place which Mr Flax had set up with advice from BLMIS' compliance department. Mr Raven appointed KPMG to advise on a structure and

produce a manual, but was disappointed with the result.  On 3 March 2003, Peter Allen was engaged by MSIL as a compliance consultant.  Mr Allen was a solicitor who had trained with a City law firm and was highly respected by the directors.  He rewrote the compliance manual.

93.     In mid 2003 Andrew Madoff was diagnosed with cancer and stepped back from involvement in BLMIS' and MSIL's business whilst undergoing treatment.  Mark Madoff took over his role in that respect.  Andrew Madoff returned in a diminished capacity to BLMIS at the end of 2003 and left much of the responsibility delegated to his managers in the trading room at BLMIS.  He gradually resumed his former responsibilities until late 2006, when his role at BLMIS became essentially part time and Mark Madoff took over his responsibilities.

94.     As a result of Andrew Madoff's cancer, in the later part of 2003, Bernard Madoff asked Mr Raven to undertake a full role as CEO assuming a general management responsibility for the business.  Mr Raven's salary was increased to £130,000 and his position was formalised by a board resolution on 5 December 2003.  Bernard Madoff's role was redesignated from executive CEO to executive chairman.  The same minute noted that the recent activities of Peter, Andrew and Mark Madoff had been of a non executive nature and recorded a resolution designating them as non executive directors.  The minute suggests that this was all done with a view to fulfilling new compliance requirements and for FSA purposes, rather than to create any significant change in roles.

95.     In 2005 Mr Toop planned to return to BLMIS in New York, but was persuaded by Bernard Madoff to stay on in London to build and expand the trading desk at MSIL as head of trading.

96.     In February 2004 Peter Allen became company secretary and on 9 May 2005 he was appointed a director.  He resigned as a director on 11 August 2006, when Mr Dale took over the role of compliance officer, but Mr Allen carried on working for MSIL in a compliance role as a consultant until the end of 2008.  Mr Allen and Mr Dale were assisted in their compliance roles by Ms Amber Wood, who had started as a receptionist in 2004, but moved to assist Mr Allen with compliance in 2005 and became compliance manager reporting to Mr Dale upon Mr Allen's resignation in 2006.  She learned on the job and gained her FSA authorisation in June 2008.  As part of the compliance revisions, Peter Madoff was appointed as an internal auditor in or around 2006, and made occasional visits to London for this purpose assisted by his daughter Shana.

97.     At the end of 2006 and during 2007, the compliance department undertook a wholesale risk assessment of MSIL's business in the light of three European directives.  One was the Markets in Financial Instruments Directive 2008/10/EC ("MiFID"), which was due to come into force on 1 November 2007.  This was used as a ground for Mr Raven to persuade Bernard Madoff to stop the MSIL Kohn payments, and the subventions from BLMIS by which they were funded, as I shall explain further below.  The element of MiFID which afforded the grounds for the cessation was not anything to do with the propriety of the payments; it was that there were to be introduced requirements that contracts for the supply of services had to be adequately documented, and subject to risk assessment in relation to an alternative source of supply.  As a result the last MSIL Kohn payment was made on 13 July

2007.  Tecno Gibraltar was thereafter paid exclusively by BLMIS.  Mr Raven wrote a letter dated 18 September 2007 to Tecno Gibraltar confirming that MSIL would not be availing itself of the latter's services in the future.

98.     In early 2007 Bernard Madoff decided to increase MSIL's capitalisation to US$ 200 million.  According to Mr Raven this was because he had increased the share capital in BLMIS US$ 800 million and wanted to keep MSIL capitalised at 25% of BLMIS' capitalisation.  This met resistance from Mr Raven, who considered that the additional loan capital would involve a burdensome overhead.  Bernard Madoff reconsidered the position and agreed to increase the capitalisation by share capital rather than loan capital.  This involved the conversion of the subordinated loans to share capital together with a further injection of US$37.5 million cash to make up a total of US$100 million.  On 18 September 2007 the two subordinated loan agreements, totalling US$62.5 million, were capitalised by a deed of termination and the issue to Bernard Madoff of 6.25 million voting shares of $10 nominal value.

99.     As a result of the increase in capital, Bernard Madoff wanted further to expand MSIL's trading desk by hiring experienced and proven successful traders to make use of it.  Over the next 18 months MSIL sought to replace less successful traders, and increased the overall number of traders.  By December 2008 MSIL had about 14 traders carrying out approximately 800 to 1000 trades daily with risk exposure of some US$50 million daily from a daily risk limit allocated to all the traders totalling some US$300 million.

100.    In this last phase of MSIL's trading activities from 2001, Mr Flax's role was gradually reduced.  From Mr Dale's appointment as finance director, Mr Flax ceased to be the person at MSIL responsible for inputting data into the ledger (this was taken on by another employee training to be an accountant, William Hui) or to have any involvement with compliance matters.  From 2003 Mr Flax no longer dealt with the accounts.  After Mr Dale's arrival he became more sidelined, and to some extent patronised, by the other directors.

101.    As is well known, 2007 and 2008 were turbulent times in financial markets.  In about May 2008, Mr Raven thought that MSIL should acquire £65 million in Gilts and, unusually, have them registered in its own name to protect against the credit risk involved in the usual practice of their being held by a third party nominee.  He arranged for the certificates to be held in a bank safety vault in MSIL's name.  In October 2008, Bernard Madoff instructed Mr Dale to sell the Gilts and buy T Bills.  Mr Dale did so and the proceeds were wired to BLMIS for the purchase.  Mr Raven was not pleased.  Injury was added to insult when following Bernard Madoff's arrest it was discovered BLMIS had simply not bought the T Bills and had been perpetrating another fraud on MSIL for over three years since September 2005.  The way this T Bills fraud was perpetrated was as simple as the Ponzi scheme itself.  MSIL's cash which was not required for trading was held on deposit in banks or in Gilts, T Bills or other securities.  Bernard Madoff regularly instructed Mr Dale to buy T Bills as a trade or for income, and such trades were executed through BLMIS as MSIL's counterparty in the normal way.  BLMIS provided the usual trade contracts and settlement statements evidencing the purchases.  When Bernard Madoff instructed Mr Dale to sell the T Bills, the apparent proceeds were paid to MSIL in London.  But in fact BLMIS never bought the T Bills, the trade contracts and settlement statements were a fiction, and the money coming back to MSIL from purported sale of T Bills

came from the 703 account. This was concealed in the books of the proprietary trading and market making divisions of BLMIS by recording the incoming funds as "commission income". Thus when the fraud was discovered, BLMIS owed MSIL the value of the T Bills which had been purchased from BLMIS in October and November 2008, but which BLMIS did not have, which should have been worth about US$160 million.

*Phase 5: December 2008 to date*

102.   On 10 December 2008 Bernard Madoff confessed to his sons Andrew and Mark that the investment advisory business was a gigantic Ponzi scheme. They immediately reported him to the US Justice Department and the Securities and Exchange Commission. On 11 December 2008 Bernard Madoff was arrested and the news began to break. The following morning the London based MSIL directors met at the Arts Club to discuss MSIL's position. They were all in a state of shock. The company's solicitor, Mr Calligan of SJ Berwin, attended with a colleague to give advice.

103.   The Barclays Capital facility was withdrawn and the company ceased trading. On 15 December 2008 a trustee for the liquidation of BLMIS was appointed by the New York court in accordance with the Securities Investor Protection Act 1970 ("the SIPA Trustee"). Joint provisional liquidators of MSIL were appointed by an order of the Companies Court on 19 December 2008. A winding up order was made by Sales J on 15 December 2009.

104.   It was a matter in dispute before me whether at that time, or at any earlier time, MSIL was in fact insolvent. The Claimant's case is that it was at all times in fact insolvent because it received its funding from BLMIS from monies attributable to the Ponzi scheme; and all such sums when received were immediately repayable to BLMIS. What is not in dispute is that at all material times MSIL appeared to its directors, auditors and regulators to be solvent. None of the Defendants had any reason to believe at the time of the events under scrutiny in this action that MSIL was insolvent or of doubtful financial integrity. Indeed one of the central elements of the Claimant's claim is that throughout the period from 2000 to 2007 MSIL was heavily overcapitalised so far as the directors were concerned.

105.   On 8 December 2010 the liquidators of MSIL and the SIPA Trustee, on behalf of BLMIS, entered into an agreement in relation to pursuit of proceedings against the Defendants. BLMIS agreed to subordinate any of its claims in the MSIL liquidation to an identified list of trade and employee creditors' claims in the liquidation (totalling about £5 million of which about £2 million was agreed or provisionally agreed), with the remainder of MSIL's assets to be paid to BLMIS. The liquidators of MSIL and the SIPA Trustee agreed that these proceedings would be brought and that they would be funded by the SIPA Trustee. On the same day, these proceedings were commenced without any letter before action or any other forewarning to the Defendants. BLMIS was a Claimant along with MSIL, but by an order of 2 December 2011 Flaux J held that the Court had no jurisdiction over BLMIS' claims and set them aside. The claim is therefore brought by MSIL alone, but by reason of the agreement between the liquidators and the SIPA Trustee of 8 December 2010, it is in substance being brought by and for the benefit of BLMIS, and indirectly, therefore,

for the benefit of the victims of the Ponzi scheme which Bernard Madoff carried out through BLMIS.

*MSIL's raison d'être*

106. As I have explained, throughout MSIL's trading history, Bernard Madoff left everyone in London in no doubt that it was his business, upon which his reputation depended. The direction of the business changed over time, in each case in accordance with what Bernard Madoff wanted to achieve. MSIL never had a simple business model or an unchanging business strategy. MSIL's future at any given stage was not necessarily a continuation of its current trading. Its raison d'être was to carry out whatever business Bernard Madoff decided upon, or indeed no business at all. The fact that MSIL did no business, or very little business in Phases 1 and 2 reflected the fact that Bernard Madoff's main vision for MSIL was not driven by profit making. He had been treated as an outsider in Europe, who was not readily accepted, and this rankled. It was for him a matter of pride and prestige to have a presence in London, and whilst he did not want to make losses, this was a secondary consideration to having a presence which would enhance his reputation. In the 1990s Bernard Madoff used to remark to his sons that MSIL "carried its own weight" which Andrew Madoff took to mean break even profitability. He seemed satisfied with this, and indeed pleased simply by the existence of MSIL, as relatively few US firms then had a presence within the UK and it conferred a level of status which he enjoyed. This was why he wanted the offices to be finished to a high standard, and why MSIL's name was included on the letterhead and business forms of BLMIS. This was reflected in his desire to see MSIL highly capitalised, and apparently profitable. He advanced funds from New York to defray its expenses and boost its balance sheet and profit and loss account for this reason. He regarded it as an outward symbol of prestige and success.

**(5) Mrs Kohn's agreement reached with Bernard Madoff**

107. There are two significant matters in dispute under this head, namely the scope of the services for which the MSIL Kohn Payments were made, and the identity of the parties to the contract for those services.

108. As to the first, Mrs Kohn's case was that that there were three strands to the services she agreed to provide and for which she was paid, namely (1) introductions of people, (2) advice, information and ideas about global financial and economic matters, communicated at face to face meetings with Bernard Madoff and (3) written research. She regarded the first of these as the most significant. MSIL's case was that the payments were solely for introductions of money to Bernard Madoff's investment advisory business.

109. As to the second, the Defendants' case is that the agreement was between MSIL as the paying party, and Erko, Tecno Italy and Tecno Gibraltar successively as the service provider. MSIL's case was that the agreement was between Bernard Madoff and Mrs Kohn personally.

110. Mrs Kohn's account of the genesis and history of her agreement with Bernard Madoff in relation to the MSIL Kohn payments was as follows. She first met Bernard Madoff in about 1987 or 1988 as a result of an introduction from Mr Cohn. Bernard Madoff

explained that he had a UK office, through which he said he carried out the same business as his US operation but which was targeted at European clients and investors. He appeared to be interested in seeing how Mrs Kohn could assist him with the international growth of his business. Mr Madoff spoke mostly about his market making business. He showed an interest in meeting some of the Europeans to whom Mrs Kohn said she could introduce him.

111.   Mrs Kohn formed the view that Bernard Madoff was the best representative of the market making industry in New York. She was able to introduce senior executives from a number of European institutions to Mr Madoff when they were in New York. Initially Mrs Kohn saw the ability to introduce European figures to those on Wall Street as an opportunity to strengthen relationships and an investment for potential future business, not something for which she would specifically charge.

112.   Following her first meeting with Bernard Madoff, Mrs Kohn's subsequent meetings began to develop a pattern. The meetings would take place at the New York Offices of BLMIS and Bernard Madoff would normally walk Mrs Kohn and those she was introducing through his trading floor, showing off its electronic trading capability which was touted by Mr Madoff as unique on Wall Street at the time. Meetings would typically last an hour, during which her guests would typically ask a variety of questions about Wall Street, financial markets in the United States and the development of electronic trading, amongst many other financial topics; and Mr Madoff would speak extensively about his market making operation, his dedication to the latest technology, and his international office in London. Bernard Madoff did not talk much about his money management or investment performance. He focused instead on trends in international markets and in finding out about the businesses of the people to whom Mrs Kohn was introducing him. The meetings were generally made at Mrs Kohn's instigation.

113.   Following the movement of the centre of her activities to Europe, Mrs Kohn met Mr Madoff less frequently, perhaps two or three times a year when she was visiting New York. They also met on two occasions at the offices of MSIL in London and once in a hotel in Milan.

114.   Once Mrs Kohn had made an introduction to Bernard Madoff, she generally dropped out of the picture in the sense that she was not told (and did not ask) whether any business relationship subsequently developed and if so what form it took. As Bernard Madoff became better known in Europe her contacts generally simply wanted her to set up a meeting. She was not given any power of decision or discretion to act on their behalf. She did not purport to give advice, and once an introduction had been made she generally had little feedback or follow up.

115.   The people whom Mrs Kohn introduced to Bernard Madoff were potential clients for his market making business as well as his investment advisory business. It appears from a letter from Bernard Madoff to the SEC dated 23 February 2006 that BLMIS's trading partners included Bank Austria, Westdeutsche Landesbank, Hypo Vereinsbank, Commerzbank, Banco Santander, and Bank of Bermuda, all of whom were introduced to Mr Madoff by Mrs Kohn. Mrs Kohn would not normally know the specific aspect of Bernard Madoff's business, if any, with which her contacts would be involved.

116.     Over time Mrs Kohn's relationship with Mr Madoff developed so that she was viewed as more than someone who could merely introduce useful individuals and institutions. Bernard Madoff viewed her as a well informed and well connected person who provided a window to the financial world outside the USA, which was the reputation she had developed generally in New York, and retained, at least with Bernard Madoff, after she moved back to Europe.

117.     Mrs Kohn would often follow up the ideas discussed by providing pieces of written research or extracts of relevant documents.    At first this was on an ad hoc basis. There came a time when written research was provided on a regular basis both to BLMIS in New York and MSIL in London.   Mrs Kohn's evidence was that at some stage in the late 1990s, Bernard Madoff said that he would like the ideas and analysis which she had always been providing to be provided in written form so they could be disseminated amongst his staff in order to give them a wider perspective on the financial world than their day to day jobs required of them; and that this was regarded by her as a formalisation of the previous practice of exchange of ideas and as being a requirement which was in addition to the introductions and face to face meetings which would continue.

118.     Her evidence was that Bernard Madoff also encouraged her to discuss her ideas with his colleagues in the UK, and when in the UK she would occasionally meet Mr Flax, and in later years Mr Raven, when they would also exchange ideas regarding global economic and financial trends.   There is documentary evidence to support at least one such occasion in a letter of 31 January 2005.   But Mrs Kohn's principal point of contact was Bernard Madoff himself, both at BLMIS and MSIL.   In New York she met Peter Madoff, Andrew Madoff and Mark Madoff occasionally.   In London she met Mr Flax and later Mr Raven occasionally and spoke to Mr Flax, and later Mr Dale, occasionally on the phone.     But these were essentially for administrative purposes, not occasions for the giving of advice or exchange of ideas.

119.     Agreement of the amount which Mrs Kohn would be paid went through three stages. Following one of their early meetings, Bernard Madoff told Mrs Kohn that some of the people she introduced were likely to bring valuable business and suggested agreeing terms for payment for the services at a rate commensurate to their value.  He said that the guideline for calculating the amount payable would be the amount of money introduced and placed under management resulting from her introductions.   In the beginning this rate was fixed at 1% of assets under management, which was to reflect payment for all the services provided by Mrs Kohn.   Ms Jones, an assistant to Bernard Madoff, communicated to Mrs Kohn, on a quarterly basis, figures which Ms Jones said represented the amounts attributable to her introductions.   These were unverifiable by Mrs Kohn who simply accepted them.   After the calculations were made, she did not keep the figures which Ms Jones provided to her.

120.     The second stage was that at one of the meetings between Bernard Madoff and Mrs Kohn, he informed her that he wanted to reduce the fee for the services from 1% to 0.5%.  Mrs Kohn was unable to remember when this was, or the reasons he gave for the reduction, but this reduction was agreed.

121.     The third stage was reached at one of their meetings in or around 2001.   Bernard Madoff told Mrs Kohn, without any prior warning, that he wanted to change the basis of their contract once more.   Part of the reason he gave was that the pricing pattern

had recently changed from eighths to decimals, and therefore the margins on trading had been reduced which had had a knock on effect on his own business. He said that he wished to establish a fixed fee for the range of services which would be US$ 6.6 million per annum, payable in four quarterly payments. He justified this figure as being about 0.5% on funds of US$ 1.3 billion which at that time were held under management pursuant to introductions by Mrs Kohn. Bernard Madoff directed that the payment should be split with US$ 775,000 being billed quarterly to MSIL and US$ 875,000 being billed quarterly to BLMIS. Mrs Kohn did not know the basis on which Bernard Madoff made that division and did not ask. Although this change to a fixed fee came as a surprise to Mrs Kohn, the discussion was short and one sided; Bernard Madoff made clear that there was no room for discussion and she considered that she was not given any choice in the matter. She agreed to the new terms.

122.  From this time, in or around 2001, Mrs Kohn stopped receiving figures from Ms Jones purporting to reflect the value of investments arising from her introductions. Thereafter she was never told whether her introductions brought value to the market making business or led to the opening of managed accounts, how much money was invested in managed accounts (if any), nor what the returns were on the sums introduced through her, or any other relevant detail.

123.  The Claimant alleges that the amount of business from investors introduced by Mrs Kohn to Bernard Madoff had reached at least US$ 9.1 billion by December 2008. If that is right, the fixed fee of US$ 6.6 million is a small fraction of the amount which would have been payable had the 0.5% arrangement continued, which would have brought a fee in the region of US$ 45 million per annum. The US$ 6.6 million was subsequently calculated by Ms Jones as 0.0019% of the funds under management attributable to Mrs Kohn's introductions.

124.  It was never suggested by either Mrs Kohn or Bernard Madoff that the agreement should be reduced to writing. The only suggestion to that effect came from Mr Dale in a discussion with Mrs Kohn at the very end of 2006, driven by the forthcoming implementation of the MiFID regulations, but even then it was left on the basis that MSIL and she were content for it to remain an undocumented oral agreement.

125.  This narrative of how the amounts were agreed was not challenged, and there is no reason to doubt Mrs Kohn's evidence in this respect. It reveals what might seem a surprising naivety and lack of formality in one who had such a successful career in finance; but that is of a piece with Mrs Kohn's unusual personal background. It is not suggestive of any sinister purpose on Mrs Kohn's part. As far as she was concerned her activities were open for all to see, in the glass windowed offices of BLMIS where she met Bernard Madoff and in the written research she delivered to BLMIS and MSIL; the invoices and the payments were transparent to the London directors of MSIL and those administering them, just as they were for those administering them for BLMIS. They were transparent to anyone else who might wish to inquire into them such as compliance departments, internal or external auditors, and regulators.

126.  Mrs Kohn told Bernard Madoff that the invoices for the services would come from a company, which both understood to be a normal way of doing business. The designation of the recipient companies, successively Erko, Tecno Italy and Tecno Gibraltar, was suggested at each stage by Mrs Kohn and agreed by Bernard Madoff. Bernard Madoff in turn directed that invoices should be sent to his companies,

BLMIS and MSIL, and not to him personally. Initially he requested that the invoices be addressed to MSIL, to which Mrs Kohn agreed. In 1998 Bernard Madoff requested, and Mrs Kohn agreed, that invoices for the services should be provided both to MSIL and BLMIS in accordance with a split agreed between them. The split of the fixed fee was agreed in about 2001 as described above. It was Bernard Madoff who in 2007 requested her to invoice BLMIS only, although she had been forewarned by Mr Flax that the change might be necessary under new regulations in the UK.

127.    The relationship between Mrs Kohn and Bernard Madoff was purely a business one and they did not meet socially. They were not on close personal terms, and the relationship was one sided, in the sense that Bernard Madoff's status and reputation meant that he dictated the course and terms of the professional relationship.

*For what services were the payments made?*

128.    I accept the evidence of Mrs Kohn, summarised above, as to the threefold nature of the services which were to be, and were, provided. Most of the evidence I have summarised above was not challenged.

129.    MSIL's case to the contrary was based on two arguments. The first was that the services did not include the third element, the written research, because the written research was worthless. I reject that submission; the research was not worthless, nor was it regarded by Mrs Kohn as such, for the reasons I explain more fully below. The second was that the services did not include advice information and ideas about global financial and economic matters communicated at face to face meetings with Bernard Madoff. I was invited to reject this element of the services because it was said that Mrs Kohn's explanation for the payments had changed over time and had not until her evidence in these proceedings included a suggestion that the payments were for such advice and ideas. This was not an accurate criticism and does not undermine this aspect of her evidence.

*Who were the parties to the contract?*

130.    The evidence of Mrs Kohn as to how the arrangement arose and was operated, which I accept, establishes that the agreement for the services was with Bernard Madoff purporting to act on behalf of BLMIS and MSIL, not personally. The services were to be provided in relation to his businesses, and understood to be benefitting those businesses. It was agreed that the payments would be invoiced to BLMIS and MSIL, as they were, and would be paid by those entities, as they were. So far as MSIL was concerned, it was the corporate entity which made the payment for the services throughout, not Mr Madoff personally. Mr Raven's treatment of MSIL as party to the contract is evident from his letter of 18 September 2007 terminating the arrangement on behalf of MSIL. The Claimant argued that there was no binding contract to which MSIL was a party on the grounds that Bernard Madoff had no authority to bind MSIL to an arrangement from which it derived no substantive benefit, as to do so would have breached his fiduciary duties to the company. This argument fails for two reasons. First, as explained below, the services were of value to MSIL. Secondly, Bernard Madoff as chairman of MSIL had ostensible authority to bind the company, which would be unaffected by any breach of fiduciary duty owed by Bernard Madoff to the company, of which Mrs Kohn was not aware.

131.    The Claimant further argued that there was no binding contract to which MSIL was a party on the grounds that any alleged contract for research purporting to bind MSIL was in reality a sham as that term was defined by Diplock LJ in *Snook v London & West Riding Investments Ltd* [1967] 2 QB 786 at 802 and created no legal rights or obligations as between MSIL and Mrs Kohn. The agreement was not a sham. So far as Mrs Kohn was concerned it was for the full range of services, including advice and introductions as well as research, and she regarded all three as of potential benefit to MSIL. So far as Bernard Madoff was concerned, it was not merely for the written research delivered in London, but also for advice and research provided to him in New York in his capacity as chairman and shareholder of MSIL, which had potential value to MSIL.

132.    The Claimant further argued that there was no binding contract to which MSIL was a party on the grounds that the research materials which Mrs Kohn caused to be delivered to MSIL's offices were incapable of constituting consideration which might justify the making of the MSIL Kohn Payments. This argument again assumes, incorrectly, that the contract with MSIL was solely for the provision of the written research in London. Moreover, as explained below, that research was of value to MSIL, and the court is not concerned, for the purposes of this argument with the adequacy of the consideration.

133.    As to the identity of the counterparty, I conclude that it was successively Erko, Tecno Italy and Tecno Gibraltar, rather than Mrs Kohn personally. The agreement between Mrs Kohn and Bernard Madoff was that the invoices were to come from those companies and payment be made to them. Although it was envisaged that it was Mrs Kohn who would personally be responsible for providing the services, which save for the written research were of a personal nature, there is no conceptual difficulty in parties agreeing that a corporate entity is to contract to provide services of a personal nature. Such contracts are common in, for example, the sports and entertainment world. The practice of invoicing by, and payment to, the corporate entities designated by Mrs Kohn with the concurrence of Bernard Madoff (and indeed those within MSIL in London who arranged for or knew of the payments) reflects agreement reached between Bernard Madoff and Mrs Kohn that the agreement would be with the companies identified by her. The companies so designated were the contractual counterparties to the agreement with MSIL. There is no need for the purposes of this action to undertake any further analysis of the anomalous position between 1998 and 2001 when Erko had in fact been dissolved.

**(6) The research**

134.    Mrs Kohn's recollection was that in the early years in which the MSIL Kohn Payments were made, she only provided written pieces of research to MSIL, or BLMIS, on an occasional or ad hoc basis; and that it was not until later, perhaps in the late 1990s, that significant quantities of written research were provided on a regular basis to MSIL. By contrast, Mr Flax's recollection was that from the time that the first payment was made there was written research provided, which he remembers keeping for the purposes of it being available to the auditors. He said that he had a clear recollection that there were regular deliveries of written research from the outset, as well as additional ad hoc pieces on occasions. He recalled showing a large pile to the auditors 9-12 inches high. At one point in his evidence he referred to this as being in the first year in which a payment was made and recorded in the company

ledger. In another passage of his evidence he spoke of such an event as sparking a direct conversation between the KPMG partner and Bernard Madoff, which would put it in about 2000 or 2001. The evidence of the traders during Phase 3, Messrs Purcell, Bond and Marshall did not support Mr Flax's recollection. It was to the effect that before the office move from London Wall in 1997, the research was sporadic not regular. There is a fax from Mrs Kohn to Mr Flax of 29 December 1992 enclosing a study on business opportunities in the US/European Capital Markets which reads as if this were a one off ad hoc offering. Mr Flax fairly conceded that his recollection might be in error, and I conclude that it was. There was written research on an ad hoc basis from 1992, but it was not until later in the 1990s that substantial quantities of written research were provided on a regular quarterly basis.

135.    There is some uncertainty as to what written research was provided to MSIL. There was in evidence a very large volume of written research which had been provided or procured by Mrs Kohn: the trial bundle contained over 1,000 individual documents running to over 58,000 pages, which was said to be only an incomplete sample. However this had not come from MSIL's offices. The research had stopped being sent to MSIL in 2007 and had not been kept after that year's audit; it was routinely destroyed after about 18 months. With the exception of some documentation disclosed by Tecno Gibraltar for the last year in question, 2007, the materials before the Court came from what was found at BLMIS in New York. The evidence suggested that written material was not passed from MSIL to BLMIS, but that what was sent to London and New York was to some extent duplicative, although not identical. Mrs Kohn in her witness statement attached a listing of the research material under various headings, a list which she said had been prepared by her solicitors. Although her witness statement referred to this as having been sent to MSIL in London, it was clear from her evidence that the listing was for the purpose of showing the breadth of the topics covered, not which documents had gone where; the listing was done by her solicitors, not her, and she had not applied her mind to whether what was identified had gone to London rather than, or as well as, to New York. She was, understandably, unable to say what had gone where. All that can be said with confidence is that the material which post dates the middle of 2007 must have gone to New York and not to London because that was when the MSIL Kohn payments ceased and the written research stopped being sent to MSIL in London.

136.    Despite the uncertainty over which particular documents went to MSIL in London, as distinct from those going to BLMIS in New York, the consistent evidence from the MSIL witnesses was that there were significant volumes of written research regularly delivered to MSIL. Witnesses referred to it arriving in boxes, as well as sometimes in smaller packages. The parties conducted the case on the footing that the material before the Court could be taken to be representative of the nature and quality of the research provided to MSIL in London. Whether the statistical analyses of the content of the extant material can safely be treated as a valid guide to the content of the totality of what was sent to London seems to me more doubtful.

137.    The headings of Mrs Kohn's listing give a flavour of the subject matter of the written research. The categories were Banks/Banking Industry, Private Banking, Stock Exchanges, Technology and Mutual Fund market/online brokerage, Sovereign Wealth Funds, Hedge Funds, Investment Funds, Real Estate, New Industries/Investment, German language market, Company overviews/International finance, Research and

Consultancy industry, Financial Crisis, High Net Worth households/Billionaires and Charity, Luxury Goods, Family office, Financial Institutions/Financial Services and updates, Securities/Capital Markets/International Markets, Wealth Management, Country study, Internet/Telecom, Art Industry, E-Commerce/trade, Gambling Industry, S & P, Market Trends, E-Learning, Insurance, High Tech Industry/Technology, Agricultural Commodities, Currency Market, Oil Market/Energy/Commodities, Diamond Market, Off-shore, and Socially Responsible Investing.

138.    There were five strands of evidence as to the nature and value of the research.  The first was its treatment by the traders at MSIL at the time.  The evidence established that throughout the period during which it was provided it was not used by the traders, and was treated by them as of no value for their day to day activity.  When it first arrived during Phase 3 the traders considered it, but swiftly concluded that it was a waste of time reading it.  Thereafter the boxes in which it arrived were sometimes left unopened; on other occasions the traders might just flick through the contents to see what was there.  Many of the traders during Phase 4 were unaware of its existence. The material was of no relevance to the daily trading being conducted in Phase 3 which required keeping abreast of developments within the hour or day.  Nor was it used by the traders or management for the purposes of the trading during Phase 4.

139.    The second strand was evidence of the directors as to the value of the research.  The Claimants relied on the transcripts of conversations which survived for the last three years of MSIL's trading, including in particular one between Mr Dale and Bernard Madoff on 20 April 2007, in which Mr Dale said that the research was not actually utilised and not of any value; and one between Mr Dale and Mrs Kohn on 29 May 2007, in which in the face of a request by Mr Dale to send only 7 of 64 prepared reports, Mrs Kohn nevertheless offered to send all 64, with Mr Dale persisting in asking Mrs Kohn not to send all 64 reports to MSIL and saying that he can *justify the expense anyway'*.  Mr Raven in his evidence confirmed that he did not regard the research as of any value to the traders.  Mr Flax said in his evidence that he had told Bernard Madoff that the traders were not using it.

140.    The third strand was evidence about the production of the research which came from three witnesses:

(1) Mrs Kohn said that she was not involved in the details of the production of the written research, although she identified the topics and general approach; she did not recall significant quantities being produced during the Erko years; Tecno Italy's research documentation was produced by its employees, and local university students supplied for the purpose by a Professor de Sury, who was paid for doing so; the Tecno Gibraltar research was produced by its own employees.  The few documents which have survived which cast light on the process, from the most recent Tecno Gibraltar period in 2007, give a different impression.  They suggest that at least on occasion Mrs Kohn was giving instructions as to how to use the content of existing available material and to reformat it so as to present it as Tecno Gibraltar's own research product, the process characterised by the Claimant as plagiarism.  She said that the purpose of the research was never designed to be stock research for the use of traders.  She was proud that that many of the research pieces could be considered "outside the box" or "untraditional" because her general approach had always

been that growing a successful business is about innovation and the ability to tap into unchartered territory. As she put it "The research was designed to provide a thought provoking view of many different areas of international markets, each of which could, at any time, impact on each other and on the markets in which MSIL was operating."

(2) Jessica Crewe was a PhD graduate in comparative literature at the University of California, Berkeley, who was employed at the Eurovaleur offices in New York for about 6 months in 2004 to produce research, and on a few occasions thereafter in 2005 and 2006 on a freelance basis. She was given the topics and prepared the reports from publicly available sources, such as websites and online newspaper articles available by subscription. The reports involved a good deal of collation and composition by her, albeit that they were drawn from publicly available sources which were quoted or paraphrased. The sources were credited and identified. Each one took her about three weeks, and she was paid $200 to $300 per report for the freelance work.

(3) Susan Alexander had spent a considerable amount of her career writing financial research, and produced research on an ad hoc and freelance basis for Mrs Kohn from 1995. At the beginning it was in exchange for being allowed to use space in the Eurovaleur office, but in 2007 and 2008 she was being paid €1,000 per report.

141. The fourth strand was statistical evidence as to the amount of research which was of potential worth or plagiarised. This included:

(1) Evidence on behalf of the Clamant from Dr Min Shi, a professional economist with an academic background. She had been given a selection of 546 of the research documents, which were reduced to a sample size of 337 once duplicates and post July 2007 documents had been removed. These were then further reduced to a sample size of 100 by eliminating those deemed to be irrelevant to MSIL based on their geographic coverage and topic. Dr Shi evaluated the remaining 100 reports and categorised them as either "directly useful", "potentially useful" or "not useful". She identified 87 of those 100 reports as not useful, 13 (from after 2002) as potentially useful and none as directly useful.

(2) Evidence of Moira Lavery, CEO of Proven, a firm which conducted an investigation into the sources of the research materials disclosed in these proceedings. She identified that, excluding duplications, there were 1648 unique documents in the combined disclosure from BLMIS/MSIL and Mrs Kohn/Tecno Gibraltar. Of those, 982 were reviewed, of which just over half were in the same format as Bank Austria/Unicredit documents. Of the remainder, 298 were copied from publicly available material in their entirety, and 138 contained some copied material.

142. The uncertainties over whether the material analysed was representative of what went to MSIL, in terms of quantity rather than quality, make it impossible to use this evidence to reach reliable conclusions about the proportions of such material which was plagiarised or fell within a particular qualitative category of worth or usefulness.

143.    The fifth strand was expert evidence as to the quality and value of the material:

(1) Dr Shi opined on the usefulness of the sample she took, as summarised above. The criterion was usefulness for the day to day activities of the traders at MSIL in Phase 3 and 4.  She also opined on what would have been a reasonable market rate to pay for the Kohn research, having regard to its value to MSIL in this respect and the market price of research from other sources. She concluded that the research provided during Phase 3 was worth nothing because it was irrelevant to MSIL's trading, and that the remainder was worth at most a few thousand dollars a year.

(2) On behalf of Mrs Kohn, expert evidence was given by Mr Whiting, an equity investment analyst with a history of producing financial research.  He accepted that much of the research was of poor quality, and some plagiarised, but some was properly to be characterised as genuine research and of high quality, including, for example, quotations from face to face interviews conducted specifically for the research in question.  In his view, the great majority would have been within the quality spectrum of research circulating at the time, particularly in the earlier part of the period in question.  As to its value, he made the point that the nature of the research on a wide range of topics was such as to be of interest and value to the more strategic decision makers within a company, and that the value to the company could not simply be judged by whether it was of use to the traders in their day to day activity.  From this point of view it was useful to a company like MSIL as educational background or as thought provoking material for new business opportunities.  His evidence was that the monetary value of research is largely in the eye of the consumer, and that it was often provided as part of a bundle of advisory and execution services, such that it is impossible to use any market information to put a monetary value on such research as an individual element of a wider range of services being charged for.

144.    Drawing these strands together my conclusions are as follows:

(1) When the payments were first made in 1992, and for the following few years, the written research being provided was irregular and ad hoc.  It was not until towards the end of the decade that there was a substantial volume of written research provided regularly to MSIL on a quarterly basis.

(2) The material was retained by Mr Flax so as to be available for the auditors and was made available to them, following which it was regularly discarded.

(3) The research was not sent on from MSIL to BLMIS or to Bernard Madoff in New York.  What was provided to MSIL in London did, however, replicate material which was sent independently to Bernard Madoff at BLMIS.  The overlap between what was sent to London and what was sent to New York was substantial but not complete.

(4) The research covered a wide range of topics.  A very small part was aimed at specific topics which might have been of use or interest in the day to day trading activity of MSIL during Phase 4; but none of it was in fact regarded by anyone at MSIL as of any such use or value for that purpose at any stage.  For

the most part, however, it comprised political, economic and market information a good deal of which might potentially have been of use or interest at a more strategic level for anyone in the financial services sector. None of the London directors of MSIL treated it as of use or value for such purposes.

(5) A significant element of what was created and supplied could properly be described as original research. It was not all drawn from sources which were available to the public generally. Moreover some which was drawn from such sources, or from sources available to particular subscribers or other clients of particular organisations, involved manipulating the material from those sources by the collection and assimilation of available material and its presentation in a coherent and articulate form within a particular theme or topic. This can properly be described as original research, which can be as much concerned with the collation and presentation of information already in the public domain as unearthing original raw data which is not. This research was not a "sham", as the Claimants sought to categorise all the research.

(6) On the other hand there was a significant proportion of the research which was simply lifted word for word, or almost word for word, from publicly available reports and passed off as original work. This plagiarised material may well have constituted the majority, and, at least in the later years, the distinct majority, of what was being supplied.

(7) As to the value of the research to MSIL:

(a) Both what I have described as original research and plagiarised research had potential commercial value. I reject the submission that the second category can have had no value: research which is plagiarised in the sense described above can be of value to someone who has no immediate access to the source document(s) or has no desire to undertake the sourcing himself. The impropriety lies in passing off the content as one's own, not in a deception as to whether the content is worth providing. Plagiarism does not negate the value of what is provided but misrepresents the creator of that value. Mr Whiting's evidence, which I accept, was that the apparently plagiarised research was amongst the highest quality of the sample he reviewed.

(b) It is difficult to put a monetary value to the research in either category with any precision. Dr Shi's valuation was limited to what might be of value to traders in their daily activity. There was evidence of disbursements being made by Mrs Kohn or the entities connected with her for the preparation of the research in amounts measured in tens of thousands of dollars over several years. On this conventional basis the value of the research which was relevant to MSIL's day to day trading activity in Phase 4 is to be measured in thousands of dollars per annum.

(c) The value of the research does not, however, fall to be considered solely by reference to the day to day trading activity of MSIL at any given time. The value of the research for management decision making at a more strategic level is not to be judged by this criterion. The strategic decision

making at MSIL fell to Bernard Madoff, not the London directors, so that their lack of use for the research is not a sure pointer to its strategic value. This aspect of its worth is impossible to measure in monetary terms. In this respect its value was real but immeasurable.

**(7) Financial and accounting treatment of the MSIL Kohn Payments: invoices, funding, auditing, accounting including the "fees receivable" issue**

*(a) The invoices*

145.    With one exception, all extant Erko invoices, that is to say those for the period 1992 to 2001 inclusive, bear the rubric "Services for period [date] to [date]", giving the dates of the quarterly period. They were addressed to "Madoff Securities" at the London address of MSIL. There are no extant invoices for the period between the first quarter of 1993 and the second quarter of 1997, but I infer that they were in the same terms. The one exception to this format is the first extant invoice, which although undated is probably for the last quarter of 1992, and is for "Research relating to Financial markets in Europe and the US".

146.    The format changed with the first Tecno Italy invoice dated 21 May 2002. This too was addressed to "Madoff Securities" at the London address, as were all subsequent invoices, and provided:

> "Market researches 1st Quarter 2002 among others
>
> - Analysis of trends with special focus on global financial industrie and technologie
>
> - Business opportunities in the countries of the common market
>
> - Specific reports about various technologie applications in the financial sector
>
> - Ideas and strategies for new business developments"

147.    The next and subsequent Tecno Italy invoices were in materially identical terms save that:

> (1) The introductory wording became "Market researches [quarter] and updating about these subjects:" followed by dropping the reference to the period so that the introduction was simply "Market researches and updating about these subjects:" and then becoming simply "Market researches: "
>
> (2) There was sometimes added a reference to a particular market, or area of research, for example "Chinas Economy and Capital Markets" or "Emerging Economy and Capital Markets" or "High and Ultra High Networth Individuals"

148.    When it came to the two Tecno Gibraltar invoices in 2007 they were in similar format, of which the first provided:

"Strategic Consulting and Market Researches

Among others:

- Real-Estate in Europe

- Mergers and Acquisitions

- Asset management industrie

- Banking Consolidation

- Ultra High Net Wealth Individuals: Their Investments, Portraits, Service Providers."

149.    Between 1992 and 2002 invoices were submitted in the name of Erko. The documents show that Erko was incorporated as a company under the laws of New York on 15 April 1987, and that six months later Mrs Kohn was a shareholder and Erko was holding the shares in Windsor. The Erko invoices sent to MSIL are headed with Erko's name and the likely address of Mrs Kohn's parents in Vienna. Mrs Kohn's evidence was that until receipt of the Particulars of Claim, she had forgotten about Erko, and she cannot now recall over 20 years on exactly how or why Erko was set up. Her reconstruction of events, which she cannot independently recall, is that when Bernard Madoff first agreed to pay for the services, her parents arranged for the invoices to be issued by Erko. This reconstruction was made in the light of her evidence that the professional adviser handling her family's finances was Dr Mueller, a Swiss fiduciary who provided trust services, set up companies and advised on financial affairs and business structures; that all the professional advice that she and her family had received over the years had been in favour of operating business activities through corporate entities; that she saw her business dealings and earnings as being for the benefit of her family rather than herself; and that her parents when alive handled the family's financial affairs. Her reconstruction may be correct, although I think it more likely that she was the one who chose Erko as the recipient, and that she caused the invoices to be prepared with her parents' address. Erko was a company associated with her own broking business, Windsor. It was she who needed to ensure that Bernard Madoff would be content with the identity of the payee.

150.    Whoever was responsible for identifying the recipient and issuing the invoices, I conclude that Mrs Kohn was responsible for the wording used. Only she knew, within her family, what services were being provided which were to be covered by the invoices. Documentation which has been disclosed for the 2007/8 period, when invoices were submitted to MSIL and BLMIS by Tecno Gibraltar, suggest a close involvement by her in the preparation of the invoices and a knowledge of their wording, as does her own evidence of a telephone discussion with Mr Dale in late 2006 (see below). The position is likely to have been the same for earlier periods.

151.    In October 1997 a company called Erko International Limited was incorporated in the British Virgin Islands. Mrs Kohn believes that this company was set up by her parents with the assistance of Dr Mueller. Erko BVI submitted a number of the invoices for the BLMIS payments (but not the MSIL Kohn Payments). As with Erko, the invoices of Erko BVI bear her parents' address in Vienna as the correspondence

address. I infer that Erko BVI was designed to replace Erko which was dissolved in June 1998, but that the continuing invoicing of MSIL by Erko thereafter was an administrative oversight. Mrs Kohn's evidence is that she does not now recall being informed by her parents or Dr Mueller of this change, which would have been a corporate governance question she did not need to handle personally. Erko BVI was dissolved on 1 May 2005.

152.    The invoices for the MSIL Kohn payments between 2002 and 2007 were rendered by Tecno Italy, which was incorporated under the laws of Italy as a limited liability company on 21 February 2002 and had its registered office in Milan.

153.    Mr Flax's evidence was that the fact that Erko had been dissolved and was still submitting invoices was noticed by KPMG, who spoke to Bernard Madoff about it, which led to the invoices from Erko ceasing and being replaced by invoices from Tecno Italy. Mrs Kohn explained the reason for the change as follows. When her father was alive her mother deferred to her father as head of the family, although she had always been involved in the business activities of Mrs Kohn's father and took care of the accounting and day to day management of the family finances. When her father died in 2002 her mother took over that role with determination. Following the establishment of FundsWorld in 1999, Mrs Kohn had been spending increasing amounts of time in Europe due to the declining health of her parents. When her centre of operations shifted towards Italy her mother consulted Dr Mueller and they incorporated Tecno Italy with the assistance of Mr Florio, an Italian accountant. At first the director of Tecno Italy was Mrs Kohn's mother. In 2002 Mrs Kohn agreed with Bernard Madoff that the invoices would be issued by Tecno Italy, which is what happened from May 2002 onwards. In line with Mrs Kohn's mother's wishes, the shares in Tecno Italy were ultimately held by a trust which had been set up by Dr Mueller, of which her family were beneficiaries.

154.    Again, while this may be correct, I think that Mrs Kohn was underplaying her own role and that it is more probable that she was herself the driving force behind the change. It was she who would need to ensure that Bernard Madoff would be content with the identity of the payee, and explain the change to him. Tecno Italy was her business, sharing offices with her European ventures, including Bank Medici. As with the Erko invoices, for the same reasons, I conclude that Mrs Kohn was herself responsible for the wording of the Tecno Italy invoices.

155.    It was submitted on behalf of MSIL that the reason for the change from Erko to Tecno Italy was that Mrs Kohn learned from Bernard Madoff that the UK revenue authorities were asking awkward questions about Erko and that the switch was to prevent any prying into payments which she knew to be improper. I have little hesitation in rejecting that suggestion. It was not supported by any evidence and is not an inference which can fairly be drawn from the documents. The source for the allegation was a list of routine queries in an Inland Revenue letter of 30 January 2002 seeking clarification of whether Erko was a connected party within the meaning of s. 839 ICTA 1988. It was not a connected party, which was all the response which was required, and which was given in a letter from KPMG of 25 March 2002. If the Inland Revenue were intent upon investigating the connectedness of the counterparty, neither MSIL nor Mrs Kohn would be in any different or better position in that regard by substituting Tecno Italy for Erko. I prefer the explanation provided by Mr Flax's evidence: the fact that Erko had been dissolved was picked up by the auditors. I infer

that the change originated in their drawing it to Bernard Madoff's attention, who raised it with Mrs Kohn.

156.    In 2007, invoices started to be provided in the name of Tecno Gibraltar in place of Tecno Italy. Mrs Kohn explained the reason for this change as being that Dr Mueller had died in 2004 and it was decided by her and her mother to replace him with Hassans, a prominent Gibraltar law firm, which professed expertise in the sort of private client services which the family trusts and business affairs needed. It was on Hassan's advice that Tecno Gibraltar was incorporated to replace Tecno Italy. I see no reason to doubt this evidence. Tecno Gibraltar was incorporated under the laws of Gibraltar on 3 January 2007. Its directors were a lawyer who worked for Hassans, Mr Netzer, together with Shlomo Amselem, who was recommended to Mrs Kohn as someone who could help with the daily administrative activities and research side of the company. Mr Netzer died in October 2007.

157.    Again I conclude that Mrs Kohn was herself responsible for the wording of the Tecno Gibraltar invoices, as is borne out by the disclosed documents evidencing her discussions of their content with Mr Amselem. It was Mrs Kohn's evidence in her witness statement that she had a conversation with Mr Dale at the end of 2006, in which the latter commented that some of the Tecno Italy invoices did not include the period of time the payments were intended to cover; and that she made sure that this was remedied in the invoices sent by Tecno Gibraltar.

158.    Tecno Italy was dissolved on 5 December 2008 following a process of voluntary liquidation which was commenced on 26 September 2007.

*(b) Funding*

159.    There is little doubt that the immediate source of the payments, at the time they were made to Erko, Tecno Italy and Tecno Gibraltar, was money which belonged to MSIL. In making the payments, MSIL was using its own beneficially owned assets.

160.    Nevertheless the payments were funded by BLMIS in the following way. In the earliest days of MSIL's business activity, in Phase 2, the company's expenses would all be met by funding from BLMIS. The trading by Ms Sutton was back to back with BLMIS and not producing any revenue in London. This continued in Phase 3 when the profits on MSIL's trading were held in the Q accounts by BLMIS in New York. The profits on this trading were remitted to MSIL at the year end and treated in the audited accounts as "fees receivable" from BLMIS (see below). During Phase 3, Mr Flax continued the practice started in Phase 2 of sending a written request for payment of expenses by fax to BLMIS, identifying the particular expense, for example bonuses, or in some cases just "general expenses". Following his request the relevant sum would be transferred by BLMIS to MSIL. The Erko payments were dealt with in accordance with this practice. Mr Flax sent a request by fax to Bernard Madoff, typically identifying that Mr or Mrs Kohn was due to call, usually enclosing the Erko invoice, and asking for the relevant sum. Such payments by MSIL to Erko were thus specifically funded in advance by BLMIS. This practice continued throughout Phase 3 until at least 2001. Mr Flax thought that it continued for some time thereafter. In each case the funds were advanced without MSIL undertaking any concomitant liability. They were donations of capital, not loans. Although they were not impressed with a *Quistclose* trust, each was specifically advanced for the purpose of

the Erko payment. If for some reason that purpose had failed, Mr Flax and Bernard Madoff would have regarded the funding as due to be returned.

161.   During Phase 4 the position changed because MSIL was generating its own trading profits in London, from which some of its expenses could be met. Nevertheless the understanding of the directors was that BLMIS would continue to fund the payments, and it did so. This was no longer done by prior requests for funding of specific MSIL Kohn payments, but by requests for payments from BLMIS from time to time which were sufficient to enable MSIL to meet its expenses and show a profit, one major element of the expenses being the MSIL Kohn Payments. The funding therefore sometimes fell in advance of the relevant payment and sometimes by way of subsequent reimbursement. Again in each case the funds were advanced without MSIL undertaking any concomitant liability. There was no direct correlation between the amounts of these subventions from BLMIS and the amount of the MSIL Kohn Payments, but Mr Dale described the funding of the payments as being cash neutral for MSIL and at no monetary cost to the company. I accept that evidence. That may not have been the precise mathematical position in every year, but that was in general terms the effect of the subventions. That was also the relevant understanding of the directors, as all who knew of the payments said in their evidence. MSIL advanced its case on the footing that such funding was irrelevant; it did not seek to put its case on an alternative basis by reference to lesser sums in particular years having been met solely out of MSIL's profits. In dealing with the "no loss" argument, it did not suggest that there was any part of any of the payments to which the argument was inapplicable on the grounds that it had not been funded by BLMIS. Nor did MSIL seek to identify to what extent in the later years the subventions operated by way of prior funding and to what extent by subsequent reimbursement. Witnesses used the word "reimburse" to cover both circumstances without intending any particular temporal precision.

162.   Accordingly I find for the purposes of this action that the MSIL Kohn Payments were made from MSIL's assets but were funded in full by BLMIS for that purpose, in the earlier years by a specific prior transfer, and in later years by subventions before or after the MSIL payment, which made the payments cash neutral for the company. Those directors who knew of the payments reasonably believed that in a business sense they were not costing MSIL anything. The commercial reality for them was that the expense was being met in full by BLMIS.

*(c) Auditing*

163.   No representative of KPMG was tendered by any party to give oral evidence, and the relevant documentation was incomplete. No doubt a good deal has not survived, but in any event, the documentation before me emanating from KPMG was only part of the material which had survived, comprising merely particular documents or categories which the liquidators of MSIL had chosen to ask for. I did not have anything like a full record of exchanges between KPMG and the company in the former's role as auditors or tax advisers and I was left with an incomplete picture of the state of KPMG's knowledge and understanding.

164.   The evidence of Mr Flax and others, which I have no reason to doubt, was that in addition to fairly regular contact with KPMG in their role as tax advisers, the annual audit would last weeks and the auditors would crawl over the documentation. They

had unrestricted access to ask questions of the directors and the traders and regularly did so. The MSIL Kohn Payments, and their funding, were patent from the company's books, and all the documents evidencing both aspects were freely available to the auditors. So too was the body of written research received in London, which was retained for audit purposes each year. The payments were included by KPMG in the corporation tax returns which they prepared. There was nothing about MSIL's treatment of the MSIL Kohn payments, or their funding, which could properly be described as secret. The only respect in which the Claimant alleged that the auditors were misled was (a) that they were told that the research was of value to MSIL and (b) in relation to the accounting treatment of MSIL's funding as "fees receivable". I reject the suggestion that the auditors were misled in either respect. As to (a) I accept Mr Flax's evidence that he told KPMG that the research was valued by Bernard Madoff, which was what the latter had told him; he did not tell the auditors that it was of use for MSIL's business or that it was used by the traders. As to (b), I address and reject that allegation below.

165.   I conclude that the directors were reasonably entitled to believe, and did believe, that KPMG in their capacity as auditors and tax advisers were at all times fully aware of:

    (1)  the nature of MSIL's business activity;

    (2)  the timing and amounts of the MSIL Kohn Payments;

    (3)  the invoices in respect of which they were paid;

    (4)  the written research provided to MSIL;

    (5)  the way in which these payments were funded by BLMIS; and

    (6)  the way in which MSIL was more generally funded by BLMIS.

166.   I should mention two particular pieces of evidence which confirm Mr Flax's openness with the auditors. The first is a file note dated 21 February 2001 prepared by Mr Flax and sent to BLMIS in New York. I accept Mr Flax's evidence that a copy was provided to KPMG. It explains amongst other things how Mr Flax called for and allocated funds from BLMIS, including in terms the treatment of the funding of Erko payments (and personal payments for Bernard Madoff's benefit being deducted from his loan account). The second is Mr Flax' evidence, supported by some extant documents, which again I accept, that sometime around 2001 or 2002 a young auditor from KPMG raised the question of the Erko/Tecno payments and the written research during the audit and asked Mr Flax if he, the auditor, could speak to Bernard Madoff about them. Mr Flax suggested that it would be better if the partner at KPMG made the approach, and rang Bernard Madoff to tell him it was coming. Mr Flax heard back from Bernard Madoff that the latter had spoken to the KPMG partner, Mr Grimditch, about the payments, and there was no further query raised in relation to them in that year's audit or the audit in subsequent years. Mr Flax took this to indicate that KPMG were satisfied with Bernard Madoff's explanations for the payments being made by MSIL.

*(d) Accounting treatment; "fees receivable"*

167.    The way in which the MSIL Kohn payments were treated in the statutory accounts occupied a large, and in my view, disproportionate amount of time and attention in the trial. The Claimant submitted that the description of the funding of MSIL, including funding of the MSIL Kohn Payments, as "fees receivable", was a false and misleading description of the payments; and that Mr Raven and Mr Flax were consciously dishonest in approving the accounts in those terms, or at the least recklessly indifferent to the truth. The Claimant contended that this dishonest description of the funding as "fees receivable" is indicative of an awareness on the part of Mr Raven and Mr Flax that the MSIL Kohn Payments themselves should not have been being made; it was further said to support a conclusion that Mr Raven and Mr Flax acted dishonestly in relation to the making of the MSIL Kohn Payments themselves by acting in knowing or reckless disregard of MSIL's interests in relation to the payments, an allegation of dishonesty which was in turn advanced for the purposes of defeating the limitation defences by reliance on s. 21(1)(a) of the Limitation Act. The Claimant further contended that the dishonest description of the funding as "fees receivable" in any event reflects adversely on the integrity and credibility of Mr Raven and Mr Flax.

168.    The Claimant relied in support on expert evidence from an accountant, Mr Wreford, as to how best accounting practice should have treated the payments. I did not find his evidence of assistance in relation to the issues which I have to decide. Mr Raven and Mr Flax had, and professed, no specialist accounting knowledge, and especially not that on which Mr Wreford based his opinions as to the proper accounting treatment. The state of mind of Mr Raven and Mr Flax must be assessed by reference to their own experience and expertise and against the background that the accounts were prepared and approved by KPMG.

169.    The audited accounts for 1992, the first year in which an Erko payment was made, are representative of the treatment in the statutory accounts throughout Phase 3. On the income side, the profit and loss account identified the main income of the company against the rubric "Fees receivable" (there was also an item for "operating profit" or "operating income", which was relatively insignificant in almost all years). Funding of the Erko payments fell within this rubric, although not separately identified. On the expenditure side, the profit and loss account had a single entry for "Administrative expenses". The amount of the Erko payments was included in this total. The payments were nowhere identified in the audited accounts by description or amount as components of the total. Inspection of the notes to that item would have revealed that the identified expenses were less than the total; and that almost £100,000 of the administrative expenses was not explained in the accounts. The same pattern, albeit with differing amounts, would have been apparent from the audited accounts for the subsequent years in Phase 3. Accordingly for these years the MSIL Kohn payments were not separately identified in the accounts within the company's expenditure, although there was a sizeable and significant element of expenditure included in the profit and loss account total which was not explained in the accounts.

170.    In Phase 4, starting from the 2002 accounts, in addition to fees receivable and administrative expenses, the profit and loss account recorded a separate amount for trading profit on the income side and an additional amount for direct trading expenses on the expenditure side. The funding of the MSIL Kohn Payments still fell within the

"fees receivable" entry, and the MSIL Kohn Payment amounts themselves were still included within the administrative expenses total throughout Phase 4, as in Phase 3.

171.   The "fees receivable" wording had been used in the audited accounts from the beginning of Phase 3, and was a compendious description for the two categories of payments by BLMIS to MSIL, namely the specific funding of expenditure, and the transfer of the trading profits made in the Q accounts. The note to the entry in the accounts for 1992, reflecting the terms of the note in the accounts from the beginning of Phase 3, provided: "*Fees receivable. These represent amounts received and receivable in respect of securities dealing and the provision of market making information to an unincorporated business: the business is owned by BL Madoff who is the chairman of the company.*" From 1992 the funding of the Erko payments thus fell within this description, although not identified separately as such. The Claimant contended that this description was in part false: the first half was justified by the fact that MSIL was trading as BLMIS' agent and received the Q account profits in respect of securities dealing; but the reference to market making information being provided to BLMIS was false.

172.   I do not consider that either Mr Flax or Mr Raven were dishonest in relation to this accounting treatment. They honestly and reasonably believed that the description was justified. In particular:

(1)   The wording was proposed and approved by KPMG. The nature of the income was patent from the books being kept by Mr Flax, including specific requests for the funding of the MSIL Kohn Payments which identified the funding as being for such a purpose.

(2)   The traders were during this period in regular contact with BLMIS. To some extent that inevitably involved information being provided from London about the markets in which the dealing was taking place, and the relevant dealing was market making. It was reasonable for Mr Flax and Mr Raven to regard the information which was shared in such exchanges as falling within the rubric of "market making information", which is not a term of art.

(3)   This was a note to the accounts, to which neither of them can be expected to have paid close attention in the absence of some question arising by it being raised by the auditors.

173.   In 2002 and 2003, the note in the accounts to the fees receivable entry was in the same terms as before. The wording of the note changed for the first time in the 2004 accounts. From this year on it replaced the reference to market making information with a reference to research and analysis, so that it read: "*These represent amounts received and receivable in respect of securities dealing and the provision of research and analysis to [BLMIS]*". From 2005 the word primarily was inserted so that the note read "*These primarily represent amounts received and receivable in respect of securities dealing and the provision of research and analysis to [BLMIS]*".

174.   The earlier "market making information" wording which was still used for the 2003 accounts was the subject of a management representation letter dated 29 March 2004 signed by Mr Raven and addressed to KPMG which was itself approved by a board resolution. It provided: "*The level of fee income represents a reasonable level of*

*remuneration for the services provided to [BLMIS] by [MSIL]"*.  The changed wording in the 2004 accounts was also subject to a similarly worded management representation letter signed by Mr Flax on 30 March 2005, and a similar one of 27 March 2007 was signed again by Mr Flax for the 2006 accounts.

175.  The Claimant contended that from Phase 4 the rubric was now wholly false: the change in the trading pattern from agency trading rendered the first half of the note in the accounts false ("securities dealing"); and the reference to research and analysis was false because none was supplied to BLMIS by MSIL.  Further, it was contended, even if the description of the services could in some way be justified, the terms of the management representation letters were false because the amount of the income could not possibly be justified as a reasonable level of remuneration for anything of that description.

176.  There is considerable force in these contentions as a matter of objective analysis.  What I have to consider, however, is the state of mind of Mr Flax and Mr Raven.  In doing so I bear in mind the principles governing the approach to allegations of fraud or dishonesty.  The standard of proof is the balance of probabilities, but the cogency and strength of the evidence required to prove dishonesty and fraud is heightened by the nature and seriousness of the allegation: *Re H* [1996] AC 563, 586.  The court will be astute not to equate dishonesty or fraud with something akin to negligence, even gross negligence.  When considering whether there has been recklessness as to the truth of a statement, not caring whether it be true or false, "not caring" does not mean not taking care; it means indifference to the truth, the moral obloquy of which consists in a wilful disregard of the importance of truth: see per Bowen LJ in *Angus v Clifford* [1891] 2 Ch 449, 471.

177.  Mr Flax explained that at the very beginning of Phase 3 it was agreed between Mr Yates and the auditors that the expression market making information would be used to justify fees used to top up MSIL to keep it in profit; and that they would be described in the profit and loss account as "fees".  He believed that MSIL was providing advice or information in one form or another to BLMIS which would justify that description.  By the time the wording changed for the 2004 accounts in early 2005, he had become sidelined in relation to the finance department generally and was no longer involved in preparing the accounts, which were Mr Dale's province in conjunction with KPMG.  He assumed, honestly and reasonably, that KPMG were well aware of the nature of the subventions which BLMIS were making, and that KPMG and Mr Dale shared his understanding that the amounts reflected Bernard Madoff's desire to see that MSIL was showing a profit.  Although he was a director, he assumed that the accounts and the management letter were in a form which KPMG and Mr Dale approved with full knowledge of the position.  He believed that if KPMG and Mr Dale were content to treat the income in the statutory accounts in this way, and the other directors too, it was an appropriate accounting treatment, and therefore appropriate for him to sign the management representation letter in these terms.

178.  That Mr Flax's understanding about KPMG's knowledge and approval was a reasonable one is supported by a number of documents which suggest that KPMG were aware that the fees receivable were in part a subsidy, that KPMG approved the description of them as fees for services, and that KPMG knew that the value to be put on such "services" was a subjective one determined by Bernard Madoff himself.  For

example a letter from KPMG to HMRC of 27 July 1992 states: "*As explained in the minutes of our meeting on 6 September 1990, the fees paid cover both dealing profits returned to the UK together with any further necessary subvention from BLMIS to cover expenses....This "top up" was intended to cover the company's expenses and ensure that the accounts did not show an overall loss after taking account of other income*". Further support is to be found in a note of a meeting with HMRC in which Mr Flax and KPMG participated on 14 February 1996, in Mr Flax's 21 February 2001 file note, and in an internal KPMG working paper from March 2005 setting out their critical audit objectives and findings based on discussions with MSIL. The latter records KPMG's understanding that the fee received from BLMIS was "*structured to represent the provision of market making services by [MSIL] to [BLMIS]. However the basis of the fee can be subjective*". Mr Flax's evidence, which I accept, was that what KPMG knew this to mean was that the value was decided by Bernard Madoff. This was what KPMG had been told in a management response recorded in a management report of 29 August 2003, although on that occasion the fee was described as being for advice from MSIL to BLMIS. The reference to "structuring" the fee was an indication that KPMG understood it to be in reality a subsidy, at least in part. The note continued: "*The directors state that they have discussed this stream of income with the Inland Revenue who are happy for it to be treated as fee income*". That was true. The note continued: "*KPMG advised the Directors that whilst for accounting purposes classification as fee income appeared to remain appropriate, they should ensure that appropriate documentation is in place over this income as it may be subject to an Inland Revenue challenge in the future.......Conclusion: The income should be classified as fee income.*"

179.    The Claimant relied on a manuscript note on a KPMG working document of 3 March 2008, which appears to record KPMG's understanding that MSIL was rendering research and analysis services to BLMIS and outsourcing those services to Tecno, so that the "research and analysis" in the fees receivable note is the same as the strategic research and analysis services being invoiced by Tecno (until the middle of 2007 which was the year under consideration). The evidence suggests that it was most likely Mr Hui who was the source for this note, whose maker remained unidentified. Neither gave evidence and the note comes very late in the history of events. I found it of little assistance in trying to assess KPMG's prior understanding.

180.    In the absence of any oral evidence from anyone involved at KPMG, and the incompleteness of the documentary evidence available, which is in any event not all of a piece, I am unable to reach any concluded view as to whether KMPG had full knowledge when they approved the accounting treatment; and it would not be right to do so on such incomplete evidence at a trial in which KPMG took no part, where the Claimant contends that such accounting treatment was professionally improper and amounted to a criminal offence. But the evidence before me supports the position of the directors that they believed KPMG had given its approval to the accounting treatment on the basis of full access to all the information necessary to inform such a view. That was Mr Flax's belief. I acquit Mr Flax of any dishonesty in respect of the accounting treatment of the funding or the management representation letters.

181.    Mr Raven too held such a belief, but he had his doubts whether it was justifiable. At least in the last few years, he was uncomfortable with this treatment in the accounts. The high water mark of the Claimant's case was its reliance on a transcript of a call

between Mr Raven and Mr Dale on 12 October 2007 which includes the following passages:

> 'I didn't want to sign the auditor's letter last year – about us giving advice to Madoff New York, because we all know that it is a sham. We don't.'

> 'We can talk to ourselves and convince ourselves that it's all right and Bernie can be part of that conversation and say "Well, you know this is what I want the London office for", and all that sort of thing, we can convince ourselves, but in front of a third party, whether that be a regulator, the Stock Exchange or the auditors or what, you and I know it is a sham. We are getting 2 or 3 or whatever many millions of dollars it is a year to make our figures look better.'

> 'What I am saying is that if we do feel that we want to give advice then I think we have to do it in accordance with the regulations… and it just may be so onerous on us to do that, just to, you know, really support what I think is a bit of a sham, that we may turn round and say that it is not worth doing.'

> 'I have always been worried about this angle that we have adopted for the last two or three years of me and others giving this advice to Bernie which he pays so highly for.'

> 'I think people will say "Look, you know, don't treat us as fools. Where is the proof, where is this research? Why would anyone in the world pay $3 million for that? You are just doing it to build your balance sheet" et cetera, and "You are creating a false impression"'

> '….it is misleading the tax people in our country, it is misleading the regulators here.'

> "…..but I have been uncomfortable with it for two or three years, not necessarily for MiFID even, for the old rules"

182.   I was not persuaded by Mr Raven's attempt under cross-examination to suggest that his concerns related only to a proposal in a draft representation letter that he be named personally as giving advice. No such document was found and the language quoted above shows a concern in relation to the portrayal of the activities of the company as a whole, not merely the portrayal of his own conduct. Some allowance should be made for the context of the conversation. Mr Raven was seeking to persuade Mr Dale to use MiFID as a ground for persuading Bernard Madoff to put an end to the MSIL Kohn Payments and the subvention funding so as to put MSIL's finances on a footing independent of BLMIS. Mr Dale was opposed to such a course, and Mr Raven may have been putting his case in more forceful and exaggerated terms than those which would more accurately have reflected his state of mind over the years. Nevertheless it is clear from this conversation that he had had concerns for at least two or three years that the accounting treatment was deceptive and difficult to justify.

183.   On the other hand there are several passages in this conversation which support his evidence that his attitude throughout was that it was not improper to go along with this accounting treatment, although he was uncomfortable about it, because KPMG were happy with it. As he put it at one point:

> *"Now, I'm happy—well, I'm not happy, I can go along with it at the moment under the old rules pre-MiFID because we have done it, it is established, the auditors are happy with it., but everything is going to change with MiFID…"*

184.    In a conversation with Mr Dale three days later on 15 October 2007, in the same context, Mr Raven again said he was unhappy that he had to sign documents saying that MSIL was giving advice to BLMIS notwithstanding that the auditors had sanctioned it to date. The word he used was "swallowed" but he did not mean that he thought that the auditors had been misled. The attitude of his finance director Mr Dale, as exemplified in this conversation, was to reassure him that the accounting treatment was appropriate, as was approving and signing the management representation letter. This was Mr Dale's stance throughout as finance director, as he confirmed in his evidence to me; he confirmed that the auditors were happy with this wording in full knowledge of the nature of the payments being received and that there was no question of the auditors being deceived. I can readily accept that that was the view he presented to Mr Raven at the time. It is consistent with the transcript of a conversation on 12 September 2006 between Mr Dale and Bernard Madoff in which Mr Dale said that the auditors had asked him about it and been satisfied with his response that it was the same as had always been done. Mr Raven did not think that KPMG had been misled. Mr Raven met the suggestion that he knew that the terms of the management representation letters misled KPMG with the response that the terms of the letters were the responsibility of his finance department and KPMG, and that if such letters, drafted as they were by KPMG, were presented to the board for approval in those terms, KPMG and the finance department were effectively putting them forward as appropriate. I accept that this was genuinely his attitude at the time. He did not focus on the particular passage in it dealing with fees receivable. Although this might be said to display a lack of intellectual rigour as to the function of the management representation letter and a slackness in signing it without sufficiently focussing on all its content, it was not dishonest, nor was he reckless as to the truth of what he was signing, in the sense of being indifferent to whether it was true or not. The same is true of the wording to be sent to KPMG in a memo drafted by Mr Dale which went under his name to Bernard Madoff on 28 August 2003 and resulted in the wording of the management response in the report of 29 August 2003: he did not focus upon the wording and was happy to leave it to Mr Dale to sort out with KPMG.

185.    My conclusion is that in relation to the accounting treatment of income as "fees receivable", and what was said about it in the management representation letters, there was no dishonesty on Mr Raven's part. He did have concerns about the potentially deceptive nature of this accounting treatment, but they were assuaged in his mind by the approval of his finance department and, as he saw it, KPMG, so as to be relegated to a residual feeling of discomfort, rather than a belief that the accounting treatment was inappropriate or unacceptable. Nor was he recklessly indifferent to the propriety of the accounting treatment: he was consciously and positively satisfied that he could go along with it and that what was being done was not dishonest or improper.

**(8) Directors' duties: the law**

186.    Before addressing the duties of which the director Defendants are alleged to be in breach, I should identify one duty of which there is no surviving allegation of breach. It is the duty to be found in s. 171 (a) of the Companies Act 2006, and the previous common law which it codified, which provides that a director must act in accordance

with the company's constitution and must not make dispositions which are ultra vires the company. In its written opening submissions the Claimant did allege a breach of this duty, on the grounds that irrespective of the subjective views of the directors, the research was of no value and accordingly the MSIL Kohn payments were a gratuitous disposition of corporate assets for no consideration, and as such ultra vires. Following argument I ruled that such an allegation had not been pleaded. There was no application to further amend the Particulars of Claim.

*The duty to act in good faith in the interests of the company*

187.    It is trite law that a director owes a duty to the company to act in what he honestly considers to be the interests of the company. This may be regarded as the core duty of a director. It is a fiduciary duty because it is a duty of loyalty. The predominant interests to which the directors of a solvent company must have regard are the interests of the shareholders as a whole, present and future. The duty is now codified in s.172 (1) Companies Act 2006 with effect from 1 October 2007 in the following terms:

> "(1)    A director of a company must act in the way he considers, in good faith, would be most likely to promote the success of the company for the benefit of its members as a whole, and in doing so have regard (among other matters) to–
>
> (a)    the likely consequences of any decision in the long term,
>
> (b)    the interests of the company's employees,
>
> (c)    the need to foster the company's business relationships with suppliers, customers and others,
>
> (d)    the impact of the company's operations on the community and the environment,
>
> (e)    the desirability of the company maintaining a reputation for high standards of business conduct, and
>
> (f)    the need to act fairly as between members of the company"

188.    For the most part the directors' conduct in this case occurred prior to October 2007 and falls to be considered under the common law, but nothing in this case turns upon any distinction, to the extent there be any, between the duty at common law and the statutory codification.

189.    As expressed in the classic formulation by Lord Greene MR in *Re Smith & Fawcett Ltd* [1942] Ch 304, 306, the duty is to act in what the director believes, not what the court believes, to be the interests of the company. The test is a subjective one. As Jonathan Parker J put it in *Regentcrest Plc v Cohen* [2001] BCC 494, at [120]:

> "The question is not whether, viewed objectively by the court, the particular act or omission which is challenged was in fact in the interests of the company; still less is the question whether the court, had it been in the position of the director at the relevant time, might have acted differently. Rather, the question is whether the director honestly believed that his act or omission was in the interests of the company. The issue is as to

the director's state of mind. No doubt, where it is clear that the act or omission under challenge resulted in substantial detriment to the company, the director will have a harder task persuading the court that he honestly believed it to be in the company's interest; but that does not detract from the subjective nature of the test"

190.   It is legitimate, and often necessary, for there to be division and delegation of responsibility for particular aspects of the management of a company. Nevertheless each individual director owes inescapable personal responsibilities. He owes duties to the company to inform himself of the company's affairs and join with his fellow directors in supervising them.  It is therefore a breach of duty for a director to allow himself to be dominated, bamboozled or manipulated by a dominant fellow director where such involves a total abrogation of this responsibility: see *Re Westmid Packing Services Ltd; Secretary of State for Trade & Industry v Griffiths (No 3)* [1998] BCC 836 at 842B-843D; *Re Barings Plc (No 5)* [1999] 1 BCLC 433 at486h-489c; *Lexi Holdings Plc v Luqman No2* [2008] 2 BCLC 725 per Briggs J at [31], [32] and [2009] BCC 716 per Sir Andrew Morritt C at [37].  Similarly it is the duty of each director to form an independent judgment as to whether acceding to a shareholder's request is in the best interests of the company: *Lonrho Ltd v Shell Petroleum* [1980] 1 WLR 627, 634F.  The duty to exercise independent judgment is now reflected in s. 173 Companies Act 2006.

191.   Moreover, it has long been established that a trustee who knowingly permits a co-trustee to commit a breach of trust is also in breach of trust.  A director who has knowledge of his fellow director's misapplication of company property and stands idly by, taking no steps to prevent it, will thus not only breach the duty of reasonable care and skill (which is not fiduciary in character: *Ultraframe v Fielding* [2005] EHWC 1638 (Ch), [1300]-[1302]), but will himself be treated as party to the breach of fiduciary duty by his fellow director in respect of that misapplication by having authorised or permitted it: *Walker v Stones* [2001] QB 902, 921D-E; *Gidman v Barron and Moore* [2003] EWHC 153 (Ch) at [131]; *Neville v Krikorian* [2006] EWCA Civ 943, [49]-[51] and *Lexi Holdings v Luqman (No. 1)* [2007] EWHC 2652 (Ch) at [201]-[205].

192.   In fulfilling this personal fiduciary responsibility, a director is entitled to rely upon the judgment, information and advice of a fellow director whose integrity skill and competence he has no reason to suspect: see *Dovey v Cory* [1901] AC 477 at 486, 492.  Moreover, corporate management often requires the exercise of judgement on which opinions may legitimately differ, and requires some give and take.  A board of directors may reach a decision as to the commercial wisdom of a particular transaction by a majority.  A minority director is not thereby in breach of his duty, or obliged to resign and to refuse to be party to the implementation of the decision.  Part of his duty as a director acting in the interests of the company is to listen to the views of his fellow directors and to take account of them.  He may legitimately defer to those views where he is persuaded that his fellow directors' views are advanced in what they perceive to be the best interests of the company, even if he is not himself persuaded. A director is not in breach of his core duty to act in what he considers in good faith to be the interests of a company merely because if left to himself he would do things differently.

193.    Where a director fails to address his mind to the question whether a transaction is in the interests of the company, he is not thereby, and without more, liable for the consequences of the transaction. In such circumstances the Court will ask whether an honest and intelligent man in the position of a director of the company concerned could, in the whole of the existing circumstances, have reasonably believed that the transaction was for the benefit of the company: *Charterbridge Corp Ltd v Lloyds Bank Ltd* [1970] Ch 62 at 74E-F. If so, the director will be treated as if that was his state of mind.

*The duty to exercise powers for the purposes for which they are conferred*

194.    A director owes a fiduciary duty to exercise the powers conferred on him by the constitution for the purposes for which they were conferred. The duty is now enshrined in s. 171(b) of the Companies Act 2006. Although the duty often overlaps with the duty to act in what is honestly considered to be the interests of the company, the duties are distinct. A power may be exercised for an improper purpose notwithstanding that the directors bona fide believe it is being exercised in the company's best interests. That was held to be the position in *Hogg v Cramphorn Ltd* [1967] 1 Ch 254, 266G-269A.

195.    The court will apply a four stage test (see *Howard Smith Ltd v Ampol Petroleum Ltd* [1974] AC 821, 835F-H; *Extrasure Travel Insurances v Scattergood* [2003] 1 BCLC 598 at [92]), which involves identifying (1) the power whose exercise is in question, (2) the proper purpose for which such power was conferred (3) the substantial purpose for which the power was exercised in the instant case and (4) whether that purpose was proper.

196.    There is an issue between the parties as to whether liability is strict or depends upon knowledge or fault on the part of the directors. The Defendants contended that a director will not be liable unless he knew or ought reasonably to have known the facts which make the payment improper. They relied on the judgment of Lord Walker in *Progress Property Co Ltd v Moore* [2011] 1 WLR 1, with which the other members of the Supreme Court agreed. That case was concerned with an unlawful payment of a dividend. At paragraph [32] Lord Walker said that he agreed with a passage in the judgment of Lord Hamilton in *Clydebank Football Club v Steedman* 2002 SLT 109, where the latter said at [79]:

> "It is plain, in my view, that directors are liable only if it is established that in effecting the unlawful distribution they were in breach of their fiduciary duties (or possibly of contractual obligations, though that does not arise in the present case). Whether or not they were so in breach will involve consideration not only of whether or not the directors knew at the time that what they were doing was unlawful but also of their state of knowledge at that time of the material facts. In reviewing the then authorities Vaughan Williams J in *In re Kingston Cotton Mill* Co *(No 2)* [1896] Ch 331, 347: 'In no one of [the cases cited] can I find that directors were held liable unless the payments were made with actual knowledge that the funds of the company were being misappropriated or with knowledge of the facts that established the misappropriation.'

Although this case went to the Court of Appeal, this aspect of
the decision was not quarrelled with (see [1896] 2. Ch 279)."

197.  The decision in *Progress Property* was delivered a few weeks after the decision of the
Supreme Court in *Revenue and Customs Commissioners v Holland,   In Re
Paycheck Services 3 Ltd* [2010] 1 WLR 2793 to which Lord Walker was also a party.
In that case, also concerned with unlawful payment of a dividend, the main issue was
whether the defendant was a shadow director so as to owe the relevant duties.  The
Court of Appeal and majority of the Supreme Court held that he was not, as a result of
which the content of the duties and liability for their breach did not fall for decision.
Lord Hope in the Supreme Court at [45]-[47] and Rimer LJ in the Court of Appeal
([2010] Bus LR 259) at [81]-[84] identified two conflicting lines of authority as to
whether liability was strict or fault based.  Lord Hope expressed a preference for the
view, without deciding it, that in the case of an unlawful payment of a dividend, a
director who causes the payment to be made is under a strict liability to make good
such misapplication of the company's property, subject only to relief from sanction if
he establishes that he acted honestly and reasonably.  In the Court of Appeal, Rimer
LJ said that he found the arguments in support of that view compelling.  Lord Clarke
also agreed with Rimer LJ's views at [146].   Lord Walker at [124] expressed
agreement with Rimer LJ on "the other issues", which would apparently include this
one, but I find it difficult to reconcile that agreement with the sentiments expressed in
the passage from Lord Hamilton's judgment which he endorsed in *Progress Property*.

198.  Both *Progress Property* and *Paycheck Services 3* were concerned with unlawful
distribution of dividends, but the language used by Lord Hope and Rimer LJ was
sometimes that of misapplication of company property more generally, and some of
the cases cited were not dividend cases.  For this reason the Claimant contended that
the preference for a rule of strict liability applied equally to the duty not to apply
company property for an improper purpose.

199.  I incline to the view that such liability is fault based: a director's liability in relation to
misapplication of a company's property by exercising a power otherwise than that for
which it was conferred cannot arise unless he knows that it is an improper purpose or
of the facts which make the purpose improper.  But I do not need to decide this
question in the light of the conclusions I reach below.

*Unlawful distribution of capital*

200.  A limited company not in liquidation may not return assets to its shareholders except
by way of a reduction of capital approved by the court; profits may be distributed to
shareholders (normally by way of dividend) but only out of distributable profits
computed in accordance with provisions of the Companies Acts: see *Progress
Property* at [1].  This is essentially a judge made rule, almost as old as company law
itself, designed for the protection of creditors, sometimes known as the rule in *Trevor
v Whitworth*, after the House of Lords decision of that name ((1887) 12 App Cas
409), *Progress Property* at [15].  It has been codified in successive Companies Acts.
Section 263 of the Companies Act 1985 (in force from 1 July 1985 to 5 April 2008,
now replaced by sections 829 and 830 of the Companies Act 2006) provided as
follows:

'**Certain distributions prohibited.**

(1)  A company shall not make a distribution except out of profits available for the purpose.

(2)  In this Part, "distribution" means every description of distribution of a company's assets to its members, whether in cash or otherwise, except distribution by way of—

    (a)       an issue of shares as fully or partly paid bonus shares,

    (b)       the redemption or purchase of any of the company's own shares out of capital (including the proceeds of any fresh issue of shares) or out of unrealised profits in accordance with Chapter VII of Part V,

    (c)       the reduction of share capital by extinguishing or reducing the liability of any of the members on any of the company's shares in respect of share capital not paid up, or by paying off paid up share capital, and

    (d)       a distribution of assets to members of the company on its winding up.

(3)  For purposes of this Part, a company's profits available for distribution are its accumulated, realised profits, so far as not previously utilised by distribution or capitalisation, less its accumulated, realised losses, so far as not previously written off in a reduction or reorganisation of capital duly made.

201.  The prohibition is also reflected in MSIL's Articles of Association, Article 29.01 of which provides as follows:

> "The Company shall not make any distribution of any kind or in any form of the Company's assets to members of the Company (other than as provided in Section 45(2) of the 1980 Act) except out of its undistributed and uncapitalised accumulated realised profits after deducting its accumulated realised losses (so far as such losses have not previously been written off in a reduction or reorganisation of capital) nor shall the Company apply an unrealised profit in paying up debentures or any amounts which are unpaid on its issued shares."

202.  A transaction which offends this principle is to be treated as ultra vires in the looser and wider sense of the term identified in *Rolled Steel Products (Holdings) Ltd v British Steel Corporation* [1986] Ch 246 at 276-278 per Slade LJ and 302 per Browne-Wilkinson LJ: see *Progress Property* at [15].

203.  The judgments of Lord Walker and Lord Mance in *Progress Property* at [1], [16]-[31], [36], [42], and of Hoffmann J in *Aveling Barford Ltd v Perion Ltd* [1989] BCLC 626, identify the correct approach to transactions impugned on this basis. Whether a transaction infringes the rule is a question of categorisation or characterisation based on substance, not form. The label attached to the transaction by the parties is not decisive. Sometimes the exercise for the court will be a purely objective one in which the subjective intentions of the directors are irrelevant: for example a distribution described as a dividend, but actually paid out of capital, is unlawful, however technical the error and however well-meaning the directors who caused it to be paid. But where what is impugned purports to be a transaction of a different character to a distribution, such as for example a contract for the purchase of assets or services, the intentions of the parties to the transaction are often highly

relevant to the categorisation exercise, being one in which the court is inquiring whether the transaction was in substance that which it purported to be. The question whether the transaction was in substance a disguised distribution of capital may be heavily influenced by whether that was the intention of the parties. In such a case an attempt to dress up a transaction as something different from what it is, is likely to provoke suspicion, and may lead to the conclusion that its true characterisation is a distribution of capital, although not all cases involving some pretence or dressing up will justify that conclusion. As Lord Walker put it at [30], pretence is often a badge of bad conscience. On the other hand the court will not recategorise an arm's length transaction if the directors intended it to be in substance that which its form purports to be.

204.   In this context the parties again relied on the passages in the ***Progress Property*** and ***Paycheck 3*** cases, and the lines of authority there considered, for rival contentions as to whether liability of directors for an unlawful distribution of capital is strict, subject to relief from sanctions, or fault based. Again I do not need to decide this question in the light of the conclusions I reach below.

*The duty to exercise reasonable care skill and diligence*

205.   A director has a duty by virtue of his office to exercise reasonable care skill and diligence. The duty is now codified in s 174 Companies Act 2006 in the following terms:

> **"174    Duty to exercise reasonable care, skill and diligence**
>
> (1)    A director of a company must exercise reasonable care, skill and diligence.
>
> (2)    This means the care, skill and diligence that would be exercised by a reasonably diligent person with–
>
>    (a)    the general knowledge, skill and experience that may reasonably be expected of a person carrying out the functions carried out by the director in relation to the company, and
>
>    (b)    the general knowledge, skill and experience that the director has."

206.   The standard of care required of a director is to be determined not only subjectively by reference to his particular knowledge, skill and experience but on general, objective criteria: ***D'Jan of London Ltd, Copp v D'Jan*** [1993] BCC 646, 648D-E and s. 174(2).

207.   A director employed under a contract of employment is bound by an implied term thereof to exercise reasonable skill and care. Mr Flax, Mr Toop and Mr Raven had contracts of employment (although not reduced to writing in Mr Raven's case). Andrew and Mark Madoff did not and received no remuneration.

208.   Directors' and employees' duties to exercise reasonable care, skill and diligence are not fiduciary in character.

**(9) MSIL Kohn payments: breaches of directors' duties**

*Acting in good faith in the interests of MSIL*

209.   I shall consider the position of each director Defendant in turn.  It is convenient to consider first Mr Flax, who knew of the payments from their start.

*Mr Flax*

210.   Mr Flax signed the cheques in respect of the Erko invoices and signed or approved almost all the electronic transfers made to Tecno Italy.  He accepted that he was responsible for effecting the payments throughout the whole period between 1992 and 2007.

211.   Mr Flax was a patently honest witness whose meticulous and conscientious nature gave him a good grasp of detail, both in his conduct at MSIL and in his evidence to me.  His recollection was generally sound, and its reliability was borne out by the extant documents and the evidence of other witnesses, although there were a few occasions when his recollection was less sure, as was to be expected of evidence covering events going back over more than 25 years without the survival of many relevant documents.

212.   The starting point for the present inquiry is that Mr Flax honestly and reasonably believed that the MSIL Kohn payments were being fully funded by BLMIS and were cash neutral for MSIL.  There was, so far as he was concerned, no significant risk of MSIL being in a position of having to make the payments without such funding.  That is not sufficient of itself to make them in MSIL's interests: some perceived benefit must have been identified, not merely the absence of detriment.  But it does mean that the perceived value of the benefit to MSIL need only have been relatively slight for Mr Flax to hold the honest perception that they were in MSIL's interests.  To my mind one of the major flaws in this aspect of the Claimant's case against each of the director Defendants is that it invites the Court to ignore the funding of the payments when assessing whether the conduct of the directors was a breach of their duties.  It proceeds on the hypothesis that the directors need to justify a perception that the company was receiving something worth the millions of dollars paid out by the company.  But that is to ignore the reality of the position in which they found themselves.  Whatever the merits of the arguments as to whether the company can with hindsight be seen to have suffered a loss (by reason of the then unimagined Ponzi scheme), or of whether a director's breach of duty gives rise to a strict liability to account irrespective of loss to the company, I can see no justification for ignoring the funding when assessing the state of mind of the directors and what they perceived to be in the interests of the company at the time.  I have little doubt that had there been no funding from BLMIS, the directors would not have contemplated these large payments, which MSIL could not afford out of its own resources.  But they were not being asked to make or sanction payments which were to be borne out of MSIL's own resources.  It is true that the immediate source for the payments was money which belonged to MSIL but the payments were only made because MSIL was given an equivalent sum by BLMIS, often in advance, for the specific purposes of enabling it to make the payment.

213.   At one stage of Mr Saini QC's questioning of Mr Raven, following an intervention on my part, Mr Saini QC confirmed that the case which he was putting was that it would have been legitimate for MSIL to make the payments, and be reimbursed by BLMIS

for them, provided it did not pretend in its accounts that it was paying for something of value and giving something of value to BLMIS in return for the funding. Two days later his questioning corrected the position by making clear that the Claimant's objection was to the payments being made, not simply to their accounting treatment. I would not regard the earlier confirmation of his case as a binding concession, despite the Defendants' reliance upon it. But I hope it is not unfair to treat the slip as reflective of the reality of the position facing the directors, which was that the propriety of making the payments could not be divorced from the context of their funding.

214.    Mr Flax did not have the skill or knowledge himself to assess the value of the written research being received.    The reports appeared to him to be substantial and professionally formatted and produced. When he became aware that the traders did not think that the material was particularly helpful, he raised the matter on the phone with Bernard Madoff and asked him whether he thought he was receiving value for money. Bernard Madoff told Mr Flax that Mrs Kohn was a good analyst who spoke to him in New York and was only being paid what a good analyst would be paid. Mr Flax was told that the research had the potential to pay for itself and that a single good idea could justify the payments. In this and subsequent discussions Bernard Madoff said that he found Mrs Kohn's advice to be of great value.    This was a reference to advice she gave in their face to face meetings, not just written research.

215.    Mr Flax was aware that the traders continued to treat the research received in London as of no practical value to their day to day activity, and raised the question of the value of the research on a number of occasions with Bernard Madoff on the phone. Mr Flax remained unhappy about the payments because he regarded it as his function to raise the question whether the payments were value for money. When he raised it, Bernard Madoff became increasingly annoyed and made clear, in colourful language, that Mr Flax did not have the knowledge or experience to contradict his judgment about trading.  Bernard Madoff made clear to Mr Flax in no uncertain terms that he got value from the research.

216.    Mr Flax did not believe that the written research which was sent to London was sent on to New York, but he was told by Bernard Madoff, and believed, that Bernard Madoff was receiving research in New York. He was not asked at the trial whether he thought that it was the same as, or overlapped with, the material received in London. Whatever he thought the content of the research received by Bernard Madoff in New York to be, he was entitled to treat it as something which Bernard Madoff received in his capacity as a director and shareholder of MSIL, and that was in fact how he viewed it.  In this context he said "*MSIL consisted of the individuals sitting in London and an individual sitting in New York in the shape of the chairman of MSIL and its major shareholder and that was Bernard Madoff.  And Bernard Madoff, in his capacity as Chairman, the major shareholder, sitting in New York, ……….told me in no uncertain terms that he got value from Mrs Kohn's research*". He said the same more generally about Mrs Kohn speaking to Bernard Madoff, namely that he treated her as speaking to the chairman and major shareholder of MSIL.

217.    Mr Flax's evidence, which I accept, was that he thought that MSIL received a benefit from Mrs Kohn's services in two respects. The first was that the advice and research was of value to Bernard Madoff, as the latter had repeatedly told him, and he regarded something which MSIL's chairman and major shareholder treated as of value as being

for that reason of value to MSIL.  As he put it at one point: "*If the chairman and major shareholder of MSIL tells me he's getting a benefit from it, I have very great difficulty arguing with that.*"  Secondly Bernard Madoff told him that he passed on the advice he received from Mrs Kohn to the traders in London when he spoke to them on the phone; the traders were therefore getting the benefit of her advice, not simply the written research.

218.  Mr Flax was further reassured that the payments were proper ones to make in the interests of MSIL by the following factors:

(1) The chairman and major shareholder of the company was instructing him to make the payments and telling him they were of benefit.  He had no reason to question Bernard Madoff's competence, integrity or motives.  On the contrary, he was one of the lowest paid directors and Bernard Madoff was a titan of Wall Street.  He held Bernard Madoff in the high respect which the latter's record and reputation commanded.  His trust and respect is reflected in the fact that he and his wife had about $3 million invested with Bernard Madoff through family trusts, which was lost in the collapse of the Ponzi scheme.

(2) There was no secrecy about the payments within MSIL.  All the London directors (except perhaps Mr Stevenson) were aware of them.  None of his fellow directors and no one in the compliance department expressed the view to him at any time that the payments were improper, illegitimate or other than in the best interests of MSIL.  On the contrary, he raised the issue on one occasion with Peter Allen, and understood that the latter spoke to Mr Raven about it, who in turn spoke to Bernard Madoff.  Mr Flax believed that Mr Raven had raised the matter with Bernard Madoff on more than one occasion and had received responses which satisfied him.

(3) The payments were openly recorded in the books and their accounting treatment was sanctioned by the audit team from KPMG, who were fully aware of them, and of the written research which was made available to them.  Mr Flax did not mislead the auditors.  The payments were noticed during the audits from the beginning and Mr Flax was asked about them.  He told KPMG that the research was valued by Bernard Madoff, which was what the latter had told him and what he believed; he did not tell the auditors that it was of use for MSIL's business or that it was used by the traders.  He could not recall either way whether he had told the auditors that it was not used by the traders, but in any event the auditors were free to talk to the traders and did so without Mr Flax being present.  He had no reason to think that they would have concealed their views about the usefulness of the research if it had been raised.  On one occasion in about 2000 or 2001 Mr Grimditch of KPMG took the matter up with Bernard Madoff and appeared to be satisfied by whatever he was told.  Mr Flax was reasonably entitled to believe, and did believe, that KPMG were at all times fully aware of the nature of MSIL's business activity, the timing and amounts of the MSIL Kohn Payments, the invoices in respect of which they were paid, the written research provided to MSIL, the way in which these payments were funded by BLMIS, and the way in which MSIL was more generally funded by BLMIS.

219. Mr Flax could legitimately treat these as being sufficient grounds for treating the payments as being in MSIL's interests, as he did. Three aspects of the relevant duty are here relevant:

(1) The fact that the payments cost MSIL nothing in commercial terms, and involved no significant foreseeable risk, means that the perceived value of the benefit to MSIL need only have been relatively slight for Mr Flax and others to hold the honest perception that they were in MSIL's interests.

(2) In the particular circumstances of this case, the interests of MSIL which fell to be taken into account in relation to the payments are to be closely associated with those of Bernard Madoff himself. The directors reasonably believed that all times the company was solvent, and had no reason to suspect that the payments were contrary to the Companies Acts or otherwise unlawful; the funding was coming from BLMIS which was heavily regulated in New York. The predominant interests to which the directors were required to have regard were those of the shareholders, including the minority non voting beneficial interests of Bernard Madoff's family and close associates. Bernard Madoff was at all times the predominant beneficial owner of the shares and the controlling shareholder. MSIL's corporate history was one which reflected Bernard Madoff's personal decision from time to time as to what business it would conduct. Its funding was dependent on him. It was Bernard Madoff's vision for the development of MSIL which would determine its future direction and financial health, and indeed its future existence. He could at any time have closed the business or caused it to change the nature of its business activity. He had the power under Article 17.05 of the Articles, as a greater than 95% voting shareholder, to appoint and dismiss directors without a general meeting. Generally, what was in Bernard Madoff's interests was likely to be in the interests of the minority shareholders and the long term success of the company. Giving effect to his wishes was something which itself was likely to promote the success of MSIL; conversely denying his wishes was unlikely to promote the success of the company. The Defendants contended that the directors were entitled to treat Bernard Madoff's interests as being the interests of MSIL. I would not go so far as to equate the two, but I accept that provided the company was solvent, and not doing anything contrary to the Companies Acts or otherwise unlawful, as was the apparent position at the time, a director who honestly believed that a payment was in accordance with the wishes of Bernard Madoff could treat that alone as a reason for believing the payment was in the interests of MSIL. Whether that was a sufficient reason would have to be weighed against any countervailing factors, such as cost and risk, but neither had a significant part to play in relation to these payments.

(3) Directors bring different experience and expertise to the joint exercise of corporate management. Whilst each is required to exercise his independent judgment, he may legitimately defer to the views of those with greater experience or expertise than him. Where there is a director who has a record and reputation for outstanding skill and experience in the company's business activity, his fellow directors are entitled to accord a high degree of deference and trust to his views as to what is in the company's best interests. It would be

unfair and unrealistic to expect Mr Flax, or any of the other directors, to have done anything other than attach great weight to the views of Bernard Madoff in deciding what was in the interests of MSIL. To take the view, as Mr Flax to some extent did, that Bernard Madoff knew best, was not a dereliction of the duty to exercise independent judgment. It was a legitimate recognition that Bernard Madoff's high standing in the financial world reflected a level of skill and experience which did indeed equip him to know what was best for the company, and put him in a much better position to make that judgment than Mr Flax or any other director.

220. The Claimant's case against Mr Flax, as against each of the director Defendants, relied upon three propositions as being true to their knowledge (in addition to proceeding on the premise, which I regard as a false one, that the funding falls to be ignored). The three propositions were:

(1) The MSIL Kohn Payments were solely for the written research and no other services or benefits were received by MSIL in exchange for them.

(2) The research supplied to MSIL by Mrs Kohn was useless and of no value to MSIL, both because of its own poor and plagiarised quality and because it was irrelevant to the trading activities in which MSIL was engaged.

(3) The research was never passed on by MSIL to BLMIS or any other entity. It was simply stored at MSIL to show to the auditors in the event that the MSIL Kohn Payments were questioned.

221. As to (1), that was not what Mr Flax was told by Bernard Madoff and not what he believed. He believed that the payments were also for advice received by Bernard Madoff from Mrs Kohn in New York and that Bernard Madoff passed on that advice to the traders in London. On more than one occasion in his evidence he said that he was clear that the payments were only for research and nothing else, but the context of those answers, and of his evidence as a whole, suggested that what he was referring to as research was all the information being provided by Mrs Kohn, not simply the written documentary material delivered in London.

222. As to (2), the research was not in fact worthless to MSIL for either of the reasons advanced. The value of the research which was relevant to MSIL's day to day trading activity in Phase 4 is to be measured in thousands to low tens of thousands of dollars per annum. The value of the research for management decision making at a more strategic level throughout Phases 3 and 4 was real but immeasurable. In any event Mr Flax was not in a position to assess the value of the research himself and reasonably believed that he should defer to Bernard Madoff's view that the research and advice which the latter was receiving was worth what was being paid for it. Given that the payments were being funded by BLMIS and costing MSIL nothing, there did not need to be any great value to the research to justify the payments, quite apart from any value in the advice from Mrs Kohn which Mr Flax thought was being passed on by Bernard Madoff to the traders.

223. As to (3) Mr Flax did not believe that the research which was sent to London was sent on to New York, but he was told by Bernard Madoff, and believed, that Bernard

Madoff was receiving research in New York and believed he was doing so in his capacity as the chairman and a major shareholder of MSIL.

224. In these circumstances I conclude, without any real hesitation, that Mr Flax honestly considered the MSIL Kohn Payments to be in the interests of MSIL and was not in breach of his duty to act in what he considered in good faith to be the interests of MSIL.

*Mr Raven*

225. Apart from a two week period in 1983 when the company was being set up, Mr Raven first became a director on 1 January 1992, initially in a non executive role. His executive role increased over the decade in the way I have described above, and by about 2001 he was the senior of the two directors left in place at that time. From 2003 he was playing the full role of a CEO. He signed a number of the cheques for the Erko payments, including one in October 1999, and signed or approved a number of the electronic transfers to Tecno Italy.

226. I found Mr Raven's evidence on the whole to be candid and reliable, conformably to the widespread testimony of those who had worked with him as a man of unquestioned integrity and ability. There were occasions on which he was keen to give the impression that he was more detached from the detail of what was happening than seemed to me likely, or was borne out by the documents. At times he put forward arguments to defend his position which did not hold water. This defensiveness was understandable given that he had been uncomfortable about both the payments and their accounting treatment at the time, and that he was responsible for stopping them in 2007. But there were many occasions during his days in the witness box on which he volunteered answers which were frank and quite obviously not designed to assist his case. In relation to the central issues in the case I feel able to treat him as an honest and reliable witness.

227. His evidence was that he did not really focus on the payments until he became CEO in 2003. I accept that that is so, but he must have been aware both of the payments and the written research from a much earlier time. I find that he became aware of the payments within a few years of joining the company as a non executive director. The research and the Erko payments were no secret and were openly discussed between Mr Flax and the other traders/directors.

228. In assessing Mr Raven's state of mind in relation to the payments, the important starting point is that, like Mr Flax, he honestly and reasonably believed that the payments were being matched by the funding from BLMIS, and involved no real cost to MSIL.

229. Mr Raven was told of the conversations which Mr Flax had had with Bernard Madoff in relation to the research and Mrs Kohn. Accordingly he knew from these reports that Bernard Madoff's attitude was that Mrs Kohn was a good analyst who spoke to him in New York and was only being paid what a good analyst would be paid; that the research had the potential to pay for itself and that a single good idea could justify the payments; that he found Mrs Kohn's advice to be of great value; and that he got value from the research. Mr Raven did not think that the written research being received in London was being sent on to New York, but he thought that Bernard

Madoff was receiving research in some form in New York, whether identical or overlapping with that sent to London, as well as advice in face to face meetings.

230.    Mr Raven himself raised the topic with Bernard Madoff from time to time, on what was probably about ten or more occasions in all.  Mr Raven queried whether MSIL should be paying so much for the research as it seemed to him to be very expensive, to which Bernard Madoff responded to the effect that he regarded it as good research and of real value and he wanted MSIL to take and pay for it.  Bernard Madoff told Mr Raven that the latter was not qualified to say whether the research was good or not. Mr Raven also learned from his conversations with Bernard Madoff that apart from research or information from Mrs Kohn, Bernard Madoff valued Mrs Kohn for her contacts.  Mr Raven tried on a number of occasions to persuade Bernard Madoff to put an end to the payments, but Bernard Madoff was insistent (until Mr Raven was able to use the introduction of MiFID to persuade him in 2007).

231.    Mr Raven candidly accepted in his evidence that when he focussed on the payments, he did not regard them as providing any benefit to MSIL.  In his witness statement he described telling Bernard Madoff in 2007, when using MiFID to convince the latter to put an end to them, that they were "not in MSIL's interests".  He agreed with the description of them as a mechanism being used by Bernard Madoff to pay Mrs Kohn or the entities associated with her.

232.    He was uncomfortable about them and wanted to put an end to them for two reasons. The first was that he saw his mission as being to build MSIL into a profitable business which could be independent from BLMIS; he therefore wished to remove the payments and the subventions from each side of the profit and loss account because they were inconsistent with MSIL operating as an independent business.  Secondly he was, as I have explained, uncomfortable about the accounting treatment of the income which funded the payments.  Neither of these reasons for wishing to put an end to the payments and their funding reflected any concern as to the propriety of the payments as such; Mr Raven had none.  But it was for these reasons that he was keen to use the introduction of MiFID to persuade Bernard Madoff to put an end to them, and in this he was successful.

233.    The Claimant contended that Mr Raven's admission that he did not see any benefit to MSIL in the payments being made, and that he tried to persuade Bernard Madoff that they were not in MSIL's interests, was sufficient to establish a breach of his duty as a director.  In my judgment that is to ignore what Mr Raven knew of Bernard Madoff's views.  Mr Raven's personal view was that he did not consider there was any value to MSIL in the research, or anything else being provided in return for the funded payments.  But he honestly believed that Bernard Madoff did.  His attitude was captured in his answer given in cross examination:

> "*When the research started coming in, in the mid to late 1990s, whenever it was, I had absolutely no idea what it was, whether it was good, bad or indifferent.  Mr Madoff wanted it, Mr Madoff made it quite clear he was going to continue to pay for it and receive it, and so that's fine, for me.  My chairman and the shareholders said "You are going to take research", I am not going to argue against that …………..because I had huge*

> *respect for Mr Madoff and his successes and his position in the*
> *industry, in New York and with us in London"*

234.    I have already identified three factors which inform the inquiry as to whether Mr Flax was acting in what he considered to be the interests of MSIL. They are equally applicable to the inquiry in Mr Raven's case. In summary they are (1) the fact that the payments cost MSIL nothing in commercial terms and involved no significant foreseeable risk, means that the perceived value of the benefit to MSIL need only have been relatively slight for Mr Raven to hold the honest perception that they were in MSIL's interests; (2) provided the company was solvent, and not doing anything unlawful or contrary to the Companies Acts, as was the apparent position at the time, a director who honestly believed that a payment was in accordance with the wishes of Bernard Madoff could treat that alone as a reason for believing the payment was in the interests of MSIL; and (3) to take the view, as Mr Raven did, that Bernard Madoff knew best, was not a dereliction of the duty to exercise independent judgment, but a legitimate recognition that Bernard Madoff's high standing in the financial world reflected a level of skill and experience which did indeed equip him to know what was best for the company, and put him in a better position to make that judgment than Mr Raven.

235.    There is, in Mr Raven's case, a fourth consideration to be kept in mind, namely that corporate management requires some give and take. A director is not in breach of his core duty to act in what he considers in good faith to be the interests of a company simply because if left to himself he would do things differently. Mr Raven regarded Bernard Madoff as a friend of many years standing whom he trusted and respected; he would express his views to Mr Madoff candidly; sometimes his views would prevail and he would persuade Bernard Madoff to his course, but on other occasions if they could not agree on matters relating to the business, he would defer to Bernard Madoff's views. One answer of Mr Raven is illustrative:

> *"Q:  Did you not consider, as the managing director, certainly*
> *from 2001, you had the responsibility to form an independent*
> *view as to the usefulness and appropriateness in respect of this*
> *research? A:  My Lord, I had my views, I had my views about a*
> *lot of things, Mr Madoff didn't agree with them all, I didn't*
> *agree with a lot of his, that's what running a business is all*
> *about."*

236.    If left to himself, Mr Raven would have done things differently, at least from 2003 when he focused on the payments. But he was entitled to go along with them and treat them as being in the interests of MSIL, as he honestly did, in the light of his belief that they were cost neutral to MSIL and that Bernard Madoff wanted them to be paid and regarded the research as of value. There was no breach of duty in his deferring to the views of Bernard Madoff. This is not a case of a director allowing himself to be dominated or manipulated by a dominant director in a way which involved a total abrogation of responsibility. It is a case of a director honestly and reasonably deferring to the views of a fellow director with whom he disagreed but whom he was entitled to treat as having greater wisdom and experience.

237.   In these circumstances I conclude that Mr Raven honestly considered the MSIL Kohn Payments to be in the interests of MSIL and was not in breach of his duty to act in what he considered in good faith to be the interests of MSIL.

*Mr Toop*

238.   Mr Toop was employed by MSIL as a trader on the trading desk from October 1999; he took over management of the London trading desk in about July 2002; he became a director on 4 February 2003; he remained Head of Trading until December 2008. He was not himself involved in effecting any of the payments.

239.   I had the advantage of hearing from Mr Toop throughout the trial, not only whilst giving his evidence, but also whilst conducting his defence as a litigant in person, making oral submissions and cross examining witnesses. He did so with conspicuous skill, fairness and dignity despite the obvious emotional trauma inflicted by these proceedings. He gave his evidence in a straightforward fashion. I have no hesitation in treating him as an honest and reliable witness.

240.   As with Mr Flax and Mr Raven, the starting point is that Mr Toop honestly and reasonably believed that the MSIL Kohn payments were being fully funded by BLMIS and were cash neutral for MSIL. There was, so far as he was concerned, no significant risk of MSIL being in a position of having to make the payments without such funding.

241.   So far as the written research received in London was concerned, Mr Toop knew about it some time after he arrived in 1999, probably in around 2000. He never saw any of the traders using it and did not use it himself. He gave it a cursory glance when he saw the boxes on a handful of occasions. All he could specifically recollect about what he saw was that some of it related to Eastern Europe. It was not something he spent any time specifically looking at and it was not "on his radar", as he put it. At the Arts Club meeting on 12 December 2008 he described the research as "garbage", but this was a comment he made following the revelation of Bernard Madoff's fraud which caused him to be suspicious about the payments after the event. He had not formed any view about its quality before then. It was not "on his radar" because he never regarded it as meant for MSIL in London. He assumed at the time that the research was being passed on from London to New York. The basis for his assumption was that it was being paid for by BLMIS in New York, and was being received in London because Mrs Kohn was based in Europe. That was a reasonable, albeit mistaken, assumption to have made. He did not know whether Mr Raven, Mr Flax or Mr Dale looked at the research.

242.   So far as the payments were concerned, he probably became aware of the fact of them at a management meeting early in his time at MSIL, although he did not become aware of the scale of the payments until he saw a spreadsheet provided by Mr Dale for a different purpose which referred to Tecno. It is impossible to date when this occurred, other than that it is likely to have been after Mr Dale became finance director in 2003. In his final written submissions Mr Toop accepted that he knew of the approximate amount of the payments from 2005 onwards. It was not suggested that Mr Toop became aware of the payments from the annual accounts which he signed and approved each year from 2003 as a director.

243.    Mr Toop was anxious to emphasise his management role as being focussed on the
        trading activities of the company. The thrust of his defence was that he relied on the
        other directors to oversee the activities for which they were managerially responsible,
        and the MSIL Kohn Payments were the responsibility of Messrs Raven, Flax and
        Dale. He pointed to a discussion at a dinner on 7 July 2004 with Mr Raven and
        Andrew Madoff, of which Mr Raven prepared a minute, at which he, Mr Toop, was
        criticised by Mr Raven for seeking to get involved with areas which were not his
        responsibility. No doubt this incident, and his somewhat fractious relationship with
        Mr Raven, discouraged him from questioning matters outside his area of managerial
        responsibility. However this did not relieve him of his personal responsibility as a
        director to exercise some independent judgment as to whether the MSIL Kohn
        Payments were in the interests of MSIL. This he failed to do. He reasonably assumed
        that there was nothing wrong with MSIL making the payments, but he did not address
        his mind to the specific question whether or how they conferred any benefit on MSIL
        as opposed to BLMIS.

244.    The question therefore arises whether an honest and intelligent man in his position
        (Mr Toop was both) could reasonably have believed that the payments were in
        MSIL's interests. The answer is that he could, for the following reasons:

        (1) The fact that the payments cost MSIL nothing in commercial terms and
            involved no significant foreseeable risk, means that the perceived value of the
            benefit to MSIL need only have been relatively slight for someone in Mr
            Toop's position to hold the honest perception that they were in MSIL's
            interests.

        (2) Provided the company was solvent, and not doing anything contrary to the
            Companies Acts or otherwise unlawful, as was the apparent position at the
            time, a director who honestly believed that a payment was in accordance with
            the wishes of Bernard Madoff could treat that alone as a reason for believing
            the payment was in the interests of MSIL.

        (3) Mr Toop held Bernard Madoff in the high respect which the latter's record and
            reputation commanded. He had worked with him in New York from 1987 and
            regarded the way he treated his employees as that of a head of a family. Mr
            Toop's attitude was that "New York knew best" how things should be done. If
            Bernard Madoff, as the chairman and effectively sole owner of MSIL,
            regarded the research as being of value, he would have deferred to that view
            without hesitation. That would not be a dereliction of the duty to exercise
            independent judgment, but a legitimate recognition that Bernard Madoff's skill
            and experience put him in a better position to make that judgment than Mr
            Toop.

        (4) So far as he was aware, the payments were openly recorded in the books and
            their accounting treatment was sanctioned by the audit team from KPMG.
            There was no secrecy about the payments within MSIL. All the London
            directors (except perhaps Mr Stevenson) were aware of them. None of his
            fellow directors and no one in the compliance department expressed the view
            to him at any time that the payments were improper, illegitimate or other than
            in the best interests of MSIL. He was entitled to defer to their views.

      (5) The services provided by Mrs Kohn could honestly and reasonably be perceived as of benefit to MSIL in a number of ways:

          (a) Mrs Kohn was introducing Bernard Madoff to leading figures in the European financial services industry. There was some intangible benefit to MSIL, the company which bore his name, from this PR activity.

          (b) Bernard Madoff wanted to grow the London business, as he explained to the London directors at a dinner on 4 October 1993, by raising its profile in the media and with contacts. A market making business needs clients so that any introductions capable of leading to potential new clients would be of benefit.

          (c) The written research was of value to MSIL. On a conventional basis the value of the research which was relevant to MSIL's day to day trading activity in Phase 4 is to be measured in thousands to low tens of thousands of dollars per annum. The value of the research for management decision making at a more strategic level was real but immeasurable.

          (d) The New York and London businesses were closely intertwined. A benefit received only in New York could honestly and reasonably be perceived as being of indirect benefit to MSIL in London.

245.    I therefore conclude that Mr Toop was not in breach of his duty to act in what he considered in good faith to be the interests of MSIL.

*Andrew Madoff and Mark Madoff*

246.    Andrew and Mark Madoff were both appointed directors of MSIL by Bernard Madoff on 31 December 1998 when they became non voting shareholders.

247.    The Claimant alleges that they were at all material times aware of the MSIL Kohn Payments. This is denied on behalf of each of them. In resolving this issue I am hampered by the fact that neither gave evidence before me. Mark Madoff took his life three days after these proceedings were issued. Andrew Madoff provided a signed witness statement but was not well enough to give oral evidence even by video link.

248.    In his witness statement, Andrew Madoff states that he did not know of the MSIL Kohn Payments or the provision of research to MSIL at any time before these proceedings; and that he believes that his brother Mark was equally unaware of them. I find myself unable to accept that evidence for the following principal reasons:

      (1) Mr Purcell described both Mark and Andrew Madoff as very diligent. Mr Flax described Andrew Madoff as very much on the ball. Each brother occupied a position of considerable responsibility in BLMIS' successful proprietary trading and market making business and each must have been financially capable and sophisticated. They were not passive directors of MSIL. They regularly attended board meetings. Andrew Madoff was particularly involved in overseeing the transition to the proprietary trading business between 2000 and 2003 before he became ill with cancer, and again thereafter from 2004. Such was his involvement that Mr Raven thought of him as MSIL's deputy

chairman. Mark Madoff took over this role for a period in 2003 and again from late 2006. In early 2006 Andrew Madoff was involved in a compliance review during which the impact of MiFID was considered.

(2) On 16 January 2001, Mr Flax sent to Mark Madoff by email a one page memorandum setting out the net amount due to MSIL at 31 December 2000. It included the results of the Q accounts, and a number of expenses which fell to be deducted. In the second category there was a line stating "Settling the Erko bill in respect of 1999 $187,500", a line stating "Increase in Bernard L Madoff's loan $1,215,967.27 (of which $750,000 relates to Erko)" and two lines each of which stated "Market making information fees used to settle Erko charges in 2000 $750,000". According to Mr Flax, it was sent to Mark Madoff for the purposes of his being able to work out the bonuses to be paid to the London traders. Although the most important aspect of it for these purposes was the part setting out the results of the Q accounts, in calculating the bonuses he would have to have stripped out the expenses. His response on 29 January 2001 demonstrates that he had focussed not only on the Q account results but also on at least one item of the expenses. It seems to me improbable that Mark Madoff would not have noticed the reference to Erko in four separate places referring to substantial sums. If he did not already understand the reference he would have inquired.

(3) Andrew Madoff's evidence is that he took an interest in the trading performance and profitability of MSIL. In the annual accounts with which he was concerned as a director for his first four years (1998-2001) the operating profit was identified in the profit and loss account as comprising mainly fees receivable less administrative expenses. He would therefore have had to focus on the administrative expenses, which would have revealed to him that there were substantial expenses not explained in the notes. Moreover he would have been bound to understand that the income booked as "fees receivable" was greater than was accounted for by the return of profit on the Q accounts. An interest in the profitability of MSIL would likely have involved understanding the Erko payments and their funding as an element on each side of the profit and loss account.

(4) That he did focus on the expenses of MSIL is confirmed by paragraphs 42 and 62 of his witness statement in which he explains that he was aware from discussions with his father and Mr Raven what salaries were paid and of the larger overhead expenses such as rent; that he knew from this that the traders' profits were covering expenses; and that he remonstrated with his father that the amount of rent being paid for MSIL's Berkeley Square offices was too high. If he focussed on the amount of the rent, the substantial size of the MSIL Kohn Payments is such as equally to have attracted his attention.

(5) Whilst Mr Raven and Mr Flax said that they did not recall any discussion with either brother about the payments, Mr Flax said in evidence that he thought all signatories to the board resolution dated 29 March 2005, which included both Madoff brothers, knew that substantial payments were being made to Mrs Kohn, although he was not asked about the basis for this belief.

(6) As I conclude below, the payments were known to Peter Madoff, to whom Andrew and Mark reported at BLMIS. I can see no reason, and none was advanced, as to why he should have concealed their existence from his nephews. Their size made them a likely topic for discussion between the three who all took an active role in MSIL's governance.

(7) Mr Raven's evidence was that he would have been surprised if Bernard Madoff had not discussed the payments and their funding with his sons. Andrew Madoff said in his witness statement that he believed that his father hid requests for payment of funds to cover the payments from him and his brother because he was aware that the brothers would object to them. This does not sit easily with the fact that the payments and their funding were no secret amongst all the London directors of MSIL or the auditors. It seems to me improbable that Bernard Madoff would have expected to keep the payments and their funding secret from his sons when they were such a large part of either side of the profit and loss account of MSIL. After all he made his sons directors of MSIL and knew they were playing an active part in its governance.

(8) If either of Andrew or Mark Madoff became aware of the MSIL Kohn Payments each would have told the other. They spent their entire working life together at BLMIS and saw each other most days. The payments were substantial and beyond MSIL's resources without funding (which Andrew Madoff was told by his father came from the latter's personal wealth). The payments would very likely have given rise to comment and discussion between the brothers.

249.   I find therefore that each of Andrew and Mark Madoff were aware of the payments and their funding from at least mid 2000 onwards.

250.   Did the brothers think that the payments were in the best interests of MSIL? The Claimant submitted that the logical inference was that they did not, else there would have been evidence put forward saying so. The alternative explanation, which I find more probable, is that they did not specifically address their minds to the question, knowing that the payments were essentially cash neutral for MSIL and that the expense was that of their father or BLMIS. My assessment is that Andrew Madoff has sought to distance himself and his brother from the payments as a defensive tactic, not only for the purpose of these proceedings but in the light of civil claims brought against them in the US. I do not draw the inference that he has done so because he or his brother believed at the time that the payments were not in MSIL's interests.

251.   I have not overlooked the assertion in paragraph 57 of Andrew Madoff's witness statement that Bernard Madoff hid the payments and funding from them because "he was aware that if [they] knew about these payments [they] would object to them". The assertion that Bernard Madoff was aware that they would have objected to the payments was put forward as an explanation for the brothers' ignorance of the payments, which I have rejected. Moreover it is an explanation put forward with the benefit of hindsight as an assessment of Bernard Madoff's state of mind, rather than an assertion that Bernard Madoff's perception was correct and that they would in fact have objected. But in any event, it would be wrong to equate an objection to the payments with a belief that they were not in MSIL's interests. Objection would have

been equally consistent with a belief that they were not in the interests of BLMIS or Bernard Madoff as the party on whom the brothers knew the expense was falling, and consistent with their having taken no specific view as to MSIL's independent interests.  I conclude that they, like Mr Toop, reasonably assumed that there was nothing wrong with MSIL making the payments, but did not address their mind to the specific question whether or how they conferred any benefit on MSIL as opposed to BLMIS.

252.    The question therefore arises whether an honest and intelligent man in the position of each brother could reasonably have believed that the payments were in the interests of the company.  The answer is that he could, for the following reasons:

(1) The fact that the payments cost MSIL nothing in commercial terms and involved no significant foreseeable risk, means that the perceived value of the benefit to MSIL need only have been relatively slight for the brothers to hold the honest perception that they were in MSIL's interests.

(2) Provided the company was solvent, and not doing anything contrary to the Companies Acts, or otherwise unlawful, as was the apparent position at the time, a director who honestly believed that a payment was in accordance with the wishes of Bernard Madoff could treat that alone as a reason for believing the payment was in the interests of MSIL.

(3) The brothers held Bernard Madoff in the high respect which the latter's record, reputation and position as paterfamilias commanded.  If Bernard Madoff, as the chairman and effectively sole owner of MSIL, regarded the research as being of value, they would ultimately have deferred to his view even had they raised objections.  That would not be a dereliction of the duty to exercise independent judgment, but a legitimate recognition that Bernard Madoff's position equipped him to know what was best for the company, and put him in a better position to make that judgment than the brothers.

(4) There was no secrecy about the payments within MSIL.  So far as the brothers were aware, the payments were openly recorded in the books and their accounting treatment was sanctioned by the audit team from KPMG.  They would have presumed that all the London directors were aware of them.  None of their fellow directors and no one in the compliance department expressed the view to them at any time that the payments were improper, illegitimate or other than in the best interests of MSIL.  The brothers were entitled to look to the English directors, MSIL's compliance personnel, and MSIL's auditors, all operating in London, to alert them to any impropriety in an English company being used as the conduit for the payments.  They were entitled to defer to the views of their fellow directors in this respect.

(5) The services provided by Mrs Kohn could honestly and reasonably be perceived as of benefit to MSIL in a number of ways:

(a) Mrs Kohn was introducing Bernard Madoff to leading figures in the European financial services industry.  There was some intangible benefit to MSIL, the company which bore his name, from this PR activity.

(b) Bernard Madoff wanted to grow the London business, as he explained to the London directors at a dinner on 4 October 1993, by raising its profile in the media and with contacts. A market making business needs clients so that any introductions capable of leading to potential new clients would be of benefit.

(c) The written research was of value to MSIL. On a conventional basis the value of the research which was relevant to MSIL's day to day trading activity in Phase 4 is to be measured in thousands to low tens of thousands of dollars per annum. The value of the research for management decision making at a more strategic level was real but immeasurable.

(d) The New York and London businesses were closely intertwined. A benefit received only in New York could honestly and reasonably be perceived as being of indirect benefit to MSIL in London.

253. I therefore conclude that neither Andrew nor Mark Madoff was in breach of his duty to act in what he considered in good faith to be the interests of MSIL.

*Exercising powers for the purposes for which they are conferred*

254. Applying the four stage test:

(1) In this case the relevant power being exercised was the power to apply the company's property to fulfil its contractual obligations. It is important to keep in mind that the conduct which is said to constitute the relevant breach of duty is the making or permitting of the payments. It is not causing MSIL to enter into the contract with the Kohn entities, which none of the Defendant directors did.

(2) The purpose for which the power was conferred was the fulfilment of the company's contractual obligations.

(3) The purpose for which the power was exercised was the fulfilment of MSIL's contractual obligations to make the payments.

(4) Accordingly there was no exercise of a power for a purpose other than that for which it was conferred.

*Unlawful distribution of capital*

255. The Claimant contended that the payments were for no value, or no significant value, to MSIL and were in substance part of a transaction in which the benefit was conferred on Bernard Madoff because the payments were in return for introductions to his investment advisory business. Insofar as that was a benefit to the business of BLMIS, it was a benefit to Bernard Madoff personally as its proprietor, both when unincorporated and when subsequently incorporated with him as its sole shareholder. Mr Clarke submitted that it was not open to the Claimant to rely on Bernard Madoff's status as the shareholder of BLMIS after its incorporation for these purposes because although the pleaded case was wide enough to encompass such an allegation, the argument advanced at the time of seeking permission to amend from Field J was that

the services were for the benefit of Bernard Madoff personally rather than BLMIS. The transcript of the hearing before Field J does not, in my view, support such a submission. The point is open to the Claimant.

256.   The Defendants contended that the short answer to this allegation was that the payments were in fulfilment of contractual obligations of MSIL; as such they were to a third party and in discharge of contractual obligations owed by MSIL, not Bernard Madoff or BLMIS. In my judgment this does not take sufficient account of the need to examine the substance of the transaction. The relevant inquiry is to identify whether the transaction was one in which, viewed through the prism of the knowledge and intentions of the protagonists at the time, the payments were made to confer a substantial benefit on Bernard Madoff; if contracting in the name of MSIL was merely part of the transactional structure and the benefit was intended to be conferred not on MSIL but on Bernard Madoff, the use of MSIL as the contracting party would be merely a matter of form rather than substance.

257.   If one ignores the funding of the payments, there is considerable force in the Claimant's submission that the substance of the arrangement was one in which there was payment by MSIL for what were substantially, although not exclusively, benefits to BLMIS rather than MSIL; and that such benefits were for MSIL's shareholder, Bernard Madoff as proprietor of BLMIS. Where a company makes payments to discharge a liability which is in form that of the company but in substance a contractual obligation to pay for benefits to be received not by the company but by the shareholder, that may readily be treated as a distribution to the shareholder.

258.   But one cannot ignore the funding of the payments by BLMIS. To my mind such funding is fatal to this aspect of the Claimant's case for two reasons.

259.   If the matter is looked at as one of substance, rather than form, the relevant transaction is not merely the payment out by MSIL in each case. The relevant transaction is a payment which was matched by a donation of capital by BLMIS. It was either specifically funded in advance for that purpose; or it was funded in advance by a generic expenses payment which was intended to be sufficient so as to be used in part for that purpose; or it was funded by reimbursement in circumstances where there was a reasonable and legitimate expectation, always fulfilled, that such reimbursement would occur. Even if one assumes for these purposes that the services for which the payments were made conferred no benefit on MSIL, and that the beneficiary of the services for which payment was being made was solely BLMIS, and therefore indirectly Bernard Madoff as its proprietor, the payments were reasonably expected to be, and were in fact, cash neutral for MSIL because BLMIS was funding them. Even on the Claimant's case, the payments by MSIL were not to confer any net economic benefit on BLMIS or Bernard Madoff personally, because it was an integral part of the arrangements, at least as understood by Bernard Madoff and the London directors, that the payments had been or would be matched by funds from BLMIS. If the payments to Mrs Kohn's recipient companies are to be regarded as for Bernard Madoff's personal benefit by virtue of being paid for benefits enjoyed by BLMIS of which he was proprietor (in its unincorporated and incorporated form), in my view the funding is equally to be regarded as made by him in the same capacity. In substance there was no distribution of anything from MSIL in the direction of Bernard Madoff or BLMIS, and there was never expected or intended to be by any director or shareholder of MSIL.

260.   If Company A wishes to pay for services it is to receive from a third party by donating capital to its wholly owned subsidiary, Company B to pay the third party for the services, can it really be said that the substance of the transaction when Company B pays the third party for the services is that Company B is distributing capital to its shareholder, Company A? Where there is such funding in advance for this purpose, this seems to me unarguable (I say nothing about cases where the funding is not by donation of capital but is by way of loan where Company B assumes a concomitant liability to repay Company A). Where there is an arrangement for subsequent reimbursement, rather than prior funding, the position may not always be so clear. I would readily accept that there may be cases in which a mere hope or expectation of subsequent reimbursement would not prevent a payment being an unlawful distribution at the time it was made; it may be a distribution of capital with the company assuming a risk of the hoped for reimbursement not materialising. All will depend upon the facts of each case. But so far as this case is concerned, the fact that some part of the funding was by way of reimbursement is not sufficient to make the prior payment a distribution of capital because:

(1)   The Claimant has not sought to identify or quantify what payments fall into this category of subsequent reimbursement rather than prior funding; they have therefore failed to establish any payment as having been the subject of subsequent reimbursement. This may be because any such payment might not in any event qualify as a distribution of capital: if there was no need for prior funding it may have been because MSIL was able to make the payment out of distributable profits.

(2)   By the time payments started to be made without prior funding, there was an established track record of BLMIS funding the payments and an understanding that BLMIS would continue to do so. It was unthinkable to all involved that Bernard Madoff would leave MSIL out of pocket for these large payments so as to risk the solvency and reputation of the company bearing his name, and he never did so. The arrangement between the parties would have given rise at the least to a confident expectation of subsequent reimbursement, reasonably held and always fulfilled; it would probably have amounted to a contractual commitment. In the circumstances of this case I would treat such an arrangement for reimbursement as sufficient to prevent the benefits of the services for which payments were being made as being distributions to Bernard Madoff.

261.   The second reason why in my judgment the funding is fatal to this aspect of MSIL's case is that once it is taken into account, it is legitimate to treat the funded discharge of MSIL's contractual liability as being in substance, as well as form, for a concomitant benefit conferred on MSIL. There was some benefit to MSIL in the services for which the payments were being made. It does not need to have been very great when the substance of the arrangement was that the payments would cost MSIL nothing.

262.   I have not overlooked MSIL's case that funding by BLMIS came from stolen monies so as to give rise to an immediate right in BLMIS to repayment from MSIL, with the result that the funding was ineffective and should be ignored. However this involves invoking an illegitimate element of hindsight into the characterisation of the transaction. The transaction falls to be characterised by reference to the knowledge

and intentions of the protagonists at the time. Neither Bernard Madoff nor the London directors knew or intended that the funding should be repayable. Moreover I reject the argument that the funding falls to be repaid to BLMIS for the reasons explained below when addressing the *Duomatic* defence.

*Failure to exercise reasonable skill and care*

263.   In the case of Mr Raven and Mr Flax I have concluded that they honestly believed that the payments were in the interests of MSIL. Their belief was reasonable for the reasons explained above. There was no failure to exercise reasonable skill and care in relation to the payments or their funding.

264.   In the case of Mr Toop and the Madoff brothers I have concluded that they failed to address their minds to the question whether the payments were in the interests of MSIL. This was a breach of their duty to exercise reasonable skill and care.

**(10) MSIL Kohn payments: the directors' *Duomatic* defence**

265.   The Defendant directors relied upon what is commonly known as the ***Duomatic*** principle, which takes its name from the decision in ***In re Duomatic Ltd*** [1969] 2 Ch 365. In that case Buckley J said at 373:

> "where it can be shown that all shareholders who have a right to attend and vote at a general meeting of the company assent to some matter which a general meeting of the company could carry into effect, that assent is as binding as a resolution in general meeting would be."

266.   Neuberger J summarised the principle in the following terms in ***EIC Services Ltd v Phipps*** [2003] 1 WLR 2360 at [122]:

> "The essence of the ***Duomatic*** principle, as I see it, is that, where the articles of a company require a course to be approved by a group of shareholders at a general meeting, that requirement can be avoided if all members of the group, being aware of the relevant facts, either give their approval to that course, or so conduct themselves as to make it inequitable for them to deny that they have given their approval. Whether the approval is given in advance or after the event, whether it is characterised as agreement, ratification, waiver, or estoppel, and whether members of the group give their consent in different ways at different times, does not matter."

267.   As Lawton LJ explained in ***Multinational Gas v Multinational Services*** [1983] Ch 258, 269E, where such approval is given to acts of a director, the approval precludes the company asserting any liability against the director because the adoption of the director's acts by the shareholders in agreement with each other makes the director's acts the acts of the company itself.

268.   It follows that the ***Duomatic*** principle does not permit shareholders to do informally what they could not have done formally by way of written resolution or at a meeting:

*Re New Cedos Engineering Co Ltd* [1994] 1 BCLC 797, 814g-h; *Atlas Wright (Europe) Ltd v Wright* [1999] BCC 163, 174G-H. Accordingly the principle can not apply to relieve the directors of liability in respect of transactions which are ultra vires in either the narrow or the wider sense in which the expression is used (see *Rolled Steel* [1986] Ch 246 at 276-278, 302-3). Therefore this defence would not be capable of applying to breaches which amounted to unlawful payment of dividends (see *Aveling Barford* at 630-631, 632; *Secretary of State for Business Innovation and Skills v Doffman* [2011] 2 BCLC 541 at [41]). Nor can it provide a defence where there has been the exercise of powers for an improper purpose: *Rolled Steel* at 277C. In each case the shareholders in general meeting could not lawfully do that which they have approved the directors in doing. In the current case the principle would therefore only be of potential application to breaches by the directors of their duty to act in what they considered to be the interests of the company, or their duty to exercise reasonable care skill and diligence.

269. The Claimant's first riposte is that there was no unanimous shareholder approval because at all material times one voting share was held by Peter Madoff and he neither knew of the payments nor approved them. The Claimant had sued Peter Madoff as the Sixth Defendant, and until reamendment of its Particulars of Claim on 7 May 2013, a little over a month before trial, it was the Claimant's pleaded case that Peter Madoff did know of the MSIL Kohn Payments. But having discontinued against him on 2 April 2013, the Claimant put in evidence a brief witness statement from him in which he denied any knowledge of the payments. He was unavailable to attend the hearing but arrangements were made for him to be cross examined by videolink from the penitentiary in the United States where he is serving his 10 year prison sentence. He chose to invoke the Fifth Amendment in response to almost every question asked, even where inappropriate, such that he simply refused to allow any investigation and testing of his evidence by cross examination.

270. None of the other Defendant directors who gave evidence to me sought to suggest that they had had any conversation with Peter Madoff from which it was apparent that he knew of the payments (another indication of their integrity since such a conversation could easily and plausibly have been invented in support of their case). Nevertheless I have little hesitation in concluding that he was aware of the payments and approved them for the following reasons:

   (1) Mr Flax sent a memorandum to Bernard Madoff and Peter Madoff on 17 December 1993 which included the following: "I expect a bill from Erko for the 4th quarter. It usually arrives after the month-end, and I normally accrue the amount due and the fees receivable to cover it".

   (2) Mr Flax sent a memorandum to Bernard Madoff and Peter Madoff on 18 January 1994 which referred to an amount due to Erko of $51,650 having been accrued in the accounts.

   (3) The memorandum attached a spreadsheet detailing the remittances from BLMIS to MSIL in 1993. The spreadsheet expressly referred in four separate places to Erko payments or Erko funding.

   (4) Peter Madoff participated in arrangements for meetings with Mrs Kohn or those whom she introduced.

(5) Peter Madoff headed BLMIS' proprietary trading and market making business and must have been a capable and sophisticated financial operator. He was a director of MSIL throughout the relevant period, from 16 March 1983, shortly after its incorporation, until December 2008. He participated in board meetings by phone or video conferencing, or occasionally in person. He became an internal auditor of MSIL in around 2006. It would have been apparent to him from the annual accounts that there were considerable administrative expenses in the profit and loss account total which were not explained in the notes, of which a major element was commonly the MSIL Kohn Payments. He is likely to have taken an interest in the profitability of MSIL, and any interest in the profitability of MSIL is likely to have involved understanding the MSIL Kohn Payments and their funding as an element on each side of the profit and loss account.

(6) As I have concluded above, the payments were known to Andrew and Mark Madoff who reported to him at BLMIS. I can see no reason, and none was advanced, as to why they should have concealed them from their uncle and boss. The size of the payments made them a likely topic of conversation for the three men who were actively involved in the governance of MSIL.

(7) Mr Raven's evidence was that he would have been surprised if Bernard Madoff had not discussed the payments and their funding with his brother. I can see no reason for him not doing so. It seems to me improbable that Bernard Madoff would have expected to keep the payments and their funding secret from his brother when they were such a large part of either side of the profit and loss account of MSIL and were no secret in London.

(8) There is nothing to suggest that Peter Madoff objected to the payments or their funding. If, as I conclude, he was aware of the MSIL Kohn payments from an early stage, it is readily to be inferred that he approved them.

271. The Claimant's second riposte is that the *Duomatic* principle is inapplicable because at all times MSIL was insolvent or of doubtful solvency. In such circumstances the principle has no application because the interests of creditors "intrude" such that unanimous shareholder approval is no longer sufficient; it is in a practical sense the creditors' assets and not the shareholders' assets which, through the medium of the company, are under the management of the directors, and the interests of the company are in reality the interests of existing creditors alone: see *Brady v Brady* (1987) 3 BCC 535, 552 per Nourse LJ; *West Mercia Safetywear Ltd v Dodd* (1988) 4 BCC 30, 33 per Dillon LJ, approving a dictum of Street CJ in *Kinsela v Russell Kinsela Pty Ltd* [1986] 4 NSWLR 722, 730; *Facia Footwear v Hinchcliffe* [1998] 1 BCLC. 218, 228b per Sir Richard Scott V-C; *Re MDA Investment Management Ltd* [2004] 1 BCLC 217, per Park J at [70]; *Ultraframe Ltd v Fielding* [2005] EWHC 1638 (Ch), at [1304] per Lewison J.

272. On behalf of Andrew and Mark Madoff it was contended that the *Duomatic* principle remained applicable if the directors honestly and reasonably believed the company to be solvent, notwithstanding that with the benefit of hindsight it could be shown to be insolvent or of doubtful solvency. I was not attracted to this submission. I am inclined to think that what matters is the solvency of the company objectively ascertained, an approach supported by principle and the authority of *Lexi v Luqman*

*(No 1)* [2007] EWHC 2652 (Ch) and ***Tradepower (Holdings) Ltd v Tradepower (Hong Kong) Ltd*** [2010] 1 HKC 380, a decision of the Hong Kong Court of Final Appeal of which Lord Walker of Gestingthorpe was a member. However since the point does not arise for decision I would prefer to express no concluded view upon it. As a matter of fact, all the directors did at all material times reasonably believe that MSIL was solvent.

273.    The Claimant's allegation of insolvency proceeded in three stages:

> (1) All, or almost all, the payments from BLMIS to MSIL were derived from money stolen by Bernard Madoff from customers as part of his Ponzi scheme.

> (2) They were for that reason immediately repayable by MSIL to BLMIS from the moment of receipt.

> (3) If the payments from BLMIS were at all times repayable to BLMIS, MSIL was at all times balance sheet insolvent, and unable to pay its debts (including the obligation to repay BLMIS) when they fell due.

274.    MSIL's records evidence 264 payments by BLMIS to MSIL over the relevant period, totalling a little over US$607 million. The major categories making up this total were:

> (1) "fees receivable" (which in Phase 3 included the trading profits on the Q accounts);

> (2) payments made to MSIL by way of the subordinated loans in 2000 and 2001 of US$62.5 million;

> (3) cash payments purporting to be proceeds of T-Bill trading carried out by BLMIS on behalf of MSIL between 2005 and 2008, totalling about US$330 million.

> (4) injections of capital of about US$200 million, including US$100 million on 26 June 2007 (which includes the US$62.5 million of loans converted to share capital on that date plus a further capital injection of US$37.5 million).

275.    It is convenient to start with stage three of the Claimant's argument, because apart from the allegation that the BLMIS payments were repayable, there is no doubt that the company was not merely solvent but sufficiently highly capitalised that a large proportion of the payments needs to be attributable to stolen funds for the argument to be engaged. Exactly how much was addressed in the evidence of Mr Wreford who was asked to assume that all payments received by BLMIS were immediately repayable, alternatively that all those other than the return of profits on the Q accounts were immediately repayable.

276.    This analysis revealed that the net asset shortfall (i.e. balance sheet insolvency) on this hypothesis was as follows (note these figures are in £ Sterling):

> (1) If the Q account profits fall to be treated as legitimate payments which are not refundable:

    (a) The net asset shortfall between 1992 and 1999 varied between about £1 million and £4 million;

    (b) In 2000 and 2001 it was less than £1 million;

    (c) From 2002 to 2004 it was less than £5 million;

    (d) From 2005 it sunk to a maximum of a little over £10 million before becoming about £8 million.

  (2) If the Q account profits fall to be treated as illegitimate payments which are refundable:

    (a) The net asset shortfall between 1992 and 2004 deteriorated year on year in most years from about £3 million to about £20 million;

    (b) In 2005 it sunk to a maximum of about £28 million before returning to about £23 million.

277. As to the first stage of the argument, Ms Collura, a forensic consultant, conducted an exercise to identify the source of these payments, which from the records of BLMIS totalled about US$609.2 million. Her evidence was that of the US$609.2 million:

  (1) About US$516.5 million came directly from the 703 account and two other accounts which were in turn wholly funded by the 703 account. An analysis of the activity into and out of the 703 account between December 1998 and December 2008 (no bank records were available for the earlier period) revealed inflows of approximately US$120 billion into that account, of which Ms Collura said in her witness statement approximately 97% related to BLMIS investment advisory business customer deposits. In her evidence she corrected that to say that approximately 97% of the payments into the 703 account were *directly* from such customer deposits; and that the majority of the c. 3% balance was also *indirectly* derived from such deposits because it represented income from investments of funds in the account which had themselves derived from the customer deposits. She quantified such income as "the majority, you know, 99% of the other inflows" (i.e. of the approximately 3% balance). These were clearly not exact calculations which she had done. If the 99% and 97% figures are used, this would leave some US$36 million of the 703 account funds as representing monies not emanating from customer deposits (1% x 3% x US$120 billion). She made clear that she was not suggesting that the 703 account received no funds other than those emanating directly or indirectly from customer deposits.

  (2) Some US$35 million came from six bank accounts used by the BLMIS proprietary trading business. Between December 1998 and December 2008 these accounts in turn had received some US$815 million directly or indirectly from investment advisory business customer deposit accounts. The proprietary trading business and market making business had also, of course, made trading profits. The gross inflows into the main account at Bank of New York (the 621 account) were approximately US$21.6 billion, the net inflows being approximately US$1.6 billion after netting outflows such as trading

related transactions. Accordingly the source of the US$35 million could not be attributed simply to monies derived from the Ponzi scheme.

(3) Approximately US$57.6 million came from four accounts which Ms Collura categorised as "BLMIS/Madoff personal accounts". Three of these, in Bernard Madoff's personal name, were wholly funded from investment advisory business customer deposit accounts. The other, in the name of BLMIS, was an account at Bear Stearns which Ms Collura described as "primarily funded" from investment advisory business customer deposit accounts. She described these four accounts as having received "billions of dollars" from the investment advisory business customer deposit accounts but did not attempt to quantify what element of the Bear Stearns account was funded otherwise.

278. Ms Collura had been working full time on the investigation of BLMIS' records for the purposes of the liquidation for almost five years, as part of a team varying in number between 20 and 50. As a result she was as well placed as anyone to address the source within BLMIS of the payments to MSIL. But even with such advantages, there was a good deal of uncertainty and imprecision as to the extent to which funds received by MSIL could be traced to customer deposits in the investment advisory business. On the whole, the analysis was presented by reference to totals and sub totals rather than as a tracing exercise for each individual BLMIS/MSIL payment. There was no attempt to plot the position temporally to fit with the net asset shortfall identified by Mr Wreford from time to time. This may have been due to some extent to the extensive intermingling of funds in numerous bank accounts, the sheer volume of the transactions within BLMIS and of the 264 payments by BLMIS to MSIL, and the length of time over which the transactions occurred, quite apart from the absence of some bank records. But it was clear that the forensic analysis undertaken by the investigatory team over 5 years had been very detailed indeed. I infer that if the MSIL payments could have been traced any more securely to the stolen monies, Ms Collura would have done so.

279. In these circumstances I am satisfied that at least US$71 million (the total of US$36m in (1) and US$35m in (2) above), and quite possibly considerably more, of the payments which went from BLMIS to MSIL can not be traced back even indirectly to customer deposits in the BLMIS investment advisory business and therefore treated as stolen monies. This is greater than the greatest net asset shortfall identified by Mr Wreford at any stage, even assuming that the Q account profits would fall to be repaid. Even assuming that the Claimant is correct in its contention at stage two that any sums derived from the fraudulent Ponzi scheme were immediately repayable to BLMIS or Bernard Madoff, these figures suggest that at no time was MSIL insolvent.

280. In fact in order for the insolvency argument to be engaged, it would have required all but a few million pounds of the funding to be shown to be derived from the fraudulent investment advisory business (which a fortiori was not the case); and on any view there was no insolvency after 2005 whatever the source of payments to MSIL by BLMIS. This is because:

(1) The Q account profits were earned by MSIL by its agency trading and the payment of those profits by BLMIS from tainted funds, unknown to MSIL, would not render them repayable. They were paid for good consideration. On

this basis the net asset shortfall was less than £5 million for all years until 2005.

(2) A large part of the payments said to be repayable from 2005 comprise the US$330 million or so receipts from the Treasury Bill trading in 2005 to 2008. These were, so far as MSIL was concerned, arms length transactions with BLMIS under which trading profits were earned. Unknown to MSIL (other than Bernard Madoff), BLMIS had not in fact purchased the T Bills which it purported to have purchased and for which it was paid by MSIL. But that would not render the receipts refundable, even had they been funded in full from proceeds of the Ponzi scheme. Moreover the Claimant's inclusion of some US$330 million for these payments ignores the fact that MSIL paid to BLMIS some US$487.7 million for the purported purchase of the T Bills. If the transactions are to be treated as void, BLMIS would have to give credit for the US$487.7 million.

281.   I have been able to reach these conclusions, despite the inherent difficulties in the forensic evidence, without resort to the burden of proof. But had I had to do so, I would have held that the burden was one which the Claimant had failed to discharge. The legal burden of proving solvency generally lies on the party invoking the *Duomatic* principle: see *Lexi v Luqman (No 1)* [2007] EWHC 2652 (Ch) per Briggs J at [193]. But the evidential burden falls on the Claimant in this case to establish the matters it relies upon as demonstrating insolvency. That is so for several reasons. According to its accounts and records, MSIL was solvent, and indeed highly capitalised. It was only insolvent if it owed debts to BLMIS which at the time BLMIS never asserted. Since the Claimant asserts the existence of such debts, it is for the Claimant to prove that which it asserts. Moreover the burden of proving that the funding came from stolen monies would have fallen on BLMIS in any claim against MSIL it would notionally have made for repayment of funding; equally it must fall on MSIL vis a vis the directors if MSIL seeks to establish that liability. If the Court were left in doubt as to whether the payments were funded from stolen monies, it could not conclude that BLMIS would have had a claim that the funding was repayable and accordingly there would be no basis for finding insolvency. Thirdly, in reality it was only the Claimant who had the material and resources to make such an analysis of the source of funding. It was in a position to do so because it had the assistance of the SIPA Trustee of BLMIS, for whose benefit these proceedings are being brought, and because part at least of such an analysis was being conducted for the purposes of the liquidations. The enormous volume of material from BLMIS' accounts and records was not available for scrutiny or analysis by the Defendants, for whom the cost of analysis would not in any event have been proportionate.

282.   Moreover, I would in any event reject the Claimant's insolvency argument at stage two also. The Claimant argued that MSIL was under a restitutionary obligation to return stolen monies either at common law as money had and received, or in equivalent circumstances in equity, relying on *Barros Mattos Junior v MacDaniels Ltd* [2004] EWHC 1188 (Ch), [2005] 1 WLR 247, at [15] per Laddie J; *Banque Belge v Hambrouck* [1921] 1 KB 321, 355-356 per Atkin LJ; *Lipkin Gorman v Karpnale Ltd* [1991] 2 AC 548 at 566E and at 565H-566A per Lord Templeman. MSIL would have a defence of change of position, however, by reason of its use of

the funds for MSIL's business. This would be unaffected by any knowledge on the part of Bernard Madoff that the funds were stolen. The relevant persons whose state of mind is here relevant are those responsible for changing MSIL's position, namely the innocent directors in London causing MSIL to make the payments. I also have some doubt whether the sums could in any event be repayable to BLMIS, rather than those from whom they had been stolen, although that would not be fatal to the insolvency issue, which depends upon there being an obligation for their repayment irrespective of the person or entity to whom it was owed.

283.   The Claimant had an alternative argument. It was that even if MSIL was not balance sheet insolvent at any time, nevertheless MSIL was dependent on BLMIS for funding, such funding was dependent on the continuation of the Ponzi scheme, and a business which is dependent for its survival on stolen money is obviously in a state of grave financial peril. I am unpersuaded that this would take MSIL outside the scope of the *Duomatic* principle. If MSIL had been denied funding by BLMIS, it would have ceased trading, save perhaps towards the very end of its history; but it would not have been insolvent. Upon such cessation it would have been able to pay its debts in full in any liquidation. A risk of ceasing to trade and going into solvent liquidation is not to be equated with insolvency. A subsidiary is not to be regarded as insolvent merely because its future activity depends upon the support of its parent. It is irrelevant for these purposes whether the risk of funding drying up arises from the whim of the funder or circumstances which would preclude its ability to continue the funding. What matters for the *Duomatic* principle is the current and foreseeable solvency of the company, for it is only if such solvency is doubtful that the interests of creditors intrude.

284.   The Claimant's final riposte to the Defendants' reliance on the *Duomatic* principle was that in order for shareholders to be able to ratify a transaction, the transaction must be bona fide or honest, relying on the dictum of Sir Andrew Morritt C. in *Re Bowthorpe Holdings Ltd* [2003] 1 BCLC 226 at [50] and the authorities there cited. It was contended that the Defendants cannot satisfy that requirement in this case because (a) the directors' own acts were dishonest and (b) Bernard Madoff was involved in a fraud and not acting bona fide: he consented to the application of MSIL's corporate property in making the payments in order to serve his own ends of covering up his fraud and laundering the proceeds of that fraud.

285.   This argument needs to be unpicked to identify the legal and factual issues involved. I have found that none of the director Defendants was acting other than honestly and in good faith. The legal issue is therefore whether the *Duomatic* principle is inapplicable where the directors are acting honestly but the shareholders approve the transaction acting in bad faith, in this case for the dishonest purposes of furthering a fraud. The factual issues depend upon the state of mind and intentions of the voting shareholders. The bad faith and fraudulent purpose alleged against them in MSIL's opening and closing submissions, by reference to paragraph 68 of the Re-amended Particulars of Claim, is that Bernard Madoff was using MSIL as a vehicle for money laundering the proceeds of his fraudulent Ponzi Scheme. The allegation is not that Bernard Madoff was acting fraudulently or in bad faith because the services for which the payments were being made were to assist the success of his investment advisory business which was a fraud. It is that the payments themselves were approved as a mechanism for concealing the proceeds of the fraud. That seems to me to require the

Claimant to establish that the funding for the MSIL Kohn payments was traceable to the investment advisory business customer deposits; and that both Peter Madoff and Bernard Madoff knew or believed that to be the case. I was not referred to any evidence which established either of these aspects. As I have indicated when considering the solvency of MSIL by reference to the funding of all its payments, the source of the payment is not established as being the Ponzi scheme merely by establishing that it was made from the 703 account, or from the accounts categorised as BLMIS proprietary trading accounts. The untainted amount feeding the source accounts from which the funding of the payments came exceeds the total of all the MSIL Kohn Payments of some US$27m. Still less was there any evidence about Bernard Madoff's understanding of the source of funding. Moreover there was no evidence, or indeed allegation, that Peter Madoff was aware of the Ponzi scheme. This is to my mind fatal to this aspect of the Claimant's argument.

286.   It is therefore unnecessary for me to express a concluded view on the legal issue, and I would prefer not to do so in the light of the fact that the arguments were not fully developed.

287.   My conclusion, therefore, on the *Duomatic* issue is that, insofar as making or permitting the MSIL Kohn payments constituted a breach by the directors of a duty to act in what was perceived to be the interests of the company, or a failure to exercise reasonable care skill and diligence, the transactions were ratified by the unanimous approval of the voting shareholders. Such ratification makes such acts the acts of the company, of which it can make no complaint against the directors, and is a complete defence to such allegations of breach. This applies to the breaches by Mr Toop and the Madoff brothers in failing to address their minds to whether the payments were in the interests of MSIL.

## (11) MSIL Kohn payments: remedy/causation

288.   Having found that the director Defendants were not in actionable breach of duty, the remaining issues of remedy and causation do not arise, but I should address the various arguments and record my relevant findings of fact.

289.   The directors accepted that if the Claimant made good its allegation that the payments were unlawful distributions of capital, the appropriate remedy would be restoration of the loss caused by the payments, but contended that for any other breach of duty the applicable remedy is compensation to the extent that the Claimant can show loss caused by the breach. This requires an investigation into the counterfactual hypothesis of what would have happened had the duty been fulfilled. On behalf of each director it was contended that had he declined to make or permit the payment, Bernard Madoff would simply have replaced him with a compliant director and the payments would have been made in any event.

290.   The Claimant contended that if it established a breach of any fiduciary duty by a director Defendant, the appropriate remedy was restoration of the trust (subject to relief from sanctions in an appropriate case), without inquiry into the counterfactual hypothesis of what would have happened if the duty had been fulfilled. This applied not only to unlawful payments of dividends but to any breach of fiduciary duty

resulting in misapplication of the company's property. On the Claimant's case, such counterfactual inquiry was only necessary for the purposes of its claim for breach of the duty to exercise reasonable care skill and diligence.

291.  I accept the submissions of the Claimant as correctly stating the law where the breach comprises an act of misapplication, rather than an omission. It is well established that the directors of a company are in a similar position in respect of the company's property as trustees (see *JJ Harrison (Properties) Ltd v Harrison* [2002] BCC 729 per Chadwick LJ at [25]) and the basic remedy for a misapplication of company property in breach of fiduciary duty, as with trustees misapplying trust property, is restitution; the liability is not merely to compensate the company for the loss said to have been caused by the breach assessed on a tortious basis: see *Bishopsgate Investment Management Ltd (in liquidation) v Maxwell (No 2)* [1994] 1 WLR 261 per Hoffmann LJ at 265a-266a; *Bairstow v Queens Moat Houses Plc* [2002] BCC 91 per Robert Walker LJ at [49]-[54]; *Re Loquitur* [2003] STC 1394 per Etherton J at [135]-[137]; *In Re Paycheck Services 3* (sup) per Rimer LJ at [96]-[98] and Lord Hope at [46], [48], [49]. There is therefore no room for an inquiry as to whether the transfer would have been made but for the breach or what would have happened had the transfer not been made.

292.  On the other hand where the breach which leads to the misapplication of company property comprises an omission, such as total inactivity, it is necessary for the company to establish what would have happened had the duty been complied with, and that but for the breach the transaction or loss would not have occurred: see *Bishopsgate v Maxwell (No 2)* (sup) at 264c-f; *Lexi Holdings Plc v Luqman No 2* [2008] 2 BCLC 725 per Briggs J at [28], [40] and [2009] BCC 716 per Sir Andrew Morritt C. at [18], [36], [38].

293.  I have concluded that Mr Toop and the Madoff brothers were in breach of their duty to exercise reasonable skill and care by failing to address their minds to the question whether the payments were in the interests of MSIL. This was not causative of any loss. Had they done so they would have concluded that the payments were in the interests of MSIL, and the payments would still have been made.

294.  As to the remaining factual issues, I would have found that, if the directors were under a duty not to make or permit the payments, such a breach by each director was causative of the payments being made. If any of the directors had made clear that he regarded it as improper to make or permit the payments, the probable outcome would have been a collective discussion and in the absence of agreement the taking of legal advice, the upshot of which (on the hypothesis now being considered) would have been that none of the directors should make or permit the payments. In those circumstances the directors would collectively have refused to make or permit the payments. If the directors had collectively refused to continue making the payments, it is likely that Bernard Madoff would not have insisted upon them being routed through MSIL and would have made them from BLMIS, as he did from mid 2007 when he was persuaded by Mr Raven to stop using MSIL. Mr Raven was able to persuade Bernard Madoff to stop using MSIL for the payments by relying on the introduction of MiFID. My assessment is that Bernard Madoff would equally have climbed down if faced with a collective revolt by the directors.

**(12) MSIL Kohn payments: the directors' no loss defence**

295.    The directors rely upon the funding of the payments by BLMIS to argue that MSIL suffered no loss and that accordingly no sums were recoverable for any actionable breaches of duty established against them.  To this the Claimant makes two responses.

296.    The first response is that the payments were made from MSIL's own assets and the obligation of a delinquent director is to restore such assets so that any reimbursement or funding from BLMIS as a third party is irrelevant.

297.    There were two aspects to this argument.  One was that the issue of loss is *legally* irrelevant to the remedy for any breach of fiduciary duty resulting in misapplication of the company's property, which is restoration of the property, subject to relief from sanction.  The Claimant relied upon the authorities to which I have referred in the context of causation, namely *Bairstow v Queens Moat Houses Plc* [2002] BCC 91 per Robert Walker LJ at [49]-[54]; *Re Loquitur* [2003] STC 1394 per Etherton J at [135]-[137]; *In Re Paycheck Services 3* (sup) per Rimer LJ at [96]-[98], Elias LJ at [124] – [125] and Lord Hope at [46], [48], [49].  But these do not seem to me to support the proposition here advanced, so as to require one to ignore any benefit which is received by the company from the very transaction which constitutes the breach.  I address below whether the funding is to be treated as part of the same transaction or is collateral, but as I understood this aspect of the Claimant's argument it was that questions of loss were simply legally irrelevant and that there was an obligation on the delinquent director to pay back to the company the full amount paid away by the company, without further inquiry into the effect of the transaction.  The other aspect of the argument was that the funding by BLMIS is *factually* irrelevant as collateral or subsequent to the breach.

298.    I cannot accept either aspect of this argument.  In the cases referred to, which were unlawful dividend cases, the Court was concerned to emphasise that the obligation of the director as quasi trustee is to restore the trust estate, so that issues of causation and remoteness which would apply to a tortious claim do not arise.  There is therefore no room for an inquiry as to whether the distribution would have been made but for the breach or what would have happened had the distribution not been made.  But they do not compel one to ignore the effect on the company of the transaction comprising the distribution itself.  The measure of a trustee's liability to restore the trust estate is that which is necessary to put the trust estate in the same position as if there had been no breach.  Other than in cases of restoration in specie, this involves restoring the value of the trust estate to the extent that it has been diminished by the breach: see *Lewin on Trusts* 18th edn. 39-09, 39-18 and *Target Holdings Ltd v Redferns* [1996] 1 AC 421, at 432E-H, 433G-H, 434D-G, 435B-C, 436C-D, 437D-E. This requires that there be taken into account the value of any benefit conferred on the trust estate by the transaction which gives rise to the breach.  If a trustee applies trust moneys in the acquisition of an unauthorised investment, he is liable to restore to the trust the amount of the loss incurred on its realisation, not the price of the investment: see *In Re Duckwari (No 2)* [1999] Ch 253, 262; *Knott v. Cottee* (1852) 16 Beav 77. To require restoration of the full price of the investment, without crediting its value, would not be restoration of the trust estate but augmentation.  Thus breaches of trust comprising unauthorised but profitable investments ("judicious" breaches of trust in the famous expression attributed to Selwyn LJ in *Perrins v Bellamy* [1899] 1 Ch 797, 798) give rise to no monetary liability because the benefit to the trust estate exceeds the loss.  The principle does not generally apply to profit and loss which arises from

distinct breaches, but will do so where they can properly be characterised as part of the same transaction: see *Bartlett v Barclays Trust Co (No 1)* [1980] 1 Ch 515 per Brightman J at 538C-E.

299. A similar principle applies in claims for damages in contract and tort, or for equitable compensation: a claimant cannot recover for avoided loss save where the benefit which diminishes or avoids the loss is collateral: *British Westinghouse Co v Underground Railway* [1912] AC 673; *McGregor on Damages* 18th Edn 7-097 to 7-167. The benefit will not be treated as collateral if it is received as a result of the transaction giving rise to the loss: *Smith New Court Securities v Citibank* [1997] AC 254 per Lord Browne-Wilkinson at 266H. The question is whether the breach which caused the loss also caused the benefit, in the sense that the benefit and the loss are part of a single continuous transaction, which is primarily a question of fact in each case: see *Needler Financial Services v Taber* [2002] Lloyd's Rep PN 32 per Sir Andrew Morritt V-C at [24] and *Rubenstein v HSBC Bank Plc* [2012] CLC 747 per Rix LJ at [133]-[136].

300. There is nothing in the authorities upon which MSIL relied which compels a different approach to breaches of duty by a director which result in payment away of the company's assets, even in the case of unlawful dividends. Restoration of the trust estate by a delinquent director should take account of the benefit received by the company from the unlawful transaction which gives rise to the distribution. In the cases relied on there was none. But the same may not always be true. For example purchase of an asset at an overvalue from a shareholder is capable of being categorised as an unlawful dividend; the measure of the director's liability is the overvalue, not the full price paid for the asset which the company has acquired.

301. In this case the funding of the MSIL Kohn Payments was not collateral. When the funding took place in advance of the payment, the funding was for the specific purpose of the payment being made. The payment would not have been made but for the funding, and the funding would not have been provided had the payment not been going to be made. Funding and payment were clearly two aspects of a single transaction. Where the funding came by way of subvention after the payment, the same is equally true. One purpose of the subvention was specifically to make MSIL whole in respect of the payment, and its amount was determined by that which was necessary to render the transaction cash neutral for MSIL.

302. The Claimant relied heavily on the decision of the Court of Appeal in *VTB Capital plc v Nutritek International* [2012] CLC 431. In that case the claimant, VTB alleged that it had been induced to lend money to a defaulting debtor, RAP, by fraudulent misrepresentations for which the defendants were jointly liable. VTB was the English subsidiary of a Russian state owned bank, VTB Moscow, who had lent it the funds to enable it to make the loan to RAP. It was accepted that the fraudulent misrepresentations gave rise to both the loan by VTB to RAP and the loan by VTB Moscow to VTB which funded it; and that VTB would not have been prepared to grant the loan to RAP had it not had a source of funds available to enable it to do so. The Court considered and rejected an argument that the claimant had suffered no loss. Because the issue arose on a jurisdiction challenge by the defendants, the threshold was no more than whether there was a serious issue that the claimant had suffered a loss, but Lloyd LJ, giving the judgment of the Court, expressed himself in language which determined the point. At [110] he identified that the funds borrowed from the

VTB Moscow were, once received, the property of VTB that there was an immediate loss to VTB at the latest when it parted with that property by making the loan to RAP, albeit that the loss became crystallised later.  He went on to say:

> "111. Furthermore, we dismiss the argument that the judge erred in rejecting the submission that the funds that VTB received from VTB Moscow had to be taken into account. Those funds were not a 'benefit received as a result of the transaction' in Lord Browne-Wilkinson's words. They were not a 'benefit'; they were the source of the funding for the loan to RAP, rather than some additional benefit that resulted from the transaction overall and in consequence of the tort of the defendants. That is the type of 'benefit' which we think Lord Browne-Wilkinson had in mind. That analysis reflects what Viscount Haldane stated in *British Westinghouse v Underground Electric* [1912] AC 673 at 689, where he said:
>
>> "... when in the course of his business, he has taken action arising out of the transaction, which action has diminished his loss, the effect in the actual diminution of the loss he has suffered may be taken into account ... The subsequent transaction, if to be taken into account, must be one arising out of the consequences of the breach and in the ordinary course of business. This distinguishes such cases from a quite different class of case illustrated by *Bradburn* ... The reason of that decision was that it was not the accident, but a contract wholly independent of the relation between the plaintiff and the defendant which gave the plaintiff the advantage."
>
> 112. The fact that VTB would not have parted with the money in the first place without being put in funds by VTB Moscow is irrelevant. VTB Moscow's funding, under the separate and distinct Participation Agreement, was the source of VTB's loan to RAP, not the consequence. Moreover, money is not the same as a physical object, which, once lost, might only be the subject of one damages claim (although there can be successive claims in respect of the same object, e.g. in conversion). Logically, the fact that the ultimate source of the funds defrayed by VTB to RAP was another party cannot diminish VTB's loss. Otherwise, if Mr Lazarus' argument were correct, then it would equally follow that VTB would have suffered no loss if the source of the funds advanced to RAP was another, entirely unconnected, third party as opposed to VTB Moscow."

303.   In my judgment there is a critical distinction between the position of VTB and that of MSIL in the current case.  VTB's funding was by way of a loan under which it undertook a concomitant liability to repay VTB Moscow.  The relationship between them was not that of agency or trusteeship but one of debtor and creditor: see [110]. The funding was not therefore a benefit to VTB in the sense that it improved its

balance sheet. Its receipt of the proceeds of the loan as an asset was matched by a concomitant liability to repay the loan to VTB Moscow. What the Court was considering when addressing whether the funding was a relevant benefit was whether it qualified as such simply because as a matter of practicality it enabled VTB to enter into the transaction. That is quite different from the position where the funding is by way of donation, as was the case for the payments by BLMIS to MSIL. In such circumstances, MSIL received a real and immediate net asset benefit when it was put in funds by BLMIS to make the payments. The net asset benefit was matched by the loss suffered by the making of the payments to the Kohn entities, such that the overall result of both aspects of the transaction was asset neutral for MSIL. By contrast the overall result of the transaction for VTB was a loss, because it had lost the assets which it acquired from its parent but retained a liability to repay that funding.

304.    The second response by the Claimant is that the funding did not prevent a loss to MSIL because the funds were immediately repayable to BLMIS at and from the moment they were received, as a result of what is now known to have been the Ponzi scheme fraud. I have rejected this argument when considering insolvency in relation to the *Duomatic* defence above.

305.    Accordingly I conclude that the no loss defence succeeds in defeating the claim.

**(13) MSIL Kohn payments: the directors' ex turpi causa defence**

306.    The doctrine ex turpi causa non oritur actio is a rule of public policy which was explained by Lord Mansfield CJ in *Holman v Johnson* (1775) 1 Cowp 341, 343 in the following terms:

> "No court will lend its aid to a man who founds his cause of action upon an immoral or an illegal act. If, from the plaintiff's own stating or otherwise, the cause of action appears to arise ex turpi causa, … there the court says he has no right to be assisted. It is upon that ground the court goes; not for the sake of the defendant, but because they will not lend their aid to such a plaintiff."

307.    The Defendants' argument is that it is of the essence of MSIL's claim that in making the MSIL Kohn Payments, MSIL was being used by Bernard Madoff as a vehicle to perpetrate and conceal the fraud perpetrated by the Ponzi scheme and to launder the proceeds of such fraud. The Claimant's case was in this respect set out in paragraph 68 of the Reamended Particulars of Claim in the following terms:

> "In fact, while MSIL may have carried on certain legitimate trading activities, its primary function, as pleaded more particularly below, was to facilitate the concealment of Bernard Madoff's Ponzi scheme and the distribution of the fruits thereof to Bernard Madoff, his family and third parties, including in particular Sonja Kohn. MSIL was abused by Bernard Madoff: (i) as a cover for his fraud (Bernard Madoff would falsely represent that substantial volumes of investment activity were undertaken in London by MSIL on behalf of BLMIS, but none was); (ii) to launder money stolen from BLMIS's customers and

return it to BLMIS's market-making and proprietary trading businesses, which were run by Mark and Andrew Madoff; and (iii) as a vehicle for making payments including the MSIL Kohn Payments, Interest Payments and Madoff Family Lifestyle Payments. The fact that MSIL was an apparently legitimate, FSA-regulated entity assisted Bernard Madoff's purposes, particularly the laundering of money."

308.    The Defendants must establish two elements. The first is that there is a sufficient connection between the illegality and the Claimant's claim. The second is that the unlawful conduct and state of mind of Bernard Madoff is to be attributed to MSIL so as to make the fraudulent and unlawful purposes of Bernard Madoff, which are relied upon as founding the illegality, those of MSIL itself.

*Connection*

309.    The modern authorities do not all speak with one voice on the nature and degree of connection required between the illegality and the claim in order for the *ex turpi causa* doctrine to be engaged. In *Tinsley v Milligan* [1994] 1 AC 340, the House of Lords was unanimous in disapproving a "public conscience" test which had previously held favour in a number of Court of Appeal decisions, but was divided over the correct test. The majority held that the relevant test was whether the claimant had to plead or rely upon his own illegality ("the reliance test"). The minority favoured a broader test of whether the claim was tainted by illegality. Some subsequent authority suggests that a more flexible approach applies at least outside the context of property rights, and that the appropriate test is of a sufficient degree of linkage (e.g. "inextricably linked") or of causation: see for example *Cross v Kirby* [2000] All ER (D) 212 per Judge LJ at [103], *Gray v Thames Trains* [2009] 1 AC 1139 per Lord Hoffmann at [30]-[31] and [54]. But in *Stone & Rolls Ltd v Moore Stephens* [2009] 1 AC 1391, the reliance test was reaffirmed expressly by Lord Walker at [131], and implicitly by Lord Scott at [96] and [103], and perhaps also by Lord Brown at [205] and Lord Mance at [208]). Only Lord Phillips at [21]-[25] treated the reliance test as neither sufficient nor determinative. In the recent decision of the Court of Appeal in *Jetivia SA and Urs Brunscweiler v Bilta (UK) Limited (in liquidation)* [2013] EWCA Civ 968, Patten LJ, giving the judgment of the Court, quoted from the speech of Lord Browne-Wilkinson in *Tinsley v Milligan* laying down the reliance test and said at [18]:

> "It is clear from this passage that a distinction is being made between reliance on the illegal act as the basis of the cause of action and (as in *Tinsley v Milligan*) the enforcement of a property or other legal right which although historically the product of an illegal act or transaction, has an independent existence from it. Although there have been subsequent *dicta* in this court suggesting that some causal connection less than the reliance test is sufficient to engage the *ex turpi causa* rule (see e.g. *Cross v Kirby* [2000] CA Transcript No. 321 per Beldam LJ), the House of Lords has re-affirmed reliance as the correct test in *Stone & Rolls Ltd v Moore Stephens* [2009] 1 AC 1391 (see Lord Walker of Gestingthorpe at [131], Lord Scott at [96] and Lord Mance at [208]) and neither party to this appeal has

suggested that it does not represent a correct statement of the law."

310. I propose to follow this clear statement of principle in a decision by which I am bound and adopt the reliance test.

311. Applying the reliance test, MSIL's claim is not founded on any illegality. The claim against the directors does not require MSIL to plead or prove any wrongdoing on the part of Bernard Madoff. The Ponzi scheme merely constitutes the occasion for the claim, not the basis for it, nor an ingredient of it.

312. The submission on behalf of the Madoff brothers, adopted by the other director Defendants, was that it was critical to bear in mind that MSIL's case was that the money which was paid out constituted the proceeds of the fraud. But although this was indeed one of MSIL's arguments advanced for the purposes of establishing insolvency when seeking to meet the Defendants' reliance on the *Duomatic* principle, it is not an allegation upon which MSIL has relied or needs to rely for the purposes of advancing its claim against the Defendant directors. Moreover and in any event I have rejected it on the facts, having found that the funding of the payments can not be traced to the customer deposits acquired in the fraud.

*Attribution*

313. There is a general principle, often called the *Hampshire Land* principle, that in a claim brought by a company for losses caused by a director's fraud or other unlawful conduct, the law will not attribute to the company the fraud or other unlawful conduct of the director when the company is itself the victim of that conduct: *In re Hampshire Land Co* [1896] 2 Ch 743; *Belmont Finance v Williams Furniture* [1979] Ch 250, *Stone & Rolls Ltd v Moore Stephens* [2009] 1 AC 1391 at [137]-[156]. *Stone & Rolls* is authority for the proposition that there is an exception to the *Hampshire Land* principle, of uncertain ambit, in the case of a "one man company" where the fraudster or fraudsters whose conduct or knowledge is sought to be attributed to the company is or are the "sole actor" in the sense that there is no separate constituency of directors or shareholders who are innocent of his/their fraud. But even in the case of such a "sole actor", the *Hampshire Land* principle remains applicable where the claim is against the delinquent directors or those associated with their wrongdoing: see *Jetivia v Bilta* at [75] and [78]-[82] explaining *Stone & Rolls*.

314. The director Defendants cannot bring themselves within the *Stone & Rolls* exception. Although it is notoriously difficult to extract a ratio from the judgments in that case, the decision does not itself support an exception to the *Hampshire Land* principle outside the context of a "one man company" or a "sole actor", which formed a critical part of the reasoning of Lord Walker and Lord Brown. MSIL was not such a one man company and Bernard Madoff was not such a sole actor. MSIL had independent and innocent shareholders at all times, being some or all of Peter, Andrew, Mark and Ruth Madoff and Mr Konigsberg and Mr Cohn. It had active independent directors. None of them were party to the fraud here relied on.

315. The Defendants contended that they did not need to bring themselves within the sole actor exception to the *Hampshire Land* principle. They contended that the principle was not engaged in the first place, because MSIL was not the victim of Bernard

Madoff's fraud but merely the vehicle or instrument through which the fraud was in part perpetrated or concealed. It was only a secondary victim in the sense that it suffered loss as a result of a fraud targeted at others, namely the victims of the Ponzi scheme. This reflects the language of the pleading which is in substance that that Bernard Madoff abused MSIL by using it as an instrument for his fraud.

316.   In *Stone & Rolls*, the Court of Appeal and two of the majority of the Supreme Court expressed the view that the status of the company as a secondary victim in that case, as opposed to the intended target of the fraud, did not prevent attribution, either because it did not trigger the *Hampshire Land* principle (Rimer LJ at [72]-[73], Lord Phillips at [55], Lord Walker at [172]), or because it did not prevent the sole actor exception applying (Lord Walker at [174]). Lord Brown at [198] left the position open. By contrast, Lord Mance at [230] to [234] treated the use of the company as a mere tool for the fraudulent scheme as sufficient to make it a victim so as to trigger the *Hampshire Land* principle.

317.   In *Jetivia v Bilta* the Court of Appeal treated the company as the intended victim of the fraud but held that if it were merely a secondary victim that would still be sufficient to trigger the *Hampshire Land* principle: see Patten LJ at [35], [75] and [77]. However the language of these passages, and of [42] and [52], emphasises that the company's status as secondary victim was sufficient to trigger the principle in that case because the defendants were seeking to attribute to the company the very wrong in which they were complicit, so as to prevent the company's claim to recover against them for such wrong. The *Hampshire Land* principle is identified and summarised in [42] in terms which treat the company as the victim *because* its claim is based on the unlawful conduct of the particular director which is the subject matter of the attribution question, the policy being to preclude that director, and those complicit with him in the fraud, from relying upon their own wrong. In this respect the fact that the auditors in *Stone & Rolls* were innocent of the fraud which was the conduct sought to be attributed to the company in that case, was treated as a crucial point of distinction, both in this context (see [52]) and in the context of the sole actor exception (see [81]).

318.   The balance of this authority suggests that the *Hampshire Land* principle is not triggered where the company is used as an instrument of a fraud targeted against a third party victim, resulting in loss to the company only as a secondary victim, in circumstances where the attribution is invoked by those not party to the relevant fraud. That would allow the attribution of Bernard Madoff's fraudulent knowledge and conduct to MSIL for the purposes of the *ex turpi causa* defence in the present case. The defence in the present case seeks to apply Bernard Madoff's knowledge and perpetration of the Ponzi scheme fraud to MSIL for the purposes of a claim which is made by MSIL not against him, but against the other directors, who were innocent of knowledge of the Ponzi scheme or participation in it. Their liability potentially arises irrespective of the Ponzi scheme.

319.   The *ex turpi* defence therefore fails solely on the ground that the reliance test is not met. Had it been, the defence would have succeeded on the issue of attribution.

**(14) MSIL Kohn payments: the directors' limitation defence**

320. In relation to breaches of contract and the duty to exercise reasonable skill and care, the limitation period is six years (Limitation Act 1980 ss. 2, 5, 36). In relation to directors' breaches of fiduciary duty the limitation period is governed by s. 21 of the Limitation Act 1980 so as to be the same as that for trustees (*Paragon Finance Plc. v D B Thakerar & Co* [1999] 1 All ER 400, 415-6; *Gwembe Valley Development Company Ltd v Koshy* [2004] 1 BCLC 131 at [90]). It is six years unless the action is in respect of any fraud or fraudulent breach of trust. Section 21 provides in material part.

> "(1) No period of limitation prescribed by this Act shall apply to an action by a beneficiary under a trust, being an action—"
>
> > (a)    in respect of any fraud or fraudulent breach of trust to which the trustee was a party or privy; […]
>
> (3) Subject to the preceding provisions of this section, an action by a beneficiary to recover trust property or in respect of any breach of trust, not being an action for which a period of limitation is prescribed by any other provision of this Act, shall not be brought after the expiration of six years from the date on which the right of action accrued. […]

321. In each case the six year period is subject to extension where there is deliberate concealment of facts relevant to the Claimant's cause of action within the meaning of section 32 which provides in material part:

> "(1) …….where in the case of any action for which a period of limitation is prescribed by this Act, either—
>
> > (b) any fact relevant to the plaintiff's right of action has been deliberately concealed from him by the defendant; […]
>
> the period of limitation shall not begin to run until the plaintiff has discovered the fraud, concealment or mistake (as the case may be) or could with reasonable diligence have discovered it.'
>
> (2) 'For the purposes of subsection (1) above, deliberate commission of a breach of duty in circumstances in which it is unlikely to be discovered for some time amounts to deliberate concealment of the facts involved in that breach of duty.'

## Dishonesty

322. On behalf of Mr Flax it was argued that s. 21(1)(a) could have no application because it is necessary to show that fraud is an essential ingredient in the cause of action; and that the breaches of duty alleged against Mr Flax are pursued on the basis that it is unnecessary to prove fraud in order to establish breach of fiduciary duty. Mr Clarke relied on *Beaman v ARTS* [1949] 1 KB 550, 557-8. That case is not directly in point; it was concerned with s. 26 (a) of the Limitation Act 1939 governing cases "based on fraud", now re-enacted in s. 32(1)(a) Limitation Act 1980, a provision upon which the

Claimant does not seek to rely.  Nevertheless he is right to submit that to come within the disapplication of any limitation period provided for in s. 21(1)(a) the cause of action alleged must be for fraudulent breach of trust.  Fraudulent or dishonest breach of fiduciary duty is a distinct cause of action from simple breach of fiduciary duty, and it requires dishonesty (in the sense described below) as a necessary element: *Paragon Finance plc v D B Thakerar & Co* [1999] 1 All ER 400, 406c-f.  But the fallacy in the argument is that the Claimant alleges both causes of action.  The claim is advanced as one for fraudulent breach of fiduciary duty, and is none the less so by reason of the fact that the Claimant's claim is also pursued in the alternative for simple breach of fiduciary duty without proof of dishonesty.  The claim for breach of fiduciary duty without dishonesty does not mean that fraud is not a necessary ingredient of its separate cause of action for dishonest breach.

323.   The exception in s. 21(1)(a) only applies where the director's conduct is dishonest: *Armitage v Nurse* [1998] Ch 241, 260F-G.  In this context, as Millett LJ explained at 251E-F, dishonesty:

> "connotes at the minimum an intention on the part of the trustee to pursue a particular course of action, either knowing that it is contrary to the interests of the beneficiaries or being recklessly indifferent whether it is contrary to their interests or not.
>
> It is the duty of a trustee to manage the trust property and deal with it in the interests of the beneficiaries. If he acts in a way which he does not honestly believe is in their interests then he is acting dishonestly. It does not matter whether he stands or thinks he stands to gain personally from his actions. A trustee who acts with the intention of benefitting persons who are not the objects of the trust is not the less dishonest because he does not intend to benefit himself."

324.   In *Fattal v Walbrook Trustees (Jersey) Ltd* [2010] EWHC 2767 (Ch) Lewison J said at [79] that he took this to mean "that in order to establish dishonesty it is necessary to show that a trustee deliberately committed a breach of trust which he did not honestly believe was in the interests of the beneficiaries".  Drawing on the analysis of Rattee J and the Court of Appeal in *Walker v Stones* [2001] QB 902, he summarised the position as follows at [81]

> "......what is required to show dishonesty in the case of a professional trustee is:
>
> i)  A deliberate breach of trust;
>
> ii) Committed by a professional trustee:
>
>> a) Who knows that the deliberate breach is contrary to the interests of the beneficiaries; or
>>
>> b) Who is recklessly indifferent whether the deliberate breach is contrary to their interests or not; or

c) Whose belief that the deliberate breach is not contrary to the interests of the beneficiaries is so unreasonable that, by any objective standard, no reasonable professional trustee could have thought that what he did or agreed to do was for the benefit of the beneficiaries.

325.   In these passages the reference to a "deliberate" breach of trust is a reference to the act or omission which constitutes the breach being a deliberate one. It is not a requirement of deliberate breach in the sense of a conscious intention that the act or omission should amount to a breach of trust. The director must take a conscious decision to perform the act or omission in question. In the case of an omission this requires a deliberate and conscious decision to abstain from doing something rather than a mere negligent failure to do so as a result of not applying one's mind to the question.

326.   I have found that Mr Raven and Mr Flax each reasonably considered that the payments were in the interests of MSIL. They were not guilty of any dishonesty in making the payments.

327.   Mr Toop and the Madoff brothers were not themselves responsible for making the payments. They assumed there was nothing wrong with them but failed to apply their minds to the question how they might be in MSIL's interests. That was not a deliberate omission. There was no deliberate breach of trust. Moreover they did not act with reckless indifference as to whether the payments were in the interests of the company. They simply failed to exercise the independent judgment required of them in relation to an aspect of the business being handled by their fellow directors. This was a breach of the duty to exercise reasonable diligence and care, not dishonesty.

328.   The conduct of the director Defendants in relation to the accounting treatment of the payments and their funding, and contact with the auditors, was not dishonest, as I have explained earlier in this judgment.

329.   Against the Madoff brothers, MSIL made a further and separate allegation of dishonesty. This was that in relation to BLMIS' fraudulent T Bill trading, between 2005 and 2008, they knew that the US$310 million received by BLMIS from MSIL was fraudulently recorded in BLMIS' books as "commission income" due from MSIL. The evidence to which I was referred by the Claimant in support of this allegation was exiguous. The treatment of the sum as commission income was attested to in a paragraph from the witness statement of Ms Collura which in turn relied upon a number of documents which did not on their face self evidently support the proposition. There was no evidence to link the Madoff brothers to knowledge of these documents. The evidence relied upon did not meet the necessary degree of cogency to make out an allegation of dishonesty, which I therefore reject. Even had this allegation been made good, I would not have treated it as supporting a conclusion that the brothers were guilty of any dishonesty in relation to the MSIL Kohn Payments. In any event it would not have assisted MSIL's case on limitation because the alleged dishonesty fell within the period six years prior to the issue of the Claim Form.

*Concealment*

330.    The Claimant's argument relied upon three propositions.  First, that the directors'
        breaches of duty were deliberate.  Second, that their breaches of duty were committed
        in circumstances where it was unlikely that they would be discovered for some time
        where (a) Bernard Madoff was the controlling shareholder of MSIL, (b) he personally
        brokered the arrangement with Mrs Kohn whereby the MSIL-Kohn Payments would
        be made, and (c) the directors were party to the making of false statements to MSIL's
        auditors in relation to the filing and approval of MSIL's accounts; specifically, the
        failure to inform the auditors that the sums being paid to Mrs Kohn were not in fact
        payments for research services properly supplied to MSIL (but were in reality
        payments made by MSIL for Mr Madoff's benefit) was an act of concealment.  Third
        that the Claimant did not discover that "concealment" until after the appointment of
        the Joint Provisional Liquidators on 19 December 2008, and could not with
        reasonable diligence have discovered the concealment before then: the concealment
        could not reasonably have been discovered earlier in circumstances where (a) the only
        members of MSIL's Board were the wrongdoers (i.e., the directors), (b) those
        directors had misled MSIL's auditors, and (c) those directors had wrongfully failed to
        disclose their own misconduct.

331.    These propositions were not made good.  As to the first, the conduct complained of
        against Mr Toop and the Madoff brothers was negligent, not deliberate.  As to the
        second, there was no concealment.  The payments and their funding were patent from
        MSIL's books and records, and were known to the auditors, who were not misled by
        any of the Defendants.  They were openly discussed amongst the directors and with
        the compliance department.  There was nothing secret about them, or about the
        written research which was being delivered to London.  If, contrary to my findings,
        the making of the payments constituted a breach of duty, there was nothing in the
        circumstances in which the payments were made which made it unlikely that such
        breach would be discovered for some time.  As to the third, anyone within the
        company could with reasonable diligence have discovered the payments throughout
        the time that they were being made.  Mr Bond, Mr Purcell, Mr Marshall, Mr Allen,
        Ms Wood, and Mr Hui all knew of them, against none of whom does the Claimant
        allege wrongdoing.

332.    Accordingly the claims against all the director Defendants in respect of MSIL Kohn
        payments made before 8 December 2004 are time barred.

**(15) MSIL Kohn payments: the directors' claims for relief from sanction**

333.    Section 727 of the Companies Act 1985, replaced in identical terms by section 1157
        of the Companies Act 2000, provides that:

        "If in proceedings for negligence, default, breach of duty or
        breach of trust against-

        an officer of the company…

        it appears to the court hearing the case that the officer or person
        is or may be liable but that he acted honestly and reasonably,
        and that having regard to all the circumstances of the case… he
        ought fairly to be excused, the court may relieve him, either

> wholly or in part, from his liability on such terms as it thinks fit."

334. I have found that Mr Raven and Mr Flax acted honestly and reasonably in making the payments. Although the Madoff brothers and Mr Toop were in breach of duty in failing to apply their minds to whether the payments were in the interests of the company, they nevertheless acted reasonably within the meaning of that word in the section. It is apparent from the fact that the section is applicable to liability for negligence that "reasonably" is a broad concept, such that the relief is potentially available even where the director has been in breach of his duty to exercise reasonable care. In *Re D'Jan of London* [1993] BCC 646 Hoffmann LJ said at page 649:

> "It may seem odd that a person found to have been guilty of negligence, which involves failing to take reasonable care, can ever satisfy a court that he acted reasonably. Nevertheless, the section clearly contemplates that he may do so and it follows that conduct may be reasonable for the purposes of section 727 despite amounting to lack of reasonable care at common law."

335. Had I found that any of the director Defendants was liable or potentially liable in respect of any of the MSIL Kohn Payments, I would have held that he ought fairly to be excused from any liability in the circumstances, in particular where:

(1) he acted reasonably and honestly throughout;

(2) the payments caused MSIL no loss;

(3) the directors did not seek or obtain any benefit from the payments;

(4) the payments were approved with full knowledge by all the voting shareholders of the company;

(5) the degree of fault, if any, was venial; and

(6) the consequences of imposing any personal liability would be unduly harsh, and disproportionate to any degree of fault.

**(16) MSIL Kohn payments: the claim against Mrs Kohn, Erko and Tecno Gibraltar**

336. The claim was advanced primarily against Mrs Kohn personally, including the receipt based claims which were advanced on the basis that the payments were received by Erko, Tecno Italy and Tecno Gibraltar ("the Recipient Companies") as agents or nominees on her behalf. The receipt based claims were maintained against Erko and Tecno Gibraltar on the alternative basis that they were the beneficial recipients of the relevant payments, rather than she. Erko's position as a defendant is anomalous. The claim was maintained against Erko on this alternative basis, notwithstanding that the company was dissolved in 1998 and that MSIL's case was that it had not received any of the payments in any capacity because the Erko payments were made by cheques which were endorsed in favour of Mrs Kohn's daughter, Ms Herzog, and paid into the latter's account at Bank Gutmann in Austria. Asserson Law Offices remained

solicitors on the record for Erko, but no evidence or representations were put forward on its behalf at the trial.

337.    The Claimant asserts liability against Mrs Kohn by reference to four causes of action:

(1) dishonest assistance constructive trust;

(2) knowing receipt constructive trust;

(3) a restitutionary claim;

(4) a proprietary claim.

*Dishonest assistance constructive trust*

338.    In order to establish this cause of action the Claimant must establish:

(1) a breach of fiduciary duty,

(2) assisted by the defendant,

(3) dishonestly.

339.    The opening and closing written submissions on behalf of Mrs Kohn contain a heading which treats the first ingredient as being a "breach of fiduciary duty *causing loss*" (my emphasis), suggesting that loss is a necessary ingredient in addition to breach. The point was not supported by authority, nor was it addressed or developed further in argument on either side. The liability of a dishonest assistant is an accessory liability which confers a personal remedy against the assistant to account in equity as if he were the trustee in breach of trust (see *Lewin on Trusts* 18th Edn 40-09). Accordingly I accept that the liability of the assistant depends upon proof of loss to the same extent as the liability of the party in breach of trust or fiduciary duty whom he assists, but no further. The liability of the assistant is for such loss as the party in breach of fiduciary duty would be liable for. It is not necessary to show that the assistance itself is causative of any loss.

*Breach of fiduciary duties by directors*

340.    I have held that none of the director Defendants was in breach of fiduciary duty. But this is not an end to MSIL's case in dishonest assistance against Mrs Kohn, because MSIL seeks to rely upon Mr Dale being in breach of fiduciary duty in making the payments. This limits the claim to the payments after 4 February 2003 when Mr Dale first became a director.

341.    Mr Crow QC described this argument, aptly in my view, as a shabby point pulled out of the hat in closing. I confess that when this argument was articulated in MSIL's written closing submissions it took me by surprise. It was not adverted to in the written or oral opening of MSIL, which relied solely on allegations of breaches by the directors who remained active defendants at the trial. It is fair to say that it is within the pleaded case, and the list of issues settled in February 2012, because both were drafted and served before MSIL settled with Mr Dale. But I had understood that the breaches of fiduciary duty being relied on were solely those of the remaining

Defendants and that the dishonest assistance claim against Mrs Kohn was parasitic on such breach being established. I therefore have considerable reservations about whether it is fair to allow MSIL to advance such a case. I will nevertheless address it.

342.    MSIL relied essentially on what was said to be Mr Dale's acceptance of fault contained in his witness statement in the following passages:

(1) "*The whole process of receipt of "fees receivable" and the making of the MSIL-Kohn Payments was, I now recognise, improper and inappropriate. I accept that I should have recognised this at the time. It was not in MSIL's best interests to make the MSIL-Kohn Payments because MSIL could not afford them without the fee income and did not need them to carry out its trading business."*

(2) "*Although I believed that the research was not worth the money being paid for it, I did not tell KPMG this.*"

(3) "*In my view the research provided by the Kohn entities was irrelevant and of no value to MSIL. No-one at MSIL used the research. Sometimes it remained unopened or was simply left on the second floor of the office. None of the traders came looking for it. It was obviously not relevant to MSIL's business and was merely regurgitated from pre-existing material containing extracts from other publications. I understood it to be the mechanism to enable the MSIL-Kohn Payments to be continued to be made through MSIL, in that the research was sent to justify the amount and frequency of the MSIL-Kohn Payments.*"

(4) "*I now recognise that it was not in MSIL's best interests to continue making these payments and that they were inappropriate, unnecessary and unsustainable having regard to MSIL's core business. I should have recognised this at the time. I chose not to act on the multiple indications given in the conversations I had with Mr Madoff and Mrs Kohn, and which were confirmed in my discussions with Stephen Raven.*"

(5) "*I knew there was no economic benefit to MSIL making such payments, and was not aware of any goods or service which Mrs Kohn, Erko or Tecno provided to MSIL at all – let alone any service worth $700,000 a quarter. In hindsight, although I spoke to Stephen Raven, I should have done more than this given my concerns and I should have challenged the payments.*"

343.    The circumstances in which Mr Dale came to give this evidence on behalf of MSIL are noteworthy. In his Defence, verified by a statement of truth, he had maintained that he believed he had been acting in MSIL's interests, and denied any breach of duty. He was not a rich man and had substantially exhausted his limited resources on legal fees before the trial, at which he could not afford to be represented. He was facing a claim which would have made him bankrupt, and which he explained was causing and would cause considerable domestic strain. He was offered the ability to settle for £20,000 plus the possibility of having to pay a further £130,000 out of future income if he earned enough prior to April 2015 to be able to afford it (in accordance with a defined formula). At the time he gave evidence he had not earned enough for any part of the £130,000 to be payable. In return he had to agree to sign a witness

statement in agreed terms, drafted initially by MSIL's solicitors, and to give evidence for MSIL.  For pragmatic reasons, which I do not criticise, he accepted a settlement on these terms.  The settlement agreement warranted the accuracy of the witness statement, so that Mr Dale was potentially at risk of losing the benefit of the settlement if he departed from it in any material respect.  The witness statement purported to accept his own wrongdoing.  It purported to explain the departure from the evidence in his Defence by being "assisted by the additional evidence disclosed by the Claimant" although it emerged that he had not himself considered such disclosure.

344.    This put Mr Dale in an uncomfortable position in giving his evidence.  I accept that within this difficult straightjacket he was doing his best to answer questions honestly and helpfully, but this background requires me to treat with considerable caution his apparent conversion to an acceptance of fault.  However that may be, it is tolerably clear that at the time of the events in question he did think that the MSIL Kohn Payments were in MSIL's interests.  He believed that Bernard Madoff had a bona fide commercial reason for the payments being made and that was sufficient to make him happy with them.  Mr Dale was told of Bernard Madoff's responses to Mr Flax and Mr Raven when they raised the matter with him.  Accordingly he knew that Bernard Madoff's attitude was that Mrs Kohn was a good analyst who spoke to him in New York and was only being paid what a good analyst would be paid; that he got value from the research; that the research had the potential to pay for itself; that a single good idea could justify the payments; that he found Mrs Kohn's advice to be of great value; and that apart from research or information from Mrs Kohn, Bernard Madoff valued Mrs Kohn for her contacts.  Mr Dale was himself told by Bernard Madoff in a conversation of 20 April 2007 that the payments were not just for research but for the services which Mrs Kohn provided to Bernard Madoff including introductions and her perspective on European institutions and markets, all of which the latter regarded as of great benefit.  Mr Dale did not think that the written research received in London was of value to the traders, although he did not know whether or to what extent it was being used, but he believed that it was sent to Bernard Madoff in New York, which was what Bernard Madoff told him: in the conversation of 20 April 2007 Bernard Madoff told him that Mrs Kohn was providing the same information to him as to MSIL in London and that he was using it to make his decisions globally, i.e. including those for MSIL.  Mr Dale was himself keen to persuade Mr Raven of the desirability of continuing to make the payments when the latter was seeking to use MiFID as a ground to put an end to the payments and their funding.  Mr Dale believed that the payments, and their funding, were properly accounted for in the statutory accounts.  Mr Dale did not mislead the auditors, his fellow directors, or those within MSIL who were concerned with compliance, and he did not believe that anyone else had.

345.    Accordingly I reject the allegation that Mr Dale was in breach of fiduciary duty.

*No loss*

346.    I have concluded that had any of the directors been in breach of fiduciary duty, such breach gave rise to no loss and so none would have been liable for any loss.  That is fatal to a claim against Mrs Kohn for assisting such alleged breaches of fiduciary duty.

*Assistance*

347.    The relevant acts of assistance on which MSIL relies against Mrs Kohn are that she delivered the research; invoiced MSIL for the payments and, so MSIL alleges, ostensibly in respect of that research; and made arrangements to receive the payments by collecting cheques or providing transfer details.

348.    Mr Crow QC submitted that if there was a breach of duty by the Defendant directors in authorising or making the payments, the Claimant's allegation that Mrs Kohn assisted in that breach is unsustainable on the face of MSIL's own pleading because the breach of duty alleged against the Defendant directors is that they caused or permitted the payments to be made, *knowing that those payments were not due in respect of the research that was delivered*; whereas by providing the research, delivering the invoices which were allegedly referable only to the research, and collecting the payments ostensibly in respect of that research, Mrs Kohn was (on the Claimant's case) attempting to *deceive* the Defendant directors into believing that *the payments were indeed due in respect of that research*. It was submitted that that cannot constitute any form of assistance to the directors in relation to their alleged breach of duty in causing or permitting payments to be made, which was a breach consisting of conduct with the knowledge that they were *not* due in respect of the research.

349.    I do not think that this fairly characterises the case against Mrs Kohn, which does not depend upon any attempt by her to deceive the directors; it is, or includes, a case that she and the directors alike intended the research to be window dressing as an excuse for payments which all knew or suspected to be for a different purpose.

350.    But in any event I feel unable to accept the submission as legally sound. In my judgment it fallaciously treats the ingredient of assistance as having to encompass the mental element which renders the conduct of the fiduciary a breach of trust or fiduciary duty; whereas what is required, or at least is sufficient, for the ingredient of assistance, is simply conduct which in fact assists the fiduciary to commit the act which constitutes the breach of trust or fiduciary duty. A dishonest participant in a transaction takes the risk that it turns out to be a breach of trust or fiduciary duty. It is not necessary for the assistant to know, or even suspect, that the transaction is a breach of trust, or the facts which make it a breach of trust, or even what a trust means; it is sufficient if he knows or suspects that the transaction is such as to render his participation dishonest: *Agip (Africa) Ltd v Jackson* [1990] Ch 265, per Millett J at 294, *Barlow Clowes International Ltd v Eurotrust International Ltd* [2006] 1 WLR 1477 per Lord Hoffmann at [28]; *Abou-Rahmah v Abacha* [2007] 1 All ER Comm 827 per Rix LJ at [39]. So accessory liability on the part of a dishonest assistant requires no more from his point of view than the actus reus of assisting by participation in the transaction, and the mens rea of dishonesty. It is not necessary that the assistance should play any part in the mental state of the fiduciary, still less that it should assist the mental state of the fiduciary in a way which is necessary to render the fiduciary's act a breach of trust or fiduciary duty.

351.    Mrs Kohn assisted the payments to be made by providing the research, submitting invoices, collecting the Erko cheques and providing details for, and receiving, the electronic transfers. That is sufficient to make out this ingredient.

*Dishonesty*

352.   The test involves a subjective and objective element. The subjective element requires the court to consider what the defendant actually knew or understood or believed or suspected at the time of his conduct. The objective element requires the court to determine whether or not, with that state of mind, the relevant conduct was dishonest, applying an objective standard. There is no requirement of conscious dishonesty; the test for dishonesty does not require that the assistant considers that he is acting dishonestly. See *Twinsectra Ltd v Yardley* [2002] 2 AC 164 explained in *Barlow Clowes Ltd v Eurocrest* [2006] 1 WLR 1476; *Abou-Rahmah v Abacha* [2007] 1 All ER (Comm) 827. The principle that heightened cogency of evidence is needed to prove allegations of fraud is applicable to this issue: *Re H & Ors* [1996] AC 563, at 586-587; *AG of Zambia v. Meer* [2008] EWCA Civ 1007, at [294].

353.   I had the advantage of hearing Mrs Kohn giving evidence over one day in March 2013, when she was being cross examined in relation to her response to disclosure orders ancillary to a worldwide freezing order, as well as at the trial. On the whole I found her to be a reliable and honest witness, although as I shall explain below there were some aspects of her evidence, in which she sought to distance herself from events or documents, which I feel unable to accept.

354.   The following elements of the evidence are important to an assessment of Mrs Kohn's honesty:

(1)   Until December 2008, Mrs Kohn had no reason to question the integrity of Bernard Madoff. On the contrary his reputation and apparent success commanded confidence and respect for his probity and financial prowess. That Mrs Kohn had such confidence and respect is apparent from the fact that she was responsible for investing about US$11.5 million of her own family's wealth in funds invested with BLMIS.

(2)   Mrs Kohn knew that MSIL (through Bernard Madoff) had made an agreement for the provision of her services which included introductions, information and research. Those were legitimate and valuable services, which she provided.

(3)   The sums paid to her in respect of those services, including the MSIL Kohn Payments, were no more than reasonable remuneration for the value of the services provided. That is apparent on the evidence before me, and is what she believed at the time.

(4)   She made no secret about the provision of those services. The face to face meetings were made in Bernard Madoff's glass fronted office for all his fellow directors and staff to see. The written research was openly provided and discussed with the London directors. She had no reason to believe that the directors of MSIL were unaware of the full range of services she was providing (and Messrs Raven, Flax and Dale at least were, as I have explained, aware that she was providing services by way of introductions, information and advice apart from the written research).

(5)   She made no secret of the invoicing for the services, or of the payments themselves. The invoices were sent by post. She or her husband collected the Erko cheques making no secret of their visits for that purpose. The electronic payments were, she correctly assumed, paid through the company's usual

facilities and recorded openly in its books. She had no reason to think that Mr Flax or others she dealt with at MSIL treated the payments with any secrecy. She discussed aspects of the payments, such as VAT, with Mr Flax, Mr Raven and Mr Dale. She reasonably believed that the payments were being made with the full knowledge of the numerous directors of MSIL over a period of 16 years. At no time did anyone at MSIL raise with her any doubt as to her entitlement to the payments or their propriety.

(6) She never received any complaints from MSIL that the services she was providing were not worth the sums paid.

(7) She knew that MSIL was audited by KPMG and regulated by the FSA (or its predecessor). She never received any inquiries from the auditors or from the regulators with regard to the payments and was not told that they had made any. As a result, she reasonably believed that the payments were fully visible to MSIL's auditors and regulators and that they had not questioned their propriety.

(8) She reasonably believed that MSIL was solvent throughout the period over which the payments were made.

(9) She believed that the services she provided conferred substantial benefits on MSIL. This was true of introductions as well as information, advice and research. Mrs Kohn did not distinguish between Bernard Madoff's American and English companies, an understandable approach not least because BLMIS' own publicly promulgated material itself blurred any such distinction. She was indifferent whether the payments were made by MSIL or BLMIS, which she regarded as part of Bernard Madoff's single global business. She believed that her introductions brought value to the businesses in both America and in England. She regarded her introductions as valuable to MSIL as well as BLMIS: they were introductions of people, not money, and, so she believed, useful to any proprietary trading business which she understood to be operated by BLMIS in New York and MSIL in London. She had also understood from Bernard Madoff that he operated the managed accounts of his investment advisory business through both BLMIS and MSIL. Her evidence, which I accept, was that whenever he mentioned the managed accounts, which was not often, he gave her the impression that investment activity was undertaken in London as well as in New York. Indeed it is MSIL's pleaded case (Reamended Particulars of Claim paragraph 68) that Bernard Madoff would falsely represent that substantial volumes of investment activity were undertaken in London by MSIL on behalf of BLMIS. When Bernard Madoff requested that invoices be sent to his English company, MSIL, Mrs Kohn assumed that any investment activity which was undertaken on behalf of the people whom she had introduced, who were primarily Europeans, would have been undertaken in London by MSIL.

355. These circumstances do not suggest dishonesty. Quite the reverse. If secrecy is the badge of dishonesty, in the memorable phrase of Millet J in *Agip v Jackson* (sup) at 294, the converse is true: transparency is the hallmark of honesty.

356.   Moreover there is no apparent motive or benefit to Mrs Kohn in the dishonesty which the Claimant alleges.  She was providing legitimate services for which she was not overcharging.  If she had thought there was an obstacle to being paid by MSIL, rather than BLMIS, it is difficult to see why she would not have raised it or why in such circumstances she would not simply have been paid solely by BLMIS, as happened after 2007.

357.   The Claimant's submission that Mrs Kohn was dishonest rested on three propositions:

   (1) The payments were solely in return for the written research.

   (2) Mrs Kohn knew the research to be valueless per se and worthless to MSIL in its trading business; it was provided merely as a pretext for the payments.

   (3) The pretext was supported by false invoicing purporting to justify the payments as being for such research.

358.   As to (1), I have concluded that the payments were not solely or even primarily for the written research.

359.   As to (2), I have concluded that the research was not valueless either per se, or to MSIL in its trading business.  It had some value, in the way I have described, and Mrs Kohn believed it to have greater value because of her understanding of MSIL and BLMIS as a single global business.  She was not told, and had no reason to believe, that the research was not used by the traders or the management in London.  On the contrary there is evidence from 2007 of Mr Dale asking for specific pieces of written research on a number of occasions, both on the phone and in writing.

360.   Nevertheless, there was a significant proportion of the research which was simply lifted word for word, or almost word for word, from existing reports, and passed off as original work.  This plagiarised material may well have constituted the majority, and, at least in the later years, the distinct majority, of what was being supplied.  I conclude that Mrs Kohn knew this was happening and was responsible for it.  I felt unable to accept her evidence that she was not involved in the details of the production of the written research and merely identified the topics and general approach.  It was she who was responsible to Bernard Madoff for providing the written research in a form which he wanted, and the extent of the plagiarism could not have escaped her knowledge.  The few documents which have survived which cast light on the process, from the most recent Tecno Gibraltar period in 2007, suggest that at least on occasion she was herself giving instructions as to how to use the content of existing available material and to reformat it so as to present it as Tecno Gibraltar's own research product.

361.   My assessment is that the plagiarism reflected a desire on her part to ensure a substantial volume of physical documentation.  That is not to say that she regarded it as of no potential value to MSIL.  The reverse was true.  The plagiarism was not indulged in because it was thought that the material was irrelevant to MSIL, but because it provided a cheaper and easier method of producing substantial documentation than would have been the case with original research.  She was not creating the research as a mere pretext for the payments.  But she was concerned to ensure that the volume of documentary research which was delivered was substantial.

362.    Although she was anxious to create volume in this way, this does not support an inference that she regarded the services she was providing to MSIL as of no value or that she thought the payments by MSIL were not justified or were not in MSIL's interests.   My assessment is that she felt the need to put greater emphasis on the physical material because she was receiving very large payments in return for what was predominantly an intangible service which left no record; and that she felt instinctively uncomfortable about this, acting as she was in a role which had no structure or precedent of which she was aware.   Her instinct was that the substantial payments she was receiving would be more easily explicable to anyone enquiring into them the greater the volume of documentary product which could be pointed to.   This instinct was articulated in a telephone conversation with Mr Dale on 29 May 2007 in which she explained that she "very much wanted you to have more quantity there, just in case people are asking you what is the reason for the bills".   The Claimant contended that this was an acceptance by her that the payments were *solely* in respect of the written research.   In the light of the totality of the evidence, that is to put upon the use of the definite article a weight which it will not bear.   This comment was simply a reflection of her view that the greater the tangible evidence of her services the better.   Her desire for volume was in order to provide more ostensible justification for that which was already justifiable, and honestly believed to be justifiable.   It was not intended to deceive MSIL's directors, who knew, so she believed, the range of services she was providing to Bernard Madoff.

363.    As to (3), the wording of the invoices, it is not right to characterise the invoices as purporting to be solely for research.   All bar one of the Erko invoices do not make any reference to research; they are simply for "services".   The Tecno Italy invoices include reference to "business opportunities" and "ideas and strategies".   Nevertheless in the Tecno Italy and Tecno Gibraltar period, the wording places predominant emphasis on research.   Most strikingly, there is no express reference at any stage to introductions, which Mrs Kohn regarded as the principle element of her services in terms of justifying the payments, or to commissions which might have been the most obvious description of payment for such introductions.

364.    I have found that Mrs Kohn was herself responsible for the wording of all the Erko and Tecno invoices at each stage, notwithstanding her attempt in evidence to distance herself from them.   I do not think it would be right to draw the inference that they were drafted with an intention to deceive.   Mrs Kohn's desire to distance herself from the wording of the invoices is explained by the extent to which the claim against her relies so heavily on their terms, which are mischaracterised as all being for research.   I accept her evidence that she did not regard the invoices as something to which she attached great importance.   The use of her parents' address and the error in continuing to use Erko after its dissolution are indicative of a casual approach to the invoicing process, which is consistent with her unusual personal and professional history.   The wording had no bearing on the amount of the payments, which were already agreed, and they served only to trigger the payments.   The tendency to emphasise the research in the wording, and the absence of express reference to introductions, was again a reflection of her instinct to emphasise the tangible element of her services over the intangible.   It does not support an inference of dishonesty in relation to the payments themselves.

365.   In these circumstances I have concluded, without any real hesitation, that Mrs Kohn was not acting dishonestly in any material respect in relation to the invoicing and receipt of the MSIL Kohn Payments.

*Knowing receipt constructive trust*

366.   In order to make out this cause of action MSIL must establish:

(1) a transfer of assets in breach of trust or fiduciary duty; and

(2) beneficial receipt by the defendant of property traceable to such assets; and

(3) knowledge on the part of the defendant which renders receipt of the property unconscionable.

*El Ajou v. Dollar Land Holdings plc* [1994] 2 All ER 685, 700;

*Bank of Credit and Commerce International (Overseas) Ltd v. Akindele* [2001] Ch 437

367.   Where the claimant is a company, and the claim is in respect of monies paid out by the company under a contract, then unless that contract is set aside as being invalid, the recipient may rely upon the contract to justify the receipt. In such circumstances no question of knowing receipt arises: *Criterion Properties plc v. Stratford UK Properties LLC* [2004] 1 WLR 1846, per Lord Nicholls at [4]:

"If ... the agreement is found to be valid and is therefore not set aside, questions of 'knowing receipt' by [the defendant] do not arise. So far as [the defendant] is concerned there can be no question of [the company]'s assets having been misapplied. [The defendant] acquired the assets from [the company], the legal and beneficial owner of the assets, under a valid agreement made between him and [the company]".

368.   The principle applies in the present case. The payments were made pursuant to valid contractual obligations owed to the Recipient Companies under a contract which is valid. That is fatal to this cause of action.

369.   I have concluded that there was no breach of fiduciary duty by the directors in making the payments, nor any loss to MSIL caused by the payments. That too is fatal to this cause of action.

370.   As to receipt, MSIL argued that the Recipient Companies were nominees or agents for Mrs Kohn in respect of receipt of the payments (cf *Prest v. Petrodel Resources Ltd*, [2013] 3 WLR 1 at [33]); or in the case of Erko that the payments were received by Ms Herzog rather than Erko because the cheques were endorsed and paid into the latter's account at Bank Gutmann; and that in this respect Ms Herzog was her mother's agent or nominee for receipt. MSIL argued in the alternative that Mrs Kohn was the ultimate beneficial recipient of the payments from those companies by virtue of the onward payment to destinations which were in whole or in part for her benefit. The evidence of Mr Doxey addressing some of the complex onward payments raises numerous questions which were not explored during the hearing (although some were

touched on during Mrs Kohn's cross examination in support of the freezing order in March 2013).

371. Given my other findings it is not necessary to determine the detailed factual issues which these arguments raise, and I will not burden this already over lengthy judgment by doing so. I should record that Mr Crow QC submitted that the only pleaded basis for alleging beneficial receipt by Mrs Kohn was by lifting the veil, a basis which cannot survive the decision of the Supreme Court in *Prest v. Petrodel Resources Ltd*, with the result that arguments based on nominee or agency status were not open to the Claimant.

372. As to unconscionability, Mrs Kohn's knowledge was not such as to render receipt and retention of the payments unconscionable. They were no more than reasonable remuneration for services legitimately provided by her and she acted honestly in relation to them in all material respects.

*Restitutionary claim*

373. This is a common law claim for unjust enrichment. It again raises questions as to the extent to which Mrs Kohn beneficially received the payments, either through the Recipient Companies, or her daughter, as her agent or nominee; or by reason of onward payments. Again I can deal with the claim without the need to resolve the complex factual issues thereby raised. It fails for five reasons.

374. First, in paragraph 178 of its written opening MSIL averred that the claim lay against the recipient of "misapplied" trust property, the misapplication arising by reason of the alleged breach by the directors of their fiduciary duties. The claim was at that time not clearly pleaded, but became the subject of subsequent amendment to the Points of Claim at paragraph 259AA(2) where again the allegation was of receipt of "misapplied monies". The plea was based on the existing pleaded allegations "for the avoidance of doubt", in which again the allegation of a restitutionary obligation in paragraph 259 was premised on receipt with knowledge that the directors were making the payments in breach of fiduciary duty (paragraph 258). MSIL thereby assumed the burden of establishing that the payments were made in breach of fiduciary duty. I have concluded that there was no such breach. An alternative plea that the payments were made for no consideration fails with my rejection of MSIL's case that the payments were solely for the written research and that the written research was of no value.

375. Secondly, there can be no unjust enrichment where payments are made pursuant to a valid contract which is fully or partly performed, just as there can be no claim in knowing receipt: *Taylor v Motability Finance Ltd* [2004] EWHC 2619 (Comm) at [23]; *MacDonald Dickens & Macklin v Costello* [2012] QB 244 at [23].

376. Thirdly, any enrichment was not unjust. It was no more than reasonable remuneration for legitimate services performed.

377. Fourthly, if there had been any unjust enrichment of the Recipient Companies or Mrs Kohn, it would not have been at the expense of MSIL, who suffered no loss and for whom the payments were cash neutral by reason of the funding by BLMIS.

378. Fifthly, the cause of action is subject to a change of position defence. Mrs Kohn and Tecno Gibraltar contend that they have changed their position in good faith by reason of the MSIL Kohn Payments and that it would be inequitable for them to have to repay or restore such payments or any part of them in that, in reliance upon the anticipated and actual receipt of such of the MSIL Kohn Payments as were payable to them, which they believed in good faith were due and payable in consideration for the provision of the services:

  (1) they did not insist upon payment being made in full by BLMIS rather than MSIL; and/or

  (2) they continued to provide or to procure the provision of the services over a period of about 16 years; and/or

  (3) they arranged for payments to be received into the hands of third parties, and/or

  (4) they expended and/or allowed sums to be expended and/or refrained from taking steps to prevent sums from being expended in the normal course of living and/or business expenses, and/or investments.

379. The first two of these are clearly made good on the evidence, and the third and fourth are made out to at least a significant extent.  That is sufficient to make good the change of position defence.

*Proprietary claim*

380. It is not clear to me what property MSIL is laying claim to by reliance on this cause of action, and in whose hands it is alleged currently to be found.  It is said to apply to "the Payments or their proceeds".  So far as the payments themselves are concerned, none is in the hands of a defendant.  None went to Mrs Kohn directly; some of the Erko payments went into her daughter's account at Bank Gutmann but have moved on in a complicated sequence of transactions to other accounts and destinations, some allegedly controlled by Mrs Kohn or members of her family.  Erko has been dissolved.  Tecno Italy has been dissolved and is not a defendant.  Tecno Gibraltar was recipient of only two payments in 2007, which again have moved on.  So far as "proceeds" are concerned, the Claimant's case on what assets currently in existence are traceable to the payments, and where they are now to be found is unclear to me, as is whether those who might be holding them are parties to the proceedings.  I can, however, address this cause of action without attempting to resolve these uncertainties, because it fails on two other grounds.

381. First, as was common ground, it is necessary to establish that the payments were made by the directors in breach of fiduciary duty.  I have rejected that allegation.

382. Secondly, it is an answer to such a claim that the property is received as a bona fide purchaser for value without notice of the alleged wrongdoing.  Mrs Kohn and the Recipient Companies were in that position.  The payments were made pursuant to a contract between MSIL and the Recipient Companies in respect of which the latter gave full value.  Mrs Kohn acted on behalf of the Recipient Companies in good faith and without notice of any wrongdoing by the directors.

**(17) MSIL Kohn payments: Mrs Kohn's limitation and laches defence.**

383.   Under s. 21(3) Limitation Act 1980, the time limit for the claims in dishonest assistance and knowing receipt constructive trust is six years, subject to the potential application of:

   (1) s. 21(1)(a) (an action in respect of a fraudulent breach of trust to which the trustee was a party or privy);

   (2) s. 32(1)(a) (an action based on the fraud of the defendant);

   (3) s. 32(1)(b) and s32(2) (deliberate concealment of a fact relevant to the right of action).

384.   *Section 21(1)(a)*. A claim can not become one in respect of a fraudulent breach of trust by virtue of any dishonesty established against the dishonest assistant. The trust referred to is not the constructive trust imposed by reason of his assistance but the trust the breach of which he has assisted. There must be a fraudulent breach of trust by the trustee of that trust, in this case by a director. See *Lewin on Trusts*, at §44-49A & §44-55 (3ʳᵈ Supplement to the 18ᵗʰ ed.); ***Paragon Finance plc v. DB Thakerar & Co*** [1999] 1 All ER 400, at 408; ***Gwembe Valley Developments Ltd v. Koshy*** [2004] 1 BCLC 131, at [86]-[91]; ***Central Bank of Nigeria v. Williams*** [2013] QB 499, at [37]. My finding that the directors acted honestly precludes the application of this subsection.

385.   Were I wrong in this conclusion the equitable doctrine of laches would have been applicable, but I decline to speculate on whether or to what extent it would have affected the claim upon hypothetical findings of dishonesty which I have not made.

386.   *Section 32(1)(a)*. A dishonest assistance constructive trust claim is a claim based on fraud because the dishonesty of the assistant is an essential ingredient in the cause of action. I shall assume, without deciding, that the unconscionability ingredient of a knowing receipt claim also brings it within the subsection. Application of the subsection does not extend the six year period in this case because MSIL could with reasonable diligence have discovered the conduct of Mrs Kohn which is alleged to have been dishonest or unconscionable when it occurred or shortly thereafter. The invoicing and payments were open and transparent and reflected in the company's books and accounts. The research was available in London for all to see, including directors, staff and auditors.

387.   *Section 32(1)(b)*. For the reasons I have given there was no deliberate concealment and so this subsection has no application. Nor, for the avoidance of doubt, does section 32(2).

388.   For the purposes of the restitutionary claim, MSIL relied solely on the application of s. 32 to defeat the six year limitation period. Such reliance fails for the reasons I have given.

389.   Accordingly the dishonest assistance and knowing receipt constructive trust claims, and the restitutionary claim, are time barred in respect of payments made prior to 8 December 2004.

**(18) The Interest Payments: the facts**

390.   Under the two subordinated loan agreements Bernard Madoff lent MSIL a total of US$ 62.5 million. MSIL's case is that this capital was neither needed nor deployed towards MSIL's trading operations, and that the Interest Payments constituted an unnecessary and burdensome overhead.

391.   The first loan agreement was dated 28 November 2000 and for $37.5 million; the second was dated 28 December 2001 and was for $25 million. Each was signed by Mr Raven on behalf of MSIL and was the subject of a board resolution signed by the directors, including by Mr Raven, Mr Flax, Mark Madoff and Andrew Madoff. The interest rate was 0.5% over LIBOR, payable quarterly in arrears. That was a commercial rate; indeed Mr Dale thought it would have been difficult for MSIL to achieve as good a rate from a commercial lender. The loans were on standard commercial terms. The loan agreements were countersigned by the FSA. The first was terminable upon 3 months notice by either side after two years, and the second on two years' notice, subject to certain conditions and SFA/FSA approval and compliance. Between 2002 and 2007 interest payments totalling about US$ 14 million were made in accordance with the terms of the agreements (save that it appears they were paid annually rather than quarterly). This figure includes withholding tax on the interest payments, which was paid directly by MSIL to HMRC. On 18 September 2007 the loans were capitalised by a deed of termination and the issue to Bernard Madoff of 6.25 million voting shares of US$10 nominal value.

392.   The loans were approved by the FSA and the board. The agreements, loan proceeds and interest repayments were recorded in the company's books and accounts. There was nothing secret about them.

*Rationale for the loans*

393.   The first loan came towards the end of Phase 3 and in preparation for Phase 4 of MSIL's trading. Bernard Madoff had had plans from the summer of 2000 to enlarge MSIL's London business to establish a market making business in the newly formed NASDAQ Europe and a proprietary trading operation trading in European and US securities.

394.   The Directors report in the 2000 statutory accounts referred to the subordinated loan agreement and said simply that "these funds were obtained in order to increase the firm's working capital and resources available to it". The 2001 accounts referred to the second loan again as "in order to increase the firm's working capital and resources available to it" and continued by way of explanation: "The company acquired adjacent premises and recruited additional personnel in order to commence trading as principal in Pan-European securities. To facilitate this objective the company has become a member of NASDAQ Europe SA, a recognised investment exchange, and a member of the London Clearing House. Trading in Pan-European securities commenced in January 2002".

395.   The directors placed emphasis on two aspects of the contemplated trading in Phase 4 as justification for the loans. The first was MSIL's intended trading on the new exchange Jiway, to which MSIL signed up eight days before the first loan. Shortly

before that Mr Flax and Mr Raven sent Bernard Madoff a memo on 8 November 2000 raising questions they expected the FSA to ask in relation to MSIL's capitalisation and intended trading on Jiway. These questions included, at points 7 and 8, '*if these trades are back to back, why do we need so much capital*' and '*If Jiway requires MSIL to have additional capital, on what basis has Jiway determined the amount.*' Bernard Madoff responded to Mr Flax and Mr Raven over the phone that Jiway had a 'formula' and that Jiway required MSIL to have a minimum of US$65 million before MSIL could trade on it. The evidence suggests that in fact the amount which Jiway required, and was actually provided, proved to be only US$10 million, reduced to US$5 million perhaps as early as 10 January 2001 (there was some doubt as to the accuracy of the date). Trading on Jiway was not a success and had stopped by January 2003.

396. The second aspect relied on was the more general expansion into proprietary trading with a particular emphasis on the statistical arbitrage book, colloquially referred to as the black box, in which a large volume of trades in equities were to be undertaken according to predetermined algorithms which were based on a very successful model used by BLMIS. As to the statistical arbitrage book, Mr Bond, who was initially in charge of the book in what he described as its test phase, said that it was envisaged that it would require "an awful lot of money" because it involved purchasing hundreds of stocks and holding them for months or even a year without margin. Mr Byrom, a trader who worked on the book from 2005 until it closed, said that the (gross) positions reached about $200 million. Mr Toop also quantified the outer limits reached on its long and short positions as at one point slightly more than $100 million on each side and that it required that amount of capital because it was not trading on margin. I accept that this was the position reached at some point with the black box and could reasonably have been foreseen as a consequence of the black box trading when the loans were agreed, although for most of the period between 2001 and its demise it required much less capital.

397. As to the trading expansion more generally, Mr Purcell, who was a director at the time of the first loan and gave evidence for the Claimant, said that the loan did not seem surprising to him in the context of the declared aim of Mr Raven and Bernard Madoff to build the business. Mr Bond, who was also a director when the first loan was executed and a consultant at the time of the second loan, regarded the first loan as an important precursor to the development of the business through the arrival of Mr Burnham's team in 2001 and both loans as good for the company in the context of Bernard Madoff looking to expand the business generally. Mr Flax's understanding was that one purpose of the company being well capitalised was to enable Bernard Madoff to take up trading opportunities as and when they arose and that in doing so he was taking a long term view of his UK business. Mr Dale was not involved at the time the loans were agreed, but the capital became his responsibility not long thereafter. He regarded it as justified by MSIL's ongoing plans to expand.

*Was MSIL overcapitalised?*

398. The company's capital position at the time the loans were entered into appears from the statutory accounts to have been that at the 2000 year end MSIL had total capital and reserves of some £31 million, not including the first subordinated loan; and at the 2001 year end, some £33 million not counting the second loan. In a letter to the FSA of 12 November 2001, Mr Raven said that the company was capitalised at US$75

million. During Phase 3 when MSIL was trading on an agency basis it had no need for capital beyond regulatory requirements so that the majority of such capital would have been available for the expansion of its trading activities in Phase 4.

399.    MSIL's case that the loan capital was unnecessary relied primarily on admissions of the Director defendants themselves rather than any accounting analysis.

400.    In a witness statement, Mr Raven said *'It is true that this loan interest was a "burdensome overhead"'*, and explained that he *'spoke to BM on many occasions about the burden of MSIL having to pay interest on capital it was not using for trading purposes.'* In an interview with the Serious Fraud Office on 9 June 2009 Mr Raven discussed the subordinated loans at length in relation to Bernard Madoff's proposal for a further subordinated loan of US$100 million in 2007. Mr Raven had a discussion with Bernard Madoff, in 2007 in which he stated that he would much rather cease the current practice of Bernard Madoff loaning MSIL money, MSIL paying interest on that loan out of its earnings, and Bernard Madoff sending money back to MSIL in the form of subventions to cover the interest payments where MSIL's own generated profits were insufficient. Mr Raven termed this practice '*a charade*'. Bernard Madoff was eventually convinced by Mr Raven to provide the additional funds by way of share capital, not loan, and to terminate and capitalise the existing subordinated loans as share capital. In discussing these 2007 events, Mr Raven stated in his 2009 SFO interview that

(1) when he took over MSIL as CEO most of MSIL's capital was in subordinated loans and only about US$20 million was being used in MSIL's day to day trading;

(2) between 2001 and 2007 MSIL only used US$20 to US$30 million in its trading, against a background of about US$100 million in capital;

(3) Bernard Madoff had explained to him in 2007 that the main reason why MSIL was so over capitalised was because he liked to have MSIL capitalised at a quarter of the capital of the New York firm.

401.    Mr Flax said in an interview on 6 August 2009 that he was aware that MSIL was (in his words) '*very handsomely capitalised*', having '*a hell of a lot of capital*', and that of the US$200 million which MSIL enjoyed in capital by the end of Phase 4, he did not think even at this late stage that MSIL was '*using more than US$25 million long and short together*' in its trading activities. Mr Toop accepted in an interview on 8 June 2009 that at all times there was a '*significant surplus*' of MSIL's capital over what MSIL was actually using for trading and he accepted in his Defence that he '*knew when he became a Director in 2003 that not all of MSIL's capital was required for equity trading*'. Mr Toop in his final written submissions accepted that MSIL had excess capital for trading and that he was aware of that position.

402.    Andrew Madoff said in his witness statement that Bernard Madoff '*was constantly insisting that BLMIS should have excess capital as a sign of its financial strength and stability, and it was the same with MSIL.*'

403.    This picture was corroborated by other witnesses. Amber Wood said that she was generally aware that MSIL was very highly capitalised; when considering the position

for the purposes of the introduction of the Capital Requirements Directive in and after January 2007, she thought only about £30 million of MSIL's capital was part of MSIL's trading book and that the company had significantly more funds than it actually needed on a day-to-day basis. Mr Dale's witness statement evidence was that MSIL only used a small percentage of its capital for proprietary trading purposes and that "*I knew that the subordinated loans were unnecessary and not utilised*". In a conversation with Bernard Madoff on 12 January 2007 Mr Dale said that MSIL was only using US$20 to US$30 million of its capital. David Calligan's evidence was that Mr Dale reported during the Arts Club meeting that even by October 2008 MSIL was still only using US$50 million of its then US$200 million in capital, with the surplus being invested in T-Bills. Mr Stevenson said in an interview of 5 June 2009 that he knew from the settlements system that the probable maximum of MSIL's capital used in trading at any time was US$40 million. Peter Allen, in an interview on 15 July 2009, estimated that MSIL only employed around US$30 million in its prime brokerage account for the purposes of its trading activities. This picture was further supported by a number of analyses undertaken by Mr Doxey.

404.    That is not to say that none of the capital from the loans was ever used to generate trading profits. Mr Dale described the proceeds of the loans being to some extent invested in the proprietary trading by the company, the remainder being invested in deposit bearing accounts, gilts, T Bills and IPOs. A number of documents showing the trading limits and positions of the traders from time to time, especially in the later years, lend support to the suggestion that the capital from the loans was in part required and utilised as regulatory and trading capital, although to a limited extent. The high water mark from the Defendants' point of view was an Oracle database document identified by Mr Toop which he had produced at about the 2006 year end analysing the performance by his traders, which suggested that the average daily net position (long and short) of all traders at the end of each day over the year was about US$79m. This suggests some use of the capital provided by the subordinated loans, but no figures were available to calculate how much. A conversation between Mr Dale and Bernard Madoff of 26 June 2007 referred to having US$100 million of capital available to cover positions at that time.

405.    I conclude that the Claimant has established on the evidence that throughout the period between 2001 and 2007, the capital derived from the subordinated loans was largely, but not wholly, surplus to trading and regulatory requirements. For some of the period some was used to cover trading positions, but even then it was usually not a majority of the loan proceeds. In that sense, and to that extent, it was unnecessary capital.

406.    That is not to say, however, that there is no advantage for a company like MSIL in being highly capitalised. It assists in the recruitment and retention of traders, who know that their trading capacity will be limited by available capital. It improves creditworthiness, so as to render the company more attractive to trading partners concerned with counterparty risk. It may enable it to negotiate better margin terms. It better equips the company to weather adverse market conditions, as the recent banking crisis has so dramatically demonstrated. It may equip the company to take swift advantage of business opportunities. It enhances the standing and prestige of a company, which was one of Bernard Madoff's reasons for wanting to keep BLMIS and MSIL highly capitalised. In these circumstances I find difficulty in knowing

where to draw the line between a company which is well capitalised (permissible and desirable) and one which is "overcapitalised" (impermissible). Mr Allen in his interview rejected the description "overcapitalised" in favour of "extremely well capitalised". The Claimant's case simply assumed that any capital beyond that immediately needed for trading and regulatory purposes rendered MSIL "overcapitalised". I do not accept that that is so for a business like MSIL in Phase 4, which was looking to expand and build a new business. In my view, for the relevant period it would be more accurate to characterise MSIL as highly capitalised than overcapitalised.

*Loss: return on the capital*

407. The Claimant's case, in its final articulation, was not that there was anything wrong per se in being so highly capitalised, but that the vice of the transactions lay in being unable to service the interest on the loans from trading profit or investment income used from deploying the capital. The written closing submissions argued: "Whilst there is nothing wrong with being highly capitalised *per se*, there is where the capitalisation takes place at an interest cost in circumstances where the company cannot or does not at least generate sufficient profits to cover the making of such interest payments." This assumes that the vice in entering into such a loan agreement is not merely that the capital is not required for trading purposes, but is additionally a knowledge or belief that it would be loss making in that way. The gravamen of the complaint is not merely that the loans were "unnecessary" but additionally that they were "burdensome" in that they cost MSIL more than the benefit conferred.

408. The loans became part of MSIL's funds available as working capital. To the extent not required for trading, such capital was usually invested in low risk fixed income investments such as bank deposits or gilts. There is no detailed evidence of the return on capital earned in this way from the two subordinated loans. There was no disclosure on the question by the Claimant, nor any financial analysis put forward by any witness for the Claimant. As I have explained, the dispute at the beginning of the trial as to how to deal with this issue resulted in agreement to address the liability questions on such evidence as was available at the trial. On those issues the Claimant bears the burden of proof. I bear in mind that the Claimant has access to the underlying documentation which would have enabled it, had it so chosen, to conduct a financial analysis of the position. By contrast the Defendants were not provided with the material to enable them to do so, but were left to construct argument on the point on the basis of such very limited documentary material as was disclosed for different purposes.

409. I confess that I was surprised that the Claimant hoped to make good a claim against the directors on this basis whilst at the same time maintaining that it did not need to address what return on use of the capital was in fact achieved by MSIL, or whether and to what extent it was less than the interest payments. Whatever the relevance of such question for the purposes of meeting a "no loss" argument, the allegation of breach of duty by the directors must posit that they knew or believed that the loan agreements suffered from this loss making vice. I recognise of course that it is important to focus on the knowledge and expectation of the directors at the time of the impugned transaction, not merely the subsequent result; one may hypothesise a director who believes that a transaction will be loss making which unexpectedly turns out to be profitable. Nevertheless I find it inherently unlikely that a director will have

been acting against what he perceives to be the interests of the company where, without any secrecy, he causes the company to take a loan, on commercial terms, approved by a regulator, which is then employed earning returns which are sufficient to service the interest repayments and is not in fact loss making for the company. Directors do not normally enter into such transactions intending the company to suffer a loss. Where the company makes no such loss, clear and cogent evidence will be required that such a result confounded the director's expectations before one can safely reach the conclusion that he was not acting in good faith.

410.    Mr Raven's evidence in his SFO interview suggested that the return was less than the rate of interest on the loans because generally they were lucky to achieve LIBOR for the fixed income investments. His recollection was that margin over LIBOR for the loans had been reduced from 0.5% to 0.25% and his answers spoke in terms of being lucky to earn LIBOR on deposits and therefore of losing a quarter percent as a result of the interest payments. This was obviously a generalised observation rather than an attempt to quantify the exact position from time to time. Nevertheless the tenor of the answers was clearly that in general terms the returns were less than the interest payments over parts of the period, and that latter were being subsidised by the subventions.

411.    Mr Dale's evidence was that sometimes the earnings were more than sufficient to cover the cost of the repayments and sometimes inadequate: for at least several years he was getting a better rate from the banks than 0.5% over LIBOR; at other times he was receiving a lower rate of return. Over the whole period he regarded the position as neutral: there was probably neither a loss nor a profit as a result of taking out the loans. Mr Dale was better placed than Mr Raven to give evidence on the issue, as the man who had day to day responsibility and control over the treasury function. Given the pressures imposed upon him by his settlement agreement, I see no reason to doubt the honesty of this evidence in favour of the defendants, which is consistent with answers given by him in earlier interviews. It is supported by Mr Flax's evidence, which I accept, that he looked at the interest paid and earned and did a calculation (as I understood it for the purpose of the proceedings, not at the time) which revealed that "there wasn't very much in it. So either it [the capital from both loans] was profitably employed or it didn't cost us very much over the period." He described it as "more or less a wash" meaning overall neither profitable or loss making.

412.    On the limited material available I conclude (solely for the purposes of deciding issues of liability) that there were some times when use of the capital rendered the loans loss making, in the sense that the trading profits and investment income generated by the loan capital was less than the amount of the interest repayments, and some when it rendered them profitable. Over the period between 2000 and 2007 the overall effect of taking out the loans was neither profitable nor loss making but roughly break even.

*Loss: funding*

413.    In periods when the interest payable exceeded the trading and investment returns, there would potentially be a loss to MSIL. But because MSIL was funded by BLMIS in the way I have described earlier in this judgment, there was no net cost to MSIL even for such periods. In October 2001, at the beginning of Phase 4, Mr Flax made a written request in advance for funds specifically for the purpose of making the first

interest payment on the first loan. Thereafter BLMIS provided subventions to MSIL from time to time, at MSIL's request, which were calculated to be sufficient to enable MSIL to meet its expenses and show a profit. The expenses covered included interest payments on the loans. Such subventions therefore covered the interest repayments so far as necessary, not only on a cash flow basis but on a net cost basis: if and to the extent that they would otherwise have been a drain on MSIL's capital or profits, they were made up by the subventions. Again this was not a precise mathematical exercise, but was the broad effect of the subventions. This was the understanding and perception of the directors. It meant that regardless of the return on capital, the interest obligation would be at worst cash neutral for MSIL.

414.    The upshot is that the Claimant has not shown that the loans were loss making to MSIL even ignoring the subventions. If the subventions are taken into account they were not loss making for MSIL, but profitable. The allegations of breach of duty by the directors fall to be considered against that background.

## (19) The Interest Payments: breach of directors' duties

### The alleged breaches

415.    The legal bases for the claims against the directors, and the directors' defences, mirror those in respect of the MSIL Kohn Payments. MSIL alleges breach of the same duties, save for the allegation of unlawful distribution of capital. The directors deny breach and rely on the same additional defences. MSIL alleges that the directors were in breach by (1) causing MSIL to enter into the loan agreements (save Mr Toop who was not then a director) and (2) causing or permitting the Interest Payments to be made. MSIL does not rely upon a failure to terminate the agreements in accordance with their terms as a separate breach, but relies upon the fact that the provisions of the loans permitted termination to support its argument that the Interest Payments themselves gave rise to a separate breach because they were not an inevitable consequence of entering into the agreements in the first place.

### Good faith interests of MSIL/reasonable skill and care

### Mr Flax

416.    Mr Flax drafted the first agreement and signed the board resolutions approving both agreements. He was himself responsible for many of the transfers by which the Interest Payments were made.

417.    Mr Flax believed that the first loan was to facilitate the expansion of trading and in particular because of the capital requirements of joining Jiway. That was supported by Bernard Madoff having told him that joining Jiway would require a capital deposit of US$65 million. The Claimant submitted that Mr Flax should have made his own inquiries as to Jiway's capital requirements and in failing to do so he did not exercise his own independent judgment or was negligent. I regard this criticism as unfounded. He acted honestly and reasonably in relying on Bernard Madoff in this respect, in a conversation to which Mr Raven was party. Jiway was not his area of expertise, nor was it his function to gainsay Bernard Madoff on what capital would be desirable for the latter's plans for the company.

418.   Mr Flax understood that the second loan was required because of MSIL's future expansion plans, both for the black box, and more generally for use by traders as and when the expansion of trading developed. Mr Flax also understood that one purpose of the company being well capitalised was to enable Bernard Madoff to take up trading opportunities as and when they arose and that in doing so he was taking a long term view of his UK business.

419.   In this way Mr Flax honestly believed that both loans were in the interests of MSIL. That was a reasonable belief in circumstances where:

(1)   The loans were on commercial terms, approved by the FSA and recorded openly in the company's books and accounts.

(2)   The loans were determined and approved by those directors most closely concerned with the future trading activity, including not merely Bernard Madoff himself but also Mr Raven and Andrew Madoff. By contrast Mr Flax had no trading expertise or experience. He was entitled to rely on the judgment of his fellow directors.

(3)   The transactions were in accordance with the wishes of Bernard Madoff, the chairman and almost sole voting shareholder. Mr Flax was entitled to treat this as a consideration which made them in MSIL's interests for the reasons I have explained in relation to the MSIL Kohn Payments.

(4)   Bernard Madoff's plans for the expanded trading in Phase 4 were not rigidly formulated, so far as Mr Flax was or ought to have been aware, and could reasonably have been expected to be fluid depending on developing circumstances such as market conditions, business opportunities and the quality of available recruits.

(5)   Whatever the deployment of the capital, there was no reason for Mr Flax to think MSIL would suffer a loss. The transaction was expected to be, at worst, cost neutral to MSIL: if some were not used to generate trading profit, there was no reason to believe that the combination of the investment income on that part and the trading profits would be insufficient to cover the interest payments; and to the extent that the interest payments were not exceeded by the trading profits and investment income generated by the use of the capital, any shortfall would be made good by the subventions by BLMIS.

420.   For the same reasons Mr Flax acted honestly and reasonably in causing or permitting the Interest Payments to be made when they fell due. The Claimant alleged that he should have monitored the capital position so as to put a stop to the payments when the failure of Jiway, and the statistical arbitrage book, removed at least in part what he had understood as the rationale for agreeing the loans. This again I regard as a misplaced criticism. The loans were understood to be for the expansion in trading generally, which Mr Flax knew was in fact taking place by the recruitment of traders and development of trading patterns over the period. The capitalisation of the company was not Mr Flax's area of concern or responsibility and he was not in a position to judge the future capital needs of the company as it expanded. It was not his responsibility to monitor how the capital was employed in trading or in investments, which was Mr Dale's function. None of Bernard Madoff, Andrew

Madoff, Mark Madoff, Mr Raven, Mr Dale or Mr Toop suggested to Mr Flax that the extent of capitalisation of the company required reconsideration. MSIL was contractually obliged to make the Interest Payments. Mr Flax still had no reason to think that the continued existence of the loans was contrary to MSIL's interests or was causing a loss. There was no negligence or breach of duty on Mr Flax's part in remaining comfortable with the status quo.

421.   Mr Flax was not in breach of his duties to act in what he perceived to be the interests of MSIL and to exercise reasonable skill and care.

*Mr Raven*

422.   Mr Raven signed both agreements on behalf of MSIL and the board resolutions approving them. He was himself responsible for some of the transfers by which the Interest Payments were made, and was aware of all of them.

423.   Mr Raven understood that Bernard Madoff wanted to capitalise the company for the purposes of its expansion. When the agreements were entered into he believed that the loans were desirable for the development of the business, including joining Jiway, becoming a registered market maker for NASDAQ Europe and proprietary trading including the statistical arbitrage book.

424.   In this way Mr Raven honestly believed that the loans were in the interests of MSIL. His belief that loans for these purposes were in the interests of MSIL was a reasonable belief in circumstances where:

(1) The loans were determined and approved by Bernard Madoff. The transactions were in accordance with the wishes of Bernard Madoff, the chairman and almost sole voting shareholder. Mr Raven was entitled to treat this as a consideration which made them in MSIL's interests for the reason I have explained in relation to the MSIL Kohn Payments.

(2) Bernard Madoff's plans for the expanded trading in Phase 4 were not rigidly formulated, so far as Mr Raven was or ought to have been aware, and could reasonably have been expected to be fluid depending upon developing circumstances such as market conditions, business opportunities and the quality of available recruits.

(3) There was no reason to think at the time the loans were taken out that the capital would not be required for the trading; the black box trading alone might foreseeably have required capitalisation to this extent.

(4) The loans were on commercial terms, approved by the FSA and recorded openly in the company's books and accounts.

(5) Whatever the deployment of the capital, there was no reason to think MSIL would suffer a loss. The transaction was expected to be, at worst, cost neutral to MSIL: if some were not used to generate trading profit, there was no reason to believe that the combination of the investment income on that part and the trading profits would be insufficient to cover the interest payments; and to the extent that the interest payments were not exceeded by the trading profits and

investment income generated by the use of the capital, any shortfall would be made good by the subventions by BLMIS.

425.  At some time after he became CEO in 2003 Mr Raven became uncomfortable with the burden of making the Interest Repayments.  By 2007 he was keen to put an end to them and succeeded in persuading Bernard Madoff to do so by terminating the loans and capitalising them.  His motivation for doing so was his belief that during at least some periods the earnings on the unused capital at LIBOR was a quarter percent below the repayment amounts; and the funding of this by the subventions by Bernard Madoff in order to repay himself made no commercial sense.  It was this aspect he regarded and described as "cockeyed", "cockamamie" and "a charade".

426.  His desire to put an end to the loans was driven by the same two considerations as those which led him to seek to put an end to the MSIL Kohn Payments.  The first was that he saw his mission as being to build MSIL into a profitable business which could be independent from BLMIS; he therefore wished to remove any resort to the subventions because they were inconsistent with MSIL operating as an independent business.  Secondly he was, as I have explained, uncomfortable about the accounting treatment of the subventions as "fees receivable".

427.  It is difficult to identify when between 2003 and 2007 he came to this view.  It was only in 2007 that he was able to overcome Bernard Madoff's initial resistance: he described Bernard Madoff as getting a bit shirty about it when he tried to be "firm" with him.  He also faced opposition from Mr Dale, who saw an advantage in the capital remaining a dollar denominated loan.  But whenever it was that he first formed the view that the payments ought if possible to stop, I do not think it can be said that thereafter he was not acting in what he perceived to be MSIL's interest in going along with the Interest Payments, merely because he personally thought it desirable to put an end to the loans, in circumstances where:

(1)  The existing arrangements were in accordance with the wishes of Bernard Madoff; and

(2)  The subventions meant that there was no net cost to MSIL; and

(3)  The arrangements were not the subject matter of any adverse comment or criticism from any of the auditors, the regulators or his finance or compliance colleagues, all of whom were aware of the loans, the Interest Payments and the subventions; and

(4)  His Finance Director was arguing in favour of maintaining the loans.  Mr Dale was better placed to form a view on the cost and return of the capital, and it appears from the evidence I have heard that Mr Raven's understanding of the cost to MSIL was unjustified or at least exaggerated.

428.  He was entitled to take the view, as he did, that MSIL's interests were best served by trying to persuade Bernard Madoff and Mr Dale round to his view, as he ultimately succeeded in doing, and in the meantime for the company to fulfil its contractual obligation to make the Interest Payments.  Mr Dale was, after all, better placed to form a view whether they were making a loss on the investments of unused capital, a

topic on which it appears from the evidence I have heard that Mr Raven was overly concerned.

429.  Mr Raven was not in breach of his duties to act in what he perceived to be the interests of MSIL and to exercise reasonable skill and care.

*Mr Toop*

430.  The loans were entered into before Mr Toop became a director in 2003, but he soon became aware of them.  They were discussed in a board meeting of 31 December 2003.  He was not personally involved in making the Interest Payments but knew they were being made.

431.  Mr Toop thought that being highly capitalised was an advantage for MSIL, in particular because it would help him to attract traders who always wanted as much capital backed trading capacity as possible.  This informed his honest belief that the existence of the loans was in MSIL's interests.

432.  That was a reasonable belief in circumstances where:

(1) The loans had been agreed and approved by the board before he became a director.

(2) The transactions were in accordance with the wishes of Bernard Madoff, the chairman and almost sole voting shareholder.  Mr Toop was entitled to treat this as a consideration which made them in MSIL's interests for the reason I have explained in relation to the MSIL Kohn Payments.

(3) There were advantages for MSIL in being highly capitalised.

(4) Bernard Madoff's plans for the expanded trading in Phase 4 were not rigidly formulated, so far as Mr Flax was or ought to have been aware, and could reasonably have been expected to be fluid depending upon developing circumstances such as market conditions, business opportunities and the quality of available recruits.

(5) Whatever the deployment of the capital, there was no reason for Mr Toop to think MSIL was suffering or would suffer a loss.  The transaction was expected to be, at worst, cost neutral to MSIL: if some were not used to generate trading profit, there was no reason to believe that the combination of the investment income on that part and the trading profits would be insufficient to cover the interest payments; and to the extent that the interest payments were not exceeded by the trading profits and investment income generated by the use of the capital, any shortfall would be made good by the subventions by BLMIS.

(6) The loans were on commercial terms, approved by the FSA and recorded openly in the company's books and accounts.  Mr Toop was not made aware of any adverse comment or criticism of the arrangements from any of his finance or compliance colleagues, the auditors, or the regulators, all of whom were aware of the loans, the Interest Payments and the subventions.

433.    Mr Toop was not in breach of his duties to act in what he perceived to be the interests of MSIL and to exercise reasonable skill and care.

*Andrew and Mark Madoff*

434.    Each knew the loans were being made and signed the board resolution approving them. Each must also have been aware that the Interest Payments were being made in accordance with their terms to service the loans.

435.    Andrew Madoff's evidence was that there was no discussion of the loans or their purpose between them and their father, but that the amount of capitalisation did not seem unusual and Bernard Madoff was constantly insisting that BLMIS should have excess capital as a sign of its strength and stability and it was the same with MSIL. The level of capitalisation did not raise any concerns or suspicions.

436.    In my judgment this was sufficient to entitle them to conclude, as I find they did, that the loans were in MSIL's interests. In particular:

(1) The loans were on commercial terms and there was no reason to think they would cause a loss to MSIL.

(2) The loans were desired by Bernard Madoff as the majority shareholder and approved by his brother Peter as the only other voting shareholder.

(3) There were advantages for MSIL in being highly capitalised which I have addressed above, including the demonstration of financial strength and stability which their father identified.

(4) They were aware of the plan to expand MSIL's trading in general terms and of a number of the specifics. They were party to the board meeting approving MSIL joining Jiway. Andrew Madoff was involved in introducing the new systems for the new trading in London, and must have been aware of the intention to start the statistical arbitrage book. Minutes of a management meeting he attended in 2002 suggest that he envisaged it would run at a US$100m span ($50m short and $50m long). In these circumstances the brothers could reasonably have expected that further capital might be needed.

437.    If I had concluded that they had failed to address their mind to the question whether the loans were in MSIL's interest, I would still have concluded that they would not have been in breach of fiduciary duty because an honest and intelligent man in the position of each brother could reasonably have believed that the loans were in the interests of the company. That was the belief of those in London whose function it was to address such questions, including Mr Raven and Mr Flax, whose belief that the loans were in MSIL's interests was honest and reasonable for the reasons I have addressed.

438.    Neither Andrew nor Mark Madoff was in breach of his duties to act in what he perceived to be the interests of MSIL and to exercise reasonable skill and care.

*Exercise of powers for improper purpose*

439.   Entering into the loan agreements was not a breach of this duty by the directors.  The power exercised was the power to borrow money.  The purposes for which it was conferred included raising capital for potential use by the company in its business. The purpose for which it was exercised was to raise capital for potential use by the company in its business.  The power was not exercised for a purpose other than that for which it was conferred.

440.   The same is true of the making of the Interest Payments themselves, which were the fulfilment of contractual obligations properly undertaken towards Bernard Madoff.

**(20) The Interest Payments: defences**

*Duomatic*

441.   Peter Madoff was aware of the loan agreements having signed the board resolutions approving them and was aware of the resulting interest obligations and of the Interest Payments.  I readily infer that he approved them.

442.   I reject the Claimant's arguments that the ***Duomatic*** principle is inapplicable because MSIL was insolvent or of doubtful solvency or because the transaction must be bona fide or honest.  The reasons which I have given when considering those arguments in the context of the MSIL Kohn Payments apply equally and mutatis mutandis to the Interest Payments.  The Claimant did not establish that the loan capital provided by Bernard Madoff itself came from the proceeds of the fraud, nor that any subventions supporting the Interest Payments did so.

443.   Accordingly if, and insofar as, entering into the subordinated loans or making the Interest Payments had constituted a breach by the directors of a duty to act in what was perceived to be the interests of the company, or a failure to exercise reasonable care skill and diligence, the company can make no complaint against the directors. The unanimous approval of the voting shareholders is a complete defence to any claim for such breach.

*Causation/remedy*

444.   I have accepted the Claimant's contention that if it established a breach of any fiduciary duty by a director Defendant in misapplying company property, the appropriate remedy would be restoration of the property (subject to relief from sanctions in an appropriate case), without inquiry into the counterfactual hypothesis of what would have happened if the duty had been fulfilled; and that such counterfactual inquiry was only necessary for the purposes of its claim for breach of the duty to exercise reasonable care skill and diligence.

445.   On behalf of Andrew and Mark Madoff it was argued that a distinction arises between breach in entering into the agreements and breach in the making of the Interest Payments; the former was said not to involve any misapplication of company property or engage the director's trustee like obligation to restore company property disbursed in breach of fiduciary duty.  I disagree.  The restoration principle applicable to the issues of causation and remedy applies to the making of the loan agreements as much as to the Interest Payments themselves.  Committing the company to the obligation to make payments is for these purposes itself a misapplication of the company's property

(on the present hypothesis that it is in breach of the director's fiduciary duties).  The position is akin to that in *Forster v Outred* [1982] 1 WLR 86 where a claimant who agreed to mortgage her house as security for an advance to her son suffered damage as soon as she entered into the mortgage deed in reliance on the negligent advice of her solicitors.  If the loan agreements had been for a fixed term with no early termination provisions, such that interest payments were an unavoidable fulfilment of existing contractual obligations, the alienation of the company's assets would have arisen solely through the directors having entered into the agreement.  There could be no doubt in such circumstances that the loan agreement itself was the instrument by which the company's property was alienated.  The same is no less true merely because the agreements in this case contained termination provisions (which were not in fact invoked) so as to impose a separate subsequent duty upon the directors to consider whether to make the payments.

446.  As to the remaining factual issues, I would have found that if the directors were under a duty not to enter into the agreements, or not to make or permit the payments, such a breach by each director was causative of the payments being made.  If any of the directors had made clear that he regarded it as improper, the probable outcome would have been a collective discussion and the taking of legal advice, the upshot of which (on the hypothesis now being considered) would have been that none of the directors should make or permit the loan agreements or the payments.  In those circumstances the directors would collectively have refused to do so, and in that eventuality, it is likely that Bernard Madoff would not have insisted upon it (the hypothesis being that the capital was known to be unnecessary and burdensome).

*No loss*

447.  This issue falls to be considered in the context of the slightly curious procedural position which has been reached by the agreement of the parties.  For the purposes of this argument it is agreed that I should not decide (without further investigation and full disclosure, or a decision for another day on the pleadings) whether the Interest Payments exceeded the return on use of the loan capital, notwithstanding that for liability purposes I have found on the presently available evidence that they do not do so, viewed over the entire life of the loans.  I must therefore assume, for the purposes of the no loss argument, the possibility of such potential loss to MSIL.  But I describe it as a potential loss because any such loss would have been made good by the subventions.  The no loss argument falls to be addressed on this basis.

448.  I have rejected the argument that the funding did not prevent a loss to MSIL because the funds were immediately repayable to BLMIS at and from the moment they were received as a result of what is now known to have been the Ponzi scheme fraud when considering insolvency in relation to the *Duomatic* defence above.  The remaining issue is therefore whether the subventions fall to be ignored as collateral third party payments.

449.  Whilst the position is perhaps less clear cut than for the MSIL Kohn Payments, because only one of the Interest Payments has been identified as having the specific funding in advance, I reach the same conclusion, that the funding of the payments was not collateral.  The purpose of the reimbursement was to make MSIL whole in respect of the Interest Payments amongst other expenses, so as to render the payments at worst cash neutral for MSIL.

450.     Accordingly the no loss defence succeeds in defeating the claim.

*Ex turpi causa*

451.     This defence arises from the Claimant's allegation that Bernard Madoff's true motive in procuring the unnecessary and burdensome loan agreements was to launder the proceeds of his fraud.

452.     The defence fails because the allegation of money laundering is not a necessary part of the Claimant's case. The liability of the directors depends upon their own acts and state of mind. Bernard Madoff's motives form no necessary part of the claim against them; and in any event it is not established that the loans in fact employed money deriving from Bernard Madoff's fraud.

*Limitation*

453.     The limitation period is six years. None of the directors was guilty of a fraudulent breach of trust so as to engage s. 21(1) (a) Limitation Act 1980. Nor was there any deliberate concealment within s.32(1)(b) or 32(2).

454.     This bars the claim insofar as it relies upon the breach being the loan agreements themselves: *Forster v Outred* [1982] 1 WLR 86. On behalf of the Defendants it was argued that this barred the whole claim because the loss was suffered at the moment the agreements were entered into and the payments were merely the consequence of the agreements. I cannot accept this argument. It is a false analysis to treat the Interest Payments as merely fulfilment of the contractual commitments already undertaken. Because of the termination provisions, the directors had a real decision to make as to whether to continue to make the payments. Had they been in breach in relation to those decisions, it would have been no answer to say that they were causing the company to fulfil its existing contractual obligations because they were in a position where they could have avoided the continuation of such obligations.

455.     Accordingly the claim is time barred in respect of Interest Payments made prior to 8 December 2004.

*Relief from sanction*

456.     Had I found that any of the director Defendants was liable or potentially liable in respect of any of the Interest Payments, I would have held that he ought fairly to be excused from any liability in the circumstances, in particular where:

     (1) he acted reasonably and honestly throughout;

     (2) the payments caused MSIL no loss;

     (3) the directors did not seek or obtain any benefit from the payments;

     (4) the payments were approved with full knowledge by all the voting shareholders of the company;

     (5) the degree of fault, if any, was venial; and

(6) the consequences of imposing any personal liability would be unduly harsh, and disproportionate to any degree of fault.

**(21) The Lifestyle Payments: claims and defences**

457. The third element of the claim concerns payments by MSIL for goods or services which were made for the benefit of Bernard Madoff or members of his family. They occurred between 2002 and 2008 and included:

> (1) payments between 17 June 2003 and 23 October 2008 totalling €5,138,647.26 for the purchase of a new Leopard Type 27 Sport motor yacht, *"Bull"*, and related expenses;

> (2) payments between 25 March 2008 and 28 November 2008 totalling £139,532.45 in respect of an Aston Martin motor car bought for Peter Madoff;

> (3) payments between 5 March 2008 and 12 December 2008 totalling €136,695.49 from an account at Fairbairn Private Bank (IOM) Ltd in the Isle of Man by the use of credit cards issued to Bernard Madoff, Ruth Madoff and the captain of *Bull*. These were used primarily for petrol and other expenses in connection with the yacht.

> (4) cash withdrawals from the Fairbairn account between 5 March 2008 and 2 December 2008, again for the private benefit of Bernard Madoff and his family.

> (5) a miscellany of other payments to Bernard Madoff or members of his family for their private benefit, including US$207,519.82 towards antiques, artworks, jewellery and furniture.

458. The total of the payments in their currency of payment is €5,316,629, US$566,535 and £180,009. The payments were made from funds in MSIL's bank accounts.

459. The payments were all made at Bernard Madoff's request. In every case the amount of these payments was deducted from Bernard Madoff's director's loan account which was always in credit. The payments therefore reduced MSIL's liability towards Bernard Madoff by an equivalent amount, which was how they were treated by Mr Flax and recorded in the company's books and accounts. The loan account was a ledger account, not a separate bank account, representing loans from Bernard Madoff to MSIL which were of no fixed term, interest free and repayable by MSIL to Bernard Madoff on demand. Mr Flax's understanding was that the account was always intended to be available to facilitate payments on behalf of Mr Madoff rather than to provide working capital for MSIL. The loans appeared in the ledger as a separate account, and in the annual accounts under "creditors, amounts falling due within one year- loan from director". The balance was confirmed annually by Bernard Madoff in a signed document required by KPMG for audit purposes. The payments themselves were meticulously recorded by Mr Flax in the general ledger, as was their deduction from Bernard Madoff's loan account. There was nothing secret about the payments or their deduction from the loan account. The company's books recording them were audited by KPMG. KPMG were aware of the practice and

raised no concerns. The arrangement was formally recorded in a letter from Mr Dale to Bernard Madoff dated 7 November 2007.

460. Mr Flax and Mr Raven were aware of the payments and responsible for making them, and knew that they were to be debited to Bernard Madoff's loan account. Mr Toop was aware of the Fairbairn account, which he was told was because Bernard Madoff wanted a Euro denominated credit card; he was aware of the issue of two credit cards issued on the account, which he was told by Mr Dale was for the captain of the yacht's use and for fuel; he was told by Mr Dale that payments would be deducted from the loan account, with which he was not previously familiar. He was not aware of any of the other payments. Andrew Madoff and Mark Madoff were similarly aware of the Fairbairn account and its purpose. Additionally Andrew Madoff was aware of a payment for a garden bench for himself. He and Mark Madoff were not aware of any other payments.

461. MSIL contends that a director's loan account is usually for the purposes of providing working capital to the company, and that in any event the loans by Bernard Madoff which were represented by the director's loan account, albeit repayable on demand, provided money which became the company's money. It argues that the directors were in breach of duty in applying such money to purchase goods and services which were not for the benefit of the company itself.

462. This argument is misconceived. The money was applied to discharge, pro tanto, the company's obligations to Bernard Madoff. He requested such payments in his capacity as creditor. There would not have been any breach or impropriety in the money being paid to him, rather than at his request to the provider of the goods and services, as the Claimant accepted. It is not suggested that the directors believed or had reason to believe that the company was insolvent or of doubtful solvency, or that the payments unfairly prejudiced other creditors. It is not suggested that the directors believed or had reason to suspect that the making of direct payments in this way involved any illegality or money laundering. In these circumstances discharging the debt by paying a third party at the debtor's request is no different from discharging it by paying the debtor directly. To describe this conduct as acting otherwise than in MSIL's interests, or as exercising powers for an improper purpose, or as negligent, seems to me unarguable. The directors honestly and reasonably believed that the payments of which they were aware would reduce the loan account, which is what happened. The allegation of breach of duty is in my judgment hopeless.

463. MSIL criticised Mr Raven for referring to this loan account as a current account belonging to Bernard Madoff which the latter was free to spend as he wished, on the grounds that the money used in fact came from accounts in the company's name. This criticism too is misplaced. The analogy with a bank account is in the circumstances of this case a sound one. The account represented a debt payable on demand by MSIL to Bernard Madoff, just like a customer's current account with a bank where the credit balance on the account represents a debt owed by the bank. Bernard Madoff could instruct MSIL to reduce the debt pro tanto by asking it to make payments to third parties, just as can a customer to its bank. A bank uses its own assets to fulfil customer payment instructions, but the bank's directors are not thereby in breach of duty in employing the bank's assets to purchase goods and services to be enjoyed by the customer.

464.   Mr Toop unearthed a document published by HMRC in May 2013 entitled "Director's Loan Accounts Toolkit" which envisaged charging to a director's loan account expenses incurred by the company for the personal benefit of the director. Whilst this is not something which was available to the MSIL directors at the time of the Lifestyle Payments, it nevertheless supports the conclusion there was no impropriety in the practice.

465.   MSIL argued that the payments did not go to discharge any loan obligation on the grounds that the loan was a sham because Bernard Madoff never intended the loan account to be repaid. There was no support for this suggestion in the evidence, and it is belied by his use of the loan account for the payments under consideration. But in any event it is irrelevant to the allegations of breach of duty by the directors who honestly and reasonably believed it to be a genuine obligation. MSIL did not allege otherwise.

466.   MSIL also argued that "In any event MSIL's liability was to return the stolen money it received, and it did not satisfy that liability by spending it on a yacht for Bernard Madoff or an Aston Martin for his brother." I found this rhetoric no more coherent than its other arguments. It was not established that the loan account was funded by stolen money. But even if it had been, there was no suggestion that the directors knew or suspected such to be the case. Moreover if the obligation was "to return" the money received from Bernard Madoff, that is pay an equivalent amount to him, as alleged, I do not understand why making payments to third parties at Bernard Madoff's request would not fulfil such obligation.

467.   That is sufficient to dispose of this claim. Had I concluded that there was any breach of duty, the claim would have failed for the following additional reasons:

   (1) The alleged breaches caused no loss.

   (2) The payments were known to and approved by Bernard Madoff and Peter Madoff and the directors have a ***Duomatic*** defence save to the claim based on improper exercise of powers.

   (3) Claims in respect of payments prior to 8 December 2004 are time barred. The Claimant did not pursue its claim of fraud so as to engage s.21(1)(a) Limitation Act 1980. There was no deliberate concealment within the meaning of s. 32(1)(b) or 32(2).

   (4) I would have granted relief from sanction because the directors acted honestly and reasonably in making or permitting such of the payments of which they were aware.

**(22) Conclusion and postscript**

468.   All claims against each Defendant fail and are dismissed.

469.   I cannot forbear from recording the commendable dignity and restraint which I have observed in each of Mr Raven, Mr Flax, Mr Toop and Mrs Kohn throughout the trial. Bernard Madoff's fraud itself blighted their lives and tainted their good names simply by association, quite apart from the financial losses suffered by some from

investments in the Ponzi scheme. To this was added the burden of this unfounded claim, making serious allegations of dishonesty, which threatened financial ruin and personal humiliation. It was commenced without forewarning – some discovered they were the subject of the claim by reading of it in the newspapers – and has been pursued aggressively and relentlessly over several years, on occasion with an unfair degree of hyperbole (for example referring to the MSIL Kohn Payments as "secret kickbacks" when there was nothing secret about them and on MSIL's own case they were introductory commissions which were not excessive). Mrs Kohn has suffered poisonous press releases by the SIPA Trustee (for example referring to her as Bernard Madoff's "criminal soul mate whose greed and dishonest inventiveness equalled his own") and been subject to a worldwide freezing order and extensive disclosure of her family's assets and affairs. Neither Mr Flax nor Mr Raven, both in their seventies, is in the best of health. In Mr Toop's case the strain of conducting his own defence without legal representation was evident, although he never surrendered his dignity or lost his mordant sense of humour. The stress imposed on them and their families by these proceedings must have been immense, just as it must also have been on Andrew Madoff, seriously ill with cancer, and his and his brother's families. I very much regret that I must have added to their burden by the time it has taken to prepare this judgment. Their honesty and integrity has been vindicated. The resolute and temperate way they have conducted themselves in these proceedings does them great credit.