# EXHIBIT 13

NEW SOUTH WALES SUPREME COURT

CITATION:   Overlook v Foxtel [2002]  NSWSC 17

CURRENT JURISDICTION:       Equity Division
Commercial List

FILE NUMBER(S):  50165/99

HEARING DATE{S}:       17/09/01; 18/09/01; 19/09/01; 20/09/01; 21/09/01;
24/09/01; 25/09/01; 26/09/01; 27/09/01; 28/09/01; 02/10/01;
03/10/01; 01/11/01; 02/11/01

JUDGMENT DATE:       31/01/2002

 PARTIES:
Overlook Management BV - Plaintiff
Foxtel Management Pty Ltd - Defendant

JUDGMENT OF:     Barrett J

LOWER COURT JURISDICTION:       Not Applicable

 LOWER COURT FILE NUMBER(S):      Not Applicable

LOWER COURT JUDICIAL OFFICER:  Not Applicable

COUNSEL:
Mr A.J.L. Bannon SC/Mr S.J. Stanton - Plaintiff
Mr A. Leopold - Defendant

SOLICITORS:
Aitken McLachlan & Thorpe - Plaintiff
Allens Arthur Robinson - Defendant

CATCHWORDS:
CONTRACT - implied terms - caution required in finding that business efficacy
makes term necessary - CONTRACT - terms implied by law - implied term requiring
exercise of good faith in performance of contract - content and meaning of such
implied term - ESTOPPEL - equitable estoppel - assertion of estoppel in face of
written contract - TRADE PRACTICES - unconscionable conduct - calculation of
"price" limit applicable to s.51AC - hallmarks of unconscionability - TRADE
PRACTICES - misleading or deceptive conduct - whether statement by one party
that it appreciates other's position imports duty to preserve that position - actionable
representation versus mere puff - causal link broken where plaintiff relies on own
independent and informed assessment.

ACTS CITED:
Trade Practices Act 1974 (Cth)

DECISION:
Dismissed with costs

JUDGMENT:

53

**IN THE SUPREME COURT
OF NEW SOUTH WALES
equity division
COMMERCIAL list**

**BARRETT J**

**THURSDAY, 31 JANUARY 2002**

**50165/99 – OVERLOOK MANAGEMENT BV  v  FOXTEL MANAGEMENT PTY LIMITED**

**JUDGMENT**

**HIS HONOUR:**

**Background, parties and key persons**

1        The plaintiff, Overlook Management BV ("Overlook"), is a Netherlands company the business of which is to acquire and on-sell television program content.  The defendant, Foxtel Management Pty Limited ("Foxtel"), is one of two companies which, at all material times, provided pay television services in Australia.  The other provider of such services was, at all material times, Optus Vision Pty Limited ("Optus").  Both Foxtel and Optus deliver television channels to Australian subscribers in their homes and other locations, both through cable and by satellite transmission.  Their geographic coverage coincides to a large extent, although South Australia, Western Australia and the Gold Coast are serviced by Foxtel only.

2        Overlook obtains its product (that is, television channel content) from a number of sources.  For present purposes, it is necessary to refer to four non-English language channels in respect of which Overlook enjoyed distribution rights.  RAI International (or simply "RAI") is an Italian language channel, Antenna a Greek language channel, LBC an Arabic language channel sourced from Lebanon and ART another Arabic language channel.  Although Overlook had the ability to supply these channels to carriers, it was not itself the producer of the content.  That content came from television production enterprises in the source countries.  RAI, for example, is a channel of the government owned television organisation in Italy and Antenna is a channel of a privately owned Greek television broadcaster.  Related or associated companies of Overlook acquired from such organisations the right to distribute their channels in particular parts of the world.  It was from those related or associated companies that Overlook obtained the rights which enabled it to enter into arrangements with pay television operators in Australia.

3        The ownership profiles of Foxtel and Overlook should be briefly described.  Foxtel is a joint venture, the members of which are Telstra Corporation Limited, The News Corporation Limited and Publishing and Broadcasting Limited, all of which are substantial corporations well known in Australia and beyond.  Overlook, although incorporated in the Netherlands, is a member of the Dallah Albaraka Group based in Saudi Arabia.  The chairman of that Group is Sheikh Saleh A Kamel.  The Group is controlled by a small number of persons led by the Sheikh and His Royal Highness Prince Al Waleed Bin Tallal.

4       During 1996 and 1997, Overlook, through an agent based in Australia, engaged in discussions with Optus about the possibility of the supply by Overlook to Optus of certain non-English language channels for dissemination through Optus's pay television system.   The Australian agent was Liban Pty Limited, the principal of which was Mr Tony Ishak.  As a result of those discussions, supply arrangements were entered into between Overlook and Optus in relation to both the RAI channel and the Antenna channel.  Although Optus began supplying those channels to its subscribers in 1997, the contractual relationship between the parties was not documented until early 1998.  One of the main employees of Optus engaged on this project and involved in close contact with Mr Ishak was Mr Warren Kelly.

5       At some point in the first quarter of 1998, Mr Kelly left Optus and became an employee of Foxtel. He was immediately assigned to a role involving the possible development of non-English language channels as part of the suite of channels available to Foxtel pay television subscribers.  In early March 1998, a meeting took place at Foxtel's premises in Sydney at which Mr Ishak and Mr Kelly were in attendance, together with another Foxtel employee, Ms May Oh.  At that meeting, preliminary discussions took place about the possibility of an arrangement between Overlook and Foxtel for the provision of non-English language channels by Overlook to Foxtel for delivery through the Foxtel pay television system.  Over the following weeks, these possibilities were further examined, although with Foxtel developing and expressing a preference for the RAI and Antenna (that is, Italian language and Greek language) channels and being less enthusiastic about the two Arabic language channels, ART and LBC.  By the last week of April 1998, the discussions had matured to a point where Mr Kelly prepared two draft term sheets, one for RAI and the other for Antenna, setting out a possible basis for contracts between Overlook and Foxtel.  He sent these to Mr Karim Abdallah, the chief executive of Overlook, who was based in Cairo.  There had been some earlier correspondence between Mr Kelly and Mr Abdallah, the latter having been introduced into the discussions by Mr Ishak.

6       Further negotiations followed.  They were not always easy.   Eventually, however, a point was reached where a documentary basis for the supply of the RAI and Antenna channels was agreed.  On 19 August 1998, documents entitled  "Schedule of Terms of Supply of Antenna" and "Schedule of Terms of Supply of RAI International" were adopted to by the parties as reflecting their agreement.  Central to each arrangement was a fee structure under which Overlook was to receive a percentage derived from sales of the channels to Foxtel customers.  It will be necessary, in due course, to refer to these and other aspects of the negotiations, discussions and correspondence, as well as the final documents.  Foxtel commenced transmission of the RAI and Antenna channels during September 1998.

7       On the Overlook side, the persons involved in the formation of the parties' arrangement, in addition to Mr Ishak, were Mr Abdallah himself, both by teleconference and correspondence from Cairo, and Mr Wahib Geagea, a lawyer representing Overlook who participated from his base in Paris by teleconference and correspondence.   At Foxtel, those involved in addition to Mr Kelly were Mr Richard Freudenstein who was the senior internal lawyer and also had commercial responsibilities and functions, Ms Lynette Ireland who was a Foxtel internal lawyer, Ms May Oh whose early involvement has already been noted and whose duties and specialty lay more in the area of finance and financial analysis and Mr Tom Mockridge, then the chief executive officer of Foxtel.  These eight persons all gave evidence, both on affidavit and in the witness box.

8       It should be explained, at this point, that both Foxtel and Optus marketed their pay television services by way of a "basic" subscription which encompassed a certain core set of channels judged to be of general interest (including news, music, movies and other entertainment), with additional channels catering to particular interests or tastes being available as "add-ons" for those subscribers wishing to have them. There were, of course, differences between the two companies in the content and composition of the basic channel packages, as well as the add-ons.  Each of the non-English languages channels (RAI and Antenna) was, for each supplier, an add-on.  This meant that a Greek speaking or Italian speaking household wishing to have the relevant non-English language channel, whether from Optus or from Foxtel, would have to subscribe for the basic package as a means of obtaining the desired non-English language channel as an additional item in the total subscription.  Such a subscriber might, of course, also elect to have other add-ons, such as channels devoted to new release movies and channels devoted to particular sporting interests. Every subscriber paid a fixed monthly sum for the core package and a further monthly sum for each add-on.

9       Fierce competition existed between Optus and Foxtel.  Each made strenuous efforts to sign up subscribers, including persons already taking the channels of the other company.  Market preferences were such that a particular subscriber would wish to do business with only one pay television supplier at a time. Strategies aimed at persuading the competitor's subscribers to desert it were therefore an acknowledged part of the marketing efforts of each company.  The process by which a subscriber left one company and signed up with the other was known in the trade as "churn".  Customers were thus said to "churn" from one supplier to the other.   "Churn" also occurred when a customer ceased subscribing altogether.

10      The difficulties between Overlook and Foxtel which eventually led to these proceedings began in July 1999, that is, when the channel supply arrangements had been in operation for some nine or ten months. On 1 July 1999, Foxtel acted to reduce the price charged to subscribers for each of the add-on components consisting of the RAI channel and the Antenna channel.  The price initially charged for each add-on was $19.95 per month.  That was in addition to a price of $44.95 for the core channels.  The reduced price for each of RAI and Antenna was $9.95 per month. The monthly charge for the core channels remained at $44.95, although this was later reduced in conjunction with some adjustment to the content of the core package.  Foxtel's reduction of the price for each non-English language channel produced a reduction in the returns to Overlook.  The reason was that the reward or return to Overlook provided for in the arrangements between the two companies was expressed as a percentage (or, rather, in practical terms, a declining percentage on a scale geared to increases in subscriber numbers) of the revenue generated by Foxtel from subscriptions for the particular add-on channels.

11      An effective halving of the subscriber price would thus severely impact Overlook's financial return from Foxtel unless and until offset by a significant increase in subscriber numbers.  An added effect upon Overlook would come from any "churn" represented by subscribers leaving Optus and joining Foxtel. The dissatisfaction of Overlook was compounded by what it regarded as failure by Foxtel to achieve for RAI and Antenna a degree of market penetration commensurate with that which Foxtel had led Overlook to expect.

### Overlook's claims

12      Overlook's claims against Foxtel were articulated as follows:

1:      A claim in contract based on alleged breach of an express oral agreement or an agreement partly oral and express and partly implied by conduct, the relevant term being that the RAI and Antenna channels would be sold by Foxtel at a price of $19.95 per month or that the price would not be varied except by agreement or would not be less than the price charged by Optus or would be such as to preserve Overlook's revenue base achieved through Optus.

2:      A claim in contract based on alleged breach of a term of the written contracts which, on its proper construction, entitles Overlook to the stipulated percentage of the part of the revenue generated from each subscriber by reason of taking the relevant non-English language channel, that revenue element being agreed externally to but not inconsistently with the contracts to be $19.95.

3:      A claim in contract based on alleged breach of implied terms of the contracts to the effect of the alleged expres terms upon which the first claim is founded.

4:        A claim in contract based on an alleged breach of an implied term obliging Foxtel to act in good faith towards Overlook should Foxtel decide to charge the price charged to subscribers for the non-English language channels.

5:        A claim that, because, to the knowledge of Foxtel, Overlook assumed that the price charged to subscribers for each channel would be $19.95 per month and Overlook was encouraged by Foxtel to make that assumption, it was unconscionable for Foxtel to act inconsistently with Overlook's assumption by reducing the price to $9.95 and Foxtel was estopped from so acting.

6:        A claim that the conduct of Foxtel in reducing the subscription price from $19.95 per month to $9.95 per month was unconscionable both in equity and under s.51AC of the **Trade Practices Act** 1974 (Cth).

7:        A claim that Foxtel engaged in misleading or deceptive conduct contrary to s.52 of the **Trade Practices Act** by failing to inform Overlook that it considered itself free to reduce the subscription price without the consent of Overlook.

8:        A claim that Foxtel engaged in misleading or deceptive conduct contrary to s.52 of the **Trade Practices Act** by representing to Overlook that it understood and appreciated Overlook's need to receive $13 per subscriber (based on a subscription price of $20) and would help achieve this.

9:        A claim that Foxtel engaged in misleading or deceptive conduct contrary to s.52 of the **Trade Practices Act** by representing to Overlook that it would achieve specified levels of subscriber numbers by 30 June 1999 and that, in effect, the channels would be successfully marketed.

13      By the closing stages of the trial, the claim most vigorously and comprehensively asserted by Overlook was the fourth of these – alleged breach of an implied term of good faith. Mr Bannon SC, who appeared as senior counsel for Overlook, made it clear, however, that, in adopting that emphasis, his client did not abandon any of its other claims.

### The negotiations
14      Given the way Overlook's case is pleaded, it is necessary to examine the negotiations, both oral and written. Each claim depends, to some extent, for its viability upon findings as to what was represented concerning Foxtel pricing and marketing in relation to the RAI and Antenna channels.

15      Two external influences should be mentioned at this point because they affected the thinking of one or both of the parties as they approached questions about the add-on price to be charged by Foxtel for

the channels.  First, the contract Overlook had with Optus and which pre-dated its arrangements with Foxtel incorporated what was known as a "most favoured nation clause" or "MFN" clause.  Mr Kelly, who had worked for Optus, knew the details of this as did the Overlook negotiators.  Others at Foxtel were generally aware of the existence and intent of such a provision but did not necessarily know its full effect.  In saying this, I should not to be taken to suggest or imply that Mr Kelly had been otherwise than properly attentive to any duties of confidentiality he, as a former employee, owed to Optus.  The second external influence was one in the minds of certain (perhaps all) of the Foxtel negotiators but apparently not appreciated by the Overlook negotiators.  I refer to the provisions of the **Trade Practices Act** concerning resale price maintenance in the form of arrangements or inducements calculated to shape the pricing behaviour of a recipient of goods or services when that recipient becomes an on-seller or on-supplier.  Mr Freudenstein, the senior Foxtel internal lawyer, made it clear in his evidence that the impact of those provisions was something he bore in mind throughout.

16      The Optus MFN clause operated in the context of a contract which expressly stated that the price at which Optus would sell each of the channels would "initially" be $20.  The possibility of subsequent alteration of the price was recognised.  The agreement required Optus to consult with Overlook in good faith in relation to any proposed price change.  There may have been an assumption or expectation (or hope) within Overlook that this meant that the price could not be changed without Overlook's consent.  But that is not what the clause said, its terms being as follows:

> "The licence fee due to OVERLOOK shall be calculated as the product of 65% of the gross amounts paid by the subscribers to the Channel without any deduction from these amounts.  Initially the price for the Channel will be not less than $20.  Vision [ie, Optus] will consult with OVERLOOK in good faith regarding any changes to the price for the Channel."

17      The MFN clause itself was as follows:

> "Vision [ie, Optus] is entitled to the terms of any license by Overlook of the Channel to another party for distribution in the Territory on an MFN basis.  For the avoidance of doubt, Vision will be entitled to reduce the retail price for the Channel and the revenue payments payable to Overlook to the levels applicable under any licence of the Channel to another party for distribution in the Territory."

18      The arrangements between Optus and Overlook thus provided for a fee for Overlook based on a percentage of the price at which Optus sold the channels to its customers.  On the price of $20 applicable "initially", the return of Overlook was $13, the percentage rate being 65%.  Overlook's approach to its negotiation with Foxtel was that it should not – indeed, could not sensibly – be party to an arrangement involving an add-on price for the channels in question lower than that charged by Optus.  Such a move would have had implications for the Optus MFN clause.  Also, availability of the channels from Foxtel at a price lower than that charged by Optus would inevitable see churn from Optus to Foxtel by persons taking pay television largely for the sake of the non-English language channel – assuming always that the basic packages were similarly priced.  Overlook had a commercial interest in seeing pricing so structured that subscribers would not prefer one supplier to the other.  Its aim was to derive revenue from the Optus and Foxtel subscriber bases and through enhancement of each such base.  It was not to its advantage to see customers simply move from one supplier to the other.

19      In the negotiations between Overlook and Foxtel, there existed from the beginning a question as to whether an add-on price of $19.95 (or $20.00 – the amounts were used interchangeably by the parties) was sustainable in the context of the existing basic package price of $44.90 (again used interchangeably with $45).  Indeed, at the initial meeting on 4 March 1998, Mr Ishak raised a concern about the viability of a total price of $64.90 (or $65) for a subscriber wanting one of the additional channels.  He thought it was too expensive.  This was a point of view repeated by the Overlook representatives as the negotiations progressed.  Mr Ishak testified that Mr Kelly countered this concern at the first meeting by saying:

"Foxtel has strong marketing and will do well with these channels. It is the premier pay TV platform in Australia."

20      Ms Oh's version of the Statement made by Mr Kelly was:

"Foxtel has strong marketing. We think we can sell the channels at $19.95."

21      The correspondence and draft term sheets which passed between the parties over the following months throw little light on the pricing issue. The term sheet clauses dealing with the licence fee show an evolution from an assumption that net subscriptions for the channels would be the base to which percentages would be applied to determine Overlook's return to one where the measure became gross subscription revenue. The final version reflected a fee at the rate of 65% of gross subscription revenue. However, this was in the context of a side letter by which Overlook undertook to make payments to a Foxtel affiliate, Customer Services Pty Ltd, for marketing and other services. Those payments were also to be calculated as percentages of gross subscription revenue for the two channels and thus had the commercial result of effectively reducing the 65% rate applicable under the supply arrangements. The fee for services was calculated on a sliding scale of percentages so that, in the case of RAI, on subscriptions for subscribers in the range 2,501 to 4,500 the rate was 15%, for subscribers in the range 4,501 to 6,500 the rate was 25% and for subscribers 6,501 and beyond the rate was 35%. For Antenna, the percentage adjustments were the same, but the brackets of subscriber numbers were 3501 to 5500, 5501 to 7500 and 7500 and beyond.

22      The draft term sheets contain only one reference to the subscription price of the channels. The final documents contain none. Before the quantity discount aspect was separated out into the side letter with Customer Services Pty Ltd (that is, while a sliding scale was still envisaged for the arrangements between Overlook and Foxtel itself), some sample calculations were included in a draft term sheet as a means of explaining or illustrating the operation of the sliding scale provision. These, of necessity, referred to a price. The price mentioned was $10. There is in evidence a copy of this draft bearing handwritten notations made by Mr Ishak. He testified that the notations were made in the course of a teleconference with Foxtel representatives. He had changed "$10" to "$20" and written in the margin, "just no's". He explained that this referred to an assurance given by Foxtel in the course of the teleconference that the $10 reference was purely for the purpose of illustrating the operation of the formula and did not reflect any actual pricing intention.

23      When the agreements were signed in August 1998, it was Foxtel's intention to sell each of the add-on channels at $19.95 per month. It was likewise Overlook's expectation that Foxtel would do so, that having been a common thread in the negotiations. There was never any discussion of another price. Nor is there evidence from which it can be inferred that either party gave any thought to the question of later price changes. These matters are illustrated by the following part of the cross-examination of Mr Abdallah:

"Q. Your understanding, as at July 1998, was that when and if the channels started operating, the retail price would be around $19.95?
A. I was very sure of that.

Q. And you believed that that is what Foxtel thought too; is that right?
A. Yes.

Q. But you did never turn your mind to any question which might arise of whether the price was going to be changed, did you?
A. No.

Q. Just didn't come up in your mind, did it?
A. Not the actual price of our channel.

Q. The changing of price was not something that even occurred to you at any time in the period March to 19 August 1998, is it?
A. Not our channel price.  Maybe they would do a mini basic, but not our channel price.

Q. You didn't even think about the possibility that somebody, because of some change in circumstances, might want to change it?  Didn't occur to you?
A. Correct.

Q. You didn't think there might be some unforeseeable circumstance which might lead you or Foxtel to want to change the price, did you?
A. Correct.

Q. You didn't think:  Oh, there might be some significant change in market conditions or economic circumstances which might lead one or other of us to want to change the price, did you?
A. No.

Q. It follows from those answers that you didn't make any assumption at all, in your mind, about anything to do with changes of price, did you?  You just didn't think about it?
A. I'm sorry, can you ask the question again?

OBJECTION.    TWO QUESTIONS.

HIS HONOUR:  Can you split it up?

LEOPOLD: Q. It follows from the answers you just gave that you didn't make any assumption at all, in your mind, about anything to do with changes to the retail price, did you?
A. Correct, I did not."

24    A combination of Overlook's commercial desire to see the add-on price set at $20 and its concern that the total subscription price of $65 might be too high for the market to bear led to a particular focus by Overlook on Foxtel's marketing planning and projections.  This was made clear by Overlook to Foxtel.  For example, Mr Ishak gave evidence of the following exchange in the course of a teleconference on 15 May 1998 in which the participants were himself, Mr Abdallah, Mr Geagea and Mr Kelly:

> "Abdallah:    'What are your predictions?'
>
> Kelly:    'Our objectives are to recruit 10,000 Greek subscribers and 12,000 Italian subscribers by 30 June 1999.  I shall ask Nicole Crabb to provide Tony with our marketing plan and projections.'
>
> Abdallah:    'That is very optimistic.  We still have not reached these numbers on Optus after two years.  We still have not reached half of your RAI projections and we have been on Optus since February 1997'.
>
> Kelly:    'Foxtel has a very aggressive marketing and advertising division.  That is why it has become the premier pay TV platform in Australia'.
>
> Me:    'Yes Karim, Foxtel is the lead in the industry.  But do you think Warren that you can sell foreign language channels on top of your

|  | very expensive entry tier of $44.95, plus $20.00 for RAI or Antenna'. |
|---|---|
| Kelly: | 'I understand your concern, but our marketing strength and overall package will make the channels a success, plus you are available in three other major cities.  Your channels are going to be sold on a real Pay TV platform who has one business only, pay TV, as opposed to Optus which is selling telephone and television'. |
| Abdallah: | 'You should consider the possibility of selling the ethnic channels as stand alone channels.  Our experiences around the world have taught us that ethnic niche markets respond better to Pay TV subscription by only being able to subscribe to the channel of their choice'. |
| Kelly: | 'This is impossible as Foxtel has minimum guarantees with channels where certain channels must be sold on a tier to subscribers'." |

25      It is accepted by Foxtel that it did make a number of representations to Overlook about marketing. In particular, Foxtel accepts that it made representations to the effect that it had strong marketing skills, that because of those skills and the quality of Foxtel's product it would make a success of the Overlook channels and that it would do everything reasonably and commercially practicable to ensure that an excellent market penetration would be achieved.  Foxtel also accepts that it communicated to Overlook an objective of achieving 10,000 Antenna subscribers and 12,000 RAI subscribers by 30 June 1999.  But it denies that any of this was expressed as a promise or guarantee.

26      Overlook, however, had its own ideas about likely or possible subscriber numbers.  Mr Ishak's estimate was that, by 30 June 1999, Foxtel would have 7,300 subscribers for Antenna and 8,200 for RAI. Mr Abdallah shared these views.  Clearly, therefore, Overlook treated with caution and scepticism the Foxtel projections (or, more accurately, targets) of 10,000 and 12,000.  Despite earlier assertions of reliance on the Foxtel target numbers, both Mr Ishak and Mr Abdallah eventually conceded that they had really done no more than take into account both those targets and Foxtel's apparent confidence that it could achieve them, at the same time making their own business assessments by reference to their own more hard-headed ideas about subscriber numbers.  At the same time, however, Overlook assumed that there would be significant churn from Optus to Foxtel.  It was Mr Abdallah's assessment that around 3,500 Antenna subscribers and 2,400 RAI subscribers would leave Optus and move to Foxtel.

27      In view of these expectations about churn from Optus where the price of two non-English language channels was already $19.95, of which Overlook received 65%, Overlook was concerned to protect that revenue base.  The subscriber levels of 3,500 for Antenna and 2,500 for RAI which attracted the highest licence fee rate of 65% under the Overlook-Foxtel-Customer Services Pty Ltd arrangements was thus explicable by a desire on Overlook's part to ensure such protection.  And that, in turn, assumed a price of $19.95 for Foxtel subscribers.

**The contracts**

28      The documents entitled "Schedule of Terms of Supply of Antenna" and "Schedule of Terms of Supply of RAI International" are dated 19 August 1998.  Each is signed by Mr Mockridge for Foxtel and Mr Abdallah for Overlook.

29      It is not necessary to quote the whole of each document.  It is sufficient to set out clauses 1 to 6, 11 and 17 of the Antenna document, noting that the provisions of the RAI document are the same, except for the description of the channel:

> "1.     **Channels**: Overlook shall supply FOXTEL with the 24 hour Greek language channel known as 'Antenna' ('the Channel').
>
> 2.     **Rights**: Overlook grants FOXTEL non exclusive subscription television rights for all delivery mechanisms (including cable, MDS, pay per view and satellite) for residential and commercial subscribers.
>
> 3.     **Licence Fees**: FOXTEL shall pay Overlook licence fees calculated as the product of 65% of the gross subscription revenue paid by the residential and commercial subscribers to the Channel for the relevant month without any deduction from these amounts except that FOXTEL shall be entitled to deduct withholding tax or similar taxes or charges. The parties acknowledge that the withholding tax rate applicable as at the date of this Agreement under the Australia/Netherlands tax treaty is 10%.
>
> 4.     **Term**: 5 years
>
> 5.     **Commencement Date**: 1 September 1998 unless otherwise agreed by FOXTEL, however the Channel signal must be available to FOXTEL by 15 August 1998.
>
> 6.     **Carriage**: FOXTEL shall carry the Channel as an a la carte channel or, if mutually agreed by both parties, as a stand alone channel.
>
> 11.    **Marketing contribution**: Overlook shall spend in cash and kind at least A$100,000 per annum for the Channel (the 'Overlook Commitment') for the purpose of advertising and promotion of the Channel on FOXTEL.   FOXTEL also agrees to make an equivalent contribution of at least A$100,000 per annum for the Channel for advertising and promotional purposes subject to Overlook making the equivalent contribution.
>
> Each party shall consult with the other in relation to the expenditure of that party's commitment prior to the expenditure of any part of that party's commitment.
>
> 17.    **Binding agreement**: This Agreement is legally binding upon the parties with the understanding that separate long form agreements for the Channel shall be executed as soon as reasonably practicable."

30      The side letters involving Customer Services Pty Ltd were dated 18 August 1998.  The signatories were again Mr Mockridge for Foxtel and Mr Abdallah for Overlook.  There is no need to quote them in detail.   It is sufficient to note that the basis for calculation of the service fee was:

> "the following incremental percentages of gross subscription revenue received by Foxtel from Foxtel residential and commercial subscribers to the Channel …"

31      As with the schedules of terms of supply, there was in each side letter a reference to an intention to enter into a subsequent long form agreement.  There was no suggestion by either party that the references to future long term agreements deprived the schedules of terms of supply and the side letters of contractual force.  In terms of the classifications suggested by the High Court in **Masters v Cameron** (1954) 91 CLR 353 as supplemented by **Baulkham Hills Private Hospital Pty Ltd v G R Securities Pty Ltd** (1986) 5 BPR 9315, these documents belong to either the first class or the fourth.  The important point is that there was an intention to be immediately bound by the terms contained in the documents.

### The price reduction

32      With effect from 1 July 1999, Foxtel took action to reduce the subscriber price of each of RAI and Antenna from $19.95 per month to $9.95 per month.   The rationale for doing so was set out in a paper prepared for the Foxtel board following a request by the board for more information on the performance of those channels.

33      The board paper gave what it called a "summary of subscriber performance" to 28 February 1999.  This showed in relation to both channels that Foxtel had budgeted on numbers of "new installs" (that is, new subscribers who had not previously done business with Foxtel) greatly in excess of the numbers of "upgrades" of existing subscribers (that is, decisions by existing subscribers to take RAI or Antenna as an add-on).  The budget for the period to 28 February 1999 envisaged for RAI 5,366 new installs and 283 upgrades.  The budgeted figures for Antenna were 4,203 and 316.  The reality differed enormously from the budget.  In the case of RAI, there were only 956 new installs (that is, about 18% of budget) but 2,828 upgrades (representing ten times budget).  For Antenna, there were 1,529 new installs (about 36% of budget) but 2,749 upgrades (some 8.7 times budget).  Looking at the total subscriptions to the channels in the period to 28 February 1999, there were 3,874 against a budget of 5,649 in the case of RAI and 4,278 against a budget of 4,519 in the case of Antenna.  Al these figures were net of disconnections.  The board paper stated there were 1,900 subscribers who had elected to take RAI but later discontinued.  The corresponding figure for Antenna was 1,800.  The discontinuation may have been from the particular add-on only or from Foxtel altogether.

34      After giving these statistics and referring to subscribers' expressed reasons for disconnecting, the board paper continued:

> "The analysis shows that subscribers with a foreign language channel are more likely to disconnect due to the total price of their FOXTEL service (ie minimum of $62.90 for cable basic plus one foreign language service).  The proposition that the high price point is limiting take-up is also supported by feedback from Salesforce, which indicates that these subscribers tend to be price sensitive.
>
> In addition, it appears that a greater percentage of these subscribers are switching to Optus than FOXTEL subscribers in general.   The entry price to the Optus service is $19.95 (increased from $9.95 in March 99) in comparison to FOXTEL of $42.95 (increasing to $44.95 from 1 April).  The relatively high entry price to FOXTEL appears to be a deterrent for potential foreign language subscribers.  It appears that the primary reason these people subscribe is for the foreign language channel and the additional benefits of the FOXTEL Basic Package do not outweigh the significant additional cost to a foreign language consumer."

35      The board paper then outlined the twofold strategy of paying a commission to the sales staff (not relevant for present purposes) and reducing the price of RAI and Antenna.  In relation to the latter, it said:

> "More consideration needs to be given to the price point, which will either by $14.95 or $9.95.  This will impact the margin on existing subscribers but is still profitable as licence fees are paid based on a percentage of revenue.  In addition, licence fees payable per subscriber will decrease due to volume discounts as the number of subscribers to the channels increase.
>
> Even with this adjustment the overall price of the FOXTEL package in comparison to Optus (ie Basic service plus one foreign language channel) will still be more expensive with FOXTEL @ $54.90 vs Optus @ $39.90.  This may be able to be further reduced in the next financial year as FOXTEL is contemplating a strategy of tiering movies and reducing the price of the FOXTEL basic package as part of the 1999/2000 budget.   If this strategy is approved by the Board it will further reduce the price differential between Optus and FOXTEL."

36      After referring to the fee structure in the agreements and side letters with Overlook, the board paper stated the financial impact of the proposed price reduction as follows:

> "The financial impact of reducing the price of each foreign language service is as follows:

| Subscriber/mth | Current price | $14.95 | | $9.95 | |
|---|---|---|---|---|---|
| Revenue | 19.95 | | 14.95 | | 9.95 |
| Revenue Share | | (2.99) | | (2.24) | | (1.49) |
| Licence Fees (1) | | (12.16) | | (8.22) | | -- |
| **Margin** | | **$ 4.80** | | **$4.49** | | **$3.48** |
| Addition subs required (2) | | | 300 | | 1,600 |

> (1) Licence fees reduce as a % of revenue for the lower price points due to volume discounts
>
> (2) Additional subscribers required to offset the reduced margin from existing subscribers due to the price reduction"

37      This analysis shows Foxtel's opinion that, notwithstanding a price reduction to $9.95, Foxtel itself would be able to capture the lost revenue by obtaining 1,600 new subscribers for each channel.  An increase of that magnitude in each subscriber base, whether from entirely new subscribers or from upgrades, would see the negative effects of the price reduction offset.  The reduced fees payable to Overlook were, of course, factored into this calculation.

38      A point emphasised by Mr Bannon in relation to the board paper's figures on total subscription numbers is that, at least in the case of Antenna, there was no significant shortfall in sales against budget.  Subscriptions achieved were almost 95% of budget.   The corresponding figure for RAI, however, was only 69%.

39      The price reduction in relation to RAI and Antenna was followed, on 29 September 1999, by a reduction in the price of Foxtel's basic package from $44.95 to $34.95.  This was achieved by removing two movie channels from the basic package.  The price for the basic package plus RAI or Antenna then became $44.90.  Mr Mockridge informed Mr Ishak of this change by letter dated 30 September 1999.  Referring to the impact of the previous price reduction in relation to the non-English language channels alone, Mr Mockridge said:

> "The reduction in the retail price coupled with the carriage of RAI and Antenna on satellite continues to drive subscribers to the channels with an additional 8% increase in the number of subscribers to RAI and Antenna since June 99 to 75% and 54% respectively in comparison to rather minimal growth of 7% to RAI and 13% to Antenna from January 99 to June 99."

40      Mr Mockridge concluded:

> "Given the terms of our distribution arrangements, the changes we have made to these channels will be cash positive to you once we achieve 9,800 subscribers on RAI and 12,200 subscribers on Antenna, a position we hope to reach within the next 12 months."

41      The respective impacts of the add-on price reduction from $19.95 to $9.95 upon Foxtel and Overlook may thus be compared.  From Foxtel's perspective, the net revenue (after licence fees) lost by reason of the reduction would be recouped by obtaining an additional 1,600 subscribers for each channel.  For Overlook, however, the reduced rewards by reason of reduced licence fees would not be recouped until subscriber numbers reached 9,800 for RAI and 12,200 for Antenna.  The required increases need to be appreciated in the context of actual subscriber numbers, as at 28 February 1999, of 3,874 for RAI and 4,278 for Antenna.   From those bases, the increase of 1,600 needed by Foxtel to return to the same net revenue position as before the price reduction was 41% for RAI and 37% for Antenna.  For Overlook, on the other hand, the increases necessary to retrieve lost licence fees were 5,926 (153%) for RAI and 7,922 (185%) for Antenna.

42      Mr Mockridge accepted in cross-examination that these required levels for Overlook were at the upper end of the range of subscribers which Foxtel could reasonably or realistically achieve in the foreseeable future.

43      Another impact of the price cut upon Overlook occurred at the level of Optus subscriptions.  Between June 1999 and June 2001, Overlook suffered a decline in RAI subscriber numbers from 7,538 to 5,455 (a decline in revenue of about $25,000 per month).  The corresponding reduction for Antenna was from 13,341 to 8,373 subscribers ($55,000 per month).

### The first contract claim

44      This claim is based on the supposed existence of an express contractual term to the effect that $19.95 per month was (and was to remain indefinitely) the add-on price for each of the non-English language channels.  To be more precise, Overlook pleads the following express terms:

(a)     that the subscription price per subscriber of receiving RAI and Antenna would not be varied except by agreement between the parties;

(b)     that the subscription price per subscriber to receive RAI and Antenna would be not less than the price of those channels through Optus at the time; and

(c)     that Foxtel would market and sell the channels on the basis that the existing revenue base of Overlook achieved through Optus would be preserved.

45      It seems to me quite clear that this claim fails.  Even allowing for the most comprehensive operation of the objective theory of contract based on an objective manifestation of mutual intention (**Brambles Holdings Ltd v Bathurst City Council** [2001] NSWCA 61), it is not possible to discover any such express term.  It does not appear in the contractual documents.  Nor does it appear in the correspondence.  While the price of $19.95 or $20 was mentioned in discussions and there appears to have been a common expectation that that would be the price for some unspecified period, statements about that price by Foxtel representatives cannot be regarded as promissory, in the sense of having conveyed a contractual assurance that $19.95 or $20 would be the monthly price and that, throughout the five year term, it would never be altered or would not be altered without the consent of Overlook.

46      Furthermore, there are good reasons which would have prevented Foxtel giving any such promise.  First, commercial common sense would have told Foxtel (as it had informed Optus which had accepted only a prior good faith consultation commitment in this area) that it could not afford to tie itself contractually to a particular price for a new and untested product throughout a five year period.  Second, Foxtel's concern about the resale price maintenance provisions of the **Trade Practices Act** would have caused it to steer clear of any form of promise it considered contrary to or questionable under that legislation.

47      In short, mutual expectation and intention as to initial price never became a contractual promise by Foxtel as to price for the five year term.

### The second contract claim

48      This claim alleges an express contractual term to the effect that the fee to Overlook (disregarding the impact of the fee for service under the Customer Services Pty Ltd side letters) was to be 65% of $19.95 per month, regardless of the actual price charged by Foxtel for the add-on channel.

49      The express terms to which the parties subscribed caused both the licence fees payable by Foxtel to Overlook and the service fee payable by Overlook to Customer Services Pty Ltd to be a percentage of "the gross subscription revenue paid by the residential and commercial subscribers to the Channel for the relevant month ….".  The reality was, of course, that a subscriber could not take the non-English language channel alone.  He or she had to take the basic package as well.  In one sense, therefore, the gross subscription revenue paid by each subscriber to the relevant channel was the aggregate sum paid to receive all channels in the particular suite chosen by the subscriber – that is $64.90 in, say, October 1998 for a subscriber who chose the basic package plus one non-English language add-on.

50      There had been no suggestion that this aggregate sum is the figure to which the percentages should be applied.  It is accepted that the "gross subscription revenue" referred to is that related to the particular non-English language channel.  It is a question of how the relationship between that channel and a particular "gross subscription revenue" figure is to be established.  The add-on price itself is the figure most obviously suited to fit the description.  The second contract claim looks beyond that obvious fit and argues that there was an express term that the relevant "gross subscription revenue figure" was fixed at $19.95 per month for the life of the contracts.

51      The written submissions of counsel for Overlook put the proposition in this way:

> "[O]n its face, clause 8 of the Agreements entitles Overlook to 65% of the gross subscription revenue received from a subscriber to the channels.  That would include the amounts paid for the basic service or any other service taken.  In order to avoid that result, one construes 'revenue' to refer to that portion of the total revenue which was the price at which the channels were to be sold.  That price was agreed between the parties externally of but not inconsistently with the agreements to be $19.95.  Hence on its proper construction, clause 8 entitles Overlook to be paid 65% of the amount of $19.95."

52      This is a strained construction.  In a context where an aggregate sum is received from a person to whom two commodities have been marketed at prices clearly identified for the respective commodities, it is an unnatural use of language to say that, of the total "received", some part other than the sum identified with one commodity is received by reason of or in relation to the sale of that commodity. The ambiguity to which the submission refers is much more comfortably resolved by supplying the words "for the Channel" after "for the relevant month".

53      As in the case of the first contract claim, it seems to me impossible to find the express term Overlook alleges, even allowing for the most comprehensive operation of the objective theory of contract. If the parties had intended to contract by reference to 65% of an immutable $19.95, they would simply have written in $13 (or $12.97) without resort to any formula or method of calculation since none would have been needed.


**The third contract claim**

54      The basis of this claim is implied terms to the effect of the express terms the subject of the first contract claim.

55      In order to determine whether such terms can be said to be implied, it becomes necessary to examine the matter against criteria most often associated with observations of members of the High Court in **Codelfa Construction Pty Ltd v State Rail Authority** (1982) 149 CLR 337.  A useful description of those criteria appears in the judgment of Tadgell JA (with whom Buchanan and Chernov JJA agreed) in **Narni Pty Ltd v National Australia Bank Ltd** [2001] VSCA 31:

> "It is trite but nevertheless useful to recall that, as Mason J noted (with the concurrence of Stephen and Wilson JJ) in **Codelfa Construction Pty Ltd v State Rail Authority of New South Wales** [(1982) 149 CLR 337], the implication of a term in a contract is designed to give effect to the parties' presumed intention.  What his Honour there called "the conditions necessary to ground the implication of a term" were summarized by the majority in **BP Refinery (Westernport) Pty Ltd v Shire of Hastings** [(1977) 180 CLR 266 at 283] thus '… (1) it must be reasonable and equitable; (2) it must be necessary to give business efficacy to the contract, so that no term will be implied if the contract is effective without it; (3) it must be so obvious that "it goes without saying"; (4) it must be capable of clear expression; (5) it must not contradict any express term of the contract'.  Although **Codelfa** and various other earlier and later decisions of the High Court indicate that the above-quoted formulation of principle may be regarded as authoritative, it is fair to say that some of the five conditions are sometimes seen to be difficult to apply and not always to serve as practical criteria.   For example, Aickin J in **Codelfa** suggested that, in approaching 'the question whether there is to be a term implied into the contract', a consideration of the remark of the 'officious bystander' postulated by MacKinnon LJ, from which the condition numbered (3) evidently draws inspiration, is not always helpful or useful; and that 'it seems no longer the exclusive means of approaching the question'.  The five conditions, although evidently expressed to operate cumulatively, may nevertheless overlap; and in some cases, I think this is one of them, a more simplified approach may be appropriate and permissible.  Thus, in **Marcan Shipping (London) Ltd v Polish Steamship Co (The Manigest Lipkowy)** [(1989) 2 Lloyd's Rep 138 at 142] May LJ remarked -
>
> > 'For my part, I think that reference to the officious bystander frequently does not assist in deciding whether or not a term is to be implied. Officious bystanders may well take different views depending on which

> side they happen to be standing.  In my judgment it is quite clear from such cases as **Liverpool City Council v Irwin** [1997] AC 239, that the real basis upon which a term can be implied in contracts such as this is that they are necessary in order to make the contract work.'

In the same case Bingham LJ expressed this succinct dictum on the point,

> > 'I take it to be well-established law that a term will be implied only where it is necessary in a business sense to give efficacy to the contract or where the term is one which the parties must obviously have intended.'"

56      The task of the court must be undertaken with the degree of caution enjoined by Giles JA (with whom Heydon JA and Ipp JJA agreed) in **State Bank of New South Wales Ltd v Currabubula Holdings Pty Ltd** (2001) 51 NSWLR 399:

> > "As is stated by Mason J in **Codelfa Construction Pty Ltd v State Rail Authority of New South Wales** at 346, the courts are slow to imply a term.  It is not enough that it is reasonable to imply a term.  It must be necessary to do so in order to give business efficacy to the contract and the term must be so obvious that it goes without saying; 'Further, there is the difficulty of identifying with any degree of certainty the terms which the parties would have settled upon had they considered the question'."

57      The same need for caution was referred to more recently in the following passage in the judgment of Kirby J in **Roxborough v Rothmans of Pall Mall Australia Pty Ltd** [2001] HCA 68 (6 December 2001):

> > "Whatever may be the precise legal criterion for implying terms into a contract upon which the parties have not expressly agreed, it would always be necessary for a court of our legal tradition to be very cautious about the imposition on the parties of a term that, for themselves, they had failed, omitted or refused to agree upon.  Such caution is inherent in the economic freedom to which the law of contract gives effect.  Absent some statutory or equitable basis for intervention, it is ordinarily left to the parties themselves to formulate any agreement to which they consent to be bound in law.  As MacKinnon LJ, who is usually credited with inventing the fiction of the 'officious bystander', admitted:

> > > '[I]n most … cases the Court has … to find … the obvious common agreement, upon a matter as to which it must have the strongest suspicion that neither party ever thought of it at all, and that, if they had, they would very likely have been in hopeless disagreement what provision to make about it'."

(According to Kirby J's footnote, the quoted passage comes from a lecture delivered by MacKinnon LJ at the London School of Economics on 3 March 1926 quoted by Phang, "Implied Terms, Business Efficacy and the Officious Bystander – A Modern History", (1998) JBL 1)

58      The terms which Overlook says are to be implied do not, to my mind, pass the applicable tests.  Had the parties been asked at inception whether their contracts included each of those terms, an affirmative answer in unison would not have been forthcoming.  Foxtel, for its part, would have demurred on a number of grounds, the most obvious being its concern about the resale price maintenance provisions of the **Trade Practices Act**.  There would have been a ready and immediate acceptance of the proposition that Foxtel

could not reduce the price of the channels to zero, thereby depriving Overlook of all revenue. But beyond that obvious common ground, it is most unlikely that any unwritten term on the subject of pricing and price variations would have been regarded as so obviously applicable to a contract of five years duration that it went without saying. No case of necessity in order to achieve business efficacy has been made out.

### The fourth contract claim

59      Overlook's fourth claim in contract presupposes that Foxtel was not under any explicit restriction preventing it from changing the subscriber price for RAI and Antenna at will. The claim is founded on an implied obligation of Foxtel to act in good faith towards Overlook in the performance of the contract. An implied term of good faith is said to arise both as a matter of law and by reason of the facts and circumstances of the case.

60      Viewed against the standard for the implication of terms on the **Codelfa** basis already discussed, the term which Overlook seeks to imply from the facts and circumstances of the case (that is, not by implication of law) seems to me to be problematic. There is nothing special or unusual about the circumstances of the contract between Overlook and Foxtel which would cause an obligation of good faith performance to be written in by the court on the grounds of presumed intention or business efficacy. There is nothing to suggest that the parties would have embraced such a provision had their minds been directed to the possibility of adopting it. They would in all likelihood have said that the contract as written worked perfectly well without it. I therefore conclude that the postulated terms are not to be implied on the **Codelfa** basis.

61      An entirely different question is whether an obligation of good faith is by law implied into the parties' contract. The High Court has recently re-affirmed that certain contractual terms are to be regarded as implied by law. In **Peters (WA) Ltd v Petersville Ltd** (2001) 75 ALJR 1385, a case concerning licensing of a brand name with associated restraint of trade, Gleeson CJ, Gummow, Kirby and Hayne JJ said:

> "The law already implies an obligation by the respondents to do all such things as are necessary on their part to enable Peters WA to have the benefit of those licence arrangements. [**Butt v McDonald** (1896) 7 QLJ 68 at 70-71; **Secured Income Real Estate (Australia) Ltd v St Martins Investments Pty Ltd** (1979) 144 CLR 596 at 607-608]. It is not now necessary to consider the basis of the implication. The law also implies a negative covenant not to hinder or prevent the fulfilment of the purpose of the express promises made in Art 5. [**Shepherd v Felt and Textiles of Australia Ltd** (1931) 45 CLR 359 at 378]."

62      An additional term implied by law into commercial contracts is a term requiring the exercise of good faith in the performance of the contract. This is now in this State a legal incident of every such contract: **Burger King Corporation v Hungry Jack's Pty Ltd** [2001] NSWCA 187. It takes its place beside the terms referred to in **Peters (WA) Ltd.**

63      But what are the content and effect of such an implied term? This question was the subject of discussion by the Court of Appeal in **Burger King**. Sheller, Beazley and Stein JJA referred to the observation of Sir Anthony Mason in his 1993 Cambridge Lecture (see now (2000) 116 LQR 66 at 69) that the concept "embraced no less than three related notions", being:

> "(1)      an obligation on the parties to co-operate in achieving the contractual objects (loyalty to the promise itself);
>
> (2)      compliance with honest standards of conduct; and

> (3)    compliance with standards of conduct which are reasonable having regard to the interests of the parties."

64      There is some overlap here with the terms implied by law as referred to in **Peters (WA) Ltd**.  Sir Anthony's duty of "loyalty to the promise itself" may well include the duties not to hinder fulfilment of the promise's purpose and to do everything necessary to enable the other party to have the benefit of the promise.  The more substantial and separate content of the duty of good faith itself would therefore seem to lie in the second and third limbs of Sir Anthony's formulation – that is, adherence to standards of conduct which are honest, as well as being reasonable having regard to the parties' interests.

65      If adherence to such standards of conduct is the predominant component of a separate obligation of good faith in performance of a contract, it becomes necessary to enquire about the extent to which selflessness is required.  It must be accepted that the party subject to the obligation is not required to subordinate the party's own interests, so long as pursuit of those interests does not entail unreasonable interference with the enjoyment of a benefit conferred by the express contractual terms so that the enjoyment becomes (or could become), in words used by McHugh and Gummow JJ in **Byrne v Australian Airlines Ltd** (1995) 185 CLR 410, "nugatory, worthless or, perhaps, seriously undermined".  This seems to me to be the principle emerging from paras 172 to 177 of the joint judgment in **Burger King** where the various authorities are collected and discussed.

66      Dr Elisabeth Peden of the University of Sydney has characterised the effect of the good faith requirement in contractual performance as follows ("Incorporation of Terms of Good Faith in Contract Law in Australia", (2001) 23 Syd L.Rev 222):

> "Most basically, by using the obligation to perform in good faith as a principle of construction the courts are merely required to ensure that the parties have genuinely adhered to the bargain which they entered into.  This will require an examination of the whole contract and the underlying intentions.  Strict rights may not be adhered to, if in the context of the contract as a whole, this would subvert the character of the contract.  Most cases that discuss the concept do so in terms of negatives, that is, what is not in breach of good faith.  This makes sense, since it is the context of the contract read as a whole that will indicate what is appropriate and what is not."

67      Viewed in this way, the implied obligation of good faith underwrites the spirit of the contract and supports the integrity of its character.  A party is precluded from cynical resort to the black letter.  But no party is fixed with the duty to subordinate self-interest entirely which is the lot of the fiduciary: **Burger King** at para 187.  The duty is not a duty to prefer the interests of the other contracting party.  It is, rather, a duty to recognise and to have due regard to the legitimate interests of both the parties in the enjoyment of the fruits of the contract as delineated by its terms.

68      In many ways, the implied obligation of good faith is best regarded as an obligation to eschew bad faith.  This is borne out by the following succinct statement by Lord Scott of Foscote in **Manifest Shipping Co Ltd v Uni-Polaris Shipping Co Ltd** [2001] 2 WLR 170, a case concerning the duty of good faith in the insurance context:

> "Unless the assured has acted in bad faith, he cannot, in my opinion, be in breach of a duty of good faith, utmost or otherwise."

69      The approach which regards a duty of good faith as a duty to eschew bad faith is also supported by United States jurisprudence to which resort may appropriately be had: **Renard Constructions (ME) Pty Ltd v Minister for Public Works** (1992) 26 NSWLR 234; **Burger King** at para 147ff.  Writing in 1968, Professor Summers described the duty of good faith imposed by the United States Uniform Commercial

Code as an "excluder": R.S. Summers, "Good Faith in General Contract Law and the Sales Provisions of the Uniform Commercial Code", (1968) 54 Va L Rev 195. Its operation and effect were stated as follows:

> "It is a phrase without general meaning (or meanings) of its own and serves to exclude a wide range of heterogeneous forms of bad faith. In a particular context the phrase takes on specific meaning, but usually this is only by way of contrast with the specific form of bad faith actually or hypothetically ruled out."

70      In **Tymshare Inc v Covell** 727 F2d 1145 (1984), Scalia J concluded that:

> "The doctrine of good faith performance is a means of finding within a contract an implied obligation not to engage in the particular form of conduct which, in the case at hand, constitutes 'bad faith'."

71      Scalia J went on to say that the contract itself will indicate the content of the duty in the sense that it is imbued or infused with the obligation not to engage in particular conduct.

72      Turning to the contracts between Overlook and Foxtel, the first task of the court is to discover its character so that there may be an appreciation of what may be entailed in upholding the integrity of that character. The same inquiry should lead to an appreciation of the prohibitory or negative spirit with which the contracts are infused in order to protect the parties' legitimate expectations of enjoyment from being rendered nugatory or worthless or seriously undermined. Having discovered these matters, the court must proceed to decide whether the conduct of Foxtel was, in the light of them, such as to cause those legitimate expectations of enjoyment to be affected in any of the ways mentioned.

73      A prohibitory or negative spirit precluding capriciousness will readily be accepted as attending the parties' contracts. The exclusion of capriciousness as an acceptable form of behaviour in the performance of the contract will prohibit conduct which has no rational basis or objective explanation. A prohibition or negative spirit precluding purely selfish behaviour calculated to destroy the position of the other party will also readily be accepted. It is more difficult to identify the point at which the prohibitory or negative spirit intervenes to preclude conduct which reduces immediate enjoyment (or the quantum thereof) which is undertaken with a view also to enhanced future enjoyment.

74      A point to be noted is that, in **Burger King** and in most, if not all, of the earlier Australian cases in which an obligation of good faith or reasonable conduct in contract performance has been found to be implied by law, the question in issue has involved exercise of a right or power arising from the terms of the contract. In **Alcatel Australia Ltd v Scarcella** (1998) 44 NSWLR 349, Sheller JA noted that the earlier cases of **Renard** (above) and **Hughes Bros Pty Ltd v Trustees of the Roman Catholic Church for the Archdiocese of Sydney** (1993) 31 NSWLR 91 had concerned a duty of good faith "both in performing obligations and exercising rights". Sheller JA said:

> "If a contract confers power on a contracting party in terms wider than necessary for the protection of the legitimate interests of that party, the courts may interpret the power as not extending to the action proposed by the party in whom the power is vested or, alternatively, conclude that the powers are being exercised in a capricious or arbitrary manner or for an extraneous purpose, which is another [way] of saying the same thing. Thus, a vendor may not be allowed to exercise a contractual power where it would be unconscionable in the circumstances to do so: **Pierce Bell Sales Pty Ltd v Frazer**."

75      In the present case, of course, Foxtel was not exercising a contractual power or performing a contractual obligation when it reduced the subscriber price of the RAI and Antenna channels. There is nevertheless scope for the operation of an implied obligation of good faith. In **Burger King**, the Court of

Appeal did not appear to disapprove certain conclusions of Rolfe J at first instance which contributed to his finding a breach of an implied obligation of good faith. Rolfe J had applied an objective standard in deciding that the actions of the defendant were neither reasonable nor for a legitimate purpose. He had concluded that the defendant deliberately pursued a course to "thwart" the plaintiff's rights under the contract in that the actions it took were not justified by any of the factual matters upon which it sought to justify them:

> "BKC was pursuing a course of attempting to thwart HJPL's further development so that BKC could develop the market without regard to the rights of HJPL."

76      In the present case, the conduct of Foxtel in reducing the price of the add-on channels falls to be assessed in a context where there was no express or implied contractual provision precluding or regulating alteration of the price by Foxtel and where Foxtel's actions were not taken pursuant to or in purported exercise or fulfilment of any contractual provision. The question, therefore, is whether the relevant implied obligation of good faith inhibits one party in the performance of "an act which the law would ordinarily permit it to do" in exercise of "the ordinary freedom of a commercial enterprise to pursue a commercial opportunity": **Far Horizons Pty Ltd v McDonald's Australia Pty Ltd** [2000] VSC 310.

77      Overlook argues that the price reduction of both RAI and Antenna by Foxtel breached the implied good faith term. It says that the reduction was designed to overcome a problem not with the price of the Overlook channels but with the price of Foxtel's basic package. The basic package price was something about which Overlook had expressed concern in the negotiations when it said that it considered the aggregate $64.90 too high. Foxtel had said that it expected to be able to sell satisfactorily at that aggregate price. According to Overlook's submissions, the price reduction decision was motivated by Foxtel's desire to capture more Greek and Italian speakers as subscribers to its basic package. On this argument, enhanced revenue for Foxtel at the basic package level was the objective of a reduction in revenue for both Foxtel and Overlook (but more particularly to the latter) at the add-on level. Overlook also says that Foxtel acted as a result of its own dissatisfaction with the sales performance of the RAI and Antenna channels notwithstanding that the performance was almost on budget for Antenna and not significantly below budget for RAI. There was nothing to suggest that Overlook was dissatisfied with the performance of the channels.

78      Foxtel, for its part, says that the price reduction was designed to overcome what it considered to be poor penetration of the RAI and Antenna channels themselves. One factor in the poor penetration might have been the fact that some consumers considered the basic package too expensive. Another, says Foxtel, was that some thought that the channels themselves were not value for money. Foxtel points to the fact that a great number of the subscribers were upgrades and that a substantial proportion of those who cancelled the RAI or Antenna subscription continued to take the basic package. In short, Foxtel says that it made a legitimate business judgment with a view to achieving an increase in market penetration of the non-English language channels and that it did so in the interests of both parties, recognising that there would inevitably be a fall in revenue from those channels for both parties but in the expectation that increased penetration would in time reap suitable rewards. That, on its face, is quite a reasonable commercial proposition, at least in abstract terms.

79      Against this, Overlook contends that the particular price reduction action Foxtel took was so structured as to work much more markedly to Overlook's disadvantage than to Foxtel's in the shorter term. As has been noticed already, Foxtel needed only an additional 1,600 subscribers for each channel to return it to the revenue position it had enjoyed immediately before the price reduction. Overlook, on the other hand, needed 5,926 for RAI and 7,922 for Antenna. But the fact is that a disparity of this kind would have prevailed whatever the extent of a price reduction. The financial realities of the relationship were from the outset and of their nature such that a price reduction would always produce for Foxtel an off-setting benefit in terms of reduced licence fees to Overlook. Thus, a price reduction of merely $1.00 would have produced for Overlook a detriment of 65 cents, being the licence fee not received on the eliminated $1.00. Foxtel, however, would have saved that 65 cents and thus suffered a net impact of the lost sum of $1.00 less the

saved 65 cents. Clearly, it would take a greater number of new subscriptions to make up Overlook's lost ground than it would to make up Foxtel's, whatever the size of the price reduction.

80      A question of central importance is whether it was any part of the obligation of good faith owed by Foxtel to be concerned about the maintenance or enhancement of Overlook's customer base within Optus. Overlook asserts, as one of the factors pointing to a breach of that obligation, Foxtel's having been motivated by a desire to secure customers from Optus notwithstanding Overlook's expressions of concern in that regard before the contracts were made and Foxtel's representations as to preservation of Overlook's existing revenue base. To my mind, however, it is unrealistic to think that the good faith obligation of Foxtel in any way precluded it from engaging in natural competition with Optus. It would have been odd, to say the least, if Foxtel had come under a duty to desist from vigorous competition with Optus across the board and in the usual way just for the sake of Overlook, the supplier of two of its add-on channels. This is particularly so where Overlook had itself factored into the pricing structure it negotiated with Foxtel an allowance for its expectation of churn of RAI and Antenna subscribers from Optus to Foxtel.

81      There can be no doubt that Overlook suffered financially in the short term by reason of the price reduction. There can equally be no doubt that Foxtel decreased the price with a view to increasing market penetration of the non-English language channels. It is true that subscription numbers for one were reasonably close to budget, even though subscriptions for the other were materially below budget. But there is no unwritten rule of reasonable business behaviour which says that efforts to achieve greater market share should be abandoned if trading is in line with or close to budget. Foxtel knew that Overlook would suffer a financial detriment in the short term. It expected, however, that that could and would be made up by increased subscriber numbers. The numbers involved were at the upper end of realistic expectations. But Foxtel remained sanguine about its own marketing abilities. It no doubt expected – indeed, intended - that some of the increased subscriber base would be churn from Optus. It must have been recognised by all that it was a fundamental of Foxtel's business strategy that it make continuous efforts to persuade Optus subscribers to come over to Foxtel. That was normal and expected competitive behaviour. Moreover, Overlook, as a sophisticated commercial player, appreciated that and had in fact taken it into account in agreeing the subscriber numbers for the purposes of the graduated fee structure with Foxtel, albeit on an assumption or expectation that the Foxtel price would remain at $19.95 throughout the whole term of five years.

82      That assumption or expectation on Overlook's part was, to my mind, one which it could have made only by way of business gamble. It had taken no steps to make the assumption part of the bargain. It was not as if the possibility can be assumed to have slipped Overlook's mind. On the contrary, the possibility was one which had been squarely addressed in its earlier negotiations with Optus. Those negotiations had produced an essentially identical commercial arrangement, but with the added feature of a provision ensuring for Overlook a measure of protection in relation to the possibility of a price reduction. That position had been achieved with Optus as a result of negotiation. Yet when Overlook came to negotiate with Foxtel, there is nothing in the evidence to show that Overlook even raised the question of a fixed price or a brake on Foxtel's ability to change the price. The possible impact of the Optus MFN provision was a subject of negotiation and was dealt with by means of the stratagem involving the Customer Services Pty Ltd side letters. Foxtel and Overlook obviously turned their minds to the possibility that certain future changes to their contracts might be made by mutual agreement: see clause 6. They also agreed to undertake future consultation in a particular event: see clause 11. Yet there is nothing to suggest that the clearly recognised possibilities of mutual agreement and consultation in the future were accepted as even potentially relevant to the maintenance of the subscription price at $19.95. It must be concluded that Overlook was content to allow the question of somehow effectively fixing the $19.95 price (or the $13 fee which, from its perspective, was the same thing) to be left out of the agreements with Foxtel and to do business by reference to its own assessment of the likelihood that Foxtel would leave the price at the initial level for the term of five years.

83      The prohibitory and negative spirit of the contracts between Foxtel and Overlook did not, in my judgment, preclude the price reduction Foxtel effected. Foxtel did not act in a capricious way: on the contrary, its action was deliberate and reasoned and had both a rational basis and an objective explanation. Furthermore, the action was not purely selfish and destructive of the position of Overlook or such as to

cause Overlook's rights to become nugatory, worthless or seriously undermined.  Foxtel acted in a way which it genuinely believed was calculated to enhance market acceptance of RAI and Antenna and to achieve an eventual level of penetration more favourable to both parties than that already pertaining.  As things turned out, Foxtel's expectations as to resultant market behaviour were too optimistic and it took significantly longer than Foxtel had expected or foreseen for subscriber numbers to reach a level which caused Overlook's revenue position to be restored to its pre-cut level.  But neither that nor any other factor can or should be regarded as having caused Foxtel's action to involve the cynical resort to black letter rights at the expense of the integrity of the contracts' spirit and character with which the implied contractual term imposing an obligation of good faith performance is concerned.  Foxtel's actions involved no departure from standards of conduct which are honest, as well as being reasonable having regard to the parties' interests.

84      I therefore conclude that Overlook does not succeed on its claim based on a breach of that implied term.


### The estoppel claim

85      Overlook's case here is built on a series of propositions.  It says that it assumed that the price of the channels would be $19.95 per month throughout the five year term of the agreements.  It was encouraged by Foxtel to make that assumption by reason of various matters, including the consistent reference to $19.95 in the course of negotiations (knowledge of the proposed price being essential to those negotiations), Foxtel's knowledge that Overlook made its decision to proceed on the basis of a $19.95 price, the absence of any reference in negotiations to the possibility of a lower price, Foxtel's reassurances that its marketing ability would cope with the apparently high combined package price of $64.90 and Foxtel's representations as to expected or targeted numbers of subscribers based on a price of $19.95.  Foxtel's representations were directed in part at dealing with Overlook's concern to protect its pre-existing revenue base from Optus.


86      In the absence of the assumption thus engendered, Overlook says, it would not have proceeded with the negotiations in the way it did.  Rather, it would have negotiated for a fee per subscriber, not one based on a percentage of revenue or, perhaps, a percentage based system with the percentages adjusting to deal with any decrease in subscription price.  It was therefore unconscionable, in Overlook's submission, for Foxtel to act inconsistently with the assumption and, on the basis emerging from the judgment of Brennan J in **Waltons Stores (Interstate) Ltd v Maher** (1988) 164 CLR 387, Foxtel was estopped from pursuing any such inconsistent action .

87      Foxtel makes several responses.  It says in the first place that an assumption that there would be no price reduction during the five year term of the contracts was an unreasonable assumption because the assumption, if fulfilled, would give rise to illegality under the resale price maintenance provisions of the **Trade Practices Act**.  As **Waltons Stores** confirms, only reasonable assumptions give rise to an estoppel.  I must confess to considerable difficulty in seeing how unilateral action of Foxtel in maintaining the price at the $19.95 level for five years would have contravened the **Trade Practices Act** in the absence of a requirement or condition imposed by Overlook or some form of agreement to that effect, including, no doubt, the kind of agreement which may be spelt out from consciously parallel behaviour.  But for Foxtel to have represented (if it did) that it would leave the price at the initial level for the full term and for Overlook to have assumed (if it did) that Foxtel would act in accordance with its representation does not, to me, involve illegal conduct making the assumption an unreasonable one.

88      Foxtel's next response is that the negotiation was between two sophisticated corporations with legal advisers (Mr Freudenstein and Ms Ireland in the case of Foxtel and Mr Geagea in the case of Overlook) and that, once they had reached and documented an agreement, neither should lightly be given the benefit of an estoppel.  Reference was made to the following passage in the judgment of Kirby P in **Austotel Pty Ltd v Franklins Selfserve Pty Ltd** (1989) 16 NSWLR 582:

> "We are not dealing here with ordinary individuals invoking the protection of equity from the unconscionable operation of a rigid rule of the common law.

> Nor are we dealing with parties which were unequal in bargaining power.  Nor were the parties lacking in advice either of a legal character or of technical expertise.  The Court has before it two groupings of substantial commercial enterprises, well resourced and advised, dealing in a commercial transaction having a great value.  As has been found, they did not reach the point of formulating their agreement in terms which would be enforced by the law of contract.   This is not, of itself, a reason for denying them the beneficial application of the principles developed by equity.  But it is a reason for scrutinising carefully the circumstances which are said to give rise to the conclusion that an insistence by the appellants on their legal rights would be so unconscionable that the Court will provide relief from it."

89      Foxtel also points to the reality that these sophisticated commercial parties, who negotiated over several months with the assistance of lawyers, eventually recorded their bargain in the form of written contracts.  That form of expression should be regarded, in the absence of some compelling indication to the contrary, to have become the fulfilment of their negotiations which were then exhausted and superseded in such a way as to be no longer the source of any estoppel.  For this proposition, Foxtel relies on the decision of McLelland J in **Johnson Matthey Ltd v A C Rochester Overseas Corporation** (1990) 23 NSWLR 190 as subsequently approved and amplified, particularly by Bryson J in **Australian Co-operative Foods Ltd v Norco Co-operative Ltd**  (1999) 46 NSWLR 267 (see also **Skywest Aviation Pty Ltd v Commonwealth** (1995) 126 FLR 61 and **C G Mal Pty  Ltd v Sanyo Office Machines Pty Ltd** [2001] NSWSC 445).

90      It is probably going too far to say that there is never scope for any form of estoppel arising from pre-contract negotiations where parties eventually reduce their bargain to written form.  The suggestion of McLelland J to that effect in **Johnson Matthey** was made in a context where an estoppel by convention was asserted in the face of an "entire agreement" clause.  There can be no doubt that, with conventional estoppel's basis in common adherence to a particular assumption as a basis of the relationship so that principles akin to those governing rectification are at work, a party seeking to establish such estoppel in the face of clear written terms expressed to be exhaustive faces a very daunting task – so daunting, perhaps, that McLelland J's view of impossibility may well be apt.  But such an approach is less clearly apt to govern cases of equitable estoppel founded on unconscionable departure by one party from a situation it has led the other to assume to be an incident of their relationship, although even then the assertion of such an estoppel in the face of silence on the particular subject in a written contract negotiated at arm's length and with the assistance of lawyers on both sides must still be regarded as a formidable task.  The reason is explained in the judgment of Kirby P in **State Rail Authority of New South Wales v Heath Outdoor Pty Ltd** (1986) 7 NSWLR 170:

> "Too great a willingness by the courts to discern, in pre-contract negotiations, a basis for estoppel will have the effect of introducing a serious element of uncertainty into our law of contract.  It may also encourage expensive litigation in which the terms of the writing are put to one side and the courts busily engaged (as we have been) in a minute examination of the wilderness of pre-contract conversations.   This may be a reason, at least in the case of written contracts which are accepted by the parties and are not varied or elaborated, to hold the parties to the applicable terms of such contracts and to limit carefully the development of the law of estoppel, lest it seriously undermine the adherence to bargains which are such an important feature of modern economic life.  But even if estoppel is pushed so far, a too tender sense of the unconscionable may mislead the courts into substituting the court's notions of equity as between contracting parties for the bargain which the *parties* have themselves negotiated and accepted."

91      In any event, the evidence does not support the proposition that Overlook made and acted upon the assumption which is central to this part of its case, namely, that the subscription price of each non-English language channel would remain at $19.95 for the life of the contract.  There is evidence that Overlook assumed that the price at the outset would be $19.95, as did Foxtel.  But Mr Abdallah's evidence was that

the possibility of a change in the initial price did not occur to him and that he did not make "any assumption at all … about anything to do with changes to the retail price". In other words, he did not assume that the price would change and did not assume that the price would not change. On his own evidence, therefore, the threshold component of such estoppel claim, if any, as may be advanced in the face of the written contract is not established. Furthermore, it has not been shown that Foxtel's representations as to a $19.95 subscription price carried within them the crucial additional element by way of assurance that that price would apply unchanged throughout the life of the contracts, with the result that another essential element of that claim is missing. Overlooks's estoppel claim fails.

### The unconscionable conduct claim

92       Overlook's unconscionability claim is put on alternative bases. First, it is said that there is an entitlement to relief according to ordinary equitable principles. The alternative claim is based in s.51AC of the **Trade Practices Act** in relation to the acquisition by Foxtel of services from Overlook, those services being the provision of the RAI and Antenna channels

93       The first of these claims may be dealt with shortly. Equity will intervene in cases where one party contracts from a position of "serious disadvantage vis-à-vis the other" (**Blomley v Ryan** (1956) 99 CLR 362) so that "an onus is cast upon the  stronger party to show that the transaction was fair, just and reasonable" (**Commercial Bank of Australia Ltd v Amadio** (1983) 151 CLR 447). The central notion is that equity will not allow advantage to be taken of a person labouring under a disability such as, but not limited to, sickness, age, drunkenness, illiteracy, lack of education or lack of assistance or explanation. Equity will divert from the party taking such advantage and restore to the victim such benefits as are produced by the unconscionable conduct. It can be said at once that there is no scope for the operation of these principles in the present case of a contract negotiated at arm's length between corporations represented by commercial negotiators led on each side by persons possessing the degree of business sophistication and experience of Mr Abdallah and Mr Mockridge and having the active and ongoing assistance of their respective lawyers. To the extent that a claim based on ordinary equitable notions of unconscionable dealing is seriously asserted by Overlook, it simply cannot be sustained in the particular commercial context.

94       The s.51AC claim raises a preliminary question as to the "price" at which services were acquired from Overlook by Foxtel under each of the non-English language channel agreements. This is because that section (being the provision upon which Overlook expressly relies) only applies in relation to the acquisition of goods or services "at a price" which does not exceed a specified threshold. For present purposes, the threshold is the sum of $1 million referred to in sub-ss.(9) and (10), unaffected by the modification (by way of increase to $3 million) effected by reg. 28AA 0f the **Trade Practices Regulations** with effect from 1 July 2000. All relevant events predated that modification.

95       Although sub-s.(11) goes some way towards explaining how to work out, for the purposes of sub-ss.(9) and (10), the price at which services are provided and acquired (including by importing, in adapted form, certain paragraphs of s.4(2) of the Act), there is nothing which throws any special light on the question of calculation of the "price" of services of the kind involved in this case. It is nevertheless made reasonably clear, I think, that there is an element of futurity to the assessment. That being so, it seems to be open to me to take the practical (and, I think, conservative) view that where, as here, there is a continuum of supply and acquisition under a single contract over a period, the relevant "price" is, at any time, at least the aggregate of the amounts paid in respect of the supply and acquisition before that time – I say "at least" because the element of futurity present in these provisions makes it clear that past events and past payments are by no means the end of the matter. According to evidence tendered by Overlook, the progressive aggregate of the fees paid by Foxtel to Overlook up to July 2001 under the relevant channel agreement was $1,408,233 for RAI and $1,544,023 for Antenna. Taking those as the respective "prices" in the way I have just described, the effect of sub-ss.(9) and (10) is to make the s.51AC proscriptions inapplicable to the supply of services by Overlook to Foxtel and the acquisition of those services by Foxtel from Overlook under the channel agreements.

96      This conclusion makes it unnecessary for me to deal with the scope and reach of s.51AC, so far as its substantive operation is concerned.  On one view, s.51AC has an operation similar to that of s.51AB and covers conduct which is unconscionable according to the general equitable criteria to which reference has already been made, plus conduct of the kind caught be general equitable principles relating to undue influence: **Hurley v McDonald's Australia Ltd** [1999] FCA 465.  That view of s.51AB was not, however, adopted by the Full Federal Court on appeal: **Hurley v McDonald's Australia Ltd** (2000) ATPR 41-471. It preferred to leave the question for future consideration, at the same time laying down some general guidelines:

> "For conduct to be regarded as unconscionable, serious misconduct or something *clearly unfair or unreasonable*, must be demonstrated – **Cameron v Qantas Airways Ltd** (1994) 55 FCR 147 at 179.  Whatever 'unconscionable' means in s.51AB and s.51AC, the term carries the meaning given by the Shorter Oxford Dictionary, namely, actions *showing no regard for conscience*, or that are *irreconcilable with what is right or reasonable* – **Qantas Airways Ltd v Cameron** (1996) 66 FCR 246 at 262.  The various synonyms used in relation to the term 'unconscionable' import a *pejorative moral judgment* – **Qantas Airways Ltd v Cameron** (1996) 66 FCR 246 at 283-284 and 298."

97      In **Australian Competition and Consumer Commission v Simply No-Knead (Franchising) Pty Ltd** (2000) 104 FCR 253, however, Sundberg J expressed the view that s.51AC is not confined in the way suggested in relation to s.51AB in the first instance decision in **Hurley v McDonald's**.  That view proceeded from a consideration of the specific factors the sections directs to be taken into account in determining unconscionability and seems to me, with respect, to be correct.  But Sundberg J also adopted the hallmarks of unconscionability expressed in the above extract from the judgment of the Full Court in **Hurley v McDonald's** – as did Lindgren J in the subsequent case of **Monroe Topple & Associates Pty Ltd v Institute of Chartered Accountants in Australia** [2001] FCA 1056.

98      When the criteria suggested by the phrases "showing no regard for conscience", "irreconcilable with what is right or reasonable" and "pejorative moral judgment" are applied in the present case, it seems to me that the conduct of Foxtel in effecting the price reduction for the RAI and Antenna channels fell short of unconscionability.  The reasons have already canvassed at some length in relation to the implied contractual obligation of good faith performance.  In short, its action had both a rational basis and an objective explanation relevant to the common welfare of Foxtel and Overlook.  It follows that, even if s.51AC was not rendered inapplicable by the price threshold in sub-ss.(9) and (10), it would provide no basis for the relief Overlook seeks.

### The first s.52 claim – failure to disclose

99      Overlook's contention here is that Foxtel engaged in conduct that was misleading or deceptive or likely to mislead or deceive by failing to inform Overlook, at the time of negotiating and concluding the channel agreements for RAI and Antenna, that Foxtel regarded itself as entitled to change the channel subscription prices at will.  This contention is based on allegations that, at or about the time the agreements were made, Foxtel was considering subscription prices of less than $19.95 and that that sum was seen as merely an initial price.  Overlook also points to the fact that Foxtel regarded itself as under a legal inhibition which precluded it from binding itself to the price it would charge subscribers.

100     This last matter may be dealt with shortly.  If, as alleged, Foxtel regarded itself as legally precluded from fixing the subscription price by way of agreement with Overlook, that really says nothing about Foxtel's view of its commercial freedom to change the price.  The fact that a person may not lawfully agree with someone else to do a particular thing does not affect the person's ability and freedom to do or refrain from doing the thing as a result of a unilateral decision according to an appreciation of where the person's own best interests lie.  I therefore regard the resale price maintenance inhibition perceived by Foxtel as essentially irrelevant to this part of Overlook's case.

101     The allegations that, in and around August 1998, Foxtel saw $19.95 as merely an initial price and was already considering lower prices encounter substantial difficulties on the evidence.  It is pertinent to quote the following passage from the cross-examination of Mr Mockridge:

> "Q. You understood their argument at the time to be based on an assumption that Foxtel would be charging $20 just like Optus was?
> A. I understood their argument was based on a $20 assumption.
>
> Q. That is $20 to be charged by Foxtel?
> A. Yes.
>
> Q. Which you understood was the same as the Optus price at the time?
> A. Yes.
>
> Q. Indeed, you were making the assumption during the course of this negotiation that Foxtel would be charging $20?
> A. Yes.
>
> Q. It hadn't occurred to you at that point that Foxtel might change the price?
> A. It had not occurred to us that we would reduce the price at this point, no.  Our objective was to go out at $19.95.
>
> Q. All your negotiations, from your point of view, was on the assumption the price was going to be $20?
> A. Our commencing price was $19.95.
>
> Q. You didn't think in terms of commencement price.  You just thought the price would be $20?
> A. That assumes things go on forever with no change.  The assumption here was that we would start with $19.95, the commencing price.
>
> Q. It no doubt crystallised in your head, during the course of these negotiations, did it, that the price of $20 might change?
> A. Crystallised in my head?
>
> Q. Yes.
> A. Did I understand that I was looking at $19.95?  I did not understand that.
>
> BANNON: Q. What I am suggesting to you, at no point during the negotiations you had with Overlook did you consider the possibility that the price might change?
> A. In the negotiations with Overlook?
>
> Q. Yes?
> A. Did I consider that the price would not change?  Sorry, the price would change?  My assumption was that was our starting price.
>
> Q. What I am suggesting to you, you didn't think in terms of starting price, you just thought in terms of 'This is the price', no more?
> A. In thinking that, you never assume price doesn't change, you wouldn't have a business if you did that.

Q. And you assumed, didn't you, that Overlook was basing its assessment of whether it should or should not go into this deal on the assumption that the price would be $20?
A. I assumed that they were working on a $20 price assumption, yes.

Q. For example, you never said during this discussion in June, 'Hold on, us giving you a higher percentage of revenue is not going to protect you, because we might lower the price and there goes your protection', you never said that, did you?
A. I understood the MFN was their prime protection, that's the protection they were seeking.

Q. But in relation to the other protection which you accept you had in mind?
A. I was meeting the debating point as opposed to it being a fundamental issue.

Q. But you didn't say to them at any point during this discussion 'The percentage won't protect you against loss on churn, because we might lower the price'?
A. I did not say that.

Q. It didn't even occur to you to say that, did it?
A. Well, it wasn't an issue in the debate.

Q. And you didn't think it in your mind and deliberately withhold it from them, did you?
A. No, I did not do that."

102    This makes it clear that, while Foxtel's chief executive may have had some appreciation of a theoretical ability of Foxtel to change the price at some future time, it accepted $19.95 as the price applicable to the transaction and did not entertain any real prospect of change.  The matter was even more clear cut in the mind of Mr Kelly, Foxtel's chief negotiator, who said in cross examination:

"A. No.  Tony [ie, Mr Ishak] and myself, throughout the entire negotiation, had agreed that $19.95 was the price.  If the price was to change, it would have been, I understand it to be a directive of both Foxtel, Optus and Overlook in consultation.   But the reason I say here it was never, No. 19 [scil.$19.95] was never a separate issue, is because it didn't need to be.   It was agreed upon."

103    It is also relevant to note that when, in February 1999, concerns emerged within Foxtel about the performance of the RAI and Antenna channels, the idea of reducing the subscriber price was by no means an obvious solution.  A group of three persons was set the task of finding a solution and when they (or, more probably, one of them, being Ms Oh) came up with the idea of reducing the price, that was not only something which had to be subjected to legal scrutiny to see if it was permissible but also an approach regarded as innovative.  Those reactions would not have eventuated had Foxtel appreciated from the outset that it could change the price at will.

104    Overlook has not made out its allegations that Foxtel should be regarded as having consciously held the belief upon which the assertion of misrepresentation by silence is based.  It follows that failure to disclose the supposed belief cannot amount to conduct within s.52, even if the other conditions allowing mere silence to be actionable under s.52 are satisfied.

**The second s.52 claim – revenue base representations**

105     Overlook's case here is that Foxtel engaged in conduct prohibited by s.52 by representing to Overlook that it understood and appreciated that it was critical to Overlook that the subscriber price be $19.95 since, first, there would otherwise be a risk of activating the Optus MFN clause and, second, Outlook had to achieve a $13 fee per subscriber (being the rate applicable under the Optus arrangements) so as to preserve its revenue base. Overlook also says that Foxtel represented that it was willing to proceed in accordance with Overlook's expectation by entering into an agreement on the basis that the revenue base was preserved.

106     Central to this part of Overlook's case is a letter of 25 June 1998 from Mr Mockridge to Mr Abdallah. The letter was written soon after a teleconference which addressed the stalemate the parties appeared to have reached. The stalemate was referred to in a letter of 23 June 1998 from Mr Abdallah to Mr Mockridge:

> "At this stage our negotiations seemed to have reached a deadlock. With Foxtel insistence on carriage agreements exceeding one year with no commitments on subscription numbers, and our group's position on ART/LBC carriage and more favourable revenue share."

107     The evidence makes it clear that there were three main matters in contention between the parties at that point. The first was the duration of the proposed channel agreements. Overlook sought a term of five years but Foxtel wished to commit for only one year initially. The second matter was the Arabic language channels, ART and LBC. Overlook wanted some agreement as to Foxtel's taking these channels as well but Foxtel was not prepared to give such a commitment. The third matter was the fee structure for RAI and Antenna. All discussions had been on the basis of a percentage of revenue. There were differences as to the percentages and their gradations.

108     The important aspects of Mr Mockridge's letter of 25 June 1998 are set out in the following parts of the written submissions of counsel for Overlook:

> "107.     Mockridge used the expression 'good faith' as a descriptor of Foxtel's proposed conduct in making the offer.
>
> *'As we discussed we now have had a change to review in detail your latest proposal. In a good faith effort to finalise this deal we are prepared to accept the economic terms you put to us on condition that all other issues are resolved as we propose below.'*
>
> 108.     Under the heading 'RAI' it was said:
>
> *'In response to your offer for the carriage terms of RAI, we understand your concern about preserving your existing revenue base and are willing to proceed on that basis. I therefore confirm our willingness to accept your proposal as part of our deal as follows:'*
>
> 109.     There was then set out a sliding scale of 65% for the first 2,500 subscribers, 50% up to 4,000, 40% up to 6,500 and 30% thereafter. Under the heading 'Antenna' a sliding sale was introduced by the words *'On the same basis I would therefore accept your proposal'*. That scale was 65% for the first 3,500 subscribers, 50% up to 5,500, 40% up to 7,500 and 30% thereafter.

110.    The letter also contained the following statements:

> '*In order to justify the expense we will incur on capital expenditure and marketing we would suggest a five year term for the carriage of RAI and Antenna.*'

> '*Karim, in accepting your suggested pricing I have attempted to address your most fundamental issue and clearly this means the channels will be a much more expensive proposition for Foxtel.*''

109     The statements by Foxtel in Mr Mockridge's letter of 25 June 1998 must be understood in the context of the state of negotiations at the time. It is useful to examine against that background each of the aspects of the letter extracted in the submissions.

110     The extract set out in para 107 of the submissions is a statement of negotiating position. Foxtel is prepared to accept the "economic terms" put to it by Overlook provided that all other matters are resolved in the way Foxtel sets out in the letter. The "good faith" reference is no more than an assurance by Foxtel of the genuineness of that negotiating position and of its desire to progress matters. Acceptance of Overlook's "economic terms" does not connote some form of stand-alone commitment. It is, rather, an acknowledgement of Foxtel's willingness to contract on certain terms, assuming other matters are resolved as Foxtel wishes. This part of the letter cannot be taken as conveying any continuing and independent representation of the kind capable of sustaining a s.52 claim.

111     The part of the letter of 25 June 1998 extracted in para 108 of the submissions, read together with the material described at para 109, is concerned with the third of the matters then in contention, namely, the sliding scale of percentages for fee purposes. One of Overlook's concerns was to protect itself against the financial effects of the expected churn of RAI and Antenna subscribers from Optus to Foxtel. Its own assessment was that up to 2,500 RAI subscribers and 3,500 Antenna subscribers might move from Optus to Foxtel. It was that assessment which caused Overlook to require those subscriber numbers to attract the 65% fee without reduction, that being the fee percentage under the Optus agreements. There can be no doubt that Overlook and Foxtel assumed, at that time, an add-on subscription price for Foxtel subscribers the same as that for Optus subscribers. But it is not possible to find in the extracted part of the letter a representation by Foxtel that the price it would charge would always be at a particular level, whether $20 (or $19.95) or the equivalent for the time being of the Optus price (which was itself expressly stated to be capable of being changed) or otherwise. What Foxtel said was that it was prepared to meet Overlook's demands on the percentages. The extract from the letter quoted at para 110 of the submissions does not call for comment additional to that already made.

112     My conclusion is that, on the evidence, the letter of 25 June 1998 did not convey the representations upon which this part of Overlook's case relies.

113     There is, in any event, a substantial question whether a representation by one party to another that the first party understands and appreciates the commercial importance of a particular matter to the second party can, via s.52, sheet home a statutory liability to the first party when that first party does something which is legally open to it although at odds with the importance attached to the particular matter by the second party.

114     A statement made by one party in the course of commercial negotiation between sophisticated corporate parties that it understands or appreciates a position stated by the other will most often be no more than what it appears to be, namely, a statement of awareness of the other's position. It is commonplace in such situations for one party to say that it cannot accept a particular position or can do so only if some concession is made. That is part and parcel of the negotiating process. But one party's representations about what is vital or important to it and the other's response that it understands or appreciates the first's

position are most commonly steps in the formulation of a complete bargain where the party who holds the particular aspect to be vital or important effectively bears the onus of putting that matter squarely on the table and obtaining an explicit promise that the other party will honour or respect it.  Furthermore, a statement that it is appreciated or understood that a matter is considered vital cannot, of itself and without more, amount to a representation that the matter will be accepted or respected or not departed from.  It might be different where the parties are dealing on unequal terms or one is entitled to place some reliance upon the other.  But here the parties were sophisticated corporations represented by experienced businessmen and assisted by lawyers.

115     In the end, this part of Overlook's case fails not only because the evidence does not support the significance and meaning sought to be attached to the statements in the 25 June 1998 letter but also because the objective effect of the statements on a reasonable person in the position of Overlook would not have been to engender a belief that anything was defined or settled by those representations.  It is, after all, the impact upon a reasonable person in the position of the recipient which is relevant in judging the quality of a representation for s.52 purposes: **Parkdale Custom Built Furniture Pty Ltd v Puxu Pty Ltd** (1982) 149 CLR 191.

### The third s.52 claim – marketing representations

116     Overlook contends that Foxtel contravened s.52 by making to Overlook representations, first, that Foxtel had strong marketing skills and would do well with Antenna and RAI; second, that Foxtel would do everything possible to ensure that an excellent market penetration by RAI and Antenna in its cabled areas would be achieved; third, that Foxtel would secure 12,000 RAI subscribers and 10,000 Antenna subscribers by 30 June 1999 and that Foxtel's marketing strength and overall package would make the channels a success; and, fourth, that Foxtel would promote and advertise the channels in a highly effective manner, consistent with the advertising strategy which had ensured that, in the for eighteen months before June 1998, Foxtel had grown from being smaller than Optus to having nearly twice the number of Optus's subscribers.  To the extent that the second representation is alleged to be in writing, it is said to be contained in a letter of 7 May 1998 from Mr Mockridge to Mr Abdallah.  To the extent that the third representation is alleged to be in writing, it is said to be contained in the document entitled "Ethnic Marketing Plan" prepared by Foxtel and given to Overlook.  To the extent that the fourth representation is alleged to be in writing, it is said to be contained in a letter of 22 June 1998 from Mr Mockridge to Mr Abdallah.

117     Foxtel accepts that it made the first representation.  It also accepts that it made the second representation, although with "everything possible" understood as "everything reasonably and commercially practicable" (a modification or interpretation I regard as appropriate as it gives proper commercial meaning to "everything possible").  Foxtel also accepts that it said words to the effect of the fourth representation.  As to the third representation, Foxtel acknowledges that it informed Overlook of an objective of recruiting 12,000 RAI subscribers and 10,000 Antenna subscribers by 30 June 1999.  Importantly, however, Foxtel also says that the first, second and fourth representations did not amount to "conduct" capable of amounting to contravention of s.52.

118     That submission on Foxtel's part is founded on the authorities about the latitude allowed in commercial dealing by way of puffery.  The cases to which reference was made in submissions include **Schindler Lifts Australia Pty Ltd v Debelak** (1989) 89 ALR 275 where it is emphasised that statements alleged to be caught by s.52 must always be assessed in their context.  The case concerned representations made by a trader about a competitor.  Pincus J said:

> "A claim by a trader that his goods or services are 'highly regarded' would ordinarily be taken to be mere puffery.  A statement to contrary effect about a rival's goods should not be held to overstep the permissible limits of denigration … .  It has to be conceded that a statement by a rival about a trader which is universally acknowledged as pre-eminent in its field that it is 'not highly' regarded might be in breach of s.52, as being simply a lie.  In my opinion, however, in the circumstances of this case, to treat statements such as that in

> which the words complained of are contained as within the prohibition in s.52
> would be to place unreasonable legal inhibition on ordinary communication in
> Australian business."

119    The reality is that a certain amount of hyperbole is permissible and to be expected in business
without attracting legal sanctions.   Thus, a statement that a bank customer's affairs "will be in the best of
hands" (**Drambo Pty Ltd v Westpac Banking Corporation**) (1996) 96 ATC 4737) or that someone will
"guarantee payment for the shipments with his life" (**Culley & Russell Pty Ltd v Goyder** [2001] WASCA
27) must be recognised as a mere puff not actionable under s.52.

120    I accept Foxtel's submission on this issue.  Section 52 does not subject commercial enterprises to a
regime of enforced modesty in relation to their achievements and skills.  One cannot imagine any
entrepreneurial concern in Foxtel's position having seen fit to say to Overlook, "It is true that we have in
eighteen months achieved a subscriber base twice the size of Optus's, but you should not assume that our
marketing skills are other than pedestrian or that, if you choose to place your channels on our platform,
there will be any particular degree of success in achieving market penetration".   That is not the way business
works.  Overlook was bound to receive and to accept a certain amount of self-laudatory comment from
Foxtel.  It should have seen the first, second and fourth representations for the commercial puff that they
were.

121    It is necessary to consider separately the third of the alleged marketing representations, that is, the
alleged representation that Foxtel would achieve 12,000 RAI subscribers and 10,000 Antenna subscribers by
30 June 1999.  It is not disputed that this degree of potential market penetration was contemplated by
Foxtel's "Ethnic Marketing Plan" and that a copy of that plan was given by Foxtel to Overlook in the course
of negotiations.  Reference has already been made to Mr Ishak's evidence about the conversation among
himself, Mr Abdallah and Mr Kelly when the 12,000 and 10,000 numbers appearing in Foxtel's plan were
made known to Overlook.

122    It is clear from the evidence that these figures were communicated as marketing objectives or
targets rather than sales penetration predictions.  That being so, the promissory quality of the representations
(or the extent to which reasonable reliance might have been invited) is by no means clear, given that
marketing objectives generally serve the primary purpose of spurring on salesmen rather than providing an
assessment of expected outcomes.  But even if the representations had been predictions, Overlook's attempt
to bring them within s.52 would have encountered the difficulty referred to by Weinberg J in **Alpine
Hardwood (Aust) Pty Ltd v Hardys Pty Ltd** [2001] FCA 1876 (21 December 2001):

> "Predictions will normally only be misleading or deceptive if they are known to
> be false, or are made with reckless disregard as to their truth.  The mere fact
> that representations as to future conduct or events do not come to pass does not make
> them misleading or deceptive."

The evidence does not support a finding that the Foxtel figures were objectionable in this way.
123    A further dimension must also be examined.  Reference has already been made to the caution and
scepticism with which Overlook regarded the subscriber numbers in Foxtel's Ethnic Marketing Plan.  Mr
Abdallah said to Mr Kelly that Foxtel targets were "very optimistic" and that Overlook had not reached
even half the Foxtel number for RAI after being on Optus since February 1997.  Overlook also had
experience with the distribution of foreign language channels in other countries.  It was no doubt upon that
experience that Overlook drew in making its own assessment of the penetration likely to be achieved
through Foxtel.  As has been mentioned already, both Mr Ishak and Mr Abdallah eventually conceded that
they had really done no more than take into account both Foxtel's marketing targets and its apparent
confidence that it could achieve them, at the same time making their own business assessments by reference
to their own more hard-headed ideas about subscriber penetration by 30 June 1999, being 8,200 for RAI and
7,300 for Antenna.  Mr Ishak said in cross examination:

> "Well, we looked at Foxtel's position with respect to their marketing parameters and their objectives and we formulated our own position."

Mr Abdallah made it clear in cross-examination that, although he understood Foxtel to believe that it could achieve the projected 12,000 and 10,000 subscriber figures by 30 June 1999, he did not himself believe that Foxtel would do so.

124    It is submitted on behalf of Overlook that, because Overlook took the relevant representations by Foxtel into account in formulating its own assessment, those representations were relied upon by Overlook in a way which is material to a right to redress for contravention of s.52. It is said that the use of the figures in that background way "is not inimical to a causal link between the representations and the conduct".

125    The nature of the link of reliance and causation which must be found to justify an award of damages under s.82 for contravention of s.52 has been considered by the High Court most recently in **Henville v Walker** (2001) 75 ALJR 1410. It is clear that an entitlement to damages arises even if the conduct within s.52 is one of several causes of the relevant loss, provided always that the conduct continued to be operative as something upon which reliance was placed and therefore as a factor which materially contributed to the loss or damage suffered. In **Henville v Walker**, a property developer suffered loss in relation to a building project. In undertaking the project, he had relied upon a feasibility study which incorporated both an incorrect estimate of likely expenditures made by the developer himself and revenue projections prepared by a real estate agent. At first instance, the agent was held liable to pay damages for contravention of s.52 because a representation as to the selling price of units was false. The Full Court of the Supreme Court of South Australia overturned that decision on the basis that the developer's loss was the result of his incorrect calculation of likely expenditure. The High Court restored the result at first instance on the footing that the developer's belief that a profit would result was the product of two fundamental errors in the absence of which he would not have gone ahead, being his own error as to likely expenditures and the agent's false representation as to expected selling prices; and that the second of these, having remained operative at all times, was in a real sense a cause of the loss, thus satisfying the criterion for liability dictated by the word "by" in s.82.

126    The present case is different. It is true that Foxtel made to Overlook the representations as to subscriber targets contained in the Ethnic Marketing Plan. It is also true that Overlook took those into account as something Foxtel seriously sought and may have believed itself capable of achieving. But Overlook, which possessed marketing knowledge about foreign language channels superior to that of Foxtel not only overseas but also in Australia (through its Optus experience), did not itself believe that the subscriber numbers suggested by Foxtel's Ethnic Marketing Plan would be achieved. It made its own projections on the basis of more conservative figures derived from its own appreciation of market realities and other relevant factors. In short, Overlook did not rely on the Foxtel target figures, with the result that the Foxtel representations cannot be regarded as having been operative and causative in Overlook's decision making.

127    For all these reasons, Overlook's third s.52 claim based on the alleged marketing representations cannot succeed.

### Conclusion

128    Overlook has not shown an entitlement to relief on any of the bases advanced in its third further amended summons filed on 17 September 2001. The proceedings must therefore be dismissed with costs.
******

LAST UPDATED:          05/02/2002