**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

U.S. BANK NATIONAL ASSOCIATION, in
its capacity as Trustee, JOSHUA N. TERRY,
and ACIS CAPITAL MANAGEMENT, L.P.,

        *Plaintiffs*,

    v.

THE CHARITABLE DONOR ADVISED
FUND, L.P., CLO HOLDCO LTD., and
NEXPOINT DIVERSIFIED REAL ESTATE
TRUST,

        *Defendants*.

Case No. 1:21-cv-11059-GHW

**ORAL ARGUMENT REQUESTED**

---

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR**
**MOTION TO DISMISS DEFENDANTS' COUNTERCLAIMS AND FOR**
<u>**JUDGMENT ON THE PLEADINGS ON PLAINTIFFS' CLAIMS**</u>

QUINN EMANUEL URQUHART & SULLIVAN, LLP
  Jonathan E. Pickhardt
  Blair A. Adams
  Misha Boutilier
  Michael R. Bloom
  Jeffrey Arnier
  51 Madison Avenue, 22nd Floor
  New York, New York 10010
  (212) 849-7000
  *Attorneys for Plaintiffs Joshua N. Terry and Acis*
  *Capital Management, L.P.*

SEWARD & KISSEL LLP
  Mark D. Kotwick
  Thomas Ross Hooper
  Julie J. Hong
  One Battery Park Plaza
  New York, New York 10004
  (202) 574-1200
  *Attorneys for Plaintiff U.S. Bank National*
  *Association, in its capacity as Trustee*

**EXHIBIT**

6

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................. 1

FACTUAL BACKGROUND ..................................................................................................... 4

    A.    The Parties And Their Contracts.............................................................................. 4

    B.    Defendants' Litigation Campaign And The Settlement Agreements ..................... 6

    C.    The DAF Parties' Counterclaims ............................................................................ 8

    D.    NexPoint's Counterclaims ...................................................................................... 9

LEGAL STANDARD.............................................................................................................. 10

ARGUMENT ........................................................................................................................... 10

I.    THE COURT SHOULD DISMISS THE DAF PARTIES' COUNTERCLAIMS ........... 10

    A.    The DAF Parties Lack Standing To Bring Their Counterclaims.......................... 11

    B.    The DAF Parties Fail To Plead Any Viable Grounds To Invalidate The 2021
            Settlement Agreement............................................................................................. 14

    C.    The DAF Parties' Aiding and Abetting Counterclaims Must Be Dismissed........ 19

II.    THE COURT SHOULD DISMISS NEXPOINT'S COUNTERCLAIMS
      AGAINST ACM AND MR. TERRY ............................................................................... 24

    A.    NexPoint Fails To State A Claim For Tortious Interference ................................. 24

    B.    NexPoint Lacks Standing To Bring Its Remaining Counterclaims ...................... 25

    C.    NexPoint's Counterclaims Are Barred for Additional Reasons ........................... 39

III.    THE COURT SHOULD GRANT JUDGMENT ON THE PLEADINGS ON
       PLAINTIFFS' CLAIMS ................................................................................................. 40

    A.    The Court Should Grant Judgment On Count One Because Defendants All Lack
            Standing ................................................................................................................. 41

    B.    The Court Should Grant Judgment On Count Two Because The 2021 Settlement
            Agreement Bars The DAF Parties' Threatened Claims......................................... 43

IV.    LEAVE TO AMEND THE COUNTERCLAIMS SHOULD BE DENIED ................... 44

CONCLUSION........................................................................................................................ 45

**TABLE OF AUTHORITIES**

**Page**

**Cases**

*ABF Cap. Mgmt. v. Askin Cap. Mgmt., L.P.*,
   957 F. Supp. 1308 (S.D.N.Y. 1997)........................................................................12, 27

*Abramowitz v. Posner*,
   672 F.2d 1025 (2d Cir. 1982)..........................................................................................18

*Accredited Aides Plus, Inc. v. Program Risk Mgmt., Inc.*,
   147 A.D.3d 122 (3d Dep't 2017)..............................................................................13, 27

*In re Acis Cap. Mgmt., L.P.*,
   2019 WL 417149 (Bankr. N.D. Tex. Jan. 31, 2019)........................................................5

*In re Allianz Global Investors U.S. LLC Alpha Series Litig.*,
   2021 WL 4481215 (S.D.N.Y. Sept. 30, 2021).............................................................27

*Altshul Stern & Co. v. Mitsui Bussan Kaisha, Ltd.*,
   385 F.2d 158 (2d Cir. 1967)......................................................................................36, 37

*In re AppOnline.com, Inc.*,
   315 B.R. 259 (Bankr. E.D.N.Y. 2004).......................................................................35, 36

*Auctus Fund, LLC v. OriginClear, Inc.*,
   2023 WL 2140478 (D. Mass. Feb. 21, 2023) .............................................................16, 17

*Bank of N.Y. Mellon, London Branch v. Cart 1, Ltd.*,
   2021 WL 2358695 (S.D.N.Y. Jun. 9, 2021) ....................................................................25

*Wandel ex rel. Bed Bath & Beyond, Inc. v. Eisenberg*,
   60 A.D.3d 77 (1st Dep't 2009) ........................................................................................38

*Belmont v. MB Investment Partners*,
   708 F.3d 470 (3d Cir. 2013)..............................................................................................29

*Benihana of Tokyo, LLC v. Angelo, Gordon & Co., L.P.*,
   259 F. Supp. 3d 16 (S.D.N.Y. 2017)................................................................................24

*Bernstein v. Mediobanca Banca di Credito Finanziario-Societa Per Azioni*,
   78 F.R.D. 1 (S.D.N.Y. 1978) ...........................................................................................44

*BlackRock Allocation Target Shares: Series S Portfolio v. Wells Fargo Bank,*
   *Nat'l Ass'n*,
   2017 WL 953514 (S.D.N.Y. Mar. 9, 2017) ....................................................................36

*BlackRock Allocation Target Shares: Series S. Portfolio v. Wells Fargo Bank,
Nat'l Ass'n,*
247 F. Supp. 3d 377 (S.D.N.Y. 2017)......................................................................39

*Borden v. City of New York,*
2017 WL 744593 (S.D.N.Y. Feb. 24, 2017) (Woods, J.) .......................................44

*Burland v Earle*
[1902] AC 83 (U.K.H.L.)..........................................................................................20

*CapLOC, LLC v. McCord,*
2018 WL 3407708 (S.D.N.Y. June 12, 2018) ........................................................25

*Clark v. Nevis Cap. Mgmt., LLC,*
2005 WL 488641 (S.D.N.Y. Mar. 2, 2005) ............................................................11

*Cordts-Auth v. Crunk, LLC,*
815 F. Supp. 2d 778 (S.D.N.Y. 2011), *aff'd,* 479 F. App'x 375 (2d Cir. 2012).....37

*Crisp v. Sw. Bacshares Leasing Co.,*
586 S.W.2d 610 (Tex. Civ. App. 1979) ..................................................................18

*CVS Pharmacy, Inc. v. Press Am., Inc.,*
377 F. Supp. 3d 359 (S.D.N.Y. 2019) (Woods, J.) .................................................40

*Davis v. Scottish Re Grp. Ltd.,*
160 A.D.3d 114 (1st Dep't 2018) ...............................................................13, 32, 33

*Denburg v. Parker Chapin Flattau & Klimpl,*
82 N.Y.2d 375 (1993) ........................................................................................11, 24

*Design Strategy, Inc. v. Davis,*
469 F.3d 284 (2d Cir. 2006).....................................................................................20

*Don King Prods., Inc. v. Smith,*
47 Fed Appx 12 (2d Cir 2002)..................................................................................25

*Durosene v. Bank of Am., N.A.,*
2020 WL 3403083 (E.D.N.Y. June 19, 2020) ........................................................11

*Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.,*
837 F. Supp. 2d 162 (S.D.N.Y. 2011)...........................................................31, 36, 39

*Fazi v. United States,*
935 F.2d 535 (2d Cir. 1991).....................................................................................30

*Ferguson v. Lion Holdings, Inc.,*
312 F. Supp. 2d 484 (S.D.N.Y. 2004).....................................................................17

*Ferring B.V. v. Allergan, Inc.*,
    932 F. Supp. 2d 493 (S.D.N.Y. 2013) ................................................................21

*Foss v. Harbottle*,
    67 Eng. Rep. 189, 2 Hare 461 [1843] ..............................................................13

*Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC*,
    376 F. Supp. 2d 385 (S.D.N.Y. 2005) .........................................................28, 29

*Garza v. Villarreal*,
    345 S.W.3d 473 (Tex. App. 2011) .............................................................18, 43

*Goldstein v. S.E.C.*,
    451 F.3d 873 (D.C. Cir. 2006) ..........................................................................30

*Grgurev v. Licul*,
    229 F. Supp. 3d 267 (S.D.N.Y. 2017) (Woods, J.) ..........................................27

*Gupta v. Headstrong, Inc.*,
    2019 WL 4256396 (S.D.N.Y. Sept. 9, 2019) ...................................................17

*Halebian v. Berv*,
    590 F.3d 195 (2d Cir. 2009) ..............................................................................35

*Halpert Enters. v. Harrison*,
    362 F. Supp. 2d 426 (S.D.N.Y. 2005) .........................................................35, 38

*Harborview Value Masterfund, L.P. v. Freeline Sports, Inc.*,
    2012 WL 612358 (S.D.N.Y. Feb. 23, 2012) ...............................................19, 21

*In re Highland Cap. Mgmt., L.P.*,
    2021 WL 3418657 (Bankr. N.D. Tex. Aug. 4, 2021), *aff'd in part, vacated in
    part on other grounds sub nom.*, *Charitable DAF Fund L.P. v. Highland Cap.
    Mgmt. LP*, 2022 WL 4538466 (N.D. Tex. Sept. 28, 2022) ................................1

*Hildene Capital Mgmt., LLC v. Bank of N.Y. Mellon*,
    105 A.D.3d 436 (1st Dep't 2013) ......................................................................35

*Horowitz v. Nat'l Gas & Elec., LLC*,
    2018 WL 4572244 (S.D.N.Y. Sept. 24, 2018) ..................................................25

*Howe v. Bank of New York Mellon*,
    783 F. Supp. 2d 466 (S.D.N.Y. 2011) .............................................13, 31, 32, 35

*In re ICP Strategic Credit Income Fund Ltd.*,
    2015 WL 5404880 (Bankr. S.D.N.Y. Sept. 15, 2015), *aff'd*, 568 B.R. 596
    (S.D.N.Y. 2017), *aff'd*, 730 F. App'x 78 (2d Cir. 2018) ...........................12, 20

iv

*Int'l Customs Assocs., Inc. v. Ford Motor Co.*,
 893 F. Supp. 1251 (S.D.N.Y. 1995), *aff'd*, 201 F.3d 431 (2d Cir. 1999) ...............................42

*Interpharm, Inc. v. Wells Fargo Bank, Nat. Ass'n*,
 655 F.3d 136 (2d Cir. 2011)................................................................................................14

*Jackson v Dear*,
 2013 GLR 167 (Guernsey Royal Ct.) ................................................................................20

*Jiminian v. Seabrook*,
 760 F. App'x 38 (2d Cir. 2019) .............................................. 39 BA_Cite_FFBFB8_000197

*Jus Punjabi, LLC v. Get Punjabi Inc.*,
 2015 WL 2400182 (S.D.N.Y. May 20, 2015) (Woods, J.), *aff'd*, 640 F. App'x
 56 (2d Cir. 2016)..................................................................................................................33

*Kansas Life Ins. Co. v. First Bank of Truscott*,
 78 S.W.2d 584 (Tex. Comm'n App. 1935)...........................................................................18

*Kaufman v. Cohen*,
 307 A.D.2d 113 (1st Dep't 2003) .................................................................................20, 21

*KDH Consulting Grp. LLC v. Iterative Cap. Mgmt. L.P.*,
 2020 WL 7251172 (S.D.N.Y. June 29, 2020) .....................................................................11

*Laboy v. Bd. of Trustees of Bldg. Serv. 32 BJ SRSP*,
 2012 WL 701397 (S.D.N.Y. Mar. 6, 2012) .........................................................................34

*Lancer Offshore, Inc. v. Dominion Income Mgmt. Corp.*,
 2002 WL 441309 (S.D.N.Y. Mar. 20, 2002) .......................................................................16

*Lerner v. Fleet Bank, N.A.*,
 459 F.3d 273 (2d Cir. 2006)...........................................................................................21, 22

*Levner v. Saud*,
 903 F. Supp. 452 (S.D.N.Y. 1994), *aff'd*, 61 F.3d 8 (2d Cir. 1995)......................................37

*Lively v. Warfa Inv. Adv. Grp.*,
 6 F.4th 293 (2d Cir. 2021) ...............................................................................40, 41, 42, 43

*Locafrance U. S. Corp. v. Intermodal Sys. Leasing, Inc.*,
 558 F.2d 1113 (2d Cir. 1977).........................................................................................16, 17

*M+J Savitt, Inc. v. Savitt*,
 2009 WL 691278 (S.D.N.Y. Mar. 17, 2009) .......................................................................39

*MacCartney v. O'Dell*,
 2016 WL 815279 (S.D.N.Y. Feb. 29, 2016).........................................................................20

*Marcus v. W2007 Grace Acquisition I, Inc.*,
    203 F. Supp. 3d 332 (S.D.N.Y. 2016) ................................................................16

*Marex Financial Ltd. v. Sevilleja*,
    [2020] UKSC 31 ....................................................................................................31

*Motorola Credit Corp. v. Uzan*,
    388 F.3d 39 (2d Cir. 2004) ..................................................................................18

*Mueller v. Michael Janssen Gallery Pte. Ltd.*,
    225 F. Supp. 3d 201 (S.D.N.Y. 2016) ................................................................40

*NAF Holdings, LLC v. Li & Fung (Trading) Ltd.*,
    2013 WL 489020 (S.D.N.Y. Feb. 8, 2013), *vacated and remanded on other
    grounds*, 801 F.3d 92 (2d Cir. 2015) ..................................................................44

*NAF Holdings, LLC v. Li & Fung (Trading) Ltd.*,
    772 F.3d 740 (2d Cir. 2014) ..........................................................................12, 26

*NexPoint Diversified Real Estate Trust v. Acis Cap. Mgmt.*,
    620 F. Supp. 3d 36 (S.D.N.Y. 2022) ..................................4, 7, 15, 31, 36, 43

*Northeast Gen. Corp. v. Wellington Advertising, Inc.*,
    82 N.Y.2d 158 (N.Y. 1993) .................................................................................28

*Oddo Asset Management v. Barclays Bank PLC*,
    19 N.Y.3d 584 (2012) .....................................................................................27, 28

*Off. Sol. Grp., LLC v. Nat'l Fire Ins. Co. of Hartford*,
    544 F. Supp. 3d 405 (S.D.N.Y. 2021) (Woods, J.) ...................................10, 21, 44

*In re Optimal U.S. Litig.*,
    813 F. Supp. 2d 351 (S.D.N.Y. 2011) ................................................................27

*Pasternack v. Shrader*,
    863 F.3d 162 (2d Cir. 2017) ..........................................................................15, 16, 17

*Paul S. Mullin & Assocs., Inc., v. Basset*,
    632 F. Supp. 532 (D. Del. 1986) .........................................................................11

*Phoenix Light SF Ltd. v. U.S. Bank Nat'l Ass'n*,
    2016 WL 1169515 (S.D.N.Y. Mar. 22, 2016) ....................................................40

*PIMCO Absolute Return Strategy 3D Offshore Fund Ltd. v. Wells Fargo Bank*,
    Index. No. 654743/17 (N.Y. Sup. Ct. 2017) ......................................................22

*Restis v. Am. Coal. Against Nuclear Iran, Inc.*,
    53 F. Supp. 3d 705 (S.D.N.Y. 2014) ..............................................................24, 25

*City of Harper Woods Emps.' Ret. Sys. v. Olver*,
    589 F.3d 1292 (D.C. Cir. 2009) ............................................................................... 2

*Robinson v. Nat'l R.R. Passenger Corp.*,
    1995 WL 444322 (S.D.N.Y. July 26, 1995) ................................................... 19, 21

*Royal Park Invs. SA/NV v. HSBC Bank USA, N.A.*,
    109 F. Supp. 3d 587 (S.D.N.Y. 2015) ................................................................... 10

*Rynasko v. New York Univ.*,
    63 F.4th 186 (2d Cir. 2023) ................................................................................... 11

*S.E.C. v. Cap. Gains Rsch. Bureau, Inc.*,
    375 U.S. 180 (1963) ............................................................................................... 15

*In re Salomon Inc. Shareholders' Derivative Litig.*,
    1994 WL 533595 (S.D.N.Y. Sept. 30, 1994) ..................................................... 37, 43

*Sanghvi v. Frendel*,
    242 F.3d 367, 2000 WL 1804506 (2d Cir. 2000) ................................................. 15

*Saratoga Advantage Tr. Tech. & Commc'ns Portfolio v. Marvell Tech. Grp.*,
    2016 WL 4364593 (N.D. Cal. Aug. 16, 2016) ................................................. 34, 35

*Scalisi v. Fund Asset Mgmt., L.P.*,
    380 F.3d 133 (2d Cir. 2004) ............................................................................. 13, 31

*Segal v. Gordon*,
    467 F.2d 602 (2d Cir. 1972) ................................................................................. 21

*Shenwick v. HM Ruby Fund, L.P.*,
    106 A.D.3d 638 (1st Dep't 2013) ................................................................ 32, 33, 34

*Smith v. City of Jackson*,
    544 U.S. 228 (2005) ............................................................................................... 15

*Solow v. Stone*,
    994 F. Supp. 173 (S.D.N.Y.), *aff'd*, 163 F.3d 151 (2d Cir. 1998) ......................... 20

*Spinelli v. Nat'l Football League*,
    96 F. Supp. 3d 81 (S.D.N.Y. 2015) ..................................................................... 39

*Stein v. Immelt*,
    472 F. App'x 64 (2d Cir. 2012) ........................................................................... 38

*Sudler v. City of New York*,
    689 F.3d 159 (2d Cir. 2012) ................................................................................. 45

*Tamez v. Sw. Motor Transp., Inc.*,
    155 S.W.3d 564 (Tex. App. 2004)...............................................................18, 44

*Thurman v. City of Lake St. Louis*,
    24 F.3d 1034 (8th Cir. 1994) ..................................................................................44

*Tobbon v. State Farm Mut. Auto. Ins. Co.*,
    616 S.W.2d 243 (Tex. Civ. App. 1981) .................................................................18

*Transamerica Mortg. Advisors, Inc. (TAMA) v. Lewis*,
    444 U.S. 11 (1979)..................................................................................................30

*In the Matter of the Trust Established Under the Pooling and Service Agreement
    relating to the Wachovia Bank Commercial Mortgage Trust Commercial
    Mortgage Pass-Through Certificates, Series 2007-C30*, Case No. 62-TR-CV-
    19-33 (Minn. Dist. Ct. Oct. 26, 2022). ..................................................................21

*Velez v. Feinstein*,
    87 A.D.2d 309 (1st Dep't 1982) ............................................................................37

*Voss v. Sutardja*,
    2015 WL 349444 (N.D. Cal. Jan. 26, 2015) ..........................................................35

*White Plains Coat & Apron Co., Inc. v Cintas Corp.*,
    8 N.Y.3d 422 (2007) ..............................................................................................25

*Wilson v. Dantas*,
    2013 WL 92999 (S.D.N.Y. Jan. 7, 2013), *aff'd*, 746 F.3d 530 (2d Cir. 2014)................23, 24

*Wilson v. Dantas*,
    746 F.3d 530 (2d Cir. 2014)......................................................................23, 24, 42

*Winn v. Schafer*,
    499 F. Supp. 2d 390 (S.D.N.Y. 2007)............................................................13, 34

*Wolf v. Barkes*,
    348 F.2d 994 (2d Cir. 1965)...................................................................................43

*Zohar CDO 2003-1, Ltd. v. Patriarch Partners, LLC*,
    2021 WL 4460547 (S.D.N.Y. Sept. 29, 2021)...............................13, 26, 31, 33, 34, 39

## Statutes, Rules & Regulations

15 U.S.C. § 80b-6 ..........................................................................................15, 29, 30

15 U.S.C. § 80b-15(a) .............................................................................11, 14, 15, 16

72 FR 44756 (Aug. 9, 2007) ...........................................................................................30

FRCP 8...............................................................................................................................21, 34

FRCP 9(b)..............................................................................................................19, 21, 22, 34

FRCP 12(b)(6)......................................................................................................1, 10, 23, 40, 41

FRCP 12(c)......................................................................................................................1, 40, 41, 43

FRCP 23.1...................................................................................................................................37, 38

Rule 206(4)-8.............................................................................................................................29, 30

## **Other Authorities**

Restatement (Third) of Trusts § 80..............................................................................................31

Bogert's The Law of Trusts and Trustees § 557 .......................................................................31

Plaintiffs U.S. Bank, National Association, in its capacity as trustee ("U.S. Bank" or the "Trustee"), Joshua N. Terry ("Mr. Terry"), and Acis Capital Management, L.P. ("ACM" or the "Portfolio Manager," and with Mr. Terry, the "ACM Parties") (collectively, "Plaintiffs"), submit this memorandum in support of their motions (1) to dismiss the counterclaims (Dkts. 77, 78)[1] brought by Defendants The Charitable Donor Advised Fund, L.P. ("DAF"), CLO HoldCo, Ltd. ("CLO HoldCo," and, collectively with DAF, the "DAF Parties") and NexPoint Diversified Real Estate Trust ("NexPoint") (collectively, the "Defendants") under FRCP 12(b)(6), and (2) for judgment on the pleadings under FRCP 12(c) on Plaintiff's claims in the Amended Complaint (Dkt. 15, "AC").

## PRELIMINARY STATEMENT

The counterclaims by the DAF Parties and NexPoint are the latest in a series of meritless lawsuits brought by entities functionally controlled by James Dondero, whose history of vexatious litigation is well-documented.[2] The counterclaims, while challenging different things, suffer from many of the same fatal flaws. Both the DAF Parties and NexPoint lack standing to pursue their claims, and both rely on conclusory rhetoric devoid of any supporting factual allegations, which is insufficient to satisfy the plausibility pleading standard. While their counterclaims are destined for failure, they are having a very real impact on the Acis CLOs and their majority investor,

---

[1] All citations to Dkts. 77 and 78 are to the counterclaim portion of those pleadings unless otherwise indicated.

[2] *See* Dkt. 15-15 (Transcript Ruling, *In re Highland Cap. Mgmt., L.P.*, No. 19-34054-sgj-11 (Bankr. N.D. Tex. Jun. 25, 2021), Dkt. 2500) at 109:17-22 (observing "vexatious litigation behavior"); *In re Highland Cap. Mgmt., L.P.*, 2021 WL 3418657, at *12 (Bankr. N.D. Tex. Aug. 4, 2021)) (finding Mr. Dondero, Mazin Sbaiti (NexPoint's counsel in this action), and others in contempt of bankruptcy order for bringing "wholly frivolous" lawsuit), *aff'd in part, vacated in part on other grounds sub nom.*, *Charitable DAF Fund L.P. v. Highland Cap. Mgmt. LP*, 2022 WL 4538466 (N.D. Tex. Sept. 28, 2022).

Highland CLO Funding, Ltd. ("HCLOF"), which bears the brunt of the expenses incurred in defending against these meritless claims. But that is really the point. The DAF Parties and NexPoint are locked in extensive litigation with HCLOF and its majority investor, Highland Capital Management, L.P. ("HCM"), and this lawsuit is just another leverage point in that broader dispute. The ACM Parties, ACM's sub-advisor, Brigade Capital Management, L.P. ("Brigade"), and the Trustee, are collateral damage. The time to put a stop to Defendants' misguided campaign is now. The counterclaims should be dismissed in their entirety, and with prejudice. And the Court should enter judgment on the pleadings for the ACM Parties and U.S. Bank for the same reasons that dismissal of the counterclaims is warranted.

The DAF Parties challenge two settlement agreements between ACM (and in one case, ACM and the Trustee) and HCLOF resolving (1) allegations that ACM mismanaged the Acis CLOs in violation of the Acis CLOs' governing agreements and (2) releasing claims regarding previously spent reserves and agreeing to forbear on claims concerning funds reserved by Plaintiffs under the Acis CLOs' governing agreements for the indemnification of future litigation expenses related to claims associated with the Acis CLOs. The DAF Parties hold direct and indirect minority interests in HCLOF and attempt through this litigation to revive the claims that HCLOF saw fit to settle. But the DAF Parties lack standing to challenge those settlement agreements and fail to plead a single fact to support their conclusory allegations of collusion by the settlement parties. There is no allegation that the settlement agreements favor HCLOF's majority shareholder, HCM, or provide any personal benefit to HCLOF's independent directors. Stripped of their empty rhetoric, the DAF Parties' counterclaims assert a mere disagreement with the terms of the settlements, and that is not enough to support an aiding and abetting breach of fiduciary duty claim against Plaintiffs, let alone to invalidate the settlement agreements altogether.

NexPoint, meanwhile, advances scattershot and conclusory allegations against the ACM Defendants for alleged mismanagement of an investment fund called Acis CLO 2015-6, Ltd. ("Acis 6"), in which NexPoint holds a minority investment.  The majority investor, HCLOF, has rejected NexPoint's allegations and twice intervened to seek their dismissal.  That is critical, because NexPoint pursues claims that do not belong to it, and does so against the will of the party with the primary economic interest in those claims.  It lacks standing to do so.  The counterclaims it purports to bring belong to Acis 6, a Cayman Islands company, and NexPoint has not pled any of the narrow exceptions to the general ban on derivative lawsuits under Cayman Islands law. Derivative standing is also lacking under New York law, to the extent it applies instead.  And, in any event, under the Acis 6 Indenture, the Trustee (on whose behalf NexPoint seeks to pursue the claims under New York law) does not have authority to bring claims based upon the breach of an obligation of the Portfolio Manager under the Acis 6 PMA absent an Event of Default under the Acis 6 Indenture, which NexPoint admits has not occurred.  Even if it could overcome its standing problem, NexPoint's claims are further barred as duplicative of its now abandoned breach of contract claims against the ACM Parties, and are barred by the economic loss doctrine.  As for NexPoint's purported "direct" claim for tortious interference with contract, it fails because NexPoint has not alleged any breach of the Subordinated Note by Acis 6 and cannot meet the malice or independent illegality hurdles under the economic interest doctrine.

For all these reasons, the counterclaims of both the DAF Parties and NexPoint fail to state a claim, and should be dismissed in their entirety.  The arguments that require dismissal of both sets of counterclaims also warrant judgment on the pleadings in favor of Plaintiffs.  Argument Section I addresses the grounds for dismissal of the DAF Parties' counterclaims.  Argument Section II addresses the grounds for dismissal of NexPoint's counterclaims.  Argument Section III

addresses the grounds for judgment on the pleadings in favor of Plaintiffs.  Argument Section IV

addresses why leave to amend the counterclaims should be denied.

**FACTUAL BACKGROUND**

Plaintiffs brought this action to address the DAF Parties' continued threat of litigation

related to HCLOF's investments in ACIS CLO 2014-4 Ltd. ("Acis 4"), ACIS CLO 2014-5 Ltd.

("Acis 5"), and Acis 6 (collectively, the "Acis CLOs") and NexPoint's ongoing litigation related

to its investment in Acis 6.  AC ¶ 1.

**A.      The Parties And Their Contracts**

**1.      The Acis CLOs And Their Service Providers**

The Acis CLOs are investment funds organized in the Cayman Islands and administered

by independent Cayman Islands-based directors.  Dkt. 78-1 ("Acis 6 Indenture") & Exs. 10 & 12

(Acis 4 & 5 Indentures, and, collectively with the Acis 6 Indenture, the "Indentures") § 7.4; *see*

Ex. 4 at 107, 109.[3]  The Acis CLOs issued notes to investors pursuant to the Indentures between

each Acis CLO, a Co-Issuer and U.S. Bank, as Trustee.  Indentures at 1-2 (Granting Clauses).  The

Acis CLOs then invested the proceeds from that note issuance in leveraged loans that serve as

collateral securing repayment of the notes.  Indentures at 1-2 (Granting Clauses).  The only notes

that remain outstanding are the unsecured "Subordinated Notes."  AC ¶ 51; Dkt. 78, Answer ¶ 51.

Counter-Defendant HCLOF holds 87% of the Subordinated Notes in Acis 6 and 100% of the

Subordinated Notes in Acis 4 and 5.  Dkt. 77, Answer ¶ 31; AC ¶ 31.  NexPoint alleges that it

holds the remaining 13% beneficial interest in the Subordinated Notes in Acis 6.  *See NexPoint*

*Diversified Real Estate Trust v. Acis Cap. Mgmt.*, 620 F. Supp. 3d 36, 49, n.6 (S.D.N.Y. 2022);

---

[3] All exhibits cited herein are attached to the Declaration of Blair A. Adams, dated May 15, 2023, submitted with this motion unless otherwise noted.

4

Dkt. 78 ¶ 46.  In addition to the Notes, the Acis CLOs issued common shares to a Cayman Islands charitable trust.  Ex. 4 at 107.

The DAF Parties do not own any Subordinated Notes or other securities issued by the Acis CLOs.  *See* Dkt. 77, Answer ¶¶ 4, 17, 31.  Rather, DAF, through CLO HoldCo, holds a 49% ownership stake in HCLOF, which itself is a holder of Subordinated Notes. *See* Dkt. 77, Answer ¶¶ 4, 12-13; Dkt. 78, Answer ¶¶ 12-13.  HCLOF is a limited company registered in Guernsey.  Dkt. 77, Answer ¶ 17; AC ¶ 17.

ACM acts as portfolio manager for each Acis CLO under the Portfolio Management Agreements.  *See* Dkt. 78-2 ("Acis 6 PMA"); Exs. 9 & 11 (Acis 4 & 5 PMAs, and collectively with the Acis 6 PMA, the "PMAs").  ACM was originally majority-owned by Mr. Dondero, but a Texas bankruptcy court transferred ownership to his co-founder, Mr. Terry, following an involuntary bankruptcy initiated by Mr. Terry to enforce a judgment arising from an unpaid arbitration award.  *In re Acis Cap. Mgmt., L.P.*, 2019 WL 417149, at *4 (Bankr. N.D. Tex. Jan. 31, 2019).  ACM, with bankruptcy court approval, appointed Counter-Defendant Brigade to serve as a sub-advisor.  *Id.* at *8.

## 2.    The Acis CLOs' Governing Agreements

The PMAs govern ACM's rights and obligations as Portfolio Manager.  The Portfolio Manager is generally tasked with "supervis[ing] and direct[ing] the investment and reinvestment of Assets" of the Acis CLOs.  PMAs § 3.  The PMAs provide that "[t]he Portfolio Manager shall have no obligation to perform any duties other than as expressly specified [in the PMA], or in the provisions of the Indenture applicable to the Portfolio Manager, and the Portfolio Manager shall be subject to no implicit obligations of any kind."  PMAs § 3(c).  Defendants are not parties to or third-party beneficiaries of the PMAs.  *See* PMAs § 31 ("[N]o … Holder of Notes[] is a third party beneficiary of this Agreement.").

The Indentures govern the rights and obligations of each Acis CLO vis-à-vis the Trustee and the Noteholders. The Indentures provide that, except during the continuance of an Event of Default, the Trustee only owes the contractual duties "specifically set forth in [the] Indenture," and owes "no implied covenants or obligations." Indentures § 6.1(a). Under Section 15.1(a) of the Acis 6 Indenture, the Trustee does not have the authority to "take any legal action upon the breach of an obligation of [ACM]" under the PMA "until the occurrence of an Event of Default." Indentures § 15.1(a). NexPoint admits that there has been no Event of Default for Acis 6. *See* Dkt. 78 ¶ 247.

### B.   Defendants' Litigation Campaign And The Settlement Agreements

Defendants have carried out a campaign of litigation and threatened litigation against Plaintiffs since the bankruptcy court transferred ownership of ACM to Mr. Terry in 2019. In late 2019 and again in early 2020, the DAF Parties twice filed lawsuits in this District purporting to assert claims on behalf of HCLOF against Plaintiffs for alleged breaches by ACM of its obligations under the PMAs to the Acis CLOs (the "2019 and 2020 Lawsuits"). Dkt. 15-6 ¶¶ 42, 73-74; Dkt. 15-7 ¶¶ 43, 74-75. After voluntarily dismissing both lawsuits, the DAF Parties repeated those allegations in a May 8, 2020 letter to the Trustee threatening to "proceed to litigation" against Plaintiffs if the Trustee did not "fulfill its duties" (the "May 8 Letter"). Dkt. 15-8 at 7.

The DAF Parties did not abandon those threats and refused to release their purported claims even after HCLOF, on whose behalf the DAF Parties purported to bring claims, entered into a settlement agreement (the "2021 Settlement Agreement") with ACM and Mr. Terry on April 28, 2021. Dkt. 15-12; Ex. 1 (Feb. 23, 2023 Tr. Ruling) at 22 (finding that the [DAF] defendants declined to withdraw their litigation threats upon request"). Pursuant to that agreement, HCLOF released "any and all claims … against … [ACM], and [Mr.] Terry, in any capacity, Brigade Capital Management, LP, [and] U.S. Bank National Association." Dkt. 15-12 § 10. HCLOF's

release expressly covered the claims that the DAF Parties brought on behalf of HCLOF in the 2019 and 2020 Lawsuits: "claims for breach of any duties or obligations owed by [ACM] to the Acis CLOs under the PMAs …, including … any fees and expenses paid by the Acis CLOs to [ACM]." *Id*. In exchange for this release, ACM agreed to: (1) dismiss ongoing litigation against HCLOF, including multi-million dollar fraudulent transfer claims, Dkt. 15-12 at 1-2 & § 7, Ex. 2, (2) provide a general release to HCLOF, Dkt. 15-12 § 9, and (3) cooperate with HCLOF to discharge the bankruptcy plan injunction prohibiting HCLOF from redeeming up to $41 million from the Acis CLOs, *id*. § 4.

Following the 2021 Settlement Agreement, NexPoint initiated a federal court action against Plaintiffs on May 14, 2021 that closely tracked the DAF Parties' two prior lawsuits. *See NexPoint Strategic Opportunities Fund v. Acis Cap. Mgmt.*, 1:21-cv-04384-GHW (S.D.N.Y.) (the "Original NexPoint Lawsuit"). On August 9, 2022, the Court dismissed NexPoint's Investment Advisers Act ("IAA") claim against ACM and breach of fiduciary duty claim against the Trustee, and declined to exercise supplemental jurisdiction on NexPoint's state claims against ACM and Mr. Terry. *Nexpoint Diversified Real Est. Tr. v. Acis Cap. Mgmt., L.P.*, 620 F. Supp. 3d 36 (S.D.N.Y. 2022).[4]

In December 2021, while Plaintiffs' motions to dismiss the Original NexPoint Lawsuit were pending, Plaintiffs initiated this lawsuit in an effort to obtain full and final resolution of all remaining disputes among the parties, including both NexPoint's state-law claims and the DAF Parties' allegations in the 2019 and 2020 Lawsuits. Plaintiffs' Amended Complaint seeks

---

[4] NexPoint has since refiled its case in state court. *NexPoint Diversified Real Estate Trust vs. Acis Capital Management, L.P. et al*, Index No. 653654/2022 (N.Y. Sup. Ct.) (the "State Court Action").

declarations that: (1) all Defendants lack standing to bring their previously filed and threatened claims against Plaintiffs and (2) the 2021 Settlement Agreement bars the DAF Parties' previously brought and threatened claims against Plaintiffs. AC ¶¶ 65, 73. On February 23, 2023, the Court denied Defendants' motions to dismiss the Amended Complaint for lack of standing and unripeness, finding that this action would provide "clarity or closure" with respect to Defendants' threatened claims by "provid[ing] a full and final declaration of plaintiffs' rights." Ex. 1 at 22-23. Following this decision, the DAF Parties and NexPoint answered the amended complaint and filed counterclaims, which are discussed below.

Shortly after the Original NexPoint Lawsuit, and consistent with the 2021 Settlement Agreement, ACM (at the request of HCLOF) caused a redemption of the Acis CLOs, resulting in a complete repayment of all noteholders except for the Subordinated Noteholders. AC ¶ 44. Faced with the pending Original NexPoint Lawsuit and the DAF Parties' litigation threats manifested in the 2019 and 2020 Lawsuits and the May 8 Letter, Plaintiffs retained a portion of the liquidation proceeds from the redemption of the Acis CLOs to secure the Acis CLOs' potential future indemnification obligations. AC ¶ 51. HCLOF objected to the reserves. *See* Exs. 18 & 19. Plaintiffs and HCLOF reached a second settlement agreement (Ex. 3, the "2023 Settlement Agreement" and, together with the 2021 Settlement Agreement, the "Settlement Agreements") on February 28, 2023 whereby Plaintiffs agreed to distribute $16 million from the reserves to Subordinated Noteholders (primarily HCLOF, but including NexPoint) in exchange for HCLOF's agreement to release claims regarding previously spent reserves and forbear on claims related to the remaining reserves until resolution of this and other ongoing litigations. *Id*. § 1.

### C.     The DAF Parties' Counterclaims

The DAF Parties assert three counterclaims against Plaintiffs. Count 1 seeks a declaratory judgment that the 2021 Settlement Agreement is unenforceable because it "waives ACM's

compliance with the [IAA]" and was "the product of collusion" between Plaintiffs and HCLOF. Dkt. 77 ¶¶ 39, 41. Counts 2 and 3 allege that "HCLOF breached its fiduciary duties" to the DAF Parties and that Plaintiffs aided and abetted that breach by entering into the Settlement Agreements. Dkt. 77 ¶¶ 46-49, 53-55.

The DAF Parties repeatedly describe the Settlement Agreements as the product of collusion, Dkt. 77 ¶¶ 19-21, 34, 41, 54, but do not allege any facts in support of that claim. Rather, they ask the Court to infer collusion and aiding and abetting from allegedly unfavorable terms of each agreement. Dkt. 77 ¶¶ 19-20, 33-34. At the same time, however, the DAF Parties admit that both agreements benefited them: the 2021 Settlement Agreement by generating $41 million of liquidation proceeds from the redemption of the Acis CLOs that would be available for distribution to the Subordinated Noteholders but for NexPoint's lawsuits and the DAF Parties' threatened litigation, *id*. ¶¶ 29, 31, and the 2023 Settlement Agreement by providing for the distribution of $16 million from the reserved funds to Subordinated Noteholders, *id*. ¶ 33.

### D. NexPoint's Counterclaims

NexPoint asserts six counterclaims against the ACM Parties, including breach of fiduciary duty (Count 1), negligence (Count 2), conversion (Count 3), unjust enrichment (Count 4), tortious interference with contract (Count 5), and declaratory judgment (Count 6). NexPoint also asserts a claim for aiding and abetting breach of fiduciary duty against Mr. Terry (Count 7). Each counterclaim is based on the same alleged conduct. NexPoint claims that ACM mismanaged Acis 6 by causing it to buy loans that violated contractual thresholds in the Indenture (e.g., the weighted average rating factor (or "WARF") and the weighted average life (or "WAL") thresholds), causing it to buy and sell loans in a manner that violated "best execution" requirements in the PMA, and charging expenses to Acis 6 that were not permitted under the PMA. Dkt. 78 ¶¶ 89-139. NexPoint further claims that ACM made these allegedly improper investment decisions to "maximize fees"

9

and other proceeds paid to ACM.  *Id*. ¶ 8.  And NexPoint seeks damages for the alleged reduction in the "net asset value" of its Subordinated Notes—a reflection of the loss "in value from [Acis 6]" that ACM's mismanagement allegedly caused.  *Id*. ¶¶ 4-5.  NexPoint's tort, contract and quasi-contract claims all seek to recover those same damages.  *Id*. ¶¶ 174, 178, 181, 202, 212, 219. NexPoint asserts both direct and derivative standing to bring its claims.  Dkt. 78 ¶¶ 161, 168, 242.

## LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Off. Sol. Grp., LLC v. Nat'l Fire Ins. Co. of Hartford*, 544 F. Supp. 3d 405, 412 (S.D.N.Y. 2021) (Woods, J.).[5]  "A claim is facially plausible when a plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id*.  "[L]egal conclusions" need not be "accept[ed] as true," and "labels and conclusions … will not do."  *Id*. at 412-13.  A court may consider documents that are integral to the allegations in a pleading on a motion to dismiss that pleading.  *Royal Park Invs. SA/NV v. HSBC Bank USA, N.A.*, 109 F. Supp. 3d 587, 596 (S.D.N.Y. 2015).

## ARGUMENT

## I.  THE COURT SHOULD DISMISS THE DAF PARTIES' COUNTERCLAIMS

In their counterclaims, the DAF Parties challenge two arms-length settlement agreements between unaffiliated parties to settle ongoing and/or contemplated litigation and distribute money to investors.  As a preliminary matter, the DAF Parties lack standing to pursue these claims, which belong to HCLOF.  In any event, the DAF Parties do not—and cannot—adequately plead the

---

[5] Unless noted, internal citations, quotation marks, and alterations are omitted from citations.

substantive elements of their claims.  "Strong policy considerations favor the enforcement of settlement agreements," and the court should enforce the Settlement Agreements so that Plaintiffs and HCLOF can enjoy the "finality and repose upon which [to] order their affairs" that they bargained for.  *See Denburg v. Parker Chapin Flattau & Klimpl*, 82 N.Y.2d 375, 383 (1993).

### A.   The DAF Parties Lack Standing To Bring Their Counterclaims

The DAF Parties seek to invalidate HCLOF's 2021 Settlement Agreement with the ACM Parties and assert an aiding and abetting claim against Plaintiffs related to both the 2021 and 2023 Settlement Agreements.  In each case, the DAF Parties' claims belong to HCLOF and the DAF Parties lack derivative standing to pursue them.

*First*, the DAF Parties cannot seek to void the 2021 Settlement Agreement based on collusive conduct because they are neither a party to, nor a third-party beneficiary of, the agreement.  *See Durosene v. Bank of Am., N.A.*, 2020 WL 3403083, at *3 (E.D.N.Y. June 19, 2020) ("Generally speaking, a non-party to a contract lacks standing to challenge an agreement in the absence of terms demonstrating that it is a third-party beneficiary."); *accord Rynasko v. New York Univ.*, 63 F.4th 186, 194 (2d Cir. 2023) ("a non-party to the contract lacks standing to sue for breach" if it is not a third-party beneficiary).  The same is true for the DAF Parties' effort to invalidate the 2021 Settlement Agreement under the IAA's anti-waiver provision, 15 U.S.C. § 80b-15(a).  *See, e.g.*, *KDH Consulting Grp. LLC v. Iterative Cap. Mgmt. L.P.*, 2020 WL 7251172, at *10 (S.D.N.Y. June 29, 2020) (plaintiff lacked standing under the IAA because it failed to allege that defendants acted as investment advisers to it); *Clark v. Nevis Cap. Mgmt., LLC*, 2005 WL 488641, at *13 (S.D.N.Y. Mar. 2, 2005) (non-parties to investment advisory contracts "have no standing" to sue under the IAA); *Paul S. Mullin & Assocs., Inc., v. Basset*, 632 F. Supp. 532, 537 (D. Del. 1986) (because  "only the parties to a contract can [seek] rescission[,]" non-parties "lack standing to sue under the [IAA]").

11

*Second*, the DAF Parties' aiding and abetting breach of fiduciary duty claims related to HCLOF's entry into the Settlement Agreements are derivative claims because any alleged breach of fiduciary duty underlying those claims belongs to HCLOF.  *ABF Cap. Mgmt. v. Askin Cap. Mgmt., L.P.*, 957 F. Supp. 1308, 1332 (S.D.N.Y. 1997) (aiding and abetting breach of fiduciary duty claim "based on [derivative] breach of fiduciary duty" claim was derivative).  The DAF Parties characterize their underlying breach of fiduciary duty claims as against HCLOF itself, but there is no fiduciary duty running from a company to its investors under Guernsey law.[6] Declaration of Todd William McGuffin, dated May 15, 2023 ("McGuffin Decl."), Ex. 6, *Carlyle Capital Corp. Ltd. v. Conway Others*, Judgment 38/2017 ¶ 414 (Guernsey Royal Ct.) (directors' "fiduciary duties … were owed to … [the company] alone," not its shareholders); *see also* McGuffin Decl. ¶¶ 4.1, 4.9, 5.1, 5.4.  Thus, the DAF Parties must be alleging that HCLOF's directors breached their fiduciary duties to HCLOF by entering into the Settlement Agreements. *Id.*  These breach of fiduciary duty claims, and any related aiding and abetting claim, however, can only be brought by HCLOF—the only party HCLOF's directors owed fiduciary duties to.  *ABF Cap. Mgmt.*, 957 F. Supp. at 1332 (breach of fiduciary duty and aiding and abetting claims were derivative) (applying Cayman law); McGuffin Decl. ¶ 6.5 (claims that directors breached their fiduciary duties to the company are derivative under Guernsey law).[7]

---

[6] Guernsey law governs this question because (1) "whether a claim is direct or derivative" is governed by the law of the company's place of incorporation, *NAF Holdings, LLC v. Li & Fung (Trading) Ltd.*, 772 F.3d 740, 743 n.2 (2d Cir. 2014), and (2) "underlying primary violations of duty" in aiding and abetting claims "are subject to the internal affairs doctrine," *In re ICP Strategic Credit Income Fund Ltd.*, 2015 WL 5404880, at *11 (Bankr. S.D.N.Y. Sept. 15, 2015), *aff'd*, 568 B.R. 596 (S.D.N.Y. 2017), *aff'd*, 730 F. App'x 78 (2d Cir. 2018)

[7]  The law is the same under most U.S. state law regimes as well, including New York and Delaware.  *ABF Cap. Mgmt.*, 957 F. Supp. at 1332 (aiding and abetting claim was also not direct

*Third*, the DAF Parties lack derivative standing to pursue contract invalidation or aiding and abetting breach of fiduciary duty claims on behalf of HCLOF.  The DAF Parties' derivative standing is governed by Guernsey law, where HCLOF is organized.  *Howe v. Bank of New York Mellon*, 783 F. Supp. 2d 466, 475 (S.D.N.Y. 2011) (the law of the company's place of incorporation governs "the right to sue derivatively" on its behalf); *Scalisi v. Fund Asset Mgmt., L.P.*, 380 F.3d 133, 138 (2d Cir. 2004) (law of the company's place of incorporation governs demand futility).  Guernsey law, like Cayman Islands law, applies the English precedent from *Foss v. Harbottle*, 67 Eng. Rep. 189, 2 Hare 461 [1843],[8] under which "a shareholder is not permitted to bring a derivative action" subject to "four narrow exceptions" for conduct that (1) "infringed on the shareholder's personal rights;" (2) "would require a special majority to ratify;" (3) "qualifies as a fraud on the minority;" or (4) "consists of *ultra vires* acts."  *Davis v. Scottish Re Grp. Ltd.*, 160 A.D.3d 114, 116 (1st Dep't 2018) (applying Cayman Islands law); *see also* McGuffin Decl. ¶ 6.7.  The DAF Parties assert only the fraud on the minority exception, Dkt. 89, at 2, but fail to satisfy its requirements.

The fraud on the minority exception "applies against defendants who (1) 'controlled a majority of the stock with voting rights' in a company and (2) 'committed fraud' against minority investors."  *Zohar CDO 2003-1, Ltd. v. Patriarch Partners, LLC*, 2021 WL 4460547, at *13 (S.D.N.Y. Sept. 29, 2021) (Cayman Islands law); *Winn v. Schafer*, 499 F. Supp. 2d 390, 396 (S.D.N.Y. 2007) (same) (English law); *see also* McGuffin Decl. ¶ 6.10 (Guernsey law follows English law on the fraud on the minority exception).  Plaintiffs here do not control a majority of

---

under Delaware law); *Accredited Aides Plus, Inc. v. Program Risk Mgmt., Inc.*, 147 A.D.3d 122, 137 (3d Dep't 2017) (because "breach [of] fiduciary duty [claim] is derivative, the related cause of action alleging ... aid[ing] and abett[ing] is also derivative") (applying New York law).

[8] Included as McGuffin Decl. Ex. 19.

the stock with voting rights in HCLOF; they own none of it.  The DAF Parties have not alleged any fraud or self-dealing by HCLOF's directors or its controlling shareholder, HCM—the parties that could plausibly be alleged to have control.  To the contrary, all of HCLOF's stakeholders share equally in the costs and benefits of the Settlement Agreements, and the DAF Parties do not allege otherwise.  If the settlement was bad for the DAF Parties, it was bad for HCM too.  And the DAF Parties do not allege that the Settlement Agreements afforded any personal benefit to HCLOF's directors.

Because each of the DAF Parties' claims are derivative in nature and the DAF Parties lack derivative standing under applicable Guernsey law, the DAF Parties' counterclaims should be dismissed in their entirety.

**B.     The DAF Parties Fail To Plead Any Viable Grounds To Invalidate The 2021 Settlement Agreement**

Even if the DAF Parties had standing, they have not plausibly pled any viable basis to invalidate the 2021 Settlement Agreement.  *See Interpharm, Inc. v. Wells Fargo Bank, Nat. Ass'n*, 655 F.3d 136, 137 (2d Cir. 2011) (dismissing claim for failure to plausibly allege grounds for invalidation).  The DAF Parties wrongly assert (Dkt. 77 ¶¶ 38-41, Dkt. 89 at 1) that the 2021 Settlement Agreement is unenforceable because it (1) violates the IAA's anti-waiver provision, Section 215(a) and (2) is the product of collusion.  Both theories fail as a matter of law.

**1.     The 2021 Settlement Complies With The IAA Anti-Waiver Provision**

The DAF Parties' argument (Dkt. 77 ¶¶ 39-40) that the IAA anti-waiver provision invalidates the 2021 Settlement Agreement fails because the DAF Parties lack an IAA claim to begin with and, in any event, the 2021 Settlement Agreement releases past conduct in exchange for consideration—a classic example of what is permissible under the IAA's anti-waiver provision.

*First*, the IAA anti-waiver provision only applies to waiver of IAA claims, which the DAF Parties do not have.  To the extent the DAF Parties would assert IAA claims under Sections 206 and/or 215 of the IAA, this Court has already found that private parties lack a right of action to pursue those claims.  *See NexPoint*, 620 F. Supp. 3d, at 43, 45 (holding that "there is no private right of action under § 206" of the IAA and NexPoint cannot pursue a claim under Section 215(b) because it "does not allege that the PMA was illegally made or requires illegal performance").  The IAA's anti-waiver provision has no bearing on the ability of parties to waive common law claims (or any other non-IAA claims).  *See* 15 U.S.C. § 80b-15(a) (prohibiting waivers that "bind[] any person to waive compliance with any provision of [the IAA]"); *Pasternack v. Shrader*, 863 F.3d 162, 173 (2d Cir. 2017) ("Section 29's [e]ffect, if any, does not extend to the common law claims.").  While *Pasternack* concerns the Securities Exchange Act's anti-waiver provision, it is equally applicable to the IAA's anti-waiver provision because both statutes share the "common," "fundamental purpose" of requiring disclosure in the securities industry, and use the same language in their anti-waiver provisions.  *S.E.C. v. Cap. Gains Rsch. Bureau, Inc.*, 375 U.S. 180, 186 (1963); *see also Smith v. City of Jackson*, 544 U.S. 228, 233 (2005) ("the same language in two statutes having similar purposes" presumptively "ha[s] the same meaning").  As such, the issue of whether Section 215(a) would void any release of IAA claims in the 2021 Settlement Agreement is merely academic because no such claims exist, and the Court need not resolve it.  *Sanghvi v. Frendel*, 242 F.3d 367 (Table), 2000 WL 1804506 at *2 (2d Cir. 2000) (resolving immunity defense was unnecessary because plaintiff had no viable claim under federal statute).

*Second*, even if the DAF Parties could state an IAA claim, the anti-waiver provision still would not apply because the 2021 Settlement Agreement does not waive compliance with the IAA.  Section 215(a) voids "provision(s) binding any person to waive compliance with any provision of

15

[the IAA]." 15 U.S.C. § 80b-15(a). But *Pasternack* ruled that the Securities Exchange Act's

materially identical anti-waiver provision, Section 29(a), does not invalidate releases that "offer

consideration" to settle "existing or contemplated litigation" because such releases "establis[h]

'compliance' with the securities laws," and "cannot be said to 'waive compliance' with [them]."

863 F.3d at 172-73. *Pasternack* equally governs Section 215(a), *see supra* at 15, and is dispositive

because the 2021 Settlement Agreement offers consideration to HCLOF to settle both existing and

contemplated litigation between Plaintiffs and HCLOF. *See* Dkt. 15-12 at 1-2 & §§ 5, 7-10. Courts

routinely enforce similar settlement agreements because the anti-waiver provisions do not apply.

*See Auctus Fund, LLC v. OriginClear, Inc.*, 2023 WL 2140478, at *6, *10 (D. Mass Feb. 21, 2023)

(Section 29(a) did not invalidate "arm's length [settlement agreement] between sophisticated

parties") (citing *Pasternack*); *Lancer Offshore, Inc. v. Dominion Income Mgmt. Corp.*, 2002 WL

441309, at *6 (S.D.N.Y. Mar. 20, 2002) (settlement releasing threatened claims did not violate

Section 29(a)); *Marcus v. W2007 Grace Acquisition I, Inc.*, 203 F. Supp. 3d 332, 342 (S.D.N.Y.

2016) (following *Lancer*); *Locafrance U. S. Corp. v. Intermodal Sys. Leasing, Inc.*, 558 F.2d 1113,

1114-15 (2d Cir. 1977) (enforcing "unambiguous" release of securities claims).

      The DAF Parties try to circumvent *Pasternack* by alleging that the scope of the 2021

Settlement Agreement is not tied to existing or contemplated litigation, Ex. 5 (May 1, 2023 Hearing

Tr.) at  22, but this claim is rebutted by the DAF Parties' own pleadings and the agreement itself.

By its terms, the 2021 Settlement Agreement settled two existing litigated matters between ACM

and HCLOF, namely HCLOF's appeal of the approval of ACM's bankruptcy plan on the grounds

that it prevented HCLOF from redeeming the Acis CLOs, and an adversary proceeding in which

ACM asserted fraudulent transfer claims against HCLOF. Dkt. 15-12 at 1-2 & §§ 7-8; Exs. 2 &

15-16. Further, HCLOF's release specifically identified "claims for breach of any duties or

obligations owed by [ACM] to the Acis CLOs under the PMAs …, including … any fees and expenses paid by the Acis CLOs to [ACM]."  Dkt. 15-12 § 10.  The scope of the release thus closely tracks the claims that the DAF Parties asserted against Plaintiffs on behalf of HCLOF in their 2019 and 2020 Lawsuits alleging that ACM violated the PMAs by mismanaging the Acis CLOs' assets and charging excessive expenses to the Acis CLOs.  *See* Dkt. 15-6 ¶¶ 42, 73-74; Dkt. 15-7 ¶¶ 43, 74-75.  It is disingenuous for the DAF Parties to suggest that the very claims they sought to advance on HCLOF's behalf before the 2021 Settlement Agreement were somehow not contemplated by the scope of the release.  And it is irrelevant that HCLOF's general release extended beyond these claims because Second Circuit precedent permits such general releases as part of the settlement of actual or contemplated litigation.  *Locafrance*, 558 F.2d at 1114-1115 (enforcing general release contained in settlement of securities claims); *Auctus Fund*, 2023 WL 2140478, at *6, *10 (general release did not violate anti-waiver provision) (citing *Pasternack*).

The DAF Parties' assertion that the 2021 Settlement Agreement is unenforceable under *Pasternack* for lack of consideration is equally unavailing.  Under the 2021 Settlement Agreement, ACM and Mr. Terry "offer[ed] consideration to [HCLOF]" as *Pasternack* requires.  *See Pasternack*, 863 F.3d at 173.  That consideration included: (1) ACM's dismissal of ongoing litigation against HCLOF, Dkt. 15-12 at 1-2 & § 7, (2) a general release, *id*. § 9, and (3) ACM's commitment to cooperate with HCLOF to discharge the bankruptcy plan injunction prohibiting HCLOF from redeeming the Acis CLOs, which HCLOF had no pre-existing right to require, *id*. at 1-2 & § 4.  Each is valid consideration under controlling Texas law.[9]  Dkt. 15-12 § 14 (selecting

---

[9] They are also valid consideration under New York law.  *See Gupta v. Headstrong, Inc.*, 2019 WL 4256396, at *4 (S.D.N.Y. Sept. 9, 2019) ("a mutual release provides sufficient consideration"); *Ferguson v. Lion Holdings, Inc.*, 312 F. Supp. 2d 484, 495 (S.D.N.Y. 2004) (obligation that promisor had "no pre-existing duty to undertake" is valid consideration).

Texas law); *see Garza v. Villarreal*, 345 S.W.3d 473, 483 (Tex. App. 2011) (release of "claims that were made [in a lawsuit] … or could have been made" was sufficient consideration); *Tamez v. Sw. Motor Transp., Inc.*, 155 S.W.3d 564, 571 (Tex. App. 2004) (granting a party "a legal right to which [it] would not otherwise be entitled" is sufficient consideration).  The DAF Parties' claim that HCLOF should have obtained additional consideration is not grounds for invalidation.  *See Tobbon v. State Farm Mut. Auto. Ins. Co.*, 616 S.W.2d 243, 245 (Tex. Civ. App. 1981) ("inadequacy of consideration is not sufficient to [invalidate] a release").  And the ACM Parties were not required to offer separate consideration to the DAF Parties in exchange for HCLOF's release because HCLOF was releasing its own claims, not those of the DAF Parties (which did not exist to begin with).  *See Abramowitz v. Posner*, 672 F.2d 1025, 1032 (2d Cir. 1982) ("The claim in a shareholder derivative action belongs to the corporation.").

### 2. The DAF Parties Fail To Plead A Viable Claim To Invalidate The 2021 Settlement Agreement Based On Collusion

The DAF Parties' attempt to invalidate the 2021 Settlement Agreement based on conclusory allegations of "collusion, bad faith, and/or unclean hands" (Dkt. 77 ¶ 41) fares no better.  Under Texas law,[10] the collusion doctrine permits a contracting principal to "avoid contracts made by [an] agent as the result of fraud or collusion between the agent and [a] third party."  *Kansas Life Ins. Co. v. First Bank of Truscott*, 78 S.W.2d 584, 587 (Tex. Comm'n App. 1935); *see also Crisp v. Sw. Bacshares Leasing Co.*, 586 S.W.2d 610, 615 (Tex. Civ. App. 1979) (similar).  The DAF Parties use the word "collusion" or "collusive" twelve times in their counterclaims.  *See* Dkt. 77 ¶¶ 5, 19-21, 30, 34, 41, 46, 49, 54, 58 & Prayer.  But they do not plead

---

[10]  Texas law governs the substance of the DAF Parties' challenges to the 2021 Settlement Agreement.  *See Motorola Credit Corp. v. Uzan*, 388 F.3d 39, 50 (2d Cir. 2004) ("a choice-of-law clause in a contract will apply to disputes about the existence or validity of that contract")

any facts that give rise to a plausible inference of improper dealing between the ACM Parties and either the HCLOF directors or HCM relating to the 2021 Settlement Agreement. There is no allegation, for example, that the 2021 Settlement Agreement benefits HCM any differently than the DAF Parties, or that the DAF Parties and HCM did not share ratably in the costs and benefits of the 2021 Settlement Agreement based on their proportionate share of HCLOF ownership. There is likewise no allegation that the 2021 Settlement Agreement gave any personal benefit to HCLOF's directors. And there are certainly no allegations that meet the heightened pleading standard of Rule 9(b), which applies to the DAF Parties' collusion allegations. *See*, *e.g.*, *Robinson v. Nat'l R.R. Passenger Corp.*, 1995 WL 444322, at *8 (S.D.N.Y. July 26, 1995) ("allegations [of] collusion … amount[] to a charge of fraud and must be alleged with particularity under Rule 9(b)"); *Harborview Value Masterfund, L.P. v. Freeline Sports, Inc.*, 2012 WL 612358, at *12 (S.D.N.Y. Feb. 23, 2012) (fraudulent conspiracy allegations are subject to FRCP 9(b)).

### C.     The DAF Parties' Aiding and Abetting Counterclaims Must Be Dismissed

The DAF Parties wrongly assert (Dkt. 77 ¶¶ 42-50) that HCLOF breached its fiduciary duties to the DAF Parties by agreeing to the 2021 Settlement Agreement and that Plaintiffs aided and abetted its breach. They assert (*id.* ¶¶ 51-56) a similar aiding and abetting theory on the 2023 Settlement Agreement. Even if the DAF Parties could establish standing, their aiding and abetting claims nonetheless fail because they cannot plausibly allege either a primary breach of fiduciary duty under Guernsey law or knowing and substantial assistance of that violation by Plaintiffs under

New York law with respect to either of the Settlement Agreements.  *See Design Strategy, Inc. v. Davis*, 469 F.3d 284, 303 (2d Cir. 2006) (elements of aiding and abetting claim).[11]

*First*, the DAF Parties do not plausibly allege any primary violations of fiduciary duty by HCLOF's directors or controlling shareholder.  *See MacCartney v. O'Dell*, 2016 WL 815279, at *7 (S.D.N.Y. Feb. 29, 2016) (dismissing aiding and abetting claim because the alleged primary fiduciary "does not owe a fiduciary duty to Plaintiff").  As noted above, *see supra* at 19, the DAF Parties do not allege any side benefit to the directors or HCM, or that the Settlement Agreements involved any self-dealing or fraud.  While the DAF Parties may not like the terms of the Settlement Agreements, Guernsey law requires more to challenge the HCLOF directors' exercise of their commercial judgment.  McGuffin Decl. Ex. 7, *Jackson v Dear*, 2013 GLR 167 ¶ 38 (Guernsey Royal Ct.) (holding that, under Guernsey law,  Courts do not substitute their "view of [a] transaction for the director's view because entering into contracts with counterparties involves commercial judgement on the part of the directors and the Courts are, as a general rule, ill-equipped to enter into consideration of such matters."); Milne Decl. Ex. 19, *Burland v Earle*, [1902] AC 83, 93 (U.K.H.L.) ("the Court will not interfere with the internal management of companies"); McGuffin Decl. ¶ 5.5.

*Second*, the DAF Parties fail to plausibly allege that Plaintiffs had actual knowledge of any alleged breach of fiduciary duty by the HCLOF directors or HCM.  *See Kaufman v. Cohen*, 307 A.D.2d 113, 125 (1st Dep't 2003) ("there must be an allegation that [the aiding and abetting]

---

[11]    Guernsey law governs the primary violation element because HCLOF is incorporated in Guernsey, *In re ICP*, 2015 WL 5404880, at *11, while New York law governs the knowing and substantial assistance elements because the DAF Parties allege that the "conduct at issue in this Counterclaim occurred in New York."  Dkt. 77 ¶ 14; *see Solow v. Stone*, 994 F. Supp. 173, 177 (S.D.N.Y.) (applying New York law to aiding and abetting claims because "the acts giving rise to the[m] … took place … in New York"), *aff'd*, 163 F.3d 151 (2d Cir. 1998).

defendant had actual knowledge of the breach of [fiduciary] duty"). The aiding and abetting claims are subject to Rule 9(b) because they are based on allegations of a fraudulent and collusive conspiracy between Plaintiffs and HCLOF. *Harborview*, 2012 WL 612358, at *12; *Robinson*, 1995 WL 444322, at *8; *see supra* at 18-19. The DAF Parties must accordingly "allege facts that give rise to a strong inference of fraudulent intent." *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006). As is the case here, "mere general allegations that there was … conspiracy or characterizations of acts or conduct in these terms are not enough" under either Rule 9(b), *see Segal v. Gordon*, 467 F.2d 602, 607 (2d Cir. 1972), or Rule 8, *see Off. Sol.*, 544 F. Supp. 3d at 413 (Woods, J.) ("labels and conclusions … will not do").

On the 2021 Settlement Agreement, the DAF Parties' sole basis for alleging that Plaintiffs knew of HCLOF's alleged breach of fiduciary duty is the conclusory statement that the agreement "was the result of HCLOF's self-dealing." Dkt. 77 ¶ 26. But this conclusory allegation is insufficient. *See Kaufman*, 307 A.D.2d at 125 (dismissing aiding and abetting claim because actual knowledge allegations were "wholly conclusory"); *Ferring B.V. v. Allergan, Inc.*, 932 F. Supp. 2d 493, 507 (S.D.N.Y. 2013) (same). The DAF Parties admit that HCLOF and Plaintiffs are not affiliated with each other. Dkt. 89 at 2. They do not allege that the 2021 Settlement Agreement provided a side benefit of any sort going to HCLOF's directors or HCM. *See supra* at 19. Without any actual fact allegations to speak of, the DAF Parties' claims must be rejected. The DAF Parties' attempt to tag U.S. Bank with aiding and abetting the 2021 Settlement Agreement is particularly baseless. The DAF Parties do not—and cannot—allege that the Trustee was a party to the 2021 Settlement Agreement, involved in its negotiation or even had knowledge of it when it was executed.

On the 2023 Settlement Agreement, the DAF Parties' do not even make a conclusory allegation of self-dealing.  They instead allege (Dkt. 77 ¶ 35) that the 2023 Settlement Agreement was collusive because HCLOF knew that Plaintiffs' maintenance of the reserves lacked "colorable legal or factual support," but the DAF Parties do not—and cannot—point to anything in the Indentures, relevant caselaw or custom and practice in the industry that supports their allegation. There is no provision in the Indentures prohibiting reserves and the only two New York law decisions addressing the legality of reserves in similar circumstances held that the creation of comparable reserves were permitted.  *See* Ex. 6, *PIMCO Absolute Return Strategy v. Wells Fargo Bank*, Index No. 654743/17 (N.Y. Sup. Ct. Nov. 13, 2017) at 18:18-24, 20:14-16 (RMBS indentures authorized the creation of litigation reserves in the context of an optional redemption to cover the trust's indemnification obligations to the trustee); Ex. 7, *In the matter of the Trust Established under the Pooling and Service Agreement relating to the Wachovia Bank Commercial Mortgage Trust Commercial Mortgage Pass-Through Certificates, Series 2007-C30* (Minn. Dist. Ct. Oct. 26, 2022) at 10 (pooling and servicing agreement authorized the trust servicers "to create [$38 million] trust reserves to meet significant anticipated future trust expenses," consistent with "custom and practice in the industry.").  Moreover, the 2023 Settlement Agreement does not even release claims as to the large majority of the reserves not already spent at the time of the agreement; rather, HCLOF merely agreed to forbear from asserting any claims until certain ongoing litigations are resolved.  The DAF Parties' allegations thus do not come close to "giv[ing] rise to a strong inference of fraudulent intent," as Rule 9(b) requires.  *See Lerner*, 459 F.3d at 290.

The DAF Parties' knowledge allegations are further rebutted by the substantial benefits that Plaintiffs provided to HCLOF under both Settlement Agreements.  For instance, in exchange for HCLOF's release in the 2021 Settlement Agreement, the ACM Parties agreed to dismiss

ongoing litigation against HCLOF that included multi-million dollar fraudulent transfer claims, give HCLOF a mutual general release, and cooperate with HCLOF to discharge the bankruptcy plan injunction then prohibiting HCLOF from redeeming $41 million from the Acis CLOs.  *See supra* at 7, 18.  Likewise, the DAF Parties admit that as consideration for the 2023 Settlement Agreement, Plaintiffs agreed to immediately distribute $16 million in reserved funds to investors in the Acis CLOs.  Dkt. 77 ¶ 33; *see* Ex. 3 §§ 1, 4(b) & (c).  These considerable benefits to HCLOF, which were shared ratably with the DAF Parties as HCLOF investors, *see* Dkt. 77 ¶¶ 29, 31, further rebut any suggestion by the DAF Parties that Plaintiffs were on notice of some breach of fiduciary duty.

*Third*, even if the DAF Parties could plausibly claim that Plaintiffs knowingly negotiated *too* good a deal for themselves in either of the Settlement Agreements, that would not constitute substantial assistance under governing Second Circuit precedent.  The Second Circuit has ruled that parties are entitled to act in "appropriate economic self-interest" when settling claims and "no authority exists for the proposition that a litigating party aids and abets an injury to a third party by entering into a confidential settlement agreement in the normal course of litigation."  *Wilson v. Dantas*, 746 F.3d 530, 536 (2d Cir. 2014); *see also Wilson v. Dantas*, 2013 WL 92999, at *6 (S.D.N.Y. Jan. 7, 2013) ("Adversarial bargaining to achieve [defendant's] own goals cannot be simultaneously construed as assisting [defendant's] opponent … in breaching a duty he owed to [plaintiff]"), *aff'd*, 746 F.3d 530 (2d Cir. 2014).  Indeed, the Second Circuit affirmed the dismissal of such aiding and abetting claims under Rule 12(b)(6) because plaintiff's allegations that the defendant engaged in collusion outside the normal course of litigation and settlement were "implausible."  *Id*.  The DAF Parties' allegations that Plaintiffs somehow went beyond the normal course of appropriate economic self-interest are equally, if not more, implausible, both because

they have not made any non-conclusory allegations of self-dealing, and because both Settlement Agreements settled actual or potential multi-million dollar claims. *See supra* at 6, 18. Plaintiffs could legitimately engage in "[a]dversarial bargaining to achieve" these outcomes without simultaneously aiding and abetting any purported breaches of duty by their arms-length counterparty, HCLOF. *See Wilson*, 2013 WL 92999, at *6; *see also Wilson*, 746 F.3d at 536. Any other rule would fundamentally undercut New York's "strong policy considerations favor[ing] the enforcement of settlement agreements," placing into question the "finality and repose upon which [to] order their affairs" that settlement parties rely upon anytime a stakeholder in one of the settlement parties happens to disagree with the outcome. *Denburg*, 82 N.Y.2d at 383.

## II.  THE COURT SHOULD DISMISS NEXPOINT'S COUNTERCLAIMS AGAINST ACM AND MR. TERRY

### A.  NexPoint Fails To State A Claim For Tortious Interference

"[T]ortious interference with contract requires … actual breach of the contract" with which the defendant allegedly interfered. *Benihana of Tokyo, LLC v. Angelo, Gordon & Co., L.P.*, 259 F. Supp. 3d 16, 29 (S.D.N.Y. 2017). The Subordinated Note merely requires Acis 6 to distribute available proceeds in accordance with the priority of payments in the Indenture. Dkt. 78-1 at Ex. A2-7. NexPoint does not allege any failure by Acis 6 to do so. Instead, NexPoint alleges (Dkt. 78 ¶¶ 95, 127-29, 137-38, 230) that the ACM Parties' violation of various duties to Acis 6 under the Acis 6 PMA—to which NexPoint is neither a party nor a third-party beneficiary—reduced the proceeds available to be distributed under the Subordinated Note. But the Subordinated Note itself does not impose any duties on the ACM Parties or Acis 6 to manage its assets in any particular way. NexPoint cannot graft onto the Subordinated Notes duties found in other agreements that it expressly lacks the authority to enforce. Absent a viable breach claim, NexPoint's tortious interference claim must be dismissed. *See Restis v. Am. Coal. Against Nuclear Iran, Inc.*, 53 F.

Supp. 3d 705, 728 (S.D.N.Y. 2014) (dismissing tortious interference claim because plaintiff "fails to allege that the contracts in question were breached").

NexPoint's tortious interference claim is also barred by the economic interest doctrine. Under the economic interest doctrine, a tortious interference claim is unavailable against a party seeking "to protect an economic interest in the breaching party's business" absent "a showing that defendant acted maliciously, fraudulently, or illegally." *Horowitz v. Nat'l Gas & Elec., LLC*, 2018 WL 4572244, at *6 (S.D.N.Y. Sept. 24, 2018). The doctrine applies here because, as Acis 6's Portfolio Manager, ACM has both a legal and financial interest in Acis 6's business. *See Bank of N.Y. Mellon, London Branch v. Cart 1, Ltd.*, 2021 WL 2358695, at *4 (S.D.N.Y. Jun. 9, 2021) (dismissing tortious interference claim against defendant that acted to protect its "legal and financial interest in [indenture trustee's] proper management of [special purpose vehicle's] funds"); *White Plains Coat & Apron Co., Inc. v Cintas Corp.*, 8 N.Y.3d 422, 426 (2007) (managerial contracts trigger the doctrine) (citing *Don King Prods., Inc. v. Smith*, 47 Fed Appx 12 (2d Cir 2002)). NexPoint has not made any non-conclusory allegations of fraud, malice, or illegality. *See infra* at 33; *CapLOC, LLC v. McCord*, 2018 WL 3407708, at *6 (S.D.N.Y. June 12, 2018) ("bare allegations of malice do not suffice"). Dismissal is therefore appropriate. *See Cart I, Ltd.*, 2021 WL 2358695, at *4 (granting motion to dismiss based on economic interest doctrine).

## B.    NexPoint Lacks Standing To Bring Its Remaining Counterclaims

### 1.    NexPoint Lacks Direct Standing

NexPoint must bring its remaining claims derivatively because they are predicated on conduct that purportedly directly injured either Acis 6 or a "trust [] under New York law" (Dkt. 78

¶ 160) that the Indenture allegedly created to hold Acis 6's assets.[12]  In particular, NexPoint alleges that ACM mismanaged Acis 6 by causing it to buy loans that violated contractual thresholds in the Indenture (*e.g.*, the WARF and WAL tests), causing it to buy and sell loans in a manner that violated "best execution" requirements in the PMA, and charging expenses to Acis 6 that the PMA did not permit.  Dkt. 78 ¶¶ 3-4, 191, 202-203, 212-214.  In each case, the direct impact of ACM's alleged conduct falls on Acis 6 and not on individual investors, as NexPoint itself admits.  *Id.* ¶ 4 (alleging that the ACM Parties "wiped out millions in value *from ACIS-6* through the combined effect of their malfeasance," thereby "depriv[ing] NexPoint of the full benefit of its investment bargain" in Acis 6); *id.* ¶ 5 (alleging that the ACM Parties "have caused the *net asset value of Acis-6* to nosedive" and "thus caused NexPoint to suffer millions in losses"); *id.* ¶ 191 (asserting that ACM's alleged breach of fiduciary duty "improperly impos[ed] expenses on the Acis CLOs"); *id.* ¶ 201 (asserting that ACM's allegedly negligent "manag[ement] [of] ACIS-6" caused losses to Acis 6); *id.* ¶ 213 (asserting that "payment of the Acis CLOs' administrative expenses" gives rise to a conversion claim).

Whether Cayman Islands law applies (for claims brought on behalf of Acis 6) or New York law applies (for claims brought on behalf of a New York common law trust holding Acis 6's assets (*see* Dkt. 78 ¶ 160)—to the extent it exists), NexPoint's claims are derivative.  *See, e.g.*, *Zohar*, 2021 WL 4460547, at *12 (Castel, J.) (applying Cayman law) (claims brought by CLO noteholder and preference shareholder are derivative because "any loss caused … would be suffered by the

---

[12] Because the "law of the [entity's] state of incorporation" governs "whether a claim is direct or derivative," *NAF Holdings*, 772 F.3d at 743 n.2, Cayman law governs claims in respect of Acis 6, and New York law governs claims in respect of a "New York trust" the Indenture allegedly created.

[CLO] Funds and the [investors] would only suffer a loss as a result of the [CLO] Funds' loss");[13]

*Accredited Aides Plus, Inc. v. Program Risk Mgmt., Inc.*, 147 A.D.3d 122, 133 (3d Dep't 2017)

("conversion, unjust enrichment, … [and] negligence [claims] … are derivative" because they "are

limited to allegations of harm caused to the trust by alleged mismanagement") (New York law).[14]

   NexPoint does not assert direct standing for its claims under Cayman Islands law.  But it

does wrongly assert (Dkt. 78 ¶¶ 144-154, 166-168) that fund investors have direct standing under

New York law to pursue breach of fiduciary duty claims against an investment adviser to the fund.

New York's highest court, however, has held the opposite.  In *Oddo Asset Management v. Barclays

Bank PLC*, the New York Court of Appeals rejected breach of fiduciary duty claims brought by a

mezzanine noteholder of a similarly-structured Cayman Islands investment fund against the fund's

collateral manager.  19 N.Y.3d 584, 587 (2012).  The Court reasoned that "[w]hile collateral

managers may have owed fiduciary and contractual duties to the [investment funds they managed],

there is no factual basis to create fiduciary duties running from the managers to the mezzanine

noteholders."  *Id.* at 593; *accord In re Allianz Global Investors U.S. LLC Alpha Series Litig.*, 2021

WL 4481215, at \*19 (S.D.N.Y. Sept. 30, 2021) ("Plaintiffs' breach of fiduciary [duty] claims arise

from Defendant's purported mismanagement of the Funds. Mismanagement of the Funds

necessarily harms the Funds directly, and the members only indirectly.  It follows that Plaintiffs

---

[13]   *See also ABF Cap. Mgmt.*, 957 F. Supp. at 1332 ("Under the law of the Cayman Islands …
claims based on breach of fiduciary duty, corporate mismanagement or third party action that result
in the diminution of share value belong to the corporation"); Declaration of Jonathon Milne, dated
May 15, 2023 ("Milne Decl.") ¶ 51.

[14]   *See also In re Optimal U.S. Litig.*, 813 F. Supp. 2d 351, 377 (S.D.N.Y. 2011) (aiding and
abetting, negligence, and unjust enrichment claims "based on the alleged mismanagement of the
[] Fund" were not direct); *accord Grgurev v. Licul*, 229 F. Supp. 3d 267, 297-98 (S.D.N.Y. 2017)
(Woods, J.) (holding that claims are derivative under New York law where "the harm done … was
suffered by [the corporation] … and Plaintiffs would benefit only indirectly [from recovery].").

27

cannot prevail without showing an injury to the corporation," and the claims must be brought derivatively) (applying Delaware law).

That is particularly the case where, as here, the parties meticulously memorialized the rights and obligations of ACM in lengthy governing agreements including the Acis 6 PMA, which carefully prescribes ACM's obligations to Acis 6, and specifically bars Subordinated Noteholders like NexPoint from pursuing claims against ACM.  *See* Dkt. 78-2 § 2 ("[T]he *Issuer* hereby engages and retains the Portfolio Manager to provide the investment advisory and related services described below ….") (emphasis added); *id.* § 10 (consenting to enforcement of the PMA "by the Issuer and by the Trustee on behalf of the Holders," but not by the Subordinated Noteholders or any other Holder of Notes); *id.* § 31 (expressly excluding noteholders from being third-party beneficiaries to the PMA.  New York law strongly disfavors creation of extracontractual duties in these circumstances.  *See Oddo Asset Mgmt.*, 19 N.Y.3d at 593 ("[I]f [the parties] do not create their own relationship of higher trust, courts should not ordinarily … fashion the stricter [fiduciary] duty for them."); *accord Northeast Gen. Corp. v. Wellington Advertising, Inc.*, 82 N.Y.2d 158, 162 (N.Y. 1993) (rejecting implied fiduciary duties under a contract that "contains no cognizable fiduciary terms or relationship").

In the face of this clear authority, NexPoint presents three arguments for why it should be permitted to pursue its claims directly, none of which are availing:

*First*, NexPoint misplaces reliance on *Fraternity Fund Ltd. v. Beacon Hill Asset Management LLC*, for the proposition that New York law allows direct claims by fund investors against fund advisers.  Dkt. 78 ¶ 167 (citing *Fraternity Fund*, 376 F. Supp. 2d 385, 409 (S.D.N.Y.

2005)).[15]  Far from supporting NexPoint's standing, *Fraternity Fund* rebuts it.  The district court in *Fraternity Fund* found that the plaintiffs, investors in certain funds, had direct claims against investment advisers because plaintiffs alleged that "they invested or retained their investments in reliance upon [] misstatements" the advisers made to them.  *Fraternity Fund*, 376 F. Supp. 2d at 409.  In contrast, the court confirmed that "mismanagement and self-dealing … without more, would be wrongs to the Funds *only*."  *Id.* (emphasis added).  Here, NexPoint seeks damages that it asserts are the result of fund losses allegedly caused by mismanagement and self-dealing.  There are *no* allegations of any reliance on any alleged misrepresentation, so the claims are plainly derivative.

*Second*, NexPoint argues (Dkt. 94 at 2) that Section 206 of the IAA and IAA Rule 206(4)-8 should be incorporated into New York common law to extend fund advisers' fiduciary duties to investors in their advised funds.  It is far from clear that the federal fiduciary duties owed under Section 206 of the IAA, for which there is no private right of action, can be used to expand common law fiduciary duties under state law.  *See Belmont v. MB Investment Partners*, 708 F.3d 470, 502 (3d Cir. 2013) (noting that Section 206 "confers no … private cause[] of action," which "ought to call into serious question whether a limitation in federal law can be circumvented simply by hanging a label 'state law' on an otherwise forbidden federal claim.").  But even if it could, neither Section 206 nor Rule 206(4)-8 expand state law fiduciary duties because they do not extend fund advisers' fiduciary duties to investors in advised funds (let alone the reach of common law fiduciary duties).

---

[15]  NexPoint also misplaces reliance on *Bullmore v. Banc of Am. Sec. LLC* for the same proposition (Dkt. 78 ¶ 167 (citing *Bullmore*, 485 F. Supp. 2d 464, 471 (S.D.N.Y. 2007)) because in *Bullmore*, the plaintiffs were the funds' liquidators and claimed for breach of the investment manager's fiduciary duty to the fund itself, not to the fund's investors.  *Id.* at 465, 469.

The Supreme Court has interpreted Section 206 as imposing both antifraud and federal fiduciary duties on investment advisers. *Transamerica Mortg. Advisors, Inc. (TAMA) v. Lewis*, 444 U.S. 11, 17 (1979). The fiduciary duties run only to the advisor's clients and do not run to non-clients, including investors in an investment-fund client. *See Goldstein v. S.E.C.*, 451 F.3d 873, 881 (D.C. Cir. 2006) ("The adviser owes fiduciary duties [under Section 206] only to the fund, not to the fund's investors."). As *Goldstein* explained, it would be arbitrary and capricious to expand the definition of clients to investors in an investment-fund client because the best interests of those investors often may not align with the fund as a whole. *Id.* at 883-84.

The SEC has embraced this distinction when it promulgated Rule 206(4)-8 shortly after *Goldstein* to clarify that the IAA's antifraud restrictions, unlike its federal-fiduciary-duty requirements, cover non-clients—such as investors in a client fund. *See* 72 FR 44756, 44757 (Aug. 9, 2007) ("Rule 206(4)-8 prohibits advisers to pooled investment vehicles from … defrauding [] investors" in those pools). But the SEC expressly declined to expand the federal-fiduciary-duty standard to investors in a client fund, which *Goldstein* held would be arbitrary and capricious:

> Rule 206(4)-8 does not create … a fiduciary duty to investors … in a pooled investment vehicle not otherwise imposed by law. Nor does the rule alter any duty or obligation an adviser has under the [IAA], any other federal law or regulation, or any state law or regulation … to investors in a pooled investment vehicle it advises.

*Id*. at 44760. Since neither Section 206 nor Rule 206(4)-8 expands the reach of the federal fiduciary duty standard to encompass NexPoint, there is no basis to claim that either expands New York common law to do so. *See Fazi v. United States*, 935 F.2d 535, 540 (2d Cir. 1991) (federal regulations not intended to protect plaintiff were not "a basis for liability under New York law").

*Third*, NexPoint argues (Dkt. 78 ¶¶ 160, 164) that ACM owes it direct fiduciary duties as a "co-trustee" of a "trust [] under New York law." But for NexPoint's co-trustee theory to work, NexPoint must point to an *actual* trustee that delegated certain of its fiduciary responsibilities to

ACM. *See* Restatement (Third) of Trusts § 80, cmt. g (2007) ("an agent [of the trustee] assumes a fiduciary role" if it "accept[s] the delegation of a trust function from a trustee"); Bogert's The Law of Trusts and Trustees § 557 (same). And, as this Court has already held, the *actual* Trustee owes no fiduciary duties to Acis 6 investors like NexPoint absent the continuance of an Event of Default. *NexPoint*, 620 F. Supp. 3d, at 47-48; *see also Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*, 837 F. Supp. 2d 162, 192 (S.D.N.Y. 2011) (Trustee's pre-Event of Default obligations "are not construed as fiduciary duties"). NexPoint admits that there has been no Event of Default. Dkt. 78 ¶ 247. The Trustee thus has no fiduciary duties to delegate to ACM or any other "co-trustee." *See Ellington*, 837 F. Supp. 2d at 193-94 ("Plaintiff's 'delegation' argument is unavailing because the Court has already held that [the trustee] was not subject to common law fiduciary obligations, and thus could not delegate such duties to [the servicer].").

### 2. NexPoint Lacks Derivative Standing

Apparently recognizing its lack of direct standing, NexPoint simultaneously claims derivative standing on behalf of Acis 6 under Cayman Islands law and a "trust [] under New York law" that Acis 6's Indenture supposedly created. Dkt. 78 ¶¶ 160, 242. NexPoint fails to plead derivative standing under either legal regime.

<u>Cayman Islands Law</u>: Cayman Islands law governs "the right to sue derivatively" on behalf of Acis 6 because it is a Cayman Islands company. *Howe*, 783 F. Supp. 2d at 475 (applying Cayman Islands law to derivative suit on behalf of Cayman CDO issuer); *Zohar*, 2021 WL 4460547, at *11 (same); *see also Scalisi*, 380 F.3d at 138 (law of place of incorporation governs demand futility). Because its claims are premised on allegations that ACM and Mr. Terry caused injury to Acis 6, NexPoint must seek to bring its claims derivatively. *See supra* at 25-26. But NexPoint does not have this right; it is not a shareholder and, even if it were, it has not pled any exceptions to Cayman law's prohibition on derivative actions.

Cayman Islands law only permits shareholders, not creditors, to bring derivative actions. *See* Milne Decl. ¶¶ 32-40; Milne Decl. Ex. 3, *Marex Financial Ltd. v. Sevilleja*, [2020] UKSC 31 ¶ 83 ("As a shareholder (*and unlike a creditor* …), [the plaintiff] does … have … the right to bring a derivative action.") (emphasis added). That rule bars NexPoint's claims because NexPoint holds Subordinated Notes, which are debt securities, not shares. *See* Dkt. 78-1 at 57 ("Subordinated Notes"), *id.* §§ 2.2-2.3. While NexPoint describes its notes as equity, see Dkt. 78 ¶ 46, Cayman Islands law and New York courts do not recharacterize subordinated debt as shares. Milne Decl. ¶¶ 32, 41-46; *see Howe*, 783 F. Supp. 2d at 476 (rejecting argument that "the Noteholders' interest [in Cayman Islands CDO] morphs into an equity interest for the purposes of derivative standing.").

Moreover, even if NexPoint's investment in the Subordinated Notes could be recharacterized as an equity investment, NexPoint still lacks derivative standing under Cayman Islands law, as "a shareholder is not permitted to bring a derivative action" subject to "four narrow exceptions" for conduct that (1) "infringed on the shareholder's personal rights;" (2) "would require a special majority to ratify;" (3) "qualifies as a fraud on the minority;" or (4) "consists of *ultra vires* acts." *Davis v. Scottish Re Grp. Ltd.*, 160 A.D.3d 114, 116 (1st Dep't 2018); *see also* Milne Decl. ¶ 61. NexPoint has asserted, in the past, both the fraud on the minority exception and the personal-rights exception, but fails to meet its "burden of establishing" a prima facie case that either applies. *City of Harper Woods Emps.' Ret. Sys. v. Olver*, 589 F.3d 1292, 1298 (D.C. Cir. 2009) (applying English law); *Shenwick v. HM Ruby Fund, L.P.*, 106 A.D.3d 638, 639 (1st Dep't 2013) (Cayman Islands derivative law is based on English law); *see also* Milne Decl. ¶ 61.

*First*, the fraud on the minority exception does not apply because NexPoint fails to allege either of its required elements, that ACM (1) "controlled a majority of the [securities] with voting rights" and (2) "committed fraud." *Davis*, 160 A.D.3d at 116; *see also* Milne Decl. ¶ 65.

NexPoint has not pled the control element because it has not alleged that ACM "own[s] a majority of [Acis 6's] [voting securities] or ha[s] acquired de facto control of those voting [securities]." *Davis*, 160 A.D.3d at 116; *see also* Milne Decl. ¶ 66. NexPoint admits that HCLOF, not ACM, "controlled" the only remaining Subordinated Notes that NexPoint did not own. Dkt. 78 ¶¶ 46, 247. NexPoint's bald assertion "upon information and belief" that HCLOF "collu[ded]" with ACM (Dkt. 78 ¶ 247) does not establish that ACM had de facto control of HCLOF's Subordinated Notes because, like the DAF Parties' similar collusion assertion, it is not supported by any factual allegations. *Davis*, 160 A.D.3d at 117 (collusion claim not supported by "a single factual allegation" did not establish de facto control); *Jus Punjabi, LLC v. Get Punjabi Inc.*, 2015 WL 2400182, at *6 (S.D.N.Y. May 20, 2015) (Woods, J.) (disregarding information and belief collusion allegations that did not "state[] [] the facts upon which the belief is founded"), *aff'd*, 640 F. App'x 56 (2d Cir. 2016); *supra* at 18-19 (DAF Parties' collusion claims are not viable). The failure to plausibly plead control is fatal to the fraud on the minority exception. *Zohar*, 2021 WL 4460547, at *13 (exception "meritless" where CLO investor failed to allege that collateral manager controlled majority of CLO voting securities); *Davis*, 160 A.D.3d at 116-17 (rejecting exception because directors did not "control[] the company's voting shares"); *see also* Milne Decl. ¶¶ 66-67.

NexPoint also has not pled the fraud element because it has not alleged that ACM "obtained a personal benefit at the company's expense" "as a result of [its] wrongful conduct." *Shenwick*, 106 A.D.3d at 639 (applying Cayman Islands law); Milne Decl. ¶¶ 68-71. Allegations that a fund manager "artificially inflat[ed] the fund's net asset value so that [it] would receive higher compensation" are not sufficient to meet the fraud requirement, absent an allegation that the manager's conduct "resulted in compensation beyond the normal emoluments of office, or came, in some special way, at the expense of shareholders." *Shenwick*, 106 A.D.3d at 638-639; *see also*

*Winn*, 499 F. Supp. 2d at 398 (allegations of entrenchment by directors "without additional benefits

… beyond the normal emoluments of office" are insufficient).   That rule bars NexPoint's primary

claim of self-dealing—that ACM acquired discounted assets for Acis 6 with the intent to increase

Acis 6's asset balance and ACM's fees—because it is directly analogous to the conduct alleged in

*Shenwick*.

NexPoint's only other claim of self-dealing, that ACM caused Acis 6 to cover expenses

that were not properly chargeable to the CLO, Dkt. 78 ¶ 100, is conclusory and does not meet the

heightened pleading requirements for fraud under either Federal Rules of Civil Procedure 8 or

9(b).   *See Laboy v. Bd. of Trustees of Bldg. Serv. 32 BJ SRSP*, 2012 WL 701397, at *3 (S.D.N.Y.

Mar. 6, 2012) (dismissing claim for excessive administrative expenses as conclusory under Rule

8); *Zohar*, 2021 WL 4460547, at *10 (fraud claim failed because plaintiffs "fail[] to meet the

particularity requirement … under Rule 9(b)"), *13 (fraud on the minority exception did not apply

because plaintiffs "fail to allege any fraud").   In particular, NexPoint does not identify any

particularized instance of improper expenses being charged, and merely deduces from the total

quantum of administrative expenses charged to Acis 6 that some of those administrative expenses

are not permitted.   Dkt. 78 ¶ 75.

*Second*, NexPoint cannot rely on the personal rights exception because it lacks any direct

claim against Plaintiffs.   This exception is more accurately characterized as an exclusion that

preserves direct claims held by shareholders and others that are not claims available to the

company.   Milne Decl. ¶ 73; *Saratoga Advantage Tr. Tech. & Commc'ns Portfolio v. Marvell

Tech. Grp.*, 2016 WL 4364593, at *4 (N.D. Cal. Aug. 16, 2016) (explaining that a "plaintiff's

personal rights as a shareholder are not implicated" if the claim is properly characterized as a

derivative action seeking to address harm to the company).   It does not apply here because all of

34

NexPoint's claims are predicated on alleged wrongs committed by Plaintiffs against Acis 6, and thus belong to Acis 6. *See Saratoga*, 2016 WL 4364593, at *4 (personal rights exception did not apply to investor claims based on lost share value); *Voss v. Sutardja*, 2015 WL 349444, at *10 (N.D. Cal. Jan. 26, 2015) (same).

Even if NexPoint could establish one of the required exceptions, its purported derivative claims must still be dismissed for failure to plead demand futility with particularity. *See Halebian v. Berv*, 590 F.3d 195, 204 (2d Cir. 2009). There is no reason why NexPoint could not demand that Acis 6's independent directors cause Acis 6 to pursue the claims here, and multiple New York courts have found that Cayman Islands issuers are the proper party to bring such claims. *See Hildene Capital Mgmt., LLC v. Bank of N.Y. Mellon*, 105 A.D.3d 436, 438-439 (1st Dep't 2013) (Cayman CDO issuer "has standing to bring a breach of contract claim" against trustee for unauthorized asset sale); *Howe*, 783 F. Supp. 2d at 475 n.9 (same). NexPoint's conclusory allegation to the contrary, *see* Dkt. 78 ¶ 246, is insufficient. *See Halpert Enters. v. Harrison*, 362 F. Supp. 2d 426, 429-430 (S.D.N.Y. 2005) (rejecting demand-futility allegations that are "conclusory" and devoid of "specific factual allegations").

No Derivative Standing Under New York Law: NexPoint cannot evade its lack of derivative standing under Cayman Islands law by asserting derivative standing on behalf of a "trust created under New York law" (Dkt. 78 ¶ 160) because the Indenture did not create such a common law trust. But even if such a trust existed, NexPoint is both contractually barred from and lacks derivative standing to sue on behalf of that trust under New York law.

*First*, NexPoint's trust theory of derivative standing fails because the Indenture did not create a common law trust. New York law common law trusts are only created if the parties intend to create a fiduciary relationship. *In re AppOnline.com, Inc.*, 315 B.R. 259, 274 (Bankr. E.D.N.Y.

2004) (a trust "is a fiduciary relationship … which arises as a result of a manifestation of an intention to create it"). The Court's ruling dismissing NexPoint's breach of fiduciary duty claim against the Trustee establishes that the parties did not intend to create a pre-Event of Default fiduciary relationship between the Trustee and noteholders. *NexPoint*, 620 F. Supp. 3d, at 47-48 (Trustee does not owe pre-Event of Default duties "resembl[ing] those of an ordinary fiduciary"). For that reason, the parties could not have intended to create a common law trust. NexPoint's allegation that ACM was a "co-trustee" does not change this because the Indenture and PMA preclude ACM from owing any fiduciary duties to noteholders as a co-trustee, and the Trustee could not delegate such fiduciary duties to ACM as it did not owe any. *See supra* at 30-31. The Court should accordingly reject NexPoint's common law trust theory, just as other courts in this district have rejected similar attempts to import common law trust principles into securitized transaction indentures. *See, e.g., Ellington*, 837 F. Supp. 2d at 183 (rejecting standing argument based on "common law trust principles" because such indentures are "distinct from generalized trust principles"); *BlackRock Allocation Target Shares: Series S Portfolio v. Wells Fargo Bank, Nat'l Ass'n*, 2017 WL 953514, at *5 (S.D.N.Y. Mar. 9, 2017) (fiduciary exception to attorney-client privilege did not waive indenture trustee's privilege because it "does not serve as a fiduciary to trust beneficiaries").

*Second*, even if NexPoint had alleged adequate demand or demand futility, its derivative claims on behalf of the trust are still barred by the Indenture. Under the Indenture, the Trustee does not have the authority "to take any legal action upon the breach of an obligation of [ACM]" under the PMA before the occurrence of an event of default. Dkt. 78-1 § 15.1(a) ("the Trustee shall not have the authority to exercise [this] right[] … until the occurrence of an Event of Default."). This provision covers tort claims based "upon the breach of" the PMA. *Id.; see, e.g.,*

36

*Altshul Stern & Co. v. Mitsui Bussan Kaisha, Ltd.,* 385 F.2d 158, 159 (2d Cir. 1967) (arbitration clause covering contract disputes applied to tort "claim [] based upon breaches of contract."). NexPoint admits both that there has been no Event of Default, Dkt. 78 ¶ 247, and that its tort claims are based on "breaches of the Portfolio Management Agreement." *Id*. at 9-10; *see also id*. ¶¶ 172-173, 201. The Trustee therefore does not have the authority to assert the claims alleged by NexPoint. NexPoint is accordingly foreclosed from bringing the same tort claims on behalf of the Trustee because, as a putative derivative plaintiff, it would be subject to the same defenses as the Trustee is. *In re Salomon Inc. Shareholders' Derivative Litig.*, 1994 WL 533595, at *4 (S.D.N.Y. Sept. 30, 1994) (derivative plaintiff was bound by company's arbitration clause with counterparty).

*Third*, even if the Indenture did not bar its claims, NexPoint still lacks derivative standing under New York law because it has neither pled an adequate demand nor demand futility with the particularity required by Rule 23.1. *See Velez v. Feinstein*, 87 A.D.2d 309, 316 (1st Dep't 1982) (these pleading standards apply to trust beneficiaries). An adequate demand must "fairly and adequately apprise [the Trustee] of the potential cause[s] of action." *Cordts-Auth v. Crunk, LLC*, 815 F. Supp. 2d 778, 795 (S.D.N.Y. 2011), *aff'd*, 479 F. App'x 375 (2d Cir. 2012). The only "demand letter" NexPoint identifies did not do this. Dkt. 78 ¶ 245 (citing Dkt. 78-3). That August 6, 2019 letter to the Trustee neither identified any causes of action against ACM and Mr. Terry nor demanded that the Trustee sue them. Instead, it made vague demands that the Trustee "detail[] … measures that [it] will take" in response to the Trustee's own alleged "misconduct." Dkt. 78-3 at 6. This vague letter was not an adequate demand. *See*, *e.g.*, *Levner v. Saud*, 903 F. Supp. 452, 456 (S.D.N.Y. 1994) (demand that company "take action" that "did not suggest … any remedial relief" was not adequate), *aff'd*, 61 F.3d 8 (2d Cir. 1995); *Cordts-Auth*, 815 F. Supp. 2d at 795

(demand that company take various actions was not adequate because it "did not relate … to the derivative claims" and made "no mention of any potential causes of action").

NexPoint also has not pled demand futility.  To allege demand futility, a plaintiff must make particularized allegations that (1) the Trustee "is interested in the challenged transaction," (2) "did not fully inform [it]sel[f] about the challenged transaction to the extent reasonably appropriate," or (3) "the challenged transaction was so egregious on its face that it could not have been the product of sound business judgment of the [Trustee]." *See Stein v. Immelt*, 472 F. App'x 64, 65-66 (2d Cir. 2012).  NexPoint has not pled any of these prongs with particularity as Rule 23.1 requires.  *Halpert Enters.*, 362 F. Supp. 2d at 429-430 (rejecting demand-futility allegations that lacked "specific factual allegations").  NexPoint has not pled the first prong because its conclusory allegation (Dkt. 78 ¶ 246) that the Trustee was "conflict[ed]" because ACM was acting as a co-trustee does not establish either that the Trustee was "self-interest[ed] in the transaction[s]" NexPoint challenges or that it was under ACM's "control."  *Stein*, 472 F. App'x at 66.  NexPoint has not pled that the Trustee was self-interested because it does not allege that the Trustee received direct financial benefits from ACM and Mr. Terry's alleged misconduct.  *Id.* (directors were not self-interested because plaintiff did not allege that they "receive[d] a direct financial benefit").  NexPoint also has not pled that ACM controlled the Trustee through ACM's alleged status as co-trustee.  *Wandel ex rel. Bed Bath & Beyond, Inc. v. Eisenberg*, 60 A.D.3d 77, 80 (1st Dep't 2009) (first prong did not apply because plaintiff alleged "nothing from which to infer … control[]").

NexPoint also has not pled the second or third demand futility prongs with particularity.  The second prong does not apply because NexPoint does not allege that the Trustee failed to inform itself, but merely that it "failed to act."  Dkt. 78 ¶ 245; *see Stein*, 472 F. App'x at 66 (second prong did not apply because plaintiff "pleads no facts with particularity supporting [it]").  The third prong

38

is limited to "rare case[s]" where a transaction is "so egregious on its face that board approval cannot meet the test of business judgment." *Stein*, 472 F. App'x at 66. It does not apply here because NexPoint has not alleged any facts demonstrating that the Trustee's actions could not have been the product of sound business judgment. *M+J Savitt, Inc. v. Savitt*, 2009 WL 691278, at *7 (S.D.N.Y. Mar. 17, 2009) (plaintiffs did not allege facts showing that the board's response to alleged misappropriation of assets "could not be the product of business judgment"); *Jiminian v. Seabrook*, 760 F. App'x 38, 43 (2d Cir. 2019) (unparticularized allegations that directors "rubber stamped" bad investments did not trigger third prong).

### C.     NexPoint's Counterclaims Are Barred for Additional Reasons

#### 1.     NexPoint's Tort Claims Must Be Dismissed As Duplicative

NexPoint's breach of fiduciary duty, negligence, and conversion counterclaims all also fail as duplicative of the breach of contract claim NexPoint has now abandoned. All of the harm NexPoint alleges flows from conduct that NexPoint contends violates the Acis 6 PMA and Indenture. *See supra* § II(A). Because the "sole basis" of these tort claims "is [ACM's] alleged breach of its contractual obligations," the tort claims must be dismissed as duplicative. *BlackRock Allocation Target Shares: Series S. Portfolio v. Wells Fargo Bank, Nat'l Ass'n*, 247 F. Supp. 3d 377, 394-395 (S.D.N.Y. 2017) (negligence claim dismissed as duplicative); *see also Zohar*, 2021 WL 4460547, at *15 (conversion); *Spinelli v. Nat'l Football League*, 96 F. Supp. 3d 81, 134 (S.D.N.Y. 2015) (breach of fiduciary duty). All of these counterclaims fail as a matter of law.

#### 2.     The Indenture and PMA Bar NexPoint's Unjust Enrichment Claim

The Acis 6 Indenture and PMA also bar NexPoint's unjust enrichment claim because those contracts govern the subject matter of that claim. *Ellington*, 837 F. Supp. 2d at 202 (S.D.N.Y. 2011) ("The existence of an express contract … governing the subject matter of the plaintiff's claim also bars any quasi-contractual claims"). NexPoint's unjust enrichment claim is pled based

39

on the same allegations as its other claims, Dkt. 78 ¶¶ 218-219, all of which are based on breaches

of the Acis 6 Indenture and PMA, *see supra* at 24.  NexPoint's argument (Dkt. 94 at 3) that this

claim survives because Plaintiffs "cannot enforce" the Indenture and PMA is wrong, both because

the Trustee and ACM can enforce the Indenture and PMA, respectively, and because those

contracts bar unjust enrichment claims "even if one of the parties to the claim is not a party to

th[ose] contracts."  *Mueller v. Michael Janssen Gallery Pte. Ltd.*, 225 F. Supp. 3d 201, 207-208

(S.D.N.Y. 2016) (agreement barred unjust enrichment claim "even though [defendant] was not a

signatory").

### 3. The Economic Loss Rule Bars The Negligence and Conversion Claims

The economic loss doctrine bars NexPoint's tort negligence and conversion claims.  A

plaintiff "seeking only a benefit of [his] bargain … may not sue in tort notwithstanding the use of

familiar tort language in [his] pleadings."  *Phoenix Light SF Ltd. v. U.S. Bank Nat'l Ass'n*, 2016

WL 1169515, at *9 (S.D.N.Y. Mar. 22, 2016); *accord CVS Pharmacy, Inc. v. Press Am., Inc.*, 377

F. Supp. 3d 359, 385-386 (S.D.N.Y. 2019) (Woods, J.) ("[A] plaintiff cannot recover in tort for

purely economic losses caused by the defendant's negligence.").  The sole, narrow exception, that

a special relationship required the defendant to "protect against the risk of harm to [the] plaintiff,"

*id.*, does not apply where, as here, neither ACM nor Mr. Terry owe fiduciary duties to NexPoint,

*see supra* 28-31, and NexPoint has not alleged any other basis for a "special relationship."

## III. THE COURT SHOULD GRANT JUDGMENT ON THE PLEADINGS ON PLAINTIFFS' CLAIMS

The Court should also grant judgment on the pleadings on Plaintiffs' claims under Rule

12(c) because they turn on questions of law, nearly all of which are implicated by Plaintiffs' Rule

12(b)(6) motions to dismiss Defendants' counterclaims.  *See Lively v. Warfa Inv. Adv. Grp.*, 6

F.4th 293, 301-302 (2d Cir. 2021) (Rules 12(b)(6) and 12(c) standards are identical and courts may resolve "questions of law" on Rule 12(c) motions).[16]

### A. The Court Should Grant Judgment On Count One Because Defendants All Lack Standing

Count I seeks declaratory judgment that (1) NexPoint lacks standing to bring the claims asserted against the ACM Parties in the Original NexPoint Action, and (2) the DAF Parties lack standing to bring the claims asserted in the 2019 and 2020 Lawsuits and threatened in the May 8 Letter.  AC ¶ 65.  Judgment on the pleadings is warranted on both points.

<u>NexPoint Lacks Standing</u>: NexPoint brought the same tort claims for breach of fiduciary duty, negligence, and conversion in the Original NexPoint Lawsuit that it now alleges as counterclaims in this action.  *See* Dkt. 83-1 ¶¶ 159-181, 219-235; Dkt. 78 ¶¶ 140-217.  As in Section II above, the Court can determine from NexPoint's pleadings that it lacks either direct or derivative standing to bring the tort claims it brought in the Original NexPoint Lawsuit.  *See supra*, Section II(B).  Based on the same reasoning, Plaintiffs are entitled to judgment on the pleadings that NexPoint lacks standing for these claims.  *See Lively*, 6 F.4th at 301 (holding that the Section 12(b)(6) and Section 12(c) standards are identical).

The Court should also grant judgment on the pleadings by declaring that NexPoint lacks standing to bring its breach of contract claim under the Acis 6 PMA and Indenture, which NexPoint brought in the Original NexPoint Lawsuit but did not advance as a counterclaim in this action.  *See* Dkt. 83-1 ¶¶ 182-192.  NexPoint lacks direct standing to sue ACM for breach of the Acis 6 PMA because it is neither a party to the PMA, nor a third-party beneficiary.  *See* Dkt. 78-2 § 31 ("[N]o

---

[16] The Court can resolve these questions of law on the facts admitted by Defendants, so summary judgment is unnecessary.

party, … including any Holder of Notes, is a third party beneficiary of this Agreement," except for the Trustee); *Wilson*, 746 F.3d at 537 (plaintiff "d[id] not have standing to enforce" contract because it was neither a party nor a third-party beneficiary). To the extent NexPoint previously purported to bring breach of contract claims against ACM under the Acis 6 Indenture, those claims fail because ACM is not a party to the Indenture. *See Int'l Customs Assocs., Inc. v. Ford Motor Co.*, 893 F. Supp. 1251, 1255 (S.D.N.Y. 1995) ("a contract cannot bind a non-party"), *aff'd*, 201 F.3d 431 (2d Cir. 1999); Ex. 10 ("The [Acis CLO] PMAs specifically provide that there are **no third party beneficiaries**") (emphasis in original). Further, NexPoint lacks derivative standing to sue on behalf of Acis 6 for breach of the PMA or the Indenture for the same reason that it lacks derivative standing to bring its counterclaims. *See supra* at Section II(B).

The DAF Parties Lack Standing: In the 2019 and 2020 Lawsuits and the May 8 Letter, the DAF Parties asserted claims under the IAA, Trust Indenture Act ("TIA"), and common law for alleged mismanagement of the Acis CLOs. But the DAF Parties only hold indirect investments in the Acis CLOs by virtue of their minority investment in HCLOF, a Guernsey company. As in Section I(A) above, the Court can determine from the DAF Parties' pleadings that they lack derivative standing to pursue claims on behalf of HCLOF. Based on the same reasoning, Plaintiffs are entitled to judgment on the pleadings that DAF Parties lacks standing for these claims. *See Lively*, 6 F.4th 301.

Like NexPoint, the DAF Parties separately lack direct standing because ACM does not owe fiduciary duties to investors in the Acis CLOs and the DAF Parties' threatened tort claims are derivative under Cayman Islands law. *See supra* at 25-27, 31. The DAF Parties lack derivative standing under Cayman Islands law because none of the exceptions to its prohibition on derivative standing apply. *See supra* at 31-35. To the extent the DAF Parties are attempting to proceed

double-derivatively on behalf of the Trustee, they cannot do so because the Trustee does not have authority under the Indentures to pursue claims based upon the breach of an obligation of the Portfolio Manager under the PMAs until the occurrence of an Event of Default, which the DAF Parties have not alleged. *See supra* at 36-37.[17]

**B.    The Court Should Grant Judgment On Count Two Because The 2021 Settlement Agreement Bars The DAF Parties' Threatened Claims**

Count II seeks declaratory judgment that the 2021 Settlement Agreement bars the DAF Parties' from bringing their IAA, TIA, and other claims they asserted in the 2019 and 2020 Lawsuits and threatened in the May 8 Letter. AC ¶ 73. The 2021 Settlement Agreement is clear on its face that it bars those claims. *See* Dkt. 15-12 § 10 (releasing "any and all claims … against … [ACM], and [Mr.] Terry, in any capacity, Brigade Capital Management, LP, [and] U.S. Bank National Association," including "with respect to any claims for breach of any duties or obligations owed by [ACM] to the Acis CLOs under the PMAs.").[18] And the 2021 Settlement Agreement applies to bar not just HCLOF's direct claims, but also derivative claims asserted on HCLOF's behalf. *See Wolf v. Barkes*, 348 F.2d 994, 997 (2d Cir. 1965) (company has authority to "negotiate a release of [its] corporate claims … before a derivative suit started."). As prospective derivative plaintiffs seeking to sue on behalf of HCLOF, the DAF Parties "have no rights greater than" HCLOF and "are subject to the same defenses as are available against [HCLOF]." *See Salomon*, 1994 WL 533595, at *4. Indeed, courts have repeatedly enforced corporate settlements to bar

---

[17] The DAF Parties additionally lack standing to bring their threatened IAA and TIA claims because they do not exist. *See NexPoint*, 620 F. Supp. 3d, at 43-44 (ruling that NexPoint's IAA claims do not exist), 47 (observing that NexPoint abandoned its TIA claim against the Trustee); Ex. 17 at 9-12 (Trustee's brief explaining why the Acis 6 Indenture is not subject to the TIA).

[18]    The Court can resolve the release's unambiguous meaning as a matter of law. *Garza*, 345 S.W.3d at 480 (release's unambiguous meaning is a question of law); *Lively*, 6 F.4th at 302 (courts may resolve "questions of law" under Rule 12(c)).

subsequent derivative claims asserted on behalf of the company that settled. *Bernstein v. Mediobanca Banca di Credito Finanziario-Societa Per Azioni*, 78 F.R.D. 1, 5 (S.D.N.Y. 1978) (corporate release barred derivative claims); *Thurman v. City of Lake St. Louis*, 24 F.3d 1034, 1036 (8th Cir. 1994) (same); *NAF Holdings, LLC v. Li & Fung (Trading) Ltd.*, 2013 WL 489020, at *10 (S.D.N.Y. Feb. 8, 2013) (companies' releases "equally bars their shareholder … from suing [releasee] derivatively on their behalf"), *vacated and remanded on other grounds*, 801 F.3d 92 (2d Cir. 2015). The Court should do so here. Because the release covers the DAF Parties' threatened claims, it is "a complete bar" to them. *See Tamez*, 155 S.W.3d at 569; *see also Borden v. City of New York*, 2017 WL 744593, at *4 (S.D.N.Y. Feb. 24, 2017) (granting motion to dismiss based on unambiguous release) (Woods, J.).

## IV. LEAVE TO AMEND THE COUNTERCLAIMS SHOULD BE DENIED

"Where the problem with [a complaint] is substantive [and] better pleading will not cure it, leave to amend should be denied as futile." *Off. Sol. Grp., LLC*, 544 F. Supp. 3d at 419. That is precisely the situation here. On the admitted facts, NexPoint lacks direct or derivative standing to pursue its counterclaims under settled law,[19] and the DAF Parties' attacks on the Settlement Agreements all fail as a matter of basic contract and tort law doctrine. Moreover, there is no indication that Defendants are "in possession of facts that would cure the problem with their claims," *Off. Sol. Grp., LLC*, 544 F. Supp. 3d at 419, and Defendants "could add no facts … that

---

[19] Indeed, NexPoint has not corrected these deficiencies even though this is the third lawsuit in which it has advanced them. *See* Dkt. 83-1; Ex. 14; Dkt. 78.

44

would change in [their] favor the state of the law," *Sudler v. City of New York*, 689 F.3d 159, 179 (2d Cir. 2012).[20]  Accordingly, further leave to amend should not be granted.

### CONCLUSION

For the reasons stated above, the counterclaims of both the DAF Parties and NexPoint should be dismissed with prejudice and Plaintiffs' motion for judgment on the pleadings should be granted.

---

[20] Plaintiffs' motion targets these "legal obstructions" because motions to dismiss assess the legal feasibility of counterclaims.  *Off. Sol. Grp., LLC*, 544 F. Supp. 3d at 419.  Plaintiffs intend to show if the case proceeds that NexPoint's factual allegations are fictitious at best, arguably frivolous, and part and parcel of Mr. Dondero and the Sbaiti firm's pattern of abusive litigation against Mr. Dondero's enemies, for which they have been held in contempt.  Ex. 13 (*In re Highland Cap. Mgmt., L.P.*, Case No. 19-34054-sgj11, Dkt. 2660 (N.D. Tex. Bankr. 2021)).

Dated: New York, New York
     May 15, 2023

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**

By:      */s/ Blair A. Adams*
    Jonathan E. Pickhardt
    Blair A. Adams
    Misha Boutilier
    Michael R. Bloom
    Jeffrey Arnier
    51 Madison Avenue, 22nd Floor
    New York, New York 10010
    (212) 849-7000

    *Attorneys for Plaintiffs Joshua N. Terry and Acis Capital Management, L.P.*

**SEWARD & KISSEL LLP**

By:      */s/ Mark D. Kotwick*
    Mark D. Kotwick
    Thomas Ross Hooper
    Julie J. Hong
    One Battery Park Plaza
    New York, New York 10004
    (202) 574-1200

    *Attorneys for Plaintiff U.S. Bank National Association, in its capacity as Trustee*

## **CERTIFICATE OF SERVICE**

The undersigned attorney certifies that on May 15, 2023, he caused a true copy of the

foregoing document to be served via CM/ECF to all counsel of record.


*/s/ Misha Boutilier*
Misha Boutilier