# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| U.S. BANK, NATIONAL ASSOCIATION, in its capacity as Trustee, JOSHUA N. TERRY, AND ACIS CAPITAL MANAGEMENT, L.P., <br><br> Plaintiffs, <br> -against- <br><br> THE CHARITABLE DONOR ADVISED FUND, L.P., CLO HOLDCO LTD., AND NEXPOINT DIVERSIFIED REAL ESTATE TRUST, <br><br> Defendants. | Case No. 1:21-cv-11059 (GHW) |

## DECLARATION OF BHAVESH NARENDRA PATEL IN OPPOSITION TO THE PLAINTIFFS' MOTION TO DISMISS DEFENDANTS' COUNTERCLAIMS AND FOR JUDGMENT ON THE PLEADINGS ON PLAINTIFFS' CLAIMS

I, **Bhavesh Narendra Patel**, of Travers Thorp Alberga, 2nd Floor Harbour Place, 103 South Church Street, George Town, Grand Cayman, Cayman Islands, declare under penalty of perjury as follows:

## Introduction

1.      I am an attorney licensed to practice law in the Cayman Islands. I am a partner in the Cayman Islands office of the law firm Travers Thorp Alberga ("**TTA**"), a firm of attorneys which has been practicing and advising on the laws of the Cayman Islands for over 40 years. TTA also advises on the laws of the British Virgin Islands ("**BVI**") and has offices in Grand Cayman, BVI, Hong Kong, London, Australia and New Zealand.

EXHIBIT

9

1

2. I am a practicing member of the Cayman Islands Legal Professionals Association and have been admitted to practice since 2016. I first qualified to practice law in England and Wales in 2011 when I worked in the disputes department of the London office of Herbert Smith Freehills. I was subsequently admitted as a legal practitioner in the Eastern Caribbean Supreme Court (Territory of the Virgin Islands) in 2013, and have practiced BVI law since then. I relocated to the Cayman Islands in 2016 and have practiced Cayman Islands law since then. I hold a Master of Arts degree from St. Catherine's College, University of Oxford, and attended law school at BPP Professional Education in London.

3. My practice covers general commercial disputes, shareholder and company litigation, and private client and contentious trusts matters in the Cayman Islands and the BVI. I also advise on litigation as well as arbitration proceedings. I have appeared in a number of reported and unreported cases before the Grand Court of the Cayman Islands and the Cayman Islands Court of Appeal. I have also authored a number of texts and articles on matters of Cayman Islands law, including recently authoring the Cayman Islands chapter of Lexology's GTDT Market Intelligence - Dispute Resolution, and the Global Law Expert's Practice Area Guide for Litigation in the Cayman Islands.

4. I also serve as the chair of a sub-committee of the Cayman Islands Recovery and Insolvency Specialists Association (RISA), and the Chairman of RISA Caribbean which encompasses the respective RISA organisations of the Cayman Islands, BVI, Bahamas and Bermuda.

5. I am familiar with the Court systems of the United States having previously provided expert opinion evidence on Cayman Islands law in other proceedings before the US Courts.

6. A copy of my CV is at Appendix 1. True copies of the authorities to which I refer herein are at Exhibits 1-28

7. I have been requested by NexPoint Diversified Real Estate Trust ("**NexPoint**") in the above-captioned proceedings to provide my opinion on certain questions of Cayman Islands law. I have personal knowledge of the matters set forth herein (other than those pleadings I have

expressly relied on) and, if properly called as a witness, I could and would competently testify thereto. I consider that I have the necessary qualifications and experience to advise on matters of Cayman Islands law.

8.　　　I submit this declaration at the request of NexPoint in connection with responding to Plaintiffs' *Motion to Dismiss Defendants' Counterclaims and for Judgment on the Pleadings on Plaintiffs' Claims* (the "**Motion to Dismiss**") and (ii) NexPoint's Amended Answer and Counterclaim to the Amended Complaint (the "**Counterclaim**"). During the preparation of this Declaration I have also read the Declaration of Jonathan Milne dated 15 May 2023 (the "**Milne Declaration**").

## Factual Background

9.　　　I have been advised that, at this stage of the proceedings, the Court's task is to decide whether the allegations in the Counterclaim, if taken as true, would give rise to NexPoint having standing to bring certain claims as a matter of Cayman Islands law. As such, I am relying upon and indeed taking at their highest the allegations contained in the Counterclaim in formulating my views of the applicable Cayman Islands legal principles. I do not believe that Mr. Milne's characterization of the facts or allegations gives full credit to what has been alleged by NexPoint, or properly gives the benefit of the doubt to NexPoint's allegations as is expected and required of the Court in these circumstances.

## Points of Cayman Law to be Addressed

10.　　I was requested to address the following questions of Cayman Islands law[1], each on the assumption that the facts as well as all matters of non-Cayman Islands law, as alleged in the Counterclaim are proved at trial:

---

[1]　　I agree with the summary provided by Mr Milne as to the Cayman legal system at section D of his declaration, and do not intend to repeat those points herein.

    a.   When would Cayman Islands law recognize the creation of a Trust, and would the alleged Acis-6 structure likely be deemed to be a trust under Cayman law given the alleged facts?

    b.   What is the Cayman Islands law relating to shadow/*de facto* directors and implied/constructive trustees, and would the Cayman Islands Courts, in applying the law to the allegations, find the relationship between Acis 6 and ACM to be a trustee or fiduciary relationship?

    c.   Would NexPoint be deemed to be a shareholder if the structure were not a trust, or if not, can a noteholder be deemed to be the equivalent of a shareholder of a Cayman Islands company for the purposes of derivative standing under the alleged circumstances where the entirety of the fund is being managed solely for the benefit of noteholders?

    d.   Who has standing to bring derivative claims in Cayman, and would NexPoint have standing to bring an action against the Counter-Defendants under Cayman Islands Law, whether it is categorized as a trust or otherwise?

    e.   Can claims be made directly against the directors or managers of entities in Cayman, or against those who provide substantial assistance to another for breach of duty, and does NexPoint have such claims against Josh Terry and/or Brigade Capital Management?

### *Cayman Islands Trusts*

11.    Under Cayman Islands Law, as under English Law, trust law concerns the protection and management of assets by one party (or group of parties) for the benefit of other parties. Thus, the following elements are generally required in order to find that a relationship among parties creates a trust:

    a.   Constituting the trust, which is adding of assets into the relationship; and

b.  Satisfying the "three certainties" (which are (1) certainty of intention to create a trust; (2) certainty of the subject matter forming the assets of the trust; and (3) certainty regarding the objects or beneficiaries of the trust.): *Islena Airlines v Jefferson* [1998 CILR 148] at Exhibit 1 .

12.  In this case, the Indenture states that "*The Issuer hereby **Grants to the Trustee**, for the **benefit** and security of the Holders of the Secured Notes... all of its rights, title and interest in... the Assets*". And it goes on to state "*The Trustee acknowledges such Grants, **accepts the trusts** hereunder in accordance with the provisions hereof*" (emphasis added). It further goes on to provide for the Trustee to be a representative of the Holders of Subordinated Notes in § 6.17, and "*Money for Note Payments to be Held in Trust*" in § 7.3 where the trustee, as paying agent holds all moneys for Note holders in trust. § 7.16(h) also provides that "*Each holder of the Subordinated Notes (and any interest therein) will be deemed to have represented and agreed to treat the Subordinated Notes as equity for U.S. federal, state and local income and franchise tax purposes*".

13.  The Indenture thus prima facie satisfies the three certainties in that it confirms that the arrangement was intended to create a trust (Certainty No. 1) of all of the Issuer's identified assets (Certainty No. 2) for the benefit of the Noteholders (Certainty No. 3).

14.  The constitution of the trust would have taken place when the Assets (as defined in the Indenture) were in fact transferred from the Issuer to the Trustee.

15.  Based on the above, Cayman Islands law, and its Courts would likely determine that the arrangement would be classified as a trust. Because the indenture used New York Law, the Cayman Islands Courts would likewise deem that New York Law governs the rights and obligations of the parties to the Trust.

16.  It is trite law in the Cayman Islands that a beneficiary can bring a claim against a trustee directly for a loss that it has suffered as a result of the trustee's actions – see section H1 of *Tolleys Administration of Trusts* at Exhibit 24. Further, whilst the traditional remedy for breach of trust has been restitution or compensation of a particular beneficiary who has been affected by the

breach of trust, the Courts have recently taken a more progressive approach to assessment of damages and applied the normal common law principles, see *Watson v Kea Investments* [2019] EWCA Civ 1759 at Exhibit 25, which confirms that the courts can award equitable interest so as to put a trust claimant into the position it would have been in had its money been invested in proper trustee investments.

### *Shadow/De Facto Directors and Implied or Constructive Trustees*

17.     The internal governance of a Cayman Islands company is conducted by a combination of actions taken by the directors of the company (typically acting together as a majority of the company's board and acting in what they bona fide consider to be the best interests of the company) and/or the members of the company (through ordinary or special resolutions passed for the directors to then implement). A Cayman Islands exempted limited partnership is run and managed by its general partner to the exclusion of its limited partners (see section 14(1) of the Exempted Limited Partnerships Act, (2022 Revision) at Exhibit 2). A Cayman Islands trust operates through its trustee, which is usually a professional trust company that has been given express powers to manage and distribute the assets of the trust in accordance with the terms of the relevant trust instrument.

18.     Where individuals or entities, regardless of their formal title, exercise a role that is substantially that of a director, general partner, or trustee (as the case may be), the Cayman Islands Courts will often classify them as operating as a shadow or de facto director/partner/trustee and impose corresponding fiduciary duties on them. A number of examples of this are set out below.

19.     The Cayman Islands Companies Act (2023 Revision) (the "**Companies Act**") provides a definition of shadow director as follows:

> "***shadow director***" *means in relation to a company, any person in accordance with whose directions or instructions the directors of the company are accustomed to act...*

20.     The Companies Act further provides that the definition of "officer" for the purposes of the offences of fraud, etc. in anticipation of winding up (section 134(2)), misconduct in the course of winding up (section 136(2)) and material misstatements relating to a company's affairs

(section 137(3)) includes a shadow director (see an extract of those sections of the Companies Act at Exhibit 3). Accordingly, the obligations and duties imposed on directors would apply to shadow directors *ipso facto*.

21.     To establish that a defendant is a shadow director of a company it is necessary to allege and prove: (1) who are the directors of the company, whether *de facto* or *de jure*; (2) that the defendant directed those directors how to act in relation to the company or that he was one of the persons who did so; (3) that those directors acted in accordance with such directions; and (4) that they were accustomed so to act. What is needed is, first, a board of directors claiming and purporting to act as such; and, secondly, a pattern of behaviour in which the board did not exercise any discretion or judgment of its own, but acted in accordance with the directions of others: *Re Hydrodam (Corby) Ltd.* [1994] 2 BCLC 180 at Exhibit 4, applied in Cayman in *In The Matter Of Omni Securities Limited (No. 4).* [1999 CILR 126] at Exhibit 5,

22.     A *de facto* director (director in fact) is someone who has assumed responsibility to act as a director, although never actually or validly appointed as such. There is no set test identifying for identifying a de facto director and the question is very much one of fact and degree. The test is objective and if a person is holding themselves out as a director, they will not avoid liability merely because they did not consider themselves to be in the position of a director. All relevant factors can be taken into account such as access to company information, the degree of importance of decisions being made, and most importantly whether they assumed responsibility for decisions made. It is not sufficient, however, to show that they merely played a role in the management of the company's affairs or undertook tasks in relation to its business which could properly be performed by a manager below board level: see *Re Hydrodam*; considered in *Hutchinson Limited v Cititrust & Ors* [1998 CILR 43] at  Exhibit 6.

23.     Cayman Islands trusts law recognizes the concept of both an implied trustee and a constructive trustee (see the definition of "trusts" within the Trusts Act (2021 Revision) at Exhibit 26, which expressly extends the term include to implied and constructive trusts). An implied trust arises where, although the legal relationship created was not expressed to be a trust, it nevertheless has the requisite characteristics of a trust (i.e. the "three certainties") described above. In the case of *Whar-Hansen v Bridge Trust Company Ltd & Ors* [1997 CILR 527] at Exhibit 7, the Cayman

Islands Court of Appeal recognized an implied trust arrangement having in particular regard to the recitals in the transfer documents which stated that the transferor "*intended to establish a trust*".

24.     Constructive trusts, on the other hand, are neither express nor implied trusts, but are what is known as remedial trusts. These trusts are created by equity, usually to allow the tracing or following of property transferred in breach of trust into the hands of a recipient, whose knowledge of or participation in the breach of trust binds his conscience and prevents him from retaining the trust property. Put another, more general way, a constructive trustee is someone who holds assets for the benefit of another, albeit not on the terms of an express or implied trust.

25.     A party may be found to be a constructive trustee and therefore liable directly for breach of trust where: (1) there has been a disposal of assets in breach of trust; (2) the party assisted in that breach or disposal; and (3) the party assisted the breach of trust dishonestly - see *Ritter v Butterfield Bank (Cayman) Ltd* [2018 (2) CILR 638] at Exhibit 8.

26.     Based on the facts alleged in this case and the manner in which I am given to understand that ACM has operated, in particular the degree to which it operated virtually seamlessly with US Bank and largely controlled the Acis-6 structure, the Cayman Courts would be likely to determine that ACM was operating either as a *de facto* or shadow director of the Issuer, or as an implied or constructive trustee over the Issuer's assets.

27.     Accordingly, whether through shadow/*de facto* directorship or implied/constructive trusteeship, ACM would have imposed upon it corresponding fiduciary duties owed directly to NexPoint as a beneficiary. As explained further below, NexPoint would accordingly be able to bring a claim directly against ACM for breach of those duties.

### *Creditor v Shareholder*

28.     Shareholders of Cayman Islands companies are *prima facie* determined by the register of members pursuant to section 48 of the Companies Act (at Exhibit 3). Nonetheless, the Cayman Courts have, in the context of insolvency proceedings, taken a commercial and pragmatic approach to the interests of stakeholders.

8

29.    In a liquidation in the Cayman Islands the following interests rank in order of priority and liquidators will apply and/or distribute the assets the insolvent company accordingly:

   a.  Expenses of the liquidation (including liquidators' fees: see section 109 Companies Act)

   b.  Preferential debts (as set out in Schedule 2 to the Companies Act)

      i.  Category 1: Debts due to employees

      ii.  Category 2: Debts due to bank depositors

      iii.  Category 3: Taxes due to the Government

   c.  Unsecured creditors (*pari passu*)

   d.  Members (*pari passu*)

30.    The position of certain categories within unsecured creditors has also been the subject of case law, particularly with reference to investors who redeemed their investment prior to the liquidation of a Cayman fund but who were unpaid (so-called 'unpaid redeemers') however that specific category is not relevant for the purposes of this matter.

31.    Unsecured creditors may also contract with the company to subordinate their debt, and I understand from the Indenture that NexPoint's interests as an unsecured creditor ranked below all other secured and unsecured creditors, such that it would only be paid once those other creditors' debts had been satisfied. It is also my understanding that, as to the assets in question, no money was to be paid to any member of the Issuer or Co-Issuer from the assets under management, making NexPoint the most junior and residuary interest (along with Highland CLO Funding, Ltd., who was the other subordinated note holder). This is the position typically occupied by a shareholder in a Cayman Islands company in the context of a liquidation.

32.    In circumstances where only the so-called creditors have a financial interest in the company, i.e. the company will not be have any surplus to pay to shareholders at the completion

of the liquidation, there is Supreme Court authority that the directors (or shadow/de facto directors, as the case may be) of the company must shift their focus to be in the interests of its creditors, not its shareholders: see *BTI 2014 LLC v Sequana SA* [2022] UKSC 25 at Exhibit 9 (the relevant point was previously determined by the English Court of Appeal and upheld by the Supreme Court in the same case, and the English Court of Appeal decision has been applied in *AHAB v SAAD Investments Company Limited et al* (unreported, CICA, 21 December 2021) at Exhibit 10.

33.     In light of that judgment, there is a logical argument that where a company enters a state such that the relevant stakeholders of a company shift from the shareholders to creditors, those creditors may enforce against a breach by the directors of not acting in accordance with their duty. In the present case, because the Noteholders' interests have become paramount, and it was therefore the Issuer's directors' (or shadow/de facto directors') duty to protect such interests as soon as the Issuer had entered a state of doubtful solvency, the Noteholders should have the ability to sue for a breach of that duty. That is, to bring a direct claim against those directors if they fail to act in the best interest of the Noteholders, particularly if the liquidation of the company is not a viable option or is not going to result in any return to the Noteholders. Given the recentness of the judgment, this point has not yet been tested under Cayman Islands law (or, as far as I am aware, any other common law jurisdiction), however, as the Cayman Courts are accustomed to protecting the rights of creditors and ensuring that Cayman entities and their directors (or managers or trustees) act in accordance with their duties, there is considerable weight in the argument that they would so find, as would likely courts in other common law jurisdictions (see *Re China Milk Products* [2011 2 CILR 61] at Exhibit 27).

34.     Further, given the subordinated nature of NexPoint's interest, it in fact sits in a position akin to a shareholder because it is ultimately only going to obtain a financial benefit from the Issuer after other creditor debts have been satisfied. Additionally, according to the Indenture, there are in fact no shareholders with any rights to receive dividends from the assets subject to the Indenture, and therefore the only class with any economic interest in the Issuer is the Noteholders (i.e. NexPoint and Highland CLO Funding, Ltd.).

35.     The Counterclaim alleges that NexPoint purchased an equity interest in the Issuer, in that it purchased unsecured notes with a residuary interest (Counterclaim, para. 45). The

Counterclaim states "*the Issuers have had no title or interest in the assets, have no independent obligation to pay NexPoint or any other Subordinated Noteholder— that obligation now rests with the Trustee who only has to pay NexPoint out of the income from the Assets and, when liquidated, NexPoint is entitled to a pro-rata share of the liquidation amount, after deducting the prescribed fees and expenses.*" (Counterclaim, para 49). I also note that the Offering Circular explains that the Issuer only has $250 in cash and minimal assets, has authorized 50,000 shares but only issued 250 of those shares which are which are held in a charitable account, and are not entitled to any payout from the Assets managed by ACM.

36. Accordingly, due to NexPoint standing in the shoes of the equity of the Issuer, and due to the fact that there is nobody else with any economic interest in the company, for all practical purposes NexPoint occupies the position of a shareholder of the Issuer and equity should recognize its rights as such. Given that a liquidation of the Issuer is impractical in the circumstances (because NexPoint's debt is tantamount to equity and it has no right to recover a set amount so cannot petition to wind up the Issuer), were equity to fail to recognize NexPoint's rights in this way there would be nobody to enforce the duty owed by those in control of the Issuer to have regard to the Subordinated Noteholders' (e.g. NexPoint's) interests. That would result in the existence of a duty which is essentially meaningless. It is trite law in common law jurisdictions, including Cayman, that *ubi jus ibi remedium* - Equity will not suffer a wrong to be without a remedy (*see Westdeutsche Landesbank Girozentrale v Islington London Borough Council* [1996] AC 669 at Exhibit 11, which was applied by the Cayman Grand Court in *Ernst & Young & ors v FOI Officer & Kerry Tibbets and Persons Unknown*, G15 and G20 of 2015, unreported judgment dated 12 February 2015) at Exhibit 12. Under Cayman Islands law, equity does not usually allow such manifest unfairness and will intervene to prevent it. *Id.*

***Cayman Islands Derivative Actions***

37. Derivative claims in the Cayman Islands fall under three categories (see *Kuwait Ports Authority et al v Port Link GP Ltd et al* (unreported, CICA (Civ), Field, Birt, Beatson JJA, 20 January 2023), at Exhibit 13:

        i.     Shareholder derivative actions brought under Grand Court Rule Order 15, rule 12A (at Exhibit 28);

ii. Limited Partner claims brought under section 33(3) of the Exempted Limited Partnerships Act;

iii. Beneficiaries of a Cayman Islands trust bringing claims on behalf of the Trust under the common law.

38. Derivative actions do not require leave of the Cayman Court to be issued, however if they are defended then the GCR require that leave be obtained in order to continue the claim. In those circumstances, the plaintiff needs to show the following in order to be able to continue the claim (following the English Court of Appeal decision in *Prudential Assur Co Ltd v Newman Indus Ltd (No. 2) [1981] Ch. 257* at Exhibit 14 as was upheld and restated by the English Supreme Court in *Marex Financial Ltd v Sevilleja* [2020] UKSC 31 at Exhibit 15:

a. The plaintiff must show *prima facie* that there is a viable cause of action vested in the company;

b. The alleged wrongdoers have control of the company or could block any resolution of the company thereby prevent the company bringing an action against themselves;

c. The claim is not spurious or unfounded, and is a serious as opposed to speculative case; and

d. The claim is brought *bona fide* on reasonable grounds, on behalf of and in the interests of the company.

39. There are a number of situations which are commonly referred to as the exceptions to the rule in *Foss v Harbottle*, which is the English case that sets out the general principal that a company should bring claims by itself and where a claim is brought derivatively then the loss must have been suffered by the company. In *Russell v. Wakefield Water Works Company (1875) LR 20 Eq 474* (at Exhibit 16) it was said that the rule in *Foss v Harbottle* is "*not a universal rule; that is, it is a rule subject to exceptions, and exceptions depend very much on the necessity of the case; that is the necessity for the court doing justice*".

*Personal Rights Exception*

40. The personal rights exception applies where the act complained of amounts to an infringement of the personal rights of individual shareholders, either instead of or in addition to an infringement of the rights of the company -- see *MacDougall v Gardiner* [1875] 1 Ch. D 13 at Exhibit 17, as applied in the Cayman Islands in *Tempo Group Ltd v Fortuna Development Corporation* (FSD 125 of 2012, unreported, 30 March 2015) at Exhibit 18.This is not actually an exception *per se* to the rule in *Foss v Harbottle*, but rather an acknowledgment that the rule does not apply because the damage has been caused to the member in his individual capacity in respect of an infringement of a right owed to him directly. *Id.*

*Fraud on the Minority Exception*

41. The fraud on the minority exception applies where (a) the action in question amounts to a fraud on the minority shareholders, and (b) the alleged "wrongdoers" are themselves in control of the company (as applied by the Cayman Court in *FamilyMart China Holding Co. Ltd v Yin-Hen Wei & Ors* (FSD 165 of 2019, unreported 9 September 2022) at Exhibit 19.

42. Equitable fraud on the minority: this "fraud on the minority" exception first and foremost requires pleading facts that amount to equitable fraud. A common example is where those in control of the company are endeavouring directly or indirectly to appropriate to themselves money, property or advantages in which the other shareholders are entitled to participate: *Burland v Earle* [1902] AC 83 at Exhibit 20; applied in *Schultz v Reynolds & Newport Limited* (CICA) [1992-93 CILR 59] at Exhibit 21.

43. Here, the Counterclaim alleges that, among other wrongs, the Plaintiffs caused the Issuer to artificially inflate their assets under management (which in turn inflated fees), and inflated expenses. The Counterclaim posits that "*The purpose of these transactions is obvious: purchasing more bad assets on the cheap to inflate the notional value of the AUM, thus inflating the fees Counter-Defendants could charge, and extending their tenure for this mountain of money. This scheme operated as an artifice to deceive and defraud the investors like NexPoint.*" (Counterclaim, para. 188). This is what the courts generally mean by equitable fraud on the minority.

13

44.    The wrongdoers are in control of the company: the exception also requires pleading that those responsible for the equitable fraud on the company are in control of the company and will therefore not permit the company to sue to obtain redress for the fraud.

45.    Here, the Counterclaim pleads the Company's management is controlled by ACM (as day to day manager) via the Portfolio Management Agreement (Counterclaim, para. 2) and that ACM and HCLOF entered into a collusive settlement agreement by which ACM has sought to ensure that the Company will not bring a suit against it (Counterclaim, para 247).

46.    Based on my understanding of the Counterclaim as pleaded, I consider that the Cayman court, if hearing such a case, would be likely to find that NexPoint would have satisfied the personal rights exception and/or the fraud on the minority exception.

### *Direct action against directors or controllers of Cayman entities*

47.    Where a claim is brought in tort against a Cayman Islands entity, the normal position is that the corporate veil cannot be pierced to attack the directors or owners of that entity directly. Instead, if a judgment was obtained against the entity, it could be placed into liquidation and the liquidators could bring claims on behalf of it against its former directors or managers.

48.    Notwithstanding the above, if there are allegations of fraud having been committed then NexPoint could commence a direct action in the Cayman Islands for fraud and/or conspiracy to defraud against both ACM and its controllers (i.e. Mr Terry and/or Brigade Capital Management). Conspiracy to defraud is a common law offence which has been held to be an agreement "to deprive a person dishonestly of something which is his or to which he is or would be or might be entitled" or "by dishonesty to injure some proprietary right" (see *Scott v Metropolitan Police Commissioner* [1974] UKHL 4 at Exhibit 22). It is sometimes summarised as efforts between two or more persons, dishonestly, to prejudice the rights of another. The Cayman Courts are also accustomed to dealing with claims for the tort of unlawful means conspiracy (see *Merkanti Holdings PLC and 1128349 BC Ltd v Raiffeisen Bank Internation AG,* CICA Appeal 14 of 2021, unreported judgment 16 March 2022) at Exhibit 23.

49.    The present case alleges sufficient facts to support a claim for conspiracy to defraud; in particular the pleading that ACM, Mr Terry and Brigade deliberately inflated the AUM

of Acis-6 in order to procure payment to ACM of overly high management fees and expenses facially supports such a claim and they would have standing to bring such a claim directly.

**Conclusion**

50.     In conclusion:

a.      it is properly arguable that NexPoint could bring claims against Plaintiffs on a number of independent bases.

b.      Those claims include direct claims for breach of trust in respect of damage to NexPoint's beneficial interest in the Acis-6 structure, and conspiracy to defraud in respect of tortious damage suffered by NexPoint.

c.      They also arguably include derivative claims which NexPoint would be entitled to bring on behalf the Issuer on the basis that (a) NexPoint has an equitable interest in the Issuer and occupies the position of a shareholder (albeit it is not a shareholder *per se*) and (b) one or more of the exceptions to the rule in Foss v Harbottle (including the fraud on the minority exception) applies in this case.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that this Declaration was executed this 14th day of June, 2023, in Grand Cayman, Cayman Islands.

_____

Bhavesh Narendra Patel

**Appendix 1: CV of Bhavesh Narendra Patel**



**BHAVESH PATEL**

*Partner, Travers Thorp Alberga, Cayman Islands*

Bhavesh is an experienced litigator specialising in commercial litigation, shareholder and company disputes, cross-border insolvency, and contentious trusts and private client matters.

Following his degree at St. Catherine's College, Oxford, Bhavesh trained and qualified into the disputes department of Herbert Smith Freehills. During that time he was seconded to RBS and UBS. Prior to joining TTA, Bhavesh worked in the litigation department of another offshore firm and was admitted to appear in both the Cayman Islands and the BVI.

Bhavesh has advised international clients on a variety of high profile matters, including the RBS Rights Issue Litigation, the Abraaj Group's liquidation, the restructuring of Luckin Coffee, and currently acts as Cayman counsel to Iriving Picard as Madoff Trustee,

Bhavesh is earmarked as a 'Future Leader' in Who's Who Legal's Litigation Guide for the Cayman Islands is listed in Legal Week's Private Client Global Elite, and has been recognized by Finance Monthly for Commercial Litigation in the Cayman Islands.  He regularly speaks at global conferences and has appeared as an expert witness on matters of Cayman law in the USA, China, and in global arbitrations.

He is an overseas member of the Chancery Bar Association and of the American Bankruptcy Institute, and serves on committees within INSOL and RISA Cayman.

Admitted:    Cayman Islands (2016)
             British Virgin Islands (2013)
             England & Wales (2011, currently non-practising)

Education:   MA Hons (Oxon) St Catherine's College, University of Oxford

Languages:   English, French and Spanish – fluent
             Hindi and Gujarati - native/fluent

1

# CURRICULUM VITAE OF BHAVESH PATEL

## EDUCATION

| | |
|---|---|
| 2006 – 2008 | BPP Professional Education, London |
| | Graduate Diploma in Law and Legal Practice Course, Commendations |
| 2002 – 2006 | St Catherine's College, University of Oxford |
| | Modern & Medieval Languages (French & Spanish), MA Hons |
| 1995 – 2002 | King Edward's School, Birmingham |
| | English Secondary Education (11 GCSE, 5 A Levels) |

## PROFESSIONAL QUALIFICATIONS

| | |
|---|---|
| March 2011 | Admitted as a Solicitor of the Supreme Court of England & Wales |
| Nov 2013 | Admitted as a Solicitor of the Eastern Caribbean Supreme Court in the Territory of the British Virgin Islands |
| April 2016 | Admitted as an Attorney-at-law in the Cayman Islands |

## EMPLOYMENT EXPERIENCE

| | |
|---|---|
| 2017 – Present | Travers Thorp Alberga (Cayman) |
| 2013 – 2017 | Forbes Hare (London, BVI, Cayman) |
| 2009 – 2013 | Herbert Smith Freehills (London, Paris, secondments to UBS and RBS) |

### Cayman Law Experience

* Appearing as lead counsel on behalf of Cayman fiduciary service providers in relation to a Norwich Pharmacal application[1]
* Acting for the Official Liquidators of a Cayman Company that holds entities part of an African mining group, including related claims for breach of director duties and creditor winding up petitions[2]
* Representing and appearing on behalf of US Investors in relation to a Cayman company with numerous creditors and restructuring proposals, including arguing in relation to Cayman Credit Restructuring Officer regime[3]

---

[1] *Northeast Securities Co Ltd v Tricor & ICSL, FSD 297 of 2022*
[2] *In the matter of Pan African Minerals Limited, FSD 29 of 2020, FSD 284 of 2021, FSD 294 of 2021*
[3] *In the matter of Carbon Holdings Limited, FSD 218 of 2022*

2

* Successfully representing a Chinese scientist in claims for just and equitable relief against a NASDAQ listed company[4]
* Representing a Chinese high end clothing manufacturer and operate in relation to winding up proceedings and the appointment of provisional liquidators[5]
* Advising and acting for companies and a wealthy Middle Eastern family in Cayman's first Court appointed estate administration (including before Cayman Islands Court of Appeal)[6]
* Acting for a group of minority shareholders in relation to a just and equitable winding up petition relating to a large Crypto Exchange and Wallet provider[7]
* Assisting and advising the largest shareholder of Luckin Coffee Inc in relation to its restructuring[8]
* Advising and representing a large Chinese electronics company in relation to its Scheme of Arrangement[9]
* Representing the founding shareholder of a Cayman company in resisting a just and equitable winding up petition[10]
* Advising directors of a Cayman company in the context of contentious trust proceedings and related ownership, insurance, and director and shareholder disputes[11]
* Advising and representing the liquidators of a Chinese paper business[12]
* Advising and representing liquidators, receivers, and lenders in relation to a large group of African mining businesses[13]
* Representing and advising a Chinese national in a high value claim for recovery of the fair value of her shares in a Chinese clinical research organisation (Cayman section 238 proceedings)[14]
* Acting for the trustees of a Cayman trust in relation to a dispute over the assets and claims made by alleged beneficiaries
* Representing a high net worth family in relating to the enforcement of a Letter of Request from a US Court by the Cayman Grand Court[15]
* Advising and representing a Cayman group of companies in confidential Arbitration proceedings relating to misrepresentation and breach of warranty claims
* Representing and advising creditors in relation to the Provisional Liquidation of a Cayman company that owns a high value quarry[16]

---

[4] *In the matter of Aquapoint LP, FSD 157 of 2021 and CICA 14 of 2022*
[5] *In the matter of Evergreen International Holdings Limited, FSD 349 of 2021*
[6] *In the matter of the Estate of Osama I Abudawood, FSD 146, 147, 148, and 196 of 2018 and CICA 2 of 2021*
[7] *In the matter of Uphold Ltd, FSD 134 of 2022 and FSD 28 of 2021*
[8] *In the matter of Luckin Coffee Inc, FSD 157 of 2020*
[9] *In the matter of PFC Device Inc, FSD 357 of 2021*
[10] *In the matter of DFLM Management Ltd, FSD 142 of 2018*
[11] *Perry v Lopag, FSD 205 of 2017*
[12] *In the matter of Changgang Dunxin Enterprise Company Ltd, FSD 21 of 2018*
[13] *In the matter of Pan African Minerals Ltd, FSD 29 of 2020, 284 of 2021, and 294 of 2021*
[14] *In the matter of Fountain Medical Development, Ltd. FSD 123 of 2015*
[15] *Gaspar v Paget Brown Trust Company FSD 154 of 2017*
[16] *In the Matter of Midland Acres Limited FSD 88 of 2017*

* Advising a wealthy Canadian family on a dispute relating to their ownership of a Cayman property[17]
* Advising a HNW Caymanian on a dispute over the construction of a multi-million dollar residence
* Advising Directors of a group of companies on restructuring issues arising out of a complex trust structure
* Assisting Digicel in relation to an employment dispute against a former employee and the enforceability of non-compete and restrictive covenants
* Advising an international conglomerate of banks on possible action in the Cayman Courts to wind up a multinational, including drafting petitions and advising on steps that could be taken to improve their position as an unsecured creditor.
* Representing and advising creditors on action to be taken in relation to the enforcement of New York judgments against Cayman entities with underlying global operations
* Advising the director and minority shareholder of a Cayman company on possible courses of action following the receipt of a winding up petition (which was also ancillary to an ongoing dispute in the BVI).
* Advising an investor as to possible remedies available to him following investments into a Cayman Islands' fund that has stopped paying out redemptions
* Representing a trustee in its operation of a Cayman Islands trust where there are associated disputes between beneficiaries in other jurisdictions.
* Defending claims brought against a former director and shareholder of Cayman Island companies in relation to investments made by international investors.

<u>Eastern Caribbean Experience</u>

* Successfully acting for the largest shareholder of Luckin Coffee Inc in relation to sanction of its acquisition of shares held by entities in liquidation[18]
* Advising a HNW Chinese business person in relation to a group of BVI companies holding assets for various business ventures in PRC and Hong Kong, and related proceedings against Chinese banks[19]
* Advising shareholders of a NASDAQ listed BVI company in relation to unfair prejudice claims and breach of fiduciary duty by the Company directors[20]
* Representing a joint venture company in relation to the LCIA Arbitration dispute between its shareholders[21]
* Advising PRC creditors in the context of a BVI insolvent liquidation[22]

---

[17] *Proprietors of Strata Plan 62 v Odermatt et al GC 126 of 2017*
[18] *In the matter of Haode Investment Inc & Summer Fame Ltd, BVIHC(COM) 55 and 56 of 2020*
[19] *In the matter of Strong Fort Limited & Ors v CNCB (HK) Investment Ltd, BVIHCOM 137 of 2022*
[20] *Ace Lead & Shao v Hollysys Automation BVIHC(COM) 15 of 2021*
[21] *SGS Universal Investment Holdings Ltd v TPG Felix LP and Intimere Holdings Ltd, LCIA Arbitration 204928*
[22] *U&D Mining v Flash Lighting Company BVIHC(COM) 194 of 2020*

* Advising a Chinese owned company on its defence of a creditor's application for liquidators to be appointed[23]
* Representing the beneficiaries and administratrix of a high net worth's BVI Estate in probate proceedings[24]
* Representing a shareholder in a joint venture dispute relating to the BVI's first 'soft touch' provisional liquidation and associated entities[25]
* Representing the Liquidators of a Chinese conglomerate in relation to the BVI liquidation and its related global proceedings[26]
* Acting (as lead associate) for the Liquidators of *Fairfield Sentry*[27] and *Mount Capital*[28], two of the largest Feeder Funds to the Madoff Ponzi scheme (BLMIS). Working on various claims to recover the monies lost by investors following the discovery of the Madoff fraud.
* Representing a BVI entity in its defence of enforcement proceedings of an ICC Arbitration Award.
* Enforcing judgments of the English High court against entities with BVI connections.
* Assisting on advice provided to an Anguilla bank on claims brought against it in the Eastern Caribbean Courts on behalf of former customers[29].
* Representing (as lead associate) BVI investors who had interests (as creditors) in the liquidation of a large Australian company. Regular correspondence with the liquidators and other affected parties and pursuing claims in order to reclaim the clients' monies. Researching relevant legal provisions relating to the impact of English and Australian law on the clients' positions.
* Representing (as lead associate) a trustee in their application to the BVI Court for adjudication on the trust and its possible amendment, and related proceedings regarding the granting of probate.
* Acting for a shareholder/director in his claims against a BVI company and its liquidators for their conduct in the liquidation[30].
* Taking steps to enforce a BVI trust against a trustee who was attempting to extort a beneficiary.
* Issuing claims and urgent applications for injunctive relief on behalf of international investors in order to protect their commercial interests in the BVI[31].

English Law Experience

---

[23] *IS Investment Fund SPC v Fair Cheerful Limited BVIHC (COM) 34 of 2020*
[24] *In the Estate of Ricardo Brennand BVIHPB 182 of 2020*
[25] *Alperton Capital Ltd v Constellation Overseas Ltd & Ors BVIHC (COM) 98 of 2019*
[26] *In the matter of Mayer Corporation Development International Limited (in Liquidation) BVIHC (COM) 32 of 2017*
[27] *In the matters of Fairfield Sentry Limited (In Liquidation), Fairfield Sigma Limited (In Liquidation), And Fairfield Lambda Limited (In Liquidation) BVIHC (COM) 74, 136, and 139 of 2009*
[28] *In the matters of Mount Capital Fund Ltd. (In Liquidation) And Mount Capital Asset Subsidiary Limited (In Liquidation) BVIHC (COM) 285 and 328 of 2009*
[29] *Anguilla Claim No AXA/HCV 2016/0032*
[30] *Rainer Busch and Mercury Partners Gmbh v Russell Crumpler and Kris Beighton (as Joint Liquidators of Keystone Private Equity Investments Limited) BVIHCOM 2014/0030*
[31] *Storca et al v Norvalo et al BVIHCOM 2015/0096*

* Acted as lead associate in representing a high net worth individual on a family dispute relating to the administration of a BVI trust.[32].
* Worked as part of a cross-practice team for RBS in its defence of claims by various shareholder action groups for alleged misleading information provided in its Rights Issue Prospectus[33].
* Represented IKOS, a European Investment Management company, in a large scale and multi-jurisdictional dispute with one of its former employees and shareholders for misuse of confidential information and infringement of intellectual property rights[34].
* Acted as lead associate for an international publishing house on its claim in the High Court of England & Wales for fraudulent misrepresentation, breach of contract, and breach of warranty.
* Advised (as lead associate) a private wealth fund on its dispute with its shareholding company regarding ownership and possible breaches of its shareholders agreement.
* Represented RBS on the regulatory investigations into its near collapse in 2008. Regular liaison with external counsel and with the business stakeholders.
* Represented UBS on banking disputes arising out of transactions from the LIBOR fixing scandal.
* Assisted Jefferies International on claims relating to the moratorium imposed by the collapse of various Icelandic Banks[35]

Speaking engagements, Publications, Expert Evidence

* Member of an offshore insolvency panel at the Canadian Bar Association Annual Insolvency Conference, St Johns, Newfoundland (September 2017)
* Presentation (as part of a cross-border insolvency panel) on Cayman fair value petitions at the Chancery Bar Association's International Conference in Shanghai (May 2018)
* Member of a panel on 'Ethical Issues that Arise' at the C5 Fraud and Asset Tracing Conference in Miami (October 2019)
* Member of a panel on "Wealth Structuring for HNW – Protecting assets when marriages end" at the Private Client Forum Americas, Mayakoba, Mexico (February 2020)
* Member of a virtual panel on Transparency, Beneficial Ownership, and Issues for HNWs with the Private Client Global Elite (March 2021)
* Member of a virtual panel at Legal Week's Litigation Week on "Alternative Fee Arrangements" (April 2021)
* Member of a panel on "Negotiation Skills in International Disputes" at the World Litigation Forum, Dubai (January 2022)
* Leading a session on Access to documents in Private Client matters at the Trusts and Estates Litigation Forum (December 2022)
* Part of a Cross Border Fraud Panel at the American Bankruptcy Institute's Caribbean Symposium (February 2023)

---

[32] *Zorin Sachak Khan et al v Gany Holdings (PTC) SA & Asif Rangoonwala BVIHCMAP 2014/0018*
[33] *The RBS Rights Issue Litigation [2017] EWHC 1217 (CH)*
[34] *Coward v Phaestos & Ors [2013] EWHC 1292 (Ch)*
[35] *Jefferies International Ltd v Landsbanki Islands HF [2009] EWHC 894 (Comm), [2009] All ER (D) 222 (Apr)*

* Leading a session on Discovery in the context of cross-border trusts and estates matters at the Private Client Forum Americas (February 2023)
* Speaker on Managing and Gathering Evidence in Cross Border Litigation at COMBAR North American and Offshore Meeting in Boston (June 2023)
* Co-Author of Cayman Islands chapter for the GLI Litigation Guide 2019 – 2022
* Author of Cayman Guide for Global Law Experts – Litigation Practice Area Guide 2023
* Author of Lexology's Getting the Deal Through – Market Intelligence Dispute Resolution in the Cayman Islands 2023
* Expert evidence on Cayman Law on matters relating to Administration of a Cayman estate and appropriate forum in proceedings before US District Court for the Central District of California, Southern Division[36]
* Expert evidence on Cayman Law on matters relating to Administration of Cayman Estates and application of Attorney-Client privilege in proceedings before US Southern District Court of New York[37]
* Expert evidence on Cayman Law on matters relating to the buyback of shares and the maintenance of share capital before the High People's Court of Fujian Province, PRC[38]

---

[36] *Eleanor de Leon v Ayman Ismail Abudawood et al, 2018*
[37] *In re Application of Michael John Pearson as Administrator of Estate of Osama I Abudawood in the Cayman Islands for an order under 28 USC s.1782 for Discovery in aid of Foreign Judicial Proceeding. 2021*
[38] *Zhongyang Construction Group Co. Ltd v AP Energy Investments Ltd et al, 2022*

## Appendix 2: Legislation and Case Law

### Index of Authorities

Exhibit 1:     *Islena Airlines v Jefferson* [1998 CILR 148]

Exhibit 2:     Exempted Limited Partnerships Act, (2022 Revision)

Exhibit 3:     Cayman Islands Companies Act (2023 Revision)

Exhibit 4:     *Re Hydrodam (Corby) Ltd.* [1994] 2 BCLC 180

Exhibit 5:     *In The Matter Of Omni Securities Limited (No. 4).* [1999 CILR 126]

Exhibit 6:     *Hutchinson Limited v Cititrust & Ors* [1998 CILR 43]

Exhibit 7:     *Whar-Hansen v Bridge Trust Company Ltd & Ors* [1997 CILR 527]

Exhibit 8:     *Ritter v Butterfield Bank (Cayman) Ltd* [2018 (2) CILR 638]

Exhibit 9:     *BTI 2014 LLC v Sequana SA* [2022] UKSC 25

Exhibit 10:    *AHAB v SAAD Investments Company Limited et al* (unreported, CICA, 21 December 2021)

Exhibit 11:    *Westdeutsche Landesbank Girozentrale v Islington London Borough Council* [1996] AC 669

Exhibit 12:    *Ernst & Young & ors v FOI Officer & Kerry Tibbets and Persons Unknown*, G15 and G20 of 2015, unreported judgment dated 12 February 2015

Exhibit 13:    *Kuwait Ports Authority et al v Port Link GP Ltd et al* (unreported, CICA (Civ), Field, Birt, Beatson JJA, 20 January 2023)

Exhibit 14:    *Prudential Assur Co Ltd v Newman Indus Ltd (No. 2) [1981] Ch. 257* a

Exhibit 15:    *Marex Financial Ltd v Sevilleja* [2020] UKSC 31

Exhibit 16:    *Russell v. Wakefield Water Works Company (1875) LR 20 Eq 474*

Exhibit 17:    *MacDougall v Gardiner* [1875] 1 Ch. D 13

Exhibit 18:    *Tempo Group Ltd v Fortuna Development Corporation* (FSD 125 of 2012, unreported, 30 March 2015)

Exhibit 19:    *FamilyMart China Holding Co. Ltd v Yin-Hen Wei & Ors (*FSD 165 of 2019, unreported 9 September 2022)

Exhibit 20:    *Burland v Earle* [1902] AC 83;

Exhibit 21:    *Schultz v Reynolds & Newport Limited* (CICA) [1992-93 CILR 59]

Exhibit 22:    *Scott v Metropolitan Police Commissioner* [1974] UKHL 4

Exhibit 23:    *Merkanti Holdings PLC and 1128349 BC Ltd v Raiffeisen Bank Internation AG,* CICA Appeal 14 of 2021, unreported judgment 16 March 2022

Exhibit 24:    H1 of *Tolleys on Administration of Trusts*

Exhibit 25:    *Watson v Kea Investments* [2019] EWCA Civ 1759

Exhibit 26:    Cayman Trusts Act (2021 Revision)

Exhibit 27:    *Re China Milk Products* [2011 2 CILR 61]

Exhibit 28:    Cayman Grand Court Rules, Order 15, rule 12A