# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------- X

|  |  |
|---|---|
| U.S. BANK, NATIONAL ASSOCIATION, in its capacity as Trustee, JOSHUA N. TERRY, AND ACIS CAPITAL MANAGEMENT, L.P., <br><br> Plaintiffs, <br><br> -*v*- <br><br> THE CHARITABLE DONOR ADVISED FUND, L.P., CLO HOLDCO LTD., AND NEXPOINT STRATEGIC OPPORTUNITIES FUND, <br><br> Defendants | No. 1:21-cv-11059 GHW |

**REPLY DECLARATION OF JONATHON MILNE IN SUPPORT OF PLAINTIFFS' MOTION TO DISMISS DEFENDANTS' COUNTERCLAIMS AND FOR <u>JUDGMENT ON THE PLEADINGS</u>**

I, Jonathon Milne of Conyers, Dill & Pearman LLP ("Conyers") SIX, 2nd Floor Cricket Square, 171 Elgin Avenue, Cayman Islands, declare as follows:

EXHIBIT

11

## A. **Introduction**

1. I am a Partner with Conyers, an international law firm that advises on the laws of the Cayman Islands, Bermuda, and the British Virgin Islands. I am a practicing member of the Bar of the Cayman Islands. I am also qualified to practice in New Zealand and Ireland, and have Higher Rights of Audience in England & Wales.

2. Further to my Declaration dated 15 May 2023 ("**First Declaration**," Dkt. 109), I make this Reply Declaration in response to points made in a Declaration submitted by Bhavesh Narendra Patel and filed on 14 June 2023 (the "**Patel Declaration**," Dkt. 141).

3. I understand this Declaration will be submitted in connection with the Plaintiffs' Reply Memorandum of Law in Support of their Motion to Dismiss Defendants' Counterclaims and for Judgment on the Pleadings on Plaintiffs' Claims in the above-captioned proceeding.

4. I consider that I have the requisite qualifications and expertise to express my opinions on the matters that I have been asked to consider under Cayman Islands law.

5. True and correct copies of any authorities cited in this Declaration that were not previously cited in my First Declaration, the Patel Declaration, or the Declaration of Mazin A. Sbaiti ("**Sbaiti Declaration**," Dkt. 140) are attached as Appendix C, marked "Appendix of Foreign Authorities." Each such authority (i.e. rule, statute or judgment) is separated by numbered tab for each exhibit, shown as **[C/Exhibit reference]**. Authorities cited in this Declaration that were previously cited in my First Declaration, the Patel Declaration, or the Sbaiti Declaration, are identified by their corresponding declaration, exhibit number, and docket number.

6.  For the purposes of this Reply Declaration and for ease of reference, I have used the same headings used in the Patel Declaration and have followed the same order to respond to certain of the points that have been made. I adopt the same definitions as those used in my First Declaration, unless otherwise stated.

7.  In my Reply Declaration, I frequently refer to English authorities. As noted in my First Declaration, Cayman Islands law is based on English law and the Cayman Islands courts often follow English case law, including decisions of the U.K. Supreme Court, as persuasive authority.[1]

**B.   Cayman Island Trusts**

**B.1 – Express Trust**

8.  Mr. Patel opines that the Acis 6 Indenture dated 15 April 2015 (the "**Indenture**," Dkt. 78-1) creates a trust as a matter of Cayman Islands law.[2] I disagree. Rather, in my opinion, the Indenture does not create a trust under Cayman Islands law because, *inter alia*, the Indenture and the Acis 6 Portfolio Management Agreement (the "**PMA**," Dkt. 78-2) are indicators that the parties did not intend to create a fiduciary relationship.

9.  As an initial matter, I note that NexPoint and Mr. Patel appear to acknowledge that the question of whether the Indenture creates a trust is governed by New York law. NexPoint alleges that the Indenture creates a trust under New York law,[3] and Mr. Patel also accepts that: "*Because the indenture used New York law, the Cayman Islands courts would likewise deem that New York law governs the rights and obligations of the parties of the Trust.*"[4] Nonetheless, I will address whether the

---

[1] First Declaration ¶¶ 14, 16.
[2] Patel Declaration ¶¶ 11-15.
[3] NexPoint's Amended Answer & Counterclaim (Dkt. 78) ¶¶ 155-165.
[4] Patel Declaration ¶ 15.

Indenture creates a trust as a matter of Cayman Islands law in case that will assist the Court.

10. I agree, in principle, with the statement at paragraph 11(b) of the Patel Declaration that the "three certainties," namely certainty of intention, subject matter, and object, must be satisfied in order to constitute a valid express trust under Cayman Islands law.

11. I refer to the following summary of the "three certainties" for creation of an express trust in *Snell's Equity*, which is a leading English treatise on trust law:

> "*A private express trust arises through the settlor's declaration of an intention to enter into a transaction that would, by the standards of the general law, be recognised as creating a trust. If the trust is to operate, its essential elements must be defined clearly enough to enable the trustee, or the court in default, to execute the trustee's duties.*
>
> *There are therefore three main ways in which an express trust must be sufficiently certain:*
>
> > *(i) the settlor must intend to impose legally enforceable duties of trusteeship on the owner of the property;*
> > *(ii) the subject-matter of the trust must be certain; and*
> > *(iii) the objects or persons intended to have the benefit of the trust must be certain.*"[5]

---

[5] John McGhee, KC & Steven Elliot, KC, *Snell's Equity* , 34th ed. (2022) [*Snell's Equity*] § 22-012 **[C/1]**; Lynton Tucker, Nicholas LePoidevin, KC & James Brightwell, *Lewin on Trusts*, 20th ed. (2020) [*Lewin on Trusts*] § 5-003 **[C/2]**; *Knight v Knight* (1840) 49 E.R. 58 at 173 **[C/3]** which is cited to as a foundational case by Snell's Equity § 22-012, *Lewin on Trusts* § 5-003 and various cases such as, for example, *Hunter v Moss* [1994] 1 W.L.R. 452, 457 **[C/4]**: "*It is well established that for the creation of a trust there must be the three certainties referred to by Lord Langdale in his judgment in Knight v Knight*".

12.     For certainty of intention to be satisfied, the settlor must have intended to impose fiduciary duties on the trustee to whom legal ownership of the property is transferred.  That is because, under English and Cayman Islands law, a trust is a fiduciary relationship.[6]

13.     This rule is reflected in *Snell's Equity*, which states that, for certainty of intention to be satisfied, the settlor must have "*intended to create ... trust duties as distinct from some [other] kind of legal relationship, such as a simple relationship of debtor and creditor.*"[7]

14.     *Lewin on Trusts*, another leading English treatise on trust law, states that:

> "*The difficulty in ... cases [involving trusts allegedly arising from contracts] lies in deciding whether there is sufficient certainty of words—whether the words used, viewed in the light of the circumstances, reveal an intention to create a trust.  The courts will not be astute to discover such an intention.*"[8]

15.     Further, English courts and, following them, Cayman Islands courts will usually be reticent to impose express trusts in the context of commercial relationships and transactions between sophisticated parties.  By way of example, *Lewin on Trusts* states that:

> "*As a general rule, a mere contract between A and B that B shall pay a certain sum to C (who is not a party directly or indirectly) will not make C a beneficiary.*"[9]

---

[6] See, for example, *Grand View Private Trust Co Ltd v Wen-Young Wong* [2022] UKPC 47 ¶ 27 **[C/5];** *In re Ta-Ming Wang Trust* [2010] (1) CILR 541, 550 **[C/6].**
[7] *Snell's Equity* § 22-013 **[C/1].**
[8] *Lewin on Trusts* § 5-014 **[C/2];** *Gorbunova v Estate of Berezovsky* [2016] EWHC 1829 (Ch) ¶¶ 55, 60–61 **[C/7].**
[9] *Lewin on Trusts* § 5-016 **[C/2];** *Re Empress Engineering Co.* (1880) 16 Ch.D. 125, 129 **[C/8].**

16.     Further, *Snell's Equity* states that:

> *"It has been said that there is a 'general disinclination of the courts to see the intricacies and doctrines connected with trusts introduced into everyday commercial transactions'. The imposition of a trust, without strong evidence of an intention to declare one, would upset the usual proportionate distribution of assets in insolvency. So a simple advance payment of money for a particular purpose is generally not enough to indicate that the recipient was intended to hold on trust for the payer."*[10]

17.     In *Westdeutsche Bank v Islington LBC*, the English House of Lords, which was the predecessor to the U.K. Supreme Court, "*warned against the wholesale importation into commercial law of equitable principles*" as "*inconsistent with the certainty and speed which are essential requirements for the orderly conduct of business affairs*" and contrary to "*commercial common sense.*"[11]

18.     Having reviewed the Indenture and the PMA, there is nothing which I have seen in those materials which would satisfy, *inter alia,* the certainty of intention requirement. I reach this conclusion for the following two reasons.

19.     *First*, the Court has already held that U.S. Bank (i.e. the Trustee) does not owe fiduciary duties under the Indenture to Acis 6 investors like NexPoint absent the continuance of an Event of Default (as defined therein) and dismissed NexPoint's breach of fiduciary duty claim against the Trustee.[12] NexPoint has admitted there have been no Events of Default.[13] Accordingly, because the Trustee does not owe fiduciary duties, the parties to the Indenture could not have intended to create a trust. For the same reason, even if the Trustee delegated certain of its duties to ACM as alleged co-trustee, ACM would also not owe fiduciary duties to NexPoint.

---

[10] *Snell's Equity* § 22-015 **[C/1]** (quoting *Neste Oy v Lloyds Banks Plc* [1983] 2 Lloyds Rep. 658, 665 **[C/9]**).
[11] *Westdeutsche Bank v Islington LBC* [1996] A.C. 669 at 704-05 **[Patel Declaration Exhibit 11, Dkt. 141-11]**.
[12] *NexPoint Diversified Real Estate Trust v. Acis Cap. Mgmt.*, 620 F. Supp. 3d 36, 47-49 (S.D.N.Y. 2022).
[13] Dkt. 78 ¶ 247.

20.    *Second*, the PMA confirms that Acis 6 and ACM did not intend to create a trust relationship between ACM and Acis 6 investors like NexPoint.  The PMA provides that NexPoint and other noteholders are not parties to or third-party beneficiaries under its terms: *"[N]o ... Holder of Notes is a third party beneficiary of this Agreement."*[14]  It further provides that ACM's duties are solely contractual and that ACM shall not be subject to any implied obligations.[15]

21.    NexPoint and Mr. Patel appear to treat ACM as a trustee notwithstanding these contractual disclaimers of any fiduciary or other obligations owed by ACM to NexPoint.  But that would run contrary to the guidance of Mr. Justice Briggs in *Re Lehman Brothers International (Europe)*, a recent English decision, that:

> *"A relationship which absolves A from one or more of the basic duties of trusteeship towards B is... a pointer towards a conclusion that it is not [a trustee/beneficiary relationship]... [T]he greater the extent to which those [basic trustee] duties are disapplied, the harder it will be for the court to conclude, taking all relevant matters into account, that the parties objectively intended to create such a [trust] relationship between them."*[16]

22.    It would also run contrary to the House of Lords' caution in *Westdeutsche Bank* against *"import[ing] ... equitable principles"* into commercial transactions that undermine the *"certainty ... require[d] for the orderly conduct of business affairs."*[17]

23.    Similarly, in *Re Lehman Brothers International (Europe)*, Mr Justice Briggs warned that *"Special care is needed in a business or commercial context... The law should*

---

[14] PMA section 31.
[15] PMA section 3(c): *"The Portfolio Manager shall have no obligation to perform any duties other than as expressly specified [in the PMA], or in the provisions of the Indenture applicable to the Portfolio Manager, and the Portfolio Manager shall be subject to no implicit obligations of any kind."*
[16] *Re Lehman Brothers International (Europe)* [2010] EWHC 2914 (Ch ) ¶¶ 225(viii), 260 **[C/10]**.
[17] *Westdeutsche Bank v Islington LBC* [1996] A.C. 669 at 704 **[Patel Declaration Exhibit 11, Dkt. 141-11]**.

*not unthinkingly impose a trust where purely personal rights between A and B sufficiently achieve their commercial objective.*"[18]

24.     Mr. Patel opines that the Indenture nonetheless creates a trust because certain clauses make reference to "*the trusts*" or that certain assets should be held "*in Trust.*"[19] I disagree that there is sufficient certainty of intention to constitute a trust as a matter of Cayman Islands law in the circumstances, upon an objective analysis of the relevant documents.

25.     The starting point is that the onus of proving the intention to create a trust under common law is on the person asserting it.[20] Under English and Cayman Islands law, such trust labels do not create a trust if the substance of the instrument shows that it was not intended to create a trust relationship.

26.     This general rule is reflected in *Snell's Equity*, which states that "*it is not enough [to satisfy the certainty of intention requirement] that the settlor describes the transaction as a trust if on its proper construction the transaction was not intended to operate as a trust.*"[21]

27.     In *Re Lehman Brothers International (Europe)*, Mr Justice Briggs provided the following guidance which is of particular relevance:

>  "[T]he question whether B has a proprietary interest in the property acquired by A for B's account depends upon their mutual intention, to be ascertained by an objective assessment of the terms of the agreement or relationship between A and B with reference to that property.
>
>  The words used by the parties such as "trust", "custody", "belonging", "ownership", "title"... **are not conclusive in favour of the recognition of**

---

[18] *Re Lehman Brothers International (Europe)* [2010] EWHC 2914 (Ch ) ¶ 225(ix) **[C/10]**.
[19] Patel Declaration ¶¶ 12-13.
[20] *Thandi v Sands* [2014] EWHC 2378 (Ch) ¶ 66 **[C/11]**.
[21] *Snell's Equity* § 22-013 **[C/1]**.

8

> ***B's proprietary interest in the property, if the terms of the agreement or relationship, viewed objectively, compel a different conclusion.***
>
> ...
>
> *[The aforementioned principles] ... serve as a warning against giving excessive weight to the labels used by the parties to describe their relationship, or even to the labels chosen to describe their supposed interests in the relevant property.*"[22]

28. As explained above, the Indenture was not intended to operate as a trust because, as the Court has ruled, it does not impose pre-Event of Default fiduciary duties on the Trustee, and the PMA disclaims any obligations owed by ACM to Acis 6 investors like NexPoint.

29. In summary, if Cayman Islands law governed whether the Indenture created a trust (which the parties appear to agree it does not), it seems very unlikely to me that a Cayman Islands court would find that an express trust had been created. Rather, a Cayman Islands court would likely find that, because the parties to the Indenture and PMA did not intend to impose fiduciary duties on the Trustee and ACM, that the parties instead intended to create a typical debtor-creditor relationship or other commercial agreement.

**B.2 – Implied Trust**

30. Mr. Patel further opines that the Indenture may have created an "*implied trust.*"[23] I disagree. As Mr. Patel acknowledges,[24] an implied trust must still satisfy the three certainties. As set out above, the Indenture does not satisfy the certainty of intention requirement and, accordingly, no implied trust arises.

---

[22] *Re Lehman Brothers International (Europe)* [2010] EWHC 2914 (Ch ) ¶¶ 225(v), 225(vi), and 249 **[C/10]**.
[23] Patel Declaration ¶¶ 23, 26.
[24] Patel Declaration ¶ 23.

9

### B.3 – Constructive Trust

31. Mr. Patel additionally opines that "*constructive trusts… are what is known as remedial trusts*" and that ACM would have been a "*constructive trustee over the Issuer's assets*".[25] Mr. Patel appears to suggest that, if a third party assists in a breach of trust and does so dishonestly, that might give rise to a dishonest assistance claim and a constructive trust.

32. *First*, in short, in order for there to be a dishonest assistance claim, a necessary requirement is a pre-existing trust or fiduciary relationship and for the third party to whom the property is transferred to be dishonest.[26] As noted above, the Trustee has already been found not to owe fiduciary duties at this point in time. Accordingly, as a matter of Cayman Islands law, such a claim would fail at the first hurdle, given that there is no pre-existing trust or fiduciary relationship.

33. *Second*, Mr. Patel only cites one authority in support of NexPoint's constructive trust theory.[27] The support which Mr. Patel draws from the decision in *Ritter v Butterfield Bank* is unclear to me as that decision does not contain the words '*constructive trust*'. That ruling was concerned with whether an adverse costs order made on the indemnity basis (which is usually reserved for cases where a party has acted unreasonably) should be made to reprimand a party for making speculative and weak dishonest assistance claims on the basis of defective pleadings and a lack of evidence. The *Ritter v Butterfield Bank* decision demonstrates that the Cayman Islands courts will not tolerate parties bringing spurious claims which are not properly pleaded or evidenced, and are prepared to make exceptional costs orders as a mark of disapproval.

---

[25] Patel Declaration ¶¶ 24, 26.
[26] See, for example, *AHAB v Saad Investments Company Limited*, CICA Civil Appeal No. 15 of 2018, ¶ 962 (Cayman Islands Ct. App. 2021) **[Patel Declaration Exhibit 11, Dkt. 141-10]**.
[27] Patel Declaration ¶ 25; see *Ritter v Butterfield Bank* [2018 (2) CILR 638] **[Patel Declaration Exhibit 11, Dkt. 141-8]**

34.     *Third,* in any event, it is wrong as a matter of law to suggest that English and
        Cayman Islands law would recognize that "*constructive trusts… are what is known
        as remedial trusts*".  I understand that the concept of a "remedial constructive trust"
        is used as a discretionary judicial remedy in other jurisdictions (such as the United
        States) and is applied retrospectively to give rise to an enforceable equitable
        obligation.

35.     As a matter of general principle[28], Cayman Islands law does not recognise the
        concept of "remedial constructive trusts" and instead focuses on "institutional
        constructive trusts" which must fall into pre-established categories (and the Court
        does not have discretion to impose remedial constructive trusts).

36.     In *Baily v Angove's Pty Ltd* Lord Sumption re-iterated earlier sentiments from
        *Westdeutsche Landesbank Girozentrale v Islington LBC* that:

> "*English law is generally averse to the discretionary adjustment of property
> rights, and has not recognised the remedial constructive trust favoured in
> some other jurisdictions, notably the United States and Canada.  It has
> recognised only the institutional constructive trust: Westdeutsche
> Landesbank Girozentrale v Islington London Borough Council [1996] AC
> 669 , 714–715 (Lord Browne-Wilkinson)… [In that case it] was explained
> by Lord Browne-Wilkinson in the following terms:*
>
>> "*Under an institutional constructive trust, the trust arises by
>> operation of law as from the date of the circumstances which give
>> rise to it: the function of the court is merely to declare that such trust
>> has arisen in the past.  The consequences that flow from such trust
>> having arisen (including the possibly unfair consequences to third
>> parties who in the interim have received the trust property) are also*

---

[28] In citing authorities from other common law jurisdictions, former Chief Justice Smellie held that: "*… the creation
of remedial constructive trusts were not based on established legal principles*" but may be "*arguable*" as a potential
remedy for victims of fraud (see *Grupo Torras S.A. v. Bank of Butterfield Intl. (Cayman) Ltd.*, 2000 CILR 452, 454
(Cayman Islands Grand Ct.) **[C/12]**)

> *determined by rules of law, not under a discretion. A remedial constructive trust, as I understand it, is different. It is a judicial remedy giving rise to an enforceable equitable obligation: the extent to which it operates retrospectively to the prejudice of third parties lies in the discretion of the court.*"[29]

37.     Accordingly, in light of the above, there is not a proper basis to assert that a remedial constructive trust arises in the circumstances as a matter of Cayman Islands law. Mr. Patel does not cite any relevant authority to support that theory.

## C.     Shadow / De Facto Directors

38.     Mr. Patel opines that "*the Cayman Courts would be likely to determine that ACM was operating either as a de facto or shadow director of [Acis 6]*" and that "*ACM would have imposed upon it corresponding fiduciary duties owed directly to NexPoint as a beneficiary.*"[30] I disagree.

39.     Based on the available facts and the pleadings, I opine that it is unlikely that ACM would be characterized by the Cayman Courts as a *de facto* director or shadow director as a matter of Cayman Islands law. Further, even if ACM was characterized as a *de facto* director or shadow director, it still would not owe direct fiduciary duties to NexPoint.

40.     It is unusual in my experience, and also somewhat contradictory, to assert that a party may be both a shadow director and *de facto* director. They are different concepts. A *de facto* director usually holds himself out as a director, whereas a shadow director does not claim or purport to act as a director.

---

[29] *Bailey v Angove's Pty Ltd* [2016] UKSC 47 [2016] UKSC 47 ¶ 27**[C/13]** (emphasis added); *Westdeutsche Bank v Islington LBC* [1996] A.C. 669, *714–715* **[Patel Declaration Exhibit 11, Dkt. 141-11]**.
[30] Patel Declaration ¶¶ 26-27.

41.  In a directors' duties case, the party alleging that a person is a *de facto* director or shadow director ordinarily has the burden to demonstrate this.[31]  It is typical, in claims alleging breaches by a *de facto* or shadow director, that there is very detailed evidence of control over the named directors and an established pattern of instructions to the named directors.[32]

42.  *First*, it is unlikely that Cayman Islands courts would characterize ACM as a *de facto* director of Acis 6 because I have not read in NexPoint's counterclaims any allegations capable of meeting NexPoint's burden to show that ACM held that status.

43.  I agree with Mr. Patel that, as a matter of Cayman Islands law, a *de facto* director is "*someone who has assumed responsibilities to act as a director*" and "*hold[s] themselves out as a director*," although never actually appointed as such.[33]  In many *de facto* director cases, the relevant person was held out by the company as a director and used the title of director.[34]

44.  In *Re Hydrodan (Corby) Ltd*, the case Mr. Patel cites for the definition of a *de facto* director, the court made clear that a party seeking to prove that a person has *de facto* director status must prove that the relevant person undertook functions in relation to the company which could properly be discharged <u>only</u> by a director.[35]  Importantly, as Mr. Patel accepts, *Hydrodan* held that it is <u>not sufficient</u> to show that the person was involved in the management of the company's affairs or undertook tasks in relation to its business which could properly be performed by a manager below board level.[36]

---

[31] See, for example, *ACL Netherlands BV v Lynch* [2022] EWHC 1178 (Ch) ¶ 581 **[C/14]**.
[32] See, for example, *Weavering Macro Fixed Income Fund Limited (in liquidation)* [2015] (2) CILR 278 **[C/15]**. Paragraphs 61 and 62 state that: "*Having carefully considered such evidence as a whole, and made due allowance for some discrepancies and those parts that are hearsay, I find that nevertheless the overwhelming weight of it is to the effect that Magnus Peterson directly, and through his company, WCUK, managed and controlled the company for all purposes relevant to these proceedings ... [and] was indeed the company's controlling mind ...*"
[33] Patel Declaration ¶ 22.
[34] *Revenue and Customs Commissioners v Holland* [2010] UKSC 51 ¶¶ 92, 108 **[C/16]**.
[35] *Re Hydrodan (Corby) Ltd*, [1994] BCC 161, 163D **[Patel Declaration Exhibit 4, Dkt. 141-4]**.
[36] *Re Hydrodan (Corby) Ltd*, [1994] BCC 161, 163D **[Patel Declaration Exhibit 4, Dkt. 141-4]**.

13

45.  It is unlikely that a Cayman Islands court would characterize ACM as a *de facto* director because I have not read any statements in NexPoint's counterclaims that allege, as Cayman Islands law requires, that ACM was held out by Acis 6 as a director of Acis 6 or that ACM held itself out as a director of Acis 6.

46.  Rather, my understanding is that ACM, as Portfolio Manager, was engaged in a professional capacity by Acis 6 to perform certain administrative and advisory functions pursuant to the PMA. ACM's performance of these business tasks pursuant to its service provider contract with Acis 6 is not sufficient under Cayman Islands law to make it a *de facto* director. The Cayman Islands courts tend to prioritize and respect freedom of contract between sophisticated commercial parties,[37] which means they are often reluctant to imply terms or read in different obligations.

47.  *Second*, it is also unlikely that Cayman Islands courts would characterize ACM as a shadow director of Acis 6 because I have not read in NexPoint's counterclaims any allegations capable of meeting NexPoint's burden to show that ACM held that status.

48.  Mr. Patel quotes part of the definition of "Shadow Director" found in Section 89 of the Cayman Islands Companies Act to define a shadow director as "*any person in accordance with whose directions or instructions the directors of the company are accustomed to act.*"[38]

49.  I do not agree with Mr. Patel's definition because his declaration omits the complete definition from Section 89 of the Cayman Islands Companies Act, which reads as follows:

---

[37] See, for example, *Pearson v Primeo Fund* [2017] UKPC 19 ¶¶ 15-16 **[C/17]**.
[38] Patel Declaration ¶ 19.

> *"shadow director" means any person in accordance with whose directions or instructions the directors of the company are accustomed to act, <u>but the person is not deemed to be a shadow director by reason only that the directors act on advice given by that person in a professional capacity"*.[39]

50. In my opinion, the underlined text, which is missing from the Patel Declaration, is an important qualification. It establishes that, under the Cayman Islands Companies Act, professional advisers that perform their roles and functions pursuant to services agreements do not, without more, assume fiduciary obligations to the relevant company by acquiring the status of shadow director.

51. Consistent with the Cayman Islands Companies Act, the English Court of Appeal has confirmed that professional advisors are not shadow directors. In *Secretary of State for Trade and Industry v Deverell,* the Court of Appeal stated that the purpose of the definition of shadow director in the English Company Directors Disqualification Act 1986, which largely tracks the Cayman Islands Companies Act, is to *"identify those, <u>other than professional advisers,</u> with real influence in the corporate affairs of the company"* (emphasis added).[40]

52. It is unlikely that Cayman Islands courts would characterize ACM as a shadow director because I have not read any statements in NexPoint's counterclaims that allege, as Cayman Islands law requires, that: (i) ACM directed or instructed the *de jure* directors of Acis 6 how to act, or (ii) the *de jure* directors of Acis 6 became accustomed to act on instructions from ACM. Rather, my understanding is that ACM, as Portfolio Manager, was engaged in a professional capacity by Acis 6 to perform certain administrative and advisory functions. Under the Cayman Islands Companies Act and at common law, ACM's performance of those professional functions for Acis 6 are insufficient to make it a shadow director.

---

[39] See Section 89 of the Companies Act [**C/18**].
[40] *Secretary of State for Trade and Industry v Deverell*, [2001] Ch 340 ¶ 35 (Eng. Ct. App.) [**C/19**].

53.   *Third*, as explained in my First Declaration,[41] even if ACM were somehow to owe fiduciary duties as a shadow or *de facto* director of Acis 6, it would owe those duties to Acis 6 itself, and not directly to individual stakeholders such as NexPoint.   I reach this conclusion because two recent Cayman Islands authorities confirm that directors owe their duties to the company, not to its shareholders.   Thus, even if NexPoint's unsecured creditor interest in Acis 6 could somehow be characterized as an equity interest, ACM would still not owe direct duties to NexPoint.

54.   For example, in the judgment of the Cayman Islands Court of Appeal in *China Shanshui Cement Group Limited v Tianrui (International) Holding Company Limited*, it was held that:

> "*[I]t is trite law that directors owe their fiduciary duties not to the shareholders but to the company which appoints them, which means that a plaintiff shareholder is not the beneficiary of the fiduciary duty owed by directors* not to exercise the powers vested in them for an improper purpose *and therefore cannot sue to enforce that duty…*"[42]   (emphasis added)

55.   Likewise, in *Gao v China Biologic Products Holdings Inc*, the Cayman Islands Court of Appeal commented that:

> "*30.  … Directors are only answerable to the company for intra vires breaches of fiduciary duty because they are agents of the company appointed on the explicit basis that they owe duties of loyalty to the company. Shareholders ordinarily acquire their shares on the explicit basis that their only means of controlling the management of the company is by way of successfully passing resolutions in general meetings.  It would be inconsistent with what is essentially a functional rule, and potentially*

---

[41] First Declaration ¶ 51.
[42] *China Shanshui Cement Group Limited v Tianrui (International) Holding Company Limited*, CICA (Civil) Appeal 1 of 2021, ¶ 23 (Cayman Islands Ct. App. 2022) (emphasis added) **[C/20]**.

> *expose companies to limitless litigation, if individual shareholders were*
> *permitted to enforce duties which are not owed to them.*"[43] (emphasis
> added)

**D.** **Creditor v Shareholder**

56.  Mr. Patel asserts, at paragraphs 28 to 36 of the Patel Declaration, that the Cayman
Islands court would recharacterize NexPoint's debt interest in Acis 6 as an equity
interest for the purposes of derivative standing.[44] I disagree.

57.  Rather, the U.K. Supreme Court's decision in *BTI 2014 LLC v Sequana SA* [2022]
UKSC 25 (Patel Declaration Exhibit 9, Dkt. 141-9) establishes that creditors are not
akin to shareholders and cannot sue derivatively, even for breaches of directors'
duties to consider their interests in the context of insolvency.

58.  As I explained in my First Declaration, (1) creditors of a Cayman Islands company
do not have standing, in their capacity as creditors, to bring derivative actions on
that company's behalf under Cayman Islands law; and (2) Cayman Islands law does
not recharacterize a creditor's debt interest as a shareholder's equity interest for the
purposes of derivative standing.[45]

59.  I agree with Mr. Patel that, as a matter of Cayman Islands law, creditors may
contract with the company to subordinate their debt.[46] I also agree with Mr. Patel
that NexPoint is an unsecured creditor.[47]

---

[43] *Gao v China Biologic Products Holdings Inc* [2018] (2) CILR 591 ¶30 **[C/21]**.
[44] Patel Declaration ¶¶ 28-36.
[45] First Declaration ¶¶ 32-46.
[46] Patel Declaration ¶ 31.
[47] Patel Declaration ¶ 31.

60.     However, I do not agree with Mr. Patel's assertion at paragraphs 32 to 36 of the
Patel Declaration that there is a "*logical argument*" that an unsecured creditor, such
as NexPoint, may sue directly or derivatively for breach of fiduciary duty in light
of the reasoning in *BTI 2014 LLC v Sequana SA*.[48]  I further disagree with Mr.
Patel's assertion, at paragraph 33 of the Patel Declaration, that "*this point has not
yet been tested*" under English or Cayman Islands law.[49]  Rather, *Sequana*
undermines Mr. Patel's assertion in at least two ways.

61.     As I noted in my First Declaration, *Sequana* held that directors may owe a duty to
act in the best interests of all creditors if it becomes clear that insolvency is probable
or imminent.[50]  This duty is sometimes referred to as the Rule in *West Mercia*, which
is derived from the English decision *West Mercia Safetywear Ltd (in liq) v Dodd*.[51]

62.     *First*, in *Sequana*, Lady Ardern[52] rejected the proposition that creditors may sue
directors directly or derivatively to enforce the Rule in *West Mercia*.  In *Sequana*,
Lady Ardern states, categorically, that:

> "**The Rule in West Mercia does not entitle creditors, either directly or
> derivatively through the company, to sue the directors if they do not
> comply with it.**  In fact, the creditors can neither sue for a breach of it nor
> recover any losses that ensue for breach.*"[53]

Rather, as Lady Ardern observed, the duty may be enforced by shareholders suing
derivatively prior to liquidation or, following liquidation, by the liquidator.[54]

---

[48] Patel Declaration ¶¶ 32-36.
[49] Patel Declaration ¶ 33.
[50] First Declaration ¶ 51 n.17.
[51] [1988] BCLC 250 [**C/22**].
[52] The *Sequana* decision was unanimous across the five-member panel of the U.K. Supreme Court.  Lord Briggs
gave the majority judgment, with which Lord Kitchin agreed.  Lord Hodge gave a concurring judgment.  Lord Reed
and Lady Arden each gave judgments which concur in the result for reasons that are broadly similar to those of the
majority, but with some differences.
[53] *BTI 2014 LLC v Sequana SA* [2022] UKSC 25 ¶ 267 [**Patel Declaration Exhibit 9, Dkt. 141-9**].
[54] *BTI 2014 LLC v Sequana SA* [2022] UKSC 25 ¶¶ 267, 270 [**Patel Declaration Exhibit 9, Dkt. 141-9**].

63.    *Sequana* is thus consistent with the earlier U.K. Supreme Court decision in *Marex Financial Ltd. v. Sevilleja*, which, as I explained in my First Declaration, stated that a creditor does not have the right to bring a derivative claim to enforce the company's rights.[55]    The Privy Council subsequently confirmed in *Primeo Fund v Bank of Bermuda (Cayman) Ltd* that Cayman Islands law on this point is the same as *Marex*.[56]    Likewise, the Cayman Islands Grand Court Rules confirm that only shareholders, not creditors, may sue derivatively.[57]

64.    As explained in my First Declaration, even beneficial owners of shares do not have derivative standing.    For example, in dealing with a case involving the "fraud on the minority" exception brought by an alleged beneficial owner of shares, the Cayman Islands Court of Appeal commented that it would be "*illogical*" to permit a beneficial owner of shares to sue derivatively because it "*is not within the defined category of shareholder.*"[58]

65.    *Second*, *Sequana* rejected the notion that creditors, like shareholders, enjoy a proprietary or quasi-proprietary interest in the company's assets.    As Lady Arden reasoned:

> "*a duty in relation to creditors based on the notion that a creditor has a proprietary interest in the company's assets is **unsound in law**.  The correct position is that on winding up the company will no longer be entitled to its assets beneficially (see Ayerst v C & K Construction Ltd [1976] AC 167, 177-180).  But **creditors do not acquire any beneficial interest in the assets** when the company is wound up, only the right to see that the assets are duly*

---

[55] First Declaration ¶¶ 36-38; *Marex Financial Ltd. v. Sevilleja*, [2020] UKSC 31 ¶ 83 [**First Declaration Exhibit 3, Dkt. 109-3**]).

[56] First Declaration ¶ 39; *Primeo Fund v Bank of Bermuda (Cayman) Ltd* [2021] UKPC 22 ¶ 2 [**First Declaration Exhibit 4, Dkt. 109-4**]).

[57] First Declaration ¶ 40; Cayman Islands Grand Court Rules, Order 15, Rule 12A [**First Declaration Exhibit 6, Dkt. 109-6**].

[58] *Svanstrom v Jonasson* [1997] CILR 192, 207 [**C/23**].

> administered and distributed: In re Calgary and Edmonton Land Ltd [1975] 1 WLR 355. "[59]

66.     Lady Ardern further stated that the notion that creditors, like shareholders, enjoy a proprietary or quasi-proprietary interest in the company's assets:

> *"while superficially attractive, is **fundamentally flawed** ... it is **impossible** to draw the analogies suggested: they are **wrong** when winding-up has commenced; they are **inappropriate** beforehand, even in a situation of marginal insolvency."*[60]

67.     I thus do not agree that a contractually subordinated unsecured creditor, such as NexPoint, *"sits in a position akin to a shareholder"*[61] and that it may assume the right of a shareholder in a company to sue derivatively by virtue of that subordinated status. Any such suggestion would be inconsistent with the U.K. Supreme Court's decisions in *Sequana* and *Marex*, the Privy Council's decision in *Primeo*, and the Cayman Islands Grand Court Rules.

68.     Mr. Patel also makes general statements that it would be inequitable not to grant NexPoint creditor derivative standing[62]. As explained above and in my First Declaration, the rights of registered shareholders to bring derivative actions in the Cayman Islands are based on well-established legal principles, statute law, and court rules.

---

[59] *BTI 2014 LLC v Sequana SA* [2022] UKSC 25 ¶ 346 **[Patel Declaration Exhibit 9, Dkt. 141-9]**.
[60] *BTI 2014 LLC v Sequana SA* [2022] UKSC 25 ¶ 347 **[Patel Declaration Exhibit 9, Dkt. 141-9]** (quoting S. Worthington, "Directors Duties, Creditors' Rights and Shareholder Intervention" (1991) 18 MULR 121) **[C/24]**.
[61] Patel Declaration ¶ 34.
[62] See, for example, Patel Declaration ¶ 36.

69.     It is well-settled that the more professionally and carefully drafted governing documents are, the less likely that equitable considerations exist, on the basis that the parties intended solely to rely on their strict legal rights.[63]

70.     The English and Cayman courts will not, as a matter of course, alter the commercial bargain agreed between the parties by imposing equitable constraints or implying additional terms into the contract unless, for example, it is necessary to give business efficacy to the contract or is so obvious that it goes without saying.[64]

71.     Relatedly, as a further indication of the reluctance of the Cayman Islands courts to interfere in commercial dealings, the general position under English and Cayman Islands law is that there is no implied covenant of good faith and fair dealing in commercial contracts (i.e. unlike the position in the United States, as I understand it).[65]

72.     Accordingly, although I agree with Mr. Patel that the maxim 'equity will not suffer a wrong to be without a remedy' does exist and is applied in appropriate circumstances, it is not used to undermine or circumvent established rules of law, including the rule that only registered shareholders, and not creditors, may sue derivatively. In the words of Lord Walker, equitable principles are *"not a sort of joker or wild card to be used whenever the Court disapproves of the conduct of a litigant who seems to have the law on his side."*[66]

73.     I reiterate that, in my opinion, NexPoint does not have creditor derivative standing as a matter of Cayman Islands law.

---

[63] See, for example, *Re Coroin Ltd* [2012] EWHC 2343 (Ch) ¶¶ 635-36 **[C/25]**.
[64] See, for example, *Monsolar IQ Ltd v Woden Park Ltd* [2021] EWCA Civ 961 ¶¶ 25, 27 & 29-30 **[C/26]**; *Chartbrook Ltd v Persimmon Homes* [2009] UKHL 38 ¶ 14 **[C/27]**.
[65] See, for example, *UTB LLC v Sheffield United Ltd & others* [2019] EWHC 2322 (Ch) ¶¶ 212-13 **[C/28]**.
[66] *Cobbe v Yeoman's Row Management Ltd* [2008] UKHL 55 ¶ 46 **[C/29]**.

## E.     Cayman Islands derivative actions

74.     Mr. Patel also opines that NexPoint satisfies the personal rights exception and/or the fraud on the minority exception to Cayman Islands law's prohibition on shareholder derivative actions.[67]  I disagree with Mr. Patel's conclusion and discussion of these exceptions for the following reasons.

75.     *First*, as Mr. Patel acknowledges, the reflective loss rule is the "general princip[le]" of English and Cayman Islands law governing shareholder derivative actions.[68] Pursuant to that rule, as I explained in my First Declaration, registered shareholders must sue derivatively where their losses are a reflection of a company's loss, even if the defendant breached a duty to the shareholder as well as the company.[69]

76.     In *Marex*, the majority confirmed that, in cases where claims are brought by a shareholder in respect of loss which he has suffered in that capacity, "*the shareholder cannot bring proceedings in respect of the company's loss, since he has no legal or equitable interest in the company's assets … It is only the company that has a cause of action in respect of its loss.*"[70]

77.     Although Mr. Patel opines that NexPoint may be treated as an equity holder, Mr. Patel does not appear to comment on or engage with the reflective loss principle in relation to any of the purported allegations or claims for damages.  He does not, for example, explain how he considers that NexPoint has suffered separate and distinct losses as a matter of Cayman Islands law.

---

[67] Patel Declaration ¶¶ 37-46.
[68] Patel Declaration ¶ 39.
[69] *Primeo Fund v Bank of Bermuda (Cayman) Ltd* [2021] UKPC 22 ¶ 47 **[First Declaration Exhibit 4, Dkt. 109-4]**; First Declaration ¶¶ 47-57.
[70] *Marex Financial Ltd. v. Sevilleja*, [2020] UKSC 31 ¶ 80 **[First Declaration Exhibit 3, Dkt. 109-3].**

78.     *Second*, I disagree with Mr. Patel's conclusion in his brief discussion of the personal rights exception that the Cayman Court "*would be likely to find that NexPoint would have satisfied the personal rights exception.*"[71]  Although I agree that the personal rights exception exists (as set out in my First Declaration),[72] I do not consider that, as a matter of Cayman Islands law, NexPoint has properly pleaded or explained how the exception is invoked on the facts of this case.

79.     As I explained in my First Declaration, for the exception to apply, a plaintiff must allege a breach of duty owed uniquely to them (rather than a duty to the company generally).[73]

80.     It is not clear to me what precise personal right, statutory or otherwise, NexPoint relies upon.  It is also not clear to me what precise personal right Mr. Patel relies upon to give the opinion that the Cayman Islands courts "*would be likely to find that NexPoint would have satisfied the personal rights exception …*"[74]

81.     In NexPoint's Response filed on 14 June 2023, at page 29, NexPoint appears to rely on paragraph 40 of the Patel Declaration in support of the proposition that Cayman Islands law would recognise an exception arising by virtue of personal rights derived from statute and cites an overruled first instance decision in support.[75]  But paragraph 40 of the Patel Declaration simply states that there may be an exception to the proper plaintiff rule where the act complained of amounts to an infringement of the personal rights of individual shareholders.  There is no explicit reference to particular statutory rights or other personal rights owed to NexPoint.

---

[71] Patel Declaration ¶ 46.
[72] First Declaration ¶¶ 72-78.
[73] First Declaration ¶ 72.
[74] Patel Declaration ¶ 46.
[75] *In the Matter of Tianrui (International) Holding Company limited v China Shanshui Cement Group Limited* (unreported, Cayman Islands Grand Ct. April 6, 2020) **[Sbaiti Declaration Exhibit 5, Dkt. 140-5]**; overruled in *China Shanshui Cement Group Limited v Tianrui (International) Holding Company Limited* CICA (Civil) Appeal 1 of 2021 (Cayman Islands Ct. App. 2022) **[C/20]**.

82.     I understand that NexPoint has previously alleged that ACM and Mr. Terry breached duties owed to it under the United States Investment Advisers Act, but that the court dismissed NexPoint's Investment Advisers Act claim with prejudice for failure to state a claim.[76]  As the English Court of Appeal has held, a statutory claim will only satisfy the personal rights exception if that claim invokes a "*right [the statute] confers upon*" the plaintiff and falls within "*the limit of [that] right.*"[77]

83.     Accordingly, NexPoint's allegations that ACM and Mr. Terry violated the Investment Advisers Act would not satisfy the personal rights exception because the Court has already ruled that NexPoint has not sufficiently pled a violation of that statute.

84.     But, even if ACM or Mr. Terry had committed an independent wrong against NexPoint, as NexPoint alleges, I would still disagree with Mr. Patel's conclusion that the personal rights exception applies.  In my opinion, that exception does not apply because the reflective loss rule bars NexPoint from bringing direct claims.

85.     As I explained in my First Declaration, under the reflective loss rule, the personal rights exception will not apply if the loss suffered by a shareholder is limited to the diminution in their share value or in distributions, which is the consequence of loss sustained by the company.  This is so even if the defendant allegedly committed an independent wrong against the shareholder in addition to wronging the company.[78]  For instance, as the English Court of Appeal ruled in *Burnford et al v Automobile Association Developments Limited*:

>       "*A shareholder cannot escape the 'reflective loss' principle merely by showing that he has an independent cause of action against the defendant. He must also have suffered 'separate and distinct' loss, and the law does*

---

[76] *Nexpoint Diversified Real Est. Tr. v. Acis Cap. Mgmt., L.P.*, 620 F. Supp. 3d 36, 43-47 (S.D.N.Y. 2022).
[77] *Mutter v. Eastern and Midlands Railway*, 38 Ch.D 92, 106 (Eng. Ct. App. 1888) **[C/30]**.
[78] First Declaration ¶¶ 73-76.

> *not regard a reduction in the value of shares or distributions which is a knock-on effect of loss suffered by the company as 'separate and distinct.'"*[79]

86.  In my opinion, the personal rights exception does not apply here because NexPoint has alleged that its losses are a reflection of Acis 6's losses. Specifically, NexPoint has alleged that ACM and Mr. Terry *"caused the net asset of value of Acis-6 to nose-dive,"* and that this harm to Acis 6 *"caused NexPoint to suffer millions in losses."*[80] In contrast, I have not read any specific statements in NexPoint's counterclaims alleging any other losses that are not a knock-on effect of loss suffered by Acis 6.

87.  It is important to note that, although diminution in the value of shares and loss of dividends are the most common examples, the reflective loss principle embraces *"all other payments which the shareholder might have obtained from the company if it had not been deprived of its funds."*[81] As such, in my opinion, NexPoint's claims would be barred as a matter of Cayman Islands law because NexPoint is seeking to recover for loss that is merely a reflection of Acis 6's losses.

88.  *Third*, I disagree with Mr. Patel's discussion of the fraud on the minority exception and its control element.

89.  As I explained in my First Declaration, the "fraud on the minority" exception has two elements: (i) the alleged wrongdoers must hold or control a majority of the vote; and (ii) the alleged wrongdoers must have obtained a benefit as a result of their actions, whether their actions were fraudulent or negligent.[82]

---

[79] [2022] EWCA Civ 1943 ¶ 30 **[First Declaration Exhibit 27, Dkt. 109-31]**.
[80] Dkt. 78 ¶ 5.
[81] *Johnson v Gore Wood & Co* [2002] 2 AC 1, 66G – 66H **[First Declaration Exhibit 11, Dkt. 109-15]**.
[82] First Declaration ¶¶ 64-71.

90.     Mr. Patel appears to assert that allegations that Acis 6's "*management is controlled by ACM*" via its PMA with Acis 6 suffice to establish the control element.[83]

91.     I disagree.  As an initial matter, as stated above, I have not read any specific statements in NexPoint's counterclaims that allege that ACM directed or instructed Acis 6's directors how to act or that they became accustomed to act on instructions from ACM.

92.     Further, in my opinion, even if NexPoint had made such specific allegations, they would not be sufficient to establish the control element of the fraud on the minority exception.  Rather, dating back to the Privy Council's 1902 decision in *Burland v Earle*, the authorities refer to the wrongdoers in this context as those who "*themselves hold and control the majority of the shares of the company.*"[84]

93.     I explained in my First Declaration that it may be enough to show *de facto* control of the majority of the voting shares.   However, allegations that a defendant controls the company's management do not, without more, establish that the defendant also owns or has acquired *de facto* control of a majority of the voting shares.

**F.**     **Direct action against directors or controllers of Cayman entities**

94.     I agree with Mr. Patel that the normal position, as a matter of Cayman Islands law, is that a plaintiff in NexPoint's position cannot sue in tort and pierce the corporate veil to attack the directors or beneficial owners of that entity directly.[85]

---

[83] Patel Declaration ¶ 45.
[84] *Burland v Earle* [1902] AC 83, 93 **[First Declaration Exhibit 19, Dkt. 109-23]**.  *See also Prudential Assurance Co Ltd v Newman Industries Ltd (No 2)* [1982] Ch 204, 219 **[First Declaration Exhibit 10, Dkt. 109-14]** (holding that "control" means controlling "*an overall absolute majority of the [shareholder] votes*" or "*a majority of votes … made up of those likely to be cast*").
[85] Patel Declaration ¶ 47.

95. However, Mr. Patel goes on to opine that the present case "*alleges sufficient facts to support a claim for conspiracy to fraud*" and that "*NexPoint would have standing to bring such a claim directly.*" [86] Mr. Patel also suggests that "*NexPoint could commence a direct action in the Cayman Islands for fraud and/or ... the tort of unlawful means conspiracy.*"[87] I disagree.

96. *First*, I have not read any allegations in NexPoint's counterclaims that specifically advance claims for fraud, conspiracy to fraud, and/or unlawful means conspiracy.

97. *Second*, even if NexPoint had pled any of these causes of action (which I do not accept), it is likely that Cayman Islands courts would treat them as derivative claims, rather than direct claims.

98. Mr. Patel appears to assume that claims for fraud, conspiracy to fraud, and/or unlawful means conspiracy are automatically direct claims that are not subject to the reflective loss rule. I respectfully disagree. Like other claims, claims for fraud, conspiracy to fraud, and/or unlawful means conspiracy are subject to Cayman Islands law's reflective loss rule.

99. Pursuant to that rule, claims are derivative if the defendant allegedly wronged the company, that wrong allegedly caused loss to the company, and the shareholder's loss is merely a reflection of the company's loss, even if the defendant also breached a duty owed to the shareholder individually.[88] For example, in *Peak Hotels & Resorts Ltd v Tarek Investments Ltd*, similar claims brought by a shareholder for fraudulent conspiracy and unlawful interference were struck out on reflective loss grounds.[89]

---

[86] Patel Declaration ¶ 49.
[87] Patel Declaration ¶ 48.
[88] First Declaration ¶ 56.
[89] [2015] EWHC 3048 (Ch) ¶¶ 55, 58-59 **[C/31]**.

100. Mr. Patel indicates that the purported claims for fraud, conspiracy to fraud, and/or unlawful means conspiracy are based on "*inflat[ion] [of] the [assets under management] of Acis-6 in order to procure payment to ACM*" by Acis 6 "*of overly high management fees and expenses.*"[90]  Those claims are accordingly derivative under the reflective loss rule because any losses NexPoint claims it suffered from allegedly excessive fees and expenses are a reflection of Acis 6's losses.

101. *Third*, as explained above and in my First Declaration, NexPoint lacks derivative standing because it is an unsecured creditor, not a registered shareholder.[91]  This lack of derivative standing extends to claims for fraud, conspiracy to fraud, and/or unlawful means conspiracy.

102. *Fourth*, as explained above and in my First Declaration, I do not agree that the personal rights or the fraud on the minority exceptions to the proper plaintiff rule apply.[92]  These exceptions also do not apply to any purported claims for fraud, conspiracy to fraud, and/or unlawful means conspiracy as characterized by Mr. Patel.[93]

**I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.**

**Jonathon Milne**

**28 June 2023**

---

[90] Patel Declaration ¶ 49.
[91] First Declaration ¶¶ 32-46.
[92] First Declaration ¶¶ 58-78.
[93] Patel Declaration ¶ 49.

28