UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| U.S. BANK, NATIONAL ASSOCIATION, in its capacity as Trustee, JOSHUA N. TERRY, and ACIS CAPITAL MANAGEMENT, L.P.,<br><br>*Plaintiffs*,<br><br>-against-<br><br>THE CHARITABLE DONOR ADVISED FUND, L.P., CLO HOLDCO LTD., and NEXPOINT DIVERSIFIED REAL ESTATE TRUST,<br><br>*Defendants*. | Case No. 1:21-cv-11059 (GHW) |

### SECOND DECLARATION OF BHAVESH NARENDRA PATEL IN OPPOSITION TO THE PLAINTIFFS' MOTION TO DISMISS DEFENDANTS' COUNTERCLAIMS AND FOR JUDGMENT ON THE PLEADINGS ON PLAINTIFFS' CLAIMS

I, **Bhavesh Narendra Patel**, of Travers Thorp Alberga, 2nd Floor Harbour Place, 103 South Church Street, George Town, Grand Cayman, Cayman Islands, declare under penalty of perjury as follows:

**Introduction**

1.  I am an attorney licensed to practice law in the Cayman Islands. I am a partner in the Cayman Islands office of the law firm Travers Thorp Alberga ("**TTA**"), a firm of attorneys which has been practicing and advising on the laws of the Cayman Islands for over 40 years. TTA also advises on the laws of the British Virgin Islands ("**BVI**") and has offices in Grand Cayman, BVI, Hong Kong, London, Australia and New Zealand.

1

EXHIBIT A

EXHIBIT 13

2. I am the same Bhavesh Patel who made a First Declaration in this matter on 14 June 2023 in response to the First Declaration of Jonathan Milne dated 15 May 2023. I now make this my Second Declaration in response to the Reply Declaration of Jonathan Milne dated 28 June 2023.

3. I have personal knowledge of the matters set forth herein (other than those pleadings I have expressly relied on) and, if properly called as a witness, I could and would competently testify thereto. I refer to the summary of my qualifications and experience set out in my First Declaration and consider that I have the necessary experience to advise on matters of Cayman Islands law.

**Factual Background**

4. I have already set out the relevant factual background in the context of my First Declaration, and I therefore do not propose to repeat that material here, save to the extent necessary to respond to the points made in Mr. Milne's Reply Declaration.

5. Mr. Milne's Reply Declaration contains a large amount of material that is irrelevant or has little to do with the matters before the Court. I therefore do not propose to address each and every point made by Mr. Milne, and any point which is not addressed should not be taken as accepted. Unless otherwise defined, capitalized terms have the same meaning as in Mr. Milne's Reply Declaration, and for convenience I adopt the same as used therein.

**Express Trust**

6. Mr. Milne says that he has reviewed the Indenture and the PMA and that there is nothing in those agreements that would satisfy the requirements for creating a trust. I observe that Mr. Milne does not even attempt to deal with two of the three requirements to establish the existence of a trust, namely, certainty of subject matter and certainty of beneficiaries. The reason

2

for this, I would respectfully suggest, is because it is quite obvious that those two certainties are established on the facts alleged in the Complaint.

7. Mr. Milne only addresses the lack of certainty of intention, stating that it is absent because the allegations are insufficient in his opinion. The opinion is simply Mr. Milne substituting his own finding of fact without any legal authority compelling his conclusion. Mr. Milne refers to no legal authority stating that the presence of these elements is insufficient as a matter of law to find certainty of intention.

8. I respectfully disagree with Mr. Milne, particularly given: (a) the express language in the Indenture that refers to a trustee/beneficiary relationship; and (b) the nature of the investment structure from a practical perspective was that the Company divested itself of any and all interest in its assets, placing the management of those assets entirely in the hands of ACM, and the financial benefit of the assets entirely in the hands of the Subordinated Noteholders. These points have already been set out in my First Declaration.

9. Mr. Milne asserts that use of the words in a document such as "trust", "beneficiary" and so on are not conclusive of an intention to create a trust; however, in my opinion, this looks beyond the simple meaning attributed to those words which, absent express detail to the contrary, is how language is interpreted in common law contracts under Cayman Islands law. Indeed, "the natural and ordinary meaning" of the words used is the very first tenet of contractual construction (see the UK Supreme Court decision in _Arnold_ v. _Britton_ [2015] UKSC 36, applied by the Cayman Islands Court of Appeal in _Al Sadik v Investcorp Bank BSC & Ors_ [2017 (1) CILR 1]) (Exhibits 1 and 2). Those words in any event clearly have probative value in establishing such an intention. In the present case, the Indenture is replete with language evidencing an intention to create a trust. I have already provided examples of this in my First Declaration (see, for example, paragraph 12).

10. Moreover, when one considers the express language in the Indenture discussed already, the practical structure of rights and obligations within Acis-6, and the position of trust and confidence that ACM occupied within that structure in particular (i.e., the factual matrix appertaining at the time the Indenture was entered into), there is nothing in Cayman Islands law, whether statutory or in jurisprudence, that holds that these points are insufficient as a matter of law. In particular, the Indenture provides that *"the obligations of the Applicable Issuers under the Notes and this Indenture are limited recourse obligations of the Applicable Issuers payable solely from the Assets and following realization of the Assets, and application of the proceeds thereof in accordance with this Indenture, all obligations of and any claims against the Co-Issuers hereunder or in connection herewith after such realization shall be extinguished and shall not thereafter revive."* (see the Indenture p. 83). Thus, it is evident that, because all rights, title and interest in all assets of the Company have been assigned away, the flow of economic interest in the assets of the Company now completely bypasses the Company itself in this case, with all of the financial benefit passing straight through to NexPoint and any other subordinated noteholders, such as Highland CLO Funding, Ltd.

11. In summary, Mr. Milne has not referred to any context or background facts available to the parties to support the allegation that words such as "trust", "beneficiary", etc., should not be given their ordinary meaning. On the contrary, coupled with the complete divestment by the Company of any interest in the Subordinated Notes, this is sufficient to find that the terms of the Indenture readily satisfy the test for certainty of intention under Cayman Islands law.

12. Mr. Milne attempts to disregard these clear indications of a trust relationship by asserting that "*as the Court has ruled, it does not impose pre-Event of Default fiduciary duties on the Trustee, and the PMA disclaims any obligations owed by ACM to Acis 6 investors like*

4

*NexPoint.*" (Milne Reply, at para. 28). However, this statement is misleading. The decision he is referring to is *NexPoint Diversified Real Estate Trust v. Acis Capital Management, LP et al.,* Cause No. 1:21-cv-04384-GHW, Dkt. 120. Because I am not an expert in American law, I am reluctant to offer any interpretation of that judicial opinion.

13. However, I am comfortable responding to Mr. Milne's point as pertains to Cayman Islands law. The Indenture does not waive any applicable duties for ACM (nor, it appears, does the PMA). And given my reading of the American case Mr. Milne cites, I do not see anywhere such is stated therein. It is these facts which I addressed in my original declaration as giving rise to the premise that Acis Capital Management, L.P., who is vested with the traditional powers accorded a traditional trustee, is a *de facto* or shadow director of the Issuer or an implied or constructive trustee over the Issuer's assets (see paragraph 26 of my First Declaration). That Acis Capital Management, L.P. is not given the title of "trustee" is irrelevant to the conclusion that there is a trust or that ACM can owe fiduciary duties under Cayman Islands law.

14. In the premises, I disagree with Mr. Milne's assessment that there is insufficient evidence for a court to conclude that the parties to the Indenture did not intend the parties (in particular, ACM) to occupy a fiduciary position in relation to the Company and the Noteholders. On the contrary, I consider it is strongly arguable that such an intention is evident, both on the face of the Indenture (noting the above-referenced trust language) and given the actual nature of the flow of rights and obligations within the Acis-6 structure. In that event, NexPoint would have standing to bring such a claim and make such an argument. I have seen no decision from a Cayman Islands court holding that such evidence is insufficient, and Mr. Milne cited no such authority. Thus, I am confident in the above conclusions under Cayman Islands law.

**Implied Trust**

15. For the same reasons, I consider that even if the Court were to find that the Indenture did not create an express trust, the Indenture nonetheless can be found to have created an implied trust. Under such an arrangement, ACM would owe fiduciary duties and NexPoint, as beneficiary, would have the right to bring direct actions for breaches of trust under Cayman Islands law. I addressed this issue in my First Declaration (see paragraph 26). Mr. Milne's Reply Declaration does not suggest otherwise.

**Constructive Trust**

16. Mr. Milne attempts to draw a distinction between remedial constructive trusts and institutional constructive trusts. This is, however, an unfortunate mischaracterisation of the manner in which that term is used in my First Declaration. Although I agree with Mr. Milne that, under Cayman Islands law, a constructive trust is not "imposed" by the Court as a remedy for a wrong, it is nevertheless often remedial in its practical effect.

17. It is well established that there are two kinds of constructive trustee: those with pre-existing fiduciary duties and those without pre-existing fiduciary duties: see <u>Williams v Central Bank of Nigeria</u> [2014] UKSC 10 (Exhibit 3). Although the latter are not trustees in the strict definition of the word, because of their role in a breach of fiduciary duties which hitherto had nothing at all to do with them, they are classified as constructive trustees. It is in that latter sense that the constructive trust may indeed be described as essentially remedial in nature, as indeed Mr. Milne rightly accepts in a footnote at paragraph 35 of his Reply Declaration where he says "[the] former Chief Justice [of the Cayman Islands Sir Anthony] Smellie held that: *'... the creation of remedial constructive trusts were not based on established legal principles'* but may be *'arguable'*

6

as a potential **remedy** for victims of fraud (see *Grupo Tarras S.A. v. Bank of Butte1field Intl. (Cayman) Ltd.,* 2000 CILR 452,454" (emphasis added).

18. In short, whether one refers to "institutional" constructive trusts or "remedial" constructive trusts is, for present purposes, a distinction without a difference. Mr. Milne appears unhelpfully to have seized upon this largely academic issue to cloud the simple fact that, in this case, ACM clearly owed fiduciary duties to the Noteholders to deal with the property placed under its care, pursuant to the terms of the Indenture in the best interests of the <u>Noteholders</u>, and not the best interests of anyone else, much less <u>itself</u>.

**De facto / shadow directors**

19. Mr. Milne states that, in his opinion, ACM would not be classified as a shadow or de facto director as a matter of Cayman Islands law. He bases this upon an assertion that there is nothing pleaded in the Counterclaim which is capable of being construed as an allegation that ACM exercised the level of control over the Company that one would ordinarily associate with a director. This is a surprising statement. I have been instructed by NexPoint's counsel that the Indenture and Portfolio Management Agreement are deemed part of the Counterclaim and can be considered part of the allegations. Given that, I would suggest that relevant to this inquiry are the following:

- The Indenture vests the Porfolio Manager with power and discretion to direct the Trustee's purchases and sales of assets (Indenture ¶¶ 12.1, 12.2, 12.4 and generally 7.5, 7.7, 9.2, 10.6), distributions of funds and investigation of alleged defaults (Indenture pp. 112, 115–116, 123, 184 and ¶¶ 10.2(d), (f), 10.3(d)), consent to the removal or replacement of the Trustee (Indenture p. 119), decide administrative expenses (Indenture pp. 4–5), the assets to purchase and sell (Indenture p. 95), and

7

determine whether a default has occurred under the Indenture (Indenture pp. 98–99).

- The Counterclaim allegations, which I understand should be accepted as true, likewise expressly state that "Acis-6 is managed by [ACM] as the portfolio manager and Terry as the primary advisor." (Counterclaim ¶ 2). It goes on to state that the "trustee's role is often limited to holding legal title to the assets, while the portfolio manager is responsible for managing the assets of the CLO." (Counterclaim ¶ 30). Other paragraphs specifically outline the extensive management responsibilities that one would be ordinarily associated with a director. (Counterclaim ¶¶ 31–36, 41, 56–57, 70, 72, 73).

20. Accordingly, it is misleading for Mr. Milne to say that "A*CM, as Portfolio Manager, was engaged in a professional capacity by Acis 6 to perform <u>certain administrative and advisory functions</u> pursuant to the PMA*" (emphasis added). In my opinion, based on both the pleadings and the terms of the Indenture and the PMA, far from having merely an administrative and advisory role, ACM had complete and total control over the Company.

21. Moreover, there is nothing in the pleadings or the evidence that suggests that the Company's directors exercised any independent judgment whatsoever. The Indenture, as already cited, precludes them from having any substantive role whatsoever once all rights are divested. Indeed, the pleadings and the evidence taken together tend to suggest that every decision taken in relation to the Company, regardless of what level (i.e., whether board level, managerial level, or administrative level) was taken by ACM, Terry and Brigade. No statute or decision I have seen under Cayman Islands law would find the foregoing facts, if true, were insufficient as a matter of

law to set out fiduciary duties on ACM's part. Thus, I am confident in the above conclusions under Cayman Islands law.

22. For these reasons, I also disagree with Mr. Milne's suggestion that there are no allegations in the Counterclaim capable of meeting NexPoint's burden to show that ACM held the status of a shadow director. On the contrary, based on the foregoing, it seems to me to be strongly arguable that on the facts of this case ACM occupied the role of a shadow director of the Company. In that event, NexPoint would have standing to bring such a claim under Cayman Islands law.

23. I agree with Mr. Milne that any shadow directorship duties owed by ACM would *prima facie* be owed to the Company and not to NexPoint (in its capacity as a quasi-shareholder of the Company). However, this argument is self-defeating in circumstances where it is predicated on the notion that ACM is in control of the Company (were it otherwise, no shadow directorship duties would arise). In that case, it is obvious that ACM would prevent the Company from redressing any breaches of directors' duties owed to it by ACM, which would amount to a prototypical example of the exception to the rule in *Foss v Harbottle*.

**Creditor versus shareholder**

24. Mr. Milne's treatment of the question whether NexPoint may sue derivatively on behalf of the Company is predicated on the erroneous assumption that NexPoint is no different than any other ordinary unsecured creditor. The opposite is true in the present case because of the specific factual background. In fact, because of the manner in which the economic interest in the Company flows, and in particular because it is only the Subordinated Noteholders (such as NexPoint) who have the residual economic interest in the Company, NexPoint occupies precisely the same position in relation to the Company as a shareholder in an ordinary corporate structure, as explained in paragraph 11 above.

25. It is for that reason that, as stated in my First Declaration, there is a logical argument that NexPoint would likely have standing to sue derivatively on behalf of the Company because there is simply no other class of individual who would have such a right. I did not, as Mr. Milne appears to suggest, attempt to argue that unsecured creditors *generally* would have such a right. Rather, the argument is that, on the facts of this case, NexPoint would have such standing. Put another way, the rule in *West Mercia* to which Mr. Milne refers (at paragraph 62, et seq.) does not apply in this cause because NexPoint's legal relationship to the Company is not simply that of an unsecured creditor.

26. In this regard, I also note that the passages from the *Sequana* case that are cited by Mr. Milne are obiter dictum comments by Lady Arden, which are not binding law on the Cayman Islands Courts. The rule from that decision remains that the directors of a company owe a fiduciary duty to the creditors where those directors are in the position of managing assets solely for the benefit of those creditors—e.g., where there is no plausible scenario that shareholders will stand to benefit. I maintain the statement from my First Declaration that, whilst today untested, there is a strong argument that because a shareholder has derivative standing to sue directors derivatively for breaches of duty to the company, where a company has entered into a financial situation of doubtful insolvency and the focus of the directors shifts from the shareholders' interests to those of the creditors, those creditors would also logically have the ability to enforce a breach by the directors of their fiduciary duties directly as, at that point, those duties are owed to the creditors and no longer to the shareholders.

**Cayman Islands Derivative Standing**

27. Mr. Milne argues that NexPoint does not have standing to sue ACM because any loss that NexPoint has suffered is in respect of the value of its interest in the Company. That is,

10

NexPoint's claim is barred by the rule against reflective loss. However, this analysis misunderstands the nature of the personal rights exception, which is unaffected by the reflective loss principle (since if it were not, the exception would never apply), that is, because, in a claim for redress of infringement of a personal right, the legal relationship which gives rise to the plaintiff's claim, and therefore the capacity in which the plaintiff has suffered loss, exists independently of the plaintiff's relationship with the company. In other words, the plaintiff in such cases does not need to rely on his status as a shareholder or quasi shareholder of the company in order to establish his claim against the company's director. Where this is established, it will ordinarily be self evident that the loss the plaintiff has suffered is independent of the value of his interest in the Company.

28. Moreover, in the case of *Broadcasting Investment Group Ltd v Smith* [2021] EWCA Civ 912 [2022] 1 WLR 1 (Exhibit 4), the English Court of Appeal held that the reflective loss principle will not prevent a shareholder, who is also a contractual promisee, from bringing a claim against a wrongdoer when the company it holds shares in would be able to bring the same claim under the English Contracts (Rights of Third Parties) Act 1999. That case demonstrates the limits of the reflective loss principle and is authority for the proposition that the mere fact that a particular kind of loss adversely affects the value of a company's assets, and the company itself would have a right to bring a claim for that loss, will not prevent a shareholder (or former shareholder) from suing the wrongdoer directly where he has a direct cause of action. Accordingly, the reflective loss principle does not go so far as to prevent NexPoint from suing to redress a wrong merely because the same wrong has also caused loss to the Company. Moreover, and in any event, because of the complete divestment of the Company's interest in the Subordinated Notes upon the terms of the Indenture, the alleged wrongdoing by ACM has not

11

actually caused loss to the Company at all (save to the extent of potentially exposing the Company to claims).

29. Mr. Milne goes on to argue that the Counterclaim does not allege sufficient facts of a direct relationship between NexPoint and ACM, that is, a relationship which exists independently of NexPoint's relationship with the Company. Not only does this not appear to be Mr. Milne's proper role as a purported expert on Cayman Islands law, his statement is incorrect. The Counterclaim identifies the fact that ACM as a registered investment advisor owed certain fiduciary duties imposed under U.S. federal securities laws which are owed directly to ACM (Counterclaim ¶¶ 144–154). It further outlines that a direct fiduciary duty is owed by ACM as a co-trustee under New York law, which appears to mirror the shadow-trustee argument we identify under Cayman Islands law (Counterclaim ¶¶ 155–165). It further identifies contractual duties in the Portfolio Management Agreement and Indenture (which appear to incorporate each other's terms), both of which prohibit ACM from "*taking any action that would intentionally, or with reckless disregard…adversely affect the interest of Holders in the Assets in any material respect*" and then hold ACM liable for any decrease in the value of the assets as a result of ACM's bad faith, misconduct, or disregard for its contractual obligations (Counterclaim ¶¶ 70–72).

30. Accordingly, there are ample pleaded facts which, if proved, would be sufficient to establish that ACM has infringed a personal right enjoyed by NexPoint for which ACM should be found directly liable to NexPoint in damages or equitable compensation.

31. Mr Milne assumes that no claims by NexPoint for tortious conspiracy could lie against ACM because those claims are limited to redress for losses suffered by the Company. However, that is incorrect. In the Counterclaim as pleaded, by virtue of the position that ACM and NexPoint occupied within the Acis-6 structure, in particular noting that ACM had complete control

over the assets in which NexPoint had a beneficial interest and the fact that the Company had divested itself entirely of the legal and beneficial title to those assets, the wrongdoing perpetrated by ACM against NexPoint and the loss associated with it does not flow through the Company. It flows from ACM as the wrongdoer directly to NexPoint as the victim. It is artificial for Mr. Milne to suggest that NexPoint's loss is a reflection of the diminution of the value of its interest in the Company because the terms of the Indenture were such that the assets which were impaired by ACM's misconduct did not belong to the Company at all.

**Conclusion**

32. The points raised by Mr. Milne in his Reply Declaration do not impact my analysis that was set out in my First Declaration or the conclusions reached therein.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that this Declaration was executed this 19th day of July, 2023, in Grand Cayman, Cayman Islands.

*Bhavesh Patel*

Bhavesh Narendra Patel

**Appendix 1: Legislation and Case Law**

**Index of Authorities**

Exhibit 1:   *Arnold* v. *Britton* [2015] UKSC 36

Exhibit 2:   *Al Sadik v Investcorp Bank BSC & Ors* [2017 (1) CILR 1])

Exhibit 3:   *Williams v Central Bank of Nigeria* [2014] UKSC 10

Exhibit 4:   *Broadcasting Investment Group Ltd v Smith* [2021] EWCA Civ 912, [2022] 1 WLR 1