# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| |
|---|
| U.S. BANK, NATIONAL ASSOCIATION, in its capacity as Trustee, JOSHUA N. TERRY, AND ACIS CAPITAL MANAGEMENT, L.P., |
| *Plaintiffs*, |
| v. |
| THE CHARITABLE DONOR ADVISED FUND, L.P., CLO HOLDCO LTD., AND NEXPOINT STRATEGIC OPPORTUNITIES FUND, |
| *Defendants*. |

No. 1:21-cv-11059 (GHW)

**<u>DECLARATION OF JEREMY TRENWITH LE TISSIER</u>**

The undersigned provides this Declaration pursuant to 28 U.S.C.A. § 1746 and declares as follows:

1.      My name is Jeremy Trenwith Le Tissier. I am over the age of eighteen and am fully competent to make this declaration. I have never been convicted of a felony or a crime involving moral turpitude. The statements in this Declaration are true and correct based on my personal knowledge, except as otherwise indicated.

2.      I was retained by the law firm of Parsons McEntire McCleary PLLC on behalf of Charitable DAF Fund, LP a/k/a The Charitable Donor Advised Fund, L.P. ("DAF") and CLO HoldCo, Ltd ("CLOH") (collectively "DAF Parties") to provide expert consulting services relating to duties owed to and the rights of the DAF Parties' under application of Guernsey law.

3.      I am an Advocate of the Royal Court of Guernsey and am qualified to practice and appear before all the Courts of the Bailiwick of Guernsey including the Guernsey Court of Appeal

1

and before the Judicial Committee of the Privy Council, which is Guernsey's highest appellate Court.  I am also admitted as a Notary Public.

4.      I was called to the English Bar by the Honourable Society of Lincoln's Inn in November 2003.  I was then subsequently called to the Guernsey Bar in August 2005. As part of the qualification process for the Guernsey Bar, I attended the University of Caen in France and received the *Certificat d'Etudes Juridiques Françaises et Normandes*.  My other qualifications, awards and employment/appointments can be viewed in my attached curriculum vitae, which is attached to this Declaration as Exhibit "A."

5.      I have practiced law in Guernsey since 2004, predominately in relation to complex and/or high value litigation which concerns a broad range of matters, which includes investment funds (I have been appointed by the Royal Court of Guernsey as the representative of all investors in a distressed Guernsey unit trust investment fund), corporate disputes, trust disputes, insolvency and other similar related matters.  I regularly appear before the Royal Court in Guernsey and also provide advisory services to firms and persons in potentially litigious situations.  I have appeared before the Guernsey Court of Appeal on multiple occasions.

6.      I am a Partner in the firm ABT Advocates and Notaries Public. We do not maintain a 'head of litigation' position.  However, I am generally the partner who deals with the more technical and high value litigious matters, particularly in relation to corporate disputes and similar matters.

7.      I have previously served as a testifying expert witness.  Specifically, I have provided an expert opinion on matters of Guernsey law to the United States Bankruptcy Court, Southern District of New York in relation to litigation concerning Fairfield Sentry Ltd in matters arising from the Madoff scandal.

8.      Based upon my education, experience and training, as well as my review and study of the materials referred to herein, I hold the opinions set forth in the following paragraphs of this Declaration.

**The Existence Of A Contractual Duty Of Good Faith Under Guernsey Law**

9.      I have been asked to opine on whether Guernsey law recognizes the existence of a contractual obligation of good faith.

    a.  It does.  I consider it an uncontroversial point of Guernsey law that the existence of an obligation to act with good faith within a contract will be recognized.

    b.  A contractual obligation to act with good faith is not present in Guernsey law contracts automatically.  If it is to form a term of a Guernsey law contract it will either need to be included as an express term or as an implied term.

    c.  In the current situation there is an express contractual term obliging various parties to act in good faith, as is set out in more detail below in paragraph 10. My view is that under Guernsey law this express obligation would be recognized and, where appropriate, enforced.

    d.  If it was needed, authority for the proposition that a contractual duty of good faith will be recognized under Guernsey law can be found in the decision *International Healthcare Solutions Ltd v Utmost Worldwide Ltd* [2022] GRC 094.

    e.  There are a number of points I consider relevant for the Court to consider which arise from the *International Healthcare* decision:

        i.  It can be seen within this decision that the Royal Court refers to a number of decisions of the Courts of England and Wales as persuasive

precedent for the approach which should be taken to certain points in issue under Guernsey law;

ii. It is common for the Guernsey Courts to use decisions of *inter alia* the Courts of England and Wales as persuasive (but not binding) precedent where the area of Guernsey law being decided is considered to be similar to that area of law under the laws of England and Wales and there are no relevant Guernsey decisions on the point, or there are valid reasons to consider that the English decision should be taken into account, such as if the law in England and Wales had developed through a number of decisions over time but there had been an absence of decisions on such a point under Guernsey law during the same period.

iii. As a general proposition, it is common for Guernsey Courts to look closely to English decisions on matters of contract law[1], and in my view this includes the consideration of an obligation of good faith.  This is demonstrated by the discussion in the *International Healthcare* decision.

iv. Below I refer to a decision *In the Matter of Compound Photonics Group Limited* [2022] EWCA Civ 1371 as the leading decision on the meaning of contractual duties of good faith in contracts.  It is relevant to note that the *Photonics* decision was dated 21 October 2022 and the *International Healthcare* decision was dated 18 October 2022, meaning that the *International Healthcare* decision was released prior to the *Photonics*

---

[1] With some notable exceptions

decision and, therefore, it could not have been taken into account by the Court in the *International Healthcare* decision.  In my view the Guernsey Courts would follow the *Photonics* decision if they were considering the scope of a contractual obligation of good faith as it provides a more contemporary and complete analysis of this position compared to the *International Healthcare* decision.  It is also relevant to note that the *Photonics* decision is a decision of the Court of Appeal of England and Wales and, therefore, its findings are likely to be considered increasingly persuasive (*cf* a decision from a Court of first instance).  The *International Healthcare* decision is predominately a decision (as it relates to this matter) on whether a contractual obligation of good faith will be implied within a contract where there is no express obligation, rather than what the scope of a contractual obligation of good faith is – in this respect it is of limited assistance to the current matter as we know that there is an express obligation of good faith contained within the relevant contractual agreement.

**Does A Contractual Duty Of Good Faith Arise In This Matter?**

10.    I have also been asked to opine on whether a contractual obligation of good faith exists in this matter – I set out my views below.

a.  There is a Members Agreement, dated November 15, 2017 ("Members Agreement") between Highland CLO Funding, Ltd. ("HCLOF") and other signatory parties, including CLOH, which is governed by Guernsey law.  The Members Agreement appears to have been signed by all signatory parties which

includes HCLOF; the Members Agreement states it has been signed by William Scott in his capacity as Director of HCLOF. For the purposes of this declaration I have presumed that the Members Agreement has been correctly and validly executed by all parties to it and that it is valid and binding upon them.

b.  At paragraph 20.5 of the Members Agreement it provides: "*Each Party shall at all times act in good faith towards the other Parties and shall use all reasonable endeavors to see that this Agreement is observed*"[2].

c.  The definition of 'Parties' within the Members Agreement is set out at Paragraph 1.1 to that agreement and it provides: *""Parties" means the parties to this Agreement and any other person who agrees to be bound by the terms of this Agreement under an Adherence Agreement"*; both HCLOF and CLOH are included within the definition of 'Parties', as such, HCLOF is obliged to observe the contractual duty of good faith expressed at paragraph 20.5 of the Members Agreement to the other Parties (which includes CLOH).

d.  Under Guernsey Law, because the duty of good faith in paragraph 20.5 of the Members Agreement is a contractual term between all of the Parties (as defined), any breach of that contractual term is able to form the basis of an action for breach of contract commenced by one party to the agreement where they have suffered loss caused by a breach of that term committed by another of the Parties to the Members Agreement; in short, if HCLOF breached the obligation to act in good faith set out in paragraph 20.5 of the Members Agreement and that breach causes CLOH to suffer actionable loss, CLOH is, as

---

[2] In my view this paragraph imposes two separate and distinct obligations, the duty to act in good faith and also, the duty to use all reasonable endeavours to see that the Agreement is observed.

a matter of Guernsey law, able to sue HCLOF directly for breach of that contractual term.

**Derivative Standing**

11.     I have also been asked to opine on whether derivative standing is required to protect against a breach of a contractual duty of good faith:

>     a.   Derivative standing is not required because of the direct contractual relationship between the Parties to the Members Agreement;  Any person falling within the definition of 'Parties' is able to directly sue another person who is also a party to that agreement if they breached the contractual duty of good faith in paragraph 20.5 and that breach causes the other party to suffer actionable loss. Please see the discussion at paragraph 10 above.

**The Legal Test When Considering If There Has Been A Breach Of A Contractual Duty Of Good Faith**

12.     I have also been asked to identify the elements of the contractual duty of good faith and the various considerations defining such a duty of good faith.

>     a.   The leading decision concerning a contractual duty of good faith is the decision of the Court of Appeal of England and Wales in *In the Matter of Compound Photonics Group Limited* [2022] EWCA Civ 1371.  Whilst this decision is not formally binding as a matter of Guernsey law, the Guernsey Courts will, in my view, consider the decision in *Photonics* as highly persuasive and will adopt the reasoning set out within the *Photonics* decision as representing the law in Guernsey on such matters.

b. In my view, the most important parts of the *Photonics* decision for present purposes are where the Court of Appeal explains the general approach to be taken in respect of the consideration of a contractual duty of good faith, are as follows[3] (all of which are taken from the decision of Snowden LJ with whom Carr LJ and Newey LJ agreed):

At [241]: *"In my judgment, therefore, the authorities do not support the proposition that a contractual duty of good faith can only be breached by conduct that is dishonest according to the explanation of that concept in Royal Brunei and Ivey . Depending on the contractual context, a duty of good faith may be breached by conduct taken in bad faith. This could include conduct which would be regarded as commercially unacceptable to reasonable and honest people, albeit that they would not necessarily regard it as dishonest."*

At [243]: *"As I have explained, I accept the argument that apart from the "core" duty of honesty and (depending on the context) a duty not to engage in conduct that could be characterised as bad faith, any further requirements of an express duty of good faith must be capable of being derived as a matter of interpretation or implication from the other terms of the contract in issue in the particular case. However, I do not think that it helps to describe those other requirements as "derivative" of the core duty of honesty."*

At [276]: *"I would also accept that clause 4.2 required the parties not to act in bad faith towards each other. As Leggatt J explained in Yam Seng , this would prohibit conduct that reasonable and honest people would regard as*

---

[3] The use of square brackets denotes the relevant paragraph of the decision

*commercially unacceptable, but not necessarily dishonest. However, in the same way as Lord Nicholls suggested in <u>Royal Brunei</u> that it is impossible to be entirely specific about the meaning of "dishonesty", I do not consider that it is appropriate to try to be prescriptive in describing what conduct might fall into this category, given that to do so would necessarily involve recourse to synonyms or epithets (such as "improper" or "sharp practice").*

    c.  As a result of the decision in *Photonics*, what constitutes a breach of a contractual obligation of good faith within an agreement will depend on all of the relevant facts. The Court of Appeal was unwilling to be overly prescriptive about what will constitute such a breach, broadly providing that the obligation to act in good faith would be breached by acting in bad faith which will include acting dishonestly or *"conduct which would be regarded as commercially unacceptable to reasonable and honest people, albeit that they would not necessarily regard it as dishonest"*. As such, the decision on whether the obligation of good faith had been breached is a question for the relevant Court to decide, using these *Photonics* principles after having heard all of the evidence.

13. As set out above, a part of the test for the breach of an express contractual duty of good faith is whether a party acted dishonestly – if it has, this will constitute a breach of the duty. The test to be applied, when considering whether a party has acted dishonestly, is contained within the decision of the Supreme Court of England and Wales in *Ivey v Genting Casinos (UK) Limited* [2018] AC 391[4]. *Ivey* is the leading decision on the test

---

[4] For a basic explanation of the factual scenario in *Ivey* the following is taken from the headnote in the law report:
*"The claimant, a professional gambler, played the card game Punto Banco Baccarat, which was a game of pure*

for dishonesty and has been applied under Guernsey law, see for instance *Domaille and others v Guernsey Financial Services Commission* [2023] GRC 017 at [156].  It is also relevant to note that in *Photonics* the Court of Appeal refers to *Ivey* at [241] when referring to dishonesty – see paragraph 12(b) above.

14. The relevant test for dishonesty, as set out in *Ivey* at [74] is:

*"When dishonesty is in question the fact-finding tribunal must first ascertain (subjectively) the actual state of the individual's knowledge or belief as to the facts. The reasonableness or otherwise of his belief is a matter of evidence (often in practice determinative) going to whether he held the belief, but it is not an additional requirement that his belief must be reasonable; the question is whether it is genuinely held. When once his actual state of mind as to knowledge or belief as to facts is established, the question whether his conduct was honest or dishonest is to be determined by the fact-finder by applying the (objective) standards of ordinary decent*

---

*chance, at the defendant's casino, winning over £7·7m. Following an investigation due to the large win the defendant determined that the claimant had compromised the game by using a method of play called edge-sorting, which involved exploiting the design irregularities on the backs of the playing cards and then persuading the croupier to rotate the cards so that those of high value could be distinguished from the others before any card was dealt and bet placed, without anyone else appreciating the purpose of rotating the cards. The defendant, which had not known about edge-sorting, refused to pay the claimant his winnings on the ground that such play altered the odds against it unfairly. His claim brought an action for recovery of the sums which he had won. The defendant contended, inter alia, that (i) the gaming contract between the parties had an implied term that the claimant would not cheat or otherwise act to defeat the essential premise of the game and if he did so the contract would be void and he would recover no winnings under it, which term he had broken, and (ii) he had committed the offence of cheating, contrary to section 42 of the Gambling Act 2005 by interfering with the game or deceiving the defendant's staff and so was not entitled to found his claim on his own criminal conduct. The claimant admitted the implied term but denied cheating or committing a criminal offence, asserting that it was lawful for "advantage players", such as him, to use such a method of play because they were in an adversarial position towards the casino, and that edge-sorting ought to have been known to the defendant which could have protected itself against it.".  The relevance of the background being that the Court decided that the legal test was no longer whether the protagonist subjectively considered what they were doing was dishonest or not (which, had this been the case in Ivey, would have meant a finding that there had been no dishonesty) or whether the activity was something which be considered to be objectively dishonest according to the standards of ordinary decent people.*

*people. There is no requirement that the defendant must appreciate that what he has done is, by those standards, dishonest."*

15. In my view, a Guernsey Court, in reaching its decision on whether there had been a breach of the obligation to act in good faith contained within Paragraph 20.5 of the Members Agreement, would consider the following:

    a. Has the party accused of the breach acted dishonestly?  If it has, this will constitute a breach of the duty to act in good faith.  I note that in the First Amended Counterclaim at paragraphs 41 to 49, and at paragraph 81i, the DAF Parties plead that HCLOF has acted dishonestly. Should this be proved at trial a Guernsey Court would, following *Photonics*, find that under Guernsey law this constitutes a breach of the contractual duty of good faith.

    b. Has the party acted otherwise in bad faith, such as by conduct which would be regarded as commercially unacceptable to reasonable and honest people, albeit that they would not necessarily regard it as dishonest?  If the Court was to find that a party had acted in bad faith in this respect, then this would constitute a breach of the contractual duty of good faith.  To reach a decision on this point the Court would have to hear all of the evidence at trial and make a finding whether or not the conduct had been in bad faith adopting the appropriate approach set out in *Photonics* and taking into account all relevant matters.  I consider the factors identified in paragraph 81 of the First Amended Counterclaim will be relevant considerations (both individually and collectively) when making a determination of whether HCLOF acted in breach of the contractual duty of good faith under Guernsey law.

16. When considering whether a party has acted in a manner which is dishonest and/or otherwise in bad faith the Court will need to consider all relevant facts and matters. It is not correct to state that certain inactions (or actions) will not constitute a breach of the duty of good faith as they will need to be considered in the factual context of the prevailing situation/scenario. It is not correct to say that, for instance, a failure to deal fairly and openly with a party will not constitute a breach of the obligation to act in good faith (as Advocate McGuffin suggests at paragraph 5.11 of his 2nd Declaration – a similar point is made by Advocate Davidson at paragraph 21 of his Declaration – my view applies to both). There will be instances where such actions will constitute a breach of the obligation of good faith and other instances where it will not because it will depend on the precise nature of the prevailing circumstances, the manner in which the obligation is drafted within the relevant contract[5] and all other evidence before the Court – one cannot be prescriptive; whether there is a breach of the obligation of good faith can only be decided by the Court after evaluating all of the evidence presented at trial. This approach is confirmed in *Photonics* where Snowden LJ at [276] states: "*I would also accept that clause 4.2 required the parties not to act in bad faith towards each other. As Leggatt J explained in* Yam Seng *, this would prohibit conduct that reasonable and honest people would regard as commercially unacceptable, but not necessarily dishonest. However, in the same way as Lord Nicholls suggested in* Royal Brunei *that it is impossible to be entirely specific about the meaning of "dishonesty",* **I do not consider that it is appropriate to try to be prescriptive in describing what**

---

[5] See [147] of *Photonics* where Snowden LJ states: "…*the first, and most important, point to emphasise is that like any question of interpretation of a contract, an express clause in a contract requiring a party to act in "good faith" must take its meaning from the context in which it is used.*"

*conduct might fall into this category, given that to do so would necessarily involve recourse to synonyms or epithets (such as "improper" or "sharp practice")."* [Emphasis Added].

17. Within the First Amended Counterclaim, in those parts of it which are relevant to a claim for breach of the obligation of good faith contained within the Members Agreement, the DAF Parties plead, *inter alia,* that HCLOF colluded with other parties to act in a manner which wrongfully caused loss and damage to CLOH. Within paragraph 7 of the First Amended Counterclaim there are particulars pleaded of how HCLOF and other parties took action, formed a collusive alliance and entered into secret agreements causing loss to CLOH[6].  There is pleaded within the First Amended Counterclaim instances of where HCLOF made representations to CLOH that the withholding by the Other Counter-Defendants (as defined therein) wrongfully and unlawfully withheld reserves in the sum of approximately $41.5 million, and that it would take steps to force the release of those funds.  It is also pleaded that contrary to what HCLOF had represented to CLOH, HCLOF then entered into the two settlement agreements secretly, and that HCLOF had misled CLOH when making the statements about the release of the funds, see for instance paragraphs 48 and 49 of the First Amended Counterclaim.  It is also pleaded at paragraph 80ii of the First Amended Counterclaim that HCLOF treated CLOH differently from other HCLOF shareholders – if it was to be found at trial that this differential treatment was conduct which

---

[6] Whilst there are not express obligations of disclosure which would require the disclosure of the secret agreements, the fact that they were negotiated secretly from CLOH in circumstances where they are also said to have a material adverse affect on CLOH's interests is, in my view, indicative that such conduct would be found at trial to be conduct which reasonable and honest people would consider to be commercially unacceptable, where there was an express obligation of good faith between the parties.

reasonable and honest people would find commercially unacceptable (even if it was not dishonest) then this would constitute a breach of the obligation of good faith. Further, entry into the settlement agreements which permit the retention of the significant funds which would otherwise be payable to HCLOF appears to be contrary to the Investment Objective of the Company as detailed within the Offering Memorandum.   Paragraphs 41 to 49 of the First Amended Counterclaim identify those actions of HCLOF which the DAF Parties maintain were the making of Dishonest Statements. Paragraphs 50 to 53 of the First Amended Counterclaim identify what the DAF Parties maintain were HCLOF's wrongful motivations for taking the actions it did, being broadly to impose financial pressure on DAF and CLOH in relation to both the *Kirshner* litigation and also in relation to assist in providing an unfavourable (to CLOH) environment in which to negotiate the buy back of CLOH's interest in HCLOF at a substantial discount.

18. At paragraph 81 of the First Amended Counterclaim the DAF Parties provide particulars of how they maintain that HCLOF has acted in breach of the obligation of good faith.  Taking into account the wording of the Members Agreement, the articles of incorporation of HCLOF, adopting the relevant tests for a breach of a duty of good faith as identified within *Photonics* (including the excerpts set out above at my paragraph 12b), I am of the view that the facts and matters pleaded by the DAF Parties within the First Amended Counterclaim, if proved at trial, would constitute HCLOF acting with bad faith to CLOH (arising from dishonest conduct by HCLOF as well as other conduct constituting bad faith, such as conduct which would be regarded as commercially unacceptable to reasonable and honest people albeit that they would not

necessarily regard it as dishonest), such that this would constitute a breach of clause 20.5 of the Members Agreement.  As such, I consider that the claim pleaded at Count III of the First Amended Counterclaim is a plausible claim on the facts and matters set out within the First Amended Counterclaim.

**Points Arising From The Second Declaration Of Todd William McGuffin**

19. I have been provided with a copy of the second declaration of Advocate McGuffin and set out my observations arising from some of the matters he raises within his declaration.  I will adopt the headings used within his declaration.

*Question 1: Are the DAF Parties' claims against the Plaintiffs derivative claims as a matter of Guernsey law?*

20. I am informed by those instructing me that Counts I, II, IV and V of the Counterclaim are matters which are all governed by the laws of the United States of America.  As such I am not in a position to be able to provide any opinion on those claims.  Given that these claims are governed by US Law I consider that the majority of what Advocate McGuffin has opinioned on under this heading within his 2nd Declaration is irrelevant as the Court will decide those claims as a matter of US Law.  As stated below in paragraph 22 and in paragraphs 10 and 11 above if HCLOF has breached its obligations under the Members Agreement then there is a direct claim available to CLOH for any actionable loss caused by that breach, which is not a derivative action.

21. Count III of the Counterclaim is a claim for breach of contract, being a breach of paragraph 20.5 of the Members Agreement.  The Members Agreement is expressly governed by Guernsey law, as set out at paragraph 22 of the Members Agreement.

22. As I have set out at paragraph 10 above, CLOH is able to sue HCLOF directly for a breach of the contractual duty of good faith contained within the Members Agreement as they are both parties to that agreement.  As such, the claim set out at Count III of the Counterclaim is not a derivative claim but a direct claim by one party against another party to a contract that the other party has breached a term of that contract.

23. I note that Count III of the counterclaim, the breach of contract claim, is the only type of claim that Advocate McGuffin fails to address under his 'Question 1' heading (the claims in Counts I, II, IV and V are specifically addressed).  This is appropriate given that the breach of contract claim is not a derivative claim and the absence of opinion on such a claim from Advocate McGuffin within this section (which is intended to address derivative claims) appears to acknowledge this.

*Question 2: Under what circumstances would a Guernsey court grant a shareholder permission to commence the claims identified in question 1 if they are derivative?*

24. As Counts I, II, IV and V of the Counterclaim are matters which are governed by the laws of the United States rather than Guernsey law I do not consider this question applies in relation to those claims, and in any event I would not be able to validly opine on matters of US Law.

25. As identified above in paragraph 11, the claim set out at Count III of the Counterclaim is not a derivative claim and therefore this question does not arise in relation to this claim.

*Question 3: What obligations does section 20.5 of the HCLOF Members Agreement impose on HCLOF and what conduct is required to establish a breach of those obligations?*

26. Advocate McGuffin appears to agree that the leading decision on this area is the *Photonics* decision, albeit he refers to it as *Faulkner & Ors v Vollin Holdings Ltd & Ors.*

27. Advocate McGuffin's reference to dishonesty being a subjective test (at para 5.5 of his declaration) is incorrect[7]. He refers to *Re Coroin* as authority for his proposition. The reference to the issue of whether a person had behaved dishonestly being a subjective test was at that time (to put matters in very simplified terms) based to a material extent on whether the person taking action considered that they were behaving subjectively dishonestly[8]. The decision in *Re Coroin* was a decision from 2013; the test for dishonesty in England and Wales has fundamentally changed since that decision and now the appropriate test is set out in *Ivey*, see paragraphs 14 and 15 above[9]. It is appropriate to note that the test for dishonesty as set out within *Ivey* does contain an element of a subjective test; the first consideration for the Court is to establish what the actual (i.e. subjective) state of the individual's knowledge or belief as to the facts was. However, once the Court has established the state of mind it will then proceed to consider whether the individual's conduct was honest or dishonest using the standards of ordinary decent people – this being an objective consideration. This makes the

---

[7] Advocate Davidson makes the same reference in paragraph 28 of his Declaration and my comments here apply equally to his reference to the test for dishonesty being subjective

[8] For instance in [57(1)] of *Ivey* the Court highlights one of the problems with the previous test as being: *"It has the unintended effect that the more warped the defendant's standards of honesty are, the less likely it is that he will be convicted of dishonest behaviour".*

[9] For confirmation that in *Re Photonics* the appropriate test for dishonesty had moved from being a subjective test to the test in *Ivey* see [219] of *Re Photonics*. For a discussion of the problems which arose from the prior test for dishonesty and its subjective element, see [56-57] of *Ivey*.

application of the test for dishonesty now a far more objective test than it was previously.   There is no requirement that the individual needs to appreciate that what they have done was dishonest.

28. Advocate McGuffin also refers to the decision of *Times Travel (UK) Limited and another v Pakistan International Airline Corporation* [2021] UKSC 40, and that this decision is authority for the proposition that to act in bad faith requires conduct which is reprehensible, unconscionable or using illegitimate means.   The *Times Travel* decision is a decision concerning whether one party had caused another party to enter into a contract by the exercise of economic duress which would permit rescission.   The reference made in paragraph 5.6 of the McGuffin 2nd Declaration to a 'bad faith demand' is a wholly different issue to the issue of whether there has been conduct which would constitute a breach of the contractual good faith requirement under the Membership Agreement.   The reference to the 'bad faith demand' in the *Times Travel* decision is set out at [102] of that decision where it provides:

*"The case may therefore be said to establish what I shall refer to hereinafter as the "bad faith demand" requirement. This requirement can be expressed as follows. In the context we are focusing on—of a demand for what is claimed to be owing, or analogously, as on the facts of this case, a demand for the waiver of a claim—it is a necessary requirement for establishing lawful act economic duress that the demand is made in bad faith in the particular sense that the threatening party does not genuinely believe that it is owed what it is claiming to be owed or does not genuinely believe that it has a defence to the claim being waived by the threatened party. This is on the assumption that, as a matter of law, what the threatening party claims to be owing is*

*not legally owing or there is no defence to the claim being waived by the threatened party."*

29. The issues considered in the *Times Travel* decision are of a wholly different nature to whether a party has acted in bad faith in breach of an express contractual duty of good faith.  It is relevant to note that in *Photonics* the Court states at [148] that: *"when considering the interpretation and meaning of an express good faith clause in context, cases from other areas of law or commerce, which turn upon their own particular facts, may be of limited value and must be treated with considerable caution"*.

30. The *Times Travel* decision is of no assistance to the present action, and it is incorrect to suggest that it is authority for the proposition that to act in bad faith in the present action requires conduct which is 'reprehensible' 'unconscionable' or 'using illegitimate means'.  The proper reference for consideration about whether conduct would amount to bad faith is in the *Photonics* decision and in particular those parts of it referred to in paragraph 12(b) above.

31. In paragraph 5.7 of his 2nd Declaration Advocate McGuffin suggests that *Photonics* *"confirmed that a contractual good faith clause may codify good faith duties that general company law already imposes, but generally does not impose additional obligations 'over and above any requirements that would be imposed ... to have regard to the interests of the Company ... as a matter of general company law'"* the latter quoted part of which is taken from [277] of the decision.  That paragraph is not authority for the statement made by Advocate McGuffin in the first part of his statement.  Paragraph 277 of *Photonics* needs to be read as a whole, in conjunction with the whole of the judgment, and it particularly needs to be read in conjunction with

paragraph 276.   Paragraph 276 of *Photonics* contains the statements of the legal principles to be applied when considering whether action constitutes acting in bad faith. Paragraph 277 is where Snowden LJ then applies the legal test to the facts of the case before him and makes his findings in relation to those specific facts – this is not something which can be viewed as general authority.  As before, the parts of *Photonics* which are authority for the test to be applied (to the specific facts of each individual case) are those set out above in paragraph 12(b).

32. The references made in the remainder of paragraph 5.7 of Advocate McGuffin's 2nd Declaration to directors duties and the *Carlyle Capital Corporation Limited v Conway and others* (2017) unreported 38/2017 are not relevant to the issues in this matter as they concern whether the Court will interfere with decisions of directors and not what the test for whether a contractual obligation of good faith has been breached.  As stated earlier, in *Photonics* the Court warns about using decisions from different areas of law which turn upon their own specific facts, and should be treated with considerable caution – see paragraph 29 above and [148] of *Photonics*.

33. The comments by Advocate McGuffin in the first sentence of paragraph 5.10 of his 2nd Declaration are not conclusions which can be properly drawn.  As set out above at paragraph 31, the observations made by Snowden LJ at [277] of *Photonics* set out his decisions on the specific facts of the case, rather than being points of general application.  The point made in the second sentence in paragraph 5.10 of the 2nd McGuffin Declaration is out of context with the preceding sentence (coming from paragraphs 277 and 255 of *Photonics* respectively) and in any event adds little to the current matters under consideration.

34.  In paragraph 5.11 of his 2nd Declaration:

    a.  In my view the proper starting point is not that set out by Advocate McGuffin in the first sentence, but that set out by Snowden LJ in [147] of *Photonics* where he says: *"In approaching the interpretation of clause 4.2, the first, and most important, point to emphasise is that like any question of interpretation of a contract, an express clause in a contract requiring a party to act in "good faith" must take its meaning from the context in which it is used. That point has been made very clearly in many cases…"*

    b.  Advocate McGuffin's conclusions in the second sentence are not supported in any way by [148] in *Photonics* – that paragraph warns of the limited value which can be obtained from cases concerning express good faith clauses which deal with other areas of law or commerce which turn upon their own facts.

35. In paragraph 5.12 and 5.13 of his 2nd Declaration Advocate McGuffin cites extracts from *Re Coroin* [2013] EWCA Civ 781 and *CPC Group Ltd v Qatari Diar Real Estate Investment Company* [2010] EWHC 1535 (Ch), as well as the Australian decision of *Overlook v Foxtel* [2002] NSWSC 17 which was cited in the *CPC* decision.  It is relevant to note that all these decisions were specifically considered by the Court of Appeal in *Photonics*[10].  As *Photonics* is the leading decision on this issue, which reviewed and took into account the relevant authorities at that time, it is of limited if any value to look beyond the *dicta* in *Photonics* to decisions which preceded it as it is *Photonics* which represents the current state of the law, not the earlier decisions.

---

[10] For the consideration of *Re Coroin* within *Photonics* see [206] et seq, for the consideration of *CPC* within *Photonics* see [170] et seq, and for the consideration/quoting of *Overlook v Foxtel* (within the consideration of *CPC*) within *Photonics* see [173] et seq.

36. In relation to the conclusions reached by Advocate McGuffin in paragraph 5.14 of his second declaration, I would comment as follows:

   a. 5.14.1 – I agree with this statement.  See my paragraphs 10 and 12 above.

   b. 5.14.2 – I partially disagree with this statement.  I agree that there will be a breach of the express contractual good faith term if a party behaves dishonestly. However, the test for dishonesty is not a subjective test; the test for dishonesty is set out in *Ivey,* see my paragraphs 13-14 above.

   c. 5.14.3 – I disagree with this statement.  The correct test for the 'second category' of bad faith is set out in [241, 243 and 276] of *Photonics (see para 12b above)*, and includes *'conduct which would be regarded as commercially unacceptable to reasonable and honest people, albeit they would not necessarily regard it as dishonest'*.  The Court will need to apply that test to the evidence before the Court on which the case is to be decided.  For the reasons set out above in my paragraphs 28-30 it is incorrect to say that it would require conduct which is reprehensible or unconscionable or that this is a high threshold. Snowden LJ in *Photonics* at [276] (see para 12b above) specifically warns that it *"I do not consider that it is appropriate to try to be prescriptive in describing what conduct might fall into this category"*.

   d. 5.14.4 – I disagree with this statement.  The issues arising from within that statement are not the issues the Court has to address.  The Court will need to consider whether, on the evidence before it, HCLOF has breached the contractual duty of good faith in the Members Agreement, which will broadly mean considering whether HCLOF has acted in bad faith, such as acting

dishonestly or in a manner which would be regarded as commercially unacceptable to reasonable and honest people, albeit they would not necessarily regard it as dishonest.

*Question 4: What protections does Guernsey law provide to third parties who contract with a company against claims that the company entered into those contracts without capacity or authority?*

37. I agree that sections 114 (Corporate Capacity) and 115 (Powers of directors to bind company) of the Companies (Guernsey) Law, 2008 provide significant protections to third parties dealing with a company.

38. However, I do not understand what relevance this has to any of the claims currently pursued by the DAF Parties as there do not appear to be, as far as I am aware, any issues under Guernsey law where:

   a. there is a dispute over whether a company did not have the capacity to undertake some act; and/or

   b. there is a dispute over whether directors had the power to bind a company.

39. In particular, and in so far as it is relevant to the claim pleaded at Count III (paragraphs 78 *et seq* of the first amended counterclaim), I am not aware of there being any Guernsey law issue arising in connection with that claim concerning corporate capacity or the power of a director to bind a company.

**Points Arising From The Declaration Of Alasdair Davidson**

40. I have been provided with a copy of the declaration of Advocate Alasdair Davidson. I set out my observations arising from some of the matters he addresses with in his declaration. I adopt the main headings he uses within his declaration.

*Heading 1: Interpretation of an express duty of good faith in shareholder agreements*

41. In paragraphs 16 to 18 of his declaration Advocate Davidson makes various assertions in relation to the interpretation of shareholder agreements, without supporting authority. In my view the appropriate starting point when considering the interpretation of an express obligation of good faith is to start with the guidance set out within the *Photonics* decision as this is the leading decision on such matters, as Advocate Davidson acknowledges in his paragraph 19.

42. In paragraph 21 Advocate Davidson makes various assertions, which include that a good faith clause does not require the majority shareholders to have regard to the interest of the minority shareholders of a company. I do not consider Advocate Davidson has set out matters correctly in this instance. The following statements are the correct exposition of the relevant principles:

   a. As a proposition of general company law, a shareholder can exercise their proprietary rights as a shareholder (which will include voting rights) in such a manner as they see fit in their own interests and they do not need to consider the interests of other shareholders (see [198-200] *Photonics*).

   b. The above right is something which can be changed or qualified by shareholders contracting with each other, such as within a shareholders' agreement (see [201] *Photonics*).

   c. Within that shareholders' agreement there may be an obligation for the parties to the agreement to act with good faith toward each other if the parties agree to incorporate such an obligation. However, ultimately the obligations and rights of shareholders in a company where there is a shareholders' agreement will be

determined by the constitution of the company and the terms of the shareholders' agreement.

43. One point which is necessary to state to ensure there is no misunderstanding, and which is relevant to the matters set out within the preceding paragraph, is that it is not suggested that HCLOF is unable to further its own interests.  However, in so doing the effect of the obligation of good faith contained within the Members Agreement is that HCLOF must not act dishonestly or otherwise in bad faith (such as by conduct which reasonable and honest people would regard as commercially unacceptable, but not necessarily dishonest) when it is furthering its own interests; if it was to do so then it would breach the obligation of good faith.

44. In paragraph 22 Advocate Davidson then discusses how the approach he maintained in paragraph 21 (i.e. the effect that an obligation of good faith and its effect on matters outside of the shareholders' agreement) was 'developed' by the decision in *Re Coroin*. It is important to note that *Re Coroin* was decided in 2013, whereas *Photonics* was decided in 2022.  *Photonics* is the more recent decision and it specifically takes into account, *inter alia,* findings made in *Re Coroin*.  For present purposes, I do not consider that *Re Coroin* provides any real assistance and the decision to which reference should be made is *Photonics*.

45. Similarly, in paragraph 23 Advocate Davidson refers to the decision in *CPC Group Ltd v Qatari Diar Real Estate Investment Company* [2010] EWHC 1535 (Ch).  Again, this is a decision which pre-dates *Re Photonics* and has specifically been taken into account in *Photonics* (at paras 170 *et seq*).  In particular, when considering the extent to which a party to an agreement which contains an obligation of good faith needs to consider or

prefer the interests of another contracting party, see para 175 *et seq* of *Photonics*.  The quoted references used by Advocate Davidson in his paragraph 23 are not complete quotes, missing aspects of relevant context, and his approach to the relevance of them appears to be unreasonably partisan.  For present purposes, I do not consider that *CPC* provides any real assistance and the proper decision to which reference should be made is *Photonics*.

46. In Paragraph 25 of Advocate Davidson's declaration he states that he is of the view that the Guernsey Court would adopt a narrow approach to the interpretation of the Good Faith Clause.  In my view, the proper observation is not to make broad assertions about the breadth of the interpretation of the clause, but to consider whether the facts on which the claim is based constitute dishonest or other acts of bad faith by HCLOF; it is clear from the decision in *Photonics* that these are the specific considerations which need to be decided by the Court.

*Heading 2: The requirements to plead a violation of an express duty of good faith in a shareholder agreement under Guernsey law*

47. I understand that when the Court considers the manner in which the claim for the breach of the obligation of good faith has been pleaded, and whether it has been adequately and properly pleaded, it will do so as a matter of New York law, being the law of the Court seized of the action. As such, consideration of whether the relevant claim has been properly pleaded, as a matter of Guernsey procedural law, is not relevant.

48. Advocate Davidson refers in paragraph 28 of his declaration to behavior that reasonable and honest people would consider as being commercially unacceptable as requiring a 'reasonably high level of bad behaviour' and he refers to an excerpt from a Court of

Appeal decision in *Soteria Insurance Ltd v IBM*.  The reference in *Soteria* concerns the approval of a decision of the Supreme Court in *Times Travel (UK) Limited and another v Pakistan International Airline Corporation* [2012] UKSC 40.   The relevant discussion relates to a 'bad faith demand'.  This is something I have already dealt with in my observations on Advocate McGuffin's 2nd Declaration as he also relies on effectively the same point from the *Times Travel* decision concerning 'bad faith demands' – see paragraphs 28, 29 and 30 above.  I repeat the conclusions made in paragraph 30 above that the points Advocate Davidson seeks to rely on in this respect are, on proper analysis, of no assistance in this matter and the proper reference for consideration about whether conduct would amount to bad faith is in the *Photonics* decision and in particular those parts of it referred to in paragraph 12(b) above.

49. Notwithstanding what I have said in the paragraphs above, I agree that the extracts taken from the *International Healthcare* decision referred to by Advocate Davidson at paragraph 29 of his declaration are appropriate in the context of the consideration of the manner in which a bad faith claim will need to be pleaded, particularly the reference made to the excerpt of the *BP Gas Marketing Ltd v La Societe Sonatrach* decision – broadly the claim needs to be pleaded in such a manner and with sufficient particularity that the defendant knows the case that it has to answer.  I do however disagree with Advocate Davidson's largely unreasoned conclusions made in paragraph 32 of his declaration that his view is that the Guernsey Courts would find that the breaches of the Good Faith Clause had been pleaded with insufficient particularity.  The facts and matters relied on by the DAF Parties at paragraphs 1 to 77 of the Amended Counterclaim identify a comprehensive range of facts and matters relied on by the DAF

Parties in their claims and the particularisation of the claim at Count III (paragraphs 78 to 83 of the Amended Counterclaim) is detailed and sets out in detail the claims/case that HCLOF has to meet – it knows the basis of the action against it and therefore I consider that the action for the breach of the obligation of good faith in the Members' Agreement has been adequately pleaded as a matter of Guernsey law.  Even if I was wrong about that, it is unlikely that such a claim would be simply struck out.  In normal circumstances  I would expect a party who does not consider that a claim against it to have been adequately pleaded to make a request (alternatively an application to Court under Rule 60 of the Royal Court Civil Rules, 2007) for further information, alternatively if the party who does not consider the claim to be properly particularised was to make an application to the Royal Court to strike the claim out I would expect the Court to give the Plaintiff the opportunity to amend its cause rather than striking it out, as happened in the *International Healthcare* decision – in particular see paragraph 48 of that decision.

*Heading 3: Whether an express duty of good faith requires a company to subordinate its interests to the interests of minority shareholders*

50. In paragraph 33 of his declaration Advocate Davidson cites part of *Photonics* and makes the statement that an express duty of good faith does not (without more) require the Company to have regard to the interests of minority shareholders.  I do not consider that this statement is a correct summary of the parts of *Photonics* he has cited and I repeat the statements I have made already at paragraph 42 above in this respect.

51. Similarly, in paragraph 34 of his declaration Advocate Davidson refers to the *CPC* decision and part of the *Overlook v Foxtel* decision which were cited by Vos J in *CPC*.

As I have referred to at paragraph 45 above the *CPC* decision is specifically dealt with by the Court of Appeal in *Photonics*, as is the *Overlook* decision – indeed the parts of the *Overlook* decision cited by Advocate Davidson are specifically addressed within *Photonics* (at paragraph 175)[11]. *Photonics* is the decision to which the Court should have regard when considering the matters before it; it is the leading decision for the purposes of the claim for breach of the obligation to act in good faith and has specifically taken into account a wide range of relevant preceding decisions, including *CPC* and *Overlook*, when reaching its decision. The correct consideration for the Court is not whether the obligation to act in good faith requires a company to subordinate its interests to the interests of minority shareholders – that is asking the wrong question. The correct question to be considered is whether HCLOF's actions have breached the obligation to act with good faith set out within the Members' Agreement which, following the decision in *Photonics,* will be made out if HCLOF has otherwise acted dishonestly or has acted in bad faith.

*Heading 4: How costs-shifting operates in the Royal Court of Guernsey*

52. I do not disagree with the broad summary that Advocate Davidson has set out at paragraphs 36 to 38 of his declaration. However, I do not understand what relevance Guernsey cost principles have to the issues before the (New York) Court at present.

53. It is appropriate to make the Court aware that the Royal Court of Guernsey has a wide discretion when it comes to awarding costs. Whilst the general rule is that 'costs follow the event' (meaning that usually the winner will have their costs paid by the loser), the Court is not bound to follow this approach and can depart from it where appropriate to

---

[11] I have also referred to these issues within my observations on the McGuffin second declaration, see paragraph 35 above

do so, such as where the conduct of those parties to the action justifies such a departure. For instance see *Shaham v Lloyds TSB and Fooks* (2008) Unreported 25 June 2008.  It is possible that a party could win an action but also find that the Court awards costs against it because of, for instance, the manner in which it has conducted the litigation.

*Heading 5: The legal requirements for a company to be considered 'in liquidation' in Guernsey*

54. I do not disagree with the statements made by Advocate Davidson at paragraphs 39 and 40 of his declaration.

55. However, it is also relevant to point out that a company does not necessarily need to be in formal liquidation under the Companies (Guernsey) Law, 2008 for its business to be brought to an orderly conclusion; formal liquidation can be an expensive process.  The directors of a company can resolve, where it is appropriate to do so, to wind down the business of a company by realizing the company's assets and satisfying its liabilities at which stage it could be put into formal liquidation in order to proceed to the final dissolution of the company, or alternatively there are provisions under s357 Companies (Guernsey) Law, 2008 which permit a company to apply to the registrar of Guernsey companies to be struck off the Register of [Guernsey] Companies, subject to certain requirements as detailed within the Companies Law.

56. I note that reference is made within footnote 26 of the First Amended Counterclaim to clauses 14.4.2 and 14.4.3 of the Members Agreement.  Clause 14.4 (as a whole) of the Members Agreement clearly envisions the winding up of HCLOF and makes various provisions for what should take place on such a winding up, but these provisions do not include a *requirement* for the company to enter formal liquidation in order for this to happen and therefore I do not regard the fact that HCLOF is not in formal liquidation

under the Companies (Guernsey) Law, 2008 as meaning that the business of HCLOF could not be being wound up by the company and its directors.

57. I also note that at clause 2.2 of the Members Agreement there is a requirement that the Parties shall *inter alia* procure that *"(i) the Company's principal activities shall be the pursuit of the objects and purposes described in Clause 2.1 conducted in accordance with the provisions hereof and with the Offering Memorandum, the Subscription and Transfer Agreement and Articles of the Company and (ii) the Parties shall not take any action inconsistent with the provisions of the Offering Memorandum..."*. The Offering Memorandum contains within the definition of 'Investment Objective' the following: *"With respect to the Company's investments, except with respect to Designated CLO Resets or Designated CLO Refinancings, if applicable, it is expected that the Portfolio Manager intends to seek monetization of such investments in the ordinary course in its discretion; provided that at the end of the Term, the Portfolio Manager, in its reasonable discretion may postpone dissolution of the Company for up to 180 days to facilitate the orderly liquidation of the investments."*.

58. The Investment Objective of the Company does not contain provisions which require there to be the formal liquidation of the Company whilst its assets are being realized. The reference within the Investment Objective to the expectation of the Portfolio Manager of the Company to seek the monetization of the Company's investments appears to be something with which the provisions of the 2023 settlement agreement which permit the withholding of significant reserves, as pleaded at paragraph 36 of the First Amended Counterclaim, is inconsistent.

**Conclusion**

59.     As applied to the facts of this case, I form the following opinions based upon my experience, training and my review of the materials provided.

     a.  HCLOF owes a contractual obligation of good faith under the terms of paragraph 20.5 of the Members Agreement to *inter alia* CLOH.  That agreement is governed by and to be construed in accordance with Guernsey law, see paragraph 22 of the Members Agreement.

     b.  All experts agree that *Photonics* is the leading decision relevant to the issue of the meaning of a contractual obligation of good faith under Guernsey law.

     c.  Adopting the reasoning in the *Photonics* decision, which I consider would be followed and applied by a Guernsey Court, HCLOF will breach the obligation of good faith under the paragraph 20.5 of the Members Agreement if it acts in a manner which would be considered bad faith.  This does not require HCLOF to have acted dishonestly, though dishonest behavior would constitute acting in bad faith.  I consider that a Guernsey Court would consider that acting in bad faith will include acting in a manner which would be regarded as commercially unacceptable to reasonable and honest people even if they would not consider such actions to be dishonest.

     d.  A decision on whether HCLOF has breached the obligation of good faith set out within paragraph 20.5 of the Members Agreement will require the Court to consider all relevant circumstances and evidence.

     e.  The First Amended Counterclaim pleads that HCLOF has acted dishonestly.  If proved (adopting the test set out in *Ivey* as detailed above), this would constitute

a breach of the contractual obligation to act in good faith in the Members Agreement.

f.   The First Amended Counterclaim also pleads that HCLOF has acted in other ways (other than dishonestly) which breach the contractual obligation to act in good faith.  In order to reach a decision on this point the Court would have to hear all of the evidence at trial and make a finding whether or not the conduct had been in bad faith (including acting in a manner which would be regarded as commercially unacceptable to reasonable and honest people, albeit that they would not necessarily regard it as dishonest).  I consider all of the factors identified in paragraph 81 of the First Amended Counterclaim will be important relevant considerations (both individually and collectively) when making a determination of whether HCLOF acted in breach of the contractual duty of good faith under Guernsey law.

g.   As detailed in paragraph 18 above, I consider that the claim pleaded at Count III of the First Amended Counterclaim is a plausible claim on the facts and matters set out within the First Amended Counterclaim.

60.   The opinions expressed in this Declaration are based upon a reasonable degree of probability and reasonableness under the application of Guernsey Law and are based upon my education, experience, training, the materials I have reviewed and considered, and my analyses.

61.   I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on September 22, 2023.

_____
Jeremy Trenwith Le Tissier

[this page is intentionally blank]

**APPENDIX A:**

**Jeremy Le Tissier CV**

**Advocate Jeremy Trenwith Le Tissier, Notary Public**

10 New Street, St Peter Port, Guernsey GY1 2PF
Tel: +44 (0)1481 724124    Email: Jeremy.letissier@guernseylegal.com

**ACADEMIC HISTORY**

| | |
|---|---|
| 2012 | <u>Association of Guernsey Notaries Public</u><br>Passed the Guernsey Notary Public Exams and sworn in as a Notary Public by the Ecclesiastical Court<br><br><u>The Chartered Institute of Arbitrators</u><br>Passed Mediation Training<br>Admitted as a CIArb Accredited Mediator<br>Admitted as a member (MCI Arb) |
| February 2007 | <u>The Chartered Institute of Chartered Arbitrators</u><br>Admitted as an Associate (ACI Arb) |
| August 2005 | Sworn as an Advocate of the Royal Court of Guernsey |
| June 2005 | <u>The Guernsey Bar</u><br>Passed the Guernsey Bar Exams |
| 2004 | <u>Université de Caen, France</u><br>Passed the Certificat d'Études Juridiques Normandes et Françaises |
| 2003 | <u>The Honourable Society of Lincoln's Inn</u><br>Called to the Bar of England and Wales |
| 2002 – 2003 | <u>The College of Law, London</u><br>Bar Vocational Course – Very Competent<br>Erskine Chambers Prize for Drafting (Top in Year) |
| 2001 – 2002 | <u>The College of Law, London</u><br>Postgraduate Diploma in Law with Commendation |
| 2001 | <u>The Royal Institution of Chartered Surveyors</u><br>Admitted as a Chartered Surveyor (MRICS) |
| 1995 – 1998 | <u>University of Portsmouth, Hampshire</u><br>Bachelor of Science in Land Management – First Class Honours<br>Royal Institution of Chartered Surveyors Education and Membership Prize |

1

**EMPLOYMENT HISTORY**

| | |
|---|---|
| 2015 to date | <u>ABT Advocates and Notaries Public</u><br>Partner |
| 2010 to 2015 | <u>Appleby, Guernsey</u><br>Founding Partner and Local Practice Group Head, Litigation and &<br>Insolvency Practice Group |
| 2004 to 2010 | <u>Ozannes, Guernsey</u> (now Mourant Ozannes)<br>Associate and Advocate in Litigation Department |
| Sept 2003 | <u>Milberg Weiss Bershad Hynes & Lerach LLP, California</u><br>Assistant (Class Action Litigation) |
| Jul – Sept 2003 | <u>Sullivan Hill Lewin Rez & Engel, California</u><br>Assistant (Litigation Department) |
| 1998 – 2001 | <u>Lovell & Partners, Guernsey</u><br>Chartered General Practice Surveyor |
| 1993 – 1995 | <u>Bachmann Trust Company, Guernsey</u><br>Trust and Company Administrator |

2

**APPENDIX B:**

**Decisions Referred to within Declaration**

|  | Decision | Page |
|---|---|---|
| 1 | International Healthcare Solutions Ltd v Utmost Worldwide Ltd | 39 |
| 2 | In the Matter of Compound Photonics Group Limited | 53 |
| 3 | Ivey v Genting Casinos Limited | 120 |
| 4 | Domaille, Clarke & Hannis v GFSC | 147 |
| 5 | Re Coroin Ltd | 268 |
| 6 | Times Travel (UK) Ltd and another v Pakistan International Airlines Corporation | 310 |
| 7 | Carlyle Capital Corporation Ltd v Conway and others | 365 |
| 8 | CPC Group Ltd v Qatari Diar Real Estate Investment Company | 835 |
| 9 | Overlook v Foxtel | 902 |
| 10 | BP Gas Marketing Ltd v La Societe Sonatrach | 957 |
| 11 | Shaham v Lloyds TSB and Fooks | 1045 |

Application for leave to amend pleadings pursuant to rule 59 of the Royal Court Civil Rules 2007

**[2022]GRC094**

## IN THE ROYAL COURT OF GUERNSEY
### (ORDINARY DIVISION)

Between:

### INTERNATIONAL HEALTHCARE SOLUTIONS LIMITED

**Plaintiff**

### -AND-

### UTMOST WORLDWIDE LIMITED

**Defendant**

**Judgment circulated under the Practice Direction:  11 October 2022**

**Final Judgment handed down:   18th October 2022**

**Before:   Jessica E Roland, Deputy Bailiff**

**Counsel for the Plaintiff:   Advocate R D Breckon**
**Counsel for Defendant:     Advocate M G A Dunster**

**Cases, texts & legislation referred to:**

The Royal Court Civil Rules, 2007
The Insurance Business (Bailiwick of Guernsey) Law, 2002
The Price Gouging Control (Emergency Circumstances) Law, 2015 of the Cayman Islands
Jefcoate v Spread Trustee Company Limited [2013] GLR 220
Tranquillity Holdings Limited v Invista Real Estate Investment Management (CI) Limited Royal Court 38/2015
Easyair Limited (t/a Openair) v Opal Telecom Limited [2009] EWHC 339 (Ch)
Astor Management AG v Atalaya Mining plc [2017] EWHC 425 (Comm)
UTB LLC v Sheffield United Ltd [2019] EWHC 2322 (Ch)
Inn Soo Kim v Youg [2011] EWHC 1781 (QB))
Yam Seng Pte Ltd v International Trade Corp Ltd [2013] EWHC 111 (QB)
Coco v AN Clark (Engineers) Ltd [1969] RPC 41)
Essex County Council v UBB Waste (Essex) Limited [2020] EWHC 2387 (TCC)
BP Gas Marketing Ltd v La Societe Sonatrach [2016] EWHC 2461
Cranway Limited v Playtech [2008] EWHC 550 (Pat)

**Introduction**

1.  This is an application by the Plaintiff dated 28 January 2022 for leave to amend its pleadings pursuant to rule 59 of the Royal Court Civil Rules 2007 ("RCCR").  On the 30 November 2021 I handed down my judgment on various cross applications dealing with the Plaintiff's pleadings (the "30 November 2021 Judgment").  In summary, the Defendant's Application to strike out or obtain summary judgment on the relevant paragraphs of the draft amended Cause and Replique was

dismissed but on condition that identified paragraphs be subject to amendment by the Plaintiff. Further I ordered that rather than responding to the Further and Better Particulars requested by the Defendant in the normal way the Plaintiff was required to amend the Cause. I refused the application by the Plaintiff for leave to amend the Cause on the basis that the Plaintiff was required to further particularise the claims in the draft amended Cause.

2. The Defendant opposes the Plaintiff's application on the basis that it does not satisfy the requirements of my 30 November 2021 Judgment, in the absence of satisfying those requirements the Cause remains confused and due to the deficiencies if leave is given, the Defendant would need to make further applications including another application for summary judgment/strike out and further and better particulars.

3. The Plaintiff relies as it did in the previous round of applications on the affidavits of Mr Randy Skoly ("Mr Skoly") one of the directors of the Plaintiff dated 14 May 2021 and Jana Valkovska dated 2 June 2021 as well as a short affidavit of Samantha Harris dated 28 January 2022 exhibiting correspondence between counsel. Both parties filed skeleton arguments and augmented these orally at the hearing on the 6 April 2022.

**Background**

4. The Plaintiff is a Cayman Islands' company which was incorporated on 8 August 2008. The purpose of the Plaintiff is to manage the marketing of and to provide certain administration services for insurance policies issued by the Defendant in the Cayman Islands, pursuant to an Agency Agreement signed on 1 September 2016 (the "2016 Agreement").

5. The Defendant is licenced by the Guernsey Financial Services Commission to carry on long-term insurance business under the Insurance Business (Bailiwick of Guernsey) Law, 2002 and by the Cayman Islands Monetary Authority ("CIMA") as a class "A" insurer to carry on business in or from the Cayman Islands.

6. The 2016 Agreement is governed by the laws of Guernsey and contains an exclusive jurisdiction clause submitting to the Royal Court of Guernsey. This replaced an earlier version of the agreement between the parties dated 1 September 2008.

7. The 2016 Agreement provides that the Plaintiff is the Defendant's agent and sole distributor of insurance policies in the Cayman Islands. The insured's contractual relationship is with the Defendant. The Plaintiff cannot offer services similar to those it provides under the 2016 Agreement to any other party other than the Defendant. Reinsurance was provided by Generali Global Health ("GGH").

8. The dispute revolves around the decision of the Defendant to exit the Cayman Islands' market in 2020. The underlying facts are set out in more detail in the 30 November 2021 Judgment.

9. The 30 November 2021 Judgment sets out the summary of the pleadings prior to that date and I shall not repeat them here save that the Defendant has complained about the inadequacies of the Cause since it went inscrite on the 31 July 2020. After the 30 November 2021 Judgment was issued, the Plaintiff's advocates provided a copy of the draft amended Cause (the "Second Draft Amended Cause") to the Defendant's advocates on 7 January 2022 and asked for confirmation that it was agreed within 7 days noting that if there was no positive response by then they were instructed to make an application for leave to amend. The Defendant's advocates responded on 17 January 2022 setting out on a broad basis what it considered to be the inadequacies of the Second Draft Amended Cause. The Plaintiff in response set out the directions it proposed for the foreshadowed leave to amend application and the matter was set down for a hearing.

**The Law**

10. The legal principles were not in dispute.

11. Rule 59 of the RCCR provides:  No party to an action may amend his pleadings except with the consent of all other parties or by leave of the Court.

12. The legal principles on amending a pleading are as set out in *Jefcoate v Spread Trustee Company Limited [2013] GLR 220*:

> "(a)  *The court has a wide discretion under the Royal Court Civil Rules, r.59 to permit amendments where one or more of the parties have not consented.*
> (b)  *The discretion must be exercised judicially having regard to legal principles.*
> (c)  *The overriding objective requires that cases be dealt with justly.*
> (d)  *What justice requires depends on the circumstances of the particular case but includes taking account of the matters particularized in the Royal Court Civil Rules, r.1(2), which will be of special importance when a late amendment is sought.*
> (e)  *In general, amendments should be allowed so that the real dispute between the parties can be adjudicated provided that any injustice to the other party can be compensated for in costs.*
> (f)  *In the ordinary course it will not be just to allow an amendment if it will defeat a defence of prescription that may otherwise be available.*
> (g)  *If a defence of prescription may be defeated, it is necessary to establish whether the proposed amendment seeks to introduce a new cause of action.*
> (h)  *What constitutes a new cause of action is not determined by the label attaching to the proposed claim but by the factual situation which is required to be proved to entitle the plaintiff's claim to succeed. If the new cause of action which is sought to be added or substituted arises out of the same facts or substantially the same facts as a cause of action already pleaded, the court will not normally regard it as a new cause of action and hence will have a discretion to allow it.*
> (i)  *However, even if the new cause of action arises from similar or substantially the same facts as already pleaded, the court will disallow the amendment if the justice of the situation so requires.*
> (j)  *Where a new cause of action may be prescribed, the effective date as to when the limitation period expired is the date of the application, although if the amendment is permitted, the effect is that it is deemed to date back to the date of the original proceedings.*
> (k)  *When considering the limitation period, it is necessary to have regard to any period of time during which the plaintiff was empêché d' agir.*
> (l)  *An amendment will not be allowed if the case introduced by it has no realistic prospect of success.*
> (m)  *Apart from considerations of prescription, the mere fact that the change effected by a proposed amendment would involve introducing a new cause of action or that it would substantially alter the character of the proceedings or the burden of conducting them is not a reason for refusing leave to amend provided that the change can be made without inflicting injustice on the other parties of a kind incapable of being compensated by an order for costs."*

**Brief Summary of the Submissions**

13. The Plaintiff's position is that it has complied with the 30 November 2021 Judgment. Further having made the amendments that it has, it has demonstrated that it has a realistic prospect of success on the claims. By applying the principles found in *Jefcoate v Spread Trustee Company Limited (ibid)* and from *Easyair Limited (t/a Openair) v Opal Telecom Limited [2009] EWHC (Ch)* on summary judgment, the Plaintiff in the Second Draft Amended Cause has demonstrated that it has a realistic

as opposed to fanciful prospect of success.  The Plaintiff criticises the Defendant for not setting out which amendments are agreed and which are not, given it says that some must be uncontroversial. Further although the Defendant argues that the Plaintiff's case is not pleaded properly and that it cannot understand the complaint it has to meet in full, the court should take into account that it has been able to file its defence and (save to the extent that the Plaintiff says that there are matters outstanding) complied with its disclosure obligations.  The threshold for permitting an amendment is a low one and the Plaintiff has overcome it.

14.   At paragraphs 14A, 15H (b), 15I, 15K of the Second Draft Amended Cause the Plaintiff sets out the basis of a breach of the term of confidentiality in the 2016 Agreement.  The Plaintiff relies on a number of incidents which the Plaintiff says the Defendant undertook in breach of 2016 Agreement (there is a refence at 15H(b) to paragraph 11(b) however there is no 11(b) so this will need amendment by the Plaintiff).  Advocate Breckon said it is not known all that may have been said to third parties in breach of the 2016 Agreement although there has been at least one phone call as it is referred to in an email sent to offices of the Defendant by a third party.  The Plaintiff says it is clear from the documentary evidence which was exhibited to the affidavit of Mr Skoly and Ms Valkovska that there has been dissemination of confidential information relating to the 2016 Agreement, as well as information and data in relation to the Cayman Islands' market provided to third parties identified as potential acquirers of the Cayman Islands' business.  These third parties are identified in paragraph 15I of the Second Draft Amended Cause and the breach of the 2016 Agreement is such that the Defendant has been able to discuss success fees with at least one of potential acquirers prior to the Defendant serving the Notice terminating the 2016 Agreement (the "Termination Notice") which was served on the Plaintiff on 15 September 2020.    Advocate Breckon said that there may be more evidence as a consequence of further disclosure as well as evidence from the Defendant's witnesses to support this claim.   The Plaintiff also relies on correspondence between the Defendant and CIMA which refers to confusion and uncertainty within the Cayman Islands' market following various announcements that had been made by the Defendant.  The Plaintiff says that the purpose of the 12 months' Notice Period (the "Notice Period") was to allow an orderly winding down of the arrangement.  The breach of confidentiality is commercially unacceptable and by the Defendant failing to deal with matters appropriately, the Plaintiff has suffered loss.  He said there is no issue that the Termination Notice was served and that the contract has ended.  Advocate Breckon did not accept the criticisms of the Defendant with respect to this pleading, he said that it is clear that the Defendant has disseminated information and data and it will have to be "*bottomed out*" at trial and to extent the further disclosure which he said was outstanding.   He submitted that Clause 14 was not respected by the Defendant.  This breach undermined the purpose of the 12 months' Notice Period.

15.   Paragraphs 15H, 17A, 20, 21 relate to the claims by the Plaintiff in relation to price setting. Advocate Breckon referred to documents exhibited to Mr Skoly's affidavit which the Plaintiff says demonstrates that prior to the service of the Termination Notice and as far back as March 2020, the Defendant had already put into place a policy involving a new pricing strategy to the detriment of the Plaintiff.  The reaction to this strategy in the market was one of "*surprise and shock*" as recorded in a working document created either by the Defendant or by GGH with input from the Defendant. Advocate Breckon submitted that even if the prices were set by GGH it was the Defendant with whom the Plaintiff had contractual obligations and duties and the strategy that was adopted was in breach of those duties.  Further the discussions between the Defendant and GGH as to the strategy failed to acknowledge or recognise the obligations the Defendant had to the Plaintiff.   There is no evidence that the Defendant ever attempted to challenge the pricing strategy on the basis that it would put it in breach of its contract with the Plaintiff rather the Defendant continued with the pricing strategy despite the clear protests of the Plaintiff.   The increases in the prices of the policies were across the board which is why there is no breakdown of the various polices (although the new schedule at 21B sets out the individual policies).  The Defendant and GGH had a joint strategy of pricing the policy premiums out of the market which was to the detriment of the Plaintiff and caused it loss.  The Defendant could join GGH to the proceedings but has not done so.  Advocate Breckon

submitted that there is a triable issue as to the Defendant's role in the pricing based on a breach of contract.

16. A reference to Price Gouging remains at paragraph 21 of the Second Draft Amended Cause and Advocate Breckon submitted it should remain despite my comments in the 30 November 2021 Judgment.  Advocate Breckon said this goes to background rather than a specific breach of clause 10 of the 2016 Agreement or of the Cayman Price Gouging law.  He referred to an email sent by Mr Skoly exhibited to his affidavit where Mr Skoly alerts the officers of the Defendant and GGH that Covid loading on the pricing of the policy could lead to conflict with the regulators or "*worse-case scenario a complaint price gouging could open a criminal investigation.*"

17. Paragraph 45 of the 30 November 2021 Judgment provides that the Plaintiff should be allowed to test the lack of good faith claim at trial subject to the previous iteration of the claim being amended.  The Plaintiff submits that the amendments in the Second Draft Amended Cause address the issues identified by me in the 30 November 2021 Judgment.  There are no allegations of dishonesty and nor does the Plaintiff need to establish any.  Due to the nature of the 2016 Agreement the Plaintiff was entirely reliant upon the Defendant to conduct itself in the promotion of the values and purposes of the 2016 Agreement, absent which, the Plaintiff would and has suffered losses.  It is these circumstances that enable the Plaintiff to rely on the principles of an implied term of good faith derived from *Yam Seng Pte v International Trade Corp Ltd [2013] 1 CLC.*  The parties acted in accordance with these values and purposes up until March 2020.  However, Advocate Breckon submits, from March 2020, the Defendant set out on a course to deliberately price itself out of the market, breached the confidentiality provisions of the 2016 Agreement for its own advantage and disseminated information to third parties in a very small market in order to gain a sell side commission; and it failed to serve any notice to terminate the 2016 Agreement until it has exhausted the potential avenues for sale but had damaged the Plaintiff.  Each of these caused the Plaintiff loss.  Advocate Breckon was clear in his submissions that where it is pleaded that there was a combined strategy between Defendant and GGH there is no pleading as to lawful or unlawful conspiracy between the Defendant and GGH.  It is the duty of good faith which the Plaintiff argues that the Defendant owed to Plaintiff that is present in this contract and that creates obligations upon the Defendant in the way it should carry out its part of the contract.  Further this implied term continues during the 12 months' Notice Period but that in any event Advocate Breckon submitted that due to the conduct of the Defendant prior to the Termination Notice these contractual obligations had been undermined.

18. In relation to the complaints by the Defendant about the references in the pleadings to an "*appropriate time*" Advocate Breckon submitted that this was a reference to a date before the Defendant had breached the 2016 Agreement, before the dissemination of the confidential information into the market and before the Termination Notice had been served.  The Defendant should have served the Termination Notice once it decided to leave the Cayman Islands' market which he submitted could have been March 2020 (on or around the date when GGH informed the Defendant that it had decided to stop its reinsurance support for the Defendant in Cayman Islands (and other jurisdictions)) but certainly at any time before it started to disseminate the fact of its leaving into the Cayman Islands' market.  In relation to the criticism made by the Defendant of the pleading at paragraph 22 I of an agreement between the parties of on or around 19 June 2020 in relation to announcing a simultaneous exit of the Bahamas and the Cayman Islands' markets, the Plaintiff points to a series of emails between the parties which Advocate Breckon submits demonstrates the agreement. With regard to the Defendant's submissions about the failure of the Second Draft Amended Cause to show the true position in relation to the request and alleged unreasonable refusal by the Defendant to waive exclusivity contained in clause 3.1 of the 2016

Agreement, the Plaintiff argues that the further correspondence exhibited to Mr Skoly's affidavit shows that taken as a whole the pleading is correct.

19. Advocate Dunster started his submissions by focusing on parts of the 30 November 2021 Judgment which provided direction as to the changes that were needed to the Plaintiff's pleadings and the failure of the Plaintiff to make the necessary changes in order that the pleadings fulfil their function. Whilst acknowledging that Advocate Breckon made clear in his submissions that there are no allegations of dishonesty nevertheless still contained within the allegations are refences to the Defendant's conduct being "*improper, commercially unacceptable and/or unconscionable*" and in "*bad faith*" and at paragraph 15H and paragraph 22A in their references to the Defendant and GGH "*set on a deliberate course*" or "*determined on a course of conduct*" fail to take into account the Court's directions on the inadequacies of the pleadings when serious allegations are being made. Likewise, the remaining references to price gouging in the pleading has no purpose and relevance.

20. In relation to pricing the Defendant says that the Plaintiff has failed to particularise in the way I had set out in detail was required to properly plead the loss at paragraph 46 of the 30 November 2021 judgment. The Plaintiff has to do better particularly where the information on the policies set out in the schedule does not show that all policies were not renewed but rather that there was an approximate 20% drop. The pleadings therefore require better particularisation to make clear how it was the Plaintiff says that the Defendant's conduct that caused this loss. Although the Plaintiff has now pleaded a figure in relation to certain losses based on the Schedule, at 26A of the Cause the Plaintiff is seeking additional damages for the breach of good faith and lack of commercial integrity based on loss of opportunity with such damages to be assessed based on the value of the loss of the whole of their business. This is unparticularised and contrary to the clear expectation of the 30 November 2021 Judgment at paragraph 47.

21. The Defendant has a wholesale objection to the current state of the pleadings therefore Advocate Dunster submits it would not be helpful or purposeful to pick out the words or sentences to which it does not object. The Defendant complains that paragraph 14, 17, 22, 24, 25(a) of the Second Draft Amended Cause create an impression that there remains a claim that the Defendant wrongly served notice by reference to the failure for example of the Defendant to "properly comply" with the termination clause. These pleadings are contrary to the express term that either party had the right to terminate on 12 months' notice which was contained in the contract at clause 2.4.2 of the 2016 Agreement. If these paragraphs are about conduct before or during the Notice Period that is not how it is pleaded.

22. With regard to allegation of a breach of clause 14 of the 2016 Agreement which is a term related to confidential information, Advocate Dunster submits that the pleadings do not adequately particularise what the confidential information is said to be. In particular it should be made clear, whether it is only the information defined in the 2016 Agreement which is said to be the confidential information which has been revealed to a third party and thereafter caused the Plaintiff loss or whether as the pleadings appear to allege, it is the fact of the Defendant leaving the Cayman Islands' market itself in which case, the Plaintiff needs to identify how this information has the necessary quality of confidence. In either case the Plaintiff must particularise how clause 14 is breached by its conduct and thereafter particularise how it is said that each alleged breach is said to have caused the Plaintiff loss. With regard to loss the Plaintiff still fails to plead how it is alleged that the Defendant informing third parties caused the Plaintiff loss (or the extent of the loss) in circumstances where the Plaintiff issued proceedings on 10 July 2020.

23. At paragraph 17A of the Cause there remains references to the Defendant having responsibility for the increase in the policy premiums contrary to the acknowledgement by the parties in the previous hearing that the Defendant was not responsible for the price (rather it was GGH). The Plaintiff must nail its colours to the mast about exactly what it says was the Defendant's alleged wrongdoing

in relation to price setting, what were its obligations and how it is said to have breached the contract, the causation and loss.  Despite the clear direction of the court in the 30 November 2021 Judgment the Plaintiff has still failed to plead with sufficient particularity about how it is said the alleged breaches increased the cost of the polices, the only clearly articulated complaint being that attributable to Covid loading.

24.  With regard to the allegation of a breach of duty of good faith, the Defendant accepts that the Plaintiff is entitled to advance this claim although it makes no admission that Guernsey law would, in fact, recognise an implied duty, or general doctrine, of good faith in contract law.    However, it is clear from the English case law any implied duty of good faith cannot undermine an express term of contract (see _Astor Management AG v Atalaya Mining plc_ [2017] EWHC 425 (Comm) paragraphs 97 and 98).  Further Justice Leggatt in that case sets out at paragraph 98:

> _"that a duty to act in good faith, where it exists, is a modest requirement. It does no more than reflect the expectation that a contracting party will act honestly towards the other party and will not conduct itself in a way which is calculated to frustrate the purpose of the contract or which would be regarded as commercially unacceptable by reasonable and honest people.  This is a lesser duty than the positive obligation to use all reasonable endeavours to achieve a specified result which the contract in this case imposed."_

25.  The Defendant also relies on _UTB LLC v Sheffield United Ltd_ [2019] EWHC 2322 (Ch) at paragraphs 203 and 204 that a general duty of good faith should not be implied into the contract which fails to have regard to the express terms of the contract:

> _"203…….…I consider, preferable to ask oneself first as Leggatt LJ did in the Sheikh Tahnoon case whether a reasonable reader of the contract would consider that an obligation of good faith was obviously meant or whether the obligation is necessary for the proper working of the contract. The overall character of the contract in issue will of course be highly material in answering that question but so will its particular terms, as recognised by the principle that (as restated in the Marks and Spencer case) no term may be implied into a contract if it would be inconsistent with an express term._
>
> _204. That approach is, in my respectful opinion, preferable also because the exact content of any implied obligation of fair dealing, or to act with integrity, or to act in good faith, will be highly sensitive to the particular context of the contract, as observed by Dove J in D&G Cars Ltd v Essex Police Authority [2015] EWHC 226 (QB) at [175]. The greater part of that context is the express terms of the contract. Thus, to imply a general obligation to act at all times in good faith towards the counterparty because the contract is a relational contract may fail to have regard to rights and obligations created by the express terms, to which any implied obligation must be tailored if it is not to be excluded as being inconsistent with them."_

26.  The Plaintiff has not pleaded what the obligations were upon the Defendant in a relationship where either side could "_pull out_" on 12 months' notice.  Therefore, the Plaintiff must plead when it is that the Defendant should have given notice if it says its failure to give notice until 15 September 2020 was in breach of the implied term.  For example, does the Plaintiff allege that notice should have been given to the Plaintiff as soon as the Defendant first considered that it was going to the withdraw from the Cayman Islands' market even if the effect would be extending the required 12 months' notice period whilst the logistics of exiting the market were being worked out.   Likewise at paragraph 22A where the Plaintiff sets out the alleged wrongdoing of the Defendant, the Plaintiff must plead for each alleged breach of the implied term, what it says were the Defendant's obligations to the Plaintiff.  For example, what does it say that the Defendant could or could not do in relation to its book of policies and how the Plaintiff says the Defendant was obligated to take into account the Plaintiff in this regard.  Whilst the Plaintiff says the references to GGH and the Defendant determining on a "course of conduct" are not any form of conspiracy, the Plaintiff is

using intemperate language not only in relation to the Defendant but towards a non-party and therefore must ensure its pleading complies with the rules on pleading.  At paragraph 22A (d) the Plaintiff pleads an unreasonable refusal by the Defendant to waive the exclusivity term at clause 3.1 of the 2016 Agreement however the Defendant says this pleading fails to take into account either the correspondence that was before the court from the Defendant which it says does not show that the Defendant unreasonably refused to waive exclusivity or take into account the regulatory limitations or how the express exclusivity clause at 3.1 is said to interplay with an implied term of good faith.  The Defendant further complains that at paragraph 22A(e) there is reference made to an agreement allegedly made on 19 June 2020 between the parties to coordinate the announcement on the exit of the Cayman Islands' market with the announcement that the Defendant was also exiting the Bahamian market but the Plaintiff fails to abide by the basic rules of pleading in relation to the alleged agreement (was the agreement oral or in writing, the individuals who reached agreement, the dates / circumstances, and the relevant terms) nor sets out properly how is it said to be material to the Plaintiff's claim in relation to the 2016 Agreement.

27.  At paragraph 17 of the Second Draft Amended Cause the Plaintiff alleges an abuse of clause 4.2 of the 2016 Agreement, referring to a failure to engage with the Plaintiff to give "*adequate notice for there to be appropriate discussions to determine the proper proving structures for the insurance year 2020/2021*" and also referring to the Defendant having "*dominant party rights*".  However, the Defendant says that neither of these claims appear be relevant to Clause 4.2 of the 2016 Agreement which states: "*For the avoidance of doubt,* [the Plaintiff] *shall not have underwriting or price-setting authority and shall not bind* [the Defendant] *to coverage under the Policies without* [the Defendant's] *approval*."  The Plaintiff must again particularise the basis of its claim properly, set out the alleged breach and articulate the consequences for it and the loss.

28.  The Defendant also complains that at paragraphs 21 and 21A the Plaintiff raises an alleged breach of clause 10 of the 2016 Agreement (which sets out the obligations of the Defendant including complying with regulatory obligations) and also makes reference to the Cayman Islands' Price Gouging Law but without asking the court to determine whether there was a breach of the law or not.   The reference to Price Gouging in the Cause serves no purpose and should be removed.  Further the Plaintiff fails to deal with what obligations clause 10 are said it impose upon the Defendant and how this clause is said to have been breached.  Again, the Plaintiff must particularise the basis of its claim properly, set out the alleged breach and articulate the consequences for it and the loss.

29.  The Defendant also makes further criticisms in relation to the amendments: of the pleadings being incoherent in paragraphs 11 and 19; that paragraph 15E fails to articulate what damage is said to have been done or when the damage is alleged to have happened; at 15G where the Plaintiff alleges that "*compliance with the express and implied terms of the 2016 Agreement changed in and around March 2020 with the decision of the Defendant to demit the Caribbean health insurance market*" but fails to make clear to what it is alleged that the Plaintiff is alleged to have breached; and at paragraph 15H(a) the Defendant says it is unclear what connection there is between "*offering only extensions to current policy holders in the hope that they would find insurance product offerings elsewhere*" and the potential risk of "*price gouging*" which concerns the pricing of policies.  Further the Defendant argues that the references to service of the Termination Notice at an "*appropriate time*" are vague.   This Defendant argues appears to be leaving in the issue of the breach of clause 2.4.2 of the 2016 Agreement when the 30 November 2021 Judgment makes clear that a claim based on the consequence of the service of the 12 months' notice in accordance with clause 2.4.2 was going to be an uphill task.   If it is about the conduct of the Defendant prior to the service of the notice then the Plaintiff must set out when it is said that the contract should have been terminated, what the Defendant's obligations to the Plaintiff are in relation to the timing of the termination of contract and how it said to have caused loss and what those losses were.

**Discussion**

30. The overriding objective of the RCCR is to decide cases justly and at proportionate cost.   This applies to the treatment of all the litigants to an action.   A properly drafted claim furthers the overriding purpose. In the 30 November 2021 Judgment I concluded that I was not prepared to grant the Defendant's application for summary judgment or strike out on the basis that I was applying the principles of _Inn Soo Kim v Youg [2011] EWHC 1781 (QB))_ set out in _Tranquillity Holdings Limited v Invista Real Estate Investment Management (CI) Limited_ Royal Court 38/2015 that a claim should not be struck out without first giving the Plaintiff the opportunity to amend the pleadings.  My decision made clear however that the dismissal of the application was conditional on the Plaintiff successfully applying (if not agreed) for leave to amend the Cause.

31. Advocate Breckon is correct in his submissions that an application to amend pleadings will be refused if it is clear that the proposed amendment has no real prospect of success. The test to be applied is the same as that for summary judgment and the court may reject an amendment seeking to raise a version of the facts of the case, which is inherently implausible, self-contradictory or is not supported by contemporaneous documentation.   Where he has been challenged on the amendments in the Second Draft Amended Cause Advocate Breckon has focused on the evidence contained in the affidavits filed in support of his application which the Plaintiff says supports the claims in the Cause.   However, it is also important for any amendment to the pleadings to satisfy the requirements of proper pleading.  At the risk of repeating what I said in the 30 November 2021 Judgment, the opponent must know from the moment that the amendment is made, what is the amended case he has to meet with as much clarity and detail as he is entitled to under the rules.  I consider that that the pleading of this Cause still remains deficient even taking account that the facts have developed partly as a result of the Plaintiff becoming aware of information that it previously did not have and that there may be more forthcoming.  Whilst the Plaintiff is correct that the Defendant has pleaded defences, there can be little doubt that from the outset the Defendant has been clear that this has been subject to the limitations placed upon it by the deficiencies of the pleading.

32. The underlying basis of the claim is the 2016 Agreement which the Plaintiff says has been breached in a number of ways.  As I understand the claim there are breaches alleged on the basis of express terms as well as a breach of implied term or terms.  For each of the alleged breaches it should be clear to the Defendant what term is alleged to have been breached, how it is said to have been breached, and what loss is said to have been caused to the Plaintiff by the Defendant's alleged breach.  In considering what should be the next step I have been mindful of the second part of the sentence from _Inn Soo Kim v Youg (ibid)_ at paragraph 40 of that judgment which is not quoted in Tranquillity holdings _"unless the court has given the party concerned an opportunity of putting right the defect, provided that there is reason to believe that he will be in a position to put the defect right."_.

33. Dealing first with claims of breach of confidentiality (paragraphs 14A, 15H (b), 15I, 15K).   These are introduced at paragraph 14A of the Second Draft Amended Cause based on a breach of the term of confidentiality which is at clause 14 of the 2016 Agreement defined in the Cause as the "Confidentiality Clause".   Where a claim is based on breach of confidentiality, the expectation is that the pleadings will identify the information which is alleged to be confidential with some precision and how that information had the "_necessary quality of confidence about it_" (see for example _Coco v AN Clark (Engineers) Ltd [1969] RPC 41_).

34. If it is the case that the Plaintiff's claim is that clause 14 is the source of the quality of confidence in relation to the exit of the Defendant from the Cayman Islands' market, then this should be pleaded properly.  It should also be clear to the Defendant how it is said that the unauthorised confidential information has alleged to have been used i.e., who it is said to have received the confidential information.  I agree with Advocate Dunster's submissions that the pleading is still as yet too vague.  I was unpersuaded that any issues with disclosure that may remain or the witness evidence at trial are sufficient to excuse the Plaintiff from the lack of particularity.   References to the Defendant making "*known its intention to the market*" or undefined third parties are not satisfactory given the pleaded breaches at 15I (a)-(d).

35. Further, despite my reference at the hearing in June 2021 to the impact of the Plaintiff issuing proceeding on 10 July 2020, the Plaintiff appears to be relying only on alleged breaches the day before and after this date, in these circumstances it is incumbent on the Plaintiff to demonstrate how, if the claim is on the basis of the Defendant's leaving the Cayman Islands' market, it survives this.  The Plaintiff still needs to nail its colours to the mast about how this alleged breach or series of breaches caused it loss.  Phrases such as "*was capable of undermining*" at 15H (b) are not sufficient nor does 15K demonstrate any proper causation.    If it is about opportunity to seek alternative insurers as paragraph 14A appears to indicate, then this needs to be properly pleaded i.e. why is it said that the alleged breach meant that this opportunity to seek alternative insurers was lost or irreparably damaged but also why the Defendant has any obligation to facilitate this.

36. With regard to the claim that the Defendant has breached an implied duty of good faith, Advocate Breckon is correct that in my 30 November 2021 Judgment at paragraph 45 I said in relation to the application for summary judgments that "*Given the uncertainty about the implied term of good faith in Guernsey law the correct course is to allow this to be tested with argument at trial*".  However, the Plaintiff cannot ignore the second part of the sentence which goes on to say that "*the current pleadings nor the draft amended Cause do not yet focus with sufficient care and precision on the case the Plaintiff is putting forward*".  The assertion that a party has not acted in good faith is a serious allegation even more so an allegation that a party has acted in bad faith and both must be pleaded properly.   The language of the current pleading is highly critical of the Defendant and yet fails to properly plead the claim.  The Defendant is right to say that the current pleading cannot be left as it is.

37. As Pepperall J said in <u>Essex County Council v UBB Waste (Essex) Limited</u> *[2020] EWHC 2387* (TCC) at paragraphs 61 to 62:

> "*61.   Whatever the basis for my judgment the core plank of UBB's case at trial was that the Authority had not acted in good faith. I acknowledge that Mr Stewart was careful to make clear that not positively to assert that they had acted in bad faith. Nevertheless, allegations of a lack of good faith involve the serious imputation that one or more individuals engaged in conduct that would be regarded as "commercially unacceptable" by reasonable and honest people. Put more colloquially, these were allegations of sharp practice rather than necessarily dishonest conduct.*
>
> *62.   I am sure that this distinction was not of any great comfort to those accused by UBB. As professional men and women employed at a senior level by a public authority, I readily accept that these officers have a deep understanding of the importance of integrity in their dealings on behalf of their employer. I have little doubt that they will have been distressed by allegations that their professional conduct might be regarded as commercially unacceptable by reasonable and honest people. Indeed, such a finding*

> *might have put their future employment, or at least their prospects of advancement in the public sector, at risk..*"

38. In relation to the alleged breach, the Plaintiff must set out with greater particularity each alleged breach and when it happened.  As set out at paragraph 382 of <u>*BP Gas Marketing Ltd v La Societe Sonatrach*</u> *[2016] EWHC 2461*:

> "*Whatever the precise boundaries of a contractual duty of good faith, an allegation of breach of such a duty, put at its lowest, involves an assertion that the other party has not acted in good faith. This is a serious allegation. In such circumstances the party making such allegation should plead its case with proper particularity so that the other party knows the case it has to face as to what breach is alleged to have occurred and when, and the party making such allegation will generally be held to its pleaded case as to what breach of duty is said to have occurred, and when, due to the nature of the allegation being made, and the fact that the evidence that will be called, will have been called to rebut that specific allegation, and only that allegation.*"

39. With regard to the references to course of conduct with GGH pleaded at paragraph 22A (a)-(c) Advocate Breckon has said that this is not an allegation of conspiracy either lawful or unlawful, however given the serious nature of the allegations the Plaintiff is making, the Plaintiff cannot simply leave these particulars in the pleadings without purpose or relevance.  The Plaintiff needs to nail its colours to the mast about what this alleged joint action means to the breach of contract claim made by the Plaintiff against the Defendant.   If these refences in the pleadings do not go to the breach of contract allegation they should be removed.   If they do go to the breach of contract allegation, the Plaintiff must particularise how.

40. Thereafter as with any claim, the pleading in relation to good faith and/or acting in bad faith must set out how the Plaintiff seeks to establish causation and the alleged damages from the Defendant's actions.  The Plaintiff needs to show how the effects of termination are said to be the Defendant's responsibility where there is an express term permitting termination of the contract on 12 months' notice in an exclusive agency contract.  The current pleading at 26A in relation to damages is not satisfactory.  The Plaintiff must properly plead the damages it says have been caused including how it says this alleged breach or breaches have caused it damage over and above the damages of $770,269.16 pleaded and what opportunities the Plaintiff has allegedly lost.   As I said in relation to the previous version of the pleading before me it is not enough for the Plaintiff to argue that "*something will turn up*" or indeed as currently pleaded that "*it is a matter for the court*".

41. I am not clear from the pleading to what extent that claims in relation to price setting are on the basis of an express term, an implied term or both.  This must be made clear.  The Defendant's criticisms of the pleadings at paragraph 17 and 17A are justified and to these I also add paragraph 20. The Plaintiff must make clear what the Defendant's obligations are in relation to the price setting of premiums including dealing with how this claim works when it appeared to be accepted in June 2021, as the Defendant has submitted, that the policy price was set by GGH.   For example, if it is the Plaintiff's case that there was a positive obligation upon the Defendant to not allow the underlying price set by GGH to be too high, the Plaintiff must plead from where this obligation is derived.   Again, the Plaintiff must nail its colours to the mast about exactly what it says was the Defendant's alleged wrongdoing, what were its obligations and how it is said to have breached the contract, the causation and loss.  The refences to the Price Gouging Law in the Cayman Islands at paragraphs 21 and 21A are not relevant to this pleading and should be deleted.  If there is a relevant purpose to the reference to clause 10 of the 2016 Agreement at paragraph 21A, then the Plaintiff needs to plead why this is relevant to the claim.   Likewise paragraph 15H(a) needs to repleaded

with focus on the material facts upon which the Plaintiff relies for its claim. This sub-paragraph also contains a reference to clause 6.1 of the 2016 Agreement which is not referred to elsewhere in the Cause and also to the offering of extensions to current policy holders. It is not clear on the current pleading what the link is between these elements. Paragraph 21B does now plead the detail of the policies written over the relevant period and as I have set out above the figure of $770,269.16 has been pleaded as damages. I consider that the Plaintiff has dealt with this element of the damages sufficiently even though it has not been done in the way that I set out in the 30 November 2021 Judgment for the reasons Advocate Breckon set out at the hearing. However as I have said (and say further below) there is still work to be done on causation which is not fulfilled (if this is their purpose) by paragraphs 24, 25 and 26 which are generalised statements and not adequate particulars of what the consequences were for the Plaintiff of the conduct of the Defendant particularly in circumstances where there is a 12 months' Notice Period and the underlying reasons for the Defendant's decision.

42. In the 30 November 2021 Judgment I made it clear that the paragraphs dealing with the 12 months' notice provision required amending. It is disappointing that the Plaintiff is still making reference at paragraph 24, *"Had the Defendant properly complied with the termination clauses of the 2016 agreement at the appropriate time and conducted an orderly and professional winding down of its affairs"* and at paragraph 25 (a) *"failing to provide proper notice at the appropriate time and not before it had served Les Defences."* These are in addition to the references at clause 14 and 22 of the failure of the Defendant to act in accordance with its contractual obligations to give notice in accordance with the terms of Clause 2.4.2…" and *"the failure by the Defendant to provide any or any proper Notice of Termination before the service of Les Defences…"* respectively. In submissions Advocate Breckon appeared to fix the time as March 2020 but this is not pleaded clearly in the Second Draft Amended Cause. If the Plaintiff wishes to allege that the Defendant has failed to properly comply with the termination clauses, it must be pleaded how it is said that the Defendant did not comply with the termination provisions, particularly when Advocate Breckon says there is no issue that the Termination Notice was served and the contract has ended. If there was an obligation on the Defendant to serve notice at a particular time or at the happening of a particular event this must be pleaded (and where the obligation is said to have been derived from) so that the Defendant can properly answer the claim. If the time the Plaintiff says was the right time is on or around the time identified at paragraph 15G as March 2020 this shouldn't be supposition, this must be pleaded clearly. Similarly, the Second Draft Amended Cause at paragraph 17 refers to an alleged abuse of clause 4.2 of the 2016 Agreement, referring to a failure to engage with the Plaintiff to give *"adequate notice for there to be appropriate discussions to determine the proper proving structures for the insurance year 2020/2021"* and *"dominant party rights"*. I agree with the Defendant, that there is not a link between the alleged failure and the term of the 2016 Agreement. Clause 4.2 goes to the Plaintiff not having underwriting or price-setting authority and not binding the Defendant to coverage under the policies without the Defendant's approval. The Plaintiff must set out the how this express term of the 2016 Agreement supports the allegation by the Plaintiff and specifically what the Plaintiff means by its reference to an obligation by the Defendant to give *"adequate notice"* and *"dominant party rights"* in this context.

43. Paragraphs 11 and 19 are incoherent. I consider that the Plaintiff must have a further attempt at re-pleading these paragraphs. Importantly I agree with the complaints of the Defendant that paragraph 11 fails to demonstrate why the Defendant had to positively cooperate with the Plaintiff to waive the express clause at 3.1. Likewise at paragraph 22A (d) the Plaintiff must plead what is the source of the obligation on the Defendant to act reasonably in waiving an express term of the 2016 Agreement as to exclusivity and at all times where the Plaintiff is seeking to rely on implied terms how this interacts with the express terms of the contract. Having established that the Plaintiff does need to replead this element of the claim, it is appropriate that the Plaintiff also deals with other

complaints that the Defendant has in order to avoid what would be legitimate exceptions de formes i.e. the terms of the letter of 18 November 2020 which do not appear to be an absolute refusal and the other correspondence that led on from this letter as well as licence limitations imposed by CIMA.   Paragraph 19 appears to be a remnant of the original pleading which hasn't been updated to reflect the changes that have happened since the original Cause was served.  If this had been a standalone amendment, I should have been unlikely to order it however given the numerous other amendments that need to be made I consider that this should be repleaded by the Plaintiff.

44. At paragraph 22A (e) there is a typo which needs amending in the first sentence.  During the hearing Advocate Breckon took me to the emails which he said are the June 2020 agreement which is pleaded at this subparagraph.  However, if the Plaintiff is alleging that there was a separate agreement this is not yet sufficiently pleaded.  As Advocate Dunster set out, the elements required for pleading an agreement are not present.  If the Plaintiff is arguing that this accord was in fact a manifestation of the obligations that the Defendant had under the 2016 Agreement likewise it is not yet adequately pleaded.  In either case it is not clear how it is material to the Plaintiff's claim in relation to the 2016 Agreement and its terms.  The Plaintiff must replead this paragraph so that the import of this alleged agreement is clear, as well as abiding by the rules of pleading.

45. At paragraph 15E the Plaintiff refers to "*the damage had already been done*".  This seems to be a general reference to the Defendant's conduct causing the Plaintiff damage.  It seems to be superfluous comment but unless it is identifying separate causation and damage other than that captured within the allegations that the 2016 Agreement should have been terminated at the appropriate time (although see my comments about this reference) this does not need to be amended. If it is an additional claim, then it must be properly pleaded.  I do not consider paragraph 15G needs to be amended as I consider that this is background information unless this is in fact the "*appropriate time*" (see paragraph 43 above) then this should be properly pleaded as I have said above.

46. To an extent although not wholly due to previous amendments in the pleadings, the shape of the current Cause is not helpful. It may be a useful exercise for the Plaintiff to stand back from the current draft and consider whether in addition to the amendments that I have directed that the claims are repleaded in an orderly way so as to clearly demonstrate the link from the pleaded material facts to the claimed relief.

47. I do consider that Advocate Breckon has shown that there are causes of action struggling to get out that are partially visible however there is still work to be done to remedy what remain defective pleadings.   I do not consider that we are in a comparable situation to that alluded to by Lewison J in *Cranway Limited v Playtech* [2008] EWHC 550 (Pat) where he refers to having struck out a claim where the claimant had been given the opportunity to amend but had not done so.    The Plaintiff has attempted to amend the claim, but the Second Draft Amended Cause still contains numerous defects.  It seems to me that the Plaintiff has failed to grasp the importance of a properly pleaded Cause.  This is not being pernickety but rather an acknowledgment that proper pleading is essential.   To restate what I said in my 30 November 2021 Judgment it is a rule of justice that if a party is going to be called upon to spend time and money on answering claims made against him, he should be given a clear indication as to what is being demanded of him and the reasons for it.

48. Advocate Dunster in his skeleton argument invited me to exercise my general powers of case management to make unless orders, adverse costs orders and/or strike out sections of the pleadings I consider appropriate in the circumstances.  Although I have come to the conclusion that the Plaintiff has been almost entirely unsuccessful in amending its Cause I do consider, on balance, that the Plaintiff should be given one last opportunity to amend its pleading in order that the real dispute

between the parties can be adjudicated upon, but this must be done in a timely way.  I therefore direct that the Plaintiff will have 28 days from the date of this judgment being handed down in final form to file its application for leave to amend the Cause.   If the Plaintiff makes the application in time but the Defendant does not consent to the amendments then the matter should be listed by the Plaintiff for the second Interlocutory Court after the 28 day deadline in order that directions can be made.  If the Plaintiff does not make its application in time, then the Defendant may wish to make consequential applications.

49.  There appears to be no good justification for the Plaintiff not to pay the Defendant's recoverable costs of and occasioned by its amendments.  I do not consider that these should be limited given the approach of the Defendant which I consider was well-grounded in the circumstances.  However, as I did not hear the parties on costs in April, I will give the parties 7 days to make any application otherwise I will make the order that I have intimated.

© Royal Court of Guernsey

Compound Photonics Group Ltd, Re, 2022 WL 14081423 (2022)

# Mark Faulkner, Jonathan Sachs, the Minorities (As listed in Schedule 1 to the Petition) v Vollin Holdings Limited, Minden Worldwide Limited, Aldon Investments Limited

 **Positive/Neutral Judicial Consideration With Appeal Outstanding**

**Court**
Court of Appeal (Civil Division)

**Judgment Date**
21 October 2022

Case No: CA-2021-000720

Court of Appeal (Civil Division)

**[2022] EWCA Civ 1371, 2022 WL 14081423**

Before: Lord Justice Newey Lady Justice Carr and Lord Justice Snowden

Date: 21 October 2022

On Appeal from The High Court of Justice Business and Property Courts of England and Wales Companies Court (ChD) Mr. Justice Adam Johnson *[2021] EWHC 787 (Ch)*

Hearing dates: 4-6 May 2022

In the Matter of Compound Photonics Group Limited and in the Matter of Compound Photonics UK Limited and in the Matter of the Companies Act 2006

**Representation**

   Andreas Gledhill KC and Donald Lilly (instructed by Allen & Overy LLP ) for the Appellants Vollin and Aldon.
   Mark Rainsford KC (instructed by Direct Access ) for the Appellant Minden.
   Robin Hollington KC and Adrian Pay (instructed by Mishcon de Reya LLP ) for the Petitioners/Respondents to the Appeal.

**Approved Judgment**

Lord Justice Snowden:

| Index to judgment | Paragraph number |
|---|---|
| A. Introduction | 1 |
| B. Factual Background | 9 |
| C. The terms of the 2013 SHA and 2013 Articles | 75 |
| D. The arguments of the parties at trial | 93 |
| E. The Judge's analysis of the law and the parties' bargain | 97 |

Compound Photonics Group Ltd, Re, 2022 WL 14081423 (2022)

| | |
|---|---|
| F. The Judge's application of the law to the facts | 122 |
| G. The central issues on the appeal | 142 |
| H. The meaning of clause 4.2 of the 2013 SHA | 147 |
| I. The parties' bargain | 243 |
| J. Was the 2013 SHA part of the Company's constitution? | 277 |
| K. Were the Minorities unfairly prejudiced? | 287 |
| L. The Respondents' Notice | 336 |
| M. Disposition | 341 |

## A. Introduction

1. This is an appeal against the decision of Mr. Justice Adam Johnson ("the Judge") given in a detailed judgment after a four week trial of an unfair prejudice petition under section 994 of the Companies Act 2006 ("section 994 " and "the 2006 Act "). The Judge ordered the Appellants ("Vollin", "Minden" and "Aldon", together "the Investors") to buy the shares of the Petitioners ("Dr. Sachs", "Mr. Faulkner" and 68 other shareholders, together "the Minorities") in Compound Photonics Group Limited ("CPGL" or "the Company") at a value to be determined.

2. The core of the case for the Minorities, which the Judge accepted, was that they had been unfairly prejudiced by the Investors when Dr. Sachs and Mr. Faulkner were respectively forced to resign and removed from office as directors and thereby excluded from any continuing role in the management of the Company.

3. It was, however, common ground that the Company was not a "quasi-partnership" company to which any equitable considerations of the type identified by Lord Hoffmann in O'Neill v Phillips [1999] 1 WLR 1092 might apply. Instead, the Judge accepted that, in excluding Dr. Sachs and Mr. Faulkner, the Investors had acted in breach of the terms of a shareholders' agreement relating to the Company. The Judge also found that the directors nominated by the Investors had acted in breach of their duties to the Company under sections 171(a) and 172 of the 2006 Act .

4. At the heart of the Judge's decision was the finding that the shareholders' agreement and the Company's articles comprised a "constitutional settlement" reached between the shareholders under which (i) Dr. Sachs and Mr. Faulkner were entrenched in office as directors; and (ii) even though the Investors had provided very substantial capital for the Company's business and as a result held 93% of the shares, if they voted in favour of removing Dr. Sachs or Mr. Faulkner from office or sought to obtain control of the board, that would be a breach of contract.

5. There were, however, no express terms of the shareholders' agreement to that effect. The central component of the Judge's reasoning in this regard was the meaning that he gave to a clause in the shareholders' agreement under which the shareholders undertook to each other and to the Company that they would at all times act "in good faith" to each other in relation to the matters contained in the agreement. In interpreting that clause, the Judge adopted the formulation of HHJ Klein in Unwin v Bond [2020] EWHC 1768 (Comm) of what were described as "minimum standards" of conduct required by a contractual good faith clause.

6.  The Judge held, in particular, that the good faith clause required the Investors to act "with fidelity to the bargain", and that the bargain that the Investors had made was "expressly designed to avoid the will of the majority prevailing in matters concerned with the commercial future of the Company". The Judge also held that the contractual duty of good faith included an obligation upon the Investors to deal "fairly and openly" with Dr. Sachs and Mr. Faulkner, and to take account of the interests of the Minorities as well as their own interests.

7.  The Investors appeal, essentially on the basis that the Judge interpreted the "good faith" clause in the shareholders' agreement far too widely. The Investors contend that the clause did not mean that they had given up the right to vote to remove Dr. Sachs and Mr. Faulkner or take control of the management of the Company in which they were very substantial investors and majority shareholders; and neither did it impose upon them any duties of procedural fairness or require them to take into account the interests of the Minorities when deciding how to exercise their right to vote as majority shareholders.

8.  On the facts, the Investors rely on the finding by the Judge that they had genuinely and reasonably formed the view that it was necessary for Dr. Sachs to cease to be involved in the management of the business for the good of the Company. On that basis they contend that they did not act in breach of their obligation of good faith when they required the resignation of Dr. Sachs as a condition of providing the substantial further financial investment that the Company needed. The Investors also deny any wrongdoing by themselves or their nominee directors when they subsequently assumed control of the management of the Company's business and removed Mr. Faulkner as a director.

**B. Factual Background**

9.  The factual background is set out in considerable and lucid detail at paragraphs 1 to 333 of the Judgment. Although the Investors challenge a number of the characterisations and legal conclusions that the Judge drew, there was no direct challenge to any of his findings of fact. What follows is therefore a simplified (and necessarily incomplete) overview of some of the key events for the purposes of understanding the legal issues arising on this appeal.

10.  The Company and its subsidiary, Compound Photonics UK Limited ("CPUK") were the vehicles for the intended development and commercialisation of academic research by Dr. Sachs into gallium arsenide and liquid crystal technology. The Company was formed in 2009 to become the holding company of CPUK, which had been formed in 2006. The focus of the plan was to develop, manufacture and sell a very small ("Pico") projector.

11.  Dr. Sachs was Chief Executive Officer ("CEO") of the Company and an employee of CPUK, and had day-to-day control of the business of the two companies. The Judge described Dr. Sachs as the man whose vision for the exploitation of the technology the Minorities had bought into when investing in the Company: or, more colourfully, as Mr. Faulkner had said in evidence, Dr. Sachs was " *the jockey they were backing* ".

12.  Mr. Faulkner was an independent financial adviser, who was the non-executive Chairman of the Company. In his role as financial adviser, Mr. Faulkner had originally introduced the other Minorities to CPUK as shareholders.

13.  Vollin and Aldon are part of an investment structure of which the beneficial owners are Dr. Alexander Abramov and Dr. Alexander Frolov, two Russian businessmen who made substantial sums on the public listing of EVRAZ plc, a mining and metals business. Together, Dr Abramov and Dr Frolov hold approximately 29% of the issued shares in EVRAZ plc. Minden is part of an investment structure of which the Israeli-Russian businessman Mr. Roman Abramovich is the beneficial

Compound Photonics Group Ltd, Re, 2022 WL 14081423 (2022)

owner. Mr. Abramovich is also the owner of a 29% stake in EVRAZ plc. During the relevant events, Vollin and Aldon were given investment advice by an entity called Kew Capital LLP ("Kew") which was based in London, and Minden was given investment advice by an entity named MHC (Services) Limited ("MHC"), also based in London.

14.  Vollin was introduced to the Company and CPUK in about 2010, and made an initial investment of about $20 million, becoming a minority shareholder in the Company on the terms of a detailed shareholders' agreement and new articles of association (the "2010 SHA" and the "2010 Articles"). Those documents entitled Vollin to nominate two directors to the board of the Company. At that time, the board comprised Dr. Sachs, Mr. Faulkner, a Dr. Robert Lind (an associate of Dr. Sachs), and a Mr. Fletcher and a Mr. Bolger from Kew (nominees of Vollin). The Company's business was, however, managed in an informal way. There is no record of any formal board meetings taking place at any time.

15.  In August 2011, further capital was needed and was raised by a rights issue which resulted in Vollin's shareholding in the Company increasing to about 51%. At this time good progress was being made with the Pico projector project and there was confidence in the business.

16.  By April 2013, the project had not kept to the timetable originally envisaged and substantial further investment was required. There was minimal further investment by the Minorities in the rights issue, and as a consequence Vollin provided the bulk of the new funding required. This saw its shareholding in the Company increase to around 80%. At the same time, a revised shareholders' agreement (the "2013 SHA") and articles (the "2013 Articles") were agreed.

17.  The 2013 SHA incorporated a new target "exit" date for Vollin, which was for the Pico projector to enter production in the second half of 2014, with mass production to follow thereafter. With a view to such production of the Pico projector, in June 2013, CPUK acquired the largest gallium arsenide fabrication plant in Europe, located at Newton Aycliffe in County Durham ("Newton Aycliffe"). Newton Aycliffe employed a large number of staff and came with substantial running costs. These were mitigated somewhat by a long-term supply contract with a company called Selex (which in turn had a contract with the Ministry of Defence), but even with this contract, the Newton Aycliffe facility was loss-making.

18.  By November 2013, the Company's business plan contemplated the Pico projector being launched in late 2014 and entering full-scale production in early 2015. But to achieve this, about US$76 million of further funding was required. This was more than Vollin was willing to provide on its own, and so, in January 2014, Mr. Abramovich was approached and given a presentation based upon the Company's business plan. He was impressed, and agreed that Minden would invest alongside Vollin. To that end, in March 2014 Minden executed a Subscription Agreement and Deed of Adherence to the 2013 SHA.

19.  After the investment by Vollin and Minden in 2014, their combined shareholdings amounted to about 93% of the equity share capital of the Company.

20.  Under the Subscription Agreement and Deed of Adherence to the 2013 SHA, Minden was entitled to appoint a single nominee to the board of the Company. As a consequence, from 2014, the board comprised six members: Mr. Faulkner (Chairman), Dr. Sachs (CEO) and Dr. Lind; Mr. Fletcher and Mr. Bolger (the Vollin nominees); and a Mr. De Cort from MHC (the Minden nominee).

21.  Unfortunately, the Pico projector project did not result in a saleable product conforming to the originally intended specification even within the extended timescales envisaged in the Company's revised business plans. In particular, there was

© 2023 Thomson Reuters.                                                                                                    4

a setback at the World Mobile Congress in Barcelona in February 2014 when Dr. Sach's efforts to engage other investors in the project failed.

22.  By mid-June 2014 it was clear that the projections that had been shared with Mr. Abramovich in early 2014 were no longer achievable. Plans for the Pico projector were then shelved and attention focused on development of a less ambitious and larger projector. However, these plans also slipped. The launch date was put back to early 2016, and by June 2015 the expectation was that the first customer shipment would not be until November 2016.

23.  By this time in June 2015, Mr. Fletcher (who had originally recommended the investment to Vollin) had begun to lose confidence in Dr. Sachs. However, a consultant appointed by the Investors provided a positive report, despite the delays. On that basis there was no overt expression of concern when, at a meeting on 1 July 2015, Dr. Sachs presented a revised request to the Investors for an "additional investment to launch " of US$118 million and an "additional investment to breakeven" of US$180 million.

24.  Subsequently, on 7 August 2015, Vollin and Minden executed a further Subscription Agreement for an additional US$31 million in monthly tranches starting on 1 August 2015. By September 2015, the Investors had invested a total of US$135 million in the Company. Their expectation at that stage was still that a product would go to market by November 2016. There was also a further quarterly presentation to the Investors in October 2015 which represented that the business was largely on track and spending was within or under budget.

25.  In November 2015, Mr. Bolger made a trip to Phoenix, USA to assess how work was progressing with the projector. Mr. Bolger was very concerned by what he saw. The prototype was larger than anticipated and there was a significant internal disagreement about likely production costs. What he saw caused Mr. Bolger to have serious reservations as to whether Dr. Sachs' vision was in fact realisable.

26.  On 16 December 2015, Mr. Bolger resigned as a director of the Company. This left the board of directors as follows: Dr. Sachs (CEO), Mr. Faulkner (Chairman) and Dr. Lind; Mr. Fletcher (Vollin's nominee) and Mr. De Cort (Minden's nominee). On 8 February 2016, a Mr. Burkey (of Kew) was appointed as Vollin's second nominee.

27.  On 7 January 2016 Dr. Sachs attended a meeting at Kew in advance of a planned presentation of a prototype to the Investors in Phoenix in February. The Judge found that preparations for the presentation in Phoenix did not go smoothly. There were continuing issues with the technology and it was difficult to get Dr. Sachs to focus on the detail. The presentation was re-scheduled and took place on 17 February 2016. Although it seemed to go successfully, issues remained about the size of the prototype, the level of further investment needed, and (at least as far as Mr. Fletcher was concerned) the continuing role of Dr. Sachs as CEO.

28.  On 4 March 2016, draft documentation for the next funding round was circulated. This included a draft Subscription Agreement for a further US$8 million investment from Vollin and Minden. This was well short of the amount needed to launch a marketable product, and would only have been sufficient to keep the Company and CPUK running for another few weeks.

29.  On 9 March 2016, Mr. Bolger made a presentation to the Investors and their representatives and Dr. Sachs at Kew's offices. Mr. Bolger suggested that the additional capital requirements to break even ranged between US$200 million and US

$270 million. Dr. Sachs openly disagreed with the figures presented and thought that the Investors were not being given a fair account of his (different) point of view.

30.  Although Dr. Sachs had the perception that Mr. Fletcher and Kew were somehow doctoring the flow of information to the Investors, the Judge rejected that suggestion and found that at this stage no decision had been taken by the Investors to remove Dr. Sachs. Rather, the primary concern of the Investors was to obtain a reliable and objective assessment of the business. To that end it was suggested that a firm of management consultants should be engaged.

31.  That idea was further discussed at a meeting at Kew's offices on Friday 11 March 2016 attended by the advisers to the Investors and Dr. Sachs. Mr. Fletcher suggested appointing a firm of management consultants at which a close associate of his was senior partner. This caused a further disagreement with Dr. Sachs, but that disagreement became of secondary importance because Dr. Sachs refused to engage with the question of the level of access to be allowed to the consultants, whoever was given the job. The meeting was adjourned over the weekend for Dr. Sachs to consider the position further.

32.  The next day, Saturday 12 March 2016, there was a meeting of the representatives of Vollin and their advisers at Kew's offices. One of the purposes of this meeting was to decide whether the Investors should support the latest funding round (i.e. to execute the draft Subscription Agreement for a further US$8 million). The Judge found that it was this group who also initially formed the view that Dr. Sachs should be asked to resign as a director and CEO, that the plan to engage management consultants should be abandoned, and that the Company should focus on a short-term strategy of seeking to retain what existing value the business had.

33.  The Judge found that Mr. Fletcher and Mr. Bolger regarded it as important to have Mr. Faulkner's support for what was proposed. Accordingly, on Sunday 13 March 2016, Mr. Burkey wrote on behalf of the Investors to Mr. Faulkner, copying Mr. Fletcher, advising that the Investors had lost confidence in Dr. Sachs as CEO and as a result would not provide further funding to the Company under the existing management arrangements. Mr. Fletcher and Mr. Burkey then telephoned Mr. Faulkner to reiterate this. When approached, Mr. Faulkner was inclined to provide his support. When cross-examined on the point at trial, he said he would "follow the money".

34.  On Monday 14 March 2016, a meeting took place between (among others) Dr. Sachs, Dr. Abramov, Mr. Fletcher and Mr. Burkey. Mr. Fletcher told Dr. Sachs that the Investors were not going to fund the Company unless he was no longer CEO and presented him with a term sheet for his removal. It was made clear to Dr. Sachs that he had to resign as a director by close of business on Thursday 17 March 2016 and that if he did not go voluntarily, he would be removed by the Investors using the procedure under the 2006 Act . The Judge concluded that Dr. Sachs felt he had been given no opportunity for discussion, had in effect been presented with a *fait accompli* , and that he had little option but to go.

35.  There were then discussions over a period of a week regarding settlement terms for Dr. Sachs. The Company paid for him to be advised and represented by a separate team at its solicitors, Fieldfisher LLP, and the Company was represented by Allen & Overy LLP. On Monday 21 March 2016, Dr. Sachs executed a settlement agreement which provided, among other things, for his removal as CEO of the Company. The settlement provided for him to be treated as a " *Good Leaver* " under the terms of the 2013 SHA. It also provided for the full and final settlement of all claims arising out of services rendered to the Company. The settlement agreement was approved by written resolution of the board of the Company, and signed by all the then directors including Dr. Sachs and Mr. Faulkner.

© 2023 Thomson Reuters.    6

36.  The subscription agreement for the further round of investment by Investors was then concluded on Tuesday 22 March 2016, resulting in a further injection of US$8 million into the business.

37.  After Dr. Sachs' resignation, Mr. Bolger assumed the role of interim CEO of the Company, announcing the creation of a new "executive committee" of the Company to the employees on Wednesday 23 March 2016.

38.  At a subsequent Investor update meeting on 13 April 2016, Mr. Bolger presented a proposal to the Investors which envisaged abandoning Dr. Sachs' vision for the Company because of its heavy capital requirements, and instead adopting a lower risk business model which involved minimising costs and entering into joint development agreements with third parties. An important element of minimising costs was for CPUK to serve a Last Time Buy Notice terminating the supply contract with Selex, and to close Newton Aycliffe after fulfilling the final orders. At the time, the plant was costing US$19 million per annum to run but was generating only US$7 million per annum from the Selex contract.

39.  After the Investor meeting on 13 April 2016, Mr. Bolger had discussions with a senior employee at Newton Aycliffe (Mr. Richard Jackson) and Selex which flagged up the possibility that a Last Time Buy Notice might be served. In addition, Mr. Bolger and Mr. Jackson began to consider the possibility of saving the facility at Newton Aycliffe by a management buy-out with a view to continuing to service Selex business.

40.  Mr. Faulkner had been told by Mr. Fletcher that he could not attend the meeting on 13 April 2016 because it was a meeting of Investors. Mr. Faulkner was, however, sent a copy of the slide deck setting out the new plans for the Company on 18 April 2016 prior to a meeting which he had with Mr. Bolger, with the result that he was made aware of the proposals in relation to Newton Aycliffe and the service of a Last Time Buy Notice.

41.  Mr. Faulkner became concerned about this and on 4 May 2016 he emailed Mr. Fletcher, acknowledging that the meeting on 13 April 2016 had been an Investor meeting, but reminding Mr. Fletcher of the need for "proper corporate governance". Mr. Faulkner asked for a board meeting of the Company to be convened for 23 or 24 May 2016. Mr. Fletcher's email response later that day was as follows,

> "We can certainly convene a board meeting if you wish and either of the two dates you suggest are currently available in my diary, but we would need to check with others.
>
> However, given that you are already extremely well briefed about the company and have full access to [Mr. Bolger] as the interim CEO, as well as the rest of the management team, I wonder if a board meeting isn't excessively formal. Wouldn't it make much more sense for you just to come in and meet with [Mr. Burkey] and I. It's obvious, following the departure of [Dr. Sachs], and the discovery of the serious condition that the company now finds itself in, that changes to both governance and the board structure and composition are required and inevitable if the company is going to continue to attract funding from its funding majority shareholders. This funding is essential for [the Company's] survival. Previous corporate governance has manifestly failed and I don't currently see much, if any, scope for negotiation on the changes required.
>
> So why don't you just come in? We can talk it all through: to the extent that changes need to be properly papered by board resolutions, we can then convene a board meeting…
>
> Next week is probably difficult, but the week following should work or we can default to your suggested dates. Feel free to call me."

© 2023 Thomson Reuters.

Compound Photonics Group Ltd, Re, 2022 WL 14081423 (2022)

42.  Mr. Faulkner responded quickly by email, agreeing to come in to discuss matters with Mr. Fletcher on 23 May 2016. He also gave Mr. Fletcher a "heads up" that the Company's accounts were due to be finalised very soon, and that there would have to be some thought given to the forward looking statement as to the ability of the Company to continue as a going concern given the funding position.

43.  On 10 May 2016 Mr. Bolger and Mr. Jackson had a further meeting with Selex, following which a Last Time Buy Notice was served by Mr. Jackson on behalf of CPUK on 16 May 2016, terminating the supply contract with Selex and giving Selex two months to place any final orders. Mr. Faulkner was not aware that a Last Time Buy Notice had actually been served until about 3 June 2016 when he learnt of this in a discussion with Mr. Jackson.

44.  When Mr. Faulkner met Mr. Fletcher on 23 May 2016, Mr. Fletcher said that Mr. Faulkner should resign, and he was left to think more generally about changes to the corporate governance and board structure and to revert to Mr. Fletcher. He did not, however, do so. Rather, he and Dr. Sachs consulted external lawyers (Bryan Cave LLP) in relation to a possible claim.

45.  Mr. Faulkner did, however, respond to a round-robin email from Mr. Bolger on 16 June 2016 which gave a general up-date, including mentioning the service of the Last Time Buy Notice. Mr. Faulkner arranged a lunch meeting with Mr. Bolger for 28 June 2016. The lunch was cordial. Among other things Mr. Faulkner told Mr. Bolger that he was under "a lot of pressure" from the Minorities and that "there was going to be some unusual behaviour coming up".

46.  As well as having lunch with Mr. Bolger, on 28 June 2016 Mr. Faulkner also spoke to Mr. Jackson and learned of a planned meeting with Selex on 4 July 2016. Mr. Faulkner insisted he should attend, and so Mr. Jackson sent Mr. Faulkner a copy of the slide pack outlining the earlier discussions that had taken place with Selex and explained that the purpose of the meeting was to discuss the economics of a management buy-out and Newton Aycliffe continuing to supply Selex after the contract with CPUK came to an end. Mr. Faulkner duly attended the meeting on 4 July 2016, at which the possibility of a management buy-out was discussed in a limited way. This led to Mr. Faulkner being keen to obtain more information about it if he could.

47.  At around this time in June 2016, Dr. Lind agreed to resign as a director of the Company. His departure was entirely consensual, albeit that his decision was in part taken because of concern that he was not being included in the business of the Company in a way that allowed him to discharge his duties as a director satisfactorily, and he was concerned about the risk of litigation.

48.  Efforts were also being made at this time to recruit a new CEO for the business. One party involved in such efforts was Target Global ("Target") an international venture capital firm founded by Mr. Alexander Frolov Junior (the son of Dr. Frolov). As a by-product of being involved in that search, Target also took a broader interest in solving the problem that the investment in the Company had come to represent for Vollin. Target's Managing General Partner's motivation for doing so was to curry favour with Dr. Frolov and possibly prise away from Kew parts of the Frolov/Abramov investment portfolio.

49.  To this end, in mid-June 2016 Target identified a company called Kaiam Corp ("Kaiam") as a potential merger partner for the Company. On 24 June 2016 Mr. Fletcher asked Mr. Bolger and another to review a slide deck giving background information on Kaiam, and indicating that it was interested in the facility at Newton Aycliffe. Further discussions involving

Compound Photonics Group Ltd, Re, 2022 WL 14081423 (2022)

Mr. Bolger took place in San Francisco in July 2016, and although Mr. Fletcher was both resistant to the level of involvement of Target and sceptical about the merger proposals, he eventually cleared the air with Mr. Alexander Frolov Junior and agreed a due diligence process.

50.  By this time in late July 2016, nothing had been heard from Mr. Faulkner concerning corporate governance and the structure of the board since the meeting with Mr. Fletcher on 23 May 2016. Mr. Fletcher had sent Mr. Faulkner a chaser email on 5 July 2016, reminding him of their earlier meeting and saying,

> "We have since heard nothing and we need to get this matter resolved. As I made clear at our meeting, we simply will not continue to fund you as Chairman or in any non-exec capacity. Additionally, the governance of [the Company] needs to be brought in line with the ownership structure.
>
> Please get back to me as soon as possible."

Mr. Fletcher followed this up with a further chaser on 17 July 2016, but again Mr. Faulkner did not respond.

51.  Mr. Faulkner's input was also required in order to finalise the statutory accounts for the Company and CPUK for 2015. Mr. Faulkner had previously been supplied with draft accounts for comment on 7 April and 18 May 2016, and on 27 July 2016 Mr. Jackson emailed him (and others) stating that the accounts had been approved by the auditors, attaching a final copy and asking for comments and questions.

52.  On 2 August 2016 (as the Judge put it) Mr. Faulkner broke his period of silence by sending an email to Mr. Jackson. It was entitled "Information required" and with no explanation simply said "Please send" and listed 16 categories of information or documents. These included financial information on the Company, CPUK and the Company's US subsidiary for the first half of 2016, lists of their employees and copies of the Selex contract and purchase orders. The email concluded,

> "I need this by COB tomorrow. I will see you in Newton Aycliffe on Thursday 11 [August] and expect you will be able to answer any questions I will have."

53.  Against the silence that had preceded it, the Judge described this email from Mr. Faulkner as peremptory and odd. The Judge found that it was very likely not simply part of an exercise of Mr. Faulkner flexing his muscles to see what he could get, but was part of a process which was going on behind the scenes in which Mr. Faulkner and Dr. Sachs were assessing litigation options and other strategies, with Newton Aycliffe and Selex being a particular focus of attention and the subject of a possible rival acquisition as part of a joint venture between them.

54.  The indication by Mr. Faulkner that he intended to visit Newton Aycliffe on 11 August 2016 presented Mr. Jackson with a problem, because that was the same day fixed for a visit from Kaiam as part of the merger discussions. The Judge found that Mr. Jackson successfully deflected Mr. Faulkner from attending by lying to him, saying that the management team were meeting in London that week. Mr. Faulkner's email and intention to visit Newton Aycliffe were discussed by Mr.

© 2023 Thomson Reuters.

Jackson with Mr. Bolger, with the net result that Mr. Bolger resolved to treat Mr. Faulkner with caution until it was clear what was happening.

55.  After their visit on 11 August 2016, Kaiam were impressed with Newton Aycliffe and were keen on the idea of some sort of venture with the Company. During this visit, Mr. Jackson took the decision to remove the page for 11 August 2016 from the visitors' book. The Judge accepted Mr. Jackson's explanation that this was not done with a view to deceiving Mr. Faulkner, but instead was taken as a routine precaution to limit the risk of the news of the Kaiam visit leaking inadvertently.

56.  On 5 August 2016, the Company's solicitors, Fieldfisher LLP, circulated a draft board resolution proposing the addition of Mr. Fletcher as a further director of CPUK. At the time Mr. Faulkner was CPUK's sole director. Mr. Faulkner protested that this was another example of the lack of governance and was the first he had heard of this proposal. Mr. Fletcher responded that Mr. Faulkner had been Chairman for years and had had ample opportunity to say something if he was unhappy about governance, but had not. The Judge commented that this exchange exemplified "the stand-off between the two sides which had developed".

57.  This caused Mr. Faulkner to contact Mr. De Cort (as Mr. Faulkner told the Judge) "in an attempt to engage Minden's interest as a possible peace-broker". Mr. Faulkner's email stated,

> "The purpose of the meeting is to discuss [the Company] and affiliated companies – some of which are insolvent. Furthermore I have not been consulted or briefed regarding any further funding proposals and the companies are out of cash in the coming weeks. There are governance issues which I have been flagging with [Mr. Fletcher] and I asked to meet with him today or tomorrow – to which he had declined.
>
> So, lots to talk about (including 86 minority shareholders) – and I am hoping to have a meaningful direct conversation with you."

58.  A call was arranged for 9 August 2016, but in the event, Mr. De Cort was unable to attend. Instead Mr. Faulkner spoke to Mr. Fletcher and Mr. Burkey. Mr. Faulkner was accompanied by a lawyer from Gordon Dadds. The next day, 10 August 2016, Mr. Fletcher sent an email to Mr. Faulkner summarising what had been agreed on the call,

> "On that call, we agreed 3 action points:
>
>> 1.  You would circulate to your fellow board members your comments, questions and open issues on the accounts of CPGL, CPUK and CPUS as well as the questions to which you have requested answers from Richard Jackson, none of which any of us have seen.
>>
>> 2.  You would sign the appropriate form which you have received from Fieldfisher approving/consenting to my appointment as a Director of CPUK.

> 3.   For so long as you remain chairman, you would seek to call regular board meetings in order to ensure that you are properly informed about CP, its direction and future strategy and in the interests of good governance.

> We note your concerns about the solvency of CPUK and CPUS. We do not share those concerns which we believe arise out of a basic misunderstanding about how [the Company] and its affiliates are funded. But as fellow directors, it is important that we hear the properly articulated rationale behind your concerns. Please let us have this."

59.  In the event, Mr. Faulkner did not respond to the invitation in the email to set out his concerns and he did not call a board meeting for the Company or CPUK at any time.

60.  There was a further investor update meeting on 15 August 2016 to discuss the future plans for the business and to review the events that had taken place since April 2016. The meeting was also to consider the financial forecast and projected cash requirements of the group for the remainder of 2016. The slide deck for the meeting contained a page entitled "What we have achieved since April" and a section headed "Kaiam Discussions". It also identified an immediate requirement of US $4.5 million in August 2016 and a further US$11 million for the remainder of the year. It was envisaged that the investment of US$4.5 million would be achieved by Vollin and Minden entering into a further subscription agreement for more shares in the Company.

61.  Mr. Faulkner was not invited to this meeting but he knew it was to take place, because on 12 August 2016 he sent an email to Mr. Bolger asking him to provide a copy of the slide deck presentation. Mr. Faulkner was also involved in discussions on 16 August 2016 — the day after the meeting had taken place — about the mechanics for approval by the Company of the subscription agreement for the proposed investment of the US$ 4.5 million.

62.  Those discussions highlighted a difference of opinion as to the meaning and effect of clause 20.1 of the 2013 SHA between Gordon Dadds (who were advising Mr. Faulkner), and Fieldfisher (who were advising the Company). The essential question was whether approval of the subscription agreement was a matter for the board or a matter for the shareholders, and if the latter, whether Vollin and Minden were conflicted and unable to vote by reason of being counterparties to the proposed agreement. Fieldfisher took the view that this was a matter for the board, but that Mr. Faulkner would be the sole director who was disinterested and who could vote; whereas Gordon Dadds took the view that it was a matter for the shareholders, and Minden and Vollin were conflicted and could not vote.

63.  Fieldfisher's advice to the Company was set out in an email to Mr. Bolger which was copied to Mr. Faulkner. The email recorded that the partner at Fieldfisher had discussed the matter with Mr. Faulkner. It concluded,

> "Mark [Faulkner] has indicated that he is willing to approve the resolution on this basis. However, before releasing his signature, he wishes to receive the outstanding data requested in his email to Richard Jackson of 2 August at 16.26, forwarded to you on 12 August at 11.08, together with the investor presentation referred to in that latter email.

Compound Photonics Group Ltd, Re, 2022 WL 14081423 (2022)

> He does so in recognition of the fact that the interests of the Company are most likely to be served by an immediate injection of cash to enable the payroll to be met, but with continuing serious misgivings about the governance of the group, and its solvency. It is clearly unsatisfactory for a director to be asked to approve a share allotment — particularly where he is the sole director empowered to give that approval — without any involvement in decisions as to the future direction of the company, or any information as to the likely future funding of the group, and thus its solvency. These are matters on which he continues to take independent advice, and which I know are very much on the agenda."

64.  Without consulting anyone, Mr. Bolger sent an amended version of the investor presentation to Mr. Faulkner, omitting the page entitled "What we have achieved since April" and the section headed "Kaiam Discussions". The Judge accepted Mr. Bolger's behaviour "was consistent with what was expected generally in dealing with Mr. Faulkner … i.e. it was one example of the practice which had developed of keeping Mr. Faulkner at arm's-length and telling him only what Mr. Bolger and others thought he needed to know."

65.  Although Mr. Faulkner had said he would approve the board resolution for the proposed share subscription by Vollin if he was given a copy of the investor presentation, that did not happen. Instead, on 17 August 2016, Mr. Faulkner took it upon himself to circulate to the Minorities a form of written resolution to have them approve the proposed Subscription Agreement. The covering letter appeared to come from the board of the Company as it mentioned the existing four directors, but the reality was that the letter did not come from the board and was against Fieldfisher's advice to the Company.

66.  Over the next few days there were a number of what the Judge described as "fraught" exchanges. Mr. Faulkner took the position that he was acting appropriately and in conformity with the legal advice had received from his lawyers, and he pressed ahead with collecting signatures from all the individual Minorities before giving his approval as director to the Vollin subscription. This exercise concluded on Wednesday 24 August 2016 shortly before the payroll deadline on Friday 26 August 2016.

67.  These events were a step too far for Vollin and Kew, and the decision was taken to remove Mr. Faulkner from office. On 7 September 2016, Vollin requisitioned a meeting to pass a resolution under section 168 of the 2006 Act removing Mr Faulkner as a director of the Company. The notice given of the meeting was defective; therefore a further notice was sent on 30 September 2016 and a meeting convened for 18 October 2016.

68.  On 9 September 2016, Mr. Fletcher offered the CEO role to a Mr. Woo. Mr. Faulkner was not involved in any relevant decision to do so, although he was still director and Chairman of the Company.

69.  On 18 October 2016, Mr. Faulkner produced a letter in accordance with his entitlement under section 169 of the 2006 Act to be heard on any resolution to remove him, setting out the representations he wished to make to the shareholders. Dr. Sachs did not attend the general meeting on 18 October 2016, with the result that it was inquorate. However, the meeting continued and Mr. Bolger presented essentially the same presentation as at the Investor meeting on 15 August 2016.

© 2023 Thomson Reuters.

Compound Photonics Group Ltd, Re, 2022 WL 14081423 (2022)

70.  The general meeting was then reconvened on 25 October 2016, and on that occasion was quorate. Vollin and Minden voted their shares in favour of Mr Faulkner's removal: Minorities holding just over one million shares voted against. The resolution was therefore passed by an overwhelming majority of 97.5% for and 2.5% against.

71.  On 26 October 2016, Mr. Faulkner was also removed as a director of CPUK and Mr. Fletcher was appointed instead. In a letter dated 9 December 2016, Mr. Faulkner, like Dr. Sachs before him, was classified as a *"Good Leaver"* for the purposes of the 2013 SHA.

*Events after Mr. Faulkner's removal*

72.  After Mr. Faulkner's removal, Mr. Fletcher and Mr. Bolger considered the proposed merger with Kaiam, a sale of Newton Aycliffe to Kaiam, and the possibility of the sale of Newton Aycliffe to a third party other than Kaiam. After exploring other options, the sale of Newton Aycliffe to Kaiam became the favoured option. On 3 May 2017. Newton Aycliffe was acquired by Kaiam Laser Limited, a newly formed subsidiary of Kaiam. The price was US$10 million, to be satisfied by shares in Kaiam.

73.  As matters turned out, following an announcement by Apple Inc. that it was looking to incorporate augmented reality hardware tools into some of its products, Kaiam Laser Limited resold Newton Aycliffe within about three months after a competition between a number of third party bidders. The price was US$80 million.

74.  Although Kaiam made a substantial profit on the acquisition and resale of Newton Aycliffe, it continued to experience liquidity problems and the companies in the group entered formal insolvency proceedings in the UK and US in December 2018 and January 2019.

**C. The terms of the 2013 Sha and 2013 Articles**

75.  At this stage it is convenient to set out the relevant provisions of the 2013 SHA and 2013 Articles.

*The 2013 SHA*

76.  The definitions section contained the following provisions:

> "Business" means the production and supply of projection products and technologies and all activities reasonably ancillary and necessary in relation to the production and supply of projection products and technologies.
>
> "CEO" means Jonathan Sachs who shall be a Director and the Chief Executive Officer of the Company.
>
> "Exit" means any of the following events:
>
> (a)  a Listing;
>
> (b)  a Share Sale;
>
> (c)  a Subsidiary IPO; or
>
> (d)  an Asset Sale;
>
> "Founder Director" means Mark Faulkner.

© 2023 Thomson Reuters.

Compound Photonics Group Ltd, Re, 2022 WL 14081423 (2022)

"Management" means Jonathan Sachs, Mark Faulkner and Robert Lind."

77.   Clause 3 recorded an agreement to create a new category of B Shares. These had no voting rights attached to them, but instead carried certain rights to participate on an "Exit" (as defined). The B Shares were allocated to Dr. Sachs and Mr. Faulkner.

78.   Clause 4 of the 2013 SHA was headed "Warranties". After a conventional set of warranties in clause 4.1 as to matters such as the power of the parties to enter into the agreement, it contained the following clause 4.2:

"4.2  Each Shareholder undertakes to the other Shareholders and the Company that it will at all times act in good faith in all dealings with the other Shareholders and with the Company in relation to the matters contained in this Agreement."

79.   Clause 5 was headed "Business of the Company". Clause 5 included the following provisions:

"5.1  The Shareholders shall procure that the only business of the Company and each CPG Group company shall, unless otherwise agreed in writing by the Shareholders, be the Business. The Shareholders shall each co-operate with the Board in the running and operation of the company and each CPG Group Company.

5.2  The Shareholders shall exercise their respective rights and powers to ensure, so far as they are lawfully able to do so, that the Company complies with its obligations under this Agreement and any other agreements to which the Company is a party, and that the Business is conducted in accordance with good business practice and on sound commercial and profit making principles.

5.3  Without prejudice to the foregoing provisions of this clause 5, the Shareholders agree that the Company and each CPG Group Company will be run in accordance with the following general principles, as varied from time to time with the written agreement of the shareholders:

(a)  the Company and each CPG group company shall carry on and conduct its business and affairs in a proper and efficient manner and for their own benefit;

(b)  the Company and each CPG Group Company shall transact all of their business on arm's-length terms;

(c)  the Business shall be carried on in accordance with policies laid down from time to time by the Board and in accordance with the Annual Budget;

[…]

(f)   the company and each CPG group company shall keep the shareholders (except the B shareholders) fully informed as to all their material financial and business affairs."

80.  Clause 7 was headed "The Board", and contained the following provisions:

Compound Photonics Group Ltd, Re, 2022 WL 14081423 (2022)

"7.1.  Subject to clause 7.3, the maximum number of Directors holding office at any one time shall be six.

7.2  The Investor shall have the right (but not the obligation) to appoint and maintain in office two of those directors (the 'Investor Directors').

7.3  If the Board resolves to increase the maximum number of Directors beyond six Directors, the Investor shall have the right (but not the obligation) to appoint and maintain in office one additional Director for every two additional non-Investor Directors appointed.

7.4  As at the date of this Agreement, the Directors are Jonathan Sachs, Mark Faulkner, Brian Bolger, Jeremy Fletcher and Robert Lind.

[…]

7.8  Subject to clause 7.9, the quorum for the transaction of business at any board meeting shall be three directors and shall include (insofar as they each remain a director) the Founder Director, the CEO and, if one or more has been appointed, an Investor Director.

[…]

7.10  Unless otherwise agreed, the Board shall meet in the United Kingdom once every four months and otherwise as circumstances require.

[…]

7.13  Subject to clause 7.16, resolutions arising at any meeting of the Directors shall be decided by a majority of votes provided that both of the Founder Director and the CEO must at all times form part of that majority. If the number of votes for and against a proposal are equal, the Chairman of the Board or other Director chairing the meeting shall not have a casting vote in addition to his own vote.

7.14  The Chairman of the Board shall be appointed by the majority of Directors. The first Chairman of the Board shall be Mark Faulkner.

7.15  If a resolution submitted to a duly convened Board Meeting is not carried by a resolution of the Board at that meeting then, without prejudice to the Board's ability to consider any other business put to it at that meeting, a new meeting may (on the written request of any Director or his alternate present at the meeting) be convened for the same day or the next week at the same time and place to consider and if thought fit, pass that resolution.

7.16  If a Director is of the opinion (acting reasonably) that there is a conflict between his fiduciary duties to the Company and his role as an appointed Director of a Shareholder in voting on any particular matter to be considered by the Board, he shall disclose that interest to the Board and shall abstain from voting on that matter and they will not be required to form part of the majority required under clause 7.13.

7.17  If a Shareholder, who has voting rights attaching to the Shares that he holds, is an Interested Shareholder (as defined in clause 20.1), the quorum shall be not less than two Directors appointed by the non-Interested Shareholders and a resolution may be passed at a Board Meeting if it is voted in favour of by the Directors present (excluding for these purposes any Director appointed by the Interested Shareholder)."

© 2023 Thomson Reuters.

81.  Clause 8 related to Shareholders' Meetings and included the following,

> "8.1   The Shareholders shall use all reasonable endeavours to procure that their respective representatives attend each meeting of the members of the Company and that a quorum is present throughout each meeting. A quorum shall consist of Jonathan Sachs, Mark Faulkner and the Investor (or a duly authorised representative of those members.
>
> 8.2  If within half an hour from the time appointed for a meeting of the members of the Company a quorum is not present the meeting shall be adjourned to the same day of the next week at the same time and place. If the business to have been conducted at that meeting;
>
> (a)  includes a Reserved Matter, then the provisions of clauses 9.2 and 9.3 shall apply;
>
> (b)  does not include a Reserved Matter, then at that adjourned meeting those members present in person or by proxy shall constitute a quorum."

82.  Reserved Matters were set out in Schedule 3. They included a number of major business decisions such as the approval of annual budgets and IP Strategy for the Company and any material change in the nature or scope of the Business. Clause 9.1 provided that,

> "The Shareholders and the Board shall exercise their powers in the Company to procure that the Company shall not transact any business which is a Reserved Matter without the approval of the Investor."

83.  Clauses 9.2 and 9.3 made provision for a situation in which the Investor abstained or voted against a resolution in relation to a Reserved Matter, and provided for the meeting to be reconvened to reconsider the Reserved Matter (but not to override the Investor's veto).

84.  Clause 14.8(a) set the target Exit date,

> "The Company and the Shareholders agree that they will work together and use their reasonable endeavours to achieve an Exit as soon as reasonably practicable after 2 years from the date of this Agreement."

Two years from the date of the 2013 SHA was April 2015.

85.  Clause 16 was headed "Compulsory transfer and disenfranchisement" and contained specific provisions applicable to the newly created category of B Shares. Broadly speaking, the effect was that if any holder of B Shares came to be characterised as a " *Bad Leaver* ", that shareholder would be required to sell all of his B Shares either to the Company or to a nominated party. On the other hand, a person designated a " *Good Leaver* " would be required only to relinquish half of his B Shares.

86.  " *Good Leaver* " and " *Bad Leaver* " were defined in clause 16.1. The definition of " *Good Leaver* " was as follows:

> "Good Leaver" means a B Shareholder who ceases to be a director, employee or consultant of the CPG group and that cessation occurs as a result of:
>
> (a) death; or
>
> (b) serious illness or physical or mental incapacity which is determined by two medical reports from independent medical specialists […]
>
> (c) wrongful dismissal; or
>
> (d) termination by the relevant CPG group Company of his service agreement, employment agreement or consultancy agreement (as applicable) without Cause […]".

The definition of " *Cause* " mirrored that in Dr. Sachs' employment contract with CPUS. " *Bad Leaver* " was then defined to mean anyone who is not a *Good Leaver* .

87.  Clause 21 of the 2013 SHA provided,

> "21.1  The Company undertakes with the Shareholders to be bound by and comply with the terms and conditions of this Agreement insofar as they relate to the Company and to act in all respects as contemplated by this Agreement.
>
> 21.2  The Shareholders undertake with one another to:
>
> (a) exercise their powers in relation to the Company in a manner consistent with ensuring that the Company fully and promptly observes, performs and complies with its obligations under this Agreement;
>
> (b) exercise their rights as Shareholders in a manner consistent with this Agreement;
>
> (c) exercise all voting and other rights and powers vested in or available to them in a manner consistent with procuring the convening of all meetings, the passing of all resolutions and the taking of all steps necessary or desirable to give effect to the terms of this Agreement and the rights and obligations of the parties set out in this Agreement; and
>
> (d) procure that any director of any CPG Group Company appointed by them from time to time shall (subject to their fiduciary duties to the Company or any relevant CPG Group Company) exercise his/her voting rights and other rights and powers vested in or available to him/her in a manner consistent with giving effect to the terms of this Agreement and the rights and obligations of the parties set out in this Agreement."

88.  Clause 23 importantly provided,

> "23.  Nothing in this agreement shall create a partnership or establish a relationship of principal and agent or any other fiduciary relationship between or among any of the parties."

© 2023 Thomson Reuters.

Compound Photonics Group Ltd, Re, 2022 WL 14081423 (2022)

89. Clause 25 was an entire agreement clause, which provided that the 2013 SHA and the other documents to be executed in accordance with it were to "supersede any prior written discussions, understanding or agreements between the parties."

*The 2013 Articles*

90. The 2013 Articles reflected the provisions of the 2013 SHA in some respects. For example, Article 17.7 reflected clause 7.8 of the 2013 SHA (quorum at board meetings) and Article 17.9 reflected clause 7.13 of the 2013 SHA (voting at board meetings). The Articles did, however, contain certain additional provisions.

91. So, for example, Article 14 was as follows,

> "14.1  The directors shall not be required to retire by rotation and regulations 73 to 80 (inclusive) of Table A shall not apply to the Company.
>
> 14.2  Subject to the approval of both the Founder Director and the CEO, the directors may appoint a person who is willing to act to be a director, either to fill a vacancy or as an additional director."

92. Article 15 also provided,

> "15.1  Subject to Article 15.2, the office of a director shall be vacated if
>
> (a)  he ceases to be a director by virtue of any provision of the 2006 Act or these Articles or he becomes prohibited by law from being a director, or
>
> (b)  he becomes bankrupt or makes any arrangement or composition with his creditors generally, or
>
> (c)  he is, or may be, suffering from mental disorder and either
>
> (i)  he is admitted to hospital in pursuance of an application for admission for treatment under the Mental Health Act 1983 …
>
> (ii)  an order is made by a court having jurisdiction … in matters concerning mental disorder for his detention or for the appointment of a receiver, curator bonis or other person to exercise powers with respect to his property or affairs, or
>
> (d)  he resigns his office by notice to the Company, or
>
> (e)  the Board passes a resolution to remove the director, or
>
> (f)  he shall for more than six consecutive months have been absent without permission of the directors from meetings of directors held during that period and the directors resolve that his office be vacated.
>
> 15.2  The Board shall not be able to pass a resolution to remove the CEO as a director or the Founder Director as a director and nor shall those individuals vacate the office of a director if they make any arrangement or composition with their creditors generally."

© 2023 Thomson Reuters.

Compound Photonics Group Ltd, Re, 2022 WL 14081423 (2022)

**D. The arguments of the parties at trial**

93.  The Judge summarised the arguments of the parties at trial in paragraphs 334-337 of his Judgment. He identified that the Minorities alleged unfair prejudice arising in two ways:

i)  breaches by the Investors of the terms of the 2013 SHA, and in particular the "good faith" clause 4.2; and

ii)  breaches by the directors nominated by the Investors of two of the 2013 Articles relating to conflicts of interest, and certain of their duties under sections 171-175 of the 2006 Act .

94.  The meaning of clause 4.2 of the 2013 SHA was central to both limbs of the Minorities' case. It was relevant to the first limb because the obligation of good faith was said to require adherence to a "bargain" which was said to be inherent in the 2013 SHA and the 2013 Articles, namely that Dr. Sachs and Mr. Faulkner would be "entrenched" as directors and would hold the balance of power on the board of the Company. The Judge summarised the Minorities' contentions in this respect at paragraph 336 of his Judgment,

> "336.  Mr. Hollington's contention on this general point of characterisation was that the 2013 constitution gave rise to what he called a contractual quasi-partnership. Mr. Hollington clarified that in making that submission, he was not seeking to rely on any oral assurances given to Dr. Sachs and Mr. Faulkner as to their continued involvement in the management of CPGL. Instead, his case was based on a reading of the constitutional documents, looked at in the round, and of course against the background of the factual matrix as it stood at the time of contracting. Mr. Hollington said that reading the constitutional documents in this way disclosed two particular agreed common purposes, namely (1) entrenchment of the positions in management of Dr. Sachs and Mr. Faulkner, and, as its corollary, (2) the prevention of Vollin and Minden from obtaining control of the CPGL board. Mr. Hollington argued that both those purposes had been overridden or frustrated by the actions taken by the Investors from March 2016 onwards, in breach of their obligation of good faith under [clause 4.2 of the 2013 SHA], and that consequently the Petitioners had been treated in a manner which was both unfair and prejudicial."

95.  The meaning of clause 4.2 was also central to the second limb of the Minorities' case, because they contended that the 2013 SHA formed part of the constitution of the Company for the purposes of the directors' duties under section 171(a) of the 2006 Act . The Minorities alleged that this meant that the directors nominated by the Investors breached their duties to act in accordance with the Company's constitution when they participated in the process for removal of Dr. Sachs and Mr. Faulkner from the board, and thereafter when the directors managed the Company without their involvement.

96.  The Judge summarised the Investors' arguments against these propositions in paragraph 337 of his Judgment as follows,

> "337.  Mr. Gledhill for the Investors disagreed fundamentally. He said there was no analogy to be drawn with the quasi-partnership type case. Such cases involved the Court recognising the existence of an equitable constraint, which inhibited in some way the otherwise unrestricted right of a shareholder to exercise its legal rights however it sees fit. In the present case, no such equitable constraint was alleged. Instead, the case in the Petition is that the Investors breached the Petitioners' legal rights under the 2013 Articles or the 2013 SHA. But there is nothing in those agreements

Compound Photonics Group Ltd, Re, 2022 WL 14081423 (2022)

which gave Dr. Sachs or Mr. Faulkner an entrenched right to remain as directors and managers of CPGL, and nothing which inhibited the statutory entitlement of the majority shareholders under CA section 168 to remove the directors if they saw fit to do so, for whatever reason. At most the Investors were subject only to the obligation under SHA clause 4.2 to act in good faith, but here the Investors had acted in good faith, because they had acted honestly and in a manner which was commercially justified: commercially, it was entirely right to have required Dr. Sachs to step down as a director of CPGL in March 2016, given the state of the business at the time which (as CEO) Dr. Sachs must have contributed to."

## E. The Judge's analysis of the law and the parties' bargain

97.  In his Judgment, after having set out his findings of fact and summarised the arguments of the parties, the Judge then set out his view of the relevant legal principles.

98.  The Judge first set out section 168 of the 2006 Act which provides,

"A company may by ordinary resolution at a meeting remove a director before the expiration of his period of office, notwithstanding anything in any agreement between it and him."

99.  At paragraph 341 of his Judgment, the Judge characterised this as an "inalienable right" of majority shareholders to remove a director from office. At paragraph 342 of the Judgment, the Judge said that although the effectiveness of the decision to remove could not be impugned, the act of doing so might infringe some other right and give rise to other remedies. I shall return to consider that analysis of section 168 later in this judgment.

100.  The Judge then referred to *Ebrahimi v Westbourne Galleries [1973] AC 360* as the paradigm case in which the exclusion of a director might give rise to a just and equitable winding up in a case of a quasi-partnership company. The Judge commented that in *Ebrahimi* the right relied upon was based on an agreement or understanding binding in equity, but that the same approach could also apply under section 994 , and could be based upon an agreement between shareholders that they would exercise their voting rights (or not exercise them) in a particular way.

101.  The Judge then stated,

"346.  In the present case, it seems to me that Mr. Hollington's argument is really based on this same logic. No equitable constraint is relied on (c.f. Ebrahimi ). Mr. Hollington instead says that there was a contractual commitment binding on the majority shareholders – Vollin and Minden – that they would not use their majority voting power to exclude either Dr. Sachs or Mr. Faulkner from their offices as directors of CPGL. He says that, consequently, although Vollin and Minden must be taken to have had the power as a matter of company law to exclude Dr. Sachs and Mr. Faulkner from office, at the same time, as a matter of private contract between the shareholders, they had agreed not to exercise or otherwise rely on that power.

© 2023 Thomson Reuters.                                                                                                    20

Compound Photonics Group Ltd, Re, 2022 WL 14081423 (2022)

_____

347.  Mr. Hollington's argument is focused on the good faith provision in clause 4.2 of the 2013 SHA, when read together with the other provisions of the SHA and indeed the Articles of CPGL. The central question, therefore, is whether the good faith provision can be read in that way, and whether it can bear the weight which Mr. Hollington places on it."

102.  The Judge then turned to consider a number of authorities on the meaning of a contractual obligation of good faith. I shall return to consider those authorities in greater detail below. Ultimately, the Judge agreed with and adopted the statements of principle set out by HHJ Klein in *Unwin v Bond [2020] EWHC 1768 (Comm) at paragraphs 229 to 232* . Those paragraphs are as follows,

"229.  First, the context in which the good faith obligation was entered into is everything, or at least a great deal. That is hardly surprising, because the extent of the obligation, that is, what prospective acts of a defendant may be subject to a duty of good faith, is a matter of the construction of the contract which contains the obligation.

230.  Secondly, once it is established that a prospective act of a defendant is subject to a duty of good faith, the defendant is bound to observe the following minimum standards:

i)  they must act honestly;

ii)  they must be faithful to the parties' agreed common purpose as derived from their agreement;

iii)  they must not use their powers for an ulterior purpose;

iv)  when acting they must deal fairly and openly with the claimant;

v)  they can consider and take into account their own interests but they must also have regard to the claimant's interest.

These minimum standards are not entirely distinct from one another. Rather, they tend to overlap.

231.  Fair and open dealing is a broad concept and what it means in practice in any case will again depend on context. It is likely that, in many cases, the claimant is entitled to have fair warning of what the defendant proposes. In those cases where the defendant is contemplating taking a decision which will affect the claimant, fair and open dealing is likely to require that the claimant is given an opportunity to put their case before the defendant makes the decision and the defendant is likely to be required to consider the claimant's case with an open mind.

232.  Thirdly, and very much linked to the second point, the fact that a defendant could have achieved the same result in a procedurally compliant way does not amount to a defence where the approach they adopt does not meet the minimum standards I have set out."

103.  In his summary of the law, the Judge then turned to the second way in which the Minorities put their case in relation to the duties of the directors nominated by the Investors.

_____

Compound Photonics Group Ltd, Re, 2022 WL 14081423 (2022)

104.  The Judge set out the relevant provisions of sections 171-175 of the 2006 Act , including in particular section 171(a) which provides,

> "171.  A director of a company must –
>
> (a)  act in accordance with the company's constitution."
>
> and section 172(1) which provides,
>
> (1)  A director of a company must act in the way he considers, in good faith, would be most likely to promote the success of the company for the benefit of its members as a whole, and in doing so have regard (amongst other matters) to,
>
> (a)  the likely consequences of any decision in the long term,
>
> (b)  the interests of the company's employees,
>
> (c)  …
>
> (d)  …
>
> (e)  the desirability of the company maintaining a reputation for high standards of business conduct, and
>
> (f)  the need to act fairly as between members of the company."

105.  In relation to section 171(a) , the Judge accepted, without comment, a submission by Mr. Hollington that by virtue of section 17 of the 2006 Act , the Company's constitution for the purposes of section 171(a) included the 2013 SHA as well as the 2013 Articles. I shall return to consider that finding later in this judgment.

106.  Having decided that a contractual obligation of good faith such as clause 4.2 of the 2013 SHA necessarily includes, as a "minimum standard", a requirement that the parties be faithful to their agreed common purpose as derived from their agreement (which the Judge paraphrased as "the parties' bargain"), and that by reason of sections 17 and 171(a) of the 2006 Act , the 2013 SHA (including clause 4.2) formed part of the Company's constitution so that the directors nominated by the Investors were bound to act in accordance with it, the Judge then sought to identify what the parties' bargain entailed in the instant case.

107.  The Judge first sought to identify the relevant factual matrix. He suggested that in 2010 the parties envisaged a potentially long term arrangement which, in light of the uncertainties inherent in commercialising a new technology, was likely to become subject to pressures over time. The Judge then commented that in 2010, the Minorities (who were then the majority shareholders) were "not investors in a technology business; they were investors in a start-up business headed by Dr. Sachs, whose purpose was to realise the vision he had set out": or in Mr. Faulkner's words, Dr. Sachs was "the jockey they were backing", and that Dr. Sachs and Mr. Faulkner were key individuals to realising the business vision the Minorities had invested in.

Compound Photonics Group Ltd, Re, 2022 WL 14081423 (2022)

108.  In passing, and in light of the importance attached to it in argument by the Minorities, I would observe that the colourful image of Dr. Sachs being "the jockey" whom the Minorities were backing when they invested in 2010, should not be allowed to lead a life of its own. In law, the Minorities had invested in and were shareholders in the Company, and their rights capable of giving rise to relief under section 994 were their rights *qua* members of the Company. Those were rights in relation to the horse, rather than the jockey, and in the absence of any suggestion of a quasi-partnership, those rights were governed by the articles and shareholders' agreement in force from time to time.

109.  As regards Vollin, the Judge acknowledged that, even in 2010, Vollin was taking a material financial risk in investing in an unproven business. He accepted that it wished to have latitude to take decisions in its own commercial interests given that there was "plenty of opportunity for things to go wrong, not only with the technology but with the management of the business more generally".

110.  At this stage in his analysis, the Judge concluded (at paragraph 385 of his Judgment) that the structure arrived at in 2010 and 2013 was a compromise designed to hold a balance between these potentially differing sets of interests. At paragraph 386, he observed that,

> "A cornerstone of this constitutional settlement, designed as it was to maintain an acceptable balance of power between the existing and new shareholders, was the allocation of management responsibility for the business to the Company's board of directors. More specifically, the allocation of responsibility was to a board having the particular characteristics described in the SHA and Articles."

111.  The Judge then turned to the central part of his analysis of the parties' bargain. He placed particular emphasis upon the provisions of clauses 7.1 to 7.3, 7.8 and 7.13 of the 2013 SHA, which he saw as providing that Vollin's representatives would be in the minority on the board; that both Dr. Sachs and Mr. Faulkner had to be present for a board meeting to be quorate; and that both Dr. Sachs and Mr. Faulkner had to vote in favour for a decision to be passed at board level.

112.  At paragraphs 386(iv)-(vi), the Judge also relied upon what he described as,

> "… other protections that were built into the overall arrangement to ensure that Dr. Sachs and Mr. Faulkner could *not* be removed from office as directors."

(the Judge's emphasis)

113.  In this regard, the Judge referred to the provisions that Dr. Sachs and Mr. Faulkner were not to retire by rotation and (unlike other directors) by virtue of Article 15.2 could not be removed from office by resolution of the board and were to vacate office only in more limited circumstances set out in Article 15.

114.  The Judge then considered the balance of power between the shareholders and the board, referring to clause 5 of the SHA and in particular to the second sentence of clause 5.1 which provided,

> "The Shareholders shall each co-operate with the Board in the running and operation of the company and each CPG Group Company."

115.  The Judge then reached his central conclusion at paragraph 390,

> "390.  Thus, the overall structure is clear: the business of CPGL and its subsidiaries was to be managed by the board; Vollin and Minden between them were to nominate three of the six board members; but Dr Sachs and Mr Faulkner were to be central figures on the board and were to hold the balance of power in the company at that level; and the board was to be able to operate free from shareholder interference, because the shareholders were bound to co-operate with it."

116.  The Judge then continued,

> "391.  Viewed in that light I have concluded that I am persuaded by Mr. Hollington's submissions on the scope and content of the good faith duty in this case.
>
> 392.  First of all as to scope, the good faith provision in clause 4.2 is in a section of the SHA headed " *Warranties* ." Given both its position within the SHA as a whole, set as it is among other, general undertakings, and given also its language which could not be broader (" *act in good faith in all dealings with the other Shareholders and with the Company in relation to the matters contained in this Agreement* "), clause 4.2 seems to me in principle wide enough in scope to capture the exercise of voting rights by the majority shareholder(s) in a manner which has an impact on the overall balance of interests achieved by the 2010 and 2013 Constitutions.
>
> 393.  As to content, it seems to me that Mr. Hollington must be right that the good faith obligation was intended to impose a contractual restriction, binding as between the shareholders, on the otherwise untrammelled rights of Vollin and Minden to exercise their majority power under Companies Act section 168 (1) as they saw fit. They were bound to act with fidelity to the bargain (see [357]-[358] above), and that meant respecting the balance of power achieved by means of the overall constitutional settlement. Critical parts of that were the special positions occupied by Dr. Sachs and by Mr. Faulkner. It makes no real sense to say that the Investors retained an entirely unrestricted right to drive a coach and horses through that constitutional settlement by virtue of their majority voting power.

© 2023 Thomson Reuters.

Compound Photonics Group Ltd, Re, 2022 WL 14081423 (2022)

394.  True, [the Investors] had such an unrestricted right as a matter of company law, which could not be excluded; but as a matter of private contract it could, and it makes perfect sense to conclude that it was, because otherwise the protections built into the overall scheme by virtue of Dr. Sachs' and Mr. Faulkner's special positions could be swept away at will. That cannot have been what the parties intended. The upshot is that the Investors could of course exercise their majority power to remove Dr. Sachs and Mr. Faulkner, and such removals would be effective and not susceptible to revocation; but at the same time, they would constitute a breach of contract as between the shareholders, entitling the disadvantaged shareholders in an appropriate case to claim a remedy – as they do in this case, in the form of relief for unfair prejudice under Section 994 ."

117.  The Judge's cross-reference in paragraph 393 to paragraphs 357 and 358 of his Judgment, was to two first instance cases, namely *Berkeley Community Villages v Pullen [2007] EWHC 1330 (Ch) ("Berkeley")* and *CPC Group Ltd v Qatari Diar Real Estate Investment Co. [2010] EWHC 1535 (Ch) ("CPC Group")* . I will return to consider those cases below.

118.  The Judge then dismissed two contrary arguments made on behalf of the Investors which drew attention to the words "insofar as they each remain a Director" in clause 7.8 of the 2013 SHA, and the provisions in clause 16 of the 2013 SHA for mandatory sale of some or all of Dr. Sachs' and Mr. Faulkner's B Shares in the event of them being a "Good Leaver" or "Bad Leaver" as defined.

119.  The Judge accepted that these clauses were consistent with Dr. Sachs and Mr. Faulkner being vulnerable to removal as directors, but he sought to explain this on the basis that this did not mean that their removal might not also give rise to other legal consequences, such as breach of contract or a claim for unfair prejudice. So, for example, in paragraph 399 he said, as regards the provisions for sale of the B Shares,

"At its highest, all that is said is that there would have been no purpose providing for what should happen to Dr Sachs and Mr Faulkner's B shares upon their being removed as directors, if the correct position is that they could never be removed. The short answer, again, is that they always could be removed by majority shareholder vote – there was nothing to be done to prevent that – but that is not the same as saying that if they were, there could be no claim for unfair prejudice."

120.  The Judge then concluded, at paragraph 400,

"That deals with what seems to me to be a critical component of the good faith obligation in this case, which is probably best expressed as the requirement of fidelity to the bargain. Before moving on to look at the facts, I should again make it clear that I regard the duty as wider than that, and I gratefully adopt in full HHJ Klein's articulation of the overall content of the duty [in *Unwin v Bond]* … I emphasise in particular the obligation to deal fairly and openly, the need to take into account the interests of the other party as well as one's own interests, and the fact that the duty may be breached where an otherwise justifiable result is achieved in procedurally non-compliant way."

121.  In summary, the Judge's reasoning was that the obligation in clause 4.2 of the 2013 SHA to act in good faith necessarily imported all of the "minimum standards" of good faith identified in *Unwin v Bond* , including the requirement of "fidelity to the bargain". The Judge also considered that because of the terms of that bargain, which he derived from the 2013 SHA and the 2013 Articles, the Investors would be acting in breach of contract if they removed Dr. Sachs or Mr. Faulkner from the board, or interfered in any way with the management of the Company by a board on which Dr. Sachs and Mr. Faulkner held the balance of power.


### F. The Judge's application of the law to the facts

122.  The Judge then turned to apply the principles of law that he had set out to the facts. I can summarise his relevant findings (omitting some of the complaints that he did not find proven) under a number of headings.


*The resignation of Dr. Sachs*

123.  The Judge first held that on the basis of his interpretation of clause 4.2, the enforced resignation of Dr. Sachs necessarily involved a breach of contract by the Investors and a breach by their nominated directors of their duties under sections 171(a) and 172(1)(f) of the 2006 Act . His reasoning as regards the Investors can be seen from the following paragraphs,

> "402.  It follows from the views I have already expressed that in my judgment, the actions taken by the Investors to exclude Dr. Sachs in March 2016 were unfairly prejudicial to the Petitioners. They were unfair in the sense that, in breach of the obligation of good faith, they involved the Investors exerting their power to exclude Dr. Sachs in a manner expressly designed to override the carefully calibrated constitutional balance; it was prejudicial because the effect was to deprive the Petitioners not only of the benefit of Dr. Sachs' technical expertise, but also of the protections which his presence on the CPGL board were designed to achieve.
>
> …
>
> 405.  I would also go further and say that the process by which Dr. Sachs' removal was achieved involved a breach of the good faith duty. In my judgment there was a failure to deal fairly and openly with Dr. Sachs, and a failure by the Investors to take into account the interests of the Minorities as well as their own interests. The effect was a result which, even if it had otherwise been justifiable, was achieved in a procedurally non-compliant way."

124.  The basis for the Judge's finding of procedural unfairness was that the Investors had deliberately taken Dr. Sachs by surprise when they presented him with an ultimatum to resign at the meeting on 14 March 2016. The Judge also found that the representatives of the Investors gave Dr. Sachs the impression that Vollin would withdraw funding immediately if he did not resign, thereby putting him under time pressure. The Judge did not find that the Investors deliberately misled Dr. Sachs in that respect, but he concluded that the obligation upon them to deal fairly and openly with Dr. Sachs required that they should have told him that Vollin had in fact agreed to provide funding until the end of May 2016.

© 2023 Thomson Reuters.

Compound Photonics Group Ltd, Re, 2022 WL 14081423 (2022)

125.  The basis for the Judge's finding that the Investors failed to take into account the Minorities' interests was essentially based on the fact that the Minorities had invested in a company led by Dr. Sachs and that he had a "special status" for them in the management and direction of the business.

126.  In the course of this part of the Judgment, the Judge made a number of important findings as to the Investors' beliefs and reasons for acting as they did. In particular, he held that the Investors genuinely, *bona fide* and rationally held the view that the success of the Company's business was only possible if Dr. Sachs was removed as a director. However, the Judge concluded that this did not matter, because of the view that he had formed that the 2013 constitution was designed to entrench Dr. Sachs and Mr. Faulkner in office and "to avoid the will of the majority shareholders prevailing in relation to the commercial future of the Company". The Judge stated,

> "413.  … By 14 March 2016, the Investors had reached the view that success (or perhaps, as they saw it, salvaging something from failure) was possible only with Dr. Sachs out of the picture. Viewed purely commercially, I have no doubt that that was a rational view to have come to: the overall project had come to be vastly more expensive than originally anticipated; there had been many setbacks including missed milestones; the P1 prototype tested in Phoenix in February was some way removed from the original vision; Dr. Sachs had demonstrated a stubborn personality and limited leadership skills; and there had been the ugly disagreement with Mr. Bolger at the meeting on 11 March, and then the stand-off over the appointment of management consultants, both of which – entirely reasonably in my view – had so unsettled Mr. Tenenbaum.
>
> …
>
> 415.  The case advanced [for the Investors] was essentially that they had finally come to the view that Dr. Sachs and his vision were a busted flush. I have no doubt that that was their legitimately held view, but I also think that in taking the action they did they failed to have regard to the facts that (1) there was at least scope for a different view …; and (2) excluding Dr. Sachs would materially disadvantage the Minorities in terms of the balance of power at board level. What one is left with is essentially the majority Investors imposing on CPGL their own vision of what should happen to CPGL commercially. In my view, it does not matter that that vision may have been a sound one. The point is that, good or bad, it was an expression of the will of the majority only. The 2013 constitution was expressly designed to avoid the will of the majority prevailing in matters concerned with the commercial future of CPGL.
>
> …
>
> 419.  The majority investors justify the exclusion of Dr Sachs on the basis that they *bona fide* held the view that it was right for the business for him to go. I am sure they did hold that view, but even so, they were not entitled to impose it on the other shareholders…."

127.  As regards the directors, the Judge held that it followed from his interpretation of clause 4.2 of the 2013 SHA and his acceptance that it formed part of the constitution of the Company that the directors had breached their duties under section 171(a) of the 2006 Act . He held, at paragraph 427,

> "427.  … it must follow that in participating in the events which led to the removal of Dr. Sachs, Mr. Fletcher and Mr. Burkey were in breach of the duty under section 171(a) of the Companies Act . That is because, in participating in those events, they were necessarily taking steps which undermined CPGL's constitution, for all the reasons I have identified above. A company's constitution is wider than its memorandum and articles for these purposes and includes a shareholders agreement such as the 2013 SHA."

© 2023 Thomson Reuters.                                                                     27

128.  The Judge also concluded, at paragraph 429, that the directors nominated by the Investors had breached their duties under section 172(1)(f) of the 2006 Act when participating in the events leading to the removal of Dr. Sachs,

> "429. … I think it must also follow that Mr. Fletcher and Mr. Burkey were in breach of their duty under the Companies Act section 172 . I say that because discharge of the section 172 duty required them specifically to have regard to " *the need to act fairly as between the members of the company* " ( section 172(1)(f) ). In supporting the initiative to remove Dr. Sachs, Mr. Fletcher and Mr. Burkey must obviously have disregarded the separate and specific interest of the Minorities in having him remain in post, for all the reasons already described above, including in particular their interest in maintaining the overall constitutional balance enshrined in the 2013 SHA."

129.  The Judge did, however, absolve the directors from any other breaches of their duties to the Company as regards the process leading to the resignation of Dr. Sachs.

*The management of the Company after the departure of Dr. Sachs*

130.  At paragraphs 434 and 435, the Judge summarised the Minorities' complaints in respect of the period after Dr. Sachs' resignation. In essence the complaint was that the management of the Company was not conducted by the board, but was conducted by the Investors at meetings from which Mr. Faulkner was excluded. The Minorities also complained that information was withheld from Mr. Faulkner.

131.  The Judge rejected the Minorities' generalised complaints about a lack of information, but found, at paragraph 448, that the "real point" was that after Dr. Sachs' resignation, "Mr. Faulkner was given no active role in the management of the business, although that is what the 2013 constitution required". He found that instead, *de facto* control of the management of the business was taken over by the Investors via the medium of the regular presentations to them by Kew. At paragraph 451, the Judge held that it was clear that the only directors present at these Investor meetings with Kew were those nominated by the Investors, whereas "the agreed on constitutional balance required others to be involved in those same discussions (Mr. Faulkner and Dr. Lind, and possibly a replacement for Dr. Sachs) but that did not happen" because they were not invited and did not attend. The Judge concluded at paragraph 453, that by this means, although Mr. Faulkner remained a director of the Company and CPUK, he was kept at arm's length from the key strategic decisions made in relation to both companies.

132.  The Judge held, at paragraph 456, that the particular instances of a failure to provide information and a failure to consult relied upon by the Minorities were best characterised as examples of the Company's constitutional machinery having broken down. He explained, at paragraphs 457 to 459,

> "457. Thus, although Mr. Faulkner was given information about the closure of Newton Aycliffe, about the possible MBO, and about the Group's funding needs, nonetheless the manner in which those matters were dealt with reveals breaches by the Investors of the material terms of the [2013] SHA, and in particular clause 4.2 (good faith), clause 5.2 (good business practice), and clause 5.3(a) (proper and efficient manner). That is because in dealing with them, the constitutional structure set out in the [2013] SHA and the 2013 Articles was effectively ignored by the Investors. In my view, because they were so fundamental, those breaches were both unfair and prejudicial.
>
> 458. The same goes for the Company's fund-raising efforts in August 2016. Mr. Faulkner was aware of what was needed, but had no active involvement in the relevant decision-making process. His resultant concerns informed his decision to circularise the Minorities on 17 August 2016, seeking their consent to the further US$4.5m subscription by Vollin. Given that their consent was sought and provided, it is impossible for them to say they did not know what was going on or were not consulted,

Compound Photonics Group Ltd, Re, 2022 WL 14081423 (2022)

but what they can say is that by this stage the proper constitutional machinery for approving new subscriptions had entirely broken down. Even assuming Fieldfisher's view of clause 20.1 of the SHA was the correct one, still, what clause 20.1 contemplated was a board constituted and operating in accordance with the 2013 constitution. Self-evidently, by August 2016 that was no longer happening. Thus, whatever they may have known, the crux of the matter is that the Minorities were deprived of the benefits of the constitutional settlement they had agreed with the Investors. The same logic can be applied to the later loan by Minden in November 2016, although that was not the subject of any detailed submissions by the parties at trial.

459.  The deception of Mr. Faulkner as regards the approach by Kaiam is a more serious matter, of course, but ultimately in my view symptomatic of the same basic problem. Thus, there was some debate at trial as to what Mr. Faulkner should have been told about the Kaiam merger approach. It seems to me the answer to that question is clear if one imagines what would have happened in the normal course had there been a properly functioning board. In such circumstances, it is obvious that Mr. Faulkner would and should have been informed about the approach by Kaiam, even at the stage when the favoured option was a merger. That is because a critical part of Kaiam's motivation was acquisition of the Newton Aycliffe Fab, and the Fab was a major asset of the Group and indeed of CPUK, of which Mr. Faulkner was the sole director … The failure to inform Mr. Faulkner was symptomatic of the generally dysfunctional governance regime which followed in the wake of Dr. Sachs' departure, and therefore a product of the ongoing breaches by the Investors which I have already referred to."

133.  As regards the conduct of the directors nominated by the Investors during this period, the Judge found (at paragraph 477) that it necessarily followed from his earlier conclusions that they acted in breach of their section 171(a) duties because,

"… the balance of powers enshrined in the 2013 constitution had been entirely overridden: the machinery of the 2013 SHA and [2013] Articles had entirely broken down."

134.  However, the Judge found that the directors had not otherwise breached their duties during the period after Dr. Sachs had left. In particular, he held (at paragraphs 479 to 485) that they had acted in good faith in taking the steps they thought necessary to salvage something from the position that the Company found itself in. The Judge also took the view that the interests of the Minorities and the Investors in the survival of the business during this period were aligned,

"485.  …I can well see that the Investors and the Minorities had divergent interests when it came to the make-up of the board and constitutional structure of the business, but not when it came to the commercial direction of the business, and to making the tough decisions which had to be made in the Spring of 2016 in the wake of Dr. Sachs' departure. Very likely, given the state the business was in, and its dependence on the majority Investors for its ongoing funding, the range of options available to the nominee directors was very narrow, and they had no real choice but to do what they did. It thus seems to me that at that point and in that sense, the interests of the Investors and the Minorities were aligned; …"

*The removal of Mr. Faulkner*

135.   The Judge upheld the Minorities' complaints about the removal of Mr. Faulkner at the general meeting held on 25 October 2016 for essentially the same reasons as he had applied to the process leading to the resignation of Dr. Sachs. As regards the Investors, he said, at paragraph 504:

> "504. … The actions taken by the Investors to remove him from his position as a director were on the face of it unfairly prejudicial for just the same reasons as in the case of Dr. Sachs. They were unfair because they involved the Investors exercising their voting power to exclude Mr. Faulkner in a manner which obviously had the effect of overriding the agreed upon constitutional balance, and they were prejudicial because they deprived the Minorities not only of Mr. Faulkner's presence on the board as someone who could look out for their interests, but also of the protections which his presence on the board were designed to achieve."

And as regards the directors, the Judge held, at paragraph 511,

> "511. The same analysis applies as above, in relation to the removal of Dr. Sachs. The removal of Mr. Faulkner was brought about by the Investors, not the directors. To the extent they were involved in encouraging or facilitating that removal, that can only have involved breaches of duty under [the] Companies Act s171(a) and s172, but not breach of any other duty…"

*The appointment of further directors*

136.   A further group of complaints by the Minorities alleged that the changes to the composition of the board of the Company in the periods after October 2016 infringed Article 14.2 (i.e. the provisions stipulating that the board could only appoint replacement or additional directors with the approval of Dr. Sachs and Mr. Faulkner). At various times after the departure of Dr. Sachs and Mr. Faulkner, new directors were appointed. These included, in particular the appointment of Mr. Woo as CEO (14 November 2016) and Mr. Bolger (7 December 2016).

137.   The Judge identified that the underlying question was "how the constitution of CPGL was intended to work, in the absence of Dr. Sachs and/or Mr. Faulkner", and observed, at paragraph 521:

> "The fact is that the 2013 constitution does not contain answers to these questions. That fact in itself, it seems to me, supports the view I have taken of the parties' bargain: the constitution contains no obvious machinery for dealing with the situation in which Dr. Sachs and Mr. Faulkner are removed from office because it was not seriously expected to happen: or perhaps, it was not seriously expected to happen and for the Minorities to remain as shareholders in a business controlled by the majority Investors."

138.   The Judge then went on to hold, at paragraphs 522 to 524, that the appointments of new directors without the consent of Dr. Sachs and Mr. Faulkner amounted to a breach by the Investors of the 2013 SHA and breaches of their duties under sections 171(a) and 172 by the other directors,

> "522.   That being so, it seems to me the real value of the Petitioners' argument under this head is that it is another example of the machinery of the 2013 constitution having entirely collapsed, and

simply not being workable in any recognisable way, in the periods after the departure of Dr. Sachs and Mr. Faulkner. As Mr. Hollington put it in his Written Closing: " *The breach of Article 14.2 is part-and-parcel of the majority investors driving a coach and horses through the 2013 Constitution by assuming full board control for themselves.* "

523.  I agree with the broad thrust of that proposition. I therefore agree that the appointments of the further directors mentioned, in a manner which ignored entirely the possibility that the Minorities might be entitled to a say in how the business was run, necessarily involved further breaches by the Investors of the material provisions of the SHA, and in particular clause 4.2 (good faith), clause 5.2 (good business practice), and clause 5.3(a) (proper and efficient manner).

524.  To the extent the appointments were approved by and/or supported by the existing directors, they must also have involved breaches by those directors of their duties under [the] Companies Act 2006, sections 171(a) and 172 …"

*The sale of Newton Aycliffe*

139.  The Judge found, having heard expert evidence, that Newton Aycliffe had not been sold to Kaiam at an undervalue. He also found that the directors had not breached their duties under section 172 of the 2006 Act in relation to the sale for similar reasons.

140.  However, on the same basis as in relation to the management of the Company more generally over the period after the departure of Dr. Sachs, the Judge found, at paragraph 569, that the *process* leading to the sale did involve breaches by the Investors of the 2013 SHA,

"569.  It follows [from the fact that Newton Aycliffe was not sold at an undervalue] that the particular potency of the [Minorities'] complaint against the Investors under this heading is rather lost. Nonetheless, I am bound to conclude, for all the reasons already explained above, that the circumstances leading down to the sale to Kaiam involved continuing breaches of the [2013] SHA by the Investors and continuing unfair prejudice. As before, I would identify in particular breaches of the [2013] SHA clauses 4.2, 5.2 and 5.3(a). That is because the relevant decisions were taken not by the board of CPGL, constituted in the manner required by the 2013 SHA and operating in the manner contemplated by the 2013 SHA. Instead, the relevant decisions, including in particular the eventual decision to sell in May 2017, were taken by a board constituted by Vollin and Minden and comprising their nominees and Mr. Woo (the CEO) whom they had selected."

141.  At paragraph 578, the Judge also found, for the same reasons, that the directors nominated by the Investors had breached their duty to act in accordance with the Company's constitution under section 171(a) of the 2006 Act .

## G. The central issues on the appeal

142.  In principle, the Judge was correct to approach matters on the basis that, in the absence of any suggestion that the Company was a quasi-partnership or that there were any other grounds for the imposition of equitable constraints upon the actions of the members, the question of whether the acts of the Investors amounted to unfairly prejudicial conduct within the meaning of section 994 turned upon whether such conduct breached the terms upon which the members had agreed that the affairs of the Company should be conducted, i.e. the 2013 Articles and the 2013 SHA: see per Lord Hoffmann in *O'Neill v Phillips [1999] 1 WLR 1092* at 1098G-1099A.

© 2023 Thomson Reuters.

143.  In that respect, as is apparent from my lengthy summary of the Judge's reasoning, the majority of his findings of unfair prejudice depended upon his interpretation of the content of the obligation of good faith in clause 4.2 of the 2013 SHA. The Judge took the view that the use of the expression "good faith" in clause 4.2 necessarily imported all of the "minimum standards" of good faith identified in *Unwin v Bond.* These minimum standards included, in addition to a requirement that the Investors should act honestly, a requirement of "fidelity to the bargain", a requirement of "fair and open dealing", and a requirement "to have regard to the interests" of the Minorities.

144.  Also critical to the Judge's decision on the meaning of clause 4.2 of the 2013 SHA was his identification of the "bargain" embodied in the 2013 constitution of the Company. He took the view that the bargain was that, come what may, the management of the Company was to be conducted by a board on which Dr. Sachs and Mr. Faulkner were entrenched and held the balance of power, and with whose decisions the Investors could not interfere.

145.  In addition to the question of whether the actions of the Investors were themselves unfairly prejudicial to the Minorities within the meaning of section 994 , the Judge also found that the actions of the directors nominated by the Investors were unfairly prejudicial, because they involved breaches of duty by the directors. Again, however, the vast majority of the Judge's findings of breach of duty against the directors also depended upon his interpretation of clause 4.2 of the 2013 SHA. Moreover, so far as the directors' duties under section 171(a) of the 2006 Act were concerned, the Judge's findings also depended upon his conclusion that by reason of section 17 of the 2006 Act , the Company's constitution was not limited to the 2013 Articles, but also included the 2013 SHA.

146.  I shall consider the Judge's legal analysis of these issues in the same sequence.

## H. The meaning of clause 4.2 of the 2013 Sha

*The general approach*

147.  In approaching the interpretation of clause 4.2, the first, and most important, point to emphasise is that like any question of interpretation of a contract, an express clause in a contract requiring a party to act in "good faith" must take its meaning from the context in which it is used. That point has been made very clearly in many cases, including by Jackson and Beatson LJJ in *Compass Group UK and Ireland Ltd (t/a Medirest) v Mid-Essex Hospital Services NHS Trust [2013] EWCA Civ 200 ("Compass Group")* at [109] and [150]- [151].

148.  The second, and related, point is that when considering the interpretation and meaning of an express good faith clause in context, cases from other areas of law or commerce, which turn upon their own particular facts, may be of limited value and must be treated with considerable caution. That point was made very clearly by Auld LJ in *Street v Derbyshire Unemployed Workers' Centre [2004] EWCA Civ 964 ("Street")* at paragraph [41], which was cited with approval by Jackson LJ in *Compass Group* at [110],

> " <u>Shorn of context, the words "in good faith" have a core meaning of honesty. Introduce context, and it calls for further elaboration.</u> Thus in the context of a claim or representation, the sole issue as to honesty may just turn on its truth. But even where the content of the statement is true or reasonably believed by its maker to be true, an issue of honesty may still creep in according to whether it made with sincerity of intention for which the Act provides protection or for an ulterior and, say, malicious, purpose. <u>The term is to be found in many statutory and common-law contexts, and because they are necessarily conditioned by their context, it is dangerous to apply judicial attempts at definition in one context to that of another.</u> "

Compound Photonics Group Ltd, Re, 2022 WL 14081423 (2022)

(my emphasis)

149.  Given that very clear warning, as Newey LJ observed at the hearing, apart from the very obvious point made by Auld LJ in *Street* that the core meaning of an obligation of good faith is an obligation to act honestly, it is very far from obvious why it is logical or appropriate to attempt to analyse other cases, decided on other facts, in order to deduce a number of further "minimum standards" of conduct that a defendant must be taken to have agreed to comply with in every case in which a good faith clause has been used in a contract.

150.  That was, however, what HHJ Klein did in paragraphs 230 to 232 of his judgment in *Unwin v Bond* , which formula the Judge endorsed and applied "in full" as the cornerstone of his reasoning in paragraphs 366, 367 and 400 of his Judgment in the instant case.

151.  I respectfully agree with the point made by Auld LJ in *Street* and the doubts expressed by Newey LJ. Whilst the concepts and ideas advanced in other cases might well be useful analytical tools in the process of interpretation of a particular contract, in my view it is not appropriate simply to apply them in a formulaic way in every case, irrespective of the context and the other terms of the agreement in issue.

*Procedural fairness*

152.  That point can be illustrated in relation to the Judge's conclusion that the duty of good faith in clause 4.2 included a procedural requirement that the Investors should deal "fairly and openly" with Dr. Sachs and Mr. Faulkner, including when seeking their respective resignation or removal from office as directors. It is evident from the Judgment that this duty was not derived by the Judge from any other provisions of the 2013 SHA or the 2013 Articles. The only basis for his conclusion that clause 4.2 was intended to impose such a duty upon the Investors in this case, was that such a duty had been found to exist in a number of earlier authorities.

153.  The first authority relied upon by the Judge in that regard, at paragraph 363 of his Judgment, was the decision of Neuberger J in *Mullins v Laughton [2002] EWHC 2761 (Ch), [2003] Ch 250* . The Judge regarded this as a "good example" of a duty of good faith being breached by procedural deficiencies in the process by which a meeting with the claimant had been held. However, I consider the facts of that case and the legal basis for Neuberger J's comments were clearly distinguishable from the instant case.

154.  *Mullins v Laughton* was a partnership case which did not concern a contractual duty of good faith at all. Instead, the partnership agreement contained a clause which required the partners to be "just and faithful to the other partners". As Neuberger J made clear at paragraph 95 of his judgment, this simply enshrined in the agreement, "the most fundamental obligation which the law imposes on a partner", namely "the duty to display complete good faith towards his co-partners".

155.  In my judgment there is, however, no equivalence between the duty of good faith imposed by law on partners, between whom there is a fiduciary relationship, and the agreement made between the shareholders of the Company in the instant case. The shareholders had expressly agreed by clause 23 of the 2013 SHA (see paragraph 88 above) that their relationship was <u>not</u> to be one of partnership, and that they owed each other no fiduciary obligations.

156.  Likewise, the Judge placed reliance, at paragraph [364] of his Judgment, on *Re Audas Group [2019] EWHC 2304 (Ch)* . That was a case in which HHJ Halliwell (sitting as a Deputy High Court Judge) had held that an express contractual duty of good faith had been breached when the minority shareholder had been dismissed as an employee of the company without a "fair and proper process". However the facts and legal context of <u>Re Audas Group</u> were very different from the instant case.

157.  <u>Re Audas Group</u> was a case in which HHJ Halliwell expressly found that the company had been formed as a quasi-partnership based upon a personal relationship involving mutual confidence, and that the subsequent shareholders' agreement containing a "good faith" clause was not intended to supersede those understandings: see paragraphs 135 and 136 of his judgment.

158.  It is therefore wholly unsurprising that in *Re Audas Group* , HHJ Halliwell took the view that the contractual good faith clause had a procedural content that reflected what he expressly referred to as "the analogous context of partnership law". In particular, HHJ Halliwell referred to the requirement of partnership law set out in *Blisset v Daniel (1853) 10 Hare 493* that

partners should not exercise a power of expulsion without first notifying the partner concerned and providing the partner with a proper opportunity to explain his case: see paragraphs 108 and 109 of his judgment. That express analogy with partnership law set the scene for HHJ Halliwell's finding that the defendants had breached their duties of good faith when "peremptorily" dismissing the claimant as an employee: see paragraph 120 of his judgment.

159.  It is also apparent that none of *Mullins v Laughton* , Re Audas Group or *Unwin v Bond* considered what a duty to deal "fairly and openly" might require in the context of the statutory process for removal of a director of a company by its shareholders pursuant to section 168 of the 2006 Act . As I have indicated, *Mullins v Laughton* was a partnership case, and the act complained of in both Re Audas Group and *Unwin v Bond* was the dismissal of the petitioner as an employee of the relevant company.

160.  In that regard, I note that section 168(2) of the 2006 Act contains an express requirement for special notice to be given of a resolution to remove a director under section 168, and section 169 of the 2006 Act contains an express statutory code under which a director faced with an intended resolution for his removal has a right to make written representations to the members of the company and to be heard on the resolution at the meeting of shareholders. However, because the Judge relied on the authorities to which I have referred, and adopted the entirety of HHJ Klein's formulation of minimum standards of good faith from *Unwin v Bond* , he did not consider how (if at all) the parties to the 2013 SHA might be taken to have envisaged that a duty of fair and open dealing was intended to fit alongside or to add to those statutory procedures.

*Fidelity to the bargain and consideration of interests*

161.  Similar points can also be made in relation to the other cases which were relied upon by the Judge in deciding that the obligation of good faith in clause 4.2 necessarily obliged the Investors to act "with fidelity to the bargain", and to have regard to the interests of the Minorities as well as their own interests.

162.  First, although the Judge did refer, in paragraphs 382 to 399 of his Judgment, to some aspects of the factual background and other provisions of the 2013 SHA and 2013 Articles in arriving at his view of what the concept of fidelity to the bargain required, there was no such analysis in relation to the concept of the need to take into account the interests of the other party. In that regard, the Judge repeated that he adopted in full HHJ Klein's "articulation of the overall duty" of good faith in *Unwin v Bond.*

163.  Secondly, an examination of the cases upon which the Judge (and HHJ Klein) relied shows that these twin concepts originated in other legal systems – in particular the United States and New South Wales – where they have been applied in other areas of law and commerce not involving changes to the constitutional structure of a company.

**Berkeley**

164.  In Berkeley , the claimant was a commercial property developer which had been engaged to promote farmland owned by the defendants in Kent for property development purposes. The agreement provided for the developer to receive a fee if planning permission was obtained. Morgan J held that the defendant's intended sale of the land would breach an express term of the agreement to co-operate with the claimant to obtain planning permission: see paragraphs 65 to 70 and 85 of the judgment. However, Morgan J went on to consider *obiter* whether the proposed sale would also breach an express contractual term requiring the parties to act "with utmost good faith towards one another".

165.  It is apparent from Morgan J's judgment that the meaning of the good faith clause was advanced by the claimant primarily by reference to dicta of French J in Bropho v Human Rights & Equal Opportunity Commission [2004] FCAFC 16 (" Bropho "). That was an Australian case which considered the concept of good faith in the very different context of a statutory defence under the Australian Racial Discrimination Act which had been held to apply to a cartoon published in a newspaper. The cartoon had depicted a group of Aboriginal people and had been the subject of a complaint that it was reasonably likely to offend, insult, humiliate or intimidate a group of people on the basis of race or ethnic origin. As Morgan J observed, Bropho was not a decision in a commercial case, nor was it one in which a contractual duty of good faith was in issue. Instead, the judgment contained a general discussion of the concept of good faith by reference to a large number of examples drawn from very different contexts and different jurisdictions.

166.  Having sounded that note of warning, two of the examples given in Bropho nonetheless resonated with Morgan J. The first was part of a citation from *Black's Law Dictionary* , an American publication, which contained a definition of good faith as,

Compound Photonics Group Ltd, Re, 2022 WL 14081423 (2022)

> "A state of mind consisting in (1) honesty in belief or purpose, (2) faithfulness to one's duty or obligation, (3) observance of reasonable commercial standards of fair dealing in a given trade or business, or (4) absence of intent to defraud or to seek unconscionable advantage. – Also termed bona fides."

From that definition, counsel for the claimant in <u>Berkeley</u> had isolated and emphasised the third point.

167.  The second example highlighted by Morgan J was said to be paragraph 205 of the United States Second Restatement of Contracts ("the US Restatement"), which French J in <u>Bropho</u> had reported to be in these terms:

> "The phrase "good faith" is used in a variety of contexts and its meaning varies somewhat with the context. Good faith performance or enforcement of a contract emphasises faithfulness to an agreed common purpose and consistency with the justified expectations of the other party; it excludes a variety of types of conduct characterised as involving "bad faith" because they violate community standards of decency, fairness or reasonableness."

168.  French J's reference to paragraph 205 of the US restatement was incorrect. Paragraph 205 of the US Restatement in fact states,

> "Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement."

The text quoted by French J actually appears in the Commentary by the American Law Institute (ALI) upon paragraph 205. In context, the ALI Commentary is describing part of a composite expression ("good faith and fair dealing") which appears to be a summation of general duties imposed by law on contracting parties in the United States.

169.  In <u>Berkeley</u> , Morgan J construed the good faith clause as imposing an obligation which was an amalgam of these US law materials to which he had been referred. He also made clear that he did so in the absence of any contrary argument. At paragraph 97 of his judgment, Morgan J stated,

> "97.  [Counsel for the defendant] did not suggest that these statements by French J. (and the material referred to by the learned judge) were not a useful attempt to describe the concept of "good faith". Nor did [he] refer me to any English authority, or any other authority, which adopted a different approach. In these circumstances, based on the material that has been put before me, I feel I am able to construe [the utmost good faith clause] as imposing on the defendants a contractual obligation to observe reasonable commercial standards of fair dealing in accordance with their actions which related to the Agreement and also requiring faithfulness to the agreed common purpose and consistency with the justified expectations of the first claimant."

© 2023 Thomson Reuters.                                                                 35

Compound Photonics Group Ltd, Re, 2022 WL 14081423 (2022)

---

**CPC Group**

170.  Morgan J's decision in Berkeley was referred to by Vos J in CPC Group . That case concerned the terms of a sale and purchase agreement by which the claimant had sold its interest in a property-owning company to the defendant on the basis that if planning permission was subsequently obtained for the property, additional deferred consideration would be paid. The claimant contended that steps taken by the defendant to withdraw an application for planning permission that had attracted adverse comment and to resubmit it with a new design, breached an express contractual term requiring the parties to act "in the utmost good faith" in relation to the matters set out in the agreement.

171.  The observations of Vos J as to the meaning of the relevant clause were expressly *obiter* , as he decided that a particular factual premise for the alleged breach of the good faith term had not been made out: see paragraph 237 of his judgment.

172.  In his judgment, Vos J referred first to Lord Scott's dictum in *Manifest Shipping v Uni-Polaris Shipping Co [2003] 1 AC 469 ("Manifest Shipping")* at paragraph 111 that,

> "Unless the assured has acted in bad faith, he cannot, in my opinion, be in breach of a duty of good faith, utmost or otherwise."

173.  Vos J then referred to the New South Wales case of Overlook v Foxtel [2002] NSWSC 17 (" Overlook "). As a preliminary matter, Vos J commented at paragraph 238 that the particular relevance of the Overlook case was that it dealt with the inter-action between an obligation of good faith and the parties' pursuit of their own commercial or other interests. As Vos J subsequently pointed out in paragraph 243 of his judgment, this raised a particular type of issue as to the extent to which a good faith clause might inhibit the defendant's ordinary freedom to act in its own interests if to do so might render the contract worthless or significantly less valuable for the claimant.

174.  That was also the particular factual context of the decision in Overlook , which concerned a contract for the supply of two foreign television channels to a company that provided pay television services in Australia. The contract provided for the claimant supplier to be remunerated by the defendant pay television provider on the basis of a percentage of revenue from supply of the channels by the defendant to its subscribers. The defendant had decided to offer the channels to its subscribers at half the previous price with a view to increasing its overall market penetration of non-English language channels, thereby causing a short-term reduction in the amounts payable to the claimant, which contended that this was a breach of contract.

175.  Vos J quoted the following extract from the judgment of Barrett J in Overlook , adding the emphasis shown in bold that focussed on the particular issue with which he was concerned,

> "65.  If adherence to such standards of conduct is the predominant component of a separate obligation of good faith in performance of a contract, it becomes necessary to enquire about the extent to which selflessness is required. **It must be accepted that the party subject to the obligation is not required to subordinate the party's own interests, so long as pursuit of those interests does not entail unreasonable interference with the enjoyment of a benefit conferred by the express contractual terms so that the enjoyment becomes (or could become), in words used by McHugh and Gummow JJ in** Byrne v Australian Airlines Ltd [1995] HCA 24; *(1995) 185 CLR 410* , " **nugatory, worthless or, perhaps, seriously undermined** ". This seems to me to be the principle emerging from paras 172 to 177 of the joint judgment in [Burger King v. Hungry Jack's Pty [2001] NSWCA 187] where the various authorities are collected and discussed.
>
> 66.  Dr. Elisabeth Peden of the University of Sydney has characterised the effect of the good faith requirement in contractual performance as follows ("Incorporation of Terms of Good Faith in Contract Law in Australia", (2001) 23 Syd L.Rev 222):

Compound Photonics Group Ltd, Re, 2022 WL 14081423 (2022)

> "Most basically, by using the obligation to perform in good faith as a principle of construction the courts are merely required to ensure that the parties have genuinely adhered to the bargain which they entered into. This will require an examination of the whole contract and the underlying intentions. Strict rights may not be adhered to, if in the context of the contract as a whole, this would subvert the character of the contract. Most cases that discuss the concept do so in terms of negatives, that is, what is not in breach of good faith. This makes sense, since it is the context of the contract read as a whole that will indicate what is appropriate and what is not."

> 67. Viewed in this way, **the implied obligation of good faith underwrites the spirit of the contract and supports the integrity of its character. A party is precluded from cynical resort to the black letter. But no party is fixed with the duty to subordinate self-interest entirely which is the lot of the fiduciary** : Burger King at para 187. **The duty is not a duty to prefer the interests of the other contracting party. It is, rather, a duty to recognise and to have due regard to the legitimate interests of both the parties in the enjoyment of the fruits of the contract as delineated by its terms.**

> 68. In many ways, the implied obligation of good faith is best regarded as an obligation to eschew bad faith. This is borne out by the … succinct statement by Lord Scott of Foscote in *Manifest Shipping Co Ltd v Uni-Polaris Shipping Co Ltd* …"

176. Vos J then cited passages from Morgan J's decision in Berkeley . There is no indication from the judgment that the origins of Morgan J's formulation were the subject of any detailed criticism or contrary argument before Vos J.

177. Vos J then drew specific attention to the other clauses in the contract which had some bearing upon the extent to which the defendant, when taking steps in relation to the planning application, was obliged to have regard to the interests of the claimant in receiving payment of deferred consideration,

> "243. In my judgment, all these authorities and analogies are helpful. The obligation in the SPA must, however, take its colour from the commercial context of the contract. Clause 7.1 is found specifically in the section concerned with the " *Protection of Deferred Consideration* ". It is, therefore, directed at things that might be done or not done in connection with the pursuit of the Planning Application, the success of which would trigger that consideration.

> 244. In addition, clause 7.3 contained an express obligation on [the defendant] not to do anything so as to avoid or reduce payment of the Deferred Consideration. Delaying the payment would obviously reduce the payment's value, and must be included within that provision.

> 245. There are other signs in the SPA, however, that the parties' commercial interests were not intended to be entirely subjugated to the pursuit of the Planning Application to the exclusion of all else. In paragraph 5(a), the central obligation was to use all reasonable but commercially prudent endeavours to procure a Planning Permission free of Legal Challenge. In paragraph 5(c), [The parties] were required to review a proposed variation " *to see if it is in their respective interests to make* " it. Moreover, clause 7.1 itself repeated the express obligation on [the defendant] to use "

© 2023 Thomson Reuters.

*all reasonable but commercially prudent endeavours* ", this time to enable the achievement of the various threshold events and Payment Dates."

178.  Vos J then concluded,

> "246.  Thus, it seems to me that the content of the obligation of utmost good faith in the SPA was to adhere to the spirit of the contract, which was to seek to obtain planning consent for the maximum Developable Area in the shortest possible time, and to observe reasonable commercial standards of fair dealing, and to be faithful to the agreed common purpose, and to act consistently with the justified expectations of the parties. I do not need, it seems to me, to decide whether this obligation could only be broken if [the parties] acted in bad faith, but it might be hard to understand, as Lord Scott said in Manifest Shipping how, without bad faith, there can be a breach of a duty of good faith, utmost or otherwise"."

179.  Although prefaced by a consideration of other terms of the SPA, Vos J's formulation of the content of the good faith duty in the first part of paragraph 246 plainly adopted the same wording as Morgan J's decision in Berkeley .

**The New South Wales cases**

180.  Given Vos J's extensive citation of Barrett J's judgment in Overlook , it is worth putting that decision and the other Australian cases upon which it was based into context.

181.  Although there was a factual similarity between the type of issue that was being considered in Berkeley and CPC Group and that considered in Overlook , it should be appreciated that there was an important juridical difference between the task being undertaken by the courts in those cases. In CPC Group , as in Berkeley , the English court was engaged in the conventional exercise of interpretation of the express term of a contract governed by English law. In contrast, Overlook did not concern the interpretation of an express contractual term of good faith. Nor did Barrett J find that a duty of good faith was to be implied on the basis of construction of the contract. A claim on that basis was considered by reference to the conventional tests for the implication of terms, and rejected on the basis that such a clause was not necessary to give business efficacy to the contract: see paragraphs 54 to 60 of the judgment, referring to *BP Refinery (Westernport) v Shire of Hastings (1977) 180 CLR 266* at 283 and Codelfa Construction v State Railway Authority of NSW *[1982] 149 CLR 337* .

182.  Instead, the term requiring good faith in the performance of the contract in Overlook was held to be implied, as a matter of the law of New South Wales, in circumstances in which a discretionary decision taken by one party affected the benefit to be enjoyed by the other under the contract. In that respect, and as is apparent from the extract cited by Vos J in CPC Group , Barrett J simply followed the earlier New South Wales decision in Burger King v Hungry Jack's Pty [2001] NSWCA 187 (" Burger King ").

183.  Burger King concerned a contract governed by New South Wales law for development of a restaurant franchise business. The court was not engaged in the interpretation of a good faith clause in the contract, but held as a matter of New South Wales law that the franchisor, Burger King, was required to exercise its discretion to approve or reject new franchises "in good faith and reasonably", and could not do so for an extraneous purpose so as to "thwart" the franchisee's ability to develop its business, and ultimately to procure a situation in which Burger King could terminate the contract: see paragraphs 185 to 187 of the judgment.

184.  The justification for the imposition of this term as to good faith was explained at paragraphs 146 to 150, making clear that it was heavily based upon the general concepts of good faith and fair dealing implied into all contracts under US law,

© 2023 Thomson Reuters.

Compound Photonics Group Ltd, Re, 2022 WL 14081423 (2022)

"146.  Until <u>Renard Construction (ME) Pty v Minister of Public Works</u> (1992) 26 NSWLR 234 [("<u>Renard</u> ")], there had only been tentative acceptance in Australian jurisprudence of an implied term of good faith. However, in <u>Renard</u> Priestley JA said at 268:

> "…that people generally, including judges and other lawyers, from all strands of the community, have grown used to the courts applying standards of fairness to contract which are wholly consistent with the existence in all contracts of a duty upon the parties of good faith and fair dealing in its performance. In my view this is in these days the expected standard, and anything less is contrary to prevailing community expectations."

147.  Priestley JA reviewed the influence that the *Uniform Commercial Code* (1951), and its later formulation in the *Restatement (Second) of Contract* (1981), had had on American case law.

148.  We respectfully refer to his Honour's detailed treatment of this development and do not repeat it, except to refer to of the *Restatement (Second)* s 205 (1981) which provides:

> "Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement."

149.  Priestley JA considered, at 268, that there were strong arguments "for recognition in Australia of [such a] duty".

150.  His Honour also observed that the American experience indicated that judges used the notion of good faith flexibly as an "excluder". In other words, the concept "serve[d] to exclude many heterogeneous forms of bad faith" so as "to do justice according to law". See generally R S Summers in *"Good Faith" in General Contract Law and the Sales Provisions of the Uniform Commercial Code* (1968) 54 Virginia Law Review 1995, discussed by Priestley JA at 266-7."

185.  The court in <u>Burger King</u> then went on to accept that although the franchise development agreement in question did not fall into a type of contract which had hitherto been subjected to a good faith duty implied by New South Wales law, it was nonetheless appropriate to extend the concept to such agreement.

**Macquarie**

186.  <u>Burger King</u> and <u>Overlook</u> were subsequently relied upon by the New South Wales Court of Appeal in <u>Macquarie International Health Clinic v Sydney South West Area Health Service</u> [2010] NSWCA 268 (" <u>Macquarie</u> "). That case was referred to by HHJ Klein in *Unwin v Bond* and by the Judge in the instant case.

187.  In <u>Macquarie</u> , the parties had entered into a number of inter-related agreements concerning the development by the claimants of a new private hospital on land owned by the defendant health authority, which hospital was then to be leased to

Compound Photonics Group Ltd, Re, 2022 WL 14081423 (2022)

the claimants for 103 years. The key "Heads of Agreement" (HOA) contained an express term requiring the parties to act with the utmost good faith in performing their duties, exercising their powers, and in their dealings with each other. A dispute arose over the non-disclosure by the defendant health authority of certain aspects of a planning application which it had made in relation to a nearby public hospital which it operated, and the effect that such a design might have on the development of the private hospital to be undertaken by the claimants and their commercial ability to exploit their future leasehold interest in it.

188.  In giving the first judgment, Allsop P stated, at paragraphs 5 to 14,

> "5.  The place of good faith in the law of contract in Australia has been debated in recent years. One significant aspect of that debate has been the place of good faith in the implication of terms in contracts (whether as a matter of fact or law and whether in contracts generally or in those of a commercial character) and in the construction and interpretation of written agreements.
>
> …
>
> 8.  The content of the clauses is to be understood and ascertained by construing the language of the parties in the context in which the clauses appear. They are contractual terms to be construed, like any other. Here, the commercial and contractual relationship was envisaged to be (in the transaction documents) for a century. This was also envisaged in the Heads of Agreement, although that contract was preliminary to the formation of others. The performance of the agreements required planning by both parties, consultation among the parties and the expenditure of very large amounts of money upon planning and building work and the operation of a significant hospital in proximity to, and in connection with, a large hospital of the other party. The parties can be seen, by the clauses providing for the utmost good faith, to have required honesty and fair dealing of a high standard to govern their contractual behaviour.
>
> …
>
> 11.  The notion of good faith in the performance of contracts is one established by a number of cases in this Court and is well-known to the law in both common law and civilian systems. It was part of the law merchant. It finds its place in international conventions. I repeat what I said in <u>United Group Rail Services Limited v Rail Corporation New South Wales</u> [2009] NSWCA 177 at [58],
>
> > "[G]ood faith is not a concept foreign to the common law, the law merchant or businessmen and women. It has been an underlying concept in the law merchant for centuries… It is recognised as part of the law of performance of contracts in numerous sophisticated commercial jurisdictions: for example *Uniform Commercial Code* s.1-201 and s.1-203 … It has been recognised by this Court to be part of the law of performance of contracts: <u>Renard Constructions (ME) Pty Ltd v Minister for Public Works</u> (1992) 26 NSWLR 234 at 263-270; <u>Hughes Bros Pty *Ltd v Trustees* of the Roman Catholic Church for the Archdiocese of Sydney</u> (1993) 31 NSWLR 91; <u>Burger King Corporation v Hungry Jack's Pty *Ltd at 565-574*</u> [141]-[187]; and <u>Alcatel Australia Ltd v Scarcella</u> at 363-369. …"
>
> 12.  The usual content of the obligation of good faith that can be extracted from <u>Renard Constructions (ME) Pty Ltd v Minister for Public Works</u> (1992) 26 NSWLR 234, <u>Hughes Bros Pty *Ltd v Trustees* of the Roman Catholic Church for the Archdiocese of Sydney</u> (1993) 31 NSWLR 91, <u>Burger King Corporation v Hungry Jack's Pty Ltd</u> [2001] NSWCA 187; 69 NSWLR 558; <u>Alcatel Australia Ltd v</u>

© 2023 Thomson Reuters.

Scarcella (1998) 44 NSWLR 349 and United Group Rail Services Limited v Rail Corporation New South Wales [2009] NSWCA 177 is as follows:

(a)  obligations to act honestly and with a fidelity to the bargain;

(b)  obligations not to act dishonestly and not to act to undermine the bargain entered or the substance of the contractual benefit bargained for;

(c)  an obligation to act reasonably and with fair dealing having regard to the interests of the parties (which will, inevitably, at times conflict) and to the provisions, aims and purposes of the contract, objectively ascertained.

13.  None of these obligations requires the interests of a party to be subordinated to those of the other. It is good faith or fair dealing between arm's length commercial parties by reference to the bargain and its terms that is called for.

14.  It is important to recognise that these obligations must be assessed and interpreted in the light of the bargain itself and its contractual terms. Those terms, however, must be assessed and interpreted in the light of the presence of the obligation of good faith, here pursuant to an express clause."

189.  The second judgment, with which both other judges agreed, was given by Hodgson JA. At paragraphs 145 to 148, he stated,

"145.  What then did the obligation of utmost good faith in the [Heads of Agreement] require of [the defendant]?

146.  Writing extra-curially, Sir Anthony Mason has argued that a contractual obligation of good faith embraces no less than three related notions:

(1)  An obligation on the parties to co-operate in achieving the contractual objects;

(2)  Compliance with honest standards of conduct; and

(3)  Compliance with standards of conduct that are reasonable having regard to the interests of the parties.

See A F Mason " Contract, Good Faith and Equitable Standards in Fair Dealing " (2000) 116 LQR 66 at 69. That the obligation has these three elements is consistent with Australian authority: Alcatel Australia Limited v Scarcella (1998) 44 NSWLR 349 at 369 (Sheller JA, with Powell and Beazley JJA agreeing), Burger King Corporation v Hungry Jack's Pty Limited [2001] NSWCA 187; (2001) 69 NSWLR 558 at [171] (Sheller, Beazley and Stein JJA).

147.  However, a contractual obligation of good faith does not require a party to act in the interests of the other party or to subordinate its own legitimate interest to the interests of the other party; although it does require it to have due regard to the legitimate interests of both parties: c.f. Overlook v Foxtel [2002] NSWSC 17 at [65] — [67] (Barrett J).

148.  Applying that approach to the HOA, in my opinion the obligation of utmost good faith did not go so far as to require [the defendant] to defer to the interests of [the claimants] in developing its own plans for [the hospital], or to include [the claimants] in its own planning processes. But in my opinion, when [the defendant's] planning processes would make a substantial difference to what [the claimants] could reasonably expect concerning the flow of persons between the hospitals or the

Compound Photonics Group Ltd, Re, 2022 WL 14081423 (2022)

creation of a campus concept, the obligation of utmost good faith would require that [the claimants] be informed of this, at least to enable them to take account of it in the design and construction of the works contemplated by the HOA."

190.  Although Macquarie involved the interpretation of an express contractual duty of good faith, the context was a long-term contract governed by New South Wales law between two parties based in New South Wales and relating to a development in Sydney. It is, therefore, hardly surprising that Allsop P and Hodgson JA approached matters on the basis that the parties had chosen expressly to adopt the same content of an obligation of good faith that had been established in earlier decisions in New South Wales in (among others) Renard , Burger King and Overlook . As I read those authorities, it is likely that such a formulation would have been implied as a matter of New South Wales law in any event.

191.  Hodgson JA also expressly relied upon a formulation of good faith derived from a 2000 Law Quarterly Review article by Sir Anthony Mason, which, like an earlier lecture on the same topic given by him in 1993, had featured in some of the earlier New South Wales cases such as Burger King and Overlook . In that article, Sir Anthony Mason advocated the imposition as a matter of law of good faith and fair dealing duties in the negotiation and performance of contracts, and traced the development of that concept in Australia.

192.  Sir Anthony Mason's formulation of the content of good faith appeared under the heading, "The concept of good faith" and simply comprised citation of the provisions of the United States UCC and paragraph 205 of the US Restatement to which I have already referred. Sir Anthony then continued,

> "It is by no means clear what "good faith" in the context of these provisions means. But it is probable that the concept embraces no less than three related notions:
>
> (1)  an obligation on the parties to co-operate in achieving the contractual objects (loyalty to the promise itself);
>
> (2)  compliance with honest standards of conduct; and
>
> (3)  compliance with standards of conduct which are reasonable having regard to the interests of the parties.
>
> Criticism that "good faith" is an obscure and uncertain concept is sometimes countered by the claim that, in substance, "good faith" is no more than an excluder of "bad faith" behaviour."

It is readily apparent that Sir Anthony Mason's focus was on the imposition of such duties as a matter of general contract law. It did not extend to contracts between shareholders in companies.

**F&C Alternative Investments v Barthelemy**

193.  Hodgson JA's judgment in Macquarie , together with the dicta of Morgan J in Berkeley were referred to by Sales J in *F&C Alternative Investments v Barthelemy (No.2) [2012] Ch 613 ("F&C")* . The case concerned a commercial joint venture between two individual members and a corporate member (Holdings) of a limited liability partnership (LLP) which was to conduct a hedge fund business. Sales J pointed out, at paragraph 208 of his judgment, that the Limited Liability Partnership Act 2000 included only a minimal legal framework for the operation of an LLP, leaving it to the parties to provide for the detail of the relationship between the members as a matter of contract in the agreement constituting the LLP. The agreement in question included a clause 13.6 under which each of the three members of the LLP was required at all times to show "the utmost good faith" to the LLP.

194.  In interpreting clause 13.6, Sales J indicated, at paragraph 255, that the content of the duty was informed by the contractual context, and that the decision in Macquarie "provides helpful guidance to the approach to be adopted". He then

Compound Photonics Group Ltd, Re, 2022 WL 14081423 (2022)

cited the judgment of Hodgson JA and also briefly noted the decision of Morgan J in <u>Berkeley</u> , before concluding, at paragraph 257,

> "257. The balance of interests established by a contractual duty of utmost good faith in the context of a commercial joint venture, which permits Holdings to have regard to [its] own commercial interests while also imposing an obligation upon it to have due regard to the legitimate interests of the other parties to the agreement, represented the parties' considered reconciliation of the interests of [Holdings] and the LLP and the defendants under the agreement. This was the essence of the bargain which they made, and it is appropriate that it should inform the content of the fiduciary obligations assumed by [Holdings'] representatives on the LLP board, mancom and compensation committee as set out above. The adoption of such a standard of conduct made sense in the context of an arrangement which sought to marry together the disparate strengths of the defendants and [Holdings] through the vehicle of the LLP in a relationship intended to last a long time (and which therefore required considerable flexibility of application to cope with the wide range of unforeseeable business challenges which might arise), where they were each required to have regard to the legitimate interests of the other parties to the agreement while at the same time being entitled to take into account their own self-interest."

195.  From this survey of the cases relied upon by the Judge, a number of points emerge relating to the concepts of fidelity to the bargain and a requirement to have regard to the interests of the other contracting party.

196.  The first, and general, point is that those specific concepts originated in a commentary on US contract law and were then adopted and developed in New South Wales in the context of the imposition of terms requiring good faith in the performance of contracts as a matter of general law. They were not developed in the context of the interpretation of individually negotiated contracts. It is entirely understandable that if a term is implied as a matter of law, it should have a single, clearly understood meaning. However, I see no sound juridical basis for saying that all of the same concepts should automatically be regarded as incorporated in a formulaic way whenever any contract governed by English law contains an express term requiring the parties to act in good faith. Put into the context of this case, I do not see why the parties to an English law governed contract concerning an English company should automatically be presumed to have intended to incorporate such obligations, irrespective of the context given by the other terms of their contract.

197.  Secondly, the particular concept of a requirement to have regard to the interests of the other contracting party has largely been developed and applied in cases concerning business decisions by one party which are capable of adversely affecting, or even depriving the other party of, the commercial benefit expected to be enjoyed by that other party under their contract (e.g. <u>Burger King</u> , <u>Overlook</u> , <u>Berkeley</u> and <u>CPC Group</u> ). It is far from obvious how or why the same approach is automatically to be applied in the context of voting by shareholders at general meetings of a limited company.

198.  The structure of a limited company and the relationship and interests of its members form a very different backdrop to that of an ordinary commercial contract. The agreement between the members and the company is to be found in the articles of association, to which section 33 of the 2006 Act gives the force of a contract. Under that contract, the rights and interests of the shareholders are defined by the holding of shares, and so far as shareholders are concerned, decisions are taken democratically by specified majority votes from time to time.

199.  In that respect, the holding of general meetings gives the shareholders the opportunity to consult with each other, but there is no requirement that they should do so. Nor is there any general requirement that shareholders should take into account the interests of other shareholders when deciding how to vote. Rather, the long-standing rule is that the votes attaching to shares are proprietary rights that the holder may exercise as they see fit in their own interests: see *North-West Transportation Co. Ltd v Beatty (1887) 12 App Cas 589* PC and *Burland v Earle [1902] AC 83* PC.

200.  It is also the case that the votes of shareholders do not ordinarily have the result of depriving other shareholders of the benefit of the statutory contract – i.e. their shares. That is certainly the case where the vote is simply to remove a director from office. But even if a resolution is proposed which might be thought to operate to the disadvantage of the minority, e.g. to alter the articles to give the board the power to remove a permanent director, the test applied by the court to determine

the validity of the resolution is simply whether those voting in favour honestly believed that it was for the benefit of the company: see *Shuttleworth v Cox Bros & Co. (Maidenhead) Ltd [1927] 2 KB 9* , cited with approval by the Privy Council in *Citco Banking Corporation v Pusser's Ltd [2007] UKPC 13 at paragraphs 15 to 17* . There is no requirement in such a case for the shareholders voting in favour to have regard to the particular interests of the minority, as opposed to the benefit of the company as a whole.

201.  That basic position under the articles of association and general company law could, of course, be affected by an agreement between individual shareholders regulating how they should each vote on specific matters. However, if such well-known principles of company law are intended to be changed, one would ordinarily expect that to be expressed clearly and directly, and any further consequences (e.g. as to consultation between the parties) to be spelled out – especially in a professionally drafted agreement.

202.  Thirdly, the judges in a number of the cases referred to above have pointed out that the interpretation of a good faith clause as requiring fidelity to the bargain may reflect the fact that an ordinary contract cannot expressly provide for every event that may happen in the future, especially if the contract is a long-term contract. In such cases, the parties might more readily be taken to have intended a good faith clause to require adherence to their common aims and purposes (as expressed or implied in the terms of their agreement) in unforeseen future situations (see e.g. <u>Macquarie</u> and <u>F&C</u> ).

203.  In argument, Mr. Hollington suggested that the relationship between the parties as shareholders of the Company was a potentially long-term one, which tended to support the conclusion that a duty of fidelity to the bargain existed in the instant case. However, quite apart from the fact that the 2013 SHA expressly envisaged the Exit of the Investors within a relatively short time, it seems to me that considerable caution must be exercised before applying that concept to the particular matters which are in issue in this case, namely changes to the constitution of a company incorporated under the 2006 Act and the composition of its board of directors.

204.  That is because, unlike an ordinary contract, the terms of the articles and the identity of a company's directors are not cast in stone when the company is incorporated, but can be amended and changed from time to time by specified majority votes of the shareholders. There is thus the inherent flexibility to amend the statutory contract by a democratic shareholder process to respond to changing and unforeseen circumstances. Given such inherent flexibility, it cannot readily be presumed that a good faith clause has been designed to prescribe how the parties should behave in unforeseen future circumstances – still less that such a clause should have the result of eliminating flexibility and entrenching the original structure so that changes cannot be made at all.

205.  Fourthly, although judges have, on occasions, used the expression "the spirit of the contract" in the context of a good faith clause, I do not read that as an open invitation to the court to interpret a good faith clause as imposing additional substantive obligations (or restrictions on action) outside the other terms of the contract. That must especially be so where (as in the instant case) the contract in question is professionally and comprehensively drafted, and contains an entire agreement clause.

206.  That proposition is consistent with the approach of the Court of Appeal to the interpretation of a clause in a shareholders' agreement which included both an express "good faith" sub-clause and an express "spirit and intention of the agreement" sub-clause in *Re Coroin [2013] EWCA Civ 781, [2014] BCC 14 ("Coroin")* .

207.  In *Coroin* , the appellant petitioner alleged that pre-emption provisions in a shareholders' agreement had been triggered by the respondents, who were therefore obliged to offer their shares for purchase by him. He contended that they had refused to do so, thereby causing unfair prejudice to him. Arden LJ rejected that argument as a matter of construction of the pre-emption provisions themselves. She then dealt with an argument that the same result should be reached by application of a different clause in the shareholders' agreement that provided,

> "8.5  Each of the Shareholders agrees that:
>
> …
>
> 8.5.2  each of them shall at all times act in good faith towards the others and shall use all reasonable endeavours to ensure the observance of the terms of this Agreement;
>
> …

Compound Photonics Group Ltd, Re, 2022 WL 14081423 (2022)

and

8.5.4  each of them will do all things [necessary] or desirable to give effect to the spirit and intention of this Agreement."

208.  Arden LJ rejected the petitioner's arguments based on both clause 8.5.2 and 8.5.4. She stated, at paragraphs 48 to 53,

"48.  … [Counsel for the appellant] argues for a meaning for this expression that was really the same as the meaning of clause 8.5.4, namely, that it required the court to enforce the spirit of the agreement and not just "its black letter" (relying on CPC Group at [238]–[246] per Vos J.). That argument in my judgment properly belongs under clause 8.5.4 and I will address it at that point. The respondents proceed on the basis that "good faith" in the context of clause 8.5.2 imposes a duty simply to act honestly. (They did not need to refine the meaning of honesty further than to say that it was a subjective test.)

49.  I consider that the respondents are right to submit that the requirement to act in good faith in cl.8.5 involves an obligation to act honestly in a subjective sense as this is its natural meaning and the context does not suggest some other meaning….

…

51.  I do not consider that the obligation to act in good faith can impose a binding general obligation to act in a manner outside the terms of the shareholders' agreement because there is no indication of the circumstances in which the obligation to act in good faith obliges the parties to go beyond the obligations in the shareholders' agreement. There is, therefore, no benchmark against which the court could enforce the obligation.

52.  The second group of provisions in the good faith clause is composed solely of clause 8.5.4. The parties agreed to do all things necessary or desirable to give effect to the spirit and intention of the shareholders' agreement. Again, this clause prescribes no basis for determining the "spirit and intention"….

53.  In my judgment, the only way in which the court can give effect to the obligation in clause 8.5.4 is to treat the reference to the "spirit and intention" of the shareholders' agreement as a reference to the shared aims of the parties in entering into the agreement. Those aims would have to be ascertained in the way in which the court ascertains the background to an agreement as part of the process of interpretation. On this basis, clause 8.5.4 has content, but it is merely a mirror image of the process of interpreting an agreement or implying terms into it…"

209.  In the instant case, at paragraph 352 of his Judgment, the Judge treated Arden LJ's decision as simply going to the scope, rather than the content, of the good faith clause. I do not agree. Arden LJ plainly determined that, in the context of the agreement before her, the requirement to act in good faith in clause 8.5.2 imposed no more than the core duty to act honestly. That was a decision on the content of the clause.

210.  For present purposes, however, what is significant is that Arden LJ reinforced her interpretation of clause 8.5.2 by making the point, in paragraph 51 of her judgment, that if the other terms of the agreement did not require the respondents to serve a transfer notice, then the good faith clause could not require them to do so, because there would be no relevant frame of reference (benchmark) outside the terms of the agreement against which to give such clause any particular meaning.

211.  Arden LJ returned to the same theme when interpreting the express "spirit and intention of the agreement" sub-clause 8.5.4 in paragraph 53 of her judgment. She held that the way to give meaning to that sub-clause was to ascertain the shared aims of the parties in entering into the agreement as a matter of conventional interpretation of the agreement or implication of terms.

212.  Understood in this way, even where thought to be inherent in an obligation of good faith, the concept of fidelity to the bargain or adherence to the spirit of the agreement could only operate to support the common purpose and aims of the parties as objectively ascertained from the express or implied terms of the contract. Depending on context, the essence of the concept might be captured by Barrett J's reference in Overlook to the prohibition of "cynical resort to the black letter" or by Allsop P's reference in Macquarie to the prohibition of conduct that "undermines the bargain entered or the substance of the contractual benefit bargained for". On any footing, however, the shared aims of the parties must be identified by interpretation of the other terms of the agreement, or by implication of terms according to the usual test outlined in *Marks & Spencer plc v BNP Paribas Securities [2016] AC 742* .

*Is dishonesty or bad faith required for any breach of a good faith clause?*

213.  As indicated above, the Judge adopted the formulation of minimum standards of good faith derived from paragraphs 230 to 232 of HHJ Klein's judgment in *Unwin v Bond.* It is also clear that the Judge thought that the duty of good faith could be breached if any one of those minimum standards were breached, even if others were not. That appears from his observation in paragraph 370 of the Judgment that on the facts of *Unwin v Bond* , HHJ Klein found the defendant to have acted in breach of the duty of good faith by not dealing fairly with the claimant and in failing to have regard to his interests, even though there had been no dishonesty or use of powers for an ulterior purpose.

214.  Approaching matters in that way, the Judge did not consider the point identified by Vos J in CPC Group by reference to the dictum of Lord Scott in Manifest Shipping . In Manifest Shipping , Lord Scott had stated that,

> "Unless [the defendant] has acted in bad faith he cannot be in breach of a duty of good faith, utmost or otherwise".

215.  It will also be recalled that Vos J cited paragraph 68 of Barrett J's judgment in Overlook , in which Barrett J expressed the view,

> "68.  In many ways, the implied obligation of good faith is best regarded as an obligation to eschew bad faith. This is borne out by the … succinct statement by Lord Scott of Foscote in *Manifest Shipping Co Ltd v Uni-Polaris Shipping Co Ltd* …"

216.  Although on the facts of CPC Group , Vos J did not consider it necessary to decide whether a term requiring the defendants to act in good faith could only have been breached if the defendants had acted in bad faith, it is clear from his dicta in paragraph 246 of his judgment that he inclined to that view.

217.  This line of argument appeared to be raised by paragraph 3.3 of the Investors' Notice of Appeal (as repeated, *mutatis mutandis* in paragraphs 6 to 8), in which it was said that the Judge erred by making findings of a breach of the good faith obligation in clause 4.2 of the 2013 SHA in circumstances in which he made no finding that the Investors or the directors appointed by them had acted in bad faith. This manifested itself in a submission in Mr. Gledhill's skeleton argument that the Judge should not have found clause 4.2 to have been breached without a finding of "dishonesty or something akin to it".

218.  In support of his thesis, Mr. Gledhill referred to Compass and Coroin . He contended that those cases were binding authority that a duty of good faith could not be breached unless the defendant had acted dishonestly.

Compound Photonics Group Ltd, Re, 2022 WL 14081423 (2022)

219.  Mr. Gledhill also accepted that Arden LJ's reference in <u>Coroin</u> to an obligation to act honestly "in a subjective sense" had to be understood in the sense that it must be assessed in light of what the defendant actually knew, albeit that the standard of behaviour required in such circumstances is an objective one. Those principles were explained by Lord Nicholls in *Royal Brunei Airlines v Tan [1995] 2 AC 378 ("Royal Brunei")* and more recently endorsed by the Supreme Court in *Ivey v Genting Casinos (UK) [2018] AC 391 ("Ivey")* .

220.  In *Royal Brunei* , Lord Nicholls stated, at page 389,

> "… in the context of the accessory liability principle acting dishonestly, or with a lack of probity, which is synonymous, means simply not acting as an honest person would in the circumstances. This is an objective standard. At first sight this may seem surprising. Honesty has a connotation of subjectivity, as distinct from the objectivity of negligence. Honesty, indeed, does have a strong subjective element in that it is a description of a type of conduct assessed in the light of what a person actually knew at the time, as distinct from what a reasonable person would have known or appreciated. Further, honesty and its counterpart dishonesty are mostly concerned with advertent conduct, not inadvertent conduct. Carelessness is not dishonesty. Thus for the most part dishonesty is to be equated with conscious impropriety. However, these subjective characteristics of honesty do not mean that individuals are free to set their own standards of honesty in particular circumstances. The standard of what constitutes honest conduct is not subjective. Honesty is not an optional scale, with higher or lower values according to the moral standards of each individual. If a person knowingly appropriates another's property, he will not escape a finding of dishonesty simply because he sees nothing wrong in such behaviour."

221.  In *Ivey* , at paragraph 74, Lord Hughes endorsed Lord Nicholls' judgment in *Royal Brunei* , and gave the following further guidance,

> "When dishonesty is in question the fact-finding tribunal must first ascertain (subjectively) the actual state of the individual's knowledge or belief as to the facts. The reasonableness or otherwise of his belief is a matter of evidence (often in practice determinative) going to whether he held the belief, but it is not an additional requirement that his belief must be reasonable; the question is whether it is genuinely held. When once his actual state of mind as to knowledge or belief as to facts is established, the question whether his conduct was honest or dishonest is to be determined by the fact-finder by applying the (objective) standards of ordinary decent people. There is no requirement that the defendant must appreciate that what he has done is, by those standards, dishonest."

222.  For the Minorities, Mr. Hollington protested that this point was not open to the Investors because it had not been taken at trial. He submitted that in their opening at trial the Investors had accepted that the content of the good faith clause was to be found in the decision in <u>Berkeley</u> , in which Morgan J had found a breach of the good faith term without making any finding of dishonesty. Mr. Hollington also objected that an argument that a breach of the obligation of good faith always required proof of "conscious dishonesty" was "only faintly trailed" in the Investors' closing submissions by reference to the decision on the meaning of the good faith sub-clause 8.5.2 in <u>Coroin</u> .

223.  I do not accept Mr. Gledhill's argument that the decisions in <u>Compass</u> and <u>Coroin</u> are binding authority that in any situation in which it might be used, the meaning of a contractual good faith clause is limited to a requirement to act honestly. Both cases were decisions on the interpretation of the particular agreement in issue in the case and did not purport to set out any general principles.

© 2023 Thomson Reuters.                                                                      47

Compound Photonics Group Ltd, Re, 2022 WL 14081423 (2022)

224.  That is readily apparent from the judgments of Jackson and Beatson LJJ in <u>Compass</u> at paragraphs 109, and 152 to 154. There is also no indication in the judgment of Arden LJ in <u>Coroin</u> that she was intending to set out any generally applicable rule as to the meaning of a good faith clause. Her view of the meaning of the good faith sub-clause 8.5.2 of the shareholders' agreement in that case (see above) was expressly reached in the absence of any indication from the context that it should be interpreted more widely. In that regard, it should also be noted that Arden LJ's rejection of the suggestion that the good faith provision in sub-clause 8.5.2 required the court to have regard to the spirit of the agreement was based upon the fact that such an obligation appeared expressly under a separate clause 8.5.4 of the contract in question, so that there was no reason to interpret the good faith sub-clause more broadly to cover the same ground.

225.  In support of his thesis, Mr. Gledhill also referred to a number of other English cases dealing with the meaning of "good faith".

226.  Mr. Gledhill first relied upon a dictum of Scott V-C in the context of a claim against a receiver for mismanaging mortgaged property in *Medforth v Blake [2000] Ch 86 at 103* ,

> "In my judgment, the breach of a duty of good faith should, in this area as in all others, require some dishonesty or improper motive, some element of bad faith, to be established."

227.  I do not consider that this dictum supports Mr. Gledhill's thesis. Quite apart from the fact that it was a very short statement in a case which primarily dealt with other issues, Scott V-C plainly did not equate the concept of good faith to dishonesty, because he also referred in the alternative to some "improper motive".

228.  Mr. Gledhill also referred to observations about the content of a duty of good faith in a contractual setting by Leggatt J (as he then was) in *Yam Seng Pte Ltd v International Trade Corp Ltd [2013] 1 All ER (Comm) 1321 ("Yam Seng")* , and the decision of Leggatt LJ (as he had become, but still sitting in the High Court) in *Al Nehayan v Kent [2018] EWHC 333 (Comm) ("Al Nehayan")* .

229.  <u>Yam Seng</u> was a case which concerned a distribution agreement relating to "Manchester United" branded fragrances that envisaged that the defendant would provide products to be sold by the claimant in specified territories in the Middle East, Asia, Africa and Australasia (including Singapore), mainly by way of duty-free sales. The distribution agreement was skeletal in form, containing only eight clauses, and had been drafted by the parties themselves without legal assistance. It did not contain an express good faith clause. The claimant contended that the defendant had acted in repudiatory breach of the agreement entitling the claimant to terminate it and claim damages, *inter alia* by shipping orders late, failing to provide ordered products, undercutting the duty free prices charged by the claimant by offering the same products for sale in the Singapore domestic market at lower prices, and providing false information about that Singapore domestic market price. The context of the case was, therefore, very different from the instant case.

230.  Leggatt J held, at paragraphs 119 et seq., after a review of domestic and overseas case-law, that as a matter of necessary interpretation so as to give effect to their presumed intention, the parties were subject to an implied duty of good faith in the performance of their contract.

231.  Leggatt J then explained that such duty had two aspects. The first aspect included both a duty to act honestly (see paragraph 135) and a requirement to observe other generally accepted standards of commercial dealing (see paragraph 138). In that latter regard, Leggatt J continued,

> "Put the other way round, not all bad faith conduct would necessarily be described as dishonest. Other epithets which might be used to describe such conduct include "improper", "commercially unacceptable" or "unconscionable"."

Compound Photonics Group Ltd, Re, 2022 WL 14081423 (2022)

232.  On its face, it seems to me that in this dictum, Leggatt J clearly took the view (i) that a duty of good faith could be breached by "bad faith conduct", and (ii) that this could include conduct that would "not necessarily be described as dishonest".

233.  At paragraph 139 Leggatt J then described "Another aspect of good faith which overlaps with the first" – namely "fidelity to the parties' bargain". The reference to the two concepts overlapping is ambiguous, but I do not read Leggatt J to be suggesting that the two aspects were co-terminous, so that a party could only be in breach of a requirement of fidelity to the bargain if they had <u>also</u> acted dishonestly or in bad faith. That reading of Leggatt J's judgment is supported by the fact that he went on, at paragraph 140, to suggest that the two aspects of good faith that he had identified were consistent with the decisions in <u>Berkeley</u> and <u>CPC Group</u> – at least the first of which did not require a finding of dishonesty or bad faith.

234.  In short, I do not consider that the dicta in *Yam Seng* support Mr. Gledhill's contention.

235.  Leggatt LJ expanded upon his views of the requirements of good faith in a contractual setting in *Al Nehayan.* The case concerned a dispute between the claimant businessman, a resident of the UAE, and the defendant, a Greek businessman. They fell out and decided to separate their business interests pursuant to a "Framework Agreement". There were various claims and cross-claims alleging breaches of a fiduciary relationship between the parties and/or for breach of this agreement.

236.  Leggatt LJ held that neither party owed any fiduciary duties to the other, but that the Framework Agreement was a so-called "relational contract" under which, as a matter of implication by law given the nature of the agreement, each party owed the other a duty of good faith: see paragraph [174].

237.  Leggatt LJ then continued, at paragraph [175] (which I have sub-divided for ease of reference),

> "175.  It is unnecessary and perhaps impossible to attempt to spell out an exhaustive description of what this obligation [of good faith] involved. There is a considerable body of Australian authority on the subject which has informed the interpretation by English courts of express contractual duties of good faith: see [ <u>Berkeley</u> ], paras 91-97; [ <u>CPC Group</u> ], paras 240-246; *Gold Group Properties v BDW Trading [2010] EWHC 1632 (TCC), paras 89-91* .
>
> In <u>Paciocco v Australia and New Zealand Banking Group Limited</u> [2015] FCAFC 50 [" <u>Paciocco</u> "], para 288, in the Federal Court of Australia, Allsop CJ summarised the usual content of the obligation of good faith as an obligation to act honestly and with fidelity to the bargain; an obligation not to act dishonestly and not to act to undermine the bargain entered or the substance of the contractual benefit bargained for; and an obligation to act reasonably and with fair dealing having regard to the interests of the parties (which will, inevitably, at times conflict) and to the provisions, aims and purposes of the contract, objectively ascertained.
>
> In my view, this summary is also consistent with the English case law as it has so far developed, with the *caveat* that the obligation of fair dealing is not a demanding one and does no more than require a party to refrain from conduct which in the relevant context would be regarded as commercially unacceptable by reasonable and honest people: see *Bristol Groundschool Ltd v Intelligent Data Capture Ltd [2014] EWHC 2145 (Ch), para 295* [sic] …; and *Astor Management AG v Atalaya Mining plc [2017] EWHC 425 (Comm), para 98* …."

238.  Leggatt LJ's reference to "the obligation of fair dealing" in the last sub-paragraph of paragraph 175 of <u>Al Nehayan</u> was plainly intended to be a reference to the obligation of good faith. That appears most clearly from Leggatt LJ's cross-reference to his earlier decision in *Astor Management AG v Atalaya Mining plc [2017] EWHC 425 (Comm) ("Astor")* at paragraph 98. That paragraph was in the following terms,

> "98.  I have discussed elsewhere the question of whether or when there is in English law an implied duty to perform a contract in good faith: see <u>Yam Seng</u> . I do not think that this case is the occasion to

Compound Photonics Group Ltd, Re, 2022 WL 14081423 (2022)

> explore that question further. <u>A duty to act in good faith, where it exists, is a modest requirement. It does no more than reflect the expectation that a contracting party will act honestly towards the other party and will not conduct itself in a way which is calculated to frustrate the purpose of the contract or which would be regarded as commercially unacceptable by reasonable and honest people.</u> This is a lesser duty than the positive obligation to use all reasonable endeavours to achieve a specified result which the contract in this case imposed."

(my emphasis)

239.  Mr. Gledhill suggested that these dicta were authority for the proposition that a duty of good faith involved no more than a requirement to act honestly. In that respect it could also be noted that Leggatt LJ's reference to "commercially unacceptable" conduct tracked Lord Nicholls' observation in *Royal Brunei at page 370* . When giving an illustration of what honest behaviour required in the context of taking risks, Lord Nicholls stated,

> "The individual is expected to attain the standard which would be observed by an honest person placed in those circumstances. It is impossible to be more specific. Knox J. captured the flavour of this, in a case with a commercial setting, when he referred to a person who is "guilty of commercially unacceptable conduct in the particular context involved:" see *Cowan de Groot Properties v Eagle Trust plc [1992] 4 All ER 700, 761* ."

240.  Whilst I accept that Leggatt LJ's statements in <u>Al Nehayan</u> and <u>Astor</u> were clearly intended to signify that a duty of good faith is not intended to impose an obligation that could be described as "demanding" or more than "modest", I do not consider that Leggatt LJ was intending to alter the views that he had expressed in <u>Yam Seng</u> or to suggest that a duty to act in good faith was entirely synonymous with a requirement of honesty. If he had intended to do so, it would have been very easy for him to say so in terms.

241.  In my judgment, therefore, the authorities do not support the proposition that a contractual duty of good faith can only be breached by conduct that is dishonest according to the explanation of that concept in <u>Royal Brunei</u> and <u>Ivey</u> . Depending on the contractual context, a duty of good faith may be breached by conduct taken in bad faith. This could include conduct which would be regarded as commercially unacceptable to reasonable and honest people, albeit that they would not necessarily regard it as dishonest. I therefore reject the Investors' argument that a finding of dishonesty was a pre-requisite for a finding of breach of clause 4.2 of the 2013 SHA.

242.  For completeness, I would observe that in opening the appeal, Mr. Gledhill reformulated his case by submitting that what he called "the autonomous aspect" of a duty of good faith was the duty to behave honestly "in a commercially moral way". He then submitted that any other "performance obligations" – such as a duty of fidelity to the bargain — would only exist if they could be arrived at by a conventional process of interpretation of the agreement or implication of terms. Mr. Gledhill further accepted that if they existed, such obligations or duties could be breached <u>without</u> any finding of dishonesty (or something akin to it), but he then described such performance duties as "derivative" of the autonomous duty of honesty.

243.  As I have explained, I accept the argument that apart from the "core" duty of honesty and (depending on the context) a duty not to engage in conduct that could be characterised as bad faith, any further requirements of an express duty of good faith must be capable of being derived as a matter of interpretation or implication from the other terms of the contract in issue in the particular case. However, I do not think that it helps to describe those other requirements as "derivative" of the core duty of honesty.

**I. The parties' bargain**

Compound Photonics Group Ltd, Re, 2022 WL 14081423 (2022)

244.  Having commented upon the Judge's approach to the content of a good faith clause, I next turn to consider what he identified as "the parties' bargain" in the context of the duty of "fidelity to the bargain" which he thought was inherent in clause 4.2.

245.  As I have indicated, a central plank of the bargain which the Judge found to have been struck between the parties was that the Investors had promised not to use their power as majority shareholders to remove Dr. Sachs or Mr. Faulkner from office as directors. In that regard, whilst the Judge rightly acknowledged that it is possible for shareholders to agree contractual restrictions on their individual right to cast the votes attaching to their shares as they see fit, I consider that his explanation of how such restrictions would operate in the context of a resolution to remove a director under section 168 of the 2006 Act was flawed in an important respect.

246.  As indicated above, in paragraphs 341 and 342 of his Judgment, the Judge took the view that section 168 of the 2006 Act ,

> "… gives the majority shareholders in a company an inalienable right to remove a director from office, notwithstanding any agreement to the contrary with the director."

The Judge then stated that this meant that although the effectiveness of the decision to remove the director could not be impugned, the act of doing so might nonetheless infringe some other right of the director/shareholder in question.

247.  That analysis was repeated in the Judge's central finding in paragraphs 393 and 394 of his Judgment that the Investors were bound to act with fidelity to the bargain, a critical part of which was the "special position" occupied by Dr. Sachs and Mr. Faulkner. The Judge held that although the Investors had "an unrestricted right as a matter of company law" to remove them as directors, that right was excluded "as a matter of private contract" by clause 4.2. He concluded,

> "… The upshot is that the Investors could of course exercise their majority power to remove Dr. Sachs and Mr. Faulkner, and such removals would be effective and not susceptible to revocation; but at the same time, they would constitute a breach of contract as between the shareholders, entitling the disadvantaged shareholders in an appropriate case to claim a remedy … "

248.  The Judge also relied upon this analysis at paragraph 396 to reject the arguments of the Investors that the wording of clause 7.8 of the 2013 SHA envisaged that Dr. Sachs and Mr. Faulkner could be removed as directors. The Judge took the view that they were vulnerable to being removed, but that this was not the same as saying that their removal might not be a breach of contract.

249.  Likewise, at paragraph 399 of his Judgment, the Judge sought to explain the inconsistency between the Minorities' contention that Dr. Sachs and Mr. Faulkner were entrenched in office by virtue of clause 4.2 of the 2013 SHA, with the provisions of clause 16 of the 2013 SHA requiring Dr. Sachs or Mr. Faulkner to sell some or all of their B Shares if they were removed as directors, by saying that,

> "… they always could be removed by majority shareholder vote- there was nothing to be done to prevent that – but that is not the same as saying that if they were, there could be no claim for unfair prejudice."

250.  Mr. Gledhill criticised the Judge's analysis in these respects as illogical and containing a fundamental conceptual error by envisaging a contractual obligation which did not prevent the removal of the director, but which at the same time gave rise to a breach of contract if the director was removed. For the following reasons I agree with that submission.

251.  Section 168 of the 2006 Act provides,

> "A company may by ordinary resolution at a meeting remove a director before the expiration of his period of office, notwithstanding anything in any agreement between it and him".

252.  Contrary to the Judge's view, it is clear from the wording of section 168 that the statutory right to remove a director is not given to the majority shareholders, and neither does it prevent them from alienating any such right. The right under section 168 is given to *the company* in general meeting, and it is *the company* that cannot by contract alienate such right by contract between *it* and the director.

253.  This is not mere semantics. The right of any shareholder is to cast his vote at a general meeting of the company, and there is nothing in section 168 which prohibits a majority shareholder from alienating or fettering how he should exercise that personal right. So, for example, a majority shareholder can validly enter into an agreement with a director or minority shareholder that the majority shareholder will not vote in favour of a resolution for the director's removal at a general meeting.

254.  Moreover, if a majority shareholder has entered into such an agreement, then the director or minority shareholder would be able to apply to the court before the meeting of the company for an injunction to restrain the majority shareholder from voting in breach of the agreement. Subject to any discretionary bars to relief being granted — such as a situation in which the director or minority shareholder was guilty of dishonesty or similar misconduct so as to make it inequitable to grant him an injunction to enforce the agreement — the director or minority shareholder could ordinarily expect to obtain an order to prevent the majority shareholder from voting in favour of such a resolution. Once the majority shareholder has been restrained from voting, the minority shareholder would then have the expectation of being able to use his own votes and those of his allies to defeat the resolution at the meeting.

255.  I consider that the Judge ought to have tested his interpretation of clause 4.2 against the other clauses of the 2013 SHA and the 2013 Articles on this basis. Had he done so, he would have asked the obvious question of why, if the bargain was that Dr. Sachs and Mr. Faulkner were to be entrenched in office as the Minorities contended, the 2013 SHA did not simply contain an express agreement by the Investors not to vote at any general meeting of the Company in favour of a resolution to remove Dr. Sachs and Mr. Faulkner as directors. The absence of such an express provision to deal with the most obvious

Compound Photonics Group Ltd, Re, 2022 WL 14081423 (2022)

way in which the Investors might seek to use their votes to remove a director under section 168 is especially striking given that the 2013 SHA is a comprehensive and professionally drafted document.

256.  Had he approached matters on this basis, the Judge would also not have been able to dismiss, as he did, the arguments of the Investors based upon the provisions of clause 7.8 of the 2013 SHA and the provisions requiring Dr. Sachs and Mr. Faulkner to sell some or all of their B Shares on being removed from office.

257.  In relation to clause 7.8 of the 2013 SHA, the Judge placed reliance upon the provision that both Dr. Sachs and Mr. Faulkner had to be present in order for any meeting of the board to be quorate, but he attached no significance to the words in clause 7.8 "insofar as they each remain a director" as supporting the Investors' contention that the bargain envisaged that they could be removed from office. The Judge accepted that Dr. Sachs and Mr. Faulkner were "vulnerable to removal" by the Investors, but stated "that is not the same as saying that such removal might not also give rise to other legal consequences". What the Judge failed to appreciate was that if the Minorities were right as to the meaning of the bargain, they could have obtained an injunction to prevent the Investors from voting on a resolution to remove Dr. Sachs and Mr. Faulkner.

258.  Likewise, at paragraph 399, the Judge dismissed the Investors' point that there would have been no purpose in the 2013 SHA providing for what was to happen to Dr. Sachs' and Mr. Faulkner's B Shares upon their being removed as directors if they could never be removed. The Judge held that "they always could be removed by majority shareholder vote – there was nothing to be done to prevent that". As indicated above, that failed to take into account that if the Minorities were right that clause 4.2 obliged the Investors to be faithful to a bargain under which Dr. Sachs and Mr. Faulkner were entitled to remain as directors, the Minorities could seek an injunction to prevent the Investors from voting to remove them at a meeting of the Company.

259.  As I have indicated in paragraph 137 above, a further point relied upon by the Judge in paragraph 521 of his Judgment in support of his conclusion as to the parties' bargain was that a number of Articles relating to the proceedings of the board appeared to envisage the continued holding of office by Dr. Sachs and Mr. Faulkner. These included Article 14.2 which required the approval of both Dr. Sachs and Mr. Faulkner for the appointment of additional directors by the board, and Article 17.7 under which the quorum of three at a board meeting had to include Dr. Sachs and Mr. Faulkner.

260.  I consider that these provisions are neutral and do not carry the weight that the Judge ascribed to them. It is true that Article 14.2 did not expressly indicate whether Dr. Sachs or Mr. Faulkner would still be required to give their approval to new directors in the event that they had been removed from office under section 168 of the 2006 Act (which the Judge noted was a possibility contemplated by Article 15.1(a)). However, neither did Article 14.2 do so in relation to any of the other circumstances in which Dr. Sachs or Mr. Faulkner might have ceased to hold office, e.g. by reason of becoming bankrupt or suffering mental disorder under Articles 15.1(b) and (c), or by resignation under Article 15.1(d) (which is of course what occurred in relation to Dr. Sachs). Further, as regards Article 17.7, as the Investors pointed out, the equivalent wording in clause 7.8 of the 2013 SHA expressly included the wording "insofar as they each remain a Director", and the 2013 SHA was expressed to prevail in the event of any conflict between its terms and those of the 2013 Articles.

261.  Accordingly, for the reasons that I have explained, I do not consider that the Judge was right in paragraph 386 of his Judgment to find that the parties' bargain as set out in the 2013 SHA and 2013 Articles envisaged that the board of the Company would always have Dr. Sachs and Mr. Faulkner on it, and that it would be a breach of the bargain if the Investors voted to remove them from office in any circumstance.

262.  That deals with the first aspect of what the Judge regarded as the "cornerstone" of the "constitutional settlement" between the parties – namely the supposed entrenching of Dr. Sachs and Mr. Faulkner in office as directors. The second

Compound Photonics Group Ltd, Re, 2022 WL 14081423 (2022)

aspect upon which the Judge relied was his conclusion, at paragraphs 387 to 390 of his Judgment, that the 2013 SHA allocated responsibility for management of the Company's business to the board which,

"was to be able to operate free from shareholder interference, because the shareholders were bound to co-operate with it".

The Judge later put this in more striking terms, at paragraph 416,

"The 2013 constitution was expressly designed to avoid the will of the majority prevailing in matters concerned with the commercial future of [the Company]."

263.  The Judge's reasoning in this respect was based upon clause 5 of the 2013 SHA (set out in paragraph 79 above) which was headed "Business of the Company". The Judge addressed this clause in paragraph 389 of the Judgment as follows,

"389.  First, there is the second sentence of clause 5.1: "The Shareholders shall each co-operate with the Board in the running and operation of the Company and each CPG Group Company." Second, there is the reference in clause 5.2 to "the Business" being conducted "in accordance with good business practice." Third, there is the commitment in clause 5.3(a) that CPGL and the CPGL group companies should conduct their affairs "in a proper and efficient manner and for their own benefit" – "proper" to my mind being a reference to proper corporate governance. Fourth, there is the provision in clause 5.3(c): " … the Business shall be carried on in accordance with the policies laid down from time to time by the Board and in accordance with the Annual Budget." And fifth, there is clause 5.4, which makes it clear that the duty to cooperate with the board continues even if the relevant shareholder has become subject to an obligation to transfer his shares, for example under a Transfer Notice or Compulsory Transfer Notice (as defined): even in such cases, the shareholders affected were required to "do all things in their power to continue to co-operate with the board in its running and operation of the Company …"."

264.  For the reasons that follow, I do not consider that these provisions in clause 5 of the 2013 SHA can be interpreted – whether in conjunction with the good faith clause 4.2 of the 2013 SHA or otherwise — as an agreement by the Investors that they would forgo any right to play a role in decisions regarding the management and commercial future of the Company, and that they would instead entirely cede such power to the board of the Company for all time and in all circumstances.

265.  I do not think that the provisions of clause 5 of the 2013 SHA were intended to be a constitutional allocation of authority and responsibility for the management of the Company as between the shareholders and the board. That allocation of power is invariably not contained in a shareholders' agreement, which may not exist in relation to every company and is not a document which is required to be publicly registered so as to give third parties notice of such allocation of power. Rather, the allocation

Compound Photonics Group Ltd, Re, 2022 WL 14081423 (2022)

of power to manage the company is invariably contained in the main constitutional document which every company has, namely its articles of association: see e.g. *Quin & Axtens v Salmon [1909] 1 Ch 311 (CA), [1909] AC 442 (HL)* .

266.  So it was that the 2013 Articles incorporated, by reference, the Companies Act 1985 Table A Regulations (as amended) ("Table A"). These included Regulation 70 ("Regulation 70") which provides,

> ""Subject to the provisions of the Act , the memorandum and the articles and to any directions given by special resolution , the business of the company shall be managed by the directors who may exercise all the powers of the company. No alteration of the memorandum or articles and no such direction shall invalidate any prior act of the directors which would have been valid if that alteration had not been made or that direction had not been given. The powers given by this regulation shall not be limited by any special power given to the directors by the articles and a meeting of directors at which a quorum is present may exercise all powers exercisable by the directors."

(my emphasis)

267.  This fundamental, and standard, provision of company articles, made it clear that the management of the Company's business was to be conducted by the board of directors, but "subject … to any directions given by special resolution" of the shareholders in general meeting. The Judge did not refer to Regulation 70 or explain how it fitted his conclusion that the Investors had agreed that they would not use their majority voting power to prevail in relation to any matters concerning the management or commercial future of the Company.

268.  In my judgment, if it had really been intended that the shareholders of the Company would not have the power to give any directions under Regulation 70, it is inevitable that this power would have been expressly excluded. That is especially so since the 2013 Articles were professionally drafted and adopted at the same time as the 2013 SHA was executed, and contained other specific exclusions of Regulations in Table A – see e.g. Article 14.1 which excluded Regulations 73 to 80 (inclusive) in relation to the retirement of directors by rotation. In that respect it is also significant that there was no restriction in the 2013 SHA on the amendment of the 2013 Articles, other than that this would be a "Reserved Matter" that would require the approval of the Investors.

269.  In my view, the function of clause 5 of the 2013 SHA to which the Judge referred was to set out parameters and operational mechanisms for the way in which the board would, in the ordinary course, manage the "Business" (as defined) and the wider affairs of the Company in the exercise of the authority given to the board under Regulation 70. The second sentence of clause 5.1 of the 2013 SHA required each shareholder to co-operate with decisions which had actually been taken by the board in the exercise of that authority. However, that is a long way from an exclusion of the express power of the shareholders of the Company in general meeting under Regulation 70 to pass a special resolution giving a direction to the board in relation to a specific matter.

270.  In short, I do not believe that the second sentence of clause 5.1 of the 2013 SHA can carry the weight that the Judge placed upon it. In my view, that sentence did not exclude the power of the shareholders to give a direction under Regulation 70, and the ability to procure the passing of such a special resolution was available to the Investors, who at all relevant times

Compound Photonics Group Ltd, Re, 2022 WL 14081423 (2022)

at and after the 2013 SHA and 2013 Articles came into force, held in excess of 80% of the voting rights at a general meeting of the Company.

271.  I therefore consider that the Judge was wrong to hold that the "bargain" embodied in the 2013 SHA and the 2013 Articles was that the Investors would be powerless to have any say in the management of the Company, or (as he put it) that the 2013 SHA and the 2013 Articles were "expressly designed to avoid the will of the majority prevailing in matters concerned with the commercial future of [the Company]".

272.  Standing back, I also consider that the Judge's view of the bargain that had been struck in 2013 – namely that Dr. Sachs and Mr. Faulkner could not be removed, and that a board of directors on which they held the balance of power was to be able to control the management and commercial future of the Company free from any interference by the Investors — was, in the context of the commercial and financial position that had been reached in 2013, an implausible conclusion to reach.

273.  By 2013 the Investors had invested a very large amount of money in the Company (in excess of $135 million), they held 80% of its equity shares, and it could be foreseen that even more substantial finance would be required from them to bring the project to completion. Against that background, for it to be concluded that the Investors had effectively surrendered to the Minorities any right, in any circumstances, to exercise any control over the management and commercial future of the Company is commercially counter-intuitive. I consider that such a surprising result would have required very clear wording, and in my view, none can be found in the 2013 SHA or 2013 Articles.

274.  For completeness, I would repeat the points that I have already made that the Judge did not identify any specific provisions of the 2013 SHA or the 2013 Articles to support his conclusions that clause 4.2 required the Investors to deal fairly and openly with Dr. Sachs or Mr. Faulkner or that the Investors were required to have regard to the interests of the Minorities when exercising their voting rights as shareholders. Those conclusions were based purely upon legal authorities concerning the meaning of good faith in other contexts, and for the reasons that I have explained, I consider that the Judge's conclusion that such duties were automatically imposed without there being anything in the other provisions of the 2013 SHA or 2013 Articles to support them, was incorrect.

275.  Pulling the threads together, the net result, in my view, is that the duty of good faith in clause 4.2 of the 2013 SHA imposed a core requirement that the parties should act honestly towards each other and the Company. It might be objected that this would simply be stating the obvious, but I consider that making such a requirement served a purpose in a contract between parties who had not worked together before, and who came from very different business backgrounds.

276.  I would also accept that clause 4.2 required the parties not to act in bad faith towards each other. As Leggatt J explained in Yam Seng , this would prohibit conduct that reasonable and honest people would regard as commercially unacceptable, but not necessarily dishonest. However, in the same way as Lord Nicholls suggested in Royal Brunei that it is impossible to be entirely specific about the meaning of "dishonesty", I do not consider that it is appropriate to try to be prescriptive in describing what conduct might fall into this category, given that to do so would necessarily involve recourse to synonyms or epithets (such as "improper" or "sharp practice").

277.  For the reasons I have explained, I have considerable reservations about finding a duty of fidelity to the bargain to be inherent in a good faith clause used in the context of a shareholders' agreement in the absence of any other indication to that effect in the agreement (c.f. the express wording in Coroin ). However, whether or not that is so, in the instant case I do not in any event accept that clause 4.2 required the parties to adhere to the concept of a bargain having the characteristics identified by the Judge of a constitutionally omnipotent board on which Dr. Sachs and Mr. Faulkner held an unalterable balance of

Compound Photonics Group Ltd, Re, 2022 WL 14081423 (2022)

power. Nor, in the absence of any supporting wording in the 2013 SHA, do I accept that clause 4.2 imposed on the Investors some procedural duty of fair and open dealing with Dr. Sachs or Mr. Faulkner going beyond the terms of sections 168 and 169 of the 2006 Act . And neither do I consider that clause 4.2 required the Investors to have regard to the interests of the Minorities in some undefined way over and above any requirements that would be imposed upon shareholders to have regard to the interests of the Company when voting on particular types of resolutions as a matter of general company law.

### J. Was the 2013 Sha part of the Company's constitution?

278.  I next turn to the Judge's finding – critical to his conclusions as regards the conduct of the directors nominated by the Investors – that the Company's constitution for the purposes of the duties of the directors included the 2013 SHA.

279.  As indicated above, in that regard the Judge accepted the submission of Mr. Hollington that this was the consequence of section 17 of the 2006 Act . That section provides,

> "17.  Unless the context otherwise requires, references in the Companies Acts to a company's constitution include—
>
> (a)  the company's articles, and
>
> (b)  any resolutions and agreements to which Chapter 3 applies (see section 29)."

280.  Chapter 3 and section 29 are both entitled "Resolutions and agreement affecting a company's constitution". Section 29 of the 2006 Act relevantly provides,

> "(1)  This Chapter applies to -
>
> (a)  any special resolution;
>
> (b)  any resolution or agreement agreed to by all the members of a company that, if not so agreed to, would not have been effective for its purpose unless passed as a special resolution;
>
> (c)  any resolution or agreement agreed to by all the members of a class of shareholders that, if not so agreed to, would not have been effective for its purpose unless passed by some particular majority or otherwise in some particular manner;
>
> (d)  any resolution or agreement that effectively binds all members of a class of shareholders though not agreed to by all those members;
>
> (e)  any other resolution or agreement to which this Chapter applies by virtue of any enactment."

Section 30 then provides that a copy of every resolution or agreement to which Chapter 3 applies must be filed with the Registrar of Companies.

281.  I consider that the Judge was wrong to accept the argument that section 17 meant that for the purposes of section 171, the constitution of the Company included the 2013 SHA.

282.  In my view, section 29 does not apply to the 2013 SHA because it is not an agreement that, if not agreed to by all the shareholders or a class of shareholders, would not have been effective for its purpose unless passed by a special resolution. The essence of subsections (b) and (c) are to include within the concept of the company's constitution a written agreement between all members or members of a class that has been used in place of a special resolution required by the 2006 Act so as, for example, to amend the articles. But the 2013 SHA does not, by its terms, purport to amend the 2013 Articles or do anything else that would require a special resolution of the Company. Nor does the 2013 SHA fall within the terms of subsections (c) – (e) of section 29 . Although not determinative, it is also of note that the 2013 SHA was not filed with the Registrar of Companies.

283.  On appeal, and I think recognising the force of these points, Mr. Hollington abandoned his reliance on section 17 . Instead he relied on section 257 of the 2006 Act . That section appears in the same Part 1 of the 2006 Act as section 171 and provides,

> "257.  References in this Part to a company's constitution include -
>
> (a)  any resolution or other decision come to in accordance with the constitution, and
>
> (b)  any decision by the members of the company, or a class of members, that is treated by virtue of any enactment or rule of law as equivalent to a decision by the company."

284.  Mr. Hollington contended that the 2013 SHA was a "decision by the members" that is treated in law as a "decision of the Company". I do not accept that submission. It is not a natural use of words to describe a shareholders' agreement such as the 2013 SHA as a "resolution" or "decision" by the shareholders; the agreement was not come to in accordance with any provision in the Company's articles of association (so as to engage section 257(a) ); and it is not treated in law as equivalent to a decision of the Company (so as to engage section 257(b) ), even though the Company was a party to the agreement.

285.  I do not consider that the intention of the legislature was that by the indirect operation of section 257, section 171 should place directors under a general obligation to exercise their powers in accordance with a shareholders' agreement. That would have been an entirely new statutory obligation to place on directors, which is not mentioned in any of the materials attending the passing of the 2006 Act , and is a proposition for which we were shown no supporting academic or other commentary.

286.  In my view, the more obvious explanation of section 257 of the 2006 Act is that it is designed to deal with cases in which, for example, (a) the shareholders in general meeting of the company decide, pursuant to a provision such as Regulation 70, to pass a special resolution to give a direction or instruction to the board to act in a certain way; or (b) the shareholders take a unanimous informal decision affecting the constitution of the company which is binding on the company under the Duomatic rule (so-called after the decision in *Re Duomatic Limited [1969] 2 Ch 365* , discussed by the Privy Council in *Ciban Management Corporation v Citco (BVI) Limited [2020] UKPC 21* ). A director who disobeyed such an instruction or decision would be acting in contravention of his section 171 duty.

Compound Photonics Group Ltd, Re, 2022 WL 14081423 (2022)

### K. Were the Minorities unfairly prejudiced?

287.  Having set out my reasons for concluding that the Judge erred in various aspects of his approach to the interpretation of clause 4.2 of the 2013 SHA, and that he also erred in his conclusion that the Company's constitution for the purposes of the directors' duties under section 171(a) included the 2013 SHA, I turn to consider the particular respects in which the Judge found that the Minorities had been unfairly prejudiced. I shall do so under the same headings as I used when summarising the Judge's application of the law to the facts.

*The resignation of Dr. Sachs*

288.  In paragraph 126 above, I have set out the Judge's findings, at paragraphs 413, 415 and 419 of his Judgment that, as regards the enforced resignation of Dr. Sachs, the Investors had reached the view that the success (or perhaps, as they saw it, salvaging something from failure) of the Company was possible only with Dr. Sachs out of the picture. The Judge also found that that was a commercially rational and legitimate conclusion for the Investors to have come to and that they were *bona fide* of the view that it was right for the business that he should go.

289.  The Judge held that none of this mattered because of the view that he had taken that clause 4.2 of the 2013 SHA meant that the Investors had to act with fidelity to a bargain that required them to maintain the "constitutional balance" of the Company and thus to refrain from removing Dr. Sachs – or at least that if they did so, it would be a breach of contract. The Judge also took the view that the Investors breached clause 4.2 because they failed to have regard to the interests of the Minorities in deciding to remove Dr. Sachs. But that finding seems to have been based upon the same premise – namely that the interests of the Minorities were to have Dr. Sachs on the board come what may, because that is what had been agreed as part of their bargain.

290.  For the reasons that I have explained, I consider that the Judge was wrong in that interpretation of clause 4.2, both as to the nature of the bargain that was embodied in the 2013 SHA and the 2013 Articles, and also because there was no basis in the terms of those agreements for the imposition of a contractual duty to have regard to the interests of the Minorities.

291.  It follows that, in my judgment, in light of the Judge's findings that the Investors rationally and genuinely held the view that what they were doing was necessary in the interests of the Company and its business, their decision to require Dr. Sachs to resign and to threaten to remove him pursuant to section 168 if he did not go voluntarily was not a breach of their duty of good faith.

292.  The Judge also found that in this regard the Investors had acted in breach of what he characterised as a procedural duty to deal fairly and openly with Dr. Sachs. He held that the Investors had deliberately ambushed him at the meeting on 14 March 2016, and although the Judge did not find that the Investors had deliberately misled him about Vollin's willingness to fund the Company, he thought that the duty to be fair and open required them to tell Dr. Sachs that Vollin had agreed to fund the Company to the end of May 2016.

293.  For the reasons that I have set out, I do not consider that such an affirmative procedural duty can be read into the obligation to act in good faith in clause 4.2 in the absence of anything in the other terms of the 2013 SHA and 2013 Articles to support it. That being so, the absence of any finding that Dr. Sachs was deliberately misled means that the issue is simply whether the Investors' conduct in taking Dr. Sachs by surprise at the meeting on 14 March 2016 could be described as being dishonest, or in bad faith in the sense in which that latter concept has been used in the authorities to connote some commercially unacceptable conduct which would not necessarily be regarded as dishonest.

294.  In my view such conduct was not dishonest, and neither do I consider that it amounted to bad faith. Although Dr. Sachs was deliberately taken by surprise by being presented with an ultimatum, he was not required to make an immediate decision, and it would in any event have taken some time before the Investors could utilise the statutory mechanism under section 168 of the 2006 Act to require a meeting of shareholders to be convened to consider a resolution for his removal. It is also the case that Dr. Sachs had the benefit of independent legal advice from solicitors paid for by the Company for a week before entering into a settlement agreement.

295.  It must necessarily follow from that conclusion, together with the conclusion that the constitution of the Company did not include the 2013 SHA, that the directors nominated by the Investors did not act in breach of their duties under section

Compound Photonics Group Ltd, Re, 2022 WL 14081423 (2022)

171(a) of the 2006 Act . The finding of the Judge in paragraph 428 of his Judgment that they did breach their duties in that respect therefore cannot stand.

296.  The Judge also found, in paragraph 429 of his Judgment, that in supporting the initiative of the Investors to remove Dr. Sachs, Mr. Fletcher and Mr. Burkey acted in breach of their duty under section 172(1)(f) of the 2006 Act "to have regard to the need to act fairly as between the members of the company". However, the Judge described this conclusion as following from his earlier findings, and the only express basis upon which he reached his conclusion was that,

> "In supporting the initiative to remove Dr. Sachs, Mr. Fletcher and Mr. Burkey must obviously have disregarded the separate and specific interests of the Minorities in having Dr. Sachs remain in post, for all the reasons already described above, including in particular their interest in maintaining the overall constitutional balance enshrined in the 2013 SHA."

297.  In my view, this finding must fall with the conclusion that the Minorities did not have a right under the 2013 SHA to have Dr. Sachs remain in office come what may. The section 172(1)(f) duty placed upon directors to have regard to the need to act "fairly" as between members of the Company must be given some legal frame of reference and cannot simply require directors to have regard to their own free-standing view of what might be "fair" between members. In the context of a proposal to remove a director from office using the procedure under section 168 of the 2006 Act , in the absence of any contractual restraint upon the exercise of voting power by the Investors under the 2013 SHA, I cannot see how the section 172(1)(f) duty could have been infringed by the directors supporting the initiative of the Investors who held the vast majority of the shares in the Company, who could inevitably be assured of passing a resolution to remove Dr. Sachs from office, and who (as the Judge found) were acting in the genuine and reasonable belief that the best interests of the Company and its business required Dr. Sachs to go.

298.  I should add, although it is not essential for the decision, that I find it difficult to see how the Minorities (and Mr. Faulkner in particular) can complain about the conduct of the directors nominated by the Investors in circumstances in which Mr. Faulkner himself indicated that he was inclined to support the removal of Dr. Sachs and certainly did not manifest any belief at the time that his duties to the Company required him to object.

*The management of the Company after the departure of Dr. Sachs*

299.  As is apparent from the extracts from the Judgment set out in paragraphs 131 to 133 above, the essential basis of the Judge's finding that the Minorities were unfairly prejudiced by the conduct of the Investors and of their nominated directors in the period after the removal of Dr. Sachs, was that decisions concerning the management and future of the Company were taken by the Investors at their update meetings with Kew, rather than by the board. This had the result that Mr. Faulkner, who was still a director, was not given an active role in the management of the business, but was kept at arm's length and marginalised by the Investors.

300.  The matters to which the Judge referred included, in particular, the discussions over the future of Newton Aycliffe, the August 2016 fund-raising and the approach by Kaiam. In paragraph 457 of the Judgment, the Judge found that "the manner in which these matters were dealt with" amounted to a breach by the Investors of clauses 4.2 (good faith), 5.2 and 5.3(a) of the 2013 SHA, essentially because "the constitutional structure set out in the 2013 SHA and 2013 Articles was effectively ignored by the Investors". The Judge also concluded that "because they were so fundamental, those breaches were both unfair and prejudicial".

301. To the extent that the Judge's reasoning depends upon his finding that the good faith provision in clause 4.2 of the 2013 SHA required the Investors to adhere to a bargain that the management of the Company should always be conducted by a board upon which Dr. Sachs and Mr. Faulkner held the balance of power, free from any interference by the Investors, these findings were flawed and cannot be supported for the reasons that I have explained.

302.  I also do not think that the Judge was right to characterise what occurred in this respect as a breach by the Investors of clause 5.2 of the 2013 SHA. As indicated above, that clause provided,

Compound Photonics Group Ltd, Re, 2022 WL 14081423 (2022)

"5.2  The Shareholders shall exercise their respective rights and powers to ensure, so far as they are lawfully able to do so, that the Company complies with its obligations under this Agreement and any other agreements to which the Company is a party, and that the Business is conducted in accordance with good business practice and on sound commercial and profit making principles."

303.  It is apparent that the last part of this clause, upon which the Judge relied, related to the conduct of the "Business". That term was defined as,

"… the production and supply of projection products and technologies and all activities reasonably ancillary and necessary in relation to the production and supply of projection products and technologies"

304.  These provisions related to the conduct of the underlying business of production and supply of projection products. They were not, in my judgment, in any way infringed by the failure to hold board meetings involving Mr. Faulkner.

305.  I do not, however, think that the Judge's finding that the Investors breached clause 5.3(a) of the 2013 SHA can be dismissed in the same way. By that clause, the Investors agreed that,

"the Company and each CPG group company shall carry on and conduct its business and affairs in a proper and efficient manner and for their own benefit;"

306.  This clause is not limited to the conduct of the "Business" as defined, and in paragraph 389 of his Judgment, the Judge expressed the view that the reference to "proper" meant "proper corporate governance". I agree. I would also observe that in any event the 2013 Articles, and in particular Regulation 70 which they incorporated by reference, placed the power to manage the business of the Company into the hands of the board (however it might be constituted from time to time). As I have explained, if the Investors wished to control the management of the Company, they were entitled to give directions to the board of the Company by voting to pass a special resolution in accordance with Regulation 70. But the 2013 Articles did not entitle the Investors to manage the business of the Company themselves.

307.  The answer given by the Investors to this point at trial and in Ground 5 of their Notice of Appeal is that Mr. Faulkner could, if he had wished to do so, convened board meetings, but he chose not to do so. The Judge dealt with this point in paragraphs 454 to 455 of his Judgment,

"454.  The Investors say that Mr. Faulkner was a director and indeed Chairman of CPGL, and so had the ability to convene board meetings himself. That is true, but in the circumstances it seems to me that the reasons are plain. Mr. Fletcher's view of Mr. Faulkner has always been poor … There is nothing to suggest that Mr. Fletcher's view had improved over time, and indeed it seems logical to think that he viewed with increasing alarm the idea of Mr. Faulkner playing an active role in the management of the business, still less one which involved him having a right of veto over resolutions at board meetings. From his point of view, the existing constitutional structure was a dead letter.

© 2023 Thomson Reuters.                                                                                     61

455.  Mr. Faulkner realised that, and indeed by 23 May he knew that the Investors wanted him to resign. In a sense he was powerless to help the unfolding chain of events because the business was dependent on continuing financial support from Vollin and Minden. Thus, the die was already cast, and no doubt to him, the idea that he should seek to invoke a governance structure which his major investors considered to have "manifestly failed" and had already in practice overridden seemed quite unrealistic."

308.  These paragraphs are based upon the correspondence between Mr. Fletcher and Mr. Faulkner in May 2016 set out in paragraphs 41 to 53 and 58 to 59 above. I do not consider that the Judge's interpretation of such correspondence was accurate or enabled him to dismiss the point made by the Investors as he did.

309.  As I have set out in paragraph 41 above, in his email of 4 May 2016, Mr. Faulkner had acknowledged that the meeting on 13 April 2016 had been an Investor meeting, and he did not pursue a complaint that he had not been invited to it. Mr. Faulkner did, however, raise the need for "proper corporate governance" and asked for a board meeting to be convened.

310.  The email response of Mr. Fletcher on the same day was not to refuse to hold a board meeting but to suggest that Mr. Faulkner should "just come in" to talk informally to him and Mr. Burkey about the state of the business and the changes which Mr. Fletcher thought would be required to the Company's governance and board structure in light of the need to obtain further funding from the Investors. Mr. Faulkner readily accepted that invitation and such a meeting was held on 23 May 2016. At that meeting Mr. Faulkner agreed to consider the issue of corporate governance and to revert to Mr. Fletcher. However, he did not do so for over two months, in spite of having consulted external lawyers and receiving chasers from Mr. Fletcher. Mr. Faulkner also did not follow up the invitation made by Mr. Fletcher on the call on 9 August 2016 and in his email the following day that he (Mr. Faulkner) should call regular board meetings.

311.  In these circumstances I do not think that the Judge was right to say that the Investors breached the 2013 SHA by ignoring the constitutional structure set out in it and in the 2013 Articles. For the reasons that I have given, the constitutional structure to which the Judge was referring was one in which Dr. Sachs and Mr. Faulkner were entitled to be entrenched on the board and hold the balance of power: but that was not the true position. Moreover, far from ignoring the constitution that was in place, through Mr. Fletcher, the Investors raised the question with Mr. Faulkner of how it could operate after the departure of Dr. Sachs and sought Mr. Faulkner's input on how to resolve the issues that had arisen.

312.  This being so, I do not accept that a failure to hold board meetings thereafter could be unfair to the Minorities when the very person who (on their case) was entitled to be actively involved in such meetings was silent for over two months and neither renewed his request for board meetings nor objected to the lack of them.

313.  Further, I do not agree with the Judge's conclusion that because the breaches of the constitution that he thought had occurred were so fundamental, they were necessarily prejudicial to the Minorities within the meaning of section 994 .

314. In paragraph 381 of his Judgment, the Judge referred to the judgment of David Richards J (as he then was) in *Re Coroin [2012] EWHC 2343 (Ch)* as authority for the proposition that prejudice for the purposes of section 994 was not confined to financial prejudice. David Richards J had said, at paragraph 630,

"630.  Prejudice will certainly encompass damage to the financial position of a member. The prejudice may be damage to the value of his shares but may also extend to other financial damage which in the circumstances of the case is bound up with his position as a member. So, for example, removal from participation in the management of a company and the resulting loss of income or profits from the company in the form of remuneration will constitute prejudice in those cases where the members have rights recognised in equity if not at law, to participate in that way. Similarly, damage to the financial position of a member in relation to a debt due to him from the company can in the appropriate circumstances amount to prejudice. The prejudice must be to the petitioner in his capacity as a member but this is not to be strictly confined to damage to the value of his shareholding. Moreover, prejudice need not be financial in character. A disregard of the rights of a member as such, without any financial consequences, may amount to prejudice falling within the section."

315. I agree with that summary, and in particular agree that a disregard of the rights of a member in his capacity as such, without any financial consequences, may amount to prejudice within the meaning of section 994 . However, "may" does not mean "must", and in that regard it is important to note what David Richards J went on to say, at paragraph 631,

> "631. Where the acts complained of have no adverse financial consequence, it may be more difficult to establish relevant prejudice. This may particularly be the case where the acts or omissions are breaches of duty owed to the company rather than to shareholders individually. If it is said that the directors or some of them had been in breach of duty to the company but no loss to the company has resulted, the company would not have a claim against those directors. It may therefore be difficult for a shareholder to show that nonetheless as a member he has suffered prejudice. In *Rock (Nominees) Limited v RCO Holdings plc [2004] BCC 466* the respondent directors of the company procured the sale of an asset to a company of which they were also directors. It was alleged to be a sale at an undervalue and procured in breach of the respondent directors' fiduciary duties to the company. The evidence established that the price paid was not an undervalue but was the best price reasonably obtainable, and the Court of Appeal upheld the decision at first instance that no prejudice had been caused to the petitioner…"

316. Those observations are relevant in the instant case, because the Judge did not find that the Minorities had suffered any adverse financial consequences arising from the way that the Company was managed by the Investors after the resignation of Dr. Sachs. Instead, when dealing with the issue of whether the directors nominated by the Investors had breached their general duty under section 172 to promote the success of the Company during this period, the Judge concluded, at paragraph 480 of his Judgment, that the directors,

> "… honestly thought (and had good reason to think) that what they were doing was in the interests of the Company as a whole."

317. The Judge explained,

> "482. … given the condition the business was in as at March 2016 – a long way behind in its plans for development of marketable products, but with significant cash requirements each month and therefore a high degree of dependence on the Investors in keeping it afloat – I find it difficult to be critical of the decisions made to cut costs and to try and reposition CPGL in its efforts to make some money (or at least, break-even), and in the meantime keep the Investors on side.
>
> 483. Newton Aycliffe was loss-making even with the Selex contract, and although a part of Dr. Sachs' vision, there were sound commercial reasons at the time for thinking that vision could not be realised, given the state of development of the P1 prototype and the disagreement over production costs (i.e., the BoM). Service of the Last Time Buy Notice was defensible commercially in that sense, even though it set the clock ticking on a possible closure, and of course in the meantime brought the Fab to a breakeven position. The same goes for the early phases of the discussions with Kaiam, to the extent the nominee directors were involved in them. Leaving aside the question of the constitutional framework within which the discussions took place, there was commercial sense at least in exploring what the Kaiam approach might involve and whether it might offer a solution."

Compound Photonics Group Ltd, Re, 2022 WL 14081423 (2022)

318.  The Judge also held, at paragraph 484, that during this period the interests of the Investors and the Minorities were aligned,

> "484.  I think Mr. Gledhill was right to submit that in the broad sense I have described, and in the circumstances as they stood through the Spring and Summer of 2016, the interests of the Investors and of the Minorities *were* effectively the same: the interest of both was in salvaging something from the position CPGL found itself in. It seems to me the nominee directors acted in good faith in taking the steps they thought necessary to bring that about."

319.  Even if, therefore, it might be said that the Investors had acted unfairly in the sense that they did not follow the 2013 Articles in ensuring that the management of the Company was carried out by the directors at board meetings, in the absence of any adverse financial consequences and light of the Judge's finding that the relevant decisions during that period were taken honestly and reasonably in an attempt to serve the interests of all members, I do not consider that any prejudice within the meaning of section 994 was thereby caused to the Minorities.

320.  As indicated above, the Judge also thought that it followed from his findings that the Investors had overridden the agreed constitutional structure after Dr. Sachs resigned, and that the 2013 SHA formed part of the Company's constitution for the purposes of section 171(a) of the 2006 Act , that the directors nominated by the Investors must also have breached their duties under section 171(a) to act in accordance with the Company's constitution during the period after Dr. Sachs' departure. For the reasons that I have given, I do not consider that either finding was correct, and hence the finding of unfair prejudice by the actions of the directors during that period also cannot stand.

*The removal of Mr. Faulkner*

321.  The Judge's reasons for finding unfair prejudice in the removal of Mr. Faulkner from office essentially tracked his reasoning in relation to Dr. Sachs. He found that it was unfair of the Investors to "override the agreed upon constitutional balance" and that it was prejudicial because Mr. Faulkner's removal deprived the Minorities of the protection which his presence on the board was designed to achieve.

322.  In my view, and for the reasons that I have explained, I do not consider that there was any such agreement for Mr. Faulkner to be entrenched in office. Nor was there any basis for a finding that the Investors had, or had breached, any duty to deal fairly and openly with Mr. Faulkner or to have regard to the interests of the Minorities when voting to remove him from office in accordance with section 168 of the 2006 Act . Accordingly, the Judge's finding that the Minorities were unfairly prejudiced by the Investors' removal of Mr. Faulkner must be set aside.

323.  The Judge's further finding that, to the extent that the directors nominated by the Investors encouraged or facilitated that removal, they breached their duty under sections 171(a) and 172(1)(f) of the 2006 Act , must also be set aside for similar reasons to those in relation to the resignation of Dr. Sachs.

*The appointment of further directors*

324.  I have set out in paragraphs 137 to 138 above the Judge's reasons for finding that the appointment of new directors after the resignation and removal of Dr. Sachs and Mr. Faulkner involved breaches by the Investors of clauses 4.2, 5.2 and 5.3(a) of the 2013 SHA and of Article 14.2 of the 2013 Articles. Although the Judgment does not say so expressly, the assumption is that such appointments were made by the board and not by the shareholders in general meeting.

325.  The Judge's reasoning as regards clause 4.2 of the 2013 SHA essentially followed his finding as to the content of the parties' bargain, and cannot stand in light of the analysis that I have set out above. Nor do I consider that the Judge was right

to regard the appointment of directors as having anything to do with clause 5.2 of the 2013 SHA, which, as I have indicated above, concerned the conduct of the Business (as defined) and not constitutional questions such as appointments to the board.

326.  The question of whether the appointment of new directors breached clause 5.3(a) of the 2013 SHA (conduct of the business and affairs in a proper manner) must turn on whether such appointments were made in breach of Article 14.2. However, because the Judge took the view that the parties' bargain required Dr. Sachs and Mr. Faulkner to remain in office, the Judge did not determine the question of whether Article 14.2 might still require their approval for the appointment of new directors if they had lawfully ceased to hold office (i.e. by resignation under Article 15.1(d) and removal under Article 15.1(a) respectively).

327.  I incline to the view that Article 14.2 did not require the approval of Dr. Sachs or Mr. Faulkner to the appointment of further directors by the board if they were no longer in office as a director and thus would have no part to play in the management of the Company by the board. That would be the necessary interpretation of Article 14.2 in the event, for example, that they were to cease to be a director by reason of death or because they were suffering from a mental disorder, and it would, I think, also be the obvious interpretation in the event that they were to vacate office by reason of becoming bankrupt. I also note that neither the 2013 SHA nor the 2013 Articles contained any provision requiring the approval of Dr. Sachs and Mr. Faulkner to the appointment of additional directors by the shareholders of the Company in general meeting.

328.  However, even if, contrary to that view, the approval of Dr. Sachs and Mr. Faulkner was still required under Article 14.2 notwithstanding that they had ceased to be directors, then although the appointment of new directors by the board would not have complied with Article 14.2 and hence could be characterised as unfair within the meaning of section 994 , I cannot see that such appointments were prejudicial to the Minorities.

329.  That is essentially for the same reasons as outlined above in relation to the Judge's findings as to the conduct of business in the period between the removal of Dr. Sachs and Mr. Faulkner. The Judge found that the interests of the Investors and the Minorities as members of the Company were aligned during that period and there was no basis for criticising the decisions taken by the directors, so that the Minorities did not suffer any adverse financial consequences. There is no indication that the position changed in any material respect as a result of the appointments of further directors in the period after the removal of Mr. Faulkner.

330.  I would therefore set aside the Judge's findings of unfair prejudice as a result of appointment of new directors.

*The sale of Newton Aycliffe*

331.  Although the Judge found that Newton Aycliffe had not been sold at an undervalue, he did hold that the process leading to the sale had involved breaches of clauses 4.2. 5.2 and 5.3(a) of the 2013 SHA by the Investors, and corresponding breaches by the directors of their duties under section 171(a) of the 2006 Act because the relevant decisions were not taken by a board including Dr. Sachs and Mr. Faulkner.

332.  The same reasoning that I have set out above in relation to the management of the Company during the period between Dr. Sachs' resignation and Mr. Faulkner's removal must also apply to these findings.

333.  The only basis for the Judge's finding of a breach of the good faith provision of clause 4.2 during this period was his view of what the parties' bargain required as regards the composition of the board. That finding must fall with my conclusion that the Judge's view of the parties' bargain was wrong. I also do not consider that clause 5.2 in relation to conduct of the Business was engaged in relation to the process of decision-making in relation to the sale of the Newton Aycliffe facility.

334.  To the extent that clause 5.3(a) of the 2013 SHA was engaged and breached by the Investors as a result of the relevant decisions concerning the future of Newton Aycliffe not being taken at board level, it seems to me that the Judge's express finding that the sale was not at an undervalue must lead to the conclusion that no prejudice within the meaning of section 994 was caused to the Minorities. In essence, the position is the same as in the case of *Rock (Nominees) Limited v RCO Holdings plc [2004] BCC 466* to which David Richards J referred in Re Coroin (above). In that case, although the respondent directors of the company breached their duties in procuring a sale of an asset to a company with which they were associated, the evidence established that the price paid was not an undervalue, with the result that the Court of Appeal upheld the decision at first instance that no prejudice had been caused to the petitioner.

*Conclusion*

335.  For the reasons I have explained, I consider that the Judge was wrong in his findings that the Investors or the directors whom they had nominated had conducted the affairs of the Company in a manner that was unfairly prejudicial to the Minorities.

## L. The Respondents' Notice

336.  For completeness I would briefly refer to the Respondents' Notice. By that notice, the Minorities contended that the Judge was wrong not to draw adverse inferences from the fact that none of the ultimate beneficial owners of Vollin, Aldon and Mindon, namely Dr. Abramov, Dr. Frolov or Mr. Abramovich, were prepared to give evidence at the trial. As clarified in a document served pursuant to an order which I made on 24 February 2022, the adverse inference for which the Minorities contend, is that,

> "…in their usurpation of the functions of the boards … [the Investors] … acted with conscious and deliberate disregard of the rights of the Minorities under the 2013 Constitution of CPGL (and CPUK) being managed and directed by their respective boards."

337.  Although the question of whether adverse inferences should be drawn from the absence of Dr. Abramov, Dr. Frolov and Mr. Abramovich was apparently raised at trial, the Judge was not expressly invited in his view that the rights of the Minorities to make findings on it, even when it was apparent from the draft Judgment that he did not propose to do so. That being so, I do not consider that it is appropriate to invite this court, which has not heard the evidence and could not sensibly put itself into the position in which to address the issue *de novo* , to do so.

338.  It would also seem (at least as expressed) that the adverse inference which it is contended should be drawn either (i) is premised upon the assumption that the Judge was correct in his view that the rights of the Minorities under the 2013 SHA were to have the business of the Company and CPUK conducted exclusively by a board upon which Dr. Sachs and Mr. Faulkner held the balance of power, or (ii) does not relate to the decision to require the resignation of Dr. Sachs or the decision to vote to remove Mr. Faulkner from office, but is to be limited to the management of the Company by the Investors rather than through board meetings in the period after Dr. Sachs' resignation.

339.  For the reasons that I have explained, I consider that the Judge was wrong in his view of the rights of the Minorities under the 2013 SHA, so that the first basis suggested for drawing an adverse inference falls away.

340.  As to the alternative basis, as I have also explained, the Judge did not find that there were any adverse financial consequences for the Minorities caused by the decisions taken by the Investors or their nominated directors after Dr. Sachs resigned. Instead the Judge found that the interests of the Investors and the Minorities were aligned and the directors concerned acted honestly and reasonably in seeking to salvage the Company's business. As such, whatever the state of mind of the beneficial owners of the Investors during this period as to where the decisions concerning the management of the Company's business should be taken, I fail to see how any prejudice could be said to have been caused to the Minorities within the meaning of section 994 .

## M. Disposition

341.  I would allow the appeal and dismiss the Respondents' Notice.

**Lady Justice Carr:**

342.  I agree.

**Lord Justice Newey:**

343.  I also agree.

Crown copyright

© 2023 Thomson Reuters.

[2018] AC                                          Ivey v Genting Casinos (UK) Ltd (SC(E))

A                                                    Supreme Court

# Ivey *v* Genting Casinos (UK) Ltd (trading as Crockfords Club)

## [2017] UKSC 67

2017  July 13;                                    Baroness Hale of Richmond PSC,
B        Oct 25                      Lord Kerr of Tonaghmore, Lord Hughes JJSC,
                              Lord Neuberger of Abbotsbury, Lord Thomas of Cwmgiedd

*Gaming — Gambling — Cheating — Card game player adopting edge-sorting*
*strategy unbeknown to casino — Implied term in contract not to cheat —*
*Whether "cheat" connoting dishonest state of mind — Whether "cheating"*
*including interference by player with process by which game played so as to gain*
C *unfair advantage without other player's knowledge — Whether claimant in*
*breach of implied term so that not entitled to recover winnings — Gambling Act*
*2005 (c 19), s 42(3)*

    The claimant, a professional gambler, played the card game Punto Banco
Baccarat, which was a game of pure chance, at the defendant's casino, winning over
£7·7m. Following an investigation due to the large win the defendant determined
that the claimant had compromised the game by using a method of play called edge-
D sorting, which involved exploiting the design irregularities on the backs of the
playing cards and then persuading the croupier to rotate the cards so that those of
high value could be distinguished from the others before any card was dealt and bet
placed, without anyone else appreciating the purpose of rotating the cards. The
defendant, which had not known about edge-sorting, refused to pay the claimant his
winnings on the ground that such play altered the odds against it unfairly. The
claimant brought an action for recovery of the sums which he had won. The
E defendant contended, inter alia, that (i) the gaming contract between the parties had
an implied term that the claimant would not cheat or otherwise act to defeat the
essential premise of the game and if he did so the contract would be void and he
would recover no winnings under it, which term he had broken, and (ii) he had
committed the offence of cheating, contrary to section 42 of the Gambling Act
2005[1] by interfering with the game or deceiving the defendant's staff and so was not
F entitled to found his claim on his own criminal conduct. The claimant admitted the
implied term but denied cheating or committing a criminal offence, asserting that it
was lawful for "advantage players", such as him, to use such a method of play
because they were in an adversarial position towards the casino, and that edge-
sorting ought to have been known to the defendant which could have protected
itself against it. The judge dismissed the claim on the ground that, although neither
dishonesty nor deception was involved, the claimant's play amounted to cheating
G for the purposes of the implied term. The Court of Appeal, by a majority, upheld his
decision.
    On the claimant's appeal—
    *Held*, dismissing the appeal, that, although there was a difference in standard of
proof as between civil and criminal proceedings, cheating carried the same meaning
when considering an implied term not to cheat and when applying section 42 of the
Gambling Act 2005; that, the expression "cheating" in the context of games and
gambling carried its own inherent stamp of wrongfulness; that the issue whether
H what had been done amounted to cheating, given the nature and rules of the game
concerned, was a jury question to be determined objectively; that consideration
of the concept of dishonesty would unnecessarily complicate the question; that,
consequently, there was no occasion to add to the value judgment whether conduct

    [1] Gambling Act 2005, s 42: see post, para 34.

© 2018 The Incorporated Council of Law Reporting for England and Wales

A

was cheating a similar value judgment as to whether it was also dishonest; and that, in the present case, the claimant's actions in taking positive steps to fix the deck in a game which depended on random delivery of unknown cards was, inevitably, cheating, and the judge's conclusion to that effect was, accordingly, unassailable (post, paras 38, 43, 48–50, 76).

B

*Per curiam*. When dishonesty is in question the fact-finding tribunal must first ascertain (subjectively) the actual state of the individual's knowledge or belief as to the facts.  The reasonableness or otherwise of his belief is a matter of evidence (often in practice determinative) going to whether he held the belief, but it is not an additional requirement that his belief must be reasonable; the question is whether it is genuinely held.  When once his actual state of mind as to knowledge or belief as to facts is established, the question whether his conduct was honest or dishonest is to be determined by the fact-finder by applying the (objective) standards of ordinary decent people.  There is no requirement that the defendant must appreciate that what he has done is, by those standards, dishonest.  If, therefore, there were in cheating at gambling an additional legal element of dishonesty, it would be satisfied in the present case by the application of that test (post, paras 74–75).

C

Dictum of Lord Hoffmann in *Barlow Clowes International Ltd v Eurotrust International Ltd* [2006] 1 WLR 1476, para 10, PC applied.

*R v Ghosh* [1982] QB 1053, CA disapproved.

Decision of the Court of Appeal [2016] EWCA Civ 1093; [2017] 1 WLR 679 affirmed.

D

The following cases are referred to in the judgment of Lord Hughes JSC:

*Abou-Rahmah v Abacha* [2006] EWCA Civ 1492; [2007] Bus LR 220; [2007] 1 All ER (Comm) 827; [2007] 1 Lloyd's Rep 115, CA

*Barlow Clowes International Ltd v Eurotrust International Ltd* [2005] UKPC 37; [2006] 1 WLR 1476; [2006] 1 All ER 333; [2006] 1 All ER (Comm) 478; [2006] 1 Lloyd's Rep 225, PC

E

*Boggeln v Williams* [1978] 1 WLR 873; [1978] 2 All ER 1061; 67 Cr App R 50, DC

*R v Cornelius* [2012] EWCA Crim 500; [2012] Lloyd's Rep FC 435, CA

*R v Feely* [1973] QB 530; [1973] 2 WLR 201; [1973] 1 All ER 341; 57 Cr App R 312, CA

*R v Ghosh* [1982] QB 1053; [1982] 3 WLR 110; [1982] 2 All ER 689; 75 Cr App R 154, CA

F

*R v Gilks* [1972] 1 WLR 1341; [1972] 3 All ER 280; 56 Cr App R 734, CA

*R v Governor of Brixton Prison, Ex p Sjoland and Metzler* [1912] 3 KB 568, DC

*R v Greenstein* [1975] 1 WLR 1353; [1976] 1 All ER 1; 61 Cr App R 296, CA

*R v Hayes* [2015] EWCA Crim 1944; [2018] 1 Cr App R 10, CA

*R v Landy* [1981] 1 WLR 355; [1981] 1 All ER 1172; 72 Cr App R 237, CA

*R v McIvor* [1982] 1 WLR 409; [1982] 1 All ER 491; 74 Cr App R 74, CA

G

*R v Rostron* [2003] EWCA Crim 2206, CA

*R v Royle* [1971] 1 WLR 1764; [1971] 3 All ER 1359; 56 Cr App R 131, CA

*R v Scott* [1975] AC 819; [1974] 3 WLR 741; [1974] 3 All ER 1032; 60 Cr App R 124, HL(E)

*R v Waterfall* [1970] 1 QB 148; [1969] 3 WLR 947; [1969] 3 All ER 1048; 53 Cr App R 596, CA

*R v Williams* [1953] 1 QB 660; [1953] 2 WLR 937; [1953] 1 All ER 1068; 37 Cr App R 71, CCA

H

*R v Williams (Gladstone)* [1987] 3 All ER 411; 78 Cr App R 276, CA

*Royal Brunei Airlines Sdn Bhd v Tan* [1995] 2 AC 378; [1995] 3 WLR 64; [1995] 3 All ER 97, PC

*Starglade Properties Ltd v Nash* [2010] EWCA Civ 1314; [2011] Lloyd's Rep FC 102, CA

© 2018 The Incorporated Council of Law Reporting for England and Wales

A  *Twinsectra Ltd v Yardley* [2002] UKHL 12; [2002] 2 AC 164; [2002] 2 WLR 802;
    [2002] 2 All ER 377, HL(E)
  *Welham v Director of Public Prosecutions* [1961] AC 103; [1960] 2 WLR 669;
    [1960] 1 All ER 805; 44 Cr App R 124, HL(E)

The following additional cases were cited in argument:

  *Cooper v Slade* (1858) 6 HL Cas 746, HL(E)
B  *R v Harvey* (unreported) 8 May 1998, CA
  *R v Moore* (1914) 10 Cr App R 54, CCA
  *Sweet v Parsley* [1970] AC 132; [1969] 2 WLR 470; [1969] 1 All ER 347;
    53 Cr App R 221, HL(E)

**APPEAL** from the Court of Appeal

C  By a claim form the claimant, Phillip Ivey, sought recovery against the defendant, Genting Casinos UK Ltd, trading as Crockfords Club, of moneys which he had won while playing Punto Banco at the defendant's casino. The defendant denied liability on the grounds that (1) no game of Punto Banco had been played since the premise on which the game proceeded, that the cards would be dealt at random, had been defeated because the claimant had known what the first card of any coup dealt was likely to be before it was D turned face up; (2) there was an implied term that the claimant would not cheat, and that term had been broken; and (3) the claimant had committed the criminal offence of cheating under section 42 of the Gambling Act 2005 by interfering with the game or deceiving the defendant's staff and so was not entitled to found his claim on his own criminal conduct. The claimant admitted the implied term but denied cheating or committing a criminal offence and asserted that he had acted lawfully throughout. By his judgment E  dated 8 October 2014 Mitting J [2014] EWHC 3394 (QB); [2015] LLR 98 determined that the claimant had given himself an advantage by using the croupier as his innocent agent or tool in circumstances in which he had known that neither she nor her superiors had realised the consequences of what she had done at his instigation, thereby converting a game in which the knowledge of both sides as to the likelihood of the player or banker winning was equal to one in which the claimant's knowledge was greater, which F  amounted to cheating for the purposes of civil law.

By an appellant's notice the claimant appealed. On 3 November 2016 the Court of Appeal (Arden and Tomlinson LJJ; Sharp LJ dissenting) [2016] EWCA Civ 1093; [2017] 1 WLR 679 dismissed the appeal.

On 16 February 2017 the Supreme Court (Baroness Hale of Richmond DPSC, Lord Wilson and Lord Hughes JJSC) granted the claimant G  permission to appeal, pursuant to which he appealed.

The facts are stated in the judgment of Lord Hughes JSC, post, paras 2–27.

*Richard Spearman QC* and *Max Mallin QC* (instructed by *Archerfield Partners llp* ) for the claimant.

H  The behaviour described in the judgments of Mitting J [2015] LLR 98 and the Court of Appeal [2017] 1 WLR 679 does not amount to cheating for the purposes of the implied term of the gaming contract between the parties or section 42 of the Gambling Act 2005 since, whether viewed from the perspective of its ordinary meaning or for the purposes of the common law or of section 42, "cheating" connotes dishonesty. Prior to the present case

© 2018 The Incorporated Council of Law Reporting for England and Wales

A

the word had not been considered in any reported decision outside the criminal context. Offences of and relating to cheating have a long history in criminal law and proof of guilt in relation to those offences has always required proof of a dishonest state of mind. The leading case, and the only case which is relevant today, is *R v Scott* [1975] AC 819 which shows that the terms "fraud" and "cheating" were frequently used interchangeably at common law and that dishonesty was plainly a requirement of both those offences. Consequently, cheating at common law inescapably involves dishonesty.

B

The common law offence of cheating was abolished, except regarding offences concerning the public revenue, by section 32(1)(a) of the Theft Act 1968. However, section 25 of the 1968 Act included the offence of going equipped to cheat which remained in force until January 2007. The reference to "cheat" was to an offence under section 15 of the 1968 Act, and this required dishonesty. Those were therefore extant offences when the 2005 Act was enacted and, consequently, that meaning of cheating must have been understood when the 2005 Act was enacted. Further, section 42 of the 2005 Act does not provide a definition of cheating but the Explanatory Notes to the Act prepared by the Department for Culture, Media and Sport state, in para 163, that cheating has its ordinary meaning: see also Gambling Bill: Hansard (HC Debates) Standing Committee B, 30 November 2004. Consequently, the concept of cheating within section 42 of the 2005 Act connotes dishonesty as defined in *R v Ghosh* [1982] QB 1053. The same test for dishonesty is applicable in civil cases where liability depends upon an activity which connotes a dishonest state of mind: see *Twinsectra Ltd v Yardley* [2002] 2 AC 164, paras 115–116, per Lord Millett. It follows that cheating requires dishonesty in a subjective sense. The judge found as a fact that the claimant had not been subjectively dishonest: he had believed that what he was doing was not cheating.

C

D

E

If dishonesty were not an element of cheating the concept would, the defendant suggests, have to connote unfairness. That is too vague a criterion to be workable. Applying that test, there are many things which would be accepted as fair in a casino, in the context of the commercial relationship between customer and business, which would not be acceptable in a purely social environment, and the claimant's conduct would not be unfair in the context. So even if it is not necessary to show dishonesty the claimant was still not cheating.

F

Consequently, the appeal should be allowed because the Court of Appeal erred in holding that dishonesty is not a necessary element of "cheating" either under the implied term or under section 42 of the 2005 Act and because (as all three members of the Court of Appeal accepted) the judge found neither that the claimant had been dishonest nor that he had perpetrated a material deception, and it is not open to an appellate court to disturb those findings.

G

*Christopher Pymont QC* and *Siward Atkins* (instructed by *Kingsley Napley llp* ) for the defendant.

H

There are two limbs to the implied term of the contract: cheating or otherwise acting to defeat the essential premise of the game. Should there be anything difficult about applying the first limb, the second limb is crystal clear and easy to apply. Punto Banco Baccarat is a pure game of chance. All the

[2018] AC
*Ivey v Genting Casinos (UK) Ltd (SC(E))*
Argument

A   odds are fixed and the player bets before a card is played. It is common ground that (i) the essential premise of Punto Banco is that the player does not know what the cards are before he places his bet and (ii) the claimant's edge-sorting was designed to and did give him a good idea of what the cards were before he placed his bet. The claimant thus plainly acted to defeat the essential premise of the game and dishonesty is irrelevant to any breach of contract.

B   Further, "cheating" in its normal meaning does not necessarily involve dishonesty and, even if it does, the test for dishonesty is objective not subjective: see *Twinsectra Ltd v Yardley* [2002] 2 AC 164 and *Starglade Properties Ltd v Nash* [2011] Lloyd's Rep FC 102. The key test for cheating is not whether the player acted dishonesty but whether he acted deliberately to gain an unfair advantage in the game. The test suggested by the claimant would lead to inconsistent results applying to the same kind of activity, depending on the subjective state of mind of the player concerned.

C   As to section 42 of the Gambling Act 2005, the Explanatory Notes make clear that cheating "has its normal everyday meaning". Accordingly, the actus reus of the offence is any sort of unfair activity which a jury believes to be cheating. A jury is perfectly able to decide whether the gambler cheated or not, once the nature and rules of the game are understood and the activity has been explained. The appropriate mens rea for section 42 is that the defendant intended the actus reus: see *Sweet v Parsley* [1970] AC 132. That is consistent with the earlier statutory offences of cheating at cards which do not contain any requirement that the accused be guilty of dishonesty. Section 17 of the Gaming Act 1845 (8 & 9 Vict c 109) provided for "fraud or unlawful device or ill practice in playing at or with cards". It was held in *R v Moore* (1914) 10 Cr App R 54 that "ill practice" was a question for the jury, who should determine simply whether the game had been played fairly: see also *Baker, The Oxford History of the Laws of England* (2003), vol VI (1483–1558), Part IX, Chapter 42 "Deceit", pp 769–773.

There is also a large number of offences at English law criminalising conduct which most people would regard as dishonest but which do not have dishonesty as a requirement for the offence to be committed, such as (i) corruption (see *Cooper v Slade* (1858) 6 HL Cas 746; *R v Harvey* (unreported) 8 May 1998); (ii) forgery under sections 36 and 37 of the Forgery Act 1861 1861 (24 & 25 Vict c 98); and (iii) forgery under section 1 of the Forgery and Counterfeiting Act 1981. Therefore, for a person to be guilty of those offences there is no requirement to prove dishonesty as defined in *R v Ghosh* [1982] QB 1053. Further the Hansard materials show that dishonesty was not to be a factor in the offence but fairness was: see Gambling Bill: Hansard (HC Debates), Standing Committee B, 30 November 2004.

The test of cheating applied by Mitting J [2015] LLR 98 and by the majority in the Court of Appeal [2017] 1 WLR 679 is correct and supported. In any event, if dishonesty is required, the claimant acted dishonestly. As Tomlinson LJ concluded, the claimant's actions were a clear case of intentional deception.

H   *Spearman QC* in reply.

It would be impossible to make a positive finding of dishonesty on the facts of the present case. Cheating is acting with deliberate dishonesty: see *R v Scott* [1975] AC 819.

The court took time for consideration.

© 2018 The Incorporated Council of Law Reporting for England and Wales

25 October 2017.  **LORD HUGHES JSC** (with whom **BARONESS HALE OF RICHMOND PSC**, **LORD KERR OF TONAGHMORE JSC**, **LORD NEUBERGER OF ABBOTSBURY** and **LORD THOMAS OF CWMGIEDD** agreed) *A*

**1**   This case, in which a professional gambler sues a casino for winnings at Punto Banco Baccarat, raises questions about (1) the meaning of the concept of cheating at gambling, (2) the relevance to it of dishonesty, and (3) the proper test for dishonesty if such is an essential element of cheating. *B*

*The facts*

**2**   Over two days in August 2012 Mr Ivey, the claimant in this case, deployed a highly specialist technique called edge-sorting which had the effect of greatly improving his chances of winning.  He had the help of another professional gambler, Cheung Yin Sun ("Ms Sun").  First they set up the conditions which enabled him to win.  Then, later that evening and the following day, over the course of some hours, he won approximately £7·7m.  The casino declined to pay, taking the view that what he had done amounted to cheating.  His case is that it was not cheating, but deployment of a perfectly legitimate advantage. *C*

**3**   What happened is not in dispute.  It was set out with admirable clarity by Mitting J [2015] LLR 98 and very little is necessary by way of addition or subtraction.  What follows in this section is almost entirely in his words. *D*

**4**   Punto Banco is a variant of Baccarat.  It is not normally, to any extent, a game of skill.  Six or eight decks or, in English nomenclature, packs of 52 cards are dealt from a shoe, face down by a croupier.  Because the cards are delivered one by one from the shoe, she has only to extract them; no deviation is permitted in their sequence.  She places them face down in two positions on the table in front of her, marked "player", the "Punto" in the name, and "Banker", "Banco".  Those descriptions label the positions marked on the table; there need be no person as "player" and ordinarily there is not.  She slides the cards from the shoe, face down, one card to player, one to banker; a second to player and a second to banker.  In prescribed circumstances she must deal one further card, either to player or to banker or to both, but this possibility is irrelevant to what occurred. *E* *F*

**5**   The basic object of the game is to achieve, on one of the two positions, a combination of two or three cards which, when added together, is nearer to nine in total than the combination on the other position.  Aces to nine count at face value, ten to King inclusive count as nothing.  Any pair or trio of cards adding up to more than ten requires ten to be deducted before arriving at the counting total.  Thus four plus five equals nine, but six plus five (which equals 11) counts as only one. *G*

**6**   Punters (of whom there need only be one) play the house.  They bet before any card is dealt and can bet on either the player or banker position.  The cards are revealed by the croupier after a full hand (or "coup"), usually of four cards, two to each position, has been dealt.  Winning bets are paid at evens on player, and at 19 to 20 on banker.  It is possible to bet on a tie.  In the event of a tie, all bets on player or banker are annulled; in other words, the punter keeps his stake and the only bet paid out on is the tie at odds set by the casino of either eight to one or, at Crockfords, nine to one.  It is possible to place other types of bet, but this case does not concern them and *H*

A    they need not be described.  The different odds mean that the casino, or house, enjoys a small advantage, taken over all the play.  That is standard and well known to all; casinos publish the percentage "house edge" which they operate.  In Punto Banco at Crockfords it was 1·24% if player wins and 1·06% if banker wins.

B    7    A pack of 52 playing cards is manufactured so as to present a uniform appearance on the back and a unique appearance on the face.  The backs of some cards are, however, not exactly uniform.  The backs of many packs of cards for social use have an obvious top and bottom: for example the manufacturer's name may be printed once only, or the pattern may have an obviously right way up and an upside down.  In casino games in which the orientation of the back of the card may matter, cards are used which are in principle indistinguishable whichever way round they are when presented in a shoe.

C    8    Cards with no pattern and no margin at the edge present no problem; they are indistinguishable.  However, many cards used in casinos are patterned.  If the pattern is precisely symmetrical the effect is the same as if the card is plain; the back of one card is indistinguishable from any other.  But if the pattern is not precisely symmetrical it may be possible to distinguish between cards by examining the backs.

D    9    "Edge-sorting" becomes possible when the manufacturing process causes tiny differences to appear on the edges of the cards so that, for example, the edge of one long side is marginally different from the edge of the other.  Some cards printed by Angel Co Ltd for the Genting Group (which owns Crockfords) have this characteristic, apparently within the narrow tolerances specified for manufacture.  The pattern is not precisely symmetrical on the back of the cards.  The machine which cuts the card leaves very slightly more of the pattern, a white circle broken by two curved lines, visible on one long edge than on the other.  The difference is sub-millimetric, but the pattern is, to that very limited extent, closer to one long edge of the card than it is to the other.  Before a card is dealt from a shoe, it sits face down at the bottom of the shoe, displaying one of its two long edges.  It is possible for a sharp-eyed person sitting close to the shoe to see which long edge it is.

F    10    Being able thus to see which long edge is displayed is by itself of no help to the gambler.  All the cards have the same tiny difference between their right and left long edges, so knowing which edge is displayed tells the gambler nothing about the value of the next card in the shoe.  The information becomes significant only if things can be so arranged that the cards which the gambler is most interested in are all presented with long edge type A facing the table, whilst all the less interesting cards present long edge type B.  Then the gambler knows which kind of card is next out of the shoe.

H    11    In Punto Banco cards with a face value of seven, eight and nine are high value cards.  If one such card is dealt to player or to banker, it will give that position a better chance of winning than the other.  Thus a punter who knows that when the first card dealt (always to the "player" position) is a seven, eight or nine, he will know that it is more likely than not that player will win.  If he knows that the card is not a seven, eight or nine, he will know that it is more likely than not that banker will win.  Such knowledge, it is

© 2018 The Incorporated Council of Law Reporting for England and Wales

398
Ivey v Genting Casinos (UK) Ltd (SC(E))                    [2018] AC
Lord Hughes JSC

agreed, will give the punter a long term edge of about 6·5% over the house if
played perfectly accurately.                                                          *A*

12    What is therefore necessary for edge-sorting to work is for the cards
in the shoe to be sorted so that all the sevens, eights and nines display edge
type A, whilst the rest display edge type B.  That means rotating the high
value cards so that they display edge type A.  If the punter were to touch the
cards, the invariable practice at most casinos, including at Crockfords,
would be that those cards would not be used again.  The only person who         *B*
touches the cards is the croupier.  So what had to happen was to get the cards
sorted (i e differentially rotated) by type A and type B by the croupier and
then to get them re-used in the next shoe, now distinctively sorted.

13    For edge-sorting to work at Crockfords it is therefore essential that
the croupier is persuaded to rotate the relevant cards without her realising
why she is being asked to do so.  Casinos routinely play on quirky and         *C*
superstitious behaviour by punters.  It is in the casino's interests that punters
should believe, erroneously, that a lucky charm or practice will improve
their chance of winning and so modify or defeat the house edge.
Consequently a wide variety of requests by punters, particularly those
willing to wager large sums on games which they must, if they play long
enough, lose in the long run, are accommodated by casinos without demur       *D*
or surprise.

14    All of the games of Punto Banco played by the claimant and Ms Sun
on 20 and 21 August 2012 were captured on CCTV, mostly with
contemporaneous audio recording as well.  The moment at which they
persuaded the croupier, Kathy Yau, to rotate the cards was at 9 p m on
20 August.  The video shows it and the words spoken have been transcribed.
Before then, the claimant and Ms Sun had played part of four shoes, the first   *E*
two plain backed, and the second two Angel cards but with no asymmetry
on the back.

15    The claimant is a high stakes gambler.  He began, by his standards,
modestly: bets placed on those four shoes ranged from £4,000 to £75,000
per coup.  He was losing.  At 8.56 p m he requested a new shoe of cards.
A new shoe was produced.  The cards were blue Angel cards with the             *F*
rounded pattern described on the back.  At 8.57 the claimant asked Jeremy
Hillier, the senior croupier overseeing the game: "If I win, can I say I want
the same cards again?"  to which Mr Hillier replied he could, "because [he
was] not bending them".  The claimant had in fact avoided touching the
cards from either the first or second shoe onwards.

16    The croupier, Kathy Yau, then put the cards face down in blocks on
the table to make the cut, as is conventional.  She cut the cards so as to      *G*
exclude about one deck from play.  The claimant asked about the cut: "Why
so big?"  Ms Sun said: "They don't cut the seven cards", a reference to the
traditional cut of seven cards from the end.  Ms Yau asked if he wanted her
to cut seven cards, to which he replied "yes", he wanted to play 90 hands,
slightly more than the maximum likely to be possible with an eight-deck
shoe with a seven-card cut.  She complied, after checking with the supervisor
on duty in the room.  That had the effect of maximising the number of coups    *H*
which would be possible with those packs, and of exposing the maximum
number of cards to the sorting (rotation) process.

17    Ms Yau then dealt the first coup.  After the bet was made, and all the
cards then dealt, the next stage was for the croupier to turn the cards face up

© 2018 The Incorporated Council of Law Reporting for England and Wales

399

[2018] AC                          Ivey v Genting Casinos (UK) Ltd (SC(E))
                                                              Lord Hughes JSC

A   to reveal whether Player or Banker had won.  Ms Sun then asked Ms Yau in
    Cantonese to do it, in other words to turn the cards over so that the face
    showed, slowly.  Ms Yau said "yes".  Ms Sun then asked her again in
    Cantonese to turn the cards in a particular and differential way as they were
    being exposed and before they were put on the pile of used cards.  "If I say it
    is good, you turn it this way, good, yes?  Um, no good."  (A slightly different
    sounding um.)  Ms Yau did not immediately understand what was required.
B   She asked, "so you want me to leave it?"  To which Ms Sun replied, "change,
    yeah, yeah, change luck".  Ms Yau: "what do you mean?"  Ms Sun gestured
    how to turn it.  "Turn it this way".  Ms Yau: "what, just open it?  Yeah".
    Ms Sun: "um", signifying good in Cantonese.

    18   The claimant then chipped in, "yeah, change the luck, that's good.
    Anything to change the luck, it is okay with me."  Ms Sun reiterated her
C   request in Cantonese, "If I say it is not good, you turn it this way.  If it is
    good, turn it this way, okay?"  To which Ms Yau said "okay".  When she
    turned over the cards of the second coup, Ms Sun said of four of them,
    "good", and of one, "not good", in Cantonese.  Ms Yau did as requested.
    What she was being asked to do, and did, was to turn the cards which
    Ms Sun called as "good" end to end, and the "not good" cards side to side.  In
    consequence, the long edge of the "not good" card was oriented in a different
D   way from the long edge of the "good" cards.  The judge found that she had
    been "wholly ignorant" of the significance of what she was doing, card by
    card, at the call of Ms Sun.

    19   This procedure was followed for each of the next 79 coups dealt
    from this shoe.  The maximum amount staked by the claimant on the coups
    towards the end of the shoe reached £100,000.  Self-evidently, at no time
E   during the play of this shoe did he derive any advantage from the rotation of
    the cards requested by Ms Sun because that rotation occurred at the end, not
    at the beginning, of each coup.  This was all preparation.

    20   At 10.03 pm, when the shoe was exhausted, the claimant said that
    he had won with that deck (i e shoe), and that he would keep it.  The senior
    croupier, who had brought in a new collection of cards, was told by the
    claimant he did not want them, as he "had won £40,000 with that deck";
F   that was agreed to.  The original cards were reused.  The defendant has not
    been able to calculate retrospectively whether that assertion of winnings to
    that point was true.

    21   Before the shoe was reused it had to be reshuffled.  The claimant had
    earlier asked Ms Yau's predecessor as croupier for a shuffling machine to
    shuffle the cards.  The cards were reshuffled by a machine.  For a punter using
G   the edge-sorting technique this ensured that the shuffle would be effected
    without rotating any of the cards unless the croupier did so before they were
    put into the machine.  Ms Yau did not do so.  Manual shuffling would have
    carried a much higher risk of re-rotation as it was done.

    22   Play with the reshuffled shoe recommenced at 10.12 pm and
    continued until Ms Yau went for a half hour break at 10.31 pm.  The
    claimant did not play during her break but resumed when she returned until
H   3.57 am on 21 August.  Ms Yau was the croupier throughout.  The
    claimant's stake increased to £95,000 and then to £149,000 per coup.  He
    won approximately £2m.

    23   The accuracy of his bets on player increased sharply.  In the first two
    shoes in which Angel cards were used, those without an asymmetric pattern

© 2018 The Incorporated Council of Law Reporting for England and Wales

on the back, he placed respectively 11 bets and then 1 bet on player and a
seven, eight or nine only occurred once in that 12 times.  On the shoe in
which the edge-sorting was done in the manner described, he placed 23 bets
on player of which eight were sevens, eights or nines.  On the succeeding
shoes, those at least that were completed on that night, shoes four to eight,
the record was as follows.  Shoe four, 23 accurate bets out of 27; shoe five,
22 accurate bets out of 25; shoe six, 20 accurate bets out of 26; shoe seven,
23 accurate bets out of 30; shoe eight, 17 accurate bets out of 19.  A similar
but slightly less pronounced pattern occurred on the following day.

24    At the end of play on the early morning of the 21st the claimant
asked if he could keep the same shoe, which he referred to as a deck, if he
returned on the following day.  He was told he could.  Ms Yau returned to
duty at 2 p m on 21 August.  The claimant resumed play with the same cards
at 3 p m and played until 6.41 p m.  His average stake was never less than
£149,000.  For the last three shoes it was £150,000, the maximum that he
was allowed to bet each time.  In the middle of play of the last shoe, the
senior croupier told the claimant that the shoe would be replaced when it
was exhausted.  When it was, the claimant and Ms Sun left.  By then he had
won just over £7·7m.

25    Crockfords' practice after a large win such as this is to conduct an
ex post facto investigation to work out how it occurred.  After quite lengthy
review of the CCTV footage and examination of the cards, the investigators
succeeded in spotting what had been done.  Nobody at Crockfords had
heard of edge-sorting before.

26    Nine days after the play, on 30 August, the claimant spoke to Mr
Pearce, Managing Director of the London casinos of Genting UK, who
told him that Crockfords would not be paying his winnings because the
game had been compromised.  The claimant said he had not touched the
cards, but did not state that which at the trial he freely admitted, that he had
used edge-sorting.  Arrangements were made to refund his deposited stake,
£1m, on 31 August.

27    The judge found that Mr Ivey gave factually frank and truthful
evidence of what he had done.  The finding was that he was a professional
gambler who described himself as an "advantage player", that is one who, by
a variety of techniques, sets out to reverse the house edge and to play at odds
which favour him.  The judge found that he does so by means that are, in his
opinion, lawful.  He is jealous of his reputation and is adamant that what he
does is not cheating.  He described what he did, with Ms Sun, as legitimate
gamesmanship.  The judge accepted that he was genuinely convinced that
what he did was not cheating.  But the question which matters is not whether
Mr Ivey thought of it as cheating but whether in fact and in law it was.  The
judge concluded that it was, and so did the majority of the Court of Appeal.
Were they right or wrong?

*Gaming and the law*

28    Gaming has been the subject of statutory rules since at least the time
of the Restoration.  They have addressed, inter alia, both (1) unfair play
and (2) the recoverability of winnings by civil action.  Very recently, the
Gambling Act 2005 has comprehensively revised the statutory framework
for gaming.  In outline, it makes it lawful but subject to detailed licensing.

© 2018 The Incorporated Council of Law Reporting for England and Wales

[2018] AC                          Ivey v Genting Casinos (UK) Ltd (SC(E))
                                                      Lord Hughes JSC

A    **29**   The Gaming Act of 1664 (16 Car 2, c 7) addressed what it identified as the social ill of excessive gambling, when conducted not for "innocent and moderate recreation" but as a means of trade or making a living. Even in times of relative debauchery, the Act castigated the effect of such gaming on the youth of the day, whether of "the nobility and gentry" or otherwise. By section 3 it made irrecoverable at law any winnings over the then enormous sum of £100. And by section 2 it imposed a forfeit of three times the winnings on anyone who won by (in effect) wrongful means. The forfeit was recoverable by civil action at the suit either of the loser or, if he did not sue, by anyone else. Half the forfeit went to the loser, and half to the Crown. The misbehaviours which gave rise to such forfeit were defined as "any fraud, shift, cousenage, circumvention, deceit or unlawful device, or ill practice whatsoever", and the activities covered included not only cards and dice, but also tennis and foot races, as well as horse-racing, skittles, bowls and many other games. The forfeit was incurred not only by winnings by wagering, but also by prize winning, if the ill practice was demonstrated.

B

C

**30**   By the time of Queen Anne, the attitude to gambling had hardened. The Gaming Act 1710 (9 Ann c 19) repeated in section 5 the list of misbehaviour attracting a forfeit (now five times the winnings), and such was now recognised as a criminal offence attracting corporal punishment. The same Act, by section 2, enabled anyone who lost more than £10 at games, however fair, to recover it by civil action, together with a forfeit of three times the loss, half for the loser and half for the poor of the parish. By section 1 it made void any security given for payment of gaming debts.

D

**31**   The Gaming Act 1845 (8 & 9 Vict c 109) abolished the forfeits, but (by section 18) made general the rule that gaming or wagering contracts were unenforceable in law. Section 17 dealt with malpractice. It referred to "fraud or unlawful device or ill practice" and made winning by such means a criminal offence, by way of deeming it to be the recognised offence of obtaining by false pretences with intent to cheat or defraud: see section 53 of the Larceny Act 1827 (7 & 8 Geo 4, c 29). Section 17 was headed "cheating at play to be punished as obtaining money by false pretences".

E

**32**   This history is of limited importance, given the enactment of an entirely new regime by the Gambling Act 2005, but it does demonstrate that the law concerned itself from very early times with malpractice at gaming, and that by 1845 a general expression used for it was "cheating". It is also of note that the malpractice thus dealt with was not confined to deception or fraud, but extended to "ill practice". Given the origins of that expression in the 1664 Act, relating to foot races, tennis and the like, as well as to gambling, it is not possible to treat "ill practice" as having been limited by the principle of ejusdem generis to deception or fraud.

F

G

**33**   The Gambling Act 2005 reversed, by sections 334 and 335, the rule that gaming contracts are unenforceable. The new Gambling Commission is, however, given by section 336 a new power to declare void a bet taken by a licensee if satisfied that the bet was "substantially unfair". Amongst the factors (not exhaustively defined) which are to be considered when deciding whether a bet was substantially unfair is included the circumstance that either party to the bet either did believe or ought to have believed that an offence of cheating had been or was likely to have been committed in connection with it, although that is by no means the only consideration. Supply of insufficient information and the belief of either party that the

H

© 2018 The Incorporated Council of Law Reporting for England and Wales

Ivey v Genting Casinos (UK) Ltd (SC(E))                    [2018] AC
Lord Hughes JSC

underlying contest is conducted in contravention of industry rules are two of    A
the other specified relevant circumstances.  The offence contrary to section 17
of the 1845 Act is replaced by a new offence of cheating at gambling created
by section 42.

34   Section 42 is in the following terms:

"*Cheating*

"(1) A person commits an offence if he— (a) cheats at gambling, or    B
(b) does anything for the purpose of enabling or assisting another person
to cheat at gambling.

"(2) For the purposes of subsection (1) it is immaterial whether a
person who cheats— (a) improves his chances of winning anything, or
(b) wins anything.

"(3) Without prejudice to the generality of subsection (1) cheating at    C
gambling may, in particular, consist of actual or attempted deception or
interference in connection with— (a) the process by which gambling is
conducted, or (b) a real or virtual game, race or other event or process to
which gambling relates."

By subsection (4) this offence carries a penalty of up to two years
imprisonment on indictment, or 51 weeks on summary conviction.
                                                                          D

*Cheating*

35   It has been common ground throughout this litigation that the (now
in principle enforceable) contract for betting into which these parties entered
is subject to an implied term that neither of them will cheat.

36   It follows that, if what Mr Ivey did was cheating, he is in breach of this    E
implied term and cannot as a result recover his "winnings".  As well as
advancing this defence, the casino pleaded that what he did amounted to the
offence under section 42, and that in consequence he could not recover the
proceeds of his criminal offence. Mitting J held that the implied term had been
broken, and that it was therefore unnecessary to decide whether or not the
statutory offence had been committed.  The majority of the Court of Appeal
dismissed Mr Ivey's appeal.  The reasoning of Arden and Tomlinson LJJ was    F
not identical, but both upheld the judge's conclusion that what had been done
amounted to cheating.  Sharp LJ would have allowed the appeal, taking the
view that there could not be cheating unless the statutory offence had been
committed and that a necessary ingredient of it was dishonesty as defined in
*R v Ghosh* [1982] QB 1053.

37   The core submission of Mr Spearman QC for Mr Ivey runs as
follows: (a) the test of what is cheating must be the same for the implied term    G
as for section 42; (b) cheating necessarily involves dishonesty; (c) the judge
found that Mr Ivey was truthful when he said that he did not consider what
he did to be cheating; therefore dishonesty and in particular the second leg of
the test established by *R v Ghosh* had not been demonstrated; (d) it follows
that what was done was not cheating, and Mr Ivey ought to have recovered
the £7·7m.

38   The concept of cheating long pre-dates section 42 of the Gambling    H
Act 2005.  It clearly embraces the kind of malpractice described in the
statutes of 1664, 1710 and 1845.  Section 42 thus adopted a longstanding
concept.  However, there is no reason to doubt that cheating carries the same
meaning when considering an implied term not to cheat and when applying

© 2018 The Incorporated Council of Law Reporting for England and Wales

[2018] AC                    *Ivey v Genting Casinos (UK) Ltd (SC(E))*
                             Lord Hughes JSC

A   section 42 of the Act.  There will be a difference in standard of proof as
    between civil and criminal proceedings, but that does not affect the meaning
    of cheating.  Section 42 expressly does not exhaustively define cheating, and
    the elaboration in section 42(3) is explanatory rather than definitive.  The
    section leaves open what is and what is not cheating, as is inevitable given
    the extraordinary range of activities to which the concept may apply.
    Plainly, what is cheating in one form of game may be legitimate competition
B   in another.

    39   For his second and crucial proposition Mr Spearman relied, as a
    matter of authority, substantially on *R v Scott* [1975] AC 819.  Viscount
    Dilhorne, with whom the other law lords agreed, referred in the course of his
    speech to the ancient common law offence of cheating.  He cited, at p 840,
    *East's Pleas of the Crown* (1803) vol II, pp 816–818 for that author's
C   opinion that that offence consisted in

        "the fraudulent obtaining [of] the property of another by any deceitful
        and illegal practice or token (short of felony) which affects or may affect
        the public.  It is not, however, every species of fraud or dishonesty in
        transactions between individuals which is the subject matter of a criminal
        charge at common law . . . it must be such as affects the public . . .
D       calculated to defraud numbers, to deceive the people in general."

    Says Mr Spearman, this demonstrates that fraud, and thus dishonesty, was
    an essential element of the common law offence of cheating.  The same, he
    contends, must follow for cheating at gambling.

    40   Mr Scott and his co-defendants were in the business of film piracy.
    They bribed employees of commercial cinemas, such as projectionists, to
E   abstract the reels of film overnight so that infringing copies could be made
    and in due course distributed commercially for profit.  The charge was not
    cheating at common law but conspiracy to defraud.  The substantial issue
    before the House of Lords was whether conspiracy to defraud required as an
    essential element that there had been deception, which had not been any part
    of the strategy employed by the defendants.  The answer was that deception
    was one very common form of defrauding, but not the only one.  Whilst no
F   exhaustive definition of defrauding was attempted, the House held that
    defrauding also included depriving another, by dishonest means, of
    something which is his or to which he would or might be entitled but for the
    fraud.  In so holding, the House followed its own decision in *Welham v
    Director of Public Prosecutions* [1961] AC 103, where it had emphasised
    that the essence of defrauding was the effect on the victim.

G   41   To the extent that defrauding someone may take the form of
    depriving him of something which is his, or to which he might otherwise be
    entitled, it is plain, and wholly unsurprising, that a criminal offence of
    defrauding must contain in addition an element which demonstrates that
    the means adopted are illegitimate and wrong.  Otherwise much perfectly
    proper business competition would be at risk of being labelled fraud, since
    such competition frequently involves strategies to divert business from A to
H   B.  Hence it is entirely unsurprising that conspiracy to defraud was held to
    require in addition the proof of dishonest means.  Dishonesty, in this
    context, supplies the essential element of illegitimacy and wrongfulness.

    42   As the citation from *East* shows, the ancient common law offence of
    cheating consisted of a particular subset of fraudulently depriving another of

© 2018 The Incorporated Council of Law Reporting for England and Wales

property, where the fraud affected the public as a whole.  This offence was      A
abolished by section 32(1) of the Theft Act 1968, except in so far as it
consisted of cheating the revenue.  There is no discussion of this abolition in
the *Eighth Report of the Criminal Law Revision Committee on Theft and
Related Offences* (1966) (Cmnd 2977), which preceded the Act and
recommended most of the terms of the statute including section 32(1), but it
is clear that the Committee took the view that whatever was previously           B
covered by other forms of common law cheating would be caught by its
newly recommended offences, particularly that of obtaining property by
deception under what became section 15 of the Act.  The Theft Act 1968
used the expression "cheat" only in one place, in relation to the offence of
going equipped created by section 25.  There, in section 25(1)(5), it was used
in a restrictive sense limited to the offences contrary to section 15.  (The
references to cheat have since been removed from that section.)                   C

   **43**   The common law offence of cheating was referred to in *R v Scott*
[1975] AC 819 only because a supplementary argument for the defendants
was that section 32(1) had impliedly abolished also the offence of conspiracy
to defraud, which argument unsurprisingly failed.  There is no occasion to
investigate the accuracy of East's opinion on the scope of the common law
offence of cheating.  It may well be that it necessarily involved dishonesty,
although that expression was not in general use in criminal statutes until the   D
Theft Act 1968 adopted it in preference to "fraudulently".  But to say that
dishonesty was a necessary element in an offence of which the gist was
obtaining the property of others who may well be strangers, and where the
offence would otherwise be likely to be impossibly wide, is of no help in
construing the meaning of cheating in the quite separate context of
gambling.  Still less is there any reason to suppose that the framers of the     E
Gambling Act adopted in 2005 an analogy with a common law offence
which had largely been abolished nearly 40 years earlier, and when "cheat"
had been used in a different sense in the Theft Act 1968.  Whilst it makes
perfect sense to interpret the concept of cheating in section 42 of the
Gambling Act in the light of the meaning given to cheating over many years,
it makes none to interpret cheating, as used over those many years, by        F
reference to an expression—dishonesty—introduced into the criminal law
for different purposes long afterwards in 1968.  In gambling, there is an
existing close relationship between the parties, governed by rules and
conventions applicable to whichever game is undertaken, and which are
crucial to what is cheating and what is not.  Cheating at gambling need not
result in obtaining the property of the other party, as section 42(2) explicitly
says.  Most importantly, whilst the additional element of dishonesty was        G
necessary to the common law offence of cheating, and no doubt still is to the
surviving offences of cheating the Revenue and conspiracy to defraud, in
order to mark out the illegitimate and wrongful from the legitimate, the
expression "cheating" in the context of games and gambling carries its own
inherent stamp of wrongfulness.
   **44**   Authority apart, Mr Spearman contended that as a matter of            H
ordinary English, cheating necessarily imports dishonesty.  This argument is
most neatly encapsulated by inversion: "honest cheating" is indeed, as has
been sensibly recognised by those who have addressed the phrase in this
litigation, an improbable concept.  But that is because to speak of honest
cheating would be to suggest that some cheating is right, rather than wrong.

© 2018 The Incorporated Council of Law Reporting for England and Wales

A   That would indeed be contrary to the natural meaning of the word cheating. It does not, however, follow, either (1) that all cheating would ordinarily attract the description "dishonest" or (2) that anything is added to the legal concept of cheating by an additional legal element of dishonesty.

45   Although the great majority of cheating will involve something which the ordinary person (or juror) would describe as dishonest, this is not invariably so. When, as it often will, the cheating involves deception of the B   other party, it will usually be easy to describe what was done as dishonest. It is, however, perfectly clear that in ordinary language cheating need not involve deception, and section 42(3) recognises this. Section 42(3) does not exhaustively define cheating, but it puts beyond doubt that both deception and interference with the game may amount to it. The runner who trips up one of his opponents is unquestionably cheating, but it is doubtful that such C   misbehaviour would ordinarily attract the epithet "dishonest". The stable lad who starves the favourite of water for a day and then gives him two buckets of water to drink just before the race, so that he is much slower than normal, is also cheating, but there is no deception unless one manufactures an altogether artificial representation to the world at large that the horse has been prepared to run at his fastest, and by themselves it is by no means clear D   that these actions would be termed dishonesty. Similar questions could no doubt be asked about the taking of performance-enhancing drugs, about the overt application of a magnet to a fruit machine, deliberate time-wasting in many forms of game, or about upsetting the card table to force a re-deal when loss seems unavoidable, never mind sneaking a look at one's opponent's cards.

46   Conversely, there may be situations in which there is deception of the E   other player but what is done does not amount to cheating. The so-called "three card trick", much practised upon travellers on Victorian and Edwardian trains especially to and from racecourses, commonly involved a deception of the target traveller by a group of associates pretending to be unconnected to one another. The idea was to lure the target into playing the game. But once he was ensnared, the game was often played genuinely; the target lost not because of any cheating but because the shuffler of the cards F   had sufficient speed of hand to deceive the eye: see for example *R v Governor of Brixton Prison, Ex p Sjoland and Metzler* [1912] 3 KB 568. No doubt other exponents of the three card trick had less genuine methods, such as a fourth (concealed) card, which would indeed be cheating. Sometimes the game admits of a level of legitimate deception. The unorthodox lead or discard at bridge is designed to give the opponent a misleading impression of G   one's hand, but it is part of the game and not cheating. Pretending to be stupid at the poker table, so that one's opponent does not take one seriously, and takes risks which he otherwise might not, may or may not be another example.

47   These far from sophisticated examples demonstrate the inevitable truth that there will be room for debate at the fringes as to what does and does not constitute cheating. To label an activity "advantage play", as H   Mr Ivey and others did, is of no help at all. It asks, rather than answers, the question whether it is legitimate or cheating. It would be very unwise to attempt a definition of cheating. No doubt its essentials normally involve a deliberate (and not an accidental) act designed to gain an advantage in the play which is objectively improper, given the nature, parameters and rules

© 2018 The Incorporated Council of Law Reporting for England and Wales

406
Ivey v Genting Casinos (UK) Ltd (SC(E))                              [2018] AC
Lord Hughes JSC

(formal or informal) of the game under examination.  The question in the     *A*
present case, however, does not depend on the near impossible task of
formulating a definition of cheating, but on whether cheating necessarily
requires dishonesty as one of its legal elements.

48   Where it applies as an element of a criminal charge, dishonesty is by
no means a defined concept.  On the contrary, like the elephant, it is
characterised more by recognition when encountered than by definition.     *B*
Dishonesty is not a matter of law, but a jury question of fact and standards.
Except to the limited extent that section 2 of the Theft Act 1968 requires
otherwise, judges do not, and must not, attempt to define it: *R v Feely* [1973]
QB 530.  In this it differs strikingly from the expression "fraudulently",
which it largely replaced, for the judge did define whether a state of mind,
once ascertained as a matter of fact, was or was not fraudulent: *R v Williams*
[1953] 1 QB 660.  Accordingly, dishonesty cannot be regarded as a concept     *C*
which would bring to the assessment of behaviour a clarity or certainty
which would be lacking if the jury were left to say whether the behaviour
under examination amounted to cheating or did not.  The issue whether
what was done amounts to cheating, given the nature and rules of the game
concerned, is likewise itself a jury question.  The judge in the present case
applied himself to the question whether there was cheating in exactly this
jury manner.  He directed himself that it is ultimately for the court to decide     *D*
whether conduct amounted to cheating and that the standard is objective.  In
so directing himself he was right.

49   There is no occasion to add to the value judgment whether conduct
was cheating a similar, but perhaps not identical, value judgment whether it
was dishonest.  Some might say that all cheating is by definition dishonest.
In that event, the addition of a legal element of dishonesty would add     *E*
nothing.  Others might say that some forms of cheating, such as deliberate
interference with the game without deception, are wrong and cheating, but
not dishonest.  In that event, the addition of the legal element of dishonesty
would subtract from the essentials of cheating, and legitimise the
illegitimate.  Either way, the addition would unnecessarily complicate the
question whether what is proved amounts to cheating.

50   The judge's conclusion, that Mr Ivey's actions amounted to     *F*
cheating, is unassailable.  It is an essential element of Punto Banco that the
game is one of pure chance, with cards delivered entirely at random and
unknowable by the punters or the house.  What Mr Ivey did was to stage a
carefully planned and executed sting.  The key factor was the arranging of
the several packs of cards in the shoe, differentially sorted so that this
particular punter did know whether the next card was a high value or low
value one.  If he had surreptitiously gained access to the shoe and     *G*
re-arranged the cards physically himself, no one would begin to doubt that
he was cheating.  He accomplished exactly the same result through the
unwitting but directed actions of the croupier, tricking her into thinking that
what she did was irrelevant.  As soon as the decision to change the cards was
announced, thus restoring the game to the matter of chance which it is
supposed to be, he first covered his tracks by asking for cards to be rotated at
random, and then abandoned play.  It may be that it would not be cheating if     *H*
a player spotted that some cards had a detectably different back from others,
and took advantage of that observation, but Mr Ivey did much more than
observe; he took positive steps to fix the deck.  That, in a game which

© 2018 The Incorporated Council of Law Reporting for England and Wales

[2018] AC                    Ivey v Genting Casinos (UK) Ltd (SC(E))
                                                    Lord Hughes JSC

A    depends on random delivery of unknown cards, is inevitably cheating. That
     it was clever and skilful, and must have involved remarkably sharp eyes,
     cannot alter that truth.

     51   Although the judge did not think it necessary to make a finding on
     the topic, and it is unnecessary to the resolution of this appeal, it would also
     seem that the facts which he found amounted in any event to a deception of
     the croupier. Certainly, the judge found [2015] LLR 98, para 40, that
B    pretending to be superstitious did not *by itself* cross the line from legitimate
     play to cheating, comparing it to the skilled poker player who pretends to be
     a fool. He also found, contrary to one of Crockfords' submissions, that
     what occurred did not amount to such deception as altogether to negate the
     existence of any contract for the game. But that was not a finding that there
     was no deception at all, and on the facts found there clearly was deception of
C    the croupier into doing something which appeared innocuous or irrelevant,
     but was in fact highly significant and enabled Mr Ivey to win when he should
     not have done. If, therefore, there were indeed (and contrary to the
     conclusion reached above) a necessary legal element of dishonesty in
     cheating, such a deception would be prima facie dishonest, unless it is
     prevented from being so by necessity to satisfy the second leg of the test in
     *R v Ghosh* [1982] QB 1053.
D

     *Dishonesty*

     52   Dishonesty has been adopted since the Theft Act 1968 in the
     definition of some, but not all, acquisitive criminal offences. Forgery, for
     example, is defined without reference to dishonesty, but rather by the
     yardstick of the intention of the forger that his false document should be
E    accepted as genuine and acted upon to the prejudice of someone else
     (Forgery and Counterfeiting Act 1981, section 1), whilst the Fraud Act 2006
     retains dishonesty as an element of several forms of fraud: see sections 2, 3, 4
     and 11.

     53   As recorded at para 48 above, dishonesty is itself primarily a jury
     concept, characterised by recognition rather than by definition. Most of the
     Theft Act 1968 offences required dishonesty without any elaboration of its
F    meaning: section 15 (dishonestly obtaining property by deception) was a
     prime example and the Fraud Act 2006, which replaces this and other Theft
     Act offences, adopts the same form. There are in section 2 of the Theft Act
     1968 limited rules relating to when appropriation is *not* to be regarded as
     dishonest (claim of right, belief in consent of owner, belief that owner
     cannot be found) and a specific provision that it may be dishonest despite a
G    willingness to pay for the goods, but these were designed to reflect existing
     rules of law, they apply only to appropriation, and they do not alter the
     underlying principle that dishonesty is not defined. This reflects the view of
     the Criminal Law Revision Committee that dishonesty was a matter to be
     left to a jury; it said in its Eighth Report, at para 39, that "'Dishonesty' is
     something which laymen can easily recognise when they see it". That is not
     to suggest that there is not room for debate at the fringes whether particular
H    conduct is dishonest or not, but the perils of advance definition would no
     doubt have been greater than those associated with leaving the matter to the
     jury. Over the succeeding half century, whilst there have undoubtedly (and
     inevitably) been examples of uncertainty or debate in identifying whether
     some conduct is dishonest or not, juries appear generally to have coped well

© 2018 The Incorporated Council of Law Reporting for England and Wales

408
Ivey v Genting Casinos (UK) Ltd (SC(E))                                    [2018] AC
Lord Hughes JSC

with applying an uncomplicated lay objective standard of honesty to     A
activities as disparate as sophisticated banking practices (for example *R v
Hayes* [2018] 1 Cr App R 10) and the removal of golf balls at night from the
bottom of a lake on a private golf course: *R v Rostron* [2003] EWCA Crim
2206.

54    A significant refinement to the test for dishonesty was introduced by
*R v Ghosh* [1982] QB 1053. Since then, in criminal cases, the judge has been     B
required to direct the jury, if the point arises, to apply a two-stage test.
Firstly, it must ask whether in its judgment the conduct complained of was
dishonest by the lay objective standards of ordinary reasonable and honest
people. If the answer is no, that disposes of the case in favour of the
defendant. But if the answer is yes, it must ask, secondly, whether the
defendant must have realised that ordinary honest people would so regard
his behaviour, and he is to be convicted only if the answer to that second     C
question is yes.

55    The occasion for this ruling owed nothing to the facts of *R v Ghosh*.
The defendant locum surgeon had claimed payment for operations which
either he had not performed, or which had been carried out under the
National Health scheme so that no fees were due. The court summarily
dismissed his appeal on the basis that no jury could have concluded, by any     D
test, otherwise than that he was dishonest.

56    The occasion for the analysis of dishonesty in *R v Ghosh* was a
tangle of what were perceived to be inconsistent decisions, some of which
were said to apply a "subjective" test, and others of which were said to apply
an "objective" one. Those terms are not always as plain to jurors as they
have become to lawyers, but it is convenient to adopt them here when
examining the reasoning in *R v Ghosh*. That case arrived, as has been seen,     E
at a compromise rule which is partly objective and partly subjective.

57    Thirty years on, however, it can be seen that there are a number of
serious problems about the second leg of the rule adopted in *R v Ghosh*.

(1) It has the unintended effect that the more warped the defendant's
standards of honesty are, the less likely it is that he will be convicted of
dishonest behaviour.

(2) It was based on the premise that it was necessary in order to give     F
proper effect to the principle that dishonesty, and especially criminal
responsibility for it, must depend on the actual state of mind of the
defendant, whereas the rule is not necessary to preserve this principle.

(3) It sets a test which jurors and others often find puzzling and difficult to
apply.

(4) It has led to an unprincipled divergence between the test for     G
dishonesty in criminal proceedings and the test of the same concept when it
arises in the context of a civil action.

(5) It represented a significant departure from the pre-Theft Act 1968 law,
when there is no indication that such a change had been intended.

(6) Moreover, it was not compelled by authority. Although the
pre-*Ghosh* cases were in a state of some entanglement, the better view is that     H
the preponderance of authority favoured the simpler rule that, once the
defendant's state of knowledge and belief has been established, whether that
state of mind was dishonest or not is to be determined by the application of
the standards of the ordinary honest person, represented in a criminal case
by the collective judgment of jurors or justices.

© 2018 The Incorporated Council of Law Reporting for England and Wales

A    58    The principal objection to the second leg of the *Ghosh* test is that the less the defendant's standards conform to what society in general expects, the less likely he is to be held criminally responsible for his behaviour. It is true that *R v Ghosh* attempted to reconcile what it regarded as the dichotomy between a "subjective" and an "objective" approach by a mixed test. The court addressed the present objection in this way, [1982] QB 1053, 1064:

B    "There remains the objection that to adopt a subjective test is to abandon all standards but that of the accused himself, and to bring about a state of affairs in which 'Robin Hood would be no robber': *R v Greenstein* [1975] 1 WLR 1353. This objection misunderstands the nature of the subjective test. It is no defence for a man to say 'I knew that what I was doing is generally regarded as dishonest; but I do not regard it as dishonest myself. Therefore I am not guilty'. What he is however entitled to say is 'I did not know that anybody would regard what I was doing as dishonest'. He may not be believed; just as he may not be believed if he sets up 'a claim of right' under section 2(1) of the Theft Act 1968, or asserts that he believed in the truth of a misrepresentation under section 15 of the 1968 Act. But if he *is* believed, or raises a real doubt about the matter, the jury cannot be sure that he was dishonest."

C

D    And a little later the court added that upon the test which it was setting:

"In most cases, where the actions are obviously dishonest by ordinary standards, there will be no doubt about it. It will be obvious that the defendant himself knew that he was acting dishonestly. It is dishonest for a defendant to act in a way which he knows ordinary people consider to be dishonest, even if he asserts or genuinely believes that he is morally justified in acting as he did. For example, Robin Hood or those ardent anti-vivisectionists who remove animals from vivisection laboratories are acting dishonestly, even though they may consider themselves to be morally justified in doing what they do, because they know that ordinary people would consider these actions to be dishonest."

E

F    59    Even if this were correct, it would still mean that the defendant who thinks that stealing from a bookmaker is not dishonest (as in *R v Gilks* [1972] 1 WLR 1341—see para 73 below) is entitled to be acquitted. It is no answer to say that he will be convicted if he realised that ordinary honest people would think that stealing from a bookmaker is dishonest, for by definition he does not realise this. Moreover, the court's proposition was not correct, because it is not in the least unusual for the accused not to share the standards which ordinary honest people set for society as a whole. The acquisitive offender may, it is true, be the cheerful character who frankly acknowledges that he is a crook, but very often he is not, but, rather, justifies his behaviour to himself. Just as convincing himself is frequently the stock in trade of the confidence trickster, so the capacity of all of us to persuade ourselves that what we do is excusable knows few bounds. It cannot by any means be assumed that the appropriators of animals from laboratories, to whom the court referred in *R v Ghosh* [1982] QB 1053, 1064 know that ordinary people would consider their actions to be dishonest; it is just as likely that they are so convinced, however perversely, of the justification for what they do that they persuade themselves that no one could call it

G

H

© 2018 The Incorporated Council of Law Reporting for England and Wales

dishonest.  There is no reason why the law should excuse those who make a     A
mistake about what contemporary standards of honesty are, whether in the
context of insurance claims, high finance, market manipulation or tax
evasion.  The law does not, in principle, excuse those whose standards are
criminal by the benchmarks set by society, nor ought it to do so.  On the
contrary, it is an important, even crucial, function of the criminal law to
determine what is criminal and what is not; its purpose is to set the standards     B
of behaviour which are acceptable.  As it was put in *Smith's Law of Theft*,
9th ed (2007), para 2.296:

> "the second limb allows the accused to escape liability where he has
> made a mistake of fact as to the contemporary standards of honesty.  But
> why should that be an excuse?"

60   It is plain that in *R v Ghosh* [1982] QB 1053 the court concluded     C
that its compromise second leg test was necessary in order to preserve the
principle that criminal responsibility for dishonesty must depend on the
actual state of mind of the defendant.  It asked the question whether
"dishonestly", where that word appears in the Theft Act, was intended to
characterise a course of conduct or to describe a state of mind.  The court
gave the following example, at p 1063, which was clearly central to its     D
reasoning:

> "Take for example a man who comes from a country where public
> transport is free.  On his first day here he travels on a bus.  He gets off
> without paying.  He never had any intention of paying.  His mind is
> clearly honest; but his conduct, judged objectively by what he has done, is
> dishonest.  It seems to us that in using the word 'dishonestly' in the Theft     E
> Act 1968, Parliament cannot have intended to catch dishonest conduct in
> that sense, that is to say conduct to which no moral obloquy could
> possibly attach."

But the man in this example would inevitably escape conviction by the
application of the (objective) first leg of the *Ghosh* test.  That is because, in
order to determine the honesty or otherwise of a person's conduct, one must     F
ask what he knew or believed about the facts affecting the area of activity in
which he was engaging.  In order to decide whether this visitor was dishonest
by the standards of ordinary people, it would be necessary to establish his
own actual state of knowledge of how public transport works.  Because he
genuinely believes that public transport is free, there is nothing objectively
dishonest about his not paying on the bus.  The same would be true of a child
who did not know the rules, or of a person who had innocently misread the     G
bus pass sent to him and did not realise that it did not operate until
after 10.00 in the morning.  The answer to the court's question is that
"dishonestly", where it appears, is indeed intended to characterise what the
defendant did, but in characterising it one must first ascertain his actual state
of mind as to the facts in which he did it.  It was not correct to postulate that
the conventional objective test of dishonesty involves judging only the
actions and not the state of knowledge or belief as to the facts in which they     H
were performed.  What is objectively judged is the standard of behaviour,
given any known actual state of mind of the actor as to the facts.

61   Although there have been relatively few appeals based upon *R v
Ghosh*, that is because judges have dutifully given the two-leg direction

© 2018 The Incorporated Council of Law Reporting for England and Wales

[2018] AC                          *Ivey v Genting Casinos (UK) Ltd (SC(E))*
                                                              *Lord Hughes JSC*

A   where there has been any occasion for it.  But the existence of the second leg
    has frequently led to trials being conducted on the basis that even if the
    defendant's actions, in his actual state of knowledge or belief about
    the relevant facts, would be characterised by most people as dishonest, the
    defendant himself thought that what he was doing was not wrong, and it
    was for that reason honest.  Juries are then required first to ask the so-called
    objective question, that is to say to apply their own standards of honesty, but
B   then to depart from them in order to ask what the defendant himself
    thought.  The idea that something which is dishonest by ordinary standards
    can become honest just because the defendant thinks it is may often not be
    an easy one for jurors to grasp.

    62   Dishonesty is by no means confined to the criminal law.  Civil
    actions may also frequently raise the question whether an action was honest
C   or dishonest.  The liability of an accessory to a breach of trust is, for
    example, not strict, as the liability of the trustee is, but (absent an
    exoneration clause) is fault-based.  Negligence is not sufficient.  Nothing less
    than dishonest assistance will suffice.  Successive cases at the highest level
    have decided that the test of dishonesty is objective.  After some hesitation in
    *Twinsectra Ltd v Yardley* [2002] 2 AC 164, the law is settled on the objective
    test set out by Lord Nicholls of Birkenhead in *Royal Brunei Airlines Sdn Bhd
D   v Tan* [1995] 2 AC 378: see *Barlow Clowes International Ltd v Eurotrust
    International Ltd* [2006] 1 WLR 1476, *Abou-Rahmah v Abacha* [2007]
    Bus LR 220 and *Starglade Properties Ltd v Nash* [2011] Lloyd's Rep FC
    102.  The test now clearly established was explained thus in the *Barlow
    Clowes* case [2006] 1 WLR 1476, para 10 by Lord Hoffmann, who had been
    a party also to the *Twinsectra* case:
E
        "Although a dishonest state of mind is a subjective mental state, the
    standard by which the law determines whether it is dishonest is objective.
    If by ordinary standards a defendant's mental state would be
    characterised as dishonest, it is irrelevant that the defendant judges by
    different standards.  The Court of Appeal held this to be a correct state of
    the law and their Lordships agree."
F
    63   Although the House of Lords and Privy Council were careful in these
    cases to confine their decisions to civil cases, there can be no logical or
    principled basis for the meaning of dishonesty (as distinct from the standards
    of proof by which it must be established) to differ according to whether it
    arises in a civil action or a criminal prosecution.  Dishonesty is a simple, if
    occasionally imprecise, English word.  It would be an affront to the law if its
G   meaning differed according to the kind of proceedings in which it arose.  It is
    easy enough to envisage cases where precisely the same behaviour, by the
    same person, falls to be examined in both kinds of proceeding.  In *Starglade
    Properties Ltd v Nash* [2011] Lloyd's Rep FC 102 Leveson LJ drew attention
    to the difference of test as between civil cases and criminal cases, and rightly
    held that it demanded consideration when the opportunity arose.  Such an
    opportunity is unlikely to occur in a criminal case whilst *R v Ghosh* [1982]
H   QB 1053 remains binding on trial judges throughout the country.  Although
    in *R v Cornelius* [2012] Lloyd's Rep FC 435 the opportunity might have
    arisen before the Court of Appeal, Criminal Division, it did not do so
    because there had been in that case no false representation of which the
    honesty needed to be examined; moreover, there is some doubt about the

© 2018 The Incorporated Council of Law Reporting for England and Wales

freedom of that court to depart from *R v Ghosh* [1982] QB 1053 in the absence of a decision from this court.

64   Prior to the Theft Act 1968, the expression "dishonestly" had not appeared in the legal definition of acquisitive offences. The mental element was usually marked by the expression "fraudulently". There is no doubt that that latter expression involved an objective evaluation of the defendant's conduct, given his actual state of knowledge and belief as to the facts. The Criminal Law Revision Committee, in its Eighth Report, advised the substitution of the word "dishonestly", on the grounds that "fraudulently" had become technical and its meaning had departed somewhat from the ordinary understanding of lay people. It recommended that "dishonestly" would be more easily understood by lay fact-finders and the public generally. At para 39 the Committee advised that

> "'Dishonestly' seems to us a better word than 'fraudulently'. The question 'Was this dishonest?' is easier for a jury to answer than the question 'Was this fraudulent?'. 'Dishonesty' is something which laymen can easily recognise when they see it, whereas 'fraud' may seem to involve technicalities which have to be explained by a lawyer."

It was in accordance with this substitution that in *R v Feely* [1973] QB 530 a five-judge Court of Appeal, Criminal Division, held that the question whether a defendant had behaved dishonestly was to be left to the jury and should not, as had been the case with "fraudulently", be the subject of judicial ruling. But there is no hint in the Committee's report of any contemplation that whether a man was or was not dishonest should henceforth depend on his own view of his behaviour. On the contrary, the report clearly assumed that the prior objective approach would continue, save that the question would be a jury matter rather than one of law.

65   Prior to *R v Ghosh* [1982] QB 1053 the post-Theft Act authorities on the meaning of dishonesty were in something of a tangle. The court in that case seems to have thought, however, that there were more or less equal strands of authority supporting the "subjective" and the "objective" approach. It identified *R v Feely* [1973] QB 530 and *R v Greenstein* [1975] 1 WLR 1353 as tending to support an objective approach, and *R v Landy* [1981] 1 WLR 355, *R v Waterfall* [1970] 1 QB 148, *R v Royle* [1971] 1 WLR 1764 and *R v Gilks* [1972] 1 WLR 1341 as tending to favour a subjective one. It treated *R v McIvor* [1982] 1 WLR 409 as an unsustainable attempt to reconcile the two lines. This apparently binary dichotomy is not entirely borne out on analysis.

66   Chronologically the first two cases, *R v Waterfall* [1970] 1 QB 148 and *R v Royle* [1971] 1 WLR 1764, decided in July 1969 and November 1971, did not concern the characterisation of behaviour as dishonest. Rather, they held that where a false representation is alleged, it must be shown that the defendant knew that it was false, or at least was reckless in making it without caring whether or not it was true. Until there is a false representation, deliberately or recklessly made, the jury does not get to whether it was dishonest or not. Plainly, the defendant's actual state of mind as to the truth of the representation is a matter for subjective determination. If he genuinely believes that what he said was true, he is entitled to be acquitted, unless of course there is some other behaviour independent of the false representation which can be said to be dishonest. It does not at all

© 2018 The Incorporated Council of Law Reporting for England and Wales

A   follow that, when once an absence of belief in the truth of his representation is established, dishonesty is likewise an entirely subjective matter, nor that it is so in cases which do not depend on allegations of false representation(s). This important distinction was subsequently identified in both *R v Landy* [1981] 1 WLR 355 and *R v Ghosh* [1982] QB 1053 itself, but the court in the latter case regarded it as unsatisfactory that the jury should have to apply successive tests, firstly of the defendant's actual knowledge or belief, and,

B   only if he deliberately made a false representation, secondly of the character of his conduct, given his actual state of mind. *R v Waterfall* [1970] 1 QB 148 and *R v Royle* [1971] 1 WLR 1764 were treated as examples of a subjective test of dishonesty, although they are not. There should in fact be no difficulty in the jury making this distinction, as cases such as *R v Greenstein* [1975] 1 WLR 1353 show. It has to be done in every case where there was a

C   false representation but there is a question whether there is any possible moral obloquy attaching to it. And it falls to be done, easily enough, in non-representation cases such as that of the bus travelling foreign visitor. A not dissimilar two-stage test is routinely applied by juries where self defence is in issue. The first stage is to ask what the facts were, as the defendant "subjectively" believed them to be. The second stage is, assuming such facts, to judge whether the response of the defendant was "objectively"

D   reasonable. See *R v Williams (Gladstone)* [1987] 3 All ER 411 and section 76 of the Criminal Justice and Immigration Act 2008.

67   In December 1972 a five-judge Court of Appeal decided *R v Feely* [1973] QB 530. Like some others, the case concerned a defendant employee who had helped himself to money from the till knowing that such a thing was forbidden, but contended by way of defence that he had intended to

E   repay it, and that his employers owed him money anyway. The decision of the court was that it is for the jury, not the judge, to say whether the conduct established was dishonest or not. The court said plainly that employees who take money from the till without permission are usually thieves, but that if the circumstances were such that no possible moral obloquy could attach to what was done, they might not be. It gave as an example the defendant who took the money only because he had no change in his pocket to pay a taxi

F   which had just delivered his wife to the shop, and who meant to and did replace it within minutes. Because the question whether that kind of analysis applied in that case had not been left open by the direction to the jury, the appeal against conviction was allowed. It is therefore inherent in that case that what the jury has to do is to apply its own (objective) standards to whether the conduct was dishonest.

G   68   *R v Greenstein* [1975] 1 WLR 1353, decided in July 1975, concerned a large-scale operation of a method of the discouraged but not illegal practice of "stagging" new issue shares by applying for vastly more than the defendants could pay for, in the hope that a smaller affordable number would be allocated, but more than would have been allotted if the application had been confined to what they could afford. The charges, of obtaining property by deception, depended on the representation made

H   when a cheque is issued, that it is good for the money on due presentation. The defendants, who applied in multiple aliases, did not have the money to meet the cheques they signed for the full number of shares applied for, which were required by the issuers, but they hoped that the return cheques which could be expected to be sent after partial allocation would feed their

© 2018 The Incorporated Council of Law Reporting for England and Wales

414
Ivey v Genting Casinos (UK) Ltd (SC(E))                                    [2018] AC
Lord Hughes JSC

accounts in time to enable their original cheques to be met.  The court upheld    A
the judge's two-part direction.  First, he told the jury that when it came to
asking whether the defendants genuinely believed that their cheques would
be met on due presentation (as many were and several were not) the answer
should depend on their actual state of belief.  Secondly, he told them that
when the question was whether the defendants had acted honestly overall
(that is if there was a false representation), they must apply their own    B
standards.  It was, the judge had said, no good applying the standards of
anyone accused of dishonesty, for in that event everyone would
automatically be acquitted.  That case accordingly supports the principle
that the test of dishonesty (but not of belief in a representation) is objective.
*R v Feely* [1973] QB 530 was applied.

69    *R v Feely* was also applied in *Boggeln v Williams* [1978] 1 WLR 873,    C
decided in January 1978.  The defendant had been acquitted of dishonestly
abstracting electricity by re-connecting his supply after the Board had cut
him off for late payment.  The acquittal was by the Crown Court on appeal
and specific findings of fact were accordingly available.  They were that he
knew how to bypass the meter, but had not done so, that he gave notice to
the Board of what he was doing, that he genuinely believed that he would be
able to pay when the time came, that that belief was not shown to be    D
unreasonable and that in the judgment of the Crown Court he had not acted
dishonestly.  The Divisional Court applied *R v Feely* [1973] QB 530 in
holding that the decision upon honesty was for the fact-finding tribunal and
that there was material entitling it to find as it did.  That case did not address
the nature of the test of dishonesty beyond saying that the defendant's view
of his conduct was, on those findings, crucial.  The reality is that the Crown
Court did not think the conduct dishonest, given what the defendant did and    E
intended.  In *R v Ghosh* [1982] QB 1053, this case was rightly treated as
inconclusive upon the perceived binary dichotomy.

70    *R v Landy* [1981] 1 WLR 355, decided in January 1981, was a case
of complex fraudulent trading via a bank, which re-affirmed that dishonesty
was a necessary element of conspiracy to defraud.  It also, and more
crucially, insisted on an indictment for conspiracy to defraud giving proper    F
particulars of the conduct complained of, the absence of which had, in that
case, led to a confused and diffuse summing up which did not properly
identify the issues for the jury.  The case was important for laying the early
ground for modern case management of fraud trials.  In the course of its
judgment, given by Lawton LJ, the court said this, at p 365:

"There is always a danger that a jury may think that proof of an    G
irregularity followed by loss is proof of dishonesty.  The dishonesty to be
proved must be in the minds and intentions of the defendants.  It is to their
states of mind that the jury must direct their attention.  What the
reasonable man or the jurors themselves would have believed or intended
in the circumstances in which the defendants found themselves is not
what the jury have to decide, but what a reasonable man or they
themselves would have believed or intended in similar circumstances may    H
help them to decide what in fact individual defendants believed or
intended.  An assertion by a defendant that throughout a transaction he
acted honestly does not have to be accepted but has to be weighed like any
other piece of evidence.  If that was the defendant's state of mind, or may

© 2018 The Incorporated Council of Law Reporting for England and Wales

[2018] AC                    *Ivey v Genting Casinos (UK) Ltd (SC(E))*
                                                      Lord Hughes JSC

A  have been, he is entitled to be acquitted.  But if the jury, applying their
   own notions of what is honest and what is not, conclude that he could not
   have believed that he was acting honestly, then the element of dishonesty
   will have been established.  What a jury must not do is to say to
   themselves: 'If we had been in his place we would have known we were
   acting dishonestly so he must have known he was.'  What they can say is:
B  'We are sure he was acting dishonestly because we can see no reason why
   a man of his intelligence and experience would not have appreciated, as
   right-minded people would have done, that what he was doing was
   dishonest.' "

   **71**  This passage was treated in *R v Ghosh* [1982] QB 1053 as
   supportive of a subjective test of dishonesty.  However, its context was an
C  alleged banking fraud consisting of dealing with money of lenders and
   depositors in ways which were likely to, and did, lead them to lose their
   money.  The ways included reckless and unsecured speculation, preferential
   payments to connected companies, the preparation of false accounts, the
   lodging of false Bank of England returns, and the creation of false discount
   bills when there was no underlying commercial transaction.  The critical fact
   is that the defence was that the defendants did not know enough of what was
D  going on to be responsible, and/or that they trusted others to manage the
   bank.  Since that was the issue, it is plain that the actual state of mind of the
   defendants was indeed the critical question for the jury, and that the jury had
   to approach it in the way explained by Lawton LJ.  The issue in the case was
   not principally whether a state of knowledge, if once established, meant that
   the defendant's conduct fell to be characterised as dishonest.  Indeed, a
E  defendant who knew about the means allegedly adopted would be hard
   pressed to suggest that he thought them honest.

   **72**  The position became more complicated in *R v McIvor* [1982]
   1 WLR 409, decided in November 1981.  This was, like *R v Feely* [1973] QB
   530, a case of unauthorised taking from the till by an employee.  The
   defendant had asked to borrow money and, having been refused, helped
   himself nevertheless.  He asserted by way of defence that he had always
F  intended to put the money back, as indeed he had done ten days later.  The
   judge had told the jury that it must apply the standards of ordinary honest
   people to whether what the defendant had done was dishonest, and that
   what he himself thought about that issue was neither here nor there.  The
   appeal came before a Court of Appeal presided over by Lawton LJ, who had
   delivered the judgments in both *R v Feely* and *R v Landy* [1981] 1 WLR 355.
G  The court held that the passage cited above in *R v Landy* applied only to the
   offence of conspiracy to defraud and not to the offence of theft (or, therefore,
   to the other Theft Act offences in which dishonesty was an essential
   element).  For the latter, the "objective" lay standard of honesty was to be
   applied.  In *R v Ghosh* [1982] QB 1053 the court treated this decision as
   suggesting a "subjective" test for conspiracy to defraud and an "objective"
   one for other offences, and understandably held that such a distinction could
H  not be sustained in logic or fairness.  It is, however, at least possible, if not
   likely, that all that Lawton LJ was saying in *R v McIvor* [1982] 1 WLR 409
   was that the passage in *R v Landy* [1981] 1 WLR 355 referred to the issue of
   the defendant's actual state of knowledge of what was happening, and to his
   actual belief in the truthfulness of any representation which he had made,

© 2018 The Incorporated Council of Law Reporting for England and Wales

rather than to the issue of whether an established state of mind is or is not dishonest.  With hindsight it can be seen that the court perceived clearly that if a wholly "subjective" test of when an established actual state of knowledge or belief is and is not dishonest were to be applied, the consequences would be that any defendant whose subjective standards were sufficiently warped would be entitled to be acquitted.  It might be noted that in *R v McIvor* [1982] 1 WLR 409 the court held that the judge's remarks about what the defendant himself thought being neither here nor there might have been taken by the jury as requiring them to disregard what he had said about his actual state of knowledge or belief.  There had thus been a misdirection, but just as in *R v Ghosh* [1982] QB 1053 the court held that the only possible conclusion was that the defendant had been dishonest.

73    There was in fact only one pre-*Ghosh* case which frankly raised the relevance of the defendant's own view as to the honesty of what he had done. *R v Gilks* [1972] 1 WLR 1341 had been decided as long ago as June 1972. The defendant had been handed, by mistake, as much as £100 too much by a bookmaker.  He realised the mistake but kept the money anyway.  Asked to account for doing so, he offered the view that whereas it would clearly be wrong to keep such an overpayment if made by the grocer, bookmakers were fair game.  He was convicted notwithstanding the judge's direction that the jury should put itself in his shoes and ask itself whether *he* had thought he was acting honestly or dishonestly.  Amongst other grounds of appeal which the Court of Appeal rejected, he contended that the judge ought to have made it yet clearer that even if he did not believe he had any claim of right in law to keep the money, he would still not be guilty unless he did not have the belief he asserted that bookmakers were fair game.  The Court of Appeal rejected that contention also, saying that the judge's direction was a proper and sufficient one.  Thus the case can be said to have endorsed the (subjective) direction as to dishonesty given by the judge.  It did so, of course, only to the extent that it rejected the defendant's argument that the judge's direction was wrongly adverse to him.  The question whether the direction was too favourable to him did not arise and was not addressed.  *R v Gilks* preceded *R v Feely* [1973] QB 530, *R v Greenstein* [1975] 1 WLR 1353, *R v Landy* [1981] 1 WLR 355, *Boggeln v Williams* [1978] 1 WLR 873 and *R v McIvor* [1982] 1 WLR 409 but was not cited to any of those later courts, which therefore did not analyse what if anything it had decided.  It might, however, be thought that the facts of *R v Gilks* [1972] 1 WLR 1341 are a powerful demonstration of the perils of the second leg of the *Ghosh* test, for it means that if the likes of Mr Gilks are once truthful about their idiosyncratic view of bookmakers, they are bound to be acquitted.

74    These several considerations provide convincing grounds for holding that the second leg of the test propounded in *R v Ghosh* [1982] QB 1053 does not correctly represent the law and that directions based upon it ought no longer to be given.  The test of dishonesty is as set out by Lord Nicholls in *Royal Brunei Airlines Sdn Bhd v Tan* [1995] 2 AC 378 and by Lord Hoffmann in *Barlow Clowes International Ltd v Eurotrust International Ltd* [2006] 1 WLR 1476, para 10: see para 62 above.  When dishonesty is in question the fact-finding tribunal must first ascertain (subjectively) the actual state of the individual's knowledge or belief as to the facts.  The reasonableness or otherwise of his belief is a matter of evidence (often in practice determinative) going to whether he held the belief, but it is not an

417
[2018] AC                    *Ivey v Genting Casinos (UK) Ltd (SC(E))*
Lord Hughes JSC

A    additional requirement that his belief must be reasonable; the question is whether it is genuinely held.  When once his actual state of mind as to knowledge or belief as to facts is established, the question whether his conduct was honest or dishonest is to be determined by the fact-finder by applying the (objective) standards of ordinary decent people.  There is no requirement that the defendant must appreciate that what he has done is, by those standards, dishonest.

B    75    Therefore in the present case, if, contrary to the conclusions arrived at above, there were in cheating at gambling an additional legal element of dishonesty, it would be satisfied by the application of the test as set out above.  The judge did not get to the question of dishonesty and did not need to do so.  But it is a fallacy to suggest that his finding that Mr Ivey was truthful when he said that *he* did not regard what he did as cheating amounted to a finding that his behaviour was honest.  It was not.  It was a

C    finding that he was, in that respect, truthful.  Truthfulness is indeed one characteristic of honesty, and untruthfulness is often a powerful indicator of dishonesty, but a dishonest person may sometimes be truthful about his dishonest opinions, as indeed was the defendant in *R v Gilks* [1972] 1 WLR 1341.  For the same reasons which show that Mr Ivey's conduct was, contrary to his own opinion, cheating, the better view would be, if the

D    question arose, that his conduct was, contrary to his own opinion, also dishonest.

76    For these several reasons, this appeal must be dismissed.

*Appeal dismissed.*

MS B L SCULLY, *Barrister*

E

————

F

G

H

© 2018 The Incorporated Council of Law Reporting for England and Wales

Appeals against sanctions imposed by GFSC on directors/managers of fiduciary services company, asserting error of law, unreasonableness, and disproportion.   Correct approach to finding of want of probity.  Need to recognise distinction between failings of corporate entity and failings of individuals.  Reasonable financial penalties to have regard to historic nature of conduct and enforcement powers at relevant time.   Other matters going to potential unreasonableness/disproportion.   Appeals allowed; Prohibition Orders quashed, and financial penalties reduced.

**[2023]GRC017**

## IN THE ROYAL COURT OF GUERNSEY
## (ORDINARY DIVISION)

Between:                                                                                              **Appellants**

**(1) IAN CHARLES DOMAILLE**
**(2) IAN GEOFFREY CLARKE**
**(3) MARGARET HELEN HANNIS**

**-and-**

**GUERNSEY FINANCIAL SERVICES COMMISSION          Respondent**

**Before: Her Honour Hazel Marshall KC Lieutenant Bailiff,**
**sitting alone**

**Hearing Dates: 25th – 27th October 2022**
**Judgment handed down: 18th April 2023**

**Counsel for the Appellants:          Advocate A Williams**
**Counsel for the Respondent:          Advocate C H Edwards**

**Cases, legislation and textbooks referred to:**

**Legislation**

**Guernsey:**

**Laws**

*Financial Services Commission (Bailiwick of Guernsey) Law 1987 ss 2(2), 2(4), 8 (1)*
*Housing (Control of Occupation) (Guernsey) Law 1994 s 56 (1)*
*Criminal Justice (Proceeds of Crime) (Bailiwick of Guernsey) Law 1999*
*Regulation of Fiduciaries, Administration Businesses, Company Directors etc (Bailiwick of Guernsey Law 2000 ss 23, 31A-C*
*Prevention of Corruption (Bailiwick of Guernsey) Law 2003*
*Financial Services Commission (Bailiwick of Guernsey) (Amendment) Law 2016 s 3*

*Financial Services Business (Enforcement Powers) (Bailiwick of Guernsey) Law 2020 ss 32, 33, 38, 39, 106*
*Regulation of Fiduciaries, Administration Businesses, Company Directors etc (Bailiwick of Guernsey) Law 2020  ss 3(1)(g), 10, 23, 34, 47(1)(b)(ii), Schedule 1 Para(1) and(2)*

**Statutory Instruments**

*Criminal Justice (Proceeds of Crime) (Financial Services Businesses*)  *(Bailiwick of Guernsey) Regulations 2007 (as amended) Regs 3,4,5,6,7,11,12,13,14,15*

<u>**Cases**</u>

**Guernsey:**

*Bordeaux Services (Guernsey) Limited v GFSC* (Guernsey Judgment 18/2016)
*Carlyle Capital Corporation Ltd v Conway and others* (Guernsey Judgment 36/2017)
*Y v Guernsey Financial Services Commission* (Guernsey Judgment 47/2018)

**England and Wales:**

*Extrasure Travel Insurances Ltd v Scattergood*  [2003] 1 BCLC 598
*R(Khatun) v Newham LBC*  [2005] QB 37
*Re H (Minors)* [1996] AC 563
*Re Doherty* [2008] UKHL 35
*Gokool v Permanent Secretary of the Ministry of Health and Quality of Life* [2008] UKPC 54
*Ivey v Genting Casinos (UK) Ltd (trading as Crockfords Club)* [2017] UKSC 67,
*Wingate v Solicitors Regulatory Authority* [2018] EWCA Civ 366
*Zeramska-Smith v United Lincolnshire Hospitals NHS Trust* [2019] EWHC 552

**European Court of Human Rights:**

*Bryan v United Kingdom* (1995) EHRR 342,
*Kingsley v United Kingdom* [2001] (ECHR Application No 35605/97: Times 9 Jan 2001)

<u>**Regulatory decisions**</u>

*Richmond Fiduciary Group Ltd* (12th April 2018)
*Louvre Trust (Guernsey) Ltd and others* (18th June 2019)
*Safehaven International Ltd and others,* (31st December 2020),
*Hansard Limited, and others* (22nd December 2021)

<u>**Textbooks**</u>

De Smith: *Judicial Review* (7th Ed) paras 11-070, 11-086

**INDEX**

**Paragraph Nos**

**Introduction** 1

**Grounds of the Appeals** 6

    Ground 1 – Error of law/fact in findings of want of probity 7
    Ground 2 – Unreasonable assessment of seriousness of findings of fact 8
    Ground 3 – Retrospective application of power to impose financial penalty 9
    Ground 4 – Failure to pay regard to sanctions in other similar cases 11
    Ground 5 – Human rights (undue interference with possessions) 12

**Commission's response** 13

**My jurisdiction** 15
**Hearing not in private** 34

**Background facts: The Legislative and Regulatory framework.** 41
**Background facts: ATL and the Appellants' respective positions.** 50

**The enforcement process in outline** 60

    **(a) Lead up** 61

    **(b) The Enforcement Procedures** 69

        **(i)**     **Enforcement Investigation** 69
        **(ii)**    **Draft Enforcement Notice and Report ("Draft Notice")** 71
        **(iii)**   **Appellants' Responses** 74
        **(iv)**   **Final Enforcement Notice ("Final Notice")** 79
        **(v)**    **Reference to the SDM** 89
        **(vi)**   **The MTN** 93
        **(vii)**  **Responses to MTN** 98
        **(viii)** **Reply by the Commission** 100
        **(ix)**   **Oral hearing** 102
        **(x)**    **The issue of the Decision** 105

**The Decision** 112

**This Appeal** 126

    **General point** 128
    **Outline** 132

**(1)**   **The "Probity" point** 133

    **(a)**     **Background context** 133

    **(b)**     **Want of Probity - Meaning, burden and standard of proof** 141

        **(i)**     **Basic meaning** 141
        **(ii)**    **Burden and standard of proof** 144
        **(ii)**    **Is the test "objective" or "subjective"?** 150