(c)     The SDM's findings                                                      165
        (i)     X Trust- Facts                                                  166
        (ii)    X Trust - the findings of want of probity                       197
                Mr Domaille                                                     198
                Mrs Hannis                                                      212
                Mr Clarke                                                       241
        (iii)   Y Trust – Facts                                                 242
        (iv)    Y Trust – the findings of want of probity                       247
        (v)     O Co or others?                                                 262

(d)     Late inclusion of charges of want of probity – significance            267

(2)     Other charges against the Appellants of failure to meet the MCL         279

                F Co                                                            285
                D Co                                                            303
                O Co                                                            317
                K Co                                                            323
                R Co                                                            338
                Z Trust/W Co                                                    354

                Systemic Governance Issues                                      375

(3)     Seriousness                                                            397

(4)     Mitigation                                                             402

        (a)     Extenuating factors and explanations                           404
        (b)     Credit for subsequent remedial measures                        406
        (c)     No mitigation credit because of the O Co matter?                412

(5)     The "retrospectivity" point                                            419

(6)     Penalties in other cases                                               445

Review at this point                                                           464

        Discussion and some conclusions                                        465
        Distinguishing between ATL and the Appellants                          468
        The "airbrushing" of Mr Sinclair                                       474
        Further general point                                                  477

Summary of conclusions emerging from general review                            482

Discussion of the principal sanctions                                          484

        Mrs Hannis – Prohibition Order                                         486
        Mrs Hannis – the charges                                               490
        Mrs Hannis – conclusion                                                500

        Mr Domaille – the charges                                              502

**Mr Domaille – Prohibition Order**                         518
**Mr Domaille – Financial penalty**                         527

**Mr Clarke – the charges**                                 533
**Mr Clarke – Prohibition Order**                           546
**Mr Clarke – Financial penalty**                           550

**Public Statement**                                        552

**Miscellaneous**                                           555

**Disposal and costs**                                      558

---

# J U D G M E N T

---

## Introduction

1.  This is an appeal by the three Appellants, respectively "**Mr Domaille**", "**Mr Clarke**" and "**Mrs Hannis**", against the Decision of the Respondent ("**the Commission**"), specifically acting by Mr J Russell Finch, OBE ("**the SDM**") as a Senior Decision Maker of the Commission, issued on 29th July 2022 ("**the Decision**").   The Decision imposed sanctions on each of the Appellants under the Commission's powers contained in the *Financial Services Business (Enforcement Powers) (Bailiwick of Guernsey) Law 2020* ("**the EP Law**").   This was based on various findings, including that the Appellants each failed to meet aspects of the Minimum Criteria for Licensing ("**MCL**") set out in Schedule 1 Articles 1 and 2 of the *Regulation of Fiduciaries, Administration Businesses, Company Directors etc (Bailiwick of Guernsey) Law 2020* ("**the Fiduciaries Law**").

2.  More specifically:

    (i)   the SDM imposed discretionary financial penalties under s 39 of the EP Law upon Mr Domaille, Mr Clarke and Mrs Hannis, of £280,000, £90,000 and £30,000, respectively;

    (ii)   he made Prohibition Orders against each of them pursuant to s 33 of the EP Law, prohibiting each of them from holding the position of Controller, Director, Partner, Manager, Money Laundering Reporting Officer and Money Laundering Compliance Officer for periods of 8 years, 4 years and 3 years, respectively; the sanction is not specific and so this presumably relates universally to any entity operating in the financial services sector in Guernsey as to which the Commission has some regulatory function;

    (iii) in tandem with the Prohibition Orders and pursuant to s 32 of the EP Law he disapplied the exemption under s 3 (1) (g) of the Fiduciaries Law (which prohibits unlicensed individuals from holding more than six separate company directorships simultaneously) in respect of each of them for the same periods of 8 years, 4 years and 3 years, respectively ("**the Disapplication Orders**"); and

(iv)he determined to issue a Public Statement in respect of the Appellants pursuant to s 38 of the EP Law in the terms of a 14-page draft annexed to his Decision.

3. The Appellants each appeal to the Royal Court, pursuant to s 106 of the EP Law, against all of the sanctions imposed upon him/her, except that Mrs Hannis has not appealed against the financial penalty imposed upon her.   Otherwise, each of the Appellants seeks to have the sanctions set aside, in whole or in part, pursuant to s 106 (6) of the EP Law.    The principal sanctions are the Prohibition Orders and the Financial Penalty Orders; the other sanctions are ancillary.

4. The right of appeal conferred on any person aggrieved by a decision to impose such sanctions is set out in s 106 (3) of the EP Law.   The grounds are that

> *"(a) the decision was ultra vires or there was some other error of law*
> *(b) the decision was unreasonable*
> *(c) the decision was made in bad faith*
> *(d) there was a lack of proportionality, or*
> *(e) there was a material error as to the facts or as to the procedure."*

5. The Appellants rely on ground (a) as to error of law, ground (b), ground (d) and ground (e) in relation to facts rather than procedure.   I will consider these grounds in more detail later, but for present purposes, in order to give an outline of the disputed issues, it is sufficient to summarise them as follows.   I do so under the separately identifiable strands of complaint which I extract from the terms of the Notices of Appeal.

**Grounds of the Appeals**

6. Artemis Trustees Limited ("**ATL**") was and is a Guernsey registered company whose business is the provision of financial and fiduciary services.   It was and is itself licensed under the Fiduciaries Law, together with associated "Artemis" companies.    The Appellants had each been holding a relevant position in ATL, as set out in paragraphs [52] – [56] below.

**Ground 1 – Error of law/fact in findings of want of probity**

7. In his Decision, the SDM found that each Appellant had acted "*without probity*" in respect of certain matters as there stated, in the course of performing his/her functions in their respective positions.   The first ground of appeal, with regard to each such finding, is that the SDM erred in law in that he

   (i)   failed correctly to apply the civil burden and standard of proof for an allegation of that nature, i.e. one going to honesty or integrity;

   (ii)  also, but in particular, failed fairly to evaluate each Appellant's own explanation of his/her conduct and to consider whether this was at least as consistent with mere incompetence as it was with (and contrasted with) lack of probity;

   (iii)wrongly held that he was not obliged to consider the Appellant's state of mind and therefore

   (iv)failed to do so, rendering his consequent finding of lack of probity wrong, unsafe and unreasonable; and

(v) in certain instances, made wrong or unjustifiable (on the evidence) findings of fact, upon which he based his finding of lack of probity.

His findings of want of probity had in turn led him in particular to impose the Prohibition Orders on the Appellants, which were therefore unreasonable or disproportionate.

**Ground 2 – Unreasonable assessment of seriousness of findings of fact leading to unreasonable and disproportionate sanctions.**

8.  Next, the SDM also found separately that in his or her conduct whilst holding the relevant position with ATL, each of the Appellants had failed to demonstrate fulfilment of the stated Minimum Criteria for Licensing, scheduled to the relevant legislation.   Aside from the above-criticised findings of lack of probity, the SDM made further factual findings of shortcomings regarding each Appellant which he found to demonstrate that such Appellant was not a "*fit and proper person*" to hold the necessary licence to work in any responsible position in the finance industry in Guernsey.     The Appellants each accepted, and did so fully by the time of the matter being considered by the SDM, that his or her conduct could rightly be said to have fallen short of certain elements of the MCL, as set out in Schedule 1 of the Fiduciaries Law, and they each accepted that it was therefore fair and reasonable that he or she should suffer an appropriate financial penalty and that an appropriate public statement should be made.     However - and this is the second general ground of appeal in each case - each Appellant contends that the SDM's findings of fact made against him or her in respect of such conduct were not fair and reasonable on a proper and balanced assessment of the evidence in that

(i)  in some instances they were demonstrably wrong;

(ii) elsewhere they were an unreasonably harsh or censorious interpretation of the facts; and/or

(iii) they failed to take into account, adequately or at all, mitigating factors advanced by each Appellant.

This had all led the SDM to take un unwarranted view of the degree of seriousness of the Appellants' faults or failures, and in consequence had led to the sanctions imposed by the Decision being unreasonable and disproportionate, first, again, in that they did not justify the making of the Prohibition Orders and second, in the case of Mr Domaille and Mr Clarke, that the financial penalties imposed were excessive.

**Ground 3 – Retrospective application of power to impose financial penalty**

9.  The third discrete ground of appeal applies only to Mr Domaille and Mr Clarke, as it relates only to the financial penalties.     It is that the SDM erred in law in imposing financial penalties calculated under the greatly increased fining powers of the Commission which came into force only on 13th November 2017 (the "**Relevant Date**") when much of the conduct in respect of which such penalties were imposed took place before that date.

10. This challenge is based both on error of law and on intrinsic unreasonableness.    It is contended that in any event, principles of fairness and justice require that any penalties should be calculated, by some process of apportionment, so as to operate the sanctions which were applicable when the relevant conduct took place.   Without this, the penalty offends the principle of non-retrospectivity of penal enactments, quite apart from any argument of general unfairness.   This contention is *a fortiori* in this particular case, it is submitted, because the Commission had previously announced

publicly (on 10th November 2017), that its policy was that it would only invoke its increased fining powers in respect of cases where the offending conduct occurred after the Relevant Date (ie 13th November 2017).   It had subsequently, and the Appellants submitted, unreasonably, changed its position, by making a further announcement on 21st July 2021 that it was thenceforth going to impose fines simply by reference to its new and increased powers.   It produced its initial Draft Enforcement Report signifying its intention to impose the current penalties in this matter just five days later.

**Ground 4–Failure to pay appropriate regard to level of sanctions imposed in other similar cases**

11. The fourth distinct ground of appeal is that the SDM failed, in evaluating the sanctions, to take into account the very significantly less harsh sanctions previously imposed in cases similar to, but actually possibly more serious than, the Appellants' cases here, as (it is submitted) he was required to do under s 39 (6) of the EP Law, and he also failed to give, let alone explain, his reasons for not doing so.   Whilst he referred to certain of those other decisions, they were then apparently just ignored.   The consequence has been to produce penalties, in the present case, which are wholly inconsistent and out of harmony with previous decisions and penalties - even having regard to the increases in fining powers conferred on the Commission from November 2017 - and this in itself is unreasonable, and supports the submission of disproportion.

**Ground 5 – Human rights issues (undue interference with "possessions")**

12. Lastly, albeit under the general umbrella of proportionality and reasonableness, it is argued that the sanctions fail to take adequate account of the fact that the Prohibition Orders are, in effect career-ending.   As such, it is said that they are not merely disproportionate but fail to have proper regard to the Appellants' rights under the Human Rights Convention, and in particular Article 1 of the First Protocol, which protects a person's right to pursue a business trade or profession and the goodwill built up therein, these being part of the "possessions" which a person has a right to enjoy.   Such rights may only be interfered with on public interest grounds and to a proportionate and reasonable extent, in accordance with conditions imposed by law or by international law.    It is argued that the Prohibition Orders step outside this constraint.

**Commission's response**

13. I will naturally examine the Commission's answers to the above points in detail later.  For present purposes, I simply record that the Commission supports its SDM's Decision.  It rejects the suggestion that he made any error of law.  It supports his findings as being perfectly properly and reasonably available to him on the evidence before him; insofar as any errors of fact may appear to have been made, it is submitted that these are very minor, and insufficient to support any argument that the overall conclusions reached, and the sanctions consequently imposed, were not justified or were unreasonable or disproportionate in all the circumstances.

14. The Commission maintains that its approach to the "retrospectivity" point was not unlawful and was in fact reasonable because of the difficulties and the cumbersomeness of any exercise of trying to do otherwise.   Any suggested inconsistency between the sanctions imposed in this instance and those imposed in any previous case is amply explained, and is justifiable, on the grounds of the significant change and increase in the Commission's fining powers in 2017; it is simply a reasonable implementation of these. There is in fact no obligation on the Commission or its SDM to give reasons relating the penalties imposed in any particular case to those imposed in previous decisions.

**My jurisdiction**

15. This is a statutory appeal and I therefore record at the outset some general but important points about my jurisdiction.

16. First, the principles applicable here are not the same as those governing an ordinary civil appeal from a court of first instance to an appellate court.   I need say no more about this, other than that that civil process is broadly based on there having been an error of law in the decision under appeal, either substantive, or procedural, or in the sense of making a finding of fact with no proper evidential basis, or making an error of logical reasoning.  Both these latter can be viewed as errors of law, giving uniformity to the whole scope of possible grounds of appeal.

17. Second the principles applicable here are not the same as those governing an application for judicial review.    This is a more important point, because the situation here has greater similarity. Indeed it may well be convenient to approach an appeal such as this in the same way as one would approach an application for judicial review.   The then Deputy Bailiff did so in *Bordeaux Services (Guernsey) Limited v GFSC* (Guernsey Judgment 18/2016), an appeal in similar circumstances to this present one, but made under the complicated suite of relevant legislation which applied prior to the consolidation of much of it into the Fiduciaries Law and the EP Law, effected from 2021.

18. That does not mean, though, that the principles are exactly the same.   Under judicial review (and leaving aside "procedural mishaps") the court can strike down an administrative act or decision as invalid on the grounds of *ultra vires* or other error of law, a flawed decision-making process (specifically, the relevant authority or tribunal's taking into account logically irrelevant matters or not taking into account logically relevant matters) or for what is known as "*Wednesbury* unreasonableness".  This last is the legal shorthand for a decision which is so illogical, irrational, or just plain perverse that the court takes the view that no reasonable decision-maker in the position of the actual decision-maker could have made it.   Once again, these bases for review are all errors of law in the making of the decision itself.  They all go either to the lawful substance of the decision or to the legality (judged by the intended scope of the authority conferred upon the decision-maker) of the manner in which the decision-maker has made his decision.    A decision made as a "*Wednesbury unreasonable*" exercise of discretion is just not within the discretion which was intended to be conferred; it is thus *ultra vires* or (amounting to the same thing) committing an error of law.

19. It is therefore the case that, on a judicial review, the court may conclude that the decision is not the decision which it would itself have made on the evidence before the decision-maker, but it cannot say that the actual decision was outside the range of decisions which different reasonable people might nonetheless reach on those same materials.   The law recognises that appropriate respect must be accorded to the fact that the relevant discretion has been conferred on the decision-maker and not on the reviewing court.   Unless, therefore, the decision is so extreme as to be unreasonable on the "*Wednesbury*" test, the original decision will not be disturbed.

20. Having said, that, even the *Wednesbury* test is applied, in practice, with a degree of "fact-specific" (or "context-appropriate") flexibility: see De Smith: *Judicial Review* (7th Ed) para 11-086, cited at [28] in *Bordeaux* above, in that

> "*the willingness of the court to invalidate a decision on the grounds that it is unreasonable or disproportionate will be influenced in part by the administrative scheme under review; the subject matter of the decision; the importance of the countervailing rights or interests and the extent of the interference with the right or interest.  Indeed, the intensity of review*

*will differ for the reason that "in public law, context is all".  The threshold of intervention is particularly influenced by the respective institutional competence of the decision-maker and the court."*

At whatever threshold is applied, though, intervention must always be justifiable under the *"Wednesbury"* formula in the particular case, because this is what respects the fact that lawful authority has confided the relevant discretionary judgement to the particular decision-maker and not the court.

21. However, I am concerned, here, not with judicial review, but with a statutorily conferred right of appeal under s 106 (3) of the EP Law, quoted above. In the light of the above comparisons, two sub-paragraphs of that provision are important.

22. The first is ground (b); the appellate court is given express jurisdiction to set aside a decision of the Commission through its SDM on the grounds that it is "*unreasonable*" - and this is provided as a different and distinct ground from an "*error of law*", which is ground (a).    It follows that the jurisdiction under ground (b) is not confined to setting aside a decision only on the extreme grounds of "*Wednesbury*" unreasonableness as applied in judicial review, and amounting, procedurally, to an error of law.   The appellate court here is given jurisdiction to set aside a relevant decision by the Commission for unreasonableness as a matter of fact.

23. This clearly-drawn distinction, and its effect, can be seen in the cases of *Walters v States Housing Authority* 1997-99 GLR 15 (GCA) and *Matheson v States Housing Authority* [1998] 26 GLJ 68 (GCA).  It has been necessary to identify it there in clear terms because of the respective function of Judge and Jurats in the Guernsey Royal Court.  Those cases considered a statutory right of appeal made available on the express ground, similar to the present, that the decision of the Housing Authority to refuse a housing licence was *"an unreasonable exercise of the Authority's powers*": see *Housing (Control of Occupation) (Guernsey) Law 1994 s 56 (1).*    Such an appeal is made to the Ordinary Court comprising the Bailiff sitting with Jurats, where the Bailiff decides all matters of law, but the Jurats are the sole arbiters of questions of fact.

24. It was laid down in *Walters* that if the Bailiff were to conclude that the decision of the Housing Authority was "*Wednesbury* unreasonable", that was a matter of law, and therefore a matter for his decision, and he would withdraw the case from the Jurats and allow the appeal.   However even if he did not do so, he could, and should, still refer the matter to the Jurats, with the direction to consider whether, on all the evidence, they concluded that the decision was "unreasonable" as a matter of fact, although directing them, that such unreasonableness would require something greater than simply that they would not, themselves, have reached the same conclusion.

25. Thus, on a scale of unreasonableness, the point at which a statutory right of appeal on the ground of unreasonableness should result in the appeal being allowed is lower than that of irrationality, perversity or illogicality.    It occurs at the point where the appellate court considers that the decision is not simply a decision which it might well not have made itself, but strikes it as objectively "unreasonable" as a matter of impressionistic fact, even if it would baulk at describing it as irrational or perverse.    Whilst it may be a little difficult actually to define where this test differs from the alternative expression of "*Wednesbury* unreasonableness" -  namely that it be outside the range of decisions which any reasonable decision-maker could have made -  it is quite clear  (and indeed Advocate Edwards for the Commission accepted in argument) that the statutory grounds of appeal do envisage that the test for unreasonableness as a matter of fact on an appeal under s 106 (3) (b) of the EP Law must be lower than the test for a successful allegation of "*Wednesbury* unreasonableness" upon judicial review.

26. As both sides have referred me to the *dicta* of the Deputy Bailiff in *Bordeaux* with regard to approaching an appeal against the imposition of sanctions under the precursor of the EP Law, and in particular [30] of that decision, I need to refer to this here.   The Deputy Bailiff there said.

> "*Ultimately what matters is whether the GFSC has achieved a fair balance.  This can involve consideration of whether the Senior Decision Maker has given disproportionate weight to one or more of the considerations relevant to his Decision, and, if so, whether it is of such significance that the aspect of the Decision affected falls outside the range of reasonable responses that could follow in the circumstances of the case (see eg, Lord Carswell in Gokool v Permanent Secretary of the Ministry of Health and Quality of Life [2008] UKPC 54).   It can also involve consideration of whether the end-product of the Decision amounts to a disproportionate interference with an appellant's rights or interests, which is sometimes referred to as an 'oppressive' decision.  At para. 11-070 in De Smith's Judicial Review, the comment of Laws LJ in R(Khatun) v Newham LBC [2005] QB 37 is quoted:*
>
> > '*Clearly a public body may choose to deploy powers it enjoys under statute in so draconian a fashion that the hardship suffered by affected individuals in consequence will justify the court in condemning the exercise as irrational and perverse.*'
>
> *In such a case, the review is less about process and more about outcome. ...*"

27. It is, however, plain from these citations that the cases being referred to by the Deputy Bailiff are cases of judicial review properly so-called.    Whilst, therefore, this citation certainly suggests methods of approach by which one might arrive at the ultimate conclusion that a decision of an SDM should not be upheld, the standards there described for such a conclusion are those of judicial review.      I consider that it is the second approach (outcome) which is the more appropriate assessment for the present situation, always remembering that it is not necessary to go so far as to find the decision "*irrational and perverse*" as set out above but merely that it is factually "*unreasonable*".    Looking at matters disclosed upon the former approach (examining process and conduct) may, however, provide a cross-check, by disclosing possible reasons why a decision may have tipped over into unreasonableness, and thus serve to support a conclusion reached on the latter basis of examining the outcome.

28. The second relevant prescribed ground of appeal here is ground (d), "*lack of proportionality*".  Although that is sometimes said to be another way of describing a decision which is "oppressive" I do not think such a paraphrase serves any useful purpose.   This ground actually provides a similar, but more focused, ground of appeal than simply factual unreasonableness although it could fairly be said that it would be a sub-category of unreasonableness.     Usefully, it does not entail the potential difficulties of analysis imported by the concept of "unreasonableness" as a matter of law or fact discussed above.  It endorses a ground of appeal which is plainly included so as to provide an overriding objective check on the exercise of powers of the Commission, which are potentially draconian and which therefore must be exercised with appropriate care and balance (see *Bordeaux* above).

29. Put broadly, whilst the Commission does not itself lay down the statutory stipulations of either primary or secondary legislation, the Commission has been given powers, in pursuit of the implementation of these stipulations, to prescribe rules, codes of conduct, guidance and principles, which it has done very extensively, and all of which it then relies on as framework and justification for the exercise of its powers of enforcement against both entities and individuals.  In sporting terms, it writes a lot of the rules of the game, but then also acts as the referee.    In more legal terms, in performing its enforcement function it operates variously as policeman,

prosecuting authority, jury, and judge.  Any institution will develop its own ethos and focus, and where there is such a concentration of functions within one institution, the importance of having some external and dispassionate check on the proportionality of the outcome is obvious.

30. This leads to the third, and, in my judgment, very important, point about my jurisdiction.   The regulatory and enforcement powers conferred on the Commission by the EP Law are exercised through an "internal" process, in the sense that the effective decisions are all made by officers or commissioners of the Commission itself or, ultimately, in the case of what the Commission apparently deems its *major enforcement cases*", by an SDM appointed and remunerated by the Commission.   But because those decisions impinge significantly on the civil rights of those who are subjected to them, that enforcement process engages their "human rights", and in particular the provisions of Article 6 (1) of the European Convention on Human Rights which protects an individual's right to have disputes regarding his civil (and criminal) rights and obligations determined by an adjudicating body which is an independent and impartial tribunal.      This remains so notwithstanding the fact that, as was observed by the then Deputy Bailiff in *Y v Guernsey Financial Services Commission* (Guernsey Judgement 47/2018) at [123], the mechanism for appointing an SDM – from a panel comprising largely English KCs, although in this particular case the appointee was, rather, a retired Judge of the Royal Court – was

> "… *intended to introduce a regime as close as it can come without referring the decision to an external person by giving it a semblance of impartiality and independence*".

31. However, in  *Y v GFSC* the Deputy Bailiff also held at [115], following *dicta* in *Kingsley v United Kingdom* [2001] (ECHR Application No 35605/97: Times 9 Jan 2001) and *Bryan v United Kingdom (*1995) EHRR 342, that the rights of appeal conferred by the then precursor of s 106 of the EP Law, (see s 19 (4) of the *Regulation of Fiduciaries, Administration Businesses, Company Directors etc (Bailiwick of Guernsey Law)* 2000 ("**the 2000 Fiduciaries Law"**)) were sufficient to render the enforcement process convention compliant, because

> "….*provided there is a right of appeal to a court of full jurisdiction, it means not just that any breach of the ECHR is purged, but it prevents such a breach from occurring in the first place."*

32. To have that effect, though, such rights of appeal must be sufficiently "*full*".   The Deputy Bailiff there concluded that rights of appeal, in identical terms to those here, coupled with the extent of the powers available to the Court on such an appeal, did meet that requirement.   That was because the Royal Court effectively had full power to provide an efficacious remedy in respect of any matter of complaint about the decision of an SDM which an appellant might wish to raise, if it were justified, whether by setting aside such decision or any part of it, or through its power to remit such decision to the Commission with appropriate directions.

33. The centrally important point which I take from all the above, however, is this.   My function, as the appellate tribunal from the Decision of the SDM in this case, is not so much that of an appellate court, or a reviewing court, but is the last component step in a convention compliant process of adjudicating finally upon the disputed rights and obligations of the Appellants arising from the process of enforcement which has been exercised in respect of them by the Guernsey Financial Services Commission.   To my mind, this serves to underline, forcefully, that my jurisdiction imports not only a power to correct mistakes of law or of a procedural nature which I may find to have affected the Decision in question, but also an element of original and independent authority

to appraise and evaluate the materials in the case, in particular, in considering whether the outcome may be flawed under the terms of grounds of appeal (b) and (d).

**Hearing not in private**

34. At the outset of this appeal, I was invited by Advocate Williams on behalf of the Appellants to rule that this hearing should be in camera.   He did so, relying on the proposition that publicity with regard to the contested Prohibition Orders, in particular, would have a ruinous effect on his clients' reputations and potentially cause them irreparable damage to their business or livelihoods. He submitted that this would be the case even if the appeal were ultimately successful because public reaction to the mere fact of its existence would be so damaging.   Other such appeals, he pointed out, had been held in camera, and reported judgments had been anonymised.

35. On behalf of the Commission, Advocate Edwards objected that there should be no such ruling in favour of privacy.   He submitted that the reason why appeals had previously apparently all been held in private and with reports anonymised had been that up to 2021, whilst there had been no universal rule that appeals under the Law should be conducted in private, statute had decreed that appeals in relation to the publication of a Public Statement should be held in private.    The courts had found it impossible to distinguish the facts relevant to such an appeal from facts which could be said to relate only to appeals on other aspects of any case, and had therefore been forced to conclude that those other appeals would have to be held in private as well.

36. However, the statutory requirement that appeals with regard to public statements should be held in private had been removed by the EP Law in 2021, such that, now, the rules relating to privacy of hearings are simply those of the general law.   The presumption there of "open justice" is that court hearings take place in public unless there is some consideration suggesting that such publicity is likely to defeat the very ends of justice.   Only then is it appropriate to direct a hearing to take place in private, and in that case any privacy order is governed by a test of necessity; only such privacy (which might not go so far as requiring a hearing to be held in private) as is necessary to ensure that the interests of justice are not prejudiced, or that the properly recognised rights of third parties are respected, would justify a privacy order.   That, he submitted, did not arise here. To emphasise that privacy is not ordered simply because publicity would be distressing, embarrassing or damaging to a party, he cited, amongst other cases, a dictum from *Zeramska-Smith v United Lincolnshire Hospitals NHS Trust* [2019] EWHC 552, in which clinical negligence proceedings would involve the claimant disclosing highly embarrassing personal medical details, but the court nonetheless refused to order the hearing to take place in private, saying

> *"Having chosen to bring these proceedings in order to secure damages arising out of that tragedy, the claimant cannot avoid the consequences of having made that decision in terms of the principles of open justice and the consequent publicity potentially associated with such proceedings being heard in open court."*

37. I was somewhat surprised that this last citation was relied on because I think it a complete distortion to suggest that the Appellants in this case have "chosen" to bring these proceedings, when they had no other option to avoid undesirable publicity, their only other option being to submit to the non-negotiable sanctions imposed by the Commission which they regard as unjust. I did not find it at all persuasive.

38. However, I did not grant the Appellants' application for privacy either.   As I pointed out to the Appellants, if the appeal fails, any adverse publicity will not have been unjustified, and if it succeeds then they will be in a position to explain that the Commission's Decision has been held

to be unjustified.   I considered that this gave them all the protection to which they were entitled. I did not consider that protection from adverse but ill-informed reactions from third parties, arising solely from the fact of sanctions having been once recommended even if then successfully challenged, could be said to defeat the interests of justice, and certainly not to a sufficient extent as to override the general and highly salutary principle of open justice.

39. However, I did accept that there were matters to which reference would inevitably be made in submissions in court which involved the client confidentiality of third parties, and that it would be correct to protect such third parties.   I ordered, therefore, that the hearing would not take place in private, but that in the event that any person not attached to the parties and their legal teams came into the public gallery, I would immediately direct that any references to ATL's clients and their associates by which they or their affairs could be identified should be referred to in some manner which would provide anonymity for them.    In practice, no member of the public sought to attend any part of the hearing, so it was possible to conduct it in the normal way, which was obviously quicker and more convenient.

40. This does, however, have two consequences.    First, I have directed that any request made by a non-party for a transcript of any part of the proceedings would/will have to be met only by a transcript which has been anonymised appropriately, and, second, any public version of this judgment (and I will be directing that there should be such a version) will itself have to be anonymised accordingly.

**Background facts - The Legislative and Regulatory framework**

41. I have recorded above that the Commission's powers and this appeal process operate under the EP Law and the Fiduciaries Law, both of 2020 though coming into force on 1st November 2021. However, a general overview of the legislative and regulatory background and framework is necessary context.

42. The Commission itself was established under the *Financial Services Commission (Bailiwick of Guernsey) Law 1987* ("**the 1987 FSC Law**"), which has subsequently been amended several times.   It was set up initially for the purposes of protecting the public in its engagement with various finance sectors, and was granted a general overarching function, as well as taking over some statutory functions previously exercised by a Committee of the States.  These latter are not relevant here, but underline that the Commission regulates many sectors of the finance industry other than just that of fiduciary services providers, with which this appeal is concerned.

43. The relevant general functions of the Commission are laid down in Section 2 (2) of the 1987 FSC Law, (as amended) and are:

> "(a)    to take such steps as the Commission considers necessary or expedient for the [...] effective supervision of finance business in the Bailiwick
>
> ...
>
> "(d)    the countering of financial crime and of the financing of terrorism [this was inserted by amendment in 2002] ...
>
> "(e)    to take such steps as the Commission considers necessary or expedient for –

> (i)    *maintaining confidence in the Bailiwick's financial services sector and*
>
> (ii)   *the safety, soundness and integrity of that part of the Bailiwick's financial services sector for which it has supervisory responsibility ...."*

By Section 2 (4)

> *"(4)   In the exercise of its ... functions the Commission may take into account any matter which it considers appropriate but shall in particular have regard to -*
>
> *(a) the protection of the public interest including the protection of the public against financial loss due to dishonesty incompetence or malpractice by persons carrying on finance business, and*
>
> *(b) the protection and enhancement of the reputation of the Bailiwick as a financial centre."*

By Section 8, (1)

> *"(1)   The Commission may do anything which appears to it to be conducive to the carrying out of its functions or to be incidental to their proper discharge."*

44. This is already very wide, but the Commission's sphere of operation and its powers have been even further expanded over the intervening years, as enactments and regulatory processes to combat corruption, money laundering and the financing of terrorism have been added to enactments designed to protect the public from malpractice, and as the Commission has sought, and apparently been readily granted by the States, ever greater powers of supervision, control and intervention in finance sector businesses. It was plainly (and I am not saying unreasonably) judged unnecessary, for the purposes of this appeal, to take me through the history of the Commission's relevant powers prior to 2020, but that history is quite impenetrable without expert assistance, largely because of the proliferation of primary and secondary enactments on different topics, and frequent amendments.

45. However, the broad background position as I understand it is that, as to primary legislation:

   a. the Fiduciaries Law and its predecessors provide for the Commission's power to license and supervise entities and individuals concerned in providing fiduciary services, and also the administration of their businesses. Minimum Criteria for Licensing (relating to integrity, competence and diligence) have been laid down in the pertinent "Schedule 1" to that Law since at least the time of the preceding 2000 Fiduciaries Law*;*

   b. various other laws, such as *The Criminal Justice (Proceeds of Crime) (Bailiwick of Guernsey) Law 1999* and *The Prevention of Corruption (Bailiwick of Guernsey) Law 2003* have introduced requirements and standards which affect the conduct of financial services business in Guernsey and they have therefore expanded the ambit of the Commission's regulatory powers either directly or indirectly; and

   c. general enforcement powers were originally provided to the Commission in s 11 of the 1987 FSC Law, but were subsequently extended in 2008 by amendments inserting

additional sections up to a s 11H.  These were finally repealed and consolidated into the EP Law in 2020; this is now the definitive source of such powers since 1ˢᵗ November 2021.

46. For present purposes, one important landmark event in this legislative development is that the Commission's power to impose discretionary financial penalties, when updated in 2008, provided for a maximum fine of £200,000 as against either a licensed entity or an individual person.   However, by the *Financial Services Commission (Bailiwick of Guernsey) Amendment Law 2016, ("the 2016 FSC Law")* which came into force on 13ᵗʰ November 2017, that maximum level was increased to £400,000 in respect of an individual, and £4,000,000 in respect of a licensed entity save that any such penalty in excess of £300,000 must not exceed 10% of the entity's *"turnover"*.  (This is, presumably, annual turnover, but in a rather unusual provision at s 3 (1B) of the 2016 FSC Law, the States is given a further power, after consultations, to make provision in respect of *"the meaning"* of that term, although it had not done this, even by the time of the EP Law in 2020.)

47. As to secondary legislation, the most important enactment is *The Criminal Justice (Proceeds of Crime) (Financial Services Businesses) (Bailiwick of Guernsey) Regulations 2007,* made under the similarly named Law of 1999, which came into force on 15ᵗʰ December 2007.  It replaced (amending yet again) a sequence of Regulations ("**Regulations**") made initially in 1999, which laid obligations on finance businesses as to their conduct, with a view to forestalling and preventing financial crime.  The Regulations stipulated matters such as obligatory business risk assessments, annually for their own business and periodically for their business relationships (Reg 3), performing appropriate customer due diligence, (Regs 4-7), effective monitoring of business relationships (Reg 11), reporting suspicious activities (Reg 12), employee screening and training (Reg 13), record keeping (Reg 14), having recorded policies on such matters and having effective procedures and controls to implement and maintain them (Reg 15), and all this is laid down now in noteworthy detail, even if there was not so much in the first iteration of the Regulations.  The Commission naturally was, or became, the supervising authority for the implementation of these Regulations.

48. But beyond this, under the various enactments above, the Commission has also itself been given powers to issue rules, (see expressly, for example, s 34 of the Fiduciaries Law, previously ss 31A-C of the 2000 Fiduciaries Law), guidance, codes, directions and instructions as to the conduct of financial services business and businesses, in all manner of instances.   The most important for present purposes is the Commission's *Handbook for Financial Services Businesses on Countering Financial Crime and Terrorist Financing*, ("**The Handbook**") first issued in 2007 and brought into force on 1ˢᵗ December that year.   The Handbook has similarly been subject to many updates and amendments over the years, with the most recent being, I understand, in 2019.  The Handbook was originally applied only to new business taken on after it came into force on 1ˢᵗ December 2007, but in November 2009, further directions were given by the Commission that by 31ˢᵗ March 2010 the Handbook's precepts should be extended to all business, even if initiated before 1ˢᵗ December 2007.    The Handbook contains rules which apparently number as far as the high 300s, but, on examination, a Handbook rule takes its number from the particular numbered paragraph in which it is laid down, and not all of them contain rules, so that the actual number of such rules is probably only about half that.  Apart from the Handbook, the Commission has issued the Financial Sector Code of Corporate Governance ("**the CCG**"), the Trust Service Providers Code ("**the TSP Code**") and the Principles of Conduct of Finance Business ("**the Principles**").  This last appears now to have been incorporated into primary legislation as s 10 of the Fiduciaries Law.

49. The precise status of such rules, guidance, codes, etc is not always clear but I understand the general effect to be that, whilst a breach of such measures is not in itself an offence (except, of course, where legislation has so enacted) the Commission will have regard to such breaches in exercising its regulatory powers, and in any legal proceedings the Court will have regard to such measures as evidence, where they are material to any issue in the proceedings (see, eg s 47 (1) (b) (ii) and s 56(3)(b) of the Fiduciaries Law).

**Background facts: ATL and the Appellants' respective positions.**

50. ATL was incorporated in March 2001 and granted a Fiduciary Licence in August 2002, before the time when many of the provisions of the financial services rules, Regulations and enforcement laws which are now relevant were enacted. It was founded between Mr Domaille, Mr Robert Sinclair, and certain others as co-founding shareholders, but eventually, as those others left and sold their shares to Mr Domaille and Mr Sinclair, those two became the only shareholders, with Mr Domaille owning a slight majority shareholding of 50.73% to Mr Sinclair's 49.27%. They had split off from being employed previously in the financial services industry by a large UK-based organisation, Saffery Champness. They decided to go their own way when they became dissatisfied with the recognition and reward given to them by that firm for their work in Guernsey.

51. ATL is actually the head "licensee" of a group of joint licensee companies, Artemis Corporate Services Limited, Artemis Nominees Limited and Artemis Secretaries Limited, but for simplicity ATL has been treated as the single relevant responsible entity in this matter. ATL also has a sister company, Artemis SARL, which is owned similarly, and which operates in general as the provider of manpower to ATL, being the employer for all ATL staff. Artemis SARL figures only peripherally in the relevant events.

52. Mr Domaille and Mr Sinclair were the main Board Directors, termed the "Executive Directors" of ATL at all relevant times. Early on they became the only main Board Directors, but from November 2009 until February 2016 they were joined by a Mr Dave Larkin. He was previously an Associate Director, a position which, in ATL, denotes senior management status but not executive Board membership. Mr Larkin resigned from his position as Director, and in fact left ATL completely, following a motorcycle accident in October 2015, after which he never returned fully to work. He has not, in the event, figured at all in the Decision or these proceedings, although he was interviewed by the Commission's Enforcement Division ("**the ED**").

53. Mr Domaille was an Executive Director of ATL from the time of its incorporation until June 2019, at which point he became Managing Director. Mr Sinclair was Managing Director of ATL from its incorporation until June 2019. He was also ATL's Money Laundering Reporting Officer from October 2008 to June 2019 and Money Laundering Compliance Officer from March 2019 to May 2019.

54. The changes of position which took place in or about May/June 2019 arose because of disagreements between Mr Sinclair and Mr Domaille, which were fall-out from a personality clash following the inspection visit of the Commission in 2018-19 which resulted in the enforcement proceedings with which I am now concerned. This was the catalyst for Mr Domaille to use his powers as the slight majority shareholder to remove Mr Sinclair as a Director, and in fact from any involvement with ATL or its operation, except as shareholder.

55. Mr Clarke was an Associate Director of ATL from January 2011 to November 2015, when he became an Executive Director, ie a Board Member.  He has remained in that capacity ever since, although I believe that he has now moved on to another firm.

56. Mrs Hannis joined ATL in March 2011 as a Manager, a position which she held until December 2016 when she was promoted to Associate Director.  This position brought her involvement in management meetings but not (except by invitation to attend) in Board meetings, which discussed privately matters such as the financial affairs of ATL itself.   Mrs Hannis became an Executive Director, ie a full Board Member, in June 2019, along with another of ATL's team leaders, at the time of the departure of Mr Sinclair.   She resigned as a Director on 8th June 2022.

57. The Decision records that in September 2019 ATL had 595 clients in total, of whom 192 were rated as "high risk" business, and 403 as "standard risk".      "High risk" is a classification stipulated by the Commission in furtherance of its policy of "risk related supervision" of financial services and fiduciary businesses.   It denotes that, owing to their connections with particular countries, particular positions of power or influence, or particularly notorious activities (eg cryptocurrencies, mining, major construction projects), such clients import a greater risk of being associated with financial crime than would be "standard".   Such discriminatory classifications are, of course, quite logical in the context of combatting financial crime.      High risk clients are deemed by the Commission to require more frequent and more intense oversight and monitoring of activity than standard risk clients.   The ratio of ATL's business was thus approximately 1:2 of high risk to standard risk, and that ratio has remained broadly constant at this level during the Relevant Period for present purposes, which is from 2014 to July 2021 (see [71] below).

58. The Decision also records that ATL's annual turnover for 1st May 2019 to 30th April 2020 was reported as approximately £6 million.   I believe it has generally been at around this level, or slightly higher, during the Relevant Period.

59. Whilst I have not been given total staff numbers, it is apparent from the quarterly compliance reports and other management documents in evidence in the case that, during the Relevant Period, ATL's business was run in four different sections, or teams, each with several members of staff, of varying grades, allocated to them.

**The enforcement process in outline**

60. The process which has led ultimately to this appeal is, of course, designed to provide a transparent, comprehensible and objectively reasonable process, compliant with general principles of natural justice.   This does, however, mean that it is quite convoluted and lengthy, and generates a large amount of written materials and exhibits in practice – and these evolve.  Rather than simply describe the steps in the process in the abstract, I will set them out through an account of the manner and the timing by which the enforcement process progressed in this case, with some description or examples to give the flavour, albeit without referring to all the detail which may be necessary later.

**(a) Lead up**

61. As the statutory licensor and regulator of financial services in Guernsey, the Commission makes inspection visits to licensees, such as ATL, when it deems appropriate.  It made a "Full Risk Assessment" visit to ATL in December 2018.  This was notified in advance by a letter dated 1st October 2018, which required, for such visit, the provision of facilities, the availability of personnel, the pre-visit completion of various report forms and the delivery of copious

supporting documentation, put into the form which the Commission required.    (It is an aside, but I note that the direct and indirect expenses to which a regulated business is put in order to comply, not merely with the actual regulations, but also with any demands of the Commission as to co-operative assistance, or remedial or other measures, are not insubstantial.)

62. Some history needs to be noted.    There had been a previous Full Risk Assessment of ATL conducted by the Commission's Fiduciary Supervision and Policy Division in 2014.  This was focused on ATL's own, internal corporate governance.  Deficiencies in ATL's operational systems were then perceived which caused the Commission to recommend that ATL should appoint a Non-Executive Director (NED) to the Board, and to require ATL to commission a third-party review of its corporate governance.   This review was provided by Madihan Limited.  Their report actually made reasonably positive statements about ATL's governance and the engagement of its Directors, but its main critical finding was that a very significant risk issue for ATL rested in the fact that, with the Board being small (then only three persons), Mr Sinclair had a multiplicity of roles, including (it was noted) Information Technology, compliance obligations, human resources, FATCA obligations, and operational and corporate secretarial matters, in addition to overseeing some client relationships.   I observe, to give further context, that Mr Sinclair's wife carried out book-keeping and similar functions for ATL and ATL SARL.  However, no structural changes were made by ATL following the Madihan report (unsurprisingly, this was a subsequent criticism from the Commission), and Mr Sinclair continued with this range of involvement and responsibilities until the fall-out of June 2019.  Mr Domaille was involved, in contrast, principally with overseeing client relationships and the securing of business, although he of course still had all the duties and responsibilities towards the management of ATL's business that are required of any company director.

63. A possibly less intense, "Fiduciary Engagement Visit" was undertaken by the Commission's Fiduciary Supervision Policy and Innovations Division in 2016, generally reviewing ATL's business model, governance, conduct of business and operational risk.   As previously noted, the Commission's statutory responsibilities are not confined to regulating how fiduciaries and financial services entities conduct external business, but also extend to monitoring their own operations, since, of course, the collapse of any such entity might have significant reputational consequences for the Bailiwick.  This inspection, though, revealed deficiencies including a great number (apparently stated to be as many as 1461) of "outstanding action points" in ATL's records and the Commission therefore required ATL to initiate a Risk Mitigation Programme in this respect.   However, when ATL, through Mr Sinclair, produced an informal work plan and gave information as to the apparently reduced number of outstanding action points in October 2017, this was regarded as acceptable and no further action was taken.  Within the complaints now made by the Commission, it is asserted that ATL only achieved the Commission's satisfaction in this regard by Mr Sinclair's giving misleading information in his reporting letter.

64. I infer, though, that no criticisms of anyone's probity were made upon either of these earlier inspection visits, since none has been cited here, when it would obviously have been highly material if there had been.   Interestingly, the facts of several of the specific charges now relied on and labeled "serious" are matters which had occurred well before the times of such previous visits, especially the 2016 one.    However, I do not know what files will have then been inspected, or whether the focus of such inspections would have included any of the files which have now been examined and relied upon.

65. The relevant "Full Risk Assessment" first mentioned above, which was undertaken in 2018-19, added "financial crime risk" to the scope of the review, and this time it was undertaken by the Commission's Financial Crime Division, assisted by the Investment Fiduciary and Pension Division.     The post-visit letter of 14th May 2019 assessed that ATL's "Financial Crime,

Governance and Operational risk" levels were "*disproportionately high*", and asserted that this therefore represented an *"unacceptable risk to the Bailiwick's reputation"*, citing that the Board of ATL "*lacked independent challenge*" and judging that it had "*failed [suitably to] invest in a proportionate governance and compliance framework*". In view of the "*seriousness*" of the potential findings identified, it was proposed to refer ATL to the Commission's Enforcement Division, but in any event to require certain immediate steps to be taken by ATL and notified to the Commission, and lastly to impose a restriction on ATL's licence. However, this restriction did <u>not</u> relate to the conduct of ATL's business but, rather, to what the Commission perceived, on an objective basis of its own assessment, to be an unacceptable level of bad debts. The Commission imposed a requirement - which ATL in fact had no difficulty at all in fulfilling - to maintain liquid assets to a value not less than 35% of its annual expenditure.

66. As regards compliance related shortcomings, the letter listed about a dozen stated areas of concern on various and varied matters, derived (apparently) from file sampling, reviewing records and interviewing staff. It ranged through: the continuing existence of a very significant number of outstanding action points and client reviews; a failure to identify what the Commission viewed as "*red flags*" in relation to certain client activities; having a Business Risk Assessment which did not expressly address terrorist financing risk; a failure to manage or minimise conflicts of interest and (but this may be the same thing) a lack of "controls" around ATL's gifts and hospitality policy; down to a stated instance of use of a personal email to communicate sensitive information. It was the cumulative effect of all these with the "operational" risks previously mentioned, and the fact that many were viewed as being repeat failings from the earlier visits, which were then held to suggest a

> "*potentially systemic failure by [ATL] to <u>identify</u> all the risks which it is exposed to*" (*emphasis added*).

67. ATL responded promptly to this letter on 31 May 2019, questioning some minor factual inaccuracies, but generally acknowledging very many areas where improvements could and would be made and setting out the steps taken to do so, accepting that very many of the noted deficiencies had been breaches of some of the very great number of Regulations, rules, codes of conduct, guidance and instructions which were either applied or issued by the Commission.

68. On 4th September 2019 the Commission then sent its "final response" letter in respect of this 2018/2019 Full Risk Assessment of ATL. It noted the steps which ATL had taken to deal with the Commission's concerns arising from the Supervisory Board's Assessment, and it made some further specific requirements of certain actions to be taken within set deadlines, such as reviewing particular operational policies, appointing certain further officers and engaging an approved third party to test the effectiveness of ATL's revised policies, procedures and controls. (This last was carried out by LMRR, who later reported back in July 2020.) However, this final response letter also stated that

> "*Whilst the Commission is encouraged by the progress made by the Firm and the attitude of the Board it remains of the view that the concerns raised during the Full Risk assessment <u>regarding past practices at the Firm</u> require further investigation by the Commission's Enforcement Division*." (emphasis added).

Consequently, and in fact already at the time the letter was dated, the Commission referred ATL to the ED, on 30th August 2019.

**(b) The Enforcement Procedures**

### (i) Enforcement Investigation

69. The ED commenced its own Investigation of ATL after introductory meetings.   It demanded (as it was of course entitled to do) information, under s 23 of the 2000 Fiduciaries Law.   The first such notice was issued on 6th November 2019 and required the production of 21 further client files as a representative sample of ATL's business relationships, together with further information both as to specific matters identified during the Full Risk Assessment visit and extensive general records and registers, and it specified precisely how such information must be provided, in electronic format.

70. The ED continued its investigation, though no doubt somewhat hampered from March 2020 by the Covid pandemic.   It issued a second s 23 Notice on 20th July 2020.   It invited the Appellants and Mr Sinclair to "voluntary interviews" in November and December 2020, although Mr Sinclair's interview was canceled and not rescheduled.   The transcripts of the Appellants' interviews and the unused transcript of the interview of Mr Larkin, in April 2021, are included in the papers before the court.   The ED later issued a third s 23 Notice against Mr Sinclair only, but that was never responded to.

### (ii) Draft Enforcement Notice and Report ("Draft Notice")

71. After a process including a first review by an internal Case Review Panel (according to the Commission's description of its enforcement procedures; I do not know its constitution), the ED produced and served a Draft Enforcement Notice and Report which was dated 26th July 2021. This was a document of 102 pages and 489 paragraphs, with supporting exhibits.   It stated that it related to the "Relevant Period", specifying this as being from 2014 to July 2021, but it stated that it would also "*refer to*" breaches earlier than this period.   It listed 13 matters, initially described as "allegations" but subsequently as "breaches", by reference to some 16 (by my count) different stipulations in the Regulations, rules, codes, instructions or principles applicable (either by law or by issuance from the Commission) to finance businesses.   These were made against both ATL in general and, in particular respects, against Messrs Sinclair, Domaille and Clarke and Mrs Hannis.

72. As regards the present Appellants, it recommended the very sanctions which were ultimately imposed by the SDM against Mr Domaille and Mr Clarke as noted above, but as against Mrs Hannis the "*discretionary financial penalty*" (ie fine, as I will now proceed to call it) then recommended was £45,000, and the proposed Prohibition Order was for 4 years.   As against ATL itself, the Notice recommended a fine of £500,000 and the issuance of a public statement. As against Mr Sinclair, it recommended identical sanctions to those recommended against Mr Domaille.

73. I infer from subsequent reaction that this verdict came as something of a shock for the Appellants.

### (iii) Appellants' Responses

74. As they were entitled to do under the Commission's Enforcement Procedures, on 15th October 2021, both ATL and the three Appellants submitted, through their Advocates, Appleby (Guernsey) LLP ("**Appleby**"), a response to the Draft Notice.   This was a document of 188 pages and 654 paragraphs.  It included a closely-referenced response, paragraph by paragraph, to the Draft Notice, and a critique of the proposed sanctions, by reference to the various matters which the Commission is statutorily obliged to consider when determining the imposition of

sanctions (see ss 38 (6) and 39 (6) of the EP Law).   It is necessary (but sufficient here) to give a general outline of the points made.

75. Whilst ATL and the Appellants admitted, as such, many of the allegations and breaches of rules, Regulations, (etc) which were asserted, they contested either the existence, or the true seriousness, of some of these, on the grounds of errors of fact, unwarranted assumptions, or a submitted unfair interpretation or characterisation of events.   A recurring complaint was that of a suggested lack of a balance in the Draft Notice.   It was said that only negative aspects or findings were cited as regards some of the incidents, and positive facts or aspects were ignored. The LMRR report on ATL, which the Commission had required ATL to commission, was also treated in that way.   It was further submitted that there was a complete failure to take into account, and give credit for, the very significant steps which ATL (through Mr Domaille in particular) had taken since June 2019 to remedy the general failings which the Commission had (rightly, it was accepted) identified.   This was not least in expelling Mr Sinclair, and appointing experienced and competent additional directors and staff, as well as making revisions to procedures.

76. It was further submitted that there was an inconsistency, amounting to disproportion, in the level of the sanctions proposed by the ED when compared with those previously imposed by the Commission on delinquent financial services providers.   It was argued that the imposition of Prohibition Orders on the individual Appellants was entirely unwarranted given that there was (it was submitted) no evidence that they actually posed any danger to the public or to the reputation of the Bailiwick.   In particular, it was pointed out, there were no findings of lack of probity against any of the present individual Appellants, in contrast to such a finding being made against Mr Sinclair.   It was further submitted that equating the sanctions recommended against Mr Domaille with those proposed against Mr Sinclair was disproportionate, having regard to the marked difference in the nature and gravity of certain charges made against the latter.

77. The language of the Response, whilst always respectful, did not shrink from using forceful epithets (eg "*irrational*") in places, nor from reminding the Commission in some detail, of its public law duties with regard to fairness and natural justice.

78. Mr Sinclair apparently made a separate response, which I have not seen.

### (iv) Final Enforcement Notice ("Final Notice")

79. In a process which involved a second Case Review Panel, the Commission considered the responses made, and eventually issued a Final Enforcement Notice on 20th December 2021, together with a tracked change version of this, helpfully indicating where it differed from the original Draft Notice.   But before turning to this a further interim matter needs mentioning.

80. On 21st July 2021, in fact just a few days before the Draft Notice had been issued, ATL – by this time through Mr Domaille, as Mr Sinclair was no longer in office – had been obliged, under Section 2.7 of the Commission's Handbook, to "self-report" a regulatory breach, in respect of a Guernsey company ("**O Co**") and an associated trust which owned that company, both of which ATL administered.   Mr C, a Polish national, was the settlor of the Trust. In brief, very substantial loans had been made to O Co in 2006-7 (before the coming into force of the Handbook) by a Lichtenstein Anstalt, (the "**T Anstalt**") and ATL had not, at that time, established the identity of the ultimate beneficial owner ("**UBO**") of the T Anstalt and nor, therefore, the legitimacy of the source of funds or source of wealth ("**SoF/W**") behind such loans.   O Co had in fact been virtually dormant since 2011, but whilst the omission had been noticed and enquiries pursued in

2013, these attempts had (from the files) been inexplicably signed off as "complete" in 2014, when they had not been.

81. In 2018, this incomplete due diligence had been noticed and further attempts had been made to pursue it, but had met with lack of co-operation from the administrators of the T Anstalt, in terms which the SDM regarded as "*insulting to anyone's intelligence*": Decision at [117].  A Suspicious Activity Report ("**SAR**") had been raised at the time, but Mr Sinclair, as the then MLRO of ATL, had decided not to "externalise" this to the Guernsey Financial Intelligence Unit ("**the FIU**"), and the situation had again been signed off, until raised once more, very recently, by a concerned junior employee.  Urgent investigations between May and July 2021 had received the initial eyebrow-raising response that the original funds had come from Mr C's lawyer, Mr KS, who was a wealthy close friend of Mr C and now his executor, and were derived from an investment in a company involved in the construction of Polish toll roads in which they had both been heavily invested.   But in July 2021 Mr KS had confirmed that the funds had in fact been Mr C's.   As it had come to ATL's attention that there were investigations regarding corrupt payments arising out of the construction contracts for the Polish toll roads and/or the overpayment of EU subsidy in respect of those roads, the possibility was perceived that ATL had been in receipt of funds deriving from corrupt sources, and this was what was therefore being reported.    However, ATL was carrying out further investigations, and had engaged a forensic accountant to identify and ring-fence any questionable sums linked to the Polish toll roads company.  ATL recognised that even if it were able to establish that relevant funds were not the proceeds of crime, nonetheless it accepted that its failure to identify the source had been a regulatory breach which must be reported; it would keep the Commission updated on progress and action taken.

82. Returning to the Final Notice issued on 21st December 2021, and again describing its effect in broad terms, certain errors of factual description and circumstances were apparently accepted (for example: the factual errors of some allegations, such as that ATL had not recognised one client – Mr A - as a "PEP [Politically Exposed Person] by Association" when it actually had ultimately done so, so that the complaint could in fact only be that this had been belated, and the correct interpretation of what constituted unlawful "insider dealing"), because they were removed from the material relied on in the Final Notice.    However, the upshot of the revisions there made was not to reduce the adverse findings, but rather that various allegations and findings of breach were re-cast in different terms to apply on the new or revised facts mentioned. For example, an alleged failure to perform certain due diligence requirements at a time before these had actually been mandated was amended (this having been pointed out) to become an alleged breach of a requirement to "*understand the client's existing business relationships*" contrary to rule no 246 of the Handbook, by referring the charge to the later time when this rule was laid down.

83. Various assertions that a "*pattern*" was displayed were now newly included, as were additional words such as "*serious*" and "*systemic*" in places.   Existing allegations were bolstered by additional materials, very often using points made in the Appellants' Response to the Draft Enforcement Notice.  A concern was newly expressed (as §438) that

> "*The Commission is concerned with the period which the breaches span, and the fact that, (in the majority of examples), failures have been identified as either having occurred in the last three years or, where more historical failings have been identified, they form part of a theme and have remained ongoing until resolved in the last three years.*"

84. Very strikingly, a whole new and lengthy allegation of "serious" breach was introduced, based entirely on the materials and admissions contained in ATL's self-reporting of the O Co matter.

85. Not quite so obviously, but very significantly, the word "*probity*" was newly inserted into the general terms of the judgments made of each of the Appellants' conduct, when previously this condemnation had been confined to Mr Sinclair.   The Commission stated, in its accompanying letter, that it was considered "*necessary*" to insert such a conclusion in relation to the Appellants, as well as to Mr Sinclair, upon "*a further review of the evidence supporting the Final Report*".

86. Reference to the steps taken to remedy matters of governance, the breadth of ATL's Board and management functions, and its internal systems and processes were now inserted as "*noted*", although, strangely, the re-casting of the Final Notice resulted in the previous recognition that the Board had been "*greatly expanded"* being removed and merely becoming a recognition that ATL had "*expanded*" its compliance department.         The consistency of the presently recommended penalties with those previously imposed in other cases was supported by reference to the Commission's stated assessment of the degree of seriousness of the present breaches as compared with those in such previous cases, and measuring such seriousness against the scale of the Commission's increased available powers of financial sanction applicable since 13th November 2017 under the 2016 FSC Law, as contrasted with measuring such assessments against the scale of the Commission's available powers under the 2008 such law.      No amendment to the recommended sanctions was therefore made, except to update references to the legislation.

87. The Commission's accompanying letter stated that the matter would now proceed either to an agreed settlement on the facts and sanctions proposed, which were "*non-negotiable*", or for a Senior Decision Maker to be appointed, and it set time limits for a response.   It also included an explanation of the Commission's attitude to the main points contained in ATL's and the Appellants' Responses to the Draft Notice.   This included expressly that any credit for the remediation measures which had been taken by ATL since June 2019 was viewed as being offset by the seriousness of the findings which had now been made in relation to the O Co matter.

88. Mr Sinclair elected not to contest the sanctions proposed against him in the Final Notice, thereby obtaining a 30% discount on these.   The personal fine was reduced to £196,000, and the term of the Prohibition Order to a bizarrely expressed "5.6" years.   However, ATL and the Appellants elected to proceed further.

**(v) Reference to the SDM**

89. On 10th January 2022 Appleby wrote to the Commission, noting that the inclusion of the O Co material in the Final Notice was new and unexpected, and requesting the opportunity to respond to these allegations before the matter was referred further to an SDM.   The Commission wrote straight back rejecting this request and stating that "*ATL do not require any further time to do that which must already have been done prior to making the disclosure which they did*" [ie in July 2021].

90. Mr Finch OBE was therefore appointed as SDM on 27th January 2022.   He was sent all the materials relied on by the Commission in support of the sanctions which the ED recommended that the Commission impose.   This included the original Draft Notice and all the materials supporting this (including interview transcripts), the Responses, and the Final Notice, also with the tracked changes. From the materials supplied in this appeal hearing, that will have amounted to something of the order of 7,000 pages of materials and 2,000 pages of legislation, regulations,

rules, codes of conduct, Handbook guidance and principles, made available for reference with regard to the suite of alleged breaches.

91. In March 2022, the SDM requested written submissions on the O Co matter from the Appellants. These were supplied in a 19 page letter of 11th March 2022, with exhibits. This explained in detail the history of the O Co matter which had been identified, arguing that the claimed deficiencies must be put into the historical context of the relevant state of regulatory requirements at the time, and that they were, on closer examination, attributable to human error (particularly the "sign off" in 2014) rather than any major, serious or systemic failure of ATL, and in particular that it was no evidence of lack of "*probity*" on the part of, specifically, Mr Domaille or Mr Clarke, in fact specifically denying (at §55) that Mr Clarke had had any involvement with O Co or the T Anstalt loans, even though allegations were being made against him. The response politely chided the Commission for having refused the Appellants permission to make any response to its allegations regarding O Co at the time of the original Final Notice, submitting that the Commission had unfairly leapt to conclusions by treating obligatorily reported suspicions as if they were established facts.

92. The SDM requested a response to this from the Commission on 22nd March 2022, and this was made, very rapidly, in a letter of 23rd March 2022. The ED emphatically rejected any criticisms of the Commission's findings in respect of O Co and the conclusions reached, and suggested that ATL was now trying to undermine the contents of its own notification letter of 21st July 2021 without any supporting evidence (which, it was submitted, could have been expected to be provided), and that it failed to acknowledge that its enquiries still did not preclude the possibility that the funds received in 2006/7 could have been the proceeds of crime. The ED asserted that ATL's very account of the matter itself supported the submission of a "*pattern of behaviour*" which had been asserted at the end of the Final Notice (in §256) and was certainly "*potentially relevant to an adverse assessment on the probity of the Directors*".

### (vi) The MTN

93. On 7th April 2022, the SDM issued his Minded to Notice ("**MTN**") under the Commission's procedures. This stated the SDM's provisional intention to impose the sanctions recommended by the ED, against ATL and the Appellants.

94. This now, of course, no longer affected Mr Sinclair who had settled with the Commission and who, (for some reason which has never been explained but presumably had its origins in some kind of confidentiality agreement,) was thereafter coyly referred to throughout the SDM process as an anonymous "Director A". The accompanying letter contained instructions as to the opportunity for those affected to make representations, and to indicate whether they wished to have an oral hearing.

95. The MTN itself entirely endorsed the Final Report, both in its assessment and ultimate verdict. It first deprecated both the length and the tone of the Appellants' Responses, favourably contrasting the Commission's Reply of 21st December 2021. It moved on to note the previous history of inspections already mentioned, and then to list (in Part A) the eight client files which were the subject of the Final Notice, and to examine, comment on and endorse the allegations made by the ED in relation to each of these. It then considered, in Part B, the three more broadly based "Systemic Governance Issues" found, namely: (i) Outstanding Periodic Reviews of clients and in particular those categorised as "High Risk" business, (ii) ATL's recorded level of Outstanding Action Points, and (iii) the absence of "adequate" Risk Mitigation Plans in respect of some High Risk clients. It reviewed the contents of the Final Notice and cited further points

of evidence, including from the transcripts of the voluntary interviews.   It asserted general support of the judgements made in the Final Notice, including the Notice's rather negative assessment of the LMRR report.   In a rearranged presentational form, it endorsed all the ED's assertions of breaches of various rules, Regulations (etc) by ATL, and it supported the ED's interpretation of these, with further opinions expressed in a "Conclusions" section.   Following the same format as the Final Notice, it then listed the failings previously found once again, but this time from the perspective of failure to comply with the MCL on the part of both ATL and the Appellants individually.

96. The findings in relation to the individual Appellants, concluding that each was "*not a fit and proper person*" [that is, to hold an individual licence to be engaged in the provision of financial services], were stated to relate to his or her

   a) probity competence experience and soundness of judgment for fulfilling the responsibilities of his or her position
   b) diligence in fulfilling such responsibilities
   c) knowledge and understanding of legal and professional obligations to be undertaken and
   d) his (or her) policies procedures and controls to act in accordance with all the Rules, Codes, Guidance, Principles and Instructions issued by the Commission under its authorising Laws  (although this last would appear to be more appropriate to an entity such as ATL itself)

   (i.e as derived from Art 2 of Schedule 1 of the Fiduciaries Law) and then

   (i)     as regards Mr Domaille, the above findings were stated (at §121) to be based on consideration of four of the eight cited client files, on allegations of failure to manage conflicts of interest in breach of Guidance at Clause 3.2 of the CCG and on failings in Mr Domaille's general responsibility, as a Director of ATL from 2007, for the O Co situation and for ATL's compliance position throughout the Relevant Period;

   (ii)    as regards Mr Clarke, the findings (at §122) were similarly stated to be based on a different sub-set of four of the eight cited client files and to similar allegations as to managing conflicts of interest and failings in his general responsibility, as a Director of ATL from 2015, for the O Co situation and for ATL's compliance position after that time; and

   (iii)   as regards Mrs Hannis, the findings were related to her position and responsibilities as a manager, but simply as to two of the eight cited client files (see §123).

97. The MTN concluded by endorsing all the sanctions proposed by the ED.

   **(vii)        Responses to MTN**

98. On 23rd May 2022, ATL (Mr Domaille) wrote to the Commission setting out its updated investigations into the O Co situation, including investigating Mr KS, and tracing the source of the funds paid over to O Co in 2006.   It stated that, having spent £95,000 on forensic accountants' fees in making such investigations, it now felt that, even without having been able to locate an actual loan agreement for what appeared to have been the original source of funds to the T Anstalt, the Lichtenstein Anstalt which had in turn made the relevant loans to O Co, it could be satisfied that those funds were not likely to have originated in any possibly suspected

financial crime relating to the Polish toll roads company, and that the admitted breach of Regulation 5 (client monitoring) had thus been resolved.

99. On 24th May 2022, ATL and the Appellants submitted to the SDM written Responses to the MTN itself (consisting of 115 pages plus appended tables) drafted by English Leading Counsel. In essence, the various alleged breaches were now accepted and admitted in principle.   It was also expressly accepted that these were deserving of sanction in the form of public censure and appropriate financial penalties, but it was argued, not on the basis of the sanctions proposed in the Final Notice and the MTN, the severity of which were "*unprecedented and unreasoned*". Whilst seeking to "*stand back from the 'heat'*" of the Final Report and the response made to it, the Responses submitted that the factual basis of several of the MTN's finding were disputed, that the findings related only to a small fraction of ATL's client base, or even the files sampled, that there was no credit given for mitigating factors in relation to the various breaches and that the findings of lack of probity against the Appellants were not defined and were without proper evidential foundation (referring to the burden and standard of proof in legal proceedings in this regard).  It was submitted that the failings relied on for those findings had been inadvertent rather than done "*willingly and with purpose*" (the phrase frequently used), and that the seriousness of many of the allegations generally had been overstated.   It was submitted that the financial penalties had not been, but ought, in justice, to be, calibrated according to the time when the wrongdoing had been committed, most of the serious matters having predated the Commission's increased powers of sanction conferred in November 2017.  The imposition of Prohibition Orders against the individual Appellants was submitted to be unnecessary and disproportionate for the protection of either the public or the reputation of the Bailiwick as a financial centre. Paying due regard to comparator cases, the financial penalties imposed should be significantly reduced and none of the Appellants should be the subject of a Prohibition Order.  The remainder of the Responses elaborated on the reasons for those submissions.

### (viii)    Reply by the Commission

100. The ED replied with a 38 page document, generally rejecting, one after another, all aspects of the above criticisms, dismissing points made by the Appellants that they <u>had</u> asked questions, or <u>had</u> taken steps as "*missing the point*" that there was <u>still</u> a risk which the ED considered should have been regarded as unacceptable.  The ED emphatically defended and reinforced its previous approach, supporting the endorsement of its recommendations by the SDM in the MTN.  They did so with a vehemence which suggests that they did not appreciate the irony of their simultaneously submitting that the enforcement process was "*not … adversarial*."

101. It is not necessary to refer to any further detail here, as such matters will arise for consideration later so far as material, but the final submission in this Reply was to the effect that the Commission's approach to imposing fines in relation solely to its current new fining powers even as regards historic behaviour, was legal and that if the <u>true</u> seriousness of the breaches cited (rather than the Appellants' minimisation of this) were taken into account, the financial penalties were perfectly reasonably calibrated; the imposition and lengths of the proposed Prohibition Orders were proportionate and reasonable in each case - and the representations now made by the Appellants actually added support for this, by showing that the Appellants had failed to appreciate, or to accept, the full extent and gravity of their conduct.

### (ix) Oral hearing

102. Against the background of all the above papers and submissions, the SDM held the required oral hearing (though the Commission prefers to call it a "meeting") on 14th and 15th June 2022,

over one and a half days.  The transcripts of that hearing are in the papers in this appeal. English leading counsel, Mr Barclay QC, appeared on behalf of ATL and the three Appellants, and addressed the SDM, effectively, on the basis of the written representations of 24th May 2022. English counsel, Mr Normanton, appeared on behalf of the Commission.  The SDM said very little and reserved his decision.

103. Following the hearing, ATL (obviously, by the decision of its Board) settled with the Commission, submitting to the financial penalty of £500,000 and the public statement which the Commission proposed, and thereby obtaining the 10% discount in the penalty which the Commission offers to those who accept its decisions without contest at this point in the enforcement process.    ATL has therefore paid a financial penalty of £450,000 in respect of the matters of breach of regulatory rules and Regulations etc found to have occurred in the previous conduct of its business.    It will presumably have had to consent to the terms of the Commission's proposed public statement; I do not know if this has been issued.

104. Thus, and importantly, by the time of the Decision itself, the materials in the case were in fact relevant only to the issue of the conduct of individual persons, and not to corporate misdeeds.

### (x) The issue of the Decision

105. A somewhat disquieting procedural event occurred in relation to the issue of the actual Decision.    Obviously, the reputational damage caused by publicising sanctions, and the imposition of a Prohibition Order in particular, can be very grave.    The Commission publishes guidance on its website about its procedures, and it had stated that it would not make notice of such sanctions public for a period, to enable parties to notify any intention to appeal, and that it would not publicise a decision which was a contested decision.    Its website guidance states (or rather, now, "stated", since it appears that the Commission subsequently removed this reasonable but inconvenient notification), that the publication of notice of Prohibition Orders will only take place "*upon the uncontested imposition of the Prohibition Order*".

106. On 22nd July 2022, fearing the way the wind seemed to be blowing, the Appellants informed the Commission that they would intend to appeal if the Decision contained the sanctions which had been proposed in the MTN, and asking for an assurance that any such sanctions would not be made public for a grace period.   The Commission refused to enter into any discussions.

107. The Decision - but now as regards only the individual Appellants - was issued by the SDM on 29th July 2022 at about 12.43 pm.    The only difference from the previously proposed sanctions was that, as against Mrs Hannis, the SDM relented slightly and reduced her penalties to a fine of £30,000 and a Prohibition Order merely for three years, apparently in recognition that she had not become a Director of ATL until June 2019 and was therefore less involved in culpability – which of course suggests some acknowledgment that this had not been appropriately recognised by the ED earlier.

108. What happened in the event was that when the Decision was produced by the SDM during the early afternoon of 29th July 2022, notice of the Prohibition Orders themselves was immediately posted on the Commission's website, and was automatically transmitted to various individuals on the Commission's mailing list - and this occurred even before the Commission had actually notified the Appellants themselves, by an email of 3.35 pm that day to Appleby, of the Decision, and that the Prohibition Orders had (in the Commission's view) immediate effect, but that it would "*temporarily delay*" the release of the associated public statements and financial penalties for 7 days during which the Appellants might notify intention to appeal, and if they did, then for 28 days for the filing of Notice of Appeal.

109. On discovering the publication of the Prohibition Orders, Appleby's demanded that the Commission take this down, in two emails of 3.54 pm and 4.09 pm on 29th July 2022, failing which injunctive relief would be sought.   The Commission refused to do so in an email of 4.34 pm.   The Commission contended that a decision which had been formally made could not be regarded as "contested" because of an intimated appeal.   The Appellants were, therefore, obliged to seek emergency out of hours injunctive relief from the Deputy Bailiff, who granted an interim order that evening.

110. The Commission therefore did remove the relevant notices, but it still contested this restriction as to publicity at the return hearing on 4th August 2022, which came before me.      I took the view that the injunction should continue (though substituted, in the event, by the more dignified form of an undertaking to the Court) until after the final disposition of any appeal against the sanctions which might be made, and which I was assured by counsel was intended.   The result was embodied in an agreed Order.

111. In the interim, the SDM himself had, very appropriately, indicated that he would not intend his Decision to take effect for 28 days, to allow time for any appeal to be instituted.   Even without that, though, I would have continued the injunction.   I found the Commission's attitude in the matter, with its apparent conviction that its own view must be rightful because it was exercising its functions as a regulator, its seeming bewilderment at being challenged, its view that its Decision could not reasonably be said to be "contested" just because it was going to be appealed, and its obliviousness to the fact that the Appellants' reputations could be irreparably damaged in a situation where a successful appeal just might show this to have been unjustified, quite extraordinary.

## The Decision

112. As to the terms of the Decision itself, again, at this juncture, a similar level overview as with the MTN is appropriate.   The SDM first set out formalities, such as the basis of his authority, and the mechanics of the enforcement process, his ultimate conclusions, referring to the materials and submissions which had been considered, and a brief reference to the submissions before him.      He then dealt (at [21] - [23]) with legal submissions on the important "probity" issue, covering the meaning of this concept, and authorities on the burden and standard of proof.

113. Next, (at [24] - [25]) he explained his approach to the evidence, indicating that he had preferred to rely on contemporaneous documents, emails, etc rather than stated recollections, where these were available.   Whilst both parties accept this as a reasonable approach, the Appellants submit that this does not justify simply dismissing people's evidence as to their recollections, especially where the very issue may be what their state of mind was.   In my judgment, this is correct; such evidence is admissible and all the evidence must be considered and weighed in the round.

114. He then (at [26]) referred to a witness statement dated 24th May 2022, of Ms Deborah Gillou, who had been in post as CEO of Artemis since September 2019, and whose evidence was introduced by the Appellants to verify and support the extent to which improvements in the governance, oversight, and the general management, efficiency and compliance of ATL had been genuinely made since the failings which were now accepted to have occurred during the Relevant Period (and before), and to show that lessons had been learned and that ATL's affairs were now well run in the respects with which the Commission was concerned, with this having been endorsed by outside consultants, PwC.   The SDM refused to give any weight to this, commenting that this evidence did not impact on the misconduct which had taken place earlier,

and (at [27]) that he had formed the view that the Appellants had minimised their responsibility and that they - particularly Mr Domaille - did not accept the seriousness of their conduct.   He elaborated ([28]-[31]) on this by particular reference to his finding that, throughout the Relevant Period, proper oversight "*from the Respondents*" had been lacking and that they had sought to "*dump*" the blame on others, likening this to the captain blaming the crew for running the ship aground.

115. Following this, the SDM returned to following the general structure of the MTN, repeating the relevant history ([32] - [40]) and then moving on to consider ([41] - [154]) the eight individual client files cited by the ED.    These are conveniently referred to as **X Trust (or "X"),** (paras [43] - [84]), **F Co** (paras [85] - [103]**), D Co** (paras [104] - 115)**, O Co** (paras [116] - [123]**), K Co**  (paras [123] - [132]**), Y Trust** (paras [133 ] - [139]), **R Co** (paras [140] - 150]) and **W Co (or Z Trust)** (paras [151] – [154]) .   He worked through each of these, largely repeating the adverse findings presaged in the MTN, but incorporating further comments and findings based on both sides' responses to the MTN and the written submissions, and the occasional comment from the oral hearing.

116. Two of these eight subject files (K Co and Z Trust/W Co) remained included in this section of the Decision even though they did not contain criticisms of any of the individual Appellants but had been framed as general criticisms of ATL who were now no longer Appellants.   (I accept, of course, that it could be said that these could still be material as examples of failures by the individual three Appellants in their oversight responsibilities as Directors, but that was not the basis on which these files were originally singled out nor stated in the Decision to be the basis for their then being relied on.)   The general tenor of further comments in the Decision was to reject any of the matters of submission by the Appellants of errors, or of unfairly damning characterisation of their acts and, if anything, to strengthen and add to such adverse judgements. As to submissions regarding factors which might be argued to mitigate the alleged seriousness of the Appellants' defaults, these were generally rejected as being of no weight, except that the appellants' submissions were stated to be accepted, but with *"unease"*, in relation to one of the two peripheral files (Z Trust/W Co) where, as mentioned, no direct allegation against any of the individual Appellants was actually made.

117. The Decision then turned to the general Systemic Governance Issues at Part B.   Once again ([155] - [172]) the SDM reiterated and somewhat enlarged on the charges made under this section in his MTN, based now, mainly, on an overview of the statistics for outstanding client reviews, action points and risk mitigation plans contained in quarterly compliance reports made to management meetings between 2014 and 2018.    Comments made by Mr Domaille and Mr Clarke in interviews and submissions on their behalf as to mitigating factors were rejected. Oddly, the charge of not dealing with the Commission in an "*open and co-operative*" manner remained in the Decision, (at [163]) even though the actual offence cited in support of this was committed by Mr Sinclair (see §378 of the Final Notice).

118. The SDM stressed his overall findings that the compliance reports demonstrated, and the statistics showed, not only that ATL was continually in breach of its own recorded targets and policies, but that, as the ED had submitted (and Mr Domaille had concurred at interview) the figures could be called "*frightening*".    Whether this had come about through lack of supervision/oversight, lack of resources or lack of training, this was a systemic issue which had not been addressed during many years when the relevant Directors (i.e Mr Domaille, and also Mr Clarke) had been responsible for oversight and the remedying of such issues.   The SDM again characterised some of the mitigation points made as being a reprehensible attempt to off-load responsibility on to junior staff.

119. The SDM endorsed the ED's treatment of the LMRR Report of 2020, (at [173]), namely that whilst it might have assessed that ATL's systems were then "effective" or "largely effective" this still meant that failings were present, and he quoted the negative comments.  He found that none of the Appellants' suggested mitigation in written submissions undermined the findings of the ED's Final Notice, nor reduced the shortcomings identified in the LMRR report.   He then turned to his own findings.

120. The SDM plainly accepted the Appellants' protest, in the Responses to the MTN, that findings of want of probity could not fairly be pronounced as broad, generalised findings, but must be made on the basis of specified facts, because he proceeded to consider probity separately to other kinds of failings.  Having discussed again the legal test for "probity" he held, at [174] - [176], that, whilst emphatically there was "*no finding of dishonesty made against any of the [Appellants]*", nonetheless, lack of probity could be constituted by something less than this.  He recorded at [174] the three allegations of lack of probity made by the ED which he later held to be made out.  These were in respect of specific aspects of the conduct of Mr Domaille regarding X Trust, Mr Clarke regarding the Y Trust and Mrs Hannis regarding X Trust.   He dismissed the Appellants' point that lack of probity had only been asserted against them belatedly as being immaterial, because the evidence "*was nonetheless what it was*" and any review of evidence should be welcomed.   He then proceeded to explain the foregoing findings at ([177] - [190]).   I will need to consider this in detail later.

121. The SDM then turned to the allegations of each Appellant's failure to comply with the MCL - ie, to display the required characteristics of a "*fit and proper person*".  These characteristics of course include probity, but go much wider.  Having listed the relevant characteristics from sub-paragraphs of Schedule 1 Paragraph 2(2) of the Fiduciaries Law, he held that Mr Domaille was not a "*fit and proper person due to his actions whilst holding the position of controller and director of a regulated fiduciary*", citing, here, Mr Domaille's lack of probity with regard to X Trust and his oversight of and dealings with the X matter and also O Co, and citing lack of competence with regard to the F Co and R Co files ([192] - [199]).   He held the same of Mr Clarke, based on his lack of probity with regard to the Y Trust and lack of competence (etc) in relation to D Co and R Co, and also in relation to O Co, but as to which he here apparently added in a further finding of lack of probity, as well ([200] - [204]).   In relation to Mrs Hannis, he found her, similarly, not to be "*fit and proper*" based on her lack of probity and competence in handling the X Trust files as previously found, and also through lack of competence (etc) in relation to F Co ([205] - [207]).

122. The Decision then includes a lengthy section (Section F) formally listing and cross-referencing each of the SDM's findings to whichever rule, Regulation, guidance or principle he found them to be a breach of, although they are actually all framed as being breaches committed by "*the Licensee*", ie ATL.

123. There then follows a section on "*Conclusions (in relation to breaches)*" at [243] - [246], related to the eight specific files and compositely to the systemic governance issues. It endorses the Commission's stated concern as to the duration of the breaches – obviously a comment regarding ATL - and then records that "*it is the Directors' responsibility to oversee and govern*" (see [243]).   The SDM prefaces the opinion given in each section by reference to "*my conclusions generally*", but (apart from as regards Mr Clarke in two places) the stated conclusions here are again framed in general terms applicable to ATL rather than being specifically referenced to any individual's actions or responsibilities.   He finally recorded, once again, a finding of "*repeated breaches of a broad range of requirements throughout client*

*relationships*", listing six aspects of these in general terms, and noting that the regulatory requirements were "*designed as safeguards to forestall, prevent and deter money-laundering and terrorist financing and are requirements of the Regulations and Handbook*" again an opinion the tenor of which is directed at the overall conduct of ATL's business.

124. At [247] he referred to the factors which are directed by ss 38 (6) and 39 (6) of the EP Law to be taken into consideration with regard to the imposition and fixing of the sanctions of the issuance of a public statement and of a fine, namely (I paraphrase the sub-paragraphs):

   (a) whether the contraventions had been brought to the attention of the Commission by the persons concerned, (which he found was only the case as to two late aspects);

   (b) the seriousness of the contraventions, (which he found was serious in each case);

   (c) whether the contraventions were "inadvertent" (which he found they were not, and indeed that the individually criticised actions of each of the Appellants were done "*willingly and with purpose*");

   (d) what efforts had been made to rectify the contraventions (which he dismissed as not meriting any effective credit);

   (e) the potential financial consequences to the Appellants or to third parties of imposing sanctions (which he did not regard as a factor which should affect his decision);

   (f) the penalties imposed in other cases (as to which he rejected the Appellants' "retrospectivity" argument as to applying penalties in force at the time of any actual misconduct); and

   (g) (solely in relation to a fine) the emoluments of any individual (as to which he had no evidence and therefore treated as "neutral").

He apparently regarded himself as limited to considering only matters within those seven categories (see [247]) although it is not clear why, as in fact there are no such words of limitation in the Law, and each of the relevant sub-sections contains a further sub-paragraph directing consideration of "*any other matter the Commission considers relevant*".   He also referred to such guidance as had previously been given in Guernsey, about the exercise of the Commission's powers of sanction, in the *Bordeaux* case, which I have mentioned above.

125. Having found the stipulated considerations to provide no worthy mitigation, and emphasising the seriousness of the Appellants' failings and their attitudes, and relating his proposed penalties to the degree of seriousness indicated in the Commission's guidance on the bandings for its intended operation of its new fining powers, in the remainder of his Decision he then confirmed, except for a slight relenting with regard to Mrs Hannis as already mentioned, the sanctions previously proposed to him by the Commission's ED.

**This Appeal**

126. The Notices of Appeal in this action were each issued, with notable promptness, on 2nd August 2022.   I have set out the grounds of appeal in [7] – [12] above; they are the same *mutatis mutandis* for each Appellant.   The Commission's Defences were tabled on 2nd September 2022, and I have set out the general thrust of those in [13] above.

127. Given the urgency of the matter, and in view of the undertaking and the Commission's public interest duty to publicise its findings, a speedy hearing was scheduled for this case, and it came on before me for three days, on $25^{th} - 27^{th}$ October 2022.

**General**

128. When reading into this Appeal, taking the materials contained in the very helpfully prepared Core Appeal Bundle of two medium size files only, I concentrated, naturally, on the Decision, the Cause (Notices of Appeal), the Defences, and the Skeleton Arguments of the parties with the documents there referred to.      I formed an initial general impression that the sanctions appeared to be harsh.   The Prohibition Orders were plainly career-ending, certainly for Mr Domaille and Mr Clarke and probably for Mrs Hannis.   The financial penalties were also, it seemed to me, severe.   The Appellants' comment that they were "*unprecedented*" seemed to be correct.   This did not, of course, mean that these sanctions were necessarily unreasonable or disproportionate, since they might well have been well and entirely deserved.   It did, though, seem to me to mean that I needed to consider very carefully and rigorously the materials and arguments which had been thought to justify such severe sanctions, not just by the SDM, but by those persons who had carried out the investigation of the matter for the Commission and prepared the Reports recommending such severe sanctions, which had effectively been presented to the SDM for scrutiny in the expectation of endorsement.   This was not least because those sanctions had been defended so vigorously at all times against any suggestions by the Appellants that they might possibly be viewed as excessive.

129. I then found that my initial impression of the swingeing nature of the sanctions was really not dispelled in the course of the hearing itself.   This was not surprising initially, as the Appellants' submissions were of course heard first.      However, the submissions on behalf of the Commission did little or nothing to counter my provisional impression.   The tenor of Advocate Edwards' submissions was really, simply, to emphasise the criticisms of the Appellants' conduct (or omissions) which were classed as amounting to a want of probity, and how serious the deficiencies in their conduct generally had been, and otherwise to stress the Commission's responsible role, and its authority, and the very great seriousness with which it viewed the failings of the Appellants, and which he emphasised were now, but only belatedly, admitted as to most of the actual facts.   In particular they were repeated failings, over a long period of time, to appreciate the need for effective policies, procedures and controls, and the need in particular, not just to make enquiries of clients regarding their activities, but also to interrogate the answers.   He urged, generally, that when properly viewed, this failing to meet the standard of conduct reasonably required in the Commission's eyes really did justify the level of penalties proposed, even though as a matter of practicality, in making submissions in the appeal hearing, broadly based failings such as were disclosed could really only be described in general terms (as had been done) apart from the specific illustrative examples contained in the Decision.

130. I concluded, therefore, (and I said as much) that if I were still inclined to doubt that the penalties proposed by the Commission were reasonable and proportionate notwithstanding Advocate Edwards' submissions, then in order to test whether my view was really justified, or was an unduly superficial impression, I would (regrettably) need to read through, review and assess all the materials which had been supplied to the SDM, the quantum of which I have noted at [90] above.   I am of course conscious that, as a judge, I am not immersed in practical experience of the practices and processes of either those working in the financial services industry itself, or of the Commission as its regulator.      Whilst this detached independence is part of the benefit of the safety mechanism which is built into the structure of the appeal system under the EP Law (see [33] above) it does mean that it is appropriate for me to test very critically any impressions

that I may form, or inferences that I may draw from the materials before me, before coming to a final conclusion, especially if that is contrary to the apparent views of the Commission or the SDM.

131. I have, therefore, carried out this reading exercise, of all the relevant materials - Draft Notice, Responses of the Appellants, Final Notice, intervening correspondence, the MTN, Responses of the Appellants, Reply of the Commission, and the Decision, including all the supporting materials referenced and sometimes beyond, and also the transcripts of the Commission's interviews with the Appellants and Mr Larkin, and the transcripts of the oral hearing before the SDM.   This is one of the reasons for the regrettable length of time it has taken me to produce this judgment, for which I apologise.   It is also one of the reasons why I have thought it appropriate to recite above the general history of the way in which the imposition of the sanctions under challenge developed, because this has had a bearing on my overall impression and conclusions, as well.

## Discussion

132. Essentially, each Appellant complains that

    a.  the Decision applied the wrong legal approach to the "probity" issue, an error of law which should have caused the SDM to reach a different conclusion regarding culpability in this respect;

    b.  the Decision failed, accurately or fairly, to find or infer some facts (both as regards the above and more generally);

    c.  the Decision failed fairly to take mitigating factors into account;

    d.  the Decision erred in law in failing to differentiate between conduct before and after the November 2017 increase of the Commission's sanctioning powers;

    e.  the Decision erred in failing to have proper regard to sanctions imposed in other similar cases, and to appreciate that the sanctions proposed by the ED against the Appellants were inconsistent and out of proportion with sanctions which it has previously imposed in other cases, for similar or worse conduct (and, in the particular case of Mr Domaille, was unreasonable and disproportionate for equating his misconduct with that of Mr Sinclair); and

    f.  any one or combination of the above caused the sanctions imposed by the SDM to be wrong, unreasonable or disproportionate.

## (1)    The "Probity" point

### (a) Background context

133. The finding of lack of probity against the Appellants is hugely significant in this case, not just because of the reputational disgrace which it brings but because it is of almost pivotal importance as to the reasonableness of imposing a Prohibition Order - certainly of the extensive generality imposed in this case.

134. The first relevant matter of context here is the function of the Commission as a regulator.   The objective of a regulator is to bring about and maintain appropriately high standards of conduct of persons involved in the sphere of activity which is regulated.   The purpose of this is public protection in that area, which has two angles; first, the protection of members of the public from loss caused to them by incompetence or malpractice, and second, more generally, the protection and enhancement of the Bailiwick's reputation as a financial centre, as laid down in the 1987 FSC Law (see above at [42] and [43]).   This latter again means protection from the results of incompetence or malpractice, but here also as regards responsibility to prevent and not to assist or facilitate financial crime - as to which 19 predicate offences are listed in Part 1.1 paragraph 3 of the Handbook.

135. To be effective a regulator obviously needs effective powers of sanction.   A regulator who can do no more than admonish would rapidly be ignored.   However, from this, it follows that any power to sanction must be operated appropriately in furtherance of the regulatory objective (see above) and this function is not as wide as the penal functions of the criminal law itself.

136. A Prohibition Order is a draconian penalty for an individual practitioner.   Its justification, in the regulatory context, is public protection by incapacitation; both protection of the public and of the Bailiwick's reputation require that the conduct of financial services business is not left in the hands of persons who cannot be trusted to carry it out with integrity and an appropriate standard of competence.   It can, of course, be suggested that a further legitimate objective of such a sanction would be deterrence.   As the SDM cites at [250] of the Decision, this was accepted by the then Deputy Bailiff in *Bordeaux* (above, at [85] in that decision), but that cannot, in my judgment, be taken too far, because of the especially punitive effect which a Prohibition Order has on the individual concerned.   The justification of deterrence - obviously of persons other than the particular individual, who is, *ex hypothesi*, removed from participation in the industry by a Prohibition Order - can all too easily morph into "making an example of" that individual, and thus easily slip into being disproportionate as regards the individual's actual offence(s) and situation.   The powers to fine, or to issue a public statement (and thus to shame and make a person work to achieve rehabilitation) are to my mind very much more appropriately and proportionately suited to doing the job of deterrence as a separate consideration, whether of the individual him/herself or of others, than is the blunt instrument of a Prohibition Order.

137. Since the primary objective of a Prohibition Order is public protection, then a finding of conduct lacking probity by an individual must be the key justification for imposing one so as to remove the relevant, untrustworthy individual from operating in this field.        But want of probity is not at all the same thing as incompetence - ie a want of due skill, care and diligence.      Of course, at the extreme, a finding of a sufficiently gross degree of incompetence could justify the conclusion that the individual in question was a danger to the public, ie to the safety of the finances of those with whom he or she might deal, or to the reputation of the Bailiwick, because such extreme incompetence could bring about a huge financial scandal.     However - and Advocate Edwards accepted this in argument – for mere incompetence, as contrasted with lack of probity, to justify a Prohibition Order, the disclosed degree of incompetence would have to be so great as to justify the conclusion that the individual's continuing in practice <u>did</u> pose a genuine danger to the public or to the reputation of the Bailiwick.

138. Thus, the major consideration going to whether it is reasonable and proportionate to impose the relevant Prohibition Orders on the Appellants in this case is whether the findings of lack of probity made against each of them were justified.        If not, the justification for imposing

Prohibition Orders would have to rest on incompetence, and incompetence of the egregious degree referred to above.

139. I would add further, though, that even if a finding of some incident of lack of probity were justified as a particular finding of fact, this would not, in my judgment, <u>automatically</u> justify the imposition of a Prohibition Order on the relevant individual, even though it might go a long way towards it.   The precise nature of the incident, the then circumstances, the length of time gone by, and the question whether the evidence over all did or did not suggest that there was any real likelihood that such behaviour might recur would still have to be taken into account, according to the particular facts.

140. I would also add that, in my judgment, it is not possible to convert a finding of even great carelessness in failing to comply with particular regulatory requirements into a supportable finding of want of <u>probity</u> *ipso facto,* ie just by labelling it as such.   It is, in my judgment, still necessary to find an actual state of mind disclosing a culpable degree of untrustworthiness - in effect, an attitude of subjective contempt for the obligation to comply with such lawful regulatory standards - before even a long and lamentable failure to comply with such standards could be properly held to constitute lack of probity, as contrasted with merely gross incompetence.     In my judgment there is a bright line distinction between want of probity and want of skill, care or diligence, similar to the bright line distinction between breach of fiduciary duty and breach of duty of care (see per Mr Jonathan Crow QC in *Extrasure Travel Insurances Ltd v Scattergood*  [2003 ] 1 BCLC 598 at [89]).   They are faults of a different quality.   As I have already said, a Prohibition Order may be justified on the grounds of behaviour which falls in the latter class, but that requires to be justified in its own right as grounds for concluding that it poses a danger to the public.   It cannot be justified, tempting though it might be, simply by deeming a large number of matters of perceived incompetence to equate to a lack of integrity - because it just does not.

## (b)    Want of Probity - Meaning, burden and standard of proof

### (i)        Basic meaning

141. Under its MCL, the Commission includes a judgement of an individual's "*integrity, honesty and reputation*".  I am, fortunately, not concerned with the third, because its difference in nature from the first two would give me concern.  I am concerned only with the first two.

142. I think it is common ground (but in any event I hold that it is the case) that "probity" can be treated as synonymous with "integrity."   As a concept it is wider than just honesty, although it naturally includes it.    It is a shorthand for the high – implicitly, "*higher*" (see Jackson LJ in *Wingate v Solicitors Regulatory Authority* [2018] EWCA Civ 366 at [97]) – ethical standards which are expected of persons working in a responsible profession, such as the provision of fiduciary and financial services.    I strongly prefer the word "ethical" to the word "moral" because, to my mind, the former suggests a more detached and objective assessment than does the latter, which can easily slide into subjective censoriousness.

143. Probity therefore relates to a person's attitude – in effect, whether they can be regarded as someone who "does the right thing".    A finding of want of probity implies that they did not, and that they therefore cannot be trusted.

### (ii)        Burden and standard of proof

144. It is common ground that the burden of proving facts which justify such a finding lies on the Commission. It is also common ground that the standard of proof is the usual civil standard of balance of probability. These are of course adversarial terms, but, whilst I understand that the Commission would prefer not to regard their enforcement process as "adversarial", that would seem to be rather unrealistic in practice. I can hardly conceive anything more adversarial than the attitude and the arguments which have been advanced by the Appellants in this case on one side and the Commission, through its Enforcement Division, on the other.

145. Much has been said in authorities about the correct approach to applying the ordinary civil standard of proof to allegations of dishonesty. Given their similar nature, I again understand it to be common ground that the same broad approach should apply to charges of lack of probity. The principal authorities are *Re H (Minors)* [1996] AC 563, and, in particular, *Re Doherty* [2008] UKHL 35. The essence of the point is that whilst the standard of proof in such cases is, and always remains, the single and uniform standard expressed as "proof on balance of probabilities", where a finding concerns a matter such as dishonesty or want of professional probity, the strength of the evidence which is properly required to make out such a finding may well be more compelling than for findings of fact which are morally neutral. Put another way, the evidence may require a greater degree of critical examination.

146. This difference is justified for two reasons. The first is the general one that, because the norm of ordinary decent behaviour is honesty and propriety, it requires stronger and more cogent evidence to justify displacing this starting point, so as to tip the balance of probability. The second is that, certainly as regards professional persons, a finding of dishonesty would have such serious personal consequences for the individual that this fact is, in itself, evidence tending to suggest that it would be unlikely that such an offence would be committed - certainly committed lightly - consequently requiring a countervailing strength of evidence to upset this. Whether one regards this as a defensible logical analysis or as convenient legal sophistry does not really matter; the point is that the cases are agreed that it is appropriate to find dishonesty only on the basis of suitably strong evidence. It appears to be accepted (and in my judgment this is correct) that the same approach should therefore apply to findings of lack of probity, by parity of reasoning, although, of course, the fact that want of probity encompasses less serious forms of ethical misconduct than outright dishonesty would be a relevant factor to take into account in making the relevant assessment of probability.

147. The SDM referred to the relevant authorities and stated that these had informed his approach. The Appellants dispute that this can have been the case, when the Decision is examined. They submit that the SDM did not apply this recognised proper approach to the evidence in relation to the findings of lack of probity which he made, but simply accepted the ED's submissions without question, and he did not even consider the second question, namely how likely was it that the Appellants would imperil their careers by committing the suggested matters of impropriety?

148. The Commission submits that the SDM did have (because he said so) the relevant authorities in mind, and that the mere fact that he did not expressly mention or quote the cases (and in particular *Re Doherty*) does not detract from this.

149. Ultimately, this issue really underlies the later substantive ground of appeal to the effect that certain of the SDM's findings were unfair and unreasonable, and it can be discussed there. However, this leads to the next point, which is whether the test for want of probity is "objective", being simply an objectively applied judgment, or whether it is "subjective" in the

sense of requiring a finding as to the accused person's actual state of mind, and whether that has itself to be found to be improper.

**(iii)      Is the test "objective" or "subjective"?**

150. The Appellants submit that the SDM erred in law in that he held that the test for want of probity was entirely objective, saying, indeed, (at [23]) that

> "...*there is no requirement to make findings on any of the* [Appellants'] *states of mind*".

151. The Commission does not expressly assert that this statement is correct, but appears to suggest that it can be discounted as the SDM's referring to the different question of dishonesty, presumably arising from the fact that in making this assertion the SDM expressly approved and followed the ED's own written submission that

> "*Contrary to the Representations… there is no requirement for the SDM to make findings as to what the Respondents' subjective state of knowledge or belief was so as to determine whether they acted without probity (unless the SDM is minded to make a dishonesty finding rather than a finding of lack of integrity)*".

152. The Commission submits, rather, that whatever the SDM may have said there, one must examine the "careful reasoning" which he applied to the issue of probity, that he was plainly not saying that the Appellants' respective knowledge (not quite the same thing as state of mind, I note) was irrelevant, that he clearly referenced the evidence and submissions of both parties, and that the evidence before him was "*overwhelming*" in justification of the conclusions as to probity which he made.

153. In my judgment, it is clear that the SDM was holding that there was a distinction between the approach to state of mind required for a finding of dishonesty (and he emphatically disavowed any such finding), and the approach to state of mind required for a finding of want of probity or integrity.   In my judgment he was wrong to do so.       In my judgment a finding of lack of probity inevitably <u>does</u> require a finding about the individual's state of mind, because that is the very essence of what is being examined and on which the individual is being judged. Further I accept and agree with the Appellants' submissions that this is what the authorities actually show, when they are correctly read.

154. Dealing with this point, at [22] of his Decision, the SDM had made the distinction noted above between dishonesty and lack of integrity.  He referred to the observations of Morris J in *Newell-Austin v Solicitors Regulation Authority* [2017] EWHC 411 as to the nature of lack of probity as compared to dishonesty, which were cited with approval by Jackson LJ in *Wingate v Solicitors Regulation Authority* [2018] EWCA Civ 366.  He noted, correctly, that Jackson LJ does, indeed, state (at [85]) that Morris J explained that

> "…*the test for lack of integrity was objective*"

but Jackson LJ then went on immediately to say (and this the SDM did not quote)

> " *Nevertheless the state of a person's knowledge was relevant to determining whether they had acted without integrity*".

155. Even more importantly and expressly, Jackson LJ later confirmed this at [117], saying

> "*We now know that the test for dishonesty is objective and that even an objective test involves having regard to the state of mind of the actor*" (emphasis added).

156. The basis for this conclusion was that, having conducted a lengthy review of the confusing and apparently vacillating state of the authorities with regard to the test for dishonesty, Jackson LJ concluded, at [90] that the correct statement of the law as to this was now to be found in *Ivey v Genting Casinos (UK) Ltd (trading as Crockfords Club)* [2017] UKSC 67, and he quoted, at [92] the analysis of Lord Hughes, that

> "*When dishonesty is in question the fact-finding tribunal must first ascertain (subjectively) the actual state of the individual's knowledge or belief as to the facts. The reasonableness or otherwise of his belief is a matter of evidence (often in practice determinative) going to whether he held the belief, but it is not an additional requirement that his belief must be reasonable; the question is whether it is genuinely held. When once his actual state of mind as to knowledge or belief as to facts is established, the question whether his conduct was honest or dishonest is to be determined by the fact-finder by applying the (objective) standards of ordinary decent people. There is no requirement that the defendant must appreciate that what he has done is, by those standards, dishonest.*"

157. Jackson LJ then went on to approve the application of the same approach to the test for lack of integrity, whilst recognising that, as this was a more nebulous concept than dishonesty, it was less easy to define but that it connoted "*adherence to the ethical standards of one's own profession*", and that (see [100]) it could be illustrated by examples.    He added, however, at [102]:

> "*Obviously, neither courts nor professional tribunals must set unrealistically high standards, as was observed during argument. The duty of integrity does not require professional people to be paragons of virtue.  In every instance, professional integrity is linked to the manner in which that particular profession professes to serve the public.*"

158. In my judgement, therefore, the correct position, both as regards any finding of dishonesty and <u>also</u> a finding of want of integrity or probity, is as stated in the quotation above from Lord Hughes.   It is a two-stage test.   The first is to make a finding, based on all the available evidence, as to the actual state of mind of the relevant actor, and whether that state of mind was culpable in the sense that he or she knew that what they were doing (or not doing) was ethically "wrong" - whether as a matter of conscious participation or facilitation, or as a matter of consciously closing his or her eyes to that possibility, or consciously not caring about it, or rationalising it away.   If so, there is a plain want of probity.    But if not, if that person is found subjectively to believe that their conduct is proper, there remains the second question, which is whether a right-thinking person in that situation could have believed that.  If not, then there is, again, want of probity, and it is in that sense that the test can be said to be "objective" rather than "subjective"; one cannot, with probity, operate, however subjectively genuinely, by a set of morals or ethics which do not correspond with those of the general upright person engaged in the profession.    It can be seen, though that, even in that case, there is still an underlying finding as to the individual's subjective state of mind, and that that state was culpable.    It is just that the relevant state of mind there is not that held with regard to the actual doing of the act, but as to the erroneous belief that what was being done was not improper.

159. It is in making that second stage judgment that the existence, or the questionability, of the person's "ethical compass" therefore comes into play.   The SDM cited (at [175]) with approval, a quotation from *Tinney v Financial Conduct Authority* [2018] UKUT 0435 (TCC)

> "*Even though a person might not have been dishonest, if they either lack an ethical compass, or their ethical compass to a material extent points them in the wrong direction that person will lack integrity*".

This expresses the second stage finding, ie that the person's subjective assessment of ethics was wrong by the appropriate relevant general standard.   However this metaphor describes an impressionistic approach rather than a legally definable test, and it is to be noted that both here ("*to a material extent*") and in the citation of Jackson LJ at [131] above, ("*[not] … set unrealistically high standards*") there is a recognition that the requirement is not that of perfection.

160. In the case of dishonesty, the paradigm for comparison at this second stage test is the ordinary person who subscribes to the shared universal moral values of ordinary people.     In the case of want of professional integrity, Jackson LJ suggests that the relevant comparator paradigm is the person with specialist knowledge of the standards of the particular profession.   Indeed, the SDM quotes paragraph [103] of *Wingate*:

> "*A professional disciplinary tribunal has specialist knowledge of the profession to which the respondent belongs and of the ethical standards of that profession. Accordingly, such a body is well placed to identify want of integrity. The decisions of such a body must be respected, unless it is aired* [sic. this should obviously read: "has erred"] *in law*."

161. I make two observations as to this.   First, *Wingate* was concerned with a different professional area, that of solicitors, where both the composition of the disciplinary tribunal and the way in which the relevant principles of conduct are formulated are quite different from this case.   In particular, the SDM is not a person drawn from the ranks of practising financial services personnel, whereas two of the three members of a solicitors' disciplinary tribunal panel are drawn from the ranks of practising solicitors.  Second, the legislation being applied in *Wingate* was s 49 of the Solicitors Act 1974, which provides simply for an "appeal" from the Solicitors' Disciplinary Tribunal to the High Court and does not include any specified grounds of appeal, such as are to be found in s 106 of the EP Law and apply in this case (see [4] above).

162. Both of these differences, in my judgment, bear on the degree of deference which it is appropriate to accord to the mere fact of the relevant decision having been made by the relevant decision-maker, which is suggested at the end of the quotation above.   (The Appellants make this submission, in their skeleton argument at §62, and I accept it.)     With the regulatory scheme in this case therefore being significantly different from that with which *Wingate* was dealing, I do not think that any but high level assistance can be gained further from that case.

163. I conclude, therefore, that the assertion of principle made by the SDM at [23] is not correct.   The decisive clarity of his pronouncement certainly suggests that he applied it in reaching his Decision.   The Appellants submit that this error has "infected" the SDM's approach to his findings about probity, causing him to fail to examine, find, and give proper weight to the evidence of what each Appellant thought at the time.     The Commission, on the other hand, rather glosses over this, and submits, as already noted at [152] above, that his ultimate finding was justified in any event.

164. To decide this therefore means moving on to consider the SDM's findings on probity, whether he in fact applied a proper approach to making these findings, notwithstanding what he said, or whether, ultimately, even if he did apply a wrong approach, his findings would actually still be justified on a correct approach. This moves on, therefore, into the second general aspect of the appeal noted at [132] above, that of unfair and unreasonable findings.

**(c)   Probity - The SDM's findings**

165. The SDM's findings specifically on the issue of probity are found in the Decision at paragraphs [21] (where he foreshadows his total endorsement of the ED's submissions on this topic) and are then examined specifically at [174] - [190] of the Decision. There, he also, and mainly, refers back to comments, findings and criticisms made *en passant* in his recital of the history of the relevant facts regarding the other main aspect of the matter, namely breaches of the relevant rules and Regulations, relied on as demonstrating the Appellants' shortcomings as to the MCL. The relevant files, with regard to the findings of want of probity, which are discussed, are "X Trust", as regards Mr Domaille and Mrs Hannis, and "Y Trust", as regards Mr Clarke.

**(i)      X Trust - Facts**

166. The X files produce the most lengthy and involved set of criticisms of ATL and the Appellants amongst the eight example files. As they are the basis of the findings of want of probity made against both Mr Domaille and Mrs Hannis, it is convenient to deal with those together, as the story is best told chronologically.

167. The account I give here is to provide the necessary context regarding the findings of want of probity with which I am here concerned. It would be disproportionate for me to set out all the detail of all the matters of criticism of the X matter files mentioned in the Decision with, or even without, my comments or my views as to how far each was accurate or reasonable, and I do not do so, although some may be discernible. I will refer to any such matters later, if need be. This does not mean that I am diminishing or ignoring that there were breaches of the Regulations, rules, guidance, principles or codes apart from matters going to want of probity. I recognise that such findings are broadly admitted, and it is issues such as their real seriousness, credit for subsequent recent remediation, and the level of penalty which is merited in all the circumstances, which remain contested. But my focus at this point is on the justification for findings of lack of probity, as contrasted with findings of lack of skill, care, wisdom, caution, perspicaciousnss, diligence, understanding, or suchlike.

168. The X files related to the affairs of Mr A. He was a wealthy Libyan businessman, but who also held a British passport and, I believe, also had property and interests in Scotland. He became a client of ATL very early in its history, in 2002. Mr Domaille was the Director with oversight of this client relationship. When Mrs Hannis joined ATL in 2011, she became manager of the ATL work section which included Mr A's affairs, and she therefore had more day to day involvement in this, supervising several more junior staff, but ultimately referring upwards to Mr Domaille.

169. Mr A's relevant businesses were in Libya. He was an engineer, with companies engaged in major construction and civil engineering projects there, using the company business name "L". Indeed his business was described (I believe this is not disputed) as being "*the largest technical engineering consultancy business in Libya*". Several of his business projects were contracts with the Libyan government.

170. He was the UBO of a Guernsey Trust, called the A Family Trust, of which he was the Settlor and he, his wife and family, including his adult son, were beneficiaries.   This Trust, in turn, owned a BVI holding company, L Holdings Limited.   ATL provided fiduciary and corporate management services for both the Trust and the company, and through the company, the Trust received monies generated by Mr A's Libyan businesses.

171. Both Mr A's sector of work and his connection with Libya caused his affairs to be designated "high risk" business (meaning: greater risk of corruption, money-laundering, and terrorist financing) under the Commission's oversight classifications.  The appropriateness of this is not disputed.   Such a designation requires financial services firms to conduct more extensive and more frequent reviews of such clients and their businesses.

172. However, these classifications, and the Commission's AML rules and regulations in its Handbook did not come into force until 1st December 2007, by which time ATL had been managing Mr A's affairs for five years.   ATL had in accordance with "know your client" procedures at the time, initially obtained high class references for him from, *inter alia* (I believe) Allied Irish Bank.   His affairs were conducted apparently smoothly, and with apparent ready co-operation for several years.   ABN AMRO provided banking services for both the Company and the Trust.

173. During the period between 2002 and 2009/10, very large sums of money, totaling about £27Mn, (though some designated in €s) were transferred into the Trust.   They were stated to have come as profits from Mr A's business empire.   However (but by later calculation), 38% of these sums - about £10Mn - were transferred through money exchange companies which changed Libyan Dinars into £ or €s.   Plainly transfers from such a source do not disclose the actual source or legitimacy of the original funds.   This can therefore - fairly obviously - be a vehicle for money laundering.   The Commission, rightly, points to this as being a very large sum.  The Appellants, equally rightly, point to the fact that 62% of the relevant funds were remitted from identified sources.

174. In June 2007, the Commission's Handbook was introduced from 1st December 2007 with regard to countering financial crime and terrorist financing.  It required financial services entities (by Regulation 5, (5) (2) (a) (vii)) to "*consider whether it is appropriate to take reasonable measures to establish the source of funds or wealth*" of any customer or beneficial owner, and if so to take such measures.   (This is the version of the Regulation which applied from 1st December 2007.   Initially, in the Draft Notice, the ED made charges by reference to a more stringent version, which was an unqualified obligation "*to take reasonable measures [etc]…*" which had been substituted in the later version issued in June 2017.  It had to amend this charge when that was pointed out.)

175. Two points arose from this.   First, records in ATL's files show that, at least by December 2009, at the time when the Commission extended its regulations as to checking source of funds to existing, as well as new, clients, ATL had raised concerns about the use of money exchange companies.   Whilst the information gap as to source of funds was identified by ATL staff, comfort was nonetheless taken (ironically in retrospect) from the fact that many of Mr A's contracts were with the Libyan government, which was seen as support for the legitimacy of his operations, and from which many funds identifiably came.   ATL's concerns were therefore particularly focused on whether using money exchange companies was a legitimate method of remitting funds out of Libya.   This limited focus itself then became the point of the Commission's criticisms.

176. ATL wanted confirmation as to the legitimacy of such mechanism for transfer. It obtained this from a Libyan lawyer, in Tripoli, a Mr OA, who was, on the face of it, a member of a recognised and respectable firm of lawyers. However, OA had been suggested as a possible source of such confirmatory legal opinion by Mr A himself - the claimed reason being that it was necessary to find a Libyan lawyer who was not only familiar with the law and practice regarding money exchange companies but who was also sufficiently fluent in English to be able to explain this, and there were not many of these. OA also sent his opinion from a personal email address, rather than from an official office address. The Commission criticises ATL's failure to question or raise doubts as a result of either of these facts, though apparently as a matter of general judgment, as there was no specific regulatory requirement in this regard. OA confirmed that the use of money exchange companies for transferring funds out of Libya was legal, and was a recognised and accepted practice. The Commission again criticises ATL's acceptance of this at face value, in the light of inconsistencies which its investigators have subsequently perceived in explanations recorded by ATL as being made by Mr A. It is suggested that ATL should have considered (but did not) whether OA was really independent or could have been put up to giving such advice by Mr A.

177. (I have read the relevant exchanges, from which it appears that OA provided this advice on an introductory basis with the final proposal that if further or more formal advice were required, a formal engagement would be entered into. The correspondence looks efficient, responsible and businesslike, although as is often possible, especially after the event, one can see that questions as to whether this was all part of a clever and elaborate collusive charade could be conceived.)

178. In fact – and I accept that this may well have been what had really stirred ATL into action in 2009 - the banks themselves were apparently becoming unhappy about receipt of funds through money exchange companies during this time. However, for whatever reasons, the use of money exchange companies for remission of funds to the Trust had ceased by 2010.

179. The second point was that although ATL did seek copies of contracts and invoices to support the source of the amounts coming in to the Trust as being legitimately from Mr A's businesses, it was pointed out, - but notably, quite openly - by Mr A that as the sums remitted were profits from the relevant contracts invoiced but taken after deduction of attributable expenses, the sums remitted would not correspond to those on the invoices, although they would be seen to be covered by them. Whilst conceding that ATL in fact did obtain translations of the documents (once again, the ED had to withdraw a criticism that this had not been done when this was shown to be untrue) the ED then revised its criticism to be of ATL's acceptance of this situation without doing more. (I am not sure that they ever said what more should have been done). ATL's files show that in 2009/10, it was contemplating sending someone out to Libya to verify Mr A's business activities. However, it never in fact did so. This is then a further point of criticism from the ED, although given the next point, it might be understandable.

180. In February 2011 armed revolution and civil war erupted in Libya. The government of Colonel Gaddafi, which had been in power for many years and provided a stable environment (even if undemocratic by Western political standards), was overthrown in the summer. Although the revolution itself terminated in October 2011 - Gaddafi was then captured and killed by the revolutionaries - the country remained in a state of civil war, uncertainty and unrest for quite long afterwards.

181. At about this time - October 2011 or December 2011 - Mr A contacted Mr Domaille to say that he wanted to change the name of the A Family Trust to something unconnected with his own name, and also to remove himself as a beneficiary of that Trust. He also wanted to change the name of the company. Mr Domaille asked why, and was told that with the great civil unrest in Libya and Mr A's previous connections with the overthrown Libyan government, he was now concerned about matters of security and did not wish his connections to the trust, etc, to be obvious. Mr Domaille pointed out that merely changing the name of the trust would still leave the family name, and Mr A's connection, on the face of the records, and he suggested that it would therefore be better to create a new trust, into which the Family Trust assets could then be transferred, and of which Mr A would not be a beneficiary, although his wife (who does not bear the "A" surname) ("Mrs A") and his son could be beneficiaries. This was the course which was put into effect. A new Trust was set up by a Declaration of Trust (with ATL as trustee) on 12th January 2012. The A Family Trust thus became the X Trust, with the beneficiaries being Mr A's wife, her children and remoter issue. Mr A was not named as a beneficiary but was not expressly excluded, either – not surprisingly, if the objective was to keep his name off the new Trust Deed. The name of the company was changed to X Capital Limited.

182. It is this transaction, (which I will call "**the change of name incident**", although that is not strictly accurate) and Mr Domaille's part in it, particularly (it seems) in actually suggesting the relevant mechanism, which the ED and the Commission characterise as facilitating the "disguising" of Mr A's connection with the assets of the A Family Trust and his businesses, and which is relied on as the central manifesting of "lack of probity" on Mr Domaille's part.

183. Continuing the history, in March 2013, a sub-trust of the (now) X Trust was set up, the X No 2 Trust, and Mr A was a named beneficiary of this trust. No criticisms arising from this transaction seem to have been made.

184. In April 2013, ATL, in the shape now of Mrs Hannis, learned, for the first time, that Mr A had a brother ("AA"), who had formerly, (ie during the Gaddafi government), held a very high position with the Libyan Office for the Development of Administrative Centres ("ODAC"), and was involved with setting up contracts on their behalf. Obviously, some such contracts were more than likely to have been with Mr A's L companies.

185. This revelation occurred as a result of meetings and correspondence between Mrs Hannis, Mr A, and also Mr A's UK (not Libyan) business partner, a Mr McM. This interaction was prompted by Mr A's expressing concerns that AA had heard rumours that a Maltese company in which they were both interested was being investigated by the Maltese authorities, because AA was being accused of misappropriation of funds from the Libyan Government during his tenure with ODAC. The concern for X and ATL was whether this might affect Mr A and his affairs. Mr McM told Mrs Hannis that it was believed that satisfactory information was being given to the Maltese authorities, and that the investigation would be closed. Mrs Hannis is criticised for simply accepting this assurance, without question.

186. Mrs Hannis did make some of her own in investigations, though, and these revealed to her that ODAC's assets had been frozen by the European Union in 2011 – but that they were no longer frozen. She sought further information as to whether possible sanctions against AA would extend also to Mr A and his assets, and she received back advice from Appleby, (who, as international advocates, had been previously involved) together with a leading counsel's Opinion to the effect that so long as Mr A's assets were not owned by or held for AA, Mr A was not affected. Therefore, no further action was taken. However, the Opinion was dated 21st March 2011, and the Commission criticises, first, ATL's failure to recognise AA as a PEP,

and therefore Mr A as a PEP by Association, until October 2014, (see below), and, second, the acceptance of the reassuring legal advice at face value by Mrs Hannis/ATL, without asking why Mr A had not revealed to ATL the existence of his brother, and the existence of his own concerns, two years earlier - and (presumably) drawing an adverse conclusion.

187. On 7th May 2014, an article in the Wall Street Journal publicised the investigation of AA for possible corruption (etc) in terms which suggested a link with Mr A, himself, through a <u>different</u> company, with which ATL was not concerned.   A copy of this article was found, bearing a date stamp at that time, in one of the files maintained by ATL, but no consequent action was taken.      Whether Mrs Hannis was aware of, or registered the potential import of, the contents of this article is a significant matter in the SDM's findings.

188. On or about 14th June 2014, both Mr A and his son notified ATL of a change of their email addresses, and to cease using the old ones.   Mr A's was changed from [L]@yahoo.com to [initials]@varantas.com.   The Commission criticises the apparent failure of ATL (therefore Mrs Hannis) to consider whether this could have been an attempt to hinder investigations by other parties, "*such as financial journalists*".   Shortly afterwards, in June 2014, through Mr A himself, requests began to be made for the transfer of very large sums of money from the X Trust into accounts with banks in Turkey, in the names, respectively, of Mr A, and his son. Between then and 24th July 2014 ATL made transfers of sums totaling $1,800,000, £1,750,000 and €4,300,000, as to 50% each to Mr A and Mr A Jr.      Mrs Hannis questioned (and so informed Mr Domaille) the commercial rationale for such transfers, but she was told that this was to enable investment, in particular by Mr A Jr, in businesses in Turkey.    Confirmatory documents in the shape of bank accounts and a confirmatory copy of the son's investment agreement with a Turkish business partner, were requested and provided, at the end of September 2014 .    The Commission later identified that the Turkish partner had previously worked in Libya and with ODAC.   This discovery is recorded as subsequent in the Final Notice (at §101), but by the time of the Decision, it had become stated as if this was known to ATL at the time ([182]).

189. A payment instruction made at this time, required the breaking of term deposit accounts with consequent interest penalties.   There was circumspection as to this within ATL, but this was apparently not spontaneous but was prompted by queries raised by ABN AMRO as to the series of transactions being put into effect.   On 26th September 2014, citing ATL's fiduciary duties as trustee, Mrs Hannis asked Mr A for the economic justification for this.   Mr A's response was that he took her point, but this was acceptable, in order to get a better return on the funds than was being given by the banks, and that in Turkey one needed to be "*fast and ready*" with money in order not to miss opportunities.    Again, the Commission criticises the ready acceptance by Mrs Hannis and Mr Domaille of this explanation, without question, although once again simply as criticism of that uncritical attitude, and without suggesting what else ought to have been done, or any particular adverse consequence because it was not.

190. But the principal criticism which the Commission then homed in on regarding the actual making of these transfers is focused on the fact that half of them were made to Mr A <u>himself</u>, although recorded as transfers to Mrs A, and were thus transfers to a non-beneficiary.      This is pejoratively characterised as a "disguised" distribution to a non-beneficiary, and therefore asserted to be inconsistent with a trustee's basic fiduciary duty to have regard to the interests of the beneficiaries.   The answers raised by ATL in justification of this included (i) the fact that Mrs A, in common with many middle eastern women, probably did not have a bank account, (ii) the known stability (since 2002) of the family unit, (iii) the fact that the requests from Mr A had reasonably been seen as being made on behalf of Mrs A and were in practice for her

benefit, (iv) the fact that Mr A was, by then and since March 2013, at least an indirect beneficiary of the X Trust through being an openly named beneficiary of the X No 2 sub-Trust, and (v) most importantly, the fact that Mrs A had, on 2nd October 2014, given ATL, as requested, a letter confirming that Mr A had made the requests for payment to himself with her authority and that it was for her benefit.   The Commission's criticisms therefore now changed to asserting a breach of rules, Regulations and principles, by not having obtained such beneficiary authority and consent <u>before</u> making the relevant payments.   The SDM accepted this, stating that the Guernsey trustee's duty to act *en bon père de famille*, had not been complied with in making the payments in the first place.

191. On 29th September 2014, and contemporaneously with the last of the above-mentioned payment requests, Mrs Hannis became aware of AA being arrested in the United Arab Emirates. This was through receiving notice, I think by a media alerts service, of an article in the Middle East Eye of 29th August 2014, which so stated.    Her further investigations showed that AA was subject to an Interpol Red Notice, on the grounds of a list of allegations of suspected embezzlement, money laundering and corruption committed in his former position in Libya. Mrs Hannis therefore concluded that there was a possibility that ATL had been handling the proceeds of crime in the X Trust and on 1st October 2014, she made an internal SAR regarding this, and externalised this, immediately, to the Guernsey FIU, on 2nd October 2014.   In this report it was stated that until this time, ATL had been "*comfortable*" with the situation, but that in the light of this latest discovery of adverse media reports, she was concerned that ATL

> "*may inadvertently have been assisting in the movements of funds pertaining to the allegations against [AA] and therefore may have been handling the proceeds of crime*".

192. It is this incident, interpreted in all its previous context, which is the basis for the main and most significant finding of want of probity against Mrs Hannis.   It is characterised in the Decision as her exhibiting "*Nelsonian blindness*" towards this fact for five months (see [188]).      The Decision also criticises the fact that her report to the FIU did not mention the fact of payments having been made to Mr A as a non-beneficiary of the X Trust.

193. The Decision does not mention, that the FIU approved the distributions requested to be made. The Commission dismisses this fact, on the basis that it must be presumed to have happened only because the fact of payment(s) being proposed to be made to a non-beneficiary was not mentioned.   This is discussed later.

194. ATL continued the Mr A client relationship for another three years.   This is a further matter of criticism from the Commission, though framed rather more as a criticism that ATL did not *consider* terminating the relationship in 2014 and onwards.      In April 2017, ABN AMRO wrote to ATL to give notice of its decision to withdraw banking facilities from the Trust, citing indicators of direct and indirect business links between Mr A and AA and the latter's associates. In May 2017, Standard Bank gave similar notice in respect of bank accounts associated with the Trust, due to adverse media reports.      ATL's management committee deliberated and agreed to end the relationship on 8th June 2017, and this was actually done on 12th June 2017.

195. The SDM endorsed the ED's criticisms of Mr Domaille for allowing ATL's relationship with the A family/X to continue as long as it did, for apparently wanting at this time in 2017 to "*[try] to keep as normal a relationship as possible*", for actually exploring options to find an alternative willing bank so that the relationship could continue, and even for terminating the relationship by a letter which was  "*apologetic*", blaming "*the ever-increasing pressures of*

*compliance regulation*".   This last comment is criticised as evidence of a failure to appreciate the need for such regulation.

196. The X Trust was therefore then wound up.   Mr A was added as a beneficiary and a final distributions totalling £9.6Mn were remitted to his account in Lichtenstein.   The SDM suggests that ATL "*apparently*" did not seek consent from the FIU to make this final distribution, although he does not state why, by then, this was necessarily required, and it did not form any part of the criticisms in the ED's Draft and Final Notices.     The SDM observed, plainly pointedly, that ATL received £500,080.70 in fees from the A family relationship in the period 2011 to 2017, although he left simply as insinuation any finding that ATL's conduct improperly subordinated compliance with financial services regulations to fee earning prospects.

### (ii)      X Trust - the findings of want of probity

197. Having now given an account of the X matter, I turn to examine the SDM's actual findings of want of probity made in relation to this client relationship.

## Mr Domaille

198. The specific findings against Mr Domaille are set out in [177] of the Decision, but repeat a previous finding made at [57].   They rest firmly on the change of name incident.   At [57] it is expressed as being that the very fact of Mr A wanting to change the name of the Trust, and the company, in October 2011, with the obvious, and obviously intended, effect of concealing his association with the relevant assets, meant it was

> "…*not much of an inferential leap to go further and conclude on the balance of probabilities that in all the circumstances Mr Domaille **would have appreciated** that [Mr A] was **simply** trying to hide his connection with the large sums of money that he had transferred out of the country including £10,000.000 plus from sources never verified*"*(emphasis added)*.

At [177], this is expressly confirmed as a finding that Mr Domaille "*turned a blind eye to what was obvious.*"

199. The SDM thus did make an express finding as to the state of mind of Mr Domaille - even though he apparently (but wrongly) considered this unnecessary.   The state of mind of "Nelsonian blindness" which he finds expressly at [177] is necessarily a positive finding that Mr Domaille either actually knew (which is what he apparently infers at [57]), or actively suspected, that the true reason for the requested change of name was that of protecting illegitimately gained funds and that he consciously failed to take appropriate action, (whatever that might have been) to report or call this out, but went along with and assisted in Mr A's request nonetheless.

200. That is not the same thing as a finding, or judgment, that the facts were objectively so obvious that Mr Domaille ought to have drawn such a conclusion even if he did not do so, and I emphasise this.   This latter may be gross negligence or utter incompetence, but it is not want of probity, because it is the element of conscious unethical behaviour in some form which is the essence of lack of probity in the shape of Nelsonian blindness.   The finding is a finding of fact that Mr Domaille did conclude that there was at least suspicion but positively chose to ignore it.   Of course such a finding, if made on a proper evaluation of all the evidence, would be fairly classed as a want of probity.   However, the fact that the SDM had previously directed himself that no such subjective finding was necessary must cause concern as to whether his apparently doing so had in practice been made upon the necessary rigorous and careful

examination of the evidence which the authorities show is required.  That is the nature of the "infection" which Advocate Williams has submitted contaminates the SDM's findings of want of probity generally, and has resulted in their being unreasonable, on this point at least.

201. Leaving this underlying misgiving aside, to justify such a finding at all plainly did require examining Mr Domaille's explanation of what he says he actually did think against all the relevant evidence, to decide first, if his explanation was true, and second, if it was, whether acting as he did with that explanation was within the range of acceptable ethical behaviour in the circumstances.    Importantly (and I accept Advocate Williams's submissions at Paragraph 47 of his skeleton argument to this effect), given the standard of proof to be applied, this required devoting critical attention to the evidence adduced on both sides of the case. Advocate Williams submits that it can be seen from the decision that the SDM either did not do so, or he did so only inadequately, because his decision does not disclose any such reasoning process.  He further submits that, on examination, the finding of want of probity could not have been made if all the relevant evidence had been properly considered.

202. In the end, although not without some anxious consideration, I agree with this assessment.  To come to the conclusion that Mr Domaille had lacked probity, the SDM should have asked himself the question: what did Mr Domaille actually think was, or might well be, the reason for Mr A's requesting the change of name or structure?    Having answered that question the SDM should then, if necessary, have gone on to ask whether Mr Domaille's actions with that state of mind, could still have been considered ethical (or not) by right-thinking persons in the financial services sector.  Of course, the answer to the first question, if it had been that Mr Domaille did in fact harbour the relevant knowledge or suspicion, might have made the answer to the second question obvious, but the first question did have to be answered, and the SDM just did not approach the matter in that way.

203. At [57] the SDM specifically makes his finding of want of probity, doing so rather disparagingly, "*despite noting the efforts to mitigate this point which have been put forward*". This is presumably a reference to Mr Domaille's explanations - although it is to be recalled that the SDM did not himself take evidence from Mr Domaille, but only considered his interview answers on the papers - and he does not explain his reasoning here at all.  At [177], his explanation is minimal; he assesses, only, that there was "*no real justification* [sic for changing the name and structure of the Trust] *at interview*".   Apart from being an objective assessment, this is very broad brush.  Advocate Williams submits that this is wrong and unfair, and I agree.

204. I start from the fact, which the SDM expressly accepts (at [57]), that requests to restructure and rename trusts are quite commonplace.  Moreover, there is nothing unlawful or unethical *per se* about doing so.     It is not regarded as unethical to use a name for a trust or company which is not that of the actual owner, settlor or UBO.   There are many reasons which perfectly normal and respectable, (particularly high net worth) individuals may have for not wishing to draw easy or obvious attention to their assets in that way - security, family relations, a natural, and quite legitimate, human wish for privacy (even including privacy from financial journalists). It follows that, for it to be unethical to assist in changing a trust or company name, the assister must have knowledge or, at least, suspicion, that it is being done for a disgraceful purpose, such as (here suggested) fraud or money-laundering.     Simply to label the implementation of such a plan with the pejorative term "hiding", "concealing", or even "disguising", adds no weight to the charge of being unethical, and is just prejudicial language used to state the obvious.   The point is whether the motive for such concealment was disgraceful or not, and whether the likelihood or possibility of this was actually suspected.

205. I would add here that the fact that Mr Domaille "facilitated" the distancing of Mr A from the trust by suggesting a more effective mechanism for doing so is, in my judgment, neither here nor there, even though it is apparently lighted upon as a disgraceful exacerbation of what Mr Domaille did.   It does not create culpability if no culpable state of mind existed otherwise.

206. The essential question therefore is whether Mr Domaille actually did think that the motive for such change was or could be to conceal the connection between Mr A and the L Cos and the assets in the Trust because they were the proceeds of crime.   The SDM's finding, replete with judgemental hindsight, is that the change of name in this case was so obviously designed "*simply*" for the purpose of concealment of Mr A's connection with the company and the trust assets for disgraceful purposes that anyone in Mr Domaille's position and with his then experience would have concluded that it must be for this purpose, and therefore Mr Domaille did.   He simply accepts the ED's submission that the evidence for this should be viewed as overwhelming and he therefore dismisses Mr Domaille's explanation as being inevitably untrue.

207. Mr Domaille's evidence and explanation was that he did turn his mind to the question of motive, and he did ask for a reason.   He was told that it was considerations of security, owing to Mr A's previous, and now possibly dangerous association with the violently ousted former government of Libya.   If Mr Domaille believed this reason, then it provided an actual, and for present purposes "innocent", state of mind.   The only justification for doubting this explanation by him is that it simply could not, even at that time, have been plausible.      Aside from this being a question which the SDM does not seem to have asked without having pre-judged the answer, I do not think that, in the end and without the benefit of hindsight, it could be fairly held that such explanation was not plausible.   This ignores or unfairly dismisses or diminishes facts such as the following:

  (i) At that time, 2011, Mr Domaille was not even aware of the existence of AA, nor of his position with regard to Libyan authorities, nor of the allegations of corruption which later came to be publicised;

  (ii) At that time, Mr A's affairs had been conducted with apparent substance, openness, co-operation - and propriety, apart, only, but only possibly, from the use of money exchange companies, which Mr Domaille believed had been appropriately explained (even if Mr Domaille be criticised for not having been rigorous enough in his acceptance of the source of such advice and explanation), and which had, in any event, ceased two years previously;

  (iii) At the time, Libya had suddenly seen a coup, with revolution and a continuing bloody civil war, in which the old order had been turned upside down.   Even those with wholly legitimate dealings with a former regime might well be concerned about vendettas, reprisals, or possible witch hunts, when the balance of political power changes in a middle eastern country.   It would not be unreasonable for people, even with totally legitimate connections with the former regime to regard this kind of change as not merely a matter of physical safety, but also of wishing to distance themselves, and their affairs and their assets from any obvious link to the former regime and those who had worked with it;

  (iv) Whilst the mechanism used to create the X Trust did indeed have the effect of removing the connection with Mr A from the face of the operative instruments, the ultimate connection with him as the economic settlor of the X Trust, and the company

formerly having been called L could not be expunged.   It would always, therefore, be visible to authorities with a legitimate right to investigate the position.  (No such duty was owed towards financial journalists);

(v) Mr Domaille's contemporaneous belief that this was a real and understandable reason for the change of name derives at least some support (absent a presumption that he was being devious) from the fact that he gave it as the reason, at the time, to the X entities' bankers.   He even stated the reason as being a wish to "*remove any perception that the Company is linked to* [the L name] " .   In the MTN, at §23, the SDM castigates this as being "*blatantly improper*" and the means of doing so for not even having the "*possible camouflage of subtlet*y".   He removed this hyperbole from the Decision, but such a lack of subtlety was surely more consistent with an innocent state of mind than a guilty one.   There is also no evidence that the bankers – or indeed any other service providers who would have had to be informed – themselves raised any concern or suspicion arising from such supposedly blatant impropriety;

(vi) It also seems to me that a judgment that Mr Domaille actually did suspect (because he "must have" suspected) that the change of name was part of an effort to hide proceeds of crime overlooks the fact that the standards of suspiciousness now expected to be routinely applied, in particular as regards foreign "high risk" clients, when providing financial services, have undoubtedly moved on, increased, and become more sensitive, since, even, 2011;

(vii) Even though this was after the event, in 2013, the X No 2 Trust was set up as a sub-trust of the X Trust, and Mr A was named as a beneficiary.   The distancing of himself from the original X Trust was therefore greatly reduced if not entirely removed.  (The Commission's response to this when it was pointed out, was then to complain that in that case the payments made in 2014 ought to have been made to the X No 2 Trust and then onwards to Mr A, and that it was improper (ie another breach) to have made them directly, but this is hardly relevant to the essence of a want of probity charge.)

(viii) Finally and even though this is of no direct relevance because it is even further after the event, as Mr Domaille pointed out - though his even doing so seems also to have been treated as a matter for criticism - there has never been any evidence as to whether the sums which were transferred through money exchange companies in the early 2000s actually were the proceeds of crime or corruption by anyone.   The furthest this suggestion goes is another press article, but as late as 2020, mentioned by the SDM at [81] but which still apparently only refers to "*allegations*".

208. Such justification as the SDM actually does give as support for his finding of want of probity set out in the remainder of para [177] is, as Advocate Williams submits, and I accept, quite unsatisfactory.

(i) To criticise the fact that the X relationship was continued for another three years as being a want of integrity (with the implied charge, from the reference to fees earned, that this was illegitimately prioritising fee earning over standards of probity) ignores the facts that

(a) permission to make the last of the payments to Turkey was given by the FIU after the notification to it.   The SDM dismisses any weight to be attached to this, on the grounds that it did not mention the "*very important*" point that substantial payments had been made to a non-beneficiary (a noted

further point of criticism; see below).   I do not think this is either fair, or, actually, logically relevant.  The important point for the FIU was the question marks over the legitimacy of the source of the funds rather than to whom they might have been paid, and still less whether or not this was a private law breach of trust.   It would hardly have made any difference to the FIU whether the funds had been paid out to Mr A himself or to Mrs A ; and

(b)      that the two banks, ABN AMRO and Standard Bank were, apparently, willing to run accounts for Mr A's entities despite being in a similar position to ATL with regard to observance of law and financial services regulatory requirements.   This is dismissed as simply irrelevant, apparently on the grounds that one does not know what the banks' compliance information would have been, and that they (allegedly) terminated the relationship with Mr A as soon as their Security Intelligence Management found indications of business or transactional links between him and AA.   I do not think that is justifiable.   Whilst ATL/Mr Domaille obviously could not justify its own position solely on the grounds that the banks were apparently not taking issue with providing banking facilities to the relevant clients, it is at least some indication that the intelligence in the financial services world did not consider Mr A to be notorious.

(ii)      To criticise Mr Domaille's "*wanting to maintain as normal a relationship as possible*" as a lack of probity strikes me as sanctimonious, and quite unfairly dismisses as unreal the possible concern of persons in the financial services industry as to committing the offence of "tipping off".   Whilst Advocate Edwards argued that this simply could not have applied to this situation (I think, because the offence of "tipping off" is confined to tipping off about investigations) that is not the point.   The point is whether a person in Mr Domaille's position might fear that it could be so interpreted, especially by a regulator as enthusiastic as the Commission, so that playing safe was a better course, even if one was thinking of terminating the relationship.   This seems to me to have been a perfectly rational and plausible fear.

(iii)      To criticise Mr Domaille for writing an "apologetic" letter when terminating the relationship I find to indicate an underlying extreme of critical approach, as also does castigating his giving, as the reason for termination, that this was "*the ever increasing pressures of compliance regulation*" when this was true and accurate.   When I asked Advocate Edwards what the Commission submitted should have been said, he said that the appropriate reason would have been a statement that Mr A's business had become "*outside ATL's risk appetite*", or "*profile*".    Apart from the fact that this is only pedantically any different from what was actually said, I find this somewhat ironic as a submission on behalf of the Commission as an entity which apparently requires those whom it regulates to conduct their affairs with honesty and frankness.

209. Finally, for completeness, even if the immediately above were justifiable ethical criticisms in 2017, they are all matters occurring some six years after the change of name incident itself, and can hardly be of any weight in establishing Mr Domaille's relevant state of mind in 2011.   If they are inserted as support for the ED's entirely generalised assertion that there was lack of probity in Mr Domaille's "*failure to reasonably consider the legitimacy of Mr A's actions …*" then they are simply inadequate for vagueness, and do not go to any such point.

210. For all the above reasons, I conclude, therefore, that the SDM's finding of want of probity in relation to Mr Domaille is flawed for being made upon an error of law and it was, whether consequently or not, unreasonably made.    First, taken on its own, it was based on a wrong approach, with the over-influence of censoriousness hindsight constructing a judgment of supposedly entertained suspicions from facts only really revealed after the event.    Second, considering the actual evidence and submissions, I have come to the further conclusion that, given proper attentive consideration, and applying the proper standard of proof, as already discussed, there is insufficient evidence to justify a finding of want of probity against Mr Domaille.    The Commission (here the SDM) had a duty to consider whether there was another explanation for Mr Domaille's actions which was consistent simply with incompetence - even gross incompetence - and lack of judgement, rather than a lack of integrity, and with an obligation to prefer the former unless there was strong evidence to suggest that it could only be the latter.    They did not do so, and I find that there was one.

211. I should add here that in the skeleton argument on behalf of the Appellants, Advocate Williams suggests that a finding by the SDM that on balance of probabilities Mr Domaille <u>was aware</u> of the adverse media in reports (which must mean, the Wall Street Journal article of 7th May 2014) concerning Mr A at the time when he approved the distributions  (meaning, as I read it, those made to the Turkish banks in 2014) was a finding made without any evidence.    Although I searched for this finding.  I was not able to locate it as such, and it did not seem to me to be comprehended within the non-specific general finding at [177] that" *Mr Domaille ... had during the course of the relationship failed to take action in the light of information that should have occasioned very serious concern about this high risk client"*.    However, in case it should be material, I make it clear that I do consider that any such specific finding against Mr Domaille was unsupported by evidence, for the reasons given in Advocate Williams' argument, which I accept.

## Mrs Hannis

212. The specific findings against Mrs Hannis are found at [178] - [188] of the Decision, again with some reference, and a great deal of direct repetition, back to the X history set out at [43] - [84].

213. Mrs Hannis did not join ATL until 2011, and can therefore in no way be implicated in matters such as the use of money exchange companies, which ceased two years before this.  Nor is it suggested that she was involved in the change of name incident.    The actions of Mrs Hannis which have been held in the Decision to exhibit want of probity concern the distributions made to Mr A and Mr A Jr during the summer of 2014.  This is against the background of two matters.  The first is the criticism of her that earlier, in April 2013, she did not entertain (or act on) suspicions which ought to have been prompted by (i) Mr A's revelation of the existence of his brother AA, and the latter's earlier position with ODAC, (ii) the possible criminal investigations of their joint Maltese company, (iii) Mr A's evident concerns about this, and especially, (iv) these matters not having been disclosed to ATL at the time they had arisen, two years earlier.  This is characterised by the Commission and the SDM as her culpably "*missing many 'red flags'*".    However, thus far such conduct can only be said to reach the level of possible incompetence, not want of probity.

214. The second factor, and the essence of the SDM's finding of want of probity with regard to Mrs Hannis appears in [188] of the Decision.  It relates to the period of five months between May 2014 - when ATL had plainly received the Wall Street Journal Article (because it was found in a file) - and 1st/2nd October 2014, when Mrs Hannis raised the SAR reports relating to the transfers of funds to Turkey.    It is expressed as follows (all emphasis added):-

> "188. It was pointed out that it took five months to raise these suspicions based on the media reports.  It is hard to understand or justify the "comfortable" feeling described by Mrs Hannis.  Not only was the SAR very belated but effective procedures and controls were lacking.  **The fact that Mrs Hannis was oblivious to the information she had long before raising the SAR is significant.**   She accepted the explanations passively at face value and the 2011 advice from a QC when obtained two years later was an obvious red flag.  The penalties for Mrs Hannis reflect her role and her responsibility for what went wrong and take applicable mitigation fully into account.  <u>**At best**</u> **she observed significant offence regarding the X entities with a Nelsonian blind-eye.**  It has been necessary to go into the amount of detail set out so as to fairly consider her position and evaluate her lack of effective action.  Her general mitigation will be considered below at paragraph [247 (ii) (c)]."

215. This subsequent paragraph contains criticisms (principally that Mrs Hannis "*lacked firmness of character*") rather than mitigations.  The points which could be described as mitigation are a recognition that, from the facts and noting her responses at interview, it was accepted that "*her responsibility is markedly less than Messrs Domaille and Clarke*" and that "*she did not have effective role models to look up to*".

216. Oddly, however, this paragraph 247 (ii) (c) also purports to record a finding of want of <u>probity</u> in relation to yet another client file, F Co.  This appears, though, to have arisen from a direct lift of wording used by the ED as its list of general criticisms of Mrs Hannis' conduct in relation to several files in the Final Notice.  This is a pattern of wording used as regards all the Appellants (see §§460.1, 477.1 and 485.1 of the Final Notice).   However, no such finding on particular facts was included in the MTN with regard to F Co, nor is any such finding explained or reasoned in the Decision.  In his findings as to Mrs Hannis regarding F Co at [207] of the Decision, the SDM does indeed refer to want of probity in the last sentence, but that is expressly related to X, not F Co.  I cannot see that there is actually any allegation amongst the F Co criticisms which could fairly be classed as want of probity on Mrs Hannis' part, as contrasted with want of competence (etc).   This seems to have been, therefore, an unguarded and unwarranted insertion into the Decision, taken from other papers, and I treat it as such.

217. Returning to the Decision at [188], once again, as with Mr Domaille, the SDM there *did* make findings as to Mrs Hannis' state of mind, being those in the emphasised passages above in the quotation of [188].  Once again, they are findings of "Nelsonian blindness".   From the previous "*amount of detail set out*" which the SDM there refers to, there are two distinct matters of real or possible impropriety which Mrs Hannis is being found to have actually known about or to have actually suspected but turned a blind eye to, although these are intertwined and conflated.  The first is the fact that the moneys being requested by Mr A to be transferred from the Trust to personal bank accounts of himself and his son with Bank Garanti in Turkey were or might have been proceeds of crime derived from AA's activities, ie the very possibility which was actually spotted and reported by her in October 2014.   The second is the fact that payments were being made to Mr A himself, when he was not within the class of named beneficiaries of the X Trust.

218. The first charge which is the more general and is (from attention given to it) seen as the more serious, is that of turning a blind eye to possible money-laundering activity, namely the transfers of moneys to Turkey sought by Mr A between June and September 2014.   This depends, however, on a finding that Mrs Hannis both (i) knew of, and (ii) registered the implications of, the Wall Street Journal article of 7th May 2014 (which the investigators found in one of ATL's files), at the slightly later time, starting in June 2014, when the requests for money transfers

were made.    The SDM makes the former finding expressly and the latter by necessary implication.    However, a finding merely that Mrs Hannis "must have known of it" would have to be based on evidence of sufficient cogency to support this as a finding of actual fact. A finding simply that she "ought to have known of it" would, again, be simply an opinion or judgment as to competence, either that of Mrs Hannis herself or of ATL's internal alerting systems. This is not enough for a finding of want of probity against Mrs Hannis personally.

219. Mrs Hannis' own evidence at interview was not, expressly, that she did not see the May article, but was framed more in terms of answering questions as to whether <u>ATL</u> was aware of the adverse press coverage, and having to investigate (so as to provide further information) what actions <u>ATL</u> might have taken in response to them, because she could not herself remember. I cannot see that any direct question to the effect that she herself must surely have entertained suspicions as to the source of funds in the X Trust from this press coverage, and actively ignored them was ever put.   The SDM, impliedly, elevates her uncertainty as to how much significance was placed (by ATL) on this press article into an admission that she knew of it, and disbelief of any underlying implication that she had not regarded it as casting possible suspicion on to the source of the funds in the trust.   However, on examination (and as Advocate Williams submits) I can see no evidence which actually gives the lie to Mrs Hannis' implicit assertion that she did not, in fact, entertain any such suspicion at the time, and one very obvious piece of evidence which supports it, namely Mrs Hannis' actual immediate and very proper reaction around 1st/2nd October 2014, when she did get notice of such allegations through having the Middle East Eye article drawn to her attention.

220. This surely suggests, very strongly, that if she had been consciously aware of the Wall Street Journal article and appreciated its import she would have reacted in the same way when she became so aware, either at once in about May 2014, or slightly later, in June, when the payment requests started to be made.   To exclude the strong likelihood of this, it would be necessary to discern some reason why a previously improper attitude on her part (facilitating money transfers between June and early September 2014 despite entertaining suspicions that they might be money-laundering) should suddenly have changed, simply by the confirmation of this <u>existing</u> (*ex hypothesi* on this scenario*)* suspicion, in another, and probably even more obscure, publication.

221. The SDM quotes Mrs Hannis' comment in the SAR which she filed that "*until I became aware of the severity of the allegations against [AA] and the participation of Interpol I was comfortable...*" as if this is an admission that Mrs Hannis was aware of the actual allegations against AA, but denying awareness of their <u>*severity*</u> before 1st October 2014.    I do not think that that is a fair reading, and certainly it does not imply that Mrs Hannis was admitting awareness of the earlier Wall Street Journal article itself.    It could equally have been a reference to the misgivings which she was aware had been raised, but which she judged had been allayed, in 2013.    However, and on any basis, even that state of mind is not necessarily "Nelsonian blindness" which, as I have said, (and I did not understand Advocate Edwards to dispute this) requires an actual suspicion and a deliberate failure to probe further for fear that that would confirm such suspicion.   Once again, being "comfortable" in the earlier situation might be argued to be lax incompetence, but it is not a finding of a conscious act or failure to perform in accordance with what would be proper professional standards.

222. The SDM should have asked himself whether Mrs Hannis' overt behaviour was more consistent with her having known and deliberately ignored current allegations in the media of corruption against AA since before June 2014, or with her having first become clearly aware of these on 29th September 2014.    The more likely answer was, to my mind, quite obviously the latter,

even if that fact could still invite any other criticism.  Given that the former would have betrayed disreputable conduct but the latter did not, and even reading all the SDM's comments, I cannot see how any other conclusion could reasonably have been reached.

223. As discussed in detail with regard to Mr Domaille (see above), this is again, I find, an occasion of the SDM's having been led into error by his mistaken approach that it was not necessary to make findings as to the relevant Appellant's actual state of mind, and therefore purporting to do so on a less rigorously considered basis than was required, and which was, in fact, an entirely objective opinion.

224. It is particularly noticeable in relation to Mrs Hannis, though, (but see also, for example, [68], [77], [181], [182] in general) that much of the material relied upon with regard to her in the relevant paragraphs of the Decision is framed in terms of "*the Licensee*" failing to do things, but which the SDM then proceeds to treat as if it is a reference to Mrs Hannis personally.   For example, he notes (at [181]) that Mrs Hannis agreed that "*the Licensee*, [ie ATL]" was aware of the Wall Street Journal article.   That, though, is only an admission of the perfectly obvious fact that someone at ATL had to have been aware of it to put it in the file where it was found.   It does not amount to an admission that Mrs Hannis was herself aware of it, although the SDM effectively treats it as such.      This suggest to me that matters which may have been material when included in the MTN because ATL was then a corporate respondent to the enforcement process, may not have been rigorously considered as to their proper evidential value as against individual Appellants, and especially not rigorously re-considered when ATL dropped out.

225. Ultimately, therefore, I accept Advocate Williams' submissions that this charge boils down, in effect, to a charge of missing what the Commission and the SDM - inevitably with the benefit of significant hindsight - regard as being "red flags", but that even if this is made out, the evidence simply does not justify elevating the charge to one of want of probity.

226. The above aspect of the finding of want of probity was concentrated on at the appeal hearing because it appeared to be the central criticism against Mrs Hannis supported by the Commission.      However, the SDM does not actually define what he calls the "*significant offence regarding the X entities*" in [188] which Mrs Hannis is held to have "*observed*", and since he makes much previous reference to the fact that Mrs Hannis authorised payments to be made to Mr A himself when Mr A was not a beneficiary of the X Trust, I have considered whether the SDM's finding of want of probity could or can be justified on the basis of the facts relating to this aspect.

227. For the avoidance of doubt, I hold that the SDM was quite right to place no weight on the submissions made in the Appellants' Responses to the MTN that, as Mr A was the original settlor of the X Trust and was not expressly excluded from benefit, payments to him could lawfully be classified, as a matter of trust law, as permissible advancements.  This is a highly technical argument of trust law even if it is correct, and it perfectly obviously formed no part of the actual reasoning of anyone at ATL in authorising those distributions.  It might be relevant as a final defence in a claim of breach of trust, but that is not what is being considered here.

228. The SDM's finding cannot be an allegation of Nelsonian blindness on Mrs Hannis' part, since she plainly knew perfectly well that Mr A was not a beneficiary.      It follows that for this to justify charges of want of probity, it would need to be found that Mrs Hannis believed that making the payments to Mr A could not be proper in all the circumstance - ie that it was a breach of trust.

229. First, it seems to me that this allegation must be tested on its own merits, and therefore without regard to any question whether the source of the funds in the X Trust was or was not entirely legitimate.  Suspicion of that possibility is a completely distinct question from whether making payments to a person in Mr A's relationship to the Trust in all the circumstances of the Trust should be condemned as lacking probity.

230. In my judgment, only by the harshest and most pedantic application of ethical principles could it be said that making the relevant payments as Mrs Hannis admittedly did make them involved a want of probity - and certainly not sufficient to merit being sanctioned expressly as such, given the serious critical connotations of such a label.   At its highest, and as the Commission in fact ultimately seems to have accepted, the only element of actual "impropriety" lay in making the relevant payments before actually receiving the letter of authority and consent from Mrs A, when this had been sought for the sake of proper records (it appears to have been a template document), and was obviously expected, on reasonable grounds, to be received back without problem.     That is a transgression virtually only of form, and is of a completely different order of culpability from paying over trust proceeds to someone not entitled to them to the damage of those who are so entitled.   It may have been taking a chance about receiving the authority, and it may have been against cautious practice to make payments in the belief that the relevant beneficiary had or would consent to them, but I do not see this as a serious breach of proper practice, in the circumstances disclosed here.

231. The SDM correctly pronounces, at [185], that "*The most basic concept of the Law of Trusts must be that the interests of the beneficiaries are paramount*", but he does not then go on to consider what this may actually <u>mean</u>, in practical terms, in the actual circumstances of the case.    He actually concedes that the payments made to a non-beneficiary "*may have been legally possible*" at [73].  This is both true, and not at all surprising.     Payments can properly be made for the benefit of a beneficiary without being made directly to the beneficiary.  There are many possible situations where this can be so, usually depending on the consent of the beneficiary, and whether there is a good reason, such as family relationships or a likely moral obligation, for the Trustee's accepting that a payment to a third party can be fairly seen as being for the benefit of the relevant beneficiary.   The question therefore depends on the Trustee's discretionary assessment of the situation.  If there were no likely rationale for such a payment, further investigation might well be appropriate, but that is not this case.

232. The SDM's reasoning appears to be that because the payments were "*large*" they <u>could not</u> have been seen as being for the benefit of Mrs A but only for the benefit of Mr A even though Mrs A was Mr A's wife, in a current, apparently normal, marriage, (although no doubt operating under Middle Eastern cultural norms), and that her fortunes, well-being and benefit would therefore be inextricably bound up with Mr A's.  Again, I note that in practice, as previously explained, to support a finding of <u>impropriety</u>, this would have to amount to a finding that the making of such payments was consciously seen by Mrs Hannis as (possibly at least) <u>not</u> being for the benefit of Mrs A.

233. As regards the SDM's treatment of submissions that the payments to Mr A could have been (and indeed were) lawful and that it was not improper for Mrs Hannis to treat them as such, the SDM says that there was an "*attempt*" by the legal representative at interview to seek to classify these payments as a gift [ie by Mrs A].   I find this deprecatory use of language disconcerting, because (a) this would be the perfectly natural and correct analysis, as a matter of trust law and (b) it was most surely appropriate for Mrs Hannis' legal representative to point that out if, as appears to have been the case, the Commission's interviewers had not grasped the point.

234. In fact, I gain the impression that the force of the Commission's criticism of these payments being permitted stems more from a view (arising from its judgment of the other questionable circumstances) that, having elected to remove himself as a named beneficiary of the A/X Trust, Mr A ought to have been held to the strict consequences of that and should not have been permitted to benefit from it by a backdoor.   That strikes me, however, as stepping out of the function of regulation and into the realm of moral judgment.     Characterising the payments pejoratively as "*potentially a disguised distribution from the X Trust*" (see [76]) is simply use of judgmental language rather than analysis.     There was no "disguised" distribution from the X Trust; the distributions made were actually perfectly open.   The Trustee considered that in all the circumstances payments made to Mr A's accounts could properly be viewed as payments to or for the benefit of Mrs A and, in my judgment, that judgment was perfectly possible and lawful, and the evidence suggests that it was the actual state of mind of those involved. Describing the payments as "disguised" is not just inaccurate; it makes no difference.

235. The Commission argues that the allegations of lack of probity against Mrs Hannis are made out on the basis of "*lack of effective action in situations representing various breaches*". However, that proposition leaps directly from objective facts to a finding of want of probity, entirely ignoring the requirement of a subjective disregard for some matter of proper legal or ethical conduct.   I accept that it might be the case, on appropriate facts, that a complete failure of a trustee to exercise his or her mind as to whether a particular action was a proper one to take in the best interests of the trust or its beneficiaries, could amount to a lack of integrity, but that is nowhere near made out on the facts in this case.

236. Having looked carefully at the evidence, to my mind, the nearest that the allegations against Mrs Hannis here come to anything reasonably capable of being classed as a lack of probity is to be found at [76] of the Decision, where it is said that "*Mrs Hannis ..... acted as a postbox*" - rather than exercising independent judgment as to whether the payments were for the benefit of Mrs A.

237. However, the SDM does not, in fact, cite this conduct in support of his endorsement of a finding of want of probity as such, and I find that he was correct not to do so.     This is not a case of a trustee simply acting as a puppet, slavishly implementing instructions from an interested party without thought or question.     Thought was given to the matter whether implementing such instructions could be seen as being for Mrs A 's benefit, and it was concluded, although possibly without great mental searching, that it properly could be.   I do not see that conclusion was colourable, considering all the circumstances which the evidence suggests were believed at the time.   The questions asked or considered by Mrs Hannis may not have gone far enough, viewed in the full glare of hindsight and with the keen eye of a determined regulator, but that still amounts only to a possible want of care or diligence.   It is a strong thing to label a professional person's conduct as "lacking integrity" and, in my judgment, this is only reasonably done in clear and obvious cases, even bearing in mind the appropriate standard of proof as being that of balance of probablities.   I note once again the judicial dicta cited at [157] and [159] above, that professionals are not expected to be paragons of virtue, and that a relevant "lack of moral compass" must be demonstrated to a material extent.

238. I should finally refer, once more, to the criticism that Mrs Hannis did not include in her report to the FIU in October 2014 the "*very important*" fact that substantial payments had been made to a non-beneficiary.   I have already stated that I do not think that this detracts at all from the evidential weight of the fact that the FIU approved the last of the 2014 payments, despite the SAR which had been made to them, and I do not consider that the point has any other importance.   The explanation of the situation is that, for better or worse (but not for want of

probity,) this fact was not seen by Mrs Hannis as being a relevant point at all in relation to her report, still less a "very important" one, and that explains its not being mentioned.

239. My conclusion in the end, therefore is that the Decision's findings of want of probity against Mrs Hannis are unreasonable and unjustified. Whilst her lack of assiduity in noting or reacting to signs of possible wrongdoing may fairly be the subject of charges of lack of competence, diligence, skill, care, judgment or whatever other MCL can be invoked, lack of probity is not fairly one of them.

240. Before leaving the charge of want of probity against Mrs Hannis, I must mention a particular point which has troubled me. I was told by Advocate Edwards that the procedure in matters which go to an SDM is always (so far as he was aware) that the evidence is confined to papers, and oral evidence is not taken. If a finding of Nelsonian blindness is to be made as a matter of <u>inference</u> (ie of circumstantial rather than direct evidence) then I have misgivings about whether any such finding can fairly be made without it being put squarely to the accused person, such that he or she can give their account and explanation of their own state of mind, knowing what the purport of the accusation really is. In a full oral hearing, this would happen. I have some doubt about whether it can happen fairly in a hearing conducted on the basis of papers and interpretation of witness evidence recorded in transcripts of interviews.

## Mr Clarke

241. The findings of want of probity against Mr Clarke are contained in [189] and [190] of the Decision, and are made by reference to the Y Trust file, as to which findings are generally set out in [133] - [139].

### (iii)     Y Trust - Facts

242. The Y Trust is a Guernsey charitable trust set up on 2007 and registered as a Guernsey charity in 2016. It was endowed by another client of ATL, a Mr B, for whom ATL operated several trusts and enterprises.

243. The B family were introduced to ATL through Mr Sinclair, who had a long standing (over 35 years) relationship with them through Mr B ' father. ATL administered the overarching discretionary family trust (the Z Trust, originally established in 1997 by Mr B's grandfather) and the suite of underlying companies held directly or indirectly as assets of that trust, of which Mr B and his family were, by 2004, the designated class of beneficiaries.

244. Mr B was described as a mining engineer and entrepreneur whose operations (carried on through companies) were mainly in sub-Saharan Africa - consequently earning his affairs a "high risk" designation on both counts. He was not only very wealthy but also appears to have been rather generous. There are several recorded incidents of his having made gifts, some of which become material later (see R Co). This particular incident, however, focuses on one aspect of the B client connection only, although the wider context should not be forgotten.

245. The objects of the charitable foundation were "*promoting the education, health culture and spiritual development of communities and individuals worldwide but more particularly in Africa, India and Europe.*" Charitable distributions were made on the recommendation of Mr B, although the trust deed left the Trustee with ultimate total discretion. Mr Clarke was the ATL manager with oversight of this and other B enterprises, although overall client relationship supervision was with Mr Sinclair until June 2019, when Mr Sinclair was removed.

246.There was an admitted breach of fiduciary regulations (and indeed law) in November 2017, when Mr Clarke allowed to be authorised, at the request of Mr B, a payment from the Y Trust of $5000 to a Mr RG, who was apparently a "lifestyle guru" and who ran an ashram in India which Mr B supported.   The payment request was thought to be for the ashram but had been requested (by Mr B) to be made to Mr RG's account.  When Mr RG, very properly, stated that the payment should be made to the ashram's account, giving details, Mr B intervened to the effect that no, it was intended as a birthday gift to Mr RG personally.   ATL did not question whether it could, therefore, properly be paid from the Foundation funds - and it was apparently so paid.  This is an obvious and admitted breach of fiduciary duty, and, as I fully accept, it is a clear and serious one, even if the sum is not huge.   But Mr Clarke, whilst accepting ultimate supervisory responsibility, blamed the actual wrong payment on the misjudgement of a particular junior employee.  The SDM, naturally regarded this as no mitigation, but considered that therefore the offence could be formulated as one of failure to operate effective control (a breach of the MCL rather than a want of probity), and that Mr Clarke's fault was aggravated by this unworthy attempt to lay blame on others.

**(iv)      Y Trust – Findings of want of probity**

247.The incident which is cited as want of probity by Mr Clarke is as follows.     One of the B enterprise companies, also administered by ATL was M Co, which operated in Guinea.     It employed a General T as one of the management team.   General T was also vice chairman of a partly owned subsidiary company of M Co, which operated a bauxite mine and was 15% owned by the Guinea government.

248.In July 2019, Mr B requested ATL, through Mr Clarke, to pay one year's university tuition fees for General T's daughter, out of the charitable foundation.     The SDM states baldly at [136] that this was a "*payment from a charitable foundation to a non-beneficiary at first blush*", but this would rather depend on to whom the payment was made, and I do not find it strange that a foreigner, not closely conversant with charity law, would regard the payment of a student's university fees as "*promoting the education of …an individual*" and blithely assume that it could be authorised as such and without difficulty .

249.Mr Clarke discussed this with Mr Domaille.   They were plainly - and properly - uneasy about the propriety of this.   The stated concern conveyed back to Mr B was that whilst the payment might be justified as being within the objects of the charitable trust (see above)

> "*there is a concern that paying funds away for the education of [General T's] daughter may be considered as being disguised remuneration for General T and a breach of trust.*"

It was consequently suggested that

> "*it would be preferable if you were to settle the university fees personally if so inclined*",

and Mr Clarke asked where such funds should be transmitted to, since they could, of course, be made available to Mr B out of the Z Trust, which was the private trust of which Mr B was an economic settlor and principal beneficiary.     On 16th July 2019, Mr B was informed that €10,000 had, accordingly, been transferred to his account in Cyprus to meet the fees, with such payment being taken from the Z Trust.

250. Unfortunately, Mr Clarke "confirmed", in his interview, that General T had been the Minister of Mining in Guinea in the 1970s when this was not true.   That fact is now accepted by the Commission (a matter which only serves to emphasise the danger of the Commission's investigators putting leading questions to interviewees, with which they helpfully agree out of timidity or a wish to be co-operative) but it led, of course, to the Commission's investigators homing in on this payment being potentially corrupt.   After finding that the factual support for this was absent, the Commission, and the SDM, then fell back on the supposedly damning recognition by Mr Clarke, in ATL's records, that the payment

*"could be considered as being disguised remuneration for [General T]….".*

251. At [137] the SDM dismisses the Appellants' stress on the false basis of the previous criticisms which had been relied on right up to the stage of the MTN as "*camouflag*[ing]" the matter, and he endorses the ED's submissions which "*correctly*" identify the "*key issue*" as being that the Appellants "*recognised the risks involved in transferring the money, ie "disguised remuneration*" yet still proceeded with this payment.   He then refers – and by obvious implication as an adverse finding - to the fact that when discussing General T at interview, Mr Sheldon, as Mr Clarke's legal representative, made the comment "*I think he* [sc Mr Clarke] *means that he's employed for his influence*" with the further statement that Mr Clarke agreed that the "*donation*" was made by Mr B alone "*essentially down to his influence within the company*".

252. This last comment is quite enigmatic, but I derive that the essential matter which the SDM treats as an adverse finding is the portentous reference to "*disguised remuneration*" and that this was recognised and "*documented*" [189] in Mr Clarke's response to the original request, but that making the payment was nonetheless ultimately authorised by Mr Clarke.   However, rather than treat the word "*disguised*" as automatically justifying the conclusion that it was being recognised that something intrinsically dubious was going on, it is important to analyse what Mr Clarke is likely to have meant.

253. The obvious natural meaning of the recorded explanation by Mr Clarke to Mr B is that, rather than the payment being seen as a charitable distribution to promote a student's education, it could be interpreted as an indirect payment to General T, which would not be charitable.   (The fact that the word used is "remuneration", which might seem to suggest a payment for services, does not seem to me to be important, as to many people "remuneration" is simply a formal word for a "payment" and Mr Clarke would not be using language with the precision of a Chancery lawyer.)   The key issue at that time was simply whether it was proper to make such a gift out of the Foundation at all, given the connection with General T, and the perception that it might therefore not be seen to be so.   The alternative then proposed was simply, that if Mr B wished such a gift to be made, he could (and should) make it out of his own resources, as to which, he could have these from the trust (Z Trust) of which he was the principal beneficiary.   I cannot see how there can be said to be anything improper about any of that.

254. When pressed on the point, Mr Clarke's explanation in interview was that he did not say that he believed the payment to be "*disguised remuneration*" for General T, but only that it was feared that it might be so considered by others.   This distinction is perfectly reasonable but is entirely ignored by the Commission and the SDM.   When pressed on this Mr Clarke referred to the possibility of it being so seen by tax authorities.   Now deprived of the "red flag" of possible prospective corruption through this being a payment to or for the benefit of a person previously in public office, the Commission then treats this as an assertion (and thus an admission) that Mr Clarke suspected that the payment was to facilitate a tax offence –

presumably evasion of tax by General T.   There are so many speculative assumptions in this proposition (not least that, if any such payment was taxable, that General T was not going to declare it as such) that it simply does not seem to me to bear the weight of revealing even suspicion of an intention to commit some kind of financial offence.   Mr Clarke's consistent explanation has been that he himself did not see the payment as anything potentially improper, but was concerned that it might appear differently to others; he was reassured, however, that if Mr B wanted to make a gift, he could do so out of his own personal resources, and there was nothing improper about giving him access to these to do so.

255. The SDM also appears (because he mentions it) to regard Mr Clarke's legal representative's suggestion of General T's being "*employed for his influence*" as being of significance, as if it were a resurgence of the original charge of plausible corruption, but he does so without any reasoning as to how or why.   First, it is not uncommon, and certainly not illegal in itself, to employ a person for reasons which may include his "influence" in the sense of the usefulness to the employer of that person's personal reputation, respected experience or even access to contacts. This is very often the very reason for choosing a particular NED in this jurisdiction, and it is not suggested that this is improper.   Any actual vice lies in the <u>corrupt</u> use of influence, not just influence *per se*.

256. The SDM's final justifying comment is that Mr Clarke ought to have been suspicious about this request because the mere size of the payment "*was significant enough to be concerning*" ([end of 190]).   This appears to me as nothing but a general afterthought.   It ignores the fact that the rationale of the payment and its size (the amount of a year's university tuition fees) were explained by the circumstances.

257. The ED's criticism amounts to finding that Mr Clarke should have suspiciously interrogated Mr B's willingness to use his own money to help an apparently valued and respected employee of one of his companies with his child's education, and perhaps even refused him access to his money for such purpose.   This is a requirement for cynical suspicion which strikes me as going beyond reasonably expected standards of alertness to possibilities of abuse, even as a matter of reasonable due diligence or appropriate monitoring of transactions.   Then to go even further, and condemn some perceived failure to act upon it as showing lack of integrity, rather than just (on the most stringent of standards) possible naivety or incompetence, is in my judgment quite excessive.

258. Examining the transcript of Mr Clarke's interview ((end of CD4) Mr Clarke in fact says that such a possibility was considered.   It did concern him and Mr Domaille, "*but the overall risk was not sufficient to take it any further.*"   The SDM actually acknowledged this at [138], but then did not go on to explain, there or later, how he treated this explanation in the context of his finding of want of probity.   This is possibly, of course, because of his view, which I have held to be in error, that it was not necessary to make any finding as to Mr Clarke's state of mind. However, in making a finding of want of probity, the likely truth or otherwise of that statement, and whether it showed an innocent (as contrasted to improper) state of mind was essential.

259. Mr Clarke's answer was given in the context that he had already said that he did not believe that General T   "*had significant wealth*", and the proposition eventually put to him at the end of this part of the interview (and against the false background that General T was supposed to be a quasi-PEP) that if Mr B himself were to pay General T's daughter's university fees this could have been a "*facilitation payment to [General T] for using [General T's] contacts in Guinea for Mr B to further his mining activities there*".   It is that proposition which Mr Clarke said was of concern, but was dismissed as not being any significant risk.   Viewed objectively,

I cannot see how that can be said to have even been an unreasonable attitude to have taken, but unless it is disbelieved, (and there is actually no suggestion that it was) any possible criticism can only be of this judgment.  (I appreciate that in such cases the Commission's next response often becomes that, in that case, this judgment should have been documented, and failure to do so is either a breach of a regulatory obligation to keep proper records, or shows that the accused person did not know or understand the extent of his regulatory obligations, but that was not the criticism made here.)  Once again, though, any such default is only a matter of competence and diligence, and not probity – and I have to say that, by the end of this part of the interview, it seems to me that a bewildered Mr Clarke was understandably confused.  I have difficulty seeing that any damning conclusion could fairly be drawn against him.

260. Returning to his findings at [202] the SDM makes it explicit that his finding, which is a repeat of the Final Notice (at [297]), is that

> "*Mr Clarke provided a client with the means to make a payment having already identified it is* [sic] *disguised remuneration, thereby potentially facilitating a payment that could be bribery and corruption*".

My reasons for rejecting this as unfairly and unsoundly based will have appeared from the regrettably detailed analysis which I have felt it necessary to undertake.   There is no reasoned finding that Mr Clarke actually suspected and deliberately chose to ignore, any such thing, which would be a requirement for a finding of want of probity on his part, on any basis.   Further, the development of this charge against Mr Clarke which I have described causes me misgivings that it owes more to a defensive reaction on the part of the ED to the discovery that its initial finding of impropriety was based on a false assumption, and a desire to justify the charge made despite this, than to a properly objective reassessment of the justice and strength of the case.

261. For all the above reasons, I reach the conclusion that the charge of want of probity against Mr Clarke based on his part in the transactions in relation to the Y Trust or the Z Trust in 2019 was made first on an erroneous basis, but was second, in any event not properly sustainable.   The simple and obvious explanation was that Mr B, with sufficient means to be generous, wanted to make a gift to General T, possibly as a friend, but anyway as a senior employee of one of the companies which Mr B owned or controlled, to help pay for his daughter's education.    This is an innocent explanation.    There does not appear to be any reason or fact which ought to have caused, let alone did cause, Mr Clarke to think there was an underlying corrupt or criminal purpose, but only (as he did) that any such gift should be made out of Mr B's own monies.   It could even be pointed out that he (and also Mr Domaille) rightly and properly, performed their duties as charitable trustees to refuse the trust-founder's request.

**(v)      O Co or others?**

262. Whether the SDM regarded the O Co matter as founding a supportable charge of want of probity is rather confusing.  He does not discuss O Co under the heading of "Probity" in the Decision, but there appears to be a further express charge of want of probity against Mr Clarke at [204] in relation to O Co.   However, this depends on whether the phrase "*The findings…*" at the start of the second sentence of that paragraph refers only to the findings in the first sentence (referring to O Co), or is a general reference to all the previous findings just made in relation to Mr Clarke in the previous paragraphs commencing at [201] which include findings of want of probity in relation to other matters, with this comment having unfortunately been misplaced within [204] relating to O Co rather than being moved separately to a subsequent, independent

summary paragraph.   The tenor of the sentence is of just such generality, and similarly misplaced comments also occur elsewhere in the Decision.

263. In fact, no charge of want of probity with regard to O Co was actually raised by the ED against Mr Clarke or Mr Domaille in the narrative of the Final Notice at all.   When permitted to make representations about the O Co matter, the Appellants' requested, in their Response of 11th March 2022 (§78) an assurance that no charge of want of probity was being made on the basis of the O Co matter.   The combative, and singularly unhelpful, response by the ED was to assert that the O Co matter was "*potentially relevant to an adverse assessment of the probity of the Directors*" (see para 14 of their responsive Note of 23rd March 2022), without elaboration, thus, in effect, leaving it to the SDM.   The MTN itself said only, in relation to both Mr Clarke and Mr Domaille as regards O Co, (107 and 114) that each bore responsibility for ATL's having potentially held monies which could be the proceeds of crime during his period as director, but there was no suggestion that either of them had perceived this or suspected it but turned a blind eye.   The Decision itself, though, contained the apparent finding of want of probity with regard to O Co in relation to Mr Clarke in [204], noted above, and, possibly also, inferentially, as to Mr Domaille (see the first sentence of [196]), albeit without elaboration or discussion of facts or evidence.   The SDM appears, however, to regard his findings of want of probity to be contained in paras [174] – [190] (see [252]), and these do not include any discussion of O Co.

264. Working from the terms of the Decision at [204], and having gained the impression that Mr Domaille had only really come into the O Co matter when it became necessary to report it to the Commission, after Mr Sinclair had left ATL, I had originally inferred that Mr Clarke's involvement must have been as case manager under the oversight of Mr Sinclair, and thus that one matter, and really the only matter, which could possibly have begun to found a charge of want of probity on Mr Clarke's part in relation to O Co would be that in 2018 he was the case manager when investigations of the source of funds for O Co had given reason to raise an internal SAR but, on the apparent decision of Mr Sinclair as the relevant compliance officer, this was  then not "externalised" to the FIU.   I have been later informed that Mr Clarke had had no involvement with the O Co file, and it was only Mr Domaille.    (Indeed, this point had been made in the Appellants' Responses to the Final Notice with regard to the O Co matter (§55), and does not appear subsequently to have been disputed.)     On either basis, the relevant party would have concurred in Mr Sinclair's decision; it is plain that at that time neither of them effectively challenged Mr Sinclair.   It could perhaps be argued that such inaction begins to amount to a want of probity, but such a charge could not be finally made out without more, and a much closer evaluation of the facts.   This thinking was, though, entirely my own speculation, caused by feeling obliged to look for a possible basis for an allegation of want of probity in relation to O Co, particularly in relation to Mr Clarke, because of the terms of para [204] of the Decision.

265. In the end, and having reviewed the matter as above, I have concluded that the SDM probably did not intend to make a finding of want of probity against either Mr Clarke or Mr Domaille in relation to O Co.   I conclude that the second sentence of [204] was an infelicitously placed reference to earlier findings.   The SDM's eventual list of "findings" of fault in the Decision appears, once again, (cf [216] above) to have remained in the wording of the Decision through just repeating the terms of the MTN with the MTN having simply recited a failure to display the whole gamut of MCL qualities as listed, citing investigation of the several files as general support, but without then identifying the particular facts from among those files which were said to display lack of probity rather than any other fault.     In relation to O Co I conclude, therefore, that there is no finding of want or probity by either Mr Clarke or Mr Domaille in the

Decision, and if there were any such finding - ie of want of <u>probity</u> (I stress) - against either of them, it should be rejected for being insufficiently founded in fact.  I accept, also, that Mr Domaille was the person dealing with the O Co file, and not Mr Clarke.

266. I record that there is no finding of want of probity against Mr Clarke (or Mr Domaille) in relation to the R Co matter.   It is therefore appropriate to leave consideration of this file until later.

### (d)      Late inclusion of charges of want of probity – significance

267. I would have come to the above conclusions with regard to the probity findings in any event, but there is one further aspect which affects them all, and which has strongly reinforced my view that the findings of want of probity made against Mr Domaille, Mr Clarke and Mrs Hannis, which on examination are whittled down to the express charges considered above, were simply not justified.   It is the following.

268. The SDM summarily rejects the Appellants' complaint that the charges of lack of probity did not figure, at all, against them in the Draft Notice, but were only inserted in the Final Notice, after they drew the Commission's attention to that fact in support of their arguments that Prohibition Orders against them were not justified.     The SDM rejects this (eg at [139]) on the basis that the evidence advanced remains the evidence advanced, and the Commission's reports are not pleadings.    In my judgment, however, this point cannot be so lightly or conveniently (for the Commission) dismissed.    This is for two reasons.

269. The first is not a ground of appeal in itself, but, in my view, it sheds a light on the attitude of the Commission, which I do find relevant, generally, to the issues of reasonableness in the appeal.     It is the Commission's attitude to changing goal posts.

270. In my judgment, a person who is being charged with misconduct by the Commission under its enforcement procedures is entitled to expect that the initial Draft Notice gives notice of the "best" (ie most serious) case which the Commission thinks it appropriate, and therefore intends, to charge against him or her - in effect, a representation that the contents of the Draft Notice would, in principle and absent any unappreciated mitigating factors, be the Commission's final decision.   The very point of the "Draft" Notice procedure, with the opportunity for the accused to make responses before a Final Notice is actually issued, is to ensure that the accused has a fair opportunity to consider and raise any answers to the specific findings and charges (and penalties where relevant) which are intended to be made or imposed against him/her, in case he or she has answers or points which might, on reflection, justify mitigating those findings, charges or penalties.   It is a standard part of the procedure which ensures that tribunals of enquiry observe their inherent duty to be fair to the person being judged.   The natural and reasonable expectation, therefore, is that the charges in a Draft Notice might be reduced before the Final Notice is issued, but they will not be increased - at any rate absent the emergence of some further, new, evidence or matter in the meantime, which radically changes the complexion of the case (but upon which the accused would, by the same token, reasonably expect an opportunity to respond.)

271. This reasonable expectation is, to my mind, not affected by the subsequent process of the appointment of a decision-maker to issue an MTN followed by yet more representations before a Final Decision.     The decision-maker's function is largely as a review and check on the primary conclusions of the Commission made by its ED, by whom the relevant charges and penalties are decided upon and fixed.

272. In this case, the seriousness of accusations against Mr Domaille, Mr Clarke and Mrs Hannis was actually increased between the Draft and Final Notice stage of the process by the addition (in particular) of charges of lack of probity, which were not contained in the Draft Notice and Report.     This was claimed by the Commission (in the accompanying letter) to be justified by a "*further review of the evidence*", but without any specific explanation of what.     In fact, the only further matter which had emerged - apart from the Appellants' own representations as to matters which they contended had not been properly taken into account in their favour - was the self-reported O Co matter.     However, that was not specified by the Commission as bearing on the issue of the Appellants' probity (the reference to this in relation to Mr Clarke was introduced into the ultimate Decision entirely by the SDM as mentioned above, and was not even included in the MTN) and I am quite unable to see any other new factual matter or evidence which had emerged in the interim and which would have been of any significance as to want of probity.     The reference to a "*further review of the evidence*" therefore simply appears to mean that the Commission had now decided that it could, and would, come to a different evaluation of the position, for no better reason than a change of mind, adversely to the Appellants.

273. If the evidence, which the ED had investigated with such thoroughness over a period of two years (even allowing for Covid), did <u>really</u> justify a finding of lack of probity, then it seems to me that, not only would this have been obvious at the Draft Notice stage, but it was incumbent upon the Commission to consider and opine definitively on that point at the Draft Notice stage.   One is left with the uncomfortable suspicion that the judgment of this increased level of seriousness of the charges against the Appellants was made rather more to bolster support for the Commission's decision as to penalties which had already been announced, by removing an inconveniently identified weakness in this respect, rather than as a dispassionate re-evaluation of the Appellants' transgressions - even if such a re-evaluation were procedurally justifiable as a matter of fairness, which I do not think it was.

274. The above is a purely procedural point, but my second observation is more important and bears directly on the substance of the appeals.

275. The fact is that charges of want of probity were not thought to be justified against the Appellants at the time of issue of the Draft Notice, *after* the ED had carried out all the rigorous investigations which it did - and this cannot be explained away as this possibility simply not having occurred to the ED at the time of the Draft Notice, but having done so later.   This is because the Draft Notice itself shows that the question of want of probity <u>was</u> a matter to which (as one would indeed expect) the ED had turned its attention at the time of issue of the Draft Notice.  This is because such accusations were expressly made against Mr Sinclair and, in this regard, the charges against him were distinctly and deliberately differentiated from those made against the Appellants.  They were given separate paragraphs.   The charges against Mr Sinclair, which I have not been concerned to examine closely because he chose to settle with the Commission rather than appeal, certainly disclosed matters which could indisputably be characterised as lack of probity, including deliberately overriding ATL's internal risk management processes in order to favour a client with whom he had a close personal relationship (D Co), accepting a significant gift from a client and then himself signing off the approval of this gift under ATL's gift, conflict and oversight procedures (R Co), suppressing an SAR (O Co), and giving misleading, self-serving, statistical information to the Commission (general).

276. It is not, therefore, the case that the ED was not then thinking about making findings of want of probity against the individuals who were part of their investigation into ATL, and only realised it was so serious, later.   The implication is clear that, unprompted, the ED considered that the

very conduct of the Appellants which is now said to amount to lack of probity, but which had by then already been fully investigated and assessed, did not amount to lack of probity.

277. The importance of this is, I find, what it shows as evidence.  The second stage of a "probity" judgement about the relevant person's state of mind is whether, if that particular person did not perceive anything unethical about what he or she was doing, he might nonetheless be held to lack probity because such a belief would be unacceptable by the universally accepted standards of the profession, and the relevant comparison is with the standards of propriety held by right-thinking persons with some specialist knowledge and understanding of the operation of the profession in question.    This fact, therefore, strikes me as rather compelling evidence that the initial reaction of those who do have experience of the standards to be expected of the professional financial services industry, and indeed who, as enforcers, would even tend to have an exacting view of such standards, did not see the Appellants' conduct as amounting to lack of probity (as distinguished from incompetence, stupidity, lack of judgment, lack of diligence etc) upon an initial, and therefore relatively dispassionate, assessment.

278. I find this fact to have quite significant weight, evidentially, in the Appellants' favour, but it was dismissed with no consideration by the SDM.   As I have said, I would have reached my eventual conclusions on probity even apart from this point, but I find it to provide major and strong reinforcement for such conclusions.

**(2)  Other findings against the Appellants of failure to meet the MCL:**

279. I have dealt with the charges of want of probity derived from client files individually and in detail, because of their great significance in the case.   This still leaves the various allegations against the Appellants of "lesser" breaches of rules and Regulations, made in relation to client files, which are relied on as demonstrating the Appellants' failure to fulfil the MCL and thus not being "fit and proper persons".    It also leaves similar charges based on more generalised responsibility for systemic governance issues.

280. It would be disproportionate to set out my views on these further matters in similar detail to that which I have felt obliged to do in relation to the probity issue, first, simply because of the length of narrative that would require, and second because, apart from a handful of points, all of which I either have discussed above (Mr A/X Trust: Mr Domaille/Mrs Hannis and Y Trust: Mr Clarke), or will do below (R Co: Mr Clarke), the Appellants have acknowledged and accepted the fact and the factual descriptions of the very many failings which the Commission has identified and now relies on as the grounds for the Decision.   The Appellants' protest is that the Commission has over-stated the true seriousness of these and the weight to be attached to them, and has failed to take reasonable account of mitigating factors.    Such mitigating factors relate both to analysing the failings themselves (which may therefore amount to the same thing as allegedly overstating their seriousness), but also concern giving credit for steps taken subsequently by them (Mr Domaille in particular) to remedy the situation, and improve ATL's standard of performance.

281. The decisions which I must ultimately make depend on an overall assessment of the outcome and the reasonableness (or otherwise) of the sanctions which the Commission has seen fit to impose.     As a matter of proportion, I will not refer further, here, to the three files already discussed in relation to probity.  I consider that with regard to these files, the nature of the matters which are said to demonstrate failure to fulfil the MCL appear sufficiently from this previous account.  However, I do need to consider also the charges of failing to fulfil the MCL in relation to the remaining five files and more generally in relation to the systemic governance issues which are invoked by the SDM.  I will do so as briefly as I feel I can.  I emphasise that

the purpose of this is not so much to examine and make judgment on the individual findings in the Decision as to see whether I detect places where things may have "gone wrong", and which could therefore show that there is potential foundation for the impression of unreasonableness/disproportion which has concerned me.

282. To do this fairly I have read again, carefully, the sequence of arguments, in relation to each such file (*mutatis mutandis* in the case of O Co), or matter.   This has meant going through) (i) the Draft Notice, (ii) the joint Responses then made, but on behalf of ATL and the Appellants, (iii) the Final Notice and the Commission's covering letter of refutation, (iv) the transcript of the hearing before the SDM, (v) the MTN, (vi) the Written Submissions in answer to the MTN made to the SDM, again on behalf of ATL and the Appellants, (vii) the ED's Responsive Written Submissions, and (viii) the terms of the Decision itself and also, where necessary, the referenced underlying materials and interview comments.

283. The eight individual case files in fact relate to only four separate clients.   Mr A and F Co each relate to a single client, but O Co and K Co concerned the affairs of one client (Mr C) and D Co, Y Trust, R Co and Z Trust/W Co all related to the affairs of the Mr B, already mentioned.

284. As also previously noted, the K Co and the Z Trust/W Co file accounts do not give rise to any charges made against the individuals themselves, but only against ATL.   At the hearing, Advocate Edwards submitted that these could therefore be ignored.   However, I do not think they can.   This is because the SDM, whose Decision I am reviewing for error of law or just general reasonableness, did not omit those files from his ultimate Decision, but retained his previous assessment and comments upon those files as material founding that Decision.   He did so despite being notified before issuing his Decision that ATL itself had settled with the Commission and was no longer concerned in the proceedings before him.   This suggests, therefore, that he either thought that the facts revealed in those files, and relied upon up to then by the Commission, were pertinent to his Decision regarding only the Appellants, or that he did not turn his attention to the question whether they really were.   Either way, they appear to have influenced his Decision, and that, it seems to me, must be a pertinent factor in my evaluation of the grounds of this Appeal.

**F Co**

285. F Co Developments Limited was a BVI company incorporated in April 2006.   ATL administered the company's affairs by providing its directors and secretary.   Its UBO, through a hierarchy of companies and a trust (eventually explained by London solicitors in January 2015 as being made for the purposes of estate planning) was a Mr D.   Mr Domaille was ultimately responsible for this client relationship, and Mrs Hannis became responsible for day to day oversight at some time after she joined the firm in 2011.

286. The immediate owners of F Co were Mr D and T1 Co, a company ultimately owned by Mr D. F Co was established because, in 2006, Mr D wanted to own a chalet in Switzerland but was not qualified to own Swiss property.   F Co therefore entered into a tenancy, or option, arrangement with a person who was so qualified (in fact, another client of ATL) who purchased the property and effectively held it as nominee (though not in that legal form) for F Co, thus enabling the use of the property to be transferred.

287. F Co initially obtained loans from T1 Co in several currencies to enable the costs (I think both capital and running costs) of the property to be paid.   It was a very simple structure, and the transactions which F Co was effecting were "low activity" and were entirely transparent - just those of meeting the expenses of the Swiss property.   Indeed, by 2014, there was no rental

being paid and the only sums passing through F Co were the fees of ATL and the resident agent for keeping F Co in good standing.   But of course, the relationship with Mr D, who was listed by the World-Check international monitoring service as a PEP, put this business into the high-risk category.   It therefore required an appropriately rigorous internal risk mitigation plan, and periodic reviews, and adherence to these.

288. It did not get them.   The history of the file shows a series of failures by ATL, and this does mean, effectively, by Mrs Hannis and Mr Domaille.   The first was a failure to verify the source of the funds going to T1Co (and thus to F Co).   Although the inception of this client relationship was before such requirements became imposed by the Commission in 2007, those requirements were subsequently extended to existing business.   The second was to monitor sufficiently what was going on in terms of changes of ownership of the superior corporate interests, and in doing so, failing to comply with the parameters of ATL's own risk mitigation plan.   This is accepted by the Appellants, so far as it concerns their own involvements at any particular time (Mr Domaille and Mr Clarke as ATL Directors, and Mrs Hannis as the relevant manager).

289. In 2013, ATL was informed that the owner of T1 Co was no longer a company ultimately owned by Mr D, but a corporation (B Co) owned by Mr D's mother, (Mrs D Snr), who was listed as a PEP by Association (with Mr D).   The reason for this change of nominal (as it pretty obviously was) ownership was not explored or investigated by ATL.     Mr Domaille is criticised for signing off a risk mitigation plan in July 2014 which still listed Mr D as the UBO of F Co.   Whilst this is an easily identified case of laxness, it is somewhat ironic as a criticism of substance because the later criticisms of ATL are that it failed to take due account of Mr D's ultimate control of F Co.

290. At the same time, July 2014, it was recorded by ATL that Mr D, apart from being a PEP and with business links to Russia, had been barred from the USA due to possible ties with organised crime and for having admitted to a European newspaper, some four years earlier in 2010, to having connections with the Russian Mafia.   (It was said later by ATL that this last was in fact a misinterpretation of his having admitted being targeted by the Russian Mafia.)   It is suggested that these were "*formidable warnings*" of possible links to financial crime, and ATL's view that this did not cause concern about the legitimacy of the apparent routine activities of F Co is criticised, although no particular consequence of this is suggested.

291. At the end of 2014, the ownership of B Co was changed to divide this among 11 persons, ten of whom held their shares in trust nominally for Mrs D Snr, who was the eleventh.   ATL was not informed of this change of ownership, which created a complicated structure which, on analysis, showed Mr D now to hold 39.6% of F Co.   ATL is criticised for its monitoring efforts not having been sufficient to reveal this.   It is also criticised for not, as a consequence, having noted that this could have been a way of disguising Mr D's position.   Although no potential nefarious consequences are actually suggested by the Commission, their complaint is that because the situation was not known, no-one thought of asking whether there were any.

292. In 2016, an unfortunate mishap occurred.     Mr D himself was no longer declared a PEP by World-Check, because it changed its policy and no longer included persons who were members of the Russian Bureau of Industrialists, of which he was a member.   This resulted in ATL now formally (and certainly belatedly, it is fair to say) recording the change of ultimate ownership of F Co to Mrs D Snr, but her being apparently no longer a PEP by Association.     In consequence, with new internal forms being filled in, the F Co files were downgraded to standard risk, because the only risk factor was now that Mrs D Snr was Russian.

293. It is accepted by Mr Domaille and Mrs Hannis, who signed this off, that this should not have happened - although superficially it would seem to have been in accordance with designated procedures, as applied to the understood facts.   On any realistic basis, though, common sense suggested that this company still ought to be classified as high risk, with the appropriate administrative consequences of enhanced due diligence and review.     However, it was discovered later that a 1% nominee share owner of B Co was classified as a PEP through having been a member of the Russian Duma between 2004 and 2007 (ie some 10 years previously), so that Mrs D Snr should have been treated as a PEP by Association with this person, and the downward reclassification of F Co was not even (therefore) technically justified.

294. In 2018, Mr D was sanctioned by the US Treasury.   ATL became aware of strongly critical adverse newspaper reports about this and about his business activities.   Mr Domaille took advice about this, but only (the Commission states critically) as to whether the US sanctions affected Guernsey, which they did not.   ATL is criticised for having then positively decided that it was appropriate to continue the business relationship, with continued monitoring of the sanctions on Mr D.

295. I find this a little surprising.   The tenor of the Commission's Handbook (I looked at the 2007 version as updated in 2017) is very much that an assessment of risk appetite is a matter to be undertaken (responsibly and with due policies and procedures, of course) by the Board of a regulated entity, but this charge appears to be criticising just such a discretionary decision.   The criticism could presumably be justified on the basis of a judgment by the Commission (if it made it) that ATL did not have the resources adequately to manage whatever risk this client business actually constituted, but even if that were fairly to be assumed on the actual facts, that is a different point and not the one taken.   Otherwise, such a criticism appears to become one, simply that the entity did not make the decision which the Commission would have liked it to make.   I am not sure exactly in what way it is suggested there was a regulatory breach here, therefore, but I will assume that one does exist.

296. This flurry of events did, though, prompt a retrospective review and questions as to the source of funds for F Co.   In particular the source of an original loan on non-commercial terms made to F Co in 2008 by a BVI company (T2 Co), owned by a cousin of Mr D, was scrutinised.   However, enquiries of that entity elicited the response that the loan had been waived in 2017 and there was no copy of the original loan agreement.   Obviously this was hardly satisfactory, even though of course, the matter was, by then, 10 years old.

297. ATL terminated the business relationship with F Co in late 2019.   This was after the start of these enforcement proceedings, and it is well understandable that at that point, doing so would be seen as the safer course for ATL.

298. Cutting through the detail, the essence of the Commission's charges made against Mr Domaille and Mrs Hannis in respect of this file are that there is a continuous thread of insufficiently effective monitoring of the real <u>client</u>, (rather than just the client's activities) and not fully understanding that client and his connections.     This arises not just from the downgrading of the risk rating, which is castigated as an egregious mistake, but also from the fact that ATL did not adhere to the standards of review and monitoring which it had set for itself.   It did not react appropriately to adverse media in 2014 with regard to Mr D, and its only reaction to notification of US sanctions in 2018 was to take advice about the effect of sanctions; it did not show sufficient suspicion as to whether this might raise concerns about other financial crime activities.     This was therefore, (it is said) a serious failure, whether viewed as a failure to have appropriate and effective monitoring procedures in place, or a failure to implement them once they were.

299. Mr Domaille pointed out that he had relied on staff to put into effect the stipulated measures, and even staff who were seen by the Commission, in its subsequent investigations, to have been commendably efficient and effective.   That though, is deprecated as part of a tendency (said to be shown by similar comments in other contexts) to try to foist blame off on to others rather than to accept his own failings and responsibility as a Director and the person in ultimate charge.   (As a breach of the MCL, such a criticism would seem to have to be classed as a breach of a part of (a): "…soundness of judgment…", and (e): "…understanding…of professional obligations", which are sufficiently generally phrased that they can be construed to comprehend a very wide range of matters.)

300. The defence of the Appellants, again levelled at the assessment of the seriousness of these breaches, is that whilst the factual faults of process are admitted, the underlying involvement of Mr D was always appreciated as a background fact and was never ignored, but the actual activities of F Co itself which were being administered were simple and *prima facie* lawful and innocuous, such that further suspicions were reasonably not entertained.    Mr D had justifiably been viewed and accepted by ATL as being the owner of a legitimate (at least in Russian terms) huge and valuable industrial empire, such that it was not unreasonable to take the source of his funds as being that.   The Commission was imposing, with unfair hindsight, a demand for an unjustified level of suspiciousness.     Over the initial years, there was nothing to call into question the above perception, and insofar as publicity about Mr D then became critical or alarming, it did not impinge directly upon what was going on, routinely, in F Co until the issue of US sanctions happened and became material; this was properly checked out, and there was a consequent raising of alertness and standards, which led to the recognition of the original failure to identify more exactly the SoF/W. The downgrading of the risk rating, it was accepted, ought not to have happened, but it was simply a mistake, and understandable in the context of the World-check downgrade of Mr D's status.

301. As is apparent, the above explanations are all rejected by the Commission as being any kind of mitigation of the failures which its inspectors found in the files.

302. As a breach of regulatory requirements, the matters complained of here certainly show a degree of laxness, although it seems to me to be fair to say that it is the mistaken downgrading of the risk from "high" to "standard" which must be the main complaint.   I find it understandable that the low, routine and apparently innocuous activities of F Co lulled Mr Domaille and Mrs Hannis into possibly unwarranted complacency at the relevant time, but that was all it was and, whilst it should not have happened, it is notable that there appear to have been no unlawful, or even questionable, consequences.   The failure to verify the ultimate source of the original funds was also, I accept, an outright serious breach of the Commission's later requirement to carry out historic due diligence.    It is, though, historic and once again it does not appear that there was anything actually nefarious which would have been uncovered.    I remind myself, also, that I am here concerned with the <u>individuals'</u> actions or inactions in relation to this file, rather than any general failures of ATL's internal procedures and controls.

**D Co**

303. This matter is a more recent matter (between 2017 and 2019) and principally concerns Mr Clarke, who was the manager involved, although acting under Mr Sinclair.     I am setting out only the aspects which relate to Mr Clarke.   Significant criticisms relating to Mr Sinclair are not directly relevant.

304. D Co is a "Mr B" file.   D Co was incorporated under another name in June 2017 but changed its name in November 2017.   It was a joint venture between Mr B (already mentioned) and a

Mr AC, who was, I think, also a client of ATL.     ATL provided the usual company administration services.    In November 2017 D Co acquired two subsidiary companies which were to be concerned with building data centres in Sweden for the purpose of being rented out to others for the mining of cryptocurrency and other services.     D Co was then re-rated as "high risk" in January 2018, owing to its being a proposed joint venture involving cryptocurrency and the involvement of external directors - amongst other risks.  Among these, ATL identified the risk of "*Bitcoin flowing up into our structures*", and also the need to verify the SoF/W of "*the JV partner*", which the Commission construes, quite reasonably, as obviously extending to outside investors generally.

305.A Mr BS proposed to invest in the venture under a subscription agreement, made in October 2018, which Mr Clarke signed off on behalf of DR.   Under this, Mr BS agreed to invest in D Co by way of transferring $300,000 worth of Bitcoin into "*the Company's wallet*" (a reference to the digital means of receipt and holding of cryptocurrencies), and it was recorded that 46.341028 Bitcoin "*has been*" received in satisfaction of this obligation.

306.In January 2019, in a risk mitigation plan signed off by Mr Clarke concerns were being raised within ATL that the structure previously agreed for this venture was not in place (I am not quite sure how, but it is the principle and not the detail which is in point) and that tax advice for D Co must be obtained and until then (quite properly) all payments would be suspended.    The risks to ATL, reputational and substantive, in dealing with cryptocurrencies were again recognised and under "risk mitigation" actions it was recorded that caution must be exercised to ensure that "*no fiat funds directly generated from the disposal of cryptocurrencies via an exchange or an OTC trade*" were transferred to Barclays Bank (D Co's bankers).  However, this risk was recognised expressly only in regard to D Co's connection with cryptocurrency mining, and not to funds coming from other sources.  The focus of the note was also very much on not contravening what was viewed as <u>Barclays'</u> policy (though the force or formality of this policy was a matter of subsequent dispute) not to accept funds derived from crypto-trading.

307.Despite this, however, between February and March 2019, a total sum of $206,434.33 was paid into D Co's account with Barclays in three tranches, from AIMS OTC, the crypto-exchange company owned by Mr AC.  They were recorded as being derived from Mr BS's sale of Bitcoin.

308.It was asserted by ATL and the Appellants, in their combined Response to the Draft Notice (at §§ 266 and 273(b)) that ATL had never opened any "wallet" for D Co and had never, therefore, engaged in holding cryptocurrency for it.  ATL did have a Coin Management Policy for such transactions.  However, emails and file notes of 19th February 2019 suggest that D Co certainly did have a "wallet", with the company AIMS OTC.    The ATL administrator recording this was comforted by the fact that the Bitcoin in such wallet were considered, by the digital service company which operated it, to be held on behalf of <u>Mr BS</u> (ie not D Co), and that "ownership" of the relevant funds was therefore not transferred to D Co until after their conversion to US$, and, as the instruction to convert was given by "*Mr [BS]'s people*" and not by ATL, the conversion had been effected by him, and neither D Co nor ATL had therefore engaged in the disposal of cryptocurrency.   I accept that this is obviously self-serving rationalisation, but the implication is clearly that it was thought that the sequence of events could therefore be justified, and in particular that Barclays' "policy" could be viewed as not being breached.  This was not justified, however, as already stated.

309.An SAR was, nonetheless, filed with the FIU on 8th March 2019.  It does not appear to have elicited any direction or prohibition.

310. An ATL compliance report in April 2019 repeated the concerns about the company's structure and the continued lack of tax advice, and added also concerns about not identifying and verifying Mr BS's SoF/W, especially in the context that he was now being reported as the deviser of a certain cryptocurrency which was then allegedly becoming the cryptocurrency of choice for cyber criminals.   It was decided, on 3rd May 2019, to terminate the relationship, although this was not done until 12th June 2019.    Whilst ATL sought credit for this, citing demonstrated concerns about the legitimacy of the business as the reasons for it, the Commission points out - and I am sure with justification - that another and probably more compelling reason was that ATL's fees of £110,000 had not been paid.

311. The failures of Mr Clarke are said to be several.  The first is failure to recognise the risk of Bitcoin flowing into D Co from any sources other than mining (eg, from investors), although this is really linked with the next charge, which is failure to interrogate the SoF/W of investors, namely Mr BS, on any basis, and particularly in the dangerous context of the source of such funds being connected with crypto-currencies, as it was plainly known to be.    There were also failures promptly to follow up ATL's own recognised requirements for tax advice and for the remediation of the structure of D Co.

312. I must say that a further and main complaint of the ED did seem to me, for a long time, to be that ATL had failed to respect and implement Barclays' stated "policy" of not accepting funds derived from cryptocurrency, because it seemed to be expressed in just that way, not least in the draft Public Statement annexed to the Decision.     I found that extremely odd, since that complaint would be a matter of the commercial relationship between ATL and Barclays rather than any regulatory principle.   Whilst the Commission will rightly expect those it regulates to behave properly in general terms, it seems to me that applying that oversight at a micromanagement level of how business is done would be unduly intrusive, even for a regulator.   However, on investigation, it transpired that the Commission's complaint was really founded on a charge that ATL had failed to implement its own policy of respecting Barclays' policy.

313. The complaints here, therefore, are not so much absences of adequate policies, procedures and control - whether at a general or a specific level - but a lack of alertness about recognising (or, perhaps actually recording, which would in practice look like the same thing) the extent of risk which the Commission considers should have been perceived, and about a lack of sufficient diligence in pursuing and implementing the actions required from such policies.

314. It is said that Mr Clarke fully admitted all the failures here, at interview (Response to MTN at 60.2).    Effectively, I think he did, but the Response plainly accepted them, anyway.     The ED, in its written submissions to the SDM, argued that this admission should be discounted, because of Mr Clarke's "*completely denying*" the breaches in his response to the Draft Notice. The SDM clearly accepted this proposition, even listing (at [115]) the relevant paragraphs of that response (248, 260, 261, 263, 273, 274, 279, 285 and 297).

315. This strikes me as unfair.  First, those denials were framed at the time as being made on behalf of ATL.    Mr Clarke's personal position must be judged in context, and his admissions at interview and in his later personal representations are more relevant.   Second, even eventual admissions are some evidence that a person has come to recognise and accept their failings, and even if it might be said that they were driven to it, that is still not to be entirely discounted.

316. Once again, whilst these may have been breaches, or only belated observance, of rules and Regulations as a matter of form and process, it is not suggested that any actual unlawful activity was facilitated as a result.

**O Co**

317.I have already set out the brief outline of the O Co matter up to 21st July 2021 above, at [79] – [80] above, and see also paragraph 264.   It now appears that it was Mr Domaille rather than Mr Clarke who actually managed this client and file, but Mr Domaille, and from 2015 Mr Clarke also, were generally responsible for oversight at Board level.

318.The breaches of proper verification of the source of funds transferred in 2006-7 were admitted, as was the further breach in closing off the investigation of this despite its being uncompleted, in 2014, but this latter was urged to be referable to human error rather than any systemic fault. This does seem to be a reasonable point, although of course I accept it can always then be argued, as the Commission does, that allowing such a human error to go unnoticed and unremedied for so long is in itself a breach of regulation and is evidence of a fault in the entity's procedures and controls.

319.Mr Domaille subsequently informed the Commission that further investigations, had concluded that the original funds remitted by the T Anstalt to O Co were legitimate and were not the potential proceeds of crime.   In a letter of 23rd May 2022 he explained this conclusion as arising from an error of his in mistaking the origin of the O Co funds for those of another entity called H&P.   It was the funds held by H&P which had originated from the sale of shares in the Polish toll road company, the value of which might have been inflated by monies which might have come from a corrupt or criminal source, but those funds had not flowed across into ATL related entities until 2009, two years after the relevant loans from the T Anstalt to O Co.   He then set out the SoF chain which had been established by further enquiries, including forensic accountancy services engaged at a cost of £95,000, together with supporting documentation, and explained that ATL was now satisfied that the source of the O Co funds had been investigated sufficiently to justify regarding it as legitimate.

320.The full explanation is too long to set out here. The ED invited dismissal of all of it (i) as still not adequately demonstrating the legitimacy of the funds provided in 2006/7, (ii) for Mr Domaille's failing to explain how he had made his mistake, and (iii) for failure to confront the inconsistencies in Mr KS's responses during May – July 2021.   I regard the first point, in particular, as being somewhat unreasonable, given the very historic nature of the original default, and also the fact that, certainly at that time, I understand that the Regulations only required reasonable efforts to be made to ascertain the source of such funds and not that absolute certainty be achieved. The SDM simply agreed with all the ED's submissions, also noting the absence amongst the papers previously of any reference either to EAC Co (sale of whose shares were now supposed to have provided the legitimate source of those funds) or to H&P.   The SDM accepted that the Commission's proposition, that Mr KS must have been  acting as a front for the settlor (Mr C), was "*rational*" (and therefore, impliedly, demanded more probing, or some other action) and he generally dismissed, as any mitigation, the points put forward by Mr Domaille and in particular the extensive and expensive efforts which had now been made in order to try to establish the position as at some 15 years before.

321.Once again, the complaints here are essentially of (a) a lack of diligence, but originating in matters as long ago as 2006/7, before there were such exacting requirements (b) an unexplained closing off of the subsequent (and obviously, belated) investigation of the relevant SoF/W in 2014,  (c) Mr Sinclair's unexplained decision not to externalise an SAR relating to this in 2018 (and neither Mr Domaille nor Mr Clarke contesting this), generally (d) the subsequent failure to pick up this matter until 2021, and latterly (e) a continuing failure to achieve what the Commission regards as a sufficient and satisfactory explanation of the source of the funds from 14 years previously, despite having spent £95,000 on forensic accountancy services to do so.

I have to say that I did not entirely follow the Commission's remaining complaints about the inadequacy of the information obtained about the source of funds, but in view of the time lag, I find it difficult to see what more, ATL (or Mr Domaille) was really, now, expected to do.

322. There are, clearly a succession of regulatory rules and breaches disclosed by this file, although several are quite historic.   Further points arise from the Commission's attitude to the O Co matter, which I deal with later (see [412] *et seq*).

## K Co

323. This is one of the files mentioned above, as to which no charges are actually made against any individual Appellant.   However, Mr Domaille was the Director in overall supervision of Mr Larkin (against whom the Commission has not proceeded) and other junior personnel. Although Advocate Edwards did not seek to rely upon it, the SDM did not remove it from the decision and presumably therefore, treated it as a relevant matter for considering the culpability of the individual Appellants.

324. K SA was a company administered by ATL as part of the business empire and affairs of Mr C. In September 2011, ATL was notified by the CFO of K SA that K SA was proposing to buy a helicopter from a German company ("OT Co"), whose UBO and representative was AW.   The cost was just under €3 million, with €550,000 being the price of the helicopter and the remainder the cost of a total refurbishment.     The request to ATL to help implement this was made with some urgency.

325. To mitigate risk, Mr Domaille proposed that the purchase should be in the name of a separate company.   K Co was set up for this purpose, with ATL providing company administration services.   It was rated high risk because of Mr C's being a PEP.

326. The sale was initially structured as an option agreement under which instalments were payable whilst the fit out took place, with delivery to take place on payment of the last instalment.   The agreement contained a warranty that the aircraft was not subject to any mortgage or other adverse rights.     Although apparently dated 11th October 2011 this was due to digital pre-population of an agreement form, and it was actually entered into on behalf of K Co on 13th October 2011.

327. An administrator at ATL advised the CFO of K SA that it was not possible to take security over the helicopter because it was not registered, and that the fitting out company would have a lien over the helicopter until it was paid.   The CFO confirmed that this was "*fine*", but the written record of this (an email) was dated 16th October 2011, ie after the first payment had been made.

328. Whilst ATL sought certified due diligence documentation for the helicopter (copies of all agreements, insurance, and written acknowledgment that OT Co would hold the helicopter in trust for K Co ) this was also only done after the first payment instalment had been paid.   This was considered by the Commission to be a regulatory breach by failure to have such documents in place before the first payment.   As such, that breach is admitted.

329. Very shortly afterwards OT Co complained that the option structure was unsatisfactory because it incurred VAT and, by agreement, the payments were therefore converted into loans and a loan agreement was drawn up.     The Commission considers that there was a breach because ATL did not verify that this explanation was true, rather than a device to "avoid" paying tax (see Final Notice para 274).     ATL points out (and previously pointed out to the ED) that any VAT payment obligation would rest on OT Co, not K Co - and I note that tax evasion is not suggested.

330. The helicopter was not delivered despite loan extensions being given, all of which were documented.   But in September 2013, it was decided that, owing to falls in the market rates for charter of helicopters, the helicopter was no longer a worthwhile investment for K Co.  This was apparently a Board decision of K Co, which the Commission has not questioned in itself.  The Commission's charge is that K Co had thus handed over around €3 million with no ownership or security.

331. Although it was supposed to have been agreed between K Co and OT Co that the helicopter should be sold, this had not yet happened in January 2020.   In 2021, ATL instituted legal proceedings in Guernsey on behalf of K Co against OT Co to recover the loan.

332. The Commission's criticisms in respect of K Co were ultimately listed as:

> (i) signing the option agreement despite knowing there would be a pre-existing lien over the helicopter;

> (ii) not obtaining due diligence papers before making the first payment and not for some years afterwards;

> (iii) not obtaining independent verification of the reason for changing the option to a loan arrangement when this was "suspicious";

> (iv) not identifying potential conflicts amongst the various roles which AW was performing (although this had to be downgraded from, "*at the time of purchase*" to "*when they were identified*" when ATL pointed out that there had been no evidence of such different roles until after the purchase had been made); and

> (v) that there had been no formal "risk assessment" of the matter since 2011, until 2018, despite this being a high-risk matter requiring annual reviews under Regulation 3 of the 2007 Regulations.    (ATL claimed, though that there had been several "reviews", even though not annually.)

333. Whilst breaches of Regulations 3 (risk assessment reviews) and 11 (monitoring) were therefore accepted to have occurred, it was submitted that many of the specific instances of breach either were really not, or that they were very minor in their effect.    Mr Domaille also pointed out that insofar as there were shortcomings in oversight, or diligence, etc, these had been shared in by several members of ATL staff as well as himself.

334. The SDM rejected the former arguments, apparently accepting fully the validity of all the criticisms made by the Commission, and castigating the last point as yet another disgraceful example of Mr Domaille's attempting to shift blame on to subordinates when responsibility "*stops with those at the top*".

335. Having read all the materials behind this charge, several times in fact, I consider that, when all the circumstances are fairly taken into account, the seriousness with which the Commission sought, at the time of the Decision itself, to endow the admitted breaches in this instance is very overstated.     This was a known client, and a commercial transaction with an open and obvious commercial rationale, which ATL was asked to facilitate as a matter of urgency.     The transaction did not proceed speedily, but the merits (or not) of that were a matter for the commercial judgment of the Directors of K Co, no doubt taking into account the advice and urgings (or otherwise) of K Co 's beneficial owners, even up to the level of its UBO Mr C (or latterly his estate).  There does not appear to have been any complaint by them.   Most of the breaches, here, relate to judgments on commercial risks (eg, absence of security, or of

documentation expected but not actually provided in advance) and whilst it is accepted that the Commission's guidance does have the apparent effect of micro-managing such commercial decisions, these are breaches of form rather than substance, and it seems to me that due recognition must be given to that, when considering whether or not to impose major penalties.

336. The only potentially "anti-money-laundering" breach contained in the above is the criticism of not independently verifying the change of the original option structure to that of a loan, but this, once again, seems to me to be demanding an unwarranted degree of suspicion or officiousness, because the reason given was perfectly comprehensible and plausible, and in any event any VAT liability would be that of OT Co and not K Co.    The possible "conflicts" arising from AW's later apparent multitude of signing powers is simply not identified as posing any real and actual risk scenario.   These are the only "risks" which it is suggested ATL failed to interrogate; I have not attempted to construct others, because this all seems to me to move unduly into the realms of fanciful speculation.

337. The failure to conduct annual formal risk reviews or assessments is admitted, but, again, it seems to me to be a defect of form and procedure, rather than having had, or even being likely to have had, any practical impact.  Whilst, of course, procedures dictated by Regulations and the Commission's regulatory regime must be loyally observed, it does strike me as appropriate, certainly with regard to considering the seriousness of any breach for sanction purposes, to distinguish those breaches which can be seen to be operating in the context of a real and identifiable risk scenario, and those which are operating only as a fail-safe,  merely against risks which can be imagined or constructed.

**R Co**

338. This file, which is another of the "Mr B" files, founds a complaint of a different nature.   It is as to acceptance of gifts and management of these and of actual or potential consequent conflicts of interests.   It concerns, here, both Mr Domaille and Mr Clarke.  Once again charges, and quite significant charges, against Mr Sinclair were originally made in this connection, but are not directly relevant here.

339. R Co was incorporated in Guernsey in August 2011 as an SPV for a rare earth extraction project in Burundi, another facet of the client relationship with Mr B .  It was obviously, therefore "high risk".   It was administered by ATL, and Mr Sinclair was personally a director of that company and Mr Clarke was his alternate.

340. On about 12th December 2016, Mr B conditionally gave 250,000 shares (of no par value) in R Co to Mr Clarke, and also to another, but junior, trust administrator (Ms X).     Mr B also conditionally gave 1,508,036 such shares to Mr Sinclair.   The shares had no value at the time, but would acquire value if and when (as intended) R Co was floated on the London Stock Exchange, and the gifts were conditional upon that taking place.   The company was, indeed, successfully floated on 30th January 2017.   The gifts then became valued at £25,000 and approximately £150,000, respectively.

341. The gifts register records this as Mr B "*gift[ing] a number of shares to family and friends*".   Although there is some evidence that Mr B was indeed giving further Christmas gifts to such persons, and the record clearly encompassed a correct description of Mr Sinclair, the Commission complains that this was not accurate as regards Mr Clarke and Ms X.   This can of course be categorised as incompetence, but it does seem to me to be trivial.

342. The gifts, though, are clearly substantial, and well above the value of any normal everyday minimal gift.   They required to be managed under ATL's Risk Management (etc) Procedures instituted in March 2016, which required them to be signed off by the Managing Director - at the time, Mr Sinclair. They also required to be managed under ATL's Conflict of Interest (etc) Policy instituted in 2015, which required prior approval of such gifts by the Board.  Mr Sinclair, as Managing Director, signed the gifts off as regards Mr Clarke and Ms X, which was thus technically correct (although the Commission then complains that there was no date against Mr Sinclair's signature).   However, Mr Sinclair also signed off approval of his own gift.    As to the Board, no prior approval of the gifts was obtained; the Board ratified approval of the gifts, but only six weeks afterwards.

343. As regards Mr Clarke, it was noted at that time that the Conflicts Register needed to be updated, and it was so amended in March 2017, thus, a few weeks late.   But a statement of the <u>nature</u> of the conflict was not included in the Register until December 2018, and a record of <u>actions</u> taken to mitigate such conflict (recorded as that the management of R Co was independent of ATL and that Mr Clarke and Ms X should not sign off any payments together) was also only noted at that time, and was then noted only in relation to R Co, and not to the other 38 entities which formed part of the B client empire.

344. The risk regarding Mr Sinclair was also identified in December 2018, but was not recorded as being identified at the time of the gift itself.   Although it was similarly recorded, by way of risk mitigation, that Mr Sinclair did not get involved in the administration of R Co, Mr Domaille and Mr Clarke were well aware that this was not what happened in practice – ie they thus did not "ensure" that even this measure was actually enforced.   A conflict mitigation measure was recorded in January 2019, namely that Mr Sinclair, Mr Clarke and Ms X should not sign documentation together relating to R Co.   This is criticised as both inadequate and too late.

345. These events are thus said to disclose that ATL's actions were inadequate, too slow, and evinced a lack of any policy to control the risk of directors and staff committing offences under the Prevention of Corruption Law.   In all, the whole matter is charged as showing a failure of ATL to have, and to implement, adequate gifts, conflicts and anti-corruption policies, procedures and controls.   The part played by Mr Sinclair is noted as egregious, as he was ATL's MLRO and had a direct personal relationship with Mr B.

346. At the end of June 2019 (ie at the time of the removal of Mr Sinclair) Mr Clarke and Ms X returned their shares, so as to avoid the potential perception of a conflict of interest, but Mr Sinclair, refused to do so.   By the time of the enforcement proceedings he was no longer playing any part in ATL's business.

347. But there is more.    In January 2017, at the time of the successful flotation, Mr Domaille and Mr Sinclair each accepted, personally, 50% of a further five million R Co shares of 10p each, in lieu of payment of £500,000 of outstanding fees due to ATL from Mr B's companies.   ATL's conflicts register recorded these receipts, but stated that neither party was engaged in the administration of the relevant companies and each was content to wait for settlement by share transfer when agreed, such that the risk of either of them influencing the conduct of R Co's business was mitigated.   This was factually untrue, certainly as regards Mr Sinclair, and it also failed to acknowledge the theoretical possibility (at least) of Mr B's even attempting to exert influence over the affairs of ATL.    However, as was pointed out, R Co itself was, after the flotation, a public company, run with a board of directors independent of ATL except for Mr Sinclair, who remained a director, but merely as one member of the Board.

348. Ultimately, the complaint on this aspect is, again, that there were inadequate policies procedures and controls, either enacted or properly implemented and enforced once they were, to manage the conflicts created by this commercial transaction, even though the Commission does not assert that it constituted a breach of any rule or Regulation in itself.  Mr Domaille and Mr Sinclair were, after all, the beneficial owners, virtually equally, of ATL.   This seems to me, therefore, to be right, and it is also right that this transaction was not improper in law so long as it was accurately accounted for as a matter of taxation - and no-one has suggested that it was not.

349. Mr Domaille had sold his shares by the time of his interview in December 2020, thereby removing any conflict of interest arising from their ownership.    Mr Sinclair's position was by then no longer material on any basis.

350. In the Draft Notice there was an added complaint that ATL had no proper policy with regard to preventing "insider dealing", through staff having access to non-publicly available information owing to their shareholdings.  However, when it was pointed out by ATL that this was R Co's responsibility, and not ATL's, this complaint was changed, in the Final Notice, to one that ATL did not have adequate "staff dealing" policies, (whatever that may entail) and that although such a policy had been introduced in September 2019 - obviously as part of the reforms following the departure of Mr Sinclair - this was belated.

351. In respect of this file, in response to the MTN, ATL admitted breaches of the CCG under the headings of Business Conduct and Ethics, Sound Risk Management and Risk Management Systems.    The admissions are of:

(i)   failure to provide suitable oversight of the potential conflicts of interest arising from the acceptance of such gifts by Mr Clarke, the other trust administrator and Mr Sinclair;

(ii)  failure to ensure that Mr Sinclair obtained third party consent to accept his gift;

(iii) failure, for two years, to record a possibility that Mr B could unduly influence ATL's affairs because of such gifts;

(iv)  failure to manage the additional risks (presumably of improper influence) caused by failing to have effective policies procedures and controls to mitigate the risks of staff dealing in the said shares - though it was pointed out that having such a policy has never been an explicit requirement of the CCG.

This appears to me to cover all facets of the breaches actually alleged, and the only issue, therefore was the extent and effect of any mitigating factors to be fairly taken into account, which falls to be considered later.

352. I remind myself, once again, that I am here concerned with the seriousness of the personal failings of Mr Clarke and Mr Domaille.     No allegation of want of probity was made against either of them in respect of R Co, and their actual actions in accepting the relevant shares were not unlawful.  They were ill-advised in terms of the perceptions created, and thus, it can be said, errors of judgment.    They were subsequently remedied.   The gravamen of the complaints, here, however is really failures of ATL to have had, and to implement, sufficiently comprehensive policies, procedures and controls, and, apart from the errors of judgment above mentioned, any sanctions imposed on Mr Domaille or Mr Clarke personally must relate to their actual personal culpability in respect of this matter.

353. I observe once again, though, that there is no evidence put forward that anything untoward actually happened as a result of these failings, in practice.

**Z Trust/W Co**

354. This is the second individual client file which founds no specific complaint against any of these Appellants, but which the SDM nonetheless cited in the Decision.   The individuals' responsibilities therefore can arise only from issues of inadequate performance of their oversight duties as Directors of ATL.

355. Z Trust/W Co is another "Mr B" matter.   The Z Trust was a discretionary trust established in 1997, by Mr B's grandfather.   The terms of the trust deed gave the Trustees wide and totally discretionary powers to pay the income of the trust fund to or for the benefit of any beneficiary, and also to make loans of trust funds (income or capital) to any beneficiary including on interest free terms, with the only restriction being not to postpone the repayment beyond the end of the Trust period - which is potentially 2097.   ATL became administrators and Trustees in 2003.   In June 2004 they (lawfully) limited the beneficiaries to Mr B, his wife, their then daughter and any future children of theirs.

356. In 2011, Mr B himself settled assets into the trust, and the Trustees formally ratified this in May 2012.   However, ATL did not formally record Mr B as being an economic settlor of the Settlement on their Acumen database until this omission was picked up and rectified in 2018. This, of course, founds a criticism from the Commission.

357. At the time of settling funds, Mr B wrote a Letter of Wishes to the Trustees, acknowledging the absolute nature of their discretion, but expressing the hope that they would consult with him during his lifetime as to the investment of the trust assets, and consider dealing with the allocation of income and capital in accordance with wishes which he might from time to time express.   This was a perfectly common practice, and it probably remains so; it has not been suggested otherwise

358. W Co was a BVI company, held within the Z Trust structure, and incorporated for the purpose of being a group management company, holding shares and assets.   Both Z Trust and W Co were obviously to be classified themselves as high risk business, owing to the underlying connections with mining activities in African jurisdictions.

359. Over the period between 1st December 2015 and 14th September 2018, some £1.2million was paid either directly to Mr B, or on his behalf, for what were plainly living expenses and "lifestyle" matters, such as for travel expenses, his daughter's school fees, the gift of a watch to his father, gifts to third parties and, in June 2017, the purchase of a Porsche motor car.   These were treated as loans to Mr B, from either Z Trust itself or from W Co, depending no doubt on which entity made the payment.     ATL thus allowed W Co to be treated, in practice, as a "wallet" company for Mr B, to fund his lifestyle.   The effect of this was that ATL's recorded description of W Co's activities as being that of a holding company, even though it was also stated that it was a "*personal*" company for Mr B, was not accurate in practice, and the risks attaching to the business, recorded as those relating to mining, were thereby inevitably inaccurately stated.   It might be doubted whether this would have made any real practical difference, but it does, of course, show a degree of lax record keeping.

360. Moreover, whilst records of the loan transactions were kept in terms of correspondence and spreadsheets, no formal loan agreements were entered into until January 2019.   This was apparently done as part of regularising Mr B's UK tax affairs, following advice from

accountants that some payments made to him should be re-classified as distributions rather than loans.

361. The ED highlighted one payment, in September 2018, where Mr B had simply asked a trust administrator to pay over £10,000 to his UK account and add it to the Z Trust loan, which she had immediately done (and recorded) but, it was presumed, without her having sought (because it was not recorded), any reason for such payment.

362. After the departure of Mr Sinclair from ATL, ATL "exited" its relationship with all Mr B's entities between 2021 and 2022.

363. In the Draft Notice the charges made were that prior to January 2019, these

> "*undocumented loans increased the potential financial crime, tax, legal, regulatory and reputation risks as it permitted a trust structure to be used at the behest of the settlor/beneficiary to make payments that were*
>
>> *(i) outside of [sic] the purpose for which the Z Trust were [sic] established,*
>>
>> *(ii) not in the best interest of the Z Trust settlement (as ATL failed to keep records of loans) and*
>>
>> *(iii) not effectively monitored or mitigated.*"

364. The above was then stated to be a breach of Principle 4 of the TSP code, which, it was said, requires trust service providers not to "*participate*" in discretionary trusts where they merely carry out the settlor's wishes and exercise no significant discretion.   Additional breaches were stated to be of the ubiquitous Regulation 11 (effective monitoring) and 14 (not having loan agreements in place at "*appropriate*" times).

365. In the Final Notice, the assertions of permitting payments to be made outside the purpose of the Z Trust settlement was, inevitably, dropped when ATL drew attention to the terms of the Trust Deed, in its Response to the Draft Notice.   The ED had taken its quotation of the supposed "*purposes*" of the Z Trust from an ATL internal record form (required no doubt, as part of procedures demonstrating KYC and understanding of client businesses) which set out the background to the wealth and assets of the Z Trust structure and the objective of maximising income from mining (etc) operations, for the benefit of its beneficiaries.   The ED quoted the first of five paragraphs of this note, and the ED had not thought it appropriate to read the actual terms of the Trust Deed itself.   These named Mr B and his wife and daughter as the beneficiaries of the Trust.

366. This mistake is a quite remarkable mistake.   Examining a trust deed before making accusations of (effectively) a breach of trust is rather fundamental.   It is an example which, coupled with other points which I have mentioned where the Commission has had to change its position, causes me concerns as to how far I can rely on the quality of accusations of fault asserted by the ED to exist, where these are not specifically explained and justified.

367. This charge of payments for unauthorised purposes was thenceforth, therefore, focused on W Co.   As such it could only be a criticism of the decision that W Co should make such loans at all, but this was not pursued (and it is difficult to see what substance it could have had in practical terms) and the focus of the criticisms shifted to the other charges.

368. As the relevant sums loaned had been accurately recorded, the charge of failing to document the loans at all, now became a charge of failing to document loans under a formal loan agreement.   The assertion that this was not in the best interests of the Z Trust was retained, despite ATL's Response to the Draft Notice that it had not been explained what adverse impact this was asserted to have had on the interests of the beneficiaries of the Z Trust.

369. When matters went to the SDM, the MTN laid stress on the seriousness of the failure to record Mr B formally as an economic settlor of the Z Trust until 2018 as an example of inadequate monitoring, giving no weight to ATL's submission that this was recognised in practice (when one looked at what happened) but was simply not expressly recorded.   The MTN laid stress on the seriousness of not recording the change of use of W Co to becoming a personal "lifestyle" company as "*pretty significant matters*", though, again, the reason was not explained and was assumed to be obvious.   The MTN laid stress on the seriousness of not having loan agreements in place for the benefit of the beneficiaries of the Z Trust, accepting this without elaboration about the nature or extent of such suggested benefit.   The MTN invoked the occasion of the unquestioning payment as a failure of ATL to exercise its discretion as Trustees, and focused on and upheld this general charge, recording that the SDM could see no "*evidence*" of the Trustees ever actively exercising their discretion in this regard and simply "*carrying out Mr B's instructions to an obedient degree*".

370. In Response to the MTN, ATL and the Appellants made limited admissions, accepting   the failures of form or practice regarding not recording Mr B as economic settlor until 2018, and not having copies of loan agreements in respect of sums paid direct to Mr B thereby failing to record the rationale for such loans, but stressing, by way of mitigation, that in practice ATL had recognised Mr B as an economic settlor of the Z Trust at all times, and that the records of the loans and payments which were actually made showed accurate understanding of what was happening, and submitting that whilst any distribution could carry the theoretical generalised risks listed by the Commission, the documented extent of ATL's knowledge showed that such risks were extremely low in practice.

371. In the actual Decision, the SDM seems partially to have accepted this, (in the absence of any express counter-representations by the ED) but he upheld and relied on the general criticism of there having been no discernible exercise by the Trustee of its discretion.   In this Appeal, the Commission has simply relied on this matter as an additional reflection of the poor governance systems which allowed "*significant and damaging breaches to occur on the Appellants' watch*".

372. I have set the above out in some detail, because I see it as a typical (but reasonably short) example of the approach of the Commission, through its ED, to asserting and evaluating the breaches of the statutory Regulations and the swathe of rules guidance, and codes, etc which it has issued.

373. Quite apart from the extraordinarily misplaced accusation of fault in relation to the purpose of the payments made from the Z Trust at the outset, the complaints are generally all about form rather than substance.  These are (now, at least) admitted as such but the ED's assessment and censure stops there and gives no consideration to whether there were any adverse consequences in practice.   I accept, of course, that it is wrong in principle for a trustee of a discretionary trust simply to do the bidding of the settlor under a letter of wishes as a puppet.    However, where the settlor is, in fact (as Mr B was here) the legitimate principal beneficiary, and the head of the household of all the beneficiaries, the likelihood that it would be reasonable to pay or advance him sums requested must be high.  ATL also had a long acquaintance with Mr B and his affairs which would give them background knowledge and an unwritten "feel" for the reasonableness

of meeting his request.  It surely cannot be right that the only method of demonstrating (to the Commission) a trustee's independent judgment would be to refuse to make a distribution requested by such a person for the sake of it, but, otherwise, it becomes a matter of form, and paperwork only, to record a solemn consideration of whether it was appropriate to agree to any such request for payment before paying it.    Apart from this, the alleged "*significant and damaging*" (my emphasis) breaches are totally unparticularised as to what damage, in practice, is supposed to have occurred.   This criticism simply has the air of a regulatory mantra.

374. It seems to me, therefore, that, yet again, the underlying essence of the charges is that of not meeting regulations of form and process, rather than matters which actually caused, or which, in the circumstances of the case were ever actually likely to cause, genuine practical damage or detriment to anyone.      Whilst the Commission's approach may be, and of course quite legitimately can be, be that it seeks to enforce and uphold "good" practice because maintaining good practice will reduce the occasions on which instances of damaging failures do arise, when it comes to the seriousness of any particular instance of shortcoming, it must surely be appropriate to consider whether the shortcoming was actually courting disaster, or was simply a failure to make a rather banale record and produce paperwork (which would make inspection easier).

**Systemic Governance Issues**

375. I now turn to the systemic governance issues.    These are stated, in the Decision, to give rise to breaches of the Regulations, relating to three aspects of the running of ATL's business focusing on the Relevant Period of July 2014 up to 2021.  These are

(i)     the continuing unacceptable number of outstanding Periodic Reviews of clients and in particular those categorised as "High Risk" business,

(ii)    ATL's recorded high level of Outstanding Action Points, and

(iii)   the absence of adequate Risk Mitigation Plans in respect of some high risk clients.

376. ATL accepted (and the Appellants accept) the recorded facts regarding the above matters, and accept that they were regulatory breaches.    The Appellants submit, however, that even with regard to these charges, there are factors which ought fairly to be taken into consideration, as regards their seriousness, which mitigate this, and which therefore ought to feed into the appropriate sanctions, for themselves as individuals.  For my purposes I need only describe the facts and the arguments in fairly general terms, to evaluate this.

377. I start, though, by making the same cautionary distinction that I have done in relation to the matters of K Co  and Z Trust/W Co, and this is the need to distinguish between culpability which is properly attributable to the operation of ATL in general, and for which a corporate sanction is appropriate, and the element of culpability which is properly attributed to the personal default of an individual, even if in relation to the same matters.    Systemic governance issues are just that; defaults recognised to be failures of the operating systems within the entity itself, and therefore not fairly attributed to any particular individual unless it can be demonstrated that he or she was personally responsible for the systemic issue itself, to some actual degree.

378. In my judgment this is important.   Whilst rule 27 of the Handbook emphasises, quite rightly, that the board of a financial services entity must take responsibility for compliance policy and implementation, and for reviewing and effectively maintaining this, it is not enough, in my

judgment, simply to say that the person was a director at the time of a corporate failing and is therefore responsible, and to be penalised because "responsibility stops at the top". The penalty imposed on an individual must, in my judgment, carry some reflection of the degree of that person's actual individual responsibility (or not) for the state of affairs in question. Otherwise it becomes a penalty of strict liability, with the obvious danger that the sanction imposed on the individual, viewed as such, may be unreasonable.

379. To make its findings on the above matters, the ED inspected, in particular, ATL's quarterly internal compliance reports, from March 2014 to September 2019, (presumably with inspection of other relevant documents on any particular aspect), noting in particular the numbers of outstanding overdue risk reviews, outstanding recorded action points and outstanding risk mitigation plans, over the period. The statistics, which are admitted as figures, certainly show large raw numbers. However, the Appellants pointed out that the first two categories, in particular, are interlinked, because, on ATL's systems, a periodic review could not be completed (and therefore remained "outstanding") until all the action points generated by it had also all been resolved. It was therefore more practical and more reasonable to concentrate on action points. Even so, the figures certainly show a concerning position, and the Appellants accept this. The point is, I think, that treating this as two separate and distinct categories of outstanding matters gives an over-heavy impression.

380. ATL had had a policy in place, from September 2013, to effect periodic risk reviews of client business with a frequency calibrated according to activity and risk level rating. If this was in itself alleged not to comply with Regulation 3 (which may depend on the meaning of the word "regular" as to risk reviews) this particular point was not pressed by the Commission as such, but what was pressed was that ATL apparently failed to implement the requirements of even its own policy. It was noted in compliance reports over the period 2014 – 2018 that ATL then did not have effective procedures to enable it to monitor its own compliance with regulatory requirements. In 2015 ATL established a project to migrate the client review activities to a new electronic system called Acureview, which was intended to improve this situation, but in practice it did not greatly alleviate the recorded numbers of outstanding risk reviews and action points, as regularly reported. The particularly bad period seems to have been between 2016 and 2017, with reviews noted as outstanding in September 2016 for 93% of high risk clients and 82% of standard clients. This clearly looks very bad, although the length of the time element of such outstandings is not fully recorded. By September 2017 this had been brought down to 79% of high risk files and 38% of standard risk – better, but still very bad. In September 2019, this had only come down to 48% and 39%, respectively.

381. The reporting manager, Ms Sherbourne (who was, I believe, accepted by the Commission as being herself an efficient member of staff - this certainly appears to be the case from the structure and businesslike presentation of her reports) repeatedly raised these shortcomings with the Board, as being essential to remedy, and asking for a review as to whether the causes were lack of resources, lack of supervision or lack of staff training.

382. Certainly, though, whilst some steps were taken (such as setting a programme with targets for dealing with a number of action points each day, and even, I think, increasing compliance team staff numbers) the figures demonstrate that these steps were reactive, perhaps desultory and not very effective.

383. It was submitted on behalf of ATL that outstanding reviews were in the "outstanding" category, not because they had not been undertaken, but only because they had not been completed and closed off. However, and as the Commission correctly submitted, this did not accord with ATL's records which showed references to certain entities not having had a review since 2009,

or even 2002.  ATL's response to this was that any <u>serious</u> delays in risk reviews were only in respect of standard risk clients, and not high risk ones, but the figures do not expressly show this.  The SDM clearly preferred the submissions of the Commission.     I have not attempted to bottom out this particular dispute.   On any basis there was clearly a very serious failure by ATL to meet general standards, over a sustained period.

384. As regards outstanding action points, it was again submitted by ATL that merely looking at unexplained statistics did not give a fair picture.  Many points would be duplicative and many were recorded simply because something was "noted".   An action point itself could range from something minor and administrative (such as not having an up-to-date copy of a client's passport) through to a matter of real substance (such as not having ascertained the reason for a large and unusual receipt).   Board/management plans for clearing action points were thwarted or hampered by unexpected matters such as staff absences and turnover, additional work burdens arising through the sad departure of Mr Larkin in 2015, administrators having to comply with extra regulatory requirements such as collation of information for the FATCA and CRS tax projects in 2016 and GDP requirements, or, simply, the fact that staff did not respond with sufficient diligence to instructions given.   The Commission responded to this last submission (and the SDM agreed) that this, of course, only went to demonstrate a lack of training.  This is perfectly fair.

385. A policy decision, to start creating individual loan agreements between connected entities instead of relying on records in correspondence (which extra meticulousness the Commission must surely have approved of), had immediately generated an unusual and large number of action points at the start of 2019, and distorted the substance of the situation.  It was also protested that the Commission's attitude that an action point was "outstanding" immediately it was raised, rather than after a suitable period (which ATL took as one month) to allow for resolution in due course, was unreal and unreasonable and made the figures look worse than they really were.   There is some force in this.

386. With regard to outstanding risk assessments/risk mitigation plans, the Appellants submitted, in effect, that the substance of this was more a failure to record than a failure to implement.     It was accepted that records did not note the conduct of any such review being done annually (for high risk clients) as required to keep these up to date, and that this was a breach of the Regulations.   However, it was submitted that within ATL, these matters had been dealt with as "live" documents, continually under review, and that once the particular failure of being unable to prove specific annual reviews was identified, then procedures were changed and, as the reported figures showed, within 18 months (between September 2016 and December 2017) those outstandings were brought down to zero and thereafter stayed at a reasonable low level. Indeed the Decision itself notes that between 15th September 2016 and 14th September 2017, outstanding risk assessments for high risk clients were reduced from 209 to 18.

387. The Commission pointed to the fact that in March 2021 ATL was obliged to self-report that it was behind schedule in respect of its own policy as to outstanding numbers of risk reviews (20%), and submitted that this was evidence that the situation had still not improved.  The SDM accepted and relied on this assertion.  However, Ms Guillou in her witness statement of 24th May 2022, gives evidence that the outstanding assessments were not, and were to be differentiated from, the general periodic  reviews (called "compliance" reviews within ATL) which were those needed to meet that regulatory requirement; they were the product of a new and improved process initiated at the start of 2021, which produced "Client Risk Assessment and Mitigation Plans", and which was aimed at other regulatory requirements and was intended to improve ATL's overall client monitoring and risk mitigation procedures.     She also asserted that following this self-reporting, the Board resolved on measures to remedy the situation within

a three month timetable, which had in fact been achieved.   She submitted that this was evidence of ATL's changed, and now responsible and effective, approach to meeting such requirements.

388. The ED, and the SDM following the ED, mention only the March 2021 self-reporting incident, and do not make the differentiation indicated by Ms Guillou, nor explain why they do not do so.   They do not refer to the evidence as regards the steps taken to remedy the situation in this context, but they do not dispute it.

389. As a general point, I should also record that on behalf of ATL and the Appellants certain submissions were made as to inferences which could be drawn from the statistics as to the number of files found by the ED to reveal examples of regulatory breaches as a percentage of the number of files actually sampled, and then of ATL's total client files.   This was so as to suggest that, when put into that perspective, the situation was not as bad as the ED sought to paint it.   These comparisons were quite rightly rejected by the ED, in particular on the grounds that one cannot extrapolate up the number of files as a percentage of a sample as if they were the only actual examples across the whole universe of files.   I accept that this latter riposte is obviously right, and ATL's submission was absurdly ambitious.

390. The only actual comparison which I do need to mention is that in Paragraph 2.2 of its Written Submissions to the SDM of 24th May 2022, ATL and the Appellants referred to the small number of individual files relied on by the Commission out of the number of individual files actually sampled, to suggest that, taking the sample as typical of the whole, 70% of client files would not disclose regulatory breaches.     The ED responded (at Paragraph 21 of its Written Reply of 8th June 2022) that it had, in fact, found regulatory breaches on many more of the files in the sample (although giving numbers of alleged types of breach rather than of files), but had decided only to proceed on the basis of those specifically mentioned, because to introduce others would be too unwieldy; it stated that it did not rely on those further matters but needed to refute any suggestion that there had been no others.

391. As to this, I can well accept that there will have been other examples of breaches of rules and Regulations within the rest of the file sample, given the overall numbers of matters of potential breach recorded by ATL itself across its whole organisation.     However, I think I can safely assume, from the temperature of the case, that the ED relied on the most serious (in its view) and therefore the most "worthwhile" of all the breaches which it had uncovered.   There was no evidence of what the other breaches actually were, but if they were not thought serious enough to mention expressly, then they cannot reasonably be assumed to have been even as serious as the ones which were mentioned.     Furthermore, I have already noted occasions of mistake and justifiable (in my view) criticisms of the basis of the ED's assertions of breach of rule or Regulation, or its seriousness, in giving the history of the matter.   Examples are K Co, the second Y Trust charge, and the Z Trust/W Co complaint, amongst individual lesser aspects of other files, this all gives me concern about the quality of any undetailed, assertions of individual breach which may be made.

392. There are further examples which explain my caution, although I fully accept that this is impression and without the benefit of any submissions.   One instance was the interview of Mr Clarke on the basis that there was a serious question of propriety or good governance about a company in common ownership with another making a loan to that other on interest free terms; it did seem that the interviewers had not really thought about the practical implications of the actual corporate structures.   Another is a matter which has not been investigated because it actually relates to Mr Sinclair. The Commission interpreted Mr Sinclair's figure of "81" as representing outstanding action points according to their interpretation, and therefore accepted that the situation was now properly "*manageable*" as he claimed, with the number being

considerably reduced.     The Commission later, it would seem, realised that the figure of 81 was only for 30+ days outstanding points.   It therefore complained that Mr Sinclair had misled it as to the number.     However, when one looks at the terms of the letter, Mr Sinclair stated, expressly, that the number given was for 30+ days outstanding points; he did not represent that they were the total of all such points.

393. If the Commission had already told ATL that it required a report of the number of all action points, not just 30+ days action points, then it could complain, although it is a bit weak, that ATL (Mr Sinclair) was not being "co-operative" in making the report.   If the Commission had not already told ATL that, then it had no complaint beyond the equally weak one that ATL ought to have thought to give it the additional figures for action points outstanding for less than 30 days, as well.     But whichever of these it may have been, the Commission simply cannot have read Mr Sinclair's letter carefully.  To charge him, therefore, with giving them misleading figures for outstanding action points (as they have done, and as is done in the proposed Public Statement) is actually to charge him with their own careless assumption.     This again illustrates the reasons for my caution about assuming that any unelaborated charge by the ED or the Commission of a breach of a rule or Regulation can simply be relied on as being well-founded. In those circumstance, as I have said, I can give no significant weight to the assertion that a further number of regulatory breaches were discovered by the ED, though not relied on as such.

394. My general impressions as to the systemic governance issues are therefore as follows.  Whilst accepting – as they obviously must - the failings and breaches which occurred between 2014 and 2021, the Appellants (in particular Mr Domaille and Mr Clarke) submitted that this was not a case of wanton disregard of the regulatory standards, but rather of the steps which were taken, with good intent, simply turning out to be insufficient in practice.  The Commission submitted that the arguments outlined above were simply excuses, and did not detract from the fundamental point that

> "*there was clearly a systemic failure in governance which either permitted or caused a company culture in which these issues were not properly addressed or taken sufficiently seriously*".

The SDM accepted this, and held at [172] that this was

> "*a failure of company culture and also the inability to confront serious issues*".

395. This finding was justified, to a greater or lesser degree, with respect to the period from 2014 through to 2019. With regard to the period following, that is more appropriately dealt with in the context of mitigation.  The position was quite bad between 2014 and 2016, and then became notably worse as regards outstanding action points.  It had improved significantly with regard to outstanding Risk Mitigation Plans by 2017, and, though still bad, was improving as regards regular Risk Reviews and outstanding Action Points from about 2017/18.     Those failings certainly justified the imposition of a significant corporate penalty on ATL itself.     The issue, for present purposes though, is the extent to which the penalties imposed on the individuals themselves remained reasonable in the context of the financial penalty imposed on the company, and having regard to the relevant individual's actual personal responsibility for that state of affairs existing, or being allowed to exist for so long.

396. From the regulatory point of view there were, indeed, serious deficiencies in the way in which ATL managed its regulatory obligations during the Relevant Period, as mentioned.     Mr Domaille was responsible as part of the corporate directing mind (ie, the Board) of ATL during

the whole of this period.    Mr Clarke became so responsible in November 2015; prior to that his responsibilities were those commensurate with a senior management position.    However, Mrs Hannis, was only a senior manager until June 2019, which is after the bulk of the matters here complained of, and she came to the Board at the point where effective remedial measures began to be put in hand.    Any personal responsibility deriving from this position was therefore only from that time and in that context.    She resigned in March 2022, and therefore after the Relevant Period.    It is convenient to examine the implications of all this at a later point.

## (3) Seriousness

397. To sum up, therefore, my overall impression in relation the individual incidents cited in the Decision is that their seriousness does seem to have been talked up to some extent, generally, through the use of emphatic or portentous language.    However, the seriousness of the extent of the matters cited as systemic governance issues, being wants of properly effective and regulatorily compliant processes within ATL is reasonably seen as grave, certainly from the period through from 2016 until matters began to be taken in hand, to a degree, from the end of 2018 and most substantially from about June 2019.

398. As to the issue of the reasonableness of penalties which might therefore follow, however, I have been struck by two general points.    The first is that it has as at no point apparently been thought necessary by the Commission to impose a "no new business" restriction on ATL, despite the alleged gravity and pervasiveness of its shortcomings and of those in charge.

399. The second is that despite all the charges which have been laid (and mostly admitted) there appears to be absolutely no evidence that any of the matters cited has in fact caused any damage to the public interest, at all.    Had there been a period of several years of extensive regulatory breaches across the whole of ATL's business which were actually serious in substantive effect, rather than just as a matter of formal requirement, then one would surely have expected to see some substantial consequences of this.    There are no complaints of anyone losing money through defaults by ATL or the Appellants – no beneficiaries complaining of breaches of trusts; no corporate collapses leaving creditors unpaid; no investors complaining of loss of or inaccessibility of their funds.    Neither is there any suggestion that ATL's defaults have caused any damage to the reputation of the Bailiwick.    ATL has not been embroiled in any financial scandal, whether as to money laundering, corruption, fraud on clients, embezzlement or otherwise, and the conduct of its personnel has not caused the Bailiwick to be associated with any matter of disrepute.    There is no evidence that ATL's activities have caused the name of Guernsey to be brought into opprobrium in any other jurisdiction, or at all.    I have absolutely no doubt that if there had been such evidence it would have been brought to the court's attention.

400. In fact, the only matter which seems to come, really, anywhere near potentially producing any such reputational damage would be the Mr A/X Trust matter, but even that has, on the evidence, seemingly gone no further than allegations against AA, and nothing has apparently emerged in which ATL or Guernsey are, or might be, implicated.

401. The Commission's response to the fact that nothing untoward appears to have happened would no doubt be "yes, but it <u>could</u> have done", but that can always be said.    The function of risk management is sensible risk <u>management</u>, not risk <u>elimination</u>.    It seems to me, though, that if one is to penalise persons or entities on the grounds that their conduct "*risked jeopardising the good name of the Bailiwick*" it is material that this actually did not happen, and is therefore merely an assertion of risk.    That must surely, reasonably, affect the penalties which it might be proportionate and reasonable to impose.

**(4) Mitigation**

402. The next point in logical sequence, and the third general ground of appeal, is that the Decision failed fairly to take into account mitigating factors.

403. Insofar as this relates to the individual instances or complaints above, I have incorporated my comments into dealing with those complaints and my views will be discernible from these so I make only some further general points here.

### (a)      Extenuating factors and explanations

404. First, the Commission submits that many of the points made by the Respondents as supposed mitigation of the systemic governance failures (see [384] above) were seen by the SDM (and rightly so) as merely excuses or explanations, and were therefore not really mitigation at all. I accept this point; such explanations cannot be of much impact.  It does seem to me, though, that a reasonable person would view them as being capable of making an acknowledged offence somewhat less reprehensible than if they were entirely absent.   Insofar as the Commission and the SDM may therefore have given no credence to such arguments but simply have dismissed them, there is the risk that the sanctions imposed could have become over-harsh as a result.   I confirm, though, that I have in practice given no weight to this point.

405. Similarly, a continuing thread of claimed mitigation throughout the Appellants' submissions has been to point out that ATL was, in fact, taking steps to seek to improve its compliance record throughout the Relevant Period, and to a degree it did so, but simply failed to realise how much it needed to do and therefore did too little.   For example, I note that ATL increased the number of its compliance staff from two to five over the Relevant Period.   The Commission again submitted that this could not really be seen as mitigation.  I agree that it may not amount to much, but it does indicate that it was at least recognised within ATL that there was an obligation to seek to comply with the range of rules and Regulations, etc, with which compliance is demanded, and ATL was not simply in contempt of this.   Once again, though, this aspect needs now to be looked at as regards the relevant individuals rather than ATL itself.

### (b)      Credit for subsequent remedial measures

406. A far more powerful point, however, as regards Mr Domaille, is his exercising his small shareholding majority to get rid of Mr Sinclair, not only as a Director of ATL but, ultimately, from all involvement with ATL's operation and business other than as a shareholder.   This cannot have been easy and must obviously have been unpleasant.   To my mind, it clearly demonstrates an eventual recognition that the situation demanded strong action and a willingness to take it, even to the extent of expelling a business partner of almost 20 years, and to follow up positively on what appear, to me, to be all of the Commission's requirements.   I have noted that in his interview Mr Domaille said that his action was partly provoked by Mr Sinclair's overweening behaviour having become unacceptable, but I do not think that that eliminates the weight which can and should be attached to his actions as mitigating conduct.

407. In taking the steps which he did, Mr Domaille evinced a positive determination to take a new direction, and his actions have lived up to that.   Given the previous administrative positions of Mr Domaille and Mr Sinclair, his eventually upending these, taking direct responsibility himself, instituting more effective governance measures and, in particular, commissioning and taking note of the PwC report, seems to me to be commendable.  Whilst this report was initially only disclosed by quotation, when the Commission objected as to this, the full report was disclosed to them, being annexed to representations.   The Commission has not, so far as I can

see, contested the terms of the PwC report relied on in mitigation by Mr Domaille, but has merely failed to allow that it should have any mitigating effect on the penalties it wishes to impose.

408. In my judgment, though, this change of approach is considerable mitigation which must, reasonably, be taken into account when penalties are being imposed, ie as at the time of the Decision itself.   This applies particularly in favour of Mr Domaille, who was the leading light in instigating the various matters of improved systems, addition of competent personnel and NEDs and a general drive for ATL's regulatory performance to improve radically, but also for Mr Clarke, as a participant in this, and (insofar as she needs it) to Mrs Hannis, in respect of their personal responsibillities.   The ED however, has, it seems to me, steadfastly sought to minimise this by ignoring this change, and giving no credit for it, as further mentioned below. The SDM endorsed this approach.

409. In a similar way, the ED and the SDM declined to give any weight to the witness statement made on 24th May 2022 of Ms Debbie Guillou, the experienced financial sector officer who was brought in to extend, improve and diversify corporate governance at Board level, as to the measures which had been implemented to improve and maintain compliance standards.   It was suggested by the ED (and agreed by the SDM) that, as she worked for ATL, her evidence could be regarded as self-serving.   The clear impression which I have is that her evidence was therefore simply ignored.

410. Again, I regard that as unfair and unreasonable.   Whatever reservations one may have about her evidence (naturally) being favourable to Messrs Domaille and Clarke and to Mrs Hannis, Ms Guillou is not tainted by being involved in these enforcement proceedings.   She has made a witness statement supported by a statement of truth, and the Appellants are entitled to have her evidence considered.

411. At the hearing I gained a sufficient underlying impression that the Commission was so strongly set against admitting anything positive about the Appellants' conduct, or that any form of subsequent conduct could mitigate previous fault, that at one stage I found myself asking Advocate Edwards if one ever got any credit from the GFSC for getting anything right.   The answer appeared to be, effectively, that one did not - the argument apparently being, that that is only what one is expected to do, anyway.     Indeed, the ED's response to the Appellants' submissions that the very extent of the measures which had been taken since June 2019 was evidence of a true and genuine change of attitude which justified some recognition in the shape of mitigation of penalties, was rejected on the basis that this just went to show how bad the situation had been allowed to get, by the Appellants, in the first place.

### (c)      No credit for mitigation because of the O Co matter?

412. This leads to another point.   The Appellants first drew attention to, and sought credit for, mitigation on account of the major remediation steps which had been taken since June 2019, in their Response to the Draft Notice, contending that this should be taken into account to mitigate the proposed penalties.   In its riposte to this, served in the letter accompanying the Final Notice, the Commission simply dismisses this mitigation on the grounds that it is "off set" by the "seriousness" of the newly emerged O Co matter (para 46).

413. I find this extraordinary, and indeed disquieting, as to the Commission's attitude, for three reasons.

414. First, as a matter of logic, the two matters are completely different in their nature and effect. One (O Co) relates to in effect, a single, if continuing, matter of failure of client due diligence, which, on a common sense basis, did not make the matters for which the Appellants were being sanctioned by financial penalty any more serious than had already been asserted.   In fact, the O Co matter did not touch on Mrs Hannis, at all.   However, the other, (mitigating actions) was in the general area of instituting procedures and demonstrating efforts to bring the conduct of ATL's business, generally, up to a proper standard of regulatory observance.   They simply do not off-set each other in any real manner.   Only if the imposition of penalties were somehow to be regarded as a matter of adding up points for and against (which I do not think it is or should be) could these two matters be used as any form of "off set" against each other.

415. Second, this mitigation was originally dismissed against all three Appellants plus ATL, and has simply remained dismissed in relation to the three Appellants (and all three Appellants) subsequently without any recorded regard as to whether culpability for the O Co matter and credit for the remedial remedies which it was alleged to offset, actually applied in the same way to these three Appellants.   This suggests that no consideration was ever given to this rather relevant point.

416. But the third point is the most fundamental of all as to reasonableness.   The O Co matter was self-reported, under a statutorily imposed obligation to do so.     It was, in effect, a forced confession.     Even the criminal law allows privilege against self-incrimination.    I consider that the ordinary person would think it wholly unreasonable for a person to be penalised - certainly significantly penalised - on the grounds of a matter which he (in effect) had been obliged to bring to the attention of the Commission, on pain of committing yet another offence.

417. I am aware that, in criminal law, an accused can be obliged to provide police with the pin number of an otherwise encrypted mobile phone, to enable the police to obtain evidence in relation to one suspected crime, and that the consequent inspection of the phone may reveal evidence of other criminal activities, which the accused then can and probably will be additionally prosecuted  for, even though this information was only discovered because of the forced giving up of the phone's pin number.   This might seem hard, but it is enforcing criminal law.     However, this situation is very different.   First, the criminal law imposes mandatory penalty for matters designated as criminal, and therefore offences against society, whilst here, the concern is with <u>discretionary</u> penalties being imposed by a regulatory body.   Second, being obliged to give information which leads to the discovery of further but incriminating information is not the same as being forced to make an incriminating confession in the first place.

418. The EP Law itself contains an obligation for the Commission to take into consideration whether any default was self-reported when considering the imposition of a "discretionary" financial penalty under s 36 of the EP Law: see s 36 (6) (a).   That is obviously meant to have some meaningful effect.   Whilst I would not go so far as to suggest (because the terms of s 36 are not mandatory in this respect) that any such self-reported admitted matter could never justify the imposition, or increase, of a financial or other penalty, it is certainly the case, in my judgment, that the "mitigation" to be attached to the fact that any particular fault was disclosed through self-reporting must be considerable.     To impose, as a penalty for a self-reported breach of regulations, that one should then be deprived of any credit which one could <u>otherwise</u> fairly claim for having taken serious and effective steps to remedy defaults and seeking to prevent their reoccurrence, (which is what has apparently happened here, as the ED's response accompanying the Final Notice in effect admits) is a significant penalty, being imposed, in practice, for a matter of self-report.   This strikes me (and I think it would strike the ordinary person as well) as unfair and grossly unreasonable.

## (5)  The "retrospectivity" point

419. Having considered, therefore, the relevant factors under the third ground of appeal, namely a failure to take mitigating factors into account, I will now turn to the two further specific grounds of appeal, before making some general points and giving my conclusions

420. This is the fourth ground of appeal, relating generally to the stringency of the sanctions imposed, and the Appellants' submission that they are unreasonable and disproportionate.   The point arises as follows.

421. As already mentioned, the Commission's power to fine was fixed in 2008 at up to £200,000 in respect of a licensed entity and £200,000 in respect of an individual.   By the 2016 FSC Law (now incorporated as s 39 of the EP Law) the Commission was given greater fining powers, namely up to £400,000 in the case of an individual and up to £4 million in the case of a licensed entity (subject to qualification by reference to turnover).    This power came into effect on 13th November 2017.

422. On 10th November 2017 the Commission publicly announced its policy as regards calculating financial penalties under the new law, and expressly stated

> *"The increased penalties will <u>only</u> be applied in new enforcement cases which are commenced on or after 13[th] November 2017 and where the alleged breaches also took place on or after that date"* (emphasis added).

The qualification for application of the new penalties was thus twofold, namely that both (i) the enforcement case was commenced after 13th November 2017 and (ii) the relevant regulatory breaches took place after 13th November 2017.     Where a case was commenced after 13th November 2017 but relevant breaches took place before 13th November 2017, the Commission was notifying the public that applicable penalties would not be increased.

423. On 21st July 2021 the Commission made a public announcement headed "*New Discretionary Financial Penalties – Update"* in which it announced a change of policy.  This was to the effect that it had now decided that it was appropriate to use its current, increased fining powers (rather than its historic ones) *"in any case in which <u>any</u> wrongdoing occurred after 13[th] November 2017"* (emphasis added*).*   The reason for this was stated to be the discovery that it would be "*taking some cases forward seeking pecuniary sanctions where there was some wrongdoing before 13[th] November 2017 and some wrongdoing after 13[th] November 2017*".  The justification for taking this approach was stated to be that the Commission's "*intent in relation to such matters*" was not "*clearly*" covered by a Guidance Note issued in January 2019, (of which I have not been able to find a copy, the current version being November 2021) and that the 2016 Amendment Law had contained no transitional provisions.

424. Rather noticeably, this announcement was made just five days before the issue of the Draft Notice in this case, which falls so clearly into the qualifying parameters, but as to which a very great deal – and certainly most of the alleged personal breaches of the MCL in relation to the eight client files, and a good deal of the "systemic governance" defaults - occurred before 13th November 2017.     Since the Commission's announcement refers to the need for this change having been occasioned by its work on recent cases where wrongdoing has occurred both before and after 13th November 2017, it would seem likely that this very case brought about this new policy.

425. The ED applied (obviously) the Commission's newly stated policy in the Draft Notice of 26th July 2021, and fixed the fines according to the gravity, in its view, of the totality of the conduct of ATL, Mr Sinclair and the Appellants, at any time, based on its own issued description of the bandings of gravity relating to a fine, which it would apply, issued on 13th November 2017.

426. ATL and the Appellants contested this approach vehemently in their Responses to the Draft Notice, arguing that on public law grounds (the rule against retroactive application of legislation; "legitimate expectations" as to public authority statements; procedural fairness (the change of approach having been introduced without consultation); and just plain substantive fairness) the correct approach was for the Commission to distinguish between wrongdoing committed before and after 13th November, and to apply its historic powers in relation to the former and its new powers only in relation to the latter.

427. The Commission rejected this in a brusque letter from its legal counsel dated 28th October 2021, maintaining that the Commission had clear legal powers to impose penalties according to its current powers in this case, whether one looked at the terms of the 2017 or 2021 Notices which it had issued, because breaches of a similar nature had occurred after 13th November 2017, and *"in addition, the proposed sanctions are based on failures to fulfil the minimum criteria for licensing that remain current."*

428. The SDM accepted the ED's approach in his MTN.   ATL submitted, in its written representations that this approach was incorrect, citing the claimed approach of the UK Financial Conduct Authority and the Bar Council, which were submitted to accord with that suggested by ATL and the Appellants, above.   They requested reconsideration of these sanctions, and otherwise requested reasons.   In its written responses the ED simply repeated the previous reasons.   There was oral argument on this point at the SDM hearing.

429. In the Decision, the SDM confirmed his acceptance of the ED's approach, and that it was justified on the basis that "*the failures remained current and the Commission relied on the words of the [EP Law]*".   (Actually, that seems to be a rather sweeping assessment of the situation, affording no recognition to the actual improvements made and reductions in failings which had occurred since November 2017, and which was even recorded by the Commission's own assertion cited at [83] above, that certain thematic failings had "*remained ongoing until resolved in the last three years*" (emphasis added).)

430. The SDM held that the ED's approach of simply applying current powers accorded with his own experience of the approach in certain criminal cases in the European Court to penalties for "continuing offences", namely patterns of repeat offences being punished as a single "continuing offence" and punishable, therefore, in accordance with the penalties in force "*at the time of the last occurrence of the offence*", the only qualification being that this must not result in a heavier penalty than if all the occurrences had been punished separately according to penalties in force at the relevant times.   He dismissed that possibility in this case, holding (at [247 (vi)]) that whilst it might have been possible to split various matters on a date basis, it would have been "*cumbersome, unjust and artificial"* to do so, and the sanctions could well have been more severe if fixed separately according to time and then aggregated.   He went on to endorse the appropriateness of the ED's proposed financial penalties against the Appellants, except for reducing that in respect of Mrs Hannis

431. In this Appeal, the Appellants continue to argue that this approach was wrong in law, for offending the recognised principle of non-retrospectivity of legislation applied generally by courts and tribunals to prevent the unreasonable imposition of penalties which are not

commensurate with the maximum penalties which applied when the misconduct actually occurred.  Advocate Williams contested that the procedure was in any way cumbersome, still less unjust or artificial, and referred back to the tabulation of sanctions which had accompanied the Appellants' Written Submissions to the SDM, to demonstrate this.

432. On behalf of the Commission, Advocate Edwards simply argues that the powers conferred on the Commission are clear and express as from 13th November 2017.  In the Defences, and in his skeleton argument, he argues that the words of s 39 (1) of the EP Law are unambiguous. S 39 (1)  reads:

> "(1)  Where, in the opinion of the Commission, a licensee, former licensee, relevant officer or other person -
>
> > (a) has contravened in a material particular -
> >
> > > (i)     a provision of this Law, the Financial Services Commission Law, or the prescribed Laws or
> > >
> > > (ii)    any prohibition, restriction, condition, obligation, enforcement requirement, other requirement, duty, direction, or arrangement, imposed issued or arising under any such provision, or
> >
> > (b) does not fulfil any of the applicable minimum criteria for licensing,
>
> it may impose on that person a penalty in respect of the contravention or non-fulfilment of such amount not exceeding the relevant sum……"

433. Advocate Edwards argues, by reference to s 39 (1) (b), that the Commission's powers of sanction are granted in respect of the current situation.   If, therefore, the Commission is "of the opinion" currently at the time of the decision by which it promulgates that opinion, that that person or entity does not fulfil the MCL, its powers of fining are thereby engaged in their current form at that time in respect of that current opinion, such that no question of retroactivity of the relevant legislation applies.  The Commission can therefore fine, as it thinks fit, within those higher authorised parameters, according to its opinion of the situation viewed currently, and therefore (apparently) without regard to the time at which any wrongdoing occurred.

434. Advocate Williams submits that this is a new argument, not advanced before.  It seems to me that it is actually foreshadowed in the last sentence of the third paragraph of the Commission's letter of 28th October 2021, but only if you know what you are looking for.

435. Advocate Williams submits that this argument is entirely without merit, because Section 39 plainly goes only to the vires of the Commission to impose fines.  He also points out that the Defences then assert that

> "While individual incidents in the past may serve to demonstrate a current failure to comply, those individual incidents did not appear as separate regulatory "charges" as against these three Appellants – the formal issue at hand was their current compliance with the MCL",

and submits that this is entirely inconsistent with the way in which the Draft Notice, the Final Notice and the Decision itself have been framed.

436. Whilst the Defences may be literally correct as to the precise form of the Decision, etc, I certainly agree with this latter submission.   I also accept Advocate Williams' submissions in general.   In my judgment it is incumbent on the Commission to have regard to the time of the offences upon which it relies in support of the charges which it brings and which give rise to its "opinion" in respect of imposing financial penalties (and I note that it is this form of sanction and only this form of sanction with which s 39 is concerned) and to calibrate this into its calculation of any appropriate fine.

437. I agree with Advocate Williams that the function of Section 39 (1) of the EP Law is simply to provide the *vires* for the Commission's imposing a financial sanction at all.   It says nothing about how any such sanction should then be quantified.   Advocate Edwards' argument rests solely on the words "does not fulfil" in s 39 (1) (b) being in the present tense but it then treats the phrase as if it is an operative offence in itself.   This is a weight it simply will not bear.   It describes a state of affairs which is a consequence of previous conduct.   One cannot fine simply by reference to the state of affairs at large (this being, in fact, the Commission's holding its "opinion"), but only by reference to the offending conduct which has brought that about.   A person's fulfilment or non-fulfilment of the MCL is only evidenced by past conduct.   The appropriate quantum of a fine can therefore only be assessed by reference to such past conduct.

438. I must say that I do find the insertion of the new justification for the Commission's preferred interpretation, cited above, to have been an opportunistic attempt to take advantage of the SDM's suggested comparison, in the Decision, with European cases.   (This is insufficiently explained in the Decision for such comparison to be evaluated, but in any event, I find it of insufficient materiality to principles of Guernsey regulatory law to be worth attempting to do so.)   I do not accept for one moment - and I do not see it as being the Commission's approach either - that one fixes the fine according to a present view of the degree to which a person <u>currently</u> falls short of the MCL.   I reject the attempt to suggest this, in order to justify the imposition of fines without regard to the level of penalty in operation when the misconduct was actually committed, but even if looking only at the Commission's "opinion" in the present tense were a permissible approach, it would still require regard to be had to the historic nature of any matters of criticism, in order to judge, fairly, the validity and balance of that opinion, and a reasonable view of the seriousness of the current circumstances, and the consequent appropriate level of any financial penalty being imposed.

439. At times during submissions, the Commission has seemed to be suggesting that the righteousness of their applying their new approach was justified because they had given notice of this intention in July 2021 (see above) before doing so.   I reject this.   One cannot authorise oneself to take a wrong or unfair approach simply by notifying people that one proposes to do so.   The question of notification might be relevant to a challenge based on "legitimate expectations" but that is not the principle under consideration here.   I regard that notification as entirely irrelevant to the present issue.

440. In short, therefore, I accept Advocate Williams' submission that in exercising its powers of sanction a regulatory authority such as the Commission must apply the principle of non-retrospectivity, generally recognised as a basic principle of law.   As this is sufficient to support his argument, I do not need to consider the application of his two arguments of "legitimate expectations" and fairness of procedure as well.   It suffices to say that I do not think they would take the matter any further than the fundamental principle of non-retrospectivity which I have accepted.

441.As regards Advocate Williams' fourth argument, that of substantive fairness, I consider that to be, in effect, implemented by observing the first principle, (non-retroactivity), which I consider to be a matter of law.     It is, actually, the practical effect of this.   However, the effect of this is reinforced by the fact that my jurisdiction in this appeal ground entitles me to set aside a sanction imposed by the Commission simply on the statutory appeal ground that I consider it unreasonable as a matter of fact.   I do consider it unreasonable in fact – as I think the ordinary intelligent layman would consider it unreasonable – for the Commission not to have regard to the fact that particular incidents of alleged misconduct are historic, even very historic, and occurred at a time when the penalties which might be imposed in respect of them if they occurred now were less severe.     I would also observe that, in this particular case, many actual incidents of alleged misconduct, and in fact those that would probably fairly be regarded as the most serious in substance, even pre-date the "Relevant Period" which the Commission set for its investigation and enforcement case (see [71]) above, ie, they occurred before 2014, and it certainly appears to me that these incidents have had more effect in feeding into the penalties imposed than is suggested by their being merely being "*refer[red] to*".

442.As regards how this allowance should be given effect to in any particular case, I do not think that a process of tabulation of the offences, their seriousness and then separate sanctions, according to date, and then an aggregation of the two results, is necessarily required.   I accept that a simple aggregation of such penalties, treating them as entirely separate and cumulative might result in an over harsh penalty; some kind of apportionment of the relevant conduct being penalised by both its time and its extent, and therefore its contribution to the overall appropriate penalty, might be required.   Whilst this is somewhat cumbersome, it does not seem to me to be unduly so, and the exercise might usefully be a helpful cross-check.   I do accept the Commission's obvious view that a current general pattern of failure to comply with the requirements of certain regulations or rules (external) or policies (internal) can properly be regarded as more serious if it took place over a period long enough to have straddled 13th November 2017, than if it were confined to a shorter period afterwards.   I would consider that, according to the facts of the case, it would probably be sufficient if an appropriate sanction is calculated with regard to current penalty levels, and a view is then taken of the general extent to which that includes sanctioning misconduct occurring before 13th November 2017, with the overall penalty being reduced or rounded down according to that.   Obviously, also, the need for this exercise will die away as time goes on.

443.The real point, however, is that in my judgment, something of this sort was required in the present case, and it did not happen.

444.I would also add, as a general comment about historic misdeeds, that whilst there may be no period of prescription as regards sanctions for regulatory offences, imposing sanctions for very historic apparent misconduct as if it were recent must run the risk of being unfair on any basis. People's memories naturally fade, and this may make it extremely difficult for them to give a fair account of their actions, a long time later, either at all, or without appearing evasive.   The particular matter about which they are being subsequently questioned, many years later, is unlikely to have been central to their life at the time when they were dealing with it, and there will usually, therefore, have been no reason why they should commit details to memory, either deliberately or naturally.   Whilst providing an interviewee with an "information pack" may go some way towards enabling him or her to refresh memories in order to do so, it can still be highly unlikely that it is really sufficient.       In my judgment it must be right to make considerable allowance for this.

**(6) Penalties in other cases.**

445. The fifth ground of appeal is that the penalties imposed bear no fair relationship to penalties imposed by the Commission in other similar cases.   By s 39(6)(f) of the EP Law, the Commission is obliged, when fixing financial penalties, to take into consideration "*the penalties imposed by the Commission under this section in other cases*".   S 39 (6) (f) replaced Section 11D(2)(f) of the FSC Law, which had been in similar terms.

446. The Commission, in fact, provided details of all regulatory disciplinary decisions which it had made as an appendix to the Draft and Final Notices, but it referred specifically only to three such decisions: *Safehaven International Ltd and others,* (31st December 2020), *Louvre Trust (Guernsey) Ltd and others* (18th June 2019) – there are in fact three "*Louvre*" related decisions, but the Commission referred expressly only to this one – and *Richmond Fiduciary Group Ltd*. This last was not a case in which sanctions were imposed on individuals, but only on the company itself, and was not referred to further.   The first two were produced in the appeal. Both were decisions made under the law prior to the 2016 FSC Law.

447. In the Draft and Final Notices, the Commission itself described *Safehaven* and *Louvre* as previous cases where "*similar failings in relation to financial crime legislation have occurred*", whilst pointing out that they were decided under the old, pre-2017, fining powers and then, apparently, ignoring them.

448. The Appellants, in their written representations on the Draft Notice, first pointed out that the failings in each of those two cases were actually (apparently) greater than were set out in relation to them in the Draft and Final Notices, that the penalties imposed on those cases had been very, very much lower than those proposed to be imposed upon them in this case, and that this was still so, even when those financial penalties were simply doubled, to reflect the intervening increase in the Commission's fining powers.   An explanation of how the financial penalties had been arrived at by the Commission was therefore invited.

449.   However, none was given, the terms of the Final Notice remained unchanged  from the Draft Notice, and in the letter accompanying the Final Notice it was simply stated that   "*It is the Commission's opinion that the behaviours exhibited in this investigation are broadly similar to that of the comparators"* whilst stressing that it had looked at all the comparators but chosen only to cite the three named cases as examples, and without giving any explanation as to how the penalties imposed therefore related  to these, (beyond, of course, the general fact that the Commission was now simply applying its new fining powers).

450. The Commission did not thereafter refer to the two cases of *Safehaven* and *Louvre* at all. Neither did the SDM in his MTN.     The Appellants therefore raised similar objections in response to the MTN, and supported their submissions as to the undue severity of the financial penalties proposed further, by reference to a tabulation of the suggested seriousness of the defaults found, and where they suggested they fell within the bandings of the old and the new penalties, as propounded by the Commission in its publicity.   In his Decision, the SDM did refer to the two cases cited above, reciting their outcome, but gave no reasoning nor any explanation as to how he saw them fitting in with the penalties which he endorsed in respect of the Appellants.   They were thus, by inference, regarded as completely irrelevant and merely noted.

451. In the Defences on this Appeal, the Commission suggests that, since these two decisions were made before s 39 of the EP Law came into effect, they were not made "*under this section"* as that section lays down at all, and so it is well arguable that the SDM was not obliged to consider them at all, even though (it submits) he will have done, because he referred to them.

452. I do not accept the first limb of this submission.  Whilst that may be the literal wording of s 39, in my judgment the SDM was bound to give consideration (and that must mean meaningful consideration) to previous penalties imposed in similar circumstances, for three reasons.

453. First, if this argument were correct, it actually meant that at the time of the Draft Notice the Commission was obliged to have regard to the penalties in *Safehaven* and *Louvre* but by the time of the Final Notice, it did not have to do so.      That would be absurd (apart from having the obvious unfair effect that the Commission could manipulate this obligation by delaying a decision.)   Indeed the absurdity is underlined by the fact that this submission would mean that the Commission would have had to take account of the penalties in those cases if issuing a decision on 31st October 2021, but would be absolved from doing so and could issue quite different penalties if it issued the very same decision on 1st November 2021.

454. Second, as a responsible public facing authority, the Commission must naturally intend to be consistent in its work.  Indeed, it states that it is committed to a "*consistent application of its enforcement powers*" in paragraph 1.2.2 (3) of its Explanatory Note on its approach to Enforcement Measures of November 2021.    This surely requires having some regard to the way in which it has previously behaved generally, rather than justifying a cut-off by a literal application of the words of a Law which was re-enacting previous principles.   Of course, this does not equate to uniformity, and an approach will not be inconsistent because of admitting an incremental development of the Commission's response to particular situations, or any other reason why an approach might change.   The point, however, is that the Commission's decisions should bear a discernable consistency of relationship with previous ones.

455. Third, even if there had been no specific direction to give such consideration contained in the Law itself, common considerations of reasonableness, proportion and fairness to the particular individuals involved must dictate that the Commission should pay some regard to other penalties which it has previously imposed in similar circumstances.

456. Plainly, in my judgment, the reference to "this section" in s 39 should be purposively interpreted as meaning a reference to "*this section or the corresponding section in previous legislation which it now replaces*".

457. Advocate Edwards submits in any event that the ultimate Decision is not incompatible with the cited previous decisions, and that these were obviously considered, but (i) the previous decisions were made under the previous fining powers and this really precludes useful comparison being made, (ii) making "*micro-comparisons*" with other cases, (as he suggests the SDM rightly found the Appellants to be doing; see [247 (vi)]), is not helpful in any event, as the imposition of appropriate sanctions relies on a matter of overall general impression, and (iii) the Appellants' suggestions as to appropriate levels of sanction, based on their submissions as to the levels of seriousness of the faults disclosed and their application to the Commission's indicated level of "banding", have been self-servingly generous and rely on the Court's accepting their other submissions as to the reduced gravity of their failings, which he submits are incorrect and cannot be accepted.

458. Advocate Williams submits, quite simply, that the outcomes of previous cases cannot just be dismissed as requiring too complex a comparison, because a very pertinent comparison can be made simply by doubling the "raw" (ie before any discount for early settlement) penalty figure to account for the doubling of the maximum personal penalty which was introduced under the 2016 FSC Law.  If one does this, then the *Louvre* case produces personal penalties being imposed of £16,000 to £24,000, and the disproportion, therefore, of fines of £280,000 (Mr

Domaille) and £90,000 (Mr Clarke) is manifest.    Applying a similar doubling to the penalties applied in the *Safehaven* case, Mr Bach, the 100% shareholder and managing director of the relevant entity, was only fined £50,000 (ie £100,000 if the scale is doubled), the other directors were fined £10,000 (£20,000 equivalent) and the mere employee £5,000 (£10,000 equivalent).

459. In my judgment, Advocate Williams' submission has considerable force.   The result shown by his general cross-check with the *Louvre* and the *Safehaven* cases, which the Commission itself cited as comparable, is striking, and no reconciliation is attempted.

460. It is, of course, right to accept that some upward adjustment may be appropriate.   Despite what the Commission has actually said, it may be right to view the failings of the Appellants as being more "serious" than those of the individuals in *Safehaven* and *Louvre*.   It may also be the case that, apart from an appropriate increase owing to inflation, some incremental toughening of the Commission's fining levels was reasonably appropriate, in the circumstances which have followed 2016/17.   Also, it is to be noted that in *Louvre*, in particular, but also in *Safehaven*, the public statement recorded that major steps to remedy the systemic failings found had been taken, but it is not stated, and it is not possible to infer (given the example of the Commission's current attitude), whether this had had any mitigating effect upon the penalties there imposed, so as to enable a better comparison with the present case where it would seem that this was not taken into account.    It is also possible to argue that the time period in ATL's case was longer.   Equally, however, the complaints about individual incidents of conduct in this case were largely so historic that they fell in the period of the previous lower fining powers, as already discussed.

461. Comparisons therefore cannot be taken too far as a matter of detail, but at a general level, the disparity does remain striking.   I can see no proportion, and no rational relationship, between the fines imposed in the *Louvre* and *Safehaven* cases, and the fines now actually sought to be levied on Mr Domaille and Mr Clarke.    There is no explanation of this, at all.    I accept that micro-comparisons of cases may not be appropriate, but I do note that the Commission itself has twice said that the first two cases exhibited "*similar failings*" and they repeated that the failings in this case were "*broadly similar to that of the comparators*" even after this point had been drawn to their attention, and they could have been expected therefore, either to withdraw this comment (as they have done, with second thoughts, in many other instances) or to provide some explanation of why, therefore, they were proposing the equivalent of far more than double the apparently corresponding fines.

462. Since the SDM does not seek to explain at all, how he squares the penalties actually imposed with what I regard as the obvious general requirement that such penalties should bear some explainable relation to other penalties previously imposed by the Commission for "consistency", I am driven to the conclusion that no meaningful consideration can have been given to this, either by the SDM or, indeed, by the ED and the Commission itself, previously. It is as if the Commission has regarded the statutory obligation to take into account penalties imposed in other cases as requiring no more than noting.   There is an obvious danger, therefore that this could have given rise to an unreasonable or disproportionate penalty being imposed.

463. Although I was not addressed on this, I would add that, reviewing generally the information provided in the papers as to previous financial penalties imposed, I noted the case of *Hansard Limited,* in December 2021, being the first of the cases under which penalties under the current fining powers were imposed.   The public statement there records that, as a result, no comparisons can be made between *Hansard* and cases with similar findings.    I was struck, however, by the similarity with the present case, of the apparent seriousness of the offences and their timescale, committed in relation to a company with a 75% high risk client appetite.    I was also struck by the apparent disparity between the penalties there imposed on the persons

involved and those imposed here.  The financial penalties there were the equivalent (before early settlement discount) of £81,000 on each of the main directors including the majority shareholder, and £63,000 on each of the directors who had held specific Compliance or MLRO offices, combined with a £200,000 penalty against the company itself, and with no prohibition orders apparently being thought appropriate against anyone.

**Review at this point**

464. In the course of the above, I have had to consider most of the seven matters which the Commission is obliged, under s 39 (6) of the EP Law, to have regard to in considering the appropriate level of a financial penalty.    I agree that sub-para 39(6)(e) (the financial consequences to the person concerned, or to third parties of imposing the proposed penalties) does not apply except as mentioned at [472] below, and sub-para 39(6)(g) (level of the offender's emoluments) has not been raised.  Since "*inadvertence*" (sub-para 39(6)(c)) can have a wide range of meanings – from being involuntary, through being accidental, through not knowing of the facts, to not knowing that the facts constituted an offence – I have effectively considered the potential content of this in the course of examining the facts of the various instances and situations.    I make it clear here, only, that, on the one hand, I agree with the Commission that the Appellants' submission that their conduct should generally be characterised as "*inadvertent*" and therefore less culpable, was absurdly ambitious, but also, on the other hand that I find the ED's frequent use of the counter-phrase "*willingly and with purpose*", which the SDM also adopted, to suggest a greater degree of deliberate wrong-doing or recalcitrance than is actually fair.

**Discussion and some conclusions**

465. I have already referred to my initial impression that the penalties (Prohibition Orders and Fines) imposed on the Appellants in this case were harsh, potentially to the point of unreasonableness and disproportion, and that this general view was not dispelled during the hearing.    I carried out the subsequent exercise of going through all the progress of the case and the evidence in order to enable me to decide whether this initial impression might be unsoundly based, which it might be because I just did not properly appreciate the reasonableness of the Commission's criticisms of the Appellants' conduct in the current regulatory environment, or I did not appreciate the reasonableness of the levels of penalty which the Commission was consequently applying appropriately.    Carrying out this exercise certainly enabled me, having regard to reported statistics, to appreciate the suggested quantitative extent of lax and even sloppy failures within ATL to set up and adhere to appropriate policies, processes and controls in the current regulatory environment, although I would also say that my review of the compliance reports, and the materials included with them, gave a much more favourable overall impression of the workings of ATL than I had expected to find.    That latter point does not, of course, affect any view of the extent of the actual failings, nonetheless.

466. The exercise did, though, also draw my attention to certain factors which I apprehended might well have contributed to producing the extremity of sanction, of which I had gained the impression noted above.    In consequence, I am satisfied that I can be confident that that impression was not unjustified.

467. For convenience, the specific features which I have so far identified are these:

(i)     the adjustment made in the Final Notice to add in findings of want of probity against the three Appellants when this had not previously been seen as appropriate, with no materially sufficient addition of evidence to justify this;

(ii)    the apparent determination to give no credit to those involved, in terms of mitigation, for the obvious major and expensive steps taken, from <u>at least</u> June 2019 onwards (even if the fact that the LMRR report showed positive comments is ignored), to seek to get a grip on ATL's compliance procedures and bring these up to a standard which would satisfy the Commission; and

(iii)   the treating of a charge relating to a matter of obligatory self-reporting as justifying the imposition of a significant penalty - that of nullifying any credit to be given for the remedial steps noted above.

## Distinguishing between ATL and the Appellants

468.My next general matter of concern is that, on an overview of how the matter has developed, there has been a lack of consideration of the appropriate relativity of penalties as between ATL itself and the individual Appellants.   As regards the systemic governance issues, which are certainly, it seems to me, the major matter of censure in the case, these failings are essentially failings of ATL the licensed entity.   Of course, failings of a corporate entity can only occur through the acts of individuals, but it is important to distinguish between the two when imposing penalties for two reasons.   First, it is only appropriate to impose personal penalties on individuals for matters of their own personal failings.   Second, if one penalises both the entity and the individuals concerned, there is a danger, according to the particular circumstances, of unfair duplication (see [472] below).

469.My concerns about possible unreasonableness on this aspect were prompted by two matters. The first is procedural.   Initially, ATL and the three Appellants made common cause in relation to challenging, first, the ED's and then the SDM's conclusions as far as the MTN.   Inevitably this has led to points which were fairly made by or against ATL generally being melded with points which could be made by or against the individuals.   The dropping out of ATL immediately before pronouncement of the actual Decision, and thus even after the oral hearing before the SDM, may well not have led, in my judgment, to a proper reappraisal of the evidence, and therefore of the appropriate penalties which should be applied to the individuals rather than to ATL.   There are various points in the Decision, (I have pointed out some of them) where comments made about "ATL", or submissions previously made on behalf of ATL, have been treated as if they could simply be applied to an individual Appellant.   My concern is therefore that the faults of ATL itself have thereby become simply attached to the individual Appellants, without regard to his or her actual involvement and culpability, as I pointed out specifically in the case of Mrs Hannis at [224].

470.The second is substantive, and is the other side of the coin.   With regard to serious systemic governance issues, it is obviously appropriate to sanction the entity itself, and particularly the entity itself, simply because the misconduct was a general failing of the entity; it should not have been allowed to occur by those in charge.   The culpability of those in charge individually then falls to be assessed separately for that, as mentioned above.   The effect of a financial sanction on the entity is, of course, to penalise the owners of the entity, either in terms of loss of dividend income or loss of the capital value of their shares or ownership, caused by the additional burden of the sanction imposed on the entity's finances.   The ultimate effect of this penalty may well therefore, (and in the case of a public company will certainly) not fall entirely

on those who are actually responsible.    This is just an effect, of course, of the recognition of separate corporate legal identity.    If the shareholders are sufficiently incensed, and sufficiently powerful in number and organisation, it may result in those who are responsible losing their positions, but that is only indirect.

471. However, in the case of an entity such as ATL, effectively owned as to 50% by each of two of the three Directors with overall Board responsibility for the defaults of ATL itself, the interaction of the corporate sanction and the personal one does also need, in my judgment, to be taken into account in assessing the appropriate personal penalty.

472. Here, the effect of fining ATL £500,000 would be that Mr Domaille and Mr Sinclair were each effectively fined about £250,000 by this route.    The combined effect of the additional financial sanctions proposed to be imposed on each of them was, therefore, to fine them £530,000 each. I accept, of course, that the corporate fine would not reflect as an immediate loss of £250,000 to either of them unless he was planning on selling his interest in ATL at that moment, but this does not detract from the point I make, which is that it seems to me to be potentially unreasonable for the Commission not to take this interaction into account in the sanctions which it imposes in such a case.    From the very size of the sanction, and in particular the individual sanctions, proposed and upheld in this case it does not seem to me that this can have been done.

473. This consideration only goes to emphasise further, in my judgment, the importance of relating the personal fine which is imposed to the personal fault of the individual being fined, ie to distinguish this as being personal fault separate from, and over and beyond, the fault for which the corporate entity is appropriately also being fined, and to make the personal sanction proportionate to that personal fault, rather than simply becoming a penalty of strict liability by association.    In my judgment this would, in the eyes of the ordinary reasonable person, be a very material distinction and balance to be maintained.

**The "airbrushing" of Mr Sinclair**

474. A further factor of potential concern is that, from considering the proposed imposition of penalties, I can see no evidence of there having been any actual appraisal of the involvement and relative culpability of the Appellants (in particular Mr Domaille) and Mr Sinclair in the matter, and it seems to me that the early departure of Mr Sinclair from the case has caused this to be further obscured.

475. Mr Sinclair settled with the Commission at the initial stage, plainly regarding doing so, and gaining the 30% discount on the proposed sanctions to be imposed on him, as being in his own best interests in all the circumstances.    His conduct has therefore not been subject to the depth of examination and criticism which has been applied to the Appellants.    I fully accept that Mr Sinclair has therefore not been here to defend himself, and that it is a usual human tendency to look to place blame on someone who is not present.    However, I have had the uncomfortable feeling that the absence of Mr Sinclair in person, and especially with the extraordinary (to my mind) treatment of anonymising him throughout the subsequent enforcement proceedings, has had the opposite effect; it has tended to suppress and diminish the part which he obviously played in these events, and to create the impression that those who are present and who chose to challenge the Commission's findings were thus relatively more responsible, in total, than is actually fair.

476. In particular, having looked through all the evidence, and even taking full account of any tendency of Mr Domaille to seek to blame others, I find it quite astonishing, and even superficial, that it could ever have been thought appropriate to impose similar sanctions on Mr

Domaille as those thought appropriate for Mr Sinclair, both as to Prohibition Orders and financial penalties.    It is as if the only thing taken into account was their almost equal shareholding in ATL.  This seems to ignore that Mr Sinclair's conduct clearly included matters which could be fairly classed as want of probity (the obviousness of this being apparent to the ED itself from the time of the Draft Notice), that his responsibilities for regulatory compliance and therefore the appreciation of these to be expected of him were increased by his performing the role of  "Compliance Director" of ATL throughout the relevant time until his removal in 2019, his assuming the express position of Money Laundering Reporting Officer (and latterly for a short time even Money Laundering Compliance Officer), and the fact that his obvious forcefulness of character placed him *de facto* in a position of considerable power and influence within ATL and on its Board.  (In making this comment, I even ignore the more forthright evidence that he was a "bully".)   Mr Sinclair's participation in the matter seems to me to have become overlooked and thereby minimised, potentially to the detriment of the Appellants.

### Further general point

477.  This leads to a further general point which I feel has contributed to potential unreasonableness, as an impression which I have gained.

478.  The level of sanction which was ultimately imposed on these Appellants (except as to the fine imposed on Mrs Hannis) was proposed in the Draft Notice, thus evidencing an opinion of the Commission, then acting through the ED and a Case Review Panel.      This decision was vociferously and extensively contested on behalf of ATL and these Appellants, though not Mr Sinclair.  Regrettably, I formed the clear impression, in reading through the progress of the matter, that instead of considering dispassionately whether the Appellants might have some points (as they did) and whether this might appropriately require some mitigation of the initially proposed penalties, the Commission's response became driven by a perceived need to put down the temerity of challenge, be the victor in any argument, and justify the Commission's original decision in order decisively to exert its authority as regulator.

479.  I accept that the Commission's function is to raise standards.   I also accept that the Commission's approach to regulation is that of managing risk.   However, the danger, it seems to me, is that approaching regulation with a dogged focus simply on risk can lead to a lack of perspective, where adherence to form and process are treated as more important than substance.  Whilst the protective effect of requiring adherence to policies, processes and controls is obvious, the Commission must surely, still, apply balance and common sense when determining whether and what sanctions to impose, in respect of defaults, if those sanctions are to remain reasonable and proportionate in the particular case.

480.  It is usually an easy exercise to find a fault.  After a charge that a person did not ask questions, when it turns out that they actually did the charge then becomes one of not recording the answer, or that one should have asked a further question rather than judged oneself "comfortable" with the answer, or that the questions should have been asked earlier.  These are complaints which it is easy to make with the benefit of determinedly critical hindsight.  Too often the real complaint then seems to become that, in a matter of discretionary judgment, the person simply did not come to the same conclusion (for example, as to whether or not to determine the business relationship, or whether or not records in a particular form were "sufficient", or whether or not it was appropriate to be satisfied with information obtained) as the Commission's inspector, armed with hindsight and a zealous eye, would have come to.   After a protest that the evil suggested did not in fact happen, the criticism becomes that this misses the point because it <u>could</u> have happened, but it seems to me that that can only be accepted up to a point, and not simply as an automatic justification for criticism or sanction.  The fact that a person has the

temerity to question the reasonableness of the Commission's criticisms then provokes the further charge that the person thereby demonstrates failure to understand his regulatory obligations.   I have found examples of this kind of approach throughout this case.   It rather suggests that once any matter has been referred to the ED, it is almost a matter of honour that charges should be laid and severe penalties successfully exacted.   Indeed, the Commission's comment accompanying the Final Notice, cited at [84] above, treating "*failures which have occurred in the last three years*" and "*more historical failings .....which have remained on going until resolved in the last three years*" (emphasis added) as being equally appropriately the target of the Commission's power to punish suggests a rather mean-spirited refusal to recognise that the latter failings have been resolved, as if the writer is so keen to make exemplary use of the Commission's powers of sanction that he finds this a matter of regret.

481. Whilst I do not diminish the breadth and importance of the Commission's function which, as the then Deputy Bailiff listed in *Bordeaux* at [28], comprehends

> "*maintaining financial stability in the regulated sector, managing risk to the financial system and maintaining market confidence; ensuring fair, efficient and transparent markets, protecting financial services' customers and countering financial crime and the financing of terrorism.*"

there must be a balance in the manner in which the Commission exercises its powers which pays due regard to the individual's case.   I said, several times during the hearing, the Commission should surely wish its reputation to be that of being "firm but fair".   I could even revise this to being "strong but fair", but on either basis, to be reasonable and proportionate, the sanctions which it imposes ought to show such a balance.

## Summary of conclusions emerging from general review

482. To summarise, therefore:  I explained previously (at [130] above) that because I still entertained the impression at the end of the hearing, that the principal sanctions imposed were unduly harsh and therefore unreasonable or disproportionate, I would have to review the whole of the materials in the case to decide whether this impression was caused simply by my intuitive impression being unduly lenient towards the Appellants, or whether there were other discernible factors which could explain why this impression might be soundly justified.      In the event, that review has caused me to conclude that there are such factors, and I now set them out here. They are:

> (i)   the background of an initial zeal by the ED for identifying faults, becoming the basis for the Draft Enforcement Notice and the fixing of the proposed sanctions;

> (ii)   a subsequent focus of the ED and the Commission becoming the perceived importance of repelling challenge, winning all arguments and finding justification for the Commission's initial decision.  This combative attitude may, indeed, have been provoked by the intemperate terms of ATL's and the Appellants' original Responses to the Draft Notice, but such intemperance cannot fairly be allowed to amplify appropriate penalties;

> (iii)   whether or not as a result of the above, the flawed and unfair introduction of charges of want of probity at the Final Notice stage, based on no relevant further evidence;