(iv)   reliance for direct or indirect penal consequences, on a further charge (O Co) based entirely on compulsorily self-reported materials;

(v)   refusal to give any appropriate recognition or credit for very major, and apparently effective, measures taken to restore the administration of ATL's business to a proper track, certainly from July 2019 if not to some degree before;

(vi)   failure to keep in mind the distinction between ATL the company, and the Appellants as individual persons, and consequent failure to consider and engage with the question of which defaults were properly and fairly sanctioned against ATL, and which against the Appellants personally.   This may have occurred as a result of ATL's dropping out of the matter only shortly before the Decision was issued, but, for whatever reason, it seems to me that it did not happen;

(vii)   failure generally to pay fair regard to how far the matters of charge were historic by the time of the Reports and the Decision (and indeed, even pre-dating the supposedly Relevant Period), and specifically failure to observe the principle of non-retrospectivity of legal powers of sanction, even just as a matter of fundamental fairness;

(viii)   failure to observe the Commission's own principle of consistency, by paying actual regard to the sanctions imposed by the Commission in similar cases, and/or not disclosing some reasoned relationship between such sanctions and those imposed in this case.

483. Any of the above, alone or in combination, provides an actual reason why the sanctions ultimately imposed on the Appellants could have become unreasonable or disproportionate.   I am therefore quite satisfied that my general impression to this effect has foundation and that I should not dismiss it on the grounds that it may have been arbitrary or speculative.

484. Against this background, I therefore turn to the sanctions imposed by the Decision on the individuals in this case, which are appealed against.

**Discussion of the principal sanctions**

485. The first thing is to consider what each of the Appellants is reasonably being sanctioned for. It is, in my judgment, important to do this in terms of fact not just rhetoric, and to focus on the real significance of what they are charged with doing wrong.     The very breadth and generality of the Commission's rules and the Regulations, and the formulation of the MCL makes it extremely easy to characterise acts or judgments made by regulated persons as being a breach of some such rule or Regulation, and just to stop there, with the focus thus being solely on form, making that the total focus of the investigation even if, in the particular circumstances, no harm might reasonably have been anticipated in practice, and no harm actually occurred.  Adherence to rules and procedures is required for a purpose, and is not solely an end in itself.

**Mrs Hannis - Prohibition Order**

486. Mrs Hannis appeals against the imposition upon her of a Prohibition Order prohibiting her from

"*holding the position of Controller, Director, Partner, Manager, Money Laundering Reporting Officer and Money Laundering Compliance Officer, for the period of three years*".

487. That wording is lifted directly from the wording of the Final Notice. It is does not specify the scope of the institutions as to which as it is supposed to have effect (as it might, and I think probably should, do, under the terms of s 33 (1) of the EP Law) but it can therefore be presumed to be intended to have totally general effect, at least in regard to any institutions over which the Commission has regulatory jurisdiction. It would seem to preclude Mrs Hannis from occupying any senior or in any way supervisory role in the financial services industry in Guernsey.

488. As a general point, the justification for putting the relevant person effectively out of action as regards operating in the financial services sector in Guernsey is the protection of the public (clients) or the protection of the reputation of the Bailiwick. It can therefore be very reasonably justified where its subject has shown a lack of probity. To be justified on the grounds of "incompetence", (a term which I will use to encompass all the general characteristics indicated by the MCL) there must be sufficient reason to believe that the subject's potential such incompetence poses a danger to the public or to the reputation of the Bailiwick. The further arguable purpose of deterrence to third parties in respect of similar conduct to that sanctioned, can only be of limited operation, because it runs the significant risk of imposing a penalty which is unreasonable or disproportionate as regards the individual subject. I have to consider, therefore, whether or not I regard it as reasonable and proportionate, against that background and in the circumstances of the case, to impose such an order on Mrs Hannis.

489. I have already held that the SDM's finding of want of probity made against Mrs Hannis was infected by an underlying error of law (namely that it was not necessary to make any finding as to her state of mind) and that insofar as such a finding was actually made, it cannot be sustained on the actual evidence. The question then becomes whether it was unreasonable or disproportionate to impose a Prohibition Order upon Mrs Hannis for three years (coupled also with a fine of £30,000 as to which there has been no appeal) in respect of the charges made against her which do not disclose a want of probity, but with the facts of these having been largely accepted.

**Mrs Hannis – the charges**

490. Those charges, as derived from the Decision, can, I think, be summarised as:

(i) in 2013, being insufficiently suspicious/enquiring as to why Mr A had felt the need to take legal advice two years earlier and had not revealed either this, or the existence of his brother AA with a questionable reputation, to ATL;

(ii) in May (or June) 2014, either failing to read, or to note, or adequately to register, the possible adverse and discreditable implications of the Wall Street Journal article of May 2014 about AA, but potentially extending by association to Mr A;

(iii) In June 2014 failing to entertain suspicion, and therefore insufficiently interrogating, why Mr A and his son were changing their email addresses;

(iv) (possibly) between June 2014 and September 2014, failing to entertain suspicion and therefore insufficiently interrogating the reasons why Mr A and his son were transferring large sums of money from the X Trust into Turkey;

(v) in the same time period, being insufficiently suspicious, and too ready to accept, the plausibility of an assertion that higher rates of return could be obtained in Turkey as a proper justification for breaking term deposits held by the Trust, and accepting interest penalties;

(vi) between June 2014 and September 2014 effecting payments to Mr A himself from the X Trust without either (i) obtaining prior (rather than assumed or anticipated) confirmation from his wife that this was her wish and was for her benefit or (ii) requiring such payments to be routed through the X No 2 sub-trust;

(vii) at any time after her arrival at ATL in 2011 (presumably), failing to obtain copies of loan agreements between T1 Co and F Co (from 2006) and T2 Co and F Co (from 2008) and by extension failing to identify the ultimate source of such funds;

(viii) from 2013 and onwards, generally failing to "know the customer" in respect of F Co adequately, by not keeping up with the changes of beneficial ownership of T1 Co or explanations for this, and the beneficial interests in F Co, despite suspicion which should (obviously) have been aroused because Mr D was plainly in control at some level;

(ix) failing to act appropriately on adverse media comment about Mr D in 2014 and upon notices of sanctions in 2018, by considering whether wider concerns were appropriate, and finding it appropriate to continue with the client relationship, despite all this, in 2018;

(x) in 2016, joining in signing off the reduced risk rating of F Co from high risk to standard risk – and (presumably) allowing this to continue until 2018 - when the continued background involvement of Mr D should have caused this investment to be subject to "high risk" monitoring activity.

491. Most of these charges, and especially those which were alleged to disclose lack of probity, (being the Mr A/X Trust matter) relate to acts as long ago as 2013/2014. Not only do they therefore date from many years ago (more than eight years before the Decision) but they are only just within the Relevant Period with which the Commission's enforcement process claimed to have been concerned. No other individual charges than the above were upheld against Mrs Hannis in the Decision. Since Mrs Hannis did not join ATL until March 2011, criticisms of "ATL" in respect of matters occurring before then cannot be regarded as importing criticism of her, individually, on any basis.

492. There is no evidence of any of the matters of which Mrs Hannis is accused having caused any harm to clients, beneficiaries, investors, creditors or members of public, nor to the reputation of the Bailiwick. The only matter coming near this was the X Trust payments matter, and it is notable that the FIU did not issue a "do not pay" order, even when notified of possible suspicions.

493. Items (i) – (v) relate to exercising insufficient suspicion (according to the standards which the ED, would wish to have seen applied) as regards client activities. Item (vi) is an argument of trustee best practice and the potential for breach of trust, where, even if accepted, it in fact caused no complaint from any one. Item (vii) is a failure to pick up on something which had happened years earlier, behind a situation which reasonably appeared to be low activity. Items (viii) and (ix) are again examples (admitted) of a somewhat complacent failure to keep up due diligence in that context, and an unduly relaxed attitude towards client actions which could possibly have been associated with suspicious activity    Item (x) is an accepted error of

judgment, at some level, as regards risk rating, (and therefore to have been a breach of regulatory requirements) which would have caused (it is accepted) an inappropriately reduced level of monitoring of the particular client, but  is, once again, a matter of breach of form rather than substance; it is not suggested to have actually caused any malpractice to go undetected.

494. Mrs Hannis must, obviously, bear personal responsibility for these matters but they have now, all too starkly been brought to her attention, by her going through all the process of the Commission's investigation and enforcement procedures - which she plainly from her interview, and not surprisingly, found intimidating and no doubt very stressful.   She will obviously not forget that quickly.

495. The next question is then the extent of personal criticism for incompetence which is properly levelled at Mrs Hannis in relation to ATL's systemic governance issues, ie the extent to which any of those can fairly be regarded as disclosing personal culpability on her part.  Mrs Hannis was not a Director of ATL at all until mid-2019, after the expulsion of Mr Sinclair and the major changes in corporate governance and the senior management issues which this brought about. The only fact relating to systemic failings relied upon after this time is the self-reporting of a failure to meet internally imposed standards of setting up a new system of risk management plans, in March 2021, which has apparently (see Ms Guillou's witness statement of 24th May 2022) since been remedied, and for which is not suggested Mrs Hannis bore any personal responsibility outside any general collective Board responsibility.

496. Prior to June 2019, Mrs Hannis was a senior manager.  However, no evidence that she bore personal responsibility for causing any aspect of ATL's systemic governance failures has been raised, and I cannot see any facts or evidence which might inferentially disclose such personal responsibility.  Mrs Hannis was, in fact, the team leader for Team C2 during the whole of the Relevant Period, and ironically this Team appears, on the statistics shown in the Compliance Reports, to have had one of the best records for keeping down action points, etc, within ATL. (I have already pointed out that the statistics themselves do not, I find, necessarily reveal the seriousness of any outstanding action points which they record, but they nonetheless plainly disclose the extent of a major failure of compliance with ATL's own internal processes which becomes, by extension, a breach of the Regulations under the Commission's rules.)

497. The ultimate question is therefore whether the above picture discloses a situation which fairly suggests that allowing Mrs Hannis to continue to operate at a senior or director level in the Guernsey financial services sector would pose a real (by which I mean of a significance greater than fanciful or speculative) danger to members of the public and from which they require protection, or would pose a similarly real risk that the reputation of the Bailiwick would be imperiled.

498. I simply cannot see any basis for holding that it does, or would do so, at all.   Most of Mrs Hannis' faults are referable to the absence of a sufficiently suspicious attitude (in the Commission's keen eyes), several years ago, to client behaviour or activity.  After so long, and particularly after having gone through being part of a GFSC investigation as revealed here, even if Mrs Hannis had been culpably unaware before 2018 or so of the standards of suspicion expected by the GFSC, I cannot see how it could be feared that she would not have revised her attitudes appropriately since then.  There is no reason to suppose that she requires a period of three years of exclusion from a responsible role in any licensed entity in the Guernsey Financial Services sector to teach her the appropriate lesson.  Insofar as it may have been appropriate to punish her for her transgressions, that has been thoroughly (in my judgment) achieved by the imposition of the financial penalty against which she has not appealed.

499. The SDM based his endorsement of a Prohibition Order on Mrs Hannis on his finding that she "*lacked firmness of character*".  She may well have been limp in some of her reactions, or even weak in her interactions with Mr Sinclair, but firmness of character is actually not one of the MCL, and it is therefore only where this produces a result which does show a deficiency in one of the express characteristics laid down that it is fair to treat it as the basis for a sanction.  Even then, such sanction must still be reasonable and proportionate in the circumstances, bearing in mind the purpose for which the power to impose a Prohibition Order must be taken to have been conferred on the Commission.

## Mrs Hannis – conclusion

500. Against all the above background, and looking at all the circumstances, I am perfectly satisfied that the imposition of a Prohibition Order, of any length and to any degree, on Mrs Hannis is and was unreasonable and disproportionate.     Indeed, in her case, it would even, in my judgment, qualify as being *Wednesbury* unreasonable, since I cannot see any basis on which it could reasonably have been held necessary, or even appropriate, at the time of the Decision, to impose such a restriction upon her in furtherance of the twin objectives of protection of the public and protection of the Bailiwick's reputation.  Any deterrent effect on third parties which it might be thought to provide would, in my judgment, arise only from fear that such Orders could be imposed by the Commission over-harshly, ie any such deterrence would be dependent on the very unreasonableness which the appeal process is intended to prevent.

501. I cannot see any basis for considering that Mrs Hannis is not, as of now, a sufficiently fit and proper person to be permitted to continue performing the functions of director or manager, etc, in a financial services business.  I conclude, therefore, that the Prohibition Order must be set aside.

## Mr Domaille – the charges

502. It is more convenient next to consider Mr Domaille.     The central sanctions imposed in the Decision on Mr Domaille are a Prohibition Order prohibiting him in the same wide and general terms as Mrs Hannis, from performing any senior or supervisory role in the financial services sector in Guernsey for a period of eight years, and the imposition of a fine of £280,000.

503. I have already dealt with and set aside the findings of want of probity against Mr Domaille on grounds similar to those applied to Mrs Hannis and otherwise for the reasons previously given. I therefore deal with the remaining findings which Mr Domaille largely admits as fact.

504. The charges made against Mr Domaille which amount to charges of failing to fulfil the MCL otherwise than through want of probity, as distilled from the Decision, can, I think, be summed up as follows:

    (i)       In and up to 2009, accepting monies from Libya into a trust being administered by him through money exchange companies and failing adequately to address the fact that this disguised the source of funds;

    (ii)      In 2009, failing to exercise an appropriate degree of circumspection about accepting the independence credentials of the Libyan lawyer, OA, who provided advice that money exchange companies were a lawful method of taking funds out of Libya;

    (iii)     In 2011 too readily accepting Mr A's explanation as to his reasons for wanting to change the name of his family trust and company so as to conceal his connections thereto as being legitimate security concerns arising from the situation in Libya, and

not asking himself whether this was a sign that the funds must be the proceeds of crime or corruption, and effectively (therefore) facilitating this so far as possible;

(iv)    Allowing the A/X Trust client relationship to continue after 2014, until 2017, and only terminating it apparently reluctantly and apologising for having to do so;

(v)    (Presumably), failing in his supervisory role with regard to Mrs Hannis' handling of the X Trust files from 2011 to 2014, (as mentioned above in regard to her);

(vi)    Failing in his supervisory role in the handling of the F Co files from 2013 or perhaps earlier, to 2019, as mentioned in relation to Mrs Hannis (above), in particular in approving the downgrading of the risk rating in 2016, and in 2018 in taking legal advice only as to the effects of sanctions relating to Mr D, and not investigating adverse media allegations of other culpable activity;

(vii)    Failing in his supervisory role in the handling of the Y Trust files in November 2017 and June 2019, as mentioned in relation to Mr Clarke (below);

(viii)    Failing in management and oversight of the O Co file, as regards confirming sources of funds in the period from March 2010 onwards, (including presumably acquiescing in Mr Sinclair's not externalising an SAR to the FIU, in 2018) and in his judgments in relation to the recent (from 2021 onwards) investigations into that matter;

(ix)    In 2017, committing a suggested error of judgment in personally accepting shares in R Co as payment in kind for fees owed to ATL;

(x)    In 2017 and after, failure to ensure that conflict risk mitigation controls as to Mr Sinclair's not being involved in the administration of R Co were maintained, knowing that they were not;

(xi)    Generally failing in his responsibilities as a main Board Director of ATL throughout the Relevant Period with regard to preventing or remedying the matters of regulatory breach arising from the systemic governance failures in ATL's administration, as described in the Decision, and the gifts/conflicts management situation, demonstrated with regard to R Co.

505. I observe, once again, that there is no evidence of any of the matters of which Mr Domaille is accused having caused any harm to clients, beneficiaries, investors, creditors or members of public, nor to the reputation of the Bailiwick.   I have already remarked that even the X affair, which must be that giving rise to most suspicion of connection with wrong-doing, does not appear ever to have developed into any instance of actual charges being laid and implicating Mr A, let alone implicating Guernsey.

506. I do accept that most of these charges, largely now admitted, are significant or serious regulatory breaches.   Items (i) – (v) relate to the Mr A/X Trust matter.  Even though I have exonerated Mr Domaille from acting with want of probity in regard to the change of name incident, that was the allegation which came nearest to want of probity, and it certainly displayed a notable lack of wariness.     However, that incident was over 10 years old before the time of the Decision, and indeed, all the Mr A/X Trust matters and most of the F Co matters pre-date the watershed date of 13th November 2017 as regards financial penalties, and much predates the supposedly Relevant Period of the Enforcement Proceedings generally.

507. Items (v) – (viii) relate to matters with which Mr Domaille was concerned, as a matter of oversight rather than direct action, apart from his historic inadequate investigation of O Co's source of funds, and failing to remedy this subsequently.    Item (ix), with regard to R Co, was a matter of error of judgment as to the potential awkward difficulties which could arise from taking a significant shareholding in a client, but was not actual wrong-doing, and was not, in itself, alleged to be a breach of any rule or Regulation, so far as I can see.  Other aspects of this (item (x)) relate to failure properly to supervise and enforce ATL's policy with regard to gift and conflict of interest management.  They certainly exhibit failures of proper and effective oversight, although in the context of an unusual, rather than a commonplace, situation, in which Mr Sinclair was really the central protagonist.    Therefore, whilst I certainly do not diminish the earlier specific instances of deficient conduct, it is item (xi) regarding Mr Domaille's responsibilities, through being a Director of ATL, for ATL's poor regulatory observance which is to my mind clearly the most weighty of the charges against him.

508. As to considering the charges, I first make one observation in relation to the SDM's forthright finding, endorsing comments from the ED, that Mr Domaille exhibited a reprehensible tendency to try to "*dump responsibility*" on junior staff.   The SDM plainly condemns this roundly, and would seem to have regarded it as a matter exacerbating Mr Domaille's offences and, by inference, tending to increase an appropriate sanction.

509. I do not think this is fair.   Mr Domaille (and this may possibly apply to Mr Clarke as well) was, in effect, being tried on charges that his conduct had not lived up to the standards required of him, with potential serious consequences in the way of sanctions.    It is not unfair or unreasonable that he should seek to defend himself.   If there are facts which might provide some partial defence, or mitigation, then it is perfectly fair that he should make reference to them.    The fact that other staff may have been those who actually committed the relevant wrong, or that other staff, even if more junior, may have taken the same line, made the same judgment or made or endorsed the same decision which he endorsed or made, is not irrelevant. A senior officer – or director - is entitled to delegate tasks, provided he does so to an apparently competent subordinate, and has no reason to believe that that subordinate cannot or will not perform the delegated function honestly and competently.   The senior party's duties then become those of a supervisor rather than the actual agent, and whilst this obviously does not absolve the senior party of responsibility, it will have an impact on the scope of matters for which he is properly made liable.   Similarly, if a person makes a decision which is open to censure, the fact that others, even persons somewhat junior to him in the organisation, may have shared the same view or misapprehension is something which *may*, in appropriate circumstances, have a bearing on an assessment of the seriousness of his culpability.  As such it is a matter of evidence, for whatever the tribunal might think it worth.

510. The point I am concerned to make here, though, is simply that one cannot fairly prevent a person from raising such points if he or she believes that they will relieve or mitigate his culpability, nor can one fairly criticise him or penalise him for doing so.    I have to say that whilst Advocate Edwards accepted this proposition in argument, it does not seem to me that this is actually what happened in practice.   It may well be that the points made by Mr Domaille do not carry any real weight in his favour when examined, but that is not the point; it would be wrong to hold it against him, simply, that he made such a point, but it does seem to me that this may well have happened, despite Mr Domaille's making it clear that he was <u>not</u> suggesting that responsibility lay on junior staff <u>rather</u> than him.

511. Considering Mr Domaille's culpability as to his own responsibility for ATL's deficiencies of regulatory compliance, I do not think this is fairly dealt with, either, simply by stating that

"*responsibility stops at the top*" and treating this, without more, as justifying the imposition of a severe penalty.  The ED and the SDM seem effectively to do this.

512. As to the responsibility of directors, company Directors (ie "the Board") have a responsibility under the present rule 27 (formerly 26) of the Handbook for their entity's compliance with the Handbook rules and the Regulations, for maintaining and reviewing policies and procedures for implementation and effectiveness and for taking action to remedy deficiencies.    That responsibility is collective, because it is implemented by Board decisions, and these are made by the whole Board on a collegiate and collective basis – and inevitably therefore, in some instances, by majority decision only.  But whilst this is a fact of corporate governance, the duties and responsibilities, and consequently the personal liabilities of directors are owed individually: see what I said in *Carlyle Capital Corporation Ltd v Conway and others* (2017) Guernsey Judgment 36/2017 at  [355], [536] and [539].    It is therefore, insufficient simply to say that Mr X (or Mr Domaille) was a member of the Board and therefore he is "responsible" for the fact that the company operated with general systemic failings for several years and should be sanctioned accordingly, without actually looking at and allowing for, his role, and estimating his consequent responsibility for that breach.

513. The Commission objected in its Defences (at §54), that to accede to Mr Domaille's submission that he reasonably acted in reliance on others, rather than dismissing this as part of his deprecated tendency to seek to shift the blame on to others would "*water down significantly the regulatory responsibilities of directors within Guernsey*".   But the Commission cannot, in my judgment, just ignore the tenets of company law, and the principle that liability is individual, when fixing sanctions.  Indeed, to go to the opposite extreme, and to rule out any allowance for the individual's particular position, turns the offence into one of strict liability, and in my judgment that is not acceptable and appropriate in enforcing a regulatory code.  Therefore, where the Decision upholds the Commission's case because X was "*responsible*", I consider that that result has to be further examined by looking at two more questions, namely "responsible for what?" and "how far responsible?"  both of which are of materiality to the level of sanction which can reasonably be imposed.

514. Taking Mr Domaille's position in this case, he was a Board Director throughout the Relevant Period.  The Board owed a collective duty to the company to ensure that the company complied with its regulatory obligations. This meant that the individual Board members each owed a duty, and had personal responsibility to use their skill and care to bring this about, bearing in mind that the company itself would operate through a combination of Board decisions and properly delegated tasks.    Mr Domaille's duty was therefore to use his best endeavours of skill and care to procure that ATL complied with its regulatory obligations, but (of course) he did not have to perform that actual compliance in person.   His duty was to seek to ensure that ATL, through its Board (operating through collective decision making), and its personnel (authorised and instructed to carry out actions at their appropriate level of appointment and competence), achieved that result.

515. Whilst Mr Domaille was a Director, it is relevant that throughout the material period, it was Mr Sinclair who was either appointed by the Board to take, or arrogated to himself (with the concurrence of Mr Domaille, and at times Mr Larkin or Mr Clarke) responsibility for matters of financial regulatory compliance.    Mr Domaille (and Mr Larkin or Mr Clarke as appropriate) were entitled, during this time, to leave that responsibility to him, unless and until Mr Sinclair showed himself unable or unwilling to perform it properly.    Clearly, with the acknowledged situation being that ATL's record of due compliance with its own policies – and by the same token (though not necessarily in perfect coincidence) of regulatory compliance – was somewhat wanting from at least 2014, and became very badly wanting from 2016, Mr Sinclair's

performance was demonstrably inadequate.   The other Directors therefore could, and should, have taken steps to correct this, once it became sufficiently apparent.   Where they failed personally in their duty therefore, was in this latter regard, ie to get matters improved, despite Mr Sinclair.

516. It was, in fact Mr Domaille, as the slight majority shareholder, who had the ultimate power to achieve this, in the face of Mr Sinclair's apparent inability, obstinacy or refusal to recognise and perform his own duties.   This was the power which Mr Domaille ultimately did exercise, but only rather late in the day in June 2019, after several years of inadequate performance by ATL.   From that point on, Mr Domaille performed his duty.   Before that point, he paid insufficient attention to it.   That is not to say that he was necessarily obliged to expel Mr Sinclair earlier.   The papers suggest that there were plans and targets supposedly devised with the objective of getting ATL's regulatory performance back on track, but these were continually ineffective over the period from at least 2016, and were known to be so.   With Mrs Sherbourne frequently advising that the statistics were (still) woeful, and those in authority – ultimately therefore the Board Directors – needed to find out whether this was lack of oversight, lack of resources or lack of training, and take action accordingly, Mr Domaille simply did not take up the involvement which he should have done to ensure that this was remedied.

517. It is, though, that identifiable deficiency for which it is appropriate to penalise him and not just for having been a Director at the relevant time.   This point emphasises the need to distinguish between the <u>personal</u> failings of Mr Domaille for which it is appropriate to sanction him, from the <u>general</u> failings of ATL, for which it is appropriate to sanction ATL, even if severely.

## Mr Domaille - Prohibition Order

518. Against the background of everything said above, the first question is whether, I consider that it was unreasonable and/or disproportionate in all the circumstances for the Decision to impose on Mr Domaille a Prohibition Order of the wide ambit already noted (discussed in relation to Mrs Hannis), for a period of 8 years, and in combination with some financial penalty (whether or not that is appropriately £280,000).

519. I am of the firm conclusion that it was.   Once again, the question seems to me to be whether, taking all relevant factors into account, the picture disclosed reasonably suggests that allowing Mr Domaille to continue to operate at a senior or director level in the Guernsey financial services sector would pose a real danger to members of the public and from which they require protection, or would pose a real risk that the reputation of the Bailiwick would be adversely affected.   I am quite satisfied that it does not, and I am even more satisfied that putting Mr Domaille out of operation for a period of 8 years would be thoroughly excessive as regards achieving any such protection, in any event.   I again discount any justification arising from claimed "deterrence" for the same reason as in relation to Mrs Hannis.

520. I have taken full note of the matters of Mr Domaille's individual personal culpability, and I emphasise that I do not diminish them.   I have discussed above his personal culpability at Board level, where he was undoubtedly lax, for far too long.   As regards the charges against him relating to individual matters, the most serious one is undoubtedly the change of name incident.   Whilst I have exonerated Mr Domaille from the charge of want of probity in relation to this, it is the matter which comes nearest to such a want of probity; it displayed a significant lack of circumspection.   However, that incident was 11 years before the Decision and whilst Mr Domaille's actions may have been seen to hark back to the old, pre-regulation, attitude of some off-shore trust service providers, that a fiduciary's function was to carry out his client's instructions to the best of his ability and not to ask questions, that extreme sense of blind loyalty

to the client's interests has now long gone.  Most importantly, I have seen nothing in Mr Domaille' subsequent conduct which suggests that he does not, now, fully appreciate this. Even if I had concluded that he had lacked probity in his conduct in relation to this one incident, over 11 years ago, I would still have concluded that this was insufficient to justify treating him <u>now</u> as if he posed a danger to the public or to the Bailiwick for any such want of integrity, because he had shown by his subsequent conduct that he was no longer likely to behave that way.   Even one-time offenders are entitled to be rehabilitated and to be credited for demonstrating this.    The remaining incidents disclosed carelessness or lack of judgment in the past, but they do not, in my judgment, justify a conclusion that Mr Domaille is not a sufficiently fit and proper person to be permitted to continue working at a senior level in the Guernsey finance industry now.

521. The matter which seems to me to be strong evidence that Mr Domaille is now prepared to, and is, operating on the basis of a proper and responsible observance of regulatory requirements is the quantum of the steps which he did take, in June 2019, and has apparently since maintained, in expelling Mr Sinclair, installing an improved and extended  Board and setting up – at what must have been not inconsiderable expense – new systems to ensure ATL's proper regulatory compliance going forward.  This is reinforced by ATL's s readiness to change consultants when those initially appointed were not felt to be delivering appropriate results    I refer back to my comments at [406] – [408] above.    I do not regard the matters of self-report which have occurred in the meantime to detract from this; they have been explained.

522. I find this a matter of very great weight as to whether it is proportionate, now to impose a Prohibition Order on Mr Domaille, and it seems to me that it has just not been given sufficient weight in any opinion of Mr Domaille's fitness.     He was undoubtedly lax in his role and responsibility in conducting ATL's business for some time up to 2019.   Reading between the lines, he undoubtedly also interviewed badly.   He surely gave an impression of not taking matters suitably seriously, for example in deploying trivial similes about a bucket of water with a small tap at the bottom and a large one going into the top to explain the continually high apparent numbers of ATL's actions points.     I do, though, have some sympathy with the frustration be must have felt when being interviewed by interviewers who were seemingly intent only on ferreting out matters which could be described as poor practice from the past and were apparently quite uninterested in the improvement which had eliminated these, and becoming heated at their being apparently unable, or unwilling, to grasp that the arrangements between ATL and Artemis SARL were fiscally and economically neutral, and there was no dubious practice going on.   Whatever may have been his deficiencies at interview, however, I do not find these to be sufficient to suggest that his continued working in a senior position in the financial services sector might now pose any danger to anyone, or to the Bailiwick.

523. I am again quite satisfied, therefore, that, after incurring the time, trouble, stress and no doubt significant expense of going through the Commission's enforcement processes and this Appeal, he has learnt lessons as appropriate, and it is entirely unnecessary to disqualify him. Moreover, I am even more satisfied that the period of eight years would be unreasonable and disproportionate, on any basis.

**Mr Domaille – Financial penalty**

524. As to the financial penalty, I find that this too is unreasonably severe, and is disproportionate. Referring to my general background findings at [482] above, two of these (item (iv), the misplaced findings of want of probity, and item (vii) the failure to apply the principle of non-retroactivity of law), are errors of law which will presumably have caused an unjustified increase in the imposed penalty.

525. As to this latter, I observe that a very great deal of Mr Domaille's conduct complained of occurred before the watershed date of 13th November 2017.   However, the general charge in item (xi) straddled this date, and as to this, I do accept that it can fairly be said that such inadequate conduct after that date, being the continuance of a state of affairs which was wrongly allowed to exist before that date, can be regarded as aggravated.

526. Two further points can be added.  I have already noted that the severity of the personal sanction imposed on Mr Domaille is in practice increased because of the indirect effect upon him of the sanction imposed on ATL (see [472]), noting that this sanction, itself, seems to have been an unprecedented outlier, in being unusually extreme for a case where there has been no financial scandal or findings of fraud or financial crime attached, although ATL has in the end elected not to appeal.       The second is the comparison between the financial penalty imposed upon Mr Domaille and that imposed upon Mr Sinclair (before he earned a discount by settling with the Commission), to see if that feels appropriate.   To me, it does not.   Given Mr Sinclair's want of probity, his far greater direct involvement in and responsibility for ATL's compliance position, arising from the duties which he assumed in ATL, and his inability, so far as I can see, to point to any mitigation in terms of serious efforts to remedy ATL's poor compliance record I am quite unable to see how the original equivalence of the sanctions proposed against each of them was reasonable at the time of the Draft Notice, and still less that it was so at the time of the Decision.   This again suggests that the penalty imposed on Mr Domaille has not been reasonable.

527. I have so far discussed the place of "deterrence" in relation only to Prohibition Orders, but I observe that even as regards the level of a financial penalty, the argument that imposing a severe penalty is "reasonable" for the purpose of deterrence cannot be carried too far either.   The argument that a sanction is reasonable for deterrence purposes may have much force on behalf of criminal law enforcement, but its strength is considerably reduced where the point is to punish breaches merely of regulatory procedures, especially where these have not led to any actual damage or harm, and are being, in effect, simply punished for themselves.  Any deterrent element must still be within the limits of proportionality.

528. In the light of all the above I conclude, therefore, that the discretionary financial penalty of £280,000 imposed on Mr Domaille cannot stand and must be set aside.

529. Although it is strictly more appropriate to discuss this under "disposal", it is convenient to deal here with what I would consider to be an appropriate (ie, not unreasonable and not disproportionate) financial penalty to be imposed on Mr Domaille.

530. The most serious fines levied on individuals in the *Louvre* case was equivalent under the current fining power to £24,000, that in the *Safehaven* case to £100,000, and in the *Hansard* case, the first to apply the Commission's actual current fining powers, it was £81,000, imposed on the director who was the main shareholder in the context of a £200,000 fine on the Company.      To my mind this suggests that a fine in excess of £200,000 levied on Mr Domaille must be disproportionate, on any basis.

531. Starting from the excessive figure of £280,000 actually imposed, I take into account reductions required to be applied for (i) recognition that no want of probity is made out against Mr Domaille and (ii) due recognition that a significant amount of the misconduct with which he is charged took place before 13th November 2017, (in particular all of the X matter, the major offence in relation to F Co, the main defaults in relation to O Co, and the whole of the acts in the R Co incident) albeit the general supervisory wrongdoings straddled that date.  I take into account further reductionary elements which I consider are appropriately made as recognition

of other matters which have contributed to my view that the penalties are excessive, but in particular the very considerable credit and merit which require to be given for Mr Domaille's eventual efforts to remedy the situation.

532. Pulling all these together, I consider that any financial penalty in excess of £200,000 would most certainly be significantly excessive and disproportionate.  The figure which I have come to as being the maximum which I consider reasonable and proportionate is £175,000.     I find that figure

> (i)  to fit with the reductions which I think are called for, mentioned above,
>
> (ii) to be commensurate with the extent of the wrongdoing which has been found to have occurred,
>
> (iii) to allow due respect for
>
> > ▪  the Commission's apparent view that the ATL situation was egregiously serious, or
> >
> > ▪  that the Commission may be justifiably requiring, incrementally, to increase the severity of its fining powers at the present time, (the unprecedented level of penalties originally exacted against both ATL and the individuals suggesting that this may have played some part in their thinking)
>
> (iv) to fit tolerably well, on that basis, with the evidence of penalties imposed in other cases and also, ultimately
>
> (v)  to sit reasonably with a comparison of the penalty imposed on Mr Sinclair, and
>
> (vi) the cumulative effect on Mr Domaille of the penalty also imposed on ATL.

## Mr Clarke – the charges

533. The principal sanctions imposed on Mr Clarke in the Decision are a Prohibition Order for four years, and a fine of £90,000,

534. I have already set aside the findings of want of probity against Mr Clarke on grounds similar to those applied to Mrs Hannis, and otherwise for the reasons previously given.     I therefore deal with the remaining findings which, again, Mr Clarke largely admits as fact.

535. The charges made against Mr Clarke which amount to charges of failing to fulfil the MCL other than through want of probity, as distilled from the Decision, can be summed up as

> (i)   in 2017-18, failing, as overseeing manager/director in respect of D Co to ensure adequately comprehensive policies, procedures and controls within ATL regarding dealing with funds derived from cryptocurrency;
>
> (ii)  in November 2017, allowing a non-charitable payment of $5000 to be made (to Mr RG) out of the Y Trust;
>
> (iii) in 2019, failing to appreciate, or summarily rejecting, any possible risk that, in paying for Miss T 's university fees, Mr B was intending to procure some corrupt activity by her father;

(iv)     in 2016, accepting the gift of R Co shares to the value of about £25,000 from Mr B, either at all (as an error of judgment) or in the context that proper procedures for managing any conflict of interest which this might create were not observed;

(v)      in relation to O Co, general directorial oversight from 2015 and apparently acquiescing in Mr Sinclair's not externalising an SAR to the FIU, in 2018;

(vi)     otherwise throughout the period from 2015 onwards, being responsible, as a Director of ATL, for ATL's general deficiencies in terms of regulatory compliance (ie having the necessary policies, procedures and controls in effect and ensuring their implementation) as exemplified in the systemic governance issues disclosed, and specifically;

(vii)    particularly, in 2017, being responsible through being a Director for the inadequate implementation of the gifts and conflict of interest policies and procedures in respect of the gifts of R Co shares to himself and others, mentioned at (iv)

536. Once again, I observe that there is no evidence of any of the matters with which Mr Clarke had particular or even general involvement, above, having caused any harm to clients, beneficiaries, investors, creditors or members of public, nor to the reputation of the Bailiwick, and I also observe that there is no criticism of his continuing conduct thereafter.

537. Item (i) was a single incident and aspect, and it appears to me really to be quite minor.  (It does not appear to be suggested, in this regard, that it was any regulatory breach to fail to implement internal ATL guidance as to not breaching Barclays Bank's "policy" of not accepting funds derived from cryptocurrency, and I would in any event entirely discount that if it were.)   Item (ii) (non-charitable payment from charitable foundation) is certainly serious and is admitted, and the comment that it only happened through the mistaken act of a junior employee is, I accept, no mitigation.  It was, though, a single incident, which simply was not effectively controlled, and later events show that attention was subsequently being paid to such matters.

538. Item (iii) is all that is left of the charge of want of probity in relation to this payment made to Mr B himself, (discussed above at [247]-[259] and in particular [253]) which I have dismissed. I include it only for that reason.   Such criticism as is left from this incident is, to my mind, founded on an unrealistic and unreasonably censorious approach to the standard of suspicion and the exercise of a reasonably based judgement by the individual concerned (in this case Mr Clarke), such that, even if it can - as is almost always the case – be argued to fall within the literal wording of some rule or Regulation, (such as want of effective monitoring or suchlike) it would be quite unreasonable to found any sanction upon it.    In fact, given its origins, I see this whole remaining complaint as an example of the ED's defensive impulse always to look for some alternative charge when faced with a challenge which removes the basis of its original one, (here, the fact that General T  had not been a PEP, as assumed), which has unfortunately simply been accepted by the SDM.

539. Item (iv) (gift acceptance) is a personal misdeed by Mr Clarke which does not disclose, so far as I can see, any actual wrongdoing or breach of Regulation, rather than perhaps an error of judgment, so long as safety procedures such as the obtaining of suitable approvals and the managing of possible conflicts of interest were given effect – but  they technically were in Mr

Clarke's case.   I accept that this whole incident is fraught with potential errors of judgement. Apart from possibly as to accepting the gift at all, it could perhaps be said that Mr Clarke ought not to have relied on the potentially tainted personal approval of Mr Sinclair of his gift, or that he should have personally ensured that the relevant conflict register was promptly and fully updated, which did not happen.   (This merges, though, into items (vi) and (vii) responsibilities for oversight.)       How far it is reasonable to impose sanctions for mere errors of judgment which were not tainted with actual impropriety and were not in themselves any breach of rule or Regulation seems to me to be a difficult question.

540. Mr Clarke subsequently, although obviously under pressure rather than spontaneously, did acknowledge that accepting such a gift could be criticised as an error of judgment, by returning it.   The criticism then becomes, naturally, that it took three years for him to do so.   However, this seems to me also to highlight a different matter, namely that I can see no evidence that anything improper in terms of influence, or the arguable effect of any conflict of interest, ever did actually occur in relation to Mr Clarke arising from this incident.   Nor did it arise from the associated failure by oversight, which the Commission subsequently pointed out, to register the potential conflict of interest also with regard to all 38 Mr B companies and not just R Co itself.

541. Item (v), (O Co), is again more of a matter of single failure, but in the context of the charge of personal deficiencies in Mr Clarke's fulfilment of his general responsibilities as a Director of ATL for its defaults in compliance with its regulatory obligations during his time as such.   As regards any personal involvement of his in such actual deficiencies by ATL, I note that Mr Clarke was in charge of Team A at ATL, which appears clearly, from the evidence, to have been the team with consistently a very poor record of clearing action points, etc.

542. As to responsibility for systemic governance issues, Mr Clarke was a Director of ATL from 2015 onwards.     He therefore appears to have become a Director at the time when ATL's compliance record seems to have been becoming particularly bad.   However, and as previously discussed in relation to Mr Domaille, it is not, in my judgment, sufficient merely to note this and impose a swingeing personal penalty on Mr Clarke simply (in effect) for having been a Director at the relevant time.

543. I have already reviewed how directors' duties work in practice, when discussing Mr Domaille. Mr Clarke did not become a director until November 2015.   He would reasonably need a few months to settle into this role.   From about March 2016 it would be fair to expect him to take serious action as a Director with regard to positive steps to perform his duties.   However, this does then pose the question what Mr Clarke was actually expected to do.   He was in a difficult but not uncommon position.   He had no individual power as a director; he was only one of three and thus a minority on the Board.   He had no shareholding, and therefore no ability to remove or expel either of the other directors (or, indeed, anyone else).   He was not in a position, himself on his own, to do anything directly about initiating measures to improve ATL's systemic compliance shortcomings.

544. In the course of the hearing, I never received any answer to the question what, in specific terms, the Commission expected someone in Mr Clarke's position to do, to avoid being vulnerable to criticism from it.     I can accept that the Commission can fairly say that it is not good enough to do nothing, but it then does seem to me that it should be possible to state what steps Mr Clarke should have taken, or what effect he was, realistically, expected to achieve, to avoid censure.   Should he have resigned as Director?  Should he have resigned from his job?  Should he have written to the Commission? (although it is a rather alarming thought that observing the MCL might require one to turn informant on colleagues on matters not involving dishonesty or

want of probity). It would be unreasonable to suggest that he should have taken any of these steps immediately. It would be fair to say that after giving thought to the situation he might have formulated a plan as to how to improve the position and demanded to put this to the Board, or, if he did not feel capable of doing this himself, a plan for obtaining and implementing external advice. If the position with Mr Sinclair was difficult, he could and should have sought the engagement and help of Mr Domaille as the other director and majority shareholder. More extreme measures such as resignation might have become appropriate if none of this produced progress. All this might have made no difference in practice but it would at least have shown that Mr Clarke was conscious of his duties and was trying to perform them. However, it is venturing into areas of speculation which simply have not been explored in this case.

545. In essence, therefore, Mr Clarke's main misdeed is that of being inactive or ineffectual in this regard, for something over three years, from spring 2016 to mid-2019, when Mr Domaille took over and took action. His direct personal failings are not many, nor very serious in themselves (except perhaps the historic one of permitting the non-charitable payment to be made out of the Y Trust). His personal oversight failings are more serious; during the Relevant Period he was the leader of the team with, apparently, the worst record of outstanding action points, etc. His personal failings as a Director are serious, but are fairly tempered by some recognition of his lack of power, although this was not an excuse for inaction.

**Mr Clarke – Prohibition Order**

546. I turn, then to consider once again whether it was/is unreasonable and/or disproportionate in all the circumstances for the Decision to impose on Mr Clarke a Prohibition Order of the wide ambit already noted (discussed in relation to Mrs Hannis), for a period of four years, and in combination with some financial penalty. Again, I ask myself whether, taking all relevant factors into account, the picture disclosed reasonably suggests that allowing Mr Clarke to continue to operate at a senior or director level in the Guernsey financial services sector would pose a real danger to members of the public and from which they require protection, or would pose a real risk that the reputation of the Bailiwick would be adversely affected.

547. In the end, I have concluded that it does not, and that it is not reasonable and proportionate to do so, although I have, strangely enough, reached this conclusion less easily in Mr Clarke's case than with either Mrs Hannis or Mr Domaille.

548. This is because I have formed the clear impression that Mr Clarke's faults lie in being potentially weak and ineffectual, rather than actively or negligently committing misdeeds or errors of judgment as regards the actual conduct of fiduciary business. It is fair to say that he has apparently been part of the remedial steps which have been taken since June 2019, but these were really headed up, it appears to me, by Mr Domaille. As a mere lieutenant in the process, Mr Clarke cannot take major credit for this mitigation. However, in the end, I have concluded that Mr Clarke does know his business, and that absent supervision by, or having to work with, the overbearing Mr Sinclair, his past conduct does not show that he is fairly viewed as falling short of the MCL so as not to be a sufficiently fit and proper person to work at a senior level in the financial services sector now, and that his doing so does not pose any real danger to the public or to the reputation of the Bailiwick. I again have no doubt but that the effects of having gone through the enforcement and appeal process, and to suffer an appropriate financial penalty, will have brought home to Mr Clarke the importance of keeping up standards of competence and diligence in the future.

549. I will say that I had wondered whether, because of what I perceive to have been the underlying cause of his failings, it would have been reasonable and proportionate to impose some kind of

limited Prohibition Order, excluding him simply from working at the level of a Board Director for some period, and whether I should remit the matter to the Commission to consider this kind of option.   However, I have ultimately concluded that this is not sufficiently necessary in all the circumstances to justify taking such a course, and it would be unreasonable to do so.   In my judgment it is just not fair to prolong the hugely stressful process of these proceedings any further, and the right course is simply to quash the Prohibition Order.

## Mr Clarke – financial penalty

550. As regards the financial penalty imposed on Mr Clarke, I have come to the conclusion, as with Mr Domaille, that this is disproportionate and unreasonable.      I do so for similar general reasons to those there mentioned.  The fine of £90,000 imposed by the Decision requires, in my judgment, to be adjusted for the removal of any charge of want of probity and for the need to recognise that a considerable amount of Mr Clarke's conduct complained of took place before the 13th November 2017, even if general failings as regards remedying ATL's regulatory compliance position straddled this date.   The credit in relation to having taken remedial steps is, though, limited as it is little more than association with this.   I will, therefore, set aside that financial penalty.

551. Having gone through a similar exercise to that described in relation to Mr Domaille, and for similar reasons, including fixing this penalty with some proportion to penalties imposed in other similar cases whilst acknowledging the change in fining powers, I have concluded that the maximum reasonable and proportionate fine which could be imposed on Mr Clarke in all the circumstances of this case would be £60,000.

## Public Statement

552. As regards the Appeals of each of the Appellants with regard to the issuance of the proposed Public Statement under s 38 of the EP Law in the terms attached to the Decision, those Appeals are allowed.     The terms of the proposed Public Statement are questionable in some respects even as regards the findings made under the Decision itself, but they are now certainly inappropriate in many respects.

553. I am uncertain as to the status of this proposed Public Statement in practice, given that ATL itself, with whom much of it is concerned, accepted the Decision and settled with the Commission, apparently, therefore, on terms that it should be issued in its original form.

554. Whilst the terms of a Public Statement are *prima facie* those which the Commission considers appropriate (see s 38(1) of the EP Law), this must itself be subject to requirements of reasonableness, given the rights of appeal which are granted in relation to that sanction.  Whilst the Appellants accept that they should be subject to the sanction of an appropriately worded Public Statement, it seems to me that the precise terms of such a statement may well be controversial.    Indeed, their interrelationship with any Public Statement being appropriately issued in respect of ATL itself, and also Mr Sinclair, may be a tricky question.    In those circumstances I consider it appropriate to give directions which will enable any dispute about the appropriateness or otherwise of the terms of such Public Statement to be resolved by the court.

## Miscellaneous

555. I note, for completeness, that I have not found it necessary to consider Grounds 5 of the Appeals, (human rights issues) in the light of the conclusions which I have come to on the other grounds.

556. Lastly, there is one further comment which I feel driven to make.  I have found this a very difficult and troubling case, although – but perhaps, in fact, <u>because</u> – I have reached my conclusions so very firmly.   The Commission did not, in this case, achieve the "*fair balance*" recognised as required by the then Deputy Bailiff in *Bordeaux* (above) at [30].

557. The financial services industry is an extremely important part of the economy of Guernsey.   It is hugely in Guernsey's interests to be a location which those who have responsible and respectable fiduciary or finance business to set up, operate or transact find attractive for that purpose.     The Commission is understandably fervent in the performance of its functions of protecting the public interest and protecting and enhancing the reputation of the Bailiwick as a financial centre.    However, it seems to me that on occasions, the Commission may overlook the fact that the reputation of the Bailiwick as a financial centre includes the reputation of the Commission itself as a regulator.     In my judgment that reputation needs to be one of being "firm but fair" and the Commission needs to keep in mind the danger that, in the interests of being perceived to be the former, it may overlook the latter.   This is particularly so as regards dealing with "small" businesses - persons or entities who could not afford the costs of challenging a decision of the Commission.     This is, perhaps, an unusual case in that regard.

## Disposal and costs

558. Based on my findings above, therefore, I propose the following disposal of these appeals.

(1) The appeals by each of Mr Domaille, Mr Clarke and Mrs Hannis against the Prohibition Orders imposed upon them by the Decision are allowed and such Orders are set aside.

(2) The appeals by each of Mr Domaille, Mr Clarke and Mrs Hannis against the concomitant Disapplication Orders imposed on each of them by the Decision are allowed and such Orders are set aside.

(3) The appeal by Mr Domaille against the discretionary financial penalty imposed upon him of £280,000 is set aside.    I will either substitute the sum of £175,000 or remit the matter to the Commission with a direction that a penalty no higher than £175,000 be imposed.

(4) The appeal by Mr Clarke against the discretionary financial penalty imposed upon him of £90,000 is set aside.   I will either substitute the sum of £60,000 or remit the matter to the Commission with a direction that a penalty no higher than £60,000 be imposed.

(5) The appeals by all three parties as regards the issuance of the Public Statement in the terms annexed to the Decision are allowed; the question of the terms of an appropriate such Statement is remitted to the Commission for reconsideration in the light of this judgment.   As to such terms, there is liberty to apply.

(6) The Respondent shall pay the Appellants' costs of these Appeals on the recoverable basis (to be taxed if not agreed) PROVIDED that if any party wishes to contend that some other order in regard to costs is appropriate, such part shall file and serve on the other parties notice to that effect within 14 days of the formal handing down of this

judgment, whereupon this paragraph shall be void, and the parties shall seek directions as to the determination of the appropriate order regarding costs.

(7) In case of further or other issues arising, there is liberty to apply.

**Her Hon Hazel Marshall KC**
**Lieutenant Bailiff**

**18th April 2023**

# RE COROIN LTD
# MCKILLEN v MISLAND (CYPRUS) INVESTMENTS LTD

## COURT OF APPEAL (CIVIL DIVISION)

## Arden, Moore-Bick and Rimer L.JJ.: 3 July 2013

### [2013] EWCA Civ 781; [2014] B.C.C. 14

**H1.** *Shares—Shareholder agreements—Pre-emption—Unfairly prejudicial conduct—Shareholder agreement prescribed pre-emption rights—Shareholder granted security of shares in return for loan—Loan transferred—Shareholder agreed to transfer shares—Other party never required sale agreement to be completed—Control of shareholder's interest in effect transferred—Whether transfer of control breached pre-emption provisions in shareholders' agreement—Whether failure of company to enforce pre-emption rights constituted unfairly prejudicial conduct—Whether term to be implied to extend company's right to extend time to enforce pre-emption rights—Companies Act 2006 s.994.*

**H2.** This was an appeal from a decision of David Richards J. ([2012] EWHC 2343 (Ch)) dismissing the appellant's petition under s.994 of the Companies Act 2006 for relief against unfairly prejudicial conduct caused by the alleged breach of pre-emption provisions in a shareholders' agreement and the relevant company's articles of association under which the failure to offer shares to the appellant was claimed to be a wrong to him as a minority shareholder in the company.

**H3.** The appellant, "M", held 36.2 per cent of the issued share capital of the company, "Coroin", which indirectly owned three major London hotels. Under cl.6 of a shareholders' agreement dated 14 May 2004 and Coroin's articles, M had pre-emption rights to purchase shares of other shareholders in particular circumstances. Under cl.6.17 of the shareholders' agreement, no shares or interests in shares could be transferred, sold or otherwise disposed of save as specified in cl.6. Under cl.6.1 a shareholder who desired to transfer one or more shares or any interest therein should give a transfer notice in writing to the company of such desire. Clause 8.5 of the shareholders' agreement contained on obligation of good faith between all shareholder parties to the agreement. The second respondent, "Q", owned a 35.4 per cent shareholding in Coroin. He had executed two charges (the 2004 charge and the 2005 charge) over his shares in Coroin in favour of a bank. Under cl.6.6.2 of the shareholders' agreement, if any shareholder security became enforceable, the shareholder would be deemed to have given a transfer notice in respect of his shares and the pre-emption provisions would apply. From at least 2009 Q experienced severe financial difficulties. In January 2011 the third defendant company, "Ellerman", acquired Q's borrowings secured on part of his shareholding in Coroin and Ellerman was registered as holder of the shares pursuant to cl.6.18 of the shareholders' agreement which did not prohibit or restrict the grant of a security on shares in Coroin. Ellerman and other parties represented "the Barclay interests", who also owned shares in Coroin and wished to gain control of it. In February 2011 Q entered into an agreement to sell his shares to Ellerman, subject to compliance with the shareholders' agreement and Coroin's articles and consent from any chargee holding security over

Q's shares. Ellerman did not call upon Q to complete the sale as that would have required Q first to offer his shares for sale under the shareholders' agreement. Q later resigned as a director of Coroin at the request of the Barclay interests. His shares carried the right to appoint a director and at the request of the Barclay interests he appointed their nominee and also gave a wide power of attorney to a nominee of the Barclay interests to perform acts in relation to Coroin on his behalf. By September 2011 the Barclay interests had acquired all the other security over Q's shares, or secured its release. M brought a petition under s.994 of the Companies Act 2006 claiming that the circumstances amounted to a breach of cl.6 of the shareholders' agreement and Coroin's articles and that the breach of his pre-emption rights amounted to unfairly prejudicial conduct. The judge held that, in consequence of what had happened, the Barclay interests had achieved practical control over Q's shareholding, but that there had been no breach of cl.6 because the arrangements deliberately fell short of the transfer of an interest in the shares to avoid triggering the pre-emption provisions. M appealed and submitted that (1) the practical effect of the arrangements was that Q had transferred his interest in his shares to the Barclay interests; (2) alternatively, there had been a transfer of a proprietary interest; (3) the express obligation of good faith contained in cl.8.5 of the shareholders' agreement had been breached; (4) the provisions of the 2004 charge and the 2005 charge had became enforceable, causing an event of default enabling the directors to implement the pre-emption articles in M's favour and failure to do so was unfairly prejudicial conduct.

**H4. Held,** dismissing the appeal:

**H5.** 1. (Per Arden L.J.) The practical effect of the arrangements between Q and the Barclay interests did not breach the pre-emption provisions. They neither resulted in Q having a desire to transfer shares for the purposes of cl.6.1 of the shareholders' agreement nor breached cl.6.17 because the sale and transfer contemplated by the February 2011 sale agreement was subject to compliance with the shareholders' agreement and Coroin's articles. There was no relevant desire or intention to transfer shares for the purpose of pre-emption provisions where what was proposed was to transfer the shares subject to a condition and so it could not be said that Q's shares had been "transferred, sold or otherwise disposed of save as provided in" cl.6. The February 2011 agreement was not an attempt to transfer shares within cl.6. (*Re Ringtower Holdings Plc* (1989) 5 B.C.C. 82 and *Scotto v Petch; Re Sedgefield Steeplechase Co (1927) Ltd* [2001] B.C.C. 889 applied.)

**H6.** 2. M could not go behind the judge's findings of fact and assert some different and wider agreement than the judge actually found. The judge held that none of the arrangements between Q and the Barclay interests, either singly or in combination, involved a transfer of an interest in shares such as to trigger cl.6.

**H7.** 3. The court could only enforce an agreement (expressed in the shareholders' agreement and Coroin's articles) that the parties had actually made and the parties were quite specific about the circumstances in which the pre-emption rights were to arise and were quite specific in cl.6.17 as to the transactions which were prohibited. Those transactions did not include a mere transfer of control.

**H8.** 4. The situation was not the same in law as if there had been a transfer of the whole of the interest in Q's shares to the Barclay interests because Q always retained the equity of redemption. Although unlikely, it was theoretically open to Q at any time to pay off the charges vested in the Barclay interests, and recover the shares himself. The arrangements were, therefore, not irreversible as they would have been if there had been a full transfer. The arrangements did not achieve the same result as if the pre-emption provisions had in fact been triggered: all that was achieved was control.

**H9.** 5. An interest in a share for the purpose of the prohibition in cl.6.17 on the transfer of interests in shares had to be a proprietary interest, and therefore did not include a mere change in the control over a share. The arrangements did not however involve the transfer of a proprietary interest in Q's

shares. Under cl.6.17, no interests in shares could be conveyed other than in a manner for which cl.6 provided. The fundamental characteristic of the February 2011 agreement between Q and Ellerman was that it was conditional on compliance with Coroin's pre-emption articles. An interest in shares would not pass under a contract for the sale of shares which was subject to a true condition precedent until the condition precedent was fulfilled. Further, a disposal of an interest in a share was not within cl.6.17 if it was a preparatory step in a transaction which would comply with cl.6.17. Moreover, looking at the proposed transaction as a whole, it could properly be said to involve a transfer which was "provided in" cl.6 within the meaning of cl.6.17. The making of the agreement therefore did not give rise to any complaint of unfair prejudice.

**H10.** 6. The requirement in cl.8.5 to act in good faith involved an obligation to act honestly in a subjective sense as this was its natural meaning and the context did not suggest some other meaning. It was not put to Q in cross-examination that he had not acted honestly in this sense and M could not now assert that he did not do so. Moreover, the terms of the February 2011 agreement were inconsistent with the notion that Q intended to act in bad faith as it was conditional on the due observance of M's pre-emption rights on any transfer of his shares to the Barclay interests. The obligation to act in good faith could not impose a binding general obligation to act in a manner outside the terms of the shareholders' agreement. There was no benchmark against which the court could enforce the obligation. The arrangements whereby control of Q's shares ended up in the hands of the Barclay interests did not result in a breach of the good faith clause. Accordingly there was no question of any act or omission of Coroin relevant for the purposes of s.994(1) of the 2006 Act, still less any such act or omission which was unfairly prejudicial to M.

**H11.** 7. The 2004 charge did not "become enforceable" for the purposes of cl.6.6.2 of the shareholders' agreement because the bank did not make the declaration of immediate enforceability required by the conditions of that 2004 charge on an event of default. The 2005 charge had become enforceable but the one-month period within which the directors had power to deem a transfer notice to have been given in respect of Q's shares had expired without them exercising that power. The directors did not know that the charge had become enforceable, but cl.6.6 contained no obligation for shareholders to notify them and there could be no implied term which extended the one-month period in cl.6.6. M had failed to establish any act of Coroin which could constitute any unfair prejudice under s.994(1) by reason of the 2005 charge becoming enforceable.

**H12.** 8. (Per Moore-Bick and Rimer L.JJ.) An event of default occurred in relation to the 2004 charge which therefore did "become enforceable" within the meaning of cl.6.6 of the shareholders' agreement but Coroin was unaware of the fact at the time and was therefore unable to consider whether to exercise its right under cl.6.6 to treat Q as having given a transfer notice while it still had the power to do so. However, its failure did not involve any breach of M's rights and could not be regarded as causing him unfair prejudice.

**Per Curiam**

**H13.** Cases under s.994(1) could be very resource-intensive and this case was an example of a heavy s.994(1) petition since the trial at first instance occupied 30 days of court time. Courts must, where possible, find ways and means of reducing the hearing times for these cases and in this case it may have been possible for significant amounts of court time to have been saved by focusing on the statutory requirements for an act or omission of the company which was unfairly prejudicial. Further, parties to appeals to the Court of Appeal must make every endeavour to ensure that the length of

skeleton arguments on an appeal fall with the normal range described in CPR Practice Direction 52C para.31 and that other documentation presented to the court was no longer than required.

**H14. Cases referred to:**

*Attorney General of Belize v Belize Telecom Ltd* [2009] UKPC 10; [2009] 1 W.L.R. 1988; [2009] B.C.C. 433

*BNY Corporate Trustee Services Ltd v Neuberger Berman Europe Ltd* [2013] UKSC 28; [2013] 1 W.L.R. 1408; [2013] B.C.C. 397

*Claygreen Ltd, Re; Romer-Ormiston v Claygreen Ltd* [2005] EWHC 2032; [2006] B.C.C. 440

*Collector of Stamp Duties v Arrowtown Assets Ltd* (2003) 6 I.T.L.R. 454

*Cottrell v King* [2004] EWHC 397 (Ch); [2004] B.C.C. 307

*CPC Group Ltd v Qatari Diar Real Estate Investment Company* [2010] EWHC 1535 (Ch)

*Greenhalgh v Mallard* [1943] 2 All E.R. 234

*Howard Smith Ltd v Ampol Petroleum Ltd* [1974] A.C. 821

*Hunter v Hunter (Emily's Case)*, unreported, 15 January 1934 (Ch); unreported 19 April 1934 (CA)

*Hunter v Hunter* [1936] A.C. 222 (HL)

*Hurst v Crampton Brothers (Coopers) Ltd* [2002] EWHC 1375 (Ch); [2003] B.C.C. 190

*Lyle & Scott Ltd v Scott's Trustees* [1959] A.C. 763

*McKillen v Misland Investments Ltd* [2012] EWCA Civ 179; [2012] B.C.C. 575

*Michaels v Harley House (Marylebone) Ltd* [2000] Ch. 104; [1999] B.C.C. 967

*O'Neill v Phillips* [1999] 1 W.L.R. 1092; [1999] B.C.C. 600

*Ringtower Holdings Plc, Re* (1989) 5 B.C.C. 82

*Scotto v Petch; Re Sedgefield Steeplechase Co (1927) Ltd* [2001] B.C.C. 889

*Smith and Fawcett Ltd, Re* [1942] Ch. 304

*Stena Line Ltd v Merchant Navy Ratings Pension Fund Trustees Ltd* [2011] EWCA Civ 543

*Tett v Phoenix Property and Investment Co Ltd* (1985) 1 B.C.C. 99327 (Ch); (1986) 2 B.C.C. 99140 (CA)

*Wood Preservation Ltd v Prior* [1968] 2 All E.R. 849 (Ch.); [1969] 1 W.L.R. 1077 (CA).

**H15.** *Lord Goldsmith QC*, *Philip Marshall QC*, *Richard Hill QC* and *Gregory Denton-Cox* (instructed by Herbert Smith Freehills LLP) for the appellant.

*Kenneth MacLean QC*, *Edmund Nourse*, *Sa'ad Hossain* and *Emma Jones* (instructed by Weil, Gotshal & Manges) for the first, third and fourth respondents.

*Stephen Auld QC*, *Michael Fealy* and *Michael d'Arcy* (instructed by Quinn Emanuel Urquhart & Sullivan LLP) for the second respondent.

## JUDGMENT

### ARDEN L.J.:

### Outline of this appeal

**1.** Mr Patrick McKillen holds 36.2 per cent of the issued share capital of Coroin Ltd ("Coroin"). He seeks through this litigation to acquire more shares in Coroin so that he becomes the majority shareholder. He contends that he should have been offered more shares for purchase, and that the failure to make that offer was a wrong to him as a minority shareholder. He was unsuccessful in these contentions at trial but he now seeks to establish his rights in this court.

**2.** Accordingly, Mr McKillen appeals from the order of David Richards J. dated 11 September 2012 ([2012] EWHC 2343 (Ch)) dismissing his petition under s.994 of the Companies Act 2006 ("CA 2006") for relief against unfairly prejudicial conduct. The appeal is opposed by the first four respondents, who are present or former shareholders in Coroin, namely Mr Derek Quinlan and three companies controlled by the trustees of the Sir David and Sir Frederick Barclay family settlements (together "the Barclay interests").

**3.** Under a shareholders' agreement dated 14 May 2004 ("the shareholders' agreement") and Coroin's articles, Mr McKillen had "pre-emption" rights, that is, rights or opportunities to purchase shares of other shareholders in particular circumstances. The essence of Mr McKillen's complaints in these proceedings is that the appropriate offer was not made when it should have been made and instead Mr Quinlan's 35.4 per cent shareholding has found its way into the control of the Barclay interests without going through the "pre-emption" provisions. The relief he seeks is an order of the court entitling him to purchase the Quinlan shareholding or exercise his pre-emption rights.

**4.** The fundamental legal issue on this appeal is whether Mr McKillen has satisfied the requirement for relief in s.994(1) of the CA 2006 that there should have been unfairly prejudicial conduct by Coroin.

**5.** In my judgment, for the reasons given below, the circumstances that occurred in this case were not circumstances in which pre-emption rights might become exercisable save in one respect. Even in that one respect there was no unfairly prejudicial conduct by Coroin as required by s.994(1) of the CA 2006.

**6.** I have divided the remainder of this judgment into the following sections:

"**How the Barclay interests acquired control of Coroin** ([7]–[10])

**What Mr McKillen has to demonstrate in order to succeed on this appeal** ([11]–[22])

        **(1) Practical effect argument** ([23]–[35])

        **(2) Proprietary interest argument** ([36]–[40] **)**

        **(3) Good faith argument** ([41]–[56])

        **(4) Security becoming enforceable argument** ([57]–[58])

**Threshold issue: (a) the 2004 charge and (b) the 2005 charge** ([59])

        **(a) the 2004 charge** ([60]–[69])

        **(b) the 2005** charge ([70]–[78])

**Substantive issue (2005 charge only)**: **no unfair prejudice to Mr McKillen** ([79])

        **(a) No implied term requiring notification of event within cl.6.6** ([80]–[92])

        **(b) Pre-emption rights not triggered by breach of cl.6.17** ([93]–[99])

        **(c) No implied term extending the one month period in cl.6.6** ([100]–[102])

        **(d) Standstill arrangements and power of Mr McKillen to convene a board meeting** ([103]–[112])

        **(e) Conclusion on security becoming enforceable argument** ([113])

**No remaining issues need to be decided** ([114]–[116])

**Handling complex appeals** ([117]–[127])

**Conclusions** ([128]–[131])

**Appendix 1 Extracts from shareholders' agreement: pre-emption provisions (cl.6) and good faith provision (cl.8.5)**

**Appendix 2 Relevant provisions of the 2004 and 2005 charges and BOSI's general conditions"**

**How the Barclay interests acquired control of Coroin**

**7.** In a meticulous and clear judgment, the judge set out the facts. I will refer simply to the facts which are essential for the purposes of this judgment. The judge's factual findings are not challenged.

**8.** Coroin is a substantial company. It indirectly owns three major London hotels, The Connaught, The Berkeley and Claridge's.

**9.** The essential facts relating to the acquisition by the Barclay interests of control over the Quinlan shareholding are as follows:

(1) Mr Quinlan was from at least 2009 in severe financial difficulties. His shares were charged to secure borrowings. He wished to sell his shares. He had discussions for this purpose with the Barclay brothers. Mr Quinlan originally thought that he could simply elect not to offer his shares under cl.6 of the shareholders' agreement.

(2) At the end of October 2010, the Barclay brothers lent Mr Quinlan the sum of €500,000. In November 2010, Mr Quinlan informally agreed to inform the Barclay brothers of any proposal to dispose of his shares.

(3) In January 2011, the fourth respondent, B Overseas Ltd ("B Overseas"), acquired the share capital of the first respondent, Misland (Cyprus) Investments Ltd ("Misland"), a company controlled by another group of investors, namely the Green family. Misland held a 25 per cent stake in Coroin. Mr McKillen subsequently unsuccessfully challenged this transaction as a breach of his pre-emption rights: see *McKillen v Misland Investments Ltd* [2012] EWCA Civ 179, now reported as *Re Coroin Ltd* [2012] B.C.C. 575 ("*Re Coroin (No.1)*").

(4) On 14 January 2011, Mr Quinlan and the Barclay brothers reached a non-binding agreement in principle that the Barclay brothers would buy Mr Quinlan's shares on the basis of a valuation of the entire share capital at £900 million.

(5) On 15 January 2011, Mr Quinlan entered into a written "exclusivity" agreement with the fourth respondent, B Overseas, a vehicle of the Barclay brothers, under which he agreed not to speak to any other party about selling his Coroin shares for four weeks. The judge found that there was also a non-binding agreement between Mr Quinlan and the Barclay brothers to co-operate.

(6) On about 15 January 2011, the Barclay brothers made a commitment to provide financial support to Mr Quinlan. However, the judge found that this commitment was not binding. In particular he did not find that the Barclay interests agreed to provide financial support in return for Mr Quinlan's co-operation in relation to Coroin. On the contrary, Mr McKillen accepts that the Barclay interests provided substantial support to Mr and Mrs Quinlan by way of gift.

(7) On 29 January 2011, Ellerman Corp Ltd ("Ellerman"), the third respondent, acquired for €71 million borrowings of Mr Quinlan secured on part of his shareholding. Ellerman was registered as holder of the shares pursuant to cl.6.18 of the shareholders' agreement. Mr Quinlan and Ellerman gave a written confirmation to Coroin that there was no agreement between Mr Quinlan and the Barclay interests for the acquisition of any interest in Mr Quinlan's shares.

(8) On 17 February 2011, Mr Quinlan entered into a binding written agreement ("the February agreement") with Ellerman Hotels Group Ltd ("EHGL") for the sale of his Coroin shares. This is a key document. This agreement provided that the sale was subject to: (1) compliance with the terms of the shareholders' agreement and Coroin's articles; and (2) consent from any chargee holding security over Mr Quinlan's shares.

   (9)  EHGL has not called for Mr Quinlan to complete the sale as that would on any view require Mr Quinlan first to offer his shares around at the agreed price of £80 million pursuant to cl.6.

(10)  On 16 May 2011 Mr Quinlan resigned as a director of Coroin at the request of the Barclay interests. Mr Quinlan said that he did so voluntarily to concentrate on his other business interests. His shares carried the right to the appointment of a director and at their request he appointed a nominee of the Barclay interests as a director.

(11)  Also on 16 May 2011, Mr Quinlan executed a power of attorney for one year in favour of a nominee of the Barclay interests. This gave the attorney wide power to perform acts in relation to the company on behalf of Mr Quinlan.

(12)  Mr McKillen only learnt about the power of attorney after commencing these proceedings.

(13)  By September 2011 the Barclay interests had acquired all the other security over Mr Quinlan's shares, or secured its release.

(14)  The judge held that, in consequence of what had happened, the Barclay interests had achieved practical control over Mr Quinlan's shareholding (judgment, [349]).

(15)  However, the judge held that there was no breach of cl.6. After handing down his judgment, the judge, in refusing permission to appeal, observed (with respect to the agreements and arrangements summarised above) that:

> "The agreements and arrangements quite deliberately fell short of the transfer of an interest in the shares, because the parties wanted to avoid triggering the pre-emption provisions."

**10.** I will refer to the agreements and arrangements between Mr Quinlan and the Barclay interests summarised above as "the arrangements".

### What Mr McKillen has to demonstrate in order to succeed on this appeal

**11.** Mr McKillen has chosen to invoke the remedy provided by s.994(1) of the CA 2006. The advantage of that remedy is that the court's power to grant relief is wide and flexible, and extends beyond the relief which could be granted, say, in an action for breach of contract. However, it is a purely statutory jurisdiction. That means, in particular, that it cannot be exercised unless the requirements of s.994(1) are fulfilled.

**12.** Section 994(1) provides:

    (1) "A member of a company may apply to the court by petition for an order under this Part on the ground–

        (a)  that the company's affairs are being or have been conducted in a manner that is unfairly prejudicial to the interests of members generally or of some part of its members (including at least himself), or

        (b)  that an actual or proposed act or omission of the company (including an act or omission on its behalf) is or would be so prejudicial."

**13.** The requirements relevant to this appeal are that: (1) there is an act or omission on the part of the company; and (2) that act or omission is unfairly prejudicial to Mr McKillen.

**14.** These requirements are cumulative. If the court concludes that the first requirement is not satisfied, the second requirement does not arise. Moreover there is nothing to stop the court considering the requirements on the basis most favourable to Mr McKillen and, if it concludes that the case could not succeed on that basis, restricting its consideration of other issues raised. Cases under s.994(1)

can be very resource-intensive. This case is an example of a heavy s.994(1) petition since the trial below occupied 30 days of court time. Courts must, where possible, find ways and means of reducing the hearing times for these cases. In this case it may have been possible for significant amounts of court time to have been saved by focusing on the statutory requirements for an act or omission of Coroin which is unfairly prejudicial.

**15.** The expression "unfairly prejudicial" has been subject to extensive judicial interpretation. There needs to be both prejudice and unfairness.

**16.** Prejudice does not mean that there has to be financial loss. It may be enough to show that the rights of the petitioning member have been infringed without showing that that led to any financial loss.

**17.** In order to show unfairness, Mr McKillen had to demonstrate unfairness stemming from a breach of a legal right conferred by the articles or the shareholders' agreement: see generally *O'Neill v Phillips* [1999] 1 W.L.R. 1092; [1999] B.C.C. 600. In one category of case, that is where the company is formed on the basis of a personal relationship between the shareholders, the court is able to subject legal rights to equitable considerations. However, the judge held that Coroin did not fall into that category of case and there is no appeal on that point.

**18.** To meet the requirement to show unfairness Mr McKillen argues that his contractual rights under the pre-emption provisions have been breached. His principal arguments (and here I leave aside other arguments which I shall refer to below) are that the pre-emption articles were triggered in the following four ways. These arguments may be summarised as follows:

(1) *The practical effect argument*: Mr McKillen argues that even though Mr Quinlan has not transferred the legal and beneficial interest in his Coroin shares to the Barclay interests, the practical effect of the arrangements is to do so and accordingly his rights under the pre-emption provisions have become exercisable;

(2) *The proprietary interest argument*: Mr McKillen argues that under the arrangements there was a transfer of a proprietary interest in Mr Quinlan's shares to the Barclay interests. This argument is alternative to (1) above. The transfer of a proprietary interest in shares is prohibited unless it complies with the pre-emption provisions.

(3) *The good faith argument*: Mr McKillen argues that there was a breach of an express obligation of good faith in cl.8.5 of the shareholders' agreement.

(4) *The security becoming enforceable argument*: Mr McKillen argues that the provisions of two charges over Mr Quinlan' shares (defined below as the 2004 charge and the 2005 charge) became enforceable and so triggered another provision of the pre-emption articles (cl.6.6) which enabled the directors to implement the pre-emption articles in Mr McKillen's favour.

**19.** The respondents' basic response is that the only disposal of an interest in shares was the transfer of shares by Mr Quinlan to the Barclay interests by way of transfer of a charge. It is common ground that this was a permitted transfer under the pre-emption provisions. There was no breach of the pre-emption provisions or of the good faith clause in cl.8.5 of the shareholders' agreement.

**20.** The pre-emption provisions appear, so far as material, in the same form in Coroin's articles and in cl.6 of the shareholders' agreement. It is therefore sufficient to take the relevant provisions of the shareholders' agreement. The most material provisions of cl.6 are cl.6.1, 6.3, 6.6, 6.17 and 6.18. These are set out in Appendix 1 to this judgment but, for ease of reading, I have changed the order of cl.6 in Appendix 1 and put cl.6.17 and 6.18 first. (For the same reason, I refer also to the sub-clauses, for example cl.6.17, as clauses). The shareholders' agreement also contains what has been called a

"good faith" clause: cl.8.5. This is also set out in Appendix 1 to this judgment. The shareholders' agreement is subject to Irish law, but nothing turns on that point.

**21.** I shall discuss the interpretation of the relevant provisions of cl.6 in more detail below. At this stage it is sufficient to give an overview of them. In many respects, the provisions followed the usual pattern. The provisions included:

- a basic provision forbidding the transfer of shares, or any interest in them, other than in accordance with the pre-emption provisions (cl.6.17);
- exceptions for permitted transfers of specified kinds, such as a transfer between a shareholder and the holders of security over his shares (cl.6.14–6.16, not replicated in Appendix 1 and cl.6.18);
- provision for a shareholder who wished to transfer his shares to offer them to the other shareholders at a price fixed by him, in which case he became bound on completion to sell them if his offer was accepted in full (cl.6.1–6.3). (Separate provision was made for the case where the offer was not accepted (cl.6.4, which is not reproduced in Appendix 1).);
- power for the directors to deem a transfer notice to have been given in certain circumstances, including where security over shares had become enforceable or an attempt had been made to transfer the shares in breach of the pre-emption provisions. In that case, they would be offered round to the other shareholders for purchase at their fair value (cl.6.6).

**22.** The expression "trigger" in relation to pre-emption provisions is convenient shorthand for describing the circumstances in which pre-emption provisions come into effect.

### (1) Practical effect argument

**23.** Lord Goldsmith QC, for Mr McKillen, submits that the practical effect of the arrangements is that the Barclay interests have obtained what they want. The only interest left in the Quinlan shares is Mr Quinlan's equity of redemption: Lord Goldsmith compares the situation to that of the smile on the Cheshire cat. He submits that Mr McKillen has seen Mr Quinlan's ownership over his shareholding disappear like the Cheshire cat until only the smile is left. Lord Goldsmith contends that the judge looked at the question whether the pre-emption articles had been breached in a blinkered and unrealistic way. He should have approached the question whether the pre-emption provisions were breached by construing the pre-emption provisions purposively and the facts realistically: see the well-known dictum of Ribeiro P.J. in *Collector of Stamp Duties v Arrowtown Assets Ltd* (2003) 6 I.T.L.R. 454 (Court of Final Appeal of Hong Kong) at [35] in the context of interpreting tax statutes:

> "Accordingly, the driving principle in the *Ramsay* line of cases continues to involve a general rule of statutory construction and an unblinkered approach to the analysis of the facts. The ultimate question is whether the relevant statutory provisions, construed purposively, were intended to apply to the transaction, viewed realistically."

**24.** Lord Goldsmith submits that there was a "desire" to transfer shares for the purposes of cl.6.1, and for this purpose relies on the observations of Lord Reid in *Lyle & Scott Ltd v Scott's Trustees* [1959] A.C. 763. In that case, art.9 of the company's articles provided:

> "… no registered shareholder of more than one per centum of the issued ordinary share capital of the company shall, without the consent of the directors, be entitled to transfer any ordinary share for a nominal consideration or by way of security and no transfer of ordinary shares by such a shareholder shall take place for an onerous consideration so long as any other ordinary

shareholder is willing to purchase the same at a price which shall be ascertained by agreement between the intending transferor and the directors and, failing agreement, at a price to be fixed by the auditor of the company. … Any such ordinary shareholder who is desirous of transferring his ordinary shares shall inform the secretary in writing of the number of ordinary shares which he desires to transfer. …"

**25.** At pp.777–778, Lord Reid adopted a purposive approach to the interpretation of the pre-emption article in that case. He held:

"The respondents are each holders of more than 1 per cent. of the ordinary shares, and it is clear from their defences that they have received the price of £3 per share and that they have not attempted to resile from their contracts with Mr. Fraser. The appellants maintain that this necessarily means that they are desirous of transferring their shares within the meaning of this article, and that they are therefore bound so to inform the secretary of the company so as to set in motion the provisions of the article under which the other shareholders are entitled to have an opportunity to purchase any share which any shareholder is desirous of transferring. …

I have come to the conclusion without difficulty that on their own admissions the respondents are in breach of article 9. The purpose of the article is plain: to prevent sales of shares to strangers so long as other members of the company are willing to buy them at a price prescribed by the article. And this is a perfectly legitimate restriction in a private company.

But the respondents argue that, whatever may have been the intention, the terms of the article are such that it has only very limited application. They say that transfer 'and transferring' only apply to a complete transfer of the ownership of shares by acceptance and registration of deeds of transfer, and that a shareholder who agrees to sell his shares is quite entitled to do so and to receive the price and vote as the purchaser wishes so long as he is not desirous of having a transfer registered.

I see no reason for reading the article in that limited way. Transferring a share involves a series of steps, first an agreement to sell, then the execution of a deed of transfer and finally the registration of the transfer. The word transfer can mean the whole of those steps. Moreover, the ordinary meaning of 'transfer' is simply to hand over or part with something, and a shareholder who agrees to sell is parting with something. The context must determine in what sense the word is used. …"

**26.** Lord Goldsmith concentrates on the practical effect of the arrangements between Mr Quinlan and the Barclay interests. He submits that the transfer of control over Mr Quinlan's shares to the Barclay interests would not be reversible unless the Barclay interests permitted Mr Quinlan to withdraw. The Barclay interests made substantial loans to Mr Quinlan. Mr Quinlan's shares were charged up to the hilt.

**27.** Moreover, submits Lord Goldsmith, there is no prospect of Mr Quinlan redeeming the charges on the Quinlan shares. The irresistible inference is that the other shareholders do not want to trigger the pre-emption rights. He relies on a submission by Mr Stephen Auld QC, for Mr Quinlan, that the charges would never be enforced as showing that the chargees have already got all that they need and that the respondents are circumventing the pre-emption provisions in cl.6.1, which is unacceptable. Lord Goldsmith submits that the Barclay interests have circumvented the pre-emption provisions so as to deprive Mr McKillen of his bargain. The pre-emption articles were triggered at the latest in September 2011 when the Barclay interests acquired the charges over Mr Quinlan's shares.

**28.** Mr Kenneth MacLean QC, for the Barclay interests, submits that the pre-emption provisions are geared to preventing transfers of proprietary interests and not mere changes in control: Mr MacLean submits that this court in *Re Coroin (No.1)* (above) at [50] decided that the interest transferred has to be a proprietary interest and not a commercial interest. It is not enough that the transaction has the same practical effect. The parties had similarly intended that control of the Misland shares should be transferred without triggering the pre-emption article. There was no transfer of a proprietary interest in Mr Quinlan's shares at any stage and the non-binding agreements which Mr Quinlan made with the Barclay interests cannot make what was not a transfer of a proprietary interest into the transfer of such an interest.

**29.** In my judgment, Mr MacLean is correct for the following reasons.

**30.** First, the arrangements between Mr Quinlan and the Barclay interests neither resulted in Mr Quinlan having a desire to transfer shares for the purposes of cl.6.1 nor breached cl.6.17 because the sale and transfer contemplated by the February agreement was subject to compliance with the shareholders' agreement and Coroin's articles. The position is on all fours with that in *Re Ringtower Holdings Plc* (1989) 5 B.C.C. 82, 99 and *Scotto v Petch; Re Sedgefield Steeplechase Co (1927) Ltd* [2001] B.C.C. 889, where the court held that there was no relevant desire or intention to transfer shares for the purpose of pre-emption provisions where what was proposed was to transfer the shares subject to a similar condition. It cannot, therefore, be said that the Quinlan shares had been "transferred, sold or otherwise disposed of save as provided in this clause 6" for the purposes of cl.6.6. It follows that the February agreement is also not an attempt to transfer shares within cl.6.6.

**31.** Secondly, Mr McKillen cannot go behind the judge's findings of fact and assert some different and wider agreement than the judge actually found. The judge held that none of the arrangements between Mr Quinlan and the Barclay interests, either singly or in combination, involved a transfer of an interest in shares such as to trigger cl.6 (judgment, [289]). He rejected the argument that there was a binding oral agreement made on 15 January 2011, and found that the February agreement was the only binding agreement which Mr Quinlan made with the Barclay interests. At [180] of his judgment the judge rejected the idea of a pre-conceived plan to acquire control of Coroin when the control of the Misland shares was acquired.

**32.** Thirdly, the court can only enforce an agreement (expressed, in this case, in the shareholders' agreement and Coroin's articles) that the parties have actually made. In this particular case, the parties were quite specific about the circumstances in which the pre-emption rights were to arise. In addition, the parties were quite specific in cl.6.17 as to the transactions which were prohibited and those transactions do not include a mere transfer of control: see *Coroin (No.1)*.

**33.** Fourth, the situation was not the same in law as if there had been a transfer of the whole of the interest in the Quinlan shares to the Barclay interests because Mr Quinlan always retained the equity of redemption. While it seems unlikely, it was theoretically open to him at any time to pay off the charges vested in the Barclay interests, and recover the shares himself. The arrangements were, therefore, not irreversible as they would have been if there had been a full transfer. I therefore do not accept that the arrangements achieved the same result as if the pre-emption provisions had in fact been triggered. All that was achieved was control. It is clear that the power of attorney was much more limited than Mr McKillen suggests. In particular, the attorney had to act in Mr Quinlan's interests. The fact that Mr Quinlan kept his arrangements with the Barclay interests secret from Mr McKillen cannot turn the arrangements into something which they were not in law already.

**34.** Lastly, as Mr MacLean points out, the machinery for giving effect to pre-emption rights is set out in detail in cl.6. This makes no provision for circumstances which have the same practical effect. This is another strong indication that cl.6 only operates in the circumstances specified in it.

**35.** It follows that the arrangements cannot by virtue of their practical effect give rise to any complaint of unfair prejudice on Mr McKillen's part.

### (2) Proprietary interest argument

**36.** In *Re Coroin (No.1)* (above), this court held that an interest in a share for the purpose of the prohibition in cl.6.17 on the transfer of interests in shares had to be a proprietary interest in shares, and therefore did not include a mere change in the control over a share. That decision is of course binding on us on this appeal.

**37.** Basing himself on this holding, Lord Goldsmith submits that, by the February agreement, Mr Quinlan had transferred to the Barclay interests a contingent proprietary interest in his shares. He points out that an interest in property includes a contingent interest: such interests are treated as interests in land by s.4 of the Law of Property Act 1925. There is no reason to limit the interests within cl.6.17 to the full beneficial interest in a share. The courts have held that where there is the grant of a mere right of pre-emption, or the entry into an agreement to sell shares which is conditional on complying with pre-emption articles, there is no desire or intention to sell the shares (see, for example *Re Ringtower Holdings* above). However, on Lord Goldsmith's submission the February agreement was not truly conditional, since Mr Quinlan was bound to accept any offer.

**38.** In my judgment, the short answer to this point is that, by virtue of cl.6.17, no interest in shares could be conveyed other than in a manner for which cl.6 provided. I shall have more to say about cl.6.17 below.

**39.** There is a further reason for rejecting Lord Goldsmith's submission. The fundamental characteristic of the February agreement is that it was conditional on compliance with Coroin's pre-emption articles. In my judgment, an interest in shares would not pass under a contract for the sale of shares which is subject to a true condition precedent until the condition precedent is fulfilled: *Wood Preservation Ltd v Prior* [1968] 2 All E.R. 849 at 845I– 856H, affirmed on other grounds [1969] 1 W.L.R. 1077. Fulfilment of the condition precedent was under the control of the Barclay interests, but that did not, in my judgment, prevent it from being a true condition precedent so far as Mr Quinlan as transferor was concerned (cf. *Michaels v Harley House (Marylebone) Ltd* [2000] Ch. 104; [1999] B.C.C. 967). (Contrary to Lord Goldsmith's submission, Mr Quinlan could not waive the condition as to the chargee's consent).

**40.** Furthermore, while cases such as *Ringtower* (above) and *Lyle & Scott* (above) turn on the question whether a party to such an agreement can be said to desire or intend to transfer his share, here the question is different but simpler: a disposal of an interest in a share is not within cl.6.17 if it is a preparatory step in a transaction which will comply with cl.6.17. Moreover, looking at the proposed transaction as a whole, it can properly be said to involve a transfer which is "provided in" cl.6 within the meaning of cl.6.17. Mr Quinlan therefore did not trigger Mr McKillen's pre-emption rights by agreeing to the restrictions imposed on him by the February agreement. Therefore the making of that agreement cannot give rise to any complaint of unfair prejudice.

### (3) Good faith argument

**41.** Lord Goldsmith further submits that, if the practical result of what has happened is to do the very thing the shareholders' agreement was intended to prevent, the "good faith" clause, that is, cl.8.5 of the shareholders' agreement (see Appendix 1 to this judgment) comes into play. The intention of the shareholders' agreement was that the shares would be offered by way of pre-emption. A party is precluded from cynical resort to the black letter of the agreement. The good faith clause must have

some meaning. In practice the whole of the interest in Mr Quinlan's shares is being controlled in perpetuity by the Barclay interests.

**42.** Mr MacLean submits that cl.6.6 cannot be given some wider meaning by reading it with cl.8.5, and that the reasons for rejecting Lord Goldsmith's practical effect argument apply equally here. He further submits that it was not put to Mr Quinlan in cross-examination that he had tried to achieve the same effect as a transfer without triggering the pre-emption provisions. There was, therefore, no basis on which the judge could make factual findings about any breach of cl.8.5. Mr MacLean also submits that there is no support in the authorities for Lord Goldsmith's submission on cl.8.5.

**43.** Mr MacLean also relies on the decision of this court in *Re Coroin (No.1)* (above). In that case, Mr McKillen also sought to argue that if the acquisition by the Barclay interests of control over the Misland shares was outside cl.6, it was nonetheless a breach of the shareholders' agreement because of the "good faith" clause. Mr Marshall's submission, as recorded in the judgment of Rimer L.J., was that the good faith clause "obviously catered for the possibility that the precise wording of the agreement had not catered for all eventualities". However, Rimer L.J., with whom Lloyd and Tomlinson L.JJ. agreed, rejected this argument:

> 45. "… I do not accept that [the good faith clause] is or purports to be capable of doing the work attributed to it. If the focus is on the suggested 'spirit and intention' of the agreement, this case is about what that was as regards the ambit of the pre-emption provisions. Clause 8.5 sheds no relevant light on that. Little reliance was placed upon cl.8.5 before the judge, although much reliance was placed on it before us. For my part, I fail to see what assistance it is supposed to provide in relation to the resolution of the question of interpretation with which we are presented."

**44.** Mr Auld supports Mr MacLean's submissions.

**45.** In my judgment, the good faith clause does not assist Mr McKillen.

**46.** The good faith clause seems to me to contain two relevant groups of provisions. The first group (cl.8.5.1–8.5.3) imposes some limited restrictions on a party by requiring him to exercise his contractual rights whilst taking account of the interests of other parties. This is an agreed departure from the normal principle that a party is free to exercise his contractual rights as he thinks fit.

**47.** The first group also contain some limited express references to filling gaps. For instance, cl.8.5.1 requires parties to enter into transactions with the Coroin group on an arm's length basis if there is no agreement as to the basis upon which they engage. However, that provision is not directly relevant because it applies only to transactions between the respondents and the Coroin group, with which we are not concerned. Neither are we concerned with cl.8.5.3, which is very general and on which no counsel has relied.

**48.** That leaves cl.8.5.2 in the first group. Any suggestion that cl.8.5.2 applies to fill gaps in the parties' agreement would have to rest on the words "in good faith". Neither party has suggested that those words lack legal content in this agreement. Lord Goldsmith argues for a meaning for this expression that was really the same as the meaning of cl.8.5.4, namely, that it required the court to enforce the spirit of the agreement and not just "its black letter" (relying on *CPC Group Ltd v Qatari Diar Real Estate Investment Company* [2010] EWHC 1535 (Ch) at [238]–[246] per Vos J.). That argument in my judgment properly belongs under cl.8.5.4 and I will address it at that point. The respondents proceed on the basis that "good faith" in the context of cl.8.5.2 imposes a duty simply to act honestly. (They did not need to refine the meaning of honesty further than to say that it was a subjective test.)

**49.** I consider that the respondents are right to submit that the requirement to act in good faith in cl.8.5 involves an obligation to act honestly in a subjective sense as this is its natural meaning and

the context does not suggest some other meaning. As it was not put to Mr Quinlan in cross-examination that he had not acted honestly in this sense, then, for that reason alone, Mr McKillen cannot now assert that he did not do so.

**50.** Moreover, as Mr MacLean pointed out, the terms of the February agreement were inconsistent with the notion that Mr Quinlan intended to act in bad faith as it was conditional on the due observance of Mr McKillen's pre-emption rights on any transfer of his shares to the Barclay interests. I accept that argument.

**51.** I do not consider that the obligation to act in good faith can impose a binding general obligation to act in a manner outside the terms of the shareholders' agreement because there is no indication of the circumstances in which the obligation to act in good faith obliges the parties to go beyond the obligations in the shareholders' agreement. There is, therefore, no benchmark against which the court could enforce the obligation.

**52.** The second group of provisions in the good faith clause is composed solely of cl.8.5.4. The parties agreed to do all things necessary or desirable to give effect to the spirit and intention of the shareholders' agreement. Again, this clause prescribes no basis for determining the "spirit and intention". The "spirit" is by implication an animating principle, which, like the smile on the Cheshire cat (see [23] above), may exist in a state that is detached from the express terms of the shareholders' agreement.

**53.** In my judgment, the only way in which the court can give effect to the obligation in cl.8.5.4 is to treat the reference to the "spirit and intention" of the shareholders' agreement as a reference to the shared aims of the parties in entering into the agreement. Those aims would have to be ascertained in the way in which the court ascertains the background to an agreement as part of the process of interpretation. On this basis, cl.8.5.4 has content, but it is merely a mirror image of the process of interpreting an agreement or implying terms into it. I shall refer in more detail to the implication of terms below.

**54.** In short, the good faith clause, while it may be an additional weapon in Mr McKillen's armoury, gives no additional support to his case. This unsurprisingly accords with the conclusion of this court on different facts in *Re Coroin (No.1)*. I have not gone quite as far as Rimer L.J. in *Re Coroin (No.1)* in denying any utility to the good faith clause as that was not the way this case was argued and in any event there may, for instance, be circumstances in which a gap can be filled by purposive interpretation.

**55.** Therefore I conclude that the arrangements whereby control of Mr Quinlan's shares ended up in the hands of the Barclay interests did not involve any breach of the good faith clause in the shareholders' agreement or of Coroin's articles. Accordingly there can be no question here of any act or omission of Coroin relevant for the purposes of s.994(1) of the CA 2006, still less any such act or omission which is unfairly prejudicial to Mr McKillen.

**56.** Finally, Lord Goldsmith drew our attention to cl.6.23, which provides that each of the shareholders agreed to use "all reasonable endeavours to comply with its obligations pursuant to this clause and to respond to all notices and requests in a prompt and timely manner and to co-operate fully with each other in the administration and operation of these terms." However, he did not submit that this provision imposed any new obligation on the Shareholders to give a transfer notice.

## (4) Security becoming enforceable argument

**57.** This point relates to two charges which Mr Quinlan executed over his Coroin shares dated 14 May 2004 ("the 2004 charge") and 20 October 2005 ("the 2005 charge") respectively in favour of

Bank of Scotland (Ireland) Ltd ("BOSI"). There is a threshold issue: did either charge become enforceable for the purposes of cl.6.6.2 of the shareholders' agreement? If either charge did become enforceable, there is a substantive issue: did the directors' failure to determine pursuant to cl.6.6 that Mr Quinlan should be deemed to have given a transfer notice in respect of his Coroin shares constitute conduct of Coroin which was unfairly prejudicial to Mr McKillen?

**58.** Appendix 2 to this judgment comprises relevant provisions of the 2004 charge and the 2005 charge, and (so far as relevant) of BOSI's general conditions of business ("the BOSI Conditions") incorporated into the charges. The 2005 charge was secured on some only of the Quinlan shares, but nothing turns on that point.

*Threshold issue: (a) the 2004 charge and (b) the 2005 charge*

**59.** The judge held that neither the 2004 charge nor the 2005 charge became enforceable for this purpose. I agree with him on the 2004 charge, but not on the 2005 charge.

(a)  The 2004 charge

**60.** The core issue here is whether para.(iv) of the tailpiece to condition 9 of the BOSI conditions (set out at the end of Appendix 2 ) ("tailpiece (iv)") meant that the 2004 charge did not "become [..] enforceable" for the purposes of cl.6.6 when there was a default in the payment of principal or interest secured by the 2004 charge but BOSI made no declaration of immediate enforceability under that tailpiece.

**61.** For the reasons given below, I conclude that:

(1)  the tailpiece formed part of the terms of the 2004 charge;

(2)  if doubtful, the rights of BOSI to enforce the 2004 charge are to be strictly construed against BOSI;

(3)  if doubtful, cl.6.6 is to be construed against any restriction on the power of members of Coroin to transfer their shares;

(4)  a restrictive interpretation of "becomes enforceable" does not prejudice the effectiveness of cl.6.

**62.** I turn first to the compatibility of the tailpiece with the 2004 charge. On the face of it, cl.10(1) of the 2004 Charge (set out in Appendix 2 below) conflicts with condition 9 in that the former provides for the power of sale to be exercisable "on the happening of an Event of Default" whereas the tailpiece to condition 9 provides for BOSI to make a declaration. However, cl.2(1)(a) of the 2004 charge, like the tailpiece to condition 9, requires a further step, that is, a demand, to be made before the secured indebtedness becomes repayable. The requirement for a demand prevails over clause 10. In the event of any doubt, as the House of Lords held in *Hunter v Hunter* [1936] A.C. 222 at 247 (per Lord Hailsham L.C., with whom Lord Blanesburgh and Lord Maugham agreed) with respect to the failure of the bank in that case to make clear that it was making a demand for repayment:

"… the right of sale is a very drastic remedy, and it is essential for the due protection of borrowers that the conditions of its exercise should be strictly complied with."

**63.** The requirements for a demand under cl.2(1)(a) and a declaration of immediate enforceability dovetail with each other. Moreover, the parties agreed numerous amendments to the numbered sub-paragraphs of condition 9 in the facility letter dated 6 April 2004 (referred to in the definitions to the 2004 charge: see Appendix 2 below). That makes it unlikely that they intended that the tailpiece

should not apply: they would surely have said so while they were making detailed amendments to condition 9 if that were the case. In the result, the 2004 charge must be read subject to the tailpiece. This is supported in a minor way by the fact that the whole of condition 9, and not just the numbered sub-paragraphs preceding the tailpiece, is headed "Events of Default".

**64.** The next question is whether the expression "becomes enforceable" in cl.6.6.2 of the shareholders' agreement means "immediately enforceable" or extends to the case where a security is enforceable subject only to the taking of a step which is within the lender's own control. As to this, as I see it, tailpiece (iv) confers a real and substantial power on the lender. It has an important commercial purpose. Its inclusion reflects the deliberate choice of the parties. The lender may, for instance, wish to waive any event of default, or grant a grace period for remedying the breach, without being placed in a position where the security has already become enforceable. There may be adverse consequences to the lender of the security becoming enforceable as it may trigger cross-default clauses under other borrowings and cause the borrower to enter an insolvency procedure against the wishes of the lender. A comparison may be made with *BNY Corporate Trustee Services Ltd v Neuberger Berman Europe Ltd* [2013] UKSC 28; [2013] 1 W.L.R. 1408; [2013] B.C.C. 397 at [16], where the lender had to make a different form of declaration to render the security enforceable, and the security was not treated as enforceable until this was done.

**65.** In addition, cl.6 of the shareholders' agreement and the pre-emption provisions in the articles set out circumstances in which members may lose the right to their shares. They are, therefore, expropriatory in nature. Given the ambiguity in the meaning of the phrase "becomes enforceable", the court should in my judgment prefer the narrower meaning. This approach is consistent with the earlier decisions of this court on construing articles of association of a company restricting the transfer of shares laid down in: *Re Smith and Fawcett Ltd* [1942] Ch. 304 at 306 and *Greenhalgh v Mallard* [1943] 2 All E.R. 234 at 237: see, for example, per Lord Greene M.R. in the first of the cases cited:

> "[When using their power under the articles to reject a share transfer, the directors] must have regard to those considerations, and those considerations only, which the articles on their true construction permit them to take into consideration, and in construing the relevant provisions in the articles it is to be borne in mind that one of the normal rights of a shareholder is the right to deal freely with his property and to transfer it to whomsoever he pleases. When it is said, as it has been said more than once, that regard must be had to this last consideration, it means, I apprehend, nothing more than that the shareholder has such a *prima facie* right, and that right is not to be cut down by uncertain language or doubtful implications. The right, if it is to be cut down, must be cut down with satisfactory clarity. It certainly does not mean that articles, if appropriately framed, cannot be allowed to cut down the right of transfer to any extent which the articles on their true construction permit."

**66.** In his judgment in *Re Coroin (No.1)* at first instance [2011] EWHC 3466 (Ch) at [73]–[74], the judge held that he would not take this principle too far, and that the court would be bound to enforce any clause which it was satisfied cut down a shareholder's rights. However, I do not read these observations as departing from what this court has previously held.

**67.** In my judgment, the authorities reflect the basic principle that rights of property should not be taken away by a side wind and without warrant. There is nothing to indicate that the wider view of "becomes enforceable" should be taken. Indeed, the high level of specificity in cl.6.6 can be said to support a meaning which covers the situation in which security is *actually* enforceable.

**68.** Furthermore, the conclusion that the 2004 charge did not "become … enforceable" for the purposes of cl.6.6.2 of the shareholders' agreement on the occurrence of an event of default until

BOSI proceeded to make a declaration of immediate enforceability under tailpiece (iv) does not reduce the effectiveness of cl.6.6. There is no potential prejudice to the other shareholders unless BOSI exercises its right to make a declaration under tailpiece (iv). Likewise, the other shareholders are not at risk of a forced sale by a receiver or mortgagee of the shares (or of an entry into possession by the charge) until the declaration is made.

**69.** Accordingly, in my judgment, the 2004 charge did not "become enforceable" for the purpose of cl.6.6.2 of the shareholders' agreement when an event of default occurred but BOSI did not proceed to declare that the security was enforceable under tailpiece (iv) to condition 9 of the BOSI conditions incorporated into the 2004 charge.

(b)  The 2005 charge

**70.** The position regarding the 2005 charge is, however, different. In my judgment, that charge did become enforceable for the reasons given in [73]–[80] below.

**71.** Shortly after 12 May 2011 Ellerman discovered that Mr Quinlan was in arrears with the payment of interest due under a loan agreement dated 28 August 2005 relating to the Bank of Ireland's headquarters at Baggott Street, Dublin, in favour of a consortium of lenders before Ellerman purchased his debts. This loan agreement was secured by the 2005 charge over the Quinlan shareholding in Coroin. By a letter dated 10 September 2009, BOSI (as agent for the lenders) required either the payment of outstanding interest payments or the remedying of the event of default within 60 days "in the manner specified in the Proviso to Clause 19.1 of the Loan Agreement", and stated that the lenders would be entitled to exercise their rights under cl.19.2 of the loan agreement, including the right to demand repayment of the loan:

> "We write to advise that various interest payments … remain outstanding. As at today's date, the aggregate outstanding interest payments [from Mr Quinlan] under the Loan Agreement total £564,664.99 … We wish to advise that as a result of the failure to make such payments [Mr Quinlan] is in default … under the Loan Agreement. This constitutes an Event of Default under clause 19.1 of the Loan Agreement unless remedied within 60 days to the satisfaction of the Majority Lenders in the manner set out in the proviso (the 'Proviso') to clause 19.1 of the Loan Agreement.
>
> We hereby make a formal demand for payment forthwith of all outstanding interest payments. In the event that the outstanding interest payments are not immediately paid or the above Event of Default is not remedied to the satisfaction of the Majority Lenders within 60 days of the date of this letter in the manner specified in the Proviso, the Lenders will be entitled to exercise the rights conferred upon them by Clause 19.2 of the Loan Agreement including the right to demand immediate repayment of the Loan together or interest and other sums (including any broken funding costs). In the event that such sums are not paid, we reserve the right to exercise the power to put the receiver over the Secured Assets, and the power of sale and all other powers conferred on us by the Security Documents."

**72.** Accordingly, it is necessary to examine the proviso to cl.19.1, and cl.19.2, of the loan agreement.

**73.** Clause 19.1 of the loan agreement sets out a number of events of default, including the non-payment of interest, and concludes with the following proviso:

> "Provided that any of the events or circumstances specified in clause 19.1 shall not be an Event of Default if such events or circumstances arise in relation to one or more (but not all) of the Borrowers and within sixty days of the occurrence of such event or circumstance either:

(a) another person acceptable to the Majority Lenders (acting reasonably) takes over the interest of the defaulting Borrower(s) to the Property and becomes a Borrower in place of such Borrowers and assumes the obligations of such Borrower under the Finance documents and the Transaction Documents, or

(b) any one or more of the other Borrowers takes over the interests of such Borrowers in the Property and assumes the obligations of such Borrowers under the Finance Documents and the Transaction Documents,

in each case in a manner satisfactory to the Majority Lenders (acting reasonably); or …"

**74.** Clause 19.2 of the Loan Agreement provides so far as material as follows:

"Rights on a default

The Agent may and, if so instructed by the Majority Lenders, shall (without prejudice to any other rights of any Finance Party upon and at any time after the happening of an Event of Default … :

19.2.2  by notice to the Borrowers declare that the Drawings have become immediately due and payable, whereupon the Borrowers shall forthwith repay the same together with all interest accrued and all other sums payable under this Agreement …"

**75.** Mr Quinlan paid the outstanding interest on about 4 November 2009. He did not comply with the proviso to cl.19.1 and provide a suitable substitute borrower.

**76.** The judge held that the 2005 charge had not become enforceable because BOSI had to wait 60 days to see if either of the alternatives in [73] above was satisfied.

**77.** I do not agree. The payment of interest some two months after the date of BOSI's demand did not constitute immediate payment. BOSI's alternative was not met because the proviso to cl.19.1 required the substitution of another satisfactory covenant which did not occur. The fact that BOSI probably had to wait until at least 4 November 2009 before it knew that the alternative course would not be taken did not prevent the late payment from being an event of default. Any other interpretation deprives the demand for immediate payment of its full effect.

**78.** On that basis, the security created by the 2005 charge was enforceable within cl.6.6.2 at the latest by 9 November 2009. This is so even though BOSI had to take further steps before it could sell the property or appoint a receiver and never did so. There was no need for an enforcement declaration in this case.

*Substantive issue (2005 charge only): no unfair prejudice to Mr McKillen:*

**79.** The Coroin board did not know that the 2005 charge had become enforceable before the expiry of the one-month time limit set out in cl.6.6. Accordingly the next issue is whether cl.6.6 can be interpreted as extending that time limit.

(a)  No implied term requiring notification of event within cl.6.6

**80.** The judge held that there had to be implied into cl.6.6 a term that a shareholder would inform Coroin of the circumstances in which the directors' discretion arose as otherwise the effect of cl.6.6 would be uncertain and haphazard. The judge observed that a similar term had been implied in *Tett v Phoenix Property and Investment Co Ltd* (1986) 2 B.C.C. 99140.

**81.** Mr MacLean submits that the judge was wrong to imply this term. He submits that it is clear from the fact that the period of one month ran from the occurrence of the relevant event that the parties

prized certainty of time over the effectiveness of the clause. The shareholders were protected by the fact that the directors had a fiduciary discretion and by the fact that if the security were enforced by a sale, there would have to be a transfer notice by virtue of cl.6.17 and cl.6.1.

**82.** Lord Goldsmith seeks to uphold the judge's holding for the reasons that the judge gave.

**83.** I prefer the submissions of Mr MacLean. The approach of the law to the implication of terms has recently undergone development as a result of the speech of Lord Hoffmann in the Privy Council in *Attorney General of Belize v Belize Telecom Ltd* [2009] UKPC 10; [2009] 1 W.L.R. 1988; [2009] B.C.C. 433. Hitherto the relevant test had been variously described but the most common formulation was that the implication of the term should be necessary for the business efficacy of the contract. In *Belize*, Lord Hoffmann made it clear that the real task is one of interpretation of the contract. He held:

> "21. It follows that in every case in which it is said that some provision ought to be implied in an instrument, the question for the court is whether such a provision would spell out in express words what the instrument, read against the relevant background, would reasonably be understood to mean. It will be noticed from Lord Pearson's speech that this question can be reformulated in various ways which a court may find helpful in providing an answer—the implied term must 'go without saying', it must be 'necessary to give business efficacy to the contract' and so on—but these are not in the Board's opinion to be treated as different or additional tests. There is only one question: is that what the instrument, read as a whole against the relevant background, would reasonably be understood to mean?"

**84.** I drew attention to the importance of this passage in my judgment in *Stena Line Ltd v Merchant Navy Ratings Pension Fund Trustees Ltd* [2011] EWCA Civ 543, with which Toulson and Rimer L.JJ. agreed. On Lord Hoffmann's approach, the underlying basis for the implication of a term is the interpretation of the document. Thus, the exercise becomes one of ascertaining the reasonable understandings and expectations of the parties. In other words, the meaning and effect of the process of testing necessity for the purposes of an implied term is not an exercise to be carried out in a manner detached from the reasonable expectations of the parties to the particular agreement being interpreted. In that way, the common law continues to insist in this field on party autonomy as a key principle of contract law.

**85.** As respects cl.6.6, there are many events which could occur and could bring it into play. There is no legal reason for Coroin to be informed of those events. On the face of it, that means that the one-month period allowed for the board to make a decision under cl.6.6 could elapse before the directors knew that the relevant event had occurred. However, that is not necessarily so, since the parties intended to work closely with one another in the hotel business and would therefore be in close contact.

**86.** The decision of this court in *Tett v Phoenix Property and Investment Co Ltd*, above, on which the judge relied, is distinguishable from this case. There this court implied a term for notification of the desire to transfer shares by shareholders into a pre-emption article. The article prohibited transfers of shares by members and non-members when members, or their families, were willing to purchase those shares but contained no machinery for implementing offers to members and their families. That case was a much stronger case than the present case for the implication of a term as to notification since the obligation to offer shares to existing members and their families was unworkable without some machinery for giving effect to it.

**87.** By contrast, in this case cl.6.6 is not rendered ineffectual without the implied term. This is because cl.6.17 guards against the possibility that one of the events in cl.6.6 leads to a sale to a

non-member by providing that neither a share nor an interest in a share can be transferred except in accordance with cl.6.

**88.** In relation to an interest in a share, this provision takes effect, in most cases, exactly as it provides and invalidates any disposition of such an interest unless it is one for which cl.6 provides. It is an incident of any interest in a share in Coroin that it cannot be transferred except by a method authorised by cl.6 (see, generally, *Linden Gardens Trust Ltd v Lenesta Sludge Disposal Ltd* [1994] 1 A.C. 85). There may be some qualification to be made where the person making the disposition is not a member and does not know of the restrictions, but that is not this case or the usual case. Dispositions of interests in shares for which cl.6 provides, whether expressly or by implication, are also excluded from the operation of cl.6.1.7.

**89.** Registration of the transfer of a share in Coroin's register of members in breach of cl.6 is of course unlikely to occur unless the directors have been misled or overlooked some material factor. Their duty is not to register any transfer in breach of cl.6.17 (see *Tett v Phoenix Property & Investment Co Ltd* (1986) 2 B.C.C. 99140 above, at pp.99150–99151 and 99155). However, it may occur. The respondents submit that, if it does occur, the registration would be of no effect. I do not accept this. At the moment of registration, the transferee acquires the status of a member under s.112 of the CA 2006. Therefore legal title would pass. Coroin would be entitled and bound to act on the basis of its register of members unless and until rectified. The register of members could only properly be rectified by an order of the court under its statutory jurisdiction to rectify the register of members contained in s.125 of the CA 2006.

**90.** Nonetheless, the other members are not prejudiced by the registration of a transfer in breach of cl.6. Either Coroin or one of its members could apply for rectification of the register. It is difficult to see how an order for rectification could be resisted in the absence of some matter such as acquiescence or waiver. Bennett J. made an order restoring the names of previous holders to the register in these circumstances in *Hunter v Hunter (Emily's action)*, unreported, 15 January 1934, affirmed by this court (Hanworth M.R., Romer and Maugham L.JJ., unreported 19 April 1934).

**91.** The decision of the House of Lords in *Hunter v Hunter*, above, was not in *Emily's action* but in an action brought by one of the previous holders of the shares, the subject of Emily's action. He sought to set aside the sale made by the persons who had been wrongly registered as the holders of his shares. They were nominees of a bank which had lent him money and taken security over his shares. The previous holder was unsuccessful in this court as the bank was held to have been entitled to sell the equitable interest in his shares. He appealed from that order but the order for rectification of the register of members in Emily's action was not appealed. Thus the appeal to the House of Lords proceeded on the basis of the order made in *Emily's action*. In the event the appeal was decided in the previous holder's favour on the basis that the bank could not sell only the equitable interest in the shares. The House of Lords did not, therefore, have to decide the effect of a transfer in breach of a pre-emption article. While some members at least of the House thought that such a sale was ineffective, their observations were only obiter and they did not give detailed consideration to this question.

**92.** Moreover, as a matter of construction, cl.6.16 expressly requires the trustees of family trusts holding shares to notify the directors if the shares cease to be held on family trusts and empowers the directors to require the shares to be transferred back to the shareholder who settled the shares on trust. The presence of this express obligation to notify suggests that none was intended in cl.6.6.

(b)  Pre-emption rights not triggered by breach of cl.6.17

**93.** Lord Goldsmith submits that the matter does not stop there. He submits that the pre-emption process in cl.6.1 would be triggered if cl.6.17 was breached. He relies on the holding of Vinelott J. in *Tett v Phoenix Property & Investment Co Ltd* (1985) 1 B.C.C. 99327 (reversed by this court on other grounds). As I have explained, in that case, the material provision in the pre-emption articles prohibited the transfer of shares if any other member or family member was willing to purchase them. At pp.99342–99343, Vinelott J. held that, if the shares have been transferred into the name of a purchaser in breach of pre-emption rights, the purchaser took subject to the rights of the other members if he had (as he usually would have) notice at the time of the transfer that the transfer was in breach of the other members' pre-emption rights. Vinelott J reasoned that the option rights of the other members conferred by the pre-emption articles would have been triggered by the registration of the transfer.

**94.** Lord Goldsmith's submission is supported by the fact that an order requiring shares to be offered to other members was made in *Lyle & Scott*, above, and also in *Hurst v Crampton Brothers (Coopers) Ltd* [2002] EWHC 1375 (Ch); [2003] B.C.C. 190 (which neither party cited). In the former case, there had been no registration of a transfer in breach of the pre-emption articles. In the latter case, the name of the transferee had been wrongly entered in the register of members. Importantly, the court made an order to secure compliance with the other members' pre-emption rights. I shall have to more to say about these two cases in [99] below.

**95.** Finally, Lord Goldsmith also submits that in cl.6.1, the word "may" means "must" so that any shareholder who desires to transfer a share is bound to give a transfer notice under cl.6.1.

**96.** It seems to me that we do not need to decide the issue whether, if a transfer were made in breach of cl.6.17, the pre-emption rights of the other members would be triggered. Whether the appropriate order is one which rectifies the register by restoring the name of the previous holder, or is one for enforcing the pre-emption process, cl.6 is effective to preserve the rights of members where an event to which cl.6.6 applies slips through the net and a share transfer is registered because the directors do not become aware of it within the one month period. Nonetheless the point is important to the parties and therefore I propose to deal with it.

**97.** The respondents submit that the conclusion of Vinelott J. does not apply because cl.6.17 prevents the transfer of an interest in a share. This submission is not dispositive of Mr McKillen's case on this point because cl.6.17 only prevents the disposition of an interest in a share which is not in accordance with cl.6. If an interest in a share had passed under the procedure in cl.6.1, the disposition of that interest would be permitted.

**98.** I do not, however, accept the argument that the expression "may" in cl.6.1 means "must". Clause 6 contains no provision which states that a shareholder cannot change his mind. Clause 6.3 provides that he is bound to transfer his shares on completion of the pre-emption process. This by implication means that he is not bound to sell his shares before that time. I can only assume that the drafter used the word "may" deliberately. Accordingly, even if a shareholder contracts to sell his share in breach of cl.6, he may choose not to serve a transfer notice. Moreover, as the respondents submit, the purchaser could not obtain an order for specific performance because the contract involves a breach of cl.6. (I am not concerned with any other remedy which the purchaser may have.) The other members may be able to implement cl.6.6.3, dealing with attempts to transfer shares, in which case the directors might decide to deem a transfer notice to be given. On that basis, an attempt to transfer shares in breach of cl.6.1 does not transfer the members' pre-emption rights into options to purchase the shares in question.

**99.** This conclusion is not inconsistent with *Lyle & Scott* ([24] and [25] above) or *Hurst v Crampton Brothers Ltd* (above). In *Lyle & Scott*, the shareholders did not resile from the transaction into which they had entered in breach of the pre-emption article in that case. They were held to have a continuing desire to transfer the shares, and the relevant article imposed an obligation to serve a transfer notice to give effect to the pre-emption rights of the other members in those circumstances. Likewise, in *Hurst v Crampton Brothers Ltd*, the pre-emption articles had been triggered. Under the pre-emption articles in question, the effect of so doing was to appoint the company the member's agent for the purpose of selling the shares. That agency was expressed to be irrevocable without the directors' sanction (which was not forthcoming). That case is, therefore, also distinguishable from the present case. Under cl.6, a member is not prevented from withdrawing from a transaction in breach of cl.6.17 unless he serves a transfer notice and the time for completion of the sale of all his shares under the pre-emption procedure arrives, or he is deemed to serve a transfer notice under cl.6.6.

(c)  No implied term extending the one-month period in cl.6.6

**100.** For the reasons given above, in my judgment, cl.6.17 provides protection against a transfer of a share or an interest in a share consequent on one of the events specified in cl.6.6. It is in effect self-policing and self-correcting: if a member decides to dispose of an interest in a share in breach of cl.6, the disposition is annulled by cl.6.17, and if a transfer of a share is registered in breach of cl.6, the court will be able to rectify the register of members to restore the previous holder. On this basis, cl.6.6 could not reasonably be understood to contain any implied term extending the one-month period to enhance its effectiveness. Indeed, the judge does not draw this conclusion.

**101.** It follows that no term is to be implied extending the one-month period in cl.6.6. If the one-month period elapsed without the directors discovering that the 2005 charge had become enforceable, they had no further power. Mr McKillen cannot, therefore, contend that he has been unfairly prejudiced by the failure to exercise such power.

**102.** That is not the end of the matter. Even if the period in cl.6.6 had not expired before the directors became aware of that the 2005 charge had become enforceable, there would in my judgment, for the reasons given in [103]–[113], have been no unfair prejudice to Mr McKillen for the following reasons:

(1)  there was, in my judgment, no threat by the directors to act in breach of duty at any such meeting; and

(2)  Mr McKillen could himself have convened a board meeting.

(d)  Standstill arrangements and power of Mr McKillen to convene a board meeting

**103.** By letter dated 13 October 2011, Weil, Gotshal and Manges, solicitors for the Barclay interests, informed Herbert Smith, Mr McKillen's solicitors, that various events rendering the shareholder security over Mr Quinlan's shares enforceable had occurred but had done so more than one month previously. On 27 October 2011 Herbert Smith, Mr McKillen's solicitors, wrote to the solicitors for Coroin notifying them that these matters constituted events making the shareholder security enforceable. At the end of their letter Herbert Smith, on behalf of Mr McKillen, requested that a board meeting should take place as a matter of urgency and within the next five days so that the directors could determine that Coroin should notify Mr Quinlan and also Ellerman and B Overseas, in whose name his shares were then registered, that a transfer notice had been deemed to have been given in respect of Mr Quinlan's shares in accordance with the pre-emption provisions.

**104.** This meeting has not been held. In his petition, Mr McKillen alleges that Coroin has wrongfully refused to convene a board meeting, and that this is demonstrated by a letter dated 1 November 2011 from DLA Piper refusing to convene a board meeting. In their defence, both Mr Quinlan and the Barclays' interests deny that this refusal was wrongful.

**105.** However the parties sensibly got together and agreed a standstill on 10 November 2011. The core provision in the standstill agreement is that, insofar as the one-month period in the pre-emption provisions was currently running in relation to the matters contained in Herbert Smith's letter of 27 October 2011, "that period be extended to exclude the time period from today's date until the earlier of (1) seven days following the final determination by a court or (2) upon seven days' notice of any party that time shall again commence." If there was any refusal to hold a board meeting between 27 October 2011 and the ending of the standstill, the slate is wiped clean by the terms of the standstill agreement.

**106.** The next question then is whether the presence of the standstill agreement would effectively remove the possibility of Mr McKillen showing any unfair prejudice as a result of the failure to hold a board meeting. I agree with the judge that it would be a breach of duty for the directors to fail to give proper consideration to circumstances of which they knew which would entitle them to exercise their powers under cl.6.6. However, as I read the correspondence, the directors, who are separately advised by solicitors and counsel, would hold a meeting if the court concluded that they were bound to do so. DLA Piper's reply of 1 November 2011 disputed that cl.6.6 had been triggered, but concluded:

> "It is sufficient to record that the Company does not consider that it yet has any evidence upon which the directors could properly conclude that [the charges have] become enforceable within the past month and that the directors could (if so minded) properly deem a Transfer Notice to have been given."

**107.** In my judgment, that reply means that the directors will be prepared to review their decision not to hold a meeting to consider whether to make a determination under cl.6.6 of the shareholders' agreement.

**108.** Moreover, Mr McKillen has his own right as a director to require a directors' meeting to be convened. As Mr Nigel Dougherty, for Coroin, in a written submission points out, each individual director has the right under art.88 of Table A (which forms part of Coroin's articles) to cause a board meeting to be convened. In my judgment, the articles confer this right on an individual director to meet the situation in which the board improperly does not convene to consider some matter, and Mr McKillen can hardly complain of unfair prejudice if he does not exercise the power he has to prevent him from suffering unfair prejudice as a shareholder. Mr McKillen could have exercised this right (if it served any purpose) at any time, including the time when he first discovered facts which made the 2005 charge enforceable in October 2011.

**109.** In any event, as Mr MacLean points out, there is no allegation in the petition of any threat not to hold a meeting or to act in breach of duty at the meeting.

**110.** If the directors were to give improper consideration to the question whether to exercise their cl.6.6 power or to prevent a board meeting from being held even on the requisition of a single director under art.88, that might form the substance of a new complaint. However, those circumstances do not exist at the present time.

**111.** The duties of the directors under cl.6.6 are potentially complex, and were not fully argued. Directors are fiduciaries. They may not use their powers for an improper purpose: see CA 2006 s.171(b). It is in general improper:

"for the directors to use their fiduciary powers over the shares in the company purely for the purpose of destroying an existing majority, or creating a new majority which did not previously exist." (See *Howard Smith Ltd v Ampol Petroleum Ltd* [1974] A.C. 821, 837)."

**112.** The respondents submit that, where shareholder security becomes enforceable, the directors can properly take into account (if it be the case) that the circumstances leading to shareholder security becoming enforceable were trivial or technical (that is, not leading to any enforcement action). They further submit that the directors could wait and see whether the security was in fact enforced, since cl.6.17 would prevent any transfer that overrode the members' pre-emption rights. In my judgment, the court should not express a view on how the directors should make their decision before they have met to do so or decide not to meet to do so. The decision is for them to take in the first instance. If required to do so, the court can then review their decision.

(e)  Conclusion on security becoming enforceable argument

**113.** For the reasons given above, as of now, Mr McKillen has failed to establish any act of Coroin which could constitute unfair prejudice by reason of the 2005 charge becoming enforceable.

**No remaining issues need to be decided**

**114.** The principal outstanding issue argued on this appeal is whether the judge was wrong to conclude that, if the pre-emption provisions had been triggered, Mr McKillen could not have funded the acquisition of his rateable share of Mr Quinlan's shareholding. Mr Philip Marshall QC, for Mr McKillen, who addressed the court on this issue, submits, first, that the judge did not address the relevant question: all that Mr McKillen needed to show was that he was deprived of an opportunity which the court should now direct should be given to him, alternatively that it is sufficient for him to show that there is now, or was at the time of the alleged breach of the pre-emption provisions, a real prospect that he could have acquired his rateable proportion of Mr Quinlan's shares. Second, Mr Marshall submits that in any event the judge's factual conclusion was wrong and should be set aside.

**115.** In the light of my conclusions on the earlier issues, these questions do not arise and I do not propose to express a view on the remaining issues.

**116.** Before I summarise my conclusions, I will make some points about handling complex appeals, further to remarks which I made at the start of the hearing.

**Handling complex appeals**

**117.** When I gave Mr McKillen permission to appeal in this case, I made an order that the appellant should reduce the length of his skeleton argument (then 68 pages) to 25 pages. My direction reflected the importance of written argument being focused on the limited issues sought to be raised on appeal. This order in fact did little more than is now required by para.31 of CPR Practice Direction 52C, as amended with effect from October 2012:

31(1) "Any skeleton argument must comply with the provisions of Section 5 of Practice Direction 52A and must–
(a)  not normally exceed 25 pages (excluding front sheets and back sheets);
(b)  be printed on A4 paper in not less than 12 point font and 1.5 line spacing.

(2) Where an appellant has filed a skeleton argument in support of an application for permission to appeal, the same skeleton argument may be relied upon in the appeal or the appellant may file an appeal skeleton argument (Timetable Section 5, Part 1).

(3) At the hearing the court may refuse to hear argument on a point not included in a skeleton argument filed within the prescribed time."

**118.** There is a sanction provided for non-compliance with this paragraph:

"(4) The court may disallow the cost of preparing an appeal skeleton argument which does not comply with these requirements or was not filed within the prescribed time."

**119.** I directed that the respondents should aim to do likewise, but that aim was not achieved. The skeleton argument of the Barclay interests was 60 pages (including a short appendix) and that of Mr Quinlan 36 pages (plus an annexe of 18 pages). I say no more as the court has yet to receive submissions on costs.

**120.** When I dealt with the permission application I saw that the trial had lasted nearly 30 days and that the careful judgment of the judge ran to 657 paragraphs, covering some 158 pages of A4 paper (single-spaced), and that the judge had received many hundreds of pages of closing submissions.

**121.** In their respondent's skeleton, Mr Quinlan's advisers suggested that the court spend 12 hours pre-reading the judge's judgment. That is an indication of the complexity of the detailed material in this case. Pre-reading time of that order is certainly not accommodated within the usual schedule of this court.

**122.** However, in general, at the appeal stage submissions can often be more focused than at first instance since there is often no challenge to the judge's primary findings of fact. It has turned out that the issues on this appeal fall within a comparatively narrow compass.

**123.** CPR Practice Direction 52C is there for a good reason. The parties are expected to co-operate in reducing the length of documentation put before the court generally: skeleton arguments, closing submissions and witness statements. Reducing or as appropriate redacting these documents will enable an appeal to be better focused.

**124.** I made similar points in open court at the start of this appeal, and I repeat them now, in order to get the message across to the professions and the public. As I said then, it is quality, not quantity, that counts. Small is beautiful. I also then made the point, by reference to my recent article ("Judgment writing: are shorter judgments achievable?" (2012) 128 L.Q.R. 515–520), and repeat, that it is in the interests of access to justice, reducing legal costs in the instant and other cases and the standing of English law in international fora that judgments should be as short and focused as the circumstances permit. This is not necessarily easy to achieve because, as Blaise Pascal famously observed (and I have quoted this in another judgment) it can take longer to write more shortly than to write at length.

**125.** Accordingly, I take this opportunity to emphasise that parties to appeals in this court must make every endeavour to ensure that the length of skeleton arguments on an appeal falls with the normal range described in Practice Direction 52. Happily, the parties in this case substantially complied with a page limit imposed when further submissions were directed after the hearing.

**126.** There is another very important point related to the length of documents. The court is required to deal with an appeal justly, and under CPR that includes, among other considerations, for any individual case:

"(e) allotting to it an appropriate share of the court's resources, while taking into account the need to allot resources to other cases."

**127.** No appeal should take more of the court's resources than it needs to do as this may result in unfairness to other litigants waiting to have their appeals heard. The length of appeal hearings cannot be governed by the desire of a party to file a longer skeleton argument than is required in order to achieve a just result in that case.

### Conclusions

**128.** In my judgment, for the reasons given above, there is no act or omission of Coroin of which Mr McKillen can complain under s.994 of the CA 2006:

- The practical effect of the arrangements between Mr Quinlan and the Barclay interests did not breach the pre-emption provisions in cl.6 of the shareholders' agreement.
- The arrangements did not involve the transfer of a proprietary interest in Mr Quinlan's shares contrary to cl.6.17 of the shareholders' agreement.
- The arrangements did not result in a breach of the good faith clause in cl.8.5 of the shareholders' agreement.
- The 2004 charge did not "become […] enforceable" for the purposes of cl.6.6 of the shareholders' agreement because BOSI did not make the declaration of the immediate enforceability required by the conditions forming part of the 2004 charge.
- The 2005 charge became enforceable at the latest on 9 November 2009. However, the one-month period within which the directors had power under cl.6.6 to deem a transfer notice to have been given in respect of Mr Quinlan's shares has expired without their exercising that power. They did not know that the 2005 charge had become enforceable and Mr McKillen cannot therefore complain about the failure to exercise the power.
- There is no implied term which has the effect of extending the one-month period in cl.6.6. Clause 6.17 in any event prevents any disposal of an interest in shares contrary to cl.6. A member of Coroin may apply to the court for an order rectifying the register of members to restore the name of the previous holder if a share transfer in breach of cl.6 is registered in that register.
- In any event, the directors have not evinced an out-and-out refusal of Mr McKillen's request to consider whether that power should be exercised. Even if they had so refused, Mr McKillen has power under the articles of Coroin to convene a board meeting himself.

**129.** For these reasons I would dismiss this appeal.

**130.** In the course of this judgment, I have also observed that courts need to consider whether the issues involved in unfair prejudice cases under s.994(1) of the CA 2006 can be reduced, as they tend to be heavy cases ([14], above).

**131.** I have also made the observations that, in the interests of (among other matters) access to justice and reducing legal costs:

- Skeleton arguments should normally comply with the length limit in CPR Practice Direction 52C para.31.
- Other documentation presented to the court should likewise be no longer than required ([117]–[127], above).

### MOORE-BICK L.J.

**132.** I agree that the appeal should be dismissed broadly for the reasons given by Arden L.J., but in relation to some aspects of the appeal I have reached conclusions which differ from hers and in

relation to others I have reached the same conclusion by a slightly different route. I therefore propose to set out the reasons for my decision as briefly as I can. In doing so I gratefully adopt the description of the circumstances giving rise to the appeal given by Arden L.J. as well as her recital of the material parts of the shareholders' agreement and the relevant parts of the Bank of Scotland (Ireland) Ltd's ("BOSI's") General Conditions, none of which I need repeat. For convenience I shall deal with the issues in the order in which they are addressed in the judgment of Arden L.J.

### The practical effect of the arrangements

**133.** The primary submission of Lord Goldsmith QC on behalf of Mr McKillen was based on the proposition that the arrangements between Mr Quinlan and the Barclay interests transferred for all practical purposes the whole of his interest in his shares to them. The argument proceeds on the footing that the court should construe the shareholders' agreement in a realistic and commercially sensible way so as to treat such arrangements as amounting to a transfer of the shares or an interest in them for the purposes of cl.6.

**134.** I agree that this submission must be rejected. In the present case the Barclay interests obtained practical control of Mr Quinlan's shares because Mr Quinlan was prepared for personal reasons to act entirely in accordance with their wishes in relation to the affairs of the company. However, it is to be assumed for these purposes that they acquired no legal or beneficial interest in them. The question, therefore, is whether the word "interest" in cl.6 is capable of connoting something less than a recognised proprietary interest. In *McKillen v Misland Investments Ltd* [2012] EWCA Civ 179; [2012] B.C.C. 575, an earlier decision in these very proceedings, this court held that "interest" in cl.6.17 meant a direct proprietary interest and did not include a commercial interest of the kind which resulted from the ownership of the company which itself owned the shares. The question under consideration on that occasion differed from that which arises on this only to the extent that it concerned a commercial or practical interest of a different kind amounting to practical control. The court's decision that "interest" means a direct proprietary interest is in my view binding on the parties. The parties could have agreed that a transfer of control, even one effected by such informal means, should be sufficient to trigger the rights of pre-emption, but they did not do so. Even if the previous decision of this court were not binding, however, I do not think that it would be possible to construe cl.6.17 as extending to the situation which now exists.

### Creation of a proprietary interest

**135.** Next there is the question whether the agreement of 17 February 2011 operated to transfer to the Barclay interests in the form of Ellerman Hotels Group Ltd a proprietary interest in Mr Quinlan's shares. Lord Goldsmith submitted that it was effective to transfer an immediate contingent equitable interest in the shares of a kind that would be recognised as such under s.4 of the Law of Property Act 1925 if the subject matter had been land. If so, it can only be because the court would grant specific performance of the contract.

**136.** The agreement of 17 February 2011 was an agreement for the sale of Mr Quinlan's shares subject to compliance with the pre-emption provisions. The agreement to transfer ownership of the shares was therefore conditional in nature. In order to perform the agreement it was necessary as a first step for Mr Quinlan to give a transfer notice pursuant to cl.6.1. The agreement does not contain any express requirement for him to do that, but it does oblige him to provide assistance to the buyer to the extent reasonably necessary to give effect to the terms of the agreement and in my view it is not difficult to find within the agreement an obligation on him to give such a notice forthwith or

whenever asked to do so. Given the nature of the subject matter, the court would in my view compel compliance with that term, but that is not the same as saying that as from the time the agreement was entered into the contract to transfer the ownership of the shares was specifically enforceable.

**137.** In *Wood Preservation Ltd v Prior* [1969] 1 W.L.R. 1077 the question arose whether the beneficial interest in certain shares had passed to the purchaser under a conditional contract for sale. At p.1091 Goff J. said that the real test was whether the property in the shares had passed in equity to the purchaser. He held that although the agreement as a whole was not subject to a condition precedent, the obligation to buy and sell the shares was and that therefore the property in the shares would not pass to the purchaser until the condition had been performed or performance had been waived. Having reviewed a number of earlier authorities, he concluded at p.1094 that ordinarily where the mutual obligations of sale and purchase are subject to a condition precedent, property does not pass so long as the condition remains unperformed. In my view that is the position in the present case. Until the pre-emption provisions have been triggered by the giving of a transfer notice and the existing shareholders' rights under them have been exhausted the purchaser does not have the right to call for the title to any remaining shares to be transferred to him. This tends to support the conclusion that no proprietary interest of any kind could pass to the Barclay interests under the agreement of 17 February 2011 until the whole of the pre-emption process had been completed.

**138.** Even if that is wrong, however, and the Barclay interests would otherwise have acquired a contingent equitable interest in Mr Quinlan's shares under the agreement, cl.6.17 is, in my view, effective to prevent the creation of any such interest, as Mr MacLean QC and Mr Auld QC both submitted. In the course of argument Lord Goldsmith did not expressly accept that proposition, but he did not expressly dispute it either. His submission as to the effect of cl.6.17 was rather different, namely, that any purported transfer in contravention of that clause obliged the transferor to give a transfer notice under cl.6.1. In my view, however, that is not correct. Clause 6.1 is essentially permissive in nature and prescribes the conditions which must be complied with if a valid transfer is to be made. A shareholder who purports to deal with or dispose of his shares may find himself the subject of a notice given under cl.6.6, but if no such notice is given, one is simply left with a transfer that contravenes cl.6.17.

**139.** As I have explained, the precise nature of cl.6.17 and the manner in which it operates were not developed during the hearing, but on reflection it seemed to us that a proper understanding of its nature and effect might play an important part in understanding the rest of cl.6, particularly cl.6.6. We therefore invited the parties to make further submissions in writing directed to that limited question.

**140.** Counsel for Mr McKillen submitted that cl.6.17 does not render a transfer contrary to the pre-emption provisions wholly ineffective or void. They argued that such a transfer confers an interest on the transferee, subject to the rights of the other shareholders under cl.6, which crystallise into an option to purchase the shares and constitute a prior equity. At that point the transferor is obliged to serve a transfer notice under cl.6.1. In support of that argument they relied on the decision of Vinelott J. at first instance in *Tett v Phoenix Property and Investment Co Ltd* (1985) 1 B.C.C. 99327 and the decision in *Cottrell v King* [2004] EWHC 397 (Ch); [2004] B.C.C. 307.

**141.** Counsel for the respondents submitted, as they had in argument, that cl.6.17 renders any transfer which does not comply with cl.6 wholly ineffective. Their argument was based on two propositions: (a) that in the case of a chose in action the instrument by which it is created (in this case the company's articles) determines its essential nature and the extent to which it can be transferred; and (b) that the creation of an equitable interest under a contract to transfer property depends on the willingness of the court to grant an order for specific performance. In this case, they said, cl.6.17 and the corresponding provision in the company's articles make it clear that neither the shares themselves

RE COROIN LTD

nor any interest in them can be transferred or disposed of otherwise than in accordance with cl.6 and the court would not order specific performance of an agreement to dispose of shares or an interest in them contrary to the terms of the articles.

**142.** In my view the respondents' submissions are to be preferred. One difficulty with the argument put forward on behalf of Mr McKillen is that the articles and the shareholders' agreement provide a procedure for giving effect to the pre-emption rights which is intended to be self-contained, but it can be initiated only by the member who wishes to make a transfer, or in certain circumstances by the company itself. They do not enable the other members to initiate the process, even where one member seeks to make a transfer in breach of the requirements of clause 6.1. (In such a case the company alone may act under clause 6.6). It is difficult to see, therefore, how the other members would enforce their equitable interests in the right of pre-emption, otherwise than by resorting to proceedings. In my view that is not what the pre-emption provisions contemplate. *Cottrell v King* (above) differs from the present case in that the transferee became the legal owner of the shares by virtue of being registered as the holder, although she took them subject to the equity in the form of the option to purchase which had been created under the articles in favour of the other member as a result of her giving notice to the company of her wish to be registered as holder.

**143.** There is authority in the shape of the decision of this court in *Tett v Phoenix Property and Investment Co Ltd* (1986) 2 B.C.C. 99141 for the proposition that the directors have no power to register a transfer of shares made otherwise than in accordance with the pre-emption provisions and there is also authority for the proposition that the transferability of a chose in action generally may be limited by the instrument creating it: see *Linden Gardens Trust Ltd v Lenesta Sludge Disposal Ltd* [1994] 1 A.C. 85. The view that this principle applies to the chose in action represented by a share in a company is supported by the decision in *Re Claygreen Ltd* [2005] EWHC 2032; [2006] B.C.C. 440. It is true that there are indications to the contrary in the judgment at first instance in *Tett v Phoenix*, but in my view the question in the present case turns on the construction of the company's articles, which contain pre-emption provisions corresponding to those in the shareholders' agreement. A similar pre-emption clause (though one not worded so as to prohibit the disposal of equitable interests) was considered in *Hunter v Hunter (Emily's Case)*, unreported, 19 April 1934 (CA). The court (upholding the judgment below) held that the purpose of the restriction was to ensure that the company remained in the hands of the family and that a transfer of shares contrary to the terms of the articles was null and void. (*Emily's Case* was not the subject of a further appeal, but in the parallel case brought by another member of the family, Samuel, which was considered by the House of Lords, various members of the House expressed similar views, albeit obiter: see *Hunter v Hunter* [1936] A.C. 222.) The purpose of the pre-emption provisions in this case is substantially the same and for all these reasons I think that cl.6.17, particularly when read in the light of cl.6.6.3, is effective to invalidate transfers or the creation of interests otherwise than in accordance with the pre-emption provisions. Having said that, I accept that if, for some reason the transferee were formally registered as the holder of the shares, he would enjoy all the rights of a member unless and until the register was rectified and his name was removed.

**144.** Accordingly, the best that can be said of the agreement of 17 February 2011 from Mr McKillen's perspective is that it constituted an attempt to transfer the shares. However, since the agreement specifically provides for the transfer of the shares to be subject to the pre-emption provisions, it cannot constitute an attempt to transfer them "otherwise than in accordance with the provisions of this Agreement" for the purposes of cl.6.6.3. I am therefore unable to accept that the pre-emption provisions were automatically triggered by the agreement of 17 February 2011.

**Breach of good faith**

**145.** Mr McKillen's alternative argument is that the informal transfer of control by Mr Quinlan to the Barclay interests constituted a breach of cl.8.5 of the shareholders' agreement, in particular cl.8.5.2 and 8.5.4. In the light of the modern approach to construction exemplified in *Attorney General of Belize v Belize Telecom Ltd* [2009] UKPC 10; [2009] 1 W.L.R. 1988; [2009] B.C.C. 433, I doubt whether in this case either of these clauses has any practical significance beyond providing part, albeit perhaps an important part, of the context in which the substantive terms of the agreement are to be construed. The intention of the parties has to be derived from the agreement as a whole, including cl.8.5, and if, as I think, the pre-emption provisions were intended to apply only to the transfer or creation of proprietary interests in the shares, arrangements falling short of that do not involve any breach of the shareholders' agreement or the company's articles. In any event, I do not think that the argument is capable of advancing Mr McKillen's case. If there had been any want of good faith on the part of Mr Quinlan and other shareholders that was capable of amounting to a breach of cl.8.5, that might give rise to a personal claim against them, but it would not constitute an act or omission of the company within the meaning of s.994(1)(b).

**Security became enforceable**

**146.** The final question is whether the security over the shares charged to BOSI in support of the 2004 or 2005 loan to Mr McKillen became enforceable within the meaning of cl.6.6.2 of the shareholders' agreement. As far as the 2005 loan is concerned, I agree with Arden L.J. that the charge became enforceable, but that for the reasons she gives there was no act or omission on the part of the company that unfairly prejudiced Mr McKillen. It is therefore unnecessary for me to say anything further about that loan. I regret, however, that I am unable to agree with her about the position in relation to the security held by BOSI in support of the 2004 loan.

**147.** Although it was not in dispute before the judge that a number of events of default had occurred under the 2004 loan agreement in 2010 and 2011, he held that on the true construction of cl. 9 of BOSI's General Conditions it was necessary for the bank to declare the security enforceable before it could become so and that in the absence of such a declaration the requirements of cl.6.6.2 were not satisfied. The General Conditions are, of course, important because they define the circumstances under which, and the manner in which, the security can be enforced, but for present purposes the court is primarily concerned with the meaning of cl.6.6.2 of the shareholders' agreement, which forms part of the pre-emption provisions.

**148.** The nature and terms of the pre-emption provisions indicate that their purpose is to ensure as far as possible that the company remains in the hands of the original members or those whom they are willing to admit to their circle. Clause 6.6 seeks to achieve that by obviating the risk of shares passing into the hands of a third party as a result of insolvency or an attempt to dispose of shares or an interest in them otherwise than in accordance with the pre-emption provisions. "Enforceable" simply means "capable of being enforced" and in the context of the shareholders' agreement I think that the expression "becomes enforceable" must have been intended to cover any situation in which the holder of security over shares in the company has an immediate power to enforce it. Whatever its purpose or function as part of the General Conditions, para.(iv) of the tailpiece to condition 9 does not impose any restriction on the bank's power to enforce the security. At most it provides a mechanism that must be complied with in the form of a notice of some kind to the borrower, but it places no restriction whatever on the bank's ability to enforce the security. If, therefore, following an event of default one were to ask whether the security over the shares had become capable of enforcement (and

therefore "enforceable"), the answer would surely be that it had, even if the bank had to declare the security enforceable before taking practical steps to realise it. For these reasons I am of the view that as soon as an event of default occurred in relation to the 2004 loan the requirements of cl.6.6 of the shareholders' agreement were satisfied in respect of the shares charged as security for it.

**149.** However, I do not think that assists Mr McKillen. Lord Goldsmith submitted that if the security became enforceable Mr Quinlan was to be deemed to have given a transfer notice, but that is not what cl.6.6 says. All it does is to give the company the power, if the directors so decide, to notify the relevant shareholder that he is to be treated as having given a transfer notice, thus initiating the pre-emption process. The directors have a discretion whether to take that step, which must be exercised within a month of the occurrence of the relevant event.

**150.** As Arden L.J. has pointed out in her [13]–[17], in order to succeed in his claim for relief under s.994(1) of the Companies Act 2006 it is necessary for Mr McKillen to establish that an act or omission on the part of the company is or would be unfairly prejudicial to him and in order to establish unfairness he must show that there has been a breach of a right conferred by the articles or the shareholders' agreement. Mr McKillen may have had a right to require the directors to consider whether the company should exercise its power under cl.6.6, but he did not seek to do so until 27 October 2011. There is no reason to think that the directors were aware of any earlier events of default and if they were not aware of them I do not think that their failure to consider whether to treat Mr Quinlan as having given a transfer notice can amount to a breach of Mr McKillen's rights.

**151.** In the course of argument it was submitted that, in order to prevent the power under cl.6.6 from lapsing before the company had become aware of its existence, it was necessary to imply into the shareholders' agreement and the articles a term that any shareholder would inform the company immediately of the occurrence of any event falling within the terms of the clause of which he became aware. The judge held that such a term should be implied in order to make the clause workable, but, for reasons which I will explain in a moment, I do not ascribe the same importance to cl.6.6 and for that reason I am unable to agree with his conclusion. However, even if one were to imply a term of that kind, I do not think that it would assist Mr McKillen. It is clear that, if Mr Quinlan was under an obligation to inform the company that an event of default had occurred under the 2004 loan agreement, he failed to do so. That might give rise to a personal claim against Mr Quinlan, but it could not extend the time in which the company could exercise its power under the clause. It is not possible, in my view, to imply a term extending the period provided in cl.6.6, because to do so would contradict the parties' intention as expressed in the contract itself.

**152.** That cl.6.6 may be of limited value in some cases is less surprising if, as I think, the effect of cl.6.17 is to invalidate any transfer of shares, or the creation or disposition of any interest in them, which does not comply with the pre-emption provisions. In those circumstances cl.6.6 does not provide the principal means of protection for the interests of the other shareholders, but can be seen to fulfil the subsidiary, but nonetheless potentially important, purpose of allowing the company to force the hand of a member whose shares are at risk of transfer to a third party by treating him as having given a transfer notice pursuant to cl.6.1. There is, therefore, no need to read into it a term of the kind suggested. However, even if the alternative view were to be preferred and a transfer were to have the effect for which Mr McKillen contends, the rights of the other members would be preserved in the form of an equitable interest which they could enforce against the transferee.

**153.** The upshot of all this is that, although the security for the 2004 loan to Mr Quinlan became enforceable, the company was unaware of the fact at the time and was therefore unable to consider whether to exercise its right under cl.6.6 to treat him as having given a transfer notice while it still

had the power to do so. However, its failure did not involve any breach of Mr McKillen's rights and cannot be regarded as causing him unfair prejudice.

**154.** For these reasons I agree that the appeal should be dismissed.

### Postscript

**155.** At the end of her judgment Arden L.J. has drawn attention to para.31 of CPR Practice Direction 52C, emphasising the importance of ensuring that skeleton arguments are as succinct as possible and that the materials prepared for the appeal are limited to those that are really necessary for that purpose. I respectfully endorse those remarks and have said much the same myself on other occasions. The reading time available to the court is limited and skeleton arguments are intended to provide a clear statement of the points that are to form the backbone of the parties' submissions. It is not their function to include all the points of detail which the parties intend to deploy in support of those submissions. They can be developed more effectively in oral argument.

### RIMER L.J.:

**156.** I have read in draft the judgments of Arden and Moore-Bick L.JJ. I too agree that Mr McKillen's appeal should be dismissed, but not in all respects for the reasons that Arden L.J. has given. I add the following observations.

### A.  The pre-emption provisions

**157.** The pre-emption provisions in the shareholders' agreement follow in all material respects those in Coroin's articles of association, and I shall refer only to the former provisions. Their scheme is that, apart from permitted transfers (which include a transfer to a mortgagee), all transfers or other dispositions must be made in a manner compliant with the requirements of cl.6: see cl.6.17. There are, however, questions as to the operation of, and inter-relation between, cl.6.1, 6.6 and 6.17.

**158.** As for cl.6.1, does the provision that "a Shareholder … desiring to transfer … Shares (or any interest therein) … may at any time give [a transfer notice] to the Company …" mean that such a shareholder *must* give such a notice? I consider that the answer is yes, although it needs a little explanation. Clause 6.1 does not compel the giving of a transfer notice as soon as a proposing transferor forms a desire to transfer any shares. A desire formed on Monday may have evaporated by Friday; and if, in the meantime, no transfer notice has been given, it would be odd if such an ephemeral desire could result in a shareholder being compelled to give a transfer notice when he no longer wishes to transfer his shares at all. On the other hand, I regard it as clear that, once the formation of the desire has moved into the valley of decision intended to be followed by action, the sense of cl.6.1 is that it is a condition of a valid transfer that the shareholder must first give a transfer notice for the purpose of activating the pre-emption provisions. If he does not, any attempt by him to transfer his shares will run into (i) the provisions of cl.6.6, under which the directors are empowered to deem him to have given a transfer notice; and (ii) in default of an exercise by the board of that power, the provisions of cl.6.17. The answer to the "may" or "must" question is, therefore, simply that it is a condition of a valid transfer of shares—and of any interest in shares—that the proposing transferor first gives a transfer notice.

**159.** Clause 6.6 also raises interpretational questions. It provides that, following the occurrence of any such events as are referred to in cl.6.6.1–6.6.3, the directors may "deem" the relevant shareholder to have given a transfer notice in respect of all his shares. Such events include the case in which the

shareholder "attempts" to deal with, or otherwise dispose of, his shares or an interest therein otherwise than in accordance with the provisions of the shareholders' agreement.

**160.** Clause 6.6 provides, however, that the directors can only so deem "within a period of one month after the occurrence of any such event". The problem here is that it is likely that in many cases the directors will only learn of such occurrence after the expiration of the one-month period: the relevant event might, for example, be a non-compliant share transfer which, with a view to circumventing the cl.6.6 time limit, the parties had deliberately kept secret and of which they had deferred applying for registration. This raises a question as to whether, in the final paragraph of cl.6.6, the quoted words mean what they say, namely that the board's discretionary power is exercisable only within the specified one-month period; or whether there is any basis for a more flexible reading to the effect that the one-month period runs from when the directors first have relevant knowledge.

**161.** In my view, the words mean what they say. First, as a matter of language, there is no scope for reading them as meaning anything else; and no basis for an inference that something has gone wrong with the drafting. It may perhaps not be a very clever piece of drafting, but it is not the court's function, by a process of purported interpretation, to improve the scheme that Coroin has chosen to adopt. Second, that interpretation is anyway unlikely to be injurious to the members' pre-emption rights. An attempted transfer, sale or disposition of shares, or of any interest in shares, that is made without prior compliance with cl.6.1 and slips the net of clause 6.6 does not get away scot-free, because the effect of cl.6.17 is to strike down any transfer, sale or disposition "save as provided by this clause 6". That means, in my judgment, that no such transaction will be effective between the parties unless it has been preceded by compliance with the pre-emption provisions.

**162.** As to the practical consequences of an attempted, but non-compliant, share transfer, the board would have no power to register it as it would have been made in breach of the articles. That is shown by the Court of Appeal's decision in *Tett v Phoenix Property and Investment Co Ltd* (1986) 2 B.C.C. 99140. In *Emily Hunter v THV Hunter*, unreported, 15 January 1934 ("the Emily Hunter case", not apparently cited in *Tett's* case (above)), Bennett J. came to a like conclusion in relation to share transfers made in breach of art.17 of a company's articles, which provided that "no member shall be entitled to transfer any share otherwise than in accordance with the following [pre-emption] provisions". Save that art.17 did not also include a restriction on dispositions of an *interest* in shares, there is no relevant distinction between the restriction in art.17 and that in cl.6.17 of the shareholders' agreement (and its equivalent in the articles) in the present case. Bennett J. made an order for the rectification of the registration of the transferees so as to restore to the register the name of the purporting transferor.

**163.** Bennett J.'s decision was upheld by the Court of Appeal (Lord Hanworth M.R., Romer and Maugham L.JJ.), unreported, 19 April 1934. Lord Hanworth expressed his agreement with Bennett J. that "the meaning of the opening words of Article 17 is that there is to be a prohibition against a transfer of any shares at all except and only in the manner in which is [sic] permitted [by the pre-emption provisions]". Romer and Maugham L.JJ. gave concurring judgments. There was no appeal against that decision to the House of Lords, although another decision in the *Hunter* litigation (the *Samuel Hunter* case) was so appealed: *Hunter v Hunter* [1936] A.C. 222. The *Emily Hunter* case shows that a purported transfer of shares made in defiance of the pre-emption provisions of cl.6 will be ineffective.

**164.** As for an attempted, but non-compliant, disposition of an *interest* in shares (for example, by a declaration of trust), no question as to that arose in the *Hunter* litigation. But just as it was open to Coroin to impose restrictions in its articles as to the manner in which a shareholder could transfer his shares, so was it open to Coroin to impose restrictions as to the manner in which a shareholder could transfer an *interest* in his shares. Mr Peter Prescott QC, sitting as a deputy High Court judge of the

Chancery Division in *Re Claygreen Ltd; Romer-Ormiston v Claygreen Ltd* [2005] EWHC 2032 (Ch); [2006] B.C.C. 440, took that view in relation to an article that, like cl.6.17, provided that "no share or any interest therein shall be transferred, assigned, charged or otherwise disposed of" unless (inter alia) pre-emption rights had been exhausted. As he put it, at [53]:

> "A share in a company should not be thought of as a tangible object, but as a bundle of rights. Those rights have existence in virtue of the company's articles. If Epsom has acquired any rights in the claimant's shares, they must be rights recognised in equity alone, for no legal transfer of the shares has been or could be effected without registration. Now, how can equity recognise or give effect to a transaction in relation to a bundle of rights which, by their very nature, do not admit of that transaction, the parties having had notice thereof?"

I agree.

**165.** The result is that I consider that, in a case where there has been no prior compliance with the pre-emption provisions, cl.6.17 renders ineffective both a purported transfer of shares and a purported transfer of any proprietary interest in shares. Of course, if, as it should not be, a transfer of shares were in fact to be registered, Coroin might well have to regard the registered owner as a member so long as he remains registered. But the other members would in principle be entitled to ask for the register to be rectified so as to restore the prior position.

### B. The "practical effect" argument

**166.** I deal below with whether the agreement of 17 February 2011 was one under which Mr Quinlan either did, or purported to, transfer an interest in his shares to the Barclay interests. Subject to that, I agree with Arden and Moore-Bick L.JJ. that the arrangements under which control in the Quinlan shares passed to the Barclay interests did not amount to the transfer either of the shares or of any interest in them, interest here meaning a *proprietary* interest. Such arrangements did not therefore engage the cl.6 pre-emption provisions.

### C. The agreement dated 17 February 2011

**167.** The essence of this agreement is that, subject to compliance with the shareholders' agreement, Mr Quinlan agreed to sell to Ellerman Hotels Group Ltd ("EHGL") all his Coroin shares for £80 million, or such of his shares as he was able to sell at a pro rata price. Lord Goldsmith QC submitted that it followed that the effect of the agreement was to give EHGL a defeasible contingent interest, and thus a proprietary interest, in all Mr Quinlan's shares. His primary submission was that this engaged cl.6.1 and 6.17; alternatively, that it engaged cl.6.6.

**168.** I do not understand how the claimed engagement of cl.6.1 and/or 6.17 can assist Mr McKillen. If the agreement amounted to a purported transfer of an "interest" in shares, and thus the type of disposition to which cl.6.1 applies, then no doubt Mr Quinlan should have given a transfer notice before entering into the agreement. He did not do so, but his omission in that respect cannot have been an unfairly prejudicial act or omission in the conduct of the affairs of Coroin. In any event, for reasons given, I consider that the effect of cl.6.17 is that any such purported transfer would have been ineffective.

**169.** I anyway respectfully regard Lord Goldsmith's interpretation of the agreement as incorrect. The nature of the agreement was that Mr Quinlan was agreeing to sell EHGL all his shares, but only if he was able to do so after prior compliance with the pre-emption provisions; and if following such compliance he was only able to sell part of his holding, the agreement was for the sale of such part

at a pro rata price. The sale agreement was in substance one for the sale of such (if any) shares as were available to be sold after compliance with the pre-emption provisions; and it was a condition of the agreement that those provisions should first be complied with.

**170.** Prior to compliance with such condition, EHGL could not, by a claim for specific performance, compel the transfer to it of any part of Mr Quinlan's shareholding, let alone the entire shareholding; and, if it could not do that, the agreement cannot have given it any proprietary interest in the shares. As the identification of the sale shares and their price was conditional upon the outcome of prior compliance with the pre-emption provisions, it follows that if any relevant "interest' in shares was destined to pass under the agreement it could only so pass at the earliest once the sale shares had been identified, which could not happen until after such compliance. It follows, therefore, that even assuming that the board became aware of the agreement within one month of its signing, the agreement was not one that triggered the board's powers under cl.6.6 and so there can be no complaint by Mr McKillen (and I am not clear that there is) that Coroin's affairs in relation to the agreement of 17 February 2011 have been conducted in any unfairly prejudicial way.

### D. The charge dated 14 May 2004

**171.** Clause 1.1 of the 2004 charge defined "Events of Default" as meaning "the events of default set out in the Facility Letter and any one an 'Event of Default'." It defined the "Facility Letter" as one of 6 April 2004, as amended by a supplemental letter of 21 April 2004. It defined the "General Conditions" as "the general conditions applicable to loan facilities provided by [BOSI]", although we were not shown any reference to such conditions in the operative parts of the charge.

**172.** Clause 2, headed "The Secured Obligations", provided so far as material:

> "2.1  For good and valuable consideration (receipt of which is hereby acknowledged):
>> (a)  The Chargor hereby unconditionally covenants to pay or discharge on demand (which demand may be made only after the occurrence of an Event of Default which is continuing unremedied or unwaived) to the Bank the Indebtedness; …
>
> 2.3  The Secured Obligations shall upon written notice by the Bank, become due and payable and the Chargor shall pay or repay all actual liabilities and provide cash cover to the Bank for all actual, and the maximum amount of all contingent, liabilities of the Chargor to the Bank on the occurrence of any Event of Default.
>
> 2.4  The Chargor hereby covenants immediately to notify the Bank in writing of the occurrence of any Event of Default or of the occurrence of any event which with the lapse of time or giving of notice or both would or may constitute an Event of Default."

**173.** Clause 10.1 provided that, upon "the happening of an Event of Default", the bank was to be entitled to exercise its power of sale or otherwise to dispose of the charged property. Clause 10.2 provided that:

> "The restriction contained in Section 103 of [the Law of Property Act 1925] on the exercise of the statutory power of sale shall not apply to any exercise by the Bank of its power of sale or other disposal which shall arise, as shall the statutory power under the [sic] Section 101 of the Act of appointing a receiver of the Charged Property or the income thereof, immediately upon the security created by this Charge becoming enforceable. In favour of a purchaser a certificate in writing by an officer or agent of the Bank that either or both of such powers has arisen and is exercisable shall be conclusive evidence of that fact."

Clause 11 permitted the Bank to appoint a receiver "at any time after the power of sale may become exercisable …". By cl.13, Mr Quinlan irrevocably appointed the bank to be his attorney for the purpose, inter alia, of doing all things necessary to enable the bank to exercise its power of sale.

**174.** The facility letter did not itself set out the "Events of Default" (cf. cl.1.1 of the charge) but, by para.9, it incorporated the bank's general conditions ("the conditions"). Paragraph 9 provided:

> "In addition to the terms contained in this facility letter, the Loan is subject to [the conditions] attached. Unless expressly excluded or varied by the terms of this facility letter, [the conditions] shall apply to this loan."

The charge post-dated the facility letter.

**175.** Condition 1.1 of the conditions defines "Events of Default" as meaning "the events specified in Condition 9 and any further events of default specified in the Facility Letter and any one an "Event of Default". Condition 9 is headed "Events of Default". Its 20 sub-paragraphs list a series of events. Arden L.J. has quoted two of them in her Appendix 2 and has so given the flavour of the list. Each event is described in conditional terms, namely "if such and such happens", although the sub-paragraphs do not explain the consequence of the event. The suspense is, however, ended by the tailpiece to condition 9, which reads "then, and in such case and at any time thereafter, the Bank may, in its absolute discretion" exercise any or more of four options, which Arden L.J. has also quoted. Option (iv) entitled the Bank to "declare that the Security Documents have become enforceable immediately in accordance with their terms, whereupon the same shall be immediately enforceable".

**176.** The judge found that several things that happened in 2010 and 2011 were "Events of Default" falling within one or more of the 20 sub-paragraphs of condition 9. He also recorded that there had been no consequential declaration under para.(iv) of its tailpiece.

**177.** In those circumstances, the question arises whether, upon the happening of the first (or any) of such events, the 2004 charge (a shareholder security) "[became] enforceable" within the meaning of the applicable paragraph of cl.6.6 of the shareholders' agreement (whether it is cl.6.6.1 or 6.6.2 may be debatable, but it does not matter). The judge favoured the view that it did not, on the ground that it would only have "[become] enforceable" upon the making by the chargee of an option (iv) declaration, which did not happen. Arden L.J. agrees with the judge. Moore-Bick L.J. favours the different view that the security did "[become] enforceable", on the ground that the key words to be interpreted are the words "becomes enforceable" in cl.6.6. In his view, they were intended to cover any situation in which the security holder had an immediate power to enforce it and para.(iv) did not impose any restriction on the exercise of such power. I agree with Moore-Bick L.J.'s conclusion.

**178.** Such problem (if any) as there may be lies in what is arguably an internal inconsistency in the charge documentation, but I regard the following as clear. First, the occasion of any event of the nature listed in the first twenty sub-paragraphs is an "Event of Default' within the meaning of the charge. Second, as follows, and contrary to Mr Auld QC's submission, the happening of such an event of default is not dependent upon the prior exercise by the bank of one or more of its options under the tailpiece to condition 9: those options can do no more than they purport to do, namely to give the bank alternative or cumulative choices of action once an event of default has happened. Third, cl.2 of the charge shows that the borrower's personal covenant to repay the indebtedness is an "on demand" obligation and that a demand can only be made after the occurrence of an event of default. Fourth, options (i) and (ii) of the condition 9 tailpiece are therefore consistent with, and add nothing to, cl.2 of the charge, the substance of both options being that, upon an event of default, the bank can by written notice call in the indebtedness. Fifth, cl.10 and 11 of the charge show that it becomes immediately enforceable by way of the exercise of a power of sale or by the appointment

of a receiver upon the occasion of an event of default, and that no prior declaration of enforceability by the bank is required before the bank may proceed to exercise its powers as chargee. Sixth, and arguably inconsistently with this, option (iv) in the condition 9 tailpiece entitles the Bank, upon the occasion of an event of default, to "declare that the Security Documents have become enforceable immediately in accordance with their terms, whereupon the same shall be immediately enforceable".

**179.** Option (iv) is a curious piece of drafting. One meaning of the permitted declaration, underpinned by the words "have become enforceable immediately in accordance with their terms", is that the declaration is directed at doing no more than confirming that which, upon the occurrence of the event of default, the charge anyway provides – namely, that the security has become immediately enforceable. If so, the declaration is not a condition of the bank's right of enforcement, since it does no more than declare the existence of a right of enforcement that has already arisen and become exercisable. A possible alternative meaning, however, is that the declaration is regarded as triggering a right of enforcement that has not yet become exercisable, and that "the terms" referred to are the means by which the charge provides for the security to be enforced (by way of sale, the appointment of a receiver etc).

**180.** As between the alternatives, I prefer the former. That is because it harmonises with the terms of the charge and is consistent with it. It is also to be noted that, unlike options (i) and (ii), the exercise of option (iv) does not apparently even require a notice of its exercise to be given to the borrower. Of course, if this is the right interpretation, the making of the declaration is pointless, since it adds nothing to what the charge provides. Nor, though, does option (i) add anything to what the charge provides; and option (ii) merely entitles the chargee to warn the borrower that he is at risk at any time of receiving a demand for payment that could have been made straight away under option (i). The problem, however, with the alternative interpretation of option (iv) is that it is inconsistent with the provisions of the charge. If, however, there is in fact any inconsistency, I consider that the provisions of the charge ought to prevail. It would be surprising if the unambiguous provisions of cl.10 and 11 of the charge should be required to yield to an ambiguous provision in the conditions to which the charge makes no reference in its material operative parts.

**181.** If, however, I am wrong about this, I consider that it anyway makes no difference to the position. The question is whether the 2004 charge "[became] enforceable" within the meaning of cl.6.6 of the shareholders' agreement. Even if the exercise of option (iv) is correctly to be regarded as a critical condition to the enforcement of the charge, it is a purely formal condition whose satisfaction is, upon the occurrence of an event of default, within the exclusive control of the chargee. The substantive position is therefore that upon the occurrence of an event of default, the charge becomes enforceable: that is because the chargee is entitled to enforce it at will.

**182.** It follows in my view that, as Lord Goldsmith QC correctly submitted, the 2004 charge did "[become] enforceable" within the meaning of cl.6.6 of the shareholders' agreement. I respectfully disagree with the views to the contrary effect favoured by the judge and Arden L.J.

**183.** That conclusion means that in theory it would have been open to the board (although only within the one-month period after the occurrence of any event of default) to determine in its discretion under its cl.6.6 power that a transfer notice should be deemed to have been given. It was submitted by Mr MacLean QC that no case was pleaded, made or sought to be made at the trial that the board had wrongly or improperly failed or refused to exercise its powers under cl.6.6 in consequence of any event of default under the 2004 charge; and, that being so, that Mr McKillen had established no act or omission in the affairs of Coroin that was unfairly prejudicial to him as a member. On the other hand, Lord Goldsmith submitted that Mr McKillen had made a clear request in October 2011 for the board to consider exercising its cl.6.6 powers in consequence of the defaults under the 2004 charge

and that the board had wrongfully refused to do so, a refusal said to amount to unfairly prejudicial conduct towards Mr McKillen.

**184.** Mr Marshall QC, in his closing submissions for Mr McKillen at the trial, had sought to make a like submission to the judge. The judge declined to allow it to be made, on the basis that such a case had not been in issue at the trial and that Mr McKillen's rights (if any) to have the board consider the exercise of its cl.6.6 powers were covered by the standstill agreement, to which Arden L.J. has referred. In the exchange with Mr Marshall, the judge made clear his understanding that the point of the standstill agreement was so that the questions of principle as to whether the cl.6.6 powers had been triggered at all could first be determined by the court in its decision on the petition. In the meantime, the parties' rights in this respect were preserved. The judge, having declined to hear Mr Marshall further on the point, did not rule upon the point in his judgment. In his view, it was simply not in issue before him.

**185.** Lord Goldsmith submitted that in that respect the judge was wrong and should have ruled that the board's refusal to call a meeting was unfairly prejudicial. I understood him to wish also to rely on an alleged, and unpleaded, refusal made in January 2012. He asked this court to make a finding as to unfairly prejudicial conduct that he says the judge should have made but refused to make.

**186.** In my view it cannot be appropriate for this court to turn itself into a court of first instance for this purpose and make findings of primary fact of the nature that Lord Goldsmith's submission invited: whilst the board's refusal to call a meeting was admitted, it was denied that such refusal was wrongful and there was no investigation at the trial as to the "wrongfulness" issue. I regard it as clear that the purpose of the standstill agreement was to stop time running under cl.6.6 pending the determination by the court in the petition of the necessary questions of principle as to the application (if any) of cl.6.6. The standstill agreement has duly preserved Mr McKillen's rights existing at the time he made his October 2011 request for the holding of a board meeting. In the light of our judgments, it will now be open to him to make such representations to the board as he thinks fit.

**187.** I add that in para.42A of his petition Mr McKillen asserts six events of default in relation to the 2004 charge. The fourth is said to have happened on 15 June 2011, some five months before the standstill agreement. I have set out my views as to the strictness of the time limits for the workings of cl.6.6, and no case was made to us that, on the findings by the judge, there had in respect of those events been any wrongful act or omission by Coroin that could be regarded as unfairly prejudicial conduct towards Mr McKillen. The two further events alleged are said to have happened on 21 October 2011 and 19 December 2011. Insofar as Mr McKillen may wish to make representations to the board in relation to those matters, I presume that his right to do so is covered by the standstill agreement.

### E.  The charge dated 20 October 2005

**188.** I respectfully agree with what Arden L.J. has said about Mr McKillen's case in relation to the 2005 charge. I have expressed my view that the "one-month" period in cl.6.6 of the shareholders' agreement means what it says; and I agree with Arden L.J. that there is no scope for implying the term that the judge favoured. Nor do I follow how the implication of such a term can help Mr McKillen. If there was such a term, Mr Quinlan may have breached his obligation under it, but that would be irrelevant to Mr McKillen's case based on s.994. In the circumstances explained by Arden L.J., Mr McKillen has proved no act or omission of Coroin in consequence of the enforceability of the 2005 charge that amounted to the conduct of its affairs in a way unfairly prejudicial to his interests as a member.

Re Coroin Ltd

**189.** I too would dismiss Mr McKillen's appeal.

*(Appeal dismissed)*

## APPENDIX 1  Extracts from the shareholders' agreement: pre-emption provisions (cl.6) and good faith provision (cl.8.5)

*No Transfers except as Permitted*

6.17   No Share nor any interest therein shall be transferred, sold or otherwise disposed of save as provided in this clause 6. [As stated in [19] above, cl.6.17 and 6.18 have been set out first for ease of reading.]

6.18   Nothing in this clause 6 shall prohibit or restrict the grant by a Shareholder of any Shareholder Security [This was defined in the shareholders' agreement as any security "as may from time to time be granted by any Shareholder over this Shares and/or Loan Stock"] or the transfer of any Share to the holder for the time being of such Shareholder Security and the Directors shall approve such transfer; provided that for the avoidance of doubt the holder of such Shareholder Security shall be subject to the terms of clause 6 (including clauses 6.1 to 6.5 hereof) in the event of any such Shareholder Security becoming enforceable.

*Transfer of Shares*

6.1   Except in respect of a transfer made pursuant to clauses 6.14, 6.15 and/or 6.16, a Shareholder (the Proposing Transferor) desiring to transfer one or more Shares (or any interest therein) (the Transfer Shares) may at any time give notice in writing to the Company (Transfer Notice) of his desire to transfer the Transfer Shares and the sale price thereof and other sale terms, as fixed by him. For the purposes of this clause 6, "Share" shall be deemed to include Loan Stock and any other debt or other instruments convertible into share capital of the Company. …

6.3   If any Transfer Shares so offered are accepted the Proposing Transferor will upon completion of the foregoing procedures (but subject to clause 6.4) be bound to sell and transfer … the relevant Transfer Shares …

6.6   If any Shareholder

6.6.1   (being a corporate Shareholder) enters into liquidation or receivership or suffers the appointment of an examiner or any Shareholder Security becomes enforceable or suffers any analogous proceeding (not being a voluntary liquidation for the purpose of and followed by a reconstruction or amalgamation while solvent upon such terms as may be approved by all of the Shareholders); or

6.6.2   (being an individual Shareholder) becomes or is adjudged bankrupt in any part of the world or enters into any composition or arrangement with his creditors generally or any Shareholder Security becomes enforceable; or

6.6.3   attempts to deal with or otherwise dispose of any Shares or interest in Shares in the Company otherwise than in accordance with the provisions of this Agreement;

such Shareholder or as the case may be, his personal representatives, if so notified by the Company following a determination by the Directors at any time within a period of one month after the occurrence of any such event, shall be deemed to have given a Transfer Notice in

respect of all Shares held by it or him on the date of such notice and the provisions of clause 6.7 shall apply…

8.5 Each of the Shareholders agrees that:

8.5.1 during the continuance of this Agreement all transactions entered into between any of them or any company controlled by them on the one hand and the Group on the other shall be conducted in good faith and on the basis set out or referred to in this Agreement or, if not provided for in this Agreement as may be agreed by the parties and in the absence of such agreement on an arm's length basis;

8.5.2 each of them shall at all times act in good faith towards the others and shall use all reasonable endeavours to ensure the observance of the terms of this Agreement;

8.5.3 no party will seek to increase its profit or reduce its loss at the expense of another; and

8.5.4 each of them will do all things [necessary] or desirable to give effect to the spirit and intention of this Agreement.

## APPENDIX 2 RELEVANT PROVISIONS OF THE 2004 AND 2005 CHARGES AND BOSI'S GENERAL CONDITIONS

*The 2004 charge*

…

**1** INTERPRETATION

1.1 In this Charge the following expressions shall, unless the context otherwise requires, have the following meanings:

…

"Events of Default" means the events of default set out in the Facility Letter and any one an "Event of Default";

…

"Facility Letter" means the facility letter dated 6 April 2004 addressed by the Bank to the Chargor as amended by supplemental letter dated 21 April 2004.

…

**2** THE SECURED OBLIGATIONS

2.1 For good and valuable consideration (receipt of which is hereby acknowledged):

(a) the Chargor hereby unconditionally covenants to pay or discharge on demand (which demand may be made only after the occurrence of an Event of Default which is continuing unremedied or unwaived) to the Bank the Indebtedness;

(b) the Chargor hereby unconditionally and irrevocably covenants to pay or discharge on demand to the Bank all costs, charges, expenses and other sums (banking, legal or otherwise) on a full indemnity basis howsoever incurred or to be incurred by the Bank or by or through any receiver, attorney, delegate, sub-delegate, substitute or agent of the Bank (including, without limitation, the remuneration of any of them) for any of the purposes referred to in this Charge or in relation to the enforcement of

this security together with interest to the date of payment (as well after as before any demand made or judgment obtained hereunder) at the Default Rate.

2.2   A certificate signed by a duly authorised officer of the Bank setting forth the amount of any sum due hereunder shall, in the absence of manifest error, be conclusive evidence against the Chargor without the necessity of proof of the signature of such person or that he holds the office described in such certificate.

2.3   The Secured Obligations shall upon written notice by the Bank, become due and payable and the Chargor shall pay or repay all actual liabilities and provide cash cover to the Bank for all actual, and the maximum amount of all contingent, liabilities of the Chargor to the Bank on the occurrence of any Event of Default.

2.4   The Chargor hereby covenants immediately to notify the Bank in writing of the occurrence of any Event of Default or of the occurrence of any event which with the lapse of time or giving of notice or both would or may constitute an Event of Default…

10.1   Upon the happening of an Event of Default the Bank shall have and be entitled to exercise the power to sell … as the Bank shall think fit, the whole or any part of the Charged Property …

10.2   The restriction contained in Section 103 of [the Law of Property Act 1925] on the exercise of the statutory power of sale shall not apply to any exercise by the Bank of its power of sale or other disposal which shall arise, as shall the statutory power under Section 101 of the Act of appointing a receiver of the Charged Property or the income thereof, immediately upon the security created by this Charge becoming enforceable. In favour of a purchaser a certificate in writing by an officer or agent of the Bank that either or both of such powers has arisen and is exercisable shall be conclusive evidence of that fact.

*The 2005 charge*

**1** INTERPRETATION

1.1   …

      …

      "Event of Default" means any failure by the Chargor to pay, on written demand by the Bank any sums which are due and payable to the Bank by the Chargor whether as principal, surety or in any other manner whatsoever;

      …

*General conditions*

GENERAL CONDITIONS APPLICABLE TO LOAN FACILITIES PROVIDED BY BANK OF SCOTLAND (IRELAND) LIMITED

**1** DEFINITIONS AND INTERPRETATION

…

"Events of Default" means the events specified in Condition 9 and any further events of default specified in the Facility Letter and any one an "Event of Default";

…

"Potential Event of Default" means any event which may, with the passage of time, the giving of notice, the making of any determination or any combination thereof constitute an Event of Default;

…

**9** EVENTS OF DEFAULT

(i)   If the Borrower fails to pay on the due date any monies payable or due by it from time to time to the Bank in the currency and manner specified in the Loan Agreement or fails to discharge or perform any obligation or liability to the Bank or if the Borrower or any Guarantor fails to comply with any term or condition under any of the Finance Documents (including without limitation, the Loan Agreement) or if any representation, warranty or undertaking from time to time made (or deemed to be made) to the Bank by the Borrower or any Guarantor is or becomes incorrect or misleading; …

(xx)   If the Registrar of Companies issues a notice to the Borrower or any Guarantor pursuant to either Section 11 or Section 12 of the Companies (Amendment) Act 1982;

then, and in such case and at any time thereafter, the Bank may, in its absolute discretion:

(i)   by written notice to the Borrower declare all Drawings to be immediately due and payable and call for the repayment thereof whereupon the same shall become immediately payable together with accrued interest thereon and any other sums due and payable by the Borrower under the Finance Documents; and/or

(ii)   by written notice to the Borrower declare the Loan to be due and payable on demand in which case the Borrower shall make payment thereof on demand made by the Bank at any time thereafter; and/or

(iii)   cancel all or any of its obligations under the Loan Agreement whereupon same shall be cancelled forthwith and the commitments of the Bank shall be reduced to zero; and/or

(iv)   declare that the Security Documents have become enforceable immediately in accordance with their terms, whereupon the same shall be immediately enforceable.

A

Supreme Court

# Times Travel (UK) Ltd and another *v* Pakistan International Airlines Corpn

## [2021] UKSC 40

B
2020  Nov 2, 3;        Lord Reed PSC, Lord Hodge DPSC,
2021  Aug 18     Lord Lloyd-Jones, Lord Kitchin, Lord Burrows JJSC

*Contract — Validity — Economic duress — Contract entered into following exercise of lawful pressure in good faith — Whether contract voidable on grounds of duress*

C
The claimant travel agency, whose business was almost exclusively the sale of flight tickets for travel to and from Pakistan, was very largely dependent on its ability to sell tickets with the defendant airline, which was the only airline operating direct flights between the United Kingdom and Pakistan. When a number of the defendant's agents brought claims against the defendant to recover substantial sums said to be due by way of commission, the defendant put pressure on the claimant not to join the claims. It cut the claimant's normal ticket allocation from 300 to 60 tickets a
D
fortnight, as it was entitled to do, and gave notice that it was terminating existing agency contracts. It offered each agent a new contract on terms that included a waiver of the agent's claim for unpaid commission. The claimant reluctantly accepted those terms. Subsequently the claimant brought proceedings to recover the commission and other payments which it said were due under its previous contract. The judge allowed the claim, holding that the claimant was entitled to avoid the new contract on the grounds that it had been procured by economic duress, even though the defendant's actions had been entirely lawful. The Court of Appeal reversed his
E
decision, holding that the claimant was not entitled to avoid the new contract because it had not established bad faith on the part of the defendant.

On appeal by the claimant—

*Held*, dismissing the appeal, that the doctrine of lawful act economic duress existed in English common law as a ground for the rescission of a contract or the restitution of a non-contractual payment; that the elements of such duress were (i) the making of an illegitimate (albeit lawful) threat by one party, (ii) sufficient causation
F
between the threat and the threatened party entering into the contract or making the non-contractual payment and (iii) the lack of any reasonable alternative to the threatened party giving in to the threat; that the illegitimacy of a threat was to be determined by focusing on the nature and justification of the demand made by the threatening party, having regard to, among other things, the behaviour of the threatening party (including the nature of the pressure applied) and the circumstances of the threatened party; that since the law generally accepted that the
G
pursuit of commercial self-interest was justified in commercial bargaining, a demand which was motivated by commercial self-interest would, in general, be justified; that, further, the question of whether a threat was illegitimate was not to be determined by applying a "range of factors" approach, nor by reference to a principle of good faith dealing; that (per Lord Reed PSC, Lord Hodge DPSC, Lord Lloyd-Jones and Lord Kitchin JJSC) a threat would be illegitimate if it amounted to the kind of reprehensible or unconscionable conduct which, in the context of the equitable
H
doctrine of undue influence, had been judged to render the enforcement of a contract unconscionable; that, in the present case, where the defendant genuinely believed that it was not liable for breach of contract as a result of its failure to pay past commission, there had been no illegitimate threat; and that, accordingly, the claimant could not avoid the new contract (post, paras 1–3, 20, 28, 30, 52, 58–61, 78–79, 86–92, 95–99, 136, 138).

© 2023 The Incorporated Council of Law Reporting for England and Wales

*Borrelli v Ting* [2010] Bus LR 1718, PC and *Progress Bulk Carriers Ltd v Tube City IMS LLC (The Cenk Kaptanoglu)* [2012] 2 All ER (Comm) 855 distinguished.
     *CTN Cash and Carry Ltd v Gallaher Ltd* [1994] 4 All ER 714, CA considered.
     Decision of the Court of Appeal [2019] EWCA Civ 828; [2020] Ch 98; [2019] 3 WLR 445 affirmed.

The following cases are referred to in the judgments:

*Al Nehayan v Kent* [2018] EWHC 333 (Comm); [2018] 1 CLC 216
*Alec Lobb (Garages) Ltd v Total Oil (Great Britain) Ltd* [1983] 1 WLR 87; [1983] 1 All ER 944; [1985] 1 WLR 173; [1985] 1 All ER 303, CA
*Astley v Reynolds* (1731) 2 Str 915
*Attorney General v R* [2003] UKPC 22; [2003] EMLR 24, PC
*Australia and New Zealand Banking Group Ltd v Karam* [2005] NSWCA 344; 64 NSWLR 149
*Aylesford (Earl of) v Morris* (1873) LR 8 Ch App 484
*BOM v BOK* [2018] SGCA 83; 21 ITELR 607
*Backhouse v Backhouse* [1978] 1 WLR 243; [1978] 1 All ER 1158
*Barton v Armstrong* [1976] AC 104; [1975] 2 WLR 1050; [1975] 2 All ER 465, PC
*Bhasin v Hrynew* 2014 SCC 71; [2014] 3 SCR 494; 379 DLR (4th) 385
*Blomley v Ryan* (1954) 99 CLR 362
*Borrelli v Ting* [2010] UKPC 21; [2010] Bus LR 1718, PC
*Boustany v Pigott* (1993) 69 P & CR 298, PC
*Braam v BBC Hardware Ltd* [2020] VSCA 164
*Burin Peninsula Community Business Development Corpn v Grandy* 2010 NLCA 69; 327 DLR (4th) 752
*CTN Cash and Carry Ltd v Gallaher Ltd* [1994] 4 All ER 714, CA
*Cavendish Square Holdings BV v Makdessi* [2015] UKSC 67; [2016] AC 1172; [2015] 3 WLR 1373; [2016] 2 All ER 519; [2016] 2 All ER (Comm) 1; [2016] 1 Lloyd's Rep 55, SC(E)
*Clark v Malpas* (1862) 4 De GF & J 401
*Crescendo Management Pty Ltd v Westpac Banking Corpn* (1988) 19 NSWLR 40
*Cresswell v Potter (Note)* [1978] 1 WLR 255
*DSND Subsea Ltd (formerly DSND Oceantech Ltd) v Petroleum Geo-Services ASA* [2000] BLR 530
*Dimskal Shipping Co SA v International Transport Workers Federation (The Evia Luck)* [1992] 2 AC 152; [1991] 3 WLR 875; [1992] ICR 37; [1991] 4 All ER 871; [1992] 1 Lloyd's Rep 115, HL(E)
*Doggett v Commonwealth Bank of Australia* [2015] VSCA 351; 47 VR 302
*Dold v Murphy* [2020] NZCA 313; [2021] 2 NZLR 834
*Electricity Generation Corpn (trading as Verve Energy) v Woodside Energy Ltd* [2013] WASCA 36
*Flying Music Co Ltd, The v Theater Entertainment SA* [2017] EWHC 3192 (QB)
*Fry v Lane* (1888) 40 Ch D 312
*Greater Fredericton Airport Authority Inc v Nav Canada* (2008) 290 DLR (4th) 405
*Hilton v Eckersley* (1855) 6 E & B 47
*Huyton SA v Peter Cremer GmbH & Co* [1999] 1 Lloyd's Rep 620
*Interfoto Picture Library Ltd v Stiletto Visual Programmes Ltd* [1989] QB 433; [1988] 2 WLR 615; [1988] 1 All ER 348, CA
*Kaufman v Gerson* [1904] 1 KB 591, CA
*MSC Mediterranean Shipping Co SA v Cottonex Anstalt* [2016] EWCA Civ 789; [2017] 1 All ER (Comm) 483; [2016] 2 Lloyd's Rep 494, CA
*McIntyre v Nemesis DBK Ltd* [2009] NZCA 329; [2010] 1 NZLR 463
*Magsons Hardware Ltd v Concepts 124 Ltd* [2011] NZCA 559
*Mannai Investment Co Ltd v Eagle Star Life Assurance Co Ltd* [1997] AC 749; [1997] 2 WLR 945; [1997] 3 All ER 352, HL(E)
*Marsden v Barclays Bank plc* [2016] EWHC 1601 (QB); [2016] 2 Lloyd's Rep 420

© 2023 The Incorporated Council of Law Reporting for England and Wales

A  *Martel Building Ltd v Canada* 2000 SCC 60; [2000] 2 SCR 860; 193 DLR (4th) 1
   *May v Brahmbhatt* [2013] NSWCA 309
   *Mitchell v Pacific Dawn Pty Ltd* [2011] QCA 98
   *Mogul Steamship Co Ltd v McGregor, Gow & Co* [1892] AC 25, HL(E)
   *Morgan Stanley Wealth Management Australia Pty Ltd v Detata (No 3)* [2018]
       WASC 32
   *Mutual Finance Ltd v John Wetton & Sons Ltd* [1937] 2 KB 389
B  *National Westminster Bank plc v Morgan* [1985] AC 686; [1985] 2 WLR 588; [1985]
       1 All ER 821, HL(E)
   *North Ocean Shipping Co Ltd v Hyundai Construction Co Ltd* [1979] QB 705;
       [1979] 3 WLR 419; [1978] 3 All ER 1170; [1979] 1 Lloyd's Rep 89
   *OBG Ltd v Allan* [2007] UKHL 21; [2008] AC 1; [2007] 2 WLR 920; [2007] Bus LR
       1600; [2007] 4 All ER 545; [2008] 1 All ER (Comm) 1, HL(E)
   *Occidental Worldwide Investment Corpn v Skibs A/S Avanti* [1976] 1 Lloyd's Rep
       293
C  *Patel v Mirza* [2016] UKSC 42; [2017] AC 467; [2016] 3 WLR 399; [2017] 1 All ER
       191; [2016] 2 Lloyd's Rep 300, SC(E)
   *Pao On v Lau Yiu Long* [1980] AC 614; [1979] 3 WLR 435; [1979] 3 All ER 65, PC
   *Port Caledonia, The and the Anna* [1903] P 184
   *Progress Bulk Carriers Ltd v Tube City IMS LLC (The Cenk Kaptanoglu)* [2012]
       EWHC 273 (Comm); [2012] 2 All ER (Comm) 855; [2012] 1 Lloyd's Rep 501
   *Royal Bank of Scotland plc v Etridge (No 2)* [2001] UKHL 44; [2002] 2 AC 773;
D      [2001] 3 WLR 1021; [2001] 4 All ER 449; [2001] 2 All ER (Comm) 1061; [2002]
       1 Lloyd's Rep 343, HL(E)
   *Skeate v Beale* (1841) 11 Ad & El 983
   *Stott v Merit Investment Corpn* (1988) 48 DLR (4th) 288; 63 OR (2d) 545
   *Techform Products Ltd v Wolda* (2001) 206 DLR (4th) 171; 56 OR (3d) 1
   *Thorne v Motor Trade Association* [1937] AC 797; [1937] 3 All ER 157, HL(E)
   *Universe Tankships Inc of Monrovia v International Transport Workers Federation
E      (The Universe Sentinel)* [1983] 1 AC 366; [1982] 2 WLR 803; [1982] ICR 262;
       [1982] 2 All ER 67; [1982] 1 Lloyd's Rep 537, HL(E)
   *Vaughan (Alf) & Co Ltd v Royscot Trust plc* [1999] 1 All ER (Comm) 856
   *Williams v Bayley* (1866) LR 1 HL 200, HL(E)

   The following additional cases were cited in argument:

   *Adam Opel GmbH v Mitras Automotive (UK) Ltd* [2007] EWHC 3481 (QB)
F  *Essex County Council v UBB Waste (Essex) Ltd (No 2)* [2020] EWHC 1581 (TCC);
       191 Con LR 77
   *Law Debenture Trust Corpn plc v Ukraine* [2018] EWCA Civ 2026; [2019] QB 1121;
       [2019] 2 WLR 655, CA
   *MSC Mediterranean Shipping Co SA v Cottonex Anstalt* [2016] EWCA Civ 789;
       [2017] 1 All ER (Comm) 483; [2016] 2 Lloyd's Rep 494, CA
   *Morley (trading as Morley Estates) v Royal Bank of Scotland plc* [2020] EWHC 88
G      (Ch)
   *Rookes v Barnard* [1964] AC 1129; [1964] 2 WLR 269; [1964] 1 All ER 367; [1964]
       1 Lloyd's Rep 28, HL(E)
   *Simantob v Shavleyan* [2019] EWCA Civ 1105, CA
   *Smith v William Charlick Ltd* (1924) 34 CLR 38
   *Walford v Miles* [1992] 2 AC 128; [1992] 2 WLR 174; [1992] 1 All ER 453, HL(E)
   *Yam Seng Pte Ltd v International Trade Corpn Ltd* [2013] EWHC 111 (QB); [2013]
       1 All ER (Comm) 1321; [2013] 1 Lloyd's Rep 526
H

   **APPEAL** from the Court of Appeal
     By a claim form dated 31 December 2014 the claimants, Times Travel
   (UK) Ltd and Nottingham Travel (UK) Ltd, commenced proceedings against
   the defendant, Pakistan International Airlines Corpn, claiming, inter alia,

© 2023 The Incorporated Council of Law Reporting for England and Wales

that they had entered into new agreements with the defendant as a result of illegitimate pressure and/or misrepresentation and that they were not bound by its terms and, therefore, that they were entitled to various categories of unpaid commission which they had waived as a result of entering into the new agreement. By a judgment dated 14 June 2017 Warren J [2017] EWHC 1367 (Ch) held that the first claimant was entitled to avoid the new agreement on the grounds that it had been procured by economic duress, but that the second claimant's position was different because of an additional term in its collateral contract with the defendant.

By an appellant's notice filed on 27 July 2017 and pursuant to permission granted by the Court of Appeal (Newey LJ) on 14 March 2018 the defendant appealed against the judge's decision that the first claimant had been entitled to avoid the new agreement on the basis that it had been procured by economic duress. On 14 May 2019 the Court of Appeal (David Richards, Moylan and Asplin LJJ) [2019] EWCA Civ 828; [2020] Ch 98 allowed the appeal.

With permission of the Supreme Court (Lord Reed PSC, Lady Arden and Lord Hamblen JJSC) granted on 5 February 2020 the first claimant appealed. Permission to intervene in the appeal was granted to: (1) Ukraine (represented by the Minister of Finance of Ukraine acting upon the instructions of the Cabinet of Ministers of Ukraine); (2) The Law Debenture Trust Corpn plc; and (3) the All-Party Parliamentary Group on Fair Business Banking.

The facts are stated in the judgment of Lord Burrows JSC, post, paras 65–75.

*Philip Shepherd QC* and *Heather Murphy* (instructed by *Charles Morgan Lawyers*) for the first claimant.

Lawful means are not disqualified from amounting to illegitimate economic duress. Duress can exist if the threat is one of lawful action but whether it does depends on the nature of the demand. Hard bargaining is one thing, coercion is another. No court has or should develop a hard and fast definition of what illegitimate pressure is, as the possibilities are endless. All previous decisions have been driven by the facts. In those circumstances no more uncertainty exists about duress than any other legal doctrine and the following nine propositions apply:

(1) The rationale for allowing a contract to be avoided for duress is apparent consent which was induced by pressure exercised on it by the other party which the law does not regard as legitimate with the consequence that the consent is treated in law as revocable: see *Barton v Armstrong* [1976] AC 104 and *Universe Tankships Inc of Monrovia v International Transport Workers Federation (The Universe Sentinel)* [1983] 1 AC 366. That rationale informs the content of duress.

(2) The rationale does not dictate any limitations on what qualifies as illegitimate pressure. For that reason the cases have repeatedly made reference to illegitimate pressure, which is deliberately open-ended. The approach is multifactorial: see *Al Nehayan v Kent* [2018] 1 CLC 216.

(3) Pressure may be illegitimate if it consists of unlawful or improper conduct. The real issue is whether pressure has become coercion and for that reason is illegitimate. Coercion and contract are antithetical to each other.

© 2023 The Incorporated Council of Law Reporting for England and Wales

A   (4) Unlawful action or threat thereof may be one form of illegitimate pressure but a threat to do an act which is in itself lawful can amount to illegitimate pressure if it is coupled with an unjustified demand.  Uncoupling the pressure from the demand is as mistaken as it is in the crime of blackmail. A lawful action may be duress when it is combined with unreasonable demand: see *Progress Bulk Carriers Ltd v Tube City IMS LLC (The Cenk Kaptanoglu)* [2012] 2 All ER (Comm) 855, *Dimskal Shipping Co SA v*
B   *International Transport Workers Federation (The Evia Luck)* [1992] 2 AC 152, *Attorney General v R* [2003] EMLR 24 and *Law Debenture Trust Corpn plc v Ukraine* [2019] QB 1121.

(5) If facts reveal a course of conduct beginning with a breach of contract and continuing into the application of threats from a party getting or keeping what is rightfully his or hers, then the mere fact that lawful means
C   were used to apply the pressure does not matter.  It is artificial and wrong to focus only on the immediate means of applying pressure rather than the course of conduct: see *Borrelli v Ting* [2010] Bus LR 1718.

(6) If the threat is contrived, in the sense that it is exploitation of something whose only real purpose is to apply pressure to extract consent, it is likely to be considered illegitimate.  The present case is a paradigm example.
D   (7) The demand coupled with a threat to commit a lawful act should be regarded as illegitimate pressure if the coercer has no reasonable grounds for making the demand and the threat would not be considered by reasonable people as a proper means of reinforcing the demand.

(8) Treating good or bad faith of the alleged coercer as determinative is mistaken: see *DSND Subsea Ltd (formerly DSND Oceantech Ltd) v*
E   *Petroleum Geo-Services ASA* [2000] BLR 530, *Adam Opel GmbH v Mitras Automotive (UK) Ltd* [2007] EWHC 3481 (QB), *CTN Cash and Carry Ltd v Gallaher Ltd* [1994] 4 All ER 714, *Huyton SA v Peter Cremer GmbH & Co* [1999] 1 Lloyd's Rep 620 and *Thorne v Motor Trade Association* [1937] AC 797.  It focuses wrongly on the state of mind of the coercer and has nothing to do with whether the other party was forced to contract.  At best good and bad faith is a factor.  Coercion is not determined by the beliefs of
F   the alleged coercer, otherwise the coercer is the judge in his own cause.  The supposed good faith of the coercer makes no difference to the victim.

(9) If it is considered that duress requires further refinement, the approach suggested by Leggatt LJ in *Al Nehayan v Kent* [2018] 1 CLC 216 is the one that the court should adopt.  In the present case the Court of Appeal did not engage with that test on the basis that it was not supported by authority.
G   In considering the legitimacy of the chain of events which led to the demand, the whole transaction has to be examined, not just the threat, as not all threats constitute duress.  The pressure exerted on the victim is of paramount importance.  The ultimate question is whether the coerced party consented or whether they had no choice but to succumb to the pressure: see *Progress Bulk Carriers* [2012] 2 All ER (Comm) 855.  In analysing that question the key issue is whether the demand was contrived in the sense of
H   being manufactured to exploit the victim for the financial gain of the coercer. Would the demand have been made in the ordinary course of business? Further issues are whether the coerced party evidently made the promise under protest and whether the coerced party had any reasonable alternative but to submit: see *Chitty on Contracts*, 33rd ed (2018), para 8-006 and

© 2023 The Incorporated Council of Law Reporting for England and Wales

Smith, "Contracting Under Pressure: A Theory of Duress" (1997) 56 CLJ    A
343.  The elements of the crime of blackmail and duress under contract
law are identical save for the mens rea.  The conduct in the present case
constituted an unwarranted demand with menaces.

Rule-based attempts to define by category what constitutes illegitimate
pressure cannot be justified.  Such formulae lose sight of the paramount
importance to the law of contract of protecting consent and party autonomy.    B
A rule-based definition of the kind adopted by the Court of Appeal should be
abandoned because it has no basis in principle, policy or authority.  The
narrow questions asked by the Court of Appeal were whether: (i) the means
of applying pressure was a threat to do or not do something technically
"lawful" and (ii) the threat was made in bad faith.  Those narrow questions
ignore the context in which the pressure was applied as well as the
reasonableness of the demand it supports.  The lack of flexibility of the    C
approach adopted by the Court of Appeal's rule-based division between
lawful and unlawful acts introduces a rigidity that is apt to produce injustice.
It is too prescriptive because of the infinite variety of parties and situations:
see *Patel v Mirza* [2017] AC 467, Bigwood and Dietrich, "Uncertainty in
Private Law: Rhetorical Device or Substantive Legal Argument?" (2021) 45
MULR 60 and Burrows, *A Restatement of the English Law of Unjust*    D
*Enrichment* (2012), pp 70–74.

The law abandoned any limits on what will or will not qualify in the
enquiry into the legitimacy of the pressure being applied when it ceased to
insist on the coercion being physical violence or the threat of it: see *Kaufman*
*v Gerson* [1904] 1 KB 591.  Pressure is still pressure, whatever form it
takes.  Further, imposing at the outset a formal limit of which acts qualify as
coercion and which do not in the supposed pursuit of certainty is    E
unnecessary.  The courts have not been overwhelmed by lawful act duress
cases.  Enforcing uniformity or conformity that the lawful/unlawful
characterisation imposes on coercion without regard to the diversity of
circumstances in which duress may be applied is not justifiable in principle
or policy.  Indeed, the crucial failure of the Court of Appeal was to keep in
mind the rationale for allowing a contract to be avoided for duress.  For the    F
interaction between duress and equitable doctrines: see Burrows, *The Law*
*of Restitution*, 3rd ed (2011), pp 283 et seq and Burrows, "We Do This At
Common Law But That In Equity" (2002) 22 OJLS 1.

*Bankim Thanki QC, Ben Jaffey QC* and *Simon Atrill* (instructed by
*Quinn Emanuel Urquhart & Sullivan UK LLP*) for the first intervener.

Lawful act duress exists under English law and is well established: see    G
*Attorney General v R* [2003] EMLR 24, *Progress Bulk Carriers Ltd v Tube*
*City IMS LLC (The Cenk Kaptanoglu)* [2012] 2 All ER (Comm) 855 and
*Borrelli v Ting* [2010] Bus LR 1718.  The approach of Leggatt LJ in *Al*
*Nehayan v Kent* [2018] 1 CLC 216, para 188 is endorsed.  That involves a
test based on the ingredients of blackmail, but assessed objectively,
i e whether the threat is a proper means of enforcing the demand.  For the
relationship between the law on blackmail and duress: see Burrows, *The*    H
*Law of Restitution*, 3rd ed (2011), p 257 and Smith, "Contracting Under
Pressure: A Theory of Duress" (1997) 56 CLJ 343.  Under the law of
blackmail there is no requirement that the demand or the menaces are
themselves unlawful.  Such threats become unlawful when attached to an

© 2023 The Incorporated Council of Law Reporting for England and Wales

A   unwarranted demand.  If such threats to take lawful action are criminal, then a fortiori the procurement of a contract by such threats ought to constitute duress.

*Thomas Roe QC, Richard Samuel, Simon Reevell, Daniel Black* and *Hannah Fry* (instructed by *Hausfeld & Co LLP*) for the third intervener.

B   The authorities already cited show that lawful action duress exists in English law.  There is no reason to overrule those authorities.  The correct approach is that of Leggatt LJ in *Al Nehayan v Kent* [2018] 1 CLC 216.  As to the question of good faith, that can be a useful tool in assessing duress but has to be assessed on an objective basis.  A situation in which parties renegotiate the future of an existing relationship between them has at least some affinity with a relational contract, into which the law will imply duties of good faith.  Such renegotiations are common in the banking context: see
C   *Morley (trading as Morley Estates) v Royal Bank of Scotland plc* [2020] EWHC 88 (Ch).  What constitutes good faith can be described as honesty plus behaviour which is regarded as commercially acceptable by reasonable and honest people: see *Yam Seng Pte Ltd v International Trade Corpn Ltd* [2013] 1 All ER (Comm) 1321 and *Essex County Council v UBB Waste (Essex) Ltd (No 2)* (2020) 191 Con LR 77.  A subjective test of good faith is
D   not useful and would be positively dangerous.

*Nigel Jones QC, Thomas Bell* and *Paul Davies* (instructed by *City Solicitors Ltd trading as Farani Taylor Solicitors*) for the defendant.

  To the extent that there is apparent support in the authorities for the doctrine of lawful act duress, it is (and should be) confined to a situation involving blackmail.  The duressor must have threatened the (lawful) act
E   solely to obtain something—be it money, property, or a contractual promise—for which there was no independent basis or justification.  However, to describe blackmail as an example of lawful act duress is a misnomer: whilst threatening to report someone to the police may in itself be lawful, it is not lawful if it done "with menaces" and in support of an "unwarranted demand".  In order to succeed the first claimant must therefore persuade the court to extend the idea of lawful act duress far more
F   broadly than it has been articulated before.  That should be rejected.  In the 40 or so years since the doctrine was mentioned as a possibility, in not a single case (other than the present case at first instance) has a finding of lawful act duress been made.  That is hardly surprising: it is not the role of the common law to police commercial dealings on the ground of duress unless they are tainted by unlawful conduct.
G   Until the late 1970s, the doctrine of duress was confined to threats of physical violence or imprisonment and unlawful threats to property, but that changed: see *Occidental Worldwide Investment Corpn v Skibs A/S Avanti* [1976] 1 Lloyd's Rep 293, *North Ocean Shipping Co Ltd v Hyundai Construction Co Ltd* [1979] QB 705, *Pao On v Lau Yiu Long* [1980] AC 614, *Universe Tankships Inc of Monrovia v International Transport Workers Federation (The Universe Sentinel)* [1983] 1 AC 366 and *Dimskal*
H   *Shipping Co SA v International Transport Workers Federation (The Evia Luck)* [1992] 2 AC 152.  In each of the above cases, the threat that was said to give rise to economic duress was the threat to carry out an unlawful act: in the first three cases, it was a threat to break a contract; in the latter two, it was a threat to commit a tort.  However, the possibility of economic

duress amounting from the threat of a lawful act was discussed in an obiter passage in the speech of Lord Scarman in *Universe Tankships Inc of Monrovia* [1983] 1 AC 366, 400–401. That passage has proved highly influential because of Lord Scarman's statement that the legitimacy of pressure comprises two questions: the nature of the threat and the nature of the demand. If the threat is to carry out an unlawful act, then that by itself makes the pressure illegitimate, regardless of the validity of the demand. If, however, the threat is of lawful action, then the enquiry shifts to the demand, which stems from the analogy to blackmail and Lord Atkin's dictum in *Thorne v Motor Trade Association* [1937] AC 797, 806. Lord Scarman's dictum was picked up by Lord Hoffmann in *Attorney General v R* [2003] EMLR 24, para 16. What those authorities show is that, to the extent the law recognises the possibility of duress amounting from the threat of a lawful act, it is only where the threat is accompanied by an illegitimate demand and thus amounts to blackmail that relief will be granted. There is no support in those authorities for the far broader proposition that an otherwise valid demand can be rendered invalid by the fact that it is supported by a threat which, though lawful, is nevertheless considered to be commercially or socially unacceptable. In other words, there is no scope for the court to equate lawful conduct with unlawful conduct on the ground that it is "beyond the pale" or by reference to some other vague moral standard.

As those cases demonstrate, if the threat of a lawful act can give rise to duress, it can only be on the basis that the defendant has made a demand that is in some sense unjustifiable. That raises the question: how is the court to judge the legitimacy of the demand? In answering that, it is necessary to have regard to how the question is answered in the law of blackmail, since, as already shown, it was Lord Atkin's dictum in *Thorne v Motor Trade Association* [1937] AC 797, 806, a case about blackmail, that gave inspiration to the idea of lawful act duress.

In the present case, the Court of Appeal regarded it as decisive that, on the judge's findings, the defendant believed it was entitled to the result it demanded. Although the Court of Appeal did not reach that conclusion specifically by reference to the law of blackmail, but by reference to case law on duress, in particular the judgment of Steyn LJ in *CTN Cash and Carry Ltd v Gallaher Ltd* [1994] 4 All ER 714, there is a clear harmony between its conclusion and the subjective nature of that offence under section 21 of the Theft Act 1968: see, further, Beatson, *The Use and Abuse of Unjust Enrichment* (1991), pp 132–133.

In the present case, applying the blackmail analogy, the defendant was not guilty of blackmail or extortion. Rather, it was acting in furtherance of its business interests. There is also a clear parallel, in that regard, with the doctrine of consideration in the context of compromise agreements: see *Simantob v Shavleyan* [2019] EWCA Civ 1105. A demand for a claimant to abandon a claim would not be an "unwarranted demand" for the purpose of blackmail under section 21 of the 1968 Act if the demand was made in the context of a genuine dispute. If, on the other hand, the defendant has no genuine belief that he has an arguable defence to the claim, then a demand for the claimant to give up his claim would (absent more) be "unwarranted" and thus capable of constituting blackmail. The relevance of the defendant's belief as to the legitimacy of his demand is shown by *CTN Cash and Carry*

© 2023 The Incorporated Council of Law Reporting for England and Wales

A    *Ltd v Gallaher Ltd* [1994] 4 All ER 714, *Progress Bulk Carriers Ltd v Tube City IMS LLC (The Cenk Kaptanoglu)* [2012] 2 All ER (Comm) 855 and *Borrelli v Ting* [2010] Bus LR 1718. There is no justification for disregarding the defendant's state of mind—i e whether he is acting in good or bad faith—when assessing the legitimacy of the demand: see *Huyton SA v Peter Cremer GmbH & Co* [1999] 1 Lloyd's Rep 620 and *Dold v Murphy* [2021] 2 NZLR 834.

B       However, the criterion of good faith has nothing to do with the defendant's own moral judgment over the legitimacy of his conduct; it is concerned solely with the defendant's subjective assessment of his legal rights. It follows that the Court of Appeal was right to confine the scope for economic duress to arise from a lawful act to situations where the defendant is attempting to obtain a result to which he knows he is not legally entitled.

C    The claimant's rationale-based approach does not stand up to analysis. If it did the same approach would apply in tort: see *Rookes v Barnard* [1964] AC 1129 and *OBG Ltd v Allan* [2008] AC 1.

        Other than blackmail (and the judge's decision at first instance in the present case), there are no actual examples of lawful act duress to be found in the authorities apart from, possibly, *Progress Bulk Carriers* [2012] 2 All ER (Comm) 855 and *Borrelli v Ting* [2010] Bus LR 1718, but those cases are better regarded as cases of unlawful act duress. The solution is to hold that the threat of a lawful act can only amount to economic duress if it would constitute blackmail in the criminal law (albeit judged according to the civil standard of proof).

D       The fundamental principle of freedom of contract also implies freedom from contract. A party is always free to decide (or threaten) not to enter into a contract with another. Commercial parties are entitled to act in their own self-interest, and to drive a hard bargain—running the risk that the other party will refuse to agree to those terms. It is not for the court to rescue a commercial actor from its own bad bargain: see *Smith v William Charlick Ltd* (1924) 34 CLR 38, *Walford v Miles* [1992] 2 AC 128, *Alf Vaughan & Co Ltd v Royscot Trust plc* [1999] 1 All ER (Comm) 856 and *OBG Ltd v Allan* [2008] AC 1.

F       *Oliver Jones* (instructed by *Norton Rose Fulbright LLP*) for the second intervener.

        The doctrine of lawful act duress cuts against many well-established doctrines of English law. First, the bargaining position of weak or vulnerable parties to a contract is protected, to the extent appropriate, by the existing doctrines of undue influence, unconscionability and misrepresentation: see *Mutual Finance Ltd v John Wetton & Sons Ltd* [1937] 2 KB 389, *Royal Bank of Scotland plc v Etridge (No 2)* [2002] 2 AC 773 and *Boustany v Pigott* (1993) 69 P & CR 298. Second, English law has rejected the contention that there is any general obligation of good faith in contractual negotiations: see *Walford v Miles* [1992] 2 AC 128 and *MSC Mediterranean Shipping Co SA v Cottonex Anstalt* [2017] 1 All ER (Comm) 483. Exceptions, such as *Yam Seng Pte Ltd v International Trade Corpn Ltd* [2013] 1 All ER (Comm) 1321 and *Al Nehayan v Kent* [2018] 1 CLC 216, are rare and rely on specific circumstances. Third, to the contrary, English law has placed a premium on freedom of contract and contractual certainty: see *National Westminster Bank plc v Morgan* [1985] AC 686.

© 2023 The Incorporated Council of Law Reporting for England and Wales

*Shepherd QC* in reply.                                                            A

All the relevant quotes on the content of the duty of good faith can be found in *Essex County Council v UBB Waste (Essex) Ltd (No 2)* (2020) 191 Con LR 77, paras 114–115.  The defendant's interpretations of *Progress Bulk Carriers Ltd v Tube City IMS LLC (The Cenk Kaptanoglu)* [2012] 2 All ER (Comm) 855, *Borrelli v Ting* [2010] Bus LR 1718 and *Simantob v Shavleyan* [2019] EWCA Civ 1105 are disputed.  *Smith v William Charlick Ltd* (1924) 34 CLR 38 would be decided differently today.                    B

The court took time for consideration.

18 August 2021.  The following judgments were handed down.

**LORD HODGE DPSC** (with whom **LORD REED PSC**, **LORD LLOYD-JONES** and **LORD KITCHIN JJSC** agreed)     C

1   I am very grateful to Lord Burrows JSC for setting out the facts of the case and the legal proceedings to date.  There is a great deal in the exposition of the law in his clear judgment with which I agree.  In particular, I agree with what he says about (i) the essential elements of duress (paras 78–80), (ii) the existence in English law of the concept of lawful act duress (paras 82–92), (iii) the importance of clarity and certainty in our commercial law, which means that the concept of lawful act duress must not be stated too widely (para 93), (iv) the rejection of a range of factors approach (para 94), (v) the similar rejection of the use of a wide principle of good faith dealing (para 95), (vi) the appropriateness of focusing on the nature and justification of the demand rather than the legality of the threat (paras 88 and 96), and (vii) the law's general acceptance of the pursuit of commercial self-interest as justified in commercial bargaining and the rarity of cases where lawful act duress will be found to exist in such bargaining (paras 97–99).  I therefore also agree with the first four points of his summary (para 136(i)–(iv)).  I also agree that the appeal should be dismissed.  In relation to point (vi) above, I would add that the court in focusing on the nature and justification of the demand, as the case law which I discuss below shows, has regard to, among other things, the behaviour of the threatening party including the nature of the pressure which it applies, and the circumstances of the threatened party.     D   E   F

2   Where I respectfully disagree with him is in my analysis of what the law has recognised as an illegitimate threat or pressure.  As I will seek to show, the courts have developed the common law doctrine of duress to include lawful act economic duress by drawing on the rules of equity in relation to undue influence and treating as "illegitimate" conduct which, when the law of duress was less developed, had been identified by equity as giving rise to an agreement which it was unconscionable for the party who had conducted himself or herself in that way to seek to enforce.  In other words, morally reprehensible behaviour which in equity was judged to render the enforcement of a contract unconscionable in the context of undue influence has been treated by English common law as illegitimate pressure in the context of duress.     G   H

3   The boundaries of the doctrine of lawful act duress are not fixed and the courts should approach any extension with caution, particularly in the

© 2023 The Incorporated Council of Law Reporting for England and Wales

A    context of contractual negotiations between commercial entities. In any
development of the doctrine of lawful act duress it will also be important to
bear in mind not only that analogous remedies already exist in equity, such
as the doctrines of undue influence and unconscionable bargains, but also
the absence in English law of any overriding doctrine of good faith in
contracting or any doctrine of imbalance of bargaining power. As I will seek
B    to explain, the absence of those doctrines in English law leads me to
conclude that Times Travel's claim for lawful act economic duress would
not have succeeded in this case even if it had shown that Pakistan
International Airline Corpn ("PIAC") had made what Lord Burrows JSC has
defined as a bad faith demand.

   4   If one focuses on the few cases in which a remedy has been provided
for what would now be analysed as lawful act duress, there are to date two
C    circumstances in which the English courts have recognised and provided a
remedy for such duress. The first circumstance is where a defendant uses
his knowledge of criminal activity by the claimant or a member of the
claimant's close family to obtain a personal benefit from the claimant by
the express or implicit threat to report the crime or initiate a prosecution.
The second circumstance is where the defendant, having exposed himself
D    to a civil claim by the claimant, for example, for damages for breach
of contract, deliberately manoeuvres the claimant into a position of
vulnerability by means which the law regards as illegitimate and thereby
forces the claimant to waive his claim. In both categories of case the
defendant has behaved in a highly reprehensible way which the courts have
treated as amounting to illegitimate pressure.

E
      *(1) The first circumstance: exploitation of knowledge of criminal activity*

   5   The examples of the first circumstance are the three cases to which
Lord Burrows JSC refers in para 89 of his judgment. In *Williams v Bayley*
(1866) LR 1 HL 200 a son forged his father's signature indorsing
promissory notes for substantial amounts of money. Representatives of the
F    bank, on discovering the forgery, put pressure on the father to undertake to
repay the sums. The representatives stated that they could not compound a
felony (i e stifle a prosecution) and that conviction for the offence would
involve transportation for life. The father, faced with this implicit threat to
prosecute his son unless he took on the debt, undertook to pay the debt and
granted an equitable mortgage of his property to secure it. The House of
G    Lords held that the contract was illegal as it was an agreement to stifle a
prosecution and, separately, the contract was invalid on the equitable
ground that it had been procured by undue influence.

   6   In *Kaufman v Gerson* [1904] 1 KB 591 the Court of Appeal refused to
enforce a contract entered into by two people domiciled in France, by which
the wife of A, who had misappropriated money belonging to B, undertook to
pay to B the misappropriated amount in consideration of his not prosecuting
her husband. Expert evidence established that such an agreement was valid
H    in French law with the result that the defence of illegality failed. But the
Court of Appeal upheld the defence of coercion; Collins MR stated (p 597)
that it was "impossible to say that it was not coercion to threaten a wife with
the dishonour of her husband and children". Romer LJ (p 599) stated that

112
Times Travel (UK) Ltd v PIA Corpn (SC(E))                    [2023] AC
Lord Hodge DPSC

A

the plaintiff had "extorted" the contract from the wife by threats of criminal proceedings against her husband if she did not comply. Mathew LJ (p 600) described the means by which the contract had been obtained as "unjust and immoral".

7    The third case, *Mutual Finance Ltd v John Wetton & Sons Ltd* [1937] 2 KB 389, involved the financial institution making an implied threat to prosecute a family member for forgery to obtain a guarantee from a family company. Joseph Wetton obtained a lorry on hire purchase by forging signatures on a guarantee which purported to be executed on behalf of the company. Neither his father nor his brother, Percy Wetton, was aware of the document at the time. The representative of the financial institution, when negotiating the signing of the replacement guarantee from the company, was aware that Percy Wetton was concerned that the prosecution of his brother would kill their father, who was seriously ill. By stressing the seriousness of the matter for Joseph Wetton, the representative sought to apply pressure to obtain the company guarantee. Porter J held that duress at common law could not be pleaded because he understood that duress was limited to duress of the person, by the use of unlawful force or threats of unlawful force. He invoked the equitable doctrine of undue influence and cited both *Williams v Bayley* and *Kaufman v Gerson* as examples of the principle that undue influence might exist where a promise was extracted by a threat to prosecute certain third persons unless that promise were given. He continued by asking himself whether the principle was wide enough to cover the case where the persons involved were the brother and father of the alleged criminal and answered that question in the affirmative, stating (p 396) that he was inclined to say that:

"it extended to any case where the persons entering into the undertaking were in substance influenced by the desire to prevent the prosecution or possibility of prosecution of the person implicated, and were known and intended to have been so influenced by the person in whose favour the undertaking was given."

8    Those three cases pre-dated the development of the common law doctrine of lawful act duress and can be seen to rely on the equitable doctrine of undue influence which in the past would have been within the exclusive jurisdiction of the Chancery Courts. The coercion from the threat of prosecution of the third-party family member and the implied term of the contract which it extracted that no prosecution would take place, even where such a contractual term was legal under a governing foreign law, caused the courts to classify the behaviour of the person using the threat to obtain personal benefit as contrary to public policy, involving undue pressure or as unenforceable in equity.

9    Those three cases are now seen as examples of lawful act duress. In leading cases which have discussed the doctrine of lawful act duress, Steyn LJ in *CTN Cash and Carry Ltd v Gallaher Ltd* [1994] 4 All ER 714, 718 and Cooke J in *Progress Bulk Carriers Ltd v Tube City IMS LLC (The Cenk Kaptanoglu)* [2012] 2 All ER (Comm) 855, 864 ("*The Cenk K*") cited *Mutual Finance Ltd* as an example of an illegitimate threat in the context of the law of duress.

© 2023 The Incorporated Council of Law Reporting for England and Wales

A    *(2) The second circumstance: using illegitimate means to manoeuvre the
     claimant into a position of weakness to force him to waive his claim*

        10    The second circumstance in which the courts have upheld a plea of
     lawful act duress is illustrated by two cases.
        11    In the first case, *Borrelli v Ting* [2010] Bus LR 1718, the liquidators
     of Akai Holdings Ltd ("Akai"), which had collapsed into an insolvent
B    winding up, wished to enter into a scheme of arrangement to obtain money
     to fund the liquidation. The scheme of arrangement needed shareholder
     approval and Mr Ting, Akai's former chairman and chief executive officer,
     held a crucial minority shareholding in Akai through Blossom Assets Ltd
     ("Blossom") and Costner Holdings Ltd ("Costner"), by which he could block
     the scheme of arrangement. Mr Ting failed to perform his duty as a former
C    officer of Akai to assist the liquidators by providing information relevant
     to the winding up in the absence of adequate books and records of the
     company's affairs. He sought to use the votes of Blossom and Costner to
     block the scheme of arrangement and he forged a document and procured
     the provision of false evidence to the liquidators in his opposition to the
     scheme. The liquidators objected to the votes which were purportedly cast
D    by Blossom and Costner at the scheme meetings and applied to the court
     to disallow their votes. Mr Ting and those companies opposed that
     application. When time was running out for the liquidators to meet a court
     deadline for approval of the scheme of arrangement, they entered into
     a settlement agreement with Mr Ting, Blossom, Costner and another
     company. In that agreement the liquidators undertook not to pursue any
E    claims against Mr Ting or those companies and to cease all investigations
     relating to the legal proceedings or to claims against Mr Ting. Thereupon,
     Mr Ting and his companies dropped their opposition to the scheme, which
     was approved by the court. The scheme of arrangement was then completed,
     and the liquidators received the payment needed to conduct the liquidation.
     Having later received reports from the Hong Kong police concerning
     criminal activity by Mr Ting, the liquidators stated that they regarded the
F    settlement agreement as unenforceable or voidable and commenced legal
     proceedings against him in Hong Kong for misappropriation of funds from
     Akai. Mr Ting and his companies raised legal proceedings in Bermuda
     seeking a declaration that the settlement agreement was valid and an
     injunction to restrain the liquidators from prosecuting the proceedings in
     Hong Kong.
G       12    The Judicial Committee of the Privy Council ("the Board") held that
     the settlement agreement was invalid because it had been entered into as a
     result of illegitimate economic pressure and that Mr Ting's behaviour had
     been unconscionable. Lord Saville of Newdigate JSC, who delivered the
     judgment of the Board, founded on two findings of fact by the trial judge.
     The first was Mr Ting's deliberate failure to co-operate with the liquidators,
H    including his failure to explain the absence of books and papers relating to
     the three years before Akai's collapse. The second finding was that Mr Ting
     had procured the opposition by Blossom and Costner to the scheme solely
     with the intention of depriving the liquidators of funds and so preventing
     them from investigating further his conduct of Akai's affairs. Mr Ting's

© 2023 The Incorporated Council of Law Reporting for England and Wales

opposition, Lord Saville JSC said, was not in good faith but was for an
improper motive.  He stated (para 32):

> "In the view of the Board James Henry Ting's failure to provide any
> assistance to the liquidators; his opposition to the scheme; and his resort
> to forgery and false evidence in order to further that opposition amount
> to unconscionable conduct on his part . . . by agreeing to withdraw the
> opposition to the scheme James Henry Ting did no more than he should
> have done from the outset, had he acted in good faith rather than in an
> attempt to avoid responsibility for his conduct of the affairs of Akai
> Holdings Ltd."

Lord Saville JSC repeated these points at para 35 of the Board's judgment
and stated that by adopting those "illegitimate means", Mr Ting had left the
liquidators "with no reasonable or practical alternative but to enter into the
settlement agreement."

13   It is clear in my view that in *Borrelli* the Board treated as important
the conclusion that it was the unconscionable or illegitimate conduct of
Mr Ting which placed the liquidators in the position that they had no
reasonable or practicable alternative but to enter into the settlement
agreement.  By so acting, Lord Saville JSC stated, at para 31, Mr Ting "had
the liquidators over a barrel".  In other words, it was Mr Ting's illegitimate
or unconscionable acts which placed the liquidators in the position of
vulnerability with the result that they had no reasonable alternative but to
agree to his demands.

14   In the second case in which the courts have upheld a claim of lawful
act duress, *The Cenk K* [2012] 2 All ER (Comm) 855, we again see a party,
A, against whom the other party, B, has a legal claim, using illegitimate
means to manoeuvre B into a position in which B has no reasonable
alternative but to enter into a contract with A, by which B waives his claims
against A.  In this case the claimant charterers entered into a charterparty
with the owners of the *Cenk Kaptanoglu* for the carriage of shredded scrap
metal to China.  The charterers had entered into a contract to sell the scrap
metal to purchasers in China who had stipulated for a fixed shipment date.
The owners, in repudiatory breach of the charterparty, chartered the *Cenk
Kaptanoglu* to another party but gave assurances to the claimant charterers
that they would provide a substitute vessel to load the cargo at a later date
and that they would compensate them for all damages resulting from their
failure to provide the contracted vessel.  In reliance on that assurance the
charterers did not seek to find an alternative vessel.  Several days later, the
owners offered a substitute vessel which would have a delayed shipment
date.  The charterers negotiated with the Chinese purchasers to obtain their
agreement to a later shipment date.  The Chinese purchasers intimated that
they would extend the shipment date but would only pay a reduced price per
metric ton for the scrap.  The owners offered to provide the substitute vessel
at a discount on the freight which fell far short of the sum needed to
compensate the charterers for the price reduction which the purchasers had
demanded.  The owners refused to offer a discount for the cargo which
matched the reduced price which the purchasers were prepared to pay for
the delayed shipment.   The charterers informed the owners that they
accepted the discount offered by the owners but reserved their rights to claim
damages arising out of the breach of the charterparty.  The charterers then

[2023] AC             **Times Travel (UK) Ltd v PIA Corpn (SC(E))**
                                         **Lord Hodge DPSC**

A   accepted the purchasers' revisions to the sale contract and the reduced price per metric ton that that entailed. Later that day, the owners gave the charterers a "take it or leave it" offer, requiring that the charterers accept the substitute vessel at the discounted price for freight which they had offered and that they waive all claims for loss and damage arising out of the nomination of the substitute vessel outside the contracted laycan and its resulting late arrival. The charterers accepted the offer under protest, B  explaining that the circumstances were urgent and they needed to mitigate their losses and accommodate their Chinese purchasers.

      **15**   The dispute went to arbitration and the arbitrators held that the waiver agreement was voidable for economic duress. They found that the owners had been in repudiatory breach of contract, had lulled the charterers into a false sense of security by their assurances, and had manoeuvred them C  into a position where, because of the passage of time, they had no choice but to accept the owners' "take it or leave it" offer. Cooke J, citing among other authorities *CTN Cash and Carry* and *Borrelli*, rejected the owners' appeal against the arbitrators' award. He held (para 36) that it was clear from the authorities that "illegitimate pressure" can be constituted by conduct which is not in itself unlawful "although it will be an unusual case where that is so." D  He continued: "It is also clear that a past unlawful act, as well as the threat of a future unlawful act can, in appropriate circumstances, amount to 'illegitimate pressure'." In para 40 he summarised the arbitrators' findings describing the owners' repudiation of the contract as "the dominant factor in the situation". He continued:

       "Whilst the arbitrators did not expressly find that the owners were in E     bad faith in what they did thereafter, it is clear that the arbitrators took the view that the owners had manoeuvred the charterers into the position they were in, following the breach, in order to drive a hard bargain. The charterers had no realistic practical alternative but to submit to the pressure . . ."

      **16**   Cooke J summarised his conclusions on "illegitimate pressure" at F  para 44:

       "As I have already said, the pressure created by the owners in their demand for a waiver of rights by the charterers has to be seen both in the light of their repudiatory breach and in the light of their subsequent conduct, including their deliberate refusal to comply with the assurances they had previously given about providing a substitute vessel and paying G     full compensation in respect of that breach. Their refusal to supply the substitute vessel to meet the charterers' needs, *in circumstances which they had created by their breach and their subsequent misleading activity*, unless the charterers waived their rights, could readily be found by the arbitrators to amount to 'illegitimate pressure'. In my judgment, not only was that a finding which the arbitrators could properly reach when applying the correct test in law, . . . it was the right decision on the facts H  of this case." (Emphasis added.)

     *(3) Summarising the cases where the court has found lawful act duress*

      **17**   The three earlier cases, *Williams v Bayley* LR 1 HL 200, *Kaufman v Gerson* [1904] 1 KB 591 and *Mutual Finance Ltd* [1937] 2 KB 389, were all

A

cases in which the court treated the attempt by the party to uphold or enforce the contract as being unconscionable because of that party's behaviour. In *Borrelli* [2010] Bus LR 1718, the Board described Mr Ting's conduct as unconscionable and treated "illegitimate" as a synonym for unconscionable. In that case and *The Cenk K* [2012] 2 All ER (Comm) 855 it was the combination of (i) the existence of legal claims by B against A and (ii) the manoeuvring by A of B by reprehensible means into a vulnerable position where it had no alternative but to waive its pre-existing rights that amounted to illegitimate pressure.

B

18    It is noteworthy that in *Borrelli*, at paras 32 and 35, Lord Saville JSC placed emphasis on Mr Ting's breach of his duty as an officer of the insolvent company and his dishonest behaviour in concluding that the pressure which he applied to the directors was illegitimate. Similarly, in *The Cenk K*, Cooke J focused not only on the ship owners' prior breach of contract but also on their subsequent "misleading activity": the context of the demand was that the owners had induced the charterers to rely on the owners' assurances to their detriment.

C

### (4) The influence of equity on lawful act duress

D

19    The role of equity in the development of the common law of duress is apparent from wider case law in which there was no finding of lawful act economic duress. In *Barton v Armstrong* [1976] AC 104, 121, a case which concerned unlawful threats of violence, Lord Wilberforce and Lord Simon of Glaisdale in a dissenting judgment which has been quoted in later judgments, discussed the nature of illegitimate pressure. They stated:

E

"out of the various means by which consent may be obtained—advice, persuasion, influence, inducement, representation, commercial pressure—the law has come to select some which it will not accept as a reason for voluntary action: fraud, abuse of relation of confidence, undue influence, duress or coercion. In this the law, *under the influence of equity*, has developed from the old common law conception of duress—threat to life and limb—and it has arrived at the modern generalisation expressed by Holmes J—'subjected to an improper motive for action'—*Fairbanks v Snow* (1887) 13 NE 596, 598." (Emphasis added.)

F

20    The ideas of an improper motive for action or illegitimate pressure are closely aligned with the equitable concept of unconscionability. In *Universe Tankships Inc of Monrovia v International Transport Workers Federation (The Universe Sentinel)* [1983] 1 AC 366 Lord Diplock discussed the development of the common law of economic duress. He stated (p 384) that the rationale for this development of the common law was that a person's apparent consent to a contract had been induced by pressure exercised upon him by the other party "which the law does not regard as legitimate" with the result that the consent was treated as revocable. He continued:

G

H

"It is a rationale similar to that which underlies the avoidability of contracts entered into and the recovery of *money exacted under colour of office, or under undue influence* or in consequence of threats of physical duress." (Emphasis added.)

© 2023 The Incorporated Council of Law Reporting for England and Wales

117
[2023] AC                    *Times Travel (UK) Ltd v PIA Corpn* (SC(E))
                                                        Lord Hodge DPSC

A   **21**   In *Huyton SA v Peter Cremer GmbH & Co* [1999] 1 Lloyd's Rep
620 Mance J at p 637 quoted the judgment of McHugh JA in the Supreme
Court of New South Wales in *Crescendo Management Pty Ltd v Westpac
Banking Corpn* (1988) 19 NSWLR 40, 46, to which Lord Goff of Chieveley
referred in *Dimskal Shipping Co SA v International Transport Workers
Federation (The Evia Luck)* [1992] 2 AC 152: "Pressure will be illegitimate if
it consists of unlawful threats *or amounts to unconscionable conduct*"

B   (emphasis added). Mance J made a similar equation between illegitimate
pressure and unconscionable conduct at the end of his judgment (p 642) in
which he stated that the pressure which Huyton applied was not a
sufficiently significant cause of the agreement for it to be unconscionable for
Huyton to insist on the agreement.

**22**   In *Borrelli* [2010] Bus LR 1718, Lord Saville JSC referred to

C   Mr Ting's conduct as "unconscionable". In *The Cenk K* [2012] 2 All ER
(Comm) 855, Cooke J (paras 34 and 35) referred to *Borrelli* and its reference
to unconscionable conduct and to the textbooks which supported the view
that the courts were willing to apply "a standard of impropriety". Lord
Saville JSC and Cooke J used the term "unconscionable" to describe the
pressure applied by the person seeking to enforce the contract. The standard
of impropriety is the high standard of unconscionability.

D   **23**   The place of lawful act economic duress in English law needs to be
seen against the backdrop of the remedies which equity already provides.
Unconscionability is not an overarching criterion to be applied across the
board without regard to context. Were it so, judges would become arbiters
of what is morally and socially acceptable. Equity takes account of the
factual and legal context of a case and has identified specific contexts which

E   call for judicial intervention to protect the weaker party. For example, the
equitable doctrine of undue influence may result in a contract being set aside
when two persons have a relationship in which A has acquired influence or
ascendancy over B and A takes unfair advantage of its influence or
ascendancy: *Royal Bank of Scotland plc v Etridge (No 2)* [2002] 2 AC 773,
paras 6–8 per Lord Nicholls of Birkenhead. It applies typically where there
is a relationship of trust and confidence between A and B which A exploits to

F   the detriment of B: *Chitty on Contracts*, 33rd ed (2018), paras 8-058–8-059.

**24**   Similarly, the equitable doctrine of unconscionable bargains has
been applied where B is at a serious disadvantage relative to A through
"poverty, or ignorance, or lack of advice or otherwise" so that circumstances
existed of which unfair advantage could be taken; A exploited B's weakness
in a morally culpable manner; and the resulting transaction was not merely
hard or improvident but overreaching and oppressive: *Alec Lobb (Garages)*

G   *Ltd v Total Oil (Great Britain) Ltd* [1983] 1 WLR 87, 94–95, per Peter
Millett QC, sitting as a deputy High Court judge. See also *Snell's Equity*,
34th ed (2019), para 8-042). Examples of unconscionable transactions
include circumstances in which A knowingly negotiates an agreement with
B while B is elderly, unwell and intoxicated (*Blomley v Ryan* (1954) 99 CLR
362) and where a poor, illiterate and unwell person is induced to enter into a

H   disadvantageous transaction without advice and in great haste (*Clark v
Malpas* (1862) 4 De GF & J 401). In *Fry v Lane* (1888) 40 Ch D 312, Kay J
summarised the then existing case law in these terms (p 322): "where a
purchase is made from a poor and ignorant man at a considerable
undervalue, the vendor having no independent advice, a Court of Equity will

© 2023 The Incorporated Council of Law Reporting for England and Wales

A

set aside the transaction." He held that the circumstances of poverty, ignorance and lack of independent advice impose on the purchaser the burden of showing that the purchase was fair, just and reasonable. Unequal bargaining power does not suffice; it is necessary for the claimant to show that unconscientious advantage has been taken of his or her disabling condition or circumstances: *Boustany v Pigott* (1993) 69 P & CR 298, 303 per Lord Templeman. Extortionate bargains can be struck down or varied in

B

other circumstances; see, for example, *The Port Caledonia and the Anna* [1903] P 184 in which the court drastically reduced a claim for salvage where a ship's captain in an emergency had been forced to accept an extortionate offer from a tug captain for the provision of salvage services. But the rules relating to salvage may depend on specialties of maritime law: *Chitty on Contracts* (above), para 8-048.

C

25   While there is an overlap between duress as it has developed in English law and the equitable doctrines of undue influence and unconscionable bargains, it is of note that under neither equitable doctrine is inequality of bargaining power sufficient of itself to entitle B to relief.

*(5) The absence in English law of a doctrine of inequality of bargaining power and of a principle of good faith in contracting*

D

26   It is not in dispute that there is in English common law no doctrine of inequality of bargaining power in contract, although such inequality may be a relevant feature in some cases of undue influence: *National Westminster Bank plc v Morgan* [1985] AC 686, 708 per Lord Scarman. As Lord Scarman observed in *The Universe Sentinel* [1983] 1 AC 366, 400–401), when he referred to the judgment of Lord Wilberforce and Lord Simon in

E

*Barton v Armstrong* [1976] AC 104, in commercial life many acts are done under pressure and sometimes overwhelming pressure. In negotiating a commercial contract each party to the negotiations seeks to obtain contractual entitlements which he or she does not possess unless and until the parties agree the terms of the contract. Inequality of bargaining power means that one party in the negotiation of a commercial contract may be able to impose terms on a weaker party which a party of equal bargaining power would refuse to countenance. Equally, a party in a strong bargaining

F

position, such as a monopoly supplier, may refuse outright to enter into a contract which the weaker party desires or may impose terms which the weaker party considers to be harsh. The courts have taken the position that it is for Parliament and not the judiciary to regulate inequality of bargaining power where a person is trading in a manner which is not otherwise contrary to law. See for example *Hilton v Eckersley* (1855) 6 E & B 47, 74–75 per

G

Baron Alderson; *Mogul Steamship Co Ltd v McGregor, Gow & Co* [1892] AC 25, 36 per Lord Halsbury LC; *OBG Ltd v Allan* [2008] AC 1, para 56 per Lord Hoffmann; *CTN Cash and Carry* [1994] 4 All ER 714, 717 per Steyn LJ, and in this case, at paras 103 and 107 per David Richards LJ.

27   The English law of contract seeks to protect the reasonable expectations of honest people when they enter into contracts. It is an important principle which is applied to the interpretation of contracts: Lord

H

Steyn, "Contract law: Fulfilling the Reasonable Expectations of Honest Men" (1997) 113 LQR 433; and *Mannai Investment Co Ltd v Eagle Star Life Assurance Co Ltd* [1997] AC 749, 771A per Lord Steyn. But, in contrast to many civil law jurisdictions and some common law jurisdictions, English

© 2023 The Incorporated Council of Law Reporting for England and Wales

A   law has never recognised a general principle of good faith in contracting. Instead, English law has relied on piecemeal solutions in response to demonstrated problems of unfairness: *Interfoto Picture Library Ltd v Stiletto Visual Programmes Ltd* [1989] QB 433, 439 per Bingham LJ; *MSC Mediterranean Shipping Co SA v Cottonex Anstalt* [2017] 1 All ER (Comm) 483, para 45 per Moore-Bick LJ.

B   28   The absence of these doctrines restricts the scope for lawful act economic duress in commercial life. In chapter 5 of his book, *The Use and Abuse of Unjust Enrichment* (1991) Professor Jack Beatson (later to become Beatson LJ) discussed the development of the modern doctrine of economic duress and the severe limitations on its application in commercial negotiation. At pp 129–130 he explained the basic approach of the common law in these terms:

C       "All that is not prohibited is permitted and there is no general doctrine of abuse of rights. If therefore a person is permitted to do something, he will generally be allowed to do it for any reason or for none. In the context of contractual negotiations this position enables people to know where they stand and provides certainty as to what is acceptable conduct in the bargaining process but it does leave many forms of socially objectionable conduct unchecked. Again, this is soundly based for
D       judges should not, as a general rule, be the arbiters of what is socially unacceptable and attach legal consequences to such conduct."

He suggested (p 134) that the scope for lawful act duress in contractual negotiations was "extremely limited". I agree.

E   29   *Anson's Law of Contract*, 31st ed (2020), eds J Beatson, A Burrows and J Cartwright, similarly recognises this restrictive approach to the law of duress in contractual negotiations (p 379, ch 10.2(d)):

        "It is not ordinarily duress to threaten to do that which one has a right to do, for instance to refuse to enter into a contract or to terminate a contract lawfully. In the cut-and-thrust of business relationships various types of pressure may be brought to bear in differing situations . . . a
F       contracting party will not be permitted to escape from its contractual obligations merely because it was coerced into making a contract by fear of the financial consequences of refusing to do so.
        "Although this approach leaves many forms of socially objectionable conduct unchecked, as a general rule the determination of when socially objectionable conduct which is not in itself unlawful should be penalized
G       is for the legislature rather than the judiciary." (Footnotes omitted.)

    30   Against this commercial background the pressure applied by a negotiating party will very rarely come up to the standard of illegitimate pressure or unconscionable conduct. It will therefore be a rare circumstance that a court will find lawful act duress in the context of commercial negotiation.

H
    *(6) The approach of other common law jurisdictions to economic duress*

    31   A similar picture of circumspection in the application of lawful act duress in commercial negotiations emerges from a review of judgments in several leading common law jurisdictions.

© 2023 The Incorporated Council of Law Reporting for England and Wales

32   As David Richards LJ demonstrated in his judgment in this case
(paras 79–82), no clear picture of the existence and boundaries of lawful act
duress has emerged throughout Australia.  The Supreme Court of New
South Wales recognised lawful act duress in *Crescendo Management* 19
NSWLR 40.  McHugh JA's views in that case have been cited with approval
by the Queensland Court of Appeal (*Mitchell v Pacific Dawn Pty Ltd*
[2011] QCA 98, paras 50–52), the Court of Appeal of Western Australia
(*Electricity Generation Corpn (trading as Verve Energy) v Woodside Energy
Ltd* [2013] WASCA 36, paras 24–25, 174–176; see also *Morgan Stanley
Wealth Management Australia Pty Ltd v Detata (No 3)* [2018] WASC 32,
paras 236–237), and the Court of Appeal of Victoria (*Doggett v
Commonwealth Bank of Australia* (2015) 47 VR 302, para 73; see also
*Braam v BBC Hardware Ltd* [2020] VSCA 164, para 82).  But the Court of
Appeal of New South Wales in *Australia and New Zealand Banking Group
Ltd v Karam* (2005) 64 NSWLR 149, para 66, and in *May v Brahmbhatt*
[2013] NSWCA 309, paras 39–40, rejected the concept of lawful act duress,
confining duress to threatened or actual unlawful conduct, thereby leaving
the weaker party to invoke the equitable doctrines of undue influence and
unconscionable transactions if it can.

33   The Australian textbook, Edelman and Bant, *Unjust Enrichment*,
2nd ed (2016), p 217, approves of a restrictive approach to the undermining
of commercial contracts which were entered into as a result of lawful
commercial threats:

"The general reluctance of courts to recognise lawful economic or
commercial threats as disproportionate to commercial goals (and thus
illegitimate) is to be applauded.  Any other approach would cut across the
statutory competition law rules which draw complex distinctions
between lawful and unlawful commercial behaviour . . . Only in the most
exceptional circumstances, if at all, should it be illegitimate to threaten to
engage in conduct which a plaintiff has a right to engage in and which is
not proscribed by competition law.  However, where the threatened
conduct is non-commercial in nature, such as threats to publish
information or threats to foster rumours about a company, a finding that
the threat is disproportionate and therefore illegitimate may be more
readily made."

The authors' reference to disproportionality has not been mirrored in
English law but the emphasis on the need to avoid conflict with statutory
competition law echoes concerns expressed in English case law that the
regulation of inequality of bargaining power should as a general rule fall to
Parliament.  Further, the authors' recognition that there might be scope for
non-commercial threats to fall within the doctrine of lawful act duress is
salutary as the control of such threats by the common law would not cut
against the grain of statutory regulation of unfair contract terms or
consumer contracts.

34   The courts in New Zealand have recognised lawful act duress,
adopting the approach of the House of Lords in *The Universe Sentinel*
[1983] 1 AC 366, but have taken a restrictive approach to it.  Like the
English courts, the courts in New Zealand have held that pressure is
commonplace in commercial negotiation and only illegitimate pressure can
support a case of duress: *McIntyre v Nemesis DBK Ltd* [2010] 1 NZLR 463

© 2023 The Incorporated Council of Law Reporting for England and Wales

121

A   (CA). Illegitimate pressure has been equated with unconscionable conduct: *Magsons Hardware Ltd v Concepts 124 Ltd* [2011] NZCA 559. More recently, the New Zealand Court of Appeal in *Dold v Murphy* [2021] 2 NZLR 834 held that the doctrine of lawful act duress does not provide a remedy against hard-nosed commercial self-interest without more. The Court of Appeal rejected a claim of lawful act duress in circumstances where a minority shareholder, who had 6.2% of a company's shares, successfully
B   demanded to be paid considerably more than the proportionate value of his shareholding when the other two shareholders, who between them held 93.8% of the shares, wished to accept a particularly valuable offer for all of the shares in the company. The court held that a threat not to enter into a contract, other things being equal, was most unlikely to be an unlawful or illegitimate act. In that case, Mr Murphy's opportunistic behaviour was not unlawful and the question of the genuineness of his belief in his entitlement
C   did not arise: "he was entitled to act in his own self-interest, even if his actions were both unexpected and ungenerous."

   35   This court was also referred to a judgment of the Court of Appeal of Singapore: *BOM v BOK* (2018) 21 ITELR 607. This case was not concerned with commercial contracts or directly with the law of duress. It concerned a deed of trust which a husband had been induced to sign by his
D   wife by means of misrepresentation and undue influence. The deed was set aside for mistake and undue influence, and as an unconscionable transaction in that the husband was suffering from an infirmity and the wife had to show that the transaction had been fair, just and reasonable. The case is indirectly relevant to this appeal in so far as it discussed and rejected a submission that Singapore law should adopt a new umbrella doctrine of unconscionability
E   which subsumed duress and undue influence. Andrew Phang Boon Leong JA, delivering the judgment of the court, recognised, in paras 169–179, the linkages between the doctrines of undue influence and unconscionable bargain and the similarities in substance between duress and undue influence. Duress in Singapore law involves the exertion by a party of illegitimate pressure on the other party in the form of a threat which coerces the will of the other. Undue influence in Singapore law involves the plaintiff
F   showing that he was suffering from an infirmity that the other party exploited in procuring the transaction. If that requirement is satisfied, the defendant has the burden of demonstrating that the transaction was fair, just and reasonable (para 142). The judge rejected an umbrella doctrine of unconscionability principally because there were no practically workable legal criteria which the court could use to determine what amounts to
G   unconscionable behaviour that vitiates a contract. An umbrella doctrine, he said, would lead to excessive subjectivity, which would engender excessive uncertainty and unpredictability and would undermine the sanctity of contract.

   36   While making clear the danger of judicial subjectivity if one were to adopt a general criterion of morally reprehensible conduct, the Singapore Court of Appeal did not discuss the meaning of "illegitimate pressure" in
H   duress.

   37   The Supreme Court of Canada has recognised the existence of economic duress as a potential defence to contractual enforcement in *Martel Building Ltd v Canada* [2000] 2 SCR 860, para 70 but the substantive case law is at the level of the provincial courts of appeal. Canadian

© 2023 The Incorporated Council of Law Reporting for England and Wales

A

jurisprudence, such as the judgments of the Court of Appeal for Ontario in *Stott v Merit Investment Corpn* (1988) 48 DLR (4th) 288 and in *Techform Products Ltd v Wolda* (2001) 206 DLR (4th) 171, has considered English jurisprudence and jurisprudence of the Board, such as in *The Universe Sentinel* [1983] 1 AC 366 and *Pao On v Lau Yiu Long* [1980] AC 614, and has required illegitimate pressure as a component in the doctrine. In *Techform Products*, which concerned the ownership of inventions, the Court of Appeal (paras 34–38) referred to *CTN Cash and Carry*, attached weight to the bona fide belief by the company that it owned the inventions in dispute, and saw as an important consideration the fact that the consultant had been allowed to take away the draft agreement, giving him ample opportunity to obtain legal advice. In *Stott* an employee in an investment firm was unexpectedly confronted by his manager without notice and given no opportunity to consider his position or consult a lawyer before being required to sign a contract to pay off a debt owed to the company by a client in a context where he was justifiably fearful for his job. The court would have treated the case as one of economic duress and given a remedy but for the claimant's subsequent conduct which approbated the contract. In *Greater Fredericton Airport Authority Inc v Nav Canada* (2008) 290 DLR (4th) 405 the Court of Appeal of New Brunswick was critical of the importation from English law of the concept of illegitimate pressure as a condition precedent to a finding of economic duress, principally because of the lack of clarity as to when pressure moved from being legitimate to being illegitimate (paras 35–50 per Robertson JA). The Newfoundland and Labrador Court of Appeal followed Robertson JA's approach in *Fredericton* in *Burin Peninsula Community Business Development Corpn v Grandy* (2010) 327 DLR (4th) 752. The approach of the Court of Appeal for Ontario appears to be the dominant line of authority, but the decision of the Canadian Supreme Court in *Bhasin v Hrynew* [2014] 3 SCR 494 to recognise a general organising principle of good faith in contractual performance may have a significant influence on the direction of Canadian jurisprudence on the doctrine of economic duress. See Brandon Kain and Justin Nasseri, "Economic Duress after *Bhasin v Hrynew*: Does the Organizing Principle of Good Faith Offer a New Framework?" in *Annual Review of Civil Litigation 2016*, p 43 (Archibald and Scott eds). S M Waddams, *The Law of Contracts*, 7th ed (2017) concludes that the courts can give relief from provisions in agreements which are "highly unreasonable or very unfair" and that the test for duress is one of unfairness or unconscionability: "whether the promisee has taken unfair advantage of inequality of bargaining power" (p 354, para 514 and p 358, para 520).

B

C

D

E

F

G

38   In the United States the *Restatement (Second) of Contracts* (1981, June 2020 update), vol 1, which the American Law Institute produced, discusses when a threat is improper. It states in section 176 so far as relevant:

"(1) A threat is improper if
"(a) what is threatened is a crime or a tort, or the threat itself would be a crime or a tort if it resulted in obtaining property,
"(b) what is threatened is a criminal prosecution,
"(c) what is threatened is the use of civil process and the threat is made in bad faith, or

H

© 2023 The Incorporated Council of Law Reporting for England and Wales

123

A      "(d) the threat is a *breach of the duty of good faith and fair dealing
       under a contract* with the recipient." (Emphasis added.)

The first heading addresses unlawful act duress.  The second heading is
the equivalent of the three lawful act duress cases to which I referred in
paras 5–9 above.  The fourth heading is influenced by the general duty of
good faith and fair dealing in contract (viz Uniform Commercial Code
B   para 1-304; *Restatement (Second) of Contracts* section 205), which does not
have its counterpart in English law.  Little guidance can therefore be gained
from the fourth heading in the Restatement on the question of lawful act
duress in English law.

   39   In summary, several jurisdictions, such as Australia, New Zealand
and Singapore, have adopted a circumspect approach to economic duress
and lawful act duress.  Jurisdictions with a general requirement of good faith
C   in contract, such as Canada and the United States, may be expected to be
more open to a claim of economic duress in the context of what Lord
Burrows JSC has described as a "bad faith demand".

*(7) CTN Cash and Carry and the "bad faith demand"*

   40   Before turning to the judgment of the Court of Appeal in this appeal,
D   I examine the earlier judgment of the Court of Appeal in *CTN Cash and
Carry* [1994] 4 All ER 714 which featured prominently in the reasoning of
David Richards LJ in his admirable judgment.  In *CTN Cash and Carry*, in
contrast with the five judgments which I have discussed in paras 5–17 above,
the Court of Appeal found that the impugned contract had not been
obtained by duress.

E      41   CTN Cash and Carry Ltd ("CTN") traded at arm's length with
Gallaher Ltd ("Gallaher") from whom it purchased consignments of
cigarettes.  Gallaher was the sole distributor in England of certain popular
brands of cigarettes.  Gallaher was not contractually bound to sell cigarettes
to CTN and each sale was a separate contract on Gallaher's standard terms
of business.  Gallaher gave credit facilities to CTN which it could withdraw
at its discretion at any time.  The manager of one of CTN's warehouses
F   ordered a consignment of cigarettes which Gallaher in error delivered to
another of CTN's warehouses.  When the mistake was discovered, Gallaher
agreed to collect and deliver the consignment to the correct warehouse.  But
before that could be done, the entire consignment of cigarettes was stolen.
Gallaher, believing, erroneously, that the goods were at CTN's risk at the
time of the theft, demanded that CTN pay the purchase price of the
G   consignment.  CTN initially refused to pay but paid the contractual sum for
the purchase when Gallaher threatened to withdraw its credit facilities in
future dealings.  CTN raised legal proceedings to recover the £17,000 which
it had paid, alleging that it had paid the sum under economic duress.  The
judge at first instance held that CTN had failed to make out a case for
economic duress and the Court of Appeal dismissed CTN's appeal.

H      42   Steyn LJ delivered the first judgment.  He identified three distinctive
features of the case.  First, he observed (p 717h–j) that the dispute arose out
of arm's length commercial dealings between two trading companies.  While
Gallaher was in a sense in a monopoly position as the sole supplier of the
brands, the control of monopolies was a matter for Parliament and the
common law did not recognise the doctrine of inequality of bargaining

© 2023 The Incorporated Council of Law Reporting for England and Wales

power in commercial dealings.  He stated: "The fact that the defendants                    A
were in a monopoly position cannot therefore by itself convert what is not
otherwise duress into duress."  Secondly, he observed that Gallaher could
lawfully refuse to enter into any future contracts with CTN for any reason or
for no reason at all and could similarly lawfully refuse to grant credit.  The
third characteristic of the case, which he regarded as "critically important",
was that Gallaher thought in good faith that the goods were at CTN's risk                   B
when they were stolen: "[Gallaher's] motive in threatening withdrawal of
credit facilities was commercial self-interest in obtaining a sum that they
considered due to them" (p 718c).  The combination of those three features
meant that CTN's claim failed.  Steyn LJ warned of the risk of introducing
uncertainty into the commercial bargaining process: "The aim of our
commercial law ought to be to encourage fair dealing between parties.  But it
is a mistake for the law to set its sights too highly when the critical enquiry is            C
not whether the conduct is lawful but whether it is morally or socially
unacceptable" (p 719b–c).  He concluded:

> "Outside the field of protected relationships, and in a purely
> commercial context, it might be a relatively rare case in which 'lawful act
> duress' can be established.  And it might be particularly difficult to                    D
> establish duress if the defendant bona fide considered that his demand
> was valid.  In this complex and changing branch of the law I deliberately
> refrain from saying 'never'.  But as the law stands, I am satisfied that the
> defendant's conduct in this case did not amount to duress."

Farquharson LJ and Sir Donald Nicholls V-C agreed.  The latter expressed
concern at the outcome, which was that Gallaher retained the money                          E
notwithstanding that the basis on which it had sought and insisted on
payment had since been shown to be false, and wondered if a claim might lie
in unjust enrichment.

43   This judgment, although an important stepping stone in the
development of the doctrine of lawful act duress and cited in later cases,
is authority for what is <u>not</u> such duress and not for what is.   It is
unquestionably correct in its conclusion that CTN's payment was not                         F
recoverable on the ground of duress.  Lord Burrows JSC in his judgment sees
an implication in the Court of Appeal's reasoning that if Gallaher had sought
the payment in bad faith and had exploited their monopoly position in
the knowledge that the money was not due, the money would have
been recoverable on the basis of economic duress.  Steyn LJ's statement
(p 718b–c) that Gallaher's bona fide belief that the goods were at the risk of
CTN when they were stolen was "a third, and critically important,                           G
characteristic" of the case readily supports that view.  Lord Burrows JSC
also derives support for that conclusion from (i) the judgment of David
Richards LJ in this case and (ii) Mitchell, Mitchell and Watterson, *Goff and
Jones on the Law of Unjust Enrichment*, 9th ed (2016) who say at
para 10-70:

> "If the claimants could have shown that when the defendants made                         H
> their threat they knew that the goods were at the defendants' risk, then
> the claimants would surely have succeeded, for the money would then
> have been extorted from them, and commercial self-interest is not
> unbridled."

© 2023 The Incorporated Council of Law Reporting for England and Wales

A
44  Although it is not necessary in order to determine this appeal to decide whether that is correct, I do not think that the Court of Appeal would have been right so to decide.  The present case can be determined by applying the analysis of lawful act duress set out in paras 2–30 above, which is anchored in established legal principles.  The analysis in the preceding paragraph is, with respect, not so anchored.  As I have said (paras 26–30

B
above), there is no doctrine of inequality of bargaining power and no general principle of good faith in contracting in English law.  A commercial party in negotiation with another commercial party is entitled to use its bargaining power to obtain by negotiation contractual rights which it does not have until the contract is agreed.  A powerful commercial party, such as a monopoly supplier or monopoly purchaser, can impose onerous terms, for example demanding a premium, as a condition for entering into a

C
transaction with another party.  Steyn LJ does not suggest otherwise.  The implication of his judgment may be that the dishonest assertion of a pre-existing entitlement to payment accompanied by a threat to carry out a lawful act, such as to withdraw credit arrangements on future contracts or to refuse to enter into further contracts, could amount to lawful act duress as a form of an abuse of right.

D
45  Lord Burrows JSC would not confine lawful act duress to a claim based on a dishonest assertion by A of a pre-existing legal entitlement to payment which was implicitly the subject matter of the Court of Appeal's discussion in *CTN Cash and Carry*.  Instead, he argues that A's demand for a waiver by B of a claim against A would amount to lawful act economic duress where (i) A did not genuinely believe that it had a defence to the claim—i e his "bad faith demand", and (ii) A has deliberately created or

E
increased B's vulnerability to that demand.
46  In my view this would extend the doctrine of lawful act duress well beyond the position reached in the five cases which I have discussed in which such a claim succeeded.
47  Dealing, first, with *CTN Cash and Carry*, the circumstance which Steyn LJ appears to have envisaged, and which persuaded David Richards LJ

F
in this case to recognise the existence of lawful act duress if the demand were made in bad faith, was simply the extreme inequality of bargaining power between A and B without any manoeuvring by A to create B's vulnerability in order to extract a concession.
48  A "bad faith demand" based on an asserted pre-existing entitlement may not be a rare occurrence in commercial life.  Discreditable behaviour can be a feature of commercial activity.  For example, it appears from the

G
judgment of Sir Donald Nicholls V-C in *CTN Cash and Carry* that, at the time of the hearing in the Court of Appeal, Gallaher had declined to repay the price of the stolen cigarettes although it knew by then both that its prior good faith demand was wrong in law and that it had no right to the money in dispute.  There may therefore be a mischief which the law could address.  But the extension of lawful act duress which may be implicit in Steyn LJ's

H
judgment in *CTN Cash and Carry* would nonetheless give rise to at least three difficulties.
49  First, it would be difficult to anchor the extension in any recognised legal principle.  Where B is induced by A's fraudulent representation to meet its demand, B may have a claim against A under the tort of deceit.  But that is

not the circumstance envisaged in *CTN Cash and Carry* or by the Court of
Appeal in this case.  Where B is induced to meet A's demand because of the
stark inequality of bargaining power which gives B no effective choice but to
meet the demand which B knows is not justified, it is not obvious to me that,
without more, B could have a claim for economic duress in the absence of a
general principle of good faith in contracting or a doctrine of imbalance of
bargaining power, neither of which currently exists.  It is difficult in principle
to distinguish such a circumstance from a circumstance in which A makes an
exorbitant demand in the course of negotiations as a condition for entering
into contractual relations with B.

50   Secondly, in the absence of an underlying principle, the extension of
lawful act duress in this way would create unwanted uncertainty.  There is,
in my view, force in the concern that the extension of the concept of lawful
act duress would risk creating unacceptable uncertainty in the sphere of
commercial transactions: see Professor Graham Virgo, *The Principles of the
Law of Restitution*, 3rd ed (2015), pp 215–221.  Lord Burrows JSC seeks to
avoid such uncertainty through the construct of the bad faith demand, but
I do not accept that, without more, lawful act economic duress would exist
even if there were such a bad faith demand.  In my view the doctrine is more
limited in the context of commercial relations.

51   Thirdly, the extension of lawful act duress in this way might be of
limited utility.  This is because, first, commercial organisations may enter
into a dispute or commence litigation without an informed idea of their legal
rights or any intention of seeking judicial resolution but with the aim of
reaching a settlement of the dispute on better terms than are currently on
offer.  The vast majority of commercial disputes do not go to trial and are
not expected to do so.  Each organisation may have to reach its own view as
to its entitlements and resolve the dispute accordingly.  Secondly, it would be
very difficult for B to establish its case because B would have to demonstrate
A's subjective bad faith.  The application of legal rules to a particular factual
circumstance, such as when risk passes on a contract of sale, commonly
involves questions of legal judgment on which legal advisers may reasonably
differ.  A party may be advised that it has an arguable case but that the
application of the law to the facts of that case is uncertain.  A party may
proceed to make a claim on the basis of legal advice of a percentage chance
of success.  What is envisaged in the "bad faith demand" requirement in this
context is that there is little, if any, uncertainty as to A's lack of entitlement,
and that A makes its demand in the knowledge that it does not have the legal
entitlement which it claims.  B would succeed in its claim for lawful act
duress only if it established that A did not genuinely believe that it had that
entitlement.

52   I therefore do not accept that the lawful act doctrine could be extended
to a circumstance in which, without more, a commercial organisation exploits
its strong bargaining power or monopoly position to extract a payment
from another commercial organisation by an assertion in bad faith of a
pre-existing legal entitlement which the other organisation believes or
knows to be incorrect.

53   Lord Burrows JSC would extend the doctrine further.  In his view
*Borrelli* [2010] Bus LR 1718 and *The Cenk K* [2012] 2 All ER (Comm) 855
support the conclusion that a demand by A that B waive a claim against it

© 2023 The Incorporated Council of Law Reporting for England and Wales

A   would be a "bad faith demand" if A did not genuinely believe that it had a defence to the claim.  If A then used its bargaining power and nothing more to make B vulnerable to its demand or to increase B's vulnerability, the combination of the bad faith demand and the manoeuvring would, he argues, be sufficient to establish lawful act duress.  I respectfully disagree for four reasons.

B   54   First, the demand for a waiver, to which A must know that it has no prior entitlement, is in principle no different from the demand for a sum of money as a pre-condition for entering into contractual relations in the context of a commercial negotiation, which I mentioned in para 44 above. Lord Burrows JSC in para 125 of his judgment accepts that economic duress could not be made out in the latter circumstance.  If the demand for money,
C   which is supported by the assertion of A's bargaining power, does not give rise to a claim for duress, why should a demand for a waiver of a valid claim which is backed up in the same way?

55   Secondly, the absence of an identifiable principle to distinguish those two circumstances would increase the undesirable uncertainty in commercial transactions which I mentioned in para 50 above.

D   56   Thirdly, and in any event, bad faith plays a wider role in lawful act duress than merely the absence of belief in an entitlement to a pre-existing right or in the invalidity of a claim for which A seeks a waiver.  In both *Borrelli* and *The Cenk K* the conduct of A by which A applied pressure to B involved bad faith or behaviour which was similarly reprehensible: para 18 above.  In both cases it was the combination of the probable or at
E   least possible validity of B's claim against A combined with A's behaviour of that nature which gave rise to the court's conclusion that the waiver had been obtained through the application of illegitimate pressure.  In other words, bad faith is potentially relevant both to the content of the demand and to the context in which A makes its demand.  To my mind, the two cases do not support Lord Burrows JSC's model.

F   57   Fourthly, there is no support in either *Borrelli* or *The Cenk K* for the proposition that the mere assertion of bargaining power, such as a lawful threat to terminate an existing contract or to reduce the supply of goods under the contract in a way which the contract allowed, could without more amount to illegitimate pressure.  Lord Burrows JSC considers that PIAC's deliberate act of cutting its ticket allocation, thereby increasing Times Travel's vulnerability to its demand for a waiver of a claim that it was in
G   breach of contract, was an act which was beyond the mere exercise of monopoly power and would have amounted to illegitimate pressure if PIAC had known that it had indeed broken its contract.  I respectfully disagree and take a narrower view of the scope of lawful act economic duress in this context.  The reduction of the ticket allocation was a hard-nosed exercise of monopoly power, which, in the absence of a doctrine of unequal bargaining
H   power, could not by itself amount to illegitimate pressure.  Something more was needed, such as the reprehensible characteristics of the behaviour in *Borrelli* and *The Cenk K* to which I have referred in para 18 above.  As I have said (para 28 above) the scope for lawful act economic duress is extremely limited in the sphere of commercial transactions.

© 2023 The Incorporated Council of Law Reporting for England and Wales

*(8) The Court of Appeal's judgment in this case*                                        A

58   In my view the Court of Appeal [2020] Ch 98 was correct to
conclude that the claimants had not made out a case of economic duress.
The court was correct to conclude that it would be rare that in a commercial
context the use by A of lawful pressure to induce B to concede to a demand
would amount to economic duress.  Significantly, there are no findings that
PIAC had used any reprehensible means such as were evident in *Borrelli*       B
[2010] Bus LR 1718 and *The Cenk K* [2012] 2 All ER (Comm) 855, to
manoeuvre Times Travel into a position of increased vulnerability in order
to exploit that vulnerability.  PIAC gave notice on 14 September 2012 that
Times Travel's contract would be terminated at the end of October 2012.
On 17 September PIAC cut Times Travel's fortnightly allocation of tickets
from 300 to 60, as under its existing contract it was entitled to do.  At the   C
meeting on 24 September 2012 PIAC gave Times Travel a "take it or leave it"
option: to sign the new agreement with the waiver and thus regain its prior
allocation of tickets, or its agency would come to an end on the expiry of the
existing contract.  While this entailed hard-nosed commercial negotiation
that exploited PIAC's position as a monopoly supplier, it did not involve the
reprehensible means of applying pressure which gave rise to the findings of   D
lawful act economic duress in *Borrelli* and *The Cenk K*.  There are also no
findings that PIAC acted in bad faith in making the demands which it did.

59   Where I respectfully disagree with David Richards LJ is in para 62 of
his judgment in which he states:

> "In my view, *CTN Cash and Carry Ltd v Gallaher* . . . can be taken to
> establish that where A uses lawful pressure to induce B to concede a
> demand to which A does not bona fide believe itself to be entitled, B's   E
> agreement is voidable on grounds of economic duress."

Taken literally this might refer to a demand in a negotiation for a contractual
term which did not yet exist rather than only the assertion of an alleged
pre-existing right; but it is clear in context that David Richards LJ had the
latter assertion in mind.  Thus, at para 96 he states: "If Gallaher had made its
demand in bad faith, not believing it to be *well founded*, the court would   F
have held the payment to have been made under duress." (Emphasis added.)
It may indeed be correct that the Court of Appeal in *CTN Cash and Carry*
would have so held.  But, for the reasons set out above, I do not think that
the court would have been correct to reach that conclusion, absent
circumstances which involved the manoeuvring by Gallaher of CTN into
a position of vulnerability by means which involved bad faith or were   G
similarly reprehensible and went beyond the use of its position as a
monopoly supplier, or which brought the transaction within the ambit of the
equitable doctrine of unconscionable transactions.

60   In this case, on the facts found by Warren J [2017] EWHC 1367
(Ch), PIAC believed in good faith that it was not liable for breach of contract
as a result of its failure to pay past commission and, in any event, the
pressure which it applied to obtain the waiver was the assertion of its power   H
as a monopoly supplier.

*9. Conclusion*

61   I would dismiss the appeal.

© 2023 The Incorporated Council of Law Reporting for England and Wales

A **LORD BURROWS JSC**

*1. Introduction and overview*

62   Duress in the law of contract focuses on an illegitimate threat (or illegitimate pressure) which induces a party to enter into a contract. If duress is established, the remedy for the threatened party is rescission of the
B contract (sometimes referred to as the avoidance, or setting aside, of the contract). In this case, we are concerned with that form of duress that has been labelled "economic duress". Economic duress was first recognised in English law in first instance cases in the 1970s (*Occidental Worldwide Investment Corpn v Skibs A/S Avanti* [1976] 1 Lloyd's Rep 293 and *North Ocean Shipping Co Ltd v Hyundai Construction Co Ltd* [1979] QB 705) and
C was authoritatively accepted by the House of Lords in *Universe Tankships Inc of Monrovia v International Transport Workers Federation (The Universe Sentinel)* [1983] 1 AC 366. Prior to those cases, the conventional view was that the common law recognised only duress of the person and, as regards the restitution of non-contractual payments (but not the avoiding of a contract: *Skeate v Beale* (1841) 11 Ad & El 983), duress of goods.
D Although economic duress may take various forms, the main example of it in the case law is where one contracting party threatens to break a contract unless the other contracting party agrees to do something (for example, to pay extra money for completion of the promised performance). However, in this case, we are not concerned with where what is threatened (or the relevant pressure) is unlawful, such as a threatened breach of contract or tort. Rather we are crossing a line to where what is threatened is lawful. In
E other words, we are concerned with what has been termed "lawful act duress". We have heard submissions on, and need to answer, fundamental questions such as, does lawful act duress exist and, if so, what is its scope? To decide this appeal, we then need to apply those answers to the facts of this case.

63   The claimant, Times Travel (UK) Ltd, is a travel agent in
F Birmingham. At the relevant time, its business almost entirely comprised selling tickets for flights to Pakistan on planes owned by the defendant, Pakistan International Airlines Corpn ("PIAC"). PIAC is the national flag carrier airline of Pakistan and, at the relevant time, it was the only airline operating direct flights between the UK and Pakistan. Disputes arose between various travel agents and PIAC as to non-payment of commission that the travel agents claimed was owed to them on the sale of PIAC tickets.
G PIAC threatened to end any contractual relationship with Times Travel, as it was legally entitled to do, unless Times Travel entered into a new contract under which, inter alia, Times Travel released PIAC from all claims that Times Travel might have against PIAC in relation to commission under the previous contract. Times Travel subsequently sought to rescind the new contract for duress thereby freeing it to recover the commission, which it
H claimed it was owed, under the previous contract.

64   At first instance, Warren J [2017] EWHC 1367 (Ch) held that Times Travel was entitled to rescind the contract for economic duress. But that decision was overturned by the Court of Appeal [2020] Ch 98, with the leading judgment being given by David Richards LJ, with whom Moylan

© 2023 The Incorporated Council of Law Reporting for England and Wales

130
Times Travel (UK) Ltd v PIA Corpn (SC(E))                    [2023] AC
Lord Burrows JSC

and Asplin LJJ agreed.  The Court of Appeal held that, as the relevant threat *A* was lawful, duress could only be established if PIAC's demand, that Times Travel give up its claims for commission, had been made in bad faith in the sense that PIAC must not have genuinely believed that it had a defence to Times Travel's claims for commission.  It followed that, as Warren J had found that PIAC did genuinely believe that it had a defence to the main claims for past commission—and that, even in relation to a relatively minor *B* claim, where there was clearly no defence, Warren J had still not found that PIAC had been acting in bad faith—lawful act duress was not made out. According to the Court of Appeal, it is insufficient for lawful act duress that PIAC's belief, that it had a valid defence, was unreasonable: in the context of lawful act duress, there is a critical distinction between bad faith demands and unreasonable demands.  Times Travel appeals to the Supreme Court *C* against that decision of the Court of Appeal.

### 2. *The facts*

**65**   It took Warren J over 200 paragraphs to cover the factual ground. He faced significant difficulties.  Agreements were reached orally as well as in writing and the events extended over several years.  His task was further *D* complicated because he was having to make factual findings in respect of two claimants (Times Travel and Nottingham Travel (UK) Ltd) in respect of whom the facts were similar but not the same.  In the circumstances, it is perhaps not surprising that one needs to jump about in Warren J's judgment in order to piece together his essential findings of fact in relation to the claims brought by Times Travel which is the sole claimant with whom we *E* are concerned in this appeal.

**66**   Times Travel entered into a relationship with PIAC in 2006, initially using the International Air Transport Association ("IATA") agency licence of its partner, Gazelle Travel.  Times Travel was paid a basic commission of 9% on ticket sales and, until the end of June 2008, was also paid an overriding commission ("ORC").  Towards the end of 2008 (the precise date is nowhere *F* made clear), Times Travel obtained its own IATA licence and began trading as an IATA-approved passenger sales agent of PIAC in its own right.  The contract between PIAC and Times Travel included the standard form IATA Passenger Sales Agency Agreement (in the form of IATA Resolution 824). This required PIAC to remunerate Times Travel for the sale of tickets in a manner and amount stated from time to time to Times Travel by PIAC; and the contract could be terminated at the end of a month by giving at least a *G* month's notice in writing.

**67**   It is not in dispute between the parties that this was a one-sided contract.  Nigel Jones QC, counsel for PIAC, did not shy away from this.  On the contrary, in his opening oral submissions, he recognised that Times Travel was the weaker party and had taken the risk of building up its business by an almost exclusive reliance on PIAC without legal safeguards. *H* PIAC could choose to terminate Times Travel's contract, and effectively end its business, simply by giving the required short period of notice.

**68**   The parties used IATA's accounting system known as the "BSP", which was shorthand for IATA's "Billing and Settlement Plan".  All IATA

© 2023 The Incorporated Council of Law Reporting for England and Wales

A   agents were required to use this system.  As Warren J explained [2017] EWHC 1367 (Ch) at [10]:

> "under the accounting system . . . an agent was obliged to pay all the fare applicable into the BSP which collates all sales and ticketing done through the booking system and produces a report on a weekly basis.  The BSP is designed to facilitate and simplify the selling, reporting and remitting procedures of IATA Accredited Passenger Sales Agents and to ensure that there is a definitive accounting between the agent and the carrier.  IATA collected ticket revenue by direct debit through the BSP system.  I note that the claimants' claims . . . are all based on figures derived from the BSP. . ."

B

C   69   It is not clear when issues first arose about the non-payment of commission allegedly owed by PIAC to its UK travel agents.  But on 25 February 2011 and, particularly importantly for this case, on 25 October 2012, actions were commenced by a number of UK travel agents against PIAC.  Under pressure from PIAC, especially exerted in September 2012, Times Travel did not join in with those legal actions.  In September 2012, PIAC gave notice that the contract with Times Travel would be terminated at the end of October 2012 and Times Travel's normal ticket allocation was suddenly cut from 300 to 60.  It is not in dispute that PIAC was acting within its legal rights in doing so: i e it was not acting in breach of contract in giving the notice of termination or in cutting the number of tickets.  But under the threat of PIAC not continuing with their contractual relationship, and therefore not supplying them with tickets to sell, Times Travel reluctantly agreed to accept an onerous waiver term (clause 6(2)) in a new agreement with PIAC (which included an agent productivity scheme) with effect from 1 November 2012.

D

E   70   To understand the significance of the sudden cutting of the ticket allocation and the general manoeuvring by PIAC of Times Travel into a particularly vulnerable position, under which Times Travel had no reasonable alternative but to bow to PIAC's demands, it is worth setting out two paragraphs from David Richards LJ's judgment in the Court of Appeal:

F

> "13. On 14 September 2012, PIAC sent a notice of termination to Times Travel, as it did also to all other agents in the UK, terminating its appointment with effect from 31 October 2012.  The notice also stated that PIAC offered terms of re-appointment as set out in an attached document.  On 17 September 2012, PIAC reduced Times Travel's fortnightly allocation of tickets from 300 to 60.  As the judge found, this reduction in ticket allocation had a major impact on Times Travel's business and, if continued for much longer, would have put it out of business.  It is not suggested that PIAC was acting in breach of contract, or otherwise unlawfully, in reducing the ticket allocation.

G

> "14. At a meeting on 24 September 2012, Times Travel signed a new agreement with PIAC . . . The New Agreement, already signed on behalf of PIAC, was provided to the representatives of Times Travel.  Earlier in September 2012, Asrar Ahmad [one of the two directors of Times Travel, the other being his son] had been shown a draft of the agreement but his request to take a copy with him, in order to read it carefully, discuss it with his son and obtain legal advice, had been refused."

H

© 2023 The Incorporated Council of Law Reporting for England and Wales

71   Under clause 6(2), Times Travel released any claims it might *A*
have against PIAC for unpaid commission under the previous contract(s).
Clause 6 read as follows:

> "In consideration for [the Agent Productivity Scheme] 1 July to
> 31 December 2012 as set out in Appendix I it is agreed that:

> "(1) The aforesaid scheme supersedes, nullifies, voids and replaces any
> and all previous incentive arrangements made or binding as between *B*
> PIAC, its directors, officers and employees and the Agent and/or anybody
> representing the Agent of any nature whatsoever and howsoever arising.

> "(2) The Agent hereby agrees to release and discharge PIAC, its
> directors, officers and employees from any and all claims, costs, liabilities
> or actions of any nature whatsoever and howsoever arising which have,
> may now or in the future arise from, or otherwise be connected in any *C*
> way whatsoever with any commission or remuneration, or the calculation
> of the amount of any commission or remuneration, due to the Agent from
> PIAC on any basis other than as set out in the New Agreement."

72   Times Travel subsequently commenced a claim against PIAC on
31 December 2014 alleging, inter alia, that it was entitled to rescind the new
agreement because Times Travel had entered into it under economic duress; *D*
and, consequent to the rescission of that new agreement, Times Travel
claimed that it was entitled to unpaid commission (for the period prior to
1 November 2012) under three main heads.

73   The three main heads of commission claimed by Times Travel (for
the period prior to 1 November 2012) were as follows:

*(1) The claim for 9% basic commission*

Times Travel claimed that it was entitled to 9% basic commission after *E*
31 October 2010 and until 31 October 2012.  PIAC disputed that, arguing
that, after 16 October 2010, the 9% basic commission had been replaced by
what was termed "net sale remuneration"; and that Times Travel had been
given notice of this on or around 23 September 2010.  This was the largest
claim of the three.  According to the judgment of David Richards LJ [2020]
Ch 98, at para 26, it amounted to £1.215m exclusive of interest (at the time *F*
of Warren J's judgment).

*(2) The ORC claim*

Times Travel claimed that it was entitled to be paid overriding
commission after 30 June 2008 until 31 October 2012.  PIAC disputed that
claim, arguing that it had been entitled to, and did, stop paying ORC after
30 June 2008.  According to the judgment of David Richards LJ, at para 26, *G*
"on a very rough basis [this claim] must have been of the order of
£250,000–£300,000" (at the time of Warren J's judgment).

*(3) The YQ commission claim (prior to October 2010)*

Times Travel claimed that the basic commission should have been
worked out by including the fuel surcharge on the ticket price.  This was
referred to as the "YQ commission".  PIAC disputed that, arguing that, prior
to the end of October 2010, it was entitled to, and therefore did, stop paying *H*
the YQ commission.  Compared to the other two heads of claim, the sum
claimed here was relatively trivial.  According to the judgment of David
Richards LJ, at para 26, it amounted to £56,639 (at the time of Warren J's
judgment).

© 2023 The Incorporated Council of Law Reporting for England and Wales

A   **74**   It is important to clarify what Warren J decided about those three heads of claim (assuming that there had been no valid waiver of them by Times Travel). He held that Times Travel was entitled to succeed on the 9% basic commission claim and on the YQ claim but not on the ORC claim. More specifically:

*(1) The claim for 9% basic commission*

B   Warren J held that Times Travel was entitled to succeed on the 9% basic commission claim (see [2017] EWHC 1367 (Ch) at [203], [224], [260(v)]). However, and this is a very important finding of fact, he found at para 260(i) that PIAC considered, and Warren J had no reason to doubt that PIAC genuinely believed, that the 9% basic commission had ceased to be payable, and had been replaced by net sales remuneration, in October 2010. Para 260(i) reads:

C       "PIAC considered (wrongly, as I have held, but I have no reason to doubt that PIAC genuinely believed it to be true) that the 9% Basic Commission had ceased to be payable, having been replaced by Net Sales Remuneration in October 2010."

*(2) The ORC claim*

D   Warren J held that Times Travel was not entitled to succeed on the ORC claim (i e after 30 June 2008, Times Travel was not entitled to ORC) (see [2017] EWHC 1367 (Ch) at [223]–[224]). Nevertheless, the claim was, on the part of Times Travel, "genuine and arguable" (para 260(v)).

*(3) The YQ commission claim (prior to October 2010)*

Warren J thought that the (relatively trivial) YQ claim for the period prior to October 2010 was very strong and that Times Travel would have been

E   entitled to summary judgment on it (see [2017] EWHC 1367 (Ch) at [224], [260(v)], [262(i)]). As regards YQ commission for the period after October 2010, Times Travel would also have had to succeed on its claim to 9% basic commission (which, as we have seen, it would have done). But even in respect of the YQ claim for the period prior to October 2010, Warren J did not find that PIAC had acted in bad faith. In para 262, Warren J said the following:

F       "(i) The case concerning YQ at least prior to October 2010 was very strong. I feel confident that summary judgment would have been given. PIAC ought to have paid 9% commission on the YQ element in respect of the periods prior to October 2010 before the New Agreement was signed . . .

G       "(ii) Whether PIAC has acted in good faith or bad faith is moot. The Claimants have not established that there was bad faith but nor has PIAC established good faith. It is clear to me that the whole basis on which the Notice was served and the terms of the New Agreement were formulated was to ensure that agents would lose their claims to accrued rights in a situation where some of those rights (in particular, 9% commission on YQ) were clear. Indeed, Mr Schama accepted that this was the

H   motivation for the Notice. Whether this demonstrates bad faith is a matter on which different minds might take different views."

**75**   I should stress that, in respect of the quantum of the sums claimed under each of the three heads, I am relying on the judgment of David Richards LJ. In turn he was relying on a schedule put before Warren J by

© 2023 The Incorporated Council of Law Reporting for England and Wales

Times Travel in March 2018 in what I assume was one of the "account" <span style="float:right">A</span>
hearings dealing with working out the sums to be paid under his judgment.
But as David Richards LJ commented, at para 26, the position on the
amounts under the three heads of claim "is not entirely clear". Moreover, it
is nowhere made clear what sums of commission Times Travel had been paid
although I note that, in para 26, David Richards LJ said that, against the
principal sum of £1.27m claimed for the 9% basic commission, "Times <span style="float:right">B</span>
Travel had to give credit for income of some £435,000 received in respect of
ticket sales between October 2010 and October 2012".

### 3. Claims other than for rescission for duress

76    Apart from the claim for rescission based on economic duress, there
were claims by Times Travel against PIAC for rescission on the ground of
misrepresentation and for breach of a collateral contract. The claim for <span style="float:right">C</span>
misrepresentation failed before Warren J. The claim for breach of a
collateral contract succeeded but Warren J held that Times Travel could not
both rescind the new agreement for economic duress and rely on the
collateral contract. It had to choose one or the other. In the event, Times
Travel chose rescission of the new agreement and so the claim for breach of a
collateral contract fell away. There was no appeal by Times Travel (or <span style="float:right">D</span>
PIAC) in relation to either of those claims. There was similarly no appeal by
Times Travel against Warren J's decision that clause 6(2) (the waiver term)
did not fall foul of the Unfair Contract Terms Act 1977.

77    It is also important at the outset to be clear that, putting to one side
misrepresentation (which is no longer in issue), Times Travel has sought
rescission of the new agreement solely on the basis of economic duress. It <span style="float:right">E</span>
has not sought to invoke the law on "unconscionable bargains". That area
of the law deals not with illegitimate threats or pressure but with the
exploitation by A of a weakness of B by entering into a contract that is
clearly disadvantageous to B who has not obtained independent advice. In
almost all past English cases on unconscionable bargains, B has been an
individual with a mental weakness such as inexperience, confusion because <span style="float:right">F</span>
of old age or emotional strain: see, e g, *Earl of Aylesford v Morris* (1873) LR
8 Ch App 484; *Fry v Lane* (1888) 40 Ch D 312; *Cresswell v Potter (Note)*
[1978] 1 WLR 255; *Backhouse v Backhouse* [1978] 1 WLR 243; *Boustany v
Pigott* (1993) 69 P & CR 298; *Chitty on Contracts*, 33rd ed (2018),
paras 8-132–8-142. But it is not inconceivable that the relevant weakness
could be the very weak bargaining position of a company; and this <span style="float:right">G</span>
possibility was recognised 35 years ago by the Court of Appeal in *Alec Lobb
Garages Ltd v Total Oil (Great Britain) Ltd* [1985] 1 WLR 173. Although
some of the submissions of Philip Shepherd QC, counsel for Times Travel,
might be thought to have been steering in the direction of the law on
unconscionable bargains, that was not the basis on which Times Travel's
claim was put. The *Alec Lobb* case was not relied on and, for example, there
was no evidence as to whether independent advice was taken by Times <span style="float:right">H</span>
Travel (although we do know that PIAC did not allow Times Travel to take
away draft copies of the new agreement prior to signing). This appeal is
therefore solely concerned with the claim for rescission based on economic
duress.

© 2023 The Incorporated Council of Law Reporting for England and Wales

A  *4. The essential elements of duress*

78   Where it is alleged that one contracting party (the defendant) has induced the other contracting party (the claimant) to enter into the contract between them by duress, the case law has laid down that there are two essential elements that a claimant needs to establish in order to succeed in a claim for rescission of the contract. The first is a threat (or pressure exerted)
B  by the defendant that is illegitimate. The second is that that illegitimate threat (or pressure) caused the claimant to enter into the contract. As Lord Goff said, in the context of economic duress, in *Dimskal Shipping Co SA v International Transport Workers Federation (The Evia Luck)* [1992] 2 AC 152, 165:

C   "it is now accepted that economic pressure may be sufficient to amount to duress [which would entitle a party to avoid a contract] provided at least that the economic pressure may be characterised as illegitimate and has constituted a significant cause inducing the plaintiff to enter into the relevant contract . . ."

79   It is also important that, in the context of economic duress (but the position appears to be different in respect of other forms of duress: see *Astley*
D  *v Reynolds* (1731) 2 Str 915), there is a third element. This is that the claimant must have had no reasonable alternative to giving in to the threat (or pressure): see, for example, Dyson J in *DSND Subsea Ltd (formerly DSND Oceantech Ltd) v Petroleum Geo-Services ASA* [2000] BLR 530, para 131; *Borrelli v Ting* [2010] Bus LR 1718, para 35.

80   As both parties accepted, the dispute in this case is solely concerned
E  with the first element: the illegitimacy of the threat or pressure. It is not in dispute that the claimant can establish causation and that it had no reasonable alternative to giving in to the threat.

81   It should be noted that it was not argued by Times Travel that the breach of contract by PIAC, in failing to pay commission owed, meant that this was a case of unlawful, rather than lawful, act duress. In my view, this acknowledgement by Times Travel that we are here concerned with lawful
F  act duress was correct. A breach of contract in failing to pay past commission was not the relevant threat or pressure inducing Times Travel to enter into the new agreement. As set out in para 69 above, it was the threat of PIAC not continuing the contractual relationship with Times Travel, and therefore not supplying Times Travel with tickets to sell—which PIAC was legally entitled not to do—that induced Times Travel, reluctantly, to enter
G  into the new agreement.

*5. Does lawful act duress exist?*

82   Lawful act duress is controversial. This is essentially because many contracts are entered into under some form of pressure exerted by the other party and, plainly, one would not wish to undermine all such
H  contracts. An insistence that the threat must be one to do something unlawful draws a clear line with a standard that is easily understood and can easily be applied. But once one crosses that line to include threats of lawful acts, it is not easy to distinguish between threats that will count as duress and threats that will not. Peter Birks, in *An Introduction to the*

© 2023 The Incorporated Council of Law Reporting for England and Wales

*Law of Restitution*, revised ed (1989), at p 177, expressed this difficulty as       A
follows:

> "Can lawful pressures also count?  This is a difficult question, because,
> if the answer is that they can, the only viable basis for discriminating
> between acceptable and unacceptable pressures is not positive law but
> social morality.  In other words, the judges must say what pressures . . .
> are improper as contrary to prevailing standards.  That makes the judges,
> not the law or the legislature, the arbiters of social evaluation."

See also the helpful discussion by Jack Beatson in *The Use and Abuse of
Unjust Enrichment* (1991), pp 129–134, especially p 130.

83    The fear of wide-ranging disruption and uncertainty, particularly for
commercial parties, has led some distinguished commentators to argue
that lawful act duress should not exist.  For example, Graham Virgo, *The
Principles of the Law of Restitution*, 3rd ed (2015), p 218 writes:

> "despite the recent explicit recognition that a lawful threat can still be
> an illegitimate threat for economic duress, the better view is that only
> unlawful threats should suffice.  A lawful threat may still result in
> restitution, but only . . . if the more stringent test of unconscionability is
> satisfied.  This ensures that the law does not intervene unacceptably in
> commercial markets.  Where a defendant has obtained a benefit as a result
> of an unlawful threat which caused the benefit to be transferred, it is
> appropriate for restitution to be awarded.  Where the benefit was
> obtained as the result of a lawful threat, it is only appropriate to
> award restitution where the defendant's conduct is characterised as
> unconscionable . . ."

84    Similarly, in their excellent case-note on the Court of Appeal's
decision in this case, Paul Davies and William Day, " 'Lawful Act' Duress
(Again)" (2020) 136 LQR 7, 12, write:

> "we suggest that the Supreme Court should jettison the concept of
> lawful act duress.  The lack of reported cases applying the doctrine
> demonstrates that there would be no gap in the law if lawful act duress
> were abolished, and the welcome effect would be to place the law of
> contract on a more certain and stable footing, avoiding protracted and
> expensive litigation about the existence and scope of lawful act duress.
> Whereas the Court of Appeal in [*CTN Cash and Carry Ltd v Gallaher Ltd*
> [1994] 4 All ER 714] took a 'never say never' approach to the possibility
> of lawful act duress, it is to be hoped that the Supreme Court in *Times
> Travel* will be more definitive and explicitly reject such an open-ended
> doctrine."

85    I am also conscious that lawful act duress has been rejected by the
Court of Appeal of New South Wales in *Australia and New Zealand
Banking Group Ltd v Karam* (2005) 64 NSWLR 149 (albeit that one needs
to be careful in making comparisons given that particular statutory
interventions in that jurisdiction may be thought relevant).  Here the
defendants were directors of a company in serious financial difficulties.  The
claimant bank gave them financial assistance in return for the defendants
securing the company's debts by giving personal guarantees and mortgages
over their own property.  It was held that the personal guarantees and

A   mortgages should not be set aside for duress or unconscionable conduct.  In
a joint judgment of the Court, Beazley JA, Ipp JA and Basten JA said the
following, at para 66:

   "[First, the] vagueness inherent in the terms 'economic duress' and
   'illegitimate pressure' can be avoided by treating the concept of 'duress' as
   limited to threatened or actual unlawful conduct . . . Secondly, if the
B   conduct or threat is not unlawful, the resulting agreement may
   nevertheless be set aside where the weaker party establishes undue
   influence (actual or presumptive) or unconscionable conduct based on an
   unconscientious taking advantage of his or her special disability or special
   disadvantage . . . Thirdly, where the power to grant relief is engaged
   because of a contravention of a statutory provision such as section 51AA,
C   section 51AB or section 51AC of the Trade Practices Act, the court may be
   entitled to take into account a broader range of circumstances than those
   considered relevant under the general law."

   86   Despite that support for the non-recognition or abolition of lawful
act duress, it is my view (as it was the view of Birks in the continuation of the
passage cited in para 82 above) that lawful act duress does, and should,
exist as a ground for rescinding a contract (or for the restitution of
D   non-contractual payments) in English law.  There are three reasons for this.
   87   The first reason is that, although the facts of the leading cases of *The
Universe Sentinel* [1983] 1 AC 366 and *The Evia Luck* [1992] 2 AC 152
concerned alleged unlawful act duress—by threats to commit a tort in the
context of the "blacking" of ships sailing under flags of convenience—the
House of Lords chose to use the language of the pressure needing to be
E   "illegitimate" not "unlawful".  In the former case, Lord Diplock (with whom
Lords Cross and Russell agreed), after recognising the development of the
common law to include economic duress, continued at p 384:

   "It is, however, in my view crucial . . . to identify the rationale of this
   development of the common law.  It is not that the party seeking to avoid
   the contract which he has entered into with another party, or to recover
F   money that he has paid to another party in response to a demand, did not
   know the nature or the precise terms of the contract at the time when he
   entered into it or did not understand the purpose for which the payment
   was demanded.  The rationale is that his apparent consent was induced by
   pressure exercised upon him by that other party which the law does not
   regard as legitimate, with the consequence that the consent is treated in
G   law as revocable unless approbated either expressly or by implication
   after the illegitimate pressure has ceased to operate on his mind."

And, in *The Evia Luck*, as we have seen in the passage set out above in
para 78, Lord Goff, giving the leading speech in the House of Lords, referred
to the economic pressure needing to be "illegitimate".
   88   The second reason is that the crime of blackmail, which is contained
H   in section 21 of the Theft Act 1968, clearly includes threats of lawful action.
Under section 21(1):

   "A person is guilty of blackmail if, with a view to gain for himself
   or another or with intent to cause loss to another, he makes any
   unwarranted demand with menaces; and for this purpose a demand with

© 2023 The Incorporated Council of Law Reporting for England and Wales

138
Times Travel (UK) Ltd v PIA Corpn (SC(E))                    [2023] AC
Lord Burrows JSC

A

menaces is unwarranted unless the person making it does so in the belief— (a) that he has reasonable grounds for making the demand; and (b) that the use of the menaces is a proper means of reinforcing the demand."

B

Classic examples of (the actus reus of) blackmail involving lawful threats would be a threat by A, unless money is paid by B, to reveal true information about B to a newspaper or to B's family or to the police. Although the link between the crime of blackmail and lawful act duress has to be very carefully handled to avoid circularity—this is best done by excluding the possibility of the crime of blackmail having been committed when considering what counts as lawful act duress—it would be very odd for the civil law of duress not to include threats of lawful acts when the criminal law of blackmail does so. Lord Scarman expressly drew an analogy with blackmail in *The Universe Sentinel* [1983] 1 AC 366, 401:

C

"The origin of the doctrine of duress in threats to life or limb, or to property, suggests strongly that the law regards the threat of unlawful action as illegitimate, whatever the demand. Duress can, of course, exist even if the threat is one of lawful action: whether it does so depends upon the nature of the demand. Blackmail is often a demand supported by a threat to do what is lawful, e g to report criminal conduct to the police. In many cases, therefore, 'What [one] has to justify is not the threat, but the demand . . .': see per Lord Atkin in *Thorne v Motor Trade Association* [1937] AC 797, 806."

D

89   The third reason is that there have been several cases—and not just recent cases—in which it has been accepted that threats of lawful action should entitle the threatened party (the claimant) to rescind a contract (or to have the restitution of non-contractual payments). A long-established area, although traditionally thought of as within the equitable doctrine of undue influence rather than the common law doctrine of duress, has comprised illegitimate threats to prosecute the claimant or a member of the claimant's family. These were not economic duress cases. Rather the threats in question were threats to reputation or emotional threats. But the important point is that (avoiding the circularity of blackmail: see the previous paragraph), the threats in question were threats to do lawful acts. So, for example, in *Williams v Bayley* (1866) LR 1 HL 200 a father agreed to pay promissory notes in favour of a bank (secured by a charge over his property) in order to avert the bank's implied threat to prosecute his son for forging his signature on the notes. As a separate ground from the contract being "illegal" (as stifling a criminal prosecution) it was held that the contract was invalid as it had been procured by undue influence. And in *Mutual Finance Ltd v John Wetton & Sons Ltd* [1937] 2 KB 389 a guarantee of payment to the claimant company was signed by Percy Wetton on behalf of the defendant company in order to avert the claimant company's implied threat to prosecute Joseph Wetton (Percy's brother) for forgery in acquiring a lorry on hire purchase. Percy Wetton signed the agreement for fear that prosecution of his brother would kill their father who was very ill. Porter J distinguished duress at common law, which he regarded as being confined to duress of the person, but held that the contract here was voidable for undue influence. See also, for example, *Kaufman v Gerson* [1904] 1 KB 591.

E

F

G

H

© 2023 The Incorporated Council of Law Reporting for England and Wales

A   90   Although these cases may have used the language of undue influence, it is clear that they were not concerned with the standard case of undue influence where the relationship between the parties is such that one party's judgment is not being exercised freely and independently of the other party. That standard area of "relational" undue influence was not in issue in those cases. Rather one was looking at actual undue influence where the influence was being exerted by a lawful threat. At the time of those cases, and prior to

B   the development of economic duress in the 1970s, common law duress was thought to be confined to duress of the person or, in the context of the restitution of non-contractual payments, duress of goods. The threats in question in those cases were not ones of physical violence or detainment or to seize or retain goods. They therefore fell outside those two categories of common law duress. But now that economic duress has been recognised at

C   common law, there is no reason to hive off those earlier cases from duress by labelling them as cases on undue influence. On the contrary, the underlying element is identical—it is an illegitimate, albeit lawful, threat—and it is therefore rational today to treat them as examples of duress (albeit not economic duress). As Lord Nicholls said in the leading modern case on undue influence, *Royal Bank of Scotland plc v Etridge (No 2)* [2002] 2 AC

D   773, para 8:

> "Equity identified broadly two forms of unacceptable conduct. The first comprises overt acts of improper pressure or coercion such as unlawful threats. *Today there is much overlap with the principle of duress as this principle has subsequently developed.* The second form arises out of a relationship between two persons where one has acquired

E   over another a measure of influence, or ascendancy, of which the ascendant person then takes unfair advantage." (Emphasis added.)

91   Furthermore, since the recognition of economic duress, there have been several cases in which lawful act economic duress can be said to have been accepted as a ground for the avoidance of a contract or restitution (whether made out on the facts or not). These include *CTN Cash and Carry

F   Ltd v Gallaher Ltd* [1994] 4 All ER 714; *Alf Vaughan & Co Ltd v Royscot Trust plc* [1999] 1 All ER (Comm) 856; *Borrelli v Ting* [2010] Bus LR 1718; *Progress Bulk Carriers Ltd v Tube City IMS LLC (The Cenk Kaptanoglu)* [2012] 2 All ER (Comm) 855; *Marsden v Barclays Bank plc* [2016] 2 Lloyd's Rep 420; *The Flying Music Co Ltd v Theater Entertainment SA* [2017] EWHC 3192 (QB); and *Al Nehayan v Kent* [2018] 1 CLC 216. One should

G   also bear in mind the Privy Council decision in *Attorney General v R* [2003] EMLR 24, in which lawful act duress was carefully considered, albeit not made out on the facts, in a non-commercial context (so that "economic" duress was not in issue). In two of those cases, *Borrelli v Ting* and *Progress Bulk Carriers Ltd v Tube City IMS LLC*, the decision was that economic duress was made out thereby rendering the contract voidable (although, as is explained in paras 104–112 below, some of the reasoning in both those cases

H   focused on the unlawful conduct prior to the relevant lawful threat). In the other cases, duress was either held not to be made out on the facts or, as in the *Al Nehayan* case, the view that lawful act duress was made out on the facts was obiter dicta. However, in none of the cases was any doubt cast on lawful act duress being a valid concept. In this respect, it is also significant

© 2023 The Incorporated Council of Law Reporting for England and Wales

that in the present case both Warren J and the Court of Appeal accepted that     A
lawful act duress exists.

92    For these three reasons, the better view is that, although controversial,
lawful act duress does, and should, exist as a matter of English law.

*6. How does one determine the illegitimacy of the threat for lawful act economic duress?*                                                                     B

  *(1) Certainty and clarity*

93    Within the realm of commercial contracts, with which we are here
concerned, English law has a long-standing reputation for certainty and
clarity and there is a significant danger that that reputation will be lost if the
law on lawful act economic duress is stated too widely or with insufficient
precision.                                                                       C

94    Mr Shepherd, counsel for Times Travel, submitted that the best way
forward would be to adopt a "range of factors" approach. He referred us to
the adoption of that approach by this court in *Patel v Mirza* [2017] AC 467,
in the context of illegality as a defence and argued that an analogous
approach was appropriate here. I do not agree. The long-standing problem
with the law on illegality as a defence was that, over many decades, rules had   D
been formulated that were inappropriate and clashed with the outcomes
that, as a matter of the policies involved, one would wish to reach. In that
context, the best solution to the problem was for the Supreme Court to draw
on the covert reasoning of the courts, to cast aside the unsatisfactory rules,
and to put forward a range of factors approach reflecting the underlying
policies. The expectation is that this will lead to desirable outcomes based
on transparent and rational reasoning and, in time, the approach seems        E
likely to lead to the formulation of appropriate rules. But in the realm of
lawful act economic duress, there is no equivalent problem of a series of
rules being applied that are unsatisfactory. On the contrary, the law is in its
infancy and the best approach is for the common law to be clarified or
developed in a traditional incremental way.

95    For similar reasons, I do not think that this is an appropriate            F
case in which to rely on a general principle of good faith dealing in so
far as that would require a court to try to apply a standard of what is
commercially unacceptable or unreasonable behaviour. That would be a
radical move forward for the English law of contract and the uncertainty
caused by it seems unlikely to be a price worth paying. In my view, the
better strategy, at this stage in the law's development, is to try to set out
a limited but clear and workable boundary for the concept of lawful act       G
economic duress in the context of the facts with which this case is
concerned.

  *(2) A focus on the demand*

96    With regard to lawful act duress, the courts have stressed that,
because the threat is of a lawful act, the question of whether it is illegitimate   H
should focus on the nature of the demand rather than the nature of the
threat. We have seen, in para 88 above, that Lord Scarman stressed this in
*The Universe Sentinel* [1983] 1 AC 366, 401 and referred to Lord Atkin's
judgment on this point in *Thorne v Motor Trade Association* [1937] AC 797.

© 2023 The Incorporated Council of Law Reporting for England and Wales

A Although said in the context of the crime of blackmail, it is worth spelling out in full what Lord Atkin said, at p 806:

> "The ordinary blackmailer normally threatens to do what he has a perfect right to do—namely, communicate some compromising conduct to a person whose knowledge is likely to affect the person threatened. Often indeed he has not only the right but also the duty to make the disclosure, as of a felony, to the competent authorities. What he has to justify is not the threat, but the demand of money."

### (3) Commercial self-interest

97 In thinking about the justification of the demand, in the context of lawful act economic duress, it is clear that, in general, a demand motivated by commercial self-interest is justified. If that were not the case, normal commercial bargaining would be seriously disrupted. For example, in the course of negotiations for a contract, lawful act threats may sometimes be used by one party (A) as a means of extracting from the other party (B) what A is demanding from B. As Dyson J observed in *DSND Subsea Ltd (formerly DSND Oceantech Ltd) v Petroleum Geo-Services ASA* [2000] BLR 530, para 131 (although the focus in that case was on alleged unlawful act economic duress): "Illegitimate pressure must be distinguished from the rough and tumble of normal commercial bargaining."

98 A useful illustration of the general position—that a lawful act threat, coupled with a demand motivated by commercial self-interest, is legitimate—is provided by the recent case in New Zealand of *Dold v Murphy* [2021] 2 NZLR 834. Mr Dold, Mr Jacobs and Mr Murphy owned a tourism company. Mr Murphy owned 6.2%. Mr Jacobs and Mr Dold each owned 46.9%. They received an offer for AUD 112m to buy their company. This offer was far higher than they were expecting. They were all keen to sell, but Mr Dold and Mr Jacobs especially so. Mr Murphy refused to sell unless he was paid another AUD 2m each from Mr Dold and Mr Jacobs for his shares. Reluctantly, as they needed his approval to be able to sell the company, Mr Dold and Mr Jacobs agreed. Mr Dold subsequently sought to recover the AUD 2m he paid Mr Murphy on the basis of economic duress. That claim failed. The New Zealand Court of Appeal took the view that, as there was no unlawfulness involved in what Mr Murphy had threatened, it would be a rare case, and this was not one, where economic duress could be made out. At para 79 Kós P said that the behaviour of Mr Murphy had been "opportunistic" but that, nevertheless, "he was entitled to act in his own self-interest, even if his actions were both unexpected and ungenerous." It should be added that, in any event, it would appear that Mr Dold did have a reasonable alternative to giving in to Mr Murphy's threat: he could simply not have sold the shares.

99 It follows from the general proposition, that a demand made in commercial self-interest is justified, that the doctrine of lawful act economic duress is essentially concerned with identifying rare exceptional cases where a demand motivated by commercial self-interest is nevertheless unjustified.

© 2023 The Incorporated Council of Law Reporting for England and Wales

*(4) CTN Cash and Carry Ltd v Gallaher Ltd: a "bad faith demand" requirement*                                                                    A

100   In thinking about the justification of the demand in relation to the facts of this case, the most important appellate decision in English law, which therefore merits careful examination, is the Court of Appeal's decision in *CTN Cash and Carry Ltd v Gallaher Ltd* [1994] 4 All ER 714.    B
The defendants mistakenly delivered cigarettes to the claimants' Burnley warehouse rather than their Preston warehouse from where the cigarettes were stolen.  Mistakenly believing that the risk had passed to the claimants, the defendants demanded the £17,000 contract price and made clear that they would withdraw the claimants' credit facilities on future contracts if they failed to pay.  The claimants paid the £17,000 but later sought repayment on the ground that they had paid under duress.  The Court of Appeal held that the claim failed.  It was stressed that it was lawful for the    C
defendants to insist that they would no longer grant credit.  Although it was accepted that duress can be constituted by lawful acts, it was thought that this would rarely be so between commercial parties.  That was so even though the defendants were the sole distributors of popular brands of cigarettes and were therefore, in a sense, in a monopoly position.  What was regarded as being of particular importance was that the defendants were    D
acting in good faith in making the demand: albeit mistakenly, they thought that the goods were at the risk of the claimants and that they (the defendants) were therefore contractually owed the payment demanded.

101   The leading judgment was given by Steyn LJ with whom Farquharson LJ and Sir Donald Nicholls V-C agreed.  Steyn LJ said the following, at pp 717–719:
                                                                                E
"The present dispute does not concern a protected relationship.  It also does not arise in the context of dealings between a supplier and a consumer.  The dispute arises out of arm's length commercial dealings between two trading companies.  It is true that the defendants were the sole distributors of the popular brands of cigarettes.  In a sense the defendants were in a monopoly position.  The control of monopolies is,    F
however, a matter for Parliament.  Moreover, the common law does not recognise the doctrine of inequality of bargaining power in commercial dealings.  See *National Westminster Bank plc v Morgan* [1985] AC 686. The fact that the defendants were in a monopoly position cannot therefore by itself convert what is not otherwise duress into duress.

"A second characteristic of the case is that the defendants were in law entitled to refuse to enter into any future contracts with the plaintiffs for    G
any reason whatever or for no reason at all.  Such a decision not to deal with the plaintiffs would have been financially damaging to the defendants, but it would have been lawful.  A fortiori it was lawful for the defendants, for any reason or for no reason, to insist that they would no longer grant credit to the plaintiffs.  The defendants' demand for payment of the invoice, coupled with the threat to withdraw credit, was neither a    H
breach of contract nor a tort.

"A third, and critically important, characteristic of the case is the fact that the defendants bona fide thought that the goods were at the risk of the plaintiffs and that the plaintiffs owed the defendants the sum in question.  The defendants exerted commercial pressure on the plaintiffs in

143

A    order to obtain payment of a sum which they bona fide considered due to them. The defendants' motive in threatening withdrawal of credit facilities was commercial self-interest in obtaining a sum that they considered due to them"

"We are being asked to extend the categories of duress of which the law will take cognizance. That is not necessarily objectionable, but it seems to me that an extension capable of covering the present case, involving

B    'lawful-act duress' in a commercial context in pursuit of a bona fide claim, would be a radical one with far-reaching implications. It would introduce a substantial and undesirable element of uncertainty in the commercial bargaining process. Moreover, it will often enable bona fide settled accounts to be re-opened when parties to commercial dealings fall out. The aim of our commercial law ought to be to encourage fair dealing

C    between parties. But it is a mistake for the law to set its sights too highly when the critical enquiry is not whether the conduct is lawful but whether it is morally or socially unacceptable. That is the enquiry in which we are engaged. In my view there are policy considerations which militate against ruling that the defendants obtained payment of the disputed invoice by duress.

D    "Outside the field of protected relationships, and in a purely commercial context, it might be a relatively rare case in which 'lawful-act duress' can be established. And it might be particularly difficult to establish duress if the defendant bona fide considered that his demand was valid. In this complex and changing branch of the law I deliberately refrain from saying 'never'. But as the law stands, I am satisfied that the defendants' conduct in this case did not amount to duress."

E    102    The decision in this case was that there was no economic duress. The explanation for why lawful act economic duress was not made out was that the demand of the defendants was made in good faith. That was the "critically important" characteristic. Given that "good faith" can be used in different senses, it is important to clarify that what was here meant was that, albeit mistakenly, the defendants genuinely believed that they were

F    contractually owed the payment demanded. The case may therefore be said to establish what I shall refer to hereinafter as the "bad faith demand" requirement. This requirement can be expressed as follows. In the context we are focusing on—of a demand for what is claimed to be owing, or analogously, as on the facts of this case, a demand for the waiver of a claim—it is a necessary requirement for establishing lawful act economic

G    duress that the demand is made in bad faith in the particular sense that the threatening party does not genuinely believe that it is owed what it is claiming to be owed or does not genuinely believe that it has a defence to the claim being waived by the threatened party. This is on the assumption that, as a matter of law, what the threatening party claims to be owing is not legally owing or there is no defence to the claim being waived by the threatened party. On the facts of *CTN Cash and Carry* lawful act economic

H    duress was not made out because this "bad faith demand" requirement was not satisfied: the defendants genuinely believed that the payment they were claiming was contractually owing.

103    It is possible to go one step further in one's interpretation of the reasoning in *CTN Cash and Carry* by treating the Court of Appeal as having

© 2023 The Incorporated Council of Law Reporting for England and Wales

implicitly laid down that lawful act economic duress would have been made *A*
out had the facts been the same except for the crucial difference that the "bad
faith demand" requirement had been satisfied.  I shall explore that wider
interpretation further below (see paras 121–125).  However, as will become
clear, I do not need to accept that wider interpretation in order to decide this
case.  All I need to take from *CTN Cash and Carry*, in order to decide this
case, is the narrower proposition that, in the context of a demand for what is *B*
claimed to be owing or, analogously, a demand for the waiver of a claim,
there is a "bad faith demand" requirement for lawful act economic duress.

### (5) Borrelli v Ting; Progress Bulk Carriers Ltd v Tube City IMS LLC

104   It is next important to clarify that the two cases from the list in
para 91 above, in which lawful act economic duress may be said to have
succeeded—*Borrelli v Ting* and *Progress Bulk Carriers Ltd v Tube City* *C*
*IMS LLC*—may both be said to be consistent with the "bad faith demand"
requirement of *CTN Cash and Carry*, although in those cases the bad faith in
question related to a demand for a waiver of a claim against the threatening
party rather than a demand for a payment owed to the threatening party.  It
is also a very important feature of these two cases that the threatening party
can be said to have deliberately created, or increased, the threatened party's *D*
vulnerability which it was then able to exploit by making the demand.

105   In *Borrelli v Ting* [2010] Bus LR 1718, James Ting was the former
chair and CEO of Akai Holdings Ltd ("Akai") which had collapsed with a
large deficit.  Akai and its liquidators wished to enter into a scheme of
arrangement (to raise money to fund the liquidation) but that needed
shareholder approval.  Ting, through two companies he controlled, Blossom *E*
Assets Ltd ("B Ltd") and Costner Holdings Ltd ("C Ltd"), held a crucial
minority shareholding in Akai.  Initially using forgery and false evidence,
Ting blocked the scheme of arrangement.  With time running out for the
liquidators to meet a court deadline for approval of the scheme of
arrangement, and with Ting threatening further to delay the scheme, as he
was lawfully free to do through his minority shareholding, the liquidators *F*
entered into a settlement agreement with Ting, B Ltd and C Ltd.  Under that
settlement agreement, the liquidators promised not to pursue any claims
they might have against Ting or B Ltd or C Ltd.  Ting thereupon dropped
his opposition to the scheme of arrangement which was approved.
Subsequently the liquidators challenged the validity of the settlement
agreement on the basis that it had been entered into under economic duress
and it was held by the Privy Council that that was indeed so. *G*

106   Lord Saville JSC, giving the judgment of the Privy Council, said, at
para 35:

> "The Board is of the view that in the present case the liquidators
> entered into the settlement agreement as the result of the illegitimate
> means employed by James Henry Ting, namely by opposing the scheme
> for no good reason and in using forgery and false evidence in support of *H*
> that opposition, all in order to prevent the liquidators from investigating
> his conduct of the affairs of Akai Holdings Ltd or making claims against
> him arising out of that conduct.  As the Board has already observed, by
> adopting these means James Henry Ting left the liquidators with no

© 2023 The Incorporated Council of Law Reporting for England and Wales

A    reasonable or practical alternative but to enter into the settlement
     agreement."

Earlier at para 28, it was said:

B    "[A] finding of particular importance is that James Henry Ting
     procured the opposition to the scheme by Blossom Holdings Ltd and
     Costner Assets Ltd 'solely so as to defeat [the scheme] with the desire and
     intention of thereby depriving the liquidators of funds with a view to
     preventing any further investigation of his conduct of the affairs of the
     company' . . . In other words, James Henry Ting's opposition was not
     made in good faith, but for an improper motive."

And at para 32:

C    "In the view of the Board James Henry Ting's failure to provide any
     assistance to the liquidators; his opposition to the scheme; and his resort
     to forgery and false evidence in order to further that opposition amount
     to unconscionable conduct on his part . . . by agreeing to withdraw the
     opposition to the scheme James Henry Ting did no more than he should
     have done from the outset, had he acted in good faith rather than in an
D    attempt to avoid responsibility for his conduct of the affairs of Akai
     Holdings Ltd."

     107   The relevant threats by Ting, which induced the settlement
     agreement, were lawful. But they had been preceded by unlawful acts in
     failing to co-operate with the liquidators and in initially using forgery and
     false evidence to block the scheme of arrangement. For that reason, one
E    might argue that this was not a case of lawful act duress. However, the fact
     remains that the pressure that finally led to the settlement was lawful. And
     importantly, viewing this as a case of lawful act duress, the decision is
     consistent with the "bad faith demand" requirement. It was clear that Ting
     was making the demand in bad faith in the sense that he did not genuinely
     believe that he had a defence to claims against him and was seeking to
F    prevent further investigation and a waiver of them. It is also clear that Ting
     deliberately brought about, or increased, the liquidator's vulnerability
     which he was then able to exploit by making the demand.

     108   Moving on to the *Progress Bulk Carriers* case [2012] 2 All ER
     (Comm) 855, the claimant charterers entered into a charterparty with the
     defendant owners of a ship (the *Cenk Kaptanoglu*) for the carriage of a cargo
G    of shredded scrap metal to China. The cargo was being sold by the
     charterers to Chinese buyers. The owners, in repudiatory breach, chartered
     the *Cenk Kaptanoglu* to another party but assured the charterers that they
     would find a substitute ship and would compensate the claimants for any
     losses caused. The owners found a substitute ship, which was available with
     a later loading period, which they offered to the charterers at a reduced rate
     of freight. The charterers wished to accept this, while reserving their rights
H    to claim damages for breach of contract. However, at a late stage, the
     owners said that they would only go ahead with the substitute ship if the
     charterers agreed to waive all their rights to damages for the breach. Under
     protest, the charterers agreed to this waiver so as to fulfil their sale contract
     with the Chinese buyers. The question was whether the waiver (settlement)

© 2023 The Incorporated Council of Law Reporting for England and Wales

146
Times Travel (UK) Ltd v PIA Corpn (SC(E))                          [2023] AC
Lord Burrows JSC

A

agreement was voidable for economic duress. The arbitrators decided that it was and, on appeal by the owners, Cooke J upheld that decision.

109   It is clear that the owners had deliberately created, or increased, the charterers' vulnerability, by misleading them as to the substitute ship, which it was then able to exploit by making the demand. But how far is this decision consistent with the "bad faith demand" requirement? Cooke J twice referred, at paras 28 and 40, to the fact that the arbitrators had made no express finding that the owners were in bad faith. But nor was there any finding that they were in good faith. Moreover, on any fair reading of the facts, and without any finding to the contrary, one can readily assume that, had the question specifically arisen, the arbitrators would have been very likely to find that the owners did not genuinely believe, prior to entering into the waiver agreement, that they had a defence to a claim against them for damages for breach of contract. In my view, the decision can be regarded as correctly decided provided that, as appears to be the case, the owners made the demand in bad faith not genuinely believing that they had a defence to a claim for damages against them. In other words, the decision can be regarded as correct assuming that it was consistent with the "bad faith demand" requirement.

110   However, as with *Borrelli v Ting*, one can ask, was this a case of lawful act duress at all? Cooke J thought it important that the owners had been in repudiatory breach by not providing the first vessel. He said at paras 37–39:

"37. The only basis of the appeal put forward was that the Arbitrators had not made findings of fact which could amount to 'illegitimate pressure', essentially because they had not found that the pressure put upon the Charterers to enter into the settlement agreement involved an unlawful act. The Owners were not threatening to break a contract at the time nor committing any tort in refusing to enter into a variation of the charter with the substitution of the Agia and a new laycan, save on terms which bore down heavily upon the Charterers because of their existing sale contract. It was said that this was just the operation of market forces of which the Owners were entitled to take advantage.

"38. The Owners contended that the Arbitrators had not found any threatened breach of contract by them, in refusing to ship the cargo on the Agia without a waiver of rights by the Charterers. It is true that the Arbitrators made no finding that there had been a binding agreement made on the 27th April to ship the cargo on the Agia, so that there could be no threatened breach in refusing to do so, without the waiver of rights. Thus far the Owners are correct.

"39. What however the Owners' submissions overlook is the fact that their repudiatory breach was the root cause of the problem and that their continuing conduct thereafter was, as described by the Arbitrators, designed to put the Charterers in a position where they had no option but to accept the settlement agreement in order to ship the cargo to China and avoid further huge losses on the sale contract to the Chinese receivers. As the Charterers submitted, it would be very odd if pressure could be brought about by a threatened breach of contract, which did amount to an unlawful act but not by a past breach, coupled with conduct since that breach, which drove the victim of the breach into a position where it had

B

C

D

E

F

G

H

A   no realistic alternative but to waive its rights in respect of that breach, in order to avoid further catastrophic loss."

111   Cooke J may be interpreted as categorising the duress as unlawful, rather than lawful act, duress. Certainly, the owners' repudiatory breach initially created the difficulty that the charterers needed a substitute ship. However, the relevant pressure or threat that led to the waiver agreement

B   was the threat not to be provided with the substitute ship that the owners had said would be provided but without committing themselves to providing. The past breach of contract created the opportunity to apply the threat or pressure. However, it was the lawful threat (or pressure) that was the effective cause of the charterers' entering into the waiver agreement. And in para 38, which I have set out in the previous paragraph, Cooke J

C   examined the argument, only to reject it, that the original contract was continuing so that the owners were contractually bound to provide the substitute ship and were therefore threatening a breach of contract in failing to do so. If one focuses on the threat (or pressure) that directly induced the contract (or non-contractual payment), we are in the realm of lawful act duress. In my view, therefore, *Progress Bulk Carriers* can be correctly viewed as a decision on lawful act duress.

D   112   Taken together, what *Borrelli v Ting* and *Progress Bulk Carriers* can be taken to have established is that, in relation to a demand for a waiver by the threatened party of a claim against the threatening party, the demand is unjustified, so that the lawful act economic threat is illegitimate where: first, the threatening party has deliberately created, or increased, the threatened party's vulnerability to the demand; and, secondly, the "bad faith

E   demand" requirement is satisfied (i e the threatening party does not genuinely believe that it has a defence, and there is no defence, to the claim being waived).

*(6) The Court of Appeal in the present case correctly accepted, and applied, the "bad faith demand" requirement*

F   113   I now turn to the central reasoning of the Court of Appeal in the present case. As in *Borrelli v Ting* and *Progress Bulk Carriers*, the facts of this case concern a demand for a waiver by the threatened party (Times Travel) of claims against the threatening party (PIAC). PIAC was in effect in a monopoly position as regards the supply of airline tickets for direct flights between the UK and Pakistan. There is obviously nothing objectionable

G   about that in itself. But there are at least two features of the facts that take this case outside the realm of the mere use of monopoly power. First, Warren J found (see paras 73–75 above) that PIAC was in breach of contract by failing to pay a very large sum of past commission owing to Times Travel (the principal sum claimed was over £1.2m, exclusive of interest). Secondly, PIAC then went further by, for example, suddenly cutting Times Travel's normal ticket allocation from 300 to 60 which increased Times Travel's

H   particular vulnerability which PIAC was then able to exploit by making the demand for the waiver (see paras 69–70 above). It follows that, in line with the analysis of *CTN Cash and Carry*, *Borrelli v Ting* and *Progress Bulk Carriers* that I have set out above, the crucial issue is whether the "bad faith demand" requirement was satisfied.

© 2023 The Incorporated Council of Law Reporting for England and Wales

148
Times Travel (UK) Ltd v PIA Corpn (SC(E))                    [2023] AC
Lord Burrows JSC

114   David Richards LJ was therefore correct to insist on, and apply, *A*
that "bad faith demand" requirement (with its subjective test).   He
distinguished a demand made without reasonable grounds (an objective
test).   In the course of a wide-ranging judgment, which surveyed English
and Commonwealth authorities, as well as academic writings, David
Richards LJ said this at para 105:

> "My conclusion on the central legal issue is that the doctrine of lawful   *B*
> act duress does not extend to the use of lawful pressure to achieve a result
> to which the person exercising pressure believes in good faith it is entitled,
> and that is so whether or not, objectively speaking, it has reasonable
> grounds for that belief.   The common law and equity set tight limits
> to setting aside otherwise valid contracts.   In this way undesirable
> uncertainty in a commercial context is reduced."
>                                                                              *C*

He went on at paras 106–107:

> "106. The relevant considerations go beyond uncertainty.   In judging
> the use of lawful acts or threats of lawful acts as commercial pressure,
> there is a sharp distinction between such use to pursue demands made in
> good faith and those made in bad faith.   As I earlier mentioned, a lack of
> good faith on the part of a contracting party is a feature in a number of   *D*
> the grounds on which contracts may be avoided.   Rescission on grounds
> of fraudulent misrepresentation or unconscionable transaction are
> examples.   It is a clear criterion involving conduct which all can agree is
> unacceptable and which is a fact capable of proof, often as it happens by
> reference to the lack of any reasonable grounds for the belief.   By contrast,
> not only is reasonableness in this context a standard of very uncertain
> content but it is also very unclear why or on what basis the common law   *E*
> should hold that a party with a private law right, whose exercise is not
> subject to any overriding duty, cannot use it to achieve a purpose which is
> both lawful and advanced in good faith.
> "107. Moreover, it is relevant to note that the economic pressure that
> PIAC was able to apply in this case resulted from its position at that time
> as a monopoly supplier of tickets for direct flights between the UK and   *F*
> Pakistan.   As I have earlier mentioned, the common law has always
> rejected the use, or abuse, of a monopoly position as a ground for setting
> aside a contract, leaving it to be regulated by statute."

Then finally at para 113, he said: "In my judgment, a lack of reasonable
grounds is insufficient to engage the doctrine of duress where the pressure
involves the commission or threat of lawful acts."
                                                                              *G*
115   In relation to a demand for a waiver of claims, even in a situation
where it can be said that PIAC deliberately increased Times Travel's
vulnerability to the demand, the "bad faith demand" requirement is crucial
for determining the illegitimacy of the lawful act threat.   Had Times Travel
proved that PIAC was in bad faith in making the demand for the waiver, its
claim for rescission would have succeeded in this case.   But as we have seen,
the findings of fact of Warren J were to the effect that there was no such bad   *H*
faith.   As Mr Shepherd accepted, we cannot go behind those findings of fact
(which were also unchallenged in the Court of Appeal).
116   It may be objected that the "bad faith demand" requirement means
that the relevant standard depends on the threatening party's own subjective

© 2023 The Incorporated Council of Law Reporting for England and Wales

A   perception of what the law is and that a more objective approach is to be preferred. However, taking a subjective approach in the context of disputed claims is consistent with the law on compromises where it has traditionally been regarded as important whether or not a party bona fide believes it has a claim: see, for example, *Chitty on Contracts*, 33rd ed (2018), para 4-051.

   **117**   Mr Shepherd submitted that the "bad faith demand" requirement would render it too easy for the threatening party to insist on a contract
B   being upheld because that party would simply have to assert that it genuinely believed that the money was owing or that there was a defence to the claim being waived (i e on these facts, PIAC would simply need to assert that it genuinely believed that it had a defence to the claims for breach of contract that were being waived). It is true that the legal burden of proof in relation to the "bad faith demand" requirement is on the threatened party who is
C   seeking redress for duress. That is, the threatened party has to prove that the threatening party was acting in bad faith in the sense that it did not genuinely believe that the money was owing or that there was a defence to the claim being waived. This was recognised by David Richards LJ who said, at para 111: "The judge accepted that Times Travel had not established bad faith. That should have been the end of the discussion of good or bad faith. It was not for PIAC to establish its good faith."
D   **118**   However, this does not mean that a court will accept that the threatened party (the claimant) cannot satisfy the burden of proof whenever the threatening party (the defendant) asserts that it genuinely believed that the money was owing or that it had a defence to the claim being waived. On the contrary, the more unreasonable that belief, the more will be required, from an examination of all relevant material, before a court will accept that
E   the defendant did genuinely have that belief. What can be envisaged is that where the defendant's belief is manifestly unreasonable, the evidential onus switches to the defendant. But ultimately such problems of proof are not unique to this area of the law and are ones that the courts are well-used to confronting and dealing with.

   **119**   In this case, therefore, David Richards LJ correctly applied the "bad faith demand" requirement to the facts as found by Warren J. As there was
F   no such bad faith, the Court of Appeal was correct to deny Times Travel's claim for rescission of the contract for economic duress. That is enough to decide this case.

   **120**   However, for the purposes of completeness, and because of the possible future incremental development of the law on lawful act economic duress, building from this decision, I now go on to discuss three further
G   matters. First, the wider interpretation of *CTN Cash and Carry*; secondly, why I have rejected several prominent alternative approaches to the scope of lawful act economic duress (i e approaches that do not turn on the "bad faith demand" requirement); and thirdly, my reasons for rejecting an alternative strategy put forward by Mr Jones (counsel for PIAC).

*(7) The wider interpretation of CTN Cash and Carry*

H   **121**   I have explained in para 103 above that *CTN Cash and Carry* [1994] 4 All ER 714 can be said to establish the "bad faith demand" requirement for lawful act economic duress; but that it is possible to go one step further in one's interpretation of the reasoning in *CTN Cash and Carry* by treating it as implicitly laying down that lawful act economic duress

© 2023 The Incorporated Council of Law Reporting for England and Wales

would have been made out had the facts been the same except for the crucial difference that the "bad faith demand" requirement had been satisfied.  In other words, one may say that the implication of Steyn LJ's reasoning is that, had the defendants made the demand in bad faith, not genuinely believing that the payment was contractually owing, the money would have been recoverable on the facts of that case.

122   That one can draw that implication derives support from Mitchell, Mitchell and Watterson, *Goff and Jones on the Law of Unjust Enrichment*, 9th ed (2016).  They write, at para 10-70:

> "If the claimants could have shown that when the defendants made their threat they knew that the goods were at the defendants' risk, then the claimants would surely have succeeded, for the money would then have been extorted from them, and commercial self-interest is not unbridled."

I agree.  Although one cannot say that the defendants had deliberately created, or increased, the claimants' vulnerability (as one could in *Borrelli v Ting* [2010] Bus LR 1718 and *Progress Bulk Carriers* [2012] 2 All ER (Comm) 855 and on the facts of this case), the defendants must have known that the claimants were in an exceptionally vulnerable position because of the defendants' monopoly position.  If one then adds to that the postulated satisfaction of the "bad faith demand" requirement—so that, on the facts, the defendants would have been dishonestly claiming that the money was owing under the contract when they knew it was not—there is a compelling analogy to the facts of *Borrelli v Ting* and *Progress Bulk Carriers*.  Although it is not necessary to decide this point in this case, I am of the view that, had the facts otherwise been the same but the "bad faith demand" requirement had been satisfied in *CTN Cash and Carry* [1994] 4 All ER 714, the demand would have been unjustified thereby rendering the threat illegitimate.

123   The Court of Appeal in the instant case also made clear that one could take the wider interpretation of the reasoning in the *CTN Cash and Carry* case.  Hence, David Richards LJ said at para 62:

> "*CTN Cash and Carry v Gallagher* can be taken to establish that where A uses lawful pressure to induce B to concede a demand to which A does not bona fide believe itself to be entitled, B's agreement is voidable on grounds of economic duress."

124   However, that bald proposition goes too far and caution must here be exercised.  Having clarified that, in that "test", David Richards LJ must have been meaning "legal" rather than "moral" entitlement (because otherwise the test would be far too vague), Davies and Day (2020) 136 LQR 7, 9, express one of the difficulties as follows:

> "However, if entitlement is used in a legal sense, then the language of this test does not quite work in the contractual context.  The demand will be to receive a contractual promise.  Unless issues of public policy are engaged, a party is always legally entitled to receive a contractual promise, even if that is a waiver of a prior claim.  This is illustrated by *Times Travel* itself: the point was not whether the defendant bona fide believed itself to be entitled to the thing demanded (the obligations under the new agency agreement) but rather whether the defendant actually

A    believed there was a prior claim against it for past unlawfulness (for not
paying commissions due under the old agency agreement).  Since the
airline had genuinely believed itself not to be liable to pay the
commissions under the old agreement, the waiver of that claim in the new
agreement could not be rescinded for duress."

B    125    It is clear, therefore, that the above statement of David Richards LJ
must be read in the context of the facts in *CTN Cash and Carry* because, on
its face, it is far too wide.  The context was one where the money was being
demanded on the mistaken basis that it was owing under the contract for the
goods that had been delivered but stolen.  The law on lawful act economic
duress would be far too wide if, generally, the illegitimacy of the threat
turned on whether the threatening party did, or did not, bona fide believe
C    that it was entitled to what it demanded.   For example, a party
(A) negotiating a contract with another party (B) may threaten (lawfully) not
to supply goods unless B pays A money.  Plainly economic duress could not
be made out (there would otherwise be a risk of undermining ordinary
contractual negotiations) even if it could be shown that A did not genuinely
believe itself entitled to the money demanded from B.  Indeed, it is obvious
that, until the contract has been concluded, A has no contractual entitlement
D    to what is demanded.  Put another way, the "bad faith demand" requirement
is dependent on there being an existing legal right and duty between the
parties (whether contractual or otherwise) which provides a clear and
certain standard against which alleged bad faith of the threatening party can
be assessed.  Without that tie to an existing legal right and duty, the "bad
faith demand" requirement loses its force as being underpinned by a
E    workable standard of dishonesty: the bad faith demand is concerned with
either a dishonest assertion of an existing right or the dishonest removal (by
waiver) of an existing right.  It also loses its force as providing a clear and
certain means of controlling the scope of lawful act economic duress and of
distinguishing a demand that is unjustified from one that is made in ordinary
commercial bargaining.

F        *(8) Some alternative approaches to the scope of lawful act economic
duress*

126    I have looked at several alternative approaches to the scope of
lawful act economic duress (i e approaches that do not turn on the "bad faith
demand" requirement).  Although these approaches have been put forward
G    generally, and are not focusing on the context of a demand for what is
claimed to be owing or for a waiver of a claim, with which we are directly
concerned in this case, they may be taken to include that narrower context.
But, with respect, these alternative approaches tend to flounder on the
shifting sands as to what constitutes a reasonably held belief or, more
generally, unreasonable or abnormal behaviour.  For example, there is the
suggestion of Hugh Beale in *Chitty on Contracts*, 33rd ed (2018), para 8-046
H    that the relevant test might be whether the lawful act threat is "coupled with
a demand which goes substantially beyond what is normal or legitimate in
commercial arrangements".

127    Again, there is a focus on assessing the reasonableness of the
demand, and indeed the threat, in the fascinating obiter dicta of Leggatt LJ

(as he then was) sitting at first instance in *Al Nehayan v Kent* [2018] 1 CLC    A
216, para 188.  He there suggested that:

> "the test suggested in *Chitty on Contracts* could be made more precise
> by transposing into objective requirements the elements of the offence of
> blackmail.  On this basis a demand coupled with a threat to commit a
> lawful act will be regarded as illegitimate if (a) the defendant has no
> reasonable grounds for making the demand and (b) the threat would not    B
> be considered by reasonable and honest people to be a proper means of
> reinforcing the demand."

128    It is my view, with respect, that those tests risk rendering the law on
lawful act duress too uncertain and would potentially jeopardise the stability
of the English law of contract.  Of course, a scholar of the distinction of
Hugh Beale is well alive to those risks and trusts that the courts can draw a    C
stable line as to what, for example, constitutes a demand that goes
substantially beyond what is normal.  But that the risk is significant is shown
by his further comment at the end of para 8-046 that "care must be taken in
treating threats lawful in themselves as amounting to duress, for otherwise
threats commonly used in business (e g of lawful strikes) would fall into the
category of economic duress".

129    Another interesting suggestion is that made by James Edelman    D
and Elise Bant, *Unjust Enrichment*, 2nd ed (2016), at p 212.  They argue
that what should, and does, underlie the law on lawful act duress is
"disproportionality between (i) the lawful threat and (ii) the defendant's
legitimate interest in the demand it supports".  However, although notions
of "disproportionality" have begun to play a role in contract law—one
thinks particularly of the restated law on penalty clauses in *Cavendish*
*Square Holdings BV v Makdessi* [2016] AC 1172—it is far from clear how    E
disproportionality would work in the context of a case like the present; and,
more generally, one can anticipate that there would be great uncertainty in
the working out of a disproportionality idea in the general context of lawful
act economic duress.  Indeed, it is significant that, in the commercial context,
Edelman and Bant go on to say the following, at p 217:

> "The general reluctance of courts to recognise lawful economic or    F
> commercial threats as disproportionate to commercial goals (and thus
> illegitimate) is to be applauded.  Any other approach would cut across the
> statutory competition law rules which draw complex distinctions
> between lawful and unlawful commercial behaviour . . . Only in the most
> exceptional circumstances, if at all, should it be illegitimate to threaten to
> engage in conduct which a plaintiff has a right to engage in and which is    G
> not proscribed by competition law."

130    The difficulties with these alternative approaches confirm my belief
that, in the context of a demand for what is claimed to be owing or for a
waiver of a claim, the "bad faith demand" requirement provides the
appropriate certainty that is essential for the recognition of lawful act
economic duress.                                                            H

### (9) An alternative strategy put forward by Mr Jones

131    Mr Jones put forward, as an alternative to his primary submission
(that the reasoning of the Court of Appeal was correct), a line of argument

153
[2023] AC        Times Travel (UK) Ltd v PIA Corpn (SC(E))
Lord Burrows JSC

A    which would deny the claim in this case for different reasons than those relied on by the Court of Appeal (i e for reasons different from the non-establishment of the "bad faith demand" requirement). His alternative submission was that, unless the criminal law offence of blackmail has been committed, lawful act duress should not exist. In particular, he submitted that *Borrelli v Ting* [2010] Bus LR 1718 and *Progress Bulk Carriers* [2012] 2 All ER (Comm) 855 are better regarded as cases of unlawful act duress not

B    lawful act duress. This alternative line of argument has some attractions. But, ultimately, I have rejected that alternative submission for the following main reasons:

    (i) As I have explained at paras 107 and 110–111, *Borrelli v Ting* and *Progress Bulk Carriers* can be correctly viewed as cases on lawful act duress.

    (ii) It is not clear how exactly a direct reliance on the crime of blackmail

C    (at least without further elaboration) would work in the civil law context. Mr Jones argued that blackmail should be recognised as an example of "unlawful means". But that involves the circularity referred to in para 88 above.

    (iii) Mr Jones's submission would involve largely ignoring the Court of Appeal's reasoning in *CTN Cash and Carry* [1994] 4 All ER 714 which accepted that there can be lawful act economic duress without reference to

D    the crime of blackmail.

    (iv) Mr Jones's submission would also run contrary to my view, explained at para 122 above, that, had there been a bad faith demand in *CTN Cash and Carry*, economic duress would have been made out. Similarly, Mr Jones's submission would also run contrary to my view that, on the facts of this case, had PIAC's demand been made in bad faith, the threat would clearly have

E    been illegitimate.

    (v) Looking across the range of past cases in English law (including some that have been classified as cases of actual undue influence) they support the view that lawful act duress does exist. See paras 89–91 above.

*7. The judgment of Lord Hodge DPSC*

F    **132**   Since writing this judgment I have had the benefit of reading the judgment of Lord Hodge DPSC. There is a large measure of agreement between us. Where we fundamentally differ is that, in deciding that there was no lawful act economic duress on the facts of this case, I regard it as essential that, on Warren J's findings, PIAC was not acting in bad faith in the specific sense relating to PIAC's genuine belief as to its not being contractually liable for the unpaid commission that was being waived. That

G    is what the Court of Appeal's decision turned on. It is my view that, had there been a contrary finding of bad faith, in that specific sense, Times Travel's claim for lawful act economic duress would here have succeeded. While already in a strong position by reason of having a monopoly over the supply of tickets for direct flights between the UK and Pakistan, PIAC withheld a very large sum of commission owing to Times Travel (the principal sum claimed was over £1.2m) and then went further by, for

H    example, suddenly cutting Times Travel's normal ticket allocation from 300 to 60 thereby increasing Times Travel's vulnerability which it was then able to exploit by making the demand for the waiver (see above paras 69–70). All this went beyond the mere use of monopoly power. On the face of it, PIAC's conduct seems to fall within Lord Hodge DPSC's lawful act duress category

© 2023 The Incorporated Council of Law Reporting for England and Wales

154
Times Travel (UK) Ltd v PIA Corpn (SC(E))                    [2023] AC
Lord Burrows JSC

A

comprising "using illegitimate means to manoeuvre the claimant into a position of weakness to force him to waive his claim". The fact that the claimant was already in a weak position (because of the monopoly) cannot make the claim for lawful act economic duress less deserving than if the claimant had been in a stronger bargaining position. It follows that, in my view, contrary, as I understand it, to that of Lord Hodge DPSC, it is the "bad faith demand" requirement, as I have explained it, that is critical to the decision that there was no lawful act economic duress in this case.

B

133   With great respect, I am also very concerned that, without any focus on the "bad faith demand" requirement, defined in the specific sense that I have set out, and with instead the essential guide being that the defendant's conduct must be "reprehensible" or "unconscionable" or using "illegitimate means" (which is, by definition, distinct from unlawful means), one will be permitting lawful act economic duress to create considerable uncertainty in the realm of commercial contracts. While not supporting a "bad faith demand" requirement, Lord Hodge DPSC also refers at some points to "bad faith" as being relevant (see, for example, paras 56 and 59) but it is not clear to me what Lord Hodge DPSC means by that and how that approach is consistent with his rejection of a "good faith dealing" principle. I have tried to make clear (see para 95) that I am precisely not advocating a general principle of good faith dealing; and the "bad faith demand" requirement that I have been relying on, and which David Richards LJ was also using in the Court of Appeal, is narrow and sharply defined.

C

D

134   Although unnecessary for this decision, we also differ in relation to what the outcome would have been in *CTN Cash and Carry* [1994] 4 All ER 714 had the defendants known that they were not contractually owed the money they were demanding for the goods. In my view, if that had been the position, the claimants would have succeeded in their claim for restitution of the money paid based on lawful act economic duress. But Lord Hodge DPSC takes the contrary view.

E

135   Finally, Lord Hodge DPSC suggests, at para 54 of his judgment, that there is no principled difference between a demand for payment, based on a bad faith demand, and a demand for payment as a pre-condition to entering into a contract. With respect, the principled difference is that one involves bad faith, as I have defined it, but the other does not. I have sought to make clear in para 125 that the "bad faith demand" requirement is dependent on there being an existing legal right and duty between the parties. To try to apply it outside that context would risk unduly interfering with ordinary commercial bargaining; and it would deprive the requirement of its force as being underpinned by a workable standard of dishonesty and as providing a clear and certain means of controlling the scope of lawful act economic duress. It is also worth stressing that the root principle, to which one is seeking to provide a clear guide, is that the demand is unjustified so that the lawful act economic threat is illegitimate. At this stage in the law's development, my strategy (see para 95 above) has been to set out a limited but clear and workable boundary for what constitutes an unjustified demand—so that a lawful act economic threat is illegitimate—in the context of the facts with which this case is concerned. Any incremental development of what the common law treats as an unjustified demand in relation to lawful act economic duress can in the future proceed cautiously, in the light of known facts, from that secure base.

F

G

H

© 2023 The Incorporated Council of Law Reporting for England and Wales

A    *8. Conclusion*

**136**    One can summarise the analysis of the law set out in this judgment as follows:

(i) Lawful act duress, including lawful act economic duress, exists in English law.

(ii) Three elements need to be established for lawful act economic duress: an illegitimate threat; sufficient causation; and that the threatened party had B    no reasonable alternative to giving in to the threat.

(iii) As the threat is lawful, the illegitimacy of the threat is determined by focusing on the justification of the demand.

(iv) A demand motivated by commercial self-interest is, in general, justified.    Lawful act economic duress is essentially concerned with identifying rare exceptional cases where a demand, motivated by commercial C    self-interest, is nevertheless unjustified.

(v) In relation to a demand for a waiver by the threatened party of a claim against the threatening party, a demand is unjustified, so that the lawful act economic threat is illegitimate, where, first, the threatening party has deliberately created, or increased, the threatened party's vulnerability to the demand and, secondly, the "bad faith demand" requirement is satisfied.    The D    demand is made in bad faith where the threatening party does not genuinely believe that it has any defence (and there is no defence) to the claim being waived.

**137**    In addition, I have explained that, although not necessary for the decision in this case, it is my view that, had the "bad faith demand" requirement been satisfied in *CTN Cash and Carry*, the demand would have been unjustified thereby rendering the lawful act economic threat illegitimate. E    That is, had the defendants not genuinely believed that the payment that they demanded from the claimants was contractually owed, it would have been recoverable by the claimants for economic duress.

**138**    Applying the analysis of the law summarised in para **136** to this case, my conclusion is that the decision of the Court of Appeal was correct largely for the reasons it gave (although it was unnecessary for it to have taken, what I have termed, the wider interpretation of *CTN Cash and* F    *Carry*).    Lawful act economic duress was not made out on the facts of this case because the threatened lawful act was not coupled with a bad faith demand.    On the facts found by Warren J, Times Travel failed to establish bad faith by PIAC in the specific sense relating to PIAC's genuine belief as to its not being contractually liable for the unpaid commission.    The Court of Appeal correctly applied the "bad faith demand" requirement in this case. G    I would therefore dismiss the appeal.

*Appeal dismissed.*

Ms B L Scully, Barrister

H

———

© 2023 The Incorporated Council of Law Reporting for England and Wales



**Carlyle Capital Corporation Limited v Conway Others**
Royal Court
4th September 2017

**JUDGMENT**
**38/2017**

Claim by liquidators of insolvent company against former directors for negligence or breach of fiduciary duty/restitution

## IN THE ROYAL COURT OF GUERNSEY

### (ORDINARY DIVISION)

### <u>CIVIL ACTION NO. 1510</u>

BETWEEN:

**(1) CARLYLE CAPITAL CORPORATION LIMITED (IN LIQUIDATION)**

**(2) ALAN JOHN ROBERTS, NEIL MATHER, ADRIAN JOHN DENIS RABET,**
solely in their capacity as Joint Liquidators
of Carlyle Capital Corporation Limited (In Liquidation)

<u>Plaintiffs</u>

**-AND-**

(1) **WILLIAM ELIAS CONWAY JR**

(2) **JAMES H. HANCE JR**

(3) **JOHN CRUMPTON STOMBER**

(4) **MICHAEL J. ZUPON**

(5) **ROBERT BARCLAY ALLARDICE III**

(6) **HARVEY JAY SARLES**

(7) **JOHN LEONARD LOVERIDGE**

(8) **CARLYLE INVESTMENT MANAGEMENT LLC**

(9) **TC GROUP LLC**

(10) **TCG HOLDINGS LLC**

<u>Defendants</u>

**Before: Her Hon Hazel Marshall QC, Lieutenant Bailiff**

| | |
|---|---|
| **Counsel for the Plaintiffs:** | **Advocates J M Wessels & Abel R Lyall** |
| **Counsel for the First to Fourth Defendants:** | **Advocates I C Swan, Anna Guggenheim** |
| | **& Bryan de Verneuil-Smith** |
| **Counsel for the Fifth to Seventh Defendants:** | **Advocate Gareth Bell** |
| **Counsel for the Eight to Tenth Defendants:** | **Advocate Simon Davies** |

**Dates of hearing:** 20th – 24th and 27th – 30th June,
4th – 7th, 11th – 14th, 18th – 21st and 25th – 28th July,

1st, 8th – 11th, 15th – 18th, 22nd – 24th and 30th August,
12th – 15th, 19th – 22nd, 26th, 27th and 30th September,
3rd – 5th, 10th – 12th, 26th and 27th October,
9th and 28th – 30th November,
1st, 2nd, and 6th – 9th December 2016.

**Judgment handed down on: 4th September 2017**

**Cases, Texts and Legislation referred to:**

**1.      Legislation**

**(a)      Guernsey**

The Companies (Guernsey) Law 1994, ss 67b 67C, 67F, 94, 95, 106, 117
The Companies (Amendment) (Guernsey) Law 1996
The Royal Court (Reform) (Guernsey) Law 2008 s 113
The Companies (Guernsey) Law 2008, ss 131, 132, 157, 407, 422, 434, 522, 527
The Evidence in Civil Proceedings (Guernsey and Alderney) Law 2009, ss 1-4

The Royal Court Civil Rules 2007, r 10
The Companies (Transitional Provisions) Regulations 2008. reg 10
The Evidence in Civil Proceedings (Guernsey and Alderney) Rules 2011, rr 2, 8

**(b)      England and Wales**

Companies Act 1862 s 80
Companies Act 1907 s 28
Companies Act 1948 ss 333, 455
Companies Act 1985 ss 518, 741
Insolvency Act 1986 ss 123, 214, 212
Companies Act 2006 s 250

**2.      Cases**

**(a)      Guernsey**

*Carlyle Capital Corpn Ltd (in Liq) v Conway and others* (Guernsey Judgment 29/2011)
*Carlyle Capital Corpn Ltd (in Liq) v Conway* (2011-12) GLR 562 (CA)
*Emerald Bay Worldwide Ltd v Barclays Wealth Directors (Guernsey) Limited* (2014) (CA. No 02/2014)
*Flightlease Holdings (Guernsey) Ltd v Flightlease (Ireland) Limited* [2009-2010] GLR 38
*In re Montenegro Investments Limited (in administration)* 2013 GLR 345
*Investec Trust (Guernsey) Ltd v Glenalla Properties Ltd* (2015)(CA. No 35/2015)
*Perpetual Media Capital Ltd v Enevoldsen* (2014) GLR 57 (CA)
*Romain Zaleski v GM Trustees Ltd* (2015) (Guernsey Judgment 42/2015)
*Savile AD4 Limited v Marlborough Trust Company Limited* (2016) (Guernsey Judgment 3/2016)

**(b)      England and Wales**

*Aberdeen Railway Co v Blaikie Brothe*rs (1854) 17D (HL) 20
*AIB Group (UK) plc v Mark Redler & Co Solicitors* [2015] AC 1503
*Armory v Delamirie,* (1722) 93 ER 664
*Bilta (UK) Ltd v Nazir (No 2)* [2016] AC 1
*Bishopsgate Investment Management Ltd v Maxwell (No 1)* [1994] 1 All ER 261
*BNY Ltd v Eurosail* [2013] 1 WLR 1408

© Royal Court of Guernsey

*Boardman v Phipps* [1967] 2 AC 46
*BPE Solicitors vs Hughes-Holland* [2017] UKSC 21
*Brady v Brady* [1988] BCLC 20
*Braganza v BP Shipping* [2015] UKSC 17*Bristol & West Building Society v Mothew* [1998] 1 Ch 1
*Browne v Dunn* (1893) 6 R 67
*Browning v Brachers* [2005] PNLR 44
*BTI 2014 LLC v Sequana SA* [2016] EWHC 1686 (Ch)
*Bucci v Carman (Liquidator of Casa Estates (UK) Ltd)* [2014] EWCA Civ 383
*Byblos Bank SAL v Al-Khudhairy* [1987] BCLC 232
*Byng v London Life Associations Ltd* [1990] Ch 170 (CA)
*Charterbridge Corp Ltd v Lloyds Bank Ltd* [1970] Ch 62
*Colin Gwyer & Associates Ltd v London Wharf (Limehouse) Ltd* [2003] 2 BCLC 153
*Daniel v Tee* [2016] 4 WLR 1538
*Donoghue v Stevenson* [1932] AC 562
*Eclairs Group Ltd v JKX Oil & Gas plc* [2016] BCC 79 (Sup Ct)
*English v Emery Reimbold & Strick Ltd* [2002] EWCA 605
*Equitable Life Assurance v Hyman*  [2002] 1 AC 408
*Extrasure Travel Insurances Ltd v Scattergood* [2003] 1 BCLC 598 (ChD)
*Facia Footwear Ltd v Hinchliffe* [1998] 1 BCLC 218 (ChD)
*Farstad Supply AS v Enviroco Ltd* [2010] UKSC 18
*Galoo Ltd v Bright Grahame Murray* [1994] 2 BCLC 492
*Gestmin SGPS SA v Credit Suisse (UK) Ltd* [2013] EWHC 3560 Comm
*Holland v HMRC* [2010] UKSC 51
*Howard Smith v Ampol Petroleum Ltd* [1974] AC 821
*Hutton v West Cork Ry Co* (1883) 23 Ch D 654
*Item Software (UK) Ltd v Fassihi* [2005] 2 BCLC 91 (CA)
*Kuwait Asia Bank EC v National Mutual Life Nominees Ltd* [1991] 1 AC 187 (PC)
*Libyan Investment Authority v Goldman Sachs International* [2016] EWHC 1538 (Ch)
*McQueen v Great Western Railway Company* (1875) LR 10 QB 569
*Madoff Securities International Limited (in liquidation) v Raven* [2014] Lloyd's Rep F C 95 (Comm)
*Nationwide Building Society v Balmer Radmore (a firm)* [1999] Lloyds Rep PN 241
*Optaglio Ltd v Tethal* [2015] EWCA Civ 1002
*Parabola Investment Ltd v Browallia Cal Ltd* [2011] QB 477
*Parkinson Engineering Services plc (in liq) v Swan* [2010] 1 BCLC 163
*Pitt v Holt* [2013] 2AC 108
*Re a company (ex p. Glossop)* [1988] 1 WLR 1068 (ChD)
*Re B Johnson & Co Builders Ltd* [1955] Ch 634
*Re Barings plc; Secretary of State for Trade and Industry v Baker* [1998] BCC 583
*Re Barings plc (No 5)* [1999] 1 BCLC 433 (ChD)
*Re Bonnelli's Telegraph Co* [1871] LR 12 Eq 246
*Re Casa Estates Ltd* [2013] EWHC 2371(Ch)
*Re Cheyne Finance Plc (No 2)* [2008] BCC 182
*Re City Equitable Fire Insurance Co Ltd* [1925] Ch 407
*Re Continental Assurance Company of London Ltd (in liqn)* [2001] WL 720239
*Re Continental Assurance Company of London Ltd (in liqn) (No 4)* [2007] 2 BCLC 287
*Re CS Holidays Ltd* [1997] 1 WLR 407
*Re Cubelock Ltd* [2001] BCC 523
*Re d'Jan of London Ltd* [1993] BCC 646 (Ch D)
*Re Edennote Ltd* [1996] BCC 718 (CA)
*Re European Life Assurance Society* (1869) LR 9 Eq 122
*Re HLC Environmental Projects Limited (in liquidation)* [2013] EWHC 2876
*Re Hawkes Hill Publishing Co Ltd (in liquidation)* [2007] BCC 937
*Re Hydrodan (Corby) Limited* [1994] 2 BCLC 180
*Re Kingston Cotton Mill Company (No 2)* (1896) 2 Ch 279 (CA
*Re Landhurst Leasing plc* [1999] 1 BCLC 286 (ChD)
*Re Lo-Line Electric Motors Ltd* [1988] Ch 477

*Re Mumtaz Properties Limited: Wetton v Ahmed* [2011] EWCA Civ 610
*Re Pantone 485 Ltd* [2002] BCLC 266 (CA)
*Re Ralls Builders Limited (in liquidation)* [2016] Bus LR 555
*Re Smith and Fawcett Limited* [1942] Ch 304 (CA)
*Re Southern Counties Fresh Foods Ltd* [2008] EWHC 2810 (Ch)
*Re Welfab Engineers Ltd* (1990) BCC 600
*Re Westmid Packing Services Ltd* [1998] 2 All ER 124
*Regal (Hastings) Ltd v Gulliver* [1967] 2AC 134
*Regentcrest plc v Cohen* [2001] 2 BCLC 80 (ChD)
*Roberts v Frohlich* [2011] EWHC 257 (Ch)
*Seaconsar Far East Ltd v Bank Markazi Jomhouri Islami Iran* [1994] 1 AC 438
*Secretary of State for Industry v Deverell* [2001] Ch 340
*Shuttleworth v Cox Brothers & Co (Maidenhead)* [1927] 2KB 9
*Smith v Molyneaux and others* [2016] UKPC *35* (PC)
*Smithton Ltd v Naggar* [2014] EWCA Civ 939
*South Australia Asset Management Corporation v York Montague Ltd* [1997] AC 191
*Ultraframe (UK) Ltd v Fielding* [2005] EWHC 1638
*Vasiliou v Hajigeorgiou* [2010] EWCA Civ 1475
*Viscount of the Royal Court of Jersey v Shelton* [1986] 1 WLR 985
*Vivendi SA v Richards,* [2013] EWHC 3006
*Wisniewski v Central Manchester Health Authority* [1998] PIQR 324
*Yam Seng Pte Ltd v International Trade Corpn Ltd* [2013] 1 Lloyds Rep 526

**(c)   Other jurisdictions**

**Australia:**
*Ampol Petroleum Ld v RW Miller (Holdings) Ltd* [1972] 2 NSWLR 850
*Houghton v Immer (No 155) Pty Ltd* [1997] 44 NSWLR 46
*Kinsela v Russell Kinsela Pty Ltd* [1986] 4 NSWLR 722
*Roach v Page (No 37)* 2004 NSWSC 1048
*The Bell Group Ltd (in liquidation) v Westpac Banking Corporation (No 9)* (2008) 70 ACSR 1
*Westpac Banking Corporation v The Bell Group Ltd (in liquidation) (No 3)* (2012) 44 WAR 1

**Cayman Islands:**
*Culross Global SPC Ltd v Strategic Turnaround Master Partnership Ltd* 2008 CILR 447
*In re Weavering Macro Fixed Income Fund Limited (in liquidation)* (18th November 2016) (CICA No 2 of 2016)

**Hong Kong:**
*Akai Holdings Ltd v Thanakharn Kasikorn Thai Chamkat* [2010] 3HKC 153
*Libertarian  Investments Ltd v Hall*   (2013) HKFCAR 681
*Moulin Global Eyecare Holdings Ltd v Mei* (2014) HKCFAR 466

**Singapore:**
*Ng Eng Ghee v Mamata Kapildeve Dave and others* [2009] 3 SLR 109

**United States:**
*CMMF LLC v JP Morgan Investment Management Inc* 43 Misc 3d 1226(A)

**3.   Textbooks and other materials**

Goode: *Principles of Insolvency Law* (4th Ed 2011) paras 4-16, 4-23
Gower's *Principles of Modern Company Law* 10th Ed, paras 9-13, 9.14
Hoffmann: *Causation* (2005) 123 LQR 592
Mortimore: *Company Directors; Duties Liabilities and Remedies* (3rd Ed 2017) paras 12.21-22
Palmer's *Company Law* (Rev Jan 2016) para 15.99.30

Snell's *Equity* (33rd Ed Cum Sup 201), para 20-028
Taube: *International Asset Tracing in Insolvency* (2009) para 4.88.

| INDEX | PARA NOS. |
|---|---|
| **1.  Introduction and overview** | 1. |
| The case in outline | 1 – 8 |
| The parties | 9 – 22 |
| The claims | 23 – 25 |
| The action | 26 – 38 |
| The trial | 39 – 56 |
| About this judgment | 57 – 60 |
| **2.  The History** | 61. |
| *The Carlyle Group* | 62 – 70 |
| *Plans for diversification into mortgage backed securities* | 71 – 80 |
| *RMBS* | 81 – 92 |
| *Leverage* | 93 – 96 |
| *Repo financing* | 97 – 114 |
| *The new company's intended business* | 115 – 118 |
| *The formation of CCC* | 119 – 126 |
| *CCC's structure* | 127 – 131 |
| *CCC's Board* | 132 – 143 |
| *Management of CCC's business* | 144 – 151 |
| *CCC's administration* | 152 – 158 |
| *Launching the business* | 159 – 160 |
| *Preliminary Private Placement Memorandum* | 161 – 171 |
| *4th October 2006 – First BOARD MEETING* | 172 – 177 |
| *October 2006* | 178 – 181 |
| *Refining the business model* | 182 – 183 |
| *Investment Guidelines and risk management* | 184 – 186 |
| *Guideline 1 - Asset allocation* | 187 – 189 |
| *Guideline 2 – liquidity cushion* | 190 – 206 |
| *Guideline 3 – Minimum borrowing capacity ("MBC")* | 207 – 215 |
| *20th December 2006 – Second BOARD MEETING* | 216 – 217 |
| *December 2006 – February 2007* | 218 – 222 |
| *15th February 2007 – BOARD MEETING* | 223 – 226 |
| *5th March 2007 – BOARD MEETING* | 227 – 232 |
| *Market events - Spring 2007* | 233 – 235 |
| *26th April 2007 BOARD MEETING* | 236 – 237 |
| *Market events - May 2007* | 238 – 239 |
| *18th May  - ALCO Meeting - Market volatility* | 240 – 245 |
| *20th May   -   Meeting of Carlyle Partners* | 246 – 254 |
| *June 2007: Bear Stearns hedge funds fail* | 255 – 271 |
| *14th June -  ALCO Meeting* | 272 – 277 |
| *15th June - Repo roll* | 278 – 280 |
| *Start of the sub-prime mortgage crisis and demands for increased haircuts* | 281 – 287 |
| *Reinstatement of CCC's IPO* | 288 – 291 |
| *Offering Memorandum* | 292 – 296 |
| *Completion of the IPO and events up to 26th July 2007* | 297 – 298 |
| *Review* | 299 – 303 |

**3.   Overview of the claims made.**                                       304.

    **(1)    July 2007 – 26th July Board Meeting**                       305 – 306
    **(2)    August 2007 – including 23rd August Extraordinary Board**    307 – 315
          **Meeting**
    **(3)    September 2007 - no Board Meeting**                        316 – 320
    **(4)    October to December 2007 -  including 13th November Board**  321 – 326
          **Meeting**
    **(5)    1st January to 27th February 2008 - including 27th February**  327 – 329
          **Board Meeting**

**4.   What this action is not about**                                       330.

    **Claims which are not made**                                     330 – 341
    **Matters included for forensic purposes**                        342 – 348

**5.   Legal principles**                                                    349.

    **The Law –  Introductory**                                       349 – 354
          **General points**                                   355 – 359

    **(1)    The duties of directors**
          **General**                                          360 – 366

      **(a)    The Fiduciary duties - general**                     367 – 369
          **1.  Duty to act in good faith.**                    370.
          The duty is subjective                              370 – 379
          The place of objective considerations               380 – 382
              Evidence
              *Charterbridge*                            383 – 395
              *Wednesbury*                               396 – 413
          (i)    Duty owed to CCC alone                      414 – 419
          (ii)   Duty not to cause (or permit) contravention of statutory or   420 – 427
              regulatory obligations
          (iii)  Duty to comply with CCC's Articles of Association   428
          (iv)   Duty to "make full and frank disclosure to the Board of all   429 – 431
              relevant and material matters".
          (v)    Duty to give proper regard to the interests of creditors and   432 – 435
              prospective creditors of CCC
              When does the duty "arise"?                   436 – 458
              Other aspects of "duty to creditors"         459 – 471
          **2.  Duty to act for proper purposes/not to act for collateral or**   472 – 478
          **improper purposes**
          **3.  Duty to exercise own independent judgement**           479 – 483
          **4.  Not to act in relation to the affairs of CCC in circumstances**   484 – 499
          **where there was an actual or possible conflict**

      **(b)    The Duty of Skill and Care**                         500 – 515
          (i)     Gross negligence                            516 – 517
          (ii)    Delegation                                  518 – 528
          (iii)   The Importance of Board Meetings and Informed   529 – 540
              Deliberation - Duty to hold Board Meetings.
          (iv)    No business judgement rule                  541 – 543

      **(c)    The practical relationship between the fiduciary duties and the**

|  |  | duty of skill and care. | 544 – 547 |
| **(2)** |  | **What is "insolvency"?** | 548 – 588 |
| **(3)** |  | **Wrongful trading** | 589 – 613 |
| **(4)** |  | **Breach of contract/tort/unjust enrichment (against CIM as manager)** | 614 – 619 |
| **(5)** |  | **Statutory Misfeasance,  and** | 620 – 622 |
| **(6)** |  | **Exculpation and Indemnity Defences** | 620 – 622 |
|  |  | **The 1994 Companies Law** | 623 – 690 |
|  |  | **The 2008 Companies Law** | 691 – 701 |
|  |  | **Further points on exoneration/indemnity defences** |  |
|  |  | (i)   Incorporation from the Articles | 702 – 707 |
|  |  | (ii)   Construction of the clauses | 708 – 711 |
|  |  | (iii)   Statutory discretion | 712 |
| **(7)** |  | **The Entity Defendants as Directors** | 713 |
|  | **(a)** | ***De facto* directors** | 714 – 738 |
|  | **(b)** | **Shadow directors** | 739 – 767 |
| **6.** |  | **The issues to be determined** | 768 – 773 |
|  |  | List of potential issues for decision | Sub-paras |
| **7.** |  | **The Evidence and the Witnesses** | 774 – 781 |
|  |  | **Documentary and witness evidence** | 774 – 781 |
|  |  | Documents | 782 – 790 |
|  |  | Assessment of oral testimony | 791 – 802 |
|  |  | Missing witnesses – adverse inferences | 803 – 823 |
|  |  | Missing questions – adverse inferences | 824 – 827 |
|  |  | **The witnesses of fact** | 828. |
|  |  | **Defendants' factual witnesses** | 829 – 831 |
|  |  | Mr Conway | 832 – 844 |
|  |  | Mr Stomber | 845 – 858 |
|  |  | Mr Hance | 859 – 863 |
|  |  | Mr Zupon | 864 – 872 |
|  |  | Mr Allardice | 873 – 889 |
|  |  | Mr Loveridge | 890 – 897 |
|  |  | Mr Sarles | 898 – 902 |
|  |  | Mr Reville | 903 – 906 |
|  |  | Miss Cosiol | 907 – 915 |
|  |  | Mr Buser and Mr Nachtwey | 916 |
|  |  | **Plaintiffs' factual witnesses** | 917. |
|  |  | Ms Alexander | 917 |
|  |  | Mr Shah | 918 – 928 |
|  |  | **The expert evidence** |  |
|  |  | General | 929 – 949 |
|  |  | **(1)  The Financial Economics experts:** |  |

| | |
|---|---|
| (a) **Dr Andrew Carron - Financial economics (financial markets, CCC's business and damages) - Plaintiffs** | 950 – 966 |
| (b) **Dr Harpal Maini – Financial economics (RMBS trading) – Plaintiffs** | 967 – 977 |
| (c) **Mr Eric Welles – Financial economics (repo financing) – Plaintiffs** | 978 – 990 |
| (d) **Professor Hubbard - Financial economics (financial markets, CCC's business, repo financing) – Defendants** | 991 – 999 |
| (e) **Dr Niculescu – Financial Economics (RMBS markets) – Defendants** | 1000 – 1018 |
| (f) **Mr Bezant – Financial economics (damages) – Defendants** | 1019 – 1022 |
| (g) **Other** | 1023 |
| | |
| (2) **The Risk Management experts** | 1024. |
| (a) **Professor Sanjiv Das - Plaintiffs** | 1024 – 1033 |
| (b) **Dr Lesley Webster (also RMBS trading)- Defendants** | 1034 – 1042 |
| | |
| (3) **The Insolvency Experts** | 1043. |
| (a) **Mr Phillip Wallace - Plaintiffs** | 1043 – 1064 |
| (b) **Mr Mark Shaw – Defendants** | 1065 – 1071 |
| | |
| (4) **Delaware Law** | 1072 |
| (5) **Audit and Accounting** | 1073 – 1074 |
| (6) **Dutch Law** | 1075 – 1076 |
| | |
| **Miscellaneous – submissions** | 1077 – 1083 |
| | |
| 8. **Some general background findings.** | 1084. |
| | |
| **The central complaint** | 1085 – 1090 |
| **The nature of the relevant markets** | 1091 – 1090 |
| **The standards of skill and care applicable to individual Defendants.** | 1100 – 1119 |
| **Contractual duties of CIM** | 1120 – 1124 |
| **The effects of the culture of "Carlyle"** | 1125 – 1150 |
| **Mr Stomber's "subservience"** | 1151 – 1156 |
| **The independence of the Independent Directors** | 1157 – 1163 |
| | |
| 9. **The Claims: JULY 2007** | 1164. |
| ***Did the Defendants react inadequately in July 2007 to signs of market instability?*** | |
| | |
| ***Events of Mid July, up to the 26th July Board Meeting.*** | 1164 – 1173 |
| **26th July 2007 – BOARD MEETING** | 1177 – 1187 |
| ***26th July – ALCO Meeting*** | 1188 – 1189 |
| ***Other events on 26th July 2007*** | 1190 – 1192 |
| ***End July 2007*** | 1132 – 1199 |
| | |
| **The claims - July 2007 – summary of arguments** | 1200. |
| **Plaintiffs' case** | 1200 – 1201 |
| **Defendants' case** | 1202 |
| **Discussion and conclusions – the claims relating to July 2007** | 1203 – 1209 |
| (a) **Duty of skill and care** | 1210 – 1212 |
| (i) Market turmoil following the Bear Stearns incidents of June 2007 | 1213 – 2216 |
| (ii) Pressure towards higher haircuts. | 1217 – 1227 |

|  |  | (iii) Increased interest rate volatility | 1228 – 1231 |
|  |  | (iv) Increased asset price volatility | 1232 – 1245 |
|  |  | (v) Previous loss of asset value | 1246 – 1250 |
|  |  | (vi) The difficulty of the IPO. | 1251 – 1252 |
|  |  | (vii) The 26th July Board Meeting | 1253 – 1260 |
|  |  | (viii) Other points | 1261 – 1262 |
|  | **Summary and conclusions** | | 1263 – 1271 |
| **(b)** | **Breach of fiduciary duty** | | 1272 – 1274 |
| **(c)** | **Contractual/tortious claim against CIM** | | 1275 – 1280 |
| **(d)** | **Wrongful trading** | | 1281 |

**10.** **The Claims:  AUGUST 2007**
*Did the Defendants react culpably inadequately to the market crisis conditions of August 2007?*    1282.

| *Market conditions in early August 2007* | 1283 |
| *7th August* | 1284 – 1289 |
| *9th August  - ALCO Meeting* | 1290 – 1294 |
| *9th – 15th August* | 1295 – 1304 |
| *15th August – repo roll* | 1305 |
| *16th and 17th August – the Carlyle loan* | 1306 – 1314 |
| *18th August - insolvency fears* | 1315 – 1317 |
| *20th August - CCC meets its lenders* | 1318 – 1322 |
| *20th to 22nd August – potential sale of $4Bn RMBS to JP Morgan* | 1323 – 1337 |
| *23rd August 2007 - Emergency BOARD MEETING* | 1338 – 1347 |
| *Approaches to Fannie Mae and Freddie Mac* | 1348 – 1349 |
| *The Citigroup affair* | 1350 – 1357 |
| *27th August  - repo roll* | 1358 – 1360 |
| *End of August 2007* | 1361 – 1374 |

| **The claims -  August 2007 – summary of arguments** | |
| **Plaintiffs' case** | 1375 – 1393 |
| **Defendants' case** | 1394 – 1411 |
| **Plaintiffs' reply** | 1412 |
| **Discussion and conclusions –  August 2007** | 1413 – 1415 |
| **(a)** | **Breach of duty of care** | 1416 – 1436 |
| **Extended duty to have regard to interests of CCC's creditors** | 1437 – 1448 |
| **(b)** | **Breach of fiduciary duty** | 1449 – 1466 |
| **The suggested conflicts of interest** | |
| (i) Reputational interests of Carlyle including payment of dividend | 1467 – 1479 |
| (ii) Fees for CIM | 1480 – 1482 |
| (iii) Embarrassment of downsizing | 1483 – 1486 |
| (iv) Personal financial interests | 1487 – 1487 |
| (a) The Mubadala sale | 1488 – 1499 |
| (b) Obtaining a term loan for TCG and | 1500 – 1506 |
| (c) Carlyle's own prospective IPO | |
| **Conclusions as regards August 2007** | 1507 – 1509 |
| **(c)** | **Contractual/tortious claim against CIM** | 1510 – 1511 |
| **(d)** | **Wrongful trading** | 1512 – 1518 |

**11.** **The Claims: SEPTEMBER 2007**    1519.
*Did the Defendants culpably fail to review and change their strategy during September 2007?*

| *General overview* | 1519 – 1524 |

*Early September 2007*                                                                   1525 – 1537
*Possible sale of $1Bn RMBS to UBS*                                                      1538 – 1539
*6th September  -  ALCO Meeting*                                                         1540 – 1541
*Changes in market behaviour*                                                           1542 – 1546
*11th September  - Carlyle Investors' Conference in Washington DC*                        1547 – 1559
*17th September - repo roll and support from Carlyle*                                     1560 – 1566
*20th September - ALCO Meeting*                                                          1567 – 1570
*Repo line negotiations continue to be fraught*                                           1571 – 1578
*25th September – repo roll*                                                             1579 – 1583
*Prospective going concern analysis*                                                     1584 – 1594
*1st October 2007*                                                                       1595 – 1597

**The claims - September 2007/1st October 2007 – summary of arguments**        1598 – 1600
    Plaintiffs' case                                                 1601 – 1614
    Defendants' case                                                 1615 – 1626
    Plaintiffs' reply                                                1627
**Discussion and conclusions – September to 1st October 2007**                 1628
**Breaches of directors' duties**                                                       1629 – 1630
**(a)**   **Breach of fiduciary duty**                                    1631
**(b)**   **Breach of duty of care**                                      1632
    **(1)**  **Failure to take insolvency advice**          1633 – 1637
    **(2)**  **Causing or implementing suspension of Investment Guidelines**   1638 – 1647
    **(3)**  **Failure to raise additional equity capital**   1648 – 1658
       *Later position on raising capital*              1659 – 1660
    **(4)**  **Pursuit of the "capital preservation strategy"/failure to resolve
       to sell substantial (or any) amounts of RMBS**   1661 – 1675

    **Factors affecting the continuation of the capital preservation
    strategy in and from September 2007.**                             1676.
                                                                       1676 – 1693
    **(i)**    **Risk management considerations**
    **(ii)**   **Investment management considerations**    1694 – 1695
       1.  Size of the market                   1696 – 1712
       2.  Depth of the market                  1713 – 1734
       3.  Price                               1735 – 1758
       4.  Risks of selling                    1759 – 1784
       5.  Sales techniques                    1785 – 1789
          (a)  Two way trading    1790 – 1797
          (b)  Recombination      1798 – 1809
          (c)  Auction sales      1810 – 1813
          (d)  Privately negotiated sales   1814 – 1829
       6.  Outlook for the future              1830 – 1831
          (a)  Price improvement/deterioration   1831 – 1856
          (b)  Funding availability   1857 – 1869
          (c)  Possibility of a second market crisis   1870 – 1880
    **(iii)**   **Other considerations**                  1881 – 1884

    **General conclusions for September 2007**                          1885 – 1889
    **Further point  -  CCC's engagement with the markets**
       **Was CCC's engagement with the markets colourable?**   1890 – 1898
       **Was CCC's engagement with the markets incompetent?**   1899 – 1902
       **The UBS Enquiry**                                1903 – 1906
       **Other enquiries, generally**                     1907 – 1923
**(c)**   **Contractual/tortious claim against CIM**                        1924 – 1929
**(d)**   **Wrongful trading**                                            1930 – 1935

**12.**   **The Claims: OCTOBER and NOVEMBER 2007**                          1936.