*Did the Defendants culpably fail to review/revise their strategy between 1st October and 30th November 2007?*

| | |
|---|---|
| *General overview* | 1936 – 1945 |
| *Early October 2007* | 1946 – 1957 |
| *4th October  - ALCO Meeting* | 1958 – 1967 |
| *15th October - repo roll* | 1968 – 1969 |
| *18th  October  -  ALCO Meeting* | 1970 – 1972 |
| *Mid October 2007* | 1973 |
| *25th October  - repo roll* | 1974 – 1976 |
| *Late October 2007* | 1977 – 1984 |
| *November 2007* | 1985 – 1986 |
| *1st November  - ALCO Meeting* | 1987 – 1992 |
| *2nd November – efforts to secure year end repo cover* | 1993 – 1996 |
| *Early November 2007* | 1997 – 2006 |
| *13th November  - Audit Committee and Board Meetings* | 2007 – 2008 |
| *- Audit Committee Meeting* | 2009 – 2026 |
| *- BOARD MEETING* | 2027 – 2061 |
| *15th November – repo roll* | 2062 – 2067 |
| *15th November  - Investor Call* | 2068 – 2069 |
| *16th November  -  ALCO Meeting* | 2070 – 2071 |
| *The Defendants purchase more shares in CCC* | 2072 – 2075 |
| *20th November  -  Investor Conference Presentation* | 2076 – 2080 |
| *26th November  - repo roll* | 2081 – 2083 |
| *29th November  - ALCO Meeting* | 2084 – 2086 |
| *End November2007 - Financial position* | 2087 – 2090 |
| | |
| **The Claims –October and November 2007 -  Summary of arguments** | |
| **Plaintiffs' case** | 2091 – 2106 |
| **Defendants' Case** | 2107 – 2124 |
| **Discussion and conclusions – October and November 2007** | |
| **Breaches of directors' duties** | 2125 – 2126 |
| **(a)    Breach of fiduciary duty** | 2127 – 2133 |
| **(b)    Breach of duty of care** | 2134 – 2140 |
| **(1)    Failure to raise additional equity capital** | 2141 – 2145 |
| **(2)    Failure to initiate sales of RMBS** | 2146 – 2192 |
| **(c)    Contractual/tortious claim against CIM** | 2193 – 2195 |
| **(d)    Wrongful trading** | 2196 – 2231 |
| | |
| **13.    The Claims: DECEMBER 2007** | 2232. |

**13.**     <u>**The Claims: DECEMBER 2007**</u>

*Did the Defendants culpably fail to review and change their strategy during December 2007?*

| | |
|---|---|
| *General overview* | 2232 – 2234 |
| *Early December* | 2235 – 2247 |
| *14th December  - ALCO Meeting* | 2248 – 2252 |
| *17th December - repo roll* | 2253 – 2254 |
| *Mid-December 2007* | 2255 – 2261 |
| *26th December  -  repo roll* | 2262 – 2263 |
| *Position at the end of December 2007* | 2264 – 2265 |
| | |
| **The Claims - December 2007 - Summary of arguments** | 2266 |
| **Plaintiffs' case** | 2266 – 2272 |
| **Defendants' case** | 2273 – 2277 |
| **Discussion and conclusions – December 2007** | 2278 – 2280 |
| **(a)    Breach of fiduciary duty** | 2281 – 2284 |

|  |  |  |
|---|---|---|
| (b) | Breach of duty of care | 2285 – 2298 |
| (c) | Contractual/tortious breach of duty by CIM | 2299 |
| (d) | Wrongful trading | 2300 – 2301 |

**14.** **The Claims: January and February 2008 - and beyond** — 2302.
*Did the Defendants culpably fail to change their strategy between 1st January 2008 and 27th February 2008?*

|  |  |
|---|---|
| *General overview* | 2303 – 2305 |
| *Early January 2008* | 2306 |
| *4th January - ALCO Meeting* | 2307 – 2310 |
| *Early January 2008, continued.* | 2311 – 2316 |
| *15th January - repo roll* | 2317 – 2319 |
| *18th January - ALCO Meeting* | 2320 – 2324 |
| *25th January - repo roll* | 2325 – 2327 |
| *31st January -  ALCO Meeting* | 2328 – 2332 |
| *Early February 2008* | 2333 – 2340 |
| *14th February – ALCO Meeting* | 2341 – 2346 |
| *15th February – repo roll* | 2347 |
| *17th – 24th February* | 2348 – 2353 |
| *25th February – repo roll* | 2354 – 2357 |
| *26th February - Audit Committee Meeting.* | 2358 – 2361 |
| *26th February - Informal voting directors' meeting* | 2362 – 2365 |
| *27th February 2008 – BOARD MEETING* | 2366 – 2381 |
| *Financial position at the end of February* | 2382 |

|  |  |
|---|---|
| *The subsequent history* | 2383 – 2385 |
| *29th February   - ALCO meeting* | 2386 – 2390 |
| *3rd - 6th March* | 2391 – 2402 |
| *6th March 2008  – BOARD MEETING* | 2403 – 2404 |
| *7th - 16th March 2008 - More BOARD MEETINGS* | 2405 – 2407 |
| *17th March – CCC is wound up* | 2408 – 2409 |

|  |  |  |
|---|---|---|
| The claims – January and February 2008 – Summary of arguments. | | 2410. |
| | Plaintiffs' case | 2410 – 2432 |
| | Defendants' case | 2433 – 2444 |
| Discussion and conclusions – January – 27th February 2008 | | 2445 – 2450 |
| | Specific points of procedure and credit | 2451 |
| | Standstill agreement | 2452 – 2453 |
| | Subsequent "admissions" | 2454 – 2464 |
| | Amendments of minutes | 2465 – 2476 |
| (a) | Breach of fiduciary duty | 2477 – 2478 |
| (b) | Breach of duty of care | 2479 – 2506 |
| (c) | Breach of contract/tort by  CIM | 2507 |
| (d) | Wrongful trading | 2508 |
| Final conclusions as regards the individual Defendants and CIM as investment manager | | 2509 |

**15.** **The Claims - Liability of the Entity Defendants as de facto or shadow directors** — 2510.

|  |  |
|---|---|
| Preliminary – limits of case | 2511 – 2513 |
| The pleaded claims of de facto and shadow directorship | 2514 – 2528 |
| *De facto* directorship – discussion and conclusions | 2529 – 2539 |
| Shadow directorship – discussion and conclusions | 2540 – 2545 |
| Final conclusions as regards the Entity Defendants as directors | 2546 – 2547 |

**16.**    **Causation and Quantum**                                       2548.

    **Preliminary**                                     2548 – 2552
    **Principles**                                       2553
        **(a) Breach of duty of care**           2554 – 2566
        **(b) Breach of fiduciary duty**          2567 – 2591
        **(c) Misfeasance and wrongful trading**   2592
    **Application to the facts of this case, assuming liability had been found.**   2593 – 2632

**17.**    **The alternative claim**                                        2632 – 2637

**18**.    **Summary of conclusions**                                       2640 – 2643

**Her Honour Lt Bailiff Marshall QC:**

**1. Introduction and overview**

**The case in outline**

1.  This is the culmination, in this jurisdiction at any rate, of a process by which the liquidators of Carlyle Capital Corporation Ltd ("**CCC**"), a company incorporated in Guernsey which has been in compulsory liquidation for the last eight years, seek to recover damages or financial contribution amounting to many millions of dollars, against its former directors and three other companies incorporated in Delaware in the United States. These were CCC's asset and investment manager, and the two corporate entities at the apex of the Carlyle Group of companies, the promoters of CCC.

2.  CCC was incorporated on 29th August 2006. The Carlyle Group was a highly successful multi-billion dollar private equity enterprise, based in the United States of America. Their business was investment and financial asset management in a variety of forms and across a variety of business sectors. This description still applies today, although in the interim, in 2012, they have become a public company.

3.  At the time with which I am concerned, the Carlyle Group was looking to extend the scope of their operations. CCC was incorporated at Carlyle's instigation as a closed-ended investment "yield vehicle". It was intended to acquire investments with permanent capital, and to hold these for income, so as to produce an attractive and steady return for its shareholding investors through the payment of dividends. This is a significant background point in the case, as will appear. CCC's being "closed-ended" meant that investors were not able to withdraw their investments in the enterprise directly from it, as might be the case with some investment funds. However, because the liquidity of an investment is an attractive feature, this was to be provided through investors being able to recover their funds by selling their shares. To make this easy, CCC was to become a public company, with listed shares. The Euronext Stock Exchange in Amsterdam was selected for this purpose.

4.  After a private placement of shares in two tranches in late 2006 and early 2007, taken up by certain supporting investment banks and existing Carlyle investors, there was an Initial Public Offering ("**IPO**") of shares in CCC in late June 2007. This was completed on 4th July 2007, following which CCC was listed on the Euronext Exchange.

5.  From its private placement and public offering, CCC had achieved capitalisation of $945Mn. It proceeded to acquire investments in accordance with the business model which had been devised for it, and which was explained in both its Private Placement Memoranda ("**PPM**") and Offering Memorandum ("**OM**"). This business model is of central importance to the case, but here it is enough to say that it depended on borrowing very substantially to buy the assets to generate the income to pay the dividends, and that those assets were to be of two broad classes, one being credit assets, principally bank loans, and the other being US Government Agency bonds whose underlying assets were residential mortgages.

6.  There were some tremors in the financial markets in the spring of 2007, and CCC's intended IPO was scaled back somewhat from the original intentions, before it went ahead and closed on 4th July 2007 as mentioned. In early August 2007 there was a crisis in the financial markets, the repercussions of which resulted in the funding on which CCC depended becoming less readily available on the kind of terms which CCC had anticipated when structuring its business model. CCC's assets had lost value and its liquidity was significantly depleted. By taking extraordinary steps – borrowing money from the main Carlyle companies and selling the bank loan sector of its portfolio – CCC survived this crisis, but the exercise had taken a toll on its liquidity and the amount of cash available as a safety net. The directors decided against actively selling the other assets in CCC's portfolio, the Agency bonds, but to retain them. They considered them to be high quality, and that they ought to

recover and return cash to the company. The directors say that they hoped and expected to weather the aftermath of the August 2007 storm and to be able to put CCC back on its feet. CCC did continue to survive, even over a well-understood difficult period for borrowing over the lending banks' own year ends, when they tend to look to keeping assets on their own balance sheets. Early in the following year, the Defendants say that CCC's financial position improved, but in early March 2008 a second even more disruptive liquidity crisis hit the financial markets. This, CCC was not able to withstand.

7.   Thus, on 17th March 2008, less than a year after its initial flotation, CCC was ordered to be compulsorily wound up in this court on the application of its own directors, with insufficient assets to meet its liabilities. The net deficiency of assets as regards creditors (although at the moment, in accordance with Guernsey liquidation procedure, these are merely claims awaiting ultimate confirmation as debts) has been quantified at more than \$350Mn. On this basis, CCC had lost a remarkable \$1.3Bn in eight months.

8.   On 7th July 2010, CCC's four duly appointed liquidators brought this action in the name of CCC, and also, for procedural reasons, in their own names as joint liquidators. They do so against CCC's seven former individual directors, and against the three main corporate entities in the Carlyle Group, claiming, in essence, damages for breach of their fiduciary duties and/or gross negligence as directors of CCC and, in the case of the Eighth Defendant, for breach of contract or common law negligence as CCC's investment manager. These proceedings were in fact one of four sets of proceedings commenced simultaneously in different jurisdictions, although I believe they are the only set which currently survives. The liquidators have also been reduced to three in number since the commencement of the action, owing to the sad demise of the fourth, Mr Christopher Morris.

**The parties**

9.   Of the seven individual director Defendants, the first four hold or held senior positions in entities within the Carlyle Group, to which I will refer as "**Carlyle**" or "**Carlyle Group**" or "**the Group**" as seems natural. They have been collectively referred to for convenience as the "**Carlyle Directors**".

10.   The First Defendant, **Mr William (Bill) Conway,** was one of the three original co-founders of the Group from 1987, and was and is a major global partner. He is an executive Director of TC Group LLC ("**TCG**"), the Ninth Defendant, which is the Group's main operating vehicle. He is also the Group's informal Chief Investment Officer.

11.   The Second Defendant, **Mr James Hance Jr,** was and is a consultant to the Carlyle Group with the title of Senior Adviser, but he also holds a range of other external directorships. He became one of the global partners of the Group in May 2005, shortly before the events with which I am concerned. In addition to being a director of CCC, he was the non-executive Chairman of its Board.

12.   The Third Defendant, **Mr John Stombe**r, was the Chief Executive Officer, Chief Investment Officer and President of CCC. He had been especially recruited by Carlyle to take up this particular position. His functions were entirely dedicated to the affairs of CCC although not as an employee; CCC had no employees of its own. As with all the other Carlyle affiliated individuals, Mr Stomber's formal employment was with a Group company, Carlyle Group Employee Co LLC ("**CGEC**"). For formal or technical reasons, and at or shortly before the relevant time, the Group had formed CGEC to be the actual Employer of most, if not all, of the salaried employees in the Group. Nothing has been argued to turn on this structure. Under that employment, Mr Stomber's services were at the disposal of the Eighth Defendant, Carlyle Investment Management LLC ("**CIM**"), the company which supplied investment management services to entities in the Carlyle Group. Mr Stomber was then seconded to fulfil the functions required of him in relation to CCC, as mentioned.

13. The Fourth Defendant, **Mr Michael Zupon**, was already, at the material time, a Carlyle employee and global partner, and was the founder and head of its US Leveraged Finance Division. This section specialised in investment in, and management of, different species of corporate debt, which, as already mentioned, were investments intended to be included in CCC's portfolio according to its original business model. Mr Zupon was therefore involved in CCC for his expertise in this area. He too was, technically, employed by CGEC and provided his management services through CIM.

14. Mr Conway and Mr Hance were voting members of CCC's Board, although they had no official day to day executive management function in its affairs. Mr Stomber and Mr Zupon, although directors of CCC and involved in the actual running of its business affairs, were non-voting directors. Their role on the Board of CCC was thus reporting and advisory.

15. The second group of Defendants comprises the remaining three individual Defendants, who have been referred to as the "**Independent Directors**". CCC's constitution specifically required the appointment of three "Independent Directors", who were not affiliated with the Carlyle Group. These were they. They were experienced bankers or financial professionals from outside the CCC Group. They were non-executive, but voting, directors. If all of the same view, they actually formed a voting majority of the Board. CCC's Articles of Association required that certain decisions on particularly significant matters required the approval of a separate majority of these Independent Directors.

16. The Fifth Defendant, **Mr Robert (Barry) Allardice III,** was an experienced recently retired investment and commercial banker, having worked for many years for Morgan Stanley and latterly for Deutsche Bank. At Deutsche Bank he had known Mr Stomber, for whom he gave a reference. Mr Stomber had suggested that he be considered for the position of Independent Director. He was experienced in capital markets, banking and accounting, and took a particular interest in audit work regarding CCC.

17. The Sixth Defendant, **Mr Harvey (Jay) Sarles,** was a former Vice President of Bank of America and Vice President and Chief Administrative Officer of FleetBoston. He was previously known to Mr Hance. He had long and senior experience in commercial banking and capital markets.

18. The Seventh Defendant, **Mr John Loveridge**, is the only non-US Defendant. He lived and still lives in Guernsey. He was a trust professional (he has since retired) with many years' experience in the administration of off-shore funds and the financial regulatory requirements of Guernsey. He was known to Carlyle through having previously been engaged by them to act as a director of certain other entities within the Carlyle empire, where these had vehicles operating in European jurisdictions.

19. CCC and the liquidators make their claims for breaches of duty and wrongful trading against all CCC's seven individual directors. As a matter of law, these claims are necessarily individual, although the Plaintiffs describe the alleged breaches as "collective".

20. The remaining Defendants are all corporate entities, incorporated in the State of Delaware. They have been referred to as the "**Entity Defendants**".

21. The Eighth Defendant is **Carlyle Investment Management LLC** ("**CIM**"). It has already been mentioned and its name is self-explanatory. CIM was contractually engaged as the Investment Manager for CCC, under a contract (the Investment Management Agreement or "**IMA**") governed by Delaware Law. CIM also had no employees of its own, and provided its services through its call on the services of employees in the Carlyle Group, who were formally employed by CGEC. CCC and its liquidators claim breach of contract against CIM alleging breach of contractual or fiduciary duty, or negligence amounting to gross negligence or recklessness.

22.   The Ninth and Tenth Defendants are **TC Group LLC ("TCG")** and **TCG Holdings LLC ("Holdings")**.   They were the two companies at the head of the Carlyle Group structure. TCG is the Group's principal operating company.   It owned a very substantial controlling interest in CIM, if not the whole.   Holdings was the sole Managing Member of TCG.   The Managing Members of Holdings were the three founding members of the Carlyle Group, namely Mr Conway and Messrs David Rubenstein and Daniel D'Aniello.   They are often collectively referred to as "the Founders" or, in Carlyle Group culture, as "DBD" (David, Bill and Daniel).   At the material times they owned around 68% of Holdings between them. They were each officers of CIM, TCG and Holdings itself.

**The claims**

23.   Somewhat oversimplifying the position for the purposes of introduction, CCC and its liquidators claim that TCG, Holdings and CIM were, by virtue of their relations with CCC and the power and influence which they exercised over it, either "shadow directors" or *de facto* directors of CCC in Guernsey law, and that they therefore owed to CCC the duties of *de jure* directors.   Whilst it appeared from the pleadings that the Plaintiffs might also be alleging other legal bases for fixing CIM, TCG and Holdings with liability to CCC, by the conclusion of the hearing it had been confirmed that the Plaintiffs' claims against these three Entity Defendants were confined to claims (a) based on the claimed status of TCG and/or Holdings and/or CIM in law as either *de facto* or shadow directors of CCC in material respects, and (b) as regards CIM only, as CCC's Investment Manager, in contract or as a concurrent claim in tort (which would be materially indistinguishable in scope).

24.   In more precise terms, the 16 claims for relief which remain live in the action are stated to be variously for breach of fiduciary duty, gross negligence, statutory misfeasance pursuant to s. 106 of the Companies (Guernsey) Law 1994 ("**the 1994 Companies Law**") or s. 422 of the Companies (Guernsey) Law 2008 ("**the 2008 Companies Law**"), wrongful trading pursuant to s. 67C of the 1994 Companies Law or s. 434 of the 2008 Companies Law and, in the case of CIM, for breach of contract or tortious negligence.   Together with interest claimed at a compound rate up to the date of issue of the proceedings, the total amount of the claim is approximately $1.4Bn.   Interest since that date brings the claim up to a little short of $2Bn.

25.   There is a secondary alternative claim against CIM, TCG and/or Holdings made in unjust enrichment, which is for the return of, principally, the management fees paid by CCC during its short life, although the claim is drafted more widely to include also interest payments, expenses and "compensation" – I think here meaning remuneration - comprised of share allocations.   This claim is quantified as being in excess of $70Mn and is claimed together with interest.

**The action**

26.   The action was commenced on 7th July 2010.   It has thus had a long procedural history, which is no longer of any direct relevance.   There have been other actions brought in other jurisdictions as well.   It is not necessary to recite details of either the procedural history, or the other actions, and I am not going to lengthen further what is unfortunately bound to be a lengthy judgment by doing so.   I will refer to any relevant points as they arise.   For general purposes here, it suffices to say only that there have been strenuously fought contests between the liquidators and the Defendants, in both this jurisdiction and in jurisdictions in the United States, on subsidiary matters including the production of documents and records and other aspects of evidence gathering.

27.   Part of this contest was a hard fought dispute about the appropriate forum for trial.   Most of the protagonists are, of course, American.   However, CCC is a Guernsey company, and any issues regarding the conduct of its business, its governance and the adjustment of the rights of interested parties in its compulsory liquidation, arise under Guernsey law and must be decided

according to Guernsey law principles.   The claims in this action have therefore ultimately fallen to be determined here, the jurisdiction in which its promoters chose to incorporate CCC and in which it is being liquidated.

28. There have been yet other proceedings in the United States regarding aspects of the affairs of CCC but not involving the same parties as here.   Again, it is unnecessary to refer to these, except to note, as a matter of context, that the dispute before me appears to be only part of a far more widely based set of hostilities which have been in train over several years.

29. As to this action, despite the remarkable length and detail of the pleadings, the real substance of the claims is actually quite simple.   The liquidators claim that "from July 2007" (being just before the time, in August 2007, when CCC's finances suffered from the first shock in the financial markets) until CCC's eventual collapse in March 2008 (following the second crisis of an even greater magnitude) the sequence of decisions and actions (or inactions) either taken or endorsed by each of the Defendants as the actual or quasi-directors of CCC were not only wrong in the sense of being a mistake, but were also wrongful.   It is claimed that these actions by the directors were in breach of their fiduciary duties as such, because they were improperly motivated in that they were taken for purposes other than the best interests of CCC itself, namely (and rather) for the perceived best interests of the wider Carlyle Group and in particular TCG and Holdings, or, as regards certain directors, for that director's conflicting personal benefit.   Alternatively or additionally, it is claimed that these decisions and actions were taken negligently (and in CIM's case thus also in breach of contract) and indeed were even reckless, or at least so seriously negligently as to amount to "gross" negligence.   The foregoing complaints are claimed also to constitute statutory misfeasance. It is further alleged that these actions by the Defendants had the effect, from August 2007, of continuing the operation of CCC's business in circumstances where the Defendants knew, or ought to have concluded, that there was no reasonable prospect of CCC's avoiding going into insolvent liquidation, and thus, in short, that the Defendants were guilty of wrongful trading.

30. The Defendants reject all these allegations.   The Entity Defendants deny that they were or became either *de facto* directors or shadow directors of CCC at all.   But in any event, all of the Defendants say that all their decisions with regard to CCC were taken in good faith, and with due care, in what they perceived at the time to be CCC's best interests, including, where material, the interests of CCC's creditors, but they also say that, in any event, in all relevant respects, the interests of CCC and the Carlyle Group were in fact aligned.   They say that they believed that CCC could and would recover from the difficulties it encountered in August 2007, that the course which was taken was believed to offer CCC (and thus also its creditors) the best chance of doing so, taking all the circumstances into account.   They say that this judgment was reasonable, both subjectively and objectively, in all the circumstances at the time, even though, in the event, CCC did not survive.   They say that its collapse was attributable to the second financial crisis of March 2008, which was not only unforeseen but was unforeseeable.   They reject all the criticisms made of them as being either ill-founded on proper examination, or as being wise with hindsight.

31. They add that, in any event, the Plaintiffs simply do not prove that the matters which they criticise caused any identified or identifiable loss to CCC.   They say that the Plaintiffs assert, but do not prove, that any of the actions which they now argue (with the benefit of hindsight) should have been undertaken on behalf of CCC from July 2007 onwards would have made CCC's ultimate financial position any better, in the result, than it ultimately was.   In fact, they say that the alternative actions proposed by the Plaintiffs might well have made that position worse.

32. As part of their Defences, the Defendants also claim the benefit of exoneration clauses and indemnities provided in CCC's Articles of Association (and in the case of CIM in the IMA) in respect of any liabilities and costs incurred by them otherwise than (broadly) through their own gross negligence, misfeasance, wilful default or bad faith.   The availability and effect of

such clauses has given rise not only to legal arguments, but has also had a palpable influence on both the breadth of matters advanced by the Plaintiffs in their main case, and the emphasis of their arguments, as they seek  to avoid the application of these provisions.

33.   I have explained that the case itself, as I see it, is ultimately within quite a narrow and straightforward compass as a matter of law.  It has unfortunately been complicated by two factors.    The first is understandable.  It is that whilst the principles of law involved may be relatively simple, the subject matter - CCC's business - is not; it is the intricate and sophisticated world of dealings in financial instruments and obligations, bonds and derivatives.    That complication is inherent in the subject matter.

34.   The second is less excusable.   It has been the complicating of the claims made with matters which, on examination, are incapable of giving rise to any relief.      I refer to this further below, but it gives rise to the following introductory point.

35.   In this judgment, I have tried to concentrate on determining only material issues, ie those which are alleged to have caused loss to CCC or otherwise to found a pleaded cause of action. However, because of the quantity of material, the persistence, and the elaborate detail with which all points in this case have been pursued, I have rather inevitably been drawn into making findings on peripheral issues at times.   I have no doubt been inconsistent in the extent to which I have done this, or the degree of detail or analysis which I have gone into at different places in this judgment.  However, I decided, that it was more efficient to risk such inconsistency, than to eliminate it either by doing a totally rigorous exercise of examination aimed at extracting and deciding only those complaints which were alleged to have themselves caused CCC loss, or by laboriously deciding all the breaches of duty alleged (I am told that there are 187 of them), material or not.  The result is therefore something of a half-way house.

36.   I will add though, that I have been comforted, in the writing of this judgment, by serendipitously discovering the November 2016 decision of the Privy Council in the case of *Smith v Molyneaux and others* [2016] UKPC 35, where Dame Mary Arden DBE at [36] says:

> *"……It is an important duty of a judge to give at least one adequate reason for his material conclusions, that is, a reason which is sufficient to explain to the reader, and the appeal court, why one party has lost and the other has succeeded: see, generally, the decision of the Court of Appeal of England and Wales in English v Emery Reimbold & Strick Ltd [2002] EWCA 605; [2002] 1 WLR 2409, especially at paras 15 to 21. The judge does not have to set out every reason that weighed with him, especially if the reason for his conclusion was his evaluation of the oral evidence:*
>
> > *"... if the appellate process is to work satisfactorily, the judgment must enable the appellate court to understand why the judge reached his decision. This does not mean that every factor which weighed with the judge in his appraisal of the evidence has to be identified and explained. But the issues the resolution of which were vital to the judge's conclusion should be identified and the manner in which he resolved them explained. It is not possible to provide a template for this process. It need not involve a lengthy judgment. It does require the judge to identify and record those matters which were critical to his decision. If the critical issue was one of fact, it may be enough to say that one witness was preferred to another because the one manifestly had a clearer recollection of the material facts or the other gave answers which demonstrated that his recollection could not be relied upon. (English v Emery Reimbold & Strick, para 19 per Lord Phillips MR, giving the judgment of the court)"*

37.   I have taken this as permission - even encouragement - to aspire to succinctness, although in the event I have not really succeeded.   Unlikely though it may appear to the reader, I have in

fact resisted the temptation to set down every thought which has crossed my mind on every point and to deal with every piece of evidence adverted to by every party.   This has been quite difficult, not least because it seems to me that for procedural purposes it is usually better for a first instance judge to err on the side of too much reasoning rather than too little. However, there would have been a major corresponding downside for both reader and writer if I had expanded any further than I have.

38.   The statistics which follow below will demonstrate why this point has been made.

**The trial**

39.   The action ultimately came on for trial, on 20th June 2016.     The parties had previously applied for the trial to be conducted by judge alone.   In view of the huge amount of material in the case and the technical complexity of the subject matter, I was content to authorise this and made an order, therefore, that pursuant to section 13(1) (b) of the Royal Court (Reform) (Guernsey) Law 2008 as amended, the Court would sit unaccompanied by Jurats.   The trial proceeded accordingly.

40.   Advocates Jeremy Wessels and Abel Lyall represented the Plaintiffs, CCC and its Liquidators.     Advocates Ian Swan, Anna Guggenheim and Bryan de Verneuil-Smith represented the Carlyle Directors.   Advocate Gareth Bell represented the Independent Directors.   Advocate Simon Davies represented the Entity Defendants.   I pay tribute to the tenacity, industry and mastery of material displayed by all the Advocates.   I also have no doubt that much is owed to the work of what I know will have been teams of support personnel behind the scenes, who also deserve commendation.   I am appreciative of the fact that I only had tentatively to request a document or other assistance, and it would appear almost immediately.

41.   A few figures will illustrate the size of the undertaking.   The trial was scheduled for 85 court days.   It has in fact occupied 67 sitting days because certain witnesses were not, in the event, summoned for cross-examination.   However, this just left more intervening days available for reading and review at that time, rather than reducing the timetabled period of the hearing, largely because most witnesses were attending from across the Atlantic on pre-arranged schedules.   Ultimately, with delays occasioned by an unfortunate accident suffered by the Defendants' last expert witness, and a three week delay caused by the Plaintiffs' lead counsel sadly becoming unwell shortly before final speeches, the hearing concluded on 8th December 2016.

42.   The Re-Amended Cause in the action, (from now on referred to simply as "**the Cause**" for short) runs, in its final form, to 252 pages.   It is the size of a small novel.   The final Amended Defences and Counterclaim of the Carlyle Defendants and Entity Defendants who have taken the main defence role in the action run – unsurprisingly in the light of the material they were obliged to meet and the sums of money in issue - to 305 pages.   Those of the Independent Directors are 269 pages.   There is an amended Réplique and Defences to Counterclaim of 131 pages, and a whole volume containing *exceptions de forme*, some of which appear never to have been answered fully.

43.   The pleadings in this case should not be regarded by the Guernsey Bar as examples to be emulated; quite the contrary – although this criticism is really levelled at the Cause, because defendants are inevitably responsive.

44.   The rules of pleading in Guernsey state that the cause shall contain

> *"a statement of the material facts on which the plaintiff relies for his claim, but not the evidence by which those facts are to be proved"*   (Royal Court Civil Rules 2007 ("**RCCR**")  rule 10(2).

45.   Whilst it may on occasions be difficult to draw the line between material facts and evidence, the appropriate level of detail is that which enables the other party to understand the nature and factual basis of the case which it has to meet, - no less, but certainly no more.  If it is considered that a bald statement of high level fact or secondary fact (inference) is insufficient to achieve this, then the correct way to deal with that is to make the high level assertion, and then to plead the necessary facts which make up this statements as "particulars", doing so in sub-paragraphs, or if that is still too cumbersome, in a schedule.  The whole point of a pleading is to make the case clear for the reader, whether that be the opposite party, the judge, or anyone else with an interest.  It is not, or should not be, to overwhelm the opposite party.  It is the quality and not the quantity of material which counts.  Including an unhelpful surfeit of detail only obfuscates the real case; if the recipient considers that he has been given inadequate detail, he can always raise *exceptions de forme*.  Still less is it a legitimate aim to try to cow the opposition into submission or a comatose state by unnecessary and overweening repetition, the quotation of portions of correspondence, the inclusion of tendentious headings, or the insertion of a myriad of hyperbolic adverbs and inflammatory comment.

46.   To the list of inappropriate inclusions, I would also add, as mentioned earlier, accusations of misconduct by the other party which do not found any head of relief being sought.  This has been a major aspect of this case.

47.   The claims which are made against the Defendants are all claims for financial redress.  In the end, (and leaving aside the fall-back restitutionary claim) the Plaintiffs' right to such relief depends on proving, not merely some breach of duty as a matter of legal analysis, but also that that breach caused a loss to CCC.  The necessary causation may of course be shown indirectly, but it still has to be demonstrated and pleaded.  Otherwise, the effect of the complaint is evidential at best and whether or not it could be juridically characterised as a breach of duty (or suchlike) is irrelevant.   If it is merely evidence, it has no place in a pleading under the Royal Court Civil Rules of Guernsey.

48.   Whilst this Cause contains a goodly number of such assertions, I realise that some could charitably be explained as being left over from a further claim which was included by the Liquidators in the original cause, seeking an order for the disqualification of the Defendants as directors of a Guernsey company.   I directed in 2015 that that claim should be stayed until after the conclusion of the trial on financial liability because it was an inconvenient, unnecessary, and trivial (in context) diversion from the real dispute.   There may, therefore, be some excuse for such matters having remained on the pleadings here.  However, that is by no means a full or adequate explanation for all the allegations which are inconsequential as to relief, and it is also no excuse for their having remained as an apparently substantive part of later submissions.

49.   The obligation to provide a clear, concise, and disciplined pleading lies particularly on the pleader of the cause because the pleader of the defences, facing a badly pleaded cause, has the unpalatable options of either applying to strike out the pleading, or parts of it, for embarrassment or abuse - which means assuming a burden of time, trouble and cost, and possible risk as to the last – or answering all the material included in it as a matter of safety play.   He can readily be excused for taking the latter course, even if it then causes him also to have to divert from the proper approach to pleading.

50.   The pleadings in this case are unwieldy to the point of even becoming an impediment to the convenient disposal of the case, certainly from the point of view of the judge.   Their complexity, length and ponderousness has made any attempt to use them as a reference point for analysing the material case on any point such a laborious and frustrating operation as to be well-nigh impossible and virtually useless.

51. On finding their lack of utility as a convenient summary of the case at the outset of my involvement, I directed initially that the parties should provide summary pleadings within the limit of 25 pages which is imposed by the English Commercial Court. These summary pleadings provided me with a very useful starting point in understanding and following the matter at the case management stage, and seemed to me to contain the case perfectly well. There was, though, no acceptance that these summaries could be treated as superseding the original pleadings. The Plaintiffs in particular insisted that the Cause itself must always prevail over any summary, and that they were not abandoning any point pleaded in the Cause. The Defendants, in turn, objected that the summary Cause had in fact introduced yet more alleged breaches of duty. No labour saving in that regard was therefore possible at the trial itself. However, I have continued to find these summaries useful for my own purposes, for refocussing on the truly essential points in the action.

52. The further written evidence and documentary material in the action included two volumes of witness statements from 14 factual witnesses, and six volumes of expert reports from 16 experts. The total evidential material runs to 107 A4 double side printed volumes. 24 of these are simply the chronological correspondence during the core period of July 2007– March 2008, ie a mere nine months. In the end, and as so-often happens, a vast number of documents - in particular publicly available materials and materials obtained by the Plaintiffs from third parties - have simply never been referred to. Even so, the finally agreed list of "documents in evidence", which I required in order to fix by way of common ground what I should regard as evidence actually admitted in the trial, so as to ensure that the rules of evidence were properly observed, ran to 4,872 identified "documents", many of which were multi-paged, or were packs of presentation slides. Written closing submissions came in at 1,331 pages from the Plaintiffs and 1,641 pages (albeit less closely typed) from the Defendants. There have been over 300 authorities referred to in the written arguments, though mercifully not all were cited in speeches.

53. I have said that it is not so much the applicable legal principles as the subject of CCC's business which is esoteric. Ten of the 16 expert witnesses mentioned above dealt with such financial matters, and I heard oral evidence from nine of these experts, five for the Plaintiffs and four for the Defendants. These were respectively in the areas of financial economics (from a macro-economic and a micro-economic perspective, and in particular with regard to the residential mortgage backed securities market), investment management, risk management, "repo" financing (a term which I explain below) and insolvency. Seven of the experts who had provided reports and joint statements were not, in the event, required to attend for cross-examination. These were the two experts in each of the areas of audit and accounting practice, Dutch financial regulatory law and Delaware contract and company law, and the Defendants' expert on financial economics dealing with damages.

54. The complexity of the subject matter is illustrated by the fact that the Plaintiffs' main expert, Dr Andrew Carron, Chairman and former President of the US organisation, National Economic Research Associates Inc, felt it necessary to provide two expert reports. The first was his expert report on the issues in the case. However, this was prefaced by advice to read his second report before reading his first report, in order to be able to understand the first report. His second report was entitled "Bond Market Fundamentals". It provided a description of the functions of the US bond market and of bonds, including mortgage backed securities in particular, how these were traded, financed and valued at the relevant times and in the relevant markets, and the risks associated with aspects of this market. I can confirm that his advice was well worth taking. Further education in the detail of these markets was provided for me later by other experts.

55. The general impenetrability of this field to the uneducated outsider can perhaps be immediately illustrated from the fact that bond prices are usually described as "spreads", and that "duration" is not a measure of time but a measure of the degree of bond value sensitivity to changes in interest rates. Prior to becoming involved in this case, I would have expected

that "synthetic shorts" were some kind of Lycra cycling gear.   The Plaintiffs thought it helpful, as it most certainly was, to provide me with a glossary of all the acronyms and technical terms which they had assembled for me before the trial, extracted from the written evidence.   This ran to more than 40 pages.   It enabled me, for example, to distinguish my WALA from my Vega.   Even that, though, could not assist in the interpretation of some of the documentary evidence.   Whilst, as an outsider, I have an idea of what a "Bloomberg message" must be, making sense of the content of such a message is an esoteric art, confined to those who have been initiated into both the symbolism and the argot of the field.   It was fortunate that there were several experts around, including, by this stage, the Advocates in the case, who were able to assist.

56.   Consistently with modern technology, the trial was covered by a live transcript service, and the whole of the documentary material potentially in the case was uploaded on to a specialist legal proceedings service, to enable documents to be produced on screens in the courtroom, with supporting software enabling notes and annotations to be made, both by the court and by the parties, (on separate networks).   Apart from the teams of counsel and support staff present in court, the proceedings were video-streamed to overflow rooms in the court building, and also to offices both here and in London, the United States and Australia where members of the parties' legal teams were working.   This trial management IT system, together with the many and various visual aids and aides memoire produced by both sides, have been of great assistance in the case itself.   It would probably have been unmanageable without them.   The extent of their existence and use also helps paint a picture of the scale of this litigation, and its importance to the parties.

**About this judgment**

57.   Structuring this judgment has not been straightforward.   Usually, after outlining the case, the parties and the procedural background, I would first try to set out a neutral history of the matter down to the commencement of proceedings, based on common ground but identifying disputed matters on the way.   With this background, I would then follow, in a convenient order which naturally varies from case to case, by setting out the relevant law (deciding any disputed legal points in the course of this), giving my views of the witnesses and any other evidence, identifying the issues, and then discussing and giving my conclusions on each of these, before pulling matters together in a final summary.

58.   However, I quickly found that trying to write an initial neutral account of the entire factual history up to the time of CCC's collapse was impractical.   It was only towards the end of the trial that the parties themselves succeeded in producing a so-called "neutral chronology", a document which, whilst helpful for providing a concise sequential skeleton of milestone events, was in practice so neutral as to be largely uninformative about facts relevant to the disputes.   It also rapidly became obvious that attempts to write a history which described events in sufficient detail to identify the disputed implications of these, even with my aim of confining myself to the truly essential matters of dispute, would produce a historical account of enormous length, which would then need repetition at the later stage of decision-making. In addition, with ten separate Defendants and six separate dates which the Plaintiffs nominated as dates for examination of their claims that breaches of duty, etc, had been committed, (identified as being around 31st July, 31st August, 30th September,  13th or 30th November, and 31st  December 2007, and 27th February 2008), successfully managing all these matters in a single introductory narrative structure would have been well-nigh impossible.

59.   In the end, therefore, I have decided that the most economical, manageable, and I hope comprehensible, course for the reader, will be first to give a general history of the matter up to the first point at which the Plaintiffs assert any breach of duty on the part of the Defendants.   That date has been identified as the date of the CCC Board Meeting of 26th July 2007.      That account will, I hope, provide the reader with sufficient background and

appreciation of the subject matter of the case to be able to follow easily my account of the later periods of time when culpable conduct is being alleged, and my findings and reasons in that regard.

60.     At that stage I then take stock of the situation, review the law, review the witnesses, and review particular aspects of the evidence and other general points, and set out a list of the issues as I then see them.   I then proceed to deal in turn with the claimed causes of action with regard to the sequential dates relied on by the Plaintiffs, having regard to the issues identified and the principles of law and suchlike already considered.       I think it both important and helpful to consider the claims on this chronological approach because of the importance of judging the Defendants' actions only on the basis of what was known or thought at the relevant time and without the influence of hindsight.   This course inevitably involves some repetition of matters which it has been appropriate to refer to in more than one context, and it has also at times been more convenient to deal with a particular topic out of strict time sequence, in which case I have noted this, and done so at the point in the story where it has most significance.  A high level summary of my conclusions then appears at the end of the judgment - as I have little doubt will already have been discovered by those who have read this far, but who will have  reacted in the time-honoured way to receipt of this judgment, by turning to the end of it to see the result.

## 2.  The History

61.     In this first narrative section of the judgment, I set out the background history of CCC up to the time of the events of which the Plaintiffs complain.   It is therefore a scene-setting exercise.   It largely sets out facts which are either common ground, or are accepted.   Even within this period though, there are some matters which are disputed, and I have drawn attention to the most important disputes, and indicated my findings.   Where I refer to any matter which may have been controversial without comment, then what I say can be treated as my findings of fact in those respects from the evidence in the trial.

### *The Carlyle Group*

62.     As already noted, The Carlyle Group is a large and well-known global asset management and investment organisation.   It was founded in 1987, and was then wholly owned by the three Founders, Daniel D'Aniello, David Rubenstein and Bill Conway, the First Defendant.

63.     By the time of CCC's formation in August 2006, the structure was more complex.   The umbrella operating company in the organisation was TCG, which owned 100% of CIM. Holdings owned 94.25% of TCG.  CGEC (the employment company) owned 0.25% of it, and a single outside institutional shareholder, CalPERS (the California Public Employees Retirement System) owned 5.5%.   Holdings was the sole managing partner or member of TCG.   Holdings was owned, as to 68% by the three Founders, and as to 32% by other "global partners" of the Carlyle Group.    Although they are known as global "partners", they are in fact shareholders in Holdings.   Both Holdings and TCG were, at the relevant time, private companies, incorporated under Delaware law.

64.     In October 2007, as will appear in more detail later because of the importance the Plaintiffs attach to this, Holdings sold a 7.5% interest in TCG to another major outside investor, the sovereign wealth fund of Abu Dhabi, known as The Mubadala Development Company (**"Mubadala"**).

65.     This reduced Holdings' interest in TCG to 86.75%, and the global partners, including the Founders, all received a *pro rata* distribution.   Nothing else changed in the structure of the Group.   Thus, it is accepted that the Founders have, at all material times, held the great majority of shares in Holdings and in turn in TCG, and effectively a controlling interest in it.

66.    Mr Conway's background was in banking and corporate finance.   He had been Chief Financial Officer and Treasurer of MCI Communications Corp, before the founding of Carlyle, and had previously worked for ten years for First National Bank of Chicago, focusing on corporate finance, corporate lending and general management.   Mr Conway was and is "a" managing director and officer of TCG.   In American corporate governance terminology the term "managing director" denotes a level of responsibility rather than a post with specific responsibilities, as it would in the UK or Guernsey.

67.    At the material time, Mr Conway held the role of TCG's Chief Investment Officer.      He also was, and remains, the Executive Managing Director of CIM.    He has, throughout Carlyle's existence, been primarily responsible for the oversight of the investment strategies and practices of all the range of investments undertaken by Carlyle except those concerned with real estate, infrastructure and energies; these latter are supervised by Mr D'Aniello.    Mr Conway's fields of expertise and operation are buyouts, venture and growth capital, and "leveraged finance" ie corporate debt.      Mr Rubenstein's areas of responsibility and leadership are those of investor relations and fund raising.

68.    In 2006, the Carlyle Group employed 418 investment professionals across 18 countries.   Its core business was private equity investing, or "buyouts".    These involved raising money from investors to purchase a controlling interest in identified target companies (ie, those identified as potentially undervalued) which Carlyle would then take in hand and rebrand or restructure, and improve in order eventually to sell the ownership onwards at a profit.   Those projects were thus finite in the sense that, ultimately, there would be an exit through which investors' funds were turned back into cash and returned.   Carlyle undertook other forms of business as well, however, and by 2006, had four main investment sectors, namely buyouts, venture and growth capital investments, real estate investments, and leveraged finance (the purchase of corporate debt of various species, with borrowed funds).

69.    Particular investment funds, or vehicles, were promoted by each sector, the most usual structure being that of a private limited partnership between a Carlyle affiliated entity and a cohort of outside investors.    The funds' affairs would actually be administered by CIM, under a management agreement, under which CIM would provide both investment advice and management and administrative functions, by supplying the services of appropriately experienced personnel, as well as "back office" administration and transactional services. This would be done in whatever way was appropriate for the particular enterprise.   CIM itself had no employees, as already noted, and the personnel performing the services were formally employed by CGEC, the Group's employer company.   CIM would, of course, earn fees for its services, usually comprising a basic recurring fee, with an additional performance or "incentive" fee earned upon the achievement of results above a specified benchmark or standard.

70.    Carlyle's investment projects are relatively risky.   They typically require the commitment of large amounts of capital for long periods of time.   Whilst the ultimate profit may be considerable, and is obviously hoped to be so, there is no guarantee of profit and indeed there is the real possibility that the investment may be entirely lost.    For that reason, Carlyle investors are – and I understand that, under US securities law, they are required to be – "Qualified Investors".   This means that they are not only wealthy, but also within the class described as "sophisticated".    This is a shorthand term for investors who not only have sufficient net worth to be able to afford both to tie up capital and undertake significant risks with it, but also who are sufficiently experienced and knowledgeable in financial matters to appreciate the risks which they are running.   Such investors therefore include funds and institutions which are large and established, with knowledgeable personnel and appropriate objects, so as to be able to run the potential risks of the particular projects because they deem it worth doing so for the potentially greater return which can be made.  They also include high net worth, or ultra-high net worth, individuals who are similarly knowledgeable and financially well-placed.

*Plans for diversification into mortgage backed securities*

71. In 2005, the successful Carlyle Group was expanding, and, (I think as always) was looking to diversify its activities as part of such expansion. Carlyle executives conceived the idea of moving into a new kind of investment fund, a speciality finance vehicle, with different objectives from those of the more usual Carlyle vehicles, namely to be a "yield vehicle" whose appeal to investors would be that of both attractively high but steady returns and potential liquidity at the same time. I am told that the idea was borne of noting that a competitor of Carlyle, KKR Financial Corporation, had promoted such an entity. It was known as KFN. This vehicle, which had had moderate success, used the Real Estate Investment Trust ("**REIT**") model. Carlyle wanted to be able to offer investors something comparable, but better. Investigations as to a possible model had started in 2005, but were not pursued with full vigour until the following year.

72. The idea was to be able to offer investors both the ability to invest smaller amounts of money than were typically required by other Carlyle investments, and a more liquid investment. The aim was thus not only to produce a high (when compared with other sources of regular and steady income) return, but also to enable investors to trade easily in and out of the investment as and if they chose, since it would be publicly listed. To make the new investment vehicle appealing, however, the dividend returns offered had to be sufficiently attractive. The dividend level targeted was described as "double digit". This is an aspiration which appears remarkable today, but was conceived, it must be remembered, in the heady financial days of 2006 when the Federal Reserve Prime Interest Rate was 8.25% and the US Treasury Federal Funds rate - the solid and basic benchmark "risk free" rate for comparing US investments - was 5.25%. To be attractive as compared to risk free investments, the projected dividend would have to be competitive in this context, a view which was relayed to the promoters of CCC by the investment banks who had been selected as likely placement agents and underwriters.

73. The business model for the new venture was intended to be distinctive from anything currently in the market, so as to provide a selling point. It was to achieve its objectives by investing in a combination of high quality fixed income assets, and riskier, but therefore higher earning, leveraged finance and credit assets (ie debt), thereby providing a diversified portfolio, constructed to produce the appealing projected dividend return.

74. (I pause to record here that, in this action, the term "fixed income" seems to me to have been used in two different senses, the first being the strictly correct one of a security yielding income of a constant fixed amount, but also sometimes and second, as a reference to a security yielding an income which is "fixed" in a formulaic sense, such as a fixed relationship to LIBOR, even though the amount produced may thus be variable. The contrast when used in this second sense is with securities which yield an intrinsically variable income, such as a dividend. The sense in which the term "fixed income" is being used in any instance, insofar as it is of importance, is generally apparent from the context.)

75. It was envisaged that the latter class of investment (the leveraged finance assets) would include investing in other Carlyle funds - yet a further benefit for the Carlyle Group itself. In addition, and as usual, CIM would manage the investments and thus earn fees. It was hoped that such a vehicle would not only be an attractive investment in itself, but would also provide an attractive convenient temporary investment in which Carlyle investors could hold funds pending a capital call or investment in other Carlyle funds, thus indirectly benefiting Carlyle's wider business as well. The project had potentially advantageous features all round.

76. The second class of assets mentioned above, ie the more risky, but therefore higher earning, leveraged finance assets, was typically corporate debt of differing kinds - syndicated bank loans, corporate debt below investment grade, "mezzanine" debt and distressed debt. This was a class of assets that was already the subject of specific investment funds, with various

profiles and objectives, managed by Carlyle.     The new entity could therefore make such investments by participating in these other Carlyle investment products     This asset class carries with it the risk of default by the corporate entity ("credit risk").     The degree of that risk, and thus the value of the debt asset, is therefore influenced by the credit rating of the paying entity in question.   A lower credit rating would imply a higher risk of default, but the return would therefore be relatively greater.   Because the benefit of owning the debt would not be so attractive in all respects, it would not be so valuable and its price would be relatively lower.

77.   This trade-off illustrates a point which has been made repeatedly in the course of this case.   It is that in the investment world, risk and return are correlated.   An investor expects a greater return for a more risky investment and accepts a lower return for a safer, or high quality, one.   The concomitance and correlation of risk and return, and the recognition by all players in the market that to obtain a high return necessarily means taking greater risk, is a point in this case which can scarcely be over-emphasised.   I was struck with the extent to which risk appeared as a factor which almost all witnesses, both factual and expert, were conscious of and had regard to.   Indeed, at times, when discussing the market, the financial economics experts were so focused on risk that they expressed themselves in a way which made it sound as though investors were investing in risk rather than the actual assets.

78.   The second class of assets, the high quality fixed income assets, which were to be invested in by CCC became, as the proposed business model was refined, Agency AAA Residential Mortgage Backed Securities or "**Agency RMBS**".   The "Agency" tag denotes that these securities were issued by one of the three giant American "Agencies" or quasi-governmental issuers of securitised mortgage products, colloquially known as Fannie Mae, Freddie Mac and Ginnie Mae (although this case is concerned only with securities issued by the first two).   "MBS" is an acronym for mortgage backed securities, and "RMBS" is thus the generic term for residential mortgage backed securities.   However, such securities are also issued by institutions or brokers other than the Agencies.   The "AAA" tag denotes quality - it is the assessed rating of the risk involved - although it is in fact superfluous in the long title given above.   This is because Fannie and Freddie only issued AAA rated securities in any event.   Other institutions could issue RMBS of lower credit ratings.

79.   During this case the term "RMBS" alone has often been used by experts and witnesses as shorthand to refer to the "Agency RMBS" issued by Fannie and Freddie, and where I use the label "RMBS", I will be referring to such securities.   Where it is necessary to make it clear that I am referring to other species of RMBS, I will do so expressly.

80.   The following account of both the structuring of RMBS and the mechanics of CCC's financing operations is doubtless oversimplified in technical terms, but will hopefully provide a sufficiently accurate background for understanding the issues in this case.

### *RMBS*

81.   In essence, RMBS are securities based on, or derived from, a parcel, or pool, of the debts due on mortgages granted to homebuyers or homeowners by lenders.     The mortgage debts are collected together, either by the original lender, or by an assignee from original lenders, and sold on, as explained below.   This enables the original mortgagee to obtain capital funds relatively quickly, which it can then use once again, to lend on to home-buyers or owners, thus helping to keep the mortgage market active and benefit the economy.

82.   The pool of mortgage debts can, if desired, be assembled so as to concentrate particular attributes, such as geographical area, sizes of loan, credit ratings of individual borrowers, etc, which investors may find attractive.   The selected pool of mortgages is then "securitised", which means converted into investment products by the institutions, or brokers, in that area of business which now hold them.   These investment products are then offered and sold to

investors. They can be, and usually are, themselves structured so as to have different attributes, as I describe later.

83. At the material time, and historically, the standard US residential mortgage (this is a "bond" in Guernsey law, but I shall refer to them as "mortgages" to distinguish them from bonds of other kinds) was a repayment mortgage for a period of 30 years at a fixed interest rate. However, and unlike in Guernsey, it is relatively easy and inexpensive in the US to make early repayment of principal, without penalty. Consequently, it is quite common for homeowners to change their mortgage or mortgage provider, either by moving, or simply by cashing in their mortgage and refinancing with a replacement mortgage. They have to do so if they move house, as mortgages are not transferable, and they will be likely to do so if better (ie lower) interest rates come on offer. The average time for holding a residential mortgage in the US market in 2006 was, I understand, around five years only.

84. As to the mortgage debts themselves, the payments being made by the homeowners are then made to the securitisation fund which has taken over the mortgages as part of the pooling process mentioned above. There is firstly the interest element within each monthly instalment payment. Then there are the small but gradually increasing tranches of capital repaid within each such instalment (called "amortisations"). In addition there are the larger, irregular, early repayment sums ("prepayments", which can be either total or partial) as already noted. The right to receive all these payments can be divided and packaged in various ways and on different terms, which have been devised by those involved in the securities and derivatives market over many years. They will be theoretically based on the 30 year duration of the underlying mortgages, although in practice they will almost certainly not last that long, but will eventually be renegotiated by the then current holder of the investment.

85. At their simplest, such packages merely involve pooling the mortgage debts into one big fund, with the purchasing investors receiving a *pro rata* share in the total pool of net income and, eventually and as it arises, capital. These are known as "pass through" MBS. They are subject to credit risk (ie the risk of individual mortgagors defaulting on their repayments) but that risk is spread amongst all investors in the pool and therefore diluted.

86. However, the mortgages can be packaged in more elaborate ways, sometimes referred to as "products". The package can be notionally sliced in layers of different priorities, such that lower tranches take the risk of default first, before higher, more protected, tranches. That way, the credit risk is distributed differently, in a hierarchy, between the securities created in the different layers, with securities at the lower levels being more vulnerable to credit risk than those in the higher ones. Their credit ratings vary accordingly. Their prices will also vary, because the more risky investments are likely to be less attractive from a credit risk perspective and therefore, all other things being equal, will fetch lower prices. Their yield, or return on capital, though, will be correspondingly higher, illustrating the basic market principle mentioned above, that investors expect a greater return from a more risky investment. The balance of risk to return is one which particular investors will select to suit their own situation, or appetite for risk.

87. There are other ways in which the derivative securities can be different. They may, for example, have a variety of terms as to the interest rate return payable or guaranteed. For example, this can be a fixed or floating rate, and if the latter, it can also be subject to either a floor, or a cap. These features will again of course, affect their attractiveness, or perceived value, and hence their price in the market.

88. Another consideration is the strength of the covenant of the issuing institution behind the offered terms. In such a case the credit risk then ceases to be primarily that associated with the underlying mortgage debts and the mortgagors (albeit *en masse* rather than individually,) and becomes rather that of the issuing entity. In the case of Agency RMBS, the covenant strength of the issuer was regarded as the equivalent of that of the US government itself. In

effect, such a security was credit risk free.   This is why it was regarded as a high quality asset.

89. All these factors affect the desirability, and therefore the market value of the securities on offer, and this is the case with the species of RMBS with which CCC was concerned in this case, namely "Agency AAA capped floaters". First, (as already mentioned) they were issued by Fannie Mae or Freddie Mac, as the case might be, with the implicit guarantee of the US government behind those Agencies. (Agency RMBS issued by Fannie or Freddie are known as "conventionals" to indicate this level of guarantee and to distinguish them from those issued by Ginnie Mae, which has the direct guarantee of the US government, and which are known as "governments".)   They were regarded, therefore, as having no credit risk.   Second, they were warranted to have AAA rating.     The Agencies only accepted AAA rated mortgages, ie those where the mortgagors were "prime" and not "sub-prime", and also within certain bounds such as size.   Third, the rate of interest payment on those securities (conveniently called the "coupon" although this may not be strictly accurate) was a floating rate, pegged to and slightly above that of one month LIBOR (London Interbank Offered Rate, which is the benchmark interest rate for short term investment financing), but subject to a specified maximum, the "cap".

90. The level of the cap can vary between bonds.  In CCC's case, the bonds which it purchased – there were ultimately a total of about 165 purchased tranches of about 150 individual bonds, and to a total value of about $23Bn – were variously capped at 6.5%, 6.75% and 7%.       The higher the cap, the more attractive and valuable the security is, potentially, because its return is less vulnerable to "interest rate risk", ie the risk that LIBOR rates might rise to a point where the cap takes actual effect.   The degree of such risk itself will be perceived to vary, depending on the current levels of market interest rates.

91. I do not think it is in dispute, but I am satisfied on the evidence, that these particular RMBS therefore provided what was seen in the financial markets as being a very safe, secure and steady investment yield.   Because the return had these characteristics, and because the return would (subject to the cap not becoming effective) represent a constantly beneficial relative rate of return on outlay comparable with totally risk free rates, RMBS tended to trade, in capital terms, at or very close to their par value.

92. Fannie and Freddie also issued other forms of security.  The most relevant comparison for present purposes is straightforward debentures.   These latter were not only free of credit risk, but were free of interest rate risk as well, because the coupon was fixed.    However, by that same token, they would provide a lower yield, reflecting the absence of such risks, because they would trade at a higher price.   An investor was absolutely certain of the return he or she would receive, but the price of that certainty was that the return would be more modest than for other, less certain investments.

*Leverage*

93. I note at this point that "leverage" in the context of this case and used as a noun, means either "borrowings" or "influence" or "exploitation".   It can also be used as a verb with similar meanings.  In this section it is used in the sense of "borrowings".

94. Whilst the income from Agency AAA capped floater RMBS was thus secure and steady and reflected current interest rates, it was in itself nothing like the double digit return on capital which Carlyle considered that the new company needed to offer to make it an attractive income yield vehicle for target investors.   The income rate was normally only a few basis points above LIBOR, a basis point (or "bp") being 1/100 of 1%, ie .01%.  The way to deal with this, and increase the actual return to the new company so as to enable it to make a sufficiently high return itself to pay the targeted dividend to shareholders was therefore to borrow money, or to "leverage" the purchase of the RMBS.

95.   Borrowing money to make such purchases would enable a greater volume to be purchased for the same outlay of CCC's own funds.  Provided the costs of any borrowing were lower than the return on the assets purchased with the borrowed money, the new company would make a profit equal to the net difference.   The more borrowed money used, the greater the total amount earned which, after paying the costs of the funding, would remain in the hands of the new company as effective profit upon its own small amount of capital invested.   However, just as such increased borrowing, or "leverage", will magnify profit being earned, it will also magnify any losses relative to invested capital, if these are suffered.

96.   A high degree of leverage is thus an additional source of risk in itself.   An appropriate business model will therefore take account of this risk along with all other perceived risks and build in precautions to mitigate or cope with the effects of any risk, or volatility, in the various factors incorporated into the model.   What these precautions are will depend on the perceived likelihood of the risk materialising, the gravity of the consequences if it does, and the cost implications or other disadvantages of any precautions which might be taken to guard against such risk.

*Repo financing*

97.   The natural source of borrowings in the financial markets in which the new company would be operating was "repurchase financing" or "repo".  This is a somewhat specialist form of funding, and different from the simple bank loan, secured or otherwise, which outsiders first think of when imagining a source of borrowings for a business.   I understand that the likely terms of any simple loan capital transaction would not have been viable as a funding source for a project such as that of the new company, but at any rate, using repo financing for the venture appears to have been regarded as normal and natural by those involved at the time.  Indeed (and notably, given the widely ranging complaints which are made in this action) there has been no criticism of CCC's assuming the use of this mode of financing as the basis for its original business model.  However, this was not a mode of financing in which the then current teams at Carlyle were experienced.

98.   Repo finance is a huge financing industry in the United States, described by various participants and experts as being both "wide and deep".   In money terms the American repo market is estimated to have been some $10 Trn in mid 2007, the time with which I am concerned, and this would have been more than twice the value of US Treasury securities then outstanding.   I think it is common ground, but in any event the evidence satisfies me, that at that time repo financing was a standard and accepted method of financing borrowings for the purchase of securities.   The repo finance market for such activity had been established for many, many years.

99.   Funding the purchase and holding of RMBS by this mechanism was attractive for the new company because the interest rates used in repo finance borrowing transactions were also fixed by reference to LIBOR.  Although fixed by an individual lender, the rates would tend to be very similar because the lenders were all in competition for business.  They would also broadly fluctuate with, and be very slightly below, current LIBOR.   It was thus – as it obviously needed to be to make any economic sense – a lower rate than the similarly floating rate being earned on the RMBS which the new company was expected to acquire, thereby providing the necessary profit, and going a long way towards eliminating funding interest rate risk – the risk of an adverse mismatch between the rate payable on borrowed finance and the rate being earned on the asset so financed.

100.   Although such financing is in substance a loan, and is even treated as such in the books of the borrowing company, it is in fact put into effect as a sale and repurchase, so as to provide the lending bank (the purchaser) with security for the repayment of its loan in the shape of title to the assets themselves.   Such security is particularly effective, because the lender, with title to the assets, can enforce his security immediately his right to do so crystallises, and is not

subject to the risks of delay in, nor the trouble of having to implement, an enforcement process.

101. Repo transactions are typically conducted on the terms of a Master Repurchase Agreement ("**MRA**") between the borrowing entity and the lending bank, which establishes the framework of the relationship between them. The MRA lays down the general terms and conditions under which the repo financing will operate as and when a specific transaction is entered into. The terms of the specific transaction will then be agreed between the repo dealer and the borrower at the time of the transaction, and will fix the parameters for that particular transaction, such as (obviously) the quantity being sold and the loan being made, the interest rate, and the transaction's duration, all within the framework of the MRA terms.

102. Repo transactions work like this. The assets (here the RMBS) are "sold", by their owner (here CCC) to the lending bank at a price which corresponds to their market value at the time, less a percentage, known as the "haircut". Less colloquially, this is the borrowing margin or another way of looking at the loan-to-value ratio. At the same time, the owner/borrower (CCC) undertakes to repurchase the assets after a fixed time period, at a price which corresponds to the sum being loaned, plus interest on that sum. The fixed period may be anything – as little as overnight (as it quite frequently would be between banks) or as long as a year, or even more. However, the commonplace period, and that generally operating in this case, was 30 days.

103. If the borrower fails to repurchase the assets, the lending bank, as the owner of the assets, is in a position to sell them immediately (or possibly after a period of grace, depending on the precise terms of the transaction), to recover its outlay. The "haircut" therefore provides the lending bank with some protection, in the event of a default by the borrower, against its selling costs and the possibility that the market price of the assets has fallen since the start of the repo period, ie the volatility of the asset price. The evidence consistently suggested that it was and is viewed principally as the latter. The very structuring of the loan transaction as a sale and repurchase also enables the lender to side-step any problems caused by the bankruptcy of the borrower, at least to the extent of the value of the assets which, legally, it owns.

104. However, the banks do not confine themselves to reliance on the haircut for protection. The MRA terms will also entitle the lending banks to call for margin deposits from the borrower during the period of the repo transaction, if and as the market value of the assets does fall. The margin deposit required will be calculated to bring the value of the security held by the repo lender back to the agreed loan to value ratio, taking into account the now reduced value of the assets. This process can and does operate even on a daily basis, although the borrower is typically given a day or so after a "margin call" to satisfy that call. It is also, though, a two way street, and if asset value rises, the borrower is entitled to call for margin deposits to be repaid.

105. Who, then, determines the market value of the securities? There are pricing agencies whose day-to-day published assessments can be used, and at any rate up until events in 2007 their published pricings were indeed generally regarded as being the standard. These were principally one known in the trade as "IDP" or "FT" (there had been a change of name), but I understand that there was also a Reuters and a Bloomberg service.

106. Up to the times with which I am concerned, the repo finance banks would, as a matter of course, use pricing agency figures for the value of the securities upon which they were lending. However, typical MRAs – there was no one standard version - would be framed in terms which often, at least ultimately, entitled the lending bank itself to decide what market value it would attribute to the assets in question, which it would then use to set the financial parameters of the repo transactions, and margin calls. Whilst this may not be of great significance on an initial repo transaction – the borrower can always go elsewhere if not

satisfied with the terms on offer - it assumes greater significance during the term of the transaction, because the borrower's options are more limited.   Unless it can negotiate its way out, it will have either to pay the margin call in question or default.   There would be no practical route to resolving any dispute as to the reasonableness of the bank's chosen pricing - even assuming that there were some term, express or implied, in the MRA requiring the repo bank to act "reasonably" or "in good faith" in its pricing -  at least during the term of a repo transaction.   This is partly because "reasonableness" is an elastic concept, depending on a value judgment of particular circumstances as well as the point of view of the propounder, but more importantly, because the timescales which operate in these transactions are so short that there would simply be no prospect of obtaining the determination of any such dispute within an effective timescale.

107.   Because the duration of the RMBS bonds could in theory be up to as much as 30 years before final redemption, and the repo financing was for a mere 30 days, repo transactions were repeat business.   They would come up for renewal, or "roll", at the 30 day intervals.   The roll was timed to coincide with the monthly payments made by Fannie and Freddie, respectively, (this making reckoning up the financial account very much easier) with the former being on the 25th of the month and the latter on the 15th, or, in each case, the nearest following working day.

108.   Repo transactions were not bound to be renewed.   Within the general principles of the MRA the precise terms were up for renegotiation at each roll.   The precise terms for the next roll would be discussed between bank and borrower in advance so that the actual transactions would roll smoothly on the relevant day.   The evidence, however, satisfies me that previously to about mid-2007, once counterparties had agreed the terms for a repo transaction, the borrower could generally expect that renewals would be on the same material terms as previously, particularly as regards the agreed level of haircut.

109.   A borrower such as CCC would expect to agree the availability of repo "lines" with several potential lending banks at large amounts, but this was in fact agreement only in principle. Such a line is described as a "soft" line, as there is no contractual obligation to provide it and the actual terms still have to be agreed in relation to each transaction at the relevant roll, although it may come to be implicitly understood between parties that the previous terms will be re-offered to a greater or lesser degree.   However I was told that as a matter of preserving reputation and relationships, it would be unusual for a bank to fail to offer the full amount of a promised repo facility if called upon, and, indeed, the bank has something of an incentive to provide the finance, because it wishes to put its money to profitable use.   So the system tended to work.   However, the point - and it is a point on which the Plaintiffs lay stress - is that a "soft" line was only indicative and not committed.   A lending bank could, of course, discourage the use of its lines by insisting on less advantageous terms attaching to the next roll, and thus inducing the borrower to turn to another repo financier prepared to offer better terms.

110.   A "hard" or committed line of repo financing could be granted, but would be more expensive for the borrower, because absolute commitment would come at the price of some form of commitment fee.   Similarly, longer term repo financing transactions, ie for terms longer than 30 days, would generally come on less advantageous terms (to the borrower) than the lender banks were prepared to give for shorter term loans.   This is, of course, because the lender would be committing itself to terms which it could not re-set after 30 days, as in the standard transaction, but would have to honour those terms for the longer duration of the agreement, whatever changes in market conditions had intervened.   It would therefore require more advantageous terms to protect its position.   I am told that, typically, the difference in terms would show as the lending bank requiring a higher "haircut" rather than, say, a higher rate of interest.   In other words, the bank would be willing to lend only a smaller percentage of the apparent market value of the assets.   Obviously this reflects the risk of the greater amount of uncertainty inherent in a longer term commitment.

111. Transactions for longer than the standard 30 day transaction are referred to as "long term repo" and also sometimes as "structured repo". "Structured repo" can also, and perhaps more accurately, refer to any repo transaction with features more complex than the straightforward ("vanilla") elements described above, eg with other embedded features such as options.

112. That, then, describes the broad mechanics of repo transactions and the repo market with which CCC would be concerned, but in the necessity to concentrate on the facts relating to CCC's position and business, it must not be forgotten that this is part of a vast network of interacting commercial arrangements which form the whole financial market.   The banks which provide repo finance (and in their jargon, the transaction with a borrower such as CCC is a "reverse repo") do not simply hold the securities which are their security in a vault like a pawn-broker.  They use them, themselves, to raise finance from other parties.  They can do this within the timescale of the 30 day transaction with CCC, for example, by borrowing on overnight repo, which is very common.

113. An apparent quirk of the situation, it also seems to me, is that the income (interest and capital amortisations and prepayments) from CCC's RMBS securities remained payable and credited to CCC, despite the sale and purchase nature of the transaction, and despite whatever deals the repo lender might then be effecting for itself.   This seems a somewhat bizarre treatment of the legal and beneficial title.   However, this would no doubt be a matter dependent on the terms of the relevant repo or other agreement, and I was not required to look into the juridical analysis of a repo financing transaction in any depth.

114. The point of these observations here, though, is that it is always salutary for a court and advocates to remember that the subject matter of a case is not usually entirely isolated and self-contained in fact, nor usually and not unreasonably, would it have been occupying the entire waking attention of the protagonists at the time.  It must therefore always be seen in context, and with an awareness of the possible effects of outside factors and circumstances.


### The new company's intended business

115. Because the new company's business was to be centred on RMBS, even if Agency AAA RMBS, two considerations played an important part in its business model.   Repo financing was plainly potentially subject to volatility in the market price of the RMBS, because a fall in this could result in margin calls, which would have to be met, and met in short order - I think within 36 hours - from liquid resources.   If they were not met then a default could be called by the lending bank, and after any appropriate remedial period (again, typically, a matter of days at most) the lending bank could forfeit the securities and realise them.   A foreclosure would obviously cause reputational damage to the company on any basis, but, and particularly if prices were currently depressed or there were several simultaneous foreclosures, it could fatally undermine the business structure of the company.   Certain safeguards were therefore put in place in the new company to protect against such eventualities.

116. First, it was intended, and this policy was implemented, that the new company which became CCC should have a diversified portfolio, including a suitable quantity of leveraged finance assets (as already described) as well as the quantity of high quality but very highly levered Agency RMBS assets.   These leveraged finance assets were more risky than Agency RMBS in terms of credit or default risk, but, by the same token, produced a higher yield, and consequently would produce the required return per unit of CCC's own capital deployed with less leverage.   These assets had also, historically, shown patterns of volatility which were uncorrelated with those of RMBS, a feature which would buffer and even out the effects of price volatility risk.  Their inclusion in a reasonable quantity in the overall portfolio therefore gave CCC flexibility and protection, and relieved CCC of some "concentration risk".

117. Second, in order to cater for the uncertainties of fluctuating prices and margin calls, it was decided that CCC needed to have a "liquidity cushion" of immediately available cash or fully liquid assets which would be ring-fenced, preserved and available to cater for the effects of adverse market conditions in which margin calls might arise, by enabling these calls to be met without being forced to sell CCC's core investment assets at a possible undervalue.     An attractive feature of RMBS, as will probably already have been deduced, is that, through amortisations and prepayments, they necessarily produce payment of their par value, in full, on maturity, which is, at the latest, by the end of their term, but probably very much earlier.

118. These various considerations eventually led to CCC's devising a business model with Investment Guidelines which provided, initially, that it should hold no more than 85% of its assets in the Agency RMBS upon which it was proposing to centre its "buy and hold" financial strategy (in the event I think it settled down with about 68% concentration), that it should seek to maintain a liquidity cushion equal to 20% of its issued capital, and that it should maintain a minimum borrowing capacity of 150% of its estimated funding requirements, ie that it should have that amount of lines of finance, albeit only soft lines, available to be called upon, thus providing enough "headroom" above its actual requirements to maintain the flexibility to shift suppliers if necessary.   The constant and continual ability to obtain borrowing finance was central to CCC's sustainability, as there was an inherent mismatch in the maturity of its assets and its borrowings.

### *The formation of CCC*

119. This account has jumped ahead of the story somewhat, however.     As already mentioned above, the Carlyle plan to launch a new "public specialty finance" company as a permanent capital yield vehicle was resumed in 2005-6.   Research had initially been carried out by Mr Mayrhofer, Carlyle's head of Private Equity Funding.   With corporate credit assets being envisaged as a part of the investments, Mr Zupon was also involved.     However, with the intention having been determined to expand the investments into mortgage backed securities to a significant degree, and this not being within Mr Zupon's area of expertise, it was decided to recruit a suitable Chief Executive Officer to head up the new company venture, although working with Mr Zupon.   A high level recruitment service was engaged by those who were progressing the project, including Mr Conway, to find a suitable candidate.   Mr Stomber, the Third Defendant, was interviewed and selected.

120. His background was perceived as being eminently suitable.   He had spent 28 years in Wall Street banking, having worked for eight years for Deutsche Bank, where he had risen to become Head of US Marketing for Derivatives and latterly Treasurer of the Americas Division, and where he had overseen funding and risk management for capital markets and banking activities, and gained considerable experience of repo financing, although with regard to the financing of US Treasuries rather than Agency RMBS.   In this position he had seen the effects of the market shock of 1998, known as the "LTCM" (Long Term Capital Management) crisis, and caused by the default of certain Russian financial entities.   In 1999 he had moved to become, Chief Financial Officer of Merrill Lynch.   This was a "Treasury" function, with overall charge of the financial state of the bank itself.   In this position he had been instrumental in Merrill's internal restructuring of their own financial model in the aftermath of the LTCM crisis, which had involved a scheme for increasing liquidity by holding highly rated Agency and government securities to provide a resource for use as collateral security and liquidity in difficult credit conditions.   It also, I understand, made use of the repo market as its natural borrowing source.   Subsequently, between 2004 and 2006, having "*lost the race*" to the very top position in Merrill Lynch, Mr Stomber had moved on to work for two years for Cerberus Capital Management.   The various facets of his experience were thought to match him well with the experience and skill sets being sought for the CEO of "Newco".

121. The Plaintiffs have suggested that Mr Stomber in fact had no experience of financing the holding of Agency RMBS through leverage, as this was no part of any of the functions in his experience;   the repo financing with Deutsche Bank had been of US Treasuries and the RMBS acquisitions with Merrill Lynch and Cerberus had used unleveraged funds.   The Plaintiffs have not, however, made any claim or allegation that engaging or appointing Mr Stomber to the position of CEO for CCC was culpable or incompetent by anyone.   This allegation therefore seems to me to add nothing to the appropriate rigour of the review of any decisions of Mr Stomber which are actually criticised or challenged in this case, as regards the requisite degree of skill and care to be expected of someone in his position.   At most, it may provide a piece of evidence from which I could be invited to infer that Mr Stomber had some misguided preconceptions which could have explained those decisions, but since his actual decisions are apparent and there is no dispute (I think) about what they brought about in practice, it is the quality of those decisions in their own right which is the important point. I should add that I do not think that Mr Stomber accepted the basis for the Plaintiffs' criticisms.

122. Mr Stomber was brought in to take charge of a 15 person team which would be dedicated to running the affairs of "Newco" which was eventually to become CCC.   He began work at Carlyle on 25th April 2006.   As already noted, he was formally employed by CGEC, who paid his salary, but his services were seconded to CIM for the purposes of intra-group charging, and were dedicated entirely to CCC.

123. He was consulted about the employment of a suitable supporting team, and in turn he brought in two former colleagues to the new team, Mr Patrick Trozzo with extensive experience in risk management, repos and derivatives, who had been a former dealer at Deutsche Bank, and Mr William (also Bill) Greenwood, a former trader in fixed income securities who had been involved in the structuring of Merrill Lynch's Agency portfolio, which Mr Stomber saw as a potential model for CCC.  It was Mr Stomber's initial task, together with his team, to develop a suitable business model.

124. The direction of interest prior to Mr Stomber's arrival had been primarily to use a REIT structure, as used by KFN, and which operates with certain US tax advantages, although other models such as a Master Limited Partnership, were also considered.    In the end, however, upon a comparison of the advantages and disadvantages in various different areas (structure, regulation, taxation, marketability, etc) a Guernsey company structure was chosen.    A Guernsey company met the requirement that there should be no corporation tax levied on the entity itself, which would have caused a double charge to taxation, ie at both the corporate and the individual investor level.    A positively attractive reason for choosing a Guernsey company was the lack of legal constraints on the permissible range of its investment portfolio compared to a REIT.

125. Another advantage, albeit this was shared with a REIT, was that a Guernsey company could operate under IFRS accounting rules rather than US GAAP.   IFRS rules did not require unrealised losses on assets to be reflected in the company's annual accounts unless and until the relevant assets had to be regarded as truly "impaired" as against their cost, whereas US GAAP rules required unrealised losses to be treated as losses for profit and loss account purposes.  By operating under the IFRS regime, the new company would not have to take price fluctuations in the underlying assets – particularly Agency RMBS – into its accounts as a matter of routine, and since it was intending to hold such assets for income rather than sell them on for profit, this was both convenient, avoiding the complexities of revaluing assets regularly in order to complete sets of accounts, and could be regarded as appropriate and justified, since CCC would not be actually suffering any such losses until it actually sold the assets.

126. Mr Stomber therefore proposed that CCC be structured as a Guernsey company, and that is what happened.    CCC was incorporated, on 29th August 2006.    It was named "Carlyle

Capital Corporation Limited" - this name having been selected, even before the beginning of May 2006, - because it was thought that branding it with the well-known Carlyle name would be an advantage for attracting investors.     In the event, this was a decision which the Founders no doubt came to regret, because the name tended to identify the company with the Carlyle Group as a whole in the immediate perception of the investing public, not differentiating that CCC was technically not even a subsidiary company.

### *CCC's structure*

127.   The actual incorporators of CCC were Mr Conway, as the sponsor representative, and Mr Loveridge, the Seventh Defendant.   Mr Loveridge lived in Guernsey, and a Guernsey company is required to have a Resident Agent who is either a resident director of the company or a corporate service provider.   It would also be required to comply with Guernsey financial regulation, and dealing with this often benefits from a local touch.   Mr Loveridge was invited to become an independent director of CCC both for these purposes and because he was already known to Carlyle.

128.   He had worked in trust management for over thirty years, initially with Ernst and Whinney, then Guernsey International Fund Managers and finally Butterfield Fund Managers.   He had formed his own firm in 1996, eventually selling his interest to Mourant Guernsey Limited whom he therefore knew, and who were intended to take on company administration services for the new company.   He had considerable experience as a Board Member of various funds and corporate investment vehicles promoted by major international investment groups based in Guernsey.   He was known to Carlyle through having previously been engaged in such capacity for a number of Carlyle entities, including at least three particular active funds. However, the apparently large number of such directorships is misleadingly inflated by the fact that many of these were subsidiaries for individual projects, especially in relation to a group known as Terra Firma.     Mr Loveridge was apparently suggested as a potential Guernsey based Board Member by someone in Carlyle's legal department.

129.   As regards CCC's precise corporate structure, CCC's share capital was to comprise 7 Class "A" shareholders, with all the remaining, vast majority, of shares being Class "B" shares. The Class A shares had voting rights but no dividend rights, and the Class B shares would receive dividends but have no voting rights.    The Class A shareholders were deliberately chosen by the Carlyle promoters for being affiliates (either employees or partners) of the Carlyle Group, but also for being non-resident US citizens and not green card holders.   This obviously had implications for both taxation and accountancy with which I am not directly concerned.    The aim was to prevent CCC being a US controlled entity and to keep TCG or Holdings from having to consolidate CCC's financial statements with its own.

130.   Its effects with regard to control of CCC are controversial.   The Plaintiffs assert that through this share structure, "Carlyle" controlled the A shares and therefore in practice (either on this score alone or in conjunction with other circumstances) controlled CCC.   The Defendants have denied that any of the Defendants "controlled" the A shares; they plead that these were held by the A shareholders in their personal capacity.   They deny generally that any Entity Defendant controlled CCC.

131.   This is a matter I will have to examine more closely when I come to consider the significance of that contention in the context of the claims being made.   For present purposes I record that there was no secrecy about the shareholding or the Board or the employment structures. They were openly described in some detail both in the PPMs and the OM issued in connection with CCC's development and its IPO.     However, amongst senior Carlyle personnel it is quite clear that this share structure had the intended purpose of ensuring that Carlyle could ultimately be sure of a sympathetic Board in CCC, so as to protect CIM from being ousted from its management position, protect the fees which this generated, and  protect the potential for CCC to be a source of investment funds for other Carlyle entities, whilst at

the same time Class B shareholders would receive the returns they expected, delivered by CCC, and they would thus - hopefully - be content.

**CCC's Board**

132. Following CCC's incorporation on 29th August 2006, five more potential directors, after Mr Conway and Mr Loveridge, were approached and agreed to act and make up the full Board of CCC, although not formally appointed until the eventual first Board Meeting on 4th October 2006.

133. I have already mentioned Mr Stomber and Mr Conway.   Mr Hance, who became CCC's Chairman, was already a senior Carlyle consultant – a position which he said he preferred to that of being an employee.   He had started his career as an auditor with PricewaterhouseCoopers (**"PwC"**) and subsequently moved to Bank of America where he rose to the roles of Vice Chairman, Executive Vice President and Chief Financial Officer. He had supervised the management of a \$400Bn portfolio of Treasury and US government backed securities including Agency RMBS and thereby gained a working understanding of managing a leveraged portfolio of such assets.   His wider responsibilities had included the oversight of Bank of America's Finance group, which had included treasury, accounting and internal control operations.   He had attended Asset and Liability Committee meetings and received reports about the Bank's own entire portfolio.   Upon retirement from Bank of America he had joined Carlyle in 2005, as a consultant, and was to become a global partner in 2007.

134. Mr Zupon's special experience, and the particular reason for his direct involvement with the new company project that was to be CCC, have already been mentioned.   Previous to his employment with the Carlyle Group he had had a finance career of more than 20 years, starting in the Acquisition Finance Department of Canadian Imperial Bank and moving on, in 1993, to NationsBanc Markets to work in leveraged finance (the function of funding a company with below-investment-grade debt, usually so as to enable it to achieve a particular objective).   After two years at Merrill Lynch in high yield bond underwriting, he had joined Carlyle in 1999, founding its Leveraged Finance Asset Group as already mentioned, becoming a global partner in 2001, and serving on Holdings' own Management Committee.

135. The remaining three directors were the "Independent" Directors of CCC.   In fact, under CCC's original Articles of Association adopted on 29th August 2006, there was no requirement for specifically "independent" directors, and the number of directors was merely to be at least two.   On 4th October 2006 , at the same time as the appointment of the five additional CCC directors, the Articles were amended by Special Resolution to introduce the concept of "Independent Directors" (ie "*independent of and not affiliated* [as defined] *with* [CIM]": see Article 1), to require that the number of directors be not less than two nor more than eleven (Article 88), to require that at all times (save when caused by death, resignation or removal) a majority of the Directors must be Independent Directors (Article 88), and to stipulate (by Article 117) that certain significant actions required not merely the voting approval of the Directors as previously laid down (under Article 109), but also the special approval of a majority of the Independent Directors.   These provisions remained the same when the Articles of Association were further amended on 27th December 2006, but by new Articles of Association later adopted on 8th May 2007, the requirement that a majority of the actual Directors of CCC should be Independent Directors was dropped (New Article 107) and reintroduced as a requirement that a majority of all the Directors voting on any effective Board Resolution must be Independent Directors (New Article 126).   The specific actions requiring an additional independent majority vote of the Independent Directors remained the same (New Article 134).   These last were the Articles actually in force at the time of the matters which are the subject of this action.   Nothing has been argued to turn on the historic changes which were made.

136. Mr Loveridge has already been mentioned.   Mr Allardice was a retired banker, who then (ie in August 2006) held board positions on a small variety of companies.   He had worked for 20 years at Morgan Stanley and subsequently at Deutsche Bank, where he had been a senior colleague of Mr Stomber, and whence he retired in 1999.   He had been one of Mr Stomber's referees, and Mr Stomber had subsequently suggested that he be considered for this appointment.   It had then emerged that Mr Allardice was known to Mr D'Aniello from their naval service together, decades earlier.   Mr Allardice was notable for his habit of sending emails all written in upper case, in the naval tradition, until he eventually ceased doing so because recipients felt they were being shouted at.

137. The final director, Mr Sarles, was also a retired commercial banker, having worked, somewhat unusually in this day and age, for the same entity in effect all of his professional life.   This was FleetBoston Financial, a major regional US bank, and its predecessors, where he spent 37 years, followed by one year as Vice Chairman of Bank of America when the latter acquired the former in 2004.   As FleetBoston's Chief Administration Officer he had been responsible for administrative functions, corporate strategy, risk management, technology and operations, treasury services and mergers and acquisitions, and latterly was responsible for its wholesale banking business.   He was known to, and proposed by, Mr Hance, having worked with him during their overlapping tenure at Bank of America. He had retired the previous year.

138. Thus, with a view to the independence structure being introduced, Messrs Loveridge, Allardice and Sarles as the required "Independent Directors" were by design not employed by, nor partners, nor consultants with Carlyle entities at all, although they will no doubt have received fees for their appointment with CCC.   I am not certain that the fees granted to the Independent Directors are in evidence, except that I believe that Mr Loveridge's annual fee, at least, was to be $50,000; the Plaintiffs did not raise this point nor cross examine on it.

139. Together, the Independent Directors would in fact be a majority of the voting Board, and in addition would have separate power, acting by a majority, to give or withhold approval to decisions relating to key aspects of CCC's business guidelines and structure.   They were responsible for making certain decisions and approving certain types of actions, including changes to the policies or procedures governing CCC's investments, related-party transactions, employee compensation, the adoption of equity incentive plans, and any material changes to CCC's investment strategy or capital allocation guidelines.

140. Thus, CCC's Board comprised seven directors with an overlapping mixture of backgrounds and former functions.   The two who were directly involved in the management of CCC's business, Mr Stomber, (the CEO and the recruit with perceived extensive experience relevant to the intended core business of CCC) and Mr Zupon, (the incumbent Carlyle executive with specialist skill in the other significant sector of CCC's business) were non-voting, reporting and advisory directors, although with their own particular executive functions on behalf of CCC, Mr Stomber in particular.   Of the remaining five, voting, directors, two only, (Mr Conway and Mr Hance) had an interest in the Carlyle Group.   Mr Conway, obviously a substantial part owner of the Carlyle group as a Founder, brought his knowledge, oversight and experience as the chief investment adviser and strategist in the Carlyle Group to the Board, as well as his contacts.   Mr Hance brought the perspective of a senior Carlyle Adviser for several years, coupled with his broader external experience and in particular his period as Chief Financial Officer of Bank of America.

141. If appropriate, the three Independent Directors could, in theory control the Board, although it naturally appears unlikely, as a matter of pragmatism and reality, that a conflict of such dimensions would ever develop.

142. I note here that the Plaintiffs dispute that the Independent Directors were truly independent at all, citing their previous acquaintance with Mr Stomber and Mr D'Aniello (as to Mr

Allardice), with Mr Hance (as to Mr Sarles) and Mr Loveridge's position as Board Member on other Guernsey registered Carlyle affiliates.  At the time of their proposal for appointment, the requirements for "independence" were considered by Carlyle's legal department, and it was concluded that each of them qualified as "independent" under the guidance as to that attribute applied by Nasdaq and New York Stock Exchange rules.  I am perfectly satisfied that all three of these directors, including Mr Loveridge, were appropriately "independent" within the meaning and the obvious objectives of CCC's Articles of Association.   Indeed I regard the pleading of Mr Allardice's historic and coincidental naval acquaintance with Mr D'Aniello as being trivial to the point of absurdity.    It is in fact the kind of point, the inclusion of which makes one look more critically at the merits of the maker's other points.  However, in the end, that is all irrelevant.   What is at issue in this action is not whether these gentlemen fitted particular criteria or qualifications for "independence" as a matter of form, but whether they in fact fulfilled their duties as directors of CCC.   Those duties fell upon them, whether or not it would be correct to call them "independent".

143.   All of those who came to serve as directors of CCC were acquainted with the duties of a director of a Guernsey company under Guernsey law through a memorandum prepared for that purpose by Ms Joanne Cosiol, a legal counsel with the Carlyle Group.   She had only recently, in April 2006, been recruited to the Carlyle Group's Legal and Compliance Department, having previously worked in private practice for five years after completing her legal degree and qualifications.   She was given the responsibility of dealing with legal, regulatory and administrative requirements and formalities for CCC, reporting to Mr Jeffrey Ferguson, a Managing Director and Chief Legal Counsel to the Carlyle Group.   She became the natural first port of call for legal advice for the directors or senior officers of CCC in the United States.   Recognition of her functions saw her given the title of CCC's "General Secretary".  However, whilst she appears on occasions to have carried out functions which are the function of a Guernsey company secretary, I am satisfied that her title was a label of convenience only, and was not intended to (and did not) appoint her to any particular office within CCC, as a matter of Guernsey corporate law.

*Management of CCC's business*

144.   The Board was not responsible for carrying out the day-to-day management of CCC's affairs.  Instead, CCC was externally managed by CIM pursuant to the IMA already mentioned, formally entered into between  CCC (acting by Mr Loveridge and Mr Conway) and CIM on 20th September 2006, but which had plainly been drafted in advance of that.  One knows this because its effect was capable of being referred to in an initial confidential PPM issued on 11th September 2006 to which I refer below.  The IMA was ratified by CCC's Board at its first meeting on 4 October 2006.

145.   The IMA is "*governed by and construed according to the laws of Delaware without giving effect to the choice of law principles thereof*" (Clause 9).  It is thus roundly and firmly a Delaware Law document.

146.   CIM was to have the obligation and authority to invest CCC's assets in accordance with CCC's investment objectives, policies and restrictions (as set out in the Preliminary PPM dated 11th September 2006, mentioned above and described later) and to carry out certain administrative functions for CCC (Cl. 1 and 2(a)).      The IMA gave CIM broad discretionary power to manage CCC's day-to-day affairs and operations, including selecting and purchasing assets, obtaining finance, and risk management activities.   CIM was also charged with the task of implementing the Investment Guidelines adopted by the Board and providing advice and recommendations to the Board.  In return, CIM's fees were to comprise (i) a flat rate annual Management Fee equal to 1.75% of CCC's current equity (as defined), calculated and paid quarterly, and (ii) a variable Incentive Fee based on a formula (the details of which do not matter) related to earnings achieved per quarter per share (Cl. 5).  I have been told that this fee structure and rates were typical of offshore fund management agreements at the time,

and I did not understand the Plaintiffs to contest this, even though they ultimately claim, at least, the return of the fees actually paid.

147. The IMA contains an indemnity from CCC to CIM and its personnel in respect of any losses, claims, expenses (etc) against them, excluding those arising from CIM's own wilful misfeasance, bad faith, gross negligence (as recognised by Delaware law) or recklessness (see Cl 6).   It also contains an exoneration clause, excusing CIM from any liability to CCC in respect of any act done in performance of its duties except where the relevant act amounts to wilful misconduct or gross negligence (as recognised by Delaware law) (Cl 2(b)).   The agreement was terminable on 180 days' prior written notice by CIM or the passing of specified resolutions by CCC and independently by its Independent Directors (Cl. 7).

148. In order to carry out its responsibilities, CIM had a team of personnel dedicated primarily or solely to CCC's affairs, and which came to be referred to as "Management".  As mentioned, Mr Stomber led this team, which included Mr. Greenwood (Chief Dealer), Mr. Trozzo (Treasurer and Chief Risk Officer), Mr. Randolph Green (CFO),  Mr. Vincent Rella (Chief Accounting Officer), a Ms. Fox (Chief Operating Officer, who otherwise plays no visible part in the case), Mr. Dean Melchior (also Risk Management) and Mr. Jason Ng (Trading), who was a junior. There were others who had responsibility for CCC's accounting and back-office operations.

149. CIM would also provide investment management services to CCC in respect of the leveraged finance elements of its portfolio through the Carlyle U.S. Leveraged Finance Group, supervised by Mr. Zupon.  This managed about a dozen funds and entities for Carlyle, specialising in bank loans and other corporate credit debt instruments, and this was an area, therefore, with which the Carlyle Group was familiar.

150. CCC was formed with a corporate subsidiary (known as Carlyle Capital Investment Limited ("**CCIL**"), which was to hold title to a portfolio of corporate credit assets, primarily bank loan securities, for CCC.  This separate subsidiary structure had been employed by Carlyle previously.   The management of this sector of CCC's portfolio was ultimately to be the subject of a Managed Account Agreement between CCC and CIM.   CCC's Management had discretion to determine what amount of CCC's capital would be allocated to this account, but Mr. Zupon's separate team then had primary responsibility for the selection of its actual portfolio securities.

151. It is suggested by the Defendants that the contractual relationship with CIM established by the IMA gave CCC the benefit of access to Carlyle's extensive resources and personnel, which would allow it to keep its operating costs lower than if it had to build its own infrastructure and operating systems.   I think this is true.   Of course, though, it also benefitted the Carlyle Group hugely in that CCC would be a source of fees earned by CIM, a source of investment in other Carlyle investment funds or products, and an indirect means of helping attract funds for other projects by providing an appealing liquid repository of funds for prospective investors, and keeping the Carlyle Group within their field of awareness.

### CCC's administration

152. As regards other aspects of CCC's corporate governance and administration, it is convenient to mention these here, although not all were formed at the initial stages.   An Investment Committee was formed by CIM for CCC's benefit, on 25th October 2006.  This committee was intended to advise and supervise the CIM personnel handling CCC's affairs and to monitor the overall performance of CCC's portfolio.  The committee comprised Messrs. Conway, Hance, Stomber and Zupon, and thus the four directors of CCC who were affiliated with Carlyle, but who also possessed the core investment expertise and experience from which CCC could usefully benefit.   This committee did not hold formal meetings, although the Defendants say, and say that it is apparent from the documents, that its members were in

frequent contact with one another regarding market conditions and CCC's investment strategies, and less was required of this committee than in the case of other Carlyle funds because CCC had its own Board.  This was unusual for a Carlyle investment vehicle which was usually structured differently.

153.  CCC also had an <u>Asset and Liability Committee</u> ("**ALCO**"), the membership of which was Messrs. Stomber, Trozzo, Greenwood and Melchior – in other words, the senior members of the "Management" team.  However, Mr Stomber made it clear from the outset that all Board members were invited to attend ALCO meetings and to receive ALCO papers, so as to keep themselves fully informed.   It is apparent from the papers that Board Members sometimes did so.   This committee was active from the outset of CCC's existence, but from June 2007 (the time of CCC's IPO) it met twice monthly until CCC's collapse.   Wherever possible, ALCO meetings were timed to take place before or after other formal meetings.   The purpose of ALCO was to review market events and conditions that might impact on CCC, examine the performance of CCC's investments on a regular basis, review CCC's compliance with its Investment Guidelines, discuss various risk and performance metrics, and the management of CCC's liquidity cushion but it was principally a reporting committee.

154.  CCC also had an <u>Audit Committee</u>, comprising the three Independent Directors.   Mr Allardice was its Chairman.  In the event, this committee only met formally (ie with Minutes) twice during the period with which I am concerned, although from at least February 2007 it appears to have conducted several informal meetings.

155.  It is also to be noted - and it is indeed clear from the documentary evidence in the case - that apart from formally convened meetings, there was a considerable amount of email communication between members of the Board, frequently taking in all of them.   Mr Stomber, in particular was a prolific writer of emails.   I am also told, and I would accept since it would be natural, that, in addition, there were telephone conversations.

156.  I am also told that there were face to face communications between many or most of the individual defendants.   The extent of this is not so easy to gauge, however.   Mr Stomber and the CCC "team" were based at Carlyle's New York Office on 42nd Street.      I am not sure if that included Mr Zupon.   Mr Conway was based in Carlyle's headquarter offices in Washington DC, although he used to travel a great deal.   Mr Hance lived in North Carolina, and obviously had to travel significantly to have face to face meetings.   Mr Loveridge was in Guernsey, and went to New York, I think, only for formal Board Meetings.   Whilst Mr Allardice lived in New York, and the papers do suggest, as he said himself, that he quite often went into CCC's offices, Mr Sarles lived in Boston and was therefore not around on an everyday basis.   Whilst I understood that I was being told that the two US based independent directors were accustomed to attending CCC's offices and speaking to its management on a "regular basis", regularity would be of a different order depending on the length of journey required.   The credibility, adequacy, worth and weight that can be accorded to any such face to face meetings outside formal Board meetings is a matter of major dispute between the Plaintiffs and the Defendants.

157.  To complete the picture, CCC had a corporate administrator, Mourant Guernsey Limited, which was responsible for various compliance, filing, document retention, and regulatory requirements applying to CCC.   The evidence suggests that they were not seen as covering themselves in glory, but none of this matters for the issues in this case.

158.  In overview, the governance of CCC would seem, on the surface at any rate, to have been structured so as to provide a practical balance between an internal and an external perspective on its business affairs.   The Defendants say that the overall arrangements were effective and, importantly, they were in any event such that CCC's own interests and the Carlyle Group's interests (meaning those of all the Entity Defendants) were aligned.   Both were interested in CCC's business being a success; there was no conflict between them.   The Plaintiffs say, in a

nutshell, that the overall arrangements were so incestuous and cosy that CCC was in effect run for the Carlyle Group's overarching benefit and as a unit of Carlyle, without proper regard to the individual and independent interests of CCC (and, when they should have been, of CCC's creditors) and in fact, in a way which was ultimately inimical to those interests.

*Launching the business*

159.     During the summer of 2006, Mr Stomber and Mr Zupon had worked on the business model for CCC, although Mr Stomber, who I am satisfied possessed energy, enthusiasm, and a strong determination to prove his worth, really took over.   Varying asset allocations and mixes were considered during the process of refining the model.   Although I heard no direct evidence on this, I infer from the expert evidence which I subsequently saw and received that this involved extensive computerised modelling of potential asset allocations for comparison, feeding in different combinations of assets and possible market trends or scenarios.

160.     The devising of the CCC business model was done with consultation and feedback from the group of six underwriting banks - Citigroup, Bear Stearns, Goldman Sachs, JP Morgan, Lehman Brothers and Deutsche Bank - with which CCC would work in raising its capital. This would be initially by a private placement, with these banks acting as placement agents, so that they would be supporting the proposed model at least by association.   The placement would be in stages.   The business would become established by this means, and subsequently there was to be the IPO leading to CCC's becoming a public company by listing on the Euronext Exchange.   It is not apparent why this particular exchange was selected but neither is it important.

*The Preliminary Private Placement Memorandum*

161.     By 11th September 2006, CCC was in a position to, and did, issue a Preliminary Confidential PPM to lead the initial commitments from the investment banks.   It actually started business operations on the following day, using funds borrowed from Carlyle, pending the receipt of the proceeds of the anticipated placement.

162.     This PPM document set out CCC's then intentions with regard to a private placement of shares.   It recorded that certain Carlyle affiliates had committed themselves to buy shares, and that there was to be an initial closing to the investment banks on 16th October 2006.    The intention was to have two future closings to outside investors on 28th December 2006 and 4th January 2007 and an optional further closing on 15th February 2007.   The proposed offer price was $20 per share with a minimum investment of $5Mn.   These arrangements were a scheme to enable CCC to begin to build up its business, initially with borrowed funds to be repaid from the receipt of placement proceeds, and subsequently by calling down instalments of the placement proceeds.    The precise detail again does not matter.

163.     This preliminary PPM is a lengthy and detailed document, and it is also not in precisely identical terms to the eventual PPM which was issued in December, in solicitation of investments from investors outside the banks.   This latter was, of course, updated with regard to events in the interim, but there were some other small changes of wording, although not, so far as I can see, any change of general form and content.   I note just one or two points from its content here.

164.     First, it is stated that:

> "*The investment objective of the Issuer is to achieve superior risk-adjusted returns for Shareholders through capital appreciation and current income, by investing in a diversified portfolio of fixed income assets with an optimal mix of mortgage products and leveraged finance assets.   In an effort to achieve this objective, the Issuer intends to invest in a wide range of fixed income assets and credit classes and utilize fixed*

*income derivatives technology to balance the trade-off between prudent risk-taking and returns. The Issuer believes that proper management of the funding of assets is of equal importance to the proper selection of assets. CIM intends to allocate capital utilizing an asset allocation model that it believes mitigates the effect of leverage based on value and risk and isolates risk-adjusted returns."*

An illustrative, but emphatically illustrative only, portfolio pie chart shows what was then viewed as a "*wide range of fixed income assets*", in that the proposed asset allocation was to be 90% mortgage backed securities of which 77% would be Agency RMBS, and 10% leveraged finance assets of which 8% would be bank loans.   Elsewhere in the text, investors were notified that CCC would intend to leverage the acquisition of Agency RMBS by 27x, but the leveraged finance assets at a much lower level of 1x – 5x, depending on asset type.

165.   Elsewhere the preliminary PPM sets out the intention to distribute 90% of CCC's net earnings as a quarterly dividend.   It gives short biographies of the proposed directors and detail of the investment management arrangements with CIM and the relevant fees.   The anticipated availability of the expertise of the Carlyle Group's US Leveraged Finance Assets Group is referred to and it is stated that

"*CIM and the Issuer have structured their relationship to ensure that their interests are closely aligned."*

It also made it clear that

"*The Issuer intends to employ leverage extensively, which may be employed without limit……"*

166.   The proposed source of funding for the leverage of RMBS assets is mentioned, but not particularly prominently (it is not even mentioned in the Executive Summary) and I infer that this is because it was not considered to be particularly noteworthy.   What is said is that

"*The Issuer expects to finance its investments in RMBS using a diversified approach involving repurchase agreements with multiple commercial and investment banks and through one or more commercial paper programs. Because this financing is expected to be short-term and floating rate, the Issuer intends to mitigate its interest rate risk through the use of various interest rate risk management strategies, including interest rate swaps. The Issuer expects, at least initially, to leverage this asset class approximately 27 times the amount of its equity, but this level may change."*

167.   Access to "*the Carlyle Group's Established Infrastructure"* and "*Extensive Relationships and Deal Flow"* are noted as some of the "*Investment Highlights*" and the Carlyle Group's reputation and established track record were set out, plainly expected to be a positive feature.

168.   The Memorandum warned that the company could change its investment strategy as and if it saw fit, but also stated that there would be "*Investment Guidelines"* approved by the Board. It stated that

"*changes to the investment strategy* [changed to "*guidelines*" in the subsequent December PPM] *must be approved by a majority of the Independent Directors".*

I shall return to consider the point of the "Investment Guidelines" later, because they, and the way in which they were subsequently treated by CCC, have been the subject of much examination in this case, but it suffices to mention here that the three central guidelines, were (i)  an asset allocation balance of a maximum of 85% RMBS to other asset classes, (ii) the maintenance of a minimum borrowing capacity of 150% of anticipated needs, and (iii) the maintenance of a liquidity cushion of 20% of capital, to meet possible margin calls.

169.  Otherwise, in general terms to which I do not think I need refer further, the PPM encouraged investment on the basis that Carlyle personnel and the placement agents were themselves investing, but at the same time there was set out a great amount of information and disclosures and a myriad of warnings as to possible risks which might affect CCC's business and investments, including all those perceived to have any potential effect on its assets, business or operation with greater or lesser degrees of specificity. They included that

> "An investment in the Shares is speculative and involves significant risks.  An investor should understand such risks and have the financial ability and willingness to accept them for an indefinite period of time and the ability to sustain the loss of its entire investment"

and

> "An investment in the Shares is suitable only for investors who are experienced in analyzing and bearing the risks associated with investments having a very high degree of leverage".

Another warning was that

> "Various potential and actual conflicts of interest may arise from the overall advisory, investment and other activities of CIM, its affiliates and their respective clients."

170.  Around this time, CCC also began entering into repo MRAs with various funding banks.  By 14th September 2006 it had already acquired $690Mn of RMBS.    Although this figure looks large, it was of course small compared to the ultimate intended size of CCC's holdings, which would be over $20Bn.

171.  Having regard to the point already noted above in considering the structure and effects of repo financing, it is interesting to note the differing approaches to the question of valuation of the assets in the various MRAs of these banks, which I infer were in the particular bank's standard form.  The MRAs of two such banks (Goldman Sachs and Lehman) provided for the "Market Value" of the securities for the purpose of margin calls, to be their price obtained from a "generally recognized source agreed by the parties" and at its most recent closing bid quotation.  The MRA with Bear Stearns allowed Bear Stearns to price the securities "in its discretion exercised in good faith".  The agreement  with Deutsche Bank provided  for an agreed "generally recognized source" but that if such source could not be agreed, Deutsche had "sole discretion (using the bid price for such Securities) to determine the value".   The agreements with Citigroup and JP Morgan entitled those banks to choose (in good faith) the pricing source to be applied.   The lack of uniformity about this suggests to me that this point had rarely arisen for serious consideration of its effects and operation in recent market practice, either as a matter of review, but still less, contentiously.

### 4th October 2006 - First BOARD MEETING

172.  CCC's first Board Meeting took place on 4th October 2006 in Washington DC, with all directors present in person or by conference call and various members of Management, other senior Carlyle personnel, and Mr John Reville of PwC, who were to be CCC's auditors, also in attendance.   The many and various formal matters relating to the setting up of the company were ratified insofar as CIM had already effected them, otherwise they were formally resolved upon.   This included the formal appointment of the last five directors, which appointment lay in the power of the subscribers to CCC's Memorandum of Incorporation.

173.  The new personnel were also introduced to the Board.  Three "related party" transactions between CCC and Carlyle were reviewed and approved, (this requiring the approval of the Independent Directors).  These were taking up investments in two other Carlyle managed leveraged finance asset funds and the taking of a bridge loan from Carlyle to enable CCC to start purchasing securities in advance of receipt of share capital.  The point of this last was to reduce the phenomenon known as "ramp drag", which is where acquired share capital remains non-income producing for the period taken up by the process of acquiring assets. The method of dealing with this is to borrow funds in advance with which to acquire the assets, such that their income is already flowing when the capital raising takes place.  The loan is then repaid out of the capital proceeds.  This manoeuvre illustrates the fact that in this business it is seen to be worthwhile and even necessary to look for every small step which maximises and improves return on assets.  They all feed into the eventual financial results by which an entity's success or failure will be judged.

174.  Continuing with the Board Meeting, CCC's business strategy model was presented by Mr Stomber, who explained the model and its intended use of leverage.   The Board noted that it was intended to invest at least 65% of CCC's assets in mortgage related products (thus, it was expressly noted, limiting CCC's ability to invest in Carlyle sponsored products).  The Board also noted, discussed and approved the draft Investment Guidelines circulated in the Board pack, and referred to above under which CCC (through CIM) would operate, and that these could be amended only with the majority approval of the Independent Directors.   In fact, with Mr Stomber notably not being a person to delay, CCC had already committed to purchase $2Bn of securities the previous day, in accordance with the business plan.

175.  There was discussion of the operation of the credit product section of CCC's intended business, led by Mr Zupon.  This appears in more detail in the Minutes, possibly reflecting the fact that this was a more familiar area of business for Carlyle personnel.  A warehouse of suitable investments for this portfolio sector had already been provisionally acquired and held by a broker (CitiGroup) and their acquisition was formally approved.  After a review of the arrangements and timetable for the intended Private Placement of shares, various enabling resolutions for this were passed, including that CCC should enter into the relevant Agent Placement Agreement with the six proposed agent banks, the creation of the Audit Committee and the appointment of PwC as CCC's external auditors.  The intended timescale to the eventual IPO of shares was reviewed.  The requirements of Guernsey corporate governance and regulation – and in particular the qualification that the company should be a Qualifying Investor Fund ("**QIF**") in Guernsey law – were discussed, and the appointment of Mourant Guernsey Limited as CCC's Guernsey administrator was approved.

176.  Mr Hance, as Chairman, stated his intention to call a Board Meeting in December, prior to the second closing of the private placement, another to review CCC's year end financial statements and subsequently at least one meeting every quarter.

177.  I have not recited every minute, but these give a flavour.   My overall impression from the Minutes is, in short, that they record a comprehensive and businesslike meeting, as one would expect for a sophisticated finance vehicle intended to become a public company.

*October 2006*

*Mr Stomber and Mr Zupon*

178.  At around this time, however, tensions emerged between Mr Stomber and Mr Zupon. It appears that these had been present from an early stage, owing to a personality clash (put simply, I think that they just did not like each other) and a lack of clarity as to their relative positions and the importance of their respective areas of responsibility.  Mr Stomber was conscious that he had been recruited to be the CEO of CCC, and it seems that he was unhappy at the degree of influence and authority which Mr Zupon – already, of course, a known and

trusted executive in the Carlyle Group - was either exercising or expecting to exercise in relation to the planned operation of CCC. The original intention had been that Mr Stomber should act as CEO of CCC with Mr Zupon - who was to have supervision of the credit product section of CCC's portfolio with an executive function as a "President" (in American corporate terminology) of CCC - reporting to Mr Stomber. However, it was becoming, or had become, clear that this was not going to work.

179. Internal contractual arrangements had to be made under which CCC's leveraged finance assets would be held, in order to comply with US securities law, by entities controlled by Mr Zupon's team, with intra-group charges being made. This necessitated negotiations between Mr Stomber and Mr Zupon. When these negotiations became bogged down in mid-October 2006, Mr Stomber involved Mr Conway, by copying him into emails. In frustration, Mr Conway felt obliged to tell both executives, fairly bluntly, to resolve their differences, with an apparent threat to remove them both if they did not do so. This was on 15th October 2006. They did; the Managed Account Agreement was completed on 16th October 2006.

180. However, Mr Stomber raised with Mr Conway his concerns that if the role of CCC was simply that of servicing other Carlyle investment funds, his mandate needed reconsideration. He was reassured by Mr Conway, who is plainly a master of diplomacy and the smoothing of ruffled feathers, that CCC was to have an individual and important role as a new and diversified investment vehicle in its own right. In consequence (I infer) though, Mr Zupon's executive position was disengaged sideways, and a structure was devised under which he had no reporting role. Mr Stomber operated as CEO calling on Mr Zupon and his team to effect such transactions as were appropriate for the ring-fenced credit product portion of the business, under the Managed Account Agreement.

181. It is quite apparent that throughout the life of CCC, Mr Stomber and Mr Zupon did not have a cordial relationship. Indeed, other witnesses acknowledged this in their evidence, with varying degrees of bluntness. Messrs Stomber and Zupon were themselves diplomatically circumspect on the subject in their own evidence, although Mr Stomber appeared more uncomfortable with being diplomatic than did Mr Zupon. I read this as simply a difference of personality. My assessment, however, is that whilst their personal relations were cool, as regards the management of CCC's affairs their relationship was professional, although conducted as far as was possible and practicable through the intermediary of others.

### *Refining the business model*

182. As already mentioned, CCCs' proposed business model was put before the six Investment Banks who were to underwrite CCC's' private placement and subsequent IPO, functions for which they would earn significant fees. Mr Stomber emphasised this point in his oral evidence; they had all reviewed CCC's business model including its evolutions, and had all been content to put their names behind it and to promote investment in CCC to clients - albeit with varying degrees of energy. Indeed ultimately they had all exercised the so-called "greenshoe" option, by which underwriting banks can choose to take a further 15% of a public share offering in their own right if it is successful, either to protect themselves from having over-committed to procure shares for investors on a particularly attractive offering, or with a view to on-selling shares at an anticipated profit. Either way, this suggests that the banks took the view that the shares on offer were a good buy. In the light of the part which at least some of these banks later took in placing the stress on CCC which ultimately destroyed it, Mr Stomber pointed this out in his evidence with scarcely concealed bitterness.

183. The first closing of capital raising, to the placement agents themselves who would then sell on, took place on 16th October 2006. CCC's business was officially launched the following day. It paid back the initial $15Mn bridge loan from Carlyle from the proceeds, which it then began to deploy. The twin processes of refining CCC's business model and seeking further rounds of capital investment continued in tandem. Marketing efforts at this stage were

focused on CCC's existing known investor base, who were, naturally, Qualifying Investors of the required standard.

***Investment Guidelines and risk management.***

184. During the capital raising campaign, at the beginning of November 2006, Mr Stomber sent a more specific email to identified potential investors explaining some particular risks with regard to CCC's portfolio, and how it was intended to manage or mitigate these. He referred to: exposure to the defaults associated with a potential credit cycle (applicable to the Leveraged Finance Asset part of the business and guarded against by investing only in B+ rated products and limiting individual exposures), the weakness of the US housing market, (avoided by investment in only Agency RMBS with the implied guarantee of the US government), exposure to any liquidity shock (dealt with by operating with a liquidity cushion tested against the 1998 LTCM crisis) and interest rate rises (assessed as being highly unlikely to any degree which would hurt CCC).  In addition it was pointed out that the returns on the two parts of the business -  credit products and RMBS - were entirely uncorrelated with each other, but were held in equal balance as regards returns on equity ("**ROE**") owing to the leverage employed,  thereby mitigating the effects of any shock to either element.  These emails provide an insight into how, by this time, Mr Stomber, as the CEO and advisory guiding hand of CCC, saw the main features of CCC's business model and associated risk, and lead appropriately to a closer look at the Investment Guidelines which were fixed upon for CCC's business and approved by the Board.

185. Investment Guidelines may cover various matters, but their effect will be both to shape the particular character of the relevant business venture, and to be a risk management tool.  Their adoption, and their publication to investors, suggest a carefully considered strategy and a management with the intention of a responsible and self-disciplined approach to running the business.

186. As already noted, though, it was always stated in the documentation, ie the PPMs and the OM for the IPO, that CCC's Investment Guidelines were not immutable and that they could be departed from without notice to shareholders, although only with the approval of a majority of CCC's Independent Directors.  The implication is that this last point is being offered to investors as a comforting safeguard as regards their investment otherwise being handled entirely in the discretion of CCC or, more accurately, CIM as its investment manager.  In the event, the guidelines were departed from by CCC, and criticisms both of this fact, and the way in which the Defendants dealt with it, form a major part of the case made by the Plaintiffs.   It is convenient here, therefore, to look at the guidelines more closely.

***Guideline 1 - Asset allocation***

187. First, there was the asset allocation guideline.  This was to govern the balance between RMBS and other leveraged finance assets in CCC's portfolio.  Ultimately, the guideline was fixed at a maximum of 85% for RMBS generally (ie here including non-Agency) as against other, leveraged finance, assets ("**LFAs**").

188. The effect of a high proportion of RMBS was that a very high degree of leverage would likely be undertaken in the acquisition of these assets.  This was made express and clear in CCC's business model and its various offering documents.  It was noted above that at the time of the PPMs the leverage of RMBS was intended to be at  27x.   This describes that for every $1 of CCC's own capital spent on acquiring RMBS, it would borrow $27, ie it would actually own 1/28[th] of the investment value itself.

189. By the time of CCC's IPO, this intended figure had risen to 32 – 37x, because the business model had been varied such that now only Agency capped floater RMBS were to be the intended acquisitions in that class.  These are less risky, and therefore, by the same token,

lower yielding assets, so CCC needed to acquire more to achieve the same return on its own capital deployed, which meant borrowing more.   This proposed leverage ratio was specifically mentioned in CCC's OM.   It was also expressly stated, though, no doubt to preserve CCC's flexibility and room for manoeuvre, that CCC would be placing no self-imposed limit on the extent of its borrowings.   For perspective, in the OM it was stated that CCC's <u>overall</u> leverage rate would be approximately 29x, and the LFAs would be leveraged at between 1x and 8x.

### Guideline 2 – liquidity cushion

190.   The second guideline was the liquidity cushion guideline, ie that CCC would maintain a block of cash or unencumbered assets available to meet immediate financial obligations.   The final model specified a liquidity cushion of 20% of "equity" or "net asset value" or "adjusted capital".   (To the extent that these may not mean exactly the same thing, I consider that "net asset value" is the most accurate articulation of what was intended.).   This meant that, in practice, 20% of CCC's capital assets would be held in a liquid form, in the shape of either cash or immediately realisable assets.

191.   The quantum of the liquidity cushion was Mr Stomber's recommendation.   It was a large increase over the figure of 5% which had been tentatively proposed in the initial model.   The increase was made because, in the course of devising the business model, the proposed structure was stress-tested by applying simulations and projections to see how the model would fare under particularly difficult market conditions or trends.   Adjectives used to describe this in the case have been "turbulent", "volatile", and "dislocated".

192.   The model was tested against the conditions of the worst liquidity crisis in general memory, which was the Long Term Capital Management crisis of 1998.   The principle of the stress test applied was that of modelling what resources would have been required in order to survive the conditions of that crisis to a 99% confidence level as to survival, on the assumption that no corrective measures to the portfolio were taken for 20 business days.   This is known as a "stressed VaR" (Value at Risk) assessment.   The parameters are conservative, both as to the "20 days with no corrective action" assumption and as to the 99% confidence level.   Typically, VaR analyses were carried out on a more normal basis of a 1 day inactivity period and a 95% degree of confidence.   Using "stressed VaR", related to the conditions of 1998 rather than simply to those of the most recent few months (again more normally used, and being described as "current VaR"), was also conservative.

193.   The stressed VaR analysis had thrown up a 16% liquidity cushion requirement.   Mr Stomber had then added 25% of this for further safety, to reach the 20% figure.   He said that the reason had been to add something, in order to be conservative as against even the worst financial crisis which could be pointed to.

194.   As stated, the purpose of the liquidity cushion was to protect CCC from inability to meet immediate financial obligations owing to absence of liquid funds, with the particular concern being the ability to meet margin calls.   CCC would be borrowing heavily on the security of the investment assets which it was purchasing.   It would do so, as regards RMBS, typically for 30 days and at a borrowing margin of 98% of the current value, ie market price, of those assets.

195.   If the market price attributed to the relevant assets in a repo transaction falls during the repo finance period, any such fall eats into the 2% value buffer which protects the repo lender against loss if it is obliged to sell its security.   The terms of the repo finance therefore entitled the repo lender to require CCC to provide additional security (ie "margin") in such a case, sufficient to restore the value of the security held by the repo lender to 98% of the new (reduced) value of the security.   To do this would require the posting of a margin amount equal (simply by mathematics) to 98% of the reduction in the value of the relevant securities.

In the context of the size of investments envisaged for CCC, which would be in $Bns, this could be a significant absolute sum, ie several $Mns. As already mentioned, margin positions were assessed daily and consequently CCC could be required, on mere hours' notice, to post such additional security.

196.   It was therefore vital that CCC should have immediately liquid funds to enable it to comply with any such demand without relying on selling its assets. Apart from the fact that these were unlikely to be realisable in the required short time frame in any event, such a pressure to sell would very likely mean that the assets had to be sold at a price which was less than their best, and indeed might even be regarded as "distressed" prices, ie those produced by an obviously forced sale. This is sometimes referred to as "firesale" prices.

197.   The liquidity cushion, though, was intended as a protection against having to meet margin calls, and only margin calls. It was not envisaged as a protection against any other factor which might adversely affect CCC's financial position under its repo financing. The most immediately salient of these factors - at any rate as one becomes more familiar with the practical aspects of the repo financing market - was the possibility that lenders might seek to reduce the 98% loan to value ratio of their repo lending, by increasing the "haircut" to more than 2%. The effect of this would be to require CCC to put more of its own money into buying the assets than the mere 2% required if it were able to borrow 98% of the price.

198.   CCC's business model was predicated on a 2% haircut being applied to its borrowings by its repo financiers. The evidence suggests that whilst this possibility of a higher haircut being demanded was not overlooked at the time of devising CCC's business model, it was dismissed for being theoretical rather than real. Mr Stomber said that his understanding and his experience had been that this was the level of haircut which was universally applied, in the wide and deep repo funding market, by repo banks lending in relation to this particular asset class, and that this had pertained even during the 1998 LTCM crisis. Where a practice was universal, if a dealer had attempted to impose a higher haircut, he was likely to find that his counterparty disappeared and "rolled" his business to a lender who was maintaining the conventional terms, ie, here, the 2%. There was enough available finance around in 2006/early 2007 for this to be easy. In those years, banks wanted, and indeed needed, to lend money to make their own profits, and the competition between them gave the borrower power in the market.

199.   The Plaintiffs have rather late in the day (but they say on the basis of the evidence at the hearing, and in particular that of their own repo expert, Mr Welles, in cross-examination) suggested that Mr Stomber had got this wrong, that the relevant rates were in fact in a range of 2%-5%, and that the 2% rate obtained by CCC in its early days was "concessionary" (owing to its connection to Carlyle) and therefore could not be relied on as being available into the future. They suggest, I think, that Mr Stomber was assuming that the 2% rate applicable to the even more stable Agency "pass through" securities or debentures, would also apply to Agency capped floaters, because his experience was in dealing with the former and not the latter and he therefore made an unwarranted assumption.

200.   It certainly emerged later from the evidence that banks would also regard the financial standing of the borrower as having some materiality to setting the haircut, rather than merely the quality of the assets – although it was not so clear to me what weight this consideration might have had at different times. But it also appeared – and I think that Mr Welles agreed – that the combination of high quality assets and a "Tier 1" borrower was regarded as making a 2% haircut satisfactory, that this would have been general practice, and that CCC was regarded as Tier 1 because of its association with the highly respected Carlyle Group. I am therefore not satisfied that there was necessarily any error in Mr Stomber's apparent assumption. But in any event, I note that the Plaintiffs have never alleged that CCC could be criticised for constructing its initial business model on the basis of the 2% haircut assumption,

and I would be most surprised if this had been overlooked during the years of preparation for this trial, if there had been any hint of a possibility that this assumption was suspect.

201.  The haircut, or achievable loan to value ratio, is part of whether finance is manageable for the borrower, because it affects the amount he has to find from his own resources either initially or during the currency of a loan term, but there are two other factors which affect this.

202.  Marginally less obvious than the nominal loan to value ratio granted is the postulated value of the security on which the loan is granted.   The amount of the loan is fixed by multiplying two component parts, the value of the security and the loan to value ratio.  A change in either will affect the amount of the finance being offered.

203.  This price, or value, of the securities is commonly referred to in financial markets as their "mark".  This is because market participants habitually review the value of their securities as against apparent market prices, doing this even as frequently as daily, and "mark them to market" (hence "**MTM**").

204.  I have already noted the industry practice of using prices posted by one of the known pricing agencies as the value for calculating the amount of loan finance they are prepared to offer (or put another way, and I think more in accordance with actual practice, the amount of security they require for making a loan of a particular amount).  These prices are based on the agencies' collection of data on known transactions, although with (I understand) adjustments to reflect the impact of current financial circumstances where felt necessary.  From this data they determine a current market price which they publish.  The agencies' published prices had always, before 2007, been used as the basis for calculating the amount of the loan which a repo lender was willing to provide, and departure from this practice was seen as so unthinkable - at any rate by those dealing with CCC's business - that the possibility of such a departure was not seen as a risk - or certainly not one against which it was necessary expressly to safeguard.    That risk was, of course, inherent in the terms of most of the standard MRAs into which CCC entered with its repo counterparties which I have noted above, but it was certainly not appreciated or evaluated as even requiring to be noted, as far as I can see.

205.  One might have thought that a third factor which would affect the acceptability of borrowing terms for CCC would be the interest rate to be applied to the loan.  This is because, to an uneducated outsider, it appears only natural that a more nervous or reluctant lender simply seeks to obtain a higher interest rate from a more risky or less attractive transaction. Surprisingly, to me at any rate, the interest rate has just never figured as a factor of any major importance at all in this case; it has only ever been given peripheral mention.  When I enquired about it, I was told that it is simply insignificant in the general order of terms to be negotiated, because interest rates were much of a muchness because of competition between lenders, and the financial effects of any likely amount of difference would be vanishingly small in this kind of transaction.  This is because it would vary only in terms of a few basis points, and for only 30 days – one twelfth of a year.  Moreover, given that the securities themselves were providing monthly interest payments which were above, and with a direct correlation to, the interest rate being charged on the repo finance, the likelihood of the interest rate being charged ever posing any financial problem, or even becoming a serious consideration for CCC, was simply not there.   As a risk attaching to the use of 30 day repo finance in the markets of 2006-7, this aspect therefore just did not figure as a serious concern in any assessment.

206.  I was taken in the course of the case to some evidence of repo transactions being discussed and negotiated, in which interest rates were mentioned, or treated as a negotiating point, but none of it suggested to me that the point was a matter of major portent, in stark contrast to the issues of pricing and haircut levels.    This tends to bear out the above comments. I need therefore say no more about it except to record, for the curious, that the interest rate being

charged to CCC during early 2007 appeared to be about 5.30%, give or take a basis point or two.

### Guideline 3 – Minimum borrowing capacity ("MBC")

207. Returning to the importance of CCC's Investment Guidelines, the third specified guideline was that CCC would maintain a "minimum borrowing capacity" of 150% of its anticipated actual repo borrowing requirements. In practical terms, this guideline translated, in relation to CCC's RMBS portfolio, into CCC's maintaining promises of unused available repo finance from its cadre of potential repo counterparties roughly equal to 50% of the value of the portfolio of RMBS (bearing in mind that its borrowing requirements were 98% of that total value). The point of this guideline was, of course, to ensure that CCC had an available backstop finance facility to give it flexibility in case it wished to "roll away" from any particular repo counterparty, and to enable it to do so without coming under any stress as to borrowing terms.

208. This point draws attention to one aspect of CCC's business model which is of major importance as context for the matters under scrutiny in this claim.   I have already referred to it but the implications bear repeating.

209. This central aspect of CCC's' intended business rested on continuously renewing contractual relationships with repo counterparties, which were subject to renegotiation twice every month, in the two large tranches required to support the "rolls" of the Fannie Mae and Freddie Mac RMBS, respectively.  CCC's borrowing capacity depended on promises of availability, should CCC request it.  However, firmly committing to the availability of finance may require the lender to decline other opportunities of deploying available funds at profit, and therefore a binding or "hard" line of available finance typically incurs a commitment fee, or comes on more expensive or less advantageous terms.  Similarly, longer term finance availability will come at a higher cost than short term loans, because the shorter term enables the lender to reconsider and re-set the return which he wants to receive more quickly, thus reducing his risk of having committed funds on terms which become disadvantageous before the transaction expires.  But any addition to the borrower's costs caused from incurring any such increased fee or rates of course reduces his profit.

210. Uncommitted, and therefore merely "in principle", or "soft", availability incurs no tangible fees, but it still has disadvantages for the lender, in that his reputation for reliability will depend on actually delivering, if called upon.  Even though, therefore, it may not require formal balance sheet commitment, the lender must have at least some regard to holding available funds which might otherwise be deployed to advantage, although he obviously has more freedom to take a view on whether he is likely to be asked to meet his soft promise, and in markets as broad as these he would no doubt expect to be able to do some juggling with other transactions in order to do so.  However, the extent to which banks are willing to promise even "soft" repo finance availability therefore still has commercial limits.  Its availability will be influenced, not just by the interplay of financial calculations, but also by reputation, and very often also the state of relations between the parties, and the consideration of favours owed or wanted, and the courting of future possible business of other types.

211. Thus, the advantage of having potential "soft" availability without paying a fee for certainty is balanced against the possibility that soft availability may dry up if the interests of the lender lean in a different direction, and plainly, at some point, the size even of a soft promised line may cause the bank in question to pause.

212. These factors, ie the uncertainty of soft repo lines, and the greater ideal of having committed, and/or longer term, repo lines available, were not entirely unnoticed in the early days of CCC as is shown by an email exchange of 18th- 21st November 2006  between Mr Trozzo and one of his managers,  Dean Melchior, into which Mr Stomber was copied.  Whilst obtaining

longer term repo financing may have been considered, it was not, though, followed through to a conclusion. I find that this was due to a combination of the factors, the first being that it would be more expensive and this needed to be balanced against profit earning, and the second being that it was not seen as an urgent or pressing necessity in the then relatively benign current market conditions. In evidence, Mr Stomber said that negotiation of such an agreement with Bank of America had in fact gone a long way, but the volatility in the market which occurred in April and May 2007 stalled progress, and this was then overtaken by the market disruption of August 2007.

213. It is also apparent from the evidence though, that, in the context of this financial trading market, where transactions can move very quickly, and the difference between a good or poor deal can rest on slim differences of terms, the securing of repo finance for CCC generally was at all times a matter which demanded monitoring, direction and even nursing on virtually a daily basis. Agreement requires two sides, and in respect of any individual repo finance transaction CCC was to be engaged in 24 rolls annually, with a cohort of around ten repo financiers in relation to each roll. This involved individual commercial negotiations with repo traders on behalf of the relevant banks, each anxious to secure benefit for his own employing bank, with CCC equally anxious to secure the best terms for itself.

214. In times of stability, with a reasonable balance between borrowing requirements and lending capacity in the market, such transactions are likely to be secured on industry standard terms which each side regards as reasonable and adequate to enable it to meet its commercial requirements or aspirations. Thus the negotiations will be relatively easy as no-one will break out of line, and there are conventional norms of behaviour and tacit understandings which operate. Mr Stomber said that there was a kind of "honour system" about the way in which market participants dealt with each other, and I can accept this, in general terms. It is relatively easy to be honourable in good times. In all commercial negotiations, though, parties still need their wits about them to avoid giving away advantage, and when circumstances change and commercial pressures mount, parties will negotiate hard, and potentially ruthlessly. How hard depends on the extent of the pressures (external or internal within the organisation) operating on the negotiators, and their particular character and appetite for ruthlessness. In those circumstances, the previously unwritten rules of the game may well go out of the window, as honour gives way to self-protection.

215. CCC's business model involved repeatedly entering upon such negotiations, and relying upon their outcome to provide sustainable resources for continuing CCC's business. Success would therefore depend on the skill and even tenacity of its negotiators, and the degree of clout (or "leverage" in another meaning) which CCC was able to bring to bear in any such negotiations. That, however, is intrinsic to business.

*20th December 2006 – Second BOARD MEETING*

216. This Board Meeting was held by telephone on 20th December 2006. The Board discussed CCC's performance to date and the progress with its asset purchases, on which Mr Stomber reported positively. As was common practice in the Carlyle Group, a parallel vehicle company to CCC had been set up, called CCC Coinvestment Limited ("**CCC Coinvest**") , to enable Carlyle Group employees and affiliates to make investments in the subject company (ie CCC itself). That had been done in this case and CCC Coinvest had already made a commitment to invest some $45Mn in CCC. The Board approved increasing the acceptance of this investment to $63.8Mn.

217. Mr Stomber updated the Board on the progress of the private placement. The PPM, in virtually identical terms to the Preliminary PPM mentioned above, had been issued on 16th December 2007. The required preparations for CCC's IPO were authorised to proceed. PricewaterhouseCoopers (Guernsey) were formally appointed as CCC's auditors, following confirmation that they were suitably independent; the importance of this attribute was noted.

*December 2006 – February 2007*

218.   By the end of 2006, CCC had secured, or was negotiating, repo lines with at least ten banks, namely its six underwriting banks mentioned above, and also Bank of America, RBS/Greenwich, Merrill Lynch and Morgan Stanley.  These lines were all, and without negotiation, at a 2% haircut.  Lehman initially quoted 2.5% but immediately reduced their terms to 2% when challenged.  This was all, therefore, in accordance with Mr Stomber's professed belief as to the norm in this regard for Agency floaters, and his team's experience.  It was also the expectation of Mr Hance and Mr Sarles, according to their witness statements, although this is in the context of their far more limited experience.  Paperwork evidencing early trades by the team confirm that 2% was routinely offered.  However, this rate also confirmed CCC as being perceived to be a highly credit worthy customer, no doubt owing to its association with Carlyle.  The evidence shows that occasionally during the period from late 2006 through to the time of the IPO a bank might propose a haircut higher than 2%, but this was never persisted in when contested, and CCC never "paid" (perhaps a misnomer but common parlance) more than a 2% haircut.

219.   The private placement of shares took place in two tranches, the first completing on 31st December 2006 and raising some $263Mn in capital at a price of $20 per B share.  A roadshow had been devised to educate investors about CCC and its strategy.    Although certain banks were engaged as placement agents, CIM and Carlyle personnel carried out much of the work of securing investors, looking mainly I understand to "legacy" investors, that is: previous Carlyle investors.

220.   In January 2007, Mr Conway, in his annual letter to Carlyle investment professionals, noted that the financial successes of the last and previous years had been fuelled by the vast availability of easy credit (the "*liquidity environment*"), which he believed simply could not last - although he did not predict that the tide would turn quite as quickly as it actually did.  As to the future, he requested Carlyle staff to start taking a more cautious approach in their pursuit of appropriate projects, and to consider projects with less ambitious investor returns than in the past if they also presented lower risk.

221.   Mr Conway had, he accepted in evidence, begun to feel concerns about the continued buoyancy of the US economy during the forthcoming year of 2007; there were plainly some signs that the economic situation might be on the turn.    There is a recognised economic cycle, under which economies do not grow or progress steadily, but in periodic waves of growth and prosperity and then slowdown and even contraction.  However, and as Mr Conway pointed out, his cautionary comments were directed generally at all the areas of Carlyle business which were his main oversight, and were certainly not focused particularly on the new project of CCC.

222.   Audit Committee meetings of CCC took place on 6th February and 15th February 2007, with nothing of moment to be recorded.

*15th February 2007 – BOARD MEETING*

223.   A telephone Board Meeting took place on 15th February 2007.  All the directors were present, and Miss Cosiol, Mr Buser (an accountant and Carlyle's Chief Accounting Officer), and Mr Reville from PwC, with an assistant, were in attendance.  The Board discussed and approved CCC's year end financial statements and other important administrative matters including approving the charter for the Audit Committee, and approving the cost-sharing agreement with CIM and the plans for CCC's IPO.

224.   Importantly for present purposes, the Board discussed and gave approval to two requests from Management (in effect Mr Stomber) with regard to the Investment Guidelines.  The first was to incorporate a definition of the liquidity cushion into the guidelines and the second was to

reduce the target minimum borrowing capacity from 150% of needs to 125%.  The former made no change to the concept and was really just refinement.  The latter was requested because of the increasing size of CCC's portfolio as it made acquisitions.  It had been discovered that banks were not willing to make available, even on a "soft" basis, very large repo financing lines which would not be used.  At that time the repo finance markets were active and stable, and the directors agreed that it did not appear that available borrowing capacity needed to increase in direct ratio to the size of the portfolio, and so this amendment was approved by the Independent Directors.  It was agreed that the MBC guideline was a target, and if excess availability could in fact be secured then it would be.

225.   The Board also recorded that the eventual OM must make it clear that the Investment Guidelines were indeed guidelines and not rigid constraints, and could be changed without shareholder approval.  This was in order to allow Management enough flexibility to do what it felt was required at any time, as speedily as was considered necessary, particularly as to changing asset allocation and with regard to the liquidity cushion and leverage.  This requirement had been made very clear in an email circulated generally by Mr Stomber the previous day, and the point was taken up by Ms Cosiol.

226.   On 28th February, the second round of CCC's private placement completed, raising a further $337Mn at $20 per share, and bringing CCC's total capital at that stage to $600Mn.

*5th March 2007 – BOARD MEETING*

227.   The next Board meeting was held at Carlyle's offices in Washington DC on 5th March 2007 (with a routine Audit Committee Meeting on the same day) and with Mr Conway in attendance by telephone.  Ms Cosiol and Mr Ferguson, Mr Buser,  Mr Harris (Carlyle's Chief Financial Officer), Mr Reville, and the three senior Management personnel, Mr Greenwood, Mr Trozzo, and Mr Rella, were also in attendance.

228.   The Board received reports of CCC's activities during January and February using the private placement funds, and in particular a positive report that CCC had been able to acquire RMBS at prices in line with those anticipated in its business model, and that CIM would thus likely earn its incentive fee for that quarter and be fully profitable for Carlyle.

229.   It is necessary, when reading the relevant minutes presenting the above material, to get used to the convention in this market that prices for bonds are described as "spreads" rather than as actual prices.  This is because the essentially interesting aspect of a bond is its yield, ie the income earned, as a return on the costs of purchasing it.   In the outside world, the yield is usually described as a percentage of the price paid, but in the bond world, it is described, not in absolute terms, but as a comparison with a benchmark interest rate which in this case is LIBOR.  The "spread" is the difference, expressed in basis points, between the LIBOR rate and the rate of return on the bond at its then price.  Thus, the greater the spread from LIBOR, the higher the return that is being made and, since the return reflects the ratio of the income to the price paid, it reflects a lower price, or value.  Conversely, if the return converges on the LIBOR rate, this "narrowing of the spread" shows a lower return, and thus reflects a rising price.  The spread therefore provides an easy measurement of price changes or trends.

230.   Whilst an actual price can be computed from the spread with the necessary data available, the bond market finds it more convenient to make comparisons of value or price for investment decision purposes in terms of the spread itself.   Since price also reflects the perceived risk in the investment (more risk means lower price) it follows that a "narrow" or "tight" spread – a higher price - indicates that a bond is viewed as less risky than one trading at a "wide" spread and lower price.    Looked at another way, the spread from LIBOR is a measure of the perceived risk premium inherent in the particular investment comparing it with the relatively risk free LIBOR rate.

231.  As the avowed purpose of CCC was to provide dividends, there was discussion as to how future income and cash flow might turn out.  Among the presentation papers were financial summary illustrations, labelled "*Risk Analysis and Summary*", which became a standard feature for meetings.  They showed projected figures for CCC's progress, including leverage at around 29x and a liquidity cushion of 22%-23%, except where increased, exceptionally, by the receipt of funds from raising capital.    The ratio of the liquidity cushion to CCC's calculated 20 day VaR (described above) was also shown.

232.  The Board also discussed the draft OM for the IPO, and various other resolutions with regard to the Board's responsibilities under the rules of the Euronext Stock Exchange.

*Market events - Spring 2007*

233.  By the time of this Board Meeting of 5th March 2007, falterings in the market, which were later to develop into the "sub-prime" mortgage crisis, can now be seen to have been developing.      CCC had, of course, already started investing by this time.  Within CCC the effect of these market factors was seen as being that higher quality RMBS, such as the Agency RMBS in which CCC was focused, were becoming more attractive, but that instability in the REITs market had made investors wary of anything apparently mortgage based; it was therefore going to be necessary to explain and emphasise to potential investors in CCC how CCC, and its risk profile, differed from those of other RMBS based investment vehicles such as REITs.    CCC, it will be recalled, had devised a business model which was, and was intended to be, different from other investment funds in the mortgage-backed financial markets, and this difference was intended to give it a unique competitive edge.  Within CCC, the sub-prime difficulties were therefore not perceived as affecting the solidity and viability of CCC's business model in practice.    Mr Stomber sent a reassuring email to investors on this topic on 15th March 2007.

234.  With the preparations for the IPO underway, ALCO met for the first time on 30th March 2007 and, as already mentioned, fortnightly thereafter.  This meeting was chaired by Mr Trozzo, and Mr Allardice was in attendance by telephone.    It reviewed aspects of the market, compliance with the Investment Guidelines and generally felt its way towards how it would run in the future.

235.  On 3rd April 2007, Mr Stomber sent a request to all Board Members by email for a temporary reduction in the liquidity cushion to 15%.  This was not because of any forced need for liquidity, but to enable CCC to buy attractively priced mortgages, in advance of the IPO.  He explained how the cushion would be restored, either from the proceeds of the IPO in June, or out of a bridge loan from the IPO underwriters, as part of the IPO process, or, ultimately, through the maturing of CCC's assets.  Board Members asked questions, and found this a sensible request, to reduce ramp drag (already explained) and each of them expressed their agreement.    Mr Stomber reported, later, that the cushion had in fact been restored out of funds from the underwriters' bridge loan, and that this exercise had gained $1.7Mn for CCC.

*26th April 2007 – BOARD MEETING*

236.  CCC's Board Meeting of 26th April was a telephone meeting, held after an Audit Committee Meeting, and was primarily concerned with arrangements for the upcoming IPO scheduled for June.  However, the Board also discussed and approved a plan to grant share incentives (a restricted stock grant) in CCC to the Independent Directors and to CIM at the time of the IPO.  I am told that such a grant is a common form of remuneration for directors and senior employees, and it is apparent that it was fully disclosed to investors in PPM and OM materials.      Plans for the IPO were discussed, appropriate resolutions authorising the necessary preparatory steps were passed, and Messrs Conway, Stomber, Hance and Allardice were appointed to be a Pricing Committee which was to have full powers to deal with matters of pricing and the size of the IPO.

237.  The definition of the liquidity cushion was further refined at the suggestion of Mr Reville. The Board also formally adopted the guidance issued by the Guernsey Financial Services Commission ("**GFSC**") with regard to corporate governance practice.  It formally approved CCC's taking the bridge loan from the underwriting banks, mentioned above and below.

*Market events - May 2007*

238.  The bridge loan of $191.7Mn was negotiated by Mr Trozzo and Mr Greenwood, and was entered into on 10th May 2007.   On the same day, Mr Stomber emailed the Board to report its completion, and therefore the rescission of the approval for the reduction of the liquidity cushion guideline, which now was to go forward at 20%, again.     The bridge loan terms in fact contained a covenant that CCC would not permit its liquidity cushion to be less than 20% of the "Value of its Investment Assets".   This is an obvious mistake, as it was only ever the value of CCC's Adjusted Capital, or Net Asset Value which was intended to be the base figure for fixing the level of the liquidity cushion.   Fortunately the loan was relatively short-lived and no issue ever arose.

239.  CCC used about $155Mn of the loan proceeds to purchase about $4Bn of Agency floaters in May 2007, and about $30Mn to restore the liquidity cushion.  This reached 31% by 10th May, and in fact remained above 25% from then until after completion of the IPO.     The bridge loan and its key terms were disclosed in the OM.

*18th May - ALCO Meeting - Market volatility*

240.  CCC held its second ALCO meeting on 18th May 2007, attended by Messrs. Trozzo, Greenwood and Melchior, and also Mr Buser, who had just become a new member.  Mr. Greenwood informed the Committee that spreads had widened over the last two months on Agency floaters but that CCC's RMBS portfolio did not have the kind of credit risk exposure that was affecting other yield vehicles at the time.  Mr. Trozzo discussed CCC's compliance with its Investment Guidelines, all of which it was passing, except for parameters concerned with the leveraged finance assets (ie not the RMBS sector of the portfolio).

241.  The materials presented to the Committee were produced by Management using CCC's internal software market modelling system called Polypaths.  This software produced both CCC's daily price projections and its price volatility and VaR calculations, drawing on daily market data inputs to do so.   These inputs included, but were not limited to, swap rates, forward interest rates, and the implied volatility also known as "cap" volatility.  I do not need to explain these metrics; their very names illustrate the kind of technical information and predictions which provided material for Management to assess trends and make decisions. Polypaths was both a price modelling and risk management tool.

242.  CCC's liquidity cushion, consisting of the uninvested proceeds of the private placements, was reported then to be $148.7Mn, or 26%, although it was noted that if these values were adjusted to the market price shown by Polypaths, there would be a reduction bringing it down to 21.8%. The "*Risk Summary*" slide showed that the asset allocation ratio of CCC's RMBS calculated using Polypaths was 55 %, and the ratio of the liquidity cushion to CCC's 1-day VaR was 9.2x.   All these were very comfortable figures - although of course the opposite side of such very comfortable figures is that they suggest that the company is perhaps not exploiting its assets to best effect.    It is in the balancing of such comfort and risk to gain optimum returns that the art of successful business lies.

243.  In late May 2007, there was a decline in prices for CCC's Agency floaters.   The evidence suggests that this was the result of market participants' fear of interest rate risk or cap risk; there were concerns that the economic growth then happening would lead to a likely rise in interest rates and fears that this might bring the cap on CCC's capped floater returns into

operation.   Mr. Stomber summarised the situation in a 31st May email to Mr. Hance and Mr. Conway:

> "*In short, in the last two weeks the unrealised MTM gains are gone and we have a small MTM loss since inception as spreads shot out.*"

244. Translated, this means that the previous small price rises which had showed as a gain in net asset values had been wiped out as the bond prices had fallen. However – and this is a constant feature of the business in this kind of market – this was not all bad news because wider spreads (lower prices) presented a buying opportunity.

245. CCC was at that time, an active player in the market, and looking for opportunities to achieve its objectives.   It is easy to forget, looking at events with the benefit of hindsight and with focus on the desirability of selling, that, up to this time, there had been an active and relatively stable market, especially in the Agency backed sector.   Participants were looking for good buys just as much as good sales, and CCC was, at that time, seeking to set up the business which it had modelled as advantageously as possible.   In fact, in early June 2007, CCC's Management even broached with Carlyle the possibility of being given an additional $100Mn loan to buy more floaters at favourable prices, although in the end, this did not happen.

***20th May - Meeting of Carlyle Partners***

246. Before that, however, on 20th May 2007, Mr Stomber provided an update about CCC to the Management Committee of the Carlyle Group, along with the heads of other Carlyle funds. This presentation was a means by which senior Carlyle Group personnel kept an overview of the Group's activities and performance.   The same day there was a meeting of the global partners of Carlyle.

247. This event is not part of CCC's own history, but the Plaintiffs lay emphasis on it as evidence of one of the matters which they say created a conflict of interest on the part of at least some of the Defendants, and put them into breach of their duties to CCC.   It is said to illustrate the accepted oversight of CCC exercised by Carlyle and it being simply taken for granted that the raison d'être for CCC was to operate for the benefit of the Carlyle Group.

248. It was the practice to hold such a meeting at least once a year, to discuss matters of interest, review performance and prospects, discuss the future, and no doubt also to strengthen internal relationships and create a collegiate ethos by recording anniversaries, new partners and suchlike.   CCC, its creation, and what it was doing, was part of the subject matter presented and reviewed at this meeting.

249. The Agenda on this occasion also included a discussion of what were referred to as "Strategic Alternatives" for the future development of the Carlyle Group itself.     The Plaintiffs have chosen to dub these "Carlyle's Strategic Objectives" in their Cause and submissions, although that is not the language actually used.   The Defendants object that this is tendentious, and that they should rather be called "Alternatives" or "Options".   They were the identified possible courses which Carlyle might take to develop itself and expand.   Among them were three which the Plaintiffs highlight.   These were, first, the possibility of taking on a syndicated loan of up to $1.5Bn to provide working capital, second, that of making a further private placement of shares in TCG/Holdings, and third, that of conducting an IPO of Carlyle itself.   There were others.  The slides for the meeting show that the perceived advantages and disadvantages of each of these courses were listed and were obviously discussed.

250. In the event, the term loan option was indeed pursued and was in fact accelerated in order to enable Carlyle to assist CCC in August, when it first suffered from the global liquidity crisis.

251. The second material option noted above eventually came about in the shape of a second sale of a major interest in Carlyle (7.5% of its earning shares) to Mubadala, the first having been that to CalPERS. This transaction was under negotiation from about this time until it completed in October 2007, and thus during the time when CCC first suffered major financial difficulty. It provided three of the Directors with a significant capital distribution as payment for the reduction in their own interests in TCG, as later detailed. The Plaintiffs assert that in making their decisions with regard to CCC at the relevant time, the Defendants improperly put the interests of Carlyle in general, and these three Defendants in particular, in securing the best price from Mubadala ahead of the interests of CCC itself and its creditors.

252. As to the third option, an IPO of Carlyle itself (in effect, I think TCG), this was not pursued at this time. One eventually took place in 2012. However, the Plaintiffs say that it was then in prospect and, once again, the Defendants' decisions with regard to CCC were improperly influenced by the concern of not jeopardising that prospect.

253. Thus, the Plaintiffs argue that when it came later to the decisions made in respect of CCC, and in particular what they dub the "inexplicable" failure to deleverage its position after August 2007 by selling off at least half of its RMBS and winding the company down, those decisions were in fact driven, they suggest, not by a consideration of the best interests of CCC and its creditors, but rather by the interests of the Carlyle group in general, and those three of CCC's directors in particular. These lay in avoiding the potentially adverse financial effects and ignominy of a public company bearing the Carlyle name being wound up, or having to admit the failure of its widely publicised intended business model. It was (say the Plaintiffs) these kinds of considerations which provide the real explanation for CCC's directors resolving that it continue on an apparent "business as usual" basis, and which resulted in its taking the obstinately reckless course as to its future, which ultimately caused it to collapse more spectacularly and expensively than would have been the case if decisions governed solely by CCC's own interests had been implemented.

254. But all this is jumping ahead.

### June 2007 - Bear Stearns hedge funds fail

255. Returning to the history, on 7th June 2007 came the first sign of what eventually turned into the sub-prime mortgage crisis, and the collapse of the Asset Backed Commercial Paper ("**ABCP**") market. Bear Stearns announced that it was suspending redemptions from two of its hedge funds that were heavily invested in subprime RMBS. "Subprime" was not, in fact, as pejorative a term then as the label nowadays conjures up. It simply means "not prime"; it is not the same as "junk".

256. Management, though, (and likewise Mr Hance) did not expect this event to have an adverse effect on CCC's portfolio of Agency floaters. Indeed they expected that it would actually benefit CCC, as investors shifted capital away from such assets and into safer fixed income assets like the Agency RMBS in CCC's portfolio, in the phenomenon known as a *"flight to quality."* The Defendants point out that this general belief and reaction was shared by others around this time, citing speeches by the Chairman of the Federal Reserve, Ben Bernanke on 17th May 2007, and research bulletins even of late June 2007 by analysts at Credit Suisse and elsewhere.

257. On 7th June 2007, Mr. Trozzo reported to Mr. Stomber that there had been a significant jump in the 5-year swap rate, a forward-looking indicator of rising interest rates, and that as a result, CCC's Polypaths software was suggesting that the value of CCC's RMBS portfolio had declined by about $45-50Mn; if CCC's repo lenders' pricing followed suit, the result could be a mark-to-market write down in the value of CCC's RMBS portfolio of some $55Mn, which would prompt margin calls of a similar order. (On a 2% haircut, the margin call would be 98% of the reduction in the recorded market value of the asset. Therefore,

treating the call as the actual reduction in value provides a good working figure.)  Margin calls of that magnitude would reduce CCC's liquidity cushion to 20.4%, and Mr Stomber so reported to Mr Conway and Mr Greenwood.

258.  Mr. Conway responded briefly, copying Messrs. Hance, Allardice, and Stomber, that this was why one had a liquidity cushion.  Mr Stomber and he then agreed, by email, that if the additional $100Mn loan were to come from Carlyle as had been suggested in order to purchase more assets, CCC would need to use part of it to protect the liquidity cushion.

259.  In one of his general emails to CCC's Board that evening (7th June), Mr Stomber gave his view on the effects of market conditions on CCC's asset prices and consequent likely margin calls, but reminded the Board that the same assets were backed, effectively, by the US government and would ultimately pay their par value, whatever happened.   His stated view was that whilst the recent developments might affect the eventual level of dividend which CCC could pay in the third quarter of 2007, they would not rule out paying a dividend, and CCC was still likely to compare favourably with other investment vehicles with different asset allocations which were more exposed to absolute fixed rate assets.  He suggested, even, that the fall in market prices provided a buying opportunity, which it would be useful to take advantage of before the IPO.

260.  On 8th June, however, Mr Stomber emailed Messrs Conway, Hance and Allardice describing events of the previous day as a "*perfect storm*" and a "*4 standard deviation event*", which CCC's own internal price modelling suggested would result in a mark-to-market price reduction of $60-70Mn in CCC's assets.     In the event, though, the margin calls made on CCC on 8th June were only for $20.3Mn in the aggregate, far lower than predicted.    The reason for this was later worked out to be that CCC's repo lenders at this time fixed their price marks by using the external pricing services already referred to, and these tended to have a time lag in recording the effects of actual market transactions, which Polypaths applied immediately.

261.  Emails between Messrs Stomber, Conway, Hance and Allardice, over the next two or three days show them considering the workings of the liquidity cushion, how to approach the potential use of it, and the appropriate reaction for CCC to the immediate market conditions.  They reflect a view that the purpose of the liquidity cushion was that it should be used if necessary to meet margin calls in order to avoid selling assets in a disadvantageous market.

262.  On 10th June 2007, there was an exchange of emails between Mr. Stomber and Mr. Trozzo in which, in the context of considering taking the loan to buy more RMBS at advantageous prices, Mr Trozzo proposed reconsidering the size of CCC's liquidity cushion for the whole portfolio and making purchases only of an amount which would leave this.  Mr Stomber disagreed, proposing to apply the guidelines only to the new purchases, although allowing that these should be at a more generous 25% liquidity cushion.     In oral evidence he explained his reasons as being his view that the current market volatility was not likely to continue, and that CCC was not facing "*an event like 1998*" (a reference to the LTCM crisis).

263.  Presumably for the purpose of arguing that Mr Stomber's judgment or conduct should be found wanting, the Plaintiffs seek to make something of the fact that Mr Trozzo has not been called as a witness by the Defendants.   They suggest that this justifies an inference that Mr Stomber was actively (and presumably culpably) disregarding advice from Mr Trozzo.     I will consider later and generally the Plaintiffs' submissions as to adverse evidential inferences from what they term "missing" witnesses, but for the present it suffices to say that Mr Trozzo's views and Mr Stomber's response are, in my view, perfectly apparent from the emails, and that in any event, this exchange pre-dates any matter of complaint by the Plaintiffs by at least six weeks.   The only evidential significance that can be attached to it is the rather tenuous suggestion that it shows an attitude of mind which might have continued and therefore influenced the later decisions which actually are in issue.   Its significance is

reduced further, though, by the fact that, in the event, CCC did not borrow any more money from Carlyle in order to make any such purchases at this time.

264. On 12th June there was another unusual spike in swap rates, which Mr Stomber considered to be a second "*4 standard deviation event.*"   His reaction, in order to protect against price falls and consequent margin calls, was to instruct his traders to stop buying assets, and that some bank loans should be sold.   $150Mn of these were sold, on 13th June, at their full market prices and therefore at no loss to CCC.   They realised $25Mn in liquidity.

265. In an email to all members of the Board on 13th June Mr Stomber comprehensively reported these few days' events and his own actions and comments.   Basically, his view was that the value of CCC's RMBS was being adversely affected by the market perception that interest rates were likely to rise, thereby increasing the risk that the payment cap on CCC's Agency floaters might take actual effect.   This drop in value had resulted in margin calls - though not as dire as had been predicted - as to which bank loans were being sold in order to increase liquidity; Mr Stomber described this as invoking "*emergency powers*".   However, he pointed out that as the two parts of CCC's portfolio were, intentionally, uncorrelated, the value of the bank loans had not been affected, and it had been possible to sell them, therefore, at prices which had caused no loss to CCC.

266. He warned that CCC's own internal software was predicting that market conditions could well produce further margin calls which could produce a reduction in the liquidity cushion to below its intended 20% level to around 11%.   He advised that the IPO would need to be postponed in these uncertain and disadvantageous circumstances.    Mr Conway responded laconically but calmly that now CCC would "*see how robust our model is*".   This email alerted all Board members to the fact that there was a significant adverse market event happening at the time, and the steps Management was taking to manage its effects.   Emails show telephone discussions between Mr Stomber and Mr Hance.

267. On the same day, Mr Stomber also requested Independent Director approval for the temporary reduction of the liquidity cushion requirement to 10%, so that margin calls could be met without the need to sell RMBS.   A telephone conference between the Independent Directors and Mr Hance was arranged and the resolution was proposed the following day.   It was discussed and approval was given, although with Mr Loveridge being away on holiday at the time, he did not actually sign the resolution until 18th June.   In the event, though, CCC's fears as to margin calls did not materialise.

268. What I take from this flurry of correspondence, which is a reasonably typical example of the kind of correspondence and communications which occurred during the material period, is that Mr Stomber was anxious to, and very much did, keep the Board fully informed of what was going on, with commentary, and that he took steps to react effectively and proactively to crisis circumstances.   What I also derive is that in fact the liquidity cushion was lined up to fulfil its purpose and would have done so even if it had had to be utilised and had thus been depleted to 11%.   In fact it remained above 20% at all times.   Whilst the suspension of the liquidity cushion guideline was never formally rescinded, and the Plaintiffs have made a point about this, I do not find this particularly surprising or even particularly culpable.   It is obvious from the documents that everyone later assumed that, with the crisis past, the basic guideline remained operative.   No-one was misled as a result.   That "*lapse in corporate documentation governance*", as Mr Stomber accepted it was, was totally trivial and, in the great scheme of matters in this case, not worthy of having any time spent on it.

269. I have mentioned that the appropriate timetable for CCC's IPO still remained in question.   This was because, whilst CCC's business model had stood up, it was perceived that the jolts to the market might well have caused investors to be nervous at the very mention of "mortgage backed" products, and result in a lack of appetite for taking up shares in CCC,

however much CCC might seek to educate investors that entertaining such fears on a totally general basis was mistaken.

270.    Having perceived this possibility himself, Mr Conway went to Carlyle's lawyers with a request that they research a potential alternative plan for capital raising if the IPO appeared not to be viable.   He did not inform the remainder of the Board, or Management, that he was doing so.   He says that this was so as not to divert the attention of Management, and he just thought it would be useful to have a second group working on an alternative.   The Plaintiffs say that this sheds significant light on Mr Conway's attitude to and relations with the Board, which they characterise as autocratic and controlling.

271.    A possible further private placement was indeed mooted, I think; there is allusion to some such discussions in other emails between Mr Stomber, Mr Conway and Mr Hance at this time.  But ultimately this is all immaterial.  No such proposals ever went to the Board because in the end CCC's Pricing Committee opted to proceed with the IPO, following the successful negotiation of the June market circumstances and general stability seemingly restored.

*14th June -  ALCO Meeting*

272.    CCC's regular ALCO meeting took place at exactly this time and in fact early on 14th June 2007.  It was reported that CCC was complying with all of its Investment Guidelines, that the liquidity cushion had dropped from 31.4 % as at 1st June, to 28.2 % as at 11th June, and various predictions were modelled to show the effects of margin calls.   As to these, Mr Trozzo commented that the projected worst case basis for *"uncalled RMBS margin calls"* being included, showed a consequent dip in the liquidity cushion to 15.3%, but that this was based on CCC's internal model rather than an external pricing service, and therefore *"possibly overstates"* uncalled margin.   I refer to this further below.

273.    Further data showed that the average price volatility ("**APV**") for CCC's RMBS portfolio as calculated by CCC's Polypaths software had risen from 0.55 % on 1st June to 0.79 % on 11th June.   An increase in this volatility metric is a matter of concern because it shows reduced stability in the market, and CCC's original business model had been stress-tested on the basis of an APV of 0.85%.  However, increased volatility was also, it was pointed out, inherent in the nature of the metric itself, given that Polypaths had been projecting a decline in prices.  Volatility measures price changes, and thus a fall in prices inevitably increases the range of figures which feed the calculation of APV.

274.    The ALCO meeting noted that even though there had been a period of unusually high volatility, CCC's liquidity cushion had in fact remained above its 20% mark, and that although CCC's own model had predicted that the liquidity cushion would fall to roughly half of the guideline level after the events of 12th June, in fact CCC still had capacity in its liquidity cushion.  Management also discussed the ways in which CCC was "*position[ing] itself defensively and bolster[ing] liquidity in light of the ongoing market turbulence.*"   This was through the sale of bank loans.

275.    I sense from the minutes of this meeting that, at the time, the concerns being expressed were not so much as to the prices of CCC's RMBS being depressed, but as to CCC's modelling software producing unduly conservative predictions compared to the real world.   I find this understandable.   In the circumstances at the time, the important aspect of risk management tools such as CCC's own price modelling was that they should be accurate and dependable, so as to enable CCC to make reliable decisions and deploy its assets sensibly but efficiently.  Whilst a cautious approach of pessimistic pricing would provide safety, it would do so at the cost of less profitable asset deployment.    Caution is valuable and necessary when the situation is known to be unsafe, but undue caution is wasteful where the situation is stable.  The art of success is therefore managing the balance of the two, and is in any event a quality to be exercised by management judgement rather than inherently built into pricing models

designed to provide information.     In the circumstances at that time, and at that stage of CCC's development, it seems to me to have been quite reasonable for CCC's Management to focus on whether their internal software pricing model was accurately reflecting the market, and that is what they did.

276.   The breadth of materials supplied to ALCO, and the minutes recording their discussion, demonstrate the extensive tracking of relevant data and metrics set up to enable Management to review what was happening in the market, consider what this suggested about CCC's assets and business, and decide on appropriate action in the circumstances.   It is important, though, to recognise such materials as what they are; tools for analysis to enable good business decisions to be made.   They take various forms.   Some will measure facts, to provide a series of comparisons over time, to assess both performance and risk.   They also provide measurements in the form of ratios, the comparison of which, from time to time, enables human managers to get a sense of trend or other matters, again so as to help inform their decisions.   They can be used to make predictions - but the important point in this respect, it seems to me, is that they are illustrations representing probabilities, and not plans or targets in themselves.

277.   Because the Defendants' reactions to the figures recorded periodically in these metrics has been the subject of much discussion and cross-examination in this case I give one example of my views about the limits on how these figures can properly be prayed in aid.   This is with regard to a particular metric which has figured centrally in this case, called the "20 day VaR" metric.   As at 11th June, CCC's liquidity cushion (at $149Mn) remained slightly above the then calculated figure for 20-day VaR produced by Polypaths, though the figure was expressed as a ratio of the one to the other.   The underlying meaning of this was that, assuming that the Polypaths calculation of recent price volatility was correct and would apply going forward, CCC had enough liquidity to have a 99% chance of being able to withstand 20 days of the statistically-calculated worst degree of price volatility it might encounter, judged from that which had occurred in the recent past – I understand taken at three months – even if it took no corrective actions at all (such as selling assets or obtaining a loan) within that period.   Thus, this calculation provides the human manager with a general feel of how 'safe' CCC's business position currently is, which can be compared with similar statistical calculations using facts at a later date, to get a sense of trend. The postulated scenario, though, is completely unreal.     Its purpose, along with that of similar metrics modelling different financial matters, is emphatically an aid, to provide that sense in order to assist management to decide what to do.     It does not mean that CCC <u>is</u> in fact going to continue for 20 days doing nothing, or that it will only decide on what action to take after 20 days.   The question what CCC's Management would therefore do "at the end of the 20 days", is therefore meaningless.   I mention, and perhaps even labour, this point, because at times this was what the cross-examination of Mr Stomber seemed to amount to.

***15th June - Repo roll***

278.   In fact, during 14th June itself, CCC's repo dealers one by one confirmed their use of IDP pricing, such that margin calls based on the lower prices predicted by CCC's Polypaths software did not materialise.   CCC's liquidity cushion remained above 20 %, with CCC still being about to receive the $25Mn from the sale of bank loans already mentioned, as these completed.

279.   The successful negotiation of a repo roll in the face of difficult market circumstances had been achieved.   I am satisfied that this would, and I think quite reasonably, have given CCC's Management and Board some confidence in the efficacy of the business model which had been devised for CCC.

280.   Mr Stomber, Mr Hance and Mr Conway each say that their view of the volatility of the market as it affected CCC was that although this appeared to be fuelled by perceptions of

interest rates rising, their own views of the state of the economy were that it was actually slowing down and weakening, such that interest rates were in fact more likely to fall in the longer term; it was therefore only a question of when.    In the light of these views about the likely trajectory of the U.S. economy (and therefore interest rates), they say that they believed that CCC's business model remained strong.

***Start of the sub-prime mortgage crisis and demands for increased haircuts***

281.   The first definite signs of what turned out to be developing market instability began to emerge in June 2007.    The first repo lender to ask CCC seriously for an increase in haircut levels from the customary 2% thus far enjoyed by it as a "first tier" customer (because of its connection with Carlyle), with high quality assets, was Deutsche Bank.   It actually did so on 13th June 2007- apparently too late for this to be the subject of discussion at the next day's ALCO meeting, reported above.

282.   Deutsche Bank had suffered in the Bear Stearns hedge fund turmoil.   Mr Stomber says he took the view that this made Deutsche Bank a special case, with its own particular reasons for becoming more cautious or trying to reduce business exposure.   CCC's 13th June 2007 "*Summary of Repo Methodology*" spreadsheet, in which it recorded the state of play with each of its repo counterparties, noted that Deutsche Bank was seeking a higher haircut but not until after a later meeting.   In subsequent summaries, starting from 10th July, it was noted that Deutsche Bank had quoted a 3% haircut to CCC for a new repo line, because of "*subprime pressure.*" and that it had been turning away new repo business "*amid BSAM [Bear Stearns hedge funds] turmoil*", but also that CCC had in fact negotiated it back to a 2% haircut.

283.   On 18th and 19th June 2007, CCC received a direct warning that instability in the sub-prime markets might affect its own position in an adverse way.   Mr John Duffy, a managing director with Bank of America, warned Mr Ng of CCC, that his bank was "*increasing haircuts across asset classes (including the safe stuff)*" and that CCC might find others doing the same in the light of "*recent hedge fund/mortgage liquidations*", seemingly referring to the Bear Stearns incidents.    The next day he gave a similar warning to Mr Greenwood. However, Bank of America did not, in fact, ask for a higher haircut from CCC at this time. CCC rolled about $1Bn of its repo away from Bank of America to Bear Stearns.   The Plaintiffs say that I should infer that this was because Bank of America must have demanded a higher haircut (in the light of Mr Duffy's warnings), rather than, as CCC said, a dispute over the interest rate, which at the difference of 1bp which was put to Mr Stomber, he said would have been "silly".   Mr Stomber was not involved in the transaction, however, and I am not prepared to draw the adverse inference which the Plaintiffs invite as it would be speculation, and I note that Mr Ng, the trader involved, did seem to act on the basis of fine differences in interest rates at other times.

284.   JP Morgan followed suit to Deutsche Bank on 21st June 2007.   It proposed a 3% haircut, citing "subprime pressure" as the reason for its request.   However, and again similarly to Deutsche Bank, it fell back to 2% for the upcoming repo roll when CCC negotiated with it.

285.   On 25th June 2007 Man Financial also requested a 3% haircut.    Man Financial does not appear to have been a major player in the repo market.   CCC only had a small ($240Mn) line with it.    CCC apparently did not think much of Man Financial, viewing it as having inadequate infrastructure for the repo market, and hence demanding uncommercial terms. CCC's response was to roll its repo away from Man Financial to other banks which were willing to provide repo finance at a 2% haircut.

286.   The Plaintiffs say that CCC's Management ought, at least from the time of the Board meeting about a month later, to have seen these warnings and requests for higher haircuts as clear signs that CCC could not, in the future, count on maintaining the 2% rate of haircut upon which its business model was predicated.   The Defendants say that this is being wise with

hindsight.       At the time, CCC's Management did not, and reasonably did not, see these matters as cause for alarm but as being prompted by the relevant banks' temporary personal circumstances and concerns, and that this perception was supported by the fact that such demands were not followed through.   They stress that CCC never had to accept a haircut above 2% at this time.     They also anticipated, and they suggest quite reasonably in the circumstances, that markets would swing back towards the more apparently "normal" conditions of before.  These views were conveyed to the Board members by Mr Stomber.

287.   Thus, the credit market risks which had been exemplified in the Bear Stearns incidents were not expected to have anything but a superficial and short term effect on CCC's RMBS portfolio.   Mr Stomber says that he saw these as the effects of bad news rather than anything more serious.       However, they did have a negative effect on the value of CCC's credit products (which it will be recalled were, by design, "*uncorrelated*" with the RMBS portfolio) as reported by Mr Stomber to Messrs Conway and Hance on 24th June 2007.       The correspondence shows that this was not a surprise, though, and it would not bring CCC's liquidity cushion below 20% after the next repo roll the following day.

### *Reinstatement of CCC's IPO*

288.   As mentioned above, the turbulence in the market of the second week of June had caused Mr Stomber to recommend the postponement of CCC's IPO.     However, when matters did not turn out to be as bad as predicted, and with the successful negotiation of the 15th June repo roll, Management proposed moving forward with CCC's IPO, as previously planned.       The fact that CCC's repo lenders had endorsed IDP pricing for CCC's assets enabled CCC's share value to be reasonably reliably calculated.   The effect of this was that CCC could, in fact, proceed to register with the Netherlands Authority for Financial Markets ("**AFM**") and proceed with the IPO.

289.   Mr Stomber therefore recommended to other Board members, and in particular Messrs Conway, Hance and Allardice, as CCC's pricing committee, that the plans for the IPO be resumed.   Taking the view (they say) that the present price volatility in the market was temporary, did not cast doubt on the solidity of CCC's business model - which had in fact shown itself to be even more robust than internal predictions - and that the expansion of CCC's investment base and the liquidity of a public listing were both what investors expected, and were in their interests, the committee members agreed.

290.   Whilst the Underwriters were cautious, they did not seek to dissuade CCC from pursuing the IPO and they lent their support, thus providing, in effect, at least an implicit endorsement of CCC's business model.    They had, of course, been supplying repo finance to CCC at the modelled 2% haircut for the previous ten months.   In this regard, the Defendants refer to an internal memorandum of Citibank, dated 22nd February 2007, as demonstrating the kind of vetting which underwriting banks would carry out as part of due diligence in deciding to support such an offering.   The memorandum noted that Citi had been in an "*ongoing dialogue*" with CCC since June 2006 "*to better understand its business objectives and long-term strategy as it pertained to the organization, initial private raise and initial public offering of CCC*", and that Citi had had several conference calls with key CCC and Carlyle individuals "*to discuss issues related to structure, operating environment, business plan, audited financials and financial projections*" and that "*the deal team will continue to conduct due diligence prior to the commencement of marketing to investors.*"  Such cautious views as the underwriters expressed were therefore, it is suggested, a product of their views of investor interest at the time, rather than misgivings about the fundamental strength and viability of CCC's business model.

291.   CCC therefore submitted its final version of the OM to the Dutch regulators on 18th June 2007, and the OM was formally published the next day.   There was a downturn in the IDP pricing of CCC's RMBS on 18th June, but this was assessed as just another flutter in the

market, not evidence of a long term trend and likely to reverse itself because the fundamentals which drove these asset prices were still favourable (for example, a recent reduction in interest rates). It did not, therefore, deflect the offering process.

***Offering Memorandum***

292. The OM itself is a very long and rather more elaborate document than the PPM. It announced the global offering of 19,047,620 Class B shares in CCC, in total. It contains all of the material in the PPM, noted above, and more. It included the Investment Guidelines (as they then stood), the fact that amendment of these required the approval of the Independent Directors but that this could be done without notice to shareholders, and a description of the liquidity cushion. It disclosed clearly that CCC's intended source of funds would be repo financing. The risk disclosures set out in it are (to my eye at any rate) notably comprehensive. They included warnings as to the extensive use of leverage, possibly "*without limit*" and that this would magnify the effects of adverse events, even to the extent of causing CCC to default or fail, and that demands for margin could arise very rapidly. They noted that the

> "*expiration or termination of available financing for leveraged positions, the requirement to post* [additional] *collateral ... can rapidly result in adverse effects to [CCC's] liquidity and its ability to maintain leveraged positions and may cause it to incur material losses.*"

293. They announced CCC's overall expected leverage ratio to be 29x and its RMBS ratio to be 32x-37x. They warned that a decrease in the market value of CCC's securities could require CCC to post additional collateral or sell assets at a bad time, that if CCC were forced to liquidate assets quickly it could realise significant permanent losses and that in unusual market conditions, the liquidity cushion designed to meet reasonably foreseeable margin requirements might be insufficient. They disclosed reductions in the value of CCC's assets due to market events since 1st April 2007, up to 13th June 2007.

294. I do not think I need describe any other statements in the OM, which, as I have said, contained all the usual information about the company, its governance, its business and objectives, the possible consequences of investing and the warning that it would be quite possible to lose all of one's money. The content of this document is of only contextual significance in this case because it was issued a month before the Plaintiffs' first alleged cause of action arose. I have, though, mentioned the most relevant parts of it.

295. The uptake of orders up to 27th June 2007 was almost $300Mn, but this was lower than had been hoped, and was attributed to "Bear fears". (In the interim, on 22nd June 2007, Bear Stearns had announced its decision to bail out one, but not the other, of its two failed hedge funds.) The consequence was that it was decided to postpone a pricing announcement and reduce the number of shares on offer, and to issue a supplemental OM in this regard. This was announced by a press release on 28th June, and the supplemental OM was issued on 29th June 2007.

296. That document, prepared by CCC's counsel, was integrated into the original OM. It alerted investors to the reduction in the size of the offering from $415Mn to $300Mn (15,962,673 Class B shares) and a revised offering price of $19 per share from $22 per share. It disclosed, in a section on "*Recent Developments*", the effect of recent market events on CCC, and the reduction in CCC's fair value reserves between 1st April and 26th June 2007 of $84.2Mn. This could be compared with the similar disclosure in the original OM of 18th June, which had disclosed a reduction of $28.9Mn between 1st April and 13th June 2007.

*Completion of the IPO and events up to 26th July 2007*

297. CCC's shares were listed on the Euronext Exchange on 4th July 2007, and the IPO was concluded on 11th July 2007.   CCC did reach its revised target of $300Mn for new capital raised - but the Plaintiffs point out that this was apparently only achieved because Mr Rubenstein undertook a forceful personal marketing initiative with the Bank of Angola, an entity which had expressed interest in investing with Carlyle, but whose enthusiasm had not been entirely reciprocated previously, at any rate by Mr Conway.   The Defendants, on the other hand, point to the fact that the underwriting banks exercised the greenshoe option to take up 15% extra shares, which, as mentioned above tends to suggest a successful offering.

298. Thus, in total, CCC raised approximately $345Mn.  After commissions and expenses, CCC was left with just over $322Mn.     $191Mn of that went to repay a bridge loan which CCC had taken from the Underwriters in order to purchase assets in advance of receipt of the proceeds of the offering, to prevent ramp drag.   The remaining net proceeds were therefore about $130Mn. In the event, about $70Mn of this was invested and the remainder was allocated to CCC's liquidity cushion.

*Review*

299. This account of the sequence of events has now reached the completion of the IPO and the point in July 2007 at which events become directly material to the first claims of breaches of duty which the Plaintiffs make, namely with regard to the Defendants' decisions taken at the Board Meeting of 26th July 2007.  It is therefore appropriate here to take stock of the case.

300. First, the Plaintiffs make no complaint about the Defendants' actions at any point before 26th July 2007.    There is no complaint about, for example, the wisdom of hiring Mr Stomber, or the initial devising and adoption of CCC's business model, with its assumption that repo finance would be obtainable at 98% of the value of CCC's RMBS assets.   The Plaintiffs' claims for breach of fiduciary duty, and negligence (and also breach of contract against CIM) are in respect of the Defendants' conduct only at, and (in effect) continuously after, the Board Meeting of 26th July 2007.

301. As regards the Plaintiffs' further or other claim for wrongful trading, they place that as being at all times from about mid-August 2007, being the point at and from which they say that the Defendants first knew, or ought reasonably to have known, that CCC stood no reasonable prospect of avoiding going into insolvent liquidation, until the end of December 2007.     It was the effect of events at the beginning of August 2007 which, they say, changed the trajectory of CCCs business so irremediably in the direction of insolvency – at any rate without appropriate action - that this ought to have been appreciated and acted upon accordingly, at least by the time of the extraordinary Board Meeting of 23rd August 2007. The important point for present purposes, though, is that the Board Meeting of 26th July 2007, viewed in the light of events immediately preceding it, is the starting point of the Plaintiffs' case against the Defendants.

302. I have given an account of the events earlier than this starting point in some detail, for two reasons.   The first is the obvious one that it recounts the background of facts known to the Defendants and against which their conduct, and in particular either side's assertions as to what they knew or thought, has to be considered.     The second is less obvious but just as important.   It is that I have to judge the conduct of the Defendants in the context of the business world in which they and CCC then operated.  To do so fairly means seeking to gain as full and sound an impression as possible of the workings of that world leading up to and at the material time, and some understanding of its characteristics, culture and atmosphere.  The account I have given has therefore been intended to give some of the flavour of this background which I have found to be important, although I will expand later on some of the impressions and understanding which I have gained from the evidence.

303. Before moving on to the rest of this judgment, though, it is helpful to set out a high level summary of the facts which are the ingredients of the Plaintiffs' allegations of breach of duty, misfeasance and wrongful trading.    Knowing this, will help the reader follow my consideration of those allegations.

### 3.   Overview of the claims made

304. For practicality in their closing submissions, the Plaintiffs group the breaches of duty and other claims which they allege by reference to five successive periods.   Conveniently identified, these are: July 2007, August 2007, September 2007, October to December 2007, and lastly early 2008.

### (1)   July 2007 – 26th July Board Meeting

305. As regards July 2007, the Plaintiffs submit that CCC's business model was "fragile" from the outset, and that various warning signs showed that the risks to CCC had increased significantly.      They cite the "fundamental changes" in the repo market following the collapse of the two Bear Stearns Hedge funds (which I will now call the "Bear Stearns incidents"), a growing risk of higher haircuts - evidenced by an increasing number of proposals for these, - which they say should have been foreseen, adverse increases in the metrics of interest rate volatility, the price volatility of RMBS and suchlike, the unanticipated but significant lost value (even if unrealised) which CCC had already suffered on its RMBS portfolio, and the difficulty of achieving a successful IPO for CCC.

306. They say that by the 26th July Board Meeting, these signs required the Defendants to re-evaluate CCC's business model, to adopt a risk-averse approach, to reduce leverage, to secure additional and varied sources of cash funding, to make no more asset purchases and to implement sales of RMBS, in the shape of a programme of (as they eventually specified) selling more than $2Bn worth, monthly, to increase liquidity.   At a minimum the Defendants should have been on "heightened" alert at this time.   What they actually did, namely freeze further purchases of assets, was obviously (the Plaintiffs say) insufficient, and in fact the Defendants actually allowed CCC to complete a purchase of about $1.5Bn more RMBS at the end of July/beginning of August 2007.   Carrying on otherwise with "business as usual" was, the Plaintiffs say, a *"knowing or in the alternative reckless [breach] of duty".*   Within this phrase, for convenience, they also include gross negligence or negligence.

### (2)   August 2007 – including 23rd August Extraordinary Board Meeting

307. In early August 2007 - in fact the particular date is 9th August - the financial markets were rocked by the suspension of redemptions from three more hedge funds operated by BNP Paribas, and the general collapse in the ABCP trading market began.   The Plaintiffs submit that this was a further and fundamental change in the financial markets, which meant that, from that time, CCC's existing business model was now *"terminal".*   They cite a list of matters, examples of which are: further increasing price volatility, requests for higher haircuts, and repo lenders pricing to their own conservative prices rather than using an outside pricing service, amongst many others, as major and obvious warning signs that CCC's business was no longer viable, and to which they say the Defendants, did not, either individually or as a Board, pay proper regard.   When CCC's liquidity began to run dangerously low, the Independent Directors, in particular, simply agreed to suspend the liquidity cushion investment guideline to fit the facts, rather than insist on steps being taken to increase liquidity.

308. Because of the perilous depletion in CCC's liquidity, on 20th August 2007 Mr Stomber and Mr Conway did the rounds of CCC's six major repo lenders and underwriting banks at high executive level, to persuade them to agree to hold haircuts at 2% in return for the Carlyle Group making a $100Mn loan to CCC to ease its liquidity.   The reaction was disconcertingly

unresponsive and negative, even to the extent that Mr Black of JP Morgan advised that CCC should immediately sell $10Bn of its $23Bn RMBS portfolio.  The Plaintiffs say that this obviously good advice was not heeded as it should have been.

309.   In the event, Carlyle made the $100Mn loan anyway.  An extraordinary Board Meeting was convened on 23rd August 2007 for the purpose of considering CCC's financial position and the Plaintiffs complain that the decisions taken at that meeting - which they attribute to Mr Conway, and which were not to embark on selling RMBS but, in effect, to continue to hold CCC's portfolio as before - were patently inappropriate, were reckless, and were thus in breach of duty.  They make general assertions that the Defendants should have investigated all avenues available to CCC to sell RMBS and/or raise further capital and reduce leverage, and should have insisted on such a course being taken; they should have carried out urgent reviews and assessments of CCC's position, made a plan to return to compliance with the Investment Guidelines, and sought investment and insolvency advice.  In failing to do so they were in reckless breach of duty.

310.   The Independent Directors were, the Plaintiffs assert, in further breach of duty in failing to ascertain the strength of Carlyle's commitment to assist CCC with a loan, or the true extent of the support for CCC which Carlyle was known to be giving by making an agreement with Citi Bank under which Citi would give CCC favourable repo terms.    They say that Mr Conway was in breach of fiduciary duty to CCC by not revealing all the terms of such agreement to CCC's Board.

311.   It is from this point that the Plaintiffs say that it should have been plain to the Defendants that, without a change of strategy, CCC would not avoid an insolvent liquidation, such that they became guilty of wrongful trading.

312.   The Plaintiffs say that from and after this time, CCC could and should have implemented a policy of selling RMBS, either as part of a necessary process of reducing leverage and increasing liquidity, or of winding down CCC's business (the effects probably being much the same).    CCC needed to sell some $10Bn of its RMBS portfolio to achieve acceptable liquidity, and it could have done so, at least, by a properly devised and controlled programme of selling RMBS at the rate of $2-$3Bn a month for several months, which could have been successfully achieved at acceptable prices.

313.   The Plaintiffs add that the criticisms which I have summarised above were, and remained, the Defendants' core breaches of duty throughout the remainder of CCC's operating life, although other alleged breaches committed later are also relied on.

314.   Although the Plaintiffs submit that it is not necessary for them to do so as the breaches speak for themselves, they offer suggested explanations for such breaches, as support for the findings which they urge.  The first is a dogged pursuit of paying a double digit dividend, even though this was not in CCC's interests, because it would help achieve the Carlyle Group's "Strategic Objective" of making a highly lucrative private placement sale of shares in TCG/Holdings to Mubadala, thereby also securing significant personal financial benefits for Messrs Conway, Zupon and Hance.  The second suggestion is a desire to avoid the embarrassment and reputational damage of the failure of an entity bearing the Carlyle name, only weeks after its public launch.    The third is the proposition that Mr Stomber was "subservient" to Carlyle and to Mr Conway, and placed his desire to please them ahead of his duty to act in CCC's best interests and advise accordingly.  The fourth is that the Independent Directors were not truly independent, but merely acted as a rubber stamp for decisions made by Carlyle, personified in Mr Conway and Mr Stomber.

315.   These matters, if found on the evidence, would not merely provide an explanation for lack of care, but would also amount to matters of improper motivation and conflict of interest, thus

(the Plaintiffs argue) giving rise to findings of breach of the Defendants' fiduciary duties to CCC.

**(3)      September 2007 - no Board Meeting**

316.    As regards September 2007, the Plaintiffs repeat the various aspects of their complaints regarding August, and say that these had simply continued.   They say nothing had materially improved, and CCC faced increasing difficulties in obtaining acceptable repo finance, including an obvious risk of haircuts rising, even to 4% or 5%, which would be unaffordable. Its net cash outflow, principally being margin payments, had been a staggering $418Mn to the end of September 2007; it remained in a state of either actual or borderline insolvency.

317.    The Plaintiffs submit that by this time the Defendants had obviously recognised that CCC's business model was no longer viable, - CCC was only surviving because of the special deal with Citi Bank, (the details of which Mr Conway still failed to disclose fully to the Board), and because Mr Stomber later issued "threats" to Bank of America as to loss of Carlyle business if BoA did not assist.   The Defendants nonetheless did nothing to devise a viable business plan or to take the "*Required Actions*" (namely, deleveraging by making sales of RMBS, raising additional capital or other finance, or winding the company down) and did not consider these options properly or at all, and did not even hold a further Board Meeting.

318.    The Plaintiffs complain about the statements made about CCC to the global Carlyle Investment Conference in September 2007 by Mr Hance, Mr Stomber and Mr Conway, which they say amounted to misleading the conference, and thus the market in general,  as to steps CCC would take or had taken to reduce leverage, adopt a new business model and improve its funding strategy in the future.   They also complain that Mr Hance gave the conference a misleading statement of the value of CCC's shares, which information was subsequently and improperly deleted from the website record of the conference.

319.    At the very end of this period, on 1st October 2007, the Plaintiffs complain that the Defendants, and in particular the Independent Directors, once more suspended CCC's Investment Guidelines for a further three months, without any proper consideration or deliberation, and as a mere formality, and culpably failed to make public disclosure of this matter, adequately or timeously, as they should have done.

320.    During this period or shortly afterwards, the Carlyle loan to CCC was converted into a revolving credit facility.

**(4)      October to December 2007 - including 13th November Board Meeting**

321.    As regards October-December 2007, the Plaintiffs again repeat the various complaints about the Defendants' actions or inactions during and since August, saying that the Defendants continued, culpably as before, to do nothing but hope to ride out the continuing adverse market conditions, ie depressed prices for CCC's RMBS and the difficulty of obtaining affordable repo finance.   CCC was struggling to maintain or obtain new repo funding, and had no prospect of obtaining longer term repo financing.

322.    Although the Defendants refer to the Auditors' (PwC's) confirmation that as at 30th September 2007 they considered CCC to be a "going concern" from an accountancy perspective, the Plaintiffs say that the Defendants cannot rely on that because they knew that PwC were relying on an enquiry of limited scope, and on management input some of which had been edited - this in itself constituting further evidence that CCC was being run improperly and kept alive only by illegitimate acts and decisions of the Defendants and the Carlyle Defendants in particular.

323.   They refer, in particular, to the Board Meeting of 13th November 2007, which they criticise for lack of analysis or deliberation, for indecision, and for allowing matters simply to carry on as before, despite recognising that the situation was getting tougher, and would get tougher still as the counterparty banks went through the usual financial year end process of improving their balance sheets for presentation purposes.  They criticise the Board's approval, once again through the Independent Directors, of the further suspension of the Investment Guidelines until March 2008.

324.   Noting that the Defendants each purchased more shares in CCC at the end of November, they criticise the fact that (they say) this was done to try to stabilise CCC's falling share price (pointing to evidence of this being discussed at the Board Meeting and mentioned at the Carlyle Group Investor Conference in Paris on 20th November 2007), and this was illegal market manipulation under Dutch law.

325.   The Plaintiffs highlight Mr Stomber's request to Mr Conway for Carlyle to be prepared to lend CCC another $50Mn over the calendar year end, citing this as a failure to recognise yet another sign of inevitable financial doom and criticising the fact that this facility was not publicly disclosed then, for being a breach of Dutch regulatory law.

326.   Ultimately therefore, with regard to this period, the Plaintiffs reiterate that CCC continued to be in a state of actual or borderline insolvency, that the Defendants continued, in effect, to do nothing and operate "business as usual", and in all the circumstances the Defendants were thus once again guilty of breaches of duty and wrongful trading.

**(5)     1st January to 27th February 2008 - including 27th February Board Meeting**

327.   As regards the period from 1st January 2008 until CCC's eventual collapse on 12th March 2008, the Plaintiffs reiterate their complaints of doing nothing but hope to ride out the market conditions despite there being no evidence that these were going to improve, submitting that the economic conditions were then no better than at the end of 2007, the obtaining of longer term or third party repo finance was a forlorn hope, and the obtaining of continued affordable repo finance was becoming ever more difficult.   The 27th February Board Meeting is once again criticised for accepting that there was still no viable business model and no sign of one, taking no steps to reduce leverage (etc) and  approving the yet further suspension of the Investment Guidelines.

328.   Similar points as before are made as to the illegitimacy of the Defendants' relying on PwC's year-end report on CCC, which endorsed it as qualifying as a "going concern" as at its year end of 31st December 2007.

329.   The Plaintiffs say that the worsening of repo financing availability continued to be an indication of an ever worsening financial situation which had started with the August 2007 crash, and that the Defendants' contention that CCC failed because of an unforeseen second crisis from about 5th March 2008 onwards is incorrect and a colourable excuse; CCC failed because the Defendants failed, as they continued to fail, to take the obviously necessary steps of selling RMBS to deleverage and increase liquidity, or raise additional equity capital, or wind CCC down, and they were in breach of their directors' duties in not doing so.

**4.     What this action is not about**

**Claims which are not made**

330.   Before turning to the legal principles applicable to the Plaintiffs' claims, I need to make clear what this action is <u>not</u> about.  This may be unusual, but it is appropriate to do so here because the allegations and materials have ranged so widely and over material much of which does not, in my judgment, have any effect as part of any operative cause of action for

determination in this trial. To try to keep a manageable perspective on the real issues in the action, it is therefore necessary to focus on the real causes of action, and resist being distracted by matters of no real relevance. The following list is an aide memoire on this point.

331.   <u>First,</u> this is not the trial of an application to disqualify the Defendants from being directors of a Guernsey company. That claim does appear on the original pleadings, but as previously noted, I directed in May 2015, during the case management stage, that that claim would be stayed and tried subsequently and separately - if appropriate. I regarded that claim as an inconvenient diversion in the context of the essential subject matter of the case, which is a contested claim for damages of nearly $2Bn including interest. In fact, given the national origins and residence of all the Defendants except Mr Loveridge, the reasons for cluttering up the substantive action with this additional claim have always seemed to me to be something of a mystery.

332.   This point is important because matters of conduct which might give cause to question a defendant's fitness to hold such office go far wider than conduct giving rise to a claim for damages for breach of fiduciary duty, or negligence, or wrongful trading. Conduct falling short of appropriate governance standards will often cause no damage to the company. An example would be the directors' failure to ensure that the company complies with regulatory requirements, or statutory administrative obligations (leaving aside any fines involved), or complaints about their conduct in relation to third parties. Allegations of such conduct may have remained on the pleadings in this case as a legacy of the stayed claims, but that does not mean they should have remained in the evidence and final submissions, or that they have any real relevance to the issues which I actually do have to decide, or that it is appropriate to investigate them.

333.   <u>Second</u>, and by the same token, this is not a disciplinary complaint about failure to comply with the rules of the Euronext Stock Exchange. It is possible that a failure properly to observe the rules of such an Exchange might be invoked as evidence showing a lack of care, or even arguably as being a breach of fiduciary duty. It is of course a duty of the directors of a listed company to seek to ensure that it observes any rules which attach to the privilege of being listed on the relevant Stock Exchange, and it is obviously in the company's best interests to keep in good standing. However, any misdemeanour in this regard would at best give rise to the sanctions prescribed by the Stock Exchange regulators, and would not *ipso facto* cause any actual loss to the company. By contrast, for the claims before me to succeed it is necessary for the Plaintiffs to assert and prove loss and damage suffered by the company as a result of whatever conduct by the Defendants is complained of. Whether or not that conduct is in breach of the rules of the relevant Stock Exchange (or any other relevant regulatory body, or even Dutch criminal law, for that matter) is just not relevant for present purposes. What is in issue is the financial consequences for CCC of the conduct of its Directors and not whether that conduct complied with any applicable rules and regulations.

334.   <u>Third</u>, this claim is not an investors' compensation claim, of any description. It is not a claim for misrepresentation inducing the <u>acquisition</u> of CCC shares; that would be an entirely separate matter and indeed I believe that such a claim has been pursued separately, and has failed. Although the terms of both the OM and the earlier PPM have been referred to quite extensively in the course of the trial, their relevance is only as context against which the substantive claims for breach of duty to CCC need to be considered. Similarly, no complaint on the part of investors with regard to suggested misrepresentation in any of the public information documents, presentations, conferences or conversations <u>subsequent</u> to their acquisition of shares is within the present claim. Even if the Plaintiffs were to prove any such alleged misrepresentation, and even if this could also be shown to have been made negligently or improperly, that is of no avail to the Plaintiffs in this action unless it could also be shown to have caused measurable financial loss <u>to CCC</u>. Whilst there seemed to me to be arguments along this line surfacing in the early stages of the trial, by its end, they appeared to

have retreated well into the background, where, in my judgment, they undoubtedly belong. Material relating to such allegations is again of the status of mere circumstance as regards this action, or just possibly as going to credit, although in the end no such argument really appeared to me to be made.

335. <u>Fourth</u>, this claim is not a claim that CCC was doomed to fail from the outset.   That point is very important.  Advocate Wessels expressly confirmed that it is no part of the Plaintiffs' case that it was negligent, or a breach of any duty, for the directors of CCC and for CIM to decide on and implement the business model which was initially devised for CCC, even up to the time of its IPO which was made on 29th June 2007 and closed on 4th July 2007.   The earliest time at which the Plaintiffs fix their complaints has been something which the Defendants have, very reasonably, been anxious to have clearly identified.  The Plaintiffs' claim was confined, in Particulars which it delivered, to complaints about the actions of the Defendants "from July 2007".  In the course of the hearing this was pinned down still further, and was ultimately stated expressly to be at and from the time of CCC's Board meeting of 26th July 2007.

336. It follows that the apparent strengths, weaknesses or flaws of CCC's initial business model are, again, relevant only as the context in which the actions of the Defendants from 26th July 2007 onwards are to be judged.  Thus, whilst it is of course open to the Plaintiffs to argue that at the relevant time, the Defendants knew or ought to have appreciated the suggested deficiencies and fragility of CCC's business model, and that this appreciation should have informed their actions, the Defendants can equally obviously point out that it has not been suggested that it was negligent of them to adopt that business model and the assumptions that it incorporated, nor to run with such model, before 26th July 2007 at the earliest.

337. Similar points arise in relation to aspects of what was going on in the market prior to 26th July 2007, and in particular to events, and the behaviour of financial market counterparties of CCC, prior to the date of 26th July 2007, and especially in May and June 2007.  This was a topic to which Advocate Wessels nonetheless devoted quite a significant part of his cross-examination of, in particular, Mr Stomber.  There is, though, no pleaded complaint about the reactions of the Defendants to such events at that time, nor about any actions which they then took or did not take.   At best, therefore, these matters are background and knowledge available to the Defendants, which it can be alleged should have influenced their actions during the later, relevant, period.

338. <u>Fifth</u>, and leading on from the above, it is not argued that it was negligent of the corporate Defendants as promoters of CCC to engage Mr Stomber to fulfil the role of CEO of the enterprise which was to become CCC because he was not competent – and should have been seen as not being competent - to take on the management of such an enterprise.   The Plaintiffs' criticisms of his knowledge, experience and ability must be judged against that basic acceptance.

339. <u>Sixth</u>, this action is not a claim by repo financiers who provided repo to CCC at any time that this finance was obtained by misrepresentation, in particular misrepresentation as to the terms on which CCC was able to obtain similar finance from other repo lenders.  This factual suggestion crops up periodically, but it is an allegation which, even if true, goes nowhere as regards the complaints of damage which are pleaded in this case.

340. <u>Seventh</u>, despite the fact that at certain points the Plaintiffs' characterise their complaints in fairly extreme terms (for example, that there was a "*plan to let CCC fail and blame it on the market*"), there is no claim of conspiracy to injure levelled against the Defendants or any combination of them.

341. There are probably yet other examples, but I make the above points to make clear that the ambit of the issues which I have to decide is defined and limited, not only by the scope of the

Plaintiffs' pleaded Cause, but also by the logical materiality of any of the facts and evidence which I am invited to explore, and also by the legal analyses, where applicable, deriving from the authorities presented to me. I do not intend to decide more than is necessary for determination of the matters comprised in the actual claims in this case if it can reasonably be avoided. I will be aiming not to decide points of law or academic legal analysis, interesting though these topics may be, unless they are part of the logical construct of a case which could ultimately entitle the Plaintiffs to the relief which they have claimed. If and insofar as any claim or complaint outside that legal ambit may have an indirect but material effect on matters which are within it, they may require some decision from me and I will of course give it, but this is centrally a judgment on the operative claims in this action. It is not a general report on the Defendants' conduct of CCC's affairs, nor is it a legal treatise on aspects of directors' duties to Guernsey companies as suggested by the facts and fate of CCC.

**Matters included for forensic purposes**

342. The second general point about the scope of the materials in the trial is that there is a very large amount of evidence and allegation which has been said by the Plaintiffs, rather coyly, to be there on "forensic grounds". The explanation for this is as follows.

343. In their Defences, the Defendants pray in aid the effect of various exoneration and indemnity clauses contained in CCC's Amended Articles of Association (as from 8th May 2007) at Articles 172-174, and also, as regards CIM, and the Entity Defendants as CIM's "affiliates", contained in Clauses 2 and 6 of the IMA. Article 172 relates to any director's liability and is framed as both an indemnity and an exoneration clause in respect of any loss caused to CCC by him except through his own "*wilful act neglect or default*". Articles 173 and 174 contain an indemnity and a limit of liability "*to the fullest extent permitted by Guernsey law*" in favour of CIM and its "affiliates" (thus including TCG and Holdings) and their respective officers and employees, except in respect of acts of "*bad faith, fraud, gross negligence or wilful misconduct*". The IMA contains similar indemnity and exoneration clauses but with the exception being framed to be in respect of the "*[wilful misfeasance, gross negligence (as determined in accordance with the laws of the State of Delaware), bad faith or reckless disregard]*" of the relevant person.

344. In other words, if the Defendants are guilty of "mere" negligence, or of any entirely innocent breach of duty, then the Plaintiffs' case will be defeated by the above clauses, unless they can argue that they do not apply.

345. The result has been that the Plaintiffs have gone to considerable lengths to formulate a case that (i) the conduct of the Defendants must be characterised as falling within the scope of the exceptions to the exoneration clauses (ie boiling down to: bad faith, improper purposes or, at least, <u>gross</u> negligence), or (ii) that the exoneration/indemnity clauses do not come into play at all. It is the assertions and arguments in support of this which are referred to as being there for "forensic purposes". It means that their inclusion has been dictated by the exigencies of the case.

346. The second aspect, the application of the clauses at all, is, of course, a matter of law. It depends upon the true construction of the clauses themselves, and/or their legal efficacy in Guernsey law (or possibly Delaware law), and the question of efficacy in Guernsey law leads in turn to two strands of argument regarding the construction and effects of s. 67F and s. 106, respectively, of the 1994 Companies Law, which I will examine in due course. None of these matters has taken up much of the case in terms either of paper or time.

347. The first aspect however - the characterisation of any proven breach of duty by a Defendant – is a lot of what has contributed to the Cause being formulated at great length, with relentless repetition, liberal use of pejorative and hyperbolic adverbs, and with allegations, often added by amendment, for the only apparent purpose of introducing yet another matter of criticism of

the Defendants even though its consequences have no effect on the key matters alleged to have caused CCC loss, as I have already mentioned.    Part of the reason for this great expanse of the pleaded case has been said to be the need for the court to have "context".    It has felt more like an attempt to influence the mind-set of the reader, by the sheer volume of material and portentousness of the criticisms, into attributing extra gravity to the complaints being made.

348.  With that, I now move on to the material legal principles and arguments.

## 5.    Legal principles

**The Law - Introductory**

349.  Apart from the contractual claim or a parallel claim in tort against CIM, the claims in the action all relate to the duties or obligations of the various Defendants as directors of CCC, and are thus matters of company law.  Company law is the creature of statute, although, as with any legislation, enacted against the background of the local common law.  Here, that is Guernsey's customary law.

350.  It is well known that the concept of a limited company was imported into Guernsey law from English law.  As the Guernsey legislation has been modelled on the English legislation, it is helpful to look at English law decisions in analogous cases, both for help in resolving any problems not directly covered by Guernsey statute or customary law (see *Flightlease Holdings (Guernsey) Ltd v Flightlease (Ireland) Limited* [2009-2010] GLR 38 per Southwell L-B at [91]) and for useful examples as to interpreting Guernsey legislation where this has been copied in identical terms from an English statute: see *In re Montenegro Investments Limited (in administration)* 2013 GLR 345 per Collas B, at [19].  English law decisions are persuasive, but no more, especially in the latter situation, because the context of Guernsey law and circumstance may well provide good reason for a different result.  Where the Guernsey legislation is not in identical terms – and in this case it often is not - the assistance to be derived from English cases on similar but different enactments is much reduced.

351.  I am satisfied that in general terms it is useful to consider English authority on matters which have a parallel in Guernsey, and I will certainly do so.  However, I do not feel that I should give as much attention to authorities from further afield.  In general, it seems to me that there is sufficient authority within the ambit of Guernsey law, possibly in Jersey law as a Channel Island jurisdiction of similar, although not identical, origins and development to Guernsey law, and in English law itself, to enable the guiding light of principle to be discerned.

352.  The Plaintiffs have cited a veritable global library of authority, in particular from Australia and in connection with their submissions about directors' duties.    I gained the distinct impression from the various citations in the course of the case, though, that Australian company law has different legislative provisions from those in either Guernsey or the UK, and has also developed on somewhat different lines, either as a result of this or simply because of different public policy considerations, or a different judicial ethos and approach.  Many of the points of dispute between the parties are quite refined as to their detail.  Deciding the weight which should attach to an authority from Australia (for example) in a Guernsey law context may well properly require looking at the detail of its own context and the policy of Australian company legislation.  The time and effort required to do so would generally be grossly disproportionate to the assistance which such authority might provide at the detailed level, even in a case of the magnitude of this one.  This is especially so where, as is frequently the case, such authority generally seems to add little but confirmation, in a different form of words, of the broad legal principles expressed in other cases closer to home.  Once it is possible to identify guiding principle, the further utility of authorities from other jurisdictions of common law origin but wider afield diminishes hugely, even though they may not be entirely irrelevant.

353. In dealing with the parties' competing submissions on the law, I will refer only to those authorities which have been directly material to my reasons; if I do not refer to an authority, then it is either because I do not regard it as expressing any sufficiently individual or material point of principle to be of influence, or because I consider it too far removed from either Guernsey law, or the facts and claims in this case, to be of more than a passing interest, insufficient to justify its inclusion in an undesirably lengthy judgment.  I have therefore considered such non-binding authority very much only where it adds real value - and I certainly will not be dealing with all the hundreds (literally) of authorities, the majority cited by the Plaintiffs, which have been referred to or referenced in the course of the case.

354. It is convenient to consider the applicable law in this case under topics in the following order:

    **(1)   Duties of directors:**

        **a.   Fiduciary duty;**

        **b.   Duty of care (negligence)**

    **(2)   "Insolvency"**

    **(3)   Wrongful trading**

    **(4)   Breach of contract/tort/unjust enrichment (against CIM)**

    **(5)   Statutory Misfeasance**

    **(6)   The impact of exculpation and indemnity defences**

    **(7)   The liability of the Entity Defendants.**

**General points**

355. I mention first two general points.  First it is common ground and indisputable that I am required to consider the positions of each of the Defendants individually when considering the claims made against them of breach of their duties as directors.  There is no such thing as a "collective" breach of such duty.   I therefore accept the Defendants' point that, where pleaded allegations are made against parties collectively for economy of expression, one must scrutinise the pleading carefully to extract what is actually pleaded against each Defendant in order to consider his or its liability.   In practice, however, I do not think much will turn on this.   With the very comprehensive pleadings in this case, and allegations levelled as widely as they have been, it seems to me to be unlikely that any Defendant has been unable to work out what allegations are being made against him or it, or that these differ very much.

356. Second, almost the Plaintiffs' opening submission is that the Defendants' duties to CCC under Guernsey law were "heightened" because CCC was a listed public company.  I consider that this proposition owes more to rhetoric than legal analysis.   The duties of a company director arise out of the nature of the office.  The fiduciary duties are matters of loyalty and integrity. They are no different whatever the status of the company.  The duties of skill, care and diligence are likewise no different in their nature, standard or description whatever the status of the company.   The only difference which might arise in the case of a public company lies in the fact that the "ordinary" person who might be expected to become the director of a public company is obviously likely to be of a higher level of education and experience, if not intelligence, than the "ordinary" person who might be expected to become the director of a small local or family business.

357. No person should accept the role of director of any company unless he regards himself as having a sufficient basis of knowledge, skill and experience to be able to carry out the

requirements of that role as needed by the particular company, but that is a different matter. It does not mean that the nature or standards of the duties themselves are in any way "heightened" in the case of a public or listed company, compared to a private one. A public or listed company will have additional legislative or regulatory requirements imposed upon it as a condition of that status. Compliance requirements thus add to the responsibilities of the company director, but it is only in that quantitative sense that the duties of directors of a public or listed company are increased. The supposed examples of such increased duty cited by the Plaintiffs are, as I read them, examples of this point.

358.  Any increased weight of responsibility in the duties of the directors of CCC arises solely from the specialist nature, size and importance of the transactions with which it was involved. The fact that it was a public and listed company does not affect any judgment about whether its directors complied with the standards appropriate to themselves and to those particular circumstances.

359.  The Plaintiffs' submission would involve that the duties of the Defendants as directors of CCC were suddenly changed in their intrinsic nature or standards on the day (4th July 2007) when CCC went public, even though its business did not change at all at that moment.   To my mind, this shows that the Plaintiffs' submission has no basis in law.

**(1)**     **The duties of directors**

**General**

360.  It is common ground that the directors of a Guernsey company owe duties to the company which can be classed under the two heads of (1) fiduciary duties and (2) duties of skill and care.   Breaches of both are alleged in this case.

361.  However in my judgment, it is important for analysis purposes to keep the distinction between the two classes of duty very clear.   I respectfully agree with the dictum of Mr Jonathan Crow QC in *Extrasure Travel Insurances Ltd v Scattergood*  [2003 ] 1 BCLC 598 at [89]:

> " *Fiduciary duties are not less onerous than the common law duty of care: they are of a different quality. Fiduciary duties are concerned with concepts of honesty and loyalty, not with competence.   In my view, the law draws a clear distinction between fiduciary duties and other duties that may be owed by a person in a fiduciary position. A fiduciary may also owe tortious and contractual duties to the cestui que trust: but that does not mean that those duties are fiduciary duties.  Bearing all that in mind, I find nothing surprising in the proposition that crass incompetence might give rise to a claim for breach of a duty of care, or for breach of contract, but not for a breach of fiduciary duty.*"

362.  A general review of principle emphasising this distinction was set out by Millett LJ in *Bristol & West Building Society v Mothew* [1998] 1 Ch 1 at pp16-18.

363.  I thus agree that there is what Advocate Swan, appearing for the Carlyle Defendants, described as a "*bright line distinction between competence and loyalty*."     It follows that where one finds - as one still does despite Millett LJ's deprecation of this - references in the authorities to a "fiduciary duty of care", I regard this as a misnomer.   (It appears that such a concept may be recognised in Delaware law, but different jurisdictions may well permit different concepts and I am not concerned with Delaware law at this point.)

364.  The importance of recognising the distinction is not just pedantry.   Eliding the concepts of a breach of a fiduciary duty and a breach of a duty of care committed by a fiduciary can lead to unduly intricate or flawed analysis, because of a cross-fertilisation from the other field.

365.   The Defendants emphasise the above distinction, whilst admitting that, as Directors of CCC, they owed to the company, in addition to their fiduciary duties, "a duty of care at common law or in equity".

366.   I have some misgivings about the concept of an "equitable" duty of care, certainly in Guernsey law.   Such a duality in English law is the product of the parallel development of systems of law and equity in the 18th and 19th centuries.    The English common law recognised duties of care specific to certain common law relationships, and equity recognised obligations of care in the trust context, but this was all before the fusion of law and equity took place in 1875, and well before recognition of the overarching "neighbour" principle which underlies the English common law duty of care, pronounced in *Donoghue v Stevenson* [1932] AC 562.  It is now a distinction without a difference, because redress for breach of a duty of care whatever its historical origin, is compensatory in nature and similar in the principles of quantification.        In Guernsey law, though, there was never a distinction of origin, as Guernsey law did not develop in the same way as English law, with a historically separate concept of equity.        Nothing, though, seems to turn on any supposed distinction in this case, because the Defendants' central submission remains that of the importance of distinguishing a director's fiduciary duties, which are duties of honesty and loyalty, from their other duties of care and skill, which are duties of competence.

**(a)        The Fiduciary duties - general**

367.   The Defendants stress, at the outset, that their case is that the claims made against them as regards breach of fiduciary duty fail at a very high level of analysis.  They say that not only were the material decisions - ie those which might be argued to have caused any actual financial damage to CCC - arrived at bona fide by them in what they believed to be CCC's best interests, but that in any event those decisions were within the range of decisions which reasonable directors of CCC could have made in good faith, in all the circumstances.   This is quite apart from their second high level argument, which is that the Plaintiffs have not proved that the impugned decisions in fact caused CCC any financial loss.   Points of detail, though, have been strenuously argued, with each side seemingly being concerned in case not refuting an apparently inconsequential proposition from the opposition might later be used as an unexpected basis for an adverse submission.

368.   In practice, even at a greater level of detail, there are not many points of real substance between the parties.  Matters in dispute seem to me to be mostly points of language, or emphasis, or how far authorities based on different factual situations, and often from other jurisdictions, are of any real assistance.    In the end, I do not think that the refinements of detail on this topic which appear in the Cause, and more particularly in the Plaintiffs' subsequent legal arguments, have significant practical consequences.    The Plaintiffs' legal submissions often seemed to me to labour the same point in different words, usually so as to justify introducing the supposed weight of another citation of authority, but I have indicated my views on authorities from other jurisdictions above.

369.   The Plaintiffs submit, in their closing submissions, that the Directors owed the following four <u>fiduciary</u> duties to CCC.

   **1.        A duty to  act bona fide in the best interest of CCC,**  which they submit included

      **a.**    a duty to act in accordance with CCC's Articles of Association,

      **b.**    a duty to make full and frank disclosure to the Board of relevant matters, and

      **c.**    a duty to take into account the interests of creditors and prospective creditors in the event that CCC was insolvent or "in the zone of insolvency".

I will refer to this in short as the "duty to act in good faith".

> **2.**   **A duty not to act for collateral or improper purposes** in exercising their powers and discharging their duties.

I will refer to this as the "proper purposes duty".

> **3.**   **A duty to exercise their own independent judgement in relation to CCC,** not to fetter their discretion in the exercise of their powers and not to abrogate their responsibilities to CCC.

I will refer to this as the "own judgement duty", and

> **4.**   **A duty not to act in relation to the affairs of CCC in circumstances where there was an actual or possible conflict between their duties to CCC and their other duties or interests**, including owed to TCG Holdings , CIM or other Carlyle Group affiliates and to avoid such situations of conflict.

I will refer to this as the "no conflicts duty".

I do not think that the Defendants disagree in general terms, but they do dispute matters of detail, of varying significance.   I will consider each of these separately.

**1.**   **The duty to act in good faith.**

*The duty is subjective*

370.   The duty to act in what the director bona fide believes is the best interests of the company is the essential fiduciary duty of a company director.   Other such duties described as "fiduciary" duties are really particular applications of this essential duty.

371.   This central duty is part of the foundation of the Plaintiffs' key ultimate complaint in the Cause that

> *".……at all material times from July 2007 onwards, CCC's best interests required the selling down of RMBS assets in order to reduce leverage and enhance liquidity; and/or the raising of additional equity capital in order to reduce leverage and enhance liquidity; and/or a restructuring or orderly winding down of CCC."* (Cause Paragraph 418G.4)

The complaint is, of course, that the Defendants failed to take any of these steps.

372.   The Plaintiffs cite this duty as the basis for other criticisms, such as of the "*imprudent and improper*" amendment or suspension of CCC's risk management measures in its Investment Guidelines, which, they assert, was "*plainly*" not in CCC's best interests "*on any view"*. However, this is just another aspect of the key complaint recorded above.   As a breach on its own it caused no loss and adds nothing to that key complaint.   It did not even provide the opportunity for the key complaint; it was just a part of the actions which surrounded it. Advocate Wessels for the Plaintiffs sought to argue that the suspension of the guidelines was causative of loss in that it caused CCC to continue to operate its business with (known) inadequate risk controls.   I reject this as a matter of causation and logic.   It does not pass even the "but for" test of causation in this regard.   It is not the case that "but for" the suspension or removal of those Investment Guidelines CCC would not have suffered the claimed loss.   The Directors would have been pursuing some course of action with regard to the actual conduct of CCC's affairs whatever the state of suspension, or otherwise, of the Investment Guidelines, and it is that course of action which falls to be judged, on its own merits.     Of course, a decision taken in accordance with carefully fixed Investment

Guidelines might provide a director with a defensive argument that that decision had not been negligent, but that is the opposite point, a different matter, and not applicable here.

373. This, though is digressing from the present point, which is that the duty of good faith is a subjective duty on the part of the directors.   The Defendants admit that CCC's directors

> "owed a duty to CCC to act in what they considered in good faith to be the best interests of CCC and its shareholders as a whole,"

and they abbreviate this to "*duty of good faith*".  This formulation is derived from Arden LJ in *Item Software (UK) Ltd v Fassihi* [2005] 2 BCLC 91 at [41].  I also note her general approach.

> "*I prefer to base my conclusion in this case on the fundamental duty to which a director is subject, that is the duty to act in what he in good faith considers to be the best interests of his company…….The duty is expressed in these very general terms, but that is one of its strengths: it focuses on principle, not on the particular words which judges or the legislature have used in any particular case or context.  It is dynamic and capable of application in cases where it has not previously been applied but the principle or rationale of the rule applies.*"

374. The Plaintiffs accept this formulation, stressing the word "*fundamental",*  but argue even so that there are objective aspects of the duty, and they seek to rely on these.   I deal with this later.   For present purposes, in my judgment, the authorities all point to the principle being that it is a subjective assessment of the director's conduct which is central to the formulation of this duty.      It has recently been reiterated by Popplewell J in *Madoff Securities International Limited (in liquidation) v Raven*  [2014] Lloyd's Rep F C 95 at [188] as the "core duty" of a director, in the following terms:-

> "*a duty to the company to act in what he honestly considers to be in the interests of the company*"

I endorse this as an appropriate modern formulation of the duty.

375. The Defendants also rely on *In Re Smith and Fawcett Limited* [1942] Ch 304 (CA), which they suggest is the leading English case on this core duty, and the dictum of Lord Greene MR, describing the duty of directors generally when exercising their powers (at p 306) as being that:

> "*They must exercise their discretion bona fide in what they consider – not what a court may consider – is in the interests of the company, and not for any collateral purpose.*"

376. This citation focuses on the supremacy of the directors' own bona fide decisions. It has firmly set the direction of later authority.   The point is that the court will not interfere with, or second guess, a decision of directors which has been made properly and in good faith.   It is, after all, the directors, and not the court, to whom the management of the company is entrusted.

377. The actual dictum from *Re Smith and Fawcett Ltd* introduces a reference to the "purpose" aspect of a director's fiduciary duty, but that is a distinct matter which it is appropriate to consider separately.   The "proper purposes duty" can, in one sense, be said to be part of the duty to act in good faith because that must include acting honestly to effect what the director believes to be the proper purposes of the company.   However, the "proper purposes" aspect of a director's fiduciary duty usually assumes key importance where what is in issue is the

<u>validity</u> of a purported act by the directors rather than their liability for any adverse financial consequences.

378. Returning to the scope of the duty of good faith, the central point is therefore, in my judgment, that a management or governance decision of a director, honestly and responsibly made, amounts to due performance of that director's duty of good faith. That the test for this is subjective has plenty of recent expressions, certainly in English law: see, eg, *Regentcrest plc v Cohen* [2001] 2BCLC 80 at [120], per Jonathan Parker J; *Extrasure* (above) at [87] per Mr Jonathan Crow QC, and *Re Southern Counties Fresh Foods Ltd* [2008]  EWHC 2810 CH at [53] per Warren J.

379. The Defendants therefore submit, with regard to the duty of good faith that a decision (whether right or wrong) reached by directors cannot be a breach of fiduciary duty if they have honestly made it in what they consider to be the interests of the company, and that therefore a claim for breach of <u>fiduciary</u> duty will only lie where it is shown that the directors did not honestly consider their action to be in the best interests of the company.   In my judgment that is correct.

### *The place of objective considerations*

*Evidence*

380. The Plaintiffs argue that objective considerations nonetheless enter into an application of the duty of good faith, in three respects.

381. The first is that an objective view of the decision can be relevant to the issue whether the directors <u>did</u> honestly and genuinely consider their actions to be in the best interests of the company.   The Defendants accept this, subject to stressing that it is an evidential point only.   In other words, the apparent reasonableness (or otherwise) of a decision may be material to an inference as to the director's state of mind in making it.   It does not, though, import into the actual test any requirement that the decision must be in the best interests of the company as determined objectively by the Court.

382. I agree with this last submission.   If the relevant decision appears clearly and objectively not to have been in the best interests of the company, this could certainly cast doubt on a director's assertion that he genuinely believed that it was.   However, in my judgment, that is as far as the relevance of an objective view of the actual merits of the decision itself can go. I do not read authorities such as *Shuttleworth v Cox Brothers & Co (Maidenhead)* [1927] 2 KB 9 as supporting the contention that an objective assessment of the merits of the decision goes directly to the question whether there has been a breach of the duty of good faith.   If it were to be so read, then it is contrary to what I see as the preponderance of later authorities which have explained the ambit of a director's duty of good faith.   There is no <u>fiduciary</u> duty to make an objectively "right" decision; under the <u>duty of care</u> it may (but only may) be a different matter.

*Charterbridge*

383. The second way in which the Plaintiffs argue that an objective assessment of the merits of the decision is material to a finding of breach of the duty of good faith is what has become known in the shorthand of this case as the "Charterbridge principle".   This refers to the decision of Pennycuick J in *Charterbridge Corp Ltd v Lloyds Bank Ltd* [1970] Ch 62.   It is the proposition that where the directors did not in fact consider the interests of the company at all (a matter which would have to be proved as a fact), then they cannot simply pray in aid their subjective honesty as a defence to a claim for breach of fiduciary duty.

384.  The Plaintiffs express this principle as being that the court cannot defer to the subjective judgment of the directors where there was no such qualifying judgment.   It might be simpler to express it as being that it is part of the fiduciary duty of a director to consider the company's best interests, and it is therefore a breach of that duty not to do so.   The making of a flawed decision would then be the consequence of this.   In such a situation, though, the test which the court will apply is to examine the relevant decision objectively, to see whether it was within the range of decisions which a hypothetical director, acting bona fide in the apparent best interests of the company, <u>could</u> reasonably have made in all the circumstances. If it was within that ambit, then the director in question will not be liable for consequent loss. If it was not, then the director will be liable for breach of fiduciary duty.

385.  The Defendants accept that the Charterbridge approach can apply, but they dispute the factual situation which triggers its application.   The Defendants say that this approach is only to be adopted in the case where the directors have given no consideration <u>at all</u> to the relevant interests of the company.   If they have given some, but arguably inadequate, consideration, then the Defendants submit that, whilst that might be a breach of the duty of care, it will not be a breach of the fiduciary duty of good faith, because such a breach is, once again, in the realms of incompetence and not of disloyalty.

386.  The Plaintiffs, however, submit that the principle comes into play where the Defendants gave no "<u>meaningful</u>" consideration to the relevant interests of the company.   They argue that to give no "meaningful" consideration is not proper consideration, and for practical purpose it is therefore no consideration at all.

387.  The Plaintiffs' formulation might be said to have the force of being purposive (an approach which has been in vogue for some years), and to be looking at substance rather than mechanism.   I accept that it would not be unnatural to describe minimal, cursory, superficial or fleeting consideration, as "no" consideration, even though the very adjective "meaningful" admits that some consideration has been given.   The difficulty which I see with the Plaintiffs' test of "no meaningful consideration" is that the word "meaningful" contains a value judgment, and one of insufficiently clear scope.   In itself, it gives no indication of what degree of research, consultation, deliberation or cerebration is contemplated by the word "meaningful" and is therefore required, and any such concept could very easily mean different things to different people.

388.  On the other hand I can see force in the Plaintiffs' argument that where any "consideration" can be shown to have been cursory in the extreme, it does not seem right that a director could still rely on it as discharging his fiduciary duty, such that the court would then be bound to find that he had done so.   The difficulty with the Defendants' submission is that it reduces the scope of the test simply to the line between whether the matter was overlooked entirely, or was noticed but summarily dismissed.

389.  The underlying principle of this concept seems to me to be whether the director actually turned his mind to the matter in issue.   In my judgment the formulation which better gives the correct flavour of this, within the context of the subjective nature of the director's consideration, is that of the Defendants, i.e. that the director gave "no" consideration to the relevant question or interest, but with the caveat that simply thinking of the point but then dismissing it without some mental process of deliberation would still amount to "no" consideration within this test.   In practical effect, this is recognising the formulation of the point adopted by Owen J in *Bell Group v Westpac Banking* (No 9), 2008 70 ASCR 1 at 265, that the consideration must be  *"more than a mere token".*

390.  I realise that it could be said that this is really describing a test of no "meaningful" consideration after all.   My answer is that, if so, the issue has become one of emphasis only, and in my judgment the correct emphasis is to describe the test as "no" consideration, but to recognise the practical interpretation of "no" consideration which I have stated.   My reason is

that describing the test with a qualifier such as "meaningful" changes the emphasis from "no" actual consideration to some indeterminate quantum of consideration, and invites arid analytical argument as to what qualifies as "meaningful". It also risks, in my judgment, pitching the appropriate test too high.

391. However, whilst I have decided this dispute between the parties, I do not think it has any real practical consequence. The director who gives a matter some little, but inadequate, consideration might avoid being in breach of fiduciary duty but would surely still be likely to be in breach of his duty of care, and probably with identical consequences (although it is possible, in some circumstances, that the approach to quantification of loss might vary in its stringency; see later). There might be some distinction in his position dependent on the application of particular wording in an exoneration or indemnity clause, if those were applicable, but that is a different point.

392. A last point does arise, however. There is apparently academic dispute, particularly in the Australian authorities, as to whether the correct legal analysis of the situation where the decision was within the range of decisions which a reasonable director acting in good faith could have made even though the director in question did not consider the best interests of the company is that the director escapes liability because there is no breach of duty or because there is a breach of duty but no loss is caused. This dispute naturally leads into argument about the principle by which a director's judgment in identifying the best interests of the company is *itself* to be judged; is it simply his subjective honesty even if unreasonable (no breach of duty)? or is it the objective reasonableness of the decision (breach of duty but causing no loss)? The analytical argument thus becomes very rarefied, and fact-sensitive at a detailed level: see the discussion in *Bell Group v Westpac Banking Corporation (No 9)*, 2008 70 ASCR 1 at [4593] – [4618]. The latter analysis also leaves open room for disagreement as to whether there should or should not be liability if the decision under attack was within the range of decisions which could reasonably have been viewed as being in the interests of the company, but was not the decision which the court would consider to be the best decision. This is one of the "tantalising questions" identified but not decided by Owen J at [4616-8] of *Bell No (9)* above.

393. Insofar as I need to decide the question here, the correct principle, in my judgment, is that a failure to consider the best interests of the company, whether total or partial, amounts to a breach of duty, but it is one as to which no consequences (no damage) flow unless the result is that the actual decision is outside the range of decisions which, viewed objectively, could reasonably have been made in the apparent best interests of the company. To take the latter requirement further, and hold that there is damage to the company unless the decision can be endorsed as objectively the best decision for the company is both to impose a higher standard of decision-making than that positively required of directors, and to tread in that dangerous area of the court's making a commercial rather than a legal judgment.

394. How far any decision which I actually have to make depends on the above principle, though, must await my findings of fact. I would just observe here that the area in which this issue arises most commonly, as the Defendants point out, is the situation of directors who are found to have failed to distinguish between the interests of the individual company with which they are concerned on the one hand and those of the group of companies to which it belongs on the other, and this situation has overtones of some of the Plaintiffs' complaints in this case. As I have said, the analytical point itself is likely to have no practical effect, but it draws attention to the overarching practical importance of the simple question: was the decision or conclusion under attack a decision or conclusion which a reasonably competent director of the particular company, in the same circumstances and with the same attributes as the relevant defendant, could have made in good faith in all the circumstances? If it was, then that will determine any question of liability for damages in the negative, and there is no need to decide whether this is the result of there being no breach, or no loss.

395. What I do take away from the above consideration as a practical point is that the *Charterbridge* principle shows that there is one element which is a requirement of both the duty of good faith and the duty of skill and care, namely that each requires that one must actually turn attention to the question of what the best interests of the company are.  In each case, however, one is saved from liability for not actually doing so if the decision made was nonetheless within the range of decisions that a properly loyal and competent director could reasonably have made in all the circumstances – which is an objective question.   However, its determinative power means that in practice, it may well be most efficient to consider it first.

*Wednesbury*

396. The third way in which the Plaintiffs submit that objectivity is material to a judgment whether there has been an actual breach of duty is where it can be shown that the director acted "unreasonably or irrationally" in deciding what course of conduct would be in the company's best interests.   The Plaintiffs' written argument merely says that in such circumstances directors will "*also*" be "*in breach of duty*".  By implication this seems to be referring, still, to the duty of good faith, although I would again have thought it inevitable that such a serious finding would constitute a breach of the director's duty of care.    I suspect that the Plaintiffs' insistence on arguing this point in support of their claimed breach of the fiduciary duty of good faith is with an eye to avoiding the application of exoneration or indemnity clauses.

397. The Plaintiffs rely, for their proposition that unreasonableness or irrationality is a breach of the duty of <u>good faith</u>, on the oft-cited dictum of Bowen LJ in  *Hutton v West Cork Ry Co* (1883) 23 Ch D 654 at 671, that

> "*[b]ona fides cannot be the sole test, otherwise you might have a lunatic conducting the affairs of the company… in a manner perfectly bona fide yet perfectly irrational.*"

398. They draw attention to dicta in other cases, such as that of Harman J in *In Re a company (ex p. Glossop)* [1988] 1 WLR 1068, suggesting that the principle of *Howard Smith v Ampol* [1974] AC 821 can be viewed as an analogous application of the *Wednesbury* principle of unreasonableness in public law.  This principle is that a public law decision is void if it is so unreasonable or irrational a decision that the court concludes that no reasonable decision-maker, in the particular circumstances, could have made it.   The Plaintiffs submit that this is judicial recognition of an analogy between the standards applicable to those exercising fiduciary discretionary powers (such as directors) and those exercising public law discretionary powers. They rely on a suggestion to this effect by Simon Mortimore QC in his book <u>*Company Directors; Duties Liabilities and Remedies*</u> (see now 3rd Ed (2017) at 12.21-22).    They cite further cases, such as *Byng  v London Life Associations Ltd* [1990] Ch 170, *Equitable Life Assurance v Hyman* [2002] 1 AC 408  and the Australian case of *Westpac Banking Corporation v The Bell Group Ltd (in liquidation) (No 3)*  (2012) 44 WAR 1 for dicta apparently endorsing the proposition that the duties of directors bear comparison with public law duties, such that, notwithstanding that a defendant may have acted honestly and in good faith, he may still be found to be in breach of his <u>fiduciary</u> duty where he has acted "unreasonably or irrationally" (obviously in the eyes of the court) in considering what steps were in the best interests of the company.

399. The Defendants invite me to reject this approach as unsound, and departing from the bright line distinction between honesty (even if incompetent) and incompetence itself.   They point out that the dictum in *Hutton* is over 130 years old, was not, in fact, concerned with lunatics (or even directors) running companies, was a passing expression of concern by the court, pre-dated the seminal recognition of a general tortious duty of care in *Donoghue v Stevenson* in 1932 and has never, apparently, been relied on to found any other decision.    They point out that the decisions where dicta alluding to public law comparisons have emerged have tended to be cases where the courts were concerned with the "proper purposes" duty, and usually

with a claim to have a decision set aside or declared invalid, rather than a claim for damages or compensation. In the former kind of case, comparison with grounds of challenge to a public law decision is not unnatural, because the issue is that of the *vires* of the decision rather than that of establishing a breach of the duty of good faith sounding in damages.

400. The Defendants also point out that endorsement of this approach is not universal, and that in *Re Edennote Ltd* [1996] BCC 718, in the context of the court's supervision of a liquidator (a situation which they submit has more in common with the scenario in this case), Nourse LJ rejected comparison with public law principles as potentially confusing. He commented that there was "*something unrealistic*" about the suggestion that one could apply the classic public law tests used in controlling public servants performing statutory duties to the oversight of businessmen engaged in commercial decision-making.

401. I unhesitatingly prefer the Defendants' arguments on this point. In my judgment, it is confusing, thoroughly unhelpful, and wrong in law, to introduce public law concepts into a determination of the liability of directors for their conduct in respect of their duty of good faith. The public law principles to which the *Wednesbury* test applies are concerned with the proper use or misuse of public powers. They are concerned essentially with *vires* and with a duty to act fairly. The director's duty of good faith in the private law stewardship of the assets of a corporate enterprise is concerned with upholding his duty of loyalty to that enterprise. The two concepts are different in their very nature, and I can see no useful analogy between them which would justify exporting the appropriate test for one into the other.

402. It is easy to have an intuitive feeling that a particularly egregious example of unreasonable, or even irrational, decision-making can be described as a breach of "fiduciary" duty. A fiduciary duty is a duty to perform a trust, and directors are appointed on the basis that they are trusted to make reasonable and rational decisions. However, that does not mean that such a general expectation turns the duty into a fiduciary duty to make decisions which pass the Wednesbury test, and in my judgment it would be an incorrect analysis to treat it this way. A director is also trusted to make skilful and prudent decisions, but that does not turn his duty of care into a fiduciary duty (see above).

403. It is also, in my judgment, quite unnecessary to introduce any such principles. A decision which, objectively viewed (which in effect means: in the eyes of the court), is grossly unreasonable or irrational or perverse will inevitably have been so judged by considering its consequences and other surrounding facts. These in themselves will tend to show either that it was not taken genuinely in the interests of the company but for some other, and consequently illegitimate, reason, or that it must have been taken without the exercise of due care and skill. (In fact, if no other such factors can be identified, then the underlying judgment that the decision is grossly unreasonable, irrational or perverse must be suspect, and would require revisiting.) If so, the decision will be a breach of the general duty of good faith or the general duty of skill and care, in any event. It is thus unnecessary, as well as potentially confusing and dangerous, to construct some further analytical basis for attacking the decisions of directors based on public law analogies. Whilst it might be suggested that the remedies available to the company for breach of fiduciary duty are more extensive than for negligence, even if that is so (and I am not satisfied that it ever will be, in practice), that is not, in my judgment, a sufficient reason, let alone a good reason, to distort or ignore the difference between a duty of integrity and a duty of care, and to pass off the latter as being the former.

404. I agree with the Defendants' criticisms of the dictum in *Hutton*. I find as well that the later authorities cited by the Plaintiffs are either directly concerned with the different "proper purposes" duty, or have dubiously transferred comments appropriate to that duty into comments about the duty of good faith.

405. I note the text-book commentaries of Simon Mortimore QC (above) suggesting that such public law principles may be gaining a place in English law. I also note that courts in Australia similarly may regard themselves as no longer giving "*the deference they once did*" to the decisions of directors (apparently the view of Drummond JA on the appeal decision in *Westpac Banking Corporation v The Bell Group Ltd (in liquidation) No 3* (2012) 44 WAR 1 at [2029], although I also note that leave was given for a further appeal from this majority decision, but the appeal was presumably compromised, as it was withdrawn.). This, however, is not the approach in Guernsey, and in my judgment quite rightly, as it is a dangerous approach.

406. On careful reading, I do not understand the approach in the *Bell/Westpac* decisions actually to be extending the court's powers to grant relief in respect of decisions of directors on the grounds that they have been made for improper purposes into the realms of commercial merits, although it seemed to me that Advocate Wessels' arguments came very close to contending that it does. The decision in that case was that the directors had granted guarantees of other group companies' debts to the banks without proper regard for whether it was in the interests of their own companies to do so, objectively proven largely by their not having had or sought pertinent information, or devised a sufficient plan, as to material effects of their doing so. It was then concluded that the granting of such guarantees was therefore not, objectively, in the best interests of those companies, such that the acts of effecting the relevant transactions were a breach of the directors' fiduciary duties as stewards of the companies' assets. The central point in the case, however, was that the banks' own knowledge of such situation was then held to be sufficient to impose "accessory" liability *on the banks* with regard to the relevant transactions, and to result in an award of equitable compensation against them. Thus, the directors' breaches of duty were established as breaches of fiduciary duty on the analysis of *vires*. This was at times referred to as if acting for "proper purposes" of the company extended to or included "acting in the best interests of the company", but this has to be seen in context; in a sense, it does, but only as an expression of the purpose for which directors are given their formal powers of management of the company's affairs conferred by the company's articles and the general law.

407. It is unfortunately easy to use this expression of the apparent relationship of "proper purposes" and the "best interests of the company" to create an argument that, since the company's interests in "good" commercial decisions must be part of its best interests, making only "good" decisions is part of the "proper purposes" of the company for which it is the directors' duty to act - thus extending the scope of the "proper purposes" duty beyond the field of *vires* and into the field of merits. This extension could then be argued to enable the court to intervene because it does not agree that the decision made was in the best business interests of the company, even in cases where the decision was conscientiously and honestly made by the directors; the court could characterise an ill-judged (but *bona fide*) decision as being not in the best interests of the company and <u>*therefore*</u> "improper", thus dubbing it a breach of *fiduciary* duty. Even if such an approach starts by being applied only on the basis of *Wednesbury* principles it can easily slip into being invoked where the court could be persuaded that a rather different decision on a serious commercial matter perhaps ought to have been made.

408. In fact, the decisions in *Bell,* both at first instance and in the Court of Appeal, whilst a judicial *tour de force,* are subject to limits on their usefulness in this case because of three matters. The first is the obvious one that they are decisions in a different jurisdiction which has pointedly developed itself separately from English law, and independently of the supervisory influence of the Privy Council, for decades. The second is that the *Bell* litigation itself was so hugely complex in its factual purview that it is unwise to draw any conclusions as to supposed parallels based upon it. The third is the more subtle point that by the time of the trial and the appeal, the claim was only being pursued against the banks involved in the transactions; the directors of the relevant companies were no longer parties. Thus, this was not a battle between injured creditors and misbehaving directors, but between injured creditors and

money-lending banks.  This explains the concentration in the case on breach of the directors' *fiduciary* duties; it was only if such a breach could be established that there would be any liability for the banks to be accessory to.  However, it also means that the psychological dynamics of the claim were very different from the present.

409.  Moreover, and once again, such an approach would tend to draw the court into making judgments on the merits of commercial decisions at an entirely inappropriate level of detail (an approach rejected by Owen J himself in *Bell Group v Westpac (No 9)* (above) at [4614].) This is a function which a court, and in particular a court of a small jurisdiction, is just not equipped to do efficiently or economically.  For those reasons, not only is it not the approach of the Guernsey courts grandly to abandon the approach of "deference" to the bona fide decisions of company directors which has hitherto been a defining limit of the court's jurisdiction in this regard, but, in my judgment, it emphatically should not be.  The admission of a direct application of *"Wednesbury"* principles in this context over-complicates simple principle, is a step in the wrong direction and is, above all, unnecessary (especially now that Guernsey law has legislated to prohibit the exclusion of company directors' liability for negligence and breach of duty in s. 157 of the 2008 Companies Law).

410.  In reaching the above conclusion I have not ignored the fact that the particular duty "to act for proper purposes" (considered further below) may involve objective considerations of the effects and the reasonableness of a challenged decision.  However, that is because there are two aspects to that particular duty.  The first is the fiduciary aspect: did the director loyally seek to perform that duty?  That is subjective.  The second is the practical angle: did he actually perform the duty correctly, in the sense of: did he in practice act for the "proper purposes" of the company?  That depends on the interpretation of those purposes and of the director's powers, and will be a matter of either general law or the true construction of the company's constitution.  As that is not a matter of the director's judgment or discretion, the test is therefore rightly, objective.  (In fact, it is to my mind highly questionable whether this aspect of a director's duty is "fiduciary" at all.  There is a tendency to label any duty of a director "fiduciary" without regard to its nature, just because it is a duty imposed on a director and it is trite law that his status is fiduciary.  It is this generalisation which has led to the similarly confusing notion of a "fiduciary" duty of care: see above.)  Thus, a director can be found to be in breach of his duty to act for proper purposes without any bad faith or disloyalty on his part, but simply because he acted under an honest misapprehension as to their scope.  It is this very limited aspect of the director's general fiduciary duty in which it is possible that Wednesbury type considerations may assist, but that does not mean that the two aspects of the duty to act for proper purposes identified above can be blurred, and still less that Wednesbury type principles should be carried over into a director's duty of good faith generally.

411.  I have also not overlooked the fact that public law principles have been extended into the private law realm in some cases, such as regarding the test for assessing the validity of the exercise of a discretionary power conferred by contract: see, eg *Braganza v BP Shipping* 2015 UKSC 17.  That, however, is an example of a private law discretionary power the exercise of which will govern the rights of others, and there is thus a clear analogy with the public law requirement of proper process and fairness.  The position can be analysed as an implied term of the contract that the discretion conferred will be exercised fairly and reasonably, and therefore on the same principle as a public law power.  However, that is once again an entirely different situation from the present.

412.  In summary, and coming back to the duty of good faith itself, I therefore accept the Defendants' proposition that if the court is satisfied, on all the evidence, that the Directors acted honestly, and gave consideration to the interests of CCC, then they would not be liable for breach of *fiduciary* (I emphasise) duty, even if their actions had been incompetent or arguably unreasonable.  I reject the Plaintiffs' varied attempts to persuade me that directors can be in breach of their fiduciary duty to act in the best interests of the company on a purely objective judgment - except where the issue is one of the true extent or construction of the

formal powers which they were purporting to exercise and in which case the epithet "fiduciary" is arguably inappropriate.  I had been minded to comment that this is another dispute, the practical effects of which hardly justify the time and energy which has had to be devoted to arguing it, but that would be to ignore the importance to the Plaintiffs' case of side-stepping the effects of the exoneration and exculpation clauses in CCC's Articles of Association and the IMA.

**Particular aspects of the duty of good faith**

413.   There are some further specific aspects of the core duty of good faith which the Plaintiffs rely on, and as to which I therefore need to indicate my views and approach.

*(i)*      *Duty owed to CCC alone*

414.   It is common ground that the duty of CCC's directors to act bona fide in the best interests of CCC - and indeed all their fiduciary duties - were owed to, and were to be performed in relation to, CCC and CCC alone.   CCC's best interests were to be considered separately and independently of the interests of any other entity and, in particular, those of the Carlyle Group (ie, in particular, TCG and Holdings).

415.   The Defendants accept this.  They argue that as a matter of fact, CCC's interests <u>were</u> considered independently, but that it is relevant practical context for this point that CCC's interests were, in practice, aligned with those of the Carlyle Group; the interests of both lay in CCC's survival and success.

416.   This point therefore gives rise to disputes of fact which I deal with later.  It does so specifically in relation to the "no conflicts" duty considered below.  I note here that, whilst the principle is clear and undoubted, the kind of questions to which it gives rise are not uncommon and are fairly obvious considerations in the context of groups of associated companies, and especially of partly-owned subsidiaries.  Whilst CCC was not an actual subsidiary of either TCG or Holdings, its position was similar in practice.

417.   An important point is therefore, in my judgment, that whilst directors of the subject company are, of course, bound to act honestly in the best interests of that company and that company alone, the mere fact that they are either appointed by, or known to, or associated with, a holding company or another company in the group does not mean that they are *ipso facto* to be suspected, still less assumed, not to be performing their duty to the subject company, or to be incapable of doing so.  The conduct in question must be examined on the usual principles of evidence and proof.

418.   Further, the requirement to act in the best interests of the subject company does not mean that a course of action cannot be in the best interests of the subject company simply because it happens also to benefit, or even be in the best interests of, its parent or another associated company.  The vice at which this rule of duty is aimed is that of subordinating the best interests of the subject company to those of another entity, or allowing the interests of another entity to influence a decision adversely to those of the subject company to whom the duty of good faith is owed.   Any impugned decision must be examined with that principle in mind, but it goes no further. The association of a director with, for example, another corporate entity in the same group may mean that his state of mind should be carefully examined rather than assumed, but it does not affect the standard of evidence or of proof by which any finding of breach must be made.

419.   Indeed, it seems to me that this aspect of the duty is what is being highlighted by the rather curious but ubiquitous description of the duty as one to act *"bona fide"* in the best interests of the company.   The words "bona fide" are plainly not used as contrast to *"mala fide"*, but are equally plainly regarded as adding something significant to the mere words "in the best

interests of the company", even though these would seem at first sight to express the duty adequately on their own. What the addition of the words *"bona fide"* does, I think, is to emphasise that the motivation to act in the best interests of the company must be genuine and actual, and not colourable or opportunistic. In other words, the best interests of the subject company must be central to the reasons for any action, not just incidental, fortuitous or conveniently arguable.

(ii)    *Duty not to cause (or permit) contravention of statutory or regulatory obligations*

420. The Plaintiffs submit that it is a breach of a director's duty to act in the best interests of the company (and also of the duty of skill and care and the duty to exercise powers for proper purposes) to cause the company to contravene statutory or regulatory obligations which apply to it. They cite this in relation to a group of allegations of breaches of Dutch regulatory law such as, for example, an alleged improper failure to make public disclosure of the suspension immediately when it occurred, of CCC's minimum liquidity cushion Investment Guidelines.

421. As I understand it, the Defendants accept that this duty exists as a matter of principle, but they deny any breach in point of fact, as a matter of Dutch company law and regulation. I think they may also dispute whether the duty is properly seen as absolute or whether it is discharged by taking all reasonable steps to secure compliance, and/or honestly believing that one has done so.

422. I readily accept the proposition that it is a private law duty of a company director to seek to ensure that the company complies with statutory or other regulations which properly apply to it, quite apart from any statutory sanctions for not doing so. It also seems reasonable to classify this as falling under the duty of good faith. It appears intuitive, at any rate at first blush, that complying with lawful regulations must be in the company's best interests, and I have not in fact been called on to grapple with the potentially difficult question, what the position would be if the directors of a company formed the honest view that complying with regulations, eg as to publicity, would in fact have some serious adverse side effect on the company.

423. However, and leaving aside any arguments as to whether the director's efforts are to be viewed subjectively or objectively, this is one of those duties of which a breach is of only peripheral importance, if any, in this case, because it is not claimed that the alleged breaches caused any loss to CCC.

424. The Defendants object that the Plaintiffs have tried to construct a case in this regard, by finding another claimed breach of duty to add to their criticisms of the Defendants, and then trying (unsuccessfully) to attach some colourably relevant consequence to it.

425. At one time, the Plaintiffs did appear to be asserting a claim that loss had occurred as a result of this particular alleged breach, suggesting that if various public disclosures had been made as they properly should, this would have had the consequence of causing CCC to be wound up earlier than it in fact was. Since the Plaintiffs' case has generally been that CCC ought to have been wound up (or down) earlier than it in fact was, this might have appeared to be another string to that bow. However, this line of argument was not pursued in the event, possibly because of the point that any <u>involuntary</u> winding down of CCC would seem likely to have been no less disorderly and causative of loss than that which in fact occurred.

426. Ultimately the point was deployed as an assertion that, insofar as the Defendants' strategy for the future involved non-compliance with regulatory obligations, it was not a "valid" or "legitimate" strategy. Where that would get the Plaintiffs in the present action, though, is unclear. It amounts to little more than a rebuke. No consequences sounding in financial damage are alleged, and none are apparent.

427.   If at any point it seems that this aspect of the Defendants' duties as directors of CCC has any materiality to the claims in the action, I will give it due consideration, but I cannot, at present, see that it does, and at this point I observe only that the authorities cited by the Plaintiffs (*Akai Holdings Ltd v Thanakharn Kasikorn Thai Chamkat* [2010] 3 HKC 153 and *Ampol Petroleum Ld v RW Miller (Holdings) Ltd* [1972] 2 NSWLR 850) suggest to me that such culpable matters have been regarded as evidential points, relevant to testing directors' assertions of their motives in the context of other duties, rather than, as the Plaintiffs submit "*support[ing] the conclusion that the relevant transactions were effected in breach of fiduciary duty*" in the directly operative sense and for the purpose of founding a claim in damages.

*(iii)      Duty to comply with CCC's Articles of Association*

428.   This is the first sub-duty expressly mentioned by the Plaintiffs, and again I do not understand the Defendants to deny the duty; they simply deny that such duty has been breached, or breached in any respect beyond the nominal or *de minimis*.   It is, once again, a matter which, even if demonstrated, has not been pleaded to have caused any loss to CCC in itself.   Again, I will consider it only if it seems necessary.

*(iv)      Duty to "make full and frank disclosure to the Board of all relevant and material matters".*

429.   This is the second expressly mentioned sub-duty.   An example of where it has been invoked is the allegation that Mr Conway wrongfully failed to disclose to the remainder of CCC's Board matters such as the full extent of financial support for CCC which he procured Carlyle Group to offer to Citibank in August/September 2007.   A second is that, at about the same time, Mr Conway failed to disclose to CCC's Board that he had a personal interest in achieving the best price for the sale of a part interest in TCG to Mubadala.

430.   Once again, the Defendants deny that the facts surrounding any of these matters did amount to any breach of duty on Mr Conway's part (or that of any other director in similar respects), and I will review this submission as to the facts, where it arises.   Once again, though, it is an allegation as to which no further plea of directly resulting loss to CCC is made, and its materiality is therefore entirely contextual, at best evidential, and not of any proportionate worth to the attention which has been devoted to it.   For example, it has led to discussion about the scope of the duty of a director to disclose his own wrong-doing, which, whilst academically very interesting, seemed to me to have no consequences for the issues of substance in the case.

431.   Again, therefore, I do not think any discussion of the point is necessary here, and I will deal with it if and when it may seem material.

*(v)      Duty to give proper regard to the interests of creditors and prospective creditors of CCC as a whole in the event that CCC was "insolvent or in the zone of insolvency".*

432.   This is the third sub-duty specifically mentioned by the Plaintiffs, but this is in a different class and it <u>is</u> a point of substance.   First, it affects the scope of the actual duty "to act bona fide in what appears to him to be the best interests of the company" and, second, it is a founding feature of the claim for wrongful trading, which is discussed later.

433.   The authorities show that when a company gets into serious financial difficulty the duty to act in the best interests of the company extends to include a duty to consider and act with proper regard for the interests of its creditors.   I have tried to use neutral language to describe this because, whilst the broad point is common ground, the parties agree neither its correct formulation nor its application in the circumstances of this case.

434.    In fact, I think it is actually somewhat misleading to talk of the duty to have regard to the interests of creditors as if it only <u>arises</u> when the company gets into a particular degree of financial difficulty although for convenience I will continue to refer to it in this way.   The interests of the company's general body of shareholders lie in the company using its assets to carry on its business activities and make profit.   The interests of the company's general body of creditors lie in the company having, or having access to, sufficient liquid assets to be able to pay off the creditors' debts and do so in a timely manner.   The directors of a company are actually always having regard to this latter interest, even when the company is solvent, because meeting it is an obligation of the company which is part of the continued conduct of its business.   When the company is solvent, though, this simply goes without saying.   The creditors' interests are protected without any need for separate consideration, because they are automatically satisfied in the course of the ordinary proper everyday conduct of the company's business.

435.    The duty to look out for creditors' interests therefore only has any practical implications where the interests of creditors and shareholders as to the course of the company's future activities begin to diverge.    This happens when the company's ability to meet its debt obligations begins to come into question, obviously with the possible approach of insolvency. The duty to have regard to the interests of the company's creditors does not so much "arise" by coming into existence at that time, as acquire separately discernible influence because of these changing circumstances.    This emphasises, though, that the arrival of this situation is not necessarily, or even usually, a sudden event, but develops, often gradually, so that identifying a clear point when the duty "arises" is not easy.   How the duty then requires to be fulfilled is also very fact-dependent, because of the huge variety of company businesses, business environments and individual circumstances.    This is all why, it seems to me, the courts have had difficulty in formulating both a precise test for the point at which a director's duty to consider the creditors' interests "arises", and a general test for the weight to be attached to those interests when that duty is being implemented.

*When does the duty "arise"?*

436.    This aspect of a director's duty is subsumed into the duty of good faith, because the authorities have described the basis of such duty as being that when a company is, or is nearly, insolvent, the reality of the situation is that such assets as it has no longer belong to the shareholders but belong to the creditors, because they have first call on those assets towards the satisfaction of their debts, and this will translate into hard practicality if there is a liquidation.

437.    Both sides refer to the most recent pronouncements on this topic by the English Supreme Court in *Bilta (UK) Ltd v Nazir (No 2)* [2016] AC 1 in which Lords Toulson and Hodge (with whom the remainder of the court agreed) said, at [123]:-

> "It is well established that the fiduciary duties of a director of a company which is insolvent or bordering on insolvency differ from the duties of a company which is able to meet its liabilities, because in the case of the former the director's duty towards the company requires him to have proper regard for the interest of its creditors and prospective creditors.  The principle and the reasons for it were set out with great clarity by Street CJ in <u>Kinsela v Russell Kinsela Pty Ltd</u> [1986] 4 NSWLR 722, 730.

>> 'In a solvent company the proprietary interests of the shareholders entitle them as the general body to be regarded as the company when questions of the duty of directors arise.  If, as a general body, they authorise or ratify a particular action of the director, there can be no challenge to the validity of what the directors have done. But where a company is insolvent the interests of the creditors intrude.  They become

*prospectively entitled, through the mechanism of liquidation, to displace the power of the shareholders and directors to deal with the company's assets.  It is in a practical sense that their assets and not the shareholders' assets are under the management of the directors pending either liquidation, return to solvency, or the imposition of some alternative administration.'*

and at [126]

*".....the protection which the law gives to the creditors of an insolvent company while it remains under the directors' management is through the medium of the directors' fiduciary duty to the company, whose interests are not to be treated as synonymous with those of the shareholders but rather embracing those of the creditors."*

438. The latter reference in particular is to an "insolvent" company.  I am here concerned with a company which is arguably approaching insolvency.   The first question is therefore when this extended duty is established.   It is common ground that the tipping point can be something short of actual insolvency (whether viewed as inability to pay debts or on the basis of the balance sheet test for solvency), but the parties differ as to the proper description of the legal test for the onset, short of insolvency, of such duty.

439. The Plaintiffs have consistently referred to being "in the zone of insolvency".      The Defendants point out, as far as I can see correctly, that "zone of insolvency" is not a concept known to Guernsey or English law (though it may well be used in Delaware law), and that the English cases have used a wide variety of formulations.   These are described as "imprecise indications" by the authors of *Gower's Principles of Modern Company Law* 10th Ed at para 9-13.   The Supreme Court's latest formulation is "*bordering on insolvency*": see *Bilta* above.  *"Prospectively insolvent"*, *"borderline insolvent"*, *"on the verge of insolvency"*, *"of doubtful solvency"* and *"of marginal solvency"* have all been used in cases and text books.

440. The Plaintiffs accept that these expressions are all feeling for the same idea, and they do not seem to me to dissent from these being the same as their "zone of insolvency".     Advocate Wessels was content, in argument, to accept the paraphrase of "bordering on insolvency".  During the hearing, phrases such as being on the "brink", or the "border", or the "verge" of insolvency were variously used.   Advocate Swan's preference was "teetering on the brink of insolvency".   The phrases seem to me to be interchangeable, and each to convey, adequately, the appropriate sense of imminence.

441. This is a situation which it is easier to recognise than to define, but the various descriptions above convey that significant closeness to insolvency is required, such that in most of the actual cases it has been found that the company was in fact already insolvent.     For that reason I prefer the phrase "on the brink of insolvency" or "bordering on insolvency" to "in the zone of insolvency", as originally proposed by the Plaintiffs, because, to me, the latter is capable of conveying a rather more distant relationship than that which is conveyed by the words "border", "verge" or "brink".

442. I am fortified in this view by the recent decision of Rose J in  *BTI 2014 LLC v Sequana SA* [2016] EWHC 1686 (Ch) at 483.   At [473] she rejected the test formulated by Mr John Randall QC in *Re HLC Environmental Projects Limited (in liquidation)* [2013] EWHC 2876, who had suggested an underlying principle that *"directors are not free to take action which puts at real (as opposed to remote) risk the creditors' prospects of being paid without first having considered their interests rather than those of the company and its shareholders".*  This is a dictum on which the Plaintiffs here had placed some reliance, but Rose J held that the authorities suggested a *"far more pessimistic"* situation than that simply of a "real", as opposed to a "remote", risk of the company becoming insolvent.

443. Rose J's approach to this test was very much fact-specific, and emphasised the need to have regard to the particular nature of the business, the state of the company's balance sheet, and all the overall circumstances.  This supports that the actual test as applied in this area is, quite rightly, flexible and fact-dependent, even though the underlying principle is uniform.

444. The Defendants themselves rely on the dictum of Rose J at [478] of her judgment that:

> "the essence of the test is that the directors ought in their conduct of the company's business to be anticipating the insolvency of the company because, when that occurs, the creditors have a greater claim to the assets of the company than the shareholders".

445. They point out, though, that in considering whether the duty to have regard to creditors' interests had been triggered at all and concluding that it had not, Rose J emphasised the "*very different*" situation of the company in the *Sequana* case from those in previous authorities on this topic, and she pointed out material differences which are in many respects (they suggest) similar to those on which the Defendants themselves rely in this case.

446. I hold that the duty to have regard to the interests of creditors arises when it can be seen that decisions about the company's actions could prejudice the creditors' prospects of recovering their debts in a potential liquidation.  The next question is how such duty then has to be approached.

447. The Plaintiffs submit that the triggering of the "creditors' interests duty", in English law, "*oblige[s] the Defendants to consider the interests of [the company's] creditors and prospective creditors as paramount*"  and they submit that the same approach should apply in Guernsey.

448. The word *"paramount"* comes from the decision of Mr Leslie Kosmin QC sitting in the English High Court in *Colin Gwyer & Associates Ltd v London Wharf (Limehouse) Ltd* [2003] 2 BCLC 153, in summarising his interpretation of previous decisions including *Kinsela*  (quoted above) and *Brady v Brady*  [1988] BCLC 20.   This latter was the case in which the principle was first expressly pronounced (by Nourse LJ), that the creditors' interests required to be considered when a company was "*insolvent or even doubtfully solvent*" (p 41i), because then *"the interests of the company are in reality the interests of existing creditors alone"*.       The word *"paramount"* was taken up from *Colin Gwyer* (above) by Norris J, without comment, in *Roberts v Frohlich* [2011] EWHC 257 (Ch).  It was also used by Mr John Randall QC in the *HLC Environment* case above, but in relation to a different point from that of Rose J's earlier noted criticism.

449. The Defendants dispute the word "*paramount*" if it is intended to suggest that recognition of the interests of the creditors requires the directors then to have regard to those interests alone, to the entire exclusion of the interests of the shareholders or others.  They urge in preference, the dictum of Lewison J in *Ultraframe  (UK) Ltd vs Fielding* [2005] EWHC 1638 at [1634], to the effect that the directors' duty to consider the interests of the company becomes

> "*extended so as to encompass the interests of the company's creditors as a whole, as well as those of the shareholders*"

450. They also point to the rejection of "paramountcy" as a general proposition in the Australian case, elsewhere often heavily relied on by the Plaintiffs, of *Bell v Westpac* [2008] WASC 239 (above): see [4438-9].   They submit that whilst directors should not act so as to leave creditors in a worse position than would a liquidation, honest attempts to save a business should not be judged by an overly strict standard, citing Hoffmann J (as he then was) in *Re Welfab Engineers Ltd* (1990) BCC 600  at 640C.

451.   *Welfab* is an interesting case in which the court took a sympathetic view towards directors of an ailing company which was under pressure from its debenture-holding bank to reduce its borrowings.   Without any bad faith, they had pursued the objective of selling the company  as a going concern in order to protect jobs (albeit including their own), and they were pursued – unsuccessfully - for misfeasance by the company's liquidator on the grounds that they could and should have sold the premises alone for a higher figure and thus realised more for the unsecured creditors.     Hoffmann J was of the view, first, that it was not the directors' duty to act as informal liquidators of the company and in effect set about a liquidation regime.   He also placed considerable weight on the imponderables which attended the course of action which the liquidators said should have been undertaken, coming to the conclusion that they meant that it was doubtful, even speculative, that the creditors would have been any better off if a different course had been pursued.   He held that in consequence the directors were not in breach of duty.    He would in any event have been willing to absolve the directors from liability for misfeasance on the statutory grounds (s 727 of the English Companies Act 1985) that they had "*acted honestly and reasonably and ought fairly to be excused*".    The Defendants submit that one can at least take from this case that it is acceptable to have regard to the interests of others and thus even shareholders, at least so long as the interests of creditors are not directly harmed.

452.   I generally prefer the submissions of the Defendants with regard to the weight to be given to the interests of creditors.   In my view, the English line of authority which proposes that the interests of creditors become "paramount" over-states the true position.   Even in English law, on closer review, there is a more fluid and fact-dependent approach than is implied by the absolutist connotations of the word "paramount".

453.   In the recent Supreme Court case of *Bilta* (above) the word "paramount" is not used; the word is "*proper regard*" (emphasis added).   The Plaintiffs submit (I think) that the "proper" regard referred to by the Supreme Court is in fact that of "paramount" regard.    With the line of authorities already in existence it would have been very easy to use that word if it had been intended, but, in any event, I do not think that the suggestion is correct.

454.   The chosen epithet of "proper" consideration imports the possibility of some degree of judgment of appropriateness according to circumstance.    Rose J in *BTI* (above) does not adopt the word "paramount" but leaves its application open at [462], where she says that the question is whether the requirement is

> "*to give paramount consideration to the interests of creditors or only to take their interests into account in some lesser way*".

It is right that at [483] she then refers to

> "*a situation in which the directors are required to run the company in the interests of the creditors <u>rather than</u> the interests of the shareholders of the company*" (emphasis added),

which appears to say that the creditors' interests displace those of the shareholders and is thus in effect saying that they are "paramount".   However, that was in the context of a finding that the creditors' interests duty, whatever standard it was, had not yet arisen in any event.   This dictum is thus *obiter* on the precise point, and in any event appears to me to be shorthand, rather than to be a carefully composed formulation of the relevant duty.

455.   In my judgment the principle, as it applies in Guernsey law is that once it is recognised that the company is "on the brink of insolvency", the directors' duty to act in the best interests of the company extends to embrace the interests of its creditors, and requires giving precedence to those interests where that is necessary, in the particular circumstances of the case, to give

proper recognition to the fact that the creditors will have priority of interest in the assets of the company over its shareholders if a subsequent winding up takes place.

456. I formulate the principle in this way to take account of differences, according to particular circumstances, in what it may be reasonable and responsible for directors to do when they find that the company is in a sufficiently weak financial situation that a conflict of interest between its creditors and its shareholders appears to arise.  The company is not – yet – in insolvent liquidation and remains under the management of the directors.  Their duty is to decide what is in the extended best interests of the company in the particular case.  It may well be that in some, possibly even most, situations, the company should thenceforth be run with regard to the best interests of its creditors alone, but that will not necessarily be true in all cases, and it is for that reason that I reject the word "paramount".

457. I agree with the Defendants that this possibility is apparently recognised in the English cases, such as *Facia Footwear Ltd v Hinchliffe* [1998] 1 BCLC 218.  It was there acknowledged that being on the brink of insolvency does not necessarily require immediate cessation of trade and realisation of the company's assets – probably at fire sale prices and therefore losses – and that attempting to trade out of difficulty may be an appropriate course for the directors to take, depending on circumstances.   The example in that case was that the directors honestly believed that, even though it carried some further financial risk, trading on provided a reasonable chance, and the best chance, of the creditors being paid in full rather than suffering losses.  This was held to be a view which could reasonably justify carrying on.

458. I agree with the view of the authors of *Gower's Principles of Modern Company Law* at 9-14 that the prospect, if bona fide and reasonably held, of the company returning to profitability and solvency may justify trading on, even though, if the interests of the creditors in being paid were the only thing to be taken into account, those would obviously be best advanced by simply liquidating the company immediately and realising its existing assets to pay them.  The propriety of any particular decision may well depend on the extent to which trading on would seem actually to harm the creditors' interests, as contrasted with merely not advancing them.   On any basis, though, the decision is fact-specific.  A balancing exercise has to be undertaken, and whilst the interests of the creditors will be of very great weight – and the more parlous the state of the company the greater that weight will be – they are not always and absolutely the only thing which the directors are obliged or entitled to take into account in deciding what to do in the then "best interests" of the company.

*Other aspects of "duty to creditors"*

459. Those are the two main issues between the parties with regard to this aspect of the duty of good faith, and I can deal briefly with the remaining points made on both sides.

460. The Plaintiffs emphasise that the extended duty of the directors is owed to the general body of CCC's creditors and prospective creditors as a whole; the directors can neither prefer specific classes of creditors, nor ignore them.

461. This proposition is certainly good at the level of individual creditors; it is obviously the directors' duty to be even-handed between such creditors.  It is no part of a director's duty to decide which creditors are more deserving of payment and it would no doubt be a wrongful preference if they did so: see eg the *HLC Environmental Products Ltd* case (above).

462. The main authority relied on by the Plaintiffs is *Re Pantone 485 Ltd* [2002] 1 BCLC 266, which was a case which sought to extend the directors' duty to have regard to the rights of creditors into having regard to the potential rights of creditors *inter se* in insolvent liquidation. The argument was advanced by the UK Revenue, who would stand as a preferred creditor in a liquidation, and would therefore take precedence over ordinary trade creditors.   This attempt was rejected by the court, on the legal grounds that the directors were not conducting a

liquidation, and were therefore concerned only with their duty to the amorphous "general body" of creditors and not with the special rights or priorities that would apply between any such creditors amongst themselves in a winding up.      This authority has no direct relevance in this case.   It supports only the proposition - which is not in dispute – that the duty to have regard to the interests of creditors is to have regard to the interests of the general body of creditors as an abstract class.

463.   However, it is pertinent to make the point that it is, in my judgment, the general body of the company's <u>unsecured</u> creditors as an abstract class.   I consider that this follows from the very reason for the interests of the "company's creditors" coming to the fore, namely that because it is in a parlous state, the company is trading at the risk of its creditors not getting paid.   It is therefore the creditors who are at such risk whose interests are to be protected, and they are the unsecured creditors.   Secured creditors - at any rate those with fixed security - are not at the same risk as unsecured creditors.   They have first call on their security whatever risks or actions the company takes and they have a degree of control through whatever powers of realisation their security confers on them.   This is the benefit as against unsecured creditors for which they have bargained, but it means that their interests are fully protected by their security as long as it is adequate.   This security is not being risked whether the company continues trading or does not, and the secured creditors' interests therefore do not require the protection of being recognised in the same way as unsecured creditors.   In my judgment, it is the interests of the general body of unsecured creditors (although of course this includes secured creditors to the extent of any unsecured balances) which are the object of the protection afforded by the duty imposed on directors of a near insolvent company to have regard to the "interests of creditors".

464.   This point is material because of the peculiar position of CCC's repo lender creditors.   The Plaintiffs have criticised the attitude shown in their evidence, they say, by Mr Conway and Mr Allardice in particular, towards CCC's repo lenders.   Mr Conway, for example, said that he thought that the repo lenders could "*look after themselves*".   The Plaintiffs have cited this as evidence of an attitude which was not consistent with a director's duty to have regard to the interests of his company's creditors.

465.   The Defendants appeared to submit, at least at one point, that although the repo lenders were treated as loan creditors - but secured loan creditors -  for accounting purposes, they were never (except at the very moment of a repo roll) actual creditors of CCC at all.   Between rolls, they had title to their securities and CCC currently owed them no money.   At best, therefore the repo lenders were contingent future creditors.   The repo (repurchase) contract gave them the right to demand the relevant payment from CCC on the specified date in the future and upon their performing their concurrent obligation to redeliver the securities.

466.   The Defendants submit, therefore, that, in fact, the only <u>actual</u> creditor of CCC at the material times (this must mean in general and ignoring any short term contractual debts created by margin calls) was TCG, by virtue of the unsecured subordinated loan of $100Mn which it made to CCC in August 2007 and which was later converted to a credit facility, as briefly mentioned above.   CCC had no trade creditors and no other ordinary creditors (such as utility or service providers).   The only other potential creditor was CIM for fees under the IMA, but no such fees were either demanded or owed during the relevant times.   The question whether the repo lenders were current, or only future contingent, creditors of CCC has particular materiality for applying the test whether CCC's directors ought to have concluded that CCC stood no reasonable prospect of not going into insolvent liquidation, discussed later.

467.   In fact, in closing submissions, the Defendants appeared to me to adopt the position that CCC's repo lenders were to be treated as currently secured creditors of CCC.   It may be that this concession is correct, as the repo transaction appears to resemble a security bill of sale transaction rather than an absolute transaction.   I note that CCC continued to receive the income on the relevant bonds, albeit the repo lender obtained sufficient title to the bonds to be

able to use them as security for its own shorter term repo borrowing transactions, usually of overnight duration, during the 30 day period of CCCs repo.  The precise legal analysis of a repo transaction at this level has not been investigated or argued in this case (although I certainly make no complaint about this).

468.   In the circumstances I will approach the matter on the basis that CCC's repo lenders did, indeed, obtain the transfer of title to the RMBS bonds in question by way of security only, insofar as that may be material, and for present purposes I will assume that they were creditors of CCC, but secured creditors.

469.   The second point, though, is that identifying the relevant group of creditors to whose interests CCCs' directors were obliged to have "proper regard" is actually of little consequence for deciding this case in practice.  If CCC's directors had no regard to the interests of <u>any</u> creditors, then any need to identify the proper composition of the pool of creditors entitled to the benefit of such regard would not arise, and the *Charterbridge* principle will apply.   The only potential materiality of the true composition of the pool of such creditors would be if it were shown as a fact, both that the Defendants <u>actually</u> had regard to a pool of the <u>wrong</u> (in law) composition, <u>and</u> that this mistake affected the decision which they made.   If it did not affect their decision, it is again, irrelevant.   If it did affect it, then it might render the subject decision a breach of duty - but then the *Charterbridge* principle would again apply.   Thus, any criticisms of the Defendants' conduct based on their views about consideration of the repo lenders' interests really becomes just another evidential point, going to inferences about the relevant mental state of any Defendant for any purpose.

470.   The Defendants' additional submissions, not already dealt with, are that the duty to consider creditors' interests, if triggered, remains a subjective duty, and that the court must be careful not to apply hindsight, citing Scott V-C in *Facia Footwear* (above).   Whilst they also emphasise his observations regarding (i) the difficulty there may be, at the time, of distinguishing between an acceptable entrepreneurial risk and an unacceptable risk which constitutes misfeasance: see [1998] 1 BCLC 218 at 228); (ii) the fact that being on the verge of insolvency does not inevitably mean that only a decision to cease trading is right (see above and *Facia Footwear* again); and (iii) the application of the objective *Charterbridge* principle in a case where it is found that the directors have given no actual consideration to the relevant creditors' interests: *Colin Gwyer Associates v London Wharf (Limehouse) Ltd* (above) at [87], these are points which I have already considered.   I accept all these propositions.

471.   Lastly, when considering any implications of this point, it needs to be firmly recollected that it is an aspect of the directors' fiduciary duties of good faith, which are duties which are owed to the <u>company</u>.   They are not even owed to the shareholders as such, even though the company's best interests may be seen to be reflective of the shareholders' interests: see the detailed analysis by Owen J in *Bell Group Ltd v Westpac Banking Corporation* 70 ASCR 1 at [4396]- [4422].   Although it may be helpful, as a broad approach, to think in terms of duties to shareholders and to creditors, that is only a crude analysis, and should not be allowed to obscure the fundamental philosophy.

**Other fiduciary duties:**

**2.      Duty to act for proper purposes/not to act for collateral or improper purposes**

472.   These are the opposite sides of the same coin and the Defendants accept that this is one of the recognised fiduciary duties of directors.  It has been touched on above, but I need expand on it a little.

473.   As indicated already, the "proper purposes" duty is traditionally treated as a separate head of duty from that of good faith, but its important focus is on *vires* rather than on loyalty.   The

directors' powers are, by definition, conferred upon them only for the purpose of acting for the proper purposes of the company, but what those purposes are is a matter of law, or mixed law and fact, and/or the construction of the company's memorandum and articles of association, and is not a matter dependent on the directors' opinion, although they may of course have to interpret those documents. Their honest opinion may go to their bona fides but it does not go to the issue whether they actually had power to do what they did, (apart perhaps from where they are clearly given some discretion expressly). This is why directors can be held not to have acted for proper purposes without any want of honesty or good faith on their part: see for example, *Howard Smith v Ampol* (above) in which, notwithstanding the bona fides of the directors, they were held to be in breach of the separate duty to act for proper purposes because the relevant power had been exercised for the purpose of encouraging a takeover bid which, it was found, did not (objectively speaking) "*involve any considerations of management within the proper sphere of the directors*" . The fact that the ambit of this duty is essentially one of construction of the instrument conferring the power was recently confirmed by the Supreme Court in the speech of Lord Sumption in *Eclairs Group Ltd v JKX Oil & Gas plc* [2016] BCC 79 at [30] – [31].

474. However, what will be the consequence of any determination that the directors did not, whether subjectively or objectively, act for the proper purposes of the company but rather for some collateral or (in context) improper purpose, depends on the nature of the case and the relief sought.

475. Whilst accepting the existence of the duty, the Defendants point out, citing the speech of Lord Wilberforce in *Howard Smith v Ampol* [1974] AC 821, that an issue to which this duty is relevant is often that of whether the directors' assertions of their motives for making the decision in question should be accepted. This, though, is the process of testing the directors' professed subjective *bona fides* by reference to objective circumstances. The courts are at pains to emphasise that that process does not involve the court either substituting its own opinion or judgment for that of the directors, or of questioning a decision bona fide arrived at.

> "……[I]t would be wrong for the court to substitute its opinion for that of the management, or indeed to question the correctness of the management's decision, on such a question, if bona fide arrived at. There is no appeal on merits from management decisions to courts of law: nor will courts of law assume to act as a kind of supervisory board over decisions within the powers of management honestly arrived at.
>
> " But accepting all of this, when a dispute arises whether directors of a company made a particular decision for one purpose or for another, or whether, there being more than one purpose, one or another purpose was the substantial or primary purpose, the court, in their Lordships' opinion, is entitled to look at the situation objectively in order to estimate how critical or pressing, or substantial or, per contra, insubstantial an alleged requirement may have been. If it finds that a particular requirement, though real, was not urgent, or critical, at the relevant time, it may have reason to doubt, or discount, the assertions of individuals that they acted solely in order to deal with it, particularly when the action they took was unusual or even extreme." ([1974] AC 821 at p832D-H,)

476. The parties are, I think, in agreement that if there are multiple purposes behind any particular decision, the test for determining the purpose for which the power to make that decision was exercised is by reference to the "substantial", "primary", or "dominant" such purpose. What is meant by a "primary" purpose may still be a matter of debate in the Supreme Court (see *Eclairs* above), a fact which itself illustrates just how rarefied discussions in this area can become. If I need to resort to distinctions at this level, I will refer further to any necessary authority at that point.

477. I observe here, though, that in *Eclairs*, after adverting to the practical difficulties and unreality of analysing a businessman's true state of mind by trying to single out the effects of any particular motivating factor, Lord Sumption suggested that the practical test was, rather, to look at it the other way, and ask whether the decision would still have been the same if the particular allegedly vitiating motivating factor had not been present. This is an approach which I find attractive. In the case of multiple alleged motivating factors, it may still leave room for refined arguments about the effects of combinations of such factors, but it seems to me that it is a good principle of common sense, at least from which to start.

478. Lastly, though, in view of some of the submissions made in the case, I would reiterate my comments as to how far the directors' fiduciary duty of good faith is tested objectively rather than purely subjectively which I considered above, in the particular context of whether the "Wednesbury" test applies, and of the approach to such objectivity in the Australian cases of *Bell Group Ltd (in liquidation) v Westpac Banking Corporation (No 9)* 2009 70 ASCR 1 and *Westpac Banking Corporation v The Bell Group Ltd (in liquidation) No 3* (2012) 44 WAR 1. These comments strayed into the relationship between the directors' duty of good faith and the particular duty to act for proper purposes. Now that I am considering this latter, it is appropriate to make clear here, at the risk of repetition, that in my judgment, there is no principle of company law, certainly in Guernsey law, that the directors' duty to act for the proper purposes of the company can found an argument that making "bad" commercial decisions is not in the best interests of the company and thus not for its proper purposes, and therefore is a breach of fiduciary duty. This is tantamount to arguing that a director has no authority or power to make a "bad" commercial decision, or else it is a back door method of making an appeal to the court from a management decision on its merits, and as such is simply <u>wrong</u>; see the citation from *Howard Smith v Ampol Ltd* at [1974] AC 823 at 832 (above). (Such an argument can be countered analytically by regarding the purposes of the company for which directors' management powers are conferred as being "to act in what they, as directors, bona fide believe to be in the best interests of the company", thereby removing any erroneous injection of an objective judgment.) The scope of the "proper purposes" duty is properly focused on matters simply of *vires* in the formal and structural sense, and does not extend into areas which are properly the province of the separate duty of skill and care.

## 3.    Duty to exercise own independent judgement

479. This duty is expanded as including (i) not to fetter their discretion in the exercise of their powers and (ii) not to abrogate their responsibilities. The Defendants admit the duty expressed in the main first limb above. The two further limbs in the expansion seem to me to be simply the articulation of different ways in which the main duty may be breached.

480. The Plaintiffs raise this issue particularly as regards the acts of the three Independent Directors, and their independent powers of oversight and separate approval.

481. The Plaintiffs submit (and I accept) that the broad principle behind this duty is that the company is entitled to the benefit of an actual and freely arrived at decision or judgement from those who are its directors. A director will therefore breach this duty if he merely does what he is told by others for whatever reason, or acquiesces without question or consideration in what he is asked to do or told by others. Directors have a duty to make a decision, and their own decision, on all matters where decision is required of them *qua* director. They have a duty, which the Plaintiffs rightly describe as an "irreducible" minimum, to oversee and keep themselves sufficiently informed about their company's affairs in order to do so.

482. However, in my judgment a duty to exercise an independent judgement does not mean a duty to act entirely alone, nor to act without taking into account any views expressed or even decisions which are made by his fellow director. A director must exercise his own judgement according to his own assessment of the facts but where, for example, a director

does not possess a particular expertise but is aware that one of his fellow directors does, there is nothing in this duty which obliges the first director either to make a decision without ascertaining the views of the expert director or without having regard to them, or to make himself a sufficient expert in the area that he can assess the opinions of the expert director from a position of expertise.   He must, of course, exercise the necessary degree of skill and care in assessing all relevant considerations which he does perceive, but if it is the case that more expert fellow directors propose or support a particular course of action, the non-expert director does not, without more, act in breach of his duty to exercise his own independent judgement because he is influenced by that fact.  This is always provided, of course, that he has weighed that fact critically, according to his own level of skill, expertise and general intelligent common sense, in permitting such influence.

483.   The real issue here is, once again not so much a matter of law, but a matter of whether the Plaintiffs plead and prove facts which amount to a breach of any such duty and, again, whether any such breach of duty as may be proved did in fact cause any identifiable loss to CCC.   It is thus fact-sensitive and no more need be said at this stage.

## 4.   Not to act in relation to the affairs of CCC in circumstances where there was an actual or possible conflict between their duties to CCC and their other duties or interests, including owed to TCG Holdings, CIM or other Carlyle Group affiliates, and to avoid such situations of conflict.

484.   The Defendants do not admit this duty in the form stated above, but do admit, in their Defences, that the Directors owed a duty to CCC:

> *"to avoid a situation in which [they] had an interest which conflicted or might conflict with the interests of CCC and to manage such conflicts or potential conflicts in accordance with CCC's Articles of Association".*

485.   The first piece of common ground is that both sides agree that the assessment of whether there is a material conflict of interest is an objective test.   Once again, the Plaintiffs therefore point out that this means that it is not necessary to make any finding of dishonesty in order to find a fiduciary party guilty of acting under a conflict of interest, citing *Regal (Hastings) Ltd v Gulliver* [1967] 2 AC 134 at 137.

486.   Once again, though, whilst this is no doubt true, it seems to me to be mostly of relevance in different situations from this case, such as where the issue is whether a transaction effected by the defendant director can or cannot be allowed to stand, or whether the defendant director should be obliged to disgorge the benefit of a transaction to the company, or possibly at the ultimate stage of an argument as to whether a director may be excused liability on the grounds that he acted "*honestly and reasonably and ought fairly to be excused*" see section 522 of the 2008 Companies Law.

487.   It is further common ground that a material conflict can arise as between either the fiduciary's duty and his personal interests ("conflict of duty and interest"), or duties owed by the fiduciary to two different principals ("conflict of duty and duty").  It is yet further common ground I think, (but I so hold if necessary), that in such latter situation the fiduciary must serve each principal "*as faithfully and loyally as if he were his only principal*" (Millett LJ in *Bristol and West Building Society v Mothew* [1998] Ch 1 at 19D).  I say "I think" because this pithy quotation is derived from a "double employment" case, namely that of a solicitor acting for two parties to a conveyancing transaction, rather than that of a director of two companies, although the Defendants appear to accept that the same principles would apply by analogy.

488.   The Plaintiffs suggested that there was a dispute as to whether the rule covered only actual existing conflicts of interest, or also possible or potential conflicts of interest.  However, I did not understand the Defendants to exclude mere potential conflicts.   As I understood their position, a potential or possible conflict was simply a matter to be weighed as part of all the circumstances, in considering whether there really was an active conflict of interest and duty.

489.   In practice, the difference between the parties is largely one of emphasis, arising out of their positions in this dispute.

490.   The Plaintiffs emphasise the strictness of the rule against acting under an apparent conflict, citing in particular the Singaporean case, *Ng Eng Ghee v Mamata Kapildeve Dave and others* [2009] 3 SLR 109, which gave three reasons for the rule, at [143] – [145].  These are

(i)     the need to "*extinguish all possibilities of temptation and to deter fiduciaries who may be tempted to abuse their positions*",

(ii)    the difficulties of  inquiring into either a person's state of mind or motives so as to ascertain whether an actual conflict of interest has occurred, and similarly,

(iii)   the practical difficulty of detecting actual conflicts of interest where a fiduciary is likely to be able to disguise these.

491.   In their closing argument the Defendants accept the basic principle of the "no conflicts" rule, dating back to as long ago as 1854: *Aberdeen Railway Co v Blaikie Brothe*rs  (1854) 17D (HL) 20, and being that

"....no-one having [fiduciary] duties to discharge shall be allowed to enter into engagements in which he has, or can have, a personal interest conflicting or which may conflict, with the interests of those whom he is bound to protect"

but they point out the qualification identified by Lord Upjohn in *Boardman v Phipps* [1967] 2 AC 46 at 124B that

"…. 'possibly may conflict' …. means that the reasonable man looking at the relevant facts and circumstances of the particular case would think that there was a real sensible possibility of conflict; not that you could imagine some situation arising which might, in some conceivable  possibility in events not contemplated as real sensible possibilities by any reasonable person, result in a conflict."

In other words, whilst accepting that the test is objective (see the words "or can have" in *Aberdeen v Blaikie,* above), their emphasis is that the appearance of a conflict of interest must be real and not fanciful.

492.   Whilst I acknowledge the reasons for the no conflicts rule, I am not over-impressed by the dramatic descriptions of it given in the *Ng Eng Ghee* case.  In my view the evaluation of a conflict or potential conflict of interest is amenable to the influence of common sense, as suggested by the Defendants.

493.   The written submissions by the parties contained much reference to the "director of two companies" or "double employment" situation which, as I mentioned above, arises frequently in cases of groups of companies.    The Plaintiffs refer to the dual involvement of, in particular, Mr Conway, in the running at Board level of both CCC and TCG/Holdings.

494.   The Defendants point out, and this appears to be correct, that there is no rule in English law, at any rate, that a person may not be a director of more than one company, even if both companies are in competition.  This supposed laxity in the rule has been criticised, and in this more modern day and age, and untrammelled by binding authority, it might be reconsidered.

However, this specific point has not been argued to apply in this case.    The only "competition" point which appeared to arise was the position highlighted in the CCC PPM and OM documents, that where CCC was investing in a particular asset and other Carlyle entities managed by CIM might also be investing in it, CCC would not get favoured treatment and its interests might even be apparently subordinated to that of the other entity.    That, however, is a different point from the present one.

495.   As far as I am aware it has never been suggested that the position in Guernsey law is or should be different from that in English law, and with the large part played in Guernsey's economy by trust and corporate services provision, it is reasonable that this should be so. Even in English law though (and it would therefore likely follow in Guernsey law) the rule is subject to the proviso, first, that the director who is in that position will have to arrange his affairs so as to enable himself to discharge his duties to both companies as loyally as if each was his only principal.  The burden of achieving this falls on him.   It is also subject to the further proviso that any such conflict may be properly avoided by the director's making full disclosure of the position, and obtaining the consent of each principal to his also acting for the other.    This proviso is no doubt the basis for the Defendants' formulation of the second limb of the duty as they would accept it, set out above.

496.   The Plaintiffs emphasise the point that the "no conflict" rule can be avoided, but only by informed consent being given.   They   observe that whilst CCC's Articles of Association permitted an interested director to vote upon any arrangement in which he or she had an interest (Article 120 (2)), this was always provided that the director complied with the duty of full disclosure expressly referred to in Article 120 (1).  In the absence of such full disclosure - which they say was not given in this case with regard to various competing personal interests or double duties - they say that the relevant director was obliged to abstain from voting or acting in the matter in which he was conflicted.   The Defendants, whilst maintaining that in fact there were no relevant conflicts of either duty/interest or duty/duty in this case, emphasise that a party cannot complain of such a conflict if he was aware of it when he appointed the relevant fiduciary to his position, that such consent to appointment in a conflicting role can be implied as well as express, and that that is plainly the position in this case as far as the "Carlyle" Defendants are concerned.

497.   I do not think I need recite any more of the supporting arguments on this point.   The dispute here is, once again, about the application of an accepted principle to the facts of this case, with the Plaintiffs, understandably, contending for a more broadly encompassing and more rigid approach than the Defendants agree is correct or appropriate.

498.   The Plaintiffs say that this duty is material because there was a conflict between the corporate and reputational interests of Carlyle and the personal financial interests of Mr Conway, Mr Hance and Mr Zupon on the one hand, and the interests of CCC on the other.   The interests of CCC required (they say) a *prompt restructuring* of its business, but the reputational interests of Carlyle and CIM, the corporate interests of Carlyle, and the personal interests of Messrs Conway, Hance and Zupon - in particular for there to be the most advantageous conclusion of the private sale agreement of TCG shares to Mubadala - all conflicted with this, and effectively made them wrongfully cause CCC to continue too long with "business as usual", so as not to jeopardise these other interests.   The allegation by the Plaintiffs is that the decisions taken by the Defendants after July 2007 in pursuit of what they have termed (but the Plaintiffs say, colourably and opportunistically) their "capital preservation strategy" for CCC, were not dictated by any real consideration of the  best interests of CCC including also the interests of its creditors, but by the conflicting interests of Carlyle, CIM and those three individual Defendants, with Mr Conway in particular effectively dictating such alleged "strategy" to the other directors.   These are allegations of fact, therefore, to be considered later where appropriate.

499.   However, this allegation by the Plaintiffs eventually became extended to assert that those Directors who, the Plaintiffs complain, had such conflict of interest should have abstained from acting in the decisions complained of.   The purpose of this allegation is mysterious, since it must involve an implied allegation that the decisions complained of would have been different if that had happened, in order to found an assertion of loss.   That is the only logically available causal link between the alleged breach of duty and loss, proof of which is necessary to complete a cause of action.   No such allegation is made, however, so far as I can see. This particular legal dispute about the scope of the "no conflicts" duty therefore appears to be another inconsequential diversion, in practice.

**(b)     Duty of Skill and Care**

500.   The Plaintiffs primary case against the Defendants, they say, is for breach of one or more of the Defendants' respective fiduciary duties.   However, in the alternative they rely on breach of the Defendants' respective duties to carry out their functions as directors of CCC with proper skill, care and diligence.

501.   It is of course common ground that there is such a duty and the formulated standard of care is also common ground.   It is that of a reasonably diligent person having both (a) the general knowledge skill and experience that may reasonably be expected of a person carrying out the same functions as those of the relevant director with regard to the company and (b) the actual knowledge skill and experience of that director: see *Re d'Jan of London Ltd* [1993] BCC 646 at 648B per Hoffmann J).   It is further common ground that this is therefore a combined objective and subjective test, and that the subjective element is capable of raising, but not lowering, the standards to be expected of an individual director.

502.   However, the Plaintiffs submit that this second, subjective element is capable of imposing a higher standard of care on a Defendant who had particular capabilities, qualifications or responsibilities within CCC (emphasis added).   They suggest that Mr Hance and his position as Chairman is an example.   They cite *Re Barings plc; Secretary of State for Trade and Industry v Baker* [1998] BCC 583 per Scott V-C at 586E:

> *"….the higher the office within an organisation that is held by an individual, the greater the responsibilities that fall upon him"*

503.   I disagree, and the citation does not support the proposition.   It is talking about the scope of the responsibilities which the individual director has undertaken, not the standard to which he must perform them, still less the subjective element of that standard.   The subjective element of the standard test refers to the particular attributes which a director is expected to bring to the Board for the benefit of the company and a "responsibility" is no such thing.   Particular responsibilities within CCC simply impose upon the relevant director the duty to discharge those responsibilities, assuming that they are undertaken as a director, in accordance with the standard of care to be expected of a director in general, and himself in particular, performing such functions.

504.   The Plaintiffs also submit that whilst the application of the duty of care may differ as regards the particular function of a director, in this case the formal designation of directors as either executive or non-executive is a matter of form and not substance and is to be ignored.   They further submit that the designation of the Fifth to Seventh Defendants as "independent" directors likewise carries no weight in their favour, as their function was, it is submitted,"far from merely supervisory", bearing in mind their special powers and functions as CCC's Audit Committee.

505.   I agree, but I do not understand these points to be particularly contentious.   It seems to me that each director's position is to be looked at according to actual factual circumstances, whatever his title may have been.   I will proceed on that basis.   It leads to the next point.

506.   It is common ground that the scope of the duty and whether or not it has been duly performed by the particular director depend on the facts.   The Plaintiffs mention five factors which they submit are material.   The first four of these are:

   (i)   the particular role of the director in the governance and management structure of the company,

   (ii)   the particular skills which he has or has held himself out as having,

   (iii)   his level of remuneration, and

   (iv)   the size of the company and the nature of its business.

507.   I do not understand these to be in dispute.   The Defendants themselves cite the first.   The second is the acknowledged subjective standard of a director's duty of care.   It did not seem to me, in practice, to feature greatly in the Plaintiffs' propositions, although at one stage it seemed that it might figure in a line of criticism as to Mr Stomber's experience and expertise in dealing in floating rate RMBS as contrasted with purely fixed rate securities.   However, this did not ultimately appear to be persisted in, and I do not think it had even been pleaded.

508.   There was no submission, argument or investigation of the third factor, ie the level of remuneration of any of the Defendants and I assume from this that there is no contention that this affected the standard of care to be expected from any of them.   The fourth factor is obvious and needs no comment.

509.   The fifth factor is:

   (v)   the circumstances of the company at the time of any alleged breach.

   Whilst I accept that this is a factor going to liability, it does not seem to me to affect the standard or scope of the director's duty of care, so much as what action is appropriate to discharge it.   Once again, I do not think this is in dispute, but it really does no more than state the obvious, namely that the director's duty is to exercise due skill, care and diligence according to all the circumstances of his action or decision.

510.   The Defendants, whilst not disputing the above, stress, firstly, that the courts have been assiduous to pay due respect and regard to the fact that directors are charged with making decisions, and they do so in the context of the facts as they appear at the time.   The skill, care and diligence of their acts are therefore to be judged without the benefit of hindsight.

511.   They go on to submit, though, that the test for whether there has been a breach of duty is a "*high one*": see the Court of Appeal in *Optaglio Ltd v Tethal* [2015] EWCA Civ 1002.   It is that a director will be in breach of his duty of skill and care only if the court is satisfied that <u>no</u> reasonably diligent director with the material degree of knowledge, skill and expertise could have acted in the way in which the particular defendant director did act.   They cite *Roberts v Frohlich* [2012] BCC 407 at [108] for both propositions.   The point is that the court must be satisfied that the decision complained of went beyond a mere error of commercial judgment.

512.   I accept these propositions.   The Plaintiffs' case has always been, on this score, that the decisions of which they complain with regard to the conduct of CCC's business from July 2007 were so obviously "wrong" as to go beyond mere errors of judgment.   They were either improperly motivated or negligent, and in fact, grossly negligent.

513.   The Defendants also submit that mere risk-taking is not negligence in the context of judging commercial decisions (again citing *Roberts v Frohlich)* because risk-taking is part of business activity; indeed the correlation between risk and reward in commercial activity has been

alluded to frequently in the evidence, especially the expert evidence, in this case.        This means that the mere fact that loss has been suffered is not, *per se*, evidence of negligence.

514.    Finally, the Defendants submit that the issue of whether negligence has been proved is very much fact-dependent and they warn against seeking to construct principles or rules of law from the facts of any particular authority.   They remind me of the well-known passage in the judgment of Jonathan Parker J in *Re Barings plc (No 5)* [1999] 1 BCLC 433 at 489a-c:

> "*In summary, the following general propositions can, in my judgment, be derived from the authorities to which  I was referred in relation to the duties of directors:*
>
> (i)     *Directors have, both collectively and individually, a continuing duty to acquire and maintain a sufficient knowledge and understanding of the company's business to enable them properly to discharge their duties as directors.*
>
> (ii)    *Whilst directors are entitled (subject to the articles of association of the company) to delegate particular functions to those below them in the management chain and to trust their competence and integrity to a reasonable extent, the exercise of the power of delegation does not absolve a director from the duty to supervise the discharge of the delegated functions.*
>
> (iii)   *No rule of universal application can be formulated as to the duty referred to in (ii) above.   The extent of the duty and the question whether it has been discharged must depend on the facts of each particular case, including the director's role in the management of the company.*"

Again, I accept these general propositions and do not understand any of them to be in dispute.

515.   The Plaintiffs rely, in particular, on the first of these factors in their claims against Messrs Allardice, Loveridge and Sarles, complaining that they took too passive a view of their roles and regarded these as mere oversight and supervision, failing to inform themselves adequately and to acquire a sufficient knowledge of CCC's on-going affairs and state of business such that they failed to discharge their duty of care.   This is, of course, a fact-dependent allegation, and I will consider it in due course where necessary and in context.

**Particular points regarding duty of care:**

*(i)    Gross negligence*

516.   As will by now be apparent, the Plaintiffs face the fact that the Defendants may have the benefit of exoneration and indemnity provisions in CCC's Articles of Association.   These do not, however, cover "gross negligence", and the Plaintiffs do assert that the matters of their complaints can be classified as such.

517.   The Plaintiffs stress – and this is obviously accepted – that negligence and even gross negligence does not involve *mala fides.*      They also submit, rightly, that the difference between gross negligence and ordinary negligence is one of degree and not kind.   Whilst they cite external authority for such propositions, I think the matter is neatly encapsulated in the implicit approval of the Guernsey Court of Appeal in the recent case of *Investec Trust (Guernsey) Ltd v Glenalla Properties Ltd*  (2015)(Guernsey (CA)  Judgment  No 35/2015) at [118]-[119] of the dictum that

> "*gross negligence meant a serious or flagrant degree of negligence, not equating with reckless or intentional fault or the like*".

Thus, distinguishing "gross" negligence from "mere" negligence is a matter of degree. "Gross negligence" is simply extreme or egregious negligence.   Figuratively and

colloquially it is jaw-dropping negligence.   Whilst it does not equate with recklessness, it is of a quality which is well on the scale towards it.

*(ii)    Delegation*

518.   It is common ground that a director is generally entitled to delegate his functions, to some degree, although he cannot delegate his "irreducible minimum" duty to oversee and monitor the affairs of the company even in areas where he may permissibly have delegated particular functions.    It is also common ground that the permissible degree of delegation in any situation is fact-sensitive.   The court will determine the dividing line between (in effect) permissible efficiency and impermissible abdication of responsibility.   The dispute between the parties is thus, once again, a fact-dependent matter to be considered later in the context of the material evidence.

519.   It suffices to note here that the Plaintiffs stress the persistence of a director's duty of oversight and supervision, which itself has to be performed with the requisite degree of skill and care. This is particularly pertinent (they say) to their complaints against the Independent Directors.

520.   They also submit that the degree of delegation and reliance upon management that is permissible is significantly less when the company is "on the brink of insolvency" than otherwise, such that the Defendants' obligation to examine, test and satisfy themselves about the appropriateness of any particular course of action was "heightened" .   However, it seems to me that there is no rule of law to this effect, and where it may appear to be the case on any particular authority, this is really the result of the application of the ordinary director's duty of care to a perilous factual situation. It is also largely stating the obvious.

521.   The Plaintiffs also submit, under the general aspect of "duty to supervise", that the Defendants ought to have sought professional advice and guidance at various times from August 2007 onwards, and that their "*decision not to do so*" (although I am not sure that there is any evidence of any actual such decision) was a breach of their duty to CCC.    Once again, if this is being advanced as a proposition that it is a rule of law regarding a director's duty of care and skill, that he should seek insolvency or other advice in such circumstances, I reject it as too prescriptive.  Although it is a proposition included in the Plaintiffs' section of argument on legal principles, I think it is again just an aspect of the evidence in any specific case.

522.   The law does not lay down particular steps that a director must take to discharge his duty of care.   Rather it sets a general standard of care and diligence against which the director's conduct in any particular case is to be measured.   Of course if directors do take, and follow, relevant expert professional advice, that may go a long way towards demonstrating that they were not in breach of a duty of care to the company.   Indeed it may even be decisive in their favour.  It does not follow, though, that the converse is the case, and that if they did not do so, they were in breach of their duty of care.   Indeed a relevant factor may well be whether the taking of any professional advice would be likely to have produced advice to take any different course from what they did.

523.   The Defendants make some more general submissions on the topic of delegation, and the related topic of reliance on others.    They first submit that it is a general principle that directors are entitled to regard information provided to them by fellow directors and management as accurate unless there are reasons to doubt it.   They cite the observation of Romer LJ in *Re City Equitable Fire Insurance Co Ltd* [1925] Ch 407 at 429 that

> "*Men in responsible positions must be trusted .... until there is reason to distrust them.*"

and they note that Hart J said in *Re Landhurst Leasing plc* [1999] 1 BCLC 286 that this is taken to mean that

> *"a director may rely upon his co-directors to the extent that (a) the matter in question lies within their sphere of responsibility given the way in which the particular business is organised and (b) that there exist no grounds for suspicion that that reliance may be misplaced."*

524. I accept this proposition subject to the qualification that the director must examine the situation sufficiently rigorously and critically as to satisfy himself that there are no matters giving grounds for caution, enquiry or suspicion.  He should be considering whether any questions, particularly awkward ones, require to be answered.  It seemed to me that the Defendants also accepted this qualification.

525. The Defendants submit similarly that a director is entitled to rely upon the advice of fellow directors and management in areas in which those other directors, or management, may be reasonably seen by the director to have greater skill, expertise or knowledge than he does himself.  They refer me to the decision of Park J in *Re Continental Assurance Co of London* [2007] 2 BCLC 287  at [399] – [401] when considering a submission that non-executive directors should have intervened more forcefully in regard to the preparation of the company's accounts:

> *"I accept that one of the duties of non-executive directors is to monitor the performance of the executive directors.  I accept that the managing director of a company ... has a general responsibility to oversee the activities of the company, which presumably includes its accounting operations.  But I do not think that those responsibilities can go so far as to require the non-executive directors to overrule the specialist directors, like the finance director, in their specialist field. The duty is not to ensure that the company gets everything right.   The duty is to exercise reasonable skill and care up to the standard which the law expects of a director of the sort of company concerned and also up to the standard capable of being achieved by the particular director concerned....."*

526. They submit that a director is not obliged to supervise every aspect of his delegate's activity, nor to be responsible for day-to-day management decisions. What is reasonable in the circumstances will depend upon how the particular company's business is organised and the part that the director could reasonably have been expected to play (*per* Hoffmann LJ in *Bishopsgate Investment Management Ltd v Maxwell (No 1)* [1994] 1 All ER 261 at 264).

527. Once again, the difference between the Plaintiffs and Defendants is that the former stress the limits on the ability of a director to delegate and the extent to which he may permissibly rely upon others, whereas the Defendants stress the extent of the permissibility of so doing, the law's recognition of the possible impracticalities and unreasonableness, in the modern world, of demanding that every director have full and equal knowledge of all aspects of a company's business, and that what is reasonably required of any particular director as regards informing himself of the company's affairs, relying on others, or supervising the performance by others of the company's activities depends on the particular facts and circumstances.

528. I prefer the Defendants' approach, but it does seem to me that it includes, with appropriate room for judgments of fact and degree, all the aspects of a director's duty which the Plaintiffs seek to stress.

*(iii)     The Importance of Board Meetings and Informed Deliberation - Duty to hold Board Meetings.*

529. One last matter has been the subject of particular emphasis by the Plaintiffs and it merits individual mention. This is because, in my judgment, it illustrates the dangers of focusing too closely on criticism of individual aspects of directors' conduct rather than having regard to an overall view of that conduct as a whole. It is the holding of Board Meetings, and the Plaintiffs' allegation that CCC's board was "dysfunctional" because they say it did not hold enough of them.

530. The Plaintiffs submit that having regard to the directors' "*collegiate and collective responsibility*" (per Woolf MR in Re *Westmid Packing Services Ltd* [1998] 2 All ER 124 at 130A) to manage the affairs of a company, the holding of regular Board meetings is of vital importance, because it is this which provides "*the mechanism for collective deliberation and informed decision making*." Whilst accepting that the frequency with which Board Meetings ought to be held depends on the circumstances, the Plaintiffs submit that CCC's Board met only infrequently (it was intended to be once every three months, in July, November, February and May, although there was an exceptional emergency Board meeting in August 2007), and that at the material times this was not frequently enough.

531. This is alleged by the Plaintiffs as a discrete breach of duty on the Defendants' part, although I think put on the basis both of breach of fiduciary duty and as an aspect of breach of duty of care. They submit that the reason for the requirement of Board Meetings is to enable actual deliberation between the directors to take place, so that a requisite "meeting of minds" (which I will call a "consensus") of the Board can take place. The authority cited in support of this is *Re Bonnelli's Telegraph Co* [1871] LR 12 Eq 246 at 258.

532. 1871 was well before the invention of email and even the general use of the telephone. Nothing more modern is cited except for a reference to such a consensus being described as "essential" in the *Bell (No 9)* case (above: (2008) 70 ACSR 1) at para [5587-9]. However examination of the facts of that case shows that the issue there was whether the minutes of a board meeting were accurate and, in that context, what were the requirements for a "meeting" where, under Australian law at the time, a valid Board resolution could only be made at and by a "meeting". Thus the particular point was not directors' liability for breach of duty but, once again, the validity (and thus the effectiveness) of an apparent act of the board. Of course if the law lays down that certain acts of a board of directors have to be effected by resolution at a meeting in order to be valid, then the directors have, in practice, a duty to hold such meetings in order to carry on the business of the company lawfully and effectively. However, that is not the same thing as saying that there is a general duty to hold meetings as part of a duty of care in conducting the business of the company.

533. In my judgment, apart from any legal requirement of an actual meeting either under statute as above or to comply with the company's articles of association, there is no legal requirement to hold meetings, even though it will be common practice and probably most efficient to do so. Any suggested "rule" that the holding of meetings is part of a director's duty of care (or fiduciary duty) is simply expressing a facet of the directors' duty actively to join and participate in the conduct of the company's affairs as entrusted to its board. Holding meetings is not an end in itself. It is a means to an end, namely the arrival at considered and appropriate decisions on relevant aspects of the conduct of the company's business by those to whose charge it is confided.

534. Of course if something has gone badly wrong in the event, then a subsequent investigation into the reasons for this, and the question of any liability of the directors, will involve a review of any meetings of the board, and of course lack of such meetings may be evidence from which it can be inferred that the directors did not give sufficient, or sufficiently conscientious, regard to the company's affairs. However, that is, once again, an evidential point only and not a substantive one. Indeed, in a time of crisis, it may be that devoting the time and attention of the directors to the holding of meetings for collective deliberation purposes, rather than carrying out other actions to run or save the company, is not even in the

company's best interests, because it would be a diversion.   It might even be that in such a case the holding of meetings was more in the personal interests of the directors themselves, to protect themselves from potential future criticism, rather than in the best interests of the company with urgent needs of the moment.   This illustrates that the convening of board meetings is a tool, to be deployed appropriately to the circumstances, and the effects of holding or not holding meetings must be judged in the context of those circumstances.

535.   The Plaintiffs' proposition that there is a duty to hold board meetings (and to do so with increasing frequency if and as the company's financial position deteriorates) is said to arise from the "collegiate and collective responsibility" to hold deliberations for decision making purposes.   However, this proposition requires closer examination.

536.   First, and as is common ground, the duties owed by a director to the company are owed individually, and not jointly or collectively.   It follows that the essence of the duty has to be something which can be carried out by an individual.   Translating an alleged "duty of collegiate deliberation" into practical fact comes down to an acknowledgement  that part of the duty of exercising independent judgement and understanding the company's business involves reception and discussion of the views of one's co-directors as relevant material. Attendance at convened meetings of the directors may well be the most efficient way of achieving this, but it is not necessarily the only way, and it seems to me that an individual director may well be able to fulfil his duty in this area, at least some of the time, by other means.   This will depend on his role in the company, the governance structure and systems of the company, and the availability both of company lines of communication and modern methods of communication.

537.   I would therefore describe the individual director's duty in this regard as being a duty to gain and maintain a sufficient understanding of the company's business and to inform and keep himself informed as to the surrounding facts and circumstances of such business, sufficiently to enable himself to participate effectively in the making, together with his co-directors, of such decisions as the board is required to make, in whatever manner is effective, and in accordance with his own role in the company's governance and with the effective deployment of the skill-sets which are distributed amongst its board.

538.   Second, and leading on from this, the "consensus" at which the board is required to arrive with regard to a board level decision is a consensus as to the course of action which the company should take, and not a consensus either as to reasoning or as to the reasons (slightly different), for doing so.        Different members of the board may well reach the same conclusion as to what is best for the company, for different reasons.   Coincidence of thought is not a requirement.   They do not have to agree on the reasons for an agreed decision as long as the result is agreed.   An obvious example is that the expert director may propose a course of action because of a judgment arising from his own expertise, and the non-expert director in that field may reach the same conclusion because he sees no reason to doubt the reliability of the propositions put forward by his fellow expert director.   In the general case, unanimity of the board is not even a requirement.   A valid board decision may be arrived at by a majority vote - a consideration which makes it quite obvious that the "consensus" will then be confined to agreement as to what the company will do in all the circumstances, including the division of opinion and the effect of the vote.

539.   Third (a point for later, but leading on from both of the above points,) bearing in mind that liability is individual, but that a board decision is collectively taken, it becomes apparent that the liability of a director for any breach of duty is dependent both on his having been in breach of his own duty and also on that breach of duty having been causative of the actual collective decision taken, because it is this last which has caused the company the loss.   Thus, the personal liability of an individual director in respect of any decision or action may well be highly fact-sensitive as to the part he played or ought to have played in the taking of the decision or action.   To illustrate, if a decision is made which turns out to be catastrophic, but

six out of seven of the directors are found to have taken it in good faith and without negligence, then the fact that one director was in clear breach of duty through having failed to read the papers or think about the company's interests is immaterial. *Ex hypothesi*, the decision which he made or subscribed to was a decision which *some* reasonable directors could have made.  On an alternative, and probably preferable, view, his breach of duty caused the company no loss.   On the other hand, if the director was in breach of duty because he failed to disclose a material conflict of interest which, if he had done, would have caused his co-directors to take a different decision, then he and he alone will be liable as the other directors were *ex hypothesi* not in breach of duty on the facts reasonably (it is assumed) known to them.

540.   In my judgment it is apparent from the above that the great range of the nature of decisions, how they were taken, business circumstances, corporate governance systems, directorial roles and individual skills which directors may be required to use, produces so many permutations of where liability may or may not come home that it is unfruitful and of little utility to attempt to formulate abstract "rules" that any particular aspect of conduct in regard to a director's participation in the decision making process is a definite, or even a likely, element of culpability, and I will not be taking such analysis any further.   I will consider such matters as the impact of holding or not holding board meetings simply as part of the factual matrix going to any alleged breach of duty, applying the broad proposition which I have formulated, and the logical considerations, mentioned above, as appropriate.

*(iv)    No business judgement rule*

541.   Lastly, the Plaintiffs make the point that there is no "business judgement rule" either in Guernsey or in England, in contrast to other jurisdictions.

542.   I understood this submission to be made in refutation of a supposed defence with regard to the claim for breach of the duty of care, but I note that the Plaintiffs interpret it as being raised in relation to fiduciary duties, either alone or as well.   This appears to arise from the *Colin Gwyer* case (above), where it actually seems to me to be difficult to decide which duty the court was relying on; Mr Kosmin QC simply seems to have found on the facts that the director's failure to inform himself at all of the facts which would enable him to form a judgement as to what were the best interests of the company was so obvious, that it was clearly a breach of duty on any basis.

543.   In fact, I accept the Plaintiffs' submission, as I think the Defendants do as well, but there seems to me to be nothing in the point.   I will not be examining its application in other jurisdictions, but my impression is that the "business judgement rule" is simply shorthand for the principle that the court will pay respect to the decisions of directors honestly and conscientiously arrived at, and will not substitute its own judgment as to the rightness or wrongness of the decision, absent some vitiating factor which can be classified as breach of fiduciary duty or negligence.   Guernsey law may not recognise an express "business judgement rule" but it recognises all the features which would feed into any such shorthand rule in other jurisdictions.   For my purposes the exercise is to consider and apply the appropriate constituent elements of liability (or not) in Guernsey law.   Whether or not they can compositely be referred to as a "business judgement rule" is immaterial.

**(c)    The practical relationship between the fiduciary duties and the duty of skill and care.**

544.   As a final point, it is helpful to strip away all the refinements of the legal analysis above, and summarise the practical relationship between these two categories of directors' duties.   The core fiduciary duty, the duty of good faith, is a duty of loyalty.  It is performed primarily and centrally by subjective honesty and conscientiousness, but if it is not so performed, it will still be discharged if the material decision or action is objectively within the range of decisions or actions which a reasonable and competent director acting in good faith could have made or

taken in all the circumstances pertinent to the relevant director and decision.  This is the *Charterbridge* principle.  The "own judgement" duty and the "no conflicts" duty, although sufficiently individual in their content to be separately identifiable, are really particular sub-categories of the duty of good faith.

545.   The "proper purposes" duty is slightly different in that its scope is objectively defined rather than subjectively defined, and it can therefore be breached despite the director's acting in perfect good faith.  However, where "proper purposes" is really just a synonym for the best interests of the company itself, this duty is either co-extensive with the duty of good faith or, in effect, a sub-category of it.   It is dangerous and liable to lead to confusion not to recognise this difference, and thereby to assume that tests for the application of the proper purposes duty can simply be transferred or implied into the application of the duty of good faith.     The consequences of the difference between the two duties mainly arise with regard to issues about the formal validity and legal effectiveness of decisions or actions (not the subject of this case) rather than claims for damages for breach of duty.   Once again, though, this duty will be discharged if the material decision or action is objectively within the range of decisions or actions which a reasonable and ordinarily competent director acting properly could have made or taken in all the circumstances pertinent to that director and decision.

546.   The duty of skill and care is an objective duty to perform all directorial acts in relation to the company with the skill and care objectively to be expected of any ordinarily competent director of such company performing the role ascribed to the particular director, but also, if applicable, to any higher standard reasonably to be expected of a director with such enhanced skills, knowledge or expertise as the particular director actually possesses.   There is apparently no express authority as regards this latter qualification in Guernsey law, but it evolved in English law as a matter of interpretation of basic principle, and I am therefore satisfied that this must apply similarly in Guernsey law.  Once again, however, there will be no liability if the material decision or action is objectively within the range of decisions or actions which any reasonably competent and careful director could have made or taken in all the circumstances pertinent to that director and decision.  This is because the actual decision or action would then have caused no damage to the company, as contrasted with there having been no breach of duty, and the suffering of damage is a requisite of the cause of action itself.  The test is thus materially the same as the *Charterbridge* principle.

547.   As a matter of practicality, therefore, if any decision or action by a director is challenged, the most economical approach to determining the issue of liability is to apply the *Charterbridge* principle first, because it is only if the decision or action fails on this test that it is necessary to decide whether, on the facts, it was actually the product of a breach of any aspect of the director's fiduciary duties - or indeed of the duty of skill and care, although plainly in that case such a finding is likely to flow from the first point.

**(2)     What is "insolvency"?**

548.   It is necessary at some stage, - and the point of moving on from directors' duties to liability for wrongful trading is as good as any, - to deal with a further and fairly basic dispute of law between the parties, namely what was the test for insolvency in Guernsey law, at the time with which this case is concerned, ie under the 1994 Companies Law?

549.   The point is material, first, to the application of the issue discussed above as to the scope of a director's duty to have regard to the interests of the company's creditors, and second, in regard to wrongful trading, where there arises the question whether the directors of the company ought to have seen that there was no reasonable prospect of the company's avoiding insolvent liquidation.     The Plaintiffs also submit that it is material to the "propriety (reasonableness or rationality) or otherwise" of the Defendants' continued operation of CCC in the manner which they deprecate, but I do not see this adds anything to the two points above.

550. Although the word itself does not appear in the legislation, the question what is "insolvency" for present purposes is a matter of the true construction of ss. 94(e) and 95 of the 1994 Companies Law.

551. It is important to bear in mind that this point is now historic.   The test for a company's insolvency under the 2008 Companies Law is contained in ss 407 and 527, and has been modified such that the discussion which follows no longer arises today.

552. Section 94(e)of the 1994 Companies Law says that

> *"A company may be wound up by the Court if the company is unable to pay its debts."*

and under s.95 a company is

> *"…..deemed to be unable to pay its debts if –*
>
> *(a)   a creditor to whom the company owes a sum exceeding £750 then due has served on the company through the office of the Sergeant at the company's registered office a written demand for payment, and*
>
> *(b)   the company has, for a period of 21 days immediately following the date of service neglected to pay the sum or to secure payment to the reasonable satisfaction of the creditor;*
>
> *or  it is proved to the satisfaction of the Court that the company is unable to pay its debts."*

Thus, there is provision for a statutory demand, failure to comply with which suffices as proof that the company is "unable to pay its debts", but that situation can also and alternatively be proved by any evidence which satisfies the court of that proposition, on the usual evidential tests.     The statute itself gives no further guidance as to what is meant by the state of being "unable to pay its debts".

553. The Plaintiffs submit, referring principally to *BNY Ltd v Eurosail*  [2013] 1 WLR 1408, *Bucci v Carman (Liquidator of Casa Estates (UK) Ltd)*  [2014] EWCA Civ 383, and latterly *In re Weavering Macro Fixed Income Fund Limited (in liquidation)*  (18th November  2016: Cayman Island Court of Appeal CICA No 2 of 2016) as well as Goode: *Principles of Insolvency Law* (4th Ed 2011) at paras 4-16 and 4-23, that being "unable to pay its debts" requires taking into account not only the present debts of the company, but those which will, or are likely to, fall due in the reasonably near future.   They submit that this test is properly described as being whether a company can pay its debts "as they fall due".   They submit that this entails looking at the ability of a company to pay its debts falling due in the "reasonably near future" as well as the present.   They go on to submit that whilst looking at the "reasonably near future" requires looking at commercial realities and is a matter of fact and circumstances, the appropriate period in this case is a period of twelve months looking forward, based on evidence of CCC's own forward projected planning and general accounting and regulatory standards.

554. The Defendants submit that this interpretation is wrong at the outset.   Sections 94(e) and 95 say nothing about debts "as they fall due" and the statutory words are merely the bald test that the company is "unable to pay its debts".     That test, they submit, is only whether the company is able to meet its liabilities which are actually due, and it is not concerned with future or contingent debts.     Whilst this may not be in accordance with the tests in other jurisdictions – and indeed Guernsey law has now been amended, in the 2008 Companies Law at ss 407 and 527(1)(a), to correspond largely with the present test in English insolvency law -

this court is concerned with construing the 1994 Companies Law, which was applicable at the material time for this action.

555.   The Defendants point out that in *BNY v Eurosail* (above) the Supreme Court (Lord Walker) noted the history of the English authorities on equivalent statutory provisions, the first of which was the Companies Act 1862 s 80(4).   This contained the same wording as the 1994 Companies Law of Guernsey, ie

> "….*proved to the satisfaction of the court that the company is unable to pay its debts.*"

556.   This provision was interpreted as referring to "*debts absolutely due*" by James V-C in 1869 in *Re European Life Assurance Society* (1869) LR Eq 122, and this was in turn summarised by Nicholls LJ in *Byblos Bank SAL v Al-Khudhairy* [1987] BCLC 232 at 248 as meaning debts *"for which a creditor might demand immediate payment"*.   Briggs J in *Re Cheyne Finance Plc (No 2)* [2008] BCC 182 at [31], described this as debts "*actually due*".

557.   In 1907, subsequently to James V-C and the *Re European Life Assurance Society* decision, s 28 of the English Companies Act 1907 introduced an addition to this basic wording, by adding

> *"and in determining whether a company is unable to pay its debts the court shall take into account the contingent and prospective liabilities of the company".*

This was the wording used in all successive English Companies Acts up to and including s 518(e) of the Companies Act 1985.   However, in s. 123(1)(e) of the Insolvency Act 1986, this test was revised to be "*unable to pay its debts <u>as they fall due</u>*" (emphasis added), and the additional words previously added and quoted above, were transferred to a second and separate test in s. 123 (2) of the Act, which provided that a company should also be

> "*deemed unable to pay its debts if it is proved to the satisfaction of the court that the value of the company's assets is less than the amount of its liabilities taking into account its contingent and prospective liabilities".*

558.   In examining s. 123 in *Eurosail,* Lord Walker, at [25], characterised the words "as they fall due" in s.123(1)(e) as *"words which look to the future as well as the present".*   The Defendants stress that Lord Walker was concerned, in *Eurosail*, with the English legislation, and whilst the Companies Law 2008 of Guernsey is now in similar terms, it was not in force at the material time.   Consequently the test for insolvency under the 1994 Companies Law remained that of being "unable to pay its debts" in unvarnished terms.   It therefore referred to actual debts currently due, with no forward looking considerations.

559.   The Plaintiffs argue that Lord Walker in *Eurosail*  (above) also said at [37] that the words "as they fall due", introduced by the 1986 Act, did not connote any change in meaning from the previous legislation but merely "underlined" the forward looking element in the test.   This is true, but, as the Defendants point out, it does not seem to me to assist, because the previous English legislation (the Acts from 1907 until 1985) had <u>already</u> been amended to add words looking to the future, so that Lord Walker's comment was not a comment on the interpretation of the bare words "unable to pay its debts". The Plaintiffs contest this on the basis that the statutory injunction in the 1907 and later Acts, to take into account the contingent and prospective liabilities of the company, was only appropriately applied to the "balance sheet" test for insolvency and not to the "cash flow" test, so that Lord Walker's statement that the 1985 Act made no change to the effects of the immediately preceding statutory provision was recognising that the qualification "as they fall due" <u>had</u> been previously implicit in applying the "cash flow" test.   I just disagree.   Such an interpretation is too convoluted.   The 1907 Act stipulated "*tak[ing]  into account contingent and*

*prospective liabilities*" in relation to the whole and entirely general test of whether a company was "unable to pay its debts", by whatever route this was approached.

560. The Plaintiffs point out that Warren J in *Re Casa Estates Ltd* [2013] EWHC 2371(Ch) at [27] suggested that the only test under the "old section" (ie s 518 of the Act of 1985) was *"Is the company unable to pay its debts?"* continuing that *"implicit in that … was the phrase 'as they fall due'"*.   However it seems to me, either the judge has simply overlooked the added words in s 518 which expressly introduce this effect, or, and I think more likely, he was just using shorthand expression for the whole clause, including the additional words.   The point was not directly relevant to his decision in any event.   Either way, I do not consider that it assists the Plaintiffs in terms, and it is also, at best, the view of a judge of another jurisdiction on the construction of legislation of that jurisdiction in different terms from those of the relevant Guernsey Law.   It is therefore of little assistance in construing the 1994 Companies Law.

561. In my judgment the Defendants' submission is correct, and the question whether CCC was "unable to pay its debts" at any material time, in accordance with the then current Guernsey legislation, is to be determined according to whether or not it could pay its debts actually due. That this is the meaning of the words of the section is mildly supported, in my judgment, also by the specific reference in s 95 (a) of the 1994 Companies Law to a debt of £750 "then due", although I accept that that is only as a matter of colour, and not direct interpretation.   The point of s. 95(a) was to provide a practical clear-cut evidential test for being unable to pay debts, apart from proof by any other evidence.

562. The Plaintiffs' argument on this point has to be that the words "unable to pay its debts", used in the 1994 Companies Law carried an implicit reference to debts which were not currently due but would or might fall due in the future.      It may be that, with the more modern approach to legislative construction being "purposive" and less black letter than in the 19th century, the bare words "unable to pay its debts" could today be construed as allowing some eye to the future, even bearing in mind that the test is clearly rooted in the present. However, that is not the issue.   The issue is, what did the Guernsey legislature mean when enacting the 1994 Companies Law?

563. I do not think that anything useful with regard to the interpretation of the bare words "unable to pay its debts" can be derived from Lord Walker's speech in *Eurosail.*      It is an unsound case on which to found arguments as to the meaning of Guernsey company law in 1994.   It was concerned with construing the two separate limbs of the English Insolvency Act 1986, ss 123 (1) (e) and 123 (2), which were part of an overhaul of English insolvency law from an earlier state of law which was not even, itself, in the same terms as the 1994 Companies Law of Guernsey, as explained above.   Indeed, Lord Walker's criticism of James V-C's judgment seems to me to imply that he accepted (even if he regretted) that James V-C *had* held that the test of "unable to pay its debts" *tout court*  was confined to present debts only.   It also seems to me to be clear that this interpretation was not questioned either by Nicholls LJ in *Byblos* (above) or, and more recently still, by Briggs J in *Cheyne Finance (No 2)* (above).

564. But the strongest supporting reason for my conclusion is that the framers of the 1994 Companies Law must have been aware of the additional words then to be found in the English equivalent legislation, and did not incorporate them into the Guernsey law.   The provision for proving inability to pay by an unsatisfied statutory demand is adapted from that very legislation.   They must also have been aware of the interpretation placed on the unqualified words by James V-C in *Re European Life Assurance Society* since this was well known as the authority on that very point.   They nonetheless selected, or re-enacted, the bare words used in the earlier English legislation, without any addition such as that found in either the English Act of 1907 or even the later act of 1986.   By implication, this was deliberate.   It cannot, therefore, be assumed that they "must have intended" some element of regard to future debts to be inherent in the bare words "unable to pay its debts".

565.   This may well be a strange and even counter-intuitive result to an English trained lawyer, for whom (because of familiarity with the parallel concepts in the English legislation) the notion that "cash flow" inability to pay debts requires also having regard to future and contingent liabilities is so standard as to go without saying.  If so, that only emphasises that lawyers need to be careful not to allow preconceptions from other jurisdictions unconsciously to influence their interpretation of Guernsey law, which is a separate and individual jurisdiction in its own right, with its own legislative priorities and policies.

566.   For completeness, I add that I do accept that the test for being "unable to pay its debts", whilst looking only at actual debts, must take account of the practical consideration of payment, and possibly requiring a short time – a matter of days - to comply with a demand, (compare the 21 days given for due compliance with a statutory demand for £750).  However, that is simply the reasonable time which is always allowed to a debtor to comply with a demand for a debt currently due.  It is, in my judgment, the only element of any "futurity" implicit in the definition, but it relates to what is meant by "pay" as a matter of mechanics, and not what are the relevant "debts".

567.   Since the hearing of this case concluded, the Plaintiffs have cited to me another decision on this point, this time in the Court of Appeal of the Cayman Islands, given on 18th November 2016: *In re Weavering Macro Fixed Income Fund Limited (in liquidation)*  CICA No 2 of 2016.   They point out that s. 93 of the Cayman Islands *Companies Law (2013 Revision)* is in the same terms as s. 95 of the 1994 Companies Law of Guernsey, providing that a company is deemed to be unable to pay its debts if

> "*it is proved to the satisfaction of the Court that the company is unable to pay its debts*".

568.   In *Weavering* the issue was whether the Plaintiff liquidators could recover as a preference certain payments made to a Scandinavian Bank by way of redemption of its investment in the company but within 6 months before its insolvent liquidation, on the grounds that the company was insolvent at the time these payments were made.     The redemption notice had given the required one month's notice to redeem at 1st December 2008, and the company's articles provided that redemption would then be effected by payment, within 30 days, of a sum equal to the notice giver's pro rata share of the Net Asset Value of the company as certified on the day before the redemption date.  That valuation had been made, but on the assumption that certain derivatives owned by the company had value, when they were in fact worthless but were included as supposedly valuable assets through the fraud of the main founder of the company.

569.   The central issue in the case was whether the inflated NAV which had been certified could be said to be in accordance with the articles of the company, it having been procured by a fraud internal to the company.   A subsidiary point, however, was whether the company was "insolvent" within the meaning of s 93 at the time of the payments, because these had been made during the 30 day grace period for payment following the redemption date.  The Bank argued that the procedure for payment meant that the debts constituted by the acceptance of the redemption notice were not due and therefore not payable until the end of that period.  The Court of Appeal rejected that argument, following a previous Cayman case (*Culross Global SPC Ltd v Strategic Turnaround Master Partnership Ltd* 2008 CILR 447) which had distinguished between a debt which falls due but for which a period of grace for payment is allowed, and a debt which does not fall due until a later date.  In a very similar factual situation, it had held that the analysis was the former, and not the latter.  Both the judge and the CI Court of Appeal held that this meant that the debts had become due on 1st December 2008.   That was enough to dispose of the issue of insolvency in *Weavering*, because it meant that the redemption obligation was an actual debt, and the company had clearly been unable to pay all the redemption debts which fell due on the 1st December 2008.

570.    However, the Court of Appeal went on to consider "very briefly" the alternative argument that the status of "being unable to pay its debts" without further qualification permitted regard to the future, and it held that under s.93 of the Cayman law, it did.   The unqualified phrase was held at [40] by Martin JA, with whom the other members of the court agreed, to look not only to debts immediately due and payable but also to debts which would or might become due in the "reasonably near future", relying on the judgment of Lord Walker in *BNY v Eurosail* (above), and noting his disapproval of James V-C in *Re European Life Insurance Society* (above): "*It may be unfortunate that his judgment has come to be regarded as a leading case*".

571.    Having looked at this further authority, it does not cause me to change my previous view, for the following reasons.  First, in view of the court's conclusion that the company was insolvent at the relevant time on the test of debts actually due, this is an *obiter dictum*.  It is, of course, also in relation to another jurisdiction even if the words of the two laws are the same.  Second, it would seem from the brief references made by Martin JA to the judgment of Lord Walker in *Eurosail* that he assumed, in the same way as the Plaintiffs in this case have invited me to assume, that Lord Walker's reference to the position in English law prior to 1985 was a reference to the unqualified phrase "unable to pay its debts", whereas it was in fact a reference to the expressly qualified position which had been enacted in the UK since 1907.   It does not appear from the judgment that the CI Court of Appeal had the benefit of the research and the arguments which have been advanced here on behalf of the Defendants by Advocate Swan.     Finally, though, it does nothing to displace my main reason for coming to the conclusion which I have done, namely that those who framed the 1994 Companies Law must have done so by reference to the position as it was then widely known and understood to have been in English law, that the bare phrase "unable to pay its debts" for insolvency purposes referred only to current debts.

572.    It follows that I will approach any issue to which the matter of CCC's insolvency or potential insolvency is germane on the basis of the above scope of the definition of insolvency in the law of Guernsey at the time.

573.    It also follows that the lengthy and elaborate argument subsequently made by the Plaintiffs in support of their submissions as to what would be meant by an inability to "*pay its debts as they fall due*" are beside the point.  However, in case I am wrong in my interpretation of ss 94(e) and 95 of the 1994 Companies Law, and s.94(e) does, on its own, import some element of regard to debts accruing in the future, I will also consider that test at the relevant juncture, where it is material.    As to legal principle, I will therefore make only the following comments here.

574.    The reasons why the test for insolvency has been allowed to have regard to future and prospective debts in other jurisdictions (and also in Guernsey under the 2008 Companies Law) is pithily summed up in the dictum of Briggs J in *Re Cheyne Finance plc (No 2)* [2008] BCC 182 at [51], in the context of the "as they fall due" test.

> "*It is clear… that … cash flow or commercial insolvency is not to be ascertained by a slavish focus only on debts due as at the relevant date. Such a blinkered review will, in some cases, fail to see that a momentary inability to pay is only the result of a temporary lack of liquidity soon to be remedied, and in other cases fail to see that due to an endemic shortage of working capital a company is, on any commercial view, insolvent, even though it may continue to pay its debts for the next few days, weeks or even months before an inevitable failure.*"

I note the word "inevitable".

575.    The Plaintiffs submit, (and it seems to me to follow anyway)  that the element of forward looking implicit in the test of being "able to pay debts as they fall due" (if that were

applicable in this case) involves looking to the "reasonably near future" (see *Bucci v Carman (Liquidator of Casa Estates (UK) Ltd* [2014] EWCA Civ 383, and also the approach in *Re Weavering* in the Cayman Islands, referred to above), in the context of applying a judgment of commercial reality as to the company's ability to pay the succession of inevitable, or likely, debts which it will incur.   I accept the Plaintiffs' submission that, if this is the test, it focuses on ability, and therefore potential future ability, to pay the series of future debts which can be anticipated to be incurred by the company.

576.   As to what is meant by such a "commercial" approach, in *Bucci* (above) Lewison LJ identified at [30] that this  required the court

> *"not to stop automatically at the answer to the question: is the company for the time being paying its debts as they fall due?  In an appropriate case it must go on to inquire: how is it managing to do so?"*

577.   This last question is plainly aimed at the further aspect of futurity which is within the test imported by the words "as they fall due", and I note also that the words "in an appropriate case" indicate the flexibility of fact-sensitivity.

578.   The purpose of this enquiry is thus to identify whether, even if the company is currently managing to pay its debts, it nonetheless appears that there is going to come a time when it will cease to be able to do so, because if that time is sufficiently imminent as to appear <u>inevitable</u>, the company is thus insolvent <u>now</u>, on the basis of the "debts as they fall due" test.  If any such time is sufficiently far off, or sufficiently imponderable that its eventuality might be avoided, the company's inability to pay debts "as they fall due" is therefore speculative, and the test is not met.   It seems to me that the "reasonably near future" test is an attempt to define the dividing line between those two positions, and in practice it is the dividing line between the prospect of inevitable failure and its possible avoidance.

579.   The assessment of "inability to pay debts as they fall due" involves considering all the company's circumstances on the potential liability side, and also on the potential asset and resource side.   It is a question of fact to be determined on evidence in the usual way.  What would be the "reasonably near future" also depends, once again, on the particular facts of the case, and especially the nature and circumstances of the particular business.

580.   However, the Plaintiffs submission, from all this, is that it is necessary for the court to determine <u>as an anterior question,</u> the period which represents the "reasonably near future" in the particular case, against which it will then make the assessment of whether the company can or could pay its debts within that period, and hence "*as they fall due"* as thereby defined*.* They submit that in this case, the appropriate period is twelve months.   A broad summary of their reasons for this is that CCC's management papers show budget forecasts and suchlike for periods of at least twelve months, internal communications contain instances of reference to looking forward for such a period, some of the Defendants had agreed in cross-examination that they had been looking at CCC's future for the next twelve months, and finally, that this is the period that accountants and suchlike habitually use and used in this case in their assessment of a company as a "going concern" for accountancy and audit purposes.

581.   I do not consider this approach to be of any help whatsoever, and in fact, I find it to be dangerous and potentially confusing.   The test of ability to "pay debts as they fall due" is impressionistic.   Inevitably, once it is accepted that considering this ability involves looking to the future to some extent, the natural question is "how far?", but in my judgment the answer to that question is so imponderable and case sensitive, that no further attempt at precision is either appropriate or useful as a matter of rule or definition.

582.   The "reasonably near future" test has apparently been picked up in England from Australian law, where the cash flow test for insolvency (which there uses the similar expression "[debts]

*as and when they become due")* seems to have been extensively applied and rigorously analysed by the courts, possibly because the legislative context contains no prescribed "balance sheet" test for insolvency, as it does in English law, as already mentioned.   The "reasonably near future" test answers the question "how far?" in the time-honoured way: it is all a matter of reasonableness.

583.   I therefore do not think that it is helpful to attempt to reduce this question to a mechanical process of trying to fix an appropriate timescale from suggested *indicia* in the facts, and then to examine the position with reference to the timescale thus selected.   Of course a particular judge, in a particular case may find that approach useful in helping him or her to come to a conclusion about the application of the broadly stated test of "as they fall due", but to elevate this to part of a necessary process of reasoning, in the way the Plaintiffs do in this case, seems to me to be too rigid.   It is translating what should be a tool of analysis into a rule of application.

584.   In short, this seems to me to be putting the process of reasoning round the wrong way.    The <u>first</u> question is whether the company is able to pay its current debts.  If it is in fact doing so – it has not defaulted – then the <u>next</u> question is, does it appear that it will be able to continue to do so in the future, taking into account its apparent future and prospective liabilities?   This will mean examining how it proposes to continue paying the debts which are anticipated.    If there is uncertainty about giving a positive answer to the second question, then the <u>final</u> question is: how soon is any such inability likely to occur?    If this likelihood is within the "reasonably near future", then the company cannot now pay its debts "as they fall due"; if it is outside that impressionist timescale, then it can, because future failure is not inevitable but speculative.  The place of the "reasonably near future" therefore lies in this last stage of the reasoning process – how far off does it seem that failure is inevitable?

585.   In other words, the "reasonably near future" relates to a description of the view the court has already formed of the strength of the company's apparent continuing ability to keep paying its debts – how long it looks as if it will be able to carry on doing so, and whether  that is the "reasonably near future"?  It is not a test which requires first determining an applicable time period and then asking whether the court is satisfied that the company can continue paying its debts during that determined period.

586.   I find that this point assumes particular importance because of the nature of CCC's business, and I consider it more closely at the appropriate point later, (with regard to August 2007).

587.   Finally on this point, it is important not to lose sight of its limited materiality.  I am not hearing a petition for the compulsory winding up of CCC.   The question whether it was "insolvent" or not at any time is of no direct relevance in itself.   The two areas where the question of CCC's insolvency is germane to issues which I <u>do</u> have to decide both relate to the Defendants' knowledge or state of mind, and, importantly both have an element of forward looking <u>already</u> built into them, which largely renders the distinction between the test of insolvency being an inability to pay (current) debts or an inability to pay debts as they fall due, irrelevant.

588.   The first issue is with regard to the Defendants' fiduciary duties; it is whether the prospects of "insolvency" were sufficient to require the Defendants, as directors, to proceed thenceforth to conduct CCC's affairs with proper regard to the interests of its general body of creditors (see above).   The second is with regard to wrongful trading; it is whether the Defendants ought, at some earlier point than they did, to have concluded that there was no reasonable prospect of CCC's avoiding going into "insolvent" liquidation, ie getting into a situation where it was in fact unable to pay its (relevant) debts.      Both these states of mind require an assessment of the <u>future</u> prospect of the company being able or unable to pay its debts.   Whether that assessment judges the prospect of being unable, at some point in the future, to pay debts then actually due, or the prospect of being unable, at some point in future, to pay debts as they

would then prospectively fall due, is reaching a level of refinement which seems to me to have no practical utility or effect.    It is hardly a distinction which any normal businessman would devote any time to, and could scarcely be decisive with regard to the propriety of any business decision likely to be being taken in practice.    The law needs to have some regard for reality.

**(3)    Wrongful trading**

589.    The third basis of liability claimed by the Plaintiffs is that of the statutory liability for wrongful trading, under s 67C of the 1994 Companies Law, as introduced in 1996 by the Companies (Amendment) (Guernsey) Law 1996.   Section 67C(1) provides for the court to make a declaration of a liability to contribute to the assets of a company in certain circumstances.   Section 67C(2) states those circumstances as being that

> "…… (a) the company has gone into insolvent liquidation; and
>
> (b) at some time before the commencement of the winding up of the company, that person knew or ought to have concluded that there was no reasonable prospect of the company avoiding going into insolvent liquidation; and
>
> (c) that person was a director of the company at that time; "

The "time" referred to in s. 67C(2)(b) has been graphically referred to as the "moment of truth": see Palmer's *Company Law*  (Rev Jan 2016) at 15.599.30, cited by the Plaintiffs.

590.    As mentioned above this is one point where the test for what is insolvency under ss 94(e) and 95 of the 1994 Companies Law might theoretically make a difference to the scope or application of this provision in Guernsey as compared to jurisdictions where the test is different.        The practical effect of s. 67C(2)(b), reading into it the Guernsey law test for what is deemed to bring about a cash flow insolvency in Guernsey law, is that the relevant person "knew or ought to have concluded that there was no reasonable prospect that there would not come a time when the company could not pay its debts then actually due".   The alternative formulation using the broader wording of English law interpretation would have to be along the lines that the relevant person "knew or ought to have concluded that there was no reasonable prospect that there would not come a time when the company could not pay its debts as they would then be falling due."

591.    The difference is subtle.   The former could be a slightly more generous test to directors than the latter, in theory.    The former is certainly more clear-cut and therefore probably easier to judge in any particular case.   As I have just said, though, I doubt if it would make any practical difference to any decision which directors might have to take, but the point remains that the former is the effect of the Guernsey law wording which I consider it appropriate to apply.

592.    Moving on, s. 67C(3) provides a defence that, after any such time as is identified in subs.(2), the director took "*every step with a view to minimising the potential loss to the company's creditors ....that he* [then] *ought to have taken*".   I note this, and the apparent stringency of the test, to which the Plaintiffs draw attention.

593.    Section 67C(4) lays down that the standard to be applied in testing whether the director ought to have known or ascertained facts (or come to the relevant conclusion or taken particular steps) is the same standard of skill and competence by which a director's duty to his company is judged generally.   This has been discussed above.   It comprises the basic objective standard to be reasonably expected of a person carrying out that director's functions in such a company, uplifted, if applicable, by virtue of any enhanced material attributes of the actual director.

594. I do not need to recite the supplementary provisions of s. 67C(5)-(8), at any rate at this point, except to note that the Entity Defendants accept that, by s 67C(7), the wrongful trading provisions are expressly applied to shadow directors. They also concede that by virtue of s 117 of the 1994 Companies Law, *de facto* directors are within the definition of a "director" for the purposes of the 1994 Companies Law, and therefore within it with regard to liability for wrongful trading under s 67C.

595. Moving on, being satisfied of the specified facts justifies the court in ordering the director in question (and, again, liability has to be considered individually) to make such contribution "*as the court thinks proper*" (s.67C(1)) to the assets of the insolvent company in its liquidation. It is common ground that the principle behind this is that of compensation, and it is not intended to be penal. The starting point (see, eg *Re Ralls Builders Limited (in liquidation)* [2016] Bus LR 555 at [238]) is that the director(s) should make good the "increased net deficiency" of the company, ie the additional losses which have been suffered by the company as a result of its wrongfully continuing to trade. Thus, the deficiency in the actual liquidation is to be compared with an assessment of the position - putatively a lesser deficiency - which would have resulted if the directors had taken the steps they should have done, which would either be a more prompt liquidation or some other steps towards winding down the company and/or realising its assets. The director(s) are *prima facie* liable for the difference, although the court has a discretion to mitigate any such liability if appropriate to the justice of the case under s.67C(1).

596. As regards the application of s 67C, the Plaintiffs first submit, and I accept, that this is a public interest provision, the object of which is to discourage directors, when a company is in the vicinity of insolvency, from taking "*excessive*" risks by continuing to trade in the hope of the company "*escaping from its financial troubles*", but knowing that if this "*gamble*" is unsuccessful limited liability will mean that the additional losses will fall on the creditors.

597. The above-quoted words are used in the textbook *Gower's Principles of Company Law,* and require comment as they have been controversial. First, the reference to "excessive" risks illustrates that a degree of risk may be permissible, and the decisions remain a value judgment of the directors, obviously according to actual circumstance.

598. Second, the Plaintiffs light on the fact that the phrase "*escaping from its financial troubles*" was paraphrased in the Hong Kong Court of Final Appeal, in *Moulin Global Eyecare Holdings Ltd v Mei* (2014) HKCFAR 466 at [50], (commenting on the equivalent provision - s. 214 - of the English Insolvency Act 1986,) in the words "*in the hope of riding out the crisis*". This, they then say, describes exactly what the Defendants did here.

599. I would not regard a paraphrase of a textbook as particularly persuasive on any basis, but any persuasiveness recedes to vanishing point when it is noted that the comment was in the context of noting that there was no equivalent statutory provision in Hong Kong law.

600. Third, the word "gamble" in itself contains a pejorative value judgment, which is fine for emphasising the point of the provision, but does not seem to me to advance a dispassionate consideration of the application of legal principle. Any decision of which the outcome is not certain can be described as a "gamble" to some extent.

601. The Defendants refer to the recent case of *Re Ralls Builders Ltd* (above) as a useful recent review of the principles of liability under the English equivalent of section 67C of the 1994 Companies Law, namely s. 214 of the Insolvency Act 1986.

602. They submit that the mere fact that a company is insolvent, whether on a balance sheet or cash flow basis, and even that a director knows that to be the case, does not mean that the director will be liable for wrongful trading if the company fails to survive. This is because the test is whether it is or ought to be apparent to the director(s) that the company "*stands no*

*reasonable prospect of avoiding going into insolvent liquidation*".    A company may show a balance sheet deficit or experience cash flow difficulties at some time, but still have a reasonable prospect of trading out of that difficulty, or otherwise taking measures which stand a reasonable prospect of restoring it and avoiding an insolvent liquidation: see, for example, *Re CS Holidays Ltd* [1997] 1 WLR 407 at 414:

> "*The companies legislation does not impose on directors a statutory duty to ensure that their company does not trade whilst insolvent; nor does that legislation impose an obligation to ensure that the company does not trade at a loss.  …  Directors may properly take the view that it is in the interests of the company and of its creditors that, although insolvent, the company should continue to trade out of its difficulties. They may properly take the view that it is in the interests of the company and its creditors that some loss-making trade should be accepted in anticipation of future profitability.  They are not to be criticised if they give effect to such view. But the legislation imposes on directors the risk that trading while insolvent may lead to personal liability. Section 214 imposes that liability where the director knew, or ought to have concluded, that there was no reasonable prospect that the company would avoid going into insolvent liquidation.*"

and  *Re Cubelock Ltd* [2001] BCC 523, at [72]:

> "*What makes trading wrongful is not the bare fact of a balance sheet insolvency, but the continuation of trading at a time when the directors either knew or on any realistic view ought to have known that there was no reasonable prospect that the company's creditors would ever get paid…. The law has to leave room for cases where it was acceptable for the directors to take the view that their company, although insolvent in balance sheet terms for the present, was going to trade its way back into credit so that all creditors would be paid … [and] there has to be room for cases like that even if in the event the directors turn out to have been wrong.*"

603. The Defendants draw particular attention to this point, and that the test is whether the decision to trade on was not unreasonable at the time, and not whether it was vindicated in the event.

604. The Defendants also submit, however, that whilst it may not be a *sufficient* condition for liability that the company be insolvent at the relevant time, this may be a *necessary* condition. The Plaintiffs dispute this, on the basis that this is not what the section actually says, and that the test is the actual or constructive state of mind of the directors.   I accept the Plaintiffs' submission on this point.  The section says nothing about the actual position of the company at the time, merely about what its future may look like.

605. The Defendants stress that the assessment of what the directors "ought reasonably to have concluded" is a matter which must not be decided with the benefit of hindsight, citing Lewison J in *Re Hawkes Hill Publishing Co Ltd (in liquidation)* [2007] BCC 937 at [41] and [47]:

> "*The answer to this question does not depend on a snapshot of the company's financial position at any given time:  it depends on rational expectations of what the future might hold.  But directors are not clairvoyant and the fact that they fail to foresee what eventually comes to pass does not mean that they are guilty of wrongful trading.*"

and

> "*Of course, it is easy with hindsight to conclude that mistakes were made.  An insolvent liquidation will almost always result from one or more mistakes.  But picking over the bones of a dead company in a courtroom is not always fair to those*

> *who struggled to keep going in the reasonable (but ultimately misplaced) hope that things would get better.*"

606.   They also rely on Park J in *Re Continental Assurance Company of London Ltd (in liquidation)* [2001] WL 720239 at [281]):

> "*An overall point which needs to be kept in mind throughout is that whenever a company is in financial trouble and the directors have a difficult decision whether to close down and go into liquidation, or whether instead to trade on and hope to turn the corner, they can be in a real and unenviable dilemma.  On the one hand, if they decide to trade on but things do not work out and the company, later rather than sooner, goes into liquidation, they may find themselves in the situation of the respondents in this case – being sued for wrongful trading.  On the other hand, if the directors decide to close down immediately and cause the company to go into an early liquidation, although they are not at risk of being sued for wrongful trading, they are at risk of being criticised on other grounds.  A decision to close down will almost certainly mean that the ensuing liquidation will be an insolvent one.  Apart from anything else liquidations are expensive operations, and in addition debtors are commonly obstructive about paying their debts to a company which is in liquidation. Many creditors of the company from a time before the liquidation are likely to find that their debts do not get paid in full.  They will complain bitterly that the directors shut down too soon; they will say that the directors ought to have had more courage and kept going.  If they had done, so the complaining creditors will say, the company probably would have survived and all of its debts would have been paid.  Ceasing to trade and liquidating too soon can be stigmatised as the cowards' way out.*"

607.   The Defendants submit that the essence of situations in which directors have been held liable for wrongful trading is where the court forms the view that what they really did was to close their eyes to the reality of an obvious situation, and to continue in business when there could be no reasonable or rational belief that the company would or could pull through the situation, return to health and, most importantly, pay its creditors: see eg *Re Ralls Builders* (above) at [174].   The Plaintiffs do not seem to dissent from this; it is their proposition that any such professed belief by the Defendants in this case was neither reasonable, nor indeed (I think) rational.

608.   The Plaintiffs rely on Palmer's *Company Law* (Rev Jan 2016 at 15.99.30) for the proposition that the "moment of truth" occurs when

> "*it was known or ought to have been realised by the director that an insolvent liquidation was inevitable or, at least, that <u>it was a reasonable probability</u>.*" (emphasis added)

and stress that a director cannot escape responsibility by asserting that he

> "*honestly <u>but unreasonably</u> believed that the company would somehow avoid insolvency*" (emphasis added).

609.   I accept the latter proposition, which follows from the words of s. 67C(2)(b), but the former is an attempt to paraphrase in a positive form the double negative of the statutory words "*no reasonable prospect of ...avoiding insolvent liquidation*", and I do not think that it is accurate. In my judgment there is no need to apply anything but the actual words of the section, which are not only unambiguous, but appear to have been deliberately and carefully formulated.

610.   I do accept, however, the Plaintiffs' further submission, relying on an interlocutory decision of the Court of Appeal in this case (*Carlyle Capital Corpn Ltd (in liq) v Conway* (2011-12) GLR 562) that in applying the test, it does not avail a director to say that some measure could

have been taken which would have avoided an insolvent liquidation if the director made no attempt or had no intention of taking it. It seems to me that this follows from the nature of the statutory test. The test is what the director(s) ought reasonably to have concluded would happen. This is a matter of anticipating the future. It necessarily, therefore, implies inputting some hypotheses as to future circumstances. In other words, the state of mind, or belief, of the directors which falls to be examined necessarily has an element of conditionality about it. It may well contain an implicit "if [x] is done (or not done)", but that would then have to be followed through.

611. The Plaintiffs also emphasise, as regards the defence afforded to a director under s. 67C, that the burden of proving this is high, as the director must show that he took "every" (not just "some") step that he ought to have done to "minimise" (not just "reduce") the prospective additional losses to creditors. I take due note of this.

612. At the end of the day, in my judgment, all the above submissions, and their various case citations, including others not mentioned, go to show that the words of the statute have to be interpreted according to their natural (and to my mind reasonably clear) meaning, but very much on a fact-sensitive basis, and I will so apply the test in due course. Matters such as whether or not the director(s) sought professional advice, and how they instructed any advisers whose views they did seek and which they seek to rely on, all fall within the ambit of such fact-sensitivity.

613. Finally, the Defendants submit, and the Plaintiffs accept, that it is necessary for causation of loss from any proven wrongful trading to be proved in order for actual liability to be imposed. The Plaintiffs therefore agree that it is for them to establish that CCC's losses were increased because of the continued trading.

**(4)      Breach of contract/tort/unjust enrichment (against CIM as manager)**

614. This can be dealt with very briefly. Leaving aside the separate allegations that CIM constituted itself a *de facto* director of CCC or a shadow director of CCC, CCC's relationship with CIM was contractual and was constituted by the IMA. This was an agreement governed by Delaware law. The Plaintiffs allege that the conduct of all the Defendants which they criticise generally under other causes of action, insofar as it can be analysed as actions by CIM or as conduct to be attributed to CIM, was a breach of the IMA, either of express terms, or of duties of trust implied into it, or of contractual duties of care. The scope of the complaints against CIM are therefore apparently accepted to be co-extensive with the matters of complaint already raised, whether of breach of fiduciary duty or of duty of care, and the central issue is therefore simply whether such breaches can be attributed, as regards CIM, to actions referable to the IMA, so as to give rise to an alternative cause of action in contract.

615. In principle, the claim is therefore for breach of contract (or a parallel duty in tort insofar as any such duty may existg in Delaware law, but which would be indistinguishable in content or scope), and for alleged damage co-extensive with the claims for damages mounted in respect of other causes of action. However, the Plaintiffs also maintain an alternative cause of action against CIM by way of a claim of unjust enrichment. They accept that this depends on establishing their other claims for breach of duty alleged against CIM, and that it will operate only as an alternative quantification of CCC's claimed damages in respect of such other alleged breaches of duty.

616. This secondary claim is for the return of all the fees which CCC paid to CIM during its existence. These comprise: quarterly regular management fees paid ($12,517,000), quarterly irregular performance-benchmarked "incentive" fees, insofar as these were actually paid ($4,682,000), incentive compensation comprising shares in CCC (whose attributed value was $54,479,593 at the time of deposit), rent, furniture and office supplies ($270,000) and payments for overhead services provided by TCG ($900,000) thus totalling $72,848,583.00.

617. The claim to recover these fees and payments is based on the doctrine of total failure of consideration. The Plaintiffs argue that it is well established that where professional services are of such shortcomings that they are rendered valueless (as they say was the case here) then such fees or other remuneration can be recovered, and indeed recovered according to their value when paid over.

618. This alternative claim is obviously very much a secondary case, maintained as a fall back from the primary case advanced by the Plaintiffs which seeks compensation for alleged losses, rather than for the very much smaller quantum of fees and expenses paid over. The usual place of this kind of fall back claim is where proving the quantum of loss on a damages claim is problematic. The application of the principles underlying such an unjust enrichment claim have not been investigated or argued other than on a broad basis in this case so far. I have to say that they would seem to me to be *prima facie* governed by Delaware law, although the Delaware law experts were not asked to give opinions on this topic, and both Advocates Wessels and Davies addressed the point on the basis of Guernsey law and authorities. Given the peripheral relevance, only, of the legal principles relating to unjust enrichment, I will not, therefore, discuss these at this juncture, but will return to them if and when it may be appropriate to do so.

619. Matters of Delaware law may, of course, become pertinent in relation to both the primary and secondary aspects of the claim against CIM for breach of contract/tort. However, for my purposes, Delaware law is to be treated as a matter of fact, and I will again defer any necessary consideration of this until the appropriate later point.

**(5)**   **Statutory Misfeasance,  and**

**(6)**   **Exculpation and Indemnity Defences**

620. I will deal with these two aspects of the claims together here, because they are inextricably linked. The issue which links them is whether, as the Plaintiffs contend, the several exculpation and indemnity provisions contained (a) in CCC's Articles of Association at Articles 172 and 174(b) and (b) in Clauses 2(b), and 6(a) of the IMA are available to be invoked by the Defendants. The relevant points also include arguments that these provisions are avoided by certain provisions of Guernsey legislation, amongst which are the provisions relevant to the scope of liability for "statutory misfeasance".

621. The relevant indemnity and exoneration provisions in CCC's Articles are those at Articles 172 – 174. They are lengthy and intricate, drafted in what has sometimes been described as the "torrential" style. For present purposes their material parts read that:

> "172 *The Directors Managing Directors, managers agents… for the time being of the Company… shall be fully indemnified out of the assets and profits of the Company from and against all … liabilities which they may... incur by reason of any… act in and about the execution of their respective offices… except such (if any) as they shall incur by or through their own wilful act neglect or default………and none of them shall be answerable for……any loss misfortune or damage …….which may happen in or about the execution of their respective offices or trusts except the same shall happen by or through their own willful act neglect or default"*

> "173 *The Company shall indemnify to the fullest extent permitted by Guernsey law [CIM] and any of its respective affiliates (and their respective officers, directors [etc])….. against all… liabilities [etc] arising from any and all claims demands, actions suits or proceedings, incurred by [them] in connection with the Company's business, investments and activities or by reason of their holding such positions, except to the extent that the claims, liabilities [etc] are determined to have resulted from [their] bad faith, fraud, gross negligence or wilful misconduct……"*

> *"174 (1)  The liability to the Company of [CIM] and any of its respective affiliates (and their respective officers, directors, agents, shareholders, partners, members and employees)…… is hereby limited to the fullest extent permitted by Guernsey law, except to the extent that their conduct involves bad faith, fraud, gross negligence or wilful misconduct,…."*

> *"174 (2)   Any matter that is approved by a majority of the Independent Directors will not constitute a breach of any duties stated or implied by law or equity, including fiduciary duties…."*

The relevant sections of the IMA read:

> *"2…(b)…..[CIM] shall   not be liable for any act or omission, error of judgment or mistake of law or for any loss suffered by [CCC] in connection with matters to which this Agreement relates except a loss resulting from willful misconduct or gross negligence (as determined in accordance with the laws of the state of Delaware) in the conduct of its duties under this Agreement…..*

> *"6(a) [CCC] hereby agrees to indemnify and hold harmless, solely out of assets of [CCC] [CIM] and its affiliates  and the officers, directors [etc] of any of them…. from and against any loss .. judgment,[etc]… or damages……* [arising out of or in connection with] *services provided by [CIM] to the fund unless such act or failure to act was the result of the willful misfeasance gross negligence (as determined in accordance with the laws of the State of Delaware), bad faith or reckless disregard of*  [the indemnified person] *with respect to the obligations of [CIM] hereunder.*

> *"(b) To the fullest extent permitted by law, no* [indemnified person] *will be liable to [CCC] or any Shareholder for any act or failure to act on behalf of [CCC] unless the act of failure to act resulted from the willful misfeasance, gross negligence (as determined in accordance with the laws of the State of Delaware), bad faith or reckless disregard of* [the indemnified person]*".*

622.    The Plaintiffs first make what appears to be a perfectly general submission that the effect of these provisions is avoided in all respects in relation to the Plaintiffs' claims, by s 67F of the 1994 Companies Law, referred to below, but in fact, (and correctly) this submission is subsequently limited to the Plaintiffs' claims for statutory misfeasance, under s 106 of the 1994 Companies Law.    This narrowing of their submission is correct because s 67F is confined to operating on claims made under any provision of the 1994 Companies Law.   It is convenient, therefore, to deal with s 106 and its interplay with s 67F at this point.


**The 1994 Companies Law**

623.    The Plaintiffs are assiduous, throughout their pleadings and submissions, to allege that the Defendants are not only guilty of breaches of duty (generally amalgamating breaches of fiduciary duty and duty of care) but also to add that the same factual circumstances render them "guilty of misfeasance".   This is an allusion to the claim brought as co-Plaintiffs with CCC *by its Liquidators* under s 106 of the 1994 Companies Law, and described as "statutory misfeasance".  (The Plaintiffs also plead a similar invocation of s 433 of the 2008 Companies Law which is in materially similar terms, but this specific assertion has not been argued, presumably - and rightly - because the 2008 Companies Law did not come into force until 1st July 2008.)

624.    Section 106 reads:

"(1)   *Where in the course of the winding up of a company it appears that any person described in subsection (2)-*

(a)   *has appropriated or otherwise misapplied any of the company's assets;*

(b)   *has become personally liable for any of the company's debts or liabilities; or*

(c)   *has otherwise been guilty of any misfeasance or breach of fiduciary duty in relation to the company;*

*the liquidator or any creditor or member of the company may apply to the court for an order under this section.*

(2)   *The persons mentioned in subsection (3) are*

(a)   *any past or present officer of the company;*

(b)   *any other person who, directly or indirectly, is or has been in any way concerned in or has participated in the promotion, formation or management of the company."*

(3)   *On an application under subsection (1) the court may examine the conduct of the person concerned and may order him:*

(a)   *to repay, restore or account for such money or such property*

(b)   *to contribute such sum to the company's assets;*

(c)   *to pay interest upon such amount at such rate and from such date as the court thinks fit in respect of the default whether by way of indemnity or compensation or otherwise".*

This claim is not, therefore, available to the company (CCC) itself.   However, the Liquidators seek on their own behalf to make, in substance, exactly the same claims against the Defendants under this section, for the same breaches of duty as are claimed by CCC under common law in the action generally.   This is because there appears to be a forensic advantage in doing this.

625.   Section 67F of the 1994 Companies Law, added by amendment in 1996, renders void any

*"....provision term or condition in whatever words and whether contained in a company's articles or in any contract with the company or otherwise, from exempting any person from, or indemnifying him against, any liability which, pursuant to sections 67A – 67D <u>or any other provision of this Law under which personal liability may be imposed or incurred, would otherwise attach to him</u>....."* (emphasis added).

626.   It follows that if the Defendants can be held liable under s 106 of the 1994 Companies Law they would (it is argued by the Plaintiffs) be unable to claim the benefit of any exculpation or indemnity clause contained either in CCC's Articles or in any contract (such as the IMA), which might otherwise be invoked against CCC itself as a plaintiff.

627.   Section 106 is modelled on a similar provision in successive English companies legislation, with a long history.   In England, the equivalent section was introduced as a more quick, efficient, cheap and simple means of pursuing the claims to which it applied in the context of a liquidation (not necessarily an insolvent one), than would be the case if the claim had to be pursued by writ of action, with more elaborate procedure, and the possibility of bringing in

third parties.   It was thus an aid to the efficient process of liquidation, and it can be seen that the flavour of the claims to which the section applies is that of gathering in assets which either belong, or ought to belong, to the company and therefore be available to be administered in the liquidation.

628.   Both Guernsey originating process and Guernsey liquidation processes are different from those of England.   It may well be that s 106 actually provided no such procedural benefit in the Guernsey context, and subsequent changes in English civil procedure in 2000 have done away with some of the original advantages even in England.   The provision is still retained in England, however, in the shape of s 212 of the Insolvency Act 1986.

629.   Importantly, though, it is common ground that s 106 creates no new or discrete substantive right.   It is an alternative process for enforcing rights (causes of action) which <u>already</u> exist apart from s 106.   The statutory discretion conferred on the court by s 106(3) provides other, and potentially more flexible, remedies than would be available in a conventional action at law.   However, the court's discretion is required to be exercised judicially, and is therefore limited by the principle that any order for relief should be compensatory in nature.   A discretionary order under s. 106 can possibly reduce the payment ordered, according to the justice of the case, below the level of full compensation, (compare per Lord Hope in *HMRC v Holland* [2010] UKSC 51) but it cannot increase it above a compensatory level; Section 106 is not a penal provision.   In principle, therefore, any award under s.106 is likely to be the same as under a common law action in respect of the same conduct, but can be tempered, or otherwise structured, if the court thinks fit.

630.   Four points therefore arise in relation to s 106 in this case.   The first three are as to the scope of the section.   They are:

(i)   whether the term "misfeasance or breach of fiduciary duty" in s 106(1)(c) (which is the subsection the elements of which are pleaded by the Plaintiffs: see Paragraph 511, 514 and 519 of the Cause) is wide enough to cover all the claims in both fiduciary duty and breach of duty of care which the Liquidators seek to bring;

(ii)   whether claims within the section can be brought against (a) *de facto* or (b) shadow directors; and

(iii)   whether claims within the section can be brought against an investment manager such as CIM.

631.   The fourth point is a *res judicata* point, regarding the interrelationship of s 106 and s 67F of the 1994 Companies Law.   It is whether I am bound to hold that the Defendants are unable to rely on any exoneration or indemnity clauses which might otherwise operate in their favour in answer to a claim capable of being advanced under s 106, because this point has already been decided against the Defendants by decisions of the Royal Court and the Guernsey Court of Appeal in the course of earlier applications in this case.

632.   I will deal with each of these in order.

633.   The Plaintiffs submit that the expression "misfeasance" in s 106 is very wide and encompasses any breach of duty which results in the misapplication of the company's property, even indirectly.   They cite English authority to this effect on the equivalent section of the Companies Act 1948 (s. 333), namely *Re B Johnson & Co Builders  Ltd* [1955] Ch 634 at 650, (Evershed MR), itself citing Lopes LJ in  *Re Kingston Cotton Mill Company (No 2)* (1896) 2 Ch 279 at 288.

> "*The object of this section of the Act is to enable the liquidator to recover any assets of the company improperly delt with by any officer of the company, and must be*

> *interpreted bearing that object in ivew.   It doubtless covers any breach of duty by an officer of the company in his capacity of officer resulting in any improper misapplication of the assets or property of the company"*

Thus far, there is common ground.

634.   However, the Plaintiffs further submit that the word "misfeasance", properly construed, is wide enough to cover all breaches of duty owed by a director to his company, including the duty of skill and care.   They cite tentative textbook suggestions of this proposition by way of authority, see, eg Taube:  *International Asset Tracing in Insolvency* (2009) at [4.88].

635.   Their arguments in support of this broad proposition, other than suggesting that it would be convenient and accord with the philosophy of modern legal interpretation, rest on the fact that a "misapplication of the company's property" is an undefined concept in the dictum of Lopes LJ (above).     Advocate Wessels therefore sought to persuade me that the word "misapplication" covers matters wider than simply an unlawful disposition of the company's property (such as paying a dividend out of capital), and extends to any application of the company's property caused by a wrongful decision, such as a decision not made in good faith, or made for improper purposes.  He further submitted that a negligent decision to dispose of the company's property in a particular way would, through the taint of such negligence, be a decision for improper purposes and hence within the relevant concept of "misfeasance".  Extending the argument one step further, and with more particular focus, he submitted that this meant that the concept of "misapplication of the company's property" would include not merely disposition, but the wrongful <u>retention</u> of CCC's RMBS pursuant to a decision made in breach of duty, whether fiduciary duty or duty of care.

636.   In answer to the point that merely retaining the same investment did not have the flavour of an "application" of property at all, he pointed out, without abandoning his contention that simply continuing the status quo with regard to the company's property was an "application" of it, that the retention of the RMBS in fact required a positive re-"application" of it (the company's property) with every repo roll, which was further support for his submission.

637.   This argument seems to me to be tantamount to arguing that making a bad investment decision is misfeasance, or (worse still) that it can, in some circumstances of unclear and rather arbitrary effect, be classified as misfeasance.   In my judgment that is not a course justified by either authority or principle.  It is either an attempt to extend misfeasance to mere negligence by a back door route, or, alternatively, it rests on an argument that a director has no power to make a bad (ie "wrong" or "ill-advised") decision, such that it is outside his powers to do so, and it is thus "misfeasance" to do so.   I was struck at the time by the thought that this convoluted argument resembled the now discredited rationale of the rule in *Re Hastings Bass* (see *Pitt v Holt* [2013] 2AC 108) as to justification for asking the court to declare that a decision of trustees with unfortunate unintended consequences was "void", because they did not have power to make a bad decision.  I have previously discussed and rejected this kind of argument in the context of considering the scope of fiduciary duty, above.

638.   I therefore accept the Defendants' submission that the Plaintiffs' second proposition, as to "misfeasance" having an extended nature which would, or could, encompass mere negligence, is wrong, but I explain further as follows.

639.   In fact, the Defendants point out that the full phrase in s 106(1)(c) is "*misfeasance or breach of fiduciary duty*", whereas, by comparison, the phrase in s 333 of the English Companies Act 1948  was "*misfeasance or breach of trust*".  They also point out that the successor phrase to s.333, contained in s. 212 of the English Insolvency Act 1986, is "*misfeasance or breach of fiduciary <u>or other</u> duty*".   Whilst the latter plainly includes claims under a duty of care, (this being an "*other duty*") the former English phrase did not do so, save insofar as a duty of care

might be held to be within the general concept of a "breach of <u>trust</u>". This distinguishes even the previous English position from the Guernsey position where the phrase is "breach of fiduciary duty".

640.   Since the qualifying culpability in Guernsey under s 106(1)(c) is "*misfeasance or breach of fiduciary duty*", and the distinction between a fiduciary duty and a duty of care has already been adverted to, it is clear, in my judgment, that the Plaintiffs can only be correct if the word "misfeasance" <u>itself</u> includes breach of a duty of care. However, the amendment made in England to the 1948 Act by the 1986 Act shows that it does not. In *Re d'Jan of London Ltd* [1993] BCC 646, Hoffmann LJ, dealing with an application made against a director, referred to the procedure of s 212 of the 1986 Act as "*a summary procedure which used to be called a misfeasance summons but has been <u>extended</u> to include breaches of any duty including the duty of care*" (emphasis added).

641.   In my judgment, therefore, the Defendants are correct in their interpretation of the scope of s 106(1)(c). The question is whether either of the expressions "misfeasance" or "breach of fiduciary duty", as understood in Guernsey law in 1994, extend to include breach of a duty of care, ie negligence. There has been no Guernsey authority on this point. Taking the words in their natural meaning, the distinction in quality between a fiduciary duty and a duty of care existed in 1994 even though it may only later have come to be expressed with the clarity of cases such as *Extrasure* (above). Breach of a "fiduciary duty" does not include negligence. Neither, in my judgment, does the term "misfeasance" include negligence. Misfeasance carries the connotation of a culpable <u>deed</u> ("mis-feasance") rather than the connotation of a non-deed, or neglect to act ("negligence"). Indeed, prior to the change made by the Insolvency Act 1986, the distinction between "misfeasance" and "non-feasance", and that the former did not include the latter, certainly in this context, was well understood in English law. It is that recognition which underlay judicial dicta in cases such as *Re B Johnson & Co Builders Ltd and Re Kingston Cotton Mill Company (No 2)* (above), where the issue whether "misfeasance" embraced negligence was in point, and which certainly do not support the Plaintiffs' argument.

642.   When the 1994 Companies Law was enacted, even if it was a re-enactment of earlier legislation, the changes which had been effected in English insolvency law in 1986 would have been perfectly apparent, and the extension of the phrase used in the English legislation so as directly to cover simple negligence could have been adopted. It was not adopted either in the 1994 Companies Law, or its amendment in 1996, or in the 2008 Companies Law. This must be taken to have been intentional.

643.   I conclude that the scope of the 1994 Companies Law, specifically s 106(1)(c), was limited to (a) misdeeds resulting in improper application or improper diversion of the company's property, or (b) breaches of fiduciary duty. It did not extend to a right to recover damages for breach of a duty of care. It may be that improper diversion of the company's property includes the diversion of assets which ought to have come to the company and did not, but in my judgment that is the furthest potential extension of the scope of "misfeasance or breach of fiduciary duty" available. It does not extend the underlying concept to mere negligence. It also does not extend to a claim for breach of contract.

644.   Neither, in my judgment, is the application of the concept retrieved by Advocate Wessels' ingenious argument that at the execution of each repo roll – more accurately the several transactions which went to constitute each roll – there was a material "application" of CCC's assets, by posting its RMBS as security for the relevant repo finance. This is because, even if the concept of misfeasance extended to negligent conduct which brought about a "misapplication" of the company's property, as Advocate Wessels suggests is the correct interpretation of *Re Kingston Cotton Mills* (above) (although I disagree, and in the event the dicta are merely obiter, because the Court of Appeal held that the auditors had not been negligent), there still has in my judgment, to <u>be</u> some misapplication, in the sense of an

improper or *ultra vires* application of the assets; a mere negligent application of the assets is not enough, as it is mere common law negligence:  *Re B Johnson Builders Ltd*  (above).

645.   Before this argument could begin to succeed, therefore, it would be necessary for Advocate Wessels to satisfy me that the execution of the relevant repo transactions had actually been "improper" in the required sense.   At a general level, this strikes me as a strained application of the concept of "misapplication", and very difficult to analyse satisfactorily in the light of the facts.    The position was that although the RMBS in theory "came back" to CCC at each repo roll, they did not then stand as CCC's unencumbered property available for beneficial disposal, but were constrained to be immediately re-used as security for the obtaining of the finance necessary for CCC to pay off the previous repo loan, and thus avoid losing the assets to repo creditors by seizure.   Taking the action necessary to sustain the roll-over sequence of funding does not naturally feel like a "misapplication" of CCC's assets by any means, whether or not caused by an (assumed) negligent decision to maintain this sequence. However, as this is a fact sensitive assessment, I will reconsider the point later if it becomes material to do so.

646.   As regards whether s 106 can be invoked against either *de facto*  or "shadow" directors, in my judgment the words of s 106(2)(b) certainly embrace the former.   For persons to be found to be *de facto* directors of a company it is required, by definition, that they have "*been… concerned in or ….participated ….in the management of*" the company.   With slightly less confidence, I am also of the view that the section applies to a "shadow" director as well, bearing in mind that the section is, as I have held, concerned essentially with misapplication of the company's property or assets, and that a person who has procured this, by being a person "*in accordance with whose directions or instructions the directors of the company are accustomed to act*" in the relevant respect, would appear to be within the scope of the intention of the section.

647.   As regards whether the section would apply to an investment manager, such as CIM, the Plaintiffs submit that a person in the position of CIM is "concerned… in the management" of the company (ie CCC) within the meaning of s 106(2).      The Defendants point out, though, that the phrase is "management of the <u>company</u>" and this is, and has been held to be, distinct from management of the property of the company.

648.   I think the point of construction here, taken in isolation, is a difficult one.      Although the requisite involvement in the "management" of the company appears, on the face of it, to be aimed at actual officers or quasi-officers or executives of the company, the language of subs. 106 (2) (b) shows an intention to extend this very broadly.   It extends to "any other person", to direct or indirect involvement, by way of being "concerned", or "participating", and to such involvement being "in any way".    As this phraseology is also applicable in respect of the "promotion or formation" of the company as well as its "management", it is apparent that it can naturally extend to persons other than actual officers or quasi-officers of the company itself.   On that basis, I would be inclined to think that the section is wide enough to cover an investment manager.      The result would though, it seems to me, depend on whether the obvious intention that the section should have a wide application as far as the persons subject to it is concerned, would prevail against any argument that a valid distinction could and should be drawn between the management of the company and the management of its property.

649.   I would observe, though, that if it is correct, as I have held above, that the subject of the section is limited to misapplication of the company's property and breaches of fiduciary duty, and does not extend to claims in negligence, then construing it as covering the widest possible categories of potential defendants including investment managers makes perfect sense, and is eminently reasonable.

650.    However, it is not necessary for me to decide that particular point in this case.  The only operative claim against CIM other than as *de facto* or shadow director (dealt with above) is for breach of contractual (or tortious) duty of care.  It follows from my earlier decisions that this is not within the scope of "misfeasance or breach of fiduciary duty" and consequently the question whether s 106 would apply to a claim against a contractually engaged investment manager in respect of any of the matters within the ambit of s106 does not arise.

651.    This leaves the final *res judicata* point, with regard to the effect of the decisions of Collas DB, and the Court of Appeal in *Carlyle Capital Corporation Ltd (in Liq) v Conway and others* (Guernsey Judgment 29/2011 and (2011-12) GLR 371, respectively.

652.    These were the first instance decision in this case, and the appeal therefrom, upon (so far as material) an application by the non-resident Defendants, (ie all of them save Mr Loveridge) to set aside an order for leave to serve these proceedings upon them out of the jurisdiction, or for a stay of these proceedings on the grounds that the more convenient forum for trial of the action was Delaware.  The learned Deputy Bailiff's decision, shorn of the complications arising from current but inchoate applications to amend the Cause at the time, was that he refused to set aside the order for leave to serve out, on the grounds that, whilst the Royal Court had jurisdiction over the disputes in the action, Delaware was the more convenient forum for determination of the substantive issues, but he stayed the proceedings in this jurisdiction pending the conclusion of the proceedings in Delaware, ruling that claims under s.106 or s 67C of the 1994 Act, which were obviously peculiar to Guernsey, and other issues if necessary, could and should be determined subsequently to the Delaware proceedings insofar as not there determined.   The Court of Appeal reversed the second part of this order and allowed the action to proceed in Guernsey, on the grounds (in essence) that Guernsey was the only jurisdiction in which all the issues in the action could be tried, fragmentation of trials was highly undesirable, and Guernsey was therefore the most convenient forum.

653.    In the course of their judgments, both the learned Deputy Bailiff and the Court of Appeal commented on the effects of s 106 in conjunction with s 67F of the 1994 Act.  Collas DB said (at [62]):

> "....*Section 106 is more than procedural; it does provide a remedy requiring a delinquent officer to contribute to a company's assets.  An order made under the Section requiring a delinquent officer to pay money or to contribute to the assets of the company does, in my view, "impose" a personal liability on the delinquent officer and hence come within S.67F   That is the natural meaning of the words in the Law.*"

654.    The Court of Appeal approved the Deputy Bailiff's interpretation of the operation of s 106 as "imposing" a liability: see [51].   They did so whilst at the same time endorsing the analysis that s106 "is procedural only" (see [45]).  They considered the effects and nature of s 106 itself in paragraphs [46] – [50], qualifying the statement at [45] in paragraph [49]:

> "*Section 106, therefore, whilst being procedural in the sense of not establishing a new or independent liability, does establish a new discretionary remedy available upon liquidation to the liquidator and others.*"

655.    Thus, the Court of Appeal considered that whilst s.106 created no new <u>right</u> or correlative liability, it did create (or impose) a liability correlative with the grant of a new <u>remedy</u>, made available in the particular circumstances stated in the section.

656.    The Court of Appeal then went on to consider the further impact on the arguments before them of the amendment to the 1994 Companies Law in 1996, to introduce s 67 and in particular s 67F, and stated, at [51]:

> *"Upon an ordinary interpretation of this provision, as the Deputy Bailiff used, it will embrace s.106, which imposes a liability"*

adding that it made no difference that the same liability might be imposed at common law; Section 106 still

> *"impose[d] a liability if sought by certain persons in certain circumstances and if deemed appropriate by the court in the exercise of its discretion."*

657.    Proceeding on the basis, therefore, that the "ordinary interpretation" of s 106 had the result that s 67F would apply to it, the Court of Appeal then went on in paragraphs [51]-[57] to consider arguments apparently directed at the proposition that this could not be the case, because s67F could not have reasonably been intended to remove the benefit of pre-liquidation contractual provisions which lawfully conferred immunity from liability under common law (see the end of [52]).   The Court of Appeal rejected all the arguments to this effect in [53]-[56].   In [57] they say that if there are "procedural advantages" attaching to proceeding under s 106 rather than by ordinary action, then the liquidators are entitled to do so.   The clear implication from the context is that the Court of Appeal viewed the advantage of avoiding the effects of such immunising provisions to be such a "procedural advantage", and that this would be an example of "*[taking] advantage of the remedy which is most advantageous to him*".

658.    The Court of Appeal therefore held that the s 106 claims in the Cause

> *"....cannot be said to be without any possible prospect of success.   They must be recognised, at this stage of the proceedings, as proper parts of the whole case brought against the various respondents"*

and they subsequently dismissed the Defendants' appeal against service out of the jurisdiction and allowed the Plaintiffs' cross-appeal against the stay of proceedings imposed by the Deputy Bailiff.

659.    The issue between the two sides, therefore, is really: what did the Court of Appeal decide?

660.    The Plaintiffs submit that the Court of Appeal actually decided, as a point of law, that s 106 did "impose a liability" on the Defendants within the meaning of s67F.   That section therefore applied in respect of the liquidators' claims brought under s 106 and had the effect of avoiding, as against the liquidators, any exoneration or indemnity clauses of which the Defendants might otherwise claim the benefit, whether in CCC's Articles of Association or (as regards CIM) in the IMA.

661.    The Defendants submit that the Court of Appeal did not decide that point either at all, or not as a final decision and for all purposes.   They submit that the Court of Appeal was concerned only with the tests for service out of the jurisdiction, which required consideration only of whether the Plaintiffs' Cause (a) disclosed at least one serious issue to be tried on its merits, (b) as to which there was a good arguable case that it fell within at least one of the classes of case for which permission to serve out may be given, and (c) that Guernsey was the most appropriate forum for the trial of the dispute: see *Seaconsar Far East Ltd v Bank Markazi Jomhouri Islami Iran* [1994] 1 AC 438 at 453-7.   The Court of Appeal was here concerned with the first "gateway" point, that of seriously arguable issue.   The Defendants had attacked the service of proceedings on the grounds that the s 106 claims were not seriously arguable, because the effect of the exoneration and indemnity clauses of which the Defendants had the benefit was, in law, to eliminate the causes of action against them to which they applied.   As s 106 created no new causes of action, but merely provided an alternative process for obtaining a statutory remedy for an already extant cause of action - and there was none - s106

never came into operation.  Neither, therefore, could s 67F, as its operation was confined to a "personal liability imposed….under [a] provision of [the 1994 Companies Law]".

662.    I need to digress for a moment to say that, for the sake of argument on this point only, I will assume that the effect of both an exculpation clause, (ie deeming liability never to arise or be incurred with regard to defaults), and an indemnity clause, (whereby the wronged party agrees to indemnify the alleged wrongdoer against any liabilities, even liabilities to the indemnifier, which do arise), is to negate the arising of what would otherwise be a cause of action.    I have no difficulty accepting this proposition in the case of an exculpation clause in the common terms that the exculpated party shall "not be liable for" the relevant complaint, as that seems to me to be engaged at the very outset and prevent any cause of action arising at all.     I have more difficulty with regard to an indemnity clause, since it seems to me, on a natural reading, that this provides the wrongdoer only with an immediate and responsive cross claim equal to any liability found to attach on the original claim.

663.    However, Advocate Swan, referred me to authority (*Viscount of the Royal Court of Jersey v Shelton* [1986] 1 WLR 985, *Farstad Supply AS v Enviroco Ltd*  [2010] UKSC 18, and the most recent and nearest to home case of *Emerald Bay Worldwide Ltd v Barclays Wealth Directors (Guernsey) Limited* (Guernsey CA: Judgment 02/2014)) which he said showed that even in the case of indemnities, because of the court's aversion to circuity of action, it had been ruled that no cause of action ever arose upon a liability as to which the plaintiff had the benefit of an indemnity from the defendant.

664.    I am not convinced that the authorities do clearly demonstrate this proposition, although I note that in *Farstad* it seems that the court took the view that the expression "hold harmless" meant the same thing as "indemnify", and I can see that one does not hold a party harmless from a suit if one brings that suit at all, in the first place.  On the other hand, Lord Clarke in *Farstad* also apparently approved (at [33]) the analysis that no remedy would be given because it was "*useless to give judgment*" in such circumstance, which, once again, draws attention to remedy rather than cause of action.

665.    Unfortunately for the point itself, owing to the limits on time for closing submissions, it was not possible for it to be thoroughly argued, and at one stage it appeared to be descending into an arid (on day 67 of a trial) pleading point as to whether the Defendants were entitled to take the point at all that the cause of action was extinguished by an applicable exculpation or indemnity clause, because they had admitted that they owed duties to CCC.   I would have ruled that they were so entitled if it had been necessary to do so, not least because it seems to me to be a pure point of law and construction of the clauses in question, and the Plaintiffs can scarcely claim to have been taken by surprise or to have relied in any irremediable way on the admission that duties were owed.    However, I have not found it either easy, or proportionate, or necessary to attempt to reach a firm conclusion on this point.  If it becomes pertinent in practice then I will invite further argument in a more focused context.     This is not least because it also seems to me from the authorities that this point, whether it is invoked in respect of exoneration or indemnity clauses, is very sensitive to nuances in the drafting of the relevant clause, and these have not been fully examined.

666.    However, and returning to more broad points of law and analysis which are material at this stage, the Defendants submit that all that the Court of Appeal did, in rejecting their arguments on their applications at that time, was to hold that the argument that s 67F did apply, in this particular action, to remove any exculpation or indemnity defences to claims made by the liquidators under s 106, was an argument with a real (rather than fanciful) prospect of success; the Court did <u>not</u> decide finally that the point succeeded.  This was because (a) that was all that the Court of Appeal had to find in the circumstances pertinent to the application before them and (b) that was all that one would expect to be decided on an important and not necessarily simple point upon a procedural application with regard to whether service out of the jurisdiction should be permitted.

667.    The Plaintiffs, however, maintain that when one examines the judgment of the Court of Appeal, it quite plainly <u>did</u> decide that the Plaintiffs' argument, which was a pure point of law on the construction of legislation and did not require the resolution of any factual dispute, was correct and did succeed.  There having been no appeal from this point, they assert that that decision is binding.

668.    I have found this a difficult point.   On the one hand, there is much force in the Defendants' argument that at an interlocutory stage, all that one would expect the Court of Appeal to have decided was that the Plaintiffs' case on the point was seriously arguable, so as to justify trial and as a gateway to considering the further qualifying circumstances for permitting service out of the jurisdiction.    It was not necessary for the Court of Appeal to make a final and binding decision on the point.  Indeed, even a decision that it was seriously arguable that a s. 106 claim was capable of being mounted was probably not a vital plank for the court's ultimate decision, since there were many other points and grounds which were ample to support their eventual decision.

669.    On the other hand, of course, the Court of Appeal <u>could</u> have made a final decision on such point at the time, as it was a pure point of law, not dependent on any disputed facts.  Furthermore, the terms of the Court of Appeal's judgment in this regard are strikingly forthright, in particular with regard to their emphasis on the public interest and the reasonableness of a policy that liquidation should be carried out by an independent officer, unimpeded by barriers created by pre-liquidation contractual limitations which operate against the interests of those in whose interests the liquidation is really being conducted.   I gain the very strong impression that if the Court of Appeal did decide the point, then it decided it in the Plaintiffs' favour.   I also note, ironically considering the argument which the Defendants now make, that in their eighth proposed grounds of appeal to the Privy Council from the decision of the Court of Appeal, the First to Fourth and Eighth to Tenth Defendants stated that the Court of Appeal <u>did</u> hold that s 67F applied to claims under s 106, and that it erred in doing so.

670.    However, and having carefully studied the judgment, I am of the view that the Court of Appeal did not make a final decision on this point, for the following reasons.  First, in a key paragraph at [57] the Court of Appeal chose the phraseology

>      *"Unless a claim is manifestly without possible foundation, this court cannot exclude from contemplation the right of the liquidators to rely upon s 106."*

671.    This circumlocution suggests to me that the Court of Appeal did regard its decision as being only whether the right to rely on s.106 was seriously arguable, and not that it was definitely and thenceforth unassailably, correct.

672.    Second, if the Court of Appeal had intended to make a final decision on this point, it would in effect have been deciding it as a preliminary issue in the case.   There had been no application for the determination of such a preliminary issue, and if a court is minded to take such a course of its own motion, it would be conventional and appropriate to make this clear to the parties so that they could argue their case on that basis, and in the knowledge that that would be the effect of the particular decision.   That did not happen in this case.

673.    I therefore conclude that the Defendants are correct, that the Court of Appeal did not decide this point of law finally.  It is therefore open to the Defendants to seek to persuade me that s 67F of the Law does not apply to the liquidators' claims in this action, and I am free to decide the point.

674.    The Plaintiffs advance the simple arguments which they have previously advanced, that the intention of 67F is to strike down the effects of exoneration or indemnity clauses which could be invoked by the company, when the relevant cause of action is instead pursued by a

liquidator (or other person so empowered by s. 106.)   Their argument, in essence, is that this is the obvious and simple - and I think they would probably say "ordinary" - meaning of s67F, as applied in the context of s 106.

675.   They say that it is nothing to the point that this might mean that a liquidator can pursue a cause of action which the company itself would be barred from pursuing.   They cite *Parkinson Engineering Services plc (in liq) v Swan* [2010] 1 BCLC 163, where a liquidator was held entitled to substitute himself as plaintiff instead of the company in order to pursue a claim for negligence under s 212 of the Insolvency Act 1986 against former administrators, notwithstanding the existence of a statutory release of liability of the administrators which would bar the <u>company</u> from making such claim.   That case was, however, principally concerned with whether it was right to permit such substitution when it would have the effect of barring an outright limitation defence which had accrued since issue of the proceedings in the company's name and before the application for substitution.   The Defendants point out, correctly, that the statutory release contained in s 20(3) of the Insolvency Act 1986 at that time expressly excluded the release of the administrator from liability at the suit of a subsequent <u>liquidator</u> under s 212 of the Act.   Consequently, the <u>liquidator's</u> right to pursue this claim was impeded only by limitation, and not, in any event, by the fact of the statutory release which bound the company.   Thus, it seems to me, this case does not decide that a liquidator can pursue a claim under s 212 where a claim by the company would be subject to defeat by a contractual exclusion clause if brought by the company.   It only decided that, as a matter of the court's discretion, where a liquidator had pursued a claim in the wrong form within the limitation period applicable to a s 212 application under <u>him</u>, he could be permitted to substitute himself for the incorrect plaintiff in respect of that claim, notwithstanding that limitation had expired against him in the meantime.   I conclude that this case does not, therefore give any support to the Plaintiffs' proposition in this case.

676.   The Defendants repeat their argument that the Plaintiffs' contention that s 67F will apply to any application brought under s 106 is not correct when one carries out a properly rigorous legal analysis.   Section 67F applies in relation to a liability imposed by a provision of the 1994 Companies Law.   Section 106 is of course, such a provision, and, it having been held that the operation of s. 106 is apt to impose a liability, the Plaintiffs then submit that this engages s. 67F.

677.   However, the Defendants argue that this simply assumes that s.106 does, in fact, operate.   Since it only operates to provide an alternative remedy for an extant cause of action, it is necessary for there to be an extant cause of action for it to operate.   Whether it does operate therefore depends on making out that qualifying condition under the general law and circumstances, apart from s 106.   The exoneration or indemnity clauses are part of those circumstance and as their effect in law is to extinguish the relevant cause of action, the conclusion has to be that there is no extant cause of action, nothing for s. 106 to operate on, and therefore, by extension, no scope or trigger for the operation of s. 67F; one just never gets there.

678.   I would not have found this a difficult point to decide but for my impression of the strength of the underlying views of the Court of Appeal, mentioned above.   This is because my own view is that the Defendants' analysis is correct.   Indeed, it seems to me that, with respect, it is compelled by the logic of the Court of Appeal's own decision, but I say that with hesitation, because it does not seem to have been the view of the Court of Appeal itself.

679.   The Court of Appeal's decision endorsed the analysis that, whilst s. 106 creates no new and independent cause of action, it creates an alternative remedy for an existing cause of action. It went on to hold, agreeing with the learned Deputy Bailiff, that the creation of that alternative remedy "imposed a liability" on the defendant party, such that s 106 was not "<u>merely</u>" procedural, but had other substantive effect.   In applying this analysis, the Court of Appeal was therefore drawing, recognising and even relying upon, a distinction between a

liability imposed through the vindication at law of a cause of action, and a liability imposed by a remedy created by statute, albeit granted in respect of that same cause of action.

680. The Court of Appeal's logic in holding that s 106 "imposes a liability" at all therefore focuses on the remedy only. It recognises a duality of liability, ie the liability naturally arising under common law from the cause of action (once demonstrated), and an alternative, separate remedial liability, which is the imposition of statute. It seems to me that recognition of this duality inevitably involves recognising that s.67F, by its very terms, only operates in respect of the <u>second</u>, statutory, such liability. The logic actually uses a distinction between substantive and remedial "liability" as justification for holding that, even though s. 106 creates no new and independent cause of action, it still "imposes a liability". It is only this latter proposition which then justifies the engagement of s.67F, but this means that s.67F simply never touches on the question whether the <u>original</u> cause of action, the existence of which is a precondition for s.106 being capable of being invoked at all, does exist. <u>If</u> it does exist, the consequences that s. 106 operates and that s. 67F will apply in its operation clearly flow, but that says nothing about whether any previous cause of action does, or must, exist, and that question is logically anterior. It has to be decided first, in order to decide if the conditions for invoking s. 106, and consequently s. 67F, are present.

681. The indemnity and exoneration clauses are potentially material to the initial question, because of their effects in law. If an indemnity or exoneration clause has the legal effect of extinguishing the relevant cause of action, then the situation in which s. 67F applies because s. 106 applies does not arise because s. 106 never applies. Arguing from the effect of s. 67F that the exoneration/indemnity clause cannot extinguish the cause of action because that would prevent s. 67F from applying to s. 106 so as to provide an alternative remedy for that cause of action, is circular. Moreover, it is not using s. 67F to prevent the avoiding of any liability "imposed by" a provision of the 1994 Companies Law, ie by s. 106, but is giving s. 67F a different effect, which is outside the express statutory scope of its operation.

682. For those reasons, untrammelled by any relevant dicta from the Court of Appeal, I would decide this point in the Defendants' favour.

683. That, however, does not seem to me to be at all how the Court of Appeal saw the position. It appears implicit in what they did say, that they regarded the combination of s. 106 and s. 67F as removing the contractual protection afforded to the Defendants by the indemnity and exoneration provisions entirely, and making the s. 106 remedy available notwithstanding such clauses. As I have observed, the tenor of their discussion seems to be that the public policy considerations behind s. 67F showed the reasonableness of making its effect applicable to claims simply because they were being brought within the qualifying situation set out in s. 106 - although at the same time they do seem, to me, to suggest that the breadth of the statutory discretion conferred upon the Court under s. 106 would allow the Court to have regard to such provisions as factors which might affect its discretion, in appropriate circumstances (see the end of [55]).

684. Whilst the Court of Appeal has not, in my judgment, decided the point so as to bind my decision, its approach would obviously be highly persuasive, and it has given me cause for anxious consideration. In the end, though, and with respectful hesitation, I have concluded that the Court of Appeal's attention was not focused on the duality of the liabilities in question, which seem to me to become clearly apparent only when the logic of the position is examined as closely as has happened in the trial of the action. I therefore prefer the Defendants' analysis.

685. However, and very importantly, I do not think that, in the end, it would make any major difference if I were to come to the other conclusion, for three reasons.