686.     First, for the avoidance of doubt, I make it clear that my decision at this point is only that <u>if</u> the effects of an exculpation or indemnity clause are found, as a matter of law and construction, to be that the material potential cause of action never arises, then the Defendants' argument is correct.   If, on the other hand, the effects are only to provide a defence or cross-claim to the material potential cause of action, then the Plaintiffs' argument would probably succeed.

687.     Second, I draw attention to my earlier holding that s. 106 is not apt to cover claims in negligence in any event, but only breaches of fiduciary duty (properly so called) and that misfeasance is an act or default which causes a misapplication of the company's property. This is not a point on which the Court of Appeal had to make any decision in their judgment considered above, and I have noted that they were very careful, throughout, to refer to claims which <u>might</u> be brought under s. 106, without any further dicta which might be argued to decide just what the array of such possible claims might be.   The potential for the use of s. 106 to import the effects of s. 67F is therefore of limited availability on that score.

688.     Third, even though there will, consequent on my decision, be no situation in which the Defendants have to face a s. 106 claim for negligence, this is the primary focus of exoneration and exculpation provisions, which, almost invariably, do not apply to any dishonesty, or wilful or deliberate default.   Any misfeasance causing the misapplication of the company's property is most unlikely to be of a nature other than "wilful" conduct.  It is therefore most unlikely that the exoneration or indemnity clause would actually apply in respect of such complaints; their potential effects would seem to be limited to innocent breaches of fiduciary duty (leaving aside "mere" negligence).  Even if their contractual effect to remove liability in respect of such breaches were to apply, the situation would then seem very likely to be a reasonable case for invoking the court's discretion under (now) s 522 of the 2008 Companies Law to relieve from liability on the grounds that such a defendant acted "honestly and reasonably and …ought fairly to be excused."

689.     Thus, the practical effect of my decision that s. 67F does not apply at the level of cause of action liability, but only at the level of remedy liability, is likely to be quite limited.

690.     Lastly, an important point to note, from a general law perspective, is that the particular situation with which I have had to grapple in this case is fortunately now no longer of general application, because the Companies (Guernsey) Law 2008 took a policy decision which went further than s. 67F, and rendered void any attempt by a company to exonerate or indemnify a director for any breach of any duty, including simple negligence:  see s 157.   Thus, the effect of the interplay of s. 106 and s. 67F of the 1994 Companies Law and the common law duties of directors is now only of historic interest.

**The 2008 Companies Law**

691.     The Plaintiffs second and more general line of attack on the indemnity and exculpation clauses actually turns to the above point, and is that they are avoided by s. 157 of the 2008 Companies Law.  The relevant parts of this section provide that

> "157(1)    Any provision that purports to exempt a director of a company (to any extent) from any liability that would otherwise attach to him in connection with any negligence, default, breach of duty or breach of trust in relation to the company is void.
>
> "(2)    An provision by which a company directly or indirectly provides an indemnity (to any extent) for a director of the company or an associated company, against any liability attaching to him in connection with any negligence default, breach of duty or breach of trust in relation to the

> *company of which he is a director is void except as permitted by section 158 or 159"*

> *"(3)   This section applies to any provision, whether contained in a company's memorandum or articles or in any contract with the company or otherwise...."*

(Sections 158 and 159 are not material.)

It will be seen that these provisions are, on the face of it, sufficient to avoid the effects of Articles 172 – 174 and the provisions of the IMA insofar as they relate to the Defendants as Directors of CCC.   However, they did not come into effect until 1st July 2008.

692.   Transitional provisions were enacted by Regulation 10 of *The Companies (Transitional Provisions) Regulations 2008.*   This provided that

> *"10 (1)   Section 157(1) and (2) of the new Law does not apply to an exemption from liability or indemnity provided before the date of commencement of the new Law until the 1st January 2010.*

> *"(2)   Accordingly,*

> *(a)   the validity and enforceability of any such exemption from liability or indemnity shall continue to be governed, until 31st December 2009, by the provisions of the 1994 Companies Law and the other relevant principles of law in force immediately prior to the date of commencement of the new Law; and*

> *(b)   any such exemption from liability or indemnity –*

> *(i)   shall after that date be deemed to be void only to the extent necessary to ensure compliance with section 157(1) or (2) as the case may be, and*

> *(ii)   subject to that may be read as if it were lawful to the fullest extent permitted by the new Law."*

693.   For the effects of this transitional, provision, the Plaintiffs referred to *Perpetual Media Capital Ltd v Enevoldsen* (2014) GLR 57.   In that case, the indemnification provision had been present in the company's articles since October 2007.   The directors took office in March 2009, the breaches of duty took place in July and August 2009 and proceedings were commenced in April 2011.   The issue arose as to whether the indemnification provision was void under s 157, or whether it remained valid in favour of the directors by reason of Regulation 10.   This depended on whether, in the circumstances, the indemnity was "provided" before 1st July 2008 or after.   The Plaintiffs argued that "provided" referred to the date when the company gave the director the benefit of the provision, which therefore had to be when the directors took office; the Defendants argued that it was when the provision was put into the Articles.   The Court of Appeal preferred the Plaintiffs' argument.

694.   The Court of Appeal explained the effects of Regulation 10 as being that directors of companies appointed before 1st July 2008 obtained, by the Transitional Regulations, a period of grace up to 31st December 2009 during which any pre-existing indemnity provisions in the company's articles would continue to be valid for their benefit, but that they could not rely upon them thereafter; directors appointed after 1st July 2008 came immediately under the new regime, and the operation of s. 157 prevented their relying on any such indemnification provision from the outset of their appointment.

695. This decision is not, therefore directly applicable to this case, where the position is that the company's Articles were adopted in June 2006, and the directors were appointed then and shortly thereafter.    The alleged breaches of duty took place in 2007 and before March 2008, and these proceedings were commenced on 7th July 2010.  Thus, everything save the actual commencement of proceedings occurred before the coming into force of the 2008 Companies Law, and proceedings were commenced after the period of transition.

696. In *Savile AD4 Limited v Marlborough Trust Company Limited* ((2016) Guernsey Judgment 3/2016), McMahon DB – who had also been the judge at first instance in *Perpetual Media* and whose decision on the availability of the indemnification provisions had been reversed by the Court of Appeal - had to consider the case where the director defendants had been appointed in 2007, the alleged breaches took place in February and May 2008, and the proceedings were commenced in April 2013.     He held that in such circumstances the directors were entitled to rely on the indemnification provision in the company's articles, because the termination of the "period of grace" in respect of directors appointed before 1st July 2008 only applied to avoid the indemnification provisions with respect to <u>breaches</u> committed after 31st December 2009; it did not prevent those provisions being invoked in respect of breaches of duty committed whilst the indemnification provisions were still permissible and therefore operative under the then law, even where proceedings were commenced after the end of the period of grace.

697. McMahon D-B said, at [32]:

> "*I am satisfied therefore that the First and Second Defendants continued to enjoy the benefit of Article 153 under the terms of Regulation 10 until the end of 2009 and that it is not a benefit that can only be invoked up to that time.  Section 157 of the Law makes such a provision void in its operation after that date, but does not also mean that invoking it after that date in respect of something which occurred when it was still operative is impermissible.  Had the proceedings against a director been commenced, as here, later than 1 January 2010, on the Plaintiffs' argument the benefit of a provision like Article 153 would depend on timing.  In my view that cannot be right.  Accordingly I reject this further attempt by the Plaintiffs to defeat this application.*"

698. The timings in the *Savile AD4* case relative to the coming into effect of s 157 under transition are materially identical to those in this case.     The Plaintiffs submit, however, that the decision of McMahon D-B was wrong and ought not to be followed.  I disagree.

699. In fact, it seems to me that the transitional provisions are a red herring, which muddies the real issue.  In neither the *Savile AD4* case nor in this case did anything material actually occur during the transitional period (unlike *Perpetual Media*) so as to make this relevant to principle.    If one simply ignores Regulation 10, then the real argument would be exactly the same.  It is whether the avoiding effects of s 157 depend on the date when proceedings were commenced, or the date when the breaches in respect of which its protection is invoked took place.    In other words, it is whether s 157 has retrospective effect to remove a right of protection which the director enjoyed at the time and in respect of the alleged breaches, but which could no longer lawfully be operative at the time of commencement of proceedings.

700. There are two reasons why I respectfully endorse the view of McMahon D-B that s. 157 does not have such retrospective operation (regardless of the period of grace).     The first is that as a matter of policy the law leans against retrospectively altering the accrued rights of citizens.  The second is that of the uncertainty to which I think McMahon D-B was adverting, although I actually wonder whether his antepenultimate sentence in the quotation above was intended to read "*Had the proceedings against a director **not** been commenced, as here, later than 1st January 2010....*".     The underlying point seems to me to be that it would be both uncertain and wrong for a defendant's ability to rely on an indemnity provision to depend on a matter

entirely within the plaintiff's control, namely when the plaintiff commenced proceedings. For the director to be able to rely on such an indemnity if proceedings against him were commenced on, say, 30th December 2009, but not if they were instead commenced on 2nd January 2010, would be arbitrary and unprincipled.

701.    In my judgment, therefore, the correct position is that a director who took up office before 1st July 2008 has a right to rely on an indemnity provision contained in the company's Articles at the time of his appointment (or if inserted therein prior to 1st July 2008) in respect of any breaches of duty which are alleged to have taken place before 1st July 2008, whenever proceedings in respect of those breaches are commenced.   That is enough to decide the point in this case, although it also seems to me that the period of grace conferred by Regulation 10 continues that right, as regards directors so appointed, in respect of breaches alleged to have been committed until 31st December 2009, but not breaches thereafter, again, whenever proceedings in respect thereof are commenced.  However, as that point is not material to my decisions on any basis, I express no concluded view on it.

**Further points on exoneration/indemnity defences**

### *(i)     Incorporation from the Articles*

702.    The Plaintiffs argue that even if the exoneration/indemnity clauses of Articles 172-4 are not rendered void by statute, there are still two further reasons why they do not provide defences to the Defendants.

703.    The first is that the terms of CCC's Articles of Association are not, in fact, incorporated into the respective service arrangements of the individual Defendants with CCC, such that they are not entitled to invoke these against CCC.

704.    This point was considered and argued in *Perpetual Media* (above).     The Court of Appeal there expressed a preference for the approach in Guernsey law to be that a director of a Guernsey company is presumed to take up office on the terms of the company's articles, but that that presumption would be rebuttable by evidence (see per Beloff JA at [35]).

705.     The Plaintiffs submit that this approach is incorrect, and that the correct approach is that the matter of incorporation must be decided simply on the balance of any evidence actually presented, in the normal way, and they submit, for example, that a crucial question is whether there is evidence that the director actually read the company's articles, with the fact that he did or did not sign them being particularly relevant.  This was the competing (but rejected) argument in *Perpetual Media,* but the Court of Appeal also went on to say that even if that rejected approach were accepted, it would be a low evidential threshold to establish incorporation.

706.     In my judgment, the preferred approach of the Court of Appeal in *Perpetual Media*, even if not binding authority on the point, is highly persuasive as being the considered view of a superior court concerned precisely with the Guernsey jurisdiction, and I will follow it.    I would add that it seems to me to be the eminently sensible, reasonable, practical and appropriate approach in any event.   Any person becoming a director of a company is plainly well aware of the fact that it has "constitutional" documents.  He could not later claim to be unaware of their contents where these governed or shaped his duty to ensure that the company is run correctly, according to its constitution.  In those circumstances, it seems to me that the natural presumption must be that a director takes office on the basis of the whole package of provisions contained in the company's Memorandum and Articles of Association, including not just the burdens, but also the benefits which may be contained in them.  This presumption will also have the merit of being clear and simple and, perhaps most importantly, to be what the ordinary man would expect.     I therefore find that it is the correct approach in Guernsey law.

707.   The issue of rebutting the presumption, if it ever arises, will, therefore, be a matter of evidence, and, of course, the evidence applicable individually to each of the seven individual Defendants.   As that is therefore a fact-finding exercise of some proportion, I will embark upon it only if and where it becomes necessary to do so.   I will simply record here that, just as the Court of Appeal opined that even if the competing approach were taken, and the matter considered on the basis only of the available evidence with no presumption in favour of incorporation, the threshold for establishing incorporation would be "low", it seems to me that the threshold for establishing that the articles of the company were not impliedly incorporated into any director's service arrangements will be high for the purposes of rebutting the presumption.

(ii)   *Construction of the clauses*

708.   The Plaintiffs' second argument is that Articles 172 – 174, do not, in any event, purport to provide exculpation or indemnity against certain kinds of conduct.   For example, Article 172, the indemnification provision for directors, excludes liabilities incurred by or through their own "*wilful act neglect or default*", and the indemnification provision in respect of CIM and its affiliates, in Article 173, excludes liabilities resulting from their "*bad faith, fraud, gross negligence or wilful misconduct*".   The director's exoneration provision in Article 174 (1) excludes conduct involving their "*bad faith, fraud, gross negligence or wilful misconduct*".

709.   Similarly Clause 2 (b) of the IMA (exclusion of CIM's liability) does not extend to a loss resulting from "*wilful misconduct or gross negligence* [in Delaware law]", and Clauses 6(a) (b) (indemnification and exoneration of CIM and affiliates) does not extend to "*wilful misfeasance, gross negligence* [in Delaware law], *bad faith or reckless disregard*".   The Plaintiffs submit that the Defendants' breaches of duty fall within the excluded standards of conduct.

710.   This submission is one of quite fine detail and will only require consideration if and when I conclude that the application of these clauses does arise as an issue which I need to determine.   It will also then require consideration, not only of the meaning of the terms used, but also my detailed findings of relevant fact.   I will therefore again leave this until such time as it may be necessary to consider it further.

711.   The Plaintiffs have further and more detailed arguments with regard to the precise or possible application of the terms of the various exoneration and indemnity clauses, upon their true construction, and they have also raised arguments as to the extent to which Article 174(2) of CCC's Articles might be void for being contrary to public policy.   Again, these arguments were not gone into in oral submissions at the trial in the interests of time.   If they require consideration, then that will be better and more effectively done in the light of relevant findings of detailed fact, rather than at the level of legal principles.   I will again, therefore, revert to these points only if and when necessary, and will invite further argument if I think appropriate.

(iii)   *Statutory discretion*

712.   Lastly, for the sake of completeness, I record that the Defendants would, if ultimately necessary, seek to invoke the court's statutory discretion under s 522 of the 2008 Companies Law, to excuse a director from liability on the grounds that he "*acted honestly and reasonably and …. ought fairly to be excused*".   (There appears to have been no equivalent provision in the 1994 Companies Law, but the court's powers here depend on the law in force when it comes to make its decision.)   This is again, obviously, a provision which would require to be applied in the context of detailed findings of fact, and I will accordingly defer any consideration of it until it may be appropriate.

**(7)   The Entity Defendants as Directors**

713.   The first seven Defendants are individuals who were formally appointed directors of CCC, as its first directors, in accordance with its Articles of Association.  The Plaintiffs' claims are made against them as such.  The Entity Defendants were not appointed directors of CCC.  The Plaintiffs nonetheless claim that, on the facts of this case, they each can and should be held liable as if they had been validly appointed directors of CCC, on the basis that they were, in Guernsey law, either *de facto* directors of CCC or "shadow" directors of CCC, and that they therefore owed to CCC the same duties as if they had been duly appointed directors.  There is little or no Guernsey law on this topic, but there is a large body at least of English law on the requirements for making out either qualification.

**(a)   *De facto* directors**

714.   The term "*de facto* director" does not appear in Guernsey company legislation.    The material Law in this case is the 1994 Companies Law, as amended in 1996.   This was the Law in force at the time of the events complained of; the 2008 Companies Law did not come into effect until 1st July 2008.

Section 117 of the 1994 Companies Law provides that

> "*In this Law unless the context otherwise requires,*
>
> *....  'director' means a person occupying the position of director, by whatever name called".*

715.   This is slightly different from s.131 of the 2008 Companies Law, and indeed from all the recent English Acts at the time – the Companies Act 1948 s 455(1), Companies Act 1985 s 741(1) and Companies Act 2006, s 250.   In all of these the definition is inclusive, rather than exhaustive, as exemplified by s. 131 of the 2008 Companies Law, which reads:

> "*In this Law "director"* <u>*includes*</u> *an alternate director and any person occupying the position of director, by whatever name called."* (emphasis added).

716.   On a straightforward reading, s. 117 therefore deals only with nomenclature, making it clear that a company officer is to be treated as a "director" if he functions as such, even if he has a different official title.   It does not refer to persons acting with no official position or title at all.    However, since the thrust of s. 117 is that liability in the eyes of the law arises from *"occupying the position of 'director' "* (ie carrying out the functions of a director) an appropriately purposive construction suggests that the definition covers persons acting as a director but with no title at all, ie no formal appointment to any office.   I would so read it, and I therefore conclude that the minor difference in wording between s. 117 of the 1994 Companies Law and s 131 of the 2008 Companies Law is not of significance for this case, and neither, here, is the fact that the 1994 Companies Law, though modelled on the English statute, used this slightly different wording.  In particular, I am satisfied that English authority provides useful assistance as to the scope of de facto directorship under the 1994 Companies Law.

717.   The concept of a *de facto* director in English law was first recognised, in the 19th century, in the case of a person who had acted as a company director, but whose appointment was defective.   Such a person could not escape responsibility as a director of the company by relying on the invalidity of his appointment.   He had acted as a director *de facto.*

718.   The first English case to extend the concept beyond this, to a person who had never even purportedly been appointed as a director of the company, appears to have been *Re Lo-Line Electric Motors Ltd* [1988] Ch 477.   The defendant there had never been formally appointed,

but was found to have been held out by the *de iure* directors of the company as being a director, and he had behaved as such. He was held to be a *de facto* director. This led Millett J (as he then was) in *Re Hydrodan (Corby) Limited* [1994] 2 BCLC 180, to explain the concept in the following terms:

> "...*a de facto director is a person who assumes to act as a director. He is held out as a director by the company, and claims and purports to be a director although never actually or validly appointed as such. To establish that a person was a de facto director of a company it is necessary to plead and prove that <u>he undertook functions in relation to the company which could properly be discharged only by a director.</u> It is not sufficient to show that he was concerned in the management of the company's affairs or undertook tasks in relation to its business which can properly be performed by a manager below board level.*" (emphasis added).

719. The concept was later extended yet again to include persons who were not even held out by the company as directors but who purported to act as directors of the company with no authority at all. It thus extends to those who "interfere" in the company's affairs.

720. All this shows, though, that the focus is on the defendant's acts. The reason for imposing liability is that those who in fact act as company directors should be held responsible as such. However, the extension simply to those who meddle brings a need to define and delimit the factual basis which does import liability. Thus, in the passage of Millett J's judgment cited above, the passage emphasised is of central importance. The principle is that liability as a director is incurred by a defendant for doing acts, in relation to the company, which could be properly done <u>only by a director</u>. It is therefore necessary to decide if that condition is made out by identifying what acts can only be done by a director in the particular company. This requires investigating and identifying the corporate governance structure of the company, so as to see whether the relevant acts of the defendant are "directorial" (as I shall now refer to them) in that context.

721. Jumping slightly ahead, the most recent English case in which the authorities with regard to *de facto* directorship have been reviewed is *Smithton Ltd v Naggar* [2014] EWCA Civ 939, relied on by the Plaintiffs. Arden LJ there synthesised the cases, concluding that:

> "*where a person had never been even invalidly appointed a director, it was necessary to examine the governance system of the company in order to assess whether he acted as a director*".

At [35] – [42] she set out a series of practical points material to determining whether a person was a *de facto* director. I distil those which are material to this case, as follows;

(i) A party may be a *de facto* director even if there is no invalid appointment; the question is whether he carried out the function, and thus assumed responsibility to act as, a director;

(ii) To answer that question, the court may have to determine in what capacity the alleged director was acting;

(iii) The court will in general <u>also</u> have to determine the corporate governance structure of the company, (which can and will vary from company to company), so as to decide whether, in relation to the company's business the defendant's acts were "directorial" in nature; it is important that a first instance judge make findings in this regard;

(iv) The court is required to look at what the party actually did and not any job title he had;

(v)    The test is objective; neither the party's intention, nor his belief that he was or was not acting as a director, is of any relevance;

(vi)    The test is fact and circumstance dependent.  It may be appropriate to look at the party's actions "in the round" but equally, in an exceptional case even a single act may be taken to constitute a person a *de facto* director; and

(vii)    Whether the company held the party out as being a director would be a relevant factor; whether third parties regarded him as being a director may be material evidence.

722.    I will adopt and apply these principles.  I also add my own comments and emphasis to them, being points which I derive from looking at the authorities generally.

723.    First, and as to (iii) above, in *Holland v HMRC* [2010] UKSC 51, Lord Collins observed at [91] that

> "it is just as difficult to define "corporate governance" as it is to identify those activities which are essentially the sole responsibility of a director or board of directors".

724.    It seems to me that these are two ways of stating what is really the same test.  Once one finds "directorial" acts, then whether one describes these as rendering the actor part of the corporate governance structure of the company, or whether one simply says that he must be taken to have assumed the functions of a director by so acting, is simply a matter of language.

725.    Also as to (iii), the qualification noted by Millett J in *Hydrodan* remains; the test requires the finding of actual "directorial" acts on the part of the defendant and merely being involved in the management of the company, or exercising a degree of influence over its decision making, is not in itself enough, although in the former case it may become enough if there is no other person involved in the management of the company in practice.  That, however, is not this case.

726.    Next, because liability as a *de facto* director is brought upon a defendant as the legal consequence of his own acts and their being found to be "directorial acts", it is imposed only in respect of such directorial acts; a "*de facto* director" does not automatically become responsible for the totality of the company's acts or activities.

727.    Identifying what are or are not "directorial" acts in any particular case may not be easy.   At the company's inception, all its powers to act are vested in its directors (by whatever name called) as a result of company legislation and the particular company's articles of association. Subsequently, such powers can be delegated, to a greater or lesser degree.  In the case of a small and simple company, authority to act for the company and deal with its assets may well remain with its directors, both at the high level of strategic decision-making and the low level of everyday decisions and acts of implementation.  In the case of companies with large enterprises, employees, advisers and agents will be engaged to carry out the more everyday work, and where the nature of the business is complex or requires expertise, others may be involved in high level decision-making or activities.   The structure will vary with the particular needs of the company and the particular skills of the directors.   Insofar as the directors delegate active functions, their involvement will then, quite properly, become more supervisory than operational, although a residue of supervisory function will always remain at the core and be non-delegable.  Therefore, whilst decisions within the retained area(s) of control remaining with the directors will certainly be "directorial" in nature, how far, within the spectrum of possible structures, actual delegation of power to act may have gone can differ from company to company, and will be fact-specific.   Whilst the authorities acknowledge the difficulty of generally identifying what are or are not "directorial" acts in

respect of a company, it seems to me that, in practice and like the proverbial elephant, one is likely to be able to recognise such an act in context, even if one cannot easily define it.

728.  Thus far, however, the cases have been concerned only with holding a natural person to be a *de facto* director of a company.  What is here alleged is that another corporate entity should be held to have been a *de facto* director of a company, and this adds yet another dimension to the concept of a *de facto* director.

729.  The important case of *Holland v HMRC* [2010] UKSC 51 illustrates the analytical issues which have to be grappled with when the factual situation extends to corporate entities.  In simple terms, in *Holland,* the subject company (S) was owned by another company (H) which was in turn owned by Mr Holland with his wife, and Mr Holland was the sole director of company H.  The sole director of company S was company H.  The issue was whether, through being the sole director of Company H which was the corporate director of Company S, and carrying out acts on behalf of Company S, Mr Holland had been a *de facto* director of Company S, so as to incur personal liability for an undoubted misapplication of Company S's funds.    It was held by the majority of the Supreme Court (led by Lord Collins) that Mr Holland was not a *de facto* director of Company S, even though every decision of Company S was actually taken by him and implemented by him.   This was because he was to be taken to have done those acts as the appropriate organ of, or agent for, Company H, the *de iure* corporate director.   His acts were therefore the acts of Company H.

730.  This decision was driven by respect for the distinction between the legal personality of a company and its owners, and a reluctance to pierce the corporate veil, (see [25]), influenced by the fact that company legislation permitted one company to be a director of another company.  The dissenting minority, (led by Lord Hope) agreed that merely being a director of a corporate director (H) of a company (S) did not *ipso facto* render that person a *de facto* director of company S, and that something "more" (compare *Hydrodan* (above) at  p 184B) was required.    However, they considered that the extensive nature of the acts actually performed by Mr Holland in regard to Company S did amount to that something "more", and they would have found him to be a *de facto* director.

731.  On any basis, though, the entire Supreme Court plainly felt it right to reject, as an acceptable basis for the imposition of liability, an impressionistic "broad brush" argument that Mr Holland was "really" a director of the subject company, in the sense that he was its directing mind in a generalised way.   All members tested the position by a principled legal analysis of the corporate structures which had been set up, and the position, authority and pertinent acts of the defendant which were claimed to have made him a *de facto* director.   (It is to be borne in mind that no argument as to Mr Holland's being a *shadow* director of Company S arose in this case.)

732.  I do not overlook that the reasoning in the *Holland* case may well have been influenced by the particular development of English law as regards the use of corporate directors.  English company law had expressly provided that a corporation could be the director of a company in the Companies Act 1985, but it had intervened again in the Companies Act 2006 (s.155(1)) to decree that a company must have at least one natural person as a director.  This was to avoid the unacceptable consequence that a company might have no natural person who could be held accountable for misapplication of its assets.

733.  No such developments have featured in Guernsey law, at any rate at the time with which I am concerned.  Corporate directors were (and still are) permitted, by the combined effects of s 117 of the 1994 Companies Law quoted above and the Interpretation (Guernsey) Law 1948, which enacts that unless the context otherwise requires, a reference in any enactment to a "person" means either a natural or a legal person.    It follows that the actual decision in *Holland*, which would not be binding on this court, might be inappropriate in a Guernsey law

context.   I can see that it also might be thought that there was some force in the minority approach in that case.

734.   However, this is not a point which arises for decision here.   The actual decision in *Holland* is not directly material to this case, because there the claim was to hold an individual liable as a *de facto* director because of his own personal acts, whereas here the claim is the reverse; it is to hold another <u>company</u> liable as a *de facto* director because of the acts of individuals associated with that company.

735.   What is to be derived from *Holland*, and other cases such as *Kuwait Asia Bank EC v National Mutual Life Nominees Ltd* [1991] 1 AC 187 (which decides that a party with the power to appoint a director to a company does not thereby become liable for the acts of such director, whether vicariously as his employer, or at all), is the importance of the capacity in which a natural person is acting, for the purpose of the correct legal analysis of the overall situation.

736.   It is material in at least two different ways.    The first is the requirement already noted that the relevant act within the subject company must be an act required to be done by someone with the capacity of a director.   If the defendant could have carried out the acts in question in some other capacity, either because they were not acts which only a director could carry out *(Hydrodan)* or because the defendant enjoyed some other capacity in which he could properly do them *(Holland)*, then the defendant is not a *de facto* director.

737.   The second is that, since a corporate entity can only act through a natural person, where it is sought to make a corporate entity liable as a *de facto* director, one must find not only directorial acts done by the relevant natural person on behalf of the subject company, but also that that natural person was carrying out those acts as agent of the corporate entity sought to be made liable as its *de facto* director.   Not only that, but it seems to me that, analysing the authorities, he must be found to be doing so <u>only</u> in such capacity.

738.   It follows, in my judgment, that it will be well-nigh impossible to fix a corporate entity with liability as a *de facto* director of another company through the acts of any individual who was a *de iure* director of that other company at the time.   That individual will obviously be carrying out "directorial acts" in his capacity as a director of the company, and not as agent for the targeted defendant.

**(b)   Shadow directors**

739.   The term "shadow director" is found in the 1994 Companies Law only through having been introduced by amendment in 1996.   It was introduced, though, only for the purpose of the new section 67C, which relates to wrongful trading:-

> "67C   ....(7)   <u>*In this section*</u> *"director" includes a shadow director, which means a person in accordance with whose directions or instructions the directors of the company are accustomed to act"* (emphasis added).

740.   It follows that the Plaintiffs can certainly invoke the doctrine of shadow directorship against the Entity Defendants with regard to their wrongful trading claims.   The question whether they can do so with regard to their claims based on the general fiduciary duties or duties of skill and care owed by a director to his company is not so clear.

741.   The concept of the "shadow director" was enacted into Guernsey law more broadly in the 2008 Companies Law (see s. 132), but that was, of course, only as from 1st July 2008, and even then the enactment did not extend the term "director" as used in the Companies Law generally to include a "shadow director" as there defined.   Rather, it enacted that where the term "shadow director" was itself used in the 2008 Companies Law, this meant a *"person in accordance with whose directions or instructions the directors of the company are*

*accustomed to act*", and in s 132(3) it specifically extended the meaning of the word "director" in particular sections of the Law (ss 160 and 162-4, which have no relevance here) to include a "shadow director", as so defined.

742.   Thus, in both the 1994 Law and the 2008 Law, the operation of the defined concept of a "shadow director" is confined to the two situations, first where that term is actually used in the Law itself, and second where it is specifically directed to be treated as if it had been used. These situations do not include the operation of the company director's fiduciary duties or duties of skill and care, neither of which is actually laid down in the Companies Laws at all. Neither Law enacted that wherever the term "director" was being used or applied in the Law, it included a shadow director.

743.   The significance of this is that liability as a *de facto* director of a company applies because the office of a "director" in company law has been held, by judicial interpretation of that term (in English law but with Guernsey law reasonably following suit), to extend to a person who acts as a director of a company in actual fact, even though not as of right.   However, liability as a shadow director is not the result of judicial interpretation, but of legislative enactment.   It is therefore confined to the cases stipulated by the enactment.

744.   It consequently seems to me, that it is only if the concept of *de facto* directorship <u>itself</u> could be extended to include the shadow directorship situation that this would enable a finding of liability for breach of fiduciary duty or of duty of skill and care to be made against a shadow director.   This would be a perfectly reasonable interpretation.   The basis for imposing liability on persons as *de facto* directors of companies is that of imposing duties and responsibilities to the company on those who are in practice taking the operative decisions on its behalf.   This principle can be applied just as readily to the shadow director situation as it does to the conventional *de facto* director situation.

745.   If it were open to me to do so, I would readily construe the Guernsey Companies Laws to the effect that a person could "occupy the position of director" of a company by issuing directions or instructions to its *de iure* directors which those directors were accustomed to act upon, and thus that person would be a director of the company, in any material respect according to the facts.

746.   However, albeit with reluctance and on balance, I do not think that doing so is open to me. It seems to me that the terms of the Companies Laws - and it is even more clear in the 2008 Law -  treat the concept of shadow directorship and the situation giving rise to it as being a separate and distinct concept in its own right.   The legislature has then prescribed the situations in which the situation of a person falling within that concept is to be taken to impose director's liabilities or duties, initially on a very limited basis in 1996, and subsequently in a wider range of situations in 2008.    That being the case, it seems to me that the legislature has to be taken to have intended those situations to be exhaustive with regard to shadow directorship, and that in enacting those express provisions it was implicitly ruling that the term "director" did not, itself, extend to them.   The consequence is that the legislation seems to me to have ruled out any permissible judicial extension of the principles of *de facto* directorship to include shadow directorship.

747.   It would follow that liability as a shadow director in Guernsey law applies only where the applicable Companies Law directly stipulates.   I would hold, therefore, that the allegation of shadow directorship against the Entity Defendants is available only in respect of the Plaintiffs' claim for wrongful trading.   However, I have to consider the legal principles regarding a shadow director for the purpose of the wrongful trading claim in any event.   I therefore do so generally and what I say below are my findings on the scope of the concept of shadow directorship in Guernsey law, whether its application is limited as just discussed or not.

748. First, a minor point of construction.   Under the 2008 Companies Law, the definition of a shadow director was extended by adding the further qualification that a person was

> *"not to be regarded as a shadow director by reason only that the directors act on advice given by him in a professional capacity"* (s. 132(2)).

749. I do not think this makes any substantive difference to the meaning of the concept under s 67 of the 1994 Companies Law as amended. In my judgment, this qualification is really implicit in the original wording, not least because "advice" and "directions or instructions" are different things.   I accept that "advice" could conceivably be rendered in such a way that it could fairly be characterised as either "directions" or "instructions".   However, that would be a matter of fact to be proved, and does not mean that advice generally is to be taken as falling naturally within such a description.

750. I do not think that I was urged by Advocate Wessels to infer, from the introduction of this qualification on 1st July 2008, that prior to that time a professional adviser in Guernsey on whose advice directors of a company would generally act was to be taken to be a shadow director of the company, but I would in any event decline to do so.   To do so would, in my judgment, be attributing far too much inferential weight to amendments to companies legislation which were probably inserted for the avoidance of doubt, and would in fact be contrary to what I have indicated I would regard as the natural meaning of the words in context, according to their obvious policy intention.

751. I approach the matter, therefore, on the basis that the court is looking for "directions" or "instructions", even though it would not be precluded from finding, on appropriate facts, that communications which were termed "advice" nonetheless fell into those categories in substance.

752. Once again, the English case of *Re Hydrodan (Corby) Ltd* (above) provides a useful starting point for formulating the appropriate test.   Millett J, at p 183 c-e, and having emphasised the contrast with a *de facto* director, (in that the former openly acts as a director, whereas the latter claims not to be a director at all), determined that the statutory definition required proof of

> *"(1) who are the directors of the company, whether de facto or de jure; (2), that the defendant directed those directors how to act in relation to the company or that he was one of the persons who did so; (3) that those directors acted in accordance with such directions; and (4) that they were accustomed so to act.   What is needed is first, a board of directors claiming and purporting to act as such; and secondly, a pattern of behaviour in which the board did not exercise any discretion or judgment of its own, but acted in accordance with the directions of others."*

753. Later English authority has established that it is not necessary for all the directors to act in accordance with the relevant directions or instructions; a governing majority will suffice: see *Ultraframe (UK) Ltd v Fielding* [2005] EWHC 1638 at [1272].   It is also not necessary that an alleged shadow director should control all the decisions of the directors, or all the company's field of activities:   *Secretary of State for Industry v Deverell* [2001] Ch 340 per Morritt LJ.   There must, though, be actual "acts" by the Board which are being controlled in the manner described, because this is what is stated in the statutory definition.   There must also be a pre-existing pattern of such allegedly controlled acting.   This is necessary in order to satisfy the requirement of "being accustomed": see *Ultraframe* (above) at [1277-8].

754. The essence of this concept is that the alleged shadow director is, in reality, the actual director or the "directing mind" of the company in the relevant respects, (ie the offending acts of the *de jure* – or it could even be: *de facto* - directors), because those who are actually carrying out the particular offending acts are merely the conduits of his wishes and decisions.

755. Lewison J in *Ultraframe* expressed some reservations as to the extent of fiduciary duties properly imposed on shadow directors, since they would usually be incurring liability precisely because they would be operating with a conflict of interest as regards another person or entity (at [1290]).   I would decline to follow that dictum on any basis, though, for being what I would regard as an unguarded comment, since the whole point of imposing liability for shadow directorship is precisely to hold liable the persons who are in fact directing a company's affairs contrary to what would otherwise be its directors' duties.   Fortunately, in *Vivendi SA v Richards,* [2013]EWHC 3006, Newey J clarified the position sensibly, concluding that shadow directors did owe fiduciary duties to the company, and that

> *"A shadow director can, I think reasonably be expected to act in the company's interests rather than his own separate interests when giving such* [sc. such as the directors will be accustomed to act upon] *directions and instructions." [143].*

756. Once again, though, discussion of this topic shows the need for careful analysis of what is actually going on in substance, especially as regards defendants with a potential conflict of interest.     This is highlighted by some of the examples considered in *Ultraframe*, which discuss (see [1266-9]) the position of funders, lenders, suppliers, etc, who may be able to dictate the actions of the company to its board because of the strength of their commercial negotiating position.     Lewison J accepted and endorsed the view that doing so would not make that counterparty a shadow director of the company.   He also accepted that a creditor of the company is entitled to protect his own interests as creditor without necessarily becoming a shadow director of the company.   This is a realistic approach and, on a more general plane, it underlines that the courts will be careful, in making judgments in the context of commercial matters, to give appropriate recognition to the realities of the business world.   Such recognition, together with the exception of trusted professional advisers from liability, emphasises both the focus of the policy that imposes liabilities on shadow directors, and that any finding is dependent on facts.

757. Advocate Wessels took me to *Secretary of State for Industry v Deverell* (above) as his principal authority and as epitomising the test for shadow directorship.     Morritt LJ summarised his conclusions at [35] in five propositions:

> *"…(1) The definition of a shadow director is to be construed in the normal way……..it should not be strictly construed………*
>
> *"(2) The purpose of the legislation is to identify those, other than professional advisers, with real influence in the corporate affairs of the company. But it is not necessary that such influence should be exercised over the whole field of its corporate activities……*
>
> *"(3) Whether any particular communication from the alleged shadow director, whether by  words or conduct, is to be classified as a direction or instruction must be objectively ascertained by the court in the light of all the evidence. In that connection I do not accept that it is necessary to prove the understanding or expectation of either giver or receiver.  In many, if not most, cases it will suffice to prove the communication and its consequence. Evidence of such understanding or expectation may be relevant but it cannot be conclusive. Certainly the label attached by either or both parties then or thereafter cannot be more than a factor in considering whether the communication came within the statutory description of direction or instruction.*
>
> *"(4) Non-professional advice may come within that statutory description. The proviso excepting advice given in a professional capacity appears to assume that advice generally is or may be included. Moreover the concepts of "direction" and*

> *"instruction"* do not exclude the concept of *"advice"* for all three share the common feature of *"guidance"*.

> *"(5) It will, no doubt, be sufficient to show that in the face of "directions or instructions" from the alleged shadow director the properly appointed directors or some of them cast themselves in a subservient role or surrendered their respective discretions. But I do not consider that it is necessary to do so in all cases. Such a requirement would be to put a gloss on the statutory requirement that the board are "accustomed to act" "in accordance with" such directions or instructions.....a qualification beyond that justified by the statutory language."*

758. I would broadly accept these propositions but with the following qualification.

759. First, I do not think that Mr Wessels sought to argue that the "real influence" referred to in proposition (2) can be viewed as either an accurate paraphrase for, or an alternative expression of, the qualifying test for being a shadow director contained in the statutory definition itself. i.e. the requirement of there being "directions or instructions." If he did, so, then I reject that argument. In my judgment, it is not available, certainly not insofar as it is inconsistent with the actual words of the statute. A test of "real influence" is not only not the statutory requirement, but is both so vague as to be unworkable, and departs too far from the essence of the concept, which is that a "shadow" director is a person who is, in reality, running the company in the relevant respect, albeit doing so through the actions of others who compliantly do his will. It may be possible that a person who has serious influence on the affairs of the company because his views or advice are habitually sought and acted on out of deference could fall within the definition of shadow director, but that would depend on whether the circumstances justified the relevant findings of fact as to the communications amounting to "directions or instructions".

760. Second, I do not understand Morritt LJ to be saying, in proposition (3), that "directions or instructions" can arise without the intention and objective of, at least, the alleged giver of the instructions being that the Board should act in accordance with his expressed wishes. If he is so saying, then I respectfully disagree. There is a difference of quality between advice, even if forcefully expressed, and a direction or instruction, and that difference is that the maker of the communication is doing so with the intention of procuring a result for his own ends. Of course, that state of mind may be capable of being inferred from indirect evidence in the usual way, but it does not seem to me that the statute authorises dispensing with such a finding. The statute requires a finding that the *de iure* directors were accustomed to act in accordance with the "directions or instructions" of the alleged shadow director and not merely in accordance with his presumed wishes or interests.

761. Third, I note, and Mr Wessels accepted, that the requirement to find "directions or instructions" requires the finding of <u>actual communications,</u> from the alleged shadow director to the Board Members, which constitute "directions or instructions". This is plain from Morritt LJ's proposition No 3. Such a finding is, of course, a matter of evidence and subject to the usual processes of pleading and proof. Again, though, it cannot simply be glossed over or assumed as part of some postulated bigger picture. Any inference that there were "directions or instructions" must be made as a finding of actual fact, justified, on balance of probability by evidence.

762. Fourth, it is clear from the cases such as *Kuwait Asia Bank,* (above) that the element of influence or even control over a company's affairs which arises from either holding its shares, or having control over the employment position of its directors, is not sufficient on its own to constitute a party – generally there a company, - a shadow director. This underlines, again, the need for proof of the factual situation which constitutes shadow directorship, and that mere allegation of a relationship of influence, or similar, is not enough.

763. Fifth, and at the risk of stating the obvious, if it is sought to make a corporate entity liable as a shadow director, then it is necessary to find directions or instructions in the form of communications issued by that entity.     Since a corporate entity can only act by human agency, then even if actual communications by a human being can be pointed to, issues of the capacity in which those communications were made will still need to be examined, to decide whether the communication was actually that of the corporate entity.   In other words, any "directions or instructions" will have to be established to be *those of the corporate entity,* and this also requires affirmative proof on the evidence.   This is not surprising, as the actual director of the company will already be liable, and fixing a shadow director with liability is an extension of liabilities arising out of the corporate structure.

764. Finally I make some general observations.   There has been dispute in the English cases as to whether the concepts of *de facto* and shadow directorships are or are not mutually exclusive. In my judgment, and for the reasons given by Millet J in *Re Hydrodan* (above), logic dictates that they have to be, certainly now that statute has intervened to delimit the concept and application of the liability of shadow directors as discussed at the beginning of this section. In this situation, it may be possible to be a shadow director and a de facto director at the same time, but <u>not</u> in respect of the same acts, because the test for each basis of liability is materially different.   A *de facto* director is fixed with liability because of what he does.   A shadow director is fixed with liability because of what he procures.   Fortunately this seems more of an academic dispute than one of real consequence.   I have indicated above the extent to which I am concerned with it here.

765. Again, and although not bearing directly on the facts of *de facto* or shadow directorships, it is helpful context, in my judgment, to keep in mind that a party which is entitled to appoint a director to the board of another company does not *ipso facto* become either a shadow, or a *de facto*, director of the company.   Whether he (or it) does so has to be judged on the basis of the actual facts; for example, he is plainly more likely to do so if he is in fact able to appoint a majority of the Board.   However, the position in law is that by appointing another person as a director of a company, the appointor is taken to authorise the appointee to perform conscientiously the duties of such a director, and therefore to exercise his own judgement and to act in what he perceives to be the best interests of the company, rather than those of his appointor.   The appointee becomes agent of the company and not of his appointor.

766. As mentioned in relation to *de facto* directors, if a company which is entitled to appoint a director to the Board of another company appoints one of its own employees, then even though the employee carries out his directorial functions as part of his employment duties, the employer is not vicariously liable *ipso facto* for the acts of the employee as such director: see. *Kuwait Asia Bank EC v National Mutual Life Nominees Ltd* [1991] 1 AC 187 (PC) – an instructive and useful case on the position of nominee directors and the proper scope of duties thereby owed.     Once again, this principle recognises that the office of director imposes freestanding personal and independent liabilities on the party holding that office, regardless of the origins of his appointment.   Of course, if the actual facts demonstrated that the employee director had been following instructions issued to him by his employer, then the situation would be different.

767. Insofar as the foregoing points are not of direct relevance to this case, I find them to provide helpful guidance as to the proper approach to the concept of shadow directorship as it does come to be applied in this case.   To distil the essential points for the present case:-

(i)     To fix any of the Entity Defendants with liability as a shadow director of CCC the Plaintiffs need to prove that the actual directors (*de iure* or possibly *de facto* if already found) were accustomed to act in accordance with "directions or instructions" given by that corporate entity.   This requires proof, on the evidence in the usual way, of actual directions or instructions.

(ii)     "The directors" would include a relevant voting majority of the board of directors.

(iii)    It is insufficient to establish one instance only of obedience to such direction or instruction; there has to be a series of such acts so as to prove the requirement of being "accustomed" so to act.   However, that does not necessarily have to be on the same subject matter, and in an appropriate case, relatively minimal evidence of previous biddability might well suffice.

## 6.     The issues to be determined

768.   Having now determined the law which I will be applying, it is convenient to marshal the issues which, in consequence, arise for determination, before turning to the evidence and the witnesses.

769.   Turning to the allegations in the case, the Defendants say that they have identified 187 separate allegations of breach of duty pleaded against them in the Cause, although I confess that I have not counted them.     They appear (from the Defendants' comments on the unagreed "Concise List of Issues" referred to below) to be the total number of sub-paragraph allegations contained in Paragraphs 263C-263H, 308D-308J, 339B-339G, 367D-367I, 369T-369Y, 390B-390G, and finally 417, 418B-E, 418I-418L, 419, 422 and 424B-424E of the Amended Cause.

770.   There are ten defendants.  The Plaintiffs' claims are purportedly made against them jointly and severally, but since the obligations (apart perhaps from wrongful trading) are individual, the liability of each Defendant has to be considered separately as already mentioned.     The 187 breaches of duty are not, I think, all alleged against all ten Defendants, but neither are they the sum of allegations against individual Defendants, because there is a pattern of pleading breaches in the Cause against groups of Defendants, comprising either the four "Carlyle Directors", the three "Independent Directors" or the three Entity Defendants.  The total number of individual breaches pleaded, with which I could theoretically be concerned, is therefore well into the 100s.

771.   If all the pleaded breaches of duty had identifiable pleaded consequences which might afford the Plaintiffs a remedy at law, then I might have felt obliged to deal with them individually, but as already mentioned, they do not.     The relief sought by the Plaintiffs is simply financial relief, being either for compensatory damages claimed for breach of fiduciary duty or for negligence, or for "contribution" on the grounds of wrongful trading (the measure of which is compensatory in nature), or for the "restitution" of unjustifiable fees and expenditure.     The last claim is discrete and is straightforward in nature.  All the other claims depend on proving wrongful acts or omissions by a relevant Defendant which can be shown to have caused a loss to CCC.   In essence, what has been ultimately claimed (the Cause is still somewhat vague in this regard) is the difference between CCC's net asset value taken at an appropriate date (depending on the findings of fact constituting liability) some time between 26th July 2007 and 27th February 2008, adjusted insofar as necessary to take account of assumed sales which should have been made on the one side, and what was actually realised upon CCC's liquidation in March 2008 on the other.

772.   To try to identify the issues which did require decision within the essential scope of the action, and to provide a working framework for covering these, I directed the parties to try to agree a "Concise List of Issues".  Unfortunately, they were not even able to agree on that.  Their attempts appear to have foundered (from the footnotes by each side to a travelling draft which has been shown to me) because any attempt by the Defendants to identify the common thread of the Plaintiffs' allegations and express the issues in such focused terms has been rebuffed by the Plaintiffs as a "partial and incomplete summary" of their case, as to which they insist on incorporating reference to the minutiae of individual allegations in their pleaded Cause.

773. In the end, therefore, I had to formulate my own list of issues.  I have based this on the partially agreed "Concise List" document, but I have used the structure suggested by the Defendants, which I find to be reasonably dispassionate and, above all, realistic.   My list does not give an entirely sequential course for decisions, but it covers all the issues which I think arise and might require determination in order to resolve the case.   It is as follows, though it should be noted that I have already partially decided some of these issues in stating my holdings on the law above, and in particular answered issue 10(ii)(b) in the negative.

**List of potential issues for decision**

### As to the First to Seventh Defendants:

1. Whether at any time between 26th July 2007, and 27th February 2008, and specifically

    (i)     on or after 26th July 2007 and in particular at CCC's Board Meeting of 26th July  2007;

    (ii)    during August 2007 and in particular at CCC's Board Meeting of 23rd August 2007;

    (iii)   during September 2007 and including 1st October 2007;

    (iv)   during October/November 2007 and in particular at CCC's Board Meeting of 13th November 2007;

    (v)    during December 2007;  and

    (vi)    during January and up to 27th February 2008

    any of the First to Seventh Defendants (and if so which) acted

    (a)    in breach of his fiduciary duty to CCC  or

    (b)    in breach of his duty of skill and care to CCC

    in failing to advise, insist or secure that CCC take urgent steps to

    (1)    sell down CCC's RMBS assets;

    (2)    raise additional equity capital;

    and/or

    (3)    conduct an orderly winding down of CCC.

2. In regard to 1 above,

    (i)     whether CCC was at any such material time insolvent or on the brink of insolvency so as to extend the duty owed by each of the First to Seventh Defendants to act in the best interests of CCC to include a duty to have proper regard for the interests of CCC's creditors, and if so

    (ii)    whether any of the First to Seventh Defendants (and if so which) acted in breach of such extended duty.

3. In regard to any decision of any of the First to Seventh Defendants found to be in breach of duty under 1 above, whether such decision was a decision to which no

reasonable director, acting properly and being in the position and with the skill, knowledge or expertise of that director, could have reasonably come in all the circumstances.

4. Whether CCC suffered any and if so what loss and damage in consequence of any breach of duty found under Paragraph 1 above for which such Defendant is consequently liable.

5. Whether in acting as above, any such Defendant (and if so which) committed misfeasance towards CCC within the meaning of s 106 of the Companies (Guernsey) Law 1994.

6. What contribution (if any) any such Defendant found guilty of misfeasance should be ordered to make to the assets of CCC in its liquidation.

7. Whether any of the First to Seventh Defendants (and if so which) knew or ought to have concluded at any time between about 17th August 2007 and 31st December 2007 that, absent the prompt taking of such steps as mentioned in Paragraph 1 (1)-(3) above, CCC stood no reasonable prospect of avoiding insolvent liquidation within the meaning of s 67C of the Companies (Guernsey) Law 1994.

8. If so, whether such Defendant thereafter took every step that he ought to have taken with a view to minimising the potential loss to the company's creditors.

9. What contribution (if any) any such Defendant found guilty of wrongful trading should be ordered to make to the assets of CCC in its liquidation.

10. Whether

   (i) any such Defendant found guilty as aforesaid is *prima facie* entitled to rely on the effects of Articles 172 – 174 of CCC's Articles of Association (as amended on 8th May 2007) so as to claim either exoneration from, or indemnification from CCC against, any liability which would otherwise fall upon him as above, but if so

   (ii) whether the effects of such provisions are avoided by the operation of either

      (a) s 67F of the Companies (Guernsey) Law 1994 or

      (b) s. 157 of the Companies (Guernsey) Law 2008.

**As to the Eighth Defendant**:

11. Whether the Eighth Defendant, during the time stated in Paragraph 1 above and in the same respects as there mentioned, was thereby in breach of its contractual duties to CCC contained in the Investment Management Agreement dated 20th September 2006 made between CCC and the Eighth Defendant, or alternatively in breach of a co-extensive tortious duty of care to CCC.

12. If so, whether CCC suffered any, and if so what, loss and damage in consequence of such breach for which the Eighth Defendant is consequently liable.

13. Insofar as the Eighth Defendant is found to be in breach of a contractual or tortious duty as mentioned in Paragraph 11 above, whether it is entitled to rely on the exoneration and indemnification provisions contained in paragraphs 2 and 6 of the said Agreement.

14. Whether, CCC is, alternatively to any claim for damages to which it may be entitled against the Eight Defendant, entitled to restitution of fees or other sums paid by it to the Eighth Defendant pursuant to the said Agreement of 20th September 2006 and if so in what sum.

**As to the Eighth to Tenth Defendants:**

15. Whether any of the Eighth to Tenth Defendants (and if so which) was either

   (a)   a *de facto* director of CCC or

   (b)   a "shadow" director of CCC

   and acted in such capacity so as to incur liability for breach of fiduciary duty and/or breach of duty of care and/or misfeasance and/or wrongful trading as a director of CCC as mentioned in Paragraphs 1- 10 above, *mutatis mutandis.*

**As to all Defendants:**

16. Whether any of the Defendants found liable under the foregoing paragraphs should be relieved from liability (in whole or in part) pursuant to s 522 of the Companies (Guernsey) Law 2008?

17. What interest, if any, should be paid by any Defendant found liable under the foregoing paragraphs?

I have used the above template for my determination of the disputes in this trial.   With the above comments as to the scope of the action and the issues arising, I now turn to the evidence and witnesses.

7. **The Evidence and the Witnesses**

**Documentary and witness evidence**

774. As one of his first submissions in closing, Advocate Wessels submitted that this is a case in which the court should – he seemed to come close to saying "must" – treat the contemporaneous written evidence as having "primacy" over the Defendants' written or oral evidence, for being the most reliable evidence.   He did so principally on the basis of the passage of time – some nine years – and its effects on a witness's natural fading of recollection, leading to a consequent tendency to "reconstruct" rather than recollect. However, from his other submissions I have no doubt that he was also urging that what has been politely described as "*the natural influence of self-interest*" (*Roach v Page (No 37)* 2004 NSWSC 1048 at [76] ) will have played a significant part in the contents of witness statements and oral testimony, undermining and reducing its weight.

775. He relied on dicta of Leggatt J in *Gestmin SGPS SA v Credit Suisse (UK) Ltd* [2013] EWHC 3560 Comm at [22].   There, having set out sceptical comments, based on research findings, on the fallibility of memory particularly as regards a former state of mind, and having alluded to the exacerbating effects upon such unreliability of the process of preparation for a court case (see [16] – [21]), Leggatt J states the following proposition:-

   "*In the light of these considerations, the best approach for a judge to adopt in the trial of a commercial case is, in my view, to place little if any reliance at all on witnesses' recollections of what was said in meetings and conversations, and to base factual findings on inferences drawn from the documentary evidence and known or probable facts. This does not mean that oral testimony serves no useful purpose - though its utility is often disproportionate to its length. But its value lies largely, as I*

> *see it, in the opportunity which cross-examination affords to subject the documentary record to critical scrutiny and to gauge the personality, motivations and working practices of a witness, rather than in testimony of what the witness recalls of particular conversations and events. Above all, it is important to avoid the fallacy of supposing that, because a witness has confidence in his or her recollection and is honest, evidence based on that recollection provides any reliable guide to the truth."*

776.  A similar approach was adopted in *Daniel v Tee* [2016] 4 WLR 1538 at [19]-[20], a claim for breach of trust by negligent investment made many years earlier, with the added factor that the plaintiffs were then aged between 9 and 13.  The judge, Mr Richard Spearman QC, cited *Gestmin* above and said at [19]:

> *"…At the end of the day, the best guide to the truth is often to be found not so much in the demeanour of the protagonists, or even concessions made in cross-examination, but in the contemporary documents and in an objective appraisal of the probabilities overall."*

777.  Rose J took a similar approach in *Libyan Investment Authority v Goldman Sachs International* [2016] EWHC 1538 (Ch) at [37]-[42] with regard to a claim launched in 2014 with regard to alleged undue influence in early 2008.

778.  Advocate Wessels, also referred to the ever-useful Australian case of *Bell Group Limited (In liqn.) v Westpac Banking Corporation (No 9)* [2008] WASC 239 at [1052-4] where Owen J had expressed similar sentiments to those of Leggatt J, having remarked that his *"primary port of call in assessing reliability was the contemporaneous documents".*

779.  Advocate Wessels' submission was that the contemporaneous records were so much more likely to reflect the facts accurately than the statements, written or oral, prepared or made for the purposes of this litigation, that they should be preferred to the witness statements or oral evidence.   Indeed he went as far as to submit that much of the oral evidence of the Defendants' witnesses should not be accepted unless corroborated by a contemporaneous record.

780.  Insofar as this submission verged on suggesting that I should ignore the written statements and the oral evidence of, in particular, the Defendants and their witnesses, I reject it.  It is a somewhat selective submission in any event, as the Plaintiffs accept and indeed rely on those parts of the Defendants' oral evidence which they can characterise as admissions.

781.  Even in a case based on matters happening some years previously, the evidence must be considered in its totality.  It is a matter for the court itself to assess the reliability or probative weight of any element.  It is stating the obvious that a contemporaneous document carries the weight of being the product of the author's thinking at the time, whilst later statements do not, but the weight to be attached to this is a matter for the judge.   I take on board all the points about the fallibility of memory, the further dangers of reconstruction as compared even to recollection, the distorting effects of preparing witness statements and continually chewing over what happened, and the natural effects of self-interest even on a conscientious and honest witness.   It is, though, my function as a judge to discern and allow for any of these where it seems right to do so, but to do so as a part of the total exercise of examining all relevant evidence, weighing the conclusions which it appears to support, doing so in context and with any appropriate injection of common sense, and then coming to the necessary finding of fact, on balance of probability.

**Documents**

782.  Given the reliance placed by the Plaintiffs on the documentary evidence, I make some further comments on documents.  The weight to be attached to statements in any document must

itself be considered in context.  Emails, for example, are undisciplined communications, and whilst they often replace formal letters and memoranda, they are much more casual in ethos and style.  This gives them an unguarded quality which may, of course, be very valuable in giving an authentic and uncrafted insight into the mind of the author, but on the other hand, they may also generate a written record of a throw-away statement which the writer would never have put in a formal memorandum as a considered view, but which is happily dashed off on a Blackberry.  The court must assess the significance of such statements with these two considerations in mind.  They apply also at the other end of the spectrum.   Where a contemporaneous document has been produced in circumstances where it has been carefully composed, the reasons for this will affect any assessment of how far its terms express the writer's fully candid views, or have been formulated for effect.

783.   Advocate Wessels moved on to a further submission, that the *absence* of documentary evidence can be "equally significant", by which I take him to mean of similar evidential importance to the claimed "primacy" of contemporaneous written documents.   He cites what I regard as an uncontroversial dictum, namely

> " …. if the judge is satisfied that certain contemporaneous documentation is likely to have existed were the oral evidence correct, and that the party adducing oral evidence is responsible for its non-production, then the documentation may be conspicuous by its absence and the judge may be able to draw inferences from its absence."

per Arden LJ in *Re Mumtaz Properties Limited: Wetton v Ahmed* [2011] EWCA Civ 610 at [14].   This is again just part of the process of weighing up all the evidence available, and drawing the inferences which appear, in all the circumstances, to be justified: see [16].   It is also an example of the permissibility of drawing adverse inferences in appropriate circumstances, but the key feature of *Mumtaz,* in that regard was that the defendant was found to be responsible for the non-production of documents which did exist, which would have shed clear light on the veracity of his evidence, and which the court found had been in his possession.   The inference was drawn, not from the non-existence of documents, but from their non-production.

784.   I know that there have been major disputes in the past about the production of documents in this case, which I have not had to investigate.  That, though, is beside the present point.   As I understand the Plaintiffs' proposition about absent documents, it is not that material documents which do exist have not, ultimately, been produced, but that if the Defendants' assertions (such as that proper consideration was given to steps to be taken with regard to managing CCC's business) are to be believed, then one would have expected documentary records of this to exist, but as such documents have not been produced, those assertions should not be believed.    That point is simply an evidential argument and not an adverse inference.

785.   Moving to another point, I required the parties, during the trial, to agree a listed bundle of the documents which I was to treat as being the actual evidence in the case.    This is because documents do not become evidence to be taken into account in a case simply by being copied into a trial bundle.  That merely makes it potential evidence, and there are further rules of procedure and evidence which need to be observed.

786.   First, even though in modern practice, the rule against the reception of hearsay evidence has been largely done away with by the *Evidence in Civil Proceedings (Guernsey and Alderney) Law* 2009 ("**the Evidence Law 2009**), such evidence still, technically, requires the service of the necessary notices to be admissible see ss 1-4 of that Law.    The Evidence Law 2009 ought not to be a reason for any party simply to expect to rely on hearsay evidence, regardless.     It has yet to be authoritatively decided whether, in Guernsey law the mere inclusion of a document in a proposed trial bundle should be deemed to be a good hearsay

notice by the proposing party under rule 2 of the *Evidence in Civil Proceedings (Guernsey and Alderney) Rules 2011* (**"the Evidence Rules 2011"**), as has apparently been decided in England in relation to similar provisions.

787.  Next, and the centrally important point, a defendant is entitled to know the case which he has to meet, including the evidence being relied on against him, and to know this <u>before</u> he makes his defence.  This requires, therefore, that the plaintiff, at the formal closing of his case, should be able to identify all the documentary evidence which he is actually relying on, so that the defendant can deal with it in the course of presenting his defence.  Although no doubt most such documents will have been referred to either in opening speeches or by witnesses, it is always possible that there are documents which are being relied on simply for their own sake, and a defendant is entitled to be clear about what these are.    Likewise, at the close of the defence, the defendant must similarly be able to add to the plaintiff's list any further documents which the defendant relies on as part of his own case, in the same way.  This has the result, first, that any objections to the admissibility of any documents which either side wants to rely on can be flagged up and determined, second that implications from any purely documentary evidence can be addressed by the opposite party in argument, and third, that the judge, when writing a reserved judgment, knows exactly what it is permissible to look at as evidence, and exactly what can, and indeed must, be ignored, out of trial bundles which all too often are many times larger than the material actually deployed in the trial.

788.  In this case, and after the inevitable sparring between the parties, the exercise has produced a list of 4,872 items of documentary evidence.    Two classes of documents within this list require special mention.

789.  First, the Plaintiffs, in particular, had often, in the course of the trial, referred to emails between persons who were not called as witnesses, within organisations, such as other banks, which were not parties to the proceedings, as evidence of the truth of what those emails said.  In the end, though, both parties wanted to refer to such materials, and therefore by mutual agreement, all such documents which either side wanted to refer to have been included within the admitted evidence.   These emails are hearsay, and I will give their contents such weight as supposed evidence of the truth of that which is asserted in them as I think appropriate.

790.  Second and similarly, there had been reference in the trial to matters such as press releases of third parties, newspaper and journal articles and so forth.    With the parties similarly each wishing to refer to some such material, even if they would no doubt have liked to exclude other such material referred to by the opposition, the final compromise position is, once again, that it is agreed that I can have such regard as I think appropriate to all such material as has been included in the admitted evidence list.   Again, of course, the weight to be attached to such matters depends on my judgment, and this in turn depends at least partly on the purpose for which it is sought to use it.

**Assessment of oral testimony**

791.  Given the accusations of lack of integrity which the Plaintiffs level at the Defendants, I think it is important to say something about my approach to the assessment of oral evidence.

792.  Two main factors affect this.  The first is whether the witness is being honest, the second is whether he has a reliable recollection.   Perfectly honest evidence can still be mistaken.   But there are also more subtle considerations, such as whether the witness is really conveying what he wants to say accurately and clearly.    This is not just a matter of intelligence or education.    The ordinary man is not accustomed to having to express himself with the precision of a chancery lawyer, and due allowance must be made for this.

793.  Also, being involved in such a momentous matter as a court action, particularly as a party, means that any witness will undoubtedly have rehearsed, many times, his recollection of

relevant occurrences, not just in the formal context of instructing lawyers, but also informally, to himself, when lying in bed at night trying to make sense of what has happened.     In the course of this rehearsal, the thought process can easily move from "I actually have no clear recollection of what happened" through "I think it is likely that that is what happened" to "that *must be* what happened" (which may be dispassionate rationalisation, but will often be wishful or consoling thought), and then further on again to, "that *is* what happened."     This is not necessarily, or even probably, dishonesty.  The witness may well be perfectly sincere in his belief that what he is stating in a witness statement or in oral evidence is true, having thoroughly convinced himself that this is the case.  Of course, it can verge on dishonesty, if the witness has some insight, and is aware of an uncomfortable feeling that what he is saying might not be right, but it can equally be totally subconscious.

794.  Also, a witness, and in particular an actual party, is entitled to give as good an account of himself in his evidence as he honestly can.    In doing so he will inevitably exercise subjective judgement on the propriety of taking the benefit of any doubt.     Some individuals are naturally more self-critical, and less self-confident than others, and people's responses may therefore vary, especially in answer to questions which they feel are illegitimate for being either unfair, or peripheral, or impertinent.    Being asked to express an opinion about a colleague, for example, may well come under more than one such head.

795.  Second, a witness in an important case will undoubtedly have prepared himself to give evidence.  There is nothing wrong with that; any intelligent person, especially a businessman, will prepare himself for any event on which important consequences ride.  It is no part of any witness's duty to avoid thinking about material events so as to be able to answer questions with innocent spontaneity.  Of course there is a difference between legitimate preparation and illegitimate coaching (see the discussion by Lewison J in *Ultraframe Ltd v Fielding* at [22] – [33]) but, I state with some relief, there has been no suggestion of the latter in this case.  Still, though, the court needs to be astute to sense where answers may have been prepared through rehearsal so as to present the most favourable case consistent with the witness's own conscience, and where answers have been prepared simply in the sense of refreshing recollection so as to be ready to deal with matters at the important time, rather than only in forlorn retrospect.

796.  Third, even absent any considerations of self-interest or desire which may affect a witness's evidence, there is a natural wish, in most ordinary people, to try to be helpful, and this will often lead a witness to try to give an answer if possible.   This can easily lead a witness to state as fact matters which are really nothing but "helpful" speculation on his part.   Ordinary people do not formulate their everyday speech with close regard to the niceties of hearsay and the forensic rules of what constitutes permissible direct oral evidence.     They do not punctuate their sentences with accurate qualifications such as "I understand", "apparently" or "is supposed to" but rather they make the assertions of belief as if they are known fact.    (As an irrelevant aside, the Turkish language has a verb tense to convey exactly this degree of uncertainty, and is used for reporting a fact, the truth of which the speaker believes but cannot personally warrant.   From this point of view, English might be seen as deficient.)

797.  All the above considerations can feed into an assessment of a witness's oral evidence and, to some degree, the contents of witness statements, and I have had regard to all of them in my assessment of the witnesses in this case.

798.  However, even if a court concludes that a witness has not been totally dispassionate, or even totally candid, that does not mean that his evidence on the topic is to be entirely disregarded.  Importantly, even if a witness may appear to have lied as to one matter, that does not mean that he must be assumed to have been lying on every, or indeed any, other matter, or to be guilty of whatever misconduct is alleged against him, or that the evidence of the opposing party is therefore true.  This is the essence of the well-known *Lucas* direction in English law.

799. With regard to my assessment of the oral evidence in this case, I need to mention two further matters arising out of the passage of time.  The material events in this case occurred between 2006 and 2008 – around nine years before the trial and seven or eight years prior to the eventual formulation of witness statements.    As I have said, I accept Advocate Wessels' point that this means that witness recollections are likely to have faded and have become more likely to have been affected by reconstruction, and I will weigh the evidence with this in mind.  I observe, though, from the history of the matter, that the Defendants and other material witnesses, will have been questioned about their recollections of events from quite early on in the aftermath. Whilst the possible effects of this for reconstruction have been noted, it also makes it more likely that their recollections became retained from a point much nearer the relevant time than now.

800. A further point, though, is that all witnesses are now eight or nine years older than they were at the material times, and I must take this into account with regard to the impressions I have gained of them from their oral evidence.  For most of the witnesses I have concluded that this factor does not make any significant difference, and the impression I have gained of them at the moment is likely to be much the same as the one I would have gained of them at the material time, but for two, I think it may do so.  Ms Cosiol, by far the youngest witness, was only 31 at the material time, and was a relatively recent and junior employee within the Carlyle organisation, for which she still works.  She is likely to have grown in maturity and confidence in the intervening years.      Mr Loveridge is the other.   He has retired and, although I understand that he is now only 73, I gained the clear impression that it is more likely than not that he has slowed down in his responses and reactions and suchlike since the time with which I am concerned.    These are probably not major points, but I bear them in mind.

801. The second point which I bear in mind is that, as in very many court cases, the matters on which I am focusing were not the be-all and end-all of the protagonists' lives at the time.  They were acts and actions being conducted in the wider context of their general life, and other aspects of their business activities.  It always needs to be remembered, particularly where a person's judgment is being retrospectively challenged, that the concentration on the "material" matters which happens in a court case creates the appearance of a context of attention and concentration which is false.   There were matters other than CCC occupying the lives and the attention of all the Defendants (though perhaps Mr Stomber less than most, as he was employed precisely to have such focus), and it was not any breach of duty that this should be the case.  Of course, at times of crisis crucial matters properly deserve more attention, and  it would be expected that the affairs of CCC would occupy a larger part of the Defendants' waking life than at other times, but a party's actions or inactions must be judged against the reasonable background of what was known to him and expected of him at the time, rather than on the assumption that the relevant matters were, or necessarily should have been, the centre of his waking attention, in the way that they in fact will be during a court case.

802. A simplistic, but quite important, example of the tendency to forget this is the fact that the Plaintiffs have continually dropped into the habit of referring to the business of CCC as if it were only ever comprised of investments in RMBS, thereby side-lining the fact that the original business model was materially diversified and deliberately constructed with a combination of leveraged finance assets and RMBS.  This case is focused only on the RMBS portfolio and the Defendants' actions with regard to that because that balance was changed, in August 2007, in response to the first financial crisis, but this was not always the case.  The capacity for distorting impression arising from a courtroom investigation must not be overlooked.

**Missing witnesses – adverse inferences**

803. Referring to authority as far back as 1744 for the proposition that all evidence is to be weighed according to the proof which it was in the power of one side to have produced and in the power of the other to have contradicted (*Blatch v Archer*  (1744) 1 Cowp 63), the Plaintiffs submit that the Defendants have failed to call at least five "important" witnesses of material fact, whose absence therefore weakens the evidence actually called by them and enables the evidence adduced by the Plaintiffs to be readily accepted, even to the point of the court's drawing inferences adverse to the Defendants upon material points.

804. The five witnesses are Mr Greenwood (CCC's Chief Dealer), who, it is suggested, could have contradicted the Plaintiffs' case with regard to opportunities for CCC to sell RMBS, Mr Trozzo, who could have supported CCC's risk management practices, Mr Green, CCC's former Chief Financial Officer, who would obviously have had knowledge of CCC's financial position, and Mr Rubenstein (a Carlyle co-Founder) and Mr Jeff Ferguson (Carlyle's general counsel) the latter two both, at times, having been involved in matters to do with CCC.

805. The Plaintiffs argue that all these witnesses were available to the Defendants for being "in their camp" as either current officers or employees, or ex-employees who are contractually obliged to cooperate with Carlyle as regards any litigation and suchlike about CCC.  They were, it is said, highly material witnesses on essential matters such as CCC's ability to sell RMBS, or at least its perceptions of this, its risk management controls, its appreciation of the potential imminence of insolvency, and, in the case of Mr Rubenstein and Mr Ferguson, the control exercised by Carlyle over CCC, which the Plaintiffs allege and found their case upon, and which the Defendants deny.  The Plaintiffs argue, therefore, that once they have adduced evidence sufficient to raise a case on such points (as they submit they do) then CCC's failure to call those witnesses, and the absence of any reasonable explanation for not doing so (which they submit there is not) bolsters the weight of the Plaintiffs' evidence and indeed justifies the court in drawing inferences adverse to the Defendants on such matters and accepting the Plaintiffs' case.

806. The Defendants first stress that any such principle is a matter of logical inference from the absence of a witness, and it therefore depends both on a *prima facie* case having been established which that witness's evidence could displace, and also, therefore that the witness must be able to give <u>material</u> evidence, with regard to an issue in the case.   They rely on Cockburn CJ in *McQueen v Great Western Railway Company* (1875) LR 10 QB 569 at 574, as cited and interpreted in *Wisniewski v Central  Manchester Health Authority* [1998] PIQR 324 at 337.

807. They also submit that any such approach has to be applied realistically.  In a large and complex case it is important to identify and distinguish (a) issues which are not central in the sense of requiring to be resolved in order fairly to determine the proceedings, and also (b) evidence which would simply be duplicative of evidence given by other witnesses.  A party is not obliged to call every single witness who might give evidence about, even, a central issue, but is entitled to make sensible judgments.   They cite Rose J in *Libyan Investment Authority v Goldman Sachs International* [2016] EWHC 1538 (Ch) at [51], declining to draw adverse inferences from the absence of certain employees of the Defendants as witnesses "*even though the contemporaneous evidence shows that they were closely involved in the events giving rise to the claim*"  and stressing the importance of not causing  parties to complex litigation to feel that they may be criticised *"if they do not provide evidence from everyone who is named in the contemporaneous documents.  That would lead to litigation becoming completely unmanageable."*

808. The Defendants submit that, applying these principles, such considerations provide a reasonable explanation for not calling the relevant witnesses.  In the case of multiple witnesses, only a failure to call the witness whose evidence would obviously be the most cogent or superior might give rise to any such adverse inference.   They also point out that a

party cannot be criticised for non-selection of witnesses in respect of any issue which only arose clearly for the first time at the trial itself.

809. The Defendants therefore dispute the Plaintiffs' arguments as to the drawing of any adverse inference against them at all. They submit that the evidence of Messrs Rubinstein and Ferguson went, at best to peripheral issues only: Mr Rubinstein could add nothing of value to the evidence of the documents and the other Carlyle witnesses, particularly Mr Conway, and it was Ms Cosiol who did give evidence, rather than her superior, Mr Ferguson, because she was directly involved with CCC. Insofar as the evidence of Messrs Trozzo and Greenwood (in particular, but similar arguments would I think apply to Mr Green also) could have gone further than peripheral issues, there was no issue upon which only they could give evidence rather than Mr Stomber, with whom they worked closely and to whom they reported, or other Board Members. The Defendants dispute, in any event, that the Plaintiffs have in practice called sufficient evidence to make out a *prima facie* case, which therefore requires rebuttal, in respect of the points as to which they now claim that these witnesses should have been called.

810. Finally, they object that, in the case of Messrs Greenwood and Trozzo, the Plaintiffs could have obtained their evidence, but elected not to do so. This is a reference to another series of skirmishes between the two sides, regarding the Plaintiffs' methods of collecting evidence in the United States. In short and simple terms, the Plaintiffs have sought to obtain evidence from these two witnesses privately, using the power of court orders in the United States, on the basis that their evidence was required for the purpose of the liquidation. The Defendants intervened to object that this was disingenuous and the powers were really being used to gain evidence for the purpose of this litigation, and thereby gain illegitimate litigation advantage. The US courts agreed with the Defendants. However, the Defendants offered to the Plaintiffs that they would procure Messrs Trozzo and Greenwood to co-operate in giving evidence by deposition, on the basis that the depositions were taken, in the usual way, with both sides in attendance. The Plaintiffs declined to depose Messrs Trozzo and Greenwood on that basis, and therefore their evidence was not taken at all.

811. Advocate Wessels' response to this is that the Plaintiffs reasonably objected to the evidence of Messrs Trozzo and Greenwood being taken and introduced into this case by way of the deposition process, because it was not a level playing field. That is because, the Plaintiffs say, the Defendants would be able to talk to Messrs Trozzo and Greenwood beforehand and outside the deposition process; it was not so much that they would therefore know what the evidence of Messrs Trozzo and Greenwood would be in advance and the Plaintiffs would not, but, and not to mince words, that this would enable the Defendants to "prepare" (ie coach) the evidence of Messrs Trozzo and Greenwood to suit their case, an advantage which the Plaintiffs would not have. He also argued that the opportunity to take a written deposition in a one or two hour appointment was not the same, or as good as, the opportunity to cross examine these witnesses orally and at greater length at the trial.

812. However, Advocate Wessels' primary point was that the potential availability of the evidence of Messrs Trozzo and Greenwood to the Plaintiffs as well as the Defendants was beside the point; the real question was: who would you expect to call them? It would (he argues) be the Defendants. And why did the Defendants not call them? He returns to the point that the obvious explanation must be the fear that their evidence would undermine the Defendants' own case as it was being presented, from which the court should therefore infer that that case was known to be flawed.

813. I decline to draw any general adverse inferences from the calling or not calling of witnesses by the Defendants in the circumstances of this case. I thoroughly support the comments of Rose J, in *Libyan Investments Authority* about the undesirability of any decision of the court which could cause parties to proliferate witnesses in a complex case out of a fear that something would be held against them if they did not.

814.   I largely accept the Defendants' propositions that the matters as to which the evidence of these witnesses might be expected to go, either at all or as a matter of being the best available evidence, were either peripheral to the real issues, or criticisms raised only as assertion and not with sufficient evidential support to raise a prima facie case.  This certainly applies to the cases of Messrs Green, Rubenstein and Ferguson.  I also consider that it applies, albeit more on balance, in relation to Mr Trozzo.  The Plaintiffs' material case is that CCC's <u>Board</u> failed to authorise or instruct the sale of RMBS when it should have done and CCC's Management failed to advise this.  The application of risk management considerations, or the Investment Guidelines as risk management tools, speak for themselves from the documents and the Defendants' actual recorded decisions in this respect, but they are only the context or the consequence of the key impugned decision, which is the decision not to <u>sell</u>.  Adding more material to the debate on these subsidiary aspects takes the key issue little further, if anywhere.    In any event, I think I can satisfactorily infer Mr Trozzo's likely attitude, so far as it may be relevant, from the emails and documents in the case.  These could be expected to have captured and recorded – and even betrayed - any significant point that he would have made.

815.   The witness about whom I have had most misgivings was Mr Greenwood, bearing in mind that, along with Mr Ng, he was directly involved in the implementation of CCC's trading transactions, and therefore actual or potential selling.  My concern arises out of the Plaintiffs' allegation that CCC had a wrong-headed or grossly negligent rigid intention not to sell RMBS at all, after about 20th August 2007.  This assertion would require not only that Mr Stomber formed, advised or put into effect such an intention, but that he gave instructions to Mr Greenwood (and presumably Mr Ng) not to effect any such sales.  The Defendants' evidence about their attitude to selling has been firstly that of their witnesses, especially Mr Stomber, and secondly reliance on the contemporaneous documents.

816.   The Plaintiffs criticise, in particular, the way in which CCC dealt with an apparent purchase enquiry from UBS for about $1Bn of RMBS at the end of August 2007, because, they say, CCC did not "show" bonds which met UBS's desired criteria even though it had them, but instead offered bonds with different attributes.  They rely on this as evidence that CCC had no genuine intention of trying to sell RMBS.   However, the only issue *on the pleadings* has been whether the communications between CCC and UBS  at the time – there being no dispute about the facts of these - justified the description "negotiations" as used in the Combined Defences, at paragraph 528: see the traverse in the Amended Réplique (para 222).   This was in October 2015.  I cannot locate any notification of the expansion of the dispute from being whether there really were any "negotiations", to being that there were negotiations which were intentionally obfuscated because there was no genuine intention to sell RMBS, before the Plaintiffs put this proposition to Mr Stomber in cross-examination.

817.   It is only at this point, though, that Mr Greenwood's evidence seems to me to begin to become independently material.  This is because Mr Greenwood's evidence as to the instructions he received from Mr Stomber, and presumably followed, would tend to remove speculation on this topic   However, it is not the only way of refuting this allegation, which was only highlighted very late in the day.

818.   I conclude, therefore, that there are sufficient explanations in (i) the late raising of the point, (ii) its place in a very complex and extensive case, and (iii) reasonable judgments as to the extent of necessary evidence, to justify Mr Greenwood's not having been called as a witness by the Defendants, at least to the extent that there is no justification for drawing any adverse inference from this.

819.   However, my decision in this regard is fortified in respect of both Mr Trozzo and Mr Greenwood by history, and by the Plaintiffs' attitude to being afforded the opportunity to take their evidence on deposition (but not in private), and declining this opportunity.  I regard their stated reasons for this as inadequate to entitle them, later, to invite adverse inferences to be

drawn from the fact that the Defendants did not then, themselves, elicit such evidence.  I have recited what happened above.  I am not impressed with the Plaintiffs' claimed justification for not joining in the deposition of Messrs Trozzo and Greenwood if the Defendants were also able to participate, namely that this would allegedly not be an even-handed process because the Defendants could discuss their evidence beforehand with Messrs Trozzo and Greenwood, but the Plaintiffs could not.  I find that an absurd and colourable excuse.  What the Plaintiffs were really trying to do, and they appear to have tried in other contexts, was to obtain evidence privately, no doubt taking whatever advantage was available from an opportunity to be in sole control of the questions, and then assess whether or not it would suit their case to deploy the evidence at all.    This shows just as much lack of confidence in the prospect that the evidence of Messrs Trozzo and Greenwood would be likely to support the Plaintiffs' case as could be inferred in the opposite direction from any failure of the Defendants to call those witnesses as additional support for the Defendants' case.   No adverse inferences are therefore justified.

820.    The Plaintiffs also add a criticism of the absence of Mr Black of JP Morgan, to give evidence about the "significant" meeting between himself and Mr Conway and Mr Stomber on 20th August 2007, as to which these latter both gave evidence.  This is somewhat ironic, as it was the Plaintiffs who were keen to elicit Mr Black's evidence, but whose efforts - notably late in the day - to obtain this through the Letters of Request procedure from the Royal Court to the English High Court were aborted, and withdrawn by them when lawyers for Mr Black intervened and objected that he had only ever spoken (to the Plaintiffs) on the basis of a categoric assurance that he would not be called to give evidence.  The Plaintiffs' criticism was then made on the more subtle – although so oblique as now to be irrelevant – grounds that the Defendants had raised objections to their attempts to use the Letters of Request procedure at all.   I find nothing to which I should give any weight in any of this.

821.    The Plaintiffs have added a further criticism of the allegedly "remarkable" absence of any representative from any of the repo lenders with whom CCC had done business, suggesting that, with Carlyle's extensive business influence, their absence must suggest that they could give no evidence to assist CCC.     This suggestion strikes me as fanciful.   CCC's repo lenders are mainly creditors with claimed debts in CCC's liquidation.   They also no doubt have their own embarrassments about what occurred in the financial markets of 2007-8.  Mr Black's obvious aversion to giving evidence suggests that very strongly.   There are many and varied reasons why, in a business world in which information, relationships, both business and personal, the doing of favours and the trading of advantages plainly plays a large part, it may be either difficult or unwise to try to seek out witnesses from others in that business world.  I can draw absolutely no fair inferences from the fact that the Defendants chose not to proliferate witnesses further in this action, in that direction.

822.    For the sake of balance I should add that these arguments and submission were not all one-sided.  The Defendants also made a submission that I should draw adverse inferences against the Plaintiffs from the fact that they had failed to call a Mr Reijtenbagh, who was present at the Carlyle Investor Conference in Washington in September 2007, to substantiate the disputed allegation that investors there were misled by CCC's senior directors to the effect that CCC was going to, or indeed had already, deleveraged significantly.   Mr Reijtenbagh is a wealthy former investor in CCC, who appears to be the funder of this litigation for the liquidators.    The application was not, however, seriously pursued, and it seemed to me to be made more out of irritation than conviction.    As I would have rejected it anyway, I say no more about it.

823.    Lastly, I must add, as regards the impact of the decisions above, that my declining to draw adverse inferences does not, of course, mean that I draw any artificial inferences at all in the opposite direction.  It just means that the evidence is what it is, and I weigh up the actual evidence on the topic which is before me in order to make any material finding of fact on the consequently apparent balance of probabilities.

**Missing questions – adverse inferences**

824. The Defendants have objected, at times, to matters not being put to witnesses, and referred to evidence being "unchallenged", with the implied or express consequent submission that the evidence of the particular witness must therefore be taken to be accepted and thus believed at face value. The Plaintiffs retort that in a case of this length and complexity the court must apply a measured and proportionate approach to the rule in *Browne v Dunn* (1893) 6 R 67 that

> *"where a party intends to challenge the evidence of a witness, the challenging party is obliged to direct the attention of the witness to that fact."*

825. They submit that the rule must be more relaxed where the case is complex such that challenging every disputed factual pronouncement by every witness would disproportionately increase the length of the trial, or where cross-examination is subject to time limits, or where there are other more central witnesses who deal with the point, or where it is perfectly plain from other sources, such as the pleadings, that the witness's evidence is in dispute.   The Plaintiffs say that all these features apply in this case, such that the rule in *Browne v Dunn* cannot or should not be applied, certainly in its full rigour.

826. I accept the Plaintiffs' submission, but in my judgment this is not an all or nothing point.  It is simply a point of fairness and a matter of degree.  The rule is based on the principle that a person should not have adverse conclusions drawn against him without knowing that he is at risk of this, and having a fair opportunity to deal with the challenge or criticism.    The court is not, in fact, bound to accept the evidence of a witness simply because it is stated and is not directly disputed.   Whether the court will do so is a matter of impression, weight, and balancing all factors relevant to doing so – in other words, whether it is reasonable to do so. Absence of cross-examination will simply be a factor feeding into this balancing exercise. Failure to cross-examine on a centrally relevant point of evidence, especially in a relatively simple case, will carry more weight than failure to cross-examine or challenge on a more peripheral one.   It will also carry more weight where there was cross-examination on other peripheral points, especially if limits on time are then prayed in aid to mitigate the effects of absence of cross-examination.    The decision whether or not to cross-examine on any particular matter is a decision for the cross-examiner.

827. I draw attention, however, to the fact that the rule does not require that a cross-examiner "put his case" to the witness, as it is often inaccurately paraphrased, but requires that he must direct the witness's attention to the fact that his evidence in a particular respect will be challenged.   It follows that the excruciating cross-examination question "Do you agree Mr X that when you did Y you were guilty of gross negligence" is as unnecessary as it is forensically absurd.

**The witnesses of fact**

828. I give below my impressions of the witnesses of fact as they gave evidence to me, as this will assist in understanding my decisions but I preface these comments with some further general observations.

**Defendants' factual witnesses**

829. The main witnesses of fact in this case were, unsurprisingly, all on the Defendants' side.   The Plaintiffs make sustained and aggressive attacks on the evidence of all these witnesses, as to both the witness's integrity and his/her reliability apart from integrity.    Whilst I will not ignore the points made, I have found them to be generally excessive, often unfair and usually tediously overemphatic in their language.  The Plaintiffs' characterisation of any partial recollection by a Defendant or their witness was routinely "selective memory" or

"reconstruction" where it was adverse to the Plaintiffs' submissions, and "candid" where it was not.

830. All the witnesses who gave factual evidence for the Defendants were obviously intelligent, highly-qualified, successful and generally articulate.   Their very positions attest to their capabilities.     I therefore do not repeat such comments in relation to each of them individually.   Having said that, however, differences of personality were apparent and I state my impressions where these have informed my assessment of their evidence.

831. I will also again say generally, at this point, that I formed the view that all of the Defendants' witnesses of fact were basically truthful and conscientious, although there were some points of concern, which I will mention.   It will be apparent from my initial remarks about the factors in assessing oral evidence that the fact that I find a witness truthful does not necessarily mean that I accept their evidence as fully accurate and reliable.

**Mr Conway**

832. Mr Conway had made a 157 page witness statement and gave oral evidence for six days.   As one of the original founding partners of the Carlyle group, within whose general area of investment responsibility CCC's activities fell, he was both a voting director of CCC and, I find, the pivotal oversight link between the Carlyle commercial organisation and CCC.     An important issue, of course, is whether his position and influence was more than that.

833. The Defendants stress Mr Conway's impressive financial background and achievements in a global context.   Whilst I accept the breadth of experience and expertise which this has no doubt given him, I am here concerned, nonetheless, to examine his conduct as regard the particular facts and circumstances of CCC.

834. The Plaintiffs assert that the evidence showed Mr Conway to be a "*strong, determined and dominant character*".   I would not dissent from the former two, but Mr Conway certainly did not strike me as being the last, although I might have accepted "forceful".   I saw no sign of an overbearing personality underlying his oral evidence, even over six days, and I did not see within the papers, either, any signs of overbearingness, as contrasted with firmness where appropriate (for example in dealing with a quarrel between Mr Stomber and Mr Zupon), and a forthright expression of opinion in discussion.

835. The Plaintiffs criticise Mr Conway as a witness giving oral evidence, for having a highly selective memory, tending to be evasive, and being allegedly inconsistent with his witness statement.   They therefore submit that his evidence is unreliable, at any rate in respects which supported his own position.

836. I find little to justify these attacks.   As to selective memory, this was asserted especially with regard to meetings with CCC's repo lenders of 20th August 2007, and in particular as regards what was said by Mr Black of JP Morgan.   In fact, I found Mr Conway's account of what he remembered and the reasons why he remembered particular aspects of such meetings but only those aspects, to be not only plausible but actually quite likely, and to have the ring of truth.   The example of "evasiveness" concerned Mr Conway's declining to attempt to give, in the witness box, details of when other business models for CCC which he said had been prepared "periodically" had actually been prepared.   Such a criticism is unfair.   A witness is perfectly entitled to make a statement of his recollection as to what happened in general terms, even if he is unable to give chapter and verse detail and does not want to do so because it would not be honest or potentially accurate, to do so.   This is frequently the state of a perfectly honest witness's mind.   The lack of detail then simply becomes a factor material to assessing what weight can be given to the general assertion, assessed in the context of all other relevant evidence.   It is not a necessary conclusion from a witness's failure or refusal to give a

categoric answer to a question that he is "evasive".    It may well be that he just cannot honestly do so.

837.   As to being inconsistent with his witness statement, I will of course judge whether any such suggested inconsistency reflects on the quality or reliability of a witness's evidence, and if so how far.  Given the quantum of written evidence and the length of cross-examination, it is not at all surprising to find that there may be points in different parts of Mr Conway's evidence which can be contrasted and suggested to be inconsistent.   I will evaluate the significance of any apparent inconsistency in its full context.

838.   In fact, though, to help myself gauge the strength of these inconsistency criticisms, I considered the two examples suggested by the Plaintiffs.  The first concerns Mr Conway's allegedly inconsistent views of the "significance" of moving CCC's investment guideline on minimum borrowing capacity from an intended 150% of actual requirement to 125%.   On examination, however it seems to me that the "inconsistency" is reasonably explained by the fact that in his witness statement Mr Conway was focusing on CCC's "investment strategy" (in regard to which the "alterations" were not "significant",) whereas in his oral evidence, the question which he was addressing was focused solely on the quantum of change in the investment guideline itself, as to which he accepted the word "significant", put to him by the cross-examiner, as being appropriate.  I also observe that the Plaintiffs failed to include the following words of Mr Conway "*I think it was significant, but it was also a recognition of reality as opposed to a significant change that was being made*" which seems to me not only to be a qualification to the tenor of what he had just said, but also to tie his meaning back very much to what he had said in his witness statement.

839.   The second example concerned discussion about the use of the word "high" in the context of the "price" paid by Carlyle to gain assistance for CCC's position from Citibank in August 2007.    On reading the passages in the evidence and contemporaneous documents, and considering the different circumstances and purposes for which those statements were made, this criticism seems to me to be greatly overstated if, indeed, there is really anything in it at all.

840.   Mr Conway gave evidence with assurance, dignity and unfailing courtesy throughout.    Just occasionally, the odd spark of what I have no doubt is an underlying steel in his personality showed through – for example, when faced persistently with pressure to agree with propositions which he felt he had already dealt with several times, or when asked a question with an embedded assumption with which he had already said he did not agree.  He had plainly prepared thoroughly for the task of giving evidence, both so as to master the material in the case and also as to how to best to present what he said, but, as I have said, preparation is not the same as contrivance and I am quite satisfied that this was part of his natural approach to doing any job as thoroughly as possible.   His answers were occasionally laconic, but I did not find them evasive.   The fact that he at one stage reminded himself audibly that he should give "*the shortest complete correct answer*" to my mind showed transparency rather than deviousness.   Mr Conway was plainly determined to give the best account of himself possible, but, I judged, with due regard to propriety and the "rules" of a court case. This was perfectly reasonable.

841.   I formed the clear view that Mr Conway is a pragmatist, but an honourable one.   I assess that he seeks to conduct his business relationships fairly, as he sees it, but also firmly and without sentimentality.   There were signs within the correspondence that others with whom he dealt saw him this way.   I have no doubt that he will be generous and accommodating where he can afford to be - he has found business relationships to work out for the best in that way – although he could probably be firm to the point of ruthlessness where necessary, but it is a matter of honour that he will keep his word and perform his obligations.   He expects others to do likewise.   Mr Conway is astute, and I think has an instinctive perceptiveness about human nature, but he is also a realist.   Such qualities, together with a natural charm, mean

that he is quite plainly a man who inspires loyalty.  I accept that they also make it important for me to be careful to look behind any veneer to his evidence, and I have done so.

842.   Mr Conway was obviously very quick thinking and I was particularly impressed with his ability to retain in his mind the general picture of events, so that even when he was being asked questions focused on one particular aspect, he could remember the bigger picture and refer back to other points where these suggested qualifications to either the questions or what would be literal answers.  His responses were open and fluent, and although there was the odd moment when he appeared slightly uncomfortable or embarrassed (it would have been surprising if there had not been, during 5 ½ days of cross-examination), I am quite satisfied that he gave me honest and sincere evidence, albeit no more expansive than his oath required.  He plainly possessed the self-discipline not to volunteer more than necessary to provide the shortest complete correct answer.

843.   That is not to say that I have had no reservations about his evidence.   I was unconvinced by his profession not to have found Mr Stomber's relentless production of emails at all irritating, and I felt that his expressions of unqualified support for Mr Stomber were somewhat mechanical.    The fact that I found his evidence difficult to accept unreservedly on some minor matters does not, though, detract from my overall acceptance of his evidence on central matters as being honest, having the ring of truth, and likely to be a reasonably reliable recollection.

844.   I have in this instance recorded my consideration of the Plaintiffs' criticisms of Mr Conway as a witness in some detail.  This is to give a sample of such criticisms, and an illustration of how I have approached them, especially in regard to one of the two most significant Defendants.    I will not do the same in respect of every individual criticism made against other witnesses, because it would be disproportionate to do so.  I will be stating my conclusions in more general terms, and give any detail only in respect of points which I have found of real significance.

**Mr Stomber**

845.   Mr Stomber had made two witness statements totalling 230 pages, and he too gave oral evidence for six days.  Although not a voting member of the Board, he is probably the focal Defendant in the case even more than Mr Conway, through having been the CEO and CIO of CCC, and also in overall charge of its investment decisions and day to day management through his position with CIM.

846.   It was apparent from the outset of his evidence that Mr Stomber felt the weight of this central responsibility.  It also emerged in the evidence that he had been maintaining his position at CCC in the context of some friction with the other non-voting director, Mr Zupon, clashing with him both as to authority and personality.

847.   The Defendants stress Mr Stomber's extensive Wall Street experience, in particular in fixed income bonds, and including at Merrill Lynch, as I have already mentioned.    The Plaintiffs point out that Merrill Lynch was nearly brought down at the same time as CCC.

848.   In their closing submissions, the Plaintiffs appeared to mount a sustained attack on Mr Stomber's competence generally, as well as upon his reliability as a witness in the case.   As to the former, they suggested that Mr Stomber did not really understand the markets in which CCC was operating, had far less relevant experience than he had led his fellow directors (and the court) to believe, and specifically had no experience in managing a highly leveraged portfolio of Agency RMBS bonds using 30 day repo finance.  They suggested that Mr Stomber had operated under a misapprehension as to the "standard" rate of haircuts for such securities in such repo transactions, failing to distinguish between rates for leveraged and unleveraged portfolios and between "customer" rates for bank to client transactions and

"dealer" rates for interbank transactions, because he had been involved only with the latter in each case.   The Plaintiffs expressly asserted in written submissions that "*[his] previous experience was not apposite for his role as CEO, CIO and President of CCC*".

849.   The ramifications of this suite of criticisms went far further than anything either pleaded in the Cause, or even put to witnesses.    Only one point directly pertinent to these submissions had been put to Mr Stomber, that being as to whether he had inverted the pre-2007 recognised standard rates of repo haircut for floating and fixed rate securities (at 2% and 3%) in one paragraph of his witness statement.   He had disagreed.   However, the implications of this suggestion, if he had indeed done so, would have undermined CCC's entire business model from the outset, going far further than any pleaded claim.    The suggestions regarding his previous experience also implied either that he had obtained his post by misrepresentations, or that it had been negligent of those promoting CCC in its early days to hire him at all.

850.   In his oral closing submissions, and in answer to direct questions from the bench, Advocate Wessels drew back from these extreme and unheralded assertions made in his written closing submissions.   He confirmed expressly that the Plaintiffs were not alleging either that CCC's original business model had always been flawed or that Mr Stomber had been insufficiently expert to have been the appropriate hiree for his position.   Whilst, as I understand it, they maintained their criticisms of some of Mr Stomber's evidence about technical aspects of the repo and financial markets, and suggested that the court could have no confidence, therefore, in the value of Mr Stomber's evidence or judgment in technical matters when otherwise unsupported, they relied on events and matters prior to July/August 2007 only as knowledge and information which the Board had before them when they came to take the decisions of which the Plaintiffs do complain.   They confirmed that 26th July 2007 was and is the starting point of those complaints.

851.   I have therefore proceeded on that basis.   I observe that the force of many if not most of the points of criticism of Mr Stomber's technical evidence is much reduced by the fact that they were raised only by reference to supplemental expert evidence, produced many days after Mr Stomber's cross-examination had concluded and he had been released and gone home.

852.   As regards Mr Stomber's credibility as a witness of fact, the Plaintiffs again submitted that he had been highly evasive, confused and confusing, suffered variously from selective memory and selective amnesia, and that he had to spend most of his evidence trying to explain away what he had written in contemporaneous emails.    I can see some reason for these points being raised, as I will explain below, but in the end, I find this criticism to be overblown.

853.   Mr Stomber struck me as studious, energetic and hardworking, but also highly strung (a description in fact volunteered by Mr Hance), somewhat awkward, and not strong on tact and diplomacy.   I also think he was rather aware of this last.   Mr Stomber is, metaphorically, a street-fighter, (Mr Sarles, an experienced banker, saw him having the character of "a trader"); he is dogged and tenacious.   In the right place this will produce results, but his natural business style is blunt and confrontational, rather than emollient or persuasive.   At the same time he seemed to me to be a self-critical person, and a natural worrier, who therefore constantly needed to reassure himself by achieving objectively demonstrable good results, and receiving the approval of others, especially those of higher rank in the workplace.

854.   As a result, he is absolutely driven in his work.   I accept the Defendants' submission that he "gave his all", although that point is not particularly material in the case.

855.   Mr Stomber's desire for approval and confirmation of his views and actions, express or implicit,  leads him to be remarkably open and informative about what he is doing, both to his peers and to his superiors, to a degree which I suspect others find excessive but are largely too polite to say.    His wish to impress others, but also to appear to be confidently relaxed, also seems to me to have led him into a style of communication which is frequently either

extravagant, or colloquial, or both.  He does not use direct description where a metaphor will do.  He is knowledgeable, but is also not adept, when recounting a matter, at sensing the degree of detail which is comfortable for his audience.  Mr Loveridge said that he "spoke in riddles".  Having seen both of them give evidence, I can well understand this comment.

856.    Mr Stomber certainly did not always express himself clearly in cross-examination, and his evidence did tend to be discursive.  This was partly because, it seemed to me, he would quickly think of many fairly refined aspects of an answer to the question, and his mind was jumping more quickly through these than he was able to express with clarity.   It was also, I am sure, because of an unsurprising nervousness, a tense concern to be accurate, an awareness of the weight of responsibility which he felt hung on him, and the pressure of being a Defendant in this action, but fundamentally because his natural manner is discursive in any event.   At first, and again unsurprisingly in the circumstances, he was defensive even to the point of truculence.  However this initial bristliness eventually gave way to weary resignation, and Mr Stomber grew ever more obviously (and I am quite certain, genuinely) extremely tired towards the end of each day of his cross-examination.   I have no doubt that he found giving evidence very, very stressful, not just as an exercise in itself but also because of having, as a result, to re-live a period which has probably been the most embarrassing in his professional career.

857.    I equally have no doubt, though, that he was an honest witness, and I formed the view that his capacity for self-doubt was greater than his capacity for self-serving reconstruction.  Although there might have been hints of the latter, I do not think it was conscious.  However, with the way things have turned out for Mr Stomber, I am sure that he will have gone over his evidence again and again, seeking to reassure himself that he did nothing wrong and that his judgments were right at the time.     I shall therefore have to bear this in mind and ask myself whether, sincere though I think he was, he has actually rationalised his answers to uncomfortable questions to any material degree.

858.    I will note here one matter which the Plaintiffs emphasised as a "*stark*" and particularly telling point against Mr Stomber.   They submitted that he had admitted that he had been caught out in an assertion that he had never produced a new proposed business model for CCC which acknowledged that it required a liquidity cushion calculated at 40%, when he was then shown an email of his of 7th September 2007 to Mr Conway which appeared to say exactly this, and had responded "trapped in my own language".   I have re-read the several pages of relevant transcript with regard to that, and I do not endow it with the significance which the Plaintiffs suggest it bears.  The appropriate place to explain that, though, is later on, in its context at the time.

**Mr Hance**

859.    Mr Hance had made two witness statements totalling 132 pages, and he gave oral evidence for four days.   He is an accountant by training with 17 years' initial experience at PwC, followed by a short spell taking over, improving and selling on, a food services company.   Thereafter, in 1985, he joined North Carolina National Bank which subsequently became Bank of America.   There, ultimately as CFO and a Board Member, Mr Hance oversaw the management of the Bank's own portfolio of about $400Bn of fixed income investments, consisting mainly of Agency RMBS, and itself leveraged (though only in the teen ratio).  He had retired from Bank of America in 2005.  In 2007 he held directorships of five other publicly listed companies apart from CCC, two being REITS and the others being respectively in energy, telecommunications and manufacturing    This gave him significant broadly-based Board experience; it was never specifically suggested that his other directorships interfered with his devoting a proper amount of time to CCC's affairs.

860.    Mr Hance has an affable manner.  He gave evidence calmly, clearly and courteously.   Indeed it seemed to me that at times his natural courtesy even led him to "accept" things out of

politeness to the cross-examiner, rather as one would in a social context.   Mr Hance seemed to me to be very willing to be direct, and also very anxious to make himself clear.   He was plainly trying to make his evidence as comprehensible as possible to those outside his sphere of familiarity and expertise.   He called on his experience both in banking and also as an auditor, from his work for PwC.

861.   Mr Hance struck me as a practical man, and I judged that whilst he would certainly do a job properly, he was not disposed to over-complicate matters.   He would do what was necessary to achieve the proper or intended result, but would not extend this.     By this I am not intending to suggest that he shirked anything, or was disposed to take a narrow view of what matters it might be necessary to consider when making any decision, but simply that he believed in efficiency and had a good judgment (and the confidence to apply it) as to what effort and work was needed, and in what direction, in order to move a project forward and guide it to success.

862.   He seemed to me to value and to be proud of his independent status, and I noted that he had chosen to be a consultant adviser with Carlyle rather than becoming a direct employee.   From the evidence, I gained the impression that he was both seen and made use of as something of a man-manager and elder statesman.     I also find that he saw that as an important part of his role as Chairman of CCC, especially to help manage the very differing, and sometimes clashing, personalities of Mr Stomber and Mr Zupon.

863.   The Plaintiffs' criticisms of Mr Hance's credibility were few and, I find, insubstantial.   I find Mr Hance to have been an honest and measured witness in whose evidence I can have confidence.

**Mr Zupon**

864.   Mr Zupon was the last of the Defendants to give evidence.   He had made a witness statement of 67 pages, and gave evidence over 2 ½ days, although originally scheduled for four.   Mr Zupon had left Carlyle a year after the events with which I am concerned to form his own business.

865.   Whilst he had been involved with CCC's investments at the outset – through CIM he was supervising that part of CCCs' investments which comprised leveraged finance assets – once it was decided to sell these in order to raise liquidity he no longer had such a function and he had already been rather distanced from the overall management of CCC by his personality clash with Mr Stomber.   However, he remained an advisory member of CCC's Board, even after his own particular area of expertise had disappeared.

866.   Mr Zupon struck me as a naturally serious man (I do not think his seriousness was caused entirely by giving evidence) with a quick and incisive brain.   I can see also that he was a very talented technician in his chosen business speciality.     His explanations of concepts, when requested, were very clear.     He appeared, and again I think this was his nature rather than simply a reaction to giving evidence, to be very logical and methodical.

867.   Whilst I did not find him evasive or unwilling to co-operate, his demeanour was guarded.   He gave evidence extremely carefully; of all the witnesses he was the one who took most care to inform himself thoroughly - as he was perfectly entitled to do - about the context of any question put to him, by reading the document or the relevant exchange of emails quite widely before giving answers.   I have no doubt, both from observing his manner of approaching giving evidence and from the contemporaneous records of his questions and interventions within the documents, that the taking of such care was also applied to his work.

868.   Mr Zupon had, he admitted, very little actual recollection of the meetings and events on which he was questioned, but he would still express a view as to what happened - although

when this was pointed out to him, he did co-operate in trying to identify where he was providing his belief rather than memory, and this seemed to me to apply to much of his evidence. Where he could really add nothing to the documentary records, though, he would say so, and this was in fact the pattern of his answers, rather than a statement simply of having "no recollection", which was what other witnesses tended to say. Where Mr Zupon did say that he had actual recall, his evidence seemed to me to carry conviction, and whilst I am conscious of the dire warning from the *Gestmin* case about the fallibility of memory expressed with conviction, I nonetheless found his answers to be generally persuasive, in context.

869. Mr Zupon gave evidence with self-possession and dignity. I am quite satisfied that he did so with his focus on giving a proper and accurate account of what he could remember (where he could do so) or what he genuinely thought to be the case, rather than with any second-guessing of the effects of his evidence. He clearly found the process of giving evidence somewhat bewildering and frustrating. I gained the impression that he viewed his witness statement as being like a report for presentation, and had therefore imagined that cross-examination would be a question and answer session simply checking out or elaborating its contents. Not, perhaps, having realised how far the point of cross-examination is to challenge and tease out flaws in written evidence, he was bewildered by the randomness and (he felt) repetition of some of the questioning.

870. After two days, this frustration overflowed into a protest that he was feeling that most of the questions were designed to trap him into making admissions or being inconsistent with evidence which he had already given. In the particular incident he protested that the answer to a question which he had not been able to answer when it was put to him was clearly apparent from a document to which he was referred, shortly afterwards but in quite a different context, and that this was not fair.

871. It did not seem to me that his cross-examination had been unfair, given the testing nature of cross-examination, although it did seem to me that it had at times been opaque, and that in the particular instance, a misunderstanding about the basis of the various questions put had some justification. Advocate Wessels agreed, therefore, that he would indicate, as he went along, the topics of questioning to which he was moving so as to enable Mr Zupon fairly to turn his mind to that topic, and that he would put the point of his case sufficiently directly to Mr Zupon to make sure that he had the opportunity to comment. After that, cross-examination proceeded more quickly and efficiently.   I mention this incident for what it told me about Mr Zupon's readiness to stand up for himself when necessary.

872. I found the Plaintiffs' general criticisms of Mr Zupon to be minor; and I regard Mr Zupon as a reliable witness, whilst making due allowance for his admitted lack of direct recollection.

**Mr Allardice**

873. Mr Allardice was the first of the independent directors to give evidence. He had made a witness statement of 87 pages and gave evidence over four days. His background experience and qualifications have already been mentioned.

874. Mr Allardice is forthright and this was certainly his style in emails. He was initially somewhat stiff and defensive in his oral evidence, but when he later relaxed, he showed a dry sense of humour. His evidence was politely precise once he got into his stride. He was well able to give a good account of himself, especially once he was reassured that giving evidence was just a process of recounting what he recalled, rather than being a memory test. He gave evidence as a man who had mentally rolled up his sleeves and prepared for battle, and I certainly gained the impression that "battle" was very much how he saw this case. He was the only one of the Defendants who I felt was consciously attempting, in his evidence, to paint a particular picture of himself. The picture he wanted to portray was that of the

common-sense, practical evaluator of CCC's situation, both in his own thinking and when contributing to discussions with fellow board members. I find this picture to have been a fair one.

875. Mr Allardice is, I am satisfied, a man of energy, who prides himself on focusing on practicalities rather than on the theoretical. He emphasised that his approach to his role was always to try to see what was really going on behind the "distractions" of what people might be saying. He also explained that his approach to being an "independent director", and in particular Chairman of an Audit Committee, was to try to see everything - problems, transactions and projections - in terms of their actual effects in cash terms, this being what he saw as the key function of any business. He portrayed himself (and I accept this) as a "figures" man, who likes to try to work out the cash implications of matters being discussed, as a frame of reference. He in fact illustrated this in the witness box and when he did so, I felt that it did carry the ring of naturalness. He said that he was generally cautious. He was ready and able to see the worst case, and think about its implications; he was not a man to "count chickens".

876. Mr Allardice clearly regarded himself as the most senior of the independent directors, no doubt because of his role as Chairman of the Audit Committee, and he translated his position as an "independent" director into the dual functions of injecting an outside pragmatic overview into the discussion of situations presented by Management, and of maintaining a detached presence in and around CCC, available to act as a sounding board where day to day issues might benefit from outside assistance to resolve. He had a close relationship with Mr Stomber through being a previous colleague, and he said (and I accept) that they would visit or speak with each other weekly, as well as communicating generally in emails. It is also plain from the evidence that Mr Allardice – very creditably - took an active and energetic part in CCC's affairs. He was certainly the most active of the independent directors.

877. I am not confident that Mr Allardice's actual memory is that good; he did frequently admit to lack of recollection, but I am prepared to accept that this was genuine and not convenient. I accept broadly that his evidence was a conscientious attempt to do his best to say what he remembered, but I do have some reservations about the confidence with which I can view parts of his evidence.

878. The Plaintiffs' criticisms of Mr Allardice's evidence (except in the respects which they regarded as supporting their case) were their usual ones of having selective memory and being evasive, and also moving into advocacy for the Defendants' cause rather than giving evidence. These broad complaints do not cause me seriously to doubt Mr Allardice's evidence or his reliability. It is only natural that some witnesses start giving longer and more assertive answers when they have gained confidence in dealing with cross-examination.

879. There is, however, one matter which has caused me real concern, and this is Mr Allardice's evidence with regard to PwC's positive assessment of CCC as a "going concern" in November 2007, which the Defendants naturally rely on as support for their own views and case that CCC was not seen as being terminally vulnerable by its own auditors. There was a long standing and rather prominent issue in the case as to the fact that PwC had given an "independent" revaluation of CCC's RMBS assets for the purpose of their review of CCC at the end of September 2007, and had reached the rather remarkable conclusion that this check valuation of a $22Bn portfolio of bonds was within $72 of the valuation placed on the portfolio by CCC itself. The Plaintiffs argued that this was so extraordinary as to be incredible, and that this was so obvious that the Defendants could not reasonably have placed any reliance on it as a properly "independent" confirmation of that value. The obvious conclusion was that PwC must have, at best, gone to the same source of valuation as CCC had and simply recomputed it, or, at worst, had simply accepted unquestioningly, and recomputed, CCC's own valuation.

880. Mr Allardice gave oral evidence immediately after Mr Reville of PwC, who had explained something of PwC's methodology and practices for making a "going concern" assessment otherwise than at a company's full year end audit, but who (the Plaintiffs had suggested) had not been able to give a convincing explanation for the remarkable small discrepancy, except to deny that it was extraordinary, and to assume that it was the result of difference in the rounding of figures on a spreadsheet.   Mr Allardice denied that he had been following Mr Reville's evidence through the transcript service.     Nonetheless, on the third day of cross-examination, Mr Allardice was questioned about his own reaction to the supposedly independent revaluation.

881. In response, he gave an elaborate description of his thought processes of noting and reacting to the remarkable fact of this very small discrepancy, and how it might have come about.   He said that he had requested sight of the underlying spreadsheet data from PwC, but to make his own assessment of it rather than ask them to explain what they had done. He had, he said, concluded that the facts of both a difference and its remarkably small size would be the result of an exercise of gathering information independently from dealers, because actual prices of the individual bonds, in $1,000 units, might run out to six or more decimal places but be very close to each other (because, he had reasoned, differences between dealers' prices would be very "tight") but they were only given to four decimal places on the relevant spreadsheets, thus producing apparent identicality in places but otherwise with rounding differences which were a plausible explanation for a $72 aggregate difference; there would have been quite a number of instances of rounding, operating in different directions, in the valuation of 165 separate parcels of bonds, such that an overall net effect of a mere $72 was not so remarkable as at first sight it might seem.

882. Not only, though, did Mr Allardice explain the several stages of the thinking which he said he actually carried out at the time, but he also testified to having a definite recollection of having spoken to Mr Reville about the PwC valuation, in order to try to understand the reasons for both the fact of the difference at all, and its remarkably small size.

883. The Plaintiffs point out, correctly, that none of this account of his thoughts appeared in Mr Allardice's witness statement, nor did he make any second witness statement when (they suggest) its materiality must have become obvious, nor did he seek to add it when invited to make any amendments to his evidence prior to confirming his evidence in chief in the witness box.   Neither was there any mention of his conversation and query to Mr Reville in his witness statement.   Mr Reville also had not mentioned it, and had, moreover, been absent on his honeymoon around the time of the 13th November Board Meeting, to which Mr Allardice had connected it.   The Plaintiffs therefore invite me to disbelieve this account as untruthful, and consequently to view all of Mr Allardice's evidence with scepticism insofar as it is self-serving.

884. I have to say that I find this evidence, as given, implausible.   I accept that in the course of sharpening up minds in preparation for giving evidence, people do remember things which they may not have thought about before, or may have dismissed as unimportant.     However, I also accept the Plaintiffs' point that it is remarkable in the extreme that this process of elaborate thinking and appraisal took place and yet Mr Allardice did not recollect any of it before preparation for giving oral evidence, and did not, even then attribute sufficient importance to it to make sure that it was introduced as part of his evidence in chief.     I cannot therefore accept that Mr Allardice did give the degree of critical thought which he now says he gave to satisfying himself that there was a good explanation for the remarkably close "independent revaluation" of CCC's portfolio by PwC.   I find that no more than general cursory thought was given to it at the time, and I also find that the "recollection" of having spoken to Mr Reville about it to try to understand how the remarkably minor discrepancy came about, is no more than wishful reconstruction in reaction to pressure.

885. I accept Mr Allardice's evidence that he noted the $72 discrepancy.   I have therefore asked myself whether the implausibility of his evidence as to what he then thought about it is simply the result of his own analytical approach, ie that in trying to articulate what was, in reality an automatic and semi-intuitive reactionary thought process at the actual time, he has over-elaborated on the detail of what such a process "must have" involved.  However, having heard, and later read and re-read very carefully his oral evidence on this topic, which lasted about 45 minutes, I am regretfully unable to reach this conclusion.  The thinking which he describes is a far too structured "due diligence" exercise simply to be explicable as the verbalisation of a general mental appraisal.

886. I am quite sure that Mr Allardice considers that reliance on PwC's audit conclusions was reasonable.   I think it most likely that, having become aware of the criticisms made of his (and others') doing so, he has subsequently looked again at the detail on the spreadsheet, and constructed a thought process which could reasonably have taken place and would, if it had taken place, have provided a reasoned justification for a reliance on it, - even though in fact it did not take place because at the time he gave the matter rather less attentive thought than this.      His later thinking therefore became a progression of thoughts as to what could have happened, becoming what "must have" happened and metamorphosing again into what did happen.

887. I regret to say, though, that I also think that Mr Allardice did have some insight into this being what he was doing.   I did not feel that Mr Allardice was entirely at ease when giving his explanations, and I noted that his words seemed quite oddly chosen in places, eg

> "*when I prepared the witness statement and then subsequently to all this preparation thought more about everything to prepare myself here, <u>and it was clear that </u>the $72 led me to have a discussion with John Reville and to want to look at the underlying materials….*" (emphasis added).

888. This is not an expression of later recollection, but of rationalisation.   I find that the combination of his underlying views that (i) reliance on PwC had been reasonable, (ii) the approach which he described could in fact have happened and would certainly have justified it, (iii) the Plaintiffs' liberal criticisms of the directors of CCC in this case are unfair, and (iv) the action is a battleground, led him to feel a kind of justification for levelling the playing field by putting forward the more favourable reasoned picture which he painted.   However, whilst, having had it explained to me, I can accept the logical reasoning behind this picture, I just do not believe that it is what actually happened.

889. This point must undoubtedly have an effect on my views of Mr Allardice's credibility generally.  It has caused me to look very carefully and critically at his answers to consider whether or not they may be affected by *ex post facto* rationalisation.   The incident itself is not, however, of direct impact on any of the points which are crucial to the case.


**Mr Loveridge**

890. Mr Loveridge was the second of the independent directors.    His witness statement was a mere 52 pages and he gave evidence over two days.

891. Mr Loveridge is now almost entirely retired, having sold his business and retired formally in 2002, but being wooed by former clients to remain on their various boards for a time.      He struck me as one of the "old school" of trust professionals, with the conservative, low key and traditional approach of that background.   He was plainly not of the same school of "cut and thrust" business executive as were the other individual Defendants.

892. Mr Loveridge was extremely nervous at the beginning of his evidence, and was very anxious to explain to me that he is 73 years old, has a bad memory and that the events about which he was being asked to give evidence took place more than eight years ago. His evidence certainly lacked the incisive quality of his co-defendants' evidence. He was inclined to be vague in his answers, and at times lacked consistency. Frequently, and after a while almost routinely, he resorted to responding "I do not recall" to any question about anything of any detail.

893. Whilst I do not suggest that Mr Loveridge's evidence was not conscientious, at times his resort to the "I do not recall" rubric seemed to me to arise from relief that this was an acceptable answer, to which he could safely retreat, as a slogan. This was particularly obvious in answering a form of question frequently put by Mr Wessels, along the lines of "when you saw this email didn't you [take some action]?" His "I do not recall" response failed to recognise the distinction that he might "not recall" because the matter had not happened at all, or because it had happened and he had simply (and quite possibly not unreasonably) forgotten it.

894. I do not suggest that Mr Loveridge's lack of recollection was untruthful, although I do not think he was really trying very hard. I gained the impression that nerves, the pressure of being a Defendant and of giving evidence, and the fact that he knew in his heart that the intricacies of CCC's business were matters rather outside his understanding, all combined to help give him a mental block.

895. It will be gleaned that I have no confidence that Mr Loveridge, at any rate by the time of giving evidence, had any real understanding of CCC's business and the financial markets in which it operated, at least beyond an utterly basic level. However, it is also the case that Mr Loveridge was not on CCC's Board for the purpose of this; his function was to represent and oversee CCC's position in Guernsey, its good standing and relations with the regulatory authorities, and to exercise the general business oversight position of an independent non-executive director. The implications of this though, are moving on to issues of competence rather than evidential reliability, and I will deal with them at the appropriate point.

896. The Plaintiffs criticise Mr Loveridge's lack of recollection as so extraordinary as to be disingenuous. I have dealt with that. They also criticise his vagueness and readiness to say, when it was put to him that certain things ought to have happened, that he was "sure" that they had, even whilst at the same time saying that he had not been there, or that he could not recall. Whilst this may have been vague, it seems to me, though, that it is not entirely fair to criticise this as evidence which could not honestly be given. I interpreted it as an expression of confidence in his co-directors. I accept, of course, that its value as probative evidence is an entirely different matter.

897. Mr Loveridge was probably in the most difficult position of all the individual defendants in this case. First, he is the only non-American, which must in itself feel somewhat isolating. Second, and more important, he is the only Defendant with no background or expertise in some form of investment or commercial banking, and with no experience of the kind of financial products and market in which CCCs' business was operating. His own experience and expertise was that of Guernsey trust administration, corporate governance and compliance, and it was that skill that he brought to the party. He made this point in the course of his evidence; I bear it in mind.

**Mr Sarles**

898. Mr Sarles had given a 65 page witness statement and gave evidence over two days. His background and credentials have already been mentioned.

899. Again unsurprisingly, Mr Sarles was somewhat brusque at the outset of his evidence, and defensiveness led him once or twice to resist propositions which, on reflection, he came to agree were correct.   But as he settled down, he became more expansive and articulate, and he provided comprehensive explanations of his thinking and his reasoning.     He struck me as highly capable and above all, organised and methodical.   He likes to marshal his thoughts on a topic into lists of points and summaries, and then to prioritise these for action or in order of importance.   Examples of his note-taking and preparation occur in the papers, and this methodicalness was apparent in the way he answered questions in his evidence.

900. The Plaintiffs' substantive argument - levelled at all the independent directors - is that they were almost entirely passive in their involvement in CCC's affairs, doing no more than comply with the suggestions or requests of, in particular, Mr Conway, Mr Hance and Mr Stomber as to the exercise of their powers under the Articles, as well as their consideration of board decisions.   Mr Sarles disputes this.

901. As with most of the other Defendants, the Plaintiffs suggest his evidence is unworthy of reliance because of some matter which is mentioned only late in the day, which they argue shows that it has been contrived and false.   In this case, it is Mr Sarles' evidence, given in cross-examination, of having had a telephone discussion with Mr Stomber on about 17th August 2007 with regard to CCC's financial position and the proposed suspension of the investment guideline as to the minimum liquidity cushion.   The Plaintiffs submit that this must be contrived and false, because of not being mentioned in Mr Sarles' witness statement, or in supplementation of his evidence in chief, and it had not been mentioned by Mr Stomber.

902. I am not persuaded by this criticism, and certainly not so far as to have any serious doubts about the general reliability of Mr Sarles' evidence in other respects.   Whilst the Plaintiffs' criticisms of lack of "discussion, deliberation or question" by the Independent Directors were of course plain to be seen on the pleadings, this was one individual matter in the context of many more such allegations.   I do not think that the occurrence of such a conversation was implausible in itself (as the Plaintiffs assert), and I do not, in this instance, find the absence of previous, or corroborating mention of it to be so extraordinary as to undermine my general favourable impression of Mr Sarles' evidence.   I accept him as a thoughtful and candid witness, doing his best to produce his best recollections of events.

**Mr Reville**

903. Mr Reville of PwC (CCC's auditors) and the partner in PwC with overall responsibility for CCC's affairs, provided a witness statement of 30 pages regarding PwC's involvement with CCC and its financial situation during the relevant period, and he gave evidence for one day, although scheduled for two.

904. The Plaintiffs suggest that Mr Reville's evidence was evasive, tendentious and of little assistance to the court, largely because they submit that he was defensive with regard to PwC's work,   disappointingly partisan in his obvious support of CCC (and, of course, Carlyle), on examination was unable to give any detailed evidence about important matters (such as the real source of the data or process which had been used to arrive at the revaluation of CCC's portfolio or RMBS within the remarkable difference of only $72 already referred to), and had declined to answer questions on the purported grounds that their premises were too hypothetical, but in reality only because they had been too awkward.

905. I do not accept any of these criticisms.   Mr Reville was a thoroughly composed witness, although he was no doubt assisted in this by the fact that neither he nor PwC is a defendant. Like Mr Hance he was direct in his answers to questions, which probably contributed to Advocate Wessels' making good time and terminating his cross-examination one day early. Mr Reville was concise and businesslike.   His explanations as to how the reviews of CCC

had been conducted were lucid and helpful.  He was very clear as to what he saw his role as auditor of CCC to be.

906.   It is unsurprising that he should have supported CCC's actions; it would have been far more surprising and significant if he had not.   It was also plain that he wished me to know that his view as an auditor had been that the Directors and Management at CCC had always behaved responsibly and commendably in regard to their conduct of CCC's business and that the standards which they imposed upon themselves were high, and he felt that they had achieved them.   The Plaintiffs dismiss and deprecate this as a superfluous and partisan piece of evidence.   That is a matter for me to review objectively for myself.   Overall I found Mr Reville to be a good witness, on whose evidence I feel I can safely rely.

## Miss Cosiol

907.   Miss Cosiol is a specialist corporate lawyer who remains employed by Carlyle currently, as a principal in its legal department.  Miss Cosiol had made two witness statements relevant to this trial, one (in fact her second in the action) a general one of 44 pages, and a further one in relation to two particular matters which arose later.    Whilst scheduled to give evidence for three days, her cross-examination was concluded by Advocate Wessels in one day only.

908.   Miss Cosiol is a quietly spoken lady, and whilst self-assured, she was, at the same time, almost self-effacing in her evidence.    Her involvement with CCC occurred in the early stages of her career in legal practice, when she was aged about 31 and was both new and very junior in the organisation.  The assurance and incisiveness of her emails at the time, however, is notable; the contrast with her manner was striking.

909.   She has clearly gained in experience, and no doubt also in confidence, since her involvement with CCC.   At that time, having just joined Carlyle, she worked under the overall supervision of Mr Jeff Ferguson, Carlyle's Chief in-house legal counsel who, she told me, was a tax lawyer, of a cautious nature.  Her title of "General Secretary" in relation to CCC meant that she provided assistance in administration, governance and compliance and liaison as regards CCC's affairs, with oversight from her legal expertise.   She took the notes at board meetings and some other committee meetings, which she later converted into minutes.    She agreed that, in this, she "took direction" (rather than "instructions") from Mr Conway and Mr Stomber and also at times from Mr Nachtwey, Mr Buser and Mr Mayrhofer of Carlyle, because they were senior to her, as well, obviously, as Mr Ferguson as her immediate boss.

910.   The Plaintiffs make their customary criticisms of Ms Cosiol: - that she was partisan, had a selective memory (or was giving evidence of things she could not in fact remember) and that she was generally an unsatisfactory witness.  I do not agree.  Miss Cosiol struck me as competent, conscientious, and efficient, and I felt that she was being candid in her oral evidence.   Her evidence was open, clear (if quiet) and thorough and I have no doubt, from the papers, that she brought those qualities to her work at the time as well.

911.   The Plaintiffs criticise Ms Cosiol roundly for being willing to give evidence that she believed that certain events had occurred even though she had no recollection.  I have already said that I do not regard that as a real criticism of a witness, as it may well be the actual truth. Ms Cosiol seemed to me to make it tolerably clear where her evidence consisted of such belief rather than actual observation or recollection, and I have no difficulty with the credit of a witness who says that she believes something must have happened either as a matter of logical reasoning or because it was her impression.  Of course, the probative value of such evidence is a different matter from its integrity.

912.   Several of the Plaintiffs' attacks on Ms Cosiol are founded on her stated belief at the time that CCC was not "in the zone of insolvency" at around 20th-23rd August 2007, on the grounds that this judgment is so plainly  wrong, and inconsistent with the notes she took at the meeting,

that it is "simply incredible".  In context, however, it seems to me quite plain that what Ms Cosiol was really saying, both in her witness statement and oral evidence, was that this judgement was not one that she made.  Having raised the point, she left it to the management of CCC who were better qualified to make it.  In fact, what she actually said was that she did not recall thinking that the company was in the zone of insolvency, not that she had positively thought that it was not.  I do not find this, more nuanced, statement to be implausible or incredible, bearing in mind Ms Cosiol's position as a new and junior legal adviser at that time.

913.   Being well aware, Ms Cosiol said, of her lack of knowledge and in-depth understanding of CCC's business, she took copious notes at meetings, and it is obvious from the documents that she certainly did.  Her actual recollection was generally, she also said, no better than her notes, and in explaining her lack of actual memory, she pointed out that CCC had been far from the only project on which she had been employed, although during the relevant period it had taken up the best part of her time, in particular at around the crisis of March 2008.  I regard her evidence as being expressed in terms consistent with this and I did not see her as indulging in reconstruction to support the Defendants, or as having to "explain away" matters.

914.   I am quite satisfied that Ms Cosiol gave honest and candid evidence.  I find her to be a reliable witness, insofar as her evidence goes, although this is really not very far.  In the end the main value of her evidence lies in the contemporaneous meeting notes which she took.

915.   I must add here that the Plaintiffs went so far as to submit that it was apparent that Ms Cosiol was "unwilling to assist the Court and gave evidence in what she perceived to best serve the interests of her employer".  This submission was based particularly on Ms Cosiol's evidence about whether she had, or must have, received legal advice from Linklaters at the end of August 2007 that a proposed guarantee by TCG of CCC's repo obligations to Citigroup in return for holding a 2% haircut would not require to be publicly disclosed.  This submission impugns Ms Cosiol's integrity and I make it clear that I entirely reject it, as without foundation.   It is regrettable that the Plaintiffs should ever have thought fit to make it.

**Mr Buser and Mr Nachtwey**

916.   The Defendants also provided witness statements from Mr Curtis Buser, currently Chief Financial Officer of the Carlyle Group, but at the relevant time its Chief Accounting Officer, and also from Mr Peter Nachtwey, the Chief Financial Officer of the Carlyle Group from July 2007 until 2010.  The Plaintiffs elected not to require them for cross-examination.  Their written evidence as to their own involvement with Carlyle and in the affairs of CCC at the material times, and certain points raised by the Plaintiffs was therefore taken as read, and is unchallenged.

**Plaintiffs' factual witnesses**

**Ms Alexander**

917.   The Plaintiffs relied on only two factual witnesses for the purpose of this trial.  The evidence of Ms Annette Alexander, a corporate and investment lawyer with Carey Olsen, went only to issues about enquiries being made by Ms Cosiol in August 2007 with regard, first, to obtaining urgent GFSC approval to Carlyle's giving CCC a $100Mn loan, and, second, as to what duties might be placed on directors of the company if it was in the "*zone of insolvency*" (a concept known to her from Delaware law) and her notes and recollections of a telephone conference call with US lawyers and (apparently) a lawyer from Linklaters which took place on 20th August 2007 with regard to this.    Ms Alexander had "very little" independent recollection of such events, seven years after them, and her evidence was accepted by the Defendants without cross-examination.

**Mr Shah**

918. The Plaintiffs' only oral witness of fact was Mr Kunjal Shah.   He gave evidence out of turn, after the conclusion of the evidence of the Defendants' factual witnesses and the Plaintiffs' own experts.   Mr Shah's evidence was brief, and it is convenient to deal with it all at this stage.

919. He was described by the Plaintiffs as a "senior investment professional experienced in managing credit risk associated with leveraged investment funds."   At the material time, Mr Shah worked for Deutsche Bank in New York as a counterparty risk manager for "hedge funds", amongst which he counted CCC.     I understood from the general tenor of the evidence and the definition in Barron's Dictionary of Financial Terms with which I was supplied, that it is very doubtful that CCC was fairly described as a "hedge fund", which term generally connotes "a lightly regulated investment pool which will typically not only use a high degree of leverage to increase returns (and thus risk) but will also engage in using long and short trading positions, derivatives and other speculative market practices and engage in many different markets".     I had thought that Mr Shah's description of CCC as a "hedge fund" arose out of a Deutsche Bank internal classification, rather than being an indication that Mr Shah himself did not focus clearly on the nature of CCC's actual business, but Mr Shah later produced a stunned silence in the court when he announced that he had understood CCC to be a company which traded in securities and in particular RMBS, and not a "buy and hold" vehicle.

920. The purpose of Mr Shah's evidence was apparently, twofold.   It was first to present an account of at least one repo lender's reaction to CCC's difficulties in and shortly after August 2007, with which Mr Shah had had some involvement at the time.   Second and seemingly more important, it was to support the Plaintiffs' assertions that CCC made misrepresentations to its counterparties about either being in the process of deleveraging substantially, or indeed having in fact already done so, at the end of August and during September 2007, when in fact it had not done so and had no intention of doing so.   This goes only to credit.   The subtext was, of course, that this showed that CCC's Directors and officers were willing to behave discreditably.

921. Mr Shah had subscribed to a witness statement in which he expressly alleged that he had himself been so misled at a meeting between Deutsche Bank representatives and CCC representatives (I think Mr Stomber) on 31st August 2007.   This culminated in the statement that in October 2007, when he had, on behalf of Deutsche Bank, agreed to waive an event of default constituted by a breach of covenant by CCC as to maintenance of its net asset value ("**NAV**"), he had not known certain negative facts about CCC's position, because he had been misled in this way.

922. The Plaintiffs ambitiously suggested, after his cross-examination, that Mr Shah was "an honest and reliable witness with a good recollection of events".   He was nothing of the sort. The Defendants say that he was not a satisfactory witness and I agree with them.

923. Mr Shah was a singularly unimpressive witness.   His evidence was inconsistent, confusing, and sloppy, and ultimately more concerned to defend a position which he had carelessly and mistakenly adopted than to accept the truth.

924. Mr Shah had written an internal Deutsche Bank email, in about October 2007, in order to brief a senior director about CCC for a meeting which the director was about to have, and he had there recorded that CCC had deleveraged substantially.   It appeared that the Liquidators had obtained a copy of his email, and, knowing that this had not been the case, had questioned Mr Shah about it.   When Mr Shah had learned that CCC had not, in fact de-levered, he asserted that he had therefore been misled by them, as described above, and he gave a witness statement to that effect.

925.   In cross-examination, he was obliged to accept that he could not plausibly have believed that CCC had actually deleveraged to the extent he now alleged that he was told within the timescale that was available, because this would have been impossible.   He also had to accept that his assertions as to alleged misrepresentations made at his 31st August meeting were in fact derived from the contents of slides for a later CCC investor conference (on 11th September 2007) which had not been in existence at the time of the August meeting, but which had been later sent to Deutsche Bank and filed.   He also accepted that he had misread the information contained on those slides.   It was further pointed out to him that there was no record, in his contemporaneous email summary of the 31st August meeting, of the supposedly important and allegedly untrue statements which he claimed had been made.

926.   I am satisfied, and I find, that what in fact happened was that Mr Shah, with no real knowledge or recollection of the facts even in October 2007, was called upon at that time to provide a briefing note about CCC to his senior management for the purposes of a high level meeting or review.   He compiled his email note from a superficial review of the papers in his file, including the slides mentioned, which he interpreted hurriedly and incorrectly.   He did not look any further, or in any more depth, at the position he was reporting.     Then, when asked about this note six or seven years later, he has defended his position by leaping to assert that the obvious error contained in it as to CCC's having deleveraged shows that he was misled by CCC, rather than considering the alternative possibility, that his own memorandum about the position had been wrong, superficial and, in fact, sloppy.

927.   At best, therefore, Mr Shah's evidence in this action was careless, and lacked any rigorous appraisal of what he was saying, despite its very serious nature.   Although I do not think Mr Shah was consciously dishonest, I am satisfied that he was well aware of the thrust of evidence which the liquidators were looking for, that his self-importance was greatly flattered by being asked to be a witness, and that this allowed him to be drawn into making inappropriate and unjustified accusations.   In fact, (and ironically in all the circumstances) the evidence of Mr Shah is a striking example of just the kind of unreliable "reconstruction" which the Plaintiffs urge me to be wary of when examining the oral evidence of the Defendants.

928.   I do not, therefore, regard Mr Shah's evidence on this topic as any evidence of CCC putting out false and misleading publicity or statements as to their financial situation.   In any event, that would not go directly to any cause of action relied upon in this case.   As to the remainder of Mr Shah's general evidence, I do not discount it entirely, as it is not in fact (and I so find) inconsistent with other evidence as regards CCC and the general circumstances of its relationships with its repo lenders.     However, it is only that corroboration which leads me to accept anything Mr Shah says.

**The expert evidence**

**General**

929.   The function of expert evidence is to assist the court to draw sound conclusions about matters of which the court does not have knowledge or experience.   The forensic emphasis with expert evidence tends to be on "opinion evidence", because of the well-known rule that the opinion of a witness is not admissible evidence except where he is an expert on the topic.   The basis of this rule of evidence is simply that of probative value; the opinion of an expert is more likely to be reliable and hence have probative value, than the opinion of a non-expert.

930.   However, much expert evidence is still evidence of primary fact, because the expert will often give evidence of factual matters, such as the customs or practices of a trade or profession, or simply facts accepted as general knowledge in the profession at the time, from his own observations.   Indeed, at time this may be the whole purpose of his evidence.   It is often useful in itself for the court where it is factual evidence of which the court has no knowledge,

but when the expert gives such evidence, (often to provide the basis for conclusions he subsequently expresses), he is giving evidence of primary fact, just like any other witness.

931.   Beyond primary observable fact comes secondary fact, in other words, inferences of fact drawn from the primary facts.  Whilst ordinary witnesses can, and frequently do, give some evidence of such secondary fact, that is on the basis that the judgement or analysis applied in drawing such inferences is no more than what is applied by ordinary people in everyday life, and requires no specific expertise.  Where drawing the correct inference is not that simple and does require some specialist knowledge or skill, expert evidence will assist the court to draw correct inferences, sometimes because it simply prevents the court from falling into error through not appreciating factors which might make an apparently logical conclusion incorrect, but also, as inferences become more complex or refined, by providing a positive opinion about the correct inference which should be drawn from particular facts.  In the end, though, however much the expert's opinion may be useful in such circumstances, it is trite law that the function of the expert is to assist the court to decide the case soundly; it is not to decide the case himself.

932.   The qualities required of the best expert witness are therefore, first, a wide and deep knowledge of his expert field; second, a mind of high intellectual ability, applied in interpreting relevant facts and matters within that field; third, the ability to be dispassionate about that exercise; and fourth, the ability to explain his expert field and his conclusions clearly enough to enable the ordinary reasonably intelligent layman (otherwise, the judge) to understand his reasoning.  The expert demonstrates not only his own expertise, but also his appreciation of his duty as a witness, by not straying into expressing opinions outside the scope of his expert function.      An expert witness's duty in giving evidence is first and foremost to assist the court by giving honest and dispassionate evidence both as to fact and as to his opinions, regardless of who has engaged him.   Probably the greatest compliment to an expert witness is that one can express confidence that his evidence would have been just the same if he had been called by the opposing party.

933.   Since expert evidence is expensive to obtain and can extend the length of trials, it is the duty both of the court and the parties to limit expert evidence to that which is necessary for resolving the proceedings ie the action: see Rule 8 of the Evidence Rules 2011.

934.   There has been a large amount of expert evidence in this case.   I permitted this at times with some reluctance but for three reasons.  First, the Plaintiffs, as liquidators, have virtually no ability to call direct evidence of the events which they rely on as grounds for their complaints. They therefore have to make their case on the basis of inferences from the available documents and other evidence with the support of expert evidence.  In a matter as significant as this, it would be unreasonable to hinder their ability to do so to any great extent.

935.   Second, there is often no very clear delimitation of separate fields of expertise.  A party who conscientiously seeks to keep down the number of expert witnesses to be called runs the risk of it being argued that a particular expert whom he calls is not sufficiently expert in some aspects of his evidence, and that these should be rejected, or the evidence of an opposing expert witness preferred, on those grounds.   Whilst there are limits as to how far it is reasonable to allow proliferation of experts to avoid this charge, once again, in a matter of this significance, I judged that it was appropriate to allow the Plaintiffs some indulgence where they insisted that they needed to call separate experts in different disciplines in order to support their case.

936.   Third, and of particular importance in a case of apparent complexity at the case management stage, there is force in the argument that the court itself, inevitably less familiar with the substance of the issues than are the parties and their advisors, is not in a good position to make sensitive judgments about what expert evidence is (or is not) going to be of real

importance at a future trial, and that therefore the safer course, if in doubt, is to allow the expert evidence in, rather than to exclude it.

937. Ultimately, therefore, I was presented with evidence from no less than 16 expert witnesses, mostly in financial fields of varying degrees of relevance. These were: Financial economics (in effect, the bond market), repo financing, RMBS, investment banking, financial risk management, insolvency, and accounting and audit. There were also experts on Delaware law, arising from the fact that CIM's management contract with CCC was governed by Delaware law, and Dutch financial regulatory law, arising from the fact that CCC had been listed on the Euronext Exchange and the Plaintiffs wished to rely on certain points regarding the Defendants' conduct as directors of such a listed company, but which required aspects of Dutch law to be established.

938. In the end, I find that my misgivings with regard to permitting some of the expert evidence, particularly that sought late in the day by the Plaintiffs, have been justified. The two accountancy/audit experts were not called and I am not sure that their evidence was even referred to in the trial, although it is considered in appendices/annexures to the parties' main closing submissions.

939. The experts in Dutch regulatory law were not called and their evidence was scarcely referred to either. This is probably because it became more and more obvious in the course of the trial that their evidence not only did not go to any matter which it was alleged caused any damage to CCC (a point which it was disproportionate to investigate closely at the case management stage), but scarcely had any material effect as regards even the reliability or credibility of any witness. In any event the adducing of expert evidence solely to found an attack on a witness's credit could never be justified, on principle.

940. The experts in Delaware law were not called either. However, since Delaware law is a matter of fact in this court, and since Delaware law was plainly material to the assessment of any potential liability of CIM under a contract governed by Delaware law, the inclusion of that evidence was justified, even though one would have hoped it might be agreed. These two experts appeared to be in little material disagreement, apart, I think, from some fairly refined questions of whether the imposition of a contractual duty of care or fiduciary duty in the Management Agreement would replace or exist in parallel with equivalent Delaware common law duties of care and good faith, and the technicalities of the application of exoneration clauses in Delaware law. Their evidence has to be dealt with from their written reports, as and when necessary. Whilst the presence of two expert witnesses might have been excessive in the event, this is not the kind of case where the imposition of a single joint expert was ever likely to be appropriate or save worthwhile costs.

941. I record one further point about the scope of the expert evidence. The Defendants have made some critical comment about the Plaintiffs' insistence on seeking the introduction of numerous experts, where, they say, this was unnecessary and duplication. They point particularly to the fact that Dr Carron appears to be well qualified to give evidence about investment risk management, having done so before, but that the Plaintiffs insisted that he was not doing so in this case, and that they therefore required a separate expert in this field, in the shape of Professor Das. Yet, say the Defendants, when Dr Carron's evidence emerged, he has expressed opinions in the field of risk management as well as financial economics.

942. Expert opinion evidence in the form of commissioned reports (as contrasted with expert opinion evidence which an existing witness of fact happens to be qualified to give by virtue of his experience) is admissible under the Royal Court Rules only pursuant to a direction of the court in that regard, to enable such evidence to be suitably controlled. It may therefore well be the case that such evidence of Dr Carron is strictly not admissible. However, it does not seem to me that the Defendants have suffered any sensible disadvantage as a result of any such duplication.

943.    Given the overlap and difficulty of always distinguishing areas of expertise, I have not sought to dissect Dr Carron's evidence so as to exclude any evidence which might be in this category.    That exercise would be unrealistic, and actually disproportionate in all the circumstances.    I have therefore not sought to exclude from my thinking any statements of experts where they seem to me to possess expertise, as contrasted with gratuitous opinions in areas where they do not.    I have taken this approach as regards all the expert evidence.

944.    The expert evidence was initiated sequentially, with the Defendants' experts being responsive to the Plaintiffs'.    This was principally because it was a convenient way of ensuring that the Defendants really did know what case they had to meet.    Expert conferral then took place, with the experts in matching disciplines compiling a joint report of matters of agreement and disagreement.    The fields of expertise of the experts called by each side did not precisely cross-match, which complicated the logistics and timings for the process of conferral and joint statements.

945.    In the interests of a convenient course for the trial itself, and having regard to the importance of the voluminous expert evidence in the case and that this ought to follow the factual evidence rather than partially precede it, it was agreed that the Defendants' factual witnesses should give evidence in the first part of the trial, with the expert witnesses following on; first the Plaintiffs' and then the Defendants'.    Unfortunately, this sensible and very convenient course of evidence caused certain procedural problems when the Plaintiffs then sought positively to supplement their own experts' reports (four of these) with further written report evidence, immediately before their own experts gave evidence, but after the Defendants' witnesses of fact had concluded their evidence, been released, and mostly flown back across the Atlantic.    Not surprisingly this provoked a degree of objection from the Defendants. However, whilst vociferously recording their complaints they elected not to pursue objections to two of these supplementary reports, (those of Mr Eric Welles and Dr Harpal Singh Maini) on the basis that they felt able to deal with the additional evidence through their own experts. They did, however, object to the other two further reports, (those of Mr Philip Wallace (insolvency) and Dr Andrew Carron (financial economics) and the admission of these therefore became the subject of an application.

946.    My approach to whether these supplementary reports should be admitted will have been apparent from the short judgment which I delivered at the time but, broadly, I held that where the supplementary report was correcting a witness's earlier report, it was obviously to be permitted.    The witness would not be able to take the oath unless it was.    However, (i) insofar as a further report simply repeated evidence previously given it was inappropriate, (ii) insofar as it contained matters which were in the nature of submission and could be advanced as such it was intrinsically inadmissible, and (iii) insofar as it raised new arguments which had not been raised previously nor been the subject of expert conferral and which had not been raised with the Defendants' factual witnesses in their cross-examination evidence, it was by then too late, and I was not prepared to permit its introduction.

947.    I therefore disallowed the further reports of Dr Carron and  Mr Wallace, although I made it clear that, insofar as any of the material contained in them naturally became referred to in the course of the relevant expert's oral evidence, (as to which I would be astute to detect any artificial attempt to achieve this) then such material, which the Defendants had by then of course seen, could become admissible in accordance with the normal rules and procedure governing the admissibility of relevant evidence arising in the course of trial.

948.    It is convenient at this point to set out my impressions as to the nine expert witnesses who gave oral evidence at the trial, and to give some indication as to my general views of the helpfulness of their evidence and where I might broadly prefer one to another.    I will of course have to deal with more of the detail of their opinions later where specifically material. It is also convenient to deal with this by taking the pairs of witnesses on opposite sides, but

owing to the lack of matching of experts previously mentioned, I will deal with the witnesses on aspects of financial economics in a convenient group.

949. Naturally, each side was critical of the other side's experts and commended its own. I will not be referring to every criticism made, but only to those which I think have either sufficient justification or significance to require me to do so.

**(1)      The Financial Economics experts:**

-          **Dr Carron, Dr Maini and Mr Welles for the Plaintiffs;**

-          **Professor Hubbard, Dr Niculescu (and Mr Bezant and Dr Webster) for the Defendants.**

**(a)    Dr Andrew Carron - Financial economics – financial markets, CCC's business and damages.**

950. Dr Carron has a BA in economics from Harvard University and an MA, MPhil and DPhil in economics from Yale University. He is principally a researcher. After some years conducting research with the Brookings Institution, he spent from 1984 -1996 in the financial investment world, working first at Lehman Brothers and then at Credit Suisse, researching into the mortgage and bond markets, and also in a risk management role. In 1996 he became a consultant with National Economic Research Associates Inc, ("NERA") an international organisation which provides economic analysis for major clients (regulators, risk managers and parties to litigation). He became its President from 2006 – 2012; he is currently its Chairman.

951. The Defendants describe him, and I think not unfairly, as a professional expert witness; his CV testifies to 129 other cases in which he has provided expert evidence. On any basis though, he plainly has vast experience and expertise.

952. Dr Carron appeared, in the early stages of the action, to be the Plaintiffs' principal expert witness. In the event, the emphasis of the Plaintiffs' case has very much shifted away from Dr Carron to Dr Maini's evidence, as appears below.

953. Dr Carron produced two reports, conferred and gave joint statements with his three counterparts among the Defendants' experts (Professor Hubbard, Dr Niculescu and Mr Bezant) and gave oral evidence for two days. Dr Carron's perspective was more of a macro-economic overview of the issues in this case than the Plaintiffs' other two financial economics witnesses.

954. I have already indicated the scope of his second report near the beginning of this judgment; it was a general description of the operation of bond markets. Its contents were factual, were not challenged, and were extremely helpful to me as an education in this area and as a reference tool. Dr Carron had also compiled, and produced, a reference list of each of the 150 RMBS bonds (165 tranches) purchased by CCC with all their details, balances, cash flows and financings. Again this was not challenged. It was hardly necessary to refer to it at the trial, but it did have the useful function of helping me not to lose sight of the nature of the assets which are central to this case, and which have inevitably been referred to as "RMBS" as if they could be regarded as fungibles. They are not; they are individual bonds or tranches of bonds, with individually different, even if often similar, characteristics.

955. Dr Carron also produced a useful document in the shape of a table and bar chart of CCC's repo funding at repo roll dates, from 15th June 2007 to 25th February 2008, broken down by counterparty bank and showing the use of repo finance from that counterparty before and after every roll date, with its attached haircut level. This was eventually refined into a neutral

factually agreed form.    It is a very useful document, and along with certain other such trial aid documents as I will specify, should be treated as appended to this judgment.

956.    Dr Carron's main evidence, very briefly summarised (from a report of 343 pages even excluding its appendices and exhibits), covered the workings of the financial bond markets with particular reference to the RMBS market, a review of CCC's business model and the risks inherent in it, an analysis of CCC's financial circumstances over the period from its IPO until its collapse in March 2008, and elaborate financial modelling (using Monte Carlo simulation techniques) of the risks for CCC's cash flow solvency implied by prospective changes of circumstance, the two of particular materiality being the potential for change in (i) the value/price of CCC's RMBS assets (evidenced by price volatility data) and (ii) the rates of haircut applied to its repo financing.    Having concluded that (simply stated) CCC needed to deleverage and increase its liquidity, raise more equity, or conduct an orderly winding down of its operations, Dr Carron then referred to an "Asset Sale Model", which he used to calculate what asset sales by CCC, at particular times and within a period (of around two months) would have increased CCC's liquidity back to an appropriate target level.    He used this further, to calculate the amount of the losses actually sustained by CCC on its insolvent liquidation in March 2008 which could thus apparently have been avoided if CCC had taken what he labelled as the "appropriate action", by which he meant selling such assets on the bases and assumptions which he had postulated.    His stated view was that

> *"sales need not have been "urgent" or immediate.   CCC's directors and managers could have conducted an orderly sale over the course of several months, thereby avoiding the "distressed prices" that may accompany a block sale".*

957.    Dr Carron gave a number of examples of his calculations, depending on the quantities of RMBS sold, when and over what period, and whether these were sold at IDP prices or at recorded secondary market prices or at an estimation of these, where information was not available.

958.    To give a flavour of his conclusions, his broad suggestion was that CCC should have sold $10Bn of its RMBS over 1-3 months after August 2007, and would then have sustained, between $553Mn and $624Mn less in losses than it ultimately did.   The highest of his calculations, though, suggested a reduction in losses of $1.4Bn, including interest, and was on the basis of a total sale of the whole portfolio at that time.   Dr Carron very fairly made it clear, however, that these many examples of damages calculations were just that, and could be recalculated appropriately to any findings of fact which the court might make as to what sales ought to have been made, and when.

959.    Dr Carron's expertise in the techniques of financial modelling and statistical analysis is undoubted.   There are challenges to his work – or perhaps more accurately the work of his team, which he has endorsed – with regard to matters which have been taken as input assumptions into his modelling and whether those assumptions are reliably based.   That point goes to my considering how far I find Dr Carron's evidence convincing in the scientific field and are more appropriately mentioned later.

960.    I do have other concerns though, as to how far I can rely upon the general objectivity of Dr Carron's evidence.   The Defendants point out that Dr Carron's instructions were to advise upon the assumption that facts stated in the Plaintiffs' Cause were true, and also that he was asked questions about CCC's financial position relating only to 2007, which therefore caused him to ignore or fail to mention (said the Defendants) improvements in CCC's position in early 2008.   Those two matters, they suggest, would tend to slant Dr Carron's evidence against the Defendants at the outset, even if this bias did not emanate from Dr Carron himself.

961.    More importantly, perhaps, the Defendants questioned the impartiality of Dr Carron's report, conscious or unconscious.   They pointed out subtle ways in which his report was worded,

apparently rather carefully, so as to create criticism by innuendo.   The Plaintiffs dismissed Advocate Swan's cross-examination on such matters as trivial and arid.

962. I am afraid that I do not agree.  From an initial reading of Dr Carron's report I had already formed the view that it/he was very conscious of the objective of his evidence for those instructing him.    This impression was reinforced by some aspects of his cross-examination. My attention was drawn to features, such as that sentences were juxtaposed so as to create an impression without actually stating it, eg:  "*In my opinion the strategy was designed primarily to avoid selling RMBS assets.  To have done so would have realised losses…*" putting into the mind of the reader, without actually opining, that the latter was the motivation for the former. In other instances, commentary was tendentious, with attention drawn to material with negative connotations, without any express comment but with material which might have been thought counterbalancing not being mentioned.  I find force in these criticisms because this kind of occurrence just seemed rather too great in number to be entirely chance.    In addition, Dr Carron strayed outside the proper scope of his own expertise in matters such as giving his opinion (helpfully to the Plaintiffs) as to the validity of PwC's reporting that CCC was a "going concern" in late 2007, and whether it was appropriate for CCC to rely on this. In fact, this did not seem to me even to feature in the scope of the instructions which Dr Carron recorded.

963. I am aware, - because I enquired - that Dr Carron had not drafted his report, or done the initial work for it, himself, but had delegated this function to persons who worked for him.    It may be that such matters as a tendentious style and gratuitous negative comments resulted from an excess of enthusiasm on the part of his subordinates who did the research and prepared the report for him, but who were less conscious of the duties of expert witnesses than Dr Carron himself might be.   He said, and I accept, that he reviewed their work and in fact edited it extensively, but even if this is the case, Dr Carron endorsed these matters and the impression they created in signing off his report.  An expert witness who delegates work to an underling needs to be particularly careful and critical to ensure that the overall flavour, and not just the literal accuracy, of what may be said is still that which he would have conveyed himself if he had originated the work.

964. Unfortunately the impression which I have formed of Dr Carron's report means that I do not feel entirely confident in placing reliance on Dr Carron's propositions or opinions, express or apparent, where these are adverse to CCC's Directors, without very critical evaluation of their objectivity.  Having confidence in the neutrality of an expert is particularly important in the case of evidence such as Dr Carron's, which is in the highly technical field of statistics and suchlike, where it is particularly difficult for the non-expert to judge whether propositions are valid or "feel" soundly based.   It is all too easy for an ordinary person to gain - or to be given - an impression from the superficial appearance of a graph, or a table of statistical probabilities, or a tendentious comment, without fully and accurately appreciating the significance, or effects, of assumptions which have been made, or the methodology which has been used, until this is carefully explained.

965. A particular further reason for my concerns in this regard, and one which I regard as rather important, arises from suggested flaws in the conclusions presented by Dr Carron about how to make an appropriate calculation of the increased losses which CCC is supposed to have suffered through not taking the "required actions" with regard to selling RMBS.    These matters were raised by Mr Bezant, in his report, and they were gone through with Dr Carron towards the end of his cross-examination, and without contest.    Mr Bezant was then not called by the Plaintiffs for cross-examination.  I refer in more detail to the substance of this later, but the important point for present purposes is that the points made by Mr Bezant and acknowledged by Dr Carron, which seem to me to be significant, were either not appreciated by Dr Carron in presenting his original report, or were ignored by him.   The implications of either explanation cause me real concern about the reliance I can place on Dr Carron's other opinions.

966. In summary, with regard to Dr Carron's evidence, I feel uncomfortably as though I have to have my wits about me in considering what weight to attach to what he says, rather than being confident that I can simply rely on his expertise as neutral assistance in interpreting facts.   In fact, if I ask myself the question, do I feel confident that Dr Carron's evidence would have been essentially the same if he had been called by the Defendants, the answer is that I actually do not.

**(b)    Dr Harpal Maini – Financial economics - RMBS trading**

967. Dr Maini has a PhD in Computer Science from Syracuse University, and is a Master of Mathematics and Engineering from the Birla Institute of Technology and Science in India. He has over 20 years' experience in the "structuring, trading and sales" of Agency Mortgage Backed Securities, during which he developed expertise in the areas of bond and portfolio analytics, risk and trading systems, market research and portfolio management.

968. Dr Maini has thus been in the market.   He has operated as both a direct investor and a market maker. He worked for Deutsche Bank from 1996 – 2000 as a Director of Mortgage Trading (being Vice President of Mortgage Swaps and Mortgage Derivatives) and similarly for GMAC-RFC from 2002-4.   From 2004-14, he was Managing Director, Head of Mortgage Trading (Market Making and Proprietary Trading) and Co-Head of Mortgage Sales and Trading at BNP Paribas in New York, where he managed a very large portfolio of RMBS products.          He is now an independent consultant in these financial areas, with Investors Consulting Group LLC.

969. Dr Maini gave evidence about RMBS trading, his analysis of CCC's portfolio, the market for such assets, and methods of selling such assets.   His initial report of 1st September 2015 was short – a mere 26 pages.   His conclusions were more subtle than those of Dr Carron.   He recognised that a bulk sale of CCC's RMBS carried risks (examined elsewhere) but was ultimately of the view that, using a combination of recognised sales techniques and appropriate volatility hedges, CCC could have incrementally disposed of about $500Mn worth of RMBS floaters per week (ie about $2Bn -$3Bn per month) beginning in July 2007 through to at least the end of the year.   At what price, though, remained opaque.

970. Upon conferral with his opposite number, Dr Niculescu, Dr Maini felt it necessary to explain his points of difference with Dr Niculescu in far more detail by producing, in May 2016, an addendum report which was longer than his primary report and raised new matters.     As has been already mentioned, he produced yet a further Supplementary Report dated 1st September 2016, part way through the trial after reviewing the evidence of the Defendants' factual witnesses during the trial.     This reactive approach in his evidence has produced a disjointed assemblage of expert evidence which was not in accordance with directions which had been given, and has not made it easy to trace and compare the relevant evidence.     The Defendants made some exasperated objections, but in the end, decided that they could deal with Dr Maini's evidence as it had emerged.   Dr Maini gave oral evidence for two and a half days.

971. Dr Maini is obviously a very intelligent man and I have no doubt that he is an excellent mathematician.   He is rightly proud of his skills, and this leads him to be confident of his opinions.     He has an energetic "hands on" type of personality and he exuded enthusiasm for his work and calling.   I formed the view that this was because he sees it as an intellectual and mathematical challenge, almost in the nature of a game, which he relishes.

972. His evidence, though, was frustrating.   His manner seemed to be naturally quite ponderous, and from the outset he was wary and suspicious.   The combination of extreme wariness and a quick mind led him, all too often, to answer, not the question he was being asked, but the question he had surmised would be the following question.     It also made him almost incapable of answering "yes" to any question, to the extent that he would answer "no" even when asked to confirm propositions quoted directly from his own expert report.   This slowed

cross-examination enormously.   When he was eventually able to accept that "yes but" would probably convey any reservations he had, the progress of cross-examination improved, but this became something of a mantra.   He was very concerned not to appear to agree with propositions without being precise as to what he was agreeing to, and had a compulsion to repeat the same reservations with each answer.   It was only when a formula on the basis that I would assume (unless told) that his answers were qualified with the phrase "all other things being equal" that cross-examination proceeded faster.   As a result of all this, though, it was often extremely difficult to elicit his views on single aspects of the RMBS landscape at all clearly.

973.   Dr Maini was keen to explain and demonstrate the complexities of RMBS products.   This was not just, he emphasised, with regard to their structuring, which became complex enough, but also as to the effects on their attractiveness in the markets of subtle implications from their underlying collateral, even matters such as the geographical groupings of the individual mortgages from which a particular bond were derived.   He readily told me that his own particular expertise lay in trading – spotting arbitrage opportunities – in the more abstruse areas of the RMBS market, ie in trading in the elements of RMBS securities which were not the relatively mundane ones of Agency debentures, or even CMO ("Collateralised Mortgage Obligation") floaters, but were the less well understood elements, often being what was left behind when a particular RMBS product had been created.   He described these as having "*whippiness*" and being "*the more risky bits*".   They were, in particular, Inverse Floaters, which were his particular speciality, but also extended to such exotic derivatives as IIOs (Inverse Interest Only), and the support collateral generated when a dealer created a PAC (Protected Amortisation Class) security.   Dr Maini had apparently built his success and reputation on a skill at spotting where such derivatives were over- or undervalued, and carrying out profitable trades accordingly.

974.   I fully accept Dr Maini's expertise and I was impressed by it.   I am also quite satisfied that, despite his combative manner, he was giving me totally sincere and honest evidence according to his own views; he just saw cross-examination as an impediment to this. However, aspects of his evidence are troubling for my purposes.   First, his style and reactions in the witness box suggested to me that his recollection of his experiences might well tend to be coloured, albeit not deliberately, by the urge to justify a theoretical view already expressed.   Second, Dr Maini is, on his own admission, not a "wordsmith", but even short of this, he did not strike me as a man with any patience for detail, - except in the technical areas of his work which are his consuming interest.   I found a lack of clarity and accuracy in what he said about matters which I could follow and evaluate relatively easily.   This therefore gives me concern as to how confidently I can rely on the apparent accuracy of what he says in areas where I am entirely dependent on his expertise.

975.   The Plaintiffs suggest that any lack of clarity was caused by unfairly aggressive or pedantic cross-examination of Dr Maini, but I do not agree.   For example, Dr Maini described himself as "*a CCC at the time*" of his work with BNP Paribas.   There is no doubt some parallel, in that what I think he meant was that he was transacting with the bank's own money, as CCC was.     However, he was quite plainly not transacting with the same business objectives as CCC, and whilst Dr Maini's comment was proffered as a helpful and courteous explanation to a judge of the position and experience which qualified him to give expert evidence on the subject, it was scarcely accurate.   Whilst Dr Maini is undoubtedly an expert, he is an expert MBS <u>trader</u>, on an all day and every day basis.     CCC was not in that business; CCC was a "buy and hold" shop, ie an investor rather than a trader.   The transactions which CCC entered into were in furtherance of its strategy as an investing operation seeking to maximise income, rather than for making money out of trades, which is what Dr Maini was doing - and I am prepared to assume doing expertly - for BNP Paribas at the relevant time.   Indeed, it was also very apparent that not only is Dr Maini's expertise that of a career trader, it is also that of a trader in an esoteric section of even the relatively esoteric RMBS bond market itself.

976. What I felt I certainly did gain very much from Dr Maini, though, was an insight into the ways and ethos of the market in some respects, which I elaborate on later, such as the importance of information and how it is prized and guarded, that no-one tells you anything they do not want you to hear, and that trading negotiations may often be indirect and oblique all with a view to gaining best advantage.

977. Whilst, therefore, I found Dr Maini's evidence extremely useful at opening my eyes to the sophistication, complexity and even psychology of the financial markets with which I am concerned, I bear in mind that his opinions are those of an enthusiastic trading participant in that market, and in a specialist area of it. I need to consider carefully, where his background may have coloured the views he expresses in ways which are therefore not a fair parallel with the circumstances of CCC and its personnel.

### (c)   Mr Eric Welles – Financial economics  - repo financing

978. Mr Eric Welles was the Plaintiffs' expert in commercial banking and particularly the repo finance aspect, and thus the financing available to CCC.

979. Mr Welles gave evidence from the background of 18 years' experience in repo lending on mortgage backed securities, including the type of securities held by CCC (which he called "Agency CMOs" rather than "Agency RMBS", although I did not understand this to be significant).   In 2007-8 he had co-managed Merrill Lynch's repo book with regard to all of that bank's US clients. It in fact emerged in his oral evidence that he had even dealt with CCC occasionally, at times when his colleague and co-head of repo financing, who was the principal contact for CCC, had been absent.   Thus, Mr Welles was generally concerned with what is termed the "reverse repo" aspect of the repo market transaction, in other words, with the transaction as viewed from the bank/lender's side.   He was thus an example of the counterparty with whom CCC would expect to deal in obtaining its repo financing.   The Plaintiffs emphasise that he was the only such expert witness called.

980. Mr Welles explained that he had himself also been involved in direct repo financing, because the bank would itself use repo finance of its own securities to obtain the funds which it would then in turn use to carry out the "reverse repo" side of the investor-facing transaction. This is in itself a salutary reminder that the transactions with which I am concerned are themselves part of a complex network of other, wider, inter-related financial transactions.

981. The essence of Mr Welles' evidence concerned the mechanics of repo financing, and lenders' attitudes to providing it, the likelihood of alternative sources or types of repo financing available to CCC from mid-2007, the likelihood of CCC's facing demands for higher haircuts from its repo counterparties, and repo lenders' attitudes to the leverage level of their counterparties.   Mr Welles' views were that the 2% haircut which CCC had obtained on its repo financing was an "aggressive" rate, owing much to CCC's connections with Carlyle, that there was a significant risk of CCC having to pay haircuts of 3% or potentially higher moving forward from June 2007, because of dealers' increasingly defensive reactions to the collapse of the Bear Stearns hedge funds, the perception of default in the sub-prime mortgage market, and their changing perception of CCC's creditworthiness owing to its large, concentrated portfolio of RMBS assets and its high leverage.

982. Mr Welles had given a report and had conferred and given joint statements with his counterparts among the Defendants' experts (Professor Hubbard and Dr Webster).   He was permitted to put in a further short report during the trial, as already mentioned.   He gave oral evidence for one day.   He did so carefully, and with dignity and courtesy.   He struck me as a person of good sense and balance.   I also have no doubt that he gave me his entirely candid opinions and was doing his best to assist me by giving his best accurate account of the repo market in which he was operating at the time.

983. The Defendants point out that Mr Welles had given his report and evidence on the basis of instructions to assume certain facts, which were not accepted. This is correct. One example is that Mr Welles consequently assumed that CCC had represented to its repo counterparties that it was taking positive steps to deleverage when in fact it then did not do so, which Mr Welles said would have undermined repo counterparties' confidence in CCC (thereby increasing the likelihood of a defensive demand for a higher haircut). The premise of this point was discredited in evidence. I will therefore have to make due allowance for any such erroneous built-in assumptions which may have affected Mr Welles' evidence, even whilst I am satisfied that the evidence was honestly given.

984. Mr Welles was also criticised by the Defendants for at times relying too much on being literal, and being satisfied that what he had said was literally true even though it possibly conveyed a misleading impression. An example given was that he said he had "known of no transaction of" a particular type during a particular time period in 2007-8, but failed to qualify this by adding that he had later learned of one, subsequently to drafting his report. However, I am quite satisfied that this did not reflect any kind of deviousness on Mr Welles' part (he said that he had brought this fact to the attention of the Plaintiffs' legal team), and that it in no way affected his impartiality. His conscientiousness was very obvious. I note that this was the first occasion on which Mr Welles had given expert evidence, and I therefore put that kind of point, and the way it was handled, down to inexperience.

985. In summary, therefore, I was impressed by Mr Welles as a clear, logical and conscientious witness, with a proper regard to the role of the expert witness. He was very clear that what he was giving me was:

> *"...a repo perspective. It's the perspective of a financing professional, and, as such, certain things are probably going to stand out as more important to me than others. And from my perspective in a very independent and unbiased way, I'm presenting you with the things that I, as a repo professional, would have focused on to a greater degree."*

986. He wanted, very properly, to emphasise that all repo traders would be different, in the sense of having individual characteristics and approaches. Whilst recognising that, I am nonetheless satisfied that he was an example of the kind of counterparty that CCC would have been dealing with in the repo market during its operational period. I found his evidence very helpful in educating me about the world of the repo trader, its workings, motivations and pressures, all at a practical, operational level.

987. Mr Welles' comment quoted above does, though, highlight one important point, which is that, once again, I am receiving evidence about the behaviour and attitudes of a different kind of participant in the market from CCC. Mr Welles' opinions and views come from the perspective of a repo lender, a party with whom CCC's directors and Management would be interacting, but with a different market view, and different objectives from those of CCC itself. Insofar as Mr Welles expresses views about the way CCC's directors conducted CCC's affairs, this is not within his expertise, but it is in any event the product of that differing background of knowledge and experience.

988. My function in this case is to judge the quality, propriety and care of decisions made and actions taken by CCC's directors. I am therefore not so much concerned with what repo lenders were actually doing or thinking at the time, as with CCC's directors' perceptions of this, and, insofar as those perceptions operated on their material decisions with regard to CCC, whether those perceptions were reasonably held, even if not correct. The materiality and weight of Mr Welles' evidence and opinions is therefore relative to that angle.

989. In short, I regard Mr Welles as a reliable and helpful example of the kind of party CCC's directors and management would actually have been dealing with at the time, but his views do

not provide an exemplar of how CCC's directors and Management "ought" to have conducted CCC's affairs.

990. I turn now to the Defendants' financial economics experts.

**(d)    Professor Hubbard  - Financial economics – financial markets, CCC's business and repo financing.**

991. Professor Hubbard is a distinguished economist.   He holds various degrees in economics from Harvard and the University of Central Florida and is currently Dean of the Graduate Business School at Columbia University where he holds two chairs in Finance and Economics. He is a research associate of the US National Bureau of Economic Research, and an adviser to the President of the Federal Reserve Bank of New York.  Since 2006, he has been co-chairman of the Committee on Capital Market Regulation and was involved in that Committee's published study (in May 2009) of the events leading up to the global financial crises of 2007-8 and their implications for financial regulatory reform.  He was an adviser on the US President's Council of Economic Advisers in 2001-3 and at the same time was also Chairman of the Economic Policy Committee for the Organisation for Economic Cooperation and Development.      He has published extensively and authored many books, including textbooks, on money, financial markets, macroeconomics and principles of economics.

992. Professor Hubbard gave a report, and conferred and provided joint statements with both Mr Welles (to whom his own evidence was mainly directed) and with Dr Carron, insofar as the latter dealt with the topics of Professor Hubbard's evidence.   He gave oral evidence for one day.

993. The Plaintiffs point out that Professor Hubbard is entirely an academic.  As he readily admitted, he has never been a practitioner, never worked on Wall Street and has no practical experience of ever trading in the repo market.   The Defendants say that his evidence is useful for bringing an objective view of the risks faced by CCC in financing.

994. Whilst I take the Plaintiffs' point, it seems to me that Professor Hubbard does, usefully bring a macroeconomic perspective to the case, and an insight, therefore, into what was happening in the financial markets and the economy generally at the relevant time.   His expertise lies in his analysis, as an economist, of observed events and data, and ability to draw (hopefully) reliable conclusions from this, and it is a different expertise from those who were directly involved in the events themselves.   His opinions are helpfully material to at least some of the decisions I may have to make, not least about the counterfactual hypotheses as to what would most likely have happened if CCC had behaved differently.

995. Professor Hubbard was asked to address three particular points, namely (i) CCC's business model and its associated risks, (ii) the size and characteristics of the repo financing market and the repo terms offered to CCC, and (iii) macroeconomic and financial conditions at the time, and their impact on the availability and terms of repo finance to CCC.

996. His evidence, in a nutshell, was that the principal risk to CCC, right from the outset since it was inherent in its business model, was "financing risk", ie the risk of not being able to obtain affordable -  or even perhaps any - finance for its operations.  This was the risk which brought it down, and he points out that it was a risk which was disclosed to investors, again, from the outset.

997. Professor Hubbard laid stress on drawing conclusions from observable data rather than "anecdotal" evidence or intuitive judgements.  This caused him to question certain assertions, in particular by Mr Welles, which he said were not backed up by the measured data which you would expect to show such evidence.  He made this point particularly with regard to Mr Welles' opinion that the effect of "contagion" from the panic over the Bear Stearns incidents

(of June 2007) had affected Agency RMBS even before August 2007.  He said that you would then have seen evidence of this affecting recorded prices, but there was no such observable data.

998.   I was broadly impressed with Professor Hubbard, both as to his obvious expertise and as to the breadth of his knowledge, albeit at a macroeconomic level.   He was measured and sensible in giving evidence.   Contrary to the submissions of the Plaintiffs, I did not gain the impression that his oral evidence was either incongruent with his written report, or sought to distance himself or to back track from any of his original statements.

999.   As a matter of confidence, I would prefer the evidence of Professor Hubbard to that of Dr Carron where they disagree.   As regards Professor Hubbard's disagreements with Mr Welles, they tend to be in areas which involve the actual workings of the market at the time.   Mr Welles gives his opinions from being engaged in the market, whereas Professor Hubbard does so from his outside observations of data about the market.   One explanation for their difference may therefore be that the wider beliefs of those involved actively in the markets at the time were not actually correct, albeit genuinely held.       Another may be that their disagreements are about matters on which there is really no right or wrong answer, as they are indeed matters of opinion, and their differing opinions are, both, reasonable opinions to be held.  This is a valuable point of evidence in itself.  If it becomes necessary to choose between their respective opinions at any point, I will consider that in the particular context, but in practice, I doubt if it will.

**(e)     Dr Niculescu – Financial Economics – RMBS markets**

1000.  Dr Niculescu is a Chartered Financial Analyst with a BA in Economics from the University of Wellington in New Zealand and a PhD in Economics from Yale University.     His career began in 1985 as an investment analyst, from where he moved on to bond market research and portfolio analysis with Salomon Brothers.  He then spent 9 years with Goldman Sachs, from 1990.  He was responsible for its Mortgage Research Division from 1993 – 1999.  He did not personally trade CMOs, but he said that he advised those who did, and did so from the vantage point of having a seat on the MBS trading desk.   From 1999 to 2008, he was an executive at Fannie Mae, and from October 2002 until September 2008 he was in charge of its Capital Mortgage Division.   He was responsible, therefore, for the acquisition of mortgage backed securities and loans for Fannie Mae's own balance sheet (up to some $700Bn), and the associated hedging and funding responsibilities, and he was at the apex of the hierarchy of personnel who carried out any transactions.   He is currently, since September 2009, a Partner at Capital Market Risk Advisors, a risk management firm providing business and litigation consulting services for US and international financial entities, specialising in portfolio strategy, risk analysis, asset valuation and stress testing, with particular expertise in residential mortgage backed securities.   As it was not mentioned by either party, I have assumed that the apparent gap in his CV from September 2008 until June 2009 has no significance.

1001.  Dr Niculescu was called for the Defendants because of his expertise in the operations of the RMBS markets, to give evidence in response to Drs Carron and Maini.   He was asked to address three matters:  (i) the nature, characteristics and risks associated with the RMBS in which CCC invested, (ii) the nature and characteristics of the market for those RMBS and (iii) the manner in which those securities were traded, and valued or priced.

1002.  Dr Niculescu provided an initial report, a further "Reply Report" (in response to Dr Maini's Addendum Report), joint statements with both Dr Carron and Dr Maini, and a Supplemental Report during the trial, again in response to further evidence from Dr Maini in the latter's Supplementary Report.  He gave oral evidence for two days in total.

1003. The essence of Dr Niculescu's opinions was to disagree with Drs Carron and Maini (in particular) about the size of the market for Agency floaters such as those held by CCC in the second half of 2007, and that it was large and liquid, and to express the view that if CCC had attempted to sell RMBS in the quantities suggested by them in that time, there would have been a real risk that CCC would have been perceived as a distressed seller, could only have achieved significantly discounted prices, and would have risked moving the market (adversely) downwards, thereby recalibrating repo lenders' pricings and generating margin calls which would have required yet more sales, which would have tended to reduce prices still further and create a downward spiral and ultimate failure.

1004. Although he referred to this phenomenon as a "liquidity spiral" it appeared from later evidence that it may be more accurate to confine that term to a market wide such phenomenon, and, in the case of an individual entity, to call it a "repo feedback loop". Nothing of substance turns on this, although I think the possible misuse of the nomenclature by Dr Niculescu may be suggested by the Plaintiffs to be a matter casting doubt on his expertise, which they criticise generally in any event. I do not find it to be of significance.

1005. The Defendants submit that Dr Niculescu's evidence was measured, impartial, detailed and reliable. They suggest that he demonstrated a broad and deep knowledge of RMBS and the relevant markets, understood the purpose of giving independent opinions, and did not speculate or offer opinions about what CCC was doing or should have done. I am not sure that I agree with the last point. Whilst Dr Niculescu may not have stated this directly, he certainly opined that CCC's strategy of holding on to RMBS was "less risky", in his view, than attempting to sell, which comes very close to offering an opinion about what CCC was doing.

1006. The Plaintiffs submit forcefully that Dr Niculescu's actual experience in trading RMBS was really very limited, and insofar as it had any practical base at all, it was very historic; he had always been involved more in either research or consulting and was therefore heavily reliant on data rather than experience. They also criticise Dr Niculescu for giving evidence about the supposed behaviour of repo lenders, when he was neither called to give such evidence, nor possessed any relevant experience. I accept the force in this.

1007. They also attacked Dr Niculescu's independence. They did so on two bases. The first was that his last report, the "Supplemental Report" had been "*at least partially drafted by*" a member of the Defendants' legal team. This assertion then became "*the revelation that Dr Niculescu's Supplemental Report was <u>drafted</u> by the Defendants' lawyers*" (emphasis added) on which basis it was then submitted that this report should be "rejected in its entirety" and the whole of Dr Niculescu's earlier reports "regarded with increased [sic] suspicion."

1008. The extremity of this submission is absurd. The evidence given was that for this final report – the need for which was occasioned by Dr Maini's disorganised approach to getting his own evidence before the court – Dr Niculescu had made a very rough draft which, owing to time pressures in the last couple of weeks or so before his evidence, the Defendants' lawyers had put into a coherent form. His previous reports had (he said and I accept) been entirely written by himself, subject to the (perfectly usual, in my experience) process of review editing by the legal team for accessibility and readability.

1009. It is undesirable for a party's lawyer to have any significant input into an expert witness's statement, and it would have been better if Dr Niculescu had managed to produce a more finished draft for final preparation for the court. This is not least because lawyers must avoid the possibility of influencing the actual expression of a witness's sentiments as a result of their natural authority in the context of appropriate preparations for a trial. However, I also accept the reasons given for the lawyers' increased involvement in this instance. Dr Niculescu endorsed the text of the report, such that I understand that he is content that it

conveys his own views accurately, and I am satisfied that he would not have done this lightly. None of this therefore causes me any concern about his proper independence.

1010. The Plaintiffs' second attack on his independence arises out of his evidence, prompted by documents shown to him on the first day of his cross-examination, that in late August 2007, when at Fannie Mae, a subordinate had brought to him the offer of a large block (I think about $1Bn) of Fannie Mae Floaters for sale, but he had turned this down, not because the offer was intrinsically unattractive, but because of a limit at that time on Fannie Mae's balance sheet for undertaking such transactions. He now considered that that offer must have been from CCC. When asked why this had not appeared in his evidence before, he said that his previous recollection of this had been so vague that it had been decided that it should not be included in his witness statement. However, sight of the documents had brought the incident back to him with greater certainty, and so he mentioned it.

1011. The Plaintiffs do not make it perfectly clear whether their attack on Dr Niculescu's independence is based on the fact that he had an indirect business encounter with CCC at the relevant time, or the fact that this was not mentioned in his witness evidence prior to cross-examination. I reject the attack on either ground. The former is not of such a nature as to impair his ability to give independent expert evidence in this case, - any more, and in fact probably less, than were Mr Welles' similarly unrevealed contemporaneous business encounters with CCC. The Plaintiffs seem more to suggest that I should regard the failure to mention it earlier as evidence of deviousness or partisan contrivance by Dr Niculescu. In fact, I found this evidence perfectly natural, and perfectly explicable. I can well imagine that if Dr Niculescu had included evidence of his hazy recollection in his witness statement in the first place, the Plaintiffs would equally have been suggesting that that was an unreliable and partisan attempt to bolster the Defendants' evidence that such an offer had even been made. Whilst, with hindsight (and as is almost invariably the case) it might have been better if it had, in fact, been mentioned and explained earlier, that is with hindsight. Even if the initial judgement not to do so was prompted by lawyers, I do not see it as anything untoward.

1012. In addition to attacking Dr Niculescu's evidence for being purely academic and straying into the expression of opinions in areas in which Dr Niculescu is not qualified (such as the psychology of repo lenders) the Plaintiffs mount more general attacks on Dr Niculescu's evidence, suggesting that it is partisan, and that he has consistently both exaggerated, and resolved evidential uncertainties, in favour of the Defendants' case. They cite instances where they say he has speculated on matters, such as the reasons behind CCC's reaction to apparent market enquiries about bonds for sale, so as to favour and support Mr Stomber's evidence on the point.

1013. I have certainly had some misgivings about Dr Niculescu's evidence. Whilst I accept that he demonstrated a deep and broad knowledge of the subject of Agency RMBS, this did seem to me to be very much from a technical rather than a practical viewpoint. I also accept that he strayed into expressing opinions about repo lenders' behaviour, although I do not see this as particularly heinous – it seemed to me to be mainly in regard to explaining why he rejected points made by Dr Maini, rather than in support of his own original opinions – and I simply treat this as a matter on which I should place no reliance.

1014. I wished, though, to consider more closely whether there was anything which should concern me as regards the suggestion of a partisan approach to the resolution of evidential uncertainties by Dr Niculescu. My reasons are, as will by now have become apparent, my concerns as to how far I can feel confident in relying on the assertions of opinion made by any expert witness generally, at least as regards their objectivity.

1015. The Plaintiffs, for example, contrast two occasions of Dr Niculescu's approach. The first is his exclusion of certain categories of Agency RMBS from his assessment of the size of the market, at the end of 2007, for RMBS with the characteristics of those held by CCC, as to

which (I express this in doubtless oversimplified terms) he dismissed evidence of demand for underlined structured Agency floaters as being any evidence of demand for underlined strip floaters (such as held by CCC), on the grounds that it was impossible to draw reliable inferences about their relative pricing, and therefore too speculative to draw any consequent conclusion about the potential volume of such demand.  They contrast this with the fact that Dr Niculescu underlined was ready to speculate that the reasons for a reduction in the market price for Agency RMBS similar to those held by CCC was   the market's expectation of the liquidation of certain SIVs (Structured Investment Vehicles), being the "Westways" funds liquidations.

1016. Aspects of Dr Niculescu's evidence in both these respects had given me cause for concern in any event.  I had been uneasy at his refusal to include any allowance for private sales of RMBS (as to which there is no available recorded data) in his calculations of market volume. To do so simply in reliance on the fact that there was no recorded data, when the fact of some such transactions having taken place seemed to be admitted, struck me, at first blush, as being unreasonable.   I had also wondered at the fact that Dr Niculescu appeared to be suggesting conclusions about the effects of the Westways liquidations spontaneously in oral evidence, and whether the fact that these had not appeared earlier in his evidence cast doubt on the depth of his knowledge of the markets at the time.

1017. Consequently, I have revisited the whole of Dr Niculescu's evidence, and re-read it in context.   On doing so, I have concluded that my own concerns were ill-founded.  As to the first (refusal to include allowance for private sales) I find that Dr Niculescu explained his reasons cogently in his Reply Report.  As to the second, my general reading of Dr Niculescu's evidence reassured me with regard to his experience and knowledge, and I noted that Dr Niculescu had in fact referred in general terms to what were the Westways transactions in his first report, and as Dr Maini had himself produced the detailed Westways data only late in the day, from having followed up references in internal CCC emails for the purpose of his Addendum Report, there appeared to be no significant difference between his and Dr Niculescu's depth of independent knowledge of the facts of what was going on in the markets, albeit they had operated in different sectors of it.

1018. As to the criticisms of inconsistency made by the Plaintiffs, re-reading the evidence simply causes me to conclude, first, that they descend to a level of detail with regard to technical expertise and judgment that I am not equipped to decide finally, but second, more importantly, that it is unnecessary for me to do so for the purpose of the decisions which I actually have to make in this case.  Whilst I have therefore, in the circumstances, applied some caution in regard to Dr Niculescu's evidence, my caution arises from my perception of there being limits to his sphere of expertise, and not from any perception of his being partisan. Whilst his technical expertise is certainly deep, it seems to me that his orientation, from the vantage point of running the capital account of Fannie Mae itself, is not as centrally focused on the general commercial and investment market in RMBS as is the position of Dr Maini, or Mr Welles.       However, that does not mean that I prefer Dr Maini's opinion to that of Dr Niculescu on any particular matter, because I look also at the quality of their reasoning, and where it is necessary, I make my preference according to the context.    As between Dr Niculescu and Dr Carron, at any point where it should matter, I would on balance prefer Dr Niculescu's evidence to that of Dr Carron, first because I felt that he had paid more personal attention to his evidence, and second because, as I have stated above, I am here more confident of Dr Niculescu's objectivity.

**(f)      Mr Bezant – Financial economics - damages**

1019. Mr Bezant's evidence, on behalf of the Defendants, and his joint statement with Dr Carron, was accepted by the Plaintiffs without cross-examination.  Although I did not assess his evidence as oral testimony, it is convenient to make reference to it here, amongst my general assessment of the expert evidence as a whole.

1020. Mr Bezant is an expert in business valuations, with an accountancy background and about 30 years' experience.  He is currently a Senior Managing Director at FTI Consulting, based in London, and has previously worked for Deloittes and Arthur Andersen. He appears to specialise in valuations for the purpose of litigation and arbitration, having carried out well over 400 such substantial valuations and given oral evidence on 41 occasions.  His evidence had been sought by the Defendants with regard to the damages calculations put forward by Dr Carron, based on his Asset Sales Model, already mentioned.   Mr Bezant had been instructed to consider the likely return to CCC as a result of the hypothetical RMBS sales commencing from July 2007 postulated by Dr Carron, and whether CCC sustained any losses which would or could have been avoided if CCC had undertaken such sales.

1021. Mr Bezant examined Dr Carron's Asset Sales Model, with a view to testing its reliability as a tool for calculating such damages   The model calculated the potential effects on CCC's ultimate financial position of its having presumptively sold certain quantities of its RMBS portfolio at certain times, and for certain prices, and the extent to which losses eventually suffered on the liquidation of its total portfolio as at March 2008 would supposedly have been reduced, had it done so.

1022. Since Mr Bezant was not called for cross-examination by the Plaintiffs, I will leave giving my views and conclusions about the comparative evidence of him and Dr Carron to the appropriate point in giving my findings on the case as a whole.

**Other experts**

1023. Before moving on to consider the other material areas of expert evidence, I record that a part of Dr Webster's evidence was concerned with investment banking and repo finance, and she conferred, therefore, with Mr Welles.  However, the main thrust of her evidence was in the area of risk management, to which I now turn.

**(2)     Risk Management experts**

**(a)     Professor Sanjiv Das – Plaintiffs**

1024. Professor Das was the Plaintiffs' expert in risk management.      He has been Professor of Finance at Santa Clara University since 2000, having previously held faculty appointments at Harvard and the University of California, Berkeley.  He has had an academic career for the last 25 years, but combines this with advisory roles relating to investment and financial risk in the United States and internationally, and he has published extensively.  Whilst he had once worked for six years for Citibank, he candidly told me that this was to save enough money to be able to pursue the academic career which was his first wish.

1025. Professor Das was called to give evidence on financial risk management and in particular the use and purpose of risk controls.  Professor Das provided a report and made a joint statement with the Defendants' corresponding expert, Dr Webster, and also gave oral evidence for 1 ½ days.

1026. The Plaintiffs submit that his evidence was appropriately focused on principles and practices of investment and risk management, this being his sphere of expertise material to this case.    I entirely agree.   The Defendants point out that Professor Das had never actually worked as a risk manager.  Professor Das readily admitted this.   His experience in the last 25 years has been entirely academic and advisory.  The Defendants also point out that Professor Das's interests are apparently focused on mathematical modelling, rather than risk management as such.  He is therefore, they suggest, an academic in the field of risk management, and an academic with a rather narrow focus.

1027. Professor Das concentrated on the risks inherent in CCC's business model of funding long term assets with short term repo funding, and doing so with a very high level of leverage in order to magnify profits to be gained, and, therefore, the appropriate management and operation of CCC's Investment Guidelines in the light of the risks run by this strategy. Professor Das clearly held strong views as to the importance of fixing, maintaining, and operating risk management tools, such as those contained in CCC's Investment Guidelines, and in particular the maintenance of a liquidity cushion. He did not see these as indicative guidance, but rather as rules laid down for the purpose of being observed. His favourite metaphor was automotive; he likened CCC's liquidity cushion to a car's brakes, with CCC's high level of leverage being the car's accelerator, and his point was that if you burned out the brakes, you could not just carry on down the motorway at high speed; you needed to "*slow down or get off the freeway and fix those brakes and come back on*".

1028. Although properly careful not to step outside his expertise, Professor Das clearly had the underlying view that the degree of risk being run by CCC in not actually selling off RMBS to deleverage, even despite other steps taken, was unacceptably great. He stressed that the risk was "asymmetric" meaning that it risked the huge and catastrophic loss of, potentially all capital, as against the small gain of ultimately realising CCC's assets at par on maturity rather than locking in whatever relatively small losses might have to be suffered by selling in the short term.

1029. Professor Das expressed very firm views that it was wrong to suspend guidelines which could not be adhered to, not just because these had been publicised to potential investors, but because suspension risked removing the internal discipline of striving to restore them, and would also signal to the outside world that you were operating riskily, which perception itself would create risk.

1030. I noted that Professor Das had provided expert evidence before, but in the context of investors suing promoters for negligent misrepresentations, and ratings agencies for negligence. Professor Das's evidence did seem to me to be permeated with an underlying focus on what he saw as the representations made to investors about CCC's business, in particular in its Offering Memorandum. I gained the impression that his views on appropriate risk management action were heavily influenced by his previous involvement in such investor-led disputes.

1031. Professor Das's view was that it was the function of risk management to identify potential risks and bring them to the attention of those whose job and duty was to manage the affairs of the company. He accepted, however (and very properly) that assessing the probabilities of such risks coming to pass was the province of those who were expert in the relevant markets, which he was not. Professor Das also accepted that whilst it might be the function of risk management to draw management's attention to what it needed to achieve in order to mitigate or eliminate the risks which had been identified, it was outside his expertise to give any opinion on the practicalities of any particular measures which might be intended to effect that achievement.

1032. I was impressed with Professor Das's candidness and professionalism as a witness. His evidence was very clear, and balanced and he had an air of being sensible. He was properly careful not to step outside his expertise. He was willing to agree frankly with propositions put to him where he did agree with them, and was not always looking out for a trap. He accepted where there were material matters which he might have been unaware of.

1033. I do thus feel that I can have confidence in the impartiality of his evidence. However, Professor Das was a theoretician and a technician, and I have to evaluate how far his views should influence my conclusions in this particular case. In assessing the significance of the views of an expert such as Professor Das, I also need to bear in mind the limits arising from his ready acceptance that he is not an expert in either repo financing or RMBS.

(b)     **Dr Lesley Webster - Defendants**

1034.   Dr Webster was the Defendants' expert witness in the field of financial risk management but her evidence also overlapped into investment management and repo financing, as mentioned. She had initially pursued an academic career, gaining a PhD in economics at Stanford University and also becoming an Assistant Professor of Economics at Washington University, focusing on microeconomic theory.   She then moved out into Wall Street.   From 1983 to 1990 she worked for Chase Manhattan Bank as head of the Fixed Income Arbitrage Desk in the securities division, where she was involved in trading a variety of securities including Agency RMBS and suchlike, and using repo finance, acting both personally and supervising others.   She then worked at Union Bank of Switzerland from 1990 - 1994 as Managing Director in charge of US Dollar Fixed Income Derivatives.  She moved into risk management in 1994, with Chemical Bank as Senior Vice President in charge of Market Risk Management.  Over the following years, through several mergers and changes of name, her employer was ultimately JP Morgan.   Her role was extended to Counterparty Risk Management in 1997; this involving managing the bank's exposure under trading, secured lending and repo financing, including the establishment of risk management procedures.  In 2000 her responsibilities were extended yet further to include Asset and Wealth Management, where she co-chaired the Risk Committee for that Division, and also became head of Global Fiduciary Risk Management, which involved the development and implementation of risk policies and procedures.  In such roles, Dr Webster served on many and various committees. She has sat on the Boards of several companies, being currently a Director of Manulife Financial, a global asset management company.  On retiring from JP Morgan in 2005, she set up her own consultancy firm in risk and investment management.

1035.   During her career Dr Webster points out that she was working in risk management through several international and global financial crises, including the notorious LTCM crisis of 1998, and, as a consultant, through the global financial crises of 2007-8, during which she was engaged to advise a clearing house for mortgage-backed securities, including Agency RMBS, monitoring their daily counterparty credit risk in the markets.

1036.   Dr Webster was instructed to provide her expert opinion on three matters namely (i) methods and means of risk management for leveraged investment portfolios such as CCC's (ii) the use, intended operation and purpose of Investment Guidelines for risk management and specifically (iii) the appropriateness or otherwise of suspending Investment Guidelines of the type used by CCC and its consequence, by reference to the standards and principles of prudent investment management.

1037.   The essence of her evidence was that CCC's risk management practices and related investment management decisions were reasonable in the light of industry practices at that time.   She considered that the suspension of Investment Guidelines was appropriate to enable recovery from what she described as a "passive" breach of these, that is, one caused by external circumstances and not internal bad decisions; she considered it pointless to maintain a guideline when it could not be adhered to.   She disagreed with Professor Das as to it being imperative immediately to restore a liquidity cushion to its previous or optimum level after it had been depleted, but saw this as a decision to be taken with regard to the circumstances. She considered that Professor Das had failed to have regard to the risks to CCC of selling its RMBS when he concluded that RMBS should have been sold after August 2007 in order to increase CCC's liquidity.

1038.   Dr Webster wrote a report and provided two joint statements with Professor Das and Mr Welles.   Most unfortunately, shortly before she was due to give oral evidence and when in Singapore at an international conference, she sustained serious injury in an accident, including fractured bones.   Her evidence was therefore postponed for two weeks, and was eventually given over two days, when she had sufficiently recovered, by video link from

Florida.   Although plainly pale and in obvious discomfort, she gave evidence decisively, and it is not suggested that her unfortunate injuries impacted on her evidence.

1039. Dr Webster was firm, extremely articulate, and certainly spoke with an air of authority.   She was also notably concerned for accuracy.   I was impressed with both her analysis and her ability to convey her ideas.   Her evidence was measured and, to my mind, very practical and redolent with common sense.   Her attitude to statistical analysis was that it was a useful tool, but to be applied with judgement, rather than rigidity.     Dr Webster's knowledge of her subject was obvious, but, whilst accepting that others were able to give more expert evidence in other areas than she was, she nonetheless stood up for herself - and it seemed to me with justification - as being knowledgeable in other areas of financial management as well.   She was able to support much of her opinion by specific reference to her experiences.

1040. The Plaintiffs dispute Dr Webster's practical expertise on the basis that her direct experience was historic, and that her professions of experience during the 2007-8 crises were undermined by her refusal to disclose the name of her client, claiming professional obligations of confidentiality.   I did not judge it necessary to require her to make this revelation.   I do not disbelieve her evidence in consequence, but by the same token I cannot attribute any particularly special weight or value to it, as I have nothing against which to gauge it.

1041. The Plaintiffs suggest that Dr Webster was neither candid nor helpful, accusing her of pedantry, exaggeration, being inconsistent, unreasonably argumentative and, most seriously, becoming an advocate for the Defendants' case.   I do not agree.   Apart from Dr Webster's becoming somewhat discursive, at times, on the second day of her evidence, I saw no such faults at the time, and looking back, I see only an occasional use of hyperbole to emphasise a point upon which she was being challenged, which might have been termed exaggeration, but was perfectly obvious and in no way misleading.    I have not found other supposed examples cited by the Plaintiffs to be borne out upon reading the evidential references.

1042. In short, I found Dr Webster to be a knowledgeable, clear, candid and objective witness.   Her evidence was convincing and I have confidence in both it and her.     Where there is disagreement between her and Dr Das, - and such disagreements are extensive - I prefer Dr Webster.   Whilst I respect Dr Das's expertise as an academic and theorist, I am satisfied that Dr Webster's experiences gave her a wide and deep material knowledge of the standards and practice of the times, and I find that her views are more practical and grounded in reality.

**(3)** **The Insolvency Experts**

**(a)** **Mr Phillip Wallace - Plaintiffs**

1043. Mr Wallace was the Plaintiffs' "insolvency" expert.   This of course means that he is, in practice, an accountant who has come to specialise in insolvency cases (ie, acting as liquidator or company administrator) and by extension, giving advice to companies who are, or fear they may be, facing the prospect of insolvent liquidation or administration.

1044. Mr Wallace had worked for KPMG (formerly Peat Marwick Mitchell) from leaving University in 1971, until his retirement in 2006.   He has an impressive CV as regards practical involvement in major liquidation situations, several in the financial products sector.   He acknowledged, though, that this was the first occasion on which he had actually given expert evidence in court.   Hitherto the litigation in which he had become involved as a potential expert witness had always settled.   He also, readily and fairly, accepted that whilst he understood the mechanics of RMBS and also the repo financing market, he was not an expert in either (and I have to say that this actually did show up in mistakes which he had made in some of his worked examples, about the financial effects of repo transactions, such as the sum which a vendor would receive back in liquidity when selling an asset as to which the haircut rate had subsequently increased.)   His real expertise, in other words, was in the

area of insolvency and insolvency practices on a general basis, although his experience meant that this was also with an emphasis on banking, and large and complex insolvencies.

1045. Since his retirement, Mr Wallace had served in non-executive roles on the Board of the Insolvency Service, (the agency of the UK Government with responsibility for insolvency matters), as Advisor to the Creditors' Committee of Lehman Brothers International (Europe) Limited (in Administration), which needs no explanation, and also on the board of the Financial Services Compensation Scheme, involved with recoveries in the case of the insolvency of regulated financial companies.

1046. Mr Wallace had provided a single report and an agreed statement with the Defendants' counterpart witness (Mr Shaw), and he gave oral evidence for two full days.     The Plaintiffs contend that Mr Wallace gave detailed and credible evidence and candidly made concessions where appropriate.   The Defendants contend that Mr Wallace's evidence was slanted, judgmental, went outside both his expertise and the proper scope of expert evidence and that the concessions which he made were forced.

1047. I do have concerns about Mr Wallace and his evidence. These relate first to the value of much of it at all, and second to the basis of Mr Wallace's instructions and my views of Mr Wallace himself.

1048. As regards evidential value, I gave leave for the introduction of expert insolvency evidence principally because of my recognition, as already mentioned, of the difficulty of liquidators making a case without live evidence, and therefore being very reliant on expert assistance. The Plaintiffs were emphatic that "insolvency" evidence was essential to an assessment of the care and/or propriety of the Defendants' conduct of the affairs of CCC at the relevant time, as well as to ensuring the correct analysis of facts going to the arising of the requirement to have regard to the interests of CCC's creditors and the complaints of wrongful trading.  The evidence of an insolvency practitioner as to the conclusions he would have drawn about the financial state of CCC's business, what needed to be done with regard to its future at any time, and the advice that he would have given to CCC's Board, were of essential importance. I gave leave for such evidence to be called, though with some misgivings as to just how worthwhile it was likely to be in practice.

1049. Mr Wallace was instructed to provide, and did, his opinion on seven topics which I summarise as

    (i)     the indicators of insolvency for a company such as CCC ("*a leveraged investment company with a strategy of investing in long term assets with short term funding*"),

    (ii)    the factors affecting and criteria for assessing insolvency or the risk of insolvency for such a company "*exposed to volatile financial markets*",

and then, with respect to each of four material dates (31st August, 1st October, 30th November - although he amended this to 13th November - and 31st December 2007):

    (iii)   the financial position of CCC,

    (iv)    the principal threats to its solvency,

    (v)     the components of its financial statements and forecasts and the "*veracity*" [sic] of projections  as to its financial position prepared by the Defendants, "*including the adequacy of and assumptions underpinning budgets and cash flow forecasts*"

    (vi)    whether CCC was then in the "zone of insolvency", and

(vii)   the nature and contents of the "independent advice" which Mr Wallace would then have given if he had been instructed to advise CCC's Board.

1050.   Mr Wallace ultimately expressed the opinion that, had he been advising the directors of CCC at about August 2007, his advice to them would have been that they should sell about $8Bn worth of RMBS in order to restore liquidity to acceptable levels.

1051.   The first four items above seem to me to be scarcely matters of insolvency expertise, but to be matters of evidence about the particular operations of a "leveraged investment company such as CCC" which is for experts in that field to deal with, but are otherwise a matter of common sense.    At the risk of being simplistic, the indicators of insolvency are an inability, or potential inability, to pay debts, and that is also the usual and obvious criterion for assessing insolvency.   The threats to solvency are matters which may bring this situation about.   The fact that in CCC's case the overriding threats were of inadequate financing or liquidity to meet financial obligations which might arise is stating the intuitively obvious.

1052.   The fifth such matter appears to be a criticism about lack of paper records, although I accept that it could have some indirect bearing on an assessment of the conduct of those in charge of the company.   Assuming the phrase "zone of insolvency" to have any legal significance, the sixth is a matter of law or mixed law and fact which is more a matter for the court.

1053.   The seventh, I do of course accept, would be a matter within Mr Wallace's personal knowledge and expertise and therefore proper for him to express an opinion on, but its value depends entirely on three factors which are, first, whether engaging the advice of an insolvency practitioner was something CCC's directors not only could, but should (on the test that any reasonable director would) have done, second, whether Mr Wallace's advice is the advice which it can safely be inferred they would then have received, and third, how CCC's directors ought then to have reacted to such advice.   None of these points seems to me to be self-evident, and this reduces the value of Mr Wallace's evidence considerably.

1054.   My second, and major, concern is as to the objectivity of Mr Wallace's approach and evidence generally.    Whilst he was not instructed to give his opinion on the basis of a set of assumed facts, he explained in oral evidence that he had been supplied by the Plaintiffs with a large selection of documents (some of which would plainly not have been available to the Defendants at the time), and had written his report by making his own investigations into and analysis of these, and he had substantially written it before he saw the Defendants' witness statements   His approach, on looking at these, was then to ask himself if they showed that he had got anything wrong in his report, and, having generally concluded that they did not, he had continued to write his report as before, preferring (he said) the conclusions that he had drawn from the documents to what was in the witness statements where there were inconsistencies.    Couple this approach with the fact that the tenor of his instructions seems to me to have been somewhat slanted towards the conclusions which the Plaintiffs invited, rather than encouraging objectivity, and I begin to feel some doubt that Mr Wallace's report is the product of a fully open-minded approach.

1055.   This unease was compounded by some of Mr Wallace's oral evidence and by my impressions of him generally.   As to the former, I give just one example; there were others.   Mr Wallace expressed criticism of the effects and the actual propriety of what CCC had (he interpreted from the documents he saw) said to dealer counterparties about their intentions with regard to deleveraging, ignoring what was said in relevant witness statements, and even though Mr Wallace accepted that the Defendants' representations in public documents and statements had been accurate.   When pressed, he said that he was only saying that "maybe" there was dishonesty.  If so, this was gratuitous speculation which was not only outside his expertise, but outside the proper scope of expert evidence at all, and the fact that Mr Wallace felt it appropriate to include it says something about his underlying approach.

1056. As to slant within his instructions, apart from matters of underlying innuendo, it was notable that Mr Wallace was not instructed to consider CCC's position after 31st December 2007.   He said that he assumed that this was to ensure that his views were not influenced by the collapse in March 2008, but I note that it also had the effect that his views were not influenced, either, by the fact that CCC's financial metrics improved somewhat in the first six weeks or so of 2008.

1057. Mr Wallace, I regret to say, struck me as opinionated and censorious, initially very much so, although he became less so later in cross-examination.   He gave me the clear impression that, consciously or unconsciously, he had set out to write a report which justified the conclusions which the Plaintiffs wanted him to support, but which were also undoubtedly what he expected to find and was looking to confirm.   Whilst this approach was encouraged by the flavour of his instructions, I also think it was part of his professional character.   He has worked for very many years as a liquidator and company administrator.   This function induces such a mind-set all too easily.   It is an important and invariable part of a liquidator's role, especially in major insolvent liquidations, to be on the lookout for financial wrongdoing or incompetence, which he is then expected to pursue vigorously, fighting for the interests of disadvantaged creditors or shareholders.   However, such a predisposition is not the appropriate approach to bring to the giving of dispassionate expert witness evidence, even about aspects of insolvency.

1058. Mr Wallace did, at times, allow himself to stray well outside the scope of either his expertise or the proper role of evidence, and to become, in effect, an advocate for the Plaintiffs' case - and by this I should say that I mean not just giving a strong opinion which in fact supported that case but arguing the merits of that case.   He did so, for example, in volunteering opinions derived from what he perceived from the documents, such as criticisms of Mr Stomber's way of handling negotiations with repo-lenders.   It was notable that, throughout his report, his language was routinely pejorative of CCC's Board, and rarely, if ever, could he see anything to approve of.

1059. I need to mention two broad points about the content of his evidence.   The first is that insofar as his evidence depended on his understanding of the appropriate concept of insolvency, he was plainly using the concept as he understood it to apply in English law, although I think that even then the Defendants say that he did so incorrectly.    I do not think that anything material turns on this, however, for reasons which I have given when considering legal principles.

1060. The second point is that a very prominent aspect of Mr Wallace's criticisms of the Defendants was of the absence of paperwork – such as written and detailed analyses, worst case scenarios with varying inputs, financial modelling, cash flow forecasts, etc – which he said he would have expected the Defendants to generate in the course of giving any proper consideration to the future options and courses of action for CCC in the circumstances.   The lack of such paperwork then led him, in effect, to opine that there could have been no proper consideration of those matters because there was no paperwork to demonstrate it.

1061. Whilst this is, again, a matter for me rather than for Mr Wallace, the importance which he attached to paperwork made me feel that he was inclined to have an undue regard for form for its own sake, as contrasted with substance.   (It also, in fact, made me feel that the involvement of someone such as Mr Wallace in CCC's affairs at the relevant times of crisis would have been a major source of irritation and even distraction for its Management.)   The Defendants point out that Mr Wallace had spent some time (18 months) as the first accountant ever seconded to the Bank of England, and they suggest that this, and his involvement and familiarity with regulated financial institutions, may well have brought about his concern for paperwork, because regulated financial institutions are obliged to produce so much such paperwork.   The Defendants also point out that CCC's investor profile was entirely different from the investor profile of such institutions, which are regulated for the protection of

ordinary, average "consumer" customers.  It is therefore, they suggest, neither necessary nor reasonable to assume that the same approach ought to apply in a company whose investors are confined to the financially astute and sophisticated.

1062. This may all go to explain Mr Wallace's emphatic desire for paperwork, but in the end, it is the quality of the decisions which were implemented and the evaluations behind them, and not whether there were written exercises in support of them, which is the important matter for me.  I will consider any implications supposedly arising from any suggested deficiency of paperwork in their particular context.

1063. In summary, therefore, whilst I accept Mr Wallace's expertise, Mr Wallace did not impress me greatly as an expert witness, but my concerns about the weight which I can place on Mr Wallace's evidence arise from the fact that I do not think he managed to come to his task with a sufficiently detached and dispassionate approach.  He let himself be drawn into the role of advocate for the Plaintiffs' case, and was too ready to step outside the limits of opinion which his expert credentials qualified him to express.

1064. My concerns therefore apply principally to his written evidence, because I am satisfied as to his integrity in giving oral evidence.  I am quite satisfied that in his oral evidence, Mr Wallace very properly gave completely honest, open, and candid answers to questions.  He did, therefore, make concessions where it was demonstrated to him that he should do so, and he did not attempt doggedly to defend the indefensible.  Indeed, he was not evasive about the fact that many of his answers about steps which he thought should have been taken by directors of a company in CCC's position, were ultimately very much in line with the Defendants' contentions as to what they did.  I felt confident that his answers were genuine, and were not calculated for effect.   For all that, he deserves credit, and it means that much of his evidence I do not discount.

**(b)   Mr Mark Shaw - Defendants**

1065. Mr Shaw, the Defendants' insolvency expert, has been a qualified insolvency practitioner since 1998 and a partner in Moore Stephens (subsequently BDO) since 2000, having obtained a first class degree in Accountancy in 1993.   He became head of BDO's London Business Restructuring team in and from 2008.  He was a practicing Insolvency Practitioner ("IP") during the 2007-8 financial crises.  He had direct experience of RMBS and similar assets as such an IP but not (he said) to the level of an expert.

1066. Mr Shaw was asked to consider the same set of topics as had been put to Mr Wallace, as a response to his evidence.   He provided a report and a joint statement with Mr Wallace and gave evidence for just over one day.

1067. The Plaintiffs seek to dismiss Mr Shaw as an "unimpressive" witness, who lacked experience, avoided key issues "clearly" relevant to the case, and referred to Mr Stomber's evidence rather than to contemporaneous documents.   I disagree.   I found Mr Shaw to be an impressive, lucid and thoughtful witness, whose evidence was measured and who was being appropriately careful to confine his evidence to his expertise.   I also found this to be perfectly sufficient to qualify him to express an expert opinion in insolvency matters, certainly so far as material to this case.

1068. I found his declared approach to advising companies who sought his advice because of financial difficulties and perhaps the risk of insolvency, to be sensible and, it seemed to me, appropriate.    He saw his function as an IP as being to understand the company, and then to ensure that its management understood the risks and consequences of particular actions, and thus made properly evaluated judgements, always with an eye on whether the company was or was not actually insolvent or moving that way.    He did not see it as his function to step in

and tell management what to do, to make judgements for them, or to effectively take over the company, this being appropriate only when the company was in liquidation.

1069. I have indicated that I do not feel that insolvency evidence is of a great deal of materiality in this case, and in the event I do not think that any insolvency matter is at all likely to require a decision from me, let alone one that could be crucial to the case.  I will deal with any specific point which may arise in its context.   As will be gathered from the foregoing, I was more impressed by Mr Shaw's approach than by Mr Wallace's.

1070. Mr Shaw appended to his report a set of exhibits charting various financial aspects of CCC's business over the period from 1st January 2007 until March 2008.  It was agreed by both sides that these charts were accurately compiled from the evidence and the figures to be found there.  I found them extremely useful and they should likewise be regarded as appended to this judgment.  I list them below as a convenient account of the matters which they showed.

B1          CCC's daily and monthly net asset value,

B2          the average final price of CCC's RMBS assets,

B3and 4 CCC's average and "effective" repo haircut levels,

B5          CCC's available repo capacity and capacity actually used,

B6          CCC's liquidity cushion measured in both absolute $ terms and as a percentage of CCC's adjusted equity,

B7          CCC's RMBS as a percentage of total asset allocation,

B8          CCC's leverage ratio,

B9          CCC's bi-weekly 20 Day 99% portfolio Value at Risk calculations,

B10        CCC's share price,

B11        The net interest income and principal repayments of CCC's RMBS, by month and cumulatively, together with levels of principal outstanding and repo lines used.

B12        The number of CCC's repo counterparties.

1071. I found these graphs very helpful, but remind myself, as with all such charts, first to be astute to avoid gaining a false impression from (for example) the scale used, or the focus of the graph itself (compare, for example, graphs B-2A and B-2B), and also that, as Mr Shaw himself pointed out, to avoid the influence of hindsight at any particular point on the time-line of such a graph, one needs to cover over the part of the graph which plots events in the future.

**(4)     Delaware Law**

1072. I have read the two reports and joint statements of **Justice Carolyn Berger** for the Plaintiffs and **Chief Justice Myron Steele** for the Defendants.  They speak for themselves, and I will refer to their contents if and when required as to any question of the application of Delaware Law.

**(5)     Audit and Accounting**

1073. The reports and joint statements of **Dr Gary Holstrum** for the Plaintiffs and **Mr Scott Carnahan** for the Defendants were all admitted without cross-examination.

1074. Their evidence was mainly concerned with two peripheral issues, going to the Defendants' motives.   The first was the potential for Carlyle having to consolidate CCC's accounts into its own and whether this would have a detrimental effect on the interests of any of the Defendants (thus providing a potential conflict of interest or motive for improper behaviour, and possibly of relevance to an issue  as to whether CCC was justified in placing reliance on the availability of financial support from Carlyle when considering its prospects).    The second appeared to be an opinion as to whether CCC's directors had provided misleading information to PwC, as its auditors, which affected the latter's assessment that CCC was a "going concern" in late 2007/early 2008.    Neither point is central to the case.    I will therefore only refer to this written evidence if and where necessary on a more detailed consideration of the factual evidence.

**(6)      Dutch Law**

1075. The reports and joint statements of **Professor Matthijs Nelemans** for the Plaintiffs and **Professor Rogier Raas** for the Defendants were also admitted without cross-examination.

1076. This evidence goes to whether or not various actions by CCC breached Dutch regulatory law obligations of public disclosure, in particular.   Again, no such breach has any direct materiality to the complaints of loss and damage in this case, as I have already mentioned in noting them on a broad basis above.  I will therefore refer to this evidence according to its written terms only if and when necessary.

**Miscellaneous  - submissions**

1077. Lastly on the general matter of evidence and submissions, the Defendants invited me to examine carefully any submissions made by the Plaintiffs as to where evidence supported any particular proposition or inference, to satisfy myself, if I was minded so to find, that their submissions were justified.

1078. I have done so, because the need for such scrutiny became very obvious.   I will give here two examples.   The Plaintiffs refer, in a footnote in their closing submissions, to the evidence of "*the Defendants' own repo finance expert, Professor Hubbard, who considered that CCC management should have taken into account the real world signals it was experiencing at the time as to the repo market*"  Hubbard XXN {Day 54/76: 2-8}" (emphasis added).

1079. This was in the context of a written submission that the CCC Management did not do so, and to my mind clearly insinuates that Professor Hubbard was endorsing this judgment.    In fact, the reference is as follows:

> "*Q.      So would you accept that in considering the risk of [sic] CCC of haircuts rising CCC would be obliged to take into account the real world signals it was experiencing at the time as to the repo market?*
>
> A.      *Among other things, yes.    My reading of various emails and internal documents suggested they were exquisitely focused on same*." (emphasis added).

1080. It is thus perfectly clear that this answer was not supporting any criticism of CCC at all, as the slight change in the footnote report from "would be obliged to take into account" to "should have taken into account", and the omission of the second sentence of the reply,  manages to insinuate.

1081. A second example is that the Plaintiffs, in submissions citing an email of Mr Stomber's late on 14th September 2007, describe him as reporting to Mr Conway and others that CCC "only" stood a 65-75% chance of meeting increased haircut demands for the ensuing Freddie Mac

repo roll without recourse to a proposed $100Mn bridge loan from Carlyle.   This is reported as if Mr Stomber used the word "only" as a negative and anxious comment from which a state of mind of knowing that CCC was in extreme peril could be inferred.   However, the word "only" was actually the Plaintiffs' own comment, and was not included in the original.   When its text is examined accurately and in context, it is rather more a positive and encouraging statement, carrying the connotation that matters were not as bad as had been feared.

1082.   There have been many other such examples, with the consequence that I have constantly felt the need to examine assertions made in the Plaintiffs' submissions to satisfy myself that they were reasonably accurately based and justified at all as assertions, even before considering whether they supported the conclusions contended for.   This has been wearisome.   It is only fair to say that there have also been some such instances in the Defendants' submissions, but these have only been occasional.

1083.   There have also been many places in which a submission in the Plaintiffs' written closing submissions has been footnoted, with the impression being that this was therefore a reference to supporting evidence.   In fact, many such footnotes were simply references to where the allegation was made in the Cause.   This obviously adds nothing to the mere assertion.   I have, though, assumed that this was not part of an attempt to bolster the appearance of strength in the Plaintiffs' case, but was provoked by the Defendants' complaint, made on many occasions, that the Plaintiffs' case was constantly going outside their pleadings.  I have of course considered whether and if so how far any such assertion is supportable on the basis of the actual evidence.

## 8.   Some general background findings.

1084.   Because I will be considering the Plaintiffs' complaints separately with regard to six particular periods of time, it is convenient here to record some findings which will be of general background application at all these times in some way or other.

**The central complaint**

1085.   Shorn of embellishment, the essence of the Plaintiffs' complaints is one matter only.   That matter is the Directors' decision, taken at its earliest (if implicitly) at the Board Meeting of 26th July 2007, but certainly and expressly as at the 23rd August 2007 Board Meeting and consistently maintained thereafter, to retain rather than sell at least half (or thereabouts) of CCC's portfolio of RMBS, with a view to surviving successfully the financial market turbulence of mid-2007 and then adapt to market conditions thereafter.

1086.   This complaint of not selling is often expressed with a qualification along the lines of: "*at any rate without otherwise raising capital or liquidity for CCC, or restructuring CCC or winding CCC down*".   However, this does not change the position.   The first element of this qualification is a different method of raising funds, and I will obviously examine this, although it has only been half-heartedly pursued in practice.   The latter elements are really just different ways of characterising what would in fact be a sale of RMBS.

1087.   It is really only the effects of the decision not to sell RMBS which are alleged in the Cause to have been a cause of loss to CCC.   The essence of the complaint is that when CCC's RMBS were later forcibly converted into cash or seized as security, CCC did not receive as great a cash equivalent as it would have done if RMBS had been liquidated earlier.   Whilst, of course, the decision not to sell can be broken down into elements by describing exactly what happened, how the decision was made, and so forth, none of these component elements, even if it could be analysed as a cause of action, itself creates any further claim unless some loss separately attributable to that element can be found and is alleged.

1088. The Plaintiffs do seem to accept this. In the "Synopsis and key propositions" of their closing submissions they say that

> "*The Defendants' core breach may be characterised as either*
>
> a.   *a decision to attempt to ride out the market without substantially reducing leverage; or*
>
> b.   *a failure to take steps to substantially reduce leverage.*"

which is again really just two ways of describing the core complaint because the only practical method of reducing leverage was selling RMBS.

1089. The Defendants agree, saying in their footnotes to the unfruitful attempt to agree a Concise List of Issues that

> "*as the Defendants understand the Plaintiffs' case, the central allegation made is that the Defendants breached their duties by, at various times, failing to "insist" or "recommend" that CCC take urgent steps to*
>
> (a)   *sell down CCC's RMBS assets;*
>
> (b)   *raise additional equity capital; and/or*
>
> (c)   *conduct an orderly winding down of CCC*
>
> (see, for example, paras 10 and 11 of Ps' Summary, and paras 308D.11, 308G.10, 308I.10 and 310 of the Amended Cause)".

1090. This seems to me to be quite right, although the Plaintiffs, as ever "standing by their pleadings", have asserted (correctly) that there are many other breaches alleged in the Cause, and they insist that they rely on them. This ignores the fact that those matters, even if breaches of duty in their own right, go nowhere in the absence of it being alleged that they caused CCC any identifiable loss in their own right. Unfortunately this is a recurrent point in the narrative following.

**The nature of the relevant markets**

1091. The following points are matters of impression which I have taken from the whole of the evidence in the case, and which I regard as significant background for the purpose of evaluating the criticisms made of the Defendants' conduct. They are about aspects of the market in which CCC was operating.

1092. The banking and financial instrument market in the United States is a hugely complex network of interrelated financial transactions. Whilst I am concerned with the bond market, and particularly the buying, holding and selling of Agency RMBS and the financing of such transactions, that market is only part of the picture, and it is not a sealed unit. The banks who lend money on the basis of 30 day repo transactions to entities such as CCC distinguish their own position on those transactions as "reverse repo". But amongst their own activities – as I have already mentioned, they do not leave their own funds standing idle, but deploy them in money-making activity for the bank itself - they engage in direct repo as well. They will obtain further funds by, for example, conducting their own repo transactions with other banks. Indeed, I understand that they would even be using the RMBS purchased from CCC as security for their (the banks') own financings, and that whilst this seems inconsistent with the obligation to return CCC's securities at the end of the repo 30 day period, it is possible because the bank's own repo will be shorter term and even generally overnight repo, rather than 30 day repo. The financial markets therefore have a lot of "moving parts" as Mr

Stomber described it.   All this illustrates that the interaction of other aspects of the market can, and will, influence the way in which players in the market behave at any particular time, and it emphasises that the actual influences in any particular situation may not be obvious, particularly to an outsider.

1093. Next, but here stating the obvious, every player in this market is in the business of trying to make money, and is therefore negotiating with a view to making profit by gaining an advantage  or benefit for itself - or at least not giving one away.    Success in achieving a profitable deal will often depend on predicting how others will react, either directly or in their reaction to outside events, so as to be able to position oneself to take advantage of what they appear likely to do.   Actions can therefore be influenced, and deals done or not done, because parties back impressions gained from small pieces of information, gossip, and even mere rumours.

1094. This second-guessing process can become very intricate where predicting how others will react involves anticipating and predicting how those others will themselves predict how yet others will react.      This is the kind of psychology which creates "highly correlated" (Dr Webster's phrase I think) reactions in a market, especially to bad news events.    The impetus for safety play gains momentum, because as Mr Welles said, when difficulties are perceived, no player wants to be caught as the "last out of the door" compared to his peers.    When behaviour starts reflecting this kind of reaction, the result can be what looks like (and very probably is) panic and exaggerated response, and can be very different from what cool-headed logic would predict.

1095. Another consequence is that, as I am perfectly satisfied, one strong underlying characteristic of the market is that information is both highly prized, and strongly guarded.    Information is power.    Information often unlocks the opportunity to make a profitable deal, or a more profitable deal than the opposition or the competitors who lack that information.   It furnishes the opportunity to get in there first, or to exploit a negotiating edge.    Almost all communications between market players are negotiations, or potential negotiations, or the obtaining of "colour" (Dr Maini's word) as useful background to potential negotiations, and I am satisfied that communication therefore generally proceeds on the basis of trying to glean as much information as possible whilst giving away as little as possible.   No player in the market will therefore voluntarily tell you something that they do not want you to hear, and I have no doubt that experienced market players recognise that it is very often necessary to be cautious, perhaps even sceptical, about information which one is apparently being given.   This is not to suggest that the market is rife with misrepresentations and attempts to overreach, and obviously having a reputation for integrity has its own advantage, but beneath all the information being exchanged is the underlying acceptance that everyone is looking to make a profit, that that is why they are dealing with you, that it is therefore important to be alert for the possible implications of any situation, and that one should at least be aware of where the subjective interests of any particular counterparty are likely to lie.    Players will always be on the look out for opportunities to do a profitable deal, and one man's misfortune is another man's business opportunity.

1096. The tension between the pull of secrecy and privacy for oneself, but the need for information about others' actions to assist in making an efficient market, is illustrated by the practice which I was told about, that where BWICs ("Bids Wanted In Competition", ie bid lists soliciting offers for particular bonds) result in a sale, it is the second highest bid, or "cover" bid, which is then recorded and publicised as the value of the security, appearing as price "discovery".   This seems to be a compromise between the desirability to the community of establishing market values, and the wish and interest of the particular transacting parties to keep the actual strike price away from the community's eyes.

1097. Another point which I glean about the market is that negotiations can be influenced or complicated by factors which are not immediately visible.    With a bank, for example, there

may be the influence, or even overriding control, of other departments or "desks" (such as credit control, or even relationship management) or other higher policy imperatives from within the bank.   These may be general, such as which department has the superior rank in the bank's internal structure, or they may be merely transient, for example, how the transaction will have to be shown on a balance sheet or in internal reporting statistics and whether this creates any internal issues.  These points can affect whether a transaction is or is not concluded and on what terms, quite apart from what may be directly discussed in direct negotiations.  There may therefore need to be a lot of reading between lines in interpreting what is going on.

1098. In a similar way the level at which negotiations are conducted, and the internal politics of the counterparty, may come to affect whether a transaction goes ahead or not.   What is agreed between Chairmen at a high level meeting may be rather different from what might be agreed at the levels of ordinary dealers, but a transaction proposed through either source will then have to find its way through the internal procedures of the entity in question, and this may produce a re-think or a veto, the reasons for which may then not be obvious to the outsider. Some transactions may be concluded, not for immediate commercial benefit, but because of a desire to cultivate relations in the more medium or long term and with an eye to future business.

1099. I have recorded my impressions as above, because there seem to me to be many examples of such matters within the materials in this case, some reasonably obvious and some not so obvious, and I need to pay appropriate regard to them when evaluating the Plaintiffs' criticisms of the Defendants' actions in any particular respect.

**The standards of skill and care applicable to individual Defendants.**

1100. Liability in this action is not joint, and therefore has to be brought home to any Defendant individually and according to the legal standards applicable to that individual Defendant.

1101. The standard required of any individual Defendant as a director of CCC (see under "Legal Principles" above) is that of the reasonably diligent person having both (a) the general knowledge, skill and experience that might reasonably be expected of a person carrying out the same functions as those of the relevant Defendant director with regard to the company and (b) the general knowledge skill and expertise of the actual relevant Defendant director insofar as that might raise (but not lower) that standard.

1102. I have therefore considered this test in relation to each individual Defendant.    The first limb of the test is, of course, an objective test, and the only difference between Defendants to which it might give rise is therefore that which could arise from differing functions of the individual directors.    The second needs to be considered with regard to the individual subjective skills of the particular director.    However, I can consider both aspects together because they apply overall as a broad common sense view.

1103. As regards the First to Fourth Defendants (the "Carlyle" Defendants), I do not consider that the difference in the respective positions of these four Defendants as voting directors (Mr Conway and Mr Hance) or non-voting directors (Mr Stomber and Mr Zupon) makes any difference to the relevant general standards to be expected of them; it simply meant that the duties of Messrs Stomber and Zupon were concentrated into a reporting and advisory function.  These four directors together comprised the Investment Committee of the Board, which function again does not seem to me to have any practical effect on the position; they would all be expected to exercise a general level of financial knowledge and skill appropriate to directing the general investment policy of a company such as CCC.

1104. As to any other individual functions, Mr Hance was CCC's Chairman, but this position has no direct relevance to the decisions complained of.  It threw upon Mr Hance the general function

of leading the conduct of Board business and ensuring that this took place efficiently and appropriately and also a duty, I think, to make sure that all matters pertinent to such business decisions were drawn to the attention of Board Members with the opportunity for appropriate discussion, but whilst this added a little to the scope of his duties, it did not, in my judgment, add anything to the general standard of care to be expected from him.   Mr Conway had no specific separate function.   I do not think Mr Zupon held any other specific appointment to an office with CCC, but certainly nothing of any significance emerged.

1105.   Mr Stomber was the appointed Chief Executive Officer of CCC, and this appointment was a Board appointment of one of their number (see Article 118 of the 4th October 2006 Articles). It seems to me, therefore, that he carried out the duties of this office as a Director of CCC, but these duties would be for the purpose of advising and implementing Board policy decisions, and they would in practice overlap with his position on the Investment Committee and would duplicate functions and powers which he would also have had through being the senior member of the CIM team contractually charged with the duty of being CCC's investment advisor with discretionary management powers.   In my judgment, these different functions therefore made no practical difference as between themselves to his overall duties as a Director of CCC.

1106.   As regards enhanced skills, arising subjectively from their individual backgrounds, Mr Stomber had a particular knowledge and expertise in relation to dealing in RMBS and repo markets, and Mr Zupon had a similar specialist skill with regard to dealing with leveraged finance products.   It seems to me that all that this does is to confirm, but from a subjective standpoint, the general level of greater specialist expertise which was to be expected from them because of their particular functions on the Board or through CIM.   Mr Conway's financial and commercial experience was plainly at a very advanced level, but this was in relation to more general business management and investment vehicles, rather than specialism in banking and financial markets.   Mr Hance's experience was principally in banking, but with accountancy training and some personal business and general directorial experience. Their personal skills do not seem to me to increase, to any notable extent, the general standards to be expected of the hypothetical director in their positions.   In essence, therefore, I view each of these directors as financial professionals from whom a high standard of business acumen could reasonably be expected, but with more specialist standards of expertise to be expected of Mr Stomber and Mr Zupon in their particular fields, having regard to their particular responsibilities on the Board or alternatively their particular knowledge, skill and expertise.

1107.   Returning to the individual positions of the remaining directors of CCC, as regards the Fifth to Seventh Defendants, (the "Independent Directors") they all had voting status on the Board, and they comprised CCC's Audit Committee.   With no executive functions in relation to CCC's day to day operations, their function was to provide intelligent input, challenge and oversight of the decisions proposed or advised by the Investment Committee and by Management, or which they thought should be so considered, and brought to the Board for discussion at that level.   They were not pure non-executive directors, however.  They were also charged, through CCC's Articles of Association, with the specific responsibilities of approving any changes in CCC's Investment Guidelines, and several other significant financial and policy matters.  That being part of their express functions, they were required to exercise the appropriate degree of knowledge and skill for such a function.

1108.   In my judgment, and as a matter of construction of these Articles of Association, the Independent Directors were not put in place in order to second guess and re-deliberate the operational management decisions of CCC.   That degree of oversight or challenge was, it seems to me, intended for the actual experts, ie Mr Stomber and Mr Zupon in particular, and at a somewhat more general business level Mr Conway and Mr Hance, as the Investment Committee.   The Independent Directors' function was to bring a dispassionate oversight view to the Board's decisions, from a more detached perspective.   It is of course quite likely that

they would ultimately accept and agree with the recommendations of the "Carlyle" directors, provided these appeared rational, because those four persons had a more immediate perspective on major decisions.  The Independent Directors provided a further and detached level of scrutiny.

1109.   In my judgment it was neither intended, nor practical, that the Independent Directors should be expected to exhibit or apply a similar degree of detailed knowledge or expertise to any decision as would the four more "executive" directors, but an appropriately high degree of general business acumen would still be expected.

1110.   Messrs Sarles and Allardice each brought significant but slightly different banking and finance experience, and experience in other directorships, to the table.  I do not regard that as increasing the general standards of competence which would be expected of them, but more as the general level of business skill and experience which it would be appropriate to expect of a director with the functions of an Independent Director of a company such as CCC.

1111.   Mr Loveridge had a further and more particular function on the Board, being that of providing the necessary point of contact in Guernsey, the jurisdiction of its incorporation, for CCC, and with the responsibility, in effect, of supervising its good standing in Guernsey, as a matter of practicality.   That was, however, in addition to the functions of an Independent Director as laid down in CCC's Articles.

1112.   I have had more concern about Mr Loveridge's position than those of Messrs Sarles and Allardice.  I am satisfied that in general terms Mr Loveridge was intelligent, skilled and experienced enough to take a position as a non-executive director of a relatively major company such as CCC.   He was also, I am equally satisfied, well equipped to perform his particular function of being the "resident Guernsey director" of CCC, for the purpose of overseeing the local company administration and relations with authorities.  It is quite reasonable, in my judgment, to appoint a non-technical director with administrative skills and experience for that purpose in an off-shore company such as was CCC.

1113.   However, Mr Loveridge was a trust administrator, and did not have any real banking or financial markets business experience or expertise.    The general duty on Mr Loveridge as a non-executive director would be to acquaint himself sufficiently with the way in which CCC's business worked, so that he would be able to judge whether the actions and proposals of his fellow, more expert, directors or of company management, were proper and reasonable.  However, as I have said, his position was more than a mere non-executive director, and this can only have increased that duty in regard to such functions.   My concern has therefore been as to whether he was really properly equipped to discharge the particular role of an Independent Director of CCC.

1114.   He said in evidence that he acquainted himself with what he regarded as a sufficient understanding of CCC's business to be able, he felt, to discharge his duties properly.   I have no doubt that he thought this, subjectively, and he was not really challenged on this point.  Having seen him in evidence, though, and even allowing for his having aged ten years, I do entertain some doubt as to whether he really did understand CCC's business model, its commercial implications, and sufficient of the technical aspects of how the business operated to be able to make any actively independent judgement on matters affecting this, still less follow the meaning and implications of the financial data and jargon which were circulated and discussed.   I have not noticed any recorded remark by Mr Loveridge at a Board or Audit Committee Meeting other than reporting on accountancy or administrative matters to do with Guernsey.

1115.   I have referred to the executive and oversight role of the Independent Directors under CCC's constitution with regard to some important matters of operational strategy, such as changes to Investment Guidelines, asset allocation, and suchlike.  In relation to that, Mr Loveridge could

realistically, it seems to me, do no more than listen to fellow board members and evaluate whether what they proposed sounded reasonable but at only a very high level, with only limited and relatively shallow knowledge and skill to guide him. As long as what was being proposed was not, therefore, egregiously suspect or bizarre, he was clearly likely, with total sincerity and honesty, simply to concur. Whilst recognising that the objective standards of knowledge, skill and expertise expected of directors as a general matter are not particularly high, they do, nonetheless, have to be judged against the functions which the director is expected to perform, and, as I have said, I have had some misgivings about Mr Loveridge. I suspect that Mr Conway instinctively recognised the weakness of Mr Loveridge's position, because at one stage he was looking to strengthen the independent directorship of CCC by bringing in a further such director. I would therefore, if it became material, have to consider Mr Loveridge's position with this reservation in mind.

1116. However, in the end, and whilst not overlooking this point, I do not think it does, for several reasons. First, the Plaintiffs have not attacked Mr Loveridge on the basis of any suggestion that, individually, he was out of his depth or did not teach himself CCC's business sufficiently thoroughly. Their case is made against him on exactly the same basis as against the other independent directors.

1117. Second, Mr Loveridge's background was perfectly obvious to anyone investing in CCC, as his short CV was set out in the PPMs and OM. The implications of his being a trust administration professional from Guernsey, rather than having high finance experience, were therefore readily apparent to anyone who gave any sensible thought to this.

1118. Third even if Mr Loveridge's lack of financial experience could have led him to be in breach of duty for simply acquiescing in decisions he was asked to make, rather than critically judging them for himself on their intrinsic merits, it would not, on the face of it, make any difference to any outcome in this case, simply because of the mathematics. Mr Loveridge was but one of three Independent Directors and five voting directors. All the decisions criticised by the Plaintiffs were unanimous ones. It follows that even if Mr Loveridge had been acting in breach of duty, his single vote made no difference to the eventual result. It would only affect the position if, on the particular facts, his mere concurrence in others' views, rather than injecting some counterfactual personal input, would possibly have caused the views of those others to alter materially, and thus change the result. I am quite satisfied that the possibility and plausibility of this is vanishingly small on the facts as they have unfolded, and indeed no such scenario was even explored.

1119. In the end, therefore, Mr Loveridge's liability (or not) simply stands or falls with the others of the group of directors of which he was part.

**Contractual duties of CIM**

1120. In addition, to being Directors of CCC, Mr Stomber and Mr Zupon, whose position in that respect I considered above, were also, in effect, the main embodiment of CIM with regard to the general advising on and implementation of CCC's investment strategy pursuant to the terms of the IMA between CCC and CIM, although CIM's responsibilities went further and included responsibility for administrative and operational matters for CCC, these latter functions being carried out by other persons, subordinate to Mr Stomber, in particular. Thus, the loyalty, skill and care of Messrs Stomber and Zupon are also material to the issue of CIM's separate contractual or tortious liability as the investment manager to CCC, under the terms of the IMA.

1121. That is a matter of Delaware law, and the Delaware law experts were not called and their evidence was taken as read. I did not, in fact, receive much in the way of oral submission about Delaware law, although this was partly because of time constraints, as both Advocate Wessels and Advocate Davies courteously made clear. As already observed, the focus of the

Delaware law experts' disagreement was mostly, it seemed to me, on the correct legal analysis of the relationship in Delaware law between contractual and common law duties and the true construction and effect of the particular provisions of the IMA with regard to the operation of Delaware law in excluding or limiting exoneration clauses.   What I broadly derived from the Delaware law evidence, and from the fact that I received no specific submissions to the contrary, is that under Delaware law and the terms of the IMA, CIM was effectively appointed "attorney in fact" of CCC for the purpose of implementing its affairs, that as a consequence of this and the generally recognised Delaware law duties of an investment adviser with discretionary management authority, CIM owed to CCC "fiduciary" duties which included both loyalty and skill and care.

1122. As regards the content of these duties, the relevant Delaware fiduciary duty (strictly so-called from the Guernsey law perspective) appears to be similar to the fiduciary duties which would be owed by a director of a company or a fiduciary agent in Guernsey law.   The standard of the duty of skill and care applied to a fiduciary in Delaware law appears to be somewhat controversial in this case, giving rise even to a dispute in closing submissions as to the correct interpretation of the written expert evidence.   There does, though, seem to me to be general agreement between the Delaware law experts that, by whatever legal analysis, the duty of skill and care imposed on a fiduciary is only a duty not to be grossly negligent, although what this entailed would be a higher test for a contractual fiduciary agent than it would be for a "corporate fiduciary", ie a director.   Delaware law apparently recognises a "business judgement rule", but as already discussed above under legal principles this seems to me to be no more than a formal label for the general approach which would be applied in both English and Guernsey law, that the court will not substitute its own judgement for that of businessmen who have made honest and conscientious decisions in the conduct of the business entrusted to them.

1123. I do not think it necessary to devote time or discussion to making precise findings as to the Delaware law aspects of this case, or on analysing the subtleties of the disagreements between the Delaware law experts.   I consider that I can safely proceed on the basis that CIM's contractual duties to CCC under the IMA, and its residual tortious duty of care (if any; the experts appear to disagree as to whether there would be one) can be treated as *certainly no lower than* the standard of fiduciary duties and duty of care which would be owed to CCC by its own specialist directors, namely Mr Stomber and Mr Zupon, as the experts in CCC's assets and business.   The difference would be that since CIM's contractual obligations and functions extended also to matters of management and the execution of transactions in and about CCC's business, those duties, and in particular the duty of care in that regard, would therefore extend to the further functions undertaken by CIM.   These were ultimately under Mr Stomber's control and guidance, in practice.   That is therefore the approach which I will adopt in the interests of efficiency and proportionality, always remembering that both experts are agreed that the standard of care imposed on a fiduciary in Delaware law is a duty not to act with *gross* negligence.   Until the question  actually requires decision, I do not need to consider whether or not that equates to recklessness, or whether, if it does, that makes any difference.

1124. It follows that I can consider the allegations of breach of contract or tort by CIM, together with the allegations of breach of duty made against the individual Defendants, and in particular Mr Stomber, because the material facts and considerations will be effectively the same.

**The effects of the culture of "Carlyle"**

1125. The next general matter applicable to all the Plaintiffs' allegations and which it is convenient to consider here is their allegation that CCC was subject to "the pervasive control of Carlyle".

1126. Although put in this abstract way, it is a proposition upon which the Plaintiffs rely particularly as part of their case against the Entity Defendants, that those Defendants were *de facto*, or alternatively shadow, directors of CCC and they incur liability to CCC on that basis. The Plaintiffs invite me to find that Carlyle controlled CCC through

    (i)    its control (in practice) of all CCC's voting shares;

    (ii)    its consequent ability to control the composition of CCC's Board and Management; and

    (iii)    Mr Conway's dominance and influence over CCC's affairs.

1127. As propositions of fact, the first two matters are common ground (and in practice indisputable). As to the third, I consider this in more detail later, and for reasons there given I find that that there was no actual or active "dominance" by Mr Conway, either of the Board or of CCC's affairs. Where he took a prominent role in representing CCC this was simply as a director, and was making the best natural use of his particular skills and connections; it was no more than that. The influence which his opinions may have had in any of the decisions made in relation to CCC may have been significant, but was neither undue nor inappropriate, especially given his formal position as a member of its Investment Committee.

1128. In connection with the liability of the individual Defendants, the relevant point here, though, is different and it is the other side of the coin. It is the effect which this alleged factual feature – the cult of "Carlyle" - may have had in influencing the mind-set of the individual Defendants and thus their approach to their separate duties to CCC itself.

1129. This has been a matter which has rather troubled me. The Plaintiffs submit that CCC was "run as a business unit of Carlyle", and this actually seems to me to be a fair broad description of what happened. Much of the Plaintiffs' case rests on the proposition that the Directors of CCC acted wrongfully because they put the interests of Carlyle (Group) ahead of those of CCC itself, and their actions were therefore aimed at benefitting Carlyle (Group) rather than CCC, thereby in fact being inimical to CCC's own best interests. In order to test this proposition with regard to any particular act or decision of the Defendants which is alleged to have caused damage to CCC, the likelihood of a Defendant having been so motivated is obviously material, and any evidence tending to suggest such a likelihood must therefore be put into the balance. That is the materiality of the alleged background influence which I am therefore considering here.

1130. The question is thus whether, and if so how far, there was a corporate culture within CCC that CCC was a part of "Carlyle" to the extent that CCC's separate corporate existence became obscured, with the general interests of the Carlyle Group inviting attention and naturally coming to gain greater prominence. In such an environment, it becomes second nature to think immediately in terms of the group interest and only second, or perhaps not really at all, to look at the discrete interests of the individual entity. Such an ethos could easily come insidiously to have an inappropriate influence on decision-making for CCC. I have therefore looked carefully at this matter to see what (if any) weight it should be given, in fact in relation to any individual Defendant, in evaluating the probabilities as to that Defendant's motivations in making the decisions under challenge.

1131. First, it is clear that CCC was incorporated for the benefit of The Carlyle Group. The whole reason for launching and incorporating CCC was that it should make money for Carlyle, in the ways which I have already described – a source of management fees, and of funds for other Carlyle investments. But there is nothing wrong with this. Carlyle (Group)'s objective was to make money from CCC by providing a service of making money for investors in CCC. Such an investor would not mind Carlyle Group making money, as long as CCC also made satisfactory money for the investor.

1132. Previously, Carlyle had solicited outside investment into managed equity or investment funds, which it administered and controlled fully, and directly.   CCC was to be its first venture into the public stock markets with one of the objectives of this being that it would provide a tradable and liquid means of investment to investors.   Nonetheless, and for obvious reasons, I infer that Carlyle wanted to retain a similar degree of control over CCC's operations as it was used to having when running its managed investment funds.   CCC was therefore structured to meet both objectives.

1133. Although, as a matter of pleading, the Defendants deny that CCC was owned by Carlyle, this is perfectly obviously only at the bare level of form - and even that seems to me to be questionable.   Because the shareholding of CCC was divided between the Class "B" shares which were entitled to dividends but not to vote, and the Class "A" shares which carried votes but no dividend entitlement, the investors had no influence or even indirect control over the running of CCC's affairs such as they would have in a conventionally structured company. Whilst TCG and Holdings did not themselves hold the voting shares, these were placed in the willing hands of individual "tame" Carlyle partners.  This separation may have been for fiscal reasons, or accountancy reasons or both - I think possibly avoiding balance sheet consolidation, which I accept (I do not think it necessary to go into the detail of the accountancy evidence on this point) it would have been reasonable to try to avoid, as a matter of trouble and practicality.   But it operated as a matter of form only, and even then it might well have been successfully argued that, in substance, the individual "A" shareholders held their shares in trust for TCG or Holdings.  The actual shareholders could be relied on to exercise their voting powers in the way in which TCG/Holdings desired.  This voting control thus gave TCG/Holdings ultimate control of all the positions on the CCC Board, in fact including the required "independent" directors.  TCG/Holdings also effectively controlled the management of CCC because this was confided, by the IMA, to CIM, which was itself a company controlled by TCG and Holdings.

1134. However, this was all disclosed to CCC's investors, and in any event it would have been perfectly obvious to the kind of investor which Carlyle was courting.   All of CCC's management team, though nominally staff of CIM (and including Mr Stomber who was officially appointed as CCC's CEO) were actually employed by CGEC, which was wholly owned by the Founders. All the management team could therefore be removed from their positions with regard to CCC by the termination of their employment with CGEC, and my understanding is that American employment law confers little or no employment protection rights on employees.

1135. The shareholding structure was designed to ensure that CCC could never take off independently of the Carlyle Group and dismiss CIM as its investment manager, so as to protect not only Carlyle fees and income, but also the Carlyle name.  It was also no doubt designed to provide tax efficiencies, or other advantages, to both Carlyle and the outside investors.  The advancement of the investors' financial interests lay in the operation of the company's articles and its publicised intended investment policies, and the management agreements which were intended to implement these to generate income and dividends for them.   The investors' protection, if things went unsatisfactorily for them, would lie either in selling their shares and getting out of the relationship, or, ultimately, in the absence of any control over the Board or the Manager, in invoking the assistance of the Guernsey Court on the grounds of "unfair prejudice" about the way in which the affairs of the company were being run (see s.75 of the 1994 Law).

1136. The reality, therefore, it seems to me, is that the structure which was adopted for CCC created a relationship between CCC and TCG/Holdings which was tantamount to that of a subsidiary (CCC) and a holding company  (TCG).   On that basis, CCC's directors would be required to behave with the same independence of judgement and attitude which the directors of a subsidiary company would be required to apply despite having been appointed to office through the powers of the holding company.

1137. I therefore find it helpful to look at the situation in that light and to ask myself whether they did so.   (I repeat that I am here looking at the general situation, as background to the particular alleged breaches of duty at different times and as to which I will make more focused findings.)   In the following few paragraphs I therefore refer interchangeably to the "holding company" or the "appointor company" and to the "subsidiary company" or the "subject company" as appropriate to the proposition.

1138. It would be unreal to expect that an appointee director, appointed to a subsidiary company by a holding company, should not himself have the understanding that he has been appointed for the purpose of furthering the holding company's interests in the running of the subsidiary. There is an uneasy legal analysis of the potential conflicts of interest in this situation to which I have already referred when considering legal principles.   To resolve this, it has been firmly laid down in authority that the appointee director's duty of loyalty is unwaveringly to the subsidiary company of which he is a director, with the reconciliation being that the holding company is deemed by the law to have appointed the director with a mandate to take precisely that attitude.   However, how the director himself reconciles the situation in his own mind is a different matter.   The easiest way to do so is probably to regard the holding company as having appointed him because it wishes properly careful and loyal decisions to be taken in furtherance of the best interests of the subsidiary company, and it trusts him to do just that.

1139. It is obviously very likely that in many, if not most, cases the best interests of the subsidiary and of the holding company will coincide.  It is only when the two diverge in some respect, <u>and</u> the interests of one demand a decision which actually has detrimental effects, relative or absolute, for the other, that any actual conflict arises.  The law then requires the director to resolve the difference in favour of the company for whom he is acting in any particular instance (ie here the subsidiary) and to act accordingly.

1140. The fiduciary obligation of the appointee director is not to prefer the interests of another party (here, the holding or appointor company) to the detriment of the company whose affairs he is conducting.   It is, though, no part of his obligation to demonstrate his independence by acting contrary to the interests of the appointor company.   If, therefore, the interests of both companies are the same, no problem arises and the fact that the appointee director may have eagerly and gratefully embraced the relevant decision because it was also in the interests of his appointor does not vitiate his decision - always so long as that decision was independently considered by him to be the best for the interests of the subject subsidiary company. Plainly, if any issue arises as to whether the decision <u>was</u> in the best interests of the subject company, any assertion by the director that he believed it to be so, when the benefit to that company may be small or questionable but the benefit to the appointor company is large or obvious, would be critically examined.

1141. If the companies' interests diverge, though, since the breach of fiduciary duty lies in not acting in good faith in the interests of the company to whom the duty is owed, liability depends on having taken a <u>different</u> decision from one in the best interests of the subject company and doing so for the purpose of benefiting the holding or appointor company.  This is the test against which I have later examined the decisions made by the Defendants in and about CCC's affairs, where what is alleged is a breach of fiduciary duty by preferring the interests of Carlyle to those of CCC.

1142. It is worth noting here, though, that where it has been held in the authorities that the directors of a company have breached their fiduciary duty by preferring the interests of a holding or associated company, the facts have always been that the directors have, deliberately or without actual regard for their duty, permitted the assets of the subject company to be used or deployed for the benefit of the holding or associated company with no, or no sufficiently significant, benefit to the subject company.   That is quite a long way from the facts of this case, in which, in practice, it was rather the assets of the associated company (Carlyle) which were deployed for the benefit of the subject company (CCC), for example by way of the

Carlyle loan to CCC. This is not a promising start for an allegation that the directors of the subject company preferred the interests of the associated company.

1143. I have said that I think it fair to say that in practice CCC was run as a business unit of Carlyle. This is also what the Entity Defendants and the Carlyle Defendants other than Mr Stomber were accustomed to; CCC was conceived as a logical extension of the financial services operations which they had moved into and successfully conducted up to that time. The underlying control exercised by TCG or Holdings and inherent in the structure of CCC was, I am satisfied, also perfectly obvious to all the Defendants. Mr Stomber stated as much in an email to Ms Cosiol of 16th August 2007 ("*he* [sc. Mr Conway] *controls my comp* [sc. remuneration]"). I am also satisfied that Messrs Sarles, Allardice and Loveridge were aware that they effectively held office at the pleasure of the Founders. All these would be factors which would conduce to a tendency to think first of "Carlyle" rather than CCC, even though, as I am again quite satisfied, all the individual Defendants had been provided with a summary of the duties of the directors of a Guernsey company at the time of their initial appointment (with the possible, but if so immaterial, exception of Mr Loveridge who would not have needed it).

1144. The Plaintiffs refer to various statements, particularly in the oral evidence of some of the Defendants, as support for the proposition that they either disregarded or failed to appreciate the fundamental point that their duties were owed solely to CCC rather than to the Carlyle Group. Much of this is unconvincing. The mere fact that, for example, Mr Conway instructed Ms Cosiol to investigate fall-back arrangements for an alternative to CCC's IPO without consulting or informing CCC's Board, or that he considered himself (he said) to be representing both Carlyle and CCC when negotiating with Citi Group in August 2007, do not seem to me to carry any weight as evidence that he actually subordinated CCC's best interests to those of Carlyle (Group). These matters are not inconsistent with recognition that in decision making for CCC, his duty was first and foremost to CCC.

1145. Mr Stomber on the other hand said clearly in an email in June 2007 that he was trying to put Carlyle's interests ahead of CCC's so as to gain the approval of the Founders as a "team player". It is somewhat disturbing to find Mr Conway agreeing and praising this in his response, but looking at the circumstances, I find that this was really said as a quick reassuring response to an apparently insecure and highly-strung employee, even if a senior one. This context means that I do not endow it with significance as regards Mr Conway's mindset in the taking of solemn decisions for CCC.

1146. I gained something of an impression that Mr Hance saw his chairmanship of CCC as being effectively "for" Carlyle, in particular in the context of mentoring and advising Mr Stomber and Mr Zupon. Also, in his oral evidence, Mr Allardice expressed the view that the four Carlyle directors were responsible to TCG and their "*ownership*", and that the three Independent Directors were responsible to the independent shareholders. This is obviously wrong as a matter of legal obligation. Having anxiously considered this, though, I do not find that either of these particular statements really betrays anything more than a recognition of its maker being an appointee of Carlyle (Group) to his position on the Board of CCC. As such it is more a recognition of the obvious than a revelation of an intrinsic conflict of loyalty, as I have discussed above. I am inclined to think that the more formalistic and gruff Mr Sarles kept the proper position clearly in mind. I am certainly satisfied that Mr Loveridge, who not only had experience of Guernsey company structures and directors' duties, but, as the only director in Guernsey rather than the USA, was well insulated from any pervading atmospheric assumption that Carlyle's interests were paramount, did so in conducting his own thinking so far as that went.

1147. As I have said, the findings which I have to make in relation to liability in this action are about accusations of breach of duty against the Defendants individually in relation to particular decisions made by them as directors of CCC. The findings which I am recording

here are about whether, and to what degree, it seems to me that any individual Defendant may have had a general disposition to think in terms of Carlyle's interests ahead of those of CCC. Leaving aside Mr Stomber for the moment, I find that the general evidence does suggest grounds to think that Messrs Conway, Hance, Zupon, and Allardice, in that order on the scale, might have had some disposition to do so.   This means only, though, that I will need to examine the circumstances of their material decisions in the case with this possibility in mind. On balance, I do not think there is a serious possibility that Mr Sarles lost sight of the fact that his duties were owed first and foremost to CCC, and I am satisfied that Mr Loveridge did not do so because of his more extraneous position.   I am quite satisfied that his attention was properly focused on CCC, although subject to his more limited skill and experience already referred to.   Mr Stomber's position requires closer consideration, which I give later.

1148.   Whilst dealing with general background circumstances, it is right to record, as a matter of balance, that the Defendants have urged, at several points, that there was no question of Carlyle's interests being preferred over CCC's because their interests were both aligned.

1149.   Looked at generally, I find a lot of force in this.   First, it is obvious that reputational interests were aligned in the sense that CCC carried the Carlyle name.   Mr Hance explained clearly in his evidence that CCC and Carlyle were "inextricably linked" as regards reputation and activities, and it was impossible, in practice, for this not to be the case.   Second, CCC's financial success would of course mean financial gain for TCG/Holdings and CIM as already described.   Third, various Carlyle affiliates, not least including all the individual Defendants, to some degree were investors in CCC.   These factors all combined, to mean that Carlyle (Group) had a clear coincidence of interest with CCC in CCC's financial success.   This would only go so far, though, because that coincidence of interests could be affected by financial considerations.

1150.   This is also material to the findings I need to make, in that, if and insofar as the interests of Carlyle (Group) and CCC were reasonably perceived, consciously or subconsciously, by the Defendants actually to be aligned, it would mean that individual Defendants would have had no cause to deliberate actively the question of conflict of interest and to make any actual choice, still less to record any such decision.   The effects of any such apparent alignment of interests being taken as read would therefore contribute to the impressions which I may have gained of their attitudes.   This will all have to be considered where material, for any fact-specific determination.

## Mr Stomber's "subservience"

1151.   I have left Mr Stomber's position and underlying attitude for separate comment because the Plaintiffs have laid great emphasis on this.   They submit that I should actually make a finding that Mr Stomber was beholden and/or subservient to Mr Conway and to Carlyle, and acted at all times in accordance with the wishes and interests of Mr Conway, Carlyle, and CIM, the implication being that he thereby ignored or subordinated CCC's best interests to that motivation.

1152.   The Plaintiffs cite three particular examples of this in their closing submissions.   They point to the fact that Mr Stomber said, several times, that CCC was "*about Carlyle first second and third*".   The second, already mentioned and most striking, is an email of 1st March 2007 in which Mr Stomber told Mr Conway that he "*hope[d] you are getting a sense that I think always about the firm first before CCC*", (emphasis added), with Mr Conway's response being "*you are acting like a team player AND you are thinking of Carlyle's best interests*". The third is that Mr Stomber appears to have actually applied this approach shortly afterwards, in June 2007, in treating the possibility of an adverse effect on Carlyle's own plans for an IPO if CCC's IPO were to be delayed as a material consideration in the decision whether to proceed with CCC's IPO or to delay it.   Although this was after the material events, a similar attitude can be said to be shown in an internal email of his of 14th March

2008, which includes comments that the decision to "*let CCC go*" was "*the right decision to protect Carlyle's balance sheet*" and to keep its name out of the headlines, which it could be argued showed continuity of this mindset throughout the intervening period.

1153. In paragraph 412ZA of the Cause the Plaintiffs list 11 quotations from Mr Stomber which they say demonstrate that he generally made Carlyle's interests his first priority, over those of CCC.    Looking carefully at these examples, they are indeed fairly stark, in particular the second one cited above.  On Mr Stomber's behalf it is pointed out that only five, and indeed not including that stark one, are in fact within the time period of the Plaintiffs' claims in the action.    That is correct, but matters outside that time period can still be evidence of Mr Stomber's likely state of mind within the time period.    They also point out that, on examination, several of the quotations where Mr Stomber appears to be anxious to take into account Carlyle (Group)'s view, or suggests that a matter is a "Carlyle decision" rather than one for him, are actually justified in context, since the material under consideration was indeed a Carlyle Group concern as much as CCC's.  They relate, for example to press releases regarding Carlyle's assistance to CCC, and as regards the "Carlyle decision" as to whether not Carlyle would actually provide assistance to CCC.

1154. I have already referred to Mr Stomber's remarkably deferential attitude to Mr Conway and the Founders of Carlyle.    Taking the evidence as a whole, I am persuaded that Mr Stomber did have an underlying attitude that his job, and the better furtherance of his career, lay in ensuring that what he did with CCC accorded with what the Founders perceived to be in the best interests of the Carlyle Group.  His obsequiousness and professions of concern for the interests of Carlyle were, I find, prompted by furthering this and trying to ingratiate or rehabilitate himself in the estimation of his superiors, as he saw them to be.  To a degree, therefore, I think that they may well have been exaggerated.  Nonetheless, I am satisfied that there is reason to think that Mr Stomber would have tended to act in what he thought (or more accurately what he thought the Founders would think) to be in Carlyle's best interests before considering what might, uncomfortably therefore, be in CCC's interests if different.

1155. This means that I have looked with great care at advice rendered by Mr Stomber and decisions made by him in relation to CCC's affairs, when evaluating any assertion of his that such decision or advice was truly regarded as being in CCC's best interests, irrespective of whether it was also in Carlyle's.  I will also bear in mind that Mr Stomber may well have been predisposed to find that what was in the best interests of CCC would, fortunately, be what would seem to serve the best interests of Carlyle.

1156. Once again, though, this is evidence which will have to be applied in the specific context of any material decision under challenge.  Furthermore, if and insofar as it really does appear that CCC's and Carlyle's interests were aligned in respect of any particular decision, any wrongful motivation behind the material decision would become irrelevant.

**The independence of the Independent Directors**

1157. There is a further prominent submission by the Plaintiffs with regard to material general background findings, and this is the allegation that the Independent Directors were not truly independent.

1158. In the Cause the Plaintiffs refer to the tenuous previous acquaintance or connections between each of the three Independent Directors and either the Carlyle Group or one of its Founders or the other Defendants, as if these should give rise to suspicion as to their ability to act independently.    In the end, and quite rightly, absolutely nothing was made of these utterly trivial points.

1159. The eventual allegations which are made in this respect are relied on mainly as going to the question of the claimed liability of the Entity Defendants as shadow or de facto directors of

CCC.   The Plaintiffs cite the Cause at Paragraphs 412ZB – 412ZD as the material relevant to this point; Paragraph 412ZD is the operative one.   The assertions there contained, however, are in general terms that they "acceded unquestioningly" to requests that they should exercise their powers to approve reduction or suspension of CCC's liquidity cushion guidelines, and to support decisions to refrain from selling RMBS and not to seek to raise further equity capital, and that they refrained from requiring sufficient Board Meetings, and abrogated their duties to CCC by permitting Carlyle and CIM to run CCC as they saw fit, after August 2007.  They are thus allegations of what happened, and do not go to establishing any attributes of these directors which compromised their actual independence.

1160. Insofar as these assertions relate to allegations of breach of duty by these three Defendants, they are thus squarely within the ambit of the duty to exercise independent judgement, this being a duty which focuses on the quality of a defendant's decision-making rather than on the status or characteristics of the defendant himself.    They can also possibly be brought under the wider ambit of the duty of good faith.   On either basis, I find that they fall to be considered in the context of examining the propriety of the actual decision complained of by the Plaintiffs in detail, and this is what I will do.   They therefore require no further consideration here.

1161. Against the above background and findings, I therefore now move on to consider the specific facts and allegations made against the Defendants with regard to their conduct of CCC's affairs from July 2007 to March 2008.

1162. Before doing so, I record here that the parties agreed a document giving the day-by-day amount of CCC's liquidity cushion from 19th January 2007 to 5th March 2008, derived from CCC's files, which contains other details and in particular CCC's then current capital value. This is the last document which should be treated as annexed to this judgment, and I have generally used its figures in the narratives which follow.  Figures reported by Mr Stomber in emails during the relevant periods do not always correspond with the figures in this document, although they are not greatly different.  I infer that Mr Stomber's figures will have been "on the hoof" calculations derived from provisional reports or information during the day, or that the differences may be because the methods of calculating such figures have been slightly different, eg as to what exactly has been averaged and multiplied up for the purpose of arriving at a total capital value.  Nothing turns on any particular such minor discrepancies.

1163. The facts which I state from now on are, except where I indicate what is in dispute, either common ground or are my findings of fact on the evidence.

## 9.    The Claims: JULY 2007

### Did the Defendants react inadequately in July 2007 to signs of market instability?

### Events of Mid July, up to the 26th July Board Meeting.

1164. I have earlier recounted the history of CCC's business up to and immediately after the IPO. I now take up the story with regard to the events which ground the claims actually advanced in the action.   I have referred already to some later events and matters in dealing with the law, the evidence and the witnesses, but it is necessary now to go back to the situation at July 2007, ignoring any knowledge of what ultimately happened.

1165. As at 13th July, CCC's liquidity cushion was viewed as being approximately $281Mn, including the net sums raised from the IPO after repayment of the Bridge Loan.

1166. In mid-July 2007, however, the credit markets showed signs of increased volatility, as "credit risk" - i.e. the risk of default in repayment of loans – became a growing fear in the minds of both investors in and the financiers of such assets.    The prices of lower rated subprime

RMBS had already begun to be affected by this fear in May and June, and this was made still more acute by the shock of the Bear Stearns incidents, with prices dropping and the costs of financing increasing.  However, in July 2007, the highest rated subprime RMBS – ie, non-Agency AAA rated RMBS - saw prices fall below par for the first time.   The perception of increased credit risk also began to affect the value of bank loans, the subject of the CCIL portfolio managed by Mr. Zupon's U.S. Leveraged Finance group.

1167. Data show, though, that CCC's Agency RMBS, which effectively had no credit risk, did not experience price deterioration in July.   Although prices had declined by half a point in June, they remained generally flat and static in July.   Mr Stomber says that he believed (and Mr Conway and Mr Hance either shared or followed his belief) that the Agency RMBS held by CCC would continue to be unaffected, because market participants would appreciate the absence of credit risk and therefore CCC would even be likely to benefit from this appreciation showing in a flight to quality; such assets would be purchased in preference to more risky ones, and this would raise prices and thus the values of CCC's securities.  These views are reflected in CCC internal emails of mid-July 2007 and also show up in a general positive circular on Bloomberg, on 10th July 2007, which Mr Greenwood passed to Mr Stomber.

1168. These comments contrast, though, with a warning email sent on 11th July 2007 by Mr Conway, to those in charge of Carlyle's leveraged finance asset funds, urging them in dramatic and very emphatic terms to ensure that they were "*defensively positioned*", and stressing his anticipation of stormy times ahead.  In his reaction to this email, Mr Stomber not only reiterated his views with regard to the solidity of CCC's Agency RMBS, but went on to express the view that it was too early to start buying further credit products as their prices still had further to fall.   This reaction reminds me (as is salutary where one is examining events whilst knowing what ultimately happened) that events with an adverse effect are not all "downside" in this business.    A setback in one aspect may represent an opportunity in another, and skilled businessmen will, quite normally and reasonably, be on the lookout for this.

1169. Before the 16th July 2007 Freddie Mac repo roll, JP Morgan apparently tried to apply a 3% haircut to CCC's repo, but they were, once again, negotiated back to 2% by Mr Ng, apparently with no real resistance.

1170. The Plaintiffs suggest that it was a repeated demand for a 3% haircut from JP Morgan in respect of the Fannie Mae roll on 25th July which caused CCC then to roll its repo off to other lenders.  The Defendants say that this is not the case, and that it was the fact that JP Morgan had proposed an interest rate of 5.30%, whilst other dealers were offering 5.29%.   I accept the Defendants' submission on this.  It is confirmed by Bloomberg Messages of 20th and 24th July 2007, in which a 2% haircut was recorded.  The Defendants also point out that shortly afterwards on 27th July, JP Morgan offered a 15 day repo line to CCC for a specific new Freddie Mac bond at a 2% haircut.

1171. The Plaintiffs say that increasing demands for higher haircuts were an unmistakable signal, which could not and should not have been ignored, that CCC's business model was no longer sound and required urgent re-evaluation and change, in particular - as is their recurrent theme - by an urgent and major reduction in CCC's level of leverage.  (To give an idea of figures, it is accepted that the total portfolio of about $21.8Bn of RMBS which had by then been acquired by CCC, had been acquired using leverage of 29.6x.)

1172. The Defendants say that this was not the case; the signs were not in fact as significant as the Plaintiffs claim, and certainly were reasonably not perceived to be of such significance; they were judged to be symptomatic of individual and idiosyncratic pressures.  CCC still had repo lines far in excess of its borrowings. (Mr Stomber said: $41.7Bn of capacity as against about $22Bn of usage, although I think that at that point in time both figures were actually

marginally lower.)  Any requests for higher haircuts had come from fewer than half of its cohort of actual lenders, and, whilst it might well have been necessary to "work" the repo line negotiations hard, this was nothing new, and the repo supply market remained competitive.

1173. Mr Stomber recognised that CCC had noted, in July, that some of its repo lenders were now having their CMO desks review asset pricing, rather than automatically applying IDP prices, but he says that he did not regard this as alarming, merely a symptom of the caution which had now affected banks, following their being caught off guard by the Bear Stearns incidents.

*26th July 2007 – BOARD MEETING*

1174. CCC held a Board meeting in Guernsey on 26th July 2007, followed immediately by an ALCO meeting.  This Board meeting marks the earliest point of the Plaintiffs' claims that the Defendants acted in breach of duty.

1175. The entire Board attended both of these meetings, as did several members of Management, including Messrs. Greenwood, Trozzo, and Green.  In addition, personnel from PwC and Mourant attended.   As was usual, Ms Cosiol, who would later prepare Minutes, took handwritten notes.

1176. The Board meeting lasted about 3½ hours.  As with all such meetings, both its formal minutes, and the handwritten notes of Ms Cosiol are in evidence, and the individual Defendants all gave evidence as to their recollections of the meetings, obviously so far as they were able, so long after the event.   It is not, therefore, necessary to do more here than given an outline flavour of the meeting, and what was discussed, mentioning points of special relevance.

1177. First, the Board discussed the recent completion of the IPO and the low trading volume of CCC stock.

1178. The Board then moved on to consider a draft of CCC's second quarter financial statements, its financial results and the performance of its portfolio.  There had been detailed discussion and review of these accounts at an Audit Committee meeting that had taken place the previous day, and the Audit Committee reported on this to the Board.  The Board also reviewed and discussed the disclosures and information intended to be included in the MD&A ("Management Discussion and Analysis") which would provide a commentary on the financial statements for the second quarter of 2007, when these were released, in fact that day.

1179. There was a review of a proposed business model updated from the earlier version of February 2007, with comparative metrics, which was presented to the Board by Mr Stomber and members of the management team.   It was highlighted that CCC's asset classes were deliberately "systemically uncorrelated".   The metrics showed a reduction in the ratio of CCC's liquidity cushion to its 20 day VaR from above 2 in February, to 1.5.   However, it is said and I find this perfectly plausible, that this was accepted as being obviously explicable.  It was the natural and mathematically inevitable result of increased price volatility in the intervening period.

1180. Mr Trozzo stated that during the market shocks of early June arising from the Bear Stearns incidents, the liquidity cushion had worked as planned.  Mr Stomber confirmed that it had in fact never dropped below 20%.

1181. There was obviously a lengthy discussion of and questions about CCC's portfolios in both of its broad asset classes.   The detail of this was not (unsurprisingly and quite normally) recorded in the formal Minutes, but appears in far greater length, although necessarily in a less easily followed form, in Ms Cosiol's contemporaneous handwritten notes.  As regards the RMBS section of the portfolio, interest rate cap levels were discussed in particular.  There is

no recorded discussion of haircut levels, or possible demands for higher haircuts.   There was a similar review and discussion about the current credit markets and its impact for the significant but far less highly leveraged (because of its higher level of return) credit product portfolio then also held by CCC.

1182.  There is an issue, among other disputes, as to the extent to which concerns about financing "rollover" risk mentioned in Ms Cosiol's notes ("*can't take a flier on liquidity = bankruptcy*") were directed only at the leveraged finance asset portfolio, as the Defendants say, or were really evidence of a deep concern about CCCs business model in general, as the Plaintiffs suggest.

1183.  There was discussion about the mechanics of paying consistent dividends during a year, and the timetable to enable a dividend to be declared and paid in December.   The Plaintiffs draw attention to this, arguing that it demonstrates an inappropriate anxiety, in all the warning circumstances, that CCC should be able to declare a generous dividend.

1184.  Mr Stomber explained that owing to the recent market volatility, ALCO had taken a more prominent role, and was now meeting every two weeks.   Mr Stomber invited Board members to attend ALCO meetings.      He described the ALCO packs of information sent to its committee members.   The Board asked to be copied in on these, and this was subsequently done as a matter of routine.

1185.  Following Board discussion, the Independent Directors approved a prospective commitment on CCC's behalf to invest $25Mn over the next three years in a form of Carlyle investment known as Carlyle Global CLP Partners, although in the event this was never implemented. The Plaintiffs suggest that this is evidence of an attitude of either complacency or an inappropriate disregard of an obvious need at the time for extreme caution.   The Defendants say that it was a perfectly natural step in taking CCC's business forward in a manner which appeared appropriate as the situation appeared at the time.

1186.  There was then a brief discussion of the various administrative, regulatory and compliance meetings which several Board members had attended whilst in Guernsey, including with Mourant, the GFSC, PwC and Carey Olsen.      The Board also formally appointed Mr Green as CFO of CCC, and approved payment of the fees owed to CIM under the IMA.

1187.  In the Cause, the Plaintiffs stigmatise the approval of the payment of these substantial sums – about $6Mn - to CIM as reprehensible when CCC had recorded substantial, if unrealised, losses on its portfolio.   The Defendants say that the fees were properly payable under the terms of the IMA.   In fact I do not understand the Plaintiffs to dispute that as fact; they merely contend subsequently that such fees ought to be recoverable as part of their alternative claim against CIM for alleged total failure of the consideration for them.

### *26th July – ALCO Meeting*

1188.  The ALCO Meeting which immediately followed was attended by all Board members as well. This was a shorter and more technical meeting, which discussed current market circumstances and outlook, including what action the Federal Reserve Bank (the "**Fed**") might take, and the likely effects on the markets.    The main concern - and one which Mr Conway and Mr Stomber had already noted and remarked on - was a reduction in liquidity in the markets generally.

1189.  As regards CCC, the discussion focused mainly on the CCIL leveraged assets portfolio, with particular concern about maintaining liquidity and avoiding the risks of "debt maturity concentration", so as to reduce exposure to adverse market conditions.    In the course of this meeting, it was agreed, at Mr Stomber's instigation, that there should be an immediate freeze

on the purchase of credit products, which would free $30Mn which had been earmarked for that purpose for more general use, including supplementing CCC's liquidity cushion.

1190. This policy was implemented.     CCC never purchased any more credit products. Management did, however, on the same day, purchase three more tranches of RMBS as mentioned below.

*Other events on 26th July 2007*

1191. On the same day as the meetings in Guernsey, a member of Carlyle Group's own management committee drew the attention of certain Carlyle personnel, including Mr Conway, to an analyst's report predicting that house prices might drop by 9% over the following year.  Mr Conway recognised the potential seriousness of this in his response *"Tough times and will get worse. Market may melt down.  Liquidity has evaporated."*

1192. Also on the same day (26th July) CCC released its quarterly report for the second quarter of 2007.  The report began with a CEO Letter to Shareholders, which reviewed CCC's performance from 1st January 2007 to 30th June 2007.  It noted increasing signs of volatility in markets, described CCC's investment strategy, explained Management's reasoning behind this and its intentions going forward.  It professed an intention to be "*conservative*" as regards risk-taking.    Within the report, CCC's investment portfolio as at 30th June 2007, was described as comprising  $22.7Bn in assets, of which 95 % were RMBS and roughly 4 % were leveraged finance assets, with 25 % of capital allocated to the liquidity cushion.  CCC's repo agreements, totalling $21.29Bn outstanding, were listed and described in detail, the fees paid by CCC to CIM were disclosed, and CCC's relationship with Carlyle was described.

*End July 2007*

1193. That market liquidity was a great concern is apparent from internal emails in the last few days of July.  The Plaintiffs point out what they say were other, gathering, adverse signs which should have prompted action by CCC.

1194. On 26th July, in fact the same day as the Board Meeting, Bear Stearns tried to secure a 3% haircut for the future but again after negotiation and an "escalation" to higher authority, the 2% haircut was maintained.

1195. On 27th July, two potential new repo lenders to CCC, RBS and Countrywide, quoted 5% and 3% haircuts respectively for the establishment of new repo lines.   CCC chose not to proceed with them.   Morgan Stanley quoted a 3% haircut on new trade "temporarily', but this was for a mere $57Mn for two weeks and was again not used.  CCC's internal Repo Line Summary as at 27th July  records the requests for higher haircuts already mentioned, and their resolutions, but also -  and presciently - noted that Goldman Sachs were apparently resorting to the backdoor method of increasing haircuts by applying lower asset prices.

1196. On July 25th, 26th and 30th, Management purchased three tranches of RMBS totalling about $364Mn, which Mr Stomber later noted with some satisfaction, were at prices which meant that these were the three best deals in three years.   However, by the same token of lower prices, CCC experienced margin calls of another $20Mn which meant that, with the continuing review of market conditions during this short period, Mr Stomber took the view, which he discussed with Mr Conway and Mr Hance on 30th July and obtained their approval, that it was preferable to "*trade off a few cents in dividend yield to maintain liquidity*".

1197. The point behind this was that CCC needed to purchase securities on which to earn the income which would provide the dividend payments which investors expected.   An example of this, on 18th July 2007, has been referred to earlier.  CCC's assets - both its RMBS and its bank loans - paid off capital each month and CCC's business model was to pay out 90% of

income earned in dividends, but to reinvest these capital returns, to keep producing income. However, such reinvestment would also maintain the current level of leverage. If the capital was not reinvested, liquidity would increase and leverage reduce, but at the same time, the pool of capital on which income was being earned would diminish and so, therefore, would income. Increasing liquidity, therefore, was at the expense of income.

1198. However, on the following day, 31st July 2007, there was another adverse event. CCC's bank loan portfolio suffered additional losses, and as a result Mr Stomber took the view that an even more defensive strategy was needed. Again, he so informed Mr Conway, Mr Hance and also Mr Zupon, and he instructed his manager to "*go ultra safe*" and purchase no more securities at all.

1199. One large acquisition of RMBS ($1.34Bn,) previously contracted, was due for settlement that day and was settled. In fact one further such purchase, a secondary bond of some $73Mn, was contracted for that day before the message to cease purchases was sent to the Management team. It, therefore, was also settled a few days later, on 3rd August. That was the last purchase of RMBS ever made by CCC.

**The claims - July 2007 – summary of arguments**

**Plaintiffs' case**

1200. The Plaintiffs submit that there were cumulative signs of adverse conditions in the financial markets, which ought to have told the Defendants, by the time of the Board Meeting in Guernsey or at least by the end of July 2007, that CCC's business model was no longer soundly based but ran significantly greater risks than previously believed, and that a re-evaluation of it and remedial action were required, or at least increased caution. They list these signs as:

    (i)    significant changes in the repo market following the Bear Stearns incidents in June 2007;

    (ii)    clear signs of impending increases in haircuts being required by repo lenders;

    (iii)    rises in interest rate volatility;

    (iv)    recent rises in the APV for CCC's RMBS; data showed that in the first 10 days of June 2007, this metric had increased from a previous 0.55% to 0.79%, which, the Plaintiffs say, was approaching dangerously close to the figure of 0.85% used by CCC for its stress testing, based on the "worst case" of the 1998 LTCM crisis;

    (v)    the incurring of significant unrealised losses on the market value of CCC's RMBS portfolio since purchase; and

    (vi)    the fact that the IPO had been "difficult".

1201. The Plaintiffs submit that the Defendants ignored those signs, failed to adopt a risk averse approach, actually purchased – recklessly – additional assets at the end of July, and failed, as they should have done, to reduce leverage and/or increase liquidity by selling RMBS or raising equity capital; they failed to consider any such options, or to conduct an appropriate "worst case" or "downside" analysis to enable them to do so. Such steps as the Defendants actually took – broadly just ceasing investment in credit products, - were plainly inadequate. The Plaintiffs submit that the Defendants' conduct in this regard was a knowing, or reckless, breach of duty (and was consequently misfeasance).

**Defendants' case**

1202. The Defendants dispute the accuracy of certain of the factual allegations made, but deny, in any event, that any of the matters cited should have been seen, at the time and in context, as having the significance which the Plaintiffs now seek to attribute to them.   They submit that, viewed objectively and without the influence of hindsight, their reactions to the events as they happened were appropriate, responsible, and not in any breach of duty to CCC.  Taking into account Management's assessment of the causes of market volatility, that a rise in interest rates now appeared unlikely, and that CCC's liquidity cushion resource had never in fact fallen below its 20% guideline in the aftermath of the Bear Stearns incidents despite fears that it might, Mr Stomber did not consider that any wholesale reappraisal or change of CCC's business model, was required.     This view was both reasonable in itself, and reasonably appeared so to the Defendants.   Caution was exercised, and the degree of caution was both considered and appropriate.

**Discussion and conclusions – the claims relating to July 2007**

1203. I deal first with the allegations of breach of duty levelled at the individual Defendants in respect of this time.  I will consider the allegations against CIM in contract thereafter.   I deal with the allegations as made against the Entity Defendants in a later and separate section.

1204. The Defendants point out, properly and correctly, that the claims which the Plaintiffs are entitled to rely on, and to ask the court to decide, are those which are actually pleaded in its Cause.     Submissions at trial amounting to allegations of further or other breaches cannot give rise to any relief; their content can, at best, be treated as submission of evidence.   In the absence of an application to amend the Cause further, this is correct.

1205. Identifying the breaches of duty alleged in the Cause in any coherent form sufficient for them to be dealt with methodically is extremely difficult because of its construction.     Paragraphs 263 - 263F, contain the allegations said to be referable to July 2007.  There is a "summary" contained in paragraph 417 of the Cause, but I do not see the elements of this which are referable to July 2007 as adding anything of any substance to Paragraph 263.   Paragraphs 418B-418G and 418I to 418N of the Cause are incorporated into the claims made with regard to July 2007 by Paragraph 264, but they expressly contain only "particulars" of breaches, and thus, implicitly, of substantive breaches previously alleged.

1206. As I am concerned only with breaches of duty or suchlike which actually caused loss to CCC, I need first to identify, amongst the many and various breaches alleged by the Plaintiffs in the Cause with regard to this period (but the same approach will apply to any other period) the complaints of action or inaction which have a direct impact on CCCs' financial position.    I will refer to these as "effectual" breaches.     Other alleged breaches (framed in terms such as failing to "recommend" or "consider" or "analyse" or "discuss" or "insist on" particular actions, choices or events) are not themselves matters which actually caused any change in CCC's financial position, and are therefore either elements of the alleged effectual breaches at the time, or are evidence of supposed material circumstances.

1207. The effectual breaches are, I judge, those in Paragraphs 263C.5 -263C.8 and 263E.5 – 263E.7 of the Cause.  Although these appear to be framed in terms appropriate to claims of breach of duty of care, they are also characterised as breaches of fiduciary duty by paragraph 264, with the particulars supporting this characterisation being those additionally pleaded in paragraphs 418B et seq as mentioned.   The allegation of the consequent loss appears at Paragraph 265, (in fact repeating Paragraphs 263C.8 and 263F.8) and is that

> *"The losses incurred in or after July 2007 by CCC would not have taken place if the breaches by….CCC's Directors had not taken place or if the action required had been taken.  Such action comprised (a) selling down CCC's RMBS assets, thereby reducing its leverage and/or (b) raising additional equity capital and/or restructuring or orderly winding down of CCC."*

1208. I interpret the first sentence to include the complaint of positive steps taken (ie that the Defendants caused or procured CCC to purchase further assets) found in Paragraphs 263C.7 and 263E.6 whilst the complaint of failure to take any of the three options of the "action required" is the allegation of negative inaction.

1209. As already mentioned, these matters are pleaded both as negligence and, with the addition of allegations as to knowledge or motive against at least some of the individual Defendants, as breaches of fiduciary duty. Although the Plaintiffs claim to put the latter as their foremost case, the particular matters complained of are essentially about commercial judgement; they are about what course of action was best or right for CCC in the conduct of its business. It is therefore more natural, certainly at this first point, to consider the charges against the Defendants first as a matter of breach of duty of skill and care.

**(a)   Duty of skill and care**

1210. The first question is therefore whether the Plaintiffs satisfy me that the decisions complained of were decisions to which no reasonably competent director could have come, making this judgment with regard to each individual Defendant if and where necessary. The Defendants were each cross-examined about their knowledge of the various warning signs pointed to by the Plaintiffs in support of these allegations of breach, and the Plaintiffs have analysed their answers in detail, to support their case.

1211. There is no major dispute as to the facts of what happened. I have, on the one hand, the Plaintiffs' arguments, that the warning signs were such obvious warning signs of impending seriously adverse conditions for CCC with regard to its repo financing, that it was negligent, even to the point of recklessness or irrationality, to act or fail to act as the Defendants did. On the other hand the Defendants ask me to examine such submissions carefully to see whether they really justify the conclusions which the Plaintiffs invite. I have the Defendants' explanations, their submissions that their conduct was reasonable in all the circumstances then apparent, or as ought to have been appreciated, and their argument that the Plaintiffs' case is infected with hindsight.

1212. Weighing all these factors, including material expert evidence, I prefer and accept the Defendants' submissions.

*(i)   Market turmoil following the Bear Stearns incidents of June 2007*

1213. As to this, it is perfectly clear that these events came to the attention of the Defendants (at least Mr Stomber, Mr Conway and Mr Allardice) and were considered by them. The Plaintiffs' contention is that these ought to have been appreciated as a sign of fundamental adverse changes in the financial markets and repo markets in particular, but, and culpably, they were not.

1214. There may be a difference of view amongst the expert witnesses as to how closely these events were connected with the subsequent credit crisis of early August 2007, but this does not really matter. The crucial issue for present purposes is whether or not reasonably competent directors of a company such as CCC ought to have viewed them as a sure sign of problems to come.

1215. There is a difference of opinion here between, in particular, Mr Welles and Professor Hubbard. Having considered their evidence, I prefer that of Professor Hubbard. Whilst some participants in the repo lending market may have been of the ominous views of which Mr Welles gave evidence, I am not satisfied that this was sufficiently pronounced that it was the only tenable view generally, and in cross-examination, Mr Welles appeared largely to concede this. In any event, though, the very fact of the difference in view between them satisfies me that there could reasonably have been differences of view amongst market

participants, at the time, as to any wider implications of the Bear Stearns incidents for the markets.   I also observe that both Dr Carron and Professor Hubbard agree that the credit crisis itself did not really happen until August, and in fact can be virtually pinpointed to 9th August 2007.

1216. The Plaintiffs suggest that the Defendants are, in effect, damned by their own admissions in evidence that these events were "significant", and even that they appreciated this at the time, because they then failed to act appropriately.   They refer in particular the evidence of Messrs Stomber, Conway and Allardice.   However, that submission ignores the questions, how significant?  And how significant at the time?    It is perfectly possible to agree that a market event is "significant" whilst at the same time considering that its significance does not require the reaction of a wholesale change of strategy, rather than a suitable adjustment.   I find the Defendants' evidence to be consistent with this latter, and that it was a reasonable view.

*(ii)    Pressure towards higher haircuts.*

1217. Second, is the question of the claimed signs that the 2% haircut rate upon which CCC's business model was predicated, could no longer safely be relied on.    In this context, the Plaintiffs first lay stress on its fragility, on the grounds that it was, and ought to have been seen to be, "concessionary".    This argument seems to me potentially to prove too much, because it applied also at the time of the devising of CCC's business model, and before its IPO.   It would therefore entail that this was devised or pursued without appropriate care. This, however, is a proposition which the Plaintiffs have conspicuously not advanced, and virtually disavowed in their express acceptance that they are not arguing that the original devising of CCC's business model was negligent.

1218. However, in fact I do not find the description "concessionary" either helpful, or actually justified in any material way.   I find that the weight of the evidence is that the 2% haircut was at the advantageous end of the range of haircuts for assets of the "safe" quality of CCC's particular RMBS, but that the advantage of being at the beneficial end of that range was a normal and reasonably expected consequence of CCC's connection with a market entity of the size and reputation of the Carlyle Group.   It is also clear that Mr Stomber's negotiations with repo counterparties exploited – and none too subtly – this relationship, which was already well-established.   I see nothing to criticise in this approach, nor any reason why it should not have reasonably been expected to continue to be exploitable as matters appeared in July 2007.

1219. The Plaintiffs submit that even leaving that consideration aside, it is "*undeniable*" that "*by June* [sic] *and July*" CCC was under mounting pressure to pay higher haircuts.   The Defendants do deny it.    They say that the pressure to higher haircuts was really not significant, and needs to be viewed in the light of the fact that, as Mr Welles conceded, accepted haircut levels had not changed through the past 20 years, even during earlier times regarded as "crises".   They point out that whilst there had been some (but they say fewer than the Plaintiffs would interpret it) attempts to impose higher haircuts, CCC never had to accept any increase but had always been able to negotiate the rate back to 2%, without real resistance.   At this time, July 2007, the warnings and attempts to secure higher haircuts had also come from parties who had apparently suffered directly in the Bear Stearns incidents.   A repo lender's attitude to financing will be influenced by its own idiosyncratic financial circumstances, and repo lenders were in competition.

1220. The Plaintiffs stress the seriousness of maintaining the assumed haircut level of the business model for CCC's continuing viability, noting that Professor Hubbard saw funding, or financing, risk as the central and the only real risk in CCC's business model, and was even prepared to describe an increase in haircuts as CCC's "key" financing risk.    The Defendants accept this, as indeed they have to; the evidence certainly shows that being subject to unavoidable demands for higher haircuts would be a major problem for CCC on its

established business model.   It would in effect invalidate this for the purposes of its declared objectives as seen at the time of the IPO, namely the generation of attractive double digit risk adjusted returns, requiring the magnifying effect of a high level of leverage on the small net returns generated by the RMBS.

1221.  For every 1% increase in haircut across a portfolio of $23Bn, CCC would be obliged to use $230Mn of its own capital as direct investment in RMBS, instead of being able to use that sum merely to provide the 2% balance required to purchase or hold 50 times that amount of RMBS.  The risk of increased haircuts was therefore, intrinsically serious.  But the key point is whether, in the circumstances of that time, it was culpable of the Defendants not to read the "signs" now focused on by the Plaintiffs as indications that that risk was so likely to materialise in reality, that it was imperative to take anticipatory remedial steps which would in fact be outside and contrary to CCC's then business model.

1222.  In my judgment it was not.  I have referred to all the instances of requests for higher haircuts because the Plaintiffs point to and rely on these, but simply doing so runs the risk of giving them the appearance of greater significance than is really appropriate, because it diverts attention from the fact that the great majority of CCC's repo funding was rolling over at a 2% haircut without incident.   I am satisfied that CCC apparently had sufficient capacity in available "soft" repo lines to justify confidence, at that time, that it could obtain finance on its chosen terms from elsewhere in the market, despite a handful of individual suggestions of higher haircuts.

1223.  I am also satisfied that such requests as were made were reasonably seen as the result of individual lenders' circumstances, and not a problem of wider or deeper significance.     A decision as to whether such incidents as there were demanded an unusual course of action in response was a matter of business judgement.      Businessmen are required to exercise judgement about the balance of disadvantage between a risk and its potential consequences (the likelihood of materialisation coupled with the gravity of effect if it does) and any possible steps which might avoid or counteract it.   I am simply not satisfied that, without the benefit of hindsight, the response of CCC at this time – the end of July 2007 - to the reasonably anticipatable degree of risk of being obliged to accept greater haircuts than the expected 2%, was outside the scope of a reasonable reaction in the exercise of such business judgement.

1224.  The Plaintiffs suggest that CCC's action in rolling repo finance away from certain counterparties is evidence of a greater sensitivity to the seriousness of the position at the time than they now admit.     They suggest that the explanation that this was attributable to following better interest rates rather than any effect of requests for higher haircuts is colourable.     They cite Mr Stomber's oral evidence that if Mr Ng had in fact rolled finance because of an interest rate of 5.30% rather than 5.29% this would have been "silly".  However, I balance this individual answer and its context against other scattered pieces of contemporaneous evidence suggesting that those concerned with effecting repo transactions at CCC did, indeed, seek to keep interest rates down to the minimum, either for the direct saving, albeit small, or as a matter of psychology for negotiation with repo counterparties.   I am satisfied that this consideration did come into play.    I note that it was Mr Ng, relatively junior, who seems to have been instrumental in this particular transaction.  I have no doubt that his general instructions were to obtain the best terms possible including as to interest rates, and I find it perfectly plausible that he would have applied such a general guideline as a rule.

1225.  In short, I am not persuaded either that, as at the end of July 2007, there was an ominous intensity of questions as to the level of haircuts, such as to suggest a serious warning of trends to come, or that CCC reacted inadequately or inappropriately to such indications as there were.

1226. In their closing submissions on this point, the Plaintiffs rely on the fact that, in connection with financing risk generally, CCC or CIM for CCC (ie Mr Stomber in particular) had failed to obtain structured repo financing (ie fixed financing for longer terms than 30 days), despite this apparently being intended prior to the IPO, and an intimation to the Board that this was being pursued.  The Plaintiffs criticise the fact that this had never been followed through, and rely on this to submit that recognition of the desirability of structured or longer term repo which was subsequently ignored is evidence that the Board appreciated the vital need for securing stability in CCC's repo funding, but culpably lost sight of this.

1227. The Defendants accept that the possibility of structured repo was contemplated and was earlier pursued, to some extent with Bank of America, but that it then fell away.   However, this becomes a mere point of evidence (I do not think it is even an allegation made in the Cause), because no negligence before 26th July 2007 is alleged.   The only material questions go to the Defendants' reaction to events of July 2007 in the circumstances in which they then actually were.   I do not think that the reasons why structured repo was not pursued in earlier times are of any materiality.   On the evidence, not only was structured repo unusual but it was likely to be more expensive than the norm of 30 day repo.  However, given the Plaintiffs' acceptance, that CCC's business model, which was predicated on the availability of 30 day repo at a 2% haircut to finance the holding of Agency RMBS, was a reasonable model to adopt at the time, this point strikes me as irrelevant.

*(iii)   Increased interest rate volatility*

1228. The third major suggested "warning sign" is increased interest rate volatility.   Measures of interest rate volatility showed this to have increased from 15% to 18% in the second half of July, and this was recognised in information provided to the ALCO meeting of 26th July, and, I find, probably discussed at the Board Meeting itself.

1229. Increased volatility is a measure of uncertainty.   Increased interest rate volatility is disadvantageous for RMBS capped floaters, because it increases the perceived risk of the cap on the coupon coming into play, limiting the return, reducing the benefit of the investment compared to LIBOR and reducing the attraction of the RMBS capped floater, leading to price reductions in the market and thus to potential margin calls under financing agreements.   The extent of this effect, though, will depend on the current levels of interest rates to be compared to the cap; obviously the effects of volatility will be greater if interest rates in general are already nearer to the cap than if they are lower and with more headroom.  No doubt for the above reasons, interest rate volatility was a metric included routinely in information supplied by Management to ALCO, and was regarded as one of the five underlying drivers of the price of CCC's assets.

1230. The Plaintiffs characterise the increase in interest rate volatility mentioned above as "*another critical warning sign*" for the Defendants.   I do not accept the description "critical"   which I find to be exaggerated.  Whilst I accept that volatility is indicative of some instability in the markets and is undesirable, the evidence does not convince me that this change was, or should have been seen to be, a factor of any more than broad significance.

1231. There was much evidence in the case about the effects of anticipated changes in interest rates on the prices of CCC's RMBS in earlier times.   This appeared to be being gone into by the Plaintiffs in order to counter an expected claim by the Defendants that falls in the prices of CCC's RMBS in May and June 2007 were attributable to rises in interest rates and the delayed intervention of the Federal Reserve, and that they were (or were reasonably seen as being) something separate and distinct from the matters which subsequently caused either the Bear Stearns incidents, or the later systemic market crisis of August 2007.   Owing to its timing, I do not find this point to be of any real relevance in the case, but for what it is worth, I would accept the Defendants' submissions as to whether it was reasonable to interpret those events in that way.

*(iv)    Increased asset price volatility*

1232.  The fourth warning sign is said to be the recorded increase in the volatility of prices for CCC's RMBS assets, and the implications of this, which ought to have been actively heeded, as regards the inadequacy of CCC's liquidity cushion.

1233.  The Plaintiffs' central argument focused on the conclusions which they submitted should have been drawn from one particular metric, namely that of the APV (Average Price Volatility) applicable to CCC's RMBS assets, and its convergence towards the figure which had been used to stress test CCC's business model and fix the required liquidity cushion to support CCC's leverage, – which was itself claimed even to be conservative.    I have previously explained that the stressed VaR test which had been used to calculate an appropriate figure for CCC's liquidity cushion in the light of its highly leveraged business model had used the market conditions equating to those of the worst financial crisis in reasonable memory (in fact those of the 1998 LTCM crisis) to calculate a 20 day VaR at a 99% level of confidence, and then taken 125% of that figure.  This computational figure could then be compared with CCC's actual liquidity cushion at any time, to provide a measure of the risk that CCC would run out of cash if presented with margin calls.

1234.  The index figure for the APV of CCC's assets which was used in the stress test model had been 0.85%.  Between mid-June and mid-July 2007, CCC's ALCO pack metrics recorded an increase in that metric from 0.55% to 0.79%.  The Plaintiffs submit that this increase was not merely a warning sign in itself, but its approach to the stress test figure showed that it was a particularly strident such warning sign.

1235.  The Defendants submit that this argument is endowing figures and statistical tools for management with undue intrinsic weight, and ignores the fact that they can and should always be interpreted by those who are in the market and making contemporaneous business judgements.  First, they point out that the figure was an annualised moving average of two years' data, which meant that once an extreme spike in the figures occurred, this would affect the figure for as long as that spike was within the range of collectable data; its implications therefore needed to be understood and analysed in context, and with this effect in mind.   If the figure turned out to be a mere spike in the general graph, it could justifiably be ignored as a statistical outlier, since otherwise it would create a false perception of a reasonable degree of caution.  This could be seen from the fact that the moment this spike dropped out of the historic period being used to calculate VaR, there would be a major shift in the metric, and it would be absurd to treat this as an accurate representation of a change in risk level actually occurring at that point.  Second, the apparent approaching of the figure itself to the "danger" level of 0.85% used in the stress test model was not a proper comparison, first because the stress test figure had had to be derived from an index of floater prices at the time because actual data was not available from 1998, and second because the APV used in CCC's calculations was an internal figure derived from CCC's Polypaths software and not actual market data.

1236.  I observe, here, that in the course of this argument, the Defendants pointed out that the graphs of this metric provided by the Plaintiffs appeared to suggest that CCC crossed the "danger" threshold of 0.85% during July 2007, but that this was a spurious impression, created by the misleading and illegitimate device of "joining up the dots" on a grid represented by measurements at particular dates, when the transition between measurements was not a straight line progression.  I note this criticism.  It underlines the need to beware of superficial appearances from expert generated data.  It also underlines the reliance of the court on experts appreciating the possibility of creating such erroneous impressions in non-experts.    It is the kind of point which has made me feel the uncomfortable imperative which I mentioned above, as to having to have my wits about me with regard to some of the propositions advanced by the Plaintiffs.

1237. Third, and as Mr Stomber emphasised, decisions about appropriate risk management had to be made on the basis of a judgement of all available evidence, and an effort to understand what was actually going on, rather than being mechanically driven by particular metrics. These metrics, including the VaR calculated figures, were simply tools to be used as an aid to judgement.

1238. I accept all these arguments and evidence, which I find to correlate with the expert opinions and approach of Dr Webster, whose views in these respects I find more persuasive than those of Professor Das, as I describe in detail later.

1239. A further submission of the Plaintiffs in this regard was that Mr Stomber ignored and unreasonably overruled warnings from Mr Trozzo with regard to a more prudent operation of CCC's liquidity cushion in the light of fallen prices for CCC's RMBS.   On examination I do not find this particular incident to be of concern.   It took place in the context of an earlier acquisition of a tranche of RMBS at the beginning of June 2007, in connection with the appropriate reaction to the Bear Stearns incidents.   Market conditions and available knowledge were then different, and I am satisfied that they were fast changing.   This incident itself occurred before any time when the Plaintiffs make any complaint about the Defendants' conduct.   However, as it could have materiality to any general criticism of the attitude of Mr Stomber towards use of the liquidity cushion, which is a key criticism made by the Plaintiffs regarding later events as well, I will deal with it here.

1240. Mr Trozzo's advice was with regard to how liquidity cushion parameters ought, in his view, to be applied to integrating the acquisition of a new tranche of RMBS into the general existing liquidity cushion scheme.  Mr Stomber explained in evidence that the reason for his disagreement with Mr Trozzo was that the liquidity cushion, which had by then been depleted somewhat in paying margin calls, would replenish itself as markets "*came back to normal*" such that no adjustment to its underlying principles needed to be made.   The Plaintiffs criticise this as being inappropriate and reckless.

1241. I reject this.   Mr Stomber explained – and this was a point which he wished to emphasise in his evidence about the workings of a liquidity cushion – that the monies expended from a liquidity cushion when margin calls are made are not "lost" to the payer.  As he put it, it is still the company's money; it is just sitting on the books of the lender.   As and when prices rise, there will be a reverse margin call, and the monies will be paid back to the paying company, thereby replenishing the liquidity cushion.   The point of a liquidity cushion (he emphasised) is that it is available for use in times of need.  Of course, once you have used it to weather times of need, it is not there until it is replenished, but it follows that the real issue is how far it is reasonable (or culpable) to regard it as likely that there will be a return to previous conditions.

1242. In other words, the material judgement is: how long will "abnormal" times continue, whether the current "abnormality" is in fact the new "normality", and how likely is it that times could become even more "abnormal", and therefore adverse, than they currently are?  Prediction of these issues is a matter of judgement, obviously to be made in the context of what has happened in the past.   An appropriate reaction to the prediction is also a matter of judgement, depending on the balance of risk and disadvantage already mentioned, the degree of likelihood in the prediction, the perceived magnitude of adverse consequences if it is wrong, and the availability of any further safety measures that can be taken in this event.   I find that Mr Stomber's reaction to Mr Trozzo's advice was within the range of reasonable judgements of the above matters, at the particular time and in all the circumstances.

1243. I should add that I find Mr Stomber's reaction to the spikes in price volatility in June (which was, on the second such occasion, to suspend asset purchases so as to enable all payments from CCC's assets to go towards increasing liquidity) to have been reasonable and appropriate at the time.   It also, and importantly, demonstrates his attention to monitoring

market circumstances and trying to react with appropriately fine-tuned responses to events which might need a reaction.

1244. I further add here, that the Plaintiffs appeared to argue, as part of their submissions with regard to the level of liquidity cushion which could properly be taken into account in the context of this warning sign, that this should be based on CCC's equity before the IPO, and that the net proceeds of the IPO should not be included in an assessment of liquidity.   The Defendants submitted that this was wrong; CCC had that capital resource, regardless of its origins.   It was therefore available for use as part of the liquidity cushion if needed, and calculations, which would now be based on 20% of the increased equity generated by the IPO, could rightly take that into account.

1245. I accept the Defendants' arguments.   The Plaintiffs' approach seems to me to be calculated to put a worse complexion on the statistics than they fairly deserve.

*(v)   Previous loss of asset value*

1246. The fifth warning sign was the previous unrealised losses on CCC's RMBS assets since their purchase which the Plaintiffs describe as "significant".    They point first to the fact that the decline in prices in May and June was "unanticipated".   I agree and find that it was, but this seems to me to be stating the obvious and to add nothing of substance.

1247. They refer (correctly) to the fact that CCC had paid out $82Mn in margin calls, and that this would have been more than half of its liquidity cushion as at mid June 2007.   I agree, but, again, it does not seem to me that that comparison adds anything to the circumstances requiring consideration in late July 2007.   As long as prices did not decline further, this was not a problem, and in "normal" times, judging by history, it would right itself as prices reverted to previous levels.

1248. Mr Stomber, from his experience and in accordance with market logic, expected a flight to quality, such as he considered had arisen in 1998.   The Plaintiffs submit that he was mistaken in this, and that he later acknowledged this.   However, I understood his evidence to be simply an acknowledgment of what had happened in practice and that his expectation had been wrong, rather than being an acknowledgment of fault.

1249. Much of the evidence in this regard was highly technical, and consisted of retrospective analyses (by Dr Maini) of component elements which he considered should be assumed to have contributed to effects on asset prices.   I am not satisfied that analyses such as these, at this level of detail, were a usual or commonplace requirement in managing an enterprise such as CCC even at the material time,  but in any event, it seems to me that they demonstrate only possible conclusions as to such attributions and not necessarily the only reasonable conclusions.   These kinds of calculations seem to owe quite a lot to art rather than science, the results often depending on the assumptions which are used, which will be matters of subjective judgement.   The nature and quality of such evidence is therefore not such as to satisfy me that it would be right to base findings as to Mr Stomber's contemporaneous judgement upon it.   In short, I am not satisfied that Mr Stomber's view of the likelihood of CCC benefitting from a flight to quality was unreasonable, and certainly not so ill-founded as to have been culpable.

1250. In the end, therefore, I find that this fifth "warning sign" is not really anything of separate significance from the other claimed warning signs highlighted by the Plaintiffs.

*(vi)   The difficulty of the IPO*

1251. Sixth, there is the suggested "difficulty" of the IPO.   I regard this as a total red herring.  The difficulties of the IPO concerned appropriate pricing of the shares, (which had to be reduced)

and the ability to generate sufficient take up of them.   In other words, the problem was making investment in CCC a sufficiently attractive proposition at the time of the IPO.   The Defendants recognised that these matters demonstrated that the financial markets were not as rosy or robust by the time of the IPO as they had previously been.   They seem to have attributed the difficulty to either a misjudgement of the appetite of investors for a pure yield vehicle by the time the IPO took place, or simply the general deterioration of market conditions since 2006 when the concept was launched; there is always the risk that market conditions and sentiment will change during the necessary lead time to an IPO.   I find this thinking and reaction to have been a reasonable view at the time.

1252. The IPO had, though, still been successful in raising an acceptable amount of capital for CCC, even if less than originally anticipated or hoped, and the features leading to its difficulty, mentioned above, do not seem to me to have any demonstrable link to the main two "threats" facing CCC, namely funding risk (loss of the continued availability of repo lines on satisfactory terms) and asset price decline (the generation of unsatisfiable margin calls), nor to suggest that a reappraisal of CCC's business model was now vital to its survival.   In my judgment these were, once again, matters which carry no weight in any assessment of the culpability, or otherwise, of the decisions taken by the Defendants at the end of July 2007.

## The 26th July Board Meeting

1253. The Plaintiffs criticise the absence, or paucity, of apparent discussion of the above factors at the Board Meeting of 26th July 2007.   They suggest that this was culpable and that if "proper" attention and discussion had been paid to them, then the decisions which are then criticised, the material "effectual breaches" therefore, must have been different.

1254. I do not accept this.   First, the discussions which took place at the Board meeting appear, even from the limited formal Minutes, to have been suitably wide ranging.   They reflect that there was then (and I find, reasonably,) greater concern for CCC's credit products because the worrying features of the market then appeared to be related to the incidence of credit risk and its effects on the markets.   I am also satisfied from the totality of the evidence, including the oral evidence, that the discussions which took place were, in practice, more wide ranging than recorded in the Minutes.   I find this to be amply demonstrated by Ms Cosiol's hand written notes, which were themselves not verbatim, even though comprehensive.

1255. The question whether "adequate" consideration or discussion of  warning factors regarding CCC's RMBS assets took place  at the time of the 26th July Board Meeting depends on the degree of importance which was appropriately attached to those matters at the time.   I am satisfied that given the significance reasonably attached to those features at the time by CCC and its Management, the amount of information shared with the Board and the consideration and discussion which was given to them was proper and reasonable.   I accept that haircuts are not specifically mentioned in the written records.   I find that it was not unreasonable that the degree of risk of higher haircuts should not have been perceived at that time as so serious as to generate a discussion sufficient to find its way into written records.

1256. For the avoidance of doubt I am also satisfied that the reference to *"can't take a flier on liquidity = bankruptcy"* was indeed a reference to the leveraged finance assets in the portfolio.   I conclude this from its context in the notes and in particular from a later related reference to "rollover risk" (which was funding, or financing, risk) not being an issue until November 2007, which applied to such credit assets.     However, I do also consider this comment to be evidence of a general degree of caution in the mind and attitude of, in particular and centrally, Mr Stomber.

1257. I find this further reflected in the fact that Mr Stomber suggested a possible freeze on the purchase of new credit assets at the Board Meeting, which was taken up at the subsequent ALCO meeting.   I note that this shows a distinct change of mind by Mr Stomber from his

position only a week earlier, (and during the period when the Plaintiffs make no criticism of the conduct of the Defendants), on 18th July, when he had instructed a $25Mn investment in a leveraged finance asset which had been held up or reserved during the market turbulence associated with the Bear Stearns incidents to be made "asap" in order to facilitate meeting CCC's dividend target.   I find this to be evidence that Mr Stomber was exercising a sensitive approach to CCC's asset holding or acquisition, according to changes in market circumstances.

1258. I am also satisfied that the references in the CEO letter and MD&A commentary for the second quarter of 2007, to CCC's approach being "cautious" or "conservative", were not only genuinely intended but were a reasonably apt description of CCC's attitude at the time.  This is always, of course, in the context of CCC's business model, its objectives and the degree of risk which would be appropriate to achieving those objectives.

1259. This sensitive approach is further demonstrated, I find, by the sequence of steps which were actually taken on behalf of CCC by the Defendants or CIM under Mr Stomber's management at that time.   At the ALCO meeting immediately following the Board Meeting, it was agreed that CCC would cease all purchase of credit products.   In the light of indications of some pressure on repo terms which occurred simultaneously with and in the few days immediately following the 26th July Board Meeting, Mr Stomber announced that he was also considering the suspension of acquisitions of RMBS as well.  Then, on 30th July 2007, he instructed this.  This was a move which he characterised as going "ultra-safe".   I find this progression to have been apposite in the context of how market conditions were appearing at that time, and some uncertainty as to how they might develop.

1260. The Defendants submit that when CCC's position up to the end of July is considered without hindsight, on every relevant measure it appeared to have ample liquidity to meet its reasonable foreseeable needs.  Its liquidity cushion was in excess of 20% and in excess of the 20 day VaR for the RMBS portfolio, which translated into the proposition that on the basis of 99% probability, it had enough liquidity still to meet the most severe market disruption recorded in past financial history, for one month.   I accept the thrust of this submission.

**Other points**

1261. Focusing on their submission that CCC's level of leverage was so high as to be clearly unsafe, at any rate in the market conditions beginning to emerge in July 2007, the Plaintiffs have pointed out that this was far greater than that of other entities which CCC regarded (from the evidence of its monitoring of their performance) as its "peers" or appropriate comparators.

1262. It is certainly the case that CCC's leverage ratios were greater, and significantly greater, than those of the funds with which it compared itself.  However, I do not consider that this is anything which ought in itself, to have caused CCC to re-evaluate and change its business model at this time.     CCC's competitors had different business models, which were influenced by their different aims, different assets and asset allocations, and probably different risk management policies.  CCC's intended leverage ratios had been carefully designed and mathematically modelled.  They had, together with the risks associated with the model, been stated clearly in its PPMs and OM and were therefore apparent to and accepted by its investors as the concomitant of the attractive rate of return expected to be generated.  The fact, therefore, that peer companies either had lower leverage ratios, or reduced these in response to market conditions at this time or later, does not strike me as anything more than a matter to be noted.   I certainly do not accept that it is a yardstick by which CCC's performance or actions could properly be measured, and I am satisfied that it could not reasonably be regarded, in itself, as a driver for CCC to change its business model.  Any such

decision was one to be taken by the Defendants on the basis of their perceptions of market conditions affecting CCC's individual circumstances and assets, and advice with regard to this, not on the basis of following suit behind others.

## Summary and conclusions

1263. In general summary, I find that the position prior to the summer of 2007 was that the US repo finance market had historically been "wide and deep" ie both sustained and solid.    In layman's terms, there had been plenty of money around to provide steady and plentiful financing on terms which varied little.    RMBS of the type in which CCC proposed to and did concentrate the larger part of its investments, ie Agency capped floaters, were regarded as safe, high quality assets, with no real risk except when benchmark interest rates might rise to near the imposed cap.    CCC's business model had (reasonably) been based on the assumption that these two features of the financial markets  would endure for the foreseeable future more or less as they had in the established past, and that markets would not suffer temporary shocks of a greater magnitude than that generated in the most severe such shock in financial living memory.    The risks of these assumptions being ill-founded were more theoretical than real. They were, however, conceivable, and were effectively flagged up in CCC's offering documents.

1264. During the run up to CCC's intended IPO, there was some downward movement in the prices of CCC's RMBS, but this was reasonably viewed as the result of concerns about possible interest rate rises.    The Bear Stearns incidents arose from risks (credit risk) which applied in the sub-prime RMBS market, and which could reasonably be viewed, both from logic and from historical perspective, as not affecting CCC's assets, either directly or by contagion. CCC successfully weathered the immediate jolts in the markets caused by these and reasonably viewed any apparent reactions rebounding on it (CCC) by those with whom it was habitually dealing as idiosyncratic reactions, rather than harbingers of general systemic doom.

1265. CCC's Management had regard to the events of the market and were duly attentive and respectful of them.    They (particularly Mr Stomber) kept relevant indications under review. They did not do nothing, but took prompt and proportionate steps to react appropriately to the situation as it appeared, first ceasing the purchase of credit products and then the purchase of RMBS shortly afterwards.

1266. Those with the direct responsibility and involvement amongst CCC's Board monitored and reacted to the events in the market with a degree of care which was appropriate both to their reasonably judged significance and to the personal level of knowledge and expertise of those involved.    They took and explained appropriate information to the Board Meeting.    Those with less personal involvement, knowledge or expertise, who followed the guidance of their more expert co-directors did so reasonably and appropriately.    The Board Meeting, ALCO Meeting and other less formal communications between members of the Board were reasonable, appropriate and sufficient discussions.

1267. Focusing, therefore, on the specific breaches of duty of care alleged against the Defendants with regard to July 2007, I am satisfied that there was no negligence in their failure to sell RMBS at this time.    I find that the steps of suspending all asset purchases in slightly staggered timing, was a reasonable prudent reaction to market circumstances at this time. Whilst there is no evidence that the Defendants considered raising equity capital, I do not find this to be in any way a criticism; I do not see the apparent demands of market circumstances and the state of CCC's liquidity cushion as reasonably requiring this, and it would in any event have been somewhat impractical so shortly after the IPO.    As regards the allegation of failure to restructure or carry out an orderly winding down of CCC, in fact the cessation of asset purchases and use of income to supplement the liquidity cushion was itself a form of such restructuring, and it was, as I have said, an appropriate reaction to perceived market circumstances.

1268. As regards the alleged breach of duty  by the positive action of making further purchases of RMBS even after the decision of 30th July 2007 to cease to do so, I reject this as a matter of fact.  I find that these were in fact the completion of orders, reasonably placed at the time when they were placed, before the decision to cease purchases of RMBS was made.

1269. The Defendants described this allegation as a misunderstanding by the Plaintiffs; they had not allowed for the gap between contracts and settlement dates.  I find the Plaintiffs' riposte, that in that case it was a breach of duty not to unravel the transactions, quite extraordinary.  There is no evidence that this could have been done, still less as to the beneficial financial consequences of doing so, and the reputational consequences of seeking to undo such commitments could plainly be damaging.   There can be no criticism in CCC's not considering doing this at the time.

1270. The above discussion embraces my findings on all the incidental matters alleged as breaches of duty in paragraphs 263C.1-4, and 263E1-4.

1271. I conclude that the Plaintiffs do not satisfy me that the decisions complained of were decisions to which no reasonably competent director could have come, and this judgment applies to each of the individual Defendants, taking account of his particular skills and experience.  The Plaintiffs therefore do not satisfy me that there were any breaches by the Defendants of their duty of care towards CCC in July 2007.

**(b)     Breach of fiduciary duty**

1272. The above findings mean that I regard the Defendants' decisions and actions as reasonable, viewed objectively as well as subjectively.     It is therefore not really necessary for me to consider the Plaintiffs' plea that breaches of the Defendants' duties at this time were not merely negligent but were improperly motivated.   This is because, if the Defendants, or any of them, did not give proper consideration to CCC's best interests or any other aspect of their fiduciary duties, the *Charterbridge* test would apply.   My findings above means that I am satisfied that, viewed objectively, the decisions which are criticised were within the range of decisions which a reasonable director could properly regard as being in the best interests of CCC, and therefore there would be no liability on the *Charterbridge* test.

1273. In fact, the Plaintiffs did not seem to me to argue their case with regard to the end of July 2007 seriously on the basis of breach of fiduciary duty as distinct from duty of care.  Their arguments in general raise possible motivations on the part of certain of the Defendants, which they suggested drove the conduct which they complain of as being reckless or irresponsible.     The only aspects of this pertaining to claims of breach of fiduciary duty as opposed to negligence at this time (July 2007) were that Mr Conway and Mr Stomber were not prepared to suffer the reputational damage to Carlyle which the actions of CCC's selling RMBS or seeking to raise further equity capital were likely to cause so soon after CCC's IPO, and an unduly singleminded pursuit of CCC's dividend target, particularly on the part of Mr Stomber, and insofar as that was a further reputational consideration for Carlyle.

1274. In practice, these points were relied on more strongly in respect of later allegations of breach of fiduciary duty, and I therefore do not see the need to consider them here, as it would be pointless to do so.   I would not have regarded them as made out in respect of July 2007, but, for reasons already given, any other such finding would be immaterial in the light of my conclusions that the decisions actually made and implemented by the individual Defendants were within the range of decisions which a reasonably careful and properly loyal Board of Directors could have made for CCC in all the circumstances.

**(c)     Contractual/tortious claims against CIM**

1275. The allegations of breach of contract (or tort) made in the Cause against CIM appear in Paragraphs 419.1-21 and Paragraph 424B.   Paragraph 419 contains a list of aspects of what was done or not done on behalf of CCC throughout the period from July 2007 to February 2008, at varying levels of specificity, which are attributed to the advice of CIM.   Insofar as they are at all specific they set out matters of complaint which are also made against the individual Defendants as directors.   Paragraph 424B refers specifically, but with the convolution of also cross-referring back to numerous other paragraphs, to actions alleged also against TCG and Holdings as well as CIM, with additional assertions that they constituted breaches of fiduciary duty in not being in CCC's best interests but rather being in, or prioritising, the best interests of TCG or Holdings.   Insofar as these matters are apparently alleged as totally freestanding breaches of fiduciary duty, that basis of claim is, as I understand it, no longer pursued.   It appears to leave, however, these same allegations against CIM made on the basis of breach of a fiduciary duty implied into the IMA.

1276. I have explained above my general finding that a working starting point with regard to the content of the contractual duties owed by CIM to CCC is that they can be treated as co-extensive with the similar claims made against those individual Defendants who had the relevant increased material expertise which one would expect to find in an investment adviser providing the services supplied to CCC by CIM under the IMA.   This is because I find, for practical purposes, that the contractual duty of care imposed on CIM under Delaware law under the IMA is materially indistinguishable from the duty of care which I would find to be imposed in similar circumstances in Guernsey law, and is further materially indistinguishable from the duty of care resting on a director of CCC with the relevant increased material expertise.   In effect, this means Mr Stomber, and in principle, it would also mean Mr Zupon, although in practice this does not seem to arise on the facts.

1277. Mr Stomber was for all practical purposes the personification of CIM with regard to the performance of CIM's advisory functions and duties under the IMA.   He was also responsible in a supervisory capacity for CIM's operational functions and duties and would have been responsible for the execution of these by his team of subordinates.   As regards this particular period, it is the case that, apart from Mr Stomber, Mr Zupon was in a comparable role as both an employee of CIM for the purpose of acting for CCC, and a non-voting Board Member of CCC.   It is also the case, though, that Mr Stomber was senior in the hierarchy and effectively in ultimate charge of policy advice, with the ability to call on the advice and assistance of Mr Zupon as he saw fit, having regard to Mr Zupon's different sphere of expertise.

1278. I have held above that the decisions in which Mr Stomber advised or participated were not in breach of his duty of care to CCC as a director of CCC.   By the same token, I find that those decisions, taken in his dual role of advising CCC as a non-voting director of CCC but also as part of investment advice and management functions provided by CIM, were no breach of CIM's contractual duty of care to CCC either.   I would find the same in respect of Mr Zupon, so far as material.

1279. Assuming the existence of a contractual fiduciary duty, I cannot see any grounds of substance for suggesting that that was breached by any matter of complaint regarding July 2007, but if any further reasoning with regard to this is needed, it will be found later where I consider these allegations at the point in the history where they have more substance.

1280. The upshot is that I dismiss the claim of breach of contract (or tort) against CIM.

**(d)     Wrongful trading**

1281. There is no claim for wrongful trading at this time.

**10.     The Claims:  AUGUST 2007**

***Did the Defendants react culpably inadequately to the market crisis conditions of August 2007?***

1282.   This and September 2007 are probably the key months as regards the Plaintiffs' case.

***Market conditions in early August 2007***

1283.   On 2nd August 2007, Mr Stomber reported to Messrs Conway, Hance and Zupon that CCC's RMBS portfolio value had improved by $4Mn, but that its bank loan portfolio value had lost another $10Mn.   There was email discussion about whether the widely reported problems in the sub-prime market would now spread to other sectors; on 1st August, the two failed Bear Stearns hedge funds had declared bankruptcy.   Mr Stomber's view from his previous experience in 1998, recorded in emails in early August 2007, was that the contagion caused by general apprehension of anything which was mortgage-backed should not persist, because the market was now beginning to understand and differentiate risk.   Whilst on the look out for a beneficial opportunity to buy assets, he would still, though, operate defensively.

***7th August***

1284.   However, on 7th August 2007, matters took a turn for the worse.    CCC's RMBS portfolio declined in value by $30Mn and Cantor Fitzgerald, one of CCC's repo lenders financing about $3Bn of its $23Bn portfolio, made a margin call of $70Mn.    Management and Mr Stomber regarded this as extraordinary and quite out of line with any reduction in the value of CCC's assets held by Cantor. Whilst the demand was negotiated back to $30Mn, even this was unacceptable, and CCC rolled its repo away from Cantor to Citigroup and BNP Paribas, conjecturing that Cantor was in fact in financial trouble.

1285.   Mr Stomber reported these facts, first to his fellow Investment Committee Members (the Carlyle Directors), and later to the full Board.   He also recorded that he would now not buy new securities, even though the reduction in their pricing presented a buying opportunity, but would focus on ensuring liquidity, whilst also recording that this would inevitably put CCC's dividend yield in question.

1286.   The Plaintiffs have suggested that various contemporaneous references by Mr Stomber to the prospects of jeopardising the payment of dividends are evidence of an imprudent, excessive, and in fact improper, concern to pay dividends rather than adopting appropriately careful measures to protect CCC's capital;   paying dividends is the very opposite of reducing leverage.   I have considered these comments by Mr Stomber where they occur, and I do not find that to be the case.   Mr Stomber had been recruited in the first place to devise and run an investment vehicle whose attraction was to be the generation of a high dividend.   It was therefore only right that he draw the Board's attention to factors which might impair that prospect, but furthermore, at these early stages after CCC's IPO, it was still, I find, reasonable that he should have this point in mind, and be alert to any opportunities which would further that aim, as well as hinder it.   Purchases at apparently advantageous spreads, when these could be effected, were the natural and obvious course.   There was no reason at this time, ie the beginning of August 2007, (I find) for Mr Stomber to have regarded it as inevitable that such prospects should be abandoned entirely.   Any inferences to be drawn from his emails and so forth in the first half of August need to be considered against this background.   I therefore do not find references at this time to dividend prospects to be any evidence of an inappropriate prioritisation of paying dividends.

1287.   In further response to the signs of turbulent market conditions, though, Mr Stomber also asked for Independent Director approval to reduce CCC's minimum liquidity cushion requirement to 15%.   The previous reduction to 10% (requested for a different purpose, namely in order to facilitate advantageous purchases prior to the IPO), appears to have been assumed to have ceased to operate.   The current request was so as to enable the cushion to be applied, if necessary, to meet possible margin calls.

1288. There was no formal Board Meeting to discuss the request.   Whilst the Plaintiffs criticise this, the Defendants point out that it was relatively soon after a Board Meeting, and there was to be an ALCO meeting in two days' time, which would discuss the position and which Board Members had an invitation to attend.   It was also the very purpose for which the liquidity cushion was intended and therefore not a matter outside expectations as to the way in which CCC would operate.

1289. The Independent Directors later gave their approval informally, over the following two days. They say that they understood that this was precisely the situation for which CCC's liquidity cushion was established.   Although not required to vote on the matter, Mr Conway also indicated his approval.   The Plaintiffs point out that this was never discussed at a CCC Board Meeting, either before or after it happened, and they also point to Mr Conway's intervention as an indication of what they characterise as his overarching "dominance" of the Board and CCC's affairs.

### 9th August 2007 - ALCO Meeting

1290. Mr Allardice and Mr Sarles attended the 9th August ALCO meeting at Mr Stomber's invitation.   The other members of the Committee comprising CCC's Management attended as usual.

1291. Earlier that day, BNP Paribas announced that it was freezing redemptions from three of its hedge funds because of inability to value the subprime RMBS which they held, and a "*complete evaporation of liquidity*".   This unusual and disconcerting event, with the likely reactions of authorities and other banks and the consequences for CCC, was the first topic for discussion at the ALCO meeting.

1292. CCC's liquidity cushion, which was nearly $203Mn, was recorded as at 3rd August to be at 25.4%.   Just as in June, the Polypaths software was throwing up prices lower than IDP prices, and suggesting that if repo counterparties followed CCC's own pricing methodology, a further $32Mn of margin might be called up.   This would reduce the liquidity cushion to 22.3%, but still not below the magic 20% level.

1293. The meeting discussed the usual deck of slides containing metrics such as CCC's 1 day and 20 day VaR calculations (Mr Stomber asked that in future these should also have the previous meeting's figures for comparison), and the ratio of its liquidity cushion to VaR.   These ratios had roughly halved since the 18th May meeting, but this of course reflected the fact that APV had doubled in the interim.   However, even these figures suggested that CCC then still had a safety margin in its liquidity.

1294. The meeting discussed CCC's relations with its repo lenders.   It was reported that Cantor Fitzgerald was out of line as the only lender trying to rely on aggressively adverse pricing. There was as yet no indication that other lenders would follow suit, or attempt to impose higher haircuts, although it was noted that all CCC's repo counterparties had likely begun to come under pressure to look after their own liquidity needs.   Thus, it was recognised that this could be a factor which would affect their dealings with CCC.

### 9th – 15th August

1295. The evidence shows that the BNP Paribas announcement heralded or prompted a sharp decline in demand for all asset backed commercial paper ("**ABCP**") products, a sharp rise in interest rates, a reduction in liquidity as banks with a large exposure to RMBS – particularly in sub-prime - began hoarding cash, and a collapse in the market for short term loans.   This was, however, a global rather than a local event, and both the Federal Reserve and the European Central Bank took emergency measures by providing liquid funds at record breaking levels.

1296. CCC gradually began to receive increasing margin calls during 9th and 10th August, initially from ING and JP Morgan. These increased from Monday 13th August throughout that week with calls from Citi, Credit Suisse, repeatedly from Lehman Bros and finally from Bear Stearns. In the course of six business days, CCC paid out over $120Mn in margin. The liquidity cushion fell below 20% on 14th August and continued to decline.

1297. This period saw repo lenders begin to abandon IDP prices and make margin calls based on their own prices, as well as to start demanding higher haircuts. This was a difference from the 1998 LTCM crisis, which marked it out as being more severe in nature. Mr Stomber appreciated the implications of such behaviour, and what it indicated about pressure on banks. He noted in an email to Mr Conway of 10th August 2007, that his biggest worry was now the availability of repo lines (banks simply withdrawing their funding), and banks attempting to increase haircut levels.

1298. On 13th August UBS and JP Morgan intimated that they would be seeking haircuts higher than 2% at the forthcoming repo roll of 15th August - which annoyed Mr Stomber because any such change was unprecedented, and he maintained that the 2% margin was quite enough to protect their security interests on a statistical basis. He noted in an email of 13th August that he was therefore going to meet with their senior management and proposed, typically, to use the Carlyle connection for pressuring at this higher level for the usual (and in his view more appropriate) terms.

1299. A review of the figures prepared by Mr Trozzo on 15th August for report to the Board shows that CCC was at this time utilising about $22.2Bn of repo, but had more than $37Bn of available (soft) line capacity in total. CCC would roll about $10Bn of repo on 15th August, of which about $2.3Bn was attracting a haircut demand possibly higher than 2%.

1300. The then strategy which the Defendants say had been discussed and agreed, generally in emails, between Mr Stomber and at least Mr Conway and Mr Hance, was to focus energies on repo negotiations both to manage haircuts and maintain line availability, to exude an image of strength and confidence, and to take advantage of the Carlyle name. Mr Stomber now sought to draw on the skills of Mr Rubenstein and any connections of his at a high level with JP Morgan and UBS, to persuade them to hold their haircuts steady at 2%.

1301. The reason for his concern about the maintenance of this figure lay, he said in evidence, not just in its financial effects but also in appearances, and market intelligence. If JP Morgan obtained a 3% haircut, this could produce *"a stampede"* by other dealers, who would scent the possibility to do likewise. Mr Stomber explained the obvious and previously noted mathematical effects of a 1% general increase in haircuts, ie that this would require CCC to find an extra $230Mn in available cash of its own.

1302. The number and urgency of emails on these days, between (principally) Messrs Stomber, Conway and Hance, but later extending to Mr Rubenstein and Mr D'Aniello show that the severity of the liquidity crisis which had developed and was continuing - and which was severely impacting on the immediate availability of sufficient affordable finance for CCC and capable of causing its collapse if not managed effectively - was fully appreciated.

1303. It is common ground (but I would so find in any event) that a universal haircut increase to 3% on RMBS repo finance could not then have been sustained by CCC on the basis of its current business model; this would have had to be changed, and the practical options for such change were not obvious. There is a dispute about the extent to which CCC could reasonably be expected to sustain an average haircut level in excess of 2%, although in the event it actually did so for a period, as will appear.

1304. Given the Plaintiffs' complaints, it is important to record that on 15th August, Mr Hance raised the possible course of selling some RMBS and taking some losses to free up some

capacity.   Mr Stomber replied that he would "*hate to sell"*, giving as his reasons that the current depressed prices of the RMBS were, in his view,  only temporarily bad and were likely to improve, and that the trade-off between generating liquidity and realising losses by selling was not a worthwhile one.   He saw the reduction in prices as being the product of an oversupply of RMBS as against demand, with demand itself being limited by the lack of financing liquidity to fund purchases.   Mr Stomber did not, however, see these conditions as likely to persist.

### 15th August – repo roll

1305.  CCC negotiated the 15th August repo roll by moving approximately $750Mn away from JP Morgan, about $400Mn each away from BNP Paribas and UBS, and increasing its line with Citi Bank by about $1.5 Bn.    It left about $2.6Bn with UBS, but UBS refused to reduce their haircut demand below 2.5%.  Thus for the first time, CCC actually suffered a nominal haircut in excess of 2%.    It was warned by UBS that the figure would rise to 3% on the next roll, as at 27th August.

### 16th – 17th August – the Carlyle loan

1306.  Mindful that problems were not at an end with the negotiation of the 15th August repo roll, Mr Stomber was looking at options going forward, including a potential rescue package for CCC from Carlyle, and also how to manage the next roll, on 27th August.   On 16th August, he approached Mr Conway, as to whether the Carlyle Founders (effectively TCG) would be prepared to provide a $100Mn loan to CCC as emergency funding, provided its repo financiers could be persuaded to agree to keep their haircuts at 2% moving forward.   In a further, heartfelt, reporting email of that same day he noted that the current state of the markets was unprecedented and acknowledged that it had been "*a mistake"* to assume that markets would react in the same way as in 1998;   CCC's repo counterparties were now marking the value of CCC's RMBS to their own distressed prices, and more margin calls could therefore be expected.   CCC's liquidity cushion had fallen to 7%.

1307.  Mr Conway's response to the loan request was that he was only prepared to advance the funds if it would solve CCC's funding problems, and on the basis that the repo counterparties would remain at a 2% haircut.    However, although initially it was proposed to use this as a negotiating tool with the repo counterparties, Mr Conway quickly revised his view and decided that the loan should be advanced anyway, as the most expedient way of helping CCC out of what were expected to be temporary difficulties.   From that perspective, the loan could be presented as a sign of Carlyle's own confidence in CCC, rather than attempting to use it as a bargaining chip.

1308.  Independent Director approval for such loan, as required by CCC's Articles of Association, was sought and obtained, apparently through telephone contacts and discussions, especially between Mr Stomber, Mr Sarles and Mr Allardice, on 16th and 17th August 2007.   When the matter was put to Mr Loveridge, in an email from Mr Allardice of 17th August which succinctly explained the position and invited discussion by telephone if necessary, he too agreed.

1309.  The arrangement was to be for an unsecured, subordinated $100Mn loan, repayable in one year, at an interest rate of 10 %, with no penalty for early repayment.   The figure had been suggested by Management.   The interest rate was higher than the then prevailing U.S. prime rate of 8.25%, which Carlyle typically used when providing secured loans to its affiliates, because this loan was to be unsecured.   The rate was proposed by Mr Stomber, who thought it was fair and advantageous; he did not think (and, as it looks highly unlikely, I would so find) that CCC would be able to obtain better terms elsewhere.

1310. The Plaintiffs' attitude to this loan, and the part it plays in their criticisms, has been rather difficult to divine during the trial.  At times they have suggested that its terms were an unreasonable exploitation of CCC by Carlyle in terms of interest rate.  At other times and actually in the Cause itself, they argue, bizarrely, that it was a breach of duty for the Defendants to cause CCC to accept the loan because it was manifestly insufficient to solve CCC's difficulties (although it is not suggested how refusing to accept the loan would have been a better course for CCC).   However, on any basis, a point which the Plaintiffs stress as significant is that in the term loan taken by Carlyle itself (technically I think TCG) to enable it to provide this funding – in fact as an acceleration of finance which it had previously been negotiating for its own business purposes - Carlyle insisted that the bankruptcy of CCC should not be treated as an event of default.   This, say the Plaintiffs, is evidence that Carlyle, and by extension Mr Conway at least, knew and feared that CCC might well go into insolvency, and that assistance from Carlyle was not open-ended.  By 19th August, a formal resolution to take the loan had been signed.

1311. On 17th August, the general market situation improved slightly as the Federal Reserve Bank lowered its discount rate by the significant amount of 50bps and extended the terms of its loans to banks, to enable them to keep lending to others.

1312. Over the period 15th – 17th August, Mr Stomber followed up on the further question of the minimum liquidity cushion guideline, and now sought Independent Director approval to suspend it entirely, so as to enable CCC to get through what he described as an "*extreme period*".    This approval was discussed and obtained, again largely in telephone conversations, over the following two days.   On the same day as Mr Conway initiated the acceleration of the first tranche of the credit facility which Carlyle had started negotiating for itself with its own bankers, so as to enable it to provide the $100Mn loan to CCC, as mentioned above, the Independent Directors formally, but by email, gave approval to the suspension of the minimum liquidity cushion guideline, with which CCC was, of course, already non-compliant.

1313. In the evening of Friday 17th August, Mr Stomber sent an email report to the full Board, reviewing the effect of the events of the previous week, highlighting the tendency for repo lenders to start using their own pricing and the general demand for 3% haircuts now being faced by CCC for the forthcoming roll.   He explained the potential loan from Carlyle, and that he had scheduled meetings with CCC's six underwriting banks, who were also repo lenders, with himself and Mr Conway on the following Monday – 20th August.    The involvement of Mr Conway was in order to deploy the full effect of his seniority, reputation and influence with those of similar power and weight at the banks themselves.   The aim was to use Carlyle's willingness to loan funds to CCC to incentivise the repo lenders to be reasonable and keep their haircuts down to 2%.   Mr Stomber hoped to put pressure on the underwriting banks because of their implicit support of CCC at the time of the IPO only about six weeks before, although that seems to me to be moral pressure only – perhaps not worth much in a crisis.

1314. Whilst recognising the need for a future revised plan, such as obtaining longer term repo, Mr Stomber said that it was as yet too early to devise this and it would be a matter for a future Board Meeting.  This view appears reasonable, because at that time the circumstances were clearly still very unsettled.

### *18th August - insolvency fears*

1315. On 18th August, Mr Ferguson, Carlyle's head in-house legal adviser, recommended to Ms Cosiol, Mr Buser and Mr Nachtwey that legal advice should be sought about the potential bankruptcy of CCC and what would be the duties of directors if CCC were in the "zone of insolvency" – a term of art in Delaware Law. Ms Cosiol sent on this request to Carey Olsen in Guernsey, and the Attorney firm Skaddens in New York, to schedule a conference call to

discuss the point. This was arranged and took place on 20th August, an important date for CCC's business.

1316. There are notes of this conference call, which record that "*one of the board is uncomfortable*" (it has proved impossible to identify whom) and also that "*Carlyle legal are panicking*". Following this call, Carey Olsen sent to Ms Cosiol copies of Sections 67B and 67C of the Companies (Guernsey) Law 1994 with notes on directors' responsibilities. Ms Cosiol later reported to Mr Stomber (although not to other board members) with a summary of directors' responsibilities, in particular reporting that once a company entered such "zone" the directors owed their fiduciary and other duties not just to the company and its shareholders "*but also to its creditors, and must take their interests into consideration*". She advised that the Board should meet on a weekly basis by telephone, but in the event this did not happen. Ms Cosiol also advised that the taking, and making, of the intended Carlyle loan was perfectly proper.

1317. On 19th August Mr Trozzo recommended to Mr Stomber and Mr Greenwood that if CCC survived the current turbulent period, it should "*deleverage and re-set the LC [*liquidity cushion*] levels*", these having been set by reference to the 1998 crisis as to which current conditions were much worse. Mr Stomber agreed, saying that CCC needed "*to rethink everything*".

### 20th August - CCC meets its lenders

1318. 20th August 2007 is a very significant day in the story. Mr Stomber and Mr Conway had been scheduled to attend hour long meetings with very senior personnel at their six underwriting banks - Citigroup, Goldman Sachs, Deutsche Bank, Lehman Brothers, JP Morgan, and Bear Stearns - throughout the day from 9 am in the morning to 5 pm in the evening. This was a concerted attempt to try to rally support from CCC's bankers who, after all, had only just underwritten and impliedly approved CCC's business model as appropriate for public offering.

1319. In the event, the results of the six meetings were mixed, and the following facts appear from Ms Cosiol's notes of a telephone call, in which Mr Stomber and Mr Conway reported back to Mr Hance as further mentioned below. It appears that Citi and Lehman agreed to maintain 2% haircuts, although as Lehman were now setting their own marks, this rather negated the direct beneficial effect of this for CCC. Deutsche Bank was described as being "*reasonably calm*." Bear Stearns indicated that their attitude would have to depend on the haircuts they were themselves being subjected to for the repo funding by which they provided their own funds. CCC had no repo lines outstanding with either JP Morgan or Goldman Sachs at the time, and Mr Conway apparently asked Goldman to consider providing CCC with a $1Bn line at a 2% haircut. It was the final meeting with JP Morgan which both Mr Stomber and Mr Conway recall most vividly, although partially. They say that this was because the attitude of Mr Steven Black of JP Morgan gave them a shock.

1320. Whilst the Plaintiffs criticise their evidence for being either less than honestly complete, I find this incorrect and unfair. In fact, I find this evidence, and the piecemeal memories which each of them describes, to be very natural and plausible. They both accept that, shortly after exchanging pleasantries, Mr. Black recommended that CCC should immediately (it may be that the phrase used was "first thing in the morning") undertake the sale of $10 Bn of its Agency RMBS, and he offered JP Morgan's services to assist in such a sale without charging. The evidence as to whether he said he actually had a buyer in mind - albeit unidentified - is not clear; neither Mr Stomber nor Mr Conway recalled him saying this. No price indication was given. Mr Black apparently also said that CCC could expect to receive $100Mns of margin calls the following day.

1321. From this, I accept that it would have been apparent that there would be no prospect of persuading JP Morgan to advance repo finance to CCC at a 2% haircut. None of the other Underwriters had made such a drastic recommendation although it seems that Bear Stearns probably gave some rather less extreme and less forceful advice about selling assets if possible. Mr Stomber recalls this, but says that he took it to refer to bank loans rather than RMBS. I would accept that this interpretation could have been pre-conditioned by his own views of the undesirability of selling RMBS, although in the end I do not think it really matters.

1322. There is also a dispute of which a lot has been made about whether Mr Black actually used the word "de-lever" or "deleverage", with neither Mr Conway nor Mr Stomber believing that he did. This dispute is entirely arid, because both of them accept that they knew and would have known at the time that selling $10Bn worth of RMBS would have the effect of deleveraging CCC. I therefore cannot see what importance the use of that precise word would have had.

### 20th – 22nd August – potential sale of $4Bn RMBS to JP Morgan

1323. Mr Stomber and Mr Conway both say, in different words, that Mr Black's "advice" was shocking. However Mr Black was a very senior and successful banker, and it was certainly Mr Conway's view that if someone like him expressed an opinion or advice, it was well worth thinking about. Mr Stomber was more cynical; he took the view that Mr Black had a buyer, and his "advice" was prompted by his trying to soften CCC up to provide a good deal with which he could impress his client.

1324. Mr Stomber and Mr Conway conferred that evening with Mr Hance about Mr Black's advice and options and implications, in a telephone meeting of which, as already noted, Ms Cosiol took notes, underlining the recognised importance of the meeting. They were three of the four members of CCC's Investment Committee. They agreed that an immediate sale of $10Bn of Agency RMBS was too draconian a step; it might cause the market, and in particular CCC's bankers, to question CCC's ongoing viability and it could have adverse consequence in triggering lower marks to market for the value of CCC's remaining RMBS, with a consequent liability for margin calls which would reduce or wipe out the liquidity gain.

1325. However, they, and also later Mr Zupon, agreed that if CCC could obtain a fair price for its Agency RMBS at or round about its existing marks, then it should pursue a sale to JP Morgan of up to (say) $4 Bn of Agency RMBS in order to generate additional liquidity. Each $1 Bn sold would raise $20Mn in liquidity and would also reduce the requirement for repo capacity. The central point was whether this could be achieved at a price which would not have the result of crystallising and locking into CCC's financial position a simply unacceptable amount of realised – and therefore never recoverable - loss. The Investment Committee Defendants came to the conclusion that a quiet sale, pursued through a single dealer that was not one of CCC's repo lenders, might be achievable at a fair price and without sending a risky and troubling message to the market about CCC's liquidity; if so, that would potentially be worthwhile, even though it would mean realisation of some losses.

1326. Therefore, later on 20th August, Mr. Greenwood was instructed to and did send JP Morgan a list of 7% Agency capped floater securities for pricing for a potential sale transaction. The list included only 7% (highest) capped floaters, because JP Morgan had advised that these had the best chance of attracting investors. One would naturally expect that the highest cap value RMBS would be the most valuable, and although I accept that this is not necessarily synonymous with attracting most interest, the evidence does suggest that that is be likely to be the case.

1327. However, when, on 21st August 2007, JP Morgan reverted to CCC with a list of prices at which it proposed to purchase the offered 7 % Agency capped floaters, their average price for

CCC's Fannie Mae capped floaters was $97.63, which was 165 bps (1.65%) below IDP prices, and represented a very substantial discount, in market terms, from the $99.35 price at which CCC was carrying those RMBS on its books.  Their proposed prices for CCC's Freddie Mac floaters were similarly discounted.

1328. This vastly altered the attraction or value of doing the deal with JP Morgan, and, based on these prices, Messrs Conway, Hance and Stomber were agreed that CCC should not proceed with the proposed sale of Agency floaters to or through JP Morgan.

1329. Importantly, it is universally agreed by all the expert evidence, that the decision which was then taken, not to pursue a sale of $4Bn or any other quantity of capped floaters at the prices offered by JP Morgan, was not only reasonable but indeed correct, even in the circumstances in which CCC found itself.

1330. An email of 21st August shows that Mr. Stomber and his team analysed the JP Morgan prices and other options for raising liquidity, which they ranked in order of efficiency.   First, CCC could sell its CLOs (interests in leveraged finance funds) to Carlyle at their purchase price, raise $60.5Mn in equity, and suffer no loss.  Second, it could sell 25 % of its bank loans to raise $26.5Mn in equity, and suffer an $11Mn loss, or sell 50 % of its bank loans to raise $53Mn in liquidity and suffer a $22Mn loss.  Third, it could sell $4Bn of its Agency RMBS to JP Morgan at the prices quoted, which would raise $27.7Mn of liquidity, and suffer a $97.3Mn loss.     This analysis was sent to Mr Conway and forwarded to Messrs Hance and Allardice.     Later, Mr Stomber also analysed the expected returns, to the end of the year, from natural amortisations on CCC's RMBS portfolio ($25Mn), which would also reduce repo requirements by about $1.2Bn.   These figures could obviously be compared with the financial effects of selling RMBS at the prices suggested in the JP Morgan offer.

1331. Quite apart from the arithmetic, the Defendants say, that there were other matters taken into account in influencing their decision.   Mr Stomber and Mr Conway have said in evidence that their various reasons were, the incurring of large and crystallised losses (around $100Mn);  the likelihood that sales at the proposed prices could actually worsen CCC's liquidity problems by fixing a market mark for CCC's remaining assets which would generate yet more margin calls, thereby eliminating the increased liquidity and with the potential to set off a further downward spiral;  the belief that the RMBS could be financed until such time as prices improved and margin calls reversed, and that there were other assets which could be sold first to produce liquidity.   These ideas are reflected in further notes taken by Ms Cosiol.  There was also concern about the message of CCC's being in difficulty which such a sale might send to the market.

1332. Interestingly, Mr Black's warning that CCC would receive $100Mn of margin calls on 21st August also proved wrong.  In fact, CCC received no margin calls on that day.

1333. On the same day as Mr Stomber and Mr Conway were doing the rounds of the banks, one of CCC's investors, Mr Louis Reijtenbagh, whose family were, I understand, the biggest investor in CCC under the private placement, was writing to Mr Conway to complain at the performance of CCC, both as to the absence of any dividend payment and the fall in share value, and also to complain at lack of information from CCC to investors.   This last complaint does seem to me to have had force, although I do not regard it as sinister.  It was, rather, evidence of a lack of public relations sensitivity, (with Mr Conway and Mr Stomber having a lot to occupy them) and perhaps the Defendants' lack of experience at running a public company.   In the evening of 21st August, Mr Conway wrote a reply to Mr Reijtenbagh describing the situation in simple broad terms and explaining what CCC and Carlyle were trying to do about it.   That email is consistent with a high level overview of the deliberations and discussions which are said to have gone on in more detail internally at CCC, and with the professed belief of the Defendants at that time that market conditions ought to improve.

1334. Mr Reijtenbagh's email seems to me to support the view that the implications of CCC's business model as regards leverage were quite apparent from its PPM and OM documents. Moreover, as I read Mr Reijtenbagh's message, far from being a call to sell RMBS, it acknowledges that "*sell[ing] the underlying collateral at depressed levels*" would be a bad idea.   Mr Reijtenbagh also urges the course of allowing current positions to "*roll off without new risk being taken*".    Since he referred to "*spread trades*" I am not certain that he was really focused on CCC's business model being "buy and hold" with regard to RMBS as it actually was, but nonetheless, I read this as an acknowledgement, in principle of the general wisdom and acceptability of a course of natural deleveraging and resulting build up of assets. Underlying Mr Reijtenbagh's email, though, I detect a frustrated desire, now, to get out of the investment, and an attempt to pressure Carlyle itself into making good to investors the losses arising from CCC's poor results, at least to some extent.

1335. As a public company, CCC was obliged to give press releases to disclose information which might be regarded as material by investors and thus price-sensitive.  The $100Mn loan from Carlyle fell in this category, and it, and the first $10Mn drawdown, was therefore announced to the market by a press release issued on 21st August 2007.

1336. Mr Conway had been shaken by the advice of Mr Black the previous day, and he received another shock at the media reaction to the news.    Those Defendants who were directly involved, and in particular Mr Conway, believed the $100Mn loan would be viewed by the market as a positive sign for CCC because it showed that CCC had Carlyle's support.  To their surprise, the media reaction was the opposite.  Although bank analysts' reports were coolly responsive to the news, the Wall Street Journal portrayed CCC as a "troubled" fund that needed to be "rescued".    The result was a panic reaction amongst CCC's repo lenders who now almost all began demanding haircuts of 3%.

1337. Mr Conway was both shaken, and, I suspect, even rather hurt by this, and I have no doubt that this unexpected response coloured Mr Conway's attitude towards managing the actions of CCC and information about it in the future.   Mr Stomber, with a more cynical disposition, I have no doubt was less surprised.    The reaction itself, though, is strong support for the reasonableness of fears expressed by the Defendants generally, about causing unpredictable or extreme market reactions adverse to CCC's interests, and the need to avoid risking this possibility if at all possible.

### 23rd August 2007 - Emergency BOARD MEETING

1338. CCC's full Board of directors convened in an emergency joint meeting of the Board and ALCO by telephone on Thursday, 23rd August 2007, to discuss the deterioration in market conditions and its impact on CCC.    It seems that this was prompted by Ms Cosiol, and the Plaintiffs point to this as evidence of the actual Defendants' shortcomings in holding sufficient and sufficiently frequent discussions to meet the situation.   There is perhaps some force in this as at that moment, but the more important point is the actual actions taken by the Defendants, and whether any alleged paucity of such meetings had any adverse effect on these.

1339. Shortly before this meeting, Mr Stomber sent a regretful email to the senior founders of Carlyle, recording that it was clear that the business model of CCC, especially regarding the funding of its RMBS, did not work, and apologising for the consequent "*terrible burden on Carlyle's liquidity and reputation.*"     The Plaintiffs rely on this as an allegedly clear admission of fault by Mr Stomber and evidence of the control and power exerted over him by the Carlyle Founders, and Mr Conway in particular.   I do not see it this way.   I find it to have been driven by Mr Stomber's personality traits which I have already mentioned, and by his perception of the required due deference to those above him in the hierarchy (and he undoubtedly saw Mr Conway as, effectively, his "boss"), being a perception which is perhaps more pronounced in his case than in most people's.

1340. Mr. Hance opened the meeting by commenting that CCC's "*very survival*" was at stake, (again a dramatic statement which the Plaintiffs invite me to take at face value) owing to the hugely worsening market conditions which had developed in the four weeks since the Board's meeting in Guernsey.   He outlined the changes in market conditions (mentioned above), that CCC had consequently exhausted its liquidity cushion having gone through $200Mn of liquidity, and that it was likely to draw the full amount of the recently offered $100Mn loan from TCG in order to meet the 27th August repo roll.

1341. Mr Stomber advised that CCC needed to preserve capital where it could, that it would be prudent to wind the company down to its "core level", (Ms Cosiol confirmed that that was the wording she had written in her notes) and that in the future a new business model would need to be established, as market conditions were now unprecedented.  He reviewed with the Board the state of the financial markets, and the ALCO pack information which had been distributed to the Board, illustrating present conditions and the state of CCC's investments.  He and Mr Conway reported on their meetings with the underwriting banks, and the unsatisfactory suggested sale of RMBS to JP Morgan. There is criticism that insufficient detail of this was conveyed to the other members of the Board, but I cannot see that this made any difference to anything material.

1342. A central part of the discussion which then took place was that of the risks and benefits of selling RMBS (illustrated by the figures and calculations thrown up by the JP Morgan affair, and concerns about the knock-on effects of such a transaction) as compared to the risks and benefits of holding on to the RMBS, namely the problems of obtaining repo funding on manageable terms in current market circumstances and with current levels of leverage, as against the benefits of the underlying fact that the RMBS themselves are quality assets which would slowly but surely pay off capital through amortisations and prepayments, and ultimately pay out at par, such that logic dictated that their value must return to par in the future.  After weighing the risks of holding as against selling, the general conclusion was that the potential gains in liquidity from selling RMBS were only small, and were far outweighed by the risks entailed in doing so; CCC would be better off taking less risky options which provided a low key route to generating liquidity.

1343. After discussions, the Board adopted a number of measures intended to support and preserve CCC's capital and liquidity, with a view to ensuring its survival.  These were seen to be, first, the sale of CLOs to Carlyle.   Those were relatively illiquid but could be sold to Carlyle quite favourably, generating about $60Mn in liquidity for little or no cost or loss. After discussion amongst the Board, the Independent Directors approved these sales.   Second, it was reported that CCC was already in the process of implementing the sale of certain of its bank loans. Although these were performing well, they were less levered than RMBS and could be easily disposed of at little or no loss, thus generating more liquidity; there was the promise also of a second short term bridge loan of up to $100Mn from Carlyle to bridge the receipt of the proceeds of these loans if these were urgently needed to meet margin calls in the interim. The Board discussed and approved these sales, and the Independent Directors voted to approve the bridge loan from Carlyle.   The third matter was formally accepting the unsecured $100Mn loan from Carlyle, which had already been put in place as an emergency measure and was likely to be drawn upon.   The Board endorsed and ratified this step.

1344. Further measures to improve liquidity were discussed, noted, and approved, namely that all asset purchases were suspended, and that, as the Board unanimously agreed, there would be no payment of any dividend in the third quarter of 2007.   Efforts would be concentrated on working on the company's lenders to increase the size of repo lines at reasonable cost; the Board discussed potential negotiations with those banks, and especially Citigroup.   In this context, Mr Conway reported that he had already opened discussions with Citi about potentially doubling CCC's repo lines, and other measures, and stated, enigmatically, that Citi was "*asking for other things from Carlyle*" which Carlyle was "*willing to do*".  He did not elaborate beyond saying that CCC was not likely to get all they were asking for.  This matter

is the subject of major and heavily critical submissions by the Plaintiffs, which I will come back to later.

1345. Lastly, the appropriate attitude to sales of RMBS was discussed.  It was a point actually raised by Mr Zupon.  It was noted that these assets were "money good", meaning that, ultimately, they bore no credit risk and would pay, in full, as to both interest and capital at maturity.  The argument against selling them was that the prices currently available were just too low to be justified having regard to both the net financial benefits and the associated unquantifiable risks.   However, it was recorded that if CCC could accomplish sales at prices at or about CCC's marks (ie at a sufficiently small actual loss) then CCC should be open to doing so.  In other words, it would take advantage of sales opportunities, if these presented themselves.  This was now described as "opportunistic sales".   In this context, the Board was also briefed by Mr. Stomber on discussions with Fannie Mae and Freddie Mac with regard to the investigation of possible sales back to them of RMBS.

1346. The Board asked Mr Stomber to provide them each with daily email updates as to the company's cash flow position, and suchlike, suggesting its clear appreciation of the gravity of the situation.   The Board also requested that Management develop a suitable system for keeping shareholders informed of recent events.

1347. Mr Conway seems to have wrapped up the meeting, by concluding it with two final thoughts.  The first was the need for Management and the Board to assess whether CCC's business model was "*permanently broken*" and how to adjust to "*new market realities*".    The second was to express his strong opinion "*that the last assets that should be sold are the AAA rated mortgages*"; it made sense for CCC to sell other assets first.   He concluded by hoping for some "good luck".   The Plaintiffs make much of these comments, and I will consider their significance later.

### *Approaches to Fannie Mae and Freddie Mac*

1348. Selling RMBS back to Fannie Mae or Freddie Mac was regarded as less risky, in terms of adverse publicity, than open market trading would be.   Already on 21st August CCC had approached Freddie Mac to investigate possible off-loading sales of RMBS in that direction.  After an initial meeting, CCC sent a list of its securities on 22nd August, which Freddie Mac were looking at the following day.   However Mr Stomber later reported that the prices which were offered were a "*non-starter*".   The Plaintiffs criticise the lack of apparent information about the prices actually offered, but as detailed consideration of prices had already taken place with regard to analysing the JP Morgan offer, it does not seem to me that the fact that no figures seem to have been recorded or survived should cause me to doubt the appropriateness of Mr Stomber's assessment.   Although Freddie Mac remained interested, and Mr Greenwood was willing to work with them, CCC indicated that it was not willing to sell at fire sale prices, and, with crisis conditions having eased slightly by 28th August, no further progress in that direction was made.

1349. On 22nd August, Mr Greenwood had also sent a list of securities to Fannie Mae.   Nothing transpired there, either.   As already mentioned, it appeared, in the course of evidence, that Dr Niculescu, the Defendants' RMBS expert, who had been in charge of Fannie Mae's capital division at the time, recalled being consulted about an offer of a large block of RMBS at about this time, but could not offer to buy it because of balance sheet constraints on the Agency; he inferred that this was probably the approach from CCC, and I accept that it probably was.   The approach to Fannie Mae therefore also proved to be a dead end.

### *The Citigroup affair*

1350. Citigroup had a strong relationship with Carlyle and was keen to win additional business from the Group.   As part of his avowed plan to "leverage" the Carlyle connection to assist CCC

and persuade Citi to increase its repo line to CCC to $10Bn, Mr Stomber had already asked Mr Conway for permission to promise Citi the "upper left" (ie the lead underwriter position) on a potential future IPO of the Carlyle Group itself, a possibility which was under consideration in 2007.   Mr Conway agreed to this proposal and he began, as he reported to the Board on 23rd August, to negotiate with Citi directly, himself.

1351.  The negotiations proceeded apace on 23rd August, and by that evening there was an agreement in principle that Citi would provide CCC with a continued repo line of $5Bn for 60 days at 2% and another $2.5Bn at 2%, provided that the collateral should not be 6 ½% capped floaters, and in return Carlyle would pay Citi $30Mn in guaranteed fee income and would also guarantee Citi against losses up to $45Mn if Citi ever had to liquidate its collateral; there was also to be agreement on a liquidity/deleveraging  plan for CCC.   Mr Conway reported the repo line availability to Messrs Hance and Stomber, but as to the other terms, he reported merely that he had had "*to agree to a few things.*"   Mr Hance and Mr Stomber both regarded this as extremely good news, an extremely beneficial deal, and Mr Stomber, in particular, was hugely appreciative of Carlyle's support, and the pressures this would therefore take off CCC. He was, I am quite sure, conscious of the advantage of being able to tell other repo lenders, and in my judgment perfectly accurately, that Citi were maintaining a sizeable repo line for CCC at a 2% haircut.

1352.  However, this was only an agreement in principle; its terms had not been finalised in detail, and in the event they never were, because practical difficulties emerged.   It is convenient to recount these here, although this takes the whole matter beyond August and into September.

1353.  The provision of the guarantee by Carlyle proved problematic.   The first problem was that it would give rise to disclosure obligations, a point considered at the end of August by CCC's/Carlyle's legal department (Ms Cosiol and Mr Ferguson) and not clearly resolved then, but confirmed at least by 5th September 2007.   Neither side wanted such disclosure.  (I am satisfied that it was neither side, although the Plaintiffs have of course emphasised Mr Conway and CCC's aversion to such disclosure.)   The natural reasons were those of relationship management with third parties who found out.   The second problem was that Carlyle's accountants were concerned that the guarantee provision might then require that Carlyle consolidate CCC's accounts into its own, which would be both complex and was, again, not desirable from a publicity perspective.

1354.  Carlyle therefore did <u>not</u> in fact provide Citi with a $45Mn guarantee.   Citi then determined that, in order to achieve the same level of protection against potential losses, it needed to raise CCC's haircut on the $7.5 Bn repo line from 2 % to 2.5 % (which Mr Conway conveyed to Mr Stomber) and from 10th  September 2007, Citi began to phase this in, by obtaining additional collateral from CCC – as Mr Stomber had been warned they would do – although not the entire $45Mn as CCC was only utilising $6 Bn of the $7.5 Bn repo line at the time. The engagement letter which was intended to provide the $30Mn in fees was never completed either, as details of the timing of payments and charging were not agreed.   In the end, the matter therefore came to nothing, but its possibility, and Citi's initial lenient implementation of it despite the fact that the intended agreement had not been finalised bought CCC time, or "*breathing room*" as Mr Rubenstein called it at the time, and Mr Conway repeated in his witness statement.   Citi, Carlyle and CCC also maintained cordial business relationships, largely, I find, because of Mr Conway's charm and negotiating skill, and Carlyle's business clout.

1355.  In the event, and as the residual upshot of these negotiations, Citi continued to provide CCC with repo lending at a 2.5 % haircut, although it advised (on 14th September 2007) that the haircut would increase to 3 % for any amounts over $6 Bn, Carlyle retained Citi as an advisor on its sale - currently in negotiation - of an ownership interest in TCG to Mubadala, which generated fee income for Citi although not the contemplated $30Mn, and Mr Stomber met with Mr Katzenberg of Citi to brief him on CCC's planned capital preservation strategy as it

had been agreed at the 23rd August Board meeting.     The Citi repo line was ultimately reduced to $5 Bn at the end of October, at the then existing 2.5% haircut.

1356. The Plaintiffs seek to make a great deal of the interactions between Mr Conway and Citi. They label it the "secret" Citi deal, and they condemn, in particular, Mr Conway's "failure" to volunteer all the details of what Carlyle was promising to Citi to CCC's Board, first at the outset and then also subsequently as a "failure" to disclose the variation of those terms when the TCG guarantee was not given  - to avoid, they say, the obligation to disclose such a guarantee under the rules of the Euronext exchange.   They submit that these failures were a breach of Mr Conway's fiduciary duties to CCC, and that the failure of the remaining directors to insist on knowing all the details and, as to the latter point, why Citigroup was increasing its haircut between repo rolls, was also a breach of their fiduciary duties. Alternatively they submit that this incident demonstrates Carlyle's (or Mr Conway's) pervasive control of CCC, and that the Board were mere cyphers.

1357. I will consider elsewhere whether there is any substance in these latter allegations, but I observe here that I can see no allegation of any loss caused to CCC resulting from such alleged breaches of duty.    The only consequence alleged appears to be that CCC's Board apart from Mr Conway was kept in ignorance of the "true" (as the Plaintiffs characterise it) terms of the support which Carlyle was giving CCC, and its value to Citi which therefore should, they contend, be translated into support for CCC, and should have been viewed as additional costs of CCC's financing.    No consequent counterfactual allegation of what otherwise would have happened is made, though.  Otherwise this incident appears to be relied on merely as evidence supporting the allegation of Carlyle's "pervasive control".

### 27th August - repo roll

1358. The most pressing issue for CCC after the 23rd August Board meeting was, of course, its next scheduled repo roll on its Fannie Mae securities on Monday, 27th August.  With the assistance of the increased Citi repo line, and the benefit of the other steps CCC already had taken to increase liquidity, CCC was able to complete this successfully.

1359. Mr Trozzo summarised the position for the Board, providing a review of the status of all CCC's repo lines.  In summary CCC had active repo loans with twelve counterparties, of whom half were at 2% and half at 3%, the major counterparties being Citi ($6Bn) and Lehman Bros ($3.8Bn) at 2% haircuts, although the latter was marking the collateral at low prices.    CCC had agreements in place with five other banks, and was seeking to reactivate lines from JP Morgan and Bank of America.    Mr Stomber calculated the weighted average haircut being paid by CCC at this time as 2.3%.  CCC had also begun discussions with four more banks.  It was about to approach Wachovia, a bank with a strong banking relationship with Carlyle, with a view to securing longer term repo financing.

1360. CCC had therefore survived.  Given the severity of the August liquidity crisis, CCC's success in rolling over the finance needed to support its RMBS portfolio – now all that remained of its asset base after the sale of its CLOs and bank loans as agreed at the 23rd August Board Meeting, apart from an insignificantly small bank loan which it was problematic to dispose of - was viewed positively by Mr Stomber and Mr Conway.  They considered that CCC had gained time and with time, would be able to adjust to new haircut levels and recover its equilibrium.

### End of August 2007

1361. During the period following the Board Meeting, the Board members were kept updated daily by Mr Stomber's emails as to the current financial position.

1362. On 26th August, owing to concerns about Mr Stomber's public relations skills and diplomacy, Carlyle (in particular Mr Rubenstein) resolved to appoint, at its own expense, a public relations/investor relations firm to "assist" CCC with public communications.

1363. On 27th August, after much discussion, drafting and redrafting amongst CCC and Carlyle personnel, and with external and internal legal input as to the amount of detail which was appropriate or advisable, and how far actual figures should be included,  CCC published a press release, and also sent a "CEO letter" to investors - individually to the private round and also published on its website - explaining the events of recent days, and CCC's consequent decisions as to how to secure the future and the steps taken to this end.

1364. This suite of decisions has subsequently been dubbed the "capital preservation strategy" by the Defendants, although it is a title which, at least at the outset of this action, the Plaintiffs have derided.  They suggest that it was concocted after the event to dignify what they suggest was just disorganised inactivity.  Even though it may never have been solemnly formalised as a "strategy", the term "capital preservation strategy" is a convenient label for the broad general policy decision to retain RMBS and not sell them (unless a sufficiently advantageous opportunity presented itself) and to seek to ride out the crisis, relying on income, and ultimately when markets had stablised, to examine the appropriate future for CCC's business. I will use this term in the future to refer to that course.

1365. The Defendants say that these circulated documents provided a clear, straight-forward summary of the company's situation, the steps it had taken to address the unprecedented market conditions, and the strategy selected by the Board for moving forward.  They disclosed that CCC's liquidity cushion had been exhausted, that an additional $100Mn loan had been obtained from TCG and expended to meet margin calls, and that CCC was selling assets (a reference to bank loans) to rebuild its liquidity cushion.   They explained CCC's market view, namely that Agency floaters were likely to see price improvements over time and remained amenable to financing on reasonable terms.

1366. The Plaintiffs say that with these documents, and in the subsequent investor telephone conference call set up on 29th August, the Defendants "misled the market".    They criticise the absence of any mention, in the final version of the press release or the letter, of the suspension of the liquidity cushion guideline (which omission they say was also a breach of Dutch regulatory law) or the additional financial support given to CCC by Carlyle, and they say that CCC attempted to downplay the severity of the impact of market events upon it. Again, it is not at all clear what operative legal consequences the Plaintiffs contend follow from these facts, in any way material to this action.   However, the amount of argument suggests that the Plaintiffs attach a great deal of importance to the point, and so I will return to it later.

1367. The media appear to have homed in on the reference to a further Carlyle loan to CCC.  On 28th August, this produced further negative media reactions.  On that day, Ms Cosiol counselled care to Carlyle that statements of support for CCC made by Carlyle should not be open-ended.  However, this seems to me to betray no more than the lawyer's natural concern to ensure that no-one who heard or saw such statements could later allege reliance upon them as some kind of warranty.  Mr Stomber, who had a tendency to make open statements of his disappointment, regret and acceptance of responsibility, respectfully accepted that his proposed remarks for the upcoming investor conference call arranged for the following day should be approved by Messrs Conway, Rubenstein and Hance.

1368. The investor conference call, as well as the written publicity, had been prompted, mainly by Ms Cosiol, because of investor questions received as a result of the negative publicity a week earlier, following the disclosure of Carlyle's first loan to CCC.   The call was conducted on 29th August by Mr Stomber and Mr Hance.  Both of them made clear that CCC had avoided selling its Agency RMBS and intended to continue to hold those assets.   Mr Stomber said

that once markets had stabilised, CCC intended to return to a more diversified and less leveraged investment vehicle.   The Defendants suggest that the tenor of questions from lenders and analysts suggests that they fully appreciated CCC's reasons for holding on to its Agency RMBS.

1369. Mr Gerstner, Carlyle's Chairman, emailed Mr Conway privately subsequent to the call, commenting that Mr Stomber "*should not be running a public company*".   Whilst the Plaintiffs point to this as contemporaneous evidence that Mr Stomber's skills were regarded as lacking, I am satisfied, from the context, from Mr Gerstner's lack, otherwise, of direct knowledge or involvement in how CCC was being run, and from having observed Mr Stomber in evidence, that this was said with regard to Mr Stomber's interpersonal and presentational skills and not as regards his business competence.

1370. CCC continued to work on securing repo lines, with the ups and downs of negotiations which are a familiar part of business activity, albeit no doubt more nerve-wracking at this time. There was, for example, a flurry of consternation when an apparent promise of an increased repo line of $3Bn at a 2% haircut, secured by Mr Rubenstein from Mr Ackermann, the CEO of Deutsche Bank on 23rd August, was then denied at the repo desk level, and CCC was confined to the existing $1.8Bn line for the 27th August roll.   A meeting between management personnel from CCC and Deutsche Bank, including Mr Shah (whose unsatisfactory evidence I have already examined), took place on 31st August and appeared to resolve the matter, but once again, on 4th September, the repo desk denied any knowledge of Mr Ackermann's promise, refused to agree any extension and intimated that they would require a 4% haircut as from the next roll in September.   Resort to Mr Rubenstein's high level good offices this time produced confirmation of the repo desk position, although in the end, Mr Stomber predicted that the $1.8Bn would be granted at a 3% haircut – and this is in fact what transpired.

1371. The account of this incident reveals several of the idiosyncracies of dealings in the market which I find need to be appreciated in assessing people's conduct, and which I have already mentioned generally.   It shows how transactions can be negotiated at different levels, but whether they will finally come to pass may depend not just on the level of seniority of the parties involved, but the power or priority of one desk or department over another, systemically or temporarily.   It shows how senior personnel who may agree matters on a broad brush basis can then change their minds when representations are made by those at the every day working levels, and how deals will be done on the basis of a compromise to save face to both sides.   This sequence of events is a good example of the wheeling and dealing which seems to me to be quite common before a final position is agreed at the level where it matters most; those with the actual authority to instruct repo line availability.

1372. With the then combination of potential lenders, Mr Stomber still calculated the weighted average haircut being paid by CCC at this time as being 2.3%.   This was manageable. Indeed CCC had received modest repayments of margin as IDP prices had improved.

1373. At the end of August there were signs which suggested that the markets were calming down somewhat, although there was still little trade in high quality assets such as CCC now held, and it still could not be said that market conditions had stabilised.   CCC had, though, survived the biggest stress point of the crisis.   With Carlyle's assistance, it had met its 27th August repo roll.   Although its repo line capacity had shrunk in August, it continued to have repo lines in excess of the volume of securities it now needed to finance.   Whilst the 2.3% haircut average could of course be anticipated to  rise at the 15th September repo roll, as more lenders increased haircuts in line with the apparent new "normal", this did not appear to be unmanageable.   CCC's liquidity cushion, if the expected proceeds of bank loan sales were included, was about $146Mn, or 14 % of capital.   CCC was invested almost solely in Agency RMBS, with no credit risk.

1374. However, at the end of August, it was necessary for CCC to seek waivers from Lehman Brothers, Credit Suisse and Deutsche Bank with regard to its prime brokerage agreement with the first and its MRAs with the others because breaches of covenants contained in those documents entitled the banks to issue notices of default if CCC's NAV declined more than 20% in any one month.  This had happened in August.  These waivers were granted in early September 2007.  For present purposes, however, the Plaintiffs use the fact that such an event had actually occurred as support for their contentions that CCC was, and ought to have been seen to be, fatally wounded by the events of August 2007.

**The claims - August 2007 – summary of arguments**

**Plaintiffs' case**

1375. The Plaintiffs say that the events of August 2007, and in particular the decisions made by the Defendants in or about late August (in particular at the 23rd August Board Meeting) are the heart of their claims.   The essence of their case is that the decision made by the Defendants (although they characterise it as a decision made by Mr Conway but acquiesced in by the other Defendants) was

> "*to continue to run CCC with a $23Bn portfolio of RMBS with 30x leverage funded by 30 day repo without risk controls, in an attempt to ride out the market.*"

This, they submit,

> "*was a reckless and patently inappropriate decision, because the Defendants knew that CCC was no longer viable on that basis in the new world of August 2007 and urgent action was required.*"

1376. The Plaintiffs set out, in their closing written argument, 46 findings of fact and conclusions of law which they invite the court to make in support of this claim.   Once again, these relate to many matters which in my judgment go nowhere in practical terms, because they are not alleged to be the direct cause of any damage and are therefore irrelevant to any operative cause of action.   I will therefore make only such findings as I consider are material to an effectual cause of action or where, for some other reason, I think it appropriate to do so.

1377. The Plaintiffs' case has several steps, which seem to be these.   The Plaintiffs submit that:

(i)     even if it had not been the case in July, the changes to the markets in which CCC operated which took place in August 2007, triggered by the collapse of the three BNP Paribas funds and the subsequent collapse of the ABCP market, were so fundamental as to render CCC's business no longer viable;

(ii)    absent urgent action, this was terminal for CCC;

(iii)   the required urgent action was to reduce leverage, and specifically to do so by selling $10 Bn of RMBS.   Their ultimate submission as to what CCC ought to have done is that the Defendants ought to have put in place

> "*plans to sell at least $10Bn of CCC's RMBS in an orderly and disciplined manner over the next quarter*"

but this has been refined, on the basis of evidence from Dr Maini, to being the effecting of net sales of some $2.5Bn to $3Bn per month;

(iv)    the Defendants either did, or ought to have perceived this; but

(v)     they in fact did nothing in this regard, and even made a decision that they would not sell RMBS;

(vi)     this failure so to act or decision not to act was a breach of the Defendants' fiduciary duties to CCC, or was negligent to the point of recklessness.

1378. The signs which they cite as sufficiently demonstrating the first three points are:

(i)     increasing RMBS price volatility, the index figure for which had by early August exceeded the 0.85% stress test figure originally applied by CCC in devising its business model, discussed above,

(ii)     the increase in haircut rates being stipulated by lenders, and decline in lenders' willingness to advance funds, generally,

(iii)     the "substantial decline" in the value of CCC's RMBS, leading to margin calls, and

(iv)     CCC's repo lenders beginning to price RMBS according to their own more "conservative" internal pricing services rather than FT/IDP pricings, which had the practical effect of a haircut, by the back door.

1379. The Plaintiffs say that by, at the latest, 17th August, when Mr Stomber made a report to all the Directors, all the Defendants knew (as the Defendants indeed accept they did) that market conditions were worse than those of the 1998 LTCM crisis. CCC had had to pay out $200Mn to its repo lenders during the month. It had run out of liquidity (this having fallen to just $5Mn at one point) and it faced a cash shortfall at the 27th August repo roll calculated to be $58.7Mn.

1380. The Plaintiffs complain that in response to the development of these problems, CCC's Independent Directors agreed, in the early part of August, first to reduce (to 15%), and then to suspend entirely, CCC's 20% minimum liquidity cushion requirement, but did so without any proper discussion or deliberation and in effect simply as a rubber stamp; this was a reckless abandonment of risk controls. Whilst this breach of duty is not claimed to have directly caused any financially damaging consequences for CCC it is (presumably) relied on as paving the way for the subsequent claimed breaches of duty which did so.

1381. By 23rd August 2007, the plan to persuade CCC's bankers to maintain haircuts at 2% by tackling them at the very highest executive levels on 20th August, had failed. Three of CCC's underwriting banks (JP Morgan, Bear Stearns and Citi) had advised that CCC needed to deleverage, and Mr Black had advised that CCC should immediately sell $10Bn worth of RMBS. The Plaintiffs submit that ignoring this advice from Mr Black, whom they first describe as a "senior and highly respected banker" but later elevate even further, to a "trusted adviser", was wrong and reckless.

1382. They suggest that the unsatisfactory prices quoted by JP Morgan for the $4Bn worth of the best quality RMBS owned by CCC should have made it clear to the Defendants that an emergency sale of large blocks of RMBS at a time not of CCC's own choosing would all too likely result in distressed prices such that CCC could not rely on selling these assets at reasonable prices at the last moment to raise cash urgently. However Advocate Wessels submitted in closing, that by the same token those prices would not be indicative of prices obtainable for smaller tranches on sales conducted in an orderly fashion. As CCC obviously required urgently to deleverage, it therefore needed to take a pro-active approach to doing so, by selling RMBS in amounts and at times of its own choosing from that time on. CCC in fact did the precise opposite in that Mr Conway had made a decision not to sell RMBS at all, probably by the time of the emergency Board Meeting on 23rd August, (but at the latest, by

the end of September 2007), and the other Directors acquiesced in this.   That decision was reckless.

1383. The focus of the 23rd August Board meeting was simply on surviving the 27th August repo roll rather than, as it properly should have been, on future longer term strategy.     The Board in effect instigated no (or no sufficiently effective) steps towards generating liquidity, and barely discussed RMBS sales.   It was informed of the steps taken and decisions made by the majority of the Carlyle Directors (Messrs Stomber, Conway and Hance) in the previous few days rather than being asked for its approval and being afforded the opportunity to discuss these and the matter generally.

1384. It was not told (by Messrs Stomber or Conway who knew, or Mr Hance, who had been informed) of Mr Black's advice to sell $10Bn of RMBS nor that he had advised that Carlyle should not make the proposed $100Mn loan, with the obvious implication that Carlyle was likely to lose the money.   Neither was the Board told that Bear Stearns had advised that CCC should sell assets, nor all the details of the aborted JP Morgan offer.

1385. It was not told (by Mr Conway) the full details of what Carlyle was having to give to Citi to obtain support for CCC, and the true extent  - which the Plaintiffs calculate at $60Mn–$75Mn – of the  "cost", therefore, of this support even though this knowledge was (say the Plaintiffs) "highly material".   Mr Conway was in breach of his fiduciary duties to CCC in failing to tell all and the consequence was that the rest of the Board was unaware of the "true" cost of the finance from Citi, who had in practice required the equivalent of a 3% haircut, and were also of the view that CCC urgently needed to deleverage.   The Plaintiffs point out that the Citi deal enabled Mr Stomber to represent to other repo dealers that Citi was supplying repo to CCC at a 2% haircut, which, they say, was therefore a misrepresentation.  They rely on this deviousness as further evidence of CCC's effective insolvency.

1386. They submit that, therefore, the Board did not have the information which it needed so as to be able to have a sufficiently thorough and considered discussion of the situation and to be in a proper position to take decisions about how to deal with it.   It took the decisions which it did in a state of inadequate knowledge and did not ask the questions which it ought to have done.   They also submit that the Board did not actually hold adequate discussions or deliberations on such matters in any event.   Ms Cosiol's suggestion of weekly Board meetings was not taken up.   The Board did not discuss any strategic matters, such as what level of liquidity CCC really required, or how its funding could be improved, or the difficulties for CCC's obtaining finance generally.

1387. Mr Stomber did not relay to the Board either the fact that legal advice had been obtained about the duties of Guernsey company directors when the company was in the "zone of insolvency", or its content; this was further information which they ought to have had.  Mr Stomber was thus in breach of duty.  He also failed to implement most of that legal advice received, and neither he nor CCC took any further or other professional advice until CCC was in default, in March 2008.

1388. The Plaintiffs add further allegations that the Defendants, (here Mr Stomber and Mr Hance) "misled the market" and violated Dutch law in failing to disclose the suspension of the liquidity cushion in the press release and the CEO letter of 27th August 2007; they continued to do so at the investor and analyst conference call of 29th August, in the same respects, and also by representing that CCC intended to reduce leverage in the future (the complaint being, by implication, that it had no such intention).

1389. The Plaintiffs also assert that in taking the decisions and actions which they did, the Defendants had no regard to the interests of CCC's creditors which they were obliged to do because CCC was clearly "in the zone of insolvency" through its precarious financial position at and around 23rd August 2007.

1390. They repeat their key complaint namely that CCC ought to have either sold RMBS (in argument, elaborated in more detail, as above) or taken action to raise more equity capital, or to carry out an orderly winding down of CCC, but instead carried on running CCC "*with a $23Bn portfolio of RMBS levered at 30 times leverage and funded by 30-day repo*".   If CCC could not raise more equity capital then its alternative courses were reduced to those of selling RMBS or winding down CCC which would involve much the same thing, but the Defendants did neither.   These failures, it is said, were breaches of duty, and also constituted misfeasance.

1391. The Plaintiffs submit, though, that there is in fact no need for the court to come to any adverse conclusion as to the Defendants' honesty or good faith in order to find liability even for breach of fiduciary duty.   However they do raise matters which they say disclose conflicts of interest on the part of the Defendants, or "explain" what they otherwise characterise as the Defendants' "inexplicable" failure to take what they say was the obvious step required for urgent deleveraging  – namely to sell RMBS.   They rely on these matters as adding support for the findings of breach of duty, which they seek.

1392. I infer that these allegations are therefore pursued in order to support an argument that the alleged breaches of duty constituted a "*wilful act, neglect, default, misfeasance or misconduct*" within the meaning of one or more of these words as they are used in the exceptions to the exoneration and indemnity provisions in CCC's Articles of Association, or (as regards CIM) in the IMA, but falling short of dishonesty.   If necessary, I will refer to this as the "wilful breach" argument.   The factors are:

    (i)     a wrong-headed pursuit of a double digit dividend target for CCC

    (ii)    the desire to avoid embarrassment and negative effects on Carlyle and CIM (thus wrongfully prioritising Carlyle's  and CIM's corporate and reputational interests over those of CCC), in various respects, such as having to take realised losses on CCC's accounts, thereby reducing capacity to pay dividends, losing fee income for CIM and effectively having to admit that CCC had been a failure

    (iii)   the personal interests of Mr Conway, and to a lesser extent Mr Zupon and Mr Hance, as part owners of Carlyle,  in

        a.     selling an ownership interest in the Carlyle Group to Mubadala in or about September 2007,

        b.     securing a $1Bn term loan for Carlyle, in August and November 2007 and

        c.      progressing Carlyle's own potential IPO,

    (iv)   Mr Stomber's subservience to Carlyle, CIM and Mr Conway, and

    (v)    the fact that the so-called Independent Directors were not truly independent.

The latter two are not so much ingredients of a cause of action but general underlying factors which may have contributed to or motivated the specific matters of alleged breach of fiduciary duty, and I have considered these above on a general basis.  I take them into account when dealing with the three particular allegations of breach of fiduciary duty, below.

1393. As regards wrongful trading, repeating the above matters, the Plaintiffs submit that from at least 17th August 2007 CCC was either cash flow insolvent or bordering on such insolvency, and needed urgently to reduce its leverage.  Without doing so it stood no reasonable prospect of avoiding insolvent liquidation and the Defendants either knew or ought to have concluded this.  The Defendants did not cause CCC to reduce its leverage as was required, and they therefore became guilty of wrongful trading from this time.

**Defendants' case**

1394. The Defendants deny the above allegations, not so much at the level of primary factual occurrences, but rather at the level of fair and correct interpretation.

1395. Broadly, the Defendants say, just as they do with regard to July, that when one examines all the evidence as to the actual course of events in August, taking matters as they appeared at the time and without the benefit of hindsight, their decisions and actions remained perfectly rational, prudent, proper and reasonable, in context. They were an appropriate response to market events as they unfolded and affected CCC, and were properly taken in what each of them believed, on adequate and careful consideration, to be CCC's best interests. They further submit that not only were the steps taken reasonably perceived to be in CCC's best interests, but on the evidence, they actually were the safest and best course for CCC to adopt in the circumstances. It certainly cannot be said, they submit, that the relevant ultimate decisions of which the Plaintiffs complain were outside the range of decisions which a reasonably diligent, competent and loyal director of CCC could have made, at the time.

1396. The Defendants point out that in opening their case (and having already drawn back from the extravagant way in which it was initially put, to which I refer later) the Plaintiffs appeared to be arguing that the Defendants' culpability lay in not having any strategy to deal with the problems posed to CCC by the market conditions of August 2007. They now, instead, disputed that the "capital preservation strategy" had actually been any such thing, asserting that this description was an *ex post facto* rationalisation of (culpably) doing nothing. They had submitted that the Defendants had "had no plan" as regards how to deal with CCC's future. However, Mr Wallace, the Plaintiffs' own insolvency expert, had accepted that "doing nothing" is, in appropriate circumstances, just as much a plan as doing something, and, at any rate with regard to selling RMBS, this was actually a positive decision by the Defendants.

1397. The Defendants further submit that the Plaintiffs' case in effect comes from the wrong starting point. In their dogged concentration on RMBS sales as a means for reducing leverage and increasing liquidity, they overlook or underrate the other steps which CCC actually did implement at this time, and which it was clearly fair to describe as a "plan" or "strategy". The steps which the Defendants cite, in the order in which they were taken, were first,

    (i)    the suspension of purchases of credit products on 26th July (recovering $30.7Mn previously earmarked for this purpose) and then

    (ii)    ceasing all RMBS purchases as from 30th July, both as already mentioned, and as first steps towards preserving cash and liquidity

which had been implemented previously. This had the effect of retaining $60Mn of the $131Mn net proceeds of the IPO as cash, and halted any increase in leverage ratios. It also had the effect that income, amortisations and prepayments on existing RMBS would be retained in order to bolster liquidity, rather than applied in purchasing more assets, as the business model previously had predicated. The consequence of this also meant that, albeit very slowly, the total size of CCC's RMBS portfolio would shrink, thereby naturally (again, albeit slowly) gradually reducing leverage ratios.

(As an aside, they observe that such a process – that of natural deleveraging by retaining income - was expressly recorded as being recognised by Annaly, one of their peer/competitor group entities, as a potential response to an increase in debt to equity ratio. I suspect that this

was in the context of the expectation of rather more modest market fluctuations than occurred in August 2007, but the basic point remains valid; this was not an outlandish technique).

When CCC received margin calls and demands for increased haircuts, the immediate reaction of Mr Stomber – who had in fact been alert and proactive – was the next step, which was

> (iii)   to seek a loan of $100Mn from Carlyle.

Whilst Mr Conway's immediate reaction was that he would want to know that this was going to be effective, the fact is that, in the event, this sum was made available.

The fourth step taken, and discussed and authorised at the 23rd August Board Meeting, in fact <u>was</u>

> (iv)   the sale of assets (just as the Plaintiffs argue should have happened) but it was the sale of CCC's two different kinds of credit assets, CLOs and bank loans.

1398. The Defendants complain that the Plaintiffs keep overlooking or ignoring the fact that they <u>did</u> sell assets.   The Plaintiffs' complaint that the Defendants did not consider selling RMBS at the 23rd August Board meeting ignores the fact that the merits of doing so at that time related to doing so as an alternative or additional course, and were being considered in the context of the option of selling credit products instead.   The <u>relative</u> demerits of selling RMBS were at the time, simply so obvious that they did not need to be considered in laborious detail.

1399. The credit assets were, in fact, re-sold to Carlyle and otherwise extremely skilfully sold, and produced about $160Mn in total further liquidity.   Furthermore, this step was supported by the promise, obtained from Carlyle, of a loan of $100Mn, as a potential bridge pending receipt of the funds for these sales if necessary (although this was not in the end called upon).

1400. The Defendants say that the sale of assets with credit risk rather than RMBS at the time of the August crisis was a prudent one in the light of the price indication obtained through the JP Morgan offer and the other risks of selling.   As to these, there was, first, the risk of moving the market and defeating the whole object of the exercise.   They point out that Mr Wallace, the Plaintiffs' own insolvency expert, had agreed that there was the potential risk that a sale of RMBS at low prices would move the recorded market prices downwards, causing repo lenders' price marks also to move down, and thereby generate margin calls, the amount(s) of which might actually exceed the cash obtained from the sales, and therefore completely wipe out any additional liquidity which had been obtained.   The second, more subtle but no less serious, risk, also agreed by Mr Wallace, was that if it became known or suspected that CCC was trying to sell RMBS, particularly in any quantity sizeable enough to make the transaction at all worthwhile, having previously proclaimed  that its business model and investment strategy was to "buy and hold" these assets, that could cause a perception that CCC was in trouble - and a loss of confidence in CCC with its repo lenders, which could well cause their withdrawal of finance or increase in haircuts, thereby damaging CCC even further, and potentially catastrophically.

1401. They submit that the Plaintiffs' stark assertion that CCC "should have sold RMBS" thus failed to have due regard to the two vital factors of (i) the likely achievable price, and (ii) the risks, not just arising from actually selling, but even from being seen to be investigating selling.   Deciding not to sell RMBS because of these risks was a decision which, the Defendants submit, was rational and sensible, and well within the range of reasonable and responsible decisions for directors of CCC to have made in the circumstances.

1402. As to the mechanics (rather than the effects) of such decision, the Plaintiffs were just wrong, on the evidence, to suggest that there had been no "analysis" of undertaking the sale of

RMBS assets.   The degree of analysis required was only such as was necessary to make a sensible decision, and the decision was not a fine one.   The evidence showed that it was a considered decision, in the light of Management's explanations, sought and given at the Board Meeting, as to why it was proposed to sell the credit assets.

1403.  It was also wrong to characterise the Board decision as either a rigid decision not to sell RMBS at all, or not to sell RMBS at a loss.   Messrs Hance, Stomber and Conway, the majority of the Investment Committee, had, immediately after the 20th August meetings with the banks, approved a potential sale of up to $4Bn of RMBS provided this could be carried out at prices close to CCC's own marks, even though that would incur a loss.   The key once again was price, and whether the liquidity generated at a particular price was sufficient to make the sale worth the disadvantages of (i) locking in the concomitant quantum of realised and irrecoverable capital losses on assets which, by common consent (and the Plaintiffs' macro-economics expert, Dr Carron agreed this) would "inexorably" rise to par value with time, and (ii) running the imponderable risks of selling RMBS, which risks would be outside CCC's control.

1404.  There was never, they submit, a fixed decision "never" to sell RMBS, and the Plaintiffs' characterisation of the position as such a decision was unjustified.   Mr Conway's closing "wind up" remark at the end of the 23rd August Board meeting could not be interpreted as such; it was simply a summary of his view at the time.   The investigation of sales to Fannie Mae and Freddie Mac (their advantage being that they would be more discreet than attempts to sell in the general over the counter markets) demonstrated this.   The policy endorsed at the Board Meeting, and thereafter, included that CCC should be responsive to "opportunistic" sales, ie sales, at affordable prices but coming from "reverse enquiries", the advantage of these being that CCC would not then be perceived to be eager to sell.   But apart from that scenario, the risks of selling were too great, and the more approaches CCC actually made to third parties, the greater was the risk that the perception of CCC being in trouble, and potentially being a forced seller, would leak out into the market.

1405.  The Defendants submit that the reasonableness of deciding not to sell RMBS at this time should also be viewed in the context of the Board's approving other indirect actions namely the active management of CCC's repo relationships, and communicating CCC's intentions to its bankers to maintain their confidence.   There was thus a properly considered approach, and not just inaction.

1406.  They say that CCC's intentions were clearly stated both in the 27th August press release and during the 29th August investor and analyst conference call and were fairly described as a "strategy" and also as a "capital preservation strategy"; it is factually wrong (as well as being irrelevant in the action) to suggest that CCC misled either its repo counterparties or its investors.

1407.  The Defendants submit further that was nothing culpable in the way Mr Conway made efforts to assist CCC by using Carlyle's influence and resources, nor about the degree of disclosure which he gave to CCC's Board.   The essential thing for the Board was simply to know what help CCC could expect from Citibank.

1408.  As to the alleged conflicts of interests, the Defendants deny the fact of any conflict, but submit that in any event there is no evidence to suggest that any such matters were remotely operative on the minds of the Defendants at all.   The evidence shows (they submit) that the Defendants believed that the course of action which was pursued in August (and indeed subsequently) gave CCC reasonable prospects of surviving and recovering sufficiently to be able to formulate a new business model, once market conditions had stabilised and hopefully returned more to the previous "normal", and that such belief was both honestly and reasonably held.