1409. In objective support of the reasonableness of the Defendants' persisting in the belief that CCC could and would survive, they rely on the following general facts:

(i)    CCC had positive net asset value on its balance sheet of over $600Mn in August 2007.

(ii)   It also continued to make an income profit from its RMBS holdings.  The Defendants remind me that CCC's RMBS did, in fact generate income at all times, from the difference between the interest payable on its financings and the income receivable from the RMBS bonds themselves, a point which they (rightly) submit tends to get overlooked; CCC was actually, from that perspective, still a profitable business.

(iii)  CCC had managed the 15th August repo roll, took steps, on 23rd August, to enable it to manage the 27th August repo roll and beyond, and in fact succeeded.

(iv)   The monies which it had had to expend on margin calls were not lost to it, but would be returned if and when market prices of RMBS rose again, and an expectation of this was not unreasonable.

(v)    At and from the end of August, so long as CCC could maintain the financing of its RMBS holdings without defaulting it would remain solvent.

(vi)   It would not be forced into default so long as market conditions did not grow significantly worse than they became during the middle two weeks of August, and there was a reasonable expectation that market conditions would improve.

1410. In those circumstances, there was no reason to conclude that CCC stood no reasonable prospect of avoiding insolvent liquidation.

1411. In short, in August 2007 (and indeed at any time) the Defendants contend that there were no breaches of duty, nor any wrongful trading.

**Plaintiffs' reply**

1412. The Plaintiffs respond that the risks of selling RMBS now claimed by the Defendants to be so major and to have played such a great part in their thinking are being hugely exaggerated after the event.  They say that this is supported by the absence of any record of any major or serious discussion of such risks to be found in the contemporaneous documents.

**Discussion and conclusions - August 2007**

1413. Again, I identify the breaches of duty actually alleged against the individual Defendants in the Cause (as before, I deal with the contractual allegations against CIM and the position of the Entity Defendants separately) as being the matters listed in Paragraphs 308D – 308H of the Cause, again as further particularised in paragraphs 418B-418G and 418I to 418N, incorporated here by Paragraph 309.   The effectual breaches, ie those capable of causing direct financial consequences for CCC, are alleged at paragraphs 308D.11 and 308G.10 although framed as "*failing to insist upon*" the required action being taken.  They are reiterated at 308E, with additional allegations of improper motivation.    They are:

> "*failing to insist that CCC either (i) sell down its RMBS assets to generate liquidity and reduce leverage, and/or (ii) raise additional equity capital to reduce leverage and/or (iii) conduct a restructuring or orderly wind down*".

1414. It is convenient from now on to refer to this formulation as the "core breach".    The remaining allegations are, once again either elements of the core breach, or, insofar as they are separate, are not matters which themselves had financial consequences.   As to this latter

point, whilst the breaches of duty alleged at paragraphs 308D14 and 308E13 (the complaint of causing CCC to accept the Carlyle loan of $100Mn) relate to financial matters, no financial consequences are alleged in the pleading.

1415.   The actual facts as to what actions the Defendants took or did not take with regard to managing CCC's assets are scarcely in dispute.   It is clearly the case that, during August 2007 and in particular at the 23rd August Board meeting, they did not resolve or insist on selling $10 Bn of CCC's RMBS -  either immediately or as to $2.5 Bn - $3 Bn per month for the following three or four months, - as the Plaintiffs now say they should have.   Nor did they consider raising further equity capital.   The resolution to sell the company's credit assets might be regarded as a form of "restructuring" of its business, or even of winding it down, but that is obviously not what the Plaintiffs mean by restructuring, as they criticise those steps as being ineffectual or inadequate.   The dispute is therefore whether the actions just referred to constituted breaches of the Defendants' duties as directors of CCC.

**(a)   Breach of duty of care**

1416.   Again taking breach of duty of care first, the issue at this point in time is therefore whether the essential decisions and actions of the Board of CCC noted above were decisions and actions which no reasonably competent director of CCC could have made in all the circumstances at the time, again being judged on an individual basis, with regard to any particular director's enhanced level of skill and knowledge if any.   I have already indicated my broad assessments of each of the individual Defendants in this regard.

1417.   Having considered all the evidence and the respective submissions which I have summarised above, I accept the Defendants' submissions.  I find the decisions made by the Defendants in August 2007 and in particular at the 23rd August Board Meeting to have been within the range of decisions which a reasonable director of CCC, possessed of the level of financial skill and expertise of any of the Defendants, could reasonably and responsibly have come to in all the circumstances.   My reasons are largely those which appear in my summarising of the Defendants' submissions above, because I find their arguments convincing.

1418.   I fully accept that the reasons now articulated as being behind the decisions taken and followed at the August 23rd Board Meeting and ALCO meeting were not recorded in the detail and coherence with which they have been expressed in the course of this trial, at or around the time the Defendants claim that their strategy was devised.   However, this does not mean that there was in fact no such strategy, nor that it was an "ex post facto rationalisation" as the Plaintiffs claim.   At the time, it was not necessary to articulate everything as comprehensively and clearly as has been prompted by the Defendants' being called to account in this action.   I am quite satisfied that the aspects of the strategy now explained and articulated were present in the thinking of the Defendants, and in particular the material Defendants (principally Mr Stomber, but also Messrs Conway and Hance and to a degree Messrs Zupon, Allardice and Sarles) at the time.   I am satisfied that, given the Defendants' personal knowledge and experience, those considerations were appreciated and weighed up by those Defendants, but to some degree intuitively and without being expressly articulated. As to Mr Loveridge, given his lack of specialist knowledge and his role in the company, it was, in my judgment, reasonable for him to endorse decisions which were not obviously unreasonable or illogical and which were arrived at by common consent of his more expert fellow directors based on all the materials which he could see had been supplied, and the discussions which he had observed taking place. I can see no reason why he ought to have doubted or mistrusted what they said.

1419.   The Plaintiffs seek to characterise the decisions made at this Board Meeting as an irresponsible gamble; they lay stress on Mr Sarles' use of this language in evidence as disclosing the Defendants' underlying attitude, when he said

*"In August we made our bet as to what the best plan was….".*

However, this is just the kind of informal figure of speech which ordinary people use, and I am quite satisfied that the word "plan" more correctly describes the decision made and what the Board thought it was actually doing than does the word "bet".

1420. I am therefore satisfied that none of the individual Defendants was in breach of his duty of care towards CCC in August 2007, in making the relevant decisions or agreeing the relevant actions or policy, either at the Board Meeting or the ALCO meeting, or with regard to any other aspect of their implementation.

1421. For completeness, given the specific points raised by the Plaintiffs, I add the following comments and findings.

1422. I have already held that the reduction and suspension of the liquidity cushion requirement by the Independent Directors is one of the many breaches of duty alleged which themselves have no financial consequence. This allegation of breach goes only to form and not to substance. The reduction/suspension of the minimum liquidity cushion requirement not only did not cause damage, but did not even cause the decisions which are alleged to have done so. The decisions to reduce or suspend this requirement were ancillary and consequential, being required for good order having regard to the potential need to use liquidity cushion assets. I am satisfied that even though these decisions were made without formal meetings, of either the Board or the Independent Directors, the process by which they were dealt with and made was adequate and reasonable in all the circumstances. I reject the allegation of inadequate deliberation or lack of independent thought. I am satisfied that each of the Independent Directors gave appropriate thought and judgement to these decisions, in the light of his personal level of expertise and the recommendations of those in direct charge of CCC's business. Whilst obliged to give the matter critical and independent thought, with their queries or suggestions being reasonably answered they were entitled to accept those recommendations.

1423. I find the Plaintiffs' criticism that the Defendants paid insufficient regard to the "advice" of Mr Black of JP Morgan to be unreal. Mr Black may well have been a senior and highly respected banker, but the suggestion that he was a "trusted adviser" to CCC (or anyone else in this case) is absurd. Mr Black's bottom line agenda was the best interests of JP Morgan. Mr Stomber was suspicious that Mr Black was trying to obtain a good deal for a client buyer whom JP Morgan had lined up, and felt that his suspicions were confirmed by the low prices eventually offered for the $4Bn of RMBS. I am inclined to think, on the evidence in the case (which does not include any evidence from Mr Black), that Mr Stomber was probably correct. In any event, the eventual offer price seems to me to support the view that Mr Black was not considering CCC's interests, certainly in the depth which would be necessary to judge them accurately. It is also notable that his advice that Carlyle should not make the $100Mn loan to CCC was not only gratuitous, but was obviously addressed to Carlyle and not CCC. His advice was also not that good, in that his prediction of large margin calls against CCC the following day did not materialise.

1424. I therefore do not attach any, let alone significant, weight to the reported comments of Mr Black. At his high executive level, I find that they are more likely to have been made for effect and general relationship purposes than to be regarded as "advice" which CCC "ought" to have taken. It was Mr Black's observable attitude, rather than the content of his comments, which it was appropriate for Messrs Stomber and Conway (and Hance) to evaluate and have regard to, and I find that they did just that. I do not find it a matter of any great moment that they apparently did not relay to the Board the precise figure ($10Bn) which Mr Black had "advised" should be sold, shocking though it might have been. It was not necessary to do so. The general seriousness of the situation and the tenor of Mr Black's attitude was perfectly adequately conveyed without reference to this figure, which I also

suspect was deployed in the meeting as much for dramatic effect as anything.  I also find that the experience of the low price offered by JP Morgan following on from Mr Black's "advice", far from suggesting that CCC ought to sell RMBS as he advocated (which is what the Plaintiffs argue), actually tended to underline the risks and dangers of doing so.

1425. Next, I find as a fact that Mr Conway did not "decide not to sell RMBS" as any kind of fixed and final decision.  It was, rather, a part of the exercise of his general business judgement that, in all the circumstances, other assets should be sold first, and other measures taken to improve CCC's financial position (such as taking a loan which TCG was willing to provide) ahead of selling RMBS, and that sales should not be made except where the balance of advantage and disadvantage favoured selling.  This in turn meant where there was a suitably worthwhile price, preferably achieved through a favourable opportunity such as a reverse enquiry.

1426. I also find as a fact that Mr Conway did not impose his view on the other Defendants, nor generally exercise control over the Board of CCC or CCC itself.   He merely made his views known clearly.  He was not only entitled, but obliged, to do so, and he did so in a manner which was not inappropriate.  I have no doubt that he was aware that his views would carry weight with other members of the Board, but it is no part of the duty of an experienced and powerful director to refrain from expressing his views clearly so as to avoid this.    It may give rise to influence, but it is certainly not undue influence.

1427. I do not find Mr Conway's insistence on reviewing CCC's future press releases after the adverse reaction to that of 21st August to be any evidence of undue control of CCC, but rather of a concern to try to head off potential damage to CCC in the future.

1428. As to the "Citi deal" it is of course the case that the full terms of the proposed arrangement with Citibank were not disclosed by Mr Conway to CCC's Board, but I do not accept that the undisclosed details were "highly material" to the Board's decision making process, let alone to the impugned decisions themselves.  Of course the undisclosed details enabled a theoretical computation of the notional value (to Citi) of additional support from TCG to be made.  It is almost always possible to reduce advantage and disadvantage to financial parameters, and it is often a tool which is of assistance in making skilful business decisions.    However, the making of such a comparison does not mean that this figure was the cost of such financing to CCC; it did not affect CCC's own financial situation.  I find as a fact that revelation of the further details of what Carlyle was prepared to do with Citi would not have affected the material decisions taken by the Board of CCC; it would simply have increased gratitude to Carlyle.

1429. I therefore reject the submission that the extent of non-disclosure was a breach of duty on Mr Conway's part, and whilst I am not persuaded that Mr Conway would have revealed the further details to CCC's Board if asked – I think he has a natural "need to know" approach with regard to business – whether or not he would have done so is therefore irrelevant.    I reject the similar, but even more tenuous, allegations with regard to his "failure" to disclose the variations to the agreement which had never been disclosed.  For the avoidance of doubt I also reject the convoluted allegation that the remainder of the Defendants were in breach of duty for failing to "insist" on receiving such disclosure.  For good measure, I record that even if Mr Conway had disclosed the full extent of the Citi Deal to the other Defendants, I am not satisfied that it would have made any difference to the decisions which they then took, or even that it should have done.

1430. I am also satisfied that any failure by Mr Stomber to pass on Ms Cosiol's legal advice as regards taking account of the interests of creditors was not of materiality or significance to the relevant decisions.  Such failure was, I find, explained by his view that at the time CCC, whilst not in a comfortable place, was not "in the zone" or on the brink of insolvency.

1431. In short, for the avoidance of doubt, I see no matter of any sufficient materiality to the decisions made at the 23rd August Board meeting which was not disclosed to the Board and I can see nothing to suggest that any matter which was arguably not disclosed to the Board, whether individually or in any combination, would have changed the decisions actually made.

1432. Lastly, in regard to the 23rd August Board Meeting, the Plaintiffs' attribution of such solemn significance to Mr Conway's recorded closing remark at the end of this meeting, as to "hop[ing we] have some good luck" that it can be regarded as evidence of recklessness is fanciful.   Having seen Mr Conway give evidence and observed his occasionally ironic style of email, I am perfectly satisfied that this was a jocular sociable remark, probably to lift the morale of those attending.   It is not deserving of the attention that has been spent on it. It is another illustration of why the material in this case (and this judgment) has had to swell to the disproportionate level which it has done.

1433. The Plaintiffs' accusation that CCC was enabled by the non-disclosure of aspects of the total proposed Citi deal to "misrepresent" to other repo lenders that it was obtaining substantial repo finance from a major player such as Citi at a 2% haircut (Citi having itself calculated the intended deal as equivalent to at least a 3% haircut, but without –unsurprisingly – itself revealing this to CCC) has no relevance to any claim in this action, even if it were justified as an accusation in itself.   However, I reject it as fact and would regard it in any event, as trivial. The statement was literally true.   It was also in CCC's interests to be able to make such a statement in the market - and I am far from satisfied that the making of such a statement in the circumstances, even if arguably incomplete, would or should be regarded as outside the ambit of acceptable practice.   The law needs to have regard to the attitude of the ordinary reasonable person, and it would be quite unreal to expect that traders and dealers should couch their "chatter" with the careful qualifications which might be expected in a solemn document.   I emphasise, though, that even if any such statement were to be classed as a misrepresentation, I do not find it to have any relevance to the claims in the action.

1434. I also reject the submission that the Defendants misled the markets in either the press release of 27th August or the investor and analyst conference call of 29th August 2007.   These allegations again have no direct materiality to the claims, and the associated allegations of breach of Dutch regulatory law are similarly immaterial.   For reasons which appear later, I do not consider that they require a decision.

1435. Finally, I reject the allegation that it was any breach of duty for CCC's Directors to approve the taking of the first Carlyle loan of $100Mn.   No evidence was called to suggest that the terms of the loan were unreasonable (and on balance of probability I would find that they were not).   In any event, the allegation that it was wrongful conduct to accept the loan because it was "insufficient" is bizarre.

1436. Although the alternative claim that the Defendants ought to have considered, and, by implication, sought to raise, further equity capital at this time was scarcely persisted in, for the avoidance of doubt I reject that allegation as well.   I accept that there is no evidence that such possibility was deliberated on, but I am quite satisfied that it was so obviously unrealistic as to require no debate.   The IPO was only recent.   There was no party who might be expected to inject further capital into CCC in the then market circumstances except TCG, and TCG was assisting by providing the term loan.   There was therefore no breach of duty in failing to waste time and effort discussing this.

**Extended duty to have regard to interests of CCC's creditors**

1437. This is as good a point as any to give my findings with regard to the potential extension of the duty of CCC's directors to CCC becoming extended to include the interests of its creditors.

1438. The Defendants argue that this duty never in fact arose, because CCC was neither insolvent nor, if properly viewed, on the brink of insolvency in August 2007, or, indeed at any time up to the days before its final collapse.

1439. I find that CCC was not insolvent within the meaning of the material Guernsey statute, ie the 1994 Law, either "as from 17th August 2007" as the Plaintiffs submit, or at any time during August 2007 - or, in fact, at any time prior to the days immediately before its actual collapse when it received the first margin call which it did not pay.   I do find, however, that CCC was in a sufficiently difficult financial position that a real possibility of future insolvency, even within the meaning of the 1994 Companies Law, could not be ruled out.

1440. As I put it no higher than this, applying the test which has been considered and refined in English law would seem not to be sufficient to trigger the extended duty.  However English law has formulated the refined version of its test whilst having regard to a test for actual solvency which is less strict than that which I find to operate under the 1994 Companies Law. Given the rationale of the extended duty, it seems to me that it would be right to regard it as applying in any situation where the interests of creditors in an insolvent winding up have a discernible possibility of becoming operational.   I will therefore assume, in favour of the Plaintiffs, that the extended duty did arise.

1441. The materiality of that was then, in my judgment, that CCC's directors, the Defendants, were obliged to have proper regard for the interests of CCC's creditors, with "creditors" meaning, as already discussed, CCC's potential unsecured creditors in general, and with "proper regard" meaning: taking a responsible view of the consequences of their actions on CCC's behalf to the interests of such creditors insofar as such actions might potentially impact on them.

1442. In fact, CCC had no unsecured creditors at the relevant time except, ironically, TCG once the unsecured loan of $100Mn was drawn down.  However, this legal principle ignores the actual personality of such creditors; their "interests" are to be treated as those of the impersonal general body of unsecured creditors.   CCC's repo lenders were not unsecured creditors. Their interests, at any moment, lay, as a matter of practicality, in CCC's being able to secure affordable funding to pay off their current repo loans at the end of the next repo period, and otherwise in the maintenance of the value of their security.   However, insofar as their security might be insufficient to pay them off, the unpaid balance would place them in the position of unsecured creditors *pro tanto*.  They did, therefore, have interests at this remove, as potential unsecured creditors to the extent of any potential inadequacy of their security in the event.

1443. I accept that there is no evidence of the Defendants' actively considering the interests of CCC's creditors at all, unsecured or otherwise.   In fact, though, legal identification of the relevant creditors' interests in CCC's case is rather technical, as indicated by the above.   I do not think that the Defendants, as businessmen, were required to embark on any such analysis. Neither, is it necessary for me to do so here.

1444. The bedrock of the principle underlying the obligation to have "proper regard" to the interests of the unsecured editors of a financially fragile company is that of drawing a fair balance between the interests of creditors and shareholders in the remaining assets of the company where these may start to diverge.  If there is no practical divergence, then "proper regard" for the interests of unsecured creditors will be subsumed in having regard to the interests of shareholders as to preservation of the company's capital.   If there is such a divergence, then the director's duty is to pay regard to the balance of such interests in making relevant decisions.

1445. I cannot in fact see that there was any discernible divergence or conflict between the interests of shareholders and the interests of any perceivably possible unsecured creditors of CCC at

the time.  I certainly cannot see that there was any conflict between those interests as regards a decision as to the desirability (or otherwise) of not immediately selling or embarking on a plan to sell up to $10Bn of CCC's RMBS portfolio.

1446. The repo lenders were, in my judgment, reasonably viewed as being well-secured for the moment.  The factors which might cause them to become at all unsecured would be the failure of CCC's repo funding arrangements or the heavy marking down of the market value of its RMBS.  Apart from those eventualities, CCC's business would continue to tick over and slowly recover the safety net of liquidity, and the repo lenders would come out of their current loans with these being repaid, and might or might not choose to roll them over. Those factors were the very same factors which CCC and its Management were striving to hold together in the interests of CCC.  There was therefore, in my judgment, no divergence of interest between CCC and the general body of its repo lenders (whether or not they are viewed as contingent unsecured creditors) so as to make it necessary for the Board to identify those differences of interest, let alone to make it plausible that the Board would have concluded that those interests would benefit from any different course of action from what appeared to be in the best interests of CCC itself.

1447. In the circumstances, I am satisfied that there was therefore no failure by the Defendants to have the required proper regard to the interests of CCC's creditors as embraced within the Defendants' duty to have regard to CCC's best interests, either at this time, or indeed at any subsequent time.

1448. I should point out, of course, that my reasoning above is of very narrow effect in this case because it is primarily in relation to the 1994 Law.  The corresponding provisions of the 2008 Law are different and more akin to those of the current English Acts.  Even applying those, though, my conclusion would be the same, because it depends on the general coincidence of the shareholders' and creditors' interests, and not on the detail of what might technically amount to "insolvency".

**(b)    Breach of fiduciary duty**

1449. In view of my finding that the challenged decisions were not only appropriately carefully taken, but were objectively well within the range of possible reasonable decisions which could be made by a duly diligent competent and careful director of CCC, they fall within the *Charterbridge* principle in any event, and it is again not strictly necessary for me to consider whether any of CCC's directors acted in breach of their fiduciary duties when making such decisions.

1450. However, the Plaintiffs have made much of various allegations in this respect, both on their pleadings and in aspects of cross-examination, and as this is the point in the history where such matters would have significant impact if they did apply, I will review the relevant allegations here and give my findings.  However, I still confine this to such of the allegations as are capable of causing loss, in effect, therefore, the elements of the "core breach".

1451. Some of these allegations are framed as breach of fiduciary duty in failing to disclose a conflict of interest to the Board and not then ceasing to participate in the decision- making process.  These complaints go nowhere as regards any claim sounding in damages.  Indeed, there is no assertion as to what it is alleged would have happened without their occurrence. For those reasons I do not propose to consider such allegations further.

1452. I have referred above (as at July) to the five factors cited by the Plaintiffs as vitiating the propriety of the material decisions made principally in August 2007, and rendering them breaches of fiduciary duty.   I have examined the last two – Mr Stomber's alleged "subservience" and the claimed lack of "true" independence of the Independent Directors - as a general point because they are of general application.   I will indicate in context where and

how far they affect my approach to any particular material allegation.   I need here, therefore to consider only the first three matters of breach of fiduciary duty.

1453.   These are subordinating CCC's best interests to:

> (ii)    a wrong-headed pursuit of a double digit dividend target;
>
> (iii)   the Entity Defendants' corporate and reputational interests in the avoidance of taking losses into CCC's accounts, reducing capacity to pay dividends, losing fees for CIM, and the embarrassment of effectively having to admit that Carlyle's first enterprise to "go public" had been a failure; and
>
> (iv)    the personal financial interests of Messrs Conway, Zupon and Hance, as part owners of Carlyle,  in
>
>> a.    the most lucrative sale of an ownership interest in the Carlyle Group to Mubadala in or about September 2007,
>>
>> b.    securing a $1Bn term loan for Carlyle, in August and November 2007 and
>>
>> c.     progressing Carlyle's own potential IPO,

1454.   As allegations of breach of fiduciary duty, they all go to the issue of the <u>propriety,</u> in August 2007 (or thereafter), of making the decision not to attempt significantly to reduce the leverage operating on CCC's RMBS portfolio by selling a significant quantity of RMBS, or of raising further equity capital, or otherwise restructuring or conducting an "orderly winding down" of CCC.  They all go to inappropriate or improper motive.

1455.   The Plaintiffs' position at the end of the trial hearing was that it was not necessary, in order for me to find a breach of fiduciary duty, to make a finding of dishonesty on the part of any Defendant.   Indeed, Advocate Wessels went even further, and in the course of closing submissions, expressly disavowed any submission that any of the Defendants had been guilty of dishonesty.   This was a welcome, but remarkable, contrast to the tone of previous submissions.

1456.   However, I find the effect of this concession both puzzling and concerning.    "Dishonesty" entails conscious wrongdoing.     You cannot have inadvertent, involuntary or accidental, dishonesty.   Here, having regard to the nature of the accusations, "dishonesty" would naturally mean: prioritising the interests of either the Carlyle Group or a Defendant personally above the interests of CCC*, whilst knowing that it was improper to do so*.   The Plaintiffs' concession appears to mean that they disavow any intention to argue that the second limb, (knowledge of impropriety) occurred, whilst submitting that the court can still find a breach of fiduciary duty by simply upholding the Plaintiffs' submission that the elements of the first limb (actual prioritisation of Carlyle or personal interests over those of CCC) are proved.

1457.   Quite where there is room for such a scenario in practical terms is difficult to see.  "Prioritisation", which is what the Plaintiffs have alleged, is an act of active consideration, comparison and preference of one interest over another.   The hypothesis itself therefore excludes the possibility that the Defendants simply did not consider CCC's interests at all.  The concession therefore entails that the Defendants should have considered those interests and deliberately given priority to competing interests of either Carlyle or themselves, but should have done so in an innocent state of mind, ie without knowing that this was improper.  This is patently impossible in the case of personal interests.   In the case of Carlyle's interests the only possible material states of mind are either a positive belief that it was in CCC's own interests to prioritise Carlyle's interest over CCC's own interests, (an inherent contradiction which is clearly absurd), or an innocent failure to appreciate, even though actually thinking

about it, that prioritising Carlyle's interests over those of CCC was something which might be improper at all.

1458. Whilst I can just about enunciate the bare logic of this latter, I find it completely unreal.   The reality is that the Plaintiffs have alleged, and indeed are still alleging (see below), a disgraceful attitude by the Defendants to the importance of CCC's best interests.   They do so in the shape of a positive allegation that they were motivated by the overriding wish to prefer the interests or perceived interests of all or some of the Entity Defendants or, in the case of Messrs Conway, Hance and Zupon, of themselves personally.   But, having thus sown the seeds of an allegation, effectively, of dishonesty, the Plaintiffs now seek to distance themselves from this, whilst still relying on the actual building blocks of such an allegation.

1459. In the middle of a trial of this length and complexity, with pleadings as labyrinthine as these, and with time limited oral submissions, the effects of the Plaintiffs' concession were not analysed by close reference to the pleadings.   It may well be that if this had been done (and I do not criticise anyone involved for not doing so in all the circumstances) I might have been persuaded to refuse to accept this concession unless the Plaintiffs simultaneously withdrew formally the allegations which carry such a strong and necessary implication of dishonesty, on the grounds that those allegations should not be allowed to remain in the action if the Plaintiffs were not prepared squarely to support the implicit allegation of dishonesty.

1460. This approach was not argued, but it seems to me that, with the precise factual allegations being so redolent of an implication of dishonesty, then even if the Plaintiffs disavow any reliance on dishonesty, it would be wrong for me to reduce the scope of my judgment so as not to deal with that point simply because I could do so by relying on some procedural or logical consideration.   This is for two reasons.   First, the unreality which I perceive about it all means that I find it impossible to carry out any such exercise succinctly or efficiently. Second, the seriousness of these allegations for the reputation and integrity of the Defendants, means that I think it would be wrong, and unsatisfactory for the interests of justice, for me now to refrain from making the findings I would have made if the Plaintiffs had not offered this concession.   I shall therefore proceed on that basis.

1461. The Defendants submit that the history of these allegations is pertinent to evaluating their quality.   They therefore begin by inviting me to consider their background in the pleadings. These allegations are all that remain, in substance, of allegations of improper conduct made against the Defendants in the "Introductory" section of the Cause in its first 35 paragraphs. As a sample, the Defendants cite the central allegation made in Paragraph 21 of the Cause, that

> "*To meet the margin calls and increased "haircuts" imposed by CCC's repo counterparties during August 2007, the Defendants propped up CCC with ineffectual, artificial, covert and self-interested short-term measures and continued to generate high fees for CIM rather than implement a long term solution for CCC.   They did not sell any of CCC's RMBS assets, which would have resulted in the recognition of losses, a loss of "incentive fees" and in turn would have been damaging to the reputation of the Carlyle Group…*",

doing so in pursuit of

> "*… a predetermined strategy* [sc on the part of TCG and Holdings] *that in the event of CCC's collapse, they would blame adverse market conditions and the actions of others to avoid scrutiny of their own misconduct.*" (see Paragraph 18).

1462. This puts the Plaintiffs' case very high.   It makes extreme allegations of negligence ("ineffectual") and, even more emphatically, misconduct ("artificial", "covert", "self-interested") and indeed expressly uses the word "misconduct".   These hugely pejorative

characterisations of the Defendants' actions, they point out, have never been withdrawn from the Cause despite significant subsequent amendments, generally adding more and more detail of matters which could be pressed into service as some form of arguable breach of duty, with or without material consequences.

1463. The Defendants next observe that once they had answered these accusations of improper motivation (by setting out their account of the actual process of consideration by the Defendants of what was perceived to be in CCC's best interests and justifying this), the Plaintiffs' response was to continue their extreme assertions, by dismissing this explanation as *ex post facto* rationalisation, in furtherance of the alleged plan to prop up CCC for improper reasons and to blame it all on extraneous circumstances "*when*" the inevitable collapse of CCC occurred.    This stance was maintained even up to and including the Plaintiffs' opening submissions in the case, but these serious allegations have gradually been backtracked and downplayed, culminating in the latest and last minute disavowal of any allegation of dishonest conduct, but whilst still retaining the claims of breach of fiduciary duty and the general accusations in the Cause.

1464. The Defendants submit that the Plaintiffs have not come close to making out these extravagant allegations, and, indeed, did not even put the specifics of several such allegations, such as prioritising the generation of high fees to CIM, to any of the Defendants at all.

1465. I did gain the impression in the course of the trial that the Plaintiffs were persisting in these allegations somewhat half-heartedly.    My overall impression was certainly that there was never any direct tackling of the allegations of improper purposes as a topic of cross-examination, although it may well be possible, within the extent of about 25 days of cumulative cross-examination, to find some questions put to a Defendant which could be construed as relating to these allegations.

1466. However, they remain on the pleadings in the circumstances already noted.  I have therefore evaluated them, but in the end I do not find them, or indeed the breaches of fiduciary duty, to be made out on the evidence.

**The suggested conflicts of interest**

*(i)        Reputational interests of Carlyle including payment of dividend*

1467. The Plaintiffs' first two allegations are of the pursuit of a high rate of dividend and the prioritisation of the corporate and reputational interests of Carlyle over the interests of CCC. It is submitted that these factors are established by the evidence.    They improperly motivated the Defendants in the impugned decision not to sell RMBS, and thus rendered those decisions a breach of the Defendants' fiduciary duties – specifically the duty of good faith, the proper purposes duty and the no conflicts duty.

1468. I can consider these together as the first (the alleged improperly motivated pursuit of a high rate of dividend) is simply part of the second, (the alleged prioritisation of Carlyle's corporate and reputational interests over those of CCC).   The allegation is that the continued dogged pursuit of paying a high level dividend was motivated by the fact that Carlyle had sponsored CCC on this basis, and it would be hugely embarrassing to Carlyle's reputation for this not to be achieved.

1469. I find no sufficient evidence to support any finding that the core breach decision was driven by a rash desire on the part of any Defendant for CCC to pay a dividend, high or otherwise, to its investors, let alone motivated by the notion that this was in the Carlyle's Group's interests regardless of CCC's.

1470. The payment of a dividend is one of the raisons d'être of a company, and in CCC's case it was really the raison d'être; CCC was conceived as a yield vehicle.   In general terms it is in the interests of the company (ie the general body of shareholders) for the company to pay a dividend, always on the basis of having sufficient funds legally available.   Whether it is in fact in the best interests of the company to do so at any particular time, and in what amount, is a matter for the judgement of the directors, based on the relative merits of paying such a dividend or preserving funds which would otherwise be used for this or other needs or purposes of the company, more or less pressing.   It is therefore not only natural, but to be expected, that the company's directors will keep the prospects of paying a dividend in their sights at any time.   It is also, therefore, more than likely that references to this being raised will be found in the company's papers.   To justify any inference that this was a driving factor as regards any other decision, or that it governed the priorities applied in making such decision, therefore requires clear evidential support of that prioritisation.   It must go beyond the mere fact that the possibility of a dividend payment was actually thought about.

1471. I have already found above that there were perfectly reasonable and respectable explanations for Mr Stomber's email references to dividend levels in August 2007 and to the prospects or possibility of declaring a dividend.   I am satisfied that these sentiments were not what drove his recommended course of action for CCC at that time.   I have equally found no evidence that the consideration of paying a dividend was what drove the decisions of the voting Board members at the 23rd August Board Meeting - quite the contrary.   Whilst these findings were made in regard to the duty of care, and therefore from the perspective of that duty, the same practical considerations apply from the perspective of the duty of good faith.

1472. Having looked at all the material cited as evidence of the Defendants' respective attitudes to the desirability of CCC's paying a dividend, not just in August (with which I am concerned here) but also later, I see nothing which convinces me that the payment of a dividend was a factor which even contributed to any Defendant's reasons for making or supporting the decision not to sell, rather than attempt to sell, RMBS, or indeed anything else.      There is certainly evidence that paying or not paying dividends was thought about;  Mr Stomber and Mr Hance in particular, were very conscious that investors would expect a dividend and be disappointed and possibly critical if they did not receive one.  However, this was, I find, simply as a recognition of the principle that, as Mr Allardice remarked, "*any yield vehicle needs to have a dividend that is declared*".   Considered in context, the terms of these references, at the time, show only that inability to pay a dividend was seen as regrettable but as a matter which was firmly secondary to taking what appeared to be the course which was most conducive (balancing all considerations) to preserving CCC's capital, and its return to strength and health.

1473. In short, to make good this allegation of breach of fiduciary duty, the Plaintiffs would have to satisfy me that the desire to pay a dividend was at least a critical factor, if not the critical factor, in the Defendants' decision not to sell RMBS, and that the reason for this being so critical was furthering the interests of the Carlyle Group in disregard of those of CCC.   They do not do so, on either score.

1474. With regard to the allegation of refusal to countenance taking realised losses into CCC's accounts, this appears to be linked to the allegation of prioritising a dividend payment, on the basis that realising losses on the sale of RMBS would have limited CCC's ability to declare and pay a dividend.   To that extent, it is dealt with above.  The Defendants submit that this allegation, once again, ignores the fact that the Defendants were willing to take losses on to CCC's books, and in that the sale of credit assets did just that.   Even if this allegation is benevolently interpreted as confined to realised losses in respect of RMBS, the fact that Messrs Stomber, Hance and Conway were prepared to sanction the sale of $4Bn of RMBS to JP Morgan belies this submission, as that sale would have been on terms which did realise a loss.

1475. The Plaintiffs submit that Mr Hance accepted that this consideration "impacted" the decision not to sell RMBS, but that was not my understanding of his evidence at the time, and on examining the transcript I find that, having regard to the way in which the questions were put, this was a statement made on the basis of general hypothesis, and not with regard to the making of a particular decision. The Plaintiffs also submit that Mr Conway accepted that the taking of losses would have affected when CCC would first be able to pay a dividend and the amount of that dividend, but once again, on examination, this was a hypothetical answer, given in the context of his having just said that

> "Nobody was thinking about a dividend at this time. There was an occasional discussion about it. But there was – dividend was not really under discussion because we had to put the company in survival mode. Taking and paying a dividend out to shareholders now was not, certainly, in my mind. I don't necessarily talk for other people, but it was not a very high priority. That was for some future date."

I find that this statement accurately expresses the general state of mind of the Defendants, as at 23rd August and generally, subsequently as well.

1476. The Defendants also point out that, the evidence does not even ground the proposition that taking realised capital losses into CCC's accounts would have prevented the payment of a dividend out of current *income*. This would be a mistaken assumption as shown by the evidence of accounting practice. That may be correct, but it is also, in my judgment, irrelevant. The issue is whether the Defendants were improperly preferring Carlyle's interests to CCC's, not whether they had a correct understanding of relevant accounting practice. The material point is the Defendants' subjective belief. Mr Conway is not an accountant and I took him in any event to be talking only in terms of commercial policy. The point made by Advocate Swan does, though, highlight the fact that if CCC's ability to pay a dividend at all had been a material consideration in the Defendants' thinking, then one would have expected to find some consideration of the question whether taking capital losses on to CCC's accounts would affect the position legally in the contemporaneous documents. I am unaware of any such evidence. That is not crucial to my finding, however.

1477. I make the above findings having taken into account my earlier recorded findings about the general underlying attitude of the Defendants towards their positions with regards to both Carlyle and CCC.

1478. In particular in relation to Mr Stomber, I do so whilst recognising that the evidence does show that on at least one occasion (in regard to the choice of timing for CCC's IPO) he apparently did place the interests of Carlyle to the fore, and actually above the independent interests of CCC, because of his concerns to please and impress the Founders. I have therefore considered the evidence relating to his decision to recommend holding rather than selling RMBS critically, in this knowledge. However, having examined the evidence specifically regarding this point in time, the end of August 2007, I am quite satisfied that the specific interests of Carlyle were not uppermost in Mr Stomber's thinking at that time, and did not have (as they would need to have done in order to found liability) the effect of causing him to make any different recommendation to CCC's Board than if he had considered solely CCC's own best interests in any event.

1479. This is for several reasons amongst which are the following. First I am quite satisfied that Mr Stomber felt no tension between CCC's own best interests, which he saw as being survival and recovery, and Carlyle's best interests, which he also saw as being CCC's survival and recovery. His efforts were therefore directed at the possibilities for achieving this and no conflict arose. Second, I am quite satisfied that Mr Stomber's natural cynicism and wariness of the wiles of others in the market, coupled with his deeply held (and perfectly logical) belief that the market value of CCC's Agency RMBS was bound to move back to par value in the end because the market would see sense about "flying to quality", were the most strongly held

views in his arsenal.   They were what actually drove his recommendation to hold on to RMBS if at all possible, and only to sell in reasonably "safe" circumstances.   Third, if Mr Stomber had been motivated by a wish to curry favour with the Carlyle Founders, as a "team man" and this thought had influenced his decision, then I think there would have been some evidence of his seeking to take credit for this in the contemporaneous papers, as he had done before.   There is no hint of this.

*(ii)   Fees for CIM*

1480.   The next suggested reason why the Defendants were acting in furtherance of Carlyle's interests at the expense of CCC's is that of not losing the opportunity to gain fees for CIM.

1481.   The Defendants submit that there is simply no evidence to support a finding of any such motivation.   They point out that it was not even raised with witnesses in cross-examination (and I certainly do not recollect its being.)   They point out, with some force, that this motivation is inconsistent with the evidence of what actually happened as regards CIM's fees. Whilst CIM was indeed paid fees which, in the abstract appear to be very substantial, they were all properly earned under and calculated in accordance with the IMA.   At and after the relevant time, starting with July 2007, CIM earned no incentive fees, (and indeed the basis on which CIM's incentive fee was to be calculated was reconsidered and modified in early 2008, to provide that it should not be paid an incentive fee in any quarter where no dividend was paid), and CIM in fact waived its incentive fees for the fourth quarter of 2007.   Thus, no payment of any further fees ever took place.

1482.   I can see absolutely no evidence suggesting that, in August 2007 or at any time, the objective of being able to "milk" CCC for the benefit of CIM, regardless of any resulting detriment to CCC, played any motivational part in the Defendants' decision to continue CCC's business without selling down RMBS.   This allegation is nothing but assertion.   It did not actually figure in the Plaintiffs' closing submissions.   I reject it and need say no more about it.

*(iii)   Embarrassment of downsizing*

1483.   The third matter is a general allegation that selling RMBS would have produced an embarrassing downsizing of CCC so shortly after its IPO.   In the Plaintiffs' closing submissions this appears to be prayed in aid in support of the third factor, namely the furtherance by Messrs Conway, Hance and Zupon of their own personal financial interests as Carlyle partners, rather than the interests of CCC.   Insofar as there remains any assertion that the retention of RMBS was directly motivated by prioritising concerns about embarrassment to the Carlyle Group, I have difficulty seeing any connection between these revealed by actual evidence, as opposed to being just a theoretical construct.   Any remarks in the evidence which might be argued to be capable of bearing such interpretation have come over to me as being just natural comment.   I have not seen anything which I would regard as evidence of any positive motivation of avoiding supposed embarrassment for Carlyle playing any part, let alone a decisive part, in driving the decision not to sell RMBS.

1484.   Mr Conway, plainly the most material Defendant in this regard as one of the Founders of Carlyle, denied that embarrassment was a factor which would have caused him to act otherwise than simply in what he thought was CCC's own best interests.   The Plaintiffs suggest the contrary, citing an email of his on 17th August 2007 to his co-Carlyle Founders and Mr Gerstner, in which he refers to the capitulation to market conditions by one of CCC's cohort of competitor "comparators", KFN Financial, which had restructured the previous day, by announcing that it had sold $5.1Bn of its mortgage backed securities for a $40Mn loss. Mr Conway certainly expressed the view that *"we do not want to pull a KKR type meltdown"*. However, the full quotation continues *"and will support CCC to avoid this. We should be successful if it costs us a little to protect our brand."*   This does not read as an expression of

intention to avoid embarrassment to Carlyle at the expense of CCC.   I accept Mr Conway's evidence in this regard.

1485. In any event, it seems to me that this motivational argument is highly implausible.    It is the Plaintiffs' case that holding on to CCC's RMBS irresponsibly risked – and the risk was such as to be a virtual certainty – the complete collapse of CCC.   This would surely be far more embarrassing, ultimately, than merely downsizing CCC.    I find it inconceivable that Mr Conway would balance out such risks and prefer the one which carried the greater embarrassment.    I do not in fact think (and I so find) that embarrassment about the appearance of downsizing played any part in Mr Conway's thinking except by comparison with the potential  costs of supporting CCC, as indicated in his email.    The logical implications of Mr Conway's conduct are not that he irresponsibly voted for CCC to retain its RMBS to avoid the embarrassment of downsizing by selling part of the portfolio, but rather that he thought that retaining the RMBS, with financial support from Carlyle would be more likely to avoid such embarrassment.

1486. The Plaintiffs therefore fail to satisfy me of their generalised allegation that it is more likely than not that the Defendants, or any of them, were motivated by an impetus to prefer the interests of Carlyle as against those of CCC.   However, and in any event, I am also satisfied (and so find) that the best interests of CCC and Carlyle were perceived as being aligned with each other in any event as regards what to do with CCC's portfolio, and in fact, that they were.

*(iv)    Personal financial interests*

1487. The third separate matter which is suggested to provide an explanation for the supposedly inexplicable decision not to deleverage CCC by selling RMBS is the argued existence of a conflict of interest between CCC and individual Defendants.   One allegation in this regard, contained in the original Cause, was that such a conflict arose because each of the material Defendants stood to have a small percentage of CIM's fee earnings rebated to him.  I find this to be even more implausible and tenuous than the allegation of a supposedly conflicting interest of Carlyle in keeping CCC alive in order to earn further fees in CIM.      This is especially so in view of the small size of any such rebate in the general order of things.  This allegation was neither put to the Defendants nor persisted in in the Plaintiffs' closing submissions, and I therefore dismiss it.

1488. More serious and at first sight potentially pertinent is an allegation which <u>is</u> persisted in, that a conflict of interest, actual or perceived (although I cannot see how this latter can really have materiality as to a damages claim), existed between CCC on the one hand and Messrs Conway (in particular), Hance and Zupon on the other, arising out of their each being partners, to varying degrees, in TCG.   It is not this status as such which is alleged to give rise to a conflict - and, indeed, their status was well known to all the CCC Board - but the fact that it gave to each of these Defendants a potential personal financial interest in the most profitable achievement of three matters which the Plaintiffs insist on calling the "Carlyle Strategic Objectives", and which the Defendants say were accurately and less tendentiously, known within Carlyle as three of the Group's "Strategic Alternatives", and which were in contemplation at the time**.**

*(a)    The Mubadala sale*

1489. The first point is that, during this period, negotiations were in hand for the potential sale of an ownership interest in TCG to Mubadala, from which Mr Conway, in particular, and Messrs Zupon and Hance to a lesser degree but still substantially, therefore stood to benefit.   The second was the securing of a $1Bn credit facility for TCG from its bankers, intended to enable a dividend to be paid to Carlyle partners, to pay off some Founder Capital and to provide TCG with further working capital with which to expand its business.   The third was

the potential IPO of TCG itself, which was at the time being suggested, and which would again benefit each TCG partner, and indeed for which the IPO of CCC had been seen as a kind of dry run.     Each of these would provide Carlyle partners with a direct or indirect financial gain of no mean sum.

1490.  With regard to the Mubadala transaction, this was to be the second sale of a partial ownership interest in TCG and thus effectively in the highly successful Carlyle Group as a whole.   The first such sale had been the sale of a 5.5% interest to the California Public Employees Retirement system ("CalPERS").   By August 2007, negotiations with Mubadala had begun, and a period of due diligence was underway.   In the event, an agreement for the sale of a further 7.5% interest in TCG was signed on 17th September 2007 and completed on 10th October 2007.

1491.  CCC's financial contribution to TCG appeared in the due diligence exercise, but the figures show that this was included as being $10Mn out of a total of $329Mn, and thus a very small fraction.

1492.  The Defendants admit that the negative publicity about CCC at the time of the August crisis, already referred to, gave rise to particular concerns raised by Mubadala as part of their pre-contract enquiries. This came about particularly from an article which was highly critical of CCC, which appeared in the Washington Post of 5th September 2007.   Mubadala's concern was unhappiness at the negative publicity associated with an enterprise in which they were about to invest, but their concerns were allayed, through meetings by Mr Conway and Mr Rubenstein, in particular, with Mubadala's negotiating intermediaries, by assurances that CCC was a very insignificant part of the TCG enterprise and had as yet contributed nothing to the Group's financial position.  Mubadala went on to proceed with the transaction without seeking any reduction in the proposed purchase price.

1493.  From the eventual deal, Mr Conway received about $280Mn, Mr Zupon around $7Mn and Mr Hance around $950,000.

1494.  Mubadala apparently contemplated acquiring a further 2.5% of TCG, after this initial investment, and might have done so in about March 2008, but this never went ahead.    The negative publicity from CCC's eventual demise are suggested as a possible reason for this, but so also is the suggestion that proceeding with the second investment at the lower relative price which was then considered appropriate in value terms might have been seen as raising the question whether Mubadala had paid too much for their first investment.

1495.  The Plaintiffs argue that the sale of RMBS would have created adverse publicity for CCC, and this prospect therefore created a conflict between, on the one hand, these three Defendants' duties to Carlyle and their personal financial interest in securing the conclusion of the sale to Mubadala at maximum value, with, on the other hand, their duty to CCC to pursue its standalone best interests which demanded (the Plaintiffs argue) the sale of RMBS or similar measures to raise liquidity and reduce leverage.  The Plaintiffs argue that this conflict continued even after the conclusion of the first Mubadala sale on 10th October 2007 because of the prospects of a second sale, or a further sale to a third party.

1496.  They invite me to find that this conflict of interest motivated these three Defendants to push through the decision not to sell RMBS, which decision the Plaintiffs characterise as so foolhardy for CCC as to be reckless and irrational.    They also accuse the three directors of breaching their duty to CCC by failing to disclose the potential sale to Mubadala and their personal conflicts of interest to CCC's Board and recusing themselves from participation in the material decisions.

1497.  Messrs Conway, Hance and Zupon each denied in evidence that he was motivated by the prospect of personal gain, and for what it is worth, Mr Nachtwey gave unchallenged written

evidence that he had no perception of any prioritisation of the interests of Carlyle (and thus indirectly the interests of these three Defendants) in the progress or pursuit of the Mubadala sale and the obtaining of the highest purchase price.

1498. I reject the Plaintiffs' submissions.   I can see no evidence of this consideration having had any actual effect on the actions of Messrs Conway, Hance or Zupon with regard to CCC.   It is the case that these three Defendants all accepted that for CCC to be seen to sell substantial assets so soon after its IPO would probably generate negative publicity for Carlyle, but that admission of the obvious does not, in my judgment lead to the conclusion that this thought influenced, or still less determined, their advice or actions when it came to making the decision on behalf of CCC not to sell RMBS.   Still less can I see that any of them actually thought that it was more in Carlyle's interests to avoid any such publicity, than to take the best decision for CCC notwithstanding potential negative publicity.

1499. Indeed, I have some difficulty in seeing any real substance, as opposed to theory, in the alleged conflict of interest itself.   It seems to me, first, to be implausible.  It depends on the dual perception that selling RMBS was both the best thing for CCC and something that would generate negative publicity.   This seems to be something of a contradiction in itself, but even if it were the case, if selling RMBS were the best decision for CCC but did generate negative publicity, then the soundness of the decision (which the Plaintiffs are saying is so obvious that any other decision is inexplicable) could surely be explained in order to quell any concerns on the part of Mubadala or any other intelligent purchaser.  In any event, the avoidance of adverse publicity by not selling RMBS, as a temporary expedient, would have to be weighed against the prospect of later even more serious adverse publicity either when RMBS was eventually sold or when CCC failed and the possibility of repercussions at this later time.  I am therefore dubious about the logical likelihood of this suggested motivation for the (assumed) wrongful decision not to sell RMBS.

1500. As regards the further allegation of breach of duty by failing to disclose such alleged conflict of interest and wrongfully continuing to participate in the relevant decision-making, this fails in just about every aspect, but the most pertinent one is that it is not alleged to have caused any damage.  There is no suggestion that if these Defendants had taken no part in the relevant decision it would have been different, and since Mr Stomber was advocating the challenged decisions, and Messrs Allardice and Sarles appear, from contemporaneous documents as well as their evidence in the case, to have agreed with his reasons, the overwhelming likelihood is that it would have been the same decision in any event.   This is therefore yet another allegation of breach of duty without consequence.

(b)   *Obtaining a term loan for TCG and*

(c)   *Carlyle's own prospective IPO*

1501. The remaining two similar allegations as to conflict between a duty to Carlyle or to personal interest and a director's duty to CCC are levelled principally at Mr Conway.

1502. The second of the "Strategic Objectives" was the obtaining by TCG of a Credit Facility from a number of the lending banks who were also repo lenders to CCC.  This was being negotiated during the period from March 2007.  It was originally intended to be a $1.8Bn facility, but became reduced to $1Bn when market conditions became less robust.  It was intended, the Plaintiffs suggest, for the purpose of funding a special dividend to Carlyle Partners of $750Mn, replacing the Founders as a source of Carlyle funding and providing further working capital.  It was due for first tranche drawdown on 3rd August 2007.

1503. The increasingly worrying financial market conditions rendered the negotiation of this facility more difficult, although in fact its first payment was accelerated so as to enable TCG to make the $100Mn loan to CCC in August 2007.   The Plaintiffs say that this shows how important

the obtaining of the facility was to Carlyle, as it did not have the funds to make the loan to CCC without it.   The Defendants say that the making of the CCC loan by using this facility shows that Carlyle and Mr Conway were certainly not putting Carlyle's interests ahead of CCC's.

1504. The Plaintiffs' eventual submission was that Mr Conway became placed in a position of conflict of interest because he was simultaneously negotiating with the same set of banks on behalf of both Carlyle, and CCC.   As to the former, his obligation was to negotiate for the best terms for the Credit Facility (and his own personal interest) whilst as to the latter, CCC's interest lay in his not negotiating too hard with those banks in case this might alienate them and deter them from offering favourable repo terms to CCC.   The allegation of failure to disclose this supposed conflict of interest to CCC's Board (etc) is then added.

1505. Before dealing with this I will describe the third material "Strategic Objective" said to generate a conflict of interest, again principally for Mr Conway.   This was the intention to take Carlyle itself public.   Although this did not happen in the event until 2012, it had been in contemplation since 2005 and by early 2007 was seen as attractive because of the premium valuation which could be placed on TCG at that time.   Preparations (such as modifying accounting compliance practices and drafting documents) began in June 2007 and continued in some form until going public was put on hold in March 2008.   It is submitted that Mr Conway's personal interest in, and indeed his duty to Carlyle to maximise the prospects of, a successful IPO for Carlyle was an incentive to avoid taking steps in relation to CCC which would jeopardise this by embarrassing Carlyle or generating adverse publicity, and that this motivation was the reason for his proposing the retention of CCC's RMBS rather than resolving to reduce leverage by selling a significant quantity of it.   There is then the familiar addition of the accusation of failure to disclose this supposed conflict of interest to CCC's Board and wrongfully continuing to act in CCC's decision making processes.

1506. I dismiss all of these allegations with regard to Mr Conway's supposed conflicts of interest. They are even more convoluted and tenuous than those regarding the Mubadala transaction. I find no evidence to support the contention that such considerations played any part in Mr Conway's (or, for the avoidance of doubt, Mr Hance's or Mr Zupon's) thinking with regard to CCC's interests and strategic business decisions, let alone one which affected and produced the actual decision of which the Plaintiffs complain.

1507. The Defendants suggest that these arguments are lawyers' constructs rather than submissions, without any foundation in the real world of actual fact.   I agree.

**Conclusions as regards August 2007**

1508. I therefore conclude that there was no breach of duty to CCC, fiduciary or otherwise, by any individual Defendant during this period.

1509. I emphasise that this conclusion is based firstly on the grounds that, on any basis, I find that the decisions actually taken by the individual Defendants as directors of CCC during this period were well within the range of decisions which reasonable directors, endowed with the particular skills and knowledge of the actual Defendants respectively, could reasonably have reached in all the circumstances.   This is enough to dispose of the Plaintiffs' claims with regard to August 2007.

1510. However, I also find that those decisions were in fact made with due and appropriate skill and care by the Defendants, and that they were, in fact, made by each Defendant in what he bona fide believed to be in the best interests of CCC, exercising actual independent judgement as appropriate, and without any taint of conflict of interest.

**(c)     Contractual/tortious claims against CIM**

1511. With regard to the claims framed in breach of contract or tort against CIM, once again, I have held that the decisions made and advice given by Mr Stomber, whether as a director of CCC or as the manifestation of CIM, and also by Mr Zupon insofar as he retained involvement as part of the investment management team provided by CIM, were within the range of properly loyal and competent such decisions or advice, and were not negligent.

1512. On the basis that the standards owed by CIM were no more stringent than those owed by these two Defendants as Directors of CCC with particular expertise in the management of CCC's type of investments, I conclude that there was no breach of contract or tortious negligence committed by CIM either.

**(d)     Wrongful trading**

1513. This allegation is first made in respect of August 2007.   With regard to it, I expressly find that the situation was not such that the Defendants as directors of CCC either did or ought to have concluded at this time that CCC stood no reasonable prospect of avoiding insolvent liquidation in the absence of setting about deleveraging by selling a large quantity of RMBS. This is principally for the reasons given by the Defendants.

1514. I make this finding on the basis of my previously expressed view of the correct interpretation of the applicable 1994 Law, namely that "insolvent" would mean "being unable to pay the company's actual debts".     However, I cannot see that if the insolvency test were that of "being unable to pay its debts as they fell due" that would make any practical difference as there was equally no reason why the Defendants ought to have concluded that CCC stood no reasonable prospect of avoiding getting into a situation in the reasonably near future where it would be unable to continue paying its debts.  The two tests seem to me to give rise to no practical difference. In laymen's terms the first involves the question "Do we foresee that there is no reasonable prospect of our avoiding becoming unable to pay our debts?" and the second would be "Do we foresee that there is no reasonable prospect of our avoiding becoming unable to keep paying our debts?"   The difference is extremely subtle.

1515. I see no reason why the Defendants ought to have concluded either of the above.    The important point is that the test is always that of "standing no reasonable chance of avoiding" the pertinent financial collapse.

1516. The business which CCC was conducting at and after August 2007 involved holding investments on a pattern of re-financing these on a 30 day cycle, staggered as regards about half of the total.   The potential debts for CCC were three-fold: its obligation to pay interest on its current round of financings, its obligation to repay those financings at the end of their term and its obligation to meet margin calls made in the interim.

1517. The first was self-funded from the higher income derived from the investments and there has been no suggestion that this differential ever failed, or should have been anticipated to do so. It was, albeit slowly, bringing in funds.   The second would be met by refinancing, and so the question becomes whether it should have been concluded that there was no reasonable prospect of avoiding failing to obtain repeat finance.   As I have already indicated, I am satisfied that there was no reason to place the prospects of obtaining repeat financing so low. As to margin calls, the question becomes whether it should have been concluded that there was no reasonable prospect of avoiding being unable to meet margin calls.  But margin calls were not even inevitable.   They were contingent on several matters, being first a further (it is to be remembered) decline in the prices of CCCs' assets below where they were currently being marked, and also this happening at a point where CCC had neither enough liquidity of its own, nor enough recourse to Carlyle for assistance, to be able to meet such calls.

1518. Put positively, CCCs Directors only had to believe that there was a reasonable chance that CCC would manage, when it came to it, be able to meet these obligations, and I cannot see that this was an unreasonable view to take. The qualifying condition for a finding of wrongful trading is therefore not made out, whichever is the appropriate test of insolvency. I therefore reject the claim of wrongful trading at this time against all the Defendants.

## 11.    The Claims: SEPTEMBER 2007

### *Did the Defendants culpably fail to review and change their strategy during September 2007?*

*General overview*

1519. In the week or so after the 23rd August Board meeting, market conditions had improved slightly. CCC went into September having survived the 9th August liquidity crisis and having resolved on and taken steps to increase liquidity by selling credit assets to raise liquidity, and taking the supporting loan of $100Mn from TCG.

1520. At the beginning of September 2007, CCC's liquidity cushion stood at $66Mn (9.9%) according to the agreed extracted figures from CCC's daily "Capital with Cash and liquidity cushion management" files (as mentioned), although the Defendants suggest that the figure could be regarded as $146Mn if the projected future proceeds of bank loan sales are included. Its net asset value as at 31st August 2007 (and excluding the credit assets just disposed of) was recorded as $642,104,242. Over the first two weeks of September, liquidity increased as proceeds of the sale of credit assets came in, peaking at $105Mn (16.8%) on 10th September, before falling to $21.9Mn (and thus only 3.8%) immediately after the 15th September roll, when the last of the haircut changes agreed in August came into effect. By 30th September, liquidity had recovered to $48.5Mn (7.2%) and CCC's net asset value was recorded as $691,843,000. The Carlyle loan of $100Mn was fully utilised during this period.

1521. However, on the financing front, CCC's soft line repo capacity was recorded as having fallen from about $37.5Bn to just over $25Bn in mid-September, as against a usage of around $22Bn, and CCC was therefore operating, by the end of the month, with only around 10-12% excess available repo capacity, as against its most recently formulated guideline of 25%. Although it had never been obliged to accept any individual repo haircut in excess of 3%, its weighted average haircuts on finance in use had risen from 2.3% at the end of August, to 2.62% at the end of September.

1522. During September, though, market conditions had calmed somewhat from the turbulence of August, although the aftermath of the August liquidity crisis was showing up in an avalanche of ABCP securities coming on to the market. There was, even so, the opportunity to draw breath and take stock in less panic-laced conditions.

1523. There were, I think, three significant aspects to CCC's activity in September. The first was trying to work out an appropriate business model for which to aim. The second, and linked to this, was preparing for and making presentations at the Carlyle Investor Conference in Washington DC on 11th September. The third, and the most consuming of effort was the general ongoing activity of sustaining CCC's business, monitoring market events, monitoring prices (collecting and analysing information and data about pricing, and processing this to keep a close eye on prices and values for CCC's RMBS), monitoring the reactions of CCC's repo lenders with a view to anticipating and possibly contesting margin calls, and otherwise "working" the relations with CCC's repo funders in order to maintain the flow of CCC's financing.

1524. In setting out the story of September 2007, I again recount facts which I consider material, either directly or evidentially, to what I have dubbed the allegations of "effectual" breach of

duty in the case, ie those which are alleged to have caused loss to CCC, and I set out my reasons for some of my findings where it is convenient to do so in the narrative.   I also deal with facts relating to some allegations which are not claimed to have caused loss, because of the prominence which they have been given in the trial despite their lack of causative weight. Where I do not refer to an allegation or fact, this does not mean that I have ignored it but only that I do not consider it of sufficient significance for my conclusions to merit separate mention.   Also, in the interests of trying to keep down the length of this judgment, I do not record all of the detailed materials contained in the ALCO pack briefings and similar records which were widely examined at the trial, although I do make some references by way of example, or illustration of their scope and general flavour.   I do not refer to all the evidence regarding day to day matters of only faint materiality, such as, for example  all Mr Stomber's email updates, and email exchanges as part of market negotiations, press articles about CCC, and reactions to these, but I note and record that many of these were meticulously dealt with in the parties' submissions.

### Early September 2007

1525. I have already recorded, in completing my account of August, the course of Mr Conway's efforts to arrange beneficial repo financing for CCC from Citigroup which continued into September and during the first half of that month in particular.  I do not repeat it here.

1526. At the beginning of September it is clear from documents that Mr Stomber was giving consideration to a possible future business model for CCC, based on the potential for assets being obtainable at higher spreads (lower prices) than previously.  They would consequently produce a greater yield, meaning that a greater return could be achieved with lower leverage. This, he considered, showed that CCC still had a viable future.    However, such remodelling could only be put into practice once markets had become sufficiently stable - at whatever parameters they might then settle at - and when he and CCC's other directors were confident that this was the case.

1527. Mr Stomber's view, expressed in an "Update" email of 3rd September 2007 to CCC's directors, and copied also to Management and the Carlyle Founders and senior personnel, was that there was a business model for CCC which could work at a lower return relative to the current "risk free" rate but which would still be attractive.  He stated that CCC "*and others*" had previously reached for too high a return and that CCC would be bankrupt without TCG support, observing also that many of CCC's comparator entities had gone out of business or had highly diluted their shareholders in order to survive.

1528. Of course CCC was not out of the woods, though.  On 4th September, Mr Stomber recorded in an email that PwC had raised the question whether CCC would qualify as a "going concern" for the purpose of PwC's 30th September audit review, and also that Deutsche Bank was currently insisting on a 4% haircut in the future.  The following day in a further general email he emphasised that CCC simply could not afford to go to a 4% haircut, because repo dealers were enquiring whether any of CCC's counterparties were at a rate higher than 3%, and they would plainly follow suit if they believed they were.   4% haircuts across the board would be simply unaffordable.

1529. In the end, first Mr Rubenstein and then Mr Conway used their good offices to persuade Deutsche Bank to remain at 3%.   Mr Conway says that he felt confident of being able to persuade them back to this figure, even at the outset.   I accept this; it fits with my general perception of how such negotiations often proceeded.   Calyon, Goldman Sachs and Lehman Brothers had all held a 2% haircut.  Negotiations with Citi, for a fairly large facility, were in train as I have mentioned above.   I think it is very fair to say, though, that repo negotiations, now for the upcoming roll on 17th September, continued to be difficult and tense.

1530. On 4th September, Mr Stomber sent another "Update" email to CCC's Directors and also Messrs Rubenstein and D'Aniello, attaching PowerPoint slides recently created by his team and presaged in his 3rd September email, showing illustrations of possible business models for CCC. These were a first draft of slides which would eventually be used at the September Investor conference.

1531. They showed scenarios for comparison. The first was that if CCC's business had been launched using its original business model, but reducing the targeted return on equity to 11% instead of 13%, it would have been operating with a 38% liquidity cushion (instead of 20%). The second was that if CCC's business were relaunched at the current level of prices but with a targeted return of 11%, it could operate with a 63% liquidity cushion. These comparisons therefore suggested that a viable business model for CCC could be devised if targets for returns were reduced.

1532. Mr Stomber recorded that other entities which had aimed for a 13-14% return, as CCC had done, had not survived. Two (Caliber and Queenswalk) had already gone out of business; KFN and Thornburg were in extreme difficulty. Annaly, a long-established and very big player in the market, had raised additional equity capital to meet unrealised losses, with the effect of diluting shareholders - a course which, it is apparent, from the evidence, Mr Stomber fundamentally disliked. He also listed some matters which he called "mistakes", such as using too fast a ramp for purchases, and not tying in funders such as Bank of America to continue to finance securities purchased from or through them.

1533. The Plaintiffs characterise the statements in the emails of 3rd and 4th September as "concessions" that the Defendants had made a number of mistakes in their management of CCC. This is true as regards objective observable fact and its consequence, but I do not read these as being a concession of fault. I read these emails as a frank analysis of past events in order to learn lessons for the future. In any event, none of the allegedly conceded mistakes is within the ambit of the claims pleaded in this action.

1534. The Plaintiffs make much of the placing of a figure of around 40% on the level of liquidity cushion shown in the slides produced by Mr Stomber. They submit, and it was put in particular to Mr Stomber and Mr Conway, that this was a contemporaneous admission by CCC that CCC needed a 40% liquidity cushion to operate viably, an admission which was not implemented at the time, and an admission which the Defendants, in particular Mr Stomber and Mr Conway, were now trying to row back from. I do not accept that this is a fair interpretation of the documents, either. The slides were, and were obviously (it seems to me) illustrations of business models upon certain assumptions, which could be operated comfortably (as one would wish and expect to operate in stable times) in the postulated circumstances, and they were there to provide material for discussion. They were not an actual plan for CCC, nor a decision as to anything. It was as yet too soon after the crisis of August to make definitive plans.

1535. For the avoidance of doubt, I accept Mr Stomber's evidence that in his eyes the liquidity cushion was a guard against margin calls and not increased haircuts, this latter being a feature which would be inputted into the business model elsewhere. I also accept his evidence that whilst he saw Mr Hance's reference in their exchange of emails to a "liquidity" of 40% as being potentially confusing - because he (Mr Hance) was referring to liquidity in terms of cash needs, which was not the same thing as a liquidity cushion - he did not see the need to correct Mr Hance, and he did not calculate a 40% liquidity cushion as being a target which CCC ought to achieve imminently. I am satisfied that his illustration of a business model incorporating a 40% liquidity cushion in late August 2007, was, as he said, a quick reaction to the shock of the sudden and recent credit/liquidity crisis, intended to show that CCC was not necessarily fatally wounded, and that it preceded a more measured assessment of the situation once some idea had been gained of how market conditions were going to develop, either with a return to the "normal" of before, or with a settlement into a new "normal".

1536. In cross-examination, and some time after a change of subject, Mr Stomber was shown his email of 7th September 2007, within which he said "*I am not debating a reduction in RMBS - a liquidity cushion of 40 per cent does that and we will do more*" and it was put to him that his recent explanations were contrived and that even at the time he had recognised that CCC needed a 40% liquidity cushion.   The Plaintiffs rely on his enigmatic response of being "*trapped within my own language*"   as virtually an admission of this, and evidence of his unreliability in evidence.   I did not, however, perceive it as such at the trial, and having gone back over the transcripts I still do not see it as such.   I saw it as a recognition of the language he had used in his contemporaneous email, and an ironic simultaneous recognition of how he feared it might therefore look in his oral evidence.   I did not see it as an admission that he had been somehow caught out in his oral evidence, nor as being an implicit withdrawal of the distinctions which he had been making in earlier cross-examination between liquidity and liquidity cushion, and between an illustrative business model and an actual proposed business model.     I actually found it quite difficult to see any necessary inconsistency between Mr Stomber's current explanation of what had been behind  his thinking and the language he had used in the to and fro of email correspondence at the time.   Insofar as there was any, it did not strike me as being of any great weight in the end, either as regards the main issues in this case or the reliance I could place on what Mr Stomber now tells me was his thinking at the time.

1537. There is a minor issue about whether the further developments of these slides, which were in preparation for use at the 11th September Carlyle Washington Investors' Conference, were really Mr Stomber's work (aided by his team) or were in fact prepared for him by Mr Conway.    This proposition was advanced, as I understand it, as evidence of Mr Conway's dominance and control over CCC in general and Mr Stomber in particular.   I am satisfied that Mr Stomber was the author of the CCC slides in substance; input from Mr Conway not being significant and being simply in the nature of a sounding board and making constructive comments.   Mr Conway in fact produced his own slides.

### Possible sale of $1Bn RMBS to UBS

1538. A possibility of CCC's selling $1Bn of RMBS to UBS emerged in early September 2007.   In the early morning of 5th September 2007, Mr Glascott of UBS, made an enquiry on the Bloomberg messaging system looking for seasoned strip floaters.   Later that day Mr Greenwood sent him a list of three securities, not quite corresponding with the descriptive details which Mr Glascott had posted, with an original face value of approximately $785Mn.

1539. The Plaintiffs relied strongly, in their opening, on the failure to show bonds directly corresponding to the description put forward by UBS, when in fact CCC had some such bonds, as evidence that CCC was not genuinely trying to sell RMBS at all, thus supporting their allegation that the Directors had made a culpable decision not to do so, for obstinately wrong or improper reasons.     Later, the Plaintiffs appeared to modify this charge in the alternative to one of incompetence.   I examine this incident and how it played out in more detail below, in considering generally the evidence about whether the Defendants were genuinely amenable to selling RMBS or not.

### 6th September 2007 - ALCO Meeting

1540. The ALCO Meeting minutes of 6th September 2007, which Mr Sarles and Mr Allardice also attended, show Management concentrating on maintaining and working repo lines.   There was no prepared pack of papers for this meeting, because of the rapidly changing events of the market.   The Minutes indicate, as also appears from emails, that from about this time Mr Stomber started using the Carlyle connection aggressively, pressuring and playing the Carlyle card, in order to try to obtain the financing terms which CCC needed.   Mr Stomber acknowledged here, and in an email update on 6th September, that the risks to CCC were now the linked risks of increasing haircuts and reducing repo availability.   Effective haircuts were noted then as being about 2.3%-2.4% on average.

1541. The possibility of raising more equity capital was raised internally at around the time of the ALCO meeting of 6th September 2007.  CCC's failure to do so in order to increase liquidity is a recurrent theme of the Plaintiffs' complaints.

*Changes in market behaviour*

1542. Changes in the behaviour of the financial markets are illustrated by a pair of emails circulated by Mr Stomber on 7th September 2007, which were headed "CCC Slides for DC (conference version)", but which in fact recorded Mr Stomber's bitter view of the way in which the repo banks were now behaving.  He recorded that FT (IDP) prices for certain of CCC's bonds had risen by $58Mn, which meant that CCC should recover $5Mn of margin.  However Credit Suisse, who owed CCC $3Mn in returnable margin had simply repriced the bonds which they held as collateral to their own, lower, marks, and retained the $3Mn.  They had, moreover, done this after themselves providing to CCC the prices which had formed the basis of the return margin calls; they had thus challenged their own prices, after the event - a course of action which was against the conventional "rules" of the market.  Similarly, Mr Stomber later reported a conversation by Mr Trozzo with the US head of credit risk at UBS, to the effect that whilst a 2% haircut well covered their risk, they had demanded 3% because they "could", and because their mandate was that there should be "*no losses, full stop no losses*".

1543. These were examples of changes in the way lenders in the market were now behaving, but Mr Stomber recorded, nonetheless, that his basic intuition was still that CCC's policy of selling credit risk securities, and protecting their RMBS with its minimal "*govt risk*" would ultimately be rewarded.

1544. At the same time as the above, the problems with CCC came to the attention of Mubadala, and had to be explained.  A matter which I have already touched on elsewhere, but I mention it hear to put it into time context.

1545. On 5th September 2007 the Washington Post published an article by Steve Pearlstein, in popular financial journalism style (and, interestingly, raising many of the matters of criticism and complaint made in this action) criticising Carlyle's embarking on a venture such as CCC in the first place, and publicising with an appearance of glee and also some exaggeration, the steps which Carlyle had had to take to support CCC.   The criticisms of Carlyle's business acumen annoyed those in the top ranks of Carlyle, and particularly, I think, Mr Rubenstein.  The article was picked up by Mubadala's negotiating representatives, who on the following day cited it as underlying their valuation concerns.

1546. To reassure them, on 7th September at a meeting between Carlyle and the Mubadala professional team,  Mr Conway "walked them through" Carlyle, to explain the position and put the difficulties with CCC into perspective as regards the Carlyle Group as a whole.  Any immediate effects of this are not recorded, but ultimately Mubadala's concerns were clearly allayed, because, as previously noted, on 20th September, their acquisition of a 7.5% interest in the Carlyle Group was publicly announced, with completion fixed for 10th October 2007.

*11th September - Carlyle Investors' Conference in Washington DC*

1547. Mr. Hance and Mr. Stomber gave a presentation at Carlyle's September 2007 Investor Conference.  Whilst CCC was of course a significant topic at this conference, the perspective needs to be retained that it was not the only one.

1548. All members of CCC's Board, save Mr. Sarles, attended.  The presentation about CCC made by Mr Hance and Mr Stomber was in three sections:  "*A market overview; What happened and where we are today*", "*Near term strategy:  Preserve investor capital and bolster liquidity cushion*" and lastly the "*Long-term strategy and outlook: Achieve stable returns.*"  Various slides were presented under these heads, containing facts which indicated, first what

CCC's original business model had been and why it had not been entirely resilient to the recent market disruption, second what CCC had done in the interim to meet its problems and what its business now comprised, and third, some illustrations as to how CCC's business might be remodelled in the future, at different spreads, parameters, and returns.

1549.  A good deal of time and argument has been devoted to examining the CCC presentation by Messrs Hance and Stomber and the slides supporting them, even though this is again of no direct relevance to any of the claims which are made in the action, and, on analysis, hardly any indirect relevance either.  This presentation did not affect CCC's financial position, and its materiality to events which are pleaded to have done so is slight.

1550.  The Plaintiffs' reliance on this conference presentation has two strands and apparent purposes.    First, at the conference it was publicly announced that the CCC presentation would be viewable by webcast and that the video would be available for 30 days on the CCC website.    In fact what happened was that in the course of the CCC presentation, Mr Hance made an unscripted remark, that the book value of CCC's shares was currently around $16.  A few days later Ms Cosiol became aware of a Dow Jones article reporting this figure, and could not understand how it had been arrived at.    Mr Hance could not recreate his thinking, and it was not at all clear from looking at CCC's published figures how the $16 figure could be supported as accurate, on any basis.   Ms Cosiol therefore sought external legal advice as to whether it was permissible to take the video of the presentation down from the website, and on receiving advice that it was, she had this done on 28th September, and thus somewhat earlier than the promised 30 days.

1551.  Mr Hance's remark is pleaded by the Plaintiffs to have been inaccurate and misleading of the market, with the innuendo that there was something sinister and culpable about the whole sequence of events.  They note specifically that it has not been possible to find the record of the presentation, and suggest that it was therefore presumably destroyed.

1552.  I cannot see anything sinister in this course of events.    I am satisfied that this was just the kind of mistake that can occur in live presentations - and which lawyers are kept on hand to be vigilant about, so as to deflect any untoward consequences.  I do not find that it was anything more than that.  The allegation also has no materiality that I can either see or construct to the claims actually made in the action, as there is no plea of any resulting damage to CCC.  At the most, therefore, it could only go to credit, and I find it to have no significance on this aspect either.  I therefore dismiss it.

1553.  The Plaintiffs' second point about the conference presentation concerns the draft slides and what they are said to have conveyed, in particular with regard to the business models which were shown.        This point was argued, and put to the relevant Defendants (Messrs Stomber, Hance and Conway) in two ways.  The first was that these business models represented to investors that, at this time, CCC had *already* deleveraged so as to be operating with a 40% liquidity cushion, and they were therefore a culpable misrepresentation of fact, misleading investors.   The second was, alternatively, that the slides either were, or gave the impression of being, <u>actual</u> plans or <u>actual</u> models representing that CCC was *going* to operate in the future with a 40% liquidity cushion - in which case they again culpably misled investors and were either a misrepresentation of intention, or of fact (if the Defendants claimed that no business model had then yet been decided on).

1554.  I unhesitatingly reject the former.  I can see nothing in the slide material which would promote the belief that CCC had already transitioned to having a 40% liquidity cushion.  The Defendants have referred to evidence which they have collated, and which they submit suggests that no-one who actually attended the conference interpreted the slides in that way either, and this appears to be the case.   (The unreliable Mr Shah seemingly did so rely, but he was not there.)

1555. As to the alternative criticism, that of a representation of intention, I also reject the suggestion that, on a fair interpretation, these slides made any clear representation that this was what CCC "would" be doing so as to amount to a warranty of intention (which is in effect what the Plaintiffs' submission means), still less a warranty with some sort of timescale attached to it. I find that the second section of the slide presentation about CCC which I described above, sufficiently explained the "capital preservation strategy" which was to be CCC's immediate approach and, by very clear implication, it revealed the intention to hold CCC's RMBS and aim to ride out the disrupted markets; the belief that CCC was in a position to "weather" the current turbulent market situation was expressly stated.  These slides are found in the third section of the slide presentation.  I find that the highest reasonable interpretation is that the presentation slides implied that changes designed to move towards some such new business model as was illustrated were intended to be implemented as soon as CCC's Management deemed this practicable.  That, though, is consistent with the truth.

1556. In context, and even independently, I find that these slides were nothing more than an illustration of what CCC might look like, or aspire to look like, in the future, as and when steps to shape a new business model in a more stable market environment could be taken.   I cannot see that any reasonably intelligent and informed participator in the Investor Conference would or could have interpreted these slides in any other way.

1557. Once again, though, this allegation of "misrepresentation to the market" simply misses the point.  It has no relevance to the claims made in the action, which are charges of a culpable failure *in actual fact* to institute an immediate or progressive disposal of RMBS.     These slides could only have materiality to that allegation if they could be argued to show that CCC's directors were aware of the necessity to sell RMBS as the Plaintiffs postulate they should have been.   Not only is this assertion not actually made, but it would be an impossible interpretation of the slides in any event, not least because the intention not to sell RMBS was clearly revealed in the slides themselves.

1558. Mr Conway also included several slides relating to CCC in his broader presentation regarding Carlyle generally.   They set out, in an elegant sequence and style, where the CCC model had gone "wrong" in the circumstances, once more indicating what changes it was intended that CCC would be making, "moving forward".  The slides proclaimed as one point "*We thought we could pay a reasonably certain 10% plus dividend, but we can't*", thus (incidentally) scarcely leaving any investor in doubt about reduced dividend prospects.

1559. Again, these slides clearly convey, I find, a vision for the future, rather than a representation as to CCC's current business model, or one that is about to be introduced – and with no promises about timing except the obvious suggestion  that changes would be implemented as soon as feasible.  Once again, moreover, their supposed relevance is, in any event and at best, merely as to credit rather than as to the substance of the Plaintiffs' claims.

### 17th September - repo roll and support from Carlyle

1560. As 15th September was a Saturday, the crucial repo roll for Freddie Mac securities would take place on 17th September.   On the afternoon of 14th September Mr Stomber provided an email report to the Board noting that CCC had $116Mn in liquidity but was expecting to use about $50Mn of that to meet collateral demands at the 17th September repo roll.  He reported that repo availability had been negotiated, although with some increase in haircuts taking place, either nominally or through the backdoor method of lowered price marks.  In fact, the repo line with Deutsche Bank had been frozen at $1.8Bn on the alternative of higher amounts being subject to a 4% haircut.  (CCC was in fact never able to return to 30 day repo with Deutsche Bank, although it did succeed in obtaining a 2 week rather than a 7 day facility over the year end.)

1561. At about 6.30 pm Mr Allardice exchanged an email with Mr Stomber to the effect that "*if everyone stays at 3% and we don't have further price erosion we should be ok. It feels like we are near the bottom*".   Mr Stomber agreed but said that CCC might need another $50Mn for safety.   That evening he emailed Mr Conway to say that he thought that CCC had a 65-75 % chance (in their submissions, the Plaintiffs, inaccurately and tendentiously, report this as "*only*" a 65%-75% chance*) of meeting all new haircuts without drawing on the $100Mn bridge loan which Carlyle had advanced in August, although there was a possibility that it might later need an additional $50Mn owing to potential new haircuts being imposed.   He said that the alternative to the further $50Mn would then be to *"fire sale assets and raise liquidity"* but that "*This is more of a Carlyle decision than mine…"* .   Mr Conway replied, saying, "*If we need it and things are roughly as they are now you will have it.   Without fireselling assets.*"

1562. The Plaintiffs rely on this exchange as evidence of Carlyle's "control" of CCC, and of Mr Stomber's being subservient to Carlyle and having regard to the interests of TCG rather than those of CCC, in breach of his duty.   I reject this and agree with the Defendants' more measured interpretation.   As explained by both Mr Stomber and Mr Conway, this was simply an acknowledgment of fact, namely that Carlyle could decide whether or not to provide any further financial support for CCC and was not obliged to do so, but that if it did not, a fire sale would likely be the only option.   Moreover, the response is consistent with what I find to have been a general pattern of willing support for CCC from Carlyle - albeit, I am sure, support which Carlyle regarded as being in its own interests just as much as CCC's, and not necessarily being unlimited.   There is nothing extraordinary, or wrong, or sinister in that.

1563. The Plaintiffs point out in their review of CCC's repo arrangements at the time, that at this roll CCC only obtained repo with a tenor (term) of one week from BNP Paribas, UBS, Citi and Deutsche Bank.   They cite this to invite the inference that CCC's repo financing was ultra-precarious and obviously so.      However, I am far from satisfied that this is the explanation.   From the evidence, it appears to me to be more likely (except in the case of Deutsche Bank, who, with Lehman, turned out to be CCC's most consistently "difficult" counterparties) that this had to do with the expectation that the Fed was about to lower interest rates on 18th September.   For CCC this would be good for the likelihood of raising RMBS pricing, but bad for paying repo interest at rates fixed at the old level.   Adjusting repo terms immediately following this would give CCC the advantage of potentially gaining the effect of beneficial pricing adjustments earlier than the next repo roll date.   In any event, I do not see this as a point of great significance, especially as most if not quite all (ie not Deutsche Bank) the material repo finance subsequently returned to its 30 day norm.

1564. CCC continued to monitor prices, events and trends in the market.   On the evening of 18th September, Mr Stomber sent his habitual update email to the Board.   There were a few encouraging points such as that CCC had received back $15Mn of margin as RMBS prices had improved, and that liquidity was up to $82Mn.   He noted that there was prospectively a forced sale auction of up to $1.5Bn in AAA floaters coming within the next 10 days, and that the results of this would be a "*test for the market*".   The importance of this is easy to see, and Mr Stomber would no doubt follow it with interest.   It has emerged that this was in fact one of the "Westways" fund auctions which have assumed some importance in the expert evidence about markets, price trends, and the question of what prices CCC could and should have obtained if it had sold RMBS from this time, as the Plaintiffs argue it should have done.   I will revert to this below.

1565. Mr Stomber also reported that Deutsche Bank had claimed to *"sell $700Mn of 7% caps at 57 over* [ie 57 basis points over LIBOR] *last week"*.   This was seen as an encouraging sign of improved demand in the secondary market.   It was also no doubt of assistance regarding price levels, but Mr Stomber also said that the transaction was not of a size to suggest that a party such as CCC could expect safely to transact greater volumes.   I also note that whilst 7% caps were held by CCC, this was only about one third of its total holding, the remainder being

6.5% or 6.75% caps, which all the evidence suggests were intrinsically less attractive and less valuable than 7% caps.

1566. On 18th September, the Federal Reserve announced an unexpectedly large cut in the Federal Funds Target rate by 50 bps to 4.75% to improve liquidity conditions generally, so as to "*forestall some of the adverse effects on the broader economy*" of the current liquidity squeeze.    This immediately caused a fall in LIBOR.    It was generally received as an encouraging sign with regard to Fed intervention.

### *20th September - ALCO Meeting*

1567. Mr Stomber did not attend the 20th September ALCO meeting, which was therefore chaired by Mr Trozzo.   Mr Allardice did attend by telephone, and he actively participated, suggesting some additional information columns which could usefully be included in the routine ALCO pack information templates with regard to haircut levels and repo rolls.   I have previously commented that the evidence shows that Mr Allardice took significant active involvement in his role as a director of CCC.

1568. Apart from the usual reviews of markets trends, metrics and so forth, the meeting's discussions centred on the course which had been decided by the 23rd August Board Meeting. It was noted that there were several "fails" recorded in CCC's investment guideline compliance indicators which were collected for inclusion in the ALCO pack materials for review, with the repeated explanation that these were because of the extraordinary events of August and a note of the measures taken in consequence.   It was in order to remedy these "fails" and to reflect the reality of CCC's current situation that it was discussed and resolved (Mr Stomber having previously requested this discussion) that CCC's Investment Guidelines ought to be amended, especially as to their minimum liquidity cushion and asset allocation requirements, and that the proposal should be circulated to the Board with a request for the Independent Directors' approval.   The justification was that this was "*necessary due to the activity in August and the impact on CCC's portfolio*".   This discussion was to culminate in the request to the Independent Directors, made on 1st October 2007 and referred to below, to approve the suspension of the liquidity cushion guideline, the minimum borrowing capacity guideline and the asset allocation guideline, until the end of the year.

1569. The prospective Westways auction was also brought to ALCO's attention as a transaction to be watched.   A pronounced decline in new CMO issuance by Fannie Mae and Freddie Mac in August was noted and explained, by Mr Greenwood, as being attributable to the "*high inventories of secondary paper that dealers were looking to sell*…." causing reduced demand for new issue. This would suggest that there was plenty of supply of similar existing bonds in the market, although of course bonds are individual and the precise characteristics of existing bonds are fixed, whereas new issuance bonds can be tailor-made.

1570. Later that same day, Mr Stomber reported the results of what was apparently this auction, as "*not being a fun day*".   This was because the $1.4Bn of Agency capped floaters which had reportedly been sold, at about 67 bps over LIBOR, was in his view an influx of supply into the market which had caused a price decline in the value of such securities, which were also held by CCC,  and resulted in a $5Mn margin call.   A $13Mn call from Lehman Bros came the following day.  Mr Stomber said, in evidence, that this event served to reinforce his view about the difficulties of selling a large volume of Agency capped floaters into the market, and the likelihood that it would depress prices.

### *Repo line negotiations continue to be fraught*

1571. From around mid-September CCC's recorded negotiated available repo capacity fell significantly, from a previous level of around $35Bn or above, to around $25Bn.

1572. I have already referred to the gradual introduction of a higher rate haircut by Citi, on its very substantial line, and also the prospect of Deutsche Bank insisting on a 4% haircut in early September, and the difficulties that this would cause to CCC.  When Deutsche Bank eventually did agree to drop back to 3% (CCC was never, in actual fact, required to meet a nominal haircut higher than 3% before the ultimate cataclysmic events of March 2008), the papers show that one of the reasons for Deutsche Bank wanting a higher haircut for a larger line was because it was perceived that "*a liquidity premium on the portfolio*" was needed "*when we repo such large positions (in case we ever have to liquidate)*".   This obviously recognises that a fire sale or a distressed sale of assets is likely to realise a lower price than a sale between unpressured parties.  It also recognises, it seems to me, that the large size of a block similarly tends to lead to lower prices.

1573. From about 19th September, CCC had had a difficult negotiation with Credit Suisse, who were providing repo at 3%, but asked CCC to roll away over the quarter end (which meant the 25th September repo roll) for its own balance sheet reasons.  When CCC said it would prefer not to do so, Credit Suisse quoted a haircut of 5%, effectively, therefore, compelling CCC to roll away.  They did, though, immediately promise to restore the line for the following roll at the same 3% haircut as before, and they honoured that promise.

1574. Mr Stomber interpreted this as part of the dance of negotiation which I have mentioned in general terms, and which is widespread in this business.   He read it as occasioned by short term internal pressures on the bank, a "*balance sheet issue*" about which his counterpart, Mr Aikenhead, "*can't tell me in an email, or he'll get fired*".  I find this view to be confirmed by the immediate reinstatement subsequently of the soft line availability, on reasonable terms, with a view to maintaining good business relations in the longer term.   It is also supported by internal documents obtained from Credit Suisse, from which it is clear that Credit Suisse's credit officer had already been asked to confirm, (and had done so) that a 3% haircut on CCC's repo was approved.

1575. Mr Stomber had been pressuring Bank of America to reinstate its repo line.  The need to roll away from Credit Suisse for the 25th September repo roll put pressure on CCC's promised availability of soft repo lines, as recorded by Mr Stomber in an email of 21st September, in which he reviewed where funding for this roll needed to come from.    In fact, Bank of America (Mr Duffy) confirmed that they would make a $2Bn line available in October, thereby relieving the pressure.

1576. However, during the Credit Suisse conversations, Mr Aikenhead of Credit Suisse had stated, in an email to Mr Stomber on 24th September 2007, that 5% was currently the market standard haircut.    The Plaintiffs put forward this statement as a major reason why CCC's Management should or would have expected to see haircuts increasing above the 3 % level.  For the reasons given above, I am satisfied that it was not.   I am not sure how closely Mr Stomber actually read the detailed position at the time, but I do accept his evidence that he did not regard the statement that 5% was "currently market standard" as being true, or that Mr Aikenhead genuinely believed it to be, and I find his beliefs to have been reasonably held.  This is an example - and this time from outside CCC - of the kind of statements which get made for the purposes of negotiation but which are not solemn representations of truth by the parties at the time, and are neither expected nor believed to be such.   This incident is also an example of the need for reading between the lines when interpreting what is really going on in communications in these markets, and the dangers (of which I am satisfied) of jumping to superficial conclusions.  It also shows that Credit Suisse, for one, was anxious to provide facilities for CCC because of the pull of further potential Carlyle Group business, and that the reality was that this was an advantage which CCC could exploit.

1577. The Plaintiffs have suggested forcefully that at this time CCC was "running out of room" with regard to repo availability, and that this fact was not given proper significance by the Defendants.    I accept that the recorded reduction in available soft line resources in mid

September, apparent from ALCO pack materials, was significant and it also made the negotiation of repo more fraught.   I also accept that there was something of a "take one day at a time" approach to the operation over this period, but this had, I think, been anticipated by Mr Stomber, and the situation was reported to the Defendants generally.   It was part of the plan considered at the 23rd August Board Meeting that the repo lenders would no doubt have to be "worked", and the fact is that CCC did succeed in obtaining repo funding which was adequate to meet its actual needs during this period.

1578. Mr Stomber also noted in this email that CCC's portfolio was gradually reducing owing to natural amortisations, and that by the second of the October rolls, this would have reduced by about $400Mn which would slightly reduce requirements.  This was, of course, one of the underlying planks of CCC's strategy.        The Plaintiffs point out though, and with justification, that the rate of reduction relative to the size of CCC's portfolio was very small. Without more, it would in fact take very many years to achieve the kind of reduced exposure which (they submit) was plainly required.

### 25th September – repo roll

1579. Having been able to move the Credit Suisse financing to other banks over the 25th September roll, Mr Stomber reported back to the Board in his update email that evening that CCC had rolled its repo and recovered $9Mn of margin, taking liquidity to $88Mn.   The weighted average haircut even fell slightly from 2.62 % to 2.6 %.   Mr Stomber also noted that CCC would start using the new Bank of America repo line in early October to bring down the amount outstanding on Citi's line, so as to encourage Citi to be willing to assist CCC for a longer period.  Thus, the repo lenders continued to be "worked".

1580. Citi, Deutsche, Lehman and UBS were CCC's main repo providers at this time.   Nominal haircuts were at 2%, 2.5% (Citi) or 3%, although conservative pricing raised the effective haircut, as mentioned above.  Bear Stearns, BNP Paribas, Calyon, ING and Merrill Lynch were providing lesser lines of around $1Bn of which only Calyon remained at 2%.  However, the overall position was that CCC was proving able to cope with this pressure on loan to value ratio.

1581. CCC had recognised its vulnerability to "funding risk", as is clearly stated by Mr Stomber at the ALCO meeting of 6th September 2007.  Consistently with statements made at the Investor Conference of 11th September, from mid-September, Mr. Stomber, Mr. Hance and Management were in negotiations with Wachovia, one of Carlyle's main banks, to obtain a 364-day term repo line, which would obviously provide more stability.        Negotiations initiated through Mr Hance appeared to be positive, although it was noted that Wachovia was not a seasoned repo lender.

1582. On 26th September, Mr. Burlingame of Wachovia emailed Mr Stomber and Mr. Hance, stating that the move towards concluding such an agreement had received final approval within Wachovia subject to final documentation.   The facility was to be for a $2Bn line, with resettable interest rates based on 1 month LIBOR and a fixed maximum 3% haircut.     Mr Stomber and Mr Trozzo regarded this as a major breakthrough.

1583. At the end of the month (30th September was a Sunday) the position was that Wachovia had agreed to work from CCC's documentation and would do their best to turn matters around quickly.   Attempts to negotiate longer term repo with Sumitomo and another lender, though, had not been successful.

### Prospective going concern analysis

1584. Towards the end of September – 26th September to be precise – the question of PwC's prospective third quarter financial audit of CCC, and in particular the evaluation which they

would then be undertaking of CCC's ability to continue as a "going concern" emerged in a telephone conference call between Mr Reville and CCC's accounting team, consisting of Mr Green, Mr Rella and Mr Allardice.   Mr Green sent an alerting note about this to Mr Stomber, Mr Hance, and the in-house Carlyle accountants (Mr Nachtwey and Mr Buser), pointing out what PwC would be looking at.   This would include a budget or cash flow forecast, and a sensitivity analysis with regard to future events such as possible changes in market prices and the "advance rate" (apparently meaning the haircut).

1585.   This produced a flurry of email responses.   On the same day, Mr Nachtwey responded with a summary of the requirements of US GAAS (Generally Accepted Auditing Standards) which PwC would use, noting in particular that this would be likely to mean looking forward for a period of one year beyond the next opinion date, and if it appeared necessary, would include reviewing management plans regarding disposal of assets, borrowing money or restructuring debt, delaying expenditure or increasing equity ownership, and so on, and the feasibility of such matters.

1586.   Mr Buser's simple summary of the position was that *"The audit issue is a judgement call as to whether the entity has sufficient resources to fund its obligations for at least 12 months"* and he voiced concerns that TCG would need to be very careful about commitments or guarantees of CCC, or waiver of fees, as this might be interpreted in accountancy terms as rendering TCG a "primary beneficiary" of CCC and requiring consolidation of accounts.

1587.   I have noted this, and am satisfied that the concern about consolidation of accounts would be a reasonable one in general terms, that is regardless of whether CCC were in any financial difficulties or not, simply because of the complications which this would have entailed, and which practical considerations would therefore make it preferable to avoid if possible.   For present purposes, though, I find that its interest lies in the fact that this immediate reaction shows a general understanding that TCG would be likely to be willing to support CCC.

1588.   Mr. Stomber responded to everyone including Mr Conway, Mr Hance and Mr Alladice on 27th  September, in an email headed "Natural cash generation – going concern" explaining, for transmission to PwC, that the portfolio would generate $150Mn in cash over the next twelve months, and the current position was that:

> *"[A]ll dealers who were to change margins have done so – that was a one time cash draw.*
>
> *The volatility of our margin calls on price is low and has been cash positive for the past 4 weeks.*
>
> *We have $87 MM of liquidity today.*
>
> *We have $5 billion of new repo lines… of which $2Bn is locked for 364 days.*
>
> *We are profitable for the first nine months [of 2007] despite the one time loss associated with selling bank loans.*
>
> *Our portfolio has no credit risk – it is quasi-US government [securities] that repays at par.*
>
> *Our portfolio self-generates a large amount of cash and a reasonable level of income.*
>
> *$4bil of 7% caps have traded in the past two weeks at about 60 over – if [CCC] had to sell to raise cash, there is a market in September that has transacted size.*
>
> *In summary – every day in September has been better than any one day in August…"*.

1589. The Plaintiffs dispute the accuracy of some of these points. As to the fourth point, this is on the grounds that some of the allegedly "new" repo lines were actually returns of old repo lines, and the final point is, of course, an unfortunately premature assumption about Wachovia, although I find it was understandable at that point in the negotiations.   The eighth point may, I think, be a generous interpretation of volume when the figures are examined, and it of course says nothing about prices.   I accept, therefore, that Mr Stomber was putting forward all the positive points that he could think of in this email.   I am still satisfied, however, that it gives a reasonable bird's eye view of the position at the end of the month and is also accurate in the final sentence, which I have no doubt also accurately recounted Mr Stomber's feelings at the time.

1590. This positivism is corroborated by the fact that when copied in on Mr Green's original email, Mr Trozzo responded in very upbeat terms, although it is clear that this was especially because of the hugely welcome prospects of the Wachovia finance.   But of interest here is the fact that he recorded that if CCC ran into more liquidity pressure, CCC could sell RMBS, because "*we do not plan or hope to right now but it is an option available*".   This is, I find, consistent with the strategy of holding on to RMBS but not being averse to selling, if it were worthwhile or appropriate.   If the policy decision had simply been not to sell at all, then this would not have been natural wording.

1591. This is as far as this "going concern" issue progressed during September.   My overall clear impression from this early correspondence is that the question was regarded as one which it was only natural for the auditors to be raising, because of CCC's obvious liquidity issues, but that the fact that it was being raised was in itself no indication that PwC had made a decision that there was real doubt about CCC's viability.       Demonstrating this positively, though, was a matter that would have to be addressed.   Mr Stomber – not an accountant but with a passionate belief that CCC could survive and ought to survive - was simply anxious to know what was needed to achieve this, and to ensure that all the positive indications available were drawn to PwC's attention.   I defer further consideration of this matter to October/November 2007, which is the timescale to which it is most material.

1592. However, there is one document which I do need to mention at this point, which has played a large part in the Plaintiffs' criticism, spearheaded by their accountancy expert, Dr Holstrum, of the reliability of the PwC going concern review and its endorsement of the view that CCC qualified as a going concern at the end of September 2007.   This is an "RMBS Repo Status Report" in a version dated 26th September 2007.   It is a table listing all (then 14) of CCCs' repo counterparties, giving the quantity of repo lines available and actually in use, divided as regards Freddie Mac and Fannie Mae securities, next repo roll dates, current and original levels of haircut, totals, and other information with regard to repo lines obtained or potentially available in the future.   It also contains a column for comments.   Although it is not clear exactly when this document was prepared, it seems reasonable to expect, and I therefore assume, that it had been prepared by the end of the month - it certainly lists "next repo roll dates" as potentially 1st October 2007 in many instances.   It was a document apparently prepared for internal use by CCC's Management.

1593. The reason why this document is controversial is that there are at least two further versions of it, although these are both dated 30th September 2007, and were clearly prepared later.   The first was prepared for presentation to PwC in connection with its review of CCC's 2007 Third Quarter financial statements, and there is a further copy of this with a few handwritten notes made on it by members of the PwC review team.   The other, which is almost but not quite identical to the version just referred to, was presented to CCC's 13th November Board Meeting.       There are differences between these versions and the 26th September document, in that not only have some figures been amended (which one might well expect owing to the date difference, or a need for correction) but certain negative remarks or explanations contained in the comments column have either been removed, amended or truncated to

present the position in either a neutral or seemingly more positive light than did the 26th September 2007 version.

1594. I will leave my findings about the importance of the fact of these amendments to consideration in relation to CCC's position in October/November. The important matter for present purposes is the state of knowledge of the Defendants as directors of CCC, or of CIM (effectively Mr Stomber and his management team) as regards CCC's financial position, its risks and its prospects.   In considering, the Plaintiffs' complaints against the Defendants focusing on 30th September/1st October 2007, I make it clear that I have measured these complaints treating the content of the 26th September 2007 version of this RMBS Repo Status Report as giving the full and true state of play in this regard at that time.

### 1st October 2007

1595. The Plaintiffs include this date in this section of their claim because it brings within it the upshot of the request, foreshadowed from the 20th September 2007 ALCO Meeting, that the Independent Directors should approve a three month suspension of the liquidity cushion, minimum borrowing capacity and asset allocation guidelines of CCC.   They say that this was, therefore, the obvious point at which the Defendants, in particular the Independent Directors, would have had brought to their attention the question of then diligently reviewing the whole question of the purported "capital preservation strategy".  The request was in fact circulated to the whole Board although only requiring approval of the Independent Directors. This was, Mr Stomber said, because it was a major decision.  It was presented, however, in a short email as "*A clean-up for corporate governance*".  The Plaintiffs criticise this as a shockingly superficial and casual approach to such a serious matter.

1596. Within an hour Mr Conway had replied with approval as did Mr Allardice shortly thereafter. Mr Loveridge and Mr Hance both responded that evening, and Mr Sarles the following day. Mr Zupon did not respond; he said that this was because he was a non-voting director, although he was in fact in agreement.   His given reason seems to me to be plausible, but I also think that his reticence owed something to his strained relationship with Mr Stomber and the fact that by this time he regarded himself as an outsider as far as CCC's operations were concerned.

1597. The Plaintiffs criticise this event as a serious breach of duty by the Independent Directors.  In itself it has no causal connection to the damage claimed to have been suffered by CCC – it is the failure to sell RMBS which is the nub of the complaint and suspension of mere investment guidelines has nothing to do with this.  It was, though, part of general corporate governance processes relating to CCC's business, and it was also a natural consequence of adopting the capital preservation strategy complained of.    It has figured very large in the Plaintiffs' arguments.

### The claims - September 2007 and 1st October 2007 – summary of arguments

1598. At the Board Meeting of 23rd August 2007 the Defendants had made or approved a decision not to sell RMBS but rather to liquidate credit assets, withdraw from commitments to purchase other assets, take a loan from TCG, and not to sell RMBS unless a favourable opportunity arose.  I have found that, at that time and in the circumstances, those decisions were no breach of duty by the Defendants, being neither improperly motivated or made for improper purposes, nor being negligent.   They were a reasonable reaction to current circumstance, as a matter of proper and responsible business judgement.

1599. This last aspect - failure to sell RMBS -  is the core allegation of breach of duty made by the Plaintiffs, and their ensuing arguments are therefore that to continue subsequently with that policy was conduct which itself became a breach of duty.   Their next argument is that it did so in and from September 2007.  With the opportunity to consider the position, with market

conditions having calmed down somewhat in September although still remaining extremely difficult for CCC, they say (in effect) that the Defendants ought at least to have revisited and reviewed the August decision and <u>then</u> decided to take the "required action".   In carrying on as before whilst only holding the highly leveraged RMBS assets, CCC was operating at a leverage ratio of an extraordinary, unprecedented, and hugely dangerous 37x.       After August, in September 2007 therefore, CCC still required to deleverage urgently, and in the absence of obtaining further capital, that meant selling RMBS.

1600. The Defendants' essential response to this remains that the balance of risk and benefit of the two courses of setting about selling RMBS or holding on to them continued to favour the latter course.  The Defendants say that this is in fact the case on an objective view, but they also submit that it was certainly a view which a duly diligent, loyal and competent director of CCC could reasonably have held.

**Plaintiffs' case**

1601. As to particular matters showing that the Defendants were, or ought to have been well aware of the pressing need for such action, and therefore supporting their key allegation, the Plaintiffs make submissions, greatly summarised, as to the following.

1602. They submit that Mr Stomber's emails of 3rd and 4th September show that he believed (and conveyed to the other Defendants) that CCC required a liquidity cushion of 40% to operate viably.   They further submit that the similar presentation slides at the Investor Conference on 11th September effectively made the same representation by CCC's directors to investors, to the repo lending banks and to the world at large.     They submit that this carried the implicit representation that this requirement was therefore the model that CCC was transitioning to, and within this was the equally implicit recognition that substantial deleveraging from the previous position was required.   All this showed that CCC needed, and the Defendants knew that it needed, to sell RMBS.

1603. I have already rejected the Plaintiffs' submissions that the slides amounted to representations or warranties, but the Plaintiffs are of course entitled to rely on the contents of the slides as evidence of the Defendants' knowledge or thinking.  That is what I am concerned with here, and since it has formed such a large part of the Plaintiffs' cross-examination, I will also say here that I am satisfied, and I find, that Mr Stomber's thinking at the time (early September 2007) was that CCC's business ought to operate with a liquidity cushion of approximately 40% liquidity in the future.  This is because there seems little point in his including such figure in his illustration otherwise.  However, I equally find that that figure was, at the time, a target at best.  It therefore may disclose Mr Stomber's thoughts at the time, but it has no more significance or evidential materiality than that.   It was a useful aspiration, but in itself it says nothing about how to achieve the transition from the then current state of the business to the target state, and it is only this latter consideration (ie what to do) which could be in point, because I am here concerned with the supportability (or otherwise) of the immediate operating decisions which were being made about CCC's business, in the state in which it then was.

1604. The Plaintiffs then point to various financial metrics noted in the ALCO Pack papers for 20th September 2007, which all the Directors had had circulated to them.  They point to the new high of the RMBS price volatility index, measured at 1.20% by 17th September, and the liquidity cushion ratio to capital of 3.8% at 17th September and 7.2% at 28th September, thus way below the 20% fundamental requirement of CCC's original business model, let alone the 40% now recognised - they say - to be required.   They point to the "*perilously low*" liquidity cushion to VaR ratio shown as being only 0.2% in September, and the fact that in absolute terms CCC's RMBS had shown a loss in value of $239Mn (that is, in practice, just over 1% or 100 bps) up to the end of September 2007.  This sum was the approximate total of margin calls suffered by CCC.    All these points, they submit, showed the continued urgency of

substantial deleveraging in order to increase liquidity and alleviate the position, ie the urgency of selling RMBS.

1605. The Plaintiffs stress the difficulties which CCC was experiencing in obtaining repo finance on affordable terms, indicated by the lengths to which Mr Stomber had had to go and the precipitous reduction in its recorded repo line availability.  As an example of the former, they argue that he only procured Bank of America to agree to provide a vitally necessary $2Bn repo line by "threats" that Carlyle would withdraw lucrative investment banking business from Bank of America if it did not step up and assist CCC.   They submit that a correct evaluation of this evidence and the negotiations which took place with other repo lenders shows that there was increasing difficulty for CCC in maintaining its necessary repo finance, and that this was indicative of a company on the verge of collapse.

1606. They submit that CCC needed at least $10Bn of excess soft repo lines at this time to secure its position - which figure I take to reflect  CCC's original investment guideline of maintaining a minimum borrowing capacity of 150% of actual requirement - when, in reality, it had none. Its repo capacity had reduced to 113% of requirements in September, but the precariousness of even this was demonstrated by the difficult negotiations taking place in all directions. They submit that this was, or should have been obvious to the Defendants, Mr Conway having admitted in evidence that CCC was "*in a tight spot*" with regard to its repo funding. They submit that proper evaluation of the evidence shows, similarly, that CCC was facing a real risk of haircuts rising to 4% or 5%, which was seen as unaffordable.

1607. Lastly, in general terms, they submit that the suspension of the Investment Guidelines on 1st October 2007 was a knowing and reckless breach of duty by the Defendants in that what was being agreed was the suspension of a vital aspect of CCC's structure, which had been acknowledged to be "*fundamental*" and "*critical*" in its PPMs and OM.  Yet this was proposed and agreed to as a mere formality – without any briefing paper being prepared or required, without convening any meeting, without any discussion or deliberations taking place, without seeking information about or considering any alternatives (ie selling RMBS or raising capital) and, lastly, without any thought being given to requiring any steps to be taken to restore the guidelines, thus leaving CCC operating without any risk controls at all.  They submit that this action totally ignored that it was essential to restore the liquidity cushion forthwith.

1608. The Plaintiffs also roundly criticise the fact that the suspension of the guidelines was not publicly disclosed until 13th November, when CCC published its quarterly report for 30th September 2007.   This criticism, though, seems to me once again to be wide of any material mark.   No financial damage to CCC is alleged to have resulted from any such delayed disclosure, and the only allegation of any form of damage caused to CCC is a submission of its "jeopardising CCC's reputation".  This scarcely has any weight in financial terms, and none is suggested.  Even assuming this allegation of delay is factually true and that there is no satisfactory explanation or excuse, the whole episode is in my judgment, simply irrelevant. Further examination would be entirely disproportionate and I will not embark upon it.

1609. Looking at the material matters among the above should, say the Plaintiffs, have caused the Defendants, at least by the end of September 2007 and in the circumstances then pertaining, to review the position with realism and care with regard to selling CCC's RMBS.   Had this been done, then, the Plaintiffs submit that the only and inevitable reasonable conclusion was that at least a major part of CCC's RMBS portfolio had to be sold.   Whilst not formally withdrawing their previous submission that there should have been an <u>immediate</u> sale of about half ($10Bn) of the portfolio, the Plaintiffs have, in the event, concentrated on the submission that CCC could and should have embarked on a planned <u>programme</u> of sales to achieve a sale rate of around (it later becomes "at least") $2.5Bn - $3Bn per month (that is $500Mn - $750Mn a week) from at least September through to December 2007, and even beyond, thereby achieving at least the $10Bn reduction in the portfolio size which is urged.

1610. As to price, the Plaintiffs initially submitted merely that this could, and therefore should, have been accomplished at "only a modest discount" from CCC's own repo marks, which were effectively FT/IDP prices. They suggested various approaches, such as that repo marks, or secondary market pricings could be taken as a "lower bound" for achievable prices, or that a "hybrid" price - which I understood to be the mid-point between IDP prices and secondary market prices, would be a reasonable assessment of what could have been expected to be achieved. When pressed on what they said this meant in terms of actual figures, they ultimately, towards the end of the hearing, rested their case on the argument that it would have been possible to sell RMBS at a discount from CCC's own repo marks (and thus IDP prices) of no more than 11 bps (effectively 0.11%). I was told that this figure had been arrived at for being the half way point of the average difference between IDP prices and secondary market prices during the period from September 2007 to January 2008, which the Plaintiffs (Dr Carron) had calculated as 22 bps; the proposition is therefore that CCC could have achieved sales at better than half this average discount. This, say the Plaintiffs, would have been acceptable and certainly should have been acceptable for being a modest loss which would be a worthwhile price for extricating CCC from the position to which it had sunk, and from which a collapse such as actually occurred in March 2008 was really inevitable.

1611. The Plaintiffs submit that the evidence, mainly the expert evidence but supported by inferences from the factual evidence, suggests that such sales could have been achieved, and that it was a breach of duty by the Defendants (and they would say an egregious breach of duty) to fail to perceive or even investigate this possibility and then - since they would have been then bound to conclude that doing so was the right course of action - to implement such a plan. The Plaintiffs argue that the Citigroup repo financing arrangements, even treating these as proper, were obviously an attempt to buy time, but this advantage was wasted because CCC then did not go on to use the respite to make any sales, as it should have done.

1612. The Plaintiffs invite me to find, first, that the risks of selling being advanced by the Defendants, which I have referred to briefly above but examine in more detail here, are a contrived *ex post facto* justification for not selling. They submit that the contemporaneous evidence does not show such risks being actively considered and found to exist at the time, as one would expect if they were real and were actually perceived. Based on the expert evidence, they submit that these risks did not really exist at all, and are now being blown up and exaggerated. They further submit that even if those risks did exist in theory, there was no serious prospect of their eventuating if CCC sold RMBS assets on a voluntary basis in a disciplined and orderly manner. They suggest that the real consideration in the Defendants' minds was that of not taking losses, and this was afforded undue and improper weight. They submit that the evidence which I ought to prefer shows that controlled deleveraging in this way was the obvious and only responsible course for CCC to take. The supposed risks of adverse consequences such as "liquidity spirals" were not real and have been seized upon and exaggerated after the event, but also, there were, in any event, recognised trading techniques which would have protected CCC.

1613. In further support of their argument that it was culpable not to sell, they submit that the evidence shows that to do so would have been in CCC's best interests from a reputational point of view as well, because visible deleveraging by CCC would have been welcomed by CCC's repo counterparties as evidence of a responsible attitude. It would have earned respect for CCC and have thus helped to make it easier to obtain further financing at a then more appropriate level of business. They point to evidence that CCC's self-acknowledged peer group did carry out deleveraging activities as evidence that this was obviously regarded as the most sensible thing to do.

1614. They also submit that the evidence undermines the Defendants' submission that they in fact had a capital preservation strategy as they now describe, because it shows that CCC failed to investigate or take advantage of enquiries or approaches from dealers which actually

presented themselves as to possible sales by CCC of RMBS. The UBS enquiry referred to above is one example. This is relied on as evidence of at least the intransigent - and therefore culpable - resolve not to sell RMBS at all, which the Plaintiffs submit was what was really motivating the Defendants.

**Defendants' case**

1615. The Defendants have said in their written and oral evidence that their views at the end of August were that CCC had survived a very severe market crisis, and that its finances were stable albeit without much room for error or manoeuvre. If market conditions remained the same, it could survive. Indeed it could also survive even if they worsened slightly; I am referred to the summary given by Mr Trozzo, CCC's risk manager, in his email of 26th September 2007. CCC's assets were cash-flow/funding matched and paid monthly. Haircut charges were at an average 2.6%. Even a change to 3% was manageable and a change to 4 % was highly unlikely. Support from TCG had shown itself to be there when required. Funding arrangements (repo finance), although hard fought for, had been kept alive and were adequate.

1616. With the return of Credit Suisse and Bank of America to the general panel of repo lenders, and the prospect, by the end of September, of a long term $2Bn repo facility from Wachovia (whilst this did not materialise in the end, I am here concerned with a reasonable view of the apparent position up to 1st October 2007), CCC's prospects of being able to continue, slowly but steadily, on its current course towards gradual natural deleveraging whilst preserving its capital assets in the meantime in consequence, were, say the Defendants, perfectly rational and reasonable. That was even without an improvement in market conditions (prices, liquidity etc). But they also say that, viewed at the time, price improvements were a reasonable expectation, and that suggesting otherwise is being influenced by the effects of hindsight. Price improvements were a reasonable expectation in general terms, but in particular because, first, the price of CCC's RMBS must inevitably revert to par in time because they would pay out in full on maturity, and second because Agency capped floaters were a high quality asset (owing to the absence of credit risk) and previous experience showed that in difficult times investors migrated their investments to such solid assets in a flight to quality.

1617. The Defendants say that there was therefore no immediate need to sell RMBS, and the reasons given previously for not doing so still applied. It was a decision which required balancing the risks of selling and the risks of holding. The Defendants had previously made a considered decision that that balance favoured holding the assets, although this was not an utterly rigid rule and the opportunity of a worthwhile sale (ie worthwhile in quantity and acceptable in price) would, if it arose, be taken up on its merits. Nothing in the circumstances during this September period had changed materially from August, and certainly not sufficiently to suggest that this policy was no longer viable or, indeed, no longer offered the best option. In any event, perceiving and acting on the basis that it remained so was well within the range of possible decisions and actions of the hypothetical reasonable and competent director of CCC.

1618. With regard to Mr Stomber's illustrative slides, both internal at 4th September 2007 and at the Investor Conference a week later, the Defendants submit that they were all quite obviously illustrations of a business model which might be appropriately adopted in the future, ie after CCC had ceased being in "capital preservation mode". Not only could no one have reasonably thought that they were representations that CCC had already assumed such a model or was warranting that it would do so in the immediate future, (as I have agreed) but they cannot be fairly interpreted as an admission that CCC could only currently operate viably with a 40% liquidity cushion; the context made CCC's present strategy quite clear.

1619. With regard to matters such as the metrics appearing in the ALCO papers, the significance attached to these as frightening figures is superficial and misguided. The Defendants submit that it is always necessary, in considering these tools of analysis, to keep them in perspective and to bear in mind what they actually are measuring. Where they provide indices based on historic data, the figures will inevitably appear outlandishly high (or low) as long as any extreme event falls within the time frame of the data capture.

1620. As regards the liquidity cushion figures, the reduction in these was the inevitable and obvious result of having just used the original liquidity cushion for its intended purpose; it would not immediately return to its previous ratio, and the issue was what steps it was appropriate or prudent to take to operate in the interim and/or to bring this return about. Comparisons with the original liquidity cushion figure were of no assistance when the conditions for its intended application had radically changed.

1621. The figure given for the ratio of the liquidity cushion to VaR, they say, illustrates this. Not only was the liquidity cushion obviously depleted, but the VaR figure calculated statistically the liquidity now needed to withstand, for 20 business days (ie one month) with 99% certainty, the worst degree of market turbulence recorded within the last three months, with no corrective measures being taken as regards the portfolio. This therefore included volatility figures for the August market disruption, which had been extreme in itself, but the effect of applying this metric was to posit the possibility of a similar level of such disruption from the present circumstances of the market - which made that possibility even more unlikely. It was therefore superficial simply to take the 0.2% ratio figure thrown up as an absolute; one had to consider its practical implication in the context of real conditions. Thus, when the Plaintiffs made the dramatic submission that CCC's liquidity cushion resources showed, in September, that it could not withstand a fall of as little as 0.25% in the price of RMBS, even assuming this was mathematically correct, the real question was just how likely a further fall in price of such magnitude might ever be, bearing in mind also that, statistically, the possibility that a price rise would take place was no less likely.

1622. Lastly and importantly, the figures given for the accumulated losses on RMBS were not actual losses but paper losses only. They were not realised, and never would be if the assets themselves could be held to maturity, or at least until prices rose. Not only that, but any such rise in prices would result in an actual return of cash to CCC; the cash handed out to repo lenders on margin had not been lost, but remained CCC's. Thus, taking into account the fact that sales would bring losses onto CCC's balance sheet was not an illegitimate concern, but one of the features which could be and was reasonably taken into account in making what was, in essence a business judgment.

1623. The Defendants also argue that the Plaintiffs draw attention only to features which are, or could be construed as, negative to CCC, and because they focus entirely on these, they therefore fail to take account of positive features such as, first, that assistance from Carlyle had hitherto been forthcoming when required and there was no reason to think that this would cease to be the case so long as it appeared likely that it would enable CCC to return to health. Second they ignore the fact that CCC was actually solvent and even profitable on a day to day basis; its income from RMBS exceeded the interest costs of its repo financing. Of course the continual wrestling with haircut negotiations and the changed attitude of the banks made matters difficult, but so long as that aspect could be managed (and with hard work there was no reason to think it could not) there was no threat to CCC's continued existence. Third, the Plaintiffs overlook (or belittle) that CCC did have an actual plan for improvement of its position, even if a slow one, in that repayments received on its RMBS would be bound, ultimately, to restore the position because the securities would repay at par at least on maturity. This prospect was a truism which, they point out, all the experts actually agreed upon.

1624. As to the proposal to suspend the Investment Guidelines, the Defendants say that it was perfectly fair to describe these as a clean up for corporate governance. It was obvious that CCC's current operation did not and could not comply with Investment Guidelines which were devised in a completely different market situation and actually for different purposes, ie the raising of income for a high yield dividend, rather than the present objective of business survival and the preservation of capital as far as possible. It was therefore absurd to maintain these guidelines in place, as this performed no practical purpose.

1625. The Defendants reject the Plaintiffs' accusation that the suspension of the guidelines was treated as a mere formality. They submit that the Plaintiffs' pejorative description of how it was effected - without any meetings, or preparation of position papers, or discussions etc - is a mischaracterisation of what really happened and, boils down to having a greater regard for form than substance. They point out that the suspension was discussed fully at the ALCO meeting at which Mr Allardice was present by telephone and joined in, and that Mr Stomber lunched with Mr Sarles on the same day that the request for approval of the suspension of the guidelines later went out, and that it is overwhelmingly likely that the matter was discussed between them, even if this now cannot be expressly remembered. In addition, the members of the Board were all aware of the lost relationship between the guidelines and the current factual position, from previous discussions, decisions, and papers sent to them. To suggest that it was a dereliction of duty not to hold a formal meeting or to demand the production of formal discussion materials or suchlike is simply unrealistic.

1626. As to the central allegation of breach of duty the Defendants repeat their previous arguments as mentioned above. The question whether CCC <u>should</u> have sold all or part of its Agency RMBS portfolio raises the questions not merely whether CCC <u>could</u> have sold all or part of its Agency RMBS portfolio, but what <u>prices</u> it could anticipate achieving if it had done so, and what other consequences might have flowed from selling. They submit that for the Plaintiffs to succeed, they need to satisfy the court that the Defendants should have done something different (that is, sell RMBS) from what they actually did, the consequences of which would, in that counterfactual world, have left CCC ultimately better off as at March 2008 than it actually became in the factual world. This means not only satisfying the court as to what prices would probably have been achieved – and the Defendants point out that this is not simply a question of selling a quantity of RMBS as fungible items, because CCC in fact owned tranches of 150 specific bonds each with different characteristics which potentially affected the price they could command – but also that any other effects of such sales would still have left CCC better off.

**Plaintiffs' reply**

1627. The Plaintiffs riposte is that the Defendants' own evidence shows that they did not, and never did, really expect "normalisation" of the market conditions; they were in no way optimistic, still less reasonably so, about Federal Reserve action having any worthwhile beneficial effect, and they never saw any evidence of the "flight to quality" they now claim to have expected and relied upon in anticipation. The reality is that they continued blindly and obstinately to fail to appreciate the underlying seriousness of the situation, and pursued a failed business model, which could not survive and in which there was, recklessly, no protection from another market crisis of the type which had occurred in August 2007.

**Discussion and conclusions – September/1st October 2007**

1628. For practicality, I here examine the situation up to roughly the end of September with 1st October being taken as a convenient date. Again, it is appropriate to turn first to what is pleaded by way of breaches of duty etc in respect of this time.

**Breaches of directors' duties**

1629. The breaches of duty actually alleged in the Cause against the individual Defendants in respect of this period of 1st September to 1st October 2007 (again dealing with the contractual allegations against CIM and the position of the Entity Defendants separately) are, against the Carlyle Directors, the matters listed in Paragraphs 339B.1 - 12 and 339C of the Cause, and against the Independent Directors, the same matters in the same words, *mutatis mutandis*, in Paragraphs 339D.1-12 and 339, all as further particularised by Paragraphs 418A-N and 424A-G incorporated here by Paragraph 340.   Among these, the effectual breaches of duty are the allegations at Paragraphs 339B.7 and 339D.7, again framed as

> *"failing to insist that CCC either (i) sell down its RMBS assets to generate liquidity and reduce leverage, and/or (ii) raise additional equity capital to reduce leverage and/or (iii) conduct a restructuring or orderly wind down".*

1630. Since the last would also involve selling RMBS, it is really an extension of the first as I have previously remarked.   It would be applicable only if the Defendants ought of their own volition to have concluded that CCC could not be navigated to a viable future but this slightly different way of putting the matter has not been argued separately from the simple general allegation that CCC ought to have sold its RMBS assets.

**(a)    Breach of fiduciary duty**

1631. Paragraphs 339C and 339E contain allegations of breach of fiduciary duty by preferring the interests of Carlyle or individual Defendants over those of CCC.   As such, they list reputational embarrassment, pursuit of dividend payments, furtherance of the alleged "Strategic Objectives", and payment of fees to CIM and rebate of such fees, as a benefit conferred on the Independent Directors, as before.   They are based on the factual allegations and submissions which I have previously considered and dismissed above when reviewing the position in respect of August, and examining whether any effectual breach of duty there could have been a breach of fiduciary duty as alleged, as opposed to a breach of the duty of skill and care.   I do not repeat that analysis.   It does not appear to me that there are any further or other circumstances applying or relating to September 2007 in that regard which I have not already considered.    I therefore dismiss the allegations of breach of fiduciary duty for the same reasons as previously given and need not refer to them further.

**(b)    Breach of duty of care**

1632. Most of the other sub-paragraphs of Paragraphs 339B and 339D are in the nature of particulars of negligence; in other words, they are aspects of the core breach alleged and are at best elements going to establishing it, rather than being separate causes of action in themselves.    They are framed in terms of, for example, failing to make a "viable business plan" for CCC or to require one to be made, or failing to make "analyses", such as of how CCC could "*achieve the "Business Model" presented* [sic] *to investors*" at the Washington DC Investor conference or "*achieve the levels of liquidity and leverage recognized as necessary*".   (This latter is predicated on a factual assumption which as I have indicated, I find to be an overstatement of the effects of the presentation to the Washington DC Investor conference in any event, but it shows the structure of the pleaded claims).   There is an allegation in Paragraphs 339B.12 and 339D.12 of breach of duty by failing to convene another Board Meeting of CCC in all the circumstances, but there is no allegation that this in fact made any difference to what happened or itself caused any loss.   In the end, therefore, the practical effects of these allegations all reduce back to the general allegation of breach of duty by failing to sell RMBS, or otherwise raise additional equity capital, etc, quoted above.   Only two particular allegations justify separate mention.

**(1)    Failure to take insolvency advice**

© Royal Court of Guernsey
470

Page 299 of

1633. The first is the allegation in Paragraphs 339B.10 and 339D.10 of breach of duty by failure to obtain insolvency advice despite the alleged insolvency or near insolvency of CCC. This goes to two possible points. The first is the more obvious one of the wrongful trading claim, although it only becomes directly material if accompanied by the implied allegation that if such insolvency advice had been obtained, the Defendants would inevitably have received advice either that CCC was insolvent, or on the verge of insolvency, or that to avoid insolvency the only possible course was to deleverage by starting to sell RMBS forthwith. This allegation is not expressly made, but I will take it as implied.

1634. For the avoidance of doubt, I again find on the evidence with regard to September 2007, as in August, that CCC was not insolvent at this time, certainly not within the meaning of the 1994 Law as I hold it to be correctly interpreted, but also not, in my judgment, even if the appropriate test of insolvency were the ability to pay its debts "as they fall due".   This is based on what, in my judgment, would be the effects of the latter test properly applied to the particular business circumstances of CCC.   CCC was able to pay its debts as they fell due. Any inability to do so would depend entirely on its being, at some point in the future, (a) unable to raise "affordable" repo finance in respect of a subsequent repo roll, or possibly (b) unable to obtain any financial support from Carlyle if it needed to do so in respect of potential margin calls.   However, CCC had thus far succeeded in obtaining repo finance on terms which it could manage, and had succeeded in meeting margin calls with financial support from Carlyle being provided, and there was no actual fact, as contrasted with doom-laden speculation, which could be pointed to to show that it could not continue to do so. Therefore, to posit that CCC was not able to "meet its debts as they fell due" was entirely speculative; it did not fall within the ambit of cash flow insolvency even on this more stringent test.

1635. The facts which might give rise to any perception that CCC was "on the verge of insolvency" – which is a different point because it throws the perception one stage further back from the state of actual "insolvency" on whichever test is applied  - were sufficiently obvious matters that it was scarcely necessary to seek the advice of an investment or insolvency practitioner to discern them, and the evidence, even of Mr Wallace, but certainly having regard to that of Mr Shaw, simply does not satisfy me that if insolvency advice had been sought and obtained, CCC would have been advised that its only possible and responsible course was to start selling RMBS forthwith.

1636. The second point to which the criticism of failing to take insolvency advice might go is perhaps an argument that if such advice had been received, it would have brought home to the Defendants the need to have regard to the interests of the company's unsecured creditors as part of the interests of the company.  This is a legal topic which I have discussed above. However, it is an argument which really adds nothing to the essential consideration, whether the Defendants <u>did</u> have proper regard to the interests of such creditors, or, if not, whether their decisions were objectively within the range of what would have been proper and reasonable if they had done so.

1637. I therefore conclude, in relation to the plea that the Defendants culpably failed to take investment or insolvency advice, not only that it was no breach of duty not to do so, but that even if it had been, CCC suffered no identifiable loss in consequence, as it is not proved that it would have made any factual difference.   There is no other identifiable complaint arising from such advice not having been sought.   Nothing can therefore be built on this allegation and I do not consider it further.

## (2) Causing or implementing suspension of Investment Guidelines

1638. The second notable separate allegation which I feel obliged to mention specifically is that of breach of duty in recommending, causing or implementing (as applicable) the suspension of CCC's investment guideline parameters on 1st October, either at all or without any plan for

restoration, (see Paragraphs 339B.11 and 339D.11).  This has more connection with the main issue, even though it is not alleged to have caused damage in itself, nor is it even pleaded as a *causa sine qua non* (or "but for" factor) bringing about the effectual breach of duty alleged.  However, as it has been extremely prominent in the Plaintiffs' arguments, I should make separate findings in this regard, and it is convenient to do so here.

1639.  Having considered the evidence and arguments, I find that there was no breach of duty in the decision to suspend the formal Investment Guidelines for three months, either intrinsic to the decision itself, or because of any supposed shortcomings in the process by which the decision was made.

1640.  First, unguided by any expert evidence, I can see nothing wrong with the decision to suspend the Investment Guidelines as a matter of common sense.   In the factual situation which CCC was now in, they were simply redundant.  They could not be adhered to, and retaining them begged the whole question as to whether their immediate restoration was the right thing to aim for at the moment, when it had been decided, in effect, that it was not.   The suspension was indeed, it seems to me, a "clean up" of corporate governance and I do not find use of that term to be a criticism where it is (as here) an expression of the realities of a situation brought about by external factors, rather than the removal of some constraint intended to promote disciplined decision-making, simply because it is turning out to be inconvenient.

1641.  The only argument for not making a formal suspension appears to be that keeping the guidelines in force, and consistently failing to comply with them, would be a discipline, reminding the Defendants and management of the need to give reasons for the guideline breaches and the (supposed) need to restore compliance with these risk management tools, which had, it is of course accepted, been thoughtfully and deliberately constructed.   This does not seem to me to be at all a strong point, first, because the Defendants and Management would be all too conscious of those points already and second, and more importantly, because that approach would imply that giving immediate priority to the restoration of those management tools was the right objective  when that was not necessarily the case.

1642.  Whilst Professor Das appears to advocate this latter approach, Dr Webster does not, and I strongly prefer her evidence and expert opinion on this topic.   She explained, and, I find, from a position of significant experience rather than academic research and theory, that the suspension of guidelines in the case of a "passive" breach of them (ie one that had been occasioned by circumstances outside the control of the entity, rather than by its own controllable internal actions) which meant that they could not currently be complied with, was appropriate.  It was also industry standard practice even in 2007, (although that goes more to whether it was reasonable to think it appropriate than to whether it was so in absolute terms).  It was a recognition that in such circumstances, previously devised guidelines were no longer applicable, whether temporarily or even perhaps for a longer term.   Dr Webster emphasised, with regard to written guidelines, that far from declining to suspend them and striving to restore them or operate them, in a crisis

> "... in circumstances that are abnormal, the idea of operating with a guideline as if market conditions were clear, sufficiently clear to alter the guideline and replace it with something else, -  a crisis of this magnitude - I believe would be imprudent.  Not just unreasonable, imprudent."

and

> "...so, whilst I certainly think there is more to guidelines than administrative statements and indeed I think they inform the conduct of an organisation or of a fund, I also think that the guidelines themselves are something prudently suspended, because one simply cannot identify what the emerging conditions are in order to say anything sensible at all, at that point, in terms of a written guideline."

1643. Professor Das advocated that investment guidelines should be treated as a set of rules which, having been devised, required to be operated strictly, as a matter of disciplined management. His approach was, to my mind, far too rigid in its outlook. Dr Webster regarded guidelines as a tool to be employed usefully and intelligently in context, and not a straitjacket. I find this view more convincing.

1644. Since I regard the suspension itself as a reasonable decision in the circumstances, it follows that the Plaintiffs' other complaints about how the decision was made (ie, either lack of individual care by the Independent Directors in giving their approval, or deficiencies in the process by which that approval was obtained) fall away as irrelevant. However, for the avoidance of doubt, and treating this as an independent matter of alleged breach of duty, I would not find either allegation to be substantiated.

1645. To start from the issue of process, I am satisfied that this was perfectly reasonable in all the circumstances, such as CCC's structure, the size of its Board, and the way in which its operations were habitually managed. There was in fact no formal requirement in its Articles for a meeting or other discussion between the Independent Directors in order to make a decision. All that was required was that a majority of them should approve the material decision. It was therefore a matter for each of them individually to decide whether he had sufficient information to be able to make a properly considered decision.

1646. I am satisfied that as at 1st October 2007, each of them could reasonably come to the conclusion that he did. The background was that matters pertinent to this point were well known to the directors. The recommendation to suspend the guidelines came from CCC's CEO (and effectively its Investment Manager, CIM) following an ALCO meeting at which it had been discussed and deliberated on by those with closest connection to the day to day management of CCC's business – including CCC's Chief Risk Officer, Mr Trozzo. (I do not find any significance in the fact that Mr Trozzo had apparently initially recommended suspension for two months only, but the eventual recommendation was for a period of three months; this is trivial.) One of the Independent Directors, Mr Allardice, had participated in the ALCO meeting and he was therefore certainly fully informed of the position. I am also satisfied that Mr Sarles must have discussed the matter, at the time, with Mr Stomber – it was such an obvious thing to do - and I have no reason to believe that this discussion was inadequate. Mr Loveridge says that, in considering whether the request was reasonable, he relied on his knowledge of relevant considerations gleaned from the 23rd August Board meeting, and logic. In all the circumstances I find that too to have been reasonable.

1647. I conclude, therefore, that the suspension of the Investment Guidelines was a decision which was in itself properly obtained and properly made. I turn now, therefore, to the essential core breach of duty complained of by the Plaintiffs, which is that of failing to sell RMBS, or raise additional equity capital, dealing first with the latter.

### (3) Failure to raise additional equity capital

1648. I have already dismissed this briefly as an unrealistic proposition in August 2007, but the situation had by now moved on somewhat from the immediate aftermath of the mid-August liquidity crisis, and the Plaintiffs' case on this point therefore requires closer examination.

1649. As mentioned, the possibility of raising new equity capital for CCC was raised at around the ALCO meeting of 6th September 2007, and the failure to pursue this possibility is a matter of specific and vehement complaint by the Plaintiffs. The essence of their criticism is that the Defendants identified the need to raise new capital, and (they suggest) avenues for doing so, but made no attempt, at least not of any substance, to pursue these. In particular, they did not raise the possibility of obtaining additional capital from Carlyle, from CCC's existing shareholders, or via a back-up line of credit from Carlyle's or CCC's investment banking relationships. They suggest that the Defendants' explanation that this was because it was not

seen as a viable possibility is an *ex post facto* justification for an inexcusable failure to pursue this option.

1650. Without doubt, the Defendants were aware of the theoretical possibility of raising extra capital as a step that would assist the situation, if it were achievable.   Unsurprisingly though (it seems to me) it was regarded as a non-starter in September 2007, even if it were legally possible - and in fact no new shares could be issued by CCC within 180 days of the original IPO (ie before the end of the year) without the consent of Citigroup.

1651. The obvious reasons for this course being impractical in any event are that it was only two months since the original IPO, which had itself found more difficulty in generating full subscription than had originally been anticipated, that CCC had no established track record of success in the interim short period to attract more investment, and that it was in fact in the aftermath, if not the throes, of a storm.   Independent capital would hardly find CCC an attractive investment at the time, and a rights issue would scarcely be popular.   It would be difficult to find underwriting banks with the cash to support any further offering of shares on any basis, and it was beginning to become apparent that banks were becoming more tight and less relaxed about dispensing their cash.   Simply subscribing equity to support a liquidity cushion (which is what such further investment would amount to) would not be an appealing proposition to anyone, outside, perhaps Carlyle itself.

1652. In support of their proposition that these arguments are all rationalisation after the event, the Plaintiffs point out that although Mr Stomber informed the Board, on 6th September 2007, that Mr Green was starting work on what CCC would have to do if it decided to raise capital, nothing ever came of this and no-one could explain why or exactly what happened.   As Mr Green had not been called to give evidence they invite the court to infer that Mr Green's evidence would not have assisted the Defendants and that no meaningful investigations were carried out.

1653.  I would decline this invitation, even if it went anywhere, which in my judgment it does not.   I have already stated that I do not find circumstances sufficient to justify the drawing of any adverse inferences arising from the absence of particular witnesses in this case.     The evidence is what it is.   On balance of probabilities, it certainly shows that any investigations were sufficiently tentative or low key that they came to nothing, to the extent that they did not even generate any records.  I do not, however, find that remotely surprising, because the other factors which suggest that pursuing them was a waste of effort seem to me to be overwhelmingly obvious.   They include both the restriction on the issue of new shares, and the general unpromising circumstances referred to above.

1654. However, (and the reason why the Plaintiffs' invited inference really goes nowhere in any event) the Plaintiffs' criticism of lack of investigation could only have any substance if they can also show that investigations would have proved fruitful, ie that if supposedly "meaningful" investigations had taken place the probability is that CCC would have been able to raise additional equity capital.   But the evidence goes nowhere near supporting any such proposition; nothing even approaching that is demonstrated.   The Plaintiffs' assertion that they have

> "*amassed a body of evidence which ... clearly demonstrates that .... raising further capital may well have been feasible.....*".

(which itself falls somewhat short of probability) turns out, on examination, to consist principally of mere repetition of the assertion itself, and a submission that because the Defendants did not actively pursue investigations of the possibilities of raising capital, the absence of evidence that they could have done so should be attributed to this failure, which thus justifies an inference that they could have done so.   This submission entirely begs the

question, and I reject it.   It amounts again to an invitation to draw an unjustified adverse inference so as to relieve the Plaintiffs of the need to prove a case on this point.

1655. The only concrete matters of fact which the Plaintiffs cite in support of their claim that CCC could have raised equity capital if it had tried appear with regard to criticism of not investigating raising capital from Carlyle or from Carlyle's "established relationships".   As regards Carlyle, this is absurd.   Carlyle was ever-present in the background as a possible source of financial assistance (I accept not guaranteed, but that is simply a matter of realism), and it had already shown itself willing to step up and assist with a loan when this was required.   I cannot see why it should be a criticism of the Defendants' care in the conduct of CCC's affairs that they did not set about attempting to embody such assistance in the formality of equity capital, which would hardly be likely to have happened and would have been a diversion of both attention and efforts.

1656. As regards Carlyle's "established relationships", the Plaintiffs present no coherent grounds for believing that capital could have been raised from Carlyle's bankers, and their only other suggested sources of capital producing relationships at this time are Mubadala, and Bank of Angola.   That possibility is nothing but the thinnest speculation, and the unreality of it is illustrated by the fact that the latter is included on the basis that Bank of Angola had expressed interest in a further investment of $500Mn in CCC in May 2006.       In fact, it is quite possible that they were approached in September 2007 and declined to subscribe, because Mr Hance had a vague and unsupported recollection of this, and early lack of success would have been the most plausible likely outcome.

1657. Both Mr Shaw and Mr Wallace agreed that it would have been unlikely that CCC could have raised further capital.     I think that is an understatement.   I am therefore quite satisfied that giving this option no further consideration in September 2007 was a reasonable and rational decision at this time.  The Plaintiffs' closing submissions to the contrary simply fly in the face of realism, and amount to little more than criticism for its own sake.

1658. It was, I therefore find, no breach of duty by the Defendants at this time to fail to investigate or pursue any more than they may tentatively have done, the possibility of raising further equity capital.   It was quite reasonably viewed as a waste of time.

*Later position on raising capital*

1659. It is convenient to mention here that I am also satisfied that CCC's position never subsequently changed sufficiently to make raising additional equity capital a remotely practical option and therefore worthy of pursuit, before it was in fact raised again at the end of February 2008 shortly before CCC's eventual collapse and, in the event, sufficiently shortly to be too late to have had any potential effect.

1660. I will give my reasons later as regards each of the times when the Plaintiffs make this criticism.    I make the point here, though that I make this finding on an objective view, quite apart from any consideration of whether, subjectively, the Defendants gave such an option proper consideration at any later time.  With regard to this latter point, I also regard criticisms of the Defendants for apparently not having given this matter further consideration at later times to be unjustified.   Businessmen work practically, and do not record repetition of their earlier decisions continually for the purposes of later scrutiny.   I do not regard it as any criticism of the Defendants that the possibility of raising more capital was not repeatedly referred to, and its impracticability confirmed, when there was no change of circumstance to give this any point.

**(4)  Pursuit of the "capital preservation strategy"/failure to resolve to sell substantial (or any) amounts of RMBS**

1661. I turn, therefore, to the central issue as regards the end of September 2007, and indeed, I think, as regards the whole case, namely whether the continuation of the capital preservation strategy as broadly formulated at the 23rd August 2007 Board Meeting, from (for choice of a convenient date) 30th September 2007 going forward, was a breach of any of the Defendants' duties of care and skill towards CCC.   Put another way, this allegation is in effect that, in the circumstances then pertaining, it was a breach of such duty not to reconsider this strategy and not to conclude that it should be replaced by a strategy of actively selling off CCC's RMBS.

1662. In essence, as I mention rather later, the crux of this point is the balance between the gravity of CCC's financing risk – principally the risk that it would not be able to continue to obtain enough repo financing on affordable terms to be able to continue to hold its RMBS – as against the risks of trying to alleviate that financing risk by selling off the relevant assets, or some part of them.     The degree of financing risk is therefore, perhaps, logically more appropriate to consider first before looking at the degree of the countervailing risks. However, since far more attention was focused on the question of selling RMBS in the evidence at the trial it has felt more natural to consider that first.

1663. The Plaintiffs' initial contention in its Cause was that it was a breach of duty not to sell the whole of CCC's RMBS portfolio immediately in July or August, or at least in about September 2007, but this rapidly became reduced to an allegation that the breach lay in not selling half of it - say $10Bn worth of it as proposed by Dr Carron, who opined rather vaguely that such sales could have been effected in two or three months.     Even this broad brush contention, though, was largely discarded by the time of trial in favour of a more sophisticated contention that the breach lay in not embarking on a programme of selling RMBS over several months.

1664. This has been variously and imprecisely expressed, at different times, as being to sell "*about*", or "*at least*" … "*$2.5Bn - $3Bn*", or just "*$3Bn*", of CCC's RMBS assets per month "*on average*", and that the period of such selling should have commenced from July 2007 through to December 2007, or, in some places, February 2008.   I will refer to this variable allegation as "selling RMBS as submitted" or, where I need to refer to it more quantitatively, then for brevity as "selling RMBS at a rate of $2½ -$3Bn a month".     Since I have already held that the earliest date upon which I think it even arguable that CCC should have commenced such a programme of selling is September 2007, and that I reject the allegation with regard to July or August 2007, future reference is also to selling starting in September 2007.

1665. I have also recorded that, in the end, the Plaintiffs' case has become that CCC could have sold RMBS under such a programme at a price discount of no more than about 0.11 percentage points from IDP prices, and therefore that this is what it should have done.

1666. The importance of a precise price, or a precise formula for ascertaining one, becomes of most relevance at the later stage of quantification of loss to CCC.   The question at this stage is the anterior one of whether CCC's directors (or CIM) ought to have reviewed the situation and resolved to attempt to sell RMBS at all, and the issue of achievable price is material to this at the more general level of what perception of achievable price it was reasonable for those parties to factor into their decisions about the desirability of selling.   The 11 bps discount figure therefore here provides a contextual benchmark in the Plaintiffs' argument that failing to embark on a programmed process of selling RMBS was culpable.

1667. I record at this point that during the trial two particular aspects of the Plaintiffs' arguments about CCC's failure to sell RMBS seemed to me to have some force, and to demand close scrutiny, which I have therefore given to them.   They both stem from the obvious fact that despite the Defendants' evidence that there was always a willingness on their part to sell RMBS in appropriate circumstances, no such sale was ever in fact made.     The question is whether this was because the circumstances were monitored and suitably investigated but were reasonably never viewed as constituting a suitable sales opportunity (as the Defendants

say), or whether this explanation is, rather, an *ex post facto* attempt to justify what was really either an inexcusable rigidity of approach, or a culpable failure to keep reviewing the position and appreciate that circumstances now demanded a change (as the Plaintiffs contend).

1668. My first particular concern on this score arose, first, from my broad impression that once the Defendants had taken the decision at the 23rd August Board Meeting not to sell RMBS except in sufficiently discreet and beneficial circumstances, it did not appear to me that that decision was consciously and deliberately re-evaluated subsequently, at any rate before the end of February 2008, as opposed to simply being treated as a given from then on.   I can accept (and this was reinforced by Dr Webster's evidence) that once a strategy to deal with a crisis or an otherwise difficult situation has been thoughtfully decided upon, it would be bad practice to be readily deflected off course, ie to change that strategy, without confidence that circumstances now justified this.   That is not, however, a reason for not keeping the strategy under review, so as to confirm whether relevant circumstances have changed, and if so, whether the original policy is still the best course.

1669. My second particular misgiving was what seemed to me to be some force in the Plaintiffs' criticism that the Defendants – most particularly Mr Stomber as the Defendant with the greatest expertise and responsibility in this area, and as, in effect, the personification of CIM – were at fault in failing adequately to appreciate, and therefore to investigate more closely and possibly adopt, the techniques for safely achieving advantageous sales of RMBS, in the market of late 2007, which the Plaintiffs' expert, Dr Maini, said were readily available, and indeed even standard practice.

1670. The Defendants' position has always been, in broad terms, that deleveraging was not necessarily the obvious and only desirable course for CCC, and that even if deleveraging were accepted as a good idea in theory, the practical problems were how to do it.   Given that CCC's assets were currently priced below par, but would ultimately pay out at par (a financial attribute apparently as inevitable as night following day), selling them in the third quarter of 2007, as on the Plaintiffs' case, would create a locked in loss of around $250Mn which would be avoided if CCC could manage to finance its holdings until their necessary  return to par value, or approaching it.  Couple that point with the fact that selling would not only crystallise capital losses potentially unnecessarily, but would risk making the immediate financial situation worse (as explained below), and the decision not to sell was certainly not unreasonable.      The problem for CCC was that the balance of risk against benefit, and in particular the risks of being seen to attempt, or even just prepare, to deleverage by selling RMBS were just too great, or too imponderable, to make it sensible to take any active steps in that direction at any material time.

1671. The Plaintiffs' retort is that these risks are being exaggerated.   They submit that the evidence suggests that these risks were simply not part of the Defendants' thinking at the time - which they rely on as itself showing that they were not great - and that they are now being given prominence so as to provide an excuse for the irresponsible, negligent, or inept (I have already dismissed "improperly motivated") decision not to make positive efforts to make at least some sales, and to reduce the recklessly high leverage ratio upon which CCC was operating.

1672. Whilst this case is a dispute about the care or propriety of the Defendants' actions, I have been presented with much external expert evidence (Dr Carron, Dr Maini, Mr Welles and Professor Das for the Plaintiffs and Professor Hubbard, Dr Niculescu and Dr Webster for the Defendants) going to these propositions.    The usefulness of this expert evidence lies generally in providing me with context (events of the time, perceptions of the time, nature of relevant transactions, contemporary industry practice, customary habits, folklore and ethos of the relevant markets and so forth) to enable me properly to evaluate these criticisms of the Defendants' conduct against the legal principles which I have held to apply.

1673. It is convenient to review the material expert evidence generally at this point, although I am here examining the reasonableness of the Defendants' continuing with the capital preservation strategy, rather than then changing it in favour of selling, only at and from September 2007. The immediately material circumstances are therefore only those which pertained, and were known or available to the Defendants, at that time. The expert evidence has of course been directed more widely than simply up to September 2007. Because it deals with all the periodic allegations of breaches of duty by the Defendants and also with the issue of what would have been the potential financial results if CCC had in fact decided to sell RMBS as it is said it should have done, from July 2007 onwards, the experts have looked at events and circumstances through the whole of the following period, and in some respects right up to CCC's actual collapse. They have also looked at material which would not necessarily have been known to a market participant, or to the Defendants, in September 2007.

1674. Later matters, if not known or knowable to the Defendants, cannot influence my view of what it was reasonable for them to do or decide at that time, although the Defendants' own later behaviour may, of course, provide material evidence from which their state of mind earlier can be inferred. Where it becomes necessary to make any such findings, I will therefore mention and take this into account.

1675. I remind myself, therefore, that I am here specifically concerned with what the experts' evidence tells me about the circumstances which applied, or which could or should have been perceived, at the end of September 2007 without the benefit of hindsight, even though it is convenient to refer to some wider or later aspects of their evidence generally.

**Factors affecting the continuation of the capital preservation strategy in and from 30th September 2007.**

**(i)       Risk management considerations**

1676. The decision not to sell RMBS was an investment management decision, but one in which risk management plays a very significant part, and I look first at the risk management evidence, which is principally that of Professor Das and Dr Webster.

1677. Before noting their material disagreements, I repeat one general point which is underlined by their evidence and which I found particularly helpful to bear in mind. This was their very useful comments about the place of risk in the field of investment management. It arises from the accepted proposition that, in business, risk and return are correlated, and the implications of this.

1678. An investor understands and expects (or should expect) that the gaining of a higher return means the assumption of a greater degree of risk. Although I think this came first from Professor Hubbard's more generalised evidence about the financial markets, it was agreed between the experts (I understand) that the returns targeted by CCC's original business model were similar to the then (in 2006/7) expected returns to be made in the equities market by investment in relatively large companies. I found this helpful for giving me a comprehensible general sense of the relevant level of anticipated risk in this case.

1679. Second, both Professor Das and Dr Webster were in agreement, that the risks disclosed in CCC's PPMs and OM were material to a consideration of appropriate risk management practices for CCC. From this I derive that risk management standards and practices are not absolute, and that appropriate conduct is influenced by the degree of risk implied in the relevant business model. This is because risk management is not the same as risk avoidance - another point which I gained from their evidence and have registered as important. Risk is intrinsic in any business where the purpose is to generate return, and it cannot be avoided, only managed.

1680. The central place of risk in the thinking of businessmen, and perhaps starkly in the financial markets sector, seems to me to be illustrated by the fact that much of Dr Maini's evidence was phrased in terms of the proposition, which sounds extraordinary when taken out of context, that market participants "found risk attractive".   This was in fact shorthand for the less controversial proposition that they found the lower prices (wider spreads) which are commanded by investments with greater perceived risk, and their consequently higher yields, attractive.   The point, though, clearly illustrates how intrinsically entwined the effects of risk and return are automatically felt to be.

1681. Turning to the particular issue, namely CCC's risk management after the August 2007 crisis, Professor Das's view, expressed very firmly, was that it was irresponsible, indeed I think he would go so far as to say grossly irresponsible, to continue operating CCC's business at its then current level of leverage.   His favourite metaphor was that this was like proceeding down the motorway with the accelerator (the high leverage ratio) pushed down, but with no brakes (the liquidity cushion) to provide safety because they were burnt out.   What you needed to do was "*get off the freeway and fix those brakes*" before coming back on.   His firm view was therefore that, as a matter of risk management, having used up the liquidity cushion (being ultimately bailed out by the Carlyle loan), the only appropriate course for CCC to take was to replenish it, forthwith.

1682. This was all the more so because the risk which CCC was running was, "asymmetric".   By this Professor Das meant, as I understood him, that the financial disadvantage of selling RMBS, which was locking into the portfolio the losses caused by sale prices being below acquisition costs, was small in amount, whereas the potential financial disadvantage which was being courted by not selling RMBS was vast; it was the potential loss of the value of the entire portfolio.

1683. However, when asked about his views on how, practically, deleveraging should be achieved, ie in any greater degree of practical detail than the simple injunction to "sell half of the RMBS portfolio", Professor Das immediately said, (quite properly) that this was not his field of expertise and he could not give evidence about this.   Indeed he said this with such notable alacrity, that I had the impression that he was rather aware of this weakness about his evidence, and was anxious to avoid getting involved in that topic.

1684. And, in my judgment, it is a significant weakness.   To take Professor Das's metaphor of hurtling down the motorway with no brakes, he was advising that one should get off the motorway to fix the problem, but without considering whether there were any risks in steering towards the exit slip road to do so.   Whilst graphically attention-catching, his metaphor strikes me as too simplistic.   If I were to extend it, then it seems to me that the comparison is that of imagining that the road surface is icy, but the road ahead is straight with a gradual uphill gradient into the distance.   In such a case, the analogous decision would be whether it was safer to steer off for the exit slip road, or simply to keep steering straight ahead and rely on gravity.   The answer then might not be as obvious, nor the apparent risks so asymmetric, as Professor Das suggests.

1685. Dr Webster's evidence was far less rigid in its approach.   She did not see the matter as being as black and white as Professor Das did.   Her opinion was that risk management practices in times of crisis or abnormal market conditions are very different from risk management practices during normal times.   During the latter, observing predetermined rules or principles is likely to be appropriate as good discipline and safety play, but as regards the former, the primary objectives are to assess the impact, or potential impact, of emerging external factors, to conduct tactical management of these on a short term day to day basis, and to work out an appropriate longer term strategy to aim for.   In this situation, she said, risk management became more of an art than a science, and without a necessarily right or wrong answer.   This is because risk management is about predicting the future, and in crisis times, the future is, by

definition, less predictable, as "*history becomes a less reliable indicator of what will happen next*".

1686. Her view was that the decisions and steps taken by CCC's management after the crisis of August 2007, and in particular the decision to retain rather than attempt to sell RMBS, were supportable decisions from a risk management perspective, especially having regard to the standards of the time.   Professor Das appeared to opine that they were irresponsible to the point of being unsupportable.

1687. I accept that Dr Webster did here express her own opinion that the decision not to seek to sell RMBS was an appropriately careful and responsible decision at the time it was made, which is really the very decision for the court.   I have criticised other experts for straying and overstepping the mark in this way.   However, I do not regard this as usurping the function of the court in this particular instance, because what Dr Webster was actually saying was that what she observed from the evidence provided to her was consistent with what she recalled and observed at the time as being within accepted appropriate risk management practice (although practice in those days was quite varied).   That is a perfectly proper form of expert opinion evidence, and I treat it as such.

1688. I have no doubt that Professor Das is an excellent academic, but I unhesitatingly prefer Dr Webster's evidence to Professor Das's evidence in the context of this case, partly because that was the very difference between them, and partly because I found Dr Webster's disagreements with Professor Das's views to be both measured and persuasive.   Professor Das's evidence was academic and theoretical.   He seemed to me to be expressing an opinion at the totally high level of what one would ideally seek to do to manage future risk after surviving a crisis but being wounded in the process. His evidence really said nothing about managing any immediate consequences of the wound.

1689. Dr Webster's evidence was redolent of practicality and common sense.   She was an academic who had moved out into the financial world in order to apply her subject knowledge and expertise in practice.   I preferred her evidence to Professor Das's, where they disagreed, for being, it seemed to me, that much more practically orientated.   I afford considerable weight to her opinion that CCC's management's approach to the issue of whether or not to sell had been consistent with good risk management practice of the time.

1690. Both these experts expressed opinions on matters other than those which I have expressly mentioned for being (in my view) the key points.   Although I have read and noted the remainder of their evidence, it is not necessary to record and comment on all their points of agreement and disagreement.   As examples, they disagreed on matters such as the appropriateness of regarding SIVs as vehicles comparable to CCC, and the usefulness of continuing to apply VaR metrics in times of crisis.   On these topics, as with others, I found myself preferring Dr Webster to Professor Das.

1691. They also disagreed as to the state of industry practice with regard to the sizing of an appropriate liquidity cushion for an investment management business of the general type which CCC was operating when it was launched, and how conservative this was, they disagreed about the usefulness of VaR metrics in this regard as well, and they disagreed about the degree of caution which would have been seen as appropriate at the time  as regards the funding risk inherent in using 30 day repo to finance long term asset holding.   None of these points is of great direct materiality because they mostly concern CCC's original business model, which is not the subject of criticism in the action.   Such disagreements do, though, tell me something about their respective approaches, and this has in turn informed my assessment of their evidence on directly material matters.

1692. In each case, Professor Das's view was that practice before 2007 was more conservative and was more driven by regard for measurements and statistics than was Dr Webster's view.   I

was more persuaded by Dr Webster.   I noted Dr Webster's view that risk management practices and standards in the finance industry today had been heavily influenced by the events of 2007-8, whilst Professor Das considered that the standards which he described in his report had been widely accepted and operative prior to that time.  I again found Dr Webster more persuasive, and I noted that she had herself been active in practice in this area both before and after that crisis period.   I suspect that the difference between the two experts in this regard may well lie in their respective perceptions of how standards were actually operating in practice at the relevant times up to and during the crises of 2007-8, and the extent to which theory and practice really did coincide before lessons were learned in reaction to the events of 2007-8.

1693. In the end, though, it is necessary for the Plaintiffs to show that the decisions and actions which the Defendants took after July 2007 with regard to CCC's business were outside the possible range of reasonably careful and skilful such decisions and actions in the circumstances.   I find that Dr Webster's evidence is strong support for the fact that, from a risk management perspective, they were not.

**(ii)   Investment management considerations**

1694. The investment management considerations are the practical matters which would be material to a decision by the Defendants that CCC should sell RMBS as submitted, ie through a sales programme devised to reduce CCC's holdings of RMBS by an average of $2 ½ - $3Bn per month from September to December 2007 or even February 2008.     That translates to about $500Mn per week or (the Defendants suggested albeit I think only for effect) $91Mn a working day.   The Defendants also point out that as these figures are proposed as an average, less frequent sales in practice would have to be in greater quantities.     The question is therefore how feasible should the devising and following of such a plan have appeared to the Defendants at this time, and in my judgment this means, in particular, although not exclusively, to Mr Stomber.

1695. I will therefore look first at the various factors which it is either common ground or common sense, would be material to making such a decision (and I am here concerned solely with the feasibility and the commercial implications of sales in themselves, and not with other factors affecting whether selling was desirable).  I will first review the expert evidence on each topic before relating this to the Defendants' own decisions, for which the expert evidence provides material background context.

*1.   Size of the market*

1696. The size of the market refers to the quantity of relevant RMBS securities which were in issue and outstanding in the market.  The experts have taken mid-2007 as a convenient appropriate time to focus on this.

1697. The Defendants in fact question the relevance of this measurement at all, on the grounds that when considering the prospects of selling something, (eg selling a car in Guernsey) it is of little assistance to know how many such items there are in the market, (ie cars currently in Guernsey).   I have some sympathy with this.    Unless there is some other evidence showing a logical link between the size of the market in this sense and the volume of transactions in the particular item, the market size is of very limited assistance.    It shows at best that, in the past, the number of parties observed in the data capture has thought it attractive to acquire the item in question at some time, but little more than an impressionistic conclusion can be drawn from this.

1698. In this case, the helpfulness of such a factor is even more diminished by the two facts, first, that it is agreed that there is little or no readily available and reliable published data as to such size and, second, that the experts disagree as to what sectors of the broader financial securities

market are appropriately regarded as part of the "market" for CCC's particular assets. However, as I have found this material of some assistance at a very high level, I will deal with the evidence briefly.

1699. The material evidence is really that of Dr Carron and Dr Niculescu, Dr Maini having merely, it appears, relied on Dr Carron's figures.   Dr Carron initially put the figure of outstanding Agency floater RMBS, as at 31st July 2007 at $537Bn.   He arrived at this figure by taking the total value of all Agency CMOs outstanding at that time ($1,342 Bn) and applying 40% as the reasonable approximation of the quantity being issued as CMO Agency floaters during 2006-2008.

1700. Dr Niculescu did not contest the reasonableness of taking 40% as the fraction of Agency CMOs issued as floaters in 2006-8, but said that this was not a reliable figure to use in the way Dr Carron did, because the figure fluctuated significantly over time based on investor demand and did not take account of the different life expectancy of certain CMO structures. He initially put his own figure at $105 Bn, using a different methodology, which was to aggregate the published data figures for certain segments of the Agency CMO market.

1701. During the expert conferral process, Dr Carron accepted that Dr Niculescu's methodology was more reliable.   He reduced his figure, consequently, to $336 Bn.   Dr Niculescu accepted that a relatively minor adjustment to add $1.8 Bn of WAC ("Weighted Average Coupon") securities to his original estimate was appropriate, making his figure $107Bn.   The remaining difference was accounted for by disagreement between the experts as to the segments of the market which it was appropriate to include in the aggregation.

1702. As an aside, this is an episode which illustrates the kind of general misgiving I have had, in places, about the thoroughness and reliability of Dr Carron's evidence and opinions.   The reduction in his figure is very significant, at about 38% of the figure which he gave initially. That original figure gave an impression that CCC's holdings of RMBS (about $22Bn) would have been being disposed of in a market ($537 Bn) into which they could easily have been absorbed because such assets were generally very widely held in a large quantity.   Whilst Dr Carron's eventual figure is still much greater than Dr Niculescu's, it is very different from his first figure, and very much diminishes that impression.   I found it disconcerting that Dr Carron should have originally presented a simplistically derived figure, which he seems to have been quite easily constrained to accept was too crude to be accurate, when other data was apparently reasonably readily available which could have been used to check it.   At best, his original approach was scarcely rigorous.   Alternatively, it relied too much on material assembled by a team with less critical experience than he himself would be expected to possess.

1703. The outstanding dispute between the experts goes to what segments of the market can be regarded as relevant, a point which assumes more significance with regard to "depth" of market, which is considered later.   The key point here is how far it is reasonable to regard types of Agency RMBS other than those actually held by CCC as part of the relevant "market".

1704. CCC's portfolio was of simple composition.   It included no Ginnie Mae securities.   Its floaters were distributed more or less evenly (one third) between 6.5%, 6.75% and 7% caps. Less than 15% of the portfolio comprised structured floaters, the remainder being standard strip floaters (where the income from the trust pool of underlying mortgages is simply divided into the floating rate tranche, as held by CCC, and the inverse floating rate tranche, and is paid through without any further redirection of the income or other structured cash-flow feature.)

1705. Dr Carron's figure includes all floating rate CMOs issued by Agencies, including Ginnie Mae floaters, structured floaters, PACs ("Protected Amortisation Class") and "exchangeables"

(securities with an added option to exchange a fixed rate coupon for a floating rate at some time, or vice versa).    Dr Niculescu says that the relevant market is really only that of conventional strip floaters, because that was the vast bulk of CCC's portfolio.

1706. This disagreement arises from the principle described as "substitutability", which is the extent to which it is reasonable to assume that buyers of one narrow class of security would regard securities of another class as sufficiently similar to their ideal (and therefore sufficiently attractive) to be willing to buy them as an alternative.    If the two classes appear to be similarly attractive to the same buyer(s), then transactions in one class of securities may be some evidence of the likelihood of transactions in the other, and could arguably be seen as part of the market for that other.

1707. The experts agree, though, that substitution would doubtless also entail an appropriate adjustment in price to make a transaction in the less-than-ideal security sufficiently attractive to secure it.    They differ as to the significance they each accord to this.    Dr Niculescu's reason for ruling out other classes of security is that he considers that demand from persons who preferred those other classes of security to the ones which CCC held would only emerge at a significant discount from the price which was (or would be) paid by those who were actively transacting in CCC's classes of security.

1708. Ultimately, the evidence shows, in my judgment,that the key consideration about "substitutability" does come down to price.    Price is determined by the point at which the willing seller drops his price requirement for a particular commodity sufficiently to meet a buyer who is willing to raise his offer to that same level.    In fact, when someone says that he "cannot sell" an item, what he usually means is that he cannot get anyone to buy it at a price which he is willing to accept.    This actually only means that its true market value is less than he would like it to be.

1709. A buyer will pay more for what he ideally wants than he will pay for something less ideal. However, "more" is relative rather than absolute, because his willingness to pay "more" may still not rise to the price which buyers who actually prefer the commodity will pay. Whether any such adjustment amounts to a "discount" from a "market" price, or itself fixes a "market" price therefore depends on the data point from which one starts and how one views the balance of supply and demand.    Whilst, therefore, I understand and fully accept the principle which Dr Niculescu's evidence says would operate, I do not think that describing it as a discount from a market price is very helpful, as it begs the question.

1710. However, this is a digression for present purposes.    I have said that I do not regard the theoretical size of the outstanding market for CCC's securities as of any great assistance in assessing the quality of its directors' decisions not to sell RMBS in September 2007; this is because the only aspect on which it is of any assistance is what I might infer from this evidence with regard to likely demand for CCC's RMBS assets, or market interest in them. Since this can only be at a highly generalised and rather impressionistic level, I do not need to resolve the experts' disagreement by making any finding as to a "right" figure for the size of the relevant market.    Having compared and contrasted the evidence, I prefer Dr Niculescu's evidence, as being more persuasive in its reasoning, although I do feel that his exclusions may well be somewhat over-stringent.    If I had to make a finding as to the size of the relevant market, theoretical though this would be on any basis, I would come to a figure which was nearer to Dr Niculescu's figure than even Dr Carron's revised figure.  I find that a figure of around $150 - $200 Bn probably gives an appropriate impression.

1711. However, the only significance of this evidence for present purposes is that I can and do derive from it that CCC's portfolio was, on any basis, a large fraction of the total pool of comparable securities outstanding in existence.    Even on Dr Carron's figures CCC held about 7% of the comparable market pool.    On Dr Niculescu's assessment it was in excess of 20%. I am satisfied that it was certainly fairly regarded as being over, and probably well over, 10%

on any basis.    I am also satisfied that this was a very significant fraction, from the point of view of market perceptions.

1712. I am also satisfied that even if this figure or perception were never expressly analysed or articulated by the Defendants, they will, to a greater or lesser degree according to their experience, have naturally gained the basic understanding that CCC's RMBS portfolio was large in the relevant market, and that this would affect market reactions to CCC's activities. This would naturally and reasonably have some influence on CCC's own choices.

*2.  Depth of the market*

1713. This aspect of the expert evidence goes to the volume of sales transactions in securities comparable to CCC's which took place in the relevant period, illustrating the liquidity of the relevant market.   Plainly, the more transactions which are taking place, the more confident a seller can probably be that it too will be able to sell on a similar basis.

1714. The expert evidence here, however, consists of the experts' views, with hindsight and over a period of time, as to what volume of activity there actually was in the relevant market. Whilst this may be of help in determining, as the experts then go on to opine about, what sales CCC could itself have effected during that period and at what prices, it is of little direct help with regard to the anterior question with which I am concerned here, namely whether it was negligent of the Defendants not to have embarked on a course of selling at all in the light of what they could perceive at the time.   Only the level of activity up to the time of the relevant decision, here taken to be the end of September 2007, would be in point.

1715. Once again, I have had much detailed evidence on this topic, and a great deal of dispute. Since some of the evidence throws up general points which I do find of some broad assistance for present purposes, I refer to them here, whilst also noting the wider aspects of the expert evidence.

1716. The first point is that the experts' disagreement referred to above, about what securities really comprise the relevant "market", obviously affects their consequent views of the volume of relevant market activity.   However, they also disagree in their assessment of what market activity there was at the time, and which is material to forming a view of the depth (ie liquidity) of the then market in CCC's assets.

1717. There is a lack of generally available data about secondary market transactions in RMBS such as CCC held.    The secondary market is the onward sale of existing bonds which have been previously created and sold as new issuance (by the relevant Agency or created by a broker/dealer) as I have previously described.    CCC's sales would have been in this secondary market.   The absence of available data is because such transactions are individual OTC ("over the counter") transactions, rather than transactions conducted on an exchange. Even though generally conducted through dealers or brokers, they can therefore often go unrecorded in public information, and they are not necessarily widely noted.    There are researchers and data vendors, such as Thompson and MBSource, who research into such matters and can supply their findings, but they are not necessarily comprehensive.   All the experts agree that market information is incomplete and even scarce.

1718. The experts have therefore used their expertise and experience to estimate the volume of material transactions.   The importance for present purposes is that apparent robustness and activity in the market would be material to CCC's Directors, or CIM, assessing the prospects of being able to make suitable sales.   However, whilst assessing the volume of actual transactions in the market may be some guide as to what would be reasonable perceptions of activity in the market, I do remind myself that CCC would have only had the impression which it obtained, or could infer, from its daily monitoring of market activity and from its communications with traders or others involved in the markets.   Its own sources of

information were therefore probably more limited than the totality of the evidence in this case, and that available through the researches of the experts, particularly after the event.

1719. Dr Carron's evidence on this topic rather fell by the wayside.  He agreed that his original calculations, based on extrapolating from transactions in 11 unique securities reported by five banks in the period from 1st June to 31st December 2007, and treating these as an average across the whole of the market which he had calculated, led to no reliable conclusions.      In the end, he did not really give any opinion of the quantum of relevant market activity on which the Plaintiffs place reliance, and this fell to Dr Maini.

1720. Dr Maini was of the view that the relevant market was healthy and active during the second half of 2007, although he accepted (indeed as all the experts agreed) that the level of activity was lower than in the first half of the year.   He estimated a total of $71.35 Bn of transaction volume between August 2007 and February 2008, inclusive.   This comprised $11.35 Bn of sales evidenced by inference from information in both BWIC data and emails and messages ("market chatter") disclosed in the materials in this action.  He later identified $6.6 Bn of this activity as taking place from September to December 2007.  (This seemingly replaced his original reliance on MBSource data - a data vendor, specialising in mortgage backed security data – which showed the quantum of dealer inventory strip floater offerings declining by $5Bn between July and December 2007, from which Dr Maini had deduced that around $5Bn of such securities had been sold.)  Dr Maini had added $10Bn as an estimate of other, undiscovered, privately negotiated sales in the secondary market, and $50Bn of new issuance. He included the latter because he argued that these bonds had sold, and that this therefore indicated demand for bonds of these types being sold as new issue, but which demand could have been satisfied (although with appropriate, modest price adjustment) by existing bonds, such as CCC's, in the secondary market.

1721. Dr Niculescu, in contrast, took September to December 2007 and estimated $7.5 Bn of transactions derived from analysis of emails and Bloomberg message information and from BWICs.   His figure for transactions of which there is actual evidence is therefore comparable with Dr Maini's $6.6Bn.      However, he did not add figures for any further privately negotiated sales, being of the view that for such sales to have taken place without being reflected at all in any of the email data or market chatter material which had been scrutinised in arriving at his first figure, was highly unlikely and certainly would not justify doubling the quantum of the evidenced transactions.      He included some allowance as regards new issuance, but this was because this included "exchangeables", and it was consequently only a small one; he was of the view that new issuance activity generally was not material because dealers had more incentive, for various reasons, to create new issue than to attempt to buy and re-sell existing bonds, and also because new issuance would tend to be bespoke, and would not be comparable with, or substitutable for, the fixed characteristics of extant conventional strip floaters.

1722. Dr Niculescu also considered that the creation of apparent demand for new issuance of Agency floaters could well have been driven by demand for inverse floaters, although I cannot quite see why that detracts from the point that the ordinary floater which was created seems, from Dr Maini's data, to have sold.

1723. Dr Niculescu pointed out that Dr Maini's reliance on this data did not take account of the fact that new issuance of conventional agency strip floaters, already down in quantum, became confined almost exclusively to 7% capped floaters from at least September 2007.  This would be a likely reflection of demand, and it was to be noted that two thirds of CCC's RMBS bore lower caps, those having been the norm when they had been purchased originally.    By common consent (ie including Dr Maini) floaters with 6.5% caps, at least, were much less liquid than those with 7%, or even higher, caps.

1724. Whilst acknowledging that there was less market activity for lower caps, Dr Maini's retort was (in effect) that lower caps were attractive because they were cheaper, their spreads increasing relative to 7% caps in the latter half of 2007.   This seems to me, however, rather to illustrate the point that they could only be shifted by reducing prices.   That must also, it seems to me, throw the focus on to questions as to the worth of the whole exercise for CCC, with its mixed portfolio.

1725. On considering the totality of the evidence of Dr Niculescu and Dr Maini on this topic of depth of market, I find Dr Niculescu's opinion generally more persuasive than that of Dr Maini, because I find it more measured and more soundly reasoned.   Some of Dr Maini's evidence seemed to me to be highly generalised.   His assumption as to the quantum of additional privately negotiated secondary market transactions appears to be little but a guess, and his approach to new issuance does not seem to me to take any account of matters of detail which I am satisfied would have been material to purchasers, and as to which I prefer Dr Niculescu's views.   In places Dr Maini's opinions appeared to be driven by his natural reaction always to find a rebuttal for challenges to views which he had earlier expressed, and sometimes to do so without regard as to whether his rebuttal comments were even consistent with those earlier views.

1726. Once again also, however, there is no need for me to make a finding of the actual level of such market activity, and given the differences between the characteristics of bonds, and the lack of precise data, I think it would be largely meaningless for me to do so.   The materiality of this evidence for present purposes is again only at a general level.   It simply helps to suggest what broad level and focus of market activity might reasonably have been perceived by Mr Stomber and his team, conducting CCC's day to day business, and would therefore reasonably have influenced their views as to the feasibility of CCC's embarking successfully on a course of selling a substantial quantity of its RMBS.   Dr Niculescu's view was that the market was much less liquid than previously (ie previous to August 2007).   Dr Maini's view was that it was less liquid but still "relatively liquid" although he acknowledged a close link between liquidity and price.     As I have said, I prefer Dr Niculescu's somewhat more conservative view with regard to market activity.

1727. I have pointed out that, for the purpose of examining the impact of market liquidity on the question whether it would be feasible to devise and to commence a sales strategy to divest CCC of $2½ - $3Bn per month of its conventional strip floaters, the evidence of market activity available to CCC was only that up to September 2007.   It is therefore material here to note one particularly pertinent item of transactional data at this time which is included within the experts' total for September to December 2007, and which seems to have been quite major but which really only came to the fore in the expert evidence at the trial itself.

1728. This was the first six "Westways" liquidation auctions, the first of which took place on 10th September 2007, with three more on 20th – 25th September and two on 4th October 2007.   They included a total of about $3.4Bn worth of Agency floaters, and thus a large part of the total specifically identified market activity over the relevant four month period.   The auctions were the compulsory liquidations of these six investment funds, brought about mandatorily under the terms of their constitution under which the funds had to be liquidated if the asset value fell below a specified level.   These were, therefore, forced sales.   On the evidence, I am satisfied that the prospect of these sales was a known fact in the market, significantly in advance of their actually taking place.

1729. The details of these auction results, insofar as known by CCC, were noted and recorded as part of CCC's day to day process of checking secondary market price information to monitor asset values and anticipate margin calls or repayments, although they were not there identified by name.   CCC had already been recording daily IDP and repo lenders' pricings for its securities, but certainly from just before the end of September, it also started periodically recording price information on secondary market transactions, indications from dealers as to

their views of prices, new issuance prices and suchlike, systematically analysing the data received into a spreadsheet entitled "RMBS Collateral Pricing Analysis" from which could be calculated secondary market prices for CCC's own individual bonds.  Dr Carron, who had reviewed this process agreed that much work was done by CCC's management in this regard.

1730.  That Mr Stomber knew of these auctions is shown clearly by emails of his of 4th October 2007 to Mr Buser and others in which he referred to an *"auction that was the result of a liquidation of an ABCP portfolio"*, and questioned whether the prices there would be considered to be "distressed" prices or "fair value" prices.   His concern about this point arose with regard to the material which PwC would take into account in forming a view of whether CCC was a going concern for the purposes of their end of September audit.  It seems to have been in this connection that CCC began its increased data collection with regard to actual secondary market prices and comparison with IDP prices and repo prices.

1731.  This specific information is therefore important with regard to assessment of achievable price levels, but what I take for present purposes from this general evidence about the volume of comparable secondary market activity is that even over the last four months of 2007 and even including these liquidations, the whole of the broadly relevant market activity – ie activity in fairly comparable assets -  was of a similar order to the whole quantity of RMBS - around $10 Bn -  which the Plaintiffs say CCC ought to have commenced disposing of in (at least) September 2007 and continuing during this period.    Much of it, also, was noted as being with regard to Agency floaters with 7% caps (as Mr Stomber noted in his emails of 27th September and 4th October 2007) which were, it is agreed, more attractive and readily saleable or better priced than lower caps, which comprised two thirds of CCC's portfolio.

1732.  The evidence of such activity which was available to CCC also shows the perception in the market, which the experts do not disagree with, that there was an increase in the supply of securities owing to the sales occasioned by the "broken" ABCP programmes which had had to liquidate in the aftermath of the August crisis.    The Westways auctions were an obvious example of that in the RMBS field.    This would tend to keep prices down.  Dr Carron acknowledged that around this time "*Because of these ABCP liquidations, other holders of RMBS avoided selling if they had the means to forbear*".

1733.  Apart from the Westways auctions, it also appears to me, looking at the evidence of actually recorded transactions, that these were generally small, by which I mean below $250Mn.   In all the circumstances, I find that the apparent volume of activity in the relevant market, its nature, and the sizes of individual transactions, were factors which were not encouraging to the idea that the market could and would absorb sales of larger quantities of RMBS, at any rate without negative implications for the price.    I conclude that the evidence of market activity which was or ought to have been available to CIM and CCC and which would have informed a decision whether or not to embark on a plan to sell RMBS, showed that whilst there were sales being transacted, except as regards forced sales, the volume was not great, certainly in comparison with the amounts which would constitute a worthwhile and meaningful disposal for CCC's purposes.    These were inauspicious circumstances for any prospect of making substantial sales at good prices.

1734.  In short the quantum of observed market activity over the four month period from September to December 2007 does not seem to me to support a conclusion, even with hindsight, that CCC could have readily disposed of half its own portfolio into the market, even on similar terms to those disclosed in actual transactions.      As to the particular immediate question, whether the volume of activity reasonably observed by CCC up to this time - say 1st October 2007 – should have produced the conclusion that CCC could embark on a sales programme to attempt to divest itself of a significant amount of RMBS at reasonable prices with confidence that doing so would meet ready demand, it seems to me that this is even less plausible.

    *3.  Price*

1735. The price which CCC might reasonably expect to realise from selling its RMBS is obviously of central importance to the question of the reasonableness of deciding not to sell.   It would affect both the extent of any capital losses which would be crystallised by a sale, and it would also provide hard available evidence to third parties of the current market value of the relevant securities.

1736. The first point with regard to the evidence on prices, which the Defendants rightly invite me to note, is that CCC originally purchased these assets at their par value, or (I was invited to assume) as near thereto as made no significant difference.   The importance of this is that by the time with which I am now concerned, the end of September 2007, prices had already fallen from this level.

1737. A graph compiled by Professor Hubbard from the ABX Home Equity Indices charts the decline in general RMBS values from the start of 2007 onwards, taking mortgage backed securities of four grades, from BBB to AAA.   The poorer quality began to decline first, from January 2007, but AA and AAA ratings remained at around par until June 2007, when they too began to decline.   AAA rated securities fared better, declining less and later than AA rated securities, but both Professor Hubbard's chart of these indices and a chart of CCC's own average pricings over the period show a slight decline beginning from around July 2007, becoming small but significant, and gradually increasing, from then on.  In fact, CCC's own assets, being Agency backed AAA rated RMBS initially fared better than the AAAs of the Home Equity Index during July 2007, but by the end of September 2007, the compilation list of CCC's own records of the "Average Final Price" of its RMBS assets, which was effectively IDP pricing, shows this now at the $99.00 level.

1738. This figure, a weighted average across all CCC's RMBS, had started the month at $98.82, about its lowest following the August upheavals.  It had risen waveringly to a high of $99.26 on 24th September, but then dropped sharply back to $99.00 on 27th September.    The price figures for the three different classes of CCC's RMBS by cap levels over the period July 2007 – December 2007 were individually calculated by Dr Maini in his report, and vary around this figure, with 7% caps being consistently higher than the others.  In September 2007, these were $98.90 (6.5% caps), $98.83 (6.75% caps) and $99.29 (7% caps).

1739. A 1% fall in value on a $23Bn portfolio meant a capital loss of $230Mn.        Thus, the Defendants point out, selling at prices below CCC's own marks would be realising losses not merely measured by that difference, but with the added loss already suffered through the decline in market prices since purchase, a not insubstantial sum.  They add, of course, that this was also a loss that could ultimately be avoided as the asset value rose back to par, as it must do by the time of maturity.

1740. Turning to evidence of current prices, CCC's "Average Final Price" was effectively IDP prices, since this was the yardstick which CCC used to mark the value of its portfolio to market daily, although at times making adjustments to factor in its own perceptions of values shown by observed actual market activity.   This adjustment tended to result in a downward mark.  I have already referred to an instance in June where CCC did this and consequently anticipated margin calls which did not materialise, as its repo counterparties continued to use IDP prices.    It became apparent then, if not before, that IDP prices tended to lag behind transactional market prices.  Indeed, when CCC started collecting actual secondary market prices and tracking them more closely from just before the end of September 2007, this became (it seems to me) even more clear, as is shown by a chart prepared by Dr Carron (his exhibit CCC-4) of the weighted average prices of CCC's portfolio comparing IDP, repo, and secondary market, and also new issuance prices.   From this time, the situation shown is that IDP prices were in general notably higher, generally between about 10 and 50 or more bps higher, (to judge impressionistically from Dr Carron's chart) than prices calculated from secondary market information.   They did later converge briefly at three points: the end of

October 2007, the beginning of December 2007 and the end of January 2008, but this was still in the future at the time I am looking at.

1741. With the scarcity of market transaction evidence and the individuality of bonds, IDP pricing was always going to be in the nature of telling its audience what prices "ought" (in a sense) to be rather than what they actually were in practice.   In times of change, IDP prices were also always going to tend to lag behind actual market transaction prices.   Looking at the evidence with the benefit of hindsight, it seems to have done so with a degree of optimism, but that may well not have been apparent at the time, based only on the information available then.   It also seems to me that in difficult times, there is no party who would have had any interest in talking IDP prices down, such that this tendency would continue until the pricing agencies themselves decided on any adjustments.   I have little doubt that Mr Stomber, avidly considering all current information, would have sensed this tendency.

1742. Repo prices as applied by CCC's counterparties had begun to diverge from IDP prices, downwards, from mid-July 2007.  They did so quite significantly, generally by around 50 bps or more, from August 2007 onwards.   The evidence suggests that this divergence represented the repo lenders' views of a margin necessary to protect themselves in the case of a mass liquidation of the relevant securities. Whilst the level of repo prices is obviously too vague, potentially the result of other unknown pressures, and generally too unscientific to be any kind of reliable indicator of likely transaction prices, it seems to be a tolerably clear indication that other players in the market - repo lenders - would expect significantly lower prices than current IDP prices in respect of realisations of such assets, especially in large quantities or stressed situations.  In the latter case, there would be the added fear of realisations possibly being in competition with other security holders.   On any basis, it seems to me that this displayed price divergence is a factor which would suggest caution about assuming that prices near IDP level could readily be obtained.

1743. This leaves any evidence of prices available from secondary market activity itself.

1744. As regards the evidence of reported transaction prices, there is an evidential difficulty where these are in the shape of market chatter, or emails.     This is that quite frequently this information is not conveyed in dollar prices but by reference to the relevant discount margin or "DM".  This is a metric used in the valuation of Agency floaters.   As I understand it, (and I trust sufficiently accurately for present purposes, although nothing turns on this) "DM" relates the price or value of the security to the current value of the future income stream which it is expected to produce, expressing this in terms of the spread (difference) between that and a benchmark such as, typically, LIBOR.     It thus provides an expression of value in the form "[x] bps over" LIBOR, or a "DM of [x]".   This is the "spread" which I referred to earlier as the way in which bond market participants choose to look at prices.   This enables ready comparison of underlying asset values shown by different transactions, or the translation of a known transaction to the equivalent theoretical price for another security, but it does not itself reveal the actual unit price of the security in question, and the relationship of this to the DM is neither simple nor immediately obvious.   The method, or formula, for converting values expressed in DM terms to the dollar price for the security does not readily emerge from the materials in the case, although it is present in what Advocate Wessels described as "punishing detail" in Dr Carron's evidence.   The conversion of DMs to an actual price therefore requires expert understanding of how the metric works, and some mathematical skill.     On my own, I therefore cannot draw any conclusions, let alone any safe ones, from the expressions of DM which I find in the evidence beyond the fact that, as I have already said, the higher the DM, the wider the "spread" and therefore the lower the price.  (This follows, in basic logic, from the point that the same dollar return on a lower capital outlay is a higher yield and therefore a (relatively) more valuable asset, all else being equal.)

1745. I am therefore very much dependent, in my appraisal of the evidence of apparent prices for RMBS, on the expert analysis and calculations which have been given to me in places.   This

brings me back to the expert evidence and also specifically to the Westways data, which became an important focus of the evidence about price in the market place at this time.

1746. Dr Carron's opinion as to the price at which CCC could have realised its portfolio, was expressed in his initial report as being that "*the range between secondary market levels and IDP prices [was] a reliable indicator of the prices CCC could have obtained in selling RMBS in an orderly sale of part or all its portfolio.*"   His secondary market prices were those derived from the evidence of secondary market transactions, including what were later identified as the Westways liquidations.   By an "orderly sale" Dr Carron was apparently proposing a sale over a period of one or two months.   He was thus contemplating sales of up to $23Bn RMBS in such a time period.

1747. Dr Carron had also compared IDP and secondary market prices with the prices for the recorded bank trade transactions referred to above.   This information was derived from informational data supplied to the liquidators on their demand by five of CCC's repo lending counterparties (Credit Suisse, Citigroup, JP Morgan, Deutsche Bank and Bank of America) after CCC's collapse.   The liquidators asked for details of those banks' dealings in specifically identified bonds.   Some of these were bonds of which CCC's portfolio contained parts of the same bond sequence.   Having filtered the transaction data down to what he considered to be true sales transactions (although of small quantities and rather few in number) Dr Carron concluded that the prices shown by these transactions were sufficiently close to, and within, the range between IDP and secondary market price levels to support the conclusion that this latter range was what was achievable by CCC, and that the secondary market pricing, particularly as it included the  Westways figures as admittedly forced sale prices, represented a "lower bound" of what would have been achievable.  Ultimately, and apparently taking a position approximating to the average (I am not quite sure on what basis) mid-point between the tracked IDP prices and the recorded secondary market figures, the Plaintiffs have finalised their case as being that prices no worse than 11 bps below IDP pricing would have been achievable.

1748. Dr Maini although presenting some analysis of the prices actually achieved in the secondary market, especially the Westways figures (as mentioned later,) did not really give an outright opinion as to the actual prices which CCC could have obtained.  His focus was more on refuting the proposition that sales in the market would have been likely to result in margin calls, which he disputed because of the even lower repo prices which lenders were using.   He acknowledged that sales in the market were taking place below published IDP prices, and otherwise referred to Dr Carron's evidence of pricing, but talked only of a "modest discount" to IDP prices being achievable on "orderly" sales.

1749. Dr Niculescu disagreed forcefully with Dr Carron's opinion and with Dr Maini's support for it.   Dr Maini had calculated that the prices achieved in the Westways sales of RMBS were on average 25 bps below IDP prices, (the latter being in effect the same as CCC's recorded marks).  Dr Niculescu analysed Dr Maini's prices with corrections to the data set which he thought appropriate, and concluded that the price was more accurately represented as being about 48 bps below IDP prices.   (I do not think Dr Maini disputed these corrections, but in any event they appeared to me to be credibly reasoned.)

1750. Dr Niculescu also rejected the proposition that these prices showed a "lower bound" to what CCC might expect to achieve.   He pointed out that the Westways auctions were for an aggregate of only $3.4 Bn of RMBS similar to CCC's in total, but were nonetheless themselves regarded as pushing an excess of supply into the market in a situation where it was generally known that that would be the total of such assets coming on to the market.    Were CCC to attempt to sell its own assets, the market would sooner or later perceive the prospect of anything up to $23Bn of such assets coming on the market.   The only actual market data point which gave some idea as to likely prices for large tranches was the JP Morgan offer in

respect of $4Bn, around 21st August 2007, which had been 165 bps below IDP prices (which prices had also been higher in August than in September) and equated to $97.68.

1751. Dr Maini objected that this was not a fair comparison as the proper course would have been to sell in smaller amounts, deploying the techniques which he advocated, and explained in greater detail, and which are considered below.  I accept this point, and also Advocate Wessels' submission that therefore CCC could expect to obtain higher prices than those offered by JP Morgan if it were selling smaller amounts, but the question is still how far that expectation could reasonab ly go.

1752. Dr Niculescu's conclusion, therefore, was that with secondary market activity being evidenced at between 44 bps and 48 bps below IDP prices, but with also the evidence of the JP Morgan offer at 165 bps below, it could not be inferred that current secondary market prices were what could be achieved by CCC's selling under a sales programme – still less the "lower bound" of this – and CCC was very likely to be faced with lower offer prices, and indeed potentially far lower offer prices, than current secondary market prices.   At any rate, the risk of this being the case was very real.

1753. I do not see that Dr Carron's original conclusion that CCC could have reasonably expected to achieve prices somewhere <u>between</u> apparent secondary market prices and IDP prices has any convincing basis in logic.  It is apparently based on the proposition that the secondary market prices being noted were "forced" sales, such that CCC could expect to achieve better prices because it would not be being "forced".   That seems to me to owe more to theory than reality.  Once CCC started selling, the market would perceive it had reasons to do so which, in that market climate, would have looked very similar to being forced.  I see no reason why the proposition that CCC as a seller was not "forced" but was selling of its own free will should induce buyers to be willing to pay significantly more for its assets than the price of the relevant similar securities currently being achieved in the markets.

1754. The Plaintiffs say that the secondary market prices must be treated as "distressed" prices because they were collected by CCC and presented as such to PwC for the purposes of convincing PwC that the values of CCC's assets could fairly be regarded as higher than those prices for the purpose of PwC's "going concern" review, to which I refer later.    I do not accept this, because the issue in the "going concern" report is not what the assets could currently be sold at but what they can fairly be taken to be worth on the basis that the entity is a going concern.

1755. I find that the Plaintiffs simply do not prove to my satisfaction the likelihood that CCC could have achieved any such figure as they propose.   It seems to me to be superficial and to take no account of the influence of wider market factors, such as, in particular, the usual market phenomenon that prices will tend to be lower for greater quantities, and trading partners broadly look to achieve the most advantageous deal they think they can for themselves.  Having considered and weighed the contrasting opinions of the experts, I very much prefer the evidence of Dr Niculescu in this regard, as it has, to my mind, far more of the ring of realism as against mere theory.

1756. I have referred above to elements of prices being noted by Mr Stomber during September.  Through management, CIM/CCC was, I am satisfied, keeping abreast of this information as well as possible - it was on any basis important as regards monitoring the margin position, which was clearly done closely and continually.  I find that on the evidence available it was reasonable to conclude that secondary market transactions were not proceeding, even for smallish quantities, at prices which approached current IDP prices.   FT/IDP prices would, for obvious practical reasons and as had been previously identified by CCC when anticipating margin calls, lag behind the timing of actual transactions in the market.

1757. The evidence from the Westways auction which was noted and commented on by Mr Stomber on 4th October shows also that the prices of moderate and larger quantities of RMBS were relatively low and apparently gave rise to margin calls.

1758. I find that all the evidence points to it being a reasonable working prediction that on selling any significant quantity of RMBS, CCC could not expect to achieve better than current secondary market pricing levels, and at the end of September 2007, the time with which I am here concerned, this was at best about 45 bps below IDP prices. There was also a significant possibility that it might not, in the event, even be able to achieve that.

   *4.   Risks of selling*

1759. The benefits of selling a worthwhile amount of RMBS at a worthwhile price would be an increase in liquidity, and a reduction in repo capacity requirements. This would come at the cost of permanently crystallising capital losses, as prices were now lower than CCC had originally paid.

1760. However, these were not the only risks of selling, about which I have heard much. The further risks of selling I identify as being broadly twofold. They were the risk of moving the market, and the risk of being perceived to be a distressed seller.

1761. As to the former, CCC's business depended on the value of its RMBS as collateral – or more accurately in practice, its repo lenders' recognition of the value of its collateral – because on this value depended, first, the amount which CCC could borrow, and second, and on a day-to-day basis, whether margin calls would be made against it. The risk of selling was that in executing a transaction, even a small size transaction, CCC would provide evidence of price and thus apparent value. If this were below current prices, (whether IDP or other actual secondary market prices), this evidence could and obviously probably would be used by repo lenders to justify marking down the already marked down repo value of CCC's other similar securities still further, potentially producing an immediate margin call and subsequently producing an increased effective haircut as against CCC's own price marks, these broadly remaining at IDP prices. Eventually the evidence would percolate through to the pricing services and affect these as well.

1762. These knock-on consequences could have the effect, first, of wiping out the value of any increased liquidity generated by the sale, especially if the sale had been relatively small and had released only a small amount of liquidity (likely to be between 2% and 3% of the total sale price, approximating to the amount of the repo-lenders' haircut), but was then used as evidence to justify margin calls in respect of much greater amounts of RMBS which were still retained by CCC. Mathematical examples show that this effect could use up all the liquidity gained, leaving CCC no better off in liquidity terms than before, and worse off as to the financing terms which it would then be likely to obtain. If the margin call more than wiped out the gained liquidity so that even more cash was then required to meet margin calls, this would generate an urgent need to sell yet more RMBS, to generate further liquidity, and with the increasing risk of being seen as a distressed seller in a weak negotiating position. This cycle could continue and bring about actual insolvency. Indeed the expert evidence of Mr Welles was that this could happen very quickly, possibly as a result of a single repo cycle.

1763. This phenomenon has been generally called a "liquidity spiral" during this case, although there is some expert disagreement as to whether this is correct. Where the phenomenon relates to an individual entity such as CCC, Dr Carron, and I think also Professor Das, say that it is more correctly termed a "repo feedback loop" with the term "liquidity spiral" being reserved for the same process on a systemic scale. The important point, though, is that all the material experts except for Dr Maini, but including Mr Welles, Mr Shaw and Mr Wallace, recognised the phenomenon, expressly.

1764. Dr Maini claimed not to recognise the term "liquidity spiral" and said that in his experience people on the trading floors did not know and were not concerned by it.   However, the logic of his other evidence – in particular his recognition that selling for CCC, particularly selling bulk, was "risky", and which risk he associated with price declines – seems to me to be a tacit recognition of the potential for the phenomenon described.   His denial of it was, I find, simply the product of his regrettably combative evidential style.   However, his evidence was still that, in any event, such a risk could be eliminated, or substantially alleviated, by the use of the sales techniques which he advocated, and to which I refer further below.

1765. Dr Maini objects that the risks of moving the market were not confined to CCC's selling quantities of RMBS, but could on the face of it be triggered by any other party selling large quantities of RMBS into the market as well.   This is not, however, a reason for rejecting the proposition that sales by CCC could have that effect.   CCC had no control over the actions of other parties, but it could at least avoid self-inflicted damage.

1766. The upshot of all this is that I am satisfied that the overwhelming preponderance of the evidence is that the creation of a liquidity spiral, or repo feedback loop, by attempting to sell into an adverse market when dependent on slim liquidity, was a well-recognised and very major risk.   This is not least because such consequences, once triggered, are entirely out of the control of the selling party, because they depend on the reactions of third parties, which are in themselves unpredictable, and which can very easily snowball adversely and gain enormous momentum.   Embarking on a course which courted this risk would therefore be a very serious decision to make.

1767. The second, perhaps more subtle and insidious, risk was that of becoming perceived to be a distressed seller.   It is associated with the first point, but has several other implications.

1768. First, there is the obvious point that a seller who is selling out of necessity rather than choice can be driven to accept a lower price because he cannot take a hard line in negotiations. Moreover, the financial markets are hard-nosed, and, especially in hard times, it must be expected that negotiating advantage will be fully driven home.

1769. Second, such a perception would have a reputational effect.   It could and would (in this information sensitive marketplace) lead indirectly to more adverse terms of trade being demanded (higher haircuts; lower repo marks) by more cautious counterparties, who would play safe in dealing with a borrower about whom there were signs, or even just rumours, of instability.

1770. Third, but particularly applicable to CCC because of its large holdings of RMBS, was the risk that, if the market perceives that there is about to be an influx of supply of some particular commodity into the market because a particular entity looks as if it is going to be selling, which would, on the usual laws of supply and demand, tend to bring down prices for the commodity, then market reaction may well be to sell off their own similar assets in advance of the anticipated sales, so as, in their own interests, to get out whilst the price remains higher. Such a reaction can gather pace as perception spreads and can itself move the market in the relevant assets down.   This is no doubt particularly so in a market which includes traders as well as investors.

1771. Fourth, and a more extreme reaction than the third, is that it is suggested that there is a phenomenon known as "predatory trading", where the perception that there is about to be a major distressed sale of assets will cause dealers actively, and even in concert, to sell the same class of assets, even going so far as to sell short, so as to force down the market price and compel the distressed vendor to dispose of the assets at rock bottom prices, so that they can then all be bought up and traded on at a later profit.

1772. I fully accept that the first three aspects of this risk, mentioned above, exist, are potentially serious and would have been reasonably perceived as such for CCC.   I am less convinced as to the fourth, which appears to me to be very extreme and artificial, and the evidence of which I find to be somewhat patchy.     Research articles in the evidence suggest that it was instrumental in the downfall of Long Term Capital Management in the 1998 crisis which assumed an iconic identity in this case.   Dr Niculescu also suggested that, on examination of the IDP pricing records, a sudden downward spike of prices for RMBS in August 2007 could have been an example of this phenomenon being applied to the anticipation of the Westways auctions, following the knowledge that their liquidation triggers had been reached.

1773. Whilst this evidence was interesting, I felt that it was speculative.   I have certainly gained the impression that there is a good deal of tactical dealing and behaviour in the financial markets, and as an outsider I may not have a natural appreciation of its full extent, but predatory trading as described to me is an intricate and complex strategy, requiring ingenuity and nerve, and involving expense and risk for the predatory trader itself.   It is virtually an attempt, even approaching a conspiracy, to bring down the entity in difficulty.   The direct or indirect gains to be made would, it seems to me, have to be perceived to be very large to provoke such action.   A technique described (by Dr Maini) of creating a "synthetic short" of an Agency floater anticipated to be coming on to the market was particularly elaborate.

1774. However, it is also to be noted that the risk of being perceived to be possibly a distressed seller can materialise even before any actual selling takes place.   The market is alert to information which may need to be acted on to gain advantage or avoid possible disadvantage, and signs that a party is thinking of selling will be noted, evaluated, and possibly provoke early reaction, especially if the selling is perceived as abnormal activity for the relevant party.   Again, such market reactions cannot be controlled and therefore, if the consequences of adverse reaction could be serious, that is all the more reason to take strong precautions to avoid possibly creating the dangerous impression.   As such consequences could be triggered even by CCC being noticed to take steps which might be interpreted as anticipation of selling, such as making enquiries by listing bonds for sale, or responding eagerly to buying enquiries, I accept that "managing the message" to the market was, and was rightly seen to be, an important consideration with regard to CCC's ongoing strategy.     It was all the more important because there would not be a second chance; once activity by CCC had attracted unwelcome   attention that it might be a distressed seller, there would be little chance of quelling the perception, except perhaps by a show of conspicuously not selling, to send a message of strength and confidence.     That, however, would be fire-fighting.     All this underlines the dangers presented by the fact that one cannot control market reactions, and, however unreasonably or frustratingly, they can quickly work in an adverse fashion.

1775. I doubt if the anticipation of predatory trading as such really figured as a scenario in the thinking of CCC's directors at the material time, but it is only an extension of the first three risks (lack of negotiating clout, being offered less good terms and prompting a run on the relevant market) and I am quite satisfied that these did so figure, even if never recorded and articulated expressly as such.   They are the kind of eventuality which players in the market observe, or gain experience of and simply "know" could happen.

1776. This, though, leads to the obvious consideration of how discreetly, in practice, CCC could have made or initiated any sales.   The experts are agreed that selling by privately negotiated sales was the best course for CCC, precisely because of the need for discretion.   Associated with this is the point that the greater the number of parties who became aware that CCC might be selling, the greater the risk of adverse reaction.   But selling a large quantity discreetly in a single transaction to or through one buyer, at an acceptable price, was itself difficult, as CCC had already had direct experience of, with JP Morgan.

1777. As I have said, I do not think it is even contentious that the risks to which I have referred did exist.     The difference between the parties is really as to how great they were (or were

reasonably perceived to be), how much they weighed against the benefits of deleveraging, and whether they could have been satisfactorily mitigated by the use of certain sales techniques, which CCC – or CIM - ought to have known about, and which CCC could, and should, have successfully employed in order to mitigate such risks and achieve a successful sales programme, as submitted by the Plaintiffs.

1778. Dr Niculescu says that the risks of selling were particularly acute for CCC because of its reporting obligations as a public company, which made it difficult to sell discreetly, and meant that any information about its activities which was open to adverse interpretation was widely disseminated. He cites CCC's short operating history and the well-known facts of its recent purchases, its virtually unique position as a large market participant and its well-advertised buy-and-hold strategy, as factors which would increase the risk of markets interpreting signs of selling activity as signs of distress. He also cites the operational problem that CCC held almost equal quantities of 6.5%, 6.75% and 7% capped floaters, and that demand for the lower caps was notably reduced, as being indicators that CCC would have struggled to find buyers for this significant portion of its portfolio other than at distressed pricing.

1779. Dr Maini's opinion, expressed in his Addendum Report, was that the fear expressed that CCC, as a buy-and-hold enterprise, would be particularly vulnerable to the risk of being perceived to be a distressed seller if it embarked on selling activity, was incorrect and exaggerated after the August liquidity crisis, because market conditions had then changed. Responsible deleveraging was expected, and indeed respected, such that sales activity by CCC would be viewed with relief by its repo counterparties, rather than concern. CCC could and ought to have engaged proactively in the market and could and should openly and actively have gathered market information and "colour", with a view to being in a position to step in and respond positively and effectively to the market sales opportunities and in particular to dealer enquiries. His view, in a nutshell, was that this risk could have been averted by ensuring that CCC established a reputation as a "disciplined net seller".

1780. The Defendants submit, in effect, that this view is an opinion about the way in which the market would have reacted, which is no more than one opinion at best, and goes nowhere to supporting the view that the only reasonable approach for CCC was to rely completely on the attitudes suggested by Dr Maini operating in practice.

1781. Having reviewed all the evidence, I am satisfied that it was both objectively the case, and a reasonable subjective perception for CCC, that the consequences of being perceived to be a distressed seller could be very damaging, and indeed potentially disastrous, both as to the terms of any sales achievable, and (and more importantly) as to consequential effects for them in the market. I find the points summarised by Dr Niculescu regarding the vulnerability of CCC to being perceived to be distressed to be significant and persuasive. Furthermore, fears of the effects of such risks would reasonably have been reinforced in the Defendants' thinking by the behaviour of CCC's repo counterparties up to that time, which suggested that they themselves were nervous and would react accordingly, and that safeguarding their own interests and internal pressures would make them hugely risk averse, and resistant to persuasion from CCC that they could safely continue lending as usual, even if that was apparently rational.

1782. Concern about highly unpredictable and disadvantageous consequences from selling RMBS in any quantity was thus, I find, not unreasonable. CCC had already had one discouraging experience in August, in the shape of being urged (and willing) to sell a large quantity of its RMBS and then finding that the discreet attempt to do so through JP Morgan had produced an offer price which all the experts agree was rightly viewed as unacceptable. Dr Maini is of the view that CCC was naïve in ever thinking that it could expect an offer for such a large block of RMBS at anything except a significant discount from the prices of more ordinary

size transactions.   That does not seem to me to detract from the point that the lessons of there being a discount for size then became all too vivid.

1783. Similarly, the news of Carlyle's support for CCC in the shape of the $100Mn loan of late August was a matter which Mr Conway had expected the market to receive favourably, and then to assist CCC by spreading the message that CCC was supported and was sound. Instead, the media reaction had been the opposite and had suggested that Carlyle support meant that CCC was in difficulties.    Mr Conway having thus found market reaction to be disconcertingly adverse and unexpectedly unpredictable, I have no doubt that he would have become more wary about assuming and relying on a positive reaction to any noteworthy steps taken by CCC in the market.  Since the consequences of a mistaken judgment about this could be so serious, it was not only reasonable but, in my judgment, prudent to be cautious in this regard.

1784. Mr Stomber had a low opinion of the degree of loyalty, or even dispassionate assessment, which might be expected from others in the market, especially in hard times, and I am satisfied that this cynicism was not an unjustifiable view, and the caution which it would engender was reasonably felt.  The other Defendants, I am satisfied, reasonably held similar views, albeit with a greater or lesser degree of conviction depending on their own background, but otherwise (and reasonably) taken from and reinforced by the obvious views of their more experienced colleagues, whether implicit or directly articulated at the time.

   *5.  Sales techniques*

1785. However, much of the expert evidence at the trial was focused on the ways in which Dr Maini said that the perceived dangers to CCC of selling could be dealt with, namely by using appropriate sales techniques.  I therefore now turn to these.

1786. I have said that a point of specific concern to me was whether Mr Stomber in particular, as the most expert amongst the Defendants, was as well acquainted with the possibility of using the techniques advocated by Dr Maini as he should have been, given the degree of skill to be expected of him, or, if he was so acquainted, whether he therefore gave their deployment sufficient consideration.   It seemed to me during the trial that this was rather a significant point in the case, and my general impression was that it had been somewhat glossed over by the Defendants.   However, having, as a result, looked in particular detail at the evidence on this topic, I have come to the conclusion that my initial impression was unjustified, and really arose because this matter barely figured in the oral evidence, which I review later.

1787. The issue of the availability of such skilful and expert sales techniques first emerged in the Expert Report of Dr Maini, in September 2015.   The Plaintiffs' case had until then been based upon the general evidence of Dr Carron, suggesting that the whole - or at least half - of CCC's portfolio ought to have been sold off with an assumption that *"the range [of prices] between secondary market levels and IDP prices [w]as a reliable indicator of the prices CCC could have obtained in selling RMBS in an orderly sale of part or all of its portfolio"*.   This statement was thus seemingly in regard to straightforward sales, with no particularly special techniques or strategies being employed.   For reasons which will already have become apparent I find (and this has been implicitly accepted by the Plaintiffs' modification of their case) that taken at face value that is far too broad, casual and simplistic a proposition.

1788. It was only with Dr Maini's evidence that it became suggested that more elaborate approaches to selling the RMBS assets might have been deployed.   Both the experts in this field, Dr Maini and Dr Niculescu, are agreed that achieving sales of Agency floaters by CCC in late 2007 would have entailed risk, was not a trivial exercise, and would have required skill and effort.   Dr Maini suggested that a combination of sales methods could have been employed which would have avoided, or at least hugely alleviated, the risks of selling mentioned above (which he considered to be being overstated in any event), and that this strategy would have

produced a marked gradual reduction in CCC's RMBS holdings and increase in liquidity, would not have moved the market, and would have enabled CCC to divest itself of RMBS at the rate of "at least around $500Mn worth a week", on average and over a period of three or four months, thus achieving the reduction of about $10Bn proposed by Dr Carron. When this was challenged as impractical by Dr Niculescu, whose conclusion was that the best that CCC could have expected to achieve safely, in its circumstances, would have been the total sale of about $1Bn of RMBS during that whole period, Dr Maini then elaborated on his propositions in his Addendum Report.

1789.  The sales techniques proposed by Dr Maini were to operate in combination (though he does not give any indication of suggested ratios) and were fourfold.   They were:

      a.    two-way trading,

      b.    recombination,

      c.    auction sales/BWICs and

      d.    negotiated sales.

Although Dr Maini gave no further detail, he gave as his opinion that selling the whole portfolio by a combination of these methods would have achieved about $100Mn less than, for comparison, selling the portfolio optimally in June or July 2007, reflecting a 0.5% change in prices since that time, and this he said would thus have limited losses to no more than about $100Mn.   This comparison is, though, not really material. There is no suggestion that the portfolio ought to have been sold in June 2007, I have found that there was no justification for arguing that it should have been sold in July, and prices had changed by the time which I find central to this point, namely around the end of September 2007.

(a)  Two way trading

1790.  Two way trading is a technique which involves achieving the end result of selling by a combination of buying and selling in the market, but ultimately selling more than was bought. It is used to disguise one's motivations.   Dr Maini expressly advanced this as a technique which would avoid the perception of being a forced seller and thus "*[avoid] putting unnecessary downward pressure on prices*."

1791.  Dr Niculescu expressed scepticism that this method would actually avoid attracting attention to the fact that CCC was selling, especially as it would have to be repeated.   Dr Maini's response was that he was not advocating stealth, but rather that CCC should establish a reputation as a "disciplined net seller".

1792.  This contention seems to me to be departing from reality.   It might fit the theory of avoiding the perception of being a *distressed* seller, but it does not meet the point and problem that CCC's reputational place in the market was that of not being a seller at all.     Dr Maini's response that CCC's reputation would merely have been changed to that of being "prepared to sell at good prices", does not, in my judgment, meet this point, first because he never focused on what were "good prices" or the reality of CCC's being able to achieve these whilst using this selling strategy, and second because the notion that CCC would expect to have the time to establish itself with such a reputation seems to me to be a long way from practical reality.   We are here looking at how the feasibility of deploying such a sales technique ought reasonably to have appeared to the relevant Defendants in September 2007.

1793.  The Defendants submit that, in the end, Dr Maini accepted that this technique came down to avoiding the perception of being a distressed seller by demonstrating the ability to refuse to sell except at "good prices", and this was actually the fundamental plank of the strategy which

CCC did adopt.   This is rather superficial, though, as Dr Maini's point was that one established the reputation by participation in negotiations and transactions and thus getting the market used to the idea that one was prepared to be a seller, rather than by never transacting at all.

1794.   However, the Defendants also point out other practical aspects of Dr Maini's technique which they submit he had not taken into account.   On the purely financial front, there was first that the need to buy further assets as well as to sell them would itself have required more liquidity - which was the very thing which CCC was short of and trying to conserve.   Next, the actual purchase of more assets so as to convince the market that CCC did not need to sell would itself entail the risk that, if sales then could not be achieved at sufficiently "good" prices - and there could be no guarantee of this - CCC risked being left with more securities, which by definition it could not sell at "good" prices, than it had started with.   A third point was that by buying more securities in order to sell them again (as part of this strategy) CCC would incur the transactional losses inherent in the bid-ask spread on the securities, which Dr Maini himself estimated at about 0.5%.    Dr Maini had also done no calculations to enable any comparison between the putative outcome of his sales programme and CCC's actual financial position in March 2008.

1795.   There were then the operational points that this activity would be time-consuming and effectively be turning CCC into a trading enterprise, and that CCC did not have the staff equipped for this; Dr Maini suggested that additional traders could have been hired in, but this would of course have further cost implications.   The buying and selling strategy would also have been inconsistent with CCC's published investment strategies and this would risk betraying the underlying fact that this was an effort by a company under pressure to increase liquidity.   Finally, the Defendants point out that this change of strategy would have brought into question CCC's accounting practices, which required that assets be held indefinitely and not used for trading in order to justify their "Available for Sale" accounting treatment.

1796.   It did not seem to me that Dr Maini, or the Plaintiffs, really had any answers to these points beyond asserting that they were exaggerated.    However, I do find them to be real disadvantages to using the technique of two way trading as a means of easily, or safely, improving CCC's liquidity in the latter part of 2007.   The supposed achievable advantage also strikes me as more theoretical than real.

1797.   It seems to me that this is somewhat betrayed by Dr Maini's pithy summary description that CCC could have set out to establish itself as a "disciplined net seller".   This is because that is a market image which can only be applied to market participants on a temporary basis, because if it is a long term description, then it must amount to running down and winding up the business.   This suggests that this is a description derived from the ever changing world of the market trader, suitable to describe a temporary attitude in the market, and thus that it would be unreal to expect that such an image could be productively cultivated for CCC.   To my mind this exposes a major lack of practicality in Dr Maini's thesis.

(b) Recombination

1798.   Recombination is a technique which relies on the fact that simple Agency pass-through securities are a better known, more widely traded and more attractive investment than are more elaborate structured securities.   The concept of recombination is that of finding the exactly corresponding parts of the original pool of collateral out of which a structured security was created and purchasing these, so as to recreate the original simple pass-through security which can then be more easily traded.

1799.   The most liquid market in this context is the TBA ("To Be Announced") market, under which standard contracts are made for the sale at a future date of a given amount of mortgage backed

pass-through securities, which are as yet not specifically identified (hence "TBA") but which will comply with certain agreed criteria or characteristics.

1800. At its simplest level, with regard to an Agency floater, recombination would therefore involve acquiring the corresponding inverse floater (possibly, I think, further divided into IO (interest only) and PO (principal only) classes), so that one owned all parts of the original pass through and could trade them on compositely.  However, to enable the complete recreation of the original collateral pool, and therefore to be tradable in the TBA market, it would also (Dr Niculescu pointed out, and I did not understand Dr Maini to disagree) involve acquiring something known as the "residual".  This is a small value part of the structure created on securitisation which exists, as I understand sufficiently for present purposes, to take account of the risk of tax liabilities arising from any mismatch in payments between the original collateral and the securitised coupon.   In the case of a floater and inverse floater, it is of minimal value and may indeed even have a negative value at the outset.  It is scarcely tradeable on its own, but it is necessary to buy it in to reconstitute the original collateral fully.  There is an additional complication, according to Dr Niculescu, in that the residual would be likely to underly not only the particular bond in question but also others in the same sequence, such that one could not collapse the particular floater/inverse floater without collapsing these others as well.

1801. In this simple form, therefore, a true recombination involves acquiring these elements – floater, inverse floater and residual.  Dr Maini said (and Dr Niculescu agreed) that there were many other forms of security as well, the product of more complex structuring.   These could also be the subject of recombination, but Dr Maini accepted that anything more complex than a two or three part recombination at the most, would be far too elaborate to be feasible, certainly for CCC.

1802. The Defendants dismiss the "true" recombination possibility because, as Dr Maini actually accepted, this would only have applied in practice to about $200Mn of CCC's Agency floaters – those which he identified as "strip trusts" - which was hardly a worthwhile prospect as it was only about 1% of the portfolio.

1803. Dr Maini's main focus in relation to recombination was the class of CCC's securities which he described as "simple" floaters, with a total face value of about $9.46 Bn, and which he said had no more than one or two matching classes to be acquired so as to be tradable in practice.  He noted that $2.57Bn of these were 6.5% cap floaters structured off 6.5% coupon collateral, which made them particularly amenable to recombination because (he said) it only required matching the inverse IO (interest only) to the relevant floater (rather, I take it, than other additional matching parts as well).      This would produce, he said, a CMO with "pass-through like" qualities which could then be more readily and advantageously traded than the capped floater itself, although he accepted, not into the classic TBA market.   As regards the remainder of CCC's portfolio, Dr Maini categorised these as "generic" and accepted that they were not amenable to recombination at all, because there were too many matching classes required.

1804. The general description of recombination was accepted by Dr Niculescu, who agreed that the mere matching of the floater and the corresponding inverse floater parts gives rise to an asset with the economic properties of a pass-through, but, as already mentioned, without the residual it cannot be traded in the TBA market, and is therefore (he said) less liquid.    He explained that it is less liquid because its deficiency as against the familiar standard complete pass-through security means that the possibility of re-selling it is less reliable, and he pointed out that lack of liquidity reduces value.    He suggested that the market for such recombinations was likely to be confined to the Agencies themselves, (although it is fair to say that, as his experience was very much within one such institution, this view might have been influenced by this background), and he pointed out that at the relevant time in 2007, as CCC had already discovered, the Agencies had balance sheet constraints which prevented

them from acquiring assets.     In addition, Dr Niculescu explained that there is the possibility of combining a floater and inverse floater which themselves do not quite match for not being from exactly the same original bond, and creating what is known as a re-REMIC, but that  this is even less readily tradable.     Dr Maini clarified that his general proposition about recombination was not intending to include this last kind.

1805. Dr Niculescu was challenged in evidence that the reason why he had not mentioned all these forms of recombination in his original report was because he was unaware of them, thus casting doubt on his expertise in this area.   I do not accept this; I find, first, that he simply used different terminology when first describing recombination, and second that as he himself dismissed this as a viable option, it was only somewhat later in the course of the evidence that it appeared to assume any real significance and therefore to require more detailed explanations from him.

1806. Dr Niculescu's opinion was that, taking all considerations into account, this technique was simply not feasible for CCC, and I found his points persuasive.   The Defendants submit that, apart from limited practicality, there are similar disadvantages in respect of recombination as in respect of two-way trading, referred to above.   The process uses up liquidity to purchase additional assets, and incurs the financial costs of the actual trades and creating the new CMO.   There are also considerable time and effort costs in tracing and purchasing the necessary parts of the securities.   These, they submit, had not been given proper weight by Dr Maini.

1807. Dr Maini was dismissive of the costs involved, in particular, the likely need to pay any premium to the holders of the material inverse IO or PO, or the effort involved for CCC in positively pursuing any such strategy.   Indeed his evidence rather moved from this to stressing the widespread use of such recombination activity, which he pointed out could be detected in the evidence, citing, as an example, an enquiry from Merrill Lynch to CCC in November 2007 with regard to a bond where they were apparently seeking to recombine a bond with the Bloomberg ID reference FHR 3262.     Whilst accepting that he was not suggesting that CCC should have embarked on such activity on a mass scale, he disputed Mr Stomber's evidence that the balance sheet (ie resource) requirements for this technique would have been unworkable for CCC, on the basis that such financing requirements could be raised through the proceeds of CCC's other sales activities and previous recombinations - or even using leverage.

1808. Dr Maini's evidence is straying, at this point, from his expertise in the world of RMBS trading   into the world of CCC's own investment management decisions.     I find it unconvincing, owing a lot to theory and hypothesis and little to any conception of practicality for CCC in the situation in which it now found itself.   Indeed, the very fact that Dr Maini advances his last proposition in apparent seriousness – that CCC could have borrowed in order to pursue his proposed techniques -  illustrates my perception that he tends to focus on winning the theoretical argument,  and in doing so loses sight of the point of the evidence at all.     Again, therefore, I am persuaded by the more measured assessment of Dr Niculescu.

1809. As a final point, the Defendants ultimately submit that, in the complete absence of any evidence as to the quantities which Dr Maini suggests could have been recombined, or the economic consequences for CCC in terms of the costs of implementing the process and the cash which could have been generated, then even if recombination were a practicable technique it is impossible to assess whether it would have been worthwhile; it is for the Plaintiffs to satisfy the court that an actual opportunity was culpably missed which should have been taken and which would, on balance of probability, have secured a better financial outcome for CCC than in fact occurred, and in this respect, they conspicuously fail to do so. In the end, I agree with this submission too.

(c)  Auction sales

1810. This includes the now familiar BWIC ("Bids Wanted In Competition") lists by which willing sellers solicit offers for their securities.    It is not an esoteric sales technique, but it is, of course a sales method which, if adopted by CCC would have made it plain that it was in the market for selling.  Thus it courted some of the risks previously referred to.

1811. Dr Maini cites the Westways liquidations in his Addendum Report, as examples of Agency floaters that traded by auction.   I have already referred to his analysis of the price and Dr Niculescu's disagreement with this.  The Westways evidence really goes no further than showing that RMBS could be sold, and the prices applicable in the particular conditions of those sales.

1812. The Defendants point out that whilst Dr Maini advocates that CCC could and should have approached several dealers with regard to a single bond at any time, apparently having no concern for the risks of CCC's intentions to sell becoming widely known and having adverse side effects, he is alone in his lack of concern about this.   Dr Carron accepted, in his original report, that a concern about alerting the market to a large volume of securities being for sale, even if the identity of the seller were not disclosed, could be met by private arrangements whereby "*one or a small number of dealers (such as CCC's larger repo counterparties)*" would "*negotiate private sales (not BWIC auctions)*" with clients (emphasis mine).

1813. The Defendants submit that the preponderance of the evidence is that it was reasonable for CCC or CIM to perceive that resort to BWIC auctions would be too dangerous and risky as regards perceptions and reactions in the market place, and that this element of Dr Maini's suggested sales techniques should be discounted.   On the balance of the evidence, I accept that this was a view which it was possible reasonably to hold.

(d)  Privately negotiated sales

1814. There is agreement between both sides that one way (the Defendants say the only potential way) in which CCC could have hoped to make any sales which would have been sufficiently worthwhile but also sufficiently discreet was by seeking to achieve privately negotiated sales.   The difference, with Dr Carron's rather "broad brush" approach having largely been discounted in the course of the trial, is that Dr Maini suggests that, as part of a concerted selling strategy using also the other techniques he has proposed, this could have been done openly and in negotiation with a reasonably broad range of counterparty brokers or dealers, such that his suggested level of deleveraging sales could have been achieved.

1815. The Defendants deny that there was any real mileage in this possibility in practice.  They point to the lack of fruition of the JP Morgan offer, the unsuccessful attempts to sell back to Fannie and Freddie, and the ultimate coming to nothing of the UBS enquiry, all briefly mentioned above, but which I examine more closely below.  They point out that this last resulted from a reverse enquiry anyway.

1816. This is really the essence of the point in the context of this general review of the factors which should have informed a decision whether or not to try to sell RMBS at the end of September 2007, because, on the evidence, it seems to me that private sales were really the central selling technique available to CCC.   I just do not find it convincing that any of the other techniques advanced by Dr Maini were either feasible or practicable for CCC to deploy, probably at all, but certainly not in any sufficient quantity to make a significant impact on the prospects of safely effecting sales of RMBS (ie without running serious risk of prompting unhelpful or even adverse reactions in the market).     However, there are also limits, in my view, on the extent to which private sales could be sensibly deployed, and I am satisfied that the general risks of CCC engaging in trying actively to set up such sales were significant.

1817. Having up to now focused on the expert evidence with regard to use of special sales techniques, it is appropriate to turn here to the Defendants' own evidence on this topic.  This

is really that of Mr Stomber, because, as I made clear above, this was a point which I certainly found troubling during the trial, and which I have therefore looked at closely.

1818. A large part of Mr Stomber's second witness statement was devoted to explaining that he was aware of the techniques advocated by Dr Maini, or at least of the simultaneous buy and sell strategy, because he had even used that when he "worked on a trading desk".   There is no express reference to working on a trading desk in Mr Stomber's account of his work history and experience in his first witness statement, but I infer that it was part of his early experience at either Pacific Bank or Deutsche Bank. It may merely be that the terms in which he described those positions in his CV included, but did not make clear to the outsider, the fact that this involved trading activity.   He was not cross-examined as to his assertion of such experience.

1819. The Plaintiffs submit that his evidence is not to be believed because it is an *ex post facto* justification of his (CCC's) inaction in this regard, not included in his first witness statement and having been (the Plaintiffs suggest) prompted by the damning production of Dr Maini's expert evidence.   However, despite what had become the centrality of this point given the fact that Dr Carron's more superficial approach had been undermined, and even allowing for the fact that it may have arisen only somewhat late in the progress of the case, Mr Stomber was scarcely cross-examined at all about his evidence that the techniques suggested and expanded on by Dr Maini could not have been deployed practically by CCC and the reasons for this.      The salient part of Mr Stomber's cross-examination took place in the very last session of his oral evidence, on the last afternoon, immediately after the short adjournment.  It was effectively two questions only, the first being:

> "Q.   *Is it your evidence that although you were aware of the methods proposed by Dr Maini those methods were not available to CCC because it wasn't a trading desk?*"

1820. The answer, in summary, was that it was much more than that, and was first, that CCC was not itself a broker or a dealer and was therefore confined to dealing with 10 – 12 such entities itself and second, that a trading desk in an investment bank was very different from a "buy and hold" fund (such as CCC); CCC did not have a team of sales persons with contacts of a thousand or more potential purchasers of product around the world, and its inventory, unlike that of a bank trading desk, was disclosed  publicly every month when it was obliged to publish information on its asset profiles in accordance with its listing regulations.

1821. The other question, which followed, was simply:

> "Q   *Do you accept that you could have retained someone to assist you deploying all the strategies that Dr Maini outlined?*"

to which the answer was "no", because his strategies were not relevant to CCC and (as I understood Mr Stomber's answer) those strategies were deployed in a different world, because

> "A   ………*I make my money by buying the security and holding it and receiving interest income.  An investment bank makes its money through the bid/offer and buying and selling securities.*"

1822. Neither answer was investigated or challenged further (although I should record that Dr Maini in his further responsive evidence did dispute the assertion that CCC was limited to dealing with 10-12 or so institutions; I regard this as peripheral).   Advocate Wessels concluded his cross-examination of Mr Stomber very briefly after this, largely by putting various general criticisms raised by the Plaintiffs to him and asking if he accepted these - which he unsurprisingly did not.

1823. Mr Stomber's evidence of his explanations for not causing CCC to pursue Dr Maini's suggested strategies was thus, it seems to me, not actively challenged.   I am not, of course, obliged to accept it if I find it implausible or unconvincing as a matter of logic or common sense, or if there is other countervailing evidence which is so forceful that I am persuaded that Mr Stomber's evidence cannot be accepted, but I am entitled to assume from the paucity of cross-examination that these were the only points on which the Plaintiffs wished, or felt able, to challenge Mr Stomber's evidence on this topic.   Their case thus really depends on my concluding that Mr Stomber's responses on these points were inadequate or implausible.

1824. I have taken into account the fact that Mr Wessels had had his time limited with regard to his cross-examination of Mr Stomber.  I do not need to make any allowance for this, however, for two reasons.  The first is that my refusal of Mr Wessels' application to extend Mr Stomber's cross-examination so as to require him to give evidence beyond the six days originally scheduled for his evidence occurred the previous day and Advocate Wessels therefore had plenty of time to adjust his cross-examination on this point appropriately to its perceived significance.   The second reason is that, in any event, he concluded Mr Stomber's cross-examination with half an hour to spare from the timetable.  I cannot conclude, therefore, that cross-examination on this topic was curtailed because of time constraints.

1825. Having initially been concerned that Mr Stomber had not really answered the point that there were expert techniques available which he ought to have known about, and could have used or instructed to be used on CCC's behalf to achieve sales to CCC's likely advantage, on looking at the detail of the case on this aspect, much of which I have referred to above, I have come to the conclusion that my initial misgivings were in fact misplaced, and that I should accept Mr Stomber's evidence on this topic, supported as it is by Dr Niculescu's views, and by submissions which I do find to chime with common sense.   At the end of the day, Dr Maini's evidence does not convince me that CCC could have sold RMBS as submitted by the Plaintiffs.  By implication Dr Maini seems to accept (and in any event I so find) that CCC, even through CIM, did not have the advanced trading expertise to carry out his suggested sales techniques.      I do not regard Dr Maini's response that such expertise could have been brought in to give CCC assistance to be either feasible, or to have any sufficient evidential support.   Nor does it meet the further point, which I would also accept, that even in itself, such a move could quite well attract the kind of unwelcome interest or speculation which was justifiably feared.

1826. I have not yet mentioned that Dr Maini's sales techniques would also require, he himself said, to be supported by the acquisition of hedges, such as against interest rate volatility.   This adds yet another element of sophistication, complexity and cost, all of which suggests to me that Dr Maini's proposed sales techniques are very much the preserve of those engaged in the specialist financial derivatives trading markets, and it would not be unreasonable to see them as unsuitable for CCC.

1827. The Defendants' fundamental criticism of Dr Maini's evidence is that it is too focused on the issue whether CCC could have achieved sales at all, rather than whether they could have been achieved at an acceptable price, which the Defendants submit is the all important issue. Standing back from the detail of Dr Maini's evidence, I find this criticism to have force.   A case as to the price which the Plaintiffs say could have been achieved, ie that the "modest discount" to IDP prices meant no more than about 11 bps, was very late in the day in coming forward, and  Dr Maini's evidence viewed in detail simply does not persuade me that it was likely that CCC could have sold $2½ - $3Bn of RMBS a month for several months, between September 2007 (still less August) and December 2007 or later at a discount of no more than around 11 bps from IDP prices at the time; it only satisfies me that Dr Maini believes that he could have done.   His confidence, though, is expressed with hindsight, after a wide examination of much more evidence than either was, or reasonably ought to have been, known to CCC at the time, from a background of particular personal expertise, and from the position that his proposals are never going to have to be tested against possibly disastrous

consequences if they were wrong, which was the situation facing CCC's managers and directors.  I am actually very sceptical that Dr Maini's confidence would have been borne out even if he had set about the task himself, but in any event that is not the test.

1828.  Dr Niculescu's view, having considered the general evidence and his impressions at the time, was that CCC could realistically have achieved no more than sales of about $1Bn of its RMBS without moving market prices down or suffering a substantial discount.   I find this more persuasive, but also that this was not a significant amount in the general scheme of things.    I am quite satisfied that it was not unreasonable for those in charge of CCC's business to be cautious, at the time, about selling possibilities, and to be justifiably fearful about the imponderable effects of reactions in the then current markets, which any such attempts could generate if identified to CCC.

1829.  Finally, the scenario proposed by Dr Maini is, in any event, now venturing a very long way from the simple allegation that it was so obvious that CCC could have safely and successfully sold RMBS to the extent of between half and the whole of its portfolio in the latter half of 2007, that it was negligent for its directors not to perceive this, and not to embark on a programme of doing so in September 2007.

### 6.  Outlook for the future

1830.  The last aspect to  which it was important to have regard in deciding whether or not to continue the capital preservation strategy of not setting out to sell RMBS at this time was what course the future appeared likely to take, so far as could be gauged.   Obviously the decision whether or not the balance of risk and benefit favoured selling or holding would need to try to take into account the likelihood of market circumstances moving favourably or unfavourably to CCC.

1831.  There are three aspects to this, though they are, of course, linked.  The most obvious would be the general prospect of price improvement or deterioration in the value of Agency floaters.  The second is the prospects of a reduction in the availability of affordable funding and the third is the possibility of another major market disruption.   The real issue, in each case is the extent to which the Defendants perceived and considered these factors, and did so with due care and competence.    The expert evidence on this topic can only provide context for evaluating the Defendants' decisions and actions.

### (a)  Price improvement/deterioration

1832.  For various reasons which will by now have become obvious, the prospect of price improvement (or otherwise) in CCC's RMBS would be a material consideration in deciding whether it was better to hold on to those assets and hope to gain the benefit of such an improvement (return of margin and perhaps some improvement in either availability of funding or terms of funding in consequence of the increased value of the security on offer), or to conclude that the present situation was too precarious and seek to sell those assets, thereby crystallising losses and  - hopefully but crucially -  increase the liquidity cushion to a more comfortable level, from which position the best course for the more long term business of CCC could then be assessed.

1833.  The Plaintiffs submit that the Defendants' decisions banked on price improvements, and certainly on market conditions not worsening, but that they had no reasonable basis on which to expect such market "*normalisations*" in the near future (which they define as their chosen period of twelve months), and more specifically that the Defendants could not have reasonably expected a flight to quality.

1834.  As already mentioned, "flight to quality" is the phenomenon of investors moving, in difficult financial times, away from more risky investments and into "safer", high quality, investments,

thereby raising the prices of the latter.   The Defendants say they saw CCC's RMBS falling into this latter category, and therefore as potentially likely to benefit from such a trend.

1835. The Plaintiffs dispute this, and rely on various statements by each of the Defendants in oral evidence, acknowledging the unpredictability of the market in which CCC was involved and confirming that their observations of the market throughout the material period – from August to CCC's collapse - were that it was in a turbulent state of disarray.  They also point out that each of the Defendants accepted, in varying terms when it was put to them in cross-examination, that they had not observed any actual flight to quality in the prices of CCC's Agency floaters during the material period.    The Plaintiffs also submit that the Defendants' expert evidence (Dr Niculescu and Dr Hubbard) to the effect that those in the market expected and reasonably expected improving market conditions in this time should be disregarded, because it was all based on theory and bore no relation to the reality, the reality being revealed in the contemporaneous documents, such as Mr Stomber's occasionally dramatic emails and other communications, and confirmed by the Defendants' own evidence as mentioned above.

1836. Dr Niculescu identified four factors, although they somewhat overlap, as to why he thought a market observer might reasonably conclude in the autumn of 2007 that Agency floater prices might well rise.   The first was the prospect of declining interest rates.  This was good for the relative attraction of CCC's capped floaters in several respects; in particular, it reduced cap risk and increased the likelihood of prepayments being made, this latter being particularly desirable when such assets are priced below par.   The second feature was indeed the likely prospect of a flight to quality as described above.   The third, linked with the first, was statements by the Federal Reserve that it would be taking steps to try to stabilise markets and improve liquidity, such as by cutting interest rates.    This would be beneficial for CCC because its Agency floater prices had suffered, primarily, from the effects of market illiquidity inhibiting purchasing.   The fourth, and linked with the second, was the fact that Agency discount notes had recently experienced a price increase – a flight to quality – and as the quality of those instruments was quite similar to that of CCC's Agency floaters, it was reasonable to expect similar considerations to begin to apply to these as well.

1837. Neither of the Plaintiffs' material experts, (principally Dr Carron but also Dr Maini) actually disputed the effects of the factors mentioned by Dr Niculescu.   Their criticisms were more of the extent to which it would have been reasonable for the Defendants to rely on these factors as matters of comfort or encouragement with regard to potential price improvement.

1838. Dr Maini's criticism was in fact a small point made only in his late Supplemental Report that it was unreasonable for CCC (Mr Stomber) to expect pre-payment speeds to double in February 2008.   It was based on Dr Maini's general personal recollection of the parameters for some recalibrations (unidentified) of prepayment speed models in late 2007.   I would be hesitant in any event to place much weight on such a late and unsupported assertion from Dr Maini, but as the point is only subsidiary, and the Defendants referred me to other aspects of the evidence which suggested that Mr Stomber's views on prepayment expectations were both a considered view and reasonable when examined in its actual context, I can place no weight on Dr Maini's criticism.   It also relates more to February 2008, which is later than the time with which I am concerned, although I mention it here for convenience.

1839. Dr Carron's principal criticism was that the Defendants had placed too much reliance on the idea that a flight to quality was something which would produce a prompt return to "normalcy" of CCC's Agency floater prices.   They, or more particularly Mr Stomber, had mistakenly relied on the flight to quality phenomenon as being exemplified by the aftermath of the LTCM crisis, when what had really happened there was that it was Agency pass-through prices which had, indeed, recovered within a month or so, but Agency floater prices had taken about 6 months to recover.   It was therefore really fixed rate securities which had

benefited from a flight to quality in 1998, and this did not and had not applied to floating rate securities such as CCC's RMBS.

1840. From this, I deduce that either the experts disagree as to whether CCC's RMBS assets were assets which would reasonably be expected to benefit from a flight to quality at all, or their disagreement is not so much whether it was reasonable to anticipate an upward price improvement, but when.   It does not seem to me that I need to decide this, though.   Mr Stomber's opinion was, I find, the lead and guiding opinion to the Defendants in this matter, and given his sphere of expertise, reasonably so.   If I accept his evidence that he believed that CCC's RMBS were the kind of assets that would gain the benefit of a flight to quality, the only question is whether this was a reasonable view for a businessman and director such as he to hold.   The fact that at least one expert upon whose evidence I feel able to rely (Dr Niculescu) holds that view is strong support for the proposition that it would be within the range of reasonableness.

1841. I do not find that Professor Hubbard's evidence really takes the matter any further.   Giving evidence about the financial markets from a general macro-economic perspective, from his experiences and researches he said the general market perceptions at the time with which I am concerned was one of reasonable optimism with regard to improving financial market conditions, and specifically liquidity.   He derived this from his own plot of what he described as the "Forward TED Spread".   The TED Spread is an index of the difference between the risk free US Treasury Rate of interest and LIBOR, which is the rate of interest at which banks lend, unsecured, to each other.  It therefore represents a risk-burdened rate, even if not greatly. This spread widens in times of market disruptions, when lenders charge higher rates for unsecured loans and increase their demand for the safety of Treasury Bills.   The "Forward TED Spread" is Dr Hubbard's own representation of the same difference, mapped forward from any given date by comparing, on the material date, forward LIBOR rates and forward Treasury Bill rates of the same forward projection in time (3 months).   This represents the market's anticipation of future rates, and is thus a measure of current optimism (where the anticipated spreads go down in the future) or pessimism (where they widen).   His results suggested that through the last four months of 2007, the forward expectations of the TED spread in three months' time had been continually those of an improving market, even from moments when the current TED spread had itself widened in fact.   It is a graphic representation of market sentiment at the time, and its apparent optimism led him to conclude that prices of Agency floaters would be seen as likely to improve.

1842. Professor Hubbard also took the view that this positive outlook was supported because the markets viewed the interventions of the Federal Reserve positively.   He listed the cuts in interest rates.   I have already mentioned 18th September 2007.  Further cuts of 25 bps took place on 31 October and 11 December 2007, of 75 bps on 22 January 2008 and again of 50 bps on 30 January 2008, and finally, but after CCC's collapse, of 75 bps on 18 March 2008. There are other interventions cited, including the infusion of funds into the markets to increase liquidity, concentrated in August 2007, December 2007 and March 2008.    Dr Hubbard's view was that these interventions had been received positively, as regards market sentiment at the time, although when shown some of the emails in the case in cross-examination, he agreed that many had considered the Fed interventions to be "too little too late", although he himself thought that this was generally in the light of hindsight.   He also accepted that the purpose of Federal Reserve intervention was the general one of stabilising the economy as a whole, and except in specific exceptional cases, it was not aimed at rescuing any particular economic institution, or, except where vital to the general economy, any particular financial market sector.

1843. Professor Hubbard's conclusions therefore support Dr Niculescu from more of a macro-economic perspective.   However, and precisely because of this, I have not found his conclusion to be of great assistance in relation to the narrow question with which I am here concerned; it is too broadly based.  I have therefore placed no direct reliance upon it.     My

impression from the contemporaneous documents in the case is indeed that those with whom I am concerned regarded the Fed's interventions, welcome as they were, as being both slow in coming over the second half of 2007 and not really sufficient when they did.   Nonetheless, I have certainly gained the broad view, from the overall evidence in the case, that general market sentiment was that after the 9th August crisis, the market ought to recover gradually back towards the state to which everyone had become accustomed before mid-2007, and this is consistent with the effects of Dr Hubbard's research.

1844.   As regards the time with which I am here concerned, the first question is therefore whether I accept Mr Stomber's evidence, and by association that of the other Defendants, that they believed that the prices of CCC's RMBS assets were likely to improve in the not-too-distant future, and the second is whether such a belief was reasonable.

1845.   I am satisfied that the Defendants did hold that belief and I am also satisfied that it was not unreasonable for them to do so.   First, in broad terms, it seems to me that 30th September was less than two months after the shock of the 9th August crash.   It had taken much of that time for markets to calm down, and the memory of previous apparently "normal" times pre August 2007 was not so far distant that it ought necessarily to have been discounted as the general norm to which markets could be expected to drift back.   That would, I think, have been a reasonable background mind-set, although no more than that.

1846.   Second, though, I am satisfied that Mr Stomber did genuinely believe that CCC's RMBS ought to benefit from a flight to quality which was likely to happen and, as indicated above, I am satisfied that this was a reasonable view to entertain.   The Plaintiffs submit that the anticipation of a flight to quality increase in CCC's prices was misconceived and effectively wishful thinking.     As mentioned, they cite the acceptance by all of the Defendants individually, at different points in their cross-examination, that they had not seen any actual flight to quality in the prices of CCC's Agency floaters.   However, putting the question in this form disguises, by making unspoken assumptions, what the speaker has in mind as being a "flight".     Looking at the figures for CCC's agency RMBS prices (see Dr Carron's chart mentioned above), it is right to say that there was never any sudden and marked rise in prices at any time which might be what would be expected by the use of the word "flight".   The graph of both secondary and IDP prices shows prices fluctuating but with no marked really sustained or steep rise (or fall) over this period.   But the real point at this time is not whether the Defendants did or did not see what could be described as a "flight" to quality, but rather, whether it was reasonable to expect such a flight, or at least a trend towards improvement in prices as a reflection of their solidity and credit quality, rather than a trend towards significant further deterioration.

1847.   The evidence shows that Mr Stomber was basing his prediction that there would be a "flight to quality" principally on his previous experiences in the LTCM crisis, but eventually came to the realisation that the market was behaving differently in the circumstances of late 2007. This does not cause me to think, though, that his initial impression was incompetent or negligent.

1848.   The Plaintiffs rely on a striking email of Mr Stomber's dated 17th August 2007 (and thus preceding this point in time) that

> "Believe me I get it – the fixed component rallying during a flight to quality swamped the spread component"

as evidence, supported by Dr Carron's interpretation of the email, that Mr Stomber had failed to appreciate that the flight to quality after the LTCM crisis was confined to fixed rate rather than floating rate securities and was not therefore an appropriate comparator for CCC's securities.   However, Mr Stomber was never, so far as I can see, cross-examined on this document and asked to confirm or explain its interpretation.   Indeed, the only question which

appears to be potentially pertinent to this alleged misapprehension was on the fifth day of cross-examination:

> "Q.    You never saw any flight to quality extending to capped floaters, did you, until           before CCC failed in 2008?"

Mr Stomber answered this by accepting that he had not seen, during this period, anything like the

> "...type of flight to quality that I saw in '98".

1849. This does not seem to me (and did not at the time) to accept the proposition that the flight to quality of 1998 was confined to fixed rate securities, but rather that the same degree of price improvement as in 1998 did not occur.    Any ambiguity in the word "type" was not explored. I do not, therefore accept the Plaintiffs' characterisation of Mr Stomber's evidence as a recognition, subsequently ignored, that he had been wrong about the likelihood of a flight to quality which would benefit CCC's assets, so serious as to require a revision of his general opinion that CCC should benefit from price improvements as the quality of its assets came to be recognised.

1850. Even if the flight to quality which occurred after the LTCM crisis were focused on fixed rate rather than floating rate securities, I am not persuaded that it was negligent to fail to make this distinction in the state of general knowledge of autumn 2007.   Neither am I satisfied that the distinction itself was so major as to invalidate any expectation that a flight to quality factor would tend to produce a rise in prices for CCC's assets as well.   The issue is whether it was reasonable for the Defendants, as at the end of September 2007, to think it reasonable to expect that some degree of flight to quality which would benefit CCC's asset values was likely to occur.   I am satisfied that it was.

1851. Third, the prospect of a general upward tendency in prices was supported by the accepted proposition that these RMBS prices would be bound to return to par at some stage because they would  pay out in full at maturity – although I accept that this is part of the quality of the asset taken into account under the second point.

1852. Fourth, I find that Mr Stomber did expect, and reasonably, that interest rates were likely to fall, and this would favour CCC's RMBS values.

1853. Fifth, I find that, as at 30th September, there was cause to be (and CCC was) positive because of the Fed cut in the target Federal Funds rate of 18th September 2007, which was both likely to benefit CCC because of a reduction in cap risk, and which was also a positive towards improving liquidity.    I find this because although Mr Conway had not set any store by the Fed's injection of liquidity in response to the August crisis, the disillusionment with the Fed expressed in CCC's internal memos did not materialise until later.  The cut in interest rates had an immediate salutary effect on LIBOR, which must have been observed, and this gave rise to a general sense of relief and therefore optimism in the markets. Indeed, although there is no direct evidence of this, I find this ethos of optimism in the email of Mr Stomber of 27th September 2007, referred to above, and a similar earlier email of Mr Trozzo of 26th September.

1854. The Plaintiffs do not rely on any evidence or indicators which are argued to suggest that RMBS prices were more likely to go down than up.    They rely only on the general and acknowledged perception that the markets were unpredictable, which of course led most, if not all, of the Defendants to agree in cross-examination, that they were not capable of predicting, at least with accuracy, factors which would influence the price of CCC's securities, nor when they thought the markets would return to "normal".  An example is Mr Sarles' acknowledgement that markets could have gone up, stayed the same, or could have

gone down "*obviously*".    I do not find these acknowledgements of what is indeed, in the abstract, a totally obvious proposition, to detract from my view that overall, the Defendants did have a cautious faith that CCC's asset prices would begin to improve again.

1855. I add here, that I make these findings in the context of the Defendants' submission, which I also accept, that CCC was not dependent on such prices improving quickly, for its survival, nor even on their not falling at all.    CCC had some room, even if uncomfortably small, to withstand a slight worsening, even, of conditions in the market.   It could also, I find, have a reasonable expectation that Carlyle would support it as against any such moderate worsening.

1856. Whilst I recognise that this last proposition rather depends on what is meant by a "slight" worsening, I do not accept the Plaintiffs' submission that "*it was apparent that even a <u>slight further market deterioration</u> could result in CCC's insolvency*" (emphasis added) where that effectively means "any" deterioration.   Indeed, and now looking forward, the fact that CCC did survive the effective deterioration in market conditions which accompanied the commercial and investment banks' respective year end adjustment activities in November and December 2007 vindicates the view that this perception would have been reasonable.

(b)   Funding availability

1857. The question here is whether, looking forward, the Defendants could reasonably anticipate that sufficient funding would be available to enable CCC to continue financing the holding of its portfolio of RMBS.

1858. Funding requirements came in two forms, the funding required for margin calls (liquidity) and the repo borrowing required to maintain ownership of the RMBS at all.    The former, the liquidity requirement, was linked with price levels, which I have reviewed above.   I have found that as long as prices did not decline significantly, liquidity held by CCC, or on the books of its repo lenders if prices improved, could be reasonably seen as available.

1859. The latter, borrowing availability, is linked with the trials and tribulations of procuring the constant regranting of repo finance, on affordable terms.   It is therefore linked with the issue of sustaining haircuts at a manageable level, which I find, on the evidence above,  certainly had to be under 4%, but could probably be sustained at about 3%, as an effective rate.   Unless repo was available on such terms, it was not, in practice, available at all.

1860. This matter - the viability of continuing repo funding - is the crucial "downside" problem of the capital preservation strategy, as I mentioned at the start of this discussion.    It is the adjudged gravity of such financing risk as against the adjudged gravity of the risks of trying to relieve it by selling RMBS, which is the main element in the judgement whether it was reasonable to pursue the capital preservation strategy, or not.   In initially describing the parties' cases above I have summarised the Plaintiffs' arguments that CCC was, and the Defendants ought to have recognised that it was, on the edge of a funding failure, such that it should have been seen as absolutely imperative to take steps to reduce funding pressure by selling assets, and the Defendants' response that it was neither as extreme, nor as clear, as that.

1861. In their opening submissions, the Plaintiffs focused very much on the plummeting of CCC's recorded excess repo borrowing capacity between 17th August 2007 and 17th September 2007, illustrated graphically in Mr Shaw's Exhibit B-5.    It was a drop of over $10Bn and it reduced CCC's soft line borrowing capacity to 113% of actual requirements.   They submitted there that any reasonable and rational director in the position of the Defendants at the time would have been "*alarmed*" by the extent and speed with which CCC's repo capacity had diminished in that time, and that it was reckless of the Defendants to permit CCC to continue in business with only this level of available borrowing after that time.   Effectively they submitted that this reduction in repo borrowing capacity ought *ipso facto* to have been seen as

indicating that CCC's business was no longer sustainable, at any rate at the level of RMBS holding which it currently held.

1862. In their closing submissions, the Plaintiffs laid less emphasis on the statistics for borrowing capacity figures, but based their argument more on what they submitted were in effect admissions by the Defendants of their knowledge that CCC's funding position was dire. They have cited various quotations from the evidence of the Defendants, in particular Mr Conway, Mr Stomber, Mr Hance and Mr Allardice in which they acknowledged that they were concerned "every day" with the possibility of CCC going under, or capital being at risk, or with news being terrible, or suchlike.

1863. I do not find these statements to be of much support to the Plaintiffs' contentions that the Defendants really knew that CCC was not capable of surviving with its then level of available repo finance, mainly because, read in context, they strike me as generalisations, simply emphasising that the speaker was well aware of the seriousness of the situation and did pay attention to it.   Some of the remarks relied on, certainly in the case of Mr Hance's comment about "*the news everywhere was just terrible*", do not relate to the time period I am here dealing with.

1864. My first impression was that the Plaintiffs' initial stress on the magnitude of the reduction in CCC's excess borrowing capacity between August and September 2007, and the gravity of this situation compared with what had originally been thought to be appropriate for CCC, had some force.   The Plaintiffs also suggested that there was an absence of apparent discussion and recognition of this in the contemporaneous paperwork, which suggested that the seriousness of this had not really been examined, or fully appreciated.

1865. In the end, though, having looked at all the evidence, I am satisfied that the seriousness of the situation was appreciated adequately by the Defendants, for what it was.   The level to which available repo capacity fell, on a general overview, did still remain above CCC's actual requirements by about 10%.  Whilst this was not comfortable, as it gave little room for rolling repo away to other suppliers, it was enough to meet CCC's actual financing requirement. The Plaintiffs' contention that a mere 10% excess in available borrowing capacity should have been seen as making the continuation of the business on that basis unsustainable and doomed therefore depends on whether or not it was reasonable to think that there was an adequate prospect that general repo availability (whether absolute, or in terms of the haircut demanded being in excess of 3%) would remain and not continue to decline after 17th September 2007.

1866. I find that the evidence suggests that there were reasonable grounds for thinking that a further decline was not inevitable.   Apart from the underlying general sense that markets had calmed somewhat over the previous month, CCC's repo position crystallised and was re-set twice a month with the cycle of repo rolls.   The full repercussions of the August crisis had not had time to work their way into the system by the repo roll of 15th August 2007, but would have become reflected during the following two rolls, such that it was reasonable to take the view that repo funding conditions had broadly "re-set" after the effects of the August market disruption by the time of the 17th September roll.   Therefore, whilst the reduction in spare repo finance capacity was concerning, and no doubt very concerning, and whilst it would no doubt be a good thing to alleviate that concern by reducing pressure on repo requirements if possible, making that decision did not necessarily have to be done on the basis that financing risk was a factor for "alarm" on that side of the balance, and that some kind of emergency reaction was the only appropriate response.

1867. Both the Defendants' witness evidence and the contemporaneous documentation show, I find, that they did appreciate that the situation was very serious, but the display of their reactions was tempered, first by the fact that they were being apprised of the situation as regards repo line availability as it developed, rather than with a single sudden revelation of the total

reduction as it appears from Mr Shaw's graph, and second by the fact that there was no immediate emergency measure to be taken in any event, as Mr Stomber and Management were charged with dealing with the situation, and doing so in accordance with the strategy which had been decided upon only three or four weeks earlier.   In addition, the seriousness of the situation, however grave, was only one matter to be fed into the overall judgment about the best way forward, at any particular time, for CCC.

1868. It is clear from the contemporaneous documents that Mr Stomber was keeping the Defendants, I think all of them but certainly Mr Conway, Mr Hance and Mr Allardice, well up to date with the position on repo availability as it unfolded, and all the Board was supplied with summary details in the ALCO pack papers.   In that situation, I again do not find it surprising that there are no other recorded discussions of the repo availability position; they took place, in practice by the emails and such other communications as took place.

1869. Ultimately, therefore on reviewing the evidence, I find that the Plaintiffs' submissions with regard to the immediately alarming state of CCC's repo financing availability are somewhat over-stated; whilst the matter was certainly serious, a level-headed review still suggested that all was not necessarily lost with regard to the ability to maintain enough repo funding, and certainly that there was sufficient prospect of this to justify contemplating continuing with the strategy of defensively seeking to preserve CCC's capital assets.   CCC had succeeded in keeping up the necessary funding to finance its RMBS portfolio at its then level.   Although this had been hard work and at times perhaps nerve-wracking, I am satisfied that it was reasonable, in September 2007, to expect that it would be possible to continue doing so for the following repo rolls and thereafter, absent any major disruption in the markets.

(c)  Possibility of a second market crisis

1870. This leaves, lastly, the question whether, and if so how, the Defendants ought to have contemplated and planned for the occurrence of a second crisis.

1871. The Plaintiffs complain that the capital preservation strategy gave CCC no prospect of surviving a further market deterioration.   I have already rejected this argument as regards any "slight" deterioration, and anything greater but still gradual would have allowed the opportunity for further consideration and adjustment.   The real issue here is the superficially more forceful point made by the Plaintiffs that the capital preservation strategy did not address, or provide any protection, from the possibility of a second sudden market crisis, and the first question is therefore whether it was only reasonable to assume the likelihood of there being one.

1872. The Plaintiffs rely again on the fact that Messrs Hance, Stomber, Allardice and Sarles each in contemporaneous documents after August 2007, recognised the possibility that "*this could happen again*" (although I observe that, once again, they tendentiously distort Mr Sarles' acceptance in oral evidence, that for the sake of argument "*let's say maybe [a] 20% [chance] at the most*" into a submission that he thought that there actually was a 20% such chance).   Again, though, I do not place much weight on these recognitions, for two reasons.   The first is that recognising that it is possible that such a situation could occur is simply stating the obvious.   The more important question is: how <u>likely</u> is it to occur?   The next major consideration is: what is it practically possible to do to protect against such a situation if it should occur?   Once again, the balance of risk, benefit and practicality comes into operation.

1873. The expert evidence on this point strikes me as being all to the effect that the prospect of there being a second crisis similar to that of August 2007 within any short time after that crisis was extremely remote.   Dr Webster said as much:

> "*the probability of having an adverse move of the orders of magnitude that we saw, call it seven or eight standard deviations, followed by another significant move that would require an additional margin call is extremely remote.*"

1874. She described the liquidity crisis of August 2007 as being an extreme event with such a statistically small likelihood that the possibility of a similarly extreme event following within a short time was so remote as to be virtually zero. The likelihood was to be measured in "centuries".

1875. Dr Carron was perhaps inclined to be less extreme, but I think even he accepted that the probability of two such events occurring within a short space of time was remote. It is now, but I think with hindsight, more widely recognised by statisticians modelling financial markets that the phenomenon of the "fat tail" – where there are in fact more instances of outlying extreme outcomes from a situation than the ends of the conventional bell curve graph of normal distribution would suggest – is more common in fact than simple statistical theory would suggest. However I am satisfied, from the expert evidence generally, that the August liquidity crisis itself was not foreseen and not foreseeable in mainstream financial circles, and that after it had hit, the likelihood of a second such market shock in short order (in fact even a worse financial crisis as that in March 2008 turned out to be) was generally regarded as very remote.

1876. The Defendants, in their evidence, certainly acknowledged that market events such as a second systemic liquidity crisis could be imagined, but they equally add that they regarded the possibility as remote, expressing this in varying degrees. In the Defendants' submissions, it is pointed out that CCC was always at risk of a systemic withdrawal of funding, simply because its business model depended on the continued availability of such funding. They submit, though that that was part of the inherent risk in CCC's business model and the price of returning the attractive yields which were part of that model. CCC took steps to protect itself against one such systemic crisis, and they were in fact successful. The need to protect against two such unlikely events in quick succession was not something that CCC could reasonably be expected to have catered for, nor, after having suffered but survived one such shock, was it unreasonable for it to regard the occurrence of a second as extremely unlikely. It follows, the Defendants submit, that it was not unreasonable to proceed on such an assumption.

1877. But, in any event, there was in practice no feasible means of protecting CCC against a second such shock whilst it was suffering the aftermath of the first. This is a return to the argument that restoration of the liquidity cushion was paramount, without having regard to the means by which this might be done. The Defendants object that the Plaintiffs' approach, and those of their respective experts, simply ignores this last point, declaiming that it was imperative that CCC "do something", (which was obviously sell RMBS) without paying any attention to the feasibility, or practicality, or risks, of this.

1878. Weighing the expert evidence and the Defendants' evidence, I am satisfied that the risk of a second systemic liquidity crisis, or "run on repo" as the March crisis has been described, was something which was generally regarded at that time as highly remote, even though the recent occurrence of August 2007 might well cause people to refer more to such a possibility. The question whether the Defendants as directors of CCC ought to have tried to take any positive steps to protect CCC from such an eventuality therefore depends on the balance between four factors: the perceived likelihood of the risk, the perceived gravity of the consequences, the availability of practical steps which could be taken and any collateral disadvantages which might arise from taking such steps.

1879. The Defendants' case is that the perceptions were, as to the first (the likelihood of the risk eventuating) that this was seen as remote and I have said that I find that reasonable. The second, the perceived gravity of the consequences, was obviously potentially catastrophic.

The third, the availability of feasible steps to protect against that eventuality, is that they were limited – probably confined to selling RMBS, which was itself in no way guaranteed to provide adequate protection from such an extreme event.   The fourth, the collateral disadvantages, were those attaching to selling RMBS and were imponderable, potentially uncontrollable, and also capable of being catastrophic.

1880.  In my judgment given this balance, it could not be said that it was unreasonable to regard the possibility of a second liquidity crisis as something which simply could not, practically, be guarded against in the circumstances, and therefore there was no point doing anything other than ignore it.   Such a reaction was, I am satisfied, certainly not outside the range of reasonable decisions which the hypothetical reasonable director of CCC could have taken.

**(iii)   Other considerations**

1881.  The above are all factors which would reasonably influence the material decision as to whether to sell RMBS as opposed to continue to hold them, and are those on which the expert evidence has had great bearing.   They are not, though, the only matters which have been argued to affect the material decision to continue the capital preservation strategy.

1882.  I have mentioned the fact that selling RMBS would crystallise and lock in capital losses for CCC, but the important consequence was that this might simply be being done during a temporary fall in prices which would recover.   The Plaintiffs have suggested that too great and unreasonable prominence was given to this consideration, but the point is one of balance. As observed elsewhere, if Directors are too quick to "cut losses" by selling off assets, they will then be criticised if it should turn out that the losses could actually have been avoided.

1883.  As a factor on the side of favouring selling and deleveraging, the Plaintiffs have argued for a reputational benefit.   They argue that such an action would even work in CCC's favour as regards funding, because after the August crisis "responsible deleveraging" was respected, seen as a positive sign by repo lenders and was therefore a factor which countered any perceived risks of such deleveraging.

1884.  There is no evidence that the Defendants ever actually considered such a point.   However, I also find it to be more theoretical than real.   Whilst it was propounded by Mr Welles, I did not find his evidence on this topic to be convincing.   My reason for this is that whilst the reaction of repo lenders might be vaguely favourable I judge that this would have a very minor effect, if any, within their consideration of a response to CCC as a seeker of repo finance.   It would be lost in amongst all the other factors including the broad apparent respectability of CCC, the Carlyle name, the solidity of the collateral security, and the effects of the banks' own internal pressure or policies affecting their readiness to provide funds to CCC.   Second, and more significant as a reason for not regarding this as a factor of any weight, the adverse consequences of selling RMBS which were feared by CCC would operate in the reactions of the banks' trading desks rather than their repo desk.   It does not appear to me, from the evidence, that traders who are on the trail either of making an advantageous trade for profit, or getting out of a disadvantageous position to avoid loss, would be likely to be paying much regard to respect for the relevant target party's judgement about responsible deleveraging.

**General conclusions for September 2007**

1885.  The decision, as to whether to sell or continue to hold RMBS in September 2007 was a balancing exercise.   It is, therefore one which is in principle a matter of business judgement, and one on which there may legitimately be differences of view.   I am concerned here only with whether the decision made was outside the range of reasonable such business judgements and perhaps, if *prima facie* this is so, whether it was nonetheless conscientiously

arrived at, in practical terms, according to the respective standards of care of the individual Defendants.

1886. In his witness statement Mr Stomber stated his views of the situation at the end of September to have been:

> "Although a sale of some RMBS seemed more feasible in late September than it had appeared in mid- or late August, the secondary market still had not improved enough that a large player, such as CCC, could carry out sales of any meaningful volume without depressing prices or raising concern about its financial health. As a result, continuing to hold the portfolio while focusing our efforts on improving financing was, in my view, the most prudent course".

1887. Mr Conway similarly says that his view was:

> "It remained true, as it had been in August, that a sale of RMBS would involve a trade-off between, on the one hand, the potential benefit of some increased liquidity (and decreased leverage) and, on the other hand, the certainty of permanent losses, risk of downward pressure on prices and market perception of distress. In August, the Board's judgment had been that the downside outweighed the upside, and as of the end of September, I thought that remained the correct judgment, although I realized that if circumstances changed (whether in the market or for CCC, or both), then the calculus might be different."

1888. I am satisfied that these views were genuinely held by each of them, and I am satisfied that they were reasonably held. I am satisfied that the other members of the Board were of similar views, whether arrived at independently or because they received the views and advice of Mr Stomber and Mr Conway, or others, and because those views were judged to be convincing. This would have happened in all probability through such contact as they had with each other. Mr Allardice and Mr Hance were both generally involved in considering CCC's activities on a frequent basis and I have no doubt that they considered the material points actively and properly. I am satisfied that these views were not only genuinely held, but were perfectly reasonable in all the circumstances, and certainly within the range of views that a reasonable director of CCC might properly and rationally hold at the time.

1889. I conclude therefore, that there was no breach of the Defendants' duties of skill and care to CCC with regard to the continuation of the capital preservation strategy in September 2007 or as at 30th September 2007, as alleged.

## Further point  -  CCC's engagement with the markets

## Was CCC's engagement with the markets colourable?

1890. Before leaving consideration of facts surrounding the Defendants' alleged breaches of duty to CCC at this time, I should refer to one further matter. This is the fact that, despite the purported feature of the capital preservation strategy being that CCC would take advantage of selling opportunities which presented themselves, they never in fact did so. The Plaintiffs have focused on evidence about this, deploying it as circumstantial evidence to rebut the Defendants' assertion that there genuinely was such a strategy, and to support the Plaintiffs' contention that it was an *ex post facto* rationalisation of what was in fact an improperly motivated, or utterly negligent rigid decision not to sell at all, or simply a culpable absence of any actual strategy at all.

1891. At a general level, the Plaintiffs' complaint made in Advocate Wessels' closing speech was that even if the Defendants had been deploying the strategy which they claimed, there was still a lack of consideration as to whether sales of RMBS <u>could</u> be effected, which was

culpable because it arose from their disorganisation.   According to the oral evidence, Mr Stomber had not followed up the possibility of making sales because the Board had decided at the August Board Meeting not to do so unless opportunities presented themselves, and so he did not look further, but the other Board Members, in particular those charged with executive decision-making powers, believed that the possibility of making sales would be monitored by Mr Stomber and brought to the Board if necessary.   It was therefore obvious that in consequence, Advocate Wessels submitted, the question of actually initiating sales was simply never considered at all after the August Board Meeting by either faction - certainly not before the next Board Meeting in November - and this was a culpable omission.

1892. I do not think that this criticism is fair.   Once a policy decision is made in general terms, its purpose is to set the direction of travel for those concerned to implement it  and it does not have to be perpetually revisited, reviewed and reconfirmed.   Mr Stomber had been given direction by the Board, and it was a direction which I infer he actually agreed with.   He pursued that direction, and kept the Board informed, often in great detail, of what was occurring in the markets.   I find it reasonable, in all the circumstances, that the Board Members should expect that if initiating sales became a possible or recommended course, then this would be the province of Mr Stomber and his Management team.   However, insofar as this means that responsibility for continually considering the merits of this course rested with Mr Stomber, it does not seem to me that his failure actively to do this expressly and record doing so is surprising.   It does not mean that the possibility would not have been in the back of his mind, and as a matter of common sense I am satisfied that it would have been.   The intervening ALCO meetings, I am satisfied, also served to keep the circumstances which might reasonably invite such reconsideration before him and his team.   He did not pursue or raise the point, I am satisfied, because he perceived - and reasonably perceived - that the uncertain circumstances in the market did not make it a realistically sensible course to consider during September 2007 and in the few weeks thereafter, before the November Board Meeting.   In any event, the objection that the possibility of CCC's initiating sales was not reconsidered only has force if it could also be shown that it would have been bound, reasonably, to result in a different course of action being taken from that which was taken, and the evidence does not satisfy me of this.

1893. The evidence supporting this criticism at a more detailed level came principally from Dr Maini, but once again in his later, Addendum Report, citing facts which he said suggested that CCC was not properly engaging with the market to induce prospective sales.   The Plaintiffs rely on this as evidence of an aversion to selling at all, rather than a justifiable fear of doing so.     The evidence consists principally of Dr Maini's collated examples of CCC not, in his view, responding to or engaging with messages or approaches in the market, which could, in his opinion, have been turned into sales opportunities.

1894. I have mentioned in the narrative of September, the initiation, on 5th September 2007, of an enquiry suggesting the possibility that UBS might purchase RMBS from CCC.  This appeared in an enquiry that day from Mr Glascott of UBS  to Mr Greenwood, which gave some general characteristics of RMBS which UBS claimed to be looking for and to which, in response, Mr Greenwood "showed" (ie supplied details of) certain bonds which did not correspond with the enquiry, even though CCC in fact held bonds which seemingly did.     The Plaintiffs rely on this as evidence that CCC was not genuinely trying to sell.

1895. The ensuing course of this incident was that in response to the non-complying bond details actually given by CCC, UBS then gave CCC more detail of what they were looking for, saying that this corresponded to what they had themselves traded.  This included a degree of "seasoning" (prepayment track record).   Later on the same day, UBS said that they had purchased $165Mn of a "worse" bond than CCC had offered, but they would see what they could do with the bonds which they had been shown.  A week later UBS reported that they were still working on CCC's bonds, but *might be able to get more traction on seasoned stuff."*   It does not appear that anything further was done by CCC towards meeting this

enquiry, and it ultimately came to nothing.  I note also that UBS never reported any interest in the bonds which CCC had offered.

1896. Shortly after the initial UBS enquiry, and for the rest of that day (5th September 2007), Mr Stomber was reporting to Mr Conway and Mr Nachtwey the possibility of being able to "lighten" by up to $1Bn, and that evening, having been informed of UBS's purchase of bonds from another dealer, he was still telling Mr Conway that *"we will continue with our orderly sale of 1bil".*   The following morning he reported that negotiations were seemingly not about price but more about *"which paper do they want",* but in answer to a direct question he expressed the view that UBS had simply been window shopping and seeing if CCC were a distressed seller.

1897. On the evidence I have been satisfied, and I find, that there was a genuine intention within CCC to engage in and be open to selling $1Bn of RMBS if the terms were right, just as there had earlier been a genuine attempt to engage in a sale of $4Bn of RMBS to JP Morgan if they had come up with an acceptable price and (I also find) genuine enquiries of both Freddie Mac and Fannie Mae.  I also find that this enquiry from UBS was being handled by Management of the appropriate level (in this case Mr Greenwood rather than just Mr Ng, in view of the size and, I suspect, the fact that this seems to have been, if not the very first, then the first relatively major, reverse enquiry that CCC had received after the policy decision of the 23rd August Board meeting) but on the basis of the general approach instructed by Mr Stomber, and with his background oversight.

1898. Whilst Mr Stomber seems to have concluded rather quickly that UBS was not genuine, (he is sceptical by nature), if Mr Stomber had no intention of selling at all, then his reports of this possibility to Mr Conway and Mr Nachtwey were entirely disingenuous, time wasting and an elaborate charade, - and for no plausible reason, since Mr Conway is supposed to have been of the same fixed intention.  Second, sending a list of securities which one had no intention of selling was pointless, yet such a list was sent.   It is not clear if this was done by Mr Greenwood before, rather than after, he communicated with Mr Stomber.   If the former, then it is even more inconsistent with an understood general policy that CCC was simply not going to sell RMBS under any conditions.  I therefore infer and find that CCC actually would have sold the bonds which it described, at the right price.   The alternative is that this was some kind of devious smokescreen for a fixed and rigid policy of not selling on any basis (although it is not clear why such a smokescreen should then be needed), or for trying to obtain information whilst actually having a fixed and rigid policy of not selling on any basis.   I find this far more implausible than that the communications were perfectly genuine but just did not go very far.

**Was CCC's engagement with the markets incompetent?**

1899. In arguing that CCC was not genuinely engaging with enquiries, the Plaintiffs make much of the fact that the bonds shown by Mr Greenwood did not exactly meet the description given by UBS for its "axe" (ie its "ask"), when CCC did actually hold some other bonds which did so.  This point did initially trouble me somewhat, not so much because it cast doubt on CCC's willingness to sell, but rather more on the basis of the case into which the Plaintiffs latterly shifted their challenge, namely that of incompetence.   It did appear to me that this episode might be evidence of a lack of skill and understanding of the market, and a failure to appreciate the importance of characteristics such as seasoning and their effects on the attractiveness of the securities.  This, however, is a shift of direction of attack which I do not think is really open to the Plaintiffs, because, on examination, it is not expressly pleaded.

1900. The only breach of duty alleged against the directors (or against CIM, who would also be implicated in any charge of incompetent investment management) which is capable of covering an allegation of incompetently failing to sell is to be found in Paragraphs 339B.6 (Carlyle Directors), 339D.6 (Independent Directors) and 339F.8 (CIM, and   TCG and

Holdings).   It is universally framed in the general terms of "*refusing and/or failing to investigate all potential avenues available to CCC to sell RMBS assets on the best available terms*" with modifications of minor detail arising from the precise relationships of the respective Defendants.  There is no other alleged breach which could encompass an allegation of incompetent handling of an actual possible sales opportunity, and even the assertion which is the only candidate for that interpretation would require giving the phrase "all potential avenues" the very broadest scope.    In its context, the allegation made in the Cause certainly does not read as if it is aimed at specific incidents, as contrasted with the investigation and formulation of a general strategy.  In other words the accusation pleaded is made at the policy level and not at the operational level.   The fact that the pleaded charge is levelled at all the Defendants in substantially similar terms, and even levelled at the Independent Directors at all, strongly reinforces that interpretation.

1901. On that view, it is not open to the Plaintiffs to convert their original case that this was deliberately devious or obtuse conduct, designed to obscure an intention not to sell any RMBS on any basis, into an allegation of negligently inept handling of a particular potential purchase inquiry with damaging consequences.

1902. Even if the Cause can be literally read as covering such an allegation, I do not think that this was clear from the pleading, and the Defendants did not have their attention adequately drawn to this alternative basis of the charge of lack of skill and care against them, whether collectively or individually before trial.     It really only emerged in the course of the trial itself.   It follows that I cannot draw any adverse inferences from any absence of evidence directly answering such an argument, because this arises, it seems to me, from such specific attack on the Defendants' actions reasonably not having been perceived by them in advance.   However, since much has been made of this particular incident, I feel I should consider it.

*The UBS Enquiry*

1903. Looking at the sequence of the exchange of the above messages carefully, I am not satisfied that they should, in all the circumstances, be interpreted as evidencing any lack of skill, understanding or competence, either by those directly concerned or on the part of Mr Stomber as the presumed supervisor of this incident.     I have heard evidence, in particular from the Plaintiffs' own RMBS expert, Dr Maini, that a good deal of posturing and feinting is often part of the process of negotiating an OTC sale/purchase of bonds, depending on the impression one may wish to create in the market (because this may well be passed on by dealer "chatter"), or as part of the skill of persuading a counterparty into a desired transaction or avoiding being metaphorically painted into a corner oneself.   Indeed, the Defendants point out that the response to UBS was very much in line with the kind of negotiating dance which Dr Maini said would be commonplace in trying to effect a sale without revealing one's hand, avoiding any suggestion of being under pressure, or trying to jockey a sale into assets one might prefer to dispose of before others.

1904. Looking at the comparison of the characteristics of the bonds offered and those which the Plaintiffs say more nearly met Mr Glascott's enquiry, it seems to me that this could easily be the case.   Whilst the bonds offered appear to have the lowest seasoning in the list – only about a year - it does not seem to me to be correct that they were not seasoned at all, as the Plaintiffs suggest, and I note also that they were actually those showing the highest yields, which I would have thought made them potentially the more attractive.   I am therefore unconvinced that the response of CCC was obviously unreasonable, or merely colourable.

1905. The Plaintiffs do not satisfy me that this incident should be characterised as incompetence as to understanding of market preferences or suchlike, either.     There is undoubtedly a huge amount of material which I have not looked at, generated by the every day work which I am satisfied was going on amongst the managerial and operational staff at CCC at the time, and on balance I think that the concerns which may have come to my mind as to any arguable lack

of skill are really the result of my (fortunately) not having had to engage with the details of such material, and therefore my sense of some gap in my acquaintance with the totality of CCC's activities at all levels.

1906. I would add, though, that even if I were to have concluded that this incident had been actual negligence or stupidity, I am not satisfied that it led to any identifiable loss of opportunity for CCC.   There is simply insufficient evidence to justify any such conclusion, even as a matter of probability.

*Other enquiries, generally*

1907. Dr Maini refers to more such evidence about approaches which he claims could have led to sales for CCC but were ignored.   Most of these are in September 2007, and it is more convenient to deal with the substance of all these at this point, as a single topic.

1908. Two such further incidents are expressly cited in the Plaintiffs' closing submissions, in addition to the UBS incident just referred to.   The Defendants suggest that these must therefore be thought by the Plaintiffs to be the best examples of their allegation, but the Plaintiffs insist, as always, that they rely on everything Dr Maini had included, although sometimes as multiple references, in his Addendum Report.

1909. On 13th September 2007, in the first of the incidents specifically cited by the Plaintiffs, Goldman Sachs made an enquiry of CCC which was received very noncommittally by Mr Ng, and not followed up.   It was, though, with regard only to $100-$150Mn worth, and would generate therefore only $2-3Mn in liquidity.   The Defendants suggest that it was probably not followed up because the price (spread in the "low 70s") was not good; they calculate this to be the equivalent of 65 bps below IDP.

1910. Also on 13th September 2007 Merrill Lynch broadcast that they were seeking 6.75% capped floaters for the same buyer as for some 6.5% caps.   However, again the price appears to have been unattractive, as the price indication for CCC's 6.5% caps was $98.9 and the sale in question had in fact been at $98.125.

1911. In the context of Dr Maini citing a possible technique of spotting or seeking out "matchers", or information about market activities in bonds of which CCC held matching tranches, on 17th September a dealer at Bear Stearns informed Mr Ng that he had just sold $50Mn of a bond "*fns 380 f7 @ 58dm*" of which CCC owned $192Mn.   This was the precursor to the second incident specifically relied on by the Plaintiffs, which took place on 31st October 2007.   At this time Bear Stearns had actually suggested that they could sell the whole of CCC's position in this bond at "*very close to your cost!*"   The dealer had elaborated in terms which suggested that he had a client with a specific need for that bond.   Dr Maini suggests outright that "*CCC could have sold it to Bear Stearns*".

1912. Mr Stomber, when shown this in evidence, acknowledged that this enquiry ought to have been followed up, and I find that he was right to do so.   This does seem to be the kind of enquiry which CCC could and probably should have cautiously responded to, as it appears to be a potentially "easy" and beneficial sales opportunity.   However, even having said that, I think it still premature to infer that a sufficiently good price would have been obtained; the evidence suggests to me that a vague offer of a "good" price will often be thrown out as a means of simply getting a start to a negotiation, or even just a reaction which can itself provide useful information.   I therefore consider that the evidence would have to be stronger before such an inference could be made.

1913. Mr Stomber was not directly involved in this matter and could only speculate on why it was not followed up, although he pointed out that the size of the tranche was small, such that there would have been little liquidity generated.   Dr Maini subsequently challenged this reasoning

as well, saying that sales of small tranches will very often achieve better prices. This may well be true.

1914. I have already explained why I am not prepared to draw any adverse inferences from the absence of Mr Greenwood as a witness, both generally, and with regard to this particular topic. The result is that the evidence is simply what it is. Whilst there could be reasons, not readily apparent after the event, why this enquiry was not followed up at the time, I cannot ignore Mr Stomber's reaction that it should have been.

1915. However, even if I were to find that this incident was negligent, it would not, in my judgment, give rise to any successful claim by the Plaintiffs against the individual Defendants for several reasons. First, as I have said, there is the technical reason that it is not adequately pleaded as a cause of action. Second, even if it were, it is negligence only at the operational level, and could therefore, in my judgment, only give rise to liability on the part of CIM, and not of the individual directors of CCC. (This includes Mr Stomber, since any involvement of his was at best supervisory only and therefore only, I would hold, in his capacity as "Management" for CCC, ie as CIM, and not personally as a Director of CCC). Third, it is not, in my judgment sufficiently egregious a fault in the general order of things that it would ever amount to "gross" negligence, such that it would prima facie (I have not heard argument on this) be within the exculpation provisions of the IMA of which CIM is entitled to the benefit. Fourth, and this really concludes the matter, I am not satisfied, on the evidence and on balance of probability, that any actual damage was suffered by CCC as a result, and none is either pleaded or, to my mind, even calculable.

1916. The further criticisms made by Dr Maini of CCC's engagement with the market refer to approaches or market chatter which are far less strongly indicative of the possibility of an actual sale opportunity. The criticisms seem to be rather more that the style and extent of CCC's involvement in the market was lacklustre and less energetic than it should have been to achieve results, and that it did not use communications as opportunities to get engaged in the market. This is of some materiality to the charge that CCC did not in fact have any genuine intention to sell RMBS at all, but I have already rejected this, and none of the cited incidents establishes anything else of materiality in the action. I mention further examples simply for example and completeness.

1917. Dr Maini refers to notification on 27th September 2007 from Lehman to Mr Ng that they had sold a part of bond FNR 07-54F, a 6.75% capped floater of which CCC held some $628Mn, at $98.25. In fact, Dr Maini does not suggest that this disclosed a potential opportunity to make a further sale, but only an opportunity to gain market "colour". The size of the relevant trade is not disclosed and the IDP price at that date was $98.74. The price was thus 49 bps below IDP prices. Nothing, it seems to me, can be inferred from this exchange, except that it goes nowhere towards supporting the Plaintiffs' case that prices 11bps below IDP prices could have been achieved.

1918. Dr Maini mentions an enquiry from UBS on 10th October to the effect that they were seeking any 6% capped strip floaters off 7% IO collateral, which was not followed up. However, CCC did not own any RMBS of this type. Nor did they own bonds with caps as high as 7.5%, the subject of another enquiry which Dr Maini cites.

1919. As a last example, on 29th November 2007, Merrill Lynch announced that, with regard to bond FHR 3262, they were looking for the floater because they held the IIO and knew where the PO was. However the size was not stated. CCC apparently owned some part of this bond. The possibility of a transaction coming out of this enquiry, though, is purely speculative.

1920. From the examples of market "conversations" like the above, and such as I have seen being conducted elsewhere in the evidence, it appears to me that Mr Ng, a junior employee, was

conducting these under the broad instruction that CCC was not selling, and that whilst he should engage in market chatter, he should not depart from that line. This would be perfectly reasonable in the circumstances, but could well have the result that approaches which more senior and seasoned players in the market might have sensed to have some potential mileage in them, and would have handled in a more nuanced way, were handled more bluntly by Mr Ng, and well on the safe side of his instructions. None of this causes me to question my conclusions and to think that the actual policy of CCC was other than as the Defendants have stated, and that the absence of any actual sales being effected arose because, in whatever circumstances at any particular time, no sufficiently attractive or worthwhile chemistry took place to progress anywhere.

1921. In the circumstances, therefore I do not find that either the UBS episode - or indeed any other instances of enquiries which were not followed up or otherwise came to nothing, and whether alone or in combination – are sufficient to support a finding that the Defendants had an unduly rigid, irrational, or improperly motivated intention not to sell RMBS. I am satisfied, rather, that they are broadly consistent with the policy of being minded to make sales if a sufficiently significant and worthwhile opportunity presented itself or could be negotiated with sufficient apparent nonchalance, but at the same time being extremely careful to convey such nonchalance. The underlying strategy was, reasonably, one of patience and opportunity only.

1922. Whilst worthwhile opportunities would be a matter of fact and degree, I do not find it to have been unreasonable for CCC to be hesitant about pursuing opportunities much below $1Bn (thus releasing between $20Mn and $30Mn in liquidity and reducing the overall requirement for repo finance by that $1Bn amount), although these would also have to be at a price which did not generate a loss that wiped out the benefits. Smaller opportunities would generate less gain and would therefore carry less weight against the considerations of not appearing to be over-eager to sell. The nonchalance requirement was that CCC must avoid, at all costs, looking as if it was under pressure to sell. In September/October 2007, suitable opportunities were likely to be scarce; the evidence is that at this time the markets were suffering generally from over-supply because of the number of failed ABCP funds, the sale of whose assets was flooding the market.

1923. In summary, then, I do not find that the evidence on this topic, when examined, negates the Defendants' assertions, which I accept, that there was a willingness to take opportunistic but prudent advantage of opportunities to sell RMBS and deleverage to some extent, if such opportunities were perceived. The degree to which this was appropriate was then a matter of business judgement. I am satisfied that there is one individual incident (Bear Stearns, but in October 2007) where such a prima facie opportunity was apparently not investigated, but even if this could be characterised as negligence, it does not provide any grounds for any recovery in this action by the Plaintiffs, for reasons given above.

**(c)   Contractual/tortious claims against CIM**

1924. Having hitherto focused on the claims against the individual Defendants, I now turn to the claim in contract or similarly in tortious negligence against CIM.

1925. Given that there was no Board Meeting during this period (September 2007), there is reason for considering CIM's involvement in the affairs of CCC closely, on the basis that decisions about continuing or changing the policy with regard to selling RMBS or not would, in the first instance, have been likely to have been initiated, quite properly, by "Management". This observation applies particularly to the issue of whether CIM, as an investment manager, ought to have had more appreciation of the potential use of the sales techniques put forward by Dr Maini. This is because these ultimately seem to have become the main reason why the balance of risk and benefit with regard to the conduct of CCC's business has been argued to

have tilted in favour of initiating a programme to effect sales of RMBS as submitted by the Plaintiffs.

1926. I have indicated that in my judgment, CIM as investment manager would properly have been expected to have and to exercise a greater degree of expertise in the affairs of CCC's business than an ordinary director of CCC, but I can see nothing which is material to CIM's obligations of care with regard to investment management for CCC under the IMA, which has not also been material to the performance of the functions and duties of care of Mr Stomber, as an expert, but advisory and non-voting, director of CCC.    In the end, therefore, for the same reasons as lead me to conclude that Mr Stomber was not in breach of his own individual duties of skill and care to CCC, and having also considered the wider actions and advice of CCC's Management as the embodiment of CIM in the performance of its contractual duties to CCC during this period, I am not satisfied that there was any breach by CIM of the duty of skill and care imposed upon it by contract.

1927. I do not see that any point arises with regard to CIM's potential contractual duties of loyalty and suchlike under the IMA.

1928. The Plaintiffs do not, in fact, seek to suggest that there are any materially different points to be made in respect of CIM's liability from that of the other Defendants, and devote only a small fraction of their closing submissions to mentioning this claim.

1929. Considering the matter at the end of September 2007, I therefore dismiss this claim against CIM for the same reasons as in relation to the individual Defendants.

**(d)   Wrongful trading**

1930. The test for liability for wrongful trading is whether, at the material time, the Defendants knew or ought to have known that the company stood no reasonable prospect of avoiding insolvent liquidation.    I discussed this test briefly in relation to August.

1931. I note here, and it is a point generally to be remembered, that this is not the same as a test of whether the company was, or was likely to be, in a position to make sufficient profits to be able to pay dividends, let alone attractive dividends.    It is not wrongful trading to continue in business despite being unable to meet profit aspirations as long as the company is not incurring debts which it has no reasonable prospect of being able to pay off.

1932. On the evidence, and whether the criterion for an insolvent liquidation would be merely that of being unable to pay debts, or being unable to pay debts as they fell due, I am not satisfied that the circumstances up to and at the end of September 2007 were such that the Defendants or any of them did or ought to have concluded that CCC stood no reasonable prospect of avoiding going into insolvent liquidation.    The considerations were the same as at the end of August in principle.  However,  CCC's financial position had actually improved slightly during this month, there was no obvious potential problem looming over the horizon, let alone anything as to which the conclusion should have been that CCC stood no reasonable chance of meeting it.    The bullet points referred to in the email of Mr Stomber regarding the PwC going concern review, and Mr Trozzo's further comments (see 26th and 27th September emails) were, I find, reasonable points which could fairly lead to such a conclusion.  I have previously discussed and considered the views which it would have been reasonable to take of CCC's financing risks, both in relation to margin calls and the sustainability of its repo financing.

1933. The classic situation in which a company is clearly unable to pay its debts as they fall due is that in which continuing business in the same way as hitherto will, on past performance, result in a continuing accretion of losses such that the company is going to be unable to meet its liabilities, and it would require some out of the ordinary event, or change of fortune, for the

company to avoid this eventuality.   CCC's situation was rather the reverse.    If it continued business in the same way as hitherto, it would continue to make small profits, and it would require some out of the ordinary event, or change of fortune, for it to fail for insolvency. Looked at this way the test is whether the Defendants ought to have concluded that there <u>was</u> a real prospect of such an out of the ordinary event or change of fortunes occurring.   For reasons already given, I have concluded that there was no reason to do so.

1934. As I have said above, whether or not CCC would be able to devise an attainable business model which would provide sufficiently desirable returns for investors might be unclear, but that is not the same test as the test for wrongful trading and is a long way from it.

1935. I conclude that the Defendants were not guilty of wrongful trading during September 2007.   I therefore dismiss the wrongful trading claim for this date.

## 12. The Claims: OCTOBER and NOVEMBER 2007

***Did the Defendants culpably fail to review/revise their strategy between 1st October and 30th November 2007?***

***General overview***

1936. In their pleaded case, the Plaintiffs next invite examination of CCC's situation as at the end of November 2007, and repeat that, even if the Defendants had not been guilty of breaches of duty or wrongful trading before, they were or had become so by then.

1937. At the end of September 2007, CCC's financial position had improved somewhat since August.   Throughout October it continued to do so, but began to decline in November 2007, when dealings with CCC's repo lenders became more problematic once again as the banks' year ends (30th November for investment banks and 31st December for commercial banks) approached.   At this time, their requirements for the presentation of their balance sheets placed pressure on their lending desks, which was reflected in their willingness or ability to lend.  This, however, was not an unanticipated matter, because it is (on the evidence) a well-recognised feature of the financial markets.

1938. As at 1st October, CCC's liquidity cushion was recorded as $48Mn (7.2%) and its capital was valued at $665,945,580.       These figures rose steadily to $140Mn (19.2%) and $729,262,109 respectively on 31st October 2007, and indeed, at the week-end of 2nd/5th November 2007, the nominal liquidity cushion briefly achieved 20.1%.  It thus apparently achieved the magic 20% original investment guideline figure, although by this time, of course, the portfolio itself consisted of 99% RMBS rather than the original diversified asset allocation, and the liquidity cushion included the Carlyle loan of $100Mn.    From that point on, though, the liquidity cushion wavered somewhat and began to decline.

1939. On 8th November 2007 the Carlyle loan was converted from a term loan to a revolving credit facility of $100Mn.  This improved the interest payment position for CCC; CCC repaid the $100Mn loan to Carlyle, instead taking $20Mn of the available credit line a few days later. The unused available sum was, though, still included in CCC's recorded liquidity cushion, on the grounds that it was a cash sum available for liquidity cushion purposes if needed.

1940. The Plaintiffs criticise this treatment as inappropriate.  It does not seem to me that it matters greatly, as these figures were for internal use.    Recording it this way has the merit of continuing the daily reporting figures on a similar overall basis, although, it makes less obvious the extent to which borrowings have actually been taken up.

1941. On 13th November 2007, at the time of the next quarterly Board Meeting, the liquidity cushion stood at some $113Mn (16.3%)  of which $100Mn was unused credit line, and capital

was recorded as $694,844,208.    At the end of November, the liquidity cushion was recorded as $71Mn (10.5%) of which $40,000 was unused credit line, with capital value being $676,349,070.

1942. Apart from the continuing ongoing requirements of managing CCC's affairs by negotiating the on-going requirement for vital repo funding, monitoring prices to anticipate and try to avoid margin calls, and generally keeping abreast with developments and events in the financial markets, the period from October to November 2007 was also marked by five particular material features or events.

1943. The first was the conduct of PwC's quarterly audit report, and the "going concern review" which it had intimated that it would be making and which has already been referred to because of its anticipation in September 2007.    The second was preparation for and the holding of the regular Board Meeting, on 13th November 2007.  The third was the release of the autumn third quarter financial statements.  The fourth was the Autumn Carlyle Paris Investor Conference, taking place on 20th November 2007, and the fifth was the purchase in the market by each of the individual Defendants of varying but significant quantities of CCC's shares.

1944. Looking outside CCC itself, throughout this period there were items of negative news in the financial markets regularly arising.   CCC's repo lenders announced major write downs on six occasions in October.  On 1st October UBS announced $3.4Bn, on 3rd October, Deutsche Bank announced $3.1Bn, on 5th October, Merrill Lynch announced $5.5Bn and a further $2.9Bn on 24th October, on 15th October, Citibank announced $5.9Bn and on 18th October, Bank of America announced $1.45Bn.  This continued in November.  On 4th November Citibank announced a further $2.1-$5.1Bn write down; on 7th November, Morgan Stanley announced $3.7Bn, on 9th November, Wachovia announced $1.7Bn, on 13th November, Bank of America announced a further $3Bn and on 16th November, Barclays announced $2.7Mn. This stream of write downs provide context and background for the actions taken by CCC, which the Plaintiffs invite me to keep well in mind.

1945. An account of the events of this period follows.

*Early October 2007*

1946. I have dealt, in the last section relating to September, with the suspension of the Investment Guidelines on 1st October 2007, the implications of this and the conclusions to be drawn, and have found that this was reasonable and proper.  I do not repeat this here.

*PwC Going Concern Review*

1947. This was current from the beginning of October through to the time of the November Board meeting when PwC's conclusions were presented to the Board.   I have already referred to the start of this at the end of September.

1948. The PwC going concern review is another matter which is not directly relevant to the complaints in the action.  The facts relied upon are not alleged to found any cause of action for the Plaintiffs.  However, it has assumed evidential importance regarding facts which do so.

1949. In a nutshell, this importance arises because the Defendants have pointed to the fact that PwC, as CCC's auditors, endorsed the assertion that CCC could be regarded as a "going concern" (essentially meaning: a company which appeared capable of continuing its business and meeting its financial obligations for the following twelve months at least) in both its review of CCC's 2007 Third Quarter financial statements and in its subsequent Year End statements. The Defendants rely on this as objective evidence that their view of CCC's continued viability

was objectively reasonable, and more directly, that it was reasonable to be of the view that there was a reasonable prospect of CCC's avoiding going into insolvent liquidation, thus negativing the accusations of wrongful trading.

1950. The Plaintiffs' riposte to this has been that the Defendants cannot rely upon PwC's reports because these were of limited scope, and they were not an independent verification of the Defendants' claimed views, because they relied on input from the Defendants themselves and/or CCC's Management which was, and was known to be, inaccurate, unduly optimistic and in certain instances edited to make it more favourable.

1951. This issue therefore requires some reference to the detailed facts of PwC's involvement, and it is more convenient to deal with this in the context of discussing the arguments made by the Plaintiffs than as part of the general scene setting narrative for this period. I leave discussion, therefore, until later, noting here only that PwC's investigations and enquiries of Management took place during October, with their report due for presentation to the Board at the 13th November Board meeting, with a view to incorporation in the Third Quarter report which was to be reviewed and endorsed for publication at that meeting.

1952. On 2nd October, Mr Stomber reported the coming to fruition of a $500Mn repo line from Credit Suisse, negotiated in September. At the same time the Carlyle Strategic Alternatives Working Group was meeting with an agenda to discuss, inter alia, the completion of the Mubadala transaction and a potential IPO of Carlyle itself.

1953. On 3rd October Mr Stomber reported obtaining an additional $1Bn line from Lehman, after meeting at a high level with one of their executives - though it is not clear from the agreed repo utilisation chart prepared by the Plaintiffs whether or when this actually was taken up, and the Plaintiffs say that in fact this was wishful thinking, as the increase was never approved by Lehman's repo desk itself. Mr Stomber was also in active negotiations with Citi to try to maintain the 2.5% haircut level after expiration of their initial 60 day agreement to this, negotiated by Mr Conway in August. He succeeded in doing so, once again using the Carlyle connection for CCC's benefit, although the available line was reduced from $7.5Bn to $5Bn.

1954. Otherwise, and later, CCC made efforts in October to establish more diversified, and stable repo lines, seeking, though ultimately apparently unsuccessfully, to establish new repo lines with Fortis, Societe Generale, ABN Amro and Barclays. Work with Wachovia to conclude an MRA for a term repo line continued.

### 4th October 2007

1955. The month of October 2007 saw gradual but fluctuating improvement in the market for Agency floaters. The handful of Westways liquidation auctions was concluded in early October 2007. Prices on Agency floaters stabilised and even improved, resulting in the return of some margin to CCC. Mr Stomber was of the view that it was the early signs of market recovery, and the Defendants point to independent market commentary as of 4th October which expresses similar views, certainly in relation to the market for Agency RMBS with a 7% cap. This appears to have been prompted by the Westways auctions.

1956. In a set of emails on 4th October 2007, Mr Stomber updated CCC's board in his usual detailed way. He referred to the more optimistic comments above, noted that the ECB had announced that it would leave interest rates unchanged at 4% in the light of the slump in the housing market, which was favourable for CCC because, historically, its type of assets did well in a flight to liquidity when credit defaults increased and interest rates were kept low. He referred last to a distressed auction of $800Mn of 7% capped floaters by Citigroup at an average discount margin of 55-57 over LIBOR, a narrowing (price improvement) over previous spreads and a fact which would enable CCC to exert pressure on lenders, particularly

Citigroup and Lehman, who were marking their collateral at higher spreads (lower prices) as a backdoor haircut.

1957. Mr Stomber was thus optimistic that his forecast recovery was slowly but surely materialising, and conveyed this to the other Defendants; Mr Conway and Mr Hance both say in evidence that their recollection is of being reassured at this time that the decision not to sell RMBS had been the right one.  Mr Stomber was, however, very anxious, as he said in one of his emails of this date, that there should be no early conclusions as to what CCC should look like going forward. Mr Stomber continued to send updates to the full Board on a roughly weekly basis throughout October, informing the directors of current market conditions and their implications for CCC.

**4th October - ALCO Meeting**

1958. The 4th October meeting was attended by Messrs. Trozzo, Stomber, Greenwood, Melchior, Buser, Allardice, Ng, Rella and Hunt.   Mr. Trozzo noted improvements in the market, and that it was expected that the Federal Reserve would ease interest rates in October; Mr Greenwood noted that short term interest rates had already fallen.  Focusing more specifically on Agency floaters, Mr. Greenwood noted that prices had become more stable, and also that as mortgage interest rates fell, this was beneficial for CCC because it brought in prepayment capital.

1959. Figures and indicators were calculated up to the date of 28th September.   CCC's continued failure to comply with certain Investment Guidelines was noted but viewed as temporary and the result of history.    It was also noted that CCC's indicators, such as VaR, were still reflecting the disrupting events of August.   Although, therefore, their consequent ratios might look ominous, both Mr Conway and Mr Hance said that they were not particularly concerned by this as VaR is backward looking rather than forward predicting.     Total liquidity had increased from $67Mn to $85Mn from 17th September to 28th September, and the liquidity cushion then stood at 7.2%.

1960. Conscious of the Board's wish to think forward to when CCC could begin making investments again, and to plan how its business model might then look, Mr Stomber advised patience with regard to this in an email of 5th October 2007.   Mr Conway and Mr Hance both agreed and they say that they continued to think, throughout October, that it was still premature to begin trying to form a new business model for CCC, until it was really clear that market conditions had stabilised.   Mr Stomber also expressed, at the time, pessimistic views on the economy and that this cautioned him against moving back into credit risk assets, too early.   It is now said that the view then was that it might well not be possible to make more investments for many months, although how firmly that view was held and articulated at the time, without the benefit of hindsight, I am not certain.

1961. On 10th October, the Mubadala deal, which had been contracted in September 2007, was completed.

1962. On 12th October 2007, Mr Stomber's report to the Board was to the effect that the work of pressing CCC's repo lenders to mark prices more reasonably was underway, relying on recent market conditions.  There had been no more distressed sales of ABCP that week, which was a good sign for it meant that the flood of such paper on to the market might well have abated, giving the opportunity for demand to catch up with supply and prices to rise in consequence. He also reported that high level negotiations were taking place with JP Morgan for a new repo line, and that management was starting work on the high level business plan which would be discussed at the November Board meeting.

1963. He also wrote at this time to Messrs. Trozzo and Greenwood reflecting, with the benefit of hindsight, on some of the "*mistakes*" that he thought Management had made over the past

several months, including that CCC had pushed too hard for low interest rates, should have spent more time building its relationships with repo lenders, and could improve its internal communications.   He explained this as part of the general importance of looking back to see what lessons could be learned for the future.  I accept that this is the case, and this email is not to be treated as a formal admission, although I can and do find it to be evidence of his thinking at that time.   Mr Stomber also commented that there was a second, but would not be a third, chance at "fixing CCC".  I do not regard this as particularly significant, either.  It simply strikes me as another example of Mr Stomber's inclination to use graphic comment.

1964. As regards review of the decision whether to sell or hold RMBS, this choice was clearly brought to Mr Conway's attention at around 13th October 2007 by a message, from an investor, Mr Jacco Reijtenbagh, expressing disappointment in CCC's performance and blaming Management for not foreseeing troubles in the mortgage market.     This was a suggestion which Mr Conway thought was unreasonable, given that it had been a global crisis which was unforeseen generally.     Mr. Reitjtenbagh further suggested in his email that "*Carlyle could sell the whole portfolio with a discount to for example Pimco and take a loss*." Mr Conway, with his customary measured style, treated the merits of this suggestion at face value in his written evidence

> "*There were several problems with this idea. First, I did not think it was necessary or in the interests of CCC or its shareholders for CCC to sell off its whole portfolio. Second, even if it were technically feasible to do so, selling RMBS continued to entail the same risks that we had sought to avoid in August, and I was sure that if CCC attempted to sell off its entire portfolio to anyone, it would be offered deeply distressed prices. . . . Third, this was not a decision for Carlyle to make and not a loss for Carlyle to suffer; if CCC's Board opted to try to wind down CCC, the losses associated with that would be borne by CCC's investors (i.e., including Mr. Reijtenbagh and me and many of my colleagues).*"

1965. Taken at face value, Mr Reijtenbagh's suggestion does seem to me to show some naivety and failure to appreciate the particular characteristics of Agency RMBS which distinguish them from non-Agency and subprime securitised mortgages, the market dynamics which would affect the level of any such "loss", and also the actual relationship between Carlyle and CCC. More likely, and as Mr Conway himself says (politely) that he perceived it, it was an attempt to pressure Carlyle into buying his shares back and relieving him of the losses on his investment.

1966. On any basis, though, this message clearly put the choice of selling or holding squarely into Mr Conway's mind, and up for consideration at this time.  Mr Conway says in his evidence that  faced with this prospect, he still did not consider it advantageous for CCC's shareholders to attempt to sell large quantities of "money-good" Agency floaters into a still-dislocated market, and saw a policy of selling as being more risky than a policy of holding.     Mr Stomber, Mr Hance and the other directors shared this view, reiterating that the risks of selling what might be seen as the tip of the iceberg of a $23Bn portfolio, despite having announced a capital preservation strategy, were of a different level of risk as to price from that attached to selling $800Mn bonds out of a known broken ABCP portfolio, which is what had been done in the most recent Westways auction.

1967. Consistent with the Board's uniform reaffirmation of CCC's capital preservation strategy at the beginning of the month, Management continued to implement that approach throughout October 2007.

*15th October – repo roll*

1968. At the Freddie Mac repo roll of $9.1Bn of securities on 15th October, Mr Stomber delightedly reported to the Board that CCC had managed to make some progress in persuading repo

lenders to adopt more favourable marks and had consequently received back $17Mn in margin – "*total liquidity $115 MM*".

1969. An email of this date from Mr. Stomber to Mr Conway shows that at this time the question of CCC raising new capital was raised between them, but rejected, with Mr Stomber expressing the view that in CCC's current conditions such a deal was not "doable", quite apart from the effect of diluting shareholders' capital, which he did not consider in their best interests.  I have already found that this was a reasonable view in September 2007.  Nothing had sufficiently changed in the interim to suggest any different view.

### *18th October -  ALCO Meeting*

1970. The 18th October ALCO meeting was similarly attended by Messrs. Trozzo, Stomber, Greenwood, Melchior, Green, Hance, Ng, Rella and Hunt.

1971. The update on market conditions and sentiment broadly reiterated that expressed at the 4th October meeting.  Mr. Greenwood provided an update on market conditions, as being still "bearish" with the expectation of a further interest rate cut.   As to CCC's portfolio, he commented that there was still "slow but steady" price improvement and no more distressed sales since 5th October, with interest and mortgage rates falling.   However these had not yet produced significant effects for CCC.  A decline in the rate of Fannie and Freddie new issuance was put down to the glut of supply on the secondary market.

1972. Referring to documents in the ALCO pack compiled on 15th October 2007, Mr. Trozzo confirmed the small but steady increase in the value of CCC's portfolio since the end of August.  He reported also that liquidity had increased (from $85Mn on 28 September to $97.9Mn on 15th October) and the liquidity cushion had doubled from the last meeting to 14 %.

### *Mid October 2007*

1973. On 18th October, Mr Stomber was able to report that liquidity had improved by $33Mn since September; he assessed the liquidity cushion at $123Mn (the daily report figures appear to put it at $116Mn gross, $111Mn net), and that his opinion on the economy was "bearish"  (ie gloomy), but this was good for the likely value of CCC's securities.  This reflected email exchanges with Mr Conway the previous day regarding the weakness of the US economy and there being no good economic news.   On 19th October Mr. Stomber again observed to Mr Conway that the economy was in trouble and that the Federal Reserve was being slow in its responses, but said that CCC would do well in such times, because his view was that the developing problems were credit-related and there could well be a *"liquidity event quickly compounded by a credit event"*.  He indicated that he expected a bumpy ride to come.    Mr Conway expressed his agreement.

### *25th October - repo roll*

1974. This was the day of the Fannie Mae repo roll, and Mr Stomber was able to report a $20Mn improvement in liquidity which he now put at $147Mn, in consequence.   Mr Hance responded noting the improvement, and with gentle encouragement for Mr Stomber and his team.

1975. Mr Stomber had successfully negotiated the reopening of a repo line with Bank of America, first for $500Mn and then $1.5Bn by the time of the 25th October roll, although the Plaintiffs, rather churlishly, insist that this was therefore not a "new" line.

1976. Mr Allardice showed particular interest in CCC's funding situation.  An exchange of emails between Mr Stomber and him on 21st and 27th October shows them both recognising that

seeking to secure CCC's financing was very important, and that the difficulties of doing so could increase.   Mr Allardice observed that lenders' liquidity could evaporate, and therefore cause major difficulties for CCC, very quickly indeed; Mr Stomber was of the view that as RMBS were "self-funding" because of interest receipts, banks therefore would, or should, be readier to lend because they would not be issuing unsecured debt.   They both say in evidence that they did not consider the total evaporation of liquidity to be at all a likely event, at that time.

### Late October 2007

1977. Mr Conway sought to explore a 90 day repo line from Bank of America, but with a 2.5% haircut. Mr. Duffy of Bank of America replied that a longer term typically would require a higher haircut but that he was exploring whether Bank of America might be able to dispense with that requirement for CCC.   In the end, though, this came to nothing.   Likewise negotiations with Wachovia were continuing.  Owing to their lack of experience in the repo market, though, it was now proposed that the deal be re-structured so that they stood as an agent between CCC and other repo lending parties, and as guarantor of the $2Bn 364 day line to CCC.

1978. At about this time, Mr Stomber began, obviously sensibly, to voice his concerns about the imminent year end of the banks, when they would seek to conserve liquidity over their financial year ends for presentational purposes, and might retract lending for this reason.   He was particularly concerned about UBS and Citi.  Mr Conway said that he shared this concern but felt that it would be temporary and that CCC could succeed in weathering the situation. The negotiation with JP Morgan was still in train at this time.

1979. An email from Mr Allardice to Mr Stomber on 26th October 2007 shows his recognition of the great significance of repo funding risk, commenting that repo finance can disappear very quickly and, in effect, that this risk should not be underestimated.

1980. Mr Stomber summarised the status of negotiations with repo lenders in a 30th October email to the Board, (although several of the apparent possibilities - ABN Amro, Barclays, Société Generale and, ultimately Wachovia - came to nothing in the event).

1981. On 30th October 2007 Mr Stomber expressed interest in purchasing more stock in CCC to Ms Cosiol.   Mr Zupon had already enquired when this could be done, earlier in October 2007. The answer to this was, apparently, that it would be some three days after release of CCC's Third Quarter financial statements, when it would be accepted by the regulators that CCC personnel would no longer have access to inside information not generally available to the public.   The enquiry prompted Ms Cosiol, at this point, to seek advice from both Dutch and U.S. counsel as to how this might be done, and what disclosure obligations might be necessary, depending on whether individuals bought in their own names or collectively through the CCC Coinvestment vehicle, as previously used to make purchases by the Board and Carlyle affiliates on the initial private round of fundraising.

1982. Mr. Stomber's pessimism about the weakness of the U.S. economy was validated when the Federal Reserve cut interest rates by another 25 bps to 4.5% on 31st October.  Falling interest rates, even though a sign of a slowing economy, were seen by Mr. Stomber as beneficial to CCC because it reduced the perception of "cap risk" on its capped floaters, which would increase their attraction and therefore price, and it also encouraged prepayments and thus natural deleveraging of the portfolio.   Balanced against this assessment that a bad economic situation would do CCC's assets no harm, though, was the countervailing possibility that a bad economic situation might make it more difficult for CCC to obtain financing.

1983. The Plaintiffs point out that Mr Stomber was apparently also focused on the future analysts conference call, which would take place a fortnight later after publication of CCC's Third

Quarter financial results, with regard to paying a dividend, stressing that "*our investors need a dividend*".

1984. At this time, the end of October, the value of CCC's portfolio - now entirely Agency floaters - was $22.18Bn, with a capital of $729,380,263 according to CCC's own internal cash files (although it later published an IFRS-adjusted value of $674,177,107). The liquidity cushion stood at 19% in the internal figures, but this therefore became 22% in the Investment Manager's monthly report. The average haircut on CCC's outstanding repo lines was 2.65%. CCC had repo capacity of $23.3Bn with twelve different lenders, of which $21.4Bn was in use. Its leverage ratio (as calculated by Professor Hubbard) was 30.4x.

*November 2007*

1985. November would be a significant month because of the holding of the next formal Board Meeting, the review and release of CCC's Third Quarter Financial Statements and receiving questions about these, and the Carlyle Paris Investor Conference.

1986. Moving into the month, though, CCC's position had improved. Its liquidity cushion had risen to around the "magic" 20% mark, its NAV had increased to an unadjusted figure of around $725Mn, and the gradual amortisation process had reduced CCC's total RMBS assets from nearly $23Bn as of 31 July to $22.17 Bn.

*1st November - ALCO Meeting*

1987. On 1st November, ALCO met to discuss the state of the markets. The meeting was attended by Messrs. Trozzo, Stomber, Greenwood, Green, and Melchior, with, amongst others, Messrs Hance and Allardice (by telephone) and Messrs Ng and Rella, and invitees from Carlyle's US Leveraged Finance Group.

1988. The Committee observed that the recent interest rate cut by the Federal Reserve was helpful for CCC's securities, but the Fed had suggested, and the market anticipated, that further rate cuts in December were unlikely. Mr. Greenwood noted that GDP in the United States was up unexpectedly but that there were lingering concerns about the credit markets, which was what market participants were really focused on. Concern, for example, at a rumour that Citi might be announcing a $9Bn write off related to its subprime holdings was noted.

1989. Mr Greenwood talked the meeting through a documented "Review of Markets". Spreads for 7% capped floaters continued to narrow, but new issuance remained at a historic low, although there had been a slight increase in new issuance volume in October over September. A 9% increase in refinancing applications had been noted, which, once again augured well for prepayment rates and assisted CCC's portfolio. Mr Greenwood made a brief comparison of Annaly's stock price, where its business had benefitted from the recent interest rate cuts, but noted that CCC's share price continued to fall, on little trading volume.

1990. Mr. Trozzo reviewed the compliance reports in the ALCO pack and noted that "*the liquidity cushion had recovered to a level above 20%*" and that "*[a]ll other compliance guidelines were in order.*" The relevant slide showed that total liquidity had increased from $97.9Mn on 15 October to $137Mn on 26th October. The ratio of the liquidity cushion to 20-day VaR continued to improve, reaching 0.7 on 26th October, but Mr. Trozzo nonetheless cautioned that liquidity was still not at desirable levels given the state of the market. Mr. Greenwood "*then walked the committee through the RMBS capped floater price change components and analysis,*" noting in particular a decline in 10-year swap rate which "*lead to a price increase in the portfolio*", and Mr. Stomber observed that "*with Fed rate cuts accompanying language*

*indicating a reluctance to cut rates further, volatility may start to ease which would also benefit the portfolio.*"

1991. With regard to repo, Mr. Trozzo stressed CCC's negotiations for new and increased repo lines and that management were working closely with repo counterparties to manage CCC's repo funding over the year end – the November fiscal year end for some investment banks and December calendar year end for the remainder.

1992. Later that day, in his daily liquidity update, Mr. Stomber reported that CCC's liquidity was at $142Mn and reported that Wachovia had "come through" and "*we expect to have our $2bil for the Dec rolls.*" He also reported, however, that the general economic news was not positive, which was causing Treasury prices to rise and yields to fall. The alert that Citi might turn out to have balance sheet difficulties suggested that CCC should take precautions by seeking to set up alternative fall-back repo availability. Mr Hance endorsed the proposal to take "*Citi evasive action if needed*". On the same day, rumours of a capital shortage at Citi prompted Management to begin preparing for the possibility of having to move some of CCC's repo line from Citi to other dealers, and as part of this preparation, Mr. Stomber asked Mr. Conway to try to finalise a new repo line with JP Morgan in time for the November repo rolls.

### 2nd November – efforts to secure year end repo cover

1993. With regard to the year-end rolls, Management began listing efforts to lock down year-end financing. On 2nd November, Mr. Trozzo sent an email outlining steps Management planned to take to obtain early assurances about the availability of funding over year end. This identified goals and concerns. The new JP Morgan line, anticipated to be possibly $2Bn with a 2.5% haircut, was only "*a phone call away*", and a new line with ABN Amro for $500Mn would be in place by month-end, but "*Wachovia will take a bit longer to Dec.*" As regards December, he indicated that "*Wachovia's $2 bln is in place*" although he suggested CCC might not employ it then but might instead save it to start in January 2008. It was reported that even based on a conservative assumption that several repo dealers either decreased or merely maintained (rather than increased) their lines, Management still expected CCC to have sufficient excess capacity to be able to *"temporarily help Citi and take them down significantly*" and potentially earn an "*IOU*" such as a "*[l]ower HC after year-end.*" I find this a useful illustration of the thinking behind the way business negotiations develop in these markets.

1994. A chart had been prepared showing borrowing needs against available lines and it gave Management's projections which expected to get through both November and December year ends with excess capacity. For December, year end figures showed expected repo capacity of over $26.6Bn as against current use of $21.4Bn, and thus $5.2Bn of excess capacity, which the Defendants point out was roughly equal to the pre-crisis minimum borrowing capacity guideline of 125%. This presentation has to be seen in perspective, though. It included, although perhaps not unreasonably in the expectations of the time, the anticipated $2Bn line from Wachovia, and whilst it did not include the $1.2Bn of additional capacity available from Deutsche Bank, that was only available at a 4% haircut (imposed for amounts between $1.8 Bn and $3Bn), a rate which the evidence suggests would have been unacceptable.

1995. That same day an updated draft of the Board Book that would be used for the upcoming Board meeting was sent to Mr. Allardice as Chairman of the Audit Committee, for his review, including the Q3 Results and Analytics slides which were based on information then available. Notably promptly, Mr. Allardice proposed that he and Mr. Stomber should review the Board materials together, in advance of their circulation to the rest of the Board. He suggested that Mr. Stomber should, in particular, "*review [the] where we think the markets are going slide . . . given the latest trauma out in the markets.*" He commented that he

thought the "*likely case*" scenario being presented by Management was "*still reasonable, no question,*" but said they should look through it together.

1996. Mr. Stomber's update for 2nd November noted that the liquidity cushion had reached $149Mn, a post-crisis high, but he also reported that given recent announcements by repo lenders he was preparing for a worst case scenario in which lines were reduced, requiring reallocation across lenders.

### Early November 2007

1997. On 5th November, Mr. Stomber reported that Citi's capitalisation problems did not appear to be as bad as he had feared, and he believed that Citi would not ask for more than a $2Bn reduction on its $5Bn repo line, if they asked for any reduction at all.  He also reported that Management was in discussions with Lehman and Bear Stearns regarding repo availability over their November year ends, as CCC sought to address proactively what it perceived as the likely next period of stress.  He also noted that he expected Amro to provide a $500Mn repo line.  Shortly after, he obtained commitments from UBS and Lehman to maintain their current repo financing through the end of the year.

1998. On 6th November 2007, Mr Conway noted interest amongst Carlyle affiliates and entities in purchasing CCC stock (I infer that the market price was beginning to make this appear a good investment to those in the know) and it was also decided that any such investment should be made collectively, through  CCC Coinvest, for tidiness and efficiency.

1999. Mr. Stomber's daily liquidity update of 7th November reported the current state of CCC.  Liquidity had remained level at $146Mn (19.6% of adjusted capital) and had remained at or around that level for nearly two weeks.    He reported the slow progress in finalising repo documentation with Wachovia, putting it down to the fact that Wachovia was not a major player. Management, though, received confirmation that JP Morgan was reinstating a $2Bn repo line with CCC.

2000. Because of rumours about Citi's financial difficulties with write-offs, he noted again the need to prepare for Citi's possibly shrinking its repo line  - a typical example, I note, of market players taking protective action based on market rumours - although he thought CCC would still be able to maintain a base level of repo with Citi.  Mr Stomber reported that he and Management were seeking to nurse CCC's repo lines through the end of 2007, but expected a freeze on the MTM value of CCC's securities as counterparties simply sought to get over the year end.  Mr Hance again replied in agreement and encouragement, approving the defensive approach to managing CCC's repo lines.

2001. There were a number of negative developments the following day as Mr Stomber then reported.  He wrote a general email to Messrs. Conway, Hance, Allardice and Loveridge, noting that banks were hoarding liquidity, using distressed pricing to justify margin calls, and that repo availability was coming under pressure.    With the market getting "*uglier*" as the year ends approached, CCC was still working to obtain additional repo capacity from Lehman.   Mr. Allardice, to whom Mr Stomber sometimes wrote individually as (it seems) a mentor-cum-ally, responded expressing his belief that there were "*seismic shifts*" taking place in the economy such that year end pressures were likely to be particularly acute.  He stressed again a view which he had previously expressed about the dangers of disappearing repo financing.    Mr. Stomber replied to the effect that everything that could be done was being done, and the leverage of the Carlyle name was, at least, a benefit.

2002. Whilst the Plaintiffs suggest that one more obvious thing that could have been done was to sell Agency floaters to reduce leverage, the Defendants suggest that this not only assumes that a price could be obtained which would reduce leverage (Mr Stomber's evidence was that prices were essentially frozen at that time) but it ignores the various risks of selling and

moving the market, which have been rehearsed before.  In this context Mr Conway observed "*I'd say we weren't anxious to sell, at least not until we could sell at a price a lot closer to par.*"

2003. The Defendants also point out that this pessimistic view of prices is supported by market "*color*" being reported by traders at the time.    A conversation with a dealer a few days later on 13th November revealed that he had "*not seen floaters this wide even in the August carnage*" and "*[spreads] [were] shockingly wide*", attributing the lack of demand which was driving floater prices down to "*mtges. . . and year end lack of balance sheet*" – ie banks lacking the availability of funds to lend, but as a year end problem.   Later on 8th November Mr Stomber wrote another email to Mr Allardice, reiterating his expectation of increased instability in the funding markets owing to year end pressures on first the investment and then the commercial banks to reduce apparent repo financing exposure over their November and December year ends (respectively).

2004. This tightening up on finance availability over fiscal year ends is a well-recognised occurrence in the financial markets.  This is recorded by Mr Hance in his witness statement and acknowledged by Mr Welles in his expert report.   I note that Mr Stomber, in anticipating difficulties to come, said that he was "*scared*".

2005. On 9th November, Carlyle made a special distribution of $1.2Bn of the proceeds of the Mubadala private placement to its partners.   Mr Conway received $280Mn, as did his co-Founders.  Mr Zupon received $7Mn and Mr Hance $950,000.

2006. On 12th November Citi informed Mr. Stomber that it would make its full $5Bn repo line available to CCC for November.

### 13th November - Audit Committee and Board Meetings

2007. These meetings took place consecutively; the Audit Committee Minutes are misdated 16th November 2007.  Both meetings were in fact attended by all Board Members, by all other ALCO committee members, by representatives of PwC (although not Mr Reville, who was on honeymoon), and by Miss Cosiol, as Legal Counsel, taking her customary notes.      They were particularly concerned, of course, with reviewing events since the August crisis, CCC's intervening progress towards recovery, and agreeing on a chart for its future course.      There had already been prepared, for presentation to the Board, CCC's Third Quarter Financial Statements (to 30th September 2007), the draft Management Discussion and Analysis ("MD&A") relating to these, and the proposed draft CEO Letter to be sent by Mr Stomber to CCC's shareholders.      The papers also included PwC's Auditors' Report on the financial statements, which in effect endorsed the view that CCC qualified as a "going concern" by not including any caveat in this regard.

2008. These are obviously important meetings.  The evidence includes both the documents referred to above, the relatively short formal Minutes of the meetings and Ms Cosiol's comprehensive handwritten notes from which these were prepared, as well as witness statement and oral evidence from the Defendants.      Reviewing all this evidence in detail would be disproportionately lengthy, but the following account is intended to give an appropriate flavour, and mentions points of potential particular materiality.

### 13th November - Audit Committee Meeting

2009. The Audit Committee, which had last met on 25th July 2007, met first at 9 am at Carlyle's offices in New York, with the primary purpose of reviewing the formal quarter end documents for publication and circulation to shareholders.   This meeting was chaired by Mr Allardice, as Chairman of the Audit Committee.

2010. Mr. Stomber explained that the goal of the draft CEO letter was to explain to the reader what had happened both in the relevant quarter and since and in particular to explain the reasoning behind the belief that, once distressed sales of ABCP had ceased, asset values would inevitably *"bounce back"* and improve, because the inherent value of the securities had not changed.  He believed CCC had a *"safe portfolio w/[a] reasonable dividend if [it could] simply hold [the] securities"* to maturity.    There was then a general, and quite detailed, discussion of both the CEO letter and the MD&A, with amendments suggested to ensure that it did not convey any undue optimism or inaccuracy about the position, especially in view of the somewhat more negative turn of events in the previous few days.  Management provided updates on certain aspects of the business, and were challenged by Board Members as to the accuracy of statements and whether they were factually supportable.  As an example, when Mr Stomber addressed the repo financing situation, explaining that Citi had agreed to maintain its line at $5Bn, that the new repo line of $2Bn from JP Morgan also was in place, and *"$2 billion @ Wachovia (almost up [and] running)"*, Mr Sarles pressed as to whether the commitments were guaranteed, and commented that even if the promises were regarded as reliable, they would fall if the counterparty needed to survive.

2011. Mr Stomber advised that it was too early to determine what a new liquidity cushion guideline should be, and the Board would be in a better position to discuss this after getting over the end of the year.  This was reflected in the MD&A which revealed that the current Investment Guidelines had been suspended and the appropriate level for a liquidity cushion was being "*evaluat[ed]*".

2012. The Plaintiffs argue that this statement was false in the light of the actual decisions of the Board to defer such "evaluation", and it was put to several witnesses that they were not in reality "*evaluating*" the appropriate level for an updated liquidity cushion guideline at all, as they were doing nothing.    The Defendants argue that, read in all its context, the statement was perfectly accurate, and the underlying reasons for not attempting, yet, to fix a liquidity cushion level or guideline were perfectly sound and reasonable.

2013. After reviewing the terms of the CEO letter, the MD&A report, the draft Third Quarter financial statements and their footnotes, the committee turned its attention to the PwC review of CCC's Third Quarter financial statements.    The presentation by PwC on this topic was treated as its presentation to the CCC Board, since all Board Members were present.

2014. PwC reported that they were prepared to issue their report based on their review of the documents previously supplied to them subject to the changes just requested by the Committee.  Following their review they were able to report that in their view everything was in compliance with IFRS requirements and they were prepared to issue an unmodified opinion, with no "going concern" qualification.   It is recorded that they confirmed that they had "*independently priced [the] RMBS securities in their entirety*" (which Mr Allardice, in fact I think correctly, interpreted or recalled as meaning all of them individually, rather than in the aggregate) and they explained why, from an accounting perspective, they concurred with Management's use of IDP prices for the purposes of valuing CCC's portfolio, rather than the "*distressed prices from repos.*"

2015. As already mentioned, the Defendants rely on PwC's report as evidential support for their case that they were not guilty of any breach of duty or wrongful trading; they rely on it now, and they also say that they relied on and took comfort from this report at the time.    The Plaintiffs say that it was not legitimate for them to do so, because, underlying this report was input from the Defendants themselves (more precisely Mr Stomber and his team, whose work in this regard was known to the Defendants) which the Defendants knew or ought to have known was incomplete, consisted of doctored or manipulated information supplied to PwC, and that in particular the supposedly "independent pricing" of CCC's RMBS could not be viewed as any form of independent verification because the final total came to a mere $72 difference in aggregate on a portfolio of over $22 Bn.  This remarkable outcome, it is said,

demonstrated that PwC had simply gone to the same pricing source as CCC and accepted these prices without question.   I consider these contentions later in the context of the parties' respective submissions.

2016. After final "AOB" items regarding compliance in Guernsey, in which Mr Loveridge played an active part, and the record of the proposal to develop internal audit functions for CCC in 2008, the Audit Committee Meeting concluded.   It had lasted over two hours, which in itself is an indication of the amount of discussion undertaken, and the extent of this is supported and illustrated by a review of the topics and comments recorded in Ms Cosiol's handwritten notes.

2017. Before leaving my overview of this meeting, I need to refer to one matter raised by the Plaintiffs, although going, in effect, to the Defendants' credit, particularly that of Mr Allardice (although the other Defendants and especially Mr Stomber by general association).

2018. The formal Minutes of this meeting were prepared in draft by Ms Cosiol, although only after some delay, and were submitted to Mr Allardice as Chairman for his approval.   He reviewed and amended these draft minutes in conjunction with Mr Stomber, and returned a change tracked edited copy to Ms Cosiol on 5th February 2008.       Although this is a long time after the meeting, it was well before the events of the end of February 2008 which began the precipitation of CCC's collapse.

2019. Mr Allardice's amendments, compared to Ms Cosiol's draft and her handwritten notes, were quite extensive.   The Plaintiffs' criticism is that they were editing of illegitimately self-serving proportions; they were a deliberate attempt to remove "unhelpful" comments and references which disclosed grave and significant concerns being expressed by or to the Defendants at the meeting, in order to present a more rosy – or at least bland - picture than was justified if appropriate dispassion had been applied.

2020. This accusation was put to Mr Allardice in cross-examination, Advocate Wessels inviting him to agree that certain of the comments which he had excised ought to have remained in the Minutes in order either to give a properly balanced picture or to record the concerns which were raised, rather than simply the bare outcome of the discussion.     Mr Allardice defended his actions on the grounds that composing meeting minutes was both a matter of judgment and of personal style; his own style was to keep minutes short, and his judgment had been that the matters which he had deleted were appropriately omitted whilst still retaining the substance of what had been decided at the meeting.

2021. The significant objections amongst those made by the Plaintiffs were two.   The first was that Mr Allardice had excised from Ms Cosiol's draft the note that, in the course of reviewing the section of the MD&A entitled "Liquidity and Capital Resources", *"Mr Green explained that, going forward, the real risk to the company was a "going concern" risk"*.   This had been the condensation of her note that Mr Green had said that "*real discussion [will?] [must?] be "going concern" as it was this year & expect that reporting 12/31 Financials look same as today*".   The second objection was that there was no mention of Mr Sarles' expressed "*uncomfortable[ness]*" that there was "*no internal audit function and no plan in 2008*", especially having regard to the fact that CCC was a public company; this had been removed merely to record the upshot, namely that Mr Allardice was going to work with Protiviti, the entity contracted to maintain CCC's financial records, to develop such policies and procedures in 2008.

2022. I have compared Ms Cosiol's notes, her original draft minutes and the amendments made by Mr Allardice, (whether or not these were his own or Mr Stomber's comments) and reviewed these to form an overall impression of the mindset behind these amendments.  They are varied in their apparent motivation.       Some are there for the purpose of precise accuracy, for example where this was fundamental to Mr Stomber's oft-intoned mantra regarding the solid

basis of CCC's RMBS portfolio and the implied guarantee of the US government, or the fact that "management's" marks were actually derived from an outside pricing service. Others show perfectly appropriate caution about unqualified statements of intention or predictions. An example is a reference to possibly being able to pay dividends being re-cast to add "*if the Board deems it appropriate*". Yet others remove references, explanations or comments which are unnecessary to the plain factual record of the Committee's business and the ultimate general thrust of the conclusion or discussion, or which are items of individual detail at a level inconsistent with the high general level of fact otherwise being recorded.

2023. They certainly, in many places, remove negative comments, but I do not see that they move the minutes outside the bounds of providing a fair record of the material upshot of the Committee's deliberations. The overall impression, to my mind, is of a draft made by someone less familiar with the subject matter and relative importance of matters under discussion, and therefore erring on the side of including material which might be of importance and perhaps with a naivety as to what should be regarded as "off the record", having then been overhauled by a far more seasoned and experienced person, who has learned that it is better not to provide hostages to fortune and to prune minutes to the minimum necessary for their utility as a record for those involved.

2024. In reality this is the way that minutes are often, perhaps even usually, prepared. I suppose it might theoretically be argued that the obligation to act in the best interests of the company requires that committee minutes should record all negative discussions, comments, fears and perceptions in order to provide evidence if the company should subsequently have cause to sue committee members, but this approach would be completely unrealistic. It would in practice redound to the disadvantage of the company by preventing or inhibiting frank discussions in case unguarded remarks made in the course of these were recorded irrevocably for future chewing over. It is also commonplace for minutes to correct misapprehensions and mistakes, even though these may well have been what was actually enunciated at the meeting. Once again it seems to me to be unrealistic to suggest that this would be improper. I therefore do not regard the extent to which these minutes have been demonstrably amended from the original draft of Ms Cosiol – neither a technician in the field nor a member of the Committee itself – to the more laconic but professional version in which they ultimately appeared, to have been improper. Nor do I regard it as in itself any reflection on the integrity or credit of Mr Allardice, or Mr Stomber or any of the Defendants, even if the overall end result is more anodyne and even optimistic than was the totality of the discussion which took place.

2025. In fact, I would consider the two amendments on which the Plaintiffs concentrated as justifiable in any event. Mr Sarles' "discomfort" at the lack of developed internal audit functions within CCC was being remedied, and flagging up that he raised this matter with discomfort is not, in my judgment, necessary for an understanding of the meeting and a record of the fact that internal audit functions were then being set to be developed. As to the other, whilst the Plaintiffs have understandably made much of the omission of Ms Cosiol's report of Mr Green's comments because it contains the words "going concern", her draft of this point was both imprecise and enigmatic in itself, and does not seem to me even to be an accurate representation of the tenor of her actual note, which talked about "discussion" and not "risk". Since, this was, once again, an incidental remark, taking the course of omitting it rather than re-casting it was, I find, perfectly reasonable.

2026. Finally, these criticisms are all ultimately, in themselves, of no materiality to the actual claims in the action.

*13th November 2007 – BOARD MEETING*

2027. The Board Meeting, with all members of the Board in attendance, began shortly after the conclusion of the Audit Committee meeting at 11.30 am with the same persons present (although now only two representatives of PwC).

2028. The Board first approved the new $100Mn revolving line of credit from Carlyle, replacing the previous $100Mn loan, referred to above and which had been repaid in full.  This credit line had a 10% interest rate and required a 1% commitment fee payable in four instalments.  The Board opined that the terms were fair as they were better than CCC was likely to be able to obtain from a third party, and the advantage to CCC was that interest was payable only on amounts actually drawn down.   Whilst this benefit would be somewhat off-set by the commitment fee, the Plaintiffs have, in the end, made no serious complaint about the terms of the loan being unreasonable or oppressive.  I would not find any such complaint to be made out and I need not consider this point further.

2029. The Board also approved an amendment to the definition of the liquidity cushion guideline to permit the undrawn portions of the loan to be treated as available liquidity, an amendment which I have considered previously, and find to be a reasonable reflection of the practical position.  The Board also discussed and approved the further suspension of the Investment Guidelines until 31st March 2008 to allow Management "*to better manage the fund in the best interest of the shareholders while they continue to review and revise the Company's business model.*"   Each of the Defendants effectively confirmed in oral evidence that this was his view of the best steps for CCC at the time.

2030. The Meeting then turned to the updated business model projections that had been prepared prior to the Board meeting, originally as projections presented to PwC in connection with its going concern analysis. These had been contained in the Board Book of materials provided to the Directors in advance of the Board meeting.   They thus show information which the Defendants had available to consider and inform themselves about before making any required decisions at the meeting itself.  As the Plaintiffs questioned various Defendants about the implications of these materials, I need to describe some of them here.

2031. Mr Stomber explained how market events and the flood of ABCP on to the market from entities in trouble during the third quarter had affected the value of CCC's securities.  He used a set of slides prepared under the heading "*CCC Q3 Results Support and Analytics*".   They contained some projections under the heading of a "*Cash roll off analysis/Static Portfolio*," and two "*12 month Projected sources and Uses of Cash*", one being a "*Likely case*" and the other a "*Downside case*", with different assumptions and illustrating different outcomes.

2032. The "*Static Portfolio*" scenario was a cash flow forecast that documented exactly how much cash CCC could expect each quarter from principal pay downs (amortisations and prepayments) plus income.   Giving rough orders of magnitude, that analysis showed that CCC earned positive net income of approximately $20Mn per quarter and could expect principal pay downs of roughly $20Mn per quarter (at an assumption of 1% pcm, said to be conservative) thus producing  a total of around $40Mn per quarter.  All other aspects of the portfolio remained unchanged in the static case (thus, unrealised losses and distressed pricing remaining the same, no new capital raised, portfolio composition being unchanged, haircuts remaining constant at 2.61%, no dividends paid, operating expenses remaining the same, and no change in prepayment speeds despite falling interest rates).  This projection showed what would happen if essentially all of the cash generated were to be added to the current liquidity cushion.  Under that scenario, CCC would continue to meet its obligations as they fell due and would gradually build its liquidity cushion by $40Mn each quarter.

2033. The "*Likely Case*" scenario projections, which in fact became the underpinning for the Business Plan Summary presented to the Board, were based on more varied assumptions than

the static case.  The *Likely Case* broadly assumed that markets and price levels would return to what was perceived as normal by mid 2008.  It assumed no new investments in RMBS and no purchases of credit products until the third quarter of 2008, at which point diversification into credit products would be funded by a sale of $1Bn in RMBS, after (it was projected) Agency floater prices had returned to cost price (effectively par).  Haircuts were assumed initially to increase to 2.75% by the year end and remain at that level until the third quarter of 2008, when they would reduce and continue at 2.5%.  Under these assumptions, CCC could again, meet its debts as they fell due and dividends were assumed to recommence payment in the fourth quarter of 2008.

2034. The "*Downside Case*," assumed a more pessimistic course, but this time involving the sale of a significant quantity ($4Bn) of RMBS.    The assumptions (apart from the obvious one that no dividends were to be paid at all) were that haircuts all moved immediately to 3%, and RMBS prices fell to the "*lowest point of Q3*" which thus came to represent supposed fair values.  These latter assumptions implied a cash shortfall of approximately $13.7Mn in the fourth quarter of 2007, and it was posited that to meet this, there would be a sale of $4Bn of RMBS "*at lowest mark of Q3 to raise cash*", ie at repo marks only.  Such a sale would, essentially, release the applicable 3% haircut, or about $120Mn in cash, and assuming that repo dealers' distressed pricing of collateral simply continued as it had been and did not change (worsen or improve) CCC would still increase its cash liquidity on that basis.

2035. Once again, as with the illustrations provided to the September investor conference, the Plaintiffs pressed several witnesses that the inclusion of this assumption of a sale of RMBS in the fourth quarter of 2007 as posited in the *Downside Case* showed that Management believed at the time that a sale of $4Bn of RMBS at CCC's repo marks was possible, and likewise the Board must have also done so when it accepted those cases.   The Defendants' evidence was, once again, that these figures were simply theoretical illustrative assumptions.   Of course if the downside case situation were to eventuate, and there were no other options for raising necessary cash, (such as further assistance from Carlyle), CCC would be compelled to attempt to raise cash to meet shortfall requirements through asset sales, and would have to take whatever risk these entailed, but this was not part of the expected "Likely Case".

2036. Returning to the course of the Board meeting itself, since the question is whether information supplied to the Defendants justified their decisions to continue with the capital preservation strategy, and the historical data disclosed was used as underpinning assumptions for the updated business model projections, it is necessary to look at some of the detail of the reasoning presented.

2037. Mr Stomber explained that the fall in prices for CCC's RMBS was blamed on the "*Large supply/demand imbalance as a result of liquidated ABCP programs",* but Management now expected liquidations to slow – none had happened for a month - even though the future could not necessarily be predicted.    The slides analysed the various factors driving changes in prices for CCC's securities.  Whilst noting that a "*rise in [interest] rates negatively affected the value of CCC's portfolio at [the time of the] IPO,*" rates had since fallen.   Management observed, however, that "*the beneficial effect of lower rates on the value of our portfolio has been more than offset by higher [interest rate] volatility*" over the period from June, but that, more recently, the "*overall rate decline was of sufficient magnitude*" that it was "*supporting the value of our securities.*"  Importantly, it was observed that lower rates should lead to higher prepayment speeds.  As interest rates decline, "*refinancing picks up, which also positively affects the value of these securities.*"   This good news was, though, tempered on a cautionary basis: "*Since IPO, rates have gone lower, supporting the value of our securities, however the current unsettled status of the mortgage financing market has dampened this benefit.*"

2038. Management had also assessed the impact which rapidly declining rates had on interest rate volatility.  Whilst lower interest rates were a positive for the value of CCC's securities, rapid

changes in rates could be a negative because interest rate volatility creates uncertainty regarding future interest rates and this is reflected adversely in the price, because of the cap, and fears that it could become operable.  Management provided a sensitivity analysis showing that a 1% change in cap implied volatility had a $30-40Mn impact on CCC's portfolio value.

2039.  Finally, Management pointed out that the Option Adjusted Spread between Agency debentures and Agency floaters (like those held by CCC) was currently wide, and that this difference was historically anomalous and not sustainable over any significant length of time because it was irrational; this should therefore cause a narrowing of this differential and an increase in price for Agency floaters.  ("**OAS**" is another financial metric, used to estimate future returns on a security relative to a benchmark after adjusting out the effects of changing interest rates on any embedded options in the security.)  Management summarised its analysis of where it saw markets going in one final slide.  They expressed the view that these factors made it reasonable to expect that "*spreads [would] continue to narrow*" for Agency floaters, and that the recovery that had taken place in October would gather momentum and eventually return the securities to par over the course of the next year.

2040.  Management also pointed to some improvements in the repo market, and CCC's financing.  They recorded increases in repo lines made available to CCC since the August crisis, these being $2Bn from Bank of America, $2Bn from JP Morgan, $1Bn from Lehman and $300Mn from Bear Stearns, with another $2Bn from Wachovia nearing completion, although it is fair to say that I am not sure that they reported the reductions that had taken place.  However, details of all repo lines as at both 30th September and 6th November were given, together with comments in the latter report showing progress on securing repo lines over the year end.   Mr Conway and Mr Hance added, in oral evidence, that they had been encouraged also by the reduction in interest rates made by the Federal Reserve, which would be expected to improve overall market liquidity and encourage banks to lend, particularly on Agency securities such as those CCC owned.

2041.  The slides also considered and analysed the risk of higher haircuts, explaining why, on the basis of experience subsequent to August, CCC did not expect haircuts to go to 4% (the *Downside Case* had in fact assumed no greater than 3%), and how this was justified in the light of events since then; all CCC's repo lines were currently at 3% or below and CCC had been able to refuse and avoid the only requests for higher haircuts.   The conclusion was that the August crisis had caused a single hike in haircuts but that they had subsequently stabilised.   Management opined that 3% was now the "new norm" and also that, in view of the degree of protection it afforded repo lenders, no further increases could be expected, (although this analysis does, of course, assume that repo lenders would behave logically and rationally as CCC perceived it).  This, according to Mr Hance, left a rise in haircuts as a possibility which could be conceived of, but was not a probability.

2042.  Mr Stomber reiterated that his selection of Agency floaters for CCC's portfolio had been made precisely because they had historically performed well in a deteriorating economy in contrast to other securities with credit risk, and he expressed his conviction that, as the markets moved from the current "*liquidity event*" to "*possibly a credit event,*" CCC would be well-positioned to take advantage of buying opportunities by selling its Agency securities after they had returned to more normal pricing and diversifying into what he anticipated would be even cheaper credit products.

2043.  The business plan projection was given on the basis of a series of assumptions, approximating to the *Likely Case* mentioned above.   Thus, haircuts were assumed to worsen to an average of 2.75% for the fourth quarter (they were currently about 2.62%) and not fall back to 2.5% until the third quarter of 2008.   A gradual recovery of RMBS prices and repo marks to the more normal level of IDP prices, but only by July 2008, was assumed.   Prepayment speeds were assumed to continue at current rates only, with some diversification of assets and dividend payments possible from the third quarter of 2008. Obviously, therefore, leverage remained

much the same, projected to be 33.3x by the end of the fourth quarter of 2007.   The liquidity cushion was projected to rise from $140Mn on 6th November (the date of preparation of the slides) to $222Mn by the year-end, resulting from natural trends and prepayments.

2044. The minutes, and Ms Cosiol's notes, reflect that the Board reviewed this model "*at length*" and that it "*questioned several of the assumptions on which management based the model*." In particular, the Board asked about the assumption "*that the fair market value of the securities increases in the first quarter of 2008 when the value was currently down and not expected to increase*" given year-end pressures.   Ms. Cosiol's notes record an extensive discussion of the projections underlying the continuation of the "*run-off plan*" for the near term.   It extends from pages 20 to 30 of her handwritten notes.   This written record shows that there was much Board discussion, and what it was.

2045. Mr Stomber's review of the projections highlighted the possibility of paying a dividend, even in a static scenario.   There were various reactions amongst the Board to this, but all were made on the basis that whilst it was obviously desirable for a yield vehicle to be paying a dividend, it would only be done if CCC clearly had funds available to do so.   The Plaintiffs light on such discussions, both here and at other points, as evidence of an improperly reckless obsession with paying a dividend, but as I have already said, I do not see it as such even here. Mr Stomber was obviously acutely conscious of the fact that he had been hired in order to provide and nurture a high yielding entity in CCC, and that after the August crisis he simply was not doing so.   I do not find it remotely surprising, or reprehensible, that he should be raising the issue of dividend payments for consideration by his fellow directors.   They were, after all, the voting directors whose reaction would govern the situation in the end.

2046. Throughout the Board's consideration, Mr Hance in particular, but others as well, were raising the question whether the proposals and suggestions made were actually viable in practice.   Mr Hance commented that the projections did not deal with the question whether affordable repo was going to be available.   He also observed that he had expected a faster bounce back in RMBS prices than had happened, and that the model did not address how CCC would survive a second financial crisis.   He said in evidence that he wanted this point to be considered, whilst regarding the occurrence of another financial crisis so soon after the last one as highly unlikely.

2047. Discussions then moved to performance and a discussion of the future.   There was much debate about this as well, and whether and when CCC might start reinvesting, and/or diversifying again, all set out in several pages of Ms Cosiol's handwritten notes.   It was discussed that this was all dependent on when CCC's RMBS asset prices might recover, and when there could be confidence in this.

2048. Board Members asked various questions, raised different points and expressed different views.   Mr Sarles counselled caution, because CCC was not a trading shop with substantial capital and could not take the risk of diversifying too soon.   Mr Stomber was opposed to courting financing risk by doing so, stating that that was the biggest risk to shareholders.   Mr Hance wanted management to be looking for ways to generate return on capital; Mr Sarles was comfortable with Mr Stomber's reluctance to start purchasing assets.   Mr Zupon agreed with this and raised the possibility of raising further capital.   Mr Stomber said that attempting this would be crazy and CCC should slow down and fix the fund, emphasising that he did not think it appropriate to use the liquidity cushion to buy credit products.   Mr. Allardice noted that using CCC's liquidity for a share buyback by the Company was one option, and it could be "efficient", a matter which had also been discussed at the Audit Committee meeting. Others observed that this was the wrong trade off.   It was agreed that CCC needed to decide what was the best use to make of the capital which had been gathered into the liquidity cushion.

2049. Mr Sarles questioned whether the CCC model with leverage at 33x was a workable model, and Mr Stomber said that it was not, and CCC needed a diversified approach.   Mr Sarles said in evidence that his comment was a reference to whether CCC would now start up with a model with leverage at that level.   I rather doubt that; I think it was more likely a shorthand allusion, not simply to whether CCC could survive, but whether it could fulfil its intended function as a yield vehicle with such leverage.        Mr Stomber urged that CCC needed to consider not only assets, diversification and dividend payments, but also financing it all, ie repo availability and the credit line from Carlyle.    Mr. Conway said that in the long term CCC could probably get repo lines on longer than 30 day terms, and "*feel better*".

2050. I have set out the above because, whilst not a full summary of the meeting, it gives examples of comments and suchlike which illustrate the amount of discussion, and the breadth of suggestions being tossed around in debate.

2051. The Board then discussed CCC's stock price, and the fact that CCC's shares appeared to be undervalued, and that there was little trading in them.      Both the Board and Management hoped that the release of the Third Quarter results would increase confidence in the stock as lack of liquidity in the stock was perceived as a problem.     After discussing the need to communicate the true value of the shares to investors, and address the issues inhibiting the liquidity of the shares, Ms. Cosiol's handwritten notes reflect the comment "*how do we handle? Pool $ & buy shares to help stabilize the price*."   Members of the Board asked if it would create an "appearance" problem if they personally purchased shares from existing shareholders who had paid full price for those shares, and it was decided this would not pose a problem, as many of these investors had complained about the lack of liquidity in the stock.   Mr. Conway stated his belief that "*the stock at the current trading price represented an excellent value*" and observed that individuals at Carlyle already had expressed an interest in buying shares; this possibility had been disclosed in the OM and the MD&A.   Ultimately, it was decided that individual purchases should be made through CCC Coinvest, the same vehicle that had been used to make purchases in the original private round of fundraising.

2052. Ms Cosiol's notes record comments by Mr. Hance at the end of the discussion, summarising comments and the general consensus arrived at.   It had been a "*good discussion – sensitizes us to the issues*".   It was "*best not to jump in now*" and start buying either credit products or RMBS; rather, the consensus was to "*let it settle off*."     He observed that the business had "*changed on*" CCC's investors, and that the current model, operating in "*roll-off*" mode, no longer offered them the original proposition of a safe, liquid diversified security.   The intention was to tell them that CCC was "*working to get back there,*" but it "*may be difficult*". It was also recorded that it was not the intention to turn CCC into just another credit product investment fund, described as a "*Zupon fund*".

2053. Mr Stomber was plainly unhappy with the Board Meeting at the time and erupted into print with a typically lengthy and forthright email to Mr Conway and Mr Hance immediately afterwards.   In it, he complained that the meeting was "*all over the map*" and that "*We discussed the current business plan and then discussed we had no business plan.   Yet all agreed that if we met the current plan – all would be happy*".   He also highlighted that CCC was "*in the middle – not the end- of the market breakdown*".

2054. The Plaintiffs have highlighted this as contemporaneous verification of their submission that CCC's Board – the Defendants - were disorganised, dysfunctional and haphazard, and supporting that the decision to continue with the supposed capital preservation strategy and not sell RMBS, which was the upshot of this meeting, was ill-considered to the point of being reckless or grossly negligent.    Mr Stomber has said in oral evidence that on reflection and with the benefit of time, he now thinks that the Board meeting reflected a healthy debate among competing views.   I give my findings about this email and evidence later.

2055. The Defendants invite attention to CCC's Third Quarter financial statements, released immediately after their approval by the Board, and to the accounts given in the CEO Letter and MD&A of the difficulties CCC had faced and how it had dealt with them, Mr Stomber's and Management's thinking as to the reasons for previous and current difficulties and the expected course of future events, and CCC's present consequential investment strategy.  This is because they say it shows the distilled thinking and beliefs behind what was agreed by the Board at the 13th November Meeting.

2056. I do not need to rehearse the detail of these two communications here.  The CEO letter provides an executive summary of the points made in more depth in the MD&A report.    I find that they both provided a lucid description of what CCC had done and the reasons for this, and expressly disclosed the resolved strategy of holding the RMBS securities *"whilst preserving shareholder capital until market conditions improved"*.    The account given of course reflected the views which Mr Stomber and the Defendants, and Management had formed of the likely future course of events.  In essence, that view was that the value of CCC's RMBS securities (and therefore CCC's own position) would continue to recover, as would the market in fixed income securities generally, that the US economy was weakening but that that would benefit the value of CCC's securities, and that CCC would become well placed to take steps, in 2008, to rebalance its portfolio to include suitable credit assets, and begin providing an attractive dividend yield again.  It was suggested that dividend payments might be resumed in respect of the fourth quarter of 2007, based on current market conditions.  The steps being taken to ensure available repo financing were also outlined.

2057. The Defendants submit that these disclosures clearly and comprehensively set out how the unprecedented August liquidity crisis had affected CCC, what steps CCC had taken to address the crisis, and what both the near term and long term plans were for stabilising the company and then beginning to invest again.

2058. On the same day as these meetings, the $100Mn term loan to CCC from Carlyle was converted into a revolving line of credit, available until 2nd January 2009 at the discretion of CCC's Management.

2059. As anticipated, the additional pressures in the market caused by imminent financial year ends now began to cause the improvements in prices and financing which CCC had gained since September to falter and cease.    On 14th November one of Mr Stomber's regular emails reported gloomily about the state of the market, that pressure on the banks' balance sheets was making things worse day by day, and that CCC was going to need to draw $20Mn of the new credit line from Carlyle to get through the 15th November repo roll.

2060. However, also on 14th November, Management succeeded in securing a 2-month repo line with UBS, which would help provide some increased certainty about CCC's repo terms during the year-end period.  Mr Stomber explained in oral evidence that in an attempt to get ahead of the year end crises, CCC was trying to gain 60 day repo commitments.    20% of CCC's outstanding repo was extended to this, and Management was still negotiating the 364-day term repo line with Wachovia at this time.

2061. On 14th and 15th November legal advice received by CCC from its various counsel cleared the way for Board Members and other CCC affiliates to invest further in CCC through CCC Coinvest, with no requirement for prior notification or reporting of such share purchases.  On 15th November, therefore, Carlyle Group issued a solicitation memorandum offering its employees and affiliates, as well as affiliates of CCC, the opportunity to invest in CCC shares.  The memorandum noted that the shares were "*currently trading at a significant discount to their original offering price*."  As was the case during the private placement, these purchases would formally be carried out through the acquisition of interests in CCC Coinvest, which would acquire the CCC shares.  The memorandum informed prospective in-house investors that the "*purchases [would] be made on the terms and conditions specified by Bill Conway.*"

**15th November – repo roll**

2062. Mr Stomber had negotiated with JP Morgan for the reinstatement of a $2Bn repo line, which came on stream for the 15th November roll, although effectively on worse terms because they repriced CCC's securities.  Mr Stomber commented that this made JP Morgan effectively at a 3.25% haircut rather than 2.75%.    Citi had also widened its pricing.

2063. There were, in addition, demands for an increased interest rate, with the average ultimately increasing to 9 bps above LIBOR.  Bank of America raised its interest rate for a 2-month repo roll by 22 bps (4.83% - 5.05%) causing Mr Stomber to complain internally and Management to roll for just one week so that the interest rate could be further negotiated.

2064. Lehman had proposed a 5% interest rate on its 1 month repo, but had reduced this to 4.85% on CCC's questioning whether, in view of other lenders quoting a range of 4.675 %– 4.75%, Lehman was sending a coded message.    CCC had therefore moved all but $500Mn of its line away from Lehman.    Lehman's attitude to both pricing and repo rates caused Mr Stomber to send a strongly-worded complaint to them, which caused Mr Conway to step in to try to de-fuse the situation.    This did not cause Lehman to withdraw financing from CCC, although it apparently led to internal Lehman comments that behaviour like Mr Stomber's often presaged "business continuation issues".  There is no suggestion, though, that the Defendants were aware of this.

2065. On this roll, balance sheet pressures caused a few of CCC's other repo dealers to reduce their lines (by approximately $1.6 Bn total).  However, this repo roll was accomplished, although whilst CCC had $117Mn of liquidity prior to that day, after the repo roll this had dropped to $106Mn.  Mr Stomber described this as a "bad" roll, and indeed, the effects of its problematic features were that CCC was not able to repay the $20Mn which it had drawn from the Carlyle loan facility as it had anticipated doing the next day.

2066. Having previously noted how year end considerations would put pressure on banks and affect finance availability and margin calls, Mr Stomber observed that additional pressures were arising because of deteriorations in the credit market, with ratings agencies now down-grading CDOs and triggering their subsequent liquidations, and banks hoarding liquidity on their own balance sheets.  He was still of the view, though, that the quality of CCC's securities should enable it still to obtain repo, and its security prices would hopefully begin to benefit from a flight to quality.

2067. CCC was able to roll over $9Bn of its repo lines and still have $2.2Bn of excess repo capacity, and despite the increased cost of its repo financing, the company was making progress toward ensuring that it would have financing available over the year-end.  CCC's repo status report for 15th November showed that Bear Stearns, Bank of America, JP Morgan, Lehman Brothers, and UBS were all "*Good for [year end]*," while the remaining banks other than Morgan Stanley (which was listed as "*[i]nsignificant*") and Goldman Sachs (which had no comment) were listed as "*Expect OK for [year end]*."

**15th November - Investor Call**

2068. CCC held an investor analyst phone in conference on 15th November 2007, following the publication of its third quarter financial results.  It was fielded by Mr Stomber, Mr Hance and Mr Green.  In the course of it, they reiterated the same descriptions and explanations as mentioned above.  Mr Stomber emphasised that the improvement in the value of CCC's securities was expected albeit with "*some tightening between now and year end*", referring expressly to the well-recognised phenomenon of banks withdrawing liquidity over their financial year ends.   Mr Hance emphasised that CCC's strategy was *"focused on preserving shareholders' equity"*, plainly on the basis of giving time for the underlying security values to become restored.  With the questioners focused on the benefit from their investments, Mr

Hance emphasised that whilst the goal was to pay a dividend, preservation of shareholders' capital was the foremost consideration. There was discussion about the disconnect between the apparent value of the underlying assets and CCC's stock price. The question of CCC buying in its own shares was raised but parried. A comment from one caller that CCC's stock was tremendous value at its current price, was welcomed and agreed with. The Defendants submit that this analysts' call was a clear, transparent disclosure of what CCC was doing.

2069. The Defendants also invite reference to materials which were not examined in the trial itself, although they were in the trial bundles, being certain investment analysts' reports on CCC following examination of its 2007 third quarter results. These reports are produced within investment banks for the purpose of advising clients on investment opportunities. They point out that each of these analysts recommended that CCC's stock should be held; none recommended selling and none was critical of CCC's actions or its explained strategy. They suggest that this is strong support for the apparent good sense of the matters reported. They point out that both Deutsche Bank and Citi, in particular, reported in terms of what I might call cautious support for CCC. All this, they say is significant.

### 16th November - ALCO Meeting

2070. This comprised broadly the usual committee participants with Mr Stomber, and also Mr Sarles and Mr Allardice attending by telephone.

2071. There were mixed signals reported to the meeting. The terms of the 15th November repo roll were reported, and that interest rate demands for repo financing had risen slightly above LIBOR for the first time. This was put down to the year-end pressure and some deterioration in market conditions. Prices in the credit markets were depressed, and interest rate volatility was rising; CCC's financing costs were thus rising somewhat, although income still exceeded them, but at the same time, financing availability and the depth of the liquidity cushion appeared healthy. The liquidity status report showed that repo availability had been actively followed up by management and was continually reported as being good over the imminent year end. Management did not expect any pressure on financing and the liquidity cushion up to the year end.

### The Defendants purchase more shares in CCC

2072. On 20th November, 2007, the trading window for share purchases by affiliates of CCC opened, and the stock broker at Citi began to purchase shares on behalf of CCC Coinvest pursuant to Mr. Conway's instructions to purchase at no more than $10 per share.

2073. Each of the Defendants (as well as some members of Management) purchased additional shares in CCC. The sums invested by the Defendants at this point were as follows: Mr. Conway, $1Mn; Mr. Hance, $1Mn, Mr. Zupon, $500,000, Mr. Sarles, $200,000, Mr. Allardice, $150,000, Mr. Stomber, $100,000 and Mr. Loveridge, $100,000, (although they each had a very small proportion of this – around 2-3% - rebated under the Co-investment scheme). Messrs Trozzo, Greenwood and Melchior also subscribed lesser sums, and other CCC affiliates may also have done.

2074. Citi completed the CCC Coinvest share purchases for these commitments on 11th December 2007. Mr Conway had in fact requested to purchase $10Mn, but Citi were unable to make sufficient purchases to cover this and all other requests, so he scaled back his own request until all other requests, including Management's, had been met. From 10th to 31st December 2007 Citi continued to purchase more shares for Mr Conway, who eventually subscribed for $7.9Mn worth. The total purchase of CCC shares for all who wished to subscribe was $14.2Mn. The CCC Coinvest purchases were initially funded by a loan to CCC Coinvest

from TCG, which was then repaid by CCC Coinvest, with interest, when it had received payment from the individual investors pursuant to capital calls.

2075. Each of the Defendants gave evidence that he made his own investment because of a firm belief that CCC's stock was undervalued and so would generate highly attractive returns in consequence, and it was not part of a scheme to stabilise the price of CCC's shares.

### 20th November - Investor Conference Presentation

2076. Carlyle's annual autumn investor conference was held in Paris on 20th November 2007 and included a presentation about CCC, the slides and audio commentary of which were made available to attendees remotely, through a live webcast. Mr Hance and Mr Stomber made the presentation and the slides and a partial audio transcription are in evidence. They show the presenters placing emphasis on CCC's capital preservation strategy, which entailed holding its Agency RMBS, described as its "core portfolio". It also contrasted this "short term" strategy with the "long term" objective of achieving targeted returns. Mr Stomber, though, also emphasised that CCC would not be hurrying into the re-diversification which was its long term objective, because the worst thing would be to do it too soon and *"then take a step down with the credit cycles"*. Mr Hance reinforced this message of being sure of having ridden out current problems, stating the plan to be to *"modify our business model to reflect the changing in the funding dynamics, and to go forward with lower leverage and greater diversification."*

2077. They were obviously conscious of disquiet expressed by investors at the depressed share price of CCC's stock and its consequent lack of liquidity, and they sought to give reassurance. Mr Hance gave a list of the reasons to be positive about CCC's situation, which seems to me to sum up the points discussed at the Board Meeting a week earlier: *"We really think the more information we get out about where the net book value [is], about the nature of the securities, about the fact that we don't have permanent impairment, about the fact that we have positive flow and are intending to pay a dividend next year, all of that will help"*. Both Mr Stomber and Mr Hance, though, also referred to the fact that Board Members, including themselves, had decided to purchase more shares personally, and indeed were doing so that very day. Mr Stomber did so in opaque terms. He referred to taking action to *"enable the share price to move up"*, or to *"try to improve that* [sc the low price]", but Mr Hance spoke more directly in saying that *"we're buying some securities in Carlyle Capital Corp in order to help stabilize the price."*

2078. Market manipulation is, of course, an offence under the regulations of the Euronext Market exchange. Ms Cosiol, on hearing these remarks, was sufficiently concerned (she described it in oral evidence as a *"visceral reaction"*) that she immediately emailed Mr Hazeleger at Linklaters, referring to these remarks, and asking if consequently *"we have a problem"*, adding that *"the intention… was to purchase because they truly believe it[']s a good investment at the current price"*. Mr Hazeleger immediately asked for a list of registrations to ascertain whether anyone from the AFM regulator had listened in. He subsequently emailed back that it looked "OK". In a telephone consultation at Mr Hazeleger's instigation later, Ms Cosiol asked if it would be permissible to omit Mr Hance's portion of the presentation from materials to be posted on CCC's website. She subsequently did so, and also removed the slides which had accompanied his remarks. She said that she believed that she must have been advised by Mr Hazeleger that it was permissible to do so, although she could not recall any actual conversation, and that she had edited the website materials in consultation with Linklaters.

2079. In cross-examination Advocate Wessels put it to her that Linklaters had given no such advice. However, from my impression of Ms Cosiol and on the balance of probabilities, I am quite satisfied that she would not have done this on her own initiative. I am satisfied that she did receive some such oral advice, encouragement, or concurrence from Linklaters.

2080. On 21st November, Mr Stomber reported that liquidity currently stood at $92Mn, inclusive of the unused $80Mn in the revolving credit line, but he expected it to be lower after the impending Fannie Mae repo roll which would take place on Monday 26th November.   He expected to (and did) draw a further $40Mn on the credit line in the next few days.   However, he commented, to all his co-Directors except Mr Zupon, that this was a *"bad news memo"* and that the *"market is spooked"*.

### 26th November - repo roll

2081. CCC also successfully managed the 26th November repo roll and closed the day with $76Mn of liquidity, which Mr Stomber reported was slightly better than expected.   After the roll, CCC still had approximately $1Bn of excess repo capacity with JP Morgan, and Management turned its focus to finalising the Wachovia term repo line and confirming excess repo capacity with Lehman of $700Mn.   Mr Stomber reported, though, that he had intuitive misgivings about the underlying strength of the financial system itself, and he anticipated bold action from the US Government or the Federal Reserve.

2082. On 28th November Wachovia approved the MRA and letter of consent necessary to implement a 364-day term repo line with CCC.   On the less bright side,though, Lehman on this day made a margin call of $19Mn on CCC, which Mr Stomber regarded as "outrageous" as it was based on a price more than 15 bps lower than any other dealer.   He was incensed at this "cash grab" by Lehman for its year end, which left CCC's liquidity cushion at $65Mn. He commented on the "mistake" of being too concentrated with Lehman, who at that time provided 15% of CCC's total repo capacity, but he was cautioned against antagonising them by Mr Hance.   In the last two days of November Mr Stomber's efforts succeeded in recovering some margin from Lehman, leaving CCC with $70.6Mn of liquidity on 30th November 2007.

2083. Within the Carlyle Group itself, the worsening financial markets caused warnings to be sent round that the economy was probably headed for a recession, and that personnel should take precautions to protect against rough times ahead.

### 29th November - ALCO Meeting

2084. CCC held another ALCO meeting on 29th November 2007, attended by the committee members (thus including Mr Stomber) and also Mr Zupon and Mr Loveridge by telephone. It was not a particularly eventful meeting.

2085. Mr. Greenwood reported that the recent news on the U.S. economy was generally negative. One month LIBOR had risen significantly, owing to the increased cost of borrowing over the year end.   He commented that interest rate spreads between one month LIBOR and Federal Funds, after "*normalizing*" in September and October, had widened notably in November, a trend which he described as "*aberrant*" but nonetheless underscoring the *"severity of the credit and liquidity crisis that continues to grip the market"*.   The TED spread also had widened, a reflection of investors' desire for safety (less counterparty risk) regardless of yield. He noted though, that the recent rise in Agency floater spreads was levelling off.   Mr Trozzo informed the committee that it was widely expected that the Federal Reserve was going to cut interest rates again.

2086. Mr. Trozzo reported that CCC's portfolio was in compliance with its current guidelines.   He warned that CCC's profit and loss statements would reflect a reduction in income caused by higher repo interest rates demanded by some repo counterparties, and that the liquidity cushion had fallen since the information in the ALCO pack papers, and declined by $17Mn that same day. It was noted that CCC had approximately $3.6Bn of two-month term repo lines, which provided relief from year end pressures.      The trends in the five significant

factors affecting the price of CCC's agency floaters were noted.      No particular decisions were taken.

### End November 2007 - Financial position

2087. At the end of November, CCC's records show that it had $21.94Bn of investment assets and a NAV of $675,623,735.  Professor Hubbard's analyses show that it was using $21.21Bn of repo lines out of a total capacity of $23.54Bn with 13 repo lenders, on which it had a weighted average haircut of 2.67%.  It thus had an excess repo capacity of $2.3Bn only, unimproved if not worse since mid-September.      Its liquidity cushion stood at 10.5%.   The upward course of liquidity from $48Mn at the end of September 2007 to $147Mn on 5th November had peaked and fallen back to $113.8Mn by the 13th November Board Meeting, but then still further, to $71Mn by the month end.

2088. As regards CCC's attitude to selling during this period the Defendants, and expressly Mr Hance, Mr Stomber and Mr Conway, explained that this remained the same as before; CCC would be willing to sell RMBS if the benefits of the transaction were both worthwhile in quantity and in price, consistently with its justifying what were perceived as the still very significant risks of being perceived to be a major player in the Agency floaters market which was in distress.   In the context of the November markets, where there was little trading  and prices remained under pressure, no such opportunities presented themselves, and CCC had to be cautious about being trapped into giving such an impression, for example, by showing too much eagerness over an enquiry, although Mr Conway insisted that, at an attractive price, CCC would have sold.

2089. The Defendants draw attention to an end of November exchange between Mr Ng and a trader at JP Morgan, which they submit demonstrates this attitude, and also the need to keep up appearances in the market.  On 27th November 2007, when the JP Morgan trader suggested to Mr Ng that CCC should sell a $50Mn bond and buy a different $50Mn bond, Mr. Ng replied that CCC would "*entertain any trade ideas,*" but was "*hand cuffed to do anything through year end.*"  The JP Morgan trader asked why CCC felt "*hand cuffed,*" and Mr. Ng explained that they were seeking to avoid "*any p/l [profit and loss] hits if any by selling*".  He later agreed that CCC's willingness to sell would therefore be limited to transactions that could be done "*close to par,*" but explained this as that CCC "*essentially can't take any losses*" because they were "*try[ing] to hit dividend targets.*"

2090. This comment is, of course, consistent with the Plaintiffs' contention that CCC was doggedly and irrationally set against crystallising any losses on its books, and a pursuit of dividend targets, but it also seems to me that the whole exchange is equally consistent with the line which the Defendants submit that CCC had all along been attempting to tread, namely that of appearing confident, not giving away information but trying to obtain it, and keeping "in the loop" so as not to miss any truly valuable opportunity which might arise.  In maintaining this front, it would be necessary to give innocuous but plausible explanations to third parties to avoid causing damaging speculation, and I am satisfied that the reference to dividend targets was just such a plausible excuse.

### The Claims – October and November 2007 - Summary of arguments

#### Plaintiffs' case

2091. The Plaintiffs' central submission is that the Defendants simply continued on throughout the fourth quarter of 2007 in the same way as they had done in September, blindly hoping that they could ride out the adverse market situation, ignoring the fact that financial market conditions remained thoroughly uncertain at best, and should have been seen as deteriorating. Repo lenders were facing their own financial difficulties, CCC was struggling to maintain sufficient repo capacity and there was no good news on the horizon to justify a continued

belief that CCC's financial situation would transform itself.    Failing to take the required action in this period, particularly (I infer) at or as the result of the 13th November Audit Committee and Board Meetings, was either a breach of fiduciary duty or gross negligence. The Plaintiffs base this submission on the following matters which they invite me to find, on the evidence.

2092.  They submit that CCC's financing situation was perilously fragile.  As was known to CCC's directors, its repo banks had suffered huge losses and were facing their own liquidity difficulties which meant that there was a growing insufficiency of available repo capacity. The Plaintiffs list the evidence of repo lending banks suffering massive losses (as witnessed by their announced write downs during this period) and showing that Messrs Stomber, Conway, Hance and Allardice, at least, were all well aware of this, that the economy was potentially going into recession, and that this was only the beginning of a bad situation.  They cite also Mr Welles' evidence that those in the repo markets perceived at this time that the adverse conditions were going to play out over a very long period.   They submit that it is clear that concerns in this regard were recognised and acknowledged by all the directors, certainly by no later than the 13th November Audit Committee and Board Meetings.

2093.  They submit that the actual facts of repo availability, when examined, belie the suggestion that CCC was achieving the extra capacity which it obviously needed, even on a "soft" basis; Mr Stomber's claim to have negotiated extra capacity with Lehman  –  CCC's second largest repo provider – at the beginning of October 2007, was worthless.  The capacity was never utilised and was probably never actually available, and Lehman became so notably "difficult" in November 2007 that CCC actually rolled repo away from them.     By 15th October, CCC had become dangerously dependent on its two biggest counterparties, Citi and Lehman, who provided nearly half its total repo requirements.

2094.  They submit that the signs, to be read from the difficulty of obtaining affordable finance, were that haircuts were rising inexorably to 4 %, a rate which CCC simply could not afford.  It must have been apparent that they would certainly be that with any new provider.  Affordable repo for CCC therefore meant concessionary rates, only achievable because of the Carlyle connection and it was therefore wrong and irresponsible to rely on these, which is what the Defendants were doing.   CCC's attempts to put in place new repo arrangements had largely failed.  Attempts to negotiate new standard repo lines with Sumitomo, Fortis, ABN Amro, Barclays and Societe Generale had all come to nothing by the end of October 2007 for various reasons.      The allegedly "new" repo lines were no such thing; CCC had, in practice, only negotiated a reinstatement of previous repo lines of $2Bn each from Bank of America and JP Morgan, and on terms which, whilst heavily negotiated, were actually less beneficial than before, and again only because of the Carlyle connection. These lines, however, only compensated for the fact that CCC was compelled to roll a total of $1.5Bn away from Citi and $1Bn away from Lehman to avoid increased haircuts or repo interest rates, and they produced no material increase in CCC's repo availability.  This remained perilously close to the full requirement capacity and, it is emphasised, only because of the Carlyle connection.   They submit that there was no reason to think that the difficulties in financing already encountered were likely to ease by the year end.  In particular, they point out that there was no evidence of any flight to quality.

2095.  The prospect of obtaining long term repo finance was fanciful, because such structured repo would only be available at unaffordable higher haircut rates, and the Defendants were aware of this.  The negotiations with Wachovia for a $2Bn one year term repo arrangement at a 3% haircut were never likely to be completed, and the Plaintiffs say that this really should have been obvious to the Defendants (Messrs Stomber, Conway and Hance in particular) because of Wachovia's inexperience in repo financing, and the fact that it was only negotiating with CCC at all because it was Carlyle's house bank.   Whilst CCC did, (extraordinarily in a time of crisis) persuade two of their lenders to grant it 60 day repo over the year ends, this comprised only 17% of CCC's requirements.  (Whilst the Plaintiffs also seek to diminish this

by pointing out that others of CCC's lenders (11%) actually reduced their repo tenor to 7 days on occasions, I note that that was earlier, in September 2007.)

2096. The Plaintiffs submit that the evidence again shows that the Defendants were giving undue weight to the possibility of paying a dividend, and that this is evidence of recklessness in their approach to CCC's affairs.   Dividends were being prioritised over what was necessary for CCC's financial survival.   They cite, for example, Mr Stomber's email to Mr Hance of 31st October 2007 which I have noted above.  They were also placing undue weight on the process of "natural" deleveraging.  This would yield only $40Mn of liquidity per quarter, and on that basis it would take a further year in business to reduce its leverage level merely to 26x, still dangerously high.

2097. They submit that, in reality, CCC's position had not materially improved since the emergency Board Meeting on 23rd August despite the emergency measures then implemented.  The fact that no Board Meeting was called before 13th November 2007 is evidence, they say, of a reckless disregard for the seriousness of that situation.    They point to worsening factors across the board.  The increased margin calls showed that, on a realistic view, the value of CCCs RMBS had continued to fall.      The level of unrealised losses recorded on CCC's portfolio since both the August crisis and CCC's inception had continually increased; there had been $114Mn of further unrealised losses recorded on the portfolio since August.  CCC's share price had halved.    The apparent increase in liquidity was illusory because it depended on the Carlyle loan and even at 16.3% at the time of the November Board Meeting the liquidity cushion still compared unfavourably with the 20% figure originally thought appropriate, and still more with the 40% figure, which was plainly seen as desirable because it had been put forward at the September Investor Conference.  They point to the ominous metrics and statistics apparent in Board and ALCO at meetings during October and November, particularly in factors known to be drivers of the value of CCC's RMBS (average price volatility, interest rate volatility, etc).   The APV of CCC's RMBS had remained "elevated" during October, and the liquidity cushion to VaR ratio remained below 1 throughout October and November 2007 and thus far lower than the ratio considered appropriate in its original business model.

2098. The Plaintiffs argue that Mr Allardice's editing of the minutes of the 13th November Audit Committee meeting to remove references to "going concern risk", whether or not legitimate, reveals that there was real concern that CCC was not a going concern at this time.

2099. The Plaintiffs criticise both the conduct and outcome of the 13th November Board meeting. They submit that it failed to address or even analyse the reasons why market conditions had not improved (they say) since the emergency Board Meeting of 23rd August.    Mr Stomber put forward no proper business plan for CCC, despite having promised one, but only a set of theoretical projections, based on optimistic assumptions that there would be an immediate and substantial improvement in the market.    They submit that the Defendants had no reasonable grounds for believing that any such improvement would take place;  several of the Defendants admitted, in evidence, that they viewed the business model projections as optimistic at the time, yet they did not demand any analysis based on deteriorating conditions, or a "worst case scenario", nor consider an alternative funding model, nor taking proactive steps to enhance liquidity and reduce leverage.   There was no analysis of what liquidity CCC actually needed.

2100. In other words, the Defendants failed to take the "required action" previously identified    All they did was to extend the suspension of the old Investment Guidelines and allow business, and the capital preservation strategy which had been discredited in practice, to continue as before.  The only decision taken was, inadequately, to revisit the question of CCC's business plan and liquidity needs in 2008 at the next (February) Board Meeting.     This was, culpably, just deferring decision-making when what was needed was urgent action; it remained irrational and reckless for the Defendants to continue to run CCC with a "broken" business model, manifestly inadequate liquidity and repo capacity and no risk management controls.

2101. The Plaintiffs therefore repeat their complaint of the core breach, pointing out that Mr Stomber's own projections contemplated the sale of $1Bn of RMBS on a "likely case" basis, and $4Bn of RMBS on a "downside case" basis, which they argue suggests that such sales were regarded as possible. They make a general submission that the evidence of the successful Westways auctions showed that RMBS could be sold in quantities, even by forced sellers, at prices which were higher than CCC's repo marks, and yet Mr Stomber, in particular, took no steps to follow up this positive evidence of a selling possibility, merely using the evidence of such sales as ammunition to try to improve repo lenders' marks, rather than being a good indication that CCC would also be able to sell. They point out that despite this no steps at all were taken to implement such sales in practice. They repeat their complaint of the continued suspension of CCC's three Investment Guidelines until 31st March 2008 without any proper consideration or deliberation.

2102. They invite me to find that Mr Stomber's spontaneous strongly worded email following the Board Meeting was evidence of his contemporaneous and correct perception that the Board was dysfunctional, which he has subsequently tried to resile from. They point out that Mr Hance and Mr Conway accepted, in oral evidence, that they shared the view he expressed there, that the financial market breakdown was not over.

2103. The Plaintiffs aver, in addition, that statements in CCC's Quarterly Reports were misleading of the market in four broad respects; an assertion that CCC's liquidity at the end of September was "strong", a misleading account of the securing, or likely securing of apparently "additional" repo capacity whilst failing to mention off-setting reductions elsewhere, an assertion that the directors were evaluating the appropriateness of a minimum liquidity cushion when in fact they had deferred any such consideration, and the delayed, undetailed, undated and unhighlighted disclosure of the suspension of the minimum liquidity cushion requirement.

2104. They then point to the worsening of conditions after the 13th November Board Meeting – the opposite direction to that which Mr Stomber's projections predicted – and the continuing recognition of such deterioration in, for example, Mr Stomber's email of 21st November, and the "aberrant" relative interest rate trends noted in the 29th November ALCO Meeting. They submit that it was thus clear before the month end, that market conditions were worsening ominously, and that this was not due simply to the predicted "year end" pressure on banks' balance sheets but to grave general pressures in the markets. The implication is that it should have been recognised as such and that this would have led to CCC taking the required action, at that time.

2105. The Plaintiffs rely on the foregoing submissions to support the charges of breach of fiduciary duty, breach of duty of care, and wrongful trading against all the Defendants (they say that by this time the Defendants either knew or at least ought to have concluded that CCC stood no reasonable prospect of avoiding going into insolvent liquidation) and breach of contract/tort against CIM.

2106. I should specifically mention that the Plaintiffs cite the evidence regarding the purchase of CCC's shares by CCC Coinvest, starting on 20th November 2007, the fact that these purchases constituted almost the entirety of trade in CCC shares for the following month, and the evidence, including the editing of the presentation at the Paris Investor Conference, that this was referable to an attempt to shore up CCC's share price. They argue that this was an offence under Dutch law, and also that failing to disclose that an entity connected with Carlyle was making the vast majority of share purchases in CCC before 21st December (when an updated share return was filed) was misleading the market. They submit that the share purchases were clearly made in order to manipulate the market and therefore "cannot be treated as providing any assistance to the Defendants' case for any purpose whatsoever."

**Defendants' Case**

2107. The Defendants' broad submission is that the decision to continue with the capital preservation strategy and not to change to a policy of selling RMBS remained a reasonable course in current market circumstances and their state of knowledge and belief at this time, ie October and November 2007.   They submit that the evidence shows that that decision was in fact taken (or continued) properly, carefully and diligently in all the circumstances, but that in any event it was a decision which was well within the range of possible reasonable decisions at the time and therefore, on the *Charterbridge* doctrine, it was no breach of either their fiduciary duties or duty of skill and care.

2108. They submit that the considerations which had made it reasonable to adopt the capital preservation strategy in the first place had not materially changed.   The advantages and disadvantages respectively attaching to selling RMBS or to holding RMBS remained the same, and there was no change in the balance of advantage and disadvantage sufficient to make a change of strategy the only reasonable thing to do.   The Plaintiffs, they submit, stress the problems and negative factors facing CCC, but they ignore or diminish the positives and, most importantly, continue to ignore the dangers and disadvantages attached to selling.   The material question continues to be whether the Plaintiffs demonstrate that in the situation at the time selling RMBS should have been seen to be the only reasonable course for the Defendants to adopt, and this is not made out on the evidence.

2109. The Defendants contest the Plaintiffs' assertion that CCC's financial situation had not improved since August.   They suggest that on a reasonable assessment it had improved somewhat during October and early November and it had certainly stabilised.     The fact is that CCC <u>did</u> succeed in securing sufficient and affordable repo finance to maintain its RMBS portfolio, which amortisations and prepayments did gradually reduce, as anticipated, during October and November.   Whilst obviously the continued availability of sufficient affordable repo financing was and remained a matter of crucial concern for the Defendants, the fact that it had been obtained thus far was positive.

2110. The suggestion that it should have been recognised that nominal haircuts were inevitably going to rise to 4% or even 5% is an exaggeration which, they submit, is demonstrated by the fact that CCC was never obliged during its life, to accept a nominal haircut higher than 3%. They invite me to prefer the evidence of both Dr Webster and Professor Hubbard which, from different viewpoints supported the view that it was then reasonable to expect haircut rates to have stabilised and to remain at 3% after the dust from the August crisis had settled, to the more pessimistic evidence of Mr Welles, and, to an extent, Dr Carron.   They submit that the objective data cited by Professor Hubbard shows that the general market perceptions throughout the period after the August crisis was broadly of similar optimism to the views taken by CCC's Directors (even if in the event they proved over-optimistic), which supports the conclusion that they were reasonable views to hold and act upon.     They criticise Mr Welles' opinion that CCC ought to have perceived a significant risk of haircuts rising above 3% as being largely speculation about what repo lenders might have worried about, coupled with over-emphasis on the small number of occasions when CCC's lenders raised the possibility of increased haircuts.

2111. They submit that whether or not the obtaining of repo finance was because of the Carlyle connection is immaterial; the important point is that it was obtained.   The Carlyle influence was a fact, it was available to CCC to exploit, and there was no reason to disregard it in evaluating CCC's position and future.   Similarly, the financial support rendered by Carlyle was a fact and its potential availability was likewise a factor which CCC's Directors were entitled to take into account appropriately when evaluating CCC's position and its near term future.

2112. The Wachovia negotiations, they submit, were genuine and were reasonably seen as being of substance.   They had not foundered during this period, and it was wrong to suggest that Messrs Stomber, Conway and Hance ought to have expected them to fail rather than come to

fruition.      Criticism of the Defendants for describing the Bank of America and JP Morgan repo lines as "new", just because there had been lines in former times, was absurd and little more than a dispute about language.

2113. The toughening of repo finance availability over the financial year ends was a well known phenomenon and it had been predicted.  It was not a development which presaged some further downturn in financial markets generally, and in fact steps had been actively taken to cater for it by the securing of some 60 day lines.  The Plaintiffs' argument that the repo lenders' reluctance to lend should have been reacted to as some greater systemic problem is being wise with hindsight.

2114. Whilst the expected discernible flight to quality, and significant recovery of the value of CCC's RMBS, had not happened in October/November 2007, - prices had, rather, stagnated - that fact was recognised in Management's data collection and it remained  reasonable, in the light of previous history and without the benefit of hindsight, to expect recovery to start within the not too distant future.  It was understood and recognised to be ultimately certain. Although general economic indicators were gloomy, the question was whether this made a sufficient difference at the time to the merits of the capital preservation strategy to mean that it ought to be abandoned.  It was a reasonable decision to aim to weather the banks' financial year end pressures and expect that circumstances would improve in the new year.

2115. Whilst recognising that the various statistics and metrics which the Plaintiffs continually referred to in cross-examination and submissions were concerning, the Defendants submit once more that these figures are merely a tool, and an aid to decision-making; they do not dictate decisions, which are properly made on the basis of much wider appraisals of benefit and risk.

2116. The Defendants submit that the argument that they took no steps to guard against a worsening of the financial situation is simply wrong as regards any slight deterioration, and infected with hindsight as regards a major one.      CCC still had the resources to withstand some small worsening in financial conditions; such would likely be temporary (as with the financial year end pressures) and CCC had support from Carlyle potentially available to meet that.      As regards a major deterioration – a second market dislocation – they submit that the Plaintiffs' case amounts to a contention that the Defendants should have taken a known risk (that of attempting to sell RMBS) and the certain suffering of a realised loss which was potentially avoidable, to protect against the possibility of an unknown and unknowable risk of a future systemic change in the repo markets.      They submit that this proposition is coloured with hindsight; it is now known that continuing with the capital preservation strategy did not enable CCC to survive the events of March 2008, but without that knowledge, the risks of attempting sales of RMBS were not justified as against the prospects of in fact being able to continue obtaining affordable repo capacity and not having to do so, or, at any rate, it was reasonable to take that view.  The likelihood of such a second market shock was, on the evidence, reasonably perceived as remote.

2117. They invite me to accept the individual Defendants' evidence, oral or written, to the effect, in each case that he considered, from August 2007 to March 2008, that CCC was currently solvent, stood a fair chance of managing to finance its portfolio, and could reasonably expect improving market conditions, and that it therefore did not need to sell RMBS at prices which would crystallise permanent losses for shareholders and with the attached risks of precipitating an even worse position.

2118. The Defendants reject the accusation that they were prioritising the payment of a dividend over CCC's best interests.  They point out that no dividend was ever in fact declared, and submit that it is not sinister, but only reasonable, for directors of a company supposed to be a yield vehicle, and with investors asking questions about when they will receive a return, to discuss the potential to pay a dividend.    There is also, they submit, no evidence that this

consideration ever had any effect on the decisions taken by the Directors. The declared objective was to preserve shareholder capital (and obviously to remain solvent whilst doing so) and the steps actually taken were consistent with that aim.

2119. In the end, ultimately, the Defendants' case is that the decision to continue the capital preservation strategy was driven by the same factors as previously in September, weighed up appropriately as to the conditions in October/November. Selling was high risk. The Defendants deny that the Westways auction results should have been regarded as evidence that CCC itself could sell similar amounts of RMBS safely at the price levels suggested by the Plaintiffs; this was unrealistic. However, CCC had a small but positive income stream. The logical prospects of the value and market for its RMBS improving were reasonable. As it was not suffering income losses in the interim it could pay its debts as they fell due. So long as it could obtain enough affordable repo financing and did not encounter significant margin calls, it would gain enough time for the markets to recover. It had managed to obtain such repo up to November even if with hard work, and also to weather margin calls with some help from Carlyle. It had the reasonable expectation of further such reasonable support if needed in the future.

2120. They submit, finally, that even if the continued pursuit of the capital preservation strategy had been a mistake – although they submit that on the evidence it was not, but was in fact the right decision at the time, citing Dr Niculescu – that would not in itself be enough to found a cause of action in negligence or negligent breach of contract (see, although in a US context, *CMMF LLC v JP Morgan Investment Management Inc* 543 Misc 3d 1226(A)) and still less a breach of fiduciary duty. It was merely an error of judgment.

2121. With regard to the specific question whether the Defendants could and did reasonably view CCC as a "going concern" they refer to their evidence of their views at the time. They cite the fact that PwC endorsed this view in its Auditors' Report on CCC's Third Quarter Financial statements (given as at 30th September 2007, but signed off with effect at the 13th November Board Meeting) and in fact again, in its year-end report, to 31st December 2007, which was finalised in February 2008. This is a matter to which I will return in more detail, because as already mentioned, the Plaintiffs argue in riposte that the Defendants cannot place reliance on that support, because they knew or should have known that it was based on incomplete and/or misleading information fed to PwC by Mr Stomber and CCC's Management.

2122. As regards the criticisms aimed at the 13th November Board Meeting, the Defendants argue that most of these criticisms go merely, and ineffectually, to form and not substance. They dispute that, on the evidence, it can fairly be said that the Board, or Management did not carry out analyses, or conduct appropriate investigations, submitting that there is plenty of evidence that they actually did so, but in any event, they accuse the Plaintiffs of taking an unreal and rigid approach to the generation of written records, analyses and the holding of meetings, when the important point is the substance of what was done. The Plaintiffs' submissions simply insist, mechanically, that investigations or analyses should have been formally carried out without regard to whether this would have had any real point or been of any practical use, in the actual circumstances.

2123. They submit that the notes and minutes in evidence, as well as the witness evidence, show that the 13th November Board Meeting in particular had all pertinent matters before it and was an in depth and robust discussion of them; they invite me to find that Mr Stomber now accepts that his intemperate email of 13th November apparently criticising its conduct as *"all over the map"* was wrong, and the Board Meeting in fact reflected just healthy discussion. They submit that Mr Stomber's projections were simple projections showing the potential effects of certain assumptions as to the future, and that the *Business Plan Summary* was reasonable for the time; it was premature to try to construct any more immediate plan to remodel CCC's original business objectives, because the markets remained in too uncertain a

state, with as yet insufficient recovery towards the (reasonably expected at the time) norm. The inclusion of sales of RMBS within the projections was again, simply an illustrative suggestion and did not prove any current acceptance that such sales could be safely undertaken, which was being ignored.   Lastly, the argument that deferring further decision making to the February Board meeting was culpable is simply another way of expressing the charge that the Plaintiffs' "required action" was not taken.

2124. With regard to the accusations regarding the purchase of CCC shares by Co-Invest, and the timing of their registration, as being breaches of Dutch regulatory law, the Defendants question the materiality of this to any of the claims in the case.  However, they submit in any event that the evidence, including evidence from the Dutch lawyers, shows that there was in fact no market manipulation.    In very short summary the Defendants invite me to find that such trade based manipulation requires an intent to manipulate the market (thus rejecting a late suggestion by Professor Nelemans on the part of the Plaintiffs that the test would or could be the objective one of whether the market was in fact manipulated).  They submit that, on that basis, the evidence shows that there was no such intention; the intention was to purchase the shares because they were good value, and not for the purpose of manipulating the market at all.    If there were any such thought in the relevant Defendant's mind it would be no more than an example of the realism applied by Lord Sumption in *Eclairs Group Ltd v JKX Oil & Gas plc* [2016] BCC 79 [20]-[21], that businessmen cannot be expected to ignore any welcome collateral advantages of actions which they propose to take for proper reasons, even if they are aware that such collateral advantage would itself not be a proper reason for the action.    There is, they submit, no basis on the evidence to conclude that these purchases would not have been made by the Defendants, using their own money as they did, regardless of any prospect of thereby stabilising the share price.    I should consequently find that there was no breach of Dutch law on the part of the Defendants arising from the share purchases by CCC Coinvestment Limited.

### Discussion and Conclusions – October and November 2007

#### Breaches of directors' duties

2125. The breaches of duty actually alleged in the Cause against the individual Defendants in respect of this period from 2nd October 2007 to 30th November 2007 (I again deal with the contractual allegations against CIM and the position of the Entity Defendants separately) are, as against the Carlyle Directors, the matters listed in Paragraphs 367D.1-10,  and 367E of the Cause, and as against the Independent Directors, the same matters using the same words *mutatis mutandis*, in Paragraphs 367F.1-10 and 367G , again as further particularised in Paragraphs 418A-N and 4124A-G incorporated here by Paragraph 368.

2126. Among these matters, the effectual breaches of duty, ie those which are capable of causing loss or damage to CCC, are the allegations at Paragraphs 367D.4 and 367F.4 first in the now familiar form of

> "failing to insist that CCC either (i) sell down its RMBS assets to generate liquidity and reduce leverage, and/or (ii) raise additional equity capital to reduce leverage and/or (iii) conduct a restructuring or orderly wind down",

with the last being tantamount to the first, in practical terms, because selling RMBS would be the only practical way of winding down the business.

#### (a)   Breach of fiduciary duty

2127. Turning first to the issue of breach of fiduciary duty, once again, the allegations at Paragraphs 367E and 367G are of breach of fiduciary duty by preferring the interests of Carlyle Group

(aspects of its reputational interests) to those of CCC, as previously pleaded in respect of September in Paragraphs 339C and 339E of the Cause.

2128. I can see no material events during October and November 2007, nor any difference in circumstances at the end of November, which makes these allegations materially more cogent or sustainable when applied to this later period.

2129. The consideration of furthering the Mubadala transaction as part of a "strategic objective" was spent with the completion of that transaction in early October 2007, in any event.   I dismiss a faint suggestion that there was still the prospect of Mubadala taking an increased stake in Carlyle as there is not even a suggestion that anyone gave any thought to this.   The considerations of Carlyle's reputation appear to me to be no different from previously.   Only as regards the question of paying a dividend does it seem to me that I perhaps need to mention anything more than I have done previously, because there may be a greater number of references to such a point in the evidence for this period.   I note in particular the importance which Mr Stomber's communications suggest that he attached to this (see 31st October email to Mr Hance) and the fact that this was a significant topic for discussion at the 13th November Board Meeting.

2130. As I have previously stated, however, since CCC's very raison d'être was the payment of dividends, it is neither surprising nor reprehensible that those concerned with conducting CCC's business should feel obliged to air that possibility.   It is, moreover, one thing to consider, and even announce, a plan to move forward with a view to paying out a dividend, and quite another actually to pursue that plan in a manner which would then be contrary to the best interests of the company.   I cannot see that the possibility of paying out a dividend actually made any difference to the decisions taken by the Defendants in this period with regard to how CCC should move forward; its acknowledgment seems to me to have been just a nod to the fact that CCC's investors would want to be assured that CCC had such an objective in mind.  It was really a statement whose main object was to reassure investors.   I therefore remain quite unconvinced that the pursuit of payment of a dividend actually affected the Defendants' crucial decisions to continue not selling RMBS at this time.   I am not satisfied that the extent to which any such objective operated in the minds of any of the Defendants was improper, or that it tainted the decisions actually made with an improper motive of somehow prioritising Carlyle's reputational interests to the individual interests of CCC as a separate entity.

2131. I referred above in the course of the narrative with regard to November, to my finding that Mr Ng's comment to a fellow trader that CCC was looking to make dividend targets was not evidence of any actual policy, but a convenient throw away excuse for showing nonchalance when gathering market colour.

2132. I have already said that I consider the allegation of an improper motive connected with bolstering the payment of fees to CIM to be unsustainable on the evidence.   The only fees ever paid by CCC to Carlyle had been properly earned in accordance with the terms of the IMA, and I can see absolutely no evidence that the continued conduct of CCC's affairs was in any way influenced by an attempt to manipulate these to enable CIM to claim fees.

2133. I therefore once again dismiss the allegations of breach of fiduciary duty in respect of this period.

**(b)     Breach of duty of care**

2134. With the effectual breaches of duty alleged distilling once more down to the core breach as alleged in sub-paragraphs 367D.4 and 367F.4, the remaining sub-paragraphs are again in the nature of particulars of that breach.     For example, it is implicit in the allegations of "failing to prepare or procure the production of a viable business plan" for CCC, either at or after the

13th November Board Meeting (Paragraphs 367D.1 and 2 and 367F.1 and 2), that the "viable" business plan which the Plaintiffs mean is one which would have involved selling RMBS or raising capital.  Failing to investigate "all potential avenues" for CCC to sell RMBS assets or raise further capital (Paragraphs 367D.3 and 367F.3) again simply states the core breach in different words (but see the discussion of this in relation to CCC's engagement with the markets in September).   Failing to prepare or procure a "worst case scenario analysis" for CCC, (Paragraph 367D.5 and 367F.5) is a criticism of form and not substance since it cannot be alleged to have caused any loss to CCC except through its leading to the core breach.

2135. Paragraphs 367D.6 and 7 and 367F.5- 367.7 respectively allege breaches of duty by failing to seek and obtain investment or insolvency advice and by approving the continued suspension of the original Investment Guidelines.  These are, once more, matters which are not alleged to be causative of any loss independently of the core breaches.

2136. As to the allegation with regard to failure to take investment or insolvency advice, I gave my analysis of the effects and scope of such an allegation when considering September and that analysis leads to the same conclusions here.      However, for the avoidance of doubt, and although it is technically of no impact on my conclusions, I make it clear that, examining CCC's financial situation at the end of November 2007 (or even 13th November 2007, as Mr Wallace chose to prefer for the purposes of his expert report), I conclude that CCC was not insolvent at the time, whether on the basis of the test which I find applicable in Guernsey law at the time of being "unable to pay its debts" or the broader test of being "unable to pay its debts as they fall due".    CCC's own financial position had, I find, improved somewhat since September; it had moved a little further back from the "cliff edge" of disaster on that cash flow front, and now had a track record of managing to meet the market conditions which presented themselves, as had been predicted.   It might be living hand to mouth (or "*roll to roll*" as Mr Allardice described it) but it was nonetheless succeeding in doing so.  Whilst market conditions remained dire and financing could become more difficult because of the year end pressures on the banks, CCC had anticipated this and taken steps to cope with it. The overall position, therefore, was that CCC was meeting its debts, and whilst it might require hard work and persuasion to ensure that it continued to do so, I am satisfied that the prospect of its not doing so was speculative rather than there being no reasonable prospect that insolvency would be avoided.

2137. As to the allegation of culpably continuing the suspension of the Investment Guidelines in November 2007 this is made and defended on a similar basis to September, and there is no material difference in either the facts or the surrounding circumstances.  I do accept that there had, by this time, been a further period of time during which it had not been possible to restore the original guidelines, but that is not in my judgment a decisive point. The present objective was to achieve running CCC solvently whilst preserving capital; the luxury of comfortable risk management guidelines was not available, and would not become available until market conditions settled to a point where CCC was able to transition to a new business model and devise suitable guidelines for that.  I find that there remained respectable reason to believe that this could be achieved.   In those conditions I do not consider that the continued suspension of the original Investment Guidelines, appropriate for a different market environment, was any breach of duty by the Directors, and I therefore reject this allegation as regards November as well.

2138. The complaint of approving the repayment of the $100Mn loan from Carlyle and its substitution with a revolving line of credit at a commitment fee "*without scrutiny*" when this was "*grossly inadequate*" to materially benefit CCC and did not address its longer term viability (Paragraph 357D.8 and 367F.8) simply focuses on one angle of the core breach.  It no longer appears to be persisted in as a basis of claim, as already mentioned.

2139. Approving the redefinition of the liquidity cushion to include the undrawn debt from Carlyle "*without considering the effect of that upon CCC's long term viability*" (Paragraphs 367D.9)

and 367F.9) is a bizarre allegation, not alleged to have caused any loss in itself, and simply diverting attention from the allegation of substance. In fact, as these funds were plainly available to meet calls on CCC's liquidity, it is difficult to see what objection there could be to this action, other than on presentational grounds. The complaint appears to boil down to an allegation of lack of self-discipline, and is therefore at best merely evidential with regard to the core breach. Once again, it does not seem to be seriously persisted in.

2140. The final allegation (Paragraphs 367D.10 and 367F.10) is that of failing to convene a Board Meeting prior to 13th November 2007 despite the fact that "*Carlyle [sic] and CIM had done nothing to reduce leverage or increase liquidity as had been represented to investors…. would occur,*" nor had presented a viable business model to the Board. This again goes nowhere beyond the scope of the core breach itself, which I therefore move on to consider.

### (1) Failure to raise additional equity capital

2141. I have already foreshadowed, in considering September 2007, that I would reject this allegation of breach of duty, and also the further associated allegations made generally that the Defendants never reconsidered their early rejection of this course of action.

2142. In fact I find this latter complaint unjustified as a matter of evidence and balance of probability. I have already stated that I do not regard it as culpable that options previously rejected should not be repeatedly reconsidered and recorded as being confirmed without any change of circumstance to give this any point. In fact, though, it is clear that the possibility <u>was</u> raised by Mr Zupon at the 13th November 2007 Board meeting, and was considered but dismissed at the time, as confirmed by the evidence of Messrs Stomber, Hance and Allardice.

2143. I find this evidence inherently probable. I also find that this action  was reasonable. Although the Plaintiffs criticise Mr Zupon, in particular, for having accepted the judgment of others that this was not a feasible option, such criticism is, in my judgment, misconceived. First, there is the general point to which I have referred previously, that Board decisions are made by a majority. It follows that a minority view may be overruled by a majority decision. Given the nature of board decision-making, it cannot, therefore, be a criticism of a minority member that he did not "insist" on pursuing his position in the face of a majority decision to the contrary, and that must be so even if the arguments of the majority had failed to convince him.   On that ground alone it seems to me to be extremely difficult, if not impossible, to bring home individual culpability to a Board Member because his point or opinion is overruled by the combined views and votes of a lawful majority of the Board, and he accepts this position. This would be so even if his own view turned out to have been the better one.

2144. Second there are two points specific to Mr Zupon. The first is that he had no vote; he was not in a position to "insist" on anything. The second is that by this time – 13th November - he was no longer involved with the day to day running of CCC's business because the assets within his specialist expertise had been disposed of. His duties were therefore largely confined to those of raising material points to ensure that they were aired, examined and not overlooked, and so that they could be pursued if appropriate. He did just that at the November Board Meeting. I do not find any justifiable criticism of his conduct at that time.

2145. Examination of the notes of the November Board Meeting also reveal, very clearly, that the possibility of attempting to raise additional capital was considered as part of a general discussion of financing issues, shareholder concerns, the balance of appropriate regard to payment of dividends or preservation of liquidity, stock prices, and suchlike. It was rejected as being impracticable, perfectly understandably.

### (2) Failure to initiate sales of RMBS