2146. Once again, then, the central complaint is simply that the Defendants failed, during this period and in particular at the 13th November Board Meeting, to take the step of commencing to sell quantities of RMBS as the Plaintiffs plead they should have done. The issue is whether their decision not to do so was a breach of their respective duties of care at that time.

2147. On the one hand, the Plaintiffs stress the difficult and perilous financial situation facing CCC at this time, especially with regard to the difficulties of obtaining affordable repo financing and the fact that this had not improved, they suggest, in a further two months since September and was likely to get worse, together with the risks of continuing to hold RMBS at a leverage ratio of 30x or more, and they submit that a decision not to start selling RMBS in those circumstance was negligent to the point of recklessness and irrationality.

2148. On the other hand the Defendants stress that whilst the financial situation facing CCC was difficult, it had not significantly deteriorated since September 2007 and that a degree of expected imminent deterioration was catered for, that CCC remained cash flow solvent, that it remained reasonable (it was certainly, they submit, within the range of expectations at the time) to expect market conditions to recover sufficiently in the reasonably near future to restore the value and liquidity of CCC's assets, and that the many risks of attempting to sell – moving the market or being perceived as being in trouble or, still worse, a distressed seller – remained major, such that the balance of advantage, disadvantage and risk made a decision not to sell RMBS a perfectly reasonable one.

2149. I prefer the Defendants' arguments and submissions. In my judgment, this was a business decision. As such, it is not a decision which the court will lightly second guess. It is only where it appears to be incontrovertibly negligent that the court would do so. It is for the Plaintiffs to convince me that the decision not to start selling RMBS at this time was a decision which no reasonably competent, careful and diligent director, (with, insofar as material, the particular skills of any relevant Defendant) could reasonably have come to in all the circumstances at the time. They fail to do so. I am in fact satisfied that it was probably the right decision to come to at the time, but I do not need even to go that far.

2150. My reasons for coming to this conclusion are broadly those advanced in submissions by the Defendants. I will not be unnecessarily repetitive by setting them out in full detail, but make the following points. Where I do not, therefore, deal expressly with any argued point or matter of evidence, it can be taken that I have preferred the submissions or evidence of the Defendants or their experts.

2151. Once it is found, as I find, that the decision taken in September 2007 to implement the capital preservation strategy was itself a reasonable one, the issue with regard to any future date becomes whether circumstances had changed sufficiently that due skill, care and attention required that decision to be revisited and then changed. I do not, in fact, see the position with regard to repo finance as having materially changed between September and November. The level of difficulty in obtaining it was, it seems to me, fairly constant. The only material change was that a further two months had elapsed without a restoration of liquidity to the markets, or a notable improvement in obtaining finance, or the value of CCC's assets actually being seen to improve significantly. Given the fact, though, that CCC was solvent with a small but positive cash flow, and that the logic behind the belief that the value and tradability of its assets would improve remained the same, there was reason to consider that this delay or stagnation was something which it was appropriate to try to weather.

2152. The timescale without improvement in prices was only a couple of months, and I am satisfied that it could be reasonably seen, at the time, as explained by the imminent financial year end pressures on banks; reduction in the availability of financing affects liquidity and has a depressing effect on asset values. The delay was not, I find, so long as to put that logic into question. Indeed, the improvement in the initial six weeks of this period, from October (after the effects of compulsory liquidations of ABCP funds had spent themselves) to early

November, was some supporting evidence that the logic of expecting recovery, even if only gradual, was sound, and  that year-end pressures were causing a mere temporary stagnation. I do not find the evidence to suggest that this should then have been seen as symptomatic of an imminent systemic failure in the markets.

2153. Neither do I think it was culpable not to see the improvements of October as a green light for now positively trying to embark on a sales programme, given the delicacy of CCC's position and the risks of selling.     It does not seem to me that, in the circumstances which I have already examined in detail when considering September, the prices achieved in the Westways auctions were an obvious indication that CCC could expect to sell similarly large (as it would have been) quantities of RMBS, even over a period, even at similar prices, and the prices achieved in the Westways auctions were not, in fact, at the levels which the Plaintiffs contend CCC ought to have been able to achieve.   Certainly I find that the evidence of the Westways auctions would not have been sufficient to justify any confidence in the safety and achievability of this course.   Although the Westways auctions were forced sales, the market was aware of the quantity of assets involved.   With CCC, there was a valid concern that the market would be well aware, as CCC was a public company, of the potential quantity of RMBS which might come up for sale, and this could easily affect the market's reactions. Being cautious in regard to selling was still, I find, not an unreasonable approach, in the circumstances of October and November 2007.

2154. I accept that Mr Stomber quite clearly, at the time, took the view that the financial difficulties of the markets were far from over, and that, at the end of November one was in the middle rather than at the end of the problems, but Mr Stomber had a dramatic style, and I interpret his emails with that in mind.   They certainly seem to show mood swings.   I have no doubt that he grasped at signs which could be interpreted hopefully, as he desperately wished them to be, but he also adverted to negative signs with the pessimism which I think comes to him more naturally, or at least did at that time.   However, I have no doubt that he conscientiously strove to maintain a soundly based balance of reason in the judgements which he made and I am satisfied that he did so.   Major difficulties there might be to come, but I am satisfied that at that stage it was reasonable to perceive the difficulties as being a possible general trend (the US economy was quite likely to go into recession), rather than as presaging a sudden systemic failure of the US financial systems which would completely disrupt the market, such as occurred three months later, and that such a gradual general trend was still one which CCC could survive.

2155. The other relevant circumstances relate to the evidence of the availability of repo finance on affordable terms. Internal email correspondence in October shows that the Defendants clearly recognised the dangers to CCC of shrinking or even disappearing availability of funding, and so forth, but this is a long way from saying that they did or should have recognised that these dangers were then so acute that they demanded efforts to sell off RMBS despite the risks which this entailed.

2156. I have rehearsed the competing points made above. I think there is some exaggeration in both the doom and gloom points advanced by the Plaintiffs and also, the more rosy position which is now advanced, I think defensively, by the Defendants.   It is a fact, though, and I find it of significance, that CCC did always manage to obtain repo finance on apparently affordable terms, ie never in excess of a nominal 3% haircut, and always below this on average, even when the effects of "backdoor" haircuts amongst some lenders were factored in.     I accept the submission by the Defendants that proposals for increased hair-cuts were often not all they seemed, and could be either coded messages or "try-ons".     Given this, I do not attach any great weight to what may have been throw away remarks in the course of negotiations.   The evidence satisfies me that CCC's Directors could reasonably believe that in practice CCC would be able to juggle all its repo financing to continue obtaining funding at a 3% haircut (which was affordable) or below, as it had in fact done during October and November, and with some steps taken to ease the likely year end pressures.

2157. I do not regard it as a major significant factor that CCC was very close (within $2.3Bn on a total borrowing requirement of just under $22Bn) to full use of its lined up available repo capacity.   Whilst it is obviously comfortable to have the semi-promise of significant extra soft line capacity to call on, CCC only needed its actual capacity requirement, and it had always achieved that.   Indeed, in October and November it did so, even if coming very close to no excess capacity for a few days in early November, and with constant juggling required.

2158. I find it irrelevant that this might only be obtainable because of the Carlyle association.  The fact is that it was obtained or obtainable in this way, and the Carlyle association was an asset of CCC, available for exploitation.  That association would also continue to be available, for whatever it might be worth in practice.

2159. In addition, I find that it was reasonable for CCC to be expecting that the promised $2Bn line at 3% for 364 days from Wachovia was virtually a done deal at the end of this period.   It is suggested that Mr Stomber's expertise (at least) should have told him that Wachovia were not a reliable party to complete such a transaction, because they were inexperienced and had had to turn to an agent/guarantor structure, the implication being that in the very end Wachovia was unlikely to be willing to take on such a role.     I do not accept that proposition; I am satisfied, on the evidence of the negotiations, that at any rate up to the end of November it was reasonable for CCC's Directors to anticipate that the line from Wachovia could be secured.  It might be that Wachovia was stretching itself because of its connection with Carlyle, but I do not see that as making it unreasonable to assume that Wachovia was intending to, and would, live up to its apparent word and intentions.

2160. As regards liquidity, there was if anything, it seems to me, an improvement since the end of September 2007, and indeed, this would reasonably have reinforced Management's and the Directors' belief in the capital preservation strategy.   Of course, this liquidity included the availability of, first, the Carlyle Term Loan and latterly the unused balance of the similar revolving credit line, but in my judgment it was reasonable to regard this as available liquidity for CCC; all the indications were that it was reliably available.     Once again, the falling off of improvement at the end of November was anticipated as a likely effect of the end of year pressures, and, I find that view not to have been unreasonable.

2161. The Plaintiffs' accounting expert, Dr Holstrum, put forward an argument that further continued support from Carlyle could not be taken into account because it could not be definitely relied upon, because he suggests that it would have been withdrawn if it would lead to the Carlyle Group's having to consolidate CCC into its own accounts.     I am satisfied by the analysis of the Defendants' expert, Mr Carnahan, and by the Defendants' submissions on this point, that the argued likelihood of a requirement to consolidate arising out of loan support by Carlyle for CCC was speculative.

2162. I accept that there is some evidence, from later on, that this possibility would have played a part in Carlyle's assessment of the position.  It is found in a recorded remark by Mr Conway at the Audit Committee meeting of 26th February 2008, that *"Carlyle does not want to be in a position where it has to consolidate CCC"* and that things were *"close to the line."* However, on examination in context, this remark was made in relation to a discussion about whether CIM should waive its incentive fee entitlement, and the matters which brought the position *"close to the line"* were not only *"credit support"* but also *"purchase assets…restricted stock and IMA"*.     This evidence therefore falls a long way short of clear evidence that Carlyle would have abandoned CCC to its fate on the financial support front if giving further loan support would cause the possibility of having to consolidate, even if, (and of which I am not satisfied) that would have been the consequence.   I am certainly satisfied that it was not an apparent or likely consequence at the time, three months earlier, that I am here considering.     I find the position at this time to be that whilst Carlyle would seek to avoid the inconvenience of consolidation if possible, that was not then, and probably not at

all, a matter which would have caused it to have refused further financial support to CCC so long as it was satisfied that such support would be likely to be commercially effective.

2163. As regards other material parameters, whilst the seriousness of CCC's position with regard to leverage was both apparent and accepted, there had been no change in this. There had equally been no change in the danger factors which were perceived, whether expressly or more intuitively, with regard to CCC's selling RMBS.

2164. For these reasons, I find that drawing the balance of business judgement in favour of continuing the capital preservation strategy was a perfectly possible, reasonable approach. It was also reasonable to conclude that only a further major change or shock to the financial markets would de-rail the reasonable likelihood of a steady, if slow, climb to recovery. On the preponderance of the expert evidence, such a second crisis was historically, statistically and logically unlikely to occur imminently, and I am also satisfied that that is how it appeared to the Defendants, and reasonably so appeared to them, at the time.

2165. Dr Carron is the only expert suggesting the contrary, but even he only says that the possibility of such a systemic withdrawal of repo funding was "signalled" by the August crisis itself, and even then he agrees that the timing of the March 2008 crisis was not anticipated by market participants; in other words, he seems to take the view that such an event was "when" rather than "if". I am not sure, though, that he does go so far as to suggest that the inevitability of "when" was actually foreseen at all generally by the markets at this time, and if so, this seems to me to smack very much of hindsight. One knows from later events and analyses that the eventual meltdown of the markets in March 2008 was the result of an accumulation of ill-judged and ever more risky lending practices by banks in the subprime mortgage and CDO markets turning out badly, and coming eventually to affect the stability and solvency of the bank lenders themselves, but how much that was appreciated, and how far the consequences could therefore be foreseen, from August 2007 before it actually happened, and, specifically, foreseen by ordinary market participants in their own particular corner of the wider market, is a different matter. It is this latter question that I am concerned with here.

2166. I do not understand Dr Carron to be saying more than that the signs of the ultimate disaster were in fact there to be read from August 2007. Whilst a small number of people (and no doubt more after March 2008 than before) may have seen and correctly (in the event) interpreted these signs in the second half of 2007, the evidence suggests that there was also a significant and much larger cohort of market participants and observers who did not expect any such second disaster to occur, but thought it most likely that there would be a gradual, if bumpy, recovery back to something approaching pre 2007 conditions.

2167. I therefore prefer the opinions of, in particular, Professor Hubbard and Dr Webster to Dr Carron. In any event, their difference of opinion supports the view that it would not have been outside the scope of reasonableness to subscribe to the expectation that a second severe market crisis was not likely.

2168. Mr Sarles, who seemed to me to give this possibility of an imminent second market crisis most credence, gave a figure of 20% possibility, but only as a maximum for the sake of argument in oral evidence. Even that is a figure significantly below likelihood.

2169. Perhaps more importantly, though, a second major crisis was in any event a matter which, it seems to me, could not, practically, be protected against at the time, because the only possible course was that of cutting losses by undertaking a major selling programme of RMBS, with the imponderable, potentially serious and uncontrollable risks which this entailed. These major risks would therefore be run in the unpredictable hope (not even a certainty) of forestalling the effects of a market event of certainly potentially catastrophic consequences, but apparently minimal likelihood. Therefore, to conclude that continuing to hold RMBS was the less risky and better course in CCC's interests than selling them was a business

judgement which, even if there might possibly be divergent views, was certainly (I find) well within the range of a reasonable business decision in all the circumstances.

2170. Mr Sarles, with typical simple bluntness, summed up the thinking in November as being:

> "...On the one hand...we've got this strategy that works in all of the cases except for the big problem, and that's - you know - we don't think too likely to occur. Even if we thought it was likely to occur, how we would deal with it is so problematic and we didn't see any way to do it that would work. So I thought we made the best strategy, we made the best choice possible, which was to stick with the capital preservation approach."

2171. I find that this was effectively the Board's approach, and I find it was not unreasonable.

2172. With regard to the 13th November Board Meeting and associated Audit Committee meetings, having considered all the evidence of the notes, Minutes and surrounding circumstances I am satisfied that the Board meeting was appropriately held and conducted, and that it gave appropriate consideration to material matters. The Defendants did engage in thorough and searching discussion to the depth reasonably to be expected at a Board Meeting of a company such as CCC in the circumstances. It is suggested that there is no evidence that the Defendants actually discussed the supposed "business plan" which was presented and the summary of which contained, it is said, unrealistic assumptions, such as the value of CCC's securities being marked at IDP prices by the third quarter of 2008, and that its liquidity would have risen to $220Mn by the year end. Having reviewed the evidence of the discussions which actually took place, I do not think this is a fair criticism. With it being reasonably seen as premature to make a defined plan for CCC, I am satisfied that proper and sufficient discussion with regard to CCC's future course, with the provided information as background material, was undertaken.

2173. But in any event, such a criticism misses the point. Even if I assume that Board Members negligently failed to examine the assumptions of Mr Stomber's illustrative cases in depth, to pull these apart for being unacceptably optimistic, and failed to insist on the preparation of some other worst case scenario, that is immaterial unless it would have made any difference to what they actually did. I am quite satisfied that it would not. The basic fact is that CCC had only two broad options; risk trying to hold RMBS or risk selling them. Whether or not Mr Stomber's assumptions as to the future in any particular case were optimistic or realistic, that practical choice was the same, and the decision which to follow depended on assessing the same balance of risk and benefit. The Plaintiffs' case would therefore depend on demonstrating that if a more "realistic" or pessimistic business plan had been put forward or commissioned this would have led to a different decision being taken as to the relative merits of holding or selling. They just do not do so. Having regard to the available options and on all the evidence in the case, I am satisfied that even if a more pessimistic view of when CCC's RMBS would begin recovering to par had been put forward or considered, it is only speculation to suggest that this would have given rise to a different decision on the relative merits of holding as against selling RMBS, and in fact, I think that in all probability the decision would have been the same.

2174. The Plaintiffs have submitted that the inclusion of suppositions that CCC's RMBS could be sold within the various "cases" put to the Board Meeting is evidence that they really believed that this could be done, but then chose to ignore the obvious benefits of doing so. The Defendants deny this, saying that those scenarios were only suppositions for illustrative purposes. I accept this evidence, because it seems to me to accord with the circumstances. These were illustrations as an aid to considering possible courses of events.

2175. I find the criticisms that the Defendants did nothing but defer decisions until February unjustified, for similar reasons. This was an actual decision, and not "no" decision. It is

clear on the evidence, supported by the meeting notes in particular, that it was accepted that the crucial point was that markets were not sufficiently recovered or stable to enable CCC yet to take active steps to start investing again, or, in other words, to transition to a new business model capable of delivering the kind of shareholder benefits which CCC had originally been designed to produce.  It is apparent that the fact that there could be no immediate prediction of when CCC might be able to invest again, together with the likelihood of imminent questions from shareholders about dividends, caused a good deal of concern and even frustration at the Board Meeting, but also a realistic recognition that it was still too early to start changing CCC's course.  In those circumstances, and with CCC on a course of operating in capital preservation mode, deferring review of the situation, and any specific decisions, to the following Board Meeting was both reasonable and obvious.   The Defendants were entitled to proceed on the basis that if there were any further major and significant change of circumstance, CCC had a Management team in position, and the system of ALCO meetings and reports, to bring this back to Board Members' attention appropriately.

2176. The Plaintiffs laid great stress on the general email of Mr Stomber later that evening (13th November), as evidence, and effectively as an admission, that the Board, and this meeting, had been dysfunctional and haphazard  - "*we were all over the map*".  I have looked carefully at this email and its surrounding circumstances.   I do not find it to amount to any such admission or evidence.   There is no indication that some sensible suggestion by Mr Stomber (and in particular some suggestion to sell RMBS, which is what the Plaintiffs are arguing was the only sensible course) was being capriciously or superficially overruled by voting Board Members, as I would have expected to find if Mr Stomber's real complaint had been the disorganisation, dysfunction or indecision of the Board.   Indeed the upshot of the meeting was to continue with the capital preservation strategy, which was what Mr Stomber had effectively been recommending, even if *faute de mieux.*      What I find happened is that during the meeting Mr Stomber found himself effectively being cross-questioned with regard to his analyses by, in particular Mr Zupon and by Mr Hance, on topics of which he had not been forewarned, and it was this which upset him, especially coming from Mr Zupon with whom he had a rivalry and a personality clash.      Mr Stomber was already sensitive about CCC's position, and the stress of such unexpected cross-questioning caused him anger and frustration, and this is what was behind the intemperate terms of this email; Mr Stomber is highly strung, tends to express himself dramatically, and often does not suppress his feelings. For that reason, I can accept Mr Stomber's recent statement that he now accepts that the Board Meeting in fact reflected, as I find it did, healthy discussion.   This culminated in an actual decision that the current strategy was correct.

2177. The above are my reasons for dismissing the claims of breach of duty of care against the individual Defendants during this period.  There are, however, three other points which I feel I need to deal with specifically in connection with the Plaintiffs' criticism of the Defendants' conduct in this period, although the first is only marginal.

2178. I have recorded above the Plaintiffs' complaints against the Defendants with regard to allegedly misleading statements in CCC's Third Quarter 2007 reporting documents, in four respects.  All four matters are all, also, yet again, allegations with no causative effect as regards the claims made in the action.

2179. Three of these (that CCC had "strong" liquidity, that the directors "were evaluating" CCC's liquidity needs, and that the disclosure of the suspension of the liquidity cushion was played down) I regard as having no substance at all.  They are matters of impression or interpretation rather than clear factual inaccuracy, even descending, to my mind, to the point of pedantry. Amongst the three completely inconsequential matters, the question whether a liquidity cushion level is "being evaluated" at a time when one has agreed that it is not yet possible to make any firm or sensible conclusion because there is insufficient information available seems to me to be a matter of semantics; I do not think it seriously arguable that the MD&A was actually misleading in this respect in the circumstances - even if it mattered for the

purposes of this case.  As regards the more material point about whether the underlying reasons for not yet making a decision about appropriate liquidity cushion levels were valid, it seems to me that they were.  I accept the recorded comment of someone at the meeting that a 20% (or whatever) liquidity cushion is not a target in a crisis; it is *"a buffer to be used in time of crisis"*.  The material point for present purposes is that, whatever the level of liquidity cushion which might ultimately be thought appropriate, it was plain that, in any event, in the interim until CCC adopted a more proactive business model with a liquidity cushion as part of it, CCC and Management were simply going to continue trying to add liquidity to CCC's position by the means which they thought the most safe and appropriate, and in the interests of CCC in all the circumstances.

2180. Only one point does, I think, have some substance, and it is the complaint of conveying a misleading impression that CCC's repo borrowing capacity had actually been increased.  Mr Conway, confronted in evidence with the statements made about increased lines having been agreed and the impression thereby given that there had been an increase in overall capacity, agreed that it *"would have been better"* if the decreases in other lines had been mentioned as well as the increases – the real position was simply that CCC had spread its repo finance somewhat - a good thing in itself, but not the same as additional capacity.  This was an appropriate recognition by Mr Conway that the text as it stood was inclined to be misleading, but, as I have said, this fact has no impact at all on the claims made in the case.  I have mentioned it only to illustrate that I do not find that the Defendants' conduct has at all times been faultless, but I am concerned only with whether any faults which I do find are sufficient to support the claims which the Plaintiffs have made in this action.

2181. The second matter is that of the purchase of additional shares by the Defendants on and shortly after November 2007 (and in the case of Mr Conway, further in early December).

2182. The Plaintiffs have alleged, in reliance on the written note of the 13th November Board Meeting, the express comments of Mr Hance excised from the record of the Paris Investor Conference on 20th November 2007, and the more oblique comments made there by Mr Stomber, that those purchases were made in order to stabilise CCC's share price, that I should make such a finding, that this is unlawful market manipulation under Dutch law, and that consequently these purchases "cannot be treated as providing any assistance to the Defendants' case for any purpose whatsoever."

2183. No authority is cited for the somewhat ambitious final proposition, and I reject it, whether as a proposition of legal principle or of evidence.  That the purchases were made is a fact.  Whether or not they were lawful under Dutch regulation is not part of any alleged cause of action against CCC, nor does it affect any assessment of damages.  Neither is it, so far as I can see, any kind of circumstantial evidence tending to prove or disprove any of the causes of action alleged.  Even assuming the Defendants had deliberately bought further shares in order to attempt to influence the price of CCC's stock, this would not provide even indirect evidence that the core decision about running CCC's business, ie holding rather than selling RMBS, was taken negligently or for improper motives.  There is no connection between the two matters, and not even, in my judgment, any connection as regards credit.

2184. It follows that I do not need to make any finding as to whether these purchases were an offence under Dutch law, and I decline to do so.  This is because it is unnecessary for me to do so for the purposes of this action, as indicated, but in addition, any such finding as I might make would be of no utility or impact for anyone, as it would simply be an (unnecessary) fact found by a Guernsey judge.  A further reason is that I do not think it right to make any such findings based solely on the written opinions of two Dutch lawyers, however eminent, who have not been called for cross-examination, are only able to tell me at best what a Dutch court or regulatory tribunal (the AFM) would be "likely" to do, and who are not entirely agreed on the position in Dutch law anyway.

2185. The fact of the purchase, as contrasted with its regulatory probity, does, though, have some materiality in the case. Balancing this and the considerations above, I therefore make the following findings.

2186. I am satisfied that after the immediate aftermath of the August 2007 crisis had been weathered, the Defendants' collective approach to conducting CCC's affairs was along the lines of how CCC was going to be managed back to health and move to an appropriate new business model. They were acquainted with CCC's affairs and the subtleties of its financial circumstances to varying degrees, through monitoring its activities and performance, in accordance with their individual functions. In the course of this, first Mr Zupon (early October 2007) but then also Mr Stomber (30th October 2007) and, by the beginning of November at any rate, also Mr Conway, had each formed the view that CCC's shares were, logically, undervalued and were likely to be a good investment for when the anticipated recovery in the markets and the value of CCC's RMBS – principally the latter - eventually occurred.

2187. The first clear suggestion of using purchases to try to halt the steady decline in CCC's stock price came at the Board Meeting of 13th November, and may well have been prompted by Mr Zupon's comment, in the context of considering raising fresh capital, that the business and stock price would first need to be stabilised. It is clear that the possible effects of purchases of stock, both on the stock price and as to possible public relations problems, were discussed more than just superficially at the Board Meeting, and it would be quite unrealistic to suppose that the possible beneficial effects of purchases on the stock price were not in the minds of at least the more commercial of the Defendants as a consequence.

2188. I am perfectly satisfied, however, that each of the Defendants did genuinely believe, when making the purchase of further shares which he did, that those shares were underpriced and were a good investment as a result. They may, to a greater or lesser degree in any particular case, have believed, and been pleased, that the purchases would also have the desirable effect of helping to stabilise CCC's share price. However, this was not the principal motive of any of them.

2189. I am satisfied about this latter point because the sums which each of the Defendants invested were significant, by any standards. I do not have details of the personal circumstances of each Defendant to enable me to judge how significant or important the amount of his individual investment would have been to that Defendant. No evidence as to this was either led or sought in cross-examination. I am, though, satisfied that none of the Defendants would have made an investment of the magnitude which he actually did make without having the belief that it was likely to be a good investment for him personally, and none would have been prepared to risk throwing such money away simply for the purpose of improving CCC's share price. On the evidence I can see no plausibly sufficient incentive for any of them to do so. I find, therefore, that these further investments were made in the belief of the worth of the investment as its primary motive, although potentially helping to stabilise CCC's stock price was probably also noted as an incidental benefit.

2190. The materiality of these facts about such further investments lies in a different direction. I have previously considered, and found, that there was no improper collateral motive of conflicting personal interest, or conflicting interests of the Carlyle Group tainting the decision or advice of the Defendants (and Messrs Stomber, Conway, Hance or Zupon in particular) not to sell RMBS. I have also found that at earlier times (August and September 2007) the Defendants genuinely believed that CCC could and would avoid insolvent liquidation. I made these findings without regard to the implications of the fact that the Defendants each, in November 2007, invested significant further sums of their own money into CCC. I find that this fact does, though, provide strong retrospective confirmation of this and also strong support for the proposition that the Defendants each did, honestly and genuinely, believe in late November 2007 that CCC was not in substantial danger of insolvent liquidation. It also

suggests by implication that the steps which the Defendants were taking in the management of CCC's affairs were sincerely regarded as being in the best interests of CCC. Otherwise, the Defendants' readiness to hazard such significant amounts of their own money in CCC defies common sense.

2191. The third particular point relates to the PwC review of CCC's Third Quarter 2007 ("3Q2007") financial statements and its evidential value with regard to the reasonableness of regarding CCC as then being a "going concern", but as this is of particular relevance to the wrongful trading claim, I will deal with it under that heading.

2192. It follows from the above, that I dismiss the Plaintiffs' claim against the individual Defendants for breach of duty of care, as well as fiduciary duty, with regard to November 2007.

**(c)     Contractual/tortious claim against CIM**

2193. Once again, the Plaintiffs do not seek to suggest that there are any materially different points to be made in respect of CIM's liability, from those which are made in respect of the individual Defendants and in particular Mr Stomber.

2194. When considering the position in September with regard to following up possible opportunities for selling RMBS, I dealt also with the enquiries regarding bond FNS 380f7 made by Bear Stearns, and concluded that on the evidence it was probably negligent (but not grossly negligent) for CIM personnel to fail to follow up this enquiry at all, as they had apparently not done. This event in fact falls within this time period and I therefore record it here. However, since I also found that there was no sufficient evidence that it would have resulted in a sale, or a sale which would have alleviated CCC's ultimate loss, it does not give rise to any entitlement to relief.

2195. Considering the matter at the end of November 2007, I therefore dismiss the contractual and tortious claims against CIM, for the same reasons as in relation to the individual Defendants and as just mentioned.

**(d)     Wrongful trading**

2196. I have already set out the test with regard to wrongful trading when considering August and September, and the considerations which I set out there remain the same. They are the factors which I discussed above with regard to duty of care, as regards my findings as to the Defendants' assessment of CCC's financial position  The only additional factor here is with regard to the investigation carried out by PwC into whether CCC could properly be considered to be a going concern, as part of its third quarter 2007 review of CCC's financial statements.

2197. The issue is whether, in defending their assertion that they honestly and reasonably believed that CCC stood a reasonable chance of avoiding going into insolvent liquidation in November 2007, the Defendants are entitled to rely on the fact that PwC carried out this "going concern" analysis and concluded that CCC did so qualify, signing off on that proposition on 13th November 2007.

2198. The definition of "going concern" under both IFRS and US GAAS accounting standards, is that of an entity as to which there is "*no substantial doubt*" that it "*will continue in operations for a reasonable time, not to exceed one year*". There is no definition or guidance as to what is meant by "substantial doubt". Mr Reville paraphrased it as "*it's probable that this entity won't exist*" and said that, in his own mind he viewed the test as a 70% level of probability.

2199. PwC were not required to carry out such an analysis for their review of the Third Quarter 2007 statements, but chose to do so because of concerns about the effects of the August 2007 liquidity crisis.   They were required under US GAAS to consider that point in carrying out their actual audit for CCC's year end Financial Statements, to 31st December 2007, and they (in fact Mr Reville) again concluded that CCC qualified, although, not unnaturally, making use of the work that had been done for the earlier review and updating this.   The Defendants place further reliance on that fact in relation to later events, but it is convenient to deal with it here, as it is the same point.

2200. The Plaintiffs argue that the Defendants are not entitled to rely on the PwC certification firstly because the responsibility is on the directors themselves to consider and state whether the company is a going concern and, where it is necessary for them to do so, such as in year end accounts, they expressly certify that they have considered and confirm the point.   The responsibility of the auditors is only secondary, and is to check and confirm the directors' view, to the appropriate standard for a quarterly review or a year-end audit.

2201. I do not think this point is disputed.   The Defendants do not allege, as I understand it, that they formed their view that CCC stood a reasonable chance of avoiding insolvent liquidation in reliance on an opinion of PwC that CCC qualified as a going concern.   They say, rather, that the endorsement of PwC of that view is support for the Defendants' independently formed view that this was the case.   The Plaintiffs' case on wrongful trading effectively puts the Defendants' entitlement to claim this support into issue.

2202. The Plaintiffs argue that the Defendants are not entitled to invoke the endorsement of PwC of their alleged belief that CCC was a going concern because that endorsement was, to the Defendants' knowledge (or at least, I think, that of Mr Stomber and Mr Allardice as the principal liaison between CCC and the auditors) based on selective, incomplete and misleading information supplied by CCC to PwC, both in respect of the 30th September review, and similarly the year-end audit.

2203. Advocate Wessels, for the Plaintiffs, opened this contention high.   It is based principally on the assertion of three matters.     The first is the discrepancy between a "Carlyle Capital Corporation RMBS Repo Status Report" of 26th September 2007 which was internal to CCC and a similar document dated 30th September which was supplied to PwC and found in their files.     This document tabulated repo lines, terms and usage with the various repo lenders. The former version contained various generally negative remarks such as about the reduction in availability, or worsening of terms being applied, which were absent in the latter, replaced, in general, by anodyne references to current meetings and negotiations.   This latter document was the basis of what was presented to the Board at the 13th November Board Meeting, and it is suggested that this was even misleading to the Board.

2204. The second was a document listing CCC's compliance with Investment Guidelines, dated 28th September and purporting to show CCC passing certain Investment Guidelines when it did not.   The only justification for an alleged "pass" certificate was that the original guidelines had been suspended - but the Independent Directors did not make this suspension until 1st October 2007, one day after the relevant 30th September date.   Advocate Wessels opened that it looked as if a "false record" had been created for PwC.

2205. The third is a fact mentioned previously, that in confirming the validity of CCC's 30th September pricing for its RMBS, PwC had come to the singular conclusion that there was only a $72 discrepancy between their own supposedly independent pricing and that of CCC, on a portfolio valued at around $22Bn.   This remarkable fact implied, Advocate Wessels opened, that all PwC could have done was accept the pricing sources supplied by CCC; they could hardly have carried out an independent pricing check producing such a small a difference.   This meant that any reliance on the supposedly independent confirmation of values could not be valid.

2206. The Plaintiffs submit that the misleading purport of the information given to PwC by CCC is supported by, and explicable from, the tone of the various emails at the end of September which I have already referred to, in which Mr Stomber plainly regarded convincing PwC that CCC was a going concern as a mission, success in which was going to be a challenge.   They criticise the points there made by Mr Stomber for stating only the positive side of matters such as increases or potential increases in repo lines, and the fact that the portfolio bore no credit risk, without mentioning the negative corollaries, such as the reduction of other repo lines and the fact that the ability to hold the portfolio was dependent on the vagaries of 30 day repo financing.

2207. They further submit, with many references to detail of documents given to PwC and comments made by them in their working papers, that Mr Stomber (and Mr Greenwood) conveyed unduly optimistic messages to PwC, including suggesting the "likely case" scenario mentioned above, with projections which were not only unduly optimistic but had already been invalidated by events.   They say that PwC was not informed, even by Mr Allardice, the Chairman of the Audit Committee of concerns about, for example CCC's ability to maintain repo funding.    Referring to a PwC comment which Mr Reville agreed, in evidence, was likely to have been a summary of matters presented by CCC, that "*there was normality returning to the markets*" they argue that PwC had clearly therefore been misled, because "the Defendants" must have known that in reality this was not true, as most of CCC's repo counterparties had ceased to rely on IDP pricing and were pricing to their own  lower marks, asset prices were on a downward trajectory and repo financing was becoming more difficult to secure.

2208. The Plaintiffs' criticisms are largely based on the evidence of their accounting expert, Dr Holstrum, who was supplied with the pleadings in the action, company and third party papers and PwC's working papers disclosed in the action, the witness statement of Mr Reville, extracts from other witness statements, and some statements of assumed facts.   It is his opinion, broadly expressed, that "*CCC's directors and managers did not provide to PwC full information for the purpose of PwC's review regarding conditions and events that might be indicative of CCC's inability to continue as a going concern*" in respect of either the 30th September review or the 31st December audit, such that PwC were not able to make an "*appropriate*" assessment of whether CCC was a going concern or not.

2209. Mr Carnahan, the Defendants' expert, disputes that any of the disclosures made by CCC to PwC were inadequate, stating that they conform to his reasonable expectations and what would have been standard in the "industry" at the time.

2210. The Plaintiffs invite me to prefer the evidence of Dr Holstrum to Mr Carnahan on the grounds of his suggested superior qualifications.   Apart from two periods of practical experience in 1961-6 and 1978-83, Dr Holstrum was an academic holding posts as a graduate teacher and Assistant Professor or Professor of Accountancy from 1965 – 2004, and taking senior employment with the US Public Company Accounting Oversight Board from 2003-2009.  He has published extensively and has held a position on the US Auditing Standards Board.  Mr Carnahan's evidence is disparaged by the Plaintiffs as being largely confined to his time conducting actual audit and advisory work such that his opinions are based on nothing more than his personal experience  and perception of ill-defined "industry standards" and reliance on the prestige of the auditing firms.

2211. I do not think it appropriate to make choices between two expert opinions based on a comparison of their credentials, especially without having had the benefit of cross-examination.  Fortunately, I do not need to, because the real value of their evidence is, it seems to me, in assisting me in deciding whether or not CCC's Directors were entitled to take comfort, if they really needed to, from PwC's endorsements, in September and December 2007, of their expressed view that CCC was a "going concern".  There is plenty of other

evidence, which supports that, in particular that of Mr Reville, who was cross-examined for a day against the background of Dr Holstrum's paper criticisms.

2212. Dr Holstrum does not actually challenge the quality of PwC's work; he goes only so far as to say that he is "*not expressing opinions as to whether [that] work was in accordance with the standards of a reasonably competent auditor of the time.*"    He expressly asserts, though, that if CCC had provided PwC with accurate information, that would have led PwC to conclude that there was substantial doubt about CCC's ability to continue as a going concern for a reasonable period of time as at December 2007.    The Defendants point out that he makes no similar assertion as regards 30th September 2007.

2213. This is a fact which might, on one view, be argued to put an end to the basis of the Plaintiffs' argument that the Defendants could derive no comfort from PwC's going concern opinion as of this date, because it would require a shift in the argument.  The argument had been that the Defendants were not entitled to rely on PwC's going concern opinion because they may have known that it would be different because of their misleading disclosures; it now has to become that the Defendants were not entitled to rely on PwC's opinion because they must have believed that it would be different because of their misleading disclosures even though in fact it would not have been.  This is getting extremely rarefied, and that precise point has mercifully not been argued.   For simplicity I will simply proceed on the basis that such an allegation that the opinion would have been expected to be different if "proper" disclosure had been made was intended by Dr Holstrum to be implicit.

2214. Apart from the evidence of his witness statement, Mr Reville was taken though much of PwC's work.   He explained what I think is an important difference between the formal "financial statements" (CCC's actual accounts) and the other reports, ie the MD&A and the CEO letter, which are all bound up together as part of the required quarterly "financials" but have different functions.    Whilst only legally committed resources and solid facts could be included in the former, it was both permissible and appropriate to include references to resources in negotiation or other material matters of intention, concern, or general views of market circumstances, in the latter.

2215. He agreed that the Third Quarter 2007 review by the auditors would be a less profound investigation than a year end audit, being an analytical review of management's opinions and an enquiry of managers, as required by accounting standard SAS 100.  He explained, though, that PwC actually did do a full investigation as regards the "going concern" issue with CCC, because of its own concerns about the effect of the August 2007 crisis, even though this had not been strictly required.  He also explained that the independent pricing exercise on CCC's RMBS portfolio had not been required upon a quarterly review, but had in fact been carried out at the request of Carlyle, in what he perceived to be a quest for best practice.

2216. As to the pricing exercise itself, Mr Reville was questioned at length about this.    He explained, first, that CCC's RMBS were not difficult collateral to value, and he gave cogent explanation for this.  They were of a sufficiently simple and common structure that there was actual market transaction "comparable" evidence of their values.    It was not necessary to value on the basis of a complex modelling of how purchasers might evaluate the risk or value of particular less-than-common structural features of the securities.  He invited comparison with the fact that there was simply a market "price" for IBM shares.

2217. With regard to the valuation exercise itself, Mr Reville also explained that PwC had a specialist securities valuation department, IMSAG, whose expertise lay in valuing securities, and who conducted the actual valuation exercise with regard to CCC's assets.   He explained that they simply gathered all available data which would enable the pricing exercise to be carried out, and that it was perfectly possible that they had in practice had resort to the same pricing service (which operates as an information gatherer, not a valuer) as CCC would have used, if this had been the only pricing data source available.   Their exercise was, therefore an

independent valuation exercise, and its similarity to CCC's results was no reason to conclude that they had simply been led by the nose into taking CCC's figures, or using the same pricing source. Indeed, he said that with his experience of valuing simple securities such as these, he would have been more concerned if IMSAG's valuation had not been extremely close to CCC's, as prices ought to be "tight", just like IBM share prices would be.

2218. Mr Reville said, and I accept, that he took into account the evidence of CCC's repo counterparty valuations. Having himself had considerable experience of repo financing, he viewed the mark downs of the repo lenders as natural and normal behaviour in their own protective interests in a difficult market; those marks were not, therefore evidence of actual value, but simply a "data point" (ie a fact) to be taken into account in the process of "grabbing" all data that could shed light on actual market value.

2219. Mr Reville laid stress on the fact that there were not merely the actual formal meetings held with CCC personnel (on 13th and 16th October in particular,) but also that he had intimate knowledge of CCC's financial affairs from his habitual attendance at ALCO meetings and receipt of their papers, and that he was in virtual daily contact with Mr Stomber or members of CCC's Management – Mr Greenwood, Mr Trozzo and Mr Rella – or Mr Allardice, in which matters with regard to the going concern question other than those appearing in the paperwork presentations were also discussed. He was very firm that matters such as the detail of the availability of repo lines were discussed and were known to him, and had been factored into his overall opinion. He explained, and I found it persuasive, that individual changes in the amount of available repo lines, or the fact that a "new" line was in practice a revival of a previous line, were not changes of such a fundamental level that they would have caused him to take a different view of CCC's viability as a going concern. Much of his opinion was formed on the basis of his concern to review how CCC was actually planning to deal with its problems, and the steps it was taking.

2220. In this context, he agreed that he would take into account the commercial clout of the Carlyle name. He said "*it's nothing nefarious; it's being an aggressive business person which is a prominent trait on Wall Street*", comments which I found both realistic and a matter of common sense. Similarly he explained that he would take account of the reasonableness of assuming that financial support from Carlyle would be granted if required, based on a common sense objective assessment. He also explained the difference between post report-date matters which might cause him to include an amendment to his expressed opinion on "going concern" and those which would not. In particular, he explained that with regard to the year end audit, the fact that CCC had suffered losses between the figures recorded in the 14th February 2008 ALCO pack and that of the 29th February when the year end reports were discussed, turning a $117Mn gain to a $16Mn loss, would still not have been such a factor, because "*It's general market volatility on an investment fund ……..an investment fund by definition fluctuates….[.it] runs to the risk of the business*". This factor was, he said, adequately dealt with by the warning references to market volatility in the MD&A.

2221. I was impressed by Mr Reville's evidence, which had an underlying air of efficiency and thoroughness, tempered with realism and practicality. I am quite satisfied that he would be well alive to any natural human tendency of directors to present the best picture of their company with a view to demonstrating it to be the going concern, once any possible doubt had been raised, and also, as a very experienced auditor, of the need to test the consequent presentations made by the company's directors and managers rigorously and critically, as a result. I am satisfied that he did so in this case.

2222. The Defendants further produced, in their closing Factual Chronology, both a detailed account of the documents actually provided to PwC, and a separate appendix including refutation of Dr Holstrum's criticisms of misleading or incomplete production of information to PwC as a matter of fact, and in particular demonstrating that the allegedly incomplete or misleading

aspects of the information provided to PwC were not not critical, or were remedied by the fact that PwC had the information, or the correct information, from other sources.

2223. Having gone through both the paperwork presentations and this commentary, I am broadly satisfied that these refutations are accurate and justified. My only concern has been that insofar as the fact that corrective or supplementary information which was only supplied to PwC with the papers for the Board Meeting of 13th November 2007 is relied on, I note that Mr Reville had formed his opinion previously, and did not attend that meeting as he was on honeymoon. I am not convinced that different or corrective information, not necessarily given with express reference to what it was correcting and at the last minute, would be sufficient to ensure reconsideration of an earlier opinion carefully and expressly formed on the basis of earlier information. I do not think, though, that this was what in fact happened in this case, however. I am satisfied from the evidence of Mr Reville, that none of the matters which Dr Holstrum criticises but which are refuted only on the basis of the provision of such last minute information would or should have caused Mr Reville to revise the general opinion which he had previously formed, and which is what went forward in practice.

2224. On the evidence, the salient parts of which are mentioned above, I conclude, therefore, that PwC's endorsement as at 13th November 2007 of the expressed view of the Directors and Management of CCC that CCC was a going concern as at 30th September 2007 was a matter which CCC's Directors were entitled to take comfort from as supporting their own opinion, then and thereafter, that CCC was reasonably viewed as a going concern. By the same token, I am satisfied that it also provides valid objective evidence that CCC was reasonably so viewed.

2225. In all the circumstances, I therefore dismiss the wrongful trading claim with regard to October and November 2007.

2226. For completeness I make the following further incidental points and findings of fact.

2227. It does seem to me, from the evidence, that Mr Stomber regarded it as a mission to set out to persuade PwC that CCC was a going concern. This is partly just because Mr Stomber sees many business activities in a somewhat confrontational light. However, it was also because of his passionate belief that CCC really was a going concern. I find that he viewed it as a mission, not in the sense of seeking to fool or to manipulate PwC, but in the sense of ensuring that every bit of evidence which could be advanced in support of the contention that CCC was a going concern was put before PwC to full effect.

2228. I see nothing wrong with this. If the directors of a company form the view that it is a going concern, it does not seem to me that it is then their duty to remain neutrally aloof on any review of the point which may be conducted by the company's auditors, and still less to press the strength of negative factors which might support an adverse conclusion. Being of the view that the company is a going concern, they are entitled to present their reasons for this view to the auditors with all the support which they perceive can be mustered. Of course they must not mislead the auditors, but I cannot see that they are to be condemned for presenting positive arguments. It is the auditors' function, as Mr Reville stressed, to test the directors' propositions and satisfy themselves that they are justified. On the evidence, I am satisfied that PwC, in effect Mr Reville, who also brought in Mr Summa, an expert in capital markets to review the position, and the remainder of his team, did do that.

2229. Second, it was put to Mr Stomber that he had set out to mislead PwC in this respect. I make it clear that I accept that he did not set out to mislead PwC, but only, as was legitimate, to put forward the best case in support of his strongly held belief that CCC was a going concern, and of the market's current surprising failure to appreciate the intrinsic worth of CCC's assets.

2230. Third, whilst I note that the presentations made to PwC included Mr Stomber's "likely" and "downside" case scenarios containing references to CCC's selling RMBS in certain situations, I accept Mr Stomber's evidence that this was put forward as an illustration to indicate to PwC that CCC could, potentially, make such sales *at the losses there indicated* and still survive, by which I mean, remain solvent.  It was a hypothetical case, and I do not find it to be evidence that Mr Stomber held a belief that such sales actually could have been made in general terms, at the particular time.   This point has been considered in relation to the similar presentation made at the 13th November Board Meeting.

2231. Fourth, the Plaintiffs invite me to discount the mutually complimentary evidence between Mr Reville and the Defendants as to their respective co-operation and thoroughness.   I have in fact taken no account of their respective opinions of each other at all.   However, it does seem to me that if Mr Reville had not expressed confidence and appreciation of the co-operation and assistance which he received from CCC in carrying out his functions that would in all likelihood have been commented on adversely by the Plaintiffs as a significant omission.

## 13.    The Claims: DECEMBER 2007

### *Did the Defendants culpably fail to review and change their strategy during December 2007?*

### *General overview*

2232. As regards December, the Plaintiffs repeat their complaint that the Defendants did nothing to protect CCC from its position of extreme vulnerability to market movements and repo financing risks, called no Board meeting to address these issues, and failed (therefore) to institute a programme of selling quantities of RMBS during this time.

2233. At the end of November, CCC's financing and liquidity positions had come under pressure with the investment banks' year end, and this was not expected to ease over the calendar year end, used by the commercial banks.  However this had been catered for, to a degree, by the arrangement of some repo finance for 60 days, to straddle this period.   The end of December and beginning of January are also, of course, a holiday period, during which there would normally be reduced activity in the market in any event.  Indeed, there were no particularly notable matters in December 2007 except perhaps for the stalling of progress towards the ultimately ill-fated Wachovia $2Bn 364 day repo credit line.

2234. CCC's overall financial position during the month was largely flat.   It worsened marginally on a comparison of month end figures, with recorded NAV going from $676,349,070 on 30th November to $667,659,278 on 31st December and liquidity down from $71Mn, including $40Mn still available from Carlyle (10.5%) to $62Mn (9.3%), but these changes are not large and, on their own, would not seem to be outside the range which might be expected from normal market fluctuation.         The consensus amongst Mr Stomber and his senior management team remained that CCC's asset price ought to recover, the only disagreement being one of greater or lesser optimism as to when.      During December, therefore, CCC largely marked time, pursuing the successful management of the two December repo rolls, and awaiting January, when markets would resume activity and there would be more information from which to plan the future.  It was noted, however, that repo counterparties were tending to adopt even more defensive pricing marks, a tendency which now appeared to be motivated more by a self-serving desire to increase assets on their own balance sheets than any genuine perception of reduced value in the collateral.

### *Early December*

2235. Mr Stomber was now emailing Messrs. Allardice, Conway, Hance and Loveridge with daily liquidity updates, Messrs Sarles and Zupon preferring less frequent information.  On 3rd December, in reporting liquidity up by $6Mn to $77Mn million, Mr Stomber also reported

small but potentially encouraging signs: that prices were improving on 5-year Agency debentures, which ought to assist CCC's asset prices by parity of reasoning, and later, that Lehman had slightly improved their hotly disputed repo marks, because they acknowledged that there had been an improvement in market conditions in the past week.

2236. Mr Stomber also took stock of the situation, and on the same day wrote to his management team Messrs Greenwood, Trozzo, Melchior, and Ng, giving his views as to glimmers of improving signs for the prices of CCC's floater spreads – in essence, signs suggesting conditions for the hoped for flight to quality – and that a "snap back" of Agency floater prices could therefore be expected in January/February 2008, but he asked each for his own separate assessment of the Agency floater market and his opinions. They all agreed that an improvement was to be expected, although with varying expectations of when, and somewhat less optimistic views than those of Mr Stomber. They were in agreement that the key problem was lack of demand, and some pointed out that this was partly due to buyers having less access to borrowed funds, rather than having no appetite for the relevant assets. Mr Ng, from the marketplace perspective, commented that dealers were nervous about *"getting stuck with secondary inventory and limited to the amount of risk they are permitted to take"* and that the market had *"gone risk-averse for anything with a mortgage name"* regardless of the value in the Agency floater structures. Mr Trozzo said that this all pointed to the best course being to "*Let it happen. Let's get over the year end and re-assess rather than predicting the snap back to[o] early."*

2237. The Defendants submit that the recorded and reasoned views of the CCC management team at that time, as well as those of Mr Stomber himself, were cogent and reasonable as to the best course for CCC being to await the new year and then assess the situation.

2238. On the same day, though, Mr Trozzo emailed Mr Stomber to the effect that the negotiations with Wachovia for the $2Bn term repo facility were basically "dead in the water" and suggesting that CCC should be willing to take a $500Mn 364 day capped 3% haircut line from them direct, by getting them to see this as a graceful way out of their prior commitment. He made further suggestions on progressing negotiations with Lehman, Fortis, Barclays and RBS.

2239. Mr Stomber subsequently had an email exchange with another Carlyle manager, Mr Akerson, who had seen and forwarded, as relevant to CCC, an article in the Washington Post warning of the possibility that "*AAA rate[d] mortgage backed securities are not all that safe/robust.*" He explained to Mr Akerson the difference in quality, because of lack of credit risk, between CCC's Agency AAA rated floaters and other non-agency AAA rated floaters. When asked if CCC would therefore be relatively unaffected if the markets deteriorated significantly, he responded that it depended on what got worse, credit risk or liquidity risk, explaining CCC's dependence on its repo financing.

2240. On 7th December, Mr Stomber was able to report liquidity back up to $82Mn and an improved NAV, and also that Citi had said that CCC's repo lines should be steady over the year end-period. On 10th December, Morgan Stanley announced a further write down of $6.6Bn assets.

2241. CCC signed an MRA with Wachovia, but had yet to agree actual repo terms, and Wachovia seemed to be having some internal difficulties with the brokerage arrangements. On 11th December Mr Stomber proposed to Mr Burlingame that Wachovia should start with a $500Mn line, which CCC would like to have in place by 21st December, as a progress step and to save face all round. Further documents were exchanged over the next few days.

2242. Also on 11th December, the Federal Reserve cut interest rates by another 25 bps, bringing the Fed Funds rate to 4.25%. The general evidence suggests that whilst intervention from the Fed was both expected and welcome there is a consensus in hindsight, and there was a view at

the time, that the Fed had been slow, and should have done more to help re-energise the markets.   Mr Greenwood expressed such a view in an email to Mr Stomber.

2243. On 12th December Mr. Stomber reported to Mr. Conway that he believed that CCC would have sufficient liquidity through the year-end, but that the pressures on the banks' balance sheets were building, and he would like to line up a potential request for a further $50Mn loan from Carlyle, if necessary, whilst still confirming his view that CCC's floaters would make big price gains in 2008.   He said that he believed that the Federal Reserve would have to do more to assist; he saw the market dynamics as not being about the value of the securities – there was no pressure for higher haircuts - but "*all about liquidity and fear*".   He candidly said that in the circumstances he did not know what else to do but "*stick with the strategy of holding on, given we are at par on maturity*," and continue to work the repo dealers.   The Plaintiffs point out that the obvious possibility of selling RMBS as an option was not mentioned or suggested for consideration here, as with his earlier reporting commentaries.

2244. The following day, the Federal Reserve announced the creation of a temporary Term Auction Facility giving banks the ability to obtain four to five week loans anonymously against a range of securities including RMBS.   $40Bn was in fact injected into the markets on 17th and 20th December through this programme.

2245. On 12th December 2007, CCC Coinvest began purchasing additional shares for Mr. Conway, whose desired investment had not been fulfilled in the initial round of purchases.   Ultimately, CCC Coinvest was able to purchase approximately $7Mn more in shares, bringing Mr. Conway's total further investment to approximately $7.8Mn.

2246. On 13th December, Ms Cosiol requested advice from Linklaters as to whether the additional proposed facility of $50Mn from Carlyle would require to be disclosed in a press release immediately or only if and when it was taken up.     This was prompted by Mr Conway's concerned recollection of the unexpectedly adverse publicity which had been attracted by the news of Carlyle's initial $100Mn support for CCC.   She was advised that this would only be necessary when the loan was executed.   The correct interpretation of this is a matter of dispute between the parties, which I will have to mention later.

2247. Also on 13th December, Mr Stomber reported to Messrs Allardice, Conway, Hance and Loveridge, in advance of the 17th December repo roll, that arrangements were going well and CCC had negotiated an improved repo rate of LIBOR minus 9.5 bps, substantially lower (better) than in November.   He reported that NAV had risen to $715Mn, but that the liquidity cushion had not shown proportionate improvement and stood at $69Mn.     He explained that this was because "*[our cash]… is on the balance sheet of our dealers.  Why?  Because they can and CCC made a mistake of not having enough repo line availability to balance fear and greed*".

### 14th December  - ALCO Meeting

2248. This meeting was attended by all the members of the ALCO committee, thus including Mr Stomber, and also by Mr Zupon and Messrs Loveridge and Sarles by telephone.

2249. Mr. Greenwood reported on market conditions.   He noted that short-term rates recently had risen "*due to year-end pressures being exaggerated by the credit crunch*," but had retreated slightly following the Federal Reserve's recent rate cut.   He noted that spread levels were at historic highs and that banks remained wary of lending to each other despite the encouragement of the Federal Reserve's actions.   There had been a flight to quality in US Treasury Bonds, and US Agency Debentures (an even more risk free form of security than CCC's Agency RMBS capped floaters) and credit markets had reacted positively to the announcement of the Fed's TAF on 12th December.     Trading in 7% floater caps was at the

same prices as November, but he agreed with Mr Stomber's comment that trading was currently non-existent and everyone was simply looking to get through the year end.

2250. The various metrics in the "Risk Summary" Slide in the ALCO pack were reviewed. Mr Trozzo gave an update on the status of repo negotiations, noting that CCC had agreed terms for 54% (roughly $11Bn) of its financing over the year end – in effect, the 26th December repo roll and beyond - and he expected the remainder to be successfully completed; CCC had completed terms for the mid-December repo roll with an average repo rate of LIBOR minus 10bps.

2251. Mr Trozzo gave an update on the status of the portfolio. He noted that there had been an "*uptick*" in CCC's NAV, which was shown in the ALCO pack to be at $712 Mn as at 11th December (as compared to $680Mn in late November). In contrast to the improvement in CCC's NAV, total liquidity had decreased from $84.4Mn (12.4 %) on 27 November to $69Mn (9.7 %) on 11th December, although Management was expecting a $6-8Mn improvement in the liquidity cushion after the next roll. Mr Zupon enquired about the reason for the disparity in the movements of NAV and liquidity and it was explained that

> "*despite improvements in CCC's mark-to-market and December estimated NAV, the liquidity cushion was still down for two reasons: 1) there is no price discovery as there is virtually no secondary trading for capped floater securities; and 2) dealers are still contending with year-end balance sheet pressures and therefore are grabbing liquidity* "*where they can because they can*"*, i.e. fair and economic pricing of our capped floater securities is not their primary concern.*"

2252. On 14th December, Mr Stomber reported in a general email that the Agency floater market was effectively now frozen until, probably, mid-January. Whilst this cessation of activity over the Christmas and New Year holiday was nothing new, the appearances were that it would be particularly long that year because everyone was nervously waiting for others to buy, and by now they simply wanted to get away from it all. It did mean, however, that the repo dealers must have concluded that margin was therefore wide enough over the year end, although CCC would still have to negotiate the 26th December repo roll.

### 17th December - repo roll

2253. CCC rolled its repo successfully on 17th December and its liquidity rose by $5Mn, with no significant changes to its repo arrangements. Mr Stomber reported liquidity of $73Mn, and Mr Hance responded "*Nice work, next we sweat out January*". The next few days saw a modest improvement in NAV and liquidity, which naturally encouraged Mr Stomber. Concerns about the year-end pressures eased slightly. On 20th December, Mr. Stomber provided Messrs. Allardice, Conway, Nachtwey, Hance and Loveridge with another update on market conditions and CCC's liquidity, then standing at $78Mn. He observed that the spread between Agency floaters and 5-year Agency debentures, which was at an historic high, ought therefore to come back in (he expected sometime in early 2008) and this would significantly improve the value of CCC's portfolio.

2254. At the same time, on 17th December, Mr Reilly of Wachovia was insisting that, with amendments having been made to the documents, Wachovia would need another legal review.

### Mid-December 2007

2255. On 18th December, not having heard from Wachovia, Mr Stomber asked Mr Conway to call Mr Burlingame.

2256. More positively though, Mr Stomber was able to report an initiative to obtain tri-party repo, following a promising meeting with Bank of New York. Tri-party repo would involve BoNY

connecting CCC with repo investors for a fee but without putting the loans on its own balance sheets.   Tri-party repo would benefit CCC because it was understood to tend to be a longer tenor, with more stable terms, and because it removed the repo bank as middle-man with the potential to grab liquidity for itself by aggressive price marking.   Mr Stomber explained that such arrangements had not, before August 2007, been competitive with the rates which banks were obliged to offer in the super-competitive area of 30 day repo, but by now, things had changed.   CCC and BoNY signed a confidentiality agreement shortly afterwards, with a further meeting arranged for mid-January, in recognition of the realities of not being able to get much done during the Christmas holiday period.

2257. On 19th December there was another "bad news" announcement, this time with JP Morgan announcing a further write down of $5.7 Bn.

2258. On 20th December Mr Stomber, circulating his usual report, recorded liquidity up to $78Mn, good progress on securing repo finance for the final roll of the year, monthly income expected to be $21Mn or a 9% return on equity, and prices for Agency Debentures which (he estimated) made CCC's Agency capped floaters look cheap, and should therefore encourage demand.

2259. On the same day the Independent Directors approved the $50Mn increase in CCC's potential line of credit from Carlyle requested by Mr Stomber, and Ms Cosiol so informed the Board. It was stated at all points in the conversations, including where details were forwarded to the Carlyle Founders, that this was not expected to be taken up but was an insurance policy, especially in view of the imminent holiday period.   It was also stated that there was to be "no disclosure".   Mr Nachtwey queried that this presumably meant no press release, but there would no doubt be a footnote in TCG's audited financial statements, to which Mr Conway responded with a notably steely "*Not even that disclosure I think*".

2260. On 21st December 2007, Ms. Cosiol and CCC's Dutch counsel at Linklaters  prepared a form to notify the AFM that CCC Coinvest's ownership of CCC shares had exceeded 15%. This form was submitted on 24th December 2007.

2261. Between 21st and 26th December CCC's liquidity fell once more, owing to margin calls by Citi and Lehman, made unsportingly on the morning of 24th December.   These were paid.

### 26th December  -  repo roll

2262. This was completed smoothly.   CCC rolled $410Mn of repo away from UBS to Bank of America, at UBS' insistence because of year end balance sheet issues.   This was largely compensated by a roll of $360Mn away from Bank of America to JP Morgan, resulting in no significant overall change to arrangements.

2263. The next ALCO meeting was set for 27th December, but this does not appear to have taken place and has not been referred to in the evidence.   On 28th December, CCC paid to CIM $6.3Mn for third quarter management fees and expenses and the $1Mn commitment fee for Carlyle's $100Mn line of credit.   This reduced CCC's liquidity, to $56Mn.   Mr Stomber reported this to Messrs Conway, Hance, Allardice, Loveridge and Nachtwey.

### Position at the end of December 2007

2264. On 31st December, Mr. Stomber sent an email to the Board letting them know that CCC ended the year with $62Mn in its liquidity cushion.   He also noted that CCC's "*[return on equity] for Q4 was in the slightly above 9 percent (annualized) range and we were able to weather 2007 to fight again in 2008 thanks to TCG's solid support*."   He noted, though, that the first week of January would bring a distressed auction of $800Mn of Agency floaters by Citibank. In his evidence, Mr Stomber said that this auction was welcomed because of the price

discovery information which it would give, as ammunition with regard to the pricing on CCC's portfolio. I suspect however, that this view owes something to hindsight, the result of the auction having turned out to be reasonably positive. To me, the tone of his note is a cautionary one, the obvious implication being that this would produce price discovery which might or might not be welcome, and would have to be coped with.

2265. The value of CCC's portfolio, according to its later Annual Report, was $21.71Bn with a NAV of $668.2Mn. The liquidity cushion then stood at 9.31% according to the 15th January 2008 ALCO pack. CCC had, $20.9Bn of repo funding rolled into January 2008 with $2.26 Bn of unused lines. Lines with Calyon, Citi, JP Morgan and Lehman (around 50%) had haircuts at least nominally lower than 3%, which was the nominal figure for all the remainder. Whilst the Defendants submit that the average repo rate was 2.6%, the Plaintiffs submit, I think more accurately and apparently taking these figures from CCC's own repo status reports that the average was 2.66% nominal, but that the effective haircut rate was 3.04%. CCC's leverage ratio, according to Professor Hubbard's calculation, was 32.5x.

**The Claims - December 2007 - Summary of arguments**

**Plaintiffs' case**

2266. The Plaintiffs rehearse the familiar complaints as before, namely that of the Defendants' not taking steps to reduce CCC's leverage and increase its liquidity by (in practice) selling large quantities of RMBS, and they argue that the need for this was so obvious as at CCC's year end, as to render the Defendants in breach of their duties.

2267. They argue first that the pressures on CCC and its asset pricing could not be dismissed for being simply and predictably caused by the passing on of the repo banks' year end pressures, because the Defendants themselves recognised, as can be seen in contemporaneous communications, that the situation was not the usual one, and was indeed very serious. The adverse effects at this year end were significantly greater than usual and it was admittedly also not usual for the markets to completely freeze up out of "fear" at the end of a normal year. The Plaintiffs submit that this shows that the crisis was still very much brewing, and the Defendants were well aware of this, and wilfully or negligently closed their eyes to it and the need to take major steps to deal with it; this can be seen, for example, in Mr Hance's acknowledgement on 17th December that CCC would have to "*sweat out January*".

2268. They point to Mr Stomber's reference in his 13th December email to a "mistake" in not having enough repo availability to be able to move it around when repo lenders made unwarranted margin calls as another indication that CCC's parlous repo financing availability was appreciated, but nothing was done to alleviate this.

2269. They rely on the additional $50Mn loan facility requested by Mr Stomber in early December as further evidence of recognition of the gravity of the situation. They submit that Mr Conway's anxiety not to disclose this facility, and the eventual failure to do so until 28th February 2008 when it was actually used, was discreditable, and a breach of Dutch regulatory law, and that Ms Cosiol was at fault in failing to apply the advice previously given by Linklaters on 17th August 2007, that disclosure was required "*as soon as it may reasonably be assumed that the funding note will be executed*", which, they argue, was before 28th February 2008 and in fact when the availability of the facility was agreed. They also say that this reluctance to make any disclosure lends support to the view that the Defendants were fully aware of CCC's desperate and precarious position and were hiding or ignoring it.

2270. They argue that it is clear that the Defendants never compared the actual year end results of CCC with the predictions of Mr Stomber's proposed "business plan" presented at the 13th November Board Meeting. Had they done so, they would have perceived the vast divergence from his assumptions, which would in itself have suggested that Mr Stomber's predictions

were not reliable.   The situation was turning out to be significantly worse than he had been assuming or predicting, thus leading to the conclusion that other urgent action, namely the sale of RMBS, ought to be now considered.  It was negligent not to have noted this and not to hold a further Board Meeting.  This was was obviously required to be called, as a matter of good governance, to assess the situation.

2271.  They point to CCC's financial performance indicators for the end of the year and that its unrealised losses on its portfolio had increased to $273Mn from $235.6Mn at the time of the November Board Meeting and $227.5Mn from even the end of September 2007.  They point out that financial metrics known to reflect or affect CCC's prices (average price volatility and spreads, interest rate volatility and option adjusted spreads) had all increased, and this showed that the market, far from improving, was continuing to deteriorate. There had still been no "flight to quality" as regards CCC's assets, notwithstanding Mr Stomber's continual reference to expecting one.

2272.  They repeat, therefore, their arguments with respect to November 2007 as applying to the circumstances of December.

**Defendants' case**

2273.  The Defendants likewise repeat the arguments which they made with regard to November and earlier.  They submit that nothing had materially changed; the choice facing the Defendants remained the same judgement call between adopting a strategy, on the one hand, of holding the RMBS with a view to keeping capital losses on paper rather than crystallised and holding on long enough, with a business which was still generating profits, to get the benefit of the inevitable ultimate return to value (and as to which the risks lay in the question whether sufficient financing could be maintained), and, on the other hand, of selling RMBS with the consequence of locking in not insignificant losses for the objective of improving liquidity and reducing leverage and reliance on finance availability - as to which the risks lay in the fact that large sales would be needed to generate any worthwhile improvement in liquidity and these might unleash adverse and uncontrollable consequences by providing concrete adverse evidence of asset value, and/or laying CCC open to being seen as a vulnerable distressed seller.

2274.  They submit that the calendar year end difficulties had been and were still reasonably perceived as being caused by the banks' usual year end pressures, but naturally exacerbated by current dislocated market conditions.  It was reasonable to see this as has having been anticipated and to some degree forestalled by arrangements which had been made  (60 day repo, etc) to ensure certainty of funding over the relevant period, and that even if the degree of exacerbation were greater than Mr Stomber and his team had anticipated, that was not of a sufficient degree to change the balance of the merits of the decision referred to above.

2275.  They submit that the prompt confirmation of the availability of an additional $50Mn from Carlyle, far from being a fact which should have caused a rethink of the previously decided strategy, was plainly just a prudent fall-back, and in the event it was not even necessary to use it at this time; it is more correctly viewed as reassuring evidence of Carlyle support, making it unnecessary to take the unpalatable decision that selling RMBS was the only option.   They submit that the allegation that failing to disclose this facility was a breach of Dutch regulatory law is wrong, or at least open to substantial doubt, on the Dutch lawyers' evidence -  but it is in any event irrelevant, as it is not alleged to have caused any damage to CCC.

2276.  They refute the submission that it was crucial that the Board compare actual results with the assumptions in Mr Stomber's proposed new business plan presented at the 13th November Board Meeting, submitting that there is no evidence that this would have made any difference to what occurred.  They submit further that the virtual standstill of the markets in December was in itself a further good reason why any thoughts of selling RMBS would not have been

appropriate at that time.   They submit that the evidence of what was happening in the markets supported the view that on a day to day basis, so long as circumstances did not worsen significantly, CCC's financial position would gradually improve – it had done so in October and the early part of November and was therefore likely to do so again when the banks' year ends had been navigated.   Discouraging figures in the present metrics being generated were, once again not of sufficiently serious practical effect that they should bring about a complete sea-change in the agreed strategy in the abnormally static state of the December 2007 financial markets.   This was also a reason why it would still be premature to conclude that there was no prospect of benefitting from a flight to quality.

2277.   In short, they submit that the Board and CIM were simply faced with a difficult situation.   CCC needed the financing on which its portfolio had been built and well understood that it was in the midst of a period of increased stress on that financing, but which ought to be temporary - Messrs Stomber, Conway and Allardice all said as much in their evidence.   It could attempt dramatic action to shift its business model in the midst of this stress, or it could do everything in its power to ride out this event, which it thought was likely to be of short duration.   Had CCC's Board or Management concluded that the financing risk could <u>not</u> be managed, the only course of action available at the time would have been to sell some of CCC's Agency floaters, but particularly during December 2007, when the trading markets had ground to a halt, this option was viewed as a last resort which the circumstances did not yet (at least) justify.

**Discussion and conclusions – December 2007**

2278.   I turn as usual to the breaches of duty as alleged in the Cause against the individual Defendants in respect of this period from 1st to 31st December 2007.   They are, as against the Carlyle Directors, the matters listed in Paragraphs 369T (duty of care) and 369U (fiduciary duty) of the Cause, and against the Independent Directors, the same matters using the same words *mutatis mutandis*, in Paragraphs 369V (duty of care) but (i) with the addition of an allegation at Paragraph 369W that they failed to prevent the Carlyle Directors from giving priority to Carlyle's interest over those of CCC and also including (ii) maintaining CIM's fee income, a portion of which would be distributed to the Independent Directors (Paragraph 369W).   Once again these breaches are said to be as further particularised in Paragraphs 418A-N and 4124A-G, incorporated here by Paragraph 369Z.

2279.   As before, the effectual breach of duty alleged against these Defendants can be distilled down to the allegations, now in Paragraph 369T.2 and 369V.2 but using the same mantra as previously, of

> *"failing to insist that CCC either (i) sell down its RMBS assets to generate liquidity and reduce leverage, and/or (ii) raise additional equity capital to reduce leverage and/or (iii) conduct a restructuring or orderly wind down".*

2280.   However, the Plaintiffs' actual submissions with regard to this period, with more realism, contain no hint of any suggestion that raising equity capital was remotely feasible.

**(a)     Breach of fiduciary duty**

2281.   The allegation of breach of fiduciary duty is here confined to acting with the improper purpose of prioritising Carlyle's reputational interests in not having to disclose CCC's poor financial performance and thereby Carlyle's failure to make it a liquid investment company

with a competitive dividend yield, and thus prejudice the pursuit of the "Carlyle Strategic Objectives".

2282. I can find no further evidence in relation to December 2007 which would or even might give me grounds for changing, in respect of this period, the conclusions which I have previously explained in rejecting similar allegations made with regard to earlier periods.  Nothing further in the financial situation in December requires any further comment in this regard.

2283. I have also already said that I consider the allegation of an improper motive connected with bolstering the payment of fees to CIM to be unsustainable.  I can see no evidence that any actions or decisions of any individual Defendant were influenced as an attempt to manipulate its affairs to enable CIM to claim fees, with or without the added allegation that a portion of these would be distributed to the Independent Directors.

2284. I therefore dismiss the claims of breach of fiduciary duty for similar reasons to those previously given.

**(b)     Breach of duty of care**

2285. I have cited the familiar pleaded terms of the core breach of duty alleged above, and repeat the familiar points that this is the only effectual breach of duty alleged, that the matters pleaded in the remaining subparagraphs of Paragraphs 269.T and 269.V are neither alleged to, nor did, give rise to any damage to CCC, and that they can be no more than particulars of the core breach, at best.

2286. As to the core breach itself, having reviewed the parties' respective arguments and submissions, summarised above, I am not persuaded by the Plaintiffs' arguments and prefer those of the Defendants.

2287. Given that I am examining the Plaintiffs' complaints in chronological order, as I am doing in order to avoid unfairly applying hindsight, I have already found that the Defendants' reactions to the financial circumstance in which CCC found itself prior to December 2007 were not reckless or negligent.  This means that the nub of the Plaintiffs' claim as regards December has to be, once again, that in the situation in which CCC then came to find itself the policy of holding RMBS and not selling was so patently the wrong course that it had *by then* become reckless or negligent.  This means judging whether there was any sufficiently significant change in the general assessment of CCC's own financial situation and the impact of surrounding circumstances, which would demand a reappraisal and alteration of the capital preservation strategy.   I am satisfied that they did not, whether the circumstances are looked at afresh generally, or only by looking to see if there had been any significant changes in that period.

2288. I am satisfied that there were no such changes, and that the considerations which drove the material decisions prior to December 2007 remained substantially and sufficiently the same.  There was also, however, the added point that any attempt to seek to sell RMBS would have been impractical in the inactive markets of December 2007 (and indeed, that attempting to do so would in itself have appeared so remarkable, in those circumstances, as to increase the chances of causing CCC to be perceived as a distressed seller.)

2289. On the one hand, CCC had certainly not seen real evidence of any flight to quality and whilst Mr Stomber had consistently reported financial indicators which ought logically to have produced such a trend, and had reaffirmed his faith that it would occur, it had not happened.  On the other hand, CCC had managed to secure affordable repo finance for that period, and was not incurring income losses.     Its balance sheet position had remained relatively flat taking month end to month end, with fluctuations of value in between, but there was also the evidence that in the weeks prior to the impact of bank year ends, its balance sheet position had

improved in the ways expected.   Although in December conditions were difficult, this had been broadly anticipated and steps taken to meet the problems.   I do not consider, therefore, that the further month with no major progress on the recovery front was a factor which ought to have caused the Board, or CIM, to reconsider the capital preservation strategy on the grounds that it was somehow not working, and it would therefore be right to consider, still less to put into effect, the alternative of selling quantities or RMBS.

2290. As regards selling RMBS, the previously appreciated disadvantages about doing so were compounded in December, I find, by the fact that there was not even a tolerably active market into which CCC could have sold RMBS.      In those circumstances, even if the matter had been actively considered, I have no doubt that a decision to defer any action into January 2008, at any rate, would have been taken, and would have been reasonable.

2291. I do find some inconsistencies in Mr Stomber's opinions as to the future of the market in his emails of early December 2007.   He was not cross-examined about this, possibly because of the time constraints which his cross-examination had come up against.   Looking at those emails, however, I take the view that the variations between gloom and optimism were once again Mr Stomber's personal reactions.   I find that he was, at the same time, fearful of the consequences if the markets did not improve, but also quite convinced, and genuinely so, that CCC's capped floaters simply must begin to become appreciated as quality assets with a consequent recovery of their value/price.   I am satisfied that this was the case even though (or perhaps because) Mr Stomber thought that market conditions might still deteriorate somewhat before they got better, a view which he certainly expressed.

2292. I do not find Mr Stomber's reference to a "mistake" in not having enough repo capacity to withstand the banks' greed and fear to be of any weight in support of the Plaintiffs.   I find this to have been a throw away remark, even if somewhat bitter, as to lessons which might be learned in the future and in no way do I see it as an admission of legal fault.

2293. I do not find it lacking in due care, or even surprising, that the Defendants should not, during December, have formally re-considered Mr Stomber's business plan assumptions from the presentation to the 13th November Board Meeting.   The business plan was concerned with illustrating ways and timings under which CCC might again get back to the stage of being able to reinvest.   The actual events, on which they were receiving updates, were of more importance to the immediately central issue of CCC's continuing survival, and I am satisfied that, in any event, even if divergence between these presentations and reality had been focused on, and it had been concluded that Mr Stomber's illustrative predictions had been optimistic, this would not (and reasonably would not) have made a difference to the course actually taken on behalf of CCC in December, in practice.

2294. I am satisfied that Mr Stomber genuinely thought that the banks' seeking to improve their own year end positions was a temporary phenomenon, even whilst acknowledging that its effects would be more pronounced (worse) in the general background of the disturbed market. I am also satisfied that the other Board Members agreed with this view, and that it was reasonable to do so.   I do not consider that the difficulties of securing further repo facilities from other lenders or obtaining significant longer term repo were such as to mean that it was only reasonable to abandon the capital preservation strategy in favour of attempting to sell RMBS.   The course, once again, of seeking at least to get over December and into the new year before making any such decision was a reasonable course.   CCC had managed to maintain its repo financing despite the difficult market conditions.   It was reasonable still to see some hope of a line from Wachovia, even if no longer of the truly significant size originally expected.

2295. The Plaintiffs quote and stress, as they have done before, the ominous sounding metrics from amongst CCC's internal analytical papers, with the clear implication that the accumulation of these provided overwhelming evidence from which the Board should have concluded that

action (implicitly, therefore, selling RMBS) should have been taken.   It is, though, in my judgment, superficial to pay regard to such statistics on that basis, and I reiterate the points which I have previously made with regard to such metrics being an aid and a tool to assist managerial decisions, and requiring to be used with judgement.   For example, apparent "dramatic increases" in statistics such as APV, spreads, interest rate volatility, and OAS may show a high level pattern of increase but the significance of any such pattern requires interpretation as against other known circumstances; it is the underlying explanation for the pattern (if any) rather than the trend in the figures, which is the material which management needs to use in order to make the best judgement.

2296. As an example of this, the Plaintiffs stress that at this time the ratio of CCC's liquidity cushion to its 20 day VaR was 0.4x, the word "only" being implicit.   The immediate impression is that such a small figure means that the position was extremely precarious.   However, what that figure meant was that CCC's available liquidity was only 40% of the sum which CCC was calculated to lose on the assumption that it suffered the worst market conditions which had been experienced within the historic period of the data capture, and took no action to correct these effects for a period of 20 working days, or one month.   Of course, *if that happened*, the metric showed that CCC was doomed, but the metric itself says nothing about the likelihood of either aspect – the degree of market disruption or the lack of any defensive action then being taken for a month – actually happening.   That is a matter which obviously affects the regard which it was necessary to give to this metric, and that assessment is a matter of managerial judgement.   In the circumstances, therefore, I do not find it either surprising, or evidence of culpable lack of care, either that such metrics were not the subject of any recorded close consideration amongst the Defendants or Management, or that there is no record of their affecting the decisions taken.

2297. All in all, therefore I do not find that it was a wrong decision, and therefore still less an unreasonable decision, not to make any change in the capital preservation strategy during December 2007.   It would, in any event, have been reasonable to defer any such decision into the New Year.

2298. This is sufficient for me to dismiss, as I do, the Plaintiffs' allegations of breach of the individual Defendants' duty of care in respect of 2007.

**(c)     Contractual breach of duty by CIM**

2299. For reasons previously discussed, this being a claim with regard to strategy and advice against CIM, (rather than a claim about execution of transactions) it depends materially on the selfsame facts as those alleged against Mr Stomber under the complaint with regard to his alleged breach of his duty of care as a director of CCC.   For the same reasons, it therefore fails.

**(d)     Wrongful trading**

2300. With regard to the wrongful trading allegation, the position up to and including December 2007 remained that at all times that CCC paid its debts (repayment of repo finance and/or margin calls), had shown a continuing ability to secure the means to do so, and was in fact otherwise making profit from the transactions which it undertook.   It was therefore not insolvent.   The only basis on which the Directors could therefore incur liability for wrongful trading was if they ought to have concluded that there was no reasonable prospect of CCC's avoiding going into insolvent liquidation. This depends entirely, as discussed before, on whether they ought to have concluded that there was no reasonable prospect of CCC's continuing to be granted sufficient affordable finance to be able to finance its assets, with if necessary, the backstop support made available or likely to be made available by Carlyle in respect of resources to meet reasonably conceivable margin calls.

2301. I am quite satisfied that there was no reason to conclude that CCC had no reasonable prospect of being able to continue in "safe mode" on this basis. I therefore dismiss the wrongful trading claim as well.

**14.     The Claims: JANUARY AND FEBRUARY 2008 -  and beyond**

*Did the Defendants culpably fail to review and change their strategy between 1st January and 27th February 2008?*

*General overview*

2302. As regards January and February 2008, the Plaintiffs repeat their complaint that the Defendants did nothing to protect CCC from its position of extreme vulnerability to market movements and repo financing risks, called no Board Meeting to address these issues, and failed (therefore) to institute a programme of selling quantities of RMBS.

2303. At the end of December 2007, CCC had a net asset value of $667,659,278, much as it had been at the start of the month, although it had had better days in the second week of December, and a low point on Christmas Eve.    In January there were also fluctuations, but with a rising trend, reaching a high of over $780Mn through the second week of February, which only fell significantly at the end of the month.      The liquidity cushion rose from $62Mn (9.3%) at the start of January, to $112Mn (16%) on 10th January and remained at or above this level until 20th February when it fell to $104Mn (13.4%).  It closed the month at $69.3Mn (10.4%).      However, the figures for the last week or so of February are erratic, reflecting the beginnings of the market turbulence which was then imminently to cause CCC's collapse.

2304. None of this, though, was predicted at the beginning of the year, which started on a more positive note, with the increasing intervention of the Federal Reserve from December and continuing in January being seen as a positive measure for CCC, for reasons explained below. Once the markets got going in January, discussions and negotiations with CCC's repo lenders broadly progressed well, although there were individual ups and downs.

2305. There were no particularly noteworthy events in this two month period, a broad account of which is as follows.

*Early January 2008*

2306. On 3rd January, Citi auctioned approximately $800Mn of Agency floaters, another of the Westways auctions previously mentioned.  It was apparently successful, and Mr Stomber viewed this with pleasure (and I am sure also relief) for the fact that it showed some liquidity in the markets, provided auction price discovery of which there had apparently been none since 4th October, and gave a positive note to the beginning of the year.  He made it clear in his oral evidence, however, that this sign of liquidity was not on its own sufficient to suggest that there was now enough liquidity in the market to make it feasible or safe to sell off large quantities of CCC's RMBS.  The general target which the Plaintiffs say should have been aimed at, it will be recalled, was $10Bn.

*4th January - ALCO Meeting*

2307. This was attended by the usual official members, and also amongst others, by Mr Zupon and Mr Rella.

2308. Mr Greenwood reviewed various aspects of the markets, including the effects and implications of the Westways auctions the previous day, analysing their results.  Mr Stomber noted to the meeting that this auction might lead to an opportunity to recover margin from repo partners in the coming weeks.

2309. The importance and positive effect of reductions in interest rates, made by the Federal Reserve in December, and the anticipated beneficial effect of this in increasing prepayment speeds, which would produce both natural deleveraging for CCC and increase the investment's attraction, was noted and discussed as a positive development, with Mr Stomber explaining that this ought to result in an improvement in CCC's asset prices.

2310. As usual, the five factors which were seen as drivers of the price of CCC's securities were reviewed.   Discussion of CCC's repo lines was to the effect that CCC had some headroom as regards the next repo roll ($2.3Bn) and that there were more lines expected.   CCC's repo position was thus seen as currently being on a sound footing.

### Early January continued

2311. On 7th January, Mr. Stomber circulated to the Board commentary from a Goldman Sachs analyst, commenting positively on the Westways auction result and opining that it was not surprising that balance sheet should be deployed in investing in Agency floaters.     Indeed, this did, in the event, mark the start of an upward trend in the accepted prices of CCC's RMBS for several weeks, with a notable initial improvement in liquidity from $86Mn to $112Mn over 9th and 10th January.

2312. The scheduled meeting with BoNY as regards the potential for a tri-party repo agreement was fixed for 8th January 2008, with Mr Stomber making encouraging reports as to BoNY's willingness to assist, although he also expressed the general view that he could not see how there could be a "soft landing" in the markets.

2313. On 10th January he also reported to the Board that Calyon and ING had agreed to consider increasing the size of their repo lines, and reported a sense that, now over the year end, dealers were taking a more positive approach, recording that it was a "*good day for CCC*". Mr Conway wrote an encouraging response, commenting that they were still focused on survival, but would soon be focused on making money and paying dividends – a response which then prompted the serious Mr Stomber even to suggest some parameters for this, although agreeing *"no dividend on borrowed money"*.

2314. Around this time, Management scheduled meetings with Barclays and RBS regarding the possibility of establishing repo lines with those institutions.

2315. A new "repo committee" chaired by Mr Stomber but including Mr Trozzo had been formed within management, to meet often, with its agenda being to progress negotiations with BoNY, Calyon and ING, Wachovia, RBS and Barclays.    Negotiations with BoNY were continuing on this and the following day.    However Wachovia at this stage formally declined to grant CCC the $500Mn 364 day repo line which they were now seeking.   Wachovia blamed balance sheet constraints and the amount of capital it would require.    Mr Stomber thought they had miscalculated and sought, but unsuccessfully, to persuade them to change their position.

2316. Lehman, hitherto a main repo lender to CCC at $3Bn with a haircut nominally at 2%, but with a marked tendency to increase this by the backdoor method of aggressively low pricing, now formally demanded a haircut of 4%.   They were alone in doing so, though, and Mr Stomber, Mr Hance and Mr Conway all suspected that this attitude owed something to unrevealed internal issues within Lehman itself.   CCC decided that it would roll most of its repo away from Lehman rather than accede to the unacceptable 4% haircut ticket, and there was negotiation about this.    Mr Stomber played the Carlyle card with Lehman, expressing willingness to go to 3% but not above.   The eventual result was that it was agreed that CCC would roll its repo away from Lehman over the following two rolls, reducing the line eventually to $1Bn, to which Lehman agreed to apply a 3% haircut.   CCC hoped to transfer the bulk of this funding to the apparently promising new tri-party arrangement with BoNY.

**15th January - repo roll**

2317. With the challenging stance of Lehman, the roll was accomplished by CCC rolling $480Mn of repo away from Lehman, principally to Citi and ING, and agreeing a 3% haircut with Lehman on the remainder, with agreement that there would be a further roll away at the next roll.        Mr Stomber reported on the state of the repo lines and negotiations to Mr Conway (who was in Japan), Mr Hance and Mr Allardice, including receipt of an approach from Calyon for more business.        Mr Conway, responded in his usual one-liner style, that they could use the good news but added, in a comment on which the Plaintiffs lay stress, that "*you and I knew it would get ugly, and it is.   It will get worse much worse*".  As his email began with the comment that he had just read the papers, I interpret that as a reference to some bad financial news in the press.

2318. That day, CCC paid back $20Mn of the Carlyle revolving credit, reducing the unused portion from $40Mn to $60Mn.

2319. On 17th January Calyon agreed to an increase in CCC's repo line by $1.3Bn, at a 2% haircut. The Defendants point out that an internal Calyon memorandum, not, of course, known to CCC at the time, shows that this was done with full knowledge of the suspension of CCC's minimum liquidity cushion requirement and its leverage ratio of 32x, and in terms which showed that this increased facility was a recognition of both the quality of CCC's RMBS assets and its support from Carlyle.  It is suggested by the Defendants that this was an implicit endorsement of the capital preservation strategy.

**18th January - ALCO Meeting**

2320. This was attended by the formal committee Members and also, amongst others, by Mr Allardice by telephone, and Mr Rella.

2321. Mr. Greenwood and Mr Trozzo informed the committee that there was increasing talk in the market that the Federal Reserve would cut interest rates significantly in January and probably even further later on.   Again, the importance of increasing prepayment speeds as a benefit for CCC's position was discussed, and the five factors which were the understood drivers of CCC's asset prices were considered, as was usually done at each meeting.

2322. On 22nd January, the Federal Reserve did cut the target federal funds rate dramatically by 75 bps to 3.5%.   Mr Stomber wrote a positive email to the Board, noting that CCC now had $123 million in liquidity, and that this was expected to rise the following day in consequence.

2323. At about this time, though, Mr Conway drafted his annual memorandum to all Carlyle Investment Professionals, acknowledging the seriousness of the current financial situation generally and commenting that he thought that "*we are much nearer the beginning than we are near the end*".

2324. On 23rd January, Mr Stomber was able to report an increase in liquidity, although only of $1Mn, but also positive news for the 25th January repo roll.   Morgan Stanley had agreed to provide an entirely new $600Mn line at a 3% haircut and ING had increased its line by $500Mn and UBS by $200Mn, also at 3%.

**25th January - repo roll**

2325. This roll was accomplished with the use of the additional repo lines just mentioned and the additional $1.3Bn from Calyon.   CCC had increased its repo lines by more than $2.5Bn, and added another repo lender.   This was positive.  However, counterbalancing this, it had also had to complete the move away from Lehman, losing $2Bn of capacity in that direction, such that the net result was only slightly improved.

2326. On 29th January, Mr. Stomber reported to the Board that the parties were "*moving at full speed*" to get the necessary documentation in place following BoNY's resolution of a technical issue with its ability to process repo for CCC. He summarised the benefits of tri-party repo and reiterated his belief that a deal with BoNY had the potential to be "*transformational to the future of CCC.*" Board Members were seemingly impressed and delighted (though Mr Sarles, Mr Hance and Mr Allardice said in evidence that they had been sceptical about whether this repo finance would actually come to fruition). It was therefore all the more disappointing no doubt, when this initiative eventually came up against problems.

2327. On 30th January the Federal Reserve further cut the target federal funds rate by 50 bps to 3.25%.

### 31st January - ALCO Meeting

2328. This was attended by the usual committee members but no other Board Members.

2329. Both Mr Greenwood and Mr Stomber commented on the Federal Reserve's apparent policy and noted positively that the Fed seemed to be seeking to be proactive to stimulate the economy, and that lower rates were essential to "repair" the commercial banking system. The reduction in rates was regarded as helpful for CCC, because of its tendency to encourage prepayments. Unlike the investor who usually does not want to receive his capital back at a time when he can no longer (by definition) invest it at such beneficial interest rates, CCC, in capital preservation mode, welcomed the prospect of more capital being repaid, importantly, at par. There was general agreement amongst the Defendants (not only Mr Stomber, but also, expressly in their evidence, Mr Conway, Mr Hance, Mr Allardice, Mr Zupon, and Mr Sarles) that this was understood to be the case at the time.

2330. I understand that this positive aspect was also expected to benefit prices in the secondary market, because the securities were currently priced below par. Mr Stomber's explanation was that

> "[i]f prepayment speeds increased, prices for these securities should increase because holders of the securities would receive principal payments more quickly and at par."

2331. I confess that I cannot readily see the logic of this for the general market as compared to CCC's peculiar position. It would seem to depend on how far the perceived likely percentage of prepayments at par, would make the purchase of the whole bond at a price higher than its current (below par) market price an attractive proposition. I do not think, though, that I need to explore or understand that point for my purposes here. This was the position generally understood by Mr Stomber and CCC's Management, and at the meeting it was noted that dealers were saying that they had now begun to notice an increase in floater activity, and that the effect of increased prepayment speeds would likely be felt significantly in March or April.

2332. Mr. Stomber reported these positive predictions to the Board members that same evening. He was also able to report that the liquidity cushion had risen to $127.8Mn, just less than 19%. He expressed the anticipation that it might reach $170Mn by the Board Meeting scheduled for 27th February. He and Messrs Conway and Hance considered that this was positive evidence that, now that the pressures associated with the banks' year ends had been withstood, CCC was back on the track towards the recovery which it had shown from September through to early November 2007.

### Early February 2008

2333. At the start of February, CCC's NAV had risen to $682Mn (Mr Stomber reported $686Mn, but this difference is immaterial) and its liquidity to $127Mn, (18.8%), and CCC's repo

capacity, marginally improved over January,  showed prospects of further improvement with the anticipation of the tri-party arrangement with BoNY.

2334. On 6th February Management met with BoNY representatives to work on the project, with Mr Stomber reporting to the Board that evening that the talks had been very constructive and CCC was sending to BoNY a letter of intent with regard both to the tri-party repo arrangement (yet another advantage of which was that BoNY would use IDP pricing, which would reduce difficulties with unmatched values as regards margin calls) and also to moving CCC's clearing business to BoNY, and away from Lehman who, it will be recalled, had been being somewhat "difficult".    BoNY would apparently welcome CCC's Agency floaters as good collateral for "*these difficult times*".   Mr. Stomber said that he expected to contact the first 15 investors within 48 hours.  Mr Hance, perhaps with a note of caution, replied that the "*conversations directly with the investors will tell you if this is for real*".

2335. In the light of positive developments, Mr. Stomber, always anxious to move quickly and impress his superiors that he was thinking ahead, recorded in an email of 8th February to Mr Conway his thoughts as to when CCC might be in a position to start making new investments again, though noting that CCC did not yet have the capital to do so, and also as to dividend policy.  He recognised the major risk of starting to buy assets too early, before fundamental economic issues had resolved themselves, and noted that the banking system was still "fragile". He stated that no matter what the state of CCC's liquidity, management would not recommend a dividend payout of more than 50% (presumably of net income) and maybe zero. Whilst this is, of course, evidence of the consideration of potential dividend payments which the Plaintiffs have roundly criticised for even existing in this case, I find this email to show Mr Stomber balancing the need to impress Mr Conway that he was conscious of the imperative to pay dividends which is what would make CCC a successful entity, against also impressing him that he (Mr Stomber) would be very responsibly cautious.  The reference to "whatever" was CCC's liquidity reflected, I find, an anticipation that the figure would be high rather than low.

2336. On 8th February Mr Stomber reported an increase in CCC's NAV by $98Mn in two days to a total of $788Mn, attributing this to rises in price because of the effect of higher prepayment speeds.   Mr Stomber says, and I accept this, that this improvement was all in line with the effects which he and his team had predicted in December and January would arise from reduced interest rates, and this gave him encouragement and confidence.    By this date, CCC had also reduced the used amount of the Carlyle revolving credit to $10Mn.

2337. On 11th February, Mr. Stomber made his first five calls to the investors on BoNY's list, but from this point matters began to unravel.   His reception was such that he concluded it was "*not a good start*" because BoNY had not forewarned the investors of CCC's potential call to them.    The following five calls were slightly more positive.

2338. Mr Burns of BoNY left a voicemail message for Mr Trozzo, saying that such arrangements did have to be lined up, whilst understanding Mr Stomber's anxiety, and offering to come and talk the following day, to discuss.   He followed up with an email the next day warning that the process was sometimes a negotiation with the investor, who would have to carry out its own due diligence and suchlike, and whose parameters for an acceptable counterparty might have changed in the environment of the times. He specifically warned that

> "…An investor that would accept non-rated companies a few months ago may have changed their requirement so you may run into a name that we think is OK but later find out its an issue."

2339. By 13th February CCC's liquidity had increased steadily, almost day by day, from $134Mn on 6th February to $151Mn on 13th February, reflecting return of margin on increases in repo price marks.        In an email to Mr Stomber of that day Mr Hance said that "*[b]oth liquidity*

*and NAV are improving as you predicted*."   Mr. Stomber responded that "*[h]ope is not a plan, but it occasionally works.*"

2340.  The Plaintiffs have lighted on this comment as a recognition that CCC had not really had any proper plan at all, and had been operating haphazardly and with reckless disregard of the factors which ought to have driven it to a different and positive course of action, namely selling RMBS.  I do not read it as such however.  The Defendants submit that it was just a response of modesty, and I accept this.   For perhaps the first time in several months, Mr Stomber had seen significant movements in CCC's position which bore out the opinions and predictions on which he had based his advice to others, and had probably received, for the first time, a complimentary acknowledgement which he actually felt he deserved, rather than just someone being encouraging.   I am quite satisfied that this was just a response covering awkwardly felt gratification, and nothing to do with any admission that previous policy had been irresponsibly based on nothing but hope.

### 14th February – ALCO Meeting

2341.  On 14th February 2008, there was an ALCO meeting at 9.30 am, attended by Messrs Trozzo, Stomber, Greenwood, Melchior and Buser as members, and also, amongst others, Mr Ng and Mr Rella, and with Mr Allardice and Ms Cosiol in attendance by telephone.   The Minutes suggest a more up-beat tone to the meeting as participants discussed the economic indicators affected by the Federal Reserve's intervention, and implications for the future.   The Committee discussed the reasons for CCC's increasing NAV and liquidity, which by then stood at $785Mn and nearly 20%, respectively.   Mr. Greenwood explained that CCC's pricing service, IDP, had factored the increasing prepayment projections into its pricing model, leading to the rapid and significant increase in Agency floater prices at around 8th February, and that as a result as at 12th February, the RMBS portfolio's year-to-date unrealised gains were up to nearly $107 Mn.  This explained why margin had been returning to CCC in substantial amounts.  It was confirmed that repo financing for the next roll was secure with rates locked in for one month, and that there would be no room for rate negotiation because the Federal Reserve was not due to meet again until 18th March.

2342.  However, that same day, there was something of a reverse in the positive signs in the market, with traders reporting adverse market conditions and volatility suggestive of more problems to come.  Significantly for present purposes, there was a surge in selling in the RMBS sector without adequate corresponding demand.  This drove down prices, although it does not appear to have affected CCC's NAV figures, which were based on IDP pricing, for another few days.  IDP pricing inevitably tended to lag behind actual transactional evidence.

2343.  Analysts' comments at the time are written in the usual jargon of the markets, but the fundamental problem appears to have been recognised as being that banks were not able or willing to lend, owing to pressures on their own balance sheets and capital ratios, arising because so much of their assets were in practice turning out to be "toxic waste".   This would, on the evidence, be the notorious sub-prime derivative bonds - debt obligations which were increasingly going bad, and the full extent of which, as part of the wider ABS market, had still not yet really emerged.

2344.  Mr. Stomber now wrote an email to Mr. Conway with some general thoughts on market conditions, now rather pessimistic and with a lugubrious reference to this not being the first quarter of 2008 but the fifth quarter of 2007.  He commented that he saw "*nothing positive*" for the US economy as a whole, and that the signs of economic deterioration made him "*worried about repo line availability*".

2345.  On 14th and 15th February, CCC received substantial margin calls totalling $39Mn from Bank of America and Deutsche Bank, supposedly due to a dispute about pricing, but interpreted by the cynical Mr Stomber, in a reporting email to Mr Conway, as likely to be "*a new wave of*

*collateral grab",* given that further write downs from the financial institutions were expected. He described credit issues as holding down prices in market sectors other than just risky sub-prime and expressed the laconic doomsday view that *"the financial system is crippled"*.  Later he remarked *"I think the near term makes or breaks us"*.

2346. The dispute with the banks about pricing was plainly compromised in some way, as CCC's liquidity only dropped from $159Mn to $127Mn, but Mr Stomber saw the following week as likely to be crucial.

### *15th February – repo roll*

2347. The 15th February repo roll was nonetheless accomplished with little change, CCC rolling just under $500Mn away from Morgan Stanley to Deutsche Bank.

### *17th – 24th February*

2348. In an email of 17th February, as the markets deteriorated further, Mr. Stomber wrote to Mr. Conway commenting that the economy appeared to be *"near or at bottom."*    When Mr. Conway asked, on 18th  February, how Mr. Stomber thought that might affect the pricing of CCC's assets and its access to repo lines, Mr. Stomber acknowledged that the pressure on banks could affect availability of financing, but he thought that further government intervention to stabilise the markets was likely, and that CCC's repo lines would hold.   His belief was that CCC would be *"OK"* because of its association with Carlyle, and if it survived through the quarter year end for the banks, then it would have *"made it."*

2349. On 20th February Mr Conway had an exchange with Mr Duffy of Bank of America, in which the latter commented on the poor markets and lack of interest in even Agency RMBS, and observed that he had commented a week or so ago to one of CCC/CIM's team that *"the best hedge [was] to sell, and it [made] sense to do so now."*    Mr Conway's response was *"Hear you, but. . .".*

2350. The Plaintiffs rely on this email as evidence that at that time the general wise view was to sell, and CCC ignored it.    Mr Conway explained his response as meaning that it was easy to suggest selling, but another thing to find a buyer at a reasonable price and to sell in a market where prices were declining without triggering further declines or margin calls; in other words his response had been a coded reference to the various difficulties perceived about CCC's selling RMBS which had affected its decision not to do so before.

2351. Mr Stomber updated his liquidity report to Messrs. Conway, Hance, Allardice, and Loveridge, noting that Deutsche Bank and Bank of America had generated margin calls which had reduced CCC's liquidity to $104Mn, down $23Mn from the previous day, and repeating the *"fifth quarter of 07,"* quip.    CCC now began to draw funds back down under the Carlyle revolving loan facility.   As ever, though, Mr Stomber added a brighter comment that margin calls and CCC's liquidity position *"could all reverse in the next 5 days,"* and that he thought this was a real possibility given how quickly market conditions had shifted in the last few weeks.

2352. Mr. Hance was surprised at these sudden adverse market developments, and could not understand why there was not a flight to quality and/or an improvement in prepayment speeds, asking how far apart the repo lenders' marks were from CCC's own FT pricing.   Mr Stomber replied that this was, collectively, about $100Mn.

2353. Mr Conway says that although he felt similarly unsettled about the worsening market, he believed that CCC was then in a better position to withstand adverse market conditions than it

had been in late 2007 and did not think it was facing an imminent threat to its survival. Comments about "*the world ... coming to an end*" are quoted from this exchange of emails by the Plaintiffs, but read in context, they seem to me to have been ironic.

### 25th February – repo roll

2354. CCC completed the 25th February Fannie Mae repo roll with no significant changes to its repo arrangements or sources, the only feature being the familiar one of unfavourable dealers' marks.

2355. On 25th February, spreads continued to widen in the light of banks' balance sheet constraints and the growing supply of Agency RMBS in the market.   Mr Stomber reported on the still deteriorating market conditions to Messrs. Conway and Allardice.   Mr. Conway responded that, given these developments, he did "*not see how we can pay a dividend,*" and that he thought Carlyle should not take any incentive fee, despite the hard work everyone had done. Mr Stomber replied that CCC was objecting to what he saw as unjustifiably low pricing by some repo lenders, but that it was likely to take two weeks to address the issue effectively with them.

2356. Also on 25th February, Mr. Stomber wrote to Messrs. Conway, Hance, Allardice and Loveridge reporting that CCC's liquidity had now fallen to $88Mn, based on the perception that repo dealers were very nervous and were therefore operating "*herd fashion*". Reiterating his concerns in a further email that day, he nonetheless said that these were tempered because of small signs of "*repair*", and indications that the Federal Reserve was now more attuned to the issues in the repo market.

2357. Up to the end of February, BoNY and CCC were still working on documentation for the tri-party agreement, and were making plans to contact another round of investors, although this project did not survive the adverse events of the very end of February itself.

### 26th February - Audit Committee Meeting.

2358. The Audit Committee met on 26th February 2008 to review CCC's 2007 year-end financial statements, including the MD&A and CEO letter, in order to ensure that those documents accurately described CCC's financial condition. Mr Stomber, Mr Conway, the members of the ALCO committee and Mr Reville of PwC, together with others, also attended.

2359. After lengthy, and I think anxious, review and discussion, the Audit Committee ultimately approved the financial statements, CEO letter, and related disclosures, including representations about Management's expectations for increased prepayment speeds and recent actions by the repo counterparties that had reduced CCC's liquidity.

2360. Mr. Reville reported that PwC was prepared to issue an "*unqualified*" audit opinion, meaning that there were "*no uncorrected misstatements and no audit adjustments.*"   Mr Reville confirmed that, owing to the continuation of the general liquidity crisis since the events of August, PwC had once more independently confirmed Management's pricing of CCC's securities and found the result to be virtually identical.  In this instance the final discrepancy over the whole portfolio was $154.

2361. The Committee discussed Carlyle's decision to waive its entitlement to incentive fees for the fourth quarter of 2007, in the light of the anticipated decision by the Board not to pay a dividend.  The Committee concluded that CCC "*had 'sufficient' liquidity to pay a dividend*" but that it "*wasn't prudent to do so because of the volatile markets.*"  It did so after weighing the effects of not paying a dividend on the stock price as against the effects of paying a dividend on the attitudes of CCC's repo counterparties.

**26th February - Informal voting directors' meeting**

2362. Later that night, before the Board meeting the next morning, Messrs. Conway, Hance, Allardice, Sarles, and Loveridge—CCC's voting directors—met for dinner to have a high-level discussion about CCC's future. This meeting had been planned and proposed by Mr Allardice at the time when it seemed that the situation had turned somewhat for the better and the capital preservation strategy was working, such that it now appeared to be the time to discuss views about the future of CCC.

2363. Messrs. Stomber and Zupon, were not present. It is suggested by the Defendants that this was because they each had managerial responsibility for, and thus had vested interests in, particular components of CCC's portfolio, and it had therefore been decided that the voting directors should meet alone to allow them to discuss candidly matters such as a potential change of asset mix and general investment strategy, which might well have consequences for whether CCC's then current Management would be retained. However, I think that is not the whole story. I find that this was really aimed at Mr Stomber, and that Mr Zupon was excluded for presentational purposes. I find this, first, because Mr Zupon's position in Carlyle was clearly secure on any basis; only Mr Stomber's position was dependent on CCC. Second, Mr Stomber had shown himself to be a prickly personality, especially when he felt threatened (as had happened, for example, at the 13th November Board Meeting). It would not have been presentationally possible to hold an informal meeting excluding only Mr Stomber and it was therefore more diplomatic to exclude Mr Zupon as well, on the basis that this could then be portrayed as simply a discussion of the voting directors, who were, at least in theory, those more distanced from CCCs every day affairs.

2364. The ever blunt and to the point Mr Sarles had prepared a list of points which he wanted to see discussed, and he took this with him. Amongst these was the issue of financing; it was his view that if CCC were continuing to finance mortgages then there had to be a better way than using 30 day repo. The evidence is that at the dinner, the group discussed financing options for Agency RMBS (as Mr Sarles recollected), the credit business, dividends, when CCC might begin investing again, and whether to shift the business model away from an RMBS-focused portfolio. In response to questions from the Independent Directors, the Defendants say that Mr. Conway reiterated that Carlyle would continue to support CCC, both from a financial and operational perspective, as it had since CCC's inception. The Plaintiffs say that, on examination, the evidence is more equivocal; Mr Conway was reluctant or avoided committing such support to an actual figure, and it was obvious that the accounts consolidation issue was going to be a potential stumbling block. They say that the other voting directors should have taken no comfort from Mr Conway's affirmation, even if it was given.

2365. The outcome of the dinner was a decision that, for the short term, CCC should continue with the capital preservation strategy, and the company would revisit the question of a long-term investment strategy after it had accumulated sufficient resources to start buying new assets. I am told that it was agreed that Mr Stomber and his team had been doing a good job managing CCC through difficult circumstances, and the directors retained full confidence in him, but that if CCC pursued a substantially different investment strategy in the future "*Mr. Stomber might not be the right person to lead the company*." In the meantime, Mr. Hance was to speak with Mr. Stomber to ask him to prepare specific proposals for the Board's consideration about the future direction of CCC.

**27th February – BOARD MEETING**

2366. CCC's Board met the next day, 27th February 2008. The Plaintiffs invite me to note (as I do) that the Minutes in the bundle are a version which went through many amendments by both the Directors and their lawyers. I have therefore looked also, and primarily, at the redoubtable Ms Cosiol's handwritten notes.

2367. After opening the meeting and making certain formal appointments, the Board discussed the documents to be included in the Annual Report and Accounts, and especially the need for updating information to reflect the situation up to the moment of its release.     The general concern of the meeting was to ensure that, with the changes in circumstances over the previous two weeks, all the material contained in these documents was fully accurate and presented clearly for investors.  The discussion  began with a review of the proposed CEO letter, and moved on to the MD&A, and then to the Financial Statements themselves and the Annual Report incorporating PwC's review as auditors.

2368. Amongst matters recorded as discussed, points of particular relevance are that in the light of the worsening market conditions Mr. Conway informed the Board that Carlyle was amenable to increasing the size of the revolving credit facility by $50Mn, if needed.  This was a repeat of the increase lined up but not used in December 2007 because it was not needed.  The December authorisation was then reaffirmed by resolutions of the Independent Directors and the Board. The availability was also extended to 1st July 2009.

2369. In line with the prior day's discussion at the Audit Committee meeting, and in conjunction with CIM's waiver of its incentive fee for the fourth quarter of 2007, the Board approved a proposed amendment to the IMA whereby CIM would not earn an incentive fee for any period in which the Board did not declare a dividend.  The Board believed this change would benefit shareholders and Mr Conway commented that he thought this change was fair; if investors were not getting a dividend, then CIM had not really earned an incentive fee.   In conjunction with this the Board discussed CCC's dividend policy and reaffirmed that whilst they believed CCC had sufficient liquidity to pay a dividend, they did not feel that it was prudent to do so and would not declare a dividend for the fourth quarter of 2007.

2370. The MD&A recorded that Management and the Board were continuing to analyse the appropriate liquidity cushion.    The reason for this was that one could not determine an appropriate liquidity cushion until one had both analysed the liquidity crisis which had required its use originally and determined an appropriate prospective business model, both of which were not yet possible because markets had still not shown signs of being settled into a state which could be treated as normal.  The Board also discussed the recent cut in interest rates by the Federal Reserve and how CCC might be affected as a result.

2371. Moving to the financial statements themselves, Mr Reville presented PwC's findings upon its review of the Fourth Quarter financial statements and recorded that PwC did not find any material weaknesses in CCC's financial reporting, that PwC had (again) independently evaluated the prices used by Management and come up with essentially identical results, and that it had been a clean audit with full cooperation from management.  He later confirmed that PwC was satisfied that CCC was to be regarded as a going concern, commenting that the increase in the potential Carlyle loan facility would be "*extremely helpful*" in this regard.  He said in his oral evidence, though, that he had already formed that view the previous evening having considered the matter and all the materials to be presented at the Board meeting, and that this increased facility was not decisive but simply bolstered his view.

2372. Mr Stomber commented that the markets had deteriorated "*markedly, rapidly and unpredictably*" since 14th February, and these developments had caused banks and securities firms to mark CCC's securities at lower prices compared to newly issued Agency floaters.  Members of the Audit Committee confirmed that this pricing was not rationally explicable and suggested that factors beyond the intrinsic value of the securities must be affecting price - by which Mr Allardice explained he was thinking of internal pressures within the banks themselves.

2373. After approving the formal year end documents, the meeting then turned to the business model and related materials presented to the Board, with updated projections that Management had prepared, showing how CCC would be positioned throughout 2008 if

Management's assumptions about market conditions were borne out.  Mr. Trozzo explained to the Board that CCC's portfolio had "*begun to stabilize*" in the fourth quarter of 2007 after the third quarter's "*unanticipated volatility*," and this had reduced CCC's need to draw on liquidity to meet haircuts and margin call demands.  He then explained CCC's basic financial model, called the "*Static Case*," was an updated version of the projections provided to PwC in October 2007 and to the Board in November 2007.  It assumed that there would be no new investments in RMBS or credit products, no sales of RMBS, no dividend payments, and that repo haircuts would remain at a weighted average of 2.74% (as at present), throughout 2008.  It further assumed that LIBOR would move down to 2.25% and that the pricing of Agency floaters would recover by 1% per month during 2008, Management's most conservative prediction.  The *Static Case* was also referred to as the *Downside Case*, because it assumed a repayment rate on RMBS held at a mere 1% per month, even though expectations were that prepayment speeds would increase notably in 2008 because of the lower interest rate environment.

2374.   Based on these assumptions, the *Static Case* projected that:  (1) liquidity would improve by over $40Mn per quarter throughout 2008; (2) leverage would reduce from about 33x to 25x by the end of 2008; (3) NAV would increase by around $25Mn in each quarter in 2008 because of asset price recovery; (4) the book value of CCC's shares would improve to $15 by year-end; and (5) CCC would earn a net annual return of 7.25% (but would not pay a dividend).

2375.   The "*Likely Case*" also contained in the Board Pack, made more favourable projections based on assumptions of faster paydowns, quicker recovery of prices in 2008, repayment of the revolving loan by the end of the first quarter of 2008 and payment of a dividend.   It is of course fair to say that the events of the immediately preceding fortnight must have cast some doubts on the attainment of these predictions, especially as regards recovery of asset price and repayment of the Carlyle loan facility.   Asked whether the earnings reflected in these projections were sustainable, Mr Trozzo responded to the effect that whilst CCC's underlying cash flows were substantial, its liquidity was being unfavourably affected by repo counterparties' tightening credit in response to unstable market conditions.

2376.   As a result, CCC's Board concluded at this 27th February meeting, that the better course was to remain on the same track as had been pursued since August 2007, namely the capital preservation strategy, which was now embodied in the *Static Case*.   Once again, the risks of selling as an alternative arose from effects of low or unpredictable price.     Nonetheless, the Board urged Management to begin preparing for a situation in which the projections in the *Static Case* were realised, such that CCC's liquidity improved over the next several quarters, as CCC would then need to have a plan for how its capital and cash would be deployed, and to do some strategic thinking for presentation at the next Board Meeting.   Various options were thrown up as thoughts, including, from the notes: staying in mortgages with varying degrees of leverage, a portfolio of diversified fixed income products, or buying another company.     Mr. Stomber explained that it would be difficult to formulate a plan as to the appropriate asset mix without making a market forecast, which remained difficult, but his view was that when the market recovered, CCC should diversify into credit products though he could not yet suggest when or what would be appropriate.

2377.   Ms Cosiol's notes record that, at one point, Mr. Sarles made the statement, "*if we can't get comfortable [with] anything, figure out how to gracefully exit*."   Mr. Sarles explained that he meant that Management and Board should consider a variety of options including a future orderly wind down if a future trading strategy could not be agreed.   Bearing in mind the Defendants' consciousness of the fact that CCC's investors were expecting a strategy to return attractively high dividends, it appears very plausible that this comment was looking to the eventual future, generally.

2378. The Board discussed a recent New York Times article, which described the steps that three of CCC's competitors were taking in reaction to market conditions.    The Board also discussed CCC's plans to switch its clearing agent to BoNY and its continued pursuit of tri-party financing arrangements.   Management explained the perceived benefits of tri-party financing to the Board and the Board approved the resolutions necessary to set up such a facility with BoNY, although in the end nothing came of this before CCC collapsed.

2379. Because of the increased signs of market volatility over the preceding two weeks, Management also recommended, and the Independent Directors unanimously approved, a resolution extending suspensions of the liquidity cushion, repo line capacity and portfolio composition Investment Guidelines through to 30 September 2008, in order to give management the desirable flexibility in its actions.

2380. After the Board meeting adjourned the Independent Directors, Messrs. Loveridge, Sarles and Allardice, met in an executive session of their own, without Management present, to discuss the challenges for CCC and the need for Management's input regarding its longer term strategic direction.    The meeting apparently confirmed the general points highlighted at the previous evening's dinner and the Board meeting itself, although there seems to have been stress on the fact that Management needed to prioritise planning for CCC's future.

2381. CCC later released its 2007 Annual Report, including the CEO Letter to Shareholders.  With PwC's clean audit and favourable going concern conclusion, the Annual Report did not contain any disclosures or cautionary language about CCC's ability to continue as a going concern for at least another year.

### Financial position at the end of February

2382. CCC's financial condition had deteriorated by this time, and substantially.   The ALCO pack documents showed that in roughly two weeks, $106Mn in unrealised gains since the year commenced had become $17Mn in losses.   Between the 12th and 27th February, liquidity had been cut in half from $151Mn (19.3%) to $75Mn (11.3%).   The NAV had also fallen, although superficially less dramatically, from $679Mn to $664Mn.    Haircuts had, though, remained reasonably steady at a weighted average of 2.7 % and now among 14 repo lenders. This aspect of CCC's financial position was therefore seen as having been managed successfully, and being apparently stable.   An intimation that Deutsche Bank was going to propose a haircut of 4% was only to come later.

### The subsequent history

2383. The Plaintiffs' claims do not rely on any acts of the Defendants after 27th February 2008, but it is convenient to continue to set out here the final short chapter of CCC's existence, before considering those claims, because it provides some evidence and context.

2384. On 28th February 2008, a press release was issued, recording the main figures and features of CCC's results for the fourth quarter and year end to 31st December 2007.

2385. Mr Trozzo had put forward to Mr Stomber the names of six banks which it was suggested be approached with regard to establishing new repo lines, the goal being a further $3Bn of funds, seen as providing defensive flexibility of funding and a bridge until the still expected tri-party repo could become established.

### 29th February - ALCO meeting

2386. CCC's ALCO met two days after the Board meeting, on the afternoon of 29th February, but it was a deliberately brief affair.  It included the formal Committee members, together with Mr Zupon and also Ms Cosiol by telephone, so there were no handwritten notes.    The record is

very short, no doubt reflecting that other more pressing matters took over in priority from around this time from tasks such as drafting minutes.    The meeting covered only a review of the markets, which consisted of Mr Greenwood explaining, in essence, that RMBS spreads had widened rapidly.

2387.  During the evening of 29th February (a Friday), Mr. Stomber sent emails to Messrs. Conway, Allardice, Hance, Loveridge and Sarles, reporting that it was a "*[r]ough day on margin calls despite market fundamentals going our way*."    Whilst CCC made successful return margin calls ($9.1Mn) on Lehman and Bank of America, it had also received margin calls from other repo counterparties, notably ING ($2.1Mn), JP Morgan ($28.3Mn) and Deutsche Bank ($28.5Mn) which it paid, reducing CCC's liquidity on that day from about $120Mn to $70Mn, (both these figures being bolstered, though, by having now included the $50Mn promised increase in the Carlyle credit facility).  On that day, also, Deutsche Bank intimated that they would be imposing a 4% haircut for the next repo roll.

2388.  Mr. Stomber explained to the Board that Management was following up with the major lenders on Monday, to dispute the prices on which the margin calls had been made; he observed that there had been a trade that day by Bank of America for $60Mn in capped floaters at a price nearly 30% better than the prices being used by JP Morgan and Deutsche.

2389.  Mr Conway replied supportively, though fearing that the markets would get worse.  Mr Stomber was still hopeful that prices for CCC's securities would improve because interest rates had to go lower and prepayment speeds therefore increase, but that the US economy was clearly *"in for a long problem"*.

2390.  Also on 29th February, Mr Gehring of Credit Suisse noted in a Bloomberg Message, that Peleton Partners, who had won an award as "best credit fund" only a month previously, had been forced into liquidation, blaming the withdrawal of credit lines by its prime broker, which had then caused a *"funding issue"* and thence the liquidation.    On Saturday 1st March 2008, the Wall Street Journal reported the collapse of Peleton Partners, and Mr Stomber emailed Deutsche Bank to request a review of the decision to increase haircuts to 4%, since CCC had never had a 4% haircut with any of its lenders.  Mr Stomber believed that this request was out of line and in fact being driven by a particular employee of Deutsche Bank with a grudge.

### 3rd - 6th March

2391.  On Monday 3rd March, at 10 am, Mr Stomber, Mr Hance and Mr Rella held an Analysts' conference call to review CCC's 2007 Annual Report.   The transcript of this call shows them broadly reiterating the points made at the Board Meeting and the contents of the CEO Letter and MD&A.     As regards haircuts, Mr Stomber says he had not taken the Deutsche Bank comment seriously at that time, and was therefore quite genuine when he said that increases were *"not happening today"*.    I accept this only in the sense that, having requested a review of Deutsche Bank's decision and not agreed to it, Mr Stomber felt he could, at that time say that such an increase was not happening; I think that Mr Stomber had indeed taken the request seriously, albeit he was determined to resist it.    Mr Hance did record that CCC was receiving margin calls, which was the reason why it was retaining its cash.

2392.  That day, though, turbulence began to spread in the markets in earnest.  Thornburg Mortgage, a large US residential mortgage originator, reportedly got "crushed" in the markets, having previously issued warnings of difficulties meeting margin calls because of the reduction in the price of home loans tied to bonds in February.  There were reports of some sort of meltdown going on in the repo loan market in general.  Mr Nachtwey, who investigated and reported on what he was hearing in the markets to Messrs Conway, Hance and Zupon, says that his recollection is that what he was being told was that there was a market wide contraction of repo lines, seemingly in response to a panic among banks who were looking to reduce their exposure and hold on to as much liquidity as possible.

2393. CCC had met all its margin calls up to this time.  However on 3rd March Mr Stomber learned that Citi was also now demanding a 4% haircut (although it would limit it to 3% if CCC would reduce the size of its line) and Deutsche Bank was now set to demand a 5% haircut at the next repo roll.

2394. At this point, on the morning of 4th March, Mr Stomber informed Mr Conway and Mr Hance that he felt that boldness was required, in order to break the cycle with the banks, (they were simply demanding collateral because they could, and it kept being forthcoming).      He proposed that CCC should seek a standstill agreement with CCC's repo lenders as to haircuts, and an agreement with them to abide by external pricing services in exchange for Carlyle lending another $100Mn to CCC, and at the same time, also put a rights offer to CCC's shareholders requiring them to contribute additional share capital to CCC or else have it sell securities at a loss.   He considered that major investors in particular were likely to want to help CCC hold on in order to realise par value on its securities at maturity.

2395. Mr Hance reacted that an immediate sale to try to recoup net asset value and thereby give investors a 30% loss might be a better option, because trying to fend off ever increasing haircuts prompted by banks' desires to gather liquidity for themselves would not work, but Mr Stomber responded that such a sale could mean a much greater loss than Mr Hance suggested.   He did a calculation of the level of losses which would be occasioned by selling $2Bn or $10Bn at CCC's marks, or at those being used by JP Morgan, which showed doubt about whether a substantial part of net asset value would be recovered, and there was also, he pointed out, the further prospect of the liquidity spiral effect.  The sight of a large sale of Agency floaters by CCC could cause the repo banks to have fears about price trends and demand yet more margin, or fears about CCC's health and retract finance still further.

2396. Whilst the situation was obviously bad, it was also somewhat uncertain; on 4th March, CCC succeed in recovering $10Mn of margin, including $4.4Mn from JP Morgan.

2397. However, on Wednesday 5th March, matters worsened again when JP Morgan now issued a margin call against CCC for $14Mn and Lehman for $3Mn, and a further substantial call from Deutsche Bank was expected.   Mr Stomber noted that, having received $47Mn in margin from CCC over the previous seven days, JP Morgan now had an advantage over CCC's other repo lenders.  He stated to Messrs Conway and Hance that "*Today will have to be the day we stop paying margin*".  He proposed a meeting with CCC's repo lending banks to agree a standstill whilst the matter was *"work[ed] through"*.

2398. Mr Conway informed his Carlyle Co-Founders of the position, commenting that such a standstill might enable CCC to get through, but that even then a 1% change in haircut levels was worth $200Mn and whilst this would have been unthinkable until recently, it was now no longer.

2399. Mr Stomber emailed all CCC's repo lenders, copied to CCC's Board, advising them of the margin demands which CCC was receiving, the request for higher haircuts and the backdoor lower pricing, and inviting them all to a meeting on the following Monday (10th March) to discuss the situation in a coordinated way, reminding them that Carlyle had always supported CCC where necessary, but that every time CCC obtained additional resources, "*one of our repo parties has moved the goalposts.*"      Mr Stomber and Mr Nachtwey then made a telephone call to Mr Black of JP Morgan, to try to persuade him not to call default on JP Morgan's margin call until after the Monday meeting.  However, they met a complete lack of co-operation and stone-wall intransigence.   They therefore predicted that JP Morgan would call default, seize assets and sell, unless JP Morgan heard from the Founders that Carlyle was willing to support CCC, effectively without limit.

2400. In fact, the first notice of default was received that evening from Deutsche Bank.  JP Morgan declared default the following morning, despite an intervening telephone call from Mr

Conway to Mr Black to attempt to persuade it to hold off.   CCC, as it was no doubt obliged to do, issued a press release that night, announcing that it had received demands for margin and additional collateral totalling more than $60Mn which it had not met, and that it had received a notice of default and expected more, although management was still actively working with CCC's repo counterparties to develop more stable financing terms.

2401. This was not, of course, enough and on the morning of 6th March, CCC received an avalanche of further margin calls from other repo lenders, totalling over $400Mn.

2402. CCC therefore accelerated the meeting with lenders from 10th March to that afternoon, 6th March.  However, four of CCC's repo lenders declined to attend, and neither did JP Morgan or Deutsche Bank.  The meeting was attended by Mr Conway as well as Mr Stomber and Management, with representatives from Citi, Bear Stearns, Lehman, Calyon, ING and UBS. A term sheet had been circulated for a proposed co-ordinated agreement which would guarantee haircuts and agree to use independent pricing, in return for an infusion of capital from Carlyle, and an issue of equity to the banks was proposed.   However no commitments from the banks were obtained, although Calyon and ING appeared to be interested in working out a deal.  This was against the background that on that same day the stock prices of companies in the Agency REIT sector suffered extraordinary one-day drops of between 18% and 31%.

### 6th March – BOARD MEETING

2403. An emergency Board Meeting was convened by telephone that evening.   Mr Hance outlined what had happened since the beginning of the month and at the meeting that afternoon.   It was agreed that the scale of any standstill agreement required was very large and also that Citi, as the largest lender was key to this.  However, Citi had intimated at the meeting that it would require Carlyle to provide at least another $800Mn in capital or collateral.   Mr Buser reported that Mr Reville of PwC, was surprised at the sudden downturn of events but remained comfortable with the opinion that he had expressed as regards CCC's having been fairly seen as a going concern at the previous year end.

2404. That evening, Mr Stomber sent a contrite email to the Founders, apologising for any "*collateral damage*" to the Group, stating that CCC had been killed by the worst market since the depression, and recognising that his employment would have to be terminated.  Mr Conway responded, assuring him that it was not his fault, that they still needed to work to do what was best for the company, and that he was not throwing him (Mr Stomber) overboard.

### 7th - 16th March - More BOARD MEETINGS

2405. I do not need to recite all the detail of what occurred over the following few days.   In summary, Carlyle devoted a great deal of time, effort and resources to trying to work out a way forward to salvage value in CCC, bringing in a skilled crisis negotiator, Mr Bruce Rosenblum, enlisting the help of outside counsel and other investment banks, and being, Mr Conway said, willing to put up large further sums if the repo lenders would hold off and avoid selling CCC's securities at firesale prices (although it is not clear that this proposed support was as much as the $800Mn that Citi had intimated).   However, it proved impossible to obtain any sufficiently co-ordinated response from the repo lenders who each had their own individual issues or agendas.   Certain repo lenders broke ranks and started selling CCC's securities which they had seized - by 10th March, over $5.7Bn of CCC's securities had already been seized and sold – and that fuelled the incentive for others to sell, to minimise the effects on them of prices falling as more such assets came on the market.

2406. CCC made almost daily press releases as to the state of its affairs, on 5th, 7th, 9th, 10th, 12th , 13th and 16th March.   Further Board Meetings were held on 7th, 10th and  12th March, but by then CCC was compelled to announce that it had been unable to reach agreement with its

lenders for continued financing, and that it therefore expected that CCC's lenders would proceed to take possession of substantially all of its remaining assets.   Unsurprisingly that occurred.   The collapse was by then inevitable, and further Board Meetings on 14th and 16th March merely discussed and then took the necessary steps to put CCC into liquidation.

2407.  Market commentary during these few days first focused on CCC's leverage (of 28x – 32x) as being the fundamental distinguishing feature between CCC and its suggested peers, (citing Prodesse, Annaly Capital Management and MFA Mortgage Investments) and latterly came to identify this as the cause of CCC's collapse for being unsustainable in the current turmoil of the mortgage markets.   The Defendants, though, point to a contemporaneous summary set out on 10th March itself, in comments to the US Federal Open Market Committee (the "FOMC") by William Dudley, then Manager of the Federal Reserve's System Open Market Account, recognising the "liquidity spiral" pattern of events, and describing the further consequence of such financial instability having started in the more risky subprime areas but then spilling over into and through the more solid AltA and Jumbo prime markets, and ultimately even to Agency  mortgage backed securities.

### 17th March 2008 – CCC is wound up

2408.  On 16th March, both the Board and the A shareholders resolved to apply to this Court for the compulsory winding up of CCC, and an Order was made, on 17th March 2008, as noted at the start of this judgment, a long time ago.

2409.  Of course, CCC was not the only entity suffering from the contraction of funding in the financial markets at the time, and the banks' reactions to it.   Other entities also failed, in the end, the most well-known being Bear Stearns and later Lehman themselves.   Bear Stearns, collapsed at the same time and speed as CCC, on 13th March 2008, with its cash reserves wiped out in three days.

### The claims: JANUARY and FEBRUARY 2008 – Summary of arguments.

### Plaintiffs' case

2410.  For present purposes, the assertions in the Plaintiffs' case must focus on what the Defendants did in January and up to 27th February 2008, being the period expressly referred to in the Cause as the reference point for their claims.

2411.  The Plaintiffs' submissions in relation to this period start from the assertion that the Defendants had already been in breach of their duties for many months, which I have found not to be the case.   However, they maintain that, during this period, the Defendants' continued running of CCC as before, holding a $23Bn [sic] portfolio levered at more than 30x and funded exclusively by 30 day repo, was an independent breach of the Defendants' duties at this time.   They repeat their general criticism of continuing this course and taking no steps to deleverage, by selling or otherwise, but they focus particularly on the deterioration in market conditions in February 2008, causing CCC, with its cash reserves nearly exhausted, then to run out of repo capacity and collapse into insolvent liquidation.   They urge that this situation was, in reality, a continuum of the financial crisis which had begun in August 2007, and that CCC's collapse therefore cannot be attributed to some claimed new cause of a supposedly freak market event in March but was the inevitable consequence of the Defendants' failure to take the now familiar "required action" from August 2007 onwards, but independently including in this period.   They point out for example that the sudden drop in IDP prices for CCC's RMBS is shown in the graph evidence as occurring only on 11th March 2008, when CCC's actual collapse occurred a few days earlier.

2412.  The Plaintiffs invite me to find that the economic conditions relevant to CCC were no better in the first quarter of 2008 than at the end of 2007, (as witnessed by the "fifth quarter of

2007" comments at the time), that nothing happened in that first quarter which justified the Defendants' having any optimism for the future, but that, on the contrary, CCC's funding position became incrementally worse, as it struggled to maintain affordable repo lines.   They point to recognition in the emails between Mr Stomber and Mr Conway in early January (2nd and 8th) that market conditions remained worryingly bad.   They point out that "most" (they in fact cite six) of CCC's repo lenders had 31st December year ends, and would be publishing at least preliminary results in late January or early February with the expectation that they would show large losses incurred - indeed Mr Hance had alluded to this expectation in November - and they remind me that Mr Stomber had also anticipated the spillover of market difficulties from the struggling sub-prime sector to other areas in one of his emails of 13th November 2007, where he referred to spread to the "Muni" (Municipal loans) market.

2413.   They argue that the emails of 12th-15th February 2008, which I described above, show that it was generally recognised (including within CCC) that this contagion had happened, and these were just the latest in a progression of worsening circumstances which made it perfectly obvious that it was not reasonable to expect any easing of difficult market conditions, and Mr Conway, they suggest, had clearly recognised this in his draft annual circular memorandum to Carlyle employees of 22nd January 2008.

2414.   Reviewing CCC's repo availability, they submit that it could clearly be seen to be deteriorating:  Deutsche Bank had reduced the tenor of CCC's repo to one week in September 2007 and had broadly kept it there.   The Plaintiffs say this was due to fears about CCC as a credit risk, and suggest that Mr Stomber accepted this (although on examining the evidence they refer to, I think that all Mr Stomber was accepting was the general point that one week repo was intrinsically "less risk" for the lender than was 30 day repo).   The Plaintiffs cite the sequence of events with Lehman, in which CCC was forced to move its repo away from them – CCC's second largest repo lender - in the midst of escalating tensions with them after Lehman had demanded a 4% haircut.   Previously the haircut had been a nominal 2%, although in practice more like 2.5% owing to aggressive pricing.   They point out that CCC then acknowledged internally that even a staggered move through a 3.5% haircut was a "*ticket we cannot print"*.   This illustrates, they submit, the obvious precarious footing of CCC's financing; it could not afford even its current repo at a modest haircut increase across the board, and this was known to those in charge.

2415.   They submit that no comfort could be taken from the negotiated increased line with Calyon because the latter was courting Carlyle business and was in any event a "*very small and unsophisticated"* dealer (this was Mr Welles' evidence) with the implication that they did not really know what they were doing, and obviously could not be relied on as representative. They point to the foundering of the negotiations with Wachovia in mid-January, even after the proposal was reduced from a $2Bn line to a relatively insignificant $500Mn.   They rely on the acknowledgements by all the main Defendant witnesses, in oral evidence, that they were worried about CCC's repo capacity.

2416.   They pour scorn on any supposed comfort being taken from the tri-party repo project with BoNY, describing it as a mirage.   They say that it should never have been relied on; it was a sign of Mr Stomber's incompetence that he ever pursued it, and it would not have made any real difference to CCC's position anyway.   They point out that Messrs Allardice, Sarles and Hance all admitted to scepticism about tri-party repo in oral evidence.   Relying on Mr Welles' evidence they submit that Mr Stomber fundamentally misunderstood the nature of tri-party repo, in that all the tri-party agent did was act as custodian and facilitator, and took no part in the negotiation of the repo terms, which had to be done directly with the ultimate lender.   This would be a more difficult negotiation than with seasoned repo lending banks, because such lenders were risk averse, and would never be prepared to lend to an entity with CCC's profile.   Whilst accepting that BoNY was the largest and best known provider of tri-party repo arrangements, they point out that BoNY was looking to gain CCC's prime brokerage business from Lehman, and suggest that BoNY may have been leading CCC on

with regard to tri-party repo, and that if tri-party repo had been so obviously feasible, CCC could and presumably would have lighted upon such arrangements with JP Morgan, the second such well-recognised intermediary, who also had existing connections with CCC. They add finally that tri-party was never, in any event going to be the great panacea for CCC which Mr Stomber apparently thought were he described its apparent potential as a "breakthrough", because placing tri-party repo arrangements would have been a protracted business, and they were also, typically, say the Plaintiffs, of even shorter duration than 30 days, and indeed mostly overnight.

2417. Focussing then on the second half of February 2008, the Plaintiffs emphasise the worsening market conditions, and  that Mr Stomber was noting and even predicting (on 14th February) that problems in the "Muni" market would spread to affect CCC, going so far as to comment, the next day, that "*the financial system is crippled*".   They quote a set of Bloomberg messages from various banks commenting on worsening market conditions between 13th and 15th February.   They submit that Mr Stomber's protestations that the eventual fall of CCC was the result of unpredicted and unpredictable market conditions is at odds with his contemporaneous comments.

2418. They observe that around 20th February Mr Conway pointed out to Mr Stomber that price indicators (spreads) were currently at 170 bps, when they had only been at 56 bps three months earlier, at the time the previous crisis had set in.     They also point to the advice from Mr Duffy of Bank of America to Mr Conway on 20th February, noting that this had been first delivered a week previously, and criticise Mr Conway for being unwilling to heed a friendly warning (again), citing this this as evidence of an unreasonably intransigent attitude to holding RMBS.

2419. They point to the fall in the IDP average prices for CCC's RMBS, between 12th and 27th February, creating a total fall in the value of the portfolio of $120Mn, which had cancelled out the much welcomed price rise (from $98.80 to $99.26) on 7th February 2008.     Consistently with this, CCC  had started to receive margin calls from about 14th  February onwards, and between 13th February 2008 and the 27th February Board Meeting CCC's liquidity cushion was reduced from $152Mn (19.3%)  to $75Mn (11.3%), a net cash out-flow of $76Mn, which wiped out all liquidity improvement since the beginning of the year.     Whilst CCC acknowledged that its weighted average nominal haircuts had increased since 31st December from 2.66% to 2.72%, it could be seen on careful examination, that three counterparties, (Bank of America, Lehman and Credit Suisse) were operating effective haircuts in excess of 3% and even 4%.  In addition, the interest rate spread to one month LIBOR had increased by 6 bps, which increased the annualised costs of CCC's borrowings by $15Mn.

2420. They point further to the figures and graphs included in the papers for CCC's ALCO meeting on 29th February, which showed worsening volatility metrics (cap volatility and average price volatility) since the year end, and a liquidity to 20 day VaR ratio continuing at the portentous level of less than 1.   All this (they submit) showed that CCC had insufficient liquidity to operate within the risk parameters which had been considered appropriate when its original business model had been devised.

2421. Overall, therefore, the Plaintiffs submit that the Defendants' suggestion that the first quarter of 2008 was an improvement for CCC does not stand scrutiny.  The reality was that there had been no material improvement, even since August 2007, and even if the first few weeks of 2008 might have given hope (although they should not have done) that CCC had turned the corner towards improvement, the events from 14th February onwards showed that this was not the case.

2422. The Plaintiffs next say that it was plain from the Audit Committee Meeting of 26th February that further support from Carlyle could not be relied on; it can be inferred from the notes of the meeting that any further support was likely to mean that Carlyle would have to

consolidate CCC's operation into its own accounts, and Mr Conway stated quite clearly at that meeting that Carlyle did not want that to happen.  It should be inferred that this was a red line matter, and this would have been apparent to those involved.

2423.  They submit that the calling of the informal Dinner Meeting of 26th February, with its organiser, Mr Allardice, referring to the stress of CCC's living "roll to roll" as the impetus for organising a "*sit down in a calm and relaxed setting*", and with Mr Sarles bluntly saying that it had been an opportunity to have a frank and open discussion and find out whether Mr Conway was interested in continuing to support CCC, itself demonstrates how inadequate the engagement of the Board with the company's business had been before this point in time – far too late - and in particular the failures of the Independent Directors.

2424.  Turning to the 27th February Board Meeting, the Plaintiffs submit that it then was (or should have been) obvious from comparison of Board materials supplied that  CCC's position had not improved from the 13th November Meeting, and had even worsened.  They suggest that the Defendants' appreciation of this is shown by an extract from the draft minutes of this meeting, which was excised from the final official version, but which Mr Sarles accepted was something he had said, that

> "*[a]ll acknowledged that it was the Company's primary goal to be in diversified fixed income, but if it could not get comfortable with any future operating strategy, the Company would have to figure out how to exit gracefully*"  (emphasis added).

2425.  The Plaintiffs submit that this shows that the Defendants were, at the time, questioning whether CCC had a viable future (although they deny it now) but that they ignored the obvious signs and recklessly continued with the same policy, without giving consideration to reducing leverage through asset sales or other means.   In addition, they (in particular the Independent Directors) extended the suspension of the Investment Guidelines until September 2008, without any deliberation, improperly treating it as a mere formality.     The Plaintiffs submit that the proper course was to reinstate and enhance them, in the light of the more volatile market conditions.

2426.  The Plaintiffs criticise the fact that no new business model was proposed at this Board Meeting, and that the Board does not appear to have even compared actual results with the projections which had been advanced at the 13th November Board Meeting and which showed how adrift from reality the latter had been.  They criticise the Board's giving no "meaningful" consideration to selling RMBS to generate liquidity.      The Plaintiffs  point to various performance statistics (though derived mainly from the ALCO papers for the 29th February meeting, tabulated against the same statistics for 31st December 2007 and not being any document actually presented to the 27th February Board Meeting) and they submit that this demonstrates that CCC's position had steadily worsened over time; there had been no sign of any "flight to quality", and CCC was plainly insolvent or on the brink of insolvency, as witness the fact that within mere days of this Board Meeting  CCC's repo lenders had served notice of default, and CCC had collapsed into insolvent liquidation.  This was as a result, they submit, of the very risk to which CCC had been increasingly exposed since July 2007.

2427.  They observe that the statements in the Annual Report, no doubt aimed at trying to reassure investors, in fact painted a far from positive outlook, and the Plaintiffs submit that they were also misleading in some respects - in particular as to statements that CCC's Board was continuing to analyse the appropriate size of a liquidity cushion, when it was not, and announcing an increase in one of CCC's repo lines in late 2007, without also mentioning the virtually corresponding decrease, in early 2008, in respect of Lehman.

2428.  Based on the above, the Plaintiffs argue that the Defendants were guilty of the core breach of duty (failing to sell RMBS or raise capital to increase liquidity) during the period from January to 27th February 2008.    They also add that it was a breach of duty not to bring about

the reinstatement and enhancement of the Investment Guidelines, and not to convene a Board Meeting before 27th February 2008.   They assert generally that CCC was cash flow insolvent or near insolvent, that the Defendants had no regard for the interests of CCC's creditors and that they are therefore guilty of breach of duty (knowing, reckless, or negligent to the point of grossly negligent) and also misfeasance.

2429. Having recited the subsequent events of CCC's collapse, they lastly add three further submissions of a more general nature with regard to matters taking place after 27th February 2008 and inferences which they say can be drawn from these.

2430. First, they refer to the urgent steps which the Defendants began to take from about 5th March onwards, seeking to make a standstill and a combined agreement with their repo lenders, and say that this is illustrative of what they could and should have done in the second half of 2007.

2431. Next, they suggest that the Founders of Carlyle (including therefore Mr Conway) tried to distance Carlyle from CCC's failure and blame it on adverse market conditions, and that Mr Rubenstein, in particular, disseminated a series of false and misleading statements in an effort to protect Carlyle.  They suggest that this is illustrative of the standards of honesty of senior Carlyle personnel when damage to the Carlyle Group was feared, implying that general inferences as to credit and motivation can be drawn from this.  Similarly, the Plaintiffs cited an email of 15th March 2008 by Mr Nachtwey, Carlyle's chief accountant, to a Mr Walsh at Evercore, an investment manager, on which the postscript includes that "we" (not defined) *"ignored the canaries in the coal mine for too long. We should have done a more substantial fix last fall",* and in effect the Plaintiffs invite me to view this as an admission.

2432. Last, they refer at length to events by which amendments were made between March and June 2008 to the then draft Minutes of, in particular, the 27th February and 12th March Board Meetings, long after CCC had been wound up, and including by several sets of external lawyers, and, particularly those acting for the Independent Directors. The Plaintiffs assert that this process amounted to creating a false record, an attempt to thwart the investigation of CCC's affairs, and an attempt to avoid blame for CCC's collapse by manipulating these to emphasise, and seek to attribute that collapse simply to, the claimed sudden deterioration in market conditions.   As with their previously noted criticism of amendments to the draft minutes of the Audit Committee's meeting of 13th November made by Mr Allardice in February 2008, they submit that these went too far to be proper.  They rely on these matters as a general attack on the integrity and evidential credit of the Defendants, and in particular the Independent Directors.

**Defendants' case**

2433. The Defendants' response is relatively short, because they repeat the arguments made previously, generally submitting that when the actions of the Defendants are considered and evaluated in the circumstances at the time, and without the infection of hindsight, what they did was fair and reasonable in those circumstances, and that the decisions they made and the actions they took were within the range of reasonable and proper decisions or actions which an ordinary and competent director (or investment manager), even with any relevant applicable degree of additional expertise, could reasonably have made.

2434. In particular, they submit that nothing in either CCC's circumstances or external market conditions had changed, or did change, sufficiently during this period to mean that the capital preservation strategy ought to be abandoned in favour of selling RMBS before or on 27th February 2008.    The gains in RMBS prices in the first six weeks of 2008 reasonably suggested that the difficulties of December and late November had indeed been the product of the banks' year end pressures;   results showed that there was an improvement in CCC's general financial position for several weeks from early January to mid-February, which

supported the perception  that the capital preservation strategy was working as anticipated, even though the improvement was not sufficient to mean that CCC could yet begin to make moves towards a different business model and starting to invest again.   The available options and considerations, however, remained those which had previously informed the decision that the balance of benefit and risk attaching to holding on to the RMBS portfolio was better for CCC than the balance of benefit and risk attaching to attempting to sell.

2435.   The Defendants dispute the Plaintiffs' assertions that CCC's repo position was such as to make it obvious that failure was inevitable.   They point out, once again, that CCC had consistently managed to obtain necessary repo financing, even if work and persistence had been required to achieve this.   Whilst greater unused capacity would obviously have been comforting, it was not necessary, and the amount of excess - $2.3Bn beyond a requirement of around $21Bn - could be worked with.   Efforts were constantly being made to increase this, and even if difficult, they had in fact borne enough fruit, until then, to keep the business going.     They submit that, at the start of 2008, it was reasonable still to expect something from Wachovia, even though this came to nothing during the period as Wachovia began to experience its own pressures.

2436.   They equally submit, contesting the further evidence from Mr Welles on this point which was only introduced late and during the trial, that it was not unreasonable for Mr Stomber to believe that a tri-party line through the BoNY connection remained a possibility; even by the end of February some contacts for this project still remained to be approached.   They point out that BoNY itself gave the appearance of believing that there was indeed such possibility, relying on the tenor of communications between Mr Burns of BoNY and Mr Stomber, which (they submit) contradict Mr Welles' suggestion that BoNY was likely to have been leading CCC on in order to gain their prime brokerage business.   This, they point out, is an entirely speculative suggestion, and outside either Mr Welles' knowledge or his field of expertise.

2437.   They submit that there was no need, practical or otherwise, for any further Board Meeting between 1st January and 27th February.   The regular meetings had been timed sensibly to coincide with the next Audit Committee meeting, and to review the preparation and approval of CCC's year-end financial statements.   In the interim, Board Members were being kept abreast of the every day position and any material developments, including by updating emails and through receipt of ALCO papers.   Nothing of sufficiently obvious and grave moment at the time occurred to require an extraordinary meeting to be called before the meeting scheduled for 27th February 2008.

2438.   Whilst acknowledging that Mr Stomber and Mr Conway, and the other Defendants who were kept in the email loop, recognised that economic conditions were still worryingly bad, the Defendants dispute the Plaintiffs' assertion that these were in effect recognised as being terminal.     Although Mr Stomber made many negative comments about financial market conditions, he also noted positive developments such as Federal Reserve interventions, and remained clearly (and, they submit, genuinely and reasonably) of the view that both market conditions and logic pointed to the likelihood of recovery in the value of CCC's assets.   The drivers of a flight to quality phenomenon even meant that a worsening of some market conditions ought to benefit CCC in this regard, thus going against any broad general negative trend.

2439.   With regard to the second half of February, whilst it was of course apparent that market conditions and indicators were then worsening again, and even that they had eliminated earlier gains, this was still something that might be part of ordinary and usual general market fluctuations for a few days.   It was too early to see that it was going to turn into the completely seismic shift in markets which started right at the end of February.

2440.   The Defendants refute the Plaintiffs' suggestion that the sudden drop in IDP prices for CCC's RMBS occurring on 11th March 2008 must show that CCC's actual collapse had not been

triggered by any precipitous change in the market, but was just the inevitable result of generally deteriorating market conditions since the previous August which should have been recognised in this period, if not earlier. They point out that the alleged implications of these IDP prices was only put - they say remarkably and inappropriately - to the Defendants' insolvency expert, Mr Shaw, and not to experts with more relevant knowledge and experience.

2441. They dispute that the potential availability of additional emergency finance from Carlyle was illusory. They submit that it was real, and reasonably so regarded, based on both previous experience and Carlyle's interest in CCC's success. The Plaintiffs try to attribute too much significance to Mr Conway's remark at the 26th February Audit Meeting, that Carlyle "did not want to consolidate CCC" into its own accounts, this being a general remark, made in the context of CIM's likely waiving of the incentive fee and pointing out the problem of indirect support having hidden consequences in this regard.

2442. They reject the Plaintiffs' criticisms of both the course and the content of the 27th February Board Meeting. They submit that on examining the evidence, it can be seen that full discussion and appropriate consideration was given to all of CCC's financial circumstances, including the metrics and the results to which the Plaintiffs point and to current market factors, noting that the materials in the Board Pack had been circulated for consideration beforehand. They object that the Plaintiffs' criticisms go to details of form (such as whether a "new business plan" was formally presented, or whether a formal comparison with previous projections was made), and miss the real point, which is what actually was discussed and whether these would reasonably have appeared to be the most crucial points, and what was perceived to be CCC's best course in all the current circumstances. They place reliance on the fact that, at the meeting, PwC repeated its confirmation that it considered that CCC could be properly regarded as a going concern, both with regard to the assessment at the end of year Annual Report, and still with regard to the date of signing off its own auditors' report, as at 27th February. This view was, they also submit, not dependent on the offer, confirmed by Mr Conway, that Carlyle was ready to provide another $50Mn of liquidity for CCC if needed, but was only reinforced by that offer. PwC's opinion was a considered, informed and external general view.

2443. They submit finally that the event which did bring CCC down was indeed, on the evidence in the case, a second financial crisis of even greater magnitude than that of eight months previously. It was not a mere credit event, but a wholesale liquidity crisis, causing a "systemic run on repo", the likes of which Professor Hubbard said had never been seen before. In support of their proposition that the eventual March 2008 crisis was recognised as not being a foreseen and foreseeable event, the Defendants cite the comments, not long afterwards, of high ranking officials such as Janet Yellen (current Chairman of the US Federal Reserve), that the acute liquidity crisis of March 2008 was devastating, unprecedented and not predicted even by astute followers of the financial market. The Defendants submit that this all chimes with the evidence of the financially experienced Defendants in this case, that they themselves did not foresee such a market shock materialising. They submit that since it can be seen that the great majority of knowledgeable and experienced market participants did not predict such a second shock, it cannot be said that it was negligent or culpable for the Defendants not to have done so - even if there had then been anything practical which CCC could have done, having survived the first crisis of August 2008 but being left in a weakened state, to avert or lessen its impact if they had foreseen it.

2444. With regard to the three general allegations made by the Plaintiffs based on matters occurring after 27th February 2008, they submit that the first – the claim that CCC ought to have sought a moratorium with its repo lenders earlier than at the last minute in March - is not a claim which was made until the trial and ought not to be permitted, even if it could have been a sensible option, which it was not. They submit that the further materials referred to - subsequent comments by Carlyle personnel, and amendments made to draft minutes - even if

taken at face value, do not support the adverse inferences which the Plaintiffs invite to be drawn.

**Discussion and conclusions – January and February 2008**

2445.   Following the usual pattern in respect of this period, the operative claims in the action are, as against the Carlyle Directors, the matters listed in Paragraphs 390B.1-3 (duty of care) and 390C.1-2 (fiduciary duty) and against the Independent Directors, they are in materially identical terms at Paragraphs in 390D.1-3 and 390E, as always, all as further particularised in Paragraphs 418A-N and 4124A-G incorporated here by Paragraph 391.

2446.   The upshot with regard to the duty of care is that, apart from the core breach of

> *"failing to cause CCC to either (i) sell down its RMBS assets to generate liquidity and reduce leverage, and/or (ii) raise additional equity capital to reduce leverage and/or (iii) conduct a restructuring or orderly wind down"*

(Paragraphs 390B.2 and 390D.2), the express allegations of breach of duty of skill and care with regard to this period are pleaded as (i) extending the suspension of the Investment Guidelines rather than reinstating them, (ii) failing to convene any Board Meeting before 27th February 2008 even though CCC had failed to meet the liquidity and leverage projections presented to the 13th November 2007 Meeting and "*Carlyle[sic] and CIM*" had done nothing to raise liquidity and reduce leverage despite (asserted) representations to the September Investors' conference that this was "*necessary and would occur*", and (iii) not presenting a viable business plan to CCC's Board since *"admit[ting]"* that the original plan was no longer viable in August 2007.

2447.   The claimed breaches of fiduciary duty made against the Carlyle Directors incorporate the same breaches, but with their commission being attributed, once again, to prioritising Carlyle's corporate and reputational interests over CCC to the latter's detriment because to sell RMBS would have locked losses into CCC's financial statements, impairing its ability to pay dividends, and would also (as would seeking to raise further equity capital) have exposed Carlyle to reputational damage, negative publicity and loss of fee income, and jeopardised the pursuit of Carlyle's alleged Strategic Objectives.   The allegations against the Independent Directors are effectively the same, with the addition of the improper motivation of pursuing alleged personal benefit through thereby maintaining CIM's fee income, a portion of which would be distributed to the Independent Directors.

2448.   Once again, the core breach is the only breach of duty which is capable (or in fact even asserted, see Paragraph 392 of the Cause) to have caused any actual damage to CCC, and the other factual allegations are variously in the nature of particulars, or of evidence, or just irrelevant.

2449.   The allegation of breach of contract or tort against CIM (Paragraph 390F) again in practice rests on the same facts as the above allegations insofar as they relate to Mr Stomber, whose monitoring, advisory and supervisory duties to CCC as an employee of CIM and therefore owed under the IMA really coincide with his similar duties as a non-voting director of CCC. I can see no matter which could constitute a breach of contract or tortious negligence by CIM which is independent of Mr Stomber's role and involvement also as a Director of CCC.

2450.   I observe that there is no allegation of wrongful trading in respect of this period.

**Specific points of procedure and credit**

2451. Before discussing the breaches of duty which are alleged, it is convenient to deal with the last three points of argument made by the Plaintiffs, and mentioned above, which are evidential or procedural in nature.

*(i)*     *Standstill agreement*

2452. As to the allegation that the Defendants were negligent because they ought to have ensured (but did not) much earlier in the history ie in the last quarter of 2007, that CCC took steps to enter into a standstill arrangement with its repo creditors, as it eventually tried to do on about 10th March 2008, this does not appear in the pleaded Cause, either directly or even by reasonable implication.   It was first raised only in Advocate Wessels' opening submissions. This is not a claimed cause of action which falls under the general formulation of the core breach.   I therefore accept the Defendants' submission that, absent a successful application to amend the pleadings, this is not a claim which the Plaintiffs are entitled to rely on at this juncture.

2453. That is sufficient to dispose of the point, but I add that I would also reject it as a matter of substance in any event.  First, I can see no actual evidence to support the argument that the Defendants ought to have perceived an imperative need for this course at an earlier time. Second, and more important, I also accept the argument that, once the general importance of CCC's avoiding any appearance of being in financial trouble is accepted, it follows that asking repo lenders for some kind of concerted favourable treatment was not a practical possibility; it would be too easily perceived as a request for a moratorium.    The important point for CCC throughout this delicate period was not to be seen to be doing anything unusual.

*(ii)*    *Subsequent "admissions"*

2454. The second point is the lengthily pleaded and pursued allegations of Carlyle's attempting to distance itself from the failure of CCC, and of Mr Rubenstein, in particular, by spreading untrue statements with this objective (or true statements which amount to admissions) which, it is suggested, should cause me to draw adverse inferences, or at least to proceed with caution, with regard to the honesty and integrity of the actions of senior Carlyle personnel where the interests of Carlyle are concerned and where this consideration is material for my deliberations.

2455. Plainly, again, none of the particular instances cited forms any part of the factual matrix of the effectual allegations of breach of duty which are made.  This is not least for the obvious reason that they all post-date the time period in which those breaches are alleged.    They could only, therefore, have any relevance if they provided evidence from which I could properly draw inferences, either directly as to what did happen earlier with regard to the substantive claims, or indirectly as affecting my assessment of the evidence of witnesses to such matters.

2456. In fact, I have not found any of this material to be of even indirect relevance or assistance on the matters which I have to determine.

2457. The Plaintiffs have highlighted certain recorded comments of Mr Rubenstein and Mr Nachtwey during early March 2008.   They appear to rely on these, for as much as they can persuade me they are worth, as evidence, or even admissions, that there was negligence in handling CCC's affairs, in particular in not deleveraging "*months ago*".    The first significant such comment is contained in an email from Mr Rubenstein to Mr Conway on 6th March 2008, reporting that Jamie Dimon of JP Morgan had told him (Mr Rubenstein) that "*Stomber is an idiot - was told to deleverage months ago and did not*".   The second is an internal JP Morgan email of 10th March 2008, which the liquidators obtained from that firm, in which James Lee of JP Morgan reported to Mr Black on a conversation he had had with Mr

Rubenstein in which he reports Mr Rubenstein as saying that "*we hired the wrong guy (who will be pushed out), we didn't deleverage when we should have and now we are paying the price*".

2458. Even leaving aside the far from clear evidential question of whom the latter comment (second hand hearsay at best) could be evidence *against*, I do not find these email statements of any relevance to my own examination of what actually happened, and whether or not it was negligence, for the following reasons.

2459. Mr Rubenstein was the "rainmaker" for the Carlyle Group, concerned principally with external relations with both counterparties and clients, and with bringing in business. Clearly, from the overall evidence, he had an exceedingly poor opinion of Mr Stomber's interpersonal skills, and I have the firm sense that he did not like Mr Stomber, probably because Mr Stomber's lack of interpersonal skills both grated with Mr Rubenstein and sometimes made his role more difficult.

2460. When CCC's difficulties became public in March 2008, one of Mr Rubenstein's functions was obviously to try to contain the fallout damage for the Carlyle Group. To this end he identified, in an internal email to Mr D'Aniello of 6th March 2008, that the impact of CCC *"will be worse than anything that has happened to us in twenty years by far. Investors are unable to understand why this happened so quickly and why it will not infect the rest of our business".* This perception was no doubt correct; investors were obviously likely to have an alarmed, hasty, angry and initially uninformed reaction to what was unfolding. It was thus this perception that Mr Rubenstein would have been setting out to allay. He would therefore, I have no doubt, have been looking for every opportunity, fortuitous or created, to distance the Group, and its other businesses from CCC, and to play down the importance of CCC to the Group, because this importance was seemingly magnified to the outside world because of CCC's name.

2461. There are further comments by Mr Rubenstein in the documentary evidence, which the Plaintiffs also cite, which were obviously made to this end, and which, in pursing it, were not scrupulously accurate. An example is an email to the President of John Hopkins University of 9th March 2008 in which Mr Rubenstein stressed that Carlyle owned "*less than eight per cent of it and did not control the Board.*" I am not sure that either assertion was literally true, but the latter was certainly not true in practical terms. These statements were made for reputational and PR purposes.

2462. Mr Rubenstein was not, of course, involved in the actual running of either CCC's business or of any entities in the same market. The only Founder with the kind of financial skills which approached understanding this market was Mr Conway, and it is quite apparent that even he did not have (and recognised that he did not have) the very specialist knowledge and skills needed to understand this particular sector of the bond market. Any comments about the merits or timing of deleveraging which Mr Rubenstein may have either received and passed on, or made on his own initiative, are therefore certainly not, I find, expressions of expert opinion, even if they did express a view held by Mr Rubenstein. Returning to the two initial statements, being those between Mr Rubenstein and JP Morgan, it is perfectly plain that Mr Rubenstein's first concern was to rehabilitate Carlyle in the eyes of JP Morgan, and I am quite satisfied that his manner and his comments would have been geared to saying what would be most impressive or ingratiating for Carlyle as regards his interlocutor at JP Morgan. The reported comments have, to my mind, just that air, and I am quite sure that whether or not such a criticism of Mr Stomber was truly justified would not have been playing much, if indeed any, part in Mr Rubenstein's thinking at the time.

2463. In short, I would not, and do not, find Mr Rubenstein's reported opinion on whether or when CCC should have deleveraged, or even his opinion of Mr Stomber's competence, of any

weight or significance in this matter.     Nor do I find extravagant comments made for PR purposes to carry the significance of solemn representations.

2464. Similarly, although the Plaintiffs cite the email of 15th March from Mr Nachtwey to Mr Walsh at Evecore, the comment relied upon (*"[we]ignored the canaries in the coal mine for too long. We should have done a more substantial fix last fall")* was in the postscript to what was quite obviously a personal and social email.   Mr Nachtwey explained in his witness statement that he was talking with the benefit of hindsight, and that in any event he had no idea what measures CCC's own Management had been taking or what they could or would have done if they had known that the second crisis of 2008 was about to happen, and he certainly had not given it any thought when he wrote what he did.     Mr Nachtwey was not called for cross-examination.   Given his distance from the actual running of CCC's business, and the casual context of the comment, I dismiss this apparent admission as likely to have been unconsidered chat.   It is also, similarly, far from clear that it could be regarded as evidence against any of the actual Defendants, in any event.

*(iii)    Amendment of Minutes*

2465. The third point is that of the inferences which might be drawn from the amendments which it can be shown were made to the draft minutes of meetings.   This is not the place to examine in depth the underlying question of the proper principles of recording minutes, and the proper limits of such amendments, for the main reason that the issue itself is so peripheral to the essence of this case that it would be quite disproportionate to do so.     I have already made some comments on this when considering the allegations against Mr Allardice and his amendments to the minutes of the Audit Committee meeting of 13th November, but I will make the following further general points.

2466. The point of meeting minutes is, obviously, to provide an accurate and sufficient record of the business of the meeting for whatever purpose such record is required, but what that requires as to the minutes themselves can vary hugely, depending on the purpose and function of the body concerned.   In addition, styles of minute taking can, in my view quite legitimately, vary enormously, from a detailed record of the entire course of discussion, to the style which records only that discussion took place and what was ultimately resolved.   Whilst recording elements of the discussion can provide a helpful record of the ideas and views which were aired, the recording of too much such detail and the attribution of views to individuals can inhibit discussion and become invidious, even in a body which continues in existence with no pressures.   When the possibility of later recriminations, or investigation by hostile outsiders, is added into the equation, the laconic style of minute taking, leaving no hostages to fortune, may reasonably appear to be preferable.

2467. As far as I can see (I was not specifically addressed on this topic, but I make no complaint about this) the only legal requirement as to what is to be recorded in the Minutes of Directors' Meetings of a Guernsey company at the time was that it should be minutes of "all proceedings" at the meeting; see s. 53 of the 1994 Companies Law.   This was re-enacted in s.154(1) of the 2008 Companies Law, but has been subsequently amended to merely "the proceedings" by the Companies (Guernsey) Amendment) Law 2015, an amendment which would seem to encourage a more succinct style of minuting.

2468. What this must mean is that all formal elements of the business of the meeting (items of business, presentations, proposals, motions, appointments, resolutions etc) would need to be recorded, but I doubt whether the content of a discussion, as contrasted with its fact, would be within the concept of a "proceeding", even in the context of the phrase "all proceedings". It follows that the Plaintiffs' submissions as to the significance of amendments to draft minutes going to the content of discussions can carry no more than the ordinary evidential implications of the making of such amendments, ie what they may indicate as to the facts of what did occur at the meeting, the attitude of those who make the amendments to having the

original statements stand as a supposed record of what occurred, and inferences as to the possible reasons for this.        That exercise only has to be stated for the likely disproportionality of undertaking it to emerge, and that is all the more so where, as here, there are in fact contemporaneous handwritten notes of the meeting in existence in any event.

2469.  As regards the copious amendments to the draft minutes of Board Meetings from 27th February 2008 onwards, it is quite obvious, taking a realistic view, that when a company has just collapsed spectacularly with an immediately clear deficiency of somewhere between $350Mn and $950Mn, those who may feel themselves vulnerable to attack as a result will, whether or not they are actually guilty of negligence or malpractice, prefer it that there are no unnecessary hostages to fortune contained in the minutes of any relevant recent meetings, whether these be matters of substance or of infelicitous expression.        It is also quite likely that they or their insurers will immediately involve lawyers, and that the lawyers will have different ideas as to the desirability or felicitousness of what is said in as yet unfinalised minutes of recent meetings.

2470.  I therefore find it quite unsurprising that these draft minutes should bear the stamp of having been combed through and amended by lawyers.        I also find it unsurprising and not unreasonable that lay persons whose lawyers, acting on their behalf, are examining proposed minutes of meetings, should accept the advice or guidance of those lawyers as to what it is either correct, necessary or appropriate to include in such minutes, and that they would therefore tend to accept lawyers' amendments without demur.        I see no reason why they should not do so, so long as these still appear fairly and reasonably to represent what did occur at the meeting.   Only, it seems to me, if lawyers were to propose amendments which the lay person who was actually present could see were actually false as to what happened at the meeting (as contrasted with merely pruning what was included, or expressing it in more accurately chosen words) does it seem to me that the lay person could be expected to refuse to sanction lawyers' amendments for not being an appropriate record of the "proceedings" of the meeting.

2471.  On this broad basis I am far from satisfied that any material criticism of any of the Defendants can be made on the above score.   I also do not think it appropriate to consider this point in any more detail than broad impression, because I do not find these copious amendments to be of any sufficient relevance to the material facts of the case to make such an exercise of any value.   Making comparisons of what was initially thought appropriate by the first draftsman (I think, Ms Cosiol) and how the Defendants or numerous other persons, especially those with a lawyer's training, may have subsequently thought it appropriate to re-cast this out of fear of its being (mis)construed against them, tells me nothing much about what actually happened. Even innocent people can behave in ways which might look suspicious, and the real question is the direct one, whether they are, or are not, guilty.        Even what happened later is of limited value, and examining how or whether what happened later at a meeting might have been subject to re-presentation because of later circumstance is of even less value.

2472.  However, I do not feel able to leave this point without giving some warning as to the part which lawyers can properly play in such a matter.   Where the lawyer has been present at the meeting, then he is obviously in a position to judge whether proposed minutes do fairly represent what occurred at the meeting, and he can legitimately advise or comment on their form from that background.   It strikes me as being a rather different matter, though, when the lawyer has not been present at the meeting.   A lawyer who then embarks on an exercise of editing or proposing amendments to draft minutes is treading on exceedingly dangerous ground, because only those who were actually at the meeting are in a position to say whether minutes do fairly record what took place.  The function of a lawyer who has not been present is therefore, it seems to me, extremely limited as a matter of proper conduct.   He may just about properly be able to suggest that recording certain points is not necessary (although he would have to satisfy himself that the apparent balance of the record was not being affected by this), or query whether the impression conveyed by the drafting is really what is intended,

or does accurately reflect what took place, but this kind of review can only properly involve raising such suggestions.   Even then, the lawyer's involvement can all too easily cross the line from assisting those who were present to compose a proper and correct record, into the lawyer's actually composing the supposed record, such that it would be a false record.  That would be highly improper.

2473. I note that no lawyers were present at the 27th February Board Meeting, and that whilst representatives of Linklaters, Skaddens, Carey Olsen and Togut, Segal are recorded as being present at later meetings, in particular that of 12th March 2008, representatives of Stroocks, consulted on behalf of the Independent Directors, were apparently not.   Because of my views as to the lack of any real materiality in these amendments for my purposes, I have not had to investigate exactly who made the amendments, or the precise process by which they came to be proposed and considered, or their precise effects on the end result.   It would have been disproportionate to do so, but all of this would be necessary in order to decide whether such process was proper or whether the ultimate record really was, as the Plaintiffs assert, a false record.

2474. I am therefore making no finding one way or the other about those points.   For present purposes, I record simply that the process of amendment to the draft Minutes of the Board Meetings from 27th February 2008 onwards is not a matter which either needs to or does play any part in my determination of the material issues in this case.

2475. I would in principle pay more regard to the amendments to the draft minutes of the Audit Committee meeting of 13th November 2007 made by Mr Allardice in February 2008, because they were entirely internal.    I have, though, considered the implications of these when discussing the events of November 2007, and for reasons there given, I have found that they are not in fact of any weight or significance.

2476. Moving back now, therefore, to the substance of the matter, and the effectual allegations of breach of duty in the Cause I turn to the Plaintiffs' claim, first of all as against the individual Defendants and then the contractual/tortious claim against CIM.

**(a)**    **Breach of fiduciary duty**

2477. The allegation of breach of fiduciary duty here is once again that of acting with the improper purpose of prioritising Carlyle's reputational interests and commercial interests over those of CCC, to its detriment, as described above.

2478. I have already dismissed these allegations for reasons given in relation to earlier periods.  I found no evidence sufficient to support them then, and I can see no further or other evidence in the period between 1st January and 27th February 2008 which might give these allegations any more substance here than previously.  Expressly, I make it clear that I am satisfied that neither the decision not to embark on generally selling RMBS, nor the broader decision to continue keeping CCC's business alive during this, or any previous, period was owed to any aspect of prioritising either the interests of "Carlyle" or the personal interests of any Defendant over the perceived interests of CCC as a discrete company.    I therefore dismiss these allegations with regard to all individual Defendants.

**(b)**    **Breach of duty of care**

2479. I have quoted above the familiar pleaded terms of the core breach of duty.    Once again, this is the only effectual breach of duty alleged, and I treat the other matters pleaded in Paragraphs 390B and 390D as particulars, or evidence of that central complaint.   I will say, though, that I regard the allegation of breach by "*failing to reinstate or even enhance, the Investment Guidelines ….in the light of more volatile market conditions*" as showing just how rigid, and consequently absurdly unreal, these allegations have by now become, because this submission

takes no account of the obvious question how CCC was then supposed to *comply* with any such guidelines, enhanced or not.    The reality was that CCC's Investment Guidelines were now to hold on to the present investments, concentrating simply on refinancing them until their value was restored sufficiently to enable other steps to be taken, and to be very cautious about possible uncontrollable consequences of simply selling without thought.    The issue is whether doing this was reckless or negligent.    The existence or the formal status of any Investment Guidelines is an irrelevant diversion.

2480. The allegation of culpable failure to convene another Board Meeting before 27th February 2008 likewise appears to have no practical function in the Cause, other than to provide an opportunity for the Plaintiffs to repeat previous criticisms by introducing them with the word "despite".

2481. Similarly, the Plaintiffs' criticism, regarded as sufficiently substantial to merit inclusion in written submissions, that CCC *"had insufficient liquidity to operate within the risk parameters considered appropriate when its original business model had been devised"* verges on the fatuous.    CCC was not, and had not since August 2007, been operating that business model, which included a set of credit product investments with risks negatively correlated with those of RMBS, for the very purpose of providing protection against the kind of problem which was in fact sustained in August 2007.  After that time, CCC was operating willy nilly with a different business model, and also operating in very different business conditions and for a very different purpose – the preservation and recovery, as far as possible, of the value of investor capital.    It is bizarre to suggest that judging the state of its liquidity by what was considered appropriate under its original but now inapplicable business model has any meaning.

2482. The core breach, the breach which is alleged to have caused damage to CCC, raises the issue whether it was reckless or negligent of the Defendants to continue with the strategy of holding rather than selling RMBS, previously embarked upon during the relevant period.  Again, the essential question is whether there was any sufficiently apparent and significant change in CCC's own financial situation, or factors or events affecting it, which ought to have prompted, not only a reconsideration of the capital preservation strategy, but a decision to change it to one of selling, whether in order to remain in business or (but it amounts to the same actions in practice) in order to conduct an orderly winding down of the company.    The Plaintiffs fail to satisfy me that this was the case.    I prefer the Defendants' submissions.

2483. This period in practice divides into two, being the period up to about 14th February, and the period from 14th - 27th February.    There are also two aspects to considering the relevant circumstances apparent to the Defendants.  The first is CCC's own individual circumstances and results, and the second is the wider market circumstances, which would affect the business environment in which CCC would be operating.    The latter would of course, come to affect the former.

2484. In the first few days of January the markets were returning to operation after Christmas and the New Year.    Little therefore happened immediately, the only matter of note being the last of the Westways auctions of Agency RMBS, on 3rd January 2008.  The results of this were apparently encouraging, although the quantity ($800Mn) of RMBS in question was obviously nothing like the amount which CCC would put into the market if it were to sell in earnest, as the Plaintiffs advocate.  This auction, I find, certainly did not show that CCC would be able to dispose of half its portfolio at satisfactory prices, ie near to its own pricing marks.  This I think is all the more the case because CCC's own portfolio was composed of 6½ %, 6.75% and 7% capped floaters and the former were less attractive assets.    The real importance of this auction event was its assistance with regard to price and providing material for negotiating more favourable repo marks with lenders.    It was therefore, I find, quite reasonable to view the results of this auction as a factor which supported the continued holding of RMBS, certainly as against any serious selling.

2485. Thereafter, during the following five weeks up to mid-February, I find on the evidence that CCC's financial position did reasonably seem generally to improve. Liquidity certainly improved. Prices did not show clear improvement, somewhat, I infer, to Mr Stomber's surprise, because he expected new lower interest rates to improve prepayment speeds which would in turn improve prices. During January it is apparent from the evidence that this improvement was simply anticipated and awaited.

2486. It is further apparent that prepayment speeds did not increase as expected by Mr Stomber, (and indeed others in the Management team, although his views naturally have most prominence in the evidence), but the realisation and appreciation that this was happening only set in gradually over February. It appears from the expert evidence that this was because, even though the logic is sound, in practice, the banks' liquidity constraints which were operating at the time and beginning to bite were such that homeowners could not actually obtain offers of finance at the lower interest rates which might then be applicable. Thus, however much they might want to refinance at a cheaper (for them) rate, they simply could not do so. That, though, is a factor which I am satisfied, had not percolated through to the perception of the market place at the time, so as to be apparent to operators like Mr Stomber, and I therefore discount it for having the benefit of hindsight.

2487. In the circumstances, I do not find it unreasonable for Mr Stomber and the other Defendants to have attributed CCC's improved position to a recovery from the banks' year end pressures, and, at least before mid-February, to have anticipated that further improvement based on increased prepayment speeds was likely, that it was slightly puzzling that it had not yet materialised very much, but that it was nonetheless something as to which it was appropriate to await expected developments.

2488. In this context, I note and accept Dr Niculescu's broad comment that the price declines in Agency RMBS of early March 2008 were unforeseen and not reasonably foreseeable, because they flew in the face of conventional economic wisdom; they were divorced from the intrinsic value of Agency RMBS and did not react consistently with market events, such as changing interest rates, which historically had been associated with the fall or rise of such prices. This is the kind of fact which can only be seen in retrospect. At the time, and with an unusual market phenomenon, there is insufficient evidence to draw such a conclusion, and awaiting further clarification of puzzling events is not unreasonable.

2489. I also find no significance in the fact that the recorded steep fall in IDP prices for RMBS took place only on 11th March 2008 and not earlier. This is because the evidence throughout the case has suggested that IDP prices lagged behind the timing of actual market transactions. I infer that this is because the pricing agencies were slower to gather the information than were participants in the market, or alternatively would wait to ensure that it was a solid trend. I am therefore satisfied that this fall actually reflected transactional information from some days earlier.

2490. I have noted that Mr Stomber's comments and emails during this period vary from reporting positive developments with somewhat upbeat assertions of confidence that the specific RMBS market would move as predicted, to expressing fear and trepidation about underlying trends in the market, comments which, at the time, Mr Conway – looking at a wider picture – rather endorsed. This, though, has been a feature of much of Mr Stomber's communications and I do not place great weight on such changes in his apparent mood. First, this is his style and personality. Second, I do not find it surprising in the light of the pressures which he no doubt felt himself under. The real issue is whether those negative features, which he obviously perceived, ought to have caused him to advise a change of strategy for CCC's business. This seems to me to depend on when it might appear that indications of a state of affairs which could or would lead either to some major market shock, or to an inexorable and terminal downturn in CCC's fortunes, became sufficiently salient that any reasonable director or manager in Mr Stomber's position should have seen this and reacted in that way. Tracing

through the evidence, I find nothing which seems to me arguably to be so sufficiently notable or prominent, before what turned out to be the sea-change in market conditions which began around 14th February 2008, as ever more gloomy analysts' comments were promulgated. Even then, however, I am satisfied that these gloom stories did not become so prominent as to demand more than monitoring and keeping careful and (obviously) concerned watch on them for the moment, to see what developed.     I note, for example, that CCC managed to negotiate both the 15th February and even the 25th February repo rolls with no significant change in its repo arrangements or sources, and no increased demands for haircuts or other features sufficiently notable to have been remarked upon.

2491.  What developed was, of course, the actual market crisis which really set in a fortnight later, and of which CCC began to feel the effects as panic and defensive tactics began to pervade the banks, apparently some time between 29th February and 3rd March.   I am not satisfied, though, that the imminence of this was sufficiently apparent during the period from 14th February to 27th February and specifically at the CCC Board Meeting, so as to mean that the Defendants culpably failed to appreciate or act on the significance of any indications at the time.   Such a finding would require me to find that no reasonably competent and careful director in the position of the Defendants at that time could have failed to appreciate the implications of such indications and to take some action in consequence.     Looking at the evidence I find that that would be to require an unreal and unreasonable degree of perspicacity in such a director.  In other words, it would be requiring the wisdom of hindsight.

2492.  The Board Meeting of 27th February was, not surprisingly, focused very much on reviewing and approving the Annual Report and Year End financial statements, in particular for accuracy and clarity to investors.   However, it is apparent from the notes of the meeting that the deteriorating market conditions since 14th February were pointed out by Mr Stomber and were discussed.  Indeed the fact that something unusual, and probably the effect of internal pressures at the banks, was affecting the position was noted by Mr Sarles, and Mr Zupon expressed concerns as well.  Comments which turned out to be prescient were made, such as that lower interest rates were not helping liquidity but helping the economy, and that banking ability to borrow and lend had not been "fixed", but the surrounding notes tend to suggest that this was in the context of ensuring that the risks of credit, liquidity and financing were all disclosed and sufficiently highlighted in the financial statements.   All in all, the notes convey the impression that these factors were perceived, but in a matter of fact way, rather than as significant indicators of a deepening crisis to come.

2493.  I have therefore asked myself whether this was culpably paying too little attention to those factors, which were indeed harbingers of the cataclysmic changes to come, but I am not satisfied that it was.    To hold so would be to apply too much hindsight.    My overall impression, having had regard to all the evidence, including both CCC's recorded results, and the metrics noted in the ALCO pack of 29th February (even assuming, in the Plaintiffs' favour, that these figures had all been available as background information to a Board Meeting on 27th February, when they clearly were not) is that the Defendants' appreciation of and reaction to the facts which were unfolding was not outside the range of reasonable appreciation or conduct of directors in their position, with such knowledge both of history and of current facts as they possessed at the time.

2494.  The true extent of the loss and damage inflicted and spilling over from the sub-prime mortgage bond market into the underlying financial systems was not then fully apparent, and it was not culpable of the Defendants not to perceive this, nor to anticipate its ultimate effects. It seems apparent from the expert evidence that by then, in managing their reverse repo business, the banks were not reacting solely to factors within their sector of the market, but more and more to credit risk in other, more diverse sectors of the market to which they were exposed, depending, of course, on the areas into which they were individually diversified and which were affecting their overall financial position.   This was further complicating the position, but in ways which the Defendants had no real means of appreciating.

2495. For completeness, although I only regard it as a small point, I consider that the Defendants' submissions do derive some small support from the attitude of PwC (Mr Reville) at the Board Meeting of 27th February, and indeed of the fact that in the run up to this meeting and the formal signing off of CCC's Annual Report, Mr Reville and his team had expressed no qualms to CCC or to its Management, about CCC's position as a going concern, or the good sense of continuing with the capital preservation strategy.

2496. At this point in the history though, close to the end of the story, another factor also becomes particularly pertinent, and it is the practicalities and practical effects of what the Defendants actually could and should have done, even if they had then appreciated the enormity of a likely market crash.       Even if the factors which the Plaintiffs rely on were indeed to be viewed as  warning signals of impending disaster which could not be ignored, by the time of mid-February 2008 it seems to me that practical considerations strongly suggest that this could have made no difference to CCC's eventual fate.      If Mr Stomber or another of the Defendants had, in fact taken the view even as early as 14th February that deteriorating market conditions were so ominous that they demanded that CCC should change its capital preservation strategy to a strategy of selling, it would have taken at least a few days to organise formal consideration of such a strategy change by the Board.       I am not fully persuaded that, had such consideration taken place, the conclusion would then necessarily have been that attempting to make major sales, was a worthwhile strategy in CCCs' interests even; I think it is speculative as to what would have been decided.   However, assuming that a process of selling would have been decided on, it also seems to me in all the circumstances (although this is inference as I have had no direct evidence on this) that it would in all likelihood still have required another few days to make organised arrangements for actually trying to do so.      On any basis, therefore, I think it is highly doubtful whether any such change of strategy could in practice have been implemented effectively before the events which brought about CCC's collapse in reality, even assuming that it was implemented at the earliest time at which I think it might even be arguable that it was incumbent on the Defendants to consider making some such change.      That is a point which I consider more widely later, in relation to causation and quantification.

2497. In summary, therefore, I am satisfied that it was reasonable for the Defendants, in particular Mr Stomber and Mr Conway, to continue proceeding during this period on the basis that there was no good reason to think that market conditions, or any other consideration, had changed or were about to change so significantly that CCC's capital preservation strategy approach ought to be reconsidered, still less so far that it was only reasonable actually to change it. The factors which had driven this strategy up to 1st January 2008 remained substantially the same during the following eight weeks.   The only superficially obvious point was that a further period of time, up to two months, was elapsing, without CCC's asset prices having risen as the strategy anticipated.   This was noted, as was the associated surprising absence of increased prepayment speeds; however, I find that, viewed at the time, there was no reason to endow that with huge significance such as to demand some immediate reaction; it was treated, and in my view reasonably, as another apparent quirk of the unusual and unsettled market, appropriate to monitor for developments, and gave no reason to doubt the logic behind the capital preservation strategy.

2498. For completeness, I add the following points.    I am satisfied that CCC's non-selling of RMBS during this period owed itself to the general capital preservation strategy, coupled with the situation not providing any obvious and sufficiently safe opportunity to conduct any sales, and not to any unreasonably intransigent refusal to countenance such sales.   The Plaintiffs continue to contend that the Defendants had all along adopted a recklessly rigid attitude to the possibility of selling any RMBS at all, and that this was their real (and indefensible) policy, rather than the more flexible one that would permit sales as a last resort or in case of opportunity, which the Defendants claimed (the Plaintiffs say only after the event) to have always adopted.

2499. I had already been disinclined to accept the Plaintiffs' submission based on my general perceptions of the evidence. However, I also note that on 10th January 2008, Mr Trozzo sent an email to Mr Thierry of Lehman which shows that, in answer to a direct enquiry from Mr Thierry, made on 3rd January 2008, as to what CCC would do if market conditions further deteriorated to a level where the liquidity cushion proved insufficient, Mr Trozzo had replied to the effect that (with the use of the Carlyle funding note programme not being an available option), the first course of action would likely be to engage TCG's assistance, but *"Secondly, we would consider voluntarily liquidating a portion of our RMBS".* This statement is completely consistent with the Defendants' position that the capital preservation strategy was only to sell RMBS as a last resort, but that sales were not completely ruled out. I find this alluded to expressly here in the papers, and I am satisfied that this had been and remained the general philosophy all along.

2500. I am satisfied that the Defendants' reaction, in particular Mr Stomber's, to the way in which repo funding was developing and evolving at all times up to the end of February was reasonable. The prospect of "working" the repo lines had always been accepted as necessary, but achievable with effort, persistence and perhaps ingenuity, ever since the crisis of August 2007. By the time of the new year, this was a routine part of keeping CCC's capital afloat, and I do not see that any events in this period were a major change of circumstance. Weighted average haircuts remained, overall, in the range which CCC had calculated it could accommodate, and repo availability, whilst tight (111%) still had some headroom, and CCC had in fact come closer to having insufficient capability to make a roll during pressures in the previous August and September but had survived.

2501. As regards the tri-party repo project with BoNY, I find that it was not unreasonable for Mr Stomber to take the view that this remained a possibility. I suspect there was initially a misunderstanding between Mr Stomber and Mr Burns of BoNY, with the latter imagining that setting up arrangements was going to proceed at a more leisurely pace than did Mr Stomber, who rushed straight ahead in making his telephone calls. The subsequent correspondence seems to me to have the air of Mr Burns repairing the position. I reject the Plaintiffs' submission, in effect, that it was negligent and incompetent of Mr Stomber to imagine that any such arrangement would ever be possible. This suggestion was based on the evidence of Mr Welles, which, whilst I am satisfied it was given in good faith, was nonetheless first given 10 weeks into the trial and in "response" to Mr Stomber's oral evidence, even though he had mentioned tri-party repo in his original witness statement; it thus apparently did not occur to Mr Welles to make these far-reaching criticisms before the trial, and Mr Stomber could not be further examined in answer to Mr Welles' point, as a result. Whatever Mr Welles' evidence that the usual circumstances of such repo arrangements were very different from CCC's perceptions, and even if Mr Stomber had succumbed to a degree of wishful thinking in his pursuit of it, I find it implausible that BoNY would have comprehensively misled CCC over such a possibility, not least because a future banking relationship would have required the nurturing of trust. Whilst I note the contemporaneously expressed scepticism of Messrs Hance, Allardice and Sarles about the likelihood of obtaining tri-party repo, I do not read this as anything more than caution about counting chickens before they hatched.

2502. In any event, in the position in which CCC found itself, in early 2008, it seems to me that it had no sensible alternative but to continue making ceaseless efforts in any possible direction to obtain necessary funding for its RMBS portfolio, insofar as there might be any possibility of their bearing fruit. This is what it in fact did. I do not find that continuing to do so was reckless or negligent.

2503. I am therefore satisfied that it is fair to say that the immediate cause of CCC's collapse in early March 2008 was the unforeseen systemic liquidity crisis among the banks, and the "run on repo" which this caused.

2504. I have not mentioned the alternative allegation of breach of duty as regards not attempting to raise additional equity capital to reduce leverage as this was not seriously argued.    For completeness, though, I have previously considered the extent to which this was a practical possibility, and concluded that it was not.    No factors which might have made it any more practical are revealed during this period.

2505. It was suggested in cross-examination of both Mr Conway and Mr Stomber that certain amongst CCC's self-admitted group of "peers" had attempted to raise capital, whereas CCC had not.    The explanation given was that they, and in particular Annaly, were in a significantly different position because they were established companies with a track record which made raising more equity capital feasible.    I accept that proposition and justification. I do not find it particularly helpful to compare what allegedly "peer" companies of CCC's might or might not have decided to do, because no such entities were precisely comparable to CCC, and in any event, the competence of a decision depends on whether it was within the range of possible reasonably competent decisions for CCC, and not whether it coincided with the thinking of some other group of directors of a different company.

2506. Mr Zupon seems to have been the director of CCC who was particularly aware of the possibility of seeking to raise more capital.       I rejected the Plaintiffs' criticism that in November 2007 he accepted the other Defendants' views that it was impractical, but they have further criticised the fact that he raised the point again in January 2008, following the apparent passing of the "year end" constraints, but then only to Mr Hance, and did not insist on obtaining further analysis.    I disagree that this response was "*inadequate given that CCC would have benefitted from additional capital*", as the Plaintiffs submit.     Mr Hance was the Chairman of CCC, with an overarching role of ensuring that appropriate consideration was given to material matters.  He was also closer to CCC's everyday operations than was Mr Zupon.    Raising the point with him seems to me to be eminently appropriate, in the circumstances, and I do not find Mr Zupon's consequent reliance on Mr Hance to pursue the point further if, and when he thought it appropriate or worthwhile doing so, to have been unreasonable or negligent.    Given that I am satisfied that it would not have been a practical approach, or indeed sufficient to make any ultimate difference if it had been attempted in any event, I do not take this any further.

**(c)    Breach of contract/tort by  CIM**

2507. Once again, this is a claim in effect based on alleged negligent advice by CIM, and therefore rests on the same facts as those alleged against Mr Stomber with regard to the claim of his alleged breach of his duty of care as a director of CCC.    For the same reasons as lead me to dismiss that claim, the claim against CIM as investment manager, in contract or tort, also fails.

**(d)    Wrongful trading**

2508. As already observed there is no claim in wrongful trading with regard to this period. However, in my judgment, CCC never reached a point where it was unable to meet its debts, even as "they fell due", before the time of the sudden avalanche of margin calls which were prompted by the brewing liquidity crisis of March 2008.       Carlyle was not pressing for payment of the loans it had made.  CCC always succeeded in obtaining financing as required up to that time and it paid all margin calls up to that date.    Also, in my judgment, there was no point prior to the point when they actually did so that the Directors of CCC ought to have concluded that CCC stood no reasonable prospect of continuing to do so and thus avoiding insolvent liquidation.       Whilst this may be a very sudden change of fortune, the evidence shows that, in the financial markets, fortunes can indeed change that quickly.

**Final Conclusions as regards the individual Defendants and CIM as investment manager**

2509. It follows from the above that, in dismissing the Plaintiffs' claims against the individual Defendants for breaches of duty and in relation to CIM for breach of contract/tort in this period, I have now dismissed all such claims in the action.

## 15.    The Claims:  Liability of the Entity Defendants as de facto or shadow directors.

2510. I have so far not considered at all the allegations of liability made against the Eighth to Tenth Defendants other than to dismiss the claims of breach of contract or negligence *qua* investment manager against CIM, and I now turn to these.

### Preliminary – limits of case

2511. Paragraph 80 of the Cause is the foundation paragraph for the Plaintiffs' claims against the Entity Defendants.  Within it, though, the Plaintiffs asserted, not just a claim founded on allegations of *de facto* and/or shadow directorship, but also (it appeared) an additional basis of claim, namely that the matters complained of amounted to breaches of "*other duties*" owed to CCC arising out of the nature of the relationship between the Entity Defendants and CCC, as asserted in paragraphs 76 and 77 of the Cause.  Those paragraphs contained allegations, first of "*pervasive control*" of CCC by the Entity Defendants and second of a "relationship of trust and confidence" between CCC and the Entity Defendants.      From this, it appeared that the Plaintiffs might be intending to argue some other grounds for imposing liability on one or other of the Entity Defendants outside the two recognised concepts of *de facto* or shadow directorship;  the second phrase, in particular, is usually found in the pleading of a cause of action based on undue influence.

2512. However, in answer to a specific query from the bench as to whether this was so, Advocate Wessels confirmed that it was not.      Following their closing submissions, the Plaintiffs expressly confirmed in writing that as against the Entity Defendants, their claims against TCG and Holdings rested entirely on the allegation that those Defendants were either *de facto* or shadow directors of CCC and thus themselves owed to CCC the various duties of directors.  They alleged no other grounds of claim against TCG and Holdings, although as against CIM, they alleged both those bases of claim and also the further or alternative claims of breach of contract and/or non-contractual negligence.

2513. Turning, therefore to the claims based on *de facto* or shadow directorship, in my judgment these claims fail against each of these Entity Defendants *in limine*.  The factual requirements for such liability are simply not made out on the evidence before me, and are scarcely even pleaded.

### The pleaded claims of de facto and shadow directorship

2514. The basic pleading of the Plaintiffs' case appears at Paragraph 80 of the Amended Cause:

> "80.   *Carlyle each controlled the affairs of CCC and performed functions properly discharged by a director of CCC and/or was part of CCC's corporate governing structure, such that each of Carlyle and CIM was a de facto director under Guernsey Law.   Further or alternatively, the majority of the directors of CCC took direction from and were accustomed to act in accordance with the directions of Carlyle and CIM such that each of Carlyle and CIM was a shadow director of CCC under Guernsey Law.*"

2515. The authorities show that the "*and/or*" in the first sentence above cannot stand except as "*and*".   The test for *de facto* directorship is emphatically what the defendant actually did, and merely "being" part of the corporate governing structure is not enough.

2516. A more technical point is that the term "Carlyle" as used in the Cause is stated to be a "*collective*" reference to Holdings and TCG.   I doubt whether a joint directorship is possible even in theory.   In my judgment a cause of action alleging either shadow or *de facto* directorship has to be made against a single individual.   I will, though, benevolently treat the "collective" definition as being disjunctive, and the allegations of *de facto* or shadow directorship as being made separately against each of TCG and Holdings.

2517. I have already referred to the pattern of the Cause in making the same general allegations against groups of Defendants in respect of the times in point, but in places with further elaborations particularly relevant to that group.   In the case of the Entity Defendants (referred to in the Cause as "*Carlyle and CIM*") the extra allegation is generally a reference to the claim of the "pervasive control" of CCC exercised by Carlyle and/or CIM.   These allegations are ultimately found in Paragraphs 412R to 412ZF of the Amended Cause, where the complaints against CIM, TCG and Holdings are collected under the side heading "*Carlyle and CIM's pervasive control of CCC*".   Attempting brevity, I summarise these paragraphs here.

2518. The Plaintiffs initially recite the ownership relations between the Founders and the Entity Defendants, and set out the circumstances of the appointment of the various personnel who actually conducted CCC's affairs day to day, in particular Mr Stomber and Messrs Greenwood, Trozzo, Rella and Green.   They stress the instrumentality of "the Founders" (in places "*on behalf of*" Carlyle and/or CIM) in setting up these structures.  They also stress the practical power of the Founders over the employment position of each of such senior personnel.

2519. A specific allegation of the shadow directorship of the Entity Defendants is made at Paragraph 412Z, and matters relied on for this then follow.   First, at paragraph 412ZA, the Plaintiffs plead 14 individual written statements made by  Mr Stomber between November 2006 and 14th March 2008, which they say show that Mr Stomber *"at all material times"* acted "*in accordance with Carlyle's wishes and its interests  and ...primarily to protect and advance the interests and reputation of Carlyle*".   These might be argued to show a mindset of servility, or even sycophancy, on Mr Stomber's part, but they do not even mention any directions or instructions from an Entity Defendant.

2520. The Plaintiffs next plead the provisions in CCC's Articles of Association which confide special powers of approval to a majority of the Independent Directors as previously noted, and they plead in Paragraph 412ZD that in exercising those powers, rather than exercising their own independent judgement and responsibility the three Independent Directors were instead

> "*accustomed to act in accordance with the directions and instructions of Carlyle, expressed through communications made by persons acting for and on behalf of, or alternatively in the interests of, Carlyle*".

2521. One can just about extract from this an assertion of the giving of instructions or directions (to the Independent Directors, therefore) by a person acting on the authority of TCG or Holdings, but it does not condescend to the necessary identification of the giver of the instructions or the alleged material instructions themselves.   This could, though, be remedied by the four matters which are then pleaded as founding this allegation.   They are

> i.   "*as a consistent course of conduct ...acceding unquestioningly to requests*" (maker not specified) for approval to reductions/suspensions in CCC's key risk management measures (including the minimum liquidity cushion),
>
> ii.   "*acceding unquestioningly*" to Mr Conway's alleged "*decision*" to refrain from selling RMBS,

iii.  "*acceding unquestioningly*" to Mr Conway's alleged "*decision*" and/or Mr Stomber's "*recommendation*" not to seek to raise additional equity capital,

and lastly

iv.  refraining from requiring more frequent Board meetings and instead simply "*permitting Carlyle and CIM to operate CCC as they saw fit*" - particularly as regards continuing to operate without maintaining a minimum liquidity cushion as a known "*fundamental*" element of CCC's business model.

None of the above however is an allegation of a direction or instruction from TCG or Holdings being followed, whether customarily or otherwise, by Messrs Allardice, Sarles and Loveridge.

2522. The Plaintiffs next plead (Paragraph 412ZE) that "*Carlyle and CIM, through the Founders and Senior Carlyle Personnel, controlled and directed the affairs of CCC*" in that they

"*1. regularly undertook functions in relation to CCC which could only be properly discharged by a director, and formed part of CCC's corporate governance structure; and/or*

*2. exercised a degree of control over the business and affairs of CCC that was at least on an equal footing with that exercised by its de jure directors; and/or*

*3. were held out to, and regarded by, CCC's shareholders and creditors as part of the corporate governance structure of CCC, and responsible for its success; and/or*

*4. were the substantial or predominant influence in directing the affairs of CCC.*"

2523. Although sounding initially like an allegation of shadow directorship, the details only mention aspects of *de facto* directorship in (1) and (3), but even none of these allegations is specific; they ring more of a submission than statements of fact and are mostly mere assertion. They do not plead specifically any fact capable of bringing home liability to any of the Entity Defendants arising from having acted as either a shadow or *de facto* director of CCC in any material respect in this action. A finding of *de facto* directorship has to be founded on proof of the doing of a <u>specific</u> (offending) "directorial act" by the relevant defendant, and a finding of shadow directorship has to be based on proof of actual directions or instructions given by the defendant.

2524. This could, again, be cured by further particulars, and the Plaintiffs do indeed go on to plead further matters at Paragraph 412 ZF, although they do this as "*further or alternatively*" rather than as particulars of Paragraph 412E. They plead here that Carlyle and CIM

"*through the Founders and Senior Carlyle Personnel, controlled and directed the affairs of CCC*",

listing 16 individual occasions of such alleged control or direction between the inception and the demise of CCC, in which Messrs Rubenstein, Mayrhof, Buser, Nachtwey, Harris, Ms Cosiol or unspecified senior Carlyle personnel, sometimes in conjunction with Mr Conway, took some step in relation to CCC's affairs. There is no need to recite all of them, but as a flavour, they include matters as diverse as seeking investment in CCC, forming plans in case its IPO did not proceed, overseeing CCC's publicity materials, dealing with CCC's funding counterparties and auditors, and receiving or making reports on CCC's affairs. However, only one such allegation is in respect of a matter which is alleged to have caused loss to CCC. This is at Paragraph 412ZF.5, which cites the familiar decision not to sell RMBS (etc) in August 2007, and the potential provision of a further loan from Carlyle to CCC in September

2007, but pleads that these were decisions of Mr Conway, acquiesced in by the other *de iure* directors of CCC.    Mr Conway was, of course, a *de iure* director of CCC.    Thus, this allegation neither alleges any "directorial acts" of CCC effected by personnel who were agents of an Entity Defendant, nor the communication of any "direction or instruction" to a *de iure* director of CCC by an Entity Defendant.

2525.  The next material Paragraphs of the Cause are those at 419 – 421, in a section headed "*CIM's wrongful conduct*".   There is first pleaded against CIM, 21 matters of conduct each said to be reckless, grossly negligent (or negligent), wilful misconduct, and a breach of the fiduciary "*or other*" obligations owed by it to CCC, and then, at Paragraph 420, it is pleaded that

> "*as a shadow and/or de facto director of CCC… , CIM owed the same <u>fiduciary</u> duties to CCC…*"

as its actual directors owed, and that CIM breached these, through the conduct pleaded, not (oddly enough) in para 419, but in Paragraphs 417.4 -417.24 and 418A- 418N - even though these are allegations of misconduct by the individual directors, of whom at least three, the Independent Directors, had nothing to do with CIM.    On close and laborious examination, none of these alleged facts is anything which could be argued to have been done by CIM otherwise than as part of its functions as CCC's investment manager, or amounted to "directions or instructions" to the directors of CCC rather than being professional advice.

2526.  In Paragraphs 422 - 424, the Plaintiffs then plead exactly the same matters as those previously pleaded in Paragraphs 419-421 against CIM, but now against "*Carlyle*", and the same points arise.

2527.  In Paragraphs 424A –G, under the heading "*Additional particulars of breach by Carlyle and CIM*" the Plaintiffs then repeat a large number of earlier paragraphs of the Cause and allege, at intricate length, that the breaches of various fiduciary duties and duties of skill and care pleaded previously in those paragraphs were also breaches of such duties owed by CIM and "Carlyle".    Again, it does not seem to me that these paragraphs contain allegations of the facts necessary to constitute either *de facto* or shadow directorship, as recognised in law.

2528.  It thus seems to me that the Cause barely pleads a sustainable basis for a claim that the Entity Defendants incurred liability as either *de facto* or shadow directors of CCC for the breaches of duty alleged to have caused CCC loss.   However, as the nature of the claim is reasonably apparent, I go on to consider what are the requirements for any such claim, and whether these can be made out on the evidence in the trial.

### *De facto* directorship – discussion and conclusion

2529.  This is not a case of acting under an invalid appointment: none of the Entity Defendants was purportedly appointed a director of CCC.

2530.  Nor is it a case of CCC having held out TCG or Holdings (or CIM) as a director despite the fact that they were not, with TCG or Holdings or CIM having joined in and purported to act as a director.   Although such holding out is pleaded in respect of TCG and Holdings, there is no evidence of this even on a general basis, and certainly none in respect of the only material allegations of breach of duty, ie those alleged to give rise to the loss suffered by CCC.

2531.  The type of *de facto* directorship alleged here is the third category of *de facto* directorship, identified above under Legal Principles, ie that of interference.    It requires that the Entity Defendants can be shown to have meddled in the affairs of CCC by <u>themselves</u> carrying out acts which only a director of CCC had power to carry out, and which were culpable on the part of a director of CCC in the ways pleaded.   To be a qualifying act, for the purpose of

founding proof of *de facto* directorship in this case, the relevant act must satisfy four criteria. It must be

    (i)    an act carried out on behalf of CCC, that only a *de iure* director of CCC could perform,

    (ii)    an act carried out by the relevant entity sought to be fixed with liability (ie by a human actor who is either an empowered officer, or the duly authorised agent, of that entity, and for that purpose),

    (iii)    an act which the relevant actor could not be legitimately doing in a capacity other than that of a director of CCC,

and, in addition, in order to give rise to liability

    (iv)    an act which was in some way causative of the damage to CCC of which complaint is made.

2532. Leaving aside the fourth requirement for the moment, as regards TCG and Holdings, there is no acknowledgment of the first three criteria in the pleading, and there is neither pleading, nor evidence, to show how it is maintained that the only actions which are claimed to have caused actual loss to CCC, namely the decisions not to sell RMBS or seek to raise further equity capital from July 2007 onwards, were carried out <u>by</u> TCG or Holdings, as a matter of fact. Certainly facts demonstrating the necessary authority from TCG or Holdings to the person(s) who actually did any such material acts would have be pleaded and proved. There is nothing approaching this.

2533. Even overlooking the absence of a properly pleaded case on the pleadings, but applying the correct legal principles to the evidence in this case, I find the allegations of the *de facto* directorship of CCC, whether by CIM, TCG or Holdings to be unsubstantiated. The allegation is little more than assertion, founded totally on the argument that the relationship of TCG and Holdings (or CIM) to CCC should be characterised as one of "control", and arguing that "therefore" any material decision or act of CCC or its Board can be regarded as being "really" that of TCG or Holdings (or CIM). That is neither principled, nor is it the law.

2534. The short point is that the only decisions which are alleged to have caused loss to CCC are the decisions made at various points between July 2007 and March 2008 not to sell RMBS (or not to try to raise equity capital) but instead to hold on to those assets and to continue the necessary borrowings to do so, and, on the evidence, those decisions were taken or endorsed, and the implementation of those acts was authorised, by the *de iure* directors of CCC. Even if the scope of relevant decisions is extended to include such ancillary matters as authorising the suspension of the Investment Guidelines, those decisions were also still taken by the *de iure* directors of CCC.

2535. There is no evidence of any such decision being taken by anyone in the capacity of agent for TCG or Holdings. Whilst it might be argued that some such decisions were taken or implemented by CIM, such acts were properly done in CIM's capacity as investment manager for CCC, appointed under the IMA. They are plainly referable to that status; they are not CIM's officiously assuming the functions of a director of CCC.

2536. Even where distinctions in capacity might begin to become blurred in practice (I note, for example, that Mr Green resigned from CIM, and thus what was effectively his position as CFO of CCC at the end of January 2008 shortly before the end of the material time, and the result was that Mr Buser of TCG rendered more assistance to the operations of CCC in his place), that makes no difference to the fundamental point that to make out *de facto* director liability it would be necessary to prove that an individual acting on behalf of TCG or

Holdings did material acts on behalf of CCC which could only have been done by a director of CCC.   I was in fact not even addressed on the basis that there were any such examples in the evidence.   The whole pattern of the Plaintiffs' submissions in this regard was simply reliance and emphasis on the strength of the alleged "pervasiveness" of the Carlyle ethos and influence in the running of CCC's affairs, and that this somehow made TCG or Holdings tantamount to directors of CCC, such that they could be called *de facto* directors of CCC.   An alternative submission was that as Mr Stomber and Mr Conway, in particular, failed themselves (it is said), to distinguish the capacities in which they might be acting, that opened up the door to treat their acts as being carried out on behalf of TCG, or Holdings (or I think, CIM), simply because they had authority to act on behalf of those entities (Mr Conway) or were effectively employed by those entities (Mr Stomber, even though that proposition is not really accurate as he was employed by CGEC).   In my judgment that simply is not enough.

2537. In their closing submissions, the Plaintiffs argue that "*the appropriate inference to be drawn*" from the evidence (including, they say, the absence of any evidence given by any other Carlyle/CIM personnel who had involvement in CCC's affairs beyond those called by the Defendants) is that

> "*…the Defendants, the Senior Carlyle Personnel and CCC's authorised Officers were acting concurrently on behalf of Carlyle, CIM and CCC at all relevant times*".

2538. This vague and broad brush approach is neither correct as a matter of legal analysis of the facts, nor is it a permissible basis of liability.   I unhesitatingly reject it.

2539. Thus the allegation of *de facto* directorship of CCC made against the Entity Defendants, in respect of the acts which are material to the alleged causing of damage to CCC therefore fails on this fundamental point of evidence.

**Shadow directorship – discussion and conclusions**

2540. As regards the allegation that CIM, TCG or Holdings was a shadow director of CCC in respect of any material decision, I find that the Plaintiffs' case also fails.

2541. The key point here, in my judgment, is that the Plaintiffs must identify some "directions or instructions" emanating from the relevant entity and in accordance with which the actual directors of CCC (or, if applicable, the relevant voting majority of such directors) was "accustomed to act".   As the entities sought to be made liable are corporate entities, CIM, TCG or Holdings, it is therefore <u>their</u> directions or instructions which have to be proved.   This requires a finding against either CIM, TCG or Holdings that <u>that entity</u> gave directions or instructions to the directors of CCC, or the relevant majority of them, in respect of any relevant act and such that there is a discernible pattern of those directors "doing as they were told" by CIM, TCG or Holdings rather than exercising their own judgment in respect of the relevant act or aspect of CCC's business.   This in turn means proving the communication of relevant "directions or instructions" by some person who was doing so in the capacity of either the appropriate organ or a duly authorised officer or agent of the entity (CIM, TCG or Holdings) in question.

2542. Again, taking TCG and Holdings first, the Plaintiffs have not, it seems to me, even focused on making out this requirement as a matter of evidence.      No evidence has been adduced or elicited, of any material "directions or instructions" being given to the Directors of CCC with regard to any of the decisions or failings complained of by any person, let alone any person shown to be acting in that regard on behalf of and with the authority of TCG or Holdings. Neither is there any evidence of conduct from which it might be properly inferred as a fact that directions or instructions were being given by either TCG or Holdings to CCC's directors (or to any material group of them such as "Allardice, Sarles and Loveridge"), and in accordance with which they were "accustomed to act".   Indeed, I do not think that it was ever

suggested to any of the last three directors that they were acting on directions or instructions at all, as contrasted with it being suggested that they exercised no independent judgement and unquestioningly did what either Mr Stomber or (as the allegation more often is) Mr Conway requested, proposed or recommended.  That is not the same thing.

2543. I have already noted when considering legal principles that the authorities show that the mere fact of holding a company's shares, or a majority of them, is insufficient to constitute an entity a shadow director of the relevant company.   Thus, even if the voting shares in CCC were to be treated as held by either TCG or Holdings, that would not justify a finding of shadow directorship.

2544. There is, I find, no evidence sufficient to found a conclusion that the *de iure* Directors of CCC (or a relevant majority of them) were accustomed to act in accordance with instructions or directions given by TCG or Holdings, let alone that they did so act in the respects which are alleged to have caused CCC loss.   There is no evidence of actual directions or instructions.   Mere influence is insufficient, even if it is considerable, and "control" would likewise only be sufficient if it manifested itself in the form of the necessary pattern of instructions given and customary compliance.   None of that is made out here.

2545. Moving to CIM, since CIM was CCC's investment adviser, it is necessary to consider in what capacity any communications to CCC's directors which are established as being from CIM were given and whether they were, in substance, advice being given in a professional capacity or, rather, "directions or instructions" as to how to act.   I have no hesitation in finding that any such communications were the former.   Even assuming that communications from Mr Stomber to the other directors of CCC were to be treated as coming from CIM, rather than (as I would have thought more reasonable) from CCC's own CEO director, there is, once again, simply no evidence to support the proposition that Mr Stomber was conveying CIM's "directions or instructions" to the directors of CCC, as contrasted with CIM's investment advice.

**Final Conclusions as regards the Entity Defendants as directors**

2546. For all the above reasons, therefore, the claims against the Entity Defendants based on allegations of their *de facto* or shadow directorships of CCC fail completely.

2547. As the Plaintiffs' claims against the Entity Defendants have now become defined, my conclusions on this aspect of the claim are sufficient to dispose of all claims which have been maintained against TCG and Holdings.  The Plaintiffs' action against those entities will therefore be dismissed.   As regards CIM, they dispose of the claims founded on *de facto* or shadow directorship.   The Claims against CIM made on the basis of breach of contract or negligence have been considered above.

**16.   Causation and Quantum**

**Preliminary**

2548. The arguments in this case have never got as far as any detailed consideration of damages calculations.  It has not been worth doing so in advance of findings of fact which would enable a properly focused exercise to take place.

2549. Because I have held that the Defendants committed no breach of duty (and nor, consequently, misfeasance) and were not guilty of wrongful trading, it is strictly unnecessary for me to deal with issues of damage and quantum.   The question is therefore whether I should nonetheless consider these points in case this matter goes further (to use the traditional phrase).

2550. Doing so raises some difficulties.    Whilst it is often possible to postulate a different legal conclusion and state what consequent alternative outcome the court would find on that basis, it is not easy to do so in this case.    This is because assuming a different result on liability here is to assume not simply a different judgment on legal principle, but a different judgment on a matter of mixed law and fact.    A major part of my reasons for holding that the Defendants did not commit breaches of duty has been the highly doubtful prospects of making worthwhile sales of RMBS at the relevant times – worthwhile in terms of both quantity but also, and in particular, in terms of likely price.    Those are findings of fact.    To assume, therefore, that failing to sell was a breach of duty involves the assumption that it was grossly negligent or a breach of fiduciary duty not to sell despite those factual circumstances.

2551. All of this makes my views on the isolated effects of causation and quantum highly unnatural and very much more hypothetical.    I have therefore been uncertain as to whether I ought to include the following conclusions in my judgment at all.    However, given the enormity of the case and the resources which have been invested in it, including argument on this topic, I have concluded that on balance I should.

2552. My conclusion, in short, is that even if the Plaintiffs had satisfied me that the Defendants' failure to sell significant quantities of RMBS was a breach of duty, or that they were guilty of wrongful trading at any of the points in the history on which they focus, their evidence entirely fails to satisfy me that it can be established on balance of probability that CCC did suffer any identifiably worse financial outcome as a result.    Therefore, this action fails for that reason as well.

## Principles

2553. It is appropriate to start by identifying the principles governing an award of financial compensation in each of the cases of breach of duty of skill and care, breach of fiduciary duty and wrongful trading alleged, so as to determine what requires to be proved with regard to loss and damage, and how an appropriate award would be quantified or calculated.

### (a) Breach of duty of care

2554. As regards breach of the duty of skill and care, the principles are those which apply in the general case of negligence.

2555. In *Bristol and West Building Society v Mothew* [1998] Ch 1, Millett LJ, distinguished the principles of causation, remoteness of damage and measure of damage applicable in the case of an "equitable" duty of skill and care from equitable compensation for "*breach of a fiduciary duty which may be awarded in lieu of rescission or specific restitution*".    He held that the former loss was recoverable on the same basis as damages for common law negligence.

2556. It is the former with which I am here concerned.    I have already pointed out that the concept of a fiduciary (or equitable) duty of care is no different a concept from the ordinary duty of care, but simply such a duty owed in the context of a fiduciary relationship.    This does not affect the dictum above, and if anything reinforces it.    The contrast referred to by Millett LJ makes no difference on this point either.    The breaches of fiduciary duty alleged here are of a different kind from those giving rise to a claim for rescission or restitution.    The Plaintiffs claim compensation for loss – more accurately, for failure to avoid loss, but it amounts to the same thing.

2557. In this context therefore the starting point is the ordinary starting point with regard to establishing causation in negligence.    Subject to rules as to remoteness, the defendant is liable for all losses which flow directly from the breach of duty, and this is initially proved by

the test that "but for" the breach of duty complained of, the loss which is being considered as the candidate for compensatory recovery would not have occurred.

2558.  There may then be a subsequent question as to whether the breach has to be "the effective or dominant" cause, or merely "an effective" cause, of the actual loss.  A distinction may also be drawn between whether the wrongful act caused the loss, or merely provided the occasion for it to occur: see *Galoo Ltd v Bright Grahame Murray* [1994] 2 BCLC 492, in which it was held that an auditor's negligence in overvaluing the company's stock, which thus hid the fact that the company was valueless and enabled it to continue trading and incur further losses, did not "cause" those losses.

2559.  These are expressions by which the courts seek to describe the line between what is perceived as a cause, or merely as a circumstance.  It may be a difficult conceptual line to draw at times, and with regard to these limiting distinctions it has been observed that

> "*Ultimately, all of them depend on a developed judicial instinct about the nature or extent of the duty which the wrongdoer has broken*"

per Lord Neuberger, in the recent case of *BPE Solicitors vs Hughes-Holland* [2017] UKSC 21 at [20]).  However the broad initial qualifying test remains that of "but for" causation, which is a necessary, although not necessarily sufficient, test for liability.  There must be a discernible direct causal link between the breach complained of and the loss in question.

2560.  Once causation is established by this test, the quantum of recoverable loss then has to be calculated or assessed, according to the rules relating to remoteness of damage and any other principles applicable to that second stage, although these assessments may themselves be affected by the perception of the nature of the duty of care in question: see the *BPE Solicitors* case, above.

2561.  In general in negligence, the doctrine of remoteness limits recovery on the basis of whether the particular loss was a reasonably foreseeable consequence of the relevant breach of duty, or not.  This depends on the facts and circumstances.  Where the loss results from some supervening and unexpected occurrence it will probably be excluded for being too remote from the breach of duty.  However, where the loss results from the very matter from which the defendant was under a duty to protect the plaintiff, it will be obvious that the test is met.  In a sense that simply re-states the question, ie was it the very matter from which the defendant was under a duty to protect the plaintiff?  It redirects attention, once again, to the nature or scope of the duty of care.  A more constructive test will often be: for what consequences does it appear that the defendant ought to be held responsible? (cf: Lord Hoffmann's article on *Causation* (2005) 123 LQR 592 at 595).  This will again depend on the circumstances.

2562.  In my judgment it is very important, though, to keep in mind that the process of assessing causation and quantum is not a single process but a two stage process: see *Parabola Investment Ltd v Browallia Cal Ltd*  [2011] QB 477 at [23]:

> "*The claimant has first to establish an actionable head of loss.  …….The next task is to quantify the loss.  Where that involves a hypothetical exercise, the court does not apply the same balance of probability approach as it would to the proof of past facts.  Rather, it estimates the loss by making the best attempt it can to evaluate the chances, great or small (unless those chances amount to no more than remote speculation) taking all significant factors into account…*" (emphasis added).

2563.  Thus, the first stage is to decide whether the defendant is liable for having sufficiently caused loss by conduct which was a breach of the duty in question.  The second stage is to quantify the recoverable loss which the plaintiff suffered as a result of the identified breach of duty, rather than some extraneous matter.

2564. The former stage, that of causation, is a finding of fact which, in common with all findings of fact has to be proved on the basis of the ordinary civil standard of proof, ie the balance of probabilities.   The latter, that of quantification, is not.      The Plaintiffs cite the following helpful passage from Patten LJ in *Vasiliou v Hajigeorgiou* [2010] EWCA Civ 1475 at [25]

> "*Where the quantification of loss depends upon an assessment of events which did not happen the judge is left to assess the chances of the alternative scenario he is presented with.   This has nothing to do with the loss of chance as such.   It is simply the judge making a realistic and reasoned assessment of a variety of circumstances in order to determine what the level of loss has been*".

2565. Although the Plaintiffs cite the above two cases in relation to assessing equitable compensation because their case lays more stress on this, the basic approach is, in my judgment, the same in negligence, and these dicta apply just as much to causation and damages with regard to the duty of care.   There are, though, aspects in which the assessment of equitable compensation does differ from that in relation to duty of care, as mentioned below.   It will depend on the facts whether these make any difference to the end result.

2566. Lastly under this head, the Defendants submit that if the Plaintiffs cannot show that <u>any</u> loss has been caused to CCC by the Defendants' alleged breaches of duty on this "but for" test and the balance of probability, then that is certainly an end to the Plaintiffs' claim based on breach of the duty of skill and care.   This is because proof of loss is a required ingredient of the cause of action itself.   I think this is correct.   A claim for breach of the duty of skill and care is a claim in negligence and the fact that it arises out of the relationship of company and director does not make any difference to the principles.

**(b) Breach of fiduciary duty**

2567. As regards the principles for recovery of equitable compensation for loss caused by breach of fiduciary duty, the Plaintiffs accept that, as its title suggests, the principle is that such an award is compensatory and, again, a "but for" test of causation is to be applied.

2568. However, they argue that the principles differ as to what is to be treated as compensatory, in other words, it seems to me, as to quantification.   They cite Snell's *Equity* (Cumulative Supplement to the 33rd Edition, 2015, at 20-028), stating that

> "*In every case equitable compensation may only be awarded in respect of losses the claimant can show would not have occurred but for the breach in question.   Such losses are to be assessed as at the time of trial using the full benefit of hindsight.*"

This latter, they then submit, applies a stricter test of liability in the case of a fiduciary, justified as a matter of policy, to encourage fiduciaries to fulfil their duties.

2569. Both Plaintiffs and Defendants rely on the Supreme Court case of *AIB Group (UK) plc v Mark Redler & Co Solicitors* [2015] AC 1503, recently approved as representing the law of Guernsey by McMahon DB in *Romain Zaleski v GM Trustees Ltd*  (1st September 2015: Guernsey Judgment 42/2015), for the principles governing equitable compensation.

2570. The Defendants submit that this case is really the last word on the matter, overriding any earlier authority, which therefore really does not need to be looked at.   They submit that the key points to be derived from the *AIB* case are that

    (i)    the purpose of equitable compensation is to compensate (Lord Reed at [2015] AC 1503 at [136]), not to punish;

    (ii)    the award is again limited by a "but for" test of causation, being confined to losses which would not have been suffered "but for" the relevant breach, and

(iii)    awarding compensation for a loss which would have been suffered even if the relevant duty had been performed is not permissible, because it would be penal (Lord Toulson at [62] – [64].

However they accept that

(iv)    there is a difference in that foreseeability as a test of whether loss is recoverable under the principles of remoteness of damage which apply in the assessment of damages for negligence does not apply; the test is simply the test of direct consequence, ie whether the breach in fact caused the loss in question, whether it was foreseeable or not (Lord Reed at [135]).

2571.  I do not understand the Plaintiffs to dissent from this.    However, and relying on the proposition that foreseeability is immaterial (*Zaleski* (above) at  [124]) the Plaintiffs then construct from this a proposition that the court can and should approach issues of proof of damage on a "broad brush" basis.

2572.  They first advance the proposition that in the case of a delinquent fiduciary, the burden of proof shifts from the plaintiff having to prove that the loss was caused by the breach, to the defendant having to prove that it was not.   As authority for this proposition they rely first on a citation from Snell's *Equity* 33rd Edition 2015 at [7-059], and second on dicta from the case of *Libertarian  Investments Ltd v Hall*    (2013) HKFCAR 681 in the Hong Kong Court of Final Appeal, where Ribeiro PJ stated at [138]) that

"…*where there is (as in the present case) evidence of a breach of fiduciary duty causing loss, equity places the onus on a defaulting fiduciary to prove that such loss would have occurred in any event even if no breach had occurred*" .

2573.  The citation from Snell's *Equity* summarises a   dictum of Blackburne J in *Nationwide Building Society v Balmer Radmore (a firm)*  [1999] Lloyds Rep PN 241 at 278-9, regarding the principles of causation and quantum in the case of a fiduciary (a solicitor) making misrepresentations or non-disclosures to a beneficiary (a mortgage lender) which caused the beneficiary to act in a particular way (granting the mortgage), and concluding that the court was entitled to assume that the beneficiary would have acted in the manner most beneficial to it unless the fiduciary proved – as it was entitled to try to do in cases other than where it had acted dishonestly – that the beneficiary would not have acted in that way.

2574.  The Plaintiffs submit that where the matter goes even further and it is the very nature of the defendant's breaches which causes the difficulty in quantifying the loss sustained, the above principle entitles the plaintiff to the benefit of the approach that the court will

"*resolve uncertainties about what would have happened but for the defendant's wrongdoing by making reasonable assumptions which err, if anything, on the side of generosity to the [plaintiffs]*"

see *Yam Seng Pte Ltd v International Trade Corpn Ltd*  [2013] 1 Lloyds Rep 526 at [188]. Put more trenchantly, the plaintiff will be entitled to the benefit of "a fair wind" in establishing the quantum of its losses (per Jonathan Parker in *Browning v Brachers* [2005] PNLR 44 at [210]).

2575.  The Plaintiffs therefore submit that, applying this principle here, the Defendants' breach of duty lay in not selling RMBS when they should have done.  The Defendants cannot, therefore, take advantage of any argument that it is impossible to quantify CCC's loss because of a lack of evidence of the price at which RMBS would have been sold, because it is the Defendants' very breach which has prevented the evidence of the price at which such sales would have taken place from being available.  The court therefore can, and should, assume against the

Defendants, if they are liable for breach of fiduciary duty, that sales would have been effected at the prices which the Plaintiffs now suggest were possible.

2576. In support of this proposition they rely on *Armory v Delamirie,* (1722) 93 ER 664.  There, a goldsmith kept a jewel which a chimney sweep had found and taken to him to value, forcing a mere nominal payment on to the sweep.   In an action in trover, the goldsmith was found liable in damages, but sought to argue that there was no evidence of the quality of the jewel, which should therefore be taken to be average.   The court held, however, that since it was the goldsmith's conduct which meant that the jewel could not be examined to ascertain its true value, it must be assumed against him that the jewel was of the finest quality, and damages should be awarded on that basis.   The Plaintiffs cite this as an example of the right approach where it is "*the actions of the wrongdoer which have made an accurate determination so problematic*" (Handley JA in *Houghton v Immer (No 155) Pty Ltd* [1997] 44 NSWLR 46 at 59) and they submit that this is precisely the situation here.

2577. With the Plaintiffs having relied heavily on the *Libertarian* case in their opening, the Carlyle Defendants, in their opening response, argued comprehensively that their submission as to shifting the burden of proof was misconceived.   They elaborated further on this in their written closing submissions, no doubt expecting major reliance on this case again from the Plaintiffs, although in the event it was merely cited as indicated above.

2578. Apart from submitting that the *Libertarian* case was in a different jurisdiction, and in any event preceded the *AIB* case which should now be regarded as the comprehensive relevant authority, the Defendants argue that *Libertarian* was a decision in a very different context.   It was concerned with a breach of fiduciary duty by actual misappropriation of trust monies by the defendant.   What was in fact held was that once it was established (as it was) that the defendant had misappropriated trust money, then all reasonable assumptions would be made against him as regards what was required in order to restore the trust fund to the position it should have been in - unless he was able to disprove the likelihood of those assumptions.

2579. In that case, the defendant had received $5.5Mn with a mandate to purchase certain shares, but had failed to purchase them and had stolen the money.   The award of equitable compensation was made on the basis, not only of the restoration of the funds, but of the loss of potential profits on an onward sale, as the evidence suggested the shares could have been sold on.  The defendant tried to argue that the plaintiffs had not proved that the shares could, in fact, have been purchased in the first place, thus limiting compensation to the sum which had been misappropriated.  This argument was rejected on several grounds (not least because it had never been pleaded or put to relevant witnesses), but these included that it would have been for the defendant to prove that proposition, and he had not done so.   The *Libertarian* case, say the Defendants, was thus an entirely different situation from the present, the principle of making assumptions against the defendant was not even determinative of the decision, and the point was, in any event, concerned with quantification of loss, and not with causation.

2580. With regard to *Armory v Delamirie*, they submit that this is an example, not of a factual evidential presumption against the defendant as regards causation, but a procedural evidential presumption as regards quantum.   In *Armory v Delamirie*, it lay within the power of the Defendant to produce the jewel, as it was in his possession (or, presumably, evidence of its actual value was, if he had sold it) but he had failed to do so.   On that basis the adverse assumption as to value made against him was justified because of his conduct in not providing evidence and trying to take advantage of this; it was not because of his wrongdoing in keeping the jewel.    A similar principle may apply where the breach of fiduciary duty lies, for example, in not keeping records which ought to have been kept and which would disclose the values of transactions necessary for taking a proper account.

2581. The key, though, lies in the fact that the material evidence is something which it would be in the defendant's control to provide directly, and which he ought to provide, but which he does not. It does not extend to making an assumption as to what evidence would exist if the defendant were not in breach of duty as claimed in the action, when what that evidence would be is the very thing which the plaintiff is required to prove to establish that there is liability at all. In the case, such as the *Libertarian,* of misappropriation of trust funds rather than merely a breach of fiduciary duty alleged to have caused damage, the basic proposition that loss has been caused is met automatically by proving the act of breach of trust, ie the misappropriation or misapplication of trust money. That deals with the initial issue of causation. The further dicta in the case are then concerned with the appropriate principles with regard to assessing quantum, ie what is required to restore the beneficiary to the position that he would have been in if the breach had not occurred.

2582. I broadly prefer the arguments of the Defendants;   in my judgment the principle of *Armory v Delamirie* should be regarded as a principle of evidence regarding quantification of loss.

2583. However, even if it could also be applied in the context of causation, it is not, in my judgment, a rule of inflexible application, and it does not or should not apply in the circumstances of this case. I reach these conclusions as follows.

2584. First, I think there are significant limits on the assistance to be derived from the authorities, and they require careful examination and comparison with the nature of the present case. For example, *Nationwide Building Society v Balmer Radmore (a firm)* [1999] Lloyds Rep PN 241 at 278-9, paraphrased in Snell's Equity at [7-059] in the passage on which the Plaintiffs rely, is a complex case, because it was a test case on issues of principle in twelve cases concerning the liability of solicitors in the context of various cases of mortgage fraud. It takes careful reading to appreciate that the reason why this is a case of breach of fiduciary duty rather than a straightforward negligence case is that the solicitors were acting for several parties and were therefore subject to undisclosed conflicts of interest. It is thus a very different situation from the present case, and one cannot safely transpose dicta from one commercial situation and apply them in another.

2585. Second, the Plaintiffs' approach simply assumes causation of loss at the outset, and then, by concentrating on arguments of equitable generosity as regards to assessment of loss, seeks to justify a "broad brush" approach being read back into the requirement for proof of causation of loss, as if such a generous approach makes the question whether loss <u>was</u> actually caused more readily decidable in favour of the Plaintiffs. This, though, removes the essential need for loss to be proved rather than simply assumed. In my judgment, this approach is back-to-front, incorrect and to be resisted. I do not find it to be supported in the authorities. The Plaintiffs' citations are all in the area of quantification rather than causation. The dicta in each case are on the basis that some loss has been proved, and they then suggest that the making of "all reasonable presumptions" can be applied to the estimation of the loss actually suffered. I cannot see that the principle relied on by the Plaintiffs has in practice been treated as applying to the issue whether there was actual proof of <u>any</u> loss in the first place, so as to enable that to be assumed.

2586. In my judgment, the Plaintiffs' arguments on this basis fall into the trap which was identified, albeit in the different context of the contractual liability of a valuer to a lender for a negligently high property valuation, by Lord Hoffmann in the House of Lords in *South Australia Asset Management Corporation v York Montague Ltd* [1997] AC 191 at [16]- [17]

> "*Much of the discussion ... has assumed that the case is about the correct measure of damages for the loss which the lender has suffered. The Court of Appeal began its judgment [by].....stating the principle that where an injury is to be compensated by damages, the damages should be as nearly as possible the sum which would put the*

> *plaintiff in the position in which he would have been if he had not been injured. It described this principle… as " the necessary point of departure."*
>
> *I think that this was the wrong place to begin. Before one can consider the principle on which one should calculate the damages to which a plaintiff is entitled as compensation for loss, it is necessary to decide for what kind of loss he is entitled to compensation. A correct description of the loss for which the [defendant] is liable must precede any consideration of the measure of damages…..".*

2587. In any event, insofar as such a principle might be invoked in the context of considering causation itself, it seems to me that it is confined to cases where the culpable conduct of the defendant which has prevented relevant evidence which might favour the plaintiff from being available has been wilful and deliberate to the extent of being dishonest, in bad faith or, at least, in cynical disregard for the interests of the plaintiff.   That element appears to me to be present in all the cases cited by the Plaintiffs.    It is easy to understand the court's natural reaction that in a contest between a wronged beneficiary and a fiduciary who acted in bad faith, material doubts should be resolved in favour of the innocent wronged beneficiary rather than the reprehensible wrongdoer.   This may come close to transgressing the principle that an award of equitable compensation is compensatory and not penal, but, in my judgment, it remains on the right side of the line and is justified as an application of appropriate evidential presumptions against a deliberate wrongdoer.   The ethos is similar to the presumptions of causation generally made against a fraudster, against whom it will be conclusively presumed, for example, that a fraudulent misrepresentation induced the plaintiff to act upon it.

2588. If I am right about this, then the Plaintiffs would not, in my judgment, be entitled to invoke any such principle here in any event, because they have, in the end, expressly disavowed any allegation of dishonesty or bad faith against the Defendants.

2589. Lastly, whatever the scope of its application, the principle only permits the making of all reasonable assumptions against the relevant defendant.    It thus falls short of permitting merely speculative assumptions to prevail over the broadly obvious inferences from facts, just because they are conceivable.    Whether this is analysed as the principle not applying in the first place, or as the defendant in fact negativing the presumption, does not seem to me to matter.

2590. It means, though, that the approach which the Plaintiffs seek to invoke, even if it could as a matter of law be applied in their favour in this situation, is of more limited application than they suggest.    If I am only obliged to make all reasonable assumptions against the Defendants, I would need to be satisfied that the assumption that the Defendants could have made sales of RMBS in the amounts and at the prices contended for by the Plaintiffs is a reasonable one.    The assumption as to value made against the goldsmith in *Armory v Delamirie* was far from unlikely or implausible, and was not unreasonable on the facts of that case, as was the assumption in the *Libertarian* case as to the likelihood of the shares being sold on at a profit.

2591. To apply the *Armory v Delamirie* principle on any basis therefore seems to me to require that I first be satisfied that the assumption I am being asked to make is a reasonably likely one, even if it might be described as generous.    It does not justify making a generous assumption which is improbable.

### (c) Misfeasance and wrongful trading

2592. Both of these matters, as grounds for financial redress, are based on the principle of compensation, with the further gloss that the award depends on the court's assessment of an appropriate contribution which the guilty defendant ought to make to the assets of the company in liquidation.   As such, it can therefore be lower than the assessed quantum of loss,

if in the court's estimation, the facts justify this, but it cannot exceed a compensatory figure. No more therefore needs to be said about this.

**Application to the facts of this case, assuming liability had been found**

2593. Applying the above principles, in order to succeed in recovering damages the Plaintiffs have to satisfy me not only that there was a breach or breaches of duty (whether of skill and care or fiduciary) which I am here assuming, but also that it/they caused a loss to CCC.

2594. This is fundamental to the very cause of action in the case of the duty of care. In the case of the claim for breach of fiduciary duty, it becomes fundamental as a practical matter because the claim is for equitable compensation, and one cannot have compensation without some loss to be compensated. At any rate, this is the basis on which the case was argued before me; it was not suggested that there could be nominal liability separately from the causation of loss, as may be possible, for example, in contract.

2595. This means that the Plaintiffs have to establish on the balance of probability that what they say that the Defendants ought to have done would have resulted in a better financial outcome for CCC than that which actually occurred when CCC ultimately collapsed. If the Plaintiffs cannot establish that, then they do not establish liability. The first stage is therefore to consider whether the Plaintiffs do establish that proposition.

2596. It is not, however, sufficient that one can speculate that CCC could have got a better outcome, or that one can envisage a series of events in which it might have done so. The test is whether, on the totality of evidence, it is more likely than not that the course which it is claimed CCC should have taken <u>would</u> have achieved a better outcome, ie avoided some, or all, of its eventual losses.

2597. The Plaintiffs' primary submission with regard to damages was the suggested "*straightforward*" one that the (here assumed) breaches of duty committed by the Defendants caused loss to CCC, "*in particular …the loss of CCC's entire capital*". Put another way, they submitted,

> "*If the Defendants had……undertaken an orderly winding down of CCC those losses would have been avoided. In particular creditor losses would have been avoided and CCC's capital would have been preserved*".

As such, this submission entirely begs the question; it has to be proved. The Plaintiffs' approach to this depends on the evidence of Dr Carron.

2598. Dr Carron's evidence, in simple terms, is to assume that CCC would have sold the whole, or some proportion (chosen, as one example, as an amount which would have restored its liquidity cushion to 20%), of its portfolio of RMBS starting at one of the dates which have been the basis of examining the claim for breaches of duty, and done so either at IDP prices or (as an alternative measure) at secondary market prices then pertaining, and then to carry the figures for these realisations through to the actual date of CCC's collapse in March 2008 and aggregate them with the putative proceeds of selling the remainder of CCC's portfolio at that date at the prices then obtained, with adjustments to allow for diminished income from the sold investments in the meantime. The result is then compared with the actual deficit figure ultimately at that time, and the difference is presented as the logically consequent measure of CCC's damage, (ie, its "unavoided" losses) at that time. Interest is then added to finalise the sum claimed as damages.

2599. The form of the exercise really only has to be stated to reveal how theoretical it is, rather than attempting to replicate what the actual effects of implementing a sales programme would have been in practice. I return to this later.

2600. Returning to the theory, as previously noted, the Plaintiffs ultimately narrowed their argument to being that the Defendants should have embarked on a programmed disposal of $10Bn worth of RMBS over a period of a few months, at an appropriate date in the second half of 2007.   When challenged on the grounds that they were not specifying what prices they were alleging the sales should have been effected at, they first suggested an indeterminate "modest" discount from IDP prices.  When challenged as to the imprecision of this, and the consequent impossibility of examining their case adequately, they finally, in closing submissions, based their case on the proposition that sales at a discount of 11 bps from IDP prices could have been achieved.

2601. I considered the evidence with regard to achievable prices above, in relation to the claims advanced as at September 2007.  I rejected the submission of the Plaintiffs that CCC could reasonably have expected to be able to achieve sales for significant quantities of RMBS at prices at or around 11 bps below current IDP prices as utterly unrealistic, looking at the evidence as a whole.    I preferred Dr Niculescu's opinion that prices would not have been higher than secondary market prices of about 44 – 48 bps below IDP prices, and very probably even lower than this, in particular for large tranches.   I found this view far more credible, as it fitted with my perceptions from surrounding circumstances.

2602. I made that assessment about prices specifically in considering the position as at the end of September 2007 but I find it also to be a reasonable starting point for likely price levels if sales had actually been attempted throughout the relevant period from about 9th August 2007 to the end of February 2008.     At the end of August, the market had been in more of a turbulent state than in September, so it was certainly no better.   As regards November 2007, the market was a little recovered but very much the same as in September, and as regards December 2007, it was not only generally lacklustre as to prices, but in a state of stagnation such that sales prospects would have been even worse.   At that date, therefore, the likely level of prices if sales had been pursued willy nilly would, I find, have been significantly worse.      Improvements in early 2008 had not really got underway to a great extent before the second crisis came.

2603. As regards the earliest time when a breach of duty is alleged, ie the 26th July 2007 Board Meeting, although it would seem technically possible that there was a short period of time before the onset of the August 2007 crisis during which the somewhat better prices of earlier times might have been obtained, it seems to me that this would have made no real difference for two reasons.    First there is no reason to suppose that CCC should have embarked immediately and urgently on such a selling programme (as previously mentioned, even Dr Carron argued that the process of selling need not have been urgent) and it is therefore not likely that any significant amount of RMBS would have been sold in those few days.  Second, even if some tranche of RMBS had been sold at better prices in this short period, the suggested quantity would have been small in the scheme of things - certainly no more than $1Bn – and the remainder of any such selling programme would then still have encountered the adverse market conditions and potentially depressed prices which predominated from around 9th August 2007 onwards.

2604. From the above, it follows that my conclusion on the evidence is that any sales transactions which had been executed by CCC as the start of a sales programme as proposed by the Plaintiffs could and would have been achieved only at prices which were well below IDP prices (even if not quite as low as the abortive JP Morgan offer), even for relatively small quantities.   I am quite satisfied that these would have been no higher than the then evidenced secondary market prices.

2605. I should mention here that, even if I were considering this point in the context of a breach of fiduciary duty by the Defendants which was of such an improper nature as possibly to justify the Plaintiffs' inviting the court to apply the *Armory v Delamirie* principle, I would decline to do so.   This is because the evidence of the disrupted and depressed state of the market, and