the consequent obvious and total unlikelihood, to my mind, that sales of significant quantities of RMBS at prices a mere 11bps below CCC's marks could have been achieved, is so clear that I would not regard the assumption of that possibility as being a "reasonable" assumption, even applying a suitable degree of generosity to the Plaintiffs.

2606. However, even an assumption that initially sales could have been made at the level I have indicated, ie no higher than that indicated by evidence of secondary market prices, would not suffice to justify an assumption that the sales programme proposed by the Plaintiffs could have been continued on the same basis and at the same price levels, and at this point, the facts which it is appropriate to posit as the continuation of any such sales strategy become, to my mind, a matter of complete speculation.

2607. The enormous difficulty which I see as facing the Plaintiffs with regard to proving any claimed quantum of loss, even in general principle, is that this is not a case where they can point to the terms of a single sales transaction which they argue should have occurred and from which a comparison with the ultimate financial outcome for CCC could readily be made, but that they have been obliged to accept that sales would have had to be effected through a series of many transactions.   The difficulty is then that not only would the circumstances and detail of any one transaction be different, but that the earliest sale or sales would affect the likely circumstances of later such sales in this counter-factual world, and that what the potential effects of this would be is neither obvious nor reasonably predictable.

2608. The Plaintiffs' argument has tried to conceal this problem by pointing to a global result which they say could and should have been achieved - namely the ultimate sale of $10Bn worth of RMBS between about September (or whenever) and December 2007 (or February 2008) - and arguing that taking this course of action would have achieved a better outcome for CCC when the collapse came in March 2008.  But the difficulty comes when one examines what would be the effects of "this" course of action in practice.   On any basis, it involves a large array of possible component sales transactions, as to which they invite the court to assume that the details do not matter, as the final outcome of any such sequence of transactions can safely be assumed to have been better for CCC than what happened in reality.

2609. I simply cannot accept this proposition. This is because the evidence shows that the financial results of such series of transactions are neither generally obvious nor effectively predictable. The prices of later sales transactions would, I am satisfied, be sensitive to circumstances created by the earlier (counterfactual) transactions, first affecting their likely achievable prices, and second, generating other matters material to CCC's finances, namely potentially lower repo marks and margin calls.   The consequence of all this is that I consider it well nigh impossible to predict the likely outcome of any sequence of such transactions with any reliability.   Certainly I do not think that it can be done sufficiently clearly as to even general terms, to enable it to be concluded that CCC would, even on balance of probability, have been better off when the market collapse of March 2008 occurred if such a sales programme had been commenced at some material time as suggested.   The possibility that this would have been the case is, in my judgment, total speculation.

2610. The Plaintiffs' invitation to me is to leave aside all the evidence of unpredictability about the way in which such a series of transactions might work out in practice and instead make some general assumptions and come to an overall impression that loss to some degree was suffered. That, though, is, in my judgment, moving a very long way from a principled determination of whether any loss is proved, let alone a calculation of it.   It is more in the nature of an appeal to the court to give a judgment on the basis of some kind of discretion as to what ought to "feel fair".

2611. In my judgment, this is not a case in which such an approach is even possible in principle, let alone a legitimate exercise of this court's powers.        Of course, the law and the court will "do the best it can", and if the court is confident that a party has suffered some loss as a result

of unlawful conduct by another, it will generally not allow any difficulties of quantification to defeat the claim. Using the best logic it can, it will arrive at a quantification of the greatest sum which it can feel sufficiently confident is the minimum loss which the plaintiff has suffered. By definition, though, this will be the quantum of loss which the plaintiff has actually proved. However, that is in a case where the difficulties of estimation go only to quantum and not to the prior issue whether it is sufficiently proved that any loss has really been suffered at all. If the court cannot be sufficiently satisfied that the relevant unlawful conduct did, on balance of probability, cause <u>some</u> loss, the plaintiff simply fails to prove a necessary element of its case. I find that the Plaintiffs simply do not surmount this initial evidential hurdle.

2612. Even a cursory view of the way CCC's business operated shows that financial conditions in the market were variable, even day by day. One can see that in the records of margin calls. Any presumed results based on Dr Carron's theoretical modelling are not only sensitive to input assumptions but that sensitivity itself cannot be predicted, or extrapolated, or averaged, or removed by any sufficiently reliable process of reasoning which has been presented to me. This is the essential criticism made by the Defendants of Dr Carron's approach to providing a supposed quantification of damages – it is an exercise arrived at by taking it as read that some loss must have been suffered and then proceeding to suggest how it might be mathematically estimated. This process, or model, I find, makes too many generalisations or assumptions, about matters which could, and probably would, have a significant effect on outcomes, and which cannot be isolated. They cannot, therefore, be either ignored or reasoned about. This is the essence of the criticisms of Dr Carron's evidence, which is illustrated by Mr Bezant's evidence.

2613. Mr Bezant's short original report raised two key questions about Dr Carron's model, and whether its results were a sufficiently accurate replication of the real world to be a reliable basis on which to predicate outcomes and thence find the fact, let alone the calculation, of loss.

2614. As I understand it without the benefit of further explanation from Mr Bezant, the first key question was as to Dr Carron's assumption that CCC's RMBS could be sold, on the basis postulated in his model, at prices commensurate with trade data for smaller volume sale transactions made at the time without any discount for the volume of the postulated sales, either at all or as regards later instalments of such sales, and without the further knock-on effect of causing re-pricings of CCC's assets. The second point was that Dr Carron's model - which did not replicate the daily sequence of valuations and margin adjustments which operated on CCC's business in real life - did not and could not take into account the potential effects of margin calls on CCC's wider position, in particular the effects on its liquidity cushion arising from such sales, and the fact that, if the cushion ever became totally depleted, this would cause an event of default by CCC, which would then potentially trigger an immediate liquidation of CCC's RMBS assets at liquidation (fire sale) prices – as in fact occurred in March 2008.

2615. Although, therefore, Mr Bezant had not himself made any hypothetical damages calculation, he had produced his own "balance sheet model" designed to model CCC's position on a daily basis, as in real life. This was in order to illustrate the effects of these points and to demonstrate (a) the sensitivity of Dr Carron's model to input assumptions, of which there were many, and (b) that (to paraphrase) Dr Carron's model was simply too broad brush to be a reliable basis for demonstrating or calculating whether losses would even have been avoided. Indeed, Mr Bezant's own model (he said) demonstrated that if different RMBS price assumptions were used and the potential repricing effect was taken into account, then CCC's capacity to meet margin calls - which was simply assumed by Dr Carron, in his model, not to affect the position at all - would lead to very different outcomes as to whether or when CCC might default. The consequences for CCC's ultimate supposed residual equity or net deficiency could therefore vary very widely. The examination suggested that, in certain

circumstances, attempts by CCC to sell RMBS as suggested by Dr Carron would actually have been likely to have resulted in just as bad an ultimate net deficiency as the actual results of March 2008, and sometimes even worse.

2616. In cross-examination, Dr Carron was taken through the basis of Mr Bezant's model, and the examples which he had given, and he agreed, at least "broadly" (by which I understand him to mean that he had no significant reservations) with both the basis of Mr Bezant's model and the accuracy of his calculations.    As already mentioned, Mr Bezant was then not called for cross-examination.    Instead, the Plaintiffs produced a written annexure to their closing submissions seeking to dismiss or sideline Mr Bezant's evidence.

2617. They first claim that Mr Bezant confirmed Dr Carron's calculations of loss and damage. This he did, as matter of mathematics.   What he did not confirm, and indeed denied, was that Dr Carron's calculations were a fair and reliable method for determining loss or damage.

2618. They then point out that Mr Bezant offers no substantive opinion evidence.   This depends on what you mean by substantive opinion evidence.   It is correct that Mr Bezant offers no opinion on the calculation of damages, but this is because Mr Bezant's opinion is actually that damages cannot be calculated because the assumptions that would require to be made in the counterfactual world in order to do so are so speculative as to be unreliable, even as founding an assumption that loss (or, I should say, less loss) was probable.

2619. The Plaintiffs thirdly argue that Mr Bezant's model is driven by assumptions he was instructed to make.    Experts usually have to be instructed to make some assumptions in order to provide building blocks upon which they can express their opinions, and as regards the usefulness or reliability of their evidence, the question is then whether the assumptions which they have been instructed to make are tendentious or not.    Having considered the points which the Plaintiffs make, I cannot see that the assumptions which Mr Bezant used were anything other than material for illustrating and explaining his misgivings and criticisms about depending on Dr Carron's model for the purpose of drawing any sufficiently reliable conclusions as to loss.

2620. Fourth and lastly, they criticise the output of Mr Bezant's model for allegedly showing only negative results and generating "counterintuitive" results.

2621. I have some misgivings about whether the Plaintiffs are entitled to advance even the critical arguments contained in their third section above, having taken the deliberate decision not to call Mr Bezant for cross-examination so as to test his evidence against these criticisms.   Most definitely, in my judgment, they are not entitled to ask me to rely on the propositions contained in their fourth section without having done so.      There are numerous instances in this case where expert evidence produces results which appear counterintuitive, but this is generally precisely because the interlocutor is not an expert, and requires education in order to appreciate the process or the reasoning which produces the apparently curious result.    If counter-intuitiveness is to be relied on as a criticism, then I take the view that it is neither proper, nor actually effective, to do so without having put the criticisms to the author of the criticised conclusions, and given him the opportunity to explain, justify, or otherwise deal with them if he can.

2622. The allegedly "patently absurd" particular result which the Plaintiffs rely on as showing that Mr Bezant's modelling and his logic should be rejected, is that selling a mere \$178Mn of RMBS on 1st October 2007 at a discount of 37 bps from IDP prices could have precipitated an immediate liquidation for CCC which thus, and on a not unlikely price assumption, would have produced a larger net asset deficiency than that actually sustained in March 2008.   In fact, this was a result which I found perfectly comprehensible, and even plausible.    To my mind, it rather went to underline the perilous uncertainty which might reasonably have been

feared by those with knowledge and experience of the actions of participants in the bond and repo markets at the time.

2623. In all the circumstances I am satisfied that the criticisms made by Mr Bezant of the shortcomings of Dr Carron's modelling of "likely" avoidable losses to CCC, had it taken the stated "required action" of selling RMBS as the Plaintiffs ultimately contend for, are well founded.   There is no other evidence in support of the Plaintiffs' case that CCC suffered identifiable loss thereby.

2624. Dr Niculescu's opinion was that the maximum sales of RMBS which CCC could have effected in small quantities from about September 2007 onwards without moving the market was $1Bn.        Even if I were to take this as evidence against the Defendants that this is what they could and should have achieved - and this is not in fact the Plaintiffs' pleaded case, although I suppose it might arguably be comprehended within it – it is entirely speculation, I am satisfied, whether this would have made any difference at all to CCC's ultimate losses. The consequences of such a series of sales would be fact-sensitive, and depend on such chance matters as, for example, whether the consequent reduction in required repo capacity is assumed to have been taken in reduction of repo utilisation from a lender who subsequently priced its security aggressively so as to generate large margin calls, or from one who did not. But perhaps an even more telling point is that any increase in liquidity generated by such a set of sales, only about $25Mn, would not have produced liquid assets for CCC which would have saved the day, but would in practical terms only have gone to reduce the amount of CCC's borrowing from Carlyle.   If I consider, therefore, whether a reduction of less than 5% (as this would have been) in the size of CCC's portfolio would have altered the dynamics of CCC's ultimate collapse in March 2008 so as to make any noticeable improvement in the position, I am just not satisfied that it would.   The features which precipitated CCC's collapse were the ultra-aggressive demands for margin from its repo lenders and the concurrent withdrawal and general unavailability of repo funding on affordable terms from players in the repo markets.   These factors would have occurred anyway, and the result would have been the collapse of CCC with much the same (and certainly not discernibly less) losses as actually occurred

2625. The unreliability of Dr Carron's model means, therefore, that the Plaintiffs fail to satisfy me that any such avoidable loss as he proposes was suffered by CCC on balance of probability. Any such finding would be pure speculation on my part, and would not merely be as to how much such avoidable loss was suffered, but as to whether in fact any was suffered at all.

2626. The Defendants submit that, on a common sense view, CCC's disastrous collapse was caused by the unpredictable and unpredicted second market liquidity crisis of late February/early March 2008 and not by the Defendants' adoption and progression of the Capital Preservation Strategy.   The Plaintiffs submit that this would be an incorrect finding of fact, and the correct finding is that it was caused by the adoption of the capital preservation strategy rather than deleveraging by sales of RMBS.   They say this for two reasons.   First the possibility of a further financial crisis such as that which actually occurred in February and March 2008 was a perfectly foreseeable event which the Defendants were under a duty to protect CCC from by devising and operating a business model which did so, and this required deleveraging. Second the events of March 2008 were not a new "cause" but a continuation of the previous and continuing "cause" of adverse financial circumstances which had been in effect since August 2007.

2627. I prefer the Defendants' arguments on this point as well.        At the time of the liquidity crisis of March 2008, CCC was not on a course of spiralling down towards disaster owing to the continued effects of adverse market conditions since August 2007.   I accept and find that its overall financial trajectory over the previous six or seven months had been one of very gradual improvement in health, and if there had been no major liquidity "event" at the beginning of March 2008, the likelihood is that this would have continued.   Continuation in

this way might not have suited investors, anxious for a dividend, but that is an entirely different point.   I therefore find that it was the second crisis of March 2008 which is correctly seen as the effective cause of CCC's collapse and of the losses which it actually suffered.   Therefore, even assuming the adoption of the capital preservation strategy had been a breach of duty, I would be inclined to classify that breach as a mere circumstance, and not a cause, of CCC's ultimate losses.

2628. By the same token, had I come to the conclusion that the Defendants ought to have known that CCC stood no reasonable prospect of avoiding insolvent liquidation, I would have concluded that the evidence did not prove that CCC's continuing in business until the time of its collapse had actually resulted in any worse financial outcome than if it had been wound up earlier.   Ironically, even Dr Carron's figures tend to show that CCC's financial position was actually improving over the period during which the Plaintiffs assert their claims for breaches of duty and wrongful trading; the measure of their damages claims actually tends to get lower the nearer one approaches the ultimate collapse.

2629. I should mention that, as the Defendants observe, the Plaintiffs have not sought to put their case on the basis of "loss of a chance", and in my judgment they were right not to do so. This is not a case of loss of a defined gain where the uncertainty was whether, because of the breach of duty, the gain would have been obtained or not, which is the classic case for evaluating loss of a chance.   Since there has been no attempt to advance such an argument, though, I do not need to analyse its unsuitability in any more detail.

2630. The Plaintiffs therefore fail to demonstrate that CCC suffered any loss as a result of the alleged breaches of duty in this matter.   This is therefore a further and ultimate reason why this claim fails.

2631. Since I have concluded that there is no evidence sufficient to demonstrate that any loss could be attributed to the alleged breach(es) of duty,   I do not go on to consider the further hypothetical  question what measure of damage I would have assessed and awarded if I had concluded that some loss was demonstrated.   The number of hypothetical counterfactual assumptions then required would make that meaningless.

## 17.   The alternative claim

2632. I have not so far mentioned the alternative claim made against the Entity Defendants in the Cause for unjust enrichment.   This is formulated as a claim that those Defendants have

> "received fees, interest payments, expenses and share-based compensation exceeding $75Mn"

and have thereby been unjustly enriched at the expense of CCC such that they should be required to disgorge those sums "*in equity and good conscience*".

2633. This claim has not figured prominently in the trial itself, and the juridical basis for it has not really been satisfactorily explained.   It is notable that the items mentioned are varied in nature and were in fact paid variously to CIM and (probably) TCG rather than Holdings, but they are simply lumped together as an apparently composite claim against all three Defendants.

2634. As the trial developed, it was said by Advocate Wessels that the claim was being put on the grounds that the claimed breaches of duty "rendered the services worthless".  This appears to amount, therefore, to a claim to recovery on the grounds of total failure of consideration, or "failure of basis", which would apply most naturally to a claim for return of fees.       As regards interest payments, this could relate only to interest on the Carlyle loan to CCC. Although the reasonableness of the interest rate of 10% charged was put in issue by the

Plaintiffs, this appeared to be largely a matter of formality, because no evidence was adduced as to its being unreasonable, and no recognised legal basis for its recovery was actually pleaded or otherwise suggested.   The expenses were never identified.   The share based compensation apparently referred to the grant to CIM of restricted stock in CCC, once valued at $55Mn but plainly worthless since the liquidation of CCC and thus giving rise to no enrichment, unjust or otherwise.

2635.  As the claim therefore appears to focus on fees, it would essentially be against CIM, to whom such fees were paid.   They were management fees and originally the incentive fee under the IMA, insofar as the latter was earned and paid in respect of the period before the IPO; it was not earned in the third quarter of 2007 and was waived in respect of the fourth quarter and not earned thereafter.   The total of such fees was $17,834,000.

2636.  As a separate alternative claim for recovery based on total failure of consideration, (although this claim is more likely to be governed by Delaware law, I assume that the applicable principles would be the same as Guernsey law, this not being a point which was dealt with in the expert evidence), this claim must fail, for the simple reason that there was no such total failure.   CIM rendered the services according to the terms of the IMA, and the fees were properly due and owing and earned, in that respect.   This applies to fees earned and paid after, as well as before, the IPO, but obviously even more clearly before it.   Since I have held that there was no breach of contract on the part of CIM (except for the minor matter in November 2007 which was *de minimis),* the possibility of awarding a return of fees as an alternative measure of damage for contractual damage which is proved but not capable of satisfactory quantification does not arise.

2637.  For the above reasons, this alternative claim against the Entity Defendants is also dismissed.

## 18.   Summary of conclusions

2638.  As I said towards the outset, many paragraphs ago, despite the length of this judgment I have not referred to or made findings on every single allegation made by the Plaintiffs and contained in the Cause, for reasons which I have rehearsed throughout.   Harking back to the guidance of *Smith v Molyneaux* [2016] UKPC 35, I trust that I have, though, given at least one adequate reason for each of my material conclusions.   Insofar as any unmentioned allegations are material to my decisions on the effectual breaches of duty and suchlike alleged, the findings which I would make about them can be inferred.   However, for the avoidance of doubt, in considering this judgment I have gone through the helpfully focused analysis of the individual allegations of breach actually pleaded in the Cause which was made by the First to Fourth Defendants and is contained in Paragraphs 1626 to 1675 of their closing written submissions, and which gives the location of those Defendants' response, and any required explanations.   I have found myself in almost universal agreement with the Defendants' submissions in those paragraphs.

2639.  I can therefore summarise my conclusions in the case as follows:

**As regards the First to Seventh Defendants:**

(1)  With regard to the claims for breach of duty made against the First to Seventh Defendants the action fails, first, because those decisions and actions of the First to Seventh Defendants which the Plaintiffs plead to have been both breaches of those Defendants' respective fiduciary duties and/or duties of skill and care towards CCC, and to have caused damage to CCC, were all decisions or actions within the range of decisions or actions which a duly diligent, skilful, conscientious and loyal director of CCC (having, in any individual case, any enhanced level of skill actually possessed by such individual Defendant) might reasonably have made in all the material circumstances at the time.   The above conclusion is sufficient to dispose of these claims.

(2)   However for the avoidance of doubt, I am also satisfied that the individual Defendants did each apply proper and appropriate care and skill in taking the material decisions and actions.  Moreover, even if any individual Defendant arguably failed to do so in any particular instance, a sufficient majority of the Defendants to carry such decision into effect did so in the full exercise of due skill and care, so that any such failure had no causative effect.

(3)   I also find that   the material decisions and actions were taken and made by each individual Defendant in the bona fide belief that they were in the best interests of CCC, including, insofar as appropriate at any particular time, the material interests of CCC's creditors.   For the avoidance of doubt in this regard, I am satisfied that insofar as any Defendant failed actively to distinguish between the interests of CCC and the Carlyle Group in any particular respect at any time, this either was not in respect of a decision material to the claims in the action, or alternatively was in respect of a matter as to which the interests of CCC and the Carlyle Group were in fact aligned such that there was no resulting detriment to CCC.      I am further satisfied that, insofar as any individual Defendant may have had personal interests which could conceivably have conflicted with the material interests of CCC, no such individual Defendant did in fact allow such personal interest to affect his decisions adversely to CCC's interests.  In any event, as I have already said, I have found that the actual decisions and actions taken were objectively within the range of decisions and actions which a properly loyal director of CCC could reasonably have taken.

(4)    For completeness, I also find that there was no material deficiency (if any) in the processes by which the material decisions were taken by these Defendants, having regard to all the circumstances of the case.

(5)   The claim of wrongful trading against the First to Seventh Defendants fails because I am satisfied that at no time prior to an immaterial few days shortly before CCC was actually placed in insolvent liquidation did the Defendants conclude, nor ought they reasonably to have concluded, that there was no reasonable prospect that CCC would avoid going into insolvent liquidation.

**As regards all Defendants**

(6)   The above conclusions go to liability, but even if I were wrong about that, the Plaintiffs have failed to satisfy me that CCC suffered any demonstrable damage or loss consequent upon the matters alleged as the material breaches of duty, above.   In other words, the evidence fails to satisfy me that, if the Defendants had made the decisions and taken the actions which the Plaintiffs claim they ought to have done, CCC would thereby, on balance of probability, have avoided some (ie any) part of the losses which it in fact sustained upon its liquidation in March 2008.      This conclusion is further, and independently, sufficient to dispose of these claims.

**As regards CIM in contract or tort**

(7)   With regard to the contractual claim against CIM, this also fails.  CIM performed its contractual duties to CCC through the Third (principally) and the Fourth Defendants and the team of staff to whom those Defendants gave instruction and authority.   Treating the material decisions and actions considered above as including responsibility for the acts of such staff, and being measured against the standards of loyalty, skill and care to be expected contractually under Delaware Law from CIM as an investment manager, I am satisfied that CIM performed its contractual duties and functions with the due standards of skill, care and loyalty which were contractually required of it under Delaware Law (save in respect of one very  minor failure in November 2007, which has not been proved

to have caused any loss to CCC and therefore does not, in any event, give rise to any liability).

In any event, and in general, the Plaintiffs have similarly failed to satisfy me that CCC suffered any identifiable damage in consequence of the alleged breaches of contractual duty by CIM, even if these had been proved.

The same facts and matters were relied on in support of the alternative allegation of breach of a tortious duty of care.  No different standards or considerations were argued to apply and it follows that that alternative basis of claim fails as well.

**As regards the Entity Defendants**

(8)   With regard to the claims against CIM, TCG and Holdings as *de facto*, alternatively shadow directors of CCC, such claims would fail for the above reasons, but they also fail *in limine* because I hold that no such Defendant ever became a *de facto* or a shadow director of CCC.

(a)      As to CIM, (i) any acts carried out by CIM  on behalf of CCC, even if acts which might otherwise be required to be carried out by CCC's directors, were in fact referable to and carried out by CIM in its capacity as Investment Manager of CCC, and not as a director of CCC, and (ii) insofar as any of the actual directors of CCC, or a sufficient majority of them, were accustomed to act in accordance with proposals which could be considered to emanate from CIM, such actions were in the nature of voluntarily following professional advice and were not in the nature of acting in accordance with instructions or directions from CIM.

(b)      As to TCG and Holdings, (i) there is no evidence that either TCG or Holdings carried out any act (let alone a material one) which could only be carried out by a director of CCC, so as to render TCG or Holdings a *de facto* director of CCC in that respect, and (ii) there is also no evidence that either TCG or Holdings ever issued or purported to issue instructions or directions to the actual directors of CCC, or any of them.

2640. In a nutshell, CCC's original business model was reasonable.   The liquidity cushion built into that model had operated as intended and in fact helped CCC to survive an even worse financial crisis than the notorious LTCM crisis of 1998.    CCC's directors then made judgements to enable CCC to try to regain health and strength which were reasonable at the time.  CCC failed because the depth of the weaknesses in the financial markets was so great that those weaknesses came to threaten, not merely the profits of major investment and commercial banks, but their very viability, and hence to cause a systemic withdrawal of what had previously been a very normal, stable and reliable form of finance.   CCC's directors did not appreciate the depth of this instability, but in this they were in wide and good company. To suggest that there was anything that they, or CIM, clearly ought to have done significantly differently from July 2007 until CCC's eventual collapse in March 2008 is, in my judgment, being entirely wise with hindsight.

**General**

2641. Viewing my conclusions in terms of the List of Issues which I originally formulated, I do not need to recite my answers to those individual issues because it will be readily appreciated that I have in effect found in favour of the Defendants on all of the substantive issues and also on the issue of no sufficient proof of loss.  The remaining issues, such as the technical scope of statutory misfeasance, the scope of the exoneration clauses in the IMA and in CCC's Articles of Association or the granting of statutory relief from liability do not arise.

2642. For the above reasons, therefore, this action, with regard to the claims other than the directors' disqualification claims which are presently stayed, is dismissed.

2643. It remains only for me to repeat my thanks to the Advocates involved in the case for their hard work and skill, and their most able presentation of arguments, all of which has assisted me greatly, and also for their courtesy and unfailing good humour throughout this very long trial.

_____

Appendices (Not reproduced)

(i)     Agreed chart of CCC's Repo Funding as at Repo Roll Dates (Dr Carron)

(ii)    Agreed chart of CCC's daily and monthly net asset value (Mr Shaw)

(iii)   Agreed chart of the average final price of CCC's RMBS assets, (Mr Shaw)

(iv)    Agreed charts of CCC's average and "effective" repo haircut levels, (Mr Shaw)

(v)     Agreed chart of CCC's available soft repo capacity and capacity actually used, (Mr Shaw)

(vi)    Agreed chart of CCC's liquidity cushion measured in both absolute $ terms and as a percentage of CCC's adjusted equity, (Mr Shaw)

(vii)   Agreed chart of CCC's RMBS as a percentage of total asset allocation, (Mr Shaw)

(viii)  Agreed chart of CCC's leverage ratio, (Mr Shaw)

(ix)    Agreed chart of CCC's bi-weekly 20 Day 99% portfolio Value at Risk calculations, (Mr Shaw)

(x)     Agreed chart of CCC's share price, (Mr Shaw)

(xi)    Agreed chart of net interest income and principal repayments of CCC's RMBS, by month and cumulatively, together with levels of principal outstanding and repo lines used. (Mr Shaw)

(xii)   Agreed chart of the number of CCC repo counterparties (Mr Shaw)

(xiii)  Agreed Table of CCC's liquidity cushion details 19 January 2007 to 5 March 2008 (Dr Carron)

**Her Honour Hazel Marshall QC,**
**Lieutenant Bailiff**

**4th September 2017**

© Royal Court of Guernsey

© Royal Court of Guernsey

CPC Group Ltd v Qatari Diar Real Estate Investment Co, 2010 WL 2516392 (2010)

# CPC Group Limited v Qatari Diar Real Estate Investment Company

 **Positive/Neutral Judicial Consideration**

**Court**
Chancery Division

**Judgment Date**
25 June 2010

Case No: HC09CO4260

High Court of Justice Chancery Division

**[2010] EWHC 1535 (Ch), 2010 WL 2516392**

Before: Mr Justice Vos

Date: 25/06/2010

Hearing dates: 17th to 21st, and 24th to 28th May, and 14th June 2010

**Representation**

Lord Grabiner Q.C. , Mr Neil Kitchener Q.C. and Mr Alexander Polley (instructed by Wragge & Co LLP ) for the Claimant.
Mr Joe Smouha Q.C. and Mr Andrew Twigger (instructed by Herbert Smith LLP ) for the Defendant.

**Approved Judgment)**

Mr Justice Vos:

**Index**

| Section | Paragraph |
| --- | --- |
| Introduction | 1 |
| Planning background | 13 |
| The main terms of the SPA dated 6th November 2008 | 15 |
| Issues | 23 |
| The facts | 32 |
| The shape of the case | 123 |
| CPC's witnesses | 135 |
| QD's witnesses | 139 |
| The terms of the Planning Orders 2000 and 2008 | 158 |

CPC Group Ltd v Qatari Diar Real Estate Investment Co, 2010 WL 2516392 (2010)

| | |
|---|---|
| The experts | 169 |
| Issue 1: Had the Mayor indicated by 12th June 2009 that he intended " *to exercise his power to direct the [WCC] to refuse the Planning Application* " within the meaning of paragraph 5(f)(i) of Schedule 4 to the SPA? | 173 |
| The meaning of the word "indicated" in paragraph 5(f)(i) | 174 |
| Can the Mayor give an indication before the 14 day period begins? | 186 |
| Can the Mayor give an indication under paragraph 5(f)(i) through his officers or agents? | 191 |
| Must the indication and the recommendation have taken place before the decision to withdraw for paragraph 5(f) to be applicable? | 195 |
| The 6 alleged indications | 198 |
| First alleged indication: 2nd April 2009 | 201 |
| Second alleged indication: 8th April 2009 | 203 |
| Third alleged indication: 22nd April 2009 | 205 |
| Fourth alleged indication: 6th May 2009 | 208 |
| Fifth alleged indication: 15th May 2009 | 211 |
| Sixth alleged indication: 10th June 2009 | 216 |
| Issue 2: **Recommendation issue** : Did Mr Woodman's email of 12th June 2009 amount to a recommendation to CPC and QD jointly that a " *revised Planning Application stands a better chance of delivering a Planning Permission than the pursuit of an Appeal of the previous planning application* " within the meaning of paragraph 5(f)(ii) of Schedule 4 to the SPA? | 222 |
| Does paragraph 5(f)(ii) require a joint instruction from CPC and QD? | 225 |
| Can a valid comparison be made without the details of a new scheme being available? | 227 |
| Did the recommendation come too late? | 232 |
| Was the recommendation otherwise valid? | 234 |
| Issue 3: **Procurement issue:** If the Mayor gave an indication that complied with paragraph 5(f)(i) of Schedule 4 to the SPA, was that indication procured by QD in breach of (a) its duty of utmost good faith contained in clause 7(1) of the SPA, and/or (b) its obligation not to do " *any act or thing designed to or with the intention to avoid or reduce payment of any Deferred Consideration* " contained in clause 7(3) of the SPA? | 237 |
| Issue 4: **QD breach issue** : Was QD's conduct in relation to the Planning Application including (a) the alleged giving of a "soft undertaking" and/or (b) its new strategy of indicating to the WCC, the GLA and the PoW that it intended to apply for outline planning permission and offsite affordable housing and/or (c) the withdrawal of the Planning Permission, a breach of:- (i) its duty of utmost good faith, or of its obligation to " *use all reasonable but commercially prudent endeavours* " contained in clause 7(1) of the SPA, and/or (ii) its obligation not to do " *any act or thing designed to or with the intention to avoid or reduce payment of any Deferred Consideration* " contained in clause 7(3) of the SPA? | 249 |
| The factual allegations of breach against QD | 255 |

CPC Group Ltd v Qatari Diar Real Estate Investment Co, 2010 WL 2516392 (2010)

| | |
|---|---|
| The alleged Soft Undertaking | 256 |
| Acting on the Emir's alleged statement to the Prince of Wales that he would " *have the designs for Chelsea Barracks changed* ", so that the application was withdrawn | 263 |
| Putting forward the new outline proposal to the WCC, GLA, the Prince of Wales and others on and after 15th May 2009 | 268 |
| The alleged failure properly and fully to support and promote the Planning Application | 281 |
| Did QD procure the indication on 10th June by pursuing the new outline proposal? | 282 |
| Issue 5: **CPC breach issue:** Was CPC's conduct between 22nd March and 12th June 2009 in breach of its duty of utmost good faith contained in clause 7(1) of the SPA, whether by devising a strategy with the objective of manoeuvring QD into a position where it would become obliged to pay CPC more quickly, or otherwise? | 284 |
| The alleged manipulation of the presentation to the PBGL board meeting on 30th March 2009 | 288 |
| CPC's suggestion that QD should say in its 23rd April 2009 letter to WCC that it intended to build out the existing scheme, when it did not | 290 |
| The alleged creation of documents to paper the file including Mr Candy's allegedly inaccurate note of 23rd May 2009, and his notes of Mr Ward's supposed acceptance that withdrawal would be a breach | 291 |
| CPC's suggestion that an appeal would take longer than it would in an attempt to push QD towards a withdrawal | 294 |
| CPC's alleged failure to alert QD to its contention that withdrawal would be a breach of the SPA | 296 |
| CPC's alleged attempts to influence Mr Woodman to adopt positions that favoured CPC | 299 |
| Issue 6: **Repudiation issue:** Were any breaches by QD and/or CPC repudiatory? If so, was either party, or is either party now, entitled to accept that repudiation as having terminated or terminating the SPA? | 301 |
| Issue 7: **QD election issue:** Is an election under paragraph 5(aa) of Schedule 4 to the SPA the only remaining available mode of contractual performance by QD and/or in the present circumstances is QD obliged pursuant to clauses 7.1 and/or 7.3 of the SPA to make payment to CPC? | 304 |
| Issue 8: **Remedies issue:** What if any declarations are CPC and/or QD entitled to, as a result of the findings/holdings on the above issues? | 315 |
| Conclusions | 317 |
| **Schedule to the Judgment: The Detailed Terms of the SPA** | 321 |

**Introduction**

1.  The site of the Chelsea Barracks in Chelsea Bridge Road, Pimlico in the City of Westminster (the "Chelsea Barracks") is extremely well known. It is an area of some 5.2 hectares (12.8 acres) opposite Ranelagh Gardens and the Royal Hospital, Kensington & Chelsea.

2.  Qatari Diar Real Estate Investment Company ("QD") is a subsidiary of the Qatar Investment Authority, a sovereign wealth fund. CPC Group Limited ("CPC") is a Guernsey company.

3.  CPC and QD entered into a joint venture through Project Blue (Guernsey) Holdings Ltd. ("PBGHL"), in which CPC held 20% of the equity. The Chelsea Barracks site was acquired from the Ministry of Defence on 5th April 2007 by a subsidiary of PBGHL, Project Blue (Guernsey) Ltd. ("PBGL") for £959 million. CPC invested around £2 million, with the balance being contributed by QD.

4.  On 2nd April 2008, PBGL applied to Westminster City Council ("WCC") for planning permission to redevelop Chelsea Barracks on the basis of designs by the main architects, Rogers Stirk Harbour + Partners ("RSHP"), and by the affordable housing architects, Allford Hall Monaghan Morris ("AHMM"), (the "Planning Application"). The design is often referred to as Lord Rogers's, although Mr Graham Stirk seems in fact to have been primarily involved. The Planning Application sought detailed consent for some 638 residential units (329 market units and 319 affordable units), a luxury 108 bedroom hotel, a restaurant, a community hall, a sports centre, flexible retail space, a landscaped park, and a café within the park.

5.  By a Sale and Purchase Agreement dated 6th November 2008 (the "SPA"), CPC sold its interest in PBGHL to QD for an initial consideration of £37,917,806, and a deferred consideration totalling a maximum of £81 million, depending mainly on future progress being made in obtaining planning permission for the proposed development. QD owed CPC various obligations including one to use all reasonable but commercially prudent endeavours to enable the achievement of the thresholds for the payment of the deferred consideration, and both parties owed each other an express duty to act in the utmost good faith.

6.  On 1st March 2009, His Royal Highness the Prince of Wales (the "Prince of Wales") wrote to QD's Chairman, His Excellency Sheikh Hamad Bin Jassim Bin Jabr Al-Thani ("Sheikh Hamad"), the Prime Minister of Qatar and a cousin of His Highness the Emir of Qatar (the "Emir"), expressing his dislike of RSHP's design for Chelsea Barracks.

7.  On 11th May 2009, the Emir met the Prince of Wales at Clarence House, and they discussed the proposals for Chelsea Barracks. Sir Michael Peat ("Sir Michael"), who is the Prince of Wales's private secretary, prepared a note of the meeting recording that " *the Emir was surprised by the Rogers design for Chelsea Barracks and said that he would have them changed* ".

8.  On 12th June 2009, QD withdrew the Planning Application (the "withdrawal").

9.  The Prince of Wales and the Emir were not, however, the only influential people to dislike RSHP's proposals for the Chelsea Barracks site. A spirited campaign against the proposals was undertaken by the "Barracks Action Group" ("BAG"), also known as the "Chelsea Barracks Action Group", and by the Belgravia Residents' Association ("BRA"). More importantly, the Mayor of London, Mr Boris Johnson, (the "Mayor" or "Mr Johnson") at various stages, both personally and through his officers at the Greater London Authority ("GLA"), expressed his concerns about the proposals. It is worth noting immediately, however, that the Mayor's concerns were not the same as the Prince of Wales's concerns. The Mayor thought the scheme was repetitive and lacked variety, whilst the Prince disliked its modernity and was looking for something more traditional.

CPC Group Ltd v Qatari Diar Real Estate Investment Co, 2010 WL 2516392 (2010)

10.  The main issues in this case are whether QD was entitled under the SPA to withdraw the Planning Application on 12th June 2009, and whether the withdrawal constituted a breach of QD's obligations under the SPA, and, if so, what are the consequences of that breach.

11.  It has been CPC's case that a crucial factual question is whether the withdrawal was precipitated by what the Emir is alleged to have said to the Prince of Wales on 11th May 2009. If it was, CPC submits that it goes a long way towards showing that QD breached the terms of the SPA.

12.  QD admits that the Emir disliked the scheme, but denies that there was any link between the discussions between the Emir and the Prince of Wales, on the one hand, and the withdrawal on the other.

### Planning background

13.  The Mayor has a role in planning applications of " *potential strategic importance* ". The Town and Country Planning (Mayor of London) Order 2000 SI 2000 No 1493 (the "Planning Order 2000") (which was replaced from 6th April 2008 by the Town and Country Planning (Mayor of London) Order 2008 SI 2000 No. 580 (the "Planning Order 2008")) gave the Mayor a power to direct the local planning authority (in this case, WCC) to refuse a planning application. I will set out the relevant provisions of the Planning Orders in due course.

14.  Mr Johnson was elected as Mayor of London on 2nd May 2008, shortly after the Planning Application was submitted.

### The main terms of the SPA dated 6th November 2008

15.  The SPA was a lengthy and carefully drafted agreement. Both parties have relied on the entirety of the agreement, pointing to its commercial purpose and the intentions of the parties that can be derived from various aspects of its detailed terms. It would make the body of this judgment too lengthy if I were to set out all the terms on which the parties have relied. In the result, I will set out in this section the terms that are most central to the issues that I have to decide. I have also prepared a schedule to the judgment incorporating more lengthy relevant extracts from the SPA.

16.  In essence, the SPA provided a regime for the pursuit of what was defined as the "Planning Application", being the Planning Application dated 2nd April 2008 as varied or any new application for the development of the Chelsea Barracks, and for the payment of the initial and deferred consideration.

17.  Clause 3.3 provided that: " *The Deferred Consideration shall be paid in accordance with the provisions of Clause 6 (Deferred Consideration) and Schedule 4* ".

18.  Clause 7 entitled " *Protection of Deferred Consideration* ", provided as follows:-

"7.1  [QD] and [CPC] shall both act in the utmost good faith towards each other in relation to the matters set out in this Deed and in Schedule 4 and [QD] shall use all reasonable but commercially prudent endeavours to enable the achievement of the various threshold events and Payment Dates

set out in Schedule 4 and [QD] shall procure that all relevant members of [QD]'s Group comply with the provisions of this Clause 7 and Schedule 4.

7.2  [QD] and [CPC] shall perform and observe their respective covenants contained in Schedule 4.

7.3  Without prejudice to Clause 7.1, provided that [CPC]'s Group is performing its obligations in relation to the matters referable to the achievement of the various events giving rise to the calculation and payment of the Deferred Consideration Amounts, from the date of this Deed to the date on which all Deferred Consideration has been received by [CPC] [QD] shall:

(a)  not do any act or thing designed to or with the intention to, or omit to do any act or thing which it has an obligation to do so as to, avoid or reduce payment of any Deferred Consideration and shall procure that no member of [QD]'s Group or the Blue Group or their respective employees does so or omits to do so and it shall not direct their respective agents, consultants or any party acting on their respective behalves to do or omit to do so; …"

19.  Paragraph 1.1 of Schedule 4 to the SPA included the following definitions:-

i)  " **Planning Application** " means the planning application bearing reference number 08/02889/FULL and any necessary associated application for Chapel Permission and/or conservation area consent for the demolition of existing former barracks buildings and redevelopment for mixed use purposes (in buildings of between 5 and 13 storeys) comprising 638 residential units (to include 319 units of affordable housing), hotel (Class C1), sports centre (Class D2), community hall (Class D1), flexible retail (Class A1/A2/A3) and/or (Class D1), restaurant (Class A3), hard and soft landscaping including the creation of public open space, new vehicular and pedestrian access and works to the public highway and the provision of basement level parking, servicing and plan areas dated 2 April 2008 as may be varied or any new application which may be made for the development of the Property by or consented by the [QD] or any member of [QD]'s Group or anyone on any of their respective behalves and as such new application may be varied.

ii)  " **Planning Permission** " means each of the consents granted pursuant to the Planning Application and separately where the Chapel has been listed pursuant to the Chapel Permission or for the avoidance of doubt on Appeal …

20.  Paragraph 5(a) of Schedule 4 to the SPA provided that: " *[QD] shall use all reasonable but commercially prudent endeavours to: (i) procure a Planning Permission free of Legal Challenge* ".

21.  Paragraph 5(aa) of Schedule 4 to the SPA provided that: " *At any time [QD] may elect to pay [CPC] £68,500,000, and upon making such payment the obligations in this Schedule shall fall away …* ".

22.  Paragraph 5(f) of Schedule 4 to the SPA is the central provision relevant to this case, and provided as follows:-

"(f)  The Planning Application shall not be withdrawn unless:

(i)  the City Council have prepared an officer's report recommending that the Planning Application be refused or the Mayor has indicated that he intends to exercise his power to direct the City Council to refuse the Planning Application or call in the Planning Application for his determination (if applicable) or the Secretary of State has issued a holding objection (a "Deemed Refusal"); and

CPC Group Ltd v Qatari Diar Real Estate Investment Co, 2010 WL 2516392 (2010)

(ii)   the Planning Consultant recommends to [QD] and [CPC] jointly that a revised Planning Application stands a better chance of delivering a Planning Permission than the pursuit of an Appeal of the previous planning application

and in such circumstances [QD] shall either:

(iii)  withdraw the Planning Application provided it submits a replacement application with a view to securing the objectives in this paragraph 5 with all due diligence and expedition to meet the reasons for the Deemed Refusal provided that such changes do not go further than is necessary to meet those reasons for the Deemed Refusal otherwise the resubmission will be treated as a variation and the provisions of paragraph 5(c), 5(d) and 5(e) shall apply to the proposed changes; or

(iv)  continue with the Planning Application where the Planning Consultant has advised that there is equal to greater than better than evens chance (meaning equal or greater than 55%) of success of an Appeal and provided that the reason for the Deemed Refusal was not the negligence of [CPC] [QD] shall make and pursue an Appeal with a view to securing the objectives in this paragraph 5 with all due diligence and expedition".

## Issues

23.  In the course of the trial, I asked the parties whether it would be possible to agree the issues that arose for decision. Most were agreed by the time of closing submissions, and it seems to me that the following list reflects the main issues that need to be determined.

## 24 Indication issue:

24.  Issue 1:  Had the Mayor indicated by 12th June 2009 that he intended " *to exercise his power to direct the [WCC] to refuse the Planning Application* " within the meaning of paragraph 5(f)(i) of Schedule 4 to the SPA?

## 25 Recommendation issue:

25.  Issue 2:  Did Mr Bob Woodman's (the "Planning Consultant" of DP9 under the SPA, and hereafter "Mr Woodman") email of 12th June 2009 amount to a recommendation to CPC and QD jointly that a " *revised Planning Application stands a better chance of delivering a Planning Permission than the pursuit of an Appeal of the previous planning application* " within the meaning of paragraph 5(f)(ii) of Schedule 4 to the SPA?

## 26 Procurement issue:

26.  Issue 3:  If the Mayor gave an indication that complied with paragraph 5(f)(i) of Schedule 4 to the SPA, was that indication procured by QD in breach of (a) its duty of utmost good faith contained in clause 7(1) of the SPA, and/or (b) its obligation not to do " *any act or thing designed to or with the intention to avoid or reduce payment of any Deferred Consideration* " contained in clause 7(3) of the SPA?

## 27 QD's breach issue:

27.  Issue 4:  Was QD's conduct in relation to the Planning Application including (a) the alleged giving of a "soft undertaking" and/or (b) its new strategy of indicating to the WCC, the GLA and the Prince of Wales that it intended to apply for outline planning permission and offsite affordable housing and/or (c) the withdrawal of the Planning Application, a breach of:-

i)  its duty of utmost good faith, or of its obligation to " *use all reasonable but commercially prudent endeavours* " contained in clause 7(1) of the SPA, and/or
ii)  its obligation not to do " *any act or thing designed to or with the intention to avoid or reduce payment of any Deferred Consideration* " contained in clause 7(3) of the SPA?

## 28 CPC breach issue:

28.  Issue 5:  Was CPC's conduct between 22nd March and 12th June 2009 in breach of its duty of utmost good faith contained in clause 7(1) of the SPA, whether by devising a strategy with the objective of manoeuvring QD into a position where it would become obliged to pay CPC more quickly, or otherwise?

## 29 Repudiation issue:

29.  Issue 6:  Were any breaches by QD and/or CPC repudiatory? If so, was either party, or is either party now, entitled to accept that repudiation as having terminated or terminating the SPA?

## 30 QD election issue:

30.  Issue 7:  Is an election under paragraph 5(aa) of Schedule 4 to the SPA the only remaining available mode of contractual performance by QD and/or in the present circumstances is QD obliged pursuant to clauses 7.1 and/or 7.3 of the SPA to make payment to CPC?

## 31 Remedies issue:

31.  Issue 8:  What if any declarations are CPC and/or QD entitled to, as a result of the findings/holdings on the above issues?

## The facts

32.  There was much evidence about the management structure of QD. Suffice it to say at this stage, Sheikh Hamad was the Chairman of QD, and Mr Ghanim bin Saad Al-Saad ("Mr Al-Saad") was (at the relevant time) the Chief Executive Officer. Mr John William Ward ("Mr Ward") was (again at the relevant time) the Chief Operational Officer of QD based in Qatar. Mr Ward reported to Mr Al-Saad in relation to the Chelsea Barracks Project. In London, Mr John Wallace ("Mr Wallace") was the UK head of QD at the relevant time, and Mr Jeremy Titchen ("Mr Titchen"), who reported to him, was managing director of Qatari Diar Development Company (UK) Limited, a QD subsidiary.

33.  A distinction was made in the evidence between CPC and an associated interior design and development management consultancy company, Candy & Candy Limited ("C&C"). Mr Christian Candy ("Mr Candy") is the owner of CPC, but was not apparently a director at the relevant time, although he told me that, notwithstanding that he was not a director, " *I do make - any significant large decision, it will come to me for my view and for my decision* ". Mr Candy is also a 50% shareholder in C&C (with his brother, Mr Nick Candy, owning the other 50%). The most important representatives of CPC involved with the Chelsea Barracks project were Mr Tim Dean ("Mr Dean"), an accountant, Mr Richard Williams ("Mr Williams"), and Mr

Simon Graham ("Mr Graham"), and Mr Steven Smith ("Mr Smith"). Mr Tim Simpson ("Mr Simpson") was group planning director, but not a board member, of C&C, and Mr Lee Hallman ("Mr Hallman") was design director of C&C.

34.  On 11th June 2008, GLA's stage 1 report concluded that overall PBGL's design for Chelsea Barracks was " *considered to be of exceptional quality and is an appropriate response to its context* ". Under the heading " *Legal Considerations* ", the stage 1 report provided that " *There is no obligation at this present stage for the Mayor to indicate his intentions regarding a possible direction, and no such decision should be inferred from the Mayor's comments unless specifically stated* ".

35.  On 18th July 2008, PBGL's board decided that that the development would ultimately differ from the RSHP scheme, since " *greater architectural diversity was important to both offer differentiated product and exclusivity* ", but that no changes would be made at least until the Planning Committee of the WCC had met on 4th September 2008.

36.  On 4th September 2008, the Planning Committee met, and gave what is termed a positive 'steer'. The minutes of the meeting record that the Planning Application offered " *a firm foundation for a detailed scheme that should be able to gain broad support when presented for a final decision, provided that significant and in part substantial changes are made to provide a proposal worthy of planning permission on this high profile site* ". The Minutes also record that: " *On the architectural style of the proposals, the committee recognises that the scheme strongly divides opinion and was not itself unanimous in endorsing the broad approach taken by the applicant* ".

37.  On 6th November 2008, the SPA was concluded. I have already set out the most important terms, and further extracts are contained in the schedule to this judgment.

38.  Also on 6th November 2008, PBGL entered into a planning services agreement with C&C (the "C&C Agreement"), by which C&C was appointed as PBGL's planning consultant for the Chelsea Barracks project, with Mr Candy appointed as the nominated Planning Project Director. C&C agreed to act in good faith, and to use all reasonable skills and endeavours to promote the success of the 'project', meaning PBGL's intention to apply for and obtain any detailed implementable planning permission for the approved scheme in accordance with the Planning Strategy. That strategy included the overriding objectives of procuring all requisite planning consents to implement the approved scheme, and to maximise the value of the property, and also to avoid an appeal and to minimise the risk that the Mayor would exercise his power to direct a refusal of permission.

39.  As I have said, on 1st March 2009, the Prince of Wales wrote to Sheikh Hamad. He wrote in the following terms:-

> "I hope you will forgive me writing, but I only do so because of a particular concern for the future of the capital city of this country. For the entire duration of my life we have had to witness the destruction of so many parts of London with one more "Brutalist" development after another. …
>
> I only mention this [the need for old-fashioned virtues in architecture and the built environment] because, quite frankly, my heart sank when I saw the plans that have been produced for the old Chelsea Barracks site, opposite the Royal Hospital, by [QD]. I am so sorry to have to write to you on this subject, and thus to be so interfering, but it [Chelsea Barracks] is a site of great importance in London and therefore deserves something that is appropriate to its context and worthy of its position next to the Royal Hospital. In this regard, I wonder whether you might be interested to see the attached alternative plans for the site which have been put together by the architect, Quinlan Terry? …

I can only <u>urge</u> you to reconsider the plans for the Chelsea site before it is too late. Many would be <u>eternally</u> grateful to Your Excellency if [QD] could bequeath a unique and <u>enduring</u> legacy to London, and my Foundation for the Built Environment would be only too delighted to work with you if you felt it could be of any help …" (emphasis in original).

The Prince of Wales enclosed the design by Quinlan Terry (another firm of architects) dated 24th February 2009, the second page of which indicated that it had been prepared for the " *Chelsea Barracks Action Group* ".

40.  On 3rd March 2009, Mr Ward sent Mr Al-Saad's personal assistant, Mr Salah Maktari ("Mr Maktari"), a note on the " *Interference of Zakaria Abdelaziz … in QD's business* ". The note recorded the following statement, with which Mr Ward agreed in evidence: " *High risk to damage QD's reputation and the outcome of the planning effort, if the West Minster (sic) Planner start to even doubt that Qatar could consider proposing a new Master plan – as this will definitely lead them to reject the current Detailed Planning Application* ".

41.  On 18th March 2009, Sheikh Hamad's office sent Mr Al-Saad a copy of the Prince of Wales's letter, and asked for his opinion.

42.  On 23rd March 2009, Mr Ward emailed Mr Maktari enclosing some materials concerning the scheme saying " *These may be valuable for the CEO [Mr Al-Saad] to have with him when he sees His Excellency [Sheikh Hamad] today* ". Later in the email, Mr Ward expressed concern at possible press leaks in the following terms: " *During HH Visit with the Queen, if the letter is leaked to the press, you could see the headings "PoW deeply concerned with Qatari development of Chelsea Barracks architecture" causing huge embarrassment to both sides. Furthermore this could cause opposition to the scheme to take off causing Westminster to deny the planning application* ".

43.  Also, on 23rd March 2009, Mr Ward telephoned Sir Michael, whose note of the same date records as follows:-

"He [Mr Ward] said that they were in a difficult situation commercially with huge amounts of money tied up in the development and could not change the architects and architecture before planning permission had been granted. [WCC including Sir Simon Milton [one of Mr Johnson's Deputy Mayors and hereinafter "Sir Simon"], had given a positive response to their initial Richard Rogers proposals which were also supported by the Royal Hospital and local people. He understood that using Candy & Candy and Richard Rogers was a problem but he could not do anything about it until planning permission had been received.

[Sir Michael] said that it was an enormously important site and that it was difficult for many people to stand by and let, in their view, an inappropriate scheme go forward on an informal understanding that it would be changed after planning permission had been received.

[Mr Ward] said that he understood this but they would like to find a solution which is more appropriate for that part of London that is somewhere in-between a traditional and a modern approach. …

[Mr Ward] said that he was very worried that the existence of The Prince's letter might get into the press and that we needed to agree a joint approach if it did as it may cause issues for UK/Qatari relations. [Sir Michael] said that The Prince of Wales' Office would make no comment to the press.

It was left that [Sir Michael] and [Mr Ward] would keep in touch on the matter and that [Mr Ward] would come and see [Sir Michael] when next in the United Kingdom in early April. [Sir Michael] mentioned to [Mr Ward] that His Royal Highness was seeing [Sir Simon] and [Councillor] Robert Davis [of WCC] the next day at Poundbury".

44.  On the 24th March 2009, a telephone conference took place at about 2 p.m. between Mr Ward, Mr Wallace, Mr Titchen, Mr Christopher Joll ("Mr Joll"), then QD's publicity consultant, Mr Candy, Mr Nick Candy, and Mr Woodman, in which CPC was briefed about the Prince of Wales's letter, and it was decided that Mr Ward should speak to Sir Michael.

45.  On the evening of 24th March 2009, Mr Ward spoke to Sir Michael again. This was a less harmonious call in which Mr Ward expressed concern that the BAG had provided the Prince of Wales with a copy of Quinlan Terry's alternative design. Sir Michael misunderstood Mr Ward as having said that QD was intending to sue the Prince of Wales. When this misapprehension was corrected, the conversation cooled, and they agreed to speak again in a week or so.

46.  Later on 24th March 2009, Mr Joll emailed Mr Ward as follows:-

> "Chris Candy has just given me an update on your [Mr Ward's] telecon with [Sir Michael Peat]. I gather that the PoW [the Prince of Wales] is "going to fight this to the finish". **In order to be able to take effective defensive action we need to know ASAP whether or not [Sheikh Hamad] is prepared to stand firm or if he will direct that the application is withdrawn** . If he decides to stand firm then we can and should inform both The Queen's Private Secretary (to whom I have direct and easy access) and No10 (John Watts has the necessary access) and tell them what the PoW is up to. I can assure you that at present they will have no knowledge of this and I am confident they will act to avoid a public row erupting between Qatar and the PoW" (emphasis added).

47.  Mr Dean commented to Mr Candy on this email " *Excellent – no middle ground* ", with which Mr Candy agreed. This is said to evidence CPC's bad faith, because it is said that what Mr Candy said to Mr Joll was part of Mr Candy's strategy to manoeuvre QD into withdrawing the Planning Application without any grounds for doing so under the SPA, thereby securing an immediate payment for CPC under paragraph 5(aa) of Schedule 4 to the SPA.

48.  On 25th March 2009, Mr Simpson emailed Mr Candy saying that he had spoken to Mr Dean and outlined " *QD's strategy* " and that Mr Dean thought that Messrs Williams and Dean should formally notify the PBGL board on 30th March 2009 that they had serious reservations about letting the Prince of Wales know that it was QD's intention to change the scheme post-consent. The email concluded by saying: " *At this stage [we] should not ask [Mr Woodman] to opine principally because he [is] likely to say that whilst under normal circumstances letting someone know that the scheme will change poses a significant risk in WCC finding out, under the circumstances where the [Prince of Wales] is about to let off a hand grenade desperate measures are required* ". This email is relied upon as further evidence of CPC's alleged bad faith.

49.  At this stage, Mr Ward was asking for Mr Candy's comments on a draft briefing paper that he was preparing for Sheikh Hamad which concluded by proposing three alternatives namely (a) allowing a discussion between Mr Ward and Sir Michael

to give the Prince of Wales " *comfort on what QD will ultimately build on this site* ", (b) withdrawing the Planning Application " *as Qatar would want to avoid a faceoff with [the Prince of Wales]* ", and (c) continuing with the Planning Application " *which is quite compliant with the WCC brief with the realisation that the [Prince of Wales] may succeed [in] having it rejected* ". The first alternative is what has been referred to in these proceedings as a " *soft undertaking* ". It should be noted, however, that different types of soft undertaking were discussed between the parties both at the time and during the trial. For present purposes, it is sufficient to distinguish between a "hard soft undertaking", which amounted to a commitment ultimately not to build out the scheme once the Planning Application was successful, and a "soft soft undertaking", which amounted to a commitment to discuss changing the scheme after the permission had been obtained.

50.  On 26th March 2009, Mr Dean emailed Mr Simpson, copied to Mr Candy, indicating how he thought the forthcoming PBGL board meeting should be handled. Mr Dean suggested highlighting that, in Mr Ward's briefing paper, QD " *point to a withdrawal or proceeding as is* ". Mr Dean continued as follows: " *We need to document the discussion to date on the non-build out and potential to resubmit. In particular we must try to document all disclosure on the matter in particular the discussion that [Mr Ward] had with [Sir Michael] and the consequent transfer of this information to Sir Simon Milton. CPC can then raise these matters as potential breaches under clause 7 and a possible red flag* ". This is another email that is said by QD to evidence CPC's bad faith.

51.  On 27th March 2009, Mr Candy emailed some figures to Messrs Williams, Smith, Dean and Nick Candy entitled " *This shows that if we were running this scheme, even under the best [current] application scenario, we would be better withdrawing and resubmitting [than] fighting this one out!!!!* ". The figures showed that a new master plan would be likely to be approved 8 months before the best case for the existing Planning Application (on the basis that there would be an appeal), and the holding costs would be some £35 million less.

52.  In the moments before the PBGL board meeting, Mr Simpson emailed Messrs Candy, Dean and Williams telling them the result of his informal conversation with Mr Woodman, to the effect that " *[h]is view on the soft undertaking becoming known to WCC and effecting the outcome was mixed* ". Mr Candy's response to his team was " *[s]o we need QD to withdraw. Fact!!!! Best NOT to red flag this point then, as agreed this [a.m.]* ". These emails are again said by QD to evidence CPC's bad faith in talking to Mr Woodman behind QD's back, and in pointing QD towards a withdrawal, which would result in an immediate payment of the Deferred Consideration.

53.  On 30th March 2009, the PBGL board held, first, a meeting with its advisors, followed by a formal board meeting. Mr Dean had altered the draft briefing paper so as to suggest 3 rather more stark alternatives, namely a hard soft undertaking, withdrawal, and " *continuing to press ahead with the current application accepting that this will involve a face-off with the [Prince of Wales]* ". At the advisor's meeting, Mr Candy said that Mr Ward would have to be very careful if there were any suggestion of a soft undertaking, as any hint that the scheme would not be built could seriously harm the chances that WCC would approve the Planning Application. The Board eventually agreed that withdrawal was not desirable, and that ignoring the Prince of Wales's letter and preparing for confrontation with him " *may not politically be attractive* ". Mr Dean expressed his concern that, if any kind of soft undertaking was given to alter the scheme after planning consent, it would leak to WCC and result in refusal. The board decided to seek advice from Mr Woodman as to the best course of action.

54.  On 1st April 2009, the parties met with the Mayor to discuss the scheme. This was the one and only occasion on which such a meeting took place. The participants included Sir Simon, Mr Giles Dolphin ("Mr Dolphin"), the head of Planning Decisions at the GLA, Ms Loren Brown, the GLA case officer, ("Ms Brown"), Mr Godfrey Woods ("Mr Woods") from WCC, Mr Wallace from QD, Mr Candy from CPC, Mr Woodman and representatives from the two firms of architects who had designed the scheme. The Mayor gave no feedback at the meeting.

CPC Group Ltd v Qatari Diar Real Estate Investment Co, 2010 WL 2516392 (2010)

55. After the meeting with the Mayor, however, Mr Woodman reported by email to CPC and QD on the 2nd April 2009 on a detailed conversation he had had with Ms Brown reporting the Mayor's reaction to the scheme. She said that: " *the Mayor liked the presentation but "to be honest doesn't like the scheme". His deliberations focused on the [Chelsea Bridge Road] element. He intimated that it was a difficult judgment for him and whilst he "is not allergic" to the design he was not keen on it. He returned to the matter at several points during discussions over subsequent schemes and said that he "thinks we should ask for it to be changed". ... The Mayor was keen to establish more clearly what it is that the local residents might have in mind as being acceptable . … On the assumption that Westminster resolves to grant consent then the GLA officers would draft a Stage 2 report recommending that the application should go ahead without intervention from the Mayor. The officers' views are (currently) that, whilst difficult to predict, it may be difficult for the Mayor to override Westminster and instruct refusal at that point. However, they could not rule this out* ". Mr Woodman's email recorded that he had said that: " *we were naturally concerned about the potential for the Mayor's views to add to the lobby opposing the scheme and so undermine confidence amongst the Members at [WCC]. [Ms Brown] was clear that the Mayor could not offer any views in public since this would affect his ability to take the formal decision in due course…* ". This email has been referred to by QD as the "first indication" of the Mayor's intention to refuse the Planning Application.

56. Mr Candy's reaction (to his own team) to Mr Woodman's report was to say: " *I think QD may now withdraw on the back of this. I am surprised at [the Mayor's] view. He is clearly unpredictable* ". Mr Dean responded by email to Mr Candy and others at CPC, copied to Mr Simpson, saying that CPC's strategy was " *predicated off the fact that DP9 will say press on if the [Mayor] "indicates that he intends to exercise his power to direct the [WCC] to refuse …". That way QD can only withdraw if they talk to us* ". This email seems to me to be the clearest indication, thus far, of what CPC was hoping to achieve, namely that, even if QD received a Mayoral indication under paragraph 5(f)(i) of Schedule 4 to the SPA, it would not obtain a recommendation from Mr Woodman under paragraph 5(f)(ii), so it would be obliged to negotiate a payment to CPC if it wanted to withdraw.

57. On the very same day (namely the 2nd April 2009), Mr Ward was emailing his team (Messrs Titchen and Wallace) saying that he needed " *an immediate view on CPC's rights (i.e. getting paid their money) under a PBGL application withdrawal scenario given that this seems to be the most commercially sound option now* ". This email shows that QD (as well as CPC) was keen to protect its position under the SPA, and was quickly and acutely aware of the combined effect of the Prince of Wales's letter and the Mayor's initial views, namely that withdrawal was a real possibility, notwithstanding the discussion at the PBGL board meeting 3 days before.

58. On 4th April 2009, the Prince of Wales's intervention leaked to the media, and was published first in the Mail on Sunday on 5th April 2009, but was rapidly followed by numerous articles across the media. It appears that Mr Joll was responsible for this leak. Mr Smith's reaction by email to the CPC/C&C team was informative: " *Took a week longer than we thought. This will help provided Bob [Woodman] is solid!* " In another email stream at the same time, in which Mr Candy started by asking Mr Ward when a meeting with Sheikh Hamad (no doubt to ascertain his reaction) would take place, Mr Candy responded to his team saying: " *I think we need to push to fight [the Prince of Wales] as this is what we need to do to get planning and [QD] will hate this* ".

59. On 7th April 2009, SJ Berwin, acting for CPC, wrote to QD's general counsel, in the lead up to the expected meeting between Mr Ward and Sir Michael. SJ Berwin warned QD in the following terms: " *[CPC] are concerned in particular at the suggestion from [QD's] other advisers of a "soft undertaking" being given to the Prince of Wales, by which we understand that [QD] has in mind indicating to his representative [Sir Michael] that QD has no intention of building out the scheme currently applied for* ". The letter explained that even a discussion was likely to come to the attention of the planning authorities, damaging the chances of obtaining planning permission. SJ Berwin continued by indicating that CPC believed that giving a (hard) soft undertaking would not be consistent with QD's obligations under clause 7.1 and schedule 4 to the SPA.

60.  On the 8th April 2009, Mr Woodman emailed Messrs Wallace, Titchen, Ward, Candy and Simpson, reporting on a conversation he had had with Mr Dolphin, who had met again with both Sir Simon and the Mayor since the 1st April 2009 presentation. Mr Woodman reported that: " *The Mayor is worried about the scheme and has said to a number of people at the GLA that it is 'keeping him up at night '. … He does not like the design – it seems his concerns are focused on [Chelsea Bridge Road], although there is not full clarity on this … I asked for [Mr Dolphin's] view of the outcome at Stage 2 if [WCC] continues to support the scheme. He said that officers would not envisage recommending refusal on design grounds and the Mayor would then be in a very difficult position. He had asked [Mr Dolphin] 'why aren't we saying no to this kind of thing? ' [Mr Dolphin's] view is that if the Mayor is looking for an example to make a point about the need for better design, then this is probably not the scheme to pick* ". This is the email that QD has referred to as the "second indication" of the Mayor's intention to refuse the Planning Application.

61.  On 8th April 2010, Mr Ward and Mr Bowman met Sir Michael and his deputy Dr Manon Williams ("Dr Williams") at Clarence House. CPC contend that a soft undertaking to the Prince of Wales was given at this meeting. The two notes of the meeting include the following summaries of what occurred:-

i)  Mr Woodman's note said: " *The potential for discussion with the Prince and/or his advisors was discussed after a resolution to grant consent by [WCC] for the current scheme. [Sir Michael] noted that this might be a way forward and that in the meantime the Prince might press His Excellency [Sheikh Hamad] for a private view on whether or not the scheme would be pursued if indeed it is supported by [WCC]. [Sir Michael] asked [Mr Ward] whether [QD] would commit not to build out the current scheme if it was consented. [Mr Ward] said that he was unable to provide any such commitment. ... [Mr Ward] noted that in other schemes [QD] had introduced a mix of traditional and modern architecture ... It was agreed that the parties would stay in touch as events unfold over the next weeks and months* ".

ii)  Sir Michael's note of the meeting said: " *An update on Chelsea Barracks: good meeting with ... QD representatives* . **They will hopefully give an informal assurance that the design will be changed when planning permission has been received** . *Wafic Said telephoned to say that [Sheikh Hamad] had said that [the Prince of Wales] was right and that the design will be changed. Sheikh Hamad will write to [the Prince of Wales]* ". Mr Al-Saad and Mr Ward both denied knowing who Wafic Said was, but an internet search reveals that he could be the well-known anglophile billionaire advisor to the Saudi Royal family. I am sure that Mr Said's identity is a matter of no importance to the issues in this case.

As will later appear, I do not think that Mr Ward actually gave any soft undertaking, or indeed any undertaking at all, in the course of this meeting. I say this, despite being conscious that the main paragraph I have cited above from Mr Woodman's meeting note was added at Mr Ward's request.

62.  On 12th April 2009, the Sunday Times published an article entitled " *Charles winning battle of Chelsea* ", which included a statement from a " *source close to the development* " saying that " *if the current plans are approved, [QD] might then return to [WCC] to submit revisions. "The Prince has a lot of good ideas and we're more than happy to discuss how they might be built into the scheme after the scheme secures consent" said the source. "What we're really saying is please let us bank [planning] consent, then we'll continue our dialogue with you and seek fresh consent for the changes* ". CPC submits that this was, in effect, a publication of QD's 'soft undertaking' to the Prince of Wales. Submissions were made as to the source of this information provided to the Sunday Times, but I do not believe that I have sufficient reliable evidence to make any determination. Moreover, I doubt that the identity of the source is significant to the issues I have to decide. Mr Dean's immediate email response to the Sunday Times article, to Mr Candy's team was " *I think there is little more that we can do. We have put our marker down and if wcc [meaning QD] withdraw we would have to litigate. Would the proposal mentioned here involve a withdrawal?* "

63.  On 13th April 2009, Mr Candy emailed Mr Ward in the wake of the Sunday Times article saying he was not sure who was making " *these statements on behalf of [PBGL] and it may be close to impossible to change the perception that is now out there but I think a clear message needs to be given that reassures WCC and the Mayor…* ".

CPC Group Ltd v Qatari Diar Real Estate Investment Co, 2010 WL 2516392 (2010)

64.  On 16th April 2009, Berwin Leighton Paisner ("BLP"), QD's then solicitors, responded to SJ Berwin's 7th April 2009 letter saying that QD did not accept their interpretation of the SPA, and that " *as a matter of fact, no "soft undertaking" was given at last week's meeting with Sir Michael Peat* ". BLP indicated that QD had no " *current intention of withdrawing* " the Planning Application.

65.  On 22nd April 2009, Mr Woodman emailed Messrs Wallace, Titchen, Ward, Candy and Simpson, reporting a telephone conversation with Mr Colin Wilson ("Mr Wilson"), Mr Dolphin's deputy at the GLA, as follows: " *He [Mr Wilson] had just attended a further meeting with the Mayor and confirmed that the scheme "is occupying the Mayor's thoughts". It seems that one point is emerging as the prime reason for the Mayor's dislike of the scheme. That is the "repetitive nature" of the design (particularly for [Chelsea Bridge Road]) – which I suggested to [Mr Wilson] might be better phrased as its consistency. Mr Wilson's reason for making the call was to ask for a formal response from us on whether the client is willing to consider making any changes on this point. His own view is that these might be of limited scale. He believes that the Mayor does not want to be seen as a supporter of the [Quinlan Terry] approach but would like to intervene to achieve some change. ... [Mr Wilson] confirmed that, currently, there is no intention to issue a new Stage 1 report and that the discussions with the Mayor are on more of an ad hoc basis* ". This email is what QD has referred to as the "third indication" of the Mayor's intention to refuse the Planning Application.

66.  On 23rd April 2009, PBGL wrote to WCC expressing disappointment that press speculation had misrepresented its commitment to the Planning Application. The letter made it " *absolutely clear that we are fully committed to the present planning application* ". QD suggested that CPC had dishonestly requested QD to include in this letter a clear statement that PBGL intended to build out the entire scheme if planning permission were granted, knowing that it had been decided early on in the process that the economic situation meant that it was most likely that the scheme would not be built out in the way envisaged by the Planning Application, but at best in phases, and probably rather differently from that suggested by the application.

67.  On 27th April 2009, SJ Berwin wrote to BLP saying they were concerned that the Sunday Times article indicated that a soft undertaking was proposed, and saying that PBGL's letter to WCC and others dated 23rd April 2009 should have been " *extended to make it clear that [PBGL's] intention is to build out the* scheme".

68.  Much emphasis was placed in the cross-examination of QD's witnesses on the numerous versions of QD's Power Point presentation entitled " *Chelsea Barracks (Project Blue)* " dated variously April 2009 and May 2009. Two pages were said to be particularly pertinent: first, one page of the April version was said to provide the seeds of what became QD's proposed outline planning application first formally mooted on 14th May 2009. Indeed, it is true that that page does intimate some of the components of the new proposal to which I shall refer in its chronological place. Secondly, another page entitled " *Situation Assessment* ", probably drafted by Mr Ward, referred to the fact that " *QD could not provide commitment to change current application as this will lead to its refusal by WCC* ", and " *QD might have to pay CPC ... c £80 million … without the benefit of a successful site planning consent* ". Mr Ward did not deny that promising anyone not to build out the scheme would be damaging to the prospects of obtaining planning permission but thought, quite rightly in my view, that the situation was rather more nuanced than was suggested to him in cross-examination. I shall return to this aspect in due course.

69.  At this stage, CPC's attention turned to:- (a) the proposed meeting between Mr Nick Candy and Sheikh Hamad, which eventually took place on 4th May 2009. As Mr Candy's email to his team of 23rd April 2009 indicated: " *the objective is to convince [Sheikh Hamad] that he should not go to public enquiry: and to pay CPC* ", and (b) sounding out Mr Woodman on his views on a possible appeal, no doubt, in order to ascertain how he would respond to requests made under paragraphs 5(f) (ii) and (iv) of schedule 4 to the SPA. The email traffic demonstrates, at least, that Mr Candy and Mr Dean were concerned that Mr Woodman was wavering and might come to think that an appeal had less than a 55% prospect of success. This is said to matter because, even if withdrawal were permitted under paragraph 5(f)(i) and (ii), Mr Candy seems to have thought

that QD might have to continue with the Planning Application and an appeal under paragraph 5(f)(iv) unless Mr Woodman advised there was a less than 55% chance of success. I shall deal with the question of construction raised by this rather convoluted reasoning in due course.

70.  The meeting between Mr Nick Candy and Sheikh Hamad took place in Doha on 4th May 2009. Ultimately, the only question that Mr Nick Candy was requested by his team to seek an answer to was whether QD really intended to build out the scheme if permission were granted. No real answer appears to have been secured to this, or indeed any other, question.

71.  On 6th May 2009, Mr Woodman, Mr Titchen and Mr Simpson met Mr Dolphin, Mr Wilson and Ms Brown at the GLA. The GLA's note records as follows: " *In this meeting [Mr Dolphin] further advised the applicant and consultant team that [the Mayor] has some major concerns with the proposal. The main problems were highlighted as being the repetition of the design, height, layout and elevation appearance of the proposals. [The Mayor] wanted more variety within the proposals. Various design suggestions were made, including adding variety to the elevations, height and layout of the site. Various options on how to progress were discussed. [QD] representatives concluded the meeting stating they would consider options for altering the scheme and would like the opportunity to present the application to the Mayor again, to which [Mr Dolphin] agreed* ". This note is referred to by QD as the "fourth indication" of the Mayor's intention to refuse the Planning Application.

72.  Mr Simpson's email report of this meeting to Mr Hallman was: " *Interesting meeting. They were clearly of the view that [the Mayor] wants to get the scheme refused probably by putting WCC under pressure unless we change the scheme…* ".

73.  On 10th May 2009, Sheikh Hamad replied to the Prince of Wales's letter saying that: " *We were gratified that the current proposals have been warmly welcomed by the relevant British authorities, including CABE [the Commission for Architecture and the Built Environment], the GLA [and [WCC]] and addressed the concerns of our neighbours including the Royal Hospital Chelsea and Grosvenor Estate. That said, I have instructed [QD] to engage with Your Royal Highness, or your Foundation for the Built Environment, to see how we might include some of your ideas for Chelsea Barracks site as it evolves over the next 10 years* ".

74.  On 11th May 2009, the Emir met the Prince of Wales at Clarence House:-

i)  The briefing to the Prince of Wales said the following: " *[Sir Michael] has had useful discussions with [QD]. There are signs that they are not wedded to the Rogers design. … The Qataris have said that to change the design approach before planning permission is granted would delay the whole scheme substantially. But they have given informal assurances that they will look again at it when planning permission has been given. Wafic Said has telephoned [Sir Michael] to report [Sheikh Hamad's] view that YRH is correct about the development …* ".

ii)  Sir Michael's note of the meeting dated 5th August 2009 (3 months after the event) said, as mentioned above, that: " *[t]he Emir was surprised by the Rogers designs for Chelsea Barracks and said that he would have them changed* ".

QD has questioned the accuracy of Sir Michael's note, pointing out, amongst other things, the delay in its preparation. QD also relied on CPC's failure to call Sir Michael to give evidence, notwithstanding the fact that CPC had access to information and explanations from him and the Prince of Wales, including a letter provided during the trial from the Prince's solicitors, Farrer & Co, giving details of the preparation of the note.

75.  After the 11th May 2009 meeting, the Emir telephoned Mr Al-Saad, who says that the Emir concurred with his concerns about whether the design was right for that part of London, and said that he did not particularly like the design, but did not ask Mr Al-Saad to make any changes to it. Later hearsay accounts of what the Emir said to Mr Al-Saad are rather more forthright, suggesting that he told Mr Al-Saad how awful the design was and that QD should withdraw as soon as possible. Mr Al-Saad was closely cross-examined about this conversation, and denied that the Emir had mentioned the Prince of Wales at all, even though he had said in his statement that " *I was told that HRH The Prince of Wales had discussed the RSHP design and*

*had explained his views* ". The impression he gave in oral evidence was that he had had other discussions with the Qatari ambassador to the UK, and it was he that had mentioned the Prince of Wales. I shall return to this conversation in due course.

76.  Mr Al-Saad's evidence was that he then spoke to Sheikh Hamad to inform him of his discussion with the Emir. Mr Al-Saad says that Sheikh Hamad said that he would speak with the Emir and discuss the issues that had been raised.

77.  Mr Al-Saad then spoke to Mr Ward. Mr Ward said in his statement that he " *understood from [his] conversation with [Mr Al-Saad] that the Emir disliked the RSHP design. That said, [Mr Al-Saad] told me that he had spoken with [Sheikh Hamad] and, as a result, my instructions were that I should continue to press on with the planning process* ". Mr Al-Saad said in his statement that he " *instructed Mr Ward to see whether it would still be possible to get planning permission* ", but in evidence he said " *As far as I remember, I did ask [Mr Ward] to have an update about the project and other solutions to solve these problems* ". Although Mr Ward said he did not recall his having been asked to find alternatives to the existing Planning Application, I am sure that is what Mr Al-Saad did indeed ask Mr Ward to do. Both Messrs Al-Saad and Ward were cross-examined in detail about this conversation, and I shall return to deal with my further findings as to what occurred.

78.  On 13th May 2009, the Board of PBGL decided to take steps to prepare a planning appeal, and identified leading planning barristers who might be able to assist them.

79.  On 14th May 2009, Ms Mira Bar Hillel, an influential Evening Standard journalist, met Messrs Ward and Titchen, and told them that she did not think that WCC or the Mayor would allow the Planning Application to get through, and that QD/ PBGL should withdraw it.

80.  Later on 14th May 2009, Mr Candy met Mr Ward. Mr Candy made two notes of this meeting, the first in an email to his team dated 14th May 2009, and the second in an email to Messrs Dean and Smith, which underwent a number of drafts, dated 23rd May 2009. QD contended that the second version was prepared to 'paper the file' in preparation for litigation, and was further evidence of CPC's bad faith. The most contentious parts of the second email recorded that: " *I [Mr Candy] informed [Mr Ward] that they could not withdraw contractually, and this would be a clear breach of contract, hence full payment to CPC group" and " [Mr Ward] also mentioned that [Mr Al-Saad] got a severe reprimand from the [Emir] post the [Emir's] visit to the UK, regarding the architecture; this was the first indication that I got that the current RSH scheme would likely be withdrawn* ". Mr Candy was vigorously cross-examined on these notes, and I am sure that the final version was somewhat self-serving. But Mr Ward accepted that he did give Mr Candy the impression that the Emir had reprimanded Mr Al-Saad, and I accept that Mr Candy's note is accurate in this regard. Mr Candy also, I think, gained the impression that a withdrawal was on the cards at this meeting. Moreover, Mr Candy's email to his team in the evening of 14th May 2009, to my mind, confirms that the parties' contractual rights were mentioned that afternoon. Mr Candy wrote: " *The reason why [Mr Ward] keeps threatening to me in a nice way that they will FIGHT any claim for our money where value has not been created is that he will probably be sacked for signing another poor QD contract, so he is just defensive. Understandably!!!* ". As later appears, however, I am not sure that this kind of dispute is of any ultimate significance, since by this time, CPC had already clearly asserted its contractual rights in SJ Berwin's two letters, and I am sure that both parties were acutely conscious of the contractual problems that they were, or perhaps more accurately, would be likely at some future stage, to be facing. Mr Ward did tell me, and I accept, that: " *Up until really the end of May … the concern was less to do with the contractual situation and more to do with what was right to do for the project* ". But I am sure that he was well aware of the contractual issues as matters progressed. QD's own Power Point presentations dated April and May 2009 demonstrate clearly that this was the case.

81.  Mr Ward told me that his best recollection was that QD's crucial change of strategy was discussed in the course of a meeting in London between him, and Messrs Wallace and Titchen on the evening of the 14th May 2009, after he had met Mr Candy. I accept that it was, but I do not, as will appear later, accept that the timing was as coincidental as Mr Ward would

have me believe. It seems to me that the new direction must have been the direct result of Mr Al-Saad having told Mr Ward to seek alternative solutions. The new strategy that Mr Ward discussed with his team was a combination of a number of ideas that had been discussed before. Its essential elements were: (a) that QD/PBGL would try to secure the support of WCC and the GLA to allow it to resubmit an outline, rather than a detailed, planning application, and to move some of the affordable housing off-site, and (b) that QD/PBGL would try to secure the support of the Prince of Wales to the change of plan, and (c) if these supports were obtained, the Planning Application would be withdrawn before the WCC planning meeting on 18th June 2009. I shall call this new strategy by the abbreviation: the "new outline proposal". In his evidence, however, Mr Ward put a gloss on the new outline proposal, which is not found in the documents, namely that he was able to hold the pursuit of the existing Planning Application over the heads of the GLA and the WCC rather as a Sword of Damocles (though he did not use that expression), by saying, in effect, that if they did not support his new outline proposal, he would go ahead with the Planning Application causing the WCC and GLA the difficulty and embarrassment of making a highly political decision that they would rather avoid. This is what Mr Woodman described in his statement as the " *dual approach* ". Whilst I do not think that the new outline proposal actually included this aspect, I accept that the two proposals were pursued for a while in tandem, and that Mr Ward was, no doubt, able to exploit, to a limited extent at least, the unwillingness of either the WCC or the GLA to make what was undoubtedly a highly sensitive decision.

82.  CPC has pointed to the absence of disclosed documents emanating from QD in relation to the lead up to the decision it made to follow the new outline proposal strategy between 11th and 14th May 2009. It relies on the fact that Mr Ward accepts that he deleted some emails as supporting the contention that the documents which show how the decision was made have not been disclosed. Whilst I accept that it is somewhat surprising that so few documents have been disclosed during this period, I have not ultimately felt handicapped in deciding what happened. As I shall explain in due course, I do not think I would be justified in drawing any adverse inferences from the way QD undertook the disclosure process, even accepting that some questions have not been fully bottomed out.

83.  In the morning of 15th May 2009, Mr Ward spoke about the new outline proposal on a conference call with both Mr Woodman and Mr Candy. Mr Ward's evidence was that both thought the idea was a " *risky strategy* ", but he thought that they both came round to the idea by the end of the call. I am bound to say that I am not so sure. Rather, I think Mr Candy was reluctant to express outright opposition whilst Mr Woodman was on the call, and Mr Woodman was accepting of what Mr Ward, as the effective client, plainly wanted.

84.  Also, on the 15th May 2009 at lunchtime, Mr Al-Saad gave an interview in London to a journalist from the Financial Times.

85.  At about 1.30 p.m. on 15th May 2009, Mr Ward and Mr Woodman held an important meeting with Sir Simon and Mr Dolphin of the GLA. This meeting was supposed to have been attended by the Mayor. Mr Al-Saad says that he spoke to Mr Ward before the meeting and approved the new outline proposal. Mr Woodman made a detailed note of the meeting, which records the events as they occurred chronologically. I accept Mr Woodman's note as a reasonably accurate record. It says:-

i)  After apologising for the Mayor's absence, Sir Simon " *confirmed his understanding that [Mr Dolphin] had already passed on that the Mayor had a problem with the scheme in its current form* ". It seems that Sir Simon was referring to the meeting that had taken place on the 6th May 2009.

ii)  After Mr Ward had explained that QD regretted that the Planning Application had become a matter of such controversy, Sir Simon said that the GLA was receiving many letters from objectors, and that he " *felt that a likely outcome at the next Westminster Planning Committee [on 18* th *June 2009] would be a deferral. If he were in his old job, his advice would be that QD should rely on its right of planning appeal* ".

iii)  It was at this point that Mr Ward raised the possibility of the new outline proposal. Mr Woodman's note records that Sir Simon's initial view was that neither WCC nor the Mayor would support that approach. After further consideration, however, " *[Sir Simon] accepted that this might be a potential way forward provided sufficient details were included to allow for a full understanding of the scheme, including building location, height and massing* ".

CPC Group Ltd v Qatari Diar Real Estate Investment Co, 2010 WL 2516392 (2010)

iv) Mr Ward said that QD might propose a blended design with more emphasis on a traditional language close to Belgravia, and a more modern approach closer to Ebury Bridge Road.

v) Sir Simon said that the affordable housing should be on site, but that the Mayor would be open to a discussion on the point, and on other matters.

vi) Sir Simon then asked if it was intended to withdraw the Planning Application: " *[Mr Ward] confirmed that he had no authority to do so at this stage but would be reporting back to Qatar. [Sir Simon] concluded by saying that if the application were promptly withdrawn, the Mayor would accept that "[QD] had done a big thing" and this should be helpful in the future* ".

This meeting is relied upon by QD as the "fifth indication" of the Mayor's intention to refuse the Planning Application.

86.   Mr Ward telephoned Mr Candy on his way back from the meeting at the GLA, when he was in a taxi with Mr Woodman. Mr Candy made a note of the call in his email dated 23rd May 2009 to Messrs Dean and Smith, which QD alleges to have been prepared to 'paper the file'. In these circumstances, it is slightly surprising that Mr Candy's note accords in most substantive points with what Mr Woodman recorded as having happened at the meeting, and what Mr Ward accepts as having been said on the call. For example, Mr Ward accepts that he told Mr Candy that, if the new outline proposal was received as well by WCC, he would recommend to Sheikh Hamad and Mr Al-Saad the withdrawal of the Planning Application. This is much the same as Mr Candy's note. The only real point of contention is that Mr Candy's note records that he reminded Mr Ward that withdrawal would be a breach of the SPA. Mr Ward does not recall that being said. The point seems to me, however, not to matter at all. As I have said, CPC had already laid down its views on the contractual position in its first solicitors' letter. Whether or not its views were repeated at every discussion cannot affect the actual contractual position.

87.   Both before and after the 15th May 2009 meeting at the GLA, Mr Candy was complaining to Mr Ward at CPC/C&C's exclusion from various meetings with the GLA and the WCC. Mr Ward made no bones about saying that he preferred to attend these meetings without Mr Candy and to report to him afterwards. Also, on the 18th May 2009, Mr Candy exchanged emails with his brother, responding to a suggestion that " *they should make it a condition of withdrawing planning that the Chapel will not be listed* ", by saying " *We do NOT want to make it difficult for QD to withdraw. So NO. Not a good idea* ". This email is said by QD to show how CPC's strategy was directed not at the good of the project, but at persuading QD to withdraw, so that it would have to pay CPC.

88.   In advance of Mr Ward's intended meeting with WCC on 18th May 2009, Mr Candy sent him a carefully prepared email, saying that he understood the new outline proposal from QD's corporate perspective, but that he was " *coming under pressure from CPC to clarify the position from a contractual perspective* ". He referred to SJ Berwin's letter concerning the 'soft undertaking', saying: " *[i]n the same way the offer to withdraw may very well result in a planning refusal, as it is not consistent with the recent PR of QD's 'whole hearted commitment to this project', as launched by QD* ". Mr Candy then explained how he saw the contractual position being sorted out between Sheikh Hamad and Mr Nick Candy, expressed admiration for Mr Ward's " *skill in this delicate process* ", and asked whether a decision had actually been made in Qatar to withdraw.

89.   Apparently after Mr Candy's email, on 18th May 2009, Mr Ward and Mr Woodman attended a meeting with Councillor Robert Davis ("Councillor Davis"), Deputy Leader and Cabinet Member for Planning of the WCC, and Mr John Walker ("Mr Walker"), WCC's Head of Planning Decisions. Again, I accept Mr Woodman's note of what occurred as an accurate record. Again, Mr Ward opened by saying that he was sorry that the scheme had become a matter of such controversy. Councillor Davis then indicated that " *if he were chairing the Planning Committee he would refuse the planning application since he believes that it is an inappropriate design* ", although the decision was actually to be made by Councillor Moss and the other members of the planning committee. The meeting then proceeded in a remarkably similar format to that of the 15th May 2009 at the GLA, culminating with Mr Walker asking " *if it was intended to withdraw the current application in the near future* ", and Mr Ward responding that " *he did not have authority to withdraw but would be reporting this meeting to Qatar* ".

CPC Group Ltd v Qatari Diar Real Estate Investment Co, 2010 WL 2516392 (2010)

90.  Mr Candy called Mr Ward after the 18th May 2009 for an update. Mr Candy's note of this call was included in his 23rd May 2009 email, to which I have already referred. Again, the note is said to have been prepared to 'paper the file', but again, the report is remarkably congruent with Mr Woodman's note. Mr Candy recorded also that Mr Ward had kept open the possibility of an appeal on the existing Planning Application, and that he had " *reminded [Mr Ward] again that this was contrary to the contract that CPC has with QD. He totally acknowledged this, but said that any payout should be based on value creation* ". I doubt that Mr Ward ever acknowledged expressly that withdrawal would be a breach of the SPA. He did not strike me as a man who would have been caught out in such a way. But again, I take the view that whatever acknowledgements Mr Ward may or may not have made, are irrelevant to the true contractual position, which I shall determine in this judgment.

91.  Also, on 18th May 2009, Mr Woodman's firm, DP9, submitted certain amendments to the Planning Application to WCC, including the removal of the top two floors of Block J in the RSHP part of the scheme.

92.  On 19th May 2009, Mr Ward and Mr Woodman met Sir Michael. Mr Ward had told Mr Candy the previous day of his intention to have this meeting. Sir Michael's note records that " *They said that they are revisiting the Planning Application to [WCC] and will now just seek outline planning approval. [Mr Ward] mentioned that the Emir had asked to be kept informed of progress and had said that he was keen for the development to be a lasting legacy which will reflect well on Qatar* ". This note misses the subtlety of what Mr Ward was saying, as recorded, accurately in my view, in Mr Woodman's note. The meeting progressed as follows:-

i)  Sir Michael opened by saying that he had heard that WCC was likely to refuse the Planning Application against the advice of its officers.
ii)  Mr Ward then explained that he had held recent meetings with Sir Simon and Councillor Davis at which he had " *explored the appetite at the GLA and [WCC]* " for the new outline proposal.
iii)  After a discussion about the details, the note records: " *Sir Michael thought this would be a good way forward. He felt that QD would be well regarded if it chose to withdraw the current planning application. [Mr Ward] said that there was currently no authority to withdraw but that he would report [Sir Michael's] views back to Qatar* ".
iv)  At the end of the meeting, Sir Michael said he would be happy to arrange a meeting at Clarence House for the key politicians from the GLA and the WCC.

93.  Following these important events, there was a flurry of internal emails amongst CPC/C&C personnel. The details of these exchanges do not seem to me to be particularly material. Suffice it to say that much planning went into what CPC ultimately wrote to QD, and there was extensive discussion of whether or not Mr Ward should be put on notice of CPC's claim that would follow withdrawal. It is true also that the emails indicate that CPC was keen for the withdrawal to take place, seemingly so that it could be paid. In the result, however, Mr Candy wrote a detailed email to Mr Titchen on 21st May 2009, pledging his support for QD " *in the interim period, and beyond, if that is what [Sheikh Hamad] (and QD) desires* ", and concluding: " *Both CPC and C&C want to work with QD and [Sheikh Hamad] both either in the corporate or private capacity, and hence we are optimistic that a fair resolution will be achieved* ". Meanwhile, Mr Williams emailed the CPC team saying that they needed to be " *laying the formal trail of correspondence that demonstrates that we are aware of their contract breach* ", and " *We have agreed that we are prepared to litigate the matter so we need to make sure that we have the ammunition with which to litigate* ".

94.  On 21st May 2009, Mr Candy wrote an email recording a discussion supposedly between Mr Simpson and Mr Titchen as follows:- " *[Mr] Titchen told [Mr] Simpson 100% confidentially (this am), and off the record, so NONE of you repeat this to anyone (and do not let onto [Mr] Titchen that you know), that when the Emir was in the UK and spoke to [the Prince of Wales], the [the Prince of Wales] pissed in his ear about how awful the scheme was. The Emir then went mental at Ghanim, telling him how awful the design was, and that they must withdraw ASAP. My points are: - They will withdraw ASAP hopefully latest next Friday – They are just trying to maximise what they can get out of it …* ". Mr Titchen denied that he said what is recorded in this email to Mr Simpson. Again, this dispute seems to me to lead nowhere. It is far more likely that these multiple hearsay accounts of the conversations between the Prince of Wales and the Emir, and between the Emir and Mr Al-

CPC Group Ltd v Qatari Diar Real Estate Investment Co, 2010 WL 2516392 (2010)

Saad have been exaggerated and distorted in the telling. I do not think it necessary to determine precisely what Mr Titchen said, since it has little or no bearing on what I shall decide to have happened in these important conversations. As will appear, however, I do think that Mr Titchen spoke to Mr Candy about these conversations, even if he did not use the precise words that Mr Candy, via Mr Simpson, reported. All QD's witnesses were, perhaps understandably, extremely sensitive, if not over-sensitive, about what was discussed in relation to any conversations that involved or concerned the Emir.

95.  On 24th May 2009, the Sunday Times published further information under the title " *Coup for Charles in the fight over Chelsea Barracks* ", including that " *[a] source close to the developers told the Sunday Times that the current application for the luxury development 'is now dead in the water' and will be withdrawn next month* ". QD alleges, but CPC denies, that this information was leaked to the press by CPC. I have considered the emails that followed this article, but I do not think there is sufficient evidence to conclude, in any event, that the leak originated from CPC/C&C's central team. Moreover, I do not think it much matters. The events that occurred were being played out in the press, and so many people were involved that it was inevitable that developments would leak to the press. There were so many disparate vested interests, and the matter was so high profile, that it was unrealistic to suppose that anything that happened would not find its way quickly into the newspapers.

96.  Also on 24th May 2009, Mr Ward sent an email to Mr Al-Saad, copied to Mr Maktari, enclosing an executive brief. The email said " *In [s]ummary, QD needs to make a decision whether to withdraw or not by around June 8* th *prior to any on site demonstration of the height of the current scheme buildings as this will generate more negative media for the project… I will be heading to London this Tuesday to meet with the Prince Foundation for the Built Environment … as well as having a meeting in Clarence [H]ouse with [Sir Michael] present with the GLA, WCC and PFBE to formally agree way forward. QD will then have to seek approval from Chairman to withdraw its current application and start preparing for a new one in collaboration with stakeholders* ".

97.  Also on 24th May 2009, Mr Joll sent Mr John Watts one of his colleagues, the following email which was later forwarded to Messrs Titchen, Wallace and Ward: " *The media seized on [Sheikh Hamad's statement in the FT, that he would get the warring [Chelsea Barracks] factions around the table and sort out a compromise, as a thinly coded signal that the scheme was being withdrawn which it is, on the orders of the Emir, but no one outside C&C and QD knows that is the reason. The media reaction has weakened the negotiating position with WCC, and therefore it could be argued that WCC revved it up but I find that hard to believe. …Now the [Sunday] Times has written the piece below [above] with a direct quote from someone "close to the developers". Well it certainly wasn't me … the prime suspects [of the leaks] must be the Candys; they have a real interest in the scheme being withdrawn as it would trigger, at least in theory, a big payout to them. I have just spoken to Jeremy Titchen and he agrees with this theory …* ". This email was only disclosed after the trial had concluded in circumstances of which CPC was highly critical. As will later appear, in some respects, the email confirms findings that I have made (and would have made anyway). But I do not regard it as significant as CPC contends. Nor do I think that I can or should make findings on the allegations made by CPC as to whether the late disclosed material was deliberately deleted or concealed. Nor do I think I would be justified in drawing adverse inferences from the late disclosure. When I asked Lord Grabiner on 14th June 2010, whether he was intending to apply to have QD's witnesses recalled to cross-examine them on these points, he expressly declined to ask for that to be done, submitting: " *I am not on a hunt to get the bottom of this and I doubt that we ever would* ". In these circumstances, it would be inappropriate for me to decide that QD or Mr Ward had behaved improperly, and I do not do so. This email has now been disclosed and I have been able to take its existence into account. In the result, it has not affected the decision I would otherwise have made.

98.  On 25th May 2009, Mr Candy sent Mr Ward another carefully drafted email saying (a) that he had now been told by two separate sources that the Emir had instructed that the Planning Application be withdrawn, and asking for confirmation one way or another, (b) that QD needed to act much more decisively and quickly, and (c) that they had agreed that withdrawal would be a breach of the SPA. Mr Ward said he did not recollect agreeing that withdrawal would be a breach, and, once again, I do not think he did. It is true, he never responded saying: "I did not say that", but what really happened, I suspect, is that Mr Candy raised the subject of the SPA and suggested that withdrawal was a breach, to which suggestion Mr Ward did not demur. Whatever else may have been the case, I do not think that Mr Ward was as focused on this aspect as CPC and C&C

CPC Group Ltd v Qatari Diar Real Estate Investment Co, 2010 WL 2516392 (2010)

were. Mr Ward responded by email assuring Mr Candy that " *I have not been instructed by anyone the proposed QD strategy regarding Blue. And I was not told about the withdrawal of the planning application being instructed by [the Emir]* ".

99.  On 26th May 2009, Mr Wallace emailed Mr Woodman and Mr Titchen, in response to an Evening Standard article that had reported that QD " *are believed to be close to dropping the current design ...* ", saying that " *[i]t seems that every man and his dog are claiming credit for the inevitable withdrawal of the planning application. Given that the application hasn't been withdrawn and QD has no authority to do so everyone seems to have jumped the gun* ". Mr Woodman responded on 27th May 2009: " *... In the meetings I attended I made clear that withdrawal is not authorised. However, [Sir Michael] seemed to have taken his own interpretation from the high level meeting with [the Prince of Wales] earlier this month and so may already be regarding withdrawal as a certain outcome* ". These are two more of the late-disclosed emails, and are again relied upon by CPC. I make the same comments about them as I did about the first of these documents that I have referred to above, namely Mr Joll's email dated 24th May 2009.

100.  On 27th May 2009, Mr Candy emailed his team reporting on a conversation with Mr Ward in a series of bullet points including: " *No decision was seriously hammering any chances we have of getting consent at WCC* ", and " *It was unacceptable that they were doing nothing* ", and " *I said we were conflicted in giving advice. With my CPC Group hat on, they should not and cannot withdraw. With my [PBGL] hat on, I could see why they would want to withdraw* ".

101.  On 28th May 2009, the Mayor wrote to Mr Kit Malthouse, another Deputy Mayor and an opponent of the RSHP scheme, saying: " *... I acknowledge your opposition to the proposals ... As you know, we have already provided the required consultation (Stage 1) response to [WCC]. As you note in your letter, the amendments are relatively minor. My officers have provided feedback to the applicant as to my thoughts on the scheme and my desire to see further, more significant changes, made. As yet, these changes have not yet been forthcoming. In the meantime, we await a response from the applicant in terms of changes to the scheme and [WCC's] formal decision. This approach follows the established procedure for all cases, so as to be consistent in any auditing, review or appeal process. Accordingly, the planning application will be reported back to me for my decision at stage II in due course* ".

102.  Also, on the 28th May 2009, Mr Candy and Mr Simpson held a meeting with Mr Woodman without informing QD. Messrs Candy and Simpson seem to have quizzed Mr Woodman closely to establish his latest views. There seems little doubt that they were doing so in order better to judge CPC's own commercial interests under the SPA, rather than for the good of the project as a whole. In outline, Mr Woodman told CPC that (a) the most likely outcome of the 18th June 2009 planning meeting was a deferment, (b) he thought the media speculation about withdrawal was not helpful, but had not damaged the Planning Application's prospects, (c) he did not think that the Mayor could give any indication of his intentions, (d) Mr Woodman thought that the chances of an appeal succeeding were still greater than 55%, and (e) that the prospects for the new outline proposal were " *good and probably stood a better chance than the current scheme* ". Mr Simpson undoubtedly tried to persuade Mr Woodman that he was wrong on this latter point, and he said he would think further about the chances of success.

103.  On 28th May 2009, it had been mooted that Mr Nick Candy might talk to Sheikh Hamad. Mr Ward emailed Mr Candy suggesting, amongst other things, that Mr Nick Candy should tell Sheikh Hamad that the new outline proposal was the right strategy. Mr Candy responded to this item 2 saying: " *We cannot promote this strategy. It is in direct conflict with the contract. If this is your chosen strategy QD representatives have to convince Sheikh Hamad* ". Mr Ward's response was emphatic. He wrote: " *This is quite disappointing Chris, I am not sure I understand. You [have] pretty much gone back on what we discussed and agreed about [Mr Nick Candy's] message to [Sheikh Hamad] when we sat together in QD's conference room yesterday. Are you telling me that you do not think that the proposed strategy of withdrawal in returns of outline application and affordable off-site is not the best strategy you would recommend to PBGL or are you telling me this strategy is not best for CPC? And you do not want Nick to recommend to [Sheikh Hamad] to quickly approve it???* ". Mr Ward followed this response with another saying " *And by the way Chris, your point on item 2 below is not correct. You promoting this strategy is not in direct conflict with the contract. I understand that you [are] maybe conflicted out but it is only ethical that if you*

CPC Group Ltd v Qatari Diar Real Estate Investment Co, 2010 WL 2516392 (2010)

*choose to communicate to [Sheikh Hamad] that the right message is delivered ... I am sorry Chris for all my raving I just did not expect this response. Specially that I have already communicated to [Mr Al-Saad] that you agreed with me on the proposed strategy...* ". Mr Candy's response was back-tracking, but persisted in saying that withdrawal needed to be decisive to avoid further bad publicity, that CPC could not recommend withdrawal, even if C&C could, and that they had previously agreed that withdrawal would be a breach of the SPA.

104.  This rapid exchange of emails provided an insight into the true position. As it seems to me, Mr Ward was genuinely upset by what he saw as Mr Candy's two-faced position, protecting CPC's economic interests above those of the project. That, at least, was the view expressed by Mr Smith, with which Mr Dean agreed. Mr Candy, on the other hand, was reiterating yet again his position that QD could not withdraw the Planning Application without breaking the SPA. Both probably persuaded themselves that the other had agreed with what they wanted them to have agreed with, but I doubt either ever actually did. There was just a great deal of shadow boxing. But whatever else occurred, neither Mr Ward nor Mr Candy was ever in doubt as to where the commercial and (in QD's case) the political interests of the other lay.

105.  On 30th May 2009, Mr Ward briefed Mr Al-Saad on the new outline proposal in a detailed paper, advocating the new outline proposal, and seeking a decision (which was not in the result forthcoming on the basis of this paper). Mr Ward's briefing is important, because it indicates Mr Ward's contemporaneous views. First, Mr Ward said that " *at best consent will need to be pursued through the appeals process* ". Secondly, Mr Ward said that the new outline strategy " *will result in achieving planning consent quicker than through the current process* ". Thirdly, Mr Ward said that: " *Even if WCC resolves to grant consent we have been advised by Deputy Mayor Sir Simon ..., that the GLA would likely direct refusal ...* ". Finally, in relation to the SPA, Mr Ward said that CPC's " *focus has been on securing their deferred consideration* ", and that " *circumstances have evolved such that DP9 [is] now of the view that the Mayor is likely to direct refusal ... and if agreement can be reached with WCC and GLA on the basis proposed, then a new outline application is likely to have a more successful and furthermore quicker outcome than the current application* ".

106.  At the end of May and the beginning of June 2009, the emails and conversations between Messrs Ward and Candy continued, but their positions did not really advance much further. Discussions centred on Mr Nick Candy's proposed call to Sheikh Hamad, the advisability of the WCC site visit going ahead on 8th June, whether Mr Ward had obtained approval for the proposed withdrawal from Mr Al-Saad and/or Sheikh Hamad, and the recommendation that was likely to come out of the WCC officers' report.

107.  On 5th June 2009, a further board meeting of PBGL took place, from which the CPC representatives absented themselves, but procured that a statement was read out stating that withdrawal would be a breach of the SPA. The board approved formal letters from PBGL's solicitors to their banks inviting their consent to the withdrawal of the Planning Application.

108.  On 8th June 2009, Mr Simpson spoke to Mr Chris Beard ("Mr Beard") of DP9. Mr Simpson's note records Mr Beard as having said that: " *he was of the view that the Mayor had not given any indication of his intentions and the reason Sir Simon ... was trying so hard to offer QD a deal was to encourage them to withdraw was because he knew the Mayor was in a very difficult position politically as he could not direct refusal* ".

109.  Also on 8th June 2009, Mr Ward sought Mr Al-Saad's formal approval to withdraw the Planning Application in another shorter briefing memorandum. He explained that in February 2009, a successful consent was deemed highly probable, but after the Prince of Wales's intervention and adverse media attention, " *there is increased uncertainty surrounding a successful outcome to the current planning process. A successful consent was deemed highly unlikely. ... At best consent will need to be pursued through the appeals process (a period of up to 2 years)* ". Mr Ward's recommendations included: (a) a suggestion

that discussions with WCC, GLA and Sir Michael were " *anticipated to continue throughout the new application process to reach a consensus* ", (b) the objective was to obtain a planning consent more quickly (target mid 2010), and (c) a statement that the Candys had verbally agreed to wait for their success payment until the new scheme is approved, although that " *does not match their contractual position to secure payment based on the current application* ". As CPC have alleged, at the time that the decision to withdraw was actually made, the formal support of WCC and the GLA to allow PBGL to resubmit an outline, rather than a detailed, planning application, and to move some of the affordable housing off-site, had not been obtained, although encouraging noises had been made, as I have already set out.

110.   On 9th June 2009, Mr Titchen emailed Mr Candy saying that QD had received Mr Al-Saad's approval (to withdrawal), and saying that Mr Ward would like to confirm an informal agreement to put aside the legal position and work together. Mr Candy's response said that he had spoken to Mr Ward and told him that there was no agreement, informal or otherwise. Mr Titchen forwarded this response to Mr Ward commenting that he had spoken to Mr Candy and he still wants to pursue the legal route, and that: " *I am hopeful we might also have an indication from the Mayor which we will need if the report [of WCC] comes out on Thursday and does not recommend a refusal* ".

111.   On 10th June 2009, Mr Woodman emailed Mr Titchen concerning a conversation he had had with Sir Simon at Mr Titchen's request. Mr Woodman asked whether, if WCC supported the Planning Application, the Mayor would be inclined to support or reject the scheme. Sir Simon replied that: " *in his view, the Mayor would refuse the scheme in its current form* ", and that Mr Dolphin would give the same advice. Mr Woodman also commented that " *[i]t seems clear that the scheme is, to say the least, high profile in political terms* ", and that he had " *asked whether [Sir Simon's view] should be regarded as an off the record view and he said that it should* ". This conversation is relied upon by QD as the "sixth indication" of the Mayor's intention to refuse the Planning Application. Mr Woodman emailed Mr Titchen later that same day saying that Sir Simon had also offered the view that the best way forward for QD would be to pursue the new outline proposal as discussed 2 weeks before.

112.   On 10th June 2009, the WCC officers issued their report for the Planning Committee on the Planning Application. The report contained no formal recommendation either to approve or refuse the Planning Application.

113.   On 11th June 2009, the board of PBGL approved the decision to withdraw, with CPC directors abstaining on the basis that the withdrawal was a breach of the SPA.

114.   At 9.40 a.m. on 12th June 2009, the Evening Standard website published the news that QD had formally withdrawn the Planning Application. QD had issued a press release the previous evening embargoed until 10.00 a.m. on 12th June 2009 saying that PBGL " *announced today that ... it has withdrawn its current planning application for the site* ".

115.   Thereafter, Mr Titchen emailed Mr Woodman (copying CPC representatives) saying " *We are of the view that the Mayor has indicated that he would direct a refusal of the current application. As discussed, in these circumstances please can you recommend [QD] and CPC jointly whether in your opinion a revised scheme would stand a better chance of delivering a planning permission than the pursuit of an appeal of the current application?* "

116.   Thereafter at 10.30 a.m. on 12th June 2009, Messrs Candy, Smith and Dean spoke to Mr Woodman about Mr Titchen's request. CPC's note of this conversation undoubtedly reads as if CPC was trying to persuade Mr Woodman of two points: (a) that the Mayor could not indicate any intention to refuse the Planning Application, and (b) that Mr Woodman could not

recommend that a new application had a better prospect of success than the existing Planning Application, at least when the form of the new application had not been defined.

117.  At 10.55 a.m. on 12th June 2009, Mr Candy emailed Mr Woodman and Mr Titchen objecting that they did not think the Mayor had given any indication, and saying that Mr Woodman could not recommend anything to QD, as a joint instruction was required under the SPA.

118.  At 14.08 on 12th June 2009, Mr Woodman replied to Mr Titchen's email, copied to CPC's representatives, saying as follows:-

> "I am not sure of the background in terms of process/your contract etc or how any particular questions should be put. Please let us know if there is some prescribed format. However, in an effort to be helpful, the main points on which we have advised and which seem to be relevant are:
>
> • we have been informed by GLA officers that the Mayor is not happy with the scheme in its current form and has said that he would be inclined to refuse it (this is why they have been pressing for changes). We have had the same view on a confidential basis from the Deputy Mayor;
> • as a direct consequence, it seems clear that the Mayor has put pressure on [WCC] to either refuse or at least defer the application – this pressure seems to have been effective since the [WCC] officers, despite issuing a very positive report, have downgraded their recommendation from one of approval to seeking members' views;
> • as a consequence there is little or no chance of approval on 18th June, a very good chance of deferral and some chance of refusal;
> • the chances of the current scheme achieving consent at appeal are good; and
> • it seems to us that a new scheme would be likely to carry political support at the local and strategic levels and so, depending of course on the precise content, would have an even better chance of achieving consent than the current scheme at appeal.
>
> I hope this is helpful background. Please do let us know if there are any particular points where we should be advising in more detail."

119.  At 14.57 on 12th June 2009, Mr Titchen instructed Mr Beard to write to WCC formally withdrawing the Planning Application. At 15.19 on 12th June 2009, DP9 confirmed by email that the letter withdrawing the Planning Application had been emailed and sent to WCC.

120.  On 29th June 2009, Wragge & Co wrote a 13-page letter before action to QD on behalf of CPC.

121.  In September 2009, QD terminated the C&C Agreement in respect of the project.

122.  On 12th November 2009, CPC issued the Claim Form in these proceedings and served it with the Particulars of Claim. On 7th December 2009, Warren J dismissed CPC's application for a speedy trial. On 5th February 2010, Peter Smith J ordered that QD's counterclaims as to what would have happened if the Planning Application had not been withdrawn should not be determined at this trial. On 23rd March 2010, the Prince of Wales gave non-party disclosure under CPR Part 31.17 . On

12th April 2010, QD purported to terminate the SPA on the grounds that CPC had committed a repudiatory breach of the SPA, which they were entitled to accept.

### The shape of the case

123.  What some might have regarded as a relatively simple dispute as to whether the conditions contained in paragraph 5(f) (i) and (ii) of Schedule 4 to the SPA were satisfied or not, has been turned into what has appeared at times to be all out war. CPC was first on the attack, by claiming, not only that the paragraph 5(f) conditions were not satisfied, but that, even if they were, their satisfaction had been procured by QD in bad faith. After disclosure of a series of documents showing, at the least, that CPC had been keen to protect its commercial interests from an early stage, QD responded by constructing a conspiracy theory aimed at demonstrating that CPC had acted in bad faith throughout the process by seeking to manoeuvre QD into a position where it was forced to withdraw without the paragraph 5(f) conditions being satisfied, and to exercise its election under paragraph 5(aa) or negotiate an early payment of the Deferred Consideration.

124.  Both these 'bad faith' cases are built, in my judgment, on unsteady foundations. Both QD and CPC were faced with a very difficult position once the Prince of Wales intervened in the planning process in March 2009. His intervention was, no doubt, unexpected and unwelcome. And the effects were, I suspect, exacerbated by the inevitable publicity which followed, and by the continuing economic malaise affecting the market for upscale developments like Chelsea Barracks.

125.  Moreover, there were differences between the business cultures of QD and its personnel on the one hand, and CPC and its personnel on the other hand, that added to the explosive mix that was being created by these adverse events.

126.  QD is obviously a large investment empire, which moves slowly, and sometimes ponderously, towards its business goals. It is sometimes difficult to see how decisions are made, not, I think, out of malice or bad faith, but as a result of its cumbersome and hierarchical procedures, and the fact that it is a company based in Qatar, with its commercial operations in other countries, in this case, in the UK.

127.  CPC and C&C, on the other hand, are two-man bands, in which decisions can be made quickly and robustly, and in which the pursuit of a quick profit is of the highest importance.

128.  To make matters worse, CPC seems at times to have been under a misapprehension as to the nature of the SPA. Mr Candy believed, quite genuinely I am sure, that the SPA meant that, if QD withdrew the Planning Application without satisfying the paragraph 5(f) conditions, it would be forced to elect under paragraph 5(aa) to pay the Deferred Consideration immediately or, at worst (from Mr Candy's point of view), negotiate a similar payment. But the SPA does not expressly require any such thing. If QD withdrew the Planning Application without satisfying the paragraph 5(f) conditions, it would be in breach of contract, and a claim for damages could be brought. Lord Grabiner Q.C., counsel for CPC, made it his central argument that QD could only lawfully perform the SPA and comply with clauses 7.1 and 7.3 by electing to pay CPC under paragraph 5(aa). I will deal with this argument under issue 7 in due course. But there was no express automatic right for CPC to insist on a paragraph 5(aa) election, and CPC's apparent assumption that this would be the result seems to have driven CPC's conduct, and has given rise, in some part at least, to what I consider are CPC's overblown allegations of bad faith against QD.

129.  Likewise, QD's allegations of bad faith against CPC were, in my judgment, overblown and largely misplaced. It is true that Mr Candy threw all his efforts into obtaining the Deferred Consideration rather than concentrating on performing C&C's advisory duties to QD. But nobody was in any doubt that CPC's interests and QD's interests were not aligned under

the SPA. Mr Candy never successfully concealed his enthusiasm for telling QD that it would have to pay CPC if it withdrew the Planning Application.

130.   Moreover, QD's case theory that CPC was manoeuvring QD into a position where it would withdraw the Planning Application rather than pursue other options, proceeds on the misapprehension that the commercial objectives of the SPA were at odds with CPC's objectives. That is not so. The commercial objective of the SPA was to get the best planning permission possible (i.e. the maximum Developable Area) in the shortest possible time. That was CPC's objective too. QD's commercial objectives, on the other hand, were complicated by its political and policy motivations, that were nowhere stated in the SPA, but undoubtedly existed, including the desire not to ruffle too many political feathers or make enemies in high places. That is not to say that these motivations were in any way malign or inappropriate. They were not. But they were different from the commercial objectives of the SPA.

131.   Set against this background, the evidence in this case falls into place. It is true that CPC personnel had a conflict between their interests and those of QD, but that conflict was because of QD's political concerns, by which CPC was unaffected. It is true that CPC tried to produce a situation in which it would be paid, though it rather misunderstood the machinery of the SPA that would produce such a payment. Yet, despite all this, I accept Mr Candy's basic thesis, namely that he wanted QD to make a decision, or to 'pick a lane' as he put it, as between withdrawal and pushing on with the Planning Application. He thought that the third way, namely the giving of a 'soft undertaking' was suicide for the commercial future of the project, and that is what he told QD. He realised that the 'soft undertaking' suited QD's political objectives, but he thought that it was not directed towards the best commercial interests of PBGL or the project. I shall come later to decide whether he was right or wrong, but, either way, Mr Candy certainly had a respectable point of view.

132.   As will later appear, I accept that CPC and Mr Candy did not always behave properly, in particular in relation to Mr Woodman, but it does not follow that their conduct was automatically in breach of Clause 7.1. QD was, for example, talking privately to Mr Woodman, so CPC thought it could do so too. In the end, Mr Woodman proved commendably incorruptible.

133.   As for QD's alleged bad faith, it is important to distinguish between the quality of QD's evidence and the establishment of bad faith allegations. I have not been able to accept all of QD's evidence. In particular, as will appear, I do not accept that Mr Al-Saad made all the decisions for QD on this project without regard to the views of Sheikh Hamad or the Emir. But QD's desire to protect Qatar's rulers does not lead inexorably, as CPC would like, to a determination that QD also acted in bad faith and in breach of its contractual obligations. QD was, in my judgment, far more circumspect in dealing with the views and, even the wishes, of the Emir and Sheikh Hamad than CPC's allegations would suggest.

134.   It is hard to say what would have happened if Mr Ward had formed the view that QD needed, under the SPA, to take a different course to the one that was indicated by the Emir and Sheikh Hamad. Most likely, it seems to me, Mr Ward would have been over-ruled. But this is not what actually happened. Ultimately, the question for me on this aspect is, whether, knowing of the Emir's desire to accommodate the Prince of Wales (about which I will obviously say more in due course), Mr Al-Saad and Mr Ward managed to keep QD from breaching the SPA.

**CPC's witnesses**

135.   Mr Candy was the only witness called by CPC. QD complained, not only that Sir Michael was not called by CPC, but also that the other CPC/C&C personnel that I have mentioned in my chronological summary above did not give evidence.

136.  I found Mr Candy a broadly truthful witness. On occasions, his conduct was undoubtedly commercially questionable, for example in preparing self serving documents, and in seeking to persuade Mr Woodman as to what view he should take without including QD in the conversations. But his answers in cross-examination were mostly disarmingly candid, and most importantly, he made no attempt to conceal his objective to obtain the Deferred Consideration for CPC as soon as possible.

137.  Mr Candy and his team undoubtedly did devise a strategy by which they hoped to improve their chances of a payment whether under paragraph 5(aa) or by negotiation. But that was not a strategy that was <u>intended</u> to involve any breach of the SPA. Mr Candy always made it clear to Mr Ward that he was protecting CPC's interests, and that he thought that certain courses that QD might follow would be breaches of its obligations under the SPA which, as Mr Candy saw it, was to obtain the best planning permission at the earliest possible time. Ironically, however, whatever strategy CPC followed seems to me to have had almost no impact on QD's actions, a point to which I shall return.

138.  Mr Candy was most challenged in cross-examination over his attempts to manipulate QD into a position where it saw withdrawal as the only option, so that CPC could then say "gotcha" (as Mr Joe Smouha Q.C., counsel for QD, put it) and claim its Deferred Consideration. Though I accept that Mr Candy is a shrewd and calculating businessman (a denomination that is not intended to be pejorative), I do not think this attack succeeded. As I have already mentioned, Mr Candy was clearly and genuinely of the view that, of the 3 options, withdrawal, pushing on, and the soft undertaking, only the first two were in the interests of PBGL and the project as a whole. He saw the 'soft undertaking' and, in due course, the new outline proposal, as only beneficial to QD's political objectives, and not to the project as a whole. And, as between withdrawal and pushing on, he thought pushing on was best for the project, but understood why withdrawal might suit QD. Either way, he was desperate for QD to decide what it wanted to do, because he thought that any delay and prevarication would promote increasing amounts of bad press and risked damaging the project irretrievably. In none of these views was he, in my judgment, motivated by bad faith. He had, as I have said, a respectable point of view. The problem was that QD had a political problem, not of its own making, that, quite understandably, mattered far more to it than it did to CPC.

### QD's witnesses

139.  Mr Al-Saad gave evidence with extreme care, but was, nonetheless, not a completely reliable witness. He was plainly motivated by a desire to keep both the Emir and Sheikh Hamad out of the picture.

140.  There are a number of important examples. First, Mr Al-Saad repeated on several occasions that he alone was the ultimate decision-maker in QD, and that, whilst he occasionally consulted Sheikh Hamad, he was never required to obtain his approval before taking a decision on behalf of QD. I am unable to accept this evidence, which flies in the face of numerous contemporaneous documents, and indeed, of all normal commercial practice as to how a CEO and Chairman might be expected to operate.

141.  Secondly, Mr Al-Saad sought to deny or minimise the political implications of the decisions that were taken in relation to the Planning Application. Yet in other parts of his evidence, he emphasised how QD was motivated by need to protect Qatar's reputation in the international community. I formed the clear view that the intervention of the Prince of Wales was immediately recognised by Mr Al-Saad and by Sheikh Hamad as raising a serious political issue that needed to be dealt with at the highest level. It would have been very surprising had it been otherwise.

142.  Thirdly, Mr Al-Saad sought to play down the importance of the telephone conversation that he had with the Emir on or about the 11th May 2009. He said in his witness statement that " *I was told that HRH the Prince of Wales had discussed the RSHP design and had explained his views [to the Emir]* ", yet after much cross-examination, he said that this information had come from the Qatari Ambassador to London, rather than from the Emir himself. The difference only serves to emphasise

the diplomatic and political implications of the problem that QD faced in early May 2009, arising from the Prince of Wales's intervention. The conversation that Mr Al-Saad had with the Emir left him in no doubt that urgent action was required to solve a diplomatic and political problem for Qatar. I doubt that the Emir expressly directed that the Planning Application be withdrawn. He did not have to do so. It was enough that, put in colloquial English (which were obviously not the actual words used), he had told Mr Al-Saad that he wanted the problem fixed or 'sorted'. And Mr Al-Saad, I am sure, passed that message on to Mr Ward.

143.   Much of the remainder of Mr Al-Saad's evidence was reliable. He did indeed leave most of the ground-work to Mr Ward. He had much else on his plate, and I do not think he was involved in the detail. But, on the evidence I have heard, I have little doubt that Sheikh Hamad himself, approved the new outline proposal strategy, through Mr Al-Saad, in what can only be described as double quick time following the Emir's telephone call to Mr Al-Saad. That it was Sheikh Hamad who took the important decisions was plain from paragraph 27(1) of QD's original un-amended defence, which expressly pleaded that " *Authority on behalf of QD to cause the Planning Application to be withdrawn was vested at all material times in [Mr Al-Saad] after his consultation and agreement with [Sheikh Hamad]* ".

144.   It is also clear that Mr Al-Saad never received any real financial briefing on the likely outcome of the new outline proposal before he authorised it on 14th May 2009. This could be regarded as improvident, but the new strategy was motivated by the desire to sort out the problem that the Emir was concerned about. It does not, however, follow that the solution that Mr Ward proposed was a foolish one. Mr Ward was certainly motivated, in part at least, by the desire to obtain a satisfactory planning permission rather than risking blighting the site by immersing it in confrontation.

145.   Mr Ward was, save in one particular respect, a broadly reliable witness, and in many respects was refreshingly candid and straightforward. He told me that he had been trained to act only on the facts, as he put it: to " *try to make as much as possible your decision based on fact, versus what is called "tribal knowledge"* ".

146.   By way of example, at the start of his evidence, Mr Ward freely accepted that " *it wouldn't be appropriate to advise the planners, in advance of the grant of permission, that it wasn't intended to build out the scheme which was the subject of the planning application* ", explaining that the planners would not " *take the political pressure* " to grant permission in such circumstances. This admission was made, despite Mr Ward's awareness that it would be said that the new outline proposal involved, in effect, doing precisely what he had said would prevent permission being granted.

147.   Mr Ward also agreed that Sir Michael's note of their 8th April 2009 meeting was accurate when he recorded his impression that " *[t]hey [QD] will hopefully give an informal assurance that the design will be changed when planning permission has been received* ".

148.   Mr Ward told me that he thought that Mr Candy had agreed the new outline proposal strategy on 15th May 2009, before he and Mr Woodman went to see the GLA. But, as I have said, I do not think he truly did gain Mr Candy's approval. Equally Mr Candy did not express outright opposition. Instead, Mr Ward told Mr Candy the direction in which he was intending to go, and Mr Candy acknowledged what he was saying.

149.   The same applies to Mr Ward's discussions with Mr Candy in which he gained the impression that Mr Candy had agreed that QD could withdraw the Planning Application, and that they would work together to achieve planning consent in the future. I do not think that Mr Candy truly agreed to that, but he may have given Mr Ward such an impression. Mr Candy

CPC Group Ltd v Qatari Diar Real Estate Investment Co, 2010 WL 2516392 (2010)

was behaving in a careful circumspect manner, trying at the same time to keep on side with Mr Ward, and also to protect CPC's commercial position.

150.  Mr Ward told me, and I accept, that: " *in all my communication to my CEO, I was trying to communicate points as clear as possible and usually put them in a worse scenario because I would not have the chance to explain all the potential scenarios of these and there would be more example of that, where you see my statements are to a certain level a bit more absolute and less written in a legal format to make sure that a point gets across. The reason for that is not that whether Mr Salah Maktari can translate in English well or not. It's the fact that some of these points need to get very clear through to our CEO* ".

151.  The irony about this evidence is that the discussions that followed Mr Al-Saad's conversation with the Emir on 11th May 2009 were rather more nuanced than CPC's submissions would suggest. In my judgment, Mr Ward was in no doubt, after he had spoken to Mr Al-Saad that he would eventually have to withdraw the Planning Application, but he was not, I think, told to do that in so many words. Instead, he was given the impression that this was a problem that needed to be fixed, and that the Emir was not happy about upsetting the Prince of Wales.

152.  The one area in which, I think, Mr Ward told me something that was simply not true was in relation to the beginnings of the new outline proposal. This untruthfulness manifested itself on several occasions, but was epitomised when he said this about the outcome of the conversation he had with Mr Al-Saad: " *the point is from his [Mr Al-Saad's] discussion with [the Emir] and [Sheik Hamad], there was nothing for me to be fixed. I was not changing anything based on that conversation* ". I am quite sure that Mr Ward's change of tack on 14th May 2009 was precipitated by his conversation with Mr Al-Saad.

153.  Mr Titchen was an almost completely truthful witness. I accept that he did hear from Mr Woodman at the end of May 2009 that there was a one third chance of approval, a one third chance of refusal, and a one third chance of deferral. Mr Titchen said that that was a two thirds chance that they would not get consent and would have to appeal, and Mr Woodman said that another design and a different height would stand a better chance of success, so that QD would be better off withdrawing the Planning Application.

154.  The only area in which I doubt Mr Titchen's veracity is in relation to the conversation he had with Mr Simpson recorded in Mr Candy's email of the 21st May 2009, in which he is alleged to have said that the Prince of Wales told the Emir how awful the scheme was, and that the Emir then went mental at Mr Al-Saad and said they must withdraw as soon as possible. I do not accept Mr Titchen's complete denial of most of this conversation, but I do think it has been recorded at third hand by Mr Candy very much from his own perspective. Conversations involving well-known people do get exaggerated in the re-telling, and, whilst I am sure that Mr Titchen did tell Mr Simpson that the Emir was unhappy with the scheme and had told Mr Al-Saad that something needed to be done, which implied the need for withdrawal, I don't think that Mr Titchen would have used the extreme language used in Mr Candy's note – which sounds to me more like Mr Candy's gloss than Mr Titchen's more measured tones.

155.  Mr Robert Woodman, a partner in DP9, the firm of planning consultants, was accepted by both sides as a reliable witness, and I find that he was just that. Indeed both CPC and QD, in their own ways, tried to get Mr Woodman to say what they wanted him to say. But I find that Mr Woodman, on each occasion he was asked, simply expressed his honest professional opinion as best he could. As I have said earlier, he was, in my judgment, commendably incorruptible.

156.  Moreover, I find Mr Woodman's notes of the various meetings the most reliable documents, and I have placed the greatest reliance upon them when there have been differences as to what happened at the meetings in question. Perhaps the best example is the 8th April 2009 meeting with Sir Michael, in relation to which Mr Woodman explained Sir Michael's own

CPC Group Ltd v Qatari Diar Real Estate Investment Co, 2010 WL 2516392 (2010)

note, by saying, very fairly, that the assurance he was expecting rather dominated the note. I accept what Mr Woodman then said about what happened, which was: " *I think it's fair for him [Sir Michael] to have received the impression that hopefully the design would be changed. ... I'm not sure it's entirely fair for him to refer to an assurance about that, I have to say* ". In reality, as I have said and Mr Ward confirmed, Sir Michael could legitimately have thought that he was being encouraged to hope that he would get an assurance.

157.  Mr Woodman also explained about the effect of the new outline proposal, which he regarded as risky and bound to have a negative impact on the Planning Application. In addition, he explained the nature of that new outline proposal as follows: " *I think it had progressed from a thought to an idea, maybe even got as far as a concept, but it hadn't got to a scheme* ".

**The terms of the Planning Orders 2000 and 2008**

158.  The terms of both the Planning Order 2000 and the Planning Order 2008 are important because they have a bearing on the proper construction of the SPA, which was intended to operate in the context of both the Planning Order 2000 , which had effect in relation to planning applications made before 6th April 2008, and the Planning Order 2008 , which applied to applications made after that date.

159.  The Planning Order 2000 provided as follows.

160.  By article 3: " *The local planning authority shall as soon as reasonably practicable after receiving an application of potential strategic importance send to the Mayor at his principal office a copy of the application and a copy of any plans, drawings or other documents submitted by the applicant in support of the application* ".

161.  By article 4:

> "(1)  The local planning authority shall not grant permission on an application that they were required to notify to the Mayor under article 3 unless— …
>
> (a)  the authority have sent to the Mayor- …
>
> (ii)  a copy of any report on the application prepared by an officer of the authority, and
>
> (iii)  a statement of the permission the authority propose to grant and of any conditions the authority propose to impose; and
>
> (i)  a period of 14 days has elapsed beginning with the date notified in writing by the Mayor to the authority as the date on which he received the items specified in sub-paragraph (a), or
>
> (ii)  the Mayor has notified the local planning authority in writing that he is content for the authority to grant permission in accordance with the statement referred to in sub-paragraph (a)(iii)".

162.  By article 5 :

CPC Group Ltd v Qatari Diar Real Estate Investment Co, 2010 WL 2516392 (2010)

"(1)  If the Mayor considers that to grant permission on an application which has been notified to him under article 3 would be—

(a)  contrary to the spatial development strategy or prejudicial to its implementation, or

(b)  otherwise contrary to good strategic planning in Greater London,

he may, within the period specified in article 4(1)(b)(i), direct the local planning authority to refuse the application.

(2)   Before giving a direction under paragraph (1)(b) above, the Mayor shall have regard to the following matters so far as material to the application—

(a)  the principal purposes of the Greater London Authority;

(b)  the effect that permission would have on—

(i)  the health of persons in Greater London, and

(ii)  the achievement of sustainable development in the United Kingdom;

(c)  national policies and such international obligations as the Secretary of State may notify to the Mayor for the purposes of section 41(5)(a) of the GLA Act 1999;

(d)  any regional planning guidance issued by the Secretary of State so far as relating to an area which includes or adjoins Greater London; …"

163.  The Planning Order 2008 provided as follows.

164.  Article 4(1) mirrors article 3 of the Planning Order 2000 requiring notification to the Mayor of applications of potential strategic importance.

165.  Article 5(1) mirrors article 4 of the Planning Order 2000 allowing the Mayor 14 days to consider any proposed grant of planning permission by the local planning authority, after he has been sent, amongst other things, a statement of the decision the authority proposes to make.

166.  Article 6(1) allows the Mayor to direct the refusal of a planning application on the same grounds as were previously contained in article 5(1) of the Planning Order 2000 .

167.  Article 7 of the Planning Order 2008 introduced a new power for the Mayor to call in a planning application (normally within the same 14 day period as applies under articles 5 and 6 ) as follows:-

CPC Group Ltd v Qatari Diar Real Estate Investment Co, 2010 WL 2516392 (2010)

**"7 Direction that the Mayor is to be the local planning authority**

"7
(1)  Subject to paragraphs (4) and (5), the Mayor may give to the local planning authority a direction under section 2A of the 1990 Act if he considers that—

(a)  the development or any of the issues raised by the development to which the PSI application relates is of such a nature or scale that it would have a significant impact on the implementation of the spatial development strategy;

(b)  the development or any of the issues raised by the development to which the application relates has significant effects that are likely to affect more than one London Borough; and

(c)  there are sound planning reasons for issuing a direction. …".

168.  The GOL Circular 1/2000 entitled "Strategic Planning in London" supplemented the Planning Order 2000 and was applicable to the Planning Application. It contained some important guidance as to the circumstances in which the Mayor could be expected to exercise his powers. Paragraph 6.1 provided as follows: " *Even within a plan-led system, the success or failure of strategic planning policies is ultimately determined through individual development control decisions. For this reason, the Mayor is to be consulted by the boroughs on a limited number of applications for planning permission that may raise issues of strategic importance. He or she will also have a power to direct refusal of such applications, which the Secretary of State considers should be used selectively as a matter of last resort". Paragraph 6.11 said that: "Where in his or her representations to the Borough, the Mayor identifies strategic issues of concern, he or she should where possible indicate how these concerns might be resolved. This should help to avoid frequent or unnecessary use of the Mayor's powers of direction* ".

### The experts

169.  Neither expert gave oral evidence, the parties being content to rely on what they said in writing in their reports and their joint memorandum. CPC relied on Mr Christopher Katkowski Q.C. ("Mr Katkowski"), a leading planning barrister with extensive experience of planning inquiries. QD relied on the evidence of Mr John Rhodes MRICS, an experienced planning consultant, who had greater experience of direct engagement with local planning authorities and the Mayor and their officers.

170.  The experts reached a large measure of agreement, and gave a very useful insight into the complexities of the planning process when the Mayor becomes involved. I found both reports and the detailed joint note extremely helpful. It was useful also to have one expert speaking from the perspective of the planning inquiry, and one from the perspective of his own direct dealings with local planning authorities, the Mayor, and their officers.

171.  Both experts agreed that the use of the word " *indicated* " in the expression in paragraph 5(f)(i): " *the Mayor has indicated that he would direct a refusal of the current application* ", was not a planning term of art. Thus, in the end, the expert evidence was more important as background and context than in the determination of the precise issues before the court.

© 2023 Thomson Reuters.

172.  In relation to the discussions with the Mayor that can be expected, the experts' joint statement said this: " *There is no dispute that the Mayor and those acting on his behalf seek to use the pre-application and post-application process to ensure that applications which are ultimately referred to the Mayor are consistent with the London Plan and are unlikely to require the Mayor to exercise his power of direction. There is no dispute about the tendency for the volume of negotiations to increase as that prospect draws closer* ". And the experts also agreed that the Mayor and those acting on his behalf would be careful about giving indications of what he intends to do when the application is formally referred to him, because of the risk that they might be accused of having pre-determined the exercise of his powers. They disagreed about whether this problem meant that the Mayor could never indicate his intention to direct a refusal before his powers had arisen. But in the end, this point seems to me to be one of construction of the SPA rather than a matter for expert evidence.

*Issue 1: Had the Mayor indicated by 12th June 2009 that he intended "to exercise his power to direct the [WCC] to refuse the Planning Application" within the meaning of paragraph 5(f)(i) of Schedule 4 to the SPA?*

173.  Before dealing with the facts, it is necessary for me to resolve four issues of construction of paragraph 5(f)(i) of Schedule 4 that have been thrown up by the dispute as follows:

i)  What is the meaning of the word " *indicated* " in paragraph 5(f)(i)?
ii)  Can the Mayor give an indication amounting to a Deemed Refusal, for the purposes of paragraph 5(f)(i), prior to the 14 day period prescribed by paragraph 4(1)(b)(i) of the Planning Order 2000 ?
iii)  Can the Mayor give an indication amounting to a Deemed Refusal, for the purposes of paragraph 5(f)(i) through his officers or agents, or must he do so personally?
iv)  Must the indication and the recommendation under paragraphs 5(f)(i) and (ii) have taken place before the decision to withdraw the Planning Application, for paragraph 5(f) to be applicable?

**The meaning of the word "indicated" in paragraph 5(f)(i)**

174.  In many ways, this was the most hotly contested construction issue. Lord Grabiner contended that the indication required must be " *clear and obvious* " and " *a clear and objectively ascertainable act by an official in his official capacity* ". Mr Smouha, on the other hand, says that: " *the parties must have been providing for the situation in which it became reasonably apparent from "indications" given by the Mayor (or those authorised by him to engage with applicants for planning permission) that the Mayor was likely to direct refusal so that action could be taken before it was too late* ".

175.  I take as my starting point the relevant dictionary definitions of the word "indication" taken from the 5th edition of the Shorter Oxford English Dictionary, which includes: " *The action or an instance of indicating; something that indicates or suggests; a sign, a symptom, a hint* ".

176.  Both parties rely on the other parts of the SPA, and the factual and planning background, particularly as described by the experts. It is now trite law that " *[t]he meaning of the document is what the parties using those words against the relevant background would reasonably have been understood to mean* " ( *ICS Ltd v. West Bromwich Building Society [1998] 1 WLR 896* , per Lord Hoffmann at page 912), and that the intention of the parties must be considered objectively.

177.  Before coming to the meaning of the word " *indicated* ", it is important to understand the way in which the SPA appears to have been intended to work. The parties agreed to make the payment of the " *Deferred Consideration* " dependent on certain future events, connected with the intended planning application. That gave CPC a continuing interest in the planning process, and meant that detailed provisions were included in the SPA to " *protect* " the Deferred Consideration. The SPA makes it clear that the parties were conscious that QD could, unless constrained by detailed contractual provisions, take steps that might damage the prospects of the threshold events and Payment Dates set out in Schedule 4 being achieved. That is presumably why they included in clause 7.1 an express provision requiring QD to " *use all reasonable but commercially prudent endeavours to enable the achievement of* " these threshold events and Payment Dates, and paragraph 5(a) required QD to " *use all reasonable but commercially prudent endeavours to … procure a Planning Permission free of Legal Challenge*

" (meaning one under section 288 of the Town and Country Planning Act 1990 as amended, or by way of judicial review). Paragraphs 5(c) and (d) point towards the objective being to obtain permission without an Appeal.

178.  The definition of the Planning Application makes it clear that it refers to the Planning Application " *as may be varied or any new application which may be made for the development of the Property* ". Notwithstanding this definition, the remainder of the SPA shows that the parties placed considerable store by the existing Planning Application, and that it was intended that that application could only be varied or withdrawn in carefully specified circumstances. This approach is confirmed by the C&C Agreement of the same date as the SPA which says expressly that the strategy includes procuring all requisite planning consents to implement the approved scheme, to avoid an appeal and to minimise the risk that the Mayor would exercise his power to direct a refusal of permission.

179.  The original Planning Application allowed for a Developable Area of 1,135,000 square feet, which would, if granted, have given CPC the maximum Deferred Consideration under paragraph 2(c)(v) of Schedule 4. If changes were to be made, including presumably those that would reduce the Developable Area (and therefore the Deferred Consideration ultimately payable to CPC), both CPC and QD were required by paragraph 5(c) to " *review the variation to see if it is in their respective interests to make the variation* ". If agreement was impossible, the Planning Consultant was to be asked to advise. Paragraph 5(d) emphasised the importance of keeping the Developable Area at the high level required to give CPC the maximum Deferred Consideration.

180.  Thus, it seems to me that the provisions relating to withdrawal need to be construed against the background of the parties having agreed that their efforts should be devoted to securing the success of the Planning Application without Appeal, Legal Challenge or, so far as possible, reduction in Developable Area.

181.  Paragraph 5(f), therefore, assumes that any changes that could be made to make the Planning Application succeed would have been made. It is only if there is serious problem that paragraph 5(f) would apply. But paragraph 5(f) is also set against the background that a refusal has serious consequences. Apart from the possible planning blight that can result from a refusal, of which the experts spoke, there is the possibility that most of the Deferred Consideration ceases to be payable at all if a Planning Permission is not granted either by the WCC or on Appeal (see clause 6.4.1). But also, of course, as Mr Smouha submitted, a withdrawal can be an astute move in obtaining a satisfactory permission, since refusals are very undesirable.

182.  Against this background, it seems to me that the meaning of the word " *indicated* " must be viewed first and foremost in the context of the paragraph in which it appears. Paragraph 5(f) provides for four possible "Deemed Refusals" as follows:-

i)  The City Council have prepared an officer's report recommending that the Planning Application be refused;
ii)  The Mayor has indicated that he intends to exercise his power to direct the City Council to refuse the Planning Application;
iii)  The Mayor has indicated that he intends to exercise his power to call in the Planning Application for his determination (if applicable);
iv)  The Secretary of State has issued a holding objection (which is under the Town and Country Planning (General Development Procedure) Order 1995 ).

183.  The first and fourth events are obviously clearly discernable, and open to little debate. Both parties would know if and when they had occurred. The words used in the relation to the second and third events make them less certain. But Lord Grabiner argues that they too should be construed as requiring a clearly discernible event, being some kind of formal indication of the Mayor's intention.

184.  Mr Smouha, on the other hand, contends that such a construction would deprive the second and third events of any real content. It is obvious, as the experts have confirmed, that the Mayor cannot give any formal and definitive indication that he will direct a refusal before the 14 day period begins. And by the time the 14 day period begins, the local planning authority will already have indicated that it intends to grant permission, and there is very little time for further negotiation with the Mayor's officers. The third event is of no relevance to the Planning Application, because the Planning Order 2008 had not come into force when it was made; but it would apply to any new application to which Schedule 4 applied. Again, however, the local planning authority will have indicated the decision it intends to make before the 14 day period starts to run, and again there would be little time for further negotiation with the Mayor.

185.  Taken together the two words " *indicated* " and " *intends* " seem to me to be directed at the Mayor's intention at the time he gives the indication, which may of course be an intention which could change before any final decision was made as to whether or not to make a direction. If the words had been intended to refer to a settled unchangeable intention to direct a refusal, other words would have been more apt. For example, the SPA could have said something like "the Mayor has informed QD/ PBGL that he will exercise his power …". Instead, the word " *indicated* " means, as it seems to me, in the words used in the dictionary definition that the Mayor has done something that suggests that he intends to direct a refusal, or that the Mayor has given a sign or a hint that he intends to direct a refusal. The hint concerned was obviously not intended to be something vague or uncertain, but a clear sign or suggestion of his present (as opposed to his future) intention.

### Can the Mayor give an indication before the 14 day period begins?

186.  Mr Katkowski's report makes two essential points:-

i)  First, that: " *the Mayor could not lawfully indicate his intention to exercise his power to direct refusal unless and until his power had arisen in the first place and he had been equipped with all the documentation that he needed to consider in order to decide what to do* ".
ii)  Secondly, that it is not too late, once the 14 day period has begun, for the Mayor to give a useful indication that he intends to direct refusal, which could result in changes to the terms on which consent would be granted. Mr Katkowski refers, by way of example, to the possibility of requiring an additional payment towards Crossrail, although he accepts that it would be too late to change the essential nature of the proposed scheme by, for example, reducing the height of the buildings.

187.  I prefer Mr Rhodes's views on these points. It seems to me on the first point that the proper construction of paragraph 5(f)(i) is not governed by when the Mayor could lawfully exercise or even lawfully indicate that he would be exercising his power. Plainly he could only do that in the 14 day period. The question of when an indication can be given for the purposes of paragraph 5(f)(i) is an altogether different one. It depends on the meaning of the words and the relevant context. Here, the events contemplated in paragraph 5(f)(i) show that the parties were considering what might happen at earlier stages in the process than the 14 day period. The first event (an officer's report recommending refusal) would always be before the 14 day period begins, allowing a tactical withdrawal of the application before a potentially damaging refusal followed. The second and third events seem to me to be directed at a different situation taking place at about the same time. Instead of the officers recommending refusal, the Mayor is indicating that he will direct a refusal or call the application in, over the heads of the planning authority. Whilst such an indication could come later, after the authority has indicated it will grant permission and has told the Mayor of its intended decision, starting the 14 day period running, there is no reason why it should not come earlier, provided the indication falls within the proper meaning of the words that I have sought to explain above.

188.  Moreover, the relevant context of the SPA was the Planning Regulation 2000 , and its accompanying GOL Circular . Paragraph 6 of the Circular and the flowchart at figure 1, which is referred to in that paragraph, show that feedback from the Mayor was contemplated throughout the planning process, as indeed happened in this case. Plainly informal indications were

contemplated from the Mayor before the 14 days, and I can see nothing in the SPA or its background that leads me to suppose that the parties were thinking about some more limited timing, when they came to draft the second event in paragraph 5(f)(ii).

189.   Mr Katkowski's second point is true, but unnecessarily limits the utility of the second and third events, without any warrant for such a limitation in the words the parties used in the SPA. It is true that some changes could be made in the 14 day period. And Mr Katkowski's suggested demand for a Crossrail contribution, as a condition of the grant, is certainly one such example. But there are many other changes that even he acknowledges could not come about in that period, including the height or fundamental design of the buildings. It seems to me that expert evidence has shown, taken as a whole, that the purpose of the Mayor's powers is to allow him to influence the course of strategically important planning applications, without having actually to use his 'nuclear option' of directing refusal (or now calling in the application under the Planning Order 2008 ). The process works by the Mayor expressing views and encouraging changes to applications before the 14 day period starts and the Mayor is forced to reach a final decision. It is very like the way in which the more normal mundane planning process operates, where local planning authority officers express informal views that are frequently reflected in changes to the applications that can then be recommended for approval as amended. It seems to me that the parties drafting the SPA were fully aware of this process, and wanted to allow a tactical withdrawal if at any time (but probably after negotiations had shown that satisfactory variations could not be made under paragraph 5(c) and (d)), it became clear that Mayor had indicated his intention to direct a refusal, and the condition in paragraph 5(f)(ii) was also fulfilled.

190.   It would, therefore, be a pointless restriction if the second and third events in paragraph 5(f)(i) were limited to the short 14 day period, and I am quite certain that that was not what the parties intended, taken from the words they used and the context of the SPA.

### Can the Mayor give an indication under paragraph 5(f)(i) through his officers or agents?

191.   As I have already said, the GOL Circular 2000 shows that feedback from the Mayor was contemplated at various stages in the planning process. It would, to my mind, be surprising if the Mayor were expected to take every step personally. Indeed the last sentence of paragraph 6.10 of the GOL Circular 2000 seems to contemplate that the Mayor will use his staff when it says: " *Where consulted the Mayor should aim to supply his or her views as promptly as possible* ... " (emphasis added). That said, however, the Planning Order 2000 and the GOL Circular 2000 do mostly refer simply to " *the Mayor* ", and plainly it is his views that are important for the purposes of the regime so established.

192.   Likewise, under the paragraph 5(f)(i), it seems to me that the relevant intention is of the Mayor personally. But there is nothing in the SPA which restricts or confines the manner by which the Mayor's relevant intentions can be " *indicated* ", or indeed to whom they must be indicated. The question of to whom the indication must be made does not, in itself, matter, since QD rely on 6 Mayoral indications made to QD itself and/or PBGL, and no independent reliance is placed, for example, on the letter that the Mayor wrote to his Deputy, Mr Malthouse, on 28th May 2009. It is, however, important to note that that letter confirms that the Mayor's own view was that he would communicate his intentions under the statutory process to the parties through his officers, when he said: " *[m]y officers have provided feedback to the applicant as to my thoughts on the scheme and my desire to see further, more significant changes, made ... This approach follows the established procedure for all cases* ... ".

193.   The Mayor's views cannot, of course, affect the proper construction of the SPA. But it seem to me inconceivable that the parties should have intended the indication, for the purposes of paragraph 5(f)(i) to have been made in any different form from the feedback normally expected from the Mayor under the statutory process, with which they were familiar. In that context, the Mayor's letter is important, because, in my judgment, it shows what the parties would have known at the time of the SPA, that the established procedure was that the Mayor's officers would provide feedback as to his thoughts on applications. The expert evidence confirms this to be the case.

CPC Group Ltd v Qatari Diar Real Estate Investment Co, 2010 WL 2516392 (2010)

194.  It is also clear that paragraph 5(f)(i) is not looking to any indications given as to the intentions of any person apart from the Mayor. But where it is clear that officers are passing on, with the Mayor's authority, the Mayor's views and intentions, the fact that those views and intentions are communicated by someone other than the Mayor, cannot affect their validity for the purposes of paragraph 5(f)(i). The Mayor's letter to Mr Malthouse shows, at least, that, by 28th May 2009, he (the Mayor) thought that he had, through his officers, " *provided feedback to the applicant as to [his] thoughts on the scheme and [his] desire to see further, more significant changes, made* ". I shall turn shortly to deal with whether these thoughts were enough to constitute an indication as to the Mayor's intention to direct a refusal for the purposes of paragraph 5(f)(i).

**Must the indication and the recommendation have taken place before the decision to withdraw for paragraph 5(f) to be applicable?**

195.  This seems to me a straightforward issue of construction. Paragraph 5(f) makes clear that " *The Planning Application shall not be withdrawn unless* " the two conditions in paragraphs 5(f)(i) and 5(f)(ii) are satisfied. It is clear from these words that the question is whether the conditions are satisfied at the time of the actual withdrawal of the Planning Application.

196.  As it seems to me, a Planning Application can only be withdrawn by notification to the planning authority to whom the application was originally made, in this case WCC. Thus, the indication and the recommendation must be in place when the withdrawal is notified to WCC.

197.  There is, however, a disparity between the past tense used in paragraph 5(f)(i) (" *the Mayor has indicated* ") and the present tense used in paragraph 5(f)(ii) (" *the Planning Consultant recommends* "). In the result, however, this disparity does not, I think, matter. Paragraph 5(f)(ii) is followed by the words " *and in such circumstances [QD] shall either; (iii) withdraw the Planning Application … or … (iv) continue with the Planning Application* ", making it clear that the two conditions must both be satisfied before any withdrawal, which is one of the consequential actions provided for in paragraph 5(f)(iii). Thus, the use of the present tense in paragraph 5(f)(ii) does not mean, in my judgment, that the recommendation can follow the withdrawal. Both the indication and the recommendation must have taken place before the withdrawal is permissible. The question that then arises, if the conditions are satisfied, is when precisely the withdrawal took place. I shall come to that in due course.

**The 6 alleged indications**

198.  It is useful first to summarise the 6 events upon which QD relies as cumulatively amounting to the Mayor's indication that he intended to exercise his power to direct WCC to refuse the Planning Application:-

i)  The feedback on 2nd April 2009, after the meeting with Mayor on 1st April 2009, in which it was reported that " *the Mayor … doesn't like the scheme* ", and " *whilst he "is not allergic" to the design he was not keen on it* ", and had said that he thought " *we should ask for it to be changed* ".

ii)  A further report of the Mayor's views on 8th April 2009 emanating from Mr Dolphin, via Mr Woodman, saying that " *The Mayor is worried about the scheme and has said to a number of people at the GLA that it is 'keeping him up at night' . … He does not like the design … He had asked [Mr Dolphin] 'why aren't we saying no to this kind of thing?' ".*

iii)  A third report of the Mayor's views emanating from Mr Wilson, again via Mr Woodman, on 22nd April 2009, saying that: " *the scheme "is occupying the Mayor's thoughts"* ", that " *one point is emerging as the prime reason for the Mayor's dislike of the scheme* ", and that Mr Wilson's reason for calling Mr Woodman was " *to ask for a formal response from us on whether the client is willing to consider making any changes* " on the scheme's 'repetitive nature', and that " *the discussions with the Mayor are on more of an ad hoc basis* ".

iv)  On 6th May 2009, Mr Dolphin said that the Mayor did not like the proposal, or, in the words of the GLA's own note, that " *Boris has some major concerns with the proposal* ", and " *[t]he main problems were highlighted as being the repetition of the design, height, layout and elevation appearance of the proposals* ". Mr Woodman's evidence was that he had no real feel at this stage for the depth of the Mayor's concerns.

CPC Group Ltd v Qatari Diar Real Estate Investment Co, 2010 WL 2516392 (2010)

v) On 15th May 2009, Sir Simon said that Mr Dolphin had " *already passed on that the Mayor had a problem with the scheme in its current form* ", and that a likely outcome was a deferral by WCC, and that if the Planning Application were promptly withdrawn, " *The Mayor would accept that "[QD] had done a big thing" and this should be helpful in the future* ".

vi) On 10th June 2009, Mr Woodman asked Sir Simon whether, if WCC supported the Planning Application, the Mayor would be inclined to support or reject the scheme. Sir Simon responded that " *in his view, the Mayor would refuse the scheme in its current form* ", and that Mr Dolphin would give the same advice.

199.   These events need to be considered in their relevant context. And of particular importance, as it seems to me, is the position as at 14th May 2009, when QD decided to follow the new outline proposal that I have described above. That date is important, not because it is the relevant date for the operation of paragraph 5(f)(i) – that is obviously the 12th June 2009 when the Planning Application was withdrawn - but because when I come to consider the Procurement issue 3, it could at least be argued that disclosing the new outline proposal to the GLA and WCC (as QD did) might have had an effect on the intentions of the Mayor, and the indications provided to QD/PBGL of those intentions. Likewise, it could be argued that what was said to Sir Michael on 8th April 2009 (and perhaps even at other times) might have had an effect on the Mayor's intentions, but, as will later appear, I do not think that the evidence demonstrates that there was in fact any such effect.

200.   For this reason, it is useful to consider each of the 6 alleged indications separately, whilst always bearing in mind that it is their cumulative effect that is relied upon by QD.

**First alleged indication: 2nd April 2009**

201.   This alleged indication was reported to have emanated directly from the Mayor. It seems to me, as I have already mentioned, that the Mayor fully understood and intended that feedback, such as this, through his officers would be taken as indicating his position.

202.   The feedback on 2nd April 2009 was, however, very far from an indication that the Mayor intended to direct the WCC to refuse the Planning Application. It was far less concrete than that. It was simply a communication of his initial, unspecific but somewhat unfavourable impressions about the scheme, following the presentation that he had liked on 1st April 2009. The Mayor communicated that he was considering asking for changes to the scheme. Nothing was said or implied about an intention to direct a refusal at that stage.

**Second alleged indication: 8th April 2009**

203.   This was further feedback directly from the Mayor. It was significantly more specific than the feedback on 2nd April 2009, criticising the design, the density, the fact that the blocks were not recognisable as residential, and the failure to integrate the affordable element. The Mayor was, by this time, aware of the Quinlan Terry proposal (and also of the Prince of Wales's opposition, which had been made public on 4th April 2009) and was said to be taking it seriously and regarding it as a realistic alternative. Mr Dolphin was specifically asked by Mr Woodman whether a refusal would be recommended, and was told that " *officers [of the GLA] would not envisage recommending refusal on design grounds and the Mayor would then be in a very difficult position* ". It was reported that the Mayor had asked Mr Dolphin: " *why aren't we saying no to this kind of thing* "?

204.   The second alleged indication was, therefore, a significantly greater cause for concern than the first. Still, however, it did not amount to any indication that, as at the 8th April 2009, the Mayor then intended that he would, when decision time came, actually direct refusal. Instead, it seems to me that the Mayor was providing a clear signal that he would be considering whether to direct refusal if changes were not made. In fact, however, the criticisms were not, at this point, sufficiently specific

CPC Group Ltd v Qatari Diar Real Estate Investment Co, 2010 WL 2516392 (2010)

to enable detailed changes to be made. The last 6 paragraphs of Mr Woodman's email of 8th April 2009 make it clear that the position was still very fluid – and discussions about QD's response to the Prince of Wales and to Quinlan Terry's design, and about some specific steps that might be taken, were being discussed.

**Third alleged indication: 22nd April 2009**

205.   The third alleged indication again emanated directly from the Mayor. This feedback was obviously specifically and deliberately fed back to QD/PBGL at the instance of the Mayor, and was intended to be taken seriously. By this time, of course, the Sunday Times had reported on 12th April 2009 that the Prince of Wales was winning the " *battle of Chelsea* ", and that a " *source close the development* " had said that " *if the current plans are approved, [QD] might then return to [WCC] to submit revisions* ".

206.   On this occasion on 22nd April 2009, the Mayor was asking specifically for changes to be made to the repetitive nature of the design for Chelsea Bridge Road. It was made clear by Mr Wilson that he was seeking a formal response as to whether QD/PBGL were willing to consider changes to deal with the Mayor's point. If they were, a proposal was made as to how revised sketches could be shown to the Mayor for his initial views.

207.   This was a clear indication of the Mayor's desire to have the scheme changed. And a clear request for that to be done, but still not yet an actual indication that the Mayor intended to direct refusal if no changes were made. That said, there was a very clear implied threat at this stage that, if the Mayor was denied what he was seeking, a direction to refuse would be seriously considered.

**Fourth alleged indication: 6th May 2009**

208.   This is the first occasion on which those attending the meeting got the message that refusal was on the cards. Mr Simpson's email to Mr Hallman said: " *They [that is the GLA officers] were clearly of the view that [the Mayor] wants to get the scheme refused probably by putting WCC under pressure unless we change the scheme* ". And indeed, as Mr Woodman said, the meeting was called with a view to discussing the variations that the Mayor might wish to see.

209.   The GLA's own note recorded that the Mr Dolphin advised that " *[the Mayor] has some major concerns with the proposal* ", which included repetition of the design, height, layout and elevation appearance of the proposals, and the need for more variety. QD told the GLA officers that they would consider options for altering the scheme, although perhaps significantly, changes to meet the Mayor's concerns were never made.

210.   Mr Woodman's evidence on this indication was, in my view, important. He said that he had no real feel for the depth of the Mayor's concerns: " *was it a case of the Mayor … 'not being allergic to the scheme' or was it a matter of the Mayor 'not liking the scheme' (such that he might direct it to be refused)* ". In the result, it seems to me that, even taken together with the previous discussions, this fourth indication cannot have been an indication that the Mayor intended at that point that he would direct refusal. This was, however, quite close to such an indication, and was an extremely clear threat that if proposals were not made for changes that could quite possibly be the result.

**Fifth alleged indication: 15th May 2009**

211.   After the 6th May 2009 meeting, Mr Simpson made a note dated 7th May 2009 headed " *Blue Planning Strategy* ", to which Mr Woodman referred in his statement. The note reinforced the clear understanding that " *[the Mayor] seems to feel*

CPC Group Ltd v Qatari Diar Real Estate Investment Co, 2010 WL 2516392 (2010)

*that the scheme is not quite right and something better should be proposed* ", and " *officers felt it would greatly increase our chances of success if we were able to suggest changes that could be accommodated to overcome [the Mayor's reservations]* ". The discussion between Mr Woodman, QD and CPC/C&C following Mr Simpson's note was on 8th May 2009, and they decided to prepare a presentation to the Mayor that " *would explain the scheme and its merits* ", but would not include any proposed changes " *but it may be worth referring to the potential for these in discussion* ". They also decided that C&C would prepare a draft paper on preparation for a planning appeal. In this way, therefore, the battle lines were being drawn, and it was becoming clear that QD/PBGL/CPC was not intending to respond to the Mayor's feedback as he was requesting.

212.  By the time of the 15th May 2009 meeting, of course, the new outline proposal strategy had been decided upon, so matters were much changed. But there is no reason to suppose that the Mayor or the GLA officers knew that before they attended the 15th May 2009 meeting.

213.  As I have already found, the 15th May 2009 meeting started with Sir Simon confirming what Mr Dolphin had already said on the 6th May 2009 namely that " *the Mayor had a problem with the scheme in its current form* ", and saying that the GLA was receiving many letters from objectors. Before the new outline proposal was made, Sir Simon said that he felt that a likely outcome of the WCC meeting on 18th June 2009 would be a deferral, so that: " *his advice would be that QD should rely on its right of planning appeal* ".

214.  It seems to me that this meeting reinforced what was said on 6th May 2009, and, had the new outline proposal not intervened, Sir Simon might well have suggested or hinted or even made clear that, absent the changes the Mayor wanted, and if the WCC, as he did not expect, granted the Planning Application, the Mayor would direct a refusal. But this did not actually happen. And it seems to me that, looking objectively at what was actually said in the meeting, whilst the Mayor had done things that suggested he <u>might</u> direct a refusal, he had not done anything that suggested he actually <u>intended</u> to direct a refusal. By that point, of course, he still had an extremely difficult political decision to make.

215.  Thus returning to my holding as to the meaning of the words " *the Mayor has indicated that he intends to exercise his power* " to direct a refusal, at this meeting on 15th May 2009:-

i)  It was clear that Sir Simon was speaking with the authority of the Mayor about his own views.
ii)  But equally, the Mayor had, as yet, done nothing that suggested that he actually intended to direct a refusal, nor had he given a sign or hint that he actually intended to direct a refusal. What was being relayed to QD/PBGL was that the Mayor wanted the scheme changed, and that if the applicant refused to change it, he would have to make a difficult decision as to whether to direct refusal. There was a hint that he might direct refusal, but no indication of the Mayor's actual present intention to direct refusal as paragraph 5(f)(i) requires.
iii)  Even taking into account the planning background which envisaged cajoling and persuasion by the Mayor, backed up by the overt risk that the Mayor would direct a refusal if his views were not accommodated, QD/PBGL were not even being told on this occasion that the Mayor intended at that point, on 15th May 2009, that he would direct refusal if appropriate changes were not made.

### Sixth alleged indication: 10th June 2009

216.  By the time of this alleged indication, Mr Al-Saad had already approved the withdrawal of the Planning Application.

217.  Lord Grabiner relies heavily on the email exchange on 9th June 2009 in which Mr Titchen wrote to Mr Ward saying: " *I spoke to [Mr Candy] after receiving this and he still wants to pursue the legal route. We should as a result actively try to protect our position. … I am hopeful we might also have an indication from the Mayor which we will need if the report comes out on Thursday and does not recommend a refusal* ". It is submitted that this email makes it clear that even QD did not

believe that any relevant indication had been given by 9th June 2009, and that it was necessary to obtain one if the 'trigger' for the payment of the Deferred Consideration was to be avoided. As I have already said, none of the first five alleged indications was, in my judgment sufficient to satisfy paragraph 5(f)(i), so this email merely confirms that QD was well aware of that when Mr Titchen asked Mr Woodman to contact Sir Simon.

218.  The detail of the sixth alleged indication is important. Mr Woodman does not say in his statement that he requested only the Mayor's views. He says that " *Jeremy Titchen asked me to find out the Mayor or Sir Simon Milton's views in relation to the Planning Application* ". And in the result what Mr Woodman got was Sir Simon's own views as to " *whether the Mayor would be inclined to support or reject the scheme* ". This is clear from the next sentence of Mr Woodman's email which says " *[he] said that in his view the Mayor would refuse the scheme in its current form* " (emphasis added). Unlike previous indications that were stating the Mayor's view, and were precipitated by meetings with the Mayor, this meeting was not. Moreover, Sir Simon said that the discussion was off the record, further emphasising that the information was his own view as to a future political decision that the Mayor had not yet made. The final words of the email reinforce this by adding that " *[Mr Dolphin] would give the same advice* ", thus indicating that what was being passed on was Sir Simon's and Mr Dolphin's personal speculation (perhaps informed speculation, but speculation nonetheless) about how the Mayor would in the future react, if WCC granted permission. This conversation did not record that the Mayor had done anything to suggest that he intended to direct a refusal. The Mayor had done nothing at all. In this conversation, there was no sign or hint from the Mayor at all, merely an indication of what the Mayor's officers thought he might intend. There was no clear sign given of the Mayor's actual present intention.

219.  I have not overlooked the wording of Mr Woodman's recommendation email of 12th June 2009 saying " *we have been informed by GLA officers that the Mayor is not happy with the scheme in its current form and has said that he would be inclined to refuse it … We have had the same view on a confidential basis from the Deputy Mayor* ". This is reflected in Mr Woodman's statement where he says that he told CPC orally on the same day that " *The Mayor has said he would be inclined to refuse it* ". But I do not think that this goes far enough to amount to an indication that the Mayor intended to direct refusal. Plainly he was inclining that way, but inclination is different from intention.

220.  I have tried to stand back from the detail of these findings to see whether they accord with the reality of the situation, and the documentation and evidence looked at as a whole. I believe they do. The planning process progressed much as the experts indicated was to be expected with, as I have said, the Mayor, through his officers and his Deputy, cajoling and persuading QD to make changes. This process was interrupted, before it had reached its natural conclusion, by the new outline proposal. Had it been allowed to run its normal course, it was possible, though far from certain, that the Mayor would have given the indication envisaged by paragraph 5(f)(i). I suspect that there was another problem that never fully developed, which was RSHP's reluctance to make any substantive changes to their design. This may explain why, on the 7th May 2009, it was decided not to include any proposed changes in the proposed presentation for the Mayor. It seems to me that the political decision for the Mayor was far from easy. He might have wanted, had he not been effectively rescued by the new outline proposal, to have gone so far as to indicate that he was intending to refuse – before taking the final decision – in order to put greater pressure on QD/PBGL to change the scheme as he wanted. He might have judged that a bridge too far, and indeed he might never have directed a refusal, had the scheme been passed by the WCC. All this is speculation, and can never be more, because of the new outline proposal. But as it seems to me, whilst the Mayor came quite close to giving the indication that QD required under paragraph 5(f)(i) he never got close enough, and that is hardly surprising, because the stage at which he might have done so would have been at the start of June, when pressure was building in the lead up to the 18th June 2009 meeting. The new outline proposal reduced the pressure, which was precisely what it was intended to do. As a result, it also meant that the Mayor never needed to escalate his attempts to get changes to the Planning Application, in the course of which escalation he might well have seen fit to give an indication of the kind envisaged by paragraph 5(f)(i).

221.  Accordingly, in my judgment, none of the six alleged indications amounted to an indication that the Mayor intended to direct refusal of the Planning Application for the purposes of paragraph 5(f)(i).

*Issue 2: Recommendation issue: Did Mr Woodman's email of 12th June 2009 amount to a recommendation to CPC and QD jointly that a "revised Planning Application stands a better chance of delivering a Planning Permission than the pursuit of an Appeal of the previous planning application" within the meaning of paragraph 5(f)(ii) of Schedule 4 to the SPA?*

222.   The key element of Mr Woodman's recommendation on 12th June 2009 was that " *it seems to us that a new scheme would be likely to carry political support at the local and strategic levels and so, depending of course on the precise content, would have an even better chance of achieving consent than the current scheme at appeal* ".

223.   CPC raises a number of reasons as to why this recommendation cannot satisfy the requirements of paragraph 5(f)(ii) of Schedule 4 of the SPA.

i)   First, it says that paragraph 5(f)(ii) required a joint instruction from CPC and QD, and no such instruction was given.
ii)   Secondly, CPC says that no valid comparison with a new scheme could be made without the details of that scheme having been available, which they were not.
iii)   Thirdly, CPC contends that the recommendation came too late, having only been provided after the decision to withdraw had already been taken and, indeed, made public.

224.   I shall deal with each of these points in turn.

**Does paragraph 5(f)(ii) require a joint instruction from CPC and QD?**

225.   I am wholly unpersuaded that paragraph 5(f)(ii) requires a joint instruction from QD and CPC. I accept that paragraph 9 of Schedule 4 makes provision for joint instructions required by the Schedule, but paragraph 5(f)(ii) is not one of the paragraphs requiring a joint instruction. Paragraph 5(i) shows what language is used when such a joint instruction is required: " *In the case of any Planning Refusal or Failure to Determine [QD] and [CPC] shall jointly instruct the Planning Consultant to advise …* ".

226.   Here, however, the word "jointly" in paragraph 5(f)(ii) is used so as to indicate that the recommendation has to be made <u>to</u> both CPC and QD jointly, not so as to indicate that both must request it: " *The Planning Consultant recommends to [QD] and [CPC] jointly* ". It would also make no sense for a joint instruction to be required. In the event of any dispute the party that did not want a recommendation would simply abstain from seeking the instruction. That would circumvent the true purpose of the SPA.

**Can a valid comparison be made without the details of a new scheme being available?**

227.   Lord Grabiner submits that Mr Woodman's recommendation cannot amount to one that a " *revised Planning Application stands a better chance of delivering a Planning Permission than the pursuit of an Appeal of the previous planning application* ", because paragraph 5(f)(ii) is contemplating a comparison with a specific proposed replacement scheme, rather than with any imaginable replacement scheme.

228.   As it seems to me, this question turns on the meaning to be attributed to " *a revised Planning Application* " in paragraph 5(f)(ii). The term " *Planning Application* " is defined broadly so as to encompass " *any new application which may be made for the Development of the Property* ". But common sense dictates that the parties cannot have envisaged it being satisfied by the Planning Consultant simply saying that he could envisage some other application that would have a better chance of success, because that would always be the case. For example, lower density applications will often be more popular with planning authorities, but will not necessarily be economically viable, and would certainly not comply with one objective of the SPA, which was to obtain a permission with the greatest achievable Developable Area.

229.  Thus, the revised Planning Application with which the paragraph 5(f)(ii) comparison is to be made must, in my judgment, be one that complies with the other terms of the SPA and indeed the spirit of the SPA, and must be discernible as an alternative approach, even if not wholly developed or worked out.

230.  Lord Grabiner argues that there was no discernible alternative scheme on 12th June 2009. Nothing had been reduced to writing or a drawing, and, as I have said, Mr Woodman described it to me as follows: " *I think it had progressed from a thought to an idea, maybe even got as far as a concept, but it hadn't got to a scheme* ".

231.  To answer this question, however, it seems to me that one needs to approach the problem from a slightly different angle. The purpose of paragraph 5(f)(ii) is to ensure that there is no withdrawal once a refusal is expected, unless something else is already in mind which has a better prospect of delivering the outcomes expected under the SPA. This is, of course, precisely what Mr Woodman was considering. As his email makes clear, he was considering whether pursuing the new idea or concept would have a better prospect of success. He thought that it would, because " *a new scheme would be likely to carry political support at the local and strategic levels* ". In the context of the events which actually occurred, this seems to me to fulfil precisely what paragraph 5(f)(ii) was aimed at achieving. It required the Planning Consultant to be able to say that another application, which could sensibly be prepared, but did not have to have already been prepared, would be more likely to obtain the consent that the SPA contemplated. Mr Woodman was able to say that, having been intimately involved with the discussions with the planning authorities in relation to the new outline proposal since 15th May 2009.

**Did the recommendation come too late?**

232.  I have already held that, to be effective, the recommendation must have been made before the Planning Application is actually withdrawn. The question, therefore, is whether the Planning Application was withdrawn before Mr Woodman's recommendation at 14.08 on 12th June 2009.

233.  Whilst it is clear that QD made its decision to withdraw before the 12th June 2009, Mr Woodman was responsible for the actual withdrawal process. His statement makes clear precisely what happened where he says: " ... *by this time [about 10.30am], I had tried to speak to Ms MacQueen at WCC, but had been unable to do so, and by this time I had spoken briefly to Mr Woods to say that I expected the Planning Application to be withdrawn later that day. I was also aware of press reporting on the matter that morning. However, the Planning Application had not formally been withdrawn at that stage, and was not withdrawn until the afternoon of 12 June 2009* ". I accept that evidence. The Planning Application was not withdrawn by the publication of the news on various press websites. It was withdrawn after Mr Titchen had instructed Mr Beard to write to WCC formally withdrawing the application. The withdrawal took place when Mr Beard's letter arrived with WCC which it did electronically at some time shortly before 3.19 p.m. on 12th June 2009.

**Was the recommendation otherwise valid?**

234.  It seems to me that the recommendation was *prima facie* valid and within the terms of paragraph 5(f)(ii). The fact that it was qualified by the words " *depending of course on the precise content* " of the new scheme does not invalidate it, for the reasons I have tried to explain.

235.  Moreover, the recommendation seems also to accord with other evidence as to Mr Woodman's earlier views. On 28th May 2009, CPC met Mr Woodman to sound out his views. As already mentioned, in that meeting, he told Mr Candy and Mr Simpson that the prospects for the new outline proposal were " *good and probably stood a better chance than the current scheme* ". In addition, Mr Titchen said that he had been told by Mr Woodman before 3rd June 2009 that a new application would have better prospects than an appeal from the current application. This accords also with the 'one third, one third, one

third' advice Mr Woodman gave Mr Titchen as to the chances of approval, refusal and deferral. All in all, Mr Woodman was, as I have already indicated, remarkably consistent and even-handed.

236.  I have no doubt, therefore, that Mr Woodman gave a genuine recommendation under paragraph 5(f)(ii) fulfilling the requirements of that sub-paragraph.

*Issue 3: Procurement issue: If the Mayor gave an indication that complied with paragraph 5(f)(i) of Schedule 4 to the SPA, was that indication procured by QD in breach of (a) its duty of utmost good faith contained in clause 7(1) of the SPA, and/or (b) its obligation not to do "any act or thing designed to or with the intention to avoid or reduce payment of any Deferred Consideration" contained in clause 7(3) of the SPA?*

237.  I have already held that the Mayor gave no indication satisfying paragraph 5(f)(i), so this issue does not really arise. Since, however, much of the evidence and the argument has been devoted to this question, I will deal with it on the assumption that paragraph 5(f)(i) was, contrary to my findings, fulfilled, in case I am later held to be wrong on this central point.

238.  It is perhaps useful to start with the meaning of the obligation of utmost good faith in clause 7.1 of the SPA. There is not as much authority on this point as one might suppose. But three cases cited by the parties seem to me to provide the most assistance, drawing on jurisprudence from Australia and the USA, as well as this jurisdiction. The New South Wales case deals primarily with the inter-action between an obligation of good faith and the parties' pursuit of their own commercial or other interests, which seems to me to be particularly pertinent here.

239.  In *Manifest Shipping Co v. Uni-Polaris Shipping Co [2003] 1 AC 469, the House of Lords* considered the obligation of utmost good faith in the more familiar insurance context under section 17 of the Marine Insurance Act 1906 , which imposes such obligations mutually. Lord Hobhouse approved counsel's agreement that utmost good faith is a principle of fair dealing at paragraph 48, and said at paragraph 50 that " *Having a contractual obligation of good faith in the performance of the contract presents no conceptual difficulty in itself* ". Lord Scott said at paragraph 111 in relation to the specific context of that case " *Unless the assured has acted in bad faith, he cannot, in my opinion, be in breach of a duty of good faith, utmost or otherwise* ".

240.  In Overlook v. Foxtel [2002] NSWSC 17, the Supreme Court of New South Wales considered the meaning of an implied contractual obligation of good faith at paragraphs 63-71. Barrett J considered much authority and said this:-

> "65.  If adherence to such standards of conduct is the predominant component of a separate obligation of good faith in performance of a contract, it becomes necessary to enquire about the extent to which selflessness is required. **It must be accepted that the party subject to the obligation is not required to subordinate the party's own interests, so long as pursuit of those interests does not entail unreasonable interference with the enjoyment of a benefit conferred by the express contractual terms so that the enjoyment becomes (or could become), in words used by McHugh and Gummow JJ in** Byrne v Australian Airlines Ltd [1995] HCA 24; (1995) 185 CLR 410 , " **nugatory, worthless or, perhaps, seriously undermined** ". This seems to me to be the principle emerging from paras 172 to 177 of the joint judgment in Burger King [ Burger Kind v. Hungry Jack's Pty [2001] NSWCA 187 ] where the various authorities are collected and analysed.

> 66.  Dr Elisabeth Peden of the University of Sydney has characterised the effect of the good faith requirement in contractual performance as follows ("Incorporation of Terms of Good Faith in Contract Law in Australia", (2001) 23 Syd L.Rev 222):

>> "Most basically, by using the obligation to perform in good faith as a principle of construction the courts are merely required to ensure that the parties have genuinely adhered to the bargain which they entered into. This will require an examination of the whole contract and the

> underlying intentions. Strict rights may not be adhered to, if in the
> context of the contract as a whole, this would subvert the character of the
> contract. Most cases that discuss the concept do so in terms of negatives,
> that is, what is not in breach of good faith. This makes sense, since it
> is the context of the contract read as a whole that will indicate what is
> appropriate and what is not."

67.    Viewed in this way, **the implied obligation of good faith underwrites the spirit of the contract and supports the integrity of its character. A party is precluded from cynical resort to the black letter. But no party is fixed with the duty to subordinate self-interest entirely which is the lot of the fiduciary** : Burger King at para 187. **The duty is not a duty to prefer the interests of the other contracting party. It is, rather, a duty to recognise and to have due regard to the legitimate interests of both the parties in the enjoyment of the fruits of the contract as delineated by its terms** .

68.    In many ways, the implied obligation of good faith is best regarded as an obligation to eschew bad faith. This is borne out by the … succinct statement by Lord Scott of Foscote in Manifest Shipping Co Ltd v Uni-Polaris Shipping Co Ltd … [as to which see above]" (emphasis added).

241.    In Berkeley Community Villages v. Pullen [2007] EWHC 1330 (Ch), there was an agreement between the claimant developer and the defendant landowners to maximise the development potential of 520 acres of the Defendants' 840 acre farm. Morgan J held that an express obligation of good faith would be broken if the Defendants entered into a proposed agreement to sell to a third party the part of the farm to which the agreement related. The express obligation was in the following terms: " *In all matters relating to this agreement the parties will act with the utmost good faith towards one another and will act reasonably and prudently at all times* ". Morgan J considered the meaning of this provision in paragraphs 95-97 as follows:-

> "[95]  In the [ Bropho v Human Rights & Equal Opportunity Commission [2004] FCAFC 16 ] case,
> the judgment of French J contains a very detailed discussion of the concept of good faith. It is not
> necessary to set out the facts of the Bropho case but it is necessary to remind oneself that it was not
> a commercial case nor was it a case where there was an obligation to act in good faith. Good faith
> came into the matter because conduct which would otherwise be unlawful as contrary to a statute
> would not be unlawful if the conduct was for a particular purpose and was done "reasonably and in
> good faith". Notwithstanding the context, French J's judgment at paras 83 – 103 looked broadly at
> a great deal of material which offered guidance as to the meaning of good faith. He cited text books
> and legal articles and a range of decisions dealing with many different subject matters. At para 90
> he quoted from dictionaries and Mr Wood relied in particular on the quotation from Black's Law
> Dictionary , 7th edition, West Group (1999) (at 701) and the reference to "Observance of reasonable
> commercial standards of fair dealing in a given trade or business". At para 92, French J quoted from
> the United States Second Restatement of Contracts para 205 which was in these terms:

>> "The phrase 'good faith' is used in a variety of contexts and its
>> meaning varies somewhat with the context. Good faith performance
>> or enforcement of a contract emphasises faithfulness to an agreed
>> common purpose and consistency with the justified expectations of
>> the other party; it excludes a variety of types of conduct characterised

CPC Group Ltd v Qatari Diar Real Estate Investment Co, 2010 WL 2516392 (2010)

as involving 'bad faith' because they violate community standards of decency, fairness or reasonableness."

[96]  At para 93 French J expressed the matter thus: "In a statutory setting a requirement to act in good faith, absent any contrary intention express or implied, will require honest action and fidelity to whatever norm, or rule or obligation the statute prescribes as attracting the requirement of good faith observance. That fidelity may extend beyond compliance with the black letter of the law absent the good faith requirement. In ordinary parlance it may require adherence to the 'spirit' of the law. This may attract the kind of penumbral judgments by courts of which Professor Stone wrote. That is not necessarily a matter for concern in the case of civil proscriptions. They are evaluative judgments which the courts are authorised and required by the legislature to take. A good faith provision offers a warning that game playing at the margins of a statutory proscription or obligation may attract a finding of liability. There is nothing in principle to prevent the legislature protecting a rule by attaching an uncertain risk of liability to conduct in the shadow of the rule."

[97]  Mr Pymont did not suggest that these statements by French J (and the material referred to by the learned judge) were not a useful attempt to describe the concept of "good faith". Nor did Mr Pymont refer me to any English authority, or any other authority, which adopted a different approach. In these circumstances, based on the material that has been put before me, I feel I am able to construe para 33 of the Third Schedule to the Agreement as imposing on the Defendants a contractual obligation to observe reasonable commercial standards of fair dealing in accordance with their actions which related to the Agreement and also requiring faithfulness to the agreed common purpose and consistency with the justified expectations of the First Claimant".

242.  QD submits that insurance analogies are unhelpful, and that the closest analogy is to partnerships. Mr Smouha cited Lord Lindley, who said: " *The utmost good faith is due from every member of a partnership towards every other member; and if any dispute arise between partners touching any transaction by which one seeks to benefit himself at the expense of the firm, he will be required to show, not only that he has the law on his side, but that his conduct will bear to be tried by the highest standard of honour* ".

243.  In my judgment, all these authorities and analogies are helpful. The obligation in the SPA must, however, take its colour from the commercial context of the contract. Clause 7.1 is found specifically in the section concerned with the " *Protection of Deferred Consideration* ". It is, therefore, directed at things that might be done or not done in connection with the pursuit of the Planning Application, the success of which would trigger that consideration.

244.  In addition, clause 7.3 contained an express obligation on QD not to do anything so as to avoid or reduce payment of the Deferred Consideration. Delaying the payment would obviously reduce the payment's value, and must be included within that provision.

245.  There are other signs in the SPA, however, that the parties' commercial interests were not intended to be entirely subjugated to the pursuit of the Planning Application to the exclusion of all else. In paragraph 5(a), the central obligation was to use all reasonable but commercially prudent endeavours to procure a Planning Permission free of Legal Challenge. In paragraph 5(c), CPC and QD were required to review a proposed variation " *to see if it is in their respective interests to make* " it. Moreover, clause 7.1 itself repeated the express obligation on QD to use " *all reasonable but commercially prudent endeavours* ", this time to enable the achievement of the various threshold events and Payment Dates.

246.  Thus, it seems to me that the content of the obligation of utmost good faith in the SPA was to adhere to the spirit of the contract, which was to seek to obtain planning consent for the maximum Developable Area in the shortest possible time, and to observe reasonable commercial standards of fair dealing, and to be faithful to the agreed common purpose, and to act consistently with the justified expectations of the parties. I do not need, it seems to me, to decide whether this obligation

CPC Group Ltd v Qatari Diar Real Estate Investment Co, 2010 WL 2516392 (2010)

could <u>only</u> be broken if QD or CPC acted in bad faith, but it might be hard to understand, as Lord Scott said in <u>Manifest Shipping</u> how, without bad faith, there can be a breach of a " *duty of good faith, utmost or otherwise* ".

247.  Against this background, the question is whether QD did actually procure the Mayor's indication in breach of clause 7.1 and/or 7.3? In effect, CPC's allegation is that QD's conduct was calculated to have and did have the effect of bringing about the indications that it needed under paragraph 5(f)(i) to allow it to withdraw. The nub of the allegation is that the consequence of the Emir's alleged instruction to Mr Al-Saad to withdraw the Planning Application was to change the attitude of the GLA so that the indications were given, when they would not otherwise have been. Some reliance is also placed on the alleged giving of a soft undertaking to Sir Michael, though this is, I think, less central to this issue.

248.  In my judgment, the factual determination of the Procurement issue is really inter-connected with the factual determination of the issue 4, the QD breach issue. That is because the underlying allegations that are said to have caused the indications are said also to constitute free standing breaches of clauses 7.1 and 7.3. In the circumstances, I propose to deal with the facts of both issues together under issue 4 below.

*Issue 4: QD breach issue: Was QD's conduct in relation to the Planning Application including (a) the alleged giving of a "soft undertaking" and/or (b) its new strategy of indicating to the WCC, the GLA and the Prince of Wales that it intended to apply for outline planning permission and offsite affordable housing and/or (c) the withdrawal of the Planning Application, a breach of:- (i) its duty of utmost good faith, or of its obligation to "use all reasonable but commercially prudent endeavours" contained in clause 7(1) of the SPA, and/or (ii) its obligation not to do "any act or thing designed to or with the intention to avoid or reduce payment of any Deferred Consideration" contained in clause 7(3) of the SPA?*

249.  The only new construction question that arises under issue 4 alone is as to the proper meaning of " *all reasonable but commercially prudent endeavours to enable the achievement of the various threshold events and Payment Dates set out in Schedule 4* " in clause 7.1, and of the same words " *all reasonable but commercially prudent endeavours* " in clause 5(a).

250.  Lord Grabiner relies on paragraph 15.07 of Lewison on the Interpretation of Contracts, 4th edition, 2007, which expresses the view that an obligation to use reasonable endeavours is less onerous than an obligation to use best endeavours. He submits, however, that an obligation to use "all reasonable endeavours" is to be equated with an obligation to use "best endeavours", so that a party subject to such an obligation must, if necessary, subordinate its own financial interests to obtaining the desired result. This view is expressed by Lewison, who refers in support of it to *Rhodia International Holdings Ltd v. Huntsman International LLC [2007] 1 CLC 59* . In that case, Flaux J said the following in paragraph 33 of his judgment:

> "I am not convinced that (apart from that decision of Rougier J) any of the judges in the cases upon which Mr Beazley relied were directing their minds specifically to the issue whether "best endeavours" and "reasonable endeavours" mean the same thing. As a matter of language and business common sense, untrammelled by authority, one would surely conclude that they did not. This is because there may be a number of reasonable courses which could be taken in a given situation to achieve a particular aim. An obligation to use reasonable endeavours to achieve the aim probably only requires a party to take one reasonable course, not all of them, whereas an obligation to use best endeavours probably requires a party to take all the reasonable courses he can. In that context, it may well be that an obligation to use <u>all</u> reasonable endeavours equates with using best endeavours and it seems to me that is essentially what Mustill J is saying in the Overseas Buyers case. One has a similar sense from a later passage at the end of the judgment of Buckley LJ in IBM v Rockware Glass at 343 …".

251.  Lord Grabiner did not, however, refer to the *Court of Appeal's decision in Yewbelle Limited v. London Green Developments [2007] EWCA Civ 475* , which is also footnoted in the passage of Lewison to which he referred. There, Lloyd LJ said at paragraph 29 that: " *Mr Dowding challenged the judge's [Lewison J] interpretation of the obligation to use reasonable endeavours. The judge dealt with this in a passage in his judgment starting at para 118. He accepted that, in using its reasonable endeavours, the Appellant was not required to sacrifice its own commercial interests: para 122* ", and

CPC Group Ltd v Qatari Diar Real Estate Investment Co, 2010 WL 2516392 (2010)

went on to hold at paragraph 33 that: "*I do not accept that the judge applied the wrong legal test in judging whether the Appellant had used all reasonable endeavours under the contract*".

252.  It seems to me, therefore, that the obligation to use "*all reasonable endeavours*" does not always require the obligor to sacrifice his commercial interests. In this case, the matter is, however, clearer, because the contract itself, as I have already said, contains other indications that QD was not to be required to sacrifice its commercial interests. Indeed the words of clause 7.1 itself make that clear by using the added words "*but commercially prudent*" in the phrase "*all reasonable but commercially prudent endeavours*".

253.  Lord Grabiner accepts that the words "*but commercially prudent*" provide a brake on the lengths to which QD had to go in using "*all reasonable endeavours*". But in my judgment, his acceptance does not go far enough. Clause 7.1 and paragraph 5(a) are not equivalent to a "best endeavours" obligation, and they do not require QD to ignore or forego its commercial interests. Instead, they allow QD to consider its own commercial interests alongside those of CPC, and require it to take all reasonable steps to procure the Planning Permission, provided those steps are commercially prudent. In the context of the facts of this case, this distinction is important, because when QD came to consider how to respond to the Prince of Wales's intervention, it was, in my judgment, permitted to consider its own commercial interests in deciding how to respond. The clauses do not, as it seems to me, allow QD to consider its own political interests, insofar as they are different from its commercial interests or insofar as they require commercially imprudent measures.

254.  In the light of what I have held to be the proper meanings of the relevant provisions of the SPA, I will now consider the factual allegations of breach against QD.

**The factual allegations of breach against QD**

255.  In relation to the free-standing allegations of breach of the SPA (under issue 4) and in relation to the procuring allegations (under issue 3) CPC relies primarily on the following alleged steps taken by QD:-

i)  The giving of a soft undertaking to the Prince of Wales.
ii)  Acting on the Emir's statement to the Prince of Wales that he would "*have the designs for Chelsea Barracks changed*", so that the application was withdrawn.
iii)  Putting forward the new outline proposal to the WCC. GLA, the Prince of Wales and others on and after the 15th May 2009
iv)  The failure properly and fully to support and promote the Planning Application.

**The alleged Soft Undertaking**

256.  There are really two conversations in which the alleged soft undertaking could have been given to Sir Michael, namely those on 23rd March and 8th April 2009. It is quite clear, in my judgment, that on neither of these occasions, nor indeed on any other occasion, did Mr Ward give Sir Michael a 'hard soft undertaking' namely an assurance that the existing scheme would not be built out even if permission were granted.

257.  On 23rd March 2009, Mr Ward was really making initial contact in response to the Prince of Wales's letter soon after he had been informed about it. No assurance of any kind was given. Sir Michael's note of the same date does indeed say that: "*[Sir Michael] said that it was an enormously important site and that it was difficult for many people to stand by and let, in their view, an inappropriate scheme go forward on an informal understanding that it would be changed after planning permission had been received. [Mr Ward] said that ... they would like to find a solution which is more appropriate for that part of London and is somewhere in-between a traditional and a modern approach*", but even on its face that does not amount to a record that any kind of undertaking, soft or otherwise, had actually been given. The fact that no undertaking had been given is confirmed by the fact that when Mr Ward spoke again to Sir Michael the following day, he became very cross with Mr Ward, which it is unlikely he would have done if he had thought he had already obtained what he wanted from him.

CPC Group Ltd v Qatari Diar Real Estate Investment Co, 2010 WL 2516392 (2010)

258.  Thus, the time when the alleged soft undertaking is really said to have been given is at the 8th April 2009 meeting. By that time, of course, the Prince of Wales's letter had leaked into the public domain.

259.  I have already set out extracts from Mr Woodman's note and Sir Michael's note of the 8th April 2009 meeting. They do not record that any soft undertaking was given, as I have already mentioned. Indeed they do not record that any undertaking was given. The closest they get is a discussion about the Quinlan Terry scheme and other mixes of traditional and modern architecture for the site. Sir Michael's note (the accuracy of which was confirmed in this respect by Mr Ward) records that " *They will hopefully give an informal assurance that the design will be changed when planning permission has been received* ", but that is an expression of Sir Michael's own (legitimate) hope rather than any kind of assurance. Sir Michael's record of what Sheikh Hamad is supposed to have said to Mr Said is multiple hearsay and cannot be relevant to what was said to Sir Michael at the meeting. Mr Woodman, whose notes I have found to be careful and reliable, makes it clear that what was actually discussed was " *The potential for discussion with the Prince and/or his advisors* " " *after a resolution to grant consent by [WCC] for the current scheme* ", and that the request for a hard soft undertaking was refused.

260.  It is true that comforting noises were made to Sir Michael, which is what Mr Ward was admitting, and that QD was aware of the twin dangers of giving any soft undertaking to the Prince of Wales, namely first that they would leak to the press, and secondly that they would damage the prospects for the Planning Application. But QD was in an impossible position. It could not pretend that the Prince of Wales had not written to its Chairman. It could not do nothing. It was, in modern parlance, caught between a rock and a hard place. If it did nothing, it would have risked exacerbating the position with the Prince of Wales, thereby risking that he might take his opposition further by contacting the Mayor, the WCC or even the press. If it spoke to the Prince of Wales, it risked the twin dangers to which I have already referred, even if it actually gave no soft undertaking at all.

261.  For CPC to allege that QD's handling of its response to the Prince of Wales's letter in advance of 11th May 2009 was a breach of clauses 7.1 or 7.3 of the SPA is, in my judgment, as unrealistic as it is unjustified. QD was making a necessary response to a serious intervention, which had the potential to affect the Planning Application whatever it did. If QD had come out fighting, and said that it would fight all the way for its scheme, it could only have expected the Prince of Wales to take further steps which might themselves have been extremely damaging to the prospects of obtaining permission.

262.  As I have said, I formed the view that Mr Ward was a broadly reliable witness. I have no doubt that he handled his contacts with Sir Michael on 23rd and 24th March and 8th April 2009 as well as could have been hoped for in the real world. Equally, I have no doubt that the cautious and conciliatory approach that Mr Ward adopted was the one best calculated to preserve the prospects for the Planning Application. Indeed, QD might reasonably have hoped, anyway before the press article on the 12th April 2009 saying that the Prince of Wales was close to victory in his battle to thwart the scheme, that Mr Ward's approach might have caused the Prince of Wales's opposition to die away. Moreover, Mr Candy himself told me that he would have " *banked the planning consent and then revised it afterwards if it were a C&C project* ", indicating that what Mr Ward told Sir Michael they would do was just what Mr Candy would have done anyway. I understand, of course, that Mr Candy was always opposed to giving the Prince of Wales any undertakings as his solicitors' letter of 7th April 2009 made clear, but Mr Ward did not do so, and in fact he had agreed confidentiality with Sir Michael on 23rd March 2009, and Sir Michael said on 8th April 2009 that the Prince of Wales was very unhappy about the matter having become public.

**Acting on the Emir's alleged statement to the Prince of Wales that he would "have the designs for Chelsea Barracks changed", so that the application was withdrawn**

263.  There is an irony in the fact that CPC's main claim of bad faith is under this head. CPC says that the Emir told Mr Al-Saad to withdraw the Planning Application, and that is what happened. In my judgment, it is not what happened at all. And

it also does not much matter, since it is what QD did in relation to the Planning Application that matters under the SPA, not what the Head of State may or may not have said should happen. But since this claim is made, I must explain my findings.

264.  It seems to me that Sir Michael's note of the conversation with the Emir on 11th May 2009 is very abbreviated, and rather like Sir Michael's note of the 8th April 2009 meeting, is more concerned with what he hoped and expected to be the outcome than with what precisely was said. I am sure that in their meeting, the Prince of Wales expressed his dislike for RSHP's design, and the Emir politely concurred. It seems likely to me that the Emir would have said something more nuanced than that " *he would have the plans changed* ", but I am sure he gave the Prince of Wales and Sir Michael the impression that that would be the outcome.

265.  As for the more important subsequent discussion between the Emir and Mr Al-Saad, I have already indicated my findings. Again, I do not think there was any blunt instruction to withdraw the Planning Application. The Emir would never have descended to that level of detail. And Mr Joll's 24th May 2009 email, which was disclosed late and was much relied upon by CPC, goes nowhere towards persuading me that the Emir gave any such instruction. Mr Joll was not called to give evidence (even though he now works for CPC), and from what I have seen of his emails, he is, to say the least, prone to exaggeration. Instead, I think the Emir explained to Mr Al-Saad that he had seen the Prince of Wales, and that the Prince was unhappy with the design for Chelsea Barracks, and that the Emir himself did not much like the design, and was not happy about upsetting the Prince of Wales, and that he should find alternatives to the existing design. As I have said, the message was clear – namely that Mr Al-Saad should fix it or sort it out.

266.  Likewise, when Mr Al-Saad spoke to Mr Ward, I think he passed on the same message. This is what made Mr Ward think again about alternatives to the pursuit of the existing Planning Application, and led him to propose the new outline proposal on 14th May 2009. To be clear, however, Mr Ward had not been instructed by Mr Al-Saad to withdraw the existing Planning Application, even though everyone in the chain knew that that would, in all probability, be the ultimate outcome. Indeed, Mr Ward was fully aware that he was not even authorised to withdraw the Planning Application. And it was helpful for him in dealing with the tricky political situation which followed, to be able to tell people, truthfully, that he was not, at that stage, so authorised. This may be what Mr Ward was driving at when he said that he was told to " *continue to press on with the planning process* ". But I think the impression given by these words was simply not true. Mr Ward knew very well, after speaking to Mr Al-Saad, that he had to come up with a suitable alternative strategy that would calm the political waters and prevent Royal feathers being further ruffled.

267.  These findings do not, however, answer the more important question of whether QD breached its obligations to CPC under the SPA. I am sure that the events which followed the 11th May 2009, and in particular the introduction of the new outline proposal and the eventual withdrawal of the Planning Application, followed as a consequence of the Emir's conversation with Mr Al-Saad. It is, therefore, most logical to consider whether what QD actually did between 14th May and 12th June 2009 constituted a breach of the SPA. I do this under the next heading.

**Putting forward the new outline proposal to the WCC, GLA, the Prince of Wales and others on and after 15th May 2009**

268.  That the Emir had intervened in the process, as I have found he had, did not affect the fact that the Planning Application was anyway facing twin problems as at 14th May 2009. By that time, the Prince of Wales's strong opposition to the scheme had been made public and was being touted widely in the press. In addition, the Mayor remained strongly opposed to the scheme, and was demanding changes to it. Even one of these problems would have been formidable. Together, they were very serious indeed.

269.  Mr Candy's simplistic 'pick a lane' philosophy was, in this context, somewhat naïve. If the best possible planning permission was to be obtained in the shortest possible time as the SPA envisaged, a more refined strategy was probably going

to be necessary. In my judgment, therefore, it is by no means obvious that the new outline proposal was not in the best interests of the commercial objectives of the SPA. That said, however, both parties were aware that intimating any different scheme would have an adverse effect on the will of the officers and politicians of the WCC and the GLA to support the existing scheme. And Mr Ward's genuine hope that he would be able to say: "support my new outline proposal or I will press on with the existing Planning Application, forcing you into difficult and embarrassing decision" was, to say the least, rather high risk.

270.  In my judgment, it has to be accepted that the introduction of the new outline strategy at the meeting with the GLA on the 15th May 2009 was, in effect, the end of the Planning Application in its existing form. The question, however, is whether that was in itself a breach of the SPA.

271.  First, the introduction of the new outline proposal did not actually involve the immediate withdrawal of the existing Planning Application, and it was at that stage unclear whether paragraph 5(f) would be satisfied by the time of the likely eventual withdrawal.

272.  Secondly, the fact, as I have mentioned above, that CPC was not affected by QD's political desire not to upset the Prince of Wales, does not mean that the Prince of Wales's views were at this point irrelevant. They were obviously having a continuing impact on the views of the officers and politicians (but primarily the latter) at the WCC and the GLA.

273.  Thirdly, the views of the Mayor had pretty well crystallised by 15th May 2009. Even though, as I have held above, the planning process was interrupted by the introduction of the new outline proposal, it was unlikely that the Mayor was going suddenly to wave through the scheme without changes, even if ultimately, had it been pushed forward without changes, it remained possible that WCC would have approved the scheme and the Mayor might not have directed a refusal, even though he did not like it.

274.  In the face of these extremely tricky obstacles to obtaining consent for the Planning Application, was the pursuit of the new outline proposal a breach of clauses 7.1 and 7.3? Certainly, it was a proposal put forward without proper economic or planning analysis, and certainly it was only elemental. But I do not think it was a breach of QD's obligations.

275.  By 15th May 2009, Mr Woodman was close to advising that the Planning Application only had a one third chance of each of grant, refusal and deferral. That meant there was a greater than two thirds chance of having to go to appeal, bearing in mind the possible action by the Mayor. The SPA was designed to avoid an appeal if possible, and an appeal meant a significant delay, as Mr Candy himself had already ascertained. Moreover, on 27th March 2009, Mr Candy's own figures had shown that " *if [CPC/C&C] were running this scheme, even under the best [current] application scenario, we would be better withdrawing and resubmitting [than] fighting this one out!!!!* ".

276.  QD had to do something, whatever the Emir's views were. Mr Candy was complaining bitterly about QD's indecisiveness, and pressing on relentlessly with the existing Planning Application, which had a one third prospect of being granted, was certainly not the only commercially viable option, and not obviously the best option.

277.  QD did not, in my judgment breach its obligation of utmost good faith by promoting the new outline proposal. It seems to me that the new outline proposal was one of a number of reasonable responses to an extremely difficult situation. It adhered to the spirit of the SPA, in that it was a step designed to seek to obtain planning consent for the maximum Developable Area in the shortest possible time, even if as things have turned out, it has taken longer to put together than was then expected.

It was faithful to the agreed common purpose, and was consistent with CPC's justified expectation that QD would try to get the best possible permission as quickly as possible. QD was not in my judgment motivated by ill-will or bad faith; they were simply dealing with a political problem, and, as it turned out, the way they chose to do so, did not depart from the commercial objectives of the SPA. In consulting CPC, albeit not obtaining their formal consent to the new outline proposal, QD was observing reasonable commercial standards of fair dealing.

278.  I also do not think that QD acted in breach of its obligations to use all reasonable but commercially prudent endeavours to enable the achievement of the threshold events and payment dates. In pursuing the new outline strategy, there would undoubtedly be delay, but there was potentially more certainty about the outcome than by seeking to force through a Planning Application that had run into very stormy waters indeed. QD was entitled to consider its own commercial interests to some extent, and I do not think it allowed its political interests to lead it into an obviously less commercially prudent course than it would otherwise have pursued. Certainly, the new outline proposal was neither designed nor intended to delay the payment of the Deferred Consideration. If that was a consequence, it was a consequence of the twin problems the Planning Application anyway faced.

279.  None of this, of course, meant that it was certain that CPC's payment would be delayed, because I still need to consider Lord Grabiner's primary construction argument to the effect that, if paragraph 5(f) was not satisfied, QD was obliged to elect to pay CPC under paragraph 5(aa); and, anyway, by 15th May 2009, it was still unclear whether the paragraph 5(f)(i) and (ii) conditions would be fulfilled, when and if a withdrawal took place.

280.  Moreover, it seems to me that my approach to these allegations of breach makes it irrelevant whether or not, ultimately, QD obtained WCC's and GLA's support for resubmitting an outline application, and for the move of some of the affordable housing off-site. It is true that formal support was not obtained before the decision to withdraw was finally taken on 9th June 2009. But in reality, as I have said, once the new outline proposal had been raised with the GLA on 15th May 2009, it was effectively irreversible. Thus the real decision as to breach arose on that date, and I do not think that what QD did at that time was a breach of the SPA for the reasons I have given.

**The alleged failure properly and fully to support and promote the Planning Application**

281.  This allegation is really a continuation of the previous one. What is said is that the promotion of the new outline proposal undermined the Planning Application. Plainly, it did. But for the reasons I have already given, I do not think that the promotion of the new outline proposal was a breach of the obligations in the SPA. The failure fully to promote and support the Planning Application was a justifiable consequence of the decision QD took on 14th May 2009. I do not think there was any failure to act in good faith, and certainly no attempt to act in such a way as to deprive CPC of its rightful entitlement to Deferred Consideration under the SPA. Mr Ward was fully conscious of the problem of the Deferred Consideration, but I do not believe that it was in any way motivating the steps he was taking at this stage.

**Did QD procure the indication on 10th June by pursuing the new outline proposal?**

282.  This is probably a wholly academic question, but I do not think QD did procure a particular response from Sir Simon to Mr Woodman's question on 10th June 2009. It would be wholly artificial in the light of my findings thus far to hold that QD had done so. QD followed a justifiable course under the SPA until 12th June 2009. On 10th June 2009, it sought to ascertain the Mayor's views for the purposes of finding out whether paragraph 5(f)(ii) would be fulfilled. No effort was made to influence the outcome. Having found that Mr Ward was justified in promoting the new outline proposal, it would be surprising if by doing so, he was held to have procured the fulfilment of paragraph 5(f)(i). I do not think that was what Mr Ward intended and I do not think that is what happened.

CPC Group Ltd v Qatari Diar Real Estate Investment Co, 2010 WL 2516392 (2010)

**Postscript to the QD Breach issue**

283.  I should mention at this point that CPC came close to arguing at the post-trial hearing to deal with QD's late disclosure of documents that the court should infer QD's bad faith by reason of this late disclosure. I do not think this suggestion was justified. The documents were, as I have said, disclosed in the end. I could not determine without another trial whether Mr Ward deliberately or improperly deleted one or more emails in expectation of this litigation, and with the intention of concealing them. It seems unlikely he can really have hoped to do so, bearing in mind the other people with whom they were shared. Moreover, I see no need to decide this question. I am perfectly satisfied that I have had access to a pretty full documentary base that has enabled me to make satisfactory findings of fact. As more documents have appeared, they have simply served to confirm those findings. Of course, the documents would, in an ideal world, have been produced earlier, but the trial was brought on quickly at CPC's behest, and disclosure was a large task. Satellite litigation is always to be discouraged. The attempt to find some conclusive smoking gun after the trial had concluded was, as so often, unsuccessful.

*Issue 5: CPC breach issue: Was CPC's conduct between 22nd March and 12th June 2009 in breach of its duty of utmost good faith contained in clause 7(1) of the SPA, whether by devising a strategy with the objective of manoeuvring QD into a position where it would become obliged to pay CPC more quickly, or otherwise?*

284.  In my treatment of Mr Candy's evidence and the shape of the case, I have largely dealt with this issue. The basic position was that both sides understood full well the interests of the other. Mr Ward was never in any doubt that Mr Candy wanted his Deferred Consideration or a payment under paragraph 5(aa). Mr Candy was never in any doubt that the Prince of Wales's intervention was causing a political problem for QD. As I have said, it is undoubtedly the case that CPC embarked upon a strategic attempt to get its money as quickly as possible. But, in the result, QD was supremely unaffected by Mr Candy's manoeuvrings.

285.  In my chronological account set out above, I have sought to deal with the majority of the documents upon which Mr Smouha relies as evidencing Mr Candy's bad faith. They are mostly internal emails that show that Mr Candy and his staff were over-enthusiastic about achieving a position in which QD withdrew without fulfilling the conditions in paragraph 5(f)(i) and (ii). In the result, this is precisely what has happened. But I do not think that anything Mr Candy did had any material effect on bringing it about.

286.  At every stage in the process, Mr Ward kept Mr Candy informed, but from 22nd March 2009 onwards, Mr Ward was fully aware that the problem of the Prince of Wales's letter was one that he had to solve. He did not expect untainted advice from Mr Candy, because he knew (as Mr Candy repeatedly told him) that if he withdrew the Planning Application, Mr Candy thought he would have to pay him (see SJ Berwin's letter of the 7th April 2009 as an example). Likewise, Mr Ward thought (as he told CPC) that he should only have to pay the Deferred Consideration when value was achieved.

287.  In these circumstances, little would be gained by going ceremoniously through every document alleged by Mr Smouha to demonstrate bad faith. I will, however, deal with the main events on which Mr Smouha relies. They are:-

i)  The alleged manipulation of the presentation to the PBGL board meeting on 30th March 2009.
ii)  CPC's suggestion that QD should say in its 23rd April 2009 letter to WCC that it intended to build out the existing scheme, when it did not.
iii)  The alleged creation of documents to paper the file including Mr Candy's allegedly inaccurate note of 23rd May 2009, and his notes of Mr Ward's supposed acceptance that withdrawal would be a breach.
iv)  CPC's suggestion that an appeal would take longer than it would in an attempt to push QD towards a withdrawal.
v)  CPC's alleged failure to alert QD to its contention that withdrawal would be a breach of the SPA.
vi)  CPC's alleged attempts to influence Mr Woodman to adopt positions that favoured CPC.

**The alleged manipulation of the presentation to the PBGL board meeting on 30th March 2009**

288.  I have dealt above with the main emails on which Mr Smouha relies in the run up to the 30th March 2009 PBGL board meeting. The events at the advisors' meeting and the board meeting demonstrate how ineffective CPC's manipulations were. CPC certainly thought it needed QD to withdraw if it was going to get its money, and it was certainly opposed to the soft undertaking route on the basis that damage might thereby be done to the Planning Application. But QD, knowing this to be the case, decided anyway to give the Prince of Wales some comfort. They were, effectively, left with no choice, since, as Mr

Dean had said in the briefing paper: " *continuing to press ahead with the current application* " would " *involve a face-off with the [Prince of Wales]* ". The Board decided, as was inevitable and obviously the only possible course in the spirit of the objective of the SPA that preparing for confrontation with the Prince of Wales " *may not politically be attractive* ". Despite, Mr Simpson's internal suggestion that asking Mr Woodman to opine would be problematic because desperate measures might be required where the Prince of Wales was about to " *let off a hand grenade* ", the board decided to do just that.

289.   Thus even though it is true that Mr Candy and his team were internally considering how they could best achieve what they wanted – namely money quickly – in the result QD/PBGL took the steps that they considered best, directed towards ameliorating the problem that had arisen (which affected all parties) following the Prince of Wales's letter, and towards obtaining planning permission as best they could.

**CPC's suggestion that QD should say in its 23rd April 2009 letter to WCC that it intended to build out the existing scheme, when it did not**

290.   It is true that CPC suggested that QD should beef up its 23rd April 2009 letter to WCC, by saying expressly that the scheme would be built out. For example, Mr Dean's email to Mr Wallace of 22nd April 2009 said " *I understand you have declined to include any reference in the proposed letter to WCC on the ultimate build out of the scheme* ", and then explained why such a reference would combat what had been reported on 12th April 2009 in the Sunday Times. Ultimately, however, QD ignored CPC's blandishments, and PBGL's board approved a letter dated 23rd April 2009 saying simply that " *[t]he reason for this letter is to make it absolutely clear that we are fully committed to the present planning application* ". CPC's wish to overstate the position (knowing that it was not anyway intended fully to build out the scheme) was not, in my judgment actually dishonest or in breach of its good faith obligation in clause 7.1. Indeed, it was reiterated by SJ Berwin in their letter of 27th April 2009. It was simply a classic example of the clash of business cultures between QD and CPC, to which I have already alluded. Ultimately, it had no effect whatever on QD/PBGL's actions.

**The alleged creation of documents to paper the file including Mr Candy's allegedly inaccurate note of 23rd May 2009, and his notes of Mr Ward's supposed acceptance that withdrawal would be a breach**

291.   In cross-examining Mr Candy, Mr Smouha made a close textual analysis of the documents leading up to the final version of Mr Candy's 'file note' email dated 23rd May 2009 to Messrs Dean and Smith purportedly recording what had happened during three conversations between Mr Candy and Mr Ward: the first on 14th May 2009, the second after the GLA meeting on 15th May 2009, and the third after the meeting with Councillor Davis on 18th May 2009. I have already set out my findings on what actually happened and my observations on the preparation of Mr Candy's 23rd May 2009 email.

292.   As it seems to me, although the email was carefully manicured for the purposes of use in future expected litigation, it was accurate in many, if not most, respects. I do not think Mr Candy repeated as often as the note suggests that withdrawal would be a breach of the SPA, nor do I think it matters. I do not think that Mr Ward ever acknowledged expressly that withdrawal would be a breach, but again I am sure that his acknowledgment or otherwise is irrelevant to the outcome of this case, which I shall decide on the evidence and the law.

293.   Overall, I think that Mr Smouha's attack on the preparation of the 23rd May 2009 email as a dishonest attempt to alter the facts for the purpose of future litigation was broadly unsuccessful. Instead, the 23rd May 2009 email was a pretty irrelevant waste of CPC's time, which had no effect whatever on QD's actions. Its preparation was certainly not a breach of CPC's contractual obligation of utmost good faith in clause 7.1.

**CPC's suggestion that an appeal would take longer than it would in an attempt to push QD towards a withdrawal**

294.  It was alleged against Mr Candy that he had sought to exaggerate the likely minimum length of a planning appeal, in order to make the prospect look unattractive to QD, and thus to push QD towards withdrawal. Indeed, it is true that CPC canvassed the various expert views on the likely minimum time that an appeal would take and came up with 10 months from Mr Simpson, 6 months from Mr Woodman, and 4 months from a Mr Hancox. Armed with that information, Mr Candy estimated 12 months, despite having told me that he was not himself a planning expert, and that he was relying on these other experts.

295.  I accept that this did not reflect well on Mr Candy, and that his explanation (" *So for me it would just be a feel from advice* ") was not wholly convincing. That said, I have no reason to suppose that Mr Candy's view had any effect whatsoever on QD. Withdrawal came about in the way that I have already described, and was not much influenced by the likely timescale of a planning appeal. I cannot say either that Mr Candy's conduct was deliberately intended to mislead. He was entitled to express a view, and I cannot say with any kind of assurance that it was not a genuine view, even if it certainly was not an average of the other experts' views. Ultimately, I do not think this incident was a breach of clause 7.1.

**CPC's alleged failure to alert QD to its contention that withdrawal would be a breach of the SPA**

296.  This is a strange allegation to make. In QD's written closing submission, it is alleged that: " *CPC avoided alerting QD to the fact that it believed that a withdrawal would be a breach of contract until the last possible moment, by which stage QD was already likely to withdraw, but, at the same time, created documents which falsely recorded that it had done so* ". This seems to me to be simply wrong. CPC's solicitors, SJ Berwin, had written to QD on 7th April 2009 saying that: " *we understand that as a further alternative QD is considering withdrawing the current application. Under the Agreement, QD cannot do this except in the limited circumstances contemplated in* paragraph 5 (f) of Schedule 4, *which do not apply at this stage* ".

297.  It is clear to me from the evidence that Mr Ward was fully aware of CPC's position throughout. He knew CPC wanted its money. He knew that CPC thought that, if QD withdrew, it would have no option but to pay. He knew that he disagreed, his view being that CPC should only be paid when value was locked in to the property – i.e. when planning was achieved. In short, I have already found that Mr Candy may well not have mentioned that withdrawal would be a breach as often as he says he did, but it was certainly clearly on the table in a formal letter from solicitors very early on, and was indeed discussed, albeit at a later stage, with Mr Ward, in particular in the 28th May 2009 exchanges of emails.

298.  CPC was not in breach of clause 7.1 in this respect as QD alleges.

**CPC's alleged attempts to influence Mr Woodman to adopt positions that favoured CPC**

299.  QD rely on 6 occasions on which CPC is alleged to have tried improperly to influence Mr Woodman.

i)  First, on 25th March 2009, when Mr Simpson suggested to Mr Candy that it was best not to ask Mr Woodman to opine. I have already decided that this was no breach of clause 7.1. As I have said, the board of PBGL decided to ask Mr Woodman's opinion on 30th March 2009.

ii)  On 30th March 2009, Mr Simpson spoke to Mr Woodman, whose views on the effect of a soft undertaking affecting the outcome were " *mixed* ". Mr Candy reacted by saying " *So we need QD to withdraw. Fact!!!!* ". This was just an exuberant self-interested response. It had no effect on anyone, let alone Mr Woodman or QD, to neither of whom it was sent.

iii)  On 4th April 2009, Mr Smith responded internally to the Mail on Sunday's article by saying: " *This will help provided Bob is solid* ". The email was another exuberant response concerning CPC's own commercial interests. Again, it had no effect on Mr Woodman or QD, to whom it was not sent.

iv)  On 28th May 2009, Mr Candy and Mr Simpson met Mr Woodman to discuss his views. As I have already held, Mr Simpson tried to persuade Mr Woodman that the prospects for the new outline proposal were not, as Mr Woodman had said: " *good and probably stood a better chance than the current scheme* ". Yet again, however, the outcome was

ineffective for CPC: Mr Woodman held to his views as his expression of opinion on 12th June 2009 demonstrates. Both QD and CPC were discussing the issues with Mr Woodman, and testing his views. I cannot see that either side's discussions over-stepped the mark or became breaches of clause 7.1. Mr Woodman was not a man to be influenced by such discussions.

v) On 3rd June 2009, Mr Candy asked Mr Simpson to " *convince [Mr Woodman] … to hold his position that he agreed to last night, regardless of the media* ". The position he had agreed was that the site visit for WCC members on 8th June 2009 should go ahead. Indeed, the visit did go ahead. I cannot see how persuading Mr Woodman to maintain his opinions (if anyone ever even sought to do so, as to which there was no evidence) was a breach of clause 7.1. Cancelling the site visit was not in the gift of QD/CPC in any event.

vi) Finally, of course, QD relies on CPC's conversation with Mr Woodman on 12th June 2009, and on Mr Candy's email to Mr Woodman of the same day after he (Mr Woodman) had been asked by Mr Titchen for his recommendation. Mr Candy wrote, copied to Mr Titchen: " *We do not think the Mayor has given any such indication. Bob cannot recommend anything to QD, as it must be a joint instruction under the [SPA] …* ". This was simply CPC seeking to assert a contractual position that was nothing to do with Mr Woodman, and indeed appears to have been ignored by him. The expression of this view cannot have been a breach of clause 7.1. Moreover, the matters of which CPC was trying to persuade Mr Woodman in the telephone call (referred to in paragraph 116 above) were also, in effect, matters of contractual interpretation.

300. Thus, whilst CPC may have come close to the line in its dealings with Mr Woodman, in my judgment it never crossed the line into acting in breach of its obligation of utmost good faith. But even if it had, Mr Woodman was wholly unaffected by CPC's conduct in any event.

*Issue 6: Repudiation issue: Were any breaches by QD and/or CPC repudiatory? If so, was either party, or is either party now, entitled to accept that repudiation as having terminated or terminating the SPA?*

301. This issue then answers itself. QD contends that it accepted CPC's repudiation of the SPA by letter dated 12th April 2010. I have held that CPC had not breached its obligations under the SPA. Accordingly, QD was not entitled to accept those breaches as evidencing CPC's intention no longer to be bound by the terms of the SPA.

302. Even if CPC had acted in breach of the SPA as alleged by QD, I would not have been inclined to hold that the breaches were sufficiently serious to evince an intention not be bound by the SPA. QD would not, therefore, even in that event have been justified in accepting CPC's breaches as a repudiation of the SPA bringing it to an end.

303. Plainly, however, QD has itself, by purporting unjustifiably to accept CPC's breaches as a repudiation terminating the SPA, evinced its own intention not to be bound by the terms of the SPA. That repudiation has not, however, been accepted by CPC as terminating the SPA (see paragraph 19.6 of CPC's amended Reply expressly reserving CPC's rights in relation to QD's repudiation). As is well known, an unaccepted repudiation is a " *thing writ in water* " (see Asquith LJ in *Howard v. Pickford Tool Co. Ltd. [1951] 1 KB 417* at page 421). Accordingly, the parties' mutual obligations under the SPA survive and are, as at today, continuing.

*Issue 7: QD election issue: Is an election under paragraph 5(aa) of Schedule 4 to the SPA the only remaining available mode of contractual performance by QD and/or in the present circumstances is QD obliged pursuant to clauses 7.1 and/or 7.3 of the SPA to make payment to CPC?*

304. This issue raises what I have already described as Lord Grabiner's central construction argument.

305. Lord Grabiner argues that the terms of the SPA provide for strictly delineated methods of contractual performance designed specifically to protect CPC's Deferred Consideration. That indeed is the heading to clause 7, which is therefore to be taken as being there for that express purpose. When one comes to Schedule 4, again one finds, so the argument runs, that QD is closely confined in its dealings with the Planning Application. It must use all reasonable and commercially prudent endeavours to procure a Planning Permission free of Legal Challenge under paragraph 5(a), but, more than that, it must pursue the Planning Application pursuant to strict tramlines. It can only make such changes to the Planning Application as are permitted under paragraphs 5(c)-(e), and can only withdraw under paragraph 5(f) if both conditions in paragraphs 5(f)(i) and (ii) are satisfied. Even then, CPC argues that QD must continue with the Planning Application under 5(f)(iv) where the Planning Consultant advises that the prospects on an appeal are better than 55%. But, most importantly, Lord Grabiner

submits, if withdrawal takes place in breach of paragraph 5(f), as I have held has occurred, QD's only remaining form of available contractual performance under the SPA was to elect under paragraph 5(aa) to pay CPC £68.5 million. Thus, in effect, QD would be in breach of its obligations of good faith in clause 7.1 and in breach of its obligations not to do anything designed to avoid or reduce (or delay) payment of the Deferred Consideration, if it failed to elect. It is for that reason that Lord Grabiner contends that, in the events which have happened, and on the findings that I have made, CPC is entitled to a declaration that " *the only mode of contractual performance now available to QD is an election under paragraph 5(aa)* ".

306.  In closing argument, I took issue with Lord Grabiner's submission that QD was " *obliged* " to elect under paragraph 5(aa) putting to him that it was open to QD to act in breach of contract by withdrawing and paying properly assessed damages designed to put CPC in the position they would have been in had the contract been performed, rather than performing the contract by electing under paragraph 5(aa). Lord Grabiner accepted that QD was not " *obliged* " so to elect, but persisted in his argument that, because the SPA was drawn with strict obligations of good faith and tramlines as to when withdrawal could take place within its terms, if it did not elect, it would follow that the Court would, in effect, treat QD as if it had, because the parties had agreed that that was the only way it could, within the SPA, withdraw if the paragraph 5(f)(i) and (ii) conditions were not fulfilled.

307.  Lord Grabiner's argument is undoubtedly attractive, but it is, in my judgment, nonetheless wrong. Had the parties wanted to provide for the SPA to mean what Lord Grabiner says it means, it would have been the easiest thing in the world to have done so. Paragraph 5(aa) or a new paragraph 5(ff) would simply have said " *If at any time QD withdraws the Planning Application, without paragraphs 5(f)(i) and (ii) being satisfied, it will be deemed to have elected under paragraph 5(aa)* ". But the SPA does not say that or anything from which that can be inferred, and the context and the remaining provisions do not, contrary to Lord Grabiner's submission, require it to be inferred. Instead, paragraph 5(aa) gives QD a free election, which it can exercise or not as it chooses and when it chooses, to pay CPC £68.5 million in return for the falling away of the obligations in Schedule 4 with the exception of those that relate to the Rights of Light Threshold Payment.

308.  The strict tramlines of the SPA do not provide the tourniquet that Lord Grabiner contended for, and the obligations in clauses 7.1 and 7.3, though included to protect the Deferred Consideration, are not enough to have the effect Lord Grabiner requires. Of course the good faith obligation required QD to adhere to the spirit of the contract, to observe reasonable commercial standards of fair dealing, to be faithful to the agreed common purpose, and to act consistently with the justified expectations of CPC. But I have held that QD was not in breach of those obligations. Even in withdrawing without actually having fulfilled paragraph 5(f)(i), I do not think QD was acting malignly or in bad faith or with the intent of depriving or delaying CPC's attainment of its deferred consideration. QD was, as I mentioned already, acting as best it could in a very difficult political situation, with the objective of securing the best possible planning permission in the shortest feasible time. It was making the best of a bad job. Unfortunately for it, in doing so, it acted in breach of paragraph 5(f) by which it had agreed that the Planning Application " *shall not be withdrawn* " unless paragraphs 5(f)(i) and (ii) were satisfied. It did not, however, in my judgment, by so doing fall foul of either clauses 7.1 or 7.3. It could, of course have done so, but on the facts it did not. QD was not withdrawing because it wanted to do so, or because it wanted to stop CPC getting its money. It was, as I have also said, between a rock and a hard place, and was doing the best it could in difficult circumstances. QD's political objectives were ultimately, in fact, aligned with its commercial objectives, and indeed the objectives under the SPA, even though they might well not have been.

309.  This means that CPC would, in theory, be entitled to damages for QD's breach of paragraph 5(f). But CPC has not claimed such damages in its Amended Particulars of Claim, preferring instead expressly to reserve its rights to seek further or other relief consequential on the any declarations made by the Court.

310.  If CPC were to seek damages, they would be at large, and would (as it seems to me subject to any further argument that the parties may seek to put forward) be determined by reference to the sum of money that would put CPC in the position it would have been in, had QD not breached paragraph 5(f): i.e. had QD not withdrawn the Planning Application, and had QD, instead, allowed the Planning Application to proceed after 12th June 2009.

311.  I have not heard any evidence on what may or may not have happened had the Planning Application not been withdrawn, and there will, if CPC apply for an award of damages, have to be a damages assessment hearing, at which such evidence can be adduced.

312.  The damages payable by QD would obviously be different (or arguably different) if I had found that the withdrawal was also a breach of QD's obligations under clauses 7.1 and/or 7.3. In that event, it might have been easier for CPC to argue that it could only properly be put in the position that it would have been in, had QD performed the SPA, by assuming an

election under paragraph 5(aa). I make no comment on whether that would actually have been the outcome, but I can at least see an argument in favour of it.

313.   On the findings I have made, however, the assessment of damages would, as it seems to me, if ordered (and subject to further argument), be rather different. It would be a comparison between:-

i)  What would have been the position had QD continued with the Planning Application, and presumably appealed if that were necessary, and presumably battled against opposition from the Mayor and from the Prince of Wales, on the one hand; and

ii)  What has happened and presumably what will happen now that the Planning Application has been withdrawn and the SPA remains in being, as I have found that it does, on the other hand.

314.   Though possible, it would not be easy to undertake this comparison until the outcome of the actual planning process is known. But damages are to be assessed as at the date of breach, and the parties will be able to make submissions after judgment as to whether there should be an enquiry as to damages at all, and whether, if there is, it should proceed immediately or whether there should be a pause in the litigation.

*Issue 8: Remedies issue: What if any declarations are CPC and/or QD entitled to, as a result of the findings/holdings on the above issues?*

315.   In the above circumstances, I would be prepared, subject to hearing counsel as to the precise form of order, to make the following orders and declarations:-

i)  A declaration that there has been no Deemed Refusal within the meaning of paragraph 5(f)(i) of Schedule 4 to the SPA.

ii)  A declaration that the Planning Consultant recommended within the meaning of paragraph 5(f)(ii) of Schedule 4 to the SPA that a revised Planning Application stood a better chance of delivering a Planning Permission than the pursuit of an Appeal of the previous Planning Application.

iii)  A declaration that QD has acted in breach of paragraph 5(f) of Schedule 4 to the SPA by withdrawing or causing PBGL to withdraw the Planning Application on 12th June 2009.

iv)  A declaration that QD was not entitled to accept CPC's alleged breaches of the SPA as a repudiation of the SPA bringing it to an end on 12th April 2010.

v)  A declaration that the SPA remains in full force and effect.

vi)  An Order that CPC's claims against QD for damages for breach clauses 7.1 and 7.3 of the SPA be dismissed.

vii)  An Order that QD's claims for relief based on CPC's alleged breaches of clause 7.1 of the SPA be dismissed.

316.   Had CPC sought it, I would have been prepared to order judgment in its favour for an enquiry as to the damages sustained by it as a result of QD's breach of paragraph 5(f) of Schedule 4 to the SPA in withdrawing the Planning Application on 12th June 2009 or causing the Planning Application so to be withdrawn by PBGL. It remains to be seen whether CPC seeks such an enquiry, which I will consider in the light of any further submissions that may be made.

**Conclusions**

317.   The orders that I intend to make are summarised in the previous section of this judgment. Earlier in this judgment, I commented that some might have regarded this as a relatively simple dispute as to whether the conditions contained in paragraph 5(f) were satisfied or not. And that is really what it has turned out to be. The parties' suspicions of one another have turned out to be rather exaggerated, and to have had little or no effect on what actually happened.

318.   It would perhaps have been better if the parties had worked a little harder towards solving their mutual problems together, rather than resorting to immediate and somewhat intransigent positions in preparation for what I think they thought was going to be inevitable litigation. It may still not be too late. It would be commendable if the outcome of this judgment were that the parties, even at this late stage, started to work collaboratively together to achieve the best possible Planning Permission, as they had envisaged they would under the terms of the SPA.

319.  I have prepared a summary of this judgment for the use of the parties and the press, but the judgment itself should be regarded as definitive, and no reliance should be placed upon the summary, which is simply an accessible means of seeing at a glance the outcome of this case.

320.  It only remains for me to thank counsel and solicitors on both sides for the quality of their arguments and of their preparation of the case. Their hard work has made it much easier for me to prepare this judgment. I will hear counsel on the form of the order, consequential directions and costs.

*Schedule to the Judgment: The Detailed Terms of the SPA*

321.  The SPA provided as follows.

322.  Clause 1.1 defined the following terms:-

i)  " **Deferred Consideration** " means the aggregate of the Deferred Consideration Amounts.
ii)  " **Deferred Consideration Amount** " means to the extent payable each of the Planning Payment, the section 106 Base Threshold Payment, the Section 106 Sports Hall Threshold Payment, the Judicial Review Payment and Rights of Light Threshold Payment, each as defined in and calculated in accordance with Schedule 4.

323.  By clauses 2.1 and 2.2, CPC agreed to sell and QD agreed to buy one special share, and £7,440,000 of 5% unsecured, subordinated loan notes issued by PBGHL.

324.  By clause 3.2, QD agreed to pay to CPC the Initial Consideration of £37,917,806.

325.  Clause 3.3 provided that: "The Deferred Consideration shall be paid in accordance with the provisions of Clause 6 (Deferred Consideration) and Schedule 4".

326.  Clause 6 provided as follows:

"6.1.  Subject to Clause 8 ( *Event of default* ) the Buyer [QD] shall pay the Deferred Consideration to the Seller [CPC] by way of deferred consideration for the Sale Interests.

6.2  Subject to Clause 6.3, 7.4 and Clause 8 ( *Event of default* ), the Deferred Consideration shall be determined and payable in accordance with the provisions of Schedule 4.

6.3  The Deferred Consideration payable to the Seller shall not exceed £81 million in aggregate.

6.4  Where:

6.4.1  an Appeal has been unsuccessful or the Buyer is not obliged to pursue an Appeal and the Seller chooses not to exercise its right to elect to pursue that Appeal (unless in each case the circumstances in paragraph 5(n) of Schedule 4 concerning the change to the City Council committee applies and the Buyer is obliged to resubmit the Planning Application pursuant to paragraph 5(n) of Schedule 4 whether or not an Appeal is pursued and Planning Permission is secured for that resubmitted Planning Application irrespective of the outcome of the Appeal);
6.4.2  an Accelerated Payment Event has occurred and payment has been made pursuant to Clause 7.4;
6.4.3  a Default Payment has been made pursuant to Clause 8.2(a) or Clause 8.4(a); or
6.4.4  a defence of a Legal Challenge has been unsuccessful and pursuant to paragraph 2(bb) of Schedule 4 Planning Counsel has advised that the successful Legal Challenge identifies issues so fundamental that a new planning application is required, then the Buyer shall have no further obligation to pay any Deferred Consideration (save in respect of any amounts that are payable but unpaid) and the obligations of the Buyer and the Seller under Schedule 4 shall cease to apply

and Schedule 4 shall cease to have any further force or effect provided that the provisions of this Clause 6.4 are without prejudice to any rights of the Seller against the Buyer for breach or non performance of any obligation under this Deed.

6.5   Subject to Clause 8 ( *Event of Default* ), each Deferred Consideration Amount (if any) due to the Seller shall be paid within ten Business Days after the Payment Date in respect of such Deferred Consideration Amount by delivery to the Seller's Solicitors for the account of the Seller of an electronic transfer to SJ Berwin LLP Client Account at Barclays Bank plc, 1 Churchill Place, Canary Wharf, London E14 5HP, Account number: 10644994, Sort code: 20-36-47, Swift Code: BARCGB22, IBAN Code: GB33 BARC 2036 4710 6449 94, Reference C20900.24 for the amount of that Deferred Consideration Amount or by such other means as the Seller shall notify in writing to the Buyer, provided that such notification shall only be effective on:

(a)   the date specified in the notification as the date on which the change is to take place; or

(b)   if no date is specified or the date specified is less than five clear Business Days after the date on which notice is deemed to have been served, the date falling five clear Business Days after notice of any such change is deemed to have been given."

327.   Clause 7 entitled " *Protection of Deferred Consideration* ", provided as follows:-

"7.1   [QD] and [CPC] shall both act in the utmost good faith towards each other in relation to the matters set out in this Deed and in Schedule 4 and [QD] shall use all reasonable but commercially prudent endeavours to enable the achievement of the various threshold events and Payment Dates set out in Schedule 4 and [QD] shall procure that all relevant members of [QD]'s Group comply with the provisions of this Clause 7 and Schedule 4.

7.2   [QD] and [CPC] shall perform and observe their respective covenants contained in Schedule 4.

7.3   Without prejudice to Clause 7.1, provided that [CPC]'s Group is performing its obligations in relation to the matters referable to the achievement of the various events giving rise to the calculation and payment of the Deferred Consideration Amounts, from the date of this Deed to the date on which all Deferred Consideration has been received by [CPC] [QD] shall:

(a)   not do any act or thing designed to or with the intention to, or omit to do any act or thing which it has an obligation to do so as to, avoid or reduce payment of any Deferred Consideration and shall procure that no member of [QD]'s Group or the Blue Group or their respective employees does so or omits to do so and it shall not direct their respective agents, consultants or any party acting on their respective behalves to do or omit to do so; …"

328.   Schedule 4 to the SPA provided as follows:-

i)

"1.   Definitions and Interpretation
(a)   In this schedule: …

" **Affordable Housing** " means any housing to be provided at less than full market value

CPC Group Ltd v Qatari Diar Real Estate Investment Co, 2010 WL 2516392 (2010)

" **Appeal** " means an appeal to the Secretary of State under section 78 of the Planning Act against Refusal or a Failure to Determine …

" **Developable Area** " means in respect of any Planning Permission the square footage of the Property of all of the:

(a)  residential space; and
(b)  ancillary storage space to (a) (being an amount capped at 6.5% of (a)); and
(c)  hotel space

shown on the Planning Drawings and measured by the Measurement Surveyor in accordance with the Measurement Criteria pursuant to paragraph 5(p) of this Schedule …

" **Failure to Determine** " means the later of a failure by the City Council (or the Mayor if he has jurisdiction of the Planning Application) to make a decision within the period prescribed by order for determination of the Planning Application or such extension to the period as determined in accordance with paragraph 5(h)

" **Judicial Review Opinion** " means Planning Counsel's written opinion obtained in accordance with paragraph 4 which is clear and unequivocal in its conclusions that there are equal to or greater than better than evens (meaning 55% to 60% or above) prospects of successfully disposing of the Legal Challenge leaving in place the Planning Permission without material modification

" **Judicial Review Payment** " means £12,500,000

" **Judicial Review Payment Threshold** " means the satisfaction of the events set out in paragraph 2 of this Schedule

" **Legal Challenge** " means any challenge of the Planning Permission made by any party either by way of judicial review or a challenge made under section 288 of the Planning Act excluding any made by or on behalf of the Buyer or any entity within the Buyer's Group or on any of their respective behalves

" **Legal Challenge Period** " means:

(c)  in the case of a grant of the Planning Permission by the Secretary of State the statutory period of six weeks following the date of the decision notice and of a correction notice under Part 5 of the Planning and Compulsory Purchase Act 2004 (if any) has expired without any person who is aggrieved making an application to the High Court under section 288 of the Planning Act ; or
(d)  in any other case, the period of three months since the grant has expired without any person making an application to the court for judicial review.

" **Mayor** " means the Mayor of London whose functions are contained in the Town and Country Planning (Mayor of London) Order 2000 or 2008 as the case may be. …

" **Planning Application** " means the planning application bearing reference number 08/02889/FULL and any necessary associated application for Chapel Permission and/or conservation area consent for the demolition of existing former barracks buildings and redevelopment for mixed use purposes (in buildings of between 5 and 13 storeys) comprising 638 residential units (to include 319 units of affordable housing), hotel (Class C1), sports centre (Class D2), community hall (Class D1), flexible retail (Class A1/A2/A3) and/or (Class D1), restaurant (Class A3), hard and soft landscaping including the creation of public open space, new vehicular and pedestrian access and works to the public highway and the provision of basement level parking, servicing and plan areas dated 2 April 2008 as may be varied or any new application which may be made for the development of the Property by or consented by the [QD] or any member of [QD]'s Group or anyone on any of their respective behalves and as such new application may be varied. …

" **Planning Consultant** " means DP9 LLP…

" **Planning Permission** " means each of the consents granted pursuant to the Planning Application and separately where the Chapel has been listed pursuant to the Chapel Permission or for the avoidance of doubt on Appeal …

" **Rights of Light Payment Date** " will be the earlier of the following:

(a)  the date on which exchange of an agreement with each Injunctible Owner for the release or modification, consent or other arrangement which will allow the development

to proceed has occurred and where relevant the RL Market Value has been agreed or determined in accordance with paragraph 8(f) provided that in the event that paragraph 8(c) applies to an Injunctible Owner obtaining insurance in accordance with the terms of paragraph 8(c) will count as exchange of an agreement for the purposes this definition in respect of the relevant Injunctible Owner; and

(b) practical completion of that part of the development of the Property which infringes the rights of light of such of the Injunctible Owners who have not entered into the requisite agreements or in respect of whom insurance has not been obtained

"Rights of Light Settlement Budget" means £5,625,000
"Rights of Light Threshold Payment" means £12,500,000
…"

ii)

"2  Planning and Judicial Review Payment Threshold
(a)  The Buyer shall pay to the Seller the Planning Payment and the Judicial Review Payment on either:
(i)  the grant of the Planning Permission and the expiry of the Legal Challenge Period with no Legal Challenge having been made; or
(ii)  if any Legal Challenge is made within the Legal Challenge Period then the later of:
(A)  expiry of in the case of a grant of the Planning Permission by the Secretary of State the statutory period of six weeks following the date of the decision notice and of a correction notice under Part 5 of the Planning and Compulsory Purchase Act 2004 (if any); or in any other case, the period of three months since the grant of the Planning Permission; and
(B)  the date when the Judicial Review Opinion is procured in relation to such Legal Challenge
(b)  In the event that the criteria for payment set out in paragraph 2(a) are not satisfied, the Planning Payment and the Judicial Review Payment shall be payable by the Buyer to the Seller on the date on which any Legal Challenge made within the Legal Challenge Period has been finally disposed of by the Court hearing the Legal Challenge at first instance, leaving in place the Planning Permission without material modification regardless of any protective or actual permission being granted by the Court of Appeal to initiate an appeal against the decision of the High Court to dismiss the Legal Challenge or any actual appeal to a higher court
(bb)  If the result of any Legal Challenge has the effect of not leaving the Planning Permission in place without material modification the Buyer and the Seller shall jointly instruct Planning Counsel to advise on whether the successful Legal Challenge identifies issues so fundamental that a new planning application is required and in such circumstances the provisions of this Schedule shall not apply save as to the Rights of Light Threshold Payment otherwise this schedule shall apply to any redetermination of the Planning Application referable to the successful Legal Challenge

**Planning Payment Calculation**

(c)  The Planning Payment shall be calculated by reference to the following:
(i)  The Planning Payment will be based upon a sliding scale between £0 and £43,500,000 dependent upon the Developable Area.
(ii)  If the Developable Area is less than or equal to 945,000 square feet then no payment is due.
(iii)  If the Developable Area is greater than 945,000 square feet and less than or equal to 1,050,000 square feet then the payment is equal the following formula: Payment = £(a-b) × c (rounded to the nearest number)
where:

a = the Developable Area
b = 945,000

    c = 295.2380952

(iv)  If the Developable Area is greater than 1,050,000 square feet and less than or equal to 1,135,000 square feet then the payment is equal the following formula: Payment = £((a-b) × c)+31,000,000 (rounded to the nearest whole number) where:

    a = the Developable Area
    b = 1,050,000
    c = 147.0588235

(v)  If the Developable Area is greater than 1,135,000 square feet then the payment is equal to £43,500,000
…"

iii)

"5  Planning Application and Developable Area Measurements

**General**

(a)  [QD] shall use all reasonable but commercially prudent endeavours to:
(i)  procure a Planning Permission free of Legal Challenge; …
(aa)  At any time [QD] may elect to pay to [CPC] £68,500,000 and upon making such payment the obligations in this Schedule shall fall away save for any that relate to the Rights of Light Threshold Payment. …

**Planning Consultant**

(b)  At any time the Buyer may elect to appoint a planning consultant to replace the then currently appointed Planning Consultant provided that before doing so the Buyer shall consult with the Seller and the Seller shall be given opportunity to put forward as soon as reasonably practicable up to three alternative planning consultants provided each is recognised as a specialist in large planning projects in London and then the Buyer shall choose one of those consultants to be the planning consultant for the Planning Application. Any such Planning Consultant who is appointed pursuant to paragraphs 5(c), 5(d), 5(f), 5(g), 5(h) and 5(i) shall be appointed jointly by the Buyer and the Seller. For the avoidance of doubt the Planning Consultant appointment is only a joint appointment where this paragraph applies and for all other aspects of the planning process the Buyer is free to appoint the Planning Consultant independently of the Seller.

**Changes to the Planning Application**

(c)  Subject to (paragraphs 5(d), 5(e) and 5(f)), where a material variation is proposed to the Planning Application but the Planning Consultant has expressed the view that such a variation could prejudice the chance of obtaining Planning Permission but [QD] wishes to proceed with that variation, [QD] and [CPC] first shall review the variation to see if it is in their respective interests to make the variation and if they agree to the variation (both acting reasonably and commercially prudent) then the variation may be made and if made shall form part of the Planning Application for the purposes of this Schedule or in the event that agreement cannot be reached [QD] and [CPC] shall jointly request the Planning Consultant to confirm whether such variation would reduce the chances of successfully obtaining Planning Permission without Appeal to less than better than evens (meaning less than 55%) then:
(i)  If the Planning Consultant opines that the chance of successfully obtaining Planning Permission without Appeal with the variation is equal to or greater than better than evens (meaning equal to or more than 55%) then the variation may be made.

(ii)  If the Planning Consultant opines that the chance of successfully obtaining Planning Permission without Appeal with the variation is less than better than evens (meaning less than 55%) then the variation may not be made unless [QD] pays to [CPC] the sum of £68,500,000 after which [QD] may make such material variation and the provisions of this Schedule shall cease to apply save as they relate to the Rights of Light Threshold Payment.

(d)  Subject to paragraph 5(e) no variation which is likely to result in a material reduction of Developable Area (and in the context of this paragraph only the term "Developable Area" shall be referable to any planning permission likely to result) may be made to the Planning Permission unless the Planning Consultant confirms to [QD] and [CPC] jointly that to maintain the Planning Application without such variation would reduce the chance of successfully obtaining Planning Permission without Appeal to less than better than evens (meaning less than 55%) or unless paragraph 5(c)(ii) is exercised in relation to that variation.

(e)  It shall be deemed that [QD] and [CPC] consent to the design changes to the masterplan, any necessary variations to the Planning Application or any new planning application necessary to follow the planning steer of the City Council on 4 September 2008 which it is acknowledged may result in a loss of floor space of between 75,000 and 100,000 square feet and/or any reasonable changes needed to reflect any listing of the Chapel if applicable.

**Withdrawals**

(f)  The Planning Application shall not be withdrawn unless:

(i)  the City Council have prepared an officer's report recommending that the Planning Application be refused or the Mayor has indicated that he intends to exercise his power to direct the City Council to refuse the Planning Application or call in the Planning Application for his determination (if applicable) or the Secretary of State has issued a holding objection (a "Deemed Refusal"); and

(ii)  the Planning Consultant recommends to [QD] and [CPC] jointly that a revised Planning Application stands a better chance of delivering a Planning Permission than the pursuit of an Appeal of the previous planning application

and in such circumstances [QD] shall either:

(iii)  withdraw the Planning Application provided it submits a replacement application with a view to securing the objectives in this paragraph 5 with all due diligence and expedition to meet the reasons for the Deemed Refusal provided that such changes do not go further than is necessary to meet those reasons for the Deemed Refusal otherwise the resubmission will be treated as a variation and the provisions of paragraph 5(c), 5(d) and 5(e) shall apply to the proposed changes; or

(iv)  continue with the Planning Application where the Planning Consultant has advised that there is equal to greater than better than evens chance (meaning equal or greater than 55%) of success of an Appeal and provided that the reason for the Deemed Refusal was not the negligence of [CPC] [QD] shall make and pursue an Appeal with a view to securing the objectives in this paragraph 5 with all due diligence and expedition.

**New applications**

(g)  Subject to 5(i) below, if [QD] wishes to submit, or to have submitted on its behalf, a planning application for the Property other than the Planning Application, while the Planning Application or Appeal remain undetermined, such application shall be referred to the Planning Consultant as if it were a material variation under paragraph 5(c) above and may not be submitted other than in accordance with that paragraph.

**Failure to Determine**

(h)  If the Planning Authority (for the purposes of this paragraph 5(h) only the term "Planning Authority" excludes the Secretary of State) fails to determine the Planning Application within the period prescribed by order for determination of the Planning Application then the Buyer may in writing to the Planning Authority unilaterally extend the period for determining the Planning Application provided that the extended period is first approved by the Seller acting reasonably.