In the event of a dispute concerning the period for extending the determination period then the dispute shall be referred for determination by the Planning Consultant.

**Appeals and Legal Challenges**

(i)  In the case of any Planning Refusal or Failure to Determine the Buyer and the Seller shall jointly instruct the Planning Consultant to advise on the prospect of success of an Appeal and where the Planning Consultant have advised that there is equal to or greater than better than evens chance (meaning equal … greater than 55%) of success of an Appeal and provided that the reason for Planning Refusal was not the negligence of the Seller the Buyer shall make and pursue an Appeal with a view to securing the objectives in this paragraph 5 with all due diligence and expedition. For the avoidance of doubt, if the Planning Consultant advises that there is less than 55% prospects of success at Appeal, or if the reason for Planning refusal was the negligence of the Seller, then the Buyer is not under an obligation to pursue the Appeal and the provisions 5(l) and 5(m) apply.

(j)  If an Appeal of the Planning Application is pursuant to paragraph … then the costs of that Appeal shall be borne equally between the Buyer and the Seller and if the Seller fails to pay its share then the Buyer's obligations … paragraph 5(i) shall no longer apply.

(k)  The Buyer will lend all reasonable but commercially prudent endeavours (which may include applying to be either a respondent or interested party where appropriate) to the City Council in defending any Legal Challenge.

(l)  Where the Buyer is not obliged to pursue an Appeal under paragraph 5(i) above then notwithstanding the fact that the Seller may or may not elect to pursue the Appeal on its own behalf the Buyer shall be at liberty to submit any alternative planning application and the provisions of this schedule shall not apply to any planning permission applied for under that application.

(m)  Where the Buyer is not obliged to pursue an Appeal under paragraph 5(i) above the Seller may at its own cost pursue an Appeal and the Buyer shall following a written request from the Seller: …"

iv)

"**Rights of Light Threshold Payment**

(a)  The parties will:

(i)  jointly but at the Buyer's cost instruct the ROL Advisors to identify the Injunctible Owners and to give an estimate of the likely level of compensation payable to the Injunctible Owners and to proceed with negotiations with such Injunctible Owners so as to achieve the payment of the Rights of Light Threshold Payment as soon as reasonably possible and to minimise the Actual Costs. Any dispute on the terms of the appointment or identity of any replacement ROL Advisor may be referred by either party to the expert to determine under paragraph 10; and

(ii)  instruct the ROL Advisors to provide promptly all information that may be required in order to obtain any relevant insurance.

(b)  The Buyer shall use all reasonable endeavours to conclude agreements with all Injunctible Owners to its reasonable satisfaction as soon as reasonably possible after the date of this Deed.

(c)  In the event that the Buyer is unable to conclude agreements to its reasonable satisfaction in accordance with paragraph 8(b) with some of the Injunctible Owners the Seller shall instead seek to obtain insurance or procure that such insurance is sought for the benefit of the Buyer and if such insurance is from an insurer and on terms satisfactory to the Buyer in its reasonable opinion, the cost of placing such insurance shall be paid by the Buyer and included as an Actual Cost.

(d)  It is accepted and acknowledged by the parties that the ROL Advisors may rely upon Crown immunity in their negotiations with the Injunctible Owners.

(e)  In conducting discussion and negotiation with the Injunctible Owners the Buyer shall keep the Seller fully informed of all negotiations and shall give them at least 5 Business Days notice of all meetings with any Injunctible Owner or the ROL Advisors and their consultant teams and allow the Seller and the Seller's representatives to attend and participate in such meetings.

(f)  Where one or more Injunctible Owner's interests are acquired by the Buyer or any member of the Buyer's Group or any person or entity otherwise connected with or related to any of them or any other party acting on behalf of any of them the Seller and the Buyer shall seek to agree the RL Market Value as soon as reasonably practicable and in the event the parties fail to reach agreement either party may refer the matter to determination in accordance with paragraph 10 of this Schedule.

(g) the Buyer shall pay to the Seller the Rights of Light Threshold Payment on the Rights of Light Payment Date provided that if the Actual Costs exceed the Rights of Light Settlements Budget then the Rights of Light Threshold Payment shall be recalculated according to the following formula: $a = £12{,}500{,}000 - ((b{-}c)/c \times 12{,}500{,}000)$

where

    a is the recalculated Rights of Light Threshold Payments
    b is the Actual Costs
    c is the Rights of Light Settlements Budget

in any case where "a" is a negative amount it shall be deemed to be zero and for the avoidance of doubt where "a" is a negative amount there shall be no set off against any other payments due under this Deed to the Seller…"

v)

"9.  Joint Appointment or Instructions

Where under any provision of this Schedule any parties are to jointly appoint any person or firm or give joint instructions if either party fails to do so upon request or fails to participate in the relevant process then either party may refer the issue to the expert under paragraph 10 for determination who shall determine the terms of the appointment or instructions which then shall be deemed to be made jointly by the parties."

Crown copyright



**Australasian Legal Information Institute**

**Supreme Court of New South Wales**

# Overlook v Foxtel [2002] NSWSC 17 (31 January 2002)

Last Updated: 26 February 2002

NEW SOUTH WALES SUPREME COURT

CITATION: ◀ **Overlook v Foxtel** ▶ [2002] NSWSC 17

CURRENT JURISDICTION: Equity Division

Commercial List

FILE NUMBER(S): 50165/99

HEARING  DATE{S):  17/09/01;  18/09/01;  19/09/01;  20/09/01;  21/09/01;  24/09/01;  25/09/01; 26/09/01; 27/09/01; 28/09/01; 02/10/01;

03/10/01; 01/11/01; 02/11/01

JUDGMENT DATE: 31/01/2002

PARTIES:

Overlook Management BV - Plaintiff

Foxtel Management Pty Ltd - Defendant

JUDGMENT OF: Barrett J

LOWER COURT JURISDICTION: Not Applicable

LOWER COURT FILE NUMBER(S): Not Applicable

LOWER COURT JUDICIAL OFFICER: Not Applicable

COUNSEL:

Mr A.J.L. Bannon SC/Mr S.J. Stanton - Plaintiff

Mr A. Leopold - Defendant

SOLICITORS:

Aitken McLachlan & Thorpe - Plaintiff

Allens Arthur Robinson - Defendant

CATCHWORDS:

CONTRACT - implied terms - caution required in finding that business efficacy makes term necessary - CONTRACT - terms implied by law - implied term requiring exercise of good faith in performance of contract - content and meaning of such implied term - ESTOPPEL - equitable estoppel - assertion of estoppel in face of written contract - TRADE PRACTICES - unconscionable conduct - calculation of "price" limit applicable to s.51AC - hallmarks of unconscionability - TRADE PRACTICES - misleading or deceptive conduct - whether statement by one party that it appreciates other's position imports duty to preserve that position - actionable representation versus mere puff - causal link broken where plaintiff relies on own independent and informed assessment.

ACTS CITED:

Trade Practices Act 1974 (Cth)

DECISION:

Dismissed with costs

JUDGMENT:

53

**IN THE SUPREME COURT**

**OF NEW SOUTH WALES**

**equity division**

**COMMERCIAL list**

Case 1:21-cv-11059-GHW    Document 180-2  NSWSC 17 (Filed 09/22/23  Page 6 of 100

**BARRETT J**

**THURSDAY, 31 JANUARY 2002**

**50165/99 – OVERLOOK MANAGEMENT BV v FOXTEL MANAGEMENT PTY LIMITED**

**JUDGMENT**

**HIS HONOUR:**

<u>**Background, parties and key persons**</u>

1 The plaintiff, Overlook Management BV ("Overlook"), is a Netherlands company the business of which is to acquire and on-sell television program content. The defendant, Foxtel Management Pty Limited ("Foxtel"), is one of two companies which, at all material times, provided pay television services in Australia. The other provider of such services was, at all material times, Optus Vision Pty Limited ("Optus"). Both Foxtel and Optus deliver television channels to Australian subscribers in their homes and other locations, both through cable and by satellite transmission. Their geographic coverage coincides to a large extent, although South Australia, Western Australia and the Gold Coast are serviced by Foxtel only.

2 Overlook obtains its product (that is, television channel content) from a number of sources. For present purposes, it is necessary to refer to four non-English language channels in respect of which Overlook enjoyed distribution rights. RAI International (or simply "RAI") is an Italian language channel, Antenna a Greek language channel, LBC an Arabic language channel sourced from Lebanon and ART another Arabic language channel. Although Overlook had the ability to supply these channels to carriers, it was not itself the producer of the content. That content came from television production enterprises in the source countries. RAI, for example, is a channel of the government owned television organisation in Italy and Antenna is a channel of a privately owned Greek television broadcaster. Related or associated companies of Overlook acquired from such

organisations the right to distribute their channels in particular parts of the world. It was from those related or associated companies that Overlook obtained the rights which enabled it to enter into arrangements with pay television operators in Australia.

3 The ownership profiles of Foxtel and Overlook should be briefly described. Foxtel is a joint venture, the members of which are Telstra Corporation Limited, The News Corporation Limited and Publishing and Broadcasting Limited, all of which are substantial corporations well known in Australia and beyond. Overlook, although incorporated in the Netherlands, is a member of the Dallah Albaraka Group based in Saudi Arabia. The chairman of that Group is Sheikh Saleh A Kamel. The Group is controlled by a small number of persons led by the Sheikh and His Royal Highness Prince Al Waleed Bin Tallal.

4 During 1996 and 1997, Overlook, through an agent based in Australia, engaged in discussions with Optus about the possibility of the supply by Overlook to Optus of certain non-English language channels for dissemination through Optus's pay television system. The Australian agent was Liban Pty Limited, the principal of which was Mr Tony Ishak. As a result of those discussions, supply arrangements were entered into between Overlook and Optus in relation to both the RAI channel and the Antenna channel. Although Optus began supplying those channels to its subscribers in 1997, the contractual relationship between the parties was not documented until early 1998. One of the main employees of Optus engaged on this project and involved in close contact with Mr Ishak was Mr Warren Kelly.

5 At some point in the first quarter of 1998, Mr Kelly left Optus and became an employee of Foxtel. He was immediately assigned to a role involving the possible development of non-English language channels as part of the suite of channels available to Foxtel pay television subscribers. In early March 1998, a meeting took place at Foxtel's premises in Sydney at which Mr Ishak and Mr Kelly were in attendance, together with another Foxtel employee, Ms May Oh. At that meeting, preliminary discussions took place about the possibility of an arrangement between Overlook and Foxtel for the provision of non-English language channels by Overlook to Foxtel for delivery through the Foxtel pay television system. Over the following weeks, these possibilities were further examined, although with Foxtel developing and expressing a preference for the RAI and Antenna (that is, Italian language and Greek language) channels and being less enthusiastic about the two Arabic language channels, ART and LBC. By the last week of April 1998, the discussions had matured to a point where Mr Kelly prepared two draft term sheets, one for RAI and the other for Antenna, setting out a possible basis for contracts between Overlook and Foxtel. He sent these to Mr Karim Abdallah, the chief executive of Overlook, who was based in Cairo. There had been

some earlier correspondence between Mr Kelly and Mr Abdallah, the latter having been introduced into the discussions by Mr Ishak.

6 Further negotiations followed. They were not always easy. Eventually, however, a point was reached where a documentary basis for the supply of the RAI and Antenna channels was agreed. On 19 August 1998, documents entitled "Schedule of Terms of Supply of Antenna" and "Schedule of Terms of Supply of RAI International" were adopted to by the parties as reflecting their agreement. Central to each arrangement was a fee structure under which Overlook was to receive a percentage derived from sales of the channels to Foxtel customers. It will be necessary, in due course, to refer to these and other aspects of the negotiations, discussions and correspondence, as well as the final documents. Foxtel commenced transmission of the RAI and Antenna channels during September 1998.

7 On the Overlook side, the persons involved in the formation of the parties' arrangement, in addition to Mr Ishak, were Mr Abdallah himself, both by teleconference and correspondence from Cairo, and Mr Wahib Geagea, a lawyer representing Overlook who participated from his base in Paris by teleconference and correspondence. At Foxtel, those involved in addition to Mr Kelly were Mr Richard Freudenstein who was the senior internal lawyer and also had commercial responsibilities and functions, Ms Lynette Ireland who was a Foxtel internal lawyer, Ms May Oh whose early involvement has already been noted and whose duties and specialty lay more in the area of finance and financial analysis and Mr Tom Mockridge, then the chief executive officer of Foxtel. These eight persons all gave evidence, both on affidavit and in the witness box.

8 It should be explained, at this point, that both Foxtel and Optus marketed their pay television services by way of a "basic" subscription which encompassed a certain core set of channels judged to be of general interest (including news, music, movies and other entertainment), with additional channels catering to particular interests or tastes being available as "add-ons" for those subscribers wishing to have them. There were, of course, differences between the two companies in the content and composition of the basic channel packages, as well as the add-ons. Each of the non-English languages channels (RAI and Antenna) was, for each supplier, an add-on. This meant that a Greek speaking or Italian speaking household wishing to have the relevant non-English language channel, whether from Optus or from Foxtel, would have to subscribe for the basic package as a means of obtaining the desired non-English language channel as an additional item in the total subscription. Such a subscriber might, of course, also elect to have other add-ons, such as channels devoted to new release movies and channels devoted to particular sporting

interests. Every subscriber paid a fixed monthly sum for the core package and a further monthly sum for each add-on.

9 Fierce competition existed between Optus and Foxtel. Each made strenuous efforts to sign up subscribers, including persons already taking the channels of the other company. Market preferences were such that a particular subscriber would wish to do business with only one pay television supplier at a time. Strategies aimed at persuading the competitor's subscribers to desert it were therefore an acknowledged part of the marketing efforts of each company. The process by which a subscriber left one company and signed up with the other was known in the trade as "churn". Customers were thus said to "churn" from one supplier to the other. "Churn" also occurred when a customer ceased subscribing altogether.

10 The difficulties between Overlook and Foxtel which eventually led to these proceedings began in July 1999, that is, when the channel supply arrangements had been in operation for some nine or ten months. On 1 July 1999, Foxtel acted to reduce the price charged to subscribers for each of the add-on components consisting of the RAI channel and the Antenna channel. The price initially charged for each add-on was $19.95 per month. That was in addition to a price of $44.95 for the core channels. The reduced price for each of RAI and Antenna was $9.95 per month. The monthly charge for the core channels remained at $44.95, although this was later reduced in conjunction with some adjustment to the content of the core package. Foxtel's reduction of the price for each non-English language channel produced a reduction in the returns to Overlook. The reason was that the reward or return to Overlook provided for in the arrangements between the two companies was expressed as a percentage (or, rather, in practical terms, a declining percentage on a scale geared to increases in subscriber numbers) of the revenue generated by Foxtel from subscriptions for the particular add-on channels.

11 An effective halving of the subscriber price would thus severely impact Overlook's financial return from Foxtel unless and until offset by a significant increase in subscriber numbers. An added effect upon Overlook would come from any "churn" represented by subscribers leaving Optus and joining Foxtel. The dissatisfaction of Overlook was compounded by what it regarded as failure by Foxtel to achieve for RAI and Antenna a degree of market penetration commensurate with that which Foxtel had led Overlook to expect.

**Overlook's claims**

12 Overlook's claims against Foxtel were articulated as follows:

1: A claim in contract based on alleged breach of an express oral agreement or an agreement partly oral and express and partly implied by conduct, the relevant term being that the RAI and Antenna channels would be sold by Foxtel at a price of $19.95 per month or that the price would not be varied except by agreement or would not be less than the price charged by Optus or would be such as to preserve Overlook's revenue base achieved through Optus.

2: A claim in contract based on alleged breach of a term of the written contracts which, on its proper construction, entitles Overlook to the stipulated percentage of the part of the revenue generated from each subscriber by reason of taking the relevant non-English language channel, that revenue element being agreed externally to but not inconsistently with the contracts to be $19.95.

3: A claim in contract based on alleged breach of implied terms of the contracts to the effect of the alleged expres terms upon which the first claim is founded.

4: A claim in contract based on an alleged breach of an implied term obliging Foxtel to act in good faith towards Overlook should Foxtel decide to charge the price charged to subscribers for the non-English language channels.

5: A claim that, because, to the knowledge of Foxtel, Overlook assumed that the price charged to subscribers for each channel would be $19.95 per month and Overlook was encouraged by Foxtel to make that assumption, it was unconscionable for Foxtel to act inconsistently with Overlook's assumption by reducing the price to $9.95 and Foxtel was estopped from so acting.

6: A claim that the conduct of Foxtel in reducing the subscription price from $19.95 per

month to $9.95 per month was unconscionable both in equity and under s.51AC of the **Trade Practices Act** 1974 (Cth).

7: A claim that Foxtel engaged in misleading or deceptive conduct contrary to s.52 of the **Trade Practices Act** by failing to inform Overlook that it considered itself free to reduce the subscription price without the consent of Overlook.

8: A claim that Foxtel engaged in misleading or deceptive conduct contrary to s.52 of the **Trade Practices Act** by representing to Overlook that it understood and appreciated Overlook's need to receive $13 per subscriber (based on a subscription price of $20) and would help achieve this.

9: A claim that Foxtel engaged in misleading or deceptive conduct contrary to s.52 of the **Trade Practices Act** by representing to Overlook that it would achieve specified levels of subscriber numbers by 30 June 1999 and that, in effect, the channels would be successfully marketed.

13 By the closing stages of the trial, the claim most vigorously and comprehensively asserted by Overlook was the fourth of these – alleged breach of an implied term of good faith. Mr Bannon SC, who appeared as senior counsel for Overlook, made it clear, however, that, in adopting that emphasis, his client did not abandon any of its other claims.

**The negotiations**

14 Given the way Overlook's case is pleaded, it is necessary to examine the negotiations, both oral and written. Each claim depends, to some extent, for its viability upon findings as to what was represented concerning Foxtel pricing and marketing in relation to the RAI and Antenna channels.

15 Two external influences should be mentioned at this point because they affected the thinking of one or both of the parties as they approached questions about the add-on price

to be charged by Foxtel for the channels. First, the contract Overlook had with Optus and which pre-dated its arrangements with Foxtel incorporated what was known as a "most favoured nation clause" or "MFN" clause. Mr Kelly, who had worked for Optus, knew the details of this as did the Overlook negotiators. Others at Foxtel were generally aware of the existence and intent of such a provision but did not necessarily know its full effect. In saying this, I should not to be taken to suggest or imply that Mr Kelly had been otherwise than properly attentive to any duties of confidentiality he, as a former employee, owed to Optus. The second external influence was one in the minds of certain (perhaps all) of the Foxtel negotiators but apparently not appreciated by the Overlook negotiators. I refer to the provisions of the **Trade Practices Act** concerning resale price maintenance in the form of arrangements or inducements calculated to shape the pricing behaviour of a recipient of goods or services when that recipient becomes an on-seller or on-supplier. Mr Freudenstein, the senior Foxtel internal lawyer, made it clear in his evidence that the impact of those provisions was something he bore in mind throughout.

16 The Optus MFN clause operated in the context of a contract which expressly stated that the price at which Optus would sell each of the channels would "initially" be $20. The possibility of subsequent alteration of the price was recognised. The agreement required Optus to consult with Overlook in good faith in relation to any proposed price change. There may have been an assumption or expectation (or hope) within Overlook that this meant that the price could not be changed without Overlook's consent. But that is not what the clause said, its terms being as follows:

"The licence fee due to OVERLOOK shall be calculated as the product of 65% of the gross amounts paid by the subscribers to the Channel without any deduction from these amounts. Initially the price for the Channel will be not less than $20. Vision [ie, Optus] will consult with OVERLOOK in good faith regarding any changes to the price for the Channel."

17 The MFN clause itself was as follows:

"Vision [ie, Optus] is entitled to the terms of any license by Overlook of the Channel to another party for distribution in the Territory on an MFN basis. For the avoidance of doubt, Vision will be entitled to reduce the retail price for the Channel and the revenue payments payable to Overlook to the levels applicable under any licence of the Channel to another party for distribution in the Territory."

18 The arrangements between Optus and Overlook thus provided for a fee for Overlook based on a percentage of the price at which Optus sold the channels to its customers. On the price of $20 applicable "initially", the return of Overlook was $13, the percentage rate being 65%. Overlook's approach to its negotiation with Foxtel was that it should not – indeed, could not sensibly – be party to an arrangement involving an add-on price for the channels in question lower than that charged by Optus. Such a move would have had implications for the Optus MFN clause. Also, availability of the channels from Foxtel at a price lower than that charged by Optus would inevitable see churn from Optus to Foxtel by persons taking pay television largely for the sake of the non-English language channel – assuming always that the basic packages were similarly priced. Overlook had a commercial interest in seeing pricing so structured that subscribers would not prefer one supplier to the other. Its aim was to derive revenue from the Optus and Foxtel subscriber bases and through enhancement of each such base. It was not to its advantage to see customers simply move from one supplier to the other.

19 In the negotiations between Overlook and Foxtel, there existed from the beginning a question as to whether an add-on price of $19.95 (or $20.00 – the amounts were used interchangeably by the parties) was sustainable in the context of the existing basic package price of $44.90 (again used interchangeably with $45). Indeed, at the initial meeting on 4 March 1998, Mr Ishak raised a concern about the viability of a total price of $64.90 (or $65) for a subscriber wanting one of the additional channels. He thought it was too expensive. This was a point of view repeated by the Overlook representatives as the negotiations progressed. Mr Ishak testified that Mr Kelly countered this concern at the first meeting by saying:

"Foxtel has strong marketing and will do well with these channels. It is the premier pay TV platform in Australia."

20 Ms Oh's version of the Statement made by Mr Kelly was:

"Foxtel has strong marketing. We think we can sell the channels at $19.95."

21 The correspondence and draft term sheets which passed between the parties over the following months throw little light on the pricing issue. The term sheet clauses dealing with the licence fee show an evolution from an assumption that net subscriptions for the channels would be the base to which percentages would be applied to determine Overlook's return to one where the measure became gross subscription revenue. The final version reflected a fee at the rate of 65% of gross subscription revenue. However, this was in the context of a side letter by which Overlook undertook to make payments to a Foxtel affiliate, Customer Services Pty Ltd, for marketing and other services. Those payments were also to be calculated as percentages of gross subscription revenue for the two channels and thus had the commercial result of effectively reducing the 65% rate applicable under the supply arrangements. The fee for services was calculated on a sliding scale of percentages so that, in the case of RAI, on subscriptions for subscribers in the range 2,501 to 4,500 the rate was 15%, for subscribers in the range 4,501 to 6,500 the rate was 25% and for subscribers 6,501 and beyond the rate was 35%. For Antenna, the percentage adjustments were the same, but the brackets of subscriber numbers were 3501 to 5500, 5501 to 7500 and 7500 and beyond.

22 The draft term sheets contain only one reference to the subscription price of the channels. The final documents contain none. Before the quantity discount aspect was separated out into the side letter with Customer Services Pty Ltd (that is, while a sliding scale was still envisaged for the arrangements between Overlook and Foxtel itself), some sample calculations were included in a draft term sheet as a means of explaining or illustrating the operation of the sliding scale provision. These, of necessity, referred to a price. The price mentioned was $10. There is in evidence a copy of this draft bearing handwritten notations made by Mr Ishak. He testified that the notations were made in the course of a teleconference with Foxtel representatives. He had changed "$10" to "$20" and written in the margin, "just no's". He explained that this referred to an assurance given by Foxtel in the course of the teleconference that the $10 reference was purely for the purpose of illustrating the operation of the formula and did not reflect any actual pricing intention.

23 When the agreements were signed in August 1998, it was Foxtel's intention to sell each of the add-on channels at $19.95 per month. It was likewise Overlook's expectation that Foxtel would do so, that having been a common thread in the negotiations. There was never any discussion of another price. Nor is there evidence from which it can be inferred that either party gave any thought to the question of later price changes. These matters are illustrated by the following part of the cross-examination of Mr Abdallah:

"Q. Your understanding, as at July 1998, was that when and if the channels started operating, the retail price would be around $19.95?

A. I was very sure of that.

Q. And you believed that that is what Foxtel thought too; is that right?

A. Yes.

Q. But you did never turn your mind to any question which might arise of whether the price was going to be changed, did you?

A. No.

Q. Just didn't come up in your mind, did it?

A. Not the actual price of our channel.

Q. The changing of price was not something that even occurred to you at any time in the period March to 19 August 1998, is it?

A. Not our channel price. Maybe they would do a mini basic, but not our channel price.

Q. You didn't even think about the possibility that somebody, because of some change in circumstances, might want to change it? Didn't occur to you?

A. Correct.

Q. You didn't think there might be some unforeseeable circumstance which might lead you

or Foxtel to want to change the price, did you?

A. Correct.

Q. You didn't think: Oh, there might be some significant change in market conditions or economic circumstances which might lead one or other of us to want to change the price, did you?

A. No.

Q. It follows from those answers that you didn't make any assumption at all, in your mind, about anything to do with changes of price, did you? You just didn't think about it?

A. I'm sorry, can you ask the question again?

OBJECTION. TWO QUESTIONS.

HIS HONOUR: Can you split it up?

LEOPOLD: Q. It follows from the answers you just gave that you didn't make any assumption at all, in your mind, about anything to do with changes to the retail price, did you?

A. Correct, I did not."

24 A combination of Overlook's commercial desire to see the add-on price set at $20 and its concern that the total subscription price of $65 might be too high for the market to bear led to a particular focus by Overlook on Foxtel's marketing planning and projections. This was made clear by Overlook to Foxtel. For example, Mr Ishak gave evidence of the following exchange in the course of a teleconference on 15 May 1998 in which the participants were himself, Mr Abdallah, Mr Geagea and Mr Kelly:

"Abdallah: 'What are your predictions?'

Kelly: 'Our objectives are to recruit 10,000 Greek subscribers and 12,000 Italian subscribers by 30 June 1999. I shall ask Nicole Crabb to provide Tony with our marketing plan and projections.'

Abdallah: 'That is very optimistic. We still have not reached these numbers on Optus after two years. We still have not reached half of your RAI projections and we have been on Optus since February 1997'.

Kelly: 'Foxtel has a very aggressive marketing and advertising division. That is why it has become the premier pay TV platform in Australia'.

Me: 'Yes Karim, Foxtel is the lead in the industry. But do you think Warren that you can sell foreign language channels on top of your very expensive entry tier of $44.95, plus $20.00 for RAI or Antenna'.

Kelly: 'I understand your concern, but our marketing strength and overall package will make the channels a success, plus you are available in three other major cities. Your channels are going to be sold on a real Pay TV platform who has one business only, pay TV, as opposed to Optus which is selling telephone and television'.

Abdallah: 'You should consider the possibility of selling the ethnic channels as stand alone channels. Our experiences around the world have taught us that ethnic niche markets respond better to Pay TV subscription by only being able to subscribe to the channel of their choice'.

Kelly: 'This is impossible as Foxtel has minimum guarantees with channels where certain channels must be sold on a tier to subscribers'."

25 It is accepted by Foxtel that it did make a number of representations to Overlook about marketing. In particular, Foxtel accepts that it made representations to the effect that it had strong marketing skills, that because of those skills and the quality of Foxtel's product it would make a success of the Overlook channels and that it would do everything reasonably and commercially practicable to ensure that an excellent market penetration would be achieved. Foxtel also accepts that it communicated to Overlook an objective of achieving 10,000 Antenna subscribers and 12,000 RAI subscribers by 30 June 1999. But it denies that any of this was expressed as a promise or guarantee.

26 Overlook, however, had its own ideas about likely or possible subscriber numbers. Mr Ishak's estimate was that, by 30 June 1999, Foxtel would have 7,300 subscribers for Antenna and 8,200 for RAI. Mr Abdallah shared these views. Clearly, therefore, Overlook treated with caution and scepticism the Foxtel projections (or, more accurately, targets) of 10,000 and 12,000. Despite earlier assertions of reliance on the Foxtel target numbers, both Mr Ishak and Mr Abdallah eventually conceded that they had really done no more than take into account both those targets and Foxtel's apparent confidence that it could achieve them, at the same time making their own business assessments by reference to their own more hard-headed ideas about subscriber numbers. At the same time, however, Overlook assumed that there would be significant churn from Optus to Foxtel. It was Mr Abdallah's assessment that around 3,500 Antenna subscribers and 2,400 RAI subscribers would leave Optus and move to Foxtel.

27 In view of these expectations about churn from Optus where the price of two non-English language channels was already $19.95, of which Overlook received 65%, Overlook was concerned to protect that revenue base. The subscriber levels of 3,500 for Antenna and 2,500 for RAI which attracted the highest licence fee rate of 65% under the Overlook-Foxtel-Customer Services Pty Ltd arrangements was thus explicable by a desire on Overlook's part to ensure such protection. And that, in turn, assumed a price of $19.95 for Foxtel subscribers.

**The contracts**

28 The documents entitled "Schedule of Terms of Supply of Antenna" and "Schedule of Terms of Supply of RAI International" are dated 19 August 1998. Each is signed by Mr Mockridge for Foxtel and Mr Abdallah for Overlook.

29 It is not necessary to quote the whole of each document. It is sufficient to set out clauses 1 to 6, 11 and 17 of the Antenna document, noting that the provisions of the RAI document are the same, except for the description of the channel:

"1. **Channels**: Overlook shall supply FOXTEL with the 24 hour Greek language channel known as 'Antenna' ('the Channel').

2. **Rights**: Overlook grants FOXTEL non exclusive subscription television rights for all delivery mechanisms (including cable, MDS, pay per view and satellite) for residential and commercial subscribers.

3. **Licence Fees**: FOXTEL shall pay Overlook licence fees calculated as the product of 65% of the gross subscription revenue paid by the residential and commercial subscribers to the Channel for the relevant month without any deduction from these amounts except that FOXTEL shall be entitled to deduct withholding tax or similar taxes or charges. The parties acknowledge that the withholding tax rate applicable as at the date of this Agreement under the Australia/Netherlands tax treaty is 10%.

4. **Term**: 5 years

5. **Commencement Date**: 1 September 1998 unless otherwise agreed by FOXTEL, however the Channel signal must be available to FOXTEL by 15 August 1998.

6. **Carriage**: FOXTEL shall carry the Channel as an a la carte channel or, if mutually agreed

by both parties, as a stand alone channel.

11. **Marketing contribution**: Overlook shall spend in cash and kind at least A$100,000 per annum for the Channel (the 'Overlook Commitment') for the purpose of advertising and promotion of the Channel on FOXTEL. FOXTEL also agrees to make an equivalent contribution of at least A$100,000 per annum for the Channel for advertising and promotional purposes subject to Overlook making the equivalent contribution.

Each party shall consult with the other in relation to the expenditure of that party's commitment prior to the expenditure of any part of that party's commitment.

17. **Binding agreement**: This Agreement is legally binding upon the parties with the understanding that separate long form agreements for the Channel shall be executed as soon as reasonably practicable."

30 The side letters involving Customer Services Pty Ltd were dated 18 August 1998. The signatories were again Mr Mockridge for Foxtel and Mr Abdallah for Overlook. There is no need to quote them in detail. It is sufficient to note that the basis for calculation of the service fee was:

"the following incremental percentages of gross subscription revenue received by Foxtel from Foxtel residential and commercial subscribers to the Channel ..."

31 As with the schedules of terms of supply, there was in each side letter a reference to an intention to enter into a subsequent long form agreement. There was no suggestion by either party that the references to future long term agreements deprived the schedules of terms of supply and the side letters of contractual force. In terms of the classifications suggested by the High Court in **Masters v Cameron** [1954] HCA 72; (1954) 91 CLR 353 as supplemented by **Baulkham Hills Private Hospital Pty Ltd v G R Securities Pty Ltd** (1986) 5 BPR 9315, these documents belong to either the first class or the fourth. The important point is that there was an intention to be immediately bound by the terms

contained in the documents.

## The price reduction

32 With effect from 1 July 1999, Foxtel took action to reduce the subscriber price of each of RAI and Antenna from $19.95 per month to $9.95 per month. The rationale for doing so was set out in a paper prepared for the Foxtel board following a request by the board for more information on the performance of those channels.

33 The board paper gave what it called a "summary of subscriber performance" to 28 February 1999. This showed in relation to both channels that Foxtel had budgeted on numbers of "new installs" (that is, new subscribers who had not previously done business with Foxtel) greatly in excess of the numbers of "upgrades" of existing subscribers (that is, decisions by existing subscribers to take RAI or Antenna as an add-on). The budget for the period to 28 February 1999 envisaged for RAI 5,366 new installs and 283 upgrades. The budgeted figures for Antenna were 4,203 and 316. The reality differed enormously from the budget. In the case of RAI, there were only 956 new installs (that is, about 18% of budget) but 2,828 upgrades (representing ten times budget). For Antenna, there were 1,529 new installs (about 36% of budget) but 2,749 upgrades (some 8.7 times budget). Looking at the total subscriptions to the channels in the period to 28 February 1999, there were 3,874 against a budget of 5,649 in the case of RAI and 4,278 against a budget of 4,519 in the case of Antenna. Al these figures were net of disconnections. The board paper stated there were 1,900 subscribers who had elected to take RAI but later discontinued. The corresponding figure for Antenna was 1,800. The discontinuation may have been from the particular add-on only or from Foxtel altogether.

34 After giving these statistics and referring to subscribers' expressed reasons for disconnecting, the board paper continued:

"The analysis shows that subscribers with a foreign language channel are more likely to disconnect due to the total price of their FOXTEL service (ie minimum of $62.90 for cable basic plus one foreign language service). The proposition that the high price point is limiting take-up is also supported by feedback from Salesforce, which indicates that these subscribers tend to be price sensitive.

In addition, it appears that a greater percentage of these subscribers are switching to Optus than FOXTEL subscribers in general. The entry price to the Optus service is $19.95 (increased from $9.95 in March 99) in comparison to FOXTEL of $42.95 (increasing to $44.95 from 1 April). The relatively high entry price to FOXTEL appears to be a deterrent for potential foreign language subscribers. It appears that the primary reason these people subscribe is for the foreign language channel and the additional benefits of the FOXTEL Basic Package do not outweigh the significant additional cost to a foreign language consumer."

35 The board paper then outlined the twofold strategy of paying a commission to the sales staff (not relevant for present purposes) and reducing the price of RAI and Antenna. In relation to the latter, it said:

"More consideration needs to be given to the price point, which will either by $14.95 or $9.95. This will impact the margin on existing subscribers but is still profitable as licence fees are paid based on a percentage of revenue. In addition, licence fees payable per subscriber will decrease due to volume discounts as the number of subscribers to the channels increase.

Even with this adjustment the overall price of the FOXTEL package in comparison to Optus (ie Basic service plus one foreign language channel) will still be more expensive with FOXTEL @ $54.90 vs Optus @ $39.90. This may be able to be further reduced in the next financial year as FOXTEL is contemplating a strategy of tiering movies and reducing the price of the FOXTEL basic package as part of the 1999/2000 budget. If this strategy is approved by the Board it will further reduce the price differential between Optus and FOXTEL."

36 After referring to the fee structure in the agreements and side letters with Overlook, the board paper stated the financial impact of the proposed price reduction as follows:

"The financial impact of reducing the price of each foreign language service is as follows:

**Subscriber/mth Current $14.95 $9.95**

price _____

Revenue 19.95 14.95 9.95

Revenue Share (2.99) (2.24) (1.49)

Licence Fees (1) (12.16) (8.22) -- _____

**Margin $ 4.80 $4.49 $3.48**

Addition subs required (2) 300 1,600

(1) Licence fees reduce as a % of revenue for the lower price points due to volume discounts

(2) Additional subscribers required to offset the reduced margin from existing subscribers due to the price reduction"

37 This analysis shows Foxtel's opinion that, notwithstanding a price reduction to $9.95, Foxtel itself would be able to capture the lost revenue by obtaining 1,600 new subscribers for each channel. An increase of that magnitude in each subscriber base, whether from entirely new subscribers or from upgrades, would see the negative effects of the price reduction offset. The reduced fees payable to Overlook were, of course, factored into this calculation.

38 A point emphasised by Mr Bannon in relation to the board paper's figures on total

subscription numbers is that, at least in the case of Antenna, there was no significant shortfall in sales against budget. Subscriptions achieved were almost 95% of budget. The corresponding figure for RAI, however, was only 69%.

39 The price reduction in relation to RAI and Antenna was followed, on 29 September 1999, by a reduction in the price of Foxtel's basic package from $44.95 to $34.95. This was achieved by removing two movie channels from the basic package. The price for the basic package plus RAI or Antenna then became $44.90. Mr Mockridge informed Mr Ishak of this change by letter dated 30 September 1999. Referring to the impact of the previous price reduction in relation to the non-English language channels alone, Mr Mockridge said:

"The reduction in the retail price coupled with the carriage of RAI and Antenna on satellite continues to drive subscribers to the channels with an additional 8% increase in the number of subscribers to RAI and Antenna since June 99 to 75% and 54% respectively in comparison to rather minimal growth of 7% to RAI and 13% to Antenna from January 99 to June 99."

40 Mr Mockridge concluded:

"Given the terms of our distribution arrangements, the changes we have made to these channels will be cash positive to you once we achieve 9,800 subscribers on RAI and 12,200 subscribers on Antenna, a position we hope to reach within the next 12 months."

41 The respective impacts of the add-on price reduction from $19.95 to $9.95 upon Foxtel and Overlook may thus be compared. From Foxtel's perspective, the net revenue (after licence fees) lost by reason of the reduction would be recouped by obtaining an additional 1,600 subscribers for each channel. For Overlook, however, the reduced rewards by reason of reduced licence fees would not be recouped until subscriber numbers reached 9,800 for RAI and 12,200 for Antenna. The required increases need to be appreciated in the context of actual subscriber numbers, as at 28 February 1999, of 3,874 for RAI and 4,278 for Antenna. From those bases, the increase of 1,600 needed by Foxtel to return to the same net revenue position as before the price reduction was 41% for RAI and 37% for Antenna. For Overlook, on the other hand, the increases necessary to retrieve lost licence fees were 5,926 (153%)

for RAI and 7,922 (185%) for Antenna.

42 Mr Mockridge accepted in cross-examination that these required levels for Overlook were at the upper end of the range of subscribers which Foxtel could reasonably or realistically achieve in the foreseeable future.

43 Another impact of the price cut upon Overlook occurred at the level of Optus subscriptions. Between June 1999 and June 2001, Overlook suffered a decline in RAI subscriber numbers from 7,538 to 5,455 (a decline in revenue of about $25,000 per month). The corresponding reduction for Antenna was from 13,341 to 8,373 subscribers ($55,000 per month).

**The first contract claim**

44 This claim is based on the supposed existence of an express contractual term to the effect that $19.95 per month was (and was to remain indefinitely) the add-on price for each of the non-English language channels. To be more precise, Overlook pleads the following express terms:

(a) that the subscription price per subscriber of receiving RAI and Antenna would not be varied except by agreement between the parties;

(b) that the subscription price per subscriber to receive RAI and Antenna would be not less than the price of those channels through Optus at the time; and

(c) that Foxtel would market and sell the channels on the basis that the existing revenue base of Overlook achieved through Optus would be preserved.

45 It seems to me quite clear that this claim fails. Even allowing for the most comprehensive operation of the objective theory of contract based on an objective manifestation of mutual intention (**Brambles Holdings Ltd v Bathurst City Council** [2001] NSWCA 61), it is not possible to discover any such express term. It does not appear in the contractual documents. Nor does it appear in the correspondence. While the price of $19.95 or $20 was mentioned in discussions and there appears to have been a common expectation that that would be the price for some unspecified period, statements about that price by Foxtel

Case 1:21-cv-11059-GHW    Document 199-2    Filed 09/22/23    Page 26 of 100

representatives cannot be regarded as promissory, in the sense of having conveyed a contractual assurance that $19.95 or $20 would be the monthly price and that, throughout the five year term, it would never be altered or would not be altered without the consent of Overlook.

46 Furthermore, there are good reasons which would have prevented Foxtel giving any such promise. First, commercial common sense would have told Foxtel (as it had informed Optus which had accepted only a prior good faith consultation commitment in this area) that it could not afford to tie itself contractually to a particular price for a new and untested product throughout a five year period. Second, Foxtel's concern about the resale price maintenance provisions of the **Trade Practices Act** would have caused it to steer clear of any form of promise it considered contrary to or questionable under that legislation.

47 In short, mutual expectation and intention as to initial price never became a contractual promise by Foxtel as to price for the five year term.

**The second contract claim**

48 This claim alleges an express contractual term to the effect that the fee to Overlook (disregarding the impact of the fee for service under the Customer Services Pty Ltd side letters) was to be 65% of $19.95 per month, regardless of the actual price charged by Foxtel for the add-on channel.

49 The express terms to which the parties subscribed caused both the licence fees payable by Foxtel to Overlook and the service fee payable by Overlook to Customer Services Pty Ltd to be a percentage of "the gross subscription revenue paid by the residential and commercial subscribers to the Channel for the relevant month ....". The reality was, of course, that a subscriber could not take the non-English language channel alone. He or she had to take the basic package as well. In one sense, therefore, the gross subscription revenue paid by each subscriber to the relevant channel was the aggregate sum paid to receive all channels in the particular suite chosen by the subscriber – that is $64.90 in, say, October 1998 for a subscriber who chose the basic package plus one non-English language add-on.

50 There had been no suggestion that this aggregate sum is the figure to which the percentages should be applied. It is accepted that the "gross subscription revenue" referred to is that related to the particular non-English language channel. It is a question of how the relationship between that channel and a particular "gross subscription revenue" figure is to be established. The add-on price itself is the figure most obviously suited to fit the description. The second contract claim looks beyond that obvious fit and argues that there was an express term that the relevant "gross subscription revenue figure" was fixed at $19.95 per month for the life of the contracts.

51 The written submissions of counsel for Overlook put the proposition in this way:

"[O]n its face, clause 8 of the Agreements entitles Overlook to 65% of the gross subscription revenue received from a subscriber to the channels. That would include the amounts paid for the basic service or any other service taken. In order to avoid that result, one construes 'revenue' to refer to that portion of the total revenue which was the price at which the channels were to be sold. That price was agreed between the parties externally of but not inconsistently with the agreements to be $19.95. Hence on its proper construction, clause 8 entitles Overlook to be paid 65% of the amount of $19.95."

52 This is a strained construction. In a context where an aggregate sum is received from a person to whom two commodities have been marketed at prices clearly identified for the respective commodities, it is an unnatural use of language to say that, of the total "received", some part other than the sum identified with one commodity is received by reason of or in relation to the sale of that commodity. The ambiguity to which the submission refers is much more comfortably resolved by supplying the words "for the Channel" after "for the relevant month".

53 As in the case of the first contract claim, it seems to me impossible to find the express term Overlook alleges, even allowing for the most comprehensive operation of the objective theory of contract. If the parties had intended to contract by reference to 65% of an immutable $19.95, they would simply have written in $13 (or $12.97) without resort to any formula or method of calculation since none would have been needed.

## The third contract claim

54 The basis of this claim is implied terms to the effect of the express terms the subject of the first contract claim.

55 In order to determine whether such terms can be said to be implied, it becomes necessary to examine the matter against criteria most often associated with observations of members of the High Court in **Codelfa Construction Pty Ltd v State Rail Authority** [1982] HCA 24; (1982) 149 CLR 337. A useful description of those criteria appears in the judgment of Tadgell JA (with whom Buchanan and Chernov JJA agreed) in **Narni Pty Ltd v National Australia Bank Ltd** [2001] VSCA 31:

"It is trite but nevertheless useful to recall that, as Mason J noted (with the concurrence of Stephen and Wilson JJ) in **Codelfa Construction Pty Ltd v State Rail Authority of New South Wales** [(1982) [1982] HCA 24; 149 CLR 337], the implication of a term in a contract is designed to give effect to the parties' presumed intention. What his Honour there called "the conditions necessary to ground the implication of a term" were summarized by the majority in **BP Refinery (Westernport) Pty Ltd v Shire of Hastings** [(1977) 180 CLR 266 at 283] thus '... (1) it must be reasonable and equitable; (2) it must be necessary to give business efficacy to the contract, so that no term will be implied if the contract is effective without it; (3) it must be so obvious that "it goes without saying"; (4) it must be capable of clear expression; (5) it must not contradict any express term of the contract'. Although **Codelfa** and various other earlier and later decisions of the High Court indicate that the above-quoted formulation of principle may be regarded as authoritative, it is fair to say that some of the five conditions are sometimes seen to be difficult to apply and not always to serve as practical criteria. For example, Aickin J in **Codelfa** suggested that, in approaching 'the question whether there is to be a term implied into the contract', a consideration of the remark of the 'officious bystander' postulated by MacKinnon LJ, from which the condition numbered (3) evidently draws inspiration, is not always helpful or useful; and that 'it seems no longer the exclusive means of approaching the question'. The five conditions, although evidently expressed to operate cumulatively, may nevertheless overlap; and in some cases, I think this is one of them, a more simplified approach may be appropriate and permissible. Thus, in **Marcan Shipping (London) Ltd v Polish Steamship Co (The Manigest Lipkowy)** [(1989) 2 Lloyd's Rep 138 at 142] May LJ remarked -

'For my part, I think that reference to the officious bystander frequently does not assist in

deciding whether or not a term is to be implied. Officious bystanders may well take different views depending on which side they happen to be standing. In my judgment it is quite clear from such cases as **Liverpool City Council v Irwin** [1997] AC 239, that the real basis upon which a term can be implied in contracts such as this is that they are necessary in order to make the contract work.'

In the same case Bingham LJ expressed this succinct dictum on the point,

'I take it to be well-established law that a term will be implied only where it is necessary in a business sense to give efficacy to the contract or where the term is one which the parties must obviously have intended.'"

56 The task of the court must be undertaken with the degree of caution enjoined by Giles JA (with whom Heydon JA and Ipp JJA agreed) in **State Bank of New South Wales Ltd v Currabubula Holdings Pty Ltd** [2001] NSWCA 47; (2001) 51 NSWLR 399:

"As is stated by Mason J in **Codelfa Construction Pty Ltd v State Rail Authority of New South Wales** at 346, the courts are slow to imply a term. It is not enough that it is reasonable to imply a term. It must be necessary to do so in order to give business efficacy to the contract and the term must be so obvious that it goes without saying; 'Further, there is the difficulty of identifying with any degree of certainty the terms which the parties would have settled upon had they considered the question'."

57 The same need for caution was referred to more recently in the following passage in the judgment of Kirby J in **Roxborough v Rothmans of Pall Mall Australia Pty Ltd** [2001] HCA 68 (6 December 2001):

"Whatever may be the precise legal criterion for implying terms into a contract upon which the parties have not expressly agreed, it would always be necessary for a court of our legal tradition to be very cautious about the imposition on the parties of a term that, for themselves, they had failed, omitted or refused to agree upon. Such caution is inherent in

the economic freedom to which the law of contract gives effect. Absent some statutory or equitable basis for intervention, it is ordinarily left to the parties themselves to formulate any agreement to which they consent to be bound in law. As MacKinnon LJ, who is usually credited with inventing the fiction of the 'officious bystander', admitted:

'[I]n most ... cases the Court has ... to find ... the obvious common agreement, upon a matter as to which it must have the strongest suspicion that neither party ever thought of it at all, and that, if they had, they would very likely have been in hopeless disagreement what provision to make about it'."

(According to Kirby J's footnote, the quoted passage comes from a lecture delivered by MacKinnon LJ at the London School of Economics on 3 March 1926 quoted by Phang, "Implied Terms, Business Efficacy and the Officious Bystander – A Modern History", (1998) JBL 1)

58 The terms which Overlook says are to be implied do not, to my mind, pass the applicable tests. Had the parties been asked at inception whether their contracts included each of those terms, an affirmative answer in unison would not have been forthcoming. Foxtel, for its part, would have demurred on a number of grounds, the most obvious being its concern about the resale price maintenance provisions of the **Trade Practices Act**. There would have been a ready and immediate acceptance of the proposition that Foxtel could not reduce the price of the channels to zero, thereby depriving Overlook of all revenue. But beyond that obvious common ground, it is most unlikely that any unwritten term on the subject of pricing and price variations would have been regarded as so obviously applicable to a contract of five years duration that it went without saying. No case of necessity in order to achieve business efficacy has been made out.

**The fourth contract claim**

59 Overlook's fourth claim in contract presupposes that Foxtel was not under any explicit restriction preventing it from changing the subscriber price for RAI and Antenna at will. The claim is founded on an implied obligation of Foxtel to act in good faith towards Overlook in the performance of the contract. An implied term of good faith is said to arise both as a matter of law and by reason of the facts and circumstances of the case.

60 Viewed against the standard for the implication of terms on the **Codelfa** basis already discussed, the term which Overlook seeks to imply from the facts and circumstances of the case (that is, not by implication of law) seems to me to be problematic. There is nothing special or unusual about the circumstances of the contract between Overlook and Foxtel which would cause an obligation of good faith performance to be written in by the court on the grounds of presumed intention or business efficacy. There is nothing to suggest that the parties would have embraced such a provision had their minds been directed to the possibility of adopting it. They would in all likelihood have said that the contract as written worked perfectly well without it. I therefore conclude that the postulated terms are not to be implied on the **Codelfa** basis.

61 An entirely different question is whether an obligation of good faith is by law implied into the parties' contract. The High Court has recently re-affirmed that certain contractual terms are to be regarded as implied by law. In **Peters (WA) Ltd v Petersville Ltd** [2001] HCA 45; (2001) 75 ALJR 1385, a case concerning licensing of a brand name with associated restraint of trade, Gleeson CJ, Gummow, Kirby and Hayne JJ said:

"The law already implies an obligation by the respondents to do all such things as are necessary on their part to enable Peters WA to have the benefit of those licence arrangements. [**Butt v McDonald** (1896) 7 QLJ 68 at 70-71; **Secured Income Real Estate (Australia) Ltd v St Martins Investments Pty Ltd** [1979] HCA 51; (1979) 144 CLR 596 at 607-608]. It is not now necessary to consider the basis of the implication. The law also implies a negative covenant not to hinder or prevent the fulfilment of the purpose of the express promises made in Art 5. [**Shepherd v Felt and Textiles of Australia Ltd** [1931] HCA 21; (1931) 45 CLR 359 at 378]."

62 An additional term implied by law into commercial contracts is a term requiring the exercise of good faith in the performance of the contract. This is now in this State a legal incident of every such contract: **Burger King Corporation v Hungry Jack's Pty Ltd** [2001] NSWCA 187. It takes its place beside the terms referred to in **Peters (WA) Ltd.**

63 But what are the content and effect of such an implied term? This question was the subject of discussion by the Court of Appeal in **Burger King.** Sheller, Beazley and Stein JJA

referred to the observation of Sir Anthony Mason in his 1993 Cambridge Lecture (see now (2000) 116 LQR 66 at 69) that the concept "embraced no less than three related notions", being:

"(1) an obligation on the parties to co-operate in achieving the contractual objects (loyalty to the promise itself);

(2) compliance with honest standards of conduct; and

(3) compliance with standards of conduct which are reasonable having regard to the interests of the parties."

64 There is some overlap here with the terms implied by law as referred to in **Peters (WA) Ltd**. Sir Anthony's duty of "loyalty to the promise itself" may well include the duties not to hinder fulfilment of the promise's purpose and to do everything necessary to enable the other party to have the benefit of the promise. The more substantial and separate content of the duty of good faith itself would therefore seem to lie in the second and third limbs of Sir Anthony's formulation – that is, adherence to standards of conduct which are honest, as well as being reasonable having regard to the parties' interests.

65 If adherence to such standards of conduct is the predominant component of a separate obligation of good faith in performance of a contract, it becomes necessary to enquire about the extent to which selflessness is required. It must be accepted that the party subject to the obligation is not required to subordinate the party's own interests, so long as pursuit of those interests does not entail unreasonable interference with the enjoyment of a benefit conferred by the express contractual terms so that the enjoyment becomes (or could become), in words used by McHugh and Gummow JJ in **Byrne v Australian Airlines Ltd** (1995) 185 CLR 410, "nugatory, worthless or, perhaps, seriously undermined". This seems to me to be the principle emerging from paras 172 to 177 of the joint judgment in **Burger King** where the various authorities are collected and discussed.

66 Dr Elisabeth Peden of the University of Sydney has characterised the effect of the good faith requirement in contractual performance as follows ("Incorporation of Terms of Good Faith in Contract Law in Australia"[2001] SydLawRw 9; , (2001) 23 Syd L.Rev 222):

"Most basically, by using the obligation to perform in good faith as a principle of construction the courts are merely required to ensure that the parties have genuinely adhered to the bargain which they entered into. This will require an examination of the whole contract and the underlying intentions. Strict rights may not be adhered to, if in the context of the contract as a whole, this would subvert the character of the contract. Most cases that discuss the concept do so in terms of negatives, that is, what is not in breach of good faith. This makes sense, since it is the context of the contract read as a whole that will indicate what is appropriate and what is not."

67 Viewed in this way, the implied obligation of good faith underwrites the spirit of the contract and supports the integrity of its character. A party is precluded from cynical resort to the black letter. But no party is fixed with the duty to subordinate self-interest entirely which is the lot of the fiduciary: **Burger King** at para 187. The duty is not a duty to prefer the interests of the other contracting party. It is, rather, a duty to recognise and to have due regard to the legitimate interests of both the parties in the enjoyment of the fruits of the contract as delineated by its terms.

68 In many ways, the implied obligation of good faith is best regarded as an obligation to eschew bad faith. This is borne out by the following succinct statement by Lord Scott of Foscote in **Manifest Shipping Co Ltd v Uni-Polaris Shipping Co Ltd** [2001] UKHL 1; [2001] 2 WLR 170, a case concerning the duty of good faith in the insurance context:

"Unless the assured has acted in bad faith, he cannot, in my opinion, be in breach of a duty of good faith, utmost or otherwise."

69 The approach which regards a duty of good faith as a duty to eschew bad faith is also supported by United States jurisprudence to which resort may appropriately be had: **Renard Constructions (ME) Pty Ltd v Minister for Public Works** (1992) 26 NSWLR 234; **Burger King** at para 147ff. Writing in 1968, Professor Summers described the duty of good faith

imposed by the United States Uniform Commercial Code as an "excluder": R.S. Summers, "Good Faith in General Contract Law and the Sales Provisions of the Uniform Commercial Code", (1968) 54 Va L Rev 195. Its operation and effect were stated as follows:

"It is a phrase without general meaning (or meanings) of its own and serves to exclude a wide range of heterogeneous forms of bad faith. In a particular context the phrase takes on specific meaning, but usually this is only by way of contrast with the specific form of bad faith actually or hypothetically ruled out."

70 In **Tymshare Inc v Covell** 727 F2d 1145 (1984), Scalia J concluded that:

"The doctrine of good faith performance is a means of finding within a contract an implied obligation not to engage in the particular form of conduct which, in the case at hand, constitutes 'bad faith'."

71 Scalia J went on to say that the contract itself will indicate the content of the duty in the sense that it is imbued or infused with the obligation not to engage in particular conduct.

72 Turning to the contracts between Overlook and Foxtel, the first task of the court is to discover its character so that there may be an appreciation of what may be entailed in upholding the integrity of that character. The same inquiry should lead to an appreciation of the prohibitory or negative spirit with which the contracts are infused in order to protect the parties' legitimate expectations of enjoyment from being rendered nugatory or worthless or seriously undermined. Having discovered these matters, the court must proceed to decide whether the conduct of Foxtel was, in the light of them, such as to cause those legitimate expectations of enjoyment to be affected in any of the ways mentioned.

73 A prohibitory or negative spirit precluding capriciousness will readily be accepted as attending the parties' contracts. The exclusion of capriciousness as an acceptable form of behaviour in the performance of the contract will prohibit conduct which has no rational basis or objective explanation. A prohibitory or negative spirit precluding purely selfish

behaviour calculated to destroy the position of the other party will also readily be accepted. It is more difficult to identify the point at which the prohibitory or negative spirit intervenes to preclude conduct which reduces immediate enjoyment (or the quantum thereof) which is undertaken with a view also to enhanced future enjoyment.

74 A point to be noted is that, in **Burger King** and in most, if not all, of the earlier Australian cases in which an obligation of good faith or reasonable conduct in contract performance has been found to be implied by law, the question in issue has involved exercise of a right or power arising from the terms of the contract. In **Alcatel Australia Ltd v Scarcella** [1998] NSWSC 483; (1998) 44 NSWLR 349, Sheller JA noted that the earlier cases of **Renard** (above) and **Hughes Bros Pty Ltd v Trustees of the Roman Catholic Church for the Archdiocese of Sydney** (1993) 31 NSWLR 91 had concerned a duty of good faith "both in performing obligations and exercising rights". Sheller JA said:

"If a contract confers power on a contracting party in terms wider than necessary for the protection of the legitimate interests of that party, the courts may interpret the power as not extending to the action proposed by the party in whom the power is vested or, alternatively, conclude that the powers are being exercised in a capricious or arbitrary manner or for an extraneous purpose, which is another [way] of saying the same thing. Thus, a vendor may not be allowed to exercise a contractual power where it would be unconscionable in the circumstances to do so: **Pierce Bell Sales Pty Ltd v Frazer**."

75 In the present case, of course, Foxtel was not exercising a contractual power or performing a contractual obligation when it reduced the subscriber price of the RAI and Antenna channels. There is nevertheless scope for the operation of an implied obligation of good faith. In **Burger King**, the Court of Appeal did not appear to disapprove certain conclusions of Rolfe J at first instance which contributed to his finding a breach of an implied obligation of good faith. Rolfe J had applied an objective standard in deciding that the actions of the defendant were neither reasonable nor for a legitimate purpose. He had concluded that the defendant deliberately pursued a course to "thwart" the plaintiff's rights under the contract in that the actions it took were not justified by any of the factual matters upon which it sought to justify them:

"BKC was pursuing a course of attempting to thwart HJPL's further development so that BKC could develop the market without regard to the rights of HJPL."

76 In the present case, the conduct of Foxtel in reducing the price of the add-on channels falls to be assessed in a context where there was no express or implied contractual provision precluding or regulating alteration of the price by Foxtel and where Foxtel's actions were not taken pursuant to or in purported exercise or fulfilment of any contractual provision. The question, therefore, is whether the relevant implied obligation of good faith inhibits one party in the performance of "an act which the law would ordinarily permit it to do" in exercise of "the ordinary freedom of a commercial enterprise to pursue a commercial opportunity": **Far Horizons Pty Ltd v McDonald's Australia Pty Ltd** [2000] VSC 310.

77 Overlook argues that the price reduction of both RAI and Antenna by Foxtel breached the implied good faith term. It says that the reduction was designed to overcome a problem not with the price of the Overlook channels but with the price of Foxtel's basic package. The basic package price was something about which Overlook had expressed concern in the negotiations when it said that it considered the aggregate $64.90 too high. Foxtel had said that it expected to be able to sell satisfactorily at that aggregate price. According to Overlook's submissions, the price reduction decision was motivated by Foxtel's desire to capture more Greek and Italian speakers as subscribers to its basic package. On this argument, enhanced revenue for Foxtel at the basic package level was the objective of a reduction in revenue for both Foxtel and Overlook (but more particularly to the latter) at the add-on level. Overlook also says that Foxtel acted as a result of its own dissatisfaction with the sales performance of the RAI and Antenna channels notwithstanding that the performance was almost on budget for Antenna and not significantly below budget for RAI. There was nothing to suggest that Overlook was dissatisfied with the performance of the channels.

78 Foxtel, for its part, says that the price reduction was designed to overcome what it considered to be poor penetration of the RAI and Antenna channels themselves. One factor in the poor penetration might have been the fact that some consumers considered the basic package too expensive. Another, says Foxtel, was that some thought that the channels themselves were not value for money. Foxtel points to the fact that a great number of the subscribers were upgrades and that a substantial proportion of those who cancelled the RAI or Antenna subscription continued to take the basic package. In short, Foxtel says that it made a legitimate business judgment with a view to achieving an increase in market penetration of the non-English language channels and that it did so in the interests of both parties, recognising that there would inevitably be a fall in revenue from those channels for both parties but in the expectation that increased penetration would in time reap suitable

rewards. That, on its face, is quite a reasonable commercial proposition, at least in abstract terms.

79 Against this, Overlook contends that the particular price reduction action Foxtel took was so structured as to work much more markedly to Overlook's disadvantage than to Foxtel's in the shorter term. As has been noticed already, Foxtel needed only an additional 1,600 subscribers for each channel to return it to the revenue position it had enjoyed immediately before the price reduction. Overlook, on the other hand, needed 5,926 for RAI and 7,922 for Antenna. But the fact is that a disparity of this kind would have prevailed whatever the extent of a price reduction. The financial realities of the relationship were from the outset and of their nature such that a price reduction would always produce for Foxtel an off-setting benefit in terms of reduced licence fees to Overlook. Thus, a price reduction of merely $1.00 would have produced for Overlook a detriment of 65 cents, being the licence fee not received on the eliminated $1.00. Foxtel, however, would have saved that 65 cents and thus suffered a net impact of the lost sum of $1.00 less the saved 65 cents. Clearly, it would take a greater number of new subscriptions to make up Overlook's lost ground than it would to make up Foxtel's, whatever the size of the price reduction.

80 A question of central importance is whether it was any part of the obligation of good faith owed by Foxtel to be concerned about the maintenance or enhancement of Overlook's customer base within Optus. Overlook asserts, as one of the factors pointing to a breach of that obligation, Foxtel's having been motivated by a desire to secure customers from Optus notwithstanding Overlook's expressions of concern in that regard before the contracts were made and Foxtel's representations as to preservation of Overlook's existing revenue base. To my mind, however, it is unrealistic to think that the good faith obligation of Foxtel in any way precluded it from engaging in natural competition with Optus. It would have been odd, to say the least, if Foxtel had come under a duty to desist from vigorous competition with Optus across the board and in the usual way just for the sake of Overlook, the supplier of two of its add-on channels. This is particularly so where Overlook had itself factored into the pricing structure it negotiated with Foxtel an allowance for its expectation of churn of RAI and Antenna subscribers from Optus to Foxtel.

81 There can be no doubt that Overlook suffered financially in the short term by reason of the price reduction. There can equally be no doubt that Foxtel decreased the price with a view to increasing market penetration of the non-English language channels. It is true that subscription numbers for one were reasonably close to budget, even though subscriptions for the other were materially below budget. But there is no unwritten rule of reasonable

business behaviour which says that efforts to achieve greater market share should be abandoned if trading is in line with or close to budget. Foxtel knew that Overlook would suffer a financial detriment in the short term. It expected, however, that that could and would be made up by increased subscriber numbers. The numbers involved were at the upper end of realistic expectations. But Foxtel remained sanguine about its own marketing abilities. It no doubt expected – indeed, intended - that some of the increased subscriber base would be churn from Optus. It must have been recognised by all that it was a fundamental of Foxtel's business strategy that it make continuous efforts to persuade Optus subscribers to come over to Foxtel. That was normal and expected competitive behaviour. Moreover, Overlook, as a sophisticated commercial player, appreciated that and had in fact taken it into account in agreeing the subscriber numbers for the purposes of the graduated fee structure with Foxtel, albeit on an assumption or expectation that the Foxtel price would remain at $19.95 throughout the whole term of five years.

82 That assumption or expectation on Overlook's part was, to my mind, one which it could have made only by way of business gamble. It had taken no steps to make the assumption part of the bargain. It was not as if the possibility can be assumed to have slipped Overlook's mind. On the contrary, the possibility was one which had been squarely addressed in its earlier negotiations with Optus. Those negotiations had produced an essentially identical commercial arrangement, but with the added feature of a provision ensuring for Overlook a measure of protection in relation to the possibility of a price reduction. That position had been achieved with Optus as a result of negotiation. Yet when Overlook came to negotiate with Foxtel, there is nothing in the evidence to show that Overlook even raised the question of a fixed price or a brake on Foxtel's ability to change the price. The possible impact of the Optus MFN provision was a subject of negotiation and was dealt with by means of the stratagem involving the Customer Services Pty Ltd side letters. Foxtel and Overlook obviously turned their minds to the possibility that certain future changes to their contracts might be made by mutual agreement: see clause 6. They also agreed to undertake future consultation in a particular event: see clause 11. Yet there is nothing to suggest that the clearly recognised possibilities of mutual agreement and consultation in the future were accepted as even potentially relevant to the maintenance of the subscription price at $19.95. It must be concluded that Overlook was content to allow the question of somehow effectively fixing the $19.95 price (or the $13 fee which, from its perspective, was the same thing) to be left out of the agreements with Foxtel and to do business by reference to its own assessment of the likelihood that Foxtel would leave the price at the initial level for the term of five years.

83 The prohibitory and negative spirit of the contracts between Foxtel and Overlook did not, in my judgment, preclude the price reduction Foxtel effected. Foxtel did not act in a

capricious way: on the contrary, its action was deliberate and reasoned and had both a rational basis and an objective explanation. Furthermore, the action was not purely selfish and destructive of the position of Overlook or such as to cause Overlook's rights to become nugatory, worthless or seriously undermined. Foxtel acted in a way which it genuinely believed was calculated to enhance market acceptance of RAI and Antenna and to achieve an eventual level of penetration more favourable to both parties than that already pertaining. As things turned out, Foxtel's expectations as to resultant market behaviour were too optimistic and it took significantly longer than Foxtel had expected or foreseen for subscriber numbers to reach a level which caused Overlook's revenue position to be restored to its pre-cut level. But neither that nor any other factor can or should be regarded as having caused Foxtel's action to involve the cynical resort to black letter rights at the expense of the integrity of the contracts' spirit and character with which the implied contractual term imposing an obligation of good faith performance is concerned. Foxtel's actions involved no departure from standards of conduct which are honest, as well as being reasonable having regard to the parties' interests.

84 I therefore conclude that Overlook does not succeed on its claim based on a breach of that implied term.

**The estoppel claim**

85 Overlook's case here is built on a series of propositions. It says that it assumed that the price of the channels would be $19.95 per month throughout the five year term of the agreements. It was encouraged by Foxtel to make that assumption by reason of various matters, including the consistent reference to $19.95 in the course of negotiations (knowledge of the proposed price being essential to those negotiations), Foxtel's knowledge that Overlook made its decision to proceed on the basis of a $19.95 price, the absence of any reference in negotiations to the possibility of a lower price, Foxtel's reassurances that its marketing ability would cope with the apparently high combined package price of $64.90 and Foxtel's representations as to expected or targeted numbers of subscribers based on a price of $19.95. Foxtel's representations were directed in part at dealing with Overlook's concern to protect its pre-existing revenue base from Optus.

86 In the absence of the assumption thus engendered, Overlook says, it would not have proceeded with the negotiations in the way it did. Rather, it would have negotiated for a fee per subscriber, not one based on a percentage of revenue or, perhaps, a percentage based system with the percentages adjusting to deal with any decrease in subscription price. It

was therefore unconscionable, in Overlook's submission, for Foxtel to act inconsistently with the assumption and, on the basis emerging from the judgment of Brennan J in **Waltons Stores (Interstate) Ltd v Maher** [1988] HCA 7; (1988) 164 CLR 387, Foxtel was estopped from pursuing any such inconsistent action .

87 Foxtel makes several responses. It says in the first place that an assumption that there would be no price reduction during the five year term of the contracts was an unreasonable assumption because the assumption, if fulfilled, would give rise to illegality under the resale price maintenance provisions of the **Trade Practices Act**. As **Waltons Stores** confirms, only reasonable assumptions give rise to an estoppel. I must confess to considerable difficulty in seeing how unilateral action of Foxtel in maintaining the price at the $19.95 level for five years would have contravened the **Trade Practices Act** in the absence of a requirement or condition imposed by Overlook or some form of agreement to that effect, including, no doubt, the kind of agreement which may be spelt out from consciously parallel behaviour. But for Foxtel to have represented (if it did) that it would leave the price at the initial level for the full term and for Overlook to have assumed (if it did) that Foxtel would act in accordance with its representation does not, to me, involve illegal conduct making the assumption an unreasonable one.

88 Foxtel's next response is that the negotiation was between two sophisticated corporations with legal advisers (Mr Freudenstein and Ms Ireland in the case of Foxtel and Mr Geagea in the case of Overlook) and that, once they had reached and documented an agreement, neither should lightly be given the benefit of an estoppel. Reference was made to the following passage in the judgment of Kirby P in **Austotel Pty Ltd v Franklins Selfserve Pty Ltd** (1989) 16 NSWLR 582:

"We are not dealing here with ordinary individuals invoking the protection of equity from the unconscionable operation of a rigid rule of the common law. Nor are we dealing with parties which were unequal in bargaining power. Nor were the parties lacking in advice either of a legal character or of technical expertise. The Court has before it two groupings of substantial commercial enterprises, well resourced and advised, dealing in a commercial transaction having a great value. As has been found, they did not reach the point of formulating their agreement in terms which would be enforced by the law of contract. This is not, of itself, a reason for denying them the beneficial application of the principles developed by equity. But it is a reason for scrutinising carefully the circumstances which are said to give rise to the conclusion that an insistence by the appellants on their legal rights would be so unconscionable that the Court will provide relief from it."

89 Foxtel also points to the reality that these sophisticated commercial parties, who negotiated over several months with the assistance of lawyers, eventually recorded their bargain in the form of written contracts. That form of expression should be regarded, in the absence of some compelling indication to the contrary, to have become the fulfilment of their negotiations which were then exhausted and superseded in such a way as to be no longer the source of any estoppel. For this proposition, Foxtel relies on the decision of McLelland J in **Johnson Matthey Ltd v A C Rochester Overseas Corporation** (1990) 23 NSWLR 190 as subsequently approved and amplified, particularly by Bryson J in **Australian Co-operative Foods Ltd v Norco Co-operative Ltd** [1999] NSWSC 274; (1999) 46 NSWLR 267 (see also **Skywest Aviation Pty Ltd v Commonwealth** (1995) 126 FLR 61 and **C G Mal Pty Ltd v Sanyo Office Machines Pty Ltd** [2001] NSWSC 445).

90 It is probably going too far to say that there is never scope for any form of estoppel arising from pre-contract negotiations where parties eventually reduce their bargain to written form. The suggestion of McLelland J to that effect in **Johnson Matthey** was made in a context where an estoppel by convention was asserted in the face of an "entire agreement" clause. There can be no doubt that, with conventional estoppel's basis in common adherence to a particular assumption as a basis of the relationship so that principles akin to those governing rectification are at work, a party seeking to establish such estoppel in the face of clear written terms expressed to be exhaustive faces a very daunting task – so daunting, perhaps, that McLelland J's view of impossibility may well be apt. But such an approach is less clearly apt to govern cases of equitable estoppel founded on unconscionable departure by one party from a situation it has led the other to assume to be an incident of their relationship, although even then the assertion of such an estoppel in the face of silence on the particular subject in a written contract negotiated at arm's length and with the assistance of lawyers on both sides must still be regarded as a formidable task. The reason is explained in the judgment of Kirby P in **State Rail Authority of New South Wales v Heath Outdoor Pty Ltd** (1986) 7 NSWLR 170:

"Too great a willingness by the courts to discern, in pre-contract negotiations, a basis for estoppel will have the effect of introducing a serious element of uncertainty into our law of contract. It may also encourage expensive litigation in which the terms of the writing are put to one side and the courts busily engaged (as we have been) in a minute examination of the wilderness of pre-contract conversations. This may be a reason, at least in the case of written contracts which are accepted by the parties and are not varied or elaborated, to hold the parties to the applicable terms of such contracts and to limit carefully the development of

the law of estoppel, lest it seriously undermine the adherence to bargains which are such an important feature of modern economic life. But even if estoppel is pushed so far, a too tender sense of the unconscionable may mislead the courts into substituting the court's notions of equity as between contracting parties for the bargain which the *parties* have themselves negotiated and accepted."

91 In any event, the evidence does not support the proposition that Overlook made and acted upon the assumption which is central to this part of its case, namely, that the subscription price of each non-English language channel would remain at $19.95 for the life of the contract. There is evidence that Overlook assumed that the price at the outset would be $19.95, as did Foxtel. But Mr Abdallah's evidence was that the possibility of a change in the initial price did not occur to him and that he did not make "any assumption at all ... about anything to do with changes to the retail price". In other words, he did not assume that the price would change and did not assume that the price would not change. On his own evidence, therefore, the threshold component of such estoppel claim, if any, as may be advanced in the face of the written contract is not established. Furthermore, it has not been shown that Foxtel's representations as to a $19.95 subscription price carried within them the crucial additional element by way of assurance that that price would apply unchanged throughout the life of the contracts, with the result that another essential element of that claim is missing. Overlooks's estoppel claim fails.

**The unconscionable conduct claim**

92 Overlook's unconscionability claim is put on alternative bases. First, it is said that there is an entitlement to relief according to ordinary equitable principles. The alternative claim is based in s.51AC of the **Trade Practices Act** in relation to the acquisition by Foxtel of services from Overlook, those services being the provision of the RAI and Antenna channels

93 The first of these claims may be dealt with shortly. Equity will intervene in cases where one party contracts from a position of "serious disadvantage vis-à-vis the other" (**Blomley v Ryan** [1956] HCA 81; (1956) 99 CLR 362) so that "an onus is cast upon the stronger party to show that the transaction was fair, just and reasonable" (**Commercial Bank of Australia Ltd v Amadio** [1983] HCA 14; (1983) 151 CLR 447). The central notion is that equity will not allow advantage to be taken of a person labouring under a disability such as, but not limited to, sickness, age, drunkenness, illiteracy, lack of education or lack of assistance or explanation. Equity will divert from the party taking such advantage and restore to the victim such benefits as are produced by the unconscionable conduct. It can be said at once that

there is no scope for the operation of these principles in the present case of a contract negotiated at arm's length between corporations represented by commercial negotiators led on each side by persons possessing the degree of business sophistication and experience of Mr Abdallah and Mr Mockridge and having the active and ongoing assistance of their respective lawyers. To the extent that a claim based on ordinary equitable notions of unconscionable dealing is seriously asserted by Overlook, it simply cannot be sustained in the particular commercial context.

94 The s.51AC claim raises a preliminary question as to the "price" at which services were acquired from Overlook by Foxtel under each of the non-English language channel agreements. This is because that section (being the provision upon which Overlook expressly relies) only applies in relation to the acquisition of goods or services "at a price" which does not exceed a specified threshold. For present purposes, the threshold is the sum of $1 million referred to in sub-ss.(9) and (10), unaffected by the modification (by way of increase to $3 million) effected by reg. 28AA 0f the **Trade Practices Regulations** with effect from 1 July 2000. All relevant events predated that modification.

95 Although sub-s.(11) goes some way towards explaining how to work out, for the purposes of sub-ss.(9) and (10), the price at which services are provided and acquired (including by importing, in adapted form, certain paragraphs of s.4(2) of the Act), there is nothing which throws any special light on the question of calculation of the "price" of services of the kind involved in this case. It is nevertheless made reasonably clear, I think, that there is an element of futurity to the assessment. That being so, it seems to be open to me to take the practical (and, I think, conservative) view that where, as here, there is a continuum of supply and acquisition under a single contract over a period, the relevant "price" is, at any time, at least the aggregate of the amounts paid in respect of the supply and acquisition before that time – I say "at least" because the element of futurity present in these provisions makes it clear that past events and past payments are by no means the end of the matter. According to evidence tendered by Overlook, the progressive aggregate of the fees paid by Foxtel to Overlook up to July 2001 under the relevant channel agreement was $1,408,233 for RAI and $1,544,023 for Antenna. Taking those as the respective "prices" in the way I have just described, the effect of sub-ss.(9) and (10) is to make the s.51AC proscriptions inapplicable to the supply of services by Overlook to Foxtel and the acquisition of those services by Foxtel from Overlook under the channel agreements.

96 This conclusion makes it unnecessary for me to deal with the scope and reach of s.51AC, so far as its substantive operation is concerned. On one view, s.51AC has an operation

similar to that of s.51AB and covers conduct which is unconscionable according to the general equitable criteria to which reference has already been made, plus conduct of the kind caught be general equitable principles relating to undue influence: **Hurley v McDonald's Australia Ltd** [1999] FCA 465. That view of s.51AB was not, however, adopted by the Full Federal Court on appeal: **Hurley v McDonald's Australia Ltd** (2000) ATPR 41-471. It preferred to leave the question for future consideration, at the same time laying down some general guidelines:

"For conduct to be regarded as unconscionable, serious misconduct or something *clearly unfair or unreasonable*, must be demonstrated – **Cameron v Qantas Airways Ltd** [1995] FCA 1304; (1994) 55 FCR 147 at 179. Whatever 'unconscionable' means in s.51AB and s.51AC, the term carries the meaning given by the Shorter Oxford Dictionary, namely, actions *showing no regard for conscience*, or that are *irreconcilable with what is right or reasonable* – **Qantas Airways Ltd v Cameron** [1996] FCA 1483; (1996) 66 FCR 246 at 262. The various synonyms used in relation to the term 'unconscionable' import a *pejorative moral judgment* – **Qantas Airways Ltd v Cameron** [1996] FCA 1483; (1996) 66 FCR 246 at 283-284 and 298."

97 In **Australian Competition and Consumer Commission v Simply No-Knead (Franchising) Pty Ltd** [2000] FCA 1365; (2000) 104 FCR 253, however, Sundberg J expressed the view that s.51AC is not confined in the way suggested in relation to s.51AB in the first instance decision in **Hurley v McDonald's**. That view proceeded from a consideration of the specific factors the sections directs to be taken into account in determining unconscionability and seems to me, with respect, to be correct. But Sundberg J also adopted the hallmarks of unconscionability expressed in the above extract from the judgment of the Full Court in **Hurley v McDonald's** – as did Lindgren J in the subsequent case of **Monroe Topple & Associates Pty Ltd v Institute of Chartered Accountants in Australia** [2001] FCA 1056.

98 When the criteria suggested by the phrases "showing no regard for conscience", "irreconcilable with what is right or reasonable" and "pejorative moral judgment" are applied in the present case, it seems to me that the conduct of Foxtel in effecting the price reduction for the RAI and Antenna channels fell short of unconscionability. The reasons have already canvassed at some length in relation to the implied contractual obligation of good faith performance. In short, its action had both a rational basis and an objective explanation relevant to the common welfare of Foxtel and Overlook. It follows that, even if s.51AC was not rendered inapplicable by the price threshold in sub-ss.(9) and (10), it would provide no

basis for the relief Overlook seeks.

## The first s.52 claim – failure to disclose

99 Overlook's contention here is that Foxtel engaged in conduct that was misleading or deceptive or likely to mislead or deceive by failing to inform Overlook, at the time of negotiating and concluding the channel agreements for RAI and Antenna, that Foxtel regarded itself as entitled to change the channel subscription prices at will. This contention is based on allegations that, at or about the time the agreements were made, Foxtel was considering subscription prices of less than $19.95 and that that sum was seen as merely an initial price. Overlook also points to the fact that Foxtel regarded itself as under a legal inhibition which precluded it from binding itself to the price it would charge subscribers.

100 This last matter may be dealt with shortly. If, as alleged, Foxtel regarded itself as legally precluded from fixing the subscription price by way of agreement with Overlook, that really says nothing about Foxtel's view of its commercial freedom to change the price. The fact that a person may not lawfully agree with someone else to do a particular thing does not affect the person's ability and freedom to do or refrain from doing the thing as a result of a unilateral decision according to an appreciation of where the person's own best interests lie. I therefore regard the resale price maintenance inhibition perceived by Foxtel as essentially irrelevant to this part of Overlook's case.

101 The allegations that, in and around August 1998, Foxtel saw $19.95 as merely an initial price and was already considering lower prices encounter substantial difficulties on the evidence. It is pertinent to quote the following passage from the cross-examination of Mr Mockridge:

"Q. You understood their argument at the time to be based on an assumption that Foxtel would be charging $20 just like Optus was?

A. I understood their argument was based on a $20 assumption.

Q. That is $20 to be charged by Foxtel?

A. Yes.

Q. Which you understood was the same as the Optus price at the time?

A. Yes.

Q. Indeed, you were making the assumption during the course of this negotiation that Foxtel would be charging $20?

A. Yes.

Q. It hadn't occurred to you at that point that Foxtel might change the price?

A. It had not occurred to us that we would reduce the price at this point, no. Our objective was to go out at $19.95.

Q. All your negotiations, from your point of view, was on the assumption the price was going to be $20?

A. Our commencing price was $19.95.

Q. You didn't think in terms of commencement price. You just thought the price would be $20?

A. That assumes things go on forever with no change. The assumption here was that we would start with $19.95, the commencing price.

Q. It no doubt crystallised in your head, during the course of these negotiations, did it, that the price of $20 might change?

A. Crystallised in my head?

Q. Yes.

A. Did I understand that I was looking at $19.95? I did not understand that.

BANNON: Q. What I am suggesting to you, at no point during the negotiations you had with Overlook did you consider the possibility that the price might change?

A. In the negotiations with Overlook?

Q. Yes?

A. Did I consider that the price would not change? Sorry, the price would change? My assumption was that was our starting price.

Q. What I am suggesting to you, you didn't think in terms of starting price, you just thought in terms of 'This is the price', no more?

A. In thinking that, you never assume price doesn't change, you wouldn't have a business if you did that.

Q. And you assumed, didn't you, that Overlook was basing its assessment of whether it should or should not go into this deal on the assumption that the price would be $20?

A. I assumed that they were working on a $20 price assumption, yes.

Q. For example, you never said during this discussion in June, 'Hold on, us giving you a higher percentage of revenue is not going to protect you, because we might lower the price and there goes your protection', you never said that, did you?

A. I understood the MFN was their prime protection, that's the protection they were seeking.

Q. But in relation to the other protection which you accept you had in mind?

A. I was meeting the debating point as opposed to it being a fundamental issue.

Q. But you didn't say to them at any point during this discussion 'The percentage won't protect you against loss on churn, because we might lower the price'?

A. I did not say that.

Q. It didn't even occur to you to say that, did it?

A. Well, it wasn't an issue in the debate.

Q. And you didn't think it in your mind and deliberately withhold it from them, did you?

A. No, I did not do that."

102 This makes it clear that, while Foxtel's chief executive may have had some appreciation of a theoretical ability of Foxtel to change the price at some future time, it accepted $19.95 as the price applicable to the transaction and did not entertain any real prospect of change. The matter was even more clear cut in the mind of Mr Kelly, Foxtel's chief negotiator, who said in cross examination:

"A. No. Tony [ie, Mr Ishak] and myself, throughout the entire negotiation, had agreed that $19.95 was the price. If the price was to change, it would have been, I understand it to be a directive of both Foxtel, Optus and Overlook in consultation. But the reason I say here it was never, No. 19 [scil.$19.95] was never a separate issue, is because it didn't need to be. It was

agreed upon."

103 It is also relevant to note that when, in February 1999, concerns emerged within Foxtel about the performance of the RAI and Antenna channels, the idea of reducing the subscriber price was by no means an obvious solution. A group of three persons was set the task of finding a solution and when they (or, more probably, one of them, being Ms Oh) came up with the idea of reducing the price, that was not only something which had to be subjected to legal scrutiny to see if it was permissible but also an approach regarded as innovative. Those reactions would not have eventuated had Foxtel appreciated from the outset that it could change the price at will.

104 Overlook has not made out its allegations that Foxtel should be regarded as having consciously held the belief upon which the assertion of misrepresentation by silence is based. It follows that failure to disclose the supposed belief cannot amount to conduct within s.52, even if the other conditions allowing mere silence to be actionable under s.52 are satisfied.

**The second s.52 claim – revenue base representations**

105 Overlook's case here is that Foxtel engaged in conduct prohibited by s.52 by representing to Overlook that it understood and appreciated that it was critical to Overlook that the subscriber price be $19.95 since, first, there would otherwise be a risk of activating the Optus MFN clause and, second, Outlook had to achieve a $13 fee per subscriber (being the rate applicable under the Optus arrangements) so as to preserve its revenue base. Overlook also says that Foxtel represented that it was willing to proceed in accordance with Overlook's expectation by entering into an agreement on the basis that the revenue base was preserved.

106 Central to this part of Overlook's case is a letter of 25 June 1998 from Mr Mockridge to Mr Abdallah. The letter was written soon after a teleconference which addressed the stalemate the parties appeared to have reached. The stalemate was referred to in a letter of 23 June 1998 from Mr Abdallah to Mr Mockridge:

"At this stage our negotiations seemed to have reached a deadlock. With Foxtel insistence on carriage agreements exceeding one year with no commitments on subscription numbers, and our group's position on ART/LBC carriage and more favourable revenue share."

107 The evidence makes it clear that there were three main matters in contention between the parties at that point. The first was the duration of the proposed channel agreements. Overlook sought a term of five years but Foxtel wished to commit for only one year initially. The second matter was the Arabic language channels, ART and LBC. Overlook wanted some agreement as to Foxtel's taking these channels as well but Foxtel was not prepared to give such a commitment. The third matter was the fee structure for RAI and Antenna. All discussions had been on the basis of a percentage of revenue. There were differences as to the percentages and their gradations.

108 The important aspects of Mr Mockridge's letter of 25 June 1998 are set out in the following parts of the written submissions of counsel for Overlook:

"107. Mockridge used the expression 'good faith' as a descriptor of Foxtel's proposed conduct in making the offer.

'As we discussed we now have had a change to review in detail your latest proposal. In a good faith effort to finalise this deal we are prepared to accept the economic terms you put to us on condition that all other issues are resolved as we propose below.'

108. Under the heading 'RAI' it was said:

'In response to your offer for the carriage terms of RAI, we understand your concern about preserving your existing revenue base and are willing to proceed on that basis. I therefore confirm our willingness to accept your proposal as part of our deal as follows:'

109. There was then set out a sliding scale of 65% for the first 2,500 subscribers, 50% up to 4,000, 40% up to 6,500 and 30% thereafter. Under the heading 'Antenna' a sliding sale was introduced by the words '*On the same basis I would therefore accept your proposal*'. That scale was 65% for the first 3,500 subscribers, 50% up to 5,500, 40% up to 7,500 and 30% thereafter.

110. The letter also contained the following statements:

'*In order to justify the expense we will incur on capital expenditure and marketing we would suggest a five year term for the carriage of RAI and Antenna.*'

'*Karim, in accepting your suggested pricing I have attempted to address your most fundamental issue and clearly this means the channels will be a much more expensive proposition for Foxtel.*'"

109 The statements by Foxtel in Mr Mockridge's letter of 25 June 1998 must be understood in the context of the state of negotiations at the time. It is useful to examine against that background each of the aspects of the letter extracted in the submissions.

110 The extract set out in para 107 of the submissions is a statement of negotiating position. Foxtel is prepared to accept "the economic terms" put to it by Overlook provided that all other matters are resolved in the way Foxtel sets out in the letter. The "good faith" reference is no more than an assurance by Foxtel of the genuineness of that negotiating position and of its desire to progress matters. Acceptance of Overlook's "economic terms" does not connote some form of stand-alone commitment. It is, rather, an acknowledgement of Foxtel's willingness to contract on certain terms, assuming other matters are resolved as Foxtel wishes. This part of the letter cannot be taken as conveying any continuing and independent representation of the kind capable of sustaining a s.52 claim.

750

111 The part of the letter of 25 June 1998 extracted in para 108 of the submissions, read together with the material described at para 109, is concerned with the third of the matters then in contention, namely, the sliding scale of percentages for fee purposes. One of Overlook's concerns was to protect itself against the financial effects of the expected churn of RAI and Antenna subscribers from Optus to Foxtel. Its own assessment was that up to 2,500 RAI subscribers and 3,500 Antenna subscribers might move from Optus to Foxtel. It was that assessment which caused Overlook to require those subscriber numbers to attract the 65% fee without reduction, that being the fee percentage under the Optus agreements. There can be no doubt that Overlook and Foxtel assumed, at that time, an add-on subscription price for Foxtel subscribers the same as that for Optus subscribers. But it is not possible to find in the extracted part of the letter a representation by Foxtel that the price it would charge would always be at a particular level, whether $20 (or $19.95) or the equivalent for the time being of the Optus price (which was itself expressly stated to be capable of being changed) or otherwise. What Foxtel said was that it was prepared to meet Overlook's demands on the percentages. The extract from the letter quoted at para 110 of the submissions does not call for comment additional to that already made.

112 My conclusion is that, on the evidence, the letter of 25 June 1998 did not convey the representations upon which this part of Overlook's case relies.

113 There is, in any event, a substantial question whether a representation by one party to another that the first party understands and appreciates the commercial importance of a particular matter to the second party can, via s.52, sheet home a statutory liability to the first party when that first party does something which is legally open to it although at odds with the importance attached to the particular matter by the second party.

114 A statement made by one party in the course of commercial negotiation between sophisticated corporate parties that it understands or appreciates a position stated by the other will most often be no more than what it appears to be, namely, a statement of awareness of the other's position. It is commonplace in such situations for one party to say that it cannot accept a particular position or can do so only if some concession is made. That is part and parcel of the negotiating process. But one party's representations about what is vital or important to it and the other's response that it understands or appreciates the first's position are most commonly steps in the formulation of a complete bargain where the party who holds the particular aspect to be vital or important effectively bears the onus of putting that matter squarely on the table and obtaining an explicit promise that the other party will honour or respect it. Furthermore, a statement that it is appreciated or understood

that a matter is considered vital cannot, of itself and without more, amount to a representation that the matter will be accepted or respected or not departed from. It might be different where the parties are dealing on unequal terms or one is entitled to place some reliance upon the other. But here the parties were sophisticated corporations represented by experienced businessmen and assisted by lawyers.

115 In the end, this part of Overlook's case fails not only because the evidence does not support the significance and meaning sought to be attached to the statements in the 25 June 1998 letter but also because the objective effect of the statements on a reasonable person in the position of Overlook would not have been to engender a belief that anything was defined or settled by those representations. It is, after all, the impact upon a reasonable person in the position of the recipient which is relevant in judging the quality of a representation for s.52 purposes: **Parkdale Custom Built Furniture Pty Ltd v Puxu Pty Ltd** [1982] HCA 44; (1982) 149 CLR 191.

## The third s.52 claim – marketing representations

116 Overlook contends that Foxtel contravened s.52 by making to Overlook representations, first, that Foxtel had strong marketing skills and would do well with Antenna and RAI; second, that Foxtel would do everything possible to ensure that an excellent market penetration by RAI and Antenna in its cabled areas would be achieved; third, that Foxtel would secure 12,000 RAI subscribers and 10,000 Antenna subscribers by 30 June 1999 and that Foxtel's marketing strength and overall package would make the channels a success; and, fourth, that Foxtel would promote and advertise the channels in a highly effective manner, consistent with the advertising strategy which had ensured that, in the for eighteen months before June 1998, Foxtel had grown from being smaller than Optus to having nearly twice the number of Optus's subscribers. To the extent that the second representation is alleged to be in writing, it is said to be contained in a letter of 7 May 1998 from Mr Mockridge to Mr Abdallah. To the extent that the third representation is alleged to be in writing, it is said to be contained in the document entitled "Ethnic Marketing Plan" prepared by Foxtel and given to Overlook. To the extent that the fourth representation is alleged to be in writing, it is said to be contained in a letter of 22 June 1998 from Mr Mockridge to Mr Abdallah.

117 Foxtel accepts that it made the first representation. It also accepts that it made the second representation, although with "everything possible" understood as "everything reasonably and commercially practicable" (a modification or interpretation I regard as appropriate as it gives proper commercial meaning to "everything possible"). Foxtel also

accepts that it said words to the effect of the fourth representation. As to the third representation, Foxtel acknowledges that it informed Overlook of an objective of recruiting 12,000 RAI subscribers and 10,000 Antenna subscribers by 30 June 1999. Importantly, however, Foxtel also says that the first, second and fourth representations did not amount to "conduct" capable of amounting to contravention of s.52.

118 That submission on Foxtel's part is founded on the authorities about the latitude allowed in commercial dealing by way of puffery. The cases to which reference was made in submissions include **Schindler Lifts Australia Pty Ltd v Debelak** [1989] FCA 311; (1989) 89 ALR 275 where it is emphasised that statements alleged to be caught by s.52 must always be assessed in their context. The case concerned representations made by a trader about a competitor. Pincus J said:

"A claim by a trader that his goods or services are 'highly regarded' would ordinarily be taken to be mere puffery. A statement to contrary effect about a rival's goods should not be held to overstep the permissible limits of denigration ... . It has to be conceded that a statement by a rival about a trader which is universally acknowledged as pre-eminent in its field that it is 'not highly' regarded might be in breach of s.52, as being simply a lie. In my opinion, however, in the circumstances of this case, to treat statements such as that in which the words complained of are contained as within the prohibition in s.52 would be to place unreasonable legal inhibition on ordinary communication in Australian business."

119 The reality is that a certain amount of hyperbole is permissible and to be expected in business without attracting legal sanctions. Thus, a statement that a bank customer's affairs "will be in the best of hands" (**Drambo Pty Ltd v Westpac Banking Corporation**) (1996) 96 ATC 4737) or that someone will "guarantee payment for the shipments with his life" (**Culley & Russell Pty Ltd v Goyder** [2001] WASCA 27) must be recognised as a mere puff not actionable under s.52.

120 I accept Foxtel's submission on this issue. Section 52 does not subject commercial enterprises to a regime of enforced modesty in relation to their achievements and skills. One cannot imagine any entrepreneurial concern in Foxtel's position having seen fit to say to Overlook, "It is true that we have in eighteen months achieved a subscriber base twice the size of Optus's, but you should not assume that our marketing skills are other than pedestrian or that, if you choose to place your channels on our platform, there will be any

particular degree of success in achieving market penetration". That is not the way business works. Overlook was bound to receive and to accept a certain amount of self-laudatory comment from Foxtel. It should have seen the first, second and fourth representations for the commercial puff that they were.

121 It is necessary to consider separately the third of the alleged marketing representations, that is, the alleged representation that Foxtel would achieve 12,000 RAI subscribers and 10,000 Antenna subscribers by 30 June 1999. It is not disputed that this degree of potential market penetration was contemplated by Foxtel's "Ethnic Marketing Plan" and that a copy of that plan was given by Foxtel to Overlook in the course of negotiations. Reference has already been made to Mr Ishak's evidence about the conversation among himself, Mr Abdallah and Mr Kelly when the 12,000 and 10,000 numbers appearing in Foxtel's plan were made known to Overlook.

122 It is clear from the evidence that these figures were communicated as marketing objectives or targets rather than sales penetration predictions. That being so, the promissory quality of the representations (or the extent to which reasonable reliance might have been invited) is by no means clear, given that marketing objectives generally serve the primary purpose of spurring on salesmen rather than providing an assessment of expected outcomes. But even if the representations had been predictions, Overlook's attempt to bring them within s.52 would have encountered the difficulty referred to by Weinberg J in **Alpine Hardwood (Aust) Pty Ltd v Hardys Pty Ltd** [2001] FCA 1876 (21 December 2001):

"Predictions will normally only be misleading or deceptive if they are known to be false, or are made with reckless disregard as to their truth. The mere fact that representations as to future conduct or events do not come to pass does not make them misleading or deceptive."

The evidence does not support a finding that the Foxtel figures were objectionable in this way.

123 A further dimension must also be examined. Reference has already been made to the caution and scepticism with which Overlook regarded the subscriber numbers in Foxtel's Ethnic Marketing Plan. Mr Abdallah said to Mr Kelly that Foxtel targets were "very optimistic" and that Overlook had not reached even half the Foxtel number for RAI after being on Optus since February 1997. Overlook also had experience with the distribution of foreign language

channels in other countries. It was no doubt upon that experience that Overlook drew in making its own assessment of the penetration likely to be achieved through Foxtel. As has been mentioned already, both Mr Ishak and Mr Abdallah eventually conceded that they had really done no more than take into account both Foxtel's marketing targets and its apparent confidence that it could achieve them, at the same time making their own business assessments by reference to their own more hard-headed ideas about subscriber penetration by 30 June 1999, being 8,200 for RAI and 7,300 for Antenna. Mr Ishak said in cross examination:

"Well, we looked at Foxtel's position with respect to their marketing parameters and their objectives and we formulated our own position."

Mr Abdallah made it clear in cross-examination that, although he understood Foxtel to believe that it could achieve the projected 12,000 and 10,000 subscriber figures by 30 June 1999, he did not himself believe that Foxtel would do so.

124 It is submitted on behalf of Overlook that, because Overlook took the relevant representations by Foxtel into account in formulating its own assessment, those representations were relied upon by Overlook in a way which is material to a right to redress for contravention of s.52. It is said that the use of the figures in that background way "is not inimical to a causal link between the representations and the conduct".

125 The nature of the link of reliance and causation which must be found to justify an award of damages under s.82 for contravention of s.52 has been considered by the High Court most recently in **Henville v Walker** [2001] HCA 52; (2001) 75 ALJR 1410. It is clear that an entitlement to damages arises even if the conduct within s.52 is one of several causes of the relevant loss, provided always that the conduct continued to be operative as something upon which reliance was placed and therefore as a factor which materially contributed to the loss or damage suffered. In **Henville v Walker**, a property developer suffered loss in relation to a building project. In undertaking the project, he had relied upon a feasibility study which incorporated both an incorrect estimate of likely expenditures made by the developer himself and revenue projections prepared by a real estate agent. At first instance, the agent was held liable to pay damages for contravention of s.52 because a representation as to the selling price of units was false. The Full Court of the Supreme Court of South Australia overturned that decision on the basis that the developer's loss was the result of his incorrect

calculation of likely expenditure. The High Court restored the result at first instance on the footing that the developer's belief that a profit would result was the product of two fundamental errors in the absence of which he would not have gone ahead, being his own error as to likely expenditures and the agent's false representation as to expected selling prices; and that the second of these, having remained operative at all times, was in a real sense a cause of the loss, thus satisfying the criterion for liability dictated by the word "by" in s.82.

126 The present case is different. It is true that Foxtel made to Overlook the representations as to subscriber targets contained in the Ethnic Marketing Plan. It is also true that Overlook took those into account as something Foxtel seriously sought and may have believed itself capable of achieving. But Overlook, which possessed marketing knowledge about foreign language channels superior to that of Foxtel not only overseas but also in Australia (through its Optus experience), did not itself believe that the subscriber numbers suggested by Foxtel's Ethnic Marketing Plan would be achieved. It made its own projections on the basis of more conservative figures derived from its own appreciation of market realities and other relevant factors. In short, Overlook did not rely on the Foxtel target figures, with the result that the Foxtel representations cannot be regarded as having been operative and causative in Overlook's decision making.

127 For all these reasons, Overlook's third s.52 claim based on the alleged marketing representations cannot succeed.

## Conclusion

128 Overlook has not shown an entitlement to relief on any of the bases advanced in its third further amended summons filed on 17 September 2001. The proceedings must therefore be dismissed with costs.

\*\*\*\*\*\*

LAST UPDATED: 05/02/2002

# BP Gas Marketing Limited v La Societe Sonatrach, Sonatrach Gas Marketing UK Limited

 No Substantial Judicial Treatment

**Court**
Queen's Bench Division (Commercial Court)

**Judgment Date**
7 October 2016

Case No: CL-2014-000844

High Court of Justice Queen's Bench Division Commercial Court

**2016 EWHC 2461 (Comm), 2016 WL 06397422**

Before: Simon Bryan QC (Sitting as a Deputy Judge of the High Court)

Date: 7 October 2016

Hearing dates: 18, 19, 20, 21, 25, 26 and 27 July 2016

**Representation**

Nigel Eaton QC (instructed by Holman Fenwick Willan LLP ) for the Claimant.
Christopher Harris and Georges Chalfoun (instructed by Bracewell (UK) LLP ) for the Defendants.

**Approved Judgment**

Mr Simon Bryan QC (Sitting as a Deputy Judge of the High Court):

## A. Introduction and Background to the Dispute

1.  This action is concerned with the proper construction of clause D2.2.2(ii)(b) of a Joint Shipper's Agreement ("JSA") entered into on 28 June 2005 between the Claimant, BP Gas Marketing Limited ("BP"), and the First Defendant La Societe Sonatrach [1] . Clause D2.2.2(ii)(b) of the JSA provides that nitrogen costs (which includes power used to generate nitrogen) allocated by Grain LNG Limited ("Grain") to BP and Sonatrach (together defined as the Shipper), in respect of nitrogen added to cargoes of Liquefied Natural Gas ("LNG") [2] imported through Grain's terminal, shall be allocated between BP and Sonatrach according to a formula as there set out.

2.  It is the proper construction of that formula, and one element within it, namely a figure of 51.41, that gives rise to the issues that arise for determination in this action. In order to understand the issues that arise (which are defined in section B below) it is first necessary to set out something of the background to the dispute.

3.  The Isle Of Grain, which is situated on the Medway Estuary, is home to a gas terminal (the "Terminal") operated by Grain, a National Grid company. The Terminal was, until 2002, a peak shaving terminal, used to supply gas to the national pipeline system during peak use periods, and storing gas as LNG when not required. It was not an import terminal and did not have

facilities for berthing or unloading of vessels. The gas which the Terminal stored was North Sea gas which came to it through Transco's National Transmission System (the "NTS").

4.   In 2002, Grain started converting the existing plant into a Terminal for discharging LNG from ocean-going tankers, storing it in tanks on-site, and then converting it back into gas to be sent it out into pipelines for distribution to domestic and commercial consumers. The Terminal came into operation in 2005. At that time, it was the only import and regasification terminal in the UK. There was accordingly no track record as to how the Terminal would be operated (including, for present purposes, in relation to the Terminal's practices concerning the addition of nitrogen to LNG to alter its composition), which provides the backdrop to the dispute between BP and Sonatrach, as to how costs charged by Grain in relation to nitrogen are to be allocated between BP and Sonatrach.

5.   In October 2003, BP and Sonatrach jointly contracted for the use of the Terminal's initial discharge, storage, re-gasification and send-out capacity under a 20-year Specific Terms Agreement ("STA"). "STA" will be used in the judgment to include subsequent amendments and additions thereto (the STA is also called the "Services Agreement" in some documents). BP and Sonatrach had to tender (and thereafter contract) jointly because the Phase 1 capacity was not sufficient to split between the two shippers — the capacity was around 192,000m3 and the LNG tankers available at the time had a capacity of around 155,000m3 with the result that a right to half the capacity (100,000m3) would not have allowed either shipper to unload a full cargo. In their relations with Grain, BP and Sonatrach are accordingly treated as a single shipper.

6.   Grain later twice expanded the Terminal. The original capacity, which is covered by the STA, is known as Phase 1. The additional capacity is divided into Phases 2 and 3. Sonatrach contracted for some Phase 2 capacity. BP is not involved in Phases 2 or 3.

7.   Although BP and Sonatrach contracted jointly with Grain, they act severally in sourcing LNG and import from different countries. Like oil, LNG is a blend of hydrocarbons. The blend differs from source to source (in terms of the precise amounts of methane, propane, nitrogen and other gases it contains). So LNGs from different sources have different properties.

8.   The LNG property which is most relevant to this case is the Wobbe number (or index). In simplistic terms, Wobbe is a measure of an LNG's energy by volume. It is expressed in megajoules per standard cubic metre (MJ/m3). More precisely, Wobbe is an LNG's higher heating value divided by the square root of the LNG's specific gravity, the specific gravity being the ratio of the density of the LNG to the density of air: $Wobbe = HHV/\sqrt{SG}$.

9.   The UK gas transportation infrastructure is built on two separate, but connected, gas transmission (pipeline) systems, namely Transco's National Transmission System (the NTS), and Local Distribution Zones ("LDZ"). The NTS is a high-pressure system for transmitting large volumes of gas over long distances to large users, e.g. power stations. The LDZ are lower-pressure systems for transmitting gas to users in the vicinity of a plant. The Terminal is connected to both systems.

10.   There are a number of parameters which apply to gas entering the NTS and the LDZ. These are largely set out in the Gas Safety (Management) Regulations 1996 (the "GSMR"). These include that the Wobbe index value of the gas cannot be lower than 47.2MJ/m3 or higher than 51.41MJ/m3. The UK infrastructure was developed around North Sea gas which is at the very lean end of the spectrum of gas produced worldwide.

© 2023 Thomson Reuters.

11.  Under the STA, BP and Sonatrach contracted that LNG would comply with the regulatory limits at the point of discharge into the Terminal, and Grain contracted that gas (i.e., regasified LNG) would comply at the point of send-out from the Terminal. In this way, the 51.41 Wobbe limit was written into the STA.

12.  The upper value of 51.41MJ/m3 is very low by international standards, and was potentially problematic for BP and Sonatrach as most international sources produce LNG with a Wobbe above 51.41. However, there is a solution, namely to add nitrogen to the gas. Adding nitrogen increases the density of the gas but lowers its energy value since nitrogen has no heating value, and in consequence the Wobbe of the LNG/nitrogen blend is lower than that of the original LNG.

13.  By a First Letter Agreement ("FLA") concluded in November 2004, Grain agreed to arrange nitrogen facilities at the Terminal to ensure that LNG discharged under the STA met the 51.41 limit on send-out. BP and Sonatrach agreed to bear the costs. This arrangement meant that the Wobbe limit at point of discharge into the Terminal could be relaxed.

14.  Following the Award of the Phase 1 capacity in October 2003 BP and Sonatrach discussed the necessary arrangements between themselves. BP and Sonatrach originally contemplated creating a joint venture entity for their joint use of Phase1, but ultimately in June 2005, when the Terminal was about to become operational, BP and Sonatrach concluded a Joint Shipper's Agreement (the JSA), under which this dispute arises.

15.  The JSA regulates the use of the Phase 1 capacity as between BP and Sonatrach (as opposed to between BP/Sonatrach and Grain, which is regulated by the STA). Amongst other matters, it regulates how costs and charges which Grain passes on under the STA are allocated between BP and Sonatrach. One such cost is nitrogen (including power used to generate nitrogen).

16.  The JSA deals with the monthly allocation of nitrogen costs at D2.2.2(ii). The JSA also provides for annual reconciliations of nitrogen costs by the same basic method, but using annual values instead of monthly values. D2.2.2(ii)(a) allocates fixed nitrogen costs 50/50. The dispute that has arisen between BP and Sonatrach concerns the proper construction of clause D2.2.2(ii)(b) which calculates a party's allocation of variable nitrogen costs according to a formula.

*The formulae in D2.2.2(ii)(b)*

17.  Clause D2.2.2(ii) is in the following terms:

> "Nitrogen Costs shall be allocated as follows, by reference to all relevant terms as they are defined in, and by measuring all relevant units in accordance with, the Services Agreement and the document entitled "GLNG — Agreed Network Entry Provisions" dated 20 June 2003 and initialled on behalf of GLNG and the Shipper:
>
> (a)  the fixed component of nitrogen costs allocated by Grain to the Shipper shall be borne equally by the Co-Shippers; and
>
> (b)  subject to Section D2.2.2(ii)(c) the variable component of nitrogen costs allocated by Grain to the Shipper shall be allocated in accordance with the quantity of gas Sent Out and the quality of the LNG delivered by each Co-Shipper (the delivering Co-Shipper) as follows:

BP Gas Marketing Ltd v La Societe Sonatrach, 2016 WL 06397422 (2016)

XMA = TCM × TN2A / TN2A + TN2B

Where:

XMA is the cost of nitrogen to be borne by a delivering Co-Shipper with respect to a month (M);

TCM is the total cost of nitrogen with respect to the month (M)

TN2A is the quantity of nitrogen used by the delivering Co-Shipper in the month (M)

TN2B is the quantity of nitrogen used by the other Co-Shipper in the month (M)

where each of TN2A and TN2B is calculated as the product of:

(i)  gas Sent out in Gwh in the month by the delivering Co-Shipper (in the case of TN2A) or by the other Co-Shipper (in the case of TN2B); and

(ii)  The greater of X or Y, where:

X is the correction factor for incomplete combustion factor (tonnes of nitrogen N2 per GWh) calculated as follows:

((weighted average higher heating value of LNG as delivered by the delivering Co-Shipper (in the case of TN2A) or the other Co-Shipper (in the case of TN2B) in the month (M) × 6.35) – 250.01)

5.83

Y is the correction factor for Wobbe (tonnes of nitrogen N2 per GWh) calculated as follows:

BP Gas Marketing Ltd v La Societe Sonatrach, 2016 WL 06397422 (2016)

((weighted average higher heating value of LNG as delivered by the delivering Co-Shipper (in the case of TN2A) or the other Co-Shipper (in the case of TN2B) in the month (M)/ (LNG molar weight) &circ; 0.5) – 51.41)

0.62381

18.  D2.2.2(ii)(b) accordingly provides that the variable component of nitrogen costs allocated by Grain to the Shipper is to be allocated in accordance with (1) the quantity of the gas sent out and (2) the quality of LNG delivered by each of Co-Shipper applying the formula that then follows. Although this formula appears somewhat complex at first sight, once all the variables have been identified, the formula can be applied with the figures contained in the formula, to produce a calculated result.

19.  Part of the formula multiplies the quantity of gas which the party sends out in the month by the greater of Factor X or Factor Y. Factor X and Factor Y are themselves determined by formulae. Factor Y involves (in simplified terms) calculating the difference between the Wobbe of the LNG which the party discharges in the month and a figure of "51.41". This figure of 51.41 is at the heart of the issue of construction.

20.  BP say the figure of "51.41", like other figures in the formula is, as a numerical value, a constant, that constant of 51.41 (Mj/m3) being the maximum Wobbe index value of gas entering the NTS and the LDZ as specified in the GSMR . In contrast Sonatrach submits that 51.41 is not a constant at all, but instead is to be understood as a variable, namely *"the average monthly operational Wobbe index value used for LNG blending and regasification at the Terminal from time to time, alternatively was a proxy for the same"* ((Re-Amended Defence and Counterclaim para 38A).

21.  In practice, if both parties discharge LNG in a given month, one party's LNG will have a lower Wobbe than the other's. Broadly, BP's LNG has had a lower Wobbe than Sonatrach's. Factor Y allocates a lower proportion of nitrogen costs to the party whose Wobbe is lower. This is because the arithmetical effect of Factor Y is that a party's allocation becomes smaller the closer that party's Wobbe gets – relative to the other party's Wobbe – to 51.41.

22.  BP's claim is for nitrogen costs which it says should be borne by Sonatrach under D2.2.2(ii)(b), based on the respective Wobbes of the parties' cargo relative to 51.41. BP and Sonatrach have paid between them 100% of the nitrogen costs invoiced by Grain. So the claim relates to the allocation, as between BP and Sonatrach under the JSA, of costs already incurred and

© 2023 Thomson Reuters.                                                                                                      5

BP Gas Marketing Ltd v La Societe Sonatrach, 2016 WL 06397422 (2016)

paid under the STA. The claim is for £3,362,216.16 principal, plus contractual interest at LIBOR+3%. Sonatrach denies that it is liable in such sums, or that the invoices issued by BP are valid and enforceable.

23.  The Terminal was not operational when the formula in D2.2.2(ii)(b) was contractually agreed. The formula had been drafted by Mr Winstanley of BP (one of the witnesses called by BP at the trial). It appears that there was little or no discussion between BP and Sonatrach about the content of the formula before it was agreed. Equally it appears that Mr Winstanley did little in the way of modelling using the formula.

24.  The initial conversion work at the Terminal was completed in 2005 and the Terminal was commissioned in July of that year. In April 2006 the Agent (jointly appointed by the Co-Shippers) had approached BP about *"strange results"* with the nitrogen cost allocation spreadsheet that had been prepared for the Co-Shippers. Mr Winstanley identified that he had omitted the 28.9 constant (the "28.9 constant") for the molecular weight of air in the formula (which involved a calculation of specific gravity relative to air in Factor Y). I address this error in due course, but it was essentially a typographical error — Mr Winstanley had simply omitted it from his formula. In due course, and as will appear, the parties agreed to add the molar weight of air into the formula.

25.  It was also identified in May 2006 that the formula sometimes produced allocations in excess of 100%, and Mr Wood as Agent, referred to this in a letter to the parties on 18 May 2006 ( *"Cost allocation calculation: Co-Shipper A: 125%, co-shipper B -25%"* ). It was not immediately clear whether this was intentional given the apparent possibility that a lean cargo might dilute a richer cargo's nitrogen requirements, generating a credit. However, it transpires that this would only be so if the lean cargo's Wobbe was below Grain's operational Wobbe (and it appears that that has not happened in practice). In due course, and as will appear, the parties agreed to a capping of allocations to 100% of costs.

26.  Once the Terminal became operational it became apparent that the level of nitrogen being used by Grain was significantly above the parties' expectations. By December 2005 BP was already in touch with Grain to investigate the use of nitrogen. In due course Grain in its March 2006 Monthly Report indicated that Grain targeted an *"optimum"* Wobbe of 51.1 and often injected more nitrogen than the *"optimum"* quantity.

27.  BP's case is that "51.41" is plain and unambiguous, and means "51.41", which is a constant. Factor Y says what it means, and means what it says. BP submits that the purpose of the clause is to produce an allocation of variable nitrogen costs in accordance with the quantity of gas sent out and the quality of LNG delivered, and that it does so by reference to the contractually agreed formula, which is to be applied in accordance with its terms.

28.  Sonatrach submits that if "51.41" is treated as a constant, the formula produces what it says are arbitrary and absurd outcomes that it says no reasonable third party would have understood in June 2005 to be the effect of the formula in D2.2.2(ii) (b). Sonatrach submits that the purpose of clause is to allocate variable nitrogen costs based upon the amount of nitrogen used in relation to the parties' respective cargoes, judged by reference to their Wobbe values at unloading, and that it will only do this if "51.41" is construed not as a constant but as meaning (as has already been quoted above), *"the average monthly operational Wobbe index value used for LNG blending and regasification at the Terminal from time to time"* alternatively is *"a proxy for the same."*

29.  Following amendments to its then Defence in January and June 2016, Sonatrach in its Amended Defence and Counterclaim (the "Defence"), advances its case under five limbs:—

> 29.1.  On the true construction of the JSA, *"51.41"* means *"the average monthly operational Wobbe index value used for LNG blending and regasification at the Terminal from time to time, alternatively was a proxy for the same"* (Defence paragraph 38A).

> 29.2.  Alternatively, there were implied terms of the JSA:

> (a)  "if the Terminal in fact blended to a Wobbe index value other than 51.41, the Co-Shippers would allocate the nitrogen costs between themselves under section D2.2.2(ii)(b) of the JSA on the basis of the average monthly operational Wobbe index value used for LNG blending and regasification at the Terminal from time to time.

(b) the apportionment of costs under section D2.2.2(ii)(b) of the JSA would result in each Co-Shipper paying an amount as close as possible to the actual costs attributable to the nitrogen used to blend the LNG they had respectively delivered by the Terminal"

(Defence paragraph 38B).

29.3. That the parties agreed at a Steering Committee meeting on 8 September 2006 (the "September 2006 Steering Committee Meeting") to amend the JSA to replace 51.41 in D2.2.2(ii)(b) with the *"the monthly weighted average of the Wobbe of the gas sent out from the Terminal as advised by [Grain]"* (Defence paragraph 52(c)).

29.4. That if the parties did not so agree at the September 2006 Steering Committee Meeting or at a subsequent Steering Committee meeting on 7 February 2007 (the "February 2007 Steering Committee Meeting") then BP should have agreed to such amendment, and its failure to agree was in breach of a JSA obligation of good faith, giving Sonatrach a defence of circuity of action and/or set-off (Defence paragraphs 88A-88B).

29.5. That the invoices issued BP in November 2008 were issued without any contractual right to do so.

30. BP's riposte to these arguments is, in summary, as follows. "51.41" is a constant, and cannot possibly mean *"the average monthly operational Wobbe index value used for LNG blending and regasification at the Terminal from time to time"* nor is it capable of being construed as a proxy for such. The JSA is a sophisticated legal document running to 180 pages and not notable for concision. If the parties had intended to refer to an actual operational Wobbe rather than "51.41" as a constant, then they would have said so, especially as they use both averages and constants in the formula. The alleged implied terms are contrary to the express term of "51.41", are not necessary, reasonable or go without saying, and the second alleged implied term, in particular, is also vague and uncertain. Whilst the parties identified and discussed a number of issues with the D.2.2.2(ii)(b) formula, (and agreed to resolve the 28.9 constant and 100% cap points), there was no agreement to replace "51.41" with operational Wobbe in either the September 2006 or February 2007 Steering Committee meetings, and there was no breach of any obligation of good faith on BP's part at either meeting. The invoices were validly issued by BP in November 2008, and BP is entitled to the sums claimed with interest from November 2008 in accordance with the terms of the JSA.

## B. The Issues in Dispute

31. Accordingly, there are five issues for determination:

31.1. The proper construction of the variable nitrogen costs clause, D2.2.2(ii)(b).

31.2. Whether the implied terms for which Sonatrach contends are indeed terms of the JSA or not.

31.3. Whether BP and Sonatrach agreed at the September 2006 Steering Committee meeting to amend the JSA to replace 51.41 in D2.2.2(ii)(b) with the monthly weighted average Wobbe value in fact blended to by Grain.

31.4. If they did not so agree at the September 2006 or February 2007 Steering Committee meetings, whether BP thereby breached an obligation of good faith under the JSA.

31.5. Whether the invoices issued by BP are valid and enforceable in any event.

## C. The Witnesses

BP Gas Marketing Ltd v La Societe Sonatrach, 2016 WL 06397422 (2016)

32.  I heard oral evidence from seven witnesses who had involvement in the relevant events, four for BP and three for Sonatrach. BP also served some evidence under CEA Notices as well as a statement from a Ms Midwinter of BP's solicitors Holman Fenwick and Willan explaining why some potential witnesses were not giving evidence.

33.  For BP the following witnesses were called and cross-examined:

> 33.1.  Martin Bax. Mr Bax became involved in the Grain Project in 2007. He was BP's Grain Asset Manager from May 2009-April 2011, responsible for BP's commercial operations in relation to the Terminal and for managing relations with Sonatrach and Grain;

> 33.2.  Richard Duncan. Mr Duncan was the Grain Asset Manager before Mr Bax, from October 2006-May 2009;

> 33.3.  Graeme Proud. Mr Proud is BP's Global Operations Manager (LNG). He has been responsible for oversight of the Grain Project since 2009, and was involved in correspondence and discussions with Sonatrach about allocation of nitrogen costs;

> 33.4.  Michael Winstanley. Mr Winstanley was BP's LNG Technical Manager until 2013. He provided technical input and support in relation to the Grain Project (which included drafting the Factor Y formula).

34.  For Sonatrach the following witnesses were called and cross-examined:

> 34.1.  Nicholas Stranks. Mr Stranks was formerly a Senior Associate and then a Director at The Energy Contract Company ("ECC"), which Sonatrach retained as a consultant in relation to the Grain Project. He was closely involved in Phase 1 from late 2004-late 2006;

> 34.2.  Andrew Way. Mr Way was a Senior Analyst at ECC, and worked on the Grain Project from 2005–2009;

> 34.3.  Alan Wood. Mr Wood is a Senior Commercial Operations Manager at Sonatrach. He has been involved in the Grain Project since September 2005.

35.  It will be apparent from the issues as identified that this is not a case which turns on disputed issue of fact on which there is conflicting factual evidence, other than what was or was not discussed and agreed in the September 2006 and February 2007 Steering Committee meetings (in the context of issues 3 and 4). Indeed, the only witness called who attended the September 2006 Steering Committee meeting is Mr Stranks of Sonatrach, and the only witnesses called who attended the February 2007 Steering Committee meeting are Mr Duncan and Mr Wood. Various witnesses also gave evidence as to events after the execution of the JSA, subsequent developments, and events before and after the September 2006 and February 2007 Steering Committee meetings, as well as evidence from Mr Way as to the work of the Agent, and the preparation of various nitrogen reconciliations.

© 2023 Thomson Reuters.

36.  Both Mr Eaton for BP, and Mr Harris for Sonatrach, made submissions in closing as to how I should treat the evidence of their respective witnesses and particular witnesses in that regard, which I have borne in mind. Where necessary I have commented on the evidence of particular witnesses as it arises in the consideration of particular issues. Generally speaking, however, I consider that all the witnesses were doing their best to assist the Court in relation to events which occurred up to ten years ago, and which can hardly have been fresh in their minds, absent refreshment by reference to the documents.

37.  Mr Winstanley and Mr Stranks gave evidence, which is relied upon by both parties, that is said to go to the factual matrix in which the JSA, and D2.2.2(ii) of the JSA are to be construed, and what a reasonable person having all the background knowledge which would have been available to the parties would have understood the parties to be using the language of the contract to mean. I will have more to say about that in the context of the issues of construction that arise, and the associated applicable legal principles, but suffice it to say at this point that, as is often the case, both witnesses, on occasions, strayed into expressing views as to what they thought provisions meant or were intended to mean, and such evidence, being subjective in nature, has always been recognised as inadmissible (from *Prenn v Simmons [1971] 1 WLR 1381* and *Reardon Smith Line Ltd v Yngvar Hansen-Tangen [1976] 1 WLR 989* through *Investors Compensation Scheme v West Bromwich Building Society [1998] 1 WLR 896* , to *Arnold v Britton [2015] AC 1619* ).

### D. The Contractual Background

*The Specific Term Agreement (STA)*

38.  As already identified BP and Sonatrach's Phase 1 rights were formalised in the Specific Term Agreement (STA) dated 27 October 2003 which sets out the detailed terms as between Grain as operator, and BP and Sonatrach as a single shipper. Whilst the STA consists of a two-page agreement it incorporates 30 pages of Schedules and 200 pages of Version 1 of Grain's General Terms and Conditions ("GTCs"). The STA was subsequently subject to various amendments including a new Version 2 of the GTCs. The rights were effective from 15 July 2005 and are valid for a period of 20 years from that date. Together, BP and Sonatrach have a contractual right to 55 berthing slots per contract year, 192,000m3 of LNG storage capacity and 140 GWhrs per day of send out capacity.

39.  The GTCs are intended as a set of uniform terms to which anyone who wants to use the Terminal (a "Shipper") must adhere (A1.1.1). They are divided into six Parts, directed to specific topics such as LNG discharge and LNG storage. The GTCs are the foundation for a contractual scheme by which a Shipper is entitled to discharge LNG into the Terminal, store it there, and nominate quantities to be regasified and sent-out into the distribution pipelines. In return, the Shipper contracts to make specified payments to Grain. The core payment is an Annual Capacity Charge, which is the basic fee for the contractual service (A6). Shippers must also reimburse Grain for certain costs (for example as set out at C10.2 & C12.1), which are to be determined in accordance with Costs Allocation Principles ("CAPs") (see D2).

40.  More specifically, Clause C10.2.1 of the GTCs deals with Grain taking blending measures for the purpose of blending regasified LNG in order to ensure that gas delivered to the LDZ System Entry Point(s) and/or the NTS System Entry Point(s) complies with the applicable Gas Entry Conditions. Clause C.10.2.2 provides that Grain is entitled to recover from Shippers (in accordance with Section C10.2.3) the capital and operating costs incurred by Grain in taking any blending measures to the extent of the costs incurred by Grain acting as a Reasonable and Prudent Operator ("RPO"), such costs being determined and allocated in accordance with the CAPs, in accordance with section D2.2.

41.  The GTCs contemplate that each Shipper would conclude a Specific Terms Agreement with Grain. This covers matters personal to the Shipper, such as capacity levels and charges (A1.2). For BP and Sonatrach, these were set out in STA Schedule 1, which essentially reserved all of the Phase 1 capacity to BP and Sonatrach.

42.  Shippers warrant under the GTCs that their LNG will comply with a *"Specification"* at the point of discharge into the Terminal (B8.2.1). Grain is entitled to reject LNG which does not comply (subject to a *"best endeavours"* obligation to implement measures which will allow for discharge) and to compensation for any losses caused (B8.3.1 & 8.3.5–6).

© 2023 Thomson Reuters.

43.  By B8.1.1(b), the Specification matches the *"Gas Entry Conditions … in … the* NTS Network Entry Agreement". This refers to the gas quality requirements in the contract between Grain and Transco under which Grain sends gas out from the Terminal and into Transco's National Transmission System (the NTS that has already been referred to).

44.  As has already been foreshadowed, the NTS is one of the UK's gas transmission (pipeline) systems. It is a high-pressure system for transmitting large volumes of gas over long distances to large users, such as power stations. Another system consists of the Local Distribution Zones (the LDZ). These are lower-pressure systems for transmitting gas to users in the vicinity of a plant. As previously noted, the Terminal is connected to both systems (B.2.1).

45.  Anyone who wants to send gas into either system must have a Network Entry Agreement ("NEA") with Transco. Grain's NEAs with Transco were still in draft when the STA was signed. Clause 8 of STA Schedule 2 provided that the finalised NTS NEA would match a document which had been initialled in June 2003. The maximum Wobbe in that document was 51.41. This value was written into the STA Specification through B8.1.1(b).

46.  Grain's finalised NEAs for both the NTS and the LDZ set the same 51.41 maximum. They also set a minimum of 47.2. These values are from Part I of Schedule 3 to the Gas Safety Management Regulations 1996 (i.e. the GSMR). GSMR Section 8(1) provides that "no person shall … convey gas in a network unless the gas conforms with the requirements specified in Part I of Schedule 3 "). Sections 8(2)-(4) make an exception for *"network emergencies"* .

47.  Corresponding to the Shipper's obligation under B8.1.2 to meet the Specification when LNG is discharged into the Terminal, Grain is obliged to ensure that LNG which is regasified and sent-out pursuant to Shipper nominations complies with the NEA when it is delivered into the NTS or LDZ. So the Shipper is obliged to ensure a maximum Wobbe of 51.41 at the point where LNG enters the Terminal, and Grain is obliged to ensure a maximum Wobbe of 51.41 at the point where it leaves the Terminal (as gas).

48.  BP in its submissions (and in its witness evidence) draws attention to the fact that compliance on arrival is no guarantee of compliance on departure. LNG can change during storage in-tank. This is called *"weathering"* . In particular, some LNG will vaporise back into gas ( *"boil-off"* ). Because some hydrocarbons vaporise more readily than others (notably those high in nitrogen), boil-off can change the composition - and properties - of the LNG which is left behind. C10.2.1 recognises this by acknowledging that Grain may have to blend regasified LNG with other gases before send-out in order to meet the NEA, even if the LNG complies with the Specification on delivery.

49.  As mentioned above, Grain is entitled to reimbursement of any such blending costs which it incurs acting as a *"Reasonable and Prudent Operator"* ("RPO") C10.2.2. The variable component of nitrogen costs in the nitrogen allocation formula in the JSA did not take into account factors such as "weathering" and "boil-off", it simply allocated in accordance with the quantity of gas sent out and the quality of the LNG delivered by each Co-Shipper (together the "Shipper" or "Co-Shippers", individually a "Co-Shipper"). This may have been to the potential benefit of Sonatrach, as some of its cargoes were more liable to "boil off" (due to a high nitrogen content).

50.  It will be necessary to say rather more about the RPO provision in due course, as an issue has arisen between BP and Sonatrach in the context of how the parties might, at the time of contracting, have reasonably expected Grain to approach nitrogen blending for Wobbe.

51.  By Clause 1 of STA Schedule 3, BP's and Sonatrach's STA rights and obligations are generally joint and indivisible, and they are *"Co-Shippers"* . By Clause 2, this does not apply to financial obligations (whether in debt or in damages), where the default is a 50/50 split.

*The First Letter Agreement ("FLA")*

52.  LNG from most sources has a Wobbe higher than 51.41. So the 51.41 maximum Wobbe in the Specification potentially restricted the Co-Shippers' use of the Terminal. In particular, Sonatrach is based in Algeria, and Sonatrach contemplated shipping Algerian cargoes, which have high Wobbe values.

53.  Clause 4 of STA Schedule 2 gave the Co-Shippers a right to increase the Specification Wobbe, conditional on their paying for nitrogen blending at the Terminal so that Grain could still comply with the 51.41 Wobbe limit in the NEAs at point of send-out. The consequence of this was that Co-Shippers would be allowed to discharge LNG which exceeded the 51.41 limit on arrival, provided that they paid for treatment to ensure that it met that limit on departure. If the Co-Shippers

**BP Gas Marketing Ltd v La Societe Sonatrach, 2016 WL 06397422 (2016)**

requested an increase, Grain was to prepare, for discussion and agreement with them, a proposal detailing *"Specific Blending Measures"* (Clause 4.8 of STA Schedule 2).

54.  The Co-Shippers invoked Clause 4. The resulting agreed proposal was brought into contractual effect by the FLA in November 2004. The FLA is founded upon, and repeatedly cross-refers to, a Nitrogen Supply Agreement ("NSA") between Grain and Air Products (BR) Ltd ("AP").

55.  By Clauses 2 to 3 of the NSA, AP agrees:

> 55.1.  To build and operate at the Terminal, in return for an annual fee, a gaseous nitrogen ("GAN") production plant;

> 55.2.  To provide the capability to truck in up to 150mt of liquid nitrogen ("LIN") per day, at a unit price per mt;

> 55.3.  Pending completion of the GAN plant, to supply Grain's nitrogen requirements on demand up to a limit of 150mt per day;

> 55.4.  After completion of the GAN plant, to supply Grain's nitrogen requirements on demand up to a limit of 480mt per day.

56.  Clause 2.2 of FLA Annex A, and Clause 1 of Appendix 1 to that Schedule, state that the NSA represents agreed Specific Blending Measures for the purposes of Clause 4 of STA Schedule 2. Clause 8.4 of FLA Annex A confirms that the Specific Blending Measures shall be deemed to comply with Clause 4.6 of STA Schedule 2.

57.  Based on AP's commitment under the NSA to supply nitrogen up to specified levels (the "Firm Nitrogen Commitment"), as set out in Clause 4.3 of the FLA Annex A, Clause 4.4 of FLA Annex A, revised (amongst other matters) the Specification Wobbe (i.e. the maximum permitted Wobbe) to:

> 57.1.  52.08 pending completion of the GAN plant;

> 57.2.  53.01 after completion of the GAN plant.

58.  Clause 3 of Appendix 1 to FLA Annex A states the categories of cost which Grain is entitled to recover from the Co-Shippers in relation to the Specific Blending Measures. They include power (to run the GAN plant), which is to be metered separately from other Terminal power costs (Clause 4).

59.  Annex B to the FLA introduced Version 2 of the GTCs. One change was a new C12.2.2(a) which effectively provided that power costs for the Specific Blending Measures would be recovered under the FLA, as opposed to the general provisions in Section C12. It will be necessary to say more about Specific Blending Measures and Grain's recovery of those costs in due course, in the context of how the parties might, at the time of contracting, have reasonably expected Grain to approach nitrogen blending for Wobbe. In this regard BP submits that the RPO provision in the GTCs does not apply to nitrogen blending under the FLA as this does not constitute blending measures within GTCs C10.2.1. It is said that such nitrogen blending constitutes shipper-specific blending measures within C10.2.4, and as such Grain's right to recover costs is not subject to the C10.2 RPO limitation. I will address this point in the context of a consideration of issue 1.

*The Joint Shippers Agreement (JSA)*

60.  The JSA contains some 120 pages, with 60 pages of Schedules (1–10). The Clauses are divided into 6 Parts, A-F, in a structure which follow that of the STA. Recital H sets out the purpose of the JSA:

967

"BP and Sonatrach wish to set out in this Agreement the terms for sharing the Grain Capacity and for scheduling and other operational arrangements with respect to the Services (as defined in the Service Agreement), and with respect to the rights and obligations of the Contracting Shipper (as defined below)."

61.  Thus the JSA regulates the division, as between BP and Sonatrach, of rights and obligations which, as between the two collectively and Grain, are generally joint and indivisible under the STA. In this regard Grain treated BP and Sonatrach as a single shipper and did not apply the CAP to them, but rather invoiced a single sum, which was then to be allocated between BP and Sonatrach in accordance with the provisions of the JSA. In this regard Sonatrach rightly notes that the relationship between BP and Sonatrach is not an adversarial commercial relationship under which BP and Sonatrach were seeking a commercial advantage over the other. Ultimately, of course, what is to be interpreted are the terms of the JSA and the allocation formulae contained therein, because those are the terms that the parties have chosen and agreed to allocate sums between them.

62.  Part A provides for the establishment of two entities, a Co-Shippers Steering Committee (the "Steering Committee") and the Agent. The Co-Shippers Steering Committee is of relevance in relation to issue 3 (and whether there was any agreement at the September 2006 Steering Committee meeting to amend the JSA to replace 51.41 in D2.2.2(ii)(b) with the monthly weighted average Wobbe value in fact blended to by Grain) and issue 4 (and whether if BP did not so agree at the September 2006 or February 2007 Steering Committee meetings, whether BP thereby breached a duty of good faith under the JSA). The Agent is relevant because one of its functions is to calculate the allocation of costs between BP and Sonatrach under the JSA, and BP's claim is based upon the Agent's calculations. The relevant provisions of the JSA in relation to the Steering Committee and the Agent are addressed in more detail in the context of issues 3 and 4 below.

63.  The Steering Committee's general role is to *"be a forum for discussion and agreement on all commercial, technical and operational matters relating to"* the STA (A1.1.1). Its more specific functions include to:

63.1.  "Consider and propose for consideration by the Co-Shippers any amendments to this Agreement that may be considered necessary … for commercial, operational and technical reasons from time to time": (A1.1.5);

63.2.  "Consider and determine solutions for any queries from the Agent in relation to the carrying out of its duties under Section A.1.6.2 or determine how any provision of this Agreement is to be applied by the Agent in carrying out its duties, in each case, on a case-by-case basis, or otherwise" (A1.1.11).

64.  BP and Sonatrach are each obliged to appoint to the Steering Committee two employees with authority to make binding decisions with respect to matters within the Committee's remit (A1.2). In performing this appointment obligation, and in performing their other obligations under the JSA, BP and Sonatrach are obliged to act as a Reasonable and Prudent Operator ("RPO") (A1.7.4). An RPO means *"a person seeking in good faith to perform its contractual obligations"* (Part F1.1).

65.  The Agent also consists of representatives appointed by BP and Sonatrach (A1.5 and Schedule 1, Clause 1.1). It has various duties under the JSA, including, " *to determine how costs are shared between the Co-Shippers."* . The Co-Shippers acknowledge at A1.6.2 that the Agent is to carry out its duties in each case, *"efficiently and effectively, acting as a Reasonable Prudent Operator and in accordance with, and subject to, the provisions of this Agreement or as otherwise agreed between the Co-Shippers"* (A1.6.2). Schedule 1 and Clause 1.7 thereof provides that the representatives designated by the Co-Shippers " *shall carry out the duties of the Agent under this Agreement in accordance with the provisions of this Agreement, and shall do so in a fair and equitable way, for the benefit of both Co-Shippers."*

66.   The JSA's Financial Provisions, and the Agent's functions in relation to invoicing and allocation of costs, are set out in Part D.

67.   Part D2 is headed "Cost Allocation Principles" and Sections D2.1 and D2.2 refer to *"Cost Allocation Principles under GTCs"* and *"Co-Shippers Cost Allocation Principles"* (respectively). D2.2.2. provides:

> "The Co-Shippers agree that the following principles shall apply, and the Agent shall apply the following principles, in determining how any cost or amount payable to or received from [Grain] under the Services, Transco under the TSA and any other parties in relation to the usage of the Terminal by the Co-Shippers are to be borne by, or allocated between, the Co-Shippers."

68.   Six types of costs are then addressed (Electrical Power Charges, Nitrogen Costs, Propane Costs, Recondenser Costs, Blending Costs and Other Costs). Notwithstanding the references to "principles" the cost allocation principles are either expressly stated or are formulaic (as in the case, for example, of Nitrogen Costs and Propane Costs).

69.   D2.2.2(i) relates to Electricity Power Charges. The fixed component is borne equally, and the variable component is borne by the Co-Shippers, *"pro-rata to their Send Out Quantities in that month"*. However, D2.2.2(i) expressly provides that *"power costs in relation to nitrogen blending will be separately measured and recovered by [Grain] as nitrogen blending costs and not as power costs"* (which reflects the terms of the FLA and the new Clause C12.2.2(a) of the GTCs, which provide for power for nitrogen blending to be treated as a nitrogen cost).

70.   D2.2.2(ii) relates to Nitrogen Costs (including power for nitrogen blending) and has already been quoted in full above, being the provision at the heart of the dispute. As already identified, D2.2.2(ii) divides nitrogen costs into fixed and variable. D2.2.2(ii)(a) allocates fixed costs (for example, AP's annual charge under the NSA) 50/50.

71.   D2.2.2(ii)(b) allocates variable costs (for power for the GAN plant, trucked in LIN) according to a formula. The variables are:

> 71.1.   The total cost of nitrogen in the relevant month;

> 71.2.   *"The quantity of nitrogen used"* by each of BP and Sonatrach in the month.

72.   The *"quantity of nitrogen used"* is itself determined by another formula. This multiplies the gas which each party sends out in the month (in GWh) by the greater of Factor X and Factor Y. Factor X relates to the Incomplete Combustion Factor ("ICF") of the LNG which each party discharges in the month. ICF is another LNG property limited by the GSMR and NEAs.

73.   Factor Y relates to the Wobbe of the LNG which each party discharges in the month. In simplified terms, and as already identified, Factor Y represents the difference between the weighted average Wobbe of the LNG which a party discharges in the month and 51.41.

74.   If a reconciliation under D2.2.2(ii) shows an amount owing between BP and Sonatrach, the creditor is entitled to issue an invoice (D2.2.3, D1.6). Invoices are payable 10 days after receipt and bear interest at LIBOR+3% if unpaid (D1.6.3, D1.6.8). It will be necessary to consider the provisions as to invoicing in more detail in the context of issue 5 (the validity of the invoices issued by BP).

75.   Under D1.2, D2.2.2(ii)(c), and D2.2.3, the Agent is to calculate the allocation of nitrogen costs monthly, with annual reconciliations. But the calculations depend upon information from Grain, and Grain did not provide sufficient information in time for the Agent to perform calculations according to plan. In the event, the Agent did not produce any complete nitrogen cost reconciliations until September 2008. Although the Agent was unable to calculate allocations, Grain invoiced nitrogen costs to BP and Sonatrach, and BP and Sonatrach have paid Grain. It is in that context that the issue arises (as subsumed

BP Gas Marketing Ltd v La Societe Sonatrach, 2016 WL 06397422 (2016)

within issues 1 and 2), as to the proper allocation of nitrogen costs, which have already been incurred and paid under the STA, as between BP and Sonatrach under D2.2.2(ii) of the JSA.

76.  D2.2.2(iii) provides that fixed propane costs relating to the additional propane facility *"shall be borne by the Co-Shipper who has requested use of the facility, i.e. Sonatrach. If BP utilises the additional propane facility, BP shall pay a portion of such fixed costs which is to be agreed."* Variable propane costs are to be borne by the Co-Shippers in accordance with *"the quantity and quality of the LNG delivered"* in accordance with provisions set out in D2.2.2(iii)(c).

77.  After addressing "Recondenser Costs" and "Blending Costs" at D2.2.2(iv) and (v), D2.2.2(vi) provides in relation to Other Costs (for which a method of allocation between the Co-Shippers is not already set out), that fixed costs incurred for the benefit of both Co-Shippers are borne evenly, and in all other circumstances, *"in accordance with the appropriate method of allocation as agreed between the Co-Shippers and notified to the Agent by the Co-Shippers. The appropriate method of allocation agreed between the Co-Shipper shall take into account the relevant basis of usage of the service or commodity or cause of the cost as the case may be."*

78.  Section E15 of the JSA provides that, *"Except as expressly provided in this Section E15 or otherwise elsewhere in this Agreement, no amendment or variation of this Agreement shall be effective unless in writing and signed by or on behalf of each Co-Shipper".* On established legal principles, a provision such as E15 does not preclude the parties from amending the JSA other than in signed writing — see, for example, *MWB v Rock [2016] EWCA Civ 553* .

*Grain's Cost Allocation Principles Under The STA/GTCs*

79.  In November 2004, Grain issued draft Cost Allocation Principles ("CAPs") for the purposes of:

79.1.  GTCs D2.2, under which Grain was to establish general CAPs for costs which it was entitled to recover under the STA;

79.2.  GTCs C10.2 under which Grain was to establish specific CAPs for LNG which required blending measures (which related to costs in relation to propane enrichment facilities);

79.3.  GTCs 12.1, under which Grain was to establish specific CAPs for power.

80.  Section 3.1 referred to the fact that the GTCs define the basis for further allocation principles, and stated, " *In general, fixed costs are to be allocated pro rata Shippers' Delivery Capacity, and variable costs are to be allocated pro rata Shippers' Delivered Quantity ...* ".

81.  The draft CAPs also referred, in *Section 7* , to the GAN plant. This was beyond the scope of the CAPs which were required under the GTCs, because nitrogen costs were already covered by the FLA (as recognised in the new GTCs Clause C12.2.2(a)). Grain acknowledged this, but (looking forward to the future and a multi-shipper environment e.g. in Phases 2 and 3) stated that it was possible that two or more shippers may share the benefit of a single nitrogen generating facility or share liquid nitrogen which had been transported to the terminal (trucked-in LIN), and Grain had given consideration to the basis on which the related monthly cost might be allocated to each shipper. Grain stated that its current approach (to such a future situation) would be that the related monthly costs to be allocated to each shipper would be calculated by reference to a formula.

82.  The formula (in simplified terms) was as follows:—

$$C = TC \times V/TV$$

C is the cost to be allocated to each shipper.

TC is the total monthly cost relating to nitrogen for that month.

BP Gas Marketing Ltd v La Societe Sonatrach, 2016 WL 06397422 (2016)

V is *"the volume of nitrogen required by GNLG to blend the LNG to be delivered of [sic]the Shipper in question, while utilising the facilities, for the relevant month and TV is the total volume of nitrogen required by all shippers."*

The volume of nitrogen (V) required by each shipper was to be calculated according to a second formula.

$V = D \times F \times W$

D is the amount of gas delivered by the shipper in GW hrs.

F is a fixed factor currently set at 0.159.

W is "the extent to which the wobbe of the shippers last unloaded LNG exceeds the maximum permitted wobbe in the Gas Quality Specification (in MJ per M3)".

83.   BP agreed with Grain's proposal in March 2005. There were no new Shippers until Phase 2 came into operation in December 2008. Before Phase 2, there was only one Shipper — i.e. BP and Sonatrach as joint Shipper under the STA with Grain passing on all nitrogen costs to BP and Sonatrach. After 2008, Grain began allocating nitrogen costs between BP and Sonatrach (as the single Phase 1 Shipper) and the Phase 2 Shippers (using, for at least some of the time, a figure of 50.9 rather than 51.41 as proposed in the draft CAPs). The further sub-allocation of Phase 1's share of nitrogen costs as between BP and Sonatrach continued to be governed by D2.2.2(ii).

84.   In January 2010 (when Phase 2 was in operation) Grain proposed a new approach to nitrogen cost allocation between Shippers in a Consultation Paper as to Nitrogen Allocation dated 4 January 2010. It recognised that in a multi-shipper terminal such as the Terminal it was necessary to comingle and manage LNG stocks from different suppliers to satisfy future storage and sendout requirements. Consequently, it was not possible to isolate and regasify an individual shippers LNG and to directly measure the nitrogen ballasting requirements for allocation of the nitrogen costs to that shipper. It identified that weaknesses in that methodology were that it took no account of deterioration of in-gas quality during storage and the resulting increase in nitrogen demand on send out and of other gas interchangeability parameters (i.e. "weathering" and the like).

85.   The proposal made was to take into consideration all gas interchangeability parameters, including both the Incomplete Combustion Factor (ICF) and Sooting Index (SI), when calculating nitrogen requirements, the energy held by each shipper at any particular time in the tanks and the LNG ageing. This proposal was not well received by shippers, and Grain did not proceed with it.

86.   Instead Grain decided in May 2011 (some five and a half years after the Terminal started operating), that it would allocate nitrogen costs between Shippers by reference to the outturn monthly flow weighted average Wobbe (i.e. the average monthly operational Wobbe), notifying Shippers of the same in a letter dated 11 May 2011. All Shippers supported this, and in a letter dated 16 June 2011 Grain notified all Shippers that it would adopt this approach with effect from 1 July 2011.

*Events after the Terminal was operational and Grain's use of nitrogen*

87.   Once the Terminal became operational and nitrogen costs began being allocated by reference to contractual formulae it became apparent that the level of nitrogen being used by Grain was significantly above the parties' expectations. By December 2005 both Mr Martinez and Mr Winstanley were looking at the issue and BP was already in contact with Grain to investigate the use of nitrogen. As I have already identified, Grain's March 2006 Monthly Report indicated that Grain targeted an *"optimum"* Wobbe of 51.1 and often injected more nitrogen than the *"optimum"* quantity. In a meeting in May 2006 between Grain, BP and Sonatrach, Grain explained that levels of nitrogen consumption were driven by the trigger points for the LDZ, which were set to 51.26, that being the target of 51.3 less an allowance for inaccuracies.

88.   I have already referred to the fact that the Agent also approached BP about *"strange results"* with its nitrogen cost allocation spreadsheet in April 2006. In an email to Mr Wood on 28 April 2006, and having reviewed the spreadsheet, Mr Winstanley identified and explained that he had omitted the 28.9 constant for the molecular weight of air in the formula (which involved a calculation of specific gravity relative to air in Factor Y). This was characterised by Mr Winstanley in his evidence, rightly in my view, as a *"typographical error"*, it was simply a constant that he had inadvertently omitted when setting out

the formulae. The failure to include the 28.9 coefficient for the molecular weight of air was referred to by Mr Wood in his email to the Co-Shippers on 18 May 2006. On 3 July 2016 the parties agreed to add the molar weight of air into the formula.

89.  In May 2006 it was identified that the formula sometimes produced allocations in excess of 100%, and Mr Wood referred to this in his letter to the parties on 18 May ( *"Cost allocation calculation: Co-Shipper A: 125%, co-shipper B -25%"* ). As I have already noted, it was not immediately clear whether this was intentional given the apparent possibility that a lean cargo might dilute a richer cargo's nitrogen requirements, generating a credit. However, it transpired that this would only be so if the lean cargo's Wobbe was below Grain's operational Wobbe (and it appears that that has not happened in practice). In any event the parties agreed to a capping of allocations to 100% of costs in August 2006 (the "cap" or "100% cap"). This limited the sum which could be allocated under D2.2.2(ii)(b) to 100% of the costs charged by Grain. Whilst there was some cross-examination of Mr Bax as to whether there was any agreement as to how this was to be implemented (which is not a pleaded point), it does not appear that there has ever been any challenge to how the Agent implemented the cap in its calculations.

90.  There were also discussions between BP and Sonatrach in the summer of 2006 as regards the use of 51.41 in the formula, and the possibility of 51.41 being changed to the monthly weighted average of the Wobbe of the gas sent out from the terminal as advised by Grain. These discussions are addressed in due course below in the context of issue 3, and whether there was any agreement in the subsequent September 2006 Steering Committee meeting to replace 51.41 in D2.2.2(ii)(b) with the monthly weighted average Wobbe value in fact blended to by Grain. It suffices for present purposes to note that it is not suggested that those discussions had led to any agreement in that regard in advance of the September 2006 Steering Committee meeting (the subject matter of issues 3 and 4).

91.  In addition to the dispute between themselves, BP and Sonatrach challenged Grain about nitrogen consumption and the level of costs which Grain was passing on to them as Co-Shippers under the STA/FLA and CAPs. Sonatrach relies on this in relation to its good faith argument under issue 4, as addressed below. In August 2013, BP wrote to Grain jointly with Sonatrach complaining that Grain was using excessive nitrogen and referring specifically to the gap between the 51.41 limit and Grain's operational Wobbe. In particular it was noted that the Terminal typically blended gas to a Wobbe index of 51.1 or lower and it was submitted that this was not a reasonable level of blending, and that Grain was not permitted to recover such costs under the STA. In the event, shippers' attempts to persuade Grain to use less nitrogen have been unsuccessful.

*Consequences of Grain's nitrogen blending when applying the formula in D2.2.2(b)(ii)*

92.  Sonatrach point out that if the figure of "51.41" is a constant, in circumstances where Grain did not target a Wobbe of 51.41, but rather targeted a Wobbe of less than that (targeting an "optimum" Wobbe of 51.1 and often injecting more nitrogen than the *"optimum"* quantity), then the effect of the formula, applying 51.41 as a constant, is that one Co-Shipper could end up paying for nitrogen used to blend the other Co-Shipper's cargo of LNG. It is said that that is an absurd outcome, and BP 's construction is an uncommercial construction which must yield to business commonsense. BP's riposte is that the allocation produced by the formula is simply a consequence of the application of the agreed contractual formula in circumstances where Grain, in the event, when the Terminal was operational, subsequently chose to blend to a Wobbe of less than 51.41, and to a level less than the Wobbe of cargoes being delivered to the Terminal. BP submits that Sonatrach is asking the court to rewrite the parties' contractual bargain by ignoring the agreed constant of 51.41 and substituting a variable of the monthly weighted average Wobbe value in fact blended to by Grain, having regard to events subsequent into the entering into the JSA.

93.  In support of its submissions on commercial construction, and its submission that BP's construction of the formula produced what it characterised as absurd results, Sonatrach relied upon a number of scenarios which it put to Mr Winstanley in cross-examination. Whilst the volumes of gas outflow were simplified and the cost of nitrogen was fixed at £100,000 for convenience, the other data is derived from real experience at the Terminal. The scenarios do not, however, take into account the effect of the 100% cap.

94.  The first and second scenarios assumed that BP brought in a cargo from Trinidad with a Wobbe of 51.37 and Sonatrach brought a cargo from Algeria with a Wobbe of 51.68. It also assumes that both parties' send-outs (of 200 GWh) were equal for that month, that Grain blends to a target Wobbe of 51.1 and that Grain's final invoice for the month was of £100,000. On these assumptions:

> 94.1.  If 51.41 is used in the formula, then Sonatrach is allocated £109,090.00 of the £100,000 invoice, and BP a negative allocation -£9,090.90 in circumstances where both cargoes required

nitrogen. The formula also suggests that Sonatrach used 144 tonnes of nitrogen and that BP used -12 tonnes, whereas both parties in fact used significantly more nitrogen.

94.2.  If 51.1 is used in the formula, then Sonatrach is allocated £68,617.63 of the costs, and BP £32,617.64, for a total of £100,000, reflecting the fact that both parties' cargoes used nitrogen. The allocation of nitrogen is also 86 tonnes to BP and 186 tonnes to Sonatrach, reflecting both Co-Shippers' use of nitrogen.

95.  The third and fourth scenarios use the same assumptions as above, but assume an unequal ratio of send out (350 GWh to BP to 50 GWh to Sonatrach, which is approximately the same as the ratio in June 2011. On these assumptions:

95.1.  If 51.41 is used in the formula, then Sonatrach is allocated £240,000 of the £100,000 invoice, whereas BP is allocated -£140,000 of that same invoice, again despite both cargoes having required nitrogen. The nitrogen requirements produced by the formula are of -21 tonnes to BP and 36 tonnes to Sonatrach.

95.2.  If 51.1 is used in the formula, then Sonatrach is allocated £23,604 of costs and BP £76,395.93 of the costs, and a usage of nitrogen of 150.5 tonnes for BP and 46.5 tonnes for Sonatrach, reflecting the actual usage of nitrogen as a result of BP's much higher send out amounts but Sonatrach's richer cargo.

96.  The fifth and sixth scenarios assume that BP brings a cargo from Trinidad with a Wobbe of 51.37 but that Sonatrach brings a cargo with a Wobbe of 51.40, from Qatar (as reflected by a particular Sonatrach cargo). They also assume equal send-outs of 200 GWh. On these scenarios:

96.1.  If 51.41 is used in the formula, then Sonatrach is allocated £700,000 of the £100,000 invoice, whereas BP is allocated -£600,000 of that same invoice (a difference of £1.3 million between the Co-Shippers' costs allocation in relation to an invoice of £100,000), in circumstances where both cargoes requiring nearly the same amount of nitrogen to be brought down to a Wobbe of 51.1, as targeted by Grain. The nitrogen allocations of each parties are of 14 tonnes for Sonatrach, and -12 tonnes to BP.

96.2.  If 51.1 is used in the formula, Sonatrach is allocated £52,747.25 (and 96 tonnes of nitrogen) and BP £47,252.00 (and 86 tonnes of nitrogen). and the close proximity of the Wobbe of both cargoes.

97.  BP accepts that these worked scenarios are broadly correct, but points out that they do not take into account the 100% cap agreed between the parties (which meant that neither party would pay more than 100% of the cost charged by Grain). In any event BP say that the cost allocation is simply a consequence of the application of the formula with the contractual constant of 51.41 in circumstances where Grain, in the event, targeted a lower Wobbe when blending and that Sonatrach's case on construction does not reflect what was contractually agreed, and Sonatrach is effectively inviting the Court to re-write the contractual bargain in the light of subsequent events that were outside the control of either party. That is simply impermissible.

98.  Sonatrach also refers to calculations for the 2008 Reconciliation in relation to which it makes similar points. During that year, BP sent out 5,690,925 GWh of gas and Sonatrach sent out 3,234,181 GWh of gas, and they were together invoiced £550,553.64 by Grain. Applying the contractual formula (corrected for the molar weight of air), this results in an allocation of nitrogen of approximately -1,024,000 tonnes to BP and 2,784,900 tonnes to Sonatrach (in circumstances where every cargo required nitrogen based on the level Grain were blending to), and an allocation of approximately £876,6100 to Sonatrach (on an invoice of £550,553.64) and of -£326,610 to BP. BP makes the same points in response — the calculations do not

take into account the 100% cap, and the outcome is the result of applying the contractual formula with a constant of 51.41 in circumstances where Grain, in the event, targeted a lower Wobbe when blending. Sonatrach's construction (whether by reference to the express terms of the JSA or the implied terms alleged) is not an available construction, and would be to re-write the parties' contractual bargain, in circumstances where it is not clear what the parties would have agreed, had it been known what levels Grain would blend to at the time of contracting.

## E. Principles of Construction and Implied Terms

*Contractual construction*

99.  The proper approach to contractual construction was common ground between the parties, and the main area of debate between the parties was the application of those principles to the facts, and (to adopt the words of Lord Neuberger PSC in *Arnold v Britton [2015] AC 1619* at [15] citing Lord Hoffman in *Chartbrook v Persimmon [2009] 1 AC 1101* ), identifying the intention of the parties by reference to, *"what a reasonable person having all the background knowledge which would have been available to the parties would have understood them to be using the language in the contract to mean."*

100.  Both parties referred me to, and relied upon, the judgment of Lord Neuberger in Arnold v Britton , supra, as containing a helpful summary of the applicable principles on contractual construction, although they disagreed on the extent to which there were factual similarities between that case and those of the present case.

101.  For its part BP also referred me to Lord Hoffman's well-known speech in *Investors Compensation Scheme Ltd v West Bromwich [1998] 1 WLR 896* at 912F-913E, and *Lewison, The Interpretation of Contracts* , 6th edn at paragraph 1.01, and identified the Court's task as to ascertain the meaning which the document would convey to a reasonable person seised of the background *"matrix"* which would reasonably have been available to the parties in the situation in which they were at the time of contracting.

102.  BP rightly pointed out that negotiations and drafts of the relevant contracts are not part of the matrix — *Lewison* at paragraphs 3.07 & 3.09; Chartbrook , supra at [42] where Lord Hoffmann said:—

> "42  The rule excludes evidence of what was said or done during the course of negotiating the agreement for the purpose of drawing inferences about what the contract meant. It does not exclude the use of such evidence for other purposes: for example, to establish that a fact which may be relevant as background was known to the parties, or to support a claim for rectification or estoppel. These are not exceptions to the rule. They operate outside it."

103.  In the event the inadmissibility of negotiations and pre-contractual drafts was recognised by the parties at trial, although it is regrettable that the trial bundles included no less than eight lever arch files full of what were described, somewhat unpromisingly, as *"Draft Contractual Documents".* Their contents were clearly inadmissible, and did not feature in the trial.

104.  Additionally, whilst Sonatrach accepted that evidence of the parties' actions after the conclusion of a contract is not admissible as evidence of the parties' intention at the time of contracting, it submitted that it can nevertheless be admissible if it would be relevant to understand what a reasonable third party would have understood by the clause (referring by analogy to what was said by Lord Hoffman in Chartbrook as quoted above). Whilst I agree that evidence of parties' actions after the conclusion of a contract may, potentially, shed light on what would have been known by the parties or a reasonable third party at the time of contracting — the stance a particular party adopts after the event (for example, in the present case, BP's submission to Grain which it is said is inconsistent with BP's stance on construction of D2.2.2(ii)(b)) may or may not shed light on what a reasonable third party would have understood by the clause at the time of contracting. There may be all sorts of reasons why a party adopts a particular stance (especially with third parties) after the time of contracting, whether or not it is consistent with its stance on construction, or indeed what the parties' knew (or a reasonable third party would have known) at the time of contracting.

105.  In addition to the points made on admissibility, BP also submitted that the focus is on the words which the parties have actually used, that it is not the Court's function to search for ambiguities to justify a departure from the natural meaning

BP Gas Marketing Ltd v La Societe Sonatrach, 2016 WL 06397422 (2016)

of those words; and that the Court should be very slow to reject the natural meaning simply because it may result in an improvident bargain for a party, referring to Arnold v Britton @ 14ff.

106.  For its part Sonatrach submitted that it was *"clear that something has gone wrong with the language"* (Lord Hoffman in Chartbrook at [25]), and that whilst it is well established on the authorities that although commercial common sense and surrounding circumstances *"should not be invoked to undervalue the importance of the language of the provision which is to be construed"* (Arnold at [17]) there will be *"unusual cases" (ibid)* and the ordinary meaning of a word or phrase in a contractual term is not always determinative, referring to *Re Sigma Finance Corporation (in administrative receivership) [2010] 1 All ER 571* in which Lord Mance, at [12] expressed the opinion that:

> "the conclusion reached below attaches too much weight to what the courts perceived as the natural meaning of the words of the third sentence of clause 7.6, and too little weight to the context in which that sentence appears and to the scheme of the Security Trust Deed as a whole … Even the most skilled drafters sometimes fail to see the wood for the trees, and the present document on any view contains certain infelicities, as those in the majority below acknowledged" (at [12]).

107.  Particular passages from the speech of Lord Hoffman in Chartbrook are relied upon by both BP and Sonatrach, who each find something to rely upon in support of their arguments on construction in paragraphs [20] and [24]-[25]:—

> "20  It is of course true that the fact that a contract may appear to be unduly favourable to one of the parties is not a sufficient reason for supposing that it does not mean what it says. The reasonable addressee of the instrument has not been privy to the negotiations and cannot tell whether a provision favourable to one side was not in exchange for some concession elsewhere or simply a bad bargain. But the striking feature of this case is not merely that the provisions as interpreted by the judge and the Court of Appeal are favourable to Chartbrook. It is that they make the structure and language of the various provisions of schedule 6 appear arbitrary and irrational, when it is possible for the concepts employed by the parties (MGRUV, C & I etc.) to be combined in a rational way.
>
> …
>
> 24  The second qualification concerns the words "on the face of the instrument". I agree with Carnwath LJ, paras 44–50, that in deciding whether there is a clear mistake, the court is not confined to reading the document without regard to its background or context. As the exercise is part of the single task of interpretation, the background and context must always be taken into consideration.
>
> 25  What is clear from these cases is that there is not, so to speak, a limit to the amount of red ink or verbal rearrangement or correction which the court is allowed. All that is required is that it should be clear that something has gone wrong with the language and that it should be clear what a reasonable person would have understood the parties to have meant … "

108.  BP relies upon the opening words of paragraph 20, and the final sentence of paragraph 25 (submitting that such final sentence is not apt to describe D2.2.2(ii)(b) and the issue of construction in this case). Sonatrach relies on the remainder of paragraph 20 and paragraphs 24 and 25, as referred to above, (submitting that the final sentence of paragraph 25 is apt to describe D2.2.2(ii)(b) and the issue of construction in this case).

109.  Sonatrach also referred, in the context of its submission that the literal meaning of a word (or here a number) would, in Sonatrach's submission, lead to what it categorised as a *"commercial nonsense"* to the well-known, and often quoted, words of Lord Diplock in *Antaios Compania Naviera S.A. v Salen Rederierna A.B. ("the Antaios") [1985] A.C. 191* , 201, referred to with approval by Lord Hoffmann in ICS v West Bromwich at p. 913E, that

"if detailed semantic and syntactical analysis of words in a commercial contract is going to lead to a conclusion that flouts business commonsense, it must be made to yield to business commonsense"

110.  In this regard Sonatrach also referred to the Supreme Court decision in *BNY Mellon Corporate Trustee v LBG Capital No 1 Plc [2016] UKSC 29* in which Lord Neuberger agreed that a clause in a financial instrument that defined a credit default event by reference to the bank's " *Core Tier 1 Capital* " should be read as including the proviso " *or its then equivalent* " (at [35] to [38]).

111.  BP's riposte to assertions of commercial nonsense was two-fold. Firstly, from a factual perspective, to submit that the formula in D2.2.2(ii)(b) was clear and deliberate, and intended to mean what it stated on its face, producing an allocation of variable nitrogen costs in accordance with the quantity of gas sent out and the quality of the LNG delivered by each Co-Shipper — such a construction did not, BP submitted, lead to a conclusion which flouted business commonsense. Secondly, from a legal perspective, by reliance upon the first of the seven factors identified by Lord Neuberger in Arnold v Britton , at [17] (which I set out in full below when addressing Arnold v Britton ), in which he emphasised that the reliance placed in some cases on commercial common sense should not be invoked to undervalue the importance of the language of the provision which is to be construed, and for the reasons he gives.

112.  Lord Carnwath JSC in his dissenting judgment in Arnold v Britton referred to the similar sentiments expressed in a rider to the well-known quotation from the judgment of Lord Diplock in The Antaios referred to by Lord Clarke in *Rainy Sky SA v Kookmin Bank [2011] 1 WLR 2900* at [23] in which he quoted the words of Hoffmann LJ in *Co-operative Wholesale Society Ltd v National Westminster Bank plc [1995] 1 EGLR 97* at p. 99:—

"This robust declaration does not, however, mean that one can rewrite the language which the parties have used in order to make the contract conform to business common sense. But language is a very flexible instrument and, if it is capable of more than one construction, one chooses that which seems most likely to give effect to the commercial purpose of the agreement."

113.  Sonatrach submitted that the position is stronger if the situation is one where it can be said that it was clear how the parties would have understood and/or drafted the contract had they been aware of an event subsequent to the contract which was " *plainly not intended or contemplated by the parties* " (referring to Lord Neuberger at [22] of Arnold v Britton , and *Lloyds TSB Foundation for Scotland v Lloyds Banking Group Plc [2013] 1 WLR 366* at [23]). Sonatrach submits that this was the case here, and that had the parties known what subsequently transpired in terms of Grain's actions concerning blending, the parties would have substituted the number "51.41" with *"the average monthly operational Wobbe value used for LNG blending and regasification at the Terminal from time to time"*.

114.  BP's riposte to this submission was that this was not such a case, whether in terms of events subsequent to the JSA, or as to how the parties would have understood and/or drafted the contract had they been aware of events subsequent to the contract, at the time of contracting. BP submitted that subsequent events showed Grain (subsequently) blending to a variety of different targets and/or operational Wobbe numbers, and it was far from clear how the parties would have understood or drafted the contract had they been aware, at the time of contracting, of what Grain subsequently did in relation to blending, in terms of what the parties might or might not have done to the figure of 51.41 given the various differing possibilities that existed (for example change the number to another number (e.g. 51.1), or to a reference to the Wobbe targeted from time to time, or to a reference to the actual Wobbe value that Grain would blend to, or a reference to an average operational Wobbe (monthly or otherwise), or indeed to do nothing).

115.  BP submitted that such permutations illustrate that Sonatrach was effectively seeking to re-write the contractual bargain between the parties. In this regard BP referred to what Lord Neuberger PSC said in Arnold v Britton at [41]:—

© 2023 Thomson Reuters.                                                                                                                20

BP Gas Marketing Ltd v La Societe Sonatrach, 2016 WL 06397422 (2016)

---

"In my judgment, there is no principle of interpretation which entitles a court to re-write a contractual provision simply because the factor which the parties catered for does not seem to be developing in the way in which the parties may well have expected."

And also at [20]:—

"The purpose of interpretation is to identify what the parties have agreed, not what the court thinks they should have agreed."

116.  I bear in mind all the authorities referred to by the parties, and the principles established by those authorities. Ultimately I consider that the most recent guidance from the Supreme Court, in Arnold v Britton , and in particular the judgment of Lord Neuberger which draws together the applicable principles on contractual construction and emphasises factors that may be of importance in particular cases, is of the greatest assistance when it comes to addressing the issues of construction that arise in this case.

117.  At paragraphs 14 to 23 of his judgment in Arnold v Britton (with whom Lords Sumption and Lord Hughes JJSC agreed) Lord Neuberger PSC said as follows:

"14   Over the past 45 years, the House of Lords and Supreme Court have discussed the correct approach to be adopted to the interpretation, or construction, of contracts in a number of cases starting with *Prenn v Simmonds [1971] 1 WLR 1381* and culminating in *Rainy Sky SA v Kookmin Bank [2011] 1 WLR 2900* .

15   When interpreting a written contract, the court is concerned to identify the intention of the parties by reference to "what a reasonable person having all the background knowledge which would have been available to the parties would have understood them to be using the language in the contract to mean", to quote Lord Hoffmann in Chartbrook Ltd v Persimmon Homes Ltd [2009] AC 1101 , para 14. And it does so by focussing on the meaning of the relevant words, in this case clause 3(2) of each of the 25 leases, in their documentary, factual and commercial context. That meaning has to be assessed in the light of (i) the natural and ordinary meaning of the clause, (ii) any other relevant provisions of the lease, (iii) the overall purpose of the clause and the lease, (iv) the facts and circumstances known or assumed by the parties at the time that the document was executed, and (v) commercial common sense, but (vi) disregarding subjective evidence of any party's intentions. In this connection, see *Prenn [1971] 1 WLR 1381* , 1384–1386; *Reardon Smith Line Ltd v Yngvar Hansen-Tangen (trading as HE Hansen-Tangen) [1976] 1 WLR 989* , 995–997, per Lord Wilberforce; *Bank of Credit and Commerce International SA v Ali [2002] 1 AC 251* , para 8, per Lord Bingham of Cornhill; and the survey of more recent authorities in *Rainy Sky [2011] 1 WLR 2900* , paras 21-30, per Lord Clarke of Stone-cum-Ebony JSC.

16   For present purposes, I think it is important to emphasise seven factors.

17   First, the reliance placed in some cases on commercial common sense and surrounding circumstances (e.g. in Chartbrook [2009] AC 1101 , paras 16-26) should not be invoked to undervalue the importance of the language of the provision which is to be construed. The exercise of interpreting a provision involves identifying what the parties meant through the eyes of a reasonable reader, and, save perhaps in a very unusual case, that meaning is most obviously to be gleaned from the language of the provision. Unlike commercial common sense and the surrounding circumstances, the parties have control over the language they use in a contract. And, again save

perhaps in a very unusual case, the parties must have been specifically focussing on the issue covered by the provision when agreeing the wording of that provision.

18  Secondly, when it comes to considering the centrally relevant words to be interpreted, I accept that the less clear they are, or, to put it another way, the worse their drafting, the more ready the court can properly be to depart from their natural meaning. That is simply the obverse of the sensible proposition that the clearer the natural meaning the more difficult it is to justify departing from it. However, that does not justify the court embarking on an exercise of searching for, let alone constructing, drafting infelicities in order to facilitate a departure from the natural meaning. If there is a specific error in the drafting, it may often have no relevance to the issue of interpretation which the court has to resolve.

19  The third point I should mention is that commercial common sense is not to be invoked retrospectively. The mere fact that a contractual arrangement, if interpreted according to its natural language, has worked out badly, or even disastrously, for one of the parties is not a reason for departing from the natural language. Commercial common sense is only relevant to the extent of how matters would or could have been perceived by the parties, or by reasonable people in the position of the parties, as at the date that the contract was made. Judicial observations such as those of Lord Reid in *Wickman Machine Tools Sales Ltd v L Schuler AG [1974] AC 235* , 251 and Lord Diplock in *Antaios Cia Naviera SA v Salen Rederierna AB (The Antaios) [1985] AC 191* , 201, quoted by Lord Carnwath JSC at para 110, have to be read and applied bearing that important point in mind.

20  Fourthly, while commercial common sense is a very important factor to take into account when interpreting a contract, a court should be very slow to reject the natural meaning of a provision as correct simply because it appears to be a very imprudent term for one of the parties to have agreed, even ignoring the benefit of wisdom of hindsight. The purpose of interpretation is to identify what the parties have agreed, not what the court thinks that they should have agreed. Experience shows that it is by no means unknown for people to enter into arrangements which are ill-advised, even ignoring the benefit of wisdom of hindsight, and it is not the function of a court when interpreting an agreement to relieve a party from the consequences of his imprudence or poor advice. Accordingly, when interpreting a contract a judge should avoid re-writing it in an attempt to assist an unwise party or to penalise an astute party.

21  The fifth point concerns the facts known to the parties. When interpreting a contractual provision, one can only take into account facts or circumstances which existed at the time that the contract was made, and which were known or reasonably available to both parties. Given that a contract is a bilateral, or synallagmatic, arrangement involving both parties, it cannot be right, when interpreting a contractual provision, to take into account a fact or circumstance known only to one of the parties.

22  Sixthly, in some cases, an event subsequently occurs which was plainly not intended or contemplated by the parties, judging from the language of their contract. In such a case, if it is clear what the parties would have intended, the court will give effect to that intention. An example of such a case is *Aberdeen City Council v Stewart Milne Group Ltd 2012 SC (UKSC) 240* , where the court concluded that "any … approach" other than that which was adopted "would defeat the parties' clear objectives", but the conclusion was based on what the parties "had in mind when they entered into" the contract: see paras 21 and 22.

23  Seventhly, reference was made in argument to service charge clauses being construed "restrictively". I am unconvinced by the notion that service charge clauses are to be subject to any special rule of interpretation. Even if (which it is unnecessary to decide) a landlord may have simpler remedies than a tenant to enforce service charge provisions, that is not relevant to the issue of how one interprets the contractual machinery for assessing the tenant's contribution. The origin of the adverb was in a judgment of Rix LJ in McHale v Earl Cadogan [2010] HLR 412 , para 17. What he was saying, quite correctly, was that the court should not "bring within the general words of a

service charge clause anything which does not clearly belong there". However, that does not help resolve the sort of issue of interpretation raised in this case."

118. Lord Hodge JSC (in agreeing with the majority) stated in relation to the conclusion that he had reached as the proper construction of the leases, as follows [76] to [79]:—

> 76 This conclusion is not a matter of reaching a clear view on the natural meaning of the words and then seeing if there are circumstances which displace that meaning. I accept Lord Clarke of Stone-cum-Ebony JSC's formulation of the unitary process of construction, in *Rainy Sky SA v Kookmin Bank [2011] 1 WLR 2900* , para 21:

> > "the exercise of construction is essentially one unitary exercise in which the court must consider the language used and ascertain what a reasonable person, that is a person who has all the background knowledge which would reasonably have been available to the parties in the situation in which they were at the time of the contract, would have understood the parties to have meant. In doing so, the court must have regard to all the relevant surrounding circumstances. If there are two possible constructions, the court is entitled to prefer the construction which is consistent with business common sense and to reject the other."

> 77 This unitary exercise involves an iterative process by which each of the rival meanings is checked against the provisions of the contract and its commercial consequences are investigated: *In re Sigma Finance Corpn [2010] 1 All ER 571* , para 12, per Lord Mance JSC. But there must be a basis in the words used and the factual matrix for identifying a rival meaning. The role of the construct, the reasonable person, is to ascertain objectively, and with the benefit of the relevant background knowledge, the meaning of the words which the parties used. The construct is not there to re-write the parties' agreement because it was unwise to gamble on future economic circumstances in a long term contract or because subsequent events have shown that the natural meaning of the words has produced a bad bargain for one side. The question for the court is not whether a reasonable and properly informed tenant would enter into such an undertaking. That would involve the possibility of re-writing the parties' bargain in the name of commercial good sense. In my view, Mr Morshead's formulation (para 67 above), on which his case depends, asks the court to re-write the parties' leases on this illegitimate basis.

> 78 Nor is this a case in which the courts can identify and remedy a mistake by construction. Even if, contrary to my view, one concluded that there was a clear mistake in the parties' use of language, it is not clear what correction ought to be made. The court must be satisfied as to both the mistake and the nature of the correction: *Pink Floyd Music Ltd v EMI Records Ltd [2010] EWCA Civ 1429* at [21], per Lord Neuberger of Abbotsbury MR. This is not an unusual case, such as *KPMG [2007] Bus LR 1336* in which a mistake was obvious on the face of the contract and the precise nature of the correction had no effect on the outcome."

119. Arnold v Britton concerned the proper construction of service charge contribution provisions in the leases of a number of chalets in a caravan park in South Wales. A first group of leases included at clause 3(2), a lessee's covenant *"to pay ... a proportionate part of the expenses and outgoings incurred by the lessors in the repair, maintenance, renewal and the*

*provision of services [as set out in the lease] in the yearly sum of £90"*, increasing thereafter at a three-yearly compound rate of 10%. Subsequently, leases in respect of further chalets were granted in which clause 3(2) provided for an annual 10% compound increase. In 2011 the tenants of those chalets whose annual service charge had risen to over £2,700, as opposed to £282 for the chalets subject to the earlier leases, and who claimed that an interpretation of the clause which required a fixed sum payment resulted in such an absurdly high annual service charge that it could not be right (the charge would reach over £550,000 by 2072), claimed that clause 3(2) should be read as requiring them to pay a variable sum, being a fair proportion of the cost of providing the services, with the specified sum being no more than a cap on the maximum sum payable.

120.   The landlord commenced Part 8 proceedings in the county court seeking a declaration that clause 3(2) required the payment of the fixed sum and not any lesser variable amount. The judge accepted the construction contended for by the tenants and so dismissed the claim. Allowing an appeal by the landlord the High Court judge held that, on a natural reading of the clause, the object of the verb "to pay" was the fixed sum of £90 as escalated, whereas the construction contended for by the tenants would involve rewriting the bargain which the parties had made, which, given the high levels of inflation in the United Kingdom when those leases had been granted, could not be said at that time to have lacked commercial purpose. Dismissing the tenants' appeal, the Court of Appeal affirmed the High Court judge's reasoning and held, additionally, that the words "a proportionate part" were not inconsistent with a fixed service charge in circumstances where other lessees were contributing to the overall service charge, which in consequence was to be apportioned between them. The Supreme Court dismissed the appeal.

121.   Lord Neuberger rejected the construction proposed by the tenants notwithstanding the consequences of the construction proposed by the lessors which he described as *"unattractive, indeed alarming"* to the lessees (at [30]). He identified that *"the natural meaning of the words used, at least until one considers the commercial consequences, seems clear"* (para [24]). He identified that the advantage of a fixed charge formula was certainty, and that the leases were made at a time of inflation which the parties objectively, and commercially, could be expected to want to confront. *"They chose to do so by this particular formula of increase."* (para [26]).

122.   Lord Neuberger then addressed the various arguments of the lessees at paragraphs [29] to [32] of his judgment:—

> "[29]   ….given the way things have turned out, it is tempting to latch onto the absence of words such as "quantified in the sum of", and to see the two halves of clause 3(2) as mutually inconsistent in their effect. This would be on the ground that the first half of the clause requires the lessee to pay a "proportionate part" of the cost to the lessor of providing services, whereas the latter half requires the lessee to pay a sum which could exceed the whole of that cost. On that basis, it might be said that the court can reject or modify one half to give effect to the real intention of the parties: eg *Walker v Giles (1848) 6 CB 662* . However, as explained in para 24 and 25 above, this argument would, in my view, involve the court inventing a lack of clarity in the clause as an excuse for departing from its natural meaning, in the light of subsequent developments.
>
> 30   Were it not for the percentage increases of 10% per annum specified in the 25 service charge clauses which are being considered on this appeal, coupled with the subsequent history of inflation in the United Kingdom, that would be the end of it…. However, the consequences of the annual sum of £90 being increased annually by 10% on a compound basis are plainly unattractive, indeed alarming, to a lessee holding a chalet under one of the 25 leases. If one assumes a lease granted in 1980, the service charge would be over £2,500 this year, 2015, and over £550,000 by 2072. This appears to be an alarming outcome for the lessees, at least judging by how things look in 2015, because annual inflation in the last 15 years has hardly ever been above 4%, indeed has been under 3% for ten of those years, and has notoriously been falling recently almost to the point of turning negative, whereas the service charge over that period has increased, and will continue to increase, by 10% per annum.
>
> 31   The appellants argue that these figures illustrate the extreme unlikelihood of the parties to the 21 leases (or to the four subsequent deeds of variation), and in particular the lessees, having intended to agree that the original £90 service charge would be automatically increased by 10% annually on a compound basis. Accordingly, they contend, the latter half of clause 3(2) should be interpreted as imposing a maximum on the annual service charge recoverable by the lessor. In other words,

© 2023 Thomson Reuters.

the effect of the clause is said to be that the lessor is entitled to an appropriate percentage of the annual cost of providing the contracted services, subject to a maximum—which was initially £90, but which increases by 10% compound annually.

32  Despite the unattractive consequences, particularly for a lessee holding a chalet under one of the 25 leases, I am unconvinced by this argument. It involves departing from the natural meaning of clause 3(2) in each of those leases, and it involves inserting words which are not there.

33  Further, the appellants' argument involves attributing to the parties to the 25 leases an intention that there should be a varying service charge and that the lessor (or some other unspecified person) should assess the total costs of the services and determine the appropriate proportion of the cost of the contractual services to allocate to each chalet. Although I accept that it has an element of circularity, it appears to me that the average reader of clause 3(2) would have thought that those are exercises which the clause seems to have been designed to avoid."

123.  Lord Neuberger also stated at paragraph [41]:—

41  I do not think that this is a case where the approach adopted by this court in *Aberdeen City Council 2012 SC (UKSC) 240* can assist the appellants. Unlike that case, this is not a case where one of the parties has done something which was not contemplated by the contract. It is clear that the 10% per annum increase in clause 3(2) was included to allow for a factor which was out of the control of either party, namely inflation. In my judgment, there is no principle of interpretation which entitles a court to re-write a contractual provision simply because the factor which the parties catered for does not seem to be developing in the way in which the parties may well have expected ." (emphasis added)

124.  BP relies, in particular, on the passage highlighted above submitting, by way of analogy, that there is no principle of interpretation that would entitle the court to re-write the Y formula substituting for the figure of 51.41, a variable in the form of, *"the average monthly operational Wobbe index value used for LNG blending and regasification at the Terminal from time to time"* simply because of the allocation that subsequently resulted because of the Wobbe level that Grain, in the event, chose to blend to (a matter outside the control of either party – like inflation says BP).

125.  More generally, BP submits that Arnold v Britton is an analogous case factually – a case where the literal words of the contract are clear, yet they produce a result which it is submitted is so uncommercial that the parties cannot have intended that, notwithstanding which the court has applied the ordinary and natural meaning of the words used, and declined to re-write the contractual bargain to produce what might be perceived to be a more commercial result in the light of subsequent events. For its part Sonatrach denies that there is an analogy to be made, and points out that it would have been possible, at the time of entering into the leases, for the parties in that case to have appreciated (indeed calculated) the consequences of the formula in the lease applying different levels of inflation (even though the level of future inflation, in fact, was unknown). By the same token, and by way of riposte, BP submits that BP and Sonatrach could have run the formula using figures different to 51.41, but they did not do so. They chose the formula that is in clause D.2.2.2(ii)(b) and that is to be given effect to in accordance with its express terms.

126.  In my opinion the real worth of Arnold v Britton is the definitive guidance given in the judgment of Lord Neuberger as to the principles of contractual interpretation and the guidance he has given in that regard in the course of his judgment. To the extent that these assist in relation to the exercise of construction in this case (which they clearly do), it is in relation to the application of those principles to the clause under consideration that is key, rather than any attempt to consider factual analogies. Ultimately it is clause D2.2.2(ii)(b) which has to be construed applying the applicable principles as to contractual construction.

*Implied Terms*

127.  Sonatrach submits that if it is wrong as a matter of construction of D2.2.2(ii)(b), then the two terms it alleges fall to be implied into D2.2.2(ii)(b) as a matter of necessity. BP denies that they meet the requirements for the implication of terms. It submits that the alleged terms are neither necessary to give business efficacy to the JSA, nor are they so obvious that *"it goes without saying",* nor are they sufficiently certain. Even more fundamentally, BP submits that in any event such terms are inconsistent with, and contradict, the express terms of D2.2.2(ii)(b), and the figure of 51.41, and as such cannot be implied on established principles. BP also submits that the alleged implied terms are based on what it says are the same incorrect premises as Sonatrach's construction argument and, as such, lend no support for Sonatrach's implied term argument either.

128.  The applicable principles on implication of terms are well-known, and not in dispute, although there was a difference between the parties as to whether the proposed implied terms were inconsistent with the express terms, and as to the utility or otherwise of considering cases in which the courts have been willing at least to modify existing phrases in contracts by an implied term, in the context of the express terms of D2.2.2(ii)(b).

129.  The applicable principles in relation to the implication of terms were reviewed and summarised by Lord Neuberger PSC in *Marks and Spencer plc v BNP Paribas Securities Services Trust Company (Jersey) Limited and another [2016] A.C. 742* at [16] – [20]:

> 16  There have, of course, been many judicial observations as to the nature of the requirements which have to be satisfied before a term can be implied into a detailed commercial contract. They include three classic statements, which have been frequently quoted in law books and judgments. In *The Moorcock (1889) 14 PD 64* , 68, Bowen LJ observed that in all the cases where a term had been implied, "it will be found that … the law is raising an implication from the presumed intention of the parties with the object of giving the transaction such efficacy as both parties must have intended that at all events it should have". In *Reigate v Union Manufacturing Co (Ramsbottom) Ltd [1918] 1 KB 592* , 605, Scrutton LJ said that "A term can only be implied if it is necessary in the business sense to give efficacy to the contract". He added that a term would only be implied if "it is such a term that it can confidently be said that if at the time the contract was being negotiated" the parties had been asked what would happen in a certain event, they would both have replied: "'Of course, so and so will happen; we did not trouble to say that; it is too clear.'" And in *Shirlaw v Southern Foundries (1926) Ltd [1939] 2 KB 206* , 227, MacKinnon LJ observed that, "Prima facie that which in any contract is left to be implied and need not be expressed is something so obvious that it goes without saying". Reflecting what Scrutton LJ had said 20 years earlier, MacKinnon LJ also famously added that a term would only be implied "if, while the parties were making their bargain, an officious bystander were to suggest some express provision for it in their agreement, they would testily suppress him with a common 'Oh, of course!'"
>
> 17  Support for the notion that a term will only be implied if it satisfies the test of business necessity is to be found in a number of observations made in the House of Lords. Notable examples included Lord Pearson (with whom Lord Guest and Lord Diplock agreed) in *Trollope & Colls Ltd v North West Metropolitan Regional Hospital Board [1973] 1 WLR 601* , 609, and Lord Wilberforce, Lord Cross of Chelsea, Lord Salmon and Lord Edmund-Davies in *Liverpool City Council v Irwin [1977] AC 239* , 254, 258, 262 and 266 respectively. More recently, the test of "necessary to give business efficacy" to the contract in issue was mentioned by Baroness Hale JSC in *Geys v Société Générale [2013] 1 AC 523* , para 55 and by Lord Carnwath JSC in *Arnold v Britton [2015] AC 1619* , para 112.
>
> 18  In the Privy Council case BP Refinery (Westernport) Pty Ltd v Shire of Hastings (1977) 180 CLR 266 , 283, Lord Simon of Glaisdale (speaking for the majority, which included Viscount Dilhorne and Lord Keith of Kinkel) said that:
>
>> "for a term to be implied, the following conditions (which may overlap) must be satisfied: (1) it must be reasonable and equitable; (2) it must be necessary to give business efficacy to the contract, so that no term will

BP Gas Marketing Ltd v La Societe Sonatrach, 2016 WL 06397422 (2016)

be implied if the contract is effective without it; (3) it must be so obvious that 'it goes without saying'; (4) it must be capable of clear expression; (5) it must not contradict any express term of the contract."

19  In *Philips Electronique Grand Public SA v British Sky Broadcasting Ltd [1995] EMLR 472* , 481, Bingham MR set out Lord Simon's formulation, and described it as a summary which "distil[led] the essence of much learning on implied terms" but whose "simplicity could be almost misleading." Bingham MR then explained, at pp 481–482, that it was "difficult to infer with confidence what the parties must have intended when they have entered into a lengthy and carefully-drafted contract but have omitted to make provision for the matter in issue", because "it may well be doubtful whether the omission was the result of the parties' oversight or of their deliberate decision", or indeed the parties might suspect that "they are unlikely to agree on what is to happen in a certain … eventuality" and "may well choose to leave the matter uncovered in their contract in the hope that the eventuality will not occur." Bingham MR went on to say, at p 482:

> "The question of whether a term should be implied, and if so what, almost inevitably arises after a crisis has been reached in the performance of the contract. So the court comes to the task of implication with the benefit of hindsight, and it is tempting for the court then to fashion a term which will reflect the merits of the situation as they then appear. Tempting, but wrong. [He then quoted the observations of Scrutton LJ in the Reigate case, and continued] it is not enough to show that had the parties foreseen the eventuality which in fact occurred they would have wished to make provision for it, unless it can also be shown either that there was only one contractual solution or that one of several possible solutions would without doubt have been preferred …"

20  Bingham MR's approach in the Philips case was consistent with his reasoning, as Bingham LJ in the earlier case *Atkins International HA v Islamic Republic of Iran Shipping Lines (The APJ Priti) [1987] 2 Lloyd's Rep 37* , 42, where he rejected the argument that a warranty, to the effect that the port declared was prospectively safe, could be implied into a voyage charterparty. His reasons for rejecting the implication were "because the omission of an express warranty may well have been deliberate, because such an implied term is not necessary for the business efficacy of the charter and because such an implied term would at best lie uneasily beside the express terms of the charter."

21  In my judgment, the judicial observations so far considered represent a clear, consistent and principled approach…"

130.  Lord Neuberger then went on to add six comments of his own (at [21]):

> "It could be dangerous to reformulate the principles, but I would add six comments on the summary given by Lord Simon in the *BP Refinery case 180 CLR 266* , 283 as extended by Bingham MR in the *Philips case [1995] EMLR 472* and exemplified in *The APJ Priti [1987] 2 Lloyd's Rep 37* . First, in *Equitable Life Assurance Society v Hyman [2002] 1 AC 408* , 459, Lord Steyn rightly observed that the implication of a term was "not critically dependent on proof of an actual intention

of the parties" when negotiating the contract. If one approaches the question by reference to what the parties would have agreed, one is not strictly concerned with the hypothetical answer of the actual parties, but with that of notional reasonable people in the position of the parties at the time at which they were contracting. Secondly, a term should not be implied into a detailed commercial contract merely because it appears fair or merely because one considers that the parties would have agreed it if it had been suggested to them. Those are necessary but not sufficient grounds for including a term. However, and thirdly, it is questionable whether Lord Simon's first requirement, reasonableness and equitableness, will usually, if ever, add anything: if a term satisfies the other requirements, it is hard to think that it would not be reasonable and equitable. Fourthly, as Lord Hoffmann I think suggested in *Attorney General of Belize v Belize Telecom Ltd [2009] 1 WLR 1988* , para 27, although Lord Simon's requirements are otherwise cumulative, I would accept that business necessity and obviousness, his second and third requirements, can be alternatives in the sense that only one of them needs to be satisfied, although I suspect that in practice it would be a rare case where only one of those two requirements would be satisfied. Fifthly, if one approaches the issue by reference to the officious bystander, it is "vital to formulate the question to be posed by [him] with the utmost care", to quote from *Lewison, The Interpretation of Contracts* 5th ed (2011), p 300, para 6.09. Sixthly, necessity for business efficacy involves a value judgment. It is rightly common ground on this appeal that the test is not one of "absolute necessity", not least because the necessity is judged by reference to business efficacy. It may well be that a more helpful way of putting Lord Simon's second requirement is, as suggested by Lord Sumption JSC in argument, that a term can only be implied if, without the term, the contract would lack commercial or practical coherence."

131.  An issue that arose in cases subsequent to the Belize Telecom case was whether Lord Hoffmann, in that case, had suggested that the traditional "business efficacy" and "officious bystander" tests were no longer central to the implication of terms, and also in relation to his suggestion that the process of implying a term is part of the exercise of interpretation. Both these matters are of potential relevance in the present case. As to the former BP submits that Sonatrach's proposed implied terms fail the "business efficacy" and "officious bystander" tests, whilst as to the latter Sonatrach's case is put both on the basis of construction of the terms of D2.2.2(ii)(b) and on the basis of implied terms. In this regard, Lord Hoffman had stated in Belize Telecom at paragraph [21], that, *"There is only one question: is that what the instrument, read as a whole against the relevant background, would reasonably be understood to mean?".*

132.  Lord Hoffmann's observation, was addressed by Lord Neuberger in Marks and Spencer at [22] -[31] where he reiterated that there had been no dilution of the requirements which have to be satisfied before a term will be implied and that in most, possibly all, disputes about whether a term should be implied into a contract, it is only after the process of construing the express words is complete that the issue of an implied term falls to be considered (also noting that the process of implication involves a rather different exercise from that of construction):—

"22  Before leaving this issue of general principle, it is appropriate to refer a little further to the Belize Telecom case, where Lord Hoffmann suggested that the process of implying terms into a contract was part of the exercise of the construction, or interpretation, of the contract. In summary, he said at para 21 that "There is only one question: is that what the instrument, read as a whole against the relevant background, would reasonably be understood to mean?"

There are two points to be made about that observation.

23  First, the notion that a term will be implied if a reasonable reader of the contract, knowing all its provisions and the surrounding circumstances, would understand it to be implied is quite acceptable, provided that (i) the reasonable reader is treated as reading the contract at the time it was made and (ii) he would consider the term to be so obvious as to go without saying or to be necessary for business efficacy. (The difference between what the reasonable reader would understand and what the parties, acting reasonably, would agree, appears to me to be a notional distinction without a practical difference.) The first proviso emphasises that the question whether a term is implied is to be judged at the date the contract is made. The second proviso is important because otherwise Lord Hoffmann's formulation may be interpreted as suggesting that reasonableness is a sufficient

© 2023 Thomson Reuters.

ground for implying a term. (For the same reason, it would be wrong to treat Lord Steyn's statement in *Equitable Life Assurance Society v Hyman [2002] 1 AC 408* , 459 that a term will be implied if it is "essential to give effect to the reasonable expectations of the parties" as diluting the test of necessity. That is clear from what Lord Steyn said earlier on the same page, namely that "The legal test for the implication of … a term is … strict necessity", which he described as a "stringent test".)

24  It is necessary to emphasise that there has been no dilution of the requirements which have to be satisfied before a term will be implied, because it is apparent that the *Belize Telecom case [2009] 1 WLR 1988* has been interpreted by both academic lawyers and judges as having changed the law. Examples of academic articles include Chris Peters, "The Implication of Terms in Fact" [2009] CLJ 513, Paul S Davies, "Recent Developments in the Law of Implied Terms" [2010] LMCLQ 140, John McCaughran, "Implied Terms: The Journey of the Man on the Clapham Omnibus" [2011] CLJ 607 and JW Carter and Wayne Courtney, "Belize Telecom: a reply to Professor McLauchlan" [2015] LMCLQ 245. And in Foo Jong Peng v Phua Kiah Mai [2012] 4 SLR 1267 , paras 34–36, the Singapore Court of Appeal refused to follow the reasoning in the Belize Telecom case at least in so far as "it suggest[ed] that the traditional 'business efficacy' and 'officious bystander' tests are not central to the implication of terms" (reasoning which was followed in *Sembcorp Marine Ltd v PPL Holdings Pte Ltd [2013] SGCA 43* ). The Singapore Court of Appeal were in my view right to hold that the law governing the circumstances in which a term will be implied into a contract remains unchanged following the Belize Telecom case.

25  The second point to be made about what was said in the Belize Telecom case concerns the suggestion that the process of implying a term is part of the exercise of interpretation. Although some support may arguably be found for such a view in the *Trollope case [1973] 1 WLR 601* , 609, the first clear expression of that view to which we were referred was in *Banque Bruxelles Lambert SA v Eagle Star Insurance Co Ltd [1997] AC 191* , 212, where Lord Hoffmann suggested that the issue of whether to imply a term into a contract was "one of construction of the agreement as a whole in its commercial setting." Lord Steyn quoted this passage with approval in the *Equitable Life case [2002] 1 AC 408* , 459, and, as just mentioned, Lord Hoffmann took this proposition further in the *Belize Telecom case [2009] 1 WLR 1988* , paras 17–27. Thus, at para 18, he said that "the implication of the term is not an addition to the instrument. It only spells out what the instrument means"; and at para 23, he referred to "The danger … in detaching the phrase 'necessary to give business efficacy' from the basic process of construction". Whether or not one agrees with that approach as a matter of principle must depend on what precisely one understands by the word "construction".

26  I accept that both (i) construing the words which the parties have used in their contract and (ii) implying terms into the contract, involve determining the scope and meaning of the contract. However, Lord Hoffmann's analysis in the Belize Telecom case could obscure the fact that construing the words used and implying additional words are different processes governed by different rules.

27  Of course, it is fair to say that the factors to be taken into account on an issue of construction, namely the words used in the contract, the surrounding circumstances known to both parties at the time of the contract, commercial common sense, and the reasonable reader or reasonable parties, are also taken into account on an issue of implication. However, that does not mean that the exercise of implication should be properly classified as part of the exercise of interpretation, let alone that it should be carried out at the same time as interpretation. When one is implying a term or a phrase, one is not construing words, as the words to be implied are ex hypothesi not there to be construed; and to speak of construing the contract as a whole, including the implied terms, is not helpful, not least because it begs the question as to what construction actually means in this context.

28  In most, possibly all, disputes about whether a term should be implied into a contract, it is only after the process of construing the express words is complete that the issue of an implied term falls to be considered. Until one has decided what the parties have expressly agreed, it is difficult to see how one can set about deciding whether a term should be implied and if so what term. This appeal is just such a case. Further, given that it is a cardinal rule that no term can be implied into a contract

BP Gas Marketing Ltd v La Societe Sonatrach, 2016 WL 06397422 (2016)

if it contradicts an express term, it would seem logically to follow that, until the express terms of a contract have been construed, it is, at least normally, not sensibly possible to decide whether a further term should be implied. Having said that, I accept Lord Carnwath JSC's point in para 71 to the extent that in some cases it could conceivably be appropriate to reconsider the interpretation of the express terms of a contract once one has decided whether to imply a term, but, even if that is right, it does not alter the fact that the express terms of a contract must be interpreted before one can consider any question of implication.

29   In any event, the process of implication involves a rather different exercise from that of construction. As Bingham MR trenchantly explained in the *Philips case [1995] EMLR 472* , 481:

> "The courts' usual role in contractual interpretation is, by resolving ambiguities or reconciling apparent inconsistencies, to attribute the true meaning to the language in which the parties themselves have expressed their contract. The implication of contract terms involves a different and altogether more ambitious undertaking: the interpolation of terms to deal with matters for which, ex hypothesi, the parties themselves have made no provision. It is because the implication of terms is so potentially intrusive that the law imposes strict constraints on the exercise of this extraordinary power."

30   It is of some interest to see how implication was dealt with in the recent case in this court of *Aberdeen City Council v Stewart Milne Group Ltd 2012 SC (UKSC) 240* . At para 20, Lord Hope of Craighead DPSC described the implication of a term into the contract in that case as "the product of the way I would interpret this contract". And at para 33, Lord Clarke of Stone-cum-Ebony JSC said that the point at issue should be resolved "by holding that such a term should be implied rather than by a process of interpretation." He added that "The result is of course the same".

31   It is true that the *Belize Telecom case [2009] 1 WLR 1988* was a unanimous decision of the Judicial Committee of the Privy Council and that the judgment was given by Lord Hoffmann, whose contributions in so many areas of law have been outstanding. However, it is apparent that Lord Hoffmann's observations in the Belize Telecom case, at paras 17–27, are open to more than one interpretation on the two points identified in paras 23–24 and 25–30 above, and that some of those interpretations are wrong in law. In those circumstances, the right course for us to take is to say that those observations should henceforth be treated as a characteristically inspired discussion rather than authoritative guidance on the law of implied terms.

133.   In terms of the "officious bystander", Sonatrach submits that the officious bystander would be aware of the potential contingencies which might arise — in so far as they could have been foreseen at the time — even if those were not at the time contemplated by the parties. In this regard Sonatrach rely on what was said by Lord Hoffmann in Belize Telecom at [25]:—

> "The need for an implied term not infrequently arises when the draftsman of a complicated instrument has omitted to make express provision for some event because he has not fully thought through the contingencies which might arise, **even though it is obvious** after a careful consideration

BP Gas Marketing Ltd v La Societe Sonatrach, 2016 WL 06397422 (2016)

of the express terms and the background **that only one answer would be consistent with the rest of the instrument** ." (emphasis added)

134.  BP, for its part, emphasises the words highlighted above, submitting that it is not obvious that there is in this case only one answer that would be consistent with the rest of the JSA. Indeed, BP submits that there are many possible answers, and the alleged terms are not so obvious as to go without saying or to be necessary for business efficacy. Developing this submission BP asserts that it is far from clear how the parties would have addressed matters, in terms of what the parties might or might not have done to the figure of 51.41, had they been aware, at the time of contracting, of what Grain subsequently did in relation to blending, given the various differing possibilities that existed, such as changing the number to another number (e.g. 51.1), or to a reference to the Wobbe targeted from time to time, or to a reference to the actual Wobbe value that Grain would blend to, or to a reference to an average operational Wobbe (monthly or otherwise) or, indeed, leaving matters as they were.

135.  Whilst Sonatrach maintained that the appropriate term to be implied if the Terminal blended to a Wobbe other than 51.41 was that, " *the Co-Shippers would allocate the nitrogen costs between themselves under* section D2.2.2(ii)(b) of the JSA *on the basis of the average monthly operational Wobbe index value used for LNG blending and regasification at the Terminal from time to time"* , on occasions Sonatrach expressed itself in terms which would not appear to be identical. For example, at paragraph 83 of its Written Closing Submissions Sonatrach submitted that " *it would have been evident to any officious bystander that, had the question been asked, the parties would have agreed that insofar as Grain were to blend at a level below 51.41, that lower Wobbe value would be used in the second formula in order to allocate nitrogen according to usage".*

136.  As to the fifth principle identified by Lord Simon in BP Refinery (Westernport) Pty Ltd v Shire of Hastings (1977) 180 CLR 266 , 283 that an implied term must not contradict any express term of the contract, BP directed me to *Lewison* at 6.11. This represents a convenient summary of the applicable principles and the reasons why a term will not be implied if it is inconsistent with an express term or its general tenor:—

> **"A term will not be implied if it is inconsistent with the express terms of the contract or its general tenor.**
>
> 6.11  Since the implication of a term rests upon what the contract must mean, it is unlikely that the reasonable reader would conclude that the contract was self-contradictory. Hence a term will not be implied if it is inconsistent with an express term.
>
> As it was put by Evershed M.R. in *Lynch v Thorne [[1956] 1 W.L.R. 303]* :
>
>> "… a term prima facie to be implied must, according to well established principle, always yield to the express letter of the bargain."
>
> In that case it was held that where a building contract specified a particular method of building which turned out to be defective, there was no room for a general implied term requiring the building to be constructed so as to be fit for human habitation when completed.
>
> Similarly, in *Interactive Investor Trading Ltd v City Index Ltd [[2011] EWCA Civ 837* , Tomlinson L.J. said:

BP Gas Marketing Ltd v La Societe Sonatrach, 2016 WL 06397422 (2016)

> "It is trite law that a term will not be implied which contradicts the express terms of the contract."

A more comprehensive version of the principle is to be found in the speech of Lord Parker of Waddington in *Tamplin (FA) Steamship Co Ltd v Anglo-Mexican Petroleum Products Co Ltd [[1916] 2 A.C. 397]* , in which he said:

> "It is, of course, impossible to imply in a contract any term or condition inconsistent with its express provisions, or with the intention of the parties as gathered from those provisions. The first thing, therefore, in every case is to compare the term or condition which it is sought to imply with the express provisions of the contract, and with the intention of the parties as gathered from those provisions, and ascertain whether there is any inconsistency."

In *Equitable Life Assurance Society v Hyman [[2002] 1 A.C. 408]* , Lord Steyn said:

> "This principle is sparingly and cautiously used and may never be employed to imply a term in conflict with the express terms of the text."

In *Johnson v Unisys Ltd [[2003] 1 A.C. 518]* , Lord Hoffmann said:

> "… any terms which the courts imply into a contract must be consistent with the express terms. Implied terms may supplement the express terms of the contract but cannot contradict them. Only Parliament may actually override what the parties have agreed."

As Toulson L.J. put it in *Anders & Kern UK Ltd v CGU Insurance Plc [[2008] 2 All E.R. (Comm) 1185]* :

BP Gas Marketing Ltd v La Societe Sonatrach, 2016 WL 06397422 (2016)

> "you cannot imply a term which contradicts an expressed term, because the parties cannot have intended that."

In *Autoclenz Ltd v Belcher [[2009] EWCA Civ 1046]* Aikens L.J. said:

> "Once it is established that the written terms of the contract were agreed, it is not possible to imply terms into a contract that are inconsistent with its express terms. The only way it can be argued that a contract contains a term which is inconsistent with one of its express terms is to allege that the written terms do not accurately reflect the true agreement of the parties." "

137.  Sonatrach characterises its first implied term as a *"modification to a phrase in an existing term of the contract"* rather than (as BP submits) a contradiction of the express term (51.41). In this regard Sonatrach refers to cases in which the court has been willing to imply terms to modify existing terms of a contract, referring to the cases of *Aberdeen City Council v Stewart Milne Group Limited [2012] SLT 205* at [31] to [32], *Rathbone Brothers v Novae Corporate Underwriting Limited [2014] 2 CLC 818* at [85] and *Spencer and another v Secretary of State for Defence [2012] 2 All ER (Comm) 480* at [91].

138.  BP's riposte is that such cases are not in point. Cases such as Aberdeen v Stewart Milne and Rathbone v Novae illustrate the familiar concept that a provision which does not contain an explicit restriction on scope may be impliedly subject to a restriction, whilst the decision of Vos J in Spencer v Secretary of State turned on its own facts, and the carrying into the memorandum in that case of a process of arbitral review which had been referred to in the existing lease. In contrast, submits BP, the terms alleged by Sonatrach are simply inconsistent with the express constant of 51.41 in D2.2.2(ii)(b). It is not a question of modification but of inconsistency. On Sonatrach's implied terms the express term, and use of the constant 51.41 in the formula, has to be disregarded, and it would be no answer, say BP, to submit that "51.41" is to be read as *"51.41 or the average monthly operational Wobbe if different"* for, in such a formula,"51.41" is not being used as a constant at all — the overall element is simply based on the average monthly operational Wobbe (and the reality is that it is inherently unlikely that it will ever be precisely 51.41 in any event).

### F. Issue 1: The Proper Construction of Clause D2.2.2(ii)(b)

139.  The court identifies the intention of the parties by reference to what a reasonable person having all the background knowledge which would have been available to the parties would have understood them to be using the language in the contract to mean, and the court does so by focussing on the meaning of the relevant words, in this case clause D2.2.2, and in particular clause D2.2.2(ii)(b), and that meaning is to be assessed in the light of (i) the natural and ordinary meaning of the clause, (ii) any other relevant provisions of the contract, (iii) the overall purpose of the clause and the contract, (iv) the facts and circumstances known or assumed by the parties at the time that the document was executed, and (v) commercial common sense, but (vi) disregarding subjective evidence of any party's intentions — see generally Arnold v Britton , supra, at [15].

140.  The starting point, albeit only the starting point, is accordingly the natural and ordinary meaning of clause D2.2.2(ii) (b) of the JSA and its constituent elements. Sonatrach points out that no one part of that clause (specifically the figure of 51.41) is to be viewed in isolation and the clause is to be construed as a whole, as is clearly right. As recognised above it is, of course, also necessary to consider the clause in context set against the backdrop of the admissible factual matrix and

© 2023 Thomson Reuters.                                                                                     33

BP Gas Marketing Ltd v La Societe Sonatrach, 2016 WL 06397422 (2016)

the purpose of the clause so far as this can be established. However, when doing so, one starts by looking at what the clause actually states, and the normal and ordinary meaning of the clause and its constituent elements.

141.  For ease of reference I will repeat Clause D2.2.2(ii) at this point:—

" **Nitrogen Costs shall be allocated as follows** , by reference to all relevant terms as they are defined in, and by measuring all relevant units in accordance with, the Services Agreement and the document entitled "GLNG — Agreed Network Entry Provisions" dated 20 June 2003 and initialled on behalf of GLNG and the Shipper:

(c)  the fixed component of nitrogen costs allocated by Grain to the Shipper shall be borne equally by the Co-Shippers; and

(d)  subject to Section D2.2.2(ii)(c) **the variable component of nitrogen costs allocated by Grain to the Shipper shall be allocated in accordance with the quantity of gas Sent Out and the quality of the LNG delivered by each Co-Shipper (the delivering Co-Shipper)** as follows:

$$XMA = TCM \times TN2A / TN2A + TN2B$$

Where:

XMA is the cost of nitrogen to be borne by a delivering Co-Shipper with respect to a month (M);

TCM is the total cost of nitrogen with respect to the month (M)

TN2A is the quantity of nitrogen used by the delivering Co-Shipper in the month (M)

TN2B is the quantity of nitrogen used by the other Co-Shipper in the month (M)

where each of TN2A and TN2B is calculated as the product of:

(iii)  gas Sent out in Gwh in the month by the delivering Co-Shipper (in the case of TN2A) or by the other Co-Shipper (in the case of TN2B); and

(iv)  The greater of X or Y, where:

X is the correction factor for incomplete combustion factor (tonnes of nitrogen N2 per GWh) calculated as follows:

((weighted average higher heating value of LNG as delivered by the

© 2023 Thomson Reuters.

delivering Co-Shipper (in the case of TN2A) or the other Co-Shipper (in the case of TN2B) in the month (M) × 6.35) − 250.01)

5.83

Y is the correction factor for Wobbe (tonnes of nitrogen N2 per GWh) calculated as follows:

((weighted average higher heating value of LNG as delivered by the delivering Co-Shipper (in the case of TN2A) or the other Co-Shipper (in the case of TN2B) in the month (M) / (LNG molar weight) &circ; 0.5) − **51.41** )

0.62381 (emphasis added)

142. Applying the express language of the clause, the purpose of the clause is accordingly expressly stated to be to allocate the variable component of nitrogen costs allocated by Grain to the Shipper in accordance with (1) the quantity of the gas sent out and (2) the quality of LNG delivered by each of Co-Shipper applying the formula that then follows. The formula does allocate the variable component of nitrogen costs allocated by Grain to the Shipper in accordance with (1) the quantity of the

gas sent out and (2) the quality of LNG delivered by each of Co-Shipper applying the formula that then follows. Sonatrach submits, and BP denies, that a wider commercial purpose is to derived from clause D2.2.2(ii)(b), and the JSA as a whole, namely to divide up nitrogen costs based on usage. Sonatrach's submission is considered in due course below. I would note at this point, however, that this is not stated on the face of D2.2.2(ii)(b), and the only reference to the quantity of nitrogen used appears in the definition of TN2A and TN2B within the formula.

143.   D2.2.2(ii)(b) states a formula for calculating XMA, the cost of nitrogen to be borne by a Co-Shipper. As a formula, it requires inputs. There are 3 inputs: TCM, TN2A, and TN2B. These three inputs are all variables, i.e. their value will change from month to month (or year to year, in relation to annual reconciliations under D2.2.2(ii)(c) and D2.2.3). But whilst TCM is simply a given number (the total nitrogen cost charged by Grain under the STA), TN2A and TN2B are calculated numbers. They are calculated according to the sub-formula in which *"the gas Sent Out in GWh in the month"* by each Co-Shipper is multiplied by *"the greater of X or Y"* .

144.   The gas sent out and X and Y are all variables. The gas sent out is simply a given (measured) number. X and Y are calculated numbers. They are calculated according to sub-sub-formulae. The Factor X and Factor Y formulae share a similar structure. The 1st input for each is *"the weighted average higher heating value of LNG as delivered …"* . That is a variable. In Factor Y (but not Factor X), the second input is also a variable ( *"LNG molar weight".* ) Then, in both Factor X and Factor Y, the three remaining inputs are *"6.35"* , *"250.01"* , and *"5.83"* in Factor X; *"0.5"* , *"51.41"* , and *"0.62381"* in Factor Y. On their face none of these are variables, they are each a numerical figure or value (i.e. a constant).

145.   Sonatrach has to say, on its case as to construction, that one (and only one) of the numerical figures in one (and only one) of the formulae for Factor X and Factor Y, *"means, and would have been understood by a reasonable third party to mean"* a (complex) variable namely *"the average monthly operational Wobbe index value used for LNG blending and regasification at the Terminal from time to time"* or is a "proxy" for the same (see Defence para 38A).

146.   As to the former, it is with the greatest of respect to Mr Harris, and Sonatrach, impossible to suggest (as a matter of language) that "51.41" means *"the average monthly operational Wobbe index value used for LNG blending and regasification at the Terminal from time to time"* . If there is anything to Sonatrach's submission it must be by reference to the latter i.e. that "51.41" is "proxy" for, or is some form of short-hand, or dictionary definition for, *"the average monthly operational Wobbe index value used for LNG blending and regasification at the Terminal from time to time"* . At first blush, at least, that would appear to be a challenging submission based on the express language of clause D2.2.2(ii)(b).

147.   Of course, and as will be addressed, one does not stop with a consideration of the language of the clause, and the clause is to be construed set against the backdrop of the admissible factual matrix and its commercial purpose. However, as Lord Neuberger made clear in Arnold v Britton at [17] reliance placed on commercial common sense and surrounding circumstances should not be invoked to undervalue the importance of the language of the provision which is being construed. As Lord Neuberger pointed out, the exercise of interpreting a provision involves identifying what the parties meant through the eyes of a reasonable reader, and, save perhaps in a very unusual case, that meaning is most obviously to be gleaned from the language of the provision. Unlike commercial common sense and the surrounding circumstances, the parties have control over the language they use in a contract. And, again save perhaps in a very unusual case, the parties must have been specifically focussing on the issue covered by the provision when agreeing the wording of that provision.

148.   At least on the face of section D2.2.2(ii)(b), the figure of "51.41", like all other figures in the formula, is a numerical value, and as such is a constant. The meaning of a constant, as a noun, is well known as a matter of English language, and is defined by the Shorter Oxford English Dictionary in these terms, *"MATH A numerical quantity which does not vary or is assumed not to vary. SCIENCE a number expressing a relation, property, etc. and remaining the same in all circumstances*

BP Gas Marketing Ltd v La Societe Sonatrach, 2016 WL 06397422 (2016)

*or for the same substance in the same conditions "* . I consider either of these definitions (reflecting the ordinary and natural use of the word "constant") is apt to describe the numerical values to be found on the face of D2.2.2(ii)(b).

149.  In testing whether "51.41" is a variable or a constant it is relevant to consider why "51.41" is used in the formula. As Lord Neuberger noted in Arnold v Britton the parties have control over the language they use in a contract, and the JSA is no exception, and unless this is that "very unusual case" (and I do not consider it is) the parties must have been specifically focussing on the issue covered by the provision when agreeing the wording of the provision. At one level at least, the reason why "51.41" (as a number) was chosen is common ground between BP and Sonatrach, as it would be to the reasonable person having all the background knowledge that would have been available to the parties at the time of contracting. Such a person would have known that 51.41 (Mj/m3) is the maximum Wobbe index value of gas entering the NTS and the LDZ as specified in the GSMR . Thus it appears from the face of the clause, viewed against the background knowledge that would have been available to the parties at the time of contracting, that the parties have deliberately chosen a constant of 51.41 because that is the maximum Wobbe index value of gas entering the NTS and the LDZ as specified in the GSMR .

150.  A particular difficulty facing Sonatrach, it seems to me, addressing matters as a matter of construction, is that "51.41" is quite clearly a figure, and it is equally clear that the objective common intention of the parties is to include that figure into this part of the formula, and to do so because that constant is the maximum Wobbe index value of gas entering the NTS and the LDZ as specified in the GSMR .

151.  If "51.41" is, as it appears to be on its face, a constant it is not " *the average monthly operational Wobbe index value used for LNG blending and regasification at the Terminal from time to time"* nor is it a proxy for that — it is quite simply a constant. Viewing clause D2.2.2(ii)(b) as a whole, it is clear that the parties have used a defined variable when they wish to use a variable (for example *"the weighted average higher heating value of LNG as delivered* ) and a figure when they wished to use a constant. To substitute a variable for a constant is, at least at first blush, to do violence to the natural and ordinary meaning of the words used in the clause (and that is viewing the clause as a whole, and not focussing on individual uses of words such as "51.41" within that clause), and to change the contractual bargain between the parties (because the parties have chosen figures when they intend to use constants, and a variable when they wished to introduce a variable).

152.  If the parties had wished to use a formula they could have stated such a formula. A similar generic submission is often made when considering competing contractual constructions. It is not always helpful as the court is construing the language of the contract and not what parties might have stated instead. However, I consider the submission has more force where, as here, the parties have used various formulae within the very same clause. It can be said with some force that the parties used a figure when they intended to include a constant, and included a variable where they intended that element to be a variable. Viewing matters objectively, the parties must have put their mind to whether constants or variables were appropriate and have drafted accordingly.

153.  Additionally, this is not a case where it can be said that there are two alternative meanings to the clause and the word "51.41" used within it, nor can it be said that clause D2.2.2(ii)(b) is ambiguous. Clause D2.2.2(ii)(b) is clear on its face as to what it says. Thus Sonatrach must demonstrate that clause D2.2.2(ii)(b), and in particular "51.41" in the formula, means something other than a constant, and is the proxy for the precise formula alleged by Sonatrach. I say proxy for the precise formula alleged by Sonatrach as there are, on examination, a number of different possible formulae that it could be alleged "51.41" is proxy for (as addressed in due course below) and conceivably there are also other possible figures that 51.41 could be proxy for (for example 51.30 or 51.1). That is not an auspicious start to Sonatrach's case on construction.

154.  It will be recalled that the sixth factor identified by Lord Neuberger in Arnold v Britton (at [22]) concerned a situation where an event subsequently occurs which was plainly not intended or contemplated by the parties judging from the language

of the contract. In such a case " *if it is clear what the parties would have intended the court will give effect to that intention"* (emphasis added). Whilst Sonatrach submits that what occurred in terms of Grain's Wobbe blending was not contemplated by the parties (although BP disagrees as to what would have been within reasonable contemplation), even if such a situation arose, it will be necessary to consider whether it is clear what the parties would have intended. Sonatrach has to say that it is clear that the parties would have intended the 51.41 element in the formula to mean " *the average monthly operational Wobbe index value used for LNG blending and regasification at the Terminal from time to time"* , whilst BP's riposte is to say that that was not clear at all and there are various possibilities as to how the parties might (or might not) have addressed such a situation had that been contemplated (ranging from doing nothing, to changing the constant to another constant, to inserting a variety of potential variables).

*The drafting of D2.2.2(ii)(b)*

155.  In opening Sonatrach submitted that the language of D2.2.2(ii)(b) had gone wrong, and the question for the court was "how wrong" referring to what it said were errors in the formula. It will be recalled that the second factor identified Lord Neuberger in Arnold v Britton [at 18] was that when considering the centrally relevant words to be interpreted, the less clear they are, or to put it another way, the worse their drafting, the more ready the court can be to depart from their natural meaning. He pointed out, however, that this does not justify the court embarking on an exercise of searching for, let alone constructing, drafting infelicities in order to facilitate a departure from the natural meaning — as he stated, if there is a specific error in the drafting it may have no relevance to the issue of interpretation which the court has to resolve.

156.  The failure to include the 28.9 coefficient for the molecular weight of air is a good example of this for two reasons. First I do not consider it is properly to be characterised as reflecting poor drafting in terms of D2.2.2(ii)(b) or the JSA as a whole — it was, as I have already found, properly to be regarded as a simple typographical error. Secondly that error has no relevance to the issue of interpretation that the court has to resolve.

157.  The second alleged "error" that Sonatrach relies upon arises out of the fact that the formula sometimes produced allocations in excess of 100%, and as has already been referred to, in August 2006 the parties agreed to a capping of allocations to 100% of costs in this context. I do not consider this allocation by the formula reflects an "error" in the drafting of the formula, or is indicative of bad drafting — it is a function of the operation of the formula when the Terminal operated at the level of Wobbe blending that it did. The parties' reaction (and agreement) as a consequence of the operation of the Terminal after the JSA was entered into, does not support a submission that D2.2.2(ii)(b) was badly drafted or that the court should more readily depart from the natural meaning of the words.

158.  Sonatrach has also identified two other situations that it suggests reflect poor drafting in the formulae. The first is a suggestion that if a party imports more than one cargo in a month there is a problem with calculating the LNG molar weight in Factor Y. In fact, on analysis, what Sonatrach proposes, namely to use the weighted average LNG molar weight, simply reflects what the parties must have intended, and can be reached as a matter of construction (and is the approach the Agent has adopted in practice).

159.  The second is a situation in which a party does not import any cargoes in a year. Whilst it is true the formula does not work in this situation, it is simply a scenario that the parties did not foresee and did not cater for. It is not an error in the drafting, nor does it suggest that D2.2.2(ii)(b) was badly drafted.

160.  In the above circumstances I do not consider that Sonatrach can pray in aid any aspect of the drafting of clause D2.2.2(ii)(b) to submit that the clause is badly drafted and the court should more readily depart from the natural meaning that "51.41" is a constant and not a variable.

161.  For the reasons I have given above I consider that "51.41" viewed as part of D2.2.2(ii)(b) as a whole, appears, on its face, to be a constant, and not a variable and does not (on its face) mean, *"the average monthly operational Wobbe index value used for LNG blending and regasification at the Terminal from time to time".*

162.  However, as stressed by Lord Clarke in Rainy Sky at [21] as referred to by Lord Hodge in Arnold v Britton at [76], the exercise of construction is essentially one unitary exercise in which the court must consider the language used and ascertain what a reasonable person, that is a person who has all the background knowledge which would reasonably have been available to the parties in the situation in which they were at the time of the contract, would have understood the parties to have meant.

163.  In this regard the clause has to be viewed in the context of the JSA as a whole (and its other terms), the facts and circumstances known or assumed by the parties at the time the contract was executed and commercial common sense, but disregarding subjective evidence of any party's intentions.

164.  There are two main limbs to Sonatrach's case as to the parties' intention by reference to the facts and circumstances known and assumed by the parties at the time the contract was executed and *"what a reasonable person having all the background knowledge which would have been available to the parties would have understood them to be using the language in the contract to mean"* (Lord Hoffmann in Chartbrook at [14], as quoted with approval by Lord Neuberger in Arnold v Britton at [15]), and commercial common sense.

165.  First that *"the parties did not know precisely to what Wobbe value Grain would blend, but believed and operated for the purposes of drafting their contract on the basis that it would be close to 51.41"* (Sonatrach Closing Submissions para 28). Secondly that it was the Co-Shippers, *"common commercial purpose that variable nitrogen costs would be allocated between them on the basis of the amount of nitrogen used in relation their cargoes, judged by reference to their Wobbe value at the time of unloading."* (Sonatrach's Closing Submissions para 32).

166.  In relation to the first limb, and facts and circumstances known to the parties at the time of contracting, Sonatrach also rely upon the nature of the JSA (that it was not adversarial) and the fact that the JSA was a long term agreement requiring some flexibility to adapt to changing circumstances.

*Facts and circumstances known at time of contracting*

### Blending by the Terminal

167.  As quoted above Sonatrach's case in closing was that, *"the parties did not know precisely to what Wobbe value Grain would blend, but believed and operated for the purposes of drafting their contract on the basis that it would be close to 51.41"* (Sonatrach Closing Submissions para 28). In contrast BP submits that at the time of contracting, and having regard to all facts and circumstances known at the time of contracting, the parties would not have expected, or operated for the purpose of drafting their contract, on the basis that Grain would blend "close to 51.41" or "target 51.41" (as Sonatrach put it at para 20 of their Defence).

168.  When Sonatrach originally pleaded its case it was put in absolute terms: *"the Terminal would blend regasified LNG to the upper limit Wobbe value of 51.41"* . This was an assertion that the parties would have expected Grain to blend to a Wobbe value of 51.41 on a continuous basis. The first difficulty with that is that, as BP submit, it is inherently implausible and the parties would have known that. Blending is not so precise. Grain could not be expected constantly to hit a target with two decimal place precision even had it wished to do so (which it would not as a consequence of its obligations in terms of maximum Wobbe value in relation to putting gas into the national transmission network). The second (and even more fundamental) difficulty is that if Grain did blend to the upper Wobbe limit it was at risk of the limits in the GSMR being exceeded with the commercial (and potential criminal) [3] consequences that would follow — and any reasonable person in the parties' position would have known that, and that therefore Grain would not blend to 51.41 or "target" 51.41 (as it was put at paragraph 20 of the Defence), as is addressed further below in terms of the parties' reasonable expectations.

169.  If Sonatrach had been right that the reasonable expectation of the parties at the time of contracting was that Grain could be expected to blend to 51.41 all of the time, this would have lent some support to the submission that "51.41" was synonymous with (a "proxy" for) an operational Wobbe (of 51.41 ). However, that clearly was not the reasonable expectation of the parties at the time — for the reasons already identified (and considered further below) any reasonable person in the party's position would have known that the Terminal would not aim to blend to the maximum limit itself — quite apart from the difficulties of doing so that would have been to risk commercial (and potential criminal) consequences.

170.  Sonatrach's amended case was that Grain would blend LNG to *"51.41, or as close thereto as possible"* (Defence para 38B(b)(iv), and that Grain *"did have some discretion to blend LNG to a Wobbe index value slightly lower than 51.41"* (Defence para 38B(b)(iv), which mutated in Sonatrach's written Closing to " *Grain would blend ... close to 51.41"* . One difficulty with this amended case is it does not lie well with the submission that "51.41" is a proxy for "operational Wobbe", still less as pleaded with *"the average monthly operational Wobbe index value used for LNG blending and regasification at the Terminal from time to time"* (which suggests a changing variable over time).

171.  There is another difficulty. If in fact it was the reasonable expectation of the parties at the time of contracting that Grain would blend to 51.41 or *"close to 51.41"* or *"slightly lower than 51.41"* (and BP says it was not) then there was every reason to contractually agree a constant of 51.41 — that would be simple, easy, and clear, and would obviate the need to attempt to ascertain what Grain was in fact blending to (generally or at any particular time). If Grain was blending to "51.41" or "close to 51.41" the parties might well consider that a figure of 51.41 would do perfectly well, especially absent any better information. It is to be borne in mind in this regard that, as Mr Winstanley confirmed, Grain were not forthcoming about what level they would blend to, and there was no track record as to how they would approach it (the Terminal was not operational at the time and there was no historic experience). It should be noted, however, that there is no correspondence that suggests there was any discussion between BP and Sonatrach about the use of 51.41, and Mr Stranks' evidence was that there was no discussion that it would be best or easiest to use a fixed number, or that this would be a simple and efficient mechanism for allocating costs.

172.  An additional point is that if it transpired subsequently (post the signing of the JSA and the Terminal going operational) that Grain was in fact targeting a different level (such as 51.1) I do not consider that it follows that had the parties been aware of that at the time of contracting this would have caused them to insert "operational Wobbe". Indeed, Mr Winstanley said when cross-examined that, *" If Grain had written to us and told us that they were going to be blending to a different number, then we would have had a conversation with Grain at the time about the basis of that number, and then whatever number we agreed, that would have gone into the cost allocation principles "* .

173.  If such evidence is admissible (which is questionable as it is essentially subjective in nature as to what BP would have done), and leaving aside the rather hypothetical nature of the question (given that such conversation did not take place) this rather suggests that the parties would (or might) have gone for a different fixed value rather than a variable based on some form of operational Wobbe (though this, of course, depends on what they would have been told by Grain on this hypothetical). However even if they had gone for some form of variable there would have been various (different) possibilities — such as the Wobbe targeted from time to time, or a reference to average operational Wobbe or the like.

174.  Indeed, in their Written Closing at paragraph 48, Sonatrach submitted that, *"the number 51.41 in the formula simply reflected what both parties assumed (and what any reasonable third party would have assumed) was the blending target by Grain"* (emphasis added). That is not the same as " *the average monthly operational Wobbe index value used for LNG blending and regasification at the Terminal from time to time"* , which is no doubt why in their oral closing Mr Harris said that what he had put in paragraph 48 of Sonatrach's Written Closing was not his case. However, the fact that there are different permutations as to what the parties might have agreed (from fixed numbers to different variables) does rather suggest that it is not clear what the parties would have intended in this scenario (for the purpose of Lord Neuberger's sixth factor in Arnold v Britton ), as I address below in due course.

175.  Even once the parties knew that Grain was blending to lower levels the parties did not have information of exact levels blended to and, initially at least, only had information about levels being targeted. As addressed in the context of issues 3 and 4, as late as the Agent's 1 February 2007 reconciliation sent to the parties shortly before the 6 February 2007 Steering Committee Meeting, the Agent was only using fixed numbers (51.41, 51.1 and 51.25), and even at the time of a subsequent reconciliation on 14 July 2008 the Agent was using a figure of 51.1, and in its reconciliation on 8 September 2008 scenario 4 did not use the actual operational Wobbe as that had not been advised by the Terminal. Set against such backdrop it is not clear what the parties would have intended, had they been aware of what they subsequently became aware, at the time of contracting. Certainly I do not consider it to be clear that the parties would have substituted " *the average monthly operational Wobbe index value used for LNG blending and regasification at the Terminal from time to time" for* the figure of 51.41, not least given the other possible constants or formulae that they could have agreed.

176.  A further difficulty with Sonatrach's submission as to what was reasonably expected at the time of contracting is what is meant (or would have been understood) by, for example, *"close to 51.41"* when set against the backdrop of the minimum and maximum Wobbe values under the GSMR of 47.2MJ/m3 to 51.41MJ/m3. Mention had been made of Grain blending to 51.31 in the context of Mr Winstanley's discussions with the terminal manager Mr Belmore, albeit that figure was mentioned in early 2004 (and Mr Winstanley's subsequently focussed on the figure of 51.41). Subsequent to the Terminal going operational the Co-Shippers became aware that Grain was in fact aiming for a Wobbe of 51.1 for gas sent to the NTS and 50.9 for gas sent to the LDZ. These are all figures below 51.41 but very much towards the upper end of the range. It does not follow that the parties would necessarily have changed "51.41" in the formula to any particular figure or formula had they been aware at the time of contracting of the level(s) that Grain subsequently targeted at the upper end of the range. It has transpired after the JSA was entered into that nitrogen consumption is very sensitive to the Wobbe value and even small differences in Wobbe inserted in the formula make a large difference in terms of nitrogen consumption, but it cannot be assumed that the parties

BP Gas Marketing Ltd v La Societe Sonatrach, 2016 WL 06397422 (2016)

(or indeed a reasonable person having all the background knowledge the parties had) would necessarily have realised this at the time. Mr Winstanley had not, for example, run a working example through the formula — if he had he would have spotted the error in relation to the omitted 28.9 constant.

177.   When cross-examined Mr Winstanley accepted the proposition that, *"Grain didn't know what they would be targeting, but [he] thought the best available number was 51.41"* and that he was, *"hoping that [Grain] would get as close ... to the 51.41 as they could reasonably attain"* , though he *"knew that they would be achieving a number beneath 51.41"*. Mr Winstanley stated as follows in response to a question I asked:—

> "JUDGE BRYAN: Sorry, can I ask a question there. You say it was "to allocate costs broadly on the usage at the time". That's because although you didn't anticipate they would blend to 51.41, you anticipated it would be something relatively close to 51.41; is that right?
>
> A. That's right, my Lord. I expected it to be as close as they could reasonably get.
>
> JUDGE BRYAN: And therefore that was really the best you could do in the formula?
>
> A. Exactly."

In re-examination he was asked about these answers, and the following exchange then took place between Mr Eaton and Mr Winstanley:—

> "Q. When you were looking into these matters in 2004/2005, were you able to form a view, in terms of figures, as to what number was likely to be as close to 51.41 as Grain could reasonably get?
>
> A. I probably had in mind a figure of around 51.31 "

Whilst Sonatrach characterises this as Mr Winstanley rowing back from his earlier testimony (and certainly 51.31 had only been raised in conversation with Mr Belmore in early 2004) what is clear is that no one knew either what Grain would in fact blend to, or precisely how close Grain would get to 51.41. That is perhaps unsurprising as the terminal was not yet operational.

178.   For his part, Mr Stranks said in his second statement that, "My understanding, as set out in Mr Winstanley's presentation given in January 2005 (by which time JSA negotiations had begun) was that the Terminal would blend gas efficiently targetting the upper permitted Wobbe limit contained in the network entry agreement (i.e. 51.41). I did not anticipate that GLNG would significantly over-inject nitrogen by targeting numbers as low as 51.1 and 50.9, nor do I believe that anybody else attending the JSA negotiations did."

179.   Mr Stranks also asserted that, *"Sonatrach agreed to the use of the formula on the basis that it would allocate costs in a manner that would reflect actual operations at the Terminal".* This latter evidence is clearly inadmissible as it looks to one parties' subjective intention — see, for example, the observations of Lord Neuberger in Arnold v Britton at [12] where he pointed out that even if evidence shows what both parties intended this is probably only admissible if there is a claim for rectification — see also *Lewison* at para 2.03 and the reference to what Lord Hoffman said in Chartbrook at [48], *"English law ... mixes up the ascertainment of intention with the rules of law by depersonalising the contracting parties and asking, not what their intentions actually were, but what a reasonable outside observer would have taken them to be."*

180.   To the extent that the understanding of particular witnesses as to what it was anticipated Grain would do in terms of nitrogen blending is admissible as an aid to construction, and it could only be to the extent that this may shed light on what a reasonable person having all the background knowledge which would have been available to the parties would have known and understood, such evidence has to be judged against the entirety of the evidence as to what the reasonable expectations of the parties were at the time of contracting. BP submits that the evidence taken as a whole does not support the proposition that parties would reasonably have expected Grain to blend to (precisely) 51.41 or *"aim to"* blend to "51.41", or to blend

BP Gas Marketing Ltd v La Societe Sonatrach, 2016 WL 06397422 (2016)

(or aim to blend) to *"slightly below"* 51.41 or *"as close as possible"* to 51.41. I will now turn to address the arguments they make in this regard.

*Lack of Operational Experience*

181.  First, I agree with BP's submission that no such expectation could reasonably have been based on operational experience, because there was no relevant operational experience. The Terminal was the first modern LNG importation, storage and regasification plant in the UK as Mr Winstanley and Mr Stranks confirmed at paragraphs 11 and 15 of their respective statements. The Terminal was not commissioned until July 2005, and did not become operational until September 2005. When the JSA was signed the Terminal was not running, and Grain had no recent practical experience of blending imported LNG to reduce the Wobbe to meet the specification in the GSMR , and Grain had no established operational practice as to how they were going to do it, as Mr Stranks accepted when cross-examined. As Mr Stranks put it, "When the JSA was being negotiated, it was all theoretical as we did not know how the Terminal would actually operate in practice" and *"As the Terminal was to be the first modern LNG importation terminal in the UK, it was not possible, prior to start up, accurately to predict all operational realities over the twenty year duration of the* [JSA]" (paragraphs 48 and 22 of his statement).

182.  This uncertainty applied as much to Wobbe as to anything else. All that Mr Winstanley (who had a good relationship with Mr Belmore) could find out was that there would be an operational margin which might change over time, and that the highest Wobbe in Grain's contemplation was 51.31 (paragraph 63 of his statement) which he confirmed in his oral evidence that Grain would not commit to writing. Mr Winstanley incorporated this figure of "51.31" into a nitrogen requirements calculation which he sent to Sonatrach in March 2004, the table showing, *"..the nitrogen required to inject into the NTS to meet the maximum Wobbe of 51.4MJ/Sm3 (actual nitrogen flowrate calculated based on achieving 51.31 MJ/Sm3)"* . Although Mr Way had no recollection (when he was cross-examined), I accept that the most likely interpretation is that this is the *"nitrogen requirements study"* referred to at a progress meeting between BP, Sonatrach and Grain on 15 May 2006. Subsequent modelling analyses carried out by Mr Winstanley (for the purposes of specifying the requirements of the GAN plant), prior to the JSA being agreed, were based on Grain blending to a Wobbe of 51.41. There is, however, no suggestion that Grain had changed its intentions (whatever they might be, and the parties were singularly lacking in information about that).

*Technological Limitations*

183.  The second point made by BP is that there was no reasonable technological basis for expecting Grain to *"aim at"* 51.41 or achieve an operational Wobbe particularly close to it. For anything approaching precision in nitrogen blending for Wobbe, Grain would need to be able, with a good degree of certainty, to know the Wobbe of the gas being sent out (before adding any nitrogen), calculate the quantity of nitrogen needed to reduce that Wobbe to (or close to) 51.41 and limit the quantity of nitrogen injected to the calculated quantity.

184.  Mr Winstanley explained when he gave his evidence that:

> 184.1.  The composition of LNG is analysed when it is discharged into the Terminal and the Wobbe of the LNG as delivered can be calculated from that. But this calculation is of no assistance to Grain when it is injecting nitrogen into send-out gas, because the composition (including Wobbe) will have changed between discharge and send-out, because of boil-off/weathering and co-mingling with other LNG;

> 184.2.  The send-out gas is analysed before it goes into the NTS or the LDZ. The Wobbe can be calculated from that analysis. But it is a calculation, which is extrapolated from data about the composition of the gas: the Wobbe is not directly measured by instrumentation. So the value obtained will be an estimate rather than a precise measurement;

> 184.3.  The analysers which are used to capture the composition data from which the estimated Wobbe is calculated are themselves subject to a margin of inaccuracy. That will add to the imprecision in the calculated Wobbe;

> 184.4.  The quantity of nitrogen injected is monitored by meters. These are also subject to a margin of inaccuracy. So it is standard operating procedure to set the control trigger to the target Wobbe less an allowance for this inaccuracy (as Grain subsequently explained at the May 2006 meeting);

184.5.  There is a time-lag before injected nitrogen affects the Wobbe of the send-out gas. It is prudent to compensate for this by allowing for a margin in the quantity. So there is a tendency towards over-injection.

185.  Mr Winstanley's evidence was that the Terminal is so set-up that the nitrogen injection points are upstream of the analysers which capture the composition of the send-out gas. So nitrogen is injected before the composition of the send-out gas is captured and before the Wobbe is calculated. The Wobbe is unknown at the moment of injection. Grain does not obtain the (estimated) Wobbe of the send-out gas and then calculate how much nitrogen to inject, rather Grain estimates the Wobbe of gas into which nitrogen has already been injected and then assesses whether or not to decrease (or increase) the injection rate. It is likely to err on the side of caution (towards over-injection) if there appears to be any risk of missing the GSMR specification.

186.  Mr Winstanley also explained that Grain controls nitrogen injection manually, not automatically. And, in deciding whether to increase or decrease the rate of injection (and by how much) the operators consult a chart which states the effect on the Wobbe for each additional 0.1mt of nitrogen injected. The process is not based on very precise calculations. BP submits that there is no reason to think that this is something which could not reasonably have been anticipated in June 2005, and Mr Winstanley described it as *"quite common"* .

187.  Whilst I do not consider that a reasonable person having all the background knowledge that would have been available to the parties at the time of contracting would know the precise detail of the above matters (not least given that the Terminal was not in operation at the time), I do accept that there was no reasonable technological basis for expecting Grain to *"aim at"* 51.41 or to achieve an operational Wobbe particularly close to it, and a reasonable person having all the background knowledge available to the parties would have known that Grain would seek to avoid any risk of breaching the GSMR specification, and would err on the side of caution in blending levels given the circumstances in which blending would be undertaken and the lack of any technological basis to allow the obtaining of a particular Wobbe level with precision.

*Existing Contractual Agreements — any RPO re: blending*

188.  It is common ground that the STA (October 2003) and the FLA (November 2004) pre-dated the JSA and that Grain's contractual obligations are relevant to how the parties might, at the time of contracting, have reasonably expected Grain to approach nitrogen blending for Wobbe. There is no provision in the STA which requires Grain to target 51.41 or to blend as close to it as possible. Instead, Grain's basic STA obligation was to ensure that send-out gas complied with the NEAs: GTC's C10.1.1. The NTS, NEA and the LDZ NEA both included the GSMR maximum Wobbe of 51.41. The minimum is 48.14 for the NTS or 47.2 for the LDZ. On the face of C10.1.1, Grain was free to select a Wobbe anywhere within the range.

189.  Sonatrach relies upon the RPO provision in GTCs C10.2.2 and (amended) GTCs C12.1.1, arguing that an RPO would operate the Terminal in a reasonable and economically efficient manner, which would mean blending to 51.41 *"or as close thereto as possible"* . This argument has led to a difference of construction between Sonatrach and BP as to whether the RPO provision applies to nitrogen blending. BP submits that, upon proper analysis it does not — and the proper construction is what a reasonable person having all the background knowledge which would have been available to the parties would have understood Grain's obligations to be. Accordingly, an entity in the position of BP and Sonatrach (who are to be taken to understand the existing contractual position) would not assume that Grain had an obligation to operate the Terminal as a RPO or have any obligation to use as little nitrogen as possible, and blend to 51.41 or as close thereto as possible.

190.  In short BP submits that nitrogen blending, and Grain's right to nitrogen costs (including the cost of power to run the nitrogen plant) is governed by the FLA. The RPO provision in C10.2.2 and C12.1.1 does not apply, and the FLA itself does not contain any RPO provision or anything like it. I address this issue in due course below.

191.  However, BP also submits that even if the RPO provision applied (contrary to its submissions on construction) it would not provide any reasonable basis for an expectation that Grain would target 51.41.

192.  A consideration of these issues necessarily involves a consideration of the relevant contractual principles in some detail. It is necessary to undertake this exercise because Sonatrach places some considerable emphasis on its argument that an RPO would operate the Terminal in a reasonable and economically efficient manner, which would mean blending to 51.41 *"or*