# EXHIBIT 1

A    **Latin American Investments Ltd v Maroil Trading Inc & Anor;
     Oceanic Trans Shipping Est v Maroil Trading Inc & Anor.**
     [2017] EWHC 1254 (Comm)

     Queen's Bench Division (Commercial Court).
B    Teare J.
     Judgment delivered 26 May 2017.

> Freezing injunctions – Joint venture – Shareholders' agreement – Reflective
> loss – Joint venture companies owning two VLCCs – JVCs owned by
C    three shareholders – One shareholder claimed disputes under contract
> of affreightment had been settled by other two shareholders in breach of
> shareholders' agreement – Shareholder obtaining freezing injunction –
> Whether freezing injunction should be discharged because claim breached
> reflective loss principle.

D    This was an application by the defendants (Maroil and Sea Pioneer) to discharge a freezing order granted to the claimant (Oceanic).

     Two VLCCs were owned by two joint venture companies (JVCs). There were three shareholders in the JVCs: Latin American Investments, Oceanic
E    and Maroil. They were party to two shareholder agreements. Pursuant to those agreements the VLCCs were made available to Sea Pioneer, which entered into a contract of affreightment (COA) with a company (PDVSA) in the Petroleos de Venezuela group. The rights of Sea Pioneer under the COA were assigned to the JVCs. Disputes arose between the JVCs and PDVSA: it was alleged that PDVSA had failed to perform its obligations under the COA. Oceanic alleged that those
F    disputes had been settled by Maroil and Sea Pioneer in breach of express and implied terms in the shareholder agreements and in breach of fiduciary duty. The claim of the JVCs had been settled for some $30 million, whereas Oceanic contended that it should not have been settled for less than $89 million. It also said that it had not received its $10 million share of the sum paid under a
G    commission agreement relating to the settlement.

     The defendants argued that the freezing order obtained by Oceanic should be discharged because its claim breached the principle that prevented a shareholder in a company from recovering loss which was reflective of loss sustained by the company.
H
     Oceanic submitted that there was a good arguable case that the 'reflective loss' principle did not debar a shareholder with a cause of action seeking a remedy which required property or payments to be restored to the company; Oceanic, as a party to the shareholder agreements, should be entitled to maintain a claim under those agreements to compel Maroil to restore to the JVCs property

or payments that should have been made to them; the remedy which Oceanic sought was specific performance.

*Held*, continuing the freezing injunction against Maroil and Sea Pioneer:

Oceanic had its own cause of action against Maroil and Sea Pioneer arising under the terms of the shareholder agreement. However, that was not sufficient to enable it to sue for damages because the loss alleged to have been suffered by Oceanic reflected the loss of the JVCs. The reflective loss principle was based on company autonomy, the need to prevent double recovery, and the need to protect creditors. Since the remedy of specific performance would result in payments being made to the JVCs rather than to Oceanic itself, it was arguable that that would not breach the principle of reflective loss. The order sought by Oceanic for the defendants to pay the commission sum to the JVCs was arguably an order for them to perform their primary obligations under the settlement agreement. There was a good arguable case that Oceanic could seek an order that the defendants pay the commission sum of $10m to the JVCs without breaching the reflective loss principle. Payment to the JVCs of such sum as was found due on account of the settlement agreement having been concluded without authority and in conflict of interest did not appear to be an order for specific performance but an order, at the suit of Oceanic, for the defendants to pay damages to the JVCs. However, there was a good arguable case that that would not breach the reflective loss principle because the order was for payment to be made to the JVCs. (*Johnson v Gore Wood & Co* [2002] 2 AC 1 and *Peak Hotels and Resorts Ltd v Tarek Investments Ltd* [2015] EWHC 3048 (Ch) considered.)

The following cases were referred to in the judgment:

*Barings plc v Coopers & Lybrand* [1997] 1 BCLC 427.
*Christensen v Scott* [1996] 1 NZLR 273.
*Fourie v Le Roux* [2007] UKHL 1; [2007] 1 WLR 320.
*Johnson v Gore Wood & Co* [2002] 2 AC 1.
*Moschi v Lep Air Services Ltd* [1973] AC 331.
*Madoff Securities International Ltd v Raven* [2011] EWHC 3102 (Comm); [2012] 2 All ER (Comm) 634.
*Peak Hotels and Resorts Ltd v Tarek Investments Ltd* [2015] EWHC 3048 (Ch).
*Prudential Assurance Co Ltd v Newman Industries Ltd* [1982] Ch 204.
*Webster v Sandersons Solicitors* [2009] EWCA Civ 830.

Akhil Shah QC and Christopher Langley (instructed by Norton Rose Fulbright LLP) for the Part 20 claimant/additional party.

David Foxton QC, Louise Hutton and Stephen Donnelly (instructed by Quinn Emanuel Urquhart & Sullivan LLP) for the defendants.

A

# JUDGMENT

**Teare J:**

B

1. On 9 May 2017 I granted the Claimant, Oceanic Trans Shipping Est, a Freezing Order against the Defendants, Maroil Trading Inc and Sea Pioneer Shipping Corporation. The return date was 19 May 2017 and on that date Mr David Foxton QC, on behalf of the Defendants, submitted that the Freezing Order should not be continued, for three reasons. First, the Claimant had no legitimate claim against the Defendants because its claim breached the principle that prevents a shareholder in a company from recovering loss which is reflective of loss sustained by the company.

C

As a result it was submitted that the Freezing Order was made on a basis which was fundamentally misconceived. Second, there was no reasonably arguable case in relation to a very substantial part of its claim. Third, there was no real risk of dissipation of assets. The first objection raises, it appears, an important question of law. The second and third objections require an assessment of the evidence relied upon by the Claimant.

D

**The background**

E

2. The background to this case is complex but may, without injustice to the parties, be shortly stated. Two VLCCs were owned by two companies, OOV and HMC ('the Joint Venture Companies'). There were three shareholders in the Joint Venture Companies, Latin American Investments Limited ('LAIL'), the First Defendant and the Claimant. The three shareholders were party to two Shareholder Agreements. Pursuant to the Shareholder Agreements the VLCCs were made available to the Second Defendant who entered into a COA with PDVSA, a company in the Petroleos de Venezuela group of companies. The rights of the Second Defendant under the COA were assigned to the Joint Venture Companies. Disputes arose between the Joint Venture Companies and PDVSA. It was alleged that PDVSA failed to perform its obligations under the COA. Those disputes were settled by the First and Second Defendants in alleged breach of the express and implied terms of the Shareholders Agreements and in breach of fiduciary duty. The claim of the Joint Venture Companies was settled for some $30m whereas the Claimant contends that it ought not to have been settled for less than $89m (which is the basis of the Claimant's claim for some $23m) and the Claimant also says that it has not received its share of a sum paid under a Commission Agreement relating to the settlement in the sum of $10m.

F

G

H

3. There is no dispute that the Claimant has a reasonably arguable claim against the Defendants (though it is said that there is no reasonably arguable case supporting the quantum of the claim in the sum of $23m). However, the Claimant's loss arises because 'the value of its shareholding in the Joint Venture is diminished and it has not received, whether by dividend or otherwise: (a) its share of the settlement or of the Commission Sum paid by Commerzbank under the Commission Agreement and (b) pending an enquiry and account into the basis on which Maroil settled the Arbitration

Claim any additional amounts for which the COA claims against PDVSA should have been settled' (see paragraph 62 of the Claimant's skeleton argument put before the court on 9 May 2017). Mr Foxton submits that a claim for such loss by the Claimant is unsustainable in law because it falls foul of the 'reflective loss' principle. The Freezing Order ought therefore not to have been granted.

4. Mr Akhil Shah QC, when applying for the Freezing Order on 9 May, very properly referred me to this difficulty. But he submitted that the difficulty could be circumvented by the Claimants seeking an order for specific performance of the Defendants' obligations to pay the sums in question to the Joint Venture Companies. In making that submission he relied upon the observations of Birss J in *Peak Hotels and Resorts Ltd v Tarek Investments Ltd* [2015] EWHC 3048 (Ch). I accepted (on the ex parte hearing) that that argument had sufficient strength to justify the grant of the Freezing Order. The question raised by Mr Foxton's submission is whether that argument is sound. He submits that it is not. Mr Shah submits that he only needs a good arguable case that it is correct. In that regard he referred me to *Madoff Securities v Raven* [2012] 2 All ER (Comm) 634 at paragraph 145 where Flaux J (as he then was) said:

> 'To justify obtaining a freezing injunction, a claimant has to show a good arguable case on the merits. In *Ninemia Maritime Corp v Trave Schiffahrtsgesellschaft mbH & Co KG (The Niedersachsen)* [1984] 1 All ER 398 at 404 Mustill J (as he then was) described a good arguable case for these purposes as one "which is more than barely capable of serious argument, and yet not necessarily one which the judge believes to have a better than 50% chance of success". It can immediately be seen that this either is the same test as "serious issue to be tried" for the purposes of resisting a strike out application or, if there is any difference between the two tests, it is an imperceptible one.'

5. This statement of the applicable test was not challenged but Mr Foxton submitted that his 'reflective loss' argument was a fundamental point which could and should be determined now because there would be no further factual matters arising at trial which would bear upon it.

**Two preliminary matters**

6. In the light of Mr Shah's reliance upon the remedy of specific performance it is necessary to note, first, the precise obligations in the Shareholders' Agreements upon which reliance is placed and, second, the remedies relied upon in the Particulars of Claim.

7. Each of the shareholders, together with the Defendants, were party to the Shareholders' Agreements. Clause 5.2 provided that each shareholder shall use its reasonable endeavours to promote and develop the business of the Company (i.e.

A    the Joint Venture) to the best advantage of the Company. Clause 5.4 provided that the Second Defendant 'shall hold its rights, title, and interest in and to the PDVSA Contract on trust for the Company'.

B    8. Reliance was also placed upon an alleged implied term of the Shareholders' Agreements that the three shareholders agreed not to do, or cause or suffer to be done, and not to cause or permit any company or other person under their control to do, any act, matter or thing likely to interfere with or harm the business of OOV/HMC or the other shareholders.

C    9. It was alleged that these terms had been breached by the Defendants when making the settlement and commission agreements without the consent of the Claimant and that the First Defendant failed to disclose that it had a conflict of interest when settling the claims of the Joint Venture Companies against PDVSA at the same time as settling a separate claim which the First Defendant had against PDVSA.

D    10. The remedies sought by the Claimant are set out in paragraphs 42 of the Particulars of Claim and include:

E
> '42.4 An order that the Defendants do pay or procure payment of the Commission payment, its traceable proceeds and any profits made from the use of the same, together with interest thereon, to the Joint Ventures.
>
> 42.5 Further or in the alternative, an order that the Defendants do pay a sum equivalent in amount to the Commission Payment and any profits made from the use of the same and/or equitable compensation and/or damages, together with interest thereon, to the Joint Ventures Agreement.'

F    **The 'reflective loss' principle**

11. The principle is stated by Lord Bingham in *Johnson v Gore Wood* [2002] 2 AC 1 at pp. 35-36 as follows:

G
> 'These authorities support the following propositions:

H
> (1) Where a company suffers loss caused by a breach of duty owed to it, only the company may sue in respect of that loss. No action lies at the suit of a shareholder suing in that capacity and no other to make good a diminution in the value of the shareholder's shareholding where that merely reflects the loss suffered by the company. A claim will not lie by a shareholder to make good a loss which would be made good if the company's assets were replenished through action against the party responsible for the loss, even if the company, acting through its constitutional organs, has declined or failed to make good that loss. So much is clear from *Prudential*, particularly at pages 222-223, *Heron International*, particularly at pages 261-262, *George Fischer*,

particularly at pages 266 and 270-271, *Gerber* and *Stein v Blake*, particularly at pages 726-729.

(2) Where a company suffers loss but has no cause of action to sue to recover that loss, the shareholder in the company may sue in respect of it (if the shareholder has a cause of action to do so), even though the loss is a diminution in the value of the shareholding. This is supported by *Lee v Sheard*, at pages 195-196, *George Fischer* and *Gerber*.

(3) Where a company suffers loss caused by a breach of duty to it, and a shareholder suffers a loss separate and distinct from that suffered by the company caused by breach of a duty independently owed to the shareholder, each may sue to recover the loss caused to it by breach of the duty owed to it but neither may recover loss caused to the other by breach of the duty owed to that other. I take this to be the effect of *Lee v Sheard*, at pages 195-196, *Heron International*, particularly at page 262, *R P Howard*, particularly at page 123, *Gerber* and *Stein v Blake*, particularly at page 726. I do not think the observations of Leggatt LJ in *Barings* at p. 435B and of the Court of Appeal of New Zealand in *Christensen v Scott* at page 280, lines 25–35, can be reconciled with this statement of principle.

These principles do not resolve the crucial decision which a court must make on a strike-out application, whether on the facts pleaded a shareholder's claim is sustainable in principle, nor the decision which the trial court must make, whether on the facts proved the shareholder's claim should be upheld. On the one hand the court must respect the principle of company autonomy, ensure that the company's creditors are not prejudiced by the action of individual shareholders and ensure that a party does not recover compensation for a loss which another party has suffered. On the other, the court must be astute to ensure that the party who has in fact suffered loss is not arbitrarily denied fair compensation. The problem can be resolved only by close scrutiny of the pleadings at the strike-out stage and all the proven facts at the trial stage: the object is to ascertain whether the loss claimed appears to be or is one which would be made good if the company had enforced its full rights against the party responsible, and whether (to use the language of *Prudential* at page 223) the loss claimed is "merely a reflection of the loss suffered by the company". In some cases the answer will be clear, as where the shareholder claims the loss of dividend or a diminution in the value of a shareholding attributable solely to depletion of the company's assets, or a loss unrelated to the business of the company. In other cases, inevitably, a finer judgment will be called for. At the strike-out stage any reasonable doubt must be resolved in favour of the claimant.'

12. In the present case there is no dispute that the Claimant shareholder has its own cause of action against the Defendants arising under the terms of the Shareholders

A  Agreement. That is not sufficient to enable the Claimant sue for damages, as Lord Bingham makes clear, unless its loss is separate and distinct from that suffered by the company (in the present case the Joint Venture Companies). Lord Millett also makes that clear at p. 66 when referring to the decisions in *Barings plc v Coopers & Lybrand* [1997] 1 BCLC 427 and *Christensen v Scott* [1996] 1 NZLR 273 which suggested that a shareholder who had his own cause of action could recover his 'personal' loss,
B  notwithstanding that such loss was measured by the diminution of the value of his shares. Lord Millett said that he disagreed. He explained:

C  'It is of course correct that the diminution in the value of the plaintiffs' shares was by definition a personal loss and not the company's loss, but that is not the point. The point is that it merely reflected the diminution of the company's assets. The test is not whether the company could have made a claim in respect of the loss in question; the question is whether, treating the company and the shareholder as one for this purpose, the shareholders' loss is franked by that of the company. If so, such reflected loss is recoverable by the company and not by the shareholders.'

D  
13. In the present case there does not appear to be any dispute that the loss alleged to have been suffered by the Claimant reflects the loss of the Joint Venture Companies. It was not suggested by Mr Shah that this was a case where there was doubt as to whether the loss suffered by the Claimant was reflective of the Joint
E  Venture Companies, which doubt could only be resolved at trial. Rather, Mr Shah submitted that there is a good arguable case that the 'reflective loss' principle does not debar a shareholder with a cause of action seeking a remedy which requires property or payments to be restored to the company. The Claimant, as a party to the Shareholder Agreements, should be entitled to maintain a claim under those agreements to compel the First Defendant to restore to the Joint Venture Companies
F  payments that should have been made to them. The remedy which Mr Shah seeks is the remedy of specific performance.

14. The underlying reason which justifies the reflective loss principle is described by Lord Bingham as 'the principle of company autonomy'. The court must also
G  ensure that 'the company's creditors are not prejudiced by the action of individual shareholders' and that 'a party does not recover compensation for a loss which another party has suffered.' Since the remedy of specific performance relied upon by Mr Shah would result in property or payments being made to the Joint Venture Companies, rather than to the Claimant, there would appear to be a good arguable case that the remedy of specific performance would not breach the principle of
H  company autonomy or prejudice the interests of the company's creditors or enable a party to recover compensation which another party had suffered.

15. In *Peak Hotels and Resorts Ltd v Tarek Investments Ltd* [2015] EWHC 3048 (Ch) the court had to deal with an application to strike out a claim for an injunction. The case concerned a dispute as to the control of a hotel group. Certain damages

A

claims which were brought by shareholders and were reflective of loss suffered by the company were struck out by Birss J; see paragraphs 55-60. But there was also a claim for an injunction, as a remedy for fraudulent conspiracy and unlawful interference with contract, requiring certain defendants to retransfer certain shares to the company; see paragraphs 64-65 and paragraphs 70-73. Birss J held that such a remedy was not caught by the 'reflective loss principle'; see paragraphs 69 and 73. Birss J's reasoning in paragraph 69 was:

B

> '… the key problem with reflective loss is double recovery. It makes sense to me that if a company's shareholder takes the damages, there is the possibility of defrauding the company's creditors and, for that matter, its other shareholders. Maybe defrauding is the wrong word to use and it might be better to speak in terms of the potential for the shareholder to act in a way which damages company's creditors and the other shareholders, but in any case the problem does not arise with an injunction to restore property to the company.'

C

16. Similarly, in paragraph 73 he said:

D

> '… it seems to me that a claim for an injunction raised different considerations to a claim for damages. If the defendant owes a duty to [the] claimant and has breached that duty, and it is otherwise appropriate, I cannot see why an injunction is not capable of being an appropriate remedy. There is no problem with double recovery and so no problem of the kind considered in *Johnson v Gore Wood* about creditors. I will accordingly refuse to strike out the injunction claim.'

E

17. This reasoning (in what appears to be an *ex tempore* judgment given on the second day of a pre-trial review, see paragraphs 24 and 26) was criticised by Mr Foxton on the grounds that the 'reflective loss' principle is not concerned with double recovery; see *Johnson v Gore Wood* at p. 66 per Lord Millett and *Webster v Sandersons* [2009] EWCA Civ 830 at paragraph 37(4) per Lord Clarke of Stone-cum-Ebony MR. It is true that the reflective loss principle is not explained simply by the need to prevent double recovery, but that need is part of the explanation; see *Johnson v Gore Wood* at p. 62 per Lord Millett. The other part of the explanation is the need to protect creditors of the company and it is clear from paragraphs 69 and 73 of Birss J's judgment that he also had in mind that the principle protected creditors of the company as explained by Lord Bingham in *Johnson v Gore Wood*. Further, his conclusion that creditors of the company would not be prejudiced by the injunctive relief sought in that case appears, with respect, to be correct. At any rate there appears to be a good arguable case that that is correct.

F

G

H

18. In the present case the remedy of specific performance is sought. An order for specific performance is an order that an obligation in a contract be enforced by means of a mandatory injunction to that effect; cf *Snell's Equity* 33rd edn at paragraph 18-017. Just as the injunction in *Peak Hotels* that the defendants retransfer shares to

A  the company did not fall foul of the reflective loss principle so an order for specific performance of obligations owed to the Joint Venture Companies would not appear to fall foul of that principle. Mr Shah submitted that there was no authority in which the reflective loss principle prevented a shareholder from seeking an order that payment be made to the company. He relied upon the statement in *Chitty on Contracts* 32nd edn at paragraph 27-056 that 'as a general principle, the promisee should be able to

B  obtain specific performance in favour of the third party whenever that is the most appropriate method of enforcing the contract which was actually made.'

19. But the question remains whether in the present case the Claimant is in truth seeking a remedy of specific performance. I have already quoted paragraphs 42.4 and

C  42.5 of the Particulars of Claim. In paragraph 42.4 the Claimant seeks payment of the Commission sum of $10m 'to the Joint Ventures'. In paragraph 42.5 the Claimant seeks payment of equitable compensation and/or damages 'to the Joint Ventures'. Mr Foxton submitted that the remedies sought were not specific performance of the primary obligations owed by the Defendants but were orders for enforcement by way of a monetary award of the secondary obligations which arose when a primary

D  obligation was breached. The reference to primary and secondary obligations is, I believe, a reference to Lord Diplock's analysis in *Moschi v Lep Air Services* [1973] AC 331 at p. 350 of what happens to contractual obligations when a contract is rescinded. This aspect of the parties' submissions was only touched on in counsel's submissions and not developed. No suggestion was made that the Shareholders

E  Agreements had been rescinded.

20. There seems to me to be little doubt that the Claimant's case is that the Defendants breached their obligations under the Shareholders Agreements (see paragraph 40 of the Particulars of Claim) and in consequence the Defendants are obliged to pay the Commission sum of $10m to the Joint Venture Companies, are

F  obliged to account to the Joint Venture Companies for concluding the Settlement Agreement without authority and in conflict of interest and are obliged to pay to the Joint Ventures the sums found due from the account (see paragraph 41 of the Particulars of Claim). Whilst the obligation to pay to the Joint Venture Companies the Commission sum of $10m is, arguably, an order that the Defendants perform

G  their primary obligations under the Settlement Agreement, the obligation to pay the sums found due on the account of the Settlement Agreement being concluded without authority and in conflict of interest appears to be an order for the payment of damages. In the course of argument Mr Shah accepted that paragraph 42.5 was a claim for consequential relief.

H
21. In view of the statement of principle in *Chitty* (see above) that the promisee should be able to obtain specific performance in favour of a third party whenever that is the most appropriate method of enforcing the contract, it seems to me that there is a good arguable case that the Claimant can seek an order that the Defendants pay the Commission sum of $10m to the Joint Venture companies without breaching the reflective loss principle. That is arguably the most appropriate method of enforcing

the Shareholders Agreements in circumstances where there is a clear dispute between one shareholder, the Claimant, and another, the First Defendant and where trust between another shareholder, LAIL, and the Claimant appears to be absent (because LAIL did not inform the Claimant that it was seeking a freezing order against the Defendants). Ultimately, the question whether an order for specific performance is 'the most appropriate method' of enforcing the contract will be a fact sensitive matter dependent upon such facts as are proved at trial.

22. However, payment to the Joint Venture Companies of such sum as is found due on account of the Settlement Agreement being concluded without authority and in conflict of interest does not appear to be an order for specific performance but appears to be an order, at the suit of the Claimant, that the Defendants pay damages to the Joint Venture Companies. If the remedy of specific performance is available, as arguably it is, where the Claimant has its own cause of action under the Shareholders Agreement I find it difficult to see why the remedy of damages should not also be available. Of course, if either remedy breached the reflective loss principle it would not be available but neither remedy appears to do so because in both cases the order is that payments be made to the Joint Venture Companies. Such orders are consistent with the principle of company autonomy (because they recognise that the payee is the company and not the shareholder), do not prejudice creditors of the company (because the sums are paid to the company) and do not enable a shareholder to recover compensation for a loss suffered by the company (because the compensation is payable to the company). At any rate there appears to be a good arguable case that these propositions are correct.

23. Mr Shah's case is not supported by authority but neither is there authority which states in terms that it is wrong. Mr Foxton relied upon the statement of the 'general rule' in *Prudential Assurance v Newman Industries* [1982] Ch 204 at p. 210 that A cannot 'bring an action against B to recover damages or secure other relief on behalf of C for an injury done by B to C. C is the proper plaintiff because C is the party injured and therefore the person in whom the cause of action is vested.' But it is not apparent that that statement of principle was applicable to the case where, as here, the shareholder has his own cause of action (though the reflective loss principle is of course applicable in such a case as was held in *Johnson v Gore Wood*).

24. Like Birss J in *Peak Hotels* I am troubled that this point could have been made in previous cases on reflective loss but was not. Nevertheless, I have reached the conclusion that there is a good arguable case that the Claimant's pleaded case and the remedies sought are available to it and are not caught by the reflective loss principle.

**Is a Freezing Order available in support of the Claimant's claim?**

25. Mr Foxton had a further point, namely, that a freezing order is only available for enforcing a monetary judgment. He relied upon *Fourie v Le Roux* [2007] 1 WLR 320 at paragraph 33 where Lord Scott said:

A

'Whenever an interlocutory injunction is applied for, the judge, if otherwise minded to make the order should, as a matter of good practice, pay careful attention to the substantive relief that is, or will be, sought. The interlocutory injunction in aid of the substantive relief should not place a greater burden on the respondent than is necessary. ... This is particularly so in the case of freezing orders applied for without notice. Assets of the defendant to which the claimant has no proprietary claim whatever are to frozen so as to constitute a source from which the claimant can hope to satisfy the money judgment that, in the substantive proceedings, he hopes to claim.'

B

C

26. I accept that a freezing order can only be made in support of an anticipated money judgment. However, what is a money judgment for this purpose is not narrowly construed. In *Commercial Injunctions* (6th edn) Mr Gee QC says that:

'There are no constraints ... on the types of monetary relief which [the claimant] may seek: his claim may be for payment of a debt, or damages, or an account, or for statutory compensation.'

D

27. The judgment which the Claimant seeks is for the payment of sums by the Defendants to the Joint Venture Companies, either by way of an order for specific performance or by way of an order for the payment of damages. Such orders for the payment of monetary sums to the Joint Venture Companies appear to me to be money judgments for the purposes of freezing order relief, notwithstanding that they do not require any sum to be paid to the Claimant.

E

28. I have therefore reached the conclusion that Mr Foxton's first point does not lead to the Freezing Order being discontinued.

F

**The $89m argument**

29. Unlike the first point this point is not a point of law but requires a consideration of the evidence. It is a short point.

G

30. The Claimant's Freezing Order is in the sum of $23m. That is arrived at on the assumption that the claim against PDVSA should not have been settled for less than $89m and that the Claimant's one third share of that sum, after deducting $20m payable to the bank, was $23m Mr Foxton submitted that there was no good arguable case that the claim against PDVSA should not have been settled for less than $89m.

H

31. The Claimant's evidence from Mr Al Tamimi, the owner and director of the Claimant, is that the settlement of the claim against PDVSA for the sum of $30m, had he known about, would not have been acceptable to him. He referred to the possible settlement amounts canvassed by John Blacker of Ross and Co, who were advising the Joint Venture Companies, ranging from $120m to nil. One of the possible figures was $89m. Mr Al Tamimi said that he regarded $89m as

the minimum settlement 'because I believe that that the fact that the VLCC JV Companies were going to conduct back-haul voyages was reasonably foreseeable in the circumstances.' He also noted that the First Defendant's other claim had been settled for a much greater sum and so PDVSA clearly had the means to settle in a sum much greater than $30m.

32. Mr Foxton submitted that the Claimant had no good arguable case that the claim against PDVSA would realistically have been settled at $89m. He pointed out that in 2013 Mr Mooney, who had instructed Ross and Co, advised, after meeting Mr Blacker, that the 'likelihood' was that the 'westbound' voyages would be excluded by the panel thus reducing the claim to $10-15m. This email was sent to, amongst others, Mr Al Tamimi, and there was no contemporaneous complaint from him. Mr Blacker's own advice, which came a little later in 2013, was that the award would be limited to $29m. Ross and Co received no further instructions and came off the record. Clyde and Co were then instructed on behalf of LAIL and in 2014 Mr Preston reported on discussions with Commerzbank. He endeavoured to explain to the Bank that $30m was a good deal in circumstances where the tribunal was going to reject the higher figures put forward.

33. I accept that that there is contemporaneous evidence that the claim was thought unlikely to be worth $89m. But Mr Al Tamimi's evidences supports the Claimant's case that the appropriate settlement figure was at least $89m. There is a conflict of evidence. At present it may be said the contemporaneous views of the lawyers, unchallenged by Mr Al Tamimi at the time, are a more reliable guide than Mr Al Tamimi's views in 2017. But I am unable to say that there is no good arguable case that the appropriate settlement figure was $89m. It is a matter to be resolved at trial.

**Risk of dissipation**

34. The third point again requires an assessment of the evidence and is, again, a short point.

35. Another shareholder in the Joint Venture companies, LAIL, had obtained a freezing order against the Defendants on 3 March 2017. In response security in the sum of US$60.8m was provided by the Defendants. Mr Foxton submitted that in those circumstances it was not credible to suggest that there was a risk of dissipation in circumstances where LAIL's claim was for an account which would not only be for the benefit of LAIL but also for the Claimant.

36. However, the Freezing Order granted by Blair J expressly excluded the Claimant's share. Moreover, when one has regard to the factors relied upon as evidencing the risk of dissipation (see paragraphs 73-75 of Mr Shah's skeleton argument) it is clear that there was more than sufficient material to establish the required risk of dissipation and to justify proceeding without notice on 9 May 2017.

A

### Conclusion as to the continuation of the Freezing Order

37. None of the three points relied upon by the Defendants leads to the Freezing Order being discontinued. I therefore direct that it be continued until trial.

B

### Security for costs

C

38. The Defendants have applied for an order for security of costs in the sum of $300,000 in respect of the period up to an including the first CMC. However, very short notice of the application was given and questions arise as to the enforceability of English court judgments in Saudi Arabia where the Claimant is incorporated and whether there is reason to believe that the Claimant will be able to pay costs if ordered to do so. I do not consider that it is appropriate to deal with this application now. The Claimant should have the time allowed by the rules to deal with it. In any event when ordering that the Claimant's undertaking in damages be fortified by the provision of $200,000 I had in mind that costs of that order might be incurred in seeking to set aside the Freezing Order. I therefore make no order on the Defendants' application but they may of course pursue it later and/or seek an order that the extent of the fortification of the undertaking in damages be increased.

D

(*Order accordingly*)
_____

E

F

G

H