# EXHIBIT 5

endorsed in *Reg. v. Mandair* [1995] 1 A.C. 208. Also a quite separate appeal against sentence which was not before the House will fall to be considered if the occasion demands.

LORD SLYNN OF HADLEY. My Lords, for the reasons given by my noble and learned friend, Lord Mustill, whose speech I have had the advantage of reading in draft, I, too, would allow this appeal and remit the matter as he proposes.

*Appeal allowed.*

Solicitors: *Crown Prosecution Service, Headquarters; Edward Harte & Co., Brighton.*

J. A. G.

[PRIVY COUNCIL]

**ROYAL BRUNEI AIRLINES SDN. BHD.** . . . APPELLANT

AND

**PHILIP TAN KOK MING** . . . . . . RESPONDENT

[APPEAL FROM THE COURT OF APPEAL OF BRUNEI DARUSSALAM]

1995 March 22;         Lord Goff of Chieveley, Lord Ackner,
     May 24            Lord Nicholls of Birkenhead, Lord Steyn
                                      and Sir John May

*Trusts—Constructive trust—Dishonesty—Controlling director of company dishonestly assisting in breach of trust by company—Whether director liable to beneficiary for resulting loss*

The plaintiff airline appointed as its agent in a particular area for the sale of passenger and cargo transportation a company of which the defendant was the managing director and principal shareholder. Under the agreement the company was to hold in trust for the airline money received from such sale until it was accounted for by the company to the airline. With the defendant's knowledge and assistance the company paid the money into its current bank account instead of into a separate account, and in breach of trust the company used that money for its own business purposes. The company failed to pay to the airline sums due within the time specified by the agreement. The airline terminated the agreement and, the company having become insolvent, commenced proceedings against the defendant to recover the money owed by the company. The judge held that the defendant

A   was liable as constructive trustee to pay that amount to the airline. On appeal the Court of Appeal of Brunei Darussalam reversed that decision, holding that the defendant could not be so liable because it had not been established that the company was guilty of fraud or dishonesty in relation to the money held in trust for the airline.

    On the airline's appeal to the Judicial Committee:—

B   *Held*, allowing the appeal, that where a third party dishonestly assisted a trustee to commit a breach of trust or procured him to do so, the third party would be liable to the beneficiary for the loss occasioned by the breach of trust, even though the third party had received no trust property and irrespective of whether the trustee had been dishonest or fraudulent; that in the context of such accessory liability honesty was to be judged objectively and acting dishonestly, or with a lack of probity, which was

C   synonymous, meant not acting as an honest person would act in the circumstances and could usually be equated with conscious impropriety as distinct from inadvertent or negligent conduct or carelessness, although a third party might be acting dishonestly if he recklessly disregarded the rights of others; that the third party's conduct had to be assessed on the basis of his actual knowledge at the time not what a reasonable person would have known or appreciated, and regard could be had to his personal attributes

D   including experience and intelligence and the reason for him acting in that way; and that, accordingly, since the defendant had caused or permitted the company to commit a breach of trust by using in the conduct of its business money held in trust for the airline when he knew that the company was not authorised to do so by the terms of the trust, the defendant had acted dishonestly, and was, therefore, liable to the airline for the amount owed to it by the company (post, pp. 385A–B, 389C–D, 390G, 391B, 392F–G,

E   393B).

    Dictum of Lord Selborne L.C. in *Barnes v. Addy* (1874) L.R. 9 Ch.App. 244, 251–252 and *Belmont Finance Corporation Ltd. v. Williams Furniture Ltd.* [1979] Ch. 250, C.A. considered.

    *Semble.* Although mere negligence by a third party acting for or dealing with trustees would not normally render him liable to the beneficiaries in respect of losses resulting from a breach of

F   trust, there might be cases where, in the light of particular facts, an honest third party will owe a duty of care to the beneficiaries in respect of the conduct of the trustees (post, p. 392B–C).

    Decision of the Court of Appeal of Brunei Darussalam reversed.

The following cases are referred to in the judgment of their Lordships:

G   *Agip (Africa) Ltd. v. Jackson* [1990] Ch. 265; [1989] 3 W.L.R. 1367; [1992] 4 All E.R. 385

*Attorney-General v. Corporation of Leicester* (1844) 7 Beav. 176

*Baden v. Société Générale pour Favoriser le Développement du Commerce et de l'Industrie en France S.A. (Note)* [1993] 1 W.L.R. 509; [1992] 4 All E.R. 161

*Barnes v. Addy* (1874) L.R. 9 Ch.App. 244

H   *Belmont Finance Corporation Ltd. v. Williams Furniture Ltd.* [1979] Ch. 250; [1978] 3 W.L.R. 712; [1979] 1 All E.R. 118, C.A.

*Carl Zeiss Stiftung v. Herbert Smith & Co. (No. 2)* [1969] Ch. 276; [1969] 2 W.L.R. 427; [1969] 2 All E.R. 367, C.A.

*Cowan de Groot Properties Ltd. v. Eagle Trust Plc.* [1992] 4 All E.R. 700

*D.P.C. Estates Pty. Ltd. v. Grey and Consul Development Pty. Ltd.* [1974] 1 N.S.W.L.R. 443; sub nom. *Consul Development Pty. Ltd. v. D.P.C. Estates Pty. Ltd.* (1975) 132 C.L.R. 373               A
*Eagle Trust Plc. v. S.B.C. Securities Ltd.* [1993] 1 W.L.R. 484; [1992] 4 All E.R. 488
*Eaves v. Hickson* (1861) 30 Beav. 136
*Equiticorp Industries Group Ltd. v. Hawkins* [1991] 3 N.Z.L.R. 700
*Fyler v. Fyler* (1841) 3 Beav. 550                                B
*Karak Rubber Co. Ltd. v. Burden (No. 2)* [1972] 1 W.L.R. 602; [1972] 1 All E.R. 1210
*Marr v. Arabco Traders Ltd.* (1987) 1 N.Z.B.L.C. 102,732
*Marshall Futures Ltd. v. Marshall* [1992] 1 N.Z.L.R. 316
*Montagu's Settlement Trusts, In re* [1987] Ch. 264; [1987] 2 W.L.R. 1192; [1992] 4 All E.R. 308
*Nimmo v. Westpac Banking Corporation* [1993] 3 N.Z.L.R. 218
*Polly Peck International Plc. v. Nadir (No. 2)* [1992] 4 All E.R. 769, C.A.   C
*Powell v. Thompson* [1991] 1 N.Z.L.R. 597
*Reg. v. Ghosh* [1982] Q.B. 1053; [1982] 3 W.L.R. 110; [1982] 2 All E.R. 689, C.A.
*Selangor United Rubber Estates Ltd. v. Cradock (No. 3)* [1968] 1 W.L.R. 1555; [1968] 2 All E.R. 1073
*Springfield Acres Ltd. v. Abacus (Hong Kong) Ltd.* [1994] 3 N.Z.L.R. 502
*Westpac Banking Corporation v. Savin* [1985] 2 N.Z.L.R. 41            D

The following additional cases were cited in argument:

*Gathergood v. Blundell & Brown Ltd.* [1992] 3 N.Z.L.R. 643
*Lion Breweries Ltd. v. Scarrot* (1986) 2 B.C.R. 242
*Reg. v. Sinclair* [1968] 1 W.L.R. 1246; [1968] 3 All E.R. 241, C.A.
*Savin & Boyle v. De Vere* (1983) 1 B.C.R. 545                        E

APPEAL (No. 52 of 1994) with leave of the Court of Appeal of Brunei Darussalam by the plaintiff airline, Royal Brunei Airlines Sdn. Bhd., from the judgment of the Court of Appeal of Brunei Darussalam (Fuad P., Cons and Kempster, Judicial Commissioners) given on 2 June 1994 allowing an appeal by the defendant, Philip Tan Kok Ming, from the judgment of Roberts C.J. delivered on 14 October 1993 in the High Court   F
of Brunei Darussalam at Bandar Seri Begawan, whereby he had ordered the defendant to pay the airline the amount which was owed by Borneo Leisure Travel Sdn. Bhd. to the airline. The Chief Registrar of the High Court on 14 December 1993 had assessed the damages to which the airline was entitled as amounting to B.$335,160 with interest.

The facts are stated in the judgment of their Lordships.             G

*Michael Beloff Q.C., Raymond Lam* (of the Brunei Bar) and *Murray Hunt* for the airline. Where a controlling director of a company assists in a deliberate, as opposed to inadvertent or negligent, breach of trust by the company of which ex hypothesi he has actual knowledge his behaviour is unconscionable and he is liable as a constructive trustee.
                                                                      H
The airline had to prove (1) the existence of a trust; (2) breach of trust by the company; (3) dishonesty (lack of probity) in the breach of trust by the company; (4) assistance by the defendant in the breach of trust; and (5) knowledge of the foregoing by the defendant. The first and second

A  requirements were rightly conceded, and the fourth and fifth were self-evidently established since the company acted through the defendant in all material respects. If dishonesty by the company was proved, it is indisputable that the defendant had knowledge of it. The company was dishonest, or acted with lack of probity, in that it deliberately used trust moneys for its own purposes and without the authority of the airline. The principles stated by Lord Selborne L.C. in *Barnes v. Addy* (1874) L.R. 9
B  Ch.App. 244, 251–252 apply. Strangers to a trust will not be at risk if they are innocent.

The test as to whether a third party is liable to account in equity for knowingly assisting a trustee to commit a breach of trust is to be found in *Baden v. Société Générale pour Favoriser le Développement du Commerce et de l'Industrie en France S.A. (Note)* [1993] 1 W.L.R. 509. [Reference
C  was also made to *Savin & Boyle v. De Vere* (1983) 1 B.C.R. 545; *Westpac Banking Corporation v. Savin* [1985] 2 N.Z.L.R. 41; *Lion Breweries Ltd. v. Scarrot* [1986] 2 B.C.R. 242 and *Gathergood v. Blundell & Brown Ltd.* [1992] 3 N.Z.L.R. 643.] If a trustee takes a risk with trust property knowing that he has no right to take that risk, that is sufficient to constitute fraud or dishonesty on the part of the trustee. The Court of Appeal erred in law in holding that the company had not acted
D  fraudulently or dishonestly in relation to the amounts which it held in trust for the airline, and so the defendant is liable as constructive trustee and the judge's order should be restored.

*Daljit Singh Sandhu* and *Geoffrey Sim* (both of the Brunei Bar) for the defendant. For the defendant to be liable as constructive trustee the airline had to prove that the company had acted fraudulently or dishonestly with
E  regard to the sums which it held in trust for the airline, and that the defendant had knowingly assisted the company to commit that breach of trust. The Court of Appeal was entitled to conclude that fraud or dishonesty by the company had not been established. The Court of Appeal applied the proper test. The test in the *Baden* case [1993] 1 W.L.R. 509 is correct and the four elements stated therein must be established. One of the four elements is that there must be a dishonest and fraudulent design
F  on the part of the trustee in order to hold a stranger liable as a constructive trustee. [Reference was made to *Reg. v. Sinclair* [1968] 1 W.L.R. 1246 and *Belmont Finance Corporation Ltd. v. Williams Furniture Ltd.* [1979] Ch. 250.]

*Beloff Q.C.* replied.

G                                                                *Cur. adv. vult.*

24 May. The judgment of their Lordships was delivered by LORD NICHOLLS OF BIRKENHEAD.

The proper role of equity in commercial transactions is a topical question. Increasingly plaintiffs have recourse to equity for an effective remedy when the person in default, typically a company, is insolvent.
H  Plaintiffs seek to obtain relief from others who were involved in the transaction, such as directors of the company, or its bankers, or its legal or other advisers. They seek to fasten fiduciary obligations directly onto the company's officers or agents or advisers, or to have them held

personally liable for assisting the company in breaches of trust or fiduciary obligations.

This is such a case. An insolvent travel agent company owed money to an airline. The airline seeks a remedy against the travel agent's principal director and shareholder. Its claim is based on the much-quoted dictum of Lord Selborne L.C., sitting in the Court of Appeal in Chancery, in *Barnes v. Addy* (1874) L.R. 9 Ch.App. 244, 251–252:

> "[The responsibility of a trustee] may no doubt be extended in equity to others who are not properly trustees, if they are found . . . actually participating in any fraudulent conduct of the trustee to the injury of the cestui que trust. But . . . strangers are not to be made constructive trustees merely because they act as the agents of trustees in transactions within their legal powers, transactions, perhaps of which a court of equity may disapprove, unless those agents receive and become chargeable with some part of the trust property, or unless they assist with knowledge in a dishonest and fraudulent design on the part of the trustees."

In the conventional shorthand, the first of these two circumstances in which third parties (non-trustees) may become liable to account in equity is "knowing receipt," as distinct from the second, where liability arises from "knowing assistance." Stated even more shortly, the first limb of Lord Selborne L.C.'s formulation is concerned with the liability of a person as a *recipient* of trust property or its traceable proceeds. The second limb is concerned with what, for want of a better compendious description, can be called the liability of an *accessory* to a trustee's breach of trust. Liability as an accessory is not dependent upon receipt of trust property. It arises even though no trust property has reached the hands of the accessory. It is a form of secondary liability in the sense that it only arises where there has been a breach of trust. In the present case the plaintiff airline relies on the accessory limb. The particular point in issue arises from the expression "a dishonest and fraudulent design on the part of the trustees."

*The proceedings*

The essential facts are these. In 1986 the plaintiff airline, Royal Brunei Airlines Sdn. Bhd., appointed Borneo Leisure Travel Sdn. Bhd. ("B.L.T.") to act, in various places in Sabah and Sarawak, as its general travel agent for the sale of passenger and cargo transportation. The terms of the appointment were set out in a written agreement of 1 April 1986. B.L.T. was required to account to the airline for all amounts received from sales of tickets. For its services it was to be paid a sales commission. The agreement was expressed to be subject to the regulations of the International Air Transport Association, one of which provided:

> "All moneys collected by the agent for transportation and ancillary services sold under this agreement, including applicable commissions which the agent is entitled to claim thereunder, shall be the property of the carrier and shall be held by the agent in trust for the carrier or on behalf of the carrier until satisfactorily accounted for to the carrier and settlement made. . . . Unless otherwise instructed by the carrier

A    the agent shall be entitled to deduct from remittances the applicable commission to which it is entitled hereunder."

It was common ground that the effect of this provision was to constitute B.L.T. a trustee for the airline of the money it received from the sale of passenger and cargo transportation for the airline.

B  In practice what happened was that money received by B.L.T. on behalf of the airline was not paid into a separate bank account. It was paid into B.L.T.'s ordinary, current account with its bank. By a standing arrangement with the bank, any balance in its current account in excess of a stated amount was transferred to a fixed deposit account of B.L.T. or, at times, of the defendant, Philip Tan Kok Ming. The defendant had founded B.L.T. He was managing director and principal shareholder. He

C  was effectively in charge and control of B.L.T. The other director and shareholder was his wife. Nothing turns on these transfers of money to other accounts because, with one immaterial exception, all the transferred money eventually found its way back to B.L.T.'s current account.

B.L.T. was required to pay the airline within 30 days, but at various times from 1988 onwards it was in arrears. In August 1992 the airline terminated the agreement. In January 1993 the airline commenced this

D  action against the defendant in respect of the unpaid money. The defendant was not himself a party to the agency agreement, although he had signed it on behalf of B.L.T.

At the trial held in October 1993 Roberts C.J. rejected a claim by the airline that the defendant had orally guaranteed payment of the money. Roberts C.J. also rejected a claim that the defendant had diverted the money to his own use. Roberts C.J. upheld a claim that the defendant

E  was liable as a constructive trustee, under the accessory limb of Lord Selborne L.C.'s formulation in *Barnes v. Addy*, L.R. 9 Ch.App. 244, 251–252. Although not particularised, this issue was pleaded explicitly and unequivocally. The defendant knew there was an express trust of the money. The money appeared to have been used by B.L.T. for its ordinary business purposes, paying salaries, overheads and other expenses, and

F  keeping down its bank overdraft. It must be assumed that the defendant authorised the use of the money for these purposes. That was sufficient to make him liable. A fraudulent and dishonest design is not confined to personal gain. It is sufficient if the stranger knowingly assists in the use of trust property in a way which is not permitted by the trust. Judgment was entered for the airline for B.$335,160.

G  The Court of Appeal of Brunei Darussalam allowed the defendant's appeal. Counsel for the defendant conceded that a trust of the money had been created, and that there had been a breach of that trust in which the defendant had assisted with actual knowledge. The issue was whether a dishonest and fraudulent design on the part of B.L.T. had been established. The court held that the evidence revealed a sorry tale of mismanagement and broken promises, but that it was not established that B.L.T. was

H  guilty of fraud or dishonesty in relation to the amounts it held in trust for the airline. Delivering the judgment of the court, Fuad P. stated:

> "As long standing and high authority shows, conduct which may amount to a breach of trust, however morally reprehensible, will not

render a person who has knowingly assisted in the breach of trust liable as a constructive trustee if that conduct falls short of dishonesty."    A

This view of the state of the law has the support of the (English) Court of Appeal. In *Selangor United Rubber Estates Ltd. v. Cradock (No. 3)* [1968] 1 W.L.R. 1555, 1591, Ungoed-Thomas J. held that the expression "dishonest and fraudulent design" was to be understood according to the principles of a court of equity. That approach was emphatically rejected by the Court of Appeal in *Belmont Finance Corporation Ltd. v. Williams Furniture Ltd.* [1979] Ch. 250. Buckley L.J. observed, at p. 267, that the rule as formulated by Lord Selborne L.C. had stood for more than 100 years, and that to depart from it would introduce an undesirable degree of uncertainty to the law over what degree of unethical conduct would suffice if dishonesty was not to be the criterion. Goff L.J., at p. 274, agreed that it would be dangerous and wrong to depart from "the safe path of the principle as stated by Lord Selborne L.C. to the uncharted sea of something not innocent . . . but still short of dishonesty."    B    C

In short, the issue on this appeal is whether the breach of trust which is a prerequisite to accessory liability must itself be a dishonest and fraudulent breach of trust by the trustee.    D

*The honest trustee and the dishonest third party*

It must be noted at once that there is a difficulty with the approach adopted on this point in the *Belmont* case [1979] Ch. 250. Take the simple example of an honest trustee and a dishonest third party. Take a case where a dishonest solicitor persuades a trustee to apply trust property in a way the trustee honestly believes is permissible but which the solicitor knows full well is a clear breach of trust. The solicitor deliberately conceals this from the trustee. In consequence, the beneficiaries suffer a substantial loss. It cannot be right that in such a case the accessory liability principle would be inapplicable because of the innocence of the trustee. In ordinary parlance, the beneficiaries have been defrauded by the solicitor. If there is to be an accessory liability principle at all, whereby in appropriate circumstances beneficiaries may have direct recourse against a third party, the principle must surely be applicable in such a case, just as much as in a case where both the trustee and the third party have been dishonest. Indeed, if anything, the case for liability of the dishonest third party seems stronger where the trustee is innocent, because in such a case the third party alone was dishonest and that was the cause of the subsequent misapplication of the trust property.    E    F    G

The position would be the same if, instead of *procuring* the breach, the third party dishonestly *assisted* in the breach. Change the facts slightly. A trustee is proposing to make a payment out of the trust fund to a particular person. He honestly believes he is authorised to do so by the terms of the trust deed. He asks a solicitor to carry through the transaction. The solicitor well knows that the proposed payment would be a plain breach of trust. He also well knows that the trustee mistakenly believes otherwise. Dishonestly he leaves the trustee under his misapprehension and prepares the necessary documentation. Again, if the    H

A accessory principle is not to be artificially constricted, it ought to be applicable in such a case.

These examples suggest that what matters is the state of mind of the third party sought to be made liable, not the state of mind of the trustee. The trustee will be liable in any event for the breach of trust, even if he acted innocently, unless excused by an exemption clause in the trust instrument or relieved by the court. But *his* state of mind is essentially
B irrelevant to the question whether the *third party* should be made liable to the beneficiaries for the breach of trust. If the liability of the third party is fault-based, what matters is the nature of his fault, not that of the trustee. In this regard dishonesty on the part of the third party would seem to be a sufficient basis for his liability, irrespective of the state of mind of the trustee who is in breach of trust. It is difficult to see why, if the third
C party dishonestly assisted in a breach, there should be a further prerequisite to his liability, namely that the trustee also must have been acting dishonestly. The alternative view would mean that a dishonest third party is liable if the trustee is dishonest, but if the trustee did not act dishonestly that of itself would excuse a dishonest third party from liability. That would make no sense.

D
*Earlier authority*

The view that the accessory liability principle cannot be restricted to fraudulent breaches of trust is not to be approached with suspicion as a latter-day novelty. Before the accessory principle donned its *Barnes v. Addy,* L.R. 9 Ch.App. 244 strait-jacket, judges seem not to have regarded the principle as confined in this way. In *Fyler v. Fyler* (1841)
E 3 Beav. 550, 568, Lord Langdale M.R. expressed the view that, if trustees invested in an unauthorised investment, solicitors who knowingly procured that to be done for their own benefit "ought to be considered as partakers in the breach of trust" even though the trustees intended in good faith that the investment would be beneficial to the life tenant and not prejudicial to the beneficiaries with interests in capital. The same judge,
F Lord Langdale M.R., in *Attorney-General v. Corporation of Leicester* (1844) 7 Beav. 176, 179, stated:

> "it cannot be disputed that, if the agent of a trustee, whether a corporate body or not, knowing that a breach of trust is being committed, interferes and assists in that breach of trust, he is personally answerable, although he may be employed as the agent of
G > the person who directs him to commit that breach of trust."

In *Eaves v. Hickson* (1861) 30 Beav. 136 trustees, acting in good faith, paid over the fund to William Knibb's adult children on the strength of a forged marriage certificate produced to them by William Knibb. Sir John Romilly M.R. held that William Knibb was liable to replace the fund, to the extent that it was not recovered from his children, and to do so in
H priority to the liability of the trustees. Far from this being a case of fraud by the trustees, Sir John Romilly M.R., at p. 141, described it as a very hard case on the trustees, who were deceived by a forgery which would have deceived anyone who was not looking out for forgery or fraud.

This point did not arise in *Barnes v. Addy*, L.R. 9 Ch.App. 244. There the new sole trustee was engaged in a dishonest and fraudulent design. He intended to misapply the trust fund as soon as it reached his hands. The two solicitors were held not liable because there was no evidence that either of them had any knowledge or suspicion of this.

What has gone wrong? Their Lordships venture to think that the reason is that, ever since the *Selangor* case [1968] 1 W.L.R. 1555 highlighted the potential uses of equitable remedies in connection with misapplied company funds, there has been a tendency to cite and interpret and apply Lord Selborne L.C.'s formulation in *Barnes v. Addy*, L.R. 9 Ch.App. 244, 251–252, as though it were a statute. This has particularly been so with the accessory limb of Lord Selborne L.C.'s apothegm. This approach has been inimical to analysis of the underlying concept. Working within this constraint, the courts have found themselves wrestling with the interpretation of the individual ingredients, especially "knowingly" but also "dishonest and fraudulent design on the part of the trustees," without examining the underlying reason why a third party who has received no trust property is being made liable at all. One notable exception is the judgment of Thomas J. in *Powell v. Thompson* [1991] 1 N.Z.L.R. 597, 610–615. On this point he observed, at p. 613:

> "Once a breach of trust has been committed, the commission of which has involved a third party, the question which arises is one as between the beneficiary and that third party. If the third party's conduct has been unconscionable, then irrespective of the degree of impropriety in the trustee's conduct, the third party is liable to be held accountable to the beneficiary as if he or she were a trustee."

To resolve this issue it is necessary to take an overall look at the accessory liability principle. A conclusion cannot be reached on the nature of the breach of trust which may trigger accessory liability without at the same time considering the other ingredients including, in particular, the state of mind of the third party. It is not necessary, however, to look even more widely and consider the essential ingredients of recipient liability. The issue on this appeal concerns only the accessory liability principle. Different considerations apply to the two heads of liability. Recipient liability is restitution-based; accessory liability is not.

*No liability*

The starting point for any analysis must be to consider the extreme possibility: that a third party who does not receive trust property ought never to be liable directly to the beneficiaries merely because he assisted the trustee to commit a breach of trust or procured him to do so. This possibility can be dismissed summarily. On this the position which the law has long adopted is clear and makes good sense. Stated in the simplest terms, a trust is a relationship which exists when one person holds property on behalf of another. If, for his own purposes, a third party deliberately interferes in that relationship by assisting the trustee in depriving the beneficiary of the property held for him by the trustee, the beneficiary should be able to look for recompense to the third party as well as the trustee. Affording the beneficiary a remedy against the third

A  party serves the dual purpose of making good the beneficiary's loss should the trustee lack financial means and imposing a liability which will discourage others from behaving in a similar fashion.

The rationale is not far to seek. Beneficiaries are entitled to expect that those who become trustees will fulfil their obligations. They are also entitled to expect, and this is only a short step further, that those who become trustees will be permitted to fulfil their obligations without
B  deliberate intervention from third parties. They are entitled to expect that third parties will refrain from intentionally intruding in the trustee-beneficiary relationship and thereby hindering a beneficiary from receiving his entitlement in accordance with the terms of the trust instrument. There is here a close analogy with breach of contract. A person who knowingly procures a breach of contract, or knowingly interferes with the due
C  performance of a contract, is liable to the innocent party. The underlying rationale is the same.

*Strict liability*

The other extreme possibility can also be rejected out of hand. This is the case where a third party deals with a trustee without knowing, or
D  having any reason to suspect, that he is a trustee. Or the case where a third party is aware he is dealing with a trustee but has no reason to know or suspect that their transaction is inconsistent with the terms of the trust. The law has never gone so far as to give a beneficiary a remedy against a non-recipient third party in such circumstances. Within defined limits, proprietary rights, whether legal or equitable, endure against third parties who were unaware of their existence. But accessory liability is concerned
E  with the liability of a person who has not received any property. His liability is not property-based. His only sin is that he interfered with the due performance by the trustee of the fiduciary obligations undertaken by the trustee. These are personal obligations. They are, in this respect, analogous to the personal obligations undertaken by the parties to a contract. But ordinary, everyday business would become impossible if
F  third parties were to be held liable for *unknowingly* interfering in the due performance of such personal obligations. Beneficiaries could not reasonably expect that third parties should deal with trustees at their peril, to the extent that they should become liable to the beneficiaries even when they received no trust property and even when they were unaware and had no reason to suppose that they were dealing with trustees.

G
*Fault-based liability*

Given, then, that in some circumstances a third party may be liable directly to a beneficiary, but given also that the liability is not so strict that there would be liability even when the third party was wholly unaware of the existence of the trust, the next step is to seek to identify the touchstone of liability. By common accord dishonesty fulfils this role.
H  Whether, in addition, negligence will suffice is an issue on which there has been a well-known difference of judicial opinion. The *Selangor* decision [1968] 1 W.L.R. 1555 in 1968 was the first modern decision on this point. Ungoed-Thomas J., at p. 1590, held that the touchstone was whether the

third party had knowledge of circumstances which would indicate to "an honest, reasonable man" that the breach in question was being committed or would put him on inquiry. Brightman J. reached the same conclusion in *Karak Rubber Co. Ltd. v. Burden (No. 2)* [1972] 1 W.L.R. 602. So did Peter Gibson J. in 1983 in *Baden v. Société Générale pour Favoriser le Développement du Commerce et de l'Industrie en France S.A. (Note)* [1993] 1 W.L.R. 509. In that case the judge accepted a five-point scale of knowledge which had been formulated by counsel.

Meanwhile doubts had been expressed about this test by Buckley and Goff L.JJ. in the *Belmont* case [1979] Ch. 250, 267, 275. Similar doubts were expressed in Australia by Jacobs P. in *D.P.C. Estates Pty. Ltd. v. Grey and Consul Development Pty. Ltd.* [1974] 1 N.S.W.L.R. 443, 459. When that decision reached the High Court of Australia, the doubts were echoed by Barwick C.J., Gibbs and Stephen JJ.: see *Consul Development Pty. Ltd. v. D.P.C. Estates Pty. Ltd.* (1975) 132 C.L.R. 373, 376, 398, 412.

Since then the tide in England has flowed strongly in favour of the test being one of dishonesty: see, for instance, Sir Robert Megarry V.-C. in *In re Montagu's Settlement Trusts* [1987] Ch. 264, 285, and Millett J. in *Agip (Africa) Ltd. v. Jackson* [1990] Ch. 265, 293. In *Eagle Trust Plc. v. S.B.C. Securities Ltd.* [1993] 1 W.L.R. 484, 495, Vinelott J. stated that it could be taken as settled law that want of probity was a prerequisite to liability. This received the imprimatur of the Court of Appeal in *Polly Peck International Plc. v. Nadir (No. 2)* [1992] 4 All E.R. 769, 777, per Scott L.J.

Judicial views have diverged also in New Zealand. In *Westpac Banking Corporation v. Savin* [1985] 2 N.Z.L.R. 41, 70, Sir Clifford Richmond preferred the approach in *Belmont Finance Corporation Ltd. v. Williams Furniture Ltd.* [1979] Ch. 250, as did Tompkins J. in *Marr v. Arabco Traders Ltd.* (1987) 1 N.Z.B.L.C. 102,732, 102,762. In *Powell v. Thompson* [1991] 1 N.Z.L.R. 597, 612, 613, 615, Thomas J. considered that the suggestion that negligence is not enough to found liability is to be resisted. The test is one of unconscionable behaviour. This, and knowledge to match, whether actual or constructive, will suffice to herald a visit from equity. In *Equiticorp Industries Group Ltd. v. Hawkins* [1991] 3 N.Z.L.R. 700, 728, Wylie J. disagreed. He adhered to the concept of want of probity as the standard by which unconscionability was to be measured. In *Marshall Futures Ltd. v. Marshall* [1992] 1 N.Z.L.R. 316, 325, Tipping J. was concerned about the difficulty of identifying as unconscionable conduct which was less reprehensible than conduct which can be described as dishonest. He would, he said, at p. 325, prefer the herald of equity to be wearing more distinctive clothing than that suggested by Thomas J. In *Nimmo v. Westpac Banking Corporation* [1993] 3 N.Z.L.R. 218, 228, Blanchard J. preferred a test of dishonesty. Most recently, in *Springfield Acres Ltd. v. Abacus (Hong Kong) Ltd.* [1994] 3 N.Z.L.R. 502, 510, Henry J. observed that the law in New Zealand could not be regarded as settled.

Most, but not all, commentators prefer the test of dishonesty: see, among others, Peter Birks, "Misdirected funds: restitution from the recipient" (1989) L.M.C.L.Q. 296; M. J. Brindle and R. J. A. Hooley, "Does constructive knowledge make a constructive trustee?" (1987) 61 A.L.J. 281; Charles Harpum, "The stranger as constructive trustee" (1986)

A   102 L.Q.R. 114, 267; *Birks, The Frontiers of Liability* (1994), vol. 1, p. 9; Patricia Loughlan, "Liability for assistance in a breach of fiduciary duty" (1989) 9 O.J.L.S. 260; *Parker and Mellows, The Modern Law of Trusts*, 6th ed. (1994), p. 253; *Pettit, Equity and the Law of Trusts*, 7th ed. (1993), p. 172; Philip Sales, "The tort of conspiracy and civil secondary liability" (1990) 49 C.L.J. 491; *Snell's Equity*, 29th ed. (1990), p. 194; and *Underhill's Law of Trusts and Trustees*, 14th ed. (1987), p. 355 and noter-up.

B

*Dishonesty*

Before considering this issue further it will be helpful to define the terms being used by looking more closely at what dishonesty means in this context. Whatever may be the position in some criminal or other contexts (see, for instance, *Reg. v. Ghosh* [1982] Q.B. 1053), in the context
C   of the accessory liability principle acting dishonestly, or with a lack of probity, which is synonymous, means simply not acting as an honest person would in the circumstances. This is an objective standard. At first sight this may seem surprising. Honesty has a connotation of subjectivity, as distinct from the objectivity of negligence. Honesty, indeed, does have a strong subjective element in that it is a description of a type of conduct
D   assessed in the light of what a person actually knew at the time, as distinct from what a reasonable person would have known or appreciated. Further, honesty and its counterpart dishonesty are mostly concerned with advertent conduct, not inadvertent conduct. Carelessness is not dishonesty. Thus for the most part dishonesty is to be equated with conscious impropriety. However, these subjective characteristics of honesty do not mean that individuals are free to set their own standards of honesty in
E   particular circumstances. The standard of what constitutes honest conduct is not subjective. Honesty is not an optional scale, with higher or lower values according to the moral standards of each individual. If a person knowingly appropriates another's property, he will not escape a finding of dishonesty simply because he sees nothing wrong in such behaviour.

In most situations there is little difficulty in identifying how an honest
F   person would behave. Honest people do not intentionally deceive others to their detriment. Honest people do not knowingly take others' property. Unless there is a very good and compelling reason, an honest person does not participate in a transaction if he knows it involves a misapplication of trust assets to the detriment of the beneficiaries. Nor does an honest person in such a case deliberately close his eyes and ears, or deliberately not ask questions, lest he learn something he would rather not know, and
G   then proceed regardless. However, in the situations now under consideration the position is not always so straightforward. This can best be illustrated by considering one particular area: the taking of risks.

*Taking risks*

All investment involves risk. Imprudence is not dishonesty, although
H   imprudence may be carried recklessly to lengths which call into question the honesty of the person making the decision. This is especially so if the transaction serves another purpose in which that person has an interest of his own.

This type of risk is to be sharply distinguished from the case where a trustee, with or without the benefit of advice, is aware that a particular investment or application of trust property is outside his powers, but nevertheless he decides to proceed in the belief or hope that this will be beneficial to the beneficiaries or, at least, not prejudicial to them. He takes a risk that a clearly unauthorised transaction will not cause loss. A risk of this nature is for the account of those who take it. If the risk materialises and causes loss, those who knowingly took the risk will be accountable accordingly. This is the type of risk being addressed by Peter Gibson J. in the *Baden* case [1993] 1 W.L.R. 509, 574, when he accepted that fraud includes taking "a risk to the prejudice of another's rights, which risk is known to be one which there is no right to take."

This situation, in turn, is to be distinguished from the case where there is genuine doubt about whether a transaction is authorised or not. This may be because the trust instrument is worded obscurely, or because there are competing claims, as in *Carl Zeiss Stiftung v. Herbert Smith & Co. (No. 2)* [1969] 2 Ch. 276, or for other reasons. The difficulty here is that frequently the situation is neither clearly white nor clearly black. The dividing edge between what is within the trustee's powers and what is not is often not clear-cut. Instead there is a gradually darkening spectrum which can be described with labels such as clearly authorised, probably authorised, possibly authorised, wholly unclear, probably unauthorised and, finally, clearly unauthorised.

The difficulty here is that the differences are of degree rather than of kind. So far as the trustee himself is concerned the legal analysis is straightforward. Honesty or lack of honesty is not the test for his liability. He is obliged to comply with the terms of the trust. His liability is strict. If he departs from the trust terms he is liable unless excused by a provision in the trust instrument or relieved by the court. The analysis of the position of the accessory, such as the solicitor who carries through the transaction for him, does not lead to such a simple, clear-cut answer in every case. He is required to act honestly; but what is required of an honest person in these circumstances? An honest person knows there is doubt. What does honesty require him to do?

The only answer to these questions lies in keeping in mind that honesty is an objective standard. The individual is expected to attain the standard which would be observed by an honest person placed in those circumstances. It is impossible to be more specific. Knox J. captured the flavour of this, in a case with a commercial setting, when he referred to a person who is "guilty of commercially unacceptable conduct in the particular context involved:" see *Cowan de Groot Properties Ltd. v. Eagle Trust Plc.* [1992] 4 All E.R. 700, 761. Acting in reckless disregard of others' rights or possible rights can be a tell-tale sign of dishonesty. An honest person would have regard to the circumstances known to him, including the nature and importance of the proposed transaction, the nature and importance of his role, the ordinary course of business, the degree of doubt, the practicability of the trustee or the third party proceeding otherwise and the seriousness of the adverse consequences to the beneficiaries. The circumstances will dictate which one or more of the possible courses should be taken by an honest person. He might, for

A  instance, flatly decline to become involved. He might ask further questions. He might seek advice, or insist on further advice being obtained. He might advise the trustee of the risks but then proceed with his role in the transaction. He might do many things. Ultimately, in most cases, an honest person should have little difficulty in knowing whether a proposed transaction, or his participation in it, would offend the normally accepted standards of honest conduct.

B  Likewise, when called upon to decide whether a person was acting honestly, a court will look at all the circumstances known to the third party at the time. The court will also have regard to personal attributes of the third party, such as his experience and intelligence, and the reason why he acted as he did.

Before leaving cases where there is real doubt, one further point should
C  be noted. To inquire, in such cases, whether a person dishonestly assisted in what is later held to be a breach of trust is to ask a meaningful question, which is capable of being given a meaningful answer. This is not always so if the question is posed in terms of "knowingly" assisted. Framing the question in the latter form all too often leads one into tortuous convolutions about the "sort" of knowledge required, when the truth is that "knowingly" is inapt as a criterion when applied to the
D  gradually darkening spectrum where the differences are of degree and not kind.

*Negligence*

It is against this background that the question of negligence is to be addressed. This question, it should be remembered, is directed at whether
E  an honest third party who receives no trust property should be liable if he procures or assists in a breach of trust of which he would have become aware had he exercised reasonable diligence. Should he be liable to the beneficiaries for the loss they suffer from the breach of trust?

The majority of persons falling into this category will be the hosts of people who act for trustees in various ways: as advisers, consultants, bankers and agents of many kinds. This category also includes officers
F  and employees of companies in respect of the application of company funds. All these people will be accountable to the trustees for their conduct. For the most part they will owe to the trustees a duty to exercise reasonable skill and care. When that is so, the rights flowing from that duty form part of the trust property. As such they can be enforced by the beneficiaries in a suitable case if the trustees are unable or unwilling to do
G  so. That being so, it is difficult to identify a compelling reason why, in addition to the duty of skill and care vis-à-vis the trustees which the third parties have accepted, or which the law has imposed upon them, third parties should also owe a duty of care directly to the beneficiaries. They have undertaken work for the trustees. They must carry out that work properly. If they fail to do so, they will be liable to make good the loss suffered by the trustees in consequence. This will include, where
H  appropriate, the loss suffered by the trustees, being exposed to claims for breach of trust.

Outside this category of persons who owe duties of skill and care to the trustees, there are others who will deal with trustees. If they have not

accepted, and the law has not imposed upon them, any such duties in favour of the trustees, it is difficult to discern a good reason why they should nevertheless owe such duties to the beneficiaries.

There remains to be considered the position where third parties are acting for, or dealing with, dishonest trustees. In such cases the trustees would have no claims against the third party. The trustees would suffer no loss by reason of the third party's failure to discover what was going on. The question is whether in this type of situation the third party owes a duty of care to the beneficiaries to, in effect, check that a trustee is not misbehaving. The third party must act honestly. The question is whether that is enough.

In agreement with the preponderant view, their Lordships consider that dishonesty is an essential ingredient here. There may be cases where, in the light of the particular facts, a third party will owe a duty of care to the beneficiaries. As a general proposition, however, beneficiaries cannot reasonably expect that all the world dealing with their trustees should owe them a duty to take care lest the trustees are behaving dishonestly.

*Unconscionable conduct*

Mention, finally, must be made of the suggestion that the test for liability is that of unconscionable conduct. Unconscionable is a word of immediate appeal to an equity lawyer. Equity is rooted historically in the concept of the Lord Chancellor, as the keeper of the Royal Conscience, concerning himself with conduct which was contrary to good conscience. It must be recognised, however, that unconscionable is not a word in everyday use by non-lawyers. If it is to be used in this context, and if it is to be the touchstone for liability as an accessory, it is essential to be clear on what, *in this context*, unconscionable *means*. If unconscionable means no more than dishonesty, then dishonesty is the preferable label. If unconscionable means something different, it must be said that it is not clear what that something different is. Either way, therefore, the term is better avoided in this context.

*The accessory liability principle*

Drawing the threads together, their Lordships' overall conclusion is that dishonesty is a necessary ingredient of accessory liability. It is also a sufficient ingredient. A liability in equity to make good resulting loss attaches to a person who dishonestly procures or assists in a breach of trust or fiduciary obligation. It is not necessary that, in addition, the trustee or fiduciary was acting dishonestly, although this will usually be so where the third party who is assisting him is acting dishonestly. "Knowingly" is better avoided as a defining ingredient of the principle, and in the context of this principle the *Baden* [1993] 1 W.L.R. 509 scale of knowledge is best forgotten.

*Conclusion*

From this statement of the principle it follows that this appeal succeeds. The money paid to B.L.T. on the sale of tickets for the airline was held by B.L.T. upon trust for the airline. This trust, on its face,

A  conferred no power on B.L.T. to use the money in the conduct of its business. The trust gave no authority to B.L.T. to relieve its cash flow problems by utilising for this purpose the rolling 30-day credit afforded by the airline. Thus B.L.T. committed a breach of trust by using the money instead of simply deducting its commission and holding the money intact until it paid the airline. The defendant accepted that he knowingly assisted in that breach of trust. In other words, he caused or permitted his
B  company to apply the money in a way he knew was not authorised by the trust of which the company was trustee. Set out in these bald terms, the defendant's conduct was dishonest. By the same token, and for good measure, B.L.T. also acted dishonestly. The defendant was the company, and his state of mind is to be imputed to the company.

The Court of Appeal held that it was not established that B.L.T. was
C  guilty of fraud or dishonesty in relation to the amounts it held for the airline. Their Lordships understand that by this the Court of Appeal meant that it was not established that the defendant intended to defraud the airline. The defendant hoped, maybe expected, to be able to pay the airline, but the money was lost in the ordinary course of a poorly-run business with heavy overhead expenses. These facts are beside the point. The defendant had no right to employ the money in the business at all.
D  That was the breach of trust. The company's inability to pay the airline was the consequence of that breach of trust.

The Court of Appeal observed that it would have been unrealistic to expect B.L.T. to keep the money in a separate bank account and not use any of the money in the conduct of the business, particularly as B.L.T. was also the ticketing agent for a number of other airlines. Their Lordships
E  express no view on this, or on what the parties are to be taken to have intended would happen in practice when the company's current bank account was overdrawn. It is possible that in certain circumstances these points might sustain an argument that, although there was a failure to pay, there was no breach of trust. They do not arise in this case because of the defendant's acceptance that there was a breach of trust.

Their Lordships will report their advice to His Majesty The Sultan and
F  Yang Di-Pertuan that this appeal should be allowed, the order of the Court of Appeal set aside and the order of Roberts C.J. restored. The defendant must pay the airline's costs before their Lordships' Board and before the Court of Appeal.

*Solicitors: Norton Rose; Denton Hall.*

G
                                                                S. S.

H