# EXHIBIT 6

Queen's Bench Division    *A*

# Astor Management AG (formerly known as MRI Holding AG) and another *v* Atalaya Mining plc (formerly known as Emed Mining Public Ltd) and others

## [2017] EWHC 425 (Comm)

*B*

2017  Jan 30, 31;    Leggatt J
Feb 1, 2;
March 6

*Contract — Construction — Condition precedent — Defendants buying claimants' interest in mine — Agreement deferring payment of consideration until senior debt facility sufficient to restart mining operations obtained by defendants —*    *C*
*Defendants undertaking to use reasonable endeavours to obtain facility — Defendants subsequently raising funds by alternative means — Whether principle of futility enabling disapplication of precondition to payment of deferred consideration — Whether obligation to use reasonable endeavours enforceable — Whether defendants in breach of obligation — Whether defendants required to pay deferred consideration*

*D*

The defendants were a group of companies that bought the claimants' interests in a dormant copper mine. Payment of most of the consideration was deferred. Under the agreement the first instalment was due from the second defendant on the "first payment date", defined as (1) the date on which mining permits were granted, and (2) a senior debt facility for a sum sufficient to restart mining operations was secured. The agreement provided that the defendants would use all reasonable endeavours to obtain the senior debt facility. It also provided that the second defendant would    *E*
apply any excess cash to repay the "consideration" due to the claimants. The defendants went on to raise the necessary funds through their parent company and not by way of a senior debt facility. The claimants, relying on the principle of futility in the interpretation of contracts, contended that, since the mining operations had restarted without the need for a senior debt facility, precondition (2) to the payment of the deferred consideration had fallen away. It being accepted that precondition (1) had been satisfied, the claimants sought payment of the deferred consideration.    *F*
They brought a claim for a declaration that: (1) payment of the deferred consideration had been triggered; (2) the defendants were in breach of the agreement to use all reasonable endeavours to obtain a senior debt facility; and (3) the second defendant was required to apply excess cash to pay the deferred consideration, even if it had not become payable.

On the claim and the question whether the reasonable endeavours undertaking was insufficiently certain to be enforceable—    *G*

*Held*, (1) that there was no principle of law or even interpretative presumption which enabled a contractual precondition to the accrual of a right or obligation to be disapplied just because complying with it was considered by the court to serve no useful purpose; that whether a contractual obligation had arisen in any given case depended on what the particular contract said, interpreted in accordance with the ordinary rules of interpretation; that it had been the parties' deliberate choice to    *H*
make payment of the deferred consideration conditional on securing a particular type of finance in the form of a senior debt facility, a choice which had a clear commercial logic; and that, accordingly, the second condition had not been satisfied, with the result that payment of the deferred consideration had not been triggered (post, paras 42, 44, 49, 51–52, 110).

© 2017 The Incorporated Council of Law Reporting for England and Wales

A        Dictum of Lord Denning MR in *Barrett Bros (Taxis) Ltd v Davies* [1966] 1 WLR 1334, 1339, CA not applied.

(2) That it would almost always be possible to give sensible content to an undertaking to use reasonable endeavours to enter into an agreement with a third party; that there was no problem of uncertainty of object, since one could tell whether an agreement with a third party had been made; that while it might be hard to prove an absence of endeavours, the difficulty of proving a breach of a contractual

B   obligation was not a reason for holding that there was no obligation; that the fact that there might have been many different forms which the senior debt facility could have taken did not make the object of the endeavours insufficiently certain; that there were objective criteria by which the reasonableness of the endeavours to obtain a senior debt facility could be judged; and that, accordingly, the obligation was enforceable but, in the circumstances, it had not been breached by the defendants (post, paras 64, 67, 69, 71–72, 96, 110).

C        *Dany Lions Ltd v Bristol Cars Ltd (No 2)* [2014] 2 All ER (Comm) 403 considered.

(3) Allowing the claim in part, that the requirement in the agreement that the second defendant use any excess cash to pay the outstanding amounts of "consideration" applied to the deferred consideration, even though it had not become due for payment (post, paras 102–104, 109, 110).

The following cases are referred to in the judgment:

D   *Arnold v Britton* [2015] UKSC 36; [2015] AC 1619; [2015] 2 WLR 1593; [2016] 1 All ER 1, SC(E)
*Balbosa v Ayoub Ali* [1990] 1 WLR 914, PC
*Barrett Bros (Taxis) Ltd v Davies* [1966] 1 WLR 1334; [1966] 2 All ER 972; [1966] 2 Lloyd's Rep 1, CA
*Dany Lions Ltd v Bristol Cars Ltd (No 2)* [2014] EWHC 817 (QB); [2014] 2 All ER (Comm) 403

E   *Durham Tees Valley Airport Ltd v bmibaby Ltd* [2010] EWCA Civ 485; [2011] 1 All ER (Comm) 731; [2011] 1 Lloyd's Rep 68, CA
*Emirates Trading Agency llc v Prime Mineral Exports Private Ltd* [2014] EWHC 2104 (Comm); [2015] 1 WLR 1145; [2014] 2 Lloyd's Rep 457
*Jet2.com Ltd v Blackpool Airport Ltd* [2012] EWCA Civ 417; [2012] 2 All ER (Comm) 1053, CA
*KS Energy Services Ltd v BR Energy (M) SDN BHD* [2014] SGCA 16; [2014] BLR 658, Singapore Ct of Appeal

F   *Lambert v HTV Cymru (Wales) Ltd* [1998] FSR 874
*Mansel Oil Ltd v Troon Storage Tankers SA* [2008] EWHC 1269 (Comm); [2008] 2 All ER (Comm) 898; [2008] 2 Lloyd's Rep 384; [2009] EWCA Civ 425; [2009] 2 All ER(Comm) 495; [2009] 2 Lloyd's Rep 371, CA
*Motor and General Insurance Co Ltd v Pavy* [1994] 1 WLR 462; [1994] 1 Lloyd's Rep 607, PC

G   *Nea Agrex SA v Baltic Shipping Co Ltd* [1976] QB 933; [1976] 2 WLR 925; [1976] 2 All ER 842; [1976] 2 Lloyd's Rep 47, CA
*Patel v Brent London Borough Council* [2004] EWHC 763 (Ch); [2005] 1 P & Cr 20
*Petromec Inc v Petroleo Brasileiro SA* [2005] EWCA Civ 891; [2006] 1 Lloyd's Rep 121, CA
*Pioneer Concrete (UK) Ltd v National Employers Mutual General Insurance Association Ltd* [1985] 2 All ER 395; [1985] 1 Lloyd's Rep 274

H   *Scammell v Dicker* [2005] EWCA Civ 405; [2005] 3 All ER 838, CA
*Scammell (G) & Nephew Ltd v H C & T G Ouston* [1941] AC 251; [1941] 1 All ER 14, HL(E)
*Total Graphics Ltd v AGF Insurance Ltd* [1997] 1 Lloyd's Rep 599
*Whitecap Leisure Ltd v John H Rundle Ltd* [2008] EWCA Civ 429; [2008] 2 Lloyd's Rep 216, CA

© 2017 The Incorporated Council of Law Reporting for England and Wales

*Yam Seng Pte Ltd v International Trade Corpn Ltd* [2013] EWHC 111 (QB); [2013]    A
     1 All ER (Comm) 1321; [2013] 1 Lloyd's Rep 526

No additional cases were cited in argument.

The following additional cases, although not cited, were referred to in the skeleton arguments:

*Chartbrook Ltd v Persimmon Homes Ltd* [2009] UKHL 38; [2009] AC 1101; [2009]    B
     3 WLR 267; [2009] Bus LR 1200; [2009] 4 All ER 677; [2010] 1 All ER (Comm)
     365, HL(E)
*EDI Central v National Car Parks* 2010 CSOH 141; 2011 SLT 75
*Electricity Generation v Woodside Energy* [2014] HCA 7
*Globe Motors Inc v TRW Lucas Varity Electric Steering Ltd* [2016] EWCA Civ 396;
     [2017] 1 All ER (Comm) 601, CA
*Hallman Holding Ltd v Webster (Anguilla) (Rev 1)* [2016] UKPC 3, PC    C
*IBM United Kingdom Ltd v Rockware Glass Ltd* [1980] FSR 335, CA
*Investors Compensation Scheme Ltd v West Bromwich Building Society* [1998]
     1 WLR 896; [1998] 1 All ER 98; [1998] 1 BCLC 531, HL(E)
*Marks and Spencer plc v BNP Paribas Securities Services Trust Co (Jersey) Ltd* [2015]
     UKSC 72; [2016] AC 742; [2015] 3 WLR 1843; [2016] 4 All ER 441, SC(E)
*Rainy Sky SA v Kookmin Bank* [2011] UKSC 50; [2011] 1 WLR 2900; [2012]
     Bus LR 313; [2012] 1 All ER 1137; [2012] 1 All ER (Comm) 1; [2012] 1 Lloyd's    D
     Rep 34, SC(E)
*Rhodia International Holdings Ltd v Huntsman International llc* [2007] EWHC 292
     (Comm); [2007] 2 All ER (Comm) 577; [2007] 2 Lloyd's Rep 325
*Turtle Offshore SA, A v Superior Trading Inc* [2008] EWHC 3034 (Admlty); [2009]
     2 All ER (Comm) 624; [2009] 1 Lloyd's Rep 177

## CLAIM    E

By a master agreement made on 30 September 2008, the claimants, Astor Management AG (formerly known as MRI Holding AG) and Astor Resources AG (formerly known as MRI Resources AG), sold their interests in a mining project to Atalaya Mining plc (formerly known as Emed Mining Public Ltd), Atalaya Riotinto Minera SL (formerly known as Emed Tartessus SL), Emed Holdings (UK) Ltd and Emed Marketing Ltd, the first to fourth defendants respectively. Payment of most of the consideration was    F deferred. On 30 October 2015 the claimants issued a claim, pursuant to CPR Pt 8, seeking declarations: (1) that the preconditions for payment of the deferred consideration had been triggered and that payment was due; (2) alternatively, that the defendants were in breach of their express or implied obligations under the master agreement; (3) in the further alternative, that even if the preconditions for payment of the deferred    G consideration had not been satisfied, under the terms of the master agreement the second defendant was obliged to apply any excess cash to paying early outstanding amounts of consideration.

The facts are stated in the judgment, post, paras 3–33.

*Stephen Smith* QC and *Christopher Lloyd* (instructed by *Hogan Lovells*    H
*International llp*) for the claimants.
*Simon Browne-Wilkinson* QC and *Alexander Milner* (instructed by
*Fieldfisher llp*) for the defendants.

The court took time for consideration.

© 2017 The Incorporated Council of Law Reporting for England and Wales

A        6 March 2017.  LEGGATT J handed down the following judgment.

| Section | Paragraph |
| --- | --- |
| Introduction | 1 |
| The parties | 3 |
| Background to the master agreement | 5 |
| The master agreement | 8 |
| The March 2009 amendment | 16 |
| The November 2009 amendment | 19 |
| Subsequent events | 21 |
| Astor's claims | 34 |
| The proceedings | 38 |
| The issues | 40 |
| (1) Did the requirement for a senior debt facility fall away? | 41 |
| (2) Were the EMED Group loans a senior debt facility? | 55 |
| (3) The obligation to use all reasonable endeavours | 59 |
| (a) Is clause 6(f) enforceable? | 62 |
| (b) Did the obligation end on 31 December 2010? | 73 |
| (c) Was there a breach of clause 6(f)? | 82 |
| (4) Alleged breach of implied duty of good faith | 97 |
| (5) Must any excess cash be paid to Astor? | 100 |
| Conclusion | 110 |

*Introduction*

1    The mining of copper ore at what is now known as the Rio Tinto
Project in southern Spain dates back at least 3,000 years.  In ancient times
the Phoenicians and the Romans worked the mine.  In modern times, British
and American companies and a Spanish workers' co-operative have done so.
The claimants and the defendants in these proceedings are the present parties
to an agreement relating to ownership and exploitation of the project.  This
agreement (the "master agreement") was originally made on 30 September

© 2017 The Incorporated Council of Law Reporting for England and Wales

2008, although it has since been re-stated and novated. Under the master   A
agreement the defendants bought out the claimants' interest in the project.
Payment of most of the consideration was deferred. It is the claimants' case
that, since mining restarted in July 2015, payment of the "deferred
consideration" (which is payable in instalments over six years and will
amount in total to at least €43·8m) has been triggered; alternatively, if it has
not been triggered, this is because the defendants were in breach of the   B
agreement. The defendants' case is that there was no breach of the
agreement, payment of the deferred consideration has not been triggered
and, in the events which have happened, it never will be.

2   Before I consider the issues in more detail, I will first identify the
parties and outline the background to the master agreement, the key terms of
that agreement and the events which have given rise to this dispute.
                                                                         C

*The parties*

3   The first claimant is the parent company of the Astor group, a private
investment group operating from Switzerland, and the second claimant is a
wholly-owned subsidiary of the first claimant. Nothing turns on the
difference between the claimants or between the claimants and the
companies which they succeeded as parties to the master agreement, and   D
I will refer to them without distinction as "Astor".

4   The first defendant, formerly known as Emed Mining Public Ltd and
now called Atalaya Mining plc, is a Cypriot company whose shares are listed
on the AIM market of the London Stock Exchange. I will refer to the first
defendant as "EMED", which is the designation used in the master
agreement. EMED is the ultimate parent company of the other three   E
defendants, which I will refer to, respectively, as "EMED Tartessus",
"EMED Holdings" and "EMED Marketing". EMED Tartessus is a Spanish
company which owns the Rio Tinto Project.

*Background to the master agreement*

5   Astor first became involved in the project in 2004, when it lent money   F
to a Spanish company which then owned the project called Mantenimiento
en General del Sur, Mantesur Andevalo SL ("MSA"). The copper mine was
dormant at the time but potentially very valuable, with 123 million tonnes of
proven and probable reserves. Astor made loans to MSA amounting in total
to some €6·7m for the purpose of restarting mining operations. The loans
were secured by a pledge over the entirety of MSA's shares. The pledge was   G
governed by Spanish law. Astor also entered into a contract known as the
"life of mine contract" with MSA's parent company, which gave Astor the
right to purchase all the copper produced by the project at a preferential
price.

6   In 2006 Astor enforced its pledge. MSA disputed Astor's right to do
so and litigation in the Spanish courts followed. While the litigation was
continuing, MSA purported to transfer the project to EMED Tartessus in   H
exchange for a 49% shareholding in EMED Tartessus. The remaining 51%
of the shares of EMED Tartessus were held by EMED Holdings.

7   Ultimately, Astor was successful in the litigation and was declared by
the Spanish courts to be the owner of all MSA's shares. The transfer of the

A  project by MSA to EMED Tartessus was therefore open to challenge on the ground that it was made without authority.

*The master agreement*

8    Against this background Astor and the EMED companies entered into the master agreement dated 30 September 2008. The broad commercial
B  effect of the agreement was that Astor gave up its 49% stake in EMED Tartessus and its right to claim ownership of the project in return for agreement to receive consideration of up to €63·3m. Payment of most of the consideration, however, was deferred. This reflected the fact that the EMED companies did not have the resources available to pay a sum commensurate with the value of Astor's interest in the project in cash and that, until mining restarted, no revenue was being generated from which payments could be
C  made to Astor.

9    More particularly, under the master agreement: (i) Astor agreed to sell its 49% shareholding in EMED Tartessus to EMED Holdings under a share purchase agreement: clause 2. (ii) Astor agreed to accept the validity of the sale of the project to EMED Tartessus and renounced all rights to take any action or make any claim to challenge the validity of the transfer: clauses 3 and 4. (iii) The benefit of the loans made by Astor to MSA and its parent
D  company was assigned to EMED by a loan assignment: clause 12. (iv) The EMED companies agreed to pay consideration of up to €63·3m to Astor consisting of (in rounded numbers): (a) €3·4m to be paid under the share purchase agreement by an allotment of shares in EMED; (b) €9·1m payable under the loan assignment; (c) €6·8m to be satisfied by the allotment of further shares in EMED; and (d) deferred consideration of €43.8m: clause 6.
E  (v) The life of mine contract was cancelled and replaced with an agency agreement under which Astor was to be paid commission by EMED Marketing on all sales of copper produced by the mine for a period of ten years: clauses 5 and 7. (vi) As security for performance of EMED's obligations under the master agreement and the loan assignment, EMED Holdings granted a pledge over the shares of EMED Tartessus to Astor: clause 9 and schedule 1.
F
10    Pursuant to clause 6(b) and schedule 2 of the master agreement (until it was later amended), the deferred consideration was payable in three tranches as follows: (i) €17,533,382·70 within 30 business days of the date on which

G      "(A) the authorisations from the Junta de Andalucía to restart mining activities in the project are granted to EMED or any other member of the EMED group ('permit approval') and (B) EMED or any other company in the EMED group secures senior debt finance and related guarantee facilities for a sum sufficient for the restart of mining operations at the project (hereafter the 'senior debt facility') . . . [and] the relevant company in the EMED group can effectively draw down on the senior debt facility. . ."

H  (ii) €13,175,000 within 20 business days of "first anniversary of the restart of mining activities", defined as "the date on which the mining facilities at the project meet continuous 400,000 tonnes/month production of ore processing"; and (iii) €13,175,000 within 20 business days of the "second anniversary of the restart of mining activities".

© 2017 The Incorporated Council of Law Reporting for England and Wales

A

11  By clause 6(f) of the master agreement, each of EMED, EMED Holdings and EMED Tartessus undertook "to use all reasonable endeavours to obtain the senior debt facility with EMED Tartessus as borrower and to procure the restart of mining activities in the project on or before 31 December 2009".

12  Clause 6(g) provided Astor with a number of protections as security for the obligations of EMED Tartessus to pay the deferred consideration. In summary: (i) EMED guaranteed performance of the obligations of EMED Tartessus; (ii) EMED Tartessus undertook not to encumber any of the assets of the project without Astor's written consent (other than as required by the provider of the senior debt facility); (iii) the EMED companies undertook to procure that the documentation for the senior debt facility would permit payment of the deferred consideration when due; (iv) EMED Tartessus undertook not to pay any dividend or distribution (other than of up to US$10m per annum for EMED group expenses not related to the project), nor to borrow any amount other than pursuant to the senior debt facility without Astor's consent, until the consideration had been paid in full; and (v) EMED Tartessus undertook to apply any excess cash (after payment of expenses associated with the project) to pay any outstanding amounts of the consideration due to Astor early.

B

C

13  By clause 7(e), EMED Tartessus undertook not to dispose of any of the assets of the project without Astor's consent until (amongst other things) the deferred consideration has been paid.

D

14  The master agreement is governed by English law and contains an agreement by the parties to submit to the exclusive jurisdiction of the English courts for all purposes relating to the agreement or its subject matter: clause 14.10.

15  As well as its claim under the master agreement, Astor has a parallel claim under the loan assignment because the amount payable under the loan assignment is payable at the same time as the deferred consideration. However, the loan assignment is governed by Spanish law and is subject to the jurisdiction of the Spanish courts. Consequently, Astor's claim under the loan assignment does not form part of these proceedings.

E

F

*The March 2009 amendment*

16  On 31 March 2009 the master agreement was amended and restated. The background to the amendment was that the permits needed to restart mining operations had not yet been obtained and EMED needed funds to cover its operating costs. To improve the project economics, Astor agreed to re-schedule payment of the deferred consideration so that it would be payable over a period of six years, instead of over two years. In return for this concession, it was agreed that Astor would also be entitled to additional "up-tick payments" if at the time when instalments of the deferred consideration were payable the price of copper was above a specified level.

G

17  As amended, schedule 2 to the master agreement provides for the deferred consideration to be paid in 18 instalments commencing on the "first payment date". The "first payment date" is defined in similar terms to the date when the first tranche of the deferred consideration was payable before the amendment. In summary it is the date on which (i) permit approval is obtained, and (ii) an EMED group company secures a "senior debt facility" and is entitled to draw down funds pursuant to this facility. I will quote the

H

© 2017 The Incorporated Council of Law Reporting for England and Wales

A   full wording of the definition later when I consider the first two issues in dispute, which turn on the meaning of the "first payment date" and in particular on the reference to the "senior debt facility".

18   An amendment was also made to extend the date in clause 6(f) by which the EMED companies undertook "to use all reasonable endeavours to obtain the senior debt facility . . . and to procure the restart of mining activities in the project". The date was extended from 31 December 2009 to 31 December 2010.

B

### The November 2009 amendment

C   19   In November 2009 the master agreement was amended again. The background to this amendment was that EMED Tartessus was continuing to incur costs associated with the project. By a deed dated 10 November 2009, Astor recorded its consent for the purposes of clause 6(g)(iv) of the master agreement to the issue by EMED Tartessus of loan notes to EMED Holdings and the borrowing of money by EMED Tartessus from EMED Holdings pursuant to the loan notes. The parties also agreed that clause 6(g)(iv) should be amended so as in future to allow funds raised by the EMED group to be made available to EMED Tartessus through intra-group loans without the need to obtain Astor's consent but on terms that such loans could not be repaid until the consideration payable to Astor under the master agreement had been paid in full. I will quote the full wording of the amended clause later in this judgment, at para 100, when I consider an issue about its meaning.

D

20   The amendment to clause 6(g)(iv)(A) is of critical significance as it has enabled substantial funds raised in 2015 by issuing new shares in EMED to be channelled to EMED Tartessus through intra-group loans without the need for Astor's consent and used to fund the restart of mining operations. The defendants say that this funding has obviated the need to obtain a senior debt facility.

E

### Subsequent events

F   21   The parties had originally expected that the permits needed to restart mining would be granted by the end of 2009. In fact, this process took far longer and it was not until 16 July 2015 that permit approval was finally obtained. While the necessary permits were being sought, substantial costs amounting to some €73m were incurred in maintaining the site and getting the site into a condition which satisfied the Junta that permits should be granted.

G

22   During this period various efforts were made to arrange finance for the project. These included in November 2008 appointing Goldman Sachs to act as lead arranger for project finance. However, Goldman Sachs did not succeed in arranging any finance. Some discussions were also held with other banks. By October 2013 four banks had expressed interest in contributing US$50m each to finance the project. It was a condition of their involvement that EMED should also raise additional finance through equity. Further equity finance was also necessary because EMED was running out of cash.

H

23   In 2012, EMED had raised US$30m by issuing shares to two new investors: Yanggu Xiangguang Copper Co ("XGC") and Orion Mine

© 2017 The Incorporated Council of Law Reporting for England and Wales

Finance ("Orion"). In July 2013, XGC and Orion between them invested a    _A_
further US$15m through an issue of convertible loan notes.

24   In April 2014 EMED engaged Bank of Montreal and Fox-Davies
Capital as brokers to help EMED raise a further US$75m in equity. The
brokers were not successful, but in May 2014 EMED received a proposal
from XGC, Orion and a prospective new investor, Liberty Metals & Mining
Holdings llc ("Liberty"), to invest US$140m in additional equity. The board    _B_
of EMED agreed to this proposal and a term sheet was signed on 3 July
2014. However, in late July the proposal collapsed after Liberty withdrew.
EMED was by this time critically short of cash. In August 2014 XGC and
Orion subscribed for shares in a sum of £13·1m (equivalent to US$22m)
which was enough to fund EMED until the end of November. At around the
same time a company in the Trafigura Group became a shareholder of
EMED by purchasing some 18% of EMED's issued share capital on the    _C_
secondary market.

25   At the beginning of September 2014 the then chief operating officer
(now chief executive officer) of EMED, Mr Lavandeira, prepared a note for
the board in which he expressed his view that, at least in the short term to
fund the initial phase of the project, a project finance loan was not going to
be an option and the company would need to raise a large amount of further    _D_
equity. Mr Lavandeira indicated that the board needed to agree the way
forward at its forthcoming board meeting because "otherwise we will 'again'
run out of funds in a critical stage of project construction". At the next
board meeting on 17 September 2014, after discussing the financing options
for the company, the board resolved to seek to raise around US$150m
through an equity raising.

26  Negotiations took place with Astor regarding a potential    _E_
restructuring of the deferred consideration to seek to improve the finances of
the project but no agreement was reached. At a board meeting on
11 December 2014, EMED's board again discussed the possibility of seeking
a project finance loan instead of the proposed equity fundraising. The board
reaffirmed that (as recorded in the minutes) "at this stage, there is no other
practical alternative to equity funding, given the lack of time and resources".    _F_
To keep EMED afloat until the proposed equity funding could be arranged,
the company's three largest shareholders (XGC, Orion and Trafigura)
agreed to provide an unsecured bridging loan of up to US$30m, of which
US$24m was advanced in December 2014. As a condition of the bridging
loan, four of EMED's directors (including Astor's chief executive officer,
Mr Mehra) were required to resign from the board of EMED at the end of    _G_
2014.

27   In February 2015 Orion indicated that it was willing to provide a
senior secured loan of US$160m to EMED. The terms of the loan proposal
were set out in an indicative term sheet dated 9 February 2015, which was
subsequently revised on 27 February 2015. The proposal would have
required Astor to agree to a restructuring of the deferred consideration. Of
the loan amount of US$160m, US$20m was to be used for making payments    _H_
to Astor on the achievement of commercial production and the balance of
US$140m for "construction of the project". Under the original proposal the
interest rate was a minimum of 8% and the loan was conditional on Orion
receiving 30% of the off-take of the mine. In the revised proposal the interest

1643

[2017] Bus LR          Astor Management AG v Atalaya Mining plc (QBD)
                                                              Leggatt J

A     rate was reduced by 1% and the off-take requirement by 5%. The loan was to
      be repayable in 14 quarterly instalments beginning in 2016.

      28   To assess Orion's proposal, Mr Lavandeira prepared a simplified
      cash flow model which indicated that (even before taking account of certain
      costs) the proposal was not financially viable, as it would result in a
      substantial negative cash balance for the four-year period over which the
B     loan would be repayable.  Mr Lavandeira sent his model to Mr Mehra of
      Astor, who said he would look at it but did not respond with any comments
      or suggestions.

      29   On 1 March 2015 Trafigura sent to EMED a non-binding offer of
      equity financing to be underwritten by the three main shareholders in an
      amount of US$150m, structured as US$75m of equity and an additional
      US$75m of preferred equity or junior debt.  It was a condition of the
C     proposal that the entire proceeds of the financing should be applied to fund
      the development of the project and should not be used to pay "expenses, fees
      or any settlement associated with the Astor agreements".

      30   On 12 March 2015, EMED sent a letter to the three main
      shareholders expressing the view that the Orion proposal was not a proposal
      that the cash flows from the project would support and attaching a draft
      term sheet based on the proposal from Trafigura.  The term sheet proposed
D     an equity fundraising of US$75m from the three main shareholders together
      with conversion into shares of the bridging loan and convertible loan notes.
      EMED also requested the shareholders to extend the bridging loan and
      convertible loan (which were due for repayment at the end of March) until
      30 June 2015 and to advance the remaining US$6m available under the
      bridging loan.  The shareholders agreed to these steps while discussions
E     continued.

      31   On 27 May 2015 EMED's board approved the proposed equity
      fundraising and on 28 May 2015 EMED entered into a subscription
      agreement with XGC, Orion, Trafigura and (as a new investor) Liberty.  The
      subscription agreement provided for the four participants to subscribe for
      new shares totalling US$80m and for the bridging loan and convertible loan
      to be converted into shares.  The equity fundraising was completed on
F     23 June 2015.  In addition to the US$80m invested by XGC, Orion,
      Trafigura and Liberty, a further US$15m was raised from other investors.
      The total amount raised was therefore US$95m (£64·9m).

      32   The funds raised were made available to EMED Tartessus through
      intra-group loans made by (i) EMED to EMED Holdings and (ii) EMED
      Holdings to EMED Tartessus.  The loan made by EMED to EMED Holdings
G     is undocumented.  It is interest free and repayable on demand.  The loan
      from EMED Holdings to EMED Tartessus was made pursuant to a
      participative loan agreement originally made on 3 July 2011 and
      subsequently amended to increase the amount of the facility.

      33   Mining restarted on 31 July 2015.  It appears that the mine achieved
      a production rate of 5mt per year in February 2016 and that by late 2016 this
      had increased to 9mt a year.
H
      *Astor's claims*

      34   I have indicated that, under the master agreement as amended in
      March 2009, the first instalment of the deferred consideration is payable on
      the date when (i) the permits required to restart mining activities are granted

© 2017 The Incorporated Council of Law Reporting for England and Wales

and (ii) an EMED group company secures a "senior debt facility" in a sum    A
sufficient to restart mining operations at the project and is entitled to draw
down funds pursuant to this facility. Astor's primary case is that, on the
proper interpretation of the agreement, payment of the deferred
consideration has been triggered and the first two instalments are now due.
This case is put in two alternative ways. First, it is said that, in circumstances
where mining operations have been restarted without the need for a senior    B
debt facility, that requirement fell away and payment of the deferred
consideration was triggered by the grant of permit approval. Alternatively,
Astor argues that either or both of the loans made by EMED to EMED
Holdings and by EMED Holdings to EMED Tartessus constitute a "senior
debt facility" within the meaning of the master agreement.

35   Astor's secondary case, if these arguments fail, is that the EMED    C
companies were in breach of their obligation under clause 6(f) of the master
agreement to use all reasonable endeavours to obtain the senior debt facility
and that, had they complied with that obligation, they would have arranged
for the funds raised as equity in June 2015 to be made available as senior
debt. As a variant of this case, Astor contends that the EMED companies
acted in breach of implied obligations of good faith in the master agreement
and that, if they had acted in good faith, they would have arranged for the
funding to be provided as a senior debt facility.    D

36   Astor also seeks declarations that, pursuant to clause 6(g)(iv) of the
master agreement, EMED Tartessus (a) cannot make any distribution or
repayment of any loans (except for US$1om a year for EMED group
expenses not related to the project) until the deferred consideration has been
paid in full and (b) must apply any excess cash to pay the deferred
consideration.    E

37   The defendants take issue with each of these contentions. It is their
case that: (1) the deferred consideration was not payable unless a senior debt
facility for a sum sufficient to restart mining operations was obtained; (2) no
such facility has been obtained and, in particular, the intra-group loans by
which the funds raised in June 2015 were made available to EMED
Tartessus were not senior debt finance; (3) the obligation in clause 6(f) of the
master agreement to use all reasonable endeavours to obtain the senior debt    F
facility was (a) unenforceable, or (b) expired on 31 December 2010, or
(c) was complied with; (4) there is no implied obligation to act in good faith
or, if there is, the defendants did so; and (5) the defendants have no
remaining obligation to pay the deferred consideration.

*The proceedings*    G

38   Astor began this action on 30 October 2015. The proceedings were
issued under CPR Pt 8 on the footing that the questions raised were unlikely
to involve a substantial dispute of fact.

39   At the trial Mr Mehra gave evidence for Astor and the defendants
called four witnesses: EMED's CEO, Mr Lavandeira, and representatives of
each of Orion, XGC and Trafigura. By agreement, disclosure and cross-
examination were limited to the questions whether (a) the defendants used    H
all reasonable endeavours to obtain a senior debt facility in the period
November 2014 to July 2015 and (b) the defendants acted in breach of any
implied obligation of good faith. It was also agreed when directions for the
trial were given that no expert evidence was necessary.

© 2017 The Incorporated Council of Law Reporting for England and Wales

A    *The issues*

    40   I will address the issues in the order identified above, as follows: (i) On the proper interpretation of the master agreement, was securing a senior debt facility for a sum sufficient to restart mining operations at the project necessary to trigger payment of the deferred consideration, or was it sufficient to trigger payment that the funds needed to restart mining were

B    raised by other means and that permit approval was given? (ii) If securing a senior debt facility was necessary to trigger payment of the deferred consideration, was the finance provided by EMED to EMED Holdings and/or by EMED Holdings to EMED Tartessus in June 2015 a senior debt facility? (iii) If payment of the deferred consideration was not triggered: (a) Was the requirement in clause 6(f) to use "all reasonable endeavours" to

C    obtain a senior debt facility a legally enforceable obligation? (b) If so, on the proper interpretation of clause 6(f), did the obligation expire on 31 December 2010 or did it continue thereafter? (c) If the obligation continued after 31 December 2010, were the defendants in breach of it in raising funds in June 2015 to restart mining at the project by issuing shares in EMED rather than by raising those funds in the form of senior debt finance? (iv) Did the master agreement contain an implied obligation to perform in

D    good faith and, if so, were the defendants in breach of that obligation by securing funding to restart mining at the project in a way which avoided payment of any of the deferred consideration to Astor? (v) Does clause 6(g)(iv) of the master agreement (a) preclude EMED Tartessus from making any distribution or repaying any of the money lent to it by EMED Holdings (other than US$10m a year for EMED group expenses not related

E    to the project) until the deferred consideration has been paid in full and (b) require EMED Tartessus to apply any excess cash to pay the deferred consideration?

   *(1) Did the requirement for a senior debt facility fall away?*

    41   Under schedule 2 of the master agreement, as amended in March

F    2009, the first instalment of the deferred consideration is due on the "first payment date" and the dates on which all subsequent instalments fall due are defined by reference to this date. The "first payment date" is defined as

       "the date on which (i) the authorisations from the Junta de Andalucía to restart mining activities in the project are granted to EMED or any other member of the EMED group ('permit approval') and (ii) EMED or

G       any other member in the EMED group secures senior debt finance and related guarantee facilities for a sum sufficient to restart mining operations at the project (hereafter the 'senior debt facility') and the relevant member of the EMED group is entitled to draw down funds pursuant to the senior debt facility."

    42   It is common ground that the first of the two conditions specified in

H    this definition (permit approval) was satisfied on 16 July 2015. It seems clear from the wording, however, that, unless the finance secured in May/June 2015 included a "senior debt facility", the second condition has not been fulfilled, with the result that the "first payment date" has not arrived.

© 2017 The Incorporated Council of Law Reporting for England and Wales

43  Astor does not accept this.  It is Astor's case that, to make    A
commercial sense of the agreement, both conditions should be read as
applicable only for as long as they remain necessary steps towards restarting
mining operations.  Astor contends that, if a senior debt facility was not
required because sufficient sums to restart mining operations had been raised
in another way, compliance with that condition would be pointless and
unnecessary and the only precondition to payment of the deferred
consideration would be the grant of permit approval.  In support of this    B
contention, counsel for Astor relied on what they described as a "principle of
futility" in the interpretation of contracts.  This principle was said to be that,
if the fulfilment of a precondition to the accrual of a contractual right
becomes futile or unnecessary, the courts do not insist upon it.

44  I do not consider that there is any such "principle of futility".  The
cases cited by Astor do not demonstrate that such a principle has emerged.    C
Nor is the existence of such a principle in my view consistent with legal
doctrine.

45  The high point of Astor's submissions on this point is a dictum of
Lord Denning MR in *Barrett Bros (Taxis) Ltd v Davies* [1966] 1 WLR 1334,
where an insured had failed to comply with a condition of a motor insurance
policy requiring him to forward to the insurers any notice of prosecution
arising from an accident.  The policy provided that fulfilment of the policy    D
conditions was a condition precedent to the liability of insurers.  The judge
held that the insurers were entitled to repudiate liability because the insured
had not complied with the condition, but the Court of Appeal reversed that
decision.  All three members of the court held that the insurers had by their
subsequent conduct waived the right to rely on the insured's breach.
A majority of the court (Lord Denning MR and Danckwerts LJ, with    E
Salmon LJ disagreeing on this point) also considered that compliance with
the condition was in any event unnecessary in circumstances where the
insurers had received the relevant information from the police.  Lord
Denning MR said, at p 1339:

> "Seeing that they had received the information from the police, it
> would be a futile thing to compel the [insured] to give them the self-same    F
> information.  The law never compels a person to do that which is useless
> and unnecessary."

46  In so far as these remarks express a general principle of "futility",
however, they have been interpreted in later cases as obiter dicta which
ought not to be followed.  Where an insurance policy stipulates that
complying with a requirement to provide notice of a claim or specified    G
information to insurers is a condition precedent to their liability, there is no
principle that the condition is only breached if the insurers have been
prejudiced by the failure to comply: see *Pioneer Concrete (UK) Ltd v
National Employers Mutual General Insurance Association Ltd* [1985] 2 All
ER 395, 401, per Bingham J; *Motor and General Insurance Co Ltd v Pavy*
[1994] 1 WLR 462, 469; *Total Graphics Ltd v AGF Insurance Ltd* [1997]
1 Lloyd's Rep 599; and see *MacGillivray on Insurance Law*, 13th ed (2016),    H
para 30–040.

47  The other two cases cited by Astor turned simply on the meaning of
the particular contractual language.  In *Balbosa v Ayoub Ali* [1990] 1 WLR
914 an agreement for the sale of land contained a clause which said that the

© 2017 The Incorporated Council of Law Reporting for England and Wales

A  sale was subject to "the obtaining from the Town and Country Planning Division of all the necessary approvals for the transfer of the premises". In fact no approvals were necessary. The Privy Council therefore concluded that the clause never operated. This conclusion was based on the wording of the contractual document and not on any principle of futility.

48  In *Mansel Oil Ltd v Troon Storage Tankers SA* [2008] 2 All
B  ER (Comm) 898; affirmed [2009] 2 All ER Comm 495, a charterparty provided that "charterers shall have the option of cancelling this charter if the vessel is not ready and at their disposal on or before 31 October 2007". The owners argued that the charterers were not entitled to cancel the charter because they had an obligation to nominate a delivery port and had not done so. This argument was rejected on the basis that, even if the charterers prima facie had an obligation to nominate a delivery port, there was no such
C  obligation where it would be futile to do so because, no matter what nomination was given, the vessel would never arrive by the cancelling date. Again, however, the decision was based on the interpretation of the particular contract and not on any general principle of futility: see paras 74–75 and 85.

49  Whether a contractual obligation has arisen in any given case in principle depends on what the particular contract says, interpreted in
D  accordance with the ordinary rules of contract interpretation. There is, in my opinion, no principle of law or even interpretive presumption which enables a contractual precondition to the accrual of a right or obligation to be disapplied just because complying with it is considered by the court to serve no useful purpose.

50  Counsel for Astor were on firmer legal ground in invoking a
E  principle stated in *Arnold v Britton* [2016] AC 1619, para 22, where Lord Neuberger of Abbotsbury PSC said:

> "in some cases, an event subsequently occurs which was plainly not intended or contemplated by the parties, judging from the language of their contract. In such a case, if it is clear what the parties would have intended, the court will give effect to that intention."

F  Mr Smith QC submitted that this principle applies in the present case as the parties plainly did not contemplate that mining might be restarted through funding which did not take the form of senior debt finance. Had they contemplated this possibility, he argued, it is clear that the parties would have intended that, in such a situation, the only precondition to payment of the deferred consideration would be the grant of permit approval. In the
G  same way, Mr Smith argued, if Spanish law had unexpectedly changed so that authorisations from the Junta de Andalucía were no longer required in order to restart mining activities, the parties would reasonably be taken to have intended that in such circumstances only the second precondition to payment would need to be fulfilled.

51  In my view, this argument starts from a false premise. I cannot accept that the possibility that restarting mining could be financed by means
H  other than senior debt finance was not within the contemplation of the parties when they made their contract (as could well be said of the possibility that Spanish law might change so as to remove the need for authorisations from the Junta). The master agreement has all the hallmarks of a professionally drafted contract made by sophisticated commercial parties.

© 2017 The Incorporated Council of Law Reporting for England and Wales

Any such party would know and have well in mind that senior debt finance is     A
not the only possible way of funding a project of this kind.  Other forms of
finance which were in fact used by EMED at various times included issuing
new shares, issuing convertible loan notes, entering into off-take agreements
and obtaining unsecured loans from shareholders.  If the intention had been
that the deferred consideration would become payable once finance *of any
kind* in a sum sufficient to restart mining operations was secured, then the     B
agreement would have said so.  Instead, the language used specifically makes
payment conditional on securing a particular type of finance in the form of a
senior debt facility.  That was plainly a deliberate choice.

52   It cannot be said that such a choice was unreasonable let alone
nonsensical.  On the contrary, it seems to me to have a clear commercial
logic.  Part of the consideration payable pursuant to the master agreement
took the form of shares allotted to Astor.  If more shares were subsequently     C
issued to other investors in order to finance the project, the value of Astor's
shares would be diluted.  This is in fact what has happened.  Astor's
shareholding in EMED has been reduced from 16% to less than 1% as a
result of the equity fundraising that has taken place.  It was therefore
advantageous from Astor's point of view to require senior debt finance to be
used.  The agreement was structured to seek to achieve this and to give Astor     D
a veto over other options.  Thus, the agreement included an undertaking by
the EMED companies to use all reasonable endeavours to obtain the senior
debt facility; it prevented EMED Tartessus from granting any encumbrance
over the project assets without Astor's consent other than as required by the
provider of the senior debt facility; and (in the original version before the
agreement was amended in November 2009) it prohibited EMED Tartessus
from borrowing any amount other than pursuant to the senior debt facility     E
without Astor's consent.  It can therefore be seen that the agreement was
carefully constructed to seek to ensure that, unless Astor agreed otherwise,
the only way in which the finance needed to restart mining operations could
be raised was by securing a senior debt facility which would trigger the
payment to Astor of the deferred consideration.

53   As described earlier, the master agreement was amended in     F
November 2009 to allow EMED Tartessus to borrow from other members
of the EMED group without requiring Astor's consent.  Such borrowing was
necessary since without it EMED Tartessus had no means of paying the
ongoing costs of the project.   Moreover, as the project was the only
significant asset of the EMED group, Astor must have recognised that the
EMED group had few means of raising money to lend to EMED Tartessus     G
and that one option—and probably the only realistic option unless or until
senior debt finance could be obtained—was to issue further shares.  The risk,
therefore, that—as has in fact happened—the EMED group without
managing to obtain a senior debt facility might nevertheless be able to raise
enough money to finance the restart of mining by issuing further shares in
EMED and lending the proceeds to EMED Tartessus through an EMED
group loan was a risk inherent in the structure of the agreement which Astor     H
chose to make.  It is not a reason to re-write the agreement by dispensing
with a requirement (the securing of a senior debt facility) which was
expressly made a precondition of Astor's right to receive the first payment of
the deferred consideration.

© 2017 The Incorporated Council of Law Reporting for England and Wales

A   54   I therefore reject Astor's argument that the "first payment date" has arisen even if no senior debt finance has been secured. That argument is inconsistent with the express language and clear intention of the master agreement.

*(2) Were the EMED group loans a senior debt facility?*

B   55   Astor's alternative ground for contending that payment of the deferred consideration has been triggered is that one or both of the intra-group loans by which money from the equity fundraising has been made available to EMED Tartessus constitutes the "senior debt facility" required by schedule 2 of the master agreement. Hence both preconditions of the first payment have been met.

C   56   I regard this argument too as unsustainable. The essence of a senior debt facility—what makes it "senior"—is that it ranks in priority in terms of repayment over other payment obligations of the borrower in the event of insolvency. An unsecured loan from another group company does not have such priority. Counsel for Astor pointed out that the participative loan agreement between EMED Tartessus and EMED Holdings contains provisions which require the borrower, when requested, to grant security to

D   the lender to guarantee repayment of the loan. But the fact is that no such security has been requested or provided. Furthermore, the indebtedness of EMED Tartessus to EMED Holdings is subordinated to its liability to Astor by reason of the share pledge referred to at para 9(vi) above.

57   I also think it clear that the "senior debt facility" contemplated by the master agreement is a facility provided by one or more lenders outside the EMED group and not an intra-group loan. That is reflected in the

E   language of the reasonable endeavours obligation in clause 6(f) and also the language of clause 6(g)(iv)(A) as amended, which expressly distinguishes between the "senior debt facility" and "EMED group loans".

58   In my view, no reasonable party to the master agreement would regard either of the two loans made between members of the EMED group as senior debt finance. It follows that the first payment of the deferred

F   consideration has not fallen due.

*(3) The obligation to use all reasonable endeavours*

59   I turn to Astor's argument that, if—as I have held—no senior debt facility has been obtained, this is a result of a breach by the EMED companies of their obligation under clause 6(f) of the master agreement. To

G   recap, clause 6(f), as amended in March 2009, provides:

"Each of EMED, EMED Holdings and EMED Tartessus undertakes to use all reasonable endeavours to obtain the senior debt facility with EMED Tartessus as borrower and to procure the restart of mining activities in the project on or before 31 December 2010 and shall provide [Astor], upon request, with such written updates as to the status of the

H   project as [Astor] may reasonably require."

60   On the first day of the trial I ruled that Astor is limited to its pleaded case that, had all reasonable endeavours been used, the funding raised in May/June 2015 from EMED's shareholders as equity would have been provided as a senior debt facility, and that it was not open to Astor to

© 2017 The Incorporated Council of Law Reporting for England and Wales

1650
Astor Management AG v Atalaya Mining plc (QBD)                    [2017] Bus LR
Leggatt J

advance a wider case that senior debt finance should have been obtained    A
from another source (as counsel for Astor had sought to argue in opening).

61    The defendants put forward three defences to Astor's case that they
were in breach of clause 6(f). First, they argue that clause 6(f) of the master
agreement is unenforceable. Second, they contend that, even if enforceable,
the clause did not apply after 31 December 2010 and therefore had long
ceased to apply by the time of the fundraising in 2015. Third, the defendants
deny that, if there was an enforceable and continuing obligation, they were    B
in breach of it.

*(a) Is clause 6(f) enforceable?*

62    In support of the first of these defences, counsel for the defendants
submitted that an obligation to use reasonable endeavours will only be
enforceable if (a) the object of the endeavours is sufficiently certain and    C
(b) there are sufficient objective criteria by which to evaluate the
reasonableness of the endeavours. They relied, in particular, on a review of
relevant authorities by Andrews J in *Dany Lions Ltd v Bristol Cars Ltd
(No 2)* [2014] 2 All ER (Comm) 403, and on the following passage, at
para 37:

> "Those two essential requirements of certainty of object and a    D
> yardstick by which to measure the endeavours are applicable across the
> board, whatever the object may be. They will not be satisfied in a case in
> which the object is a future agreement with the other contracting party,
> because even if the first requirement is satisfied (e g there is a draft
> contract on the table) the second will not be . . . They may be satisfied if
> the object is a future agreement with a third party, but such cases are    E
> likely to be exceptional because of the difficulty of satisfying both
> requirements. If the essential terms of the prospective agreement with the
> third party are identified in advance, there may be both the requisite
> certainty of object and sufficient criteria by which to judge the
> endeavours. If those terms are left open for negotiation, satisfying the
> second requirement is just as problematic as it would be in a case where
> the prospective agreement is with the other contracting party, and for    F
> precisely the same reasons."

63    For the defendants, Mr Browne-Wilkinson QC submitted that,
applying those principles, clause 6(f) of the master agreement cannot be
regarded as falling within the "exceptional" category of enforceable
obligations referred to in the quoted passage because it fails to satisfy the
second requirement referred to by Andrews J: that is to say, there are no    G
objective criteria by which the court could judge the reasonableness of
EMED's endeavours to obtain a senior debt facility. He submitted that the
court could not, for example, determine whether or not EMED ought
reasonably to have pursued a negotiation with a particular lender, or
accepted a given offer, or proposed a lower interest rate, as this would
potentially require the court to make an unlimited number of minute
judgements as to what was in EMED's best commercial interests, which no    H
court would be in a position to do.

64    Although it may be largely a matter of emphasis, I cannot agree with
the observations quoted from the *Dany Lions Ltd* case [2014] 2 All ER
(Comm) 403 in so far as they give the impression that the requirements of

© 2017 The Incorporated Council of Law Reporting for England and Wales

A   certainty of object and sufficient objective criteria are difficult to satisfy and will not usually be satisfied where the object of an undertaking to use reasonable endeavours is an agreement with a third party. The role of the court in a commercial dispute is to give legal effect to what the parties have agreed, not to throw its hands in the air and refuse to do so because the parties have not made its task easy. To hold that a clause is too uncertain to be enforceable is a last resort or, as Lord Denning MR once put it, "a counsel

B   of despair": see *Nea Agrex SA v Baltic Shipping Co Ltd* [1976] 1 QB 933, 943.

    65   This point has often been made but, given its importance, I will quote four clear and authoritative statements of it. In *Scammell (G) & Nephew Ltd v H C & T G Ouston* [1941] AC 251, 268, Lord Wright said:

C       "The object of the court is to do justice between the parties, and the court will do its best, if satisfied that there was an ascertainable and determinate intention to contract, to give effect to that intention, looking at substance and not mere form. It will not be deterred by mere difficulties of interpretation. Difficulty is not synonymous with ambiguity so long as any definite meaning can be extracted."

D   In *Petromec Inc v Petroleo Brasileiro SA* [2006] 1 Lloyd's Rep 121, para 121, Longmore LJ noted:

      "It would be a strong thing to declare unenforceable a clause into which the parties have deliberately and expressly entered . . . To decide that [the clause] has 'no legal content' to use Lord Ackner's phrase [in *Walford v Miles* [1992] 2 AC 128, 138G] would be for the law deliberately

E       to defeat the reasonable expectations of honest men . . ."

  In *Whitecap Leisure Ltd v John H Rundall Ltd* [2008] 2 Lloyd's Rep 216, para 21, Moore-Bick LJ said:

      "The conclusion that a contractual provision is so uncertain that it is incapable of being given a meaning of any kind is one which the courts have always been reluctant to accept, since they recognise that the very

F       fact it was included demonstrates that the parties intended it to have some effect."

  And in *Durham Tees Valley Airport Ltd v bmibaby Ltd* [2011] 1 All ER (Comm) 731, para 88, Toulson LJ observed:

      "Where parties intend to create a contractual obligation, the court will

G       try to give it legal effect. The court will only hold that the contract, or some part of it, is void for uncertainty if it is legally or practically impossible to give to the agreement (or that part of it) any sensible content": citing *Scammell v Dicker* [2005] 3 All ER 838, para 30, per Rix LJ.

    66   A recent example of the willingness of the courts (and increasingly so

H   in recent times) to give legal effect to contractual provisions even when they are cast in very open-ended language is *Emirates Trading Agency llc v Prime Mineral Exports Private Ltd* [2015] 1 WLR 1145. In that case Teare J held that an agreement to seek to resolve a dispute "by friendly discussion" before referring it to arbitration created an enforceable obligation.

© 2017 The Incorporated Council of Law Reporting for England and Wales

67   Far from being "exceptional", I would say that it should almost    A
always be possible to give sensible content to an undertaking to use
reasonable endeavours (or "all reasonable endeavours" or "best
endeavours") to enter into an agreement with a third party. There is no
problem of uncertainty of object, as there is no inherent difficulty in telling
whether an agreement with a third party has been made. Whether the party
who gave the undertaking has endeavoured to make such an agreement (or    B
used its best endeavours to do so) is a question of fact which a court can
perfectly well decide. It may sometimes be hard to prove an absence of
endeavours, or of best endeavours, but difficulty of proving a breach of a
contractual obligation is an everyday occurrence and not a reason to hold
that there is no obligation. Any complaint about lack of objective criteria
could only be directed to the task of judging whether the endeavours used
were "reasonable", or whether there were other steps which it was    C
reasonable to take so that it cannot be said that "all reasonable endeavours"
have been used. Where the parties have adopted a test of "reasonableness",
however, it seems to me that they are deliberately inviting the court to make
a value judgment which sets a limit to their freedom of action.

68   As noted by Sir Kim Lewison in *Lewison, The Interpretation of
Contracts* 5th ed (2014), p 486, footnote 249, the court in the *Dany Lions*    D
*Ltd* case [2014] 2 All ER (Comm) 403 does not appear to have been referred
to the decision of the Court of Appeal in *Lambert v HTV Cymru (Wales) Ltd*
[1998] FSR 874. In that case an author sold the copyrights in a storyline and
drawings to a company which intended to use them in making a film. The
contract contained an undertaking by the purchaser to "use all reasonable
endeavours to obtain a right to first negotiation from any assignee of the    E
purchaser for the author to draw or write 'conceptual' children's books in
connection with the film on terms to be negotiated in good faith". The Court
of Appeal rejected an argument that this clause was too uncertain to be
enforceable. Morritt LJ made the point, at p 881, that an obligation to use
all reasonable endeavours to procure a contract with a third party is not too
uncertain to be enforceable just because there is a variety of possible forms
which the contract could take, since the obligation may be satisfied by a    F
contract in any of those forms.

69   Similarly, in the present case the fact that there may have been many
different forms which the "senior debt facility" could take does not make the
object of the endeavours insufficiently certain or provide a reason to excuse
the EMED companies from making any effort at all to obtain any form of
senior debt finance.                                                          G

70   I note that in the *Dany Lions Ltd* case [2014] 2 All ER (Comm) 403,
in a passage at para 26, which precedes the one already quoted, Andrews J
suggested that

"there is a distinction between cases in which the object of the
reasonable endeavours is a clearly defined object (e g permission to import
certain goods, or the acquisition of a grant, or of another form of finance)    H
which can only be achieved by obtaining the consent of, or even entering
into a contract with, a third party, and cases in which the object of the
endeavours is the future agreement itself. Cases falling within the first
category do not suffer from the problems besetting agreements to agree,

© 2017 The Incorporated Council of Law Reporting for England and Wales

A    because there is sufficient certainty about the object of the endeavours,
and the putative future agreement is merely a means of achieving it."

The present case falls into the first category identified in this passage which is
said not to be problematic, since the object of the endeavours was to obtain a
particular form of finance. But I am not in any case persuaded that there is
any clear or meaningful distinction of the kind suggested, since contracting
B    is an essentially instrumental activity: that is, entering into a contract with
someone is never an end in itself but always a means of achieving some
further object or purpose. Even if a wide area of discretion is left open, that
object or purpose provides a standard by which to judge the reasonableness
of a party's endeavours.

C    71   I certainly do not accept that in the present case there are no
objective criteria by which the reasonableness of endeavours to obtain a
senior debt facility can be judged. I do agree that a court will be very slow to
second-guess a commercial party on matters of commercial judgment. For
that reason, it may in many circumstances be extremely difficult or
impossible to show that a party ought reasonably to have pursued a
negotiation with a particular lender, or accepted a given offer, or proposed a
lower rate of interest—to take the examples given by the defendants'
D    counsel. But it is important to remember that the burden of proof is on the
party alleging failure to comply with the obligation. Where the criticism
involves a matter of fine judgment, it may be impossible to establish a
breach. In other cases, however, the absence of reasonable endeavours may
be obvious. It does not follow from the fact that there may often be difficulty
in proof that there is no obligation at all or that the obligation has no
E    sensible content.
72   Accordingly, I have no hesitation in concluding that clause 6(f) is
enforceable.

*(b) Did the obligation end on 31 December 2010?*

73   The defendants' second line of defence is that, on the proper
interpretation of clause 6(f), the obligation to use all reasonable endeavours
F    ended on 31 December 2010.
74   Astor's first response to this was to submit that the date referred to in
clause 6(f) was intended only to govern the obligation to use all reasonable
endeavours to procure the restart of mining operations and not the
obligation to use all reasonable endeavours to obtain a senior debt facility.
But apart from the fact that it seems to me to be a linguistically unnatural
G    reading of the clause, this interpretation flouts commercial common sense.
The express purpose of obtaining the senior debt facility was to enable
mining operations to be restarted. It would make no sense for the obligation
to obtain the requisite funding to continue after the obligation to procure the
event for which the funding was required had been fulfilled. In my view, the
only coherent interpretation of the clause is to read the date as applicable to
both limbs of the obligation.
H    75   The second and much better argument made on behalf of Astor by
Mr Smith is that the date should reasonably be understood as a target, not a
cut-off for the obligation. When a contract imposes an obligation to do
something by a particular date, this does not usually mean that the
obligation expires on that date. For example, if a seller agrees to deliver

© 2017 The Incorporated Council of Law Reporting for England and Wales

goods to the buyer on or before a specified date, this would not normally be     A
understood to mean that, if the goods are not delivered by that date, a once
and for all breach of contract occurs at that time, after which the seller is no
longer under any obligation to deliver the goods.   Rather, the ordinary
understanding would be that, once the specified date has passed, there is a
breach that continues until such time as the goods are delivered (or the
obligation ceases, for example because performance is waived or the
contract is terminated).   An undertaking to use all reasonable endeavours     B
differs from an unqualified undertaking such as an obligation to deliver
goods in that failure to achieve the relevant objective by the specified date
does not by itself mean that there is a breach of contract.   But it seems to me
equally unreasonable (absent some special factor) to regard failure to
achieve the objective by the given date as a reason for releasing the party
which has given the undertaking from any further performance.     C

76   Another way of putting the point is to say that the date in clause 6(f)
would reasonably be understood as the *earliest* date on which a breach of the
obligation could occur, not the latest date.   Thus, it would be natural to
expect a party in the position of the EMED companies to have wanted the
date in clause 6(f) to be as late as possible in order to give them more time in
which to try to obtain the senior debt facility and to procure the restart of     D
mining operations.   If the defendants' interpretation of the clause were
correct, however, it would have the paradoxical result that it would have
been to the advantage of the EMED companies to have agreed the earliest
possible date—because it would be harder to establish a breach of the clause
if the relevant objectives had not been achieved by such a date and, once the
date had passed, the obligation would expire.

77   Counsel for the defendants argued that it is inherently improbable     E
that the EMED companies would have agreed to go on using all reasonable
endeavours to obtain senior debt finance indefinitely.   They suggested that
there would then be no limit to the expenses which the EMED companies
could be forced to incur in continuing to maintain the project without any
mining activities taking place.   They submitted that it is most unlikely that
the parties would have intended the EMED companies to bear those costs ad
infinitum without mining being restarted, even where other funding options     F
were available.

78   This argument seems to me to mistake the nature of the obligation.
An obligation to continue using all reasonable endeavours does not require
unlimited expenditure because the amount of costs which have been and are
being incurred in maintaining the project is a relevant factor in deciding
what, if any, further steps are reasonable.   In other words, it is a factor     G
already built into the obligation and therefore does not provide a reason for
setting a time limit to the obligation.   What seems to me inherently
improbable is that the parties would have intended that if, after any length of
time, the EMED companies were able through the exercise of reasonable
endeavours to obtain a senior debt facility in an amount sufficient to restart
mining operations, they should nevertheless be free to arrange some other
form of funding instead which would have the effect of leaving Astor unpaid.     H

79   Astor's interpretation is also supported by authority.   In *Patel v
Brent London Borough Council* [2004] EWHC 763 (Ch) the claimant in
pursuance of a planning obligation deposited a sum of money with the
defendant ("the council") as payment for certain works which the council

© 2017 The Incorporated Council of Law Reporting for England and Wales

A  agreed to use its reasonable endeavours to complete by a specified date (21 October 1994). The date passed without any progress being made and nothing was done subsequently. Eventually, in August 1999 the claimant demanded the return of its deposit. One of the issues in the case was whether the council was under an obligation to use reasonable endeavours which continued after 21 October 1994. Hart J held that it was, accepting the claimant's argument that, in order to give business efficacy to the agreement,

B  it was necessary to imply a term that the council would continue to use its reasonable endeavours after 21 October 1994 to complete the works within a reasonable time. He said, at para 64:

C  "It is simply a nonsense to suggest that the council was under an obligation until that date but thereafter was at liberty simply to sit on the money until either it chose to do something or the [claimant] made an application to discharge the planning obligation under section 106A. Even the most unofficious of bystanders would, it seems to me, have roused himself to protest that that cannot have been intended."

D  80  This authority was followed by the Singapore Court of Appeal in *KS Energy Services Ltd v BR Energy (M) SDN BHD* [2014] BLR 658, in which a party to a joint venture agreement had undertaken to use all reasonable endeavours to procure that an oil rig was constructed and ready for delivery within six months after a charter agreement for the rig was executed. The Court of Appeal, at paras 103–104, held that the obligation to use all reasonable endeavours continued beyond the specified deadline, if the rig had not been delivered by then. They preferred to see this as the proper interpretation of the clause rather than to rely on an implied term (as in

E  *Patel's* case [2004] EWHC 763 (Ch)). In their view, it did not make any sense for the party concerned to be under no obligation at all after the date specified in the contract had passed.

81  In my view, a similar interpretation should be given to clause 6(f) of the master agreement in the present case in order to give it business sense. Its effect, as I construe the clause, is to require the EMED companies to use all reasonable endeavours to obtain the senior debt facility and procure the

F  restart of mining activities on or before 31 December 2010 provided that is practicable and, if not, as soon as practicable thereafter.

*(c) Was there a breach of clause 6(f)?*

82  The question whether, and if so to what extent, a person who has undertaken to use best endeavours can have regard to his own financial

G  interests depends on the nature and terms of the contract in question: see *Jet2.com Ltd v Blackpool Airport Ltd* [2012] 2 All ER (Comm) 1053, para 32. The same must equally apply where the undertaking is to use "all reasonable" endeavours. In the present case, other things being equal, it was clearly in the defendants' financial interests to fund the restart of mining operations, if they could, without obtaining a senior debt facility, as this would avoid triggering payment of the deferred consideration. But the fact

H  that the EMED companies would be better off if they could avoid or delay payment of the deferred consideration to Astor cannot in itself be a legitimate reason for them to prefer another form of finance. If it were, it would defeat the plain contractual purpose of clause 6(f), which was to seek to ensure that Astor will indeed be paid. It does not follow, however, that

© 2017 The Incorporated Council of Law Reporting for England and Wales

financial considerations are irrelevant and that the EMED companies were    A
required to try to obtain a senior debt facility at any cost. In particular, it
cannot reasonably have been contemplated that the EMED companies
should have to enter into a senior debt facility if to do so would make the
project commercially unviable. This would also defeat the contractual
purpose, as the EMED group would not be able to pay the deferred
consideration if it became insolvent in the period over which the instalments
of the deferred consideration were payable.                                  B

83   Accordingly, clause 6(f) could not, in my view, require the EMED
companies to obtain a senior debt facility unless there was a reasonable
expectation that the copper produced from the mine when mining restarted
would generate enough revenue to maintain the EMED group as a going
concern. That meant that the anticipated revenue would need to be
sufficient, on reasonable assumptions, to cover the anticipated project costs    C
for the foreseeable future—including the costs of servicing the senior debt
and making the payments due to Astor.

84   Astor's case that the defendants were in breach of clause 6(f)
ultimately boiled down to the contention that the sum of US\$95m which
EMED raised from its shareholders in May/June 2015 could—and would if
all reasonable endeavours had been used—have been obtained in the form of
a senior debt facility provided by one or more of the shareholders. On the    D
evidence, however, this case has not been made out.

85   Of the three main shareholders, Trafigura made it expressly clear at
the time when funding was being discussed that it was not prepared to
provide finance in a form that would trigger payment of the deferred
consideration. Hence, as mentioned earlier, Trafigura's non-binding offer of
finance dated 1 March 2015 contained an express condition that EMED    E
should not be permitted to use the finance to make any payments to Astor.
Mr Fernandez of Trafigura had previously sent a letter to Astor dated
21 January 2015 setting out Trafigura's analysis based on legal advice that, if
the project was financed by equity investment, no obligation would arise to
pay the deferred consideration. Whilst EMED could not consistently with
its obligation under clause 6(f) treat that potential cost saving as a reason to
prefer equity to senior debt, there was nothing to prevent Trafigura from    F
doing so and from taking the position, as it did, that it was only prepared to
provide finance in a form which would not trigger payment of the deferred
consideration.

86   Mr Fernandez said in evidence that Trafigura did not believe that the
project was capable of sustaining payment of the deferred consideration. He
also explained that Trafigura is not in the business of lending money and had    G
no interest in simply being a creditor of EMED. He made it clear that
Trafigura would have preferred to let EMED become bankrupt rather than
provide a senior debt facility, not least because Trafigura would have been
well placed to acquire the project for itself in that event. I see no reason to
doubt any of this evidence. Nor indeed did counsel for Astor dispute
Trafigura's willingness to let the company fail rather than provide finance in
a form which would have resulted in Astor being paid.                        H

87   Mr Liu of XGC was equally clear in his evidence that XGC would
also not have been willing to provide senior debt finance. He explained that
XGC is a smelting business and that it has no interest in providing debt
finance on any long-term basis: its objective in investing in the mining sector

A  is to gain equity exposure.  He also said that his evaluation at the time was that the project simply could not accommodate both debt financing and payment of the deferred consideration to Astor.  XGC had invested around US$20m in EMED and Mr Liu said that XGC would have preferred to write off that investment rather than invest, say, a further US$40m when the economics of the project indicated that EMED would not be able to repay it.

B  88    Again, I see no reason to doubt this evidence.  Counsel for Astor suggested that Mr Liu's evidence that XGC would not have been willing to provide senior debt finance is contradicted by assurances given by XGC to EMED's board in September 2014 and February 2015 that XGC was committed to funding the restart of mining operations and by XGC's apparent agreement to participate in Trafigura's non-binding offer of 1 March 2015 which proposed junior debt as one possible element of the

C  offer.  I am not persuaded by this.  Even if XGC would have been willing to provide junior debt alongside an equity investment, XGC never gave any assurance or indication that it was willing to provide senior debt finance nor that it considered that, if the finance arranged had the effect of triggering payment of the deferred consideration, the project would be financially viable.

D  89    Unlike Trafigura and XGC, Orion was willing to provide senior debt finance to EMED and offered to do so.  However, as described earlier (see para 28 above), it was Mr Lavandeira's contemporaneous assessment that Orion's proposal, even after it was revised to make it more attractive, would not work.  Astor did not adduce any evidence to contradict that assessment.  I am sure too that, if Mr Mehra had disagreed with it at the time, he would have responded to say so when he was sent Mr Lavandeira's

E  cash flow model.  Furthermore, Orion's offer was conditional on Astor's agreement to restructure the deferred consideration.  There is no evidence in any communication sent at the time nor which Mr Mehra gave in these proceedings to indicate that Astor was willing to agree to the proposed restructuring.

F  90    Counsel for Astor argued that, even if Orion's offer to lend US$160m was not viable, EMED should have requested a senior debt facility in the amount of US$95m.  Mr Lewnowski who gave evidence on behalf of Orion accepted that, if Orion was prepared to lend US$160m, it "stands to reason" that Orion would have been prepared to lend US$95m.  Counsel for Astor submitted that, if a US$95m facility had been requested, the court can infer that Orion would have agreed to provide such a facility on terms which would not have led EMED into insolvency.

G  91    In my view, there is no reasonable basis for drawing such an inference.   In  the  first  place,  the  parties  involved  were  sophisticated businessmen experienced in the mining industry and with knowledge of the project.  I think it probable that, if a smaller loan would have sufficed, this would have been suggested by either EMED or Orion.

H  92    Astor's contention that a senior debt facility of US$95m would have been sufficient appeared to be based on the fact that this was the amount of cash raised from share subscriptions in June 2015.  Shares were also issued then to repay the bridging loan (US$31·4m) and the convertible loan notes (US$16·8m).  But this was not new money as the proceeds of the bridging loan and the convertible loan had already been spent and the further shares were issued to repay these liabilities.  However, if senior debt finance had

© 2017 The Incorporated Council of Law Reporting for England and Wales

been obtained, although the loan notes would automatically have converted   A
to shares in that event, the bridging loan would have had to be repaid.
Furthermore, the first instalment of the deferred consideration would have
been triggered (€7·3m or US$8m) together with the first payment under the
loan assignment (€1·5m or US$1·7m). To meet these obligations, some
US$40m of additional finance would therefore have been needed over and
above the US$95m of new money. In circumstances where borrowing
US$160m from Orion as a senior debt facility was not financially viable,   B
there is no reason to suppose that reducing the amount of the facility by
US$25m would have made it financially viable. Indeed, from looking at the
large negative cash balances in years two to five of Mr Lavandeira's
simplified model, it seems clear that it would not.

   93   In written submissions in reply lodged (with permission) after the
end of the hearing, counsel for Astor suggested that a total of US$38m was   C
needed to restart mining and to get production to a level of 5mt a year plus
US$30m to repay the bridging loan and US$10m to pay the first instalment
of the deferred consideration (and the associated payment due under the
loan assignment). Mr Lavandeira was adamant in his evidence that
significantly more than US$38m was needed for the development of the
mine. But even if these figures are correct, they do not begin to show that the
project would have been economic if a senior debt facility of US$95m had   D
been obtained from Orion. As mentioned, Mr Lavandeira's model showed a
positive cash flow in year one, followed by negative cash balances
for the next four years which would prima facie have resulted in insolvency.
No evidence has been adduced by Astor to show that there would have been
a different expected outcome if the amount borrowed had been US$95m.

   94   If it was seriously to be maintained in these proceedings that there   E
was a viable funding option not identified or pursued at the time which
EMED ought reasonably to have identified and pursued, that suggestion
would need evidence to support it. Realistically, such evidence would need
to have taken the form of a report from an independent expert containing a
detailed financial analysis. As it is, the case put forward by Astor was based
on nothing more than arguments made by counsel. In the circumstances
I am wholly unpersuaded that obtaining a senior debt facility in the sum of   F
US$95m from Orion (or anyone else) was a sensible aim to which EMED
ought to have directed any endeavours.

   95   I add for completeness that I also regard as untenable an alternative
argument made on Astor's behalf that the funds raised by EMED in 2015
could and should have been lent to EMED Tartessus by EMED Holdings (or
another member of the EMED group) pursuant to a senior debt facility.   G
I have already held that such an EMED group loan could not constitute a
"senior debt facility" within the meaning of the master agreement. But even
if it could, the evidence has shown that Trafigura and XGC would not have
provided further funds if the funding was structured in a way which
triggered payme'nt of the deferred consideration to Astor, and there is no
evidence that Orion would have been willing to provide any further finance
in the form of equity if Trafigura and XGC had refused to do so. Lending   H
money to EMED Tartessus under a senior debt facility was therefore not an
available option.

   96   I accordingly find that Astor has failed to establish a breach of
clause 6(f).

© 2017 The Incorporated Council of Law Reporting for England and Wales

A   *(4) Alleged breach of implied duty of good faith*

**97**   As an alternative or addition to its case that the defendants were in breach of their obligation under clause 6(f) to use all reasonable endeavours to obtain a senior debt facility, Astor has alleged that the defendants owed implied obligations of good faith to do so, and were in breach of those obligations.

B   **98**   I have discussed elsewhere the question of whether or when there is in English law an implied duty to perform a contract in good faith: see *Yam Seng Pte Ltd v International Trade Corpn Ltd* [2013] 1 All ER (Comm) 1321. I do not think that this case is the occasion to explore that question further. A duty to act in good faith, where it exists, is a modest requirement. It does no more than reflect the expectation that a contracting party will act honestly towards the other party and will not conduct itself in a way which is

C   calculated to frustrate the purpose of the contract or which would be regarded as commercially unacceptable by reasonable and honest people. This is a lesser duty than the positive obligation to use all reasonable endeavours to achieve a specified result which the contract in this case imposed.

**99**   It follows, as it seems to me, that there is no need or scope to imply a

D   term requiring the defendants to act in good faith to obtain senior debt finance, since such a requirement is subsumed within the express obligation to use all reasonable endeavours. It also means that, even if an obligation to act in good faith is implied, there is no basis for saying that the defendants did not act in good faith in circumstances where Astor has failed to establish a breach of the reasonable endeavours obligation.

E   *(5) Must any excess cash be paid to Astor?*

**100**   Astor's fallback position is that, even if the deferred consideration has not become payable and the defendants are not thereby in breach of contract, the requirement to pay the deferred consideration has not disappeared. Astor relies, in particular, on clause 6(g)(iv) of the master agreement (as amended), by which EMED Tartessus has undertaken:

F   "(A) not to make, declare or pay any dividend or distribution or make any repayment of or other payment in respect of loans from members of the EMED group ('EMED group loans') (other than as required for up to US$10m per annum in aggregate for EMED group expenses (excluding dividends or other distributions to shareholders of EMED) related to matters other than the project ("EMED group expenses")), nor borrow or

G   agree to borrow any amount other than pursuant to the senior debt facility or EMED group loans without the prior written consent of [Astor] (not to be unreasonably withheld or delayed), until the consideration has been paid in full to [Astor] in accordance with the terms of the transaction documents; and

"(B) to apply any excess cash (after payment of operating expenses and sustaining capital expenditure for the project, debt service requirements

H   under the senior debt facility and US$10m per annum for EMED group expenses (without double counting EMED group expenses taken into account under paragraph (A) above)) to pay any outstanding amounts of the consideration due to [Astor] (including . . . under the loan assignment) early."

© 2017 The Incorporated Council of Law Reporting for England and Wales

101   Astor contends that the effect of these provisions is that EMED    A
Tartessus (a) cannot make any distribution or any repayment of the money it
has borrowed from EMED Holdings (except for up to US$10m a year for
group expenses not related to the project) until the deferred consideration
has been paid in full and (b) must apply any excess cash (as defined) to pay
the deferred consideration early.

102   The defendants dispute this.   They argue that the references in    B
clause 6(iv)(g) to the "consideration" should be understood to mean such
part of the "consideration" referred to in the master agreement as is due or
may fall due in future.   Mr Browne-Wilkinson submitted that, now that the
EMED companies have managed to restart mining operations without
triggering payment of the deferred consideration, the deferred consideration
will never become payable and that in these circumstances it no longer forms
part of the "consideration".   There is therefore no impediment to EMED    C
Tartessus repaying the loan made to it by EMED Holdings and distributing
any excess cash generated from the mining operations.

103   I do not accept that this is a reasonable, let alone the correct,
interpretation of the relevant provisions.   In the first place, the definition of
the "consideration" in clause 6(a) of the master agreement includes the
"deferred consideration" and does not cease to do so just because the
deferred consideration has not become due for payment.   In its original form    D
clause 6(a) identified the amount of the deferred consideration as
€43,883,382·70.   Although this was changed when the contract was
amended in March 2009 to read "up to €59,783,382·70", the introduction
of the words "up to" is explained by the fact that the amendment added the
possibility of additional "up-tick payments" which would also be payable if,
when any instalment of the deferred consideration is due, the price of copper    E
is above a specified level.   The amendment made no provision for the
deferred consideration to be reduced below the original amount of
€43,883,382·70.   I therefore think it clear that the "consideration" will not
have been paid in full until such time as the whole of the deferred
consideration of €43,883,382·70 (together with any up-tick payments, if
applicable) has been paid to Astor.

104   There is nothing to prevent EMED Tartessus, if it has the cash    F
available, from paying the deferred consideration even though the deferred
consideration has not become due for payment.   Indeed, clause (6)(d)(iv)(B)
specifically requires EMED Tartessus to apply any excess cash for this
purpose.   Counsel for the defendants argued that there can only be an
obligation to pay any amounts of the consideration "early" if those amounts
will—or at least will if certain conditions are met—become payable in the    G
future.   I do not think this self-evident.   It seems to me that payment of an
outstanding debt can without undue strain be described as "early" even if the
payment date stipulated in the contract is a date which it can now be said is
never going to arrive.   But in any case I do not think it clear that the deferred
consideration will never otherwise become payable.   It is at least possible
that mining could stop at some point in the future if the project again runs
out of money and that senior debt finance could then be secured for a sum    H
sufficient to restart mining operations at the project.   It seems to me that, on
the plain wording of the definition of the "first payment date" (quoted in
para 41 above), the first instalment of the deferred consideration would fall
due in such circumstances.

© 2017 The Incorporated Council of Law Reporting for England and Wales

1661

[2017] Bus LR          Astor Management AG v Atalaya Mining plc (QBD)
                                                              Leggatt J

A    105   On the natural and ordinary meaning of the language used in the
master agreement, therefore, clause 6(g)(iv) in my view has the effect
contended for by Astor.

     106   That conclusion is reinforced when account is taken of the
consequences of the defendants' interpretation. It is one thing to say that the
EMED companies are entitled to fund the project by making a loan to
EMED Tartessus without triggering payment of the deferred consideration
B    where it is not possible or not reasonable to obtain a senior debt facility. It is
quite another to say that, when this happens, the outstanding amounts owed
to Astor can be written off so that they need never be paid even when excess
cash becomes available from which such payments could be made. I do not
regard the latter as a reasonable intention to attribute to the parties when
they agreed the terms on which Astor's interest in the project would be
C    bought out. To the contrary, this seems to me an interpretation which
should only be adopted if the language of the contract clearly compelled
it—which it does not.

     107   The defendants made another argument. They argued that under
clause 6(g)(iv)(A) payments by EMED Tartessus are permitted if Astor
consents to them and that such consent is "not to be unreasonably withheld
or delayed". Counsel for the defendants submitted that it would be clearly
D    unreasonable for Astor to withhold its consent in circumstances where it no
longer has any legitimate interest in preventing EMED Tartessus from
making payments.

     108   This argument seems to me, however, to be based on a misreading
of clause 6(g)(iv)(A). I think it clear from the wording and punctuation of
that provision that the permission to act with Astor's consent is limited to
E    the borrowing of any amount other than pursuant to the senior debt facility
or EMED group loans. It does not apply to the prohibition against making
any distribution or any repayment in respect of any EMED group
loan—which is an unqualified prohibition. In any case, even if the contract
had permitted such payments to be made with Astor's consent, I cannot see
why in the ordinary course of things it would be unreasonable for Astor to
withhold its consent, since Astor plainly has a legitimate interest in receiving
F    payment in full of the consideration.

     109   I conclude that, on the proper interpretation of the master
agreement, EMED Tartessus (subject to the specified exception) cannot
repay the money lent to it by EMED Holdings and must apply any excess
cash to make payments to Astor until the outstanding amount of the
deferred consideration has been paid in full.

G
     *Conclusions*

     110   For the reasons given, my decisions on the issues raised by Astor's
claim in this action are, in summary, as follows: (i) The deferred
consideration of at least €43·8m which EMED Tartessus agreed to pay to
Astor under the master agreement did not start to become payable when
permit approval was given for the project, nor did the EMED group loans by
H    which funding for the restart of mining operations was made available to
EMED Tartessus constitute a "senior debt facility" so as to trigger payment
of the deferred consideration. Accordingly, the first instalment of the
deferred consideration has not fallen due. (ii) The obligation in clause 6(f) of
the master agreement to use all reasonable endeavours to obtain a senior

© 2017 The Incorporated Council of Law Reporting for England and Wales

1662
**Astor Management AG v Atalaya Mining plc (QBD)**                [2017] Bus LR
**Leggatt J**

debt facility is enforceable and continued after 31 December 2010, but Astor    A
has failed to show that there has been a breach of this obligation, let alone
that the defendants have acted in bad faith in not obtaining a senior debt
facility. (iii) By reason of clause 6(g)(iv) of the master agreement, however,
other than up to US$10m a year if required for EMED group expenses not
related to the project, EMED Tartessus cannot make any distribution or any
repayment of the money lent to it by EMED Holdings and must apply any
excess cash to pay the deferred consideration, until it has been paid in full.    B

*Order accordingly.*

SARAH ADDENBROOKE, Barrister

C

D

E

F

G

H

© 2017 The Incorporated Council of Law Reporting for England and Wales