USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 2/1/2024

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ X
                                        :

JOSHUA N. TERRY, U.S. BANK, *National*     :
*Association*, *in its capacity as Trustee*, ACIS    :
CAPITAL MANAGEMENT, L.P.,             :
                                        :
                        Plaintiffs,   :
                                          :
      -against-                       :
                                          :
THE CHARITABLE DONOR ADVISED     :
FUND, L.P., CLO HOLDCO, LTD., *and*     :
NEXPOINT DIVERSIFIED REAL ESTATE   :
TRUST,                                   :
                                          :
                      Defendants.   :
------------------------------------------------------------ X

1:21-cv-11059-GHW

MEMORANDUM OPINION &
ORDER

GREGORY H. WOODS, United States District Judge:

This suit involves a dispute between a set of entities allegedly controlled by James Dondero, and another set affiliated with Joshua Terry.[1]  Mr. Dondero and Mr. Terry had what can generously be described as a "falling out" of such a magnitude that litigation ensued in New York state court, New York federal courts (four lawsuits),[2] a Texas bankruptcy court,[3] and the Royal Court of Guernsey.[4]  Plaintiffs/Counter-Defendants U.S. Bank, Joshua N. Terry, and Acis Capital

---

[1] While the defendants in this case assert that they are not in fact controlled by Mr. Dondero, the defendants agree that the plaintiffs in this case—affiliated with Mr. Terry—"hold[] substantial animus, malice and ill-will towards James Dondero," and this supposed "animus" constitutes an apparently animating sentiment for the litigation against Defendants.  *See, e.g.*, Defendants' Second Amended Answer and First Amended Counterclaim (the "Answer" or "Counterclaim"), Dkt. No. 155 ¶ 55.

[2] This includes *The Charitable Donor Advised Fund, L.P. v. U.S. Bank Nat'l Ass'n, et al.*, 1:19-cv-9857-NRB (S.D.N.Y.) (the "2019 Lawsuit"); *The Charitable Donor Advised Fund, L.P. v. U.S. Bank Nat'l Ass'n*, 1:20-cv-1036-LGS (S.D.N.Y) (the "2020 Lawsuit"); *NexPoint Strategic Opportunities Fund v. Acis Capital Management, L.P., et al.*, Case No. 1:21-cv-04384-GHW (S.D.N.Y.) (the "NexPoint Lawsuit"); and *Joshua N. Terry et al. v. The Charitable Donor Advised Fund, L.P. et al.*, Case No. 1:21-cv-11059-GHW (this lawsuit).

[3] *In re* ACIS *Capital Management, L.P. and In re* ACIS *Capital Management GP, L.L.C.*, Case No. 18-30264-SGJ-11 (N.D. Tex. Bankr.) ("ACIS Bankruptcy Proceedings"); *In re: Highland Capital Management, L.P.*, Case No. 19-34054-SGJ-11 (N.D. Tex. Bankr.) ("HMC Bankruptcy Proceedings").

[4] *See CLO HoldCo, Ltd v. Highland CLO Funding, Ltd.*, Civil No. 2479 (Royal Court of Guernsey, Ordinary Division), Dkt. No. 229-1 (the "Guernsey Judgment").

Management, L.P. ("ACM") (collectively, "Plaintiffs") brought this lawsuit "to stop James Dondero, the former majority owner of Plaintiff ACM, from holding investors in subordinated notes issued by ACIS CLO 2014-4 Ltd. ('ACIS 4'), ACIS CLO 2014-5 Ltd. ('ACIS 5'), and ACIS CLO 2015-6 Ltd. ('ACIS 6' and, collectively with ACIS 4 and ACIS 5, the 'ACIS CLOs') hostage by threatening to bring meritless litigation against Plaintiffs."  Plaintiffs' Amended Complaint, Dkt. No. 15 ("Compl.") ¶ 1.

Plaintiffs allege that Mr. Dondero, who "functionally controls" Defendants Charitable Donor Advised Fund ("DAF") and CLO HoldCo ("CLOH") (collectively, the "DAF Parties"), has previously brought "vexatious and meritless lawsuits against ACM for purported mismanagement of the ACIS CLOs' investments and against U.S. Bank, the Trustee of the ACIS CLOs, for purported failures to prevent ACM's alleged mismanagement." *Id.*  Plaintiffs allege that Defendants' lawsuits—actual and threatened—"have delayed distributions to the ACIS CLOs' subordinated noteholders by forcing the holdback of funds from the ACIS CLOs' final distributions to cover potential indemnity obligations to U.S. Bank, ACM, Mr. Terry (ACM's owner), and Brigade Capital Management, L.P. ('Brigade') (ACM's sub-advisor)." *Id.*  As a result, Plaintiffs seek a declaratory judgment that (a) the DAF Parties lack standing to bring their claims and (b) the DAF Parties' claims are barred by a 2021 settlement agreement between ACM and Highland CLO Funding ("HCLOF"), which is "the actual owner of the subordinated notes on which DAF and CLO HoldCo's threatened claims are based." *Id.*  The latter argument depends on a finding that the "settlement" agreements are valid and enforceable.

In their answer, the DAF Parties assert fourteen affirmative defenses and a counterclaim. They argue that the so-called "settlement" agreements are invalid and were wrongfully and collusively entered into, amounting to a breach of HCLOF's contractual duty of good faith to CLOH arising from a shareholder members agreement between the two of them, *see* Dkt. No. 155-2

(the "Members Agreement"); additionally, they argue that Plaintiffs tortiously interfered to prompt said breach, and were unjustly enriched as a result. *See* Counterclaim ¶¶ 3–7 (describing the counterclaims); *id.* ¶¶ 78–83 (alleging breach of contract against HCLOF for breaching the Members Agreement with CLOH); *id.* ¶¶ 84–93 (alleging tortious interference with contract against Plaintiffs for inducing said breach); *id.* ¶¶ 94–98 (alleging unjust enrichment against Plaintiffs for "retain[ing] the benefits of their misconduct" with respect to the tortious interference). As a result, the DAF Parties seek a declaratory judgment that the agreements executed between HCLOF and Plaintiffs in 2021 and 2023, respectively, are unenforceable. *See id.* ¶¶ 66–77.[5]

In extensive briefing reminiscent of a law school issue-spotter, Plaintiffs and HCLOF moved to dismiss the DAF Parties' counterclaims—raising issues of standing, conflict of laws, personal jurisdiction, subject matter jurisdiction, *forum non conveniens*, international comity, collateral estoppel, and failure to state a claim. *See* Dkt. Nos. 106 (Plaintiffs' motion), 77 (HCLOF's motion). In addition, Plaintiffs moved for judgment on the pleadings under Federal Rule of Civil Procedure 12(c). For the reasons that follow, Plaintiffs' and HCLOF's respective motions to dismiss are GRANTED, and Plaintiffs' motion for judgment on the pleadings is DENIED.

## I.   BACKGROUND

### A.   Parties and Relevant Non-Parties

Plaintiff U.S. Bank, a national banking association, is the Trustee of the ACIS CLOs under the ACIS Indentures. Compl. ¶¶ 9, 27; *accord* Answer ¶¶ 9, 27.[6] Plaintiff Mr. Terry "is the President and sole executive of ACM." Counterclaim ¶ 11.[7] Plaintiff ACM is a Delaware limited partnership

---

[5] Note that "Answer" citations and "Counterclaim" citations both originate from Dkt. No. 155; the paragraph symbols denoted by "Answer" and "Counterclaim," respectively, appear in the corresponding section.

[6] All facts taken from the Complaint cited herein are admitted by the DAF Parties in their Answer and Counterclaim, unless noted otherwise. For reference, the DAF Parties' affirmative admissions are noted at paragraph numbers in the Answer that directly correspond to the Complaint paragraph numbers cited herein.

[7] According to Plaintiffs, Mr. Terry is also a resident of Texas and the President of Shorewood GP, LLC, the general partner of ACM; Mr. Terry owns 100% of the limited partnership interests in ACM. Compl. ¶¶ 10, 11. The DAF Parties "are without sufficient information to admit or deny whether Shorewood is the general partner of ACM, and

located in Texas; ACM is the Portfolio Manager to the ACIS CLOs, responsible for managing the ACIS CLOs' assets.  Compl. ¶ 11.

Defendant DAF, a limited partnership organized in the Cayman Islands, owns 100% of CLOH.  *Id.* ¶ 12.  CLOH is a Cayman Islands company that owns 49% of HCLOF.  *Id.* ¶ 13. Defendant NexPoint Strategic Opportunities Fund ("NexPoint"), which is not involved in these motions to dismiss, is a Delaware statutory trust managed by NexPoint Advisors, L.P.  *Id.* ¶ 14.[8] Plaintiffs contend that NexPoint is a minority investor in ACIS 6, which is primarily owned by HCLOF.  *See id.* ¶¶ 44, 18.[9]  The DAF Parties assert that "NexPoint is unrelated to DAF and CLOH."  Counterclaim ¶ 64.

Non-parties "ACIS 4, ACIS 5, and ACIS 6 are exempted limited liability companies incorporated in the Cayman Islands."  Compl. ¶ 15.  They conduct business through directors located in the Cayman Islands.  *Id.*  ACM manages the offshore ACIS CLO investment funds, which "issued, among other things, certain subordinated notes to investors pursuant to the ACIS Indentures in private offerings."  *Id.*; *see also id.* ¶ 25.

Non-party HCLOF is a collective investment scheme registered in Guernsey; HCLOF owns 100% of the subordinated notes issued by ACIS 4 and ACIS 5, as well as 87% of the subordinated notes issued by ACIS 6.  *Id.* ¶ 17.  Approximately 51% of HCLOF is owned by Highland Capital Management, L.P. ("Highland").  *Id.* ¶ 18.[10]  Again, CLOH owns the remaining 49% of HCLOF.  *Id.* ¶ 13.

---

whether Terry is a . . . resident of Texas," or "whether Terry owns Shorewood and ACM's limited partnership interests." Answer ¶¶ 10, 11.
[8] While Plaintiffs assert that NexPoint's business address is in Texas, Compl. ¶ 14, the DAF Parties deny that, Answer ¶ 14.
[9] The DAF Parties lack sufficient knowledge to admit or deny this.  Answer ¶ 18.
[10] Specifically, the DAF Parties assert that Highland and its wholly owned subsidiary, HCMLP Investment, L.P., collectively own approximately 51% of equity in HCLOF.  Counterclaim ¶ 19.  "As such, [Highland] controls the affairs of HCLOF."  *Id.*

Non-party Mr. Dondero resides in Texas and, according to Plaintiffs, "functionally controls NexPoint," *id.* ¶ 19, although the DAF Parties deny this, Answer ¶ 19.  Plaintiffs allege that "[u]pon information and belief, Dondero also functionally controls DAF and, through it, CLO[H]," Compl. ¶ 19, although the DAF Parties dispute this too, *see* Answer ¶ 19.[11]  The parties agree that Mr. Dondero formerly owned ACM and formerly served as Highland's CEO.  *See* Compl. ¶ 19; Answer ¶ 19.

## B.  Facts

### 1.  HCLOF and CLOH's Members Agreement

In November 2017, HCLOF and its shareholders—including CLOH—entered into a "Members Agreement Relating to the Company," providing that "[t]he Parties are entering into this Agreement to regulate the relationship between them and the operation and management of [HCLOF]."  Counterclaim ¶ 22 (quoting Members Agreement at 5[12]).  Section 20.5 of the Members Agreement states:  "Each Party shall at all times act in good faith towards the other Parties and shall use all reasonable endeavours to ensure that this Agreement is observed."  Members Agreement at 16 (the "Good Faith Clause").  The Members Agreement does not further define "good faith."

### 2.  ACM's Management and Bankruptcy

ACM, as Portfolio Manager, "is responsible for identifying and purchasing the assets that are held in the ACIS CLOs, monitoring those assets, and monetizing those assets in specified circumstances."  Compl. ¶ 26; *accord* Answer ¶ 26.  The ACIS CLOs raise funds by selling secured notes and subordinated notes, purchasing corporations' senior-secured debt instruments with the

---

[11] As noted in the Complaint, a bankruptcy judge made a series of findings of fact suggesting that Mr. Dondero might in fact exercise such functional control.  *See* Compl. ¶ 31 n.1 (citing HMC Bankruptcy Proceedings, ECF 2660, which appears in this case's docket at Dkt. No. 15-2).  These include findings that "DAF controls $200 million of assets, which asset base was derived from Highland, Mr. Dondero, Mr. Dondero's family trusts, or other donor trusts.  Mr. Dondero has historically been DAF's informal investment advisor (without an agreement), and he was DAF's managing member until 2012."  Dkt. No. 15-2 at 3 (ECF pagination).
[12] Page numbers throughout refer to ECF pagination, and not native pagination.

proceeds; and any income that the investments generate is used, in turn, to pay the CLOs' expenses, as well as principal and interest owed to the CLOs' noteholders.  Compl. ¶ 25; Answer ¶ 25.

According to Plaintiffs, Mr. Dondero, as former owner of ACM, "lost control" of the company through an "involuntary" bankruptcy proceeding.  Compl. ¶ 28.  The DAF Parties deny this.  Answer ¶ 28.  The bankruptcy was allegedly precipitated by Mr. Dondero's termination of Mr. Terry, who was ACM Portfolio's Manager; an arbitration proceeding followed.  Compl. ¶ 28; Answer ¶ 28 (denying this).  The parties do not dispute that the arbitrator found ACM and its general partner, Acis Capital Management GP, LLC ("ACM GP") liable and awarded Mr. Terry $8 million in damages.  Compl. ¶ 28; Answer ¶ 28.

Plaintiffs allege that, instead of directing ACM and ACM GP to pay the arbitration award, Mr. Dondero instead "attempted to frustrate Mr. Terry's ability to enforce it by stripping ACM and ACM GP of their assets"—a "scheme" that Mr. Terry "stopped . . . by commencing a bankruptcy case against ACM and ACM GP."  Compl. ¶ 29.  The DAF Parties deny this.  Answer ¶ 29.  There is no dispute that the bankruptcy court ultimately approved a transfer of 100% of ACM and ACM GP's equity to Mr. Terry.  Compl. ¶ 30; Answer ¶ 30.

### 3.  Series of Lawsuits

Plaintiffs allege that Mr. Dondero then launched a series of lawsuits against Mr. Terry and ACM because he was "[u]nwilling to accept [the bankruptcy judge's] ruling" and aims "to harass Plaintiffs through the court system," Compl. ¶ 31, which the DAF Parties deny, Answer ¶ 31.  These filings include the 2019 Lawsuit, *see* Compl. ¶¶ 32–37, which was voluntarily dismissed without prejudice, *id.* ¶ 38; and the 2020 Lawsuit, *see id.* ¶¶ 39–40, which was likewise voluntarily dismissed without prejudice, *id.* ¶ 41.[13]  The 2019 Lawsuit generally entailed allegations of mismanagement of

---

[13] While the DAF Parties dispute Plaintiffs' detailed descriptions of the lawsuits, instead asserting that the lawsuits "speak for [themselves]," *see* Answer ¶¶ 32–40, they admit both lawsuits' occurrence and that the 2019 Lawsuit "alleg[ed] mismanagement of the ACIS CLOs by ACM," *id.* ¶ 32.

the ACIS CLOs by ACM, *see id.* ¶ 32, and in turn U.S. Bank, *id.* ¶ 36, seeking damages allegedly

suffered by the subordinated notes owned by HCLOF, *id.* ¶ 37.  The 2020 Lawsuit was similar.  *See*

*id.* ¶¶ 39–40.

Shortly after a 2021 agreement between HCLOF and Plaintiffs was executed, and before

ACM had commenced the process of redeeming the ACIS CLOs pursuant to that agreement,

NexPoint, "another Dondero-controlled entity" according to Plaintiffs, commenced the NexPoint

Lawsuit, *id.* ¶ 44, which the DAF Parties deny, Answer ¶ 44 (asserting that the NexPoint Lawsuit

"speaks for itself").  This lawsuit similarly concerns ACM's alleged mismanagement of ACIS 6 and

another ACM-managed CLO, but not ACIS 4 or ACIS 5.  Compl. ¶ 44 (citing the NexPoint

Lawsuit).  Plaintiffs then sought a release from the DAF Parties of the threatened claims, which the

DAF Parties declined to grant, Compl. ¶ 47; Answer ¶ 47; *see also* Dkt. No. 15-11.[14]  As a result,

Plaintiffs contend, the DAF Parties "continue to threaten to bring further litigation related to the

ACIS CLOs," Compl. ¶ 47; the DAF Parties deny this, Answer ¶ 47.

#### 4.  2021 and 2023 Agreements

Plaintiffs allege that shortly after Highland became a majority investor in HCLOF,

Highland's CEO directed the company and HCLOF to jointly investigate the claims brought in the

DAF Parties' 2019 and 2020 Lawsuits.  Compl. ¶ 48.[15]  Following this, HCLOF, ACM, ACM GP,

and Mr. Terry entered into what Plaintiffs describe as a "settlement agreement," pursuant to which

HCLOF agreed to release claims against Plaintiffs, Brigade, another non-party, and the ACIS CLOs,

pertaining to any alleged breach of ACM's duties with respect to managing the CLOs.  *Id.* ¶ 49; Dkt.

Nos. 15-12, 155-3 (the "2021 Agreement").[16]  In turn, ACM and ACM GP agreed to "execute in

---

[14] The DAF Parties assert that the letters showing the offer, Dkt. No. 15-10, and their refusal, Dkt. No. 15-11, each "speak[s] for itself."  Answer ¶ 47.
[15] The DAF Parties lack sufficient knowledge to admit or deny this.  Answer ¶ 48.
[16] The DAF Parties state that the 2021 Agreement "speaks for itself."  Answer ¶ 49.  As the agreement is attached to the Counterclaim, the Court considers its contents—rather than merely the DAF Parties' description thereof—in evaluating

good faith the redemptions of the Acis CLOs," on HCLOF's terms.  Compl. ¶ 49 (quoting 2021 Agreement ¶ 5).

The DAF Parties allege that "HCLOF neither consulted with nor provided notice to CLOH that it was negotiating or entering into" the 2021 Agreement, which they allege "was negotiated in secrecy."  Counterclaim ¶ 26.  They assert that CLOH was not aware of the 2021 Agreement until it "was attached to the Plaintiffs' Complaint filed in this matter in 2022."  *Id.*  They further allege that the 2021 Agreement "includes terms highly adverse to both CLOH and DAF," "treat[s] CLOH in a manner substantially different from other HCLOF shareholders," and is "unrelated to any legitimate business purpose of HCLOF."  *Id.* ¶ 27.  For example, the 2021 Agreement "exclude[s]" the DAF Parties from "the benefits of the releases extended to HCLOF and HCLOF's other shareholders," "in perpetuity" prohibiting assignment or transfer of the subordinated notes to the DAF Parties.  *Id.* ¶ 28.  The DAF Parties allege that this "interference" was "intentional" and "undertaken in the absence of any business justification or privilege."  *Id.*  Last, they allege that the 2021 Agreement "states, falsely, that CLOH and DAF are controlled by James Dondero when HCLOF knew this to be untrue."  *Id.* ¶ 29.

Following the 2021 Agreement's execution, the ACIS CLOs liquidated their assets and redeemed their secured notes, which left only the subordinated notes outstanding.  Compl. ¶ 51; Answer ¶ 51.  Plaintiffs claim that the ACIS CLOs' "ability to make the full distributions to the subordinated notes that they otherwise would" from the liquidation proceeds has been "frustrated" by NexPoint's and the DAF Parties' ongoing litigation and threat thereof, respectively, Compl. ¶ 51, which the DAF Parties deny, Answer ¶ 51.  According to Plaintiffs, but denied by the DAF Parties, the ACIS CLOs retained liquidation proceeds to protect against potential future indemnification obligations arising from the lawsuits.  *See* Compl. ¶ 51; Answer ¶ 51.  This decision to retain those

the motions to dismiss the counterclaim.  *See In re Thelen LLP*, 736 F.3d 213, 219 (2d Cir. 2013); *see also Goldman v. Belden*, 754 F.2d 1059, 1065–66 (2d Cir. 1985).

funds as a bulwark against the expected litigation has allegedly resulted in the delay of payments to HCLOF and other subordinated noteholders.  *See* Compl. ¶ 51; Answer ¶ 51 (denying this).  For their part, the DAF Parties contend that by June 2021, following the initiation of an optional redemption at HCLOF's direction, Plaintiffs "wrongfully withheld reserves to help fund expenses for what they initially claimed was *potential* litigation, as well as litigation expenses in a separate, unrelated lawsuit filed by NexPoint"—amounting to a total of $41.5 million.  Counterclaim ¶ 35 (emphasis in original).

Another "'settlement' agreement" between HCLOF and ACM and U.S. Bank was negotiated in December 2022 and entered into in February 2023.  Counterclaim ¶¶ 31, 32; *see also* Dkt. No. 155-4 ("2023 Agreement").[17]  The DAF Parties similarly allege that "[t]he 2023 Agreement, which incorporates the 2021 Agreement, was also negotiated in secrecy, and it was not produced to CLOH until it was attached as an exhibit to a motion filed by [Plaintiffs]."  Counterclaim ¶ 32.  It, too, they allege is "highly injurious to CLOH;" and its "signature pages . . . were secretly held in escrow pending determination whether CLOH was allowed to pursue the Guernsey Proceedings."  *Id.*  The pages were released when the Texas bankruptcy court allowed the proceedings in Guernsey to go forward.  *Id.* ¶ 33.  The DAF Parties allege that the "secret" and "collusive" nature of this negotiation is suggested by "[n]umerous written communications between HCLOF and counsel for [Plaintiffs] during the Fall of 2022."  *Id.*

The DAF Parties complain that the 2023 Agreement contains terms that (1) are "inconsistent with multiple representations made by HCLOF to CLOH," (2) "treat[] CLOH in a manner starkly different from the other HCLOF shareholders," and (3) are "adverse to CLOH's contractual interests."  *Id.* ¶ 34.  And they allege that the 2023 Agreement was neither "ordinary nor necessary to resolve any litigation between the signatories," *id.*, nor consistent with any "legitimate

---

[17] The Court considers the 2023 Agreement itself in evaluating these motions to dismiss, given that it is attached to the Counterclaim.

business need or justification" of HCLOF's, *id.* ¶ 37, given HCLOF's apparently sole "legitimate" purposes of liquidating and winding-down, *id.* ¶ 36.  The DAF Parties allege that, pursuant to both agreements, Plaintiffs are using "wrongfully withheld reserves as a slush fund to cover litigation expenses and liability," "effectively using money that is owed, in significant part, to CLOH for the purpose of frustrating CLOH's rights and thereby causing it to incur unwarranted legal expenses." *Id.* ¶ 35.  They assert that "HCLOF advised CLOH that this withholding was wrongful and illegal" and "that [HCLOF] would take steps to force the release of these funds."  *Id.* ¶ 36.  Nonetheless, pursuant to the 2023 Agreement, Plaintiffs are allegedly withholding $25 million and have "released claims relating to their prior wrongful activity, including the unauthorized use of these funds."  *Id.*; *see also id.* ¶ 63 (asserting that CLOH owns an expectancy interest of approximately 49% in that $25 million).  As with the 2021 Agreement, the DAF Parties additionally allege that the 2023 Agreement wrongly contains terms that allow (1) Plaintiffs to pursue attorneys' fees against the DAF Parties, (2) HCLOF to "cooperate" with Plaintiffs in those efforts, and (3) the indefinite prohibition of any transfers or assignments of HCLOF's subordinated notes to the DAF Parties.  *Id.* ¶¶ 38–39.

### C.  Procedural History

On July 8, 2023, the DAF Parties filed the Answer and Counterclaim, (1) requesting declaratory judgments that the 2021 and 2023 Agreements are unenforceable, (2) asserting breach of contract against HCLOF, for alleged breach of the Members Agreement, (3) asserting tortious interference with contract against Plaintiffs, pertaining to the latter's alleged inducement of HCLOF's alleged breach of the Members Agreement, and (4) unjust enrichment against Plaintiffs.

### 1.  The DAF Parties' Counterclaim Against HCLOF and Plaintiffs

In the Counterclaim, the DAF Parties argue that they "are fighting a coordinated, two-front assault on their substantive rights and economic interests"—in part resulting from HCLOF's alleged breach of its contractual duties of good faith, and in part brought about by Plaintiffs who "have

undertaken a malicious campaign to interfere with CLOH's contractual rights and expectancies arising out of its ownership interests in HCLOF."  Counterclaim ¶ 3.

The DAF Parties allege, first, that Highland "is using HCLOF as a piggybank to [Highland's] benefit concerning matters unrelated to HCLOF's legitimate business purposes," "exercising this leverage by controlling HCLOF's current directors" through financial incentives.  *Id.* ¶ 4.  To this end, they assert that HCLOF's directors are "financially beholden" to the majority owner of HCLOF, Highland, *id.* ¶ 50; that a litigation trustee in HCM's bankruptcy initiated prior, separate litigation against Plaintiffs, *id.* ¶ 51; and that HCLOF, at Highland's direction, can "exert financial pressure on" the DAF Parties by "withhold[ing] funds" and "cooperat[ing]" with Plaintiffs to obtain attorneys' fees against the DAF Parties, *id.* ¶ 52.  They argue that this is "intended to deprive CLOH of needed cash-flow to support its defenses and protect its rights in the [bankruptcy] litigation."  *Id.* They also assert that HCLOF is effectively coercing CLOH to buy back its minority interest in HCLOF at a discount, which would allegedly benefit Highland in turn.  *Id.* ¶ 53.

Second, they allege that HCLOF's Directors, at Highland's directions, have induced HCLOF to breach the Good Faith Clause through "breaches of HCLOF's duties . . . to deal honestly with CLOH, to not treat CLOH in a disparate manner in relation to other HCLOF shareholders, to consider CLOH's interests when acting, and to avoid acting in a manner commercially unacceptable to ordinary and reasonable people."  *Id.* ¶ 5; *see also id.* ¶ 41 (alleging HCLOF's failure to disclose the 2021 or 2023 Agreements' terms to CLOH); *id.* ¶ 25 (alleging HCLOF's "fail[ure] to act with impartiality and fairness toward CLOH," and HCLOF's failure to notify CLOH of the 2021 or 2023 Agreements or their negotiation); *id.* ¶ 41 (alleging HCLOF's agreement to terms harmful to CLOH); *id.* ¶ 26 (alleging that by failing to notify CLOH, HCLOF "thereby prevent[ed] CLOH from voicing objection [to the 2021 or 2023 agreements], and otherwise lawfully preventing [the

agreements'] execution"); *id.* ¶ 41 (alleging HCLOF's failure to disclose its cooperation and "collu[sion]" with Plaintiffs).

As further support for the "dishonesty" allegation, the DAF Parties allege that the HCLOF directors themselves believed the reserve retention was "unlawful" and had told CLOH that they were "taking urgent and proportionate steps to secure unrestricted control over this cash and any as yet unliquidated securities." *Id.* ¶ 42; *see also id.* ¶ 43 (HCLOF considering taking "legal remedies"); *id.* ¶¶ 44–45 (reasserting HCLOF's position); *id.* ¶ 46 (asserting HCLOF's position that its directors believe "there is no credible basis for the litigation being pursued by the Dondero Parties, nor is there a proper basis in law for the withholding of the Company's assets by US Bank"). The DAF Parties allege that they were not pursuing any litigation at the time. *Id.* ¶ 46.

Third, they allege that HCLOF breached its duties arising from the Members Agreement via "a collusive alliance" that it formed with Plaintiffs "to serve economic interests unrelated to the legitimate business purposes of HCLOF which, at this time, are limited to liquidation and winding-down." *Id.* ¶ 6. They complain that HCLOF "should have" fully liquidated and distributed its assets to shareholders, including CLOH, in proportion to CLOH's 49% equity interest. *Id.* And, the DAF Parties allege, the reason HCLOF has not done so is because of this "collusive alliance," through which HCLOF and Plaintiffs "entered into two secret agreements"—the 2021 and 2023 Settlement Agreements—"and have acted in derogation of CLOH's contractual rights and expectancies" in turn. *Id.* ¶ 7. The DAF Parties allege not only that these agreements were secretly entered into, but also that they "were commercially unacceptable to an ordinary, honest, and reasonable person" and that the agreements "seek to prohibit CLOH's access to the courts in the United States and Guernsey." *Id.*

As for Plaintiffs' participation in this "collusive alliance" and inducement, the DAF Parties allege that Plaintiffs "were aware of the existence of the Members Agreement during all relevant

times and, upon information and belief, knew that the Members Agreement defined the relationship and obligations by and between HCLOF and its shareholders, including CLOH." *Id.* ¶ 24.  They allege this knowledge because Plaintiffs "were each parties to various legal proceedings in which the Members Agreement was disclosed and marked as an exhibit," noting that the Members Agreement was additionally "referred to in exhibits attached to Plaintiffs' Original and Amended Complaints." *Id.*  Moreover, the DAF Parties allege that Plaintiffs "were aware of public statements made by HCLOF regarding the withholding of funds [and], given the terms of the 2023 Agreement, . . . knew that HCLOF had misled CLOH in making these statements." *Id.* ¶ 48.

Fourth, the DAF Parties allege that ACM wrongfully withheld the reserves and had no right to do so under the Portfolio Management Agreements (the "PMAs"), including the PMAs' indemnity provisions—amounting to willful and malicious misconduct in bad faith by ACM and Mr. Terry. *Id.* ¶ 56.  Nor did U.S. Bank have any right to "participat[e] in this collusive alliance" under the relevant Indentures, the DAF Parties allege; U.S. Bank, too, "acted maliciously, wrongfully, intentionally, . . . without just cause or excuse," and in bad faith when it did so. *Id.* ¶¶ 57–59.

The DAF Parties argue that this conduct has resulted in the knowing and wrongful retention of millions of dollars "which should have been distributed to HCLOF and, in turn, distributed to CLOH." *Id.* ¶ 7.  Further, they allege that HCLOF "permit[ted]" Plaintiffs' "wrongful[]" use of the reserves to fund litigation—including that against the DAF Parties—and "wrongful[ly]" subsequently agreed to "release" said "misappropriations." *Id.*  The DAF Parties allege that HCLOF thereby agreed to release Plaintiffs' "material breaches" under a series of agreements, and HCLOF did so despite repeatedly representing to CLOH "that it was taking steps to force the distribution of wrongfully withheld reserves." *Id.*  They allege that Plaintiffs, in inducing HCLOF to engage in such alleged breaches, "knew that this withholding and use was wrongful and also knew that HCLOF had taken this position." *Id.*; *see also id.* ¶ 42 (asserting HCLOF's directors' view that the reserve

retention was "unlawful and . . . inconsistent with the . . . CLO Indentures"). Last, the DAF Parties complain of HCLOF's agreement to "cooperate" with Plaintiffs to recoup legal fees and expenses relating to the series of lawsuits detailed above. *See id.* ¶ 7.

### 2. Plaintiffs' Motion to Dismiss the DAF Parties' Counterclaim

Plaintiffs moved to dismiss the DAF Parties' Counterclaim against them, and requested judgment on the pleadings, on August 15, 2023. Dkt. No. 176. This motion was supported by a memorandum of law, Dkt. No. 183, and two declarations, Dkt. Nos. 180 and 182. The DAF Parties filed a response on September 22, 2023. Dkt. No. 199. Plaintiffs' reply was filed on October 19, 2023, Dkt. No. 217, with supporting declarations, Dkt. Nos. 215, 216.

In short, Plaintiffs argue that the DAF Parties' Counterclaim should be dismissed because the DAF Parties (1) lack standing to bring their claims, (2) "fail to plead any viable grounds to invalidate" the 2021 and 2023 Agreements, and (3) "fail to adequately plead their counts for New York law tortious interference with the Members Agreement and unjust enrichment." *See* Dkt. No. 183 at 5, 9, 13. The DAF Parties, in turn, argue that they (1) have standing—namely, direct standing; (2) have pleaded plausible claims to invalidate the 2021 and 2023 Agreements, primarily on grounds of collusion; and (3) have adequately pleaded their claims for tortious interference and unjust enrichment, particularly given the Rule 12(b)(6) standard. Last, the DAF Parties argue that Plaintiffs fail to meet the burden of Rule 12(c) regarding judgment on the pleadings, because the disputed factual issues raised by the Answer are neither immaterial nor too implausible to be supported by discovery. *See* Dkt. No. 199.

### 3. HCLOF's Motion to Dismiss the DAF Parties' Counterclaim

On August 15, 2023, HCLOF moved to dismiss the DAF Parties' Counterclaim against it "under Rule[s] 12(b)(1), (2), and (6) of the Federal Rules of Civil Procedure and the doctrines of international comity and *forum non conveniens*." Dkt. No. 177 at 1; *see also* Dkt. Nos. 178 (HCLOF's

14

mem. of law), 180 and 181 (supporting declarations).  On September 22, 2023, the DAF Parties filed

a response.  Dkt. Nos. 200 (response), 201 (declaration).  On October 19, 2023, HCLOF filed its

reply.  Dkt. No. 214.

In its motion to dismiss, HCLOF argues that the Court lacks (1) both general and specific

jurisdiction over it and (2) subject matter jurisdiction over the counterclaims.  Moreover, it asserts

that dismissal is proper under *forum non conveniens* and international comity, and that the

counterclaims are substantively meritless for the same reasons argued in Plaintiffs' motion to

dismiss.  *See* Dkt. No. 178.  The DAF Parties respond that HCLOF is subject to specific personal

jurisdiction, and that a finding personal jurisdiction comports with due process; that the Court has

subject matter jurisdiction pursuant to the Edge Act, among others; that neither *forum non conveniens*

nor international comity warrant dismissals of the counterclaims; and that the counterclaims survive

under Rule 12(b)(6).  *See* Dkt. No. 200.

## II.   LEGAL STANDARDS

Generally, jurisdictional questions must be decided first on motions to dismiss "because a

disposition of a Rule 12(b)(6) motion is a decision on the merits, and therefore, an exercise of

jurisdiction."  *De Masi v. Schumer*, 608 F. Supp. 2d 516, 523–24 (S.D.N.Y. 2009) (internal quotation

marks and alterations omitted) (citing *Homefront Org., Inc. v. Motz*, 570 F. Supp. 2d 398, 404

(E.D.N.Y. 2008); *Arar v. Ashcroft*, 532 F.3d 157, 168 (2d Cir. 2008)).  Further, "[w]hen a defendant

moves to dismiss pursuant to Rule 12(b)(1) for lack of subject matter jurisdiction and also moves to

dismiss on other grounds, the Court usually must consider the Rule 12(b)(1) motion first."  *Al-*

*Ahmed v. Twitter, Inc.*, 553 F. Supp. 3d 118, 123 (S.D.N.Y. 2021); *cf. Ruhrgas AG v. Marathon Oil Co.*,

526 U.S. 574, 588 (1999) (finding that, when faced with a "straightforward" personal jurisdiction

issue, a district court may decide the case on those grounds first, though need not).

### A.  Rule 12(b)(1):  Subject Matter Jurisdiction

Pursuant to Rule 12(b)(1), the Court must dismiss a claim when it "lacks the statutory or constitutional power to adjudicate it."  *Morrison v. Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008) (internal quotation marks omitted); *see also Arar*, 532 F.3d at 168 ("A federal court has subject matter jurisdiction over a cause of action only when it 'has authority to adjudicate the cause' pressed in the complaint.") (quoting *Sinochem Int'l Co. v. Malay Int'l Shipping Corp.*, 549 U.S. 422, 425 (2007)).  "The plaintiff bears the burden of proving subject matter jurisdiction by a preponderance of the evidence." *Aurecchione v. Schoolman Transp. Sys., Inc.*, 426 F.3d 635, 638 (2d Cir. 2005).  When considering a motion made pursuant to Rule 12(b)(1), "the court must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of the plaintiff."  *Raila v. United States*, 355 F.3d 118, 119 (2d Cir. 2004).

### B.  Rule 12(b)(2):  Personal Jurisdiction

On a motion to dismiss pursuant to Rule 12(b)(2), moreover, the "[non-movant] bears the burden of demonstrating personal jurisdiction over a person or entity against whom it seeks to bring suit." *Penguin Grp. (USA) Inc. v. Am. Buddha*, 609 F.3d 30, 34 (2d Cir. 2010) (citing *In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204, 206 (2d Cir. 2003) (*per curiam*)); *accord Bank Brussels Lamberts v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 784 (2d Cir. 1999) (same).  To defeat a jurisdiction-testing motion, the non-movant's burden of proof "varies depending on the procedural posture of the litigation." *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84 (2d Cir. 2013) (quoting *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990)).  At the pleading stage—and prior to discovery—a [non-movant] need only make a prima facie showing that jurisdiction exists. *Id.* at 84–85; *see also Eades v. Kennedy, PC Law Offices*, 799 F.3d 161, 167–68 (2d Cir. 2015) ("In order to survive a motion to dismiss for lack of personal jurisdiction, a [non-movant] must make a prima

facie showing that jurisdiction exists.") (quoting *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 167 (2d Cir. 2013)).

Courts may rely on materials outside the pleadings in considering a motion to dismiss for lack of personal jurisdiction. *See DiStefano v. Carozzi N. Am., Inc.*, 286 F.3d 81, 84 (2d Cir. 2001). If a court considers only pleadings and affidavits, the non-movant's prima facie showing "must include an averment of facts that, if credited by the ultimate trier of fact, would suffice to establish jurisdiction over the [movant]." *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659, 673 (2d Cir. 2013) (quoting *Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 163 (2d Cir. 2010)). The allegations in the complaint must be taken "as true 'to the extent they are uncontroverted' by the [movant's] affidavits, 'which the district court may also consider.'" *NuMSP, LLC v. St. Etienne*, 462 F. Supp. 3d 330, 341 (S.D.N.Y. 2020) (quoting *GlaxoSmithKline LLC v. Laclede, Inc.*, No. 18-cv-4945, 2019 WL 293329, at *3 (S.D.N.Y. Jan. 23, 2019)) (citing *MacDermid, Inc. v. Deiter*, 702 F.3d 725, 727–28 (2d Cir. 2012)). But if the parties present conflicting affidavits, "all factual disputes are resolved in the [non-movant's] favor, and the [non-movant's] prima facie showing is sufficient notwithstanding the contrary presentation by the moving party." *Seetransport Wiking Trader Schiffahrtsgesellschaft MBH & Co., Kommanditgesellschaft v. Navimpex Centrala Navala*, 989 F.2d 572, 580 (2d Cir. 1993) (citation omitted). Courts will not, however, "draw argumentative inferences in the [non-movant's] favor . . . [or] accept as true a legal conclusion couched as a factual allegation." *In re Terrorist Attacks*, 714 F.3d at 673 (internal quotation marks and citation omitted).

District courts "resolving issues of personal jurisdiction must . . . engage in a two-part analysis." *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 784 (2d Cir. 1999). "First, they must determine whether there is jurisdiction over the [movant] under the relevant forum state's laws. . . . Second, they must determine whether an exercise of jurisdiction under these laws is consistent with federal due process requirements." *Id.* "To establish personal jurisdiction over a

[movant], due process requires a [non-movant] to allege (1) that a [movant] has 'certain minimum contacts' with the relevant forum, and (2) that the exercise of jurisdiction is reasonable in the circumstances." *In re Terrorist Attacks*, 714 F.3d at 673 (citing *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). "To determine whether a [party] has the necessary 'minimum contacts,' a distinction is made between 'specific' and 'general' personal jurisdiction." *Id.* Courts "may assert general personal jurisdiction over a foreign [party] to hear any and all claims against that [party] only when the [party]'s affiliations with the State in which the suit is brought 'are so constant and pervasive so as to render it essentially at home in the forum State.'" *Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 331 (2d Cir. 2016) (quoting *Daimler AG v. Bauman*, 571 U.S. 117, 122 (2014)). Specific jurisdiction, by contrast, "depends on an affiliation between the forum and the underlying controversy, principally, activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation." *Id.* (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)).

The New York State long-arm statute provides for general jurisdiction under section 301 of the New York Civil Practice Law and Rules (the "N.Y.C.P.L.R."). *See Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88, 95 (2d Cir. 2000). In addition to general jurisdiction, "[t]he New York long arm statute authorizes personal jurisdiction over non-domiciliar[ies] under [section 302(a)]." *Whitaker v. Am. Telecasting, Inc.*, 261 F.3d 196, 209 (2d Cir. 2001) (citing N.Y.C.P.L.R. § 302(a)). N.Y.CPLR § 302(a)(1) permits a court to exercise personal jurisdiction over an out-of-state party if that party "transacts any business within the state," and if the claim arises from these business contacts. *CutCo Indus., Inc. v. Naughton*, 806 F.2d 361, 365 (2d Cir. 1986). "To meet the transacting business element under [section] 302(a)(1), it must be shown that a party purposely availed [itself] of the privilege of conducting activities within New York and thereby invoked the benefits and protections of its laws." *D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 104 (2d Cir. 2006) (internal quotation marks omitted).

"To determine whether a party has transacted business in New York, courts must look at the totality of circumstances concerning the party's interactions with, and activities within, the state." *Id.* at 105 (internal quotation marks omitted). "Although it is impossible to precisely fix those acts that constitute a transaction of business, [New York] precedents establish that it is the quality of the [movant's] New York contacts that is the primary consideration." *Fischbarg v. Doucet*, 9 N.Y.3d 375, 380 (N.Y. 2007). Factors to consider in assessing whether an out-of-state party "transacts business" in New York include:

> (i) whether the defendant has an on-going contractual relationship with a New York corporation; (ii) whether the contract was negotiated or executed in New York, and whether, after executing a contract with a New York business, the defendant has visited New York for the purpose of meeting with parties to the contract regarding the relationship; (iii) what the choice-of-law clause is in any such contract; and (iv) whether the contract requires franchisees to send notices and payments into the forum state or subjects them to supervision by the corporation in the forum state. Although all are relevant, no one factor is dispositive. Other factors may also be considered, and the ultimate determination is based on the totality of the circumstances.

*Agency Rent A Car Sys., Inc. v. Grand Rent A Car Corp.*, 98 F.3d 25, 29 (2d Cir. 1996) (citations omitted).

### C.  Rule 12(b)(6):  Failure to State a Claim

"In considering a motion to dismiss a counterclaim, the court applies the same standards as a motion to dismiss a complaint." *Zurich Am. Life Ins. Co. v. Nagel*, 571 F. Supp. 3d 168, 175 (S.D.N.Y. 2021) (citations omitted); *see also Garvey v. Face of Beauty LLC*, 634 F. Supp. 3d 84, 89 (S.D.N.Y. 2022) (similar). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).

It is not enough for a plaintiff to allege facts that are consistent with liability; the complaint or counterclaim must "nudge[ ]" claims "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. "To survive dismissal, the [non-movant] must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'" *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Twombly*, 550 U.S. at 555). Determining whether a complaint or counterclaim states a plausible claim is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. The court must accept all facts alleged in the complaint or counterclaim as true and draw all reasonable inferences in the non-movant's favor. *See Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 124 (2d Cir. 2008) (*per curiam*). However,

> "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." A complaint [or counterclaim] must therefore contain more than "naked assertion[s] devoid of further factual enhancement." Pleadings that contain "no more than conclusions . . . are not entitled to the assumption of truth" otherwise applicable to complaints in the context of motions to dismiss.

*DeJesus v. HF Mgmt. Servs., LLC*, 726 F.3d 85, 87–88 (2d Cir. 2013) (alterations in original) (quoting *Iqbal*, 556 U.S. at 678–79). Although Rule 8 "does not require 'detailed factual allegations,' . . . it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678. Thus, a complaint or counterclaim that offers "labels and conclusions" or "naked assertion[s]" without "further factual enhancement" will not survive a motion to dismiss. *Iqbal*, 556 U.S. at 678 (alteration in original) (citing *Twombly*, 550 U.S. at 555, 557).

"A court's task" on a motion to dismiss "is to assess the legal feasibility of the complaint [or counterclaim]; it is not to assess the weight of the evidence that might be offered on either side." *Lynch v. City of New York*, 952 F.3d 67, 75 (2d Cir. 2020). "The purpose of Rule 12(b)(6) is to test, in a streamlined fashion, the formal sufficiency of the [non-movant's] statement of a claim for relief *without* resolving a contest regarding its substantive merits. The Rule thus assesses the legal

feasibility of the complaint [or counterclaim], but does not weigh the evidence that might be offered to support it." *Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 155 (2d Cir. 2006) (emphasis in original); *see also In re Aluminum Warehousing Antitrust Litig.*, 95 F. Supp. 3d 419, 437 (S.D.N.Y. 2015) (noting that the Court "may not weigh the evidence in the guise of a plausibility analysis").

Finally, on a motion to dismiss, a court must generally "limit itself to the facts stated in the complaint" or, here, counterclaim. *Field Day, LLC v. Cnty. of Suffolk*, 463 F.3d 167, 192 (2d Cir. 2006). When deciding a motion to dismiss, a court may also consider "any written instrument attached to the complaint as an exhibit, any statements or documents incorporated in it by reference, and any document upon which the complaint heavily relies." *In re Thelen LLP*, 736 F.3d 213, 219 (2d Cir. 2013); *see also Goldman v. Belden*, 754 F.2d 1059, 1065–66 (2d Cir. 1985). Here, as the 2021 and 2023 Agreements are attached to the counterclaim as exhibits—*see* Counterclaim ¶¶ 30, 40; Dkt. Nos. 155-3, 155-4—the Court considers those agreements in its decision.

### D. Rule 12(c):  Judgment on the Pleadings

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12. "'Pleadings' include both the 'complaint' and the 'answer to [the] complaint.'" *Lively v. WAFRA Inv. Advisory Grp., Inc.*, 6 F.4th 293, 301 (2d Cir. 2021) (citing Fed. R. Civ. P. 7(a)). "The standard for granting a Rule 12(c) motion for judgment on the pleadings is identical to that [for granting] a Rule 12(b)(6) motion for failure to state a claim." *Lynch*, 952 F.3d at 75 (quoting *Patel v. Contemporary Classics*, 259 F.3d 123, 126 (2d Cir. 2001)). In evaluating a motion for judgment on the pleadings pursuant to Rule 12(c), a court must accept all facts set forth in the non-movant's pleading as true and draw all

reasonable inferences in favor of the non-movant. *See Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 78 (2d Cir. 2015).

"To survive a Rule 12(c) motion, '[the non-movant's pleadings] must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *WC Capital Mgmt., LLC v. UBS Secs., LLC*, 711 F.3d 322, 328 (2d Cir. 2013) (quoting *Johnson v. Rowley*, 569 F.3d 40, 44 (2d Cir. 2009)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). "The assessment of whether a complaint's factual allegations plausibly give rise to an entitlement to relief . . . calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of illegal conduct." *Lynch*, 952 F.3d at 75 (internal quotation marks omitted). "In making this assessment, we 'draw all reasonable inferences in [the non-movant's] favor.'" *Lively*, 6 F.4th at 301 (quoting *Johnson v. Rowley*, 569 F.3d 40, 43 (2d Cir. 2009)). Further, "[w]hen a plaintiff is the moving party, 'the plaintiff may not secure a judgment on the pleadings when the answer raises issues of fact that, if proved, would defeat recovery.'" *Flextech Rts. Ltd. v. RHI Ent., LLC*, No. 09 CIV. 3462 (DC), 2010 WL 245570, at *2 (S.D.N.Y. Jan. 22, 2010) (quoting 5C CHARLES ALAN WRIGHT & ARTHUR MILLER, FED. PRAC. & PROC. CIV. § 1368 & n. 20 (3d ed. 2009)).

Rule 12(c) motions "may be filed before discovery is complete;" and "[u]ntil both parties have an opportunity to test their evidence at summary judgment or trial, [courts] must accept the non-movant's pleading as true and decline to weigh competing allegations asserted by the moving party." *Id.* (citation omitted). That said,

> "judgment on the pleadings is not appropriate if there are issues of fact which if proved would defeat recovery, even if the trial court is convinced that the party opposing the motion is unlikely to prevail at trial." Thus, where a "question [of fact] is in dispute, it [is] improper for the district court to answer it on a motion for dismissal on the pleadings." Thus, a court may consider undisputed allegations of fact on a Rule 12(c) motion under the

same standard as Rule 12(b)(6), but it may not use a motion for judgment on the pleadings to weigh disputed factual allegations.

*Id.* (citations omitted); *see also* 5C CHARLES ALAN WRIGHT & ARTHUR MILLER, FED. PRACTICE & PROCEDURE CIV. § 1367 (3d ed. 2021) ("[A] Rule 12(c) motion is designed to provide a means of disposing of cases when the material facts are not in dispute between the parties . . . .  The motion for a judgment on the pleadings only has utility when all material allegations of fact are admitted or not controverted in the pleadings and only questions of law remain to be decided by the district court.").

## III.   DISCUSSION

The Court first addresses Plaintiffs' motion to dismiss the counterclaim against them, followed by HCLOF's motion to dismiss the counterclaim against it.

### A.   Plaintiffs' Motion to Dismiss the DAF Parties' Counterclaim

#### 1.   2021 and 2023 Agreements

Because the DAF Parties lack standing to bring their counterclaims alleging collusion and dishonesty, *inter alia*, surrounding the 2021 and 2023 Agreements, the counterclaims seeking to invalidate the 2021 and 2023 Agreements must be dismissed.

##### a.   Standing and Choice of Law

In contrast to Article III standing, "contractual standing . . . asks a different question: whether a party has the right to enforce a contract. . . .  [C]ontractual standing speaks to a party's right to relief for breach of contract."  *SM Kids, LLC v. Google LLC*, 963 F.3d 206, 211 (2d Cir. 2020).  It is "a prudential limitation on the Court, rather than a constitutional one."  *Tang Cap. Partners, LP. v. BRC Inc.*, 661 F. Supp. 3d 48, 73 (S.D.N.Y. 2023).  "Contractual standing is appropriately decided on a motion to dismiss."  *U.S. Bank Nat'l Ass'n as Tr. to Bank of Am., N.A. v. KeyBank, Nat'l Ass'n*, No. 20-CV-3577 (PKC), 2023 WL 2745210, at *16 (S.D.N.Y. Mar. 31, 2023) (citations omitted).

The DAF Parties lack direct standing to bring their claims under both New York and Texas law.  "[A] choice-of-law clause in a contract will apply to disputes about the existence or validity of that contract."  *Motorola Credit Corp. v. Uzan*, 388 F.3d 39, 50 (2d Cir. 2004); *see also Sphere Drake Ins. Ltd. v. Clarendon Nat'l Ins. Co.*, 263 F.3d 26, 32 n.3 (2d Cir. 2001) ("consider[ing] New York and New Jersey law, as appropriate, for questions relating to contract formation," given that the contracts at issue selected New York and New Jersey, respectively, in their choice-of-law clauses).  Here, the 2021 Agreement between HCLOF, ACM, ACM GP, and Mr. Terry is governed by the laws of the State of Texas, Dkt. No. 155-3 at 8; and the 2023 Agreement between HCLOF, ACM, and U.S. Bank is governed by the laws of the State of New York, Dkt. No. 155-4 at 11.  Thus, in evaluating the DAF Parties' standing to bring their claims seeking to invalidate the 2021 and 2023 Agreements, the Court applies the laws of Texas and New York, respectively.

### b.  2021 Agreement

The DAF Parties lack standing to sue to invalidate the 2021 Agreement under Texas law.  "Generally, Texas courts presume that a non-contracting, third party has no justiciable interest in a contract."  *Cassidy v. TeamHealth, Inc.*, No. 01-08-00324-CV, 2009 WL 2231217, at *3 (Tex. App. July 23, 2009) (citing, *inter alia, S. Texas Water Auth. v. Lomas*, 223 S.W.3d 304, 306 (Tex. 2007)).  In Texas, "there is a presumption against conferring third-party-beneficiary status on noncontracting parties."  *Lomas*, 223 S.W.3d at 306 (citations omitted).  "A third party may *only* enforce a contract when the contracting parties themselves intend to secure some benefit for the third party and entered into the contract directly for the third party's benefit.  To qualify as one for whose benefit a contract was made, the third party must benefit more than incidentally; he must be either a donee or creditor beneficiary."  *Id.* (citations omitted and emphasis added); *see also City of Houston v. Williams*, 353 S.W.3d 128, 145 (Tex. 2011) ("Texas law recognizes that third parties have standing to recover

under a contract that is clearly intended for their direct benefit. . . . . [A] third party cannot enforce a contract if the third party benefits only incidentally from it.")

Here, it is clear—indeed, the DAF Parties affirmatively argue—that the 2021 Agreement does not intend to secure *any* benefits to the DAF Parties; the DAF Parties assert that it causes them affirmative and intentional harm. *See, e.g.*, Counterclaim ¶¶ 27–29, 41; Dkt. No. 199 at 9 ("[T]here should not be any question that the DAF Parties are directly harmed and aggrieved by the two Agreements at issue. . . . [Certain provisions of the agreements] reflect an intent to impact the DAF Parties substantive and procedural rights, and the Counterclaim alleges that this targeting has caused harm."). Accepting all facts alleged in the counterclaim as true, and drawing all reasonable inferences in the DAF Parties' favor, *see Burch*, 551 F.3d at 124, it is clear that the DAF Parties are non-contracting third parties and not third-party beneficiaries to the 2021 Agreement. As a result, the DAF Parties lack standing to bring their claims seeking to invalidate the agreement under Texas law. *See Lomas*, 223 S.W.3d at 306.

### c.   2023 Agreement

Nor do the DAF Parties have standing under New York law to invalidate the 2023 Agreement. "A non-party to a contract governed by New York law lacks standing to enforce the agreement in the absence of terms that 'clearly evidence[] an intent to permit enforcement by the third party' in question." *Premium Mortg. Corp. v. Equifax, Inc.*, 583 F.3d 103, 108 (2d Cir. 2009) (quoting *Fourth Ocean Putnam Corp. v. Interstate Wrecking Co.*, 66 N.Y.2d 38, 45 (1985)). That is, in New York, non-parties to contracts may have standing to sue if they are third-party beneficiaries, but "a non-party to the contract lacks standing to sue for breach absent a valid assignment of the claim." *Rynasko v. New York Univ.*, 63 F.4th 186, 194 (2d Cir. 2023); *see also Durosene v. Bank of Am., N.A.*, 2020 WL 3403083, at *3 (E.D.N.Y. June 19, 2020) ("[A] non-party to a contract lacks standing to challenge [it] . . . [unless] it is a third-party beneficiary.").

Again, it is clear that the DAF Parties are not intended beneficiaries of the 2023 Agreement; the DAF Parties themselves assert as much. *See, e.g.*, Counterclaim ¶¶ 33–36. And although the DAF Parties cite to a New York state case for the proposition that "direct harm" can itself suffice to confer direct third-party standing to enforce a contract, the Court questions whether that is a correct statement of the law in New York.[18] The Court therefore follows the Second Circuit's description of the standard, as described above. And even if "direct harm" was the standard, the "direct harms" that the DAF Parties allege[19] do not appear to be of the sort contemplated by that court.[20]

To the extent that the DAF Parties claim that they are "harmed" by a reduction in their distributions as shareholders of HCLOF due to apparent "harms" that HCLOF suffered, any such

---

[18] The DAF Parties cite a rule articulated instead by the First Department of the Appellate Division in *Decolator, Cohen & DiPrisco, LLP v. Lysaght, Lysaght & Kramer, P.C.* The *Decolator* Court stated that in New York, "[i]t is well settled that in order to have standing to challenge a contract, a non-party to the contract must either suffer direct harm flowing from the contract or be a third-party beneficiary thereof." 304 A.D.2d 86, 90 (1st Dep't 2003); *accord FGP 1, LLC v. Dubrovsky*, 197 A.D.3d 441, 441 (1st Dep't 2021) (same); *see also Chen v. New Trend Apparel, Inc.*, 8 F. Supp. 3d 406, 437 (S.D.N.Y. 2014) (citing the *Decolator* rule). For this proposition, *Decolator* itself cites to a four-paragraph opinion in *P.A. Bldg. Co. v. City of New York*, which found that the plaintiff in that case "does not have standing to contest the contract, as there is no direct harm flowing from a governmental action and plaintiff is neither a party nor a third-party beneficiary of the contract." 629 N.Y.S.2d 240, 240 (1st Dep't 1995). Absent further explanation, *P.A. Building* cites to a 1940s case that states the usual rule that appears in the Second Circuit cases cited above—namely, that a "claim of illegality, although open to the contracting parties, cannot, as a general rule, be invoked by third parties. Of course, an exception may attend where the third party claims to be the beneficiary of a contract to which he is not a party . . . ." *I. Miller & Sons v. United Off. & Pro. Workers Loc. 16 C.I.O.*, 88 N.Y.S.2d 573, 575 (N.Y. Sup. Ct. 1949). The Court is unsure of what the *Decolator* Court may have meant when it stated that "direct harm" could suffice for third-party contractual standing—especially given that the sources cited by the First Department in support of this proposition do not at all support it. In any case, the Court doubts that the First Department intended for the "direct harm" idea to provide an end-run around the traditional restraints on derivative standing.

[19] Citing to *Decolator*, the DAF Parties argue that they suffered "direct harms" from the agreements, which identify the DAF Parties by name and thus "were intended to directly impact" and "target[]the DAF Parties" with terms that have a "direct negative impact" on them. *See* Dkt. No. 199 at 9. They claim that the agreements "impact the DAF Parties' substantive and procedural rights." *Id.* Specifically, the Counterclaim alleges that the 2023 Agreement treats CLOH disparately and adversely. Counterclaim ¶ 34. It alleges that the 2023 Agreement enables Plaintiffs to withhold approximately $25 million, *id.* ¶ 36; and in using the reserves, Plaintiffs are "effectively using money that is owed . . . to CLOH for the purpose of frustrating CLOH's rights and thereby causing it to incur unwarranted legal expenses," *id.* ¶ 35. The DAF Parties additionally complain that the agreement "release[s] claims relating to . . . the unauthorized use of these funds," *id.* ¶ 36; "allows the . . . recovery of attorneys' fees against DAF and CLOH," *id.* ¶ 38, and "prohibit[s] any transfers or assignments of the HCLOF Notes to DAF or CLOH in perpetuity," including "an agreement that HCLOF would take steps to prevent any assignment of assets to DAF or CLOH and give [Plaintiffs] the right to enjoin any such transfers or assignments," *id.* ¶ 39.

[20] The *Decolator* Court reasoned that another non-contracting third party was not directly harmed by an agreement between two other parties that "in no way affect[ed] [the third party's] right[s.]" 304 A.D.2d at 90. Here, although the DAF Parties assert that their "substantive and procedural rights," Dkt. No. 199 at 9, were impacted by the agreement between Plaintiffs and HCLOF, this conclusory allegation is not supported by adequately pleaded facts. *See, e.g.*, Section III.A.2, *infra* (discussing, first, the Royal Court of Guernsey and its conclusions regarding the duties HCLOF owed to CLOH; and second, the duties HCLOF owed to CLOH under Guernsey law).

harms would be derivative, not direct.  New York law—which governs the 2023 Agreement, *see* Dkt. No. 155-4 at 11—requires that "courts 'look to the law of the state of incorporation in adjudicating a corporation's internal affairs,' *Galef v. Alexander*, 615 F.2d 51, 58 (2d Cir. 1980), including questions as to whether a claim is direct or derivative," *NAF Holdings, LLC v. Li & Fung (Trading) Ltd.*, 772 F.3d 740, 743 (2d Cir. 2014), *certified question answered*, 118 A.3d 175 (Del. 2015) (citing *Seidl v. Am. Century Cos.*, 713 F. Supp. 2d 249, 255 (S.D.N.Y. 2010), *aff'd*, 427 Fed. Appx. 35 (2d Cir. 2011)).

HCLOF is registered in Guernsey and incorporated under Guernsey laws.  Counterclaim ¶ 13.  So to the extent that the DAF Parties' claims might be derivatively sought on HCLOF's behalf, Guernsey law would apply.  Plaintiffs persuasively argue that the DAF Parties lack standing to bring such derivative claims under Guernsey law, *see* Dkt. No. 183 at 14–16 (identifying the exceptional circumstances in which shareholders have standing to bring derivative claims and persuasively arguing that none apply here); and the DAF Parties have, in any case, forfeited that argument, *see* Dkt. No. 199 at 19, 26 (declining to argue that the DAF Parties would have derivative standing and asserting that "[t]his is not a derivative claim"); *Ramirez v. Temin & Co., Inc.*, No. 20 CIV. 6258 (ER), 2021 WL 4392303, at *9 n.2 (S.D.N.Y. Sept. 24, 2021) ("[A] plaintiff's failure to address an issue in its opposition raised by its adversary amounts to a concession or waiver of the argument.") (citations omitted).

For the avoidance of doubt, even if New York law applied to this question, the DAF Parties would still lack standing to bring these claims derivatively.  *See, e.g.*, *Serino v. Lipper*, 123 A.D.3d 34, 40 (2014) ("[E]ven where an individual harm is claimed, if it is confused with or embedded in the harm to the corporation, it cannot separately stand."); *id.* at 41 ("The lost value of an investment in a corporation is quintessentially a derivative claim by a shareholder."); *cf. Yudell v. Gilbert*, 99 A.D.3d 108, 115 (2012) ("To the extent, if any, that plaintiffs have asserted direct claims, they are embedded

in an otherwise derivative claim for partnership waste and mismanagement, and, thus, subject to dismissal.").

Accepting all facts alleged in the Counterclaim as true, and drawing all reasonable inferences in the DAF Parties' favor, *see Burch*, 551 F.3d at 124, the Court concludes that the DAF Parties lack standing to bring their counterclaims pertaining to the 2021 or 2023 Agreements.  Given this finding, the Court need not address whether the DAF Parties' Counterclaim adequately pleads viable grounds to invalidate the 2021 and 2023 Agreements on the merits.

### 2. Tortious Interference

The DAF Parties' counterclaim for tortious interference with contract is dismissed for failure to adequately allege breach.  This counterclaim alleges that Plaintiffs, *inter alia*, "engaged in unjustified activities that intentionally caused and induced HCLOF's breach of the Members Agreement" between HCLOF and CLOH.  *See* Counterclaim ¶¶ 84–93.  Specifically, the DAF Parties allege that Plaintiffs induced HCLOF to breach the Members Agreement by (1) "induc[ing] HCLOF to delay the distribution of funds," which had been allegedly wrongfully withheld once the CLOs were redeemed, *see id.* ¶ 90, and (2) "extracting promises, releases, and warranties from HCLOF to which [Plaintiffs] were not entitled and that were wholly inconsistent with HCLOF's good faith obligations to CLOH" under the Members Agreement's Good Faith Clause, *id.* ¶ 91.

While the Members Agreement states that it "shall be governed by and construed in accordance with the laws of the Island of Guernsey," Dkt. No. 155-2 ¶ 22, the parties dispute which law governs the question of prudential standing to bring this claim.[21]  But regardless of whether the DAF Parties have contractual standing to bring it, any claim for tortious interference must be dismissed as the DAF Parties have failed to adequately allege an underlying breach.  *See, e.g.*, *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 401–02 (2d Cir. 2006) (listing the elements of tortious interference

---

[21] Neither party briefs a conflicts-of-law analysis on this question.  *See* Dkt. Nos. 183, 199, 217.

with contract under New York law, which include "actual breach of the contract"). Further, the Royal Court of Guernsey's final judgment issued on December 1, 2023, Dkt. No. 229-1 (the "Guernsey Judgment") collaterally estops the DAF Parties from alleging no such breach of the Good Faith Clause. And even if collateral estoppel did not apply, the Guernsey Judgment would additionally persuade the Court that, under Guernsey law, the DAF Parties fail to adequately allege breach of contract.

### a. Collateral Estoppel:  The Guernsey Judgment

"Collateral estoppel, or issue preclusion, prevents parties or their privies from relitigating in a subsequent action an issue of fact or law that was fully and fairly litigated in a prior proceeding." *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 288 (2d Cir. 2002). "Collateral estoppel, also known as issue preclusion, [may] 'appl[y] to judgments issued by courts of foreign countries.'" *F.T. Mar. Servs. Ltd. v. Lambda Shipholding Ltd.*, 533 F. Supp. 3d 149, 155 (S.D.N.Y. 2021) (quoting *Yukos Cap. S.A.R.L. v. OAO Samaraneftegaz*, 963 F. Supp. 2d 289, 295 (S.D.N.Y. 2013)). In order for a foreign judgment to have preclusive effect, the court first must "recognize the foreign judgment . . . based on principles of comity." *F.T. Mar. Servs. Ltd.*, 533 F. Supp. at 155 (citing *Yukos Cap. S.A.R.L.*, 963 F. Supp. at 295). "Federal courts generally extend comity whenever the foreign court had proper jurisdiction and enforcement does not prejudice the rights of United States citizens or violate domestic public policy." *Id.* (quoting *Victrix S.S. Co., S.A. v. Salen Dry Cargo A.B.*, 825 F.2d 709, 713 (2d Cir. 1987)) (internal quotation marks omitted).

The decision of the Royal Court of Guernsey is entitled to recognition. Here, like in *State Street Global Advisors Trust Co. v. Visbal*, "[t]here is no question" that the Guernsey courts had jurisdiction over this case, given that CLOH chose to sue HCLOF, a Guernsey company, in Guernsey. *See* No. 1:19-CV-1719-GHW, 2023 WL 4053170, at *10 (S.D.N.Y. June 16, 2023), *adhered to on reconsideration*, No. 1:19-CV-1719-GHW, 2023 WL 4764021 (S.D.N.Y. July 25, 2023) (reasoning

the same with respect to a plaintiff suing an Australian defendant in Australia); *see also F.T. Mar.*, 533

F. Supp. 3d at 155–56 (finding proper jurisdiction where plaintiff sued foreign company in foreign

country, that country's jurisdiction was not challenged, and there was no prejudice "because neither

party is an American company").  Here, too, CLOH's decision to prosecute HCLOF, a Guernsey

company, in Guernsey "defeats its argument that enforcing that decision here would prejudice its

rights or violate domestic public policy."  *See id.*  CLOH itself created the possibility that it may

suffer an adverse decision in Guernsey by suing there.  Accordingly, enforcing the Guernsey

Judgment here "would not be so 'repugnant to fundamental notions of what is decent and just' such

that it would violate public policy."  *Id.* (quoting *Ackermann v. Levine*, 788 F.2d 830, 842 (2d Cir.

1986) (noting that this "standard is high, and infrequently met," and that "only in clear-cut cases

ought it to avail" the party seeking not to apply the foreign judgment (citation omitted)).  Moreover,

"[i]t is incontrovertible that the English judicial system," on which Guernsey's legal system is based,

"provides impartial tribunals and 'procedures compatible with the requirements of due process of

law.'"  *See Soc'y of Lloyd's v. Edelman*, No. 03 CIV. 4921 (WHP), 2005 WL 639412, at *3 (S.D.N.Y.

Mar. 21, 2005) (recognizing English judgment) (citations omitted); Dkt. 111 ¶¶ 3.1–3.3 (noting that

Guernsey courts generally follow English common law); *see also Clarkson Co., Ltd. v. Shaheen*, 544 F.2d

624, 629–30 (2d Cir. 1976) ("[E]xceptions [to recognition] are construed especially narrowly when

the alien jurisdiction is . . . a sister common law jurisdiction . . . .").

  In addition, the Royal Court's ruling on the question of whether HCLOF breached the

Good Faith Clause has preclusive effect.  "In order to apply the doctrine of collateral estoppel to bar

litigation of an issue, '(1) the issues in both proceedings must be identical, (2) the issue in the prior

proceeding must have been actually litigated and actually decided, (3) there must have been a full and

fair opportunity for litigation in the prior proceeding, and (4) the issue previously litigated must have

been necessary to support a valid and final judgment on the merits.'"  *Levy v. Kosher Overseers Ass'n of*

*Am., Inc.*, 104 F.3d 38, 41 (2d Cir. 1997) (quoting *Gelb v. Royal Globe Ins. Co.*, 798 F.2d 38, 44 (2d Cir. 1986)).  In determining whether the issues in both proceedings are "the same," courts consider whether the inquiries required in both actions are identical.  *See id.* at 43.

Further, "parties are barred from relitigating not only matters actually litigated in the preceding action but also any matters that could have been litigated in that action."  *West v. Ruff*, 961 F.2d 1064, 1065 (2d Cir. 1992).  And "[t]he general rule in this Circuit is that 'if a court decides a case on two grounds, each is a good estoppel.'"  *Gelb v. Royal Globe Ins. Co.*, 798 F.2d 38, 45 (2d Cir. 1986) (quoting *Irving National Bank v. Law*, 10 F.2d 721, 724 (2d Cir. 1926) (L. Hand, J.)) (other citations omitted)); *see also Brandon v. NPG Records*, 2020 WL 2086008, at *9 n.6 (S.D.N.Y. Apr. 30, 2020) (Woods, J.), *aff'd*, 840 F. App'x 605 (2d Cir. 2020) (same).

Here, following a trial, the Royal Court of Guernsey issued its judgment dismissing CLOH's suit.  *See* Guernsey Judgment ¶¶ 6–10 (describing the trial and judgment); *id.* ¶ 221 (dismissing the case).  The Guernsey Judgment concerned whether HCLOF had engaged in "unfairly prejudicial conduct" against CLOH in violation of sections 349 and 350 of the Companies Law.  *Id.* ¶ 85.  The Royal Court stated that, in Guernsey, conduct "becomes unfairly prejudicial" when it "goes outside the boundaries of what can be seen as properly inherent in the agreement" between the two parties. *Id.* ¶ 87(ii).  In the context of a commercial relationship, Guernsey courts look to "the contractual terms which govern the relationships of the shareholders" in order to determine "what is fair or unfair;" "[s]ince keeping promise and honouring agreements is probably the most important element of commercial fairness, the starting point . . . will be to ask whether the conduct of which the shareholder complains was in accordance with the articles of association."  *Id.* ¶ 92 (quoting *In Re Saul D Harrison & Sons PLC* [1994] BCC 475, 488); *id.* ¶ 93 (beginning its analysis here with "the agreement documents" – that is, HCLOF's Articles of Association and the Members Agreement – as "the start point in judging whether conduct is 'unfairly prejudicial'").

In the Guernsey proceeding, CLOH argued, first, that HCLOF breached the Good Faith Clause, *id.* ¶ 95, and second, that equitable constraints imposed duties on HCLOF to protect CLOH's interests, *id.* ¶ 98.  In particular, CLOH referred to HCLOF's conduct as "unfair" under the Companies Law specifically insofar as it "was a breach of the good faith clause," for being "commercially unacceptable to reasonable and honest people" or for bringing "into play 'equitable considerations' of constraint on HCLOF which had not been observed . . . ." *Id.* ¶ 133.  HCLOF argued, in turn, that "the only question is [whether there] has . . . been a breach of the contractual terms" and, if not, "there has been no unfairly prejudicial conduct." *Id.* ¶ 101.  HCLOF argued that equitable considerations do not come into play because the relationship is purely commercial. *Id.* ¶ 103.  CLOH had disavowed bad faith, however. *Id.* ¶ 105.  Thus, the Royal Court of Guernsey was presented with the question of "whether . . . any question of unfair prejudicial conduct necessarily requires there to have been some breach of the agreements . . . and if so[,] whether there has been a breach . . . or whether equitable principles have any supervening application." *Id.* ¶ 107.

The Royal Court concluded that it "unhesitatingly prefers [HCLOF's] submissions" on these questions to those of CLOH. *Id.*  It continued:  "[i]t is . . . difficult to see how performing a contract strictly according to its terms could ever amount to bad faith," and "there is no conceptual space where actions can be a breach of a duty to act in good faith but simultaneously not amount to bad faith;" "actual dishonesty" is not required to show bad faith. *Id.* ¶ 108.  "It is in fact difficult to see how performing a contract strictly according to its terms could ever amount to bad faith (except possibly where the party asserting that it was doing so knew or seriously suspected that the counterparty had contracted under a mistake about the effect of the relevant term, which is not this case and is very far from it)." *Id.*  The Royal Court found that "there is really no room for equitable considerations to modify or constrain . . . the express terms of the relevant contracts where the context is a commercial relationship, and the contractual documents are carefully drawn, no doubt

after negotiation, clearly with legal advice, and made between commercially sophisticated parties," as here, *id.* ¶ 109; *see also id.* ¶ 113 (noting that Guernsey law rarely implies terms into formally drafted contracts to impart into them "equitable principles" not expressly stated). Thus, any of the duties that HCLOF owed to CLOH were spelled out "in the express terms of the relevant contracts." *Id.* ¶ 109.

Thus, applying Guernsey law, the Royal Court of Guernsey found that, with respect to the CLO reserves and the 2021 and 2023 Agreements, "it is not open to CLOH to allege breach of the 'act in good faith' clause whilst simultaneously disavowing any intention to allege bad faith," and as a result, "[t]hat [claim] is therefore dismissed . . . ." *Id.* ¶ 115. The Royal Court of Guernsey continued: "in case the latter finding [that, by disavowing an allegation of bad faith, CLOH failed to allege breach of the parties' express terms] is wrong, and since the matter was fully examined and argued . . . the Court has gone on to examine the various matters of allegedly unfairly prejudicial conduct . . . ." *Id.* ¶ 116.

The court subsequently, independently found that CLOH "has established no breach towards it of any term of the contractual documents defining the legal rights of the parties," including the Members Agreement; and that "[t]here is no evidence that the Directors of HCLOF have taken steps other than in what they honestly and reasonably believed to be the best interests of the company, HCLOF, itself," such that "CLOH's complaints are largely simply that it disagrees with what have been, on the face of it, valid and appropriate management decisions made by HCLOF's admittedly independent Directors." *Id.* ¶ 220(i), (iii); *see also id.* ¶ 111 (finding that CLOH complains of "simply . . . bad business judgment, or, more accurately perhaps, . . . a business judgment with which it does not agree"). In support of this finding, the Royal Court examined, for example, CLOH's allegation of HCLOF's failure to inform CLOH that it was negotiating the agreements (finding no issue as "[t]here is no obligation, express or implied . . . which would oblige

33

the Directors of HCLOF to inform the shareholders" in this way, *id.* ¶ 125) and the retention of Highland as the "effective" Portfolio Manager (finding no issue as this, too, was "within the scope of the Directors' authority," *id.* ¶ 126).  The Royal Court looked at the full circumstances surrounding entry into the 2021 Agreement, *see id.* ¶¶ 135–59, and it concluded that neither the transfer restrictions nor the releases amounted to unfair prejudice, *id.* ¶¶ 147–48 (on the former, finding that CLOH never had a right to acquire HCLOF's assets or to gain direct title to the ACIS CLOs); *id.* ¶ 151 (finding that HCLOF has no duty to elevate "the personal interests or circumstances of particular shareholders" when making decisions pertaining to what is in "the best interests of the company as a whole"); *id.* ¶ 159 (reasoning that thus, no unfair prejudice ensued).

Further, HCLOF's supposed failure to sue U.S. Bank to obtain the reserves did not amount to unfair prejudice, and the Royal Court found that HCLOF's actions in entering into the 2021 Agreement were in its best interest.  *See id.* ¶¶ 178–79.  So too was its conduct regarding the 2023 Agreement.  *See id.* ¶¶ 199.  Neither of these agreements amounted to a showing of unfair prejudice, in the Royal Court's view.  The Royal Court therefore concluded that CLOH's lawsuit "fails for the following reasons, *alone or in combination:* (i) "CLOH has established no breach towards it of any term of the contractual documents," (ii) equitable considerations do not apply, (iii) "[t]here is no evidence that the Directors of HCLOF have taken steps other than in what they honestly and reasonably believed to be the best interests of the company, HCLOF, itself," etc.  *See id.* ¶ 220 (emphasis added).  Notwithstanding the Royal Court's earlier caveat that it went on to analyze the issue of breach in case it was wrong that the case should be dismissed merely for CLOH's failure to allege bad faith, *id.* ¶ 116, the Royal Court nonetheless stated that CLOH's claims fail on the independent grounds of failure to establish breach of the Good Faith Clause, *see id.* ¶ 220; *Gelb*, 798 F.2d at 45 ("The general rule in this Circuit is that 'if a court decides a case on two grounds, each is a good estoppel.")

Accordingly, the Guernsey Judgment is entitled to preclusive effect because (1) the issue of whether HCLOF breached the Good Faith Clause is identical in both the Guernsey proceeding and this case, (2) the issue of breach was actually litigated and actually decided, in a comprehensive and thoroughly reasoned 42-page, single-spaced opinion, following a full trial on the merits, (3) the DAF Parties had a full and fair opportunity to litigate it there, notwithstanding CLOH's decision to disavow its argument of bad faith,[22] and (4) it was necessary on the merits for the Royal Court to decide the issue of breach. *See Levy*, 104 F.3d at 41. That Plaintiffs were not a party to the Guernsey proceeding is of no matter. *See, e.g.*, *Austin v. Downs, Rachlin & Martin Burlington St. Johnsbury*, 270 F. App'x 52, 54 (2d Cir. 2008) (summary order) ("Under non-mutual collateral estoppel, if a litigant has had an opportunity to fully and fairly litigate an issue and lost, then third parties unrelated to the original action can bar the litigant from relitigating that same issue in a subsequent suit."); *Wilder v. Thomas*, 854 F.2d 605, 621 (2d Cir. 1988) (allowing the "defendants to invoke defensive collateral estoppel even though they were not parties to the [prior] proceeding"). Nor are minute changes to the DAF Parties' theories between the Guernsey action and this one of any consequence. *Ranasinghe v. Kennell*, 2017 WL 384357, at *4 (S.D.N.Y. Jan. 25, 2017) (holding that "[t]he fact that [the plaintiff] repackaged his claims slightly and presented them in the guise of new legal theories is immaterial" for purposes of collateral estoppel); *Zherka v. City of N.Y.*, 459 F. App'x 10, 13 (2d Cir. 2012) (summary order) ("The doctrine of collateral estoppel developed to address precisely this situation, where a party seeks to repeatedly litigate the same issue by means of more specific pleadings, by

---

[22] *See, e.g.*, *West*, 961 F.2d at 1065 ("[P]arties are barred from relitigating not only matters actually litigated in the preceding action but also any matters that could have been litigated in that action."); *cf. In re Red Dot Scenic, Inc.*, 313 B.R. 181, 188 (Bankr. S.D.N.Y. 2004) (finding that a party was "collaterally estopped" from making an argument that he conceded below); *GAF Corp. v. Eastman Kodak Co.*, 519 F. Supp. 1203, 1213 (S.D.N.Y. 1981) ("[T]he decision to agree to certain facts was a decision made by [the defendant] as part of its litigation strategy. Several courts, including the Second Circuit, have recognized that collateral estoppel should not be barred because a party entered into stipulations." (citing *Tillman v. Nat'l City Bank of New York*, 118 F.2d 631, 635 (2d Cir. 1941) (finding that a "prior judgment can[] be used as an estoppel" notwithstanding that "certain facts on which it rested were stipulated")).

repackaging the same factual allegations under different causes of action, or by filing identical actions against different defendants.").

### b. Failure to Allege Breach

Even if collateral estoppel did not apply, this Court would conclude that the DAF Parties have failed to adequately allege breach under Guernsey law. The parties agree that Guernsey law governs at least the element of actual breach for the tortious interference claim. *See* Dkt. No. 183 at 21 (Plaintiffs arguing that "Guernsey law governs the claim's actual breach element, and New York law governs the other elements"); Dkt. No. 199 at 17 (the DAF Parties applying Guernsey law to the question of breach of the contractual duty of good faith); *id.* at 20–22 (applying New York law for the remaining elements). The Second Circuit considers the parties' implied consent to be "sufficient to establish the applicable choice of law." *See Arch Ins. Co. v. Precision Stone, Inc.*, 584 F.3d 33, 39 (2d Cir. 2009) (quoting *Golden Pac. Bancorp v. FDIC*, 273 F.3d 509, 514 n.4 (2d Cir. 2001) ("The parties' briefs assume that New York substantive law governs the issues . . . presented here, and such implied consent is, of course, sufficient to establish the applicable choice of law.")); *see also Krumme v. WestPoint Stevens Inc.*, 238 F.3d 133, 138 (2d Cir. 2000) (similar). Thus, the Court treats Guernsey law as applicable to the question of breach, and New York law as applicable to the remaining elements of tortious interference.

The DAF Parties assert that HCLOF breached the Members Agreement's Good Faith Clause, and the parties appear to agree that the leading Guernsey case on this question is *Faulkner v. Vollin Hldgs. Ltd.*, [2022] EWCA Civ 1371, Dkt. 182-8 ("*Faulkner*").[23] *See, e.g.*, Dkt. No. 183 at 21–25 (Plaintiffs applying this case); Dkt. No. 199 at 18 (the DAF Parties stating that "the proper reference for consideration are the standards explicit in [*Faulkner*]"); Dkt. No. 217 at 11 (Plaintiffs calling *Faulkner* "the leading case"). The *Faulkner* Court states that "[d]epending on the contractual context,

---

[23] *See also* Guernsey Judgment ¶ 105 (citing to *Faulkner* for the standard of "bad faith" under Guernsey law).

a duty of good faith may be breached by conduct taken in bad faith.  This could include conduct which would be regarded as commercially unacceptable to reasonable and honest people, albeit that they would not necessarily regard it as dishonest." *Faulkner* ¶ 241.  The *Faulkner* Court repeatedly emphasizes the importance of examining the context surrounding the drafting of the Good Faith Clause.  *See, e.g., id.* ¶ 229 ("[T]he context in which the good faith obligation was entered into is everything . . . .") (internal quotation marks and citation omitted); *id.* ¶¶ 147–48 ("[T]he first, and most important, point to emphasise is that like any question of interpretation of a contract, an express clause in a contract requiring a party to act in 'good faith' must take its meaning from the context in which it is used," such that "cases from other areas of law or commerce, which turn upon their own particular facts, may be of limited value and must be treated with considerable caution.").

Moreover, the *Faulkner* Court and the Royal Court of Guernsey emphasize that under Guernsey law, any duties HCLOF would owe CLOH, given the sophisticated nature of their agreements and their purely commercial relationship, are contained in the four corners of their agreements.[24]  *See, e.g., Faulkner* ¶ 5 (considering whether there were any "express terms of the shareholders' agreement" that would support breach); *id.* ¶ 147 ("[A]n express clause in a contract requiring a party to act in 'good faith' must take its meaning from the context in which it is used.") (citations omitted); *id.* ¶ 212 (looking to the "terms of the contract" rather than what is merely "thought to be inherent in an obligation of good faith").  Under Guernsey law—where parties have a purely commercial relationship governed by the company's articles and shareholders' agreement—

---

[24] The interpretation of the Royal Court of Guernsey on matters of Guernsey law is highly persuasive to this Court.  *See, e.g.*, Dkt. 111 ¶ 3.2 ("The Royal Court [of Guernsey] is the primary court for civil matters."); *cf. Animal Sci. Prod., Inc. v. Hebei Welcome Pharm. Co.*, 138 S. Ct. 1865, 1873 (2018) ("In the spirit of 'international comity,' a federal court should carefully consider a foreign state's views about the meaning of its own laws.") (citations omitted); *Bugliotti v. Republic of Argentina*, 952 F.3d 410, 414 (2d Cir. 2020) (stating that, in addressing questions of foreign law, "[t]he district court's task . . . is to arrive at an independent interpretation of the governing [foreign] law, aided by the most persuasive (or, as the case may be, authoritative) materials available to it. . . . [A] decision by [the foreign] court as to the meaning of the relevant [foreign] laws may be preferable to [other] materials"); *Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 313 F.3d 70, 92 (2d Cir. 2002) ("[A] foreign sovereign's views regarding its own laws merit—although they do not command—some degree of deference.").

it is "not the norm" for "equitable considerations" to come into play when interpreting commercial agreements. Guernsey Judgment ¶ 102.[25] Rather than being equitably implied, "the terms on which a member agreed that the affairs of the company should be conducted will usually be found in . . . any shareholders' agreements" and other contracts. Guernsey Judgment ¶ 102; *see also id.* ¶ 109 ("[T]here is really no room for equitable considerations to modify or constrain a party's reliance on its powers and rights embodied in the express terms of the relevant contracts where the context is a commercial relationship, and the contractual documents are carefully drawn, no doubt after negotiation, clearly with legal advice, and made between commercially sophisticated parties"); *id.* (finding that the contractual documents in this case, in particular, are "plainly within that class"); *id.* ¶ 220(i) (finding that CLOH "has established no breach towards it of any term of the contractual documents defining the legal rights of the parties"). This is because parties, when drafting "a comprehensive and professionally drafted document," like the Members Agreement, are expected to have opted to include express provisions that effectuate their intent. *See Faulkner* ¶¶ 255, 268 ("[I]f it had really been intended that the shareholders of the Company would not have [a particular] power . . . , it is inevitable that this power would have been expressly excluded."); *cf.* Guernsey Judgment ¶ 106 (quoting dicta from another Guernsey court, which found that "a general term of an obligation to act in good faith cannot in itself impose an obligation to 'act in a manner outside the terms of the . . . agreement'") (citation omitted).

None of the conduct that the DAF Parties allege amounts to "breach" concerns the violation of any duties spelled out in the four corners of the Members Agreement. First, the DAF Parties allege a breach of the Good Faith Clause insofar as the 2021 and 2023 Agreements "were

---

[25] *See also In Re Saul D Harrison & Sons PLC* [1994] BCC 475, 488 ("The articles of association are just what their name implies: the contractual terms which govern the relationships of the shareholders with the company and each other. They determine the powers of the board and the company in general meeting and everyone who becomes a member of a company is taken to have agreed to them. Since keeping promises and honouring agreements is probably the most important element of commercial fairness, the starting point . . . will be to ask whether the conduct of which the shareholder complains was in accordance with the articles of association.") (cited in Guernsey Judgment ¶ 92).

negotiated in secrecy." Dkt. No. 199 at 16.  But the Members Agreement did not impose on HCLOF an affirmative duty to disclose its negotiation or entering into of any agreements with third parties, nor was it under any express duty to elevate the interests of CLOH above those of any other shareholder.  Nor was HLCOF under any duty under Guernsey law to negotiate releases on the DAF Parties' behalf, to shield the DAF Parties from attorneys' fees in adverse litigation, or to go against their own commercial self-interests.  *See, e.g.*, *Faulkner* ¶ 274 (finding that an agreement's good faith clause did not require investors "to have regard to the interests of the Minorities when exercising their voting rights as shareholders"); *id.* ¶ 277 (declining to accept "in the absence of any supporting wording in the [agreement] . . . that [a good faith clause] imposed on the Investors some procedural duty of fair and open dealing," and finding that the clause did not "require[] the Investors to have regard to the interests of the Minorities in some undefined way over and above any requirements that would be imposed upon shareholders to have regard to the interests of the Company"); Guernsey Judgment ¶ 109; *Re Coroin*, [2013] EWCA Civ 781 ¶ 51, Dkt. 182-9 (finding that a good-faith obligation did not "impose a binding general obligation to act . . . outside the terms of the shareholders' agreement").  Nor have the DAF Parties plausibly alleged that, by entering into the 2021 and 2023 Agreements that secured clear economic benefits for HCLOF—including the release of millions of dollars and a release of legal claims—HCLOF has in some way engaged in conduct that is "commercially unacceptable to reasonable and honest people" under Guernsey law. *See Faulkner* ¶ 241.

Thus, in drawing all reasonable inferences in the DAF Parties' favor and accepting the allegations in their counterclaim as true, *see Burch*, 551 F.3d at 124, the Counterclaim fails to plausibly allege the element of actual breach required for the DAF Parties' tortious interference claim to succeed, *see Kirch*, 449 F.3d at 401–02.  The unjust enrichment claim—which further asserts that Plaintiffs were "enriched at CLOH's expense," *see* Counterclaim ¶ 96, as a result of the supposed

tortious interference inducing breach of contract—fails as a result.  Accordingly, Plaintiffs' motion to dismiss the DAF Parties' Counterclaim is granted.

### 3.  Judgment on the Pleadings

Plaintiffs' Rule 12(c) motion for judgment on pleadings, however, is denied.  In deciding this motion, the Court accepts all facts in the DAF Parties' Answer as true and draws all reasonable inferences in the DAF Parties' favor.  *See Vega*, 801 F.3d at 78.  Even if the Court may be unconvinced that the DAF Parties are likely to prevail at trial, "judgment on the pleadings is not appropriate if there are issues of fact which if proved would defeat recovery . . . ." *Id.*  Here, questions of fact are in dispute, *see id.*, and the DAF Parties have raised a series of affirmative defenses and denials in their Answer—notwithstanding the dismissal of their Counterclaim as to Plaintiffs.  For example, the DAF Parties deny that DAF and CLOH "are effectively affiliated parties because they are all entities that Dondero functionally controls," Answer ¶ 54; and they allege that the 2021 Agreement "states, falsely, that CLOH and DAF are controlled by James Dondero when HCLOF knew this to be untrue," *id.* ¶ 29.  As a result, they argue that "selective portions of the 2021 Settlement Agreement [are thereby rendered] unenforceable as to the DAF Parties, particularly Section 2 involving the representations and warranties of . . . HCLOF . . . ." Dkt. No. 199 at 25.  The DAF Parties additionally allege, as another affirmative defense, "a failure of consideration" with respect to the 2021 Agreement.  *See* Answer at 15–16.  As a result, Plaintiffs' Rule 12(c) motion for judgment on the pleadings is denied.

### B.  HCLOF's Motion to Dismiss the DAF Parties' Counterclaim

For the reasons that follow, the Court concludes that it has subject matter jurisdiction and personal jurisdiction over the DAF Parties' Counterclaim as to HCLOF.  But the DAF Parties fail to state a claim under Rule 12(b)(6) for the same reasons discussed above in ruling on Plaintiffs'

motion to dismiss.  As a result, HCLOF's motion to dismiss the DAF Parties' Counterclaim is granted.

### 1.  Subject Matter Jurisdiction

The Court has subject matter jurisdiction over the Counterclaim against HCLOF.  By way of background, Plaintiffs' Complaint asserted that, first, "[t]his Court has subject matter jurisdiction over this action pursuant to the Edge Act, 12 U.S.C. § 632, because Plaintiff U.S. Bank is a national banking association and this action arises out of transactions involving U.S. Bank's international banking and/or financial operations."  Compl. ¶ 20.  Plaintiffs additionally asserted subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367, inasmuch as "[t]his Court has federal question jurisdiction over Plaintiffs' declaratory judgment claims that Defendants lack standing to bring [Investment] Advisers Act [of 1940 ('IAA')] and [Trust Indenture Act of 1939 ('TIA')] claims under 28 U.S.C. § 1331 because 'a coercive action brought by the declaratory judgment defendant[s]' under the [IAA] and/or the TIA 'would necessarily present a federal question.'"  *Id.* ¶ 21 (quoting *Medtronic, Inc. v. Mirowski Fam. Ventures, LLC*, 571 U.S. 191, 197 (2014) and citing *Paysafe Holdings UK Ltd. v. Accruit, LLC*, No. 18 Civ. 75 (ER), 2019 WL 1115054, at *2 (S.D.N.Y. Mar. 11, 2019) (finding federal question jurisdiction because Plaintiffs seeking declaratory judgment "ask the Court to resolve several potential claims [by Defendants] that could arise under federal laws")).  As for jurisdiction over the counterclaim, the DAF Parties similarly assert that the Court has subject matter jurisdiction under the Edge Act, as well as supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a).  Dkt. No. 200 at 20–21.  In addition, they state in a footnote that the IAA, in their view, "independently supports federal question subject matter jurisdiction to the extent it has been invoked by Plaintiffs and, at a minimum, supplemental jurisdiction over the matters alleged by the DAF Parties."  Dkt. No. 200 at 21 n.47.

### a. Edge Act

The Edge Act contains section 632, which provides for federal court jurisdiction over certain suits to which "banking corporations chartered by the Federal Reserve Bank, so-called 'Edge Act banks' or 'Edge Act corporations,'" are parties. *See Am. Int'l Grp., Inc. v. Bank of Am. Corp.*, 712 F.3d 775, 778–79 (2d Cir. 2013); 12 U.S.C. § 632. The Second Circuit summarized the requirements for a purported Edge Act action to be removed to federal court pursuant to section 632 as:

1. The suit must be a civil suit "at common law or in equity."

2. A "corporation organized under the laws of the United States" (i.e., an Edge Act corporation) must be a party to the suit.

3. The suit must "aris[e] out of" one of three described types of offshore transactions or operations: "transactions involving international or foreign banking, or banking in a dependency or insular possession of the United States, or out of other international or foreign financial operations."

*Am. Int'l Grp., Inc.*, 712 F.3d at 780 (quoting 12 U.S.C. § 632). Further, the Second Circuit concluded that "§ 632 provides that in order for its grant of federal jurisdiction . . . to apply, the suit must have a federally chartered corporation as a party, and the suit must arise out of an offshore banking or financial transaction of that federally chartered corporation." *Id.* at 784. As Judge Preska has observed:

> In general, courts have interpreted § 632 narrowly. The Second Circuit has cautioned that courts must carefully examine the nature of the transaction said to ground § 632 jurisdiction. As Judge Wood has observed, "a district court cannot find that it has § 632 jurisdiction merely because there was a federally chartered bank involved, there were banking-related activities, and there were foreign parties." Rather, a Court should satisfy itself that the suit arises out of an international or foreign transaction which falls within the realm of those "characterized as traditional banking activities."

*Bank of New York v. Bank of Am.*, 861 F. Supp. 225, 232 (S.D.N.Y. 1994) (citing *Corporacion Venezolana de Fomento v. Vintero Sales Corporation*, 629 F.2d 786 (2d Cir. 1980) and *Lazard Freres & Co. v. First National Bank of Maryland*, No. 91 CIV. 0628 (KMW), 1991 WL 221087, at 2 (S.D.N.Y. Oct. 15, 1991) (Wood, J.), *inter alia*). Traditional bank activities may include, for example, paying out funds

on deposit, or acting on letters of credit, or other claims that are "integrally tied to banking activity, such that . . . [a] court[] [is] required to consider and apply principles of banking law to resolve" the case. *See id.* at 232–33 (citations omitted).

The DAF Parties argue that because this civil action "involves an Edge Act corporation, US Bank, a national banking association organized under the laws of the United States, and the action concerns the wrongful withholding of proceeds and assets by US Bank from an international corporation," the Edge Act applies. *See* Dkt. No. 200 at 20; *see also id.* at 21 ("[B]oth Plaintiffs . . . and the DAF Parties specifically allege that this matter involves offshore banking—indeed, even HCLOF has argued that the case involves banking related to Guernsey and Cayman Island entities."); *id.* ("The 2023 Agreement is signed by US Bank, and it addresses reserves that are being withheld and a smaller portion of which are being distributed to HCLOF in Guernsey.  This invokes the Edge Act.").  Plaintiffs, in turn, assert that the 2023 "[A]greement is a forbearance agreement, and the CLOH Parties do not even contend that it constitutes a banking arrangement;" and "[t]he mere fact that it was signed by U.S. Bank does not create Edge Act jurisdiction."  Dkt. No. 214 at 10.

However, as the Counterclaim does not arise out of "transactions involving . . . foreign banking," the Edge Act cannot confer subject matter jurisdiction on this Court.  *See Am. Int'l Grp., Inc.*, 712 F.3d at 780; 12 U.S.C. § 632.  "[A] district court cannot find that it has § 632 jurisdiction merely because there was a federally chartered bank involved, there were banking-related activities, and there were foreign parties."  *Lazard Freres & Co.*, 1991 WL 221087, at *2; *see also Corporacion Venezolana de Fomento v. Vintero Sales Corp.*, 629 F.2d 786, 792 (2d Cir. 1980) (suggesting that the phrase "arising out of . . . international or foreign banking" does not imply that *all* transactions simply involving foreign banks are necessarily "foreign banking" transactions); *Societe d'Assurance de l'Est SPRL v. Citigroup Inc.*, No. 10 CIV. 4754 JGK, 2011 WL 4056306, at *4 (S.D.N.Y. Sept. 13,

2011) ("Edge Act jurisdiction will not lie 'merely because there was a federally chartered bank involved, there were banking-related activities, and there were foreign parties.'") (quoting *Bank of N.Y.*, 861 F. Supp. at 232).

Here, as in *Bank of New York v. Bank of America*, "merely . . . a federally chartered bank [was] involved, there were banking-related activities, and there were foreign parties." 861 F. Supp. at 232. In addition, "the case is essentially contractual and presents only the most elementary contract law issue: Did the parties reach a binding agreement?" *Id.* at 233. That U.S. Bank, as trustee of the ACIS CLOs, "provided financial services to" the CLOs, Counterclaim ¶ 20, and that U.S. Bank "is a national banking association," *id.* ¶ 10, does not suffice to allege that U.S. Bank provided *banking services* to the CLOs, as traditionally contemplated by section 632. Section 632's "arising under" standard "should [not] be construed broadly" to invoke the jurisdiction of the federal courts simply because a foreign bank was involved. *See Lazard Freres & Co.*, 1991 WL 221087, at *2; *see also Weiss v. Hager*, No. 11 CV 2740 VB, 2011 WL 6425542, at *3 (S.D.N.Y. Dec. 19, 2011) (similar advocating a tighter connection).

### a.   Investment Advisers Act

As for the Investment Advisers Act, the DAF Parties assert that the IAA "independently supports federal question subject matter jurisdiction to the extent it has been invoked by Plaintiffs and, at a minimum, supplemental jurisdiction over the matters alleged by the DAF Parties." Dkt. No. 200 at 21 n.47 (citing *Fogel v. Chestnutt*, 668 F.2d 100 (2d. Cir. 1981)). This is wrong. Plaintiffs "invoke" the IAA only insofar as they seek a declaratory judgment that the DAF Parties and NexPoint lack standing to bring IAA claims, Complaint ¶ 1, arguing that NexPoint has brought such claims before, *see* NexPoint Lawsuit.[26] Plaintiff stated that "there is . . . little doubt that [the DAF

---

[26] In its August 9, 2022 ruling on the motion to dismiss in the NexPoint Lawsuit, the Court found that NexPoint had failed to adequately plead a claim under the IAA. *See* NexPoint Lawsuit, ECF 120 at 6 (reasoning that there is no private right of action to bring a claim pursuant to Section 206 of the IAA, nor had NexPoint stated a claim alleging a Section

Parties] will also eventually bring Advisers Act claims against ACM and Mr. Terry" since NexPoint brought similar claims in earlier litigation, Compl. ¶ 46; *see also id.* ¶¶ 58–60, and the DAF Parties "have threatened to bring those same claims against Plaintiffs Mr. Terry and ACM," *id.* ¶ 64. Importantly, the DAF Parties deny this purported threat, full-stop.  Answer ¶¶ 46, 64.  Nowhere in the complaint do Plaintiffs bring their own claims under the IAA, or cite to a particular provision of the IAA that may apply.  Nor do the DAF Parties cite to any particular section of the IAA.  Indeed, they affirmatively deny that they threaten to bring *any* such claims under the IAA in the future.  *See id.*  In a footnote in their briefing, the DAF Parties argue that the IAA confers subject matter jurisdiction because "the DAF Parties have expressly pleaded that the 2021 Agreement improperly includes a broad release of CLOH's claims regarding mismanagement of CLO investments," and "[t]he 2023 Agreement relates to HCLOF and Plaintiffs secretly withholding distributions owed to CLOH from the CLO investments."  Dkt. No. 200 at 21 n.47.  But they fail to explain the basis for purported subject matter jurisdiction under the IAA.  And *Fogel v. Chestnutt*, which does not concern a similarly potentially contemplated, prospective future lawsuit involving the IAA, is not applicable.

### a.  Supplemental Jurisdiction

Nonetheless, the Court has supplemental jurisdiction over the DAF Parties' counterclaims to the extent that they derive from a common nucleus of operative fact with Plaintiffs' claims. Plaintiffs' Declaratory Judgment Act claim confers subject matter jurisdiction on this Court inasmuch as Plaintiffs seek a declaratory judgment that Defendants lack standing to bring IAA and TIA claims because "'a coercive action' brought by 'the declaratory judgment defendant[s]'" under

---

215 violation).  Section 215 "voids a contract only where the contract would be invalid under that principle—that is, where the contract was made illegally or requires illegal performance."  *Omega Overseas Partners, Ltd. v. Griffith*, No. 13-CV-4202 RJS, 2014 WL 3907082, at *3 (S.D.N.Y. Aug. 7, 2014); *see also KDH Consulting Grp. LLC v. Iterative Cap. Mgmt. L.P.*, No. 20 CIV. 3274, 2020 WL 7251172, at *10 (S.D.N.Y. June 29, 2020) (same).  "[U]nder § 215(b), as under the common law, 'if an agreement can by its terms be performed lawfully, it will be treated as legal, even if performed in an illegal manner.'"  *Omega*, 2014 WL 3907082, at *3 (quoting 12 AM. JUR. § 153 (1938)).  Thus, "a contract does not become void under § 215(b) merely because an investment adviser defrauded her or his client—rather, a contract is void only if it was made illegally or requires illegal performance."  *Id.*

the IAA or the TIA "'would necessarily present a federal question.'"  *Medtronic, Inc.*, 571 U.S. at 197

(quoting *Franchise Tax Bd. of Cal.*, 463 U.S. at 19); *see also Krechmer v. Tantaros*, 747 F. App'x 6, 9 (2d

Cir. 2018) (summary order) ("Whether there is federal question jurisdiction over a declaratory

judgment action depends on whether 'a coercive action brought by the declaratory judgment

defendant . . . would necessarily present a federal question.'") (quoting *Medtronic, Inc.*, 571 U.S. at

196).

 28 U.S.C. § 1367(a) provides that "district courts shall have supplemental jurisdiction over all

other claims that are so related to claims in the action within such original jurisdiction that they form

part of the same case or controversy under Article III of the United States Constitution."  28 U.S.C.

§ 1367; *see also United Mine Workers v. Gibbs*, 383 U.S. 715, 725 (1966) ("Pendent jurisdiction . . . exists

whenever there is a claim 'arising under [the] Constitution, the Laws of the United States, and

Treaties made, or which shall be made, under their Authority,' and the relationship between that

claim and the state claim permits the conclusion that the entire action before the court comprises

but one constitutional 'case.'") (quoting U.S. CONST. art. III, § 2).

 "For purposes of section 1367(a), claims 'form part of the same case or controversy' if they

'derive from a common nucleus of operative fact.'"  *Shahriar v. Smith & Wollensky Rest. Grp., Inc.*, 659

F.3d 234, 245 (2d Cir. 2011) (quoting *Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc.*, 373 F.3d 296, 308

(2d Cir. 2004)); *see also id.* (finding that the case's federal- and state-law claims "clearly derive from

such a common nucleus of operative facts since they arise out of the same compensation policies

and practices of" the defendant); *Treglia v. Town of Manlius*, 313 F.3d 713, 723 (2d Cir. 2002) (finding

that "[s]upplemental jurisdiction in this case is proper because [Plaintiff's] state[-law] claim arises out

of approximately the same set of events as his federal . . . claim").  The decision to exercise

supplemental jurisdiction over a state-law claim is, by its nature, discretionary.  *City of Chicago v. Int'l

Coll. of Surgeons*, 522 U.S. 156, 173 (1997) (citing *Gibbs*, 383 U.S. at 726).

Here, the Counterclaim alleges collusion by HCLOF with Plaintiffs via enforcement of the 2021 and 2023 Agreements, and breach of the contractual duty of good faith under Guernsey law. *See, e.g.*, Counterclaim ¶ 41 (alleging HCLOF's "dishonest[y] towards CLOH" and collusion in entering into the agreements); *id.* ¶ 48 (alleging that HCLOF "misled CLOH" and worked with its "collusive partners, U.S. Bank and ACM" in "withhold[ing] distributions"); *id.* ¶¶ 50–53 (alleging "HCLOF's [w]rongful [m]otivations" with respect to the withheld reserves). The alleged collusion entails actions taken by HCLOF together with Plaintiffs, with respect to entering into and enforcing the 2021 and 2023 Agreements. Plaintiffs' Complaint, in turn, seeks a declaration that the DAF Parties' "claims are barred by" the 2021 Agreement—which depends on a finding that the 2021 Agreement, at least, is valid and enforceable. *See* Compl. ¶ 1. In this way, the DAF Parties seek to invalidate at least one of the agreements that Plaintiffs ask this Court to "validate," with the Counterclaim largely mirroring that part of the Complaint. Thus, deriving from a common nucleus, the Counterclaim pertaining to HCLOF may be adjudicated by virtue of the Court's supplemental jurisdiction. *See Shahriar*, 659 F.3d at 245.

## 2. Personal Jurisdiction

The DAF Parties have established a prima facie showing that personal jurisdiction over HCLOF exists. *See Dorchester Fin. Sec., Inc.*, 722 F.3d at 84–85; *Eades*, 799 F.3d at 167–68. The Counterclaim alleges that the "Court has personal jurisdiction over HCLOF because HCLOF has availed itself of the benefits of doing business in the State of New York, has requisite minimum contacts with the State of New York[,] and HCLOF's various conduct at issue in this Counterclaim occurred in New York and is related to or otherwise gives rise to the claims asserted against HCLOF in this Counterclaim." Counterclaim ¶ 16. The DAF Parties specifically allege that, first, "HCLOF actively participated in negotiations within the State of New York that resulted in at least one of the secret agreements at issue in this Counterclaim," *id.*; *see also* Dkt. No. 200 at 8–9 (making a similar

argument and citing Declaration of Sawnie McEntire, Dkt. No. 200-12 ("McEntire Decl."), Exs. 1-3, 5-8, 12, 14-15, 21-41 (showcasing emails between HCLOF and its lawyers in New York negotiating the 2021 and 2023 Agreements), Exs. 1, 6-7, 9-11 (showing the New York lawyers negotiating the 2021 and 2023 Agreements)). On this point, the DAF Parties allege that HCLOF's directors traveled to New York to participate in meetings concerning the 2023 Agreement, although HCLOF disputes this, and the record is unclear. *See* Dkt. No. 200 at 9 (citing McEntire Decl., Exs. 12–13); Dkt. No. 214 at 8 (citing Dkt. No. 200-13 at 106–07, alleging that at least one of the alleged meetings in New York did not actually happen, given that one of the parties had pre-existing commitments in Texas that week).

Second, the DAF Parties assert that the 2023 Agreement's forum selection clause "also stipulates that New York law will apply, and that HCLOF will submit to the jurisdiction of the State and federal courts in New York in any action relating to the agreement," such that "the exercise of personal jurisdiction over HCLOF is consistent with due process and does not offend traditional notions of fair play and justice." Counterclaim ¶ 16; *see also* Dkt. No. 200 at 9 (citing Dkt. No. 155-4, ¶ 12(d)). Or, in the alternative, the DAF Parties argue that because "HCLOF has made a general appearance in these proceedings . . . , HCLOF has [thereby] waived its right to challenge the exercise of personal jurisdiction in these proceedings." Counterclaim ¶ 16.

The Court concludes that, in applying the factors laid out in *Agency Rent A Car Systems, Inc.* and when viewed under the totality of the circumstances, the DAF Parties have met their burden of making a prima facie showing that, under N.Y.C.P.L.R. § 302(a)(1), HCLOF "transacts . . . business within the state" of New York, and that the Counterclaim against HCLOF arises from these business contacts. *See CutCo Indus., Inc.*, 806 F.2d at 365; *see also Agency Rent A Car Sys., Inc.*, 98 F.3d at 29. The 2023 Agreement was allegedly negotiated in New York; HCLOF allegedly "visited New York for the purpose of meeting with parties to the contract regarding the relationship;" and the

choice-of-law clause selects New York. *See Agency Rent A Car Sys., Inc.*, 98 F.3d at 29 (listing these

factors). The DAF Parties alleged HCLOF's presence in New York to negotiate the 2023

Agreement. *See* Counterclaim ¶ 16 (alleging that "HCLOF's various conduct at issue in this

Counterclaim occurred in New York"); McEntire Decl., Exs. 12-13 (alleging that HCLOF's

directors visited New York to meet with parties to the 2023 Agreement in the course of its

negotiation). HCLOF affirmatively projected itself into New York to negotiate here, along with its

New York counsel, the substantive terms of the 2023 Agreement—which is a central subject of the

DAF Parties' counterclaim. *See Maranga*, 386 F. Supp. 2d at 306; *Agency Rent A Car Sys., Inc.*, 98 F.3d

at 29; *see also Berkshire Cap. Grp., LLC v. Palmet Ventures, LLC*, 307 F. App'x 479, 481 (2d Cir. 2008)

(summary order).[27] That the contract additionally contains choice-of-law and forum selection

clauses selecting New York also militates in favor of a finding of personal jurisdiction. *See Agency*

*Rent A Car Sys., Inc.*, 98 F.3d at 29.

These alleged facts of HCLOF's physical presence in New York to negotiate the 2023

Agreement there alongside HCLOF's New York counsel, "if credited by the ultimate trier of fact,

would [additionally] suffice to establish jurisdiction over" HCLOF. *See In re Terrorist Attacks on Sept.*

*11, 2001*, 714 F.3d at 673; *Navimpex Centrala Navala*, 989 F.2d at 580 (factual disputes in conflicting

affidavits must be resolved in the non-movant's favor at this stage). In addition, the Court

concludes that the exercise of personal jurisdiction in this case is proper pursuant to due process,

given that HCLOF has sufficient minimum contacts with New York, and the exercise of jurisdiction

---

[27] *Cf. Berkshire Cap. Grp., LLC*, 307 F. App'x at 481 (finding that a party that "projected itself into New York" by retaining "New York lawyer[s] whose work was performed within the state" to negotiate a contract additionally militated in favor of a finding of jurisdiction) (citing *Fischbarg v. Doucet*, 880 N.E.2d 22, 26 (2007) ("CPLR 302(a)(1) jurisdiction is proper 'even though the defendant never enters New York, so long as the defendant's activities here were purposeful and there is a substantial relationship between the transaction and the claim asserted'" (citation omitted)); *Waldman*, 835 F.3d at 331 (noting that specific jurisdiction "depends on an affiliation between the forum and the underlying controversy, principally, activity or an occurrence that takes place in the forum State") (quoting *Goodyear Dunlop Tires Operations, S.A.*, 564 U.S. at 910).

is reasonable under the circumstances.  *See In re Terrorist Attacks*, 714 F.3d at 673 (citing *Int'l Shoe Co.*, 326 U.S. at 316).

The cases HCLOF cites to the contrary are inapposite.  For example, in *Freeford Ltd. v. Pendleton*, 53 A.D.3d 32, 38 (1st Dep't 2008), the New York state court found that a forum selection clause, *without more*, entered into by non-parties failed to establish personal jurisdiction.  This case involves more than that.  Nor is this situation analogous to *Lear v. Royal Caribbean Cruises Ltd.*, No. 1:20-CV-4660-GHW, 2021 WL 1299489, at *7 (S.D.N.Y. Apr. 7, 2021), in which a brief contractual relationship existed between the parties, no representative of the defendant traveled to New York, and the sole allegation of personal jurisdiction was, in essence, that the defendant had "offered a job to a New Yorker."  *Id.*  Here, the DAF Parties allege that the 2023 Agreement was substantively negotiated and entered into by HCLOF's counsel in New York, and that HCLOF's Directors also allegedly appeared in New York to negotiate the contract here.

Having considered the totality of the circumstances, *see D.H. Blair & Co.*, 462 F.3d at 105, the Court concludes that the DAF Parties have met their prima facie burden of alleging personal jurisdiction.  The facts alleged by the DAF Parties, "if credited by the ultimate trier of fact, would suffice to establish jurisdiction over the defendant."  *In re Terrorist Attacks*, 714 F.3d at 673.  Thus, the Court cannot dismiss the Counterclaim against HCLOF on Rule 12(b)(2) grounds for lack of personal jurisdiction.

### 3.  Failure to State a Claim

Nonetheless, the DAF Parties' Counterclaim fails to adequately state a claim against HCLOF under Rule 12(b)(6) for the same reasons explained above in regard to Plaintiffs' motion to dismiss. To reiterate, the DAF Parties lack standing to bring their counterclaims seeking to invalidate the 2021 and 2023 Agreements; their allegation of breach is refuted by the Guernsey Judgment, whose ruling on the issue is entitled to preclusive effect; and even absent collateral estoppel, the DAF

50

Parties would fail to adequately plead breach of the Members Agreement, from which the remainder of the DAF Parties' counterclaims flow.  With respect to HCLOF's motion, the Court adopts in full its prior reasoning on 12(b)(6) grounds from the preceding discussion of Plaintiffs' motion to dismiss.

Accordingly, HCLOF's motion to dismiss the DAF Parties' Counterclaim is granted.  As a result, the DAF Parties' motion to compel jurisdictional discovery from HCLOF, Dkt. No. 205, is denied as moot.

## IV.   LEAVE TO AMEND

"It is the usual practice upon granting a motion to dismiss to allow leave to replead."  *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991); *see also* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave [to amend] when justice so requires.").  Leave to amend may be denied "for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party."  *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014) (internal citation omitted).

Plaintiffs' and HCLOF's motions to dismiss the DAF Parties' Counterclaim are granted without leave to amend, as any amendment here would be futile.  "The court should freely give leave [to amend] when justice so requires."  Fed. R. Civ. P. 15(a)(2).  However, leave may be denied "for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party."  *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014) (quoting *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007)).  "A plaintiff need not be given leave to amend if it fails to specify either to the district court or to the court of appeals how amendment would cure the pleading deficiencies in its complaint."  *Id.*  Because the DAF Parties lack standing to bring their counterclaims seeking to invalidate the 2021 and 2023 Agreements as a matter of Texas and New York law, respectively, any attempt to replead those counterclaims would be futile.  Likewise, the DAF Parties are estopped from arguing breach of contract over the Members Agreement, as well as

the related counterclaims of tortious interference and unjust enrichment—which, even absent

collateral estoppel, would fail on 12(b)(6) grounds.

## V.     CONCLUSION

The Clerk of Court is directed to terminate the motions pending at Dkt. Nos. 176, 177, and

205.

SO ORDERED.

Dated:  February 1, 2024
New York, New York

_____
GREGORY H. WOODS
United States District Judge