USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  3/1/2024

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
                                                             :
JOSHUA N. TERRY, U.S. BANK, *National*                       :
*Association, in its capacity as Trustee*, ACIS              :
CAPITAL MANAGEMENT, L.P.,                                    :
                                                             :
                                             Plaintiffs,     :          1:21-cv-11059-GHW
                                                             :
                 -against-                                   :      MEMORANDUM OPINION &
                                                             :              ORDER
                                                             :
THE CHARITABLE DONOR ADVISED                                 :
FUND, L.P., CLO HOLDCO, LTD., *and*                          :
NEXPOINT DIVERSIFIED REAL ESTATE                             :
TRUST,                                                       :
                                                             :
                                             Defendants.     :
-------------------------------------------------------------X

GREGORY H. WOODS, United States District Judge:

   In this one of a series of protracted lawsuits between a set of entities allegedly controlled by

James Dondero, and another set affiliated with Joshua Terry,[1] one allegedly Dondero-affiliated entity

brings counterclaims against Mr. Terry and his affiliates.  Defendant/Counter-Claimant NexPoint

Diversified Real Estate Trust ("NexPoint") brought counterclaims against Plaintiffs/Counter-

Defendants Acis Capital Management, L.P. ("ACM") and Joshua N. Terry (together, the "ACM

Parties") and Counter-Defendant Brigade Capital Management, LP ("Brigade").  NexPoint and its

subsidiary, NHF TRS, LLC ("NHF") (together, the "NexPoint Parties"), have been subordinated

---

[1] While the defendants in this case assert that they are not in fact controlled by Mr. Dondero, the DAF Party defendants agree that the plaintiffs in this case—affiliated with Mr. Terry—"hold[] substantial animus, malice and ill-will towards James Dondero," and this supposed "animus" constitutes an apparently animating sentiment for the litigation against Defendants.  *See, e.g.*, Defendants' Second Amended Answer and First Amended, Dkt. No. 155 ¶ 55; the NexPoint Parties' Amended Answer and Counterclaim (the "Answer" or "Counterclaim"), Dkt. No. 78, ¶ 54 (the NexPoint Parties denying that NexPoint, DAF, and CLOH "are related parties.").  The series of lawsuits that this dispute has generated are detailed in the Court's February 1, 2024 memorandum opinion and order at Dkt. No. 253.

noteholders in ACIS 6, a fund that acquired interests in collateralized loan obligations ("CLOs").[2]

ACM is the Portfolio Manager of ACIS 6, and Mr. Terry—who owns and serves as President of

ACM—is the primary adviser of ACIS 6.  ACM retained Brigade as its sub-adviser to manage the

portfolio.  As investors in ACIS 6, the NexPoint Parties allege that the ACM Parties and Brigade

mismanaged ACIS 6 and caused the noteholders to incur substantial losses in turn.

Through their creative, but meritless arguments, the NexPoint Parties seek to reconfigure

the fundamental elements of their investment:  although they hold notes, they claim that they have

the derivative rights of shareholders, and that they are directly owed fiduciary duties that are

contractually limited to the issuer of the notes alone.  But their arguments cannot change the basic

capital structure of their deal:  the NexPoint Parties are noteholders, not equity holders, and their

rights are limited to those set forth in the governing transaction documents, as discussed below.  As

a result, the NexPoint Parties lack standing to bring the majority of their claims.  The ACM Parties'

and Brigade's respective motions to dismiss are therefore GRANTED, and the ACM Parties'

motion for judgment on the pleadings is DENIED.

---

[2] On October 31, 2023, the parties filed a stipulation and proposed order regarding the addition of NHF as a party.  Dkt. No. 220.  In that stipulation, the parties stated that on the date the amended complaint and Counterclaim were filed by NexPoint, "and as of today, NexPoint's subsidiary NHF . . . has been the registered holder of the Subordinated Note issued by Acis CLO 6 that is the subject of this litigation."  *Id.* at 1.  The parties agreed to add NHF as an additional defendant and counter-plaintiff, with all plaintiffs and Brigade consenting to NexPoint filing a second amended answer and counterclaim that added NHF as a party.  *Id.* at 2; *see also* Dkt. No. 220-1 (supplying the amended counterclaim).  The parties also agreed to allow plaintiffs to file the second amended complaint.  *See* Dkt. No. 220 at 2; *see also* Dkt. No. 220-2 (supplying the second amended complaint).  The parties agreed that they would not be "required to serve any further answer to the Second Amended Complaint under FRCP 12(a)(1)(A)."  Dkt. No. 220 at 2.  And they agreed to treat the already-briefed motions to dismiss NexPoint's counterclaims and Plaintiffs' motion for judgment on the pleadings as governing, notwithstanding the addition of NHF as the real party in interest.  *See id.*  They also agreed that the already-briefed motions will not be deemed premature, and that "the arguments for dismissal and judgment on the pleadings raised therein, will apply equally to NHF TRS once it is added as a defendant and any ruling on the Original Motions to Dismiss and/or the Original MJOP will bind NHF TRS."  *Id.* at 3.  They agreed that all references to the amended complaint in the original motions to dismiss and motion for judgment on the pleadings will refer to the Complaint at Dkt. No. 15, "except for the supplemental briefing" on the contemporaneous ownership rule; and that all references to the Counterclaim refer to that at Dkt. No. 78.  *Id.*  The Court so-ordered the stipulation and proposed order on November 1, 2023.  Dkt. No. 223.  The Court's citations herein follow the same convention as that described in the stipulation, and the Court references the "NexPoint Parties" throughout to encompass NHF, notwithstanding the fact that the underlying documents at Dkt. Nos. 15, 78 reference only NexPoint and not NHF.  Additionally, the Court accepts the parties' stipulation that its findings here as to NexPoint and the NexPoint Parties are binding on NHF.

## I.   BACKGROUND

On February 1, 2024, the Court issued a memorandum opinion and order granting the motions to dismiss the counterclaims brought by Defendants Charitable Donor Advised Fund ("DAF") and CLO HoldCo ("CLOH") (collectively, the "DAF Parties").  Dkt. No. 253 (the "DAF Counterclaim Ruling").  The Court assumes the reader's familiarity with the general background of this case as set forth in that opinion.

### A.  Parties and Relevant Non-Parties

Plaintiff U.S. Bank is the Trustee of the ACIS CLOs under the ACIS Indentures.  Plaintiffs' Amended Complaint, Dkt. No. 15 ("Compl.") ¶¶ 9, 27;[3] *accord* the NexPoint Parties' Amended Answer and Counterclaim (the "Answer" or "Counterclaim"), Dkt. No. 78 ¶¶ 9, 27, as amended (counterclaims only) at Dkt. No. 220-1.[4]  Plaintiff Joshua N. Terry is a resident of Texas and the President of Shorewood GP, LLC, the general partner of ACM.  Compl. ¶ 10.  According to the Complaint, Mr. Terry owns 100% of the limited partnership interests in ACM, and ACM is the Portfolio Manager to the ACIS CLOs, responsible for managing the ACIS CLOs' assets.  *Id.* ¶ 11.[5] According to the NexPoint Parties, "Terry exercises complete dominion over [ACM] and its

---

[3] All facts taken from the Complaint cited herein are admitted by the NexPoint Parties in the Answer and Counterclaim, unless noted otherwise.  For reference, the NexPoint Parties' affirmative admissions are noted at paragraph numbers in the Answer that directly correspond to the Complaint paragraph numbers cited herein.

[4] Note that "Answer" citations and "Counterclaim" citations both originate from Dkt. No. 78; the citations prefaced by "Answer" or "Counterclaim," respectively, appear in the corresponding section.  As noted above, the Court recognizes the parties' stipulation adding NHF as a party, as well as the NexPoint Parties' amended counterclaim filed as an exhibit at Dkt. No. 220-1 (which largely duplicates the counterclaim filed at Dkt. No. 78).  As the NexPoint Parties declined to file an amended *answer* at Dkt. No. 220, the Court treats the admissions from the Dkt. No. 78 Answer as binding on both NexPoint and NHF in accordance with its understanding of the parties' stipulation.  The Court treats any conflicting facts provided in the amended counterclaims filed at Dkt. No. 220-1 as superseding those of the original counterclaim filed at Dkt. No. 78 and notes any divergences accordingly, citing to Dkt. No. 220-1 as appropriate.

[5] The NexPoint Parties are "without sufficient knowledge to admit or deny" this.  Answer ¶ 11.  The NexPoint Parties agree that generally, "the portfolio manager is responsible for managing the assets of the CLO."  Counterclaim ¶ 30.  The portfolio manager's role is to "(1) identify and purchase the assets within a CLO, doing so in a manner that creates the cash flow necessary to satisfy a CLO's debt-service requirements (e.g., the payout, diversification, credit-quality, and average-life requirements) while not exposing the CLO to non-market risks; and (2) to monitor the assets within a CLO to ensure that, over time, those assets individually continue to meet various collateral-quality tests, which are designed to ensure a CLO can meet its debt-service requirements—all the while producing income for equity holders."  *Id.* ¶ 31.

activities;" "Terry and [ACM] have no executive-level employees aside from Terry . . . ." Counterclaim ¶ 65.  Further, ACIS 6 "is managed by [ACM] as the portfolio manager and Terry as the primary advisor.  Brigade is a sub-advisor.  All three are registered investment advisors and agreed to abide by the Portfolio Management Agreement (the 'PMA')."  *Id.* ¶ 2.

Specifically, the NexPoint Parties allege that Mr. Terry "took over [ACM] in August 2018" and became the adviser to the ACIS 6 portfolio then.  *Id.* ¶ 57.  ACM retained Brigade as sub-adviser, according to the NexPoint Parties, "[a]s a result of [ACM] having neither the labor force nor the wherewithal to manage the [CLO] Assets on its own."  *Id.* ¶ 58.  Brigade, as the sub-adviser, "is the agent of [ACM] and, therefore, of ACIS[ ]6."  *Id.* ¶ 62.  Brigade was allegedly retained by Mr. Terry "to provide advisory services, as well as back-and middle-office functions, including, but not limited to, accounting, payments, operations, technology, and finance, among other things, in connection with [ACM's] obligations under the PMA."  *Id.*  Brigade additionally "assist[ed] in the negotiation and execution of all documents necessary to acquire or dispose of assets under the PMA," "identif[ied] potential assets (and their buyers and sellers)[,] and model[ed] ratings, default, and price scenarios as needed."  *Id.* ¶ 63.  Thus, "Brigade worked directly with and for Terry," and Mr. Terry "intended for this arrangement to manifest."  *Id.* ¶ 64.  ACM paid Brigade for its services. *Id.* ¶ 67.

Defendant DAF, a limited partnership organized in the Cayman Islands, owns 100% of CLOH.  Compl. ¶ 12.  CLOH is a Cayman Islands company that owns 49% of HCLOF.  *Id.* ¶ 13. Defendant NexPoint is a publicly traded Delaware statutory trust managed by NexPoint Advisors, L.P., with its principal place of business in Texas.  *Id.* ¶ 14; Counterclaim, Dkt. No. 220-1 ¶ 9. Though NexPoint today operates as a qualified real estate investment trust, "[a]t the time of the events herein, it was operating as 'NexPoint Strategic Opportunities Fund,' a publicly traded (NYSE: NHF) Delaware closed-end trust."  Counterclaim, Dkt. No. 220-1 ¶ 9.  NHF is a Delaware limited

liability company, a "qualified 'taxable real estate subsidiary,' and is a wholly owned subsidiary of NexPoint (and has been at all relevant times)," with its principal place of business in Texas.  *Id.* ¶ 9.1.  NexPoint became an investor in ACIS 6 in 2016, when it "became a holder of certain subordinated notes" of ACIS 6 through a secondary market transaction.  *Id.* ¶ 46.  "At that time, the face value of the equity was approximately $7.5 million."  *Id.*  NexPoint transferred its ACIS 6 notes to NHF on March 31, 2021 for no consideration, and NHF became the noteholder.  *Id.* ¶ 46.1–46.2.[6]  According to Plaintiffs, HCLOF owns 87% of the subordinated notes issued by ACIS 6. Compl. ¶ 17.[7]  "NexPoint denies that NexPoint, DAF, and CLO[H] are related parties."  Answer ¶ 54.

Non-parties "ACIS 4, ACIS 5, and ACIS 6 are exempted limited liability companies incorporated in the Cayman Islands."  Compl. ¶ 15.  They conduct business through directors located in the Cayman Islands.  *Id.*  ACM manages—though, according to the NexPoint Parties, not exclusively—the offshore ACIS CLO investment funds, which "issued, among other things, certain subordinated notes to investors pursuant to the ACIS Indentures in private offerings."  *Id.*; *see also id.* ¶ 25; Answer ¶¶ 15, 25.[8]  According to the NexPoint Parties, Acis CLO 2015-6 Ltd. and Acis CLO 2015-6 LLC (collectively, the ACIS 6 "Issuers") "acquired a series of assets, namely interests in collateralized loan obligations [CLOs].  Via a trust indenture agreement, the Issuers granted all rights, title, and interest in the assets to a trustee, U.S. Bank, N.A., and vested all management power over the securities in [ACM], thus creating a trust for the purpose of paying off the secured noteholders and paying all residual cash flows to the equity holders . . . ."  Counterclaim ¶ 1.  "[T]his arrangement is referred to as 'ACIS[ ]6.'"  *Id.*  The NexPoint Parties assert that "in executing the

---

[6] Accordingly, where the NexPoint Parties describe their alleged injuries in the counterclaims, they refer to those of NexPoint itself from February 15, 2019 to March 31, 2021 and to those of NHF thereafter.  *Id.* ¶ 46.3.
[7] The NexPoint Parties are "without sufficient knowledge to admit or deny" this.  Answer ¶ 17.
[8] "NexPoint denies that Acis manages the ACIS CLOs to the extent that the allegation implies that Acis is the exclusive manager."  Answer ¶¶ 15, 25.

Indenture, the Issuers, as trust settlors, formed ACIS[ ]6, a trust created under New York law." *Id.*
¶ 160. "Other than the investors themselves, the key parties to the success or failure of a CLO in
this arrangement are (1) the portfolio manager, (2) the advisor, and (3) the indenture trustee," who
are "bound by contracts known as indentures and portfolio management agreements." *Id.* ¶¶ 28, 29.
The NexPoint Parties further allege that ACIS 6 "is a valid trust under New York law,"
Counterclaim Dkt. No. 220-1 ¶ 154; that "[t]he Indenture designates the equity holders as the
beneficiaries of ACIS[ ]6;" and that "[i]n doing so, the Issuers granted all *equitable* title in the Assets
to the noteholders, among them, NexPoint and NHF TRS LLC," *id.* ¶ 155 (emphasis in original).

   According to Plaintiffs, HCLOF owns 87% of the subordinated notes issued by ACIS 6,
Compl. ¶ 17, although the NexPoint Parties lack sufficient knowledge to confirm or deny this,
Answer ¶ 17. Approximately 51% of HCLOF is owned by Highland Capital Management, L.P.
("Highland"). Compl. ¶ 18; Counterclaim ¶ 48. Again, CLOH owns the remaining 49% of
HCLOF. Compl. ¶ 13. Non-party Mr. Dondero resides in Texas and, according to Plaintiffs,
"functionally controls NexPoint," *id.* ¶ 19, although the NexPoint Parties deny this, Answer ¶ 19.
Plaintiffs allege that "[u]pon information and belief, Dondero also functionally controls DAF and,
through it, CLO[H]," Compl. ¶ 19, although the NexPoint Parties dispute this too, *see* Answer ¶ 19.[9]
Plaintiffs further allege that Mr. Dondero formerly owned ACM and formerly served as Highland's
CEO, although the NexPoint Parties deny this. *See* Compl. ¶ 19; Answer ¶ 19.

---

[9] As noted in the Complaint, a bankruptcy judge made a series of findings of fact suggesting that Mr. Dondero might in
fact exercise such functional control. *See* Compl. ¶ 31 n.1 (citing *In re: Highland Capital Management, L.P.*, Case No. 19-
34054-SGJ-11 (N.D. Tex. Bankr.), ECF 2660, which appears in this case's docket at Dkt. No. 15-2). These include
findings that "DAF controls $200 million of assets, which asset base was derived from Highland, Mr. Dondero, Mr.
Dondero's family trusts, or other donor trusts. Mr. Dondero has historically been DAF's informal investment advisor
(without an agreement), and he was DAF's managing member until 2012." Dkt. No. 15-2 at 3 (ECF pagination).

### B. Facts

#### a. The Structure of the Transaction

The ACIS CLOs raise funds by selling secured notes and subordinated notes, purchasing corporations' senior-secured debt instruments with the proceeds; and any income that the investments generate is used, in turn, to pay the CLOs' expenses, as well as principal and interest owed to the CLOs' noteholders.  Compl. ¶ 25; Answer ¶ 25.  ACM, as the portfolio manager, "is responsible for identifying and purchasing the assets that are held in the ACIS CLOs, monitoring those assets, and monetizing those assets in specified circumstances."  Compl. ¶ 26; *accord* Answer ¶ 26 (admitting the same while caveating that ACM is not "the exclusive manager").

Generally speaking, portfolio managers like ACM are compensated by "receiv[ing] a percentage of the assets under management . . . , which is determined by the face value, or par value, of the assets in a CLO."  Counterclaim ¶ 35.  When "unchecked, portfolio managers can maximize their own pay by purchasing debt instruments with the highest par value, irrespective of the quality of these assets," in effect "manipulat[ing] a CLO's fee structure for their own benefit."  *Id.* ¶¶ 36–37.  The NexPoint Parties allege that the Indenture trustee (here, U.S. Bank) "monitors changes in the assets within a CLO, as well as in the portfolio's credit quality and maturity" to "safeguard the beneficiaries" and protect against this risk.  *Id.* ¶ 40.  "[T]hose managing an indenture trust," like the portfolio manager, "have several benchmarks [that are] designed to protect a CLO's noteholders and equity holders."  *Id.* ¶ 44.  This includes ensuring that the CLOs meet certain collateral-quality tests.  *Id.* ¶¶ 41–44.  These tests include the weighted average rating factor ("WARF") and the weighted average life ("WAL"), which examine, respectively, the credit quality of a CLO's portfolio, and the average maturity of its debt instruments.  *Id.*

The Issuers, Acis CLO 2015-6 Ltd. and Acis CLO 2015-6 LLC, purchased a series of CLOs around 2014, at which point "the face value of the equity was approximately $7.5 million," according

to the NexPoint Parties.  *Id.* ¶¶ 45–46.  "[T]he Issuers granted all ownership, title, and interest not

only in the [CLOs'] Assets, but also in the Indenture (attached as Exhibit 1), the PMA (attached as

Exhibit 2), and other instruments, to the trustee" on April 16, 2015 through a trust indenture.  *Id.* ¶

47 (citing Dkt. Nos. 78-1 (the "Indenture"), 78-2 (the "Portfolio Management Agreement" or

"PMA")).  Since closing on the Indenture, the Issuers lack any "title or interests in the assets, [nor

do they have any] independent obligation to pay NexPoint or any other Subordinated Noteholder;"

rather, the trustee (U.S. Bank) is obligated to pay the noteholders out of the CLO assets' income

"and, when liquidated, NexPoint is entitled to a pro-rata share of the liquidation amount, after

deducting the prescribed fees and expenses."  *Id.* ¶¶ 49–50.  In 2016, NexPoint acquired

subordinated notes issued by ACIS.  Counterclaim, Dkt. No. 220-1 ¶ 46.  NexPoint transferred its

note to NHF on March 31, 2021.  *Id.* ¶ 46.1.  The NexPoint Parties invested in ACIS 6 "because the

portfolio was supposed to contain relatively safe, diversified investments and, if managed properly,

secure returns."  *Id.* ¶ 7.  The NexPoint Parties are a signatory to neither the Indenture, *id.* ¶ 51, nor

the PMA, which is between Counter-Defendants and the trustee, *id.* ¶ 55.

### b.  The Governing Documents

"According to the Notes, NexPoint may not seek recourse from the Issuers, the officers or

directors of the Issuers, or the Trustee.  Once all senior debt is paid off, the subordinated notes

become entitled to all net residual proceeds (after expenses and fees)."  *Id.* ¶ 52.  All senior debt has

been paid off.  *Id.*  The NexPoint Parties allege that "[t]he subordinated notes expressly incorporate

by reference certain duties that are explained in the Indenture and provide that there is no recourse

against the Issuers."  *Id.* ¶ 53 (quoting Indenture at A2-7 ("The obligations of the Issuer under this

Note and the Indenture are limited recourse obligations of the Issuer payable solely from the Assets

in accordance with the Indenture . . . ."); *id.* at A2-8 ("Reference is hereby made to the Indenture

and all indentures supplemental thereto for a statement of the respective rights, limitations of rights,

duties and immunities thereunder of the Issuer, the Trustee and the Holders of the Notes and the terms upon which the Notes are, and are to be, authenticated and delivered.")).  The NexPoint Parties allege that "[t]he subordinated notes are essentially equity."  *Id.* ¶ 54 (quoting Indenture at A2-3 (stating that each noteholder "will be deemed to have . . . agreed to treat the subordinated notes as equity for . . . tax purposes")).

In the Indenture, the Issuers "assigned away the Issuers' rights and obligations as to the original securities."  *Id.* ¶ 55.  Therefore, the NexPoint Parties allege that the PMA is "[n]ow" a contract between the ACM Parties and Brigade and the trustee (U.S. Bank), rather than the Issuers. *Id.*  The ACM Parties and Brigade, all registered investment advisers, agreed to abide by the PMA. *Id.* ¶ 2.  The PMA requires ACM as the portfolio manager to "'supervise and direct the investment and reinvestment of the Assets' and to 'monitor the Assets.'"  *Id.* ¶ 56.  Section 8 of the PMA sets forth the obligations of the portfolio manager, including that it "shall use commercially reasonable efforts to ensure that no action is taken by it, and shall not intentionally or with reckless disregard take any action, which would (a) materially and adversely affect the status of the Issuer . . . (b) not be permitted by the Issuer's Governing Instruments, (c) violate any law, rule or regulation of any governmental body or agency having jurisdiction over the Issuer, . . . or (f) knowingly and willfully adversely affect the interests of the Holders in the Assets in any material respect (other than (i) as expressly permitted hereunder or under the Indenture or (ii) in connection with any action taken in the ordinary course of business of the Portfolio Manager in accordance with its fiduciary duties to its clients)."  *See* PMA at 15.

Section 11(a)(i) of the PMA provides the limits of responsibility for the portfolio manager, ACM.  It dictates that, although the portfolio manager and its agents may not be liable to noteholders "for any act, omission, error of judgment, mistake of law, or for any claim, loss, liability, damage, judgments, assessments, settlement, cost, or other expense . . . arising out of any

investment, or for any other act taken by or recommended by or omission arising out of or in connection with the performance by the Portfolio Manager [or its] agents . . . , the Portfolio Manager shall be liable (i) by reason of acts or omissions constituting bad faith, willful misconduct, gross negligence or reckless disregard in the performance of its obligations hereunder or the terms of the Indenture applicable to the Portfolio Manager . . . ." *Id.* at 18–19. The PMA does not expressly state to whom the portfolio manager would be liable in the latter circumstance. *See id.*

### c. ACM's Management and Bankruptcy

According to Plaintiffs, Mr. Dondero, as former owner of ACM, "lost control" of the company through an "involuntary" bankruptcy proceeding. Compl. ¶ 28. The NexPoint Parties deny this. Answer ¶ 28. The bankruptcy was allegedly precipitated by Mr. Dondero's termination of Mr. Terry, who was ACM's portfolio manager; an arbitration proceeding followed. Compl. ¶ 28; Answer ¶ 28 (denying this). The parties do not dispute that the arbitrator found ACM and its general partner, Acis Capital Management GP, LLC ("ACM GP") liable and awarded Mr. Terry $8 million in damages. Compl. ¶ 28; Answer ¶ 28. In addition, the NexPoint Parties allege that "[e]ffective February 15, 2019, the Bankruptcy Court issued an order (the 'BK Order') that (1) released any claims against [ACM] or Terry that accrued prior to the effective date, and (2) enjoined any lawsuit from being filed against [ACM] or Terry to recover on any claims that accrued prior to the effective date." Counterclaims, Dkt. No. 220-1 ¶ 75, n.6. Accordingly, the NexPoint Parties' counterclaims accrue after February 15, 2019. *Id.* at 2 n.1, ¶ 250.

Plaintiffs allege that, instead of directing ACM and ACM GP to pay the arbitration award, Mr. Dondero instead "attempted to frustrate Mr. Terry's ability to enforce it by stripping ACM and ACM GP of their assets"—a "scheme" that Mr. Terry "stopped . . . by commencing a bankruptcy case against ACM and ACM GP." Compl. ¶ 29. The NexPoint Parties lack sufficient information to admit or deny this. Answer ¶ 29. There is no dispute that the bankruptcy court ultimately

approved a transfer of 100% of ACM and ACM GP's equity to Mr. Terry.  Compl. ¶ 30; Answer

¶ 30 (asserting that the Texas bankruptcy court's ruling, Dkt. No. 15-1, "speaks for itself"); *see also*

Dkt. No. 15-1 at 18–19 (ECF pagination).  The bankruptcy court additionally "formally approved

[ACM]'s appointment of Brigade as sub-advisor and shared-services provider to [ACM] in

connection with [ACM]'s management of the Assets."  Counterclaim ¶ 60.

Plaintiffs allege that Mr. Dondero then launched a series of lawsuits against Mr. Terry and

ACM because he was "[u]nwilling to accept [the bankruptcy judge's] ruling" and aims "to harass

Plaintiffs through the court system," Compl. ¶ 31, which the NexPoint Parties deny, Answer ¶ 31.

Among these lawsuits was one initiated by NexPoint against the ACM Parties, Brigade, and U.S.

Bank, filed on May 14, 2021.  *See* Answer ¶ 44 (citing *NexPoint Strategic Opportunities Fund v. Acis

Capital Management, L.P., et al.*, Case No. 1:21-cv-04384-GHW (S.D.N.Y.) (the "First NexPoint

Lawsuit")).  The First NexPoint Lawsuit involved, *inter alia*, Investment Advisers Act of 1940

("IAA") claims against the ACM Parties and claims brought under the Trust Indenture Act against

U.S. Bank.  *Id.*; *see also* First NexPoint Lawsuit.  These claims concerned ACM's alleged management

of ACIS 6 and another ACIS-managed CLO.  *See* Answer ¶ 44; *see also* First NexPoint Lawsuit.

### d.  Alleged Mismanagement of ACIS 6

In this case, the NexPoint Parties allege that the ACM Parties and Brigade:  (1) "[k]nowingly

charged ACIS[ ]6 exorbitant amounts of 'expenses' without accountability or justification;

[k]nowingly caused ACIS[ ]6 to purchase loans that failed to meet credit-quality tests and average-life

tests, causing the entire portfolio to fail the applicable collateral-quality tests; [k]nowingly caused

ACIS[ ]6 to sell valuable assets cheaply; and [k]nowingly breached industry standards (e.g., best

execution) when buying and selling assets of managed funds."  Counterclaim ¶ 3.  Again, the

NexPoint Parties' counterclaims are "solely predicated on claims that accrued after February 15,

2019, which is the effective date of the Bankruptcy Court order exculpating Counter-Defendants

from liability as of that date and enjoining any lawsuit or action seeking to recover for liability accruing on or prior to that date." Counterclaim, Dkt. No. 220-1 at 2.

As a result of this alleged "malfeasance," "since February 16, 2019, Counter-Defendants have wiped out millions in value from ACIS[ ]6 . . . and deprived NexPoint of the full benefit of its investment bargain." *Id.* ¶ 4. Both ACM's "conduct through Terry's direction and control" and Brigade's conduct allegedly "severely and adversely impacted ACIS[ ]6, in which NexPoint is a noteholder and equity holder." *Id.* ¶ 66. The NexPoint Parties allege that "Counter-Defendants are legally obligated fiduciaries who must look out for the best interests of the advised funds, i.e., ACIS[ ]6 and its beneficiaries." *Id.* ¶ 8.

In the Counterclaim, the NexPoint Parties contrast the performance of the ACIS CLOs under the ACM Parties and Brigade's management to that of Highland, which managed the ACIS indenture trusts and served as ACM's sub-adviser prior to the ACM bankruptcy. *See id.* ¶ 68. Following Mr. Terry's takeover of ACM, Highland continued to manage another investment vehicle, ACIS 7, which continued to produce heightened returns, while the net proceeds of ACIS 6 allegedly plummeted under Mr. Terry's leadership. *See id.* ¶¶ 68–69; *see also id.* ¶¶ 78–79 (alleging that the ACIS CLOs "had produced consistent distributions to equity holders over time" when under Highland's management, though this ceased after Mr. Terry took control); *id.* ¶¶ 80–86 (detailing ACM's alleged mismanagement under Mr. Terry's control, including that ACM replaced shorter-term debt with longer-term loans, increased risk, and decimated the assets' value); *id.* ¶ 87 (noting the comparatively superior performance of ACIS 7, which has remained under Highland's control). NexPoint alleges that the ACM Parties and Brigade "caused ACIS[ ]6 to incur astronomic, unprecedented expenses, which were well outside the historical expense patterns—and . . . clearly outside market and industry norms." *Id.* ¶ 75; *see also id.* ¶¶ 89–101 (detailing the "mis-accru[ed] and mis-allocat[ed] expenses"); *id.* ¶¶ 102–24 (alleging the failure to purchase loans that satisfy collateral-

quality requirements); *id.* ¶¶ 125–30 (alleging Counter-Defendants' purchase of "bad investments"); *id.* ¶¶ 131–39 (alleging Counter-Defendants' "failure to provide best execution").  In addition, the NexPoint Parties allege that ACM "failed to uphold its duty to ensure that every purchase and sale made thereunder maintained or improved any failing collateral-quality test," *id.* ¶ 76; and that "Counter-Defendants attempted to offset transactions that the Indenture prohibited by making same-day, bulk purchases of loans with non-failing WALs, [which] were overpriced or bad investments . . . ," *id.* ¶ 77.

### C.  Procedural History

On March 30, 2023, the NexPoint Parties filed the Answer and Counterclaim (as amended on October 31, 2023, Dkt. No. 220-1), raising a series of affirmative defenses and counterclaims. The NexPoint Parties allege (1) breach of fiduciary duty by both the ACM Parties and Brigade, "with respect to the management of an investment trust in which NexPoint invested," ACIS 6; (2) negligence and/or gross negligence, (3) conversion, (4) unjust enrichment, assumpsit, or money had and received, (5) "tortious interference with NexPoint's rights under its Notes," and (6) aiding and abetting against Mr. Terry and Brigade, for aiding and abetting ACM's alleged breach.  *See* Counterclaim, Dkt. No. 220-1 at 1–2.  The counterclaims allege, in sum, that the Counter-Defendants' conduct "transgress[es] fiduciary duties which have caused NexPoint damages."  *Id.*  In addition, the NexPoint Parties seek a declaratory judgment.

#### a.  The NexPoint Parties' Counterclaim Against the ACM Parties and Brigade

The NexPoint Parties' Counterclaim raises seven causes of action.  First, the NexPoint Parties allege breach of fiduciary duty by both the ACM Parties and Brigade.  *See id.* ¶¶ 139–97.[10]

---

[10] Specifically, the NexPoint Parties "plead that Counter-Defendants (or any of them) owed fiduciary duties directly to NexPoint during the period prior to March 31, 2021, and to NHF TRS LLC from that day on.  [And] to the extent that the fiduciary duties were owed to Acis-6 CLO fund, and that any claims would have to be brought derivatively, NHF

They allege that both the ACM Parties and Brigade "owe fiduciary duties under the IAA that are actionable under New York law," *id.* at 28; that "[ACM] owes fiduciary duties as co-trustee of ACIS[ ]6," *id.* at 30; that "under New York law, [ACM] owes fiduciary duties to ACIS[ ]6 even if not a trust," *id.* at 32; and that the ACM Parties "violated their fiduciary duties by breaching the terms of the Indenture, by self-dealing, and by converting property of the investors for themselves," *id.* ¶ 168. The NexPoint Parties allege that this conduct has caused "substantial losses" to "the ACIS[ ]6 portfolio." *Id.* ¶ 173.

Second, the NexPoint Parties allege negligence and/or gross negligence against all Counter-Defendants "[t]o the extent Counter-Defendants would be liable for any of the foregoing causes of action prior to their lack of sufficient intent or willful actions . . . ." *Id.* ¶ 199. The NexPoint Parties allege that they are owed a duty of care by the ACM Parties "in managing ACIS[ ]6 and in discharging their duties under the IAA, the Indenture, and the PMA," *id.* ¶ 200, that the ACM Parties' conduct has "resulted in substantial losses to NexPoint," *id.* ¶ 201, and "was knowing and willful and done in disregard of known and established safeguards implemented and created in the industry to avoid well-known, foreseeable risks," *id.* ¶ 202.

Third, the NexPoint Parties allege conversion against the ACM Parties and Brigade insofar as "[u]nder the note, the holder is entitled to an amount from the Assets, that is residual after compliance with the investment criteria has been met and specific and identifiable administrative expenses in addition to other costs and expenses have been deducted." *Id.* ¶ 209. The NexPoint Parties allege that Mr. Terry "[i]n allowing the payment of inexplicably high expenses . . . wrongfully and improperly reimbursed [ACM], and potentially himself and Brigade, using NexPoint's and NHF TRS LLC's property designated for the payment of ACIS[ ]6's administrative expenses and costs."

TRS LLC has standing to bring such claim as the holder of the subordinated note." Counterclaim, Dkt. No. 220-1 ¶ 139.1.

*Id.* ¶ 211. And "Terry, [ACM,] and Brigade each exercised a wrongful and unauthorized dominion over NexPoint's and NHF TRS LLC's property designated for the payment of fees and ACIS[ ]6's administrative expenses and costs to the alteration of its condition or to the exclusion of NexPoint's and NHF TRS LLC's rights." *Id.* ¶ 213.

Fourth, the NexPoint Parties allege that "in the alternative[, . . . ] the foregoing actions and omissions are wrongful, and [the NexPoint Parties] are entitled to disgorge the ill-gotten gains from Counter-Defendants under the theory of unjust enrichment, assumpsit or money had and received." *Id.* ¶ 218.

Fifth, the NexPoint Parties allege tortious interference with contract—specifically, the subordinated note—against the ACM Parties and Brigade. *See id.* ¶¶ 219–31.

Sixth, "[t]o the extent that Terry and Brigade are found to not owe a duty to NexPoint and/or NHF TRS LLC under Counts 1, 2, 3, 4 and 5, [the NexPoint Parties] alternatively plead that Terry and Brigade actively aided and abetted [ACM]'s breaches of the duties [ACM] owed to NexPoint." *Id.* ¶ 233.

Seventh, the NexPoint Parties "seek a declaratory judgment to resolve questions concerning the respective rights, obligations, and duties of [the NexPoint Parties] viz-a-viz Counter-Defendants under the Indenture, the PMA, and New York law." *Id.* ¶ 237. Specifically, the NexPoint Parties seek declaratory relief under 28 U.S.C. §§ 2201–02 that "Counter-Defendants manipulated the assets in derogation of the rights of subordinated noteholders under the Notes in one or more ways as described herein; [t]he [ACIS 6] fund and/or [NexPoint or NHF] were damaged by Counter-Defendants' actions; [NexPoint and NHF] were or are owed fiduciary duties under New York or Federal law as an investor in [ACIS 6; and as] Noteholder[s] suing for [their] rights under the Notes, [NexPoint or NHF] are not bound by the Indenture's No-Action clause for each of its claims." *Id.* ¶ 239.

**b.  The ACM Parties' Motion to Dismiss the NexPoint Parties' Counterclaim**

The ACM Parties moved to dismiss the NexPoint Parties' Counterclaim against them, and requested judgment on the pleadings, on May 15, 2023.  Dkt. No. 106.  This motion was supported by a memorandum of law, Dkt. No. 107 (the "ACM Mem."), and four declarations, Dkt. Nos. 108–11.  The NexPoint Parties filed a response on June 14, 2023, Dkt. No. 139 (the "ACM Opp'n"), with supporting declarations, Dkt. Nos. 140, 141.  The ACM Parties' reply was filed on June 28, 2023, Dkt. No. 151 (the "ACM Reply"), with a supporting declaration, Dkt. No. 150.  The NexPoint Parties filed a sur-reply on July 19, 2023.  Dkt. No. 162.

In short, the ACM Parties argue that the NexPoint Parties' Counterclaim should be dismissed because the NexPoint Parties (1) fail to state a claim for tortious interference, (2) lack standing to bring their remaining claims, and (3) even if the NexPoint Parties had standing, they nonetheless fail to adequately plead their remaining counterclaims.[11]  *See* Dkt. No. 107 at 24–40.  The ACM Parties additionally moved for judgment on the pleadings under Federal Rule of Civil Procedure 12(c).  Further, in their supplemental briefing, the ACM Parties argue that Rule 23.1 bars both NexPoint's and NHF's derivative claims.  *See* Dkt. No. 224.

**c.  Brigade's Motion to Dismiss the NexPoint Parties' Counterclaim**

On May 31, 2023, Brigade moved to dismiss the NexPoint Parties' Counterclaim against it under Federal Rule of Civil Procedure 12(b)(6).  Dkt. No. 119; *see also* Dkt. Nos. 120 (the "Brigade Mem."), 121 (supporting declaration).  On June 26, 2023, the NexPoint Parties filed a response.

---

[11] Specifically, the ACM Parties argued that the tort claims should be dismissed as duplicative, that the unjust enrichment claim should be dismissed as barred by the underlying contracts, and that the negligence and conversion claims should be dismissed as barred by the economic loss doctrine.

Dkt. No. 147 (the "Brigade Opp'n"). On July 10, 2023, Brigade filed its reply. Dkt. No. 157 (the "Brigade Reply").

In its motion to dismiss, Brigade argues that (1) it has no fiduciary relationship with the NexPoint Parties, nor have the NexPoint Parties alleged that Brigade breached any fiduciary duty; (2) the NexPoint Parties lack standing to pursue their claims; and, in any event, (3) the NexPoint Parties fail to state their claims. *See* Dkt. No. 120.

### d. The Addition of NHF TRS, LLC

On October 31, 2023, the parties agreed to add NHF as an additional defendant and counter-plaintiff in this case, given that NHF—a subsidiary of NexPoint—"has been the registered holder of the Subordinated Note issued by Acis CLO 6 that is the subject of this litigation" since the FAC and Counterclaim were filed. *See* Dkt. No. 220 at 1. The Court "so-ordered" the stipulation and proposed order on November 1, 2023. Dkt. No. 223. In their stipulation, the parties also agreed that the ACM Parties' and Brigade's respective motions to dismiss NexPoint's counterclaims, Dkt. Nos. 106 and 119, "and the arguments for dismissal and judgment on the pleadings raised therein, will apply equally to NHF TRS . . . and any ruling on the Original Motions to Dismiss and/or the Original MJOP will bind NHF TRS." Dkt. No. 223 at 2–3. "Thus, for example, if the Court enters an order ruling that NexPoint lacks direct and derivative standing to assert its claims based on the arguments in the Original Motions to Dismiss and/or the Original MJOP, that ruling will apply equally to NHF TRS and the Court shall, either *sua sponte* or upon the request of a party, enter an identical order against NHF TRS without further briefing." *Id.*

The parties agreed that while the original briefing remains applicable notwithstanding the addition of NHF as a party, they would file supplemental briefing on the issue of whether NexPoint has derivative standing to assert its counterclaims given that it is not at present a subordinated noteholder, and whether NHF TRS has derivative standing given that it was not a subordinated

noteholder at the time of the alleged wrongdoing. *See id.* at 3–4.  In November 2023, the parties

filed this supplemental briefing on whether the NexPoint Parties satisfy the contemporaneous and

continuous requirement of Federal Rule of Civil Procedure 23.1.  *See* Dkt. No. 224 (the ACM Parties

and Brigade's mem.); Dkt. No. 225 (the NexPoint Parties' response); Dkt. No. 228 (the ACM Parties

and Brigade's reply).

## II.   LEGAL STANDARDS

### A.   Rule 12(b)(6):  Failure to State a Claim

"In considering a motion to dismiss a counterclaim, the court applies the same standards as a

motion to dismiss a complaint." *Zurich Am. Life Ins. Co. v. Nagel*, 571 F. Supp. 3d 168, 175 (S.D.N.Y.

2021) (citations omitted); *see also Garvey v. Face of Beauty LLC*, 634 F. Supp. 3d 84, 89 (S.D.N.Y. 2022)

(similar).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter,

accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S.

662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial

plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable

inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at

556).

It is not enough for a plaintiff to allege facts that are consistent with liability; the complaint

or counterclaim must "nudge[ ]" claims "across the line from conceivable to plausible." *Twombly*,

550 U.S. at 570.  "To survive dismissal, the [non-movant] must provide the grounds upon which his

claim rests through factual allegations sufficient 'to raise a right to relief above the speculative

level.'" *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Twombly*, 550

U.S. at 555).  Determining whether a complaint or counterclaim states a plausible claim is a

"context-specific task that requires the reviewing court to draw on its judicial experience and

common sense." *Iqbal*, 556 U.S. at 679.  The court must accept all facts alleged in the complaint or

counterclaim as true and draw all reasonable inferences in the non-movant's favor. *See Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 124 (2d Cir. 2008) (*per curiam*).  However,

> "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  A complaint [or counterclaim] must therefore contain more than "naked assertion[s] devoid of further factual enhancement."  Pleadings that contain "no more than conclusions . . . are not entitled to the assumption of truth" otherwise applicable to complaints in the context of motions to dismiss.

*DeJesus v. HF Mgmt. Servs., LLC*, 726 F.3d 85, 87–88 (2d Cir. 2013) (alterations in original) (quoting *Iqbal*, 556 U.S. at 678–79).  Although Rule 8 "does not require 'detailed factual allegations,' . . . it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Iqbal*, 556 U.S. at 678.  Thus, a complaint or counterclaim that offers "labels and conclusions" or "naked assertion[s]" without "further factual enhancement" will not survive a motion to dismiss.  *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555, 557) (alteration in original).

"A court's task" on a motion to dismiss "is to assess the legal feasibility of the complaint [or counterclaim]; it is not to assess the weight of the evidence that might be offered on either side."  *Lynch v. City of New York*, 952 F.3d 67, 75 (2d Cir. 2020).  "The purpose of Rule 12(b)(6) is to test, in a streamlined fashion, the formal sufficiency of the [non-movant's] statement of a claim for relief *without* resolving a contest regarding its substantive merits.  The Rule thus assesses the legal feasibility of the complaint [or counterclaim], but does not weigh the evidence that might be offered to support it."  *Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 155 (2d Cir. 2006) (emphasis in original); *see also In re Aluminum Warehousing Antitrust Litig.*, 95 F. Supp. 3d 419, 437 (S.D.N.Y. 2015) (noting that the Court "may not weigh the evidence in the guise of a plausibility analysis").

Finally, on a motion to dismiss, a court must generally "limit itself to the facts stated in the complaint" or, here, counterclaim.  *Field Day, LLC v. Cnty. of Suffolk*, 463 F.3d 167, 192 (2d Cir. 2006).  When deciding a motion to dismiss, a court may also consider "any written instrument

attached to the complaint as an exhibit, any statements or documents incorporated in it by reference, and any document upon which the complaint heavily relies." *In re Thelen LLP*, 736 F.3d 213, 219 (2d Cir. 2013); *see also Goldman v. Belden*, 754 F.2d 1059, 1065–66 (2d Cir. 1985).  Here, as the Indenture, Portfolio Management Agreements, and Note are attached to the Counterclaim as exhibits—*see* Dkt. Nos. 78-1 (the "Indenture"), *id.* Ex. A (the "Note"), 78-2 (the "Portfolio Management Agreement" or "PMA")—the Court considers those documents in its decision.

### B.  Rule 12(c):  Judgment on the Pleadings

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  "After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings."  Fed. R. Civ. P. 12.  "'Pleadings' include both the 'complaint' and the 'answer to [the] complaint.'"  *Lively v. WAFRA Inv. Advisory Grp., Inc.*, 6 F.4th 293, 301 (2d Cir. 2021) (citing Fed. R. Civ. P. 7(a)).  "The standard for granting a Rule 12(c) motion for judgment on the pleadings is identical to that [for granting] a Rule 12(b)(6) motion for failure to state a claim."  *Lynch*, 952 F.3d at 75 (quoting *Patel v. Contemporary Classics*, 259 F.3d 123, 126 (2d Cir. 2001)).  In evaluating a motion for judgment on the pleadings pursuant to Rule 12(c), a court must accept all facts set forth in the non-movant's pleading as true and draw all reasonable inferences in favor of the non-movant.  *See Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 78 (2d Cir. 2015).

"To survive a Rule 12(c) motion, '[the non-movant's pleadings] must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'"  *WC Capital Mgmt., LLC v. UBS Secs., LLC*, 711 F.3d 322, 328 (2d Cir. 2013) (quoting *Johnson v. Rowley*, 569 F.3d 40, 44 (2d Cir. 2009)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).  "The assessment of whether a

complaint's factual allegations plausibly give rise to an entitlement to relief . . . calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of illegal conduct." *Lynch*, 952 F.3d at 75 (internal quotation marks omitted).  "In making this assessment, we 'draw all reasonable inferences in [the non-movant's] favor.'" *Lively*, 6 F.4th at 301 (quoting *Johnson v. Rowley*, 569 F.3d 40, 43 (2d Cir. 2009)).  Further, "[w]hen a plaintiff is the moving party, 'the plaintiff may not secure a judgment on the pleadings when the answer raises issues of fact that, if proved, would defeat recovery.'" *Flextech Rts. Ltd. v. RHI Ent., LLC*, No. 09 CIV. 3462 (DC), 2010 WL 245570, at *2 (S.D.N.Y. Jan. 22, 2010) (quoting 5C CHARLES ALAN WRIGHT & ARTHUR MILLER, FED. PRAC. & PROC. CIV. § 1368 & n. 20 (3d ed. 2009)).

Rule 12(c) motions "may be filed before discovery is complete;" and "[u]ntil both parties have an opportunity to test their evidence at summary judgment or trial, [courts] must accept the non-movant's pleading as true and decline to weigh competing allegations asserted by the moving party." *Id.* (citation omitted).  That said,

> "judgment on the pleadings is not appropriate if there are issues of fact which if proved would defeat recovery, even if the trial court is convinced that the party opposing the motion is unlikely to prevail at trial." Thus, where a "question [of fact] is in dispute, it [is] improper for the district court to answer it on a motion for dismissal on the pleadings." Thus, a court may consider undisputed allegations of fact on a Rule 12(c) motion under the same standard as Rule 12(b)(6), but it may not use a motion for judgment on the pleadings to weigh disputed factual allegations.

*Id.* (citations omitted); *see also* 5C CHARLES ALAN WRIGHT & ARTHUR MILLER, FED. PRACTICE & PROCEDURE CIV. § 1367 (3d ed. 2021) ("[A] Rule 12(c) motion is designed to provide a means of disposing of cases when the material facts are not in dispute between the parties . . . .  The motion for a judgment on the pleadings only has utility when all material allegations of fact are admitted or not controverted in the pleadings and only questions of law remain to be decided by the district court.").

## III.   DISCUSSION

Because the NexPoint Parties' counterclaims against the ACM Parties and Brigade proceed in tandem, the Court considers them together and proceeds claim by claim.

### A.  Tortious Interference

The NexPoint Parties have failed to adequately state a claim for tortious interference.  They fail to adequately allege an underlying breach of the Note, which is the only contract that the NexPoint Parties have with the ACM Parties; and to the extent that the NexPoint Parties' brief suggests an allegation of tortious interference with the Indenture, the claim fails because the NexPoint Parties are not parties to the Indenture.[12]  "Under New York law, the elements of tortious interference with contract are (1) 'the existence of a valid contract between the plaintiff and a third party'; (2) the 'defendant's knowledge of the contract'; (3) the 'defendant's intentional procurement of the third-party's breach of the contract without justification'; (4) 'actual breach of the contract'; and (5) 'damages resulting therefrom.'"  *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 401–02 (2d Cir. 2006) (quoting *Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 424 (1996)).  The counterclaim alleges "tortious interference with NexPoint's rights under its Notes," Counterclaim, Dkt. No. 220-1 at 2–3, insofar as "NexPoint was a holder of" the ACIS 6 Note, *id.* ¶ 221, and the Note "incorporates certain duties and obligations of the Indenture and is a contract with ACIS-6," *id.* ¶ 222; *see also* the Note.

The NexPoint Parties claim that "[u]nder the note, the holder is entitled to an amount from the Assets, that is residual after compliance with the investment criteria has been met and specific and identifiable administrative expenses in addition to other costs and expenses have been deducted."  *Id.* ¶ 209 (emphasis in original).  The NexPoint Parties allege that the ACM Parties

---

[12] Nor can the NexPoint Parties amend their pleadings through the briefing.  *See, e.g.*, *Budhani v. Monster Energy Co.*, No. 20-CV-1409 (LJL), 2021 WL 5761902, at *3 (S.D.N.Y. Dec. 3, 2021) (collecting cases).

"were well aware of the note's terms since they were appended to the Indenture, which is incorporated into the PMA . . . ." *Id.* ¶ 224.  And, according to the NexPoint Parties, the ACM Parties' "actions caused ACIS[ ]6 to breach the terms of the subordinated note . . . by causing the portfolio to pay substantially less than what subordinated noteholders were entitled to under the subordinated note." *Id.* ¶ 229.  Specifically, they allege that the ACM Parties' "direct involvement in identifying the securities to be bought and sold in violation of the note's requirements, . . . in executing the trades, and . . . in inflating the amount of expenses and fees directly caused ACIS[ ]6 CLO fund to pay less to [NexPoint and NHF] than what it is obligated to pay under the note." *Id.*

The NexPoint Parties fail to adequately allege breach of the terms of the Note.  Because the Note is attached as an exhibit to the Counterclaim, the Court considers it in evaluating this motion to dismiss.  *See In re Thelen LLP*, 736 F.3d at 219.  The Note obligates ACIS 6 to distribute available proceeds to noteholders in accordance with the payment priority laid out in the Indenture.  *See* Note at Ex. A2-7.  By its terms, the Note does not separately confer any duties enforceable by the noteholders against ACIS 6, the Note's trustee, or anyone else; and the Note's mere reference to the Indenture is not sufficient to confer upon noteholders the right to enforce duties prescribed by the Indenture.  *See, e.g.*, Note, A2-7-8 ("Reference is hereby made to the Indenture . . . for a statement of the respective rights, limitations of rights, duties and immunities *thereunder* of the Issuer, the Trustee and the Holders of the Notes and the terms upon which the Notes are, and are to be, authenticated and delivered.") (emphasis added); *see also Intesa Sanpaolo, S.p.A. v. Credit Agricole Corp. & Inv. Bank*, No. 12 CIV. 2683 RWS, 2013 WL 4856199, at *3 (S.D.N.Y. Sept. 10, 2013) ("[W]hile express identification of a document is a *necessary* condition for incorporation of that document, it is not a *sufficient* one.  In addition to language explicitly identifying the referenced document, there must also be language that 'clearly communicate[s] that the purpose of the reference is to incorporate the referenced material into the contract[,] rather than merely to acknowledge that the referenced

23

material is relevant to the contract, e.g., as background law . . . .'") (quoting *Northrop Grumman Info. Tech., Inc. v. United States*, 535 F.3d 1339, 1345 (Fed. Cir. 2008)) (emphasis in original).[13]  An allegation that the Indenture was breached does not suffice to adequately allege that the Note was breached.  Nor do the NexPoint Parties adequately allege—or for that matter, argue in their response—that the Note *itself* was breached in any way beyond their incorporation argument.  *See, e.g.*, ACM Mem. at 24 ("The Subordinated Note merely requires Acis 6 to distribute available proceeds in accordance with the priority of payments in the Indenture.  NexPoint does not allege any failure by Acis 6 to do so." (citing Note at Ex. A2-7)); ACM Opp'n at 14 (not disputing this assertion, and instead simply stating that the NexPoint Parties "plead[ed] violations of the Indenture's material investment terms," and arguing that the ACM Parties failed to comply with the Indenture and the PMA—both contracts to which the NexPoint Parties are not parties).  Again, the Note, which requires ACIS 6 to distribute any remaining proceeds to the noteholders in accordance with the Indenture's priority of payments, does not confer upon the noteholders any rights to hold the portfolio manager liable for any conduct leading up to the distribution of payments.  Accordingly, the NexPoint Parties have failed to adequately allege actual breach of the Note.

Nor have they adequately pleaded alleged interference with the Indenture.  While the Counterclaim itself alleges tortious interference involving actual breach of the Note, *see, e.g.*, *id.* ¶ 229 (alleging that the ACM Parties' "actions caused ACIS[ ]6 to breach the terms of the subordinated note"), the NexPoint Parties' briefing instead argues that Plaintiffs' conduct induced a breach of the

---

[13] And as the ACM Parties rightly point out in their Reply, "[w]hen the drafters of Acis 6's governing documents wanted to incorporate by reference, they said so."  ACM Reply at 11 (citing Dkt. No. 140-2 at viii; Dkt. No. 78-1 at Ex.A2-9). *See, e.g.*, *Cruden v. Bank of New York*, 957 F.2d 961, 976 (2d Cir. 1992) ("Under New York law, a written contract is to be interpreted so as to give effect to the intention of the parties as expressed in the unequivocal language they have employed."); *cf. Eastman Chem. Co. v. Nestle Waters Mgmt. & Tech.*, No. 11 CIV. 2589 JPO HBP, 2012 WL 4473288, at *10 (S.D.N.Y. Aug. 16, 2012), *report and recommendation adopted*, No. 11 CIV. 2589 JPO HBP, 2012 WL 4474587 (S.D.N.Y. Sept. 28, 2012) ("[T]he parties knew how to draft and include language requiring pro ration when that is what they intended.  The absence of similar pro ration language [elsewhere in the contract] compels the conclusion that the parties did not intend monthly pro ration with respect to [that item in the contract].").

Indenture, *see* ACM Opp'n at 25 ("NexPoint pleads that [the ACM Parties'] . . . acts . . . caused [ACIS 6] . . . to breach the terms of the Indenture, which in turn caused NexPoint to lose money in the form of both the misappropriated fees and expenses and the lost appreciation in the investments themselves."); *id.* at 26 n.34 (discussing breach of the Indenture); Brigade Opp'n at 4 (asserting that Brigade participated in "violat[ing] the investment standards in the Indenture").  The NexPoint Parties may not amend their pleadings through their briefing.  And in any case, as the NexPoint Parties admit, they are not parties to the Indenture.  Counterclaim ¶ 51 ("NexPoint was *not* a signatory to the Indenture.") (emphasis in original).  That the Note may merely reference "certain duties that are explained in the Indenture and provide that there is no recourse against the Issuers," *id.* ¶ 53 (citing Note, A2-7), does not suffice to transform the Indenture into a contract existing between the NexPoint Parties and ACIS 6.  Tortious interference requires "the existence of a valid contract between the plaintiff and a third party."  *See Kirch*, 449 F.3d at 401–02 (internal quotation marks and citations omitted).  Thus, to the extent that the NexPoint Parties' tortious interference claim concerns alleged interference with the Indenture—to which NexPoint and NHF are not parties—the claim is dismissed.

Thus, the NexPoint Parties have failed to adequately plead breach of the Note, or any other contract to which the NexPoint Parties are signatories.  The tortious interference claim is therefore dismissed.

### B.  Standing on the Remaining Claims

The NexPoint Parties lack standing to assert their remaining counterclaims.  New York law—which governs the Indenture and each Note, *see* Indenture § 14.9—requires that "courts 'look to the law of the state of incorporation in adjudicating a corporation's internal affairs,' *Galef v. Alexander*, 615 F.2d 51, 58 (2d Cir. 1980), including questions as to whether a claim is direct or derivative," *NAF Holdings, LLC v. Li & Fung (Trading) Ltd.*, 772 F.3d 740, 743 (2d Cir. 2014), *certified*

*question answered*, 118 A.3d 175 (Del. 2015) (citing *Seidl v. Am. Century Cos.*, 713 F. Supp. 2d 249, 255

(S.D.N.Y. 2010), *aff'd*, 427 Fed. Appx. 35 (2d Cir. 2011)).[14]  ACIS 6 is a limited liability company

incorporated in the Cayman Islands, and it conducts business through directors located in the

Cayman Islands.  Compl. ¶ 15; *accord* Answer ¶ 15; Counterclaim ¶ 20 ("admit[ting] that the ACIS

CLOs are Cayman Islands-exempted limited liability companies").  Therefore, Cayman law applies

to the question of whether the NexPoint Parties' counterclaims are direct or derivative.  *See also Winn*

*v. Schafer*, 499 F. Supp. 2d 390, 393 (S.D.N.Y. 2007) (finding that "under New York choice of law

rules, Cayman law applies" to claims of breach of fiduciary duty where the state of incorporation

was the Cayman Islands); *Howe v. Bank of N.Y. Mellon*, 783 F. Supp. 2d 466, 476 (S.D.N.Y. 2011)

(same).

The NexPoint Parties assert that they have both direct and derivative standing under New

York and Cayman law.  *See* ACM Opp'n at 16–29.  The NexPoint Parties' argument for direct

standing is largely rooted in their errant argument that the ACM Parties are "co-trustees" of ACIS 6,

and their argument for derivative standing in turn is grounded in their inappropriate

mischaracterization of the ACIS 6 notes as "equity."[15]  *See id.*  For the reasons that follow, the Court

finds that the NexPoint Parties lack both direct and derivative standing to bring their counterclaims.

---

[14] The NexPoint Parties' assertion that the PMA's choice of law clause—which selects New York law "without giving effect to [its] conflicts of laws provisions," PMA § 24—governs is incorrect.  *See* ACM Opp'n at 28.  As a non-party to the PMA, NexPoint may not enforce it.  *See* PMA § 31 ("Other than as provided below"—none of which applies here— "no party, including any Holder of Notes, is a third party beneficiary of this Agreement."); *see also St. Clair-Hibbard v. Am. Fin. Tr., Inc.*, 812 F. App'x 36, 40 (2d Cir. 2020) (summary order) (noting that although the contract's choice of law clause selecting New York specifically did so "'without regard to the principles of [New York's] conflicts of law,' . . . the law of [the party's] state of incorporation, Maryland, applies to the threshold issue of Plaintiff's standing to sue") (citing *NAF Holdings, LLC v. Li & Fung (Trading) Ltd.*, 772 F.3d 740, 743 n.2 (2d Cir. 2014); *Howe v. Bank of N.Y. Mellon*, 783 F. Supp. 2d 466, 476 (S.D.N.Y. 2011) ("Plaintiff cites no law to support his contention that a choice of law provision can govern standing, which is a constitutional issue and governed by the laws of the state of incorporation.")).

[15] The NexPoint Parties argue, in the alternative, that they have derivative standing as trust beneficiaries.  *See* Dkt. No. 139 at 27–28.

1.   **Derivative Standing**

Under Cayman law, the NexPoint Parties' claims involving alleged mismanagement of the CLO funds suffered by ACIS 6 must be brought derivatively.  To the extent that the NexPoint Parties claim that they have been "harmed" by a reduction in their net proceeds flowing from the ACM Parties' monetization of the ACIS 6 CLOs' assets, these alleged harms are suffered directly by ACIS 6, and only indirectly—if at all—by the noteholders.[16]  But the NexPoint Parties lack derivative standing to sue under Cayman law because in the Cayman Islands, creditors like the NexPoint Parties cannot sue derivatively in these circumstances.  *See* Milne Decl. ¶ 63 ("[A] creditor does not have the right to bring a derivative claim to enforce the company's rights.") (citing *Marex Financial Ltd. v. Sevilleja*, [2020] UKSC 31 ¶ 83, Dkt. No. 109-3 (noting that although shareholders' losses are not "separate and distinct from [those of] the company[], and therefore [the shareholder] has no claim to recover it," shareholders, "*unlike a creditor*," may have "the right to bring a derivative claim to enforce the company's rights if the relevant conditions are met" (emphasis added)); Cayman Islands Grand Court Rules, Order 15, Rule 12A, Dkt. No. 109-6) (describing the rules for derivative actions as "appl[ying] to every action begun by writ by one or more *shareholders* of a company where the cause of action is vested in the company and relief is accordingly sought on its behalf" (emphasis added))).

The NexPoint Parties argue that the general prohibition against creditor derivative suits does not apply because "NexPoint has alleged [its Note] is equity," such that the NexPoint Parties can bring a derivative action as "shareholder[s]."  ACM Opp'n at 29 (citing Counterclaim ¶¶ 56–67; Patel Decl. ¶¶ 27–35).  But subordinated notes are debt securities, not shares.  *See* Indenture at 57

---

[16] The Counterclaim itself appears to acknowledge as much.  *See, e.g.*, Counterclaim ¶¶ 4 ("Counter-Defendants have wiped out millions in value *from ACIS[ ]6* . . . and deprived NexPoint of the full benefit of its investment bargain.") (emphasis added), 5 (alleging that the NexPoint Parties suffered losses only as a result of ACIS 6's losses), 66 (alleging that the ACM Parties and Brigade's conduct "severely and adversely impacted ACIS[ ]6"), 75 (alleging harm to ACIS 6), 88 (same), 94 (same), 112 ("The purchase of these loans caused ACIS[ ]6 to suffer substantial losses.").

(defining "Subordinated Notes"), *id.* §§ 2.2–2.3 (describing the Secured Notes and Subordinated Notes).[17]  The noteholders' interest in their subordinated debt does not morph into an equity interest for purposes of derivative standing.  *See, e.g.*, *Howe*, 783 F. Supp. 2d at 476 (rejecting the argument that "the Noteholders' interest [in Cayman Islands CDO] morphs into an equity interest for the purposes of derivative standing").  Put very simply, notes are a different part of a company's capital structure than equity.  Defendants presumably were aware of the rights of noteholders when they invested and where they fit in the capital structure; Cayman law does not allow them to obtain the rights of equity holders simply by mischaracterizing their notes as "equity."

And even if the NexPoint Parties' notes were equity, under Cayman law shareholders may bring derivative actions in only "four narrow" circumstances—none of which apply here.  *See Zohar CDO 2003-1, Ltd. v. Patriarch Partners, LLC*, No. 17-CV-307(PKC), 2021 WL 4460547, at *11 (S.D.N.Y. Sept. 29, 2021), *amended*, No. 17-CV-307 (PKC), 2021 WL 4710787 (S.D.N.Y. Oct. 7, 2021) ("Under Cayman law, 'derivative claims are owned and controlled by the company, not its shareholders' and, thus, 'a shareholder is not permitted to bring a derivative action on behalf of that company.'" (quoting *Davis v. Scottish Re Grp. Ltd.*, 73 N.Y.S.3d 533, 534–35 (1st Dep't 2018)); *Davis*, 73 N.Y.S.3d at 535 ("Cayman Islands law recognizes only four narrow exceptions to the [rule

---

[17] The NexPoint Parties argue that they pleaded that the notes are essentially equity.  ACM Opp'n at 29.  It is true that the Counterclaim alleges that the "junior-most noteholders . . . . are *tantamount* to the equity holders, who take on the most risk of any investor in a CLO."  Counterclaim ¶ 25 (emphasis added).  This legal conclusion, however, need not be accepted as true.  *See Iqbal*, 556 U.S. at 678 ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.").  The Court is not required to credit as true the NexPoint Parties' characterization of the notes as equity because it is contradicted by the documentation incorporated into the complaint.  *See In re Thelen LLP*, 736 F.3d at 219; *see also May v. Sony Music Ent.*, 399 F. Supp. 3d 169, 179 (S.D.N.Y. 2019) ("If a document relied on in the complaint contradicts allegations in the complaint, the document, not the allegations, control, and the court need not accept the allegations in the complaint as true." (internal quotation marks and citations omitted)).  And even the Counterclaim acknowledges the difference between notes and actual equity—as it must, given the structure of these transactions.  *See, e.g.*, Counterclaim ¶¶ 1 (stating that the secured noteholders are paid off, and then the "equity holders" later receive "all residual cash flows"), 20 (describing the process of CLO fundraising in which "the special purpose vehicle brings in the necessary funds by (1) raising equity funds from equity investors, and (2) obtaining additional financing in the form of debt, . . . by issuing notes to third-party investors"), 39 (distinguishing "noteholders *and* equity holders") (emphasis added), 44 (same).  It does not escape the Court's notice that the NexPoint Parties, subject to the constraints of Rule 11, plead no more than that "[t]he subordinated notes are *essentially* equity."  *See id.* ¶ 54 (emphasis added).

generally barring shareholder actions]:  "(1) if the conduct infringed on the shareholder's personal rights; (2) if the conduct would require a special majority to ratify; (3) if the conduct qualifies as a fraud on the minority; or (4) if the conduct consists of ultra vires acts.").  The NexPoint Parties' apparent argument that the personal rights exception may be satisfied by virtue of "an injury inur[ing] to [the NexPoint Parties] under a specific right granted under statute," which the Court assumes to be the IAA,[18] *see* ACM Opp'n at 29, fails as the IAA does not confer upon NexPoint a private right of action.  *See, e.g.*, *NexPoint Diversified Real Est. Tr. v. Acis Cap. Mgmt., L.P.*, 80 F.4th 413, 418 (2d Cir. 2023) ("[T]he IAA provides 'a limited private remedy [in § 215] . . . to void an investment advisers contract,' but it 'confers no other private causes of action, legal or equitable.'" (citation omitted)); *id.* at 418–21 (concluding, in upholding this Court's ruling on the motion to dismiss in the First NexPoint Lawsuit, that NexPoint is not entitled to rescission under § 215(b), and that "NexPoint does not seek rescission of any contract requiring a party to engage in conduct prohibited by the IAA"); *see also NexPoint Diversified Real Est. Tr. v. Acis Cap. Mgmt., L.P.*, 620 F. Supp. 3d 36, 43–47 (S.D.N.Y. 2022), *aff'd*, 80 F.4th 413 (2d Cir. 2023) (explaining the same and collecting cases).

Nor would the Counter-Defendants' conduct qualify to confer standing on the NexPoint Parties under the fraud-on-the-minority exception, as the NexPoint Parties fail to allege that the ACM Parties or Brigade control a majority of the ACIS 6 voting securities.  *See Davis v. Scot. Re Grp. Ltd.*, 73 N.Y.S.3d 533 (1st Dep't 2018) ("In order to invoke [the fraud-on-the-minority] exception, plaintiff must plead and prove that the alleged wrongdoers controlled a majority of the stock with voting rights and that those wrongdoers committed fraud.").[19]

---

[18] The NexPoint Parties do not specify to what statute they are referring here, nor do they mention another statute that this could conceivably be.  *See* ACM Opp'n at 29.

[19] Though not addressed in the briefing, the NexPoint Parties' suggestion in the Counterclaim that Highland, the "controlling holder of HCLOF," is "the majority in interest" and entered into a "collusive settlement" between HCLOF and the ACM Parties does not suffice to argue fraud on the minority.  *See* Counterclaim ¶ 247.  The Court has already

Nor is a duty triggered to creditors based on an insolvency argument given that no Event of Default has occurred. *See* Milne Decl. ¶ 61 (noting that in Cayman law, "directors may owe a duty to act in the best interests of all creditors if it becomes clear that insolvency is probable or imminent" (citing *West Mercia Safetywear Ltd (in liq) v Dodd*, [1988] BCLC 250, Dkt. No. 150-22)); Counterclaim ¶ 247 (acknowledging that no Event of Default has occurred).

And even if the NexPoint Parties had derivative standing to bring these claims, they would not be able to bring them at this time as a practical matter because the underlying documents do not permit it. The counterclaims concern alleged breaches of the PMA, as well as failure to abide by the terms of the Indenture and the IAA, *see, e.g.*, Counterclaim at 1–3; *id.* ¶¶ 194–96, 200. The NexPoint Parties seek to bring these claims derivatively on behalf of ACIS 6. The Indenture's granting clause vests all of ACIS 6's "rights under the Portfolio Management Agreement" to U.S. Bank, the trustee. *See* Indenture at 1. The Indenture further provides that the trustee lacks the authority "to take any legal action upon the breach of an obligation of the Portfolio Manager" (ACM) under the PMA until an Event of Default occurs. Indenture § 15.1(a) ("[T]he Trustee shall not have the authority to exercise [this] right[] . . . until the occurrence of an Event of Default."). As the NexPoint Parties acknowledge, no Event of Default has occurred. Counterclaim ¶ 247. Thus, even the trustee—who was granted ACIS 6's rights to sue ACM under the PMA in accordance with the Indenture's granting clause—would be unable to bring the claims the NexPoint Parties allege at this time.

### 2. Direct Standing

In addition, the NexPoint Parties lack direct standing to bring their counterclaims. The NexPoint Parties first argue that they have standing to bring a direct claim for breach of fiduciary

---

dismissed the counterclaims brought by the DAF Parties seeking to invalidate the settlement agreement on similar grounds of alleged collusion. *See generally* DAF Counterclaim Ruling. Moreover, because the NexPoint Parties have declined to brief this argument any further, they have, in any case, forfeited it. *See Ramirez v. Temin & Co., Inc.*, No. 20 CIV. 6258 (ER), 2021 WL 4392303, at *9 n.2 (S.D.N.Y. Sept. 24, 2021) ("[A] plaintiff's failure to address an issue in its opposition raised by its adversary amounts to a concession or waiver of the argument.") (citations omitted).

duty because the ACM Parties and Brigade owe them "direct fiduciary duties" either (i) under "the trust theory," (ii) due to the "nature of the relationship," or (iii) "under the IAA" as "actionable under New York law." *See* ACM Opp'n at 16–26. Similarly, in the Counterclaim, the NexPoint Parties allege that both the ACM Parties and Brigade "owe fiduciary duties under the IAA that are actionable under New York law," Counterclaim, Dkt. No. 220-1 at 28; that ACM "owes fiduciary duties as co-trustee of ACIS[ ]6," *id.* at 30, which NexPoint argues is a "a trust created under New York law," *id.* ¶ 159; that "under New York law, [ACM] owes fiduciary duties to ACIS[ ]6 even if not a trust," *id.* at 32; and that the ACM Parties and Brigade "violated their fiduciary duties by breaching the terms of the Indenture, by self-dealing, and by converting property of the investors for themselves," *id.* ¶ 168, causing "substantial losses" to the ACIS 6 portfolio, *id.* ¶ 173. The Court addresses each theory in turn—none of which suffice to confer direct standing on the NexPoint Parties.

###### a. The "Co-Trustee" Theory

The NexPoint Parties argue that ACIS 6 assigned its assets "to two trustees: U.S. Bank to hold legal title, and ACM as Portfolio Manager to control the fund and manage the Assets 'for the benefit of' the noteholders." ACM Opp'n at 3. The NexPoint Parties' trust theory posits that the Indenture created a trust under either Cayman or New York law, and that ACM thereby owes to the ACIS 6 noteholders direct fiduciary duties as either a "co-trustee" (under New York law) or "shadow trustee" (Cayman law). *See id.* at 19–20. This theory fails.

Because there is no indication in the Indenture that the ACM Parties are a "co-trustee," it would be inappropriate to ascribe that role to them. In New York, "much of the common law of trusts, and its corresponding fiduciary obligations, are not applicable to commercial trusts." *Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*, 837 F. Supp. 2d 162, 191 (S.D.N.Y. 2011). Rather, "[i]t is . . . well-established under state common law that the duties of an indenture trustee are strictly

defined and limited to the terms of the indenture." *Elliott Assocs. v. J. Henry Schroder Bank & Tr. Co.*, 838 F.2d 66, 71 (2d Cir. 1988); *see also AG Capital Funding Partners, L.P. v. State Street Bank & Trust Co.*, 11 N.Y.3d 146, 156 (2008) ("The trustee under a corporate indenture . . . has his rights and duties defined, not by the fiduciary relationship, but exclusively by the terms of the agreement." (internal quotation marks and citations omitted)); *accord Meckel v. Cont'l Res. Co.*, 758 F.2d 811, 816 (2d Cir. 1985) ("Unlike the ordinary trustee, who has historic common-law duties imposed beyond those in the trust agreement, an indenture trustee is more like a stakeholder whose duties and obligations are exclusively defined by the terms of the indenture agreement.").

Neither the Indenture nor the PMA identify the ACM Parties as "co-trustees" with fiduciary duties running from the ACM Parties (or Brigade) to the noteholders, as the NexPoint Parties' creative (but wrong) theory posits. Indeed, the parties affirmatively disavowed any intention for the fiduciary duties of the ACM Parties and Brigade, pursuant to the PMA, to run from ACIS 6 to the noteholders. *See* PMA § 11(a)(i) (stating that generally, the ACM Parties may not be held liable by noteholders); *id.* § 2 (noting that the *Issuer* retains the portfolio manager for its services); *id.* § 10 (ACM consenting to enforcement of the PMA "by the Issuer and by the Trustee on behalf of the Holders"); *id.* §§ 31–32 (expressly excluding noteholders from being third-party beneficiaries to the PMA absent specified circumstances not present here); *see also* Dkt. No. 140-2 (the "Offering Circular") at 28 ("None of the Co-Issuers, the Initial Purchaser, the Portfolio Manager, the Collateral Administrator, the Trustee nor any of their respective affiliates is providing investment, accounting, tax or legal advice in respect of the Notes *and will not have a fiduciary relationship with any investor or prospective investor in the Notes*." (emphasis added)); *id.* at 29 (noting that ACM is not "providing investment, accounting, tax or legal advice in respect of the Notes and will not have a fiduciary relationship with any investor or prospective investor in the Notes"); *id.* at 57 (noting ACM's "fiduciary duties owed to the Issuer and such other clients, funds or other investment

accounts," while not listing the noteholders); *id.* at 102 (describing ACM's limitation of liability).

The Indenture did establish a trustee: U.S. Bank.  Indenture at 1.  There is no indication in the

instruments that the parties intended for any "trustee-like" fiduciary duties to run from the ACM

Parties (or Brigade for that matter) to the noteholders.  To the contrary, the documents expressly

disclaim the creation of such a relationship.  The Court is not aware of a "trustee by implication"

doctrine pertaining to indenture trustees, "whose duties and obligations are exclusively defined by

the terms of the indenture agreement."  *Meckel*, 758 F.2d at 816.[20]  Thus, the "co-trustee" theory fails

to confer direct standing on the NexPoint Parties to sue the ACM Parties over the alleged

mismanagement of the ACIS 6 funds.[21]

Given the Indenture's and PMA's choice-of-law clauses, New York law applies to the

question of whether the ACM Parties are "co-trustees" of the fund.  But even if Cayman law applied

to this issue, the NexPoint Parties' argument still fails.  In the Cayman Islands, parties must satisfy

the "three certainties" in order to form a trust:  "(1) certainty of intention to create a trust; (2)

certainty of the subject matter forming the assets of the trust; and (3) certainty regarding the objects

or beneficiaries of the trust."  *See* Declaration of Bhavesh Patel, Dkt. No. 141 (the "Patel Decl.") ¶

11 (citing *Islena Airlines v. Jefferson* [1998 CILR 1481], Dkt. No. 141-1 at 159 ("[I]n order to constitute

a trust, an arrangement must have three characteristics, known as the three certainties:  certainty of

intent, of subject-matter and of object.")); Declaration of Jonathan Milne, Dkt. No. 150 (the "Milne

Decl.") ¶¶ 10–11 (agreeing with this statement of Cayman law and collecting additional Cayman

---

[20] As the ACM Parties note in their reply, the NexPoint Parties' authorities on this theory "are inapposite."  *See* ACM Reply at 8; *see also* ACM Opp'n at 19 (citing *Matter of Will of Rubin*, 540 N.Y.S.2d 944, 947 (N.Y. Sur. Ct. 1989) (a Surrogate's Court case examining common-law fiduciary trustees in the context of interpreting an individual's will, not a lengthy Indenture that clearly defines the trustees and prescribes specified duties); 106 N.Y. Jur. 2d Trusts § 348 (citing *Rubin*); Restatement (Second) of Trusts § 185(c), (e) (1959) (discussing the duties of advisors to common-law fiduciary trustees); J.R. Kemper, *Construction and Operation of Will or Trust Provision Appointing Advisors to Trustee or Executor*, 56 A.L.R.3d 1249 § 10 (1974) (same)).

[21] It is not lost on the Court that the NexPoint Parties assert this creative "common law co-trustee" argument only after the Court's previous holding, in the First NexPoint Lawsuit, that the NexPoint Parties cannot sue the *actual* trustee for breach of fiduciary duty under the terms of the Indenture. *See NexPoint*, 620 F. Supp. 3d at 47–49.

cases in support).  To satisfy the first certainty—that of intent to create a trust—"the settlor must

have intended to impose fiduciary duties on the trustee to whom legal ownership of the property is

transferred . . . .  because, under English and Cayman Islands law, a trust is a fiduciary relationship."

Milne Decl. ¶ 12 (citing *Grand View Private Trust Co Ltdv Wen-Young Wong* [2022] UK.PC 47 ¶ 27,

Dkt. No. 150-5 (noting that trustees have fiduciary duties); *In re Ta-Ming Wang Trust* [2010] (1) CILR

541, 550 ¶ 19, Dkt. No. 150-6 (acknowledging that trustees owe fiduciary duties to their

beneficiaries)); *see also id.* ¶¶ 13–15 (citing SNELL'S EQUITY § 22-013, Dkt. No. 150-1 (stating that to

form a trust, "[i]t is unnecessary . . . to use the word 'trust;'" rather, "[t]he settlor's intention must be

clear on two main questions:  (1) that they intended the trustee to owe legally enforceable duties . . . ;

(2) that if they intended to create a legal relationship, it was to involve trust duties as distinct from

some kind of legal relationship, such as a simple relationship of debtor and creditor"); *id.* § 22-015

("[A] simple advance payment of money for a particular purpose is generally not enough to indicate

that the recipient was intended to hold on trust for the payer," and "[t]he imposition of a trust,

without strong evidence of an intention to declare one, would upset the usual proportionate

distribution of assets in insolvency.")).

Under Cayman law, it is the intention of the parties to form a trust that controls whether a

"trust relationship" has been formed.  *See* Milne Decl. ¶ 25 ("Under English and Cayman Islands

law, such trust labels do not create a trust if the substance of the instrument shows that it was not

intended to create a trust relationship.") (citing SNELL'S EQUITY § 22-013, Dkt. No. 150-1); *Re*

*Lehman Brothers International (Europe)* [2010] EWHC 2914 (Ch) 11225(v), 225(vi), 249, Dkt. No. 150-

10 (stating that "[t]he words used by the parties such as 'trust' . . . are not conclusive in favour of the

recognition of [one of the parties'] proprietary interest in the property, if the terms of the agreement

or relationship . . . compel a different conclusion")).  Again, the governing documents here do not

suggest that the ACM Parties and the NexPoint Parties intended to form a trustee/beneficiary

(respectively) relationship.  To the contrary, the documents affirmatively disavow any such intention.  *See* PMA §§ 11(a)(i), 2, 10, 31–32; *see also* Offering Circular at 28, 29, 57, 102.  Thus, the NexPoint Parties' argument that the ACM Parties constituted "trustees" under Cayman law also fails.

### b.  The "Nature of the Relationship"

Nor do the ACM Parties or Brigade owe the NexPoint Parties any direct fiduciary duties due to the "nature of the relationship."  In New York, courts have "held that a 'fiduciary relationship arises between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation.'"  *Oddo Asset Mgmt. v. Barclays Bank PLC*, 19 N.Y.3d 584, 592–93 (2012) (quoting *Roni LLC v. Arfa*, 18 N.Y.3d 846, 848 (2011)).  "A fiduciary relationship is 'necessarily fact-specific' and is also 'grounded in a higher level of trust than normally present in the marketplace between those involved in arm's length business transactions.'"  *Id.* at 593 (citations omitted).  Where the parties "do not create their own relationship of higher trust" as through, for example, a contract, "courts should not ordinarily transport them to the higher realm of relationship and fashion the stricter duty for them."  *Id.* (internal quotation marks and citations omitted).  As the New York Court of Appeals has observed, "there is generally 'no fiduciary obligation in a contractual arm's length relationship between a debtor and a note-holding creditor.'"  *Id.* (citations omitted).  This is because "[a] debtor and creditor have no special relationship of confidence and trust, and the relationship is generally controlled by contract."  *Id.* (citations omitted).

Here, as in *Oddo*, the NexPoint Parties are noteholders, not shareholders; and "there is no factual basis to create fiduciary duties running from the managers to the mezzanine noteholders."  *See id.*  Nor did the NexPoint Parties and the ACM Parties, or Brigade for that matter, have any direct contractual relationship.  *See id.* at 594; *cf. Williams Trading LLC v. Wells Fargo Sec., LLC*, 553 F. App'x 33, 35–36 (2d Cir. 2014) (summary order) (finding that no fiduciary duty was owed to a

plaintiff that received funds indirectly from the defendants' profit, where the profits themselves "belonged solely to" the defendant); *In re Zohar III, Corp.*, 2021 WL 3124298, at *15 (Bankr. D. Del. July 23, 2021) (applying New York law and finding that CLO investors' allegations that "Managers were required to manage the [CLO] Funds' assets for the Noteholders" are "insufficient to support a conclusion that a higher trust arose between the sophisticated and commercial parties involved in this proceeding") (citing *Oddo*, 19 N.Y.3d at 593 ("A debtor and creditor have no special relationship of confidence and trust, and the relationship is generally controlled by contract.")).  And as already discussed, the underlying documents at issue disclaim any intent to confer fiduciary duties onto the ACM Parties that run to the NexPoint Parties.  Accordingly, neither the ACM Parties nor Brigade owe any fiduciary duties to NexPoint under New York common law.[22]

### c.  Fiduciary Duties Under the IAA

Nor does NexPoint have direct standing to bring its counterclaims under the IAA as "actionable under New York law."[23]  *See* ACM Opp'n at 23.  First, as the Court explained in its ruling in the First NexPoint Lawsuit, "there is no private right of action to bring a claim pursuant to [Section 206 of the IAA]."  620 F. Supp. 3d at 43 (citing *Transamerica Mortgage Advisors, Inc. (TAMA) v. Lewis*, 444 U.S. 11, 19–25 (1979); *Omega Overseas Partners, Ltd. v. Griffith*, No. 13-CV-4202 RJS, 2014 WL 3907082, at *3 (S.D.N.Y. Aug. 7, 2014)).  Second, any fiduciary duties owed by the investment advisers (the ACM Parties and Brigade) under the IAA run to the fund—here, ACIS 6—and not to its investors.  *See, e.g.*, *XY Plan. Network, LLC v. United States Sec. & Exch. Comm'n*, 963 F.3d 244, 248 (2d Cir. 2020) ("Investment advisers are regulated under the Investment Advisers Act of 1940

---

[22] Although the header in the NexPoint Parties' opposition asserts that the "nature of the relationship" confers direct standing on the NexPoint Parties under both New York common law and Cayman Islands law, *see* ACM Opp'n at 20, the NexPoint Parties do not brief any argument regarding Cayman law.  *See id.* at 20–23 (discussing only New York law for the "nature of the relationship" argument); *see also generally* Brigade Opp'n (making no such argument under Cayman law).  Accordingly, the Court understands the NexPoint Parties to have asserted this argument upon the basis of New York common law only.
[23] It is unclear what this phrase is intended to mean, given that the IAA is a federal statute.

('IAA') and owe a fiduciary duty to their *clients*." (citing 15 U.S.C. § 80b-2(a)(11)(C) (defining investment adviser)) (emphasis added)); *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 194 (1963) (describing "an affirmative duty of utmost good faith, and full and fair disclosure of all material facts, as well as an affirmative obligation to employ reasonable care to avoid misleading . . . *clients*" (emphasis added)); *see also S.E.C. v. DiBella*, 587 F.3d 553, 568 & n.11 (2d Cir. 2009) (acknowledging that while "[t]he 'legislative history [of the IAA] leaves no doubt that Congress intended to impose enforceable fiduciary obligations' on investment advisors," the IAA "does not provide a definition of 'client'" (quoting *TAMA*, 444 U.S. at 17)). While Section "206 establishes 'federal fiduciary standards' to govern the conduct of investment advisers," this section was "intended to benefit the *clients* of investment advisers . . . ." *TAMA*, 444 U.S. at 17 (citation omitted and emphasis added).

Here, the ACM Parties and Brigade's client was ACIS 6, not ACIS 6's subordinated noteholders. *See* PMA § 2 ("[T]he Issuer hereby engages and retains the Portfolio Manager to provide . . . investment advisory and related services . . . ."); *id.* § 10 (ACM consenting to enforcement of the PMA "by the Issuer and by the Trustee on behalf of the Holders"); *id.* §§ 31–32 (expressly excluding noteholders from being third-party beneficiaries to the PMA absent specified circumstances not present here); *see also* Offering Circular at 28 ("[Neither t]he Portfolio Manager, . . . nor any of [its] affiliates is providing investment, accounting, tax or legal advice in respect of the Notes and will not have a fiduciary relationship with any investor or prospective investor in the Notes."); *id.* at 29 (noting that ACM is not "providing investment, accounting, tax or legal advice in respect of the Notes and will not have a fiduciary relationship with any investor or prospective investor in the Notes"); *id.* at 57 (noting ACM's "fiduciary duties owed to the Issuer and such other clients, funds or other investment accounts," while not listing the noteholders); *id.* at 102 (describing ACM's limitation of liability). The ACM Parties and Brigade do not owe the NexPoint Parties any

fiduciary duties pursuant to the IAA since the NexPoint Parties are not the investment advisers' clients.  Nor do the NexPoint Parties provide any within-Circuit support for their assertion that section 206(4) of the IAA "views NexPoint as within the class of persons that the statute was designed to protect" as "[o]ther jurisdictions have recognized that state fiduciary-duty actions are vehicles for vindicated breaches of § 206's fiduciary duties."  ACM Opp'n at 24–25 (citing exclusively out-of-Circuit decisions that are not binding on this Court); *see also id.* at 24 (the NexPoint Parties acknowledging that "no court has expressly held that violations of § 206 are actionable under New York law").  Particularly given the underlying documents at issue here, moreover, the Court declines to find that the NexPoint Parties have direct standing to sue under the IAA as "actionable under New York law," in the NexPoint Parties' words.  *See* ACM Opp'n at 23.

Accepting all facts alleged in the Counterclaim as true, and drawing all reasonable inferences in the NexPoint Parties' favor, *see Burch*, 551 F.3d at 124, the Court concludes that the NexPoint Parties lack standing to bring their counterclaims pertaining to any alleged mismanagement of the ACIS 6 funds.  The NexPoint Parties' application for a declaratory judgment is denied in turn.[24] Even if they had standing, the NexPoint Parties have failed to adequately allege any fiduciary duties owed to them by the ACM Parties or Brigade as discussed above, so their breach of fiduciary duty claims must be dismissed.[25]

---

[24] The NexPoint Parties requested declaratory relief that "Counter-Defendants manipulated the assets in derogation of the rights of subordinated noteholders under the Notes in one or more ways as described herein; [t]he Acis-6 fund and/or [the NexPoint Parties] were damaged by Counter-Defendants' actions; [the NexPoint Parties] were or are owed fiduciary duties under New York or Federal law as an investor in Acis-6; [and as] Noteholder[s] suing for [their] rights under the Notes, [the NexPoint Parties] are not bound by the Indenture's No-Action clause for each of [their] claims." Counterclaim, Dkt. No. 220-1 ¶ 239.

[25] "The elements of a claim for breach of a fiduciary obligation are: (i) the existence of a fiduciary duty; (ii) a knowing breach of that duty; and (iii) damages resulting therefrom."  *Johnson v. Nextel Commc'ns, Inc.*, 660 F.3d 131, 138 (2d Cir. 2011) (citation omitted).

### C.  Aiding and Abetting Against Brigade

Because the NexPoint Parties' counterclaim against the ACM Parties for breach of fiduciary duty is dismissed, the counterclaim against Brigade for aiding and abetting the ACM Parties' alleged breach of fiduciary duty, Counterclaim ¶¶ 233–36, fails in turn.  *See MLSMK Inv. Co. v. JP Morgan Chase & Co.*, 431 F. App'x 17, 19 (2d Cir. 2011) (summary order) ("To state a claim for aiding and abetting breach of fiduciary duty under New York law, a plaintiff must show 'breach by a fiduciary of a duty owed to plaintiff; defendant's knowing participation in the breach; and damages.'") (quoting *SCS Commc'ns, Inc. v. Herrick Co.*, 360 F.3d 329, 342 (2d Cir. 2004)).  Accordingly, the aiding and abetting counterclaim is dismissed.

### D.  Unjust Enrichment

This claim, too, fails for lack of standing.  And even if the NexPoint Parties had standing to bring their counterclaims, the Indenture and PMA would nonetheless bar the NexPoint Parties' quasi-contractual claim for unjust enrichment.[26]  "Unjust enrichment is a quasi-contractual claim that 'ordinarily can be maintained only in the absence of a valid, enforceable contract.'"  *Ellington Credit Fund*, 837 F. Supp. 2d at 202 (quoting *Ohio Players, Inc. v. Polygram Records, Inc.*, No. 99 Civ. 33, 2000 WL 1616999, at *4 (S.D.N.Y. Oct. 27, 2000)) (citing *Clark-Fitzpatrick, Inc. v. Long Island R. Co.*, 70 N.Y.2d 382, 389 (1987) ("It is impermissible . . . to seek damages in an action sounding in quasi contract where the suing party has fully performed on a valid written agreement, the existence of which is undisputed, and the scope of which clearly covers the dispute between the parties.")).  The Indenture and the PMA bar this quasi-contractual claim notwithstanding the fact that the NexPoint Parties are not signatories to those contracts.  *See, e.g.*, *Ellington Credit Fund*, 837 F. Supp. 2d at 202

---

[26] "Under New York law, for a plaintiff to prevail on a claim of unjust enrichment, he must establish (1) that the defendant was enriched; (2) that the enrichment was at the plaintiff's expense; and (3) that the circumstances are such that in equity and good conscience the defendant should return the money or property to the plaintiff."  *Golden Pac. Bancorp v. F.D.I.C.*, 273 F.3d 509, 519 (2d Cir. 2001) (citations omitted).

("Although New York law on this issue is not entirely settled, in the last two decades, 'decisions both in New York state courts and in this district have consistently held that claims for unjust enrichment may be precluded by the existence of a contract governing the subject matter of the dispute even if one of the parties to the lawsuit is not a party to the contract.'" (quoting *Am. Med. Ass'n v. United Healthcare Corp.*, No. 00 Civ. 2800 (LMM), 2007 WL 683974, at *10 (S.D.N.Y. Mar. 5, 2007) (collecting cases))); *see also Mueller v. Michael Janssen Gallery Pte. Ltd.*, 225 F. Supp. 3d 201, 207 (S.D.N.Y. 2016) ("Numerous decisions applying New York law have held that an unjust enrichment claim is barred 'if there is a valid contract governing the subject matter of the dispute, even if one of the parties to the claim is not a party to that contract.'" (citations omitted)).

Here, the Indenture and the PMA clearly cover the subject matter at issue—namely, whether the ACM Parties and Brigade breached their obligations to ACIS 6 as investment advisers. The Indenture and the PMA set forth the ACM Parties and Brigade's obligations to ACIS 6, as well as potential liabilities for any alleged mismanagement. Indeed, the NexPoint Parties pleaded their unjust enrichment claim based on the same allegations as their claims alleging breaches of the Indenture and the PMA. *See* Counterclaim ¶¶ 218–19. Accordingly, the NexPoint Parties' claims for "unjust enrichment, assumpsit or money had and received," *id.* ¶ 219, are dismissed.

### E. Conversion

Even if the NexPoint Parties had standing to bring their conversion claim, *see* Counterclaim ¶¶ 207–17, this claim fails for similar reasons. The NexPoint Parties allege conversion against the ACM Parties and Brigade insofar as "[u]nder the note, the holder is entitled to an amount from the Assets, that is residual after compliance with the investment criteria has been met and specific and identifiable administrative expenses in addition to other costs and expenses have been deducted." Counterclaim, Dkt. No. 220-1 ¶ 209. The NexPoint Parties allege that Mr. Terry, "[i]n allowing the payment of inexplicably high expenses[,] . . . wrongfully and improperly reimbursed [ACM], and

potentially himself and Brigade, using NexPoint's and NHF TRS LLC's property designated for the payment of ACIS[ ]6's administrative expenses and costs." *Id.* ¶ 211.  According to the NexPoint Parties, "Terry, [ACM,] and Brigade each exercised a wrongful and unauthorized dominion over NexPoint's and NHF TRS LLC's property designated for the payment of fees and ACIS[ ]6's administrative expenses and costs to the alteration of its condition or to the exclusion of NexPoint's and NHF TRS LLC's rights." *Id.* ¶ 213.

But "New York law is clear that 'a cause of action for conversion cannot be predicated on a mere breach of contract.'" *Zohar CDO 2003-1*, 2021 WL 4460547, at *15 (quoting *Fesseha v. TD Waterhouse Investor Services, Inc.*, 761 N.Y.S.2d 22, 24 (1st Dep't 2003)) (citing *Johnson v. Cestone*, 80 N.Y.S.3d 15, 17 (1st Dep't 2018)).  The NexPoint Parties' conversion claims here are based on the ACM Parties' alleged breach of the Indenture's expense provisions, which the NexPoint Parties allege were incorporated into the Note.  Counterclaim ¶¶ 53, 104, 209–10, 212; *see also Zohar*, 2021 WL 4460547, at *15 (finding that the conversion claims of a CLO "noteholder[] or preference shareholder" were "based on contract" and dismissing them accordingly).  Besides the fact that the NexPoint Parties lack standing to assert it, the conversion counterclaim would additionally be subject to dismissal insofar as it is predicated on an alleged breach of contract.

### F.  Negligence

To the extent that the negligence counterclaim fundamentally concerns mismanagement of the ACIS 6 funds, the NexPoint Parties lack standing to bring it, as discussed above.  Even if they had standing, the NexPoint Parties fail to state a claim for negligence inasmuch as they fail to establish that a special relationship exists between them and the ACM Parties or Brigade.  The NexPoint Parties allege that they are owed a duty of care by the ACM Parties "in managing ACIS[ ]6 and in discharging their duties under the IAA, the Indenture, and the PMA," *id.* ¶ 201, that the ACM Parties' conduct has "resulted in substantial losses to NexPoint," *id.* ¶ 202, and "was knowing and

willful and done in disregard of known and established safeguards implemented and created in the industry to avoid well-known, foreseeable risks," *id.* ¶ 203.

"New York applies the economic loss doctrine to negligence claims. This doctrine prevents a plaintiff from recovering purely economic losses in a negligence action." *Cruz v. TD Bank, N.A.*, 855 F. Supp. 2d 157, 178 (S.D.N.Y. 2012), *aff'd and remanded*, 742 F.3d 520 (2d Cir. 2013). "A defendant is not liable to a plaintiff for economic loss unless there exists 'a special relationship that requires the defendant to protect against the risk of harm to plaintiff.'" *Id.* (quoting *532 Madison Ave. Gourmet Foods, Inc. v. Finlandia Ctr., Inc.*, 96 N.Y.2d 280, 289 (2001)). "[C]ourts have applied the economic loss rule to prevent the recovery of damages that are inappropriate because they actually lie in the nature of breach of contract as opposed to tort." *Hydro Invs., Inc. v. Trafalgar Power Inc.*, 227 F.3d 8, 16 (2d Cir. 2000); *see also Dormitory Auth. v. Samson Constr. Co.*, 30 N.Y.3d 704, 711 (2018) ("[W]e have made clear that 'where plaintiff is essentially seeking enforcement of the bargain, the action should proceed under a contract theory.'" (citation omitted)). While "the applicability of the economic loss rule outside the product-liability context from which it originated is doubtful," *Ambac Assurance Corp. v. U.S. Bank Nat'l Ass'n*, 328 F. Supp. 3d 141, 159 (S.D.N.Y. 2018); *accord 532 Madison Avenue*, 96 N.Y.2d at 289, "in practice the principle has been applied broadly," *King Cnty., Wash. v. IKB Deutsche Industriebank AG*, 863 F. Supp. 2d 288, 302 (S.D.N.Y. 2012), *rev'd in part on other grounds*, No. 09 CIV. 8387 SAS, 2012 WL 11896326 (S.D.N.Y. Sept. 28, 2012) (collecting cases).

Moreover, the economic loss rule "allows . . . recovery in the limited class of cases involving liability for the violation of a professional duty." *Hydro Invs., Inc. v. Trafalgar Power Inc.*, 227 F.3d 8, 18 (2d Cir. 2000). Courts look to "whether [the] plaintiff allege[s] damages that flow from the violation of a professional duty, or merely from the violation of the governing agreements . . . ." *BlackRock Allocation Target Shares: Series S. Portfolio v. Wells Fargo Bank, Nat'l Ass'n*, 247 F. Supp. 3d 377, 399 (S.D.N.Y. 2017), *objections overruled sub nom.*, No. 14CIV10067KPFSN, 2017 WL 3610511 (S.D.N.Y.

Aug. 21, 2017); *see also Nat'l Credit Union Admin. Bd. v. U.S. Bank Nat'l Ass'n*, 439 F. Supp. 3d 275, 283 (S.D.N.Y. 2020) (same); *Phoenix Light SF Ltd. v. Deutsche Bank Nat'l Tr. Co.*, 172 F. Supp. 3d 700, 719 (S.D.N.Y. 2016) ("The dispositive issue is whether [the defendant] owed duties to the plaintiffs that were separate from the duties set forth in the PSAs and the Indenture Agreements."); *Nat'l Credit Union Admin. Bd. v. U.S. Bank Nat'l Ass'n*, No. 14-CV-9928 (KBF), 2016 WL 796850, at *11 (S.D.N.Y. Feb. 25, 2016), *aff'd*, 898 F.3d 243 (2d Cir. 2018) ("Plaintiff's allegations for damages arising from conflict of interest sound in defendants' failure to take contractual actions . . . . Thus, while the cause of action for breach of fiduciary duty may arise from common law duties and not from the PSA, 'the injury' and 'the manner in which the injury occurred and the damages sought persuade us that plaintiff's remedy lies in the enforcement of contract obligations,' and are barred by the economic loss doctrine.").

Here, as in *National Credit Union*, the NexPoint Parties' alleged tort injury is that the ACM Parties and Brigade caused losses in the value of the NexPoint Parties' subordinated notes. *See* 439 F. Supp. 3d 275, 283 (S.D.N.Y. 2020) (similar). These damages, as in *National Credit Union*, "are the same and occurred in the same manner as the contract claim's damages: [the defendant] failed to take certain actions required under the [pooling and servicing agreements], which resulted in losses to plaintiffs' . . . investments." *Id.* (citations omitted). In addition, the PMA circumscribed the duties owed by the ACM Parties and Brigade to ACIS 6. "[T]he presence of a contract or a financial transaction that is 'in the nature of contract' can be a strong indicator that a plaintiff was not owed a legal duty separate and apart from obligations bargained for and subsumed within the transaction." *King Cnty.*, 863 F. Supp. 2d at 303 (citations omitted). The NexPoint Parties have failed to allege that a special relationship exists between them and the ACM Parties or Brigade given the terms of the underlying contracts, as discussed above. Accordingly, the negligence counterclaim is dismissed.

### G.  Judgment on the Pleadings

The ACM Parties' Rule 12(c) motion for judgment on pleadings, however, is denied for the same reasons that the Court articulated in evaluating the motions to dismiss the DAF Parties' counterclaims.  *See* DAF Counterclaim Ruling at 21–23.  To reiterate, in deciding this motion, the Court accepts all facts in the NexPoint Parties' Answer as true and draws all reasonable inferences in the NexPoint Parties' favor.  *See Vega*, 801 F.3d at 78.  Even if the Court may be unconvinced that the NexPoint Parties are likely to prevail at trial, "judgment on the pleadings is not appropriate if there are issues of fact which if proved would defeat recovery . . . ."  *Id.*  Here, questions of fact are in dispute, *see id.*, and the NexPoint Parties have raised a series of affirmative defenses and denials in their Answer—notwithstanding the dismissal of their Counterclaim.  For example, the NexPoint Parties assert that the ACM Parties fail to state a claim, that their claims are barred by res judicata and waiver, and that the ACM Parties lack standing to bring their claims.  *See* Answer at 8–9.  As a result, the ACM Parties' Rule 12(c) motion for judgment on the pleadings is denied.

As a result, the ACM Parties' and Brigade's respective motions to dismiss the NexPoint Parties' Counterclaim are granted in part and denied in part as described above.

## IV.  LEAVE TO AMEND

"It is the usual practice upon granting a motion to dismiss to allow leave to replead."  *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991); *see also* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave [to amend] when justice so requires.").  Leave to amend may be denied "for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party."  *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014) (internal citation omitted).

The ACM Parties' and Brigade's motions to dismiss the NexPoint Parties' Counterclaim are granted without leave to amend, as any amendment here would be futile.  "The court should freely give leave [to amend] when justice so requires."  Fed. R. Civ. P. 15(a)(2).  However, leave may be

denied "for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party." *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014) (quoting *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007)). "A plaintiff need not be given leave to amend if it fails to specify either to the district court or to the court of appeals how amendment would cure the pleading deficiencies in its complaint." *Id.* Because the NexPoint Parties lack standing to bring their counterclaims alleging purported injuries to a third party as a matter of both Cayman and New York law, any attempt to replead those counterclaims would be futile.

## V.   CONCLUSION

The ACM Parties' and Brigade's respective motions to dismiss the NexPoint Parties' Counterclaim are granted in part, with prejudice, and denied to the extent that they seek judgment on the pleadings.[27]   The Clerk of Court is directed to terminate the motions pending at Dkt. Nos. 106 and 119.

SO ORDERED.

Dated:  March 1, 2024
New York, New York

_____
GREGORY H. WOODS
United States District Judge

---

[27] In accordance with the parties' stipulation and the Court's subsequent order, *see* Dkt. Nos. 220, 223, this ruling is binding upon both NexPoint and NHF TRS, LLC.